# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

FIDELITY INTERNATIONAL CURRENCY )
ADVISOR A FUND, L.L.C., by the Tax )
Matters Partner, )
                             )
            Plaintiff, )
    v. )         Case No.:  05-40151-FDS
                             )
UNITED STATES OF AMERICA, )
                             )
           Defendant. )

## UNITED STATES OF AMERICA'S OPPOSITION TO PLAINTIFF'S MOTION TO QUASH THIRD-PARTY SUBPOENA ISSUED TO KPMG

This discovery dispute is before the Court because the plaintiff failed to comply with the

Local Rules, which require the parties to attempt in good faith to resolve or narrow the issues and

to advise the Court of the threshold issue in dispute.[1]  Here, the threshold issue is the plaintiff's

---

[1]The United States requests, pursuant to the provisions of LR 1.3, that the plaintiff's motion be stricken or summarily denied, or, alternatively, the imposition of sanctions as the Court deems appropriate.  The imposition of sanctions is warranted because the plaintiff failed to attempt in good faith to resolve or narrow the issues, as required by LR 7.1(a)(2) and LR 37.1(a), and failed even to advise the Court of the threshold issue in dispute– whether the plaintiff has standing to quash a third-party subpoena duces tecum– in violation of LR 37.1(b)(2) and (5).

The United States informed the plaintiff by letter on April 13, 2006 that the plaintiff lacked standing to object to the third-party subpoena.  *See* Pl.'s Mem., Ex. D.  In that letter, the United States also addressed the relevance issue, with substantial legal citations.  The United States offered to discuss the issues on April 14, 2006, intending to give the plaintiff time to research the issues.  The plaintiff insisted on a conference that same day– April 13.  During that ten-minute conference, the plaintiff merely asserted that it has standing, without addressing any of the contrary authority provided by the United States, and without citing any authority of its own.  Refusing to discuss the standing issue further, despite the United States' contention that it is a threshold issue, the plaintiff merely demanded that the United States alter its subpoena.  In making its demand, the plaintiff again failed to cite any authority supporting its assertion that Federal Rule of Civil Procedure 26 should not allow for broad discovery including discovery of any matter that may be relevant or may lead to the discovery of relevant evidence.  The United States even offered to review any draft filing the plaintiff could come up with to support its positions.  The plaintiff immediately refused that offer.  After concluding its perfunctory phone call, the plaintiff filed its motion less than 24 hours later, failing to alert the Court of the

lack of standing to quash a third-party subpoena issued by the United States upon KPMG. Because the plaintiff lacks standing, its motion should be stricken or summarily denied.

The plaintiff's failures to comply with the Local Rules can be attributed to its ongoing attempt to stifle discovery and present a myopic view of the case to the Court. In contrast, the United States wishes to present all relevant evidence to the Court, including a complete picture of the plaintiff's tax shelter, which was the culmination of years of coordinated design and redesign of similarly fraudulent tax shelter products by various professionals and their clients– the so-called investors such as the plaintiff. The redesign of the tax shelters was intended to, at least cosmetically, differentiate the fraudulent shelter employed in this case from other fraudulent shelters such as those known as FLIP, OPIS, and BLIPS. Despite the efforts of the promoters and their clients to alter appearances, the shelters share common roots, goals, and, of course, outcomes– the sheltering of hundreds of millions of dollars from federal income taxation based on the employment of transactions designed and implemented for that very purpose (and in some cases based only on the reporting of transactions that never occurred). The complete picture includes but is not limited to the iteration of the tax shelter employed in this case, which did not simply come into being one day in 2001. The plaintiff's attempts to prevent thorough discovery here are no more than a continuation of the cat and mouse game that fraudulent-tax-shelter promoters and their clients have been playing for years. As such, it should not be allowed.

---

threshold issue of standing. The plaintiff's list of sixty issues and the United States' purported responses were created out of whole cloth, as the parties did not discuss the sixty issues and, as such, the United States did not respond as asserted. *See* Pl.'s Mem. at 3, and Pl.'s Mem. Ex. E. The plaintiff's failures to follow the Local Rules have already created an unnecessary burden on the United States which was forced to respond to the motion that should not have been filed. More importantly, the plaintiff has created an unnecessary burden for the Court while depriving the Court of so much as a suggestion that the core issue in dispute is the plaintiff's lack of standing to make its motion in the first place. Adding to the burdens, the plaintiff has requested oral argument on the motion that it lacks standing to make.

**Factual Background**

KPMG documents show that in July 2000, and just prior to the issuance of IRS Notice 2000-44, it was marketing the Short-Option Strategy ("SOS").[2]  SOS was a tax shelter [3] that was then being marketed by The Diversified Group ("DGI"), Helios Financial, Alpha, Brown & Wood[4], and KPMG.  Helios and Alpha appear to be affiliates of The Diversified Group ("DGI").[5]  Fidelity International Currency Advisor A Fund, LLC, ("Fidelity International"), was purportedly formed by Richard Egan on July 19, 2000, just prior to the issuance of IRS Notice 2000-44.[6]  By e-mail dated August 15, 2000, KPMG put out the "stop marketing" word to its Innovative Strategies team because IRS Notice 2000-44 had zeroed in on its BLIPS and SOS strategies.[7]

By e-mail dated April 5, 2001, Helios circulated "draft marketing materials" for a new product named the "Financial Derivatives Investment Strategy" ("FDIS"), which it sent to the law firms of Brown & Wood, Proskauer Rose, Lord Bissell, and Bryan Cave for "review and

---

[2]  *See* KPMG "IS Conference Call - Summary" dated July 10, 2000, Govt. Ex. 3.

[3]  As designed, SOS involved the acquisition by a taxpayer of sets of purported virtually offsetting and self-financed options.  The taxpayer then transferred the offsetting options to a purported partnership. The taxpayer claimed that the basis in his alleged partnership interest was increased by the cost of the purchased option but was not reduced by the partnership's assumption of the taxpayer's obligation under the sold option. Like KPMG's BLIPS, FLIP, and OPIS tax shelter strategies, SOS was also meticulously pre-planned and solely intended to be a short-term tax-loss generating transaction.  In August 2000 the IRS informed accountants, tax lawyers, and taxpayers that purported losses resulting from offsetting option transactions similar to SOS which are designed to generate tax losses through artificially high bases do not reflect bona fide losses reflecting actual economic consequences. The IRS concluded that such uneconomic losses are therefore not allowable for federal income tax purposes.  *See* IRS Notice 2000-44, 2000-36 I.R.B 255, Govt. Ex. 1.

[4]  Brown & Wood's successor in interest is Sidley Austin Brown & Wood, now known as Sidley Austin LLP.

[5]  *See* DGI e-mail dated January 16, 2001, Govt. Ex. 4.

[6]  *See* Certification of Formation for Fidelity International. Govt. Ex. 2.

[7]  *See* KPMG e-mail dated August 15, 2000, Govt. Ex. 5.

3

comment."[8]  This new product had features of SOS and other tax shelter transactions, as well as

some design innovations.  Like SOS, FDIS began with a taxpayer acquiring offsetting options to

generate an artificially-high basis in his alleged partnership interest.  However, this tax strategy

also added some new design features whereby the taxpayer would now realize his purported tax

loss through the separation of the gain and loss legs of additional offsetting options acquired not

by the taxpayer but by his purported partnership.  Although these "separation" transactions would

produce a small net economic gain or loss to the purported partnership, they were so timed and

structured to generate a huge tax loss to the taxpayer.[9]

The draft FDIS design and marketing materials appear to have been additionally

circulated by DGI and its affiliate Helios to various accounting firms, also for the apparent

purpose of seeking these firms' design and marketing input.  Those firms include KPMG, BDO

Seidman ("BDO"),[10] and Grant Thornton.[11]  Along with the draft PowerPoint presentation, it

appears that the FDIS marketing materials also included a "listing analysis" purportedly showing

---

[8]  *See* e-mail re Financial Derivatives Investment Strategy dated April 5, 2001, Govt. Ex. 6.

[9]  *See* Gov. Exs. 8 at Bates No. 11 BDO 00002935-38, and Gov. Ex. 13 at Bates No. 1 BDO P 035469.

[10]  Ivan Ross of Alpha had previously reported to Jimmy Haber of DGI that the accounting firm of BDO still considered itself a marketing channel for tax shelters and that it was desperate for new product.  *See* Ivan Ross e-mail re BDO dated August 23, 2000, Govt.  Ex. 7. The involvement of BDO in the development, marketing, and implementation of abusive tax shelters has already been the subject of litigation in a summons enforcement action by the United States against the firm.  *See, United States v.  BDO Seidman, LLP*, Case No.  02-4822 (USDC NDIL).  The BDO Bates-stamped documents attached hereto were filed as exhibits in that action. *See* FDIS PowerPoint presentation produced by BDO in response to IRS summons and filed therein, Govt. Ex. 8.

[11]  The FDIS PowerPoint presentation was also sent from James Haber of DGI, to Israel Press of Grant Thornton on June 27, 2001, with a cover memo stating "This is to confirm that the enclosed materials will not be distributed to anybody."  *See* FDIS PowerPoint, Govt. Ex. 9.

4

why the FDIS product was not substantially similar to the abusive tax shelters identified in IRS

Notice 2000-44 and otherwise exempted from the list maintenance requirements  under

26 U.S.C. 6112.[12]  It also appears that the promoters circulated a draft opinion outlining the

strategy's tax consequences,[13] estimating an "all in cost" for the FDIS tax shelter product equal to

10% of the taxpayer's desired loss.[14]   BDO documents reflect that BDO wanted to see more of

an "Investment Story" in order to disguise the transaction, and also wanted the fees structured so

that BDO and the law firm issuing the legal opinion are separately paid by the taxpayer rather

than by Helios to create the "appearance" that BDO was providing tax advice and that the legal

opinions were "independent."[15]  By e-mail dated April 17, 2001, BDO internally circulated an

outline of the FDIS transaction for marketing approval.[16]  By e-mail dated May 21, 2001, both

Robert Greisman and Michael Kerekes of BDO circulated their comments on the draft opinion

for the FDIS tax shelter, and by e-mail dated May 30, 2001, Helios provided a response to their

comments.[17]  By e-mail dated June 20, 2001, Helios sent BDO a contact list for Helios and its

Advisors, listing the law firms of Brown & Wood, Proskauer Rose, Lord Bissell and Bryan Cave

as its Advisors.[18]

   Thus, it appears that at least four law firms (Brown & Wood, Proskauer Rose, Lord

---

  [12]  *See* BDO e-mail dated April 5, 2001, 3:45 p.m., Govt. Ex. 11.

  [13]  *See* BDO e-mail and memorandum dated May 21, 2001, Govt.  Ex. 17; BDO Mem. dated May 21, 2001, Govt. Ex. 18; BDO e-mail re Helios comments, without att., dated May 30, 2001, Govt.  Ex. 19.

  [14]  *See* BDO e-mails dated April 5, 2001, Govt.  Exs. 10 and 11.

  [15]  *See* BDO handwritten notes dated April 5, 2001, Govt. Ex. 12; BDO e-mail chain dated April 26, 2001 through April 29, 2001, Govt. Exs. 14-16.

  [16]  *See* BDO e-mail dated April 17, 2001, Govt. Ex.13.

  [17]  *See* BDO e-mail and memorandum dated May 21, 2001, Govt. Ex. 17; BDO Mem. dated May 21, 2001, Govt. Ex. 18; Helios e-mail dated May 30, 2001, Govt. Ex. 19.

  [18]  *See* e-mail dated June 20, 2001, Govt. Ex. 20.

Bissell and Bryan Cave) and three accounting firms (KPMG, BDO and Grant Thornton) all assisted in the design and development of the FDIS product and the legal opinions blessing the product for federal tax purposes.  BDO documents also reflect that it contributed to the wording of the product's marketing materials and marketed at least three FDIS transactions.[19]  As illustrated by the attached "Outline of Proposed Transaction" for one of these BDO transactions, the steps of the FDIS transaction were all minutely scripted.[20]  Brown & Wood documents reflect that it was paid $1.2 million for issuing thirty (30) opinions for DGI transactions, sixteen (16) of which appear to be FDIS transactions.[21]

# I

## ARGUMENT

### PLAINTIFF'S MOTION TO QUASH IS MERITLESS AND SHOULD BE SUMMARILY DENIED

#### A.    Plaintiff Lacks Standing to Quash The Third-party Subpoena[22]

The plaintiff lacks standing to quash the subpoena issued by the United States to KPMG.

---

[19]  *See* BDO e-mail dated November 28, 2001 regarding Gupta transaction involving a $5 million investment to generate a $75 million capital loss and $25 million in ordinary loss, Govt. Ex. 21; BDO e-mail dated November 30, 2001 regarding a transaction involving a $700,000 investment (investor name redacted), Govt. Ex. 22; and BDO e-mail dated December 4, regarding a transaction involving a $3 million  investment (investor name redacted) to generate a $30 million loss ($20 million in 2001 and $10 million in 2002), Govt. Ex. 23.

[20]  *See* Outline of Proposed Transaction dated June 12, 2001, Govt. Ex. 24.

[21]  *See* DGI Memorandum dated January 2, 2002, Govt. Ex. 25.  In this memorandum, the opinions for the FDIS transactions appear to have been referenced as "Standard Partnership."

[22]The plaintiff requested in its April 11, 2006 letter a teleconference to discuss its "object[ion] to the subpoena."  There is no requirement that the parties confer to discuss an objection to a subpoena under Rule 45 of the Federal Rules of Civil Procedure.  Nonetheless, the United States responded and offered to confer.  During the conference, the plaintiff stated for the first time that it would move to quash or for a protective order.  It then filed the motion to quash, suggesting in a footnote that it could also be a motion for a protective order.  While the plaintiff seems to be taking a try-anything approach, it lacks standing to object, quash, or seek a protective order.

Under Federal Rule of Civil Procedure ("Rule") 45(c)(2)(B), only the person commanded to produce and permit inspection and copying may object to the subpoena. *See, e.g., Langford v. Chrysler Motors Corp.*, 513 F.2d 1121, 1126 (2d Cir. 1975) ("In the absence of a claim of privilege a party usually does not have standing to object to a subpoena directed to a non-party witness.") (*citing* Moore's Federal Practice, para. 45.05[2]); *Beard v. Hall Drive-Ins, Inc.*, NO. 1:04-CV-202, 2005 U.S. Dist. LEXIS 3097 (N.D. Ind., Mar. 1, 2005) ("It is well settled that 'a party ordinarily lacks standing to quash a subpoena directed at a nonparty unless the party is seeking to protect a personal privilege or right.'"); *Donahoo v. Ohio Dep't of Youth Servs.,* 211 F.R.D. 303, 306 (N.D. Ohio 2002) ("The law is clear, absent a claim of privilege, a party has no standing to challenge a subpoena to a nonparty."); *Bulkmatic Transport Co., Inc. v. Pappas*, No. 99 Civ. 12070, 2001 U.S. Dist. LEXIS 6062, at *4-*5 (S.D.N.Y. May 11, 2001) ("Generally, in the absence of a claim of privilege or proprietary interest, parties to an action may not object to a subpoena served on a non-party."); *Epling v. UCB Films, Inc.,* Nos. CIV. A. 98-4226-SAC, CIV. A. 98-4227-RDR, 2000 U.S. Dist. LEXIS 21818, at *7 (D. Kan. Aug. 7, 2000) (only person to whom subpoena is directed has standing to object under Rule 45).

In sum, the overwhelming weight of authority makes its eminently clear that plaintiff does not have standing to challenge this subpoena issued by the United States to nonparty KPMG.. Plaintiff makes no argument that any of the documents sought by the subpoena are privileged or subject to some personal right or proprietary interest. Nor could it since it is itself seeking some of these same KPMG documents to the extent that they relate to the Fidelity International transaction.[23] In light of its notable failure to assert privilege and the overwhelming

---

[23] Interestingly, plaintiff is requesting these documents not from KPMG, one of promoters that it paid a huge fee to on the acquisition of its FDIS tax shelter transaction, but from the United States. *See* Plaintiff's First Set of Requests for Documents, No. 1, Pl.'s Mem. Ex. A.

7

authority against standing absent privilege or some other personal right, the reason for plaintiff's

failure to address the issue, both during the conference and in its motion, is quite apparent.

## B.    Plaintiff Cannot Obtain a Protective Order

Apparently recognizing its lack of standing to object and to quash, the plaintiff delicately

sidesteps the issue, throwing in the possibility that its motion could also be considered a motion

for a protective order under Rule 26(c).[24]  The inclusion of an alternative motion under Rule 26

does not alter the plaintiff's lack of standing.  *See, e.g., McMahan Sec. Co., L.P. v. FB Foods,*

*Inc. (In re FB Foods, Inc.)*, No. M8-85, 2005 U.S. Dist. LEXIS 26301, at *1-*2 (S.D.N.Y. Nov.

2, 2005) ("Absent a showing of privilege or privacy, a party ordinarily lacks standing to

challenge a non-party subpoena with a motion for a protective order or to quash.").[25]  Indeed, the

---

It is not clear why plaintiff took this circuitous route to obtain documents in the custody and
control of KPMG.. It should be noted though that Richard Egan and other KPMG so-called
investors brought a class action against KPMG seeking damages for violation of the Racketeer
Influenced and Corrupt Organization Act ("RICO") as well as for various state law tortious
activity in connection with KPMG's alleged marketing of fraudulent tax shelters. *See* Amended
Class Action, *Simon v. KPMG*, Civ. 05-03189 (USDC NJ), Dkt No. 49-1, Govt. Ex. 26.
Richard and Maureen Egan are identified in court papers filed January 10, 2006 as having opted
out of a proposed settlement of this class action.  *See* Dkt. No. 121-4, Govt. Ex. 27.

[24]  The plaintiff is required under Federal Rule of Civil Procedure 26(c) to certify that it
has conferred or attempted to confer with "other affected parties" to attempt to resolve the
dispute. Fed.R.Civ.P. 26(c).  The plaintiff makes no certification that it conferred or attempted to
confer with KPMG, which, as the recipient of the subpoena, is certainly an affected party.
Without that certification, the plaintiff's motion for protective order is improper and may not be
granted.  Fed.R.Civ.P. 26(c).

[25]In the face of the overwhelming authority holding that a party lacks standing to
challenge a third-party subpoena, there is only scant caselaw suggesting that standing may exist if
the motion to quash is styled as a motion for a protective order.  *See, Auto-Owners Ins. Co. v.
Southeast Floating Docks, Inc.*, 231 F.R.D. 426, 429 (D. Fla. 2005) (citing *Washington v.
Thurgood Marshall Acad.*, 230 F.R.D. 18, 22 (D.D.C. 2005).  But none of these minority
opinions were reviewed by a higher court.  Furthermore, they are inconsistent with, and
eviscerate the rule established by, abundant contrary authority.  The rule of law established by the
majority cases would be meaningless if it could be so easily overcome by a name change for the
motion.  To avoid such an absurd result, the majority cases stand for the fundamental proposition
that a party lacks standing to object on behalf of a nonparty, whether that objection is called an

party the plaintiff purportedly seeks to protect (KPMG, represented by Skadden, Arps, Slate, Meagher & Flom LLP) has already begun production of documents, without any objection. *See* Govt. Ex. 29. The plaintiff cannot object on KPMG's behalf when KPMG does not object at all. *See* Wright, Miller & Marcus, 8 *Federal Practice and Procedure*: Civil 2d § 2035, at 475 ("A party may not ask for an order to protect the rights of another party or a witness if that party or witness does not claim the protection for himself. . . .").[26]

## C.    Plaintiff's Motion is Moot

Furthermore, the plaintiff's motion is, for all intents and purposes, moot. KPMG has already complied with most of the subpoena's production requests and will likely comply with all of the subpoena's production requests, as revised by agreement, before the Court addresses the motion to quash. That plaintiff's motion is now moot is simply a logical consequence of the fundamental rule of law that only the person to whom a subpoena is directed has standing to object under Rule 45 .

## D.    In Any Event, Plaintiff Has Utterly Failed to Demonstrate its Entitlement to a Protective Order.

### 1.    Plaintiff's Argument of "Undue Burden" is Misplaced

Even assuming *arguendo* that the plaintiff has standing to seek a protective order here, it cannot begin to meet the criteria for obtaining one. The Court may grant a proper motion for a protective order under Rule 26(c) to protect a party from annoyance, embarrassment, oppression,

---

objection, a motion to quash, or a motion for a protective order.

[26]KPMG's only expressed concern is that the documents produced by it remain confidential during the discovery phase of the litigation. To that end, the United States and KPMG are in the process of finalizing the terms of a stipulated protective order, which will require that the KPMG documents remain confidential unless introduced during deposition, at trial, or in some other court proceeding.

or undue burden or expense.  Fed.R.Civ.P. 26(c).  Of course, that protection must be "for good

cause shown."  That good cause must be shown by the moving party– here, the plaintiff.

Fed.R.Civ.P. 26(c); *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 789 (1st Cir. 1988).  "A

finding of good cause must be based on a particular factual demonstration of potential harm, not

on conclusory statements."  *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 8 (1st Cir. 1986).

        The plaintiff, apparently recognizing that KPMG has not objected and has not asserted

undue burden, asserts that its own review of the documents sought by the subpoena would be

unduly burdensome.  While that assertion is both unsupported and unsupportable, an

examination of the plaintiff's memorandum reveals that the plaintiff is not arguing that the

subpoena that the United States issued to KPMG would create undue burden, but instead that a

*different* subpoena *could* create undue burden.  The plaintiff even attempts to establish good

cause by suggesting that the United States "may well" seek information on other taxpayers in the

future.  Pl.'s Mem. at 8.  The plaintiff cannot possibly establish good cause here by arguing

hypothetical harm from a hypothetical subpoena and hypothetical production.  The plaintiff then

cites the possibility that documents could be produced relating to 600 transactions.  Pl.'s Mem. at

8.  Of course, what the plaintiff either fails to recognize or fails to acknowledge is that the United

States is not seeking all documents relating to the hundreds of fraudulent tax shelters sold to

people like Richard Egan.  The United States' request for transactional documents is limited to

SOS and its subset, FDIS, and is intended to ensure that the subpoena captures the transactional

documents for all of the FDIS transactions (which is a far smaller number of transactions than the

600 the plaintiff suggests).[27]  As discussed, *infra,* an analysis of the collective conduct of these

_____

        [27]*See* Pl.'s Mem. Ex. B (Subpoena Att. at ¶39 and Subpoena App. A).  Plaintiff states that
the subpoena to KPMG could result in production of documents relating to at least 600

other FDIS participants may be acutely relevant to the application of a number of fundamental

tax principles in this case, including the economic substance doctrine, the step transaction

doctrine, and the sham partnership principle.

In addition, the United States seeks documents "discussing the development, marketing,

promotion, implementation, and/or reporting" of the BLIPS, FLIP, OPIS and SOS tax shelter

products. Pl.'s Mem. Ex. B., Subpoena at ¶¶ 7-8. The United States seeks those documents

because, among other reasons, as detailed in the Factual Background, the design and

development of these earlier and in certain respects similar tax shelter products will shed light on

the essential purposes underlying the design and marketing features of the FDIS successor tax

shelter. While the plaintiff wants to "secure the speedy and inexpensive" end of this case, (Pl.'s

Mem. at 8), the desire to avoid the time and expense of thorough and proper civil discovery is not

justification for a protective order.

Furthermore, if the plaintiff is convinced that the documents the United States seeks are

irrelevant, it can avoid any burden or expense by not reading them. The plaintiff's request, by

letter to KPMG dated April 14, for a duplicate document production demonstrates that it is not

willing to take this simple step.

---

transactions. The superceding indictment cited by the plaintiff demonstrates the falsity of that
assertion. The superseding indictment details that approximately 165 SOS transactions were
marketed through KPMG. The remaining transactions referenced in the superseding indictment
are FLIP, OPIS, and BLIPS transactions, and the subpoena clearly does not seek any of the
transactional documents with respect to those transactions. FDIS appears to be a subset of SOS,
and it is unknown at this time how many of these 165 SOS transactions were in fact the FDIS
variant. Nor is it known whether KPMG itself can readily identify all of the transactions that fall
within this subset. To assist, the United States has identified in Appendix A to its subpoena at
least 16 FDIS transactions. However, since that list is principally based upon information that
the United States obtained from Sidley Austin, and since Sidley Austin is only one of the four
law firms that promoted FDIS, KPMG may well have also been involved in the development,
marketing, and implementation of other FDIS transactions.

11

The plaintiff's allegation that the subpoena is unduly burdensome to the Court is perhaps its most obviously misguided. The Court is only involved in this dispute because the plaintiff filed a motion without standing, without compliance with federal and local rules, and without any basis for relief. The plaintiff's argument in this instance is not an argument for relief, but instead a threat of more unnecessary and unsupported discovery motions.

### 2.     The United States Seeks Relevant Documents

The plaintiff effectively seeks to recover $62,100,000, which is the amount by which Richard Egan was able to decrease his tax liability on income he earned in 2001 by entering into the FDIS tax shelter transaction. In its complaint, the plaintiff alleges that Richard Egan "was not interested in investing in a proposed investment plan that was mass-marketed or that had been identified as abusive by the IRS." Compl. at ¶ 23. Now that the United States seeks to discover evidence that would demonstrate that the plaintiff's allegation is patently false, the plaintiff desperately seeks to slam the door on any pattern evidence and any evidence that the tax shelter at issue here was devised to *appear* as something other than the tax shelters that had already been deemed abusive by the IRS. Furthermore, the plaintiff claims to have relied on the purportedly independent opinions and advice of various law firms, accounting firms, and "others." Compl. at ¶¶ 20, 25, 28. Here again, the plaintiff seeks to make this hit-and-run allegation while attempting to prevent any discovery that would demonstrate that these purported advisors were not independent and that reliance on them was unreasonable. The plaintiff cannot simply make these allegations and then prevent the United States from testing their veracity through the discovery of relevant documents.

The issue of relevance at this stage of the litigation relates not to the admissibility of the

subpoenaed documents into evidence, but instead their relevance for purposes of discovery under Rule 26. On that score, the documents requested by this subpoena are manifestly relevant under the broad scope of Rule 26. As the First Circuit has recognized, "the plain language of ... Rule 26(b)(1) contemplates wide-ranging discovery to the fullest possible extent." *Klonoski v. Mahlab,* 156 F.3d 255, 267 (1st Cir. 1998). In the discovery context, "the word 'relevant' encompasses any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case" and is "not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues." *Id.* (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978)). Furthermore, using that broad definition of relevance, the "information is discoverable if there is *any possibility* it might be relevant to the subject matter of the action." *Cabana v. Forcier*, 200 F.R.D. 9 (D. Mass. 2001) (emphasis added). here is no question that there is a possibility – and the United States believes a strong probability – that these documents are relevant to the subject matter of this litigation.

        **(a)     The Discovery Sought is Relevant to the Determination of Whether the Plaintiff's Tax Shelter Was a Factual and/or Economic Sham**

The discovery sought here is clearly relevant to one of the bedrock issues in this litigation– whether the tax shelter employed here, as designed, developed, marketed and implemented, was a factual and/or economic sham. It is fundamental that the substance, not the form, of a transaction controls for tax purposes. *Gregory v. Helvering*, 293 U.S. 465 (1935). *See also*, *Yosha v. Commissioner*, 861 F.2d 494, 497 (7th Cir. 1988); *Executive Jet Aviation, Inc. v. United States*, 125 F.3d 1463, 1469 (Fed. Cir. 1997).

One incarnation of the basic substance-over-form principle is the sham transaction doctrine. Courts have recognized two types of sham transactions: shams in fact and shams in

13

substance. *ACM Partnership v. Commissioner*, 157 F.3d 231, 247 n.30 (3d Cir. 1998), *cert. denied*, 526 U.S. 1017 (1999). Shams in fact are transactions that are created on paper but in reality never occur. Shams in substance, or economic shams, are transactions that actually occur but lack non-tax economic substance. *Ibid.* If a transaction lacks either the factual or economic substance that its form represents, then purported losses claimed on the transaction are not deductible. *Kirchman v. Commissioner*, 862 F.2d 1486, 1490 (11th Cir. 1989).

Under the economic substance doctrine, transactions that are invented solely to create tax deductions and otherwise have no economic substance, even though formally complying with the letter of the Internal Revenue Code, will not be recognized. *Knetsch v. United States*, 364 U.S. 361 (1960). The test for whether a transaction is an economic sham is "whether the transaction had any practicable economic effect other than the creation of income tax losses." *See* e.g., *Rose v. Commissioner*, 868 F.2d 851, 853 (6th Cir. 1989). This analysis is guided by the related factors of whether the transaction can produce economic benefits apart from the generation of tax losses (an objective analysis) and whether the taxpayer possessed a non-tax business purpose (a subjective analysis). *Id*. at 853; *accord*, *Sochin v. Commissioner*, 843 F.2d 351, 354 (9th Cir.), *cert. denied*, 488 U.S. 824 (1988). As stated by the Third Circuit in *ACM Partnership*:

> The inquiry . . . turns on both the 'objective economic substance of the transactions' and the 'subjective business motivation' behind them. However, these distinct aspects of the economic sham inquiry do not constitute discrete prongs of a 'rigid two-step analysis,' but rather represent related factors both of which inform the analysis of whether the transaction had sufficient substance, apart from its tax consequences, to be respected for tax purposes.

*ACM*, 157 F.3d at 247 (citations omitted). Thus, the determination of whether the instant tax shelter would produce an economic profit absent tax benefits is an objective inquiry, requiring a full analysis as to how the product was designed, developed, marketed and implemented.

14

In addition to determining how the tax shelter here was designed, developed, and marketed, the United States is seeking discovery to determine whether it was structured identically for all participants. The United States contends that this product was a "cookie-cutter" tax shelter transaction. Such pattern evidence is particularly relevant to prove the existence of a sham.

As noted, the objective test for economic substance focuses on whether a set of transactions can produce economic benefits apart from tax losses. *See ACM Partnership*, 157 F.3d at 247.[28] When it is determined that taxpayers have engaged in a pre-packaged transaction creating artificial losses that are not reflective of economic reality, evidence regarding the potential economic benefits of similar cookie-cutter transactions by other investors is highly relevant to the objective economic substance analysis. Specifically in this case, such evidence can demonstrate whether the transaction, as originally designed and implemented, could possibly have generated actual economic benefits apart from paper tax losses. In addition, evidence regarding virtually identical transactions by other participants is also relevant in determining whether the transaction was marketed as a tax shelter to potential investors without regard to whether the transaction could possibly have had any business purpose separate from tax savings.

The courts have repeatedly recognized that evidence relating to other investor transactions involving the same tax shelter product is relevant to the sham analysis. In *Sochin v.*

---

[28] In *ACM Partnership,* the Third Circuit held that, where a partnership's basis in contingent payment notes was artificially increased under the installment sale regulations to an amount substantially in excess of the value of those notes, no loss was allowable by the partnership on the subsequent disposition of the notes because the installment sale transaction in which the inflated basis was created lacked objective economic substance. As the court emphasized, tax losses which do not correspond to any actual economic loss do not constitute the type of bona fide loss that can be deducted under the Internal Revenue Code. 157 F.3d at 252.

*Commissioner*, 843 F.2d 351 (9th Cir.), *cert. denied,* 488 U.S. 824 (1988), the taxpayers argued

that the Tax Court improperly considered evidence of other investor transactions involved in the

same investment program.  In rejecting this contention, the Ninth Circuit stated:

> The tax court admitted evidence of other investor transactions in the GGS
> program as relevant to the sham determination.  As discussed above, at least part
> of the sham analysis focuses on the "economic substance" of the transaction; i.e.
> whether it was "likely to produce economic benefits aside from a tax deduction."
> A consideration of the entire investment program directly relates to the analysis of
> Taxpayers' probable economic benefits.  It is also directly relevant to the court's
> assessment of Taxpayers' credibility with respect to their assertions of a non-tax
> based motive.

*Sochin* at 355 (citations omitted). *See also*, *Karme v. Commissioner,* 673 F.2d 1062 (9th Cir.

1982).[29]

Moreover, the Court of Federal Claims recently made clear in *Jade Trading, LLC v.

United States*, 65 Fed.Cl. 188  (2005), involving a tax shelter product similar to the one

employed here, that one of the indicia of a sham transaction is that the transaction has been

structured identically for all participants:

> Importantly for purposes of the present motion, the Tax Court held that evidence
> of the promoters' dealings with participants other than the petitioners was
> "admissible in order to determine whether the transactions with petitioners [were]
> bona fide." *Id.* at 972 n. 6.   In analyzing whether the transactions at issue were
> shams, the Court noted that the contracts at issue operated identically for all other
> participants.  *Id.* at 988.

*Jade Trading, LLC v. United States*, 65 Fed.Cl. 188, 191 (2005)*.   Accord, American Electric

Power Co. v. United States,* 191 F.R.D. 132, 140-41 (S.D.Ohio 1999) (refusing to quash a

---

[29] *Accord, Brannen v. Commissioner*, 78 T.C. 471 (1982), *aff'd*, 722 F.2d 695 (11th Cir.
1984), (court admitted evidence with respect to 19 other similar partnerships); *Barrister
Equipment Associates Series # 115, Barrister Associates, Tax Matters Partner v. Commissioner
of Internal Revenue*, T.C. Memo. 1994-205, (court found evidence of the activities of a shelter
promoter and his controlled and affiliated entities relevant to whether the transactions at issue
had economic substance and were entered into with a profit objective).

government subpoena seeking names of non party clients of insurance broker noting that Rule

26(b) permitted discovery of the identity of persons having knowledge of any discoverable matter

and that the clients' identity could be adequately protected under an agreement).

> **(b)** **The Discovery Sought is Relevant to the Determination of Whether the Steps of the Tax Shelter Here Should Be Collapsed for Federal Income Tax Purposes**

Documents related to other participants or potential participants in these generic tax

shelters are also relevant in determining the application of the step transaction doctrine in this

litigation. That doctrine, which is simply another variant of the fundamental substance over form

principle, provides that "interrelated yet formally distinct steps in an integrated transaction may

not be considered independently of the overall transaction." *Commissioner v. Clark*, 489 U.S.

726, 738, 109 S. Ct. 1455, 103 L.Ed.2d 753 (1989) (quotation marks and citation omitted); see

also *Security Indus. Ins. Co. v. United States*, 702 F.2d 1234, 1244 (5th Cir.1983). The doctrine

requires the courts to link together "all interdependent steps with legal or business significance,

rather than [take] them in isolation," so that "federal tax liability may be based on a realistic view

of the entire transaction." *Clark*, 489 U.S. at 738, 109 S. Ct. 1455 (quotation marks and citation

omitted).

We believe that the facts relating to other participants and potential participants will show

that the various steps of the tax shelter transactions were minutely scripted and integrated from

the outset. Pattern evidence regarding how each investor executed the individual steps of their

transactions is relevant in determining whether the steps of this tax shelter transaction were

preplanned and integrated or undertaken independently. This discovery will be especially

relevant if it shows, as we believe it will, that many different participants in this and similar tax

17

shelters followed the same chronology of steps, regardless of the particular facts of their situation.

## II.

### PARTICIPANTS OF POTENTIALLY ABUSIVE TAX SHELTERS HAVE NO EXPECTATION OF CONFIDENTIALITY

Plaintiff's arguments about the improper disclosure of tax-return information of non-parties are misplaced.  Plaintiff advances a claim of confidentiality on behalf of KPMG's tax shelter clients even though KPMG itself has asserted no such privilege.  KPMG has made no claim of confidentiality on behalf of its client-purchasers of abusive tax shelters – not because it is somehow beholden to the United States – but rather because the issue has been recently fully litigated and law is clearly to the contrary.  *See* KPMG LLP, 316 F.Supp.2d 30 (D.D.C. 2004) (KPMG's clients have no expectation of confidentiality with respect to their participation in potentially abusive tax shelters); *see also*, *John Doe 1, John Doe 2 v. KPMG LLP*, U.S., C.A. No. 03-*37 cv-2036-H, 2004 WL 797719 (N.D.Tex. Apr. 12, 2004); accord, *United States v. BDO Seidman*, 337 F.3d 802, 812-813 (7th Cir. 2003); *John Doe # 1* v. *Wachovia Corp*., 268 F.Supp.2d 627 (W.D.N.C.2003);

Plaintiff also implies that KPMG's disclosure of certain information would be a criminal offense under 26 U.S.C. § 7216(a), but then concedes that the disclosure prohibition is inapplicable because subsection (b) allows disclosure pursuant to a court order, which includes a subpoena issued by a federal agency. 26 U.S.C. § 7216(b)(1)(B); 26 C.F.R. § 301.7216-2(c)(3)(I). While properly supplying information in response to a subpoena, KPMG has taken the appropriate steps to protect its clients' privacy interests.  As stated above, the United States and KPMG are near finalization of a protective order which will protect KPMG documents during

18

the discovery phase of this case. With KPMG's and its clients' privacy interests well-protected, the plaintiff seems to be injecting itself into this matter to protect its own interest – the prevention of discovery on information that is highly relevant to the issues in this case.

Finally, Section 6103, also cited by plaintiff, has absolutely no applicability here. That statute generally prohibits the disclosure of "returns" or "return information" by officers or employees of the United States. KPMG is, of course, not an officer or employee of the United States, despite the plaintiff's repeated assertions that the deferred prosecution agreement somehow transforms it into one.

Moreover, the statute only prohibits disclosure of documents constituting "returns" and "return information" which consist only of documents that are "filed with, received by, recorded by, prepared by, furnished to, or collected by" the IRS. 26 U.S.C. § 6103(b). KPMG is, obviously, not a component of the IRS. Thus, documents in KPMG's custody and control are clearly not "returns" or "return information" with the meaning of Section 6103(b). *See e.g. Baskin v. United States*, 135 F.3d 338, 342 (5th Cir. 1998) ("The plain language of the statute reveals that 'return information' must be information which has somehow passed through, is directly from, or generated by the IRS."); *Ryan v. United States*, 74 F.3d 1161, 1163 (11th Cir. 1996) (". . . Section 6103 'protects only information filed with and disclosed by the IRS, not all information relating to any tax matter.'"); *Stokwitz v. United States*, 831 F.2d 893, 896 (9th Cir. 1987) ("the central fact evident from the legislative history, structure, and language of section 6103 (including the definitions of 'return and return information') [is] that the statute is concerned solely with the flow of tax data to, from, or through the IRS.").

Indeed, even the IRS recognizes that return information of tax-shelter participants may be

disclosed in a judicial proceeding under the item-test exception in section 6103(h)(4)(B). *See* Chief Counsel Notice CC-2006-003.[30]  Under that exception, disclosure is permitted in judicial proceedings "if the treatment of an item reflected on such [third party's] return is directly related to the resolution of an issue in the proceeding." 26 U.S.C. § 6103(h)(4)(B). As the IRS recognizes in the Notice, nonparty taxpayer information may be disclosed if that taxpayer "participated in substantially similar transactions promoted by the same [tax-shelter] promoter" as the party, and if the information relates directly to the resolution of an issue in the proceeding. Chief Counsel notice CC-2006-003 at 2.  The Notice gives an example of such a direct relationship which is relevant here.  That example is as follows:

> Government argues that Investor A engaged in an abusive transaction for the sole purpose of tax avoidance. Investor A responds that the transaction was motivated by the non-tax purpose of portfolio diversification and was tailored to effect this specific purpose. The Government refutes Investor A's contention by showing that the transaction was not unique and that other taxpayers (Investors B, C, D, E and F) all participated in substantially similar transactions through the same promoter, all reported similar items of income, deduction and loss, and all claimed a similar non-tax purpose for entering into the transaction. The treatment of an item reflected on Investor B, C, D, E and F's returns is directly related to the resolution of an issue in Investor A's proceeding (whether the loss reported by Investor A arose from a transaction that was a sham in substance because it lacked independent economic substance or business purpose).

*Id.* at 2-3.

Similarly, plaintiff is arguing here that its transaction was not mass marketed and had a legitimate non-tax purpose.  To refute those allegations, as discussed above, the United States seeks material, including tax return information of other KPMG FDIS clients, to show that plaintiff's transaction was not unique and that other KPMG clients all participated in substantially similar transactions.  We believe this information will also show that these other FDIS participants all reported similar items of income, deduction and loss, that all took the same

---

[30]Chief Counsel Notice CC-2006-003 is attached hereto as Exhibit 28.

1674482.1

series of steps in consummating their FDIS transactions and that all also realized no economic

profit in excess of the enormous fees on these transactions.  In short, this information is highly

relevant to multiple issues in this case.


**CONCLUSION**

The plaintiff's motion should be stricken or summarily denied for its failures to comply

with applicable federal and local rules..  Also as a threshold matter, the plaintiff lacks standing to

bring the motion– an issue the plaintiff simply refuses to address.  In any event, the motion is

21

1674482.1

now moot.  And, finally, the plaintiff's motion  fails on the merits. We respectfully submit that

the United States should be entitled to conduct complete and thorough discovery in defense of

this action.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

/s/ Dennis M. Donohue
DENNIS M. DONOHUE
SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
MATTHEW C. HICKS
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044-0055
Telephone: (202) 307-6542
Facsimile:  (202) 514-5238
E-mail: matthew.c.hicks@usdoj.gov
          john.a.lindquist@usdoj.gov
          barry.e.reiferson@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants identified on the Notice of Electronic Filing and paper copies will be sent to
those indicated as non registered participants on April 28, 2006.

/s/ Barry E. Reiferson
Trial Attorney
US Department of Justice, Tax Division

1674482.1

Citation                 Found Document                Rank 1 of 1                Database
Notice 2000-44                                                                    FTX-ANN
2000-36 I.R.B. 255, 2000 WL 1138430 (IRS NOT)
C

Internal Revenue Service (I.R.B.)

Notice

TAX AVOIDANCE USING ARTIFICIALLY HIGH BASIS

Released: August 13, 2000

Published: September 5, 2000

Tax avoidance using artificially high basis. Taxpayers and their representatives are alerted that the purported losses arising from certain types of transactions are not properly allowable for federal income tax purposes. Also, the Service may impose penalties on participants in these transactions or, as applicable, on persons who participate in promoting or reporting these transactions.

In Notice 99-59, 1999-52 I.R.B. 761, the Internal Revenue Service and the Treasury Department described certain transactions that were being marketed to taxpayers for the purpose of generating artificial tax losses. This notice concerns other similar transactions that purport to generate tax losses for taxpayers.

As stated in Notice 99-59, a loss is allowable as a deduction for federal income tax purposes only if it is bona fide and reflects actual economic consequences. An artificial loss lacking economic substance is not allowable. See ACM Partnership v. Commissioner, 157 F.3d 231, 252 (3d Cir. 1998), cert. denied, 526 U.S. 1017 (1999) ("Tax losses such as these ... which do not correspond to any actual economic losses, do not constitute the type of 'bona fide' losses that are deductible under the Internal Revenue Code and regulations."); Scully v. United States, 840 F.2d 478, 486 (7th Cir. 1988) (to be deductible, a loss must be a "genuine economic loss"); Shoenberg v. Commissioner, 77 F.2d 446, 448 (8th Cir. 1935) (to be deductible, a loss must be "actual and real"); § 1.165-1(b) of the Income Tax Regulations ("Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.").

Notice 99-59 describes an arrangement that purported to give rise to deductible losses on disposition of stock by applying the rules relating to distributions of encumbered property to shareholders in order to create artificially high basis in the stock. The Service and the Treasury have become aware of similar arrangements that have been designed to produce noneconomic tax losses on the disposition of partnership interests. These arrangements purport to give taxpayers artificially high basis in partnership interests and thereby give rise to deductible losses on disposition of those partnership interests.

One variation involves a taxpayer's borrowing at a premium and a partnership's subsequent assumption of that indebtedness. As an example of this variation, a taxpayer may receive $3,000X in cash from a lender under a loan agreement that

Copr. © West 2002 No Claim to Orig. U.S. Govt. Wo



GOVERNMENT
EXHIBIT

1

Notice 2000-44

provides for an inflated stated rate of interest and a stated principal amount of only $2,000X. The taxpayer contributes the $3,000X to a partnership, and the partnership assumes the indebtedness. The partnership thereafter engages in investment activities. At a later time, the taxpayer sells the partnership interest.

Under the position advanced by the promoters of this arrangement, the taxpayer claims that only the stated principal amount of the indebtedness, $2,000X in this example, is considered a liability assumed by the partnership that is treated as a distribution of money to the taxpayer that reduces the basis of the taxpayer's partnership interest under § 752 of the Internal Revenue Code. Therefore, disregarding any additional amounts the taxpayer may contribute to the partnership, transaction costs, and any income realized or expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the excess of the cash contributed over the stated principal amount of the indebtedness, even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. In this example, the taxpayer purports to have a basis in the partnership interest of $1,000X (the excess of the cash contributed ($3,000X) over the stated principal amount of the indebtedness ($2,000X)). On disposition of the partnership interest, the taxpayer claims a tax loss with respect to that basis amount, even though the taxpayer has incurred no corresponding economic loss.

In another variation, a taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.

Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under § 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of § 165. The purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes. The purported tax benefits from these transactions

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Notice 2000-44

may also be subject to disallowance under other provisions of the Code and regulations. In particular, the transactions may be subject to challenge under § 752, or under § 1.701-2 or other anti-abuse rules. In addition, in the case of individuals, these transactions may be subject to challenge under § 165(c)(2). See Fox v. Commissioner, 82 T.C. 1001 (1984). Furthermore, tax losses from similar transactions designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for federal income tax purposes.

Appropriate penalties may be imposed on participants in these transactions or, as applicable, on persons who participate in the promotion or reporting of these transactions, including the accuracy-related penalty under § 6662, the return preparer penalty under § 6694, the promoter penalty under § 6700, and the aiding and abetting penalty under § 6701.

Transactions that are the same as or substantially similar to the transactions described in this Notice 2000-44 are identified as "listed transactions" for the purposes of § 1.6011-4T(b)(2) of the Temporary Income Tax Regulations and § 301.6111- 2T(b)(2) of the Temporary Procedure and Administration Regulations. See also § 301.6112-1T, A-4. It should be noted that, independent of their classification as "listed transactions" for purposes of §§ 1.6011-4T(b)(2) and 301.6111-2T(b)(2), the transactions described in this Notice 2000-44 may already be subject to the tax shelter registration and list maintenance requirements of § 6111 and 6112 under the regulations issued in February 2000 (§§ 301.6111-2T and 301.6112-1T, A-4), as well as the regulations issued in 1984 and amended in 1986 (§§ 301.6111-1T and 301.6112-1T, A-3). Persons required to register these tax shelters who have failed to register the shelters may be subject to the penalty under § 6707(a) and to the penalty under § 6708(a) if the requirements of § 6112 are not satisfied.

In addition, the Service and the Treasury have learned that certain persons who have promoted participation in transactions described in this notice have encouraged individual taxpayers to participate in such transactions in a manner designed to avoid the reporting of large capital gains from unrelated transactions on their individual income tax returns (Form 1040). Certain promoters have recommended that taxpayers participate in these transactions through grantor trusts and use the same grantor trusts as vehicles to realize the capital gains. Further, although each separate capital gain and loss attributable to a portion of a trust that is treated as owned by a grantor under the grantor trust provisions of the Code (§ 671 and following) is properly reported as a separate item on the grantor's individual income tax return (see § 1.671-2(c) and the Instructions to Form 1041, U.S. Income Tax Return for Estates and Trusts), the Service and the Treasury understand that these promoters have advised that the capital gains and losses from these transactions may be netted, so that only a small net capital gain or loss is reported on the taxpayer's individual income tax return. In addition to other penalties, any person who willfully conceals the amount of capital gains and losses in this manner, or who willfully counsels or advises such concealment, may be guilty of a criminal offense under §§ 7201, 7203, 7206, or 7212(a) or other provisions of federal law.

The principal authors of this notice are David A. Shulman of the Office of Associate Chief Counsel (Passthroughs and Special Industries) and Victoria S. Balacek of the Office of Associate Chief Counsel (Financial Instruments and

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Page 4

Notice 2000-44

Products). For further information regarding this notice, contact Mr. Shulman at
(202) 622-3080 or Ms. Balacek at (202) 622-3930 (not toll free calls).
Notice 2000-44, 2000-36 I.R.B. 255, 2000 WL 1138430 (IRS NOT)
END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09.00 AM 07/19/2000
001365498 - 3262025

## CERTIFICATE OF FORMATION

### OF

### FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC

The undersigned, an authorized natural person, for the purpose of forming a limited liability company under the provisions and subject to the requirements of the Delaware Limited Liability Company Act of the State of Delaware (6 Del.C.§18-101, et seq.) hereby certifies that:

FIRST:  The name of the limited liability company (hereinafter called the "limited liability company") is Fidelity International Currency Advisor A Fund, LLC.

SECOND:  The address of the registered office is c/o Corporation Service Company, 1013 Centre Road, Wilmington, New Castle County, Delaware 19805.

THIRD:  The name and address of the registered agent of the limited liability company required to be maintained by Section 18-104 of the Delaware Limited Liability Company Act is Corporation Service Company, 1013 Centre Road, Wilmington, New Castle County, Delaware 19805.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of July 19, 2000

Stephanie H. Denby, Authorized Person



GOVERNMENT
EXHIBIT
2

1IRS1420

kpmg

**IS Conference Call – Summary**

**July 10, 2000**

1. **Short-Option Strategy**

    - Areas are starting to meet with clients. Need to do the pre-engagement letters for everyone we are presenting the strategy to.

    - We are dealing with competition on a case by case basis. Clients still have a preference to do business with us even though competition is adjusting their fee structure to compete with us – i.e., us helping the client to implement.

    - Engagement information form – internal documentation – need to comply – see TPPL.

    - Engagement letters – we are now required to attach addendum to engagement letter which goes through the boiler plate language to a number of engagement letters. TPPL recommends early adoption – but it is not required with respect to the short option engagement letter. So October 1 deadline will apply to the short-option trade.

    - Helios fee structure is still 25 basis points more than Presidio. (275 BPS – Presidio, 300 BPS – Helios). Minimum 200 BPS go into options (225 BPS for Presidio). In addition, it is generally recommended that the more money put into the investment partnership, the more economics are in the partnership and the more chance of the strategy withstanding scrutiny later on. Additional assets support active management argument to justify putting the options into the investment partnership – more money to actively manage.

    - Sample representation letter will be posted to Outlook – at least Brown and Woods for now.

    - Make sure that you take out the tax return prep out of the pre-engagement letter unless you intend to give it away.

    - We need to make sure that an I/S team member is involved with the preparation of tax returns – make sure we don't look bad in the final analysis.

    - Opinion letters will be delivered to clients



GOVERNMENT
EXHIBIT

3

**Proprietary Material
Confidentiality Requested**

**KPMG 0049272**

**Unknown**

| | |
|---|---|
| **From:** | Jimmy Haber [jhaber@divgroup.com] |
| **Sent:** | Tuesday, January 16, 2001 6:31 PM |
| **To:** | R. J. Ruble |
| **Subject:** | Re: Draft Reliance Letter |

General counsel and CFO.

"R. J. Ruble" wrote:

> Is there a way to describe them easily. I can include Helios and Alpha
> themselves by naming them as affiliates, I would think that most of the
> individuals would be officers, but maybe I'm wrong.

GOVERNMENT
EXHIBIT

4

PENGAD-Bayonne, N. J.

1

CONFIDENTIAL

M360747
SIDL166182

**Unknown**

| | |
|---|---|
| **From:** | Eischeid, Jeffrey A [eischeid@KPMG.com] |
| **Sent:** | Tuesday, August 15, 2000 12:54 PM |
| **To:** | DeLap, Larry |
| **Subject:** | RE: TaxNewsFlash 2000-148 and -149 |

I put the "stop marketing" word out to the Innovative Strategies team last night.  I'm currently gathering information regarding what returns have been extended, which transactions involved grantor trusts, which opinion letters have not been completed, etc. I hope to have that completed by the end of the week.

Jeff

> -----Original Message-----
> From:      DeLap, Larry
> Sent:      Saturday, August 12, 2000 2:18 AM
> To: Eischeid, Jeffrey A
> Cc: David Brockway (E-mail); Richard Smith (E-mail); Mark Ely (E-mail);
> Evelyn Elgin (E-mail); Douglas Ammerman (E-mail)
> Subject: FW: TaxNewsFlash 2000-148 and -149
>
> Jeff -
>
> Looks like Notice 2000-44 zeroes in on BLIPS and Short Option
> Strategy. Hopefully, opinions were already issues on all the late
> breaking BLIPS transactions. To the extent an opinion was not issued,
> I don't think there is any way we could issue one now. With respect to
> Short Option Strategy, have you got out the word to stop marketing it?
>
> When I get back in the country (August 28), we need to have
> conversation regarding the grantor trust issue that has been discussed
> in the past.
>
> Larry
>
> -----Original Message-----
> From:      US-WNTNewsBureau
> Sent:      Friday, August 11, 2000 11:31 AM
> Subject:  TaxNewsFlash 2000-148 and -149
>
> The following message will be e-mailed to clients shortly.
>
> Today, there are two editions of TaxNewsFlash:
>
> *    The IRS and Treasury Department modified the temporary and proposed
> tax shelter regulations that were originally issued in February 2000.
>
> *    The IRS issued Notice 2000-44, taking aim at transactions using
> artificially high basis.
>
> To read more, open the attachments or click on
> http://www.us.kpmg.com/taxnewsflash
>  << File: TNF00_148.DOC >>  << File: TNF00_149.DOC >>
> Questions or comments should be directed to US-WNTNewsBureau in Outlook.
>
>

**Proprietary Material**
**Confidentiality Requested**

**GOVERNMENT
EXHIBIT
5**

1

**KPMG 0017785**

Document 324 of 1,295

| | | |
|---|---|---|
| BATESBEG | = | |
| BATESEND | = | |
| PRODBEG | = | |
| PRODEND | = | |
| ATTYCOMMENTS | : | |
| FROM | : | R. J. Ruble |
| ORG | : | |
| TO | : | Jacob Amato <Jacob Amato/NY/BWLLP@BWLLP> |
| CC | : | |
| BCC | : | |
| DATE | = | 04/05/2001 |
| TIME | : | 20:07:00 GMT |
| SUBJECT | : | Financial Derivatives Investment Strategy |
| FOLDER | : | \R. J. Ruble\Sent Items |

| | | |
|---|---|---|
| HEADER | : | |
| MESSAGEID | : | 00000000B7BDA75CAEB14148A8FFD86DDCA220D5A4812100 |
| BODY | : | |

---------------- Forwarded by R. J. Ruble/NY/BWLLP on 04/05/2001 11:03 AM ----------------

"Mox Tan" <moxtan@heliosfinancial.com> on 04/04/2001 06:43:36 PM

To:     "John Truskowski" <jtruskow@lordbissell.com>, "John Hughes" <jhughes@lordbissell.com>,
        "Sergei Mytko" <smytko@lordbissell.com>, R. J. Ruble/NY/BWLLP@BWLLP, "Ira Akselrad"
        <iakselrad@proskauer.com>, jbarrie@bryancavellp.com, esmith@bryancavellp.com
cc:     "\(DGI\) Phil Kampf" <philkampf@heliosfinancial.com>, "\(Alpha\) Ivan Ross"
        <ivanross@alphaltd.net>, "\(DGI\) Orrin Tilevitz" <otilevitz@divgroup.com>, "\(DGI\) Jimmy
        Haber" <jhaber@divgroup.com>
Subject: Financial Derivatives Investment Strategy


Attached for your review and comments are draft marketing materials for our "Financial Derivatives
Investment Strategy". If you have any questions, please call either Jimmy Haber at 212-688-2700, or me,
at my numbers listed below.

Since there are many color slides in the presentation, you may wish to choose "pure black and white" when
you print to a black and white printer.

Regards,

Mox


Mox Tan
225 West Washington Street, Suite 2200
Chicago, Illinois 60606
Office:    (312) 419-6150
Fax:       (312) 419-6153
Mobile:    (312) 399-3620

GOVERNMENT
EXHIBIT
6
PENGAD-Bayonne, N. J.

SABWZ0151940

SIDL0345487

- att1.htm
- Partnership 04.05.01.ppt

ATTACHTEXT          :
METADATA            :
BATESPAGES          :
PRODPAGES           :
CREATIONDATE        = 11/12/2003
EDITTRAIL           : 20031112 163817 Eas [AU22Y8-1144] esferrel;

**SABWZ0151941**

Attached for your review and comments are draft marketing materials for our "Financial Derivatives Investment Strategy". If you have any questions, please call either Jimmy Haber at 212-688-2700, or me, at my numbers listed below.

Since there are many color slides in the presentation, you may wish to choose "pure black and white" when you print to a black and white printer.

Regards,

Mox


Mox Tan
225 West Washington Street, Suite 2200
Chicago, Illinois 60606
Office:       (312) 419-6150
Fax:          (312) 419-6153
Mobile:       (312) 399-3620


**SABWZ0151942**

file://\\Nyimage3\image2\22406\1000\ATTACH0000\00000000B7BDA75CAEB14148A8Fl... 6/3/2004

SIDL0345489

# FINANCIAL DERIVATIVES INVESTMENT STRATEGY

Presented By

**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151943

SIDL0345490

# Table of Contents

I.    Investment Strategy

II.   Sample Option Trades - Range Trades

III.  Sample Option Trades - Call Spreads or Put Spreads

IV.   Investment in LLC

V.    Overview of The Diversified Group Incorporated

VI.   Overview of Alpha Consultants, LLC



THE DIVERSIFIED GROUP INCORPORATED

SABWZ0151944

# I.    Investment Strategy

**_Situation:_**  An individual ("**Investor**") has certain views on the direction of the equity markets (e.g. the S&P 500 or the NASDAQ 100), or of the foreign currency markets, and wants to trade based on those views in a manner that limits downside and maximizes upside and investment leverage.

**Option Spreads: Significant Upside Potential + Limited Downside**

➤  The Diversified Group Incorporated ("**Diversified**") and Alpha Consultants LLC ("**Alpha**") recommend the use of option spreads, i.e. the purchase of an option along with the simultaneous sale of a similar option at a different strike price, as a fundamental investment tool.

➤  A trading strategy based on one or more combinations of option spreads could result in significant profit and investment leverage, with limited downside risk.

**Flexible Investment Strategy: Five Variables to Choose From**

➤  Underlying Market or Index

➤  Direction of the Chosen Market or Index

➤  Investment Time Horizon

➤  Probability of Profit

➤  Amount of Investment


**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151945

SIDL0345492

# I.    Investment Strategy

**Flexible Investment Strategy: Five Variables to Choose From (continued)**

➤ (1) Choice of Market or Index: Option spreads can be structured for certain equity indices, foreign currencies, interest rates and other exposures.  The examples in Sections II and III of this presentation are based on options on the S&P 500, the NASDAQ 100, and the Japanese Yen.

➤ (2) Choice of Market Direction:  Option spreads can be structured to effectuate bullish perspectives (i.e. the chosen market or index will "go up") or bearish perspectives (i.e. the chosen market or index will "go down").  They can also be structured to effectuate a perspective that the chosen specific market or index will trade within a certain range (which in itself can be "bullish", "bearish" or "neutral").   Sections II and III illustrate a variety of these types of perspectives.

➤ (3) Choice of Investment Time Horizons:  Option spreads can accommodate a wide variety of investment time horizons.  Sections II and III illustrate 90-Day options.

➤ (4) Choice of Probability of Profit:  Option spreads can be designed for desired levels of profit probability (based on the Black-Scholes option pricing model).   Sections II and III illustrate scenarios where the probability of profit ranges from 15% to 40%.

➤ (5) Choice of Amount of Investment:  The amount to be invested will be a function of Investor's asset allocation strategy and  comfort level with all of the foregoing variables. Sections II and III illustrate the potential returns on a $2 million investment in a variety of scenarios.

 THE DIVERSIFIED GROUP INCORPORATED

SABWZ0151946

# II.  Sample Option Trades – S&P Range Trade



**S&P 500 Range Trade Examples**
**$2,000,000 Initial Investment**

Strike Range at 90-Day Expiration (Spot Today = 1153.29)

**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151947

SIDL0345494

II.    Sample Option Trades – NDQ Range Trade



**NDQ Range Trade Examples**
**$2,000,000 Initial Investment**

15% Probability
$8,056,390 Payoff

20% Probability
$6,720,683 Payoff

25% Probability
$5,763,890 Payoff

30% Probability
$5,045,807 Payoff

35% Probability
$4,486,492 Payoff

40% Probability
$4,038,913 Payoff

1501.14 — 1665.16
1473.40 — 1692.90
1445.30 — 1721.00
1416.73 — 1749.57
1387.55 — 1778.75
1357.61 — 1808.69

Strike Range at 90-Day Expiration (Spot Today = 1583.15)

1350  1400  1450  1500  1550  1600  1650  1700  1750  1800  1850

THE DIVERSIFIED GROUP INCORPORATED

SABWZ0151948

SIDL0345495

## II.    Sample Option Trades – YEN Range Trade



**Yen Range Trade Examples**
$2,000,000 Initial Investment

| | |
|---|---|
| 15% Probability | $8,071,559 Payoff |
| 20% Probability | $6,722,807 Payoff |
| 25% Probability | $5,757,071 Payoff |
| 30% Probability | $5,046,661 Payoff |
| 35% Probability | $4,485,652 Payoff |
| 40% Probability | $4,041,582 Payoff |

Strike Range at 90-Day Expiration (Spot Today = 121.7)

**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151949

# III.   Sample Option Trades – S&P Call Spread



## S&P 500 Call Examples

THE DIVERSIFIED GROUP INCORPORATED

SABWZ0151950

SIDL0345497

# III.   Sample Option Trades - NDQ Call Spread



## NDQ Call Examples

# III.   Sample Option Trades - YEN Put Spread

## Yen Put Examples



THE DIVERSIFIED GROUP INCORPORATED

SABWZ0151952

# IV.   Investment in LLC

## Investment in LLC

➢ Investor, Alpha and a third party who will be a foreign person ("**Foreign Investor**") will form a Delaware limited liability company (the "**LLC**") for the purpose of investing and trading in option spreads and other derivative instruments on equity indices, foreign currencies or interest rates.

➢ Investor and Foreign Investor contribute $22,500 and $427,500, respectively, in exchange for 5% and 95%, respectively, of the LLC's common interests (the "**Common Interests**").

➢ Investor and Alpha also contribute $3,000,000 and $50,000, respectively, in exchange for preferred interests (the "**Preferred Interests**") in the LLC. Investor's contribution may be in the form of cash and/or options previously acquired through Investor's single member LLC.

➢ The LLC will have been initially capitalized with a substantial amount (e.g. $3,500,000 in the example discussed herein) to invest in option based strategies.

## Investor can convert his Preferred Interests into Common Interests at any time

➢ Investor may at any time convert his Preferred Interests into Common Interests to increase his share of the profits or losses of the LLC.

## Management of the LLC

➢ Alpha will provide investment advice with respect to structuring the option strategies.

➢ Diversified, as Manager of the LLC, will provide administrative support for the LLC, such as distributing the daily values of LLC's assets, and handling LLC documentation and record keeping responsibilities.

**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151953

SIDL0345500

# IV.  Investment in LLC

*INITIAL CAPITALIZATION* - Formation of LLC



**Investor**

Contributes
$22,500 for 5% of the Common Interests
$3,000,000 for Preferred Interests

**Alpha**

Contributes
$50,000 for Preferred Interests

**Foreign Investor**

Contributes $427,500 for
95% of the Common Interests

**LLC**

Manager = Diversified
Initial Capital = $3,500,000

➤ Investor, Alpha and Foreign Investor form a Delaware limited liability company ("LLC") for the purpose of investing and trading in options and other derivative instruments on equity indices, foreign currencies or interest rates.

➤ Investor and Foreign Investor contribute $22,500 and $427,500, respectively, in exchange for Common Interests of 5% and 95%, respectively.

➤ Investor and Alpha also contribute $3,000,000 and $50,000, respectively, in exchange for Preferred Interests.



**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151954

SIDL0345501

# IV.   Investment in LLC

## Initial Capitalization Table

| | Common Cash Contribution | Preferred Cash Contribution | Total Cash | Capital Share | Profit/Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | $ 3,000,000 | $ 3,022,500 | 86.36% | 5.00% |
| Alpha | 0 | 50,000 | 50,000 | 1.43% | 0.00% |
| Foreign Investor | 427,500 | — | 427,500 | 12.21% | 95.00% |
| Total | $450,000 | $3,050,000 | $3,500,000 | 100.00% | 100.00% |

## Provisions of the LLC Operating Agreement

➤ After the preferred return (as described below) is paid, profits (to the extent distributed) are distributed 95% to Foreign Investor and 5% to Investor.

➤ The LLC's gains and losses are allocated 95% to Foreign Investor and 5% to Investor, except that (i) the LLC operating agreement contains a "qualified income offset" and (ii) provides that to the extent losses would decrease a member's capital account below zero, they are allocated to the other members with positive capital accounts.

➤ Upon liquidation of the LLC or any member's interest therein, capital accounts are first booked up or down to reflect gain or loss which would be allocated to the members if the LLC's assets were sold for fair market value.

➤ Each member is entitled to receive his capital account, in the event of a complete redemption of such member's interest. Each Preferred Interest carries a preferred return of 8% per year independent of LLC profits, payable semi-annually.

## Transfer of Membership Interests

➤ A member may transfer or contribute, at any time, some or all of his interests to another entity.

**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151955

# IV. Investment in LLC



**OPTIONAL CONVERSION** - Investor may wish to convert his Preferred Interest into a Common Interest

**Investor**

Converts $3,000,000 Preferred Interest into additional Common Interests Now has up to 98% of the Common Interests

**Alpha**

$50,000 Preferred Interest

**Foreign Investor**

$427,500 Common Interest Diluted to no less than 2% of the Common Interests

**LLC** Manager = Diversified

▲ At some point in time, Investor may wish to convert his $3,000,000 Preferred Interest into a Common Interest, in order to have a higher percentage of the LLC's profits and losses.

▲ In the event that the LLC's net asset value has declined to the point where Foreign Investor's capital account would be zero if his interest were liquidated, under Foreign Investor's Anti-Dilution Provision, Investor's common interest cannot be increased beyond 98%.



**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151956

SIDL0345503

# IV.  Investment in LLC

## Provisions of the LLC Operating Agreement Governing Conversion of Preferred into Common

▷ Preferred Interests are convertible at any time into Common Interests on a dollar-for-dollar basis based on the net asset value of the LLC at that time, taking into consideration any accrued but unpaid preferred return and each Common Interest holder's proportional share of any LLC gains or losses up to the time of conversion.

▷ **Example:** Assume that Investor converts his Preferred Interest at a time when the LLC had a net asset value of $5 million and that Alpha has not converted. If we ignore accrued but unpaid preferred return, this implies that at the time of the conversion, the Common Interests had a gain of $1.5 million which would be allocated 5% ($75,000) to Investor and 95% ($1,425,000) to Foreign Investor, respectively. When Investor converts his Preferred Interests into Common Interests, he would have $3,097,500, or 62.58%, of the $4,950,000 total value of the Common Interests.  See Table.

## Capitalization Table after Conversion of Investor's Preferred Interests
Assume LLC Net Asset Value at the time of conversion is $5,000,000

| | Initial Common Contribution | Proportional Share of Gains or (Losses) | Conversion Proceeds | Value of Common Interests (Post-Conversion) | Profit/ Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | $75,000 | $ 3,000,000 | $3,097,500 | 62.58% |
| Alpha | 0 | 0 | 0 | 0 | 0.00% |
| Foreign Investor | 427,500 | $1,425,000 | 0 | 1,852,500 | 37.42% |
| Total | $450,000 | $1,500,000 | $3,000,000 | $4,950,000 | 100.0% |

**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151957

SIDL0345504

# IV.    Investment in LLC

**Foreign Investor's Anti-Dilution Provision**

⋏   Under no circumstances may a conversion cause Foreign Investor to retain less than 2% of the Common Interests.

⋏   **Example:** Assume that Investor converts his Preferred Interest at a time when the LLC had a net asset value of $3,060,000 and that Alpha has not converted. If we ignore accrued but unpaid preferred return, this implies that at the time of the conversion, the Common Interests had a loss of $440,000 which would be allocated 5% ($22,000) to Investor and 95% ($418,000) to Foreign Investor, respectively. When Investor converts his Preferred Interests into Common Interests, his $3,000,500 share represents 99.68% of the $3,010,000 total value of the Common Interests, but because of Foreign Investor's Anti-Dilution provision, Investor's maximum percentage interest in the Common Interests is capped at 98%. See Table.

**Capitalization Table after Conversion of Investor's Preferred Interests**
**Assume LLC Net Asset Value at the time of conversion is $3,060,000**

|  | Initial Common Contribution | Proportional Share of Gains or (Losses) | Conversion Proceeds | Value of Common Interests (Post-Conversion) | Profit/ Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | ($22,000) | $ 3,000,000 | $3,000,500 | No greater than 98% |
| Alpha | 0 | 0 | 0 | 0 | 0.00% |
| Foreign Investor | 427,500 | ($418,000) |  | 9,500 | No less than 2% |
| Total | $450,000 | ($440,000) | $3,000,000 | $3,010,000 | 100.0% |



**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151958

SIDL0345505

# V.    Overview of The Diversified Group Incorporated

A    Diversified is a boutique merchant banking firm headquartered in New York.  Over the last twenty years, its principals have been engaged in the business of arranging or investing in, special situations and complex financing or investment structures involving limited partnerships, limited liability companies, hybrid instruments (debt/equity), hybrid entities (pass-through versus corporate) or derivatives, such as options on foreign currencies, interest rates, commodities or equity indices.  Diversified usually acts as a principal, but depending upon the needs of the transaction, we may also act as the investment banker.

A    We apply our expertise in structuring transactions that typically involve all of the following seven disciplines:

economic analysis             book accounting
tax analysis                  legal analysis
equity investment             debt placement
        deal execution / administration

A    The disciplines are woven together through "structuring":

- the ability to correctly analyze the necessary component parts individually;
- the understanding of how the components interact and fit together;
- the judgment and experience that enables intelligent choices to be made when "trade offs" arise; and
- the ability to produce a solution that works - all in a timely and professional manner.

A    There is as much art as science involved in reaching a solution.

 **THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151959

SIDL0345506

# V.    Overview of The Diversified Group Incorporated

**Philosophy -**   Diversified is a small and highly successful firm whose principals embrace the following core values:

ᐳ   We know we will get "repeat business" from our clients, whether they are equity investors, lenders or borrowers, buyers or sellers, only if we are ethical and oriented toward long-term relationships, and only if the participants in our transactions are pleased with the results.

ᐳ   We pride ourselves on outstanding execution of transactions, which comes through creativity, hard work and a close attention to detail.

ᐳ   We do not aspire to being big.   We aspire to being the best at what we do with a strong focus on some of the most complex and highest value added transactions in mergers and acquisitions and corporate finance.

ᐳ   We recognize our limitations.  We cannot individually be leading experts in each and every discipline represented in a transaction, but we do retain the talents of some of the most creative members of nationally known legal and accounting firms for our transactions.  Our expertise in being able to analyze the client's problem/opportunity, with a generalist's overview, enables us to select the particular team of national experts best suited to assist Diversified in tailoring a customized, detailed, fully integrated structure.

ᐳ   Because our transactions are "document intensive", we view our ability to firmly manage and control the process of getting two to four sets of attorneys and accountants to expeditiously reach the desired conclusions as being one of our most valuable contributions to our clients.

## THE DIVERSIFIED GROUP INCORPORATED

SABWZ0151960

# V.    Overview of The Diversified Group Incorporated

**Principals - New York Office (212-688-2700)**

⅄    **James Haber, President (New York)** - Jimmy is the company's founder and has been involved in financial services since 1978. A certified public accountant, he is a member of the AICPA and the New York Society of CPA's. He received a B.S. degree in accounting from Brooklyn College and a M.S. degree in taxation from Pace University in New York.

⅄    **John Huber, Chief Financial Officer (New York)** - John has extensive experience in the financial services industry, both in public accounting and in private industry. As a tax manager at Arthur Andersen, he gained extensive experience in the owner managed business area, as well as in the real estate, banking, equipment leasing and manufacturing industries. Upon leaving Arthur Andersen, he became chief financial officer of one of his clients, an investment company which sponsored the formation of numerous investment entities. John returned to the field of public accounting in 1989, when he established his practice which later merged to form the firm Weeks, Holderbaum, Huber & DeGraw, LLP. Recently, he has taken a leave of absence from the firm to become Diversified's Chief Financial Officer. John holds a B.S. in Business Administration from California Polytechnic State University, San Luis Obispo, and attended graduate studies in taxation at Golden Gate University in San Francisco. He is a member of the New Jersey Society of Certified Public Accountants and the American Institute of Certified Public Accountants.

⅄    **Orrin Tilevitz, Vice President and General Counsel (New York)** - Orrin has over twenty years of experience in numerous areas of federal, state and local income taxation. Prior to joining Diversified, Orrin was a Director in the International Tax Services Group of PricewaterhouseCoopers LLP, where he represented multinational corporations engaged in cross-border transactions and developed sophisticated planning strategies to minimize worldwide taxes. Prior to that he spent over two years in the International Tax Group of Deloitte & Touche LLP, designing and developing a variety of cross-border tax-driven financial products and structured finance arrangements. He began his career as a tax lawyer in 1979 with Willkie, Farr & Gallagher in New York. Orrin received his B.A. degree, Cum Laude in the Biochemical Sciences, from Harvard College, where he was the speaker at the undergraduate commencement exercises, his J.D. degree from Columbia University School of Law, where he was a Harlan Fiske Stone Scholar, and his LL.M. in Taxation from New York University School of Law.

 **THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151961

SIDL0345508

# V.    Overview of The Diversified Group Incorporated

## Principals - Chicago Office (312-419-6150)

➤ **Mox Tan, Managing Director (Chicago)** - Prior to joining The Diversified Group, Mox was a Managing Director and head of BankAmerica's 10-person tax products group and 30-person corporate finance advisory group, with units located in Chicago, New York, San Francisco and Los Angeles. The tax products group specialized in tax-advantaged M&A and cross-border financings, including "double dips" and principal and interest deductibility strategies. Prior to starting up the tax products group in 1995, he was a co-head of Continental Bank's lease and project finance advisory group, and before that, created and headed up a tax-driven real estate finance group at an investment banking boutique in New York to take advantage of arbitrage opportunities that came out of the 1986 Tax Act. Prior to 1986, he was a corporate finance and securities attorney with Davis Polk & Wardwell in New York. Mox also spent four years in government, where he was the head of enforcement (Northeastern Region) for New Jersey's Division of Water Resources. Mox holds a B.Sc. from M.I.T. in Mathematics, an M.S. in Mathematics from the Courant Institute of Mathematical Sciences and a J.D. (cum laude) from Harvard Law School.

➤ **Philip L. Kampf, Jr., Managing Director (Chicago)** - Prior to joining The Diversified Group, Phil was a Vice President/senior transactor and a founding member of BankAmerica's tax products group in Chicago where he specialized in tax-advantaged/sub-libor cross-border financings such as "double dips", principal and interest deductibility strategies and certain Asia-Pacific funding strategies. Prior to founding the BankAmerica group with Mox in 1995, he was responsible for equity private placements and the execution of tax-or accounting-driven leases and project financings in Continental Bank's lease and project finance advisory group. Prior to joining Continental Bank, he was a financial analyst in the Property Finance Group of LaSalle Partners Limited. Phil holds a B.A. in International Studies from Northwestern University and an M.B.A. from the J.L. Kellogg School of Northwestern University.



## THE DIVERSIFIED GROUP INCORPORATED

SABWZ0151962

SIDL0345509

# VI.    Overview of Alpha Consultants, LLC

➢ Alpha Consultants, LLC ("Alpha LLC") is a Florida limited liability company engaged in trading and trade consulting for structured options and foreign currencies. A team of professionals led by Ivan Ross and Don Uderitz conducts the management of Alpha LLC. The team has over 50 years of combined experience in identifying, analyzing, structuring and trading investment portfolios. This team also has broad expertise in investment fund management, structured finance, investment banking and tax arbitrage. Additionally, the principals of Alpha LLC operate an NASD registered broker-dealer and a family of NFA registered private investment funds. Over the years, the team has developed numerous proprietary analytical models and disciplined investment strategies that historically have generated profitable returns with a controlled level of risk.

➢ From February 1995 to November 1999, the team provided trading advice and execution for the III Funds, a group of hedge funds that, as of their departure, had over $2 billion of investor capital. Two of Alpha LLC's principals (Uderitz and Ross) were general partners of the investment advisors to the III Funds and Adams, Viner, and Mosler, Ltd., ("AVM"), an affiliated fixed-income securities NASD registered broker-dealer. During its tenure with the III Funds and AVM, the team managed a large mortgage position, which at its peak exceeded $20 billion of the funds $30 billion of assets. This component of the portfolio consistently generated profitable returns. This includes the extremely difficult 1997-1998 period when many fixed-income funds experienced dramatic losses.

 **THE DIVERSIFIED GROUP INCORPORATED**

**SABWZ0151963**

SIDL0345510

# VI.    Overview of Alpha Consultants, LLC

**Principals - Palm Beach Gardens, Florida (561-624-9998)**

A    **Ivan J. Ross, Managing Member** - Prior to forming Alpha LLC, Mr. Ross was co-head of Mortgage Trading with primary responsibility for the management of the domestic mortgage position in the III funds. He was a trader and portfolio manager for AVM and III from February 1995 to November 1998. Prior to joining AVM/III, Mr. Ross was a Senior Vice President and Portfolio Manager for Ocwen Financial Corporation ("Ocwen") from February 1994 to February 1995. While at Ocwen, Mr. Ross was responsible for managing the investment-grade mortgage component of the Quasar fund, with capital in excess of $250 million. Quasar is a fund of funds managed by George Soros with capital allocated to top managers in various sectors. Additionally, Mr. Ross managed a similar portfolio for Ocwen's principal subsidiary, Berkeley Federal Bank & Trust, with capital in excess of $100 million. Prior to joining Ocwen, Mr. Ross was a Vice President and Portfolio manager for Heritage Asset Management from April 1988 to February 1994. Mr. Ross began his investment career in 1985 at Philadelphia based Coresitates Investment Advisers. Mr. Ross graduated from the Wharton School of the University of Pennsylvania in 1985. Additionally, he is a Chartered Financial Analyst (CFA).

A    **Donald S. Uderitz, Principal** - Prior to forming Alpha LLC, Mr. Uderitz was co-head of Mortgage Trading with primary responsibility for structuring and tax arbitrage. He was a trader and portfolio manager for AVM and III from February 1995 to November 1998. Mr. Uderitz was previously with Ocwen from February 1991 to February 1995, most recently as Senior Vice President and Portfolio Manager. At Ocwen, Mr. Uderitz was responsible for tax-related securities including REMIC residuals and low-income housing tax credits. Mr. Uderitz began his investment career with the Federal Home Loan Mortgage Corporation. Mr. Uderitz received a bachelor's degree in economics from the State University of New York in 1988 and an MBA from the College of William and Mary in 1991.



**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151964

# VI.    Overview of Alpha Consultants, LLC

➤ **G. Felix Cua, Managing Director -** Prior to joining Alpha LLC, Mr. Cua was a trader and portfolio manager for AVM and III from February 1995 to December 1998. While at AVM/ III Mr. Cua had several areas of responsibility including portfolio management, trading, and creation of pricing models. His primary expertise is the formation of arbitrage opportunities with the use of swaps, options and derivative mortgage-backed securities. Prior to joining AVM/ III, Mr. Cua was employed at Ocwen where he was instrumental in the management of the Quasar Fund. From 1992-1994, Mr. Cua was an Analyst at BlackRock Financial Management specializing in total rate-of-return analysis. Mr. Cua received a bachelor's degree in economics from Cornell University in 1992 and is a Chartered Financial Analyst (CFA).

➤ **Yoshiyuki Nobumoto, Managing Director -** Prior to joining Alpha LLC, Mr. Nobumoto was a trader and portfolio manager for AVM and III from February 1995 to December 1998. Mr. Nobumoto has several areas of responsibility including portfolio management, risk analysis and trading. His primary expertise is in cash flow modeling and systems programming. Using various asset classes, he has created synthetic cash flow constructions that have resulted in superior tax advantaged performance. From November 1992 to February 1995, Mr. Nobumoto was employed with Ocwen as a Senior Associate in the investment group. While at Ocwen, Mr. Nobumoto was also responsible for the pricing, acquisition and resolution of non-performing 1-4 family loans, participating in over $2 billion in portfolio acquisitions. Mr. Nobumoto received a bachelor's degree from the School of Engineering and Applied Science of the University of Pennsylvania in 1992 and is currently a CFA level III candidate.

➤ **Ronald Buesinger, Managing Director -** Prior to joining Alpha LLC, Mr. Buesinger was with AVM/ III as a trader and portfolio manager from February 1998 to December 1998. His primary focus has been in the determination and exploitation of relative value trades between various types of structured mortgage products, including all mortgage derivatives. Prior to joining AVM and III, Mr. Buesinger was employed as a vice-president and institutional mortgage bond trader for Mercantile Bank in St. Louis, Missouri. Preceding his position at Mercantile, he was Vice-President and Manager of Mortgage Bond Trading for Boatmen's Bank capital markets group. While at Boatmen's, he was responsible for trading and hedging a $200 million mortgage position. He also spent considerable time generating trade ideas and marketing those ideas to bank customers. Mr. Buesinger began his career in February 1990, at Heritage Asset Management. From 1991 to 1993, he served as an assistant portfolio manager for all of the Heritage Funds and assets managed by Ivan Ross. Mr. Buesinger received a Bachelor's degree in finance from the University of Missouri-St. Louis in 1989.

 **THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151965

SIDL0345512

PrivLog  017

ivanross@alphaltd.net          To:  Jim Haber <JHaber@dlvgroup.com>
<ivanross                      cc:
                               Subject:  MEETING WITH MORRIE GOTTLIEB
06/23/2000 10:57 AM

Jim:

Bob was at BDO yesterday and met with Morrie Gottlieb. These are the
notes from his meeting.

Ivan

GOVERNMENT
EXHIBIT

7

## <u>MEETING WITH MORRIE GOTTLIEB</u>
### <u>8/22/00</u>

I was at BDO yesterday and the following is a summary of my conversation with Morrie about the BDO's view of the current situation:

- BDO's board is presently assessing what action they will take and it depends primarily on their ability to get legal opinions they need to complete the deals. He said they have many deals in various stages all the way through contribution to the partnership. He said if they could not get an opinion, they would roll everyone into a new structure but would not elaborate as to what type.

- He mentioned that Deutschebank has put a moratorium on the FX options trading. He expects that all the Big-5 will get out of the business. But, no matter what happens now, BDO is not getting out. Its chairman is a tax partner and they just formed a joint venture with McGladrey (owned by HR Block) for the purpose of expanding the tax consulting business. He said going forward that BDO would pursue developing a truly boutique tax solutions business, dealing only with big clients. He said they were forced into the smaller market by their competition.

- BDO considers itself the distribution channel and said they are desperate for product. He said they considered Diversified but went with ICA because they had a prior relationship with some ex-Deutschebank and Chase employees who went to ICA. He also said that they made more money with ICA than they would have would with Jimmy. He mentioned that at the beginning they charged 8% for their FX option trade, when others were at 5%.

- He expects that follow-up articles will appear in the WSJ, probably starting in late September. He said the WSJ has contacted BDO but does not know if they will be mentioned.

# FINANCIAL DERIVATIVES INVESTMENT STRATEGY

Presented By



&

Alpha Consultants, Inc.

11 BDO 00002922





# Table of Contents

I.    Investment Strategy

II.   Sample Option Trades - Range Trades

III.  Sample Option Trades - Call Spreads or Put Spreads

IV.   Investment in LLC

V.    Overview of Helios Financial LLC

VI.   Overview of Alpha Consultants, Inc.



Helios|Financial

11 BDO 00002923

# I.    Investment Strategy

***Situation:***    An individual ("**Investor**") has certain views on the direction of the equity markets (e.g. the S&P 500 or the NASDAQ 100), or of the foreign currency markets, and wants to trade based on those views in a manner that limits downside and maximizes upside and investment leverage.

## Option Spreads: Significant Upside Potential + Limited Downside

ⱱ   Helios Financial LLC ("**Helios**") and Alpha Consultants, Inc. ("**Alpha**") recommend the use of option spreads, i.e., the purchase of an option along with the simultaneous sale of a similar option at a different strike price, as a fundamental investment tool.

ⱱ   A trading strategy based on one or more combinations of option spreads could result in significant profit and investment leverage, with limited downside risk.

**Economic Factors Underlying the Investment Strategy** - The options underlying the investment strategy are European style, over the counter, custom made, digital options.

ⱱ   "European style" options are only exercisable at termination, as opposed to "American style" options which are exercisable at any time up to the termination date. However, European style options can be valued and traded at any time.

ⱱ   "Over the counter" options are not traded on any exchange.

 Helios Financial

# I.     Investment Strategy

**Economic Factors Underlying the Investment Strategy (continued)**

- "Custom Made" means all the terms of the options are negotiable and determined pursuant to five different variables listed below:

  - Underlying Market or Index
  - Direction of the Chosen Market or Index
  - Investment Time Horizon
  - Probability of Profit
  - Amount of Investment

- A "Digital Option", also known as a "binary option", has a fixed, pre-determined payoff if a certain strike price or strike range is met at the expiration of the option, and expires worthless if the option expires "out-of-the-money".

  - The market for digital options is large, with at least $87 billion of volume in 1998 alone.   *Risk*, May 2000.

**Helios Financial**

11 BDO 00002925

# I.   Investment Strategy

**Flexible Investment Strategy: Five Variables to Choose From (continued)**

(1)  Choice of Market or Index: Option spreads can be structured for certain equity indices, foreign currencies, interest rates and other exposures.  The examples in Sections II and III of this presentation are based on options on the S&P 500, the NASDAQ 100, and the Japanese Yen.

(2)  Choice of Market Direction:  Option spreads can be structured to effectuate bullish perspectives (i.e. the chosen market or index will "go up") or bearish perspectives (i.e. the chosen market or index will "go down").  They can also be structured to effectuate a perspective that the chosen specific market or index will trade within a certain range (which in itself can be "bullish", "bearish" or "neutral").  Sections II and III illustrate a variety of these types of perspectives.

(3)  Choice of Investment Time Horizons: Option spreads can accommodate a wide variety of investment time horizons.  Sections II and III illustrate 90-Day options.

(4)  Choice of Probability of Profit:  Option spreads can be designed for desired levels of profit probability (based on the Black-Scholes option pricing model).  Sections II and III illustrate scenarios where the probability of profit ranges from 15% to 40% and how such pay-offs are determined.

(5)  Choice of Amount of Investment:  The amount to be invested will be a function of investor's asset allocation strategy and comfort level with all of the foregoing variables. Sections II and III illustrate the potential returns on a $2 million investment in a variety of scenarios.

Helios Financial

11 BDO 00002926

## II.   Sample Option Trades – S&P Range Trade



**S&P 500 Range Trade Examples**
**$2,000,000 Initial Investment**

| Strike | Probability | Payoff |
|---|---|---|
| | 15% Probability | $8,058,626 Payoff |
| | 20% Probability | $6,721,002 Payoff |
| | 25% Probability | $5,764,243 Payoff |
| | 30% Probability | $5,048,474 Payoff |
| | 35% Probability | $4,486,248 Payoff |
| | 40% Probability | $4,039,082 Payoff |

Strike Range at 90-Day Expiration (Spot Today = 1153.29)

Helios Financial

11 BDO 00002927

## II. Sample Option Trades – NDQ Range Trade



**NDQ Range Trade Examples**
**$2,000,000 Initial Investment**

Strike Range at 90-Day Expiration (Spot Today = 1583.15)

Hellos Financial

11 BDO 00002928

## II.  Sample Option Trades – YEN Range Trade



11 BDO 00002929

## III. Sample Option Trades – S&P Call Spread



**S&P 500 Call Examples**

## III.   Sample Option Trades - NDQ Call Spread



NDQ Call Examples

## III.   Sample Option Trades - YEN Put Spread





Helios|Financial

# IV.    Investment in LLC

## Investment in LLC

- Investor, Alpha and a third party (the "**Co-Investor**") will form a Delaware limited liability company (the "**LLC**") for the purpose of investing and trading in option spreads and other derivative instruments on equity indices, foreign currencies or interest rates.

- Investor and Co-Investor contribute $22,500 and $427,500, respectively, in exchange for 5% and 95%, respectively, of the LLC's common interests (the "**Common Interests**").

- Investor and Alpha also contribute $3,000,000 and $50,000, respectively, in exchange for preferred interests (the "**Preferred Interests**") in the LLC. Investor's contribution may be in the form of cash and/or options previously acquired through Investor's single member LLC.

- The LLC will have been initially capitalized with a substantial amount (e.g. $3,500,000 in the example discussed herein) to invest in option-based strategies.

## Investor can convert his Preferred Interests into Common Interests at any time

- Investor may at any time convert his Preferred Interests into Common Interests.

## Management of the LLC

- Alpha will provide investment advice with respect to structuring the option strategies.

- Helios, as Manager of the LLC, will provide administrative support for the LLC, such as distributing the daily values of LLC's assets, and handling LLC documentation and record keeping responsibilities.

 Helios Financial

# IV.   Investment in LLC

### *INITIAL CAPITALIZATION* - Formation of LLC



- Investor, Alpha and Co-Investor form a Delaware limited liability company ("LLC") for the purpose of investing and trading in options and other derivative instruments on equity indices, foreign currencies or interest rates.
- Investor and Co-Investor contribute $22,500 and $427,500, respectively, in exchange for Common Interests of 5% and 95%, respectively.
- Investor and Alpha also contribute $3,000,000 and $50,000, respectively, in exchange for Preferred Interests.



Helios, Financial

11 BDO 00002934

# IV.   Investment in LLC

## Initial Capitalization Table

| | Common Cash Contribution | Preferred Cash Contribution | Total Cash | Capital Share | Profit/ Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | $ 3,000,000 | $ 3,022,500 | 86.36% | 5.00% |
| Alpha | 0 | 50,000 | 50,000 | 1.43% | 0.00% |
| Co-Investor | 427,500 | - | 427,500 | 12.21% | 95.00% |
| Total | $450,000 | $3,050,000 | $3,500,000 | 100.00% | 100.00% |

## Provisions of the LLC Operating Agreement

- After the preferred return (as described below) is paid, profits (to the extent distributed) are distributed 95% to Co-Investor and 5% to Investor.

- The LLC's gains and losses are allocated 95% to Co-Investor and 5% to Investor, except that (i) the LLC operating agreement contains a "qualified income offset" and (ii) provides that to the extent losses would decrease a member's capital account below zero, they are allocated to the other members with positive capital accounts.

- Upon liquidation of the LLC or any member's interest therein, capital accounts are first booked up or down to reflect gain or loss which would be allocated to the members if the LLC's assets were sold for fair market value.

- Each member is entitled to receive his capital account, in the event of a complete redemption of such member's interest. Each Preferred Interest carries a preferred return of 8% per year independent of LLC profits, payable semi-annually.

## Transfer of Membership Interests

- A member may transfer some or all of his interests at any time.

 Helios·Financial

11 BDO 00002935

# IV.   Investment in LLC

**_OPTIONAL CONVERSION_** - Investor may wish to convert his Preferred Interest into a Common Interest



| Investor | Alpha | Co-Investor |

Converts $3,000,000
Preferred Interest
into additional Common Interests
Now has <u>up to 98%</u> of the Common Interests

$50,000 Preferred
Interest

$427,500 Common Interest
Diluted to <u>no less than 2%</u>
of the Common Interests

**LLC**
Manager = Helios

- At some point in time, Investor may wish to convert his $3,000,000 Preferred Interest plus any unpaid preferred return into a Common Interest, in order to have a higher percentage of the LLC's profits and losses.
- In the event that the LLC's net asset value has declined to the point where Co-Investor's capital account would be zero if his interest were liquidated, under Co-Investor's Anti-Dilution Provision, Investor's common interest cannot be increased beyond 98%.

 Helios Financial

11 BDO 00002936

# IV.    Investment in LLC

**Provisions of the LLC Operating Agreement Governing Conversion of Preferred Into Common**

- Preferred Interests are convertible at any time into Common Interests on a dollar-for-dollar basis based on the net asset value of the LLC at that time, taking into consideration any accrued but unpaid preferred return and each Common Interest holder's proportional share of any LLC gains or losses up to the time of conversion.

- **Example:** Assume that Investor converts his Preferred Interest at a time when the LLC had a net asset value of $5 million and that Alpha has not converted. If we ignore accrued but unpaid preferred return, this implies that at the time of the conversion, the Common Interests had a gain of $1.5 million which would be allocated 5% ($75,000) to Investor and 95% ($1,425,000) to Co-Investor, respectively. When Investor converts his Preferred Interests into Common Interests, he would have $3,097,500, or 62.56%, of the $4,950,000 total value of the Common Interests.  See Table.

**Capitalization Table after Conversion of Investor's Preferred Interests**
**Assume LLC Net Asset Value at the time of conversion is $5,000,000**

| | Initial Common Contribution | Proportional Share of Gains or (Losses) | Conversion Proceeds | Value of Common Interests (Post-Conversion) | Profit/ Loss Share |
|---|---|---|---|---|---|
| **Investor** | $ 22,500 | $75,000 | $ 3,000,000 | $3,097,500 | 62.56% |
| **Alpha** | 0 | 0 | 0 | 0 | 0.00% |
| **Co-Investor** | 427,500 | $1,425,000 | 0 | 1,852,500 | 37.42% |
| **Total** | $450,000 | $1,500,000 | $3,000,000 | $4,950,000 | 100.0% |

 Helios Financial

11 BDO 00002937

# IV.   Investment in LLC

## Co-Investor's Anti-Dilution Provision

- Under no circumstances may a conversion cause Co-Investor to retain less than 2% of the Common Interests.

- **Example:** Assume that Investor converts his Preferred Interest at a time when the LLC had a net asset value of $3,060,000 and that Alpha has not converted. If we ignore accrued but unpaid preferred return, this implies that at the time of the conversion, the Common Interests had a loss of $440,000 which would be allocated 5% ($22,000) to Investor and 95% ($418,000) to Co-Investor, respectively. When Investor converts his Preferred Interests into Common Interests, his $3,000,500 share represents 99.68% of the $3,010,000 total value of the Common Interests, but because of Co-Investor's Anti-Dilution provision, Investor's maximum percentage interest in the Common Interests is capped at 98%.   See Table.

## Capitalization Table after Conversion of Investor's Preferred Interests
### Assume LLC Net Asset Value at the time of conversion is $3,060,000

|  | Initial Common Contribution | Proportional Share of Gains or (Losses) | Conversion Proceeds | Value of Common Interests (Post-Conversion) | Profit/ Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | ($22,000) | $3,000,000 | $3,000,500 | No greater than 98% |
| Alpha | 0 | 0 | 0 | 0 | 0.00% |
| Co-Investor | 427,500 | ($418,000) | 0 | 9,500 | No less than 2% |
| Total | $450,000 | ($440,000) | $3,000,000 | $3,010,000 | 100.0% |

 **Helios** Financial

11 BDO 00002938

## V.    Overview of Helios Financial LLC

Helios is a boutique investment banking firm headquartered in Chicago. Over the last dozen years, its principals have been engaged in the business of arranging or advising in special situations and complex financing or investment structures involving limited partnerships, limited liability companies, hybrid instruments (debt/equity), hybrid entities (pass-through versus corporate) or derivatives, such as options on foreign currencies, interest rates, commodities or equity indices.

We apply our expertise in structuring transactions that typically involve all of the following seven disciplines:

economic analysis                         book accounting
tax analysis                                 legal analysis
equity investment                          debt placement

                    deal execution / administration

The disciplines are woven together through "structuring":

- the ability to correctly analyze the necessary component parts individually;
- the understanding of how the components interact and fit together;
- the judgment and experience that enables intelligent choices to be made when "trade offs" arise; and
- the ability to produce a solution that works - all in a timely and professional manner.

There is as much art as science involved in reaching a solution.



Helios·Financial

11 BDO 00002939

## V.　Overview of Helios Financial LLC

Philosophy -　Helios is a small client focused firm whose principals embrace the following core values:

➤　We know we will get "repeat business" from our clients, whether they are equity investors, lenders or borrowers, buyers or sellers, only if we are ethical and oriented toward long-term relationships, and only if the participants in our transactions are pleased with the results.

➤　We pride ourselves on outstanding execution of transactions, which comes through creativity, hard work and a close attention to detail.

➤　We do not aspire to being big. We aspire to being the best at what we do with a strong focus on some of the most complex and highest value added transactions in mergers and acquisitions and corporate finance.

➤　We recognize our limitations. We cannot individually be leading experts in each and every discipline represented in a transaction, but we do retain the talents of some of the most creative members of nationally known legal and accounting firms for our transactions. Our expertise in being able to analyze the client's problem/opportunity, with a generalist's overview, enables us to select the particular team of national experts best suited to assist Diversified in tailoring a customized, detailed, fully integrated structure.

➤　Because our transactions are "document intensive", we view our ability to firmly manage and control the process of getting two to four sets of attorneys and accountants to expeditiously reach the desired conclusions as being one of our most valuable contributions to our clients.

 Helios｜Financial

11 BDO 00002940

# V.   Overview of Helios Financial LLC

- **Max Tan, Principal (Chicago 312-419-6150)** - Prior to forming Helios, Max was a Managing Director and head of BankAmerica's 10-person structured transactions group and 30-person corporate finance advisory group, with units located in Chicago, New York, San Francisco and Los Angeles. Prior to starting up the structured transactions group in 1995, he was a co-head of Continental Bank's lease and project finance advisory group, and before that, created and headed up a real estate finance group at an investment banking boutique in New York. Prior to 1986, he was a corporate finance and securities attorney with Davis Polk & Wardwell in New York. Max also spent four years in government, where he was the head of enforcement for the Northeastern Region of New Jersey's Division of Water Resources. Max holds a B.Sc. from M.I.T. in Mathematics, an M.S. in Mathematics from the Courant Institute of Mathematical Sciences and a J.D. (cum laude) from Harvard Law School.

- **Philip L. Kampf, Jr., Principal (Chicago 312-419-6151)** - Prior to forming Helios, Phil was a Vice President/senior transactor and a founding member of BankAmerica's structured transactions group in Chicago where he specialized in cross-border financings. Prior to founding the BankAmerica group with Max in 1995, he was responsible for equity private placements and the execution of leases and project financings in Continental Bank's lease and project finance advisory group. Prior to joining Continental Bank, he was a financial analyst in the Property Finance Group of LaSalle Partners Limited. Phil holds a B.A. in International Studies from Northwestern University and an M.B.A. from the J.L. Kellogg School of Northwestern University.

- **James Haber (New York 212-688-2706)** - Jimmy has been involved in financial services since 1978. A certified public accountant, he is a member of the AICPA and the New York Society of CPA's. He received a B.S. degree in accounting from Brooklyn College and a M.S. degree in taxation from Pace University in New York.



Helios;Financial

11 BDO 00002941

# VI.    Overview of Alpha Consultants, Inc.

· Alpha Consultants, Inc. ("Alpha"), based in Palm Beach Gardens, Florida, is engaged in trading and trade consulting for structured options and foreign currencies. A team of professionals led by Ivan Ross conducts the management of Alpha. The team has over 50 years of combined experience in identifying, analyzing, structuring and trading investment portfolios. This team also has broad expertise in investment fund management, structured finance and investment banking. Additionally, the principals of Alpha operate an NASD registered broker-dealer and a family of NFA registered private investment funds. Over the years, the team has developed numerous proprietary analytical models and disciplined investment strategies that historically have generated profitable returns with a controlled level of risk.

· From February 1995 to November 1998, the team provided trading advice and execution for the III Funds, a group of hedge funds that, as of their departure, had over $2 billion of investor capital. Ivan Ross, the President of Alpha, was a general partner of the investment advisors to the III Funds and Adams, Viner, and Mosler, Ltd., ("AVM"), an affiliated fixed-income securities NASD registered broker-dealer. During its tenure with the III Funds and AVM, the team managed a large mortgage position, which at its peak exceeded $20 billion of the funds $30 billion of assets. This component of the portfolio consistently generated profitable returns. This includes the extremely difficult 1997-1998 period when many fixed-income funds experienced dramatic losses.

· Ivan J. Ross, President - Prior to forming Alpha, Mr. Ross was co-head of Mortgage Trading with primary responsibility for the management of the domestic mortgage position in the III funds. He was a trader and portfolio manager for AVM and III from February 1995 to November 1998. Prior to joining AVM/III, Mr. Ross was a Senior Vice President and Portfolio Manager for Ocwen Financial Corporation ("Ocwen") from February 1994 to February 1995. While at Ocwen, Mr. Ross was responsible for managing the investment-grade mortgage component of the Quasar fund, with capital in excess of $250 million. Quasar is a fund of funds managed by George Soros with capital allocated to top managers in various sectors. Additionally, Mr. Ross managed a similar portfolio for Ocwen's principal subsidiary, Berkeley Federal Bank & Trust, with capital in excess of $100 million. Prior to joining Ocwen, Mr. Ross was a Vice President and Portfolio manager for Heritage Asset Management from April 1988 to February 1994. Mr. Ross began his investment career in 1985 at Philadelphia based Corestates Investment Advisers. Mr. Ross graduated from the Wharton School of the University of Pennsylvania in 1985. Additionally, he is a Chartered Financial Analyst (CFA).

 Helios|Financial

11 BDO 00002942

## VI.    Overview of Alpha Consultants, Inc.

- G. Felix Cua, Managing Director - Prior to joining Alpha, Mr. Cua was a trader and portfolio manager for AVM and III from February 1995 to December 1998. While at AVM/ III Mr. Cua had several areas of responsibility including portfolio management, trading, and creation of pricing models. His primary expertise is the formation of arbitrage opportunities with the use of swaps, options and derivative mortgage-backed securities. Prior to joining AVM/ III, Mr. Cua was employed at Oexen where he was instrumental in the management of the Quasar Fund. From 1992-1994, Mr. Cua was an Analyst at BlackRock Financial Management specializing in total rate-of-return analysis. Mr. Cua received a bachelor's degree in economics from Cornell University in 1992 and is a Chartered Financial Analyst (CFA).

- Yoshiyuki Nobumoto, Managing Director - Prior to joining Alpha, Mr. Nobumoto was a trader and portfolio manager for AVM and III from February 1995 to December 1998. Mr. Nobumoto has several areas of responsibility including portfolio management, risk analysis and trading. His primary expertise is in cash flow modeling and systems programming. Using various asset classes, he has created synthetic cash flow constructions that have resulted in superior tax advantaged performance. From November 1992 to February 1995, Mr. Nobumoto was employed with Oexen as a Senior Associate in the investment group. While at Oexen, Mr. Nobumoto was also responsible for the pricing, acquisition and resolution of non-performing 1-4 family loans, participating in over $2 billion in portfolio acquisitions. Mr. Nobumoto received a bachelor's degree from the School of Engineering and Applied Science of the University of Pennsylvania in 1992 and is a Chartered Financial Analyst (CFA).

- Ronald Buesinger, Managing Director - Prior to joining Alpha, Mr. Buesinger was with AVM/ III as a trader and portfolio manager from February 1998 to December 1998. His primary focus has been in the determination and exploitation of relative value trades between various types of structured mortgage products, including all mortgage derivatives. Prior to joining AVM and III, Mr. Buesinger was employed as a vice-president and institutional mortgage bond trader for Mercantile Bank in St. Louis, Missouri. Preceding this position at Mercantile, he was Vice-President and Manager of Mortgage Bond Trading for Boatmen's Bank capital markets group. While at Boatmen's, he was responsible for trading and hedging a $200 million mortgage position. He also spent considerable time generating trade ideas and marketing those ideas to bank customers. Mr. Buesinger began his career in February 1990, at Heritage Asset Management. From 1991 to 1993, he served as an assistant portfolio manager for all of the Heritage Funds and assets managed by Ivan Ross. Mr. Buesinger received a Bachelor's degree in finance from the University of Missouri-St. Louis in 1989.

 Helios Financial

**11 BDO 00002943**



**THE DIVERSIFIED GROUP INCORPORATED**
950 THIRD AVENUE. 23RD FLOOR, NEW YORK, NEW YORK 10022   TEL: (212) 688-2700   (800) 841-1132   FAX: (212) 688-7908

# MEMORANDUM
## Via FedEx

**TO:**       Israel Press                    **DATE:**     June 27, 2001

**FROM:**   James Haber

This is to confirm that the enclosed materials will not be distributed to anybody.

EXHIBIT
E
3/4/03   M E

GOVERNMENT
EXHIBIT
PENGAD-Bayonne, N. J.
9

CONFIDENTIAL                                         GT    00725

# FINANCIAL DERIVATIVES
# INVESTMENT STRATEGY

Presented By

**THE DIVERSIFIED GROUP INCORPORATED**

# Table of Contents

I.      Investment Strategy

II.     Sample Option Trades - Range Trades

III.    Sample Option Trades - Call Spreads or Put Spreads

IV.     Investment in LLC

V.      Investor's Option to Purchase Additional Common

VI.     Investor's Conversion Option

VII.    Overview of The Diversified Group Incorporated

VIII.   Overview of Alpha Consultants LLC

**DG THE DIVERSIFIED GROUP INCORPORATED**

GT 00728

# I. Investment Strategy

**_Situation:_** An individual ("**Investor**") has certain views on the direction of the equity markets, and wants (e.g. the S&P 500 or the NASDAQ 100), or of the foreign currency markets, and wants to trade based on those views in a manner that limits downside and maximizes upside and investment leverage.

## Option Spreads: Significant Upside Potential + Limited Downside

▸ The Diversified Group Incorporated ("**Diversified**") and Alpha Consultants LLC ("**Alpha**") recommend the use of option spreads, i.e., the purchase of an option along with the simultaneous sale of a similar option at a different strike price, as a fundamental investment tool.

▸ A trading strategy based on one or more combinations of option spreads could result in significant profit and investment leverage, with limited downside risk.

**Economic Factors Underlying the Investment Strategy** - The options underlying the investment strategy are European style, over the counter, custom made, digital options.

▸ "European style" options are only exercisable at termination, as opposed to "American style" options which are exercisable at any time up to the termination date. However, European style options can be valued and traded at any time.

▸ "Over the counter" options are not traded on any exchange.

 **THE DIVERSIFIED GROUP INCORPORATED**

# I.    Investment Strategy

**Economic Factors Underlying the Investment Strategy (continued)**

"Custom Made" means all the terms of the options are negotiable and determined pursuant to five different variables listed below:

- Underlying Market or Index
- Direction of the Chosen Market or Index
- Investment Time Horizon
- Probability of Profit
- Amount of Investment

A "Digital Option", also known as a "binary option", has a fixed, pre-determined payoff if a certain strike price or strike range is met at the expiration of the option, and expires worthless if the option expires "out-of-the-money". _Risk_.

- The market for digital options is large, with at least $87 billion of volume in 1998 alone. May 2000.

**THE DIVERSIFIED GROUP INCORPORATED**

# I. Investment Strategy

**Flexible Investment Strategy: Five Variables to Choose From (continued)**

(1) **Choice of Market or Index:** Option spreads can be structured for certain equity indices, foreign currencies, interest rates and other exposures. The examples in Sections II and III of this presentation are based on options on the S&P 500, the NASDAQ 100, and the Japanese Yen.

(2) **Choice of Market Direction:** Option spreads can be structured to effectuate <u>bullish</u> perspectives (i.e. the chosen market or index will "go up") or <u>bearish</u> perspectives (i.e. the chosen market or index will "go down"). They can also be structured to effectuate a perspective that the chosen specific market or index will trade within a certain range (which in itself can be "bullish", "bearish" or "neutral"). Sections II and III illustrate a variety of these types of perspectives.

(3) **Choice of Investment Time Horizons:** Option spreads can accommodate a wide variety of investment time horizons. Sections II and III illustrate 90-Day options.

(4) **Choice of Probability of Profit:** Option spreads can be designed for desired levels of profit probability (based on the Black-Scholes option pricing model). Sections II and III illustrate scenarios where the probability of profit ranges from 15% to 40% and how such pay-offs are determined.

(5) **Choice of Amount of Investment:** The amount to be invested will be a function of Investor's asset allocation strategy and comfort level with all of the foregoing variables. Sections II and III illustrate the potential returns on a $2 million investment in a variety of scenarios.

**THE DIVERSIFIED GROUP INCORPORATED**

CONFIDENTIAL

GT    00730



## II.  Sample Option Trades – S&P Range Trade



**S&P 500 Range Trade Examples**
**$2,000,000 Initial Investment**

1178.74 — 15% Probability $5,058,626 Payoff — 1127.84

1187.38 — 20% Probability $5,721,002 Payoff — 1119.20

1196.16 — 25% Probability $5,764,243 Payoff — 1110.42

1205.13 — 30% Probability $5,915,474 Payoff — 1101.45

1214.33 — 35% Probability $4,486,248 Payoff — 1092.25

1223.81 — 40% Probability $4,039,082 Payoff — 1082.77

THE DIVERSIFIED GROUP INCORPORATED

CONFIDENTIAL

GT   00731

# II. Sample Option Trades – NDQ Range Trade



**NDQ Range Trade Examples**
**$2,000,000 Initial Investment**

THE DIVERSIFIED GROUP INCORPORATED

CONFIDENTIAL

# II. Sample Option Trades – YEN Range Trade



Yen Range Trade (Sample)
$2,000,000 Initial Investment

15% Probability
$9,071,559 Payoff

20% Probability
$6,722,907 Payoff

25% Probability
$5,757,071 Payoff

30% Probability
$5,048,661 Payoff

35% Probability
$4,465,662 Payoff

40% Probability
$4,041,582 Payoff

THE DIVERSIFIED GROUP INCORPORATED

CONFIDENTIAL

GT 00733

# III.   Sample Option Trades – S&P Call Spread



S&P 500 Call Examples

THE DIVERSIFIED GROUP INCORPORATED

CONFIDENTIAL

# III.   Sample Option Trades - NDQ Call Spread



NDQ Call Examples

THE DIVERSIFIED GROUP INCORPORATED

CONFIDENTIAL

GT   00735



III. Sample Option Trades - YEN Put Spread

CONFIDENTIAL

GT 00736

# IV.   Investment in LLC

## Investment in LLC

Investor, Alpha, Diversified and a fourth party (the "**Co-Investor**") will form a Delaware limited liability company (the "**LLC**") for the purpose of investing and trading in option spreads and other derivative instruments on equity indices, foreign currencies or interest rates.

Investor and Co-Investor contribute $22,500 and $427,500, respectively, in exchange for 5% and 95%, respectively, of the LLC's common interests (the "**Common Interests**").

Investor, Alpha and Diversified also contribute $3,000,000, $25,000 and $25,000, respectively, in exchange for preferred interests (the "**Preferred Interests**") in the LLC. Investor's contribution may be in the form of cash and/or options previously acquired through Investor's single member LLC.

The LLC will have been initially capitalized with a substantial amount (e.g. $3,500,000 in the example discussed herein) to invest in option-based strategies.

## Investor's Call Option and Conversion Option

Investor may purchase up to 93% of the outstanding Common Interests from Co-Investor.

Investor may at any time convert his Preferred Interests into Common Interests.

## Management of the LLC

Alpha will provide investment advice with respect to structuring the option strategies.

Diversified, as Manager of the LLC, will provide administrative support for the LLC, such as distributing the daily values of LLC's assets, and handling LLC documentation and record keeping responsibilities.

THE DIVERSIFIED GROUP INCORPORATED

GT   00737



# IV.   Investment in LLC

## *INITIAL CAPITALIZATION* - Formation of LLC

**Co-Investor**

Contributes $427,500 for 95% of the Common Interests

**Alpha / Diversified**

Contribute $50,000 for Preferred Interests

**LLC**

Manager = Diversified
Initial Capital = $3,500,000

Contributes
$22,500 for 5% of the Common Interests
$3,000,000 for Preferred Interests

Investor, Alpha, Diversified and Co-Investor form a Delaware limited liability company ("LLC") for the purpose of investing and trading in options and other derivative instruments on equity indices, foreign currencies or interest rates.
Investor and Co-Investor contribute $22,500 and $427,500, respectively, in exchange for Common Interests of 5% and 95%, respectively.
Investor, Alpha and Diversified also contribute $3,000,000 and $50,000, respectively, in exchange for Preferred Interests.

**THE DIVERSIFIED GROUP INCORPORATED**

# IV. Investment in LLC

## Initial Capitalization Table

| | Common Cash Contribution | Preferred Cash Contribution | Total Cash | Capital Share | Profit/ Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | $ 3,000,000 | $ 3,022,500 | 86.36% | 5.00% |
| Alpha | 0 | 25,000 | 25,000 | 0.71% | 0.00% |
| Diversified | 0 | 25,000 | 25,000 | 0.71% | 0.00% |
| Co-Investor | 427,500 | | 427,500 | 12.21% | 95.00% |
| Total | $450,000 | $3,050,000 | $3,500,000 | 100.00% | 100.00% |

## Provisions of the LLC Operating Agreement

After the preferred return (as described below) is paid, profits (to the extent distributed) are distributed 95% to Co-Investor and 5% to Investor.

The LLC's gains and losses are allocated 95% to Co-Investor and 5% to Investor, except that (i) the LLC operating agreement contains a "qualified income offset" and (ii) provides that to the extent losses would decrease a member's capital account below zero, they are allocated to the other members with positive capital accounts.

Upon liquidation of the LLC or any member's interest therein, capital accounts are first booked up or down to reflect gain or loss which would be allocated to the members if the LLC's assets were sold for fair market value.

Each member is entitled to receive his capital account, in the event of a complete redemption of such member's interest. Each Preferred Interest carries a preferred return of 8% per year independent of LLC profits, payable semi-annually.

## Transfer of Membership Interests

A member may transfer some or all of his interests at any time.

## THE DIVERSIFIED GROUP INCORPORATED

CONFIDENTIAL

# V.     Investor's Option to Purchase Additional Common

**_OPTION TO PURCHASE ADDITIONAL COMMON_** - Investor may wish to purchase additional Common Interests from Co-Investor



93% Common Interests

$ FMV

Co-Investor

2% of the Common Interests

LLC
Manager = Diversified

Alpha / Diversified

$50,000 Preferred Interest

After the purchase from Co-Investor, has up to 98% of the Common Interests and $3,000,000 of the Preferred Interests

At some point in time, Investor may wish to purchase additional Common Interests (up to 93%) from Co-Investor in order to have a higher percentage of the LLC's profits and losses. Investor's purchase price is the greater of (i) the amount of the capital account (adjusted to reflect the fair market value of LLC's assets at the time) allocable to the interests being purchased or (ii) the amount of any *bona fide* third party purchase offer obtained by Co-Investor within 48 hours of being notified of Investor's intent to purchase.

## THE DIVERSIFIED GROUP INCORPORATED

# V.    Investor's Option to Purchase Additional Common

## Provisions of the LLC Operating Agreement Governing Investor's Option to Purchase Additional Common Interests from Co-Investor

Investor has the option at any time to purchase up to 93% of the 95% Common Interests held by Co-Investor for the greater of (i) the amount of the capital account (adjusted to reflect the fair market value of the LLC's assets at the time) allocable to the interests being purchased or (ii) the amount of any *bona fide* offer from a third party to purchase such interest obtained by Co-Investor within 48 hours of being notified of Investor's intent to purchase.

**Example.** Assume that Investor exercises the option at a time when the LLC had a net asset value of $5 million and that none of Alpha, Diversified or Investor has exercised an option to convert Preferred into Common. If we ignore accrued but unpaid preferred return, this implies that at the time of the conversion, the Common Interests had a gain of $1.5 million which would be allocated 5% ($75,000) to Investor and 95% ($1,425,000) to Co-Investor, respectively. Investor has the option to purchase up to 93% of the 95% Common Interests held by Co-Investor for $1,813,500. See Table.

Capitalization Table after Purchase of Common Interests held by Co-Investor
LLC Net Asset Value at the time of purchase is $5,000,000

| | Initial Common Contribution | Proportional Share of Gains or (Losses) | Value of Common Interests (Before Acquisition) | Value of Common Interests (After Acquisition) | Profit/Loss Share (After Acquisition) |
|---|---|---|---|---|---|
| Investor | $ 22,500 | $75,000 | $ 97,500 | $1,911,000 | 98.00% |
| Alpha | 0 | 0 | 0 | 0 | 0.00% |
| Diversified | 0 | 0 | 0 | 0 | 0.00% |
| Co-Investor | 427,500 | 1,425,000 | 1,852,500 | $39,000 | 2.00% |
| Total | $450,000 | $1,500,000 | $1,950,000 | $1,950,000 | 100.0% |

## THE DIVERSIFIED GROUP INCORPORATED

# V. Investor's Option to Purchase Additional Common

**Example:** Assume that Investor exercises the option at a time when the LLC had a net asset value of $3,060,000 and that none of Alpha, Diversified or Investor has exercised an option to convert Preferred into Common. If we ignore accrued but unpaid preferred return, this implies that at the time of the conversion, the Common Interests had a loss of $440,000 which would be allocated 5% ($22,000) to Investor and 95% ($418,000) to Co-Investor, respectively. Investor has the option, to purchase up to 93% of the 95% Common Interests held by Co-Investor for $9,300. See Table.

Capitalization Table after Purchase of Common Interests held by Co-Investor
LLC Net Asset Value at the time of purchase is $3,060,000

| | Initial Common Contribution | Proportional Share of Gains or (Losses) | Value of Common Interests (Before Acquisition) | Value of Common Interests (After Acquisition) | Profit/ Loss Share (After Acquisition) |
|---|---|---|---|---|---|
| Investor | $ 22,500 | ($22,000) | $ 500 | $9,800 | 98.00% |
| Alpha | 0 | 0 | 0 | 0 | 0.00% |
| Diversified | 0 | 0 | 0 | 0 | 0.00% |
| Co-Investor | 427,500 | ($418,000) | $9,500 | $200 | 2.00% |
| Total | $450,000 | ($440,000) | $10,000 | $10,000 | 100.0% |

**THE DIVERSIFIED GROUP INCORPORATED**

# VI.　Investor's Conversion Option



**OPTIONAL CONVERSION** - Investor may wish to convert his Preferred Interest into a Common Interest

Converts $3,000,000 Preferred Interest into additional Common Interests Now has up to 98% of the Common Interests

$50,000 Preferred Interest

$427,500 Common Interest Diluted to no less than 2% of the Common Interests

Co-Investor

Other Diversified

LLC Manager = Diversified

At some point in time, Investor may wish to convert his $3,000,000 Preferred Interest plus any unpaid preferred return into a Common Interest, in order to have a higher percentage of the LLC's profits and losses. In the event that the LLC's net asset value has declined to the point where Co-Investor's capital account would be zero if his interest were liquidated, under Co-Investor's Anti-Dilution Provision, Investor's common interest cannot be increased beyond 98%.

## THE DIVERSIFIED GROUP INCORPORATED

# VI.   Investor's Conversion Option

## Provisions of the LLC Operating Agreement Governing Conversion of Preferred into Common

Preferred Interests are convertible at any time into Common Interests on a dollar-for-dollar basis based on the net asset value of the LLC at that time, taking into consideration any accrued but unpaid preferred return and each Common Interest holder's proportional share of any LLC gains or losses up to the time of conversion.

**Example:** Assume that Investor converts his Preferred Interest at a time when the LLC had a net asset value of $5 million and that Alpha and Diversified have not converted. If we ignore accrued but unpaid preferred return, this implies that at the time of the conversion, the Common Interests had a gain of $1.5 million which would be allocated 5% ($75,000) to Investor and 95% ($1,425,000) to Co-Investor, respectively. When Investor converts his Preferred Interests into Common Interests, he would have $3,097,500, or 62.58%, of the $4,950,000 total value of the Common Interests. See Table.

**Capitalization Table after Conversion of Investor's Preferred Interests**
**Assume LLC Net Asset Value at the time of conversion is $5,000,000**

| | Initial Common Contribution | Proportional Share of Gains or (Losses) | Conversion Proceeds | Value of Common Interests (Post-Conversion) | Profit/Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | $75,000 | $3,000,000 | $3,097,500 | 62.58% |
| Alpha | 0 | 0 | 0 | 0 | 0.00% |
| Diversified | 0 | 0 | 0 | 0 | 0.00% |
| Co-Investor | 427,500 | 1,425,000 | | 1,852,500 | 37.42% |
| Total | $450,000 | $1,500,000 | $3,000,000 | $4,950,000 | 100.0% |

## THE DIVERSIFIED GROUP INCORPORATED

# VI.  Investor's Conversion Option

**Co-Investor's Anti-Dilution Provision**

Under no circumstances may a conversion cause Co-Investor to retain less than 2% of the Common Interests.

**Example:** Assume that Investor converts his Preferred Interest at a time when the LLC had a net asset value of $3,060,000 and that Alpha and Diversified have not converted. If we ignore accrued but unpaid preferred return, this implies that at the time of the conversion, the Common Interests had a loss of $440,000 which would be allocated 5% ($22,000) to Investor and 95% ($418,000) to Co-Investor, respectively. When Investor converts his Preferred Interests into Common Interests, his $3,000,500 share represents 99.68% of the $3,010,000 total value of the Common Interests, but because of Co-Investor's Anti-Dilution provision, Investor's maximum percentage interest in the Common Interests is capped at 98%. See Table.

**Capitalization Table after Conversion of Investor's Preferred Interests**
Assume LLC Net Asset Value at the time of conversion is $3,060,000

| | Initial Common Contribution | Proportional Share of Gains or (Losses) | Conversion Proceeds | Value of Common Interests (Post-Conversion) | Profit/ Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | ($22,000) | $ 3,000,000 | $3,000,500 | No greater than 98% |
| Alpha | 0 | 0 | 0 | 0 | 0.00% |
| Diversified | 0 | 0 | 0 | 0 | 0.00% |
| Co-Investor | 427,500 | ($418,000) | | 9,500 | No less than 2% |
| Total | $450,000 | ($440,000) | $3,000,000 | $3,010,000 | 100.0% |

**THE DIVERSIFIED GROUP INCORPORATED**

# VII.    Overview of The Diversified Group Incorporated

Diversified is a boutique merchant banking firm headquartered in New York. Over the last twenty years, its principals have been engaged in the business of arranging or investing in, special situations and complex financing or investment structures involving limited partnerships, limited liability companies, hybrid instruments (debt/equity), hybrid entities (pass-through versus corporate) or derivatives, such as options on foreign currencies, interest rates, commodities or equity indices. Diversified usually acts as a principal, but depending upon the needs of the transaction, we may also act as the investment banker.

We apply our expertise in structuring transactions that typically involve all of the following seven disciplines:

economic analysis                    book accounting

tax analysis                         legal analysis

equity investment                    debt placement

                deal execution / administration

The disciplines are woven together through "structuring":

- the ability to correctly analyze the necessary component parts individually;
- the understanding of how the components interact and fit together;
- the judgment and experience that enables intelligent choices to be made when "trade offs" arise; and
- the ability to produce a solution that works - all in a timely and professional manner.

There is as much art as science involved in reaching a solution.

## THE DIVERSIFIED GROUP INCORPORATED

# VII.    Overview of The Diversified Group Incorporated

**Philosophy -** Diversified is a small and highly successful firm whose principals embrace the following core values:

We know we will get "repeat business" from our clients, whether they are equity investors, lenders or borrowers, buyers or sellers, only if we are ethical and oriented toward long-term relationships, and only if the participants in our transactions are pleased with the results.

We pride ourselves on outstanding execution of transactions, which comes through creativity, hard work and a close attention to detail.

We do not aspire to being big. We aspire to being the best at what we do with a strong focus on some of the most complex and highest value added transactions in mergers and acquisitions and corporate finance.

We recognize our limitations. We cannot individually be leading experts in each and every discipline represented in a transaction, but we do retain the talents of some of the most creative members of nationally known legal and accounting firms for our transactions. Our expertise in being able to analyze the client's problem/opportunity, with a generalist's overview, enables us to select the particular team of national experts best suited to assist Diversified in tailoring a customized, detailed, fully integrated structure.

Because our transactions are "document intensive", we view our ability to firmly manage and control the process of getting two to four sets of attorneys and accountants to expeditiously reach the desired conclusions as being one of our most valuable contributions to our clients.

**THE DIVERSIFIED GROUP INCORPORATED**

# VII.    Overview of The Diversified Group Incorporated

<u>Principals - New York Office (212-688-2700)</u>

**James Haber, President (New York)** - Jimmy is the company's founder and has been involved in financial services since 1978. A certified public accountant, he is a member of the AICPA and the New York Society of CPA's. He received a B.S. degree in accounting from Brooklyn College and a M.S. degree in taxation from Pace University in New York.

**John Huber, Chief Financial Officer (New York)** - John has extensive experience in the financial services industry, both in public accounting and in private industry. As a tax manager at Arthur Andersen, he gained extensive experience in the owner managed business area, as well as in the real estate, banking, equipment leasing and manufacturing industries. Upon leaving Arthur Andersen, he became chief financial officer of one of his clients, an investment company which sponsored the formation of numerous investment entities. John returned to the field of public accounting in 1989, when he established his practice which later merged to form the firm Weeks, Holderbaum, Huber & DeGraw, LLP. Recently, he has taken a leave of absence from the firm to become Diversified's Chief Financial Officer. John holds a B.S. in Business Administration from California Polytechnic State University, San Luis Obispo, and attended graduate studies in taxation at Golden Gate University in San Francisco. He is a member of the New Jersey Society of Certified Public Accountants and the American Institute of Certified Public Accountants.

**Orrin Tilevitz, Vice President and General Counsel  (New York)** - Orrin has over twenty years of experience in numerous areas of federal, state and local income taxation. Prior to joining Diversified, Orrin was a Director in the International Tax Services Group of PricewaterhouseCoopers LLP, where he represented multinational corporations engaged in cross-border transactions. Prior to that he spent over two years in the International Tax Group of Deloitte & Touche LLP. He began his career as a tax lawyer in 1979 with Willkie, Farr & Gallagher in New York. Orrin received his B.A. degree, Cum Laude in the Biochemical Sciences, from Harvard College: ···ere he was the speaker at the undergraduate commen··  ·ent exercises, his J.D. degree from Columbia University School of Law, where he was a Harlan Fiske Stone Scholar, and hi· ·· L.M. in Taxation from New York University School of Law.

# THE DIVERSIFIED GROUP INCORPORATED

# VII.   Overview of The Diversified Group Incorporated

## Principals - Chicago Office (312-419-6150)

**Mox Tan, Managing Director (Chicago)** - Prior to joining The Diversified Group, Mox was a Managing Director and head of BankAmerica's 10-person structured transactions group and 30-person corporate finance advisory group, with units located in Chicago, New York, San Francisco and Los Angeles. Prior to starting up the structured transactions group in 1995, he was a co-head of Continental Bank's lease and project finance advisory group, and before that, created and headed up a real estate finance group at an investment banking boutique in New York. Prior to 1986, he was a corporate finance and securities attorney with Davis Polk & Wardwell in New York. Mox also spent four years in government, where he was the head of enforcement for the Northeastern Region of New Jersey's Division of Water Resources. Mox holds a B.Sc. from M.I.T. in Mathematics, an M.S. in Mathematics from the Courant Institute of Mathematical Sciences and a J.D. (cum laude) from Harvard Law School.

**Philip L. Kampf, Jr., Managing Director (Chicago)** - Prior to joining The Diversified Group, Phil was a Vice President/senior transactor and a founding member of BankAmerica's structured transactions group in Chicago where he specialized in cross-border financings. Prior to founding the BankAmerica group with Mox in 1995, he was responsible for equity private placements and the execution of leases and project financings in Continental Bank's lease and project finance advisory group. Prior to joining Continental Bank, he was a financial analyst in the Property Finance Group of LaSalle Partners Limited. Phil holds a B.A. in International Studies from Northwestern University and an M.B.A. from the J.L. Kellogg School of Northwestern University.

**THE DIVERSIFIED GROUP INCORPORATED**

# VIII.    Overview of Alpha Consultants LLC

Alpha Consultants LLC ("Alpha"), based in Palm Beach Gardens, Florida, is engaged in trading and trade consulting for structured options and foreign currencies. A team of professionals led by Ivan Ross conducts the management of Alpha. The team has over 50 years of combined experience in identifying, analyzing, structuring and trading investment portfolios. This team also has broad expertise in investment fund management, structured finance and investment banking. Additionally, the principals of Alpha operate an NASD registered broker-dealer and a family of NFA registered private investment funds. Over the years, the team has developed numerous proprietary analytical models and disciplined investment strategies that historically have generated profitable returns with a controlled level of risk.

From February 1995 to November 1998, the team provided trading advice and execution for the III Funds, a group of hedge funds that, as of their departure, had over $2 billion of investor capital. Ivan Ross, the President of Alpha, was a general partner of the investment advisors to the III Funds and Adams, Viner, and Mosler, Ltd., ("AVM"), an affiliated fixed-income securities NASD registered broker-dealer. During its tenure with the III Funds and AVM, the team managed a large mortgage position, which at its peak exceeded $20 billion of the funds $30 billion of assets. This component of the portfolio consistently generated profitable returns. This includes the extremely difficult 1997-1998 period when many fixed-income funds experienced dramatic losses.

Ivan J. Ross, President - Prior to forming Alpha, Mr. Ross was co-head of Mortgage Trading with primary responsibility for the management of the domestic mortgage position in the III funds. He was a trader and portfolio manager for AVM and III from February 1995 to November 1998. Prior to joining AVM/III, Mr. Ross was a Senior Vice President and Portfolio Manager for Ocwen Financial Corporation ("Ocwen") from February 1994 to February 1995. While at Ocwen, Mr. Ross was responsible for managing the investment-grade mortgage component of the Quasar fund, with capital in excess of $250 million. Quasar is a fund of funds managed by George Soros with capital allocated to top managers in various sectors. Additionally, Mr. Ross managed a similar portfolio for Ocwen's principal subsidiary, Berkeley Federal Bank & Trust, with capital in excess of $100 million. Prior to joining Ocwen, Mr. Ross was a Vice President and Portfolio manager for Heritage Asset Management from April 1988 to February 1994. Mr. Ross began his investment career in 1985 at Philadelphia based Corestates Investment Advisers. Mr. Ross graduated from the Wharton School of the University of Pennsylvania in 1985. Additionally, he is a Chartered Financial Analyst (CFA).

# THE DIVERSIFIED GROUP INCORPORATED

# VIII.    Overview of Alpha Consultants LLC

**G. Felix Cua, Managing Director** - Prior to joining Alpha, Mr. Cua was a trader and portfolio manager for AVM and III from February 1995 to December 1998. While at AVM/ III Mr. Cua had several areas of responsibility including portfolio management, trading, and creation of pricing models. His primary expertise is the formation of arbitrage opportunities with the use of swaps, options and derivative mortgage-backed securities. Prior to joining AVM/ III, Mr. Cua was employed at Ocwen where he was instrumental in the management of the Quasar Fund. From 1992-1994, Mr. Cua was an Analyst at BlackRock Financial Management specializing in total rate-of-return analysis. Mr. Cua received a bachelor's degree in economics from Cornell University in 1992 and is a Chartered Financial Analyst (CFA).

**Yoshiyuki Nobumoto, Managing Director** - Prior to joining Alpha, Mr. Nobumoto was a trader and portfolio manager for AVM and III from February 1995 to December 1998. Mr. Nobumoto has several areas of responsibility including portfolio management, risk analysis and trading. His primary expertise is in cash flow modeling and systems programming. Using various asset classes, he has created synthetic cash flow constructions that have resulted in superior tax advantaged performance. From November 1992 to February 1995, Mr. Nobumoto was employed with Ocwen as a Senior Associate in the investment group. While at Ocwen, Mr. Nobumoto was also responsible for the pricing, acquisition and resolution of non-performing 1-4 family loans, participating in over $2 billion in portfolio acquisitions. Mr. Nobumoto received a bachelor's degree from the School of Engineering and Applied Science of the University of Pennsylvania in 1992 and is a Chartered Financial Analyst (CFA).

**Ronald Buesinger, Managing Director** - Prior to joining Alpha, Mr. Buesinger was with AVM/ III as a trader and portfolio manager from February 1995 to December 1998. His primary focus has been in the determination and exploitation of relative value trades between various types of structured mortgage products, including all mortgage derivatives. Prior to joining AVM and III, Mr. Buesinger was employed as a vice-president and institutional mortgage bond trader for Mercantile Bank in St. Louis, Missouri. Preceding his position at Mercantile, he was Vice-President and Manager of Mortgage Bond Trading for Boatmen's Bank capital markets group. While at Boatmen's, he was responsible for trading and hedging a $200 million mortgage position. He also spent considerable time generating trade ideas and marketing those ideas to bank customers. Mr. Buesinger began his career in February 1990, at Heritage Asset Management. From 1991 to 1993, he served as an assistant portfolio manager for all of the Heritage Funds and assets managed by Ivan Ross. Mr. Buesinger received a Bachelor's degree in finance from the University of Missouri-St. Louis in 1989.

# THE DIVERSIFIED GROUP INCORPORATED

**From:**      Charles Bee
**To:**        Robert Greisman
**Date:**      Thu, Apr 5, 2001  3:38 PM
**Subject:**   Re: Fees-New Transaction

The "all-in" cost to the investor is lower and the Jimmy pays legal fees. This should mean that we can take the difference. I didn't think that it was hugely greater for us. I do think we have got to agree on the amount of the investment by the taxpayer based on his schedule. Obviously, the higher the better. We need to decide this by Monday. What do you think? Let's send to the Opinion Committee for their review. Jim thinks that an "all-in" cost to the client of 10% is the ceiling. We have done much better. This will be a market driven analysis but we should set parameters and targets.   I don't think Michael's 10% equity will fly.

>>> Robert Greisman 04/05/01 04:15PM >>>
Charlie:
When we have our TOC call on Monday at 10 on the new deal, we should also cover pricing and fees. (You should have received a pricing sheet from Jimmy after our call with him early in the week.) In comparing to Gramercy, I think it's about the same fee to us. Assuming no expenses in Gramercy deal, we net 4.6 (capital at 7% x 2/3) and 8.6% ordinary (10% x 2/3). With Jimmy, it looks like we'd be at 4.5% capital and 6% ordinary. (see his worksheet.) Moreover, if he's only taking 2.25% I presume we'll be on our own in absorbing ADC fees, whereas Gramercy shares them with us. All that said, not a bad deal with Jimmy, but not head and shoulders better than Gramercy. Let me know if you see it differently.
Bob

        Cooperation...     Collaboration...     Concentration...     Communication...



GOVERNMENT EXHIBIT
10

GOVERNMENT'S EXHIBIT
A-47

7 BDO 00001567

Robert Greisman - Re: Fees-New Transaction                                                Page 1

**From:**     Charles Bee
**To:**       Robert Greisman
**Date:**     Thu, Apr 5, 2001  3:45 PM
**Subject:**  Re: Fees-New Transaction

I went over Diversified's "listing" analysis.  It raises some interesting points, in particular, #5 but I don't see how they are concluding that simply having a 5% of tax profit potential exempts promoters from listing. However, this is not inconsistent with the IRS boast that none of the deals have "any" profit potential".

Did you see that the OTSA is setting up teams for each promoter.  this worries me about Diversified and ICA/Bricolage.  The newspapers have contacted all of them as well as us.  We got our letter.  They are putting together information about us and them.  I think we ought to be hedging our bets.  They don't have "privilege".  I think we should go forward with Gramercy on some kind of transaction, similar to the ICA deal and Diversified's deal but different.  We should also go forward with Bricolage for the time being. What do you think?

>>> Robert Greisman 04/05/01 04:15PM >>>
Charlie:
When we have our TOC call on Monday at 10 on the new deal, we should also cover pricing and fees. (You should have received a pricing sheet from Jimmy after our call with him early in the week.) In comparing to Gramercy, I think it's about the same fee to us. Assuming no expenses in Gramercy deal, we net 4.6 (capital at 7% x 2/3) and 6.6% ordinary (10% x 2/3). With Jimmy, it looks like we'd be at 4.5% capital and 6% ordinary. (see this worksheet.) Moreover, if he's only taking 2.25% I presume we'll be on our own in absorbing ADC fees, whereas Gramercy shares them with us. All that said, not a bad deal with Jimmy, but not head and shoulders better than Gramercy. Let me know if you see it differently.
Bob

        Cooperation...    Collaboration...    Concentration...    Communication...

GOVERNMENT
EXHIBIT
11

GOVERNMENT'S
EXHIBIT
A-48

7 BDO 00001566

45-1

Thoughts: I'd like to see more of an "investment story"... desire to engage in some form of "alternative" investments... and that BDO is employed to evaluate tax aspects of structure. Client could do this trading or could employ a strategy that provides a tax advantage.

Add fee to DiV, w/ Cons agreement w/ DiV group + client ... gives us better chance of getting fee — but no privilege.

GOVERNMENT'S
EXHIBIT
A-49

7 BDO 00001568


GOVERNMENT
EXHIBIT
12

4.6 + 6.6 =
Dismissed
club

1-5    C    0

Notional 20,000,000

Client

invests Total of 15% [for 3 years]
# 3,000,000

Options = 4.75% (if Capital)
7.0% (if ordinary)

BDO fee 4½% (capital)
6% (ordinary)

story is that BDO will engage in
a broad range of Tax planning
(all subject to privilege)
do we need some other
"deliverables" to justify fee
i.e. Lincoln?
Tax review letter
Standby Consulting?

7 BDO 00001572

Lawrence Cohen - Approval for New Structure | Page 1

| | |
|---|---|
| **From:** | Robert Greisman |
| **To:** | Charles Bee;  Denis Field;  Lawrence Cohen;  Lorin... |
| **Date:** | Tue, Apr 17, 2001  9:09 AM |
| **Subject:** | Approval for New Structure |

Attached are two items: an outline for a transaction structure, and comments and revisions from Michael. I believe the committee received these items previously, so neither should look new. In any case, so that we may move forward quickly, please provide your approval, disapproval or comments/questions by email to the group no later than the close of business Friday. The intent is to have opinion writers look at the transaction and to move forward with showing it to clients, so your prompt response is appreciated.
Bob

Cooperation...　　Collaboration...　　Concentration...　　Communication...

**CC:** Michael Kerekes

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW

1 BDO P 035466

GOVERNMENT EXHIBIT
13

GOVERNMENT'S EXHIBIT
A-51

1. Original Investor, a foreign person ("OI"), and Advisor ("A") form a partnership, LLC-1, contributing $3,000,000 on a 99%/1% basis.

   a.  Purpose of the partnership is to engage in a range of derivative trading both to earn a profit and as a hedge relative to other investments. (Trading can be in either foreign currency derivatives or in U.S. equity derivatives.)

   b.  Partnership by its terms require a three-year lock-up of all partners except for sales of partnership interests to new partners (i.e., no redemption for three years.)

2. Initial investments of the partnership capital include $2,000,000 in net premium on a series of option spreads (the "option spreads") and $1,000,000 in other derivative investments (the "other investments").

   a.  The option spreads will have a gain leg and a loss leg that will be separate instruments.

3. Subsequently, when the gain leg is up $50 million (and the loss leg is down $51 million for a net loss on the positions of $1 million[1], the gain leg is sold and replacement assets purchased with the proceeds, which are similar but not identical to the assets sold.

   a.  OI will have a gain of $49.5 million and a basis in its partnership interest of $52,470,000 ($49.5 plus initial contribution of $2,970,000).

4. OI contributes its partnership interest to a new partnership, DEF, so that the partnership is owned 99% by DEF and 1% by A.

   a.  The contribution terminates the partnership year with respect to OI. (Section 706(c) (2) (A).)

   b.  The partnership uses an "interim closing of the books method" causing the gain to be allocated to OI. In order for this allocation to be respected, there must be "substantial economic effect," or it must be pursuant to the partners' interests.

5. Subsequently, client ("C") purchases 90% of DEF's partnership interest for $1,800,000, which is fair market value of the interest (assuming value of other investments remains constant for this illustration).

---

[1] NOTE: The positions could be reversed: the gain leg could be up $51,000,000 and the loss leg could be down $50 million for a net gain on the positions of $1 million.

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW

REVISED 04/17/019:10 AM

1 BDO P 035469

Robert Greisman - Re: TOC-Conclusion Needed | Page 1

| | |
|---|---|
| From: | Michael Kerekes |
| To: | Charles Bee; Denis Field; Lawrence Cohen; Lorin... |
| Date: | Fri, Apr 27, 2001 7:14 PM |
| Subject: | Re: TOC-Conclusion Needed |

I prefer having BDO collect the entire fee and then pay Helios. There are at least two reasons for doing so:

(1) It's none of the client's business who is receiving what part of the total fee;

(2) There may be an argument that if we pay Helios, Helios derives some protection from our accountant-client privilege (something of a long shot, but I wouldn't mind litigating it for a couple of years while statutes run); and

(3) While this means that the client does not directly pay for the legal opinion, I think that is fine because it is well established that an attorney-client relationship can exist without the direct (or for that matter, without any) payment of fees.

We haven't really thought about reason (2) before. Following Charlie's lead on the basic privilege issue, it may turn out to be a powerful consideration. We might want to get the input of someone more knowledgeable on the subject to figure out whether it can significantly help us. If so, we may want to extend it beyond this transaction.

Cooperation...    Collaboration...    Concentration...    Communication...

13  BDO  P    00234

GOVERNMENT
EXHIBIT
_____14_____

GOVERNMENT'S
EXHIBIT
_____A-56_____

13  BDO  P    00234

Robert Greisman - Re: TOC-Conclusion Needed                                      Page 1

| | |
|---|---|
| **From:** | "L & A Luchs" <lars4@starpower.net> |
| **To:** | "Pam Packard" <PPackard@bdo.com>, <BGreisman@bdo.c... |
| **Date:** | Sun, Apr 29, 2001  7:20 PM |
| **Subject:** | Re: TOC-Conclusion Needed |

I agree with Pam. I had always thought that this was the decision we had reached at an initial meeting we had in NY.

----- Original Message -----
From: Pam Packard <PPackard@bdo.com>
To: <BGreisman@bdo.com>; <CBee@bdo.com>; <DField@bdo.com>; <LCohen@bdo.com>; <LLUCHS@bdo.com>; <MKerekes@bdo.com>; <PSHANBROM@bdo.com>
Sent: Sunday, April 29, 2001 1:41 PM
Subject: Re: TOC-Conclusion Needed

I feel strongly that the client should pay the attorney's fee directly. The advice would appear to be more independent.

With respect to the balance of the fee, my preference would be for BDO to be paid solely for consulting, thereby appearing to have been given "in the normal course of business". If it is problematic from a marketing perspective, I could live with us paying Helios.

>>> Robert Greisman 04/25/01 03:19PM >>>
In connection with the Helios (Haber) transaction--please respond the this question: Should Helios charge its fee and we charge our fee independently, or should we charge the entire fee and pay Helios, as we do with Gramercy? Please respond to the committee with your answer and reasoning by the close of business on Monday April 30 (sooner if possible) so that we can bring our pricing considerations on this structure to a conclusion.
Thanks.
Bob

        Cooperation...      Collaboration...
Concentration...      Communication...

GOVERNMENT
EXHIBIT
15
PENGAD-Bayonne, N.J.

GOVERNMENT'S
EXHIBIT
A-55
PENGAD 800-631-6989

13  BDO  P      00236

Robert Greisman - Re: TOC-Conclusion Needed                                                    Page 1

**From:**      Pam Packard
**To:**        Bee, Charles;  Cohen, Lawrence;  Field, Denis;  Gr...
**Date:**      Sun, Apr 29, 2001 12:44 PM
**Subject:**   Re: TOC-Conclusion Needed

I feel strongly that the client should pay the attorney's fee directly.  The advice would appear to be more independent.

With respect to the balance of the fee, my preference would be for BDO to be paid solely for consulting, thereby appearing to have been given "in the normal course of business".   If it is problematic from a marketing perspective, I could live with us paying Helios.

>>> Robert Greisman 04/26/01 03:19PM >>>
In connection with the Helios (Haber) transaction--please respond the this question: Should Helios charge its fee and we charge our fee independently, or should we charge the entire fee and pay Helios, as we do with Gramercy? Please respond to the committee with your answer and reasoning by the close of business on Monday April 30 (sooner if possible) so that we can bring our pricing considerations on this structure to a conclusion.
Thanks.
Bob

Cooperation...       Collaboration...       Concentration...       Communication...





13  BDO  P      00235

**From:** Robert Greisman
**To:** Charles Bee; Denis Field; Lawrence Cohen; Lorin Luchs; Michael Kerekes; Pam Packard; Paul Shanbrom
**Date:** Mon, May 21, 2001 10:04 AM
**Subject:** Comments on Draft Helios Opinion

Attached are my observations on the draft Helios opinion. Once I have heard from everyone, I'll compile our comments and send them on for response. Please let me know if you have no comments or questions. It is my understanding that the four law firms are also reviewing this draft, so it will change to reflect their thoughts as well.
Bob

Robert S. Greisman
BDO Seidman, LLP
233 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Phone: 312-616-4693
Fax: 312-856-1319
email: bgreisman@bdo.com

Cooperation...        Collaboration...        Concentration...        Communication...

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY



GOVERNMENT'S EXHIBIT
A-59

GOVERNMENT EXHIBIT
17

 **BDO**

BDO Seidman, LLP
Accountants and Consultants

233 North Michigan Avenue, Suite 2500
Chicago, Illinois 60601
Telephone: (312) 856-9100

**MEMORANDUM**

| To | Tax Opinion Committee | Date | May 21, 2001 |
|----|------------------------|------|--------------|
| Re | Comments on Helios Opinion Draft | From | Robert S. Greisman |

### CONFIDENTIAL FOR TAX OPINION COMMITTEE

- Why is the preferred partnership interest necessary? If there are good reasons to have the partnership start with three partners (Investor, Co-Investor, and Advisor), why not have the initial investor interest and Advisor interests be small common interests?

- The Description of Transaction remains to be completed. Presumably that will include a detailed description of the initial spread option trade. It would be helpful to see an example trade described.

- Under the Summary of Transaction, number 9, I presume that the advisory fee paid for the transaction will be the fee charged by Helios, which BDO may pay on behalf of the client. My understanding is that BDO will be paid a consulting fee for a variety of tax consulting services, including analysis of the tax aspects of this investment. In prior situations there was no mention of our tax consulting services, or the fee paid for them, in the opinion, and I do not believe it is relevant or required in this opinion.

- Under the Investor Representations, item 4, I'm not sure what the offering materials are. It would be nice if the partnership had a private placement memorandum, but I did not think one was being prepared. If there is a PPM, presumably the profit potential described is more than that to be derived from one or a series of spread option trades. If the materials contemplated are the illustrative materials recently provided to us, my understanding is that those will not be left behind for clients, thus should not be referenced in the opinion. In any case, the profit potential that attracts an investor should be that from broad investing activities to be conducted over time, and not limited to a speculative albeit potentially profitable spread option trade.

- Under Fund Representations, item 4, I'm not sure I understand or like this. Would it be better if the example were deleted?

7 BDO P 009520

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

 **BDO** BDO Seidman, LLP
Accountants and Consultants
Telephone: (310) 557-0300
Fax: (310) 557-1777

1900 Avenue of the Stars, 11th Floor
Los Angeles, California 90067-4301

To:        Tax Solutions Opinion Committee

From:    Michael Kerekes

Date:    May 21, 2001

Re:       Questions about draft opinion for Diversified transaction

---

The draft opinion for the Diversified transaction generally looks okay to me. It does a better job of applying law to facts than did last year's efforts. I assume the factual analysis will woven more completely into the analysis on a client-by-client basis. I do have some questions and comments, which follow.

Several of my comments find problems with the preferred interest and the non-dilution-below-5% protection attaching to the partnership interest originally to be owned by the Co-investor. I think we should find a way to eliminate those special terms. My comments are:

Why does the Facts section recite that "any member has the right, at any time, to purchase any other member's interest for the member's capital account balance?" I don't understand the reason for the contractual provision, and I certainly don't know how it affects our analysis.

Why is there still a preferred class of interests? I don't see how it helps, and, as discussed below, it may create some technical issues.

Investor Representation #4 is very troublesome: "Investor would not have invested in the Transactions but for the opportunity for profit presented in the offering materials." This representation is similar to representations that have been made before, but it goes farther in putting the onus on the investor. It makes the opinion very easy for the attorney to sign, but I think many investors would find it a difficult representation to make.

Fund Representation #10 (to the effect that Fund uses the U.S. dollar as its functional currency) is not a factual representation, it is a conclusion of law. The Fund should represent that it maintains its books and records in U.S. dollars, then let the opinion writer reach the legal conclusion.

I would like to see the Co-investor Representations, which were omitted from the draft.

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

7 BDO P 009516

GOVERNMENT
EXHIBIT
18

Fund Representation #10 (to the effect that Fund uses the U.S. dollar as its functional currency) is not a factual representation, it is a conclusion of law. The Fund should represent that it maintains its books and records in U.S. dollars, then let the opinion writer reach the legal conclusion.

I would like to see the Co-investor Representations, which were omitted from the draft.

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

7 BDO P 009516

GOVERNMENT'S
EXHIBIT
A-58

Fund Representation #10 (to the effect that Fund uses the U.S. dollar as its functional

The discussion of the conclusion that the Fund will be treated as a partnership needs to discuss the requirement that there be at least two partners for an entity to be treated as a partnership. The Adviser will apparently not be a partner for this purpose, owning only a very small preferred interest (unless the preferred interest concept is eliminated). We therefore need to make sure that the Co-investor always has a large enough interest to qualify as a partner. In that regard, if the non-dilution protection is retained, the opinion needs to analyze whether Co-investor still has an adequate share of partnership losses to be treated as a partner.

The discussion of the investment partnership rules (opinion section IV.D.1(b)) assumes that there is no more than a negligible amount of appreciation in the positions contributed to the Fund. We have learned the hard way that this may not be true, especially since making a contribution immediately after establishing the positions looks bad. We need to figure out whether the investment partnership rules really are not applicable (applying the de minimis diversification test). If they are not applicable, then we have the freedom to have the investor hold the positions for a relatively long time before contributing them to the Fund, which helps appearances. If not, either (1) they will have to be contributed shortly after being established (which looks bad) or (2) they will have the potential to give rise to taxable gain upon contribution (in which case it will be necessary to understand exactly how and when the increased basis resulting from recognition of that gain will create an additional loss, who will receive that loss, and whether there will be a match of character between gain and loss).

The termination of tax year analysis (opinion section IV.E.6) will be incorrect if we get rid of the preferred class. I don't believe this will create any additional technical problem, but the analysis will have to be revised.

The discussion of the IRS' power to recharacterize the Transactions for purposes of IRC § 988 (opinion section IV.E.7(c)) is far too cursory. The opinion can't just say that the Transactions are different from those referred to in the regulation; it must say how they differ. Normally I prefer not to interfere with the writer's judgment in how to frame an opinion, but I think this section may be weak enough to fail to constitute penalty protection.

In the section describing the application of IRC § 704 (opinion section IV.E.9), many of the arguments turn on the proposition that the allocation of losses is required because it is in accordance with the partners' economic interests. That is, the opinion's position is that even if the allocations fail to meet the substantial economic effect test, the consequence is only that gains and losses must be allocated in accordance with the partners' "interests," which would have the same effect as the intended allocation. As you are probably all aware, there is no way to be sure what the IRS would deem to be the partners' interest in this situation. Where (1) there are preferred interests and (2) one partner has a protection allowing it never to have its interest diluted below 5%, I think the IRS could very easily

2

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

argue that the holders of the preferred and non-dilutable interests should be receiving large portions of the partnership gain and loss. This may not be a problem with respect to the loss: the additional allocation of loss would be either to the preferred interests (probably 99% owned by the client) or to the non-dilutable common interest (probaby 90% owned by the client by the time the loss is realized). However, with respect to the gain, any required allocation to the preferred interest would mean a large allocation of gain to the client.

I think the at-risk rule treatment (opinion section IV.F.6) needs to include some discussion as to why the various things going on inside the Fund all constitute a single activity for at-risk purposes.

3

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

**From:**    Robert Greisman
**To:**

    MKerekes.LOSANGELES.001,LCohen.NYC_TAX.005,PSHANBROM.Detroit.003,CBee.
NYC_TAX.005,DField.Executive.EXEC,PPackard.NYC_TAX.005,LLUCHS.WASHINGTON.002
**Date:**    Wed, May 30, 2001  6:19 PM
**Subject:**    Fwd: response to comments

Attached are Hellos' comments to our comments on the draft tax opinion. Also attached are sample
details of the gain leg/loss leg trade. That should be of particular interest as we attempt to understand the
details, including profit potential. I'm not sure that helps us with the amount a client may expect to lose on
that trade, but it's a start. We do need to conclude on the precise trade structure soon, as next week
implementation will begin on a trade for Dudzinsky's client.
Bob



**GOVERNMENT
EXHIBIT**

19

**GOVERNMENT'S
EXHIBIT**

A-60

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

7 BDO P 009521

**From:**     Robert Greisman
**To:**       BOB DUDZINSKY; Charles Bee; David DiMuzio; Denis Field; GARY MITCHELL; John Pridnia; Joseph Klausner; Kurt Huntzinger; Lawrence Cohen; Lorin Luchs; Mark Puckett; Michael Kerekes; Mike Lichner; MORRY Gottlieb; Pam Packard; Paul Shanbrom; Randy Frischer; Randy Moorman; Robert A. Jones
**Date:**     Wed, Jun 20, 2001 4:49 PM
**Subject:**  Fwd: Contact List

To: National Tax Consulting Group
Attached is a contact list I received from Helios, which includes opinion writer contact information as well. This is for your reference.
Bob


Robert S. Greisman
BDO Seidman, LLP
233 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Phone: 312-616-4893
Fax: 312-856-1319
email: bgreisman@bdo.com

        Cooperation...     Collaboration...     Concentration...     Communication...



GOVERNMENT EXHIBIT
20

GOVERNMENT'S EXHIBIT
A-61

8 BDO 00001279

**Lawrence Cohen - Contact List**

| | |
|---|---|
| **From:** | "Philip Kampf" <philkampf@heliosfinancial.com> |
| **To:** | "Robert S. Greisman" <bgreisman@bdo.com> |
| **Date:** | 6/20/2001 4:30 PM |
| **Subject:** | Contact List |

Bob,

Here is the contact list for Helios and its advisers. Feel free to distribute.

Phil

file://D:\Documents%20and%20Settings\cohel\Local%20Settings\Temp\GW}00001.HTM    10/29/2002

8 BDO 00001280

## Helios Financial LLC
### Contact List

### Helios Financial LLC – New York

Jimmy Haber
950 Third Avenue, 23rd Floor
New York, NY 10022
Tel: (212) 688-2700
Fax: (212) 688-7908
E-Mail: jhaber@divgroup.com

John Huber
950 Third Avenue, 23rd Floor
New York, NY 10022
Tel: (212) 688-2700
Fax: (212) 688-7908
E-Mail: johnhuber@divgroup.com

Orrin Tilevitz, Esq.
950 Third Avenue, 23rd Floor
New York, NY 10022
Tel: (212) 688-2700
Fax: (212) 688-7908
E-Mail: otilevitz@divgroup.com

### Helios Financial LLC – Chicago

Philip L. Kampf, Jr.
225 West Washington, Suite 2200
Chicago, IL 60606
Tel: (312) 419-6151
Fax: (312) 419-6153
E-Mail: philkampf@heliosfinancial.com

Mox Tan
225 West Washington, Suite 2200
Chicago, IL 60606
Tel: (312) 419-6150
Fax: (312) 419-6153
E-Mail: moxtan@heliosfinancial.com

8 BDO 00001281

**Bryan Cave LLP**

John P. Barrie, Esq.
700 Thirteenth Street, N.W.
Washington, DC   20005
Tel: (202) 508-6051
Fax: (202) 508-6200
E-Mail: jpbarrie@bryancave.com

NYC Office:

245 Park Avenue
New York , NY   10167
Tel: (212) 692-1847
Fax: (212) 692-1900

Elizabeth Ann Smith, Esq.
245 Park Avenue
Tel: (212) 692-1889
Fax: (212) 692-1900
E-Mail: esmith@bryancave.com

**Lord, Bissell & Brook**

John M. Hughes, Esq.
115 South LaSalle Street
Chicago, IL   60603
Tel: (312) 443-0650
Fax: (312) 896-0650
E-Mail: jhughes@lordbissell.com

John B. Truskowski, Esq.
115 South LaSalle Street
Chicago, IL   60603
Tel: (312) 443-0257
Fax: (3122) 896-6257
E-Mail: jtruskow@lordbissell.com

**Proskauer Rose LLP**

Ira Akselrad, Esq.
1585 Broadway
New York, NY   10036
Tel: (212) 969-3880
Fax: (212) 969-2900
E-Mail: iakselrad@proskauer.com

**Sidley Austin Brown & Wood LLP**

R.J. Ruble, Esq.
One World Trade Center
New York, NY   10048
Tel: (212) 839-5573
Fax: (212) 839-5599
E-Mail: rruble@brownwoodlaw.com

8 BDO 00001282

From:       BOB DUDZINSKY
To:         Cohen, Lawrence
Date:       Wed, Nov 28, 2001  5 24 PM
Subject     Re  Information Request

Larry,

As Requested

Best Regards

PRIVILEDGED AND CONFIDENTIAL COMMUNICATION UNDER SECTION 7525 OF THE INTERNAL
REVENUE CODE intended only for the individual(s) or entity named above and others who have been
specifically authorized to receive it  If you  are not the intended recipient, please do not read, copy, use or
disclose the contents of this communication to others   Please notify the sender that you have received
this e-mail in error by replying to the e-mail or by telephoning 215 636 5675  Please then delete the e-mail
and any copies of it  Thank you

Robert J  Dudzinsky
BDO Seidman, LLP
bdudzinsky@bdo com
215 636 5500
fax 215 636 5699
1700 Market Street
29th Floor
Philadelphia, PA 19103


>>> Lawrence Cohen 11/28/01 05 10PM >>>
In order to do our quality control and plan for the issuance of opinions, please complete the attached sheet
for each calendar year 2001 transaction

Please complete and return the attachment ASAP, but in no event later than the close of business on
Wednesday, December 5  Also please make sure that you have sent me a copy of all consulting
agreements

PRIVILEGED AND CONFIDENTIAL COMMUNICATION UNDER SECTION 7525 OF THE INTERNAL
REVENUE CODE intended only for the individual(s) or entity  named above and others who have been
specifically authorized to receive it  If you are not the intended recipient, please do not read, copy, use or
disclose the contents of this communication to others  Please notify the sender that you have received this
e-mail in error by replying to the e-mail or by telephoning 212 885-8434  Please then delete the e-mail and
any copies of it  Thank you


Cooperation
Collaboration
Concentration
Communication



GOVERNMENT
EXHIBIT
21

GOVERNMENT
EXHIBIT
A-66

9 BDO 00000478

| Date | 11/28/01 |
|---|---|
| NTCG Member | Dudzinsky |
| Client Name | Jai and Sashi Gupta , Ruchi Gupta, Sonali Gupta |
| Investment Adviser | Alpha, Helios and Suntrust Bank |
| Opinion Writer | Bryan Cave – John Barrie |
| Investment Amount | $ 5 mill , (cap gain $ 75 ordinary $25) |
| Type of Transaction | Helios – capital and ordinary with spread option |

9 BDO 00000479

From·        MORRY Gottlieb
To           Cohen, Lawrence
Date:        Fri, Nov 30, 2001  3 52 PM
Subject.     Re  Information Request

see attached

PRIVILEGED AND CONFIDENTIAL COMMUNICATION UNDER SECTION 7525 OF THE INTERNAL
REVENUE CODE intended only for the individual(s) or entity named above and others who have been
specifically authorized to receive it  If you are not the intended recipient, please do not read, copy, use or
disclose the contents of this communication to others  Please notify the sender that you have received this
e-mail in error by replying to the e-mail or by telephoning (561)688-1600  Please then delete the e-mail
and any copies of it  Thank you

Morris D  (Morry) Gottlieb
Partner, BDO Seidman, LLP
1601 Forum Place, Suite 904
West Palm Beach, Fl 33401
Telephone  (561) 688-1600
Fax  (561)688-1848
Email  mgottlieb@bdo com

Cooperation  Collaboration  Concentration  Communication



GOVERNMENT
EXHIBIT
22

GOVERNMENT
EXHIBIT
A-67

9  BDO 00000480

| Date | 11/30/01 |
|---|---|
| NTCG Member | Morry Gottlieb |
| Client Name | redacted |
| Investment Adviser | Diversified Group |
| Opinion Writer | RJ Ruble |
| Investment Amount | $700,000 |
| Type of Transaction | Helios- Capital |

**9 BDO 00000481**

| Date | 11/30/01 |
|---|---|
| NTCG Member | Morry Gottlieb |
| Client Name | Robert Cuillo |
| Investment Adviser | Gramercy Advisors |
| Opinion Writer | Ira Akselrad |
| Investment Amount | $ 3,300,000 |
| Type of Transaction | Distressed Debt |

9 BDO 00000482

Page 1 of 1

## Lawrence Cohen - control sheet

| | |
|---|---|
| **From:** | Paul Shanbrom |
| **To:** | Cohen, Lawrence |
| **Date:** | 12/4/2001 2:11 PM |
| **Subject:** | control sheet |

see attached

PRIVILEGED AND CONFIDENTIAL COMMUNICATION UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE intended only for the individuals(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this e-mail in error by replying to the e-mail or telephoning (248) 244-6516. Please then delete the e-mail and any copies of it. Thank you.



GOVERNMENT
EXHIBIT
23

GOVERNMENT
EXHIBIT
A-68

file://D:\Documents%20and%20Settings\cohel\Local%20Settings\Temp\GW

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

**14 BDO 058576**

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | — *redacted* |
| Investment Adviser | Gramercy |
| Opinion Writer | Proskauer |
| Investment Amount | 2,500,000 |
| Type of Transaction | Gramercy II |

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | — *redacted* |
| Investment Adviser | Helios/Alpha |
| Opinion Writer | Proskauer |
| Investment Amount | $3,000,000 |
| Type of Transaction | Helios – 30 CG (20 in 2001, 10 in 2002) |

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | — *redacted* |
| Investment Adviser | Gramercy |
| Opinion Writer | Proskauer |
| Investment Amount | $300,000 |
| Type of Transaction | Gramercy II – 3 OI (years undecided) |

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | — *redacted* |
| Investment Adviser | Gramercy |
| Opinion Writer | Proskauer |
| Investment Amount | 1,700,000 |
| Type of Transaction | Gramercy II – 17 OI (years undecided) |

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

**14 BDO 058577**

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | redacted |
| Investment Adviser | Gramercy |
| Opinion Writer | Proskauer |
| Investment Amount | |
| Type of Transaction | Gramercy II (4.5 OI in 2001, 1.35 OI in 2002) |

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | redacted |
| Investment Adviser | Gramercy |
| Opinion Writer | Proskauer |
| Investment Amount | |
| Type of Transaction | Gramercy II (4.5 OI in 2001, 1.35 OI in 2002) |

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | redacted |
| Investment Adviser | Gramercy |
| Opinion Writer | Proskauer |
| Investment Amount | |
| Type of Transaction | Gramercy II (5.5 in 2001) |

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | redacted |
| Investment Adviser | Gramercy |
| Opinion Writer | Proskauer |
| Investment Amount | 150,000 (plus 150,000 in 2002) |
| Type of Transaction | Gramercy II (2.25 OI in 2001, .75 OI in 2002) |

**14 BDO 058578**

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | *redacted* |
| Investment Adviser | Gramercy |
| Opinion Writer | Proskauer |
| Investment Amount | 200,000 (plus 200,000 in 2002) |
| Type of Transaction | Gramercy II - 3 OI in 2001, 1 oi in 2002 |

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | *redacted* |
| Investment Adviser | Gramercy |
| Opinion Writer | Proskauer |
| Investment Amount | 200,000 (plus 200,000 in 2002) |
| Type of Transaction | Gramercy II - 3 OI in 2001, 1 oi in 2002 |

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | Shahid Khan |
| Investment Adviser | Gramercy |
| Opinion Writer | Proskauer |
| Investment Amount | 2,500,000 |
| Type of Transaction | Gramercy II – 25 OI in 2001 |

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | *redacted* |
| Investment Adviser | Gramercy |
| Opinion Writer | Proskauer |
| Investment Amount | 1,500,000 |
| Type of Transaction | Distressed Debt 15 CG in 2001 |

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

**14 BDO 058579**

| Date: | \ |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | redacted |
| Investment Adviser | Gramercy |
| Opinion Writer | Proskauer |
| Investment Amount | 2,000,000 |
| Type of Transaction | Distressed Debt – 20 CG in 2001 |

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | redacted |
| Investment Adviser | Gramercy |
| Opinion Writer | Brown & Wood |
| Investment Amount | |
| Type of Transaction | Distressed Debt – 50 CG in 2001 |

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | redacted |
| Investment Adviser | Gramercy |
| Opinion Writer | Brown & Wood |
| Investment Amount | 480,000 |
| Type of Transaction | Distress Debt - 6 OI in 2001 |

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | Randy Lowry |
| Investment Adviser | Gramercy |
| Opinion Writer | Brown & Wood |
| Investment Amount | |
| Type of Transaction | Distressed Debt |

**14 BDO 058580**

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | Jay Moffitt |
| Investment Adviser | Gramercy |
| Opinion Writer | Brown & Wood |
| Investment Amount | |
| Type of Transaction | Distressed Debt |

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | redacted |
| Investment Adviser | Gramercy |
| Opinion Writer | Brown & Wood |
| Investment Amount | |
| Type of Transaction | Distressed Debt |

| Date: | |
|---|---|
| NTCG Member | Shanbrom |
| Client Name | redacted |
| Investment Adviser | Gramercy |
| Opinion Writer | Proskauer |
| Investment Amount | 1,200,000 |
| Type of Transaction | Distressed Debt (12M total, years undecided) |

**14 BDO 058581**

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

6/12/01

### Outline of Proposed Transaction

1. Jai N. Gupta Revocable Trust (Fed. ID # 54-6494526) will form a single member limited liability company. Proposed name is JNG Trading LLC ("**JNG**").

2. **JNG** will enter into a Nasdaq Put Spread (purchase of a put and the sale of a put) as follows:

| | | |
|---|---|---|
| Long Put Premium | $42,000,000 | |
| Short Put Premium | 40,160,000 | |
| Net Investment | $ 840,000 | (2%) |

| | 25% Probability |
|---|---|
| Gross Potential Payoff | $2,665,740 |
| Net Investment | 840,000 |
| Net Potential Return Before Fees | $1,825,740 |

| | |
|---|---|
| Current Spot | 1830.00 |
| Strike Price | 1206.61 & below |

| | |
|---|---|
| Option Term | 365 days |

| | |
|---|---|
| Movement Necessary | 34.07% |

| | |
|---|---|
| # of Times in Last 2 Years Movement Necessary Occurred | 436 times |

3. Shashi A. Gupta Revocable Trust (Fed. ID # 54-6491527) will form a single member limited liability company. Proposed name is SAG Trading LLC ("**SAG**").

4. SAG will enter into a Nasdaq Put Spread (purchase of a put and the sale of a put) as follows:

| | | |
|---|---|---|
| Long Put Premium | $51,000,000 | |
| Short Put Premium | 49,980,000 | |
| Net Investment | $ 1,020,000 | (2%) |

| | 25% Probability |
|---|---|
| Gross Potential Payoff | $3,236,969 |
| Net Investment | 1,020,000 |
| Net Potential Return Before Fees | $2,216,969 |

| | |
|---|---|
| Current Spot | 1830.00 |
| Strike Price | 1206.61 & below |



GOVERNMENT EXHIBIT
24

GOVERNMENT'S EXHIBIT
SUPP. 7

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

10 BDO P 000205

| Option Term | 365 days |
|---|---|
| Movement Necessary | 34.09% |
| # of Times in Last 2 Years Movement Necessary Occurred | 436 times |

5.     DSG Irrevocable Trust (Fed. ID # 54-6462510) will form a single member limited liability company. Proposed name is DSG Trading LLC ("**DSG**").

6.     **DSG** will enter into a Nasdaq Put Spread (purchase of a put and the sale of a put) as follows:

| Long Put Premium | $ 3,500,000 |
|---|---|
| Short Put Premium | 3,430,000 |
| Net Investment | $ 70,000 (2%) |

| | 25% Probability |
|---|---|
| Gross Potential Payoff | $222,145 |
| Net Investment | 70,000 |
| Net Potential Return Before Fees | $152,145 |

| Current Spot | 1830.00 |
|---|---|
| Strike Price | 1206.61 & below |

| Option Term | 365 days |
|---|---|
| Movement Necessary | 34.07% |
| # of Times in Last 2 Years Movement Necessary Occurred | 436 times |

7.     DRG Irrevocable Trust (Fed. ID # 54-6492192) will form a single member limited liability company. Proposed name is DRG Trading LLC ("**DRG**").

8.     **DRG** will enter into a Nasdaq Put Spread (purchase of a put and the sale of a put) as follows:

| Long Put Premium | $ 3,500,000 |
|---|---|
| Short Put Premium | 3,430,000 |
| Net Investment | $ 70,000 (2%) |

| | 25% Probability |
|---|---|
| Gross Potential Payoff | $222,145 |
| Net Investment | 70,000 |
| Net Potential Return Before Fees | $152,145 |

| Current Spot | 1830.00 |
|---|---|
| Strike Price | 1206.61 & below |

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

| Option Term | 365 days |
| Movement Necessary | 34.07% |
| # of Times in Last 2 Years Movement Necessary Occurred | 436 times |

9. Approximately 7 days later, **Gupta Investments** LLC, a limited liability company taxable as a partnership, is formed and capitalized as follows:

(a) Jai N. Gupta Revocable Trust will contribute his member interest in JNG (assumed value of $650,000) and cash of $1,176,000.

(b) Shashi A. Gupta Revocable Trust will contribute her member interest in SAG (assumed value of $750,000) and cash of $1,428,000.

(c) DSG Irrevocable Trust will contribute its member interest in DSG (assumed value of $50,000) and cash of $98,000.

(d) DRG Irrevocable Trust will contribute its member interest in DRG (assumed value of $50,000) and cash of $98,000.

(e) Alpha Consultants LLC will contribute $40,000.

(f) Helios Financial LLC will contribute $40,000.

(g) Martin Hawkes, an Individual Investor will contribute $380,000.

The following is a summary of the capital structure after the initial contribution:

| | Common Cash Contribution | Preferred Cash & Property * Contribution | Total Cash & Property | Capital Share | Profit/Loss Share |
|---|---|---|---|---|---|
| Jai N. Gupta Revocable Trust | $8,400 | $1,817,600 | $1,826,000 | 38.36% | 2.10% |
| Shashi A. Gupta Revocable Trust | 10,200 | 2,167,800 | 2,178,000 | 45.76 | 2.54 |
| DSG Irrevocable Trust | 700 | 147,300 | 148,000 | 3.11 | .18 |
| DRG Irrevocable Trust | 700 | 147,300 | 148,000 | 3.11 | .18 |
| Alpha | | 40,000 | 40,000 | .84 | -- |
| Helios | | 40,000 | 40,000 | .84 | -- |
| Hawkes | 380,000 | | 380,000 | 7.98 | 95.00 |
| TOTAL | $400,000 | $4,360,000 | $4,760,000 | 100.00 | 100.00 |

\* Values of SMLLC interests are estimated. To the extent values differs the preferred interests will be adjusted accordingly.

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

10 BDO P 000207

10.    Gupta Investments LLC will enter into a series of trades with the following terms:

|  | Nasdaq 25% Probability | Yen 25% Probability | Total |
|---|---|---|---|
| Gross Potential Payoff | $6,237,756 | $2,108,670 | $8,346,426 |
| Net Investment | (2,062,500) | (687,500) | (2,750,000) |
| Net Potential Return Before Fees | $4,175,256 | $1,421,170 | $5,596,426 |
| Current Spot | 1830.00 | 121.50 | |
| Strike Price for Profitability | 953.75 to 1460.00 Range Trade | 115.28 to 127.22 Range Trade | |
| Option Term | 540 days | 730 days | |

11.    After approximately 30 days, Mr. Hawkes will sell a portion of his common interests as follows:

|  | Percentage Interest | Purchase Price * |
|---|---|---|
| Jai N. Gupta Revocable Trust | 37.80% | $ 84,000 |
| Shashi Gupta Revocable Trust | 45.90 | 102,000 |
| DSG Irrevocable Trust | 3.15 | 7,000 |
| DRG Irrevocable Trust | 3.15 | 7,000 |
| Total | 90.00% | $200,000 |

 * Will be at FMV with a minimum which is stated above.

12.    <u>Summary of Out of Pocket Expenditures</u>

|  | JNG | SAG | DSG | DRG | Total | % |
|---|---|---|---|---|---|---|
| SMLLC Capital Contribution | $840,000 | $1,020,000 | $70,000 | $70,000 | $2,000,000 | 2.0% |
| Cash Contribution to Gupta Investments | 1,176,000 | 1,428,000 | 98,000 | 98,000 | 2,800,000 | ] 3% |
| Buy Out of Hawkes | 84,000 | 102,000 | 7,000 | 7,000 | 200,000 | |
| Fees | 2,900,000 | 3,500,000 | ----- | ----- | 6,400,000 | 6.4% |
|  |  |  |  |  |  | |
| Total Out of Pocket Costs | $5,000,000 | $6,050,000 | $175,000 | $175,000 | $11,400,000 | 11.4% |

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

13.    Gupta Investments LLC – Pre-Tax Profit Potential

Gross Payoff Options        $14,693,425

Potential Share for Each Member

| | JNG | SAG | DSG | DRG | Total |
|---|---|---|---|---|---|
| Preferred Interest | $1,817,600 | $2,167,800 | $147,300 | $147,300 | $4,280,000 |
| Common Interest (1) | 4,123,037 (39.9) | 5,005,511 (48.44) | 344,103 (3.33) | 344,103 (3.33) | 9,816,754 (95) |
| Total | $5,940,637 | $7,173,311 | $491,403 | $491,403 | $14,096,754 |
| Out of Pocket Costs | 5,000,000 | 6,050,000 | 175,000 | 175,000 | 11,400,000 |
| Net Potential Return | $ 940,637 | $1,123,311 | $316,403 | $316,403 | $ 2,696,754 |

(1)  Gross return less preferred interests of $4,360,000 times their respective common interests.

PRIVILEGED & CONFIDENTIAL
FOR IN CAMERA REVIEW ONLY

10 BDO P 000209

# M E M O R A N D U M
## Via Email

**TO:**      R.J. Ruble, Esq.          **DATE:**      January 2, 2002

**FROM:**    James Haber

---

Below is a list of tax opinions we propose to be prepared by your firm and proposed compensation for such preparation:

| | **Client Name** | **Opinion Type** | **Notes** |
|---|---|---|---|
| 1. | JSB Montana | Old Style Partnership | Complete Already |
| 2. | Phillip Bennett | Old Style Partnership | Complete Already |
| 3. | Michael Palitz | Old Style Partnership | Complete Already |
| 4. | William Weiss | Old Style Partnership | Complete Already |
| 5. | Charles Patterson | Old Style Partnership | |
| 6. | Harold Nix | Old Style Partnership | ] Same LLC |
| 7. | Nelson Roach | Old Style Partnership | ] |
| 8. | David Cowan | Standard Partnership | To be paid directly by client (75,000) |
| 9. | Richard & Maureen Egan | Standard Partnership | |
| 10. | Barry Hoyt | Basis Only Sec. 351 | ] Principals of Anbar |
| 11. | Andrew Jarmel | Basis Only Sec. 351 | ] |
| 12. | Anbar Inc. | Standard Partnership | Owned by Hoyt / Jarmel |
| 13. | Jerome Schostak | Standard Partnership | To be paid directly by client (75,000) |
| 14. | Stan Dziedzic | Standard Partnership | |
| 15. | Ed Caputo | Standard Partnership | Represented by Richard Siegel (knows you from prior deal) |
| 16. | John Giesecke | Standard Partnership | ] |
| 17. | Catherine Giffen | Standard Partnership | ] Same LLC |
| 18. | Affco, LLC | Standard Partnership | Owned by Powers, LaGitt, Powers Children Trust |
| 19. | LaGitt 88 Trust | Basis Only Sec. 351 | ] |
| 20. | John Powers | Basis Only Sec. 351 | ] Own Affco, LLC (Affco is taxed as |
| 21. | Powers Children Trust | Basis Only Sec. 351 | ] an S Corp.) |
| 22. | Alan Ginsburg | Standard Partnership | |
| 23. | Roger Scommenga | Standard Partnership | |
| 24. | Wolff Family Trust | Standard Partnership | |

PENGAD 800-631-6989

GOVERNMENT'S
EXHIBIT

25

M0534079

CONFIDENTIAL

SIDL251560

| 25. | The Tafeen Family Trust | Standard Partnership | |
|-----|------------------------|---------------------|---|
| 26. | Ron Tschetter | Standard Partnership | |
| 27. | Nelson Civello | Standard Partnership | |
| 28. | Geewax, Terker & Co. | Standard Partnership | Owned by Geewax & Terker |
| 29. | Bruce Terker | Basis Only Sec. 721 Contribution | ] |
| 30. | John Geewax | Basis Only Sec. 721 Contribution | ] Own Geewax, Terker & Co. |

## Proposed Fee Arrangements

### Summary

  7 Old Style Opinions (1 Midco)
16 New Style Opinions
_7 Basis Only Opinions
30 Total Opinions
22 Clients

Paid Directly By Client
Schostak           $   75,000
Cowan                75,000

To Be Paid by DGI       800,000

Smith Credit           250,000
      Total Payments   $1,200,000

CONFIDENTIAL

MILBERG WEISS BERSHAD & SCHULMAN LLP
Melvyn I. Weiss (MW-1392)
Brad N. Friedman (BF-9309)
Rachel S. Fleishman (RF-5080)
Peter Sloane (PS-4672)
One Pennsylvania Plaza
New York, NY 10119-0165
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

CARELLA, BYRNE, BAINE GILFILLAN,
  CECCHI, STEWART & OLSTEIN
James E. Cecchi (JC-7697)
John M. Agnello (JA-0338)
6 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————————x
                                                      :
                                                      :
MARVIN SIMON, as Authorized Representative            :
for The Marvin Simon Trust, as amended, for           :
Palm Investors, LLC and for The Jeffrey Markman       :
1993 Irrevocable Trust, MARILYN SIMON,                :
CLAUDE HARRIS, ANN HARRIS, BEN                        :        Civ. 05-CV-03189 DMC
SIMON, HEIDI SIMON, BRITT SIMON, KIM                  :
FINK, ANDREW FINK, AMY GOLDBERG,                      :        **AMENDED CLASS ACTION**
MICHAEL LE, Individually and as Trustee of the        :        **COMPLAINT**
ML Le 1999 Trust, STEFAN RESSING,                     :
Individually and as Trustee of The S. Ressing         :        **JURY TRIAL DEMANDED**
1999 Trust, FITZROY VENTURES, LLC, and                :
MACKENZIE VENTURES LLC,                               :
                                                      :
                        Plaintiffs,                   :
                                                      :
                                                      :
          vs.                                         :
                                                      :
KPMG LLP and SIDLEY AUSTIN BROWN &                    :
WOOD LLP, f/k/a BROWN & WOOD, LLP,                    :
                                                      :
                        Defendants.                   :
                                                      :
                                                      :
———————————————————————x

GOVERNMENT'S
EXHIBIT

26

PENGAD 800-631-6989

1.      Beginning in at least 1996 and continuing into 2003, Defendants KPMG LLP

("KPMG") and Sidley Austin Brown & Wood LLP, f/k/a Brown & Wood, LLP ("Brown &

Wood") (collectively, the "Defendants") together with non-parties Presidio Growth LLC

("Presidio"), Quellos Group LLC, formerly doing business as Quadra Capital Management LLP

and QA Investments LLC ("Quellos"), Deutsche Bank AG, Deutsche Bank Securities, Inc., d/b/a

Deutsche Bank Alex Brown, a division of Deutsche Bank Securities, Inc. (collectively,

"Deutsche Bank"), HypoVereinsbank AG ("HVB"), National Westminster Bank, Plc, d/b/a

NatWest ("Nat West"),UBS AG ("UBS"), Wachovia Bank, N.A., (as the successor by merger to

First Union National Bank, N.A.) ("Wachovia") and certain other entities and individuals

(collectively, the "Non-Parties") engaged in a common course of conduct in furtherance of a

scheme to defraud plaintiffs and others who purchased tax products which were sold under the

names Foreign Leveraged Investment Program ("FLIP"), Offshore Portfolio Investment Strategy

("OPIS"), Bond-Linked Issue Premium Structure ("BLIPS") and Short Option Strategy ("SOS")

out of millions of dollars in unearned fees.

2.      Defendants and the Non-Parties fraudulently misrepresented that FLIP, OPIS,

BLIPS and SOS were legitimate investment strategies that would, among other things, reduce tax

liability in a manner that "more likely than not" would be approved by the Internal Revenue

Service (the "IRS"), when Defendants and the Non-Parties knew that FLIP, OPIS, BLIPS and

SOS were abusive tax shelters that would not pass IRS scrutiny. Thus, in making the fraudulent

misrepresentations, Defendants and the Non-Parties purposefully traded on their reputations as

top-tier accounting and law firms and premier investment banks and advisors to sell FLIP, OPIS,

BLIPS and SOS. Indeed, KPMG's 2003 Annual Report reflects KPMG's continued awareness

of the fact that reputation, trust and name-recognition are important selling points, insisting that

KPMG "accept[s] the unique responsibilities we have to the capital markets and the investing

public. These responsibilities require integrity . . . in everything we do. Nothing is more

important to KPMG and our worldwide network of 100,000 people than a culture that supports

this professionalism and inspires trust." As a result of Defendants' and the Non-Parties' repeated

and willful violations of state common law and the professional rules of conduct alleged below,

Plaintiffs seek damages from Defendants on their own behalf and on behalf of every purchaser of

FLIP, OPIS, BLIPS and SOS (the "Class"), and seek a judgment declaring that, among other

things, Defendants are liable for any penalties or interest assessed by any tax authority, loss of

deductions, professional fees and damages.

       3.     Each  Defendant and the Non-Parties had knowledge, which they recklessly

disregarded, that FLIP, OPIS, BLIPS and SOS were unlawful tax shelters that should have been,

but were not, registered with the IRS, and were not "more likely than not" to be approved by the

IRS if discovered. As set forth in detail herein, notwithstanding the concerns voiced internally

by the Defendants and virtually every Non-Party concerning the legality of these tax products,

the Defendants and the Non-Parties sold them to hundreds of clients, all of whom have been

substantially injured as a result of Defendants' wrongdoing.

       4.     As a result, Class Members have been subjected to audits of their state and federal

tax returns and have been, or will be, assessed millions of dollars in back taxes. In addition to

being liable for back taxes, Class Members must also tender interest and penalty payments. This

is all in addition to the substantial fees paid by each FLIP, OPIS, BLIPS and SOS purchaser to

the Defendants and the Non-Parties.

       5.     As described below, the FLIP, OPIS, BLIPS and SOS tax products were

comprised of a series of complex transactions which Defendants and the Non-Parties

- 2 -

implemented on behalf of a taxpayer (or group of taxpayers). The number of steps involved, and

their complexity, are truly mind-numbing. For all their complexity, though, FLIP, OPIS, BLIPS

and SOS were pre-wired deals that were the same, from one taxpayer to the next. Only the

names changed.

6.    The fraudulent scheme to market FLIP, OPIS, BLIPS and SOS involved

providing a "tax opinion letter" to the purchaser. All FLIP, OPIS, BLIPS and SOS purchasers

received substantially identical form FLIP, OPIS, BLIPS and SOS tax opinion letters that

"opined" that these investment strategies would "more likely than not" be approved by the IRS

in the event of an audit. Unknown to Plaintiffs and the Class, these opinion letters were mere

boilerplate letters, crafted jointly by KPMG and Brown & Wood before the product at issue in

the opinion was sold to even a single client. Rather, the joint creation of these boilerplate

opinion letters was an important part of the scheme of preparing the tax products for mass-

marketing. As such, these opinion letters did not represent genuine, independent advice, but

rather, were part and parcel of a well-planned fraudulent scheme.

7.    Indeed, Brown & Wood functioned as something of a mill for opinion letters,

churning out some 600 opinion letters for 13 tax products, including FLIP, OPIS, BLIPS and

SOS, and earning at least $50,000 per opinion letter. Brown & Wood earned at least $13.2

million in fees in connection with BLIPS alone, and more than $23 million in fees in connection

with FLIP, OPIS and SOS. Yet, Brown & Wood never even met its supposed "clients," but

rather merely inserted a new name and address into the boilerplate opinion letter that it had long

since agreed to with KPMG, making an absolute mockery of the fact that Brown & Wood was

represented to be, and held itself out as, an "independent" law firm offering "independent"

advice on the legitimacy of the FLIP, OPIS, BLIPS and SOS tax strategies. KPMG, too, profited

handsomely from its role in marketing FLIP, OPIS, BLIPS and SOS. Between 1996 and 1999,

KPMG marketed and sold FLIP to at least 80 high net worth clients and generated fees of at least

$17 million. OPIS was marketed and sold by KPMG between 1998 and 2000 to at least 170

individual clients and generated fees of at least $28 million. From October 1999 to October

2000, KPMG sold at least 186 BLIPS products nationwide, generating at least $53 million.

Between 1998 and 2002, KPMG marketed and sold SOS to at least 165 individual clients and

generated fees of at least $17 million.

       8.     Non-Parties Deutsche Bank, HVB, NatWest and UBS provided multi-billion

dollar credit lines to make the FLIP, OPIS, BLIPS and SOS transactions operate. Internal emails

and documents of these banks reveal that the banks knowingly and willingly participated in these

improper transactions only because the banks bore no genuine economic risk. Thus, as a result

of the pre-wired nature of the FLIP, OPIS, BLIPS and SOS products, the role played by the

banks of providing billions of dollars in "loans" and "loan premiums" to Class Members never

exposed the banks to genuine financial risk, but earned them millions of dollars in fees.

Deutsche Bank issued approximately 56 loans from September 1999 to October 1999 in

connection with BLIPS transactions. The total issue price (the stated principal amount plus

premium) of these loans was approximately $7.8 billion. Deutsche Bank's revenues with regard

to BLIPS were approximately $44 million. HVB participated in more than 30 BLIPS

transactions in 1999 and 2000, including those relating to Plaintiffs, providing BLIPS credit lines

that totaled nearly $2.5 billion, in return for millions of dollars in bank fees. Wachovia acted in a

somewhat different role than the other banks, steering clients to KPMG and thereby lending its

name and credibility to the effort to market FLIP, OPIS, BLIPS and SOS products. In all, 23

bank clients implemented FLIP; 1 implemented OPIS; 1 implemented BLIP; and 25

implemented SOS. According to the U.S. Senate Permanent Subcommittee on Investigations of

the Committee on Homeland Security and Governmental Affairs (the "Senate Subcommittee"),

NatWest participated in "a significant number of BLIPS transactions in 1999 and 2000,

providing credit lines totaling more than $1 billion." UBS participated in 100 to 150 OPIS and

FLIP transactions in 1997 and 1998, providing credit lines for KPMG clients which, in the

aggregate, were in the range of several billion Swiss francs.

      9.    Defendants' and the Non-Parties' tax shelter schemes, including FLIP, OPIS,

BLIPS and SOS, have prompted extensive investigations by numerous government entities. The

Senate Subcommittee conducted an extensive investigation that included two days of hearings at

which representatives of the Defendants and certain Non-Parties were compelled to appear and

testify. Notably, R.J. Ruble, the Brown & Wood partner who oversaw Brown & Wood's tax

practice, including the firm's participation in FLIP, OPIS, BLIPS and SOS, invoked his Fifth

Amendment privilege against self-incrimination when called before the Senate Subcommittee.

Thereafter, in a tacit admission of Ruble's and Brown & Wood's participation in the fraud

alleged herein, Brown & Wood terminated Ruble's partnership. Similarly, an April 28, 2005

*Wall Street Journal* article reported that KPMG had fired Richard Smith, the senior executive

who headed KPMG's tax services division during the period when KPMG was promoting and

marketing FLIP, OPIS, BLIPS and SOS, and had dismissed two partners: David Brockway, a

national partner in charge of KMPG's Washington, D.C., tax practice, and Michael Burke, a

managing partner with KPMG in Los Angeles. The article described the firings as the "latest

personnel change tied to the tax shelter scrutiny."

      10.    At the conclusion of a lengthy investigation, the Minority Staff of the Senate

Subcommittee (the "Minority Staff") issued a report in 2003 entitled "U.S. Tax Shelter Industry:

The Role of Accountants, Lawyers, And Financial Professionals" that included four volumes of

documents obtained by the Senate Subcommittee (the "Minority Staff Report"). These

documents, which include internal e-mails from the Defendants and certain Non-Parties, reveal

the shocking lengths to which they went to generate massive fees. Indeed, one of KPMG's

internal e-mails concludes that KPMG "should be paid a lot of money here for our opinion

[letter] since *the [BLIPS] transaction is clearly one that the IRS would view as falling squarely*

*within the tax shelter orbit*." (Emphasis added). The documents also demonstrate that the

Defendants and the Non-Parties acted in concert, to some extent, in developing and marketing

the abusive tax products at issue. Until the Minority Staff released its report and the shocking

exhibit volumes, Plaintiffs and the Class did not know, and could not have guessed, the existence

and scope of the Defendants' and the Non-Parties' conspiracy and fraudulent scheme.

     11.    On February 8, 2005, the Permanent Subcommittee on Investigations released its

final report, entitled, "The Role of Professional Firms in the U.S. Tax Shelter Industry" (the

"Senate Report"). The Senate Report's findings included the following:

     (1)    The sale of potentially abusive and illegal tax shelters is a lucrative business in the United States, and some professional firms such as accounting firms, banks, law firms, and investment advisory firms have been major participants in the development, mass marketing, and implementation of generic tax products sold to multiple clients.

     (2)    During the period 1998 to 2003, KPMG devoted substantial resources and maintained an extensive infrastructure to produce a continuing supply of generic tax products to sell to clients, using a process which pressured its tax professionals to generate new ideas, move them quickly through the development process, and approve, at times, illegal or potentially abusive tax shelters.

     (3)    KPMG used aggressive marketing tactics to sell its generic tax products by turning its tax professionals into tax product salespersons, pressuring its tax professionals to meet revenue targets, using telemarketing to find clients, developing an internal tax sales force, using confidential client tax data to find clients, targeting its own audit clients for sales pitches, and using tax opinion letters and insurance policies as marketing tools.

     (4)    KPMG was actively involved in implementing the tax shelters which it sold to its clients, including by enlisting participation from banks [*i.e.*, Deutsche Bank, HVB, NatWest, UBS and Wachovia], investment advisory firms [*i.e.*, Presidio and Quellos], and tax exempt organizations; preparing transactional documents; arranging purported loans; issuing and arranging opinion letters; providing administrative services; and preparing tax returns.

     (5)    KPMG took steps to conceal its tax shelter activities from tax authorities, including by claiming it was a tax advisor and not a tax shelter promoter, failing to register potentially abusive tax shelters, restricting file documentation, imposing marketing restrictions, and using improper tax reporting to minimize detection by the IRS or others.

****

     (11)    Brown & Wood provided legal services that facilitated the development and sale of potentially abusive or illegal tax shelters, including by providing design assistance, collaboration on allegedly independent tax opinion letters, and hundreds of boilerplate tax opinion letters to clients referred by KPMG and others, in return for substantial fees.

***

     (13)    Deutsche Bank, HVB, NatWest, UBS and Wachovia provided billions of dollars in lending critical support to transactions which the banks knew were tax motivated, involved little or no credit risk, and facilitated potentially abusive or illegal tax shelters known as . . . FLIP, OPIS, BLIPS and SOS.

***

     (15)    Some investment advisors, including Presidio . . . and the Quellos Group, helped develop, design, market and execute potentially abusive or illegal tax shelters.

    12.    In addition to the Congressional investigation, the United States Attorney's Office for the Southern District of New York (the "U.S. Attorney's Office") has conducted a grand jury investigation to determine whether the sale of generic tax products by KPMG, Brown & Wood and certain Non-Parties violated criminal laws. The Securities and Exchange Commission is also investigating to determine whether KPMG violated auditor independence rules by jointly marketing certain generic tax products with at least one of its audit clients.

- 7 -

13.    On August 26, 2005, the United States Attorney's Office and KPMG entered into

a Deferred Prosecution Agreement (the "Agreement") whereby, among other things, KPMG

consented to the filing of a one-count Information charging KPMG with participating in a

conspiracy in violation of 18 U.S.C. § 371 to (i) defraud the United States and its agency the

Internal Revenue Service; (ii) commit tax evasion in violation of 26 U.S.C. § 7201; and (iii)

make and subscribe false and fraudulent tax returns, and aid and assist in the preparation and

filing of said tax returns in violation of 26 U.S.C. § 7206.

14.    The Agreement further provides that KPMG admits and accepts certain conduct

set forth in an attached Statement of Facts, which is part of the Agreement. The Statement of

Facts sets forth conduct which involved "certain KPMG tax leaders, partners, and employees,

during a period from 1996 to 2002," including the following:

- "developing, promoting, and implementing unregistered and fraudulent tax shelters;"

- "[a] number of KPMG tax partners engaged in conduct that was unlawful and fraudulent, including: (i) preparing false and fraudulent tax returns for shelter clients; (ii) drafting false and fraudulent proposed factual recitations and representations as part of the documentation underlying the shelters; (iii) issuing opinions that contained those false and fraudulent statements and that purported to rely on those representations . . . (iv) actively taking steps to conceal from the IRS the shelters and the true facts regarding them; and impeding the IRS by knowingly failing to locate and produce all documents called for by the IRS summonses and misrepresenting to the IRS the nature and extent of KPMG's role with respect to certain tax shelters;"

- KPMG has agreed to pay a total of $456 million to the United States as part of the Agreement which included a fine consisting of disgorgement of $128 million of fees received by KPMG from these activities and $100 million as a "promoter penalty."

(*See* the Agreement, at p. 2-3.)

15.    In the Statement of Facts, which is a part of the Agreement, KPMG further

admitted the following:

- "[t]his [fraudulent tax shelters] course of conduct was deliberately approved and perpetrated at the highest levels of KPMG's tax management, and involved dozens of KPMG partners and other personnel.  Certain individuals involved were later promoted to firm-wide leadership positions."

- "Moreover, during the period of 1996 through 2002, KPMG changed its policies and practices in a manner that encouraged the sale of tax "products" to multiple clients.  In this regard, KPMG changed its compensation structure in a manner that encouraged the sale of tax products, set policies and goals that demanded the creation and sale of tax products, and created within the tax department groups of partners and other personnel who were specifically charged with developing and selling tax shelters";

- "Throughout the period in question, the firm's internal control systems failed to prevent the improper and illegal conduct because of inherent weaknesses in the system of internal controls and because those controls that were in place were overridden by certain individuals in tax management";

- "KPMG tax partners helped design or sell the following tax shelters (and variations of them) to high net worth United States citizens during the period in question:    Foreign Leveraged Investment Program ("FLIP"); Offshore Portfolio Investment Strategy ("OPIS") ...."

- "FLIP was marketed and sold by KPMG between 1996 and 1999 to at least eighty high net worth individual clients and generated at least $1.9 billion in bogus tax losses;  KPMG's gross fees from FLIP transactions were at least $17 million."

- "FLIP and OPIS were designed by KPMG tax partners, a New York lawyer who at the time was a partner in a prominent national law firm (the "New York Lawyer"), other individuals, and two KPMG tax professionals who left KPMG in 1997 to form a purported "investment advisory" firm located in San Francisco, which in truth and in fact was in the business of promoting tax shelters (the purported "investment advisory firm").  FLIP, OPIS, and variations sold by another major accounting firm were substantially similar.  These shelters were intended to generate substantial capital losses through the pre-arranged series of purchases of and options on stock of one of two prominent international banks followed by redemptions of those investments by the bank."

16.    On August 29, 2005, *eight* former partners and/or executives of KPMG *and a*

*former partner* of Brown & Wood were indicted.  A former executive of non-party HVB,

Domenick DeGiorgio, has also pled guilty to multiple charges arising out of his participation and involvement in the marketing and implementation of BLIPS.

17.    Previously, on June 16, 2005, KPMG had issued a statement admitting that its conduct in connection with the sale of tax shelters, including FLIP, OPIS, BLIPS and SOS, had been intentional and wrongful, stating: "KPMG takes full responsibility for the unlawful conduct by former KPMG partners . . . and we deeply regret that it occurred." Neither Brown & Wood nor the Non-Parties -- with the exception of Domenick DeGiorgio, the former HVB executive who has pled guilty to a number of crimes relating to BLIPS -- have yet been as forthcoming.

18.    As set forth within, the Defendants have repeatedly violated state common laws and rules of professional conduct causing substantial damages to the Plaintiffs and the other members of the Class.

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d) because the claims of all Plaintiffs, aggregated together, exceed $5 million and at least one plaintiff is diverse from at least one defendant. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims asserted herein occurred and caused damages in this district.

## PARTIES

20.    Plaintiffs Marvin Simon (as authorized representative for The Marvin Simon Trust, as amended, for Palm Investors, LLC and for The Jeffrey Markman 1993 Irrevocable Trust), Marilyn Simon, Claude Harris, Ann Harris, Ben Simon, Heidi Simon, Britt Simon, Kim Fink, Andrew Fink and Amy Goldberg (collectively, the "Simon Plaintiffs") are citizens of the United States and reside in Virginia Beach, Virginia. Plaintiff Michael Le, individually and as

trustee of the ML Le 1999 Trust ("M. Le, Trustee"), is a citizen of the United States and resides

in Raleigh, North Carolina. Plaintiff Stefan Ressing, individually and as trustee of the S. Ressing

1999 Trust ("S. Ressing, Trustee"), is a citizen and resident of Germany (but resided in the

United States in 1999). MacKenzie Ventures LLC ("MacKenzie") and Fitzroy Ventures, LLC

("Fitzroy") are limited liability companies formed under the laws of the state of Delaware.

Fitzroy is a single member LLC owned by S. Ressing, Trustee and McKenzie is a single member

LLC owned by M. Le, Trustee. (M. Le. Trustee, S. Ressing Trustee, Mackenzie, and Fitzroy are

sometime collectively referred to as the "Trustee Plaintiffs" and the Simon Plaintiffs and the

Trustee Plaintiffs are collectively referred to as "Plaintiffs").

      21.     The Simon Plaintiffs each purchased an OPIS during the year 1998 and a BLIPS

during the year 2000. In 1999, the Trustee Plaintiffs each bought BLIPS. Plaintiffs relied on the

representations of the Defendants regarding the propriety and tax effect of FLIP, OPIS, BLIPS

and SOS. Both of the Defendants knew that FLIP, OPIS, BLIPS and SOS were, in fact,

improper and abusive tax shelters and not investment strategies that would lawfully reduce tax

liabilities, as Defendants had falsely represented to Plaintiffs.

      22.     Defendant KPMG LLP ("KPMG"), a limited liability partnership with its

principal executive office and headquarters located at Chestnut Ridge Road, Montvale, New

Jersey 07645. KPMG is a worldwide firm of certified public accountants, auditors and

consultants that provides a variety of accounting, auditing and consulting services, and that

conducts extensive business in this District. KPMG is the third largest accounting firm in the

United States, and is a member of KPMG International, which is one of the largest accounting

firms in the world, with over 700 offices in 152 countries. KPMG developed, marketed and sold

the abusive tax products described herein.

23.     Defendant Sidley Austin Brown & Wood LLP ("Brown & Wood") is a Delaware

limited partnership that maintains its principal place of business in Chicago, Illinois. Brown

& Wood is a nationally prominent law firm with a practice that is nationwide and international in

scope. Brown & Wood represents clients all over the United States and regularly appears in

courts throughout the United States, including the state and federal courts of this state and

District. Brown & Wood was formed by the merger of Sidley & Austin and Brown & Wood.

Brown & Wood obtained fees in excess of $23 million for doing nothing more than issuing

boilerplate concurring legal opinions regarding FLIP, OPIS, BLIPS and SOS, each of which

Brown & Wood knew to be an abusive tax shelter.

## THE NON-PARTIES

24.     Presidio Growth LLC ("Presidio") is a California limited liability company that

maintains its principal place of business in San Francisco, California. Presidio is an independent

investment advisor registered under the Investment Advisers Act of 1940 that specializes in

structured financial products and the execution of associated investment and derivative-based

trading strategies. Presidio was formed by two former KPMG partners tax professionals who

had already entered into a joint venture with Deutsche Bank to develop tax products prior to their

departure from KPMG. Presidio participated in the development, marketing, and

implementation of all 186 BLIPS transactions related to KPMG clients, including Plaintiffs. In

addition, Presidio had also participated in the development, marketing and implementation of

OPIS products sold by KPMG.

25.     Quellos Group LLC, formerly doing business as Quadra Capital Management

LLP and QA Investments LLC, is a Delaware limited liability company that maintains its

principal place of business in Seattle, Washington. Quellos acted as a tax shelter promoter and

assisted in the design, development, marketing, and implementation of tax shelters marketed by

- 12 -

KPMG. In addition, Quellos provided so-called "investment advisory services" with respect to KPMG's OPIS transactions similar to the service that Presidio provided with respect to BLIPS.

26.    Deutsche Bank AG is a German corporation that maintains its principal place of business in Frankfurt, Germany. Deutsche Bank AG offers various investment, financial and related products and services to consumer and corporate clients worldwide. Deutsche Bank AG has approximately 67,700 employees and more than 13 million customers in 76 countries worldwide. As of December 31, 2002, Deutsche Bank AG had total assets of $1.25 trillion.

27.    Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown ("DB Alex Brown") is a United States subsidiary of Deutsche Bank AG. DB Alex Brown is organized under the laws of the State of Delaware and maintains its principal place of business in New York, New York. DB Alex Brown is a member of the New York Stock Exchange. Deutsche Bank AG and DB Alex Brown are sometimes collectively referred to as "Deutsche Bank." Deutsche Bank provided the financing to make the FLIP, OPIS, BLIPS and/or SOS transactions possible.

28.    HypoVereinsbank AG ("HVB") is a German bank that maintains its principal place of business in Munich, Germany. HVB has 60,000 employees, 2,000 branch offices and more than 8.8 million customers. HVB provided financing for many of the BLIPS transactions.

29.    National Westminster Bank, Plc d/b/a NatWest ("NatWest") is an English bank whose registered office is located in London, England. NatWest fulfilled a role similar to Deutsche Bank and HVB in some BLIPS transactions, by providing lending and securities services to KMPG and its clients.

30.    UBS AG ("UBS") is a Swiss bank whose head offices are located in Zurich, Switzerland and Basel, Switzerland. UBS maintains a "main office" in the United States in New

York, New York. UBS describes itself as "one of the world's leading financial institutions [and] wealth management businesses." UBS participated in OPIS transactions.

31.    Wachovia Bank, N.A. ("Wachovia") is a banking corporation with its principal place of business located in the State of North Carolina. Wachovia is the successor by merger to First Union National Bank, N.A. and maintains offices throughout the United States, including the State of New Jersey. Wachovia, acting through First Union, played a different role than Deutsche Bank, HVB, NatWest and UBS by providing client referrals and marketing assistance to KPMG for its tax products in return for substantial fees. The Subcomittee investigation determined that Wachovia provided this same assistance to other tax shelter promoters and, in fact, had implemented a systematic review and approval process for offering a variety of third-party tax shelter products to Wachovia clients. Wachovia typically received $100,000 for each client referral and has estimated that, for the 5 year period between 1997 to 2002, it obtained revenues totaling approximately $13 million for providing client referrals on tax products.

## FACTUAL STATEMENT

### I.    THE STRUCTURE OF FLIP, OPIS, BLIPS AND SOS AND THE NATURE OF TAX SHELTERS

32.    As indicated above, each of the FLIP, OPIS, BLIPS, and SOS transactions was structured in substantially the same way for all KPMG clients, including Plaintiffs.

33.    The Defendants and the Non-Parties fraudulently characterized FLIP, OPIS, BLIPS and SOS as investment strategies. None of FLIP, OPIS, BLIPS or SOS were characterized as a tax shelter, legal or illegal, although the Defendants and the Non- Parties knew -- as reflected in their internal e-mails and other documents -- that, in fact, FLIP, OPIS, BLIPS and SOS were unregistered and abusive tax shelters.

- 14 -

34.    Tax shelters are not, in and of themselves, necessarily unlawful. In 1984, Congress enacted a comprehensive system to regulate the development, promotion and marketing of tax shelters. That system was amended and modified by law and regulation in subsequent years. Notably, the Secretary of the Treasury promulgated temporary regulations concerning, among other things, the registration of tax shelters and the creation and retention of lists of investors in tax shelters by the promoters and marketers of the tax shelter.

35.    In this regard, under 26 U.S.C. § 6111, a promoter of tax shelters is required to register each shelter with the IRS prior to offering the public the opportunity to participate in the shelter. Pursuant to 26 U.S.C. § 6112, an organizer and/or seller of a tax shelter is required to keep a list of investors and provide it to the IRS within ten (10) days. Failure either to register a tax shelter, or to maintain (or provide to the IRS) a list of investors subjects the tax shelter, subjects a seller/organizer to potential penalties.

36.    In order to further the policies of the aforementioned provisions, the Secretary of the Treasury promulgated regulations under 26 U.S.C. § 6111 that authorize the IRS to publish a list of arrangements which it considers to be tax shelters subject to registration and disclosure. When the IRS publishes a notice listing such transactions as tax shelters, they are referred to as "listed transactions" and become subject to the requirements of 26 U.S.C. §§ 6111 and 6112.

37.    IRS regulations make it clear that tax shelter promoters include the "person principally responsible for organizing a tax shelter as well as persons who participate in the organization, management and sale of a tax shelter" and any person who is a "material advisor" on a tax shelter transaction.

38.    In September 2000, the IRS issued Notice 2000-44, identifying KPMG's "Bond Linked Issue Premium Structure, also known as "BLIPS," as a "listed transaction" and declaring

- 15 -

that the "purported losses" arising from these types of transactions, which use an "artificially

high basis," "do not represent *bona fide* losses reflecting actual economic consequences" and

"are not allowable as deductions for federal income tax purposes." The IRS has since audited

and penalized numerous taxpayers, including Plaintiffs, for using BLIPS.

39.    In July 2001, the IRS issued Notice 2001-45 regarding "Basis Shifting Tax

Shelters." The IRS Notice stated that certain types of transactions utilizing foreign corporations

or other foreign entities could be subject to disallowance for tax purposes, interest on unpaid

taxes, and possible penalties against taxpayers, tax return preparers and tax shelter promoters.

FLIP, OPIS and SOS are also covered by the "listed transactions" that the IRS identified in

Notice 2001-45.

40.    Although Defendants and the Non-Parties were well aware that FLIP, OPIS,

BLIPS and SOS should have been registered with the IRS as "tax shelters," and that the

Defendants and the Non-Parties should have been registered as tax shelter "promoters" under

these federal statutes and regulations, Defendants and the Non-Parties never disclosed this to the

Plaintiffs or Class Members.

### A.    The Fraudulent FLIP and OPIS Shelters

41.    FLIP and OPIS were substantially similar. FLIP and OPIS were generally

marketed only to people who had capital gains in excess of $10 million for FLIP and $20 million

for OPIS. These shelters were designed to generate substantial phony capital losses (i.e., in

excess of $10 million for FLIP and in excess of $20 million for OPIS) through the use of an

entity created in the Cayman Islands for purposes of the tax shelter transaction. The Plaintiffs

and Class Members purportedly entered into an "investment" transaction with the Cayman

Islands entity by purchasing a purported warrant or entering into a purported swap. The Cayman

Islands entity then made a pre-arranged series of purported investments, including purchasing

stock in a Non-Party bank using money purportedly loaned by the Non-Party bank, followed by

redemptions of the stock purchases by the same Non-Party bank. The pre-wired investments had

been designed by the Defendants and the Non-Parties to eliminate economic risk to the Plaintiffs

and Class Members, beyond the all-in cost, and minimize the amount of the all-in cost used for

the investment component. The purported investments were also devised to last for only

approximately 16 to approximately 60 days.

### B.    The Fraudulent BLIPS Shelter

42.    BLIPS was designed to generate substantial capital and ordinary tax losses

through a series of pre-arranged transactions that involved the Plaintiffs and Class Members

purportedly borrowing money from one of the Non-Party banks in order to make purported

foreign currency investments, including currencies that were "pegged" to the United States

dollar. The bank involved in the purported loan also served as the counterparty on all of the

purported currency and other transactions involved in BLIPS. The transaction was designed by

KPMG and the Non-Parties so that after a short period of time (approximately 67 days), the

Plaintiffs and Class Members would exit the purported BLIPS transaction and trigger the desired

tax loss.

### C.    The Fraudulent SOS Shelter

43.    SOS and it variants were designed to generate substantial capital and ordinary tax

losses through a series of pre-arranged transactions that involved the Plaintiffs and Class

Members entering into virtually offsetting foreign currency option positions with a Non-Party

bank, transferring the offsetting positions to a partnership or other entity, and then withdrawing

from the transaction and claiming a loss in the desired amount. KPMG's Washington National

Tax office considered whether KPMG should issue "more likely than not" opinions regarding

SOS-type transactions, and concluded that the phony losses generated by those transactions were

- 17 -

*not* more likely than not to withstand IRS challenge. Nevertheless, between 1998 and 2003,

certain KPMG tax partners assisted in implementing SOS-type transactions for KPMG clients,

for a fee to KPMG generally equal to 1% of the tax losses to be generated, and prepared and

caused to be prepared tax returns based on the phony SOS tax losses. For many of these SOS-

type transactions, KPMG did not issue an opinion letter, but instead certain lawyers issued "more

likely than not" opinion letters with respect to those transactions.

## II.    THE DEVELOPMENT OF GENERIC TAX PRODUCTS AND THE PURSUIT OF INCREASING REVENUES

44.    In the latter half of the 1990's, KPMG's Tax Services Practice -- a major division

of KPMG that provides tax compliance, tax planning and tax return preparation services --

underwent a fundamental change in direction, shifting its focus away from the development of

individualized tax products for single clients who initiated a request for advice, to the

development of generic products. KPMG pressed its tax professionals to market these generic

tax products aggressively to existing and prospective clients, without regard to whether clients

had approached KPMG for tax advice.

45.    FLIP, OPIS, BLIPS and SOS were among the most successful of KPMG's

generic tax products. In late 1996, KPMG met with representatives of UBS for the purpose of

arranging UBS's assistance in the tax product scheme. UBS was assured it would receive

substantial fees from its participation in these transactions.

46.    In September 1997, KPMG's head of its Department of Professional Practice

requested that tax specialists at KPMG's Washington National Tax Planning Office examine

whether FLIP complied with the tax laws and whether KPMG needed to register FLIP as a tax

shelter.

47.    Following this request, KPMG's Washington National Tax Planning Office

concluded, in writing, that FLIP needed to be registered as a tax shelter and KPMG needed to

register as a tax shelter promoter. KPMG's tax specialists also recommended that KPMG cease

selling and making assurances about the FLIP product to potential clients, at least temporarily.

Notwithstanding these conclusions from its own in-house tax experts, KPMG continued to

market and sell FLIP to the public.

48.    Additionally, several other KPMG partners and/or senior managers had identified

numerous flaws and weaknesses that, in the words of KPMG's former Deputy Chairman Jeffrey

Stein, in early 1998, would lead to a "tax disaster" for KPMG's clients if the IRS discovered

FLIP.

49.    The concerns of many KPMG personnel about flaws and weaknesses in FLIP

were well known within KPMG, and were highlighted in a March 14, 1998 email by Jeffrey

Stein. In his March 14, 1998 email, Mr. Stein informed his colleagues:

> In September or October of last year [1997], Bob Simon and Bob Pfaff began to
> have discussions on a successor to the FLIP transaction which was being
> marketed. These discussions took on an air of urgency when Larry DeLap
> determined that KPMG should discontinue marketing the existing product . . . .
>
> Simon and Pfaff met in late October and throughout November to tweak or
> redesign if necessary the old strategy-focusing on the Cayman partnership and
> adding features designed to lessen any subpart F or other risks. They determined
> that whatever the new product, it needed a greater economic risk attached to it and
> should probably include a debt or convertible debt feature . . . . As you may
> know, the Cayman entity (in both FLIP and OPIS) is nominally owned by an
> NRA [meaning "non-resident alien"]. Under the FLIP structure, there was a real
> question as to whether an NRA was truly an equity holder. In particular, the NRA
> received a preferred return, was protected from risk, and in most cases looked like
> a service provider or debt holder. If that were true, either of those
> characterizations would have lead [sic] to a tax disaster . . . .
>
> Simon was the one who pointed out the weakness in having the U.S. investor
> purchase a warrant for a ridiculously high amount of money – well in excess of
> the strike price – which in no event would be exercised (since the investor also

had a cash settled option which would enable him to gain any upside in the
Cayman Company without paying the strike price of the exercise). It was clear,
we needed the option to be treated as an option for Section 302 purposes, and yet
in truth the option was really illusory and stood out more like a sore thumb since
no one in his right mind would pay such an exorbitant price for such a warrant . . .
.

The FLIP strategy included a loan from a foreign bank to the Cayman Company.
The Cayman Company then turned around and purchased shares in the same
bank. Later, the shares were redeemed and magically, at the same moment, the
U.S. Investor (related to Cayman through the Warrant) would buy an option for
the equivalent amount of the shares from the bank . . . .

In kicking the tires on FLIP (perhaps too hard for the likes of certain people)
Simon discovered that there was a delayed settlement of the loan which then
raised the issue of whether the shares could even be deemed to be issued to the
Cayman Company. Naturally without the shares being issued they could not later
be redeemed.

50.    KPMG did not disclose the concerns voiced by Messrs. Simon and Pfaff to the

Plaintiffs. In fact, this relevant and critical information was concealed from the Plaintiffs. Also,

although Mr. DeLap had informed his partners KPMG would not prepare tax opinions on FLIP

for any new FLIP clients, Mr. DeLap did not prohibit KPMG partners from working with

Quellos to continue selling the FLIP strategies and continuing to provide "advice" on the tax

consequences of FLIP. These material omissions by KPMG were fraudulent in light of its own

internal emails referenced above.

51.    In 1998, KPMG and Brown & Wood developed and began marketing a so-called

refined version of FLIP, known as OPIS or "Son of FLIP." KPMG created OPIS because

KPMG believed that a slightly different product using a different name would better shield

KPMG's activities from IRS scrutiny. However, just like FLIP, OPIS sought to generate a large,

artificial capital loss through a complicated "basis-shift" transaction. Just as with FLIP, the

vehicle to accomplish this involved creation of a shell Cayman Island company, the U.S. client's

purchase of an interest in a Cayman Island company, the Cayman Island company's purchases

and sales of foreign bank stock and options, and the U.S. client's purchases and sales of the

foreign bank stock and options. The essential mechanics of FLIP and OPIS were identical, with

the only differences being that KPMG added some features -- solely for the purpose of

improving the "optics" and providing better "window-dressing" -- to give OPIS the illusion of

having a "business purpose" or "economic substance."

52.    On February 23, 1998, KPMG's Robert Simon prepared an internal memorandum

to Mr. Ritchie, Randy Bickham and John Harris of KPMG, which stated in the first sentence "I

thought it might be useful to summarize some of my comments with respect to OPIS." In this

memorandum, Simon stated in part:

> You will undoubtedly recall that Larry DeLap charged us with development of (i)
> a product that could be the subject of a more likely than not opinion and (ii) *a*
> *product that was sufficiently different from the FLIP transaction that we could*
> *justify registering the current product (but not FLIP). I believe that in its*
> *current state, the product fails on both counts*. . . . If OPIS is not exactly the
> FLIP product, it is, in the words of J. Harris, "son of FLIP." In my view, OPIS
> incorporates very few of the positive features of the LLC product previously
> submitted to Larry DeLap. The omission of these features is significant not only
> in a substantive sense, but because many were in direct response to concerns
> raised by L. DeLap and G. Bloom. . . . *We are the firm writing the opinions.*
> *Ultimately, if these deals fail in a technical sense, it is KPMG, which will*
> *shoulder the blame*. . . . In OPIS, the use of debt has apparently been jettisoned.
> If we can not structure a deal with at least some debt, it strikes me that all the
> investment banker's economic justification for the deal is smoke and mirrors. . . .
> The only thing that really distinguishes OPIS (from FLIP) from a tax perspective
> is the use of an instrument that is purported to be a swap. . . . Without true
> economic risk, the NRA's true characterization is probably that of a service
> provider or debt holder (or possibly a preferred shareholder). Obviously, any of
> these characterizations would lead to the conclusion that the U.S. investor is the
> equity holder (and the direct recipient of millions of dollars of income). . . . If
> upon audit, the IRS were to challenge the transaction, the burden of proof will be
> on the investor. The investor will have to demonstrate, among other things, that
> the transaction was not consummated pursuant to a firm, and fixed plan. Think
> about the prospect of having your client on the stand having to defend against
> such an argument. The failure to use an independent 3[rd] party in any of the
> transactions indicates that the deal is pre-wired. The issue was a significant
> concern of G. Bloom (in the FLIP transaction). . . . Nothing was done to shore up
> the status of the Cayman Islands company. As you may recall, the lack of any

substance (to the Cayman company) was the primary objection of an attorney from a prominent firm (who was reviewing the FLIP product for his client). The LLC memorandum to DeLap suggested some possibilities in this regard. As it stands now, the Cayman company remains extremely vulnerable to an argument that it is a sham. (Emphasis added.)

53.    On May 26, 1998, KPMG's Greg Ritchie authored an incriminating internal

memorandum, titled "OPIS Tax Shelter Registration." In this memorandum, Ritchie states, in

part:

> For purposes of this discussion, I will assume that we will conclude that the OPIS product meets the definition of a tax shelter under IRC section 6111façade. ... Based on this assumption, *the following are my conclusions and recommendations as to why KPMG should make the business/strategic decision not to register the OPIS product as a tax shelter.* My conclusions and resulting recommendation are based upon the immediate negative impact on the Firm's strategic initiative to develop a sustainable tax products practice and the long-term implications of establishing a precedent in registering such a product. ... *First, the financial exposure to the Firm is minimal. Based upon our analysis of the applicable penalty sections, we conclude that the penalties would be no greater than $14,000 per $100,000 in KPMG fees.* Furthermore, as the size of the deal increases, our exposure to the penalties decreases as a percentage of our fees. For example, our average deal would result in KPMG fees of $360,000 with a maximum penalty exposure of only $31,000. This further assumes that KPMG would bear 100 percent of the penalty. In fact, as explained in the attached memo, the penalty is joint and several with respect to anyone involved in the product who was required to register. ... If other OPIS participants (*e.g.*, Deutsche Bank, Brown & Wood, etc.) were also found to be promoters subject to the registration requirements, KPMG' s exposure would be further minimized. Finally, any ultimate exposure to the penalties are abatable if it can be shown that we had reasonable cause. ... Third, the tax community at large continues to avoid registration of all products. Based on my knowledge, the representations made by Presidio and Quadra, and Larry DeLap's discussions with his counterparts at other Big 6 firms, there are no tax products marketed to individuals by our competitors, which are registered. This includes income conversion strategies, loss generation techniques, and other related strategies. *Should KPMG decide to begin to register its tax products, I believe that it will position us with a severe competitive disadvantage in light of industry norms to such degree that we will not be able to compete in the tax advantaged products market. ... Fourth, there has been (and, apparently, continues to be) a lack of enthusiasm on the part of the Service to enforce section 6111.* In speaking with KPMG individuals who were at the Service (*e.g.*, Richard Smith), the Service has apparently purposefully ignored enforcement efforts related to section 6111. In informal discussions with individuals currently at the Service, WNT (Washington National Tax) has confirmed that there are not many registration applications

submitted and they do not have the resources to dedicate to this area. . . . *Based on the above arguments, it is my recommendation that KPMG does not register the OPIS product as a tax shelter. Any financial exposure that may be applicable can easily be dealt with by setting up a reserve against fees collected. Given the relatively nominal amount of such potential penalties, the Firm's financial results should not be affected by this decision. ... In summary, I believe that the rewards of a successful marketing of the OPIS product (and the competitive disadvantages, which may result from registration) far exceed the financial exposure to penalties that may arise.* Once you have had an opportunity to review this information, I request that we have a conference with the persons on the distribution list (and any other relevant parties) to come to a conclusion with respect to my recommendation. As you know, we must immediately deal with this issue in order to proceed with the OPIS product. (Emphasis added.)

54.    In 1999, BLIPS was developed through KPMG's "Tax Innovation Center," whose sole purpose was to develop such products. BLIPS was a successor product to OPIS, which was itself a successor to FLIP. In an effort to avoid IRS detection, these tax products were marketed for only one or two years.

55.    A draft KPMG memorandum, dated May 18, 2001, sets forth the chronology of KPMG's development of the FLIP, OPIS and BLIPS products:

In 1997, Gregg Ritchie formed CaTS [the Capital Transaction Services practice group, later renamed Innovative Strategies] around the Foreign Leveraged Investment Program (FLIP) capital loss strategy. The initial revenue goal was $4 million and the practice delivered $11 million in fiscal '98. After calendar 1997, DPP [KPMG's Department of Practice and Professionalism] retired the FLIP strategy leaving Ritchie (before his 1998 retirement from the Firm), Randy Bickham and Jeff Eischeid to devise a replacement capital loss strategy, the Offshore Portfolio Investment Strategy (OPIS). The fiscal '99 IS revenue goal was $18 million and the practice delivered $28 million. The practice's success was largely attributable to OPIS revenue generated in calendar '98. After calendar '98, DPP retired the OPIS strategy leaving Bickham, Eischeid and Mark Watson [of KPMG's Washington National Tax Center] to devise a replacement strategy, the Bond Linked Issue Premium Structure (BLIPS). The fiscal '00 IS revenue goal was $38 million and the practice delivered $52 million (without accruals). Again, the success was largely attributable to a single strategy, BLIPS. It is noteworthy in that BLIPS was very flexible in that it generated either capital or ordinary losses (or both). After calendar year 1999, DPP retired the BLIPS strategy leaving Eischeid to devise a replacement strategy.

56.    Further evidence of KPMG's ongoing commitment to selling generic tax products was a draft business plan for fiscal year 2002, prepared for the Personal Financial Planning (PFP) Tax Practices Innovative Strategies Group (Tax Strategies Group). This business plan indicated that, while the IS Group's marketing efforts had decreased after IRS issuance of new tax shelter notices, it had done all the preparatory work needed to resume vigorous marketing of new, potentially abusive tax shelters in 2002. The IS business plan first recounts the Group's past work on FLIP, OPIS and BLIPS, noting that the millions of dollars in revenue produced from sales of these tax products had enabled IS to exceed its annual revenue goals in each year from 1998 until 2000. The business plan then stated:

> The fiscal [2001] IS revenue goal was $38 million and the practice had delivered $16 million through period 10. The shortfall from plan is primarily attributable to the August 2000 issuance [by the IRS] of Notice 2000-44. This Notice specifically described both the retired BLIPS strategy and the then current [replacement, the Short Option Strategy or] SOS strategy. Accordingly, we made the business decisions to stop the implementation of 'sold' SOS transactions and to stay out of the 'loss generator' business for an appropriate period of time.

## III.    KPMG KNOWINGLY APPROVED AND MARKETED ABUSIVE TAX SHELTERS SUCH AS FLIP, OPIS, BLIPS AND SOS

57.    The Senate Subcommittee found that in developing its tax shelter schemes, KPMG used "a process which pressured its tax professionals to generate new ideas, move them quickly through the development process, and *approve, at times, illegal or potentially abusive tax shelters*." (Emphasis added.) The Senate Subcommittee concluded that evidence relating to FLIP, OPIS, BLIPS and SOS (among other tax products developed by KPMG) "demonstrates that the KPMG development process led to the approval of tax products that senior KPMG tax professionals *knew had significant technical flaws and were potentially illegal tax shelters*." (Emphasis added.)

- 24 -

58.    As alleged herein, KPMG officials had become concerned that technical problems with FLIP would alert the IRS to the abusive and illegal nature of the FLIP product. Hence, as set forth in a March 1998 e-mail from Jeffrey Stein, the former second-in-command of KPMG's Tax Services Practice, "the OPIS product was developed in response to DPP Tax's concerns over the FLIP strategy." OPIS was not substantively different from FLIP, but was an effort by KPMG to create better "optics," *i.e.*, to better conceal the illegal nature of the product.

59.    Just like FLIP, OPIS sought to generate a large, artificial capital loss through a complicated "basis-shift" transaction. Just like FLIP, the vehicle used to accomplish this involved creation of a shell Cayman Island company, the U.S. taxpayer's purchase of an interest in the Cayman Island company, the Cayman Island company's purchases and sales of foreign bank stock (such as Deutsche Bank or UBS) and options, and the U.S. taxpayer's purchases and sales of the foreign bank stock and options.

60.    The essential mechanics of FLIP and OPIS were identical, other than KPMG's efforts to provide better "optics," or "window-dressing," to give OPIS the appearance of having a "business purpose" or "economic substance." As noted in a February 23, 1998, memorandum from Robert Simon, a senior KPMG tax professional, to several other KPMG tax professionals, "[t]he only thing that really distinguishes OPIS (from FLIPS) from a tax perspective is the use of an instrument that is purported to be a swap. . . . However, the instrument described in the opinion is <u>not</u> a swap under I.R.C. § 446." (Emphasis in original.)

61.    KPMG's internal e-mails and other documents demonstrate that KPMG knew exactly how serious the technical flaws in OPIS were. As evidenced by KPMG's February 23, 1998 email roughly seven months before OPIS was approved for sale to clients, Simon noted: "In OPIS, the use of debt has apparently been jettisoned. If we can not structure a deal without

- 25 -

at least some debt, it strikes me that all of the investment banker's economic justification for the deal is smoke and mirrors."

62.    Simon bluntly labeled OPIS as "doubtful" to pass IRS scrutiny, a far cry from the "more likely than not" opinion letters being pumped out by KPMG and Brown & Wood: "If the risk of loss concepts of Notice 98-5 were applied to OPIS, I doubt that the investor's ownership interest would pass muster. . . . *As it stands now, the Cayman company remains extremely vulnerable to an argument that it is a sham*." (Emphasis added.)

63.    On May 26, 1998, Mark Springer of KPMG sent an e-mail to Gregg Ritchie, Jeff Stein and other KPMG personnel with the subject "OPIS Tax Shelter Registration." Springer wrote: "If for some reason the IRS decides to 'get tough' with someone vis-à-vis the old rules, I suspect it could easily pick on ANY of the Big 6 or for that matter any number of law firms/promoters — I don't think we want to create a competitive DISADVANTAGE, nor do we want to lead with our chin." In other words, KPMG knew OPIS was a tax shelter that needed to be registered, but chose not to do so because that would hurt KPMG's ability to compete effectively against the unlawful tax products being sold by other accounting firms.

64.    In a January 21, 2000, email to KPMG tax professionals, Richard Bailine stated:

Folks — just so we are all on the same page, please be aware that I just left David a voicemail telling him that in my view OPIS is NOT a viable strategy anymore. I had been very concerned about OPIS strictly from an economic substance point of view and would have preferred to see OPIS not sold by our Firm simply because of this. . . . Please call to discuss if you have any questions but given the above, especially in concert with existing concerns over economic substance, I do not see how KPMG can go forward with OPIS. (Emphasis added.)

65.    These concerns were never shared with Plaintiffs.

66.    Although KPMG initially halted sales of OPIS in 1998, Larry DeLap, the head of the KPMG Department of Professional Practice ("DPP") for Tax, which approved and reviewed all new KPMG tax products for sale to clients, eventually permitted KPMG to resume selling

- 26 -

OPIS. Ironically, after DeLap discontinued BLIPS sales in 1999, he was pressed by the BLIPS

National Deployment Champion and others for an alternative product. Bowing to this pressure,

DeLap relented and allowed KPMG tax professionals to resume sales of OPIS.

67.    A February 23, 2000, e-mail further underscores the fact that KPMG and Brown

& Wood knew that they were selling illegal products: "WNT is concerned that recent regulatory

changes adversely impact our ability to issue a MLTN [more likely than not] opinion." After

discussing the possible impact of recently regulatory changes and their potential application to

OPIS, the e-mail provides presciently: "First of all, we would be unable to issue MLTN opinions

on approximately 25 OPIS transactions that were consummated in 1999. Furthermore, the

collateral damage with clients would be devastating. In addition to approximately $10MM in

fees that could be refundable, we would be at risk relative to significant client relationships,

underpayment penalties, outside fees and expenses." The e-mail concludes by stating that,

notwithstanding these concerns, all pending OPIS opinion letters have been substantially

completed and were awaiting approval.

68.    BLIPS was proposed as a replacement product for OPIS in late 1998. Just as

KPMG had replaced FLIP with OPIS, KPMG replaced OPIS with BLIPS.

69.    From the beginning, senior KPMG tax leadership put pressure on the firm's tax

professionals to quickly approve BLIPS for sale to clients. The Senate Subcommittee found that:

"Some of the most difficult technical questions, including whether the BLIPS transactions had

economic substance, were assigned to two of WNT's most senior tax partners, who despite this

difficulty, took just 2 weeks to determine, on March 5, that their technical concerns had been

resolved."

70.    A February 10, 1999, email demonstrates that KPMG was bent on hurrying

BLIPS to market, and that the "approval" of BLIPS was never in serious doubt. After being told

that BLIPS would likely be approved in approximately one month, the head of KPMG's entire

Tax Services Practice, John Lanning, wrote in the February 10, 1999, e-mail:

> Given the marketplace potential of BLIPS, I think a month is far too long —
> especially in the spirit of 'first to market.' I'd like for all of you, within the
> bounds of good professional judgement, to dramatically accelerate this timeline.
> . . . I'd like to know how quickly we can get this product to market.

71.    Mark Watson, the technical expert in KPMG's Personal Financial Planning

("PFP") practice, the division of KPMG that focused on selling "tax-advantaged" products to

high net worth individuals and large corporations and led KPMG's efforts on BLIPS, was

assigned responsibility for moving BLIPS through the review process. Five days after Lanning

wrote his e-mail inquiring how quickly BLIPS could get to market, Watson wrote to several

colleagues asking for a "progress report." He added a postscript: "P.S. I don't like this pressure

any more than you do."

72.    On April 30 and May 1, 1999, a number of KPMG tax professionals working on

BLIPS attended a meeting with Presidio to discuss how the investments called for by the product

would actually be carried out. At these meetings, a Presidio representative commented that "the

probability of actually making a profit from this transaction is remote," and stated that the bank

would have a "veto" over how the loan proceeds used to finance the BLIPS deal would be

invested. According to Watson, the technical expert in KPMG's PFP practice, these statements,

if true, meant the investment program at the heart of the BLIPS product lacked the economic

substance and the business purpose required by law, and therefore, would be an abusive tax

shelter.

73.    After these meetings with Presidio, on May 4, 1999, Watson wrote to Larry

DeLap, the DPP head, expressing doubts about approving BLIPS:

> Larry, while I am comfortable that WNT did its job reviewing and analyzing the
> technical issues associated with BLIPS, based on the BLIPS meeting I attended
> on April 30 and May 1, *I am not comfortable issuing a more-likely-than-not
> opinion letter [with respect to] this product for the following reasons:* "[T]he
> probability of actually making a profit from this transaction is remote (possible,
> but remote); . . . The bank will control how the 'loan' proceeds are invested via a
> veto power over Presidio's investment choices; and it appears that the bank wants
> the 'loan' repaid within approximately 60 days. . . .
>
> Thus, I think it is questionable whether a client's representation [in a tax opinion
> letter] that he or she believed there was a reasonable opportunity to make a profit
> is a reasonable representation. Even more concerning, however, is whether a loan
> was actually made. If the bank controls how the loan proceeds are used and when
> they are repaid, has the bank actually made a bona fide loan?
>
> I will no doubt catch hell for sending you this message. *However, until the above
> issues are resolved satisfactorily, I am not comfortable with this product.*

(Emphasis added.)

74.    DeLap responded: "It is not clear to me how this comports with your April 27

message [expressing comfort with BLIPS], but because this is a PFP product and you are the

chief PFP technical resource, the product should not be approved if you are uncomfortable."

Watson responded that he had learned new information about how the BLIPS investments would

occur during his meetings with Presidio, and it was this subsequent information that caused him

to reverse his position on issuing a tax opinion letter supporting the product.

75.    On May 7, 1999, DeLap forwarded Watson's e-mail to Douglas K. Ammerman,

Jeffrey A. Eischeid, and Randall S. Bickham (copying Lanning and Jeff Stein), the leadership of

KPMG's tax group and noted: "I don't believe a PFP product should be approved when the top

PFP technical partner in WNT believes it should not be approved."

76.    On May 8, 1999, Lanning, the head of KPMG's entire Tax Services Practice,

wrote: "I must say that I am amazed that at this late date (must now be six months into this

process) our chief WNT PFP technical expert has reached this conclusion. I would have thought
that Mark would have been involved in the ground floor of this process, especially on an issue as
critical as profit motive. What gives? This appears to be the antithesis of 'speed to market.' Is
there any chance of ever getting this product off the launching pad, or should we simply give
up???"

77.     Watson was not the only KPMG tax professional to express concerns about
BLIPS. For example, on May 9, Richard H. Smith, one of the senior WNT partners at KPMG
supporting BLIPS sent an e-mail to Steven M. Rosenthal, one of the WNT technical reviewers
objecting to BLIPS, and asked him: "Based on your analysis . . . do you conclude that the tax
results sought by the investor are NOT 'more likely than not' to be realized?" Rosenthal
responded: "Yes." (Emphasis in original.)

78.     Despite these clear acknowledgments that BLIPS would be nothing more than an
illegal, unregistered tax shelter, on May 10, Philip J. Wiesner, the head of WNT, sent a long
email to eight senior KPMG tax professionals, including Watson, DeLap, the head of KPMG's
DPP for Tax, and Lanning, the head of KPMG's Tax Services Practice, urging final approval of
BLIPS. Wiesner wrote, in part:

> The business decisions to me are primarily two: (1) Have we drafted the opinion
> with the appropriate limiting bells and whistles . . . and (2) Are we being paid
> enough to offset the risks of potential litigation resulting from the transaction? . . .
> *My own recommendation is that we should be paid a lot of money here for our*
> *opinion since the transaction is clearly one that the IRS would view as falling*
> *squarely within the tax shelter orbit . . . ."* (Emphasis added.)

79.     The same day Wiesner sent his e-mail recommending that KPMG extract large
fees for BLIPS, Watson again voiced concerns about BLIPS in an e-mail to Lanning:

> John, in my defense, my change in heart about BLIPS was based on information
> Presidio disclosed to me at a meeting on May 1. This information raised serious
> concerns in my mind about the viability of the transaction, and indicated that
> WNT had not been given complete information about how the transaction would

be structured. ... I want to make money as much as you do, but I cannot ignore information that raises questions as to whether the subject strategy even works. Nonetheless, I have sent Randy Bickham four representations that I think need to be added to our opinion letter. Assuming these representations are made, I am prepared to move forward with the strategy.

80.    The next day, May 11, Watson reiterated his doubts in an e-mail to DeLap in which he stated: "Larry, I don't like this product and would prefer not to be associated with it. However, if the additional representations I sent to Randy on May 9 and 10 are in fact made, based on Phil Wiesner's and Richard Smith's input, I can reluctantly live with a more-likely-than-not opinion being issued for the product." According to the Senate Report, however, Watson told the Senate Subcommittee staff that he never, at any time after May 1, 1999 meeting, expressed clear support for approving the sale of BLIPS.

81.    Over the course of the next year, KPMG sold BLIPS to 186 individuals and obtained more than $50 million in fees, making BLIPS one of its highest revenue-producing tax products to date.

82.    Based on the above, it is clear that senior KPMG tax professionals knew that the BLIPS product was "clearly one that the IRS would view as falling squarely within the tax shelter orbit." It is also clear how important "speed to market" was as a factor in the review and approval process. It is further clear that Watson, KPMG's key technical tax expert, reluctantly agreed to approve a tax product that he did not support or want to be associated with, in response to the pressure exerted by senior KPMG Tax Services professionals. Finally, it is clear that senior KPMG tax professionals knew they were approving a dubious tax product that would be sold in part by relying on KPMG's "reputation" and that they did so in order to enrich KPMG and themselves, without any regard for the effects it would have on the purchasers.

83.    Key KPMG tax professionals continued to express serious concerns about the technical validity of BLIPS *even after it was approved for sale* by KPMG.  For example, in July

1999, two months after BLIPS was approved by KPMG, Watson sent an e-mail to his superiors

in WNT — Philip Wiesner, the head of KPMG's WNT practice, and Richard Smith, one of the

senior WNT partners — questioning whether the BLIPS transaction had "economic substance."

Watson pointed out that his calculations showed *that the planned foreign currency transactions*

*involved in BLIPS would "have to generate a 240% annual rate of return" just to break even*.

(Emphasis added). His e-mail then asked his superiors whether they were "still comfortable with

the economic substance of this transaction." His superiors later indicated that they were.

      84.    One month later, in August 1999, after completing a review of the BLIPS

transactional documents, Watson again expressed concerns to his superiors in WNT:

> However before engagement letters are signed and revenue is collected, *I feel it is*
> *important to again note that I and several other WNT partners remain skeptical*
> *that the tax results purportedly generated by a BLIPS transaction would*
> *actually be sustained by a court if challenged by the IRS.* We are particularly
> concerned about the economic substance of the BLIPS transaction, and our review
> of the BLIPS loan documents has increased our level of concern. (Emphasis
> added.)

      85.    Steven Rosenthal, one of the WNT technical reviewers, also expressed his

concerns, writing:

> I share your concerns. We are almost finished with our technical review of the
> documents that you gave us, and we recommend some clarifications to address
> these technical concerns. We are not, however, assessing the economic substance
> of the transaction (ie., is there a debt? Who is the borrower? What is the amount
> of the liability? Is there a reasonable expectation of profit?) I continue to be
> seriously troubled by these issues, but I defer to Phil Wiesner and Richard Smith
> to assess them.

      86.    Despite these grave concerns, the senior partners in WNT chose to go forward

with BLIPS. Nevertheless, it is clear that BLIPS was never wholly accepted as legitimate within

KPMG. For example:

         (a)    In August 1999, in response to an e-mail stating that KPMG would

provide a "more likely than not" opinion, indicating a greater than 50% chance of success on the

merits, Paul Kearns, a KPMG tax professional who refused to sell BLIPS to his clients, wrote

"[j]ust so we are clear, *I personally view it no greater than 15%.*" (Emphasis added.)

        (b)    A BLIPS power point presentation produced by the PFP group in June

1999, a few weeks after BLIPS' approval for sale, characterized BLIPS as having "about *a 10*

*risk on [a] scale of 1–10*." (Emphasis added.)

        (c)    In March 2000, Rosenthal, who had objected to the BLIPS product,

expressed his concern about BLIPS, "grandfathered BLIPS," and KPMG's plan to develop a

modified "BLIPS 2000." In a March 6, 2000 e-mail, Rosenthal stated:

> I am writing to communicate my views on the economic substance of the Blips,
> Grandfathered Blips, and BLIPS 2000 strategies. Throughout this process, I have
> been troubled by the application of economic substance doctrines . . . and have
> raised my concerns repeatedly in internal meetings. The facts as I now know
> them and the law that has developed, has not reduced my level of concern.
>
> *In short, in my view, I do not believe that KPMG can reasonably issue a more-
> likely-than-not opinion on these issues.* (Emphasis added.)

    87.    Notwithstanding all of the flaws and deficiencies which KPMG professionals had

identified in FLIP, OPIS and BLIPS, certain KPMG tax partners assisted in implementing SOS-

type transactions for KPMG clients for a fee to KPMG generally equal to 1% of the tax losses to

be generated, and prepared and caused to be prepared tax returns based on the phony SOS tax

losses. For many of these SOS-type transactions, where KPMG did not issue an opinion letter,

certain law firms, including Brown & Wood, issued "more likely than not" opinion letters with

respect to those transactions. The SOS opinion letters, and other associated documents, were

false and fraudulent since they misrepresented SOS as an investment, when in truth and in fact, it

was a tax shelter designed to generate tax losses and garner substantial fees and income for

KPMG, Brown & Wood and others.

88.    In addition, from at least 1999 through at least 2002, a KPMG partner, with the approval of members of KPMG's tax leadership, marketed and implemented dozens of SOS-type transactions to KPMG clients, often charging fees well in excess of 1% of the phony tax loss to be generated.

## IV.    THE MASS-MARKETING OF FLIP, OPIS, BLIPS AND SOS

89.    KPMG undertook massive efforts to market FLIP, OPIS, BLIPS and SOS. Indeed, the Senate Subcommittee noted that many potential buyers had little interest in the tax shelters, did not understand them, and likely would have not used them if they were not approached by KPMG.  In selling and marketing FLIP, OPIS, BLIPS and SOS, KPMG affirmatively and aggressively targeted potential clients for sales pitches on tax products, including at times, according to the Senate Subcommittee, using "high-pressure sales tactics." The Senate Subcommittee found that:

> KPMG used aggressive marketing tactics to sell its generic tax products by
> turning tax professionals into tax product salespersons, pressuring its tax
> professionals to meet revenue targets, using telemarketing to find clients,
> developing an internal tax sales force, using confidential client tax data to find
> clients, targeting its own audit clients for sales pitches, and using tax opinion
> letters and insurance policies as marketing tools.

90.    KPMG compiled and scoured prospective client lists, exhorted its personnel to meet aggressive sales targets, closely monitored all sales efforts, advised its professionals to use questionable sales techniques, and even used cold calls to drum up business.  KPMG maintained an extensive marketing infrastructure to sell its tax products, including a market research department, a Sales Opportunity Center that worked on tax product "marketing strategies," and even a full-fledged telemarketing center staffed with people trained to make cold calls to find buyers for specific tax strategies.

91.    KPMG also allowed a corporate culture to exist in KPMG's Tax Services Practice

that condoned placing intense pressure on the firm's tax professionals — certified public

accountants and lawyers included — to sell the firm's generic tax products.  Numerous internal

e-mails by senior KPMG tax professionals exhorted colleagues to increase their sales efforts.

For example, in an e-mail dated February 18, 2000, Richard Rosenthal thanked everyone for a

very quick approval process with respect to a KPMG tax product, and than implored the

recipients of the e-mail: "Now let's SELL, SELL, SELL!!"

92.    Additionally, an e-mail asked all partners in KPMG's premier technical tax group,

the WNT, to "temporarily defer non-revenue producing activities" and concentrate for the "next

5 months" on meeting WNT's revenue goals for the year.  The e-mail stated:

> Listed below are the tax products identified by the functional teams as having
> significant revenue potential over the next few months. . . . Thanks for help in this
> critically important matter. As [the Tax Services Practice second in command]
> said, 'We are dealing with ruthless execution—hand to hand combat—blocking
> and tackling.' Whatever the mixed metaphor, let's just do it.

93.    KPMG also used opinion letters issued by KPMG and nationally prominent law

firms, like Brown & Wood, as selling points to try to convince uncertain buyers to purchase a tax

product.  KPMG tax professionals were instructed to tell potential buyers that opinion letters

supporting the legality of FLIP, OPIS, BLIPS and SOS would be provided by both KPMG and

Brown & Wood.  Thus, KPMG presented its tax products, including FLIP, OPIS, BLIPS and

SOS, as a risk-free gambit for its clients.  In the words of the Senate Subcommittee, KPMG

"deliberately traded on its reputation as a respected accounting firm and tax expert in selling

questionable tax products."

94.    A tax opinion letter, sometimes called a legal opinion letter when issued by a law

firm, is intended to provide written advice to a client on whether a particular tax product is

permissible under the law and, if challenged by the IRS, how likely it would be that the

- 35 -

challenged product would survive court scrutiny. Such opinion letters are supposed to be rendered by an independent tax expert with no financial stake in the transaction being evaluated. Moreover, individualized opinion letters are supposed to be created to suit each individual client's needs and should not be mass-produced boilerplate letters into which only names and addresses are inserted prior to mailing.

95.    KPMG and Brown & Wood engaged in the mass production of its respective boilerplate opinion letters in connection with the sale of FLIP, OPIS, BLIPS and SOS. The Senate Report noted that the KPMG and Brown & Wood opinion letters were virtually identical in content and reflected little, if any, individualized client interaction or legal advice."

96.    In connection with FLIP, OPIS, BLIPS and SOS, KPMG arranged for Brown & Wood to provide a second favorable opinion letter. Brown & Wood issued hundreds of opinion letters supporting FLIP, OPIS, BLIPS and SOS. KPMG would either direct its clients to Brown & Wood to obtain the second opinion letter, or KPMG itself obtained the second opinion letter from the law firm and delivered it to the client, without the client's actually speaking to, or being advised by, any of the lawyers at Brown & Wood. Consequently, the independence of Brown & Wood's opinion letter was compromised.

97.    The findings of Chief Judge Thomas F. Hogan of the United States District Court for the District of Columbia support the conclusion that the opinion letters issued by Brown & Wood were shams, designed solely for the purpose of advancing KPMG's scheme to market its tax shelters. In an action to enforce IRS summonses requesting information relating to KPMG's promotion of and participation in tax shelter transactions, Chief Judge Hogan found evidence that "Brown & Wood was not engaged in rendering true legal advice, but was rather a partner with KPMG in its tax shelter marketing strategy."

- 36 -

98.    Chief Judge Hogan went on to conclude, based on the court's review of the tax

shelter opinion letters provided to KPMG clients by Brown & Wood, that the letters were

canned, one-size-fits-all opinions that were not independent and whose purpose was to assist

KPMG's marketing of the tax shelters rather than provide genuine legal advice.  Chief Judge

Hogan stated:

> Having reviewed the Brown & Wood 'opinion letters' through the lens of the
> newly discovered evidence, the Court finds these opinion letters to be ***boiler-plate***
> ***templates that are almost, if not completely, identical*** except for date, investor
> name, investor advisor, and dates and amounts of investment transactions. ***There***
> ***is little indication that these are independent opinion letters that reflect any sort***
> ***of legal analysis***, reasoned or otherwise.  In fact, when examined as a group, the
> letters appear to be ***nothing more than an orchestrated extension of KPMG's***
> ***marketing machine.*** (Emphasis added.)

99.    Chief Judge Hogan characterized e-mails produced by KPMG for in-camera

inspection as "evidence" of an "***improper arrangement between KPMG and Brown & Wood to***

***further KPMG's tax shelter marketing strategy***." (Emphasis added.)  Chief Judge Hogan also

found that KPMG attempted to conceal its tax shelter scheme from an IRS investigation, stating

that, "[a]fter carefully reviewing the entire record of this case, the Court comes to ***the***

***inescapable conclusion that KPMG has taken steps since the IRS investigation began that***

***have been designed to hide its tax shelter activities***." (Emphasis added.)

100.    The opinion letters issued by KPMG and Brown & Wood also violated Treasury

regulations which provide:

> The advice [in an opinion letter] must not be based on unreasonable factual or
> legal assumptions (including assumptions as to future events) and must not
> unreasonably rely on the representations, statements, findings, or agreements of
> the taxpayer or any other person.  For example, the advice must not be based upon
> a representation or assumption which the taxpayer knows, or has reason to know,
> is unlikely to be true, such as an inaccurate representation or assumption as to the
> taxpayer's purposes for entering into a transaction or for structuring a transaction
> in a particular manner.

Treas. Reg. § 1.6664-4(c).

101.    KPMG stated in its opinion letters that its analysis relied on "factual representations" provided by, among others, the client. Thus, KPMG's prototype BLIPS tax opinion letter stated that KPMG's "opinion and supporting analysis are based upon the following description of the facts and representations associated with the investment transactions undertaken by Investor." Brown & Wood's prototype opinion letter contained the same language.

102.    These statements, and similar statements in KPMG's and Brown & Wood's opinion letters concerning FLIP, OPIS and SOS, were entirely false. In fact, as described above, KPMG and Brown & Wood had drafted their opinion letters long before FLIP, OPIS, BLIPS and SOS were even offered for sale. Plaintiffs and the other members of the Class did not make representations about investments to KPMG or to Brown & Wood, but rather, relied upon the Defendants and certain Non-Parties for all investment and tax advice concerning FLIP, OPIS, BLIPS and SOS.

103.    Not only did KPMG and Brown & Wood attribute factual representations to Plaintiffs that Plaintiffs had not made, but the Defendants also refused to allow clients to deviate from the already-drafted representations, even when clients disagreed with the statements purportedly attributed to them.

104.    In addition, various of the key factual representations that KPMG attributed to clients contained false or misleading statements. For example, in the BLIPS prototype representation letter, KPMG wrote: "Investor has represented to KPMG . . . [that the] Investor independently reviewed the economics underlying the [BLIPS] Investment Fund before entering into the program and believed there was a reasonable opportunity to earn a reasonable pretax profit from the transactions." KPMG included these identical, prefabricated "client

- 38 -

representations" in the opinion letters to create the appearance of a client profit motive and a

reasonable opportunity to earn a reasonable pre-tax profit, both of which are central factors in

determining whether a tax strategy has a business purpose and economic substance apart from its

respective tax benefits. These "client representations" were repeated substantially verbatim in

every FLIP, OPIS, BLIPS and SOS tax opinion letter KPMG and Brown & Wood issued.

105.    KPMG and Brown & Wood knew that these boilerplate "factual representations"

and "client representations" were false. In an October 21, 2003, public hearing before the Senate

Committee, a KPMG Senior Manager who was placed on indefinite leave after reporting the

firm's unlawful activity to federal officials, testified that "the tax shelter promoters are well

aware that many of the facts and representations contained in the associated tax opinion letter

(e.g., business purpose and step-transactions facts) are false . . . ."

106.    In addition, because the products were pre-wired, Defendants and the Non-Parties

knew there was, at best, only a remote theoretical possibility that a client would ever earn a profit

on a FLIP, BLIPS, OPIS or SOS transaction. Nevertheless, because the existence of a

reasonable opportunity to earn a reasonable profit was critical to creating the appearance that

these transactions had economic substance, KPMG and Brown & Wood included these "client

representations" in their FLIP, OPIS, BLIPS and SOS tax opinion letters despite full knowledge

of their falsity.

107.    Internal e-mails reveal that KPMG recognized that the "representation" that the

client expected to make a profit on BLIPS was untrue. In 2000, Philip Wiesner, the KPMG tax

partner in charge of WNT, wrote:

> Lastly, an issue that I am somewhat reluctant to raise but I believe is very
> important going forward concerns the representations that we are relying on in
> order to render our tax opinion in BLIPS I. *In each of the 66 or more deals that*
> *were done last year, our clients represented that they "independently' reviewed*

- 39 -

*the economics of the transaction and had a reasonable opportunity to earn a pretax profit.* . . . As I understand the facts, all 66 closed out by year-end and triggered the tax loss. Thus, while I continue to believe that we can issue the tax opinions on the BLIPS I deals, *the issue going forward is can we continue to rely on the representations in any subsequent deals if we go down that road?* . . . My recommendation is that we deliver the tax opinions in BLIPS I and close the book on BLIPS and spend our best efforts on alternative transactions. (Emphasis added.)

108.    This e-mail and other documentation indicate that KPMG was well aware that the BLIPS transactions were of limited duration and uniformly produced substantial tax losses that "investors" used to offset and shelter other income from taxation. This growing factual record, showing that BLIPS investors invariably lost money, made it increasingly difficult for KPMG to rely on an alleged client representation about BLIPS having a reasonable profit potential. It also demonstrated that KPMG knew that its BLIPS product had virtually no profit potential. KPMG nevertheless continued to sell the product and to issue tax opinion letters relying on a critical purported "client representation" that KPMG had drafted without client input and attributed to its client, but which KPMG knew or had reason to know, was unsupported by the facts.

109.    For example, DeLap, the head of DPP, announced an end to BLIPS sales in the fall of 1999, but allowed KPMG tax professionals to complete numerous sales of BLIPS in 1999 and 2000 to taxpayers who had been solicited before KPMG announced the discontinuation of BLIPS sales. These purchasers were referred to internally at KPMG as "grandfathered BLIPS" clients. A handful of new sales (not involving "grandfathered BLIPS" clients) took place in 2000, over DeLap's objection, which was overruled by the head of the Tax Services Practice.

110.    KPMG's acts of fraud in developing, selling and executing abusive tax shelters, as well as KPMG's efforts to hide this conduct from the IRS, were also exposed by the written testimony of Michael Hamersely to the U.S. Senate Committee on Finance in October 2003. Mr. Hamersely explained how KPMG concealed the truth from its clients as well as the IRS:

- 40 -

During my tenure at KPMG, I have observed several disturbing practices and workplace conditions with respect to the promotion of abusive tax shelters, including but not limited to:

- Tax professionals ignoring unfavorable facts and law, inventing facts, and subtly shifting the responsibility for these false facts to tax shelter clients via the facts and representations included in the tax opinion letters associated with tax shelters (i.e., opinion letters based on hypothetical facts).

- Tax professionals attempting to conceal from the IRS the existence of a transaction or discovery of unfavorable facts and circumstances associated with tax shelters. This conduct occurred both in the design and implementation of the tax shelters (e.g., side agreements, multi-tier 'netting' structures, abuse of attorney/client privilege) and in subsequent IRS controversy matters (e.g., entering into IRS closing agreement without disclosing the existence of a listed transaction in the closed year). Tax shelters having a design or implementation intended to conceal unfavorable facts were often referred to and promoted by certain KPMG tax shelter partners as having 'good optics.'

- Tax shelter promoters engaging in conduct that demonstrates a blatant disregard for tax laws and those who write and enforce these laws. . . . In recent years, some tax shelter promoters have trivialized the risks associated with tax promotion of abusive tax shelters making statements to the effect of (i) the IRS will never discover the tax shelter because it does not have the resources or ability to do so, (ii) even if IRS does discover the tax shelter, the law will likely only be changed and enforced prospectively thus the penalties will be minimal, and (iii) all public accounting firms are selling these tax shelters and the government cannot shut down all of these firms.

- Tax shelter promoters misleading or otherwise inadequately informing tax shelter clients regarding the legal merits and true risks associated with these tax shelters, including the nature of the taxpayer representations provided and the limited scope of protection provided by KPMG's tax opinion letters.

- Tax professionals failing to inform tax shelter clients upon discovery of fatal flaws in tax shelters, particularly where such clients were KPMG audit clients and had already included the benefit of such tax shelters on their financial statements.

- 41 -

V.    **THE ROLE OF KPMG'S CO-CONSPIRATORS IN IMPLEMENTING
FLIP, OPIS, BLIPS AND SOS**

111.    KPMG enlisted several other professionals, including lawyers, bankers,

investment advisors and others, to carry out the transactions necessary to effectuate the FLIP,

OPIS, BLIPS and SOS transactions. Defendants and the Non-Parties entered into an agreement,

combination, association and/or union associated in fact to develop, market and execute the

FLIP, OPIS, BLIPS and SOS transactions for the sole purpose of receiving and splitting millions

of dollars in fees. The Defendants and the Non-Parties knew that FLIP, OPIS, BLIPS and SOS

were abusive tax shelters, but were blinded by their desire to receive huge fees, and acted with a

willful disregard to the ramifications of selling fraudulent tax products to the Plaintiffs and the

Class.

112.    In executing their scheme, Defendants and the Non-Parties often performed

separate tasks, including, but not limited to, finding prospects for the tax products, which was

usually KPMG's responsibility; promoting the FLIP, OPIS, BLIPS and SOS strategies to

potential investors, which was usually the responsibility of KPMG and/or Presidio or

Quadra/QA/Quellos; arranging the purportedly proper investment transactions through a foreign

bank such as Deutsche Bank, HVB, NatWest or UBS, which transactions were usually

performed by these banks with Presidio or Quellos; processing the trades, which was usually

performed by Deutsche Bank, HVB, NatWest or UBS; handling the paperwork such as the tax

opinions, which was usually performed by KPMG and/or Presidio or Quellos; processing

documentation concerning the transactions, which was usually performed by Presidio or Quellos

and Deutsche Bank, HVB, NatWest or UBS, with assistance from KPMG; processing cash

disbursements, which was usually performed by Presidio, Quellos, Deutsche Bank, HVB,

NatWest, UBS and/or KPMG; and supplying financial data for Plaintiffs' tax returns, which was usually performed by KPMG and Presidio or Quellos.

### A.    Brown & Wood

113.    As previously described, in exchange for substantial fees, Brown & Wood actively facilitated KPMG's development, implementation and sale of FLIP, OPIS, BLIPS and SOS, including providing design and technical assistance and collaborating with KPMG on allegedly "independent" opinion letters representing to clients that the tax products would withstand IRS challenge. According to the Minority Staff Report, "Sidley Austin Brown & Wood . . . became a member of a working group that jointly developed OPIS." The Senate Subcommittee found that Brown & Wood:

> Provided legal services that facilitated the development and sale of potentially abusive or illegal tax shelters, including by providing design assistance, collaboration on allegedly independent tax opinion letters, and hundreds of boilerplate tax opinion letters to clients referred by KPMG and others, in return for substantial fees.

114.    Thus, Brown & Wood did more than simply draft opinion letters supporting KPMG tax products. Brown & Wood played a significant and ongoing role in the development, marketing, and implementation of FLIP, OPIS, BLIPS and SOS and formed an alliance with KPMG in order to do so. For example, a September 1997 e-mail between Gregg Ritchie and Randall Hamilton of KPMG states: "our deal with Brown and Wood is that if their name is used in selling the strategy, they will get a fee. We have decided as a firm that [Brown & Wood] opinion should be given in all deals. If you did a Quadra deal, our share of this cost is $25K. If you did a deal through Presidio, the cost is already built in to the fee schedule."

115.    Moreover, a December 1997 e-mail by Randall Bickham of KPMG states that KPMG and Brown & Wood had formed an alliance or agreement "to jointly develop and market tax products and jointly share in the fees." A December 1997 KPMG memorandum from

- 43 -

Randall Bickham to Gregg Ritchie indicates that KPMG formed a "strategic alliance" with Brown & Wood to "develop and market products for both high-wealth individuals and publicly-traded corporations." This same memorandum confirms that KPMG "had strategic alliances with Quadra and Presidio." Another December 1997 e-mail, from R.J. Ruble of Brown & Wood, stated: "This morning my managing partner, Tom Smith, approved Brown & Wood LLP working with the newly conformed tax products group at KPMG on a joint basis in which we would jointly develop and market tax products and jointly share in the fees." In 1999, Brown & Wood's management committee specifically approved BLIPS as a new client matter for tax advice services to KPMG.

116.    A December 1997 KPMG memorandum stated: "[W]e need to consummate a formal strategic alliance with Brown & Wood." Three months later, an internal KPMG memorandum discussing an upcoming meeting between KPMG and Brown & Wood stated that KPMG tax professionals intended to discuss "how to institutionalize the KPMG/B&W relationship." Among other items, KPMG planned to discuss "the key profit-drivers for our joint practice," citing in particular KPMG's "Customer list" and "Financial commitment" and Brown & Wood's "Institutional relationships within the investment banking community." The memorandum stated that KPMG also planned to discuss "[w]hat should be the profit-split between KPMG, [Brown & Wood] and the tax products group implementer for jointly-developed products," and suggested that, in "a 7% deal," KPMG, [Brown & Wood] and the "Implementor" should split the net profits evenly, after awarding a "finder's allocation" to the party who found the taxpayer victim.

117.    Brown & Wood was instrumental in developing and participating in FLIP, OPIS, BLIPS and SOS transactions from inception, beginning with the design of FLIP and continuing

through the rendering of crucial legal opinions. Communications between Brown & Wood and KPMG uncovered by the Senate Subcommittee also indicate that Brown & Wood was part of the development team for BLIPS at its earliest stages and provided extensive and detailed technical assistance to KPMG in the development of BLIPS.

118.    Brown & Wood knew that the tax products it was promoting together with KPMG and the Non-Parties were illegal unregistered tax shelters. An unsigned handwritten memo regarding "Brown & Wood" and "OPIS," dated March 4, 1998, states: "<u>Must</u> register the product. [Brown & Wood] concerns — risk is too high. Confirm w/ Presidio that they will register." (Emphasis in original.) The IRS is currently auditing Brown & Wood to evaluate the law firm's role in the tax shelter scheme and its compliance with federal tax shelter requirements.

119.    The opinion letters provided by Brown & Wood were, like KPMG's opinion letters, materially uniform, virtually identical in content and reflected little, if any, individualized client interaction or legal advice; they contained canned, "one-size-fits-all" analysis and "factual representations," including "representations" purportedly made by the client, and were issued to Class Members in substantially identical form, regardless of the actual individual circumstances of, and representations (if any) made by, a particular client. Thus, the legal advice provided by Brown & Wood to FLIP, OPIS, BLIPS and SOS clients was always written and did not vary in substance from client to client.

120.    The preparation by Brown & Wood of its standard boilerplate opinion letter was a collaborative, rather than independent, process between Brown & Wood and KPMG. This collaboration included joint identification, research, and analysis of key legal and tax issues; discussions about the best way to organize and present the reasoning used in their respective letters; and joint efforts to identify necessary "factual representations" by the participating parties

- 45 -

in the transactions being analyzed. For example, a June 20, 1999, KPMG e-mail states: "If you have a KPMG opinion, you should also have a [Brown & Wood] opinion. We do ours and they use it as a factual template for their opinion letters usually within 48 hours." A February, 2000, KPMG e-mail states that Brown & Wood . . . "using our [*i.e.*, KPMG's] opinion as the starting point for their [*i.e.*, Brown & Wood's] opinion." Brown & Wood and KPMG went so far as to exchange copies of their respective draft opinion letters and conducted a detailed side-by-side review to make sure each covered everything the other had included. The result was two allegedly "independent" opinion letters that were not independent at all. Indeed, they contained numerous virtually identical paragraphs.

121.    KPMG used the availability of a second opinion letter from Brown & Wood (in addition to the tax opinion letter issued by KPMG itself) as a marketing tool to increase sales of its tax products, telling clients that having this second letter would help protect them from penalties if the IRS ever invalidated the use of the tax strategy.

122.    Typically, KPMG arranged to obtain the law firm opinion letter directly from Brown & Wood and delivered it to the client, without the client ever speaking to any Brown & Wood lawyer, producing a steady stream of easy money for the law firm. Brown & Wood was paid at least $50,000 for each FLIP, OPIS, BLIPS and SOS opinion letter. In fact, Brown & Wood was paid this fee in every case where its name was mentioned during a sales pitch for FLIP, OPIS, BLIPS or SOS, whether or not the client actually received the law firm's opinion letter. By Brown & Wood's own estimation, the firm wrote 72 opinions for OPIS and 180 opinions for BLIPS, generating $6,427,637 in fees from OPIS and $13,286,790 from BLIPS, for a total of almost $20 million in fees from the OPIS and BLIPS products alone.

123. Brown & Wood has all but conceded that its involvement in the tax shelter scheme was unlawful. In May 2001, Brown & Wood decided to discontinue the practice of issuing generic tax product opinion letters. Despite this decision, the law firm continued to issue such opinions in violation of its own policy. Further, one Brown & Wood partner who was heavily involved in the tax shelter schemes, R.J. Ruble, was terminated by Brown & Wood for, *inter alia*, breaches of fiduciary duties, and invoked his Fifth Amendment right against self-incrimination in response to questioning about these schemes by the Senate Subcommittee. On information and belief, Mr. Ruble has recently been indicted for conduct arising out of his participation in the sale of these tax shelters.

### B.    The Banks (Deutsche Bank, HVB, NatWest, UBS and Wachovia)

124. Five banks -- Deutsche Bank, HVB, NatWest, UBS and Wachovia -- played an important role in the FLIP, OPIS, BLIPS and SOS schemes by providing the loans and other related services needed by customers to effectuate the FLIP, OPIS, BLIPS and SOS transactions, including by executing various steps in the pre-wired transactions, in return for lucrative fees.

125. According to the Senate Subcommittee, KPMG's tax shelter schemes "could not have been executed without the active and willing participation" of major banks, including Deutsche Bank, HVB, UBS and Wachovia, which "provided multi-billion dollar credit lines essential to the orchestrated transactions." The Senate Subcommittee found that Deutsche Bank, HVB, and UBS "provided billions of dollars in lending critical to transactions which the banks knew were tax motivated, involved little or no credit risk, and facilitated potentially abusive or illegal tax shelters known as FLIP, OPIS, and BLIPS."

126. The Senate Subcommittee noted that: (a) Deutsche Bank participated in more than 50 BLIPS transactions in 1999 alone, providing credit lines to KPMG clients totaling $7.8

billion and approximately 100 FLIP, OPIS, BLIPS and SOS transactions combined; (b) HVB

participated in 29 BLIPS transactions in 1999 and 2000, providing BLIPS credit lines that totaled

over $2 billion; (c) NatWest participated in a "significant number" of BLIPS transactions in 1999

and 2000, providing credit lines totaling more at least $1 billion, and possibly $2 billion or more;

and (d) USB participated in 100 to 150 FLIP and OPIS transactions in 1997 and 1998, providing

credit lines which, in the aggregate, were in the range of several billion Swiss francs. The Senate

Subcommittee found that Wachovia played a different role, assisting KPMG and Brown & Wood

by providing client referrals and marketing assistance for the tax products in return for

substantial fees.

127.    The participation of the banks was not limited solely to providing financing.

Deutsche Bank, in addition to providing financing, was involved in the scheme to develop the

fraudulent products, almost from the start. In fact, the two KPMG tax partners who left KPMG

to form Presidio said that they had a "handshake joint development and marketing relationship"

with Deutsche Bank regarding these types of tax products which was exclusive. Under the

arrangement with Deutsche Bank, Presidio would be "doing sort of sales implementation, sort of

the securities advice type of roll, they'd [Deutsche Bank] rather sit back and trade their stock and

do the options and get generous fees for it and, essentially, get paid by us."

128.    The first product the Presidio/Deutsche Bank "joint venture" was involved in was

OPIS. The input from Deutsche Bank included advice concerning the design of OPIS. Later,

Deutsche Bank participated in actively promoting OPIS.

129.    A KMPG memorandum, dated February 13, 1998, confirms that Deutsche Bank

was involved with OPIS from the very beginning. The memorandum states, "Presidio, in

conjunction with Deutsche Morgan Grenfell and Deutsche Bank, has designed an integrated

portfolio investment strategy. . . ." the memorandum further explains that a document outlining

the economics of the investment strategy "is currently being compiled by Presidio with

assistance from Deutsche Morgan Grenfell and Deutsche Bank."

130.    A July 13, 1998, KPMG e-mail further illuminates the role played by Deutsche

Bank in the fraudulent scheme to promote OPIS: "Mike, Larry, I and several others were on a

conference call with Deutsche Bank and Presidio principals and discussed the tax product OPIS,

the independence implications of the proposal, and the current situation with our Atlanta client.

We believe our message was understood and is consistent with the one discussed with you and

John last week."

131.    Moreover, an August 22, 1998, KPMG memorandum demonstrates that Deutsche

Bank was not only an integral player as to OPIS, but was a big part of any future endeavors:

> *Our existing alliances with Deutsche Bank and Brown & Wood exemplifies
> this approach.* We have used our existing OPIS product as the mechanism for
> establishing close strategic relationships with Deutsche Bank and Brown and
> Wood at both an institutional level and with key individuals within the
> organizations. In that our product development focus is on products which
> require the use of relatively complex financial securities and third party financing,
> we consider these relationships as being critical to our future success. *The
> strategy is to co-develop with Deutsche Bank and Brown & Wood and sell into
> the $1 and $5 million segment on a joint basis.*

(Emphasis added.)

132.    An e-mail from the managing director of Deutsche Bank, dated August 25, 1998,

to a KPMG tax professional further ties Deutsche Bank to the OPIS scheme. "We confirm that

OPIS investment using the common stock of either Deutsche Bank AG or Commerzbank AG are

currently available."

133.    According to a written statement, dated November 20, 2003, submitted to the

Senate Subcommittee by Deutsche Bank Executive William Boyle: "Deutsche Bank made a

loan to each OPIS . . . investor. OPIS involved the purchase of Deutsche Bank common stock

- 49 -

and equity derivatives." From June, 1997, to March, 1999, Deutsche Bank made 62 OPIS loans totaling $3 billion, earning fees of $35 million.

134.    In addition to participating in the design and marketing of FLIP, OPIS, BLIPS and SOS, Deutsche Bank and other banks actively participated in the elaborate efforts to create the impression of a legitimate investment strategy. According to the Senate Report, "KPMG negotiated intensively with the banks over the factual representations that would be attributed to the banks." Moreover, "[e]ach of the banks that participated in BLIPS made factual representations that varied slightly from bank to bank, but did not vary at all for a particular bank." In other words, more pre-wired boilerplate.

135.    The banks also obtained lucrative fees for their participation in BLIPS. Deutsche Bank received over $40 million in fees from BLIPS transactions. HVB received over $5 million for the BLIPS transactions it completed in less than three months in 1999, and won approval of increased BLIPS transactions throughout 2000 "based on successful execution of previous transactions, low credit risk and excellent profitability." On information and belief, NatWest also received millions of dollars in fees for the BLIPS transactions in which it participated in 1999 and 2000. On information and belief, Wachovia obtained approximately $13 million in revenues for client referrals on tax products, including FLIP, OPIS, BLIP and SOS.

136.    The Senate Subcommittee noted that, "evidence . . . shows that the banks knew they were participating in transactions whose primary purpose was to provide tax benefits to persons who had purchased tax products from KPMG" and that documentation uncovered by the Senate Subcommittee "makes it plain that the banks were aware that the tax products were potentially abusive and carried a risk to the reputation of any bank choosing to participate in it." For example, a number of Deutsche Bank internal documents make it clear that the bank knew

- 50 -

BLIPS was a tax-related transaction and posed a reputational risk to the bank if the bank chose to

participate in it. Ivor Dunbar, a Deutsche Bank official working to obtain bank approval to

participate in BLIPS, wrote in a July 30, 1999, email to several Deutsche Bank professionals:

> In this transaction, reputation risk is tax related and we have been asked by the
> Tax Department not to create an audit trail in respect of the Bank's tax affairs.
> The Tax department assumes prime responsibility for controlling tax related risks
> (including reputation risk) and will brief senior management accordingly. We are
> therefore not asking R&R [Reputation & Risk] Committee to approve reputation
> risk on BLIPS. This will be dealt with directly by the Tax Department and
> [Deutsche Bank Chief Executive Officer] John Ross.

137.    Another (undated) Deutsche Bank memorandum prepared for the "New Product

Committee" to use in reviewing BLIPS, included the following statements explaining the

transaction:

> BLIPS will be marketed to High Net Worth Individual Clients of KPMG. . . .
> Loan conditions will be such as to enable DB to, in effect, force (p)repayment
> after 60 days at its option. . . . For tax and accounting purposes, repaying the
> [loan] premium amount will 'count' like a loss for tax and accounting purposes . .
> . . At all times, the loan will maintain collateral of at least 101% to the loan +
> premium amount. . . . *It is imperative that the transaction be wound up after 45–*
> *60 days and the loan repaid due to the fact that the HNW individual will not*
> *receive his/her capital loss (or tax benefit) until the transaction is wound up and*
> *the loan repaid.* . . . At no time will DB Private Bank provide any tax advice to
> any individuals involved in the transactions. This will be further buttressed by
> signed disclaimers designed to protect and 'hold harmless' DB. . . . DB has
> received a legal opinion from Shearman & Sterling which validates our envisaged
> role in the transaction and sees little or no risk to DB in the trade. Furthermore
> opinions have been issued from KPMG Central Tax department and Brown &
> Wood attesting to the soundness of the transactions from a tax perspective. . . .

(Emphasis added.)

138.    Deutsche Bank documentation indicates that a variety of internal bank

departments, including the tax, accounting, and legal departments, were asked to, and did,

approve the bank's participation in BLIPS. Thus, this participation was not the work of a few

rogue traders.

139.    Indeed, Deutsche Bank's Chief Executive Officer, John Ross, personally made

the final decision approving the bank's participation.  Minutes, dated August 4, 1999, describing

the meeting in which Mr. Ross approved the bank's participation in BLIPS, state:

> [A] meeting with John Ross was held on August 3, 1999 in order to discuss the
> BLIPS product. [A bank representative] represented [Private Banking]
> Management's views on reputational risk and client suitability.  John Ross
> approved the product, however insisted that any customer found to be in litigation
> be excluded from the product, the product be limited to 25 customers and that a
> low profile be kept on these transactions. . . . John Ross also requested to be kept
> informed of future transactions of a similar nature.

140.    Given the extensive and high level attention provided by the bank regarding its

participation in BLIPS, it is clear that Deutsche Bank had evaluated BLIPS carefully and knew

what it was getting into. The Senate Subcommittee discovered evidence demonstrating that

Deutsche Bank was aware of "red flags" indicating that the transactions underlying the tax

shelter schemes were not legitimate.  For example, Deutsche Bank  had knowledge that the

BLIPS loans it had been asked to provide were not standard commercial loans, but had unusual

features, including a multi-million dollar "loan premium" credited to the borrower's account at

the inception of the loan, which was not consistent with industry standards.

141.    One year after Deutsche Bank began executing BLIPS transactions, William

Boyle, a key Deutsche Bank official handling these transactions, wrote an email, dated June 20,

2000, which acknowledged the "tax benefits" associated with BLIPS and noted, again, the

reputational risk these transactions posed to the bank:

> During 1999, we executed $2.8b. of loan premium deals as part of the BLIP's
> approval process.  At that time, NatWest and [HVB] had executed approximately
> $0.5 b. of loan premium deals.  I understand that we based our limitations on
> concerns regarding reputational risk which were heightened, in part, on the
> proportion of deals we have executed relative to the other banks.  Since that time,
> [HVB], and to a certain extent NatWest, have participated in approximately an
> additional $1.0–1.5 b. of grandfathered BLIP's deals. . . . [HVB] does not have
> the same sensitivity to and market exposure as DB does with respect to the
> reputational risk from making the high-coupon loan to the client. . . . As you are

aware, the tax benefits from the transaction potentially arise from a contribution to the partnership subject to the high-coupon note and not from the execution of FX positions in the partnership, activities which we perform in the ordinary course of our business.

142.    To address the issue of reputational risk, the e-mail went on to propose that, because HVB had a limited capacity to issue more BLIPS loans, and Deutsche Bank did not want to expose itself to increased reputational risk by making additional direct loans to BLIPS clients, "we would like to lend an amount of money to [HVB] equal to the amount of money [HVB] lends to the client. . . . We would like tax department approval to participate in the aforementioned more complex trades by executing the underlying transactions and making loans to [HVB]." In other words, Deutsche Bank wanted to be the bank behind HVB, financing more BLIPS loans in exchange for fees and other profits, without being subjected to the "reputational risk" to Deutsche Bank that BLIPS otherwise would have entailed.

143.    Deutsche Bank's knowledge that it was involved in a fraudulent scheme is further demonstrated by its attempt to conceal its BLIPS- related activities. Internal Deutsche Bank documents show that Deutsche Bank officials discussed limiting the bank's discussion of BLIPS on paper in order to avoid leaving an "audit trail" and conducting its involvement in BLIPS (including discussions and the preparation of documents) "in a way that makes them legally privileged."

144.    Deutsche Bank also actively assisted KPMG in finding clients and otherwise marketing BLIPS. A November, 1999, presentation by the bank's "Structured Finance Group," for example, listed BLIPS as one of several tax products the group was offering to U.S. and European clients seeking "gain mitigation." The presentation listed as the bank's "strengths" its ability to lend funds in connection with BLIPS, and its "relationships with [the] 'promoters,'"

- 53 -

who were later identified as Presidio and KPMG. An internal bank email a few months earlier asked: "What is the status of the BLIPS. Are you still actively marketing this product[?]"

145.    Like Deutsche Bank, HVB also participated willingly and knowingly in the BLIPS scheme. In 1999 and 2000, HVB participated in more than 30 BLIPS transactions, providing loans that totaled nearly $2.5 billion in return for millions of dollars in fees. HVB knew BLIPS had been designed, and was intended to provide questionable tax benefits to KPMG clients. For example, in a September 1999 document seeking approval to provide a significant line of credit to finance BLIPS loans, HVB wrote this about the tax risks associated with BLIPS:

> Disallowance of tax attributes. A review by the IRS could potentially result in a ruling that would disallow the [BLIPS] structure.

146.    An undated handwritten document prepared by Alex Nouvakhov, an HVB official, is even more direct. It characterizes the 7% fee charged to KPMG clients for BLIPS as "***paid by investor for tax sheltering***." (Emphasis added.) This document also states that the bank "amortizes premium over the life of loan for tax purposes."

147.    When it became clear that the IRS would list BLIPS as an abusive tax shelter, an internal HVB memorandum again acknowledged that BLIPS was purely a tax transaction and ordered a halt to financing the product, while attempting to disavow any liability for the bank's role in carrying out the BLIPS transactions:

> [I]t is clear that the tax benefits for individuals who have participated in the [BLIPS] transaction will not be grandfathered because Treasury believes that their actions were contrary to current law. . . . It is not likely that KPMG/Presidio will go forward with additional transactions. . . . As we have stated previously, we anticipate no adverse consequences for the HVB since we have not promoted the transaction. We have simply been a lender and nothing in the notice implies a threat to our position. In view of the tone of the notice we will not book any new transactions and will cancel our existing unused [credit] lines prior to the end of this month.

- 54 -

148.    Like Deutsche Bank, HVB understood that BLIPS was pre-wired in such a manner that the bank was exposed to essentially no risk on the loans it provided. An internal HVB document reveals that the bank understood that, "[w]e are protected in our documentation through a minimum overcollateralization ratio of 1.0125 to 1 at all times. Violation of this ratio triggers immediate acceleration under the loan agreements without notice." HVB also wrote: "The Permitted Investments . . . are either extremely conservative in nature . . . or have no collateral value for margin purposes." KPMG put it this way: "Lender holds all cash as collateral in addition to being custodian and clearing agent for Partnership. . . . All Partnership trades can only be executed through Lender or an affiliate. . . . Lender must authorize trades before execution."

149.    HVB admitted to the Senate Subcommittee that, contrary to normal banking and securities practices, it often failed to prepare documentation for BLIPS-related currency trades, which, the Senate Subcommittee noted, *raise questions about "whether the trades actually took place or were simply bookkeeping shams undertaken to justify a BLIPS client's alleged tax losses."* (Emphasis added.)

150.    NatWest participated in a significant number of BLIPS transactions in 1999 and 2000, providing credit lines totaling at least $1 billion, and possibly more than $2 billion. As such, NatWest must have received millions of dollars in fees for the BLIPS transactions in which it participated in 1999 and 2000. On information and belief, discovery will reveal the same types of internal emails and other documents reflecting NatWest's knowledge that BLIPS was an abusive tax shelter as have already been described above with respect to Deutsche Bank and HVB.

- 55 -

151.    UBS also played a critical role in executing OPIS transactions.  UBS participated in 100 to 150 FLIP and OPIS transactions in 1997 and 1998, providing credit lines which, in the aggregate, were in the range of several billion Swiss francs.

152.    UBS became involved with FLIP and OPIS after being contacted by KPMG and Quellos and asked to assist in KPMG's FLIP and OPIS transactions, referred to collectively by UBS as "redemption transactions."  UBS documentation clearly and repeatedly describes these transactions as motivated by tax considerations and demonstrates that UBS was aware that these transactions were designed solely to operate as tax shelters.  For example, an internal UBS document, dated March 1, 1999, explaining these transactions is entitled:  "U.S. Capital Loss Scheme - UBS 'redemption trades.'"  It states:

> The essence of the UBS redemption trade is the creation of a capital loss for U.S. tax purposes which may be used by a U.S. tax resident to off-set any capital gains tax liability to which it would otherwise be subject.  The tax structure was originally devised by KPMG. . . . In October 1996, UBS was approached jointly by Quadra . . . and KPMG with a view to it seeking UBS' participation in a scheme that implemented the tax loss structure developed by KPMG.  The role sought of UBS was one purely of execution counterparty. . . . It was clear from the outset - and has been continually emphasized since - that UBS made no endorsement of the scheme and that its connection with the structure should not imply any implicit confirmation by UBS that the desired tax consequences will be recognized by the U.S. tax authorities. . . . UBS undertook a thorough investigation into the propriety of its proposed involvement in these transactions.  The following steps were undertaken: [redacted by UBS as 'privileged material'].

153.    This UBS document also explains the "Economic Rationale" for redemption transactions to be: "Tax benefit for client."  Another internal UBS document, dated November 13, 1997, states: "The motivation for this structure is tax optimization for U.S. tax residents who are enjoying capital gains that are subject to U.S. tax.  The structure creates a capital loss from a U.S. tax point of view (but not from an economic point of view) which may be offset against existing capital gains."

154.    Although UBS was well aware that FLIP and OPIS were designed and sold to

KPMG clients as ways to reduce or eliminate their U.S. tax liability, the bank apparently justified

its participation in the transactions by reasoning that its participation did not signify its

endorsement of the transactions and did not constitute aiding or abetting tax evasion. The bank

then proceeded to provide the financing that made these tax products possible.

155.    In February 1998, an unidentified UBS "insider" sent a letter to UBS management

in London "to let you know that [UBS unit] Global Equity [D]erivatives is currently offering an

illegal capital gains tax evasion scheme to US tax payers." The letter continued:

> This scheme is costing the US Internal Revenue [S]ervice several hundred million
> dollars a year. *I am concerned that once IRS comes to know about this scheme
> they will levy huge financial/criminal penalties on UBS for offering tax evasion
> schemes.* . . . In 1997 several billion dollars of this scheme was sold to high net
> worth US tax payers, I am told that in 1998 the plan is continu[ing] to market this
> scheme and to offer several new US tax avoidance schemes involving swaps.
>
> My sole objective is to let you know about this scheme, so that you can take some
> concrete steps to minimize the financial and reputational damage to UBS.
>
> P.S. I am sorry I cannot disclose my identity at this time because I don't know
> whether this action of mine will be rewarded or punished.

(Emphasis added.)

156.    In response to this letter, UBS temporarily halted redemption trades for several

months, but later resumed selling the products, stopping only after KPMG discontinued the sales.

157.    The Senate Subcommittee concluded that UBS knew the tax products were

shams, but proceeded anyway after weighing what they viewed as their risk of liability against

the potential financial reward: "UBS documents show that the bank was well aware that FLIP

and OPIS were designed and sold to KPMG clients as ways to reduce or eliminate their U.S. tax

liability. The bank justified its participation in the transactions by reasoning that its participation

did not signify its endorsement of the transactions and did not constitute aiding and abetting tax

evasion. The bank then proceeded to provide the financing that made these tax products possible."

158.    According to information furnished by Wachovia to the Senate Subcommittee, the total number of Wachovia Bank customers who implemented KPMG products was: 23 FLIP; 1 OPIS, 1 BLIPS and 25 SOS.

### C.    The Investment Advisors (Presidio and Quellos)

159.    The Senate Subcommittee noted that Presidio played a "key role" in FLIP, OPIS and BLIPS and found that it "helped develop, design, market, and execute potentially abusive or illegal tax shelters such as FLIP, OPIS, and BLIPS." Investment experts at Presidio also played key roles in designing, marketing, and implementing BLIPS, working closely with KPMG tax professionals throughout the process. Presidio, which was formed by two former KPMG tax partners, initially brought the idea for BLIPS to KPMG and thereafter participated in the development, marketing, and implementation of all 186 BLIPS transactions related to KPMG clients, including Plaintiffs. In fact, the working relationship between Presidio and KPMG was so close and intertwined that Presidio earned 95% of its revenues from the sale of KPMG tax products. The Senate Subcommittee also noted that both Presidio and Quellos assisted in "the development and design of potentially abusive or illegal tax shelters sold by KPMG," "the marketing of these tax shelters to multiple clients" and "the implementation of these tax shelters by establishing partnerships, participating in loans, and executing some of the currency or security trades required to produce the claimed tax benefits for KPMG clients." In addition, both Presidio and Quellos "had relationships with banks that were instrumental in providing the client loans necessary for the tax shelters, as well as certain investment services."

160.    Presidio initiated the idea for BLIPS in 1998 and formed a working group which included representatives of KPMG, Brown & Wood and Deutsche Bank. Presidio also hired a

- 58 -

former Deutsche Bank official to provide economic and investment expertise. In testimony to the Senate Subcommittee, a Presidio witness stated that Presidio had wanted to present KPMG with a polished "turn-key" tax product that could be easily sold to multiple clients.

161.    According to the Senate Subcommittee, Presidio also played a "critical role" in KPMG's internal evaluation of BLIPS's viability. On May 1, 1999, prior to the Defendants' final approval of BLIPS for sale to clients, Presidio representatives made a detailed presentation to KPMG tax professionals on how Presidio was planning to implement the BLIPS transactions. During the presentation, among other points, Presidio representatives explained that there was only a "remote" possibility that any investor would actually profit from the contemplated foreign currency transactions involved in BLIPS, and that the banks providing the financing planned to retain, under the terms of the contemplated BLIPS "loans," an effective "veto" over how the "loan proceeds" could be invested. These statements, among others, caused KPMG's key technical reviewer in the Washington National Tax group, Mark Watson, to reconsider his approval of the BLIPS product, in part because he felt he had "not been given complete information about how the transaction would be structured."

162.    According to the Senate Subcommittee, in addition to contributing to the development of KPMG tax products, Presidio also played a "key role" in marketing and implementing them. When BLIPS was eventually approved over the objections of the WNT technical reviewer, Presidio made numerous presentations to KPMG clients to sell BLIPS and assisted in implementing BLIPS transactions by forming partnerships, executing trades and working with banks to secure client loans and develop the trading strategies for the transactions. For example, in the fall of 1999, Presidio initiated contact with HVB and then worked with HVB to help structure loan terms and refine the investment strategy.

163.    Presidio also formed numerous other companies, many of them shells, to participate in business dealings including, in some cases, OPIS and BLIPS transactions. One of the most important roles Presidio played in each BLIPS transaction was to direct two of the companies it controlled, Presidio Growth and Presidio Resources, to enter into a "Strategic Investment Fund" partnership with the relevant BLIPS client. This partnership was central to the entire BLIPS transaction, since it was this partnership that assumed and repaid the purported "loan" that gave rise to the BLIPS client's "tax loss." In each BLIPS transaction, a Presidio company acted as the managing partner for the partnership and contributed a small portion of the funds used in the BLIPS transactions.

164.    Presidio also made false and misleading misrepresentations in the opinion letters issued by KPMG and Brown & Wood. These misrepresentations included: Presidio believed that there was a reasonable opportunity for the investor to earn pre-tax profit, in excess of all associated fees and costs, and without regard to any tax benefits, and that Presidio acted independently of, and at arm's length from any of the other participants in the program. Presidio knew that all such representatives were false when made.

165.    Presidio also performed administrative tasks that were critical to the success of the tax product. For example, when BLIPS was just starting to get underway, Presidio took several steps to facilitate the transactions, including stationing personnel at one of the law firms preparing the transactional documents.

166.    When an "error" arose indicating that currency conversions in two particular BLIPS transactions had been timed in such a way that they would create negative tax consequences for the BLIPS clients, Presidio took the lead in initiating a cover-up. An e-mail sent by Kerry Bratton of Presidio to Alexandre Nouvakhov and Amy McCarthy of HVB states:

I know that Steven has talked to you regarding the error for Roanoke Ventures. I have also noted an error for Mobil Ventures. None of the Euro's should have been converted to [U.S. dollars] in 1999. Due to the tax consequences that result from these sales, *it is critical that these transactions be reversed and made to look as though they did not occur at all*.

(Emphasis added.)

167.    Documents uncovered by the Senate Subcommittee suggest that, as Presidio requested, HVB then "reversed" the referenced 1999 currency trades and executed them in early 2000. When asked about this by the Senate Subcommittee, HVB responded that it had been unaware of this e-mail exchange and admitted that the bank could make currency trades "look as though they did not occur at all."

168.    Further, Presidio failed to register BLIPS as a tax shelter although it qualified for registration under the law. In testimony to the Senate Subcommittee, Larry DeLap, the head of KPMG's DPP for Tax, said that he believed that BLIPS should have been registered with the IRS and that Presidio should have completed the registration.

169.    Quellos played a similar investment advisory role with respect to FLIP and OPIS. The Senate Subcommittee found that Quellos "helped develop, design, market, and execute potentially abusive or illegal tax shelters such as FLIP, OPIS, and BLIPS." In the case of FLIP — the predecessor to OPIS, upon which OPIS was modeled — Quellos assisted KPMG in designing the complex series of financial transactions called for by the product. Using contacts it had established in other business dealings, Quellos helped KPMG convince UBS to provide financing and participate in FLIP and OPIS transactions throughout 1997 and 1998. Quellos worked with UBS to fine-tune the financial transactions, helped KPMG make client presentations about FLIP and, for those who purchased the product, helped complete the paperwork and transactions, using Quellos securities brokers.

- 61 -

170.    Quellos also worked with KPMG, Presidio, and the relevant banks to ensure that the banks established large enough credit lines, at times in the billions of dollars, to allow a substantial number of individuals to carry out FLIP, OPIS, and BLIPS transactions.

171.    Quellos and Presidio shared in Defendants' fee-splitting arrangement in connection with each  FLIP, OPIS, BLIPS and SOS transaction in which they participated, which generated substantial profits for Quellos and Presidio.

## VI.    KPMG HID ITS TAX SHELTER ACTIVITIES FROM GOVERNMENT AUTHORITIES AND THE PUBLIC

172.    The Senate Subcommittee found that KPMG took a number of measures to "conceal its tax shelter activities from tax authorities," including "claiming it was a tax advisor and not a tax shelter promoter, failing to register potentially abusive tax shelters, restricting file documentation, imposing marketing restrictions, and using improper tax return reporting to minimize detection by the IRS or others."

173.    Despite its inventory of 500 active tax products, KPMG never registered, and thus never disclosed to the IRS the existence of a single one of its tax products, including FLIP, OPIS, BLIPS and SOS.  As noted above, KPMG, Brown & Wood, as well as the Non-Parties, were well aware that these products should have been registered under IRS rules.  In fact, in testimony to the Senate Subcommittee, a KPMG official stated his belief that BLIPS should have been registered with the IRS.

174.    Despite its awareness that these products should have been registered, KPMG made a deliberate decision not to register them after conducting a "cost-benefit" analysis and concluding that the potential penalties were vastly lower than the potential fees. In a May, 1998, memorandum concerning "the potential financial consequences associated with failing to register

[OPIS as] a tax shelter" addressed to Jeffrey Stein, then-head of operations in KPMG's Tax

Services Practice and the second most senior KPMG tax official, Gregg Ritchie stated:

> For purposes of this discussion, I will assume that we will conclude that the OPIS product meets the definition of a tax shelter under IRC section 6111. Based on this assumption, the following are my conclusions and recommendations as to why KPMG should make the business/strategic decision not to register the OPIS product as a tax shelter. . . .
>
> **First, the financial exposure to the Firm is minimal**. Based upon our analysis of the applicable penalty sections, we conclude that the penalties would be no greater than $14,000 per $100,000 in KPMG fees. Furthermore, as the size of the deal increases, our exposure to the penalties decreases as a percentage of our fees. For example, our average deal would result in KPMG fees of $360,000 with a maximum penalty exposure of only $31,000. . . .
>
> **Third, the tax community at large continues to avoid registration of all products**. Based on my knowledge, the representations made by Presidio and Quadra, and Larry DeLap's discussions with his counterparts at other Big 6 firms, *there are no tax products marketed to individuals by our competitors which are registered*. This includes income conversion strategies, loss generation techniques, and other related strategies.
>
> Should KPMG decide to begin to register its tax products, I believe that it will position us with a severe competitive disadvantage in light of industry norms to such degree that we will not be able to compete in the tax advantaged products market.
>
> Fourth, there has been (and, apparently, continues to be) a lack of enthusiasm on the part of the Service to enforce section 6111. In speaking with KPMG individuals who were at the Service . . . the Service has apparently purposefully ignored enforcement efforts related to section 6111. In informal discussions with individuals currently at the Service, WNT has confirmed that there are not many registration applications submitted and they do not have the resources to dedicate to this area. . . .
>
> Based on the above arguments, it is my recommendation that KPMG does not register the OPIS product as a tax shelter. Any financial exposure that may be applicable can easily be dealt with by setting up a reserve against fees collected. Given the relatively nominal amount of such potential penalties, the Firm's financial results should not be affected by this decision. . . . In summary, I believe that the rewards of a successful marketing of the OPIS product . . . far exceed the financial exposure to penalties that may arise. Once you have had an opportunity to review this information, I request that we have a conference with the persons on the distribution list . . . to come to a conclusion with respect to my recommendation.

(Emphasis in original.)

175.    The KPMG May, 1998 memorandum, quoted herein, assumed that OPIS qualified

as a tax shelter under federal law, and then coldly recommended that KPMG not register it, as

required by law, with the IRS solely based on a cost-benefit analysis, without any regard to the

ramifications to its clients.

176.    According to the Senate Report, although the head of the DPP-Tax unit at KPMG

apparently recommended registering not only OPIS, but also BLIPS, he was overruled in each

instance by KPMG's Vice Chairman for Tax.

> Further, although consideration of tax shelter registration issues was a required
> step in the KPMG tax product approval process, this consideration did not result
> in IRS registrations of tax products; instead, KPMG appears to have devoted
> resources to devising rationales for *not* registering a product with the IRS. For
> example, a May 1998 e-mail from Jeffrey Zysik, a KPMG tax professional, to
> other KPMG tax professionals states:  If we decide we will be registering in the
> future, thought should be given to establishing a separate entity that meets the
> definition of an organizer for all of our products with registration potential. This
> entity, rather than KPMG, would then be available through agreement to act as
> the registering organizer. . . . If such an entity is established, KPMG can avoid
> submitting its name as the organizer of a tax shelter on Form(s) 8264 to be filed in
> the future.

177.    KPMG also attempted to evade IRS detection by directing its clients to use

"stealth" tax reporting mechanisms — such as participating in OPIS through "grantor trusts" and

filing tax returns that "netted" the losses from the OPIS transactions with the capital gains

realized by the taxpayer at the grantor trust level — in order to minimize the appearance of

losses and gains sustained by the client. In a September 1998 e-mail to KPMG tax professionals,

Mark Watson of KPMG stated:  "When you put the OPIS transactions together with this 'stealth'

reporting approach, *the whole thing stinks*." (Emphasis added.)  In a January 1999 e-mail to

KPMG tax professionals, Watson stated that by employing one of these "stealth" reporting

approaches, "*I believe we are filing misleading, and perhaps false, returns by taking this reporting position.*" (Emphasis added.)

178.    KPMG further attempted to avoid detection by using "non-disclosure agreements." KPMG required BLIPS clients to sign "nondisclosure agreements" that prevented them from consulting their own tax counsel and accountants, and severely limited the paperwork used to explain the tax products. Similarly, FLIP, OPIS and SOS transactions were explained to potential clients only after the potential clients signed a confidentiality agreement promising not to disclose the information to anyone else.

179.    In the case of FLIP and OPIS, KPMG attempted to conceal the truth about the strategy by taking measures to limit the external distribution of written materials concerning OPIS and discouraging clients from obtaining the legal and tax opinions of genuinely independent third party professionals. For example, KPMG conducted presentations to clients by writing on chalkboards or erasable whiteboards, and any written materials shown to clients were retrieved from clients before leaving a meeting. In a June 8, 1998, email sent to KPMG personnel, Ritchie states: "Please be reminded that you should NOT leave this material with clients or targets under any circumstances. Not only will this unduly harm our ability to keep the product confidential, it will DESTROY any chance the client may have to avoid the step transaction doctrine." And on June 17, 1998, Ritchie sent an e-mail to Larry DeLap and the "CaTS Team" titled, "June 11 OPIS Conference Call," in which Ritchie states:

> We should discourage clients/targets from having their incumbent lawyers/CPAs/etc. review the strategy from a technical perspective. This will help to prevent the spread of the strategy to competitors and other advisors who may not protect its confidentiality. Clients/targets may have full access to Brown & Wood should they wish to obtain input from a legal perspective.

(Emphasis added.)

180. Senior KPMG tax professionals also instructed its staff not to keep certain revealing documentation in their files and/or to clean out their files, again to avoid or limit detection of firm activity. For example, Dale Baumann, a KPMG tax professional, sent an e-mail to multiple colleagues stating:

> You may want to remind everyone on Monday NOT to put a copy of Angie's e-mail on the 988 elections in their BLIPS file. It is a road map for the taxing authorities to all the other listed transactions. I continue to find faxes from Quadra in the files . . . in the two 1996 deals here which are under CA audit which reference multiple transactions—not good if we would have to turn them over to California.

In the case of OPIS, a KPMG tax professional identified simply as "Bob" wrote in a September 1998 e-mail:

> I have quite a few documents/papers/notes related to the OPIS transaction. . . . Purging unnecessary information now pursuant to an established standard is probably ok. If the Service asks for information down the road (and we have it) we'll have to give it to them I suspect. Input from (gulp) DPP may be appropriate.

181. KPMG further attempted to fly under the IRS's radar screen by purposely limiting the number of each tax product sold, quickly discontinuing each product, and replacing it with a slightly different product.

## VII. DEFENDANTS DISREGARDED PROFESSIONAL ETHICS IN THE MARKETING, SALE AND IMPLEMENTATION OF FLIP, OPIS, BLIPS AND SOS

182. KPMG and Brown & Wood violated well-known and long-established ethical standards, including those related to fees, auditor independence and conflicts of interest in legal representation.

183. For example, although traditionally accounting firms such as KPMG charge flat fees or hourly fees for tax services, KPMG charged BLIPS clients a "contingency fee" equal to

7% of the "tax losses" that KPMG expected the client's BLIPS transaction to generate. The client fee was paid to Presidio, which apportioned the fee amount among the various Defendants.

184.    An e-mail, dated May 24, 2000, from Kerry Bratton of Presidio to Angie Napier of KPMG, provides additional detail on how the 7% fee was split among Defendants: "The breakout for a typical deal is as follows: Bank Fees 125; Mgmt Fees 275; Gu[aran]teed Pymt. 8; Net Int. Exp. 6; Trading Loss 70; KPMG 125; Net return to Class A 91." This fee-splitting arrangement violated restrictions on contingency fees, client referral fees, and fees paid jointly to lawyers and non-lawyers.

185.    KPMG charged clients these "contingency fees" despite the fact that more than 20 states prohibit the payment of contingency fees to accountants, and rules promulgated by the SEC, the American Institute of Certified Public Accountants and other regulatory or watchdog bodies constrain their use in various ways. Even within KPMG, the head of its Department of Professional Practice (DPP) for Tax, Larry DeLap, took the position that fees based on projected client tax savings were contingency fees prohibited by AICPA Rule 302.355 ("Rule 302"). Yet this warning, too, was ignored, and based once again on a concern that such a position would reduce KPMG's profits. A KPMG memorandum, dated July 14, 1998, from Gregg Ritchie, a senior KPMG tax professional, to multiple KPMG tax professionals stated that the DPP interpretation of Rule 302 "threatens the value to KPMG of a number of product development efforts," "hampers our ability to price the solution on a value added basis," and would cost the firm millions of dollars.

186.    KPMG deliberately manipulated the way it handled OPIS to circumvent state prohibitions on contingent fees. For example, a July 1998 memorandum concerning OPIS from Gregg Ritchie and Jeffrey Zysik of KPMG to "CaTS Team Members" identifies the states that

prohibit contingent fees. Then, rather than prohibit OPIS transactions in those states or require an alternative fee structure, the memorandum directs KPMG tax professionals to make sure that the OPIS engagement letter is signed, the engagement is managed, and the bulk of services is performed "in a jurisdiction that does not prohibit contingency fees."

187.    As previously noted, Brown & Wood was paid at least $50,000 for each legal opinion it provided in connection with BLIPS. The law firm was paid even more in transactions intended to provide clients with particularly large tax losses. An e-mail, dated May 15, 2000, from Angie Napier of KPMG to Jeffrey Eischeid of KPMG and others describing the fee amounts to be paid to Brown & Wood in FLIP, OPIS, BLIPS and SOS deals assigns Brown & Wood a 30 basis point fee for a BLIPS transaction.

188.    American Bar Association (ABA) Model Rule 1.5 states that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee," and cites as the factors to consider when setting a fee amount "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly."

189.    Despite the clear directive of Rule 1.5, Brown & Wood charged substantially the same fee for each legal opinion it issued to a FLIP, OPIS, BLIPS and SOS client, even when opinions drafted after the initial prototype opinion contained no new facts or legal analysis, were virtually identical to the prototype except for client names, and in many cases required no client consultation. With respect to FLIP, OPIS and BLIPS transactions, Brown & Wood also was paid a fee in connection with any sale where a prospective buyer was told that the law firm would provide a favorable tax opinion letter if asked, *regardless of whether the opinion in fact was later requested or provided*. Brown & Wood's fees violated the spirit and express terms of ABA Model Rule 1.5.

190.    One of the factors the Defendants and the Non-Parties used to apportion fees among themselves was which organization had brought the client to the table. Such fee splitting between a law firm and others violates restrictions on contingency and client referral fees, as well as an American Bar Association rule prohibiting law firms from sharing legal fees with non-lawyers.

191.    Deutsche Bank's, HVB's and Wachovia's involvement and participation in KPMG's tax products also violated standards relating to auditor independence. Deutsche Bank, HVB and Wachovia are both audit clients of KPMG, and played roles in marketing and implementing KPMG tax products. Deutsche Bank, HVB and Wachovia provided billions of dollars in financing to make KPMG's tax shelter products, including FLIP, BLIPS and OPIS, possible. SEC rules state that auditor independence is impaired when an auditor has a direct or material indirect business relationship with an audit client. KPMG attempted to address the auditor independence issue by giving its clients a choice of banks to use in the transactions, including at least one bank that was not a KPMG audit client. However, this choice did not alleviate KPMG's conflict of interest, since it still had a direct or material, indirect business relationship with a bank whose financial statements were certified by KPMG auditors.

192.    KPMG also marketed tax products to its own audit clients, in violation of its own company guidelines. KPMG's Tax Services Manual states: "Due to independence considerations, the firm does not enter into alliances with SEC audit clients." KPMG defines an "alliance" as "a business relationship between KPMG and an outside firm in which the parties intend to work together for more than a single transaction." KPMG policy is that "[a]n oral business relationship that has the effect of creating an alliance should be treated as an alliance." Another provision in KPMG's Tax Services Manual states: "The SEC considers independence

to be impaired when the firm has a direct or material indirect business relationship with an SEC audit client."

193.    Despite the SEC prohibition and the prohibitions and warnings in its own Tax Services Manual, KPMG worked with audit clients, including Deutsche Bank, HVB and Wachovia, on multiple OPIS and BLIPS transactions. In fact, the KPMG partner in charge of Deutsche Bank audits in the United States expressly approved the bank's accounting for the loans in the BLIPS transactions. Thus, KPMG not only took advantage of its auditor-client relationship, but also created a conflict of interest in those cases where it successfully sold a tax product to an audit client.

## ALLEGATIONS RELATED TO THE NAMED PLAINTIFFS

194.    After being approached by KPMG, each of the Simon Plaintiffs entered into an OPIS transaction in 1998 and a BLIPS transaction in 2000.

195.    Plaintiffs Michael Le and Stephan Ressing were co-owners of RCM Technologies, Inc., an information technology business in Raleigh, North Carolina. In 1999, they sold this business for a substantial capital gain to a company whose accountant was KPMG. At or about this time they were approached by Michael Gray, a KPMG partner in KPMG's Raleigh, North Carolina office, who sold them the BLIPS strategy. In connection with the purchase of their BLIPS, and at the recommendation of Michael Gray, Plaintiffs Le and Ressing formed the M. Le Trust and the S. Ressing Trust and, in turn, these two trusts formed and became sole owners of Mackenzie (owned by M. Le Trust) and Fitzroy (owned by S. Ressing Trust). It was through these two trusts and LLCs that Messrs. Le and Ressing implemented their BLIPS transactions.

196.    The documents that the Plaintiffs received in connection with the Defendants' and certain Non-Parties' marketing of the BLIPS transactions were replete with material

- 70 -

misrepresentations or omissions. For instance, the Simon Plaintiffs received a KPMG document

titled, "BLIPS: Bond Linked Issue Premium Structure," which described the BLIPS transaction

as a "[m]ulti-stage strategy designed by Presidio Advisors to generate significant investment

returns through strategic investments in emerging market currencies." The Simon Plaintiffs also

received from Presidio a document entitled "Strategic Investment Funds Confidential

Memorandum," dated January 2000, describing the BLIPS transaction. The Trustee Plaintiffs

also received from Presidio a document entitled "Strategic Investment Funds Confidential

Memorandum," dated August, 1999, describing the BLIPS transaction. Each of these documents

fraudulently misrepresented the BLIPS transactions as investments and concealed, or at the very

least downplayed, the fact that BLIPS was designed primarily to generate a tax loss.

197.    On or around September 22, 1998, KPMG sent each of the Simon Plaintiffs an

engagement letter agreement pertaining to their OPIS transaction, which was the same in

substance for each Simon Plaintiff. With respect to BLIPS, each Simon Plaintiff signed an

engagement letter agreement with KPMG dated on or about February 3, 2000 (the "KPMG

BLIPS Agreement"), which likewise was identical in substance. Michael Le and Stephan

Ressing each signed an engagement letter agreement with KPMG dated on or about August 26,

1999 and August 10, 1999 (also the "KPMG BLIPS Agreement"), which was identical in

substance.

198.    These KPMG BLIPS Agreements repeatedly used the word "investment" with

respect to the BLIPS transaction and fraudulently made it appear that the KPMG BLIPS

Agreement was crafted to suit each Plaintiff's individual needs. For example, the KPMG BLIPS

Agreement represented that KPMG was being engaged to "provide tax consulting services to you

with respect to participation in an *investment program* involving investments in foreign

- 71 -

currency." (Emphasis added.) KPMG also represented that it would "[p]rovide you with an opinion letter that addresses the U.S. federal income tax consequences associated with participation in [BLIPS] *based upon your unique facts and circumstances*." (Emphasis added.) The KPMG BLIPS Agreement further stated that KPMG understood that the Plaintiffs would engage Presidio to provide them with "the investment advisory services and trading strategies with respect to [BLIPS]."

199.    Moreover, in each of these KPMG BLIPS Agreements, KPMG also falsely represented that its fee was based on the complexity of the issues and the value of the services provided. In truth, KPMG's fee was not based on services rendered, but was calculated based solely on the amount of the tax loss expected to be generated by the BLIPS transaction.

200.    These KPMG BLIPS Agreements also set forth some of the substantial fees that each of the Plaintiffs would pay to KPMG in connection with BLIPS. Pursuant to these Agreements, KPMG received fees from Marvin Simon in the amount of $125,000; from Claude Harris in the amount of $50,000; from each of Ben Simon, Britt Simon and Kim Fink in the amount of $25,000; from Michael Le in the amount of $150,000; and from Stefan Ressing in the amount of $100,000. In most instances, KPMG would cause its fees to be paid by Presidio from funds contributed by the Plaintiffs. In connection with OPIS, Plaintiffs paid fees totaling $155,000 to KPMG, $30,000 to Brown & Wood, and $30,000 to Quellos.

201.    Each of the steps involved in the individual FLIP, OPIS, BLIPS and SOS transactions by the Plaintiffs and other Class Members, as outlined above, were substantially the same. The execution of the Simon Plaintiffs' OPIS transactions were carried out by Quellos and UBS, and each of the Simon Plaintiffs' actions in connection with the execution of those steps was taken at the direction, and upon the advice, of KPMG, Quellos, UBS, and/or Brown &

Wood. The execution of Plaintiffs' BLIPS transactions were carried out by Presidio, Deutsche Bank and/or HVB and each of such Plaintiffs' actions in connection with the execution of those steps was taken at the direction, and upon the advice, of KPMG, Presidio, Deutsche Bank, HVB and/or Brown & Wood.

202.    At or about the time each Plaintiff implemented a BLIPS transaction, KPMG sent such Plaintiff a "draft" tax opinion letter. Each letter was materially uniform and virtually identical in substance to the opinion letters that KPMG provided to all its BLIPS clients. Each letter falsely recited various "representations" that allegedly had been made to KPMG by the client. All of the KPMG opinion letters contained a "Summary of Opinion" which concluded that it was "more likely than not" (*i.e.*, that there was "a greater than 50 percent likelihood") that the positions taken pursuant to the letter would be upheld if challenged by the IRS. None of these "draft" opinion letters contained an appropriate discussion or analysis of the relevant law relating to tax shelters generally, or to BLIPS specifically. On information and belief, these draft opinion letters were virtually identical to the draft opinion letters KPMG provided to each of its BLIPS clients before KPMG stopped providing them so that they could not be used in a due diligence investigation.

203.    The Trustee Plaintiffs, Fitzroy and Mackenzie each received a "final" KPMG opinion letter on or about December 31, 1999. On or about November 6, 2000, KPMG sent each Simon Plaintiff a similar opinion letter concerning BLIPS. Like the "draft" opinion letters, these "final" opinion letters were the same canned and materially uniform written opinions that KPMG provided to all its BLIPS clients. Each such "final" opinion letter again falsely recited various "representations" that allegedly had been made to KPMG by the client as well as by the other participants in the BLIPS transactions, including Presidio and HVB, and set forth KPMG's

purported discussion and analysis of the applicable law. Like the "draft" opinion letters, the "final" opinion letters concluded that it was "more likely than not" that the positions taken pursuant to the letter would be upheld if challenged by the IRS even though KPMG knew that the representation was false. On information and belief, these opinion letters were virtually identical in substance to the opinion letters KPMG provided to each of its BLIPS clients. Each of these opinion letters also contained the fraudulent representation that the opinion was given in regard to certain transactions that were structured through an investment program designed by Presidio, when in fact KPMG knew that such investment program — "BLIPS" — was designed by KPMG.

204.    On or about December 31, 1999, Brown & Wood, too, sent the Trustee Plaintiffs, Fitzroy and Mackenzie an opinion letter concerning BLIPS. The Simon Plaintiffs each received a similar opinion letter from Brown & Wood on or about November 6, 2000. As with the KPMG opinion letters, Brown & Wood's opinion letter was canned, materially uniform for each Plaintiff, and was substantially the same as the KPMG opinion letter. Brown & Wood's opinion letters, like KPMG's opinion letters, each stated that, in Brown & Wood's opinion, it was "more likely than not" that the positions taken pursuant to the letter would be upheld if challenged by the IRS. On information and belief, these opinion letters were virtually identical in substance to the opinion letters Brown & Wood provided to each of its BLIPS clients.

205.    In 1998, each Simon Plaintiff received similar boilerplate opinion letters from both KPMG and Brown & Wood concerning OPIS, which also contained false recitations of various "representations" that allegedly had been made to KPMG by the client as well as by the other participants in the OPIS transactions, and concluded that it was "more likely than not" that the OPIS transactions would be upheld if challenged by the IRS. On information and belief,

these opinion letters were virtually identical in substance to the opinion letters KPMG and

Brown & Wood provided to each of its OPIS clients.

206.    On February 4, 2002, KPMG sent a letter to the Plaintiffs informing them of a

new IRS voluntary disclosure program (the "Voluntary Disclosure Program" or the "Program"),

and recommended that each Plaintiff participate in the Program. The Voluntary Disclosure

Program provided that tax shelter clients who identified themselves and made certain required

disclosures by April 23, 2002 might obtain protection against certain penalties in the event an

audit were to show that a tax underpayment had occurred based on their participation in BLIPS

or certain other transactions. On March 8, 2002, Brown & Wood sent a similar letter to each

Plaintiff, recommending that they each participate in the Voluntary Disclosure Program.

207.    On or about February 28, 2002, KPMG sent letters to the IRS stating that the

Plaintiffs desired to participate in the Voluntary Disclosure Program and provided a disclosure

statement relating to each Plaintiff's BLIPS transactions.

208.    On October 2, 2003, Brown & Wood sent a letter to each Plaintiff informing him

or her that Brown & Wood had been served with summonses by the IRS requiring it to provide,

among other things, the names of clients to whom Brown & Wood provided opinions regarding

"certain transactions" and informing the Plaintiffs that they were among the clients who the IRS

wanted identified. Brown & Wood informed the Plaintiffs that the firm would provide the

Plaintiffs' names and addresses to the IRS no later than October 13, 2003.

## CLASS ACTION ALLEGATIONS

209.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of all persons who, at any time during the period from

January 1, 1996 through and including September 14, 2005, either (a) consulted with, relied

upon, or received an oral or written opinion or advice from both KPMG (or any current or former

partner, principal or employee of KPMG who at the time was a partner, principal or employee of

KPMG) and Sidley Austin Brown & Wood LLP, or its predecessor Brown & Wood LLP (or any

current or former partner or employee of either of them who at the time was a partner or

employee of the firm) concerning a FLIP, OPIS, BLIPS or SOS transaction and who

implemented, in whole or in part, directly or indirectly, such FLIP, OPIS, BLIPS or SOS

transaction; or (b) filed a tax return (joint or otherwise) relating to a FLIP, OPIS, BLIPS or SOS

described in (a); and (c) the administrators, executors, personal representatives, heirs, successors,

beneficiaries and assigns of all persons described in (a) and (b). (Herein, described as "Class

Members"). Excluded from the Class are Defendants, Non-Parties, the officers and directors of

the Defendants and the Non-Parties, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which Defendants or the Non-

Parties have or had a controlling interest.

210.    The members of the Class are so numerous that joinder of all members is

impracticable.  At least 186 BLIPS products were sold over a one year period alone, and scores

of FLIP, OPIS and SOS products were sold during the time period in question.  Members of the

Class may be identified from records maintained by Defendants and may be notified of the

pendency of this action by mail, using a form of notice similar to that customarily used in class

actions.

211.    Plaintiffs' claims are typical of the claims of the Members of the Class as all

Members of the Class are similarly affected by Defendants' and the Non-Parties' wrongful

conduct in violation of law that is complained of herein.

212.    If brought and prosecuted individually, each of the Class Members would necessarily be required to prove their claims upon the same material and substantive facts, and upon the same remedial theories.

213.    The claims and remedial theories pursued by Plaintiffs are sufficiently aligned with the interests of the Class to ensure that the Class's claims will be prosecuted with diligence and care by the Plaintiffs as representatives of the Class.

214.    Plaintiffs will fairly and adequately protect the interests of the other members of the Class. Plaintiffs have retained counsel competent and experienced in class action litigation. Plaintiffs have no interests antagonistic to, or in conflict with, the Class they seek to represent.

215.    Plaintiffs' and the Class's claims have a common origin and share a common legal and factual basis. All Class Members' claims originate from the same fraudulent transactions promoted and implemented by the Defendants and the Non-Parties.

216.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants acted knowingly or recklessly;

(b)    whether Defendants were aware that FLIP, OPIS, BLIPS and SOS lacked economic substance and that therefore any losses attributable to FLIP, OPIS, BLIPS and SOS would be disallowed by the IRS;

(c)    whether Defendants and the Non-Parties conspired to create, approve and market FLIP, BLIPS, OPIS and SOS to Plaintiffs and the Class Members;

- 77 -

(d)    whether Defendants took advantage of a relationship of trust and confidence and used their knowledge of Plaintiffs' finances to solicit Plaintiffs to purchase FLIP, BLIPS, OPIS and SOS;

(e)    whether Defendants failed to disclose that the opinion letters provided in connection with the transactions were not issued independently; and

(f)    whether Members of the Class have sustained damages and, if so, the appropriate measure of damages.

217.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy and there will be no difficulty in the management of this action as a class action. Plaintiffs also allege that questions of law and fact applicable to the Class predominate over individual questions. Plaintiffs also allege that they are willing and prepared to serve the Court and the proposed Class in a representative capacity, that their interests are co-extensive with, and not antagonistic to those of the absent members of the Class, and that they will undertake to vigorously and truly protect the interests of the absent members of the Class. Plaintiffs have engaged the services of the undersigned counsel, who are experienced in complex class action litigation, who will adequately prosecute this action and who will assert, protect and otherwise represent the named Class representatives and absent members of the Class.

## CAUSES OF ACTION

### COUNT I

### FRAUD

#### By All Plaintiffs Individually And On Behalf Of
#### All Class Members Against The Defendants

218.    Plaintiffs and the other members of the Class repeat and reallege each and every prior allegation, as if fully set forth herein.

219.    For the sole purpose of inducing Plaintiffs and the Class to pay millions of dollars in aggregate fees, the Defendants made numerous knowingly false affirmative representations and intentional omissions of material facts, including but not limited to:

(a)    Representing to Plaintiffs and the Class that FLIP, OPIS, BLIPS and SOS were investment strategies with tax benefits;

(b)    Representing to Plaintiffs and the Class that FLIP, OPIS, BLIPS and SOS would more likely than not be approved by the IRS;

(c)    Failing to disclose to Plaintiffs and the Class that the Defendants and the Non-Parties formed an alliance whose sole purpose was to develop, market, and implement tax products, such as FLIP, OPIS, BLIPS and SOS, as investment strategies, when each of the Defendants and the Non-Parties knew that they were abusive tax products;

(d)    Failing to disclose that the Defendants and the Non-Parties developed, marketed, and implements the purported investment strategies, such as FLIP, OPIS, BLIPS and SOS, for the sole purpose of generating fees;

(e)    Failing to disclose that the Defendants and the Non-Parties were operating together, and not as independent entities, when they were developing, marketing, selling and implementing knowingly abusive tax shelters, such as FLIP, OPIS, BLIPS and SOS;

(f)    Failing to disclose that the Defendants knowingly traded on their reputations as respected members of their professions to induce Plaintiffs and the Class to purchase the purported investment strategies, such as FLIP, OPIS, BLIPS and SOS that Defendants knew were abusive tax shelters;

(g)    Representing that Defendants' fees were based on services rendered;

      (h)    Failing to disclose that the fees Defendants were collecting were unreasonable, excessive, and unethical fees;

      (i)    Failing to disclose that the Defendants and the Non-Parties were splitting and/or sharing fees;

      (j)    Failing to disclose that the opinion letters provided by the Defendants in connection with the transactions were not issued independently;

      (k)    Representing to Plaintiffs and the Class that the Brown & Wood opinion letter was an "independent" legal opinion from an "independent" law firm;

      (l)    Representing to Plaintiffs and the Class that Brown & Wood's opinion letters could be relied upon to protect Plaintiffs from incurring penalties and to satisfy the IRS as to the propriety of FLIP, OPIS, BLIPS and SOS if audited;

      (m)    Failing to advise Plaintiffs and the Class that Brown & Wood and KPMG had already prepared "form" opinion letters approving FLIP, OPIS, BLIPS and SOS and that the Defendants needed only fill in several blanks for each of the many clients to which they rendered such opinion letters across the country;

      (n)    Failing to advise Plaintiffs and the Class that the Defendants and certain Non-Parties were illegally promoting and selling unregistered tax shelters by marketing and selling FLIP, OPIS, BLIPS and SOS to Plaintiffs and the Class;

      (o)    Failing to disclose to Plaintiffs and the Class that if they filed tax returns claiming capital and/or ordinary losses based on FLIP, OPIS, BLIPS and SOS they would be liable for penalties and interest;

(p)    Recommending, advising, instructing, and/or assisting Plaintiffs and the Class Members in the formation of the limited liability companies and partnerships to carry out FLIP, OPIS, BLIPS and SOS;

(q)    Representing to, and advising Plaintiffs and the Class that the various entities formed to carry out FLIP, OPIS, BLIPS and SOS had a business purpose and economic substance;

(r)    Making and endorsing the statements and representations in the opinion letters authored and signed by KPMG and Brown & Wood;

(s)    Making and endorsing the statements and representations contained in the Defendants' oral advice, instructions, recommendations, and the tax returns prepared by the Defendants;

(t)    Failing to advise Plaintiffs and the Class of the roles of Deutsche Bank, HVB, NatWest, UBS and Wachovia in FLIP, OPIS, BLIPS and SOS, and the fees these banks received for assisting in and carrying out the FLIP, OPIS, BLIPS and SOS transactions;

(u)    Recommending, advising, instructing, and assisting Plaintiffs and the Class in carrying out each of the steps of FLIP, OPIS, BLIPS and SOS;

(v)    Failing to disclose that the majority of the principals of Presidio were former KPMG partners;

(w)    Failing to disclose that David Lippman Smith, who was employed by Quellos, had formerly been a partner or manager with KPMG and helped design FLIP;

(x)    Failing to disclose that the true purpose of FLIP, OPIS, BLIPS and SOS was to generate fees for the Defendants and the Non-Parties; and

(y)    Providing erroneous legal and tax opinions and advice, including

representing that FLIP, OPIS, BLIPS and SOS were not tax shelters, that they were legitimate

tax avoidance strategies, and were "more likely than not" to withstand IRS scrutiny.

220.    The above intentional omissions of material fact and/or affirmative

misrepresentations made by each Defendant were false when made and the Defendants knew

these representations to be false when made. Moreover, they were made with the intention that

Plaintiffs and the Class would rely upon them in entering into the FLIP, OPIS, BLIPS and SOS

transactions so that Plaintiffs and the Class would pay them millions of dollars in fees.

221.    In reasonable reliance on the Defendants' false affirmative representations and

intentional omissions of material facts regarding the FLIP, OPIS, BLIPS and SOS transactions,

Plaintiffs and the Class paid millions of dollars to Defendants for tax and legal advice, paid

millions of dollars to execute the FLIP, OPIS, BLIPS and SOS transactions, purchased

unnecessary "investments" to effectuate the transactions, did not avail themselves of legitimate

investment and/or tax savings opportunities, and filed state and federal tax returns that reflected

improper deductions for capital and ordinary losses resulting from the FLIP, OPIS, BLIPS and

SOS transactions.

222.    But for Defendants' intentional misrepresentations and material omissions

described above, Plaintiffs and the Class would never have engaged Defendants to provide

advice on the FLIP, OPIS, BLIPS and SOS strategies, participated in the FLIP, OPIS, BLIPS and

SOS transactions, claimed the purported resulting capital and/or ordinary losses on their income

tax returns, filed and signed their tax returns as prepared by the KPMG or others in reliance on

the Defendants' advice, and/or failed to avail themselves of legitimate investment and/or tax

savings opportunities.

223.    As a result of Defendants' conduct set forth herein, Plaintiffs and the Class Members have suffered injury in that: (1) they paid Defendants and the Non-Parties millions of dollars in fees; (2) they purchased unnecessary investments to effectuate the FLIP, OPIS, BLIPS and SOS transactions; (3) they have, or may in the future, incur tax penalties and interest; (4) they have and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the position they are in resulting solely as a result of Defendants' wrongdoing; and (5) they have foregone legitimate investment and/or tax savings opportunities.

224.    As a proximate cause of the foregoing, Plaintiffs and the Class have been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

## COUNT II

### CIVIL CONSPIRACY

**By All Plaintiffs Individually And On Behalf Of
All Class Members Against The Defendants**

225.    Plaintiffs and the other members of the Class repeat and reallege each and every prior allegation, as if fully set forth herein.

226.    The Defendants and the Non-Parties engaged in a civil conspiracy with each other which consisted of an (1) agreement between and among the Defendants and the Non-Parties, (2) to misrepresent to Plaintiffs and the Class the true nature of FLIP, OPIS, BLIPS and SOS and/or to defraud the Plaintiffs and the Class into paying large fees for a fraudulent product, (3) which agreement resulted in injury to Plaintiffs and other Class Members.

227.    As described more fully above, the Defendants and the Non-Parties knowingly acted in concert to market and implement the fraudulent and abusive FLIP, OPIS, BLIPS and SOS tax shelters. In doing so, the Defendants and the Non-Parties acted with full knowledge and

- 83 -

awareness that the transaction was designed to give the false impression that a complex series of

financial transactions were legitimate business transactions which had economic substance from

an investment standpoint, when they in fact lacked those and other features necessary for a

successful tax strategy.

228.    Prior to the marketing and sale of FLIP, OPIS, BLIPS and SOS to Plaintiffs and

the Class, the Defendants and the Non-Parties entered into an agreement, association and union

associated in fact to devise, design, facilitate, promote, and sell FLIP, OPIS, BLIPS and SOS to

Plaintiffs and the Class for the express purpose of generating and sharing in millions of dollars in

fees. KPMG and Brown & Wood knew the details of its respective co-Defendants' and Non-

Parties' agreements and understandings, and specifically knew, or was reckless in not knowing,

that the FLIP, OPIS, BLIPS and/or SOS tax shelters being sold:

      (a)    were being falsely represented as investment strategies;

      (b)    were being sold with fill-in-the-blank tax opinions used as de facto sales

literature;

      (c)    involved improper disqualifying step transactions;

      (d)    involved KPMG, Brown & Wood, Deutsche Bank, HVB, NatWest, UBS,

Wachovia, Presidio and Quellos functioning as illegally unregistered tax shelter promoters;

      (e)    were sold as a valid and valuable investment but presented almost no

likelihood of the investors making an economic profit on the cash that they invested;

      (f)    involved improper and unethical fee-splitting by KPMG in tandem with

Brown & Wood and the Non-Parties;

      (g)    involved improper and unethical entry into a business joint venture with

lay agencies by KPMG and Brown & Wood in tandem with the other Non-Parties;

- 84 -

      (h)     involved improper and unethical conflicts of interest;

      (i)     involved the issuance of legal opinions based on false facts and without the exercise of due care by KPMG and Brown & Wood;

      (j)     involved a tax strategy that had no valid business purpose, and

      (k)     would likely be deemed abusive or fraudulent tax shelters by the IRS.

229.    Not only did the Defendants know that FLIP, OPIS, BLIPS and SOS were abusive tax shelters, but KPMG's and Brown & Wood's respective opinion letters implicitly represented that FLIP, OPIS, BLIPS and SOS were not tax shelters and explicitly represented that FLIP, OPIS, BLIPS and SOS were legitimate tax strategies. This was manifestly untrue, as the Defendants either knew, or were reckless in not knowing.

230.    The Defendants knew, or were reckless in not knowing, that the amount of fees charged by them was not representative or reflective of the amount of time and effort they expended in providing tax, accounting, legal or investment advisory services, but rather was based upon the amount of the capital losses and/or basis shift the Plaintiffs and the other members of the Class would claim on their tax returns and the amount of tax the clients supposedly would avoid.

231.    The acts of the Defendants violated the law, as well as rules governing professional standards.

232.    The Defendants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action all for the sole purposes of obtaining professional fees from Plaintiffs and the Class.

233.    As co-conspirators, each of the Defendants aided the other and the Non-Parties in the implementation and execution of the Defendants' and the Non-Parties' joint deceptive

- 85 -

scheme by causing Plaintiffs and the Class to invest in FLIP, OPIS, BLIPS and SOS. There was a meeting of the minds between and among the Defendants and the Non-Parties, and other individuals and entities, both known and unknown, to commit the unlawful acts alleged herein. This conspiracy, to commit these unlawful, overt acts, proximately caused and continues to cause Plaintiffs' and the Class's damages as previously set forth herein.

234.    KPMG's fee-splitting arrangement with Brown & Wood, and the Non-Parties, gave them a significant pecuniary interest in the solicitation, promotion and provision of professional services to Plaintiffs and the Class.

235.    As a result of Defendants' conduct set forth herein, Plaintiffs and the Class Members have suffered injury in that: (1) they paid Defendants and the Non-Parties millions of dollars in fees; (2) they purchased unnecessary investments to effectuate the FLIP, OPIS, BLIPS and SOS transactions; (3) they have, or may in the future, incur tax penalties and interest; (4) they have and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the position they are in resulting solely as a result of Defendants' wrongdoing; and (5) they have foregone legitimate investment and/or tax savings opportunities.

236.    Plaintiffs and the Class have been injured in an actual amount to be proven at trial and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

**COUNT III**

**BREACH OF FIDUCIARY DUTY**

**By All Plaintiffs Individually And On Behalf Of
All Class Members Against The Defendants**

237.    Plaintiffs and the other members of the Class repeat and reallege each and every prior allegation, as if fully set forth herein.

238.    Defendants hold themselves out to the public and held themselves out to Plaintiffs and the Class Members as experts with particular competence in tax matters. Defendants KPMG and Brown & Wood each issued a tax opinion letter in which each respectively opined that the tax losses generated in the FLIP, OPIS, BLIPS and SOS tax schemes were legitimate and would more likely than not survive scrutiny by the IRS.

239.    In connection with the FLIP, OPIS, BLIPS and SOS tax schemes, Defendants KPMG and Brown & Wood were Plaintiffs' and the Class Members' fiduciaries, and thus owed Plaintiffs and the Class Members the undivided duties of honesty, loyalty, care and compliance with the applicable codes of professional responsibility. Plaintiffs and the Class Members relied on KPMG and Brown & Wood to act as their fiduciaries and to advise them as to the legitimacy of the FLIP, OPIS, BLIPS and SOS transactions and the propriety of the tax deductions claimed from FLIP, OPIS, BLIPS and SOS.

240.    In truth, the FLIP, OPIS, BLIPS and SOS tax schemes lacked economic substance, were designed to generate false tax losses and were contrary to the Internal Revenue Code, Treasury Regulations, and public announcements and policies of the IRS, all of which was known to KPMG and Brown & Wood, or which should have been known to each of them upon the exercise of reasonable professional research and judgment.

241.    KPMG and Brown & Wood breached their fiduciary duties to Plaintiffs and the Class by, among others, the following acts and/or omissions:

(a)    Taking advantage of a relationship of trust and confidence and using their knowledge of Plaintiffs' and the Class's confidential information to solicit them to purchase FLIP, OPIS, BLIPS and SOS products;

(b)    Charging and collecting unreasonable, excessive, and unethical fees;

- 87 -

(c)     Failing to disclose that the Defendants and the Non-Parties were splitting and/or sharing fees;

(d)     Failing to disclose that the opinion letters provided by Brown & Wood and KPMG in connection with the transactions were not issued independently;

(e)     Failing to fully explain the details of FLIP, OPIS, BLIPS and SOS and to ensure that Plaintiffs and the Class understood those details before inducing them to enter into the FLIP, OPIS, BLIPS and SOS transactions;

(f)     Representing to Plaintiffs and the Class that their tax savings from FLIP, OPIS, BLIPS and SOS would be significant and far outweigh the amount of fees and costs incurred;

(g)     Advising Plaintiffs and the Class that the Brown & Wood opinion letter was an "independent" legal opinion from an "independent" law firm;

(h)     Advising Plaintiffs and the Class that Brown & Wood's opinion letters could be relied upon to protect them from incurring penalties and to satisfy the IRS as to the propriety of FLIP, OPIS, BLIPS and SOS if audited;

(i)     Failing to advise Plaintiffs and the Class that Brown & Wood and KPMG had already prepared "form" opinion letters approving BLIPS and OPIS and that these Defendants needed only to fill in several blanks for each of the many clients to which they rendered such opinion letters across the country;

(j)     Promoting and selling unregistered tax shelters;

(k)     Failing to disclose to Plaintiffs and the Class that if they filed tax returns claiming capital and/or ordinary losses based on FLIP, OPIS, BLIPS and SOS they would be liable for penalties and interest;

(l)      Advising Plaintiffs and the Class that the capital and/or ordinary losses created by FLIP, OPIS, BLIPS and SOS were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(m)      Recommending, advising, instructing, and/or assisting Plaintiffs and the Class in the formation of the limited liability companies and partnerships necessary to carry out FLIP, OPIS, BLIPS and SOS;

(n)      Representing to, and advising Plaintiffs that the various entities formed to carry out FLIP, OPIS, BLIPS and SOS had a legitimate business purpose and economic substance;

(o)      Making and endorsing the statements and representations in the opinion letters authored and signed by KPMG and Brown & Wood;

(p)      Making and endorsing the statements and representations contained in the Defendants' oral advice, instructions, recommendations, and the tax returns prepared by KPMG;

(q)      Failing to advise Plaintiffs and the Class of the roles of Deutsche Bank, HVB, NatWest, UBS and Wachovia in FLIP, OPIS, BLIPS and SOS and the fees these banks received for assisting and carrying out FLIP, OPIS, BLIPS and SOS;

(r)      Recommending, advising, instructing, and assisting Plaintiffs and the Class in carrying out each of the steps of FLIP, OPIS, BLIPS and SOS;

(s)      Advising, instructing, and assisting in the preparation and filing of Plaintiffs' and the Class's tax returns, utilizing the capital and/or ordinary losses generated by FLIP, OPIS, BLIPS and SOS;

(t)      Advising Plaintiffs and the Class that their tax returns, which utilized the capital and/or ordinary losses generated by FLIP, OPIS, BLIPS and SOS, were prepared in

- 89 -

accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

      (u)    Failing to ensure that the transactions into which Defendants advised each Plaintiff and Class Member to enter complied with applicable state and federal rules and regulations;

      (v)    Failing to comply with their ethical obligations to Plaintiffs and the Class, and violating their respective professional rules of conduct, including engaging in professional relationships that violated these obligations and rules; and

      (w)    Providing erroneous legal and tax opinions and advice.

    242.    As a result of Defendants' conduct set forth herein, Plaintiffs and the Class have suffered injury in that: (1) they paid Defendants and the Non-Parties millions of dollars; (2) they purchased unnecessary investments to effectuate FLIP, BLIPS, OPIS and SOS; (3) they have, or may in the future, incur tax penalties and interest; (4) they have incurred, and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation; and (5) they have foregone legitimate tax savings opportunities.

    243.    As a proximate cause of the foregoing, Plaintiffs and the Class have been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

## COUNT IV

### PROFESSIONAL MALPRACTICE

#### By All Plaintiffs Individually And On Behalf Of
#### All Class Members Against The Defendants

    244.    Plaintiffs and the other members of the Class repeat and reallege each and every prior allegation, as if fully set forth herein.

245.    As Plaintiffs' and the Class's tax advisers, accountants and attorneys, Defendants

KPMG and Brown & Wood owed Plaintiffs and the Class undivided duties of care, loyalty and

honesty, a duty to comply with the applicable standards of care, and a duty to comply with the

applicable provisions of their codes of professional responsibility.

246.    Defendants KPMG and Brown & Wood also had a duty to Plaintiffs and the Class

to meet the applicable standard of care for accountants and attorneys. The Defendants failed to

meet those applicable standards of care, which proximately caused damages to Plaintiffs and the

Class as set forth elsewhere in this Complaint.

247.    During the course of their representation of Plaintiffs and the Class, KPMG and

Brown & Wood each made numerous knowingly or negligently false affirmative representations,

and intentional or negligently misleading omissions of material fact, and gave numerous

recommendations, advice, instructions, and opinions to Plaintiffs and the Class Members,

including but not limited to:

(a)    Taking advantage of a relationship of trust and confidence and using their

knowledge of Plaintiffs' and the Class's finances to solicit them for FLIP, OPIS, BLIPS and

SOS;

(b)    Using Plaintiffs' and the Class Members' confidential and sensitive

information to target and solicit them to purchase FLIP, OPIS, BLIPS and SOS transactions;

(c)    Using their reputations as prominent, top-tier firms to induce Plaintiffs and

the Class Members to purchase FLIP, OPIS, BLIPS and SOS which KPMG and Brown & Wood

knew were abusive tax shelters;

(d)    Charging and collecting unreasonable, excessive, and unethical fees;

(e)    Failing to disclose that the Defendants and the Non-Parties were splitting and/or sharing fees;

(f)    Failing to disclose that the opinion letters provided by Brown & Wood and KPMG in connection with the transactions were not issued independently;

(g)    Failing to fully explain the details of BLIPS and OPIS and to ensure that Plaintiffs and the Class understood those details before inducing them to enter into the FLIP, OPIS, BLIPS and SOS transactions;

(h)    Representing to Plaintiffs and the Class that their tax savings from FLIP, OPIS, BLIPS and SOS would be significant and far outweigh the amount of fees and costs incurred;

(i)    Advising Plaintiffs and the Class that the Brown & Wood opinion letter was an "independent" legal opinion from an "independent" law firm;

(j)    Advising Plaintiffs and the Class that Brown & Wood's opinion letters could be relied upon to protect them from incurring penalties and to satisfy the IRS as to the propriety of FLIP, OPIS, BLIPS and SOS if audited;

(k)    Failing to advise Plaintiffs and the Class that Brown & Wood and KPMG had already prepared "form" opinion letters approving FLIP, OPIS, BLIPS and SOS and that the Defendants needed only to fill in several blanks for each of the many clients to which they rendered such opinion letters across the country;

(l)    Promoting and selling an unregistered tax shelter;

(m)    Failing to disclose to Plaintiffs and the Class that if they filed tax returns claiming capital and/or ordinary losses based on FLIP, OPIS, BLIPS and SOS they would be liable for penalties and interest;

(n)    Advising Plaintiffs and the Class that the capital and/or ordinary losses created by FLIP, OPIS, BLIPS and SOS were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(o)    Recommending, advising, instructing, and/or assisting Plaintiffs and the Class in the formation of the limited liability companies and partnerships necessary to carry out FLIP, OPIS, BLIPS and SOS;

(p)    Representing to, and advising Plaintiffs and the Class that the various entities formed to carry out FLIP, OPIS, BLIPS and SOS had a legitimate business purpose and economic substance;

(q)    Making and endorsing the statements and representations in the opinion letters authored and signed by KPMG and Brown & Wood;

(r)    Making and endorsing the statements and representations contained in KPMG's and Brown & Wood's oral advice, instructions, and recommendations, and in the tax returns prepared by KPMG;

(s)    Failing to advise Plaintiffs and the Class of the roles of Deutsche Bank, HVB, NatWest, UBS and Wachovia in FLIP, OPIS, BLIPS and SOS and the fees these banks received for assisting and carrying out FLIP, OPIS, BLIPS and SOS;

(t)    Recommending, advising, instructing, and assisting Plaintiffs and the Class Members in carrying out each of the steps of FLIP, OPIS, BLIPS and SOS;

(u)    Advising, instructing, and assisting in the preparation and filing of Plaintiffs' and the Class Members' tax returns, utilizing the capital and/or ordinary losses generated by FLIP, OPIS, BLIPS and SOS;

- 93 -

      (v)     Advising Plaintiffs and the Class that their tax returns, which utilized the capital and/or ordinary losses generated by FLIP, OPIS, BLIPS and SOS, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

      (w)     Failing to ensure that the transactions into which Defendants advised each Plaintiff and Class Member to enter complied with the applicable state and federal rules and regulations;

      (x)     Failing to comply with their ethical obligations to Plaintiffs and the Class, and violating their respective professional rules of conduct, including engaging in professional relationships that violated these obligations and rules; and

      (y)     Providing erroneous legal and tax opinions and advice.

248.    Defendants KPMG and Brown & Wood either knew or reasonably should have known their representations, recommendations, advice, instructions, and opinions to be false. In addition, the rendering of such representations, recommendations, advice, instructions and opinions, as well as the failure to advise Plaintiffs and the Class of the omissions set forth above, was negligent, grossly negligent, and reckless. Accordingly, the Defendants failed to exercise the standard of care required of them as accountants and attorneys.

249.    Plaintiffs and each Class Member fully performed their obligations to Defendants under their contracts and thus did not contribute to the intentional, negligent, grossly negligent, and/or reckless acts in any way.

250.    In reasonable reliance on Defendants' advice regarding FLIP, OPIS, BLIPS and SOS, Plaintiffs and the Class paid millions of dollars for tax and legal advice, paid millions of dollars to execute their FLIP, OPIS, BLIPS and SOS transactions, purchased unnecessary

investments to effectuate FLIP, OPIS, BLIPS and SOS, did not avail themselves of legitimate tax savings opportunities, filed federal and state tax returns that reflected deductions for capital and/or ordinary losses resulting from the FLIP, OPIS, BLIPS and SOS transactions, and did not take advantage of other legitimate tax savings opportunities.

251.    But for Defendants failure to meet the applicable standard of care described above, Plaintiffs and the Class would never have engaged in the FLIP, OPIS, BLIPS and SOS transactions, purchased unnecessary investments to effectuate their FLIP, OPIS, BLIPS and SOS transactions, filed federal and state tax returns that reflected deductions for capital and/or ordinary losses resulting from FLIP, OPIS, BLIPS and SOS transactions, and/or failed to avail themselves of other legitimate tax savings opportunities.

252.    As a result of the Defendants' conduct, as set forth herein, Plaintiffs and the Class Members have suffered injury in that: (l) they paid Defendants and the Non-Parties millions of dollars; (2) they purchased unnecessary investments to effectuate FLIP, BLIPS, OPIS and SOS; (3) they have, or may in the future, incur tax penalties and interest; (4) they have and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation; and (5) they have foregone legitimate tax savings opportunities.

253.    As a proximate cause of the foregoing, Plaintiffs and the Class Members have been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

## COUNT V

### DISGORGEMENT OF UNETHICAL, EXCESSIVE AND ILLEGAL FEES

#### By All Plaintiffs Individually And On Behalf Of
#### All Class Members Against The Defendants

254.    Plaintiffs and the other members of the Class repeat and reallege each and every

prior allegation, as if fully set forth herein.

255.    Defendants charged Plaintiffs and the Class the same or substantially similar fees

for the same or substantially similar worthless work and expended little, if any, additional time

or effort in providing advice, products, opinions and/or services to Plaintiffs and the other Class

Members.

256.    Regardless of the merits of the legal advice and the opinion letters that

Defendants provided to Plaintiffs and the Class, the fees charged by Defendants, and which

Plaintiffs and the Class paid, are unethically excessive and in violation of the Rules of

Professional Conduct of the American Institute of Certified Public Accountants, which govern

accountants, and the Illinois and New York Rules of Professional Conduct, which govern

attorneys, including Rule 1.5 of the Illinois Rules of Professional Conduct and § 1200.11 (DR 2-

106) of the New York Rules of Professional Conduct.

257.    Further, because Defendants did not disclose information that they were required

to disclose — *i.e.*, that FLIP, OPIS, BLIPS and SOS were designed, created, marketed and

implemented by both Defendants and the Non-Parties rather than solely by KPMG, that the

Brown & Wood opinion letter was not independent, that both Defendants and the Non-Parties,

rather than only KPMG, had a significant pecuniary interest in the FLIP, OPIS, BLIPS and SOS

transactions, that their representation of Plaintiffs and the other Class Members and their

- 96 -

arrangement with each other and the Non-Parties violated the applicable rules of professional
conduct — their fee agreements with Plaintiffs and the other Class Members are not enforceable.

258.    Accordingly, all fees that Defendants received either directly from Plaintiffs and
the other Class Members or from any and all other Non-Parties in connection with FLIP, OPIS,
BLIPS and SOS, and in the preparation of Plaintiffs' and other Class Members' tax returns
involving FLIP, OPIS, BLIPS and SOS, must be disgorged.

## COUNT VI

### UNJUST ENRICHMENT

**By All Plaintiffs Individually And On Behalf Of
All Class Members Against The Defendants**

259.    Plaintiffs and the other members of the Class repeat and reallege each and every
prior allegation, as if fully set forth herein.

260.    In connection with FLIP, OPIS, BLIPS and SOS, the Defendants charged
Plaintiffs and the Class fees, purportedly for, among other things, the provision of professional
services. In truth, Defendants knew that, rather than receiving valuable professional services,
Plaintiffs and the Class were being sold illegitimate tax products that the IRS likely would not
approve. The fees that Plaintiffs and the Class paid to the Defendants and the Non-Parties were
subject to a fee-splitting arrangement, according to which the Defendants and the Non-Parties
apportioned among themselves the fees paid to any one or more of the Defendants.

261.    The amount of fees received by Defendants was not tied to or reflective of the
amount of time and effort they expended in providing tax, accounting, legal, investment or
consultancy services, but rather was tied to the amount of capital and/or ordinary losses each
client would claim.

- 97 -

262.    Indeed, internal KPMG e-mails reflect that KPMG, which charged clients millions of dollars in fees, ensured that the fees it received would offset the risk of potential fines levied for the marketing of fraudulent tax shelters, rather than tying those fees to the value of its services.

263.    Brown & Wood received millions of dollars in fees for the provision of FLIP, OPIS, BLIPS and SOS opinion letters that did not reflect the time or resources expended in providing those opinion letters, which were "canned," "one-size-fits-all" written opinions which were substantially the same for each Plaintiff and Class Member.

264.    Deutsche Bank, HVB, NatWest, UBS, Wachovia, Presidio and Quellos received millions of dollars in fees from their active participation in FLIP, OPIS, BLIPS and SOS, including their promotion and marketing of FLIP, OPIS, BLIPS and SOS and provision of investment advisory and execution services, despite the fact that they knew that FLIP, OPIS, BLIPS and SOS were not legitimate investment transactions, and that they were simply acting in furtherance of a fraud.

265.    Accordingly, Defendants were unjustly enriched at Plaintiffs' and the other Class Members' expense by virtue of the fees charged to Plaintiffs and the Class in connection with FLIP, OPIS, BLIPS and SOS.  Defendants are not entitled to retain any of the fees received from Plaintiffs and other Class Members or from any or all of the other Defendants in connection with FLIP, OPIS, BLIPS and SOS.  Moreover, equity and good conscience mandate that the Defendants return the fees to Plaintiffs and the Class

## COUNT VII

### BREACH OF CONTRACT

#### By All Plaintiffs Individually And On Behalf Of
#### All Class Members Against KPMG

266.    Plaintiffs and the other members of the Class repeat and reallege each and every prior allegation, as if fully set forth herein.

267.    Plaintiffs and the other Class Members, and KPMG entered into one or more Agreements under which KPMG agreed to, among other things, satisfactorily perform professional tax planning, and render opinions and tax return assistance for Plaintiffs and the other Class Members. Plaintiffs and the other Class Members bargained for KPMG's contractual undertakings and paid KPMG millions of dollars for such services. Plaintiffs and other Class Members were either contracting parties or intended third-party beneficiaries of KPMG's contractual undertakings.

268.    Under the terms of the KPMG Agreement that KPMG entered into with each of the Plaintiffs, KPMG obligated itself to provide each Plaintiff with "an opinion letter that addresses the U.S. federal income tax consequences associated with participation in [BLIPS [and OPIS]] *based upon your unique facts and circumstances*." (Emphasis added.)

269.    KPMG materially breached its obligations under the KPMG Agreement by failing to provide the Plaintiffs an opinion based on each Plaintiff's "unique facts and circumstances." Instead, KPMG provided each Plaintiff "canned" and inaccurate opinion letters with respect to Plaintiffs' FLIP, OPIS, BLIPS and SOS transactions that were materially uniform and substantially the same as the opinion letters provided to other Class Members.

270.    Further, under the terms of Plaintiffs' and the other Class Members' contractual dealings with KPMG, KPMG had an obligation not to engage in fraudulent and/or reckless

- 99 -

and/or negligent behavior, not to engage in improper conflicts of interest, not to engage in

corrupt or unethical behavior with lawyers or law firms, and not to sell fraudulent investments,

but rather to act in good faith, to deal fairly and honestly, and to act reasonably and with due care

toward Plaintiffs and the Class.

271.    KPMG materially breached its obligations under the Agreements by devising,

orchestrating and executing a worthless, abusive tax shelters, and by not informing Plaintiffs and

the Class of the very substantial risks associated with FLIP, BLIPS, OPIS and SOS and that

Plaintiffs and the Class could not rely on the opinions and advice provided to them.

272.    Further, KPMG failed and neglected to perform under its Agreements by failing

to exercise due care, by failing to act in good faith, by failing to honor its fiduciary duties, by

acting fraudulently and by entering into a conspiracy to deprive Plaintiffs and the Class of

property through deception.  The actions of KPMG were accompanied by aggravating

circumstances and tortious and fraudulent conduct, as alleged above.  Accordingly, KPMG has

breached the Agreements between it, on the one hand, and Plaintiffs and the other Class

Members, on the other hand.

273.    Plaintiffs and the Class fully performed their obligations to KPMG under these

Agreements and did not contribute to KPMG's breaches in any way.

274.    As a result of KPMG's conduct, as set forth herein, Plaintiffs and the Class have

suffered injury in that: (l) they paid Defendants and the Non-Parties millions of dollars; (2) they

purchased unnecessary investments to effectuate FLIP, BLIPS, OPIS and SOS; (3) they have, or

may in the future, incur tax penalties and interest; (4) they have and will continue to incur

substantial additional costs in hiring new tax and legal advisors to rectify the situation; and

(5) they have foregone legitimate tax savings opportunities.

275.    By reason of the foregoing, Plaintiffs and the Class are entitled to recover actual damages, including prejudgment interest, and to have exculpatory provisions in KPMG's contracts declared illegal, void and unenforceable.

## COUNT VIII

### BREACH OF CONTRACT

#### By All Plaintiffs Individually And On Behalf Of All Class Members Against The Defendants

276.    Plaintiffs and the other members of the Class  repeat and reallege each and every prior allegation, as if fully set forth herein.

277.    Plaintiffs and the other Class Members entered into implied, oral and written contracts with the Defendants to provide Plaintiffs and the other Class Members with professionally competent tax advice, legal advice and services, accounting services, investment advisory and execution services and tax return preparation services.  In connection therewith, Defendants were required and expected to meet all applicable standards of care, to meet the fiduciary duties of loyalty and honesty, and to comply with all applicable rules of professional conduct.

278.    The Defendants ignored their obligations and instead materially breached their contracts by, among other things, providing Plaintiffs and the Class with advice, opinions, recommendations, representations, instructions and services that the Defendants either knew or reasonably should have known to be wrong and in furtherance of the conduct described above. In addition, the rendering of such advice, opinions, recommendations, representations, instructions and services was negligent, grossly negligent and reckless.  Accordingly, the Defendants failed to exercise the standard of care required of them and materially breached their contracts with Plaintiffs and the other Class Members.  In the alternative as to KPMG, no express

- 101 -

contract existed for the services described herein, and Plaintiffs have been damaged under theories of implied contract and/or unjust enrichment.

279.    Plaintiffs and the Class fully performed their obligations to the Defendants under these contracts and did not contribute to the Defendants' material breaches in any way.

280.    As a result of these Defendants' material breaches of the contracts, as set forth herein, Plaintiffs and the other Class Members have suffered injury in that: (1) they paid Defendants millions of dollars; (2) they purchased unnecessary investments to effectuate FLIP, BLIPS, OPIS and SOS; (3) they have incurred, or may in the future, incur tax penalties and interest; (4) they have incurred, and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation; and (5) they have foregone legitimate tax savings opportunities.

281.    By reason of the foregoing, Plaintiffs and the Class Members are entitled to recover actual damages, including prejudgment interest, and to have exculpatory provisions in KPMG's contracts declared illegal, void and unenforceable.

## COUNT IX

### DECLARATORY JUDGMENT

### By All Plaintiffs Individually And On Behalf Of
### All Class Members Against The Defendants

282.    Plaintiffs and the other members of the Class repeat and reallege each and every prior allegation, as if fully set forth herein.

283.    The IRS audited Plaintiffs' tax returns, and has audited, or will audit all Class Members' tax returns with respect to FLIP, BLIPS, OPIS and SOS. As a result, Plaintiffs and the Class will incur additional professional fees and expenses, and potentially other costs, to rectify the Defendants' wrongdoing.

- 102 -

284.   Defendants are legally responsible for: (1) interest and/or penalties assessed by the IRS and/or state tax authorities, as well as the disallowance of certain other deductions; (2) professional fees and costs incurred by Plaintiffs and the Class Members in connection with the state and/or federal investigations and audits; and (3) professional fees and expenses incurred by Plaintiffs and the Class Members on account of the Defendants' violations of law and other actionable conduct.

285.   Pursuant to 28 U.S.C. § 2201, Plaintiffs and the Class Members are entitled to a declaration that Defendants are liable to Plaintiffs and the Class Members for such penalties, interest, loss of deductions, costs, professional fees, expenses and damages. There exists an actual, justiciable controversy between the parties as Defendants have denied such liability.

286.   Pursuant to 28 U.S.C. § 2201, Plaintiffs and the Class are also entitled to a declaration that the agreements entered into with Defendants are void and unenforceable and are, in any event, inapplicable in all respects to the claims asserted herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the other Class Members, demand judgment against the Defendants as follows:

A.   Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.   Certifying Plaintiffs as the Class Representatives and undersigned counsel as Class Counsel;

C.   Awarding Plaintiffs and the Class Members actual and punitive damages in an amount which may be proven at trial, together with interest thereon;

D.   Awarding Plaintiffs and the Class Members pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees and other costs;

- 103 -

E.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure and any appropriate state law remedies to assure that the Class has an effective remedy;

F.      Declaring that Defendants are liable to Plaintiffs and the Class Members for the penalties, interest, loss of deductions, costs, professional fees, expenses and damages they have incurred;

G.      Declaring that the agreements that Plaintiffs and the Class Members entered into with Defendants are void and unenforceable and are, in any event, inapplicable in all respects to the claims asserted herein; and

H.      Awarding such other, further, and different relief as the Court deems just and proper under the circumstances.

I.

DATED:    September 27, 2005

Respectfully submitted,

**CARELLA, BYRNE, BAINE GILFILLAN,
CECCHI, STEWART & OLSTEIN**

By: _____
James E. Cecchi (JC-7697)
John M. Agnello (JA-0338)
6 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744

**MILBERG WEISS BERSHAD &
SCHULMAN LLP**

By: _____
Melvyn I. Weiss (MW-1392)
Brad N. Friedman (BF-9309)
Rachel S. Fleishman (RF-5080)
Peter Sloane (PS-4672)
One Pennsylvania Plaza
New York, NY 10119-0165
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

**WILKS, ALPER & HARWOOD, P.C.**
Susan C. Alper
Suite 700 Town Point Center
150 Boush Street
Norfolk, Virginia 23510-1637
Telephone: (757) 623-6500
Facsimile: (757) 623-6508

*Counsel for the Class*

DOCS\312390v1

- 105 -

*Exhibits to Declaration*

*Civil 05-3189*

## VALID EXCLUSIONS

| NME | Number of Distinct Requests | Person Making Request | Individual/Entity |
|---|---|---|---|
| 1000013 | 1 | Donald Alt | Donald Alt<br>Judy Alt<br>Bellavary Ventures |
| 1000022 | 2 | Kerby Confer | Kerby Confer<br>Judith Confer<br>Barrow Ventures |
| 1000109 | 3 | Bird Marella | Bernard Salick<br>Bernard and Gloria Salick Trust<br>Stanton Street<br>Dana Street<br>Burdekin Ventures<br>Isaac Ventures<br>Gloria Salick |
| 1000201 | 4 | Blank Rome | Peter Amato<br>Joseph Amato<br>James Chebalo<br>Leonard Ross |
| 1000284 | 5 | Deary Montgomery | Affco Investments<br>Affco<br>La Git 88 Trust<br>Powers Childrens Inter Vivos Trust<br>John Powers<br>LG 88 Trading<br>Albert Gunther III<br>Shannon Ellis<br>Martha Gunther<br>Michael Bach<br>Heidi Gunther<br>Eric Linquest<br>Gretchen Linquest |

GOVERNMENT'S
EXHIBIT

27

PENGAD 800-631-6989

| | | | Additional Entities related to above |
|---|---|---|---|
| 1000032 | 6 | Lynn Deppen | Lynn Deppen<br>Castlebar Ventures |
| 1000095 | 7 | Carol Logan | Carol Logan<br>Black Ventures |
| 1000151 | 8 | Kerr & Wagstaffe | Christopher Cohan Separate Property Trust<br>Sonic Enterprises<br>Sonic Cable Television<br>Sonic Cable Leasing Corp<br>Sonic Cable Television of Northern CA<br>Sonic Cable Television of Santa Cruz<br>Sonic Cable Television of Utah<br>Christipher Cohan Properties<br>CC Basketball<br>Sonic Communications<br>Sonic Partners<br>Foghorn<br>CCE, Inc.<br>CC Partners<br>Cohan Company Inc.<br>Christopher Cohan<br>Angela Cohan |
| 1000293 | 9 | Robert Spears | Robert Spears |
| 1000066 | 10 | Doffermyre Shields | Daren Keeter<br>Kelly Keeter<br>Kaylan Keeter<br>Julie Keeter<br>Bradley Keeter<br>Cheryl Keeter<br>Steven Keeter<br>James Keeter |

|         |    |                  | Kak Trust<br>Daren Keeter, as trustee for KAK Trust<br>Julie Keeter as guardian of the property of Kaylan Keeter |
|---------|----|------------------|---------------------------------------------------------|
| 1000152 | 11 | Bondurant Mixson | Robert Cohen<br>RKC Revocable Trust<br>Christie Cohen |
| 1000136 | 12 | Bondurant Mixson | E. Stephen Stroud<br>Grace Ramsey<br>Tanana Ventures<br>E. Stephen Stroud 1999 Trust |
| 1000156 | 13 | Bondurant Mixson | Raymond Gellein Jr.<br>Raymond Gellein Jr. Revocable Trust<br>Raymond Gellein<br>Chilliwack Ventures |
| 1000162 | 14 | Bondurant Mixson | Mark Hawn<br>Connie Hawn<br>MEH Annuity Trust<br>Barwon Ventures |
| 1000080 | 15 | Bondurant Mixson | Henry MacNair<br>Patricia MacNair<br>Smokey Hill Ventures<br>Henry MacNair 1999 Trust |
| 61      | 16 | Bondurant Mixson | Brett Gellein |
| 1000094 | 17 | Bondurant Mixson | Ronald Newitt<br>Jean Newitt<br>Robertson/Newitt Capital<br>Revocable Living Trust of Ronald Newitt<br>Hat Creek Ventures |

| 1000249 | 18 | Robert Reagan | Robert Reagan<br>Reagan Family Trust |
|---|---|---|---|
| 1000108 | 19 | Bondurant Mixson | Ross Robertson<br>Darla Robertson<br>Robertson/Newitt Capital (same as above)<br>Revocable Living Trust of Ross Robertson<br>Pitt River Ventures |
| 69 | 20 | Dalene Reagan | Dalene Reagan |
| 1000016 | 21 | Scott Blum<br>Audrey Blum | Scott Blum<br>Audrey Blum |
| 73 | 22 | Deree Reagan | Deree Reagan<br>Alexander Reagan McGlocklin Trust |
| 1000055 | 23 | Bondurant Mixson | Janice Gellein<br>Janice Gellein Revocable Trust<br>Wallace Ventures |
| 76 | 24 | Bondurant Mixson | Matthew Gellein |
| 1000088 | 25 | Bondurant Mixson | Carlton Midyette Jr.<br>Catherine Midyette<br>Lena Ventures<br>Carlton Midyette II Revocable Trust |
| 1000017 | 26 | Deary Montgomery | James Bochnowski<br>Janet Bochnowski<br>Family Foundation<br>Cor de Valle<br>Cor de Valle Ventures |
| 1000122 | 27 | Deary Montgomery | David Shimmon<br>Cherry Ventures |

| 1000281 | 28 | Deary Montgomery | Peter Howley<br>PAH Trading |
| 1000275 | 29 | Steven Goldman | Steven Goldman<br>Azita Etaati |
| 1000144 | 30 | Bondurant Mixson | Jeffrey Adler<br>Rita Adler<br>Jeffrey Adler Revocable Trust<br>Sultan Ventures |
| 1000146 | 31 | Fine, Kaplan & Black | Edward Arnold |
| 1000159 | 32 | Chandler & Hart | James Green<br>Robert Green |
| 1000167 | 33 | Wlison & Ratledge | Peter Loftin |
| 1000179 | 34 | Stovash Case | Diane Schneider<br>Schneider Interests |
| 1000184 | 35 | Stewart Resnick | Stewart and Lynda Resnick<br>Revocable Trust of 1988 |
| 1000193 | 36 | Wlison & Ratledge | Joseph Umbach |
| 1000222 | 37 | William Hawkins III | William Hawkins III |
| 1000278 | 38 | Patti Haines<br>Jeffrey Haines | Patti Haines<br>Jeffrey Haines |
| 1000283 | 39 | Michael Keller<br>Kim Keller | Michael Keller<br>Kim Keller |
| 1000301 | 40 | Gittler & Bradford | Shigehiro Uchida<br>Michiko Uchida |

| 1000221 | 41 | Lawrence Gaslow | Lawrence Gaslow |
|---------|----|-----------------|-----------------|
| 1000203 | 42 | Kurt Schnaubelt | Avado Brands |
| 17 | 43 | Donna Eacho | Donna Eacho |
| 1000218 | 44 | William Eacho III | William Eacho III |
| 1000208 | 45 | Deary Montgomery | John Chew Jr.<br>John Chew Jr. Revocable Trust<br>Karen Trumpore<br>Clair Robinson<br>Kelly Robinson<br>Olivia Robinson<br>Clair Robinson Subchapter S Trust<br>Kelly Robinson Subchapter S Trust<br>Olivia Robinson Subchapter S Trust<br>North Hampton Investments |
| 1000082 | 46 | R. Cary McNair, Jr. | R. Cary McNair, Jr.<br>Tolt Ventures<br>1989 Energy Trust<br>Raging Ventures |
| 1000149 | 47 | Bobby Stevenson<br>Delaine Stevenson<br>Bobby Stevenson Revocable Trust | Bobby Stevenson<br>Delaine Stevenson<br>Bobby Stevenson Revocable Trust |
| 1000083 | 48 | Daniel Calhoun McNair | Daniel Calhoun McNair<br>Melissa McNair<br>Snoqualmie Ventures |
| 1000250 | 49 | J. Paul Reddam | J. Paul Reddam<br>J. Paul Reddam Trust<br>Clarence Ventures<br>Zed Corporation |

| 1000194 | 50 | Kent Villepigue | Kent Villepigue<br>Susan Villepigue<br>Villepigue Outdoor Advertising Corp.<br>Villepigue Family Trust |
| 1000270 | 51 | Grant Genovese | Rowland Day II |
| 1000037 | 52 | Dixon Doll | Dixon Doll |
| 1000173 | 53 | Workman Lawfirm | Regent Corporation |
| 1000140 | 54 | Gary Wendt | Gary Wendt<br>TNRT Investments |
| 1000192 | 55 | Thomas Henson | Francis Patrick Tomlin Family Trust II |
| 1000317 | 56 | Earl Meck | Earl Meck<br>SM Investments |
| 1000258 | 57 | Randy Stanley | Randy Stanley<br>SM Investments |
| 1000158 | 58 | Steven Gottlieb | Steven Gottlieb |
| 1000257 | 59 | Richard Simon | Richard Simon<br>Richard Simon Revocable Trust |
| 1000042 | 60 | Frederick R. Tulley | John Engquist<br>Palmer Ventures LLC |
| 1000272 | 61 | David E. Lieberman | Richard J Egan<br>Maureen Egan |

## INVALID EXCLUSIONS

| NME | Number of Distinct Requests | Person Making Request | Individual/Entity | Postmarked | |
|---|---|---|---|---|---|
| 1000299 | 1 | James M Webster III | Keith Tucker | 12/20/2005 | 1. |
| 1000279 | 2 | James M Webster III | Robert L Hechler | 12/20/2005 | 1 |

| Department of the Treasury | Internal Revenue Service | Office of Chief Counsel | # Notice |
|---|---|---|---|

CC-2006-003

October 25, 2005

| | | | |
|---|---|---|---|
| **Subject:** | Disclosure of Third Party Tax Information in Tax Shelter Matters | **Cancel Date:** | Upon incorporation into CCDM |

## I. Purpose

This Notice provides guidance rega rding the disclosure und er the item and transaction tests of section 6103 of third party returns and return information gathered in examinations or other investigations of tax shelter promoters or investors by Service and Chief Counsel employees. The Notice also provides guidance r egarding disclosure of third party tax information in judicial or administrative tax proceedings.

## II. In General

The Service conducts n umerous investigations of tax shelter promoters and investors. Often, during the course of an investigation of a promoter for civil promoter penalties, inj unctions, or criminal conduct, the Service secures information and documents pertaining to investors. This information may include investors' names, information on shelters established for the investors, and promotional material, such as prospectuses and sales contracts. Similarly, during the cour se of an examination of a tax shelter investor, the Service oft en secures information and documents pertaining to the promoter. This may include information provided to m ultiple investors, including promotional material, statements or promises made by the promoter to the investor, or information regarding payments of fees to the promoter, and the promoter's activities in setting up the entities, plans or arrangements to facilitate the shelter. This type of information may provide evidence of a pattern or practice, referred to as "pattern evidence," relevant to issues arisi ng in judicial or administrative tax proceedings involving tax shelters. For example, information obtained from an investor may be pattern evidence that demonstrates a consistent lack of a bona fide business purpose among the other investors in the same or substantially similar tax shelter arrangements.

## III. The Item Test

Under section 610 3(a), returns and return information may not be disclosed by the Service except as authorized by the Code. Several exc eptions to section 610 3(a) may apply in the context of disclosures of third party tax information in ad ministrative and judicial proceedings

Filing Instructions: Binder

NO: Circulate ___ Distribute _X_ to: All Personnel _X_ Attorneys ___ In: _____

Other ___ FOIA Electronic Reading Room

Electronic Filename: CC-2006-002.pdf    Original signed copy in: CC:FM:PM



GOVERNMENT'S EXHIBIT
28
PENGAD 800-631-6989

-2-

relating to tax administration. The section 6103(h)(4)(B) exception to the disclosure p rohibition, the "item test," permits disclosure of third party returns and return information in judicial or administrative proceedings pertaining to tax administration,

> if the treatment of an item reflected on such [third party's] return is directly related to the resolution of an issue in the proceeding.

Under section 6103(h)(4)(B)'s item test, the disclosure of tax information of taxpayers who participated in substantially similar transactions promoted by the same promoter is permitted, so long as the tax information directly relates to the resolution of an issue in the proceeding. On the other hand, the disclosure of tax information of taxpayers participating in tax shelters promoted by different promoters or taxpayers participating in different tax shelters promoted by the same promoter, in general, may not be covered by the item test. In an unpublished order in *ACM v. Commissioner*, T.C. Docket No. 10472-93 (August 18, 1995), in ruling on discovery motions concerning the depositions of nonparty witnesses, the Tax Court permitted the use of third party pattern evidence, stating "if transactions reported on a third party return are directly related to an issue in the proceeding, not only the pertinent portions of the return but also any extrinsic information obtained by the IRS regarding the tax treatment of the reported transaction may be offered into evidence without violating section 6103." Slip op. at 34-35. As was stated in *United States v. Northern Trust Co.*, 210 F. Supp. 2d 955, 957 (N.D. Ill. 2001), while section 6103(h)(4)(B) does not require any transactional nexus between the third party and the taxpayer, the "[third party's] tax return's contents must be germane to an element of the claim, not simply be used to impeach a witness' credibility, and must apply to the specific taxpayer's liability, not analogous third parties."

Whether third party information directly relates to an issue will depend, first, upon the nature of the particular proceeding and, second, on the particular issues in dispute in that proceeding. For example, the way a third party reported a tax shelter loss on a tax return can directly relate to the issue of whether the taxpayer (who is the party to the proceeding at issue) should be allowed to claim a loss from a substantially similar tax shelter, since the collective conduct, *i.e.*, pattern evidence, of all of the investors in reporting the losses from these transactions can be used to demonstrate that none of the investors could realistically have had a bona fide business or investment purpose. Accordingly, information obtained in the examination of the third party's return that directly relates to the resolution of an issue in the taxpayer's proceeding, such as promotional material that the third party received from the common promoter, or responses to IDRs inquiring about the third party's non-tax purpose for investing in the substantially similar transaction, can be disclosed in that proceeding.

The following example illustrates this application of the item test. In a judicial proceeding, the Government argues that Investor A engaged in an abusive transaction for the sole purpose of tax avoidance. Investor A responds that the transaction was motivated by the non-tax purpose of portfolio diversification and was tailored to effect this specific purpose. The Government refutes Investor A's contention by showing that the transaction was not unique and that other taxpayers (Investors B, C, D, E and F) all participated in substantially similar transactions through the same promoter, all reported similar items of income, deduction and loss, and all claimed a similar non-tax purpose for entering into the transaction. The treatment of an item reflected on Investor B, C, D, E and F's returns is directly related to the resolution of an issue in Investor A's proceeding (whether the loss reported by Investor A arose from a transaction that was a sham in substance because it lacked independent economic substance or business

-3-

purpose). As a result, in Investor A's judicial proceeding, the disclosure of tax information obtained during the Service's examinations of Investors B, C, D, E and F regarding their reporting of the tax shelter loss is permissible as pattern evidence.

## IV. The Transaction Test

Disclosures in investor/promoter administrative or judicial tax proceedings may also be permitted under section 6103(h)(4)(C), the "transaction test." Under the authority of this provision, a third party's tax information may be disclosed in judicial or administrative proceedings pertaining to tax administration if the third party's tax information directly relates to a transactional relationship between a person who is a party to the proceeding and the third party and directly affects the resolution of an issue in the proceeding. For instance, in *Balanced Financial Management, Inc. v. Fay*, 662 F. Supp. 100 (D. Utah 1987), the disclosure of a promoter's tax information in pre-filing notification letters sent to investors was held to be proper under section 6103(h)(4)(C).

The following example illustrates an application of the transaction test. In a section 7408 injunction action against Promoter A, the Government intends to disclose certain tax information of Investor B relating to his participation in the tax shelter promoted to him by Promoter A. This return information consists of the information provided to Investor B by Promoter A outlining the details of the shelter and the details of Investor B's specific investment in the tax shelter. Pursuant to section 6103(h)(4)(C), a third party's tax information can be introduced in the injunction action provided the third party's tax information directly relates to a transactional relationship between the taxpayer who is a party to the proceeding and a third party, which directly affects the resolution of an issue in the proceeding. Thus, Investor B's tax information can be introduced in the injunction action against Promoter A, under the authority of section 6103(h)(4)(C), since it directly relates to a transactional relationship between Promoter A and Investor B and directly affects the resolution of an issue in the injunction proceeding.

## V. Additional Considerations

Chief Counsel employees should continue to strike a fair and reasonable balance between the need to use third party tax information and the degree of intrusion on that third party taxpayer's privacy. Consideration should be given to other methods of proof that do not require disclosure of third party tax information, such as summaries or compilations. We should offer in evidence only those returns or portions of returns, and only those items of return information, that specifically meet the item or transaction tests. In general, public identification of specific taxpayers should be avoided, except when it is determined to be necessary to the matter before the court. In judicial tax proceedings, courts may be requested to consider appropriate protective orders. In Tax Court proceedings or when providing advice to the Department of Justice with respect to any proposed protective order regarding disclosures of third party tax information under section 6103(h)(4)(B) or (C), Chief Counsel employees must consult with Branch 3 of the Administrative Provisions and Judicial Practice Division, at (202) 622-7950. APJP Branch 3 shall provide appropriate guidance in dealing with any proposed protective order on a case-by-case basis.

If neither the item nor transaction test can be met, necessary third party returns and return information should be obtained using available and authorized information gathering tools.

-4-

When using those information gathering tools, privacy concerns of third parties should be respected, particularly third party identifiers.

For further information regarding this notice, contact Sarah Tate of the Office of the Associate Chief Counsel (Procedure & Administration), Disclosure and Privacy Law Division, at (202) 622-4570.

/s/

Deborah A. Butler
Associate Chief Counsel
(Procedure & Administration)

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111

———

TEL: (202) 371-7000

FAX: (202) 393-5760

www.skadden.com

FIRM/AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
SAN FRANCISCO
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

DIRECT DIAL
(202) 371-7868

April 14, 2006

## VIA EMAIL AND HAND DELIVERY

Matthew C. Hicks, Esq.
Trial Attorney
U.S. Department of Justice, Tax Division, CTS-N
555 Fourth St., NW, Suite 7804
Washington, DC 20001

RE:     *Fidelity Int'l v. United States*, No. 05-40151

Dear Mr. Hicks:

On behalf of KPMG LLP ("KPMG"), enclosed are seven boxes, containing the following items: (i) one hard drive containing documents bates numbered KPMG-FE-001-00001 through -54954, which are documents previously produced by KPMG to the Senate Permanent Subcommittee on Investigations; (ii) one hard drive containing documents bates numbered KPMG-FE-002-00001 through -31149, which are non-taxpayer specific documents that relate generally to FLIP and OPIS; (iii) one hard drive containing documents bates numbered KPMG-FE-003-00001 through -70351, which are non-taxpayer specific documents that relate generally to BLIPS; (iv) three boxes containing hard copy documents bates numbered KPMG-F-00010001 through -2884, KPMG-F-00020001 through -3213, and KPMG-F-00030001 through -2685, which are documents relating specifically to the Egans and Fidelity; and (v) one box containing hard copy documents bates numbered KPMG-F-00040001 through -0498, which comprise transcripts of interviews conducted in connection with the IRS promoter examination of KPMG. As we discussed, since the vast majority of the aforementioned documents are being produced in electronic format as fully searchable Concordance databases, we have not undertaken to organize the materials by specific subpoena request.

We will continue to pull together additional materials responsive to the subpoena issued to KPMG in this matter, as it was narrowed during our discussion on April 4, 2006. If you would like us to prioritize the production of any specific materials, please feel free to let us know. In the meantime, we await your response regarding the draft protective order we sent to your Office on April 10.

GOVERNMENT'S
EXHIBIT

29

PENGAD 800-631-6889

Matthew C. Hicks, Esq.
April 14, 2006
Page 2

Lastly, we will be sending under separate cover copies of the first four items delineated above directly to David Curtin, counsel to the plaintiffs in this matter. We have advised Mr. Curtin that, absent a subpoena requiring production to plaintiffs, we cannot produce to plaintiffs any documents that specifically relate to taxpayers other than plaintiffs. Once the protective order we have discussed is in place, however, we would be happy to provide two copies to your Office of the remaining materials to be produced by KPMG pursuant to the instant subpoena.

Should you have any questions, please call me at (202) 371-7868 or Matt Michael at (202) 371-7176.

Sincerely,

Armando Gomez

Enclosures

cc:    Dennis Donohue, Esq. (via e-mail, without enclosures)
       John A. Lindquist, Esq. (via e-mail, without enclosures)
       Barry E. Reiferson, Esq. (via e-mail, without enclosures)