UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | )<br>)<br>)<br>) | |
| Plaintiff, | )<br>) | Civil Nos. 05-40151-FDS (D. Mass.)<br>06-40130-FDS (D. Mass.) |
| v. | )<br>) | Judge Saylor |
| UNITED STATES OF AMERICA, | )<br>) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF UNITED STATES OF AMERICA'S MOTION TO COMPEL RSM MCGLADREY'S PRODUCTION OF DOCUMENTS**

The United States of America moves, pursuant to Federal Rule of Civil Procedure 45(c)(2)(B), for an order compelling accounting firm RSM McGladrey LLP ("RSM") to produce all documents responsive to a subpoena *duces tecum* personally served upon it on October 23, 2006.[1] The documents subpoenaed relate to RSM McGladrey's involvement in the design of, development of, marketing of, promotion of, implementation of, opining on, and/or reporting of certain tax shelter transactions, including tax-shelter products known as SOS and FDIS.[2] By letter dated December 1, 2006, the United States agreed to limit the scope of the materials requested to documents related only to the SOS and FDIS transactions.[3]

---

[1] The United States sent three subpoenas to RSM in this case, and personally served two. A subpoena dated October 6, 2006 was sent to RSM's counsel by Federal Express and delivered on October 9, 2006. Counsel for RSM refused to accept service of that subpoena unless the United States limited the scope of the subpoena. Accordingly, a second subpoena, dated October 20, 2006, was served upon RSM's Washington, DC office. Among other objections, RSM claimed that this second subpoena was invalid because it was not properly issued. A third subpoena, dated October 23, 2006, was therefore served upon RSM's Boston, MA office.

[2] *See* RSM subpoena dated October 23, 2006, Govt. Ex. 1 (excluding Appendix A). Exhibits supporting the United States' motion to compel are appended to the Declaration of Barry Reiferson, which is being filed contemporaneously herewith.

[3] *See* Reiferson letter dated December 1, 2006, at 6, Govt. Ex. 2 (Govt. Ex. 2 is not filed herewith because the United States intends to move for an order allowing it to file that exhibit under seal).

2280863.11

Over four months has elapsed since the service of this subpoena. Yet RSM has failed to produce a single subpoenaed document. Although it has offered on several occasions to produce certain of the documents requested, its offers were consistently contingent upon the United States agreeing to limit the scope of the subpoena.[4] By letter dated February 14, 2007, the United States again informed RSM's counsel that we could not agree to their request to limit the scope of our request for SOS and FDIS documents because all such documents were highly relevant to issues in this litigation. The letter stated that unless RSM agreed to produce the subpoenaed documents immediately, we would be constrained to file a motion to compel. The letter further noted that if RSM produced any of the documents subpoenaed, the United States would limit its motion to only documents not produced. As of this date, RSM has still not produced any of the subpoenaed documents.

**Factual Background**

A.  **RSM's Involvement with FDIS**

RSM McGladrey ("RSM") was one of the principal participants in the coordinated development, marketing, and implementation of the FDIS tax-shelter product. RSM also prepared and signed Richard Egan's and Fidelity International Currency Advisor A Fund's

---

[4]After numerous telephone conferences and the exchange of several letters over a four-month period, by letter dated February 13, 2007, RSM counsel indicated that it was willing to produce certain carefully-defined categories of so-called "non-tax-return-type" subpoenaed documents and also certain so-called "tax-return" subpoenaed documents. Counsel stated that RSM was willing to produce the "non-tax-return-type" documents under the United States' proposed protective order and would produce the "tax-return-type" documents under a protective order that would be drafted in accordance with the Court's ruling on the pending BDO Seidman motion for a superseding protective order. Critically, as discussed, *infra,* the letter asked the United Stated to agree to RSM's approach to this limited production, noting that, after review of the documents, the United States could then request additional materials, with RSM thereupon also being allowed the right to interpose objections to such later requests. See RSM counsel letter dated February 13, 2007, Govt. Ex. 3.

