UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF BARRY E. REIFERSON

I, Barry E. Reiferson, pursuant to the provisions of 28 U.S.C., §1746, certify as follows:

1.      I am a Trial Attorney with the U.S. Department of Justice, employed in the Tax Division, Northern Region, with a post of duty at Washington, D.C.

2.      I am one of the assigned trial attorneys for the defendant United States in this case.

3.      I make this declaration based upon my personal knowledge and the documents referenced herein, copies of which are attached hereto.

4.      The United States attempted to negotiate an agreeable governing protective order with RSM McGladrey, after RSM McGladrey refused to produce "confidential or commercially sensitive proprietary" documents in the absence of a protective order.

5.      The United States informed RSM McGladrey by letter to counsel dated December 1, 2006 that the United States would agree to a protective order, upon request, identical to the stipulated and Court-approved orders entered into in this case by the parties, KPMG, Refco Capital Markets, and Proskauer Rose.

6.      Negotiations relating to the protective order took place by telephone and between counsel

2280914.1

for the U.S. and counsel for RSM McGladrey on the following dates: December 21, 2006;

January 4, 2007; January 5, 2007; January 18, 2007; February 7, 2007; and February 8, 2007.

7.      The United States sent a proposed protective order to counsel for RSM McGladrey by

electronic mail on January 19, 2007.

8.      On October 20, 2006, before service of the October 23 subpoena, and while discussing

whether counsel would accept service of a subpoena, the United States offered to accept a rolling

production of documents, whereby RSM McGladrey would produce the readily available

documents first, following with additional documents as it could review them and make them

available.

9.      The documents attached as exhibits 1 through 26 are true and correct copies of documents

obtained by the United States in discovery in this matter.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed in Washington, D.C., on this sixth day of March, 2007.


                                        /s/ Barry E. Reiferson
                                        BARRY E. REIFERSON
                                        Trial Attorney, Tax Division
                                        U.S. Department of Justice
                                        Post Office Box 55
                                        Ben Franklin Station
                                        Washington, D.C.  20044
                                        Telephone: (202) 514-6058

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants identified on the Notice of Electronic Filing and paper copies will be sent to
those indicated as non registered participants on March 6, 2007.


                                        /s/ Barry E. Reiferson
                                        Trial Attorney, US Department of Justice, Tax Division

**JENNER&BLOCK**

February 13, 2007

Jenner & Block LLP          Chicago
One IBM Plaza              Dallas
Chicago, IL 60611          New York
Tel 312-222-9350           Washington, DC
www.jenner.com

Barry E. Reiferson
U.S. Department of Justice
P.O. Box 55
Ben Franklin Station
Washington, DC 20044

Robert T. Markowski
Tel 312 923-2736
Fax 312 840-7736
rmarkowski@jenner.com

**RE:    Fidelity International Currency Advisor A Fund, L.L.C. v. United
States, No. 05-40151**

Dear Barry:

This letter is a follow-up to the telephone discussion Matt Neumeier and I had with you
on February 8 concerning the subpoena the government served on RSM McGladrey ("RSMM").

With respect to the protective order, we indicated that RSMM would be prepared to
accept the form that you had sent to us on January 19 for non-tax-return-type materials. With
respect to tax-return-type materials, we indicated that RSMM would be prepared to accept the
Court's ruling on BDO's recently filed superseding protective order motion.

In addition, we reviewed the BDO order to which the government had agreed and suggest
we also make two other clarifying changes included in the BDO order. We suggest adding the
phrase "and those persons identified in Paragraphs 4(b), 4(d), 4(e), 4(f), 4(g), and 4(h) may not"
after the word "Parties" on line 1 of Paragraph 3 and that the words "agree not to" be stricken
from that same line. Also, we suggest adding the words "and 4(g)" after 4(f) on the second line
of paragraph 5. Since the government previously agreed to these changes we assume this will
not present an issue for you.

With respect to the scope of documents to be searched for and produced by RSMM, we
suggested the following approach:

1.    RSMM would search for and produce the documents specifically related
to the Egan transaction that is the subject of the lawsuit.

2.    RSMM would produce the documents it previously produced in
connection with IRS production requests related to DGI transactions.

3.    To the extent not covered by item #2, RSMM would search for and
produce the closing binders, tax returns, and legal opinions, if any, related
to DGI deals that were implemented.

GOVERNMENT
EXHIBIT
3

Barry E. Reiferson
February 13, 2006
Page 2

> 4. To avoid the need to log privileged documents falling within items 1, 2, and 3 that were created after the transactions were implemented and the IRS/DOJ had begun their inquiries, the parties agree that privileged documents generated after October 22, 2002, when the IRS made its request for "all information [RSMM] is required to maintain under section 6112 of the Internal Revenue Code and regulations thereunder" need not be logged.

> 5. The parties agree that this production would be without prejudice to the government's right, after reviewing the materials produced, to request additional materials under the previously issued subpoena. Likewise, if the government requests any additional materials, RSMM would be free to assert any appropriate objections if agreement cannot be reached concerning any further production.

During the course of our conversation, you expressed an interest in also obtaining "marketing materials" relating to DGI transactions. We expressed a willingness to discuss that with RSMM if we could reach an agreement on what constituted "marketing materials" that allowed for a reasonable search and for sufficient clarity to avoid uncertainty over what production would be required to comply with this request.

As always, we remain willing and able to discuss these matters further in a constructive way to achieve a resolution that does not impose an unreasonable burden on RSMM, which is not a party, and protects RSMM from disputes over whether it has satisfied its compliance obligations.

Sincerely,

Robert T. Markowski

RTM/dar

cc:    Matthew M. Neumeier

**From:**          Orrin Tilevitz  [otilevitz@divgroup.com]
**Sent:**          Wednesday, April 18, 2001 5:20 PM
**To:**            Akselrad, Ira ; R. J. Ruble
**Cc:**            Haber Jimmy
**Subject:**       preferred stock

I sent the attached to Bob Greisman and Charlie Bee of BDO.



Transitory
preferred.doc

- Transitory preferred.doc

1



M346133
SIDL165638

CONFIDENTIAL

Document 324 of 1,295

| | | |
|---|---|---|
| BATESBEG | = | |
| BATESEND | = | |
| PRODBEG | = | |
| PRODEND | = | |
| ATTYCOMMENTS | : | |
| FROM | : | R. J. Ruble |
| ORG | : | |
| TO | : | Jacob Amato <Jacob Amato/NY/BWLLP@BWLLP> |
| CC | : | |
| BCC | : | |
| DATE | = | 04/05/2001 |
| TIME | : | 20:07:00 GMT |
| SUBJECT | : | Financial Derivatives Investment Strategy |
| FOLDER | : | \R. J. Ruble\Sent Items |

| | | |
|---|---|---|
| HEADER | : | |
| MESSAGEID | : | 00000000B7BDA75CAEB14148A6FFD86DDCA220D5A4812100 |
| BODY | : | |

---------------------- Forwarded by R. J. Ruble/NY/BWLLP on 04/05/2001 11:03 AM ----------------------

"Mox Tan" <moxtan@heliosfinancial.com> on 04/04/2001 06:43:36 PM

To:    "John Truskowski" <jtruskow@lordbissell.com>, "John Hughes" <jhughes@lordbissell.com>, "Sergei Mytko" <smytko@lordbissell.com>, R. J. Ruble/NY/BWLLP@BWLLP, "Ira Akselrad" <lakselrad@proskauer.com>, jbarrie@bryancavellp.com, esmith@bryancavellp.com

cc:    "\(DGI\) Phil Kampf" <philkampf@heliosfinancial.com>, "\(Alpha\) Iven Ross" <ivanross@alphaltd.net>, "\(DGI\) Orrin Tilevitz" <otilevitz@divgroup.com>, "\(DGI\) Jimmy Haber" <jhaber@divgroup.com>

Subject: Financial Derivatives Investment Strategy

Attached for your review and comments are draft marketing materials for our "Financial Derivatives Investment Strategy". If you have any questions, please call either Jimmy Haber at 212-688-2700, or me, at my numbers listed below.

Since there are many color slides in the presentation, you may wish to choose "pure black and white" when you print to a black and white printer.

Regards,

Mox

Mox Tan
225 West Washington Street, Suite 2200
Chicago, Illinois 60606
Office:    (312) 419-6150
Fax:    (312) 419-6153
Mobile:    (312) 399-3620

GOVERNMENT
EXHIBIT
5

**SABWZ0151940**

- att1.htm
- Partnership 04.05.01.ppt

ATTACHTEXT        :
METADATA          :
BATESPAGES        :
PRODPAGES         :
CREATIONDATE      = 11/12/2003
EDITTRAIL         : 20031112 163817 Eas [AU22Y8-1144] esferrel;

**SABWZ0151941**

SIDL0345488

Attached for your review and comments are draft marketing materials for our "Financial Derivatives Investment Strategy". If you have any questions, please call either Jimmy Haber at 212-688-2700, or me, at my numbers listed below.

Since there are many color slides in the presentation, you may wish to choose "pure black and white" when you print to a black and white printer.

Regards,

Mox


Mox Tan
225 West Washington Street, Suite 2200
Chicago, Illinois 60606
Office:    (312) 419-6150
Fax:    (312) 419-6153
Mobile:    (312) 399-3620

SABWZ0151942

file://\\Nyimage3\image2\22406\1000\ATTACH0000\00000000B7BDA75CAEB14148A8F1... 6/3/2004

SIDL0345489

# FINANCIAL DERIVATIVES INVESTMENT STRATEGY

Presented By

**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151943

SIDL0345490

# Table of Contents

I.    Investment Strategy

II.   Sample Option Trades - Range Trades

III.   Sample Option Trades - Call Spreads or Put Spreads

IV.   Investment in LLC

V.    Overview of The Diversified Group Incorporated

VI.   Overview of Alpha Consultants, LLC



THE DIVERSIFIED GROUP INCORPORATED

SABWZ0151944

SIDL0345491

# I.    Investment Strategy

***Situation:***    An individual ("**Investor**") has certain views on the direction of the equity markets (e.g. the **S&P 500** or the **NASDAQ 100**), or of the foreign currency markets, and wants to trade based on those views in a manner that **limits downside and maximizes upside** and investment leverage.

**Option Spreads: Significant Upside Potential + Limited Downside**

⋏    The Diversified Group Incorporated ("**Diversified**") and Alpha Consultants LLC ("**Alpha**") recommend the use of option spreads, i.e. the purchase of an option along with the simultaneous sale of a similar option at a different strike price, as a fundamental investment tool.

⋏    A trading strategy based on one or more combinations of option spreads could result in significant profit and investment leverage, with limited downside risk.

**Flexible Investment Strategy: Five Variables to Choose From**

⋏    Underlying Market or Index

⋏    Direction of the Chosen Market or Index

⋏    Investment Time Horizon

⋏    Probability of Profit

⋏    Amount of Investment



**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151945

SIDL0345492

# I.     Investment Strategy

**Flexible Investment Strategy: Five Variables to Choose From (continued)**

⋏   (1) Choice of Market or Index: Option spreads can be structured for certain equity indices, foreign currencies, interest rates and other exposures.  The examples in Sections II and III of this presentation are based on options on the S&P 500, the NASDAQ 100, and the Japanese Yen.

⋏   (2) Choice of Market Direction:  Option spreads can be structured to effectuate <u>bullish</u> perspectives (i.e. the chosen market or index will "go up") or <u>bearish</u> perspectives (i.e. the chosen market or index will "go down").  They can also be structured to effectuate a perspective that the chosen specific market or index will trade within a certain range (which in itself can be "bullish", "bearish" or "neutral").   Sections II and III illustrate a variety of these types of perspectives.

⋏   (3) Choice of Investment Time Horizons: Option spreads can accommodate a wide variety of investment time horizons.  Sections II and III illustrate 90-Day options.

⋏   (4) Choice of Probability of Profit:  Option spreads can be designed for desired levels of profit probability (based on the Black-Scholes option pricing model).  Sections II and III illustrate scenarios where the probability of profit ranges from 15%  to 40%.

⋏   (5) Choice of Amount of Investment:  The amount to be invested will be a function of Investor's asset allocation strategy and comfort level with all of the foregoing variables.  Sections II and III illustrate the potential returns on a $2 million investment in a variety of scenarios.

 THE DIVERSIFIED GROUP INCORPORATED

SABWZ0151946

II.    Sample Option Trades – S&P Range Trade



**S&P 500 Range Trade Examples**
**$2,000,000 Initial Investment**

| Range | Probability | Payoff |
|---|---|---|
| 1127.84 – 1178.74 | 15% Probability | $8,055,626 Payoff |
| 1119.20 – 1187.38 | 20% Probability | $6,721,002 Payoff |
| 1110.42 – 1196.16 | 25% Probability | $5,764,243 Payoff |
| 1101.45 – 1205.13 | 30% Probability | $5,045,474 Payoff |
| 1092.25 – 1214.33 | 35% Probability | $4,466,248 Payoff |
| 1082.77 – 1223.81 | 40% Probability | $4,039,082 Payoff |

Strike Range at 90-Day Expiration (Spot Today = 1153.29)

1070  1090  1110  1130  1150  1170  1190  1210  1230

**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151947

SIDL0345494



II.  Sample Option Trades – NDQ Range Trade

NDQ Range Trade Examples
$2,000,000 Initial Investment

| Probability | Payoff |
|---|---|
| 15% Probability | $8,058,390 Payoff |
| 20% Probability | $6,720,683 Payoff |
| 25% Probability | $5,763,890 Payoff |
| 30% Probability | $5,045,607 Payoff |
| 35% Probability | $4,486,492 Payoff |
| 40% Probability | $4,038,913 Payoff |

1665.16
1501.14
1692.90
1473.40
1721.00
1445.30
1749.57
1416.73
1778.75
1387.55
1808.69
1357.61

1350   1400   1450   1500   1550   1600   1650   1700   1750   1800   1850

Strike Range at 90-Day Expiration (Spot Today = 1583.15)

THE DIVERSIFIED GROUP INCORPORATED

SABWZ0151948

SIDL0345495

## II.    Sample Option Trades – YEN Range Trade



Yen Range Trade Examples
$2,000,000 Initial Investment

15% Probability
$8,071,559 Payoff

20% Probability
$6,722,807 Payoff

25% Probability
$5,757,071 Payoff

30% Probability
$5,046,681 Payoff

35% Probability
$4,485,652 Payoff

40% Probability
$4,041,552 Payoff

120.71

120.21

120.70

120.19

119.66

119.12

Strike Range at 90-Day Expiration (Spot Today =

THE DIVERSIFIED GROUP INCORPORATED

SABWZ0151949

SIDL0345496

# III. Sample Option Trades – S&P Call Spread



## S&P 500 Call Examples

SABWZ0151950

SIDL0345497



III.    Sample Option Trades - NDQ Call Spread

NDQ Call Examples

SABWZ0151951

SIDL0345498

# III.    Sample Option Trades - YEN Put Spread



Yen Put Examples

THE DIVERSIFIED GROUP INCORPORATED

SABWZ0151952

SIDL0345499

# IV.   Investment in LLC

## Investment in LLC

➢ Investor, Alpha and a third party who will be a foreign person ("**Foreign Investor**") will form a Delaware limited liability company (the "**LLC**") for the purpose of investing and trading in option spreads and other derivative instruments on equity indices, foreign currencies or interest rates.

➢ Investor and Foreign Investor contribute $22,500 and $427,500, respectively, in exchange for 5% and 95%, respectively, of the LLC's common interests (the "**Common Interests**").

➢ Investor and Alpha also contribute $3,000,000 and $50,000, respectively, in exchange for preferred interests (the "**Preferred Interests**") in the LLC. Investor's contribution may be in the form of cash and/or options previously acquired through Investor's single member LLC.

➢ The LLC will have been initially capitalized with a substantial amount (e.g. $3,500,000 in the example discussed herein) to invest in option based strategies.

## Investor can convert his Preferred Interests into Common Interests at any time

➢ Investor may at any time convert his Preferred Interests into Common Interests to increase his share of the profits or losses of the LLC.

## Management of the LLC

➢ Alpha will provide investment advice with respect to structuring the option strategies.

➢ Diversified,as Manager of the LLC, will provide administrative support for the LLC, such as distributing the daily values of LLC's assets, and handling LLC documentation and record keeping responsibilities.

**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151953

# IV.  Investment in LLC



**INITIAL CAPITALIZATION - Formation of LLC**

Investor

Contributes
$22,500 for 5% of the Common Interests
$3,000,000 for Preferred Interests

Alpha

Contributes
$50,000 for Preferred Interests

Foreign Investor

Contributes $427,500 for
95% of the Common Interests

LLC

Manager = Diversified
Initial Capital = $3,500,000

➢ Investor, Alpha and Foreign Investor form a Delaware limited liability company ("LLC") for the purpose of investing and trading in options and other derivative instruments on equity indices, foreign currencies or interest rates.

➢ Investor and Foreign Investor contribute $22,500 and $427,500, respectively, in exchange for Common Interests of 5% and 95%, respectively.

➢ Investor and Alpha also contribute $3,000,000 and $50,000, respectively, in exchange for Preferred Interests.

**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151954

# IV.  Investment in LLC

## Initial Capitalization Table

| | Common Cash Contribution | Preferred Cash Contribution | Total Cash | Capital Share | Profit/ Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | $ 3,000,000 | $ 3,022,500 | 86.36% | 5.00% |
| Alpha | 0 | 50,000 | 50,000 | 1.43% | 0.00% |
| Foreign Investor | 427,500 | - | 427,500 | 12.21% | 95.00% |
| Total | $450,000 | $3,050,000 | $3,500,000 | 100.00% | 100.00% |

## Provisions of the LLC Operating Agreement

➤ After the preferred return (as described below) is paid, profits (to the extent distributed) are distributed 95% to Foreign Investor and 5% to Investor.

➤ The LLC's gains and losses are allocated 95% to Foreign Investor and 5% to Investor, except that (i) the LLC operating agreement contains a "qualified income offset" and (ii) provides that to the extent losses would decrease a member's capital account below zero, they are allocated to the other members with positive capital accounts.

➤ Upon liquidation of the LLC or any member's interest therein, capital accounts are first booked up or down to reflect gain or loss which would be allocated to the members if the LLC's assets were sold for fair market value.

➤ Each member is entitled to receive his capital account, in the event of a complete redemption of such member's interest. Each Preferred Interest carries a preferred return of 8% per year independent of LLC profits, payable semi-annually.

## Transfer of Membership Interests

➤ A member may transfer or contribute, at any time, some or all of his interests to another entity.



**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151955

SIDL0345502

# IV.    Investment in LLC

*OPTIONAL CONVERSION* - Investor may wish to convert his Preferred Interest into a Common Interest



**Investor**

Converts $3,000,000
Preferred Interest
into additional Common Interests
Now has up to 98% of the Common Interests

**Alpha**

$50,000 Preferred
Interest

**Foreign Investor**

$427,500 Common Interest
Diluted to no less than 2%
of the Common Interests

**LLC**
Manager = Diversified

A    At some point in time, Investor may wish to convert his $3,000,000 Preferred Interest into a Common Interest, in order to have a higher percentage
    of the LLC's profits and losses.

A    In the event that the LLC's net asset value has declined to the point where Foreign Investor's capital account would be zero if his interest
    were liquidated, under Foreign Investor's Anti-Dilution Provision, Investor's common interest cannot be increased beyond 98%.



**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151956

SIDL0345503

# IV. Investment in LLC

Provisions of the LLC Operating Agreement Governing Conversion of Preferred into Common

➢ Preferred Interests are convertible at any time into Common Interests on a dollar-for-dollar basis based on the net asset value of the LLC at that time, taking into consideration any accrued but unpaid preferred return and each Common Interest holder's proportional share of any LLC gains or losses up to the time of conversion.

➢ **Example:** Assume that Investor converts his Preferred Interest at a time when the LLC had a net asset value of $5 million and that Alpha has not converted. If we ignore accrued but unpaid preferred return, this implies that at the time of the conversion, the Common Interests had a gain of $1.5 million which would be allocated 5% ($75,000) to Investor and 95% ($1,425,000) to Foreign Investor, respectively. When Investor converts his Preferred Interests into Common Interests, he would have $3,097,500, or 62.58%, of the $4,950,000 total value of the Common Interests. See Table.

**Capitalization Table after Conversion of Investor's Preferred Interests**
**Assume LLC Net Asset Value at the time of conversion is $5,000,000**

|  | Initial Common Contribution | Proportional Share of Gains or (Losses) | Conversion Proceeds | Value of Common Interests (Post-Conversion) | Profit/ Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | $75,000 | $ 3,000,000 | $3,097,500 | 62.58% |
| Alpha | 0 | 0 | 0 | 0 | 0.00% |
| Foreign Investor | 427,500 | $1,425,000 | 0 | 1,852,500 | 37.42% |
| Total | $450,000 | $1,500,000 | $3,000,000 | $4,950,000 | 100.0% |

 **THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151957

SIDL0345504

# IV.   Investment in LLC

## Foreign Investor's Anti-Dilution Provision

∧   Under no circumstances may a conversion cause Foreign Investor to retain less than 2% of the Common Interests.

∧   **Example:** Assume that Investor converts his Preferred Interest at a time when the LLC had a net asset value of $3,060,000 and that Alpha has not converted.  If we ignore accrued but unpaid preferred return, this implies that at the time of the conversion, the Common Interests had a loss of $440,000 which would be allocated 5% ($22,000) to Investor and 95% ($418,000) to Foreign Investor, respectively.  When Investor converts his Preferred Interests into Common Interests, his $3,000,500 share represents 99.68% of the $3,010,000 total value of the Common Interests, but because of Foreign Investor's Anti-Dilution provision, Investor's maximum percentage interest in the Common Interests is capped at 98%.  See Table.

