UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FIDELITY INTERNATIONAL CURRENCY ) 
ADVISOR A FUND, L.L.C., by the Tax )
Matters Partner, )
                     )
              Plaintiff, )     Civil No. 05-40151
                     )
      v. )     Judge Saylor
                     )
UNITED STATES OF AMERICA, )
                     )
              Defendant. )

**Declaration of Margo L. Stevens**

MARGO L. STEVENS certifies as follows:

1. I am the Assistant Chief Counsel (Disclosure & Privacy Law) in the Office of Associate Chief Counsel (Procedure & Administration), Office of Chief Counsel, Internal Revenue Service (Service). The predecessor position to my present position before the Office of Chief Counsel reorganization in 2000 was the position of the Assistant Chief Counsel (Disclosure Litigation). I have assumed the authority previously vested in, or delegated to, the Assistant Chief Counsel (Disclosure Litigation). See IRM 1.11.4.3.1, a true and correct copy of which is attached hereto as Exhibit A. As Assistant Chief Counsel (Disclosure & Privacy Law), I am the official in the Office of Chief Counsel primarily responsible for the management and direction of the Disclosure & Privacy Law Program, which involves planning, directing, and coordinating the legal work of the Chief Counsel's office relating to the disclosure of any and all records or information of the Service and the Office of Chief Counsel. My specific duties include the

assignment, review, and coordination of the work performed on various types of cases handled by the organization's attorney staff, including responsibility for furnishing advice and assistance to other offices within the Office of Chief Counsel on disclosure questions. I am also a principal legal advisor to the Service and the Chief Counsel's office on all disclosure questions and related legal matters pertaining to the Privacy Act, the Freedom of Information Act (FOIA), and the disclosure provisions of the Internal Revenue Code. I am also responsible for coordinating with the Department of Justice all litigation involving disclosure, and maintaining close coordination with the Office of Governmental Liaison and Disclosure in order to furnish legal assistance on disclosure questions including the processing of requests for the production of documents or testimony. A complete description of the duties for my current position, the Assistant Chief Counsel (Disclosure & Privacy Law), is published at IRM 30.3.2.3.8.4 (July 21, 2005); a true and correct copy is attached hereto as Exhibit B.

2. Pursuant to Delegation Order No. 220 (Rev. 3), signed by the Commissioner of Internal Revenue and effective April 16, 1997, I have been delegated the authority to claim executive privilege on behalf of the Service with respect to its documents or information in actions before this Court. Delegation Order No. 220 (Rev. 3) is a delegation by the Commissioner of Internal Revenue to my predecessor position, the Assistant Chief Counsel (Disclosure Litigation), of the authority vested in the Commissioner by Treasury Department Order 150-10 to claim executive privilege with respect to Service records and information in

2

actions before Federal courts, including the United States District Courts. The Delegation Order specifies the Commissioner's standards and procedures required to be applied, including policy considerations, in making a determination whether to assert executive privilege as a basis for protecting internal or inter-agency records that reflect recommendations, advisory opinions, and deliberations, which comprise the process by which governmental decisions and policies are formulated. A true and correct copy of Delegation Order No. 220 (Rev. 3) is attached hereto as Exhibit C.

3. In connection with my responsibilities, I am aware of the above-captioned lawsuit in which plaintiff seeks a readjustment of the partnership items set forth by the Commissioner in a Notice of Final Partnership Administrative Adjustment (FPAA), dated April 6, 2005, for the taxable period ending December 31, 2001. I am also aware of the related case, 06-40130, in which plaintiff seeks a readjustment of the partnership items set forth by the Commissioner in a FPAA, dated April 26, 2006, for the taxable period ending December 31, 2002. I am informed by Blaine Holiday, an attorney in the Office of Division Counsel (Small Business/Self-Employed), St. Paul, Minnesota, who is assigned to this case, that the issues in this case are:

A.    Whether the "basis creating" and "gain/loss generating" pairs of offsetting option transactions lacked economic substance because, viewed objectively, there was no reasonable possibility they would generate an economic profit and because the offsetting option transactions lacked a tax-independent business purpose. The

plaintiff takes the position that the transaction was motivated in part by his desire to hedge risk of EMC stock deterioration attributable to currency rate changes, as well as his exposure to interest rate risk associated with his real estate and airplane leasing businesses. The Court will have to determine whether the executed option transactions served this purpose.

B.    Whether Fidelity International entered into this series of offsetting option transactions for the primary purpose of making a profit for purposes of section 165(c).

C.    Whether the entity of Fidelity International should be disregarded for federal income tax purposes because the primary purpose for its existence was to generate paper tax losses to allocate to the plaintiff.

D.    Whether Fidelity International should be disregarded for federal income purposes because Samuel Mahoney was not in reality an actual partner but simply an accommodation partner or nominee who was paid a fee for his participation in the transaction.

E.    Whether the steps of the transaction in which 93% of the accounting gains were allocated to Samuel Mahoney and 93% of the accounting losses were allocated to plaintiff should be integrated into one unified allocation to plaintiff under the step transaction doctrine because the steps of this transaction were totally interdependent and also because this was the preplanned

end result of the transaction from its outset.

F.    Whether the allocation of the partnership profits of 93% to Samuel

Mahoney and 5% to plaintiff should be disregarded because this

allocation does not have substantial economic effect under section

704(b)(2) of the Internal Revenue Code.

G.    Whether the long and short options within each pair were, in

substance, a single transaction with the result that plaintiff's basis in

Fidelity International would be the net premiums paid by plaintiff for

the two options.

H.    Whether the transaction at issue was the same or similar to the

offsetting option transaction described in IRS Notice 2000-44, with

the effect that the short options here must be treated as liabilities

within the meaning of section 752, thereby requiring plaintiff's basis

in Fidelity International to be equal to the net premium paid by him

in acquiring the interest rate options.  *See* Treas. Reg. § 1.752-6.

I.    Whether Fidelity International should must be disregarded as an

entity because it entered into the offsetting options transactions for

the primary purpose of substantially reducing the present value of

plaintiff's tax liability in a manner inconsistent with the intent of

Subchapter K of the Internal Revenue Code and in violation of the

anti-abuse partnership regulation of Treas. Reg. § 1.701-2.

J.    Whether Fidelity International is liable for accuracy-related

penalties for engaging in the offsetting option transactions because

5

the plaintiff's underpayment of tax resulting from this series of
transactions is attributable to, among other things, (1) negligence or
disregard of rules and regulations, (2) a substantial underpayment
of income tax, and (3) a substantial or gross valuation misstatement
and also because Fidelity International did not have reasonable
cause and a good faith basis for its reporting of the claimed losses.
*See* I.R.C. § 6662 (a), (b)(3) and (e).

The benefit of the transaction, structured as the plaintiff claims, is tax
losses of over $150 million.

4. I am further informed by Mr. Holiday that the documents in issue were
located and compiled in response to plaintiff's First through Fifth Sets of
Requests for Document Production.

5. I have also been informed by Mr. Holiday that, in response to these
discovery requests, he conducted, or caused to be conducted, searches of the
Service's files seeking responsive documents.

6. Based upon the thorough review of the documents located in response
to Plaintiff's First through Fifth Sets of Requests for Document Production by Mr.
Holiday, the information provided to me by Mr. Holiday, and my own personal
review of these documents, I have determined to assert the claim of executive
privilege with respect to certain documents, or portions of certain documents,
more thoroughly described herein below in paragraph 10. Should the Court
determine the withheld documents or portions thereof to be relevant and that

I.R.C. § 6103 or no other evidentiary privileges apply, I am claiming executive privilege.

7.  When the Service asserts a formal claim of executive privilege with respect to predecisional/deliberative documents, the privilege is claimed only to protect those intra-governmental documents reflecting advisory opinions, recommendations, and deliberations which comprise part of the process by which agency decisions and policies are formulated.  The agency does not seek to protect documents containing factual matters unless such factual matters are so intertwined with advisory opinions, recommendations, conclusions, or reasoning by Government officials that the factual material cannot be excised from the privileged material or unless the factual matter itself, through its selection and distillation by the author, would reveal the author's mental processes or the agency's deliberations.  The privilege is not claimed to protect all opinions, conclusions, mental impressions, and thought processes of Government officials, but only those whose disclosure would interfere with vital Government functions or would cause injury to the quality of agency decisions.

8.  When the Service asserts a formal claim of executive privilege with respect to predecisional/deliberative documents, the agency first considers whether the document falls within the scope of the deliberative process privilege; that is, whether the document was generated before the adoption of an agency policy or position and whether the document reflects the give-and-take of the consultation process leading up to the formulation of an agency policy or position.  The agency also considers whether the document is recommendatory

in nature or is a draft of what may become a final document; whether the

document weighs the pros and cons as to the agency's ultimate adoption of one

viewpoint or another; and whether the material is so candid or personal in nature

that public disclosure is likely in the future to stifle honest and frank

communication within the agency.  Consequently, the agency considers

protecting recommendations, draft documents, proposals, suggestions, and other

subjective documents which reflect the personal opinions of the writer rather than

the policy or position of the agency.  These types of documents could

inaccurately reflect or prematurely disclose the views of Government officials,

suggesting an agency position which is, as yet, only a personal position.

Disclosure of documents containing reasons and rationales that were not

ultimately relied upon by the agency in reaching its decision(s) could create

public confusion.

      9.  The following documents, authored during 2004 through April 26, 2006,

were prepared and/or considered by employees of the Office of Chief Counsel

and the Internal Revenue Service during the examination of Fidelity International

Currency Advisors, L.L.C., a single partner entity of which plaintiff was the sole

partner, including the issuance of FPAAs on April 6, 2005 and April 26, 2006.

The production of the withheld documents, or portions thereof, more fully

described below, would inhibit the frank and honest discussion of legal and policy

matters and thus would adversely affect the quality of the Service's decisions and

policies.  Furthermore, disclosure of the withheld documents, or portions thereof,

would reveal opinions of personnel within the Office of Chief Counsel and

Internal Revenue Service at many levels at a time when the opinions were not fully developed and the issues were still being debated. None of the withheld documents, or portions thereof, represents a statement of agency policy or a final decision and release of the withheld information could, therefore, result in confusion to the public. Disclosure of the withheld information would also adversely affect the Service's ability to administer and enforce the law under the Internal Revenue Code at all levels, from voluntary compliance and examination to appeals and litigation. By way of example, taxpayers may choose to argue that the Service must defend positions that were not adopted, or that consideration of a position not adopted demonstrates the reasonableness of a taxpayer's position.

10. The following documents are maintained in the examination files of the plaintiff. I am claiming executive privilege for these documents, or portions thereof, as more fully described below.

    a. **Pages 1IRS1161-1166** – Six-page email string that consists of four emails, dated between 03/26/04 and 03/29/04, among William E. Montoro, Senior Program Specialist, Tax Shelter Support Unit, Large & Mid-sized Business (LMSB), Cheryl P. Claybough, Tax Shelter Program, Territory Manager, LMSB (Manhattan), Mary B. Baker, Supervisory Revenue Agent, LMSB (Washington, D.C.), and Gary Takahashi, Supervisory Revenue Agent, LMSB (Ogden), then forwarded by Ms. Baker to Barry Shott, Director, Field Operations, Financial Services, LMSB, by a 03/31/04 email, who in turn forwarded the email string to Woody K. Howell, Program Manager, Communications, Technology & Media, LMSB, with copies to Patricia C. Chaback, Director, Field Operations, Communications, Technology & Media, LMSB, and Paul D. DeNard, Director, Pre-filing & Technical Guidance, LMSB, who in turn forwarded the email string to Mark Chan, Program Manager, Communications, Technology & Media, LMSB (Boston), by emails dated 04/01/04. Mr. Chan then forwarded the email string to Debra E. Morrill, Team Manager, Financial Services,

Team 1545, LMSB, on 04/06/04.  The Service asserts executive privilege for the entire document because the email string contains the employees' respective discussions of, and opinions regarding the viability of, several possible strategies that should be employed by the Service in examining the individual and partnership returns of plaintiff and Fidelity, respectively, in light of certain evidence obtained to date, at a time when the examination was ongoing and before the issuance of the FPAA.

b.  **Page 1IRS1154** – One page of handwritten notes, dated 04/08/04, authored by Debra Morrill, reflecting her opinion, as relayed to Michael M. Whalin, Partnership Technical Advisor, SBSE, Joseph P. Kennedy, Supervisory Revenue Agent, SBSE (Stoneham), and Philip P. Vinciguerra, Revenue Agent, SBSE (Worcester) as to the proper classification of the transaction as it would impact the ongoing examination of plaintiff.  The Service asserts executive privilege for the entire document because it contains the author's views as to the proper classification of the transaction and what approach to take in the examination of plaintiff, at a time when the examination was ongoing and before the issuance of the FPAA.

c.  **Page 1IRS1155** – One page of handwritten notes, dated 04/26/04, authored by Debra Morrill, reflecting her conversation with Veronica Miller, Tax Examining Technician, Memphis Campus.  The notes memorialize their respective views of the proper classification of the transaction.  The Service asserts executive privilege for the entire document because it contains the two employees' respective views as to the proper classification of the transaction and what approach should be taken in the examination of the plaintiff, at a time when the examination was ongoing and before the issuance of the FPAA.

d.  **Page 1IRS1158** – One page consisting of two emails, both dated 05/20/04, between the case agent, William K. Conway, Revenue Agent, Communications, Technology & Media, LMSB (Southboro) and John Aletta, attorney, Small Business/Self Employed (SBSE) Division Counsel (Hartford), concerning copies of documents relating to plaintiff's transaction, which had been received from promoter examination teams.  The Service asserts executive privilege for the entire document because it contains the respective authors' discussion of the utility of certain information relating to plaintiff's transaction that may be available from other agents working tax shelter cases and its likely effect on the scope and direction of plaintiff's examination, as well as the disclosure rules that may affect the use of such information, all of which were

10

exchanged during the early stages of the examination and before issuance of the FPAA.

e. **Pages 1IRS0717-1IRS0718** – Two pages, consisting of three emails, beginning with an email from Jesus Melon, Revenue Agent, Financial Services, LMSB (Manhattan) to Ronald L. Calewarts, International Technical Adviser, LMSB, and Cary Russ, Manager, Technical Advisor (Financial Products-Offshore Compliance-Pass Through Entities), LMSB (Illinois), copied to Elise F. Alair, attorney, Financial Services, LMSB (Hartford), dated 06/03/04, which was then forwarded by Mr. Russ to Bill Wilson, Partnership Technical Advisor, Office of Pre-Filing & Technical Guidance, LMSB (Dallas), Dianne Adelberg, Partnership Technical Advisor, LMSB (Baileys Crossroads), Rodney Oakes, Partnership Technical Advisor, Office of Pre-Filing & Technical Guidance, LMSB (St. Paul), Stewart W. Connard, Revenue Agent, Pre-Filing & Technical Guidance, LMSB (Washington, D.C.), and copied to Messrs. Melon and Calewarts, that same day; and responded to by Ms. Adelberg, by email dated 06/04/04. The Service asserts executive privilege for the entire document as it describes Melon's identification of possible issues warranting the examination of several taxpayers (none of which are plaintiff) and his request for strategic advice on the treatment of these facts in his and related cases, as well as Ms. Adelberg's advice in return. The Service also asserts I.R.C. § 6103(a) to protect the fact and nature of the tax investigation of a specific, but unnamed, third party taxpayer discussed in the document. The fact and nature of a tax investigation, including certain details as to the type of taxpayer, the type of return at issue, and other details collected by the examiner in the course of that examination, are items of return information under I.R.C. § 6103(b)(2)(A). As such, the fact and nature of the investigation, as well as the other items compiled during the examination, is confidential under I.R.C. § 6103(a). Plaintiff has not demonstrated a material interest in this third party return information under section 6103(e), secured a consent from the taxpayers under section 6103(c), nor otherwise demonstrated its entitlement under the Internal Revenue Code.

f. **Pages 1IRS0719-1IRS0720** – Two pages, consisting of two emails, dated 03/16/05 and 03/24/05, respectively, between Ronald Calewarts and Peter Macintyre, International Examiner, Heavy Manufacturing & Transportation, LMSB (Southboro). The Service asserts executive privilege for the entire document because it contains the agent's identification of possible issues warranting examination of a third party taxpayer and his request

11

for assistance on how to address such issues and the technical adviser's preliminary views as to the strategies he should employ in response. The Service also asserts I.R.C. § 6103(a) to protect the fact and nature of the tax investigation of a third party taxpayer discussed in the document. The fact and nature of a tax investigation is an item of return information under I.R.C. § 6103(b)(2)(A). As such, the fact and nature of the investigation is confidential under I.R.C. § 6103(a). Plaintiff has not demonstrated a material interest in this third party return information under section 6103(e), secured a consent from the taxpayers under section 6103(c), nor otherwise demonstrated its entitlement under the Internal Revenue Code.

g. **Pages 1IRS1489-1IRS1491** – Three pages, consisting of three emails, beginning with an 09/10/04 email from Debra E. Morrill to Cheryl R. Kiger, Case Coordinator (Son of Boss), LMSB, continuing with her response, also dated 09/10/04, which was then copied to Michael M. Whalin, James C. Fee, Associate Area Counsel, LMSB (Philadelphia), Katy I. Lin, attorney, LMSB (Detroit), and Jadie T. Woods, attorney, LMSB (Detroit), and which was later forwarded by Ms. Morrill to William K. Conway, Mark A. Corrigan, Lead Revenue Agent, Communications, Technology & Media, LMSB, and Peter D. Macintyre, on 09/13/04. The email string reflects the agent's identification of issues arising from the facts she had developed to date in plaintiff's examination and how other shelter cases may impact on the scope and direction of her examination, as well as the advice from counsel concerning "Son of Boss"-style transactions. The Service asserts executive privilege for the entire document because it contains a discussion among the respective authors of the fact patterns involved in, and strategies employed for examining, various shelters currently under investigation and how the Service is treating the transactions, at a time when the examination of plaintiff was ongoing and before issuance of the FPAA.

h. **Pages 1IRS1471- 1IRS1473** – A three-page memorandum, dated 09/17/04 from Debra E. Morrill requesting advice from John Aletta. The Service asserts executive privilege for the entire document as it reflects the author's views as to those facts deemed pertinent from the development of the ongoing examination of plaintiff, which gave rise to a number of issues for which she sought legal advice and assistance, in order for Examination personnel to determine how to proceed with the examination of plaintiff, at a time before the issuance of the FPAA.

12

i. **Pages 1IRS1268-1270** – This is a duplicate of Pages 1IRS1471-1473. The Service asserts executive privilege for the entire document for the same reasons as set forth above for that duplicate document.

j. **Pages 1IRS1265-1IRS1267** – This is also a duplicate of Pages 1IRS1471-1473. The Service asserts the executive privilege for the entire document for the same reasons as set forth above for that duplicate document.

k. **Pages 13IRS00308-13IRS00310** – This is also a duplicate of Pages 1IRS1471-1473. The Service asserts the executive privilege for the entire document for the same reasons as set forth above for that duplicate document.

l. **Pages 13IRS00308-13IRS00310** - This is also a duplicate of Pages 1IRS1471-1473. The Service asserts the executive privilege for the entire document for the same reasons as set forth above for that duplicate document

m. **Pages 1IRS0102-1IRS0103** – Two pages of typed notes titled "Meeting 10-18-2004," reflecting discussions among Debbie Morrill, Mark (either Mark Chan or Mark Corrigan), Bill Wilson, Denis McSweeney, International Team Manager, LMSB (Southboro), and William K. Conway, and advice received from John Aletta. This internal meeting was in anticipation of an upcoming meeting with plaintiff and his representatives. The Service asserts executive privilege for the entire document because it reflects the author's summarization of the attendees' respective views as to Examination's approach to the examination and the transaction involved, their identification of possible issues to explore during the upcoming meeting with plaintiff (including their assessment of hazards associated therewith), as well as counsel's legal advice as to the steps to be taken with respect to the possible issuance of information document requests. All of the deliberations reflected herein occurred during the examination of plaintiff at a time before the issuance of the FPAA.

n. **Page 1IRS0101** – One page of typed notes, by William K. Conway, dated 10/27/04 and titled "Conference Calls" reflecting advice of Richard Gannon, Senior Counsel, Retailers, Food & Pharmaceuticals, LMSB (Plantation). The Service asserts executive privilege for the entire document because it reflects the author's summarization of a conference call with respect to the author and counsel's discussion of Examination personnel's

approach to the ongoing examination of plaintiff, including the steps that should next be taken, and the nature of the transaction involved. All of the deliberations reflected herein occurred during the examination of plaintiff at a time before the issuance of the FPAA.

o. **Page 1IRS0100** – One page of typed notes titled "Audit day 11-01 Meeting" summarizing the legal advice the author, William K. Conway, received from Richard Gannon and John Aletta. The Service asserts executive privilege for the entire document because it summarizes the three participants' discussion of Examination's approach to the ongoing examination of plaintiff, including the scope and direction they wished to pursue, and the nature of the transaction involved. All of the deliberations reflected herein occurred during the examination of plaintiff at a time before the issuance of the FPAA.

p. **Pages 1IRS0233-1IRS0234** – Undated typed notes titled "Background," consisting of an analysis of information available at that time, possible areas to explore and a list of questions to be resolved. The notes were written by William K. Conway. The Service asserts executive privilege for the entire document because it reflects the views of the author as to how Examination personnel should proceed with the examination of plaintiff, including items of evidence developed to date that raised additional issues for which Mr. Conley believed further development was warranted, and the nature of the transaction involved. The notes were generated during the examination of plaintiff, with a focus on further information that appeared necessary to obtain, at a time before the issuance of the FPAA.

q. **Page 1IRS1476** – One page email, dated 02/17/05, from James Fee to Joseph F. Maselli, Area Counsel, Heavy Manufacturing & Transportation, LMSB (Newark), James C. Lanning, Area Counsel, Retailers, Food & Pharmaceuticals, LMSB (Chicago), Christopher B. Sterner, Deputy Division Counsel, SBSE, Paul R. Zamolo, Associate Area Counsel, SBSE (San Francisco) – which five comprised the Counsel component of the "Son of Boss" Executive Steering Committee – Scott W. Schmidt, Director, Examination, SBSE Area 7 (Los Angeles), Henry V. Singleton, Industry Director, Retailers, Food & Pharmaceuticals, LMSB, Jonathan R. Zelnik, Senior Counsel to the Chief Counsel (Tax Shelters) and copied to William G. Merkle, Deputy Area Counsel, LMSB (Chicago), Richard Gannon, Jadie T. Woods, Katy S. Lin, Cheryl Kiger, Bill Wilson and Christine Ellison, Chief, Branch 3, Office of Associate Chief Counsel (Passthroughs and Special

14

Industries), discussing the approach that should be followed as to the treatment of the transaction involved in the examination of plaintiff. The Service asserts executive privilege for the entire document because it reflects the views of the author, as well as advice he received, as to the strategies that may be employed during the examination of plaintiff, in light of advice received from Ms. Ellison as to how to address the transaction involved. The deliberations reflected herein occurred during the ongoing examination of plaintiff at a time before the FPAA was issued.

r.    **Page 1IRS1478** – A one-page email, dated 02/18/05, from Richard Gannon to James Fee, which was copied to Sergio Garcia Pages, Senior Counsel, Retailers, Food & Pharmaceuticals, LMSB (Miami), John Aletta, William K. Conway, Donald R. Patterson, Team Leader, Heavy Manufacturing & Transportation, LMSB (St. Petersburg), Kathleen F. Baryza, Supervisory Revenue Agent, Heavy Manufacturing & Transportation, LMSB (Tampa), Ronald A. Grote, Pre-Filing & Technical Guidance, LMSB (Tampa), Lenny T. Smathers, Pre-Filing & Technical Guidance, LMSB (Hickory), Anamaria B. Estrada, Lead Revenue Agent, Heavy Manufacturing & Transportation, LMSB (Tampa), Leslie Mueller, Revenue Agent, Heavy Manufacturing & Transportation, LMSB (Tampa), Rose Reinhard, Revenue Agent, Heavy Manufacturing & Transportation, LMSB (St. Petersburg), Grant E. Kruger, Revenue Agent, Heavy Manufacturing & Transportation, LMSB (Jacksonville), William J. Tarras, Heavy Manufacturing & Transportation, LMSB, Mark D. Frost, Supervisory Revenue Agent, Heavy Manufacturing & Transportation, LMSB (Grand Rapids), seeking clarification of legal advice provided in Page 1IRS1476, above. The Service asserts executive privilege for the entire document because it reflects the author's understanding of the advice rendered in Page 1IRS1476, as it would inform his rendering of advice to Examination personnel assigned to the examination of plaintiff, with respect to how to proceed with the treatment of the involved transaction. These deliberations occurred during the ongoing examination of plaintiff at a time before the issuance of the FPAA. The Service also asserts I.R.C. § 6103(a) to protect the identities of, and fact and nature of the investigations of, third party taxpayers mentioned in the document. A taxpayer's identity, as well as the fact and nature of a tax investigation, are items of return information under I.R.C. § 6103(b)(2)(A). As such, their identities, and the fact and nature of these investigations, is confidential under I.R.C. § 6103(a). Plaintiff has not demonstrated a material interest in this third party return information under section 6103(e), secured a consent from

the taxpayers under section 6103(c), nor otherwise demonstrated its entitlement under the Internal Revenue Code.

s.  **Page 13IRS00312** – An email, dated 02/21/05, from James Fee to Debra E. Morrill and William K. Conway, which was copied to Richard H. Gannon and John Aletta, concerning the approach Counsel is recommending that Examination personnel take in the examination of plaintiff.  The Service asserts executive privilege for the entire document because it reflects the author's views as to the strategy with which to proceed as to the treatment of the transaction, in light of advice received from Christine Ellison (which is the same content as part of the document numbered as 1IRS 1476, above).  These deliberations occurred during the examination of plaintiff, at a time before the issuance of the FPAA.

t.  **Page 1IRS1477** – This is a duplicate in content of the one-page 02/21/05 email numbered 13IRS00312 above, printed by a different recipient.  The Service asserts executive privilege for the same reasons as set forth for that duplicate document.

u.   **Page1IRS0954** – A one-page email, dated 03/15/05, from Larry Letkewicz, Special Trial Attorney, Retailers, Food & Pharmaceuticals, LMSB (Chicago), as a result of his review of the draft FPAA.  The email, with accompanying revised draft language, conveys his advice as to the approach Examination personnel should take in the ongoing examination of plaintiff and, in particular, with regard to the issuance of the FPAA.  The Service asserts executive privilege for the entire document (including the attachment) because it reflects the author's views as to alternative approaches to the issuance of, and language to be included in, the draft FPAA, at a time when the examination of plaintiff was ongoing and before the FPAA was issued.

v.  **Pages 1IRS0111-1IRS0117** – Seven pages of typed notes, with a handwritten notation at the top of the first page, "My Notes, 7/2004" pertaining to case actions and providing a chronology of the plaintiff's transaction, as the agent had developed to date in the examination.  The author of the document is William K. Conway. The Service asserts executive privilege for the entire document as it reflects certain facts developed to date by the Examination team, the author's assessment of their relevance and significance to the Service's theory of the transaction, and his thought processes and mental impressions as to how to proceed with the examination of plaintiff in light thereof.  This information appears to have been incorporated into Pages 12IRS00343-

16

00351, described below.  This document was generated during the ongoing examination of plaintiff at a time before the issuance of the FPAA.

w.  **Pages 12IRS00343-12IRS00351** – Nine pages of undated, typewritten notes, "Executive Summary," which shows that Examination Group 1571 received it on 07/19/04, consisting of a description of case actions and providing a chronology of the plaintiff's transaction, as the agent had developed to date in the examination.  The author of the document is William K. Conway.  The Service asserts executive privilege for the entire document as it reflects certain facts developed to date by the Examination team, the author's assessment of their relevance and significance to the Service's theory of the transaction, and his thought processes and mental impressions as to how to proceed with the examination of plaintiff in light thereof.  (Pages 12IRS00345-351 is a duplicate of Pages 1IRS0111-117.)  This document was generated during the ongoing examination of plaintiff at a time before the issuance of the FPAA.

x.  **Pages 1IRS1864-1IRS1877** – Fifteen pages of drafts of Information Document Requests (IDRs) that were prepared by Examination personnel assigned to the examination of plaintiff, but which were not issued.  The draft IDRs were developed between June and November, 2004.  The Service asserts executive privilege for the entire document because they are drafts of IDRs not issued and because they reflect International Examiner Macintyre and Revenue Agent Conway's thought processes and mental impressions with respect to certain facts developed to date, the questions for which they believed they needed further information and answers, and the scope and direction of how they intended to proceed with respect to the examination of the plaintiff and the involved transaction.  These draft IDRs were prepared during the ongoing examination of plaintiff at a time before the issuance of the FPAA.

y.  **Pages 1IRS1435-1IRS1439** – Two page checklist titled "Fidelity International Currency Advisor A Fund Notice 2000-44," pertaining to the tax year 2001 examination with an attachment of three pages of notes by William K. Conway, on the possible applicability of the section 6664 penalty to the transaction under examination.  The Service asserts executive privilege for the entire document because it reflects the various indicia the Service considers in evaluating the applicability of the penalty, as well as the author's views as to the appropriateness of the application of this penalty to the involved transaction undergoing examination,

including some assessment of risks associated with asserting the penalty. This checklist was completed during the examination of the plaintiff, prior to the issuance of the FPAA.

z. **Pages 13IRS00548-13IRS00549** – Two pages of typewritten notes by William K. Conway, titled "Fidelity International Currency Advisor A Fund" pertaining to the tax year 2002 examination and the possible applicability of the section 6662 penalty to the transaction under examination. The Service asserts executive privilege for the entire document because it reflects the various indicia the Service considers in evaluating the applicability of various penalties, as well as the author's views as to the appropriateness of the application of penalties to the involved transaction undergoing examination, including some assessment of risks associated with asserting penalties. These notes were completed during the examination of the plaintiff, prior to the issuance of the FPAA.

aa. **Page 1IRS1442** – One page of William K. Conway's workpapers on a form titled "Miscellaneous 2000-44 transaction: Lead Sheet for 2001" pertaining to Fidelity International Currency Advisor A Fund. Although it is undated, it appears to be early in the examination of the Form 1065 wherein Mr. Conway identified tentative issues and steps he believed needed to be taken. The Service asserts executive privilege for the entire document because it reflects certain facts developed to date, the additional factual and issue development that the case agent thought needed to be done, and Mr. Conway's views as to how to proceed with the examination of the plaintiff and the involved transaction, at a time when the examination was ongoing and prior to the issuance of the FPAA.

bb. **Pages 1IRS1207 and 1IRS1214** –Page 1IRS1207 is a one-page spreadsheet titled "K-1 Reconciliations for TY 2001" (page 1IRS1214 is a duplicate of page 1IRS1207), containing draft calculations pertaining to plaintiff's investments and losses. The Service asserts executive privilege for both pages because they reflect William K. Conway's views and the preliminary estimates of profit and loss pertaining to the involved transaction, based upon the evidence gathered to date, at a time when the examination was ongoing and prior to the issuance of the FPAA.

cc. **Pages 1IRS1209-1IRS1211** – Three pages titled "PCS TEFRA Establish or Add" for Fidelity International for TY2001. The Service asserts executive privilege for the entire document because it reflects William K. Conway's views as to the category

and nature of the transaction involved in this examination, and the steps to be taken, based upon the evidence gathered to date, at a time when the examination was ongoing and prior to the issuance of the FPAA.

dd. **Pages 13IRS00250-00252** – Three pages of TEFRA-PCS Check sheet for Fidelity International Currency Advisor A Fund for TY2002. The Service asserts executive privilege for the entire document because it reflects William K. Conway's views as to the category and nature of the transaction involved in this examination, and the steps to be taken, based upon the evidence gathered to date, at a time when the examination was ongoing and prior to the issuance of the FPAA.

11. The production of the documents, or the withheld portions thereof, described in paragraph 10, would inhibit the frank and honest discussion of legal and policy matters, and thus would adversely affect the quality of the Service's decisions and policies. Disclosure of the withheld documents, or portions thereof, would reveal opinions of the Office of Chief Counsel and Internal Revenue Service personnel at many levels at a time when the opinions were not fully developed and the issues were still being debated. None of the withheld information represents a statement of agency policy or a final decision and release of the withheld information could, therefore, result in confusion to the public. Disclosure of the withheld information would adversely affect the Service's ability to administer and enforce the law under the Internal Revenue Code at all levels, from voluntary compliance and examination to appeals and litigation.

12. In addition, portions of certain of the documents described in paragraph 10 above relate to third party taxpayers and contain the names, the fact of their examination, and details concerning the tax treatment of the

19

transactions under examination, of these unrelated third party taxpayers. These items of information constitute the confidential return information of these third party taxpayers. These items of information are withheld pursuant to I.R.C. § 6103(a), which provides that returns and return information shall not be disclosed except as authorized by a provision of the Code. None of the provisions of the Code authorize the release of this information to the plaintiff, and we are withholding this material pursuant to I.R.C. § 6103(a).

13. I am informed by Counsel for the Government that Plaintiff's Second Set of Requests for Production of Documents (Nos. 6-30) included requests for the background files for Notice 2000-44 (Request No. 16), Chief Counsel Notice 2003-20 (Request No. 17), Treasury Regulation § 1.752-6 (Request No. 19) and Revenue Ruling 88-77 (Request No. 20). With respect to such, I have previously lodged formal claims of the executive privilege for the privileged documents maintained in those background files, in declarations executed in the following cases: For Notice 2000-44, my Third Declaration in *Jade Trading, LLC v. United States*, No. 03-2164T (Fed Cl.); for Chief Counsel Notice 2003-20 and Treasury Regulation § 1.752-6, my Fourth Declaration in *Klamath Strategic Investment Fund, LLC v United States*, No. 5:04-CV-278 (E.D. Tex.) (order upholding privilege claims issued September 19, 2006) and for Revenue Ruling 88-77, my

20

declaration in *Marriott International Resorts, L.P. v United States*, 437 F.3d 1302

(Fed. Cir. 2006). I affirm my prior claims of executive privilege respecting the

documents, or portions thereof, maintained in those files.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true and correct.

Executed this 23rd day of March, 2007, in Washington, D.C.


_____
Margo L Stevens
Assistant Chief Counsel
(Disclosure & Privacy Law)
Office of Chief Counsel
Internal Revenue Service
1111 Constitution Avenue, N.W.
Washington, D.C. 20224

# Delegations Orders 1.11.4

1.11.4.3.1
(05-01-2006)
**Effect of Personnel and
Organizational Changes
on Delegation Orders**

(1) Delegations of authority made by any predecessor of an incumbent will be treated as having been made by the incumbent, unless or until the incumbent modifies or revokes such authority. Similarly, an incumbent assumes all authorities previously vested in, or delegated to, the incumbent's position.

(2) When organizational or personnel changes are made which alter title/designation, without substantive alteration in function or duty, existing Delegation Orders remain in effect until updated by the appropriate organization. When organizational or personnel changes are made which alter title/designation, without substantive alteration in function or duty, existing delegation orders remain in effect until updated by the appropriate organization.

**EXHIBIT A**

# Delegations of Authority and Designations 30.3.2

30.3.2.3.8.4
(07-21-2005)
**Assistant Chief Counsel
(Disclosure & Privacy
Law)**

(1) General. The Assistant Chief Counsel (Disclosure & Privacy Law) (DPL) is one of three technical subject expert components within the Office of the Associate Chief Counsel (P&A). The Assistant Chief Counsel manages a subordinate office consisting of two branches of attorneys responsible for assisting the Associate Chief Counsel (P&A) in accomplishing the mission of the office with respect to matter arising under the disclosure laws, Privacy Act and Freedom of Information Act.

(2) Subject Matter Responsibilities. The Assistant Chief Counsel (DPL) is responsible for planning, directing, and coordinating the work of the Office of Chief Counsel with respect to matters relating to the disclosure of any and all records or information of the Service and the Office of Chief Counsel. The Assistant Chief Counsel's subject matter responsible includes matters under the disclosure provisions of the Internal Revenue Code (sections 6103, 6104, 6108, 6110, 4424, 7213, 7213A, 7431, 7513 and 7852(e)), Treas. Reg. § 301.9000-1, the Freedom of Information Act, and the Privacy Act of 1974.

(3) The Assistant Chief Counsel (DPL) performs the following functions (in addition to those described in CCDM 30.3.2.3.8.1:(3)):

      a. Develops the Service's position in litigation with the Operating Division Counsel, the Service, and Department of Justice in areas within the Assistant's jurisdiction in order to ensure that consistent and appropriate positions are taken in litigation. Provides direct litigation support to Department of Justice in matters within the Division's area of responsibility.

      b. Coordinates with other executives and managers in the handling and processing of all cases or matters referred to Department of Justice for prosecution or defense.

      c. Makes recommendations for the Office concerning the recommendation of acquiescence and nonacquiescence in adverse decisions in litigation; actions on decision in adverse decisions, where appropriate; and recommendations to Department of Justice regarding appeals from adverse decisions, rehearing and rehearing en banc, the filing of amicus curiae briefs, and petitions for writ of certiorari to the U.S. Supreme Court.

      d. Assists the Associate in coordinating disclosure matters with congressional committees, the Department of the Treasury, the Commissioner's office, the Treasury Inspector General for Tax Administration, Department of Justice, and other departments and agencies on matters within his/her jurisdiction.

      e. Advises Department of Justice as to the facts and legal positions of the Service in litigation. Coordinates the Service position in litigation with other Associate offices, the Operating Divisions, Operating Division Counsels, and the Service in areas within his/her jurisdiction. Coordinates, as appropriate, with other executives and managers in the

**30.3.2.3.8.4** Chief Counsel Directives Manual Cat. No. 29599U (08-09-2006)

**EXHIBIT B**

preparation of advice to Department of Justice as to the facts and law; and makes recommendations concerning defense, settlement, or concession in suits pending in the courts. Coordinates with Department of Justice the defense of any case where an employee's refusal to testify or produce Service records results in, or may result in, an Order to show cause as to why that employee should not be held in Contempt of Court, or an actual Order of Contempt. Prepares such documents setting forth the Service position in such cases.

f. Coordinates, as appropriate, with other executives and managers in his/her handling and processing of actions to restrain disclosure under section 6110 in the U.S. Tax Court, including the determination of the Service's litigating position in such cases.

g. Discharges such other responsibilities as the Associate Chief Counsel (P&A) may from time to time prescribe.

(4) The Chief Counsel's authority to receive service of subpoenas or summons in other than U.S. Tax Court matters is delegated, through the Associate Chief Counsel (P&A), to the Assistant Chief Counsel (DPL). This includes the authority to receive service of any subpoena, summons, or other judicial process directed to any officer or employee of the Department of the Treasury in his or her official capacity in any litigation (other than the U.S. Tax Court).

a. Under the authority of the Assistant Chief Counsel (DPL), the Deputy Assistant Chief Counsel, Branch Chiefs, and Senior Technician Reviewers in the Office of Assistant Chief Counsel (DPL) are authorized to receive service of any subpoena, summons, or other judicial process directed to an officer or employee of the Department of the Treasury in his or her official capacity in any litigation (other than the U.S. Tax Court).

b. This authority may be redelegated by the Assistant Chief Counsel (DPL) to other attorneys in the office of the Assistant Chief Counsel (DPL).

c. If a Deputy U.S. Marshall or other process server attempts to serve process on any person not delegated authority to receive process under this provision, that person should refuse such service and direct the process server to one of the persons having authority to receive service.

**30.3.2.3.8.4** Chief Counsel Directives Manual Cat. No. 29599U (08-09-2006)

**EXHIBIT B**

# 1.2 Servicewide Policies and Authorities

1.2.53.6
(04-16-1997)
**Delegation Order 220
(Rev. 3)**

(1) **Claims of Executive Privilege in Federal Courts (Updated (10-02-2000) to reflect additional new organizational titles required by IRS Modernization.)**

(2) **Authority:** To claim executive privilege with respect to the Internal Revenue Service records or information in matters before the United States Court of Federal Claims, the United States Tax Court, and other federal courts.

(3) Certain federal courts recognize claims of executive privilege by the head of the agency as the sole basis for protecting internal or inter-agency records or information that reflect recommendations, advisory opinions, deliberations, and other similar matters, comprising the process by which governmental decisions and policies are formulated.

(4) Executive privilege may be claimed only for those internal or inter-agency records or information that are predecisional and deliberative, the disclosure of which would significantly impede or nullify Internal Revenue Service actions in carrying out a responsibility or function or would constitute an unwarranted invasion of personal privacy. Before any claim of executive privilege is made, there shall be coordination with the appropriate function(s).

(5) Authority to claim the states secrets privilege is not delegated by this order. The states secrets privilege generally encompasses records or information, the disclosure of which would harm national security or the conduct of international relations.

(6) **Delegated to:** Through the Chief Counsel to the Assistant Chief Counsel (Disclosure Litigation), or in the absence, or at the request, of the Assistant Chief Counsel (Disclosure Litigation), to the Deputy Assistant Chief Counsel (Disclosure Litigation).

*Note:* This authority is also delegated through the Chief Counsel to the Deputy Associate Chief Counsel (Procedure and Administration)

(7) **Redelegation:**

*Note:* This authority may only be redelegated by the Chief Counsel.

(8) **Source of Authority:** Treasury Department Order 150-10.

(9) To the extent that the authority previously exercised consistent with this order may require ratification, it is hereby approved and ratified. This order supersedes Delegation Order 220 (Rev. 2), effective October 1, 1991.

(10) Signed: Margaret Milner Richardson, Commissioner

**EXHIBIT C**