UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil No. 05-40151 |
| v. | ) ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) ) ) | |
| Defendant. | ) | |

DECLARATION OF JOHN A. LINDQUIST

I, John A. Lindquist, pursuant to the provisions of 28 U.S.C., §1746, certify that:

1.    I am a Trial Attorney with the U.S. Department of Justice, employed in the Tax Division, Northern Region, with a post of duty at Washington, D.C.

2.    I am one of the assigned trial attorneys for the petitioner United States in the above-referenced matter.

3.    I make this declaration based upon my personal knowledge and the documents referenced herein, copies of which are attached hereto.

4.    Attached hereto as Exhibit 1, is a copy of memorandum that was filed in support of the United States motion to compel The Diversified Group to Produce Documents, a copy of which was served upon plaintiff on March 5, 2007.

5.    Attached hereto as Exhibit 2, is a partial copy of the transcript from the deposition of Robert Prifti which was taken on February 27, 2007, including pp. 101 -121.

6.    Attached hereto as Exhibit 3, is a copy of KPMG's proposed disclosure statement for attachment to Richard and Maureen Egan's 2001 Form 1040, U.S. Individual Income Tax

Return, which was marked as a part of Prifti Deposition Exhibit 48.

7.      Attached hereto as Exhibit 4, is a copy of a handwritten memo from Patrick Shea of

Carruth Management, to Tim Speiss of KPMG dated August 28, 2002, which was marked as

Prifti Deposition Exhibit 47.

8.      I have obtained and reviewed the filed 2001 Form 1040 of Richard and Maureen Egan.

The filed 2001 Form 1040 of Richard and Maureen Egan does did not include a disclosure

statement with respect to Egan's 2001 FDIS transaction.

9.      Attached hereto as Exhibit 5, is a copy of a purported legal opinion dated March 8, 2002,

issued by the law firm of Sidley Austin Brown & Wood to Richard Egan with respect to Egan's

2001 FDIS transaction.  This document was produced to the United States by Sidley Austin

Brown & Wood.

10. Attached hereto as Exhibit 6, is a fax dated March 28, 2002, forwarding to R.J. Ruble of

Sidley Austin Brown & Wood an undated representation letter signed by Richard Egan with

respect to his 2001 FDIS transaction.  This document was produced to the United States by

Sidley Austin Brown & Wood.

11. Attached hereto as Exhibit 7, is a copy of a purported legal opinion dated September 4,

2002, issued by the law firm of Proskauer Rose with respect to Egan's 2001 FDIS transaction.

This document was produced to the United States by the law firm of Proskauer Rose.

12.     On February 27, 2007, immediately following the deposition of Prifti, I requested further

clarification from counsel for plaintiff as to precisely what documents were being requested by

plaintiff with respect to the *Helmer* litigation in plaintiff's Request for Production No. 21.  In

response, plaintiff's counsel verbally asserted that the government should produce copies of the

filed pleadings and papers from the *Helmer* litigation.  Plaintiff's counsel represented that they

had attempted to obtain these litigation files directly from the Tax Court, but that the Tax Court no longer had any of its *Helmer* files. I represented that I too also had not been able to locate these court files. The IRS has not been able to locate a copy of these files, which are now over 30 years old. I have since learned that the IRS' records center only has a 25 year retention policy for litigation files.

13.    On March 26, 2007, the United States amended its Answers to Plaintiff's Second Set of Interrogatories, as well as its responses to Plaintiff's Fifth Set of Requests for Production of Documents, copies of which are attached hereto as Ex. 8 and 9, respectively.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Washington, D.C., on March 26, 2007.

JOHN A. LINDQUIST
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, DC 20044

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non registered participants on March 26, 2007.

/s/ John A. Lindquist
Trial Attorney, US Department of Justice, Tax Division

2349342.1

**Exhibit 1**

# FILE COPY

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America
By: DAVID S. JONES (DJ-5276)
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Telephone: (212) 637-2739



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Petitioner, | | |
| -against- | | M8-85 |
| THE DIVERSIFIED GROUP INCORPORATED, | | (Related civil action No. 05-40151 in the District of Massachusetts) |
| Respondent. | | |

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

DENNIS M. DONOHUE
CHIEF LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

2280845.1

**TABLE OF CONTENTS**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Nature of the Instant Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Business Relationship of DGI, ALPHA and Helios . . . . . . . . . . . . . . . . . . . . 3

    C.    Law and Accounting Firms Assisted in Design and Marketing of FDIS . . . . . . . 8

    D.    Co-Promoters' Sharing of Fees on the FDIS Tax Shelter . . . . . . . . . . . . . . . . . 13

    E.    Sham-Partner Design of the FDIS Tax Shelter . . . . . . . . . . . . . . . . . . . . . . . . . 14

    F.    DGI's 2002 FDIS Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    I.    DGI'S DEVELOPMENT AND MARKETING OF TAX
        SHELTERS IS NOT A PRIVILEGED ACTIVITY . . . . . . . . . . . . . . . . . . . . . . 19

    II.    DGI DOES NOT HAVE A VALID CLAIM OF PRIVILEGE UNDER THE
        COMMON INTEREST DOCTRINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    III.    ANY OTHERWISE VALID CLAIMS OF PRIVILEGE ARE VOID UNDER
        THE CRIME FRAUD EXCEPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

ii

2280845.1

This memorandum of law is being filed in support of Petitioner's motion, pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure, for an order compelling the third-party Respondent, The Diversified Group Incorporated ("DGI"), to produce all documents responsive to a subpoena *duces tecum* served upon DGI on July 3, 2006. DGI has withheld 437 documents to which it has asserted claims of attorney-client and/or common-interest privilege. As detailed herein, those documents and the communications described therein relate to DGI's development, marketing and implementation of tax shelters, and hence are inextricably related to the rendering of business and not legal advice. Even if the communications were otherwise confidential attorney-client communications – which they are not – any privilege claims are void under the crime fraud exception insofar as the withheld communications were made in furtherance of the design, development and implementation of tax shelters which were fraudulent. DGI has also attempted to conceal other responsive documents by placing them off-shore.

## INTRODUCTION

On July 3, 2006, the United States served its subpoena on DGI requesting all documents relating to DGI's involvement in the design, development, marketing, promotion, implementation, opining on, and reporting of certain tax shelter transactions, including a product known as FDIS.[1] In responding to the subpoena, DGI has tendered a privilege log listing 437 documents, all of which clearly fell within the scope of the subpoena. A common theme of the extensive privilege log was that the withheld documents involved communications with in-house attorneys or outside law or accounting firms purportedly providing *legal advice* with respect to

---

[1] *See* Subpoena, Govt. Ex. 66. The exhibits referenced herein are attached to the declaration of John Lindquist, which is being filed simultaneously with this motion and supporting memorandum. Appendix A includes a list and summary of each of the attached exhibits.

1

2280845.1

the design, marketing, and implementation of these tax shelter transactions.[2]  By letter dated

October 12, 2006, the United States informed DGI's counsel that the documents on the privilege

log did not appear to be covered by the attorney-client privilege, and unless the documents were

produced, we would move to compel their production.[3]  As detailed herein, the vast majority of

DGI's privilege claims are frivolous.

## FACTUAL BACKGROUND

The relevant facts supporting this motion and, in particular, the Unites States' claim of

crime fraud can be briefly summarized as follows:

### A.    Nature of the Instant Lawsuit

The lawsuit in which DGI was subpoenaed to produce these tax shelter documents is

*Fidelity International Currency Advisor A Fund, LLC v. United States*, 05-40151 (D.Mass),

pending in the District of Massachusetts ( Honorable F. Dennis Saylor ).  This case involves a tax

shelter product purchased by Richard Egan, a former U.S. ambassador to Ireland, from Helios

Financial, LLC ("Helios"), with which DGI had a formal and informal business relationship.

The tax shelter in this litigation was developed and marketed by DGI under the name "Financial

Derivatives Investment Strategy" or "FDIS."[4]  Egan purchased an FDIS tax shelter in 2001,

designed to generate $150 million in tax benefits.  Egan's FDIS tax shelter is but one of 47 FDIS

---

[2]  A summary of DGI's privilege log, with our response to each separate claim of privilege, is attached hereto as Appendix B.  For analysis, these claims are divided into five sub-groups: Appendix B-1 (listing 56 DGI privilege claims with no discernable basis); Appendix B-2 (listing 54 DGI claims of privilege involving communications by purported in-house counsel); Appendix B-3 (listing 269 DGI claims of privilege involving communications with law firm promoters); Appendix B-4 (listing 27 DGI claims or privilege involving communications with accounting firm promoters ); and Appendix B-5 (listing 31 DGI claims of privilege involving other counsel).

[3]  *See* Govt. Ex. 68 (letter to DGI re filing of a motion to compel).

[4]  DGI referred to its initial design-iteration of FDIS as the "2001 Partnership Option Strategy." *See* DGI memo dated 3/23/01, Govt. Ex. 10.

2

tax shelters that were marketed and sold by DGI in 2001, generating over $1 billion in fraudulent tax losses.[5]

As detailed in Appendix B-1, two (2) of DGI's 437 privilege claims involve communications between DGI and Richard Egan's counsel, Stephanie Denby. The first, claim B-1 No.1 [DGI No. 333], is described as an email dated 4/3/02 from Haber of DGI to Denby "attaching draft opinions" which DGI contends is privileged under the attorney-client and common-interest doctrines. The second, claim B-1 No.2 [DGI No. 310], is described as an email dated 6/19/02, from Haber to Denby, also "attaching draft opinions," to which DGI asserts a claim of common interest, but no claim of attorney-client privilege. As to both of these documents, insofar as DGI was not Denby's client, there is no basis for DGI's attorney-client privilege claims. Denby's client was Richard Egan. As such, any communications between DGI and Denby were not for the purpose of providing legal advice to DGI and would not be protected under the attorney-client privilege.

## B.    Business Relationship of DGI, ALPHA and Helios -

DGI is located at 950 Third Avenue, New York,[6] and holds itself out as a "boutique investment banking firm."[7] James Haber is the president and director of DGI.[8] John Huber was

---

[5] The forty-seven (47) FDIS transactions, including the Egan FDIS transaction, are detailed in a DGI spreadsheet attachment to an email dated May 1, 2002. *See* email dated 5/1/02, re "2001-Customers-Haber_Invst-4-22-01.xls," Govt. Ex. 50; Govt. Ex. 51 (list of DGI transactions and amount of loss to be generated, wherein the listed FDIS transactions total in excess of $1 billion. Each of these forty-seven (47) FDIS transactions are also listed in Appendix C.

[6] Haber Dep. 5/12/03, at 9:15 - 9:17, Govt. Ex. 63. Haber testified on 6/29/01 that DGI's office in New York was its only office. *See* Haber Dep. 6/29/01 at 29:23 - 30:2, Govt. Ex. 37.

[7] *See* FDIS PowerPoints, Govt. Exs. 18, 20.

[8] Haber Dep. 5/12/03, at 9:18 - 9:21, Govt. Ex. 63; Haber Dep. 8/12/03, at 17:10 - 17:15, Govt. Ex. 58. DGI was formed at the direction of James Haber ("Haber") by the law firm of Brown, Raysman
(continued...)

3

DGI's Chief Financial Officer.[9] Orrin Tilevitz was DGI's Vice-President and General Counsel.[10]

"Diversified Group, Inc. is a business engaged in conceiving and marketing products and

methods for the minimization of corporate and personal income taxes in New York and the

United States."[11]

As described by DGI in its FDIS marketing materials, by their very nature, the design,

development, marketing, and implementation of tax shelters interweave both legal and business

advice.[12] While Tilevitz was DGI's in-house counsel, the record shows that he was intimately

---

[8](...continued)
& Milstein. Haber Dep. 8/12/03, at 17:16 - 17:17, Govt. Ex. 64. Haber appears to have transferred his
stock ownership of DGI to a trust for the benefit of his children. Haber Dep. 8/12/03, at 19:19 - 20:2,
Govt. Ex. 5.

[9] *See* FDIS PowerPoints, Govt. Exs. 18, 20. John Huber was employed by DGI for two years.
Haber Dep. 5/12/03, at 10:19 - 11:1, Govt. Ex. 63.

[10] *See* FDIS PowerPoint, Govt. Exs. 18, 20 (describing Orrin Tilevitz as DGI's Vice-President
and General Counsel). However, Tilevitz only worked for DGI from 1999 until the end of 2001. *See*
Haber Dep. 8/12/03, at 61:21 - 62:7, Exhibit 64.

[11] Govt. Ex. 5, Haber Dep. 9/7/00, at 7:25 - 8:6 (Haber admitted that this was a fair statement of
DGI's business). *See also*, Govt. Ex. 65, Haber Dep. 8/12/03, at 21:9 - 21:20 (Haber testified that prior
to 8/12/03, "[DGI] was effectuating structured tax transactions.")

[12] DGI describes its process of interweaving legal and business concerns as follows:

> We apply our expertise in structuring transactions that typically involve
> all of the following seven disciplines:
>
> | | |
> |---|---|
> | tax law | book accounting |
> | legal analysis | equity investment |
> | debt placement | economic analysis |
> | administration | |
>
>      \*\*\*\*\*
>
> There is as much art as science involved in reaching a solution.
>
>     \* \* \* \*
>
> Because our transactions are "document intensive", we view one of our
> most valuable contributions to our clients is to firmly manage and
> control the process of getting 2-4 sets of attorneys and accountants to

(continued...)

4

involved in the design, development, marketing, and implementation of DGI's tax shelter products.[13]

Since about 1998, Helios and Alpha Consultants, LLC ("Alpha") have assisted DGI in the development and marketing of tax shelters. Alpha is a Florida limited liability company which purports to be engaged in trading and trade consulting for structured options and foreign currencies, lead by Ivan Ross.[14] Helios is a partnership formed by Mox Tan and Phil Kampf, Jr., under a marketing agreement with DGI to market DGI strategies.[15] Both Helios and Alpha have

---

[12](...continued)
    expeditiously reach a conclusion.

*See* FDIS PowerPoints, Govt. Exs. 18 and 20.

[13] Tilevitz joined DGI in 1999. Prior to joining DGI, Tilevitz worked for the accounting firm of Price Waterhouse, where he assisted DGI and R.J. Ruble of Sidley Austin, Brown & Wood in co-developing a tax shelter which became known as the Option Partnership Strategy ("OPS"). *See* Affirmation of Orrin Tilevitz, ¶¶8-14, Govt. Ex. 6. R. J. Ruble has since been indicted for his involvement in the development, marketing and implementation of various fraudulent tax shelter products. *See* Superceding Indictment, ¶¶ 16 and 25-78, Govt. Ex. 65. During his employment at DGI, Tilevitz continued to be intimately involved in the design and marketing of tax shelters. *See* email dated 2/23/01, Govt. Ex. 8 (forwarding R.J. Ruble a revised memo on the 2001 partnership strategy); email dated 3/26/01, Govt. Ex. 12 (forwarding R.J. Ruble a cleaned-up version of the partnership strategy memo); email dated 4/2/01, Govt. Ex. 17 (setting up a conference call with BDO Seidman on the partnership strategy); email dated 4/18/01, Govt. Ex. 28; email dated 4/24/01, Govt. Ex. 30 (circulating a document to Bob Greisman and Charlie Bee of BDO Seidman, Ira Akselrad of Proskauer Rose, and R.J. Ruble of Sidley Austin on transitory preferred stock); Govt. Exs. 8, 10, 11 and 12 (forwarding strategy memo to R.J. Ruble of Sidley Austin); Govt. Ex. 33 (Email dated 5/17/01 from Orrin Tilevitz of DGI to R.J. Ruble of DGI forwarding drafting operating agreement, along with exhibits thereto, to implement the strategy); email dated 4/24/01, Govt. Ex. 30 (Orrin Tilevitz of DGI preparing draft of opinion for the 2001 option spread partnerships); email dated 4/26/01, Govt. Ex. 31 (forwarding partnership opinion from Orrin Tilevitz of DGI to R.J. Ruble of Sidley Austin).

[14] *See* FDIS PowerPoints, Govt. Exs. 18, 20, and 21.

[15] DGI has produced a copy of a marketing agreement with Helios which reflects that Helios was formed in 1998 by Mox Tan and Phil Kampf, Jr., to market DGI tax strategies. *See* Govt. Ex. 1; *see also*, Haber Dep. 6/29/01 at 72:19 - 72:25, Ex. 37. The marketing agreement reflects that by letter dated November 1, 1998, Helios Group, LLC, confirmed and set forth the terms and conditions by which it would be engaged by DGI as an independent contractor to market DGI products. *See* DGI/Helios Agreement, Govt. Ex. 1. In furtherance of that business relationship, on or about November 16, 1998, Mox Tan and Phil Kampf formed Helios Financial LLC ("Helios") as the entity to be used to market DGI

(continued...)

a profit sharing arrangement with DGI.[16] Under the DGI/Helios marketing agreement, Helios

was to market and implement DGI products and was to be paid a percentage portion of DGI's net

fee.[17] Helios had offices in Chicago, but Tan and Kampf would come to DGI's New York office

from time to time for a few days to prepare closing binders for DGI's tax shelter products.[18]

Haber has testified that neither Tan nor Kampf were DGI employees.[19] Nor was Helios in the

business of providing legal advice.[20]

Fifty-six DGI privilege claims which have not discernable basis are collected in Appendix

B-1: Nos. 1-11 involve communications between DGI and DGI's customers (including the 2

with the Egan lawyers); Nos. 12-17 involve communications between DGI and financial

institutions; Nos. 18-29 involve internal DGI communications (to which DGI's purported in-

house counsel were not party);[21] No. 30 is a communication between DGI and Ivan Ross of

---

[15](...continued)
products. DGI/Helios Agreement, Govt. Ex. 1. According to Haber, this written agreement is the only
version of DGI's marketing agreement with Helios. Haber Dep. 6/29/01 at 74:10 - 74:14, Ex. 37. Haber
has testified that he was also a director of Helios. See Haber Dep. 8/12/03, Ex. 64, at 31:3 - 31:8. In fact,
Helios marketing materials reflect that he was the managing director of Helios. Govt. Ex. 6, at p.5.

[16] Haber has testified that Ivan Ross, of Alpha, was integral to DGI's development and
marketing of tax shelters and also had a profit sharing agreement with DGI. Haber Dep. 9/7/00, at 57:5 -
23, 58:9 -15, Govt. Ex. 5; see also, Govt. Ex. 1 (marketing agreement between DGI and Helios) and
Govt. Exs. 50 and 51 (providing a reconciliation of aggregate fees and expenses for purposes of
computing the profit split between DGI, Alpha and Helios).

[17] Govt. Ex. 1, ¶¶ I a., and II; Haber Dep. 8/12/03, at 32:7 - 32:21; 32:22 - 33:6, 177:16 - 178:22
Govt. Ex. 64.

[18] Haber Dep. 8/12/03 at 60:20 - 61:5, Govt. Ex. 64. It appears that under the marketing
agreement between DGI and Helios, DGI was allowed to use Helios's logo and Helios was allowed to
use DGI's logo. See DGI/Helios Agreement, Ex. 1. Helios was apparently also allowed to use DGI
letterhead. Haber Dep. 8/12/03 at 60:16 - 60:19, Ex. 64.

[19] Haber Dep. 8/12/03 at 61:6 - 61:8, Ex. 64.

[20] See Helios Marketing Materials, Govt. Ex. 6.

[21] These internal DGI communications included communications between Jimmy Haber and
(continued...)

6                                                                        2280845.1

Alpha [DGI No. 426]; and Nos. 31-56 involve communications between DGI and Helios.[22]  None of these entities were in the business of providing legal advice.  Nor is there any basis for DGI's claim that these third-party communications did not effect a waiver of any privilege that might have otherwise applied.

As detailed in Appendix B-2, fifty-four (54) of DGI's 437 privilege claims involve Orrin Tilevitz, and Elizabeth Jung, DGI's purported in-house counsel.[23]  While both are attorneys, the record amply shows that neither were providing legal advice to DGI.  They were assisting DGI in the design, development, marketing and implementation of fraudulent of tax shelters.  For Tilevitz, this is most notably evidenced: by his design of the FDIS strategy, Govt. Exs. 8 and 10; the circulation of proposed FDIS marketing materials, Govt. Ex. 18; his design discussions with RJ Ruble, Govt. Ex. 25; his design of the operating agreement for the FDIS transaction, Govt. Ex. 35;  and his participation in the review of the cookie-cutter FDIS opinions,  Govt. Ex. 47. For Jung this is evidenced, notably, by Govt. Exs. 42 and 48, which show Jung monitoring the production process for "cookie-cutter" FDIS opinions, not providing legal advice to DGI.  *See* Govt. Ex. 42 (email dated 3/22/02 "Please send all future changed drafts electronically to Elizabeth Jung, ejung@divgroup.com, at this office so she can check the changes and we can

---

[21](...continued)
John Huber, DGI's controller, and Jimmy Haber and Dorothy Suchawacki, his secretary. Neither Haber, Huber nor Suchawack are attorneys.

[22]  Mox Tan was initially misidentified in DGI's privilege log as an attorney with DGI. As amended, DGI now correctly identifies Mox Tan as an attorney with Helios. As will be shown, this correction cannot cure the fatal flaw that neither Mox Tan nor Helios were providing legal advice to DGI.

[23]  *See* Appendix B-2, listing 54 DGI privilege claims in which it appears DGI is contending that Orrin Tilevitz and Elizabeth Jung were its in-house counsel. As detailed therein, B-2 claim Nos. 1-53 are communications involving Orrin Tilevitz, an attorney with DGI until the end of 2001; and No. 54, a communication involving Elizabeth Jung.

7

2280845.1

keep track of the process."); Govt. Ex. 48 (fax dated 4/4/02 "Please advise if the circled language was intentionally deleted in the *** [another FDIS transaction] legal opinions." )

DGI's privilege claims with respect to Tilevitz's communications are also fatally flawed by the fact that B-2 claims Nos. 26-53 are dated after 2001, when, according to Haber's testimony, Tilevitz no longer worked for DGI. *See* Govt. Ex. 64, Haber Dep. 8/12/03, at 61:21 - 62:7. This is corroborated by a memo in early 2002, which reflects that Tilevitz was no longer to be an employee of DGI, but instead was to hold himself out as a consultant to Trilogy Financial Products. *See* Govt. Ex. 52, Revised Trilogy US Implementation Memo. This is further corroborated by the fact that the financial records produced by DGI in response to the subpoena *duces tecum* do not reflect any direct payments to Tilevitz after 2001.

As detailed in Appendix B-5, thirty-one (31) of DGI's 437 privilege claims involve communications with law firms which also do not appear to be providing legal advice to DGI. For instance, Thomas Long appears to have been counsel for Haber's children's trust, not DGI. Similarly, the law firm of Fullbright & Jaworski appears to have been retained by Haber personally, not DGI. The law firm of McDermott, Will & Emory appears to have been engaged by Helios, not by DGI. To the extent that any of these communications were privileged, the privilege has been waived by disclosure to DGI and/or other third-parties.

## C.    Law and Accounting Firms Assisted in Design and Marketing of FDIS.

As described by DGI in its FDIS marketing materials, a number of law firms and accounting firms assisted DGI on a regular basis in its development and marketing of tax shelters.[24] DGI viewed its ability

---

[24] *See* FDIS PowerPoint, Govt. Exs. 18; *see also,* Ruble Affidavit, ¶¶8-12, Govt. Ex. 7

(continued...)

2280845.1

> ... to manage and control the process of getting two to four sets of attorneys and
> accountants to *expeditiously reach the desired conclusions* as being one of [its]
> most valuable contributions to [its] clients.

(Emphasis added).[25]  For the FDIS product, DGI documents reflect that it enlisted four law firms

to review the product and issue opinions, all for the apparent purpose of making each of their

opinions appear independent.   These law firms included Proskauer Rose, Lord Bissell & Brook,

Bryan Cave, and Sidley Austin Brown & Wood ("Sidley Austin").   The FDIS transactions upon

which these law firms issued opinions are listed in Appendices C and D.  DGI also enlisted

Brown Raysman, whose role appears to have been limited to implementation documents.  DGI

documents reflect that it also enlisted four accounting firms to assist in targeting potential

customers.[26]  These accounting firms included BDO Seidman, LLP ("BDO"); Grant Thornton;

KPMG; and RSM McGladrey.  The FDIS transactions, in which these accounting firms have

been identified as having received a fee, are also listed in Appendices C and D.

    As detailed in Appendix B-3, 269 of DGI's 437 privilege claims involve communications

with five law firms that co-promoted the FDIS transactions.  As detailed therein, B-3 claim Nos.

1-34 involve communications with the law firm of Brown Raysman; Nos. 35–55 involve

communications between DGI and the law firm of Bryan Cave; No. 56 involves a communication

between DGI and the law firm of  Lord Bissell & Brook; Nos. 57-151 are communications

between DGI and the law firm of Proskauer Rose; and Nos. 152-269 are communications between

---

[24](...continued)
(describing how Ruble assisted DGI in developing its Option Partnership Strategy).

    [25] *See* FDIS PowerPoint, Govt. Exs. 18.

    [26] *See*, e.g., Govt. Exs 17, 19, 21, 22, 33 and 34 (with respect to BDO); Govt. Ex. 36 (with
respect to Grant Thornton); Govt. Ex. 51 (listing Ron Wainwright, an RSM McGladrey's Partner, as an
accommodation party whom DGI gave a $1.25 million FDIS transaction to shelter his own income as a
"favor").

2280845.1

DGI and the law firm of Sidley Austin. As detailed in Appendix B-4, twenty-seven (27) of DGI's

437 privilege claims involve communications with four accounting firms that also co-promoted

the FDIS transactions.

As detailed therein, B-4 claim Nos. 1-14 involve communications between DGI and the

accounting firm of BDO Seidman, LLP ("BDO"); Nos. 15-16 involve communications between

DGI and the accounting firm of Grant Thornton; Nos. 17-18 involve communications between

DGI and KPMG; and Nos. 19-27 involve communications between DGI and the accounting firm

of RSM McGladrey.

While DGI has asserted a claim of attorney-client privilege as to its communications with

these law firms, it is abundantly clear that none of these law firms were providing legal advice to

DGI. DGI's records reflect that the law firms of Proskauer Rose, Lord Bissell & Brook, Bryan

Cave, and Sidley Austin were all paid by DGI for the opinions that they issued to DGI's

customers. Prior to the engagement of any of these customers, these law firms, as well as Brown

Raysman, assisted DGI in the design and development of the FDIS marketing materials.[27] In

addition to receiving the draft FDIS marketing materials for review and comment, these same law

firms also assisted in the drafting of the boilerplate implementation documents for the FDIS

transactions, as well as drafting purportedly independent – but actually cookie cutter – opinions

---

[27] Govt. Ex. 18 (Helios Email dated 4/4/01 forwarding FDIS marketing materials for review and comment); Govt. Ex. 20 (Ruble email dated 4/5/01, "I have made some modification to the slides which I hope come out when you open them. Basically, I have eliminated the term 'Foreign Investor' and replaced it with the term 'Investor(s) II'"). RJ Ruble of Sidley Austin was also involved in the design and development of the FDIS product prior to this. *See* Govt. Exs. 8, 10, 11 and 12. Ruble was also involved in the design and development of other DGI tax shelter products in prior years. *See* Govt. Ex. 7 (Ruble Affidavit, ¶¶8-12, describing how Ruble also assisted DGI to develop its Option Partnership Strategy).

2280845.1

blessing the very FDIS transactions which they had helped to design.[28] These law firms appear to have provided these services to DGI, in exchange for the promise that they would then be paid for issuing opinions to the targeted customers. As such, during this development phase, these law firms were providing DGI nothing more than business advice, not legal advice.

DGI records show that the four accounting firms also shared in the design and development of the FDIS product which they then marketed.[29] In targeting potential customers, these accounting firms were directed not to leave the customer with a copy of the FDIS PowerPoint because it "show[ed] too much of the structure."[30] The fee for these accounting firms, like the fee for DGI, was computed as a fixed percentage of the tax loss to be generated.[31] In the instance of BDO, DGI's fee was collected by BDO and paid through Helios. As confirmed by the

---

[28] *See* email dated 4/24/01, Govt. Ex. 30 (Orrin Tilevitz of DGI preparing draft of opinion for the 2001 option spread partnerships); email dated 4/26/01, Govt. Ex. 30 (forwarding partnership opinion from Orrin Tilevitz of DGI to R.J. Ruble of Sidley Austin); email dated 2/7/02 Govt. Ex. 45 ("I've been through the Proskauer draft for the new deal. Ira has done an excellent job pairing down a number of the discussion from what we have said in the past. In a perfect world I would probably adopt many of the changes Ira made, but it hard to get changes to boilerplate here. Do you have a problem if we continue to use our form of discussion on most of these issues??")

[29] *See* fax dated 6/17/01, Govt. Ex. 36 (transmitting FDIS PowerPoint to Grant Thorton); Govt. Exs. 21 and 22 (FDIS PowerPoints produced by BDO); *see also,* Govt. Ex. 28 (DGI email dated 4/18/01 to Akselrad of Proskauer Rose and Ruble of Sidley Austin, confirming that the referenced attachment named "Transitory Preferred" also had been sent to Charlie Bee of BDO); Govt. Ex. 29 (Fax dated 4/23/01 from BDO to Haber of DGI confirming a conference call for 4/26/01). Haber previously has testified that DGI's "referral sources" included KPMG, BDO Seidman, Grant Thornton and RSM McGladrey. Haber Dep. 2/28/03 at 290:21 - 291: 6, Govt. Ex. 62.

[30] *See* Govt. Exs. 21 (Handwritten cover notes on front page of FDIS marketing materials read "(1) Confirm that this will not be left with client (i) if it is left...shows too much of the structure (ii) if not left, should have some investment-oriented material to leave (2) we need to decide about fee inside or out -- (3) if out - how do we justify it..."); *see also,* Govt. Exs. 22 (FDIS PowerPoints produced by BDO) and Govt. Ex. 36 (transmitting FDIS PowerPoint to Grant Thorton and stating "This is to confirm that the enclosed materials will not be distributed to anybody").

[31] Govt. Ex. 23 (BDO email dated 4/5/01, describing the proposed fee split with DGI)

11

following internal BDO email, this was nothing more than an attempt to create the facade of a

privileged relationship:

> There may be an argument that if we pay Helios, Helios derives some protection
> from our accountant-client privilege (something of a long shot, but I wouldn't
> mind litigating it for a couple of years while the statutes run)[32]

To make the law firms appear to be in a privileged relationship with the customer, BDO also

wanted to have the law firms paid directly by the client, even though the fee to the law firm would

still come out of DGI's split.[33]

Each of the targeted customers appear to have been apprised that DGI had arranged for

four law firms from which to pick who would issue an opinion blessing the FDIS transaction,

which would be paid through DGI out of its fee.[34]  As candidly disclosed in an email exchange

between R.J. Ruble of Sidley Austin and Haber of DGI, the pretense that these law firms were

independent was mere play acting:

> Ruble: just got my lunch invitation from larry cohen [of BDO].  I'll act surprised
> when he hands me the memo.

---

[32] BDO email dated 4/27/01, Govt. Ex. 32.

[33] *See* BDO email dated 9/25/01, Govt. Ex. 39.  While DGI collected and paid most of the fees
for the opinions that were issued to its customers, some customers paid their legal fees directly.  *See*
Govt. Exs. 41, 42, and 43.

[34] DGI confirmed the amounts payable by it to Sidley, Proskauer and Bryan Cave for their
issuance of opinions by memo dated 1/2/02. *See* Govt. Exs. 41, 42, and 43.  The 2001 reconciliation of
net fees and expenses reflects that DGI paid Sidley $800,000, Proskauer $1,020,000, Bryan Cave
$560,000, Lord Bissell & Brook $75,000, and Brown Raysman $250,000. *See* email dated 5/3/02, with
attached 2001 reconciliation, Govt. Ex. 51.  The general understanding was that these legal fees would be
paid by DGI out of the money that it collected from the taxpayers as part of the "all-in" cost which was a
fixed percentage of the deal, namely the desired tax loss.  *See* BDO email dated 4/5/01, Govt. Ex. 23.

2280845.1

> Haber: You don't have to rely on your acting skills because I have already told him that
> you have it and that we are working together to enhance the opinion.[35]

The law firm of Brown Raysman appears to have been assigned the specific task of preparing the

implementation documents for each of the FDIS transactions.[36]

**D.    Co-Promoters' Sharing of Fees on the FDIS Tax Shelter.**

DGI and its two primary co-promoters, Alpha and Helios, marketed their tax shelter

products to wealthy taxpayers seeking to offset multi-million dollar amounts of ordinary income

or capital gains, such as from the exercise of stock options or the sale of a business. DGI charged

a fee for the FDIS product based on a percentage of the taxpayer's desired tax loss.[37] After the

payment of all transaction-related expenses, DGI allocated the remaining net fee between itself,

Alpha, and Helios, if involved on the transaction, on an agreed-upon percentage basis.[38] DGI's

records reflect that DGI, Alpha and Helios shared net profits, after expenses, on a 40/40/20 basis,

respectively, in 2001.[39]

---

[35] *See* DGI email dated 1/25/02, Govt. Ex. 44.

[36] *See* Govt. Ex. 35 (Email dated 5/17/01 from Orrin Tilevitz of DGI to R.J. Ruble of DGI forwarding drafting operating agreement, along with exhibits thereto, to implement the strategy). DGI records reflect that Brown Raysman was paid $250,000 for its services. Govt. Ex. 51.

[37] *See* Govt. Ex. 51(attached spreadsheet computes the net fee from each of the listed customers as a fixed percentage of the amount of the transaction).

[38] *See* Govt. Ex. 51 (attached spreadsheet computes Alpha's 40% share of the net profits after shared expenses for 2001).

[39] *See* Govt. Ex. 30 (email dated April 26, 2001 from Steve Jacoby of SMD, a salesman for DGI products, to Haber of DGI, stating "On Tuesday you told me that DGI and Alpha would get 80% of the profits and Helios would get 2/3 and SMD 1/3 of the remaining 20%."); Govt. Ex. 51 (attached spreadsheet computes Alpha's 40% share of the net profits after shared expenses for 2001); Govt. Ex. 61 (Alpha email dated 2/27/03, computing allocation between DGI, Alpha and Helios on a 40/40/20 basis for 2002).

2280845.1

.E.    **Sham-Partner Design of the FDIS Tax Shelter.**

The FDIS tax shelter was fundamentally fraudulent in its design. Its tax benefits were
critically dependent on a multi-member LLC being treated as a valid partnership for federal
income tax purposes. *See, e.g., Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949) (a valid
partnership for tax purposes requires the parties to join together as partners in good faith with a
legitimate business purpose).

Including Egan's transactions, DGI sold forty-seven (47) FDIS partnership transactions in
2001. As reflected in Appendix C, these forty-seven FDIS tax shelters generated over a $1 billion
in tax losses.[40] Each of those transactions involved the formation of a multi-member LLC, which
was treated as a partnership for tax purposes, with the participation of a purported foreign partner,
who nominally acquired the bulk of the common interests of the partnership for a relatively small
share of its total contributed capital. Once capitalized, the purported partnership would acquire
multiple pairs of simultaneously-executed, offsetting European digital options. They would then
meticulously time the termination of the offsetting options, first to terminate the gain legs of the
options, generating massive paper gains to the purported foreign partner who was not subject to
U.S. taxes. Simultaneously therewith, the partnership would replace the terminated gain legs with
options having virtually the exact same terms. Then, almost immediately thereafter, the taxpayer
would purchase the bulk of the purported foreign partners' common interest for one-half of the
foreign partner's purported capital contribution. A few weeks thereafter, the partnership would
terminate the remaining options, generating a massive paper loss to the taxpayer who would then

---

[40] *See* Appendix C (listing 47 2001 FDIS transactions generating desired tax losses totaling
$1,027,050,000); Govt. Ex. 50 (listing 47 2001 FDIS transactions and the adjusted basis of the purported
foreign investors, Samuel Mahoney and Martin Hawkes); Govt. Ex. 51 (listing all of DGI's 2001
customers, including the 47 2001 FDIS transactions, generating losses totaling $1,545,950,000).

claim the paper loss on his personal return as a real economic loss. On the partnership tax return, however, the paper gains and paper losses would virtually offset each other, with the partnership reporting only a small net economic gain or loss on the offsetting option transactions.[41]

Prior to each of these FDIS transactions, the promoters prepared an outline of the proposed transactions, which detailed the pre-arranged steps common to each of the FDIS transactions.[42] As summarized in Appendix C,[43] these outlines reflect that one of the same purportedly independent foreign partners, Samuel Mahoney or Martin Hawkes, participated in each of the forty-seven (47) 2001 FDIS transactions.[44] DGI produced records with respect to its profit sharing and accounting for all of its 2001 deals, including the forty-seven (47) FDIS deals, copies of which are marked as Govt. Exs. 50 and 51. Those records reflect that DGI collected gross fees in excess of $32 million on its 2001 tax shelters, including its forty-seven (47) FDIS deals. Those records also reflect that DGI fully reimbursed the purportedly independent foreign partners on the forty-seven (47) FDIS deals; and also show that DGI paid these purportedly independent foreign

---

[41] In marketing FDIS, DGI highlighted the fact that the face of the partnership return, *i.e.*, Form 1065, reporting the offsetting options transactions "did not show a large net loss." Email dated 4/10/01, Govt. Ex. 26. The application of this design is illustrated on the Form 1065 that was filed for the Egan transaction, a copy of which is attached as Govt. Ex. 70.

[42] Both the design memo and FDIS marketing materials outline the multiple steps of the transaction. In the first step of the transaction, the taxpayer's basis in the partnership is artificially inflated to make it appear that the taxpayer has sufficient basis to claim a tax deduction for the allocated partnership loss. *See* DGI memo dated 3/23/01, Govt. Ex. 10; FDIS PowerPoint, Govt. Ex. 18.

[43] *See* Appendix C to the Declaration of John Lindquist. Appendix C details information from the collected outlines for each of the forty-seven (47) FDIS transactions. The outline for the Egan transaction is also attached to Appendix C as a sample.

[44] Samuel Mahoney and Martin Hawkes are also both listed as directors of Biosphere Finance, an Irish entity. *See* 2001 Form B1 of Biosphere Finance, Govt. Ex. 55. As reflected on Appendix B, DGI is asserting claims of attorney-client privilege as to its communications with Biosphere.

15

2280845.1

partners $2 million.[45] More specifically, Govt. Ex. 51 lists the desired tax loss for each 2001 deal,

DGI's fee as a fixed percentage of that tax loss, and the fee collected. For example, Egan's

desired tax loss for his FDIS deal was $150 million.[46] The fee Egan paid to DGI for this deal, as a

fixed percentage of the tax loss, was 2.25%, for a fee of $3,375,000. After listing the fees

collected from its customers, the accounting then lists DGI's expenses, which includes not only

the legal fees paid by DGI for five law firms that wrote the FDIS opinions and implementing

documents, but also the "cost-basis" of Sam Mahoney and Martin Hawkes in their so-called

investments in the forty-seven (47) FDIS deals. This "cost basis" of $1,320,978, reflects the

initial "investment" by the foreign investors totaling $3,707,715, less the so-called "buy-out" of

the foreign investors by each of the FDIS customers, totaling $2,404,737.[47] After tallying all

expenses including those of the foreign investors, the DGI accounting subtracts those expenses

from the fees collected from the customers to arrive at a net fee, which, after out-of pocket

expenses, yielded a net profit, and then computes the 40% split to Alpha. These DGI documents

---

[45] The forty-seven (47) FDIS transactions from 2001, including the Egan transaction, are detailed in a spreadsheet attachment to an email to DGI dated May 1, 2002. *See* email dated 5/1/02, re "2001-Customers-Haber_Invst-4-22-01.xls," Govt. Ex. 50. The spreadsheet shows that the purported foreign partners' alleged total original investment for all forty-seven (47) transactions in 2001 was $3,707,715. The spreadsheet also shows that the purported foreign partners received a total of $2,404,737 on the sale of the bulk of their partnership interests to the taxpayers for the 47 transactions, leaving the amount of $1,302,978 as their still unrecovered "cost basis"on their alleged original investment ($1,302,978 = $3,707,715 - $2,404,737). DGI's records further reflect that DGI considered Mahoney and Hawkes unrecovered cost basis of $1,302,978 along with an additional $2,000,000 as a joint expenses to be subtracted from gross profits for purposes of computing DGI's, Alpha's and Helios's share of the net profits. *See* Govt. Ex. 51. These records show that DGI was therefore the ultimate source of Samuel Mahoney's and Martin Hawkes' unrecovered capital contributions, referenced in Govt. Ex. 51 as "SM-MH Cost Basis." Moreover, they also show that DGI paid Mahoney and Hawkes a lump sum amount of $2,000,000 for playing the role of a nominee or sham partner on these 47 transactions. *See* Govt. Ex. 51.

[46] These records reflect that Egan also did another 2001 tax shelter transaction with DGI to generate an additional $160 million loss. However, that transaction was not a FDIS transaction.

[47] *See* Govt. Ex. 50 and Appendix C.

16

clearly demonstrate that Mahoney and Hawkes were falsely represented in the deal documents,

opinion letters, and partnership tax returns as independent foreign investors, when in fact they

were nominees arranged for and paid for by the promoters. Thus, the taxpayer and the so-called

foreign co-investors did not join together in good faith as real partners in these tax-driven

ventures, and the purported FDIS partnerships were not valid partnerships for federal income tax

purposes. Without the participation of an independent foreign partner, the FDIS transactions

collapse. [48]

**F.    DGI's 2002 FDIS Transactions.**

DGI continued to market FDIS transactions in 2002,[49] but through the facade of Trilogy

Financial Products, Limited.[50] On April 30, 2002, Jimmy Haber went to London to acquire 20%

of Trilogy Financial Products.[51] By email dated May 24, 2002, Mox Tan of Helios circulated a

memo detailing how Haber, Tilevitz, Huber, Tan, and Kampf would become consultants to

Trilogy Financial Products, that these individuals would no longer carry business cards with a

logo or company identification, that their secretaries would no longer identify their company when

answering their phone, that they should each obtain a personal e-mail address in lieu of the their

---

[48] The FDIS transactions were fraudulent in design, development and implementation as a result of the fact that Mahoney and Hawkes were sham partners. While it can also be argued that the FDIS transactions were fraudulent upon other grounds, for purposes of this motion, the United States has limited its showing of fraud to the fact that Mahoney and Hawkes were sham partners.

[49] The FDIS transactions for 2002 are summarized in Appendix D to the Declaration of John Lindquist.

[50] DGI had a prior working relationship with Trilogy going back as far as 1999. *See* email dated 2/15/00, Govt. Ex. 2 (stating that the attached PowerPoint presentation for the "UK Pathfinder" "...is essentially the same as the Trilogy/Diversified joint presentation that we all agreed upon in August 1999, spiffed up to incude logos and standardized fonts." *See also*, Haber Dep. 8/12/03, at 47:25-48:21, Govt. Ex. 64.

[51] *See* email dated 4/30/02, Govt. Ex. 49 ("[W]e have a meeting...to run through how you want to structure your 'acquisition' of 20% of Trilogy....").

2280845.1

existing company email addresses, and that all customer files were to be sent off-shore to Trilogy so DGI would be able to contend that it did not to have possession or control of the books and records.[52] Under this new marketing and implementation scheme, Sam Mahoney and Martin Hawkes continued to act as mere nominees for DGI, but through Trilogy.[53] In addition to the documents identified in their privilege logs, DGI has also failed and refused to produce any of the documents that it transferred offshore to Trilogy.

On its privilege log, DGI has listed 2 documents involving communications by Orrin Tilevitz with Martin Hawkes and Samuel Mahoney.[54] The first document, B-2 claim No. 23, is an email dated 11/13/01 from Martin Hawkes to Jimmy Haber, described as an "Email re: legal tax advice," which DGI claims is protected under the attorney-client and common-interest privileges. There is no identifiable basis for these claims insofar as neither DGI nor Biosphere provide legal advice. Nor did DGI share a common legal interest with Biosphere. The second document, B-2 claim No. 51, is an email dated August 6, 2003, from Jimmy Haber to Biosphere Finance described as "attaching a draft legal tax memo from Orrin Tilevitz to Haber re: tax litigation." DGI has asserted claims of attorney-client and work-product privilege with respect to this

---

[52] *See* email dated 5/24/02, with Revised Trilogy U.S. Implementation Memo, Govt. Ex. 52.

[53] *See* email dated 9/25/02, Govt. Ex. 53 ("They are Trilogy correct"?); email dated 10/1/02, Govt. Ex. 54; email dated 11/5/02, Govt. Ex. 57 ('I have changed "Trilogy Financial Investments Limited" to "Trilogy Investments Ltd."'); email dated 11/7/02, Govt. Ex. 58 ("Don't use Trilogy Financial Investments or Trilogy Financial Products only use Trilogy Investments Ltd."); email dated 11/21/02, Govt. Ex. 59 ("Sam [Mahoney] will make his contributions to the various aforementioned FUNDS and authorize Trilogy Investments Ltd. to make their contributions to the FUNDS."); email dated 1/23/03, Govt. Ex. 60 ("[Jimmy Haber] said that Trilogy will not allow us to release [the closing books] until they are paid in full.")

[54] *See* Appendix B-2, listing B-2 claim Nos. 23 and 51, involving communications between Orrin Tilevitz and Biosphere Finance. Biosphere Finance is an Irish company at which Mahoney and Hawkes were the listed directors. *See* Govt. Ex. 55 (Form B1 for Biosphere Finance identifying Mahoney and Hawkes as directors).

2280845.1

document, but no claim of common interest. Again, Tilevitz was not providing legal advice. He

was providing business advice to DGI. Moreover, even if the attached memo was legal work-

product belonging to DGI, DGI's sharing of this document with Biosphere effected a waiver.

Notably, DGI has not asserted a common interest privilege with respect to this document.

## ARGUMENT

### I

### DGI'S DEVELOPMENT AND MARKETING OF TAX SHELTERS IS NOT A PRIVILEGED ACTIVITY

The attorney-client privilege "is one of the oldest recognized privileges for confidential

communications."[55] The privilege, designed to "encourage full and frank communication between

attorneys and their clients," shields from discovery advice given by the attorney as well as

communications from the client to the attorney, made in pursuit of or in facilitation of the

provision of legal services.[56]

> The broad outlines of the attorney-client privilege are clear: '(1) where legal
> advice of any kind is sought (2) from a professional legal advisor in his capacity as
> such, (3) the communications relating to that purpose, (4) made in confidence (5)
> by the client, (6) are at his instance permanently protected (7) from disclosure by
> himself or by the legal advisor, (8) except the protection be waived.'

*United States v. International Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir.1997). A

corporation's "in-house counsel" may be afforded the same protection as an outside counsel with

respect to this privilege.[57] In all instances, the privilege must be "strictly confined within the

---

[55] *Swidler Berlin v. United States*, 524 U.S. 399, 403 (1998).

[56] *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

[57] *Upjohn Co. v. United States*, 449 U.S. 383; *Lugosh v. Congel*, 2006 WL 931687 (2006
N.D.N.Y.). The privilege may also protect communications between in-house counsel and a corporation's
outside counsel. *United States Postal Serv. v. Phelps Dodge Refining Corp.*, 852 F.Supp. 156, 160

(continued...)

2280845.1

narrowest possible limits consistent with the logic of the principle" insofar as it is in derogation of the search for truth.[58]

The party asserting the attorney-client privilege bears the burden of proof.[59] Making statements to an attorney, in and of itself, does not render the communication or the advice privileged. This is because "[a]ttorneys frequently give to their clients business or other advice which, at least insofar as it can be separated from their essentially professional legal services, gives rise to no privilege whatever."[60] "When a lawyer acts merely to implement a business transaction or provides accounting services, the lawyer is like any other agent of the corporation whose communications are not privileged." *United States v. KPMG LLP*, 237 F. Supp. 2d 35, 40

---

[57](...continued)
(E.D.N.Y.1994) (citing *Upjohn Co. v. United States*, 449 U.S. at 395). The same is true for partnerships' internal attorneys. *In re Bieter Co.*, 16 F.3d 929, 935 (8th Cir.1994) (reasoning that the rules regarding the attorney-client privilege of corporations are no less instructive when applied to a partnership or some other client entity not an individual); *Denney v. Jenkens & Gilchrist*, 362 F.Supp.2d 407, 414 n. 34 (S.D.N.Y.2004) (citing, *inter alia, United States v. Campbell*, 73 F.3d 44 (5th Cir.1996) and holding that "there is no logical reason to distinguish partnerships from corporations or other legal entities in determining the client a lawyer represents" and that "the rules regarding the attorney-client privilege of corporations are no less instructive when applied to a partnership")).

[58] There is the general maxim that the public, particularly within the judicial forum, is entitled to be exposed to "everyman's evidence." 8 Wigmore, Evidence § 2317 (McNaughton rev. ed.1961). The quest is for the truth of the matter to flow forward before the court, and "[t]he suppression of truth is a grievous necessity at best ... [only justified] when the opposed private interest is supreme." *In re Megan-Racine Assocs., Inc.*, 189 B.R. 562, 570 (Bankr. N.D.N.Y. 1995) (*citing McMann v. Sec. and Exch. Comm'n*, 87 F.2d 377, 378 (2d Cir.1937)); *Nixon v. United States*, 418 U.S. 683, 709 (1974). But since the attorney-client privilege "stands in derogation of the public's right to everyman's evidence, ... it ought to be strictly confined within the narrowest possible limits consistent with the logic of the principle." *In re Grand Jury Proceedings v. John Doe*, 219 F.3d 175, 182 (2d Cir.2000) (*citing United States v. Int'l Bhd. of Teamsters*, 119 F.3d at 214).

[59] *See In re Grand Jury Subpoena Dated Dec. 19, 1978*, 599 F.2d 504, 510 (2d Cir.1979).

[60] *Colton v. United States*, 306 F.2d 633, 638 (2d Cir. 1962), *citing Lowy v. Commissioner*, 262 F.2d 809 (2d Cir. 1959); *Olender v. United States*, 210 F.2d 795 (9th Cir. 1954); *Pollock v. United States*, 202 F.2d 281 (5th Cir.), *cert. denied*, 345 U.S. 993 (1953); 8 Wigmore, Evidence § 2296 (McNaughton rev. 1961).

2280845.1

(D.D.C. 2002) (finding no attorney-client relationship between Sidley Austin and KPMG in their marketing of DGI tax shelters).[61]

This is particularly true where the communications involve a communication with in-house counsel, because in-house counsel frequently give their client business, management or other advice in addition to legal advice. *Colton v. United States,* 306 F.2d 633, 638 (2d Cir.), *cert. denied* 371 U.S. 951(1963); *MSF Holding, Ltd. v. Fiduciary Trust Co. Intern.,* 2005 WL 3338510, at *1 (S.D.N.Y. Dec.27, 2005). These dual functions are very likely to become mixed, in some degree obfuscating the true nature of the function performed. *Bank Russells Lambert v. Credit Lyonnais (Suisse),* 220 F.Supp.2d 283, 286 (S.D.N.Y. 2002). The Second Circuit has made clear that only those communications related to "legal, as contrasted with business, advice" are protected. *See* In *Re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1037 (2d Cir.1984); *In re John Doe Corp.,* 675 F.2d 482, 488 (2d Cir.1982); *TVT Records v. Island Def Jam Music Group,* 214 F.R.D. 143, 144 (S.D.N.Y.2003) (quotation in original); *see also, Altronic Intern., GMBH v. SAI Semispecialists of Am.,* 232 F.R.D. 160, 163 (E.D.N.Y. 2005). Therefore, the request for legal advice must be distinctly clear and void of nuances of business consultation or instruction, if it is to be privileged.[62]

---

[61] *See also, Diversified Group, Inc. v. Daugerdas,* 2003 WL 22077466, *4 (S.D.N.Y. 2003) (finding DGI's tax shelter marketing materials were not privileged); *Doe v. Wachovia,* 268 F. Supp.2d 627, 634-635 (W.D.N.C. 2003) (finding law firm promoting tax shelter was not in a protected relationship with investors).

[62] *United States v. Millman,* 822 F.2d 305, 310 (2d Cir.1987) (the party has to show that attorney-client communications were not related to his role as business advisor); *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d at 1037 ("[T]he privilege is triggered only by a client's request for legal, as contrasted with business advice."); *United States Postal Serv. v. Phelps Dodge Refining Corp.,* 852 F.Supp. at 160 (stating that "if the communication is made to the attorney in her capacity as a business adviser ... it ought not be privileged"); *Rattner v. Netburn,* 1989 WL 223059, at *6 (S.D.N.Y. June 20, 1989) (ruling that the communication must be characterized as predominately (continued...)

2280845.1

To ensure that the attorney-client privilege remains affixed to the communication and/or advice, the entity has the burden of establishing that the communication was for the purpose of procuring legal advice. *In re Grand Jury Subpoena*, 599 F.2d at 510. To evaluate such a claim of privilege, "a court may have to parse not only the words but their intent in order to glean the authentic purpose of the communication." *Lugosh v. Congel*, 2006 WL 931687 (2006 N.D.N.Y) (footnote omitted). As discussed in *Lugosh*:

> Because of the duality of the advice, a court must assume the very complicated task of inquiring into the subject matter of the communication in order to determine its true characteristic. *Elliot Assocs., L.P. v. Republic of Peru*, 176 F.R.D. 93, 97 (S.D.N.Y.1997) (citing *Colton v. United States*, 306 F.2d at 636) (opining that the inquiry should be of a "sufficient abstract level so as to not reveal the substance of the advice"). When the ultimate decision is based upon both legal and business considerations, the business and management aspect of the discussion will not be as fortunate in receiving protection by the privilege. *TVT Records v. Island Def Jam Music Group*, 214 F.R.D. 143, 144 (S.D.N.Y.2003) (*citing In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d at 1037 (protects legal advice not business)); *Fine v. Facet Aerospace Prod. Co.,* 133 F.R.D. 439, 444 (S.D.N.Y.1990); *Hardy v. New York News, Inc.,* 114 F.R.D. 633, 643-44 (S.D.N.Y.1987); *United States v. Schenectady Sav. Bank,* 525 F.Supp. 647, 650 (N.D.N.Y. Oct.28, 1981) (citing *Colton v. United States,* 306 F.2d at 638, for the proposition that tax advice is not protected).

*Lugosh v. Congel*, 2006 WL 931687 (N.D.N.Y. 2006) (footnote omitted). "The party seeking to invoke a privilege has the burden of establishing non-waiver of the privilege."[63]

---

[62](...continued)
legal in order for the privilege to apply) (emphasis added).

[63] *Nikkal Industries, Ltd. v. Salton, Inc.*, 689 F. Supp. 187, 191 (S.D.N.Y. 1988). *See also, United States v. Lewis*, 943 F.2d 58 (unpublished), 1991 WL 172666 at *3 (10th Cir. 1991) ("the proponent of the attorney-client privilege bears the burden of establishing both that communications at issue are privileged and that the privilege was not waived "); *United States v. Bay State Ambulance and Hosp. Rental Service*, 874 F.2d 20, 27-28 (1st Cir. 1989) (same); *New York State Teamsters Council v. Primo & Centra*, 159 F.R.D. 386, 388 (N.D.N.Y. 1995) (same).

2280845.1

A prior court has already ruled that, because these law firms were engaged in the business of marketing tax shelters, there could not have been "a true attorney client relationship." *United States v. KPMG LLP*, 316 F.Supp.2d 30, 39 (D.D.C. 2004). That case involved KPMG's claims of attorney-client privilege in opposition to IRS promoter summonses. KPMG is one of the four accounting firms through which DGI marketed the FDIS product. Judge Hogan, after conducting an extensive *in camera* review, found that Sidley Austin's tax shelter opinion letters had "little indication" that they were:

> independent opinion letters that reflect any sort of legal analysis, reasoned or otherwise. In fact, when examined as a group, the letters appear to be nothing more than an orchestrated extension of KPMG's marketing machine.

*United States v. KPMG LLP*, 316 F.Supp.2d 30, 40 (D.D.C. 2004). Judge Hogan further found that KPMG had misrepresented its "unprivileged tax shelter marketing activities as privileged communications" and that KPMG's privilege logs had been shown to be "inaccurate, incomplete, and even misleading regarding a very large percentage of the documents." *United States v. KPMG LLP*, 316 F.Supp.2d 30, 44 (D.D.C. 2004). DGI's privilege logs are replete with similar defects.

Here, KPMG is the same accounting firm through which the DGI tax shelter in issue was purchased by the taxpayer, Richard Egan. Sidley Austin is the same law firm that issued the tax shelter opinion to Richard Egan on his FDIS transaction. The withheld documents all appear to relate to DGI's design, development and implementation of tax shelters and DGI appears to have misrepresented its unprivileged marketing activities as privileged. DGI's privilege logs are misleading in that none of the attornies party to these communications, be they in-house or outside

counsel, were providing confidential legal advice to DGI. Instead, they all involve unprivileged marketing activities.

DGI's privilege logs are inaccurate on multiple grounds. Kampf and Tan were not employed by DGI, but by Helios. In addition, Haber has previously testified on behalf of DGI that Tilevitz was not employed by DGI after 2001. DGI cannot now be heard to claim that Tilevitz continued to be employed by DGI as its in-house counsel after that date. Moreover, as previously noted, Tilevitz also was inextricably involved in the design, marketing and development of DGI's tax shelter products. As such, DGI cannot carry its burden of establishing that these communications were for the purpose of procuring legal advice. Nor can DGI carry its burden of showing that these communications were not disclosed to DGI's co-promoters and customers. That is, these communications are not and could not possibly have been confidential.

In sum, DGI asserts a whole series of improper claims of privilege. DGI asserts privilege for communications with Mox Tan, whom it has identified as its in-house attorney, when it is clear that Tan was never in fact an employee of DGI or in the business of providing legal advice to DGI. DGI asserts privilege for post-2001 communications with Orrin Tilevitz, whom it has also identified as a DGI attorney, when it is clear, based upon Haber's own testimony, that Tilevitz was not employed by DGI after 2001. It also has flagrantly misrepresented the nature of the communications it is withholding. The communications between DGI and Sidley Austin, and between DGI and attorneys and accountants at the other co-promoter law and accounting firms, do not arise out of *true attorney client relationship* but rather in furtherance of the promotion and marketing of a highly abusive tax shelter scheme. Such documents in no way can be privileged.

2280845.1

## II

## DGI DOES NOT HAVE A VALID CLAIM OF PRIVILEGE UNDER THE COMMON INTEREST DOCTRINE

In the alternative, and/or in addition, DGI has asserted multiple claims of privilege under

the common interest doctrine. These privilege claims are equally frivolous. As explained in

*United States v. Schwimmer*, 892 F.2d 237 (2d Cir.1989):

> The joint defense privilege, more properly identified as the "common interest rule," has
> been described as "an extension of the attorney client privilege," *Waller v. Financial Corp.*
> *of Am.*, 828 F.2d 579, 583 n. 7 (9th Cir.1987). It serves to protect the confidentiality of
> communications passing from one party to the attorney for another party where a joint
> defense effort or strategy has been decided upon and undertaken by the parties and their
> respective counsel. *See United States v. Bay State Ambulance and Hosp. Rental Serv.*, 874
> F.2d 20, 28 (1st Cir.1989). Only those communications made in the course of an ongoing
> common enterprise and intended to further the enterprise are protected.

*Id.* at 243-244. The phrase "ongoing common enterprise" references an "ongoing common

litigation enterprise,"[64] not a ongoing common business enterprise. Moreover, as 'an extension of

the attorney-client privilege', the common interest doctrine can only apply to communications that

are otherwise already protected by the attorney-client privilege.[65] Most fundamentally, as

previously discussed, the attorney-client privilege does not apply to the rendering of business

advice. As with all claims of privilege arising out of the attorney-client relationship, the party

asserting the common interest rule bears the burden of showing that there was "an agreement,

---

[64] *In re Wanger*, 2006 WL 3699544, at 12 (N.D.N.Y.2006), *citing United States v. Schwimmer*,
892 F .2d at 243; *In the Matter of Bevill, Bresler & Schulman Asset Mgmt Corp.*, 805 F.2d 120, 126 (3d
Cir.1986).

[65] *United States v. Schwimmer*, 892 F.2d 237 (2d Cir.1989), quoting *Waller v. Financial Corp.*
*of Am.*, 828 F.2d 579, 583 n. 7 (9th Cir.1987).

25                                                        2280845.1

though not necessarily in writing, embodying a cooperative and common enterprise towards an identical legal strategy."[66]

Here, DGI was in the business of developing, marketing, and implementing tax shelters. As previously described, DGI's promotion of the FDIS tax shelter involved Helios, Alpha, Biosphere, Sidley Austin, Proskauer, Bryan Cave, Lord Bissell, Brown Raysman, KPMG, BDO Seidman, Grant Thorton, and RSM McGladrey. This was an ongoing common business enterprise, not an ongoing common litigation enterprise. This is not the type of enterprise that is protected under the common interest doctrine. It might, of course, be argued that DGI's tax shelter products were so fraudulent that advice from counsel was readily foreseeable. Where a client seeks advice or services from an attorney in furtherance of the commission of a fraud or crime, the crime-fraud exception serves to break the "seal" of secrecy.[67]

### III

### ANY OTHERWISE VALID CLAIMS OF
### PRIVILEGE ARE VOID UNDER THE CRIME FRAUD EXCEPTION

Claims of privilege are subject to the crime-fraud exception when the client seeks legal advice or services in furtherance of the commission of a crime or fraud. *United States v. Zolin*, 491 U.S. 554, 562-63 (1988) (citing 8 Wigmore § 2298). "Fraud," in this context, is not limited to activity that is criminal, but also encompasses fraudulent activity that is merely tortious. *Id.* at 569-570. Fraudulent activity in a civil tax context can occur where a person assists in the design,

---

[66] *Denny v. Jenkens & Gilchrist*, 362 F.Supp.2d 407 (S.D.N.Y.2004), *citing Lugosch v. Congel*, 219 F.R.D. 220, 237 (N.D.N.Y.2003).

[67] *United States v. Zolin*, 491 U.S. 554, 562-63 (1989) ("the purpose of the crime-fraud exception to the attorney-client privilege [is] to assume that the 'seal of secrecy' . . . between a lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime") (citations omitted); *see also, Clark v. United States*, 289 U.S. 1, 15 (1933).

2280845.1

marketing and implementation of a partnership, other entity or any investment plan or arrangement, and in the process thereof makes or furnishes or causes another person to make or furnish a statement with respect to the tax shelter scheme which the person knows or has reason to know is false or fraudulent. *See, e.g.,* 26 U.S.C § 6700 (a)(2)(A); *United States v. Raymond*, 228 F.3d 804, 811-12 (7th Cir. 2000) (describing the broad scope of section 6700(a)(1)(A)). Fraud in a civil tax context includes the use of phony foreign partners to create the fiction of a valid partnership for federal income tax purposes. Equally indicative of fraud is the attempt to create and foster the illusion of legitimate tax losses through the use of false or fraudulent marketing materials, legal advice or other acts devised to conceal the true nature of the tax shelter scheme.

The crime-fraud exception to the attorney-client privilege applies to any communications between an attorney and client that are intended "to further a continuing or future crime or tort." *United States v. John Doe*, 429 F.3d at 450, 454 (3rd Cir. 2005) (internal citation omitted); *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997) ("the crime-fraud exception removes the privilege from those attorney-client communications that are 'relate[d] to client communications in *furtherance of contemplated or ongoing* criminal or fraudulent conduct.'") (Emphasis added; internal citations omitted).[68] "It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." *United States v. Zolin*, 491 U.S. at 563 (citations omitted).

To overcome a claim of privilege, the party challenging the privilege need not prove the existence of a crime or fraud beyond a reasonable doubt. *In Re Sealed Case*, 754 F.2d 395, 399

---

[68] *See also, United States v. Richard Roe, Inc*, 68 F.3d 38, 40 (2d Cir. 1996)

2280845.1

(1985 D.C. Cir.).[69]  Rather, the party must demonstrate that there is a factual basis for a showing

of *probable cause to believe* that a fraud or crime has been committed and that the

communications in question were in furtherance of the fraud or crime.  *United States v. Jacobs*,

117 F.3d 82, 87 (2d Cir. 1997); *In re John Doe Corp.*, 675 F.2d at 491 & n. 7 (2d Cir. 1984); *In re*

*Grand Jury*, 731 F.2d 1032, 1039 (2d Cir.1984).[70]

> Other circuits have referred to the burden in terms of the need to
> make a prima facie showing.  *See, e.g., In re International Systems,*
> *supra*, 693 F.2d at 1242; *In re Grand Jury Proceedings,* 689 F.2d
> 1351, 1352 (11th Cir.1982); *In re Sealed Cases, supra,* 676 F.2d at
> 814-15.  As a practical matter, there is little difference here
> between the two tests.  Both require that a prudent person have a
> reasonable basis to suspect the perpetration or attempted
> perpetration of a crime or fraud, and that the communications were
> in furtherance thereof.  *See In re International Systems, supra,* 693
> F.2d at 1242 n. 11.

*In Re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1039 (2d Cir.1984).[71]

For purposes of determining whether this *probable cause* threshold has been satisfied, a

court may also consider the withheld documents themselves.  *Zolin*, 491 U.S. at 572; *United*

*States v. Jacobs*, 117 F.3d at 87.[72]  Here, an in camera inspection is not required because the

---

[69] *See also In re Grand Jury Subpoena Duces Tecum (Marc Rich & Co. A.G.),* 731 F.2d 1032,
1039 (2d Cir.1984) ("The crime or fraud need not have occurred for the exception to be applicable; it
need only have been the objective of the client's communication.  And the fraudulent nature of the
objective need not be established definitively; there need only be presented a reasonable basis for
believing that the objective was fraudulent").

[70] *See also, United States v. Richard Roe, Inc*, 68 F.3d 38, 40 (2d Cir. 1996).

[71] This threshold is even lower than that required to prove-up a civil penalty under 26 U.S.C. §
6700 for making false representations in the promotion of a tax shelter.  *See Barr v. United States*, 67
F.3d 469 (2d Cir. 1995)(holding that the civil penalty under §6700 must be proven by preponderance of
the evidence).

[72] *Zolin* set forth a two step process for a court to determine whether it should also conduct an in
camera examination of the withheld document.  Under the first step, the proposed factual basis must at
least strike "a prudent person" as constituting "a reasonable basis to suspect the perpetration or attempted
perpetration of a crime or fraud, and that the communications were in furtherance thereof."  *United States*

(continued...)

28                                2280845.1

record before the Court already more than satisfies the probable cause threshold. The tax benefits of the FDIS transaction were critically dependent on a multi-member LLC being treated as a valid partnership for federal income tax purposes. Such partnership status, if accepted as valid, might have allowed huge non-economic paper losses to be allocated to the alleged taxpayer-partner and equally-large offsetting paper gains to be allocated to the purported foreign partner. In reality, these purported foreign investors were not real partners at all but were fully funded by DGI, which also paid them a $2 million fee for serving the role of phony foreign investors in these transactions.[73] As such, they were mere nominees or sham partners of the very promoters who designed and marketed the transactions. Thus, the partnerships were not valid partnerships for federal income tax purposes, and the tax benefits claimed on the FDIS transaction were based on false and fraudulent representations of the status of these individuals as real co-investors and the multi-member LLCs as real partnerships. Given that the FDIS transaction generated over $1 billion in claimed illegal tax losses during 2001 alone, this is a fraud of mammoth proportions and any legal advice being given to DGI in connection with the FDIS transaction was in furtherance of a crime or fraud.

This is a necessary conclusion based upon DGI's own records. The forty-seven (47) FDIS transactions, including the Egan transaction, are detailed in a spreadsheet attachment to an email to DGI dated May 1, 2002. *See* email dated 5/1/02, re "2001-Customers-Haber_Invst-4-22-01.xls," Govt. Ex. 50. The spreadsheet shows that the purported foreign partners' alleged total

---

[72](...continued)
*v. Jacobs*, 117 F.3d at 87; *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir.1994). Second, once there is a showing of such a factual basis, the District Court may then engage in an *in camera* review of the evidence to determine if the withheld documents are in furtherance of the crime or fraud and if the crime fraud exception otherwise applies. *Zolin*, 491 U.S. at 572; *United States v. Jacobs*, 117 F.3d at 87.

[73] *See* fn 45, supra, which details the factual support for this statement.

2280845.1

original investment for all forty-seven (47) transactions in 2001 was $3,707,715. The spreadsheet also shows that the purported foreign partners received a total of $2,404,737 on the sale of the bulk of their partnership interests to the taxpayers for the forty-seven (47) transactions, leaving the amount of $1,302,978 as their still unrecovered "cost basis"on their alleged original investment ($1,302,978 = $3,707,715 - $2,404,737). DGI's records further reflect that DGI considered Mahoney and Hawkes unrecovered cost basis of $1,302,978 along with an additional $2,000,000 as joint expenses to be subtracted from gross profits for purposes of computing DGI's, Alpha's and Helios's share of the net profits. *See* Govt. Ex. 51. These records show that DGI was therefore the ultimate source of Samuel Mahoney's and Martin Hawkes' unrecovered capital contributions, referenced in Govt. Ex. 51 as "SM-MH Cost Basis." Moreover, they also show that DGI paid Mahoney and Hawkes a lump sum amount of $2,000,000 for playing the role of a nominee or sham partner on these forty-seven (47) transactions. *See* Govt. Ex. 51.

This fraud is manifest in the 2001 Forms 1065, partnership tax returns, reporting these transactions, in which Mahoney and Hawkes were held out as foreign partners. On the 2001 Form 1065, U.S. Return of Partnership Income for Fidelity International Currency Advisor A Fund, LLC, which was filed with respect to Egan's FDIS transaction, the Form K-1 for Samuel Mahoney reflects that he contributed $651,000 to the FICAA partnership and was allocated income in the amount of $154,503,242.[74] In the aggregate, during 2001 Samuel Mahoney and Martin Hawkes were allocated over $1 billion in income from forty-seven (47) FDIS transactions. This fiction was necessary to manufacture over $1 billion in off-setting fraudulent tax losses. All of the communications at issue here appear to have been in furtherance of this fraud, including,

---

[74] *See* 2001 Form 1065 of FICAA, Govt. Ex. 70, Mahoney K-1 at Bates 1IRS0801, lines J(b) and 7.

2280845.1

most notably, the legal opinions issued by the very law firms which helped to design the FDIS transaction.

The government submits that it has established probable cause that foreign partners were not real co-investors in these purported partnership ventures and that DGI was soliciting advice to design and implement fraudulent tax shelters and to conceal the true nature of these transactions, and that the withheld communications were in furtherance of such fraudulent activity. *See* 26 U.S.C. §§6694, 6701 & 7206(2). In the event that the Court determines that DGI has rebutted the government's showing of probable cause, the government would request that the Court conduct an *in camera* review of the withheld documents. Additional factors which would warrant such a review include the following: Here, with an equal attempt at deceit, DGI highlighted the fact that the face of the Form 1065 reporting the transaction "did not show a large net [paper] loss."[75] To further conceal the true nature of these transactions, DGI advised its co-promoters to ensure that copies of the marketing materials would not be left with the client.[76] DGI also conspired to create the fiction that its customers were receiving independent legal advice, in part to cloak its own communications with the appearance of privilege. In addition, during 2002, DGI continued to market the FDIS transaction, but further attempted to conceal its continuing fraud by placing its books and records off-shore.

---

[75] *See* Email dated 4/10/01, Govt. Ex. 25.

[76] *See* Handwritten notes on front of BDO copy of FDIS PowerPoint, Govt. Ex. 21 ("Confirm that this will not be left with client (i) if it is left...shows too much of the structure (ii) if not left, should have some investment oriented material to leave"); email dated 6/21/01 forwarding copy of FDIS PPT to Grant Thorton, Govt. Ex. 36 ("This it to confirm that the enclosed materials will not be distributed to anybody").

2280845.1

**Conclusion**

For the foregoing reasons, DGI's claims of attorney-client and/or common-interest

privilege should be rejected and DGI should be ordered to produce all of the documents which it

has withheld upon a claim of privilege. If the Court determines that any of the documents are

privileged, the court should find that the claim of privilege is void under the crime-fraud

exception. Finally, DGI should also be ordered to produce all of the documents that it has

attempted to conceal by transfer off-shore to Trilogy Financial Products, Limited.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

DENNIS M. DONOHUE
CHIEF LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER RICHTARCSIK
Trial Attorneys, Tax Division
U.S. Department of Justice
Telephone: (202) 307-6542

DAVID S. JONES (DJ-5276)
Of Counsel
Assistant United States Attorney
U.S. Department of Justice
Telephone: (212) 637-2739

32

2280845.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on _____ 3/5/07, I sent a copy of the foregoing by U.S. Mail to:

Howard Kleinhendler
Wachtel & Masyr, LLP
110 East 59th Street
New York, New York 10022

David J. Curtin, Esq.
McKee Nelson LLP
Suite 200
1919 M Street, NW
Washington, DC 20036


JOHN A. LINDQUIST
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 307-6561

33

2280845.1

**Exhibit 2**

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3               CENTRAL DIVISION

4

5

6    - - - - - - - - - - - - - -x

7    FIDELITY INTERNATIONAL      :

8    CURRENCY ADVISOR A FUND, :

9    L.L.C., by the Tax          :

10   Matters Partner,            :

11         Plaintiff,            :    Case Nos.:

12      vs.                      :    05-cv-40151 FDS

13   UNITED STATES OF AMERICA :    06-cv-40130 FDS

14         Defendant.           :

15   - - - - - - - - - - - - - -x

16

17          DEPOSITION OF ROBERT W. PRIFTI

18               Washington, DC

19               Tuesday, February 27, 2007

20

21   REPORTED BY:

22      JULIE BAKER

1    Deposition of ROBERT W. PRIFTI, called for

2  examination pursuant to notice of deposition, on

3  Tuesday, February 27, 2007, in Washington, DC, at

4  the law offices of McKee Nelson, 1919 M Street, NW,

5  Suite 200, at 10:29 a.m., before JULIE BAKER, a

6  Notary Public within and for the District of

7  Columbia, when were present on behalf of the

8  respective parties:

9

10     RONALD L. BUCH, JR., ESQ.

11     LENA AMANTI, ESQ.

12     MICHELLE ABROMS, ESQ.

13     McKee Nelson LLP

14     1919 M Street, NW

15     Suite 200

16     Washington, DC  20036

17     202-327-2078

18     On behalf of Plaintiff

19

20

21

22       -- continued --

1    APPEARANCES (Continued):

2           JOHN A. LINDQUIST, III, ESQ.

3           HEATHER L. RICHTARCSIK, ESQ.

4           BARRY E. REIFERSON, ESQ.

5           United States Department of Justice

6           PO Box 55

7           Washington, DC  20044

8           202-307-6561

9           On behalf of Defendant

10

11

12

13

14

15

16

17

18

19

20

21

22

THIS DOCUMENT CONTAINS CONFIDENTIAL MATERIAL

4

1                    P R O C E E D I N G S

2    Whereupon,

3                    ROBERT W. PRIFTI

4    was called as a witness and, having first been duly

5    sworn, was examined and testified as follows:

6                    EXAMINATION

7              BY MR. BUCH:

8         Q    Good morning, Mr. Prifti.

9         A    Good morning.

10        Q    Could you state your full name for the

11   record and where you live.

12        A    Robert W Prifti, P-r-i-f-t-i and 27

13   Village Drive, Quincy, Massachusetts 02169.

14        Q    You're here accompanied by counsel?

15        A    Correct.

16        Q    Counsel is provided for you by your former

17   employer KPMG; is that correct?

18        A    That's correct.

19             MR. BUCH:  Before this deposition, a copy

20   of the protective order that has been entered in

21   this case has been provided to the court reporter

22   and who read it and Ms. Baker, you acknowledge that

1     Q    Who was involved in reviewing the form

2   1040 that was filed by the Egans for the year 2001?

3     A    Tim Speiss and myself.

4     Q    You indicated this morning that you didn't

5   know whether or not the return that you reviewed

6   was, in fact, filed?

7     A    That's a correct statement.

8     Q    Did you ever have any understanding or

9   belief that it was not filed?

10    A    The reason for my comment is the return

11  that we gave the Egans contained disclosure of the

12  transaction.  KPMG's relationship was terminated

13  because of that disclosure.  So my sense is it's

14  possible that the return that was filed was not the

15  exact return KPMG signed, i.e., without disclosure.

16    Q    So were you the one who presented the

17  return to the Egans with this disclosure on it?

18    A    Tim Speiss did.

19    Q    Were you there at that time?

20    A    Yes, I was.

21    Q    Where was that?

22    A    It was at the Carruth family office in

1    Hopkinton.

2         Q    Who else was in attendance at that

3    meeting?

4         A    I believe Bill Connolly from KPMG was also

5    there.

6         Q    What was said at that meeting and by whom

7    about that disclosure notice that was placed in that

8    draft return?

9         A    There were discussions with Tim and Pat

10   privately, and then there were other discussions in

11   the conference room that we generally sat, and those

12   discussions that I recall from the conference room

13   where we generally sat were Pat being very upset

14   that the disclosure was in there, especially after

15   paying Proskauer Rose to opine that the transaction

16   is not substantially similar.

17        Q    You were aware at that time that Proskauer

18   had already, in fact, been paid?

19        A    I have no knowledge if they were paid or

20   not.

21        Q    Had you seen the Proskauer Rose opinion?

22        A    I knew it was there.  I never read it from

1    page 1 to the end.

2         Q    Do you know how much had been paid for

3    that opinion?

4         A    I do not, sir.

5         Q    You said that there were private meetings

6    or side meetings prior to the conference room.  Were

7    you party to those private meetings?

8         A    I was not.

9         Q    After Pat Shea indicated he was upset,

10   what then happened?

11        A    I can recall Pat Shea leaving the

12   building.  I could see him through the windows

13   walking outside and being very upset.

14        Q    And then what happened?

15        A    At a later date, and I'm not sure if it

16   was days or a week or two, KPMG's relationship was

17   terminated.

18        Q    How were you notified that it was

19   terminated?

20        A    It was not a written letter.  I went out

21   to the family office to further review other

22   entities, and I remember Michael Egan saying what's

THIS DOCUMENT CONTAINS CONFIDENTIAL MATERIAL

104

1    he doing here, and I was asked to leaf.

2        Q    And that's how you learned that KPMG had

3    been terminated?

4        A    That's how I learned.  I don't know

5    whether there was formal termination otherwise.

6        Q    Was KPMG ever asked to destroy its files

7    with respect to the return that it had reviewed?

8        A    No, sir.

9        Q    You don't recall any direction for KPMG to

10   destroy the someone form 1040 draft that it had

11   reviewed and put the disclosure notice on?

12       A    Not that I'm aware of.

13       Q    You indicated that the H2 transaction was

14   not a cookie cutter transaction, and my question is

15   did anyone ever tell you that?

16       A    Tim Speiss did.

17       Q    He expressly used those words?

18       A    Not cookie cutter.  He said the

19   transaction is a highly customized transaction, and

20   it's not one that is similar to the short option

21   transaction that they use to market.

22       Q    And there you're referring to it's not

1    similar to a notice 2000-44 transaction?  Is that

2    what you're talking about?

3         A    Yes.

4         Q    And what was the context in which he made

5    that statement to you?

6         A    I don't recall the exact context.  I was

7    trying to learn a little more about the transaction

8    and how it worked, and that's when Tim told me, and

9    this is after meetings with various Egan entity

10   people that this was a highly customized

11   transaction, and it has various steps and/or

12   attributes that are different than other

13   transactions apparently that KPMG didn't per Tim's

14   representation to me.

15        Q    Did you have any knowledge whether or not

16   KPMG was involved in the design of the transaction,

17   the H2 transaction?

18        A    When you say design, are you talking

19   about --

20        Q    This outline of proposed transaction that

21   we were just looking at and you've got open in

22   RP-36.

1      A      These are the trades.

2      Q      It says outline of proposed transaction.

3  Go to the front page.  It goes through step 1, step

4  2 -- it doesn't say step -- 1 through 9, and then it

5  ends up with item number 7, summary of out of pocket

6  expenditures, and it has a Richard Egan pretax

7  profit potential?

8      A      Yes.

9      Q      Do you know whether KPMG played any role

10 in the design of this outline for the transaction?

11     A      I could only guess that they did.

12     Q      Did Mr. Speiss ever tell you anything

13 about how this outline was put together?

14     A      In detail, no, he did not.

15     Q      If you look on the front page, it says two

16 examples of possible trades, and it has a 25 percent

17 probability there.

18     A      Yes, sir.

19     Q      Do you know how that 25 percent

20 probability was arrived at?

21     A      I do not.

22     Q      You previously indicated there were

1   certain things that were discussed that included --

2   at least a couple technical terms -- you said

3   something about the likely outcome given prior

4   history, that the options would pay off.  Do you

5   have any expertise in options?

6        A    Other than knowing about them and their

7   attributes, no, I do not.

8        Q    Do you know what type of trades these were

9   that are shown here?  Are these options, to your

10  knowledge?

11       A    Item 2 says the input spread.

12       Q    Does that mean that it's an option to you?

13       A    In parentheses it says purchase of a put

14  and sale of a put.  Puts are generally options.

15       Q    You personally sir --

16       A    No, I do not.

17       Q    Do you know whether these were vanilla

18  options or European options?  Was that ever

19  discussed?

20       A    It was discussed.  I don't recall.  My

21  sense is they were European options.

22       Q    Was this at a meeting -- where was this

1    discussed?  Was this with a taxpayer or just you and

2    Mr. Speiss?

3        A    No.  This was at one of those meetings at

4    the Carruth family office, and I remember this type

5    of document, whether it's this or a version of it

6    was discussed and the options were discussed at a

7    high level.

8        Q    Was Mr. Haber ever on the phone during any

9    of these discussions with the taxpayer?

10       A    I think he was in one meeting, and it may

11   have been with respect to these trades, but I can't

12   recall for certainty.

13       Q    Do you know if anybody else on behalf of

14   the addition do you know if Mr. Ivan Ross was ever

15   on the phone?

16       A    I don't know that name.  I do not.

17       Q    Do you have a recollection of what

18   Mr. Haber said during his presence on the phone?

19       A    I do not, sir.

20       Q    Did you take any notes during your

21   conference with the taxpayers at Carruth discussing

22   the transaction on this day on September 21, 2001?

1          A      I did not.  Tim was the scrivener, if you

2     will.

3          Q      Tim --

4          A      Speiss.

5          Q      Did Mr. Rivotto take any notes during that

6     time?

7          A      Mr. Rivotto was not at the meeting.

8          Q      Did Mr. Rivotto have a habit of taking

9     notes?

10         A      In the meetings I've been to with

11    Mr. Rivotto, yes, he took notes.

12         Q      Due a habit of taking notes at meetings?

13         A      Generally I do.

14         Q      But you don't recall taking notes at this

15    particular meeting?

16         A      All of these meetings with Tim Speiss, Tim

17    and I discussed that he would be the scrivener, the

18    one keeping the notes.

19         Q      Do you recall that Tim Speiss, in fact,

20    kept notes at this September 21, 2001 meeting?

21         A      I would assume he did.  I saw him write

22    notes.  Whether he kept them, he would have to

THIS DOCUMENT CONTAINS CONFIDENTIAL MATERIAL

1  answer that.

2      Q     You indicated that KPMG had some in-house

3  people that had some expertise in derivatives.  Were

4  any of those people ever involved in discussing the

5  H2 transaction with you?

6      A     Not that I'm aware of, not with me.

7      Q     Did you ever discuss the preferred

8  interest in the partnership in the H2 transaction?

9      A     No, sir.

10     Q     Were you ever aware that Mr. Egan's

11  preferred interest in the H2 transaction changed?

12     A     I'm aware that there was a change from

13  reading various documents.  The actual mechanics I'm

14  not aware of.

15     Q     Were you ever aware of an investment by

16  the foreign investor, Mr. Samuel Mahoney in the

17  partnership at issue in the Fidelity International

18  case?

19     A     I was aware he was an investor.  That's

20  all I'm aware of.

21     Q     Did you ever check to see whether he, in

22  fact, put cash in?

1          A     No, I did not.

2          Q     Were you aware that the foreign investor

3     was bought out?

4          A     No, I was not.

5          Q     Were you aware of a profit sharing

6     arrangement between Helios and alpha?

7          A     No, sir.

8          Q     Were you aware of a profit sharing

9     arrangement between alpha Helios and DGI in this

10    transaction?

11         A     I don't know who DGI is.

12               MR. LINDQUIST:  Allow me to show you what

13    is marked as Government Exhibit 41.

14               (Government Exhibit 41 identified.)

15               MR. LINDQUIST:  I'm following the same

16    numbering system that we started with the prior

17    deposition, and this will be Government Exhibit 41.

18               BY MR. LINDQUIST:

19         Q     Have you ever seen this document before?

20         A     No, sir.

21         Q     This is an e-mail that appears to be on a

22    KPMG letterhead.  Who's Stratecon?

 1     A     That is the group that John Schrier was a

 2  member of.  I don't remember what the acronym or

 3  what the shortened name stood for, Strategic

 4  something.

 5     Q     Were you associated with Stratecon?

 6     A     Absolutely not.

 7     Q     You said John Schrier was out of New York

 8  and that's where we see the address here?

 9     A     Yes, sir.

10     Q     This is dated August 11, 2000.  Do you

11  know why this would have been sent to Patrick Shea

12  and Stephanie Denby at Carruth management at that

13  time?

14     A     No, sir.

15           (Government Exhibit 42 identified.)

16           BY MR. LINDQUIST:

17     Q     I'd like to show you what I've marked

18  as 42.  Here's a fax dated August 11, it to you from

19  Mox Tan at Helio financial to Stephanie Denby.  Have

20  you ever seen this before?

21     A     No, sir.

22     Q     You previously referenced a Helios.  Do

1    you know if you were talking about Helios Financial

2    LLC?

3          A      I would assume so.

4          Q      You don't remember the specific name of

5    Helios?

6          A      I do not.

7          Q      We previously identified Stephanie Denby

8    as the taxpayer's counsel?

9          A      Correct.

10         Q      Do you have any knowledge why that would

11   have been sent to the taxpayer by Helios?

12         A      I do not, sir.

13                (Government Exhibit 43 identified.)

14                BY MR. LINDQUIST:

15         Q      Allow me to show you Exhibit 43.  Here's a

16   fax dated September 5, 2000 from a James Haber to

17   Stephanie Denby.  Have you ever seen this document

18   before?

19         A      No, sir.

20         Q      Here you can see that Mr. Haber is

21   identified as with the diversified group,

22   incorporated.  Does that refresh your recollection

1    as to the diversified group, incorporated, whether

2    you had ever heard that name?

3        A    I have heard of Diversified Group,

4    Incorporated.  Never heard of them referred to as

5    DGI.

6        Q    Were you aware that DGI had had prior

7    discussions with your taxpayer's counsel in 2000?

8        A    I did not, sir.

9        Q    This says "enclosed please find a section

10    of the Proskauer opinion related to the contribution

11    of options to an S Corp."  Have you ever seen this

12    draft finance before that's attached from pages 2

13    through 12?

14        A    No, sir.

15        Q    Were you aware whether the taxpayer had

16    previously, in 2000, been involved with an SOS

17    transaction?

18        A    I'm sorry.  Repeat it.

19        Q    Were you aware whether the taxpayer was

20    involved in the purchase of an SOS transaction in

21    2000?

22        A   I was not.

```
 1                  (Government Exhibit 44 identified.)

 2                  BY MR. BUCH:

 3         Q       Showing you Exhibit 44.  Here is a

 4    memorandum dated August 10, 2000 --

 5                  MR. BUCH:  Excuse me just a moment.  May I

 6    have a copy?

 7                  MS. BACH:  Actually, it's right here.  I

 8    neglected to pass along.

 9                  BY MR. LINDQUIST:

10         Q       This is a memorandum with respect to the

11    Fidelity high-tech option A fund LLC.  Do you see

12    that?

13         A       Yes, sir.

14         Q       Attached is a proposed opinion letter

15    that's addressed to HSBC Bank.  Is that the same

16    bank, an address at which you're currently employed?

17         A       This is HSBC Bank U.S. in New York.  I'm

18    employed by a subsidiary of HSBC in Boston.

19         Q       Have you ever seen this document before?

20    I think I might have asked you that one.

21         A       I have not.

22         Q       Were you aware -- does this refresh your
```

1    recollection that Fidelity high-tech was to be used

2    in a transaction in 2000 that involved options?

3         A    I don't recall a transaction in 2000.

4              (Government Exhibit 45 identified.)

5              BY MR. LINDQUIST:

6         Q    Allow me to show you Exhibit 45.  Here are

7    two copies.  Here's a memo dated September 8, 2000,

8    and it's from Helios Financial to Stephanie Denby

9    regarding draft implementation steps for purchasing

10   options in a capital gains strategy.

11             Have you ever seen this document before?

12        A    No, sir.

13        Q    You indicated that you had this

14   conversation with Patrick Shea at a baseball game

15   where he asked you about a gain eliminator.  Is that

16   the phrase -- lost generator.  Was that the phrase?

17        A    Yes.

18        Q    Do you know what the difference is between

19   a loss generator and a capital gains strategy?

20        A    It would only be a guess.

21        Q    Did the taxpayer ever tell you that it had

22   previously been in negotiations with Helios

 1    Financial to purchase a tax shelter transaction?

 2         A    I was not aware of that for sure.

 3              (Government Exhibit 46 identified.)

 4              BY MR. LINDQUIST:

 5         Q    Let me show you 46.  Here's the second one

 6    so I don't get in trouble.  I think I may have given

 7    somebody my number.  You can keep it.  Nothing

 8    magical on there.  Exhibit 46 is a filed stamped

 9    copy of the Fidelity International form 1065 for the

10    year 2001.  Do you recognize this return as the

11    return that you reviewed?

12         A    I did not review this return.

13         Q    Did you ever see it?

14         A    I believe I saw the K-1s from this return.

15         Q    How did that come about?

16         A    Form K-1 is necessary for a taxpayer to

17    pick up the flow through income of which one of the

18    Egan family members was on the K-1.

19         Q    Where did you get the K-1s from?

20         A    From Tim she's in New York.

21         Q    Did Mr. Speiss ever provide you with a

22    complete copy of the form, 1065 for 2001 for

1    Fidelity International to look at?

2         A    No, sir.

3         Q    Were you aware whether or not the taxpayer

4    had a Tim plate for the form 1065 that it was using

5    for purposes of having KPMG prepare the form 1065

6    for 2001?

7         A    A template?

8         Q    A template, a draft return on how to

9    report a transaction, short option transaction?

10        A    Not aware of a template as you're

11   referring to.

12        Q    You were not involved in any way in

13   overseeing a any of the people responsible for the

14   preparation of this return, Government Exhibit 46?

15        A    No, sir.

16        Q    And who would have been the people

17   involved in the preparation and review of this

18   return?

19        A    It would be the New York practice, Tim

20   Speiss as the partner, Brent Lipschultz as the

21   senior manager.

22             (Government Exhibit 47 identified.)

JB

THIS DOCUMENT CONTAINS CONFIDENTIAL MATERIAL

119

```
 1              BY MR. LINDQUIST:

 2         Q    Allow me to show you Exhibit 47.  Have you

 3    ever seen this note dated August 28, 2002 signed by

 4    a Pat?

 5         A    I actually do remember this note.

 6         Q    And what does this note relate to?

 7         A    This note relates to the disclosure in the

 8    2001 tax return.

 9         Q    Who's Tim?

10         A    Timothy Patrick Speiss New York partner

11    KPMG.

12         Q    Do you recognize Pat Shea's handwriting

13    here?

14         A    Not for sure.

15         Q    Do you know whether or not -- how is it

16    you saw a copy of this?

17         A    Because I was at the family office when

18    this happened.  I didn't remember this note until

19    you actually gave it to me, but reading it refreshed

20    my memory.

21         Q    Before Pat Shea left the office, he left

22    this note and gave it to Tim Speiss?
```

THIS DOCUMENT CONTAINS CONFIDENTIAL MATERIAL

1       A    Before he left the office --

2       Q    You indicated he walked away.  You saw him

3  walking away.

4       A    I think it was subsequent, because if one

5  looks at the return I seem to remember an August

6  23rd signature date, not August 28th.

7       Q    There was a subsequent meeting at their

8  office around August 28th?

9       A    One would assume.  I can't recall.

10      Q    But you indicated that you saw this and

11  you believe you saw it at their office?

12      A    Yes, that's correct.

13      Q    Is it possible that you were given this

14  note to take back to Mr. Speiss when you were told

15  to leave the premises?

16      A    It's possible.  I don't remember if on

17  this exact date, August 28th, if Tim Speiss was

18  there or not.

19      Q    And here it says as discussed please

20  provide this return in your file copies.  The as

21  discussed, do you know what that relates to?  Was

22  there a discussion about destroying the return and

JB

121

1    final copies of the return?

2         A    Not that I was aware of.

3         Q    And then it says remove any records of

4    Mr. Egan from your files.  Do you know what that's

5    relating to?

6         A    No, sir.

7         Q    You don't recall being the person who was

8    to deliver this to Mr. Speiss?

9         A    I don't recall specifically.  I know I

10   talked to Tim about this.  I don't remember other --

11   or specific events regarding this.

12              (Government Exhibit 48 identified.)

13              BY MR. LINDQUIST:

14        Q    Allow me to show you Exhibit 48.  It's a

15   slightly different version than what we looked at

16   this morning, but you can see that on the second

17   page there's a signature here that's been signed by

18   Timothy Speiss, and this appears to be the front of

19   the 10402001.  Did you ever review this return?

20        A    Yes, sir, I did.

21        Q    I assume there was more to this return

22   than just these few pages?

### CERTIFICATE OF NOTARY PUBLIC & REPORTER

I, JULIE BAKER, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn; that the testimony of said witness was taken in shorthand and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.


_Julie Baker_
Notary Public in and for the
District of Columbia


My Commission Expires:        OCTOBER 15, 2007

**Exhibit 3**

Disclosure Statement Under Temp. Treas. Reg. Sec. 1.6011-4T
Richard J. Egan
SSN: ▓▓▓▓▓▓
Attachment to 2001 Form 1040 – U.S. Individual Income Tax Return

1. Identification of transaction:

   Not applicable.

2. Registration status under section 6111:

   Not Registered

3. Description of transaction:

   In 2001, the taxpayer as a 100% member of Fidelity World Currency Advisor A Fund, LLC ("World LLC") acquired call and put options (investments). The taxpayer contributed 100% of World LLC to Fidelity International Currency Advisor A Fund, LLC ("International LLC"). At December 31, 2001 the taxpayer is a 93% common member and a 100% preferred member of International LLC. As a result of the taxpayer's contribution of (i) the 100% interest in World LLC to International LLC, and (ii) additional assets to International LLC, the taxpayer's aggregate basis in International LLC (including 2001 allocated International LLC investment income) was $ 171.8 million. The long position in the options was acquired with proceeds from the short sale of options. International LLC buys and sells investment options and invests in hedge funds and similar investments.

4. Principal tax benefits:

   As a result of the taxpayer's tax basis in the amount of $ 171.8 million in International LLC (considering 3. above), the taxpayer deducted an allocable International LLC investment loss in the amount of $ 165.7 million.

5. Estimates of expected reduction of Federal income tax liability for affected tax years:

   $ 65.5 million in 2001

6. KPMG LLP provided tax advice regarding the transaction. Sidley Austin Brown & Wood provided tax advice regarding the transaction.

KPMG-F-021-0017

**Exhibit 4**

**CARRUTH ASSOCIATES LLC**

FROM THE DESK OF
PAT SHEA

8/28/02
DATE

Tim —

As discussed please destroy
this return and your file copies

Remove any records of Mr
Egan from your files

Thanks

Pat

87 ELM STREET · HOPKINTON, MA 01748
(508) 497-0800 · FAX (508) 497-0877



GOVERNMENT
EXHIBIT
47

BWMS 03965

1BWMS03965

Produced by Burke, Warren, MacKay, and Serritella to United States on 11/08/06

# Exhibit 5

## SIDLEY AUSTIN BROWN & WOOD LLP
A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

| | | |
|---|---|---|
| CHICAGO | 875 THIRD AVENUE | BEIJING |
| DALLAS | NEW YORK, NEW YORK 10022 | HONG KONG |
| LOS ANGELES | TELEPHONE 212 906 2000 | LONDON |
| SAN FRANCISCO | FACSIMILE 212 906 2021 | SHANGHAI |
| SEATTLE | www.sidley.com | SINGAPORE |
| WASHINGTON, D.C. | FOUNDED 1866 | TOKYO |

WRITER'S DIRECT NUMBER
(212) 906-2577

WRITER'S E-MAIL ADDRESS
rruble@sidley.com

March 8, 2002

Mr. Richard J. Egan
87 Elm Street
Hopkinton, MA

### Re: Investment Transactions

Dear Mr. Egan:

You ("Investor") have requested our opinion regarding certain federal income tax consequences of various investment transactions ("Transactions"), described more fully below, that Investor has made directly and through the use of options.

### I.    The Transactions

#### A.    International LLC

Fidelity International Currency Advisor A Fund LLC ("International") is a domestic limited liability company that has represented that it has not elected and will not elect to be treated as a corporation for federal tax purposes.  International was formed to buy and sell options and to conduct other investment activities.  International has four members: Investor; Alpha Consultants, LLC, a domestic limited liability company ("Alpha"),[1] the investment

---

[1]    Based on materials provided by Alpha, Alpha was formed in 1999.  Prior to forming Alpha, principals of Alpha were the investment advisor to hedge funds having approximately $30 billion in assets.  Alpha has substantial experience managing option positions, including those with a notional size as large as $30 billion.  One of Alpha's employees was a market-maker in options on the floor of the American Stock Exchange.

SABWZ0346139

SIDL 0381952

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 2

advisor to International ("the Investment Advisor"); Mr. Samuel Mahoney, an individual ("Co-
investor"); and International's manager, Michael J. Egan ("Manager").

    **B.**    **International's Operating Agreement**

    As set out in its operating agreement (the "Operating Agreement"), International has two
classes of membership interests, common and preferred. Only common interest holders share in
International's profits and losses. Both classes share in International capital in proportion to the
fair market value of the capital originally contributed by all members. Each preferred interest
carries a guaranteed return of 12% per year independent of International's profits, payable semi-
annually, and is convertible at any time into a common interest on a dollar-for-dollar basis
(including any unpaid accrued preferred return) at the net asset value of International at that time,
except under no circumstances may a conversion cause Co-investor to retain a common share of
less than 2%. On the complete redemption of his interest, each member is entitled to receive his
capital account, computed for tax purposes (as discussed below). Also, after the preferred return
is paid, available cash is distributed in accordance with capital accounts.

    . International maintains capital accounts for the members in accordance with the Treasury
Regulations under Section 704(b). Upon a contribution of money or property to International or
a liquidation of International or any member's interest therein, capital accounts are booked-up or
down to reflect gain or loss which would be allocated to the members if International's assets
were sold for fair market value. Liquidation proceeds are distributed to the liquidated member(s)
in accordance with positive capital account balances after the book-up or down. Also, there is a
shotgun buyback provision that allows a member to set a price for purchase or sale of
membership interests. International's income, gains and losses are allocated to the common
members for book and income tax purposes in accordance with profit and loss sharing ratios (the
ratio of capital originally contributed by such members), except that the Operating Agreement (i)
contains a "qualified income offset", (ii) provides that to the extent losses would decrease a
member's capital account below zero, they are allocated to those members with positive capital
accounts, (iii) provides that following a capital account book-up or book-down, gains and losses
are allocated for tax purposes using Section 704(c) principles as provided in Regs. §1.704-
1(b)(4)(i), and (iv) generally gives the Manager the power to allocate items of income and loss in
some other manner immediately before a distribution if this allocation is necessary to make
capital accounts reflect the economic arrangement among the parties. The Operating Agreement

NY1 5160176v1

**SABWZ0346140**

SIDL 0381953

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 3

also provides that when members' interests change during the year, their distributive shares are
determined using the interim-closing-of-the-books method.

Fidelity World Currency Advisor A Fund, LLC ("World") is a limited liability company
whose sole membership interest was owned by Investor.

All investment decisions of International are made by its Manager in consultation with
the Investment Advisor.

### C.   Description of Transactions

Each of the trades described below was entered into with Refco Capital Markets, Ltd.
("Counterparty"). On October 9, 2001, World entered into two European-style digital 365-day
call options as follows:

| Trades | Premium (Paid)/Received | Potential Proceeds to be (Paid)/Received | Strike Price (10 Year CMS) |
|---|---|---|---|
| Sold 10 Year CMS Call (Option # RCM 2001-10-09-04) | $73,875,000 | $ (303,368,823) | 4.7570% |
| Purchased 10 Year CMS Call (Option # RCM 2001-10-09-05) | (75,000,000) | 306,736,486 | 4.7620% |
| **Total** | ($1,125,000) | $3,367,663 | |

The spot price at the time of the trades was 5.2670%. World could realize a net profit of
$2,242,663 from the positions. There was a 25% probability that this would occur. If the 10
Year CMS price was equal to or less than 4.7570% (i.e., at 4.7570% and below) at expiration,
World would receive a net payment of $3,367,663 and if it was greater than 4.7620%, World
would lose the $1,125,000 net premium. However, if the 10 Year CMS price was precisely
4.7620% at expiration, World would receive $306,736,48 and not owe anything on the short
position.

On October 9, 2001, World entered also into two European-style digital 365-day put
options as follows:

NYI 5160878v1

**SABWZ0346141**

**SIDL 0381954**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 4

| Trades | Premium (Paid)/Received | Potential Proceeds to be (Paid)/Received | Strike Price (3 Month LIBOR) |
|---|---|---|---|
| Sold 3 Month LIBOR Put (Option # RCM 2001-10-09-01) | $73,875,000 | $ (303,633,750) | 3.8770% |
| Purchased 3 Month LIBOR Put (Option # RCM 2001-10-09-02) | (75,000,000) | 307,003,559 | 3.8740% |
| **Total** | ($1,125,000) | $3,369,809 | |

The spot price at the time of the trades was 2.4300%. World could realize a net profit of $2,244,809 from the positions. There was a 25% probability that this would occur. If the 3 Month LIBOR price was equal to or greater than 3.8770% (i.e., at 3.8770% and above) at expiration, World would receive a net payment of $3,369,809 and if it was less than 3.8740%, World would lose the $1,125,000 net premium. However, if the 3 Month LIBOR price was precisely 3.8770% at expiration, World would receive $307,003,559 and not owe anything on the short position.

On October 22, 2001, Investor assigned his membership interest in World, which was then worth $1,559,439, together with $2,674,500 in cash to International in exchange for 5% of the common interests and 100% of the preferred interests. Simultaneously, Co-investor contributed $651,000 in exchange for 93% of International's common interests, and Alpha and Manager contributed $7,000 each in exchange for 1% each of the common interests. As a result, International's initial capital structure was as follows:

| | Common Contribution | Preferred Contribution | Total Contribution | Capital Share | Profit/Loss Share |
|---|---|---|---|---|---|
| Investor | $35,000 | $4,198,939 | $4,233,939 | 86.43% | 5.00% |
| Alpha | 7,000 | 0 | 7,000 | 0.14 | 1.00 |
| Manager | 7,000 | 0 | 7,000 | 0.14 | 1.00 |
| Co-investor | 651,000 | 0 | 651,000 | 13.29 | 93.00 |
| **Total** | $700,000 | $4,198,939 | $4,898,939 | 100.00% | 100.00% |

NY1 5160476v)

**SABWZ0346142**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 5

On October 22, 2001, International entered into four European-style digital 179-day USD/EUR options as follows:

|  | Trades | Premium (Paid)/Received | Potential Proceeds to be (Paid) Received | Strike Price (USD/EUR) |
|---|---|---|---|---|
| Call Spread | Sold USD/EUR Call (Option # RCM 2001-10-22-07) | $200,000,000 | ($333,260,084) | 0.8656 |
|  | Purchased USD/EUR Call (Option # RCM 2001-10-22-08) | (197,706,830) | 328,877,361 | 0.8653 |
| Put Spread | Sold USD/EUR Put (Option # RCM 2001-10-22-09) | 200,000,000 | (1,416,123,720) | 0.8115 |
|  | Purchased USD/EUR Put (Option # RCM 2001-10-22-10) | (199,460,342) | 1,411,740,997 | 0.8118 |
|  | **Total** | **$2,832,828** | Not Applicable |  |

The spot price at time of the trades was 0.8921 USD/EUR and International was required to post a margin of $1,500,000 plus the net premium received, which on termination of the options would have grown (with interest on the $2,832,828) to $2,882,723. This would be the maximum gross amount that International could owe. International could realize a net profit of $2,832,828 on the trades plus $49,895 in interest.

As the result of the trades entered into on October 22, 2001, the options would have the following net economic consequences (inclusive of any accrued interest) for International:

| USD/EUR at Expiration | Net Gain | Net Loss | Probability |
|---|---|---|---|
| Between 0.8115 and 0.8656 | $2,882,723 | 0 | 25% |
| Below and including 0.8115 | 0 | ($1,500,000) | 61% |
| Above and including 0.8656 | 0 | ($1,500,000) | 14% |

NY1 5160876v1

**SABWZ0346143**

SIDL 0381956

SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 6

On October 22, 2001, International entered into four European-style digital 179-day JPY/USD options as follows:

| | Trades | Premium (Paid)/Received | Potential Proceeds to be (Paid) Received | Strike Price (JPY/USD) |
|---|---|---|---|---|
| Call Spread | Sold JPY/USD Call (Option # RCM 2001-10-22-12) | $200,000,000 | ($334,120,440) | 123.63 |
| | Purchased JPY/USD Call (Option # RCM 2001-10-22-13) | (197,711,391) | 329,735,305 | 123.66 |
| Put Spread | Sold JPY/USD Put (Option # RCM 2001-10-22-14) | 200,000,000 | (1,398,951,883) | 130.89 |
| | Purchased JPY/USD Put (Option # RCM 2001-10-22-15) | (199,453,397) | 1,394,566,748 | 130.86 |
| | Total | $2,835,212 | Not Applicable | |

The spot price at time of the trades was 122.35 JPY/USD and International was required to post a margin of $1,500,000 plus the net premium received, which on termination of the options would have grown (with interest on the $2,835,212) to $2,885,135. This would be the maximum gross amount that International could owe. International could realize a net profit of $2,835,212 on the trades plus $49,923 in interest.

As the result of the trades entered into on October 22, 2001, the options would have the following net economic consequences (inclusive of any accrued interest) for International:

| JPY/USD at Expiration | Net Gain | Net Loss | Probability |
|---|---|---|---|
| Between 123.63 and 130.89 | $2,885,135 | 0 | 25% |
| Below and including 123.63 | 0 | ($1,500,000) | 61% |
| Above and including 130.89 | 0 | ($1,500,000) | 14% |

NY1 5160876v1

**SABWZ0346144**

SIDL 0381957

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 7

On October 29, 2001, International executed the following trades:

| Trades | Original Premium (Paid)/Received | Proceeds Actually (Paid)/Received | Gain/(Loss) |
|---|---|---|---|
| Sold USD/EUR Call (Option # RCM 2001-10-22-08) | ($197,706,830) | $227,8881,115 | $30,174,285 |
| Covered USD/EUR Put (Option # RCM 2001-10-22-09) | 200,000,000 | (112,239,365) | 87,760,635 |
| **Total** | **$2,293,170** | **$115,641,750** | **$117,934,920** |

On October 29, 2001, International acquired a 112-day instrument, styled a "Complex Multi-variate Barrier Option" ("CMBO"), paying a purchase price of $115,656,169. The USD/EUR spot price was 0.9047 USD/EUR. The CMBO was acquired with the proceeds from the aforementioned trades plus an additional $14,419. In addition, International had to post additional margin of $10,581. International would receive $328,896,399 if the USD/EUR price was equal to or greater than 0.8653 USD/EUR or would owe $1,416,134,422 if the USD/EUR price was equal to or less than 0.8115 USD/EUR. Unlike the options which it replaced, the CMBO was not subject to netting with any other option position under an ISDA Master Agreement.

On October 30, 2001, International executed the following trades:

| Trades | Original Premium (Paid)/Received | Proceeds Actually (Paid)/Received | Gain/(Loss) |
|---|---|---|---|
| Sold JPY/USD Call (Option # RCM 2001-10-22-13) | ($197,711,391) | $210,321,601 | $12,610,210 |
| Short JPY/USD Put (Option # RCM 2001-10-22-14) | 200,000,000 | (154,942,046) | 45,057,954 |
| **Total** | **$2,288,609** | **$55,379,555** | **$57,688,164** |

NY1 5360578v1

**SABWZ0346145**

**SIDL 0381958**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 8

On October 30, 2001, International acquired a 111-day JPY/USD CMBO, paying a purchase price of $55,393,605. The JPY/USD spot price was 121.66 JPY/USD. The new options were acquired with the proceeds from the aforementioned trades plus an additional $14,050. In addition, International had to post additional margin of $10,950. International would receive $329,755,773 if the JPY/USD price was equal to or less than 123.66 JPY/USD or would owe $1,398,962,958 if the JPY/USD price was equal to or greater than 130.89 JPY/USD. Unlike the options which it replaced, this CMBO was not subject to netting with any other option position under an ISDA Master Agreement.

Investor made an additional contribution in exchange for preferred membership interests to International on October 31, 2001. This contribution comprised 4,028 shares of Stockton Holdings Limited valued at $4,663,135.04.

On November 5, 2001, Investor purchased all but 5% of Co-investor's total 93% common membership interest in International for $325,500 pursuant to the terms of the Operating Agreement.

On November 6, 2001, World entered into two European-style digital 337-day call options as follows:

| Trades | Premium (Paid)/Received | Potential Proceeds to be (Paid)/Received | Strike Price (10 Year CMS) |
|---|---|---|---|
| Sold 10 Year CMS Call (Option # RCM 2001-11-06-18) | $105,693,337 | ($306,736,486) | 4.7620% |
| Purchased 10 Year CMS Call (Option # RCM 2001-11-06-19) | (104,532,968) | 303,368,823 | 4.7570% |
| **Total** | $1,160,409 | ($567,193) | |

By executing these trades, World locked in its economic gain and/or loss from its October 9, 2001 trades and realized a net economic profit of $35,409 ($1,160,409 minus $1,125,000).

NY1 5160876v1

SABWZ0346146

SIDL 0381959

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 9

On November 6, 2001, World also entered into two European-style digital 337-day call options as follows:

| Trades | Premium (Paid)/Received | Potential Proceeds to be (Paid)/Received | Strike Price (3 Month LIBOR) |
|---|---|---|---|
| Purchased 3 Month LIBOR Put (Option # RCM 2001-11-06-21) | ($30,025,598) | $303,633,750 | 3.8770% |
| Sold 3 Month LIBOR Put (Option # RCM 2001-11-06-22) | $30,358,830 | ($307,003,559) | 3.8740% |
| **Total** | $333,232 | ($3,369,809) | |

By executing these trades, World locked in its economic gain and/or loss from its October 9, 2001 trades and realized a net economic loss of $791,768 ($333,232 minus $1,125,000).

On November 29, 2001, Investor made an additional contribution of $5,000,000 to International in exchange for additional preferred membership interests.

On December 3, 2001, International executed the following trades:

| Trades | Premium (Paid)/Received | Proceeds Actually (Paid)/Received | Gains/(Losses) |
|---|---|---|---|
| Covered USD/EUR Call (Option # RCM 2001-10-22-07) | $200,000,000 | ($203,596,915) | ($3,596,915) |
| Sold USD/EUR Put (Option # RCM 2001-10-22-10) | (199,460,342) | 163,404,260 | (36,055,082) |
| # Sold USD/EUR CMBO Option # RCM 2001-10-29-28) | (115,656,169) | 37,017,244 | (78,638,925) |
| **Total** | ($115,116,511) | ($3,174,411) | ($118,290,922) |

As result of the December 3, 2001 USD/EUR trading, International realized a net taxable loss of $118,290,922.

NYI 3160876v1

**SABWZ0346147**

**SIDL 0381960**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 10

On December 3, 2001, International also executed the following trades:

| Trades | Premium (Paid)/Received | Proceeds Actually (Paid)/Received | Gains/(Losses) |
|---|---|---|---|
| Covered JPY/USD Call (Option # RCM 2001-10-22-12) | $200,000,000 | ($173,022,303) | $26,977,697 |
| Sold JPY/USD Put (Option # RCM 2001-10-22-15) | (199,453,397) | 239,249,723 | 39,796,326 |
| Sold JPY/USD CMBO Option RCM 2001-10-30-34) | (55,393,605) | (69,241,845) | (124,635,450) |
| **Total** | **($54,847,002)** | **($3,014,425)** | **($57,861,427)** |

As result of the December 3, 2001 JPY/USD trading, International realized a net taxable loss of $57,861,427.

International realized a net economic pre-tax loss of $549,265, calculated as follows:

|  | Realized Gains/(Losses) |
|---|---|
| October 29, USD/EUR trades | $117,934,920 |
| October 29, JPY/USD trades | 57,668,164 |
| December 3, USD/EUR trades | (118,290,922) |
| December 3, JPY/USD trades | ( 57,861,427) |

On December 14, 2001, Investor made an additional contribution of $2,000,000 to Fidelity in exchange for additional preferred membership interests.

In connection with the foregoing investments, Investor or Investor's controlled entities incurred fees of $3,375,000, in addition to fees incurred to KPMG LLP.

**D.    Summary of Transactions**

The Transactions can be summarized as follows:

NY1 5160876v1

**SABWZ0346148**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 11

1.  Investor, through World, entered into a series of Long and related Short options (the "Contributed Options") with Counterparty.

2.  Investor contributed his interest in World to International in exchange for common and preferred interests.

3.  Alpha and Manager also contributed cash to International in exchange for common interests.

4.  International entered into additional Long and related Short Options (together with the Contributed Options, the "Original Options").

5.  International disposed of or terminated out certain of these Options, including at least one Long Option and one Short Option which had appreciated in value (the "Gain Legs"), and retained the other Options (the "Remaining Options").

6.  To balance the Remaining Options, International acquired a replacement instrument for each pair of Options sold or disposed of (the "Replacement Instruments"), with the same expiration dates and strike prices, and requiring a net premium of approximately the disposition proceeds, but with different payoff amounts, using a different legal form and with different legal rights.

7.  Investor made an additional contribution of shares of Stockton Holdings Limited for additional preferred membership interests of International.

8.  Investor purchased a portion of Co-investor's common interest.

9.  Investor made a contribution of cash for additional preferred membership interests of International.

10. The Remaining Options and Replacement Instruments (collectively, the "Other Legs") were sold, closed out or expired at termination.

11. Investor made a contribution of cash for additional preferred membership interests of International.

12. Investor or his controlled entities incurred certain fees and additional transaction costs. (the "Advisory Fee").

In the discussion below, "Options" include "Replacement Instrument" except where the context requires otherwise. The Options on the Japanese Yen and the Euro are referred to as the "FX Options", and the Options on the 10-year CMS and 3-month LIBOR are referred to as the "Interest Rate Options".

NY1 51601476v1

**SABWZ0346149**

**SIDL 0381962**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 12

II.    **Representations:**

A.    **Investor Representations:**

For purpose of rendering our opinion, Investor has represented as follows:

1.    Investor entered into the Transactions for substantial non-tax business reasons, predominantly related to offsetting various investment risks associated with a large single concentrated holding in a U.S. technology company, and to hedge against currency fluctuations in international markets in which this technology company has significant currency exposure due to sales. Investor at the time was barred from engaging in direct hedging techniques with respect to his holdings. Also Investor has entered into certain Options to hedge against interest rate fluctuations since Investor was drawing on a large line of credit with a floating interest rate. It was important to be able to manage the interest rate risks due to size of the loans as well as the limitations on the Investor's ability to sell his concentrated holdings due to trading restrictions and sales lockouts at a time when the stock price was becoming increasingly volatile. The intent was for these options to provide cushion if the stock price dropped significantly or if interest rates significantly increased.

2.    Based on advice of the Investment Advisor as to the probability of the referenced property reaching certain price levels at which the Options would be profitable, and on Investor's own independent evaluation, Investor believed that he had a reasonable opportunity to earn a reasonable profit from the Transactions in excess of all fees and transaction costs and without regard to tax benefits.

3.    Investor contributed the membership interest in World to International for substantial non-tax business reasons. Investor has a very sophisticated investment portfolio. Investor continually attempts to group similar purpose investments in limited liability companies or limited partnerships to provide more accurate investment monitoring, to maintain overall portfolio balance, to achieve diversification of Investor's portfolio and to monitor investment risk. In addition, Investor has actively pursed investment opportunities since 1994 in alternative investments (such as real estate, private equity, venture funds, hedge funds, etc.). In order to boost economic performance, diversify holdings and limit risk. All of these investments have been done through limited liability companies or limited partnerships. Many of these investments have outside participants and/or outside managers. Some of these investments have periodically involved hedging strategies.

Based on historical correlations, Investor believed that one group of the Options

NY1 5160176v1

**SABWZ0346150**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 13

would move in the opposite direction of the stock price relating to his concentrated holdings and another group of the Options would move in the opposite direction of his interest rate exposure on his line of credit related to his concentrated holding. The Options were intended to provide a hedge against large losses arising due to Investor's concentrated holdings until Investor was able to sell a larger percentage of these holdings and pay down his line of credit and lower his interest rate exposure.

4.   World has not elected under Treas. Reg. §301.7701-3 to be classified as a corporation.

5.   Investor has not hedged Investor's risks with respect to the Options.

6.   Investor has not identified, and will not identify, any of the Options as being part of a hedging transaction under Treas. Reg. §1.446-4.

7.   Investor maintains Investor's books and records using the U.S. dollar.

8.   Investor is not related to the other members of International or to Counterparty within the meaning of Code Section 267(b).

9.   There existed no understanding, agreement, obligation, or arrangement pursuant to which any of the parties described herein committed to undertake all or any of the transactions described herein upon the happening of any other transaction, except to the extent that Investor/World (and International as transferee of Investor) and Counterparty were contractually obligated to perform under the Options in accordance with their stated terms.

10.  Investor has reviewed the description of the Transactions as set forth herein and such description is accurate and materially complete.

**B.     International Representations:**

For purpose of rendering our opinion, International has represented as follows:

1    International has not hedged its risks with respect to the Options.

2    International has not identified, and will not identify, any of the Options as being part of a hedging transaction under Treas. Reg. §1.446-4.

NY1 5160876v1

**SABWZ0346151**

**SIDL 0381964**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 14

3.   International will determine its members' distributive shares of income, gain, loss, deduction, or credit and will maintain its members' capital accounts in accordance with the Operating Agreement.

4.   None of the members' capital contributions are guaranteed, directly, indirectly, or in some other form, by Investor or another member.

5.   International has not made an election under Code Section 754 and will not do so for the taxable year or years in which the Transactions occur.

6.   International has not elected, and will not elect, under Treas. Reg. §301.7701-3 to be classified as a corporation.

7.   International entered into the Transactions for substantial non-tax business reasons related to hedging investment risks in concentrated holdings and protecting against adverse interest rate fluctuations, with a goal of producing an overall profit from its investments.

8.   Based on the advice of the Investment Advisor, (x) the Options are not listed on or subject to the rules of a qualified board or exchange as those terms are used in Section 1256(g)(5); (x) the Options are not regulated futures contracts within the meaning of Section 1256(g)(1), (y) the Options are not listed options within the meaning of Section 1256(g)(5), and (z) the price of the Options was not determined by reference to the price in the interbank market.

9.   International has not caused, and will not cause, World to elect under Treas. Reg. §301.7701-3 to be classified as a corporation.

**C.   Co-investor Representation**

For purpose of rendering our opinion, Co-investor has represented that:

1.   There existed no understanding, agreement, obligation, or arrangement pursuant to which any of the parties described herein committed to undertake all or any of the transactions described herein upon the happening of any other transaction, except to the extent that Investor/World (and International as transferee of Investor) and Counterparty were contractually obligated to perform under the Options in accordance with their stated terms.

2.   Co-investor believed that he had a reasonable opportunity to earn a reasonable profit from the Transactions in excess of all fees and transaction costs and without

NY1 516087641

**SABWZ0346152**

**SIDL 0381965**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 15

> regard to tax benefits. Co-investor is a sophisticated investor and has engaged in
> options trading in the past.

### D.    Investment Advisor Representation

For purpose of rendering our opinion, Investment Advisor has represented that every
transaction did occur as described in Part I, above.

### III.    Conclusions

In rendering our opinions, we have reviewed the facts set forth in Section I above, and
representations and advice, including financial information, from various parties to the
Transactions and made certain assumptions, which representations, advice and assumptions are
referred to below. We have made no independent verification of such representations, advice,
assumptions, records, agreements, certificates, instruments, documents, and responses to such
inquiries. We have assumed, with your consent, that all of the representations and statements set
forth in the documents related to the Transactions ("Transaction Documents") are true and
correct, and all of the obligations imposed by any such documents on the parties thereto have
been and will be performed or satisfied in accordance with their terms. We also have assumed
the genuineness of all signatures, the proper execution of all documents, the authenticity of all
documents submitted to us as originals, the conformity to originals of documents submitted to us
as copies, and the authenticity of the originals from which any copies were made. Further, we
have assumed that the Transaction Documents have not been, subsequent to our review of them,
modified or amended in any way. In rendering our opinions, we have also examined such
agreements, certificates, instruments and documents, and we have made such other inquires of
officers, owners and representatives of the entities involved in the Transactions as we have
considered necessary to render the opinions set forth herein. If any such fact, representation,
advice, assumption, record, agreement, certificate, instrument, document, or response is
inaccurate in any material respect, or any such agreement, certificate, instrument, or document
prove not to be authentic, the opinions contained herein may not be relied upon.

In rendering our opinion, we have reviewed the applicable provisions of the Code and of
the final, temporary, and proposed Treasury Regulations ("Treas. Reg.", "Treasury Regulations",
or "Regulations") promulgated thereunder; relevant decisions of the federal courts; published
Revenue Rulings ("Rev. Rul.") and Revenue Procedures ("Rev. Proc.") of the Internal Revenue

NY1 5160876v1

**SABWZ0346153**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 16

Service ("IRS"); and such other materials as we have considered relevant (the "Law"). In certain
instances we have determined that there is no authority directly on point, and in such instances
we have reached our opinion reasoning from such other authority as we believe to be relevant to
the issues addressed. The Law is subject to change, which may or may not be retroactive in
effect, and which may result in modifications of our opinion. We assume no obligation to update
our opinion in light of any change in the Law subsequent to the date hereof.

Based on and subject to the facts set out at Section I above, the Representations set out at
Section II above, and the analysis of the pertinent statutory provisions and legal doctrines at
Section IV below, as of the date hereof:

(a)     We are of the opinion that for federal income tax purposes it is more likely than
        not that:

    (i)     World would be disregarded as an entity separate from Investor or (after
                its contribution to International) International[2].

    (ii)    International would be classified as a partnership.

    (iii)   The Options would be treated as separate instruments.

    (iv)    The Options would not be subject to the timing rules of Treas. Reg.
                §1.446-4.

    (v)     The Options would not be section 1256 contracts.

    (vi)    Investor's tax basis in the Contributed Long Option would equal the
                premium paid to Counterparty with respect thereto, and any other costs
                associated with acquiring such Option.

    (vii)   Investor would not recognize taxable gain or taxable loss upon the
                contribution of the Long Option to International or on the assignment of
                the Short Option to International.

    (viii)  A Short Option would not be considered a liability for purposes of Code
                Section 752.

---

[2]     Because it is more likely than not that World will be disregarded as an entity separate from Investor and
        International, unless otherwise stated or implied by the context, the remainder of the Conclusions and
        Analysis contained herein will disregard World's existence.

NY1 3160874v1

**SABWZ0346154**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 17

(ix)    Investor's basis in Investor's membership interest in International would be equal to Investor's basis in the Contributed Long Option, increased by the amount of the Advisory Fee.

(x)    The IRS would not be successful if it were to reallocate any gain or loss pursuant to Section 446(b).

(xi)    The allocation of gains and losses to the members in the amounts set forth in the Operating Agreement would be respected for tax purposes, either because the allocations would have "substantial economic effect" or because they would be in accordance with the members' interests in International.

(xii)    Gain or loss allocated to Investor with respect to the Interest Rate Options would be characterized as a capital gain or loss and gain or loss allocated to Investor with respect to the FX Options would be characterized as a ordinary income or loss.

(xiii)    With respect to the application of certain loss limitation rules potentially affecting the deductibility of any loss claimed by Investor in connection with the Transactions:

a.    The sham transaction doctrine would not apply and, based on the representations of Investor, the Transactions would have the requisite business purpose and economic substance;

b.    Although the matter cannot be entirely free from doubt because of the factual nature of the inquiry, on balance, the requisite profit motive exists to support the deduction of any loss from the Transactions under Code Section 165(c)(2) and Code Section 183;

c.    The step transaction doctrine would not apply to the Transactions;

d.    The IRS would be unsuccessful were it either to assert under Treas. Reg. §1.701-2 that the Transactions are inconsistent with the intent of subchapter K or to assert that International should be disregarded entirely under Treas. Reg. §1.701-2 or under common law principles;

e.    Investor's deduction of his allocable share of International's losses would not be limited by Section 1092;

NY1 5160876v1

**SABWZ0346155**

**SIDL 0381968**

SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 18

      f.    Investor's deduction of his allocable share of International's losses
           would not be limited by the Section 465 "at risk" rules;

      g.    Investor's deduction of his allocable share of International's losses
           would not be limited by Section 469; and

      h.    The IRS would be unsuccessful if it were to attempt to apply
           Section 482 to reallocate International's gains or losses among its
           members.

(b)    Based upon the foregoing, there is a greater than 50 percent likelihood that the tax
       treatment of the Transactions would be upheld if challenged by the IRS.

(c)    Based upon the foregoing, the IRS should not be successful were it to assert a
       penalty against Investor under Code Section 6662(b)(2) or (3) for positions taken
       on Investor's federal income tax return with respect to the Transactions.

(d)    It is more likely than not that the Transactions would not constitute a tax shelter
       within the meaning of Code Section 6111(c)(1) and, therefore, would not be
       required to be registered under Code Section 6111(a).

    We wish to point out that our opinion is not binding upon the IRS or a court of law.
Accordingly, there can be no assurance that (i) following an audit, the IRS will not take a
position contrary to the opinion set forth herein, or (ii) such position would not be sustained by
the courts.

**IV.    Analysis**

    **A.    World Disregarded**

    Treas. Reg. §301.7701-2(b)(1)-(8) describes certain entities that are classified as
corporations for federal income tax purposes. Treas. Reg. §301.7701-3 provides that an entity
not described in Treas. Reg. §301.7701-2(b)(1), (3), (4), (5), (6), (7), or (8) is considered to be an
"eligible entity", which may elect to be classified as a corporation or, if it has a single owner, be
disregarded as an entity separate from its owner. Treas. Reg. §301.7701-(3)(b)(1) provides that a
domestic eligible entity that has a single owner and does not elect to be classified as a
corporation would be disregarded as an entity separate from its owner for federal income tax
purposes.

NY1 5160570v1

SABWZ0346156

SIDL 0381969

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 19

Based on the facts set forth above, it is more likely than not that World would constitute a domestic eligible entity. Consequently, if World does not elect to be classified as a corporation, it is more likely than not that World would be disregarded as an entity separate from Investor or (after its contributions to International) International, under Treas. Reg. §301.7701-(3)(b).

**B.    International Treated as a Partnership**

As discussed above, Treas. Reg. §301.7701-(3)(b)(1) provides that a domestic eligible entity that has two or more members and does not elect to be classified as a corporation will be classified as a partnership for federal income tax purposes. It is more likely than not that International would constitute a domestic eligible entity. Consequently, if International does not elect to be classified as a corporation, it is more likely than not that International would be classified as a partnership under Treas. Reg. §301.7701-(3)(b).

The courts have held that a partnership is respected for tax purposes if the parties join together to jointly conduct a business and share the profits and losses or both. See, e.g., Comm'r v. Culbertson, 337 U.S. 733, 741 (1949); see also, PLR 9914006 (12/23/98). Here, Investor and the other members invested in International with the intent of jointly conducting an activity (investing) and sharing the profits and losses therefrom, and this is reflected in the Operating Agreement.

In ASA Investerings Partnership v. Comm'r, T.C. Memo. 1998-305, aff'd 201 F.3d 505 (D.C. Cir. 2000), the court held that a partnership formed by Allied Signal and ABN, a foreign partner, was not a valid partnership for U.S. federal income tax purposes, in part based on what it viewed as the two party's different investment objectives. In the court's view, Allied Signal only wanted capital losses, and ABN was interested only in earning a specified rate of return on its investment and did not want to share in any losses. Allied Signal paid all expenses, guaranteed ABN a minimum profit and made all the critical management decisions. As a result, the court concluded that ABN was not a partner in a partnership, but rather was a mere lender. The court noted that Allied Signal agreed to enter into the transaction before it even knew that ABN would be involved. ASA Investerings is distinguishable from the Transactions because each member of International has the potential for profit or loss from the collective investment of each in International. Except to the extent of the guaranteed return on the preferred interests, no member was guaranteed a particular minimum profit.

NY1 5160876v1

**SABWZ0346157**

SIDL 0381970

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 20

There exists little or no minimum required participation in a venture's profits and losses for a venturer to be treated as a partner. For example, under the prior entity classification Regulations, Treas. Reg. §4.01 of Rev. Proc. 89-12, 1989-1 CB 798 required the collective interests of all general partners of a limited partnership in each material item of income, gain, loss, deduction or credit to equal at least one percent. Thus, a limited partnership would not be classified as other than a partnership merely because a sole limited partner had a 99% partnership interest. Here, at no time did Investor's interest in any item of International's income, gain, loss, deduction or credit exceed 98%. Accordingly, it is more likely than not that any minimum required gain or loss sharing for members other than the Investor to be classified as partners would be met.

Based upon the foregoing, it is more likely not that International would be treated as a partnership under the common law principles discussed above.

**C.     The Options**

**1.     Taxation of Options Generally**

The tax consequences of the issuance of an option are set out not in the Code, but in cases and rulings. The seminal case regarding the timing of income arising from an option is <u>Virginia Iron Coal & Coke Co. v. Comm'r</u>, 37 B.T.A. 195 (1938), a reviewed decision, holding that under an "open transaction" approach, the receipt of an option premium is not income and the premium is taxed only when (and if) the option transaction closes. The rationale of the <u>Virginia Iron Coal</u> case, that the receipt of an option premium is not income, repeatedly has been accepted by the IRS. See, I.T. 3835, 1947-1 CB 53, first holding; Rev. Rul. 58-234, 1958-1 CB 279.

Rev. Rul. 78-182, 1978-1 CB 265, which deals with options on the Chicago Board Options Exchange, follows Rev. Rul. 58-234 in holding, <u>inter alia</u>, that as to the writer of a put or call, "there is no federal income tax incident on account of either the receipt or the payment of such option premium, that is, from the standpoint of either the optionor or the optionee, unless and until the options have been terminated, by failure to exercise, or otherwise, with resultant gain or loss." As discussed below, PLR 8038087, <u>infra</u>, PLR 7938018, <u>infra</u>, and PLR 8113024 hold that the assumption of a warrant in a corporate reorganization is not an event that would trigger such gain. Furthermore, World remains Counterparty's counterparty with respect to the

SABWZ0346158

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 21

Options until their termination. As a result, the legal relationship of the optionor and optionee
remain unchanged throughout the Transactions until the Options terminate.

Based on the foregoing, it is more likely than not that no income or loss would be
recognized with respect to an Option at the time it was entered into. Furthermore, as discussed
below, it is more likely than not that any income or loss arising from the termination of an
Option would be treated as income or loss of International, the then-owner of the Option, and
would not be directly attributed to Investor.

### 2.    The Options as Separate Instruments

In determining the federal income tax consequences of the Transactions, it must be
determined whether the Long Option and the Short Option components of an option spread
would be treated as separate instruments or the Options would be integrated in some way.

Each Option may be transferred or assigned independently, an important factor in
determining if two instruments should be treated as one. For example, Congress needed to add
Code Section 269B to the Code to provide special rules for the treatment of a stapled entity,
which is one whose stock cannot be traded without trading the stock of the other entity. The
legislative history of this provision indicates that the law in this regard was unclear. Staff of the
Joint Committee on Taxation, General Explanation of the Revenue Provisions of the Tax Reform
Act of 1984, 98th Cong., 2d Sess., 454 (1984). We are not aware of any efforts by Congress to
treat non-stapled entities as a single entity.

Further, Investor and Counterparty, and International and Counterparty, retain real net
economic risk which they will not hedge with each other. As discussed below, it is more likely
than not that Treas. Reg. §1.446-4 would not apply to the Options. Even if these Regulations
were to apply, nothing in them would cause the Options to be integrated.

In addition, Congress has recognized that separate instruments are generally given
separate effect, even when one transaction may significantly offset the risk of the other. See,
e.g., Code Section 1092 (loss on one position of a straddle is deferred until gain is recognized on
the offsetting position; the offsetting positions are not netted); Code Section 1258
(recharacterizing certain gain attributable to the time value of a taxpayer's investment as

**SABWZ0346159**

SIDL 0381972

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 22

ordinary income, not purporting to recharacterize the transaction as a borrowing) and Code
Section 1259 (constructive sale provision).

Finally, case law recognizes that a taxpayer can hold long and short positions in property
at the same time, and that each position is a separate property. In Smith v. Comm'r, 78 T.C. 350
(1982), the court held that each leg of a straddle should be treated as separate property, whether
the legs were acquired at different times or at the same time. See also, Stoller v. Comm'r, 994
F.2d 855 (DC Cir. 1993), aff'g in part and rev'g in part, 60 TCM (CCH) 1554 (1990) (separate
contracts were respected); Richardson v. Comm'r, 121 F.2d 1 (2d Cir. 1941) (can hold long and
short positions at the same time); Rev. Proc. 65-29, 1965-2 CB 1023; Rev. Rul. 78-182, supra;
Arnall v. U.S., a District Court case unofficially reported at 59-2 USTC ¶9779 (N.D. Ga. 1959).

Consequently, based on the foregoing, it is more likely than not that the Options would
be treated as separate instruments.

### 3.    Tax Basis in the Contributed Long Option

In Rev. Rul. 78-182, supra, the IRS concluded that the tax basis of the purchaser of a put
or a call option with respect to certain stock was the premium paid for the option plus any fees or
other costs associated with acquiring the options. Consequently, it is more likely than not that
Investor's tax basis in the Long Option would equal the premium paid to Counterparty with
respect thereto and any other costs associated with acquiring such option.

### 4.    Inapplicability of Treas. Reg. §1.446-4

Treas. Reg. §1.446-4 provides that the timing of income, gains, deduction and losses
from a hedging transaction as defined in Treas. Reg. §1.1221-2(b)(1) match those of the hedged
transaction. Treas. Reg. §1.1221-2(f) provides, with two exceptions, that the absence of a proper
identification of a transaction as a hedging transaction establishes that the transaction is not a
hedging transaction. The exceptions are (i) for inadvertent error and (ii) an anti-abuse rule which
provides, in appropriate circumstances, not that the transaction is a hedging transaction but that
gain from the transaction is ordinary. Based upon the representations contained in II, above,
neither International nor Investor has identified or will identify the Options as being part of a
hedging transaction. Consequently, it is more likely than not that the matching rule of Treas.
Reg. §1.446-4 will not apply.

NY1 5160876v1                                    **SABWZ0346160**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 23

### 5.    The Options are not Section 1256 Contracts

Code Section 1256(a) requires mark-to-market treatment for a "section 1256 contract" held by a taxpayer at the close of the taxpayer's taxable year or on the termination or transfer of a taxpayer's rights or obligations with respect to such a contract by assignment, lapse, or otherwise. This is achieved by treating the contract as sold on such date for the contract's fair market value on such date. Code Section 1256(a)(1). Code Section 1256(a)(2) provides that "proper adjustment shall be made in the amount of gain or loss subsequently realized for gain or loss taken into account by reason of such paragraph (1)."

It is more likely than not that the Options would not be "section 1256 contracts" because an over-the-counter option held by a taxpayer other than a dealer is not within the literal terms of any of the statutory definitions of a "section 1256 contract".[3] Even if they were "section 1256 contracts" and the mark-to-market rules were to apply, the only likely consequence would be that Investor would be required to recognize the net gain or loss on the Options at the time the Options were contributed and assigned to International. Since this occurred soon after their acquisition, that gain or loss was not material.

Were the Options section 1256 contracts, the IRS might contend that the transfer to International should be treated either (i) as if Investor sold the Option to International or (ii) as if Investor closed Investor's position in the Option and International entered into a "new" Option having the same terms. It is more likely than not that the IRS would not be successful were it to so contend.

Code Section 1256 was enacted to conform the tax treatment of regulated futures contracts to the daily cash settlement, mark-to-market system employed by U.S. commodity

---

[3]    Section 1256(b) defines a section 1256 contract as (i) a regulated futures contract (RFC) within the meaning of section 1256(g)(1), (ii) a foreign currency contract within the meaning of section 1256(g)(2), (iii) a nonequity option within the meaning of section 1256(g)(3), and (iv) a dealer equity option within the meaning of section 1256(g)(4).  An option is not a "contract" and so likely is not either an RFC or a "foreign currency contract".  See, CFTC Glossary: A Layman's Guide to the Language of the Futures Industry; Rev. Rul. 87-43, 1987-1 C.B. 252; FSA 200025020 (March 17, 2000), Issue 3.  Section 1256(g)(3) defines a nonequity option as, in part, a "listed option", within the meaning of section 1256 (g)(5), which in turn defines a listed option as one listed on, or subject to the rules of, a qualified board or exchange.  An over-the-counter option is not listed on or subject to the rules of a CFTC-designated contract market.  Section 1256(g)(4) defines a dealer equity option as, in part, a listed option purchased or granted by an options dealer.  The Options are not listed options and International is not a dealer.

SABWZ0346161

SIDL 0381974

SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 24

futures exchanges for purposes of determining margin requirements. Under this system, even
though a trader does not close out a position, but continues to hold it, the trader receives any gain
in the position in cash as a matter of right each trading day and the trader has the right to
withdraw such amount. Correspondingly, if the position declines in value, the trader is required
to deposit additional funds. Thus, Congress intended Code Section 1256 to apply the doctrine of
"constructive receipt" to the economic gains or losses realized by the taxpayer at year end even
though the taxpayer continued to hold such positions. See, General Explanation of the Economic
Recovery Act of 1981 (H.R. 4242, 97th Cong., P.L. 97-34) prepared by the Staff of the Joint
Committee on Taxation (12/31/81) ("1981 General Explanation") at 296. In Murphy v. U.S.,
992 F.2d 929 (9th Cir. 1991), aff'g an unreported District Court decision, the court concluded that
Code Section 1256 was constitutional because Congress premised recognition of gain or loss
under Code Section 1256 on the existing doctrine of constructive receipt.

The 1981 General Explanation to the Economic Recovery Act of 1981 states:

> If a taxpayer holds futures contracts at the beginning of a taxable
> year, any gain or loss subsequently realized *on these contracts*
> must be adjusted to reflect any gain or loss taken into account *with*
> *respect to these contracts* in a prior year.

Although Congress could just as easily have provided that the mark-to-market rules
created a constructive sale and repurchase of the contracts to adjust the basis of the contracts to
reflect the gains and losses triggered under Code Section 1256(a)(1), it did not do so. Instead, it
chose to apply constructive receipt principles to merely trigger mark-to-market gain or loss with
respect to a contract at a particular time and to adjust the amount of subsequent gain or loss with
respect to such contract by reference to such previously recognized gain or loss.

Code Section 1256(a) as enacted applied only to contracts held by a taxpayer at year-end
and did not address events occurring within the year, such as a termination or transfer of a
contract. To do so, Congress added Code Section 1256(c) as part of the Technical Corrections
Act of 1982 ('1982 Act"). Code Section 1256(c) provides relevant part:

> (1) IN GENERAL. The rules of paragraphs (1) [income and loss
> recognition], (2) [proper adjustment], and (3) [character] of
> subsection (a) shall also apply to the termination (or transfer)
> during the taxable year of the taxpayer's obligation (or rights)
> with respect to a section 1256 contract by offsetting, by taking

NY1 516087641

**SABWZ0346162**

SIDL 0381975

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 25

> or making delivery, by exercise or being exercised, by
> assignment or being assigned, by lapse, or otherwise.

In enacting Code Section 1256(c)(1) Congress clearly intended the rules of Code Section 1256(a)(1), (2), and (3) to apply to transfers by a partner to a partnership. See, JCS-20-82, Description of H.R. 6056, Technical Corrections Act of 1982, prepared for Use by the Committee for Ways and Means for a Hearing on April 27, 1982 by the Staff of the Joint Committee on Taxation ("Description"). At page 3, the Description states:

> The bill would require expressly that gains and losses be taken into
> account when a taxpayer's rights in a regulated futures contract are
> transferred. Thus, section 1256(a) would apply when transfers of
> regulated futures contracts are made to and from partnerships and
> other flow through entities.

Although the legislation could have provided that a transfer to a partnership (or other flow through entity) would be deemed to be a sale by the partner to the partnership or the termination of the contract by the partner and the entering into of a "new" contract by the partnership, it did not do so. Rather, it merely required that such a transfer trigger the mark-to-market gain recognition and other rules of Code Section 1256(a).

Based on the foregoing, it is more likely than not that (x) the application of Code Section 1256(a)(1) to the transfer of the Options by Investor to International would not cause Investor to be treated either (i) as selling the Options to International or (ii) as closing Investor's position in the Options and International entering into "new" Options having the same terms, (y) the transfer of the Options to International would be subject to the rules regarding contributions to a partnership, as discussed below, and (z) a Code Section 1256(a)(2) "proper adjustment" would be made with respect to any subsequent gain or loss recognized by International with respect to the Contributed Options.

6.    **The Acquisition of the Options is a Section 988 Transaction**

Code Section 985(a) generally requires that all income tax determinations with respect to a taxpayer be made in the taxpayer's functional currency. Code Section 985(b)(1) generally provides that a taxpayer's functional currency is the U.S. dollar, although a qualified business unit, or QBU, of a taxpayer may use another currency as its functional currency if certain conditions are met. Treas. Reg. §1.988-1(c) provides that any currency of a taxpayer or a QBU

NY1 5160876v1

SABWZ0346163

SIDL 0381976

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 26

other than its functional currency is "nonfunctional currency". Since the U.S. dollar is functional currency of Investor and World, any other currency will be nonfunctional currency.

Code Section 988 governs the federal income tax treatment of certain transactions in foreign currency, described as "section 988 transactions", and governs such transactions notwithstanding any other provisions of Chapter 1 (Code Sections 1 through 1400) of the Code.

A section 988 transaction includes entering into or acquiring an option, warrant or similar financial instrument, if the taxpayer is entitled to receive, or is obligated to pay, an amount denominated in a nonfunctional currency. Code Section 988(c)(1) and Treas. Reg. §1.988-1(a). Consequently, the acquisition of the Options by Investor and International likely are section 988 transactions.

Code Section 988(c)(1)(D) and Treas. Reg. §1.988-1(a)(7)(i) exclude from the scope of a section 988 transaction a regulated futures contract and a nonequity option that would be marked to market under section 1256 if held on the last day of the taxable year. As discussed above, the Options likely are not regulated futures contracts or nonequity options that would be marked to market under section 1256. Therefore, the Options likely would not be excluded from the scope of a section 988 transaction.

    **D.    Contribution of the Options to International**

    **1.    Nonrecognition of Income**

        **(a)    General Rule**

Code Section 721(a) and Treas. Reg. §1.721-1 generally provide that no gain or loss is recognized by either the partnership or any partner in the case of a contribution of property to the partnership in exchange for a partnership interest. Although the term "property" is not defined in subchapter K of the Code, its common meaning implies that to be property an asset or right must involve some potential economic return (even if that return would not generate a profit). See, e.g., Dillon v. U.S., an unreported District Court case unofficially reported at 84-2 USTC ¶9921 (S.D. Tex, 1981). Furthermore, although neither the Code nor the Regulations defines the term "property" under Code Section 721, that Section is similar to Code Section 351 in the corporate context, where the term "property" is given a broad interpretation, and serves to distinguish services from property. See, Stafford v. U.S., 611 F.2d 990 (5th Cir.

NY1 5160876v1

**SABWZ0346164**

SIDL 0381977

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 27

1980); PLR 8225069 (3/24/82). Consequently, it is more likely than not that the Long Option would qualify as property for purposes of Code Section 721 and that Code Section 721 would generally apply to the contribution of such Long Option by Investor to International.

While a Short Option would, more likely than not, not constitute property under this interpretation, it is more likely than not that Investor would nonetheless not recognize gain or loss on the assignment of the Short Option because (i) Code Section 721(a) applies by its literal terms "in the case of a contribution of property" to a partnership, and the assignment here occurs in conjunction with such a contribution, and (ii) as discussed below, gain or loss is recognized by the grantor of an option only when that option "terminates" in a transaction in which gain or loss would otherwise be recognized, and the assignment of the Short Option to International does not result in its "termination".

### (b)    Investment Partnership Rules

Code Section 721(a) does not apply to gain realized on a transfer of property to a partnership that would be treated as an investment company within the meaning of Code Section 351. Code Section 721(b). Thus, gain, but not loss, will be recognized on the contribution of the Long Option to International if, as is likely, International were an investment company within the meaning of Code Section 351 were it incorporated.

Consequently, under Code Section 721(b), it is more likely than not that Investor would recognize gain only to the extent of appreciation in the value of the Long Option at the time of its contribution to International, and would not recognize any loss with respect to any depreciation in value. Because the Long Option had depreciated, it is more likely than not that Investor would recognize no gain or loss on the contribution of the Long Option to International.

### (c)    Code Section 1234(b)

Code Section 1234(b) provides that the grantor's gain or loss with respect to any "closing transaction" is treated as short-term capital gain or loss. Code Section 1234(b)(2)(A) was enacted to provide uniform character rules to transactions in which a taxpayer recognized income, gain or loss from the lapse or other termination of an option that the taxpayer had granted. H. Rpt. No. 94-1192, 94th Cong., 2d Sess., 5 (5/26/76) ("TRA Report"). The TRA Report states at page 5 that the then-present law was "based upon several widely publicized

NYI 5160875v1

**SABWZ0346165**

SIDL 0381978

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 28

private letter rulings issued to the Chicago Board Options Exchange ("CBOE") in which the IRS concluded that the gain or loss from a closing transaction was ordinary, even if the options were capital assets and the underlying securities would be capital assets in the hands of the option writer. In those rulings, a closing transaction was described as one in which the grantor or purchaser of a listed option eliminated his obligation by purchasing an offsetting listed option and describing the transaction as a closing transaction under the rules of the Exchange.[4] The TRA Report at pages 3 through 5 contemplated that an option writer could terminate his obligations under an option in one of three ways: by exercising the option, by letting the option lapse, or by entering into such a closing transaction with respect to the option. As described in the TRA Report at page 4, a closing transaction occurs when the option writer terminates his obligation under the option by either reacquiring the option or by making a payment to the options exchange equivalent to the value of an offsetting position. The TRA Report noted, however, that in the case of an over-the-counter option, a writer can relieve himself of his obligation under the option only by repurchasing the specific option that he has written (although the writer could hedge his position by buying a similar option). In the case of an exchange-listed option, the writer could terminate his obligation by buying a listed option identical to the one that he has written. This is because under the rules of the exchange, the two listed options cancel each other out.

From the TRA Report, it appears that Code Section 1234(b) was intended not to create a separate recognition event, but rather was intended to provide rules to fix the character of certain events: lapse, payment, or closing transactions with respect to listed options that were treated as closing transactions under the rules of the board or exchange on which the option is listed. See, e.g., Treas. Reg. §1.1234-1, which discusses Code Section 1234 in terms of the character of gain or loss recognized. See also, Treas. Reg. §1.1234-1(f), which provides that losses described under Code Section 1234 are subject to the general disallowance rules of the Code, i.e. that Code Section does not create an independent loss allowance rule, but instead any loss described in Code Section 1234 is not allowed if it would be otherwise disallowed under the

---

4    Although the legislative history did not cite such private letter rulings, one appears to be 7404080200A. Subsequently, in Rev. Rul. 78-182, supra, the IRS described the federal income tax treatment of transactions in options traded over the CBOE. The IRS pointed out that if a taxpayer paid an amount equal to the then fair market value of the option and declared the transaction a "closing transaction", under the CBOE rules the taxpayer would be released from liability to settle the closed option. In the Ruling the IRS treated such a 'termination' as a recognition event. See, Rev. Rul. 78-182, 1978-1 CB. 265.

**SABWZ0346166**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 29

Code.[5] Consequently, it is more likely than not that Code Section 1234(b)(2) would not independently cause gain or loss to be recognized by Investor upon the transfer of the Options to International.

Furthermore, in the context of non-traded options, the IRS has ruled that the assumption by an acquiring corporation in a corporate reorganization of warrants to purchase the target company's stock does not constitute a closing transaction, because neither did the option lapse nor did the grantor's obligation terminate. Instead, the requirement that the grantor issue stock pursuant to the warrants was assumed by the acquiror. PLR 8038087 (6/26/80) and PLR 7938018 (6/19/79)[6]. Although not directly on point, because these rulings involve transactions under subchapter C of the Code rather than subchapter K, these rulings support the proposition that the assumption of an undertaking to perform under an option in the context of a nonrecognition transaction is not a transaction with respect to which gain or loss is recognized apart from the applicable nonrecognition transaction. This should be particularly true where, as here, the legal relationship of the optionor, World, and optionee, Counterparty, remain unchanged.

      **(d)**    **No Assignment of Income**

Under the assignment of income doctrine, income earned from property must be included in the gross income of the person who beneficially owns the property. See, Blair v. Comm'r, 300 U.S. 5 (1937).

Two cases analogous to the instant case involve the transfer of contract claims for money damages in litigation. In Cold Metal Process Co. v. Comm'r, 247 F.2nd 864 (6th Cir. 1957), rev'g 25 T.C. 1333 (1956), the IRS attempted to tax to the transferor amounts received in

---

5    Cf. Rev. Rul. 79-314, 1979-2 CB 132, and Rev. Rul. 80-101, 1980-1 CB 70, in which certain corporate nonrecognition rules were permitted to override general gain recognition rules, where the interpretation of the nonrecognition rules was clear.

6    Code Section 6110(k)(3) provides that a written determination, (i.e., a private ruling, determination letter, technical advice memorandum or field service advice), may not be used or cited as precedent. However, in Xerox Corp. v. U.S., 656 F.2d 659 (Ct. Cl. 1981), the court noted that although private letter rulings have no precedential value, "they are helpful, in general, in ascertaining the scope of the ... doctrine adopted by the Service and in showing that the doctrine has been regularly considered and applied by the Service."

**SABWZ0346167**

**SIDL 0381980**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 30

litigation where the transferor had transferred the claims before the litigation ended. The Sixth
Circuit Court of Appeals concluded that at the time of the transfer:

> there was no certainty at the time of the transfer that the
> transferor's rights thereto would ever be established or that the
> money would ever be paid to the transferor or the transferee. The
> amount that might eventually be collected was unliquidated.

247 F.2nd at 872.

The court distinguished Estate of Holmes, 1 T.C. 508 (1943), in which the Tax
Court taxed dividends that were declared, but unpaid, at the time of transfer to the transferor
rather than to the transferee. The court noted that the Tax Court considered the dividend similar
to interest in that the liability and the amount were both unquestioned at the time of the transfer
and that only a future maturity date prevented immediate payment. By contrast, the litigation
claim was:

> an unliquidated chose in action. Cold Metal divested itself of all
> title, interest and control at that time. Later developments over
> which Cold Metal had no control transformed it into taxable
> income which was paid to and received by the new owner for its
> sole benefit. These facts fall far short of classifying the transaction
> as an anticipatory assignment of income taxable to the assignor
> when later paid.

247 F.2d at 872.

Similarly, in Jones v. Comm'r, 306 F.2d 292 (5th Cir. 1962), rev'g T.C. Memo.
1960-115, a subcontractor transferred a claim for additional compensation, which was subject to
litigation between the prime contractor and the U.S. government, to a corporation of which he
was a majority shareholder. The IRS asserted that upon recovery, the proceeds were taxable to
the transferor shareholder rather than to the transferee corporation. Because at the time of
transfer the claim was "uncertain, doubtful, and contingent", while the transfer was "full,
complete, final and definite", the court held that the recovery was taxable to the transferee
corporation rather than the transferor shareholder. The Fifth Circuit Court of Appeals also noted
that the transfer had a commercial rationale and was not merely gratuitous.

NYI 5160876v1

**SABWZ0346168**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 31

Here, the Options are contract rights similar to the claims in Cold Metal Process Co. and Jones; at the time of the transfer there was no immediate right to payment or certainty as to whether an Option would settle in or out of the money; there were commercial reasons for Investor to transfer the Options to International; and the transfer of the Options was not gratuitous. Consequently, based upon these cases, it is more likely than not that the transfer of the Options to International would not constitute an anticipatory assignment of income such that income arising on the settlement of the Options would be taxable to Investor. Instead, any income derived from the termination of an Option would be included in the income of its beneficial owner, International, not Investor.

As discussed above, while it is more likely than not that the Short Option would not be treated as property for purposes of Code Section 721, it is more likely than not that the rationale of these cases would equally apply to it and any income derived from the termination of the Short Option also would be included in the income of International, not Investor.

    2.    **Basis of Partnership Interest**

        (a)    **In General**

Code Section 722 provides that the basis of a partnership interest to the contributing partner is equal to the amount of money plus the adjusted basis of the property contributed to the partnership, increased by the amount of gain, if any, recognized by the partner on the contribution under Code Section 721(b). Consequently, it is more likely than not that Investor's basis in International would be equal to the basis of the Long Option plus Investor's cash contribution. As discussed below, it is more likely than not that this basis would also be increased by the Advisory Fee.

It is more likely than not that the transfer would be viewed as a contribution of the Long Option to International and International's assumption of the Short Option. The IRS might assert that Investor acquired an economic unit the basis of which should be the net premium paid for the Options. Alternatively, the IRS might assert that Investor acquired the Long Option in exchange for the net premium and the undertaking under the Short Option, and that such undertaking is too contingent to provide basis in the Long Option, so that again Investor's basis in the Long Option would be the net premium. As discussed above, these positions are not supported by case law, which respects the separate nature of the Long and Short Options.

NY1 5160876v1

**SABWZ0346169**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 32

Code Section 752(b) provides that any decrease in a partner's share of the partnership liabilities or the assumption by the partnership of a partner's individual liabilities is treated as a distribution of money from the partnership to the partner. Under Code Section 733, a partner's basis in the partnership interest is decreased by the amount of money and the adjusted basis of property other than money distributed to a partner other than in liquidation of the partner's interest. Thus, if the potential claims by Counterparty against Investor under each Short Option were considered liabilities for purposes of Code Section 752, Investor's basis in International would be reduced by them, but would be increased by Investor's share, as determined under Code Section 752, of the liabilities of International, including the Short Option. In addition, these liabilities would be treated as cash received by Investor on the sale or redemption of Investor's interest in International or on termination of the Short Option. See, Code Section 752(d). As discussed below, it is more likely than not that these potential claims would not be treated as liabilities for purposes of Code Section 752.

      **(b)     Agency Doctrine Inapplicable**

The IRS might contend that Investor was acting as an agent of International in acquiring the Options, and thus that Investor should be treated as having contributed to International not the Options, but only the net cash needed to acquire them.

The Supreme Court has addressed the issue of when an agency relationship exists and affects tax results of a transaction in Comm'r v. Bollinger, 485 U.S. 340 (1988), where, using the six-part test established in National Carbide Corp. v. Comm'r, 336 U.S. 422 (1949), the Court held that a corporation that held nominal title to property on the taxpayer's behalf was the taxpayer's bona fide agent, and rejected the contention of the IRS that the corporation was the property's true owner. The six "National Carbide factors" are:

      1)     whether the corporation operates in the name and for the account of the principal;

      2)     whether the agent corporation binds the principal by its actions;

      3)     whether the corporation transmits money received for the account of the principal to the principal;

      4)     whether the receipt of income is attributable to the services and assets of the principal and not the agent;

NY1 3160876v1

SABWZ0346170

SIDL 0381983

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 33

        5)    whether the corporation is a true agent; that is, whether its relations with its principal are dependent on the latter's ownership of the agent; and

        6)    whether the corporation's business purpose is the carrying on of the normal duties of an agent.

        The Court found that the genuineness of the agency relationship was adequately assured because (1) the relationship was set forth in a written agreement at the time each development was begun; (2) the corporation acted as an agent and not principal with respect to the development for all purposes; and (3) the corporation held itself out as the agent and not as a principal in all dealings with third parties related to the asset. See also, Cottage Savings Assoc. v. Comm'r, 499 U.S. 554 (1991) (no agency when parties act at arm's length and transactions between them have legal and economic substance). Cf., Northern Indiana Pub. Serv. Co. v. Comm'r, 115 F.3d 506, 511 (7th Cir. 1997).

        It is more likely than not that an application of the National Carbide agency factors to the Transactions would not result in a finding of agency. No indicia of a principal/agent relationship between International and Investor exist. International and Investor acted independently of one another. In acquiring the Options, Investor did not operate in the name of International, had no authority to bind International by its actions, did not transmit or receive funds on behalf of International, did not receive income attributable to services or assets of International, and did not act as a true agent or have as its business purpose the carrying out of normal duties of an agent. Furthermore, unlike Bollinger, there were no agency agreements involved and no party acted as the agent of another or held itself out as an agent in dealings with third parties. Moreover, as in Cottage Savings, the parties acted at arm's length and the transactions between them had both legal and economic significance. Finally, Investor had all of the benefits and burdens of ownership of the Options until the Options were contributed to International. Accordingly, it is more likely than not that the agency doctrine would not apply to the Transactions.

**SABWZ0346171**

SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 34

    (e)    **Short Options as Liabilities**

    i.    **Code Section 752 in General**

Code Section 752 itself does not define the term "liabilities".[7] The 1988 temporary and proposed Regulations under Code Section 752 (T.D. 8237, December 30, 1988) defined the term "liability" for purposes of Code Section 752 as follows:

> [A]n *obligation is a liability* of the obligor for purposes of section 752 and the regulations thereunder to the extent, but only to the extent, that incurring or holding such obligation gives rise to –
>
> (1) The creation of, or increase in, the basis of any property owned by the obligor (including cash attributable to borrowings);
>
> (2) A deduction that is taken into account in computing the taxable income of the obligor; or
>
> (3) An expenditure that is not deductible in computing the obligor's taxable income and is not properly chargeable to capital.

Temp. Treas. Reg. §1.752-1T(g) [Emphasis added].

Final Regulations issued in 1991 eliminated, without explanation, this definition of "liability" that was contained in the temporary and proposed Regulations. Nevertheless, because the definition in the 1988 temporary and proposed Regulations was based on pre-existing interpretations, and is supported by the legislative history of the Deficit Reduction Act

---

[7]    Both Congress and the IRS have indicated that the terms "liability" as used in Code Sections 357, 358 and 752 are synonymous. In the 1984 tax act, Congress amended Code Section 704(c) to, inter alia, require that accounts payable contributed to a partnership be allocated to the contributing partner and not be treated as a liability of the partnership under Code Section 752. The conference committee report states that this treatment was intended to be "parallel to the [1978] amendment to section 357(c)", which also excludes deductible liabilities from the definition of "liability". H.R. Conf. Rep. No. 861, 98th Cong., 2d Sess, 1984-3 (vol. 2) CB 110-11. In Rev. Rul. 88-77, 1988-2 CB 129, the IRS noted that "The legislative history accompanying the amendment to section 704(c) made by the Tax Reform Act of 1984 explicitly rejected the conclusion reached in Revenue Ruling 60-345 in favor of an interpretation of section 752 that is consistent with section 357(c)". And in Rev. Rul. 95-74, 1995-2 CB 36, in support of its ruling that contingent environmental liabilities were not "liabilities" for purposes of Code Sections 357 and 358, the IRS cited Rev. Rul. 88-77, which addresses the treatment of liabilities under Code Section 752.

NY1 516087v1

SABWZ0346172

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 35

of 1984, it may still be viewed as applicable. It is also consistent with Rulings defining the term "liability" in the context of Code Section 752 and analogous Code Sections 357 and 358. These Rulings require both an obligation and the creation of either basis, a deduction, or an expenditure that is neither deductible or chargeable to capital.

In addition, the IRS has taken the position that a liability does not arise before an obligation would be considered to arise under general federal income tax principles. Rev. Rul. 73-301, 1973-2 CB 215, concludes that interim payments received by a partnership for services rendered in connection with a long-term contract reported on the completed contract method do not constitute liabilities for purposes of Code Section 752 because, although the partnership received money, there was no attendant legally binding obligation to repay. See also, Kovtun v. Comm'r, 54 T.C. 331, 338 (1970), aff'd per curiam, 448 F.2d 1268 (9th Cir. 1971), cert. denied, 405 U.S. 1016 (1972);[8] Rev. Rul. 81-241, 1981-2 CB 146. The IRS's position in Rev. Rul. 73-301 is consistent with the position of the Tax Court in Helmer v. Comm'r, T.C. Memo. 1975-160, discussed below.

The courts have also held that unmatured claims, such as contested or contingent claims, are not liabilities under Code Section 752. In Long v. Comm'r, 71 T.C. 1 (1978), motion for reconsideration, 71 T.C. 724 (1979), aff'd and remanded, 660 F.2d 416 (10th Cir. 1981), the court considered whether contested liabilities were liabilities within the meaning of Code Section 752. The partnership in this case was in the construction business and was sued for defects in a building. The suits were pending when the partnership was liquidated, raising the question of the partnership basis necessary to compute the taxpayer's gain or loss. The court rejected the argument that the contingent claims were liabilities for purposes of Code Section 752, stating:

> Although they may be considered "liabilities" in the generic sense of the term, contingent or contested liabilities such as the Kansas City Life-TWA and USF&G claims are not "liabilities" for partnership basis purposes at least until they have become fixed or liquidated. This Court has held on a number of occasions that contingent and indefinite liabilities assumed by the purchaser of an asset are not part of the cost basis of the asset. . . . We think that

---

8    In Kovtun v. Comm'r, no interest deduction was allowed to a partnership where a note was found to be unenforceable. This implies that the note was not an obligation of the partnership.

NY1 5160176v1

**SABWZ0346173**

SIDL 0381986

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 36

> partnership liabilities should be treated in the same manner. . . . We
> see no logical reason for distinguishing the above cases solely
> because the asset involved is an interest in a partnership, and
> neither party suggests such a distinction. Those liabilities should
> be taken into account only when they are fixed or paid. . . .
>
> The Kansas City Life-TWA and USF&G claims were too
> contingent at the death of the decedent to be included in the
> estate's initial computation of its basis in the decedent's
> partnership interest. Liability for those claims had not been
> established and was in fact contested. Moreover, the amounts of
> damages sought were by no means definite or fixed.

71 T.C. at 7-8 [citations omitted].

The Tax Court again held that contingent claims are not liabilities within the
meaning of Code Section 752 in La Rue v. Comm'r, 90 T.C. 465 (1988). The taxpayers in this
case were general partners of Goodbody & Co., a stock brokerage firm. Because of its inability
to keep up with the trading volume, Goodbody incurred large "back office" liabilities due to the
following types of transactions: (i) the failure to purchase securities at a stated price; (ii) the
failure to sell securities at a stated price; (iii) differences between the securities actually held and
the securities the partnership should have held; and (iv) the failure to receive dividends or
interest on securities held for customers. Goodbody was fully liable for the losses represented by
these errors. Another firm acquired the assets and assumed the liabilities of Goodbody for an
amount equal to the difference between the fair market value of the assets and the liabilities. In
an attempt to minimize their gain, the partners sought to increase their basis in Goodbody by
including the reserves for the back office claims as partnership liabilities under Code Section
752. The court rejected this attempt, noting that the reserves were for potential liabilities, and
that the amount of the liabilities was speculative and could not be determined with reasonable
accuracy.

The court stated that the "all events" test of Code Section 461(a), which is used to
determine when an expense can be accrued for deduction purposes, should also be applied to
determine when a liability is fixed or definite and thus includible in basis. In La Rue, the claims
or obligations were too speculative and contingent to be accrued as an expense, and therefore
could not be included in basis. Here, when the Options were transferred to International the
claims of Counterparty against Investor under the Short Option were entirely speculative and

NY1 5160876-1

**SABWZ0346174**

**SIDL 0381987**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 37

contingent (particularly since the Short Option was out of the money), and the amount thereof
could not be determined.

In Old Harbor Native Corp. v. Comm'r, 104 T.C. 191 (1995), the Tax Court
analyzed an option contract as having two elements: "(1) a continuing offer to do an act, or to
forbear from doing an act, which does not ripen until accepted; and (2) an agreement to leave the
offer open for a specified or reasonable period of time." See also, Rev. Rul. 58-234, 1958-1 CB
279. This analysis is also consistent with the view expressed in Rev. Rul. 80-238, infra, that the
writer of a call option is obligated to perform only if and when the holder exercises his or her
option. This position is also consistent with Long v. Comm'r, supra, in which claims were not
recognized as liabilities where liability for the claims had not been established and was
contested.

In an analogous situation, under Code Section 246(c)(4) and its predecessors, the
IRS has ruled that the rights of a counterparty against the writer of an out-of-the-money call
option do not mature into a legal obligation until the counterparty exercises its rights under the
option. Code Section 246 deals with the ability of a corporation to claim a dividends received
deduction if the recipient has held the payor's stock for a requisite period of time. Code Section
246(c)(4) states in relevant part:

> The holding periods determined for purposes of this subsection
> shall be appropriately reduced...for any period in which –
>
> (A)    the taxpayer has an option to sell, is under a contractual
> obligation to sell, or has made (and not closed) a short sale of,
> substantially identical stock or securities....

As noted, the statute itself distinguishes between a "contractual obligation to sell"
and an "option to sell", implying that an option is not such an obligation. The IRS has
specifically recognized this distinction and has ruled in Rev. Rul. 80-238, 1980-2 CB 96, that the
writing of a call that is not in the money does not create an obligation to sell the referenced stock
or security for purposes of the predecessor of Code Section 246(c)(4). This analysis was
elaborated upon in G.C.M. 38305 (3/12/80), issued in connection with Rev. Rul. 80-238, which
states in part:

> The writing of a call on stock as is done in the present case
> provides the purchaser of the call with an option to buy the

NY1 5160876v1

SABWZ0346175

SIDL 0381988

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 38

> underlying stock at a specified price within a stated period of time.
> See, Rev. Rul. 58-234, 1958-1 C.B. 279. If the market price of the
> stock were to fall during such period, reasonable business practice
> would dictate that the call holder not exercise his option to obtain
> the underlying stock since the same stock could be purchased on
> the open market at the lower figure. See, Rev. Rul. 78-182, 1978-1
> C.B. 265.

The IRS addressed the issue again in a 1992 Field Service Advice, FSA 1999-
704.[9] The FSA addressed a program described as a "Dividend Rollover Program" involving the
acquisition of shares of stock and the writing of call options. According to the FSA, the prices of
the stocks used in this program were very stable and the issuing companies had an established
history of dividend payments in previously announced amounts. Consequently, the FSA
concluded that the probability of a fall in the market value of the stock in excess of 14% in 18
days or less was very remote. As it turned out, all of the call options sold by the taxpayer were
exercised. The FSA stated:

> *The Service's position is that a call option should be deemed an*
> *obligation to sell under section 246(c)(3) where the option's price*
> *is so deep-in-the-money that it is almost guaranteed, at the time the*
> *option is written, that the option will be exercised.* In Progressive
> Corp. v. United States, 970 F.2d 188 (6th Cir. 1992), the Sixth
> Circuit approved of the position taken by the Service in Rev. Rul.
> 80-238, 1980-2 C.B. 96, and remanded the case to the trial court
> for a determination as to whether the call options at issue in
> Progressive were so deep-in-the-money as to be the equivalents of
> the contractual obligations to sell. We think it likely that other
> courts will also adopt the Service's position on this issue.
>
> The determination as to whether the call option is so deep-in-the-
> money as to be equivalent to a contractual obligation to sell will
> depend on the totality of circumstances surrounding the
> transaction, including the amount of the difference between the
> strike price and the fair market value of the stock, and past market
> volatility of the stock involved.

---

9    See also, FSA 199904033. Although an FSA does not constitute authority that can be relied upon by a
     taxpayer, it is useful in understanding the position of the author on the issues addressed therein.

NY1 5160176v1

**SABWZ0346176**

**SIDL 0381989**

SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 39

[Emphasis added.]

Thus, the IRS takes the position for purposes of Code Section 264(c)(4) that unless at the time the call option is written "it is almost guaranteed…that the option will be exercised", the writer of the call option is not to be treated as under a contractual obligation to sell the referenced stock or security for purposes of Code Section 246(c)(4). This conclusion is consistent with the decision in Progressive Corp. v. U.S., cited in the FSA, where the court expressed a view that a call option could be so deep-in-the-money as to constitute a contractual obligation to sell, i.e. the exercise of the option was sufficiently certain to be a "guarantee".[10] In the instant case, the Short Option was out of the money at the time of the transfer by Investor to International and was not "almost guaranteed" to be exercised at its termination.

Counterparty's claims against Investor under the Short Option are similar to the back office claims in La Rue, but are even less certain. Investor must make a payment under the Short Option only if the Option is in the money on the expiration date, whereas in La Rue, the partnership had an obligation to its customers for its back office failures at the time they occurred and was merely waiting to see if claims would be filed to determine the extent and amount of its liability. Even more analogous is Long, where liability for the claims had not been established and was contested. Furthermore, under Rev. Rul. 80-238, supra, G.C.M. 38305, supra, and FSA 1999-704, it appears that the IRS view is that the obligation of the writer of an option that is not in-the-money does not arise prior to the exercise of the option by the holder.

The IRS might argue that the Short Option is a liability for purposes of Code Section 752 because it could effectively be extinguished by payment or offset at a price that is fixed and determinable by the market at any given time. However, as in La Rue, this amount would not be known until the offsetting transaction is entered into. Furthermore, this argument proves too much: corporations often repurchase their common stock on the open market, in the process retiring the stock and effectively extinguishing their obligations thereunder, yet stock is clearly not a "liability" for purposes of Code Section 357. Consequently, it is more likely than not that the IRS would not be successful were it to make such an argument.

---

10    We see no reason why this result should depend on whether the option is a call option or a put option.

NY1 5160876v1

SABWZ0346177

SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 40

#### ii.    The Helmer Case

In what appears to be the only decision on point, the Tax Court agreed with the
IRS that the holder's claim against the grantor of an option is not a liability within the meaning
of Code Section 752. In Helmer v. Comm'r, supra, a partnership sold an option to purchase land
that it owned and distributed the premium to the partners. The taxpayer asserted that the holder's
claim against the partnership to perform under the option was a liability for purposes of Code
Section 752, and thus increased his basis in his partnership interest. If the option was not
considered a liability, then the amount of the premium distributed would exceed the partner's
basis in the partnership, and the partner would recognize gain on the excess under Code Section
731. The court agreed with the IRS that the holder's claim did not create a partnership liability
partnership. The partnership had no obligation to return the premium, and the premium had no
restriction on its use, other than that it would be credited against the purchase price if the option
were exercised.

> The option agreement, however, created no liability on the part of
> the partnership to repay the funds paid nor to perform any services
> in the future. Therefore we hold that no liability arose under code
> section 752 and the partners' bases cannot be increased by such
> amounts.

34 TCM (CCH) at 731. Likewise, a short option contract creates no obligation to return the
premium to the purchaser. Indeed, the premium represents deferred income to the seller and is
not a liability.

Consequently, based upon the Helmer case, and the authorities cited in the
previous Section of this letter, it is more likely than not that a Short Option would not be
considered a "liability" for purposes of Code Section 752.

#### iii.    Treatment of Short Sales

Rev. Rul. 95-26, 1995-1 CB 131, concludes that a partnership obligation to return
securities sold short creates a partnership liability for purposes of Code Section 752. The Ruling
addressed each prong of the obligation/deduction-basis-capital test. First, it maintained that a
short sale created an obligation to return the securities borrowed to effect the sale. Second, it
maintained that the cash proceeds of the short sale create a partnership asset, thereby increasing

NY1 5160170v1

SABWZ0346178

SIDL 0381991

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 41

basis and bringing the obligation within the definition of liability based upon the logic of Rev.
Rul. 88-77. Cf., Rev. Rul. 95-45, 1995-1 CB 53 (applying a similar analysis under Code
Sections 357 and 358).

        In Salina Partnership LP, FPL Group, Inc. v. Comm'r, T.C. Memo 2000-352, the
taxpayer purchased a 98% interest in Salina Partnership LP, a Delaware limited partnership.
Among the transactions that Salina had entered into prior to taxpayer's purchase was a short sale
of U.S. Treasury bills. Under Regulations then in effect, the purchase of 50% or more of the
interests in a partnership within a 12 month period caused a constructive termination of the
partnership, involving a deemed liquidation of the "old" partnership and a contribution of the
assets, subject to partnership liabilities to a "new partnership". As a result of the constructive
termination, the "new" partnership received the Treasury bills subject to the "old" partnership's
undertakings under the short sale. The IRS contended that these undertakings constituted
liabilities for purposes of Code Section 752; the taxpayer contended that they did not. The Court
concluded that the partnership's obligation to close its short sale by replacing the Treasury bills
that it had borrowed represented a partnership liability for purposes of Code Section 752.

        In making its argument that the short sale did not create such a liability, the
taxpayer relied upon Helmer, supra, for the proposition that an "open transaction" did not create
a liability. The court distinguished the option in Helmer from a short sale, stating that a short
sale transaction and the writing of an option are "materially different" because the option in
Helmer, as is the case with the Short Options, created no claim for repayment or demand for
further services. Thus the court implicitly approved its decision in Helmer that an option which
may expire unexercised is not a liability for purposes of Code Section 752.

        Based upon the foregoing, it is more likely than not that Rev. Rul. 95-26, supra,
would be distinguishable from International's indirect assumption of undertakings under the
Short Option, because, as recognized in the Salina case, the short sale creates a legally
enforceable obligation (i.e., to deliver securities), whereas a short option does not. It is the
creation of such an enforceable obligation, coupled with the receipt of sale proceeds by the
partnership that allowed the IRS to bootstrap itself into the liability conclusion reached by the
Ruling. See also, Rev. Rul. 88-77, supra, cited in the Ruling, which also involved
noncontingent, legally enforceable obligations. As discussed above, the requirement to perform

NY1 3160276v1

**SABWZ0346179**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 42

under an option is not treated as fixed or legally enforceable at the time the option is entered into.[11]

Here the Short Option is a European-style option, which means that it could be exercised or settled only on its termination date.[12] Thus, at the time of the transfer the claims of Counterparty against Investor under the Short Option were entirely speculative and contingent, because it was unknown whether the Short Option would be in the money on termination.

### iv.    Code Section 358(h)

Code Section 358(h) provides in relevant part that if the basis of property transferred to a corporation in a Code Section 351 transaction:

> exceeds the fair market value of such property, then such basis shall be reduced (but not below such fair market value) by the amount (determined as of the date of the exchange) of any liability
> --

> (A) which is assumed in exchange for such property, and

> (B) with respect to which subsection (d)(1) does not apply to the assumption.

---

11    In Rev. Rul. 95-74, 1995-2 CB 36, the IRS concluded that contingent environmental liabilities are not liabilities for purposes of Code Sections 358 and 357(c), but, while admitting that the liabilities were not fixed or enforceable, the Ruling reached its conclusion by relying on Code Section 357(c)(3)(A), which excludes deductible liabilities from Code Section 357(c). This Ruling could be read as treating contingent liabilities as liabilities under Code Section 357(c) (and presumably the partnership analog of Code Section 752) unless they do not give rise to an asset or are deductible. In an FSA in which the IRS addressed the issue of whether a contingent liability is the type of liability that is to be taken into account for purposes of I.R.C. sections 357 and 358, the IRS stated: "However, because of the specific language of I.R.C. sections 357(c)(3) and 358(d)(2), as interpreted by Rev. Rul. 95-74, 1995-2 CB 36, we do not believe that it is necessary to address this broader issue. That is, we will assume for purposes of the following discussion that such contingent liability is the type of liability to be taken into account currently under I.R.C. sections 357 and 358." The FSA goes on to analyze the obligations under Code Section 357(c)(3). FSA 199905008 (10/29/98). Consequently, it appears that the IRS has not reached the conclusion that contingencies themselves do not keep the obligation from being a "liability" for purposes of Code Sections 357/752.

12    This is to be distinguished from American-style options that can be exercised at any time on or before their termination date.

NY1 5140876v1

SABWZ0346180

SIDL 0381993

SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 43

> (2) EXCEPTIONS. -- Except as provided by the Secretary,
> paragraph (1) shall not apply to any liability if --
>
> (A) the trade or business with which the liability is
> associated is transferred to the person assuming the liability as part
> of the exchange, or
>
> (B) substantially all of the assets with which the liability is
> associated are transferred to the person assuming the liability as
> part of the exchange.
>
> (3) LIABILITY. -- For purposes of this subsection, the
> term 'liability' shall include any fixed or contingent obligation to
> make payment, without regard to whether the obligation is
> otherwise taken into account for purposes of this title."

The legislation pursuant to which Code Section 358(h) was enacted provides that
the Treasury:

> shall prescribe rules which provide appropriate adjustments under
> subchapter K of chapter 1 of the Internal Revenue Code of 1986 to
> prevent the acceleration or duplication of losses through the
> assumption of (or transfer of assets subject to) liabilities described
> in section 358(h)(3) of such Code (as added by subsection (a)) in
> transactions involving partnerships....

P.L. 106-554, Section 309(c)(1) (12/2000)

Here, Investor transferred to International all of the assets to which the Short
Option was associated. Consequently, were the Short Option otherwise considered a liability, it
is more likely than not that the exception contained in Code Section 358(h)(2), as added by
Section 309 of H.R. P.L. 106-554 would apply with the result that it is more likely than not that
the Short Option would not be considered to be an obligation of Investor that would constitute a
liability for purposes of Code Section 358 (and therefore under Regulations to be issued, Code
Section 752) under Section 309 of H.R. P.L. 106-554.

> **v.    Amount of Liability**

Even if the undertaking under the Short Option were considered a liability, it is
more likely than not that Investor's basis in International would not be affected. This is because

NY1 5160876v1

SABWZ0346181

## SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 44

it is more likely than not that the amount of the "liability" would be considered zero. In Rev. Rul. 95-45, supra, the taxpayer sold securities short and contributed the $1,000x proceeds and the short sale obligation to a corporation in exchange for stock in a Code Section 351 transfer. At the time of the transfer, the value of the securities was $800x. The IRS concluded that the short sale obligation was a liability, and that the amount of the liability was $1,000x.

If the IRS is correct that the amount of the liability is determined by the original value of the securities to be delivered, the contributed Short Option nevertheless is distinguishable because at the time the Short Option was transferred, it was out of the money. Consequently, Investor would not have had to transfer anything to satisfy Investor's undertaking under the Short Option. By contrast, the short seller would have had to transfer securities worth $1,000x.

The IRS also might contend that the amount of the liability is not the actual amount of the liability but the amount included in basis. This argument produces an incorrect result in other contexts, and should be rejected here. To illustrate, assume that a taxpayer purchases an asset with $1,000x of borrowed funds, repays a portion of the loan with other assets, and then contributes the property and the liability to a corporation. Under the IRS approach, the taxpayer's basis under Code Section 358 in the stock received would be reduced by $1,000x, the original amount of the loan included in basis. This is clearly the incorrect result: basis likely would be reduced only by the actual amount of the liability. In the case of an out-of-the-money option, this must be zero.[13]

---

[13]     Furthermore, the amount of the liability is not the amount that the obligor might have to pay the obligee currently to free himself of the obligation. Accord, Rev. Rul. 95-45, supra, where the IRS ruled that the assumed obligation was a "liability" in the amount of $1000x even though the obligee would have had to pay only $800 to free himself from the obligation. Similarly, except in the case of the original issue discount rules (which are an overlay on the common tax law of debt obligations and in any event apply only after a de minimis threshold), the amount of a debt obligation for tax purposes is set when the obligation is issued: it does not change with fluctuations in interest rates or the issuer's credit rating, even though these changes would affect the value of the debt obligation and therefore the amount that an economically rational issuer would pay the holder to discharge the debt. Also, while discharge of indebtedness income is measured by the original issue price and not by the face amount, for numerous other tax purposes the amount of a debt obligation is its face amount, i.e., the amount that the holder would receive at maturity. See, e.g., Code Sections 144(a)(1), 148(f)(4)(D), 453A(e)(4), 691(a)(5)(B). A Short Option has no "face amount" per se, but particularly when it is out of the money, any "face amount" would more likely than not be deemed to be zero.

NY1 5160876v1

SABWZ0346182

SIDL 0381995

SIDLEY AUSTIN BROWN & WOOD LLP

Mr Richard J. Egan
March 8, 2002
Page 45

### 3.    The Advisory Fee

Code Section 212(1) allows the deduction of all "ordinary and necessary" expenses paid for the production or collection of income. In part because of this "ordinary and necessary" language, Code Section 212(1) is generally considered the non-business analogue of Code Section 162, which permits the deduction of "ordinary and necessary" business expenses. For purposes of Code Section 162—and therefore for purposes of Code Section 212(1) as well—an "ordinary" expense is one which is not capital. Treas. Reg. §1.212-1(n); Comm'r v Tellier, 383 U.S. 687 (1966).

In Rev. Rul. 53-3, 1953-1 CB 37, investors paid a "creation" fee to the sponsor for its services in connection with the development, sale and administration of an investment plan established to enable investors to acquire and hold X Corp stock. They also paid a "custody" fee to the custodian for his services in collecting the cash dividends, reinvesting them in stock, maintaining individual records and mailing statements to the investors. In practice, the custodian deducted both fees from the investment, retained the custody fee and paid the creation fee to the sponsor. The IRS held under the 1939 Code that the custody fee was deductible as a non-business expense, but the creation fee was a capital expenditure because the "dominant service" performed by the sponsor was to make possible the acquisition of shares of stock under favorable terms.

In Vestal v. U.S., 498 F.2d 487 (8th Cir. 1974), the taxpayer, one John Daniel, had been brought into an oil investment partnership by Vestal and had agreed to pay Vestal certain sums for doing so. Daniel attempted to deduct the payments, made when the investment was sold, as expenses for the production of income. The court held that the payments must be capitalized.

In Honodel v. Comm'r, 76 T.C. 351 (1981), aff'd, 722 F.2d 1462 (9th Cir. 1984), the taxpayer acquired a limited partnership interest recommended by FMS, an investment planning service. As the appeals court explained the problem:

> FMS charged fees in two separate methods. First, clients were
> charged monthly nonrefundable retainer fees, the amount
> depending on that individual's income level and his financial
> planning, tax advice, and investment needs. Second, when a client
> elected to invest in a project, a flat investment fee representing a
> specific percentage of the total cost of the project was assessed

NY1 5160876v1

SABWZ0346183

SIDL 0381996

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 46

The Tax Court held that the retainer fee was deductible, but that the flat fee had to be capitalized in the cost of the partnership interest because it originated in the process of the acquisition of property.

Because the Advisory Fee originated in the acquisition of an interest treated for tax purposes as a partnership interest, it is more likely than not that the Advisory Fee would be treated as a cost of acquiring that interest and therefore that it would be included in the basis of Investor's interest in International.

All or a portion of the Advisory Fee instead could be treated as an organization or syndication fee under Code Section 709(a), that is, an amount paid or incurred to organize a partnership or promote the sale of interests therein. Organization fees paid by a partnership may be capitalized and, at the partnership's election, amortized over 60 months, and syndication fees are non-deductible. An amount paid by a partner as an organization or syndication expense fee would be deemed to have been contributed by the partner to the partnership as a contribution to capital, and then paid by the partnership. This deemed capital contribution would increase the partner's outside basis in his partnership interest. Rev. Rul. 89-11, 1989-1 CB 179 (syndication fees). It could then contribute to a loss (or reduce a gain) upon the partner's sale or liquidation of his partnership interest. Cf., Rev. Rul. 87-111, 1987-2 CB 160 (organization fees as to which no election to amortize over 60 months has been made); McKee, Nelson and Whitmire, Federal Taxation of Partnerships and Partners ¶4.07 at fn. 212 (3rd Ed., Cum Supp. No. 3).

**E.    Operations of International**

**1.    Tax Basis of a Long Option**

Under Code Section 723, International's basis in the Contributed Long Option will equal Investor's basis in the Long Option, increased by any gain recognized to Investor under Code Section 721(b) on the contribution. It is more likely than not that International's basis in a Long Option would equal the cost thereof. Code Section 1012.

**2.    Status of International as a Dealer, Trader, or Investor**

Under federal tax common law, a dealer is one who holds himself out to the public as buying property for resale. A trader is one who buys and sells in frequent and continuous operations for his own account, generally with the aim of profiting from short-term appreciation

NY1 5160876v1

**SABWZ0346184**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 47

in values.  An investor is one whose buying and selling activities are limited to occasional
transactions, and who generally intends to profit from long-term appreciation  See, generally,
Whipple v. Comm'r, 373 U.S. 193 (1963); Levin v. U.S., 597 F.2d 760, 765 (Ct. Cl. 1979);
Moller v. U.S., 721 F.2d 810 (Fed. Cir. 1983); Ball v. Comm'r, T.C. Memo 2000-245.  Under
these principles, it is more likely than not that International would not be a dealer or trader and
would be an investor.  See, FSA 200025020, supra.

> 3.    **Termination or Disposition of the Options**

International recognized gain or loss when the Options expired or International otherwise
disposed of them in a taxable transaction.  It is more likely than not that gain or loss on the Long
Option would equal the difference between International's basis therein and its value at the time
of disposition or the consideration received for it.  While no written guidance appears to exist on
this issue, gain or loss on the Short Option would more likely than not equal the difference
between (i) the original proceeds received by Investor, reduced by any gain and increased by any
loss recognized by the Investor on the assignment to International and (ii) the value of the Short
Option to the Counterparty at the time of disposition or expiration (or the amount paid by
International to relieve itself of the undertaking under a Short Option).

The IRS might attempt to recharacterize International's disposition of the Original
Options and acquisition of the Replacement Instruments as a non-taxable exchange.  Treas. Reg.
§1.1001-1(a) states that, except as otherwise provided in the Code, gain or loss is recognized on
the conversion of property into cash or on the exchange of property for other property "differing
materially either in kind or in extent."  Here, there has been no actual exchange of property.
Consequently, the IRS would have to first recharacterize the sale and repurchase as an exchange.
It is significant that the Code contains no "wash sale" rule for gain that would permit the IRS to
disallow a gain when the taxpayer repurchases equivalent property soon after a sale.  Moreover,
we have been advised that persons dealing in commodities often close out one position in and
enter into an identical position for delivery in a different month.  This procedure is called a
"switch" and generally does not prevent gain or loss from being recognized on the initial close-
out.  Smith v. Comm'r, supra at 376.[14]

---

[14]    Citing, inter alia, Valley Waste Mills v. Page, 115 F.2d 466 (5th Cir. 1940), but see, Estate of Israel v.
Comm'r, 108 T.C. 208 (1997) (Halpern, J. dissenting).

NY1 5160976v1

**SABWZ0346185**

SIDL 0381998

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 48

Assuming that the sale and new purchase were treated as a Treas. Reg. §1.1001-1(a) "exchange," it is more likely than not that such exchange would nonetheless result in realization of gain or loss if the Original Options and Replacement Instruments are "differing materially either in kind or in extent." In Cottage Savings Assoc. v. Comm'r, supra, the Supreme Court interpreted this clause to mean that for gain or loss to be realized on an exchange, it is sufficient that legal rights of the parties change materially after the exchange even if the parties are in essentially the same economic positions. Thus, the Court permitted the taxpayer to recognize a loss on the sale of a portfolio of single family mortgages to another bank where the taxpayer immediately purchased a portfolio of different mortgages from the same bank, even though the portfolios were essentially indistinguishable as a matter of creditworthiness and yield (and even though the sale was consummated solely to realize the tax loss), because they represented different bundles of legal rights. (The Court appeared to assume, without discussing it, that the sale and repurchase was really an exchange.)

The Court relied on three old cases, U.S. v. Phellis, 257 U.S. 156, 173 (1921), Weiss v. Stearn, 265 U.S. 242, 253-254 (1924), and Marr v. U.S., 268 U.S. 536, 540- 542 (1925). As the Court stated:

> In each case, the taxpayer owned stock that had appreciated in value since its acquisition. And in each case, the corporation in which the taxpayer held stock had reorganized into a new corporation, with the new corporation assuming the business of the old corporation. While the corporations in Phellis and Marr both changed from New Jersey to Delaware corporations, the original and successor corporations in Weiss both were incorporated in Ohio. In each case, following the reorganization, the stockholders of the old corporation received shares in the new corporation equal to their proportional interest in the old corporation. . . . .
>
> The question in these cases was whether the taxpayers realized the accumulated gain in their shares in the old corporation when they received in return for those shares stock representing an equivalent proportional interest in the new corporations. In Phellis and Marr, we held that the transactions were realization events. We reasoned that because a company incorporated in one State has "different rights and powers" from one incorporated in a different State, the taxpayers in Phellis and Marr acquired through the transactions property that was "materially different" from what they previously

NY1 5160876v1

**SABWZ0346186**

**SIDL 0381999**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 49

> had. United States v. Phellis; 257 U.S., at 169-173; see Marr v.
> United States, supra, at 540-542 (using phrase "essentially
> different"). In contrast, we held that no realization occurred in
> Weiss. By exchanging stock in the predecessor corporation for
> stock in the newly reorganized corporation, the taxpayer did not
> receive "a thing really different from what he theretofore had"
> Weiss v. Stearn, supra, at 254. As we explained in Marr, our
> determination that the reorganized company in Weiss was not
> "really different" from its predecessor turned on the fact that both
> companies were incorporated in the same State. See Marr v. United
> States, supra, at 540-542 (outlining distinction between these
> cases).
>
> Obviously, the distinction in Phellis and Marr that made the stock
> in the successor corporations materially different from the stock in
> the predecessors was minimal. Taken together, Phellis, Marr, and
> Weiss stand for the principle that properties *are "different" in the*
> *sense that is "material" to the Internal Revenue Code so long as*
> *their respective possessors enjoy legal entitlements that are*
> *different in kind or extent.*

[Emphasis added.]

Here, even if the Original Options and Replacement Instruments are indistinguishable
economically (and in fact they are not because the payoff amounts differ), they differ as a legal
matter in two ways. First, each pair of Gain Legs were replaced by a single Replacement
Instrument, so that they differ as a legal matter in their form. Second, the Original Options were
subject to netting under a standard ISDA agreement while the Replacement Instruments are not.
As a result, it is more likely than not that Counterparty would be viewed as taking on economic
risk that it did not have previously. Accordingly, it is more likely than not that the disposition of
the Original Options and acquisition of the Replacement Options resulted in International's
recognizing gain or loss on the former.

Furthermore, it is more likely than not that under Code Sections 702 and 704 each
International member would be allocated such member's distributive share of this gain or loss
pursuant to the Operating Agreement, and that under Code Section 705, each International
member's distributive share of this gain or loss so allocated would be reflected in such member's
outside basis in his membership interest.

NY1 5160976v1

**SABWZ0346187**

**SIDL 0382000**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 50

4.    **Closing of International's Books on Sale of Co-investor's Interest**

With exceptions not relevant here, if during a partnership's taxable year any partner's interest changes, each partner's distributive share of income, gain or loss for the year is determined "by the use of any method prescribed by the Secretary by regulations which takes into account the varying interests of the partners in the partnership during such taxable year." Code Section 706(d)(1). No such regulations have yet been issued.

Code Section 706(c)(1)(A), as amended by the Tax Relief Act of 1997, provides that the taxable year of a partnership closes with respect to a partner whose entire interest in the partnership terminates, by any means. This would include a sale or exchange of an entire partnership interest. Treas. Reg. §1.706-1(c)(2). Code Section 706(c)(2)(B) then provides that a partnership's taxable year does not close with respect to a partner who disposes of less than his entire interest or whose interest is merely reduced. In the first case, the Regulations provide that the partners' distributive shares for the pre-closing period shall be determined through an interim closing of the books on the date of the closing, unless the partners agree to determine distributive shares based on a pro rata portion of income, gain or loss for the entire taxable year. Treas. Reg. §1.706-1(c)(2)(ii). In the second case, the Regulations state only that distributive shares shall be determined "by taking into account [the partner's] varying interests in the partnership during the taxable year." Treas. Reg. §1.706-1(c)(4). However, as one treatise notes, "[t]he legislative history of the Tax Reform Act of 1976 makes it clear that the rules applicable to sales or exchanges of entire interests are equally applicable to partial sales and exchanges and reductions." McKee, Nelson & Whitmire, supra at ¶ 11.03[1], citing S. Rep. No. 938, 94th Cong., 2d. Sess. 98 (1976). Code Section 706(d), as added by the Tax Reform Act of 1984, applies the varying interests rule to all shifts of partnership interests, and the accompanying committee reports make clear that no change was intended to prior-law methods of computing distributive shares. Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1984 at 219. The authors of the treatise go on to state, "[a]ccordingly, the 'interim-closing-of-the-books' and the 'proration' allocation procedures continue to apply to all shifts of partners' interests that bring the varying interests rule into play." Mckee, et al., supra.

Here, the Operating Agreement provides that where members' interests change during the taxable year, their distributive shares are determined using the interim-closing-of-the-books method. Based upon the previous discussion, it is more likely than not that the use of this

NY1 5150970v1

SABWZ0346188

SIDL 0382001

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 51

method will be respected. Accordingly, subject to the Code Section 704(b) discussion below, it is more likely than not that gain on the Gain Legs would be allocated to the common interest holders based on their profit and loss shares before Investor purchased Co-investor's interest.[15]

### 5.    No Termination of Tax Year

So long as the partnership business continues, a partnership tax year does not terminate with respect to all partners unless interests in profit and capital aggregating at least 50% are sold or exchanged. Code Sections 706(c)(1) and 708(b)(1)(B). Because Co-investor's interest in International's capital (as opposed to profits) is at all times less than 50%, it is more likely than not that Investor's purchase of Co-investor's membership interest would not cause International's tax year to terminate. Therefore, International would file a single partnership return for the entire partnership year.

### 6.    Code Section 988

#### (a)    Ordinary Income and Loss Treatment

Code Section 988 contains a complex set of rules prescribing the tax treatment of transactions in foreign currency. The general rule of Code Section 988(a)(1)(A) is that gain or loss on a "section 988 transaction" is ordinary income or loss. This rule applies notwithstanding any contrary provision providing for capital gain or loss, such as Code Section 1234. Code Section 988(a)(1)(A); Treas. Reg. §1.988-3(a).

A "section 988 transaction" includes, *inter alia*, (a) the disposition of nonfunctional currency or (b) entering into or acquiring a forward contract, futures contract, option, warrant or similar financial instrument, if the taxpayer is entitled to receive, or is obligated to pay, an amount denominated in a nonfunctional currency. Code Section 988(c)(1); Treas. Reg. §1.988-1(a). Since the U.S. dollar is the functional currency of both International and Investor, any other currency is nonfunctional currency.

Code Section 988(c)(1)(D) and Treas. Reg. §1.988-1(a)(7)(i) exclude from the scope of a "section 988 transaction" a regulated futures contract ("RFC") and a nonequity option that would be marked to market under section 1256 if held on the last day of the taxable year. As discussed below,

---

[15]    See Instructions to Form 1065, Schedules K and K-1, How Income Is Shared Among Partners.

NY1 5160876v1

SABWZ0346189

SIDL 0382002

SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 52

custom options on foreign currency are not RFCs or nonequity options. Therefore, it is more likely than
not that Code Section 988(c)(1)(D) would not apply to the Options, and that any gain or loss on the
Options would be treated as ordinary income or loss.

### (b)    Computation of Gain or Loss on Nonfunctional Currency

Treas. Reg. §1.988-2 provides rules for determining the amount of gain or loss that arises
from a section 988 transaction and that is characterized as ordinary under Treas. Reg. §1.988-3. Treas.
Reg. §1.988-2(a)(2)(i) provides that on a disposition of nonfunctional currency, the exchange gain is the
excess of the amount realized over the taxpayer's adjusted basis in the currency and the amount of
exchange loss is the excess of the taxpayer's adjusted basis in the currency over the amount realized on
its disposition. Treas. Reg. §1.988-2(a)(2)(i) provides that the amount realized on the disposition of
nonfunctional currency is determined under Section 1001, and Treas. Reg. §1.988-2(a)(2)(iii)(A)
provides that the adjusted basis of nonfunctional currency is determined under the applicable provisions.
Thus, nonfunctional currency is generally treated in the same manner as non-cash property (except for
the ordinary gain or loss characterization).

### (c)    IRS's Power to Recharacterize Transaction

Treas. Reg. §1.988-1(a)(11) empowers the IRS to exclude a transaction from the
provisions of Code Section 988 if its substance is not a section 988 transaction. Here, the
Transactions are not a surrogate for a transaction involving an asset not described in Code
Section 988, so it is more likely than not that this provision would not apply.

Treas. Reg. §1.988-2(f)(1) empowers the IRS to recharacterize the timing, source
and character of gain or loss on a section 988 transaction in accordance with its substance. An
example in the regulations provides that if a taxpayer enters into a transaction that it designates
as a "currency swap contract" that requires the prepayment of all payments to be made or to be
received (but not both), the IRS may recharacterize the contract as a loan. Treas. Reg. §1.988-
2(f)(1). That example is much different from International's holding of the Long Option and the
Replacement Instrument, and the offsetting Short Option, where the substance of the transaction
is the same as its form.

Treas. Reg. §1.988-2(f)(1) also states that in applying the substance over form
principle, "separate transactions may be integrated where appropriate." As discussed above, the

NY1 5160876v1

SABWZ0346190

SIDL 0382003

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 53

Options are separate transactions and integrating them for tax purposes would be inappropriate. Thus, it is more likely than not that the substance over form principle would not be applied.

       **(d)    Code Section 988 Hedging Transactions**

       Code Section 988(d) provides that, to the extent provided in regulations, if any section 988 transaction is part of a 988 hedging transaction, all transactions that are part of such a 988 hedging transaction must be integrated and treated as a single transaction "or otherwise treated consistently for purposes of [the Code]." These regulations are contained in Treas. Reg. §1.988-5 and depend on the existence of a "§1.988-5 hedge", defined as various enumerated financial instruments together with a qualifying debt instrument. Since the Transactions involve no "§1.988-5 hedge", it is more likely than not that these rules would not apply.

       **(e)    Conclusion**

       Based upon the foregoing, it is more likely than not that gain or loss recognized by International on the disposition or expiration of the FX Options will be treated as ordinary income or loss.

       **7.    Expiration or Disposition of the Interest Rate Options**

       Under Section 1001(a) a taxpayer recognizes gain or loss from the sale or exchange of an asset equal to the difference between the taxpayer's adjusted basis in the asset and the amount realized from the sale or exchange. If the asset is a capital asset within the meaning of Section 1221, the gain or loss is capital gain or loss, and long term or short term capital gain or loss depending on the taxpayer's holding period for the asset.

       Under Code Section 1234(a), gain or loss attributable to the sale or exchange of, or loss attributable to the failure to exercise, an option in the hand of the purchaser of that option has the same character as the underlying property would have if owned by the purchaser. Treas. Reg. §1.1234-1 states that the period for which the taxpayer has held the option determines whether the gain is capital or ordinary. Under Section 1234(b), gain or loss to the grantor from a "closing transaction" with respect to and gain on lapse of, an option on "property" is short-term capital gain or loss. Code Section 1234(b)(2)(A) defines a "closing transaction" as the termination of the taxpayer's obligation under an option other than through exercise. Code Section 1234(b)(2) defines "property" as stock, securities, commodities, and commodity futures.

NY1 516087v1

**SABWZ0346191**

**SIDL 0382004**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 54

Since International is not a dealer, if International held the property underlying the Interest Rate Options, any gain or loss would be capital. Accordingly, it is more likely than not that gain or loss on a Long Interest Rate Option would be capital gain under Section 1234(a). Since International did not hold any Long Interest Rate Option for one year or more, it is more likely than not that this gain or loss would be short term capital gain or loss. It is more likely than not that gain or loss on the Short Interest Rate Options would be short term capital gain or loss under Section 1234(b) and that gain or loss on the Replacement Interest Rate Instruments similarly would be short term capital gain or loss under Code Section 1234(a) or (b).

**8.    Allocation of International Profits and Losses**

Under Code Sections 702 and 704 each International member is allocated such member's distributive share of income, gain or loss recognized by International, and under Section 705, this distributive share is reflected in the member's outside basis in his membership interest.

Code Section 704(a) provides that a partner's distributive share of income, gain, loss, deduction or credit is determined under the partnership agreement, except as otherwise provided in the Code. Code Section 704(b) provides that this distributive share is determined in accordance with the "partner's interest in the partnership" if either the partnership agreement does not provide for such allocation, or, if it does, the allocation does not have substantial economic effect. Treas. Reg. §1.704-1(b)(2)(i) provides that whether an allocation of an item has substantial economic effect involves a two-part analysis to be made at the end of each partnership year. The first part of the analysis requires determining whether the allocation has economic effect within the meaning of Treas. Reg. §1.704-1(b)(2)(ii) and the second part requires determining whether such economic effect is substantial within the meaning of Treas. Reg. §1.704-1(b)(2)(iii).

To have economic effect, the allocation must reflect the actual economic benefit or burden of the allocation to the partner to whom the allocation is made. Treas. Reg. §1.704-1(b)(2)(ii)(a). This "fundamental principle" would be satisfied here because Co-investor, which is allocated the bulk of International's tax gain, would receive the same percentage of the partnership's economic gain while its profits interest is this percentage. Thus, if International's assets were to have appreciated during that time, that percentage of the profit would have inured to Co-investor's benefit. The fact that, as in this case, the tax gain exceeds any economic gain does not matter.

NY1 3160876v1

**SABWZ0346192**

SIDL 0382005

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 55

Consistent with this principle, under the alternate test for economic effect set out in Treas. Reg. §1.704-1(b)(2)(ii)(d), an allocation has economic effect (to the extent the allocation will not reduce such partner's capital account below zero) if (i) the partnership maintains capital accounts in the manner provided in the regulations, (ii) upon liquidation of the partnership or any partner's interest therein, distributions are made in accordance with positive capital account balances, and (iii) the partnership agreement contains a "qualified income offset", pursuant to which income or gain is allocated to the partner to eliminate any capital account deficit and the allocation in question must not create or increase a capital account deficit for the partner. Under the capital account maintenance rules set out in Treas. Reg. §1.704-1(b)(2)(iv)(b), in relevant part a partner's capital account equals the amount of his capital contributions increased by his allocable share of partnership income and gain and decreased by his allocable share of partnership loss. In addition, under Treas. Reg. §1.704-1(b)(2)(iv)(f), a partnership agreement may provide that upon certain events (including, in relevant part, a contribution of property to the partnership or the liquidation of a partnership interest), partnership capital accounts are booked-up or down to reflect the manner in which unrealized gain or loss would be allocated among the partners if the partnership's assets were disposed of for fair market value.

The Operating Agreement requires International to maintain its members' capital accounts in accordance with Code Section 704 and the Regulations promulgated thereunder. Upon Investor's contribution of the Contributed Options, his capital account will be credited with the net fair market value of such Options, not the gross value of the Long Option. It is more likely than not that this is the correct result under the capital account maintenance rules, even though Investor's outside basis would (as concluded earlier) be increased by the gross premium paid for the Long Option. A partner's basis in his partnership interest and the partner's capital account in the partnership are not necessarily the same.[16] Treas. Reg. §1.704-1(b)(2)(iv)(b)(2) provides that a partner's capital account is increased by "the fair market value of property contributed by him to the partnership (net of liabilities secured by such contributed property that the partnership is considered to assume or take subject to under section 752)." Treas. Reg. §1.704-1(b)(2)(iv)(h) provides:

> For purposes of this paragraph (b)(2)(iv), the fair market value assigned to property contributed to a partnership ... will be

---

[16]    See, Willis, Pennel, Postlewaite, Partnership Taxation, Vol. 1, 5.02 (6th Ed 1997).

NY1 5160670v1

**SABWZ0346193**

SIDL 0382006

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 56

> regarded as correct, provided that (1) such value is reasonably
> agreed to among the partners in arm's-length negotiations, and (2)
> the partners have sufficiently adverse interests. ... Valuation of
> property contributed to the partnership ... shall be on a property-
> by-property basis....

Although, as discussed above, it is more likely than not that the Short Option would not
be a liability, its acceptance by International represents the assumption by International of an
economic undertaking. In that regard it is analogous to assuming a Code Section 752 liability
and treating it in the same manner as such a liability for capital account purposes is consistent
with establishing a capital account for Investor that reflects Investor's economic interest in
International. Furthermore, nothing in Treas. Reg. §1.704-1(b)(2)(iv)(h) appears to prevent the
partners from agreeing to a negative value for such an undertaking if in fact that item reflects a
potential economic cost to the partnership. Such an approach is consistent with the revaluation
rules of Treas. Reg. §1.704-1(b)(2)(iv)(f) and the book value adjustment rules of Treas. Reg.
§1.704-1(b)(2)(iv)(g).

The Operating Agreement provides that distributions on liquidation are made in
accordance with members' capital accounts. Also, members' capital accounts may, in the
Manager's discretion, be adjusted upon the events set out in Treas. Reg. §1.704-1(b)(2)(iv)(f).
Consequently, it is more likely than not that the alternate economic effect test will be satisfied.

Even where an allocation has economic effect, the allocation will not be respected unless
the economic effect is substantial. Code Section 704(b)(2); Treas. Reg. §1.704-1(b)(2)(i). Treas.
Reg. §1.704-1(b)(2)(iii) provides that the economic effect of an allocation is substantial if there
is a reasonable possibility that the allocation will affect substantially the dollar amounts to be
received by the partners from the partnership, independent of tax consequences. This is the case
here because, as stated above, at the beginning of the Transactions there was a reasonable
possibility that the option trades would result in a substantial economic profit to International and
the bulk of this economic gain would be apportioned to Co-investor. Where the amount of the
item to be allocated cannot be predicted with any reasonable certainty, it appears that the inquiry
required by Treas. Reg. §1.704-1(b)(2)(iii) need go no further. See, Treas. Reg. §1.704-1(b)(5),
Example 10(i). However, where this is not the case, the Regulations provide a three-part
analysis to determine whether the economic effect of the allocation is substantial.

NY1 51606 70v1

**SABWZ0346194**

SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 57

Under the initial analysis, the economic effect of an allocation will not be substantial if, at the time it becomes part of the partnership agreement, (i) the after-tax economic consequences of at least one partner may, in present value terms, be enhanced and (ii) there is a strong likelihood that the after-tax economic consequences of no partner will, in present value terms, be substantially diminished, in each case compared to the position such partner would be in were the allocation not contained in the partnership agreement. Treas. Reg. §1.704-1(b)(2)(iii)(a). As the references to Treas. Reg. §1.704-1(b)(5), Examples 5 and 9 show, this provision is aimed at special allocations of partnership income and loss, not—as here—general allocations. That is, the test is not meaningful where all income, gain and loss is shared in the same proportion because if that general sharing arrangement were not contained in the partnership agreement, no other sharing arrangement would apply. While in such a case allocations would be made in accordance with "the partner's interests in the partnership," nothing suggests that this provision was intended to mean that a general sharing arrangement was to be compared with "the partner's interest in the partnership."

Even if the economic effect of an allocation would otherwise be substantial under the initial analysis, it will not be regarded as substantial if the allocation is one which either involves "shifting tax consequences" or is "transitory." Treas. Reg. §1.704-1(b)(2)(a). An allocation involves prohibited "shifting" tax consequences under Treas. Reg. §1.704-1(b)(2)(iii)(b) if at the time the allocation or allocations become part of the partnership agreement there is a strong likelihood that (i) the net increases and decreases in the partners' respective capital accounts will not differ substantially from the net increases and decreases that would arise if the allocation were not in the partnership agreement and (ii) the total tax liability of the partners for the taxable years in which the allocations are taken into account by them will be less than if the allocations were not in the partnership agreement. Examples contained in the Treasury Regulations provide guidance regarding the types of allocations with which the shifting tax consequences analysis is concerned. The examples all involve allocations of items in the same taxable year of the same category, but which have different tax consequences, e.g., an allocation of loss from the sale of Code Section 1231 property to a partner with Code Section 1231 gains and an equivalent amount of other types of loss to another partner; and an allocation of tax-exempt income to a partner in a high tax bracket and an equivalent amount of taxable income to a partner in a lower tax bracket. See, Treas. Reg. §1.704-1(b)(5), Ex. 6, Ex. 7(ii) and (iii), Ex. 10(ii). None of the examples involve allocations in the same taxable year of items of different categories (e.g., an item of

NY1 3160876v1

**SABWZ0346195**

SIDL 0382008

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 58

income and an item of loss) which offset one another. Instead, such offsetting allocations are
dealt with under the third part of the analysis dealing with transitory allocations.

An allocation is a prohibited "transitory allocation" within the meaning of Treas. Reg.
§1.704-1(b)(2)(iii)(c) if the partnership agreement provides for the possibility that one or more
allocations (an "original allocation") will be largely offset by one or more other allocations (an
"offsetting allocation") and at the time the allocations become part of the partnership agreement
there is a strong likelihood that (i) the net increases and decreases to be recorded in the partners'
respective capital accounts for the taxable years to which the allocations relate will not differ
substantially from the net increases and decreases that would be recorded in the partners'
respective capital accounts for such years if the original allocation and the offsetting allocation
were not contained in the partnership agreement and (ii) the total tax liability of the partners (for
their respective years in which the allocations will be taken into account) will be less than if the
allocations were not contained in the partnership agreement (taking into account tax
consequences that result from the interaction of the allocations with partner tax attributes
unrelated to the partnership). Thus, as in the case of allocations involving "shifting" tax
consequences, this test concludes that an allocation or allocations that would be substantial under
the initial test do not result in substantial economic effect if they merely reduce partners' tax
liability without affecting capital accounts. Examples contained in the Treasury Regulations
provide guidance regarding the types of allocations with which the transitory allocation analysis
is concerned. The examples all involve allocations of offsetting types (e.g., cost recovery
deductions and income from the sale of the asset) which creates a strong likelihood of offsetting
each other and which arise in different tax years of the partnership. See, Treas. Reg. §1.704-
1(b)(5), Ex. (7), Ex. 8 (ii) and Ex. 17.

In addition, again as reflected in the examples, the prohibitions of both "transitory" and
"shifting" allocations were aimed at special allocations, which are absent here.

Accordingly, it is more likely than not that the allocations will be respected as having
substantial economic effect.

Treas. Reg. §1.704-1(b)(4)(i) provides that following an adjustment to capital accounts
triggered by a revaluation of partnership property, allocations of tax items cannot have economic
effect and so must be made in accordance with the partners' interest in the partnership are made

**SABWZ0346196**

SIDL 0382009

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 59

in accordance with Code Section 704(c) principles. The Operating Agreement contains such a provision.

In general, if an allocation of an amount does not have substantial economic effect, the amount will be reallocated in accordance with the "partner's interest in the partnership" as determined under Treas. Reg. §1.704-1(b)(3). This refers to the manner in which the partners share the economic benefit or burden of a particular item, and this sharing ratio may differ from the partner's overall interest in the partnership. The Treasury Regulations list four factors as "among those" that will be considered: the partners' relative contributions to the partnership, their interests in economic profits and losses, their interests in cash flow and other nonliquidating distributions, and their rights to distribution of capital on liquidation. Here, the members have agreed that (so long as Co-investor has the bulk of the common interests), the bulk of International's gain, as well as the same percentage of International's losses up to the amount of Co-investor's capital account, inure to the benefit and detriment of Co-investor. In addition, once the preferred return is paid, cash flow out of these gains is also distributed in the same percentage to Co-investor. While Investor has made the bulk of the contributions to International and has the bulk of the rights to distributions of capital on liquidation, these factors do not detract from the fact that, in terms of gain (as opposed to losses), the bulk of it inures to the benefit of Co-investor, not Investor. Consequently, the allocation of this percentage of the gain to Co-investor would more likely than not be respected as being in accordance with Co-investor's interest in International.

Accordingly, it is more likely than not that the allocations of International's gains and losses as set out in the Operating Agreement would be respected either because they have "substantial economic effect" or because they are in accordance with the members' interests in International.

F.    **Rules Relating to the Limitation of Deductions**

It is possible that the IRS also may attempt to assert that one or more of the following apply to the Transactions.

NY1 5160876v1

**SABWZ0346197**

**SIDL 0382010**

SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 60


**1.    Sham Transaction, Economic Substance, and Business Purpose Doctrines**

There are innumerable cases addressing the judicially developed doctrines of "sham transaction", "business purpose", and "economic substance". One attempt to synthesize the rules appears in "Appendix II To JCX-82-99: Description and Analysis of Present-Law Rules and Recent Proposals Relating to Corporate Tax Shelters", Prepared by the Staff of the Joint Committee On Taxation, JCX-84-99, November 10, 1999 ("JCT Appendix").

**(a)    "Sham Transaction Doctrine"**

With respect to the "sham transaction doctrine", the JCT Appendix describes two types of "shams", "shams in fact" and "shams in substance". The first involves transactions that in fact never occur. As an example, the JCT Appendix cites <u>Goodstein v. Comm'r</u>, 267 F.2d 127 (1st Cir. 1959), in which assets were never purchased and a loan never incurred by the taxpayer. Reference is also made to <u>ASA Investerings Partnership v. Comm'r</u>, T.C. Memo. 1998-305, aff'd 201 F.3d 505 (D.C. Cir. 2000) in which a party never actually entered into a partnership formed to effectuate the transaction. It is more likely than not that the Transactions would not constitute one or more "shams in fact", based upon the representation of Investment Advisor that every transaction did in fact occur as described in Part I hereof.

With respect to the "sham in substance" aspect of the doctrine, the JCT Appendix II cites <u>Yosha v. Comm'r</u>, 861 F.2d 494 (7th Cir. 1988) as an example. In <u>Yosha</u>, the taxpayers entered into a series of transactions on the London Metals Exchange ("LME") that were not "shams in fact" because they actually occurred. The taxpayers, however, were fully protected against loss through arrangements by the promoter with the LME brokers, and the transactions were structured so that the taxpayers could not earn a profit from them, <u>i.e.</u>, as an economic matter the trades were voided although as a legal and factual matter they occurred.[17] Thus the taxpayers were in the position of economically, or "in substance", never having entered into the transactions. A similar analysis is applied in determining whether a taxpayer is the owner for federal income tax purposes of a particular asset. Thus, if the taxpayer has none of the economic

---

17    Because the arrangements to protect against loss were arranged by the promoter, the court was not faced with addressing the effect of <u>bona fide</u> hedging transactions with unrelated parties. Hedges provided by a party involved in the transactions was also viewed as a negative factor in <u>ACM Partnership v. Comm'r</u>, T.C. Memo. 1997-115, aff'd in part and rev'd in part, 157 F3rd 231 (3rd Cir. 1998), cert. denied, 526 U.S. 1017 (1999).

NYI 5160876v1

**SABWZ0346198**

SIDL 0382011

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 61

risk of an owner and none of the economic benefits of an owner, the taxpayer would ordinarily not be treated as the owner, i.e., the taxpayer's economic ownership is voided, and such situations could be viewed as "shams in substance".

In the instant case, neither Investor nor International entered into arrangements that voided the economic risks of ownership or the economic benefits of ownership with respect to any of the Transactions. Consequently, it is more likely than not that the Transactions would not constitute one or more "shams in substance". Much confusion about the sham transaction doctrine has arisen because the courts often treat transactions that fail the "economic substance" or "business purpose" doctrines " as "shams". In this regard, the JCT Appendix notes:

> [T]he delineation between [the sham transaction] doctrine
> (particularly as applied to "shams in substance") and the
> "economic substance" and the "business purpose" doctrines…is
> not always clear. Some courts find that if transactions lack
> economic substance and business purpose, they are "shams" not
> withstanding that the purported activity did actually occur.

JCT Appendix at n. 29.

    (b)    **Economic Substance and Business Purpose Doctrines**

As with the relationship of the sham transaction doctrine to the business purpose and economic substance doctrines, there is some confusion about the relationship of the latter two to each other. Again, the JCT Appendix is helpful in trying to clarify the confusion:

> In its common application, the courts use business purpose (in
> combination with economic substance…) as part of a two-prong
> test for determining whether a transaction should be disregarded
> for tax purposes: (1) the taxpayer was motivated by no business
> purpose other than obtaining tax benefits in entering into the
> transaction, and (2) the transaction lacks economic substance.
> [citation omitted]

JCT Appendix, at n. 63. This language mirrors the language of the Fourth Circuit in Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89, 91 (4th Cir. 1985) ("To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purpose other than

NY1 3160876v1

**SABWZ0346199**

SIDL 0382012

# Exhibit 5
## (2 of 2)

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 62

obtaining tax benefits in entering the transaction, and that the transaction has no economic
substance because no reasonable possibility of a profit exists.") Under this test, the Transactions
will not be respected for federal income tax purposes only if they fail both prongs, i.e., they lack
both business purpose and economic substance. The D.C. Circuit agrees with this approach.
See, e.g., Horn v. Comm'r, 968 F.2d 1229 (D.C. Cir. 1992). While the Eleventh Circuit requires
both prongs to be met, Kirchman v. Comm'r, 862 F.2d 1486 (11ᵗʰ Cir. 1989), the Fifth and
Eighth Circuits have not yet decided whether both or only one prong need be met, Compaq and
IES, infra, and the Tenth Circuit treats these "prongs" as simply factors in determining whether
the transaction has "any practical economic significance", James v. Comm'r, 899 F.2d 905, 908
(10ᵗʰ Cir. 1990); the JCT Appendix's citation of Rice's Toyota World and the fact that some
perfectly legitimate transactions (e.g., a shuffling of entities, for pure business motives, within a
corporate group) have business purpose but lack "economic substance" suggest that the approach
of Rice's Toyota World is the correct one.

    i.    **Business Purpose**

        For a transaction to have a business purpose, there must be a business or
commercial reason for the taxpayer to engage in the transaction. Friedman v. Comm'r, 869 F.2d
785, 792 (4th Cir. 1989); Rice's Toyota World, Inc. v. Comm'r, supra. The existence of such a
purpose, and the balancing of such a purpose with tax motivations, was recently addressed in
United Parcel Service of America, Inc. v. Comm'r, 254 F3rd 1014 (11ᵗʰ Cir. 2001), rev'g T.C.
Memo. 1999-268.

        In the United Parcel Service case, the taxpayer tried to avoid taxation with respect
to certain fees by restructuring them as insurance. Economically, the taxpayer was in
substantially the same position as before the restructuring, but through the arrangements was able
to exclude the payments from income. The taxpayer put forth a number of commercial reasons
for the restructuring of the fees. The taxpayer argued that (i) it was required to restructure the
arrangements because such payments would fall afoul of restrictions under some state insurance
laws; (ii) it intended to leverage the profits into the creation of a new reinsurer that could become
a full-line insurer; (iii) by removing the fees from its operating ratios it could obtain larger rate
increases than had it received the fees directly; and (iv) by restructuring the fees it protected its
transportation business from the risk of increased liabilities. However, the Tax Court concluded
that the taxpayer offered no credible evidence that the restructuring would in fact achieve goals

NY1 5360876v1

**SABWZ0346200**

SIDL 0382013

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 63

(i), (iii), and (iv). The Tax Court also found that goal (ii) could have been accomplished by
merely making an investment in such a reinsurer. On appeal, in reversing the Tax Court the
Circuit Court concluded that adequate business purpose exists for a transaction undertaken by a
going concern such as UPS as long as the "[transaction] figures in a bona fide profit seeking
business." The Circuit Court stated:

> The Code treats lots of categories of economically similar behavior
> differently. For instance, two ways to infuse capital into a
> corporation, borrowing and sale of equity, have different tax
> consequences; interest is usually deductible and distributions to
> equityholders are not. *There may be no tax-independent reason for*
> *a taxpayer to choose between these different ways of financing the*
> *business, but it does not mean that a taxpayer lacks a "business*
> *purpose." To conclude otherwise would prohibit tax planning.*

[emphasis added]

The Circuit Court determined that the transaction "simply altered the form of an
existing, bona fide business, and this case therefore falls in with those that find an adequate
business purpose to neutralize any tax avoidance motive."

In <u>Winn-Dixie Stores Inc. v. Comm'r</u>, 113 T.C. 254 (1999), aff'd 254 F 3rd 1313
(11th Cir. 2001), the court disallowed interest deductions on policy loans in a COLI program that
insured the lives of approximately 30,000 workers. The program resulted in a pre-tax loss for the
taxpayer. The taxpayer argued that the program (i) enabled it to fund costs of one of the benefit
programs, and (ii) increased the benefits it could offer to its employees. As to (i), the court
found that there was no contemporary evidence that it had purchased the COLI policies to
provide such funding; that the COLI policies were not designed to fund such benefits; that the
taxpayer's CFO never told the entity that was planning the COLI transactions that the purpose
was to fund the benefit program; and that projections showed that the cash flow from the
program was needed to pay future interest and premiums as opposed to being available to fund
the benefits plan. As to (ii), the court found that the described additional benefits were not
related to the COLI program. Thus, the Tax Court did not find the commercial motivation for
the transaction that the 11th Circuit found in the <u>United Parcel Service</u> case. See also <u>IRS v. CM</u>
<u>Holdings</u>, 245 B.R. 578 (D. Del. 2000) and <u>American Electric Power v. U.S.</u>, 136 F. Supp. 2d
762 (SD Ohio 2001).

NY1 51688/6v1

**SABWZ0346201**

**SIDL 0382014**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 64


In ACM Partnership v. Comm'r, supra, ASA Investerings Partnership v. Comm'r, supra, and Saba Partnership v. Comm'r, T.C. Memo. 1999-359, vac'd and rem'd for reconsideration 273 F.3d 1135 (D.C. Cir. 2001) all involving a similar tax-motivated strategy, the courts found that the purported business purposes of the transactions were unsupported by the evidence and, similar to the foregoing cases, the individuals involved with execution of the transaction did not exhibit behavior consistent with trying to achieve the purported commercial purposes.

However, in another series of cases involving a tax-motivated strategy, the Eighth and Fifth Circuit Courts of Appeal found the requisite business purpose. Pursuant to the strategy a domestic corporate taxpayer purchases stock issued by a foreign corporation (generally traded in the form of American Depositary Receipts or "ADRs") immediately prior to the dividend declaration date (referred to as "cum dividend"), thereby entitling the purchaser to the dividend. The purchaser then sells the stock following the dividend declaration (referred to as "ex dividend"). The cum dividend price is necessarily higher than the ex dividend price, because the purchaser has to pay the seller for the dividend the seller would otherwise receive, and as a result, the purchaser suffers a capital loss that can be used to offset other capital gains that the purchaser may have. In the case of a dividend paid by a foreign corporation, the dividend is subject to a foreign withholding tax that can be credited against the U.S. income tax liability of the purchaser with respect to the dividend.

In Compaq Computer Corp. v. Comm'r, 113 T.C. 214 (1999), the Tax Court disallowed foreign tax credits associated with dividends on certain ADRs representing shares of Royal Dutch Shell, a Netherlands corporation. The IRS treated the withholding tax paid to the Netherlands government as an expense of the transaction and concluded that after deducting the withholding tax from the gross dividend paid on the ADRs that the taxpayer could never make a profit from the transaction. The taxpayer on the other hand asserted that the potential profit on the transaction had to be measured by taking into account the gross dividend paid on the ADRs, disregarding the withholding tax. The Tax Court agreed with the IRS. In addition, among the factors taken into account by the Tax Court as demonstrating there was no purpose to the transaction other than avoiding taxes was that the officer of the taxpayer in charge of the investments made no independent inquiry into the commercial risks with respect to the transactions. Furthermore, the Tax Court concluded that the transactions were "shams" without the requisite business purpose because they were structured to minimize the risk to the taxpayer

NY1 5160876v1

SABWZ0346202

SIDL 0382015

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 65

that the transactions would not occur at the anticipated prices. The taxpayer appealed the Tax Court's decision to the Fifth Circuit Court of Appeals.

While the appeal in <u>Compaq</u> was pending, in a case involving the same strategy and very similar facts, <u>IES Industries, Inc. v. U.S.</u>, 253 F3rd 350 (8th Cir. 2001), <u>rev'g in part an unreported District Court decision</u>, No. C97-206 (N.D. Ohio, 9/22/99), the Eighth Circuit Court of Appeals determined, contrary to the determination of the Tax Court in its <u>Compaq</u> decision, that in assessing the profit motive for such a strategy, the foreign withholding tax should be disregarded and that where in making the investments a non-tax motive, or legitimate profit motive, was involved, as opposed to making the investment solely for reasons relating to tax considerations, the transactions have the requisite business purpose. Furthermore, the Circuit Court stated, echoing the 11th Circuit's sentiment expressed in the <u>United Parcel Service</u> decision that tax planning, <u>i.e.</u> taking into account the tax benefits of structuring a transaction in a particular way, does not void a valid motivation:

> A taxpayer's subjective intent to avoid taxes thus will not by itself determine whether there was a business purpose to the transaction.

The Eighth Circuit Court of Appeals determined that the taxpayer had entered the transactions to make a profit, had in fact made a profit, and, contrary to the finding of the Tax Court in the <u>Compaq</u> case, had approached the transactions in a commercial manner, making independent inquiry into the risks.[18] Consequently, the Circuit Court concluded that such facts established the requisite business purpose, notwithstanding the tax benefits that the taxpayer anticipated receiving from the transactions.

On appeal, and following the Eighth Circuit Court of Appeals <u>IES Industries, Inc. v. U.S.</u> decision, the Fifth Circuit Court of Appeals reversed the Tax Court's Compaq decision. See, <u>Compaq Computer Corp. v. Comm'r</u>, 277 F3rd 778 (5th Cir. 2001). The Fifth Circuit Court of Appeals agreed with the Eighth Circuit Court of Appeals that that in assessing the profit motive for such a strategy, the foreign withholding tax should be disregarded. Having determined that the taxpayer had the requisite profit motive, the Fifth Circuit Court of Appeals

---

18      The Circuit Court also noted that the transactions were not carried out by "straw entities" or "alter-egos" of the taxpayer, but were carried out with independent parties who were participating in the transaction consistent with their legitimate businesses.

NY1 5160876v1                                        **SABWZ0346203**

**SIDL 0382016**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 66

reiterated (and elaborated at some length in its footnote 8) the view of the Eighth Circuit Court of
Appeals expressed in the IES Industries case that the desire to obtain tax benefits does not cause
a transaction to be disregarded for lack of business purpose for federal income tax purposes, and
that such desire does not cause the transaction to be so disregarded even if the tax benefits sought
were intended to reduce tax liabilities from an unrelated transaction:

> Second, as to business purpose: even assuming that Compaq
> sought primarily to get otherwise unavailable tax benefits in order
> to offset unrelated tax liabilities and unrelated capital gains, this
> need not invalidate the transaction.[citations omitted][8]

> [8]    In particular the fact that Compaq had a large unrelated capital gain in
> 1992 does not mean that Compaq had an impermissible motive in seeking to
> engage in the transaction. The capital gain, of course, made it possible for
> Compaq to obtain an otherwise unavailable tax benefit from the ADR
> transaction by offsetting its $20.7 million in capital losses from the transaction
> against the gain. If Compaq had had no capital gain whatsoever in 1992, it
> would still have had to pay tax on the gross amount of its $22.5 million dividend
> from Royal Dutch, which – in the absence of a capital gain against which to
> offset its capital losses – would have resulted in a substantial after-tax loss to
> Compaq. Put otherwise, the availability of a capital gain against which to offset
> the capital losses from the ADR transaction was a necessary precondition to the
> profitability of the transaction on an after-tax basis. A sensible taxpayer would
> have engaged in the transaction only if it had a capital gain against which to
> offset the capital losses that the taxpayer knew would result from the
> transaction. All this is unremarkable and is no evidence that Compaq had an
> impermissible motive.....The possible benefits from ADR transactions for
> investors with unrelated capital gains and tax liabilities are analogous to the
> benefits that taxpaying investors (especially investors with high incomes), but
> not tax-exempt persons get from the purchase of tax-exempt bonds with lower
> yields than the pre-tax yields available from non-exempt bonds.  In both
> instances the benefits would not exist were it not for the investors' individual
> tax attributes. [citations omitted]

277 F3rd at 787.

> Furthermore, contrary to the determination of the Tax Court, the Court of Appeals
concluded that the limited inquiry into the risks of the transactions by the responsible officer of
the taxpayer was sufficient and that risk minimization was not inconsistent with having a
business purpose.  The Court stated:

> Although, as the Tax Court found, the parties attempted to
> minimize the risks incident to the transaction, those risks did exist

NY1 5160876v1

SABWZ0346204

SIDL 0382017

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 67

and were not by any means insignificant. The transaction occurred
on a public market, not in an environment controlled by Compaq
or its agents. The market prices of the ADRs could have changed
during the course of the transaction (they did in fact change, 113
T.C. at 218); any of the individual trades could have been broken
up or, for that matter, could have been executed incorrectly; and
the dividend might not have been paid or might have been paid in
an amount different from that anticipated by Compaq. See, IES,
253 at 355. The absence of risk that can legitimately be eliminated
does not make a transaction a sham, see, id.; but in this case risk
was present.[9]

> [9]    In IES, the court noted the Tax Court's assertion in this case that in
> light of Compaq's limited investigation of the risks of the Royal Dutch
> transaction, Compaq had had no non-tax business purpose in agreeing to the
> transaction. 253 F.3rd at 355. Even if we agreed with the Tax Court that Compaq
> had not adequately investigated the risks, it would not make a difference to the
> outcome of this case. Though Compaq could have done more to evaluate the
> risks of the transaction, the process it used does not alone prove a lack of
> business purpose for a transaction that had real risks....

277 F3rd at 787.

The common thread that runs through all of the foregoing cases is that to have the
requisite business purpose to support the tax benefits achieved, there must be a commercial
reason (to make a profit or otherwise) for engaging in the various transactions notwithstanding
that significant tax benefits can be achieved, the transaction must be consistent with such reason,
and such reason must be supportable by contemporary evidence, including a showing that the
transaction was handled in a manner consistent with the non-tax goals. This analysis is
supported by a number of cases.

For example, in Levy v. Comm'r, 91 T.C. 838 (1988), the taxpayers entered into a
sale-leaseback of computer equipment for the purported reason of diversifying their business and
investments. In upholding the tax benefits the court stated:

> Based upon our careful examination of the relevant facts and
> evidence in this case, we conclude that petitioners entered into the
> transaction in issue for sound business reasons (namely to diversify
> their investments by entering into a legitimate long-term
> investment involving the purchase and leaseback of computer

NY1 5160876v1

**SABWZ0346205**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 68

equipment). Petitioners approached the decision to enter into this
transaction in a businesslike manner. Petitioner's financial advisor
thoroughly and in good faith investigated the proposed purchase-
leaseback transaction. He prepared cash flow analyses which
included the components of the transaction that were critical to
earning a profit on the investment. Those components included the
current fair market value and projected residual value of the
equipment, the fair rental value of the lease, and the rent
participation agreement. He explained to petitioners the
significance of and risks associated with the projected residual
value of the equipment and the rent participation agreement. In
addition, he explained to petitioners the tax consequences of the
transaction. Petitioners also retained a law firm with expertise in
leasing transactions to investigate the financial status and
creditworthiness of each participant involved in the transaction, to
investigate each participant's business reputation, and to handle the
legal aspects of this complex transaction.

We are satisfied that petitioners had a good faith and substantial
business purpose for entering into the transaction. Petitioners
participated in the purchase leaseback transaction only after they
were convinced that the investment had a reasonable possibility of
producing a profit.

91 T.C. 838, 855-856. Similarly see, Pearlsten v. Comm'r, T.C. Memo. 1989-621; Rubin v.
Comm'r, T.C. Memo. 1989-484.

        In Caruth Corp. v. Comm'r, 865 F.2d 644 (5th Cir. 1989), aff'g 688 F. Supp.1129
(N.D. Tex. 1987), the issue was whether a charitable contribution would be allowed for a
contribution of stock of a controlled corporation after the dividend was declared, but before the
dividend record date. The court upheld the deduction in part upon finding that lag between the
declaration and record dates had a business purpose:

        [Taxpayer] contends that the distinction between the two dates was
        designed to encourage his nephews… to sell their shares to
        him….The lag between the declaration date and record dates was
        designed to give the nephews an opportunity to sell. The plan
        failed in this respect; the nephews held their shares.

        The district court made factual findings that the [taxpayer] wished
        to buy out his nephews' interests in North Park Incorporated, and

NY1 5160876v1

SABWZ0346206

SIDL 0382019

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 69

that he believed declaration of a dividend might facilitate this objective. We review these findings pursuant to the clearly erroneous standard, and find clear support in the record. With these factual findings in place, we believe it obvious that the distinction between declaration and record date did, as [taxpayer] contends, serve a legitimate business purpose.

Lastly, it should be noted that a transaction can have an appropriate business purpose even if the transaction itself does not generate a profit. For example, in Chisholm v. Comm'r, 79 F.2d 14 (2nd Cir. 1935), cert. denied, 296 U.S. 641 (1935), the court held that the desire to pool and jointly manage assets was adequate business purpose for owning and managing assets through a partnership. See also, Caruth v. Comm'r, supra. In Jacobson v. Comm'r, 915 F2d 832 (2d Cir. 1990), which was cited by the Court of Appeals in the United Parcel Service case, the taxpayer had invested in a movie. After noting that only one movie in ten is a commercial success, the court held that a bona fide profit motive provided a business purpose even for a losing investment if the investment was not an obvious loser ex ante. Indeed, in Boca, the court found that the transaction did have economic substance and should be respected for federal income tax purposes.

Investor believed that he had a reasonable opportunity to earn a reasonable profit, in excess of all fees and transaction costs, from the Transaction, without regard to tax benefits. Also as stated above, Investor contributed the Options to International for substantial non-tax business reasons, including hedging of risk in a highly concentrated stock, hedging currency risk as foreign markets made up an increasingly large component of the business in their concentrated holdings, and hedging currency risk with respect to a line of credit, the professional management provided by the Investment Advisor, and the desire to create a larger pool of capital through the involvement of other investors such as Co-investor. These reasons would more likely than not satisfy any business purpose requirement for Investor's entering into the Transactions in the first instance and for contributing the Options to International. The IRS might assert that Investor could have accomplished the same result by contributing cash to International and having International acquire the Options, and that there was no business purpose for the form chosen by Investor. Although the IRS might assert that this goal could have been accomplished in some other form, and that there was no business purpose for the form chosen by the parties, as recognized in those decisions, long-standing judicial authority has also recognized that "any one may so arrange his affairs that his taxes shall be as low as possible". Helvering v. Gregory, 69

NY1 5160876v1

**SABWZ0346207**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 70


F.2d 809 (2d Cir. 1934), aff'd, Gregory v. Helvering, 293 U.S. 465 (1935). See also, Compaq Computer Corp. v. Comm'r, supra; IES Industries, Inc. v. U.S., supra. Therefore, a taxpayer is free to choose the most tax-favored method of accomplishing an economic result without any business justification for the specific method chosen, so long as that economic result has a bona fide business purpose.

      ii.    **Economic Substance**

      As discussed above, the courts have often appeared to confuse the issues of business purpose and economic substance. See, for example, the Court of Appeals discussion of risk mitigation in Compaq Computer Corp. v. Comm'r, supra. It is well established that a transaction or series of transactions will not be respected for tax purposes unless the transaction or transactions have economic substance separate and distinct from the economic benefit derived from tax reduction. Gregory v. Helvering, supra. Transactions failing to meet this standard lack the requisite "economic substance" (often interpreted as a having a reasonable possibility of pre-tax profit) and will not be respected for tax purposes. However, the Supreme Court has held that a transaction should be respected if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." Frank Lyon Co. v. U.S., 435 U.S. 561, 583-584 (1978). Thus, transactions have been upheld where the transactions were designed to achieve a tax benefit, but were also endowed with positive pretax economics. See, e.g., Northern Indiana Public Service Company v. Comm'r, 105 T.C. 341 (1995), aff'd, 115 F.3d 506 (7th Cir. 1997).

      The Yosha decision articulated the standard slightly differently:

> A transaction has economic substance when it is the kind of transaction that some people enter into without a tax motive, even though the people fighting to defend the tax advantages of the transaction might not or would not have undertaken it but for the prospect of such advantages—may indeed have had no other interest in the transaction."

Yosha v. Comm'r, supra, at 499.


NY1 5160876v1

**SABWZ0346208**


**SIDL 0382021**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 71

   The test, according to <u>Rice's Toyota World</u>, is whether there is a reasonable possibility of an economic profit. That profit potential cannot be illusory. In <u>ACM Partnership v. Comm'r</u>, <u>supra</u>, the Tax Court found that at the time it entered into the partnership, the taxpayer's only real opportunity to earn a profit was through an increase in the credit quality of the issuers of certain notes, or a 400-500 basis point increase in 3-month LIBOR interest rates. The court found no impact on credit quality was possible as the lenders were extremely highly rated at the time of the transaction. Moreover, the court did a 6-year review of 3-month LIBOR rates and did not find an increase of even 300 basis points in the necessary time frame. Since the analysis of the historical data showed no reasonable basis for expecting a profit, the court ruled against the taxpayer. "We do not suggest that a taxpayer refrain from using the tax laws to the taxpayer's advantage. In this case, however, the taxpayer desired to take advantage of a loss that was not economically inherent in the object of the sale, but which the taxpayer created artificially through the manipulation and abuse of the tax laws. A taxpayer is not entitled to recognize a phantom loss from a transaction that lacks economic substance". In its analysis, the Third Circuit focused upon the foregoing finding of the Tax Court, stating:

> Tax losses such as these, which are purely an artifact of tax accounting methods and which do not correspond to any actual economic losses, do not constitute the type of 'bona fide' losses that are deductible under the Internal Revenue Code and regulations.

The Third Circuit also noted:

> [O]n November 3, 1989, [the partnership] invested $175 million of its cash in private placement Citicorp notes paying just three basis points more than the cash was earning on deposit, then sold the same notes 24 days later for consideration equal to their purchase price, in a transaction whose terms had been finalized by November 10, 1989, one week after ACM acquired the notes. These transactions . . . offset one another and with no net effect on ACM's financial position.

See also, <u>Saba Partnership v. Comm'r</u>, <u>supra</u>; <u>ASA Investerings v. Comm'r</u>, <u>supra</u>; <u>Merryman v. Comm'r</u>, 873 F.2d 879 (5th Cir. 1989) (conduit partnership without economic substance disregarded).

NY1 5160976v1

**SABWZ0346209**

SIDL 0382022

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 72

In Winn-Dixie Stores Inc. v. Comm'r, supra, the court found a lack of economic substance. This was because, as the transactions were designed and executed, the taxpayer was bound to suffer a pre-tax loss.

From these cases it appears that the "substance" necessary to meet the requirements of the "economic substance" doctrine is somewhat different from the "substance" required under the "sham in substance" doctrine. As discussed above, the latter requires that the transaction have the economic consequences consistent with what the transaction claims to be: Does the taxpayer really have the economic incidents of ownership if the taxpayer purports to own the asset? The former requires that, having passed the "sham in substance" test, the transaction make economic sense: Does the taxpayer have a reasonable possibility of economically benefiting from the transaction without regard to tax benefits? See, IES Industries, Inc. v. U.S., supra. Cf. Compaq Computer Corp. v. Comm'r, supra.

Despite being inconsistent with the economic substance cases, one case has suggested that there must be not only a reasonable possibility of making a profit, but also the possibility must relate to a profit that is greater than de minimis. See, Sheldon v. Comm'r, 94 T.C. 738 (1990); Estate of Baron v. Comm'r, 83 T.C. 542 (1984), aff'd, 798 F.2d 65 (2d Cir. 1986).[19]  In any event, the tax benefits achieved in a transaction should not be denied under the economic substance doctrine merely because the transaction's principal purpose was to achieve such tax benefits. See, e.g., Northern Indiana Public Service Company v. Comm'r, supra. Congress has precluded such a broad test for all disallowance by incorporating such a principal purpose test into specific Code Sections such as Code Section 269. Long-standing judicial authority has also recognized that "any one may so arrange his affairs that his taxes shall be as low as possible". Helvering v. Gregory, 69 F.2d 809 (2d Cir. 1934). See also, Cottage Savings

---

19   On December 23, 1997, the IRS issued Notice 98-5, announcing that the IRS will issue Regulations effective on and after such date dealing with foreign taxes paid or accrued in connection with certain abusive transactions. Such transactions were described as those in which the anticipated economic benefits are insubstantial in relationship to the anticipated tax benefits. It is currently uncertain as to when or whether such regulations will be issued, the criteria they will establish with respect to the insubstantiality of anticipated economic benefits, or whether such regulations will have application beyond the area of foreign taxes. Furthermore, the Fifth Circuit Court of Appeals appeared to view Notice 98-5 merely as an attempt by the IRS to "stack the deck" against the taxpayer in a case before it. See, Compaq Computer Corp. v. Comm'r, supra, at 785. The Regulations referred to in Notice 98-5 are not on the current IRS business plan.

NY1 5160876v1

**SABWZ0346210**

SIDL 0382023

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 73

Association v. Comm'r, supra, upholding the tax benefits generated by a transaction executed
solely for tax purposes.

  In Salina Partnership LP, FLP Group, Inc. v. Comm'r, supra, a partnership had
been previously formed by an investment bank and made a series of investments. Understanding
from the investment bank that the purchase of 50% or more of the interests in the partnership
would provide certain tax benefits, the taxpayer purchased 98% of the outstanding partnership
interests. The IRS conceded that the partnership was profitable and such profitability provided
the taxpayer with sufficient profit motive to imbue the *post-purchase portion* of the transaction
with economic substance. However the IRS contended that the pre-purchase part of the
transactions did not have sufficient economic substance and, accordingly the taxpayer's tax
benefits achieved through the transaction should be denied. The court stated that although the
purchase of the partnership interest provided the taxpayer with a perceived tax benefit, "this
factor, standing alone, is insufficient to render the transaction a sham in substance." The court
found that the investment in the partnership provided the taxpayer with a reasonable opportunity
to earn profits independent of tax benefits, and that such opportunity imbued the entire
transaction with a sufficiently valid business purpose to give the transaction the economic
substance necessary to be respected.

  The IRS may take the position that the Transactions lack economic substance
under Keeler v. Comm'r, 243 F.3d 1212 (10th Cir. 2001), aff'g, Leema Enterprises, Inc. v.
Comm'r, T.C. Memo 1999-18. However, the straddle transactions at issue in Keeler are
materially different from the Transactions despite their facial similarity to them. Merit Trading,
a subsidiary of taxpayer Leema Enterprises, sponsored a trading program in options and forward
contracts.[20] A taxpayer would acquire long and short options or forward contracts from Merit.
Just before year-end, the taxpayer would dispose of the loss leg and acquire a replacement leg,
thus executing a "switch." The taxpayer would dispose of the gain legs in the following year,
and in most cases enter into a similar straddle to offset the deferred gain. Merit set the prices on
the contracts using a variant of the Black-Scholes formula.

---

[20] Keeler is only the most recent case to deal with this program. Earlier cases, cited by the Tax Court in
Leema Enterprises, include Lee v. Comm'r, T.C. Memo. 1997-172, aff'd. in part and rem'd in part, 155 F.3d
584 (2d Cir. 1998); London v. Comm'r, T.C. Memo. 1996-192; Alessandra v. Comm'r, T.C. Memo. 1995-
238, aff'd. without published opinion, 111 F.3d 137 (9th Cir. 1997); Lamborn v. Comm'r, T.C. Memo.
1994-515; Seykota v. Comm'r, T.C. Memo. 1991-234, modified, T.C. Memo. 1991-541.

**SABWZ0346211**

SIDL 0382024

SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 74

The Tenth Circuit held that the transactions lacked economic substance, stating that the trading program "provided hefty opportunities for tax savings but only illusory opportunities for economic profit."[21] It based its conclusion on the following aspects of the program: (a) the investors traded "exclusively in tax-advantaged assets"; (b) the offering memorandum, while describing at length the program's anticipated tax benefits, lacked detailed projections of realistic economic returns; (c) the large transaction fees reduced "to almost nil" the realistic expectation of economic gain; (d) the investors "deliberately incurred losses" by executing a switch" (the court asserted that a typical straddle will not include a switch); (e) most investors consistently rolled gains into future years; (f) taxpayers continued to trade with Merit despite consistent losses; (g) Merit charged bid/ask fees only on an opening transaction, suggesting that the first trade was only a link in a prearranged chain of transactions; (h) Merit retained customers' margin deposits in larger amounts and for longer periods than required; (i) Merit customers rarely took delivery on the forward contracts; and (j) the prices were set not by market forces but by Merit.

In our view, the most significant difference between the Transactions and the Merit trading program is that Counterparty, the counterparty for each of the Options, is an independent institutional counterparty that enters into options transactions with third parties who acquire options for purposes having nothing to do with the Transactions. Investor, like any person who buys an option from Counterparty or sells one to Counterparty, including anyone else who invests in a partnership similar to International, trades with Counterparty. By contrast, according to the Tax Court's opinion, Merit entered into transactions only with customers of its tax trading program.[22] The result of this closed circle (not explicitly pointed out by the court) was that while any individual customer in the trading program could theoretically make a profit, the customers as a whole (particularly after paying fees to Merit) could not possibly do so. For the same reason, as the Tax Court pointed out, Merit could offer only "spreads" (combinations of long and short positions), not "open" positions. By contrast, we understand from the Investment Advisor that Counterparty would enter into open positions similar to the Long Option and Short Option with any customer. Also, while prices for the Options, like those in Keeler, are set based on the Black-Scholes formula, these prices represent (based on representations of the

---

[21]    243 F.3d at 1215.

[22]    In fact, the Tax Court pointed out that "Merit initially organized its option customers into two groups—the A side and the B side. Members of the A side traded only with members of the B side, and vice versa."

NY1 5160176v1

SABWZ0346212

SIDL 0382025

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 75

Investment Advisor) what a party wholly unrelated to the Transactions would pay for similar Options, and thus, in contrast with the positions in Keeler, are set by market forces. Similarly, we understand that any margin required in the Transactions, and the time Counterparty held that margin, represents what any third party customer would have had to post.

Another difference is that in the Transactions, the tax benefit was the result of International's triggering gain on the Gain Legs, not Investor's triggering loss on the Remaining Options. The tax loss came only later. This difference is significant in three ways. First, the Tenth Circuit's concern that there was a "deliberate [and unnecessarily premature] incurrence of first-year losses" literally does not apply. Neither Investor nor International took any action to incur losses. International acted only to incur gain, and no published authority forbids that, even where the gain was incurred for a tax advantage. Cf., Salina Partnership, supra. Second, the Tenth Circuit said that the losses were taxed as losses "due only to the necessary but artificial device of separate taxable years." By contrast, the loss in the Transactions is incurred by a party unrelated to the one who is taxed on the gain. Third, the Tenth Circuit, in focusing on the indefinite rollover of gain into future years, seemed to be concerned that the offsetting gain would in fact never be recognized. The gain on the Transactions is recognized, in the same tax year, although again by a different party.

Finally, we understand that at no point did Investor receive offering materials for the Transactions that discussed tax aspects. Thus, as in Salina Partnership, Investor would be able to reasonably state that he entered into the Transactions with an intent to make a profit and not solely for tax purposes. Accordingly, on balance it is more likely than not that Keeler would not bar Investor from deducting loss from the Transactions.

It also is likely that, according to the standards used by the U.S. District Court for the District of Columbia in Boca Investerings Partnership v. U.S., 167 F. Supp. 2d 298 (D.D.C. 2001), appeal docketed No. 01-5429 (D.C. Cir. Feb. 19, 2002), that the Transactions would have economic substance and would not be a sham.

In the Boca case, the taxpayers (a U.S. corporation and its wholly owned domestic subsidiary) formed a partnership with two affiliates of a foreign bank. In year 1 the partnership ("Boca") purchased private placement floating-rate certificates of deposit ("CDs"), then sold the CDs to institutional investors for consideration consisting of cash and seven-year LIBOR notes. Relying on the tax rules applicable to contingent installment sales, Boca apportioned its basis in

NY1 5160876v1

**SABWZ0346213**

**SIDL 0382026**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 76

the CDs pro rata over the seven-year term of the notes, recognizing a large amount of gain on
their sale, most of which was allocated to the foreign partners who held the largest interests in
Boca. At this point the taxpayers began buying out the foreign partners' interests in Boca at fair
market value plus a small premium. In tax year 2, Boca distributed the installment notes to the
taxpayers, and the cash to the foreign partners. Over the course of a few more transactions
taxpayers continued to buy out the interests of the foreign partners, then sold the LIBOR notes
and recognized a short term capital loss.

        The court restated the standard the D.C. Circuit, to which an appeal would lie, had
previously set forth in Horn v. Comm'r, supra, under which the transaction would have
economic substance if either "(1) using a subjective analysis, the transaction has a nontax
business purpose, or (2) using an objective analysis, the transaction has a reasonable possibility
of generating a profit, ex ante." Although only one of these requirements needed to be met the
court found that both tests were met in the Boca case. As to the first requirement the court
concluded that each step in the transaction was taken with the intent of giving a financial benefit
to the taxpayers, and that the taxpayers would not have entered into the transaction in the first
place had they not believed they could make a profit. As to the second requirement the court
concluded that due to the volatile nature of the investments involved there was a reasonable
possibility that the transaction could have resulted in substantial profits for the taxpayers rather
than losses. Furthermore, the court noted that opportunity costs, or the profits taxpayers could
made had the money been invested in a less risky transaction, were not to be counted in
determining whether the expectation of profit was reasonable. The court stated that the issue is
whether or not a taxpayer has a legitimate business purpose for entering into a transaction, not
whether they may also have had a tax motive for entering into the transaction. Thus the court did
not even discuss the fact that the taxpayers' losses resulted in tax savings well in excess of any
potential economic profit.

        If a court were to apply the Boca economic substance test to the Transactions, it is
more likely than not that it would conclude that the Transactions would be found to have
economic substance. First, as described above, the Investor entered into the Transactions for
investment purposes. Although the Horn standard relied upon by the Boca court affords
taxpayers wide latitude -- i.e., that a transaction undertaken for a nontax business purpose will
not be considered an economic sham even if there was no objectively reasonable possibility that
the transaction would produce profits -- Investor's reasons for investing in World and later

NY1 5150176v1

**SABWZ0346214**

**SIDL 0382027**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 77

International, were for investment and Investor could realize a profit and accomplish other significant business purposes. Thus, even if the analysis were limited to this test, a court likely would find that Investor had a nontax business purpose for the investments.

Second, a court also could find that using an objective analysis, the Transactions had a reasonable possibility of generating a profit, *ex ante*. As restated by the Boca court, "a transaction that has economic consequences other than tax benefits will not be disregarded even if it was motivated by tax considerations." As set forth in the facts above, if the strike prices were favorable to Investor, there was a possibility that Investor, and later, International, could realize a pre-tax profit from the Transactions. It also is likely that Investor also realized that any losses from the investments could be utilized for tax purposes. However, just because Investor considered the tax consequences from the Transactions when evaluating his investment prospects does not require a court to conclude that Transactions lacked economic substance. Accordingly, as Investor had a reasonable opportunity to earn a pre-tax profit, a court likely would conclude that Investor's participation in the Transactions had economic substance.

### (c)    Conclusion

Based upon the representations provided in II, above, it is more likely than not that the Transactions will have the requisite economic substance and business purpose to be respected under the authorities discussed above.

### 2.    Code Section 165

### (a)    In General

Code Section 165(a) provides:

> There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by deduction or otherwise.

Treas. Reg. §1.165-1 further provides that for the loss to be allowable under Code Section 165(a) the loss must be evidenced by closed and completed transactions, fixed by identifiable events, and be actually sustained during the taxable year; that the loss be a bona fide loss; and that substance rather than form should govern. The loss arising from the Transactions is evidenced by a closed and completed transaction and fixed by an identifiable event. Further,

NY1 5160876v1

**SABWZ0346215**

SIDL 0382028

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 78

the disposition of the Options, triggering the gain and the loss, likely would be treated as <u>bona fide</u> and as having sufficient economic substance to be sustained. Consequently, it is more likely than not that the loss from the Transactions would meet the requirements of Code Section 165(a).

  However, it is possible that the IRS might contend otherwise. In Rev. Rul. 2000-12, 2000-11 IRB 1, Situation 1, a corporation purchased two privately placed debt instruments from unrelated issuers for $1,000,000 each. The notes bore interest at a fixed rate adjusted for a contingency as of a reset date. In the case of one note, if the contingency occurred, the interest rate would double, but if it did not occur, the interest rate would be reduced to zero. In the case of the other note, the effects of the contingency were reversed. As a result, at the time the notes were purchased, based upon their structure on the reset date it could be expected that the value of one note would increase while the value of the other note would decrease by approximately the same amount. As a further result, the amount of the tax loss suffered with respect to the note that declined in value significantly exceeded the amount of the economic loss suffered by the taxpayer on the two notes. Thus, the Ruling compared the tax loss on one instrument to the economic loss from the combined position. The Ruling concluded that the loss on the note that declined in value was not allowable because it did not reflect actual economic consequences and was not "bona fide". As support for its position, the Ruling cited <u>ACM Partnership v. Comm'r</u>, <u>supra</u>; <u>Scully v. U.S.</u>, 840 F.2d 478 (7th Cir. 1988); and <u>Shoenberg v. Comm'r</u>, 77 F.2d 446 (8th Cir. 1935). See also, Notice 99-59, 1999-52 IRB 761, and Notice 2000-44, 2000-36 IRB 1, discussed in detail below, in which the IRS took the same position in reliance on the same authorities. In addition, the Ruling cited <u>Lerman v. Comm'r</u>, 939 F.2d 44 (3rd Cir. 1991), <u>cert. denied</u>, 502 U.S. 984 (1991), and <u>Keane v. Comm'r</u>, 865 F.2d 1088 (9th Cir. 1989).

  In <u>ACM Partnership v. Comm'r</u>, <u>supra</u>, the Third Circuit Court of Appeals did in fact adopt the concept of a bona fide loss. However, the taxpayer in <u>ACM</u> acknowledged in its own submissions that the transaction was structured so that the securities in issue were purchased and sold at the same price. The Court of Appeals stated:

> As the Supreme Court emphasized in <u>Cottage Savings</u>, deductions are allowable only where the taxpayer has sustained a "bona fide " loss as determined by its "[s]ubstance and not mere form." According to ACM's own synopsis of the transactions, the contingent installment exchange would not generate actual economic losses. Rather, ACM would sell the Citicorp notes for the same price at which they were acquired, generating only tax

NY1 5160876v1

**SABWZ0346216**

SIDL 0382029

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 79

> losses which offset precisely the tax gains reported earlier in the
> transaction with no net loss or gain from the disposition.  Tax
> losses such as these, which are purely an artifact of tax accounting
> methods and which do not correspond to any actual economic
> losses do not constitute the type of "bona fide" losses that are
> deductible under the Internal Revenue Code and regulations.

157 F.3rd 252 [citations omitted].

Thus, the Court of Appeals denied the allowance of a loss arising from the purchase and sale of a
security in a manner akin to a "repo" or a "reverse repo" transaction, which is generally treated
as a lending transaction rather than a sale upon which gain or loss is recognized.

To try to get an understanding of the Third Circuit's concept of a bona fide loss it
is useful to examine footnote 31.  Footnote 31 provides:

> While it is clear that a transaction such as ACM's that has neither
> objective non-tax economic effects nor subjective non-tax
> purposes constitutes an economic sham whose tax consequences
> must be disregarded, and equally clear that a transaction that has
> both objective non-tax economic significance and subjective non-
> tax purposes constitutes an economically substantive transaction
> whose tax consequences must be respected, its is also well
> established that where a transaction objectively affects the
> taxpayer's net economic position, legal relations, or non-tax
> business interests, it will not be disregarded merely because it was
> motivated by tax considerations.  See, e.g., Gregory, 293 U.S. at
> 468-69, 55 S. Ct. at 267 ("if a reorganization in reality was
> effected... the ulterior purpose will be disregarded"), Northern
> Indiana Pub. Serv. Co., 115 F.3d at 512 (emphasizing that Gregory
> and its progeny "do not allow the Commissioner to disregard
> economic transactions...which result in actual, non-tax-related
> changes in economic position" regardless of tax avoidance motive"
> and refusing to disregard role of the taxpayer's foreign subsidiary
> which performed a "recognizable business activity" of securing
> loans and processing payments for parent in foreign markets in
> exchange for legitimate profit); Kraft Foods Co. v. Commissioner,
> 232 F.2d 118, 127-128 & n. 19 (2d Cir. 1956) ( refusing to
> disregard tax effects of debenture issue which "affected ... legal
> relations" between taxpayer and its corporate parent by financing

NY1 5160676v1

**SABWZ0346217**

**SIDL 0382030**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 80

> subsidiary's acquisition of venture used to further its non-tax
> business interests).  In analyzing both the objective and subjective
> aspects of ACM's transaction in this case where the objective
> attributes of an economically substantive transaction were lacking,
> we do not intend to suggest that a transaction which has actual,
> objective effects on a taxpayer's non-tax affairs must be
> disregarded merely because it was motivated by tax considerations.

157 F.3d at 248 n.31.

In the instant case, the Transactions were motivated by non-tax reasons and so
likely would not be treated as "shams in substance", and (unlike the so-called Citicorp notes)
none of the Transactions occurred at predetermined prices that would insure no economic change
of position for International.  Consequently, the reasoning set forth in ACM for concluding a loss
is not "bona fide" likely would not be applicable to the loss sustained from the Transactions.

Rev. Rul. 2000-12, supra, also cited Scully v. U.S., supra, and Shoenberg v.
Comm'r, supra, for the proposition that the losses described in the Ruling were not "bona fide".
In Scully, the Seventh Circuit Court of Appeals held that there was no deductible loss involving
the sale of real estate by trustees of the family trust to other family trusts with the same
fiduciaries, beneficiaries and remaindermen.  This disposition merely resulted in a reshuffling of
assets which resulted in no "genuine economic loss" because the taxpayer retained control over
the property – i.e., the sale was effectively a circular transaction with no economic substance.
Citing from 7 J. Mertens, Law of Federal Income Taxation §28.26 (1980), the Court of Appeals
relied upon the following principle for its conclusion that the loss incurred on the sale of the real
estate was not deductible:

> Losses will not be allowed which are claimed in connection with
> transactions which do not vary control or change the flow of
> economic benefits….[A taxpayer] will not be permitted to transfer
> assets from one pocket to another and take a loss thereby where he
> remains at the conclusion of the transfer the real owner of the
> property, either because of retention of title, command over the
> property, either directly or through the person who appears as the
> nominal vendee or transferee.

840 F.2d at 485.

NY1 5160876v1

**SABWZ0346218**

**SIDL 0382031**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 81

In the instant situation, International did not continue to own, beneficially or otherwise, the assets, i.e. the Options, the disposition of which generated a loss. Accordingly, the reasoning set forth in Scully for denying a loss deduction, is not applicable to the loss sustained from the Transactions.

In Schoenberg, the Eighth Circuit Court of Appeals held that there was no deductible loss where an investor sold stock at a loss and on the same day bought the same number of identical shares through his investment company. A little more than thirty days later, the investor purchased the shares from his investment company at a lower price than that for which he had originally sold them. The Court of Appeals denied the investor's loss deduction, stating that "where such sale is made as part of a plan whereby substantially identical property is to be reacquired and that plan is carried out, the realization of loss is not genuine and substantial; it is not real." Id. at 449. Economically, the transaction was again a circular transaction with no economic substance. Schoenberg, like Scully, is a case in which the court held that a loss was not realized by the taxpayer because the taxpayer held the same beneficial interest in the purportedly sold assets both before and after the sales. As previously stated, in the instant situation International did not continue to own, beneficially or otherwise, the asset, the disposition of which resulted in a loss. Accordingly, the reasoning set forth in Schoenberg for denying a loss deduction also is not applicable to the loss sustained from the Transactions.

Rev. Rul. 2000-12, supra, also cited Lerman v. Comm'r, supra, and Keane v. Comm'r, supra, for the proposition that courts have disallowed loses from option straddle transactions that were found to be devoid of economic substance, where the trades were prearranged to generate a loss for tax purposes while deferring offsetting gain. These cases are only two of many involving the so-called "London option transactions". In each of the cases in which the loss was denied, the denial was based upon the inability of the taxpayer to make a profit from the transaction, i.e. that the transactions did not meet the standards, discussed above, regarding economic substance and business purpose. In the instant situation, it is more likely than not that the Transactions met the standards.[23] Accordingly, the reasoning set forth in these

---

[23]    Similarly, the Tenth Circuit in Keeler, supra, cited the "principle that tax advantages must be linked to actual losses." For the existence of this "principle", the Tenth Circuit cited Gregory v. Helvering, 293 U.S. 465, 469 (1935) and Bohrer v. Comm'r, 945 F.2d 344, 347 (10th Cir. 1991). Neither case states or stands for this principle. Bohrer is another of the LME cases where the courts held that there was no reasonable possibility of an economic profit.

NY1 5160876v1

**SABWZ0346219**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 82

case for denying a loss deduction also is not applicable to the loss sustained by Investor in the Transactions.

Furthermore, there is no support for the implication in Rev. Rul. 2000-12, supra, that the mere existence of offsetting position means a loss is not "bona fide". Code Section 1256 was added to the Internal Revenue Code by the Economic Recovery Tax Act of 1981. Among other reasons stated in the General Explanation of the Economic Recovery Tax Act of 1981 (the "General Explanation"), Congress enacted Code Section 1256 "to prevent taxpayers from claiming the tax benefits which were allegedly obtained by using a futures straddle as a tax shelter." Thus, Code Section 1256 was enacted to address the abuse that the courts sought to address in the "London option transactions" cases. It did so not through an outright disallowance of any losses inherent in such positions, but rather by accelerating the tax consequences of holding such positions by marking to market the positions at the close of the taxable year or upon certain other events. Thus, in those situation in which the offsetting positions are entered into with the requisite economic substance and business purpose, it would appear that losses arising from the offsetting positions should be allowed unless they are restricted by Code Section 1256. Code Section 1092 was also adopted by the Economic Recovery Tax Act of 1981 to deal with offsetting positions. The Tax Court in Smith v. Comm'r, supra, refused to find a non-statutory wash sale rule that would deny the losses and looked to the adoption of Code Section 1092 by the Economic Recovery Tax Act of 1981 as evidence that the mere existence of offsetting positions was not enough to deny a loss. Although ultimately finding for the IRS and against the taxpayer, the IRS denied the losses on the grounds that there was an absence of a sufficient profit motive. Accordingly, it is more likely than not that the mere existence of offsetting positions would not be enough to allow the IRS to successfully contend that a loss arising therefrom is not "bona fide".

Moreover notwithstanding the IRS's contentions or dictum in some cases, tax losses are wholly independent from actual economic losses. This follows from the existence of specific, Internal Revenue Code-mandated tax accounting methods and the annual accounting period. This principle is at the heart of the rule that a corporation's earnings and profits account, which is designed to mirror (at least in some sense) its economic income, is computed differently from its taxable income, less taxes and dividends paid. It also can be illustrated by the following examples:

NY1 5160876v1

**SABWZ0346220**

SIDL 0382033

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 83

(1)    An investor purchases improved real estate with the proceeds of interest-only bank financing. Operating income equals expenses, including debt service, and the investor deducts the depreciation. As the real estate appreciates, the investor borrows against the appreciation. The investor holds the real estate until his death. It is then sold, for no taxable gain, to pay the loan. The investor has realized substantial depreciation deductions and the cash from the appreciation.

(2)    An investor purchases a sports franchise. Operating income may or may not cover expenses, but the net depreciation is currently deductible. In any event, the value of the franchise is appreciating at a double-digit compounded rate. Either the investor sells the sports franchise at a substantial capital gain (having recognized deductions against ordinary income in prior years) or his estate sells it at no taxable gain.

(3)    A foreign investor contributes depreciated land to a foreign corporation in exchange for consideration, in the form of stock, equal to the value of the contributed property. Later, when the value of the land is unchanged, the stock is old to a U.S. investor who domesticates the corporation. The corporation, having obtained the land for consideration of equal value, has no economic gain or loss. The U.S. investor also has no economic gain or loss. Nonetheless, absent Code Section 269 and any limitation on capital losses, the corporation may deduct this noneconomic loss against other income.

Based upon the foregoing, it is more likely than not that the loss sustained from the Transactions would be allowable under Code Section 165(a).

**SABWZ0346221**

SIDL 0382034

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 84

     **(b)**    Code Sections 165(c)(2) and 183

     Code Section 165(c)(2) limits an individual's deduction of losses not arising from a business, casualty or theft to those "incurred in any transaction entered into for profit"[24] What matters under Code Section 165(c)(2) is taxpayer's subjective motive for entering into the transaction, as indicated by the objective facts and circumstances. That there is a "reasonable expectation" of a profit is not sufficient.[25]

     Similarly, Code Section 183(a) generally bars deductions attributable to an activity "not engaged in for profit." Treas. Reg. §1.183-2(a) provides that "[a]lthough a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity . . . with the objective of making a profit." In the case of a commercial transaction (as opposed to a "hobby loss" situation), the profit objective need not be the "primary" objective; a taxpayer need only have a good faith expectation of earning a reasonable pre-tax profit from the activities undertaken.[26]

     Despite the literal language of Code Section 165(c)(2) and the apparent parallel language in Code Section 183(a), courts have required that under Code Section 165(c)(2) the taxpayer's profit motive be the "primary" motive for entering into the transaction. The "primary" gloss is derived from a footnote in Helvering v. National Grocery Co., 304 U.S. 282, 289 n. 5, reh'g denied, 305 U.S. 669 (1938), where the Court, in giving examples where the taxpayer's state of mind determined the incidence of income tax, stated that under the 1939 Internal Revenue Code predecessor of Code Section 165(a)(2), the deductibility of losses may depend on whether the taxpayer's motive in entering the transaction was "primarily" profit. The case involved the constitutionality of the accumulated earnings tax and the statement is merely

---

[24]    In the case of a partnership (or entity treated as a partnership), Code Section 165(c)(2) is applied at the partnership level, based on the actions of those who manage the partnership's affairs. Fox v. Comm'r, 80 T.C. 972, 1006 (1983), citing Hager v. Comm'r, 76 T.C. 759, 784 (1981); Andros v. Comm'r, T.C. Memo. 1996-133.

[25]    By contrast with the "reasonable expectation" of profit standard some courts had read into the same language in Section 108 of the Deficit Reduction Act of 1984 ("DRA"). See, e.g., Wehrly v. U.S., 808 F.2d 1311 (9th Cir. 1986), overruled by Landreth v. Comm'r, 859 F.2d 643 (9th Cir. 1988).

[26]    See, e.g., Levy v. Comm'r, supra, 91 T.C. at 869 ("actual and honest objective of making a profit"); Johnson v. U.S., 11 Cl. Ct. 17, 27 (1986) ("objective of, and a reasonable chance of making, a reasonable profit apart from tax considerations").

NY1 5160876v1

**SABWZ0346222**

**SIDL 0382035**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 85

dictum since the Court's point would have been made equally by asserting that what matters is the taxpayer's motive to make a profit.

For the next 45 years, following the National Grocery footnote, cases applied this gloss to bar deduction of losses, but only in a noncommercial setting such as a hobby, the purchase of a personal residence, or another transaction entered into for personal purposes. See, e.g., Ewing v. Comm'r, 20 T.C. 216 (1953), aff'd, 213 F.2d 438 (2d Cir. 1954), and Austin v. Comm'r, 298 F.2d 583, 584 (2d. Cir. 1962),. In Austin, the court explained that the "primary" gloss is a consequence of the apparent conflict between Code Section 165(c)(2), which permits the deduction of losses from a "for profit" transaction, and Code Section 262, which bars a deduction for "personal, living, or family expenses". In a transaction that a taxpayer enters with mixed motives, one must determine which motive predominates to determine which Code provision applies.

By contrast, a loss from a partially tax-motivated transaction is not a "personal" expense, being wholly unlike any of the examples of "personal, living, and family expenses" set out in Treas. Reg. §1.262-1(b). The court in Wier v. Comm'r, 109 F.2d 996, (3d Cir), cert. denied 310 U.S. 637 (1940), made this very point, rejecting the IRS's attempt to disallow the deduction of a loss on a sale of housing cooperative stock. While the taxpayer had testified that he had bought the stock to have a voice in management and because he intended to live in the building, since what the taxpayer had bought was corporate stock, the court inferred an intention to receive profits (dividends or accretion in value) "unless the purchaser knows at the time of purchase that such profits are an impossibility", which was not the case. The court pointed out that the taxpayer's intention to influence the corporation through his stock ownership did not conflict with a profit motive; they could exist side-by-side:

> This last, it will be noted, serves to distinguish the decisions dealing with non-income producing property. If, for instance, the taxpayer has purchased a yacht, his cruising about in it presupposes a state of mind inconsistent with making a profit out of it by chartering. Hence that inconsistency must be resolved by ascertaining whether the intention or motive of pleasure or that of profit is the 'prime thing'.

citing, inter alia, the footnote in National Grocery. The court then concluded:

NY1 5160476v1

**SABWZ0346223**

SIDL 0382036

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 86

> The public coffers are weighted with the same amount from taxes
> on [the stock] dividends, whether the stock is held with the motive
> of voting or with the motive of profit. That portion of petitioner's
> capital was 'used to produce taxable income'. That being so,
> petitioner is entitled to his deduction. We need hardly add that a
> contrary position would only serve to embroil the administrators of
> the taxing statute in a hectic and ridiculous search for non-profit
> motives.

109 F.2d at 998.

A commercial transaction resulting in a tax benefit is no more like the purchase of a yacht
than the purchase of the co-op stock in Wier, as Justice Harlan said in Comm'r v. Brown, 380
U.S. 563, 580 (1965) (concurring opinion), "[A] tax dollar is just as real as one derived from
another source." As late as 1982, the Tax Court suggested in a tax-motivated transaction that
any bona fide nontax motive would suffice, although it failed to find any:

> The mere fact that petitioners may have had a strong tax-avoidance
> purpose in entering into their commodity tax straddles does not in
> itself result in the disallowance of petitioners' losses under section
> 165(c)(2), provided petitioners also had a nontax profit motive for
> their investments at the time. . . . Such hope of deriving an
> economic profit aside from the tax benefits need not be reasonable
> so long as it is bona fide. . . . However, the existence of a nontax
> profit objective is a question of fact on which the petitioners bear
> the burden of proof. . . .
>
> Contemporaneous evidence, we think, belies any nontax motive on
> petitioners' part. [Citations omitted.]

78 T.C. at 391.

Nonetheless, later courts recited the "primary" gloss in opinions on wholly or partially
tax-motivated transactions, without explaining why the gloss should apply. The first case to do
so was Fox v. Comm'r, 82 T.C. 1001 (1984),[27] involving the deductibility of losses from so-

---

[27] The court's citation of cases and its providing an exception to its holding demonstrates its belief that it was
making new law and commentators have so read the case as well. See Gideon, "Mrs. Gregory's
Grandchildren: Judicial Restrictions on Tax Shelters", 5 Va. Tax Rev. 825, 835 (1986); Barrella, "The
Deductibility of Pre-ERTA Straddle Losses—The Impact of Section 108 of the Tax Reform Act of 1984",

NY1 5160876v1

**SABWZ0346224**

SIDL 0382037

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 87

called "vertical option spreads" on Treasury bills, traded on a promoter-sponsored market. In
determining that the taxpayer "was motivated primarily by tax considerations, and not primarily
by the desire for economic profit" — assuming, the court said, the taxpayer had any economic
profit motive at all — the court noted the following factors: the taxpayer had learned of the
market from a tax attorney; the only written material that the taxpayer received from the
promoter was a letter explaining the tax treatment of the transactions; he sustained losses after
commissions yearly for three years; he did not "appear to make profit-maximizing decisions",
switching at year-end into positions offering a lower potential profit and higher potential loss; the
bulk of the trading in the market occurred in November, December, and January; customers
commonly engaged in identical trades; an NASD investigator had concluded that the promoter's
market was suitable only for investors interested only in tax advantages; the market itself closed
with enactment of the anti-tax straddling rules in 1981; and strike prices for the options were set
much higher than the prevailing market price of the particular Treasury bill. The court then
proceeded to "relax" its holding to "allow for those essentially tax-motivated transactions which
are unmistakably within the contemplation of congressional intent."

The "primary" gloss in Fox has been criticized on the ground that it is inconsistent with
the principal that a tax motive will not invalidate an otherwise proper transaction.[28] It is also
technically dictum since the court merely assumed, arguendo, that the taxpayer had any profit
motive. Moreover, the opinion cites no justification for applying the "primarily" gloss to a
commercial transaction and none of the six cases it cites as authority for doing so is, in fact, such
authority. As noted earlier, Austin and Ewing each involved noncommercial transactions, and
the rationale of Austin is limited to such transactions; Weir declined to apply the standard at all
where the taxpayer's non-personal motive did not conflict with his economic motive; and in
National Grocery, the gloss was dictum in a footnote. In the other two cases, Knetsch v. U.S.,
348 F.2d 932, 172 Ct. Cl. 378 (1965), and King v. U.S., 545 U.S. 700 (10ᵗʰ Cir. 1976), the courts,
while reciting the gloss, proceeded to set out a standard in direct contradiction with it.

---

63 Taxes 116, 120 (1985) ("[T]he adoption of the 'primarily for profit' standard, to be applied after
evaluating the tax straddle as a whole, was an enormous IRS victory [emphasis added].") Barrella was one
of three IRS attorneys to litigate Smith and Fox.

[28]   Gideon, supra, citing Gilbert v. Comm'r, 248 F.2d 399, 411 (2d Cir. 1957) (Hand, J., dissenting). Gideon
further asserts that the Fox result can be justified instead based on an analysis of a pre-tax profit potential if
a de minimis profit is ignored.

NYI 5160876v1

**SABWZ0346225**

**SIDL 0382038**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 88

In Knetsch, the appellate Court of Claims, while again reciting that "the determinative question is whether the taxpayer's purpose in entering into the transaction was primarily for profit", citing National Grocery, proceeded to indicate that it thought the test required much less:

> There are two crucial words contained in this test: purpose and profit. . . . Thus, you can have a profit intention side-by-side with a nonprofit motive. However, the statutory requirement 'for profit' can be satisfied by either. . . . By the same token, you can have a prohibited profit motive or intent side-by-side with a legitimate profit motive or intent and meet the statutory requirement.

348 F.2d at 936.

The court then noted that two possible motives or intents could be ascribed to the taxpayers when they purchased annuity contracts on a leveraged basis. The "dominant intent or motive" was to deduct the purported interest. A "secondary purpose" would be to provide for retirement income. The court held, though that although the first purpose would produce a "profit" of sorts, that was not the sort of profit intended to be covered by Code Section 165(c)(2). That is, "the statutory word 'profit' cannot embrace profit seeking activity in which the only economic gain derived therefrom results from a tax reduction", i.e., when "the transaction which gave rise to the loss has been determined to have been 'without economic substance' or a 'sham.'" Now, if the "primary" tax motive were treated the same as a "primary personal" motive, since the court had stated previously that the taxpayer's non-tax motive was "secondary" the court should have stopped here. But it did not. It engaged in no balancing of the taxpayers' tax and nontax motives. Instead, it said:

> [I]n order for the realized loss to be recognized under section 165(c)(2), the permissive profit motive previously discussed is required. Thus taxpayers here are required to show that they intended, when they purchased their annuity contract, to realize a profit through the increase in the cash value of the annuity contract apart from the tax savings.

> It appears that the taxpayers' *only* motivating factor was the tax deduction . . .[Emphasis added.]

348 F.2d at 939.

NY1 516087601

**SABWZ0346226**

**SIDL 0382039**

SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 89

Knetsch is read by Johnson v. U.S., 11 Cl. Ct. 17, 27 (1986), in dictum as suggesting that
"some, arguably even a slight, profit motive, in addition to tax motives will sustain tax
deductions" under Code Section 165(c)(2).[29]

In King, dealing with the deduction of losses from an investment in oil and gas net
operating interests (NOPIs), the court began by stating that "We agree with the IRS that in order
to deduct a loss under [Code Section 165(c)(2)] the taxpayer must show that profit was the
primary motivation", citing Austin and Knetsch,[30] and adding "profit motivation" (not "a
primary profit motivation") was required because the ordinary loss deduction

> *was not intended to extend to a transaction lacking economic
> substance, amounting to nothing more than a sham*[31] ....
> However, while profit motivation is required it is not necessary
> that the venture actually result in a profit. It has been recognized
> that even though the prospects of a profitable operation are
> negligible or even absent, that alone is not conclusive in
> determining the taxpayer's purpose. ... What need be shown is
> that the taxpayer entered into the venture in good faith, for the
> purpose of making a profit. ...Accordingly, in order for an
> ordinary loss deduction to be taken on the NOPIs it must be shown
> that these transactions *were entered in good faith for the purpose
> of making a profit* [Citations omitted; emphasis added].

545 F.2d at 708

While numerous later cases recite the "primarily profit" gloss in commercial transactions
with tax motives, in nearly all the recitation is dictum, sometimes accompanied by contradictory
dictum and, in at least one case, by a disclaimer that the "primarily" gloss is the correct standard.
For the most part, the recitation is dictum because the taxpayer lacked any intent to make a profit
(even if a possibility of profit existed) or because the court held that the "for profit" requirement

---

[29]    One commentator also understands Johnson and the Court of Claims to reject the "primary" gloss.
McGuire, "Tax Shelters: Recent Developments in the Meaning of 'For Profit'", 15 J. Real Estate Tax'n 362
(1986). See also, Illes v. Comm'r, T.C. Memo 1991-449, where the court simply stated that an "actual and
honest profit motive" was sufficient to meet the requirements of Code Section 165(c)(2).

[30]    Which, as shown supra, do not necessarily stand for this proposition.

[31]    Which would be true only if the sole purpose of the transaction were tax avoidance. See, e.g., Lynch v.
Comm'r, 273 F.2d 867, 870 (2d Cir. 1959).

NY1 5160176v1                                                          **SABWZ0346227**

SIDL 0382040

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 90

in DRA Section 108 meant an objective possibility of profit as opposed to a subjective intent to profit, which the court phrased as "primarily for profit". See, e.g., Friedman v. Comm'r, 869 F.2d 785 (4th Cir. 1989); Wehrly, supra. By contrast, in Laureys v. Comm'r, 92 T.C. 101 (1989), the court held that the taxpayer entered into a straddle on a public market for the "primary" purpose of realizing a profit, but in testimony the taxpayer had denied any tax motive for the transaction and the IRS's only proffered evidence was that the tax benefits were disproportionate to the potential economic gain, so once again the recitation of the gloss is dictum. Other cases, like King, juxtapose a recitation of the gloss with a citation of cases that do not support its application in commercial transactions or a statement that the taxpayer need merely enter the venture "in good faith, for the purpose of making a profit", bringing into question whether the court intended the gloss to be taken literally. For example, in Miller v. Comm'r, 836 F.2d 1274 (10th Cir. 1988), denying the deduction of losses from a straddle transaction, the court cited National Grocery, Austin, Knetsch and King in support of applying the gloss, and then, quoting King, stated:

> Losses from a transaction entered into in part for tax-avoidance may still be allowable under §165(c)(2), provided the required nontax profit motive predominates. . . . In other words, the tax tail cannot wag the business judgment dog; there must be an economic purpose for the transaction other than tax-avoidance. . . .. The taxpayer, however, need not ultimately show that the transaction was profitable. "What need be shown is that the taxpayer entered into the venture in *good faith*, for the purpose of making a profit" at the time of entering into the transaction. [Citations omitted; emphasis in original].

836 F.2d at 1279.[32]

---

[32] Ironically, the two Tax Court decisions reversed by Miller, Miller v. Comm'r, 84 T.C. 827 (1985) and Kurtz v. Comm'r, T.C. Memo. 1985-410, are among the very few cases to have found that the taxpayer had an actual profit motive that was "incidental" (Miller) or "secondary" (Kurtz) to a tax motive. Both cases nonetheless held that under DRA Section 108, "a reasonable prospect of some profit" was sufficient. On this point, they were reversed on appeal. Computer searches reveal no other cases that balance actual tax and "incidental" or "secondary" nontax motives. Cf. Ewing v. Comm'r, 91 T.C. 396 (1988), aff'd in unpub. opinion, 940 F.2d 1534 (9th Cir. 1991) (nontax motive assumed); Thumer v. Comm'r, T.C. Memo 1990-529 ("we find that petitioner had no more than an incidental interest in potential economic gain"); Leslie v. Comm'r, T.C. Memo. 1996-86, aff'd, 146 F.3d 643 (9th Cir. 1998), cert. denied, 525 U.S. 1071 (1999) (listing reasons why profit motive not primary without holding that one existed).

NY1 5160876v1

**SABWZ0346228**

**SIDL 0382041**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 91

And in Yosha, the court stated that it need not decide whether the standard was "for profit" or "primarily for profit" (thus showing that it believed the question to be open) because

> By either standard--"no nontax motive or consequences," the test
> under the judge-made doctrine of substance over form, applicable
> to all deductions, or "no predominant nontax motive," the statutory
> test applicable to the deduction of losses--this is an easy case.
> There was no nontax profit motive and the transactions did not
> impinge on the world. . . . Forget the gloss: the effort here to turn
> paper losses into tax benefits was contrary to the original,
> unembellished purpose of section 165(c)(2), on which see Fox v.
> Comm'r [citation omitted].

861 F.2d at 499.

Even some of those cases that appear to apply the "primary" gloss—and even then without specifically finding that the taxpayer had a profit motive at all—do so in circumstances where, for the most part, the taxpayer's conduct is inconsistent with a profit motive. For example, in Keeler v. Comm'r,[33] the court looked to such factors as the taxpayer's continued trading even while he and every other non-insider were losing money on the bulk of their transactions; his losses offsetting almost all of his income over a three-year period; his leaving a large balance in his margin account "making net profit on his [trading] activities all but impossible"; and his continued trading even though it was clear that prices and participation on the market were fixed, exiting the program only when Congress eliminated its tax benefits in 1984. Moreover, the court distinguished cases such as Laureys where "the trading at issue occurred on established markets and was part of taxpayers' overall profit-motivated strategy to hedge their investments."[34] And in cases such as Ewing, one factor was that the trades were closed out in a noncommercial manner, designed to maximize tax benefits, and requiring a higher commission.[35]

The word "primary" does not appear in Code Section 165(c)(2). As the Seventh Circuit observed in a similar case, "[W]e find no basis therein for our undertaking to put words into the

---

[33]    Supra. See also, Sevkota v. Comm'r, T.C. Memo. 1991-234, supp. T.C. Memo. 1991-541.

[34]    243 F.3d at 1219.

[35]    Supra, 146 F.3d at 646.

NY1 5160876v1

**SABWZ0346229**

**SIDL 0382042**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 92

statute that, whatever the reasons may have been, Congress did not put there. Our task is to construe and apply, not to write, legislation."[36]  Inserting it to govern a commercial transaction is not required by a construction of the statute,[37] is inconsistent with its justification in noncommercial transactions, is inconsistent with the longstanding principle that a tax avoidance motive will not void an otherwise proper transaction, and is unsupported by precedent appearing before 1984. Few courts have recited the "primary purpose" standard in commercial cases with tax motives other than as dictum, and some of the same cases contain contrary dictum. We believe that an appellate court faced squarely with the issue of whether a primary tax avoidance motive prevents an individual with some bona fide non-tax profit motive from deducting a loss could well hold that it does not. This is particularly true in the Court of Claims, a forum open to all taxpayers. Moreover, to the extent the "primary" gloss applies to transactions in which a tax motive is a factor, we believe that courts likely would apply it only where, in the main, the taxpayer acts inconsistently with any profit motive. Furthermore, while some of the factors present in such cases as Fox, Keeler and Ewing are present in the Transactions, we believe that they are largely distinguishable because the Transactions are entered into with independent counterparties (making the Transactions more like those in Laureys) at fair market prices and with commissions that are not excessive; there exist no promotional materials setting out anticipated tax benefits; the managers of International are informed daily of the values of International's positions and act on this information to maximize profits; there exists a reasonable prospect of a profit; and in general the Transactions are consummated in what we understand to be a commercially reasonable manner. For all of these reasons, it is likely that the requisite profit motive would exist to support the deduction of the loss under Code Sections 165(c)(2) and 183.

---

[36]  International Trading Co. v. Comm'r, 484 F.2d 707, 711 (7th Cir. 1973); see also, De Soto Securities v. Comm'r, 235 F.2d 409, 410 (7th Cir. 1956) ("Courts have no right, in the guise of construction of an act, to either add words to or eliminate words from the language used by congress. We may also consider pertinent legislative history pertaining to events both before and after the passage of the act being construed. We have no right to first determine the legislative intention and then proceed to change the words used in an attempt to justify the predetermined conclusion).

[37]  Cf., Gitlitz v. Comm'r, 531 U.S. 206, 212 (2001) (looking to "text and structure of the statute"); Arkansas Best Corp. v. Comm'r, 485 U.S. 212 (1988).

NY1 5160876v1

SABWZ0346230

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 93

> **(c)**    **Notice 2000-44**
>
> **i.**    **Description of Notice 2000-44**

Notice 2000-44, supra, describes two arrangements that the IRS and the Treasury believe "have been designed to produce noneconomic tax losses on the disposition of partnership interests. These arrangements purport to give taxpayers artificially high basis in partnership interests and thereby give rise to deductible losses on disposition of those partnership interests."

> The arrangement having relevance here is described as follows:
>
> [A] taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.
>
> ...[T]he taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under section 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, ... the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

Among other things, the Notice states that "[t]he purported losses resulting from the transaction described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of section 165."

NY1 5160876v1

SABWZ0346231

SIDL 0382044

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 94

### ii.    Authority to Issue Notice 2000-44

IRS Notices are issued under the statutory authority of Code Section 7805(a) which states: "the Secretary [of the Treasury]...shall prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code. Furthermore, authority for the issuance of Notices exists in Treas. Reg. §301.7805-1(a) which states: "[t]he Commissioner [of the Internal Revenue Service], with the approval of the Secretary [of the Treasury] shall prescribe all needful rules and regulations for the enforcement of the Code ... including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." However, Section 7805(b)(1)(C) of the Code limits the express statutory authority for Notices to those "substantially describing the expected contents of any temporary, proposed, or final regulation."

Under Code Section 7805(b)(1)(C), a proposed, temporary, or final Treasury Regulation may be given retroactive effect to the date on which, among other things, "any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public." It appears that the rationale for granting this statutory authority was to enable the Treasury Department and the IRS to secure retroactive effect for intended future Treasury Regulations by giving notice of its intent to issue such Regulations while affording it the appropriate time to properly substantially and procedurally issue such regulations. Therefore, we believe that the retroactive application of Treasury Regulations to the date of the issuance of the Notice as provided in Code Section 7805(b)(1)(C) requires the Notice to contain some indication of an intent to issue Treasury Regulations. It does not appear that Notice 2000-44 contains such an intent since it neither describes in any detail the contents to be included in a future temporary, proposed, or final regulation nor does it reference any specific intent to issue future regulations under any specific statutory provision. Compare, Notice 97-21, 1997-1 CB 407. Consequently, it is at least questionable whether Notice 2000-44 is properly issued under Code Section 7805.

### iii.    Legal Weight Accorded an IRS Notice

For purposes of the penalty provisions of Code Section 6662, the IRS considers . Notices authority that will be binding on the IRS and can be relied on by taxpayers to the same

**SABWZ0346232**

**SIDL 0382045**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 95

extent as a Revenue Ruling or a Revenue Procedure.[38]  Revenue Rulings do not have the force or effect of Treasury Regulations.  Treas. Reg. §601.601(d)(2)(v)(d).

There appears to be only one case in which a court weighed the effect to be given an IRS Notice, and in that case the court treated an IRS Notice as if it were a Revenue Ruling. Constantino v. TRW, Inc., 13 F.3d 969, 980-981 (6th Cir. 1994).  Even if one assumes the Sixth Circuit's approach of treating a Notice as a Revenue Ruling is correct, there nonetheless exists a lack of uniformity among the courts in their treatment of Revenue Rulings.

As a general matter, the Tax Court is inclined to treat a Revenue Ruling merely as the view of one of the parties to the litigation.  See, e.g., Trinova Corp. and Subsidiaries v. Comm'r, 108 T.C. 68 (1997).  The Tax Court has stated that it considers a Revenue Ruling to be "advisory only" and a mere "useful guide, outlining some of the factors to be considered" in interpreting the Code.  Burck v. Comm'r, 63 T.C. 556 (1975) aff'd 533 F.2d 768 (2d Cir 1976). Rather than giving deference to Revenue Rulings, the Tax Court has treated the rulings as "merely the Commissioner's position with respect to a specific factual situation."  Pasqualini v. Comm'r, 103 T.C. 1, 8 n. 8 (1994) (citing Tandy Corp v. Comm'r, 92 T.C. 1165, 1170 (1989)).

The Circuit Courts, however, have struggled with the exact deference, if any, to give to Revenue Rulings.  The Fifth Circuit has recognized that "revenue rulings are odd creatures unconducive to precise categorization in the hierarchy of legal authorities.  They are clearly less binding on the courts than treasury regulations or Code provisions, but probably (and in this circuit certainly) more so than the mere legal conclusions of the parties."  McLendon v. Comm'r, 135 F.3d 1017 (5th Cir. 1998).  Likewise, the Third Circuit Court of Appeals has stated that it will "give weight to IRS revenue rulings and [will] not disregard them unless they 'conflict with the statute they purport to interpret or its legislative history, or if they are otherwise unreasonable.'"  Gillis v. Hoechst Celanese Corp., 4 F.3d 1137, 1145 (3rd Cir. 1993), cert. denied, 511 U.S. 1004 (1994) (quoting Geisinger Health Plan v. Comm'r, 985 F.2d 1210,

---

38    Rev. Rul. 90-91, 1990-2 CB 262.  It is also important to note that the authority of the IRS to issue Revenue Rulings is derived directly from its regulatory authority.  Treas. Reg. §601.201(a)(5) and §601.601(d)(2)(v) define what constitutes a Revenue Ruling and sets forth its effects.  With the exception of Code Section 7805(b)(1)(C), there is no such provision, statutory or regulatory, that provides for either the parameters for issuing Notices or their effect.  Thus, for the reasons discussed above, an argument exists that the IRS does not have the requisite authority to bind taxpayers or courts to a Notice, though the IRS is free to bind itself as it did in Rev. Rul. 90-91.

NY1 5160876v1

**SABWZ0346233**

SIDL 0382046

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 96

1216 (3rd Cir. 1993). Similarly, in discussing a Revenue Ruling, the Fourth Circuit in Wood
noted, without holding, that "it is well established that considerable weight is to be given to an
agency's construction of a statute that it is charged with administering." Wood v. Comm'r, 955
F.2d 908, 913 (4th Cir. 1992), cert. dismissed 505 U.S. 1231 (1992). Additionally, the Second
Circuit has held that a Revenue Ruling is presumed to "'have the force of legal precedent unless
unreasonable or inconsistent with the provisions of the Internal Revenue Code." Gillespie v.
U.S., 23 F.3d 36, 39 (2d Cir. 1994) (quoting Salomon, Inc. v. U.S., 976 F.2d 837, 841 (2d Cir.
1992). However, the Second Circuit's decisions in Gillespie and Salomon, Inc. seem
irreconcilable with its statement in Canisius College v. U.S. that "the statutory interpretation [of]
a revenue ruling does not have the force of law and is of little aid in interpreting a tax statute."
Canisius College v. U.S., 799 F.2d 18 n. 8 (2d Cir. 1986) cert. denied 481 U.S. 1014 (1987)
(citing Dixon v. U.S., 381 U.S. 68, 73 (1965); Biddle v. Comm'r, 302 U.S. 573, 582 (1938);
Temple University v. U.S., 769 F.2d 126, 137 ( 3d Cir. 1985) cert. denied 476 U.S. 1182 (1986)).
The Ninth Circuit followed the Second Circuit's opinion in Salomon, Inc. and afforded Rev. Rul.
82-20 "great deference" where the Ruling was neither unreasonable nor inconsistent with the
Code. Walt Disney Inc. v. Comm'r., 4 F.3d 735 (9th Cir. 1993).

Notwithstanding this lack of uniformity among the courts as to what weight, if
any, to afford Revenue Rulings, the courts "have not looked favorably upon bootstrapping
revenue rulings issued shortly prior to or after the initiation of litigation." Ludwig v. Comm'r,
68 T.C. 979 n. 4 (1977) (citing Fribourg Navigation Co. v. Comm'r, 383 U.S. 272, 279 (1966),
rev'g 335 F.2d 15 (2d Cir. 1964); Busse v. Comm'r, 479 F.2d 1147, 1152 n. 12 (7th Cir. 1973)).
See also, Silco, Inc. v. U.S., 779 F.2d 282 (5th Cir. 1986).

As a result, the weight given to a Revenue Ruling in litigation will generally
depend upon the forum chosen. At best, Revenue Rulings will be given little or no weight and at
worst a court will give significant deference to a Revenue Ruling. However, the amount of
deference, if any, afforded to a Revenue Ruling by a court will be further dependent upon the
context in which it was issued. Moreover, if the Revenue Ruling is issued in connection with
litigation, a court that would otherwise give deference to a Revenue Ruling may give it no
weight at all. Consequently, were the IRS to contend that Notice 2000-44 were to apply to the
Transactions and a court were to treat the Notice as if it were a Revenue Ruling, it is more likely
than not that the Notice would not constitute authority that would bind a court, but could be

NY1 516017691

**SABWZ0346234**

**SIDL 0382047**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 97

given significant weight by the court in reaching its conclusion and in that case it would have to
be distinguished on the basis of fact or by refuting the legal analysis upon which it relies.

iv.     **Application of Notice 2000-44 and the**
        **Authorities cited therein to the Transactions**

As support for its position in Notice 2000-44 that the losses described therein
were not "bona fide" and did not reflect "actual economic consequences", the Ruling cited ACM
Partnership v. Comm'r, supra; Scully v. U.S., supra; and Shoenberg v. Comm'r, supra. See also,
Rev. Rul. 2000-12, supra, Situation 1, and Notice 99-59, supra, in which the IRS took the same
position in reliance on the same authorities. These authorities have been addressed in the context
of the Transactions above.

As discussed above, in the instant case the Transactions were motivated by non-
tax reasons and so more likely than not would not be treated as "shams in substance". In the
instant case, the Transactions were not structured to insure that there was no economic change of
position for International, as was the case for the so-called Citicorp notes in the ACM case.
Consequently, as we discussed above, it is more likely than not that the reasoning set forth in
ACM for concluding a loss is not "bona fide" would not be applicable to the loss sustained from
the Transactions. With respect to Scully v. U.S., supra, and Shoenberg v. Comm'r, supra, in the
instant case neither Investor nor International continued to own, beneficially or otherwise, the
asset that generated a loss. Accordingly, as discussed above, it is more likely than not that the
reasoning set forth in Scully and Schoenberg for denying a loss deduction would not be
applicable to the loss sustained from the Transactions. As a result, it is more likely than not that
the authorities cited in Notice 2000-44 would not provide a basis for denying the deduction of a
loss sustained from the Transactions.

Furthermore, it is possible to argue that the Transactions are not "the same as or
substantially similar to" (within the meaning of Treas. Reg. §301.6111-2T(b)(2)) the transactions
set out in the Notice because (i) in the transaction described in the Notice, the contribution of the
option spread directly results in a tax loss when the investor disposes of his partnership interest,
while in the Transactions, the increased outside basis resulting from the contribution of the
option spread simply permits Investor to deduct a loss incurred by International on a transaction
based on entirely different tax principles, and, more pertinently, (ii) in the transaction described
in the Notice, the taxpayer's net economic outlay is described as "zero or nominal" while in the

NYI 5160876v1

**SABWZ0346235**

SIDL 0382048

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 98

Transactions, in absolute terms it is far greater than "nominal". See, <u>Transamerica Corp. v. U.S.</u>, 15 Cl. Ct. 420 (Cl. Ct. 1988), aff'd <u>on other issue</u>, 902 F.2d 1540 (Fed. Cir. 1990); <u>Oesterreich v. Comm'r</u>, 226 F.2d 798 (9th Cir. 1955); <u>Watson v. Comm'r</u>, 62 F.2d 35 (9th Cir. 1932); Rev. Rul. 55-541, 1955-2 CB 19.

    3.    **Disregard of Co-investor: Brief Ownership and Step transaction Doctrine**

    The IRS might contend that Co-investor's ownership of the bulk of his common interest in International should be disregarded because (i) the period of ownership is too brief a time to be treated as real ownership or (ii) it is merely a step to be integrated with other steps under the "step transaction doctrine". If the IRS were successful in such contention, Investor would be treated as owning this portion from the beginning.

    (a)    **Brief Ownership**

    Ordinarily, a taxpayer owns an asset for tax purposes if he has the "benefits and burdens of ownership" of that asset. In Rev. Rul. 82-144, 1982-2 CB 34, the IRS stated:

> Although no absolute rule can be established to determine which party to a transaction will be considered the owner of the property involved in all situations because of the factual nature of the issue, as a general rule the party to the transaction that bears the economic burdens and benefits of ownership will be considered the owner of the property for federal income tax purposes. In making the determination of which party bears the economic burdens and benefits of ownership, two significant factors of ownership are: (1) which party to the transaction has the right to dispose of the property; and (2) which party bears the risk of profit or loss with respect to the property.

    Thus, in the Ruling, the taxpayer was held to own a tax-exempt bond even though he had simultaneously acquired a right to put the bond to the seller. Here, during the time Co-investor owned the bulk of the common interests, he had the benefits and burdens of ownership of those interests. Investor did not since he had no right to share in the profits or losses allocable to that interest. Since International's assets were volatile, the common interest holder's right to

NY1 5160876v1

**SABWZ0346236**

SIDL 0382049

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 99

share in profits and losses, even for a brief period, cannot be said to be illusory.[39]  Therefore, under the standard of Rev. Rul. 82-144, it is more likely than not that Co-investor, not Investor, owned the bulk of the common interest until it was purchased by Investor.

Moreover, the Ruling does not set out a minimum period for which the bondholder would need to own the bond to be considered its owner.  In fact, the Ruling deals with short-term bonds (those with maturities of one year or less) and states, as a ground for the holding, that "all of the 'puts' are for periods substantially less than the life of the obligations to which they apply."  See also, Intermountain Lumber Co. v. Comm'r, 65 T.C. 1025, 1031-32 (1976):

> A determination of "ownership," as that term is used in section 368(c) and for purposes of control under section 351, depends upon the obligations and freedom of action of the transferee with respect to the stock when he acquired it from the corporation.  Such traditional ownership attributes as legal title, voting rights, and possession of stock certificates are not conclusive. If the transferee, as part of the transaction by which the shares were acquired, has irrevocably foregone or relinquished at that time the legal right to determine whether to keep the shares, ownership in such shares is lacking for purposes of section 351.  By contrast, if there are no restrictions upon freedom of action at the time he acquired the shares, *it is immaterial how soon thereafter the transferee elects to dispose of his stock or whether such disposition is in accord with a preconceived plan not amounting to a binding obligation.*

[Emphasis added; citations omitted.]

That even brief ownership is respected for federal income tax purposes, so long as during that period the titular owner has the economic benefits and burdens of ownership, is implicit in Congress's legislative response to so-called "dividend-stripping" transactions, in which a corporate taxpayer would purchase stock immediately before the record date and sell it soon after.  The stock would trade ex-dividend at a price reflecting the dividend to be paid the holder on the record date, so the taxpayer would receive the dividend subject to a dividends-

---

[39]    We understand that during this period, there was a substantial possibility that, for example, the value of the partnership's net assets could have doubled or instead declined in value to the point that, but for the anti-dilution provision, the other common interest holder's interest would be worthless.

NY1 5160176v1

**SABWZ0346237**

**SIDL 0382050**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 100

received deduction and a capital loss roughly equal to the dividend. Code Section 246(c), as
originally added by the Technical Amendments Act of 1958, required that to receive the
deduction, the taxpayer had to hold the stock for at least 15 days (and be under no obligation to
sell substantially identical stock during this period). Under the House version of the bill that
ultimately became law, the minimum holding period was only 10 days. H. Rep. No. 775, 58th
Cong., 1st Sess., 1957, 1958-3 CB 811, 824. While the minimum holding period was lengthened
to 45 days in 1984, this history demonstrates that absent the statute, which applies by its terms
only to the dividends-received deduction, a taxpayer ordinarily is treated as owning an asset
during the period he owns it (and only during that period), no matter how short the time he owns
the asset.

   Based upon the foregoing, it is more likely than not that the IRS would not be
successful were it to contend Co-investor's ownership of his common interest in International
should be disregarded because the period of ownership is too brief a time to be treated as real
ownership.

  **(b)**  **Step Transaction Doctrine**

   In determining the tax consequences of a series of events, the courts use a step
transaction analysis to determine the scope of the transaction to which the tax law should be
applied. The step transaction doctrine combines and treats a series of separate steps "as a single
transaction if they are in substance integrated, interdependent, and focused toward a particular
end result." Bittker & Lokken, Federal Taxation of Income, Estates and Gifts (2d ed.), ¶4.3.5.
The courts have articulated three different formulations of the step transaction doctrine: the
"binding commitment" test, the "interdependence" test, and the "end result" test. Penrod v.
Comm'r, 88 T.C. 1415, 1429 (1987).

   Under the "binding commitment" test, a series of transactions are integrated only
if there is a binding legal commitment to undertake each of the steps. Comm'r v. Gordon, 391
U.S. 83, 96 (1968). It is more likely than not that this formulation would not apply to the
Transactions because Co-investor was under no binding commitment to sell his common
interests to Investor. Similarly Investor was under no binding commitment to transfer the
Contributed Options to International.

NY1 5160876v1

**SABWZ0346238**

SIDL 0382051

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 101

Under the "interdependence" test, a series of transactions are integrated only if the steps are "so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." Manhattan Building Co. v. Comm'r, 27 T.C. 1032, 1042 (1957), acq., 1957-2 CB 5. The interdependence test focuses on whether the first step would have occurred without the second. For example, in Associated Wholesale Grocers, Inc. v. U.S., 927 F.2d 1517 (10th Cir. 1991), the court applied the interdependence test to integrate two purportedly independent transactions and deny the claimed loss because the two agreements were, by their terms, dependent on each other. Unlike the factual situation in Associated Wholesale Grocers, each transaction described above had independent significance. See also, Security Industrial Insurance Co. v. U.S., 702 F.2d 1234 (5th Cir. 1983). Where each step has independent economic significance, the courts will not integrate the steps. Redding v. Comm'r, 630 F.2d 1169 (7th Cir. 1980), cert. denied, 450 U.S. 913 (1981). In Rev. Rul. 79-250, 1979-2 CB 256, mod., Rev. Rul. 96-29, 1996-1 CB 59, the IRS agreed, but also inserted a requirement that each step must be "undertaken for valid business purposes and not mere avoidance of taxes."

Based upon the foregoing, since each transaction, including Co-Investor's ownership of his common interests and Investor's ownership of the Contributed Options, has independent economic significance, it is more likely than not that the "interdependence" formulation of the step transaction doctrine would not be applicable to the transactions. Furthermore, even adopting the position of the IRS in Rev. Rul. 79-250, based on the representations made to us, each of the transactions undertaken by the parties was supported by a reasonable expectation of profit.

The "end result" formulation integrates a series of transactions into a single transaction "when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." King Enterprises, Inc. v. U.S., 418 F.2d 511, 516 (Ct. Cl. 1969). However, at least some courts have indicated, and at least one commentator maintains, that the test, like the "interdependence" test, applies only to "steps" that have no independent economic significance. McDonald's of Zion v. Comm'r, 76 T.C. 972 (1981), rev'd sub. nom. McDonald's of Illinois, Inc. v. Comm'r, 688 F.2d 520 (7th Cir. 1982); True v. U.S., 190 F.3rd 1165 (10th Cir. 1999); Boca, supra; Bowen, "The End Result Test", 72 Taxes 722, 723 (1994). See also, Norwest Corp. v. Comm'r, 108 T.C. 265 (1997) ("a step in a series of transactions or in an overall transaction that has a discrete business purpose and a discrete economic significance, and that appropriately triggers an incident of

NY1 51608769v1

**SABWZ0346239**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 102

federal taxation, is not to be disregarded. Further, the simultaneous nature of a number of steps does not require all but the first and the last (or 'the start and finish') to be ignored for federal income tax purposes", quoting G.M. Trading Corp. v. Comm'r, 106 T.C. 257, 267 (1996), supplementing103 T.C. 59 (1994), rev'd on other grounds, 121 F.3d 977 (5th Cir. 1997)). This potential limitation reflects the reality that the test cannot possibly be applied literally because if it were, it would apply to all business transactions that, for purely business reasons, are consummated in segments.

An example of how the courts have limited the expansive scope of the end-result test is Esmark, Inc. v. Comm'r, 90 T.C. 171 (1988), aff'd without published opinion, 886 F.2d 1318 (7th Cir. 1989). In Esmark, the taxpayer wanted to dispose of certain businesses owned by one of its subsidiaries. Mobil, an unrelated company, acquired a portion of Esmark's outstanding shares from the public in a tender offer, and then tendered these shares to Esmark in exchange for stock of a wholly-owned subsidiary of Esmark. Under the law at the time, the exchange of the subsidiary's stock for the Esmark shares was tax-free at the corporate level. By contrast, a sale of the subsidiary's stock for cash, which could then have been used to buy back the Esmark shares, was taxable at the corporate level.

Although it recognized that the reduction of taxes was a significant factor in structuring the transaction, that Mobil's tender offer was part of an overall plan, and that Mobil, not Esmark, had borne the economic cost of the tender offer, the Tax Court held that Mobil's ownership of the Esmark shares, "however transitory," must be respected, and the transaction treated as a redemption of the Esmark shares. In rejecting the IRS's attempt to apply the step transaction doctrine to recast the transactions, the court stated:

> That Mobil's tender offer was but part of an overall plan is not in dispute. The existence of an overall plan does not alone, however, justify application of the step-transaction doctrine. Whether invoked as a result of the "binding commitment," "interdependence, " or "end result" tests, the doctrine combines a series of individually meaningless steps into a single transaction. In this case, respondent has pointed to no meaningless or unnecessary steps that should be ignored.
>
> Respondent proposes to recharacterize the tender offer/redemption as a sale of the Vickers shares to Mobil followed by a self-tender. This recharacterization does not simply combine steps; it invents

NY1 3180876v1

SABWZ0346240

SIDL 0382053

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 103

new ones. Courts have refused to apply the step-transaction
doctrine in this manner.

90 T.C. at 195-197. The court further noted that each of the steps "had permanent economic
consequences," and could not be combined. 90 T.C. at 198. See also, Grove v. Comm'r, 490
F.2d 241 (2d Cir. 1973) and Carrington v. Comm'r, 476 F.2d 704 (5th Cir. 1973). The Tax
Court subsequently reaffirmed the Esmark step transaction analysis. Turner Broadcasting
System Inc. v. Comm'r, 111 T.C. 315 (1998).[40]

More recently, in True v. U.S., supra, the Court of Appeals affirmed the District
Court's summary judgement in favor of the IRS regarding the integration of one series of
transactions under the "end result" formulation of the step transaction doctrine, where the
evidence clearly showed that the end result intended from the outset was the sole outcome
intended to be achieved by entering into the transactions from the outset. With respect to such
series of transactions, the Court of Appeals also concluded that such integration would be
appropriate under the "mutual interdependence" formulation as well, because the facts showed
that each of the steps would have been fruitless without the others. The Court of Appeals,
however, reversed the District Court's summary judgement integrating another series of
transactions. The Court of Appeals concluded that there was a factual issue under the "end
result" formulation, because the evidence created a genuine factual issue as to whether the end
result achieved was the sole intended result from the outset. The Court of Appeals concluded
that there similarly was a factual issue under the "mutual interdependence" formulation, because
it appeared that the each of the steps might have economic significance on its own. The
conclusion that can be drawn from the True decision appears to be that if the facts demonstrate
that at the time of entering into series of transactions an investor has in mind a sole outcome and
no other outcome can be discerned, a court can apply the "end-result" formulation of the step
transaction doctrine to disregard intermediate steps, particularly if those intermediate steps had
so little economic significance on their own to fall within the "mutual interdependence"
formulation.

---

40    The IRS agrees that the step transaction doctrine does not permit the creation of new steps or the reordering
of existing steps. See, Rev. Rul. 78-197, 1978-1 CB 83. In each of PLR 8815003 (December 11, 1987);
PLR 8738003 (May 22, 1987); PLR 8735007 (May 18, 1987); and PLR 8735006 (May 18, 1987), an
unrelated underwriter acquired a corporation's outstanding debt, exchanged that debt for other securities of

**SABWZ0346241**

SIDL 0382054

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 104

In both Salomon, Inc v. U.S., 976 F.2d 837 (2d Cir. 1992) and Walt Disney, Inc. v. U.S., 4 F.3d 735 (9th Cir. 1993), the issue was whether a transfer of assets to a subsidiary as part of a divisive "D" reorganization resulted in the recapture of investment credit. While both courts seemed to apply the "end result" formulation to integrate the transfer of assets and subsequent spin-off, each court cited facts that would indicate a "binding commitment" or "mutual independence" test. In Walt Disney, the court cited an overall intention for the steps to occur, and the fact that the company had a legal obligation to transfer the assets and distribute the stock. In Salomon, the court based its conclusion in part on the fact that at the time of the asset transfer the taxpayer intended to spin off the stock, establishing the interdependence of the steps. The District Court concluded that such interdependent relationship also existed in the series of transaction integrated under the step transaction doctrine in True.

Investor and Co-investor was each placed at risk with respect to its respective investment in International and Investor was placed at risk with respect to Investor's ownership of the Contributed Options. Thus, the transactions had the type of economic significance lacking in the integrated transactions in True and in Salomon. Investor and Co-investor each also had available a number of alternative transactions with respect to Investor's and Co-investor's respective investment in International and Investor's ownership of the Options. Consequently, although the issue is inherently a factual one, based on Esmark it is more likely than not that the "end result" formulation of the step-transaction doctrine would not apply to the Transactions described above.

Lastly, the IRS might argue that one of the formulations of the step transaction doctrine should apply because Investor is effectively compelled to purchase the bulk of the common interests from Co-investor. Even assuming that an "economic compulsion" doctrine exists, the argument is factually flawed. No economic considerations "compel" Investor to purchase. To the extent Investor is compelled to purchase to obtain the tax benefits, this "compulsion" comes into play only after the gain has been recognized. In the interim, the original common interest holders have all of the economic benefit and risk of loss. Also, there is no certainty at the beginning of the transaction that the tax law will not somehow change in the

---

the corporation, and then sold such other securities to the public. In each technical advice memorandum, the IRS held that the step transaction doctrine cannot be applied to reverse the order of the transactions.

NY1 5160876v1

**SABWZ0346242**

SIDL 0382055

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 105

interim, so that there was no certainty, going into the Transactions, that the purchase option would be exercised as a practical matter.  Moreover, as Bowen, supra, states:

> It is submitted that: In the absence of any binding commitment, the individual steps in a multi-step corporate stock transaction should not be stepped together or collapsed, unless they are mutually interdependent.
>
> 1.    Such individual steps should not be regarded as mutually interdependent if they have independent economic significance . . .
>
> 2.    If a party to a particular transactional step has obtained or parted with the traditional benefits and burdens of stock ownership, this should be a sufficient reason for concluding that such step has independent economic significance....
>
> 3.    There may be circumstances in which some form of economic compulsion—other than a binding commitment—makes the completion of later steps extremely likely, if not a foregone conclusion. . . .
>
> The concept of economic compulsion is introduced because it logically extends, and protects the integrity of, the position taken herein, not because there is any (clear) authority supporting it.  If the concept is valid, however, it should be narrowly construed, so as to avoid the openendedness characteristic of the end result test. . . . [T]he concept of economic compulsion should not include such things as . . . consistent with Gregory, the likely consequences of potentially applicable federal income tax rules.

72 Taxes at 727.  Accordingly, it is more likely than not that Co-investor's initial ownership of the bulk of the common interests likely would not be disregarded as "transitory".

Based on the foregoing analysis, it is more likely than not that the step transaction doctrine would not apply to the Transactions.

NY1 51608Xvi

**SABWZ0346243**

**SIDL 0382056**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 106

 4.    **The Partnership Anti-Abuse Regulations;**
       **Disregard of International under Common Law**

        In December 1994, the IRS issued Treas. Reg. §1.701-2 (the "Anti-Abuse Regulations")
in an effort to stop what it perceived were abuses of the partnership form.  These Regulations
consist of two broad rules: the "abuse of subchapter K rule" and the "abuse of entity rule."

        Notwithstanding a transaction's literal compliance with the Code and Regulations, the
Regulations authorize the IRS to recast the transaction for federal tax purposes as it deems
appropriate if the requirements of the Anti-Abuse Regulations are satisfied.  The IRS can  (1)
disregard the partnership in whole or in part;  (2) treat one or more partners as not partners;  (3)
adjust the method of accounting used by the partnership or a partner to clearly reflect the
partnership's or the partner's income;  (4) reallocate the partnership's income, gain, loss, credit,
or deduction; or  (5) otherwise adjust or modify the claimed tax treatment.  Treas. Reg. §1.701-
2(b).  In addition, the IRS can treat a partnership as an aggregate of its partners to carry out the
purpose of the Code or Treasury regulations.  Treas. Reg. §1.701-2(e).

        (a)    **Validity of the Regulations**

                These Regulations were severely criticized by practitioners and commentators
when they were adopted as being invalid, and the controversy has not been resolved.  It is
reasonable to believe that the validity of these Regulations will be challenged in court.

                The commentators have argued that the Regulations are invalid because they are
vague and lack clear and workable standards.[41]  The language of the Regulations is exceedingly
broad, and even the inclusion of examples in the final Regulations does not help to elucidate the
meaning of the broad terms.  Further, it has been argued that the Regulations are invalid as they
were adopted in violation of Executive Order 12866.  This Executive Order applies to all
significant regulatory actions, which includes a Treasury Regulation, that is likely to result in a
rule that may (i) have an annual effect on the economy of $100 million or more; (ii) adversely

---

41    See, e.g., McKee, Nelson and Whitmire, Federal Taxation of Partnerships and Partners supra, at ¶1.05;
      Banoff, Anatomy of an Anti-Abuse Rule: What's Really Wrong with Reg. Section 1.701-2, 66 Tax Notes
      1859 (March 20, 1995); Gouwar, The Proposed Partnership Anti-Abuse Regulation: Treasury Oversteps Its
      Authority, 11, J. of Partnership Tax'n 287 (1995).

NY1 510087v1

**SABWZ0346244**

SIDL 0382057

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 107

affect in a material way the economy or a sector; or (iii) raise novel legal or policy issues. The
partnership Anti-Abuse Regulations satisfy each of these requirements.

       Commentators have also asserted that the Regulations are invalid because they are
an unconstitutional usurpation of legislative and judicial powers. The Regulations grant the IRS
the power to disregard the language of the statute when literal compliance with specific
provisions is not consistent with the "intent" of subchapter K, and then creates that intent without
relying on anything of Congressional origin. In adopting subchapter K as part of the Internal
Revenue Code of 1954, Congress specifically considered and rejected the type of tax avoidance
test that appears in the Regulation. See, S. Rep. No.938, 94th Cong., 2d Sess 100 (1976). The
courts have held that the IRS does not have the authority to disregard statutory provisions merely
to reach the result that the IRS desires. See, Crooks v. Harrelson, 282 U.S. 55 (1930); Comm'r
v. Brown, 380 U.S. 563 (1965); Busse v. U.S., 479 F.2d 1147 (7th Cir. 1973), acq., 1978-2 CB 1;
Woods Investment Co. v. Comm'r, 85 T.C. 274 (1985), acq., 1986-2 CB 1. See also, RLC
Industries Co. v. Comm'r, 98 T.C. 457 (1992), aff'd 58 F3rd 413 (9th Cir. 1995). Furthermore,
the Regulations attempt to supersede the statute and add restrictions not found in subchapter K.

       Moreover, the Regulations are not based on any specific legislative grant of
authority. Consequently, the Regulations would appear to be invalid under Chevron USA, Inc.
v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984) and Rowan Cos., Inc. v. U.S.,
452 U.S. 247 (1981). The Regulations usurp judicial power by granting the IRS the power to
apply the substantive law on a case by case basis, which is a judicial function. The courts are
thus relegated to the role of determining whether the IRS has abused its discretion, rather than
hearing the case de novo where the IRS and the taxpayer are on an equal footing.

       **(b)**    **Abuse of Subchapter K Rule**

       Treas. Reg. §1.701-2(b), the abuse of subchapter K rule, provides that:

> [I]f a partnership is formed or availed of in connection with a
> transaction a principal purpose of which is to reduce substantially
> the present value of the partners' aggregate federal tax liability in a
> manner that is inconsistent with the intent of subchapter K, the
> Commissioner can recast the transaction for federal tax purposes,
> as appropriate to achieve tax results that are consistent with the

NY1 5160876v1

**SABWZ0346245**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 108

intent of subchapter K, in light of the applicable statutory and
regulatory provisions and the pertinent facts and circumstances.

Thus, two requirements must be met to invoke this rule: a principal purpose of the transaction
must be to reduce the present value of the partners' aggregate tax liability, and the tax reduction
must be inconsistent with the intent of subchapter K.

      (c)     **Intent of Subchapter K**

      The Regulations state that the intent of subchapter K is to permit the conduct of
business and investment activities without incurring an entity level tax. Treas. Reg. §1.701-2(a)
then provides that the following requirements are implicit in the intent of subchapter K:

1.    The partnership must be bona fide and each partnership transaction or series of
related transactions must be entered into for a substantial business purpose.[42]

2.    The form of each partnership transaction must be respected under substance over
form principles.

3.    The tax consequences to each partner of partnership operations and of
transactions between the partner and partnership must accurately reflect the
partners' economic agreement and clearly reflect the partners' income.

However, because certain provisions of the Code and Regulations were adopted for
administrative convenience and other policy objectives, this test will be satisfied if the ultimate
results are clearly contemplated by that provision.

      The first implicit intent of subchapter K, that a partnership is bona fide and that
transactions be entered into for a business purpose, seems to be a restatement of well established
principles. See, e.g., Comm'r v. Culbertson, supra, Gregory, supra, and Rice's Toyota World,
supra. However, the Regulations do not elaborate on what is meant by these terms, and also
insert the term "substantial" in the business purpose requirement. Culbertson held that a
partnership would be respected for tax purposes if the parties had joined together to jointly

---

42    See, Statement of John Rooney, attorney advisor in the Treasury's Office of Tax Legislative Counsel to the
ABA Tax Section on January 29, 1995, reprinted in Sheppard, 66 Tax Notes 776, 778 (1995), that
"[s]ubstantial business purpose and principal purpose of tax avoidance cannot co-exist."

NY1 5160876v1

**SABWZ0346246**

**SIDL 0382059**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 109

conduct a business and share the profits. As Justice Frankfurter expressed in his concurring
opinion:

> In plain English, if an arrangement among men is not an
> arrangement which puts them all in the same business boat, then
> they cannot get into the same boat merely to seek the benefits of
> [partnership tax provisions]. But if they are in the same business
> boat, although they may have varying rewards and responsibilities,
> they do not cease to be in it when the tax collector appears.

337 U.S. at 754.

The determination of whether the abuse of subchapter K rule is applicable is
based on all of the facts and circumstances, including a comparison of the business purpose for
the transaction and the tax benefit. Treas. Reg. §1.701-2(c) contains a non-exclusive list of
factors that indicate, but do not establish, that a partnership was formed or availed of with a
principal purpose of tax reduction in a manner inconsistent with the intent of subchapter K. The
factors are:

1.  The present value of the partners' aggregate federal tax liability is substantially
    less than had the partners owned the partnership's assets and conducted the
    partnership's business directly.

2.  The present value of the partners' aggregate federal tax liability is substantially
    less than if purportedly separate transactions that are designed to achieve a
    particular end result are treated as steps in a single transaction.

3.  One or more partners who are necessary to achieve the claimed tax results either
    have a nominal interest in the partnership, are substantially protected from any
    risk of loss from the partnership's activities, or have little or no participation in
    the profits from the partnership's activities other than a preferred return in the
    nature of a payment for the use of capital.

4.  Substantially all of the partners are related.

5.  Partnership items are allocated in accordance with the literal language of Treas.
    Reg. §1.704-1 and §1.704-2 but the results are inconsistent with the purpose of
    Code Section 704(b).

NY1 3160376v1

**SABWZ0346247**

SIDL 0382060

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 110

6.   The benefits and burdens of ownership of property nominally contributed to the
     partnership are in substantial part retained by the contributing partner.

7.   The benefits and burdens of ownership of partnership property are in substantial
     part shifted to the distributee partner before or after the property is actually
     distributed to the distributee partner.

        The first factor appears to be a restatement of the substantiality test of Treas. Reg.
§1.704-1(b)(2)(iii), although there the test is limited to allocations of partnership income and
deduction and does not create an artificial comparison to hypothetical events occurring outside of
the partnership. In the instant case, there is no assurance that the present value of the members'
aggregate federal tax liability would necessarily be substantially less than had the members
owned the partnership's assets and conducted the partnership's business directly. An initial
question is: what should the point of comparison be? If one of the goals of the Transactions is to
create a limited liability pooled investment vehicle for the Investor and others, it would be
impossible for the Investor do so "directly"; a limited liability vehicle with two or more members
would be necessary. Similar federal income tax results could be obtained through other
structures. Thus, there is no certainty that the test could be applied in the instant case, or if the
test were applied to one or more alternative structures, there is no certainty that this factor would
apply to the Transactions.

        The second factor appears to be a restatement of the "end-result" formulation of
the step transaction doctrine. As discussed above, each transaction was undertaken for
independent reasons, no step was dependent on another step, and Investor was at risk with
respect to each transaction. Consequently, it is more likely than not that this factor would not be
present.

        The third factor is not present in this case, as no member has a nominal interest in
International. Treas. Reg. §1.701-2(d)(1), Ex. 1 holds that a 1% interest in a partnership is not
nominal. All of the members of International have interests in excess of 1%, and no partner is
substantially protected from risk of loss from the partnership's activities.

        The fourth factor is also not present. We have been informed that none of the
members are related.

NY1 5160776v1

**SABWZ0346248**

**SIDL 0382061**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 111

The fifth factor relates to the allocation of partnership income. As determined in accordance with the Operating Agreement, each item of International's income, gain, loss, deduction or credit will be allocated in accordance with each member's interest in International and each member's capital account will be appropriately charged, and there is no special allocation of any item of income, gain, loss, deduction or credit.

The sixth factor is also not present in this case. There is no property that has been "nominally" contributed to International by any member. Further, all property contributed to International is owned by International, and no member has in substantial part retained the benefits and burdens of ownership of the contributed property.

Finally, the seventh factor is also not present. The benefits and burdens of ownership of International property is not shifted to any distributee partner before or after the property is actually distributed.

The Regulations also contain certain examples of transactions that are considered to be, or not be, consistent with the intent of subchapter K. Treas. Reg. §1.701-2(d), Example 8, concludes that a deliberate failure to make a Code Section 754 election, therefore avoiding the resulting adjustments under Code Sections 734 and 743(b)(2), in order to duplicate an asset's built-in loss is inconsistent with the intent of subchapter K. While International has not made and will not make a Section 754 election, it is more likely than not that Example 8 would not apply to this transaction because (i) the parties are wholly unrelated and (ii) there is no duplicated loss since the loss that Co-investor recognized on the sale of his interest to Investor merely offsets his share of the gain. Cf., Treas. Reg. §1.701-2(d), Example 9.

Based on the foregoing, it is more likely than not that the IRS would be unsuccessful were it to assert that the Transactions are inconsistent with the intent of subchapter K.

**(d)    Abuse of Entity Rule**

The other part of the anti-abuse Regulations, the abuse of entity rule, is found in Treas. Reg. §1.701-2(e). This Regulation provides that the IRS may treat a partnership as an aggregate of its partners "as appropriate to carry out the purpose of any provision" of the Code or Regulations. However, this rule will not apply to the extent that (a) a provision of the Code or

NY1 51608761

**SABWZ0346249**

**SIDL 0382062**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 112

Regulations prescribes the treatment of a partnership as an entity and (b) entity treatment and the
ultimate tax results, taking into account all the relevant facts and circumstances, are clearly
contemplated by that provision. Thus, under Treas. Reg. §1.701-2(e)(2), a partnership may not
be so disregarded when a provision of the Code prescribes entity treatment for such a partnership
and that treatment and the ultimate tax results, taking into account all relevant facts and
circumstances, are clearly contemplated by that provision.

        Although there is no authority on point, as discussed above, the partnership
provisions themselves (including the Treas. Reg. §1.701-2(a) intent of subchapter K anti-abuse
rules) contemplate the use of a partnership as a vehicle to permit taxpayers to conduct joint
activities; Code Section 722 by its terms contemplates that a partner's tax basis in the partner's
partnership interest is determined with reference to the tax basis of property contributed by the
partner; and the partnership provisions contemplate that there can be disparities between a
partner's tax basis in its partnership interest and the partnership's tax basis in its assets (see, e.g.,
Code Section 754). In addition, the Code and Regulations clearly contemplate disparities in the
allocations of gains and losses, provided only that the Code Section 704(b) rules are followed.
Furthermore, the examples contained in Treas. Reg. §1.701-2(f) relate to the use of the
partnership to gain advantage of its entity status outside of subchapter K. Consequently,
although the matter cannot be free from doubt because of the absence of direct authority, it is
more likely than not that the IRS would not be successful were it to attempt to disregard
International as an entity under Treas. Reg. §1.701-2(e).

        **(e)**      **Disregard of International under Common Law**

        In appropriate circumstances, a partnership can be ignored for federal income tax
purposes even though a valid partnership was formed under local law. In PLR 9914006
(12/23/98), because one of two members had no interest in the profits and losses of the limited
liability company, the IRS concluded that the corporation was not a partner, and the limited
liability company was not a partnership. This was because (in the IRS' view) the purported
partners had not joined together to conduct a business and share the profits and losses. In the
present situation, Investor and the other members invested in International with the intent of
jointly conducting an activity (investing) and sharing the profits and losses therefrom, and at all
times at least two members of International had some interest in International's profits and
losses.

NY1 5160876v1

**SABWZ0346250**

## SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 113

       ASA Investerings Partnership v. Comm'r, supra, concerned a transaction substantially similar to that in ACM, supra. In ASA Investerings, the court found that the partnership formed by Allied Signal and ABN, a foreign partner, was not a valid partnership arrangement for federal income tax purposes because ABN had no share in any losses and so was a mere lender. The court noted that Allied Signal agreed to enter into the transaction before it even knew that ABN would be involved. In the instant case, each member invested in International in anticipation of realizing profits from International's investment activities, and both Investor and Co-investor shared economically in International's profits and losses. No member was guaranteed a particular minimum profit.

       Based upon the foregoing, it is more likely than not that the IRS would be unsuccessful were it to attempt to disregard International as an entity under the common law principles contained in these cases.

### 5.    Code Section 1092

       Code Section 1092(a)(1) provides that any loss on one or more "positions" is taken into account for any taxable year only to the extent that the loss exceeds the unrecognized gain (if any) on "offsetting positions" held by the taxpayer or a related party. Code Section 1092(d)(2) defines a "position" as an interest (including an option) in "personal property", defined in Code Section 1092(d)(1) as any personal property "of a type that is actively traded".

       In the instant case, gain was recognized before the loss, so that when the loss was recognized there was no unrecognized gain from "offsetting positions". Accordingly, it is more likely than not that any loses that Investor incurs from Investor's investment in International would not be limited by Code Section 1092.

### 6.    Code Section 465

       Generally, the "at risk" provisions limit the current deduction of losses attributable to certain activities to the extent those losses exceed the taxpayer's "amount at risk" in the "activity." The "at risk" rules apply to individuals directly and to individuals in their capacity as partners in a partnership.[43] The "at risk limitation" applies to the partners, not the partnership.

---

[43]    The "at risk" rules apply to trusts and estates as well. See, Code Section 542(a)(2) and S. Rep. No. 94-938,

NY1 5160876v1

SABWZ0346251

SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 114

H.R. Rep. No. 432, 98th Cong., 2d Sess. 1597 (1984).  Consequently, these rules may apply to
Investor's investment in International.

Whether the taxpayer is "at risk" is determined on the basis of facts as of the close of the
taxable year.  Prop. Treas. Reg. §1.465-1(a).  The determination of the amount the taxpayer is "at
risk" in cases where the activity is engaged in by an entity separate from the taxpayer is made as
of the close of the taxable year of the entity unless otherwise stated.  Here, International and
Investor are on the same taxable year, the calendar year.

7.      Activities Subject to the "At Risk" Rules

The "at risk" rules apply to each activity engaged in by the taxpayer in carrying on a
trade or business or for the production of income.  In applying the "at risk" rules, a two-step
analysis is required.  The scope of an activity must be first defined and then it must be
determined whether separate activities should be aggregated or segregated for purposes of
applying the "at risk" rules.  The Code Section 465 Proposed Regulations provide only limited
guidance regarding how to determine the scope of the activities in which a taxpayer is engaged.
If two activities are interrelated, it is not clear whether there are two activities or only one.

Code Section 465(c)(3) applies to each activity engaged in by the taxpayer in carrying on
a trade or business or for the production of income.  Although a partnership itself is not subject
to the "at risk" rules, the nature of any activity involving a partner is determined at the
partnership level.  As a result, Investor is considered to engage in an activity with respect to the
investments made by International for the production of income.  Thus, the "at risk" activity of
Investor includes his investments through International.  In addition, if Investor invests directly
in marketable securities and other financial instruments on his own account, these direct
investments would also constitute an "at risk" activity.  While in an economic sense, Investor's
investment activities would be interdependent, Investor's direct investment activity and its
investment through International would arguably constitute two separate "at risk" activities.
With respect to carrying on a trade or business under the Section 465(c)(3) rules, if a taxpayer
actively participates in the management of such trade or business, then all activities comprising
the trade or business are aggregated for purposes of the "at risk" rules. Code Section

---

94th Cong., 2d Sess. 48 (1976), 1976-3 CB at 86 (the "Senate Report"); see also, Code Section 641(b) (the
taxable income of an estate or trust is computed in the same manner as an individual).

NY1 5160836v1

**SABWZ0346252**

SIDL 0382065

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 115

465(c)(3)(B). No such rules are provided for the production of income. In addition, Code
Section 465(c)(3)(C) provides that activities are aggregated or treated as separate activities as
Treasury prescribes by Regulations. No such Regulations have been proposed or adopted since
enactment of the provision in 1978.

The legislative history of the amendment of Code Section 465 by the Revenue Act of
1978 indicates that Regulations, when adopted, may provide for the aggregation of related
activities for the production of income that do not have tax shelter characteristics, in the absence
of Regulations segregation of such activities may be appropriate. H.R. Rpt. No. 95-1445, 95th
Cong. 2d Sess., 68-70 (8/4/78). At least one commentator, however, states that such legislative
history "no longer makes much sense" in view of subsequent developments, in particular the
enactment of the passive activity loss rules, discussed below. Harllee, At-Risk Rules, 550 Tax
Management Portfolio A-10. Under these rules all "portfolio income" is treated as not subject to
the limitations of Code Section 469, thus falling into a single activity. Furthermore, these rules
adopt a "facts and circumstances" test to determine what activities covered by the rules should be
aggregated. Treas. Reg. §1.469-4(c)(1).

In Elliston v. Comm'r, 82 T.C. 747 (1984), aff'd without published opinion, 765 F.2d
1119 (5th Cir. 1985), the court addressed an analogous issue. Elliston involved a two-tier
partnership situation with Dallas Associates, a partnership, owning interests in a number of lower
tier partnerships, each engaged in the leasing business. Dallas aggregated the income and losses
of the lower tier partnerships in determining its own taxable income. The IRS challenged this
aggregation, claiming that each lower tier partnership had to be treated as a separate activity for
purposes of Code Section 465. The Tax Court in a reviewed decision with one dissent concluded
that the income and losses of the separate lower tier partnerships could be aggregated by Dallas
Associates. Part of the court's rationale was that had Dallas Associates carried on the activities
of each of the lower tier partnerships directly, they would have been aggregated within Dallas
Associates. In a concurring opinion, Judge Dawson also took into account that Code Section 465
focuses upon the activities of a "taxpayer" and that although a partnership may be a separate
person for federal income tax purposes, it is not a taxpayer. As a result, Judge Dawson's view
was that for purposes of interpreting Code Section 465, a partnership must be treated as an
aggregate of its partners and that each of the partners should be viewed as directly engaging in
the activities of the partnership. Judge Dawson found support for this conclusion in the
legislative history of Code Section 465. Although Elliston was decided prior to amendments to

NY1 516016v1

**SABWZ0346253**

**SIDL 0382066**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 116

Code Section 465, the rationale of Elliston should continue to be relevant to situations such as the aggregation of activities for the production of income described in Code Section 465(c)(3)(a)(ii) where statutory and regulatory guidance is absent.

Consequently, until regulations are released defining parameters for aggregation and segregation of activities relating to the production of income, it is more likely than not that Investor would be permitted to combine all directly-held investment activities and investment activities undertaken by International into a single activity.

**8.    Amount "At Risk"**

A taxpayer is considered "at risk" for an activity in the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity. A taxpayer is not considered "at risk", however, for amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or "other similar arrangements". No such arrangements exist here. The IRS might take the position that the potentially offsetting nature of the Options constitutes such an arrangement. In Laureys v. Comm'r, 92 T.C. 101 (1989), the Tax Court held that when a commodities market maker hedged itself through offsetting straddle positions, such offsetting positions were not covered by Section 465(b)(4). Instead, the Court concluded that Code Section 465(b)(4) was intended to address "new and creative" methods of protecting a taxpayer against loss. Compare, Thurner v. Comm'r, 60 T.C.M. (CCH) 961 (1990), in which the court affirmed the Laureys conclusion that an offsetting option is not a such an "arrangement," but denied the taxpayer "at risk" treatment because, in addition to the offsetting options, an actual stop loss arrangement was in place. Based upon Laureys, it is likely that the IRS would be unsuccessful were it to contend that the potentially offsetting nature of the Options constituted an arrangement described in Code Section 465(b)(4).

A taxpayer's amount "at risk" in a partnership is increased by the partner's distributive share of taxable and tax-exempt income generated from the activity. Prop. Treas. Reg. §§1.465-22, 1.465-23 and 1.465-66.[44]   Code Section 465(b)(5) provides that if in any taxable year the

---

[44]     See also, Lansburgh v. Comm'r, 92 T.C. 448 (1989) (taxpayer's "at risk" amount increased to the extent that the taxpayer recognizes income with respect to the activity); Allen v. Comm'r, 55 T.C.M. (CCH) at 688 (1988) (gain recognized on the disposition of the activity or an interest in the activity increases the taxpayer's amount "at risk"). These adjustments reflect the fact that the "at risk" amount is determined in a manner consistent with the determination of the taxpayer's adjusted basis, except that certain nonrecourse

NY1 51608%v1

**SABWZ0346254**

SIDL 0382067

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 117

taxpayer has a loss from an activity to which Code Section 465 applies, the "at risk" amount in subsequent taxable years for that activity is reduced by the portion of the loss allowable as a deduction.

The legislative history of Code Section 465 states that a partner's "at risk" amount is computed with reference to the basis of the partner's partnership interest. S. Rep. No. 938, 94th Cong., 2d Sess. 50 n.8 (1976). The link between the partnership rules and Code Section 465 is corroborated in Private Letter Ruling 9036013 (6/8/90) where the IRS stated that the economic risk of loss analysis of Code Section 752 applied to determine a partner's amount "at risk."

The "at risk" rules and the Code Section 704(d) partnership loss allowance rules diverge in two areas. First, a partner can acquire basis through nonrecourse financing for Code Section 704(d) purposes, while under Code Section 465(b)(4), nonrecourse financing generally does not create an amount at risk. Second, if a partnership interest is sold and the selling partner has suspended Code Section 704(d) losses, subsequent gain on the sale of the partnership interest can not be used to free-up the losses. The partnership's taxable year closes with respect to the selling partner under Code Section 706(c)(2)(A) and the basis for the partner's partnership interest at that date is zero. See, Sennett v. Comm'r, 80 T.C. 825 (1983), aff'd per curiam, 752 F.2d 428 (9th Cir. 1985). By contrast, losses suspended under Code Section 465 are offset against income from the sale of a partnership interest, as this income is treated as "income from the activity." Prop. Treas. Reg. §1.465-66(a). In effect, the Code Section 465 limitation applies at the partner level, while the Code Section 704(d) limitation isolates the disallowed loss at the partnership level. Here, however, no partnership debt was involved and there has been no termination of an interest in an activity. Based on the foregoing analysis, Investor's "at risk" amount likely includes his tax basis in International.

9.    **Code Section 469**

Conceptually similar to the application of the Code Section 465 "at risk" rules are the passive activity loss rules of Code Section 469, which limit losses from certain activities in which a taxpayer does not materially participate. The aggregate amount of deductions

---

debt amounts and amounts protected against loss are not included. See, Senate Report at 50.

**SABWZ0346255**

SIDL 0382068

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 118

disallowed for the taxable year under Code Section 469 is generally equal to a net amount
designated as the "passive activity loss."

Code Section 469(c)(1) states that a "passive activity" is any activity which involves the
conduct of any "trade or business" in which the taxpayer does not materially participate. Code
Section 469(c)(6) further provides that, to the extent provided in regulations, the term "trade or
business" includes any activity in connection with a trade or business or any activity with respect
to which expenses are allowable as a deduction under Code Section 212. Treas. Reg. §1.469-
1(e)(2) and §1.469-4(b)(1)(i) provide that the term "trade or business activity" includes any
activity that involves the conduct of a trade or business within the meaning of Code Section 162.

Treas. Reg. §1.469-1T(e)(6) provides that the activity of trading personal property for the
account of owners of interests in the activity is not a passive activity, regardless of whether the
activity is a trade or business and regardless of a partner's level of participation. Treas. Reg.
§1.469-1T(e)(6) provides an example of "trading personal property for the account of owners of
interests in the activity." This example indicates that a partnership's trading activities consists of
"trading for the account of its partners" where the capital employed by the partnership in the
trading activity consists of amounts contributed by the partners in exchange for their partnership
interests.

The term "personal property" is defined in the regulations to have the same meaning as
under Code Section 1092(d), but without regard to Code Section 1092(d)(3) which generally
excludes stock from the definition. For purposes of this analysis of Code Section 469, we have
assumed, arguendo, that the Options and similar options traded by International would qualify as
personal property under this definition.

Whether International would be treated as a "trader" or "investor" is discussed above. If
International is deemed to be a mere "investor", then it would be deemed not to be engaged in a
trade or business and more likely than not Code Section 469 would not apply. If instead
International is deemed to be carrying on a trade or business as a trader, then it is more likely
than not that Investor's participation in International would constitute an activity that is not a
passive activity based upon the exception for the "activity of trading personal property for the
account of owners of interests in the activity" described in Treas. Reg. §1.469-1T(e)(6).
Accordingly, it is more likely than not that losses generated by International would not be subject
to the limitations under Code Section 469.

NY1 5160176v1

**SABWZ0346256**

SIDL 0382069

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 119

10.    Code Section 482

Code Section 482 gives the IRS the power to, among other things, reallocate income and deductions, among "two or more organizations, trades, or businesses... owned or controlled directly or indirectly by the same interests...." Treas. Reg. §1.482-1(i)(1) provides that an organization for this purpose includes an organization of any kind, including a sole proprietorship. Treas. Reg. §1.482-1(a)(2) gives the IRS the power allocate "income, deductions, credits, allowances, basis, or any other item or element affecting taxable income" among members of a controlled group.

The Code does not define the requisite ownership or control necessary to fall within Code Section 482. Treas. Reg. §1.482-1(i)(4) defines "controlled" as follows:

> Controlled includes any kind of control, direct or indirect, whether legally enforceable or not, and however exercisable or exercised, including control resulting from the actions of two or more taxpayers acting in concert or with a common goal or purpose. It is the reality of the control that is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.[45]

In a Field Service Advice relating to a so-called lease stripping transaction, FSA 199914018 (1/5/99), the IRS contended that it could apply Code Section 482 to transactions between a non-controlling party and a corporation if the non-controlling party acts in concert with a controlling party. Similarly, the IRS could contend that Co-investor and Investor are "acting in concert" and attempt to reallocate Co-investor's share of International's income to Investor, or Investor's share of International's losses to Co-investor.

It is more likely than not that such contentions would not succeed. As discussed above, the concept of "acting in concert" in the context of Treas. Reg. §1.482-1(i)(4) relates to two or more persons so acting to exercise control over a third person. That is, Treas. Reg. §1.482-1(i)(4) should be read as providing, not that two or more persons who act "in concert" are

---

45    No case addresses facts specifically like the instant case. The Fifth Circuit Court of Appeals has held in a different factual context that the burden of proof is upon the government to demonstrate the appropriateness of the presumption. See, Dallas Ceramic Co. v. U.S., 598 F.2d 1382 (5th Cir. 1979). Once the presumption has been established, however, the burden of proof would appear to fall on the taxpayer.

NY1 316087v1

**SABWZ0346257**

SIDL 0382070

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 120

somehow "in control" of each other, but that two or more persons "control" a third party when they act "in concert" to exert such control, even though neither controls the third party separately. Any other interpretation would subject any arm's length commercial transactions undertaken pursuant to a contract to Code Section 482.

B. Forman Co., Inc. v. Comm'r, 453 F.2d 1144 (2d Cir. 1972), cert. denied, 407 U.S. 934, reh'g denied, 409 U.S. 899 (1972), which appears to be the only case to have dealt with the "acting in concert" element of Code Section 482, is consistent with this interpretation. In Forman, two corporations acquired equal interests in a third corporation, neither individually having the requisite voting power to control the third, but having a written agreement and jointly appointed officers and directors pursuant to which they mutually exercised control over the third. In short, the third corporation was controlled either by both shareholders or by nobody, and the court adopted the former view. The result was that the IRS successfully allocated income *from the controlled taxpayer to the controlling taxpayers* (the shareholders). Neither the statute nor Forman is authority for the IRS to allocate income *from one controlling person to another*. Here, Investor and Co-investor do not in any way "control" each other. Consequently, it is more likely than not that, even if the "acting in concert" element is present, this would not permit the IRS to allocate income from Co-investor to Investor or loss from Investor to Co-investor.

In Notice 95-53, 1995-2 CB 334, the IRS raised the possibility that a non-controlling and controlling party could be considered "acting in concert" for purpose of applying Code Section 482 in the context of a tax-advantaged transaction. Here again, however, the "acting in concert" aspect of Code Section 482 was asserted with respect to a non-controlling party exercising control over a third party. Furthermore, Proposed Treasury Regulations issued pursuant to the Notice were issued under Code Section 7701(l) and not under Code Section 482. To our knowledge, the position that parties can be "acting in concert" merely because they have a business relationship has not been reviewed by a court, and we believe that the decision in Forman is the appropriate standard. As discussed above, under such standard it is more likely than not that Code Section 482 would not be applicable to the Transactions.

Lastly, it can also be argued that Code Section 482 is inapplicable because Investor and Co-investor are acting in the capacity of mere investors with respect to International. As discussed by a noted corporate commentator, in the context of the application of Code section 482 between a corporation and its controlling shareholder:

**SABWZ0346258**

**SIDL 0382071**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 121

> It is clear that §482 applies to transactions between a corporation
> and a sole proprietorship operated by the corporation's controlling
> shareholder, or between a corporation and a partnership of the
> corporation's shareholders, since the proprietorship or partnership
> business is different from that of the corporation. If, however, a
> corporation deals with its controlling shareholder solely in that
> shareholder's capacity as an investor, the individual's activities do
> not constitute an organization, trade, or business, and hence should
> not bring §482 into play.

B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, ¶13.20[2][a]
(7th Ed. 2000).

The courts have found the requisite trade or business in the case of individuals who
leased property at non-arm's length rent to corporations that they owned, treating the leasing
activity of the individual as the relevant trade or business. See, e.g., Fegan v. Comm'r, 71 T.C.
1979 (1978). A number of cases involving a personal service corporation and its individual sole
shareholder/employee have also held that the individual had the requisite "organization, trade or
business" distinct from the corporation where the individual was employed by the corporation.
See, e.g., Keller v. Comm'r, 77 T.C. 1014 (1981), aff'd 723 F.2d 1216 (10th Cir. 1983), Rubin v.
Comm'r, 56 T.C. 1155 (1971), aff'd per curiam 460 F.2d 58 (2d Cir. 1972).

In Fogelsong v. Comm'r, 691 F.2d 848 (7th Cir. 1982), rev'g 77 T.C. 1102 (1981),
however, the Circuit Court held that Code Section was designed to be used to prevent income or
loss from being manipulated between two or more businesses and that an individual has no trade
or business separate from the corporation if the individual only works for the corporation. In
such case the two or more organizations, trades, or businesses requirement of Code section 482
is not met. Although the IRS has disagreed with the Circuit Court's decision in Rev. Rul. 88-38,
1988-1 CB 246, it has recently cited the decision in FSA 199952041 (9/30/99) concluding that
for an allocation under Code Section 482 to occur between a corporation and its individual sole
shareholder it should be established that the individuals is engaged in a trade or business other
than working for corporation.

To be compared to Fogelsong is Dolese v. Comm'r, 811 F.2d 543 (10th Cir. 1987), aff'g
82 T.C. 830 (1984). In Dolese an individual owned all of the stock of a corporation that in turn
was a 51% owner of a partnership. The individual was the 49% owner. The partnership was

NY1 516087v1

**SABWZ0346259**

SIDL 0382072

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 122

engaged in the trade or business of real estate development. The corporation owned two pieces of property, one of which was intended to be sold the other to be contributed to a charity. Under the circumstances of the case, a charitable deduction was more valuable to the individual than the taxable proceed of a sale. The partnership distributed the two pieces of property disproportionately: 76% of the contribution property to the individual and 24% to the corporation and 24% of the sale property to the individual and 76% to the corporation. The IRS asserted Code Section 482 to readjust the results of the transactions to reflect the 51%/49% actual ownership interests. The Tax Court held that the individual had a trade or business as an employee of the corporation and that trade or business was enough to sustain a Code Section 482 allocation to him even though the ownership of the partnership interest was not connected to that trade or business. In affirming the Tax Court, the Circuit Court held:

> To justify the exercise of the Commissioner's power under [Code Section 482], Mr. Dolese argues the two or more separate trades or businesses must deal with one another to produce a distortion of income. In the instant case, he characterizes the pertinent transaction as the distribution of the subject property from the partnership assets. Because he contends his trade or business as corporate executive was not involved in the distribution of the subject property from the partnership to him as a partner, Mr. Dolese concludes the dual business requirement is not met.

> Mr. Dolese's insistence upon narrowing the scope of the transaction to the distribution of partnership property obfuscates the issue presented. The distortion of income the Commissioner sought to correct are from the disproportionate distribution of each tract of land followed by the contribution of one tract and the sale of the other. The corporate partner's acquiescence in the distribution and the subsequent contribution and sale was made possible solely through Mr. Dolese's exclusive control of the corporation. Therefore, Mr. Dolese's trade as a corporate executive and his role in the partnership were both involved in the transaction that produced distorted tax consequences.

811 F.2d at 547-8.

A fair reading of the <u>Dolese</u> Circuit Court decision is that in fact for the IRS to be able to make an allocation under Code Section 482 with respect to a transaction between an individual

NY1 5160378v1

**SABWZ0346260**

**SIDL 0382073**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 123

who is engaged in a trade or business and another organization, trade or business, the trade or business of the individual must be involved in the transaction. This would allow the Circuit Court decision in <u>Dolese</u> to be read consistently with the Circuit Court decision in <u>Fogelsong</u>. Under such a reading, it is also more likely than not that the IRS would be unsuccessful were it to attempt to allocate income or losses between Investor and Co-investor.

**V.    Application of Code Section 6662**

**A.    Substantial Understatement of Taxable Income**

Code Section 6662(b)(2) provides for a 20% underpayment penalty for taxpayers if there is a substantial understatement of income tax on a return. For non-corporate taxpayers, an understatement is considered substantial for this purpose if it exceeds the greater of 10% of the correct tax or $5,000. See Code Section 6662(d)(1). An understatement generally does not include deficiency amounts attributable to a position that is supported by "substantial authority"[46] or for which there is adequate disclosure.

Substantial authority for a position exists if the weight of authorities supporting the position is substantial in relation to the weight of authorities against the position. See, Treas. Reg. §1.6662-4(d). Authorities for this purpose include (but are not limited to) applicable provisions of the Code; proposed, temporary and final regulations; revenue rulings and revenue procedures; court cases; Congressional intent as reflected in committee reports; private letter rulings and technical advice memoranda issued after October 31, 1976; and actions on decision and general counsel memoranda issued after March 12, 1981. The weight of an authority depends upon its relevance and persuasiveness, and the type of document. Treas. Reg. §1.6662-4(d)(3).

The "substantial authority" standard is higher than the "reasonable basis" standard but generally below "more likely than not". See, Treas. Reg. §1.6662-4(d)(2). The "reasonable basis" standard is defined in Treas. Reg. §1.6662-3(b)(3) as a position that is significantly higher than not frivolous or not patently improper. The Internal Revenue Manual ("IRM") states that

---

[46]    There is considered to be substantial authority for a return position if substantial authority is present either on the last day of the taxable period covered by the taxpayer's return, or on the date the return is filed. Treas. Reg. §1.6662-4(g)(1)(i)(A) and §1.6662-4(d)(3)(iv)(C).

NY1 5160876v1

**SABWZ0346261**

SIDL 0382074

SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 124

the standard is one where a position is arguable but fairly unlikely to prevail in court. The IRM further states that "the substantial authority exception can be met when the taxpayer has less than a 50 percent, but more than a one-in-three likelihood of being sustained on the issue." See, IRM (20)535 (1997). The "more likely than not" standard is one where there is a greater than 50 percent likelihood that a position will be upheld if challenged by the IRS. See, Treas. Reg. §1.6662-4(d)(2).

If the position involves a tax shelter,[47] there must be both "substantial authority" for the position and the taxpayer must have "reasonably believed ... that the tax treatment was more likely than not the proper treatment". For purposes of our analysis, we have assumed that the Transactions would constitute a "tax shelter". The "reasonable belief" requirement can be satisfied if the taxpayer reasonably relies in good faith (i.e., the taxpayer discloses all the facts it knows or should know) on the opinion of a qualified tax professional that unambiguously states that there is a greater than 50 percent likelihood that the tax treatment will be upheld if challenged by the IRS.

B.    Substantial Valuation Misstatement

Code Section 6662(b)(3) provides for a 20% underpayment penalty for taxpayers if there is a substantial valuation misstatement under chapter 1 of the Code. Code Section 6662(e)(1)(A) provides that there is a substantial valuation misstatement if, among other things, the value or adjusted basis of any property claimed on any income tax return is 200% or more of the amount determined to be the correct amount of such valuation or adjusted basis. Code Section 6662(h)(1) increases the penalty to 40% in the case of any gross valuation misstatement. Code Section 6662(h)(2) provides that there is a substantial valuation misstatement if, among other things, the valuation/adjusted basis of any property claimed on any income tax return is 400% or more of the amount determined to be the correct amount of such valuation/adjusted basis. The penalty does not apply, however, if the reasonable cause exception of Code Section 6664(c) and Treas. Reg. §1.6664-4, discussed below, applies.

---

47    Prior to the Taxpayer Relief Act of 1997, a tax shelter was generally defined as any plan or arrangement the principal purpose of which was the avoidance or evasion of federal income tax. Tax avoidance or evasion was considered the principal purpose if that purpose exceeded any other purpose. The 1997 Tax Act modified the definition of tax shelter by requiring only a "significant" (rather than principal) tax avoidance or evasion purpose.

NY1 5160176v1

**SABWZ0346262**

**SIDL 0382075**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 125

Because the tax basis of the Long Option is more than 400 percent of the net basis of the Options, the terms of Code Section 6662(h)(2) might appear to apply, absent the Code Section 6664(c) reasonable cause exception. However, the legislative history of Code Section 6662(e) implies that the provision is intended to apply only where excessive basis arises as a result of an excessive valuation, i.e. an issue of fact, as opposed to an issue of law.

The gross valuation misstatement penalty is an extension of the 20% penalty under Code Section 6662(e) for a "substantial valuation misstatement", which exists if the value or adjusted basis claimed on the return is 200% or more of the correct amount. This penalty, which was part of the 1989 modification of the civil tax penalty regime, first entered the tax law in 1981 as Code Section 6659, which imposed a penalty on an underpayment arising from a "valuation overstatement." Under Code Section 6659(c), a "valuation overstatement" occurred where the value or adjusted basis claimed on a tax return was 150% or more of the correct amount. The amount of the penalty was 10% of the underpayment at an overstatement of 150% and rose to 30% of the underpayment for an overstatement of 250%.

A dispute with the IRS regarding the basis of an asset can arise either from an issue of fact or from an issue of law. The Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981 discussion of the reasons for the new penalty made clear that Congress was concerned only with basis overstatement resulting from excessive valuations, not incorrect application or interpretation of law. It stated:

> The Congress believed that a specific penalty was needed to deal with various problems related to the valuation of property. This particular need is illustrated by the fact that there are about 500,000 tax disputes outstanding which involve property valuation questions of more than routine significance. These cases alone involve approximately $2.5 billion in tax attributable to the valuation issues.
>
> The Congress recognizes that valuation issues frequently involve difficult issues of fact. Often these questions seem to be resolved simply by "dividing the difference" in the values asserted by the Internal Revenue Service and those claimed by the taxpayer. Because of this approach to valuation questions, the Congress believes that taxpayers were encouraged to overvalue certain types of property and to delay resolution of the valuation issues....

NY1 5160878v1

**SABWZ0346263**

**SIDL 0382076**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 126

> In recognition of the fact that valuation issues often are difficult,
> especially where unique property is concerned, the Congress
> decided to adopt a test for the application of a new penalty under
> which only significant overvaluations will be penalized.
> [Emphasis added].

Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981
at 332.

The Joint Committee provided two examples of the situations that the provision was
intended to address. Neither example involved a disputed tax-free reorganization, Code Section
351 exchange, or like-kind exchanges, common situations resulting in legal disputes over the
adjusted basis of property. Instead, one example involved an excessive valuation in the context
of a charitable deduction and the other involved a basis adjustment arising from an excessive
estate tax valuation. At no point did the Joint Committee Explanation refer to basis adjustments
arising from disputes over matters of law.

Furthermore, the amendments made in 1989 would indicate that no change in this view
was intended. Thus, a separate penalty provision, Code Section 6662(e)(1)(B), was enacted to
deal with valuation and basis adjustments arising from adjustments under Code Section 482,
which involves both issues of fact and issues of law.

In Gilman v. Comm'r, 933 F.2d 143 (2d Cir. 1991), aff'g T.C. Memo. 1989-684, cert.
denied, 502 U.S. 1031 (1992), the Second Circuit held that an overvaluation penalty could apply
even where tax benefits were disallowed entirely because a transaction lacked economic
substance. Although the case does not make this point explicitly, the facts of the case indicated
that the lack of economic substance was a direct consequence of the fact that the property was
overvalued when it was acquired, i.e., the purchase price was so high that in the court's view it
was impossible for the taxpayer to make a profit from the transaction without regard to tax
benefits. Thus, Gilman ought to be read, consistent with the legislative history discussed above,
to permit the imposition of an overvaluation penalty in those cases in which an overvaluation of
property as a matter of fact, as opposed to as a matter of law, was the cause of, and was integral
to, the lack of economic substance. Other appellate courts have also upheld the imposition of the
overvaluation penalty in such a case. See, e.g., Massengill v. Comm'r, 876 F.2d 616 (8th Cir.
1989); Merino v. Comm'r, 196 F.3d 147 (3d Cir. 1999); Zfass v. Comm'r, 118 F.3d 184 (4th Cir.
1997); Illes v. Comm'r, 982 F.2d 163 (6th Cir. 1992). But see Heasley v. Comm'r, 902 F.2d 380

NY1 5160878v1

SABWZ0346264

SIDL 0382077

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 127

(5th Cir. 1990). Here, by contrast, there should be no dispute over any economic valuation of property, i.e., no issue of fact, because the value of the Options was determined using market standard valuation techniques, and the valuation of the property is irrelevant to the determination of tax basis, which occurs as a matter of operation of law. Accordingly, Gilman should be distinguishable from the Transactions.

Based upon the foregoing, a fair reading of the statute and its legislative history strongly suggests that a basis overstatement arising from issues of law, such as the Transactions, should not be the type of overstatement intended to be reached by Code Section 6662(e)(1)(A).

### C.     Code Section 6664(c)

Code Section 6664(c) provides a general exception to Code Section 6662 penalties in the case of a position taken with reasonable cause and in good faith (the "reasonable cause exception"). Whether a taxpayer has "reasonable cause" and "good faith" is a facts and circumstances determination made on a case-by-case basis. The most important factor is the extent of the taxpayer's effort to determine proper tax liability. See, Treas. Reg. §1.6664-4(b). Reliance on the opinion of a professional tax advisor constitutes "reasonable cause" and "good faith" if the advice is based on all pertinent facts and circumstances and the law as it relates to those facts and circumstances. For example, relevant facts include the taxpayer's purpose for entering into a transaction and for structuring the transaction in a particular manner. All facts that are relevant to the tax treatment of a transaction must be disclosed. Treas. Reg. §1.6664-4(c)(1)(i).

Treas. Reg. §1.6664-4(c)(1) also sets forth the following requirements ("General Opinion Requirements") all of which must be satisfied in order for reliance on tax advice, including opinion letters, to be considered reasonable and in good faith:

(i)     The opinion was based on all pertinent facts and circumstances, including the taxpayer's purposes (and the relative weight of such purposes) for entering into the transaction and for structuring the transaction in a particular manner. In addition, reliance on an opinion will not be considered reasonable if the taxpayer fails to disclose a fact that it knows or should know to be relevant to the proper tax treatment of an item.

(ii)    The opinion was based on the law as it relates to those facts and circumstances.

NY1 3160176v1

**SABWZ0346265**

**SIDL 0382078**

**SIDLEY AUSTIN BROWN & WOOD** LLP

Mr. Richard J. Egan
March 8, 2002
Page 128

(iii)    The opinion was not based on any unreasonable factual or legal assumptions (including assumptions as to future events).

(iv)    The opinion did not unreasonably rely upon the representations, statements, findings or agreements of the taxpayer or any other person. For example, the opinion must not be based upon a representation or assumption that the taxpayer knows or has reason to know is unlikely to be true.

Although we have found no court case that has construed the General Opinion Requirements, which were issued in August 1995[48], numerous judicial decisions have relied upon similar principles in holding that a taxpayer's reliance upon the advice of a tax professional qualified for the reasonable cause and good faith exception to the substantial understatement penalty. See, e.g., Mauerman v. Comm'r, 22 F.3d 1001 (10th Cir. 1994); Vorsheck v. Comm'r, 933 F.2d 757 (9th Cir. 1991); Heasley v. Comm'r, 902 F.2d 380 (5th Cir. 1990); Daoust v. Comm'r, T.C. Memo. 1994-203; and English v. Comm'r, T.C. Memo. 1993-111.

The Supreme Court also reaffirmed the right of a taxpayer to rely upon the substantive advice of the taxpayer's accountant or attorney to avoid penalties in U.S. v. Boyle, 469 U.S. 241 (1985) (which distinguished between reasonable reliance on professionals to avoid filing deadlines, which did not constitute "reasonable cause," and reasonable reliance on professionals as to questions of substantive law, which would). According to Boyle:

> When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. Id. at p. 251.

In a number of cases, courts have not permitted a tax shelter investor to rely on an opinion of counsel—even one stating that it was "more likely than not" that the tax benefits would be respected—as a shield from penalties. See, e.g., Robertson v. Comm'r, T.C. Memo. 1999-30; McRary v. Comm'r, 92 T.C. 827 (1989). Almost without exception, the opinion was

---

[48]    T.D. 8617.

NY1 5160176v1

**SABWZ0346266**

**SIDL 0382079**

# SIDLEY AUSTIN BROWN & WOOD LLP

Mr. Richard J. Egan
March 8, 2002
Page 129

not directed to the specific investor and in fact was a part of, or attached as an exhibit to, the offering materials. Moreover, the opinion was based on factual assumptions, such as appraisals, which were at the very least open to question and, as a result, were "replete with cautions and waivers," in the words of the court in Charlton v. Comm'r, T.C. Memo. 1990-402. Even in one recent case, Barber v. Comm'r, T.C. Memo. 2000-372, where the investor secured, and claimed to have relied on, the "more likely than not" opinion of independent counsel, the advisor himself had no knowledge of the industry on which the tax shelter was based, relied on an obviously unreasonable appraisal, and applied so many caveats to the opinion that the taxpayer should have realized it was insufficient. By contrast, the opinion here is not part of any offering materials, is rendered directly to Investor, and does not rely on any factual assumptions which should be controversial in the least.

Furthermore, as discussed above, the substantial understatement penalty should not apply merely because the tax reasons for a transaction outweigh the business reasons. In enacting the substantial understatement penalty, Congress acknowledged that "no reasonably informed business decision is made without regard to its tax effects." A "tax shelter" is defined as an arrangement in which "the" principal purpose is to avoid or evade tax. Such a strict reading of the penalty would therefore eliminate the reasonable cause and good faith exception to the penalty for all corporate and non-corporate taxpayers participating in such transactions. It is clear from the Act and its history that Congress intended to preserve, not eliminate, this exception for all taxpayers. Unlike the cases where a penalty was sustained despite advice of counsel, the Transaction does not rely on unreasonable financial assumptions, based on representations set out above Investor had a profit motive for entering into the Transaction, and there existed an objective ability to make an economic profit. Accordingly, any substantial understatement penalty would not apply to Investor.[49]

### D.    Conclusion

Based upon our understanding of the facts set forth in I, above, the representations set forth in II, above, and upon our opinions set forth in III, above, the IRS should not be successful

---

[49]    In recent tax shelter cases discussed earlier where a court sustained a substantial understatement penalty, the taxpayer had not secured a "more likely than not" opinion of counsel. Compaq, supra; IRS v. CM Holdings, Inc., 254 B.R. 578 (D. Del. 2000).

NY1 5160876v1

SABWZ0346267

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 130

were it to attempt to impose a penalty against Investor under Code Section 6662(b)(2) or (3) for positions taken in Investor's federal income tax return with respect to the Transactions.

## VI. Tax Shelter Registration

Code Section 6111(a)(1) requires a tax shelter organizer to register a "tax shelter" with the IRS. Code Section 6111(c)(1) defines a "tax shelter" as certain types of investments, if the "tax shelter ratio" at the close of any of the first 5 years is greater than 2 to 1. Code Section 6111(c)(2) defines "tax shelter ratio" as the ratio of (i) the aggregate deductions which are represented as potentially available to the investor bears (ii) to the investor's "investment base" at the close of the taxable year. Code Section 6111(c)(3) defines "investment base" with respect to any year as the amount of money and the tax basis of other property (reduced by any liability to which such property is subject") contributed by the investor as of the close of the taxable year.

As discussed above, it is more likely than not that Investor's tax basis in the Long Option would equal the cost thereof, and Investor's tax basis in his interest in Investments would equal Investor's cost for the Long Option. As discussed above, it is more likely than not that the claims by Counterparty under the Short Option against Investor would not be treated as liabilities. Consequently, it is more likely than not that Investor's "investment base" as defined in Code Section 6111(c)(3) would equal Investor's cost for the Long Option.

Because under Code Section 704(d) the loss deducted by Investor cannot exceed his tax basis in Investments, the amount of this loss likely would be not in excess of Investor's "investment base". Consequently, it is more likely than not that the Transactions would not constitute a tax shelter within the meaning of Code Section 6111(c)(1) and, therefore, would not be required to be registered under Code Section 6111(a).

This opinion does not address, and is not intended to address any tax issues, whether federal, state, local or foreign, other than those specifically addressed herein  This opinion is being issued to the addressee solely for the addressee's use and the use of the addressee's professional advisors to determine the amount, if any, of the addressee's federal income tax liability.

NYL 5160876v1

**SABWZ0346268**

**SIDLEY AUSTIN BROWN & WOOD LLP**

Mr. Richard J. Egan
March 8, 2002
Page 131

The addressee or the addressee's professional advisors may not use this opinion for any other purpose without our prior written consent. Again, we wish to point out that none of the opinions expressed herein are binding upon the IRS or a court of law.

Very truly yours,

SABWZ0346269

SIDL 0382082

# Exhibit 6

MAR-28-2002  11:46     DIVERSIFIED GROUP          12127523972   P.01

960 Third Avenue, 23rd Floor
New York, NY 10022
Tel: (212) 888-2700
Fax: (212) 888-7908

**THE DIVERSIFIED GROUP
INCORPORATED**



| To: | Mr. R. J. Ruble / Ms. Susan Sodano | From: | Ms. Elizabeth Jung |
|---|---|---|---|
| | Sidley Austin Brown & Wood LLP | | |
| Fax: | (212) 906-2021 | Pages: | (including cover sheet)  3 |
| Phone: | | Date: | March 28, 2002 |
| Re: | RICHARD EGAN | CC: | |

☐ Urgent   ☒ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

Hello R.J. & Susan

Please find attached Mr. Egan's signed Representations of Investor document.

Please call me should you require any additional documentation.  I may be reached
at 212-888-2700.

Regards,

Elizabeth Jung

**SABWZ0346273**

SIDL 0382086

Mr. Richard J. Egan
87 Elm Street
Hopkinton, MA

Sidley Austin Brown & Wood LLP
875 Third Avenue
New York, NY 10022
Attn. R.J. Ruble

Dear Mr. Ruble:

      I ("Investor") have requested your opinion regarding certain federal income tax consequences of various investment transactions ("Transactions") that Investor made directly and through the use of options ("Options"). The investments were made through Fidelity World Currency Advisor A Fund, LLC ("World"), a limited liability company whose sole membership interest was owned by Investor, and Fidelity International Currency Advisor A Fund LLC ("International").

      All investment decisions of International are made by Michael J. Egan ("Manager") in consultation with Alpha Consultants, LLC (" Investment Advisor"). Each of the trades entered into by World and International was entered into with Refco Capital Markets, Ltd. ("Counterparty").

      For purpose of rendering our opinion, Investor hereby represents as follows:

      1.    Investor entered into the Transactions for substantial non-tax business reasons, predominantly related to offsetting various investment risks associated with a large single concentrated holding in a U.S. technology company, and to hedge against currency fluctuations in international markets in which this technology company has significant currency exposure due to sales. Investor at the time was barred from engaging in direct hedging techniques with respect to his holdings. Also Investor has entered into certain Options to hedge against interest rate fluctuations since Investor was drawing on a large line of credit with a floating interest rate. It was important to be able to manage the interest rate risks due to size of the loans as well as the limitations on the Investor's ability to sell his concentrated holdings due to trading restrictions and sales lockouts at a time when the stock price was becoming increasingly volatile. The intent was for these options to provide cushion if the stock price dropped significantly or if interest rates significantly increased.

1

SABWZ0346274

SIDL 0382087

2.    Based on advice of the Investment Advisor as to the probability of the referenced property reaching certain price levels at which the Options would be profitable, and on Investor's own independent evaluation, Investor believed that he had a reasonable opportunity to earn a reasonable profit from the Transactions in excess of all fees and transaction costs and without regard to tax benefits.

3.    Investor contributed the membership interest in World to International for substantial non-tax business reasons. Investor has a very sophisticated investment portfolio. Investor continually attempts to group similar purpose investments in limited liability companies or limited partnerships to provide more accurate investment monitoring, to maintain overall portfolio balance, to achieve diversification of Investor's portfolio and to monitor investment risk. In addition, Investor has actively pursued investment opportunities since 1994 in alternative investments (such as real estate, private equity, venture funds, hedge funds, etc.). In order to boost economic performance, diversify holdings and limit risk. All of these investments have been done through limited liability companies or limited partnerships. Many of these investments have outside participants and/or outside managers. Some of these investments have periodically involved hedging strategies.

Based on historical correlations, Investor believed that one group of the Options would move in the opposite direction of the stock price relating to his concentrated holdings and another group of the Options would move in the opposite direction of his interest rate exposure on his line of credit related to his concentrated holding. The Options were intended to provide a hedge against large losses arising due to Investor's concentrated holdings until Investor was able to sell a larger percentage of these holdings and pay down his line of credit and lower his interest rate exposure.

4.    World has not elected under Treas. Reg. §301.7701-3 to be classified as a corporation.

5.    Investor has not hedged Investor's risks with respect to the Options.

6.    Investor has not identified, and will not identify, any of the Options as being part of a hedging transaction under Treas. Reg.§1.446-4.

6.    Investor maintains Investor's books and records using the U.S. dollar.

8.    Investor is not related to the other members of International or to Counterparty within the meaning of Code Section 267(b).

2

SABWZ0346275

MAR-28-2002  11:47        DIVERSIFIED GROUP            12127523972   P.04

9.    There existed no understanding, agreement, obligation, or arrangement pursuant to which any of the parties described herein committed to undertake all or any of the transactions described herein upon the happening of any other transaction, except to the extent that Investor/World (and International as transferee of Investor) and Counterparty were contractually obligated to perform under the Options in accordance with their stated terms.

10.   Investor has reviewed the description of the Transactions attached hereto and such description is accurate and materially complete.

Very truly yours,

Richard J. Egan

3

TOTAL P.04

SABWZ0346276

SIDL 0382089

**Exhibit 7**

# PROSKAUER ROSE LLP

1585 Broadway
New York, NY 10036-8299
Telephone 212.969.3000
Fax 212.969.2900

LOS ANGELES
WASHINGTON
BOCA RATON
NEWARK
PARIS

September 4, 2002

Mr. Richard J. Egan
116 Flanders Road
West Borough, MA
01581

Dear Mr. Egan:

You have requested our opinion (the "Opinion") regarding whether Richard J. Egan (the "Investor") would be subject to disclosure requirements under Section 6011 of the Internal Revenue Code of 1986, as amended (the "Code")[1], for Investor's involvement in various investment transactions (the "Transactions"). For purposes of this discussion, we assume that Investor is a United States individual.

You have provided us with certain documents summarizing the Transactions. We assume that all pertinent facts, circumstances and representations relevant to the Transactions were thereby disclosed to us and such documents were, in relevant part, true, accurate and complete.

## I.   The Transactions

In the Transactions, Fidelity World Currency Advisor A Fund, LLC ("World") is a limited liability company whose membership interests are solely owned initially by Investor.[2]

Fidelity International Currency Advisor A Fund, LLC ("International") is a limited liability company with four members, one of whom is the Investor. International was formed to buy and sell options and to conduct other investment activities.

International's operating agreement establishes two sets of membership interests, common and preferred. Only common interest holders share in International's profits and losses and each preferred interest carries a guaranteed annual return of 12 %, independent of

---

[1]   All sections references herein are to the Code, unless otherwise indicated. All references to Regulations herein are to the Treasury Regulations promulgated pursuant to the Code, unless otherwise indicated.

[2]   Based on our understanding that World is a single member LLC that has not filed an election to be treated as a corporation, it should be treated as a disregarded entity for federal income tax purposes.

**B 0037893**

CONFIDENTIAL
Produced by Proskauer to United States on 11/30/06

PR(EGAN)0024347
2PR-EGAN-0024347

September 4, 2002
Page 2

International's profits. International maintains capital accounts for its members in accordance with Regulations under section 704(b). The operating agreement also provides that when members' interest change during the year, their distributive shares are determined using the interim "closing of the books" method.

On October 9, 2001, World entered into a pair of European-style digital call options and a pair of European-style digital put options (together, the "World Options"). In each pair, World purchased a call option (or put option) and sold a call option (or put option) based on the same underlying interest rate derivative or index but having different strike prices. The net premium paid by World to acquire the World Options was $2,250,000.

On October 22, 2001, Investor contributed his interest in World to International in exchange for 5% of the common interest and 100% of the preferred interests of International. On the same date, another member ("Co-Investor") contributed cash in exchange for 93% of International's common interests[3]. The other members contributed cash and obtained the remaining common interests in International.

On the same date, International invested in a number of foreign currency options contracts. On October 29 and October 30, 2001 International closed certain of these contracts and acquired new foreign currency-based instruments. These trading activities resulted in a realized gain.

On October 31, 2001, Investor acquired additional preferred membership interests in International by contributing shares of Stockton Holdings.

On November 5, 2001, Investor purchased all but 5% of Co-Investor's total 93% common membership interest.

On November 6, 2001, World entered into new options contracts, eliminating its economic risk of gain or loss from its October 9 trades, and recognizing a small net loss.

On November 29, 2001, Investor made an additional contribution of $5,000,000 to International in exchange for additional preferred membership interests.

On December 3, 2001, International closed out its remaining options (the "Remaining Options") and recognized losses.

On December 14, 2001, Investor made an additional contribution of $2,000,000 to International in exchange for additional preferred membership interests.

We understand that Investor has obtained an opinion of counsel that the intended tax treatment of the Transactions would more likely than not be sustained if challenged, and we

---

[3]    Co-Investor was a foreign resident individual.

**B 0037894**

September 4, 2002
Page 3

assume that Investor has reasonably relied on such opinion for purposes of reporting the Transactions on his federal income tax return.

## II.   Disclosure Requirements

As relevant here, Section 6011(a) requires every person liable for any tax under the Code to make a return according to the forms and regulations provided by the Secretary including all information required by the forms and regulations. Every individual, trust, partnership, and S corporation that has participated, directly or indirectly, in a "reportable transaction" that is a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4T(b)(2) must attach to its return for the taxable year of the transaction a disclosure statement in the form prescribed by Treasury Regulation Section 1.6011-4T(c).[4]

The preamble to the revised regulations states that the IRS plans to issue future guidance extending the disclosure requirement to other reportable transactions (i.e., non-listed transactions)[5] entered into by individuals, partnerships, trusts and S corporations. However, no such guidance has been issued to date. Therefore to date, individuals, such as Investor, have no obligation to disclose their participation in "other reportable transactions," as defined in Treasury Regulation Section 1.6011-4T(b)(3)(i).

A "listed transaction" is any transaction which is the same as or "substantially similar" to one of the types of transactions that the Internal Revenue Service (the "IRS") has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction for purposes of Section 6011.[6]

A transaction will be treated as being the same as or "substantially similar" to one of the types of transactions that the IRS has determined to be a tax avoidance transaction if the transaction is expected to obtain the same or similar types of tax benefits and is either factually similar or is based on the same or a similar tax strategy.[7] The term "substantially similar" is to be broadly construed in favor of disclosure.[8] The Regulations do not define what is meant by "tax strategy."[9]

---

[4]   Treas. Reg. § 1.6011-4T(a)(1).  T.D. 9000 (June 18, 2002) revised the temporary Regulations under Section 6111(d) to include this disclosure requirement for individuals who participate in "listed transactions."

[5]   Treas. Reg. § 1.6011-4T(b)(3)(i).

[6]   Treas. Reg. § 1.6011-4T(b).

[7]   Treas. Reg. § 1.6011-4T(b)(1)(i).

[8]   Treas. Reg. § 1.6011-4T(b)(1)(i).

[9]   The IRS appears to have previously used the term "tax strategy" very rarely in published guidance; as a result, it is difficult to discern what the term means specifically.  For example, Private Letter Ruling 9328022 (March 5, 1993) refers to a "tax strategy" of purchasing taxpayers' initial inventory from discounters' suppliers at the end of their initial abbreviated tax year, marking on higher retail prices (fully expecting to sell nothing at the prices marked on the merchandise), thereby locking in a low valued inventory base.  Field Service Advice

CONFIDENTIAL
Produced by Proskauer to United States on 11/30/06

**B 0037895**

PR(EGAN)0024349
2PR-EGAN-0024349

September 4, 2002
Page 4

    A taxpayer will be considered to have indirectly participated in a "listed transaction" if the taxpayer's Federal income tax liability is affected by the transaction, even if the taxpayer does not participate in the transaction itself. For example, where the "listed transaction" is consummated through a partnership, the taxpayer will be treated as an indirect participant if the taxpayer is a partner and the taxpayer's Federal income tax liability is likely to be affected by the partnership's participation in the transaction.[10]

## III.    Analysis

    The IRS has published a number of notices describing various listed transactions. See, e.g., Notice 2000-61, 2000-2 C.B. 569; Notice 2001-16 (February 26, 2001), 2001-1 C.B. 730. The majority of these notices have no bearing on the Transactions. However, there are two notices that the IRS may argue are the same as or substantially similar to the Transactions, in which case the IRS would contend that Investor is required to disclose his participation in the Transactions. These two notices are Notice 2002-44, 2000-2 C.B. 255, and Notice 2002-50 (June 26, 2002). For the reasons discussed below, it is more likely than not that the Transactions would not be considered "listed transactions" as they are not substantially similar to any listed transactions.

### A.    Notice 2000-44

In Notice 2000-44, the IRS addressed two fact patterns, including the following:

> [A] taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.

> Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under Section 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income

---

    199952001 (September 29, 1999) refers to a consolidated group's "tax strategy" of selling a subsidiary's stock but retaining investment assets.

[10]   Treas. Reg. § 1.6011-4T(a)(1).

**B 0037896**

CONFIDENTIAL
Produced by Proskauer to United States on 11/30/06

PR(EGAN)0024350
2PR-EGAN-0024350

September 4, 2002
Page 5

realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of Section 165. The purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for Federal income tax purposes. The purported tax benefits from these transactions may also be subject to disallowance under other provisions of the Code and regulations. In particular, the transactions may be subject to challenge under Section 752, or under [Treas. Regs.] § 1.701-2 or other anti-abuse rules. In addition, in the case of individuals, these transactions may be subject to challenge under § 165(c)(2). See Fox v. Commissioner, 82 T.C. 1001 (1984). Furthermore, tax losses from similar transactions designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for Federal income tax purposes.

T.D. 9000 added the definition of "substantially similar" and the following example to illustrate when a transaction is the same as or substantially similar to a listed transaction. The example states:

Notice 2000-44 (2000-2 C.B. 265) (see § 601.601(d)(2) of this chapter), sets forth a listed transaction involving offsetting options transferred to a partnership where the taxpayer claims basis in the partnership for the cost of the purchased options but does not reduce basis under section 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the options. Transactions using short sales, futures, derivatives or any other type of offsetting obligations to inflate basis in a partnership interest would be the same as or substantially similar to the transaction described in Notice 2000-44. Moreover, use of the inflated basis in the partnership interest to diminish gain that would otherwise be recognized on the transfer of a partnership asset

**B 0037897**

CONFIDENTIAL
Produced by Proskauer to United States on 11/30/06

PR(EGAN)0024351
2PR-EGAN-0024351

September 4, 2002
Page 6

would also be the same as or substantially similar to the transaction described in Notice 2000-44 (the "Example").[11]

The Transactions more likely than not would not be considered "substantially similar" to Notice 2000-44. There are a number of factual differences between the Transactions and the transaction in Notice 2000-44. The Transactions did involve the Investor contributing his membership interest in World to International and claiming basis in International[12] based upon the World Options. However, the important difference is that the World Options did not produce a loss, or reduce any gain to be recognized, as was the case in Notice 2000-44. Rather, the loss in the Transactions results from an actual depreciated asset, the Remaining Options.

In contrast, the transaction in Notice 2000-44 results in an artificial, non-economic loss. In the Notice 2000-44 transaction, the taxpayer artificially inflates his basis in his partnership interest by including the cost of the purchased call options but not reducing his basis for the written call options under Section 752. When the taxpayer disposes of his partnership interest he has a non-economic loss, as a result of his previous basis manipulation.

In addition, the taxpayer in the Notice 2000-44 transaction had a net economic outlay that was nominal or zero. Here, Investor acquired the World Options for $2,250,000, a significant investment. The Investor also contributed stock valued at over $4,600,000 and $7,000,000 of cash to International in exchange for additional membership interests. Thus, Investor had a substantial economic outlay with respect to the Transactions.

Applying the test in Treasury Regulation Section 1.6011-4T(b)(1)(i), a transaction will be substantially similar to the transaction in Notice 2000-44 if it is expected to result in a similar type of tax benefit and is either factually similar or is based on a similar tax strategy. The tax benefit of the Notice 2000-44 transaction would appear to be the non-economic loss generated by the inflated basis in the partnership created through the use of offsetting options, which is lacking with respect to the Transactions. Even if the IRS were to argue that the tax benefit resulting from the Transactions is similar to that described in Notice 2000-44, the facts and tax strategy are different. Although the Investor used offsetting positions to claim basis in a partnership interest, Investor did not use that as a strategy to create an artificial loss. Instead, the loss arose from separate transactions entered into by International. In addition, Investor's investment in the Transactions was not nominal. Accordingly, the Transactions are likely neither factually similar to, nor based on a similar tax strategy as, the transactions described in Notice 2000-44.

The language in the Example is consistent with this conclusion. The purpose of the Example is to illustrate when a transaction is the same as or substantially similar to a listed transaction. The introductory language to the Example in Treasury Regulation Section 1.6011-4T(b)(1)(ii) uses this explicit language. The preamble to the revised regulations explains that:

---

[11]    Treas. Reg. § 1.6011-4T(b)(1)(ii), Example 1.

[12]    A portion of Investor's basis in International is also the result of contributions of cash and stock.

CONFIDENTIAL
Produced by Proskauer to United States on 11/30/06

B 0037898

PR(EGAN)0024352
2PR-EGAN-0024352

September 4, 2002
Page 7

> Some taxpayers and promoters have applied the <u>substantially</u>
> <u>similar</u> standard in an overly narrow manner to avoid disclosure.
> For instances, some taxpayers and promoters have made subtle and
> insignificant changes to a listed transaction in order to claim that
> their transactions are not subject to disclosure.... The IRS and
> Treasury believe that these interpretations are improper.

While the scope of some of the language in the Example is not entirely clear, we believe it would likely be interpreted in light of its express purpose to illustrate the definition of "substantially similar." For instance, the Example states that transactions using short sales, futures, derivatives or other offsetting obligations to inflate basis would be the same as or substantially similar to the transactions in Notice 2000-44. We do not interpret this sentence to mean that <u>every</u> transaction "using short sales ... to inflate basis in a partnership interest" is a listed transaction. Instead, we interpret this sentence, in light of the purpose of the Example, to mean that transactions that are described in Notice 2000-44, apart from the fact that they used short sales or futures instead of options (as was the case in Notice 2000-44), are listed transactions. Our interpretation is based on the regulatory framework, which provides that whether a transaction is a "listed transaction" is determined by testing the transaction against the transaction described in the Notice, and also on the fact that the express purpose of the Example was to illustrate the meaning of "substantially similar" and not to modify the Notice itself.

The Example also states that "the use of the inflated basis in the partnership interest to diminish gain that would otherwise be recognized on the transfer of a partnership asset" would be the same as or substantially similar to the transaction described in Notice 2000-44. This statement would appear to encompass an attempt to shift an artificially high partnership basis to an appreciated asset and thereby diminish gain recognized on the disposition of that asset. The sentence does not appear to apply to the Transactions, since they do not involve the use of an inflated basis to reduce the amount of gain recognized on the transfer of a partnership asset.

Based on the foregoing analysis and discussion, it is more likely than not that the Transactions would not be considered to be substantially similar to the transactions in Notice 2000-44.

### B.    Notice 2002-50

Notice 2002-50 describes a transaction which uses "a straddle, a tiered partnership structure, a transitory partner, and the absence of a 754 election to allow [the] Taxpayer to claim a permanent non-economic loss." Notice 2002-50 identifies the following fact pattern as a listed transaction:

> This transaction involves partnerships manipulated through a series
> of steps carried out in the following order. No § 754 election is in
> effect at any relevant time. Step 1: Corporation acquires a majority
> interest in an upper tier partnership (UTP) at fair market value.
> Step 2: UTP acquires a majority interest in a lower tier partnership

**B 0037899**

CONFIDENTIAL
Produced by Proskauer to United States on 11/30/06

PR(EGAN)0024353
2PR-EGAN-0024353

September 4, 2002
Page 8

(LTP) at fair market value. Step 3: LTP enters into straddles on foreign currencies and may acquire other assets. Step 4: LTP terminates the gain leg of a foreign currency straddle. LTP allocates a pro rata share of the gain to UTP, which in turn allocates a pro rata share of the gain to Corporation. This gain increases the basis of each partnership interest. Step 5: Corporation sells its interest in UTP to Taxpayer at fair market value. This results in a loss to Corporation sufficient to offset the gain that was allocated to Corporation. Step 6: Taxpayer purchases UTP's interest in LTP at fair market value. UTP realizes a loss on this sale, but the loss is disallowed under § 707(b)(1)(A)[13] because Taxpayer owns more than 50% of UTP. Step 7: LTP engages in a transaction that is intended to increase Taxpayer's basis in the LTP interest. For example, LTP may incur a liability that Taxpayer guarantees. LTP then terminates the loss leg of the foreign currency straddle and allocates a pro rata share of the loss to Taxpayer. Step 8: Taxpayer sells the interest in LTP at its fair market value and realizes gain (for example, from the relief of liability). Taxpayer then claims that this gain is offset under § 267(d)[14] by the amount of the loss that was disallowed to UTP under § 707(b)(1)(A).

ANALYSIS

The transaction described in this notice has been designed to use a straddle, a tiered partnership structure, a transitory partner, and the absence of a section 754 election to allow Taxpayer to claim a permanent non-economic loss.

Notice 2002-50 concludes that because the gain realized by the taxpayer on the sale of its interest in LTP does not correspond to any increase in the value of the assets within LTP, the loss previously disallowed on the sale of the LTP interest by the UTP cannot be used to offset the taxpayer's gain. Notice 2002-50 also provides that a transaction will be considered "substantially similar" to the transaction described therein even if the last step of the transaction has not been completed, i.e., the partnership interest has not yet been sold.

The Transactions more likely than not would not be considered substantially similar to the transactions in Notice 2002-50. As stated above, the key features of a Notice 2002-50 transaction are that it uses "a straddle, a tiered partnership structure, a transitory partner, and the

---

[13]  Section 707 disallows losses arising from sales or exchanges of property between a partnership and a person or other partnership that owns more than 50% of the interests in the partnership.

[14]  Generally, Section 267(d) allows the recapture of deductions previously disallowed due to the relationship between the parties to the transaction.

**B 0037900**

CONFIDENTIAL
Produced by Proskauer to United States on 11/30/06

PR(EGAN)0024354
2PR-EGAN-0024354

September 4, 2002
Page 9

absence of a 754 election to allow [the] Taxpayer to claim a permanent non-economic loss." Thus, the elements of a Notice 2002-50 transaction are (i) a straddle, (ii) a tiered partnership structure, (iii) a transitory partner, (iv) the absence of a Section 754 election and (v) a permanent non-economic loss.

Reviewing these factors there are some superficial similarities between the Transactions and the Notice 2002-50 transaction. First, the World Options in the Transaction may constitute a "straddle" for Federal income tax purposes as may some of the investments made by International. Second, there is no Section 754 election made in the Transactions.

However, the Notice 2002-50 transaction is distinguishable in certain crucial respects. First and foremost, the Transactions did not utilize a tiered partnership structure, a factor which was fundamental in generating the permanent non-economic loss described in the Notice. In the Notice 2002-50 transaction, when the gain from the options is recognized it is allocated to UTP and thus increases UTP's basis in the LTP (and in turn it increases the corporation's basis in UTP). Upon the sale of the interest in LTP to taxpayer, the offsetting loss is disallowed under Section 707. However, that loss remains available to offset the taxpayer's gain when he sells his LTP interest, or if he causes LTP to distribute or sell its assets. Thus, the tiered partnership structure is used to create a permanent non-economic loss.

In contrast, in the Transactions there is only one partnership,[15] International. There is no increase in basis arising from gain in a lower-tier partnership, and no corresponding deferred loss on the sale of the lower-tier partnership that will be available to offset taxpayer's future gain.

In addition, unlike the Notice 2002-50 transaction, there are no "transitory partners" in the Transactions. The four members of International do change their percentage ownership in the common and preferred interests of International during the Transactions but every member retains a more than nominal interest in International. Therefore, in the Transactions it is unlikely any of the parties would be characterized as transitory partners.

Notice 2002-50 states that a transaction will be considered to be the same as, or substantially similar to the Notice 2002-50 transaction even if the taxpayer has not engaged in the final step of the transaction, the sale of the partnership interest. Therefore, a transaction is covered by Notice 2002-50 even if the deferred loss created in Step 6 of Notice 2002-50 is not yet applied to offset gain. However, the creation of a deferred loss through the use of a tiered partnership remains the fundamental premise of Notice 2002-50, and that aspect is lacking in the Transactions.

Treasury Regulation Section 1.6011-4T(b)(1)(i) states that a transaction will be considered substantially similar to a listed transaction where the taxpayer is expected to obtain similar tax benefits and the transaction is factually similar or is based on a similar tax strategy.

---

[15]   At all relevant times, World is a limited liability company with a single member and thus is treated as an entity disregarded from its member. Even if World is treated as a separate entity for these purposes, no lower tier is acquired or disposed of, as occurs in Notice 2002-50. Additionally, no loss is disallowed in the Transactions.

**B 0037901**

CONFIDENTIAL
Produced by Proskauer to United States on 11/30/06

PR(EGAN)0024355
2PR-EGAN-0024355

September 4, 2002
Page 10

However, as discussed above the Transactions would likely not be considered factually similar to the Notice 2002-50 transaction as they are lacking a key feature, the use of a tiered partnership to create a deferred loss and thus achieve a permanent non-economic loss. For the same reason, the tax strategy used in the Transactions is likely not similar to the tax strategy used in Notice 2002-50. Accordingly, it is more likely than not that the Transactions would not be considered substantially similar to the Notice 2002-50 transaction.

## IV.   Penalties

Neither the Code nor the Regulations impose any specific penalty for failing to disclose under Treasury Regulation Section 1.6011-4T.

Section 6664(c)(1) states that the underpayment penalty does not apply if there was "reasonable cause" for the underpayment and the taxpayer "acted in good faith". The IRS asserted in the preamble to the February 28, 2000 regulations[16], citing Treasury Regulation Section 1.6664-4(b)(1), that a failure to disclose when required "could indicate" that the taxpayer had not acted in "good faith" depending on all facts and circumstances (including why the taxpayer had not disclosed) and if so the reasonable cause exception would not apply even if the taxpayer had relied on professional advice, such as an opinion of counsel, relating to the underlying transaction.[17] The IRS apparently reads the statute to impose separate requirements of good faith and reasonable cause. If the IRS's reading of the statute is correct, this opinion would likely supply any required "good faith". However, Treasury Regulation Section 1.6664-4(c)(1), which the IRS does not quote, uses the "good faith" requirement in conjunction with a legal opinion to require only that the reliance itself must be in good faith (e.g., that the opinion correctly sets out all facts known to the taxpayer).[18] This regulation suggests that there is no independent "good faith" requirement and that the reasonable cause defense would apply as long as the taxpayer's reliance on the tax opinion on the underlying transaction is in good faith.

Moreover, taxpayers that are not C corporations need not rely on the reasonable cause exception to the substantial understatement penalty. For these taxpayers under section 6662(d)(2)(C), the understatement is reduced by any portion attributable to the tax treatment of an item (i) for which there was substantial authority and (ii) which the taxpayer reasonably

---

[16]   See, T.D. 8877 (March 2, 2000).

[17]   The IRS did not assert that the failure to disclose meant the taxpayer had not filed a return at all and so would be liable for a failure-to-file penalty under section 6651(a)(1). "Summary on Corporate Tax Shelter Disclosure Regs Clarified", 2000 TNT 41-15 (Feb. 29, 2000); see also Lee Sheppard, News Analysis -- Corporate Tax Shelter Disclosure: But Will It Work?, 2000 TNT 44-2 (Mar. 3, 2000).

[18]   Regs. § 1.6664-4(b) states: "Reliance on . . . professional advice . . constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. (See paragraph (c) of this section for certain rules relating to the advice of others.)" Regs. § 1.6664-4(c) then begins: "All facts and circumstances must be taken into account in determining whether a taxpayer has reasonably relied in good faith on advice (including the opinion of a professional tax advisor) . . . . [emphasis added]"

CONFIDENTIAL
Produced by Proskauer to United States on 11/30/06

**B 0037902**

PR(EGAN)0024356
2PR-EGAN-0024356

September 4, 2002
Page 11

believed was more likely than not proper.[19] Treasury Regulation Section 1.6662-4(g)(4)(i)B) states that the taxpayer may meet the "reasonable belief" test if he "relies in good faith" on a more-likely-than-not tax opinion. While the regulation also requires that the requirements of Treasury Regulations Section 1.6664-4(c)(1) be met, unlike section 6664(c), neither section 6662(d)(2)(C) nor this latter regulation even arguably impose a separate "good faith requirement".

For the foregoing reasons, we believe that even if a court were to find that Investor was required to disclose the Transactions, it is more likely than not that Investor would not be subject to penalties under the Code, directly or indirectly, for his failure to disclose the Transactions.

## III.     Conclusions

Based on the foregoing analysis and discussion, it is more likely than not that the Transactions would not be considered substantially similar to the transaction described in Notice 2002-50 or Notice 2000-44, and therefore the Transactions more likely than not would not be considered a "listed transaction" for the purposes of the disclosure requirements under section 6011. We also believe that even if a court were to find that Investor was required to disclose the Transactions, it is more likely than not that Investor would not be subject to penalties under the Code, directly or indirectly, for his failure to disclose the Transactions.

The opinions expressed herein are furnished by us solely for your benefit and thus may not be relied upon by or delivered to any other person without our express, prior written approval. This opinion is furnished to you solely for your use in determining the federal income tax consequences of the transactions described above and is not to be used, circulated, quoted, or otherwise referred to for any other purpose without our express written permission. Our permission is not required in connection with any examination conducted or required by a

---

[19]   This reasoning does not apply to the substantial valuation misstatement penalty under section 6662(b)(3); since the exception in section 6662(d) is limited to the understatement penalty, the taxpayer must rely on the reasonable cause exception. However, notwithstanding the IRS's contention in several recent field service advice memoranda, FSA 200134002 (Mar. 23, 2001); FSA 200150001 (Aug. 2, 2001); FSA 200224011 (Mar. 5, 2002), the Transactions should not be subject to this penalty because, unlike the situation at which section 6662(e) was aimed, any misstatement of basis would result from a legal, not factual, dispute. *See* Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981 at 332. These FSAs cite *Gilman v. Comm'r*, 933 F.2d 143 (2d Cir. 1991), *aff'g* T.C. Memo. 1989-684, *cert. denied*, 502 U.S. 1031 (1992), for the proposition that the overvaluation penalty could apply even where tax benefits were disallowed entirely because a transaction lacked economic substance. Although the court's opinion does not specifically address this point, the facts indicated that the lack of economic substance bore directly on the fact that the property was overvalued when it was acquired, *i.e*, the purchase price was so high that in the court's view it was impossible for the taxpayer to make a profit from the transaction without regard to tax benefits. Thus, *Gilman* ought to be read, consistent with the legislative history noted above, to permit the imposition of the penalty in those cases in which an overvaluation of property as a matter of fact, as opposed to as a matter of law, was the cause of, and was integral to, the lack of economic substance. Other appellate courts have also upheld the imposition of the penalty in such a case. *See, e.g., Massengill v. Comm'r*, 876 F.2d 616 (8th Cir. 1989); *Merino v. Comm'r*, 196 F.3d 147 (3d Cir. 1999).

**B 0037903**

CONFIDENTIAL
Produced by Proskauer to United States on 11/30/06

PR(EGAN)0024357
2PR-EGAN-0024357

September 4, 2002
Page 12

governmental or regulatory body, including disclosure to your outside accountants or lawyers in order to allow them to assist with such an examination on your behalf.

In addition, our opinion is based on the law and other authorities in effect on the date hereof, which are subject to change, possibly with retroactive effect. Any such changes could affect the opinions expressed herein. We assume no obligation to update our opinion in light of any subsequent changes in law. All opinions expressed herein relate solely to the federal income taxes discussed. No opinions are expressed or implied as to any other federal income tax issues or any foreign, state or local tax issues.

Very truly yours,

Proskauer Rose LLP

**B 0037904**

CONFIDENTIAL
Produced by Proskauer to United States on 11/30/06

PR(EGAN)0024358
2PR-EGAN-0024358

**Exhibit 8**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FIDELITY INTERNATIONAL CURRENCY                )
ADVISOR A FUND, L.L.C., by the Tax Matters     )
Partner,                                        )
                                                )
              Plaintiff,                         )         Case Nos.: 05-40151-FDS
                                                )                    06-40130-FDS
       v.                                       )
                                                )
UNITED STATES OF AMERICA,                       )
                                                )
              Defendant.                         )

## UNITED STATES' AMENDED RESPONSE TO
## PLAINTIFF'S SECOND SET OF INTERROGATORIES

The United States, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure

and Rule 33.1 of the Local Rules of the United States District Court for the District of

Massachusetts, responds to Plaintiff's First Set of Requests for Production of Documents as

follows:

INTERROGATORY NO. 15

At the November 14, 2006 status conference, Defendant stated that Defendant had

"determined that the transaction that is at issue in this case is . . . a boilerplate standard tax

product." Please set forth all facts supporting the statement that the transaction at issue in this

case is a "boilerplate standard tax product."

RESPONSE: The United States objects to this interrogatory on the ground that it is

overbroad and unduly burdensome, and because it seeks attorney work-product and trial-

preparation materials. Notwithstanding and without waiving the foregoing objection, see the

United States motion papers filed in support of its motion to compel The Diversified Group to

produced documents, a copy of which was served upon plaintiff on March 5, 2007, and which are

incorporated herein.   The facts upon which counsel for defendant based this statement are set

forth in those motions papers.

INTERROGATORY NO. 16

At the November 14, 2006 status conference, Defendant stated that Defendant had

"determined that this tax product [referenced in Interrogatory No. 15] has been, in fact, sold to 63

separate taxpayers, or taxpayer entities."  Please set forth all facts supporting the statement that

the tax product was "sold to 63 separate taxpayers, or taxpayer entities," including the identity of

the 63 taxpayers or entities.

RESPONSE:  The United States objects to this interrogatory on the ground that it is

overbroad and unduly burdensome, and because it seeks attorney work-product and trial-

preparation materials.  Notwithstanding and without waiving the foregoing objection, see the

United States motion papers filed in support of its motion to compel The Diversified Group to

produced documents, a copy of which was served upon plaintiff on March 5, 2007, and which are

incorporated herein.  Appendices C and D thereto identify a total of 58 partnerships which were

involved in cookie-cutter FDIS tax shelter transactions, encompassing over 63 individual

taxpayers.

INTERROGATORY NO. 17

At the November 14, 2006 status conference, Defendant stated that Defendant had

"determined that in each of these entities [referenced in Interrogatory No. 16] there was a foreign

partner" and that "the foreign partner in these entities was either ... Samuel Mahoney; or

alternatively, his partner in Ireland, a person by the name of Martin Hawkes." Please set forth all facts supporting the statement that the foreign partner in each of the entities referenced in Interrogatory No. 16 was either Samuel Mahoney or Martin Hawkes.

RESPONSE: The United States objects to this interrogatory on the ground that it is overbroad and unduly burdensome, and because it seeks attorney work-product and trial-preparation materials. Notwithstanding and without waiving the foregoing objection, the United States avers that evidence demonstrating "that in each of these entities [referenced in Interrogatory No. 16] there was a foreign partner" is in the documents exchanged by the parties during discovery.

INTERROGATORY NO. 18

At the November 14, 2006 status conference, Defendant stated that Samuel Mahoney and Martin Hawkes were "partners." Please set forth all facts supporting the statement that Samuel Mahoney and Martin Hawkes were "partners."

RESPONSE: The United States objects to this interrogatory on the ground that it is overbroad and unduly burdensome, and because it seeks attorney work-product and trial-preparation materials. Notwithstanding and without waiving the foregoing objection, see the United States motion papers filed in support of its motion to compel The Diversified Group to produced documents, a copy of which was served upon plaintiff on March 5, 2007, and which are incorporated herein. Appendices C and D thereto identify a total of 58 partnerships which were involved in cookie-cutter FDIS tax shelter transactions, encompassing over 63 individual taxpayers. Martin Hawkes and Samuel Mahone participated as pupurted foreign partners in each of these partnerships.

INTERROGATORY NO. 19

At the November 14, 2006 status conference, Defendant stated that Defendant had "determined that [the transactions referenced in Interrogatory No. 16] were structured identically in terms of the steps of the transaction." Please set forth all facts supporting the statement that the referenced transactions were "structured identically in terms of the steps of the transaction."

RESPONSE: The United States objects to this interrogatory on the ground that it is overbroad and unduly burdensome, and because it seeks attorney work-product and trial-preparation materials. Notwithstanding and without waiving the foregoing objection, see the United States motion papers filed in support of its motion to compel The Diversified Group to produced documents, a copy of which was served upon plaintiff on March 5, 2007, and which are incorporated herein. Appendices C and D thereto identify a total of 58 partnerships which were involved in cookie-cutter FDIS tax shelter transactions, encompassing over 63 individual taxpayers. As detailed therein, the marketing outlines for each of these transactions reflect that each of these transactions were structured identically in terms of the steps of the transactions.

INTERROGATORY NO. 20

At the November 14, 2006 status conference, Defendant stated that Defendant had "determined that ... in each of these transactions [referenced in Interrogatory No. 16], the foreign partner, in fact, was bought out ... after a so-called gain was recognized to this foreign partner." Please set forth all facts supporting the statement that, in each of the referenced transactions, the foreign partner was bought out following his recognition of gain.

RESPONSE: The United States objects to this interrogatory on the ground that it is overbroad and unduly burdensome, and because it seeks attorney work-product and trial-

preparation materials. Notwithstanding and without waiving the foregoing objection, see the

United States motion papers filed in support of its motion to compel The Diversified Group to

produced documents, a copy of which was served upon plaintiff on March 5, 2007, and which are

incorporated herein. Appendices C and D thereto identify a total of 58 partnerships which were

involved in cookie-cutter FDIS tax shelter transactions, encompassing over 63 individual

taxpayers. Exhibits 50 and 51 thereto evidence the buyout of each of these partners following his

recognition of gain.

INTERROGATORY NO. 21

At the November 14, 2006 status conference, Defendant stated that, in each of the

transactions referenced in Interrogatory No. 16 a gain was recognized by a foreign partner and

that Defendant has "determined in each case [that the gain] was not a real economic gain."

Please set forth all facts supporting the statement that the gain recognized by the foreign partner

in each of the referenced transactions was "not a real economic gain."

RESPONSE: The United States objects to this interrogatory on the ground that it is

overbroad and unduly burdensome, and because it seeks attorney work-product and trial-

preparation materials. Notwithstanding and without waiving the foregoing objection, see the

United States motion papers filed in support of its motion to compel The Diversified Group to

produced documents, a copy of which was served upon plaintiff on March 5, 2007, and which are

incorporated herein.

INTERROGATORY NO. 22

At the November 14, 2006 status conference, Defendant stated that Defendant had

"determined that it is, to say the least, strange as to the source of the foreign partners capital

contributions in each of these separate different transactions [referenced in Interrogatory No. 16]." Please set forth all facts concerning the source of the foreign partner's capital contribution in each of the referenced transactions.

RESPONSE: The United States objects to this interrogatory on the ground that it is overbroad and unduly burdensome, and because it seeks attorney work-product and trial-preparation materials. Notwithstanding and without waiving the foregoing objection, see the United States motion papers filed in support of its motion to compel The Diversified Group to produced documents, a copy of which was served upon plaintiff on March 5, 2007, and which are incorporated herein. Appendices C and D thereto identify a total of 58 partnerships which were involved in cookie-cutter FDIS tax shelter transactions, encompassing over 63 individual taxpayers. Exhibits 50 and 51 thereto evidence the buyout of each of these partners by the promoters.

Dated: March 26, 2007

JOHN A. LINDQUIST
Trial Attorney
U.S. Department of Justice, Tax Div.
P.O. Box 55, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 307-6561
Email:John.A.Lindquist@usdoj.gov

2348187.1

CERTIFICATE OF SERVICE

I hereby certify that the UNITED STATES' AMENDED RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES was served upon the plaintiff by sending a copy by first class mail, postage prepaid, to the following address on the _24_ day of March, 2007.

> David J. Curtin
> MCKEE NELSON LLP
> 1919 M Street, N.W., Suite 200
> Washington, D.C. 20036

> _____
> JOHN A. LINDQUIST

2348187.1

**Exhibit 9**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | Case Nos.: 05-40151-FDS 06-40130-FDS |
| v. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

UNITED STATES' AMENDED RESPONSE TO PLAINTIFF'S
FIFTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS NOS. 44-51

The United States, pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure

and Rule 34.1 of the Local Rules of the United States District Court for the District of

Massachusetts, responds to Plaintiff's Fifth Set of Requests for Production of Documents Nos.

44-51 as follows:

Request No. 44: all records, documents, and materials concerning the information requested in
Interrogatory No. 15.

Response: The United States objects to this request on the ground that it is overbroad and

unduly burdensome, and because it seeks attorney work-product and trial-preparation materials.

Notwithstanding and without waiving the foregoing objection, see United States' Motion to

Compel DGI, a copy of which was served upon plaintiff on March 5, 2007.

Request No. 45: all records, documents, and materials concerning the information requested in
Interrogatory No. 16.

Response: The United States objects to this request on the ground that it is overbroad and

unduly burdensome, and because it seeks attorney work-product and trial-preparation materials.

Notwithstanding and without waiving the foregoing objection, see United States' Motion to

Compel DGI, a copy of which was served upon plaintiff on March 5, 2007.

Request No. 46: all records, documents, and materials concerning the information requested in
Interrogatory No. 17.

     Response:  The United States objects to this request on the ground that it is overbroad and

unduly burdensome, and because it seeks attorney work-product and trial-preparation materials.

Notwithstanding and without waiving the foregoing objection, see United States' Motion to

Compel DGI, a copy of which was served upon plaintiff on March 5, 2007.

Request No. 47: all records, documents, and materials concerning the information requested in
Interrogatory No. 18.

     Response:  The United States objects to this request on the ground that it is overbroad and

unduly burdensome, and because it seeks attorney work-product and trial-preparation materials.

Notwithstanding and without waiving the foregoing objection, see United States' Motion to

Compel DGI, a copy of which was served upon plaintiff on March 5, 2007.

Request No. 48: all records, documents, and materials concerning the information requested in
Interrogatory No. 19.

     Response:  The United States objects to this request on the ground that it is overbroad and

unduly burdensome, and because it seeks attorney work-product and trial-preparation materials.

Notwithstanding and without waiving the foregoing objection, see United States' Motion to

Compel DGI, a copy of which was served upon plaintiff on March 5, 2007.

     Request No. 49: all records, documents, and materials concerning the information
requested in Interrogatory No. 20.

Response:  The United States objects to this request on the ground that it is overbroad and unduly burdensome, and because it seeks attorney work-product and trial-preparation materials. Notwithstanding and without waiving the foregoing objection, see United States' Motion to Compel DGI, a copy of which was served upon plaintiff on March 5, 2007.

Request No. 50: all records, documents, and materials concerning the information requested in Interrogatory No. 21.

Response:  The United States objects to this request on the ground that it is overbroad and unduly burdensome, and because it seeks attorney work-product and trial-preparation materials. Notwithstanding and without waiving the foregoing objection, see United States' Motion to Compel DGI, a copy of which was served upon plaintiff on March 5, 2007.

Request No. 51: all records, documents, and materials concerning the information requested in Interrogatory No. 22.

Response:  The United States objects to this request on the ground that it is overbroad and unduly burdensome, and because it seeks attorney work-product and trial-preparation materials. Notwithstanding and without waiving the foregoing objection, see United States' Motion to Compel DGI, a copy of which was served upon plaintiff on March 5, 2007.

Dated: March 26 , 2007

JOHN A. LINDQUIST
Trial Attorney
U.S. Department of Justice, Tax Div.
P.O. Box 55, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 307-6561
Email:John.A.Lindquist@usdoj.gov

2345369.1

CERTIFICATE OF SERVICE

I hereby certify that the UNITED STATES' RESPONSE TO PLAINTIFF'S FIFTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS NOS. 44-51 was served upon the plaintiff by sending a copy by first class mail, postage prepaid, to the following address on the 26th day of March, 2007.

David J. Curtin
MCKEE NELSON LLP
1919 M Street, N.W., Suite 800
Washington, D.C. 20036

JOHN A. LINDQUIST

2345369.1