UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

MOTION FOR ISSUANCE OF LETTERS ROGATORY
REQUESTING INTERNATIONAL JUDICIAL ASSISTANCE

The United States of America, through undersigned counsel, moves this Court for the

issuance of letters rogatory directed to the appropriate judicial authorities in Ireland and the Isle

of Man.  One letter rogatory requests the judicial authorities of Ireland to compel the appearance

of Samuel Mahoney, Martin Hawkes, and John Hussey to produce documents and give testimony

under oath.  The second letter rogatory requests the judicial authorities of the Isle of Man to

compel the appearance of Oliver Peck and Nigel Glazier Scott to produce documents and give

testimony under oath.  The letters rogatory are attached and a memorandum of law is being filed

contemporaneously with this motion.

**Certification**

I certify that counsel for the United States conferred by telephone on April 4, 2007 with counsel for the plaintiff and attempted in good faith to resolve or narrow the issues raised in this motion.  The plaintiff takes no position at this time with respect to this motion.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

 /s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER L. RICHTARCSIK
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044-0055
Telephone: (202) 307-6561
Facsimile:  (202) 514-5238
E-mail: john.a.lindquist@usdoj.gov
             barry.e.reiferson@usdoj.gov
             heather.l.richtarcsik@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and copies will be sent to those indicated as non registered participants on April 4, 2007.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

2191612.2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTER ROGATORY)

The United States District Court for the District of Massachusetts presents its

compliments to the appropriate judicial authority of Ireland, and requests international judicial

assistance to obtain evidence to be used in a civil proceeding before this court in the above-

captioned matter.

This court requests the assistance described herein as necessary in the interests of justice.

This court requests that the appropriate judicial authority of Ireland compel the appearance of

Samuel Mahoney, Martin Hawkes, and John Hussey to give testimony and produce documents.

### Witnesses to be Served

1.    Samuel Mahoney
      123 Howth Road          and/or          43 Ailesbury road
      Dublin 3                                 Dublin 4
      Ireland                                  Ireland

2.    Martin Hawkes
      5 Bushfield Avenue
      Donnybrook

Dublin 4
Ireland

3.      John Hussey
        Taormina, Silchester Road
        Glenageary
        Co. Dublin
        Ireland

## Facts

This case involves a set of transactions marketed by various U.S. promoters, including international accounting firm KPMG, and engaged in by a U.S. taxpayer in purported partnership with, among others, an Irish citizen named Samuel Mahoney.[1]  That purported partnership is called Fidelity International Currency Advisor A Fund.  To become a partner in Fidelity International Currency Advisor A Fund, Mr. Mahoney purportedly contributed $651,000 for a 93% share of the common interests in the "partnership."  Days later, Mr. Mahoney sold to the U.S. taxpayer an 88% share of the common interests in the "partnership" for half of what he had "contributed" days earlier.  Samuel Mahoney claims that his $651,000 contribution to Fidelity International Advisor A Fund was made on his behalf by Kilsture Ltd., of which he claims to be an employee.

The set of transactions purportedly resulted in a profit to the foreign "partner" and losses to the U.S. taxpayer.  Samuel Mahoney purportedly made a profit of approximately $163.8 million from his participation in the set of transactions.  Because Mr. Mahoney was not a U.S. citizen or resident, he was not required to pay U.S. taxes on that purported profit.  From the same set of transactions, the U.S. taxpayer purportedly lost more than $158 million, and offset the

---

[1]As discussed later, identical sets of these marketed transactions were engaged in by many U.S. taxpayers, including the plaintiff.

taxpayer's stock-option income of approximately $150 million.  That offset of income allowed

the U.S. taxpayer to avoid payment, preliminarily, of approximately $63 million in U.S. income

taxes.  The United States's taxing authority disallowed the claimed losses, adjusting the

partnership items for U.S. tax purposes.  The plaintiff seeks readjustment of the partnership items

for tax purposes, pursuant to Title 26 of the United States Code, Section 6226.

One of the primary legal issues in this case is whether the Fidelity International Currency

Advisor A Fund, in which Samuel Mahoney was purportedly a partner, should be recognized as a

partnership for tax purposes.  The Supreme Court of the United States held that a partnership

should be respected for tax purposes only if

> considering all the facts – the agreement, the conduct of the parties in execution of
> its provisions, their statements, the testimony of disinterested persons, the
> relationship of the parties, their respective abilities and capital contributions, the
> actual control of income and the purposes for which it is used, and any other facts
> throwing light on their true intent – the parties in good faith and acting with a
> business purpose intended to join together in the present conduct of the enterprise.

*Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949).  This court's determination of intent

requires testimonial and documentary evidence from the purported partners and others.

Another of the primary issues is whether the transactions employed here had economic

substance– that is, whether the set of transactions were invented solely to create tax deductions.

The test for whether a transaction is an economic sham is "whether the transaction had any

practicable economic effect other than the creation of income tax losses."  *See, e.g.*, *Rose v.

Commissioner*, 868 F.2d 851, 853 (6th Cir. 1989).  This analysis is guided by the related factors

of whether the transaction can produce economic benefits apart from the generation of tax losses

(an objective analysis) and whether the taxpayer possessed a non-tax business purpose (a

subjective analysis).  *Id*. at 853;  *accord*, *Sochin v. Commissioner*, 843 F.2d 351, 354 (9th Cir.),

*cert. denied*, 488 U.S. 824 (1988). There must be a legitimate non-tax business purpose for forming the partnership in order to meet the intent test set forth in *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949) as stated above. See *Boca Investerings Partnership v. United States*, 314 F.3d 625 (D.C. Cir. 2003); *Saba Partnership v. Commissioner of Internal Revenue*, 273 F.3d 1135 (D.C. Cir. 2001); *ASA Investerings Partnership v. Commissioner of Internal Revenue*, 201 F.3d 505 (D.C. Cir. 2000). Here again, testimonial and documentary evidence from the purported partners and others is essential to this court's determination, which must include a determination of how the product was designed and implemented, and the purpose behind the formation of Fidelity International Currency Advisor A Fund.

In determining the product's design and purpose, and the participants' intent, this court must also examine evidence of other similar or identical transactions. The objective test for economic substance focuses on whether a set of transactions can produce economic benefits apart from tax losses. See *ACM Partnership*, 157 F.3d at 247. When it is determined that taxpayers have engaged in a pre-packaged transaction creating artificial losses that are not reflective of economic reality, evidence regarding the potential economic benefits of similar or identical transactions by others is highly relevant to the objective economic-substance analysis.

Samuel Mahoney engaged in dozens of similar or identical transactions through various entities. Martin Hawkes engaged in dozens more. The United States alleges that Messrs. Mahoney and Hawkes were directors of an Irish company known as Biosphere Finance, Ltd. which received payments from the U.S. promoters. The United States also alleges that Messrs. Mahoney and Hawkes appear to have been employees of two Isle of Man entities, Kilsture Ltd. and Maddox Ltd., which also received substantial payments from the U.S. promoters. Kilsture

and Maddox were shareholders of Cumberdale Holdings, also an Isle of Man entity. John

Hussey was a director of both Biosphere Finance and Cumberdale Holdings. As such, each has

evidence that is highly relevant to the determination of the intent of the participants. Each also

has information that is highly relevant to the determination of the design, development,

marketing and implementation of the transactions at issue.

### Documents to be Produced by Samuel Mahoney, Martin Hawkes, and John Hussey

1.    Company-formation and registration documents for Kilsture Ltd., Maddox Ltd.,

Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy

Financial Products Ltd., and Biosphere Finance Ltd.

2.    Minutes for each meeting of the directors of Kilsture Ltd., Maddox Ltd., Cumberdale

Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial

Products Ltd., and/or Biosphere Finance Ltd.

3.    Company resolutions for Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd.

(Including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., and

Biosphere Finance Ltd.

4.    Financial statements for Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd.

(Including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., and

Biosphere Finance Ltd.

5.    Marketing materials for all Helios and The Diversified Group transactions in which Messrs.

Mahoney, Hawkes, and/or Hussey participated.

6.    Partnership agreements for each partnership in which Samuel Mahoney or Martin Hawkes

was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and

then transferred the offsetting options to the partnership.

7.    Contribution agreements for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

8.    Buy-sell notices for each transaction entered into by each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

9.    Operating agreements for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

10.    Tax returns for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

11.    Opinion letters for each transaction for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

12.    Outlines of transactions for each transaction for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

13.    Contracts for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

14.    Contracts between Samuel Mahoney, Martin Hawkes, and/or John Hussey, and Helios, The Diversified Group Inc., Kilsture Ltd., Maddox Limited, Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., and/or Biosphere Finance Ltd.

## Documents to be Produced by Samuel Mahoney

1.    Loan documents for loans from Kilsture Ltd. to Samuel Mahoney.

2.    Proof of Samuel Mahoney's repayment of any loans from Kilsture Ltd.

3.    Bank records of Kilsture Ltd. showing trans-Atlantic payments to or from Kilsture Ltd.

4.    Bank records of Samuel Mahoney showing payments to or from Kilsture Ltd. or trans-Atlantic payments to or from Samuel Mahoney

## Questions to Samuel Mahoney, Martin Hawkes, and John Hussey

1.    Were you a Director of Biosphere Finance Ltd.?

2.    Who were the other Directors of Biosphere Finance Ltd.?

3.    When was Biosphere Finance Ltd. founded?

4.    Who were Biosphere Finance Ltd.'s shareholders?

5.    When did you become a Director of Biosphere Finance Ltd.?

6.    Was Biosphere Finance Ltd. engaged in business?

7.    What business was Biosphere Finance Ltd. engaged in at inception?

8.    What business was Biosphere Finance Ltd. engaged in from January 1, 2000 through January 1, 2003?

9.    Were you an employee of Biosphere Finance Ltd.?

10.    What were your duties as an employee of Biosphere Finance Ltd.?

7

11.   Were you a Director of Kilsture Ltd.?

12.   Who were the other Directors of Kilsture Ltd.?

13.   When was Kilsture Ltd. founded?

14.   Who were Kilsture Ltd.'s shareholders?

15.   When did you become a Director of Kilsture?

16.   Was Kilsture engaged in business?

17.   What business was Kilsture engaged in at inception?

18.   What business was Kilsture engaged in from January 1, 2000 through January 1, 2003?

19.   Were you an employee of Kilsture Ltd.?

20.   What were your duties as an employee of Kilsture Ltd.?

21.   What was your annual salary from Kilsture Ltd. during each year of its existence?

22.   Were you a Director of Maddox Ltd.?

23.   Who were the other Directors of Maddox Ltd.?

24.   When was Maddox Ltd. founded?

25.   Who were Maddox Ltd.'s shareholders?

26.   When did you become a Director of Maddox?

27.   Was Maddox engaged in business?

28.   What business was Maddox engaged in at inception?

29.   What business was Maddox engaged in from January 1, 2000 through January 1, 2003?

30.   Were you an employee of Maddox Ltd.?

31.   What were your duties as an employee of Maddox Ltd.?

32.   Were you a Director of Cumberdale Investments Ltd.?

33.   Who were the other Directors of Cumberdale Investments Ltd.?

34.   When was Cumberdale Investments Ltd. founded?

35.   Who were Cumberdale Investments Ltd.'s shareholders?

36.   When did you become a Director of Cumberdale Investments?

37.   Was Cumberdale Investments engaged in business?

38.   What business was Cumberdale Investments engaged in at inception?

39.   What business was Cumberdale Investments engaged in from January 1, 2000 through

January 1, 2003?

40.   Were you an employee of Cumberdale Investments Ltd.?

41.   What were your duties as an employee of Cumberdale Investments Ltd.?

42.   Were you a Director of Cumberdale Holdings Ltd.?

43.   Who were the other Directors of Cumberdale Holdings Ltd.?

44.   When was Cumberdale Holdings Ltd. founded?

45.   Who were Cumberdale Holdings Ltd.'s shareholders?

46.   When did you become a Director of Cumberdale Holdings?

47.   Was Cumberdale Holdings engaged in business?

48.   What business was Cumberdale Holdings engaged in at inception?

49.   What business was Cumberdale Holdings engaged in from January 1, 2000 through

January 1, 2003?

50.   Were you an employee of Cumberdale Holdings Ltd.?

51.   What were your duties as an employee of Cumberdale Holdings Ltd.?

52.   What were the subsidiaries of Cumberdale Investments Ltd.?

53.    What business was each of those subsidiary entities engaged in?

54.    What was your relationship to each of Cumberdale Investments Ltd.'s subsidiaries?

55.    Why were each of Cumberdale Investments Ltd.'s dissolved subsidiaries dissolved?

56.    Why did you agree to be a purported partner in Fidelity International Currency Advisor A Fund?

57.    Did you believe when a $651,000 initial contribution was made by you or on your behalf into Fidelity International Advisor A Fund that your interest was going to be bought by Richard Egan?

58.    Did you believe when a $651,000 initial contribution was made by you or on your behalf into Fidelity International Advisor A Fund that your interest was not going to be bought by Richard Egan?

59.    When did you become aware that your interest in Fidelity International Currency Advisor A Fund was to be reduced?

60.    When did you become aware that, upon reduction of your interest in Fidelity International Currency Advisor A Fund, you would lose approximately 50% of your initial contribution to Fidelity International Currency Advisor A Fund?

61.    During the time period June 1, 2001 to August 1, 2002, how many so-called partnerships did you enter into in which you lost approximately 50% of your initial contribution within the first month after your initial contribution?

62.    During the time period June 1, 2001 to August 1, 2002, how many so-called partnerships did you enter into in which you did not lose approximately 50% of your initial contribution within the first month after your initial contribution?

10

63.     Why did you continue to enter into partnerships during 2001 and 2002 for which you were almost certain to lose 50% of your initial contribution?

64.     Did you earn any money from your role as a purported partner in Fidelity International Currency Advisor A Fund?

65.     How much money did you earn from your role as a purported partner in Fidelity International Currency Advisor A Fund?

66.     Was all of the money you earned from your role as a purported partner in Fidelity International Currency Advisor A Fund a fee to be earned regardless of the performance of the option trades entered into by Fidelity International Currency Advisor A Fund?

67.     How much money did you earn from your role as a purported partner in Fidelity International Currency Advisor A Fund as a result of the performance of the option trades entered into by Fidelity International Currency Advisor A Fund?

68.     What was the amount of each payment you received either directly or indirectly as a result of your participation in Fidelity International Currency Advisor A Fund?

69.     What was the original source of each payment made to you as a result of your participation in Fidelity International Currency Advisor A Fund?

70.     What attributes, skills, or value did you bring to Fidelity International Currency Advisor A Fund?

71.     Was Fidelity International Currency Advisor A Fund designed so that you would be allocated the majority of the gains and sell a majority of your interest before realization of a loss?

72.     What is the Financial Derivatives Investment Strategy?

73.     What is the Helios product known as H2?

74.    Did you report any income from your participation in Fidelity International Currency Advisor A Fund?

75.    Did you report any income from your participation in any Financial Derivatives Investment Strategy?

76.    Did you report any income from your participation in any H2 transaction?

77.    Have you ever met or spoken with Richard Egan?

78.    Have you ever met or spoken with any partner in any FDIS or H2 transaction?

79.    Have you ever met or spoken with any employee of Carruth Management?

80.    Have you ever received money from Helios?

81.    Where did you deposit money you received from Helios?

82.    Did you ever receive any money from The Diversified Group Inc.?

83.    Where did you deposit the money you received from The Diversified Group Inc.?

84.    Where did Kilsture maintain each of its bank accounts?

85.    Where did Maddox maintain each of its bank accounts?

86.    Where did you maintain each of your bank accounts in 2001 and 2002?

87.    Why did The Diversified Group Incorporated pay more than $1,000,000 to Cumberdale Holdings Ltd. in December 2001?

88.    Was any of the more than $1,000,000 paid by The Diversified Group Incorporated to Cumberdale Holdings Ltd. in December 2001 paid directly or indirectly to you?  If so, how much was paid to you?

89.    Why did The Diversified Group Incorporated pay $50,000 to Biosphere Finance Limited on February 15, 2002 purportedly for "Administration and Agency Services?"

90.     What administration and agency services did Biosphere Finance Ltd. perform to earn the $50,000 paid to it by The Diversified Group Incorporated on February 15, 2002?

91.     Why did The Diversified Group Incorporated pay $570,000 to Maddox Ltd. on February 22, 2002 purportedly for "Consultancy services?"

92.     Was any of the $570,000 paid by The Diversified Group Incorporated to Maddox Ltd. on February 22, 2002 paid directly or indirectly to you?  If so, how much was paid to you?

93.     What consultancy services did Maddox Ltd. perform to earn the $570,000 paid to it by The Diversified Group Incorporated on February 22, 2002?

94.     Why did The Diversified Group Incorporated pay $380,000 to Kilsture Ltd. on February 22, 2002 purportedly for "Consultancy fees?"

95.     Was any of the $380,000 paid by The Diversified Group Incorporated to Kilsture Ltd. on February 22, 2002 paid directly or indirectly to you?  If so, how much was paid to you?

96.     What consultancy services did Kilsture Ltd. perform to earn the $380,000 paid to it by The Diversified Group Incorporated on February 22, 2002?

97.     Why did The Diversified Group Incorporated pay $952,000 to Biosphere Finance Limited on March 23, 2001?

98.     Was any of the $952,000 paid by The Diversified Group Incorporated to Biosphere Finance Limited on March 23, 2001 paid directly or indirectly to you?  If so, how much was paid to you?

99.     Why did The Diversified Group Incorporated pay $120,000 to Kilsture Limited on March 23, 2001?

100.     Was any of the $120,000 paid by The Diversified Group Incorporated to Kilsture Limited

13

on March 23, 2001 paid directly or indirectly to you?  If so, how much was paid to you?

101.    Were you a Director of Trilogy Financial Products Ltd.?

102.    Who were the other Directors of Trilogy Financial Products Ltd.?

103.    When was Trilogy Financial Products Ltd. founded?

104.    Who were Trilogy Financial Products Ltd.'s shareholders?

105.    When did you become a Director of Trilogy Financial Products Ltd.?

106.    Was Trilogy Financial Products Ltd. engaged in business?

107.    What business was Trilogy Financial Products Ltd. engaged in at inception?

108.    What business was Trilogy Financial Products Ltd. engaged in from January 1, 2000

through January 1, 2003?

109.    Were you an employee of Trilogy Financial Products Ltd.?

110.    What were your duties as an employee of Trilogy Financial Products Ltd.?

111.    What was Nigel Scott's role with Trilogy Financial Products Ltd.?

112.    What was Oliver Peck's role with Trilogy Financial Products Ltd.?

113.    What was Singer & Friedlander's relationship to Trilogy Financial Products Ltd.?

114.    Why were records of Helios and The Diversified Group transactions sent to Trilogy

Financial Products Ltd.?  Where were those records sent?  Where are those records now?  Who

has custody and control of those records now?

### Additional Questions to Samuel Mahoney

1.    Did Kilsture Ltd. pay on your behalf your $651,000 initial contribution into Fidelity

International Currency Advisor A Fund?

2.    How much, if any, of Kilsture Ltd.'s payment to Fidelity International Currency Advisor A

Fund on your behalf was salary due to you?

3.     During what period did you earn the salary that represented any and all portions of Kilsture

Ltd.'s payment to Fidelity International Currency Advisor A Fund on your behalf?

4.     What duties did you perform to earn the salary that represented any and all portions of

Kilsture Ltd.'s payment to Fidelity International Currency Advisor A Fund on your behalf?

## **Special Procedures**

This court requests testimony under oath, or the submission of a declaration by the

custodian of records for each entity that produces documents in response to this request, attesting

to the authenticity of documents produced.  Under the United States's Federal Rules of Evidence,

which apply in this lawsuit and in all civil proceedings in the United States district courts, certain

business records may be received into evidence only if a competent representative of the business

appears at trial as a witness and testifies as to the authenticity of the records and the manner in

which they are prepared and maintained at the business.  However, with respect to foreign

business records, the appearance and testimony at trial of a representative of a foreign entity may

not be required if a representative of the foreign entity gives testimony under oath as to the

authenticity of the records (or true copies thereof) or if the records (or true copies thereof) are

accompanied by a written declaration certifying the authenticity of the business records.

Therefore, this court considers it necessary in the interests of justice that testimonial evidence

and/or written declarations certifying the authenticity of business records be obtained from the

producing entities and/or their representatives.  To be of value to this court, the written

declaration(s) must comply with the requirements of Title 28 of the United States Code, section

1746.  A proposed declaration is attached to this letter of request.

## Reciprocity

The courts of the United States are authorized by statute codified at Title 28 of the United States Code, Section 1782 to extend similar assistance to the tribunals of Ireland and will gladly reciprocate the courtesies shown by the judicial authorities of Ireland.

## Reimbursement of Costs

The United States District Court for the District of Massachusetts is prepared to reimburse your Court for all costs incurred in executing this request.  The court extends to the judicial authorities of Ireland the assurances of its highest consideration.


DATE: _____


_____
HON. F. DENNIS SAYLOR, IV
U.S. District Judge
U.S. District Court for the District of Massachusetts
Worcester, Massachusetts

## CERTIFICATION OF BUSINESS RECORDS

I, the undersigned, _____, with the understanding that

I am subject to criminal penalty under the laws of Ireland for an intentionally false declaration,

declare that I am:

employed by/associated with _____ in the position of _____

_____ and by reason of my position am authorized and qualified to make

this declaration.

I further declare that the documents attached hereto are original records or true copies of

records identified as Exhibit(s) _____ (list all exhibits as appropriate), and:

1.    were made at or near the time of the occurrence of the matters set forth therein, by (or
      from information transmitted by) a person with knowledge of those matters;

2.    were kept in the course of regularly conducted business activity;

3.    were made by the said business activity as a regular practice; and,

4.    if not original records, are duplicates of original records.

The originals or duplicates of these records are maintained in the country of _____

_____.

Date of execution:                    _____

Place of execution:                   _____

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Signature: _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTER ROGATORY)

The United States District Court for the District of Massachusetts presents its

compliments to the appropriate judicial authority of the Isle of Man, and requests international

judicial assistance to obtain evidence to be used in a civil proceeding before this court in the

above-captioned matter.

This court requests the assistance described herein as necessary in the interests of justice.

This court requests that the appropriate judicial authority of Isle of Man compel the appearance

of Nigel Scott and Oliver Peck to give testimony and produce documents.

### Witnesses to be Served

1.    Nigel Scott
      Overdale, Bay View Road
      Port Erin
      Isle of Man IM9 6LG

2.    Oliver Peck
      c/o Fortis Intertrust
      Clinch's House
      Lord Street
      Douglas
      Isle of Man
      IM99 1RZ

## **Facts**

This case involves a set of transactions marketed by various U.S. promoters, including international accounting firm KPMG, and engaged in by a U.S. taxpayer in purported partnership with, among others, an Irish citizen named Samuel Mahoney.[1]  That purported partnership is called Fidelity International Currency Advisor A Fund.  To become a partner in Fidelity International Currency Advisor A Fund, Mr. Mahoney purportedly contributed $651,000 for a 93% share of the common interests in the "partnership."  Days later, Mr. Mahoney sold to the U.S. taxpayer an 88% share of the common interests in the "partnership" for half of what he had "contributed" days earlier.  Samuel Mahoney claims that his $651,000 contribution to Fidelity International Advisor A Fund was made on his behalf by Kilsture Ltd., of which he claims to be an employee.

The set of transactions purportedly resulted in a profit to the foreign "partner" and losses to the U.S. taxpayer.  Samuel Mahoney purportedly made a profit of approximately $163.8 million from his participation in the set of transactions.  Because Mr. Mahoney was not a U.S. citizen or resident, he was not required to pay U.S. taxes on that purported profit.  From the same set of transactions, the U.S. taxpayer purportedly lost more than $158 million, and offset the taxpayer's stock-option income of approximately $150 million.  That offset of income allowed the U.S. taxpayer to avoid payment, preliminarily, of approximately $63 million in U.S. income taxes.  The United States alleges that Mr. Mahoney was paid a fee for his participation in this set of transactions, and that the fee was paid to Mr. Mahoney from U.S. tax-shelter promoters through the use of various foreign entities and with the assistance of Nigel Scott and Oliver Peck.

---

[1]As discussed later, identical sets of these marketed transactions were engaged in by many U.S. taxpayers, including the plaintiff.

The United States's taxing authority disallowed the claimed losses, adjusting the partnership items for U.S. tax purposes.  The plaintiff seeks readjustment of the partnership items for tax purposes, pursuant to Title 26 of the United States Code, Section 6226.

One of the primary legal issues in this case is whether the Fidelity International Currency Advisor A Fund should be recognized as a partnership for tax purposes.  The Supreme Court of the United States held that a partnership should be respected for tax purposes only if

> considering all the facts – the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent – the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

*Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949).  This court's determination of intent requires testimonial and documentary evidence from the purported partners and others, including the others who allegedly facilitated payments to the purported partners.

Another of the primary issues is whether the transactions employed here had economic substance– that is, whether the set of transactions were invented solely to create tax deductions. The test for whether a transaction is an economic sham is "whether the transaction had any practicable economic effect other than the creation of income tax losses."  *See, e.g.*, *Rose v. Commissioner*, 868 F.2d 851, 853 (6th Cir. 1989).  This analysis is guided by the related factors of whether the transaction can produce economic benefits apart from the generation of tax losses (an objective analysis) and whether the taxpayer possessed a non-tax business purpose (a subjective analysis).  *Id*. at 853;  *accord*, *Sochin v. Commissioner*, 843 F.2d 351, 354 (9th Cir.), *cert. denied*, 488 U.S. 824 (1988).  There must be a legitimate non-tax business purpose for forming the partnership in order to meet the intent test set forth in *Commissioner v. Culbertson*,

337 U.S. 733, 742 (1949) as stated above.  See *Boca Investerings Partnership v. United States*,

314 F.3d 625 (D.C. Cir. 2003); *Saba Partnership v. Commissioner of Internal Revenue*, 273 F.3d

1135 (D.C. Cir. 2001); *ASA Investerings Partnership v. Commissioner of Internal Revenue*, 201

F.3d 505 (D.C. Cir. 2000).  Here again, testimonial and documentary evidence from the

purported partners and others is essential to this court's determination, which must include a

determination of how the product was designed and implemented, and the purpose behind the

formation of Fidelity International Currency Advisor A Fund.

In determining the product's design and purpose, and the participants' intent, this court

must also examine evidence of other similar or identical transactions.  The objective test for

economic substance focuses on whether a set of transactions can produce economic benefits apart

from tax losses.  See *ACM Partnership*, 157 F.3d at 247.  When it is determined that taxpayers

have engaged in a pre-packaged transaction creating artificial losses that are not reflective of

economic reality, evidence regarding the potential economic benefits of similar or identical

transactions by others is highly relevant to the objective economic-substance analysis.

Samuel Mahoney engaged in dozens of similar or identical transactions through various

entities.  A second Irish citizen, Martin Hawkes, engaged in dozens more.  The United States

alleges that Messrs. Mahoney and Hawkes were directors of an Irish company known as

Biosphere Finance, Ltd. which received payments from the U.S. promoters.  The United States

also alleges that Messrs. Mahoney and Hawkes appear to have been employees of two Isle of

Man entities, Kilsture Ltd. and Maddox Ltd., which also received substantial payments from the

U.S. promoters.  Kilsture and Maddox were shareholders of Cumberdale Holdings, also an Isle of

Man entity.  Nigel Scott, an Isle of Man resident, was a principal of Cumberdale Holdings,

Kilsture, and Maddox.  Oliver Peck, also an Isle of Man resident, is or was the Managing

Director of Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander), which the United

States alleges facilitated the creation and operation of Cumberdale, Kilsture, and Maddox.  As

such, Messrs. Scott and Peck have evidence relating to marketing, implementation, and/or

financial aspects of the transactions at issue.  That evidence is highly relevant to the

determination of the intent of the participants and to the determination of the design and

development of the transactions at issue.

### Documents to be Produced by Nigel Scott and Oliver Peck

1.    Company-formation and registration documents for Kilsture Ltd., Maddox Ltd.,

Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy

Financial Products Ltd., and Biosphere Finance Ltd.

2.    Minutes for each meeting of the directors of Kilsture Ltd., Maddox Ltd., Cumberdale

Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial

Products Ltd., and/or Biosphere Finance Ltd.

3.    Company resolutions for Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd.

(Including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., and

Biosphere Finance Ltd.

4.    Financial statements for Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd.

(Including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., and

Biosphere Finance Ltd.

5.    Marketing materials for all Helios and The Diversified Group transactions in which Messrs.

Scott and/or Peck participated.

6.    Partnership agreements for each partnership in which Samuel Mahoney or Martin Hawkes

was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and

then transferred the offsetting options to the partnership.

7.    Contribution agreements for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

8.    Buy-sell notices for each transaction entered into by each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

9.    Operating agreements for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

10.    Tax returns for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

11.    Opinion letters for each transaction for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

12.    Outlines of transactions for each transaction for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

13.    Contracts for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

14.    Contracts between Nigel Scott, Oliver Peck, Singer & Friedlander (n/k/a Kaupthing Singer

& Friedlander), Samuel Mahoney, Martin Hawkes, and/or John Hussey, and Helios, The

Diversified Group Inc., Kilsture Ltd., Maddox Limited, Cumberdale Investments Ltd. (including

all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., and/or Biosphere

Finance Ltd.

15.    Loan documents for loans from Kilsture Ltd. to Samuel Mahoney.

16.    Proof of Samuel Mahoney's repayment of any loans from Kilsture Ltd.

17.    Bank records of Kilsture Ltd. showing trans-Atlantic payments to or from Kilsture Ltd.

### Topics of Inquiry of Nigel Scott and Oliver Peck

1.    Singer & Friedlander's relationship with Biosphere Finance Ltd., Kilsture Ltd., Maddox

Ltd., Cumberdale Investments Ltd., and Cumberdale Holdings Ltd.

2.    The purpose, management, and operations of Biosphere Finance Ltd., Kilsture Ltd., Maddox

Ltd., Cumberdale Investments Ltd., and Cumberdale Holdings Ltd.

3.    The business purpose(s) and design of Fidelity International Currency Advisor A Fund.

4.    Payments to Samuel Mahoney for his role as a purported partner in Fidelity International

Currency Advisor A Fund.

5.    The business purpose(s) and design of the Financial Derivatives Investment Strategy.

6.    Contracts between Nigel Scott, Oliver Peck, Singer & Friedlander (n/k/a Kaupthing Singer

& Friedlander), Samuel Mahoney, Martin Hawkes, and/or John Hussey, and Helios, The

Diversified Group Inc., Kilsture Ltd., Maddox Limited, Cumberdale Investments Ltd. (including

all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., and/or Biosphere

Finance Ltd.

7.    Payments to or from Nigel Scott, Oliver Peck, Singer & Friedlander (n/k/a Kaupthing

Singer & Friedlander), Samuel Mahoney, Martin Hawkes, John Hussey, Kilsture Ltd., Maddox

Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd.,

Trilogy Financial Products Ltd., and/or Biosphere Finance Ltd., to or from Helios, The

Diversified Group Inc., James Haber, Mox Tan, or John Huber.

8.     Payments to or from Samuel Mahoney and/or Martin Hawkes, to or from John Hussey,

Nigel Scott, Oliver Peck, Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander), Kilsture

Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale

Holdings Ltd., Trilogy Financial Products Ltd., and/or Biosphere Finance Ltd.

9.     The location of bank records of Biosphere Finance Ltd., Kilsture Ltd., Maddox Ltd.,

Cumberdale Investments Ltd., and Cumberdale Holdings Ltd.

10.     The transfer of records of Helios and The Diversified Group to Trilogy Financial Products

Ltd., and the current location and custodian of those records.

## Special Procedures

This court requests testimony under oath, or the submission of a declaration by the

custodian of records for each entity that produces documents in response to this request, attesting

to the authenticity of documents produced.  Under the United States's Federal Rules of Evidence,

which apply in this lawsuit and in all civil proceedings in the United States district courts, certain

business records may be received into evidence only if a competent representative of the business

appears at trial as a witness and testifies as to the authenticity of the records and the manner in

which they are prepared and maintained at the business.  However, with respect to foreign

business records, the appearance and testimony at trial of a representative of a foreign entity may

not be required if a representative of the foreign entity gives testimony under oath as to the

authenticity of the records (or true copies thereof) or if the records (or true copies thereof) are

accompanied by a written declaration certifying the authenticity of the business records.

8

Therefore, this court considers it necessary in the interests of justice that testimonial evidence

and/or written declarations certifying the authenticity of business records be obtained from the

producing entities and/or their representatives.  To be of value to this court, the written

declaration(s) must comply with the requirements of Title 28 of the United States Code, section

1746.  A proposed declaration is attached to this letter of request.

## Reciprocity

The courts of the United States are authorized by statute codified at Title 28 of the United

States Code, Section 1782 to extend similar assistance to the tribunals of Isle of Man and will

gladly reciprocate the courtesies shown by the judicial authorities of Isle of Man.

## Reimbursement of Costs

The United States District Court for the District of Massachusetts is prepared to

reimburse your Court for all costs incurred in executing this request.  The court extends to the

judicial authorities of Isle of Man the assurances of its highest consideration.


DATE: _____


_____
HON. F. DENNIS SAYLOR, IV
U.S. District Judge
U.S. District Court for the District of Massachusetts
Worcester, Massachusetts

9

## CERTIFICATION OF BUSINESS RECORDS

I, the undersigned, _____, with the understanding that

I am subject to criminal penalty under the laws of Isle of Man for an intentionally false

declaration, declare that I am:

employed by/associated with _____ in the position of _____

_____ and by reason of my position am authorized and qualified to make

this declaration.

I further declare that the documents attached hereto are original records or true copies of

records identified as Exhibit(s) _____ (list all exhibits as appropriate), and:

1.      were made at or near the time of the occurrence of the matters set forth therein, by (or
        from information transmitted by) a person with knowledge of those matters;

2.      were kept in the course of regularly conducted business activity;

3.      were made by the said business activity as a regular practice; and,

4.      if not original records, are duplicates of original records.

The originals or duplicates of these records are maintained in the country of _____

_____.

Date of execution:                  _____

Place of execution:                 _____

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Signature: _____