UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ISSUANCE OF LETTERS ROGATORY REQUESTING INTERNATIONAL JUDICIAL ASSISTANCE

The United States of America submits this memorandum in support of its motion for

issuance of letters rogatory requesting assistance from the appropriate judicial authorities of

Ireland and the Isle of Man.  In support, the United States is concurrently filing the Declaration of

John Lindquist, to which supporting exhibits are attached.[1]  The proposed letters rogatory are

attached to the motion.

### Introduction

One letter rogatory requests the judicial authorities of Ireland to compel the appearance of

Samuel Mahoney, Martin Hawkes, and John Hussey to produce documents and give testimony

under oath.  The other letter rogatory requests the judicial authorities of the Isle of Man to

compel the appearance of Nigel Scott and Oliver Peck to produce documents and give testimony

---

[1]  Because the supporting exhibits reference the identities of other taxpayers, the United States is separately moving for leave to file the Declaration of John Lindquist and the attached exhibits under seal.  To the extent that supporting exhibits have already been filed in this action, they are also cross-referenced to the Docket Index ("DI") number under which they have been filed.  However, for the convenience of the Court, duplicate copies are also attached to the declaration.  The exhibits are listed in Appendix A.  There are 52 exhibits attached to the Declaration of John Lindquist and referenced in this memorandum.  Those 52 exhibits range in number from 1-78.  (There are gaps in the exhibit numbering).

under oath. As detailed herein, Messrs. Mahoney, Hawkes, Hussey, Scott, and Peck were involved in the marketing and/or implementation and/or have knowledge of certain financial aspects of the Financial Derivatives Investment Strategy ("FDIS") tax-shelter product at issue, and this foreign discovery is essential to the United States' defense of this case.

The core domestic promoters of this product included The Diversified Group Incorporated ("DGI"), Helios Financial ("Helios"), and Alpha Consultants ("Alpha"). As detailed herein, Mahoney and Hawkes participated as purported foreign partners in each of the FDIS tax shelter products sold by the domestic promoters. For their participation, they appear to have been paid a fee by the domestic promoters. It is unclear exactly how the fees were paid, though it seems the promoters used an elaborate web of foreign entities. It is essential that this foreign discovery be allowed to enable the United States to untangle that elaborate web.

The tax-shelter promoters began marketing the FDIS foreign-partner tax shelter in mid-2001. So far, the United States has identified 58 FDIS transactions. In each transaction, a foreign "partner," as described in the Complaint, (Complaint at ¶34), not subject to United States taxation was needed to make the tax shelter work. In each transaction, the tax-indifferent foreign partner was Samuel Mahoney or his business associate, Martin Hawkes.[2] In each transaction, the

---

[2] Through discovery upon the promoters, the United States has obtained copies of marketing outlines for not only the Egan transaction, but also 57 other nearly identical transactions. These outlines are summarized in Appendices C and D to the Declaration of John Lindquist. Appendix C details information from the collected outlines for each of the 46 FDIS transactions implemented in 2001. The outline for the Egan FDIS transaction is also attached to Appendix C as a sample. Appendix D details information from the collected outlines of the 12 FDIS transactions implemented in 2002. It appears that copies of these outlines were shared with the purported foreign investors prior to the transaction. *See* Govt. Ex. 67 (email dated 11/16/01, from James Haber to Biosphere Finance, forwarding outlines for three of the FDIS transactions). As shown in Appendices C and D, Samuel Mahoney was the foreign partner in 24 of the known FDIS transactions and Martin Hawkes was the foreign partner in 34 of them. The accounting firms and law firms that co-promoted these FDIS transactions are summarized in Appendix B.

foreign partner was to make an initial contribution to the "partnership," only to sell most of that interest shortly thereafter. Each time, the foreign partner was to sell the majority of his recently purchased common interest – 88% of his 93% common interest or 90% of his 95% interest – to the taxpayer. As detailed in each of the outlines for the proposed transactions, the purchase price for the interest was to be exactly one-half of the foreign "partner's" initial capital contribution.

So far the United States' discovery has been largely limited to the tax-shelter promoters and the U.S. taxpayer-participants. It is essential that the United States examine the foreign participants in order to obtain a complete picture of the tax shelter and to present additional evidence showing that the so-called foreign partners were not, in fact, real partners.

The need to take this foreign discovery is particularly acute given the suspicious source of the funding of the foreign partner's capital contributions, the use of a maze of foreign entities to route circuitously payments to these foreign partners, and the intentional transfer of records of various FDIS transactions to foreign entities. The funding of the capital contributions is suspicious because half of each contribution by the foreign partner was seemingly lost within days of being made, when the majority of the foreign partner's interests was purchased by the U.S. taxpayer for half of the initial contribution amount. That suspicious transaction occurred over and over again, with the foreign participant seemingly unfazed by the quick loss of half of his investment. Moreover, the tax-shelter promoters sought to mask their funding of the foreign partner's contributions and a substantial additional amount paid to the foreign partners – apparently to compensate them for serving as phony partners – through the use of a labyrinth of foreign entities. To further conceal the highly-abusive nature of these transactions, the promoters transferred overseas the FDIS records for their 2002 FDIS transactions. It is unclear what other records, if any, including developmental records and records relating to the 2001 transactions,

2370273.1

were transferred overseas.

Through domestic discovery, the United States has been able to uncover the web of foreign entities receiving payments from the domestic promoters. Each of those entities has some relationship to Mahoney and/or Hawkes. Mahoney and Hawkes are Irish citizens who were directors of an Irish company known as Biosphere Finance, Ltd. ("Biosphere"), which received payments from the domestic promoters. They also appear to have been employees of two Isle of Man entities known as Kilsture and Maddox, which also received substantial payments from the domestic promoters. Kilsture and Maddox were shareholders of Cumberdale Holdings, also an Isle of Man entity. Nigel Scott, an Isle of Man resident, was an employee of Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander), which appears to have facilitated the creation and operation of Cumberdale, Kilsture, and Maddox. Nigel Scott was also a principal of Cumberdale Holdings, Kilsture, and Maddox, and a manager of Trilogy Financial Products Ltd., which was used to secrete evidence offshore. Oliver Peck, also an Isle of Man resident, is or was the Managing Director of Singer & Friedlander. In addition to facilitating the creation of and operation of Cumberdale, Kilsture, and Maddox, Singer & Friedlander appears to have facilitated payments to Messrs. Mahoney and Hawkes. It appears to have done so, at least in part, through an account at Singer & Friedlander called "The H&M [*i.e.*, Hawkes and Mahoney] Joint Venture account." It further appears that all 2001 FDIS investors, when purchasing the interests of Mahoney or Hawkes, wired the agreed upon amount to that same "H&M Joint Venture account number 20195700" at Singer & Friedlander Limited, London.

2370273.1

The United States must be allowed to examine the foreign participants, their foreign associates, and their records in order to fully analyze and present evidence illuminating whether the purported foreign partners were real or phony partners, and, accordingly, whether Fidelity International Advisor A Fund ("Fidelity International") was an actual or sham partnership for federal income tax purposes.

## Factual Background

### A.     Business Relationship of DGI, Alpha, and Helios.

It is important to describe the framework in which the tax-shelter promoters operated, how the foreign participants were apparently paid to make the tax shelter work, and the efforts by the tax-shelter promoters to transfer FDIS records overseas:

Beginning in about 1998, Helios Financial, LLC ("Helios") and Alpha Consultants, LLC ("Alpha") assisted The Diversified Group, Inc. ("DGI") and its president James "Jimmy" Haber in the development and marketing of tax shelters. Alpha is a Florida limited liability company purportedly engaged in trading and trade consulting for structured options and foreign currencies, lead by Ivan Ross and Ron Buesinger.[3]  Helios is a partnership formed by Mox Tan and Phil Kampf, Jr. under a marketing agreement with DGI to market DGI strategies.[4]  Both Helios and

---

[3]  *See* FDIS PowerPoint presentation, Govt. Exs. 18, 20, and 22 (Govt. Exs. 7, 8, and 23 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (exs. attached to Reiferson Decl., DI# 68)).

[4]  DGI has produced a copy of a marketing agreement with Helios which reflects that Helios was formed in 1998 by Mox Tan and Phil Kampf, Jr., to market DGI tax strategies. *See* Govt. Ex. 1.  *See also* Haber Dep. Tr. 6/29/01 at 72:19 - 72:25, Govt. Ex. 37.  The marketing agreement reflects that by letter dated November 1, 1998, Helios Group, LLC, confirmed and set forth the terms and conditions by which it would be engaged by DGI as an independent contractor to market DGI products.  *See* DGI/Helios Agreement, Govt. Ex. 1.  In furtherance of that business relationship, on or about November 16, 1998, Mox Tan and Phil Kampf formed Helios Financial LLC ("Helios") as the entity to be used to market DGI products.  DGI/Helios Agreement, Govt. Ex. 1.  According to Haber, this written agreement is the only version of DGI's marketing agreement with Helios.  Haber Dep. Tr. 6/29/01 at 74:10 - 74:14, Govt. Ex. 37.  Haber has testified that he was also a director of Helios.  *See* Haber Dep. Tr. 8/12/03, Govt. Ex. 64, at 31:3 - 31:8.  In fact, Helios marketing materials reflect that he was the managing director of Helios.

(continued...)

2370273.1

Alpha have a profit-sharing agreement with DGI.[5]  Under the DGI/Helios agreement, Helios was

to originate, market, and execute DGI products, and was to be paid a percentage of DGI's net

fee.[6]

**B.    The Promoters Coordinated with Law and Accounting Firms.**

As described by DGI in its FDIS marketing materials, a number of law firms and

accounting firms assisted DGI on a regular basis in its development and marketing of tax

shelters.[7]   DGI viewed its ability

> . . . to manage and control the process of getting two to four sets of attorneys and
> accountants to *expeditiously reach the desired conclusions* as being one of [its]
> most valuable contributions to [its] clients.

(Emphasis added).[8]  For the FDIS product, DGI enlisted four law firms to review the product and

issue opinions, all for the apparent purpose of making each of their opinions appear independent.

These included Proskauer Rose, Lord Bissell & Brook, Bryan Cave, and Sidley Austin Brown &

Wood (n/k/a Sidley Austin LLP), all of whom were sent a copy of the draft FDIS marketing

---

[4](...continued)
Govt. Ex. 3, at p.5.

[5]  Haber has testified that Ivan Ross of Alpha was integral to DGI's development and marketing
of tax shelters and also had a profit sharing agreement with DGI. Haber Dep. Tr. 9/7/00, at 57:5 -23, 58:9
-15, Govt. Ex. 5.  *See also*, Govt. Ex. 1 (marketing agreement between DGI and Helios) and Govt. Exs.
50 and 51 (providing a reconciliation of aggregate fees and expenses for purposes of computing the profit
split between DGI, Alpha and Helios) (Govt. Ex. 51 was previously filed as Govt. Ex. 14 to U.S. Mot.
to Compel RSM McGladrey's Prod. of Docs. (DI#66) (exhibit filed under seal)).

[6]  Govt. Ex. 1, ¶¶ I a. and II; Haber Dep. Tr. 8/12/03, at 32:7 - 32:21; 32:22 - 33:6, 177:16 -
178:22 Govt. Ex. 64.

[7]  *See* FDIS PowerPoint presentation, Govt. Ex. 18 (Govt. Ex. 7 to U.S. Mot. to Compel RSM
McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).  *See also* Ruble Affidavit, ¶¶ 8-
12, Govt. Ex. 7 (describing how Ruble also assisted DGI to develop its Option Partnership Strategy)
(Govt. Ex. 6 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl.,
DI# 68)).

[8]  *See* FDIS PowerPoint presentation, Govt. Ex. 18 (Govt. Ex. 7 to U.S. Mot. to Compel RSM
McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).  These law firms then also issued
purported opinions on the same transactions they helped to design.  The particular FDIS transactions
upon which they issued opinions are listed in Appendix B.

2370273.1

materials for review and comment.[9]  Additionally, these same law firms also assisted in the

drafting of the boilerplate FDIS implementation documents, which were then to be executed for

each FDIS transaction by the law firm of Brown Raysman.[10]  The four opining law firms also

worked with DGI in drafting purportedly independent – but actually cookie-cutter – opinions

blessing the very transaction which they helped design.[11]  As candidly disclosed in an email

exchange between R.J. Ruble of Sidley Austin and Haber, these law firms were even prepared to

engage in play acting to make it appear that they were acting independently:

> Ruble:    just got my lunch invitation from larry cohen [of BDO].  I'll act
>           surprised when he hands me the memo.

---

[9]  Govt. Ex. 18 (Helios Email dated 4/4/01 forwarding FDIS marketing materials for review and comment) (Govt. Ex. 7 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)); Govt. Ex. 20 (Ruble email dated 4/5/01, "I have made some modification to the slides which I hope come out when you open them.  Basically, I have eliminated the term "Foreign Investor" and replaced it with the term "Investor(s) II") (Govt. Ex. 8 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).  R.J. Ruble of Sidley Austin was involved in various facets of the design and development of the FDIS product.  *See* Govt. Exs. 8, 10, 11 and 12 (Govt. Exs. 9, 10, 11, and 12 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (exs. attached to Reiferson Decl., DI# 68)).  Ruble was also involved in the design and development of other DGI tax shelter products in prior years.  *See* Govt. Ex. 7 (Ruble Affidavit, ¶¶ 8-12, describing how Ruble previously assisted DGI to develop its Option Partnership Strategy) (Govt. Ex. 6 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

[10]  *See* Govt. Ex. 35 (Email dated 5/17/01 from Orrin Tilevitz of DGI to R.J. Ruble forwarding draft operating agreement, along with exhibits thereto, to implement the strategy) (Govt. Ex. 13 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).  DGI records reflect that Brown Raysman was paid $250,000 for its services.  Govt. Ex. 51 (Govt. Ex. 14 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (DI#66) (exhibit filed under seal)).

[11]  *See* email dated 4/24/01, Govt. Ex. 30 (Orrin Tilevitz of DGI preparing draft of opinion for the 2001 option spread partnerships) (Govt. Ex. 15 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)); email dated 4/26/01, Govt. Ex. 31 (forwarding partnership opinion from Orrin Tilevitz of DGI to R..J. Ruble of Sidley Austin) (Govt. Ex. 25 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)); email dated 2/7/02 Govt. Ex. 45 ("I've been through the Proskauer draft for the new deal.  Ira has done an excellent job pairing down a number of the discussion (sic) from what we have said in the past.  In a perfect world I would probably adopt many of the changes Ira made, but it's hard to get changes to boilerplate here.  Do you have a problem if we continue to use our form of discussion on most of these issues?") (Govt. Ex. 16 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

2370273.1

Haber:    You don't have to rely on your acting skills because I have already told him that
you have it and that we are working together to enhance the opinion.[12]

One of the expenses included in DGI's gross fee was an amount agreed to be paid by DGI to the

four law firms for their issuance of the tax-shelter legal opinions.[13]

Similarly, DGI records show that it shared the FDIS design and development documents

with the accounting firms who helped DGI target potential customers.[14]  These records reflect

that the accounting firms were directed not to leave a copy of the FDIS PowerPoint presentation

with potential customers because it "show[ed] too much of the structure."[15]  Haber testified that

---

[12] *See* DGI email dated 1/25/02, Govt. Ex. 44 (Govt. Ex. 17 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

[13] DGI confirmed the amounts payable by it to Sidley Austin, Proskauer Rose, and Bryan Cave for their issuance of opinions by memo dated 1/2/02. *See* Govt. Exs. 41, 42, and 43 (Govt. Exs. 18, 19, and 20 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (exs. attached to Reiferson Decl., DI# 68)).  The 2001 reconciliation of net fees and expenses reflects that DGI paid Sidley Austin $800,000, Proskauer Rose $1,020,000, Bryan Cave $560,000, Lord Bissell & Brook $75,000, and Brown Raysman $250,000.  *See* email dated 5/3/02, with attached 2001 reconciliation, Govt. Ex. 51 (Govt. Ex. 14 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (DI#66) (exhibit filed under seal)).

[14] *See* memorandum dated 6/27/01, Govt. Ex. 36 (transmitting FDIS PowerPoint presentation to Grant Thornton) (Govt. Ex. 7 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)); Govt. Exs. 21 and 22 (FDIS PowerPoint presentations produced by BDO) (Govt. Exs. 23 and 24 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (exs. attached to Reiferson Decl., DI# 68)).  *See also* Govt. Ex. 28 (DGI email dated 4/18/01 to Ira Akselrad of Proskauer Rose and Ruble of Sidley Austin, confirming that the referenced attachment named "Transitory Preferred" had also been sent to Charlie Bee of BDO) (Govt. Ex. 4 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)); Govt. Ex. 29 (Fax dated 4/23/01 from BDO to Haber of DGI confirming a conference call for 4/26/01) (Govt. Ex. 22 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

[15] *See* Govt. Ex. 21 (Handwritten notes on front page of FDIS marketing materials read "(1) Confirm that this will not be left with client (i) if it is left…shows too much of the structure (ii) if not left, should have some investment-oriented material to leave (2) we need to decide about fee inside or out – (3) if out - how do we justify it . . .") (Govt. Ex. 23 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).  *See also* Govt. Ex. 22 (FDIS PowerPoint presentation produced by BDO) (Govt. Ex. 24 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)) and Govt. Ex. 36 (transmitting FDIS powerpoint to Grant Thornton and stating "This is to confirm that the enclosed materials will not be distributed to anybody") (Govt. Ex. 7 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

2370273.1

the accounting firms, which the promoters called "referral sources," included KPMG, BDO

Seidman, Grant Thornton and RSM McGladrey.[16]  The fee for these accounting firms, like the

fee for DGI, was computed as a fixed percentage of the tax loss to be generated.[17]

**C.     Co-Promoters Shared Fees from the FDIS Tax Shelter**.

DGI and its two primary co-promoters, Alpha and Helios, marketed their tax shelter

products to wealthy taxpayers seeking to offset multi-million dollar amounts of ordinary income

or capital gains that had oftentimes been recently realized by the taxpayers on their exercise of

employee stock options or the sale of a business or capital assets.  DGI sold the FDIS tax-shelter

product for an amount based on a percentage of the taxpayer's desired tax loss.[18]  DGI then

allocated the net amount remaining after the payment of all transaction-related fees and expenses

between itself, Alpha, and Helios, if Helios was involved in the transaction, on an agreed-upon

percentage basis.[19]  DGI's records reflect that DGI, Alpha, and Helios shared net profits, after

fees and expenses, on a 40/40/20 basis, respectively, in 2001.[20]

---

[16] Haber Dep. Tr. 2/28/03 at 290:21 - 291: 6, Govt. Ex. 62 (Govt. Ex. 21 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

[17] Govt. Ex. 23 (BDO email dated 4/5/01, describing the proposed fee split with DGI) (Govt. Ex. 26 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

[18] *See* Govt. Ex. 51 (computes the net fee from each of the listed customers as a fixed percentage of the loss amount of the transaction) (Govt. Ex. 14 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (DI#66) (exhibit filed under seal)).

[19] *See* Govt. Ex. 51 (computes Alpha's 40% share of the net profits after shared expenses for 2001) (Govt. Ex. 14 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (DI#66) (exhibit filed under seal)).

[20] *See* Govt. Ex. 32 (email dated April 26, 2001 from Steve Jacoby of SMD, another salesman for DGI products, to Haber of DGI, stating "On Tuesday you told me that DGI and Alpha would get 80% of the profits and Helios would get 2/3 and SMD 1/3 of the remaining 20%."); Govt. Ex. 51 (attached spreadsheet computes Alpha's 40% share of the net profits after shared expenses for 2001); Govt. Ex. 61 (Alpha email dated 2/27/03, computing allocation between DGI, Alpha, and Helios on a 40/40/20 basis for 2002).

2370273.1

**D.      Sham-Partnership Design of the FDIS Tax Shelter**.

The tax benefits of the FDIS tax shelter were critically dependent on a multi-member

LLC, with a foreign participant, being treated as a valid partnership for federal income tax

purposes. *See, e.g., Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949) (a valid partnership

for tax purposes requires the parties to join together as partners in good faith with a legitimate

business purpose). It is the Government's position that the so-called partnership created here,

Fidelity International, does not meet the requisite standard, and is a sham.

Including Egan's transactions, DGI sold 46 identically structured FDIS tax shelters in

2001 (and 12 more in 2002), each using a sham partnership. Those 46 tax shelters generated

over $1 billion in phony tax losses.[21]  Each of those 46 tax shelters involved the formation of a

multi-member LLC, which was treated as a partnership for tax purposes, with the participation of

a purported foreign partner, who nominally acquired the bulk of the common interests of the

partnership for a relatively small share of its total contributed capital. Once capitalized, the

purported partnership would acquire multiple pairs of simultaneously-executed, offsetting

European digital options, and would meticulously time the termination of the offsetting options,

first to terminate the gain legs of the options, generating massive paper gains to the purported

foreign partner. Simultaneously therewith, the partnership would replace the terminated gain

legs with options having virtually the exact same terms. Then, almost immediately thereafter, the

taxpayer would purchase the bulk of the purported foreign partners' common interest for one-half

---

[21]  *See* Appendix C (listing 46 2001 FDIS transactions generating desired tax losses totaling $1,027,050,000); Govt. Ex. 50 (listing 46 2001 FDIS transactions and the adjusted basis of the purported foreign investors, Samuel Mahoney and Martin Hawkes); Govt. Ex. 51 (listing all of DGI's 2001 customers, including those for the forty-six 2001 FDIS transactions generating losses totaling $1,545,950,000) (Govt. Ex. 14 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (DI#66) (exhibit filed under seal)).

10

2370273.1

of the foreign partner's purported capital contribution. A few weeks later, the partnership would terminate the remaining options, generating a massive paper loss to the taxpayer who would then claim the paper loss on his personal return as a real economic loss. On the partnership tax return, however, the paper gains and paper losses would virtually offset each other, with the partnership reporting only a small net economic gain or loss on the offsetting option transactions.[22]

Before implementing each of these FDIS transactions, the promoters prepared an outline of the proposed transactions, which detailed the pre-arranged steps common to each of the FDIS transactions.[23] As summarized in Appendix C,[24] those outlines reflect that one of two purportedly independent foreign partners, Samuel Mahoney or Martin Hawkes, participated in each of the forty-six 2001 FDIS transactions.[24] Records produced by DGI reflect that it collected gross fees in excess of $32 million in 2001, from which it fully funded the purportedly independent foreign partners while also paying them $2 million for their short-lived role as a nominee or sham partner.[25] Thus, the taxpayer and the so-called foreign co-investors did not join together in good faith as real partners in these tax-driven ventures, and the purported FDIS

---

[22] In marketing FDIS, DGI highlighted the fact that the face of the partnership return, *i.e.*, Form 1065, reporting the offsetting options transactions "not show a large net loss." Email dated 4/10/01, Govt. Ex. 26.

[23] Both the design memorandum and FDIS marketing materials outline the multiple steps of the transaction. In the first step of the transaction, the taxpayer's basis in the partnership is artificially inflated to make it appear that the taxpayer has sufficient basis to claim a tax deduction for the allocated partnership loss. *See* DGI memorandum dated 3/23/01, Govt. Ex. 10 (Govt. Ex. 10 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)); FDIS PowerPoint presentation, Govt. Ex. 18 (Govt. Ex. 7 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

[24] *See* Appendix C.

[25] The forty-six 2001 FDIS transactions, including the Egan transaction, are detailed in a spreadsheet attached to an email to DGI dated May 1, 2002. *See* email dated 5/1/02, re "2001-Customers-Haber_Invst-4-22-01.xls," Govt. Ex. 50.

2370273.1

partnerships were not valid partnerships for federal income tax purposes. Without the
participation of an independent foreign partner, the FDIS transactions collapse.

**E.**    **Payments to Mahoney and Hawkes, the Foreign "Partners," Routed Through
Foreign Entities**

The promoters' internal accounting records show that Mahoney and Hawkes contributed,
at least facially, a combined total of $3,707,715 to participate as purported partners in the forty-
six (46) 2001 FDIS transactions. *See* Govt. Ex. 50. That internal accounting further shows that
Mahoney and Hawkes then received a total of $2,404,737 from the sale of the bulk of their
partnership interests to the taxpayers in these transactions, leaving $1,302,978 as the Mahoney
and Hawkes combined total unrecovered "cost basis" in these transactions. (The unrecovered
"cost basis" of $1,302,978 equals the $3,707,715 total initial contributions minus $2,404,737
from the sale of partnership interests). *See* Govt. Ex. 50. Not only do the domestic promoters
account for this exact amount of $1,302,978 as a joint promoter expense, but their internal
accounting further reflects that they also paid Mahoney and Hawkes the round sum of
$2,000,000. *See* Govt. Ex. 51. From those internal accounting records, it appears that
Mahoney's and Hawkes's purported investment in the forty-six 2001 FDIS transactions was not
only fully funded by the promoters, but Mahoney and Hawkes were also paid a fee of
$2,000,000. What is unclear is precisely how the fee payments were made.

Upon questioning by the Irish Competent Authority, Mr. Mahoney has represented that
the source of his $651,000 capital contribution to Fidelity International was Kilsture. He further
represented that $325,510 of that amount represented salary due him as an employee of Kilsture
and that the balance of $325,490 was a loan from Kilsture to Mr. Mahoney which was repaid by
Mr. Mahoney in full on November 7, 2001. It appears that Kilsture is a shell entity with an

12

address at Samuel Harris House, 5-11 St. George's Street, Douglas, Isle of Man as its only physical presence on the Isle of Man.[26]  Kilsture and a second entity, Maddox are each 50% shareholder entities of Cumberdale Holdings Ltd. ("Cumberdale Holdings"), also an Isle of Man entity.[27]  It further appears that Cumberdale, Kilsture and Maddox were used solely to route payments to and from Mahoney and Hawkes, though the mechanics used to circuitously route the payments are unclear.

The records of DGI, one of the core domestic promoters, reflect that on March 23, 2001, the same date that DGI announced that it had revised its "contemplated Partnership Strategy,"[28] DGI made substantial payments to both Biosphere and Kilsture.  On that date, DGI paid $952,000 to Biosphere and $120,000 to Kilsture.[29]  The directors of Biosphere were Samuel Mahoney, Martin Hawkes, and John Hussey.[30]  Samuel Mahoney has represented that he was also an employee of Kilsture and that the $651,000 contribution to Fidelity International on October 22, 2001 was made on his behalf by Kilsture, an Isle of Man Company.[31]  A copy of an

---

[26]  That address is still the Isle of Man address for Singer & Friedlander, n/k/a Kaupthing Singer & Friedlander (Isle of Man) Limited, which is a merchant bank and is or was Nigel Scott's and Oliver Peck's employer.

[27]  A sister company of Cumberdale Holdings is Cumberdale Investments Ltd. ("Cumberdale Investments"), which is directed by Messrs. Mahoney, Hawkes, and Hussey (each Irish nationals), and which has approximately eleven dissolved and short-lived subsidiary companies.  These companies appear to have been used by DGI to effect another DGI tax shelter product which it marketed under the name "CFC."  As of March 19, 2002, the address for Cumberdale Investments Ltd. is 43 Ailesbury Road, Ballsbridge, Dublin 4.  Govt. Ex. 70.

[28]  *See* email dated 3/23/01, Govt. Ex. 10 (email announcing to R.J. Ruble of Sidley Austin that DGI had revised its contemplated Partnership Strategy) (Govt. Ex. 10 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

[29]  *See* HSBC Account Statement of DGI for March 2001, Govt. Ex. 66.

[30]  *See* Form B1 filed by Biosphere Finance, Govt. Ex. 55.

[31]  *See* Letter dated 5/22/06 re Interview of Mahoney (p. 1 only), Govt. Ex. 78 ("Mr. Mahoney would now further confirm that the capital contribution of US$651,000 was made on his behalf by Kilsture Limited, an Isle of Man company, and that US$325,510 of this amount represented salary due to

(continued...)

2370273.1

email produced by Alpha shows that on December 12, 2001, shortly after implementation of the forty-six (46) 2001 FDIS transactions, DGI wired two payments to Cumberdale, through Refco, totaling $1,051,400.69.[32] The two shareholders of Cumberdale Holdings, Ltd., are Kilsture and Maddox.[33] Refco Capital Markets is the counterparty in all of the FDIS tax-shelter transactions. The promoters' records further show that, shortly thereafter, in February 2002, DGI made payments totaling $1,000,000 to Biosphere, Kilsture, and Maddox, comprised of $50,000 to Biosphere on February 15, 2002, purportedly for "Administration and Agency Services;" $570,000 to Maddox on February 22, 2002, purportedly for "Consultancy services;" and $380,000 to Kilsture on February 22, 2002, purportedly for "Consultancy fees."[34] These payments may be summarized as follows:

| Date | Total | Biosphere | Cumberdale | Kilsture | Maddox |
|-------|--------------|------------|------------|------------|------------|
| 3/23/01 | 1,072,000.00 | 952,000.00 | | 120,000.00 | |
| 12/12/01 | 204,710.80 | | 204,710.80 | | |
| 12/12/01 | 846,689.89 | | 846,689.89 | | |
| 2/15/02 | 50,000.00 | 50,000.00 | | | |
| 2/22/02 | 950,000.00 | | | 380,000.00 | 570,000.00 |
| Total | 3,123,400.69 | 1,002,000.00 | 1,051,400.69 | 500,000.00 | 570,000.00 |

Given the timing and amounts of the transatlantic payments, it appears likely that all or some of the cost-basis and $2 million fee for Mahoney's and Hawkes's participation in the forty-six 2001 FDIS transactions was routed to them by DGI through these foreign entities.[35]

---

[31](...continued)
him as an employee of Kilsture Limited and the balance of US$325,490 was a loan [from Kilsture limited] (sic) to Mr. Mahoney which was repaid by Mr. Mahoney in full on 7 November, 2001.")

[32] *See* Alpha email dated 12/12/01, from John Huber of DGI to Ron Buesinger of Alpha, Govt. Ex. 68.

[33] *See* Alpha email dated 10/8/02, Govt. Ex. 73 (". . . the two shareholders of Cumberdale Holdings, Ltd. are 1) Maddox Ltd. 2) Kilsture Ltd")(underline in original). *See also* Govt. Exs. 74 and 76.

[34] *See* email dated 4/30/02, from Mox Tan re Helios 2002 Cash Flows, Govt. Ex. 71.

[35]The evidence suggests that *all* of the cost-basis and $2 million fee for Mahoney's and
(continued...)

2370273.1

**F.    Sham-Partnership Design Continued in DGI's 2002 FDIS Transactions.**

DGI continued to market FDIS transactions in 2002,[36] but through the facade of Trilogy

Financial Products, Limited ("Trilogy"),[37] which was apparently managed by the now familiar

Nigel Scott.  Mr. Scott was an employee of Singer & Friedlander, managed by Oliver Peck.

Haber set forth some of the elements of this plan on January 13, 2002, in an email to BDO:

> As a follow up to our dinner I wanted to outline some of the decisions we made
> and request input on some of the decisions yet to be made.
> 1.    We have decided that neither Alpha or (sic) Helios will be members of the
> LLC in year 2002 transactions.  They would remain as a manager.  By not being
> members they would not receive K-1's.  Follow up query: Who would be tax
> matters partner?
> 2.    A non U.S. LLC wouldn't accomplish anything since the U.S. member would
> have to report the operations of the LLC in a similar manner to a Form 1065.
> 3.    We continue to negotiate with a London based company to take over our
> marketing efforts in the U.S.  We hope that the negotiations will lead to their
> retaining of all U.S. personnel so that the transition will be seamless to you and
> our prospective clients.
> 4.    We will forward to you a description of our new strategy within the next
> week with the understanding that counsel will be reviewing it at the same time.

*See* Govt. Ex. 69.  On April 30, 2002, Haber went to London to acquire 20% of Trilogy.[38]

Trilogy acted as both a facade for the co-promoters and a repository for evidence hidden

offshore.  By email dated May 24, 2002, Mox Tan of Helios circulated a memorandum detailing

---

[35](...continued)
Hawkes's participation in the forty-six 2001 FDIS transactions was routed to them by DGI, but
the United States has so far discovered the payments summarized in the table above.

[36] The FDIS transactions for 2002 are summarized in Appendix D to the Declaration of
John Lindquist.

[37] DGI had a prior working relationship with Trilogy going back as far as 1999.  *See*
email dated 2/15/00, Govt. Ex. 2 (stating that the attached PowerPoint presentation for the "UK
Pathfinder" "...is essentially the same as the Trilogy/Diversified joint presentation that we all
agreed upon in August 1999, spiffed up to incude logos and standardized fonts."  *See also*, Haber
Dep. Tr. 8/12/03, at 47:25-48:21, Govt. Ex. 64.

[38]  *See* email dated 4/30/02, Govt. Ex. 49 (". . .  [W]e have a meeting…to run through
how you want to structure your 'acquisition' of 20% of Trilogy . . . .").

2370273.1

how Haber and other DGI employees, and Phil Kampf of Helios, would each thereafter be called

consultants to Trilogy.  According to that email, those individuals would no longer carry business

cards with a logo or company identification, their secretaries would no longer identify their

company when answering their phone, they should each obtain a personal email address in lieu of

their existing company email addresses, and all customer files were to be sent offshore to Trilogy

so DGI would be able to contend that it did not to have possession or control of the books and

records.[39]  Under that marketing and implementation scheme, Samuel Mahoney and Martin

Hawkes continued to act as purported foreign partners on the FDIS transactions, but with

Trilogy now acting as the nominal promoter of the transaction.[40]

## ARGUMENT

**I.     UNITED STATES DISTRICT COURTS HAVE THE POWER TO ISSUE REQUESTS FOR FOREIGN JUDICIAL ASSISTANCE**

Letters rogatory are formal requests from a court of one nation to the judiciary of a

foreign nation for the latter's assistance in obtaining evidence.  The execution of a request for

judicial assistance by the foreign court is based on comity between nations at peace.  *United*

*States v. Zabady*, 546 F. Supp. 35, 39 n.9 (M.D. Pa. 1982); *The Signe*, 37 F. Supp. 819, 820 (E.D.

---

[39]  *See* email dated 5/24/02, with Revised Trilogy U.S. Implementation Memo, Govt. Ex. 52.

[40]  *See* email dated 9/25/02, Govt. Ex. 53 ("They are Trilogy correct?"); email dated 10/1/02, Govt. Ex. 54; email dated 11/5/02, Govt. Ex. 57 ('I have changed "Trilogy Financial Investments Limited" to "Trilogy Investments Ltd."'); email dated 11/7/02, Govt. Ex. 58 ("Don't use Trilogy Financial Investments or Trilogy Financial Products only use **Trilogy Investments Ltd.**")(emphasis in original); email dated 11/21/02, Govt. Ex. 59 ("Sam [Mahoney] will make his contributions to the various aforementioned FUNDS and authorize Trilogy Investments Ltd. to make their contributions to the FUNDS.")(emphasis in original); email dated 1/23/03, Govt. Ex. 60 ("[Jimmy Haber] said that Trilogy will not allow us to release [the closing books] until they are paid in full.")

2370273.1

La. 1941). The power of federal courts to issue letters rogatory derives from 28 U.S.C. § 1781 and from the judiciary's "inherent" authority. *United States v. Reagan*, 453 F.2d 165, 171-73 (6th Cir. 1971), *cert. denied*, 406 U.S. 946 (1972); *United States v. Staples*, 256 F.2d 290 (9th Cir. 1958); *DBMS Consultants v. Computer Assocs. Int'l*, 131 F.R.D. 367, 369 (D. Mass. 1990) ("It is settled that the courts have inherent authority to issue letters rogatory," citing, *United States v. Reagan*, 453 F.2d at 172); *Evanston Ins. Co. v. Oea,* No. CIV S-02-1505, 2006 U.S. Dist. LEXIS 42068 (E.D. Cal. 2006); *United States v. Strong*, 608 F. Supp. 188, 192-94 (E.D. Pa. 1985); *B & L Drilling Electric v. Totco*, 87 F.R.D. 543, 545 (W.D. Okla. 1978).

A United States district court should grant a motion for issuance of letters rogatory unless a party opposing the motion demonstrates "some good reason" for denial. *DBMS Consultants v. Computer Assocs. Int'l*, 131 F.R.D. at 369; see also *Zassenhaus v. Evening Star Newspaper Co.*, 131 U.S. App. D.C. 384, 404 F.2d 1361 (D.C. Cir. 1968) (holding that the district court erred in refusing to issue a letter rogatory to request assistance in effort to secure witness testimony). The sufficiency of the opponent's showing depends on the facts and circumstances of the particular case. See *DBMS Consultants v. Computer Assocs. Int'l*, 131 F.R.D. at 369; *Zassenhaus v. Evening Star Newspaper Co.*, 404 F.2d at 1364; *B & L Drilling Electric v. Totco*, 87 F.R.D. at 545.

## II. THE PROPOSED REQUESTS FOR INTERNATIONAL JUDICIAL ASSISTANCE IS NECESSARY TO THE UNITED STATES' DEFENSE OF THIS SUIT.

### A. Introduction

The foreign discovery sought here is essential to the United States' defense of this suit because the foreign partner– in each instance Samuel Mahoney or Martin Hawkes– was, we

2370273.1

believe, an integral part of the generic and abusive tax-shelter product employed here.  As an integral part of each FDIS transaction, the partner (Mahoney or Hawkes) and his business associates and advisors, including John Hussey and Nigel Scott, possess discoverable and essential information.  That information is relevant to each of the issues in this case, and integral to at least three of them: (1) whether Fidelity International was a sham partnership because the foreign "partner" was not an actual partner but simply an accommodation partner or nominee who was paid a fee for his participation in the tax-shelter transaction; (2) whether Fidelity International was a sham partnership and therefore should be disregarded for federal income tax purposes because it had no legitimate non-tax business purposes; and (3) whether the FDIS transaction itself, as designed, developed, marketed, and implemented, was a factual and/or economic sham.

> **B.    The Discovery Is Necessary to Determine Whether Fidelity International was a Sham Partnership because Mahoney and Hawkes were not In Fact Real Partners.**

This foreign discovery is essential to show whether Fidelity International should be treated as a valid partnership for federal tax purposes.  Courts will disregard an entity for federal tax purposes "if it is fictitious or if it has no business purpose . . . other than the creation of tax deductions."[41]  The basic inquiry turns on whether considering all the facts "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949).  In conducting a sham entity analysis, a court's inquiry is fundamentally objective, focusing upon whether the partners truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both.  *Commissioner v. Tower,* 327 U.S. 280, 286, (1946); *Andantech v. Commissioner*,

---

[41] *Ferguson v. Comm'r*, 29 F.3d 98, 101 (2d Cir. 1994) (citations omitted); *accord Merryman v. Comm'r*, 873 F.2d 879, 881 (5th Cir. 1989).

2370273.1

331 F3rd 972, 978-79 ( D.C. Cir.2003) (partnership disregarded because foreign partners did not intend to join together to share in profits and losses of the business but instead were well compensated to facilitate the tax avoidance feature of the transaction).

As such, the existence of a partnership for tax purposes depends on the objective intent of the purported partners. To examine the objective intent of the foreign partners in the Fidelity International transaction and the other related FDIS transactions, the United States must obtain documents and testimony from those purported partners. It is equally essential to obtain documents and testimony from the foreign partners' business associates, who have knowledge regarding the marketing and implementation of the FDIS tax shelter and/or the nature and amounts of payments made by the promoters to Mahoney's and Hawkes's foreign entities.

The foreign partners entered into 58 FDIS transactions over the course of approximately one year, from July 2001 to July 2002. The source of their funding for these transactions is unclear. The foreign partners must therefore explain the funding of each of their capital investments into these 58 FDIS transactions. The evidence indicates that the foreign partners were not real partners at all, but rather nominees paid a fee for participation in the tax shelter. Their participation in those 58 tax shelters is particularly suspicious because each resulted in the nearly immediate loss of 50% of the foreign partner's capital investment within the span of a few weeks from their initial capital investment. Without a behind-the-scenes agreement to compensate him, Samuel Mahoney would have lost $991,815 of initial contributions into these tax shelters. He would have lost $325,500 in Fidelity International alone.[42] Similarly, without more, Martin Hawkes would have lost $979,754 of initial contributions.

There is evidence demonstrating that, despite appearances, Mahoney and Hawkes were

---

[42]*See* Appendix C and Outline of Egan Transaction, a copy of which is attached to Appendix C.

2370273.1

funded for their initial-contribution expenses, and were additionally compensated.  The

additional compensation was in the form of fees totaling at least $2 million for participation in

the FDIS tax shelters.  The promoters' records show that they considered Mahoney's and

Hawkes's funding and compensation to be a joint expense.  DGI's records show that, as of May

1, 2002, the "Co-Investor Adj. Cost basis" for the 46 FDIS transactions entered into in 2001

totaled $1,261,515.  The records show that as of that same date, the "Irish Distributions"–

Mahoney and Hawkes being the Irish– in the amount of $41,463 related to another six

transactions.  *See* Govt. Ex. 44.  Making this scheme even clearer, DGI booked as an expense

"SM-MH Cost Basis," *i.e.*, Samuel Mahoney-Martin Hawkes Cost Basis, of $1,302,978, which

equals the total of $1,261,515 from the forty-six 2001 transactions and the $41,463 from the

additional six transactions.  *See* Govt. Ex. 45.

 The United States requires these foreign examinations to obtain additional evidence

proving that Mahoney and Hawkes did not intend to join together as partners for the purpose of

carrying on a business;  *i.e.*, they did not join together to share in the profits or losses of an option

investment partnership venture.  Instead, we believe the evidence will show they were acting as

mere nominees or accommodation partners and were compensated handsomely to facilitate this

deceit.

 **C.** **The Discovery Is Necessary to Determine Whether Fidelity International Should Be Disregarded Because it Did Not Have a Legitimate Non-Tax Business Purpose.**

 As discussed,  the basic inquiry in determining whether a partnership is valid for tax

purposes is "whether, all facts considered, the parties intended  to join together as partners to

conduct business activity for a purpose other than tax avoidance." *ASA Investorings v.

Commissioner,* 201 F.3d 505, 513 (D.C. Cir 2000).  "Where taxpayers use an 'elaborate

2370273.1

partnership' with ... [partners] created solely for the purpose of the questioned transaction, 'the absence of a non-tax purpose is fatal to the recognition of the entity for ...tax purposes.'" *Boca Investorings Partnership v. United States*, 314 F3d 625, 632 (D.C. Cir. 2003) (internal citations omitted.). ("The only logical explanation of the partnership's formation was the exploitation of Temp. Treas.. Reg. §15A.453-1(c)(3)(I) and the gain of a paper tax loss to absorb its enormous capital gains.")

Here, the foreign partners also possess critical evidence as to what was the real purpose of the formation of Fidelity International. They were intimately involved in dozens of FDIS-type tax shelters, including those known as Short-Option-Strategy ("SOS") and its subset FDIS tax shelters, before, during, and after 2001. Either Mahoney or Hawkes was a partner in each of the 58 known FDIS transactions in 2001 and 2002, with Mahoney as the foreign partner in Fidelity International. Moreover, the source of their capital contributions to their FDIS tax-shelter entities and their apparent compensation for participating in this scheme is traceable to an array of foreign entities in which they and/or their business associates were directors, employees, and/or shareholders.

From 1999 to approximately 2001, Mahoney and Hawkes engaged in similar FDIS-type transactions through Biosphere, of which Messrs. Mahoney and Hawkes were directors. Two such transactions are at issue in the Tax Court in the consolidated cases of *Tucker and Heckler v. Commissioner*, Tax Court Docket Nos. 12307-04, 16571-04, 16752-04. John Hussey, one of those the United States seeks to examine here, was the third director of Biosphere Finance.

By 2002, Mahoney and Hawkes were still participating in the FDIS transactions, but now while DGI and Helios were marketing the FDIS tax shelter through Trilogy, an Isle of Man entity which was formerly a United Kingdom entity. Nigel Scott of the Isle of Man appears to have

21

been Trilogy's manager from 2000 to 2002 while the domestic promoters purported to be consultants of that entity. Tax-shelter-related correspondence was sent to Scott's attention when addressed to Trilogy Investments Ltd. That Trilogy correspondence was sent to the same Isle of Man address identified earlier as belonging to Kilsture and to Nigel Scott's and Oliver Peck's employer, Singer & Friedlander.

Each of the overseas participants and their business associates therefore possesses vital information as to the real purpose of the formation of the FDIS tax-shelter entities, including Fidelity International at issue here. Specifically, Messrs. Mahoney and Hawkes possess critical information regarding why they participated in a tax-shelter venture in which they were destined to lose about half of their purported investment in just a few weeks.

Moreover, they should be equally knowledgeable as to why millions of dollars were paid to them from U.S. tax shelter promoters and participants shortly before and after the 2001 FDIS transactions were implemented. Specifically, they should know why DGI paid $952,000 to Biosphere and $120,000 to Kilsture. They should also know why Helios made a $570,000 payment to Maddox and a $380,000 payment to Kilsture, which Mahoney and Hawkes were closely associated with, and why DGI paid more than $1 million to the Cumberdale entities they directed. Those payments appear to represent a portion of the $2 million in fees paid to Messrs. Mahoney and Hawkes for their participation in this tax shelter scheme in 2001.

Mr. Hussey is knowledgeable regarding the source of the capital contributions made by Biosphere Finance for Mahoney's and Hawkes's involvement in similar FDIS-type transactions in 1999 and 2000. He should be equally knowledgeable regarding payments made by the domestic promoters to Biosphere Finance in 2001 and 2002. Nigel Scott should be knowledgeable regarding the marketing and implementation of the FDIS tax shelter in 2001 and

2370273.1

2002, and, critically, should also be able to produce the records of the 2002 FDIS transactions.

The evidence thus far appears to show that Mahoney and Hawkes were merely masquerading as foreign partners to be the recipients of the paper gains generated on the FDIS offsetting options transactions. In their role of tax-indifferent foreign partners, they could facilitate the apparent *raison d' etre* of the FDIS partnership entities – to be a set piece to funnel paper tax losses to the purchasing U.S. taxpayer. This foreign discovery is therefore vital to corroborate that evidential position. Such evidence would conclusively confirm that Fidelity International did not possess a legitimate non-tax business purpose, and should therefore be disregarded for tax purposes.

### D.     The Discovery Is Necessary to Determine Whether the FDIS Transaction Was an Economic Sham and Even Possibly a Factual Sham.

This discovery is necessary to determine whether the tax shelter employed here, as designed, developed, marketed, and implemented, was an economic sham, if not even a factual sham. It is fundamental that the substance, not the form, of a transaction controls for tax purposes. *Gregory v. Helvering*, 293 U.S. 465 (1935). One incarnation of the basic substance-over-form principle is the sham transaction doctrine. Courts have recognized two types of sham transactions: shams in fact and shams in substance. *ACM Partnership v. Commissioner*, 157 F.3d 231, 247 n.30 (3d Cir. 1998), *cert. denied*, 526 U.S. 1017 (1999). Shams in fact are transactions that are created on paper but in reality never occur. Shams in substance, or economic shams, are transactions that actually occur but lack non-tax economic substance. *Ibid.* If a transaction lacks either the factual or economic substance that its form represents, then purported losses claimed on the transaction are not deductible. *Kirchman v. Commissioner*, 862 F.2d 1486, 1490 (11th Cir. 1989).

Under the economic substance doctrine, transactions that are invented solely to create tax

2370273.1

deductions and otherwise have no economic substance, even though formally complying with the letter of the Internal Revenue Code, will not be recognized. *Knetsch v. United States*, 364 U.S. 361 (1960); *Dewees v. Commissioner*, 870 F2d 21, 32, 35 (1st Cir. 1989).[43]  There is a two-prong test for determining economic substance.  The first prong examines whether the transaction has a reasonable possibility of a profit (an objective inquiry). *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778, 781-82 (5th Cir. 2001) (internal citation omitted; emphasis added). The second prong looks to whether there existed a tax-independent business purpose for the transaction (a subjective inquiry). *Id.*  The fundamental question for a court is therefore not whether the mere possibility of profit exists, but whether a *reasonable* possibility of profit exists. Critically, in determining profit potential, all expenses and costs associated with the transaction that produces the tax benefits must be taken into account.[44]  Moreover, a taxpayer's subjective profit motive cannot salvage a transaction that is otherwise lacking in economic substance.  As now Mr. Justice Breyer stated in *Dewees*, the "[c]ase law makes clear that a taxpayer cannot deduct a 'sham transaction' loss, irrespective of his subjective profit motive." *Id.* at 35.

The fact and economic sham analyses require thorough examination of the design, development, marketing, and implementation of the FDIS tax-shelter product.  That thorough examination is impossible without the requested foreign discovery.  The foreign partners and their business associates have exclusive possession of evidence that goes directly to the heart of the factual-sham and economic-sham issues.  The FDIS taxpayers, including the taxpayer here, paid enormous fees to the promoters for their right to participate in an integrated transaction that appeared from the outset to be singularly focused on the generation of paper tax gains and losses.

---

[43]*See also*, *Yosha v. Commissioner*, 861 F.2d 494, 497 (7th Cir. 1988);  *Executive Jet Aviation, Inc. v. United States*, 125 F.3d 1463, 1469 (Fed. Cir. 1997).

[44] *See Long-Term Capital Holdings*, 330 F. Supp 2d at 175-84.

2370273.1

On this score,  Mahoney and Hawkes are (or certainly should be) acutely knowledgeable as to the nature of the offsetting option trading strategies employed in the FDIS transactions. They also should be able to explain why they participated in option trading transactions that appear from the outset to have been predestined to lose money not only for them but also for the taxpayers after all the taxpayers' transaction costs are taken into account.  Significantly, the funding of and apparent fees paid to Mahoney and Hawkes for their participation appears to have been built into the cost structure of the FDIS transaction.

Moreover, each of the overseas participants should also be able to explain why the domestic promoters made their records inaccessible in the United States.  As described earlier, Trilogy was used to secrete evidence of the fraudulent tax-shelter product.  The promoters directed that books and records of the FDIS transactions were to be sent offshore to Trilogy so that none of the domestic promoters would have possession or control of them.  Nonetheless, Mahoney and Hawkes continued to act as mere nominees for DGI through Trilogy, thereby facilitating the anonymity of the domestic promoters.  Such evidence relates directly to the factual sham analysis.  Yet DGI has refused to produce any of the documents it transferred offshore to Trilogy.  Because of the secreting of evidence overseas, the foreign examinations are the only means of obtaining a wealth of essential evidence.

Given Mahoney's, Hawkes's, Hussey's, Scott's, and Peck's intimate involvement with the overseas arm of the tax-shelter operation, and their exclusive possession of a substantial store of evidence, examination of each of them is essential to the required two-prong economic substance analysis as well as to the factual sham analysis.

III.    **THE INFORMATION SOUGHT THROUGH INTERNATIONAL JUDICIAL ASSISTANCE IS HIGHLY RELEVANT AND IS INTENDED TO BE USED AS EVIDENCE AT TRIAL.**

The relevant and essential information the foreign partners and their business associates possess is highly relevant to this case, and will likely be used at trial to support the United States' defenses. While the parties have referred to the procedure of foreign evidence gathering as discovery, it is not discovery in the usual sense. The United States is not seeking here the broad discovery allowed under Federal Rule of Civil Procedure 26. More narrowly, it is seeking critical trial evidence. There can be no doubt that the information possessed by the foreign "partners" and their associates is relevant to both Fidelity International's claims and the United States' defenses. The plaintiff referred to Samuel Mahoney as a "co-investor" in Fidelity International, Compl. at ¶ 31,[45] and described Mahoney as one of four Fidelity International members or partners. Compl. at ¶ 34.[46] Examination directed to the "partners," relating to their involvement in this tax-shelter transaction and dozens of identical tax-shelter transactions, will provide a wealth of evidence that is otherwise unavailable, at least in part because of the secreting efforts of the foreign "partners" and the tax-shelter promoters.

## IV. THE COURT HAS THE AUTHORITY TO ISSUE REQUESTS FOR FOREIGN JUDICIAL ASSISTANCE IN OBTAINING EVIDENCE IN THE ISLE OF MAN, AND TWO ALTERNATIVE PROCEDURES EXIST FOR ISSUING THAT REQUEST.

The power of federal courts to issue letters rogatory derives from 28 U.S.C. § 1781 and from the judiciary's "inherent" authority. One procedure for issuing those letters rogatory and obtaining evidence is found in The Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, commonly referred to as the Hague Evidence Convention, where the

---

[45]References to the Complaint are to the Complaint in case number 05-40151.

[46]There is a notable absence of the plaintiff's seeking or facilitation of discovery of the foreign "partner." The plaintiff also failed to list the foreign "partner" on his initial disclosures.

2370273.1

receiving nation is a signatory.[47]  The Isle of Man is a signatory.[48]  A second, and often more

efficient procedure for issuing those letters rogatory is available.  Under the second procedure,

the United States may hire a foreign solicitor as its agent.  That foreign solicitor would be sent

the letter of request directly from this Court, and would then apply for a commission from the

foreign court to take the testimony of the witnesses.  In furtherance of this procedure, the United

States has retained United Kingdom solicitor Mr. Laurence Shore of Herbert Smith LLP,

Exchange House, Primrose Street, London EC2A 2HS, (telephone) +44 20 7374 800043.

Consistent with the option of transmitting a letter rogatory directly to a foreign solicitor,

the Federal Rules of Civil Procedure permit a deposition to be taken in a foreign country,

pursuant to a letter rogatory, as follows:

> (1) pursuant to any applicable treaty or convention, or (2) **pursuant to a letter of
> request (whether or not captioned a letter rogatory)**, . . . .  A . . . letter of request
> shall be issued on application and notice and on terms that are just and appropriate.
> It is not requisite to the issuance of . . . a letter of request that the taking of the
> deposition in any other manner is impracticable or inconvenient; and . . . a letter of
> request may be issued in proper cases . . . .

Fed. R. Civ. P. 28(b) (emphasis added).

## V.    THE PROCEDURE FOR OBTAINING EVIDENCE IN IRELAND BY THE ISSUANCE OF REQUESTS FOR FOREIGN JUDICIAL ASSISTANCE IS GOVERNED BY THE VIENNA CONVENTION ON CONSULAR RELATIONS.

Compelled evidence from an Irish witness must be taken before an Irish court and

generally may be requested pursuant to a letter rogatory transmitted via the diplomatic channel.

Ireland is not a party to the Hague Evidence Convention.  Unlike judicial assistance between the

United States and Isle of Man, judicial assistance between the United States and Ireland is

governed by the Vienna Convention on Consular Relations ("VCCR"), 21 UST 77, TIAS 6820,

---

[47]"The United States ratified the Convention in 1972."  *Boreri v. Fiat S.P.A.*, 763 F.2d 17,
19 (1st Cir. 1985).

[48]23 U.S.T. 2555, T.I.A.S. No. 7444, codified at 28 U.S.C. § 1781.

2370273.1

596 U.N.T.S. 261 and the Hague Convention on the Service Abroad of Judicial and

Extra-Judicial Documents in Civil and Commercial Matters , 20 UST 361; to which the United

States and Ireland are parties.  The VCCR authorizes transmission of letters rogatory through

diplomatic channels.  The VCCR lists in Article 5(j) among the functions of a consular post

"executing letters rogatory or commissions to take evidence for the courts of the sending State in

accordance with international agreements in force, or, in the absence of such international

agreements, in any other manner compatible with the laws and regulations of the receiving

State."  The VCCR does not obligate Ireland to execute the request, but simply provides a formal

avenue by which the requests may be made.

The United States will follow the outlined formal procedures in transmitting the letter rogatory to the appropriate Irish authorities.

Dated:   April 4, 2007

                                        Respectfully submitted,

                                        MICHAEL J. SULLIVAN
                                        United States Attorney

                                         /s/ Dennis M. Donohue
                                        DENNIS M. DONOHUE
                                        CHIEF SENIOR LITIGATION COUNSEL
                                        OFFICE OF CIVIL LITIGATION
                                        Tax Division, U.S. Department of Justice
                                        P.O. Box 403, Ben Franklin Station
                                        Washington, D.C.  20044
                                        Telephone: (202) 307-6492
                                        Facsimile: (202) 307-2504
                                        E-mail: dennis.donohue@usdoj.gov

                                        JOHN A. LINDQUIST
                                        BARRY E. REIFERSON
                                        HEATHER L. RICHTARCSIK
                                        Trial Attorneys, Tax Division
                                        U.S. Department of Justice
                                        P.O. Box 55, Ben Franklin Station
                                        Washington, D.C.  20044-0055
                                        Telephone: (202) 307-6561
                                        Facsimile:  (202) 514-5238
                                        E-mail: john.a.lindquist@usdoj.gov
                                                barry.e.reiferson@usdoj.gov
                                                heather.l.richtarcsik@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and copies will be sent to those indicated as non registered participants on April 4, 2007.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

2370273.1