UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos.  05-40151 |
| | ) | 06-40130 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Judge Saylor |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' SUR-REPLY
TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

I.    **PLAINTIFF'S REQUESTS FOR DOCUMENTS CONCERNING THE
      REASONS BEHIND THE FPAA ARE MOOT OR EXCEED THE SCOPE
      OF PERMITTED DISCOVERY**

A.    **In its Reply plaintiff contends that its motion is not moot
      because it recently received a production of documents from
      the IRS in response to a Freedom of Information Act request
      which included four documents referencing plaintiff and
      Notice 2000-44.**

Contrary to plaintiff's representation, not one of the four referenced documents that it has

attached to its Reply, (Pltf. Reply Exs. A-D), in fact reference the plaintiff Fidelity International

Currency Advisor A Fund, LLC (FICAA).   Nor do they advance plaintiff's argument.  More

deeply troubling is the fact that plaintiff is engaging in *ex parte* discovery with the IRS,

apparently on matters in litigation before this Court, thereby attempting to circumvent the

discovery procedures and protections afforded by the Federal Rules of Civil Procedure and this

Court.  Counsel for the United States has not ever seen the Freedom of Information Act

2397352.1

("FOIA") request in issue, nor the other documents produced, and does not know from which file

the referenced emails were produced by the IRS.[1]

**B.    Plaintiff's Claims of Relevance are Hollow**

In support of its contention that the IRS's internal deliberations are relevant for discovery

purposes, plaintiff cites to *Timken Roller Bearing Co. v. United States*, 38 F.R.D. 57, 62-63

(N.D. Ohio 1964). *Timken* is not authority, and is not applicable here. As the *Timken* court

stated, that was "a most unusual case."[2]  Its decision in that "unusual case" is also at odds with

the weight of authority. The applicable analysis, set forth in the United States' response, is

recited in *Nordberg v. United States*, 1996 U.S. Dist. LEXIS 5259; 96-1 U.S. Tax Cas. (CCH)

P50,295; 77 A.F.T.R.2d (RIA) 2158 (D.Mass. 1996)(copy attached).

---

[1]  In light of plaintiff's representation that these documents were from a recent FOIA request, counsel for the United States inquired of the IRS as to why there had been no notice of this request. The IRS has confirmed that there indeed are a number of pending FOIA requests involving Richard Egan and Fidelity High Tech, but represents that no documents have yet been produced. Thus, these email may have in fact been produced by the IRS in response to a FOIA request by another taxpayer. If plaintiff is indeed now coordinating its discovery efforts with other taxpayers, it should have disclosed this fact.

[2]  The *Timken* Court stated as follows with respect to that case:

> This is a most unusual case. The Internal Revenue Service has disallowed 91.24% of the cost of all charges in a general account of the plaintiff labeled "Employee and Public Relations" which is devoted to general advertising. It tests the credulity of this Court to say that a responsible business enterprise  will set aside a fund of $330,803.94, as in 1953, and will devote only 8.76% of it to promote the sale of its products. Assuming, as we must, that the Government  is acting in good faith, it is reasonable to expect that a novel theory of defense will be interposed to defeat the claim of the plaintiff; it should not be kept secret until the moment of trial. Since the letters and reports sought by this motion will probably clarify the Government's defense, good cause exists for their production.

*Timken Roller Bearing Co. v. United States*, 38 F.R.D. at 62-63 .  Here, unlike in *Timken*, the basis for the Commissioner's determination has in no way been concealed.  It is expressly set forth in the FPAA.

The discovery does not relate to the facts existing during 1987, upon which the IRS determinations were based.  In light of the principle that a challenge to a tax determination results in a trial de novo rather than a review by this Court of an existing administrative record, the defendants' discovery requests fail to satisfy the mandate of *Fed.R.Civ.P. 26(b)* that information sought to be discovered be relevant or "reasonably calculated to lead to the discovery of admissible evidence." See, e.g., *Lewis v. Reynolds, 284 U.S. 281, 283, 76 L. Ed. 293, 52 S. Ct. 145 (1932); Ruth v. United States, 823 F.2d 1091, 1094 (7th Cir. 1987)* ("courts conduct a de novo review of the... assessment"); *Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 328 (1974)* (a court's determination as to a taxpayer's liability "must be based on the merits of the case and not any previous record developed at the administrative level").

The information sought by defendants which forms the basis for the motion to compel is, therefore, evidence which would not be relevant to determining their 1987 tax liability. Information about people who participated in the audit is not relevant, nor are notes made by IRS employees during the audit. Indeed, the audit of the Nordbergs' 1987 tax return took place well after the tax year at issue. In short, the information requested by defendants has no bearing on the sole issue in the case at bar because the Nordbergs' ultimate tax liability is not influenced by the IRS' conduct or findings during the audit. In rejecting a similar argument, one District Court denied a motion to compel upon observing that:

> the opinions, impressions, conclusions and reasoning of IRS agents are irrelevant to the validity of the assessment against [the taxpayer] ....Resolution of the[] issues depends solely on application of the pertinent law to the facts of [the] case... The opinions of individual IRS agents regarding their propriety are immaterial.

*Garity v. United States, 81-2 U.S. Tax Cas. (CCH) P 9599, 1980 WL 1765,* at *2 (E.D. Mich. May 20, 1980). Similarly, the Southern District of New York has recognized that:

> the subjective analysis of the agent and technical advisor based upon the information derived from [taxpayer's] records and their respective opinions as to the proper method to be applied in determining whether taxes are due form no part of the [taxpayer's] case. While no doubt disclosure of such information would be of interest to [taxpayer], it is not essential nor required for proper preparation.

*Detroit Screwmatic Co. v. United States, 49 F.R.D. 77, 79 (S.D.N.Y. 1970).*

Furthermore, if the Nordbergs' treatment of the trading losses on their 1987 tax return was erroneous as a matter of law, they are liable regardless of what an IRS agent, at any time, might have thought. See *United States v. Tuthill, 55 F.2d 415, 416 (7th Cir. 1931); United States v. Ellis, 154 F. Supp. 32, 38 (S.D.N.Y. 1957),* aff'd, *264 F.2d*

> *325 (2d Cir. 1959); see also Flamingo Fishing Corp. v. United States, 31 Fed. Cl. 655, 658 (1994)* (where the Court of Claims allowed the government's motion for protective order precluding taxpayer from deposing IRS agents because agents' opinions and conclusions regarding the applicable Code provisions were irrelevant to the determination of the case).

Here, plaintiff's reliance upon *Timken* is not only misplaced, but fails to recognize the applicable legal standard set forth in *Nordberg*.

Moreover, whether or not the FDIS transaction is substantially similar to a transaction set forth in Notice 2000-44 is a pure question of law.   The personal opinions of the officials of the IRS regarding this issue of law are totally irrelevant to its resolution.  In response to a similar argument in *United States v. Farley*, 11 F.3d 1385, 1389 (1993), the Seventh Circuit stated:

> This defense requires only that the district court interpret the statutory exemption and determine whether Farley's purchases were within the scope of that exemption.  The suppositions of FTC staff members expressed in internal memoranda as to requirements of the Act are not pertinent to this task.  In its attempt to decipher the meaning of a statute a court may rely on various tools, including official agency interpretations.***  *"[V]iews of individual members of the [agency's] staff are not legally germane."*

> [Internal citations omitted and emphasis added]

The Seventh Circuit further observed that all the various defenses raised by the party seeking discovery there constituted matters of statutory and regulatory interpretation as well as constitutional analysis, and that none of these defenses would  "require the court to review the postulations of agency staff members." *Id.* at 1391.

Presented with a similar IRS interpretative argument as presented here, the District Court in *Furman v. United States*,1983 WL 1687 at *3 (D. S.C. 1983) also rejected it, stating:

> [T]he only issue raised by the plaintiffs with respect to Treas. Reg.1.1348-3(a)(1)(i)(D) is whether, as a matter of law, that regulation creates a rule in harmony with Internal Revenue Code Section 1348.  Thus, the issue raised is one which this Court must decide based on legal authorities.  Simply stated, the plaintiffs have

2397352.1                                                 4

raised an issue of law.  The issue is not, as the plaintiffs contend, "why" the Internal Revenue Service promulgated this regulation.  Therefore, the factual reasons why the Secretary of the Treasury promulgated this regulation are irrelevant.

Nor is there any support for plaintiff's suggestion that the IRS's internal discussions might somehow set a benchmark against which to evaluate whether plaintiff should have known that this was a Notice 2000-44 transaction.  The reasonable-reliance defense, even if within the jurisdiction of this Court, has nothing to do with the views or non-views of individuals at the IRS.  *See McMurray v. C.I.R.*, 985 F.2d 36 (1st Cir. 1993); *United States v. Boyle*, 469 U.S. 241, 250 (1985).  That the IRS examination lasted nine (9) months is equally immaterial, particularly in light of plaintiff's willful attempt to spoliate evidence by directing KPMG to destroy its files.[3]  As in *Nordberg*, "[w]hile no doubt disclosure of such information would be of interest to [taxpayer], it is not essential nor required for proper preparation."  *Id*.  Even more fundamentally, the views of individual IRS employees regarding whether or not the FDIS transaction is substantially similar to a Notice 2000-44 transaction is patently irrelevant to any issue in this case.

### C.    Plaintiff cannot show any evidentiary need for the documents withheld upon a claim of executive privilege

Abandoning its prior arguments with regard to the impropriety of the Government's claims of privilege,[4] plaintiff instead now asserts that the documents in issue are "critical" and that the government has "failed to prove that production of the requested materials would result in significant harm . . . ."  (Pltf. Reply at 5.)  As noted in the United States' response:

---

[3] *See* Prifti Dep. Tr. Ex. 47, attached to Lindquist Decl. as Ex. 4.

[4] In its Reply plaintiff no longer contends that the supporting declaration of Margo Stevens is untimely.  Nor does plaintiff challenge the sufficiency of Ms. Stevens's declaration.

> Even if a document satisfies the criteria for protection under the deliberative process privilege, nondisclosure is not automatic. The privilege "is a qualified one," *FTC v. Warner Communications Inc.*, 742 F.2d 1156, 1161 (9th Cir.1984), and "is not absolute." *First Eastern Corp. v. Mainwaring*, 21 F.3d 465, 468 n. 5 (D.C. Cir.1994). Thus, in determining whether to honor an assertion of the privilege, a court must weigh competing interests. *See id.*; *see also Developments*, *supra,* at 1621 (noting that courts asked to apply the privilege must engage in "ad hoc balancing of the evidentiary need against the harm that may result from disclosure").

*Texaco Puerto Rico, Inc., supra*, 60 F.3d at 885. Contrary to plaintiff's suggestion, the United States is not, however, required to prove that its production of the requested materials would result in significant harm. As discussed in *Faiella v. IRS*, 2006 WL 2040130, *16 (D.N.H. 2006), the harm is axiomatic.[5]   To prevail against this competing interest, it is plaintiff that must prove that the documents in issue are "critical to responding to the various defenses raised by the government." *First Heights Bank, FSB v. United States*, 46 Fed. Cl. 312, 322 (2000).

Here, plaintiff alleges that the documents may be "critical" to its case. (Pltf. Reply at 5.) However, as discussed above, there is no possible logical foundation to this assertion because none of the documents in issue are relevant to an issue or defense in this case. Furthermore, they cannot lead to admissible evidence.

---

[5] "The 'deliberative process' privilege is designed to safeguard and promote agency decisionmaking processes in at least three ways: It serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *See Faiella v. IRS*, 2006 WL 2040130, *16 (D.N.H. 2006).

## II.     PLAINTIFF'S REQUESTS FOR INTERNAL, UNPUBLISHED IRS DOCUMENTS CANNOT LEAD TO ADMISSIBLE EVIDENCE

In support of its contention that "[a]ll pleadings, records, documents, and materials maintained by the IRS in connection with *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975)" are relevant, plaintiff again cites *Timken Roller Bearing Co. v. United States*, 38 F.R.D. 57, 62-63 (N.D. Ohio 1964).  (Pltf. Reply at 6.)  Critically, however, these materials could not possibly have any relevance to the question whether or not the *Helmer* case has any applicability to an issue in this case.  Like the issue of the applicability of Notice 2000-44 to the facts of the transaction here, the relevance of the *Helmer* case to any issue in this litigation is likewise exclusively one of law.  Thus, in addition to the fact that the request is vague, ambiguous, and/or burdensome,[6]  the requested *Helmer* documents are simply not relevant and therefore fall well outside the scope of appropriate discovery under Fed R.Civ.P. 26(b)(1).  Just as in *Nordberg*, "[w]hile no doubt disclosure of such information would be of interest to [taxpayer], it is not essential nor required for proper preparation."  *Id* at *6.

---

[6]  As recited in the United States' response, plaintiff's request for production No. 21 asked for "All pleadings, records, documents, and materials maintained by the IRS in connection with *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975), including, but not limited to, all documents previously produced by the Government in any other proceeding concerning this subject."  Each part of this request is undefined, vague and/or ambiguous.  Those parts are as follows:
1) "maintained by the IRS;"
2) "in connection with "*Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975);"
3) "in any other proceeding;" and
4) "concerning this subject."
While this request might be construed to reference the *Helmer* litigation file, as noted in the United States' response, the *Helmer* litigation file is no longer available.

III.    **PLAINTIFF'S REQUEST FOR INTERNAL IRS DOCUMENTS ON WHETHER KPMG WAS REQUIRED TO REGISTER ANY TAX STRATEGY CANNOT LEAD TO ADMISSIBLE EVIDENCE**

Plaintiff has not advanced any further support of Document Requests Nos. 31 and 32, or otherwise shown how the requested documents could possibly lead to relevant information.  Here again, plaintiff is simply seeking the views of individual IRS employees– this time regarding taxshelter registration requirements applicable to KPMG.  Once again such views could not have the remotest relevance to any issue in this case.  *See Sidell v. Comm'r of Internal Revenue*, 225 F.3d 103, 111 (1st Cir. 2000) (rejecting the taxpayer's reliance on a number of internal IRS memoranda to show that a proposed regulation was not meant to cover a particular situation); *Conn. Gen. Life Ins. Co. v. Comm'r of Internal Revenue*, 177 F.3d 136, 145 (3d Cir. 1999), *cert. denied*, 528 U.S. 1003 (1999) ("reliance upon remembered details from officials who lacked the ultimate authority to issue any proposed regulation has little support in the law"); *Schwalbach v. Comm'r of Internal Revenue*, 111 T.C.215, 228 n.4 (1998) (giving "no weight" to oral statements made by "agents of the Commissioner" describing the content of final regulations); *Armco Inc. v. Comm'r of Internal Revenue*, 87 T.C. 865, 867-68 (1986) (affidavit of IRS employee explaining his intent in drafting a regulation irrelevant to interpreting the regulation).

In short, just as in *Nordberg*, "[w]hile no doubt disclosure of such information would be of interest to [taxpayer], it is not essential nor required for proper preparation."  *United States v. Nordberg* at *7.   Moreover, these documents are inherently privileged and subject to 26 U.S.C. 6103.  Given the overbreadth of these document requests, and irrelevancy and inherently privileged nature of the documents requested, as set forth in our memorandum in opposition at 24-25, this request also falls well outside proper discovery under Fed R.Civ.P. 26(b)(1).

2397352.1                                        8

IV.   **PLAINTIFF'S REQUEST FOR INFORMATION AND DOCUMENTS SUPPORTING THE REPRESENTATIONS OF GOVERNMENT COUNSEL TO THIS COURT CONCERNING THE STATUS OF ITS DISCOVERY**

As reported to the Court on November 14, 2006, the United States has identified a number of identical FDIS transactions (46 in 2001 and 12 in 2002), all employing the same steps and the same sham foreign partners.  The United States, in its response, suggested that though previously asserting that the information and materials supporting these representations constituted work product, this part of plaintiff's motion was moot.  Specifically, we noted that we had recently filed a motion to compel against one of the promoters detailing the factual basis for our  report to the Court on November 14, 2006, and had also amended our responses to plaintiff's interrogatories on this issue incorporating our papers on this motion to compel.  In reply, plaintiff complains that this count of FDIS transactions has been a floating number and that, more critically, the United States improperly amended its answers to interrogatories by incorporating, by reference, its recently filed motion papers.

Before turning to the merits of plaintiff's "improper incorporation by reference" argument, it is first worth noting that the various arguments raised by plaintiff to justify its entitlement to information and documents supporting our report to the Court are fundamentally flawed.  First, plaintiff asserted that it was simply seeking discoverable factual information.  Citing the advisory committee notes and case law authority, it argued that work-product protection does not extend to facts within documents that may otherwise qualify as work product, and it was therefore entitled to this basic factual information. (Pltf's mem. at 25-26.)

But plaintiff already possessed the factual materials upon which our report to the Court was based.  Throughout the discovery process, we have taken painstaking efforts to provide

plaintiff with all third-party-promoter materials produced to us.  Thus, plaintiff was not simply

seeking factual materials.  It already possessed such materials.  Plaintiff was also not just asking

for the process of our "selection of documents" from this database of materials.[7]  Rather, plaintiff

was seeking our in-depth analysis of the documents that we selected.  Or, more precisely, it

sought the fruits of our analytical review of the documents we selected as relevant to our defense

of this litigation.

 In short, plaintiff was seeking our analytical or opinion work product.  Critically, opinion

work product is accorded an almost absolute protection from discovery because "[u]nder the

work product rule, codified in Fed.R.Civ.P. 26(b)(3) 'an attorney is not required to divulge, by

discovery or otherwise, facts developed by his efforts in preparation of the case or opinions he

has formed about any phase of the litigation.'" *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th

Cir.1998) (citations omitted).[8]

 Recognizing the inherent weakness of its "merely seeking facts" argument, plaintiff

alternatively argued that even if this information did constitute work product, we waived any

work product protection by reporting the conclusions of our document analysis to the Court.

(Pltf's mem. at 27.)  Citing *United States v. Nobles*, 422 U.S. 225, 239-40, 240 n.14 (1975),

plaintiff pointed out that when "counsel attempts to make *testimonial use* of these [work product]

materials, the normal rules of evidence come into play." (Emphasis added).  But plaintiff failed

---

 [7]Plaintiff in fact concedes that a counsel's process of selection of documents is entitled to ordinary work product protection because it necessarily reveals an attorney's developing strategy. (Pltf's Mem. at 27.)

 [8]While a claim of work product is not absolute, the relevant threshold is not the burden upon the party claiming the privilege, but the burden upon the party who is seeking to pierce the work product privilege. Fed.R.Civ.P. 26(b)(3).

to cite the complete text of the Supreme Court's discussion of when the work product privilege can be waived.  What the Court actually said was –

> What constitutes a waiver with respect to work-product materials depends, of course, upon the circumstances. Counsel necessarily makes use throughout trial of the notes, documents, and other internal materials prepared to present adequately his client's case, and often relies on them in examining witnesses. When so used, there normally is no waiver.  But where, as here, counsel attempts to make a testimonial use of these materials the normal rules of evidence come into play with respect to cross-examination and production of documents.

In short, the Supreme Court expressly recognized that counsel can make full use of work product information for a broad array of legitimate purposes even in an open courtroom.  Our reporting to the Court on the current status of our discovery efforts fits more closely the Supreme Court's description of a proper use of work product information in the courtroom.  It most certainly did not constitute a testimonial use of such information.  Thus, the authorities cited by plaintiff simply did not support its novel position on waiver.[9]

Nonetheless, by late February the United States recognized that we were about to disclose the principal analytical work product underlying our report to the Court on November 14, 2006. This disclosure would be reflected in the papers of a motion to compel we were filing against one of the promoters, Diversified Group Inc. ("DGI").  Since the work product protection of our disclosed document analysis would therefore no longer be applicable, we anticipated that we would shortly be able to respond affirmatively to the plaintiff's discovery requests for this information.  Indeed, as stressed in the reply on our Motion to Strike, had plaintiff not

---

[9]Plaintiff also argued that we were improperly relying on work product information as both a sword and shield because we were "selectively using privilege information *to prove a point* but then invoking the privilege to prevent an opponent from challenging the information." (Citations omitted; emphasis added; Pltf's Mem. at 28.)  But our reporting to the Court on the status of our discovery efforts was no more proving a point than it was making testimonial use of this information.

2397352.1                                    11

prematurely filed its motion to compel, we believed that this issue could have resolved without intervention of the Court, as counsel for the United States so informed plaintiff's counsel on March 6.  (Def. Reply Mem. at 6, n2.)

Apparently recognizing that any attempt now to resolve this issue would undermine its position on our Motion to Strike, plaintiff argued in its reply memorandum that this issue was, however, not moot.  To support this argument, it asserted that our amended discovery responses improperly incorporated by reference our filed motion papers. (Plf.'s Reply Mem.. at 8.) Although the case law generally disfavors a party's attempt to answer interrogatories by referring to other documents, contrary to plaintiff's position, the practice is not per se improper.  *See. e.g.* Scaife v. Boenne, 191 F.R.D. 590 (N.D. Ind. 2000) permitting an interrogatory response to incorporate other documents or statements in pleadings so long as it is apparent from the incorporation of those documents or pleadings what answer is being provided.  *Martin v. Easton Pub. Co.*, 85 F.R.D. 312 (E.D. Pa. 1980), noting that an answer to an interrogatory can refer to other documents as long as it is clear where within those documents the responsive information can be found.  Pointedly, the memorandum supporting our motion to compel cited in our amended discovery responses made perfectly clear what specific exhibits and appendices supported our report to the Court on November 14, 2006 regarding the number and characteristics of the 58 identical FDIS transactions.

Thus it appears that plaintiff declined to accept our amended responses not because this issue was not, or could not have been, resolved or considerably narrowed, but rather because it desperately wanted to keep this issue alive.  To thwart such gamesmanship, however, we have now further amended our responses to these discovery requests so as to make it crystal clear as to

what were the principal factual bases of our report to the Court on November 14, 2006.  Those amended responses are now attached at Exhibit A hereto.  Accordingly, we again respectfully submit that this issue is now moot.

## V.    PLAINTIFF'S REQUESTS FOR THE PRODUCTION OF OTHER TAXPAYER INFORMATION FROM THE INTERNAL REVENUE SERVICE

Plaintiff is correct that courts have recognized the relevance of pattern evidence in tax shelter matters.  In affirming a Tax Court determination that a particular shelter constituted a sham, the Ninth Circuit stated:

> The Tax Court admitted evidence of other investor transactions in the CGS program as relevant to the sham determination. As discussed . . ., at least part of the sham analysis focuses on the "economic substance" of the transaction; *i.e.*, whether it was "likely to produce economic benefits aside from a tax deduction." A consideration of the entire investment program directly related to the analysis of Taxpayers' probable economic benefits. It is also directly relevant to the court's assessment of Taxpayers' credibility with respect to their assertions of a non-tax based motive."

*Sochin v. Comm'r*, 843 F.2d 351, 355 (9th Cir. 1988), *cert. denied*, 488 U.S. 824 (1988).  However, plaintiff is incorrect in its reliance upon *Shell Petroleum, Inc. v. United States*, 47 Fed. C. 812 (2000), for the proposition that all relevant information is necessarily excepted under 26 U.S.C. § 6103.

Plaintiff contends that *Shell* construed the "directly related" requirement in section 6103(h)(4)(B) in a fashion that would permit the open-ended discovery it seeks  – namely that "'directly related' information is relevant information." *Id*. at 818.  This very same argument was assiduously reviewed and rejected by Judge Allegra in *Vons Companies, Inc. v. United States*, 51 Fed. Cl. 1, 18-19 (2001, stating –

> *Shell* did not hold that all evidence admissible under the Federal Rules of Evidence is "directly related" to an issue.  To be sure, the relevancy standard in the Federal

2397352.1                                13

Rules of Evidence provides an outer boundary on what may be disclosed under section 6103(h)(4)(B) -- if information is not relevant at all, it obviously does not meet the requirements of that paragraph. But, as Judge Damich's opinion in *Shell* infers, because a document meets the evidentiary relevancy standard does not mean that it also meets the disclosure requirements -- the two standards are not coterminous. Indeed, the language establishing what is "relevant evidence" under the Federal Rules of Evidence is quite different and certainly much broader than the "directly related" language in section 6103(h)(4)(B) -- a difference which the legislative history of the latter provision indicates should not be overlooked.

Plaintiff's reliance upon Chief Counsel Notice 2006-003 (October 25, 2005) is also misplaced. Chief Counsel Notice 2006-003 did not change the law. However, it did clarify the law. Although IRC § 6103(a) generally bars disclosure of taxpayer information, § 6103(h)(4)(B) provides an exception "if the treatment of an item reflected on such [third party's] return is directly related to the resolution of an issue in the proceeding." As Chief Counsel has recently made clear in Notice 2006-003, IRC § 6103(a) does not bar the IRS from providing the Department of Justice with generic promotional materials or pattern evidence. The Notice states that "[u]nder section 6103(h)(4)(B)'s item test, the disclosure of tax information of taxpayers who participated in substantially similar transactions promoted by the same promoter is permitted, so long as the tax information directly relates to the resolution of an issue in the proceeding." Notice at 2. The United States agrees with plaintiff's contention that the transactional information of "other investors" may indeed satisfy the Item Test because the treatment of these transactions on the returns of the other investors who participated in similar and/or identical transactions can be directly related to one or more of the principal issues in the litigation. As Chief Counsel has stated:

> [T]he way a third party reported a tax shelter loss on a tax return can directly relate to the issue of whether the taxpayer (who is the party to the proceeding at issue) should be allowed to claim a loss from a substantially similar tax shelter, since the collective conduct, i.e., pattern evidence, of all the investors in reporting the losses

> from these transactions can be used to demonstrate that none of the investors could realistically have had a bona fide business or investment purpose. Accordingly, information obtained in the examination of the third party's return that directly relates to the resolution of an issue in the taxpayer's proceeding, such as promotional material that the third party received from the common promoter, or responses to IDRs inquiring about the third party's non-tax purpose for investing in the substantially similar transaction, can be disclosed in that proceeding.

Notice at 2-3.

Here, the transactional information from the other FDIS transactions bears upon multiple issues in this litigation, including whether the FDIS product was "likely to produce economic benefits aside from a tax deduction." The transactional information from other FDIS transactions also bears upon the issue as to whether the Step-Transaction Doctrine applies. Pattern evidence regarding how each investor executed the individual steps of the FDIS is necessary to determine whether the steps of these generic products were preplanned and integrated or undertaken independently. The evidence obtained to date shows that each of the FDIS taxpayer-investors followed the same chronology of steps, regardless of the particular facts and their particular situations. Also, and most fundamentally, such transactional information also relates to whether the foreign partners in these 58 other transactions were real or phony partners.

Accordingly, as noted in the United States' Response, whether, and to what extent, other taxpayer information is excepted from 26 U.S.C. §6103 is subject to the transaction and/or item tests is still under review by the IRS. The United States contends that the plaintiff's FDIS transaction is one of 58 cookie-cutter FDIS tax shelter transactions, all of which appear to have been joined at the hip not only with common promoters but also with sham foreign partners. In light of the United States recent discovery of some of these facts, the United States has again

asked the IRS to review the other taxpayer information of the promoters and other investors for possible exception under the transaction or item tests.

Needless to say, given the extensive scope of this generic tax shelter scheme, this is a massive undertaking which will take some time. The IRS must first locate the 57 other partnership files. It must then review each of them for possible exception under 26 U.S.C. 6103(h)(2), which allows the IRS to disclose tax return information to the Department of Justice in certain carefully delineated circumstances. IRS counsel has already requested the assignment of an agent to assist in this process. Then government counsel must separately review any documents disclosed to the Department of Justice under § 6013 (h)(2) for possible release under the item and/or transaction tests of (h)(4) of that statute.

Consequently, once this review is completed, we anticipate producing to plaintiff transactional information relating to the 57 other FDIS transactions as consistent with Chief Counsel Notice 2006-003, at least to the extent such information has not already been produced to the plaintiff. It is not likely, however, that the partnership files for these 57 other FDIS transactions will contain much in the way of additional information that is not already in the parties' multi-million-page database of promoter-document information. This is because we have already obtained, or are attempting to obtain through discovery, all promoter-related documents for each of these 58 FDIS transactions. For the foregoing reasons, this section of plaintiff's motion to compel is at best premature, and therefore, we respectfully ask the Court to deny it or alternatively hold it in abeyance until the review and disclosure process mentioned above is completed.

**Conclusion**

For all the above reasons, the Court should deny plaintiff's motion to compel.

DATED:  April 11, 2007

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

 /s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER L. RICHTARCSIK
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044-0055
Telephone: (202) 307-6561
Facsimile:  (202) 514-5238
E-mail: john.a.lindquist@usdoj.gov
        barry.e.reiferson@usdoj.gov
        heather.l.richtarcsik@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non registered participants on April 11, 2007.

/s/ John A. Lindquist
Trial Attorney, US Department of Justice, Tax Division

2397352.1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FIDELITY INTERNATIONAL CURRENCY       )
ADVISOR A FUND, L.L.C., by the Tax Matters  )
Partner,                              )
                                      )
            Plaintiff,                )       Case Nos.: 05-40151-FDS
                                      )                 06-40130-FDS
      v.                              )
                                      )
UNITED STATES OF AMERICA,             )
                                      )
            Defendant.                )

**UNITED STATES' SECOND AMENDED RESPONSE TO
PLAINTIFF'S SECOND SET OF INTERROGATORIES**

The United States, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure

and Rule 33.1 of the Local Rules of the United States District Court for the District of

Massachusetts, responds to Plaintiff's Second Set of Interrogatories as follows:

INTERROGATORY NO. 15

At the November 14, 2006 status conference, Defendant stated that Defendant had

"determined that the transaction that is at issue in this case is . . . a boilerplate standard tax

product." Please set forth all facts supporting the statement that the transaction at issue in this

case is a "boilerplate standard tax product."

RESPONSE: The United States objects to this interrogatory on the grounds that it is

overbroad and unduly burdensome, and because it seeks attorney work-product and trial-

preparation materials. Notwithstanding and without waiving the foregoing objections, the

following principal facts support the statement that the transaction at issue in this case is a

2397350.1

"boilerplate standard tax product":

A.    The FDIS product was designed, marketed, and implemented to generate artificial tax losses;

B.    The FDIS product is the same as or substantially similar to a Notice 2000-44 transaction;

C.    The FDIS product was marketed using a boilerplate PowerPoint presentation;

D.    The FDIS PowerPoint presentation was not to be left with the participants in an attempt to avoid possible discovery of the PowerPoint by the Internal Revenue Service;

E.    The FDIS product follows a series of pre-arranged orchestrated steps detailed by the promoters in an outline of proposed transaction. The outlines of proposed transaction detail the terms for the proposed sale of the FDIS product;

F.    The fee for the FDIS product was computed as a fixed percentage of the desired tax loss to be generated;

G.    The implementation documents for the  FDIS product, copies of which are included in the transaction closing binders, are virtually identical;

H.    The implementation of the FDIS product for each taxpayer was virtually identical or identical;

I.    The opinions blessing the FDIS product were virtually identical or identical;

J.    Multiple law firms were pre-selected to issue opinions blessing the FDIS product in order to create the appearance of independence; and

K.    The FDIS product is a sham transaction.

2

2397350.1

Documents evidencing these facts are attached to the Declaration of John Lindquist, filed in support of the United States' motion to compel The Diversified Group Incorporated's production of documents, Case No. M8-85 (USDC SDNY), a copy of which was served upon plaintiff. A copy of the closing binder for each of the 2001 FDIS transactions has already been produced to plaintiff by the United States. A copy of the outlines of proposed transaction for the 101 participants has already been produced to plaintiff by the United States.

INTERROGATORY NO. 16

At the November 14, 2006 status conference, Defendant stated that Defendant had "determined that this tax product [referenced in Interrogatory No. 15] has been, in fact, sold to 63 separate taxpayers, or taxpayer entities." Please set forth all facts supporting the statement that the tax product was "sold to 63 separate taxpayers, or taxpayer entities," including the identity of the 63 taxpayers or entities.

RESPONSE: The United States objects to this interrogatory on the grounds that it is overbroad and unduly burdensome, and because it seeks attorney work-product and trial-preparation materials. Notwithstanding and without waiving the foregoing objections, the following principal facts support the statement that the tax product was "sold to 63 separate taxpayers, or taxpayer entities," and identify those taxpayers and taxpayer entities:

A.   The identities of the taxpayers and entities are found in Appendices C and D attached to the Declaration of John Lindquist, filed in support of the United States' motion to compel The Diversified Group Incorporated's production of documents, Case No. M8-85 (USDC SDNY), a copy of which was served upon plaintiff;

3                                                                2397350.1

B.      The outlines of proposed transaction detail the terms for the proposed sale of the FDIS product to these 101 participants who participated in a total of 58 FDIS transactions during 2001 and 2002;

C.      The closing binders for these transactions include the implementation documents for each of these transactions; and

D.      Govt. Ex. 51 attached to the Declaration of John Lindquist, filed in support of the United States' motion to compel The Diversified Group Incorporated's production of documents, Case No. M8-85 (USDC SDNY), a copy of which was served upon plaintiff, lists the fees collected by The Diversified Group, Incorporated and/or Helios from the sale of the 46 2001 FDIS transactions.

A copy of the closing binder for each of the 2001 FDIS transactions has already been produced to plaintiff by the United States. A copy of the outlines of proposed transaction for the 101 participants has already been produced to plaintiff by the United States.

INTERROGATORY NO. 17

At the November 14, 2006 status conference, Defendant stated that Defendant had "determined that in each of these entities [referenced in Interrogatory No. 16] there was a foreign partner" and that "the foreign partner in these entities was either ... Samuel Mahoney; or alternatively, his partner in Ireland, a person by the name of Martin Hawkes." Please set forth all facts supporting the statement that the foreign partner in each of the entities referenced in Interrogatory No. 16 was either Samuel Mahoney or Martin Hawkes.

RESPONSE: The United States objects to this interrogatory on the grounds that it is overbroad and unduly burdensome, and because it seeks attorney work-product and trial-

4

2397350.1

preparation materials.  Notwithstanding and without waiving the foregoing objections, the

following principal facts support the statement that in each of these entities [referenced in

Interrogatory No. 16] there was a foreign partner" and that "the foreign partner in these entities

was either . . . Samuel Mahoney; or alternatively, his partner in Ireland, a person by the name of

Martin Hawkes" :

    A.    The purported foreign partner in each of the FDIS transactions is listed in
Appendices C and D, attached to the Declaration of John Lindquist, filed in
support of the United States' motion to compel The Diversified Group
Incorporated's production of documents, Case No. M8-85 (USDC SDNY),  a
copy of which was served upon plaintiff, and in each instance was Samuel
Mahoney or Martin Hawkes;

    B.    The outlines of proposed transaction detail the terms for the proposed sale of the
FDIS product, including the planned participation of Samuel Mahoney and/or
Martin Hawkes;

    C.    The closing binder for each of these transactions reflects the participation of
Samuel Mahoney or Martin Hawkes as a purported partner in each of these FDIS
transactions; and

    D.    Govt. Exs. 50 and 51, attached to the Declaration of John Lindquist, filed in
support of the United States' motion to compel The Diversified Group
Incorporated's production of documents, Case No. M8-85 (USDC SDNY),  a
copy of which was served upon plaintiff, reflect payoffs to Mahoney and Hawkes
for their participation as purported partners in the 2001 FDIS transactions listed in

2397350.1

Appendix C.

A copy of the closing binder for each of the 2001 FDIS transactions has already been produced to plaintiff by the United States. A copy of the outlines of proposed transaction for the 101 participants has already been produced to plaintiff by the United States.

## INTERROGATORY NO. 18

At the November 14, 2006 status conference, Defendant stated that Samuel Mahoney and Martin Hawkes were "partners." Please set forth all facts supporting the statement that Samuel Mahoney and Martin Hawkes were "partners."

RESPONSE: The United States objects to this interrogatory on the grounds that it is overbroad, unduly burdensome, vague and ambiguous, and because it seeks attorney work-product and trial-preparation materials. Further, the United States objects because government counsel's statement from the November 14, 2006 status conference is misquoted in this interrogatory. Government counsel stated at the November 14, 2006 status conference that the purported foreign partner in each of the known FDIS tax shelters was "Samuel Mahoney . . . or alternatively, his partner in Ireland, a person by the name of Martin Hawkes." (November 14, 2006 Tr. at 19.) Notwithstanding and without waiving the foregoing objections, the following principal facts support the statement that Martin Hawkes was Samuel Mahoney's "partner in Ireland":

A.  Samuel Mahoney and Martin Hawkes were directors of an Irish company known as Biosphere Finance, Ltd.;

B.  Samuel Mahoney and Martin Hawkes also appear to have been employees of two Isle of Man entities known as Kilsture Ltd. and Maddox Ltd.;

6

C.      Samuel Mahoney or Martin Hawkes was a purported foreign "partner" in
each of the 2001 and 2002 FDIS tax-shelter transactions;

D.      The outlines of proposed transactions reflect the planned participation of
Martin Hawkes and/or Samuel Mahoney as purported partners in each of
the FDIS transactions;

E.      The FDIS participants wired money to Samuel Mahoney and Martin Hawkes
through a joint venture account;

F.      The closing binder for each of the FDIS transactions reflects the participation of
Samuel Mahoney or Martin Hawkes as a purported foreign partner in each of the
FDIS transactions; and

G.      Govt. Exs. 50 and 51 attached to the Declaration of John Lindquist, filed
in support of the United States' motion to compel The Diversified Group
Incorporated's production of documents, Case No. M8-85 (USDC SDNY),
a copy of which was served upon plaintiff, reflect payoffs to Mahoney and
Hawkes for their participation as purported foreign partners in the 2001
FDIS transactions listed in Appendix C.

A copy of the closing binder for each of the 2001 FDIS transactions has already been produced to
plaintiff by the United States. A copy of the outlines of proposed transaction for the 101
participants has already been produced to plaintiff by the United States.

7                                    2397350.1

INTERROGATORY NO. 19

At the November 14, 2006 status conference, Defendant stated that Defendant had "determined that [the transactions referenced in Interrogatory No. 16] were structured identically in terms of the steps of the transaction." Please set forth all facts supporting the statement that the referenced transactions were "structured identically in terms of the steps of the transaction."

RESPONSE: The United States objects to this interrogatory on the grounds that it is overbroad and unduly burdensome, and because it seeks attorney work-product and trial-preparation materials. Notwithstanding and without waiving the foregoing objections, the following principal facts support the statement that Defendant had "determined that [the transactions referenced in Interrogatory No. 16] were structured identically in terms of the steps of the transaction" :

A.    The FDIS product was marketed using a boilerplate PowerPoint presentation;

B.    The FDIS PowerPoint presentation was not to be left with the participants in an attempt to avoid possible discovery of the PowerPoint by the Internal Revenue Service;

C.    The FDIS product follows a series of prearranged orchestrated steps detailed by the promoters in an outline of proposed transaction;

D.    The implementation documents for the FDIS product, copies of which are included in the closing binders, were virtually identical;

E.    The implementation of the FDIS product for each taxpayer was virtually identical or identical; and

F.    The opinions blessing the FDIS product were virtually identical or identical.

8

2397350.1

Documents evidencing these facts are attached to the Declaration of John Lindquist, filed in support of the United States' motion to compel The Diversified Group Incorporated's production of documents, Case No. M8-85 (USDC SDNY), a copy of which was served upon plaintiff. A copy of the closing binder for each of the 2001 FDIS transactions has already been produced to plaintiff by the United States. A copy of the outlines of proposed transaction for the 101 participants has already been produced to plaintiff by the United States.

INTERROGATORY NO. 20

At the November 14, 2006 status conference, Defendant stated that Defendant had "determined that ... in each of these transactions [referenced in Interrogatory No. 16], the foreign partner, in fact, was bought out . . . after a so-called gain was recognized to this foreign partner." Please set forth all facts supporting the statement that, in each of the referenced transactions, the foreign partner was bought out following his recognition of gain.

RESPONSE: The United States objects to this interrogatory on the ground that it is overbroad and unduly burdensome, and because it seeks attorney work-product and trial-preparation materials. Notwithstanding and without waiving the foregoing objections, the following principal facts support the statement that Defendant had "determined that ... in each of these transactions [referenced in Interrogatory No. 16], the foreign partner, in fact, was bought out . . . after a so-called gain was recognized to this foreign partner" :

A.    The FDIS product was marketed using a boilerplate PowerPoint presentation which details this sequence of steps, including the purported purchase the bulk of the purported foreign partner's common interest for one-half of the foreign

2397350.1

partner's purported capital, immediately after a so-called gain had been recognized by the foreign partner;

B.    The outline of proposed transaction details this proposed sequence of steps, including the purported purchase of the bulk of the purported foreign partner's common interest for one-half of the foreign partner's purported capital contributions, immediately after a so-called gain had been recognized by the foreign partner;

C.    The implementation documents for the FDIS product, copies of which are included in the closing binders, reflect this sequence of steps, including the purported purchase of the bulk of the purported foreign partner's common interest for one-half of the foreign partner's purported capital contributions, immediately after a so-called gain had been recognized by the foreign partner;

D.    The opinions blessing the FDIS product reflect this sequence of steps, including the purported purchase of the bulk of the purported foreign partner's common interest for one-half of the foreign partner's purported capital contributions, immediately after a so-called gain had been recognized by the foreign partner;

E.    Samuel Mahoney and Martin Hawkes received payments through their joint venture account from the preplanned orchestrated purported buyout of their purported common interest.

Documents evidencing these facts are attached to the Declaration of John Lindquist, filed in support of the United States' motion to compel The Diversified Group Incorporated's production of documents, Case No. M8-85 (USDC SDNY), a copy of which was served upon plaintiff. A

10                                                            2397350.1

copy of the closing binder for each of the 2001 FDIS transactions has already been produced to plaintiff by the United States. A copy of the outlines of proposed transaction for the 101 participants has already been produced to plaintiff by the United States.

INTERROGATORY NO. 21

At the November 14, 2006 status conference, Defendant stated that, in each of the transactions referenced in Interrogatory No. 16 a gain was recognized by a foreign partner and that Defendant has "determined in each case [that the gain] was not a real economic gain." Please set forth all facts supporting the statement that the gain recognized by the foreign partner in each of the referenced transactions was "not a real economic gain."

RESPONSE: The United States objects to this interrogatory on the grounds that it is overbroad and unduly burdensome, and because it seeks attorney work-product and trial-preparation materials. Notwithstanding and without waiving the foregoing objections, the following principal facts support the statement that Defendant has "determined in each case [that the gain] was not a real economic gain":

A. Each FDIS tax-shelter transaction involved the formation of a multi-member LLC, which was treated as a partnership for tax purposes, with the participation of a purported foreign partner, who nominally acquired the bulk of the common interests of the partnership for a relatively small share of its total contributed capital;

B. Once capitalized, the purported partnership would acquire multiple pairs of simultaneously-executed, offsetting European digital options;

C. They would then meticulously time the termination of the offsetting options, first

11                                                    2397350.1

to terminate the gain legs of the options, generating massive paper gains to the purported foreign partner who was not subject to U.S. taxes;

D.    Simultaneously therewith, the partnership would replace the terminated gain legs with options having virtually the exact same terms. Then, almost immediately thereafter, the taxpayer would purchase the bulk of the purported foreign partners' common interest for one-half of the foreign partner's purported "capital contribution";

E.    On the partnership tax return, the paper gains and paper losses would virtually offset each other, with the partnership reporting only a small net economic gain or loss on the offsetting option transactions; and

F.    While reporting a gain to the foreign partners, the foreign partners received no payments.

Documents evidencing these facts are attached to the Declaration of John Lindquist, filed in support of the United States' motion to compel The Diversified Group Incorporated's production of documents, Case No. M8-85 (USDC SDNY), a copy of which was served upon plaintiff. A copy of the closing binder for each of the 2001 FDIS transactions has already been produced to plaintiff by the United States. A copy of the outlines of proposed transaction for the 101 participants has already been produced to plaintiff by the United States.

INTERROGATORY NO. 22

At the November 14, 2006 status conference, Defendant stated that Defendant had "determined that it is, to say the least, strange as to the source of the foreign partners capital contributions in each of these separate different transactions [referenced in Interrogatory No.

2397350.1

16]." Please set forth all facts concerning the source of the foreign partner's capital contribution in each of the referenced transactions.

RESPONSE:  The United States objects to this interrogatory on the grounds that it is overbroad and unduly burdensome, and because it seeks attorney work-product and trial-preparation materials.  Notwithstanding and without waiving the foregoing objections, the following principal facts support the statement that Defendant has "determined that it is, to say the least, strange as to the source of the foreign partners capital contributions in each of these separate different transactions [referenced in Interrogatory No. 16]."

    A.    Each FDIS tax-shelter transaction involved the formation of a multi-member LLC, which was treated as a partnership for tax purposes, with the participation of a purported foreign partner, who nominally acquired the bulk of the common interests of the partnership for a relatively small share of its total contributed capital;

    B.    Once capitalized, the purported partnership would acquire multiple pairs of simultaneously-executed, offsetting European digital options;

    C.    They would then meticulously time the termination of the offsetting options, first to terminate the gain legs of the options, generating massive paper gains to the purported foreign partner who was not subject to U.S. taxes;

    D.    Simultaneously therewith, the partnership would replace the terminated gain legs with options having virtually the exact same terms;

    E.    Then, almost immediately thereafter, the taxpayer would purchase the bulk of the purported foreign partner's common interest for one-half of the foreign partner's

13

purported capital contribution;

F.    The original purported capital contributions of the purported foreign partners, Samuel Mahoney and Martin Hawkes, in all 46 2001 FDIS transactions was $3,707,715;

G.    The purported foreign partners then received a total of $2,404,737 from the sale of the bulk of their partnership interests to the participants in these 46 2001 FDIS transactions, leaving the amount of $1,302,978 as their still unrecovered "cost basis" on their original purported capital contributions ($1,302,978 = $3,707,715 - $2,404,737); and

H.    DGI considered Samuel Mahoney and Martin Hawkes unrecovered cost basis of $1,302,978 along with an additional $2,000,000 as a joint expense to be subtracted from gross profits for purposes of computing DGI's, Alpha's, and Helios's share of the net profits.

Documents evidencing these facts are attached to the Declaration of John Lindquist, filed in support of the United States' motion to compel The Diversified Group Incorporated's production of documents, Case No. M8-85 (USDC SDNY), a copy of which was served upon plaintiff. A copy of the closing binder for each of the 2001 FDIS transactions has already been produced to plaintiff by the United States. A copy of the outlines of proposed transaction for the 101 participants has already been produced to plaintiff by the United States.

14

2397350.1

Dated: April __11__, 2007.

JOHN A. LINDQUIST
Trial Attorney
U.S. Department of Justice, Tax Div.
P.O. Box 55, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 307-6561
Email:John.A.Lindquist@usdoj.gov

15

2397350.1

## CERTIFICATE OF SERVICE

I hereby certify that the UNITED STATES' SECOND AMENDED RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES was served upon the plaintiff by sending a copy by first class mail, postage prepaid, to the following address on the ⟋⟋ᵗʰ day of April, 2007.

David J. Curtin
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036


JOHN A. LINDQUIST

2397350.1

1996 U.S. Dist. LEXIS 5259, *; 96-1 U.S. Tax Cas. (CCH) P50,295;
77 A.F.T.R.2d (RIA) 2158

LEXSEE



Positive
As of: Apr 10, 2007

**UNITED STATES OF AMERICA, Plaintiff v. PAUL C. NORDBERG and DEBRA L. NORDBERG, Defendants**

**Civil Action No. 93-12681-NMG**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*1996 U.S. Dist. LEXIS 5259; 96-1 U.S. Tax Cas. (CCH) P50,295; 77 A.F.T.R.2d (RIA) 2158*

**April 8, 1996, DATED**

**COUNSEL:** [*1] For UNITED STATES OF AMERICA, Plaintiff: Beth A. Westerman, Trial Attorney, Tax Division, U.S. Department of Justice, Washington, DC. Richard J. Gagnon, Jr., U.S. Department of Justice, Tax Division, Washington, DC.

For PAUL C. NORDBERG, Defendant: Paul C. Nordberg, [PRO SE], Auburn, MA.

For DEBRA L. NORDBERG, Defendant: Debra L. Nordberg, [PRO SE], Auburn, MA.

For UNITED STATES OF AMERICA, Counter-Defendant: Richard J. Gagnon, Jr., U.S. Department of Justice, Tax Division, Washington, DC.

**JUDGES:** Nathaniel M. Gorton, United States District Judge

**OPINION BY:** NATHANIEL M. GORTON

**OPINION:**

**MEMORANDUM AND ORDER**

GORTON, J.

There are five motions currently pending before this Court in the above-entitled civil action: 1) defendants' motion for judgment on the pleadings [Docket #11], 2) plaintiff's motion for partial summary judgment on defendants' counterclaim [#12], 3) defendants' motion to compel [#17], 4) plaintiff's motion for a protective order [#18], and 5) plaintiff's motion for partial summary judgment [#20]. For the reasons that follow, the defendants' motion to compel will be denied and plaintiff's motion for summary judgment will be [*2] allowed; the remaining motions will, therefore, be denied as

1996 U.S. Dist. LEXIS 5259, *; 96-1 U.S. Tax Cas. (CCH) P50,295;
77 A.F.T.R.2d (RIA) 2158

moot.

## I. Introduction

On December 9, 1993, the United States government filed this civil action, pursuant to *26 U.S.C. § 7405,* to collect what it asserts was an erroneous refund paid to defendants. Section 7405 provides that "any portion of a tax imposed by this title, refund of which is erroneously made, ... may be recovered by civil action brought in the name of the United States." The dispute arises out of defendants' 1987 tax return, which was the subject of a lengthy IRS audit that lasted until May, 1990. The issue in the case is whether the defendants' treatment of their 1987 securities trading losses on their 1987 tax return was erroneous as a matter of law.

Although an initial "Audit Report" issued by the IRS to the Nordbergs in May, 1990, indicated no deficiency, the agency later alleged a deficiency of $ 30,665, plus interest. By December 10, 1991, defendants paid, under protest, the entire amount of the alleged deficiency.

In late December, 1991, the IRS issued a check payable to defendants for $ 45,188.25 as a refund for overpayment of their 1987 taxes. In May, 1992, however, the IRS informed [*3] defendants that the refund was erroneous and requested repayment. Defendants, claiming that the refund was owed to them, refused to return the money. Subsequently, the IRS refused to refund the defendants' claimed overpayments on their 1991 and 1992 tax returns but instead applied those amounts ($ 2,430 and $ 5,317, respectively) to the claimed outstanding liability. n1

n1 The IRS withheld the later refunds pursuant to *26 U.S.C. § 6402*(a), which provides that "in the case of any

overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment...."

On December 9, 1993, the United States filed the instant suit to recover the amount of the erroneous refund plus statutory interest. The defendants filed an answer and counterclaim on December 29, 1993, seeking return of the money held by the IRS as credits toward repayment [*4] of the alleged deficiency.

## II. Defendants' Motion to Compel [Docket #17]:

Defendants' motion to compel asserts that the government has repeatedly objected to and declined to answer requests for admissions and interrogatories concerning various aspects of the IRS' audit of their 1987 tax return. The importance of the audit, at least to the defendants, is further evidenced by their expressed desire to depose IRS employees involved during the process, which has led the government to file a motion for a protective order. The government responds that, in light of the sole issue at stake in the underlying action, the defendants' requests for admissions and production of documents fail to satisfy the requirements of *Fed.R.Civ.P. 26(b)*. This Court agrees.

Resolution of the case at bar turns solely on the specific issue of whether the Nordbergs' treatment of their 1987 trading losses was erroneous as a matter of law. Their discovery requests seek to obtain information about the reasoning and processes by which IRS employees involved with the audit of the taxpayers' return decided to assess the tax

1996 U.S. Dist. LEXIS 5259, *; 96-1 U.S. Tax Cas. (CCH) P50,295;
77 A.F.T.R.2d (RIA) 2158

liabilities with respect to their trading transactions. The discovery does [*5] not relate to the facts existing during 1987, upon which the IRS determinations were based. In light of the principle that a challenge to a tax determination results in a trial de novo rather than a review by this Court of an existing administrative record, the defendants' discovery requests fail to satisfy the mandate of *Fed.R.Civ.P. 26(b)* that information sought to be discovered be relevant or "reasonably calculated to lead to the discovery of admissible evidence." See, e.g., *Lewis v. Reynolds, 284 U.S. 281, 283, 76 L. Ed. 293, 52 S. Ct. 145 (1932); Ruth v. United States, 823 F.2d 1091, 1094 (7th Cir. 1987)* ("courts conduct a de novo review of the... assessment"); *Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 328 (1974)* (a court's determination as to a taxpayer's liability "must be based on the merits of the case and not any previous record developed at the administrative level").

The information sought by defendants which forms the basis for the motion to compel is, therefore, evidence which would not be relevant to determining their 1987 tax liability. Information about people who participated in the audit is not relevant, nor are notes made by IRS employees [*6] during the audit. Indeed, the audit of the Nordbergs' 1987 tax return took place well after the tax year at issue. In short, the information requested by defendants has no bearing on the sole issue in the case at bar because the Nordbergs' ultimate tax liability is not influenced by the IRS' conduct or findings during the audit. In rejecting a similar argument, one District Court denied a motion to compel upon observing that:

the opinions, impressions, conclusions and reasoning of IRS agents are irrelevant to the validity of the assessment against [the

taxpayer] ....Resolution of the[] issues depends solely on application of the pertinent law to the facts of [the] case... The opinions of individual IRS agents regarding their propriety are immaterial.

*Garity v. United States, 81-2 U.S. Tax Cas. (CCH) P 9599, 1980 WL 1765,* at *2 (E.D. Mich. May 20, 1980). Similarly, the Southern District of New York has recognized that:

the subjective analysis of the agent and technical advisor based upon the information derived from [taxpayer's] records and their respective opinions as to the proper method to be applied in determining whether taxes are due form [*7] no part of the [taxpayer's] case. While no doubt disclosure of such information would be of interest to [taxpayer], it is not essential nor required for proper preparation.

*Detroit Screwmatic Co. v. United States, 49 F.R.D. 77, 79 (S.D.N.Y. 1970).*

Furthermore, if the Nordbergs' treatment of the trading losses on their 1987 tax return was erroneous as a matter of law, they are liable regardless of what an IRS agent, at any time, might have thought. See *United States v. Tuthill, 55 F.2d 415, 416 (7th Cir. 1931); United States v. Ellis, 154 F. Supp. 32, 38 (S.D.N.Y. 1957),* aff'd, *264 F.2d 325 (2d Cir. 1959);* see also *Flamingo Fishing Corp. v. United States, 31 Fed. Cl. 655, 658 (1994)* (where the Court of Claims allowed the government's motion for protective

1996 U.S. Dist. LEXIS 5259, *; 96-1 U.S. Tax Cas. (CCH) P50,295;
77 A.F.T.R.2d (RIA) 2158

order precluding taxpayer from deposing IRS agents because agents' opinions and conclusions regarding the applicable Code provisions were irrelevant to the determination of the case). Accordingly, defendants' motion to compel will be DENIED.

### III. Plaintiff's Motion for Partial Summary Judgment [Docket #20]:

The government has also filed a motion for "partial summary [*8] judgment on the issue of the nature of the defendants' losses from trading in 1987." In the memorandum in support of its motion, the government enumerates the "questions presented" to the Court as: 1) whether Paul Nordberg was a trader or a dealer with respect to the options he traded in 1987, and, accordingly, 2) whether the losses from the trading activity are properly capital or ordinary. The Nordbergs vigorously contest the government's assertion that there is no genuine issue of any material fact with respect to the nature of the losses, and, therefore, it is important for this Court to identify precisely the material facts upon which plaintiff bases its motion.

### A. The Summary Judgment Standard

Summary judgment shall be rendered where the pleadings, discovery on file and affidavits, if any, show "there is no genuine issue of material fact and...the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. The Court must view the entire record in the light most favorable to the plaintiffs and indulge all reasonable inferences in their favor. *O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993)*.

With respect to a motion for summary judgment, [*9] the burden is on the moving party to show that "there is an absence of evidence to support the non-moving party's case." *FDIC v. Municipality of Ponce, 904 F.2d 740, 742 (1st Cir. 1990)* (quoting *Celotex Corp.*

*v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986))*. If the movant satisfies that burden, it shifts to the non-moving party to establish the existence of a genuine material issue. Id. In deciding whether a factual dispute is genuine, this Court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. The nonmovant's assertion of mere allegation or denial of the pleadings is insufficient on its own to establish a genuine issue of material fact. *Fed.R.Civ.P. 56(e)*.

### B. Material Facts

On their joint income tax return for 1987, the Nordbergs reported, on Schedule C (entitled "Profit or (Loss) From Business or Profession"), losses of $ 86,821.86. According to a letter written by Paul Nordberg to the Internal Revenue Service, those losses resulted from his trading of securities called "OEX options," which are "puts" and "calls" indexed to a [*10] basket of stocks in the Standard & Poors 100. In response to the United States' Requests for Admissions, Paul Nordberg admitted that his trading of securities in 1987 was done "exclusively for an account" in the Nordbergs' name at Shearson, Lehman Brothers. Government Exhibit 9 at p.4.

Moreover, Mr. Nordberg admitted that he was aware of no facts or evidence that in 1987 he ever traded securities except through a "securities exchange," assuming that that term encompasses the Chicago Board of Exchange. Id. at pp. 5-6. By reporting the losses on a Schedule C form, the Nordbergs claimed the entire trading loss as an ordinary business loss. An audit by the IRS followed, with which the defendants cooperated fully.

At the conclusion of the exhaustive audit, the only unresolved substantive issue was whether

1996 U.S. Dist. LEXIS 5259, *; 96-1 U.S. Tax Cas. (CCH) P50,295;
77 A.F.T.R.2d (RIA) 2158

Paul Nordberg's trading losses for the 1987 tax year were capital or ordinary. Indeed, in a letter to the IRS dated May 8, 1989, Mr. Nordberg wrote that:

> The only material, unresolved matter is the proper treatment...of Nordberg's trading of securities... The issue to be determined is whether Nordberg is limited to a maximum "Capital Loss" deduction of $ 3,000 (for 1987) [*11] or is entitled to treat the entire net trading loss in 1987 as the loss incurred in a "business" or "trade", and therefor [sic] deductible in its entirety in 1987.

Government Exhibit 2, p. 2.

According to an "Income Tax Examination Changes" form dated July 11, 1990, the IRS changed the characterization of the Nordbergs' 1987 loss to a capital loss. Government Exhibit 3. Consequently, the IRS proposed a deficiency of $ 30,665, plus interest, for a total of $ 44,015.70. In November and December of 1991, the defendants made payments by check in the amount equal to the total amount of the assessment, plus interest.

By what the IRS admits was mistake, it issued a refund check to the Nordbergs on December 20, 1991, for $ 45,188.25, representing the payments made by defendants plus $ 388.25 in interest. Government Exhibits 4, 6. In early 1992, the IRS sent the defendants a notice that 1) informed them that the refund check had been issued erroneously, and 2) requested repayment. Government Exhibit 7. By letter dated February 14, 1992 to the IRS Center Director, the Nordbergs informed the Service that

they would not return the money. The government then commenced the pending [*12] lawsuit.

C. Legal Analysis

Sections 165(a) and (c) of the Internal Revenue Code permit individuals to deduct losses incurred in a trade or business or in a transaction entered into for profit. *26 U.S.C. § 165*(a), (c). Section 165(f) provides, however, that capital losses are deductible only to the extent allowed by sections 1211 and 1212. Under section 1211, an individual's capital losses are deductible only to the extent of capital gains, plus $ 3,000 of ordinary income.

Section 1221 of the Code broadly defines the term "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)," and then narrows that definition by enumerating various exceptions. The relevant provision in the case at bar is section 1221(1), which excludes from the definition of capital assets:

> stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business[.]

*26 U.S.C. § 1221*(1).

In the case at bar, the government maintains [*13] that 1) Paul Nordberg was a trader in securities (as opposed to a dealer) who engaged in securities transactions entirely on his own account and lacked "customers," and 2) he

1996 U.S. Dist. LEXIS 5259, *; 96-1 U.S. Tax Cas. (CCH) P50,295;
77 A.F.T.R.2d (RIA) 2158

cannot, therefore, invoke the exception to the definition of capital asset provided by § 1221(1). The government asserts that the Nordbergs' 1987 losses were therefore capital in nature and, accordingly, they must repay to the United States "the portion of the refund attributable to the disallowance of the Nordbergs' ordinary loss claim." Government Memorandum at 14.

To determine whether securities constitute "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," see § 1221(1), courts have identified three classifications of purchasers of securities: dealers, traders and investors. E.g., *United States v. Wood, 943 F.2d 1048, 1051 (9th Cir. 1991); King v. Commissioner, 89 T.C. 445, 457-58 (1987)*. Of those three classifications, only the first two are relevant to the case at bar. "The tax liability of a seller of securities depends upon which classification best identifies the seller; dealers may qualify for [the § 1221(1) exception], [*14] while traders and investors do not." *Wood, 943 F.2d at 1051*.

The critical issue in distinguishing between dealers and traders is whether the taxpayer has "customers." *Wood, 943 F.2d at 1050-53*. The United States Tax Court explained that a "dealer" is a person who purchases securities or commodities with the expectation of realizing a profit,

> not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller, and

> performing the usual services of retailer or wholesaler of goods.

*Kemon v. Commissioner, 16 T.C. 1026, 1032-33 (1951)*. The Kemon Court thus employed a "merchant" analogy to determine whether a seller of securities is a dealer who sells to "customers" for purposes of section 1221. See id.; see also *Wood, 943 F.2d at 1051; United States v. Diamond, 788 F.2d 1025, 1029 (4th Cir. 1986)*.

"Traders," on the other hand, are sellers of securities or commodities who [*15] "depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost." *Kemon, 16 T.C. at 1033*. In contrast to dealers, traders "perform[] no merchandising functions nor any other service which warrants compensation by a price mark-up of the securities he or she sells." *Id. at 1032-33; Diamond, 788 F.2d at 1029*. A trader will be deemed to be engaged in a "trade or business" if his or her trading is frequent and substantial. *King, 89 T.C. at 458*. As the Wood Court observed, however, although "generally both dealers and traders will be engaged in a trade or business[,] only a dealer...has customers." *943 F.2d at 1052*. In short, unlike a trader, a dealer in securities or commodity futures can take advantage of the section 1221(1) exception to capital asset tax treatment because the latter deals in property held "primarily for sale to customers in the ordinary course" of business. Id.; see also *26 U.S.C. § 1221*(1).

The foregoing cases illustrate that, even when a taxpayer is engaged in the trade or business of selling securities, the gains or losses derived from that activity are nonetheless [*16] capital in nature if the taxpayer has no customers. See *Diamond, 788 F.2d at 1028; King, 89 T.C. at 458*. In Diamond, for example, the Court of

Appeals observed that the taxpayer's emphasis upon the significant financial and hourly commitment to securities trading "misses the crucial point that, whether or not his 1980 transactions amounted to a trade or business, he was not selling 'to customers' for purposes of § 1221(1)." n2 *788 F.2d at 1028*. In the case at bar, then, even assuming that Paul Nordberg was engaged in the "trade or business" of trading securities, this Court's focus properly turns to the issue of whether or not he had "customers" within the meaning of § 1221(1).

n2 It is worth noting that the phrase "to customers" was added to the predecessor of § 1221(1) to exclude from the definition of capital assets only those securities bought and sold by dealers, and not those traded by investors on their own account. See *Mirro-Dynamics Corp. v. United States, 374 F.2d 14, 16 (9th Cir. 1967)* (citing legislative history); see also *MacAdam v. Commissioner, T.C.Memo. 1991-410, 1991 WL 157917 (1991)*.

[*17]

Numerous cases demonstrate that a taxpayer who trades solely on his own account through a broker has no customers with respect to the securities so traded. *Diamond, 788 F.2d at 1028* ("courts have clearly and consistently held that a taxpayer who trades securities for his own account does not sell 'to customers' within the meaning of § 1221(1)"); *Van Suetendael v. Commissioner, 152 F.2d 654 (2d Cir. 1945)* (per curiam). In the instant case, the Nordbergs admit both that their trading of securities in 1987 was exclusively for an account in their name at Shearson, Lehman Brothers and that they are aware of no facts or evidence that in 1987 they ever traded securities other than through a securities exchange. Government Exhibit 9 at

p.4.

Defendants attempt to avert summary judgment merely by reciting that "a significant factual issue in dispute in this case is whether [defendants] had 'customers,'" and citing a dictionary definition of the term "customer" (i.e., "one that purchases a commodity or service"). Opposition at 9. Defendants further reason that:

by that straightforward meaning of the term, there could not have been sales (which there undisputedly were) [*18] in the absence of the "seller" (Paul Nordberg) having "customers." A "customer" is always needed for a sale to occur.

Id.

Several courts have, however, considered and rejected the argument that securities sold by taxpayers through a broker eventually reach customers. See, e.g., *George E. Warren Co. v. United States, 53 F. Supp. 578, 581 (D. Mass. 1944)* ("while it may be contended that each time [the taxpayer corporation which was not a dealer in securities] sold the securities it dealt with a customer, such is not true within a fair reading of the taxing statute"); *Mirro-Dynamics, 374 F.2d at 16* (rejecting taxpayer's argument that securities it sold eventually reached customers); *Seeley v. Helvering, 77 F.2d 323, 324 (2d Cir. 1935)*("So far as [the taxpayer] traded in securities on his own account, his sales were on the exchange to persons whom he did not even know; these were not his customers....").

In Swartz v. Commissioner, for example, the Tax Court dismissed the taxpayer's argument that his commodity contract trades, all of which were made through Merrill Lynch or Prudential-Bache, were made to "customers." Rather, [*19]

1996 U.S. Dist. LEXIS 5259, *; 96-1 U.S. Tax Cas. (CCH) P50,295;
77 A.F.T.R.2d (RIA) 2158

the Court observed that those brokerage houses "were not [taxpayer's] customers, but...[he] was one of their customers," and the court declined to regard as taxpayer's customers "the nameless members of the commodity markets who ultimately purchased the commodity contracts [taxpayer] sold and sold the commodity contracts [he] purchased." *T.C. Memo. 1987-582,* aff'd, *876 F.2d 657 (8th Cir. 1989),* cert. denied, *494 U.S. 1006 (1990).*

In short, if a taxpayer transacting in securities has no customers, then that taxpayer cannot, within the meaning of the second clause of § 1221(1), hold securities "primarily for sale to customers in the ordinary course of his trade or business." As the Fourth Circuit Court of Appeals noted in Diamond,

> the government's position...merely reflects the well-settled rule that a trader buying and selling securities exclusively for his own account does not sell 'to customers,' whatever the character of his transactions.

*788 F.2d at 1030.*

A taxpayer without customers likewise cannot satisfy the first clause of § 1221(1), to wit, hold the securities as "stock in trade...which would properly be included in the inventory [*20] of the taxpayer if on hand at the close of the taxable year." The general rules governing inventories are enumerated in *section 471 of the Internal Revenue Code*. See *26 U.S.C. § 471*. Tellingly, regulation 1.471-5, promulgated under that Code section, applies to taxpayers who are "dealers" in securities, and states that:

For the purposes of this section, a dealer in securities is a merchant of securities..., with an established place of business, regularly engaged in the purchase of securities and their resale to customers; that is, one who as a merchant buys securities and sells them to customers with a view to the gains and profits that may be derived therefrom... Taxpayers who buy and sell or hold securities for investment or speculation, irrespective of whether such buying or selling constitutes the carrying on of a trade or business,...are not dealers in securities within the meaning of this section.

*Treas. Reg. 1.471-5* (emphasis added); see also *Mirro-Dynamics, 374 F.2d at 16; Swartz v. Commissioner, 876 F.2d 657, 659 (8th Cir. 1989)*(rejecting taxpayer's argument that his commodity futures contracts were property he included in inventory [*21] at the end of each tax year, explaining that "commodity futures contracts are capital assets in the hands of a trader"), cert. denied, *494 U.S. 1006, 108 L. Ed. 2d 478, 110 S. Ct. 1301 (1990).*

This Court concludes, therefore, that the securities that Mr. Nordberg purchased and sold for his own account at Shearson, Lehman Brothers were capital assets in his hands, and the losses from such trading were capital in nature.

### ORDER

For the foregoing reasons:

1) The defendants' motion to compel [Docket #17] is **DENIED**;

1996 U.S. Dist. LEXIS 5259, *; 96-1 U.S. Tax Cas. (CCH) P50,295;
77 A.F.T.R.2d (RIA) 2158

2) The plaintiff's motion for summary judgment [Docket #20] is **ALLOWED**; and

3) The defendants' motion for judgment on the pleadings [Docket #11], the plaintiff's motion for partial summary judgment on defendants' counterclaim [Docket #12] and the plaintiff's motion for a protective order [Docket #18] are **DENIED AS MOOT.**

So ordered.

Nathaniel M. Gorton

United States District Judge

DATED: April 8, 1996