2

("Fidelity International's") 2002 tax returns at issue in this case. It was likely also involved in the decision not to disclose Richard Egan's participation in the FDIS tax shelter. According to Robert Prifti, formerly of KPMG and subpoenaed for deposition by the plaintiffs, KPMG was fired by the Egan family when it included a disclosure of the transaction in Egan's draft 2001 federal income tax return.[5] KPMG was replaced, the transaction was not disclosed, and RSM then was retained to prepare Egan's 2002 Form 1040 personal tax return and Fidelity International's 2002 Form 1065 partnership tax return. RSM received huge fees for its participation in the promotion of FDIS. Moreover, a number of RSM managers had an additional personal interest in FDIS. Ronald Wainwright, managing director of tax at RSM and a chief FDIS architect, entered into his own FDIS tax shelter in 2001. Five other RSM managers, including Michael G. Belitsos, Karen A. Bowman, Frank Campiani, Richard J. How, and Bruce Jorth, then also entered into FDIS transactions in 2002. In fact, apparently as a reward for his marketing success, the FDIS promoters treated Wainwright as a so-called accommodation party and charged him no promoter fees for his FDIS tax shelter.[6]

RSM's participation was integral to the abusive tax shelter scheme. As described by The Diversified Group, Inc. ("DGI") in its FDIS marketing materials, a number of law firms and accounting firms, including RSM, assisted DGI on a regular basis in its development and marketing of tax shelters.[7] DGI viewed its ability

---

[5] The transcript of Mr. Prifti's deposition is not yet available. The United States will supplement the record with the relevant testimony once the transcript becomes available.

[6] *See* Govt. Ex. 14 (listing DGI's 2001 customers and recording a $1.25 million fee that would have been paid by Ronald Wainwright for his own FDIS tax shelter, but was waived by DGI as a "favor" to Wainwright) (Govt. Ex. 14 is not filed herewith because the United States intends to move for an order allowing it to file that exhibit under seal).

[7] *See* FDIS PowerPoint presentation, Govt. Ex. 5. *See also* Ruble Affidavit, ¶¶ 8-12, Govt. Ex. 6 (describing how Ruble also assisted DGI to develop its Option Partnership Strategy).

> . . . to manage and control the process of getting two to four sets of attorneys and accountants to *expeditiously reach the desired conclusions* as being one of [its] most valuable contributions to [its] clients.

(Emphasis added).[8] For the FDIS product, DGI enlisted four law firms to review the product and issue opinions, all for the apparent purpose of making each of their opinions appear to be independent. These included Proskauer Rose, Lord Bissell & Brook, Bryan Cave, and Sidley Austin Brown & Wood (n/k/a Sidley Austin LLP), all of whom were sent a copy of the draft FDIS marketing materials for review and comment.[9] In addition to receiving the draft FDIS marketing materials for review and comment, these same law firms also assisted in the drafting of the boilerplate FDIS implementation documents, which were then to be executed for each FDIS transaction by the law firm of Brown Raysman.[10] These law firms also worked with DGI and the various accounting firms in drafting purportedly independent– but actually cookie-cutter– opinions blessing the very transaction they helped design.[11] As candidly disclosed in an email

---

[8] *See* FDIS PowerPoint presentation, Govt. Ex. 5.

[9] Govt. Ex. 5 (Helios Email dated 4/4/01 forwarding FDIS marketing materials for review and comment); Govt. Ex. 8 (Ruble email dated 4/5/01, "I have made some modification to the slides which I hope come out when you open them. Basically, I have eliminated the term 'Foreign Investor' and replaced it with the term 'Investor(s) II')." R..J. Ruble of Sidley Austin was also involved in the design and development of the FDIS product prior to this. *See* Govt. Exs. 9, 10, 11, and 12. Ruble was also involved in the design and development of other DGI tax shelter products in prior years. *See* Govt. Ex. 6 (Ruble Affidavit, ¶¶ 8-12, describing how Ruble previously also assisted DGI to develop its Option Partnership Strategy).

[10] *See* Govt. Ex. 13 (Email dated 5/17/01 from Orrin Tilevitz of DGI to R.J. Ruble of Sidley Austin forwarding draft operating agreement, along with exhibits thereto, to implement the strategy). DGI records reflect that Brown Raysman was paid $250,000 for its services relating to the 2001 FDIS tax shelters. Govt. Ex. 14. (Govt. Ex. 14 is not filed herewith because the United States intends to move for an order allowing it to file that exhibit under seal).

[11] *See* email dated 4/24/01, Govt. Ex. 15 (Orrin Tilevitz of DGI preparing draft of opinion for the 2001 option spread partnerships); email dated 4/26/01, Govt. Ex. 25 (forwarding partnership opinion from Orrin Tilevitz of DGI to R.J. Ruble of Sidley Austin); email dated 2/7/02 Govt. Ex. 16 ("I've been through the Proskauer draft for the new deal. Ira has done an excellent job pairing down a number of the discussion (sic) from what we have said in the past.

(continued...)

exchange between R.J. Ruble of Sidley Austin and James Haber of DGI, the pretense that these law firms were independent was mere play acting:

> Ruble: just got my lunch invitation from larry cohen [of BDO]. I'll act surprised when he hands me the memo.
>
> Haber: You don't have to rely on your acting skills because I have already told him that you have it and that we are working together to enhance the opinion.[12]

One of the expenses included in DGI's gross fee was an amount agreed to be paid by DGI to the four law firms for their issuance of the tax-shelter legal opinions.[13]

Similarly, DGI records show that it shared the design and development of FDIS with the accounting firms who helped DGI target potential customers.[14] Those records reflect that the accounting firms were directed not to leave a copy of the FDIS PowerPoint presentation with potential customers because it "show[ed] too much of the structure."[15] Haber testified that the

---

[11](...continued)
In a perfect world I would probably adopt many of the changes Ira made, but it's hard to get changes to boilerplate here. Do you have a problem if we continue to use our form of discussion on most of these issues?")

[12] *See* DGI email dated 1/25/02, Govt. Ex. 17.

[13] DGI confirmed the amounts payable by it to Sidley, Proskauer, and Bryan Cave for their issuance of opinions by memo dated 1/2/02. *See* Govt. Exs. 18, 19, and 20. (Govt. Exs. 18, 19, and 20 are not filed herewith because the United States intends to move for an order allowing it to file those exhibits under seal). The 2001 reconciliation of net fees and expenses relating to the 2001 FDIS tax shelters reflects that DGI paid Sidley $800,000, Proskauer $1,020,000, Bryan Cave $560,000, Lord Bissell & Brook $75,000, and Brown Raysman $250,000. *See* email dated 5/3/02, with attached 2001 reconciliation, Govt. Ex. 14. (Govt. Ex. 14 is not filed herewith because the United States intends to move for an order allowing it to file that exhibit under seal).

[14] *See* fax dated 6/17/01, Govt. Ex. 7 (transmitting FDIS PowerPoint to Grant Thornton); Govt. Exs. 23 and 24 (FDIS PowerPoints produced by BDO); *see also,* Govt. Ex. 4 (DGI email dated 4/18/01 to Akselrad of Proskauer Rose and Ruble of Sidley Austin, confirming that the referenced attachment named "Transitory Preferred" also had been sent to Charlie Bee of BDO); Govt. Ex. 22 (Fax dated 4/23/01 from BDO to Haber of DGI confirming a conference call for 4/26/01). Haber previously has testified that DGI's "referral sources" included KPMG, BDO Seidman, Grant Thornton, and RSM McGladrey. Haber Dep. Tr. 2/28/03 at 290:21 - 291: 6, Govt. Ex. 21.

[15] *See* Govt. Ex. 23 (Handwritten cover notes on front page of FDIS marketing materials
(continued...)

accounting firms, which were referred to as "referral sources," included RSM McGladrey, KPMG, BDO Seidman, and Grant Thornton.[16] The fee the taxpayer paid for the participating accounting firms, like the fee for DGI, was computed as a fixed percentage of the tax loss to be generated.[17]

**B.    The United States's Efforts to Secure Compliance of the Subpoena.**

Throughout the four months since it served the subpoena upon RSM, the United States has continually negotiated with RSM in an attempt to secure its production of the subpoenaed SOS and FDIS documents. First, the United States limited the scope of the subpoena to documents relating to SOS and FDIS, after RSM claimed the subpoena went beyond those tax shelter products. It allowed additional response time and offered to accept a so-called rolling production when RSM claimed it could not comply before the subpoena return date.[18] It further defined SOS and FDIS after RSM claimed not to know what those terms mean. It provided as an appendix to the subpoena a list of suspected tax-shelter participants in order to assist RSM in

---

[15](...continued) read "(1) Confirm that this will not be left with client (i) if it is left…shows too much of the structure (ii) if not left, should have some investment-oriented material to leave (2) we need to decide about fee inside or out -- (3) if out - how do we justify it..."). *See also* Govt. Ex. 24 (FDIS powerpoints produced by BDO) and Govt. Ex. 7 (transmitting FDIS powerpoint to Grant Thornton and stating "This is to confirm that the enclosed materials will not be distributed to anybody").

[16] Haber Dep. 2/28/03 at 290:21 - 291: 6, Govt. Ex. 21.

[17] Govt. Ex. 26 (BDO email dated 4/5/01, describing the proposed fee split with DGI).

[18] As discussed later, RSM now claims to have already produced documents to the Internal Revenue Service in 2002, making its claims of insufficient time all-the-more inappropriate.

locating responsive documents. The United States then supplemented the initial list with a list of 29 participants in FDIS tax shelters promoted by RSM in 2001.[19]

Approximately three weeks later, the United States again tried to assist RSM in locating specific tax-shelter-client files, as counsel for the United States has knowledge as to how the relevant files are often kept. RSM merely stated at that time that it was looking into its file-maintenance practices. The United States also attempted to negotiate an agreeable governing protective order, after RSM refused to produce "confidential or commercially sensitive proprietary" documents in the absence of a protective order.[20]

C.   **RSM's Offer to Produce Three Limited Categories of Documents.**

After the United States' efforts described above, RSM proposed to limit its production to an incomplete portion (and unknown percentage) of the subpoenaed documents, including some that it had apparently been sitting on since October 2002 when it produced them to the Internal Revenue Service. In a letter dated February 13, 2007, RSM proposed that the United States limit the scope of the subpoena to three carefully-circumstanced categories of documents. They were as follows:

1.   RSM would search for and produce the documents specifically related to the Egan transaction that is the subject of the lawsuit.

2.   RSM would produce the documents it previously produced in connection with IRS production requests related to DGI transactions.

---

[19] *See* Reiferson letter dated December 1, 2006, at 10-11, Govt. Ex. 2 (Govt. Ex. 2 is not filed herewith because the United States intends to move for an order allowing it to file that exhibit under seal).

[20] *See* Reiferson Declaration, ¶¶ 4-7. *See also* Reiferson letter dated December 1, 2006, at 3, Govt. Ex. 2 (Govt. Ex. 2 is not filed herewith because the United States intends to move for an order allowing it to file that exhibit under seal)..

      3.      To the extent not covered by item #2, RSM would search for and produce the closing binders, tax returns, and legal opinions, if any, related to DGI deals that were implemented.[21]

This proposal would allow RSM to withhold production of all design and development documents (*i.e.,* materials relating to the development of SOS and FDIS), marketing materials (which include PowerPoint presentations and other materials used to market SOS and FDIS to potential buyers), draft opinion letters, and documents related to specific SOS and FDIS transactions that were not implemented. All of these materials would be vital to any understanding and analysis of the basic nature and operation of these tax shelter products.

In its letter of February 13, 2007, RSM proposed that the United States could review the above categories of documents (which it chooses to produce), and then "seek" additional documents it has already subpoenaed. But this cleverly-devised proposal would shift the burden of identification and production to the United States, who would not know which responsive documents were inappropriately withheld in order to seek them. Furthermore, the United States has already demanded the documents with this subpoena. To make matters worse, RSM proposed at the same time to limit its privilege log to documents generated before October 22, 2002, the date it says the Internal Revenue Service made its document request.[22] Thus, despite the United States' good faith efforts to procure RSM's compliance with the subpoena, RSM has steadfastly refused to produce the subpoenaed documents and stands on its objections addressed in detail later in this memorandum.

**D    RSM's Tax Shelter-Client Litigation**

As has become an all-too-familiar tactic among the promoters of abusive tax shelters, RSM appears to be making its frivolous arguments to protect itself and its co-promoters from

---

[21]RSM letter dated February 13, 2007, Govt. Ex. 3.

[22]Such a limitation to RSM's privilege log would deprive the United States of sufficient information to contest any claim of privilege. That information is required under Federal Rule of Civil Procedure 45(d)(2).

liability for their actions relating to SOS and FDIS.  RSM marketed the SOS and FDIS tax shelters to their clients, and at least six of those clients are now suing RSM for its actions.  *See Samuel Trading, LLC v. Diversified Group, Inc.*, 420 F. Supp. 2d 885 (N.D. Ill. 2006); *McNeill, et al. v RSM McGladrey, et al.*, Civ. No. 6CV009985 (N.C. Sup. Ct.).  The clients have alleged, among other things, that "[p]ursuant to instructions from DGI and Alpha, [RSM] McGladrey and the remaining defendants recruited plaintiffs to participate in" the tax shelters.  *Samuel Trading, LLC v. Diversified Group, Inc.*, at 888.  They also alleged that the "defendants informed plaintiffs they would receive significant tax savings by purchasing the [FDIS-tax-shelter] options, and that an 'independent' law firm. . . would prepare an opinion letter supporting the" tax shelter in order to "insulate them against IRS penalties" despite the prior issuance of "IRS Notice 1999-59 and IRS Notice 2000-44" that should have alerted the "defendants . . . [that the] tax strategy was illegal." *Id.*

In a second lawsuit, its tax-shelter clients accuse RSM , DGI, James Haber, Proskauer Rose, and others, of, among other things, acting "singly and in concert" to defraud the plaintiffs. *McNeill, et al. v RSM McGladrey, et al.*, Civ. No. 6CV009985 (N.C. Sup. Ct.) (Compl. at ¶ 34.) They also allege that various RSM representatives promoted the tax shelter and that RSM's tax managing director, Ronald Wainwright, "informed the plaintiffs that the [tax shelter] was the product of extensive study and investigation by [RSM] . . . ." *Id.* at ¶ 44.  Significantly, these clients further allege that DGI, BDO Seidman, and RSM formed an alliance to design, market, and implement abusive tax shelters and, most significantly, support this allegation by reference to "documents subpoenaed by the United States Department of Justice." *Id.* at ¶ 19.[23]

---

[23] It is not clear what Department of Justice subpoenaed documents the plaintiffs are referring to. What is plain, however, is that RSM is fully aware of the relevance and explosive nature of documents produced in this tax case to their tax-shelter-client litigation.

While defending these lawsuits in which it is alleged that RSM "recruited" clients to participate in illegal tax shelters and lured them with claims of tax benefits based on "extensive study," RSM argues here that it doesn't understand the meaning of the term "marketing materials" and cannot obtain related documents without an undue burden. Moreover, RSM does not claim to have even spoken with the third-party taxpayers or its own partners identified in the complaints and in the subpoena.

In furtherance of its self-interests, and to the detriment of the search for the truth in this case, RSM is standing on its ability to withhold documents based on patently frivolous objections.

## ARGUMENT

## RSM'S PRO FORMA OBJECTIONS ARE MERITLESS

### A. Introduction

As an initial matter, it should be dispositive that RSM has failed to tender any objections whatsoever to our subpoena of October 23, the subpoena which is the subject of this motion to compel. RSM claims that its objections to our subpoena of October 20 apply equally to our subpoena of October 23. But RSM's objections do not so state and RSM has cited no authority to support the proposition that objections to one subpoena apply equally to another subpoena served by the same party. Accordingly, since the subpoenaed tax shelter documents are clearly relevant to multiple issues in this litigation,[24] we respectfully request the Court to enter an order compelling their production. In any event, RSM's litany of pro forma general and specific objections to our subpoena of October 20 are meritless.

### B.   RSM McGladrey's "General Objections" are Meritless.

---

[24]*See infra* at pages 13-15; *see also*, U.S. Opp. to Mot. for Superseding Prot. Ord. (DI# 60) at 11-18.

RSM's general objections have no basis in law or fact, and are separately addressed as follows:

### 1. The Subpoena Was Properly Served.

RSM objects to service of the October 23 subpoena on the ground that RSM's "Boston office is neither [its] principal office nor a location where the materials that are the focus of the Subpoena are or were located." (Gen. Obj. at ¶ 4.) Service of a subpoena is valid when a nonparty is personally served within the district of the issuing court. *See First American Corp. v. Price Waterhouse LLP*, 154 F.3d 16 (2d Cir. 1998) (service of a subpoena proper where U.K.-based partnership was served with a subpoena through one of its partners who was temporarily visiting New York). Massachusetts' long-arm statute permits personal jurisdiction over a partnership that transacts business in the Commonwealth. Mass. Gen. Laws ch. 223A, § 3(a).

There is little question that RSM transacts business in Massachusetts and has sufficient minimum contacts with Massachusetts to subject it to the jurisdiction of this Court. As RSM boasts on its website, it has four offices in Massachusetts, and it "entered the Massachusetts market in August 2000" when it combined with "one of Boston's largest accounting firms . . . ." It claims to have a "group [of] (sic) 225 professionals staff[ing] the Massachusetts office."[25] Regardless of the location of RSM McGladrey's "principal office," which it has not identified, the partnership is subject to the Court's jurisdiction and must, subject to valid objections (which are absent), produce the responsive documents in its possession, custody, or control.

### 2. The Subpoena Provided Adequate Time for Compliance.

RSM objects "on the ground that the Subpoena fails to allow reasonable time for

---

[25] http://www.rsmmcgladrey.com/About-Us/Our-U-S-Locations/Massachusetts/ [viewed on February 28, 2007.]

compliance." (Gen. Obj. at ¶ 6.) RSM was given adequate time to comply then (particularly in light of its retention of a large portion of the documents it has already produced to the Internal Revenue Service), and has now had an additional four months to comply. The return date of the October 23 subpoena was fifteen days after service. Approximately two weeks before service of that third subpoena, RSM received from the United States the nearly identical October 6 subpoena. Consequently, RSM had over one month's notice of the documents sought in our subpoena of October 23.

Furthermore, the United States was more than willing to accommodate a reasonable request for additional response time, but RSM made no such request. In fact, the United States offered to accept a rolling production of documents, whereby RSM would produce the readily available documents first, following with additional documents as it could review them and make them available.[26] RSM neither agreed to nor refused that offer. Instead of requesting additional time– which would have been granted as it has been for almost every other subpoena recipient– or accepting the offer of a rolling production, RSM instead pursued a strategy of attempting to condition its compliance on our agreement to limit the scope of the subpoena, coupled with the interposition of improper objections.

**3.     RSM's Request for a Protective Order to Safeguard Sensitive Materials Is Not a Proper Basis to Withhold All Responsive Documents**.

The United States agrees that entry of a protective order is appropriate to safeguard certain sensitive information, making RSM's objection to production of "confidential or commercially sensitive proprietary" material in the absence of a protective order unnecessary.

---

[26]*See* Reiferson Declaration, ¶ 8. *See also* Reiferson letter dated December 1, 2006, at 3, Govt. Ex. 2 (Govt. Ex. 2 is not filed herewith because the United States intends to move for an order allowing it to file that exhibit under seal)..

Here again, RSM failed to request agreement and instead objected unnecessarily. The United States has no objection to RSM withholding a limited group of sensitive documents pending the Court's ruling on BDO Seidman's motion for a superseding protective order.[27] However, that is no basis to withhold production of all documents.

### 4. RSM's General Objections Based on Privilege Are Also Improper.

RSM's objection based on "attorney-client and/or work product" privilege is also not a valid general objection to a subpoena. (Gen. Obj. at ¶ 11.) Federal Rule of Civil Procedure 45(d)(2) expressly requires, to the extent RSM asserts that the documents requested are subject to privilege, the subpoenaed person to produce a privilege log identifying and describing each such document. The United States reminded RSM of this obligation in the instructions to the subpoena. RSM objected to the number of instructions, (Gen. Obj. at ¶ 5), while apparently failing to follow them in accordance with the Federal Rules. Since RSM did not produce a privilege log as required by the Federal Rules of Civil Procedure, any objection it may have had based on privilege is now waived.[28]

### C. RSM McGladrey's "Specific Objections" are Equally Meritless.

#### 1. The SOS and FDIS Documents are Clearly Relevant.

In an attempt to obtain RSM's compliance, the United States agreed on December 1, 2006 to limit the scope of the subpoena to documents relating to SOS and/or FDIS, to the extent that it can be read to request other documents. Those documents relate to RSM's and others'

---

[27]It is noteworthy that the plaintiffs in *McNeill, et al. v RSM McGladrey, et al.*, Civ. No. 6CV009985 (N.C. Sup. Ct.) allege that RSM McGladrey and BDO Seidman engaged in a joint venture to market illegal tax shelters. According to the allegations, BDO Seidman and RSM developed business arrangements with DGI and Proskauer Rose to market the tax shelters and split the fees generated from the sales, while hiding the business arrangements from the clients.

[28]Moreover, RSM's objections based on 26 U.S.C. § 6103 are wholly inappropriate, as § 6103 is inapplicable here. The United States has briefed this matter on many occasions in this case, and will not take up the Court's time by doing so again here.

2280863.11

involvement in the design, development, marketing, promotion, implementation, and reporting of the SOS and FDIS tax shelters. Such documents are clearly relevant to multiple issues in this litigation. Specifically, they relate to whether the tax shelter employed here, as designed, developed, marketed and implemented, was a factual and/or economic sham. We have fully briefed this issue previously.[29] Suffice it to say now that apart from revealing the actual economics of these transactions, such documents may also show, as we strongly suspect, that the so-called foreign investors in the FDIS tax shelter were in reality nominee or sham partners.

Moreover, this discovery will also be especially relevant if it shows, as we believe it will, that many different participants in this and similar tax shelters followed the same chronology of steps, regardless of the particular facts of their situation. The United States contends that this product was a "cookie-cutter" tax shelter transaction. Such evidence is particularly relevant to prove the existence of a sham.

In fact, the Court has already considered the relevance of such documents in this case. The Court "agree[d[ with the government" and held that the United States "is entitled to explore in discovery whether these are cookie-cutter transactions." (May 11, 2006 Tr. at 20.) As has also already been determined in this case, the tax treatment and tax-return information of other tax-shelter participants is relevant for purposes of discovery and may be considered by the Court. (*See* May 11, 2006 Tr. at 25-26.)

RSM had a role in the development, marketing, promotion, implementation, and/or reporting of many FDIS transactions, including the plaintiff's transaction. Indeed, RSM McGladrey continued to promote the FDIS product in subsequent tax years and RSM

---

[29]*See* U.S. Opp. to Mot. to Quash KPMG Subpoena at 12-18.

2280863.11

McGladrey's tax managing director, Ronald Wainwright, and other RSM managers were also participants in FDIS transactions.

Here, under the cover of a phantom burden, RSM has desperately sought to limit its production to those documents it sees fit to disclose. As is the case whenever the design of any mass-marketed product is at issue– here, the FDIS tax shelter– a design and marketing participant cannot limit its production to the documents relating to a single buyer and those other documents that were used to create a facade of legitimacy and hide the abusive nature of the product. All of the design and marketing documents of each participant in the highly coordinated efforts are equally important, and only together paint a complete picture of the true nature of the transaction.

### B. The Subpoena Was Hardly Burdensome

Given RSM's extensive involvement in the FDIS promotion, it should not have been burdensome for it to review its files, to the extent necessary, to locate the responsive documents. Undoubtedly, it has long since already done so in connection with its client tax-shelter litigation. While desperately trying to convince the United States to further limit the scope of the subpoena to exclude documents that would shed additional light on RSM's involvement, RSM failed to cite a single fact that would suggest an undue burden here.

In fact, many of the documents RSM now seems willing to produce– if the United States agrees to accept only those documents now– are documents RSM says it already produced to the Internal Revenue Service. Production of those documents should have been made in response to this subpoena immediately upon service, and would have created no burden at all. To assist RSM's compliance with the subpoena, the United States appended a list of suspected tax-shelter participants to the subpoena. It did so to assist RSM. The United States then supplemented that list with an additional assistive document listing 29 participants in FDIS tax shelters promoted by RSM in 2001. Approximately three weeks later, counsel for the United States spoke with RSM

to try to assist it in locating specific client files. Despite the United States' repeated efforts to reduce any burden RSM may experience, RSM has unjustifiably failed to comply with the subpoena.

        **C.    RSM's Objection to Definitions Are Baseless**.

RSM's also objected to the definitions of SOS and FDIS – the subjects to which all of the responsive documents relate– as "vague, overbroad, and unduly burdensome." (Spec. Obj. at ¶ 2, 3). Given RSM's extensive involvement in the development, marketing, promotion, implementation, and/or reporting of SOS and/or FDIS, these objections ring particularly hollow. In any event, the United States provided RSM with extensive descriptions of those tax-shelter products by letter dated December 1, 2006.[30] It is unknown whether RSM continues to stand by its objections to the definitions.

**Conclusion**

RSM was one of the principal participants in the design, development, marketing, and implementation of the related SOS and FDIS tax-shelter products at issue. It worked in a highly coordinated manner with other participants for the purpose of concealing the true nature of the abusive tax shelters from the Internal Revenue Service while selling the products for huge fees based on the amount of its clients' desired tax loss. Despite its extensive involvement in this massive and coordinated fraud, RSM now refuses to produce the highly relevant subpoenaed documents. RSM still refuses even to produce the documents relating specifically to Richard Egan's and Fidelity International's participation in the tax shelter, without unwarranted

---

[30]RSM also objected to the definitions of "client-specific" and "Tax Shelter Products." (Spec. Obj. at ¶¶ 4-5.) It has not responded to the United States' December 1, 2006 offer to further clarify those terms to the extent RSM could explain what it deems to be vague or otherwise unclear.

      2280863.11

concessions from the United States. Instead, RSM wishes to continue to conceal the truth. It should not be allowed to do so.

RSM has made only boilerplate and frivolous objections, likely because its production would not be particularly burdensome at all, much less unduly burdensome given its extensive involvement in a fraud which created more than $1.3 billion in phony tax losses.

As such, RSM should be compelled to make its long-overdue production of documents in response to the October 23, 2006 subpoena.

                                                      Respectfully submitted,

                                                      MICHAEL J. SULLIVAN
                                                      United States Attorney

                                                      /s/ Dennis M. Donohue
                                                     DENNIS M. DONOHUE
                                                     SENIOR LITIGATION COUNSEL
                                                     OFFICE OF CIVIL LITIGATION
                                                     Trial Attorney, Tax Division
                                                     U.S. Department of Justice
                                                     P.O. Box 403, Ben Franklin Station
                                                   Washington, D.C. 20044
                                                   Telephone: (202) 307-6492
                                                   Facsimile: (202) 307-2504
                                                   E-mail: dennis.donohue@usdoj.gov

                                                   JOHN A. LINDQUIST
                                                   BARRY E. REIFERSON
                                                   HEATHER RICHTARCSIK
                                                   Trial Attorneys, Tax Division
                                                   U.S. Department of Justice
                                                   P.O. Box 55, Ben Franklin Station
                                                   Washington, D.C. 20044-0055
                                                   Telephone: (202) 307-6542
                                                   Facsimile: (202) 514-5238
                                                   E-mail: john.a.lindquist@usdoj.gov
                                                                barry.e.reiferson@usdoj.gov
                                                                heather.l.richtarcsik@usdoj.gov

<u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non registered participants on March 6, 2007.

                                                  /s/ Barry E. Reiferson
                                                  Trial Attorney, US Department of Justice, Tax Division

2280863.11