## Capitalization Table after Conversion of Investor's Preferred Interests
Assume LLC Net Asset Value at the time of conversion is $3,060,000

| | Initial Common Contribution | Proportional Share of Gains or (Losses) | Conversion Proceeds | Value of Common Interests (Post-Conversion) | Profit/ Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | ($22,000) | $ 3,000,000 | $3,000,500 | No greater than 98% |
| Alpha | 0 | 0 | 0 | 0 | 0.00% |
| Foreign Investor | 427,500 | ($418,000) | 0 | 9,500 | No less than 2% |
| **Total** | **$450,000** | **($440,000)** | **$3,000,000** | **$3,010,000** | **100.0%** |

 **THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151958

# V.     Overview of The Diversified Group Incorporated

➤ Diversified is a boutique merchant banking firm headquartered in New York. Over the last twenty years, its principals have been engaged in the business of arranging or investing in, special situations and complex financing or investment structures involving limited partnerships, limited liability companies, hybrid instruments (debt/equity), hybrid entities (pass-through versus corporate) or derivatives, such as options on foreign currencies, interest rates, commodities or equity indices. Diversified usually acts as a principal, but depending upon the needs of the transaction, we may also act as the investment banker.

➤ We apply our expertise in structuring transactions that typically involve all of the following seven disciplines:

economic analysis                    book accounting
tax analysis                         legal analysis
equity investment                    debt placement
                deal execution / administration

➤ The disciplines are woven together through "structuring":

- the ability to correctly analyze the necessary component parts individually;
- the understanding of how the components interact and fit together;
- the judgment and experience that enables intelligent choices to be made when "trade offs" arise; and
- the ability to produce a solution that works - all in a timely and professional manner.

➤ There is as much art as science involved in reaching a solution.



**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151959

# V.    Overview of The Diversified Group Incorporated

**Philosophy -**    Diversified is a small and highly successful firm whose principals embrace the following core values:

∆    We know we will get "repeat business" from our clients, whether they are equity investors, lenders or borrowers, buyers or sellers, only if we are ethical and oriented toward long-term relationships, and only if the participants in our transactions are pleased with the results.

∆    We pride ourselves on outstanding execution of transactions, which comes through creativity, hard work and a close attention to detail.

∆    We do not aspire to being big. We aspire to being the best at what we do with a strong focus on some of the most complex and highest value added transactions in mergers and acquisitions and corporate finance.

∆    We recognize our limitations. We cannot individually be leading experts in each and every discipline represented in a transaction, but we do retain the talents of some of the most creative members of nationally known legal and accounting firms for our transactions. Our expertise in being able to analyze the client's problem/opportunity, with a generalist's overview, enables us to select the particular team of national experts best suited to assist Diversified in tailoring a customized, detailed, fully integrated structure.

∆    Because our transactions are "document intensive", we view our ability to firmly manage and control the process of getting two to four sets of attorneys and accountants to expeditiously reach the desired conclusions as being one of our most valuable contributions to our clients.

**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151960

# V.  Overview of The Diversified Group Incorporated

**Principals - New York Office (212-688-2700)**

▲  **James Haber, President (New York)** - Jimmy is the company's founder and has been involved in financial services since 1978.  A certified public accountant, he is a member of the AICPA and the New York Society of CPA's. He received a B.S. degree in accounting from Brooklyn College and a M.S. degree in taxation from Pace University in New York.

▲  **John Huber, Chief Financial Officer (New York)** - John has extensive experience in the financial services industry, both in public accounting and in private industry. As a tax manager at Arthur Andersen, he gained extensive experience in the owner managed business area, as well as in the real estate, banking, equipment leasing and manufacturing industries.  Upon leaving Arthur Andersen, he became chief financial officer of one of his clients, an investment company which sponsored the formation of numerous investment entities.  John returned to the field of public accounting in 1989, when he established his practice which later merged to form the firm Weeks, Holderbaum, Huber & DeGraw, LLP.  Recently, he has taken a leave of absence from the firm to become Diversified's Chief Financial Officer.  John holds a B.S. in Business Administration from California Polytechnic State University, San Luis Obispo, and attended graduate studies in taxation at Golden Gate University in San Francisco.  He is a member of the New Jersey Society of Certified Public Accountants and the American Institute of Certified Public Accountants.

▲  **Orrin Tilevitz, Vice President and General Counsel (New York)** - Orrin has over twenty years of experience in numerous areas of federal, state and local income taxation.  Prior to joining Diversified, Orrin  was a Director in the International Tax Services Group of PricewaterhouseCoopers LLP, where he represented multinational corporations engaged in cross-border transactions and developed sophisticated planning strategies to minimize worldwide taxes.  Prior to that he spent over two years in the International Tax Group of Deloitte & Touche LLP, designing and developing a variety of cross-border tax-driven financial products and structured finance arrangements. He began his career as a tax lawyer in 1979 with Willkie, Farr & Gallagher in New York. Orrin received his B.A. degree, Cum Laude in the Biochemical Sciences, from Harvard College, where he was the speaker at the undergraduate commencement exercises, his J.D. degree from Columbia University School of Law, where he was a Harlan Fiske Stone Scholar, and his LL.M. in Taxation from New York University School of Law.

 **THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151961

# V.    Overview of The Diversified Group Incorporated

### Principals - Chicago Office (312-419-6150)

➤ **Mox Tan, Managing Director (Chicago)** - Prior to joining The Diversified Group, Mox was a Managing Director and head of BankAmerica's 10-person tax products group and 30-person corporate finance advisory group, with units located in Chicago, New York, San Francisco and Los Angeles.  The tax products group specialized in tax-advantaged M&A and cross-border financings, including "double dips" and principal and interest deductibility strategies.  Prior to starting up the tax products group in 1995, he was a co-head of Continental Bank's lease and project finance advisory group, and before that, created and headed up a tax-driven real estate finance group at an investment banking boutique in New York to take advantage of arbitrage opportunities that came out of the 1986 Tax Act.  Prior to 1986, he was a corporate finance and securities attorney with Davis Polk & Wardwell in New York.  Mox also spent four years in government, where he was the head of enforcement (Northeastern Region) for New Jersey's Division of Water Resources.  Mox holds a B.Sc. from M.I.T. in Mathematics, an M.S. in Mathematics from the Courant Institute of Mathematical Sciences and a J.D. (cum laude) from Harvard Law School.

➤ **Philip L. Kampf, Jr., Managing Director (Chicago)** - Prior to joining The Diversified Group, Phil was a Vice President/senior transactor and a founding member of BankAmerica's tax products group in Chicago where he specialized in tax-advantaged/sub-libor cross-border financings such as "double dips", principal and interest deductibility strategies and certain Asia-Pacific funding strategies.  Prior to founding the BankAmerica group with Mox in 1995, he was responsible for equity private placements and the execution of tax-or accounting-driven leases and project financings in Continental Bank's lease and project finance advisory group.  Prior to joining Continental Bank, he was a financial analyst in the Property Finance Group of LaSalle Partners Limited.  Phil holds a B.A. in International Studies from Northwestern University and an M.B.A. from the J.L. Kellogg School of Northwestern University.



THE DIVERSIFIED GROUP INCORPORATED

SABWZ0151962

SIDL0345509

# VI.   Overview of Alpha Consultants, LLC

A   Alpha Consultants, LLC ("Alpha LLC") is a Florida limited liability company engaged in trading and trade consulting for structured options and foreign currencies. A team of professionals led by Ivan Ross and Don Uderitz conducts the management of Alpha LLC. The team has over 50 years of combined experience in identifying, analyzing, structuring and trading investment portfolios. This team also has broad expertise in investment fund management, structured finance, investment banking and tax arbitrage. Additionally, the principals of Alpha LLC operate an NASD registered broker-dealer and a family of NFA registered private investment funds. Over the years, the team has developed numerous proprietary analytical models and disciplined investment strategies that historically have generated profitable returns with a controlled level of risk.

A   From February 1985 to November 1999, the team provided trading advice and execution for the III Funds, a group of hedge funds that, as of their departure, had over $2 billion of investor capital. Two of Alpha LLC's principals (Uderitz and Ross) were general partners of the investment advisors to the III Funds and Adams, Viner, and Mosler, Ltd., ("AVM"), an affiliated fixed-income securities NASD registered broker-dealer. During its tenure with the III Funds and AVM, the team managed a large mortgage position, which at its peak exceeded $20 billion of the funds $30 billion of assets. This component of the portfolio consistently generated profitable returns. This includes the extremely difficult 1997-1998 period when many fixed-income funds experienced dramatic losses.

**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151963

SIDL0345510

# VI.    Overview of Alpha Consultants, LLC

**Principals - Palm Beach Gardens, Florida (561-624-8998)**

➤ **Ivan J. Ross, Managing Member** - Prior to forming Alpha LLC, Mr. Ross was co-head of Mortgage Trading with primary responsibility for the management of the domestic mortgage position in the III funds. He was a trader and portfolio manager for AVM and III from February 1995 to November 1998. Prior to joining AVM/III, Mr. Ross was a Senior Vice President and Portfolio Manager for Ocwen Financial Corporation ("Ocwen") from February 1994 to February 1995. While at Ocwen, Mr. Ross was responsible for managing the investment-grade mortgage component of the Quasar fund, with capital in excess of $250 million. Quasar is a fund of funds managed by George Soros with capital allocated to top managers in various sectors. Additionally, Mr. Ross managed a similar portfolio for Ocwen's principal subsidiary, Berkeley Federal Bank & Trust, with capital in excess of $100 million. Prior to joining Ocwen, Mr. Ross was a Vice President and Portfolio manager for Heritage Asset Management from April 1988 to February 1994. Mr. Ross began his investment career in 1985 at Philadelphia based Corestates Investment Advisers. Mr. Ross graduated from the Wharton School of the University of Pennsylvania in 1985. Additionally, he is a Chartered Financial Analyst (CFA).

➤ **Donald S. Uderitz, Principal** - Prior to forming Alpha LLC, Mr. Uderitz was co-head of Mortgage Trading with primary responsibility for structuring and tax arbitrage. He was a trader and portfolio manager for AVM and III from February 1995 to November 1998. Mr. Uderitz was previously with Ocwen from February 1991 to February 1995, most recently as Senior Vice President and Portfolio Manager. At Ocwen, Mr. Uderitz was responsible for tax-related securities including REMIC residuals and low-income housing tax credits. Mr. Uderitz began his investment career with the Federal Home Loan Mortgage Corporation. Mr. Uderitz received a bachelor's degree in economics from the State University of New York in 1988 and an MBA from the College of William and Mary in 1991.



**THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151964

SIDL0345511

# VI.   Overview of Alpha Consultants, LLC

> **G. Felix Cua, Managing Director -** Prior to joining Alpha LLC, Mr. Cua was a trader and portfolio manager for AVM and III from February 1995 to December 1998. While at AVM/ III Mr. Cua had several areas of responsibility including portfolio management, trading, and creation of pricing models. His primary expertise is the formation of arbitrage opportunities with the use of swaps, options and derivative mortgage-backed securities. Prior to joining AVM/III, Mr. Cua was employed at Ocwen where he was instrumental in the management of the Quasar Fund. From 1992-1994, Mr. Cua was an Analyst at BlackRock Financial Management specializing in total rate-of-return analysis. Mr. Cua received a bachelor's degree in economics from Cornell University in 1992 and is a Chartered Financial Analyst (CFA).

> **Yoshiyuki Nobumoto, Managing Director -** Prior to joining Alpha LLC, Mr. Nobumoto was a trader and portfolio manager for AVM and III from February 1995 to December 1998. Mr. Nobumoto has several areas of responsibility including portfolio management, risk analysis and trading. His primary expertise is in cash flow modeling and systems programming. Using various asset classes, he has created synthetic cash flow constructions that have resulted in superior tax advantaged performance. From November 1992 to February 1995, Mr. Nobumoto was employed with Ocwen as a Senior Associate in the investment group. While at Ocwen, Mr. Nobumoto was also responsible for the pricing, acquisition and resolution of non-performing 1-4 family loans, participating in over $2 billion in portfolio acquisitions. Mr. Nobumoto received a bachelor's degree from the School of Engineering and Applied Science of the University of Pennsylvania in 1992 and is currently a CFA level III candidate.

> **Ronald Buesinger, Managing Director -** Prior to joining Alpha LLC, Mr. Buesinger was with AVM/ III as a trader and portfolio manager from February 1998 to December 1998. His primary focus has been in the determination and exploitation of relative value trades between various types of structured mortgage products, including all mortgage derivatives. Prior to joining AVM and III, Mr. Buesinger was employed as a vice-president and institutional mortgage bond trader for Mercantile Bank in St. Louis, Missouri. Preceding his position at Mercantile, he was Vice-President and Manager of Mortgage Bond Trading for Boatmen's Bank capital markets group. While at Boatmen's, he was responsible for trading and hedging a $200 million mortgage position. He also spent considerable time generating trade ideas and marketing those ideas to bank customers. Mr. Buesinger began his career in February 1990, at Heritage Asset Management. From 1991 to 1993, he served as an assistant portfolio manager for all of the Heritage Funds and assets managed by Ivan Ross. Mr. Buesinger received a Bachelor's degree in finance from the University of Missouri-St. Louis in 1989.

 **THE DIVERSIFIED GROUP INCORPORATED**

SABWZ0151965

SIDL0345512

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| THE DIVERSIFIED GROUP INCORPORATED, | : | |
| | : | |
| Plaintiff, | : | |
| | : | 00 CIV 0771 (SAS) |
| -against- | : | |
| | : | |
| PAUL DAUGERDAS, | : | |
| | : | |
| Defendant. | : | |

---

| | | |
|---|---|---|
| JENKENS & GILCHRIST, | : | |
| | : | |
| Plaintiff, | : | |
| | : | 00 CIV 6484 (SAS) |
| -against- | : | |
| | : | |
| THE DIVERSIFIED GROUP | : | AFFIDAVIT OF R.J. RUBLE |
| INCORPORATED, | : | IN OPPOSITION TO THE |
| | : | MOTIONS FOR SUMMARY |
| Defendant. | : | JUDGMENT |

---

R.J. RUBLE, an attorney duly licensed to practice law in this State, affirms under penalty of perjury as follows:

1.    I am a partner in the law firm of  Brown & Wood LLP ("Brown & Wood") and am responsible for the firm's relationship with The Diversified Group Incorporated ("Diversified") and its principal, James Haber ("Haber").

2.    I have been engaged in the practice of tax law for almost thirty years.  Part of my practice involves reviewing tax strategies and issuing opinions by Brown & Wood in transactions which require them.

GOVERNMENT
EXHIBIT
6

1

DGI 007872

3.   As I understand the term, a "tax strategy" is (i) a technique, (ii) used in a business or investment transaction (iii) designed to achieve a particular tax result (iv) predicated on particular tax and economic principles.

4.   The process of developing a novel tax strategy, researching and documenting the legal justification for it, and planning economic business transactions based on it requires an enormous expenditure of time and intellectual effort.

5.   I am familiar with a tax strategy (the "short sale strategy") in which a prospective partner borrows a Treasury security, sells the security short, and then contributes the short sale proceeds (or property obtained with them), subject to the obligation to return the borrowed security, to a partnership in exchange for a partnership interest. In general, the partner ultimately sells the partnership interest, either before or after the short sale obligation is closed. The partner takes the position that the short sale obligation is not a "liability" for tax purposes, that the transfer of the assets together with the obligation to close the short sale does not trigger income recognition to the contributing party, and that (i) his basis in his partnership interest ("outside basis") is increased by the value of the property contributed to the partnership and (ii) the short sale obligation has no effect on that outside basis or

2 __

DGI 007873

1DGI-04-29-047627

the amount of gain or loss recognized on disposition of the partnership interest.

6.    I am also familiar with a tax strategy ("OPS") which was first presented to me by Diversified, in which a prospective partner sells an option, purchases a similar option for a somewhat greater premium, and then contributes and assigns the purchased option together with the grantor's position under the sold option (a "short option") to a partnership in exchange for a partnership interest. The partner ultimately sells the partnership interest, either before or after the short option expires. The partner takes the position that the short option is not a "liability" for tax purposes, that the contribution of the purchased option together with the assignment of the short option does not trigger income recognition to the contributing party, and that (i) his outside basis would be increased by the gross premium paid for the option contributed to the partnership, and (ii) the short option would have no effect either on that outside basis or the amount of gain or loss realized on disposition of the partnership interest. However, unlike the short sale strategy, the use of options requires compliance with certain Code Sections, notably Code Sections 1234 and 1256 that do not apply to short sales and which impose technical requirements in addition to the requirements applicable to short sale transactions.

3

DGI 007874

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06    1DGI-04-29-047628

7.    Because of its relationship with Diversified, on occasion Brown & Wood is requested to render opinions to clients referred by Diversified, or to clients of Brown & Wood which it has referred to Diversified, on transactions using tax strategies developed by Diversified (including OPS) based on information, which could be factual information or legal positions, provided to Brown & Wood by Diversified ("Diversified Strategies").

8.    To the best of my knowledge, because of the actual or perceived conflict of interest, Brown & Wood has not, without Diversified's prior consent, rendered opinions to other clients on the basis of such information, or on transactions using Diversified Strategies.

9.    I am also familiar with a tax strategy set out in Example 13 of the appendix to comments, submitted in 1994 by the New York State Bar Association on then-proposed partnership "anti-abuse" regulations  and published at 94 TNT 130-34 (the "NYSBA strategy").  The strategy set out in full in the Example involves a short sale, not an option, and it is only the concluding language at the end of the Example that states that "the result would be the same" if options were used instead.  As noted earlier, one cannot assume that "the result would be the same" because statutory rules unique to options must be considered, and the Example does not consider them.  But even

4

DGI 007875

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-04-29-047629

setting aside these issues, the NYSBA strategy, if it were to use options, is substantially different from OPS because it involves a different technique (a partnership with accommodation partners first buys and sells options, and then the taxpayers buys a 98% interest of one of the accommodation partners), is used in business or investment transactions which are different (in part because, unlike OPS, it does not employ European-style digital options), reaches a different tax result (the partnership recognizes capital gain and the partner an offsetting ordinary loss), and, aside from the principle that a short option is not a "liability", is based on different tax principles, including some of which are no longer law (e.g., a partnership termination results in the partnership's taking an inside basis in its assets equal to the partners' outside basis in the partnership).

10.    In several opinions on transactions using this strategy, Brown & Wood has concluded that the positions involve in the OPS strategy would more likely than not be sustained if challenged.

11.    To the best of my knowledge, the OPS strategy arose out of an early 1998 conversation between Orrin Tilevitz, who was then an employee of Price Waterhouse LLP, and me. Mr. Tilevitz and I were discussing a tax strategy involving a taxpayer's entering into a "swap" (or more technically, a

5

DGI 007876

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06                1DGI-04-29-047630

"notional principal contract") transaction involving the payment to the taxpayer of a tax-free upfront nonperiodic payment, and contributing or assigning the payment together with the taxpayer's obligations under the swap, to a corporation in a section 351 exchange. The goal was to increase the shareholder's basis in his stock by the gross amount of the prepayment without triggering taxable gain to the taxpayer on the contribution to the corporation. At one point, Mr. Tilevitz suggested that we could avoid a number of technical tax issues regarding notional principal contracts by using options instead, which relied upon a different set of provisions under the Code and Regulations. I thought this was a novel and very good idea, provided Diversified was able to structure the options with proper economic objectives consistent with current market practices, and comply with the specific tax rules applicable to options. Subsequently, Mr. Tilevitz , working with Diversified, applied the option technique, using the rules specifically applicable to options and substantially the same general tax principles, to a partnership.

12. I wish to point out that in the area of financial instruments, although a number of transactions can appear to be conceptually similar, the rules regarding the specific financial instruments involve can be quite different. In other words, in the area of transactions regarding financial instruments, form

6

DGI 007877

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-04-29-047631

matters to a significant degree over substance, and a number of articles have been written discussing this very point. OPS is predicated on compliance with, or avoidance of, certain tax rules specifically applicable to options, such as Code Section 1234 and Code Section 1256, and such rules are not applicable to short sale transactions.   It is only if the rules relating to options are mastered that OPS works.

R. J. Ruble

7

DGI 007878

1DGI-04-29-047632



**THE DIVERSIFIED GROUP INCORPORATED**

950 THIRD AVENUE, 23RD FLOOR, NEW YORK, NEW YORK 10022   TEL: (212) 688-2700   (800) 841-1132   FAX: (212) 688-7905

### MEMORANDUM
#### Via FedEx

TO:     Israel Press          DATE:    June 27, 2001

FROM:   James Haber

This is to confirm that the enclosed materials will not be distributed to anybody.

GOVERNMENT
EXHIBIT
7
PENGAD-Bayonne, N. J.

CONFIDENTIAL

**DGI 73585**

GT 000525

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-09-51-100965

# FINANCIAL DERIVATIVES INVESTMENT STRATEGY

Presented By

**THE DIVERSIFIED GROUP INCORPORATED**

CONFIDENTIAL

DGI 73586

GT 000526

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-09-51-100967

R. J. Ruble
<rruble@brownwoodlaw.co
m>

04/05/2001 02:09 PM

To: Max Tan <maxtan@heliosfinancial.com>
cc: John Truskowski <jtruskow@lordbissell.com>, John Hughes
<jhughes@lordbissell.com>, Sergei Mytko <smytko@lordbissell.com>,
Ira Akselrad <iakselrad@proskauer.com>, jbarrie@bryancavellp.com
<jbarrie@bryancavellp.com>, esmith@bryancavellp.com
<esmith@bryancavellp.com>, DGI) Phil Kempf
<philkempf@heliosfinancial.com>, Alpha) Ivan Ross
<ivanross@alphaltd.net>, DGI) Orrin Tilevitz <otilevitz@divgroup.com>,
DGI) Jimmy Haber <jhaber@divgroup.com>, Jacob Amato
<jamato@brownwoodlaw.com>
Subject: Re: Financial Derivatives Investment Strategy

I have made some modifications to the slides which I hope come out when you open
them. Basically, I have eliminated the term "Foreign Investor" and replaced it
with the term "Investor(s) II". To the party receiving it, the status of the
other investor (or whether there are more than one) is irrelevant as an
investment matter. The status and role can always be explained one-on one. I
have changed the provision on conversion of the preferred interests to state
that Alpha's interests are not convertible and are there to provide leverage.I
have also changed the description of the transferability section to merely say
that interests are transferable.
Lastly, please include my colleague Jake Amato on your future distribution lists.
His email is jamato@brownwoodlaw.com. Thanks.



GOVERNMENT
EXHIBIT
8

ALPHA0000000596

# FINANCIAL DERIVATIVES INVESTMENT STRATEGY

Presented By

**THE DIVERSIFIED GROUP INCORPORATED**

ALPHA0000000597

ALPHA1_PRIV000428

# Table of Contents

I.    Investment Strategy
II.   Sample Option Trades - Range Trades
III.  Sample Option Trades - Call Spreads or Put Spreads
IV.   Investment in LLC
V.    Overview of The Diversified Group Incorporated
VI.   Overview of Alpha Consultants, LLC

THE DIVERSIFIED GROUP INCORPORATED

ALPHA0000000597.0002

ALPHA1_PRIV000429

# I.    Investment Strategy

**_Situation:_**  An individual ("**Investor**") has certain views on the direction of the equity markets (e.g. the **S&P 500** or the **NASDAQ 100**), or of the foreign currency markets, and wants to trade based on those views in a manner that limits downside and maximizes upside and investment leverage.

**Option Spreads: Significant Upside Potential + Limited Downside**

➢ The Diversified Group Incorporated ("**Diversified**") and Alpha Consultants LLC ("**Alpha**") recommend the use of option spreads, i.e. the purchase of an option along with the simultaneous sale of a similar option at a different strike price, as a fundamental investment tool.

➢ A trading strategy based on one or more combinations of option spreads could result in significant profit and investment leverage, with limited downside risk.

**Flexible Investment Strategy: Five Variables to Choose From**

➢ Underlying Market or Index

➢ Direction of the Chosen Market or Index

➢ Investment Time Horizon

➢ Probability of Profit

➢ Amount of Investment

**THE DIVERSIFIED GROUP INCORPORATED**

ALPHA0000000597.0003

ALPHA1_PRIV000430

# I.    Investment Strategy

**Flexible Investment Strategy: Five Variables to Choose From (continued)**

➤ **(1) Choice of <u>Market or Index</u>:** Option spreads can be structured for certain equity indices, foreign currencies, interest rates and other exposures. The examples in Sections II and III of this presentation are based on options on the S&P 500, the NASDAQ 100, and the Japanese Yen.

➤ **(2) Choice of <u>Market Direction</u>:** Option spreads can be structured to effectuate <u>bullish</u> perspectives (i.e., the chosen market or index will "go up") or <u>bearish</u> perspectives (i.e. the chosen market or index will "go down"). They can also be structured to effectuate a perspective that the chosen specific market or index will trade within a certain range (which in itself can be "bullish", "bearish" or "neutral").    Sections II and III illustrate a variety of these types of perspectives.

➤ **(3) Choice of <u>Investment Time Horizons</u>:** Option spreads can accommodate a wide variety of investment time horizons.  Sections II and III illustrate 90-Day options.

➤ **(4) Choice of <u>Probability of Profit</u>:** Option spreads can be designed for desired levels of profit probability (based on the Black-Scholes option pricing model).  Sections II and III illustrate scenarios where the probability of profit ranges from 15%  to 40%.

➤ **(5) Choice of <u>Amount of Investment</u>:** The amount to be invested will be a function of investor's asset allocation strategy and  comfort level with all of the foregoing variables. Sections II and III illustrate the potential returns on a $2 million investment in a variety of scenarios.

 **THE DIVERSIFIED GROUP INCORPORATED**

ALPHA0000000597.0004

ALPHA1_PRIV000431



II. Sample Option Trades – S&P Range Trade

S&P 500 Range Trade Examples
$2,000,000 Initial Investment

15% Probability
$8,068,626 Payoff

20% Probability
$6,721,002 Payoff

25% Probability
$5,764,243 Payoff

30% Probability
$5,045,474 Payoff

35% Probability
$4,486,248 Payoff

40% Probability
$4,039,082 Payoff

1178.74
1187.38
1196.16
1205.13
1214.33
1223.81

1127.84
1119.20
1110.42
1101.45
1092.25
1082.77

1070   1090   1110   1130   1150   1170   1190   1210   1230

Strike Range at 90-Day Expiration (Spot Today = 1163.29)

THE DIVERSIFIED GROUP INCORPORATED

ALPHA0000000597.0005

ALPHA1_PRIV000432

# II.    Sample Option Trades – NDQ Range Trade



NDQ Range Trade Examples
$2,000,000 Initial Investment

Strike Range at 90-Day Expiration (Spot Today = 1663.16)

THE DIVERSIFIED GROUP INCORPORATED

ALPHA0000000597.0006

ALPHA1_PRIV000433



II.    Sample Option Trades – YEN Range Trade

ALPHA0000000597.0007

ALPHA1_PRIV000434



III.  Sample Option Trades – S&P Call Spread

ALPHA0000000597.0008

ALPHA1_PRIV000435

## III.    Sample Option Trades - NDQ Call Spread



NDQ Call Examples

THE DIVERSIFIED GROUP INCORPORATED

ALPHA0000000597.0009

ALPHA1_PRIV000436

## III.  Sample Option Trades - YEN Put Spread



Yen Put Examples

THE DIVERSIFIED GROUP INCORPORATED

ALPHA0000000597.0010

ALPHA1_PRIV000437

# IV.   Investment in LLC

**Investment in LLC**

➤ Investor, Alpha and a third party who will be a foreign person ("Foreign Investor") will form a Delaware limited liability company (the "LLC") for the purpose of investing and trading in option spreads and other derivative instruments on equity indices, foreign currencies or interest rates.

➤ Investor and Foreign Investor contribute $22,500 and $427,500, respectively, in exchange for 5% and 95%, respectively, of the LLC's common interests (the "Common Interests").

➤ Investor and Alpha also contribute $3,000,000 and $50,000, respectively, in exchange for preferred interests (the "Preferred Interests") in the LLC. Investor's contribution may be in the form of cash and/or options previously acquired through Investor's single member LLC.

➤ The LLC will have been initially capitalized with a substantial amount (e.g. $3,500,000 in the example discussed herein) to invest in option based strategies.

**Investor can convert his Preferred Interests into Common Interests at any time**

➤ Investor may at any time convert his Preferred Interests into Common Interests to increase his share of the profits or losses of the LLC.

**Management of the LLC**

➤ Alpha will provide investment advice with respect to structuring the option strategies.

➤ Diversified, as Manager of the LLC, will provide administrative support for the LLC, such as distributing the daily values of LLC's assets, and handling LLC documentation and record keeping responsibilities.

**THE DIVERSIFIED GROUP INCORPORATED**

ALPHA0000000597.0011

ALPHA1_PRIV000438

# IV.  Investment in LLC

## INITIAL CAPITALIZATION - Formation of LLC



**Investor**

Contributes
$22,500 for 5% of the Common Interests
$3,000,000 for Preferred Interests

**Alpha**

Contributes
$50,000 for Preferred Interests

**Foreign Investor**

Contributes $427,500 for
95% of the Common Interests

**LLC**

Manager = Diversified
Initial Capital = $3,500,000

➢ Investor, Alpha and Foreign Investor form a Delaware limited liability company ("LLC") for the purpose of investing and trading in options
  and other derivative instruments on equity indices, foreign currencies or interest rates.
➢ Investor and Foreign Investor contribute $22,500 and $427,500, respectively, in exchange for Common Interests of 5% and 95%, respectively.
➢ Investor and Alpha also contribute $3,000,000 and $50,000, respectively, in exchange for Preferred Interests.



**THE DIVERSIFIED GROUP INCORPORATED**

ALPHA0000000597.0012

ALPHA1_PRIV000439

# IV.    Investment in LLC

## Initial Capitalization Table

| | Common Cash Contribution | Preferred Cash Contribution | Total Cash | Capital Share | Profit/Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | $ 3,000,000 | $ 3,022,500 | 88.38% | 5.00% |
| Alpha | 0 | 50,000 | 50,000 | 1.43% | 0.00% |
| Foreign Investor | 427,500 | - | 427,500 | 12.21% | 95.00% |
| Total | $460,000 | $3,050,000 | $3,500,000 | 100.00% | 100.00% |

## Provisions of the LLC Operating Agreement

➤ After the preferred return (as described below) is paid, profits (to the extent distributed) are distributed 95% to Foreign Investor and 5% to Investor.

➤ The LLC's gains and losses are allocated 95% to Foreign Investor and 5% to Investor, except that (i) the LLC operating agreement contains a "qualified income offset" and (ii) provides that to the extent losses would decrease a member's capital account below zero, they are allocated to the other members with positive capital accounts.

➤ Upon liquidation of the LLC or any member's interest therein, capital accounts are first booked up or down to reflect gain or loss which would be allocated to the members if the LLC's assets were sold for fair market value.

➤ Each member is entitled to receive his capital account, in the event of a complete redemption of such member's interest. Each Preferred Interest carries a preferred return of 8% per year independent of LLC profits, payable semi-annually.

## Transfer of Membership Interests

➤ A member may transfer or contribute, at any time, some or all of his interests to another entity.



THE DIVERSIFIED GROUP INCORPORATED

ALPHA0000000597.0013

ALPHA1_PRIV000440

# IV.   Investment in LLC

***OPTIONAL CONVERSION*** - Investor may wish to convert his Preferred Interest into a Common Interest



Investor

Converts $3,000,000
Preferred Interest
into additional Common Interests
Now has up to 98% of the Common Interests

Alpha

$50,000 Preferred
Interest

Foreign Investor

$427,500 Common Interest
Diluted to no less than 2%
of the Common Interests

LLC
Manager = Diversified

➤  At some point in time, Investor may wish to convert his $3,000,000 Preferred Interest into a Common Interest, in order to have a higher percentage
of the LLC's profits and losses.

➤  In the event that the LLC's net asset value has declined to the point where Foreign Investor's capital account would be zero if his interest
were liquidated, under Foreign Investor's Anti-Dilution Provision, Investor's common interest cannot be increased beyond 98%.

**THE DIVERSIFIED GROUP INCORPORATED**

ALPHA0000000597.0014

ALPHA1_PRIV000441

# IV.   Investment in LLC

Provisions of the LLC Operating Agreement Governing Conversion of Preferred into Common

A  Preferred Interests are convertible at any time into Common Interests on a dollar-for-dollar basis based on the net asset value of the LLC at that time, taking into consideration any accrued but unpaid preferred return and each Common Interest holder's proportional share of any LLC gains or losses up to the time of conversion.

A  **Example:** Assume that Investor converts his Preferred Interest at a time when the LLC had a net asset value of $5 million and that Alpha has not converted. If we ignore accrued but unpaid preferred return, this implies that at the time of the conversion, the Common Interests had a gain of $1.5 million which would be allocated 5% ($75,000) to Investor and 95% ($1,425,000) to Foreign Investor, respectively. When Investor converts his Preferred Interests into Common Interests, he would have $3,097,500, or 62.58%, of the $4,950,000 total value of the Common Interests. See Table.

Capitalization Table after Conversion of Investor's Preferred Interests
Assume LLC Net Asset Value at the time of conversion is $5,000,000

| | Initial Common Contribution | Proportional Share of Gains or (Losses) | Conversion Proceeds | Value of Common Interests (Post-Conversion) | Profit/Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | $75,000 | $ 3,000,000 | $3,097,500 | 62.58% |
| Alpha | 0 | 0 | 0 | 0 | 0.00% |
| Foreign Investor | 427,500 | $1,425,000 | 0 | 1,852,500 | 37.42% |
| Total | $450,000 | $1,500,000 | $3,000,000 | $4,950,000 | 100.0% |

 THE DIVERSIFIED GROUP INCORPORATED

ALPHA0000000597.0015

ALPHA1_PRIV000442

# IV.  Investment in LLC

**Foreign Investor's Anti-Dilution Provision**

➤ Under no circumstances may a conversion cause Foreign Investor to retain less than 2% of the Common Interests.

➤ **Example:** Assume that Investor converts his Preferred Interest at a time when the LLC had a net asset value of $3,060,000 and that Alpha has not converted. If we ignore accrued but unpaid preferred return, this implies that at the time of the conversion, the Common Interests had a loss of $440,000 which would be allocated 5% ($22,000) to Investor and 95% ($418,000) to Foreign Investor, respectively. When Investor converts his Preferred Interests into Common Interests, his $3,000,500 share represents 99.68% of the $3,010,000 total value of the Common Interests, but because of Foreign Investor's Anti-Dilution provision, Investor's maximum percentage interest in the Common Interests is capped at 98%. See Table.

**Capitalization Table after Conversion of Investor's Preferred Interests**

**Assume LLC Net Asset Value at the time of conversion is $3,060,000**

| | Initial Common Contribution | Proportional Share of Gains or (Losses) | Conversion Proceeds | Value of Common Interests (Post-Conversion) | Profit/Loss Share |
|---|---|---|---|---|---|
| **Investor** | $ 22,500 | ($22,000) | $ 3,000,500 | $3,000,500 | No greater than 98% |
| **Alpha** | 0 | 0 | 0 | 0 | 0.00% |
| **Foreign Investor** | 427,500 | ($418,000) | 0 | 9,500 | No less than 2% |
| **Total** | $450,000 | ($440,000) | $3,000,000 | $3,010,000 | 100.0% |

**DG** **THE DIVERSIFIED GROUP INCORPORATED**

ALPHA0000000597.0016

ALPHA1_PRIV000443

# V.  Overview of The Diversified Group Incorporated

⋏ Diversified is a boutique merchant banking firm headquartered in New York. Over the last twenty years, its principals have been engaged in the business of arranging or investing in, special situations and complex financing or investment structures involving limited partnerships, limited liability companies, hybrid instruments (debt/equity), hybrid entities (pass-through versus corporate) or derivatives, such as options on foreign currencies, interest rates, commodities or equity indices. Diversified usually acts as a principal, but depending upon the needs of the transaction, we may also act as the investment banker.

⋏ We apply our expertise in structuring transactions that typically involve all of the following seven disciplines:

economic analysis                book accounting

tax analysis                     legal analysis

equity investment                debt placement

deal execution / administration

⋏ The disciplines are woven together through "structuring":

- the ability to correctly analyze the necessary component parts individually;
- the understanding of how the components interact and fit together;
- the judgment and experience that enables intelligent choices to be made when "trade offs" arise; and
- the ability to produce a solution that works – all in a timely and professional manner.

⋏ There is as much art as science involved in reaching a solution.



**THE DIVERSIFIED GROUP INCORPORATED**

ALPHA0000000597.0017

ALPHA1_PRIV000444

# V.    Overview of The Diversified Group Incorporated

**Philosophy** - Diversified is a small and highly successful firm whose principals embrace the following core values:

➢ We know we will get "repeat business" from our clients, whether they are equity investors, lenders or borrowers, buyers or sellers, only if we are ethical and oriented toward long-term relationships, and only if the participants in our transactions are pleased with the results.

➢ We pride ourselves on outstanding execution of transactions, which comes through creativity, hard work and a close attention to detail.

➢ We do not aspire to being big. We aspire to being the best at what we do with a strong focus on some of the most complex and highest value added transactions in mergers and acquisitions and corporate finance.

➢ We recognize our limitations. We cannot individually be leading experts in each and every discipline represented in a transaction, but we do retain the talents of some of the most creative members of nationally known legal and accounting firms for our transactions. Our expertise in being able to analyze the client's problem/opportunity, with a generalist's overview, enables us to select the particular team of national experts best suited to assist Diversified in tailoring a customized, detailed, fully integrated structure.

➢ Because our transactions are "document intensive", we view our ability to firmly manage and control the process of getting two to four sets of attorneys and accountants to expeditiously reach the desired conclusions as being one of our most valuable contributions to our clients.

 **THE DIVERSIFIED GROUP INCORPORATED**

ALPHA0000000597.0018

ALPHA1_PRIV000445

# V.    Overview of The Diversified Group Incorporated

**Principals - New York Office (212-688-7700)**

> Jamea Haber, President (New York) - Jimmy is the company's founder and has been involved in financial services since 1978. A certified public accountant, he is a member of the AICPA and the New York Society of CPAs. He received a B.S. degree in accounting from Brooklyn College and a M.S. degree in taxation from Pace University, in New York.

> John Huber, Chief Financial Officer (New York) - John has extensive experience in the financial services industry, both in public accounting and in private industry. As a tax manager at Arthur Andersen, he gained extensive experience in the owner managed business area, as well as in the real estate, banking, equipment leasing and manufacturing industries. Upon leaving Arthur Andersen, he became chief financial officer of one of his clients, an investment company which sponsored the formation of numerous investment entities. John returned to the field of public accounting in 1989, when he established his practice which later merged to form the firm Weeks, Holdsbaum, Huber & DeGraw, LLP. Recently, he has taken a leave of absence from the firm to become Diversified's Chief Financial Officer. John holds a B.S. in Business Administration from California Polytechnic State University, San Luis Obispo, and attended graduate studies in taxation at Golden Gate University in San Francisco. He is a member of the New Jersey Society of Certified Public Accountants and the American Institute of Certified Public Accountants.

> Orrin Tilevitz, Vice President and General Counsel  (New York) - Orrin has over twenty years of experience in numerous areas of federal, state and local income taxation.  Prior to joining Diversified, Orrin was a Director in the International Tax Services Group of PricewaterhouseCoopers LLP, where he represented multinational corporations engaged in cross-border transactions and developed sophisticated planning strategies to minimize worldwide taxes. Prior to that he spent over two years in the International Tax Group of Deloitte & Touche LLP, designing and developing a variety of cross-border tax-driven financial products and structured finance arrangements. He began his career as a tax lawyer in 1978 with Willkie, Farr & Gallagher in New York. Orrin received his B.A. degree, Cum Laude in the Biochemical Sciences, from Harvard College, where he was the speaker at the undergraduate commencement exercises, his J.D. degree from Columbia University School of Law, where he was a Harlan Fiske Stone Scholar, and his LL.M. in Taxation from New York University School of Law.

 **THE DIVERSIFIED GROUP INCORPORATED**

ALPHA0000000597.0019

ALPHA1_PRIV000446

# V. Overview of The Diversified Group Incorporated

**Principals - Chicago Office (312-419-8150)**

Δ    Mox Tan, Managing Director (Chicago) - Prior to joining The Diversified Group, Mox was a Managing Director and head of BankAmerica's 10-person tax products group and 30-person corporate finance advisory group, with units located in Chicago, New York, San Francisco and Los Angeles. The tax products group specialized in tax-advantaged M&A and cross-border financings, including "double dips" and principal and interest deductibility strategies. Prior to starting up the tax products group in 1995, he was a co-head of Continental Bank's lease and project finance advisory group, and before that, created and headed up a tax-driven real estate finance group at an investment banking boutique in New York to take advantage of arbitrage opportunities that came out of the 1986 Tax Act. Prior to 1986, he was a corporate finance and securities attorney with Davis Polk & Wardwell in New York. Mox also spent four years in government, where he was the head of enforcement (Northeastern Region) for New Jersey's Division of Water Resources. Mox holds a B.Sc. from M.I.T. in Mathematics, an M.S. in Mathematics from the Courant Institute of Mathematical Sciences and a J.D. (cum laude) from Harvard Law School.

Δ    Phillip L. Kampf, Jr., Managing Director (Chicago) - Prior to joining The Diversified Group, Phil was a Vice President/senior transactor and a founding member of BankAmerica's tax products group in Chicago where he specialized in tax-advantaged/sub-libor cross-border financings such as "double dips", principal and interest deductibility strategies and certain Asia-Pacific funding strategies. Prior to founding the BankAmerica group with Mox in 1995, he was responsible for equity private placements and the execution of tax-or accounting-driven leases and project financings in Continental Bank's lease and project finance advisory group. Prior to joining Continental Bank, he was a financial analyst in the Property Finance Group of LaSalle Partners Limited. Phil holds a B.A. in International Studies from Northwestern University and an M.B.A. from the J.L. Kellogg School of Northwestern University.

 THE DIVERSIFIED GROUP INCORPORATED

ALPHA0000000597.0020

ALPHA1_PRIV000447

# VI.    Overview of Alpha Consultants, LLC

➤ Alpha Consultants, LLC ("Alpha LLC") is a Florida limited liability company engaged in trading and trade consulting for structured options and foreign currencies. A team of professionals led by Ivan Ross and Don Uderitz conducts the management of Alpha LLC. The team has over 80 years of combined experience in identifying, analyzing, structuring and trading investment portfolios. This team also has broad expertise in investment fund management, structured finance, investment banking and tax arbitrage. Additionally, the principals of Alpha LLC operate an NASD registered broker-dealer and a family of NFA registered private investment funds.  Over the years, the team has developed numerous proprietary analytical models and disciplined investment strategies that historically have generated profitable returns with a controlled level of risk.

➤ From February 1995 to November 1999, the team provided trading advice and execution for the III Funds, a group of hedge funds that, as of their departure, had over $2 billion of investor capital.  Two of Alpha LLC's principals (Uderitz and Ross) were general partners of the investment advisors to the III Funds and Adams, Viner, and Mosler, Ltd., ("AVM"), an affiliated fixed-income securities NASD registered broker-dealer.  During its tenure with the III Funds and AVM, the team managed a large mortgage position, which at its peak exceeded $20 billion of the fund's $30 billion of assets.  This component of the portfolio consistently generated profitable returns.  This includes the extremely difficult 1997-1998 period when many fixed-income funds experienced dramatic losses.

**DG** THE DIVERSIFIED GROUP INCORPORATED

ALPHA0000000597.0021

ALPHA1_PRIV000448

# VI.    Overview of Alpha Consultants, LLC

**Principals - Palm Beach Gardens, Florida (561-624-9998)**

➤ Ivan J. Ross, Managing Member - Prior to forming Alpha LLC, Mr. Ross was co-head of Mortgage Trading with primary responsibility for the management of the domestic mortgage position in the III funds. He was a trader and portfolio manager for AVM and III from February 1995 to November 1998. Prior to joining AVM/III, Mr. Ross was a Senior Vice President and Portfolio Manager for Ocwen Financial Corporation ("Ocwen") from February 1994 to February 1995. While at Ocwen, Mr. Ross was responsible for managing the investment-grade mortgage component of the Quasar fund, with capital in excess of $260 million. Quasar is a fund of funds managed by George Soros with capital allocated to top managers in various sectors. Additionally, Mr. Ross managed a similar portfolio for Ocwen's principal subsidiary, Berkeley Federal Bank & Trust, with capital in excess of $100 million. Prior to joining Ocwen, Mr. Ross was a Vice President and Portfolio manager for Heritage Asset Management from April 1988 to February 1994. Mr. Ross began his investment career in 1985 at Philadelphia based Corestates Investment Advisers. Mr. Ross graduated from the Wharton School of the University of Pennsylvania in 1985. Additionally, he is a Chartered Financial Analyst (CFA).

➤ Donald S. Uderitz, Principal - Prior to forming Alpha LLC, Mr. Uderitz was co-head of Mortgage Trading with primary responsibility for structuring and tax arbitrage. He was a trader and portfolio manager for AVM and III from February 1995 to November 1998. Mr. Uderitz was previously with Ocwen from February 1991 to February 1995, most recently as Senior Vice President and Portfolio Manager. At Ocwen, Mr. Uderitz was responsible for tax-related securities including REMIC residuals and low-income housing tax credits. Mr. Uderitz began his investment career with the Federal Home Loan Mortgage Corporation. Mr. Uderitz received a bachelor's degree in economics from the State University of New York in 1988 and an MBA from the College of William and Mary in 1991.

 **THE DIVERSIFIED GROUP INCORPORATED**

ALPHA0000000597.0022

ALPHA1_PRIV000449

# VI.  Overview of Alpha Consultants, LLC

⋗ G. Felix Cua, Managing Director - Prior to joining Alpha LLC, Mr. Cua was a trader and portfolio manager for AVM and III from February 1995 to December 1998. While at AVM/ III Mr. Cua had several areas of responsibility including portfolio management, trading, and creation of pricing models. His primary expertise is the formation of arbitrage opportunities with the use of swaps, options and derivative mortgage-backed securities. Prior to joining AVM/ III, Mr. Cua was employed at Ocwen where he was instrumental in the management of the Cuasar Fund. From 1992-1994, Mr. Cua was an Analyst at BlackRock Financial Management specializing in total rate-of-return analysis. Mr. Cua received a bachelor's degree in economics from Cornell University in 1992 and is a Chartered Financial Analyst (CFA).

⋗ Yoshiyuki Nobumoto, Managing Director - Prior to joining Alpha LLC, Mr. Nobumoto was a trader and portfolio manager for AVM and III from February 1995 to December 1998. Mr. Nobumoto has several areas of responsibility including portfolio management, risk analysis and trading. His primary expertise is in cash flow modeling and systems programming. Using various asset classes, he has created synthetic cash flow constructions that have resulted in superior tax advantaged performance. From November 1992 to February 1995, Mr. Nobumoto was employed with Ocwen as a Senior Associate in the investment group. While at Ocwen, Mr. Nobumoto was also responsible for the pricing, acquisition and resolution of non-performing 1-4 family loans, participating in over $2 billion in portfolio acquisitions. Mr. Nobumoto received a bachelor's degree from the School of Engineering and Applied Science of the University of Pennsylvania in 1992 and is currently a CFA level III candidate.

⋗ Ronald Buesinger, Managing Director - Prior to joining Alpha LLC, Mr. Buesinger was with AVM/ III as a trader and portfolio manager from February 1998 to December 1998. His primary focus has been in the determination and exploitation of relative value trades between various types of structured mortgage products, including all mortgage derivatives. Prior to joining AVM and III, Mr. Buesinger was employed as a vice-president and institutional mortgage bond trader for Mercantile Bank in St. Louis, Missouri. Preceding his position at Mercantile, he was Vice-President and Manager of Mortgage Bond Trading for Boatmen's Bank capital markets group. While at Boatmen's, he was responsible for trading and hedging a $200 million mortgage position. He also spent considerable time generating trade ideas and marketing those ideas to bank customers. Mr. Buesinger began his career in February 1990, at Heritage Asset Management. From 1991 to 1993, he served as an assistant portfolio manager for all of the Heritage Funds and assets managed by Ivan Ross. Mr. Buesinger received a Bachelor's degree in finance from the University of Missouri-St. Louis in 1989.

 THE DIVERSIFIED GROUP INCORPORATED

ALPHA0000000597.0023

ALPHA1_PRIV000450

**Unknown**

| | |
|---|---|
| **From:** | Orrin Tilevitz  [otilevitz@divgroup.com] |
| **Sent:** | Friday, February 23, 2001 2:07 PM |
| **To:** | R. J. Ruble |
| **Cc:** | Haber Jimmy |
| **Subject:** | partnership options |

Here is a revised memo; please discard the prior version.



partnership
strategy 2001.doc ...

- partnership strategy 2001.doc

1

GOVERNMENT
EXHIBIT
9

CONFIDENTIAL

M362883
SIDL166249

**Unknown**

| | |
|---|---|
| **From:** | James Haber [jhaber@divgroup.com] |
| **Sent:** | Friday, March 23, 2001 6:07 PM |
| **To:** | R. J. Ruble |
| **Subject:** | Partnership Strategy 2001- revised |

We have revised our contemplated Partnership Strategy with what we hope
to be a better result. Please review the outline and see if there are
any faults in our reasoning or thinking. We expect to be launching the
idea within the next 3-4 days, so I humbly ask for your immediate
attention.



partnership
strategy 2001-rev...

- partnership strategy 2001-revised.doc

1



CONFIDENTIAL

M363615
SIDL166289

950 Third Avenue, 23rd Floor
New York, NY 10022
Phone: (212) 688-3700
Fax: (212) 688-7908



THE DIVERSIFIED GROUP
INCORPORATED

## MEMORANDUM

| | | |
|---|---|---|
| **TO:** | Jimmy Haber | |
| **FROM:** | Orrin Tilevitz, Esq. | **Confidential—** |
| **DATE:** | March 23, 2001 | **Attorney-Client** |
| **SUBJECT:** | 2001 Partnership Option Strategy | **Privilege** |

This memorandum outlines an example of a transaction implementing a strategy involving option spreads acquired by a partnership.

Partners A, B and C, who are unrelated to each other, form a limited liability company treated as a partnership for federal tax purposes (the "partnership"). Partner C is a foreign person not subject to U.S. taxing jurisdiction. Partners A and C contribute $22,500 and $422,500, respectively, in exchange for common interests of 5% and 95%, respectively. Partners A and B also contribute $2,500,000 and $50,000, respectively, in exchange for a preferred interest. Each preferred interest carries a guaranteed return of 10% per year independent of partnership profits, payable semi-annually, and is convertible at any time into a common interest on a dollar-for-dollar basis at the net asset value of the partnership at that time, except under no circumstances may a conversion cause Partner C to retain a common share of less than 5%. Partner C desires this provision because the partnership's assets will be largely volatile, and a timely conversion by Partner A or B while the net asset value is low would deny Partner C the ability to profit from a later upswing in that value. After the preferred return is paid, profits (to the extent distributed) are distributed according to the profit/loss share set forth above. On the complete redemption of his interest, each partner is entitled to receive his capital account, computed for tax purposes (as discussed below).

For example, if Partner A were to convert his interest after Partner B had converted and when the partnership had a net asset value of $4 million, his common interest percentage would be about 64.4% (5% of net asset value ($4,000,000) after reduction for Partner A's preferred interest ($2,500,000) equals $75,000, plus $2,500,000, divided by $4,000,000).

None of the partners' capital contributions are guaranteed, directly, indirectly, or in some other form, by the partnership or another partner; for example, Partner C will not be refunded any part of the $425,000 actually lost in this transaction in the form of a fee for participating in the transaction, and to the extent Partner C does receive a fee for participating, the amount of it is independent of the amount Partner C lost (or could have profited).

{PAGE }

AJD  00160

The partnership's initial capital structure is as follows:

| | Common Cash Contribution | Preferred Cash Contribution | Total Cash | Capital Share | Profit/Loss Share |
|---|---|---|---|---|---|
| Partner A | $ 25,000 | $ 2,500,000 | $ 2,525,000 | 84.3% | 5.0% |
| Partner B | | 50,000 | 50,000 | 1.6% | 0% |
| Partner C | 425,000 | — | 425,000 | 14.1% | 95.0% |
| Total | $450,000 | $2,550,000 | $3,000,000 | 100% | 100.0% |

The partnership's gains and losses are allocated to the partners for income tax purposes in the above percentages as well, except that the partnership agreement (i) contains a "qualified income offset" and (ii) provides that to the extent losses would decrease a partner's capital account below zero, they are allocated to other partners with positive capital accounts. The partnership maintains capital accounts for the partners in accordance with the regulations under section 704(b).[1] Upon liquidation of the partnership or any partner's interest therein, capital accounts are first booked up or down to reflect gain or loss which would be allocated to the partners if the partnership's assets were sold for fair market value, and then proceeds are distributed to the liquidated partner(s) in accordance with positive capital account balances.

The partnership uses $2 million of its capital to pay the net premium on a series of 60-day option spreads and invests the remainder in other, less volatile financial instruments. For each option spread, the amounts invested, payoff amounts, and strike prices are slightly different, such that for the option spreads as a whole there exists a reasonable possibility of a substantial economic profit after all transaction costs. The partnership receives separate confirmation for each trade, i.e., for each long option and each short option, with the stated premium reflecting the fair market purchase price of that option. After 20-30 days, when certain options (the "gain legs") have appreciated by a total of $100 million (although the partnership's positions, taken together, have declined in value by $1 million, i.e., there is $101 million in unrecognized loss), the partnership disposes of the gain legs and acquires replacement instruments[2] with similar terms and requiring a net premium of approximately the disposition proceeds. At this point, the partnership's net asset value is $2 million. After 45 days from the date the original option spreads were acquired, when (we shall assume for simplicity's sake) this value has not changed further, Partner A converts his preferred interest into a common interest.[3] Since partnership's net asset value has declined to the point that Partner C's capital account would be zero if his interest were liquidated, Partner A's common interest is increased to the

---

[1] Section references are to the Internal Revenue Code of 1986, as amended, and Treasury regulations issued thereunder.

[2] If the original options are foreign currency options, the replacement options will be on a different, although linked, foreign currency (e.g., if the original options are on the euro, the replacement options may be on the deutschmark. If the original options are on a NASDAQ index, the replacement instruments will be notes with similar payoff schedules but legally different rights, e.g., options are subject to netting under a standard ISDA agreement while the note would not be. In both cases, the amount invested in and payoff from the replacement instruments will differ slightly from the original options.

[3] Partner C may wish to have a portion, but not all, of his interest redeemed at the same or some other time.

{PAGE }

AJD 00161

7IRS00312

maximum 95%. Also, Partner C contributes his partnership interest to a new partnership XYZ with third parties in exchange for a partnership interest.

Following the contribution of Partner C's interest and the conversion of Partner A's interest, the partnership's capital structure is as follows:

| | Common Cash Contribution | Preferred Cash Contribution | Total Cash | Capital Share | Profit/ Loss Share |
|---|---|---|---|---|---|
| Partner A | $2,525,000 | – | $2,525,000 | 84.3% | 95% |
| Partner B | | 50,000 | 50,000 | 1.6% | 0% |
| Partner XYZ | 425,000 | | 425,000 | 14.1% | 5% |
| Total | $2,950,000 | 50,000 | $2,575,000 | 100% | 100.0% |

The partnership subsequently disposes of the remaining options or permits them to expire.

### Tax Discussion

1. The separate legs of each option spread (or an option/ note spread) should be treated as separate instruments for tax purposes. See, e.g., Arnall v. United States, 59-2 USTC ¶ 9779 (N.D. Ga. 1959); Stoller v. Commissioner, 994 F2d 855 (DC Cir. 1993), aff'g in part and rev'g in part, 60 TCM 1554 (1990).

2. A partnership tax year terminates with respect to a partner whose partnership interest terminates, by any means. Section 706(c)(2)(A) (as amended by the Tax Relief Act of 1997). This would include a sale or exchange of a partnership interest, Regs. §1.706-1(c)(2), including a non-taxable sale or exchange such as transfer of an partnership interest in a section 721 exchange. McKee, Nelson and Whitmire, Federal Taxation of Partnerships and Partners ¶ 11.02[2] (3rd ed., 2000 Cum. Supp. No. 3); cf. Rev. Rul 87-110 (transfer of 50% partnership interest in corporate reorganization is sale or exchange, terminating partnership tax year under section 708). Therefore, the partnership's tax year terminated with respect to Partner C when he conveyed his partnership interest to XYZ.

3. The partnership uses an "interim closing of the books method" to allocate gains and losses when a partner's entire partnership interest terminates. See Regs. § 1.706-1(c)(2). Therefore, 95% of the gain during this interim period, or $95 million, is allocated to Partner C and 5%, or $5 million, is allocated to Partner A. This allocation will be respected if (as concluded below) the allocation has "substantial economic effect" or if it is or is in accordance with the partners' interest in the partnership. Regs. § 1.704-1(b)(1)(i).

4. So long as the partnership business continues, a partnership tax year does not terminate with respect to all partners unless interests in profit and capital aggregating at least 50% are sold or exchanged. Sections 706(c)(1) and 708(b)(1)(B). Since Partner C's interest in partnership capital (as opposed profits) is at all times less than 50%, the transfer of Partner

{PAGE }

AJD 00162

C's interest to XYZ does not cause the partnership tax year to terminate.[4] Also, the partnership files a single partnership return for the entire partnership year; the "interim closing of the books method" is merely a method of allocating income during the year. See Instructions to Form 1065, Schedules K and K-1, How Income Is Shared Among Partners.

5.  The partnership recognized gain on sale or disposition of the gain legs; the immediate repurchase of the replacement instruments should not cause the transaction to be recharacterized as a tax-free exchange or otherwise as an event on which no gain or loss was recognized. See, e.g., Cottage Savings Assoc. v. Commissioner, 499 U.S. 554 (1991).

6.  The conversion of Partner's A's preferred interest into a common interest should be treated as a contribution of the preferred interest to the partnership in exchange for the common interest pursuant to section 721. See Rev. Rul 84-52, 1984-1 CB 157 (conversion of general partnership interest into limited partnership interest in the same partnership).

7.  Under section 705, Partner C's outside basis in the partnership is increased by the gain allocated to him.

8.  If Partner C's interest is partially redeemed, Partner C does not recognize any loss. Section 731(a)(2); Regs. § 1.731-1(a)(2). Instead, his outside basis is reduced by the cash distributed to him. Section 733(1).

9.  If a partnership has a section 754 election in effect, (i) under section 743(b)(2), upon a "sale or exchange" of a partner's partnership interest, the inside basis of partnership property is decreased by the excess of the transferee's share of that basis over his outside basis; and (ii) under section 734, on a liquidating distribution to a partner a partnership's inside basis is reduced by the amount of any loss recognized by the partner and the difference between the partnership's inside basis in any distributed assets and the partner's outside basis in those assets after the distribution. This partnership will not make a section 754 election. However, even if did so, neither section 743(b)(2) nor section 734 would apply. This is because (i) the conversion of Partner A's interest into a common interest is not a "sale or exchange" for purposes of section 743(b); Regs. § 1.743-1(a) (last sentence); McKee, Nelson and. Whitmire, supra, at ¶ 24.03[1]; and (ii) if Partner C's interest is partially redeemed, the distribution to Partner C is not a liquidating distribution, so section 734 does not apply.

10. Example 8 of Regs. § 1.701-2(d), the partnership anti-abuse regulations, concludes that one may not use a deliberate failure to make a section 754 election, and therefore to avoid the resulting adjustments under section 734 and 743(b)(2), to duplicate an asset's built-in loss for the benefit of the asset-holder's relative. Cf. Example 9. Example 8 does not apply to this transaction because (i) section 734 and 743(b)(2) would not apply even if the

---

[4] Furthermore, to the extent a portion of Partner C's interest is redemption, that redemption is not a "sale or exchange" for this purpose. Regs. § 1.708-1(b)(2).

[PAGE ]

AJD 00163

7IRS00314

partnership had made a section 754 election, so that the partnership's failure to make a section 754 election has no effect, and (ii) even if these sections did apply, there is no duplicated loss because (x) since the loss that Partner C will eventually recognize merely offsets his share of gain, there is only one loss and (y) since Partner C is foreign, no party receives any U.S. tax benefit from this loss. No other provision of the partnership anti-abuse regulations would likely change the intended tax result.

11. Under Regs. § 1.704-1(b)(2), an allocation has substantial economic effect if it has "economic effect" that is "substantial". In general, a "fundamental principle" is that an allocation has economic effect if the partner to whom an allocation is made must receive the economic benefit—if there is any—that corresponds to the allocation. This fundamental principle is satisfied here because Partner A, who is allocated 85% of the partnership's tax gain, would receive 85% of the partnership's economic gain. That, as in this case, the tax gain in fact exceeds any economic gain does not matter.

Under the alternate test for economic effect set out in Regs. § 1.704-1(b)(2)(ii)(*d*), an allocation has economic effect if

    (i)    the partnership maintains capital accounts in the manner provided in the regulations,

    (ii)    upon liquidation of the partnership or any partner's interest therein, distributions are made in accordance with positive capital account balances, and

    (iii)    the partnership agreement contains a "qualified income offset",

to the extent the allocation will not reduce such partner's capital account below zero. Under the capital account maintenance rules set out in Regs. § 1.704-1(b)(2)(iv), in relevant part a partner's capital account equals the amount of his capital contributions increased by his allocable share of partnership income and gain and decreased by his allocable share of partnership loss. In addition, under Regs. § 1.704-1(b)(2)(iv)(*f*), a partnership agreement may provide that upon certain events (including, in relevant part, the liquidation of a partnership interest), partnership capital accounts are booked up or down to reflect the manner in which unrealized gain or loss would be allocated among the partners if the partnership's assets were disposed of for fair market value.

Under the facts set out above, each of these requirements is satisfied. Partner C's initial capital account of $425,000 is increased to $85,425,000 by its share of the partnership's gain. If Partner C were instead to receive a liquidating distribution when his interest is partially redeemed, immediately before the distribution, Partner C's share of the partnership's unrecognized gain would be $85,850,000, so that on the book-down its capital account would be reduced to zero, with the remaining $425,000 in negative capital account adjustments allocated to other partners (presumably Partner A). Accordingly, the alternate test for economic effect is satisfied and the allocation of 85% of the gain to Partner C has economic effect.

{PAGE }

AJD 00164

7IRS00315

Under Regs. § 1.704-1(b)(2)(iii), the economic effect of an allocation is substantial if, at the time the allocation becomes part of the partnership agreement (not at the time actual income or loss is allocated) there is a reasonable possibility that the allocation will affect substantially the dollar amounts to be received by the partners from the partnership. This is the case here because, as stated above, there is a reasonable possibility that the option trades will result in a substantial economic profit to the partnership and 85% of this economic gain would be apportioned to Partner C. The regulation goes on to say that the economic effect of an allocation is nonetheless not substantial if the after-tax economic consequences of at least one partner may be enhanced compared to such consequences if the allocation were not contained in the partnership agreement, *and* there is a strong likelihood that the after-tax economic consequences of no partner will be substantially diminished compared to such consequences if the allocation were not contained in the partnership agreement. As the references to Regs. § 1.704-1(b)(5), examples 5 and 9, show, this provision is aimed at special allocations of partnership income and loss, not— as here—general allocations. That is, the test is not meaningful where all income, gain and loss is shared in the same proportion because if that general sharing arrangement were not contained in the partnership agreement, no other sharing arrangement would apply. While in such a case allocations would be made in accordance with "the partner's interests in the partnership", nothing suggests that this provision was intended to mean that a general sharing arrangement was to be compared with "the partner's interest in the partnership." The regulation further goes on to say that economic effect is not substantial if the allocations are transitory or shifting. Neither is the case here; again as reflected in the examples which this provision references, this provision was aimed at special allocations, which are absent here.

Accordingly, the allocation of 85% of the gain to Partner C should be treated as having substantial economic effect.

12. If an allocation of an amount does not have substantial economic effect, the amount will be reallocated in accordance with the "partner's interest in the partnership" as determined under Regs. § 1.704-1(b)(3). This refers to the manner in which the partners share the economic benefit or burden *of a particular item,* and this sharing ratio may differ from the partner's overall interest in the partnership. The regulations list four factors as "among those" that will be considered: the partners' relative contributions to the partnership, their interests in economic profits and losses, their interest in cash flow and other nonliquidating distributions, and their rights to distribution of capital on liquidation. Here, the partners have agreed that 85% of the partnership's gain, as well as 85% of the partnership's losses up to the amount of Partner C's capital account, inure to the benefit and detriment of Partner C. In addition, once the preferred return is paid, cash flow out of these gains is also distributed 85% to Partner C. While Partner A has made the bulk of the contributions to the partnership and has the bulk of the rights to distributions of capital on liquidation, these factors do not detract from the fact that in terms of *gain* (as opposed to losses), 85% of it inures to the benefit of Partner C, not Partner A. Accordingly, the allocation of 85% of the gain to Partner C should be respected as being in accordance with Partner C's interest in the partnership.

{PAGE }

AJD 00165

7IRS00316

13. Partner C's status as a partner should not be disregarded for tax purposes because, unlike the situation in *ASA Investerings v. Comm'r*, 201 F3rd 505 (DC Cir. 2000), Partner C's capital is fully at risk, not guaranteed; Partner C would benefit in 85% of any economic gain, and suffer 85% of any economic loss, in the partnership's assets while it is a partner; and Partner C retains an economic stake in the partnership after the transfer of his interest to XYZ.

14. Whether, on general partnership debt-equity tax principles, Partner A's preferred interest is properly characterized as debt, *Cf. Hambuechen v. Comm'r*, 43 TC 90 (1964), does not materially change the above analysis and thus is not material to the desired tax result.

{PAGE }

AJD 00166

7IRS00317

**Unknown**

| | |
|---|---|
| **From:** | R. J. Ruble |
| **Sent:** | Friday, March 23, 2001 6:09 PM |
| **To:** | Jacob Amato |
| **Cc:** | jhaber |
| **Subject:** | Partnership Strategy 2001- revised |

would you also take a look at this. this was the one that you liked.
———————— Forwarded by R. J. Ruble/NY/BWLLP on 03/23/2001 04:08 PM ————————



James Haber <jhaber@divgroup.com> on 03/23/2001 04:07:58 PM

To:    R. J. Ruble/NY/BWLLP@BWLLP
cc:
Subject: Partnership Strategy 2001- revised

We have revised our contemplated Partnership Strategy with what we hope
to be a better result. Please review the outline and see if there are
any faults in our reasoning or thinking. We expect to be launching the
idea within the next 3-4 days, so I humbly ask for your immediate
attention.



partnership
strategy 2001--rev...
- partnership strategy 2001--revised.doc



1

CONFIDENTIAL

M355159
SIDL165821

**Unknown**

| | |
|---|---|
| **From:** | Orrin Tilevitz  [otilevitz@divgroup.com] |
| **Sent:** | Monday, March 26, 2001 2:39 PM |
| **To:** | R. J. Ruble |
| **Cc:** | Haber Jimmy |
| **Subject:** | (no subject) |

Attached is a cleaned-up version of the partnership strategy memo Jimmy sent you on Friday. I've marked it against the version he sent you, but you can disregard that marked changes to pages 6-7 of th original document—the marking is an artifact of the program.



partnership
strategy 2001–rev...

- partnership strategy 2001–revised II.doc



GOVERNMENT
EXHIBIT

12

PENGAD 800-631-6989

1

CONFIDENTIAL

M363624
SIDL166291

**Unknown**

| | |
|---|---|
| **From:** | Orrin Tilevitz [otilevitz@divgroup.com] |
| **Sent:** | Thursday, May 17, 2001 6:43 PM |
| **To:** | R. J. Ruble |
| **Cc:** | Haber Jimmy |
| **Subject:** | partnership |

Attached for your review are an operating agrement, along with exhibits
thereto, to implement the strategy.  A contribution agreement will be

operating
greement--exhibits..reement.doc (273 K

forthcoming.



GOVERNMENT
EXHIBIT
/3

CONFIDENTIAL

M365989
SIDL166341

```
FROM            : Orrin Tilevitz <otilevitz@divgroup.com>
ORG             :
TO              : R. J. Ruble <R. J. Ruble/NY/BWLLP@BWLLP>
CC              :
BCC             :
DATE            = 04/24/2001
TIME            : 21:01:00 GMT
SUBJECT         : (no subject)
FOLDER          : \R. J. Ruble\diversified

MESSAGEID       : 00000000B7BDA75CAEB14148A8FFD88DDCA220D5A4802000
BODY            :
```

Before I prepare it, do you have anything distinguishing the Merit
Trading program from what we're doing in the 2001 option spread
partnerships? (The most recent case is Keeler, affirming Leeme
Enterprises. Other cases in the group include Lee, Allesandra, Seykota,
Lond, and Lamborn).



GOVERNMENT
EXHIBIT
15

SABWZ0152999

SIDL0346546

From:   Ruble, R.J. <rruble@sidley.com>
Date:   2/7/2002 9:48:28 AM

I've been through the Proskauer draft for the new deal. Ira has done an
excellent job of paring down a number of the discussion from what we have
said in the past. In a perfect world I would probably adopt many of the
changes Ira made, but it's hard to get changes to boilerplate here.  Do you
have a problem if we continue to use our form of discussion on most of these
issues?

R.J. Ruble
Sidley Austin Brown & Wood LLP
875 Third Avenue
New York, NY 10022
rruble@sidley.com

(212) 906-2577 - direct
(212) 906-2021 - fax
(646) 349-2409 - efax

---

This e-mail is sent by a law firm and may contain information that is privileged or confidential.  If you are not the intende
d recipient, please delete the e-mail and any attachments and notify us immediately.



**GOVERNMENT
EXHIBIT
16**

DGI 33766

From:   Ruble, R.J. <rruble@sidley.com>
Date:   1/25/2002 11:02:06 AM
Subj:   RE:

thanks

> -----Original Message-----
> From: James Haber [SMTP:jhaber@divgroup.com]
> Sent: Friday, January 25, 2002 12:07 PM
> To:   Ruble, R.J.
> Subject:    Re:
>
>
> You do not have to rely on your acting skills because I have already told
> him that you have it and that we are working together to enhance the
> opinion.
>
> ----- Original Message -----
> From: "Ruble, R.J." <RRuble@Sidley.com>
> To: "'jimmy haber'" <jhaber@divgroup.com>
> Sent: Friday, January 25, 2002 11:43 AM
>
>
> > just got my lunch invitation from larry cohen.  I'll act suprised when
> he
> > hands me the memo.
> >
> > R.J. Ruble
> > Sidley Austin Brown & Wood LLP
> > 875 Third Avenue
> > New York, NY 10022
> > rruble@sidley.com
> >
> > (212) 906-2577 - direct
> > (212) 906-2021 - fax
> > (646) 349-2409 - efax
> >
> >
> >
> > ----------------------------------------------------
> > ------------------------
> >
> > This e-mail is sent by a law firm and may contain information that is
> privileged or confidential.  If you are not the intended recipient, please
> delete the e-mail and any attachments and notify us immediately.
> >
> >
> >
> >
> > .

--------------------------------------------------------------------

This e-mail is sent by a law firm and may contain information that is privileged or confidential.  If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.



GOVERNMENT
EXHIBIT
17

DGI 33762

## In The Matter Of:

*United States Internal Revenue Service*
*Diversified Group Incorporated & Subsidiaries*

---

*James Haber*
*February 28, 2003*

---

*TANKOOS REPORTING COMPANY*
*142 Willis Avenue*
*Mineola, NY 11501*
*(212) 349-9692   or   (516) 741-5234*

*Original File jb022803.asc, 128 Pages*
*Min-U-Script® File ID: 1838426390*

## Word Index included with this Min-U-Script®



GOVERNMENT
EXHIBIT
21
PENGAD-Bayonne, N. J.

Page 289

[1]          **J. Haber**

[2]     **Q:** The numbers obviously were different
[3] for each investor as compared to the premiums
[4] of the options, what was the amount out of the
[5] pocket?
[6]     **A:** Again, I don't recall.
[7] It would have varied again investor by
[8] investor. There may have been some investors
[9] that had similar percentages but I don't recall.
[10]     **Q:** Did you ever request a ruling from the
[11] IRS on whether the OPS transaction is a
[12] corporate tax shelter?
[13]     **A:** No.
[14]     **Q:** We have another exhibit. We are coming
[15] to Exhibit Number 1.
[16]     **A:** Do you want to refer back to Exhibit
[17] Number 1? Is that what you are saying?
[18]     **Q:** We want to ask follow-up questions
[19] getting back to the financial derivative
[20] investment strategy, but the question now is:
[21] Did investors typically invest cash to acquire
[22] options by the single member LLC through the
[23] single member LLC?
[24]     **A:** I am unaware of any investor that did
[25] it with something other than cash.

Page 290

[1]          **J. Haber**

[2]     **Q:** Could we turn to Exhibit Number 1?
[3]     **A:** Certainly.
[4]     **Q:** It was a PowerPoint presentation on
[5] financial derivative investment strategies that
[6] I will refer to as the FDIS strategy.
[7]     Are you familiar with this document?
[8]     **A:** I familiarized myself with it
[9] yesterday.
[10]     **Q:** How did DGI use this type of document?
[11]     **A:** Well, it was used to present the
[12] strategy to potential referral sources. I am
[13] unaware, I was never firsthand involved in
[14] presenting it to any clients directly or
[15] indirectly, but I believe it was used to present
[16] the idea to referral sources.
[17]     **Q:** So was it presented to investors?
[18]     **A:** I am unaware of that. I mean, it
[19] could have been but it certainly wasn't used by
[20] me at any time.
[21]     **Q:** With regard to this FDIS strategy
[22] transaction, what referral sources are you
[23] talking about?
[24]     **A:** BDO Seidman, Grant Thornton, RSM
[25] McGladrey.

Page 291

[1]          **J. Haber**

[2]     **Q:** Did it have any other relationship with
[3] other accounting firms?
[4]     **A:** Relative to the strategy or in general?
[5]     **Q:** Relative to this strategy.
[6]     **A:** There may have been, but I don't recall
[7] right now.
[8]     **Q:** You mentioned that this PowerPoint
[9] presentation was presented to the referral
[10] sources.
[11]     Who did that on behalf of DGI?
[12]     **A:** I did.
[13]     **Q:** Who developed this transaction?
[14]     **A:** DGI did.
[15]     **Q:** I would like to ask some specific
[16] questions just going through the PowerPoint
[17] presentation, if you don't mind.
[18]     Could you look at, I guess it is Page
[19] 6, where the sample option trades are presented.
[20]     **A:** When you say "Page 6," you mean P-0006,
[21] the one that says Bates Stamp 6 on it?
[22]     **Q:** It is 7 actually.
[23]     **A:** In the lower left-hand corner is a
[24] number I am talking about.
[25]     **Q:** It is 6.

Page 292

[1]          **J. Haber**

[2] So the PowerPoint presentation shows
[3] different sample option trades that the investor
[4] could choose from designing the investment,
[5] particularly options which he wants to choose?
[6]     **A:** Is that question or statement?
[7]     **Q:** That's a statement.
[8]     **A:** Because if it was a question, I would
[9] disagree with that.
[10]     **Q:** How would you disagree?
[11]     **A:** This was merely done as an example to
[12] show, again, I believe it is shown to referrals,
[13] but we can say investor generically now, but it
[14] was merely done as an example to show how
[15] options worked relative to how their pay-off
[16] would differ based on their probability of
[17] profit.
[18]     It was not meant to be a specific
[19] example of a particular trade that would be
[20] available to clients, because as an example
[21] this, the S & P market movement in the Standard
[22] & Poors Index, is an ever changing by the second
[23] market so there is no way this could be examples
[24] of an actual potential trade, but rather it is
[25] representative of at a certain point in time.

8IRS0077

**Page 293**

[1]                              **J. Haber**

[2] And I think we used the example when the stock
[3] price was at 11.5329 what the different ranges
[4] could be for an S & P trade given a different
[5] probability of profit.
[6]     **Q:** Could the investor choose what type of
[7] options he or she would use in the FDIS
[8] transaction?
[9]     **A:** If you turn to Page Number 4, Bates
[10] Stamp Number 4, which says "Investment
[11] Strategy," there are five factors that go into
[12] designing the characteristics of a particular
[13] option. A client, with our help, can choose any
[14] one – I mean, made a decision on each one of
[15] the five different factors involved in crafting
[16] the option that they entered into.
[17]     So the first one, underlying market or
[18] index, that is they could have done an S & P
[19] option, they could have done a NASDAQ option,
[20] they could have done an interest rate movement
[21] option, they could have done a foreign currency
[22] option, they could have done dollar to a
[23] particular foreign currency like the Japanese
[24] yen, or they could have done dollar to the U.K.
[25] pound, or they could have done U.K. pound to the

**Page 294**

[1]                              **J. Haber**

[2] Japanese yen. They had virtually a limitless
[3] amount of decisions to make in terms of just the
[4] choice of the market or the index.
[5]     Similarly, the next one was the
[6] direction of market, did they believe the market
[7] was going to go up, did they believe the market
[8] was going to go down, did they believe interest
[9] rates would go up or did they believe interest
[10] rates would go down. So that was, again,
[11] another choice that an investor would make.
[12]     Investment time horizon, were they
[13] going to enter into an option that was for 30
[14] day or three years or anywhere in between.
[15]     So, again, these were custom-made
[16] options, and each one of these five variables
[17] were ones in which clients made a decision on
[18] relative to their investment.
[19]     **Q:** And the choice of any specific type of
[20] option wouldn't influence the implementation of
[21] the transaction; is that correct?
[22]     **A:** Well, the generic implementation it
[23] wouldn't because it worked the same irrespective
[24] of the type of option they entered into.
[25]     But, again, each client made a personal

**Page 295**

[1]                              **J. Haber**

[2] decisions because it was an investment that they
[3] were making.
[4]     **Q:** Could we look at Bates Number 12, the
[5] investment in LLC. And this Part Number 4,
[6] investment in LLC.
[7]     The first refers to common interest and
[8] preferred interest?
[9]     **A:** Yes.
[10]     **Q:** Why would the LLC use different types
[11] of interest?
[12]     **A:** Same reason why a company would have
[13] common stock or preferred stock. There are
[14] different types of returns and investment
[15] criteria for each class of interest.
[16]     **Q:** Did you have any FDIS transactions
[17] where instead of preferred interest you used
[18] borrowed funds?
[19]     **A:** Not that I am aware of.
[20]     **Q:** Could you look at Bates Number 15, Part
[21] Number 5?
[22]     **A:** Section Number 5, okay.
[23]     **Q:** Section Number 5, investor's option to
[24] purchase additional common. And further,
[25] Section Number 6, investor's conversion option.

**Page 296**

[1]                              **J. Haber**

[2]     Are those options offered to investors
[3] as alternatives?
[4]     **A:** Well, it's incorporated into the
[5] operating agreement of every LLC, just like
[6] there would be any other purchase agreement, you
[7] have a right to purchase interest from
[8] co-partners. So we believe that the operating
[9] agreement was pretty much standard in any other
[10] partnership.
[11]     **Q:** Did I understand you in a correct way
[12] that in the cooperative agreement both options
[13] were included as separate provisions?
[14]     **A:** They were terms in the operating
[15] agreement, correct.
[16]     **Q:** What were the advantages and
[17] disadvantages of those two options, from the
[18] investor's point of view?
[19]     **A:** Well, I mean, I think both of them
[20] involved the acquisition of additional common
[21] interest in this LLC, so to the extent the
[22] preferred interest paid them a return, it paid
[23] them a fixed return. I forget, but I think it
[24] may have been eight percent.
[25]     To the extent that they wanted to enjoy

8IRS0078

Page 297

[1]                          J. Haber
[2] the benefits of a return that was greater than
[3] eight percent with the potential detriment of
[4] having losses, they would convert their
[5] preferred interest or acquire common interests
[6] in order to increase their common interest
[7] percentage.
[8]     Q: Comparing an options, conversion option
[9] or the investor's option to purchase additional
[10] common, what were the advantages and
[11] disadvantages for investors to choose one of
[12] them?
[13]     A: Well, I guess the advantage of the
[14] conversion option is that – well, the
[15] distinction is that under the one that is
[16] described in Bates Stamp Number 15, they have to
[17] go out of pocket and purchase a common interest
[18] from the co-investor.
[19]     Now, that would make sense if they
[20] thought that the value of co-investor's
[21] position, that they were going to get a good
[22] value for it in their purchase. They could
[23] convert their preferred interest without paying
[24] any more for common interest, just converting
[25] their preferred interest. So to the extent that

Page 298

[1]                          J. Haber
[2] they wanted to convert preferred interest, they
[3] could have done that. Or if they wanted to
[4] acquire a new common interest by buying them,
[5] they could have done the first alternative.
[6]     MS. MISSRY: Can we have a minute,
[7] please?
[8]     (Discussion held off the record.)
[9]     MS. KOZOULINA: Let's go back on the
[10] record.
[11]     Q: Just some follow-up questions with
[12] regard to Exhibit Number I.
[13]     Why did DGI create such a PowerPoint
[14] presentation?
[15]     A: Again, to the best of my recollection,
[16] it was in order to describe a proposed
[17] transaction to referral sources.
[18]     Q: Who would be presented with such
[19] PowerPoint presentations?
[20]     A: Only – to the best of my recollection,
[21] only the referral sources that we have
[22] previously identified.
[23]     Q: Did DGI create documents similar to
[24] this PowerPoint presentation with respect to
[25] other types of transactions?

Page 299

[1]                          J. Haber
[2]     A: It may have done so for OPS
[3] transactions. I don't recall it did it for any
[4] other transactions.
[5]     Q: Did DGI retain such OPS related
[6] PowerPoint presentations in DGI's files?
[7]     A: I don't recall.
[8]     Q: How were such PowerPoint presentations
[9] relating to OPS transactions used?
[10]     A: Again, I believe if they were used they
[11] would have been used solely for introduction to
[12] referral sources.
[13]     Q: Did DGI provide any documents similar
[14] to this PowerPoint presentation with respect to
[15] other transactions in response to the summonses?
[16]     A: I am not sure if they ever existed.
[17] Certainly whatever we delivered if they met a
[18] category of transactions that we felt fell
[19] within the definition set forth in the
[20] summonses, but I don't recall if they ever
[21] existed or if they did even if we retained them.
[22]     Q: Were copies of the document similar to
[23] Exhibit Number 1 given to investors?
[24]     A: Again, not that I can recall. It is
[25] possible that it was given by somebody else

Page 300

[1]                          J. Haber
[2] other than myself, but I don't recall it.
[3]     Q: What type of fee did DGI receive from
[4] the Safe Skin transaction?
[5]     A: I mean, as I recall, we received both a
[6] cash fee and certain non-qualified options that
[7] turned out to be worthless, but I don't remember
[8] the amount of the cash fee.
[9]     Q: What was this fee paid for to DGI?
[10]     A: For helping them effectuate the
[11] transaction.
[12]     Q: What type of fee did DGI receive with
[13] respect to transactions involving Aqua Source
[14] LLC?
[15]     A: It wasn't involving Aqua Source LLC.
[16] It was involving Aqua Source which was the name
[17] of a corporation. And I don't recall.
[18]     If we did receive a fee, it would have
[19] been in the form of a cash fee because that's
[20] the only way we received fees. But I don't
[21] recall if one was paid, how it was paid and how
[22] much.
[23]     Q: Was Aqua Source LLC involved in this
[24] transaction?
[25]     A: No, I don't believe that is the name of

8IRS0079

Page 301

[1]                         *J. Haber*
[2] the LLC that was involved.
[3]    **Q:** What was the name of the LLC?
[4]    **A:** I think it was Water Acquisition LLC,
[5] if I remember correctly.
[6]    **Q:** What was the role of this LLC in this
[7] transaction?
[8]    **A:** It was to acquire an asset and
[9] therefore that asset subject to debt to Aqua
[10] Source.
[11]    **Q:** What was DGI's role in the transaction
[12] involving Aqua Source?
[13]    **A:** We acted as manager of that LLC, and as
[14] manager of that LLC we effectuated both the
[15] acquisition of the asset and bank borrowing and
[16] the 351 transfer.
[17]    **Q:** Who were the members of Aqua Source,
[18] LLC?
[19]    **A:** Water Acquisition LLC, I believe the
[20] member was the Skull Valley Goshutes tribe.
[21]    **Q:** Previously you mentioned that you
[22] didn't recall, or I don't remember your answer
[23] but please maybe answer again, that DGI – was
[24] DGI involved in any other, other than Starlike
[25] Properties, transactions involving this tribe?

Page 302

[1]                         *J. Haber*
[2]    **A:** I'm sorry, could you repeat the
[3] question? I am not sure I understood the
[4] question.
[5]    **Q:** Disregard that question.
[6] Was the owner of Aqua Source LLC tax
[7] insensitive?
[8]    **A:** You mean Water Acquisition LLC?
[9]    **Q:** Water Acquisition LLC.
[10]    **A:** Yes. It was Skull Valley Goshutes
[11] tribe, as I previously responded.
[12]    **Q:** With regard to the Starlike
[13] transaction, DGI Acquisition Star LLC acquired
[14] Starlike Properties. Who participated in – who
[15] received the gains of this transaction?
[16]    **A:** Which gains are you referring to?
[17]    **Q:** Of this acquisition transaction.
[18]    **A:** I am not sure I understand your
[19] question.
[20]    **MR. TAYLOR:** Mr. Haber, if the answer
[21] is there were no gains with respect to her
[22] question, then that's the answer.
[23]    You don't understand what she is
[24] asking?
[25]    **THE WITNESS:** I previously testified

Page 303

[1]                         *J. Haber*
[2] there was money that was made because the value
[3] of the assets at the end of the day were in
[4] excess of the purchase price. I don't recall
[5] exactly how much of this flowed through to
[6] Diversified Acquisition Star or its member.
[7]    I think that's consistent with prior
[8] testimony. I don't know if she is allowing for
[9] those gains.
[10]    **MR. TAYLOR:** You don't know when she
[11] uses the word "gain" what she is talking about?
[12]    **THE WITNESS:** Correct.
[13]    **MR. TAYLOR:** Let's try again because I
[14] don't understand it either.
[15]    **Q:** You mentioned previously that the tribe
[16] made money on this Acquisition transaction.
[17]    Did any other entity or party involved
[18] in this transaction receive any economic
[19] benefits of this transaction?
[20]    **A:** I don't recall, there may have been.
[21] Certainly what comes to mind, the law
[22] firm paper transaction, they got paid for fees.
[23] That does count as an economic benefit to some
[24] law firms. Certainly a bank got paid a fee for
[25] bringing financing on a transaction. I don't

Page 304

[1]                         *J. Haber*
[2] recall who may have else received a fee.
[3]    **MS. KOZOULINA:** I think at this point
[4] we will break for lunch:
[5]    (Lunch recess was taken.)
[6]    **MS. KOZOULINA:** Could we please start
[7] back on the record?
[8]    **MS. MISSRY:** I provided, pursuant to
[9] Mr. Taylor's request, copies of Pages 1 and 7 of
[10] the confidentiality agreement.
[11]    **MR. TAYLOR:** Thank you.
[12]    (A summary of a transaction involving
[13] Chadgis Peak Investment LLC was marked as
[14] Exhibit 12 for identification only, as of this
[15] date.)
[16]    **CONTINUED EXAMINATION**
[17]    **BY MS. KOZOULINA:**
[18]    **Q:** I will continue with asking a number of
[19] questions with regard to the financial
[20] derivatives investment strategy, but I will ask
[21] Ted to give you Exhibit Number 12, which is a
[22] summary of the transaction involving Chadgis,
[23] C-H-A-D-G-I-S, Peak Investments LLC. The table
[24] of contents is on the right upper corner of this
[25] document and this document is marked as Exhibit

8IRS0080

Page 305

[1]                          J. Haber

[2] 12.

[3]      Mr. Haber, could you please look at
[4] this executive summary and turn to Item 8 on
[5] Page 3? If you want, you could read for
[6] yourself this Item 8.

[7]      A: I familiarized myself with the
[8] paragraph.

[9]      Q: What is the significance of acquiring a
[10] new type of option at this stage of the
[11] transaction? Options which is named "Complex
[12] Multi Variant," is it?

[13]      A: Variant, I think is good as any.

[14]      Q: "Complex Multi Variant Option
[15] Instrument"?

[16]      A: I am not sure I understand the point of
[17] the question that you are asking.

[18]      Q: How specific is this option compared to
[19] previous options used in this transaction?

[20]      A: What do you mean by "specific?" I'm
[21] sorry.

[22]      Q: Could you describe how this Complex
[23] Multi Variant Option Instrument works?

[24]      A: I think it is described here in this
[25] paragraph that essentially, this LLC purchased

Page 306

[1]                          J. Haber

[2] an option for $10,905,556. At the time it
[3] purchased it, the Japanese Euro stop price, that
[4] is the exchange rate between a Japanese yen and
[5] a Euro, which I think it means that it takes
[6] 108.28 yen to buy one Euro. And it would – I
[7] don't think that it says here what the term of
[8] the option - oh, 64 days from November 8th was
[9] the term of the option.

[10]      What it says is that the terms of this
[11] option, the pay-off would be either the
[12] partnership LLC or investment as defined here
[13] would receive $29,593,852. And it would receive
[14] that if the Japanese Euro price was less than or
[15] equal to 110.50 Japanese yen to Euro. So that
[16] means that the Euro would increase in value by a
[17] little over two yen, 2.22 yen to be exact,
[18] within 64 days. And if that happened, this
[19] option would pay to investments $29,593,852.

[20]      Now, if the Japanese yen Euro at the
[21] end of 64 days was equal to or greater than
[22] 113.64, then it would owe $151,610,644.

[23]      Q: The last sentence in this Item 8, could
[24] you read, please, and just explain this last
[25] sentence?

Page 307

[1]                          J. Haber

[2]      A: I think the sentence speaks for itself.
[3] The way options – the way – and I don't want
[4] to sound like – I don't want to pass myself off
[5] as a securities expert or an options expert
[6] because I am not. But it is my understanding if
[7] you want to trade a security or options with an
[8] institution, you enter into an ISDA agreement
[9] which I think is a standard, formalized
[10] agreement that has been worked out with, I think
[11] it is the International Association of Dealers
[12] or something like that. That's what ISDA stands
[13] for.

[14]      And all this sentence says is that this
[15] new option that was entered into was entered
[16] into pursuant to a new ISDA agreement as opposed
[17] to the ISDA agreement that was in place at the
[18] time.

[19]      Q: So why was this type of option was used
[20] in the transaction at this stage of the
[21] transaction?

[22]      A: From an investment perspective an
[23] option was entered into to hedge the positions
[24] that the partnership already owned. And that
[25] was what this option did. And because it

Page 308

[1]                          J. Haber

[2] had an exposure to a position below a certain
[3] price or it stood to receive money above a
[4] certain price, that's why this particular option
[5] would have been entered into.

[6]      Q: Could you please look at Item 11?
[7] How is it determined which options are
[8] terminated on December 28, 2001?

[9]      A: I don't have the summaries with the
[10] rest of the books here with me, but I am
[11] assuming, based on the way this is described,
[12] and I could be wrong, that they terminated
[13] pursuant to their terms. That the actual term
[14] of the option, that they expired on December
[15] 28th.

[16]      Q: Does Chadgis Peak Investment LLC that
[17] was involved in this FDIS transaction still
[18] exist?

[19]      A: I have no idea.

[20]      Q: Is the co-investor that was involved in
[21] FDIS transactions always a foreign citizen?

[22]      A: Define the "core investor."

[23]      MR. CRISCIONE: Co-investor.

[24]      THE WITNESS: I'm sorry, I didn't
[25] understand co-investor.

8IRS0081

Page 309

[1]                          J. Haber

[2]    A: In the transactions -- if you are

[3]    defining co-investor as it is defined in

[4]    Paragraph 3, I believe that the only

[5]    co-investors were Sam Mahoney or Martin Hawkes.

[6]    Q: Speaking not about this particular FDIS

[7]    transaction but generically, is the co-investor

[8]    in FDIS transactions always a foreign citizen?

[9]    A: In transactions that were effectuated

[10]    by DGI that have the same basic general strategy

[11]    as this, the co-investors were either Sam

[12]    Mahoney or Martin Hawkes, which I previously

[13]    testified as being both Irish citizens.

[14]    I hope that answers your question.

[15]    Q: What was the role of DGI as a manager

[16]    in the FDIS transactions?

[17]    A: Well, it helped facilitate the entire

[18]    transaction. It put together closing books, it

[19]    was responsible for producing this summary. I

[20]    think it acted as a tax matter partner for the

[21]    LLC. The role that I described pretty clearly

[22]    yesterday.

[23]    Q: What was the role of Alpha Consultants

[24]    LLC in FDIS transactions?

[25]    A: Again, I think I described the role

Page 310

[1]                          J. Haber

[2]    yesterday, but they acted as a member of the

[3]    partnership, of the LLC, that made an actual

[4]    investments, received back a preferred interest

[5]    for that investment, and they were responsible

[6]    for administering the trading activities of the

[7]    LLC.

[8]    Q: Please describe the ownership of Alpha

[9]    Consultants LLC.

[10]    A: I don't know the ownership.

[11]    Q: Does DGI own any interest in Alpha

[12]    Consultants?

[13]    A: It does not.

[14]    Q: Did Mr. Hawkes or Mr. Mahoney, as

[15]    co-investors, ever receive losses from

[16]    participation in FDIS transactions?

[17]    A: I mean, I cannot tell you that I have

[18]    looked at all the K-1s that were produced by

[19]    each one of the partnerships, so, therefore, I

[20]    cannot answer that question without having done

[21]    so, if I understood your question correctly.

[22]    Q: Why is it that in some FDIS

[23]    transactions the manager is Helios and in others

[24]    DGI?

[25]    A: If it was a transaction that was

Page 311

[1]                          J. Haber

[2]    referred it us either by Helios or parties to

[3]    which Helios had a relationship, then they would

[4]    be the manager of that entity.

[5]    Q: You previously mentioned that referral

[6]    sources for FDIS transactions to DGI were BDO,

[7]    Grant Thornton or McGladrey.

[8]    What did you mean in your previous

[9]    statement that Helios referred some clients to

[10]    DGI?

[11]    A: I think I testified yesterday when --

[12]    I'm sorry, I don't know Ted's last name, but

[13]    when Ted walked me through the privilege log

[14]    documents and we came across Mr. Kemp from Maas

[15]    Henn, and he asked me at that time who is

[16]    Helios. And I think I referred to them as a

[17]    referral source as well, similar to Steve Jacobi

[18]    or John Roth.

[19]    Q: Did you execute the designation

[20]    agreement with either of the referral sources

[21]    for the FDIS transaction?

[22]    A: With which referral sources, I'm sorry?

[23]    Q: So far you mentioned such referral

[24]    sources as BDO, Grant Thornton, McGladrey and

[25]    Helios.

Page 312

[1]                          J. Haber

[2]    A: Correct, and Mr. Jacobi and Mr. Roth.

[3]    Q: So did DGI execute any designation

[4]    agreements with each of those sources?

[5]    A: I have to check my records.

[6]    Obviously, I know of the ones with RSM

[7]    McGladrey, the one with Grant Thornton. I would

[8]    have to check my records to see if we executed

[9]    any other designation agreements. I don't

[10]    recall.

[11]    Q: Can an FDIS transaction be effectuated

[12]    for corporate clients as well as individual

[13]    clients?

[14]    A: I don't see why there would be any

[15]    restrictions on a corporation to do it.

[16]    Q: Do you recall any specific FDIS

[17]    transactions that were effectuated for corporate

[18]    clients?

[19]    A: I believe that I turned over every

[20]    transaction that Diversified effectuated for

[21]    what you are calling the FDIS transactions, so I

[22]    don't recall specifically if any investors were

[23]    corporations. I don't believe so, but it is

[24]    possible.

[25]    Q: When was the first FDIS transaction

8IRS0082

Page 313

J. Haber

[2] effectuated by DGI?

[3]     A: Sometime in the year 2001.

[4]     Q: When was the last FDIS transaction

[5] effectuated by DGI?

[6]     A: I believe, and I could be wrong, that

[7] it was sometime in the year 2001 as well.

[8]     Q: Does it mean that all FDIS transactions

[9] were completed within the year 2001?

[10]     A: I don't understand what you mean by

[11] "completed." All these partnerships, to the

[12] best of my knowledge, still exist so I am not

[13] sure what you mean by "completed."

[14]     Q: Why did DGI stop offering FDIS

[15] transactions to its clients, to any clients?

[16]     A: I think there are a number of factors

[17] relating to why it stopped offering, none of

[18] which relate to DGI's thoughts about the

[19] structure of the transaction.

[20]     Now, if a client wanted to do a

[21] transaction, you know, in the year 2002, we may

[22] have considered doing one with them, but DGI, as

[23] I said earlier or yesterday at some point in

[24] time, the market conditions seemed as though

[25] that it is less likely that the market had

Page 314

J. Haber

[2] appeal or the transaction.

[3]     Q: How would gains from FDIS transactions

[4] be distributed to Mr. Hawkes or Mr. Mahoney?

[5]     A: Well, all profits and losses were

[6] allocated pursuant to the common interest

[7] ownerships so whatever percentage owned of the

[8] common interest any one of the members had, the

[9] gains and losses were allocated pursuant to

[10] those percentages.

[11]     Q: How would the payments be made to

[12] co-investors, to Mr. Hawkes and Mr. Mahoney?

[13]     A: You mean distributions? Is that what

[14] you mean by "payments?"

[15]     Q: Yes.

[16]     A: Distributions were made at their

[17] direction. If there was a distribution owed to

[18] them, then the money would be wired to them.

[19]     Q: In response to the summonses, did DGI

[20] provide any documents evidencing the payments of

[21] gains to Mr. Hawkes and Mr. Mahoney?

[22]     A: I am not sure I understand your

[23] question, but DGI produced all documents it had

[24] in its possession regarding those transactions.

[25]     Q: In those closing books, which were

Page 315

J. Haber

[2] produced by DGI, I don't recall seeing any wire

[3] transfer of funds to co-investors or any similar

[4] type of document.

[5]     Does DGI have any documents evidencing

[6] such type of payments?

[7]     A: I don't know. I would have to – I

[8] don't know.

[9]     I mean, the partnership may have

[10] records of wire instructions to make

[11] distributions to either the co-investor or any

[12] other members of the partnership. Off the top

[13] of my head, I don't recall as to whether or not

[14] after those transfers are executed if we retain

[15] copies of those instructions.

[16]     Q: Where would the documents and records

[17] of the partnerships or LLCs, as I understand, be

[18] stored or retained?

[19]     A: If they were retained, they would be in

[20] the offices of Diversified. But if they weren't

[21] retained, they weren't retained.

[22]     The institution that wired the money

[23] may have it available.

[24]     Q: Was the strategy, FDIS strategy,

[25] designed so co-investors would always receive

Page 316

J. Haber

[2] distribution of gains?

[3]     A: I would guess based on the way you

[4] asked that question, the answer would be no.

[5]     Q: Were the gains that were allocated to

[6] co-investors distributed to them?

[7]     A: I am not clear as to what you mean by

[8] "gains."

[9]     Q: If you will look at Page 2 of Exhibit

[10] Number 12, Item 7. As I understand, on November

[11] 8, 2001, investments, LLC terminated the trade

[12] recognizing gain and loss as follows, and the

[13] total number indicates that those were gains.

[14]     So according to the interest of the

[15] numbers of LLC, the share of those gains was

[16] distributed – the question was allocated gains,

[17] were they distributed to co-investors?

[18]     A: Were allocated gains – no, the

[19] proceeds of any gains would have been reinvested

[20] inside the partnership, as is shown in Paragraph

[21] 8.

[22]     Q: So they were never distributed –

[23]     A: No, correct.

[24]     Q: – to co-investors?

[25]     A: Correct.

8IRS0083

Page 317

[1]                    J. Haber
[2] They were reinvested similarly to the
[3] way it is described in Paragraph 8.
[4]      Q: Did you register the FDIS transaction?
[5]      A: No, we did not.
[6]      Q: Why is this?
[7]      A: Both based on our own internal analysis
[8] and advice of counsel, we felt it did not meet
[9] requirements necessary to lead to a tax shelter
[10] registration.
[11]      Q: Do you know anyone from your clients or
[12] any parties involved in this transaction that
[13] registered FDIS transactions?
[14]      A: I am not aware of anybody who has.
[15]      Q: In response to the summonses, did you
[16] provide all documents relevant to FDIS
[17] transactions?
[18]      A: We believe we did. All documents that
[19] were called for in the summonses.
[20]      Q: What summons are the FDIS documents
[21] responsive to?
[22]      A: I believe it was responsive to the
[23] summons that's entitled "Potential Tax Shelter
[24] Transaction Tax Under 60-11C."
[25]      Q: Could you explain why you decided that

Page 318

[1]                    J. Haber
[2] FDIS transactions may be described by this
[3] summons?
[4]      A: I read the definition under
[5] transactions and I believe that the
[6] characteristics of that transaction met the
[7] description here.
[8]      Q: In designing the FDIS transaction, did
[9] DGI consider the tax shelter statutes that
[10] existed at that time, 61-11C and 61-11D?
[11]      A: I believe that DGI considered all
[12] relevant Internal Revenue Code statute and
[13] regulations.
[14]      Q: Did you think that those statutes are
[15] not relevant to FDIS transactions?
[16]      A: I think they are absolutely relevant,
[17] but I don't think that they are covered by them.
[18]      Q: Did you consider Notice 2002-50 and its
[19] application to the FDIS transactions?
[20]      A: I think that that notice would have
[21] been issued subsequent to us marketing any of
[22] those transactions. You said it was Notice
[23] 2002 –
[24]      Q: 2002-50?
[25]      A: I believe my prior testimony – I

Page 319

[1]                    J. Haber
[2] believe, and I could be mistaken, that we only
[3] effectuated transactions in the year 2001.
[4]      Q: Did you consider Notice 2002-50 and its
[5] application to FDIS transactions?
[6]      A: I don't know how to answer that
[7] question.
[8]      I just said that we only marketed it in
[9] the year 2001 and you are asking about a Notice
[10] that was issued in the year 2002.
[11]      MR. TAYLOR: Mr. Haber, did you
[12] consider in 2001 a notice issued by the IRS in
[13] 2002?
[14]      THE WITNESS: No, I did not.
[15]      Q: Did you consider Notice 2002-65 and its
[16] application to the FDIS transaction?
[17]      MR. TAYLOR: 65?
[18]      MS. KOZOULINA: 2002-65.
[19]      A: I can't tell you off the top of my head
[20] what Notice that is, so I wouldn't know if I
[21] considered it.
[22]      Q: Did you advise your clients to file a
[23] corporate disclosure statement under Regulation
[24] 60-11-14 with regard to an FDIS transaction that
[25] was implemented for those clients?

Page 320

[1]                    J. Haber
[2]      A: No.
[3]      Q: Did you ever request a ruling from the
[4] IRS on whether the FDIS transaction is a
[5] corporate tax shelter?
[6]      A: No.
[7]      Q: Did DGI prepare any federal income tax
[8] returns for the clients implementing the FDIS
[9] transaction –
[10]      A: No.
[11]      Q: Or for the entities that participated
[12] in this transaction?
[13]      A: Well, to the extent we prepared the
[14] Diversified Group tax returns and we
[15] participated in the transaction.
[16]      Q: What about other entities involved in
[17] the FDIS transaction?
[18]      A: Well, the LLCs, the investment
[19] partnerships, we aided the accounting firm in
[20] the preparation of those tax returns, but that's
[21] it.
[22]      Q: What is the name of this accounting
[23] firm?
[24]      A: I testified yesterday that it was Grant
[25] Thornton.

8IRS0084

Page 321

[1]                    J. Haber
[2]    MS. KOZOULINA: Okay, thank you.
[3]    MS. MISSRY: I believe that Sandy
[4] Criscione, the Financial Products Specialist,
[5] has some questions.
[6]            EXAMINATION
[7]        BY MR. CRISCIONE:
[8]    Q: I just have some questions about some
[9] documents that I have been looking through.
[10]    I have been looking through, beginning
[11] with Box 15 through 18 so far, and I guess I
[12] would like to get some of your comments on the
[13] structure and the document that Anna just gave
[14] us. Exhibit 12 does a fairly good job of
[15] showing that basic structure where you have
[16] trading entity, you have an investor and then
[17] you have an entity called Investments. And also
[18] there may be co-investors defined in that area.
[19]    I guess my question is, in the
[20] distribution of gains and losses to, let's say,
[21] the co-investor, what entity does the gain,
[22] then, come from or where would it be
[23] distributed, out of trading or out of
[24] Investments?
[25]    A: Trading is a single member LLC, so that

Page 322

[1]                    J. Haber
[2] would not be a partnership. For U.S. tax
[3] purposes, it is considered a transparency being
[4] single member LLC. Investments is a partnership
[5] because it has multiple members.
[6]    Q: So investments is showing the gain
[7] legs?
[8]    A: Investments are recognizing gains
[9] pursuant to Paragraph 7, which is what Anna
[10] pointed out before.
[11]    Q: Which may be distributed to Mr. Mahoney
[12] or Mr. Hawkes?
[13]    A: No. I think I previously testified
[14] that it was not distributed, but, rather, it was
[15] reinvested in investments pursuant to Paragraph
[16] 8.
[17]    Q: But the gains would be allocated from
[18] investments to Mr. Mahoney or co-investors?
[19]    A: The gains would be allocated to whoever
[20] owned the common interest at that time. And it
[21] would be allocated pro rata to their common
[22] interest.
[23]    Q: Through investments?
[24]    A: Investments is the only partnership
[25] here, and it allocated on investments tax return

Page 323

[1]                    J. Haber
[2] pursuant to the ownership of who owned the
[3] common interest.
[4]    Q: If we look within that same Exhibit 12,
[5] if we go to Item 11, we see losses.
[6]    Now, the losses are distributed to U.S.
[7] persons or companies?
[8]    A: I think you mean are allocated, and
[9] they would be allocated pursuant to who owned
[10] the common interest at that time.
[11]    Q: They're typically U.S. investors.
[12]    A: They owned some common interests.
[13] Martin Hawkes, Sam Mahoney owned some common
[14] interests.
[15]    So, again, it is my understanding of
[16] the partnership tax rules and, again, I am not
[17] trying to pass myself off as being expert, is
[18] that gains and losses get allocated on a daily
[19] basis under the partnership tax rules. So
[20] whoever owned the common interest on the date
[21] that gains occurred, those gains would be
[22] allocated to owners of the common interest at
[23] that time.
[24]    Similarly, if losses were incurred,
[25] they would get allocated to the members that

Page 324

[1]                    J. Haber
[2] owned common interests at that time.
[3]    Q: I guess a couple of questions on Alpha
[4] Consultants.
[5]    Would their evaluation be based on, I
[6] think you mentioned the Black Scholls Model? Is
[7] it a basic Black Scholls or a proprietary?
[8]    A: I think it is a basic Black Scholls --
[9] I didn't know there was a proprietary Black
[10] Schools, but I think it is a basic Black
[11] Scholls' calculation.
[12]    If you remember from the closing books,
[13] you have the daily values, all of the inputs
[14] necessary to achieve the value are part of that
[15] daily value summary. It gives you all of the
[16] inputs.
[17]    Q: Does DGI have any ownership in Alpha?
[18]    A: No.
[19]    Q: Would Alpha also provide services to
[20] other companies other than DGI?
[21]    A: I don't know, you would have to ask
[22] them.
[23]    Q: Are they U.S. based?
[24]    A: Yes, they are.
[25]    Q: Where are they located?

8IRS0085

**Page 325**

[1]                    J. Haber
[2]    A: In West Palm Beach, Florida.
[3]    Q: Does any entity related to DGI have any
[4] interest in Alpha?
[5]    A: No.
[6]    Q: You mentioned entities with high basis
[7] assets. The high basis would be in which
[8] entity?
[9]    Let's say, if we were looking at
[10] Exhibit 12, would that be in the investment's
[11] vehicle?
[12]    A: Please refresh my memory in terms of
[13] what context we were discussing assets that have
[14] high basis?
[15]    Q: I think early on yesterday you
[16] mentioned that there were transfers in carry-
[17] overs with built in loss assets?
[18]    A: Built in loss assets, right. I don't
[19] think that relates to transactions in Exhibit 12
[20] at all.
[21]    Q: I would like to get a little bit of a
[22] clearer understanding of a Complex Multi Variant
[23] Option and how that is used.
[24]    Let's say you have the calls and the
[25] inputs originally placed, okay? The market

**Page 326**

[1]                    J. Haber
[2] moves, gains and losses are created within those
[3] options. At what point does, let's say, the
[4] gain get allocated to the investor?
[5]    There is a trigger where they change
[6] their interest or they say I want to exchange
[7] this common interest for preferred, does that
[8] trigger the event where a gain would get
[9] allocated?
[10]    A: I am not sure I understand your
[11] question.
[12]    The option trading was the option
[13] trading. That's what happened inside the
[14] partnership. Economically there were options
[15] purchased and options that were sold and options
[16] that were purchased again. That resulted in
[17] various gains and losses. Depending on who
[18] owned common interest at the time of each event,
[19] that's how it would get allocated.
[20]    I am not sure that answers your
[21] question, but that's how I understood it.
[22]    Q: At that point, when that gain gets
[23] allocated another option may come up –
[24]    A: If you follow this particular
[25] transaction, on November 8th investments

**Page 327**

[1]                    J. Haber
[2] terminated two options and recognized a gain of
[3] $11,189,000. It received proceeds, if you look
[4] at that, of $10,898,572.
[5]    Do you see that?
[6]    Q: Yes.
[7]    A: So on Number 8, also on November 8th,
[8] it purchased a new option, the CMBO. And it
[9] paid for it partially from the proceeds it
[10] received, which was the 10,898,572, and it paid
[11] additional money of $6,984, and it purchased a
[12] new option. And the purchase price of that new
[13] option was 10,905,556.
[14]    Q: Why would they purchase another option?
[15] There was a transaction, there was a gain
[16] generated, why then from the proceeds would you
[17] need to generate –
[18]    A: Well, it could not have purchased.
[19]    MR. TAYLOR: I don't think he
[20] finished.
[21]    A: I'm sorry.
[22]    Q: Why then would another option be put
[23] on?
[24]    A: You could not have put on. Obviously,
[25] the partnership could have chosen not to put on

**Page 328**

[1]                    J. Haber
[2] another option but then it would have been left
[3] totally unhedged as to other options.
[4]    Q: So you are using it as hedge. You
[5] still have open positions and so now with the
[6] open positions, we now have losses generated.
[7] Down the line we see predominately losses are
[8] generated, net losses?
[9]    A: That's apparent in Paragraph 11 of the
[10] summary.
[11]    Q: In my review of the documents in Boxes
[12] 15 through 18, I noticed open positions
[13] remaining that are not on this attachment. I
[14] didn't bring the copies with me today.
[15]    The open positions of any options that
[16] were not closed, who reports those?
[17]    A: They are still owned by the
[18] partnership. It is like you own stock, it's an
[19] open position. When you sell the stock, or if
[20] its an option when it terminates, then the owner
[21] reports what results are of that position.
[22]    In this case investments as it is
[23] defined, if it had open positions it would wait
[24] until it terminated or closed and then report
[25] the tax results of that position.

8IRS0086

Page 329

*J. Haber*

[1]
[2] **Q:** How would they be treated? If they are
[3] the FX barrier options, foreign exchange barrier
[4] options, would they be recorded under Section
[5] 988 or 1256 of the Code or do you know?
[6] **A:** No, I think that the partnership has
[7] taken a tax position that any foreign currency
[8] options would be treated pursuant to 988. And
[9] if they were non-foreign currency, they would be
[10] capital in nature and would be reported on
[11] Schedule D, I guess.
[12] **Q:** Capital would be the character. How
[13] would it be recognized?
[14] Would it be recognized on a marked to
[15] market basis or closed and completed?
[16] **A:** The partnership all took the position
[17] that these options were not marked to market.
[18] **MR. CRISCIONE:** I don't have any more
[19] at this point.
[20] **MS. MISSRY:** Any final housekeeping
[21] matters?
[22] **MR. TAYLOR:** Let's see, you got me the
[23] confidentiality agreement Pages 1 and 7.
[24] And I am going to check back with you
[25] directly, Michelle, about whatever order I can

Page 330

*J. Haber*

[1]
[2] find. And Ted got me an old fashioned copy of
[3] everyone's information so I can get that going.
[4] The only thing I guess that I want to
[5] make sure of is, it looks like Exhibits 3, 4, 5
[6] and 9 and 10 are disclosure statements filed
[7] pursuant to the announcement. I am considering
[8] contacting those folks just so I can find out
[9] more. I assume I am not going to cause an
[10] uproar. I assume they consented to you all
[11] disclosing that to us; otherwise, it would be
[12] 6103 type stuff, I am not going create a fire
[13] storm, these people aren't going to be surprised
[14] if I call them up –
[15] **MS. MISSRY:** We look into 6103 to see
[16] if there are possible 6103 ramifications and we
[17] have been advised that there are none.
[18] **MR. LEIGHTON:** We have not contacted
[19] those individuals and specifically told them
[20] that we were going to disclose them to you all.
[21] But as Michelle says, we have been advised that
[22] 6103-wise, there was no problem in disclosing
[23] those to you.
[24] **MR. TAYLOR:** But if I contact them, it
[25] is going to be surprise to them.

Page 331

*J. Haber*

[1]
[2] **MR. LEIGHTON:** That's correct.
[3] **MS. MISSRY:** Not necessarily.
[4] **MR. LEIGHTON:** They don't know they
[5] were used in this fashion ,but if you feel that
[6] is appropriate, go ahead and do it.
[7] **MR. TAYLOR:** I am going to think about
[8] it. I don't know what Mr. Haber will tell me to
[9] do or not to do, but I just wanted to make sure
[10] I knew what had gone on so I don't walk into a
[11] problem.
[12] **MS. MISSRY:** In addition, Mr. Haber
[13] testified, I believe, with respect to
[14] individuals, that he had been contacted after
[15] the fact by KPMG and informed that these
[16] disclosure statements were filed. So it is not
[17] going to come as a shock to those people that
[18] you inquire about them.
[19] **MR. TAYLOR:** I didn't know that was
[20] true for each one of these five but, obviously,
[21] if someone has already told you these things
[22] were filed, there won't be any problem with me
[23] calling them up and asking about it.
[24] **MS. MISSRY:** He answered the question
[25] to all individuals represented by KPMG. His

Page 332

*J. Haber*

[1]
[2] responses with respect to corporate ones were
[3] that he did not know that they were filed.
[4] **MR. TAYLOR:** Thanks for keeping track
[5] of that. I will be especially careful on the
[6] corporate ones.
[7] That is all that I've got.
[8] **MS. MISSRY:** Thank you.
[9] (Time noted: 2:30 p.m.)
[10]
[11]
[12]
[13]
[14] Subscribed and sworn to
[15] before me this day
[16] of , 2003.
[17]
[18] Notary Public
[19]
[20]
[21]
[22]
[23]
[24]
[25]

8IRS0087

Every 216:25; 217:4; 296:5; 312:19
everybody 252:21
everyone's 330:3
evidencing 314:20; 315:5
exact 306:17
Exactly 235:14; 253:17, 23; 262:3; 271:14; 282:11; 286:15; 288:7; 303:5
EXAMINATION 21 5:7; 238:23; 248:7; 252:18; 304:16; 321:6
examined 210:4
example 213:9; 226:19; 292:11, 14, 19, 20; 293:2
examples 292:23
excess 247:13; 253:22; 265:19, 25; 266:11; 303:4
Exchange 257:14; 265:23; 287:19; 288:16; 306:4; 326:6; 329:3
exchange-traded 288:13
excuse 224:18
execute 226:24; 31 1:19; 312:3
executed 211:3; 216:19; 257:18; 312:8; 315:14
executive 305:4
exempt 249:13
Exhibit 218:6, 17, 20; 219:8; 239:13; 255:17, 19, 25; 256:4, 6, 8, 24; 261:24; 262:7, 9, 9, 17; 264:4, 5; 268:19, 24; 272:22; 273:5; 274:21; 289:14, 15, 16; 290:2; 298:12; 299:23; 304:14, 21, 25; 316:9; 321:14; 323:4; 325:10, 19
Exhibits 330:5
exist 230:18, 20; 308:18; 313:12
existed 211:15; 284:20; 299:16, 21; 318:10
expect 213:21; 21 5:25
expected 219:6
expert 307:5, 5; 323:17
expired 308:14
explain 253:12, 17; 269:10; 306:24; 317:25
explained 261:3
exposure 308:2
express 215:23
extent 215:24; 216:3, 10; 296:21, 25; 297:25; 320:13
extrapolate 234:8

**F**

facilitate 309:17
facilitated 253:14
fact 220:8; 226:21;

227:24; 234:9; 243:10; 280:10; 331:15
factors 293:11, 15; 313:16
facts 211:15; 227:11; 254:23; 259:21
fairly 267:18; 321:14
falling 236:23
falls 213:4; 236:18
familiar 249:22, 24; 250:22, 25; 256:16; 264:11, 17; 265:14; 272:2; 273:8, 20; 274:4; 290:7
familiarized 290:8; 305:7
far 235:23; 265:19; 311:23; 321:11
fashion 331:5
fashioned 330:2
fax 214:19
FDIS 290:6, 21; 293:7; 295:16; 308:17, 21; 309:6, 8, 16, 24; 310:16, 22; 311:6, 21; 312:11, 16, 21, 25; 313:4, 8, 14; 314:3; 315:24; 317:4, 13, 16, 20; 318:2, 8, 15, 19; 319:5, 16, 24; 320:4, 8, 17
Fed-Ex 214:23
federal 320:7
fee 215:25; 216:9; 261:19, 20; 263:13, 17, 20, 20; 283:2; 300:3, 6, 8, 9, 12, 18, 19; 303:24; 304:2
feel 225:7; 236:15; 331:5
feeling 277:2; 279:10
feels 229:21
fees 216:10, 11; 223:25; 225:8; 300:20; 303:22
fall 241:3; 269:13, 16; 299:18
felt 235:24; 237:13; 241:3; 282:16; 299:18; 317:8
few 260:18; 278:15; 281:19
figure 230:22
file 273:10; 281:10; 282:8; 319:22
filed 216:15; 224:12; 255:22; 272:25; 330:6; 331:16, 22; 332:3
files 214:11, 14; 299:6
final 234:24; 329:20
finance 246:21
financial 218:4; 253:5; 257:23; 274:17, 23; 289:19; 290:5; 304:19; 321:4
financing 303:25
find 210:13; 214:4, 4, 11; 330:2, 8
fine 212:9; 252:17
finish 219:2
finished 327:20
fire 330:12

firm 249:4, 12; 258:18; 270:4, 7, 12; 272:8; 280:4; 284:13; 303:22; 320:19, 23
firms 269:24; 270:19; 271:13, 16, 17; 272:2; 275:5, 13; 276:10; 279:24; 284:5; 291:3; 303:24
first 211:2; 268:16; 269:12; 277:23; 278:6, 8; 285:20; 293:17; 295:7; 298:5; 312:25
firsthand 290:13
fit 253:9; 263:2
FITS 274:18
five 293:11, 15; 294:16; 331:20
fixed 296:23
flexibility 288:8
Florida 325:2
flowed 305:5
folks 330:8
follow 252:22; 326:24
follow-up 289:18; 298:11
follows 210:5; 316:12
foreign 220:16; 293:21, 23; 308:21; 309:8; 329:3, 7
Forester 270:4; 271:18
forget 277:19; 296:23
form 282:9; 300:19
formalized 307:9
forth 228:5; 299:19
forward 211:25
found 214:14
free 236:15; 284:17; 285:9
freely 287:4
Freemont 256:11
Fremont 255:14, 16; 256:17; 258:5, 8, 11, 17, 23; 259:4, 8, 10, 18, 21, 25; 260:11, 16, 21; 261:6, 9, 23; 262:14, 20; 263:8, 11, 14, 19, 24; 264:19, 21; 267:21; 269:5; 270:3, 9; 272:7
frustrated 229:4
full 275:25; 277:20, 22
funds 288:20; 295:18; 315:3
furnished 223:12
further 212:13; 295:24
FX 329:3

**G**

gain 219:12; 220:5, 8; 247:10, 11; 266:2, 5; 303:11; 316:12; 321:21; 322:6; 326:4, 8, 22; 327:2, 15
gains 219:14, 17, 19; 220:12; 254:15; 302:15, 16, 21; 303:9; 314:3, 9, 21;

316:2, 5, 8, 13, 15, 16, 18, 19; 321:20; 322:8, 17, 19; 323:18, 21, 21; 326:2, 17
gave 257:10; 268:24; 276:24; 288:4, 8; 321:13
general 219:16; 221:7; 261:9; 265:11; 269:7; 275:10; 279:10; 281:17; 291:4; 309:10
generally 221:11; 250:24; 257:3; 258:13; 267:24; 281:11, 21
generate 327:17
generated 219:14, 20; 220:12; 327:16; 328:5, 8
generic 294:22
generically 274:14; 275:2; 292:13; 309:7
gets 326:22
Gilcrest 225:15, 23; 234:15; 275:15, 23; 276:10
Given 215:3; 227:8; 239:15; 242:2; 293:4; 299:23, 25
gives 288:17; 324:15
giving 264:6
Goldwin 258:8; 264:7, 19; 265:7; 267:22
Goldwin's 264:25
good 256:5; 297:21; 305:13; 321:14
Goehutes 219:22; 240:19, 25; 242:19; 244:10, 18, 20, 23; 246:20; 301:20; 302:10
Grant 290:24; 311:7, 24; 312:7; 320:24
great 256:24
greater 297:2; 306:21
Group 242:21; 283:14; 320:14
guess 229:5; 291:18; 297:13; 316:3; 321:11, 19; 324:3; 329:11; 330:4
guessing 222:10

**H**

HABER 210:3, 20; 211:9, 16; 212:11, 13; 224:10; 226:24; 227:15; 229:21; 236:12, 13, 17; 238:25; 302:20; 305:3; 319:11; 331:8, 12
Haber's 211:8; 223:17
happen 216:7; 268:17
happened 229:18; 238:17; 306:18; 326:13
happy 211:17, 25; 255:10
hard 281:24
Hawkes 220:3, 6; 221:8, 22; 239:3, 5, 16, 20, 24; 240:9; 241:5; 242:2; 264:22; 265:6; 309:5, 12;

310:14; 314:4, 12, 21; 322:12; 323:13
head 236:11; 237:6, 12; 315:13; 319:19
hear 236:5; 252:21
hearing 275:10
heavily 263:20
hedge 307:23; 328:4
held 220:9, 13, 15; 221:11; 238:21; 272:18; 273:19; 298:8
Helios 310:23; 311:2, 3, 9, 16, 25
help 210:13; 271:20; 293:13
helped 282:22; 283:21; 309:17
helpful 227:8; 230:7
helping 300:10
Henn 311:15
hesitate 275:21
high 251:18; 325:6, 7, 14
hold 220:10; 221:9
Holdings 249:23; 250:4; 254:20, 22; 281:3
Hong 249:23; 250:3; 254:20, 24; 255:6, 12
hope 214:3; 309:14
hopeful 214:10
horizon 294:12
housekeeping 329:20

**I**

idea 215:16; 256:6; 290:16; 308:19
identical 281:15
identification 255:17; 262:7; 272:22; 304:14
identified 298:22
identify 261:22; 268:20; 283:10
identifying 235:25
immediate 242:8
immediately 241:11; 276:6
implementation 294:20, 22
implemented 319:25
implementing 320:8
important 243:11, 17
inactive 248:2, 4
inc 242:24; 254:10
inception 221:10
included 223:11; 280:17; 296:13
income 239:21; 240:16; 241:14; 243:8, 11; 247:23; 320:7
Incorporated 296:4
increase 297:6; 306:16
incurred 323:24
independent 256:14;

8IRS0088

233 N. Michigan Ave. Suite 2500 Chicago IL 60601
312-616-4693   (Fax-312-856-1318)

**BDO SEIDMAN, LLP**

# Fax

| To: | Jimmy Haber | From: | Bob Greisman |
|-----|-------------|-------|--------------|
| Fax: | 212-688-7908 | Pages: | 1 |
| Phone: |  | Date: | April 23, 2001 |
|  | 212-688-2700 |  |  |
| Re: |  | CC: |  |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

● Comments:

Jimmy:
To reconfirm our weekly conference call is at 11:30 EDT on Thursday April 26.
The call-in number is 800-851-1769 and the participant code number is 225166.
Your presentation to the group is the main event. The group will be Charlie Bee,
Larry Cohen, Randy Frisher, Joe Klausner, and Pam Packard all from New York.
Michael Kerekes and Mike Lichner are from LA. David Dimuzio is from Grand
Rapids, Bob Dudzinsky from Philadelphia, Morry Gottlieb from West Palm, Kurt
Huntzinger from Atlanta, Lorin Luchs from Washington DC, Gary Mitchell from
Denver, Randy Moorman from Houston, John Pridnia from Muskegon, Mark
Puckett from Memphis and Paul Shanbrom from Detroit. We look forward to the
call.
Bob



GOVERNMENT'S
EXHIBIT
A-53

**7 BDO 00001559**



GOVERNMENT
EXHIBIT
22

# FINANCIAL DERIVATIVES INVESTMENT STRATEGY

Presented By

THE DIVERSIFIED GROUP INCORPORATED

① Confirm that this will
NOT be left with the client
(i) if it is left... show
too much of the
structure

(ii) if not left, should
some invest most – orientes
maintain to venue.

③ we need decide about the
fee inside w/out —
& out – How do we <sub>That</sub>H

⑤ ...

GOVERNMENT
EXHIBIT
23

**CONFIDENTIAL**

BDO 000436

DGI 74501

# FINANCIAL DERIVATIVES
# INVESTMENT STRATEGY

Presented By

Helios|Financial

&

Alpha Consultants, Inc.

11 BDO 00002922

GOVERNMENT
EXHIBIT
24

GOVERNMENT
EXHIBIT
A-52

# Table of Contents

I.     Investment Strategy

II.    Sample Option Trades - Range Trades

III.   Sample Option Trades - Call Spreads or Put Spreads

IV.    Investment in LLC

V.     Overview of Helios Financial LLC

VI.    Overview of Alpha Consultants, Inc.

Helios | Financial

11 BDO 00002923

# I.    Investment Strategy

**Situation:**    An individual ("**Investor**") has certain views on the direction of the equity markets (e.g. the S&P 500 or the NASDAQ 100), or of the foreign currency markets, and wants to trade based on those views in a manner that limits downside and maximizes upside and investment leverage.

**Option Spreads: Significant Upside Potential + Limited Downside**

-    Helios Financial LLC ("**Helios**") and Alpha Consultants, Inc. ("**Alpha**") recommend the use of option spreads, i.e., the purchase of an option along with the simultaneous sale of a similar option at a different strike price, as a fundamental investment tool.

-    A trading strategy based on one or more combinations of option spreads could result in significant profit and investment leverage, with limited downside risk.

**Economic Factors Underlying the Investment Strategy** - The options underlying the investment strategy are European style, over the counter, custom made, digital options.

-    "European style" options are only exercisable at termination, as opposed to "American style" options which are exercisable at any time up to the termination date. However, European style options can be valued and traded at any time.

-    "Over the counter" options are not traded on any exchange.

    Helios Financial

11 BDO 00002924

# I.     Investment Strategy

**Economic Factors Underlying the Investment Strategy (continued)**

"Custom Made" means all the terms of the options are negotiable and determined pursuant to five different variables listed below:

- Underlying Market or Index
- Direction of the Chosen Market or Index
- Investment Time Horizon
- Probability of Profit
- Amount of Investment

A "Digital Option", also known as a "binary option", has a fixed, pre-determined payoff if a certain strike price or strike range is met at the expiration of the option, and expires worthless if the option expires "out-of-the-money".

- The market for digital options is large, with at least $97 billion of volume in 1998 alone. *Risk* May 2000.

Helios Financial

11 BDO 00002925

# I. Investment Strategy

**Flexible Investment Strategy: Five Variables to Choose From (continued)**

(1) <u>Choice of Market or Index</u>: Option spreads can be structured for certain equity indices, foreign currencies, interest rates and other exposures. The examples in Sections II and III of this presentation are based on options on the S&P 500, the NASDAQ 100, and the Japanese Yen.

(2) <u>Choice of Market Direction</u>: Option spreads can be structured to effectuate <u>bullish</u> perspectives (i.e. the chosen market or index will "go up") or bearish perspectives (i.e. the chosen market or index will "go down"). They can also be structured to effectuate a perspective that the chosen specific market or index will trade within a certain range (which in itself can be "bullish", "bearish" or "neutral"). Sections II and III illustrate a variety of these types of perspectives.

(3) <u>Choice of Investment Time Horizons</u>: Option spreads can accommodate a wide variety of investment time horizons. Sections II and III illustrate 90-Day options.

(4) <u>Choice of Probability of Profit</u>: Option spreads can be designed for desired levels of profit probability (based on the Black-Scholes option pricing model). Sections II and III illustrate scenarios where the probability of profit ranges from 15% to 40% and how such pay-offs are determined.

(5) <u>Choice of Amount of Investment</u>: The amount to be invested will be a function of investor's asset allocation strategy and comfort level with all of the foregoing variables. Sections II and III illustrate the potential returns on a $2 million investment in a variety of scenarios.

Helios Financial

11 BDO 00002926



## II.   Sample Option Trades – S&P Range Trade

**S&P 500 Range Trade Examples**
**$2,000,000 Initial Investment**

11 BDO 00002927

## II. Sample Option Trades – NDQ Range Trade



**NDQ Range Trade Examples**
**$2,000,000 Initial Investment**

Strike Range at 90-Day Expiration (Spot Today = 1663.45)

Helios:Financial

11 BDO 00002928



## II.  Sample Option Trades – YEN Range Trade

11 BDO 00002929

## III. Sample Option Trades – S&P Call Spread



S&P 500 Call Examples

Helios Financial

11 BDO 00002930

# III.    Sample Option Trades - NDQ Call Spread



NDQ Call Examples

HeliosiFinancial

11 BDO 00002931

# III. Sample Option Trades - YEN Put Spread

## Yen Put Examples



Legend:
- Net Return on Investment Before Fees
- Gross Payoff

Chart values (Yen at 90-Day Expiration):

| Yen | Probability | Scenario |
|---|---|---|
| 123.17 | | No Movement |
| 124.08 | 40% Probability | |
| 125.19 | 35% Probability | |
| 126.36 | 30% Probability | |
| 127.64 | 25% Probability | |
| 129.07 | 20% Probability | |
| 130.77 | 15% Probability | |

Y-axis: $(2,000,000) to $8,000,000

**Helios|Financial**

11 BDO 00002932

# IV.    Investment in LLC

**Investment in LLC**

- Investor, Alpha and a third party (the "Co-Investor") will form a Delaware limited liability company (the "LLC") for the purpose of investing and trading in option spreads and other derivative instruments on equity indices, foreign currencies or interest rates.

- Investor and Co-Investor contribute $22,500 and $427,500, respectively, in exchange for 5% and 95%, respectively, of the LLC's common interests (the "Common Interests").

- Investor and Alpha also contribute $3,000,000 and $50,000, respectively, in exchange for preferred interests (the "Preferred Interests") in the LLC. Investor's contribution may be in the form of cash and/or options previously acquired through Investor's single member LLC.

- The LLC will have been initially capitalized with a substantial amount (e.g. $3,500,000 in the example discussed herein) to invest in option-based strategies.

Investor can convert his Preferred Interests into Common Interests at any time

- Investor may at any time convert his Preferred Interests into Common Interests.

**Management of the LLC**

- Alpha will provide investment advice with respect to structuring the option strategies.

- Helios, as Manager of the LLC, will provide administrative support for the LLC, such as distributing the daily values of LLC's assets, and handling LLC documentation and record keeping responsibilities.

 Helios:Financial

11 **BDO 00002933**

# IV.   Investment in LLC

## INITIAL CAPITALIZATION - Formation of LLC

**Investor**

Contributes
$22,500 for 5% of the Common Interests
$3,000,000 for Preferred Interests

**Alpha**

Contributes
$50,000 for Preferred Interests

**Co-Investor**

Contributes $427,500 for
95% of the Common Interests

**LLC**

Manager = Helios
Initial Capital = $3,500,000

- Investor, Alpha and Co-Investor form a Delaware limited liability company ("LLC") for the purpose of investing and trading in options and other derivative instruments on equity indices, foreign currencies or interest rates.
- Investor and Co-Investor contribute $22,500 and $427,500, respectively, in exchange for Common Interests of 5% and 95%, respectively.
- Investor and Alpha also contribute $3,000,000 and $50,000, respectively, in exchange for Preferred Interests.

 **Helios Financial**

11 BDO 00002934

# IV.   Investment in LLC

## Initial Capitalization Table

| | Common Cash Contribution | Preferred Cash Contribution | Total Cash | Capital Share | Profit / Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | $ 3,000,000 | $ 3,022,500 | 86.36% | 5.00% |
| Alpha | 0 | 50,000 | 50,000 | 1.43% | 0.00% |
| Co-Investor | 427,500 | - | 427,500 | 12.21% | 95.00% |
| Total | $450,000 | $3,050,000 | $3,500,000 | 100.00% | 100.00% |

## Provisions of the LLC Operating Agreement

- After the preferred return (as described below) is paid, profits (to the extent distributed) are distributed 95% to Co-Investor and 5% to Investor.

- The LLC's gains and losses are allocated 95% to Co-Investor and 5% to Investor, except that (i) the LLC operating agreement contains a "qualified income offset" and (ii) provides that to the extent losses would decrease a member's capital account below zero, they are allocated to the other members with positive capital accounts.

- Upon liquidation of the LLC or any member's interest therein, capital accounts are first booked up or down to reflect gain or loss which would be allocated to the members if the LLC's assets were sold for fair market value.

- Each member is entitled to receive his capital account, in the event of a complete redemption of such member's interest. Each Preferred Interest carries a preferred return of 8% per year independent of LLC profits, payable semi-annually.

## Transfer of Membership Interests

- A member may transfer some or all of his Interests at any time.

 Helios Financial

11 BDO 00002935

# IV. Investment in LLC

**OPTIONAL CONVERSION** - Investor may wish to convert his Preferred Interest into a Common Interest



**Investor**

Converts $3,000,000
Preferred Interest
into additional Common Interests
Now has up to 98% of the Common Interests

**Alpha**

$50,000 Preferred Interest

**Co-Investor**

$427,500 Common Interest
Diluted to no less than 2%
of the Common Interests

**LLC**
Manager = Helios

- At some point in time, Investor may wish to convert his $3,000,000 Preferred Interest plus any unpaid preferred return into a Common Interest, in order to have a higher percentage of the LLC's profits and losses.
- In the event that the LLC's net asset value has declined to the point where Co-Investor's capital account would be zero if his interest were liquidated, under Co-Investor's Anti-Dilution Provision, Investor's common interest cannot be increased beyond 98%.

**Helios Financial**

11 BDO 00002936

# IV.  Investment in LLC

## Provisions of the LLC Operating Agreement Governing Conversion of Preferred into Common

- Preferred Interests are convertible at any time into Common Interests on a dollar-for-dollar basis based on the net asset value of the LLC at that time, taking into consideration any accrued but unpaid preferred return and each Common Interest holder's proportional share of any LLC gains or losses up to the time of conversion.

- **Example:** Assume that Investor converts his Preferred Interest at a time when the LLC had a net asset value of $5 million and that Alpha has not converted. If we ignore accrued but unpaid preferred return, this implies that at the time of the conversion, the Common Interests had a gain of $1.5 million which would be allocated 5% ($75,000) to Investor and 95% ($1,425,000) to Co-Investor, respectively. When Investor converts his Preferred Interests into Common Interests, he would have $3,097,500, or 62.58%, of the $4,950,000 total value of the Common Interests. See Table.

Capitalization Table after Conversion of Investor's Preferred Interests
Assume LLC Net Asset Value at the time of conversion is $5,000,000

| | Initial Common Contribution | Proportional Share of Gains or (Losses) | Conversion Proceeds | Value of Common Interests (Post-Conversion) | Profit/Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | $75,000 | $3,000,000 | $3,097,500 | 62.58% |
| Alpha | 0 | 0 | 0 | 0 | 0.00% |
| Co-Investor | 427,500 | 1,425,000 | | 1,852,500 | 37.42% |
| Total | $450,000 | $1,500,000 | $3,000,000 | $4,950,000 | 100.0% |

 Helios Financial

11 BDO 00002937

# IV.    Investment in LLC

## Co-Investor's Anti-Dilution Provision

- Under no circumstances may a conversion cause Co-Investor to retain less than 2% of the Common Interests.

**Example:** Assume that Investor converts his Preferred Interest at a time when the LLC had a net asset value of $3,060,000 and that Alpha has not converted. If we ignore accrued but unpaid preferred return, this implies that at the time of the conversion, the Common Interests had a loss of ($440,000) which would be allocated 5% ($22,000) to Investor and 95% ($418,000) to Co-Investor, respectively. When Investor converts his Preferred Interests into Common Interests, his $3,000,500 share represents 99.68% of the $3,010,000 total value of the Common Interests, but because of Co-Investor's Anti-Dilution provision, Investor's maximum percentage interest in the Common Interests is capped at 98%.    See Table.

**Capitalization Table after Conversion of Investor's Preferred Interests**
**Assume LLC Net Asset Value at the time of conversion is $3,060,000**

| | Initial Common Contribution | Proportional Share of Gains or (Losses) | Conversion Proceeds | Value of Common Interests (Post-Conversion) | Profit/Loss Share |
|---|---|---|---|---|---|
| Investor | $ 22,500 | (822,000) | $3,000,000 | $3,000,500 | No greater than 98% |
| Alpha | 0 | 0 | 0 | 0 | 0.00% |
| Co-Investor | 427,500 | ($418,000) | 0 | 9,500 | No less than 2% |
| Total | $450,000 | ($440,000) | $3,000,000 | $3,010,000 | 100.0% |

 Helios Financial

11 BDO 00002938

## V.    Overview of Helios Financial LLC

Helios is a boutique investment banking firm headquartered in Chicago. Over the last dozen years, its principals have been engaged in the business of arranging or advising in special situations and complex financing or investment structures involving limited partnerships, limited liability companies, hybrid instruments (debt/equity), hybrid entities (pass-through versus corporate) or derivatives, such as options on foreign currencies, interest rates, commodities or equity indices.

We apply our expertise in structuring transactions that typically involve all of the following seven disciplines:

economic analysis                    book accounting
tax analysis                         legal analysis
equity investment                    debt placement

                    deal execution / administration

The disciplines are woven together through "structuring":

* the ability to correctly analyze the necessary component parts individually;
* the understanding of how the components interact and fit together;
* the judgment and experience that enables intelligent choices to be made when "trade offs" arise; and
* the ability to produce a solution that works - all in a timely and professional manner.

There is as much art as science involved in reaching a solution.

 Helios;Financial

11 BDO 00002939

## V.     Overview of Helios Financial LLC

Philosophy -   Helios is a small client focused firm whose principals embrace the following core values:

- We know we will get "repeat business" from our clients, whether they are equity investors, lenders or borrowers, buyers or sellers, only if we are ethical and oriented toward long-term relationships, and only if the participants in our transactions are pleased with the results.

- We pride ourselves on outstanding execution of transactions, which comes through creativity, hard work, and a close attention to detail.

- We do not aspire to being big. We aspire to being the best at what we do with a strong focus on some of the most complex and highest value added transactions in mergers and acquisitions and corporate finance.

- We recognize our limitations. We cannot individually be leading experts in each and every discipline represented in a transaction, but we do retain the talents of some of the most creative members of nationally known legal and accounting firms for our transactions. Our expertise in being able to analyze the client's problem/opportunity, with a generalist's overview, enables us to select the particular team of national experts best suited to assist. Diversified in tailoring a customized, detailed, fully integrated structure.

- Because our transactions are "document intensive", we view our ability to firmly manage and control the process of getting two to four sets of attorneys and accountants to expeditiously reach the desired conclusions as being one of our most valuable contributions to our clients.

 Helios Financial

11 BDO 00002940

## V.    Overview of Helios Financial LLC

· Max Tan, Principal (Chicago 312-499-6150) - Prior to forming Helios, Max was a Managing Director and head of BankAmerica's 10-person structured transactions group and 30-person corporate finance advisory group, with units located in Chicago, New York, San Francisco and Los Angeles. Prior to starting up the structured transactions group in 1995, he was a co-head of Continental Bank's lease and project finance advisory group, and before that, created and headed up a real estate finance group at an investment banking boutique in New York. Prior to 1986, he was a corporate finance and securities attorney with Davis Polk & Wardwell in New York. Max also spent four years in government, where he was the head of enforcement for the Northeastern Region of New Jersey's Division of Water Resources. Max holds a B.Sc. from M.I.T. in Mathematics, an M.S. in Mathematics from the Courant Institute of Mathematical Sciences and a J.D. (cum laude) from Harvard Law School.

· Philip L. Kampf, Jr., Principal (Chicago 312-419-6151) - Prior to forming Helios, Phil was a Vice President/senior transactor and a founding member of BankAmerica's structured transactions group in Chicago where he specialized in cross-border financings. Prior to founding the BankAmerica group with Max in 1995, he was responsible for equity private placements and the execution of leases and project financings in Continental Bank's lease and project finance advisory group. Prior to joining Continental Bank, he was a financial analyst in the Property Finance Group of LaSalle Partners Limited. Phil holds a B.A. in International Studies from Northwestern University and an M.B.A. from the J.L. Kellogg School of Northwestern University.

· James Harber (New York 212-499-2706) - Jimmy has been involved in financial services since 1978. A certified public accountant, he is a member of the AICPA and the New York Society of CPA's. He received a B.S. degree in accounting from Brooklyn College and a M.S. degree in taxation from Pace University in New York.

 Helios:Financial

11 BDO 00002941

## VI.    Overview of Alpha Consultants, Inc.

Alpha Consultants, Inc. ("Alpha"), based in Palm Beach Gardens, Florida, is engaged in trading and trade consulting for structured options and foreign currencies. A team of professionals led by Ivan Ross conducts the management of Alpha. The team has over 50 years of combined experience in identifying, analyzing, structuring and trading investment portfolios. This team also has broad expertise in investment fund management, structured finance and investment banking. Additionally, the principals of Alpha operate an NASD registered broker-dealer and a family of NFA registered private investment funds. Over the years, the team has developed numerous proprietary analytical models and disciplined investment strategies that historically have generated profitable returns with a controlled level of risk.

From February 1995 to November 1998, the team provided trading advice and execution for the III Funds, a group of hedge funds that, as of their departure, had over $2 billion of investor capital. Ivan Ross, the President of Alpha, was a general partner of the investment advisors to the III Funds and Adams, Viner, and Mosler, Ltd., ("AVM"), an affiliated fixed-income securities NASD registered broker-dealer. During its tenure with the III Funds and AVM, the team managed a large mortgage position, which at its peak exceeded $20 billion of the funds $30 billion of assets. This component of the portfolio consistently generated profitable returns. This includes the extremely difficult 1997-1998 period when many fixed-income funds experienced dramatic losses.

Ivan J. Ross, President - Prior to forming Alpha, Mr. Ross was co-head of Mortgage Trading with primary responsibility for the management of the domestic mortgage position in the III funds. He was a trader and portfolio manager for AVM and III from February 1995 to November 1998. Prior to joining AVM/III, Mr. Ross was a Senior Vice President and Portfolio Manager for Ocwen Financial Corporation ("Ocwen") from February 1994 to February 1995. While at Ocwen, Mr. Ross was responsible for managing the investment-grade mortgage component of the Quasar fund, with capital in excess of $250 million. Quasar is a fund of funds managed by George Soros with capital allocated to top managers in various sectors. Additionally, Mr. Ross managed a similar portfolio for Ocwen's principal subsidiary, Berkeley Federal Bank & Trust, with capital in excess of $100 million. Prior to joining Ocwen, Mr. Ross was a Vice President and Portfolio manager for Heritage Asset Management from April 1988 to February 1994. Mr. Ross began his investment career in 1985 at Philadelphia based Consolidate Investment Advisers. Mr. Ross graduated from the Wharton School of the University of Pennsylvania in 1985. Additionally, he is a Chartered Financial Analyst (CFA).



Helios|Financial

11 BDO 00002942

# VI.    Overview of Alpha Consultants, Inc.

**G. Felix Cua, Managing Director** - Prior to joining Alpha, Mr. Cua was a trader and portfolio manager for AVM and III from February 1995 to December 1998. While at AVM/ AVM/ III, Mr. Cua had several areas of responsibility including portfolio management, trading, and creation of pricing models. His primary expertise is the formation of arbitrage opportunities with the use of swaps, options and derivative mortgage-backed securities. Prior to joining AVM/ III, Mr. Cua was employed at Ocwen where he was instrumental in the management of the Quasar Fund. From 1992-1994, Mr. Cua was an Analyst at BlackRock Financial Management specializing in total rate-of-return analysis. Mr. Cua received a bachelor's degree in economics from Cornell University in 1992 and is a Chartered Financial Analyst (CFA).

**Yoshiyuki Nobumoto, Managing Director** - Prior to joining Alpha, Mr. Nobumoto was a trader and portfolio manager for AVM and III from February 1995 to December 1998. Mr. Nobumoto has several areas of responsibility including portfolio management, risk analysis and trading. His primary expertise is in cash flow modeling and systems programming. Using various asset classes, he has created synthetic cash flow constructions that have resulted in superior tax advantaged performance. While at Ocwen, Mr. Nobumoto was also responsible for the pricing, acquisition and resolution of non-performing 1-4 family loans, participating in over $2 billion in portfolio acquisitions. Mr. Nobumoto was employed with Ocwen as a Senior Associate in the Investment group. From November 1992 to February 1995, Mr. Nobumoto received a bachelor's degree from the School of Engineering and Applied Science of the University of Pennsylvania in 1992 and is a Chartered Financial Analyst (CFA).

**Ronald Buesinger, Managing Director** - Prior to joining Alpha, Mr. Buesinger was with AVM/ III as a trader and portfolio manager from February 1989 to December 1998. His primary focus has been in the determination and exploitation of relative value trades between various types of structured mortgage products, including all mortgage derivatives. Prior to joining AVM and III, Mr. Buesinger was employed as a vice-president and institutional mortgage bond trader for Mercantile Bank in St. Louis, Missouri. Preceding his position at Mercantile, he was Vice-President and Manager of Mortgage Bond Trading for Boatman's Bank capital markets group. While at Boatman's, he was responsible for trading and hedging a $200 million mortgage position. He also spent considerable time generating trade ideas and marketing those ideas to bank customers. Mr. Buesinger began his career in February 1990, at Heritage Asset Management. From 1991 to 1993, he served as an assistant portfolio manager for all of the Heritage Funds and assets managed by Ivan Ross. Mr. Buesinger received a Bachelor's degree in finance from the University of Missouri-St. Louis in 1989.



Helios Financial

11 BDO 00002943

**Unknown**

| | |
|---|---|
| **From:** | Orrin Tilevitz [otilevitz@divgroup.com] |
| **Sent:** | Thursday, April 26, 2001 8:26 PM |
| **To:** | R. J. Ruble |
| **Cc:** | Haber Jimmy |
| **Subject:** | partnership opinion |

opinion—transmittal
—RJ.doc (...

- opinion—transmittal—RJ.doc

opinion.doc (336
KB)

- opinion.doc

1



CONFIDENTIAL

M365585
SIDL166333

Robert Greisman - Re: Fees-New Transaction                                        Page 1

| | |
|---|---|
| **From:** | Charles Bee |
| **To:** | Robert Greisman |
| **Date:** | Thu, Apr 5, 2001  3:45 PM |
| **Subject:** | Re: Fees-New Transaction |

I went over Diversified's "listing" analysis. It raises some interesting points, in particular, #5 but I don't see how they are concluding that simply having a 5% of tax profit potential exempts promoters from listing. However, this is not inconsistent with the IRS boast that none of the deals have "any" profit potential".

Did you see that the OTSA is setting up teams for each promoter. this worries me about Diversified and ICA/Bricolage. The newspapers have contacted all of them as well as us. We got our letter. They are putting together information about us and them. I think we ought to be hedging our bets. They don't have "privilege". I think we should go forward with Gramercy on some kind of transaction, similar to the ICA deal and Diversified's deal but different. We should also go forward with Bricolage for the time being. What do you think?

>>> Robert Greisman 04/05/01 04:15PM >>>
Charlie:
When we have our TOC call on Monday at 10 on the new deal, we should also cover pricing and fees. (You should have received a pricing sheet from Jimmy after our call with him early in the week.) In comparing to Gramercy, I think it's about the same fee to us. Assuming no expenses in Gramercy deal, we net 4.6 (capital at 7% x 2/3) and 6.6% ordinary (10% x 2/3). With Jimmy, it looks like we'd be at 4.5% capital and 6% ordinary. (see his worksheet.) Moreover, if he's only taking 2.25% I presume we'll be on our own in absorbing ADC fees, whereas Gramercy shares them with us. All that said, not a bad deal with Jimmy, but not head and shoulders better than Gramercy. Let me know if you see it differently.
Bob

Cooperation...      Collaboration...      Concentration...      Communication...

GOVERNMENT'S
EXHIBIT
A-48

7 BDO 00001566

GOVERNMENT
EXHIBIT
26