# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, ) ) ) )<br><br>Plaintiff, )<br> )<br>v. )<br> )<br>UNITED STATES OF AMERICA, )<br> )<br>Defendant. )<br> )<br> ) | Case No.: 05-40151-FDS<br>06-40130-FDS |

**EXHIBITS TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR ISSUANCE OF LETTERS ROGATORY REQUESTING INTERNATIONAL JUDICIAL ASSISTANCE**

Dated this 18th of April 2007.

PLAINTIFF
FIDELITY INTERNATIONAL CURRENCY ADVISOR
A FUND, L.L.C., by the Tax Matters Partner

/s/ Lena Amanti_____
David J. Curtin, D.C. Bar #281220
Ronald L. Buch, Jr., D.C. Bar #450903
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone: (202) 775-1880
Facsimile: (202) 775-8586
Email: dcurtin@mckeenelson.com
    rbuch@mckeenelson.com
    lamanti@mckeenelson.com

1

John O. Mirick, BBO #349240
MIRICK, O'CONNELL, DEMALLIE
& LOUGEE, LLP
100 Front Street
Worcester, MA 01608
Telephone:  (508) 791-8500
Facsimile:  (508) 791-8502
Email:  jomirick@mirickoconnell.com

**Certificate of Service**

I hereby certify that this document(s) filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non registered participants on April 18, 2007.

/s/ Lena Amanti
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email: lamanti@mckeenelson.com

# Exhibit A





**Revenue**

Office of the Revenue Commissioners
Direct Taxes Interpretation and
International Division
Dublin Castle
Dublin 2
Ireland

www.revenue.ie

Oifig na gCoimisinéirí Ioncaim
Rannán Idirmáisiúnta agus Léiriúcháin
Cánacha Díreacha
Caisleán Bhaile Átha Cliath
Baile Átha Cliath 2
Éire

THIS INFORMATION IS FURNISHED UNDER
THE PROVISIONS OF AN INCOME TAX
TREATY WITH A FOREIGN GOVERNMENT.
ITS USE AND DISCLOSURE MUST BE
GOVERNED BY THE APPLICABLE
PROVISIONS.

Our Ref: EXC 1830
Your Ref: #106418

22 May, 2006

Mr. Robert H Green,
C/o Ms Linda M Garrard,
Revenue Service Representative,
US Embassy,
24 Grosvenor Square,
London W1A 1AE,
UK

RECEIVED

26 MAY 2006

Internal Revenue
Service, London

**MR. SAMUEL MAHONEY**

Dear Ms. Garrard,

John McNamara as competent authority for the purposes of our Double Taxation Treaty,
wrote to Mr. Mahoney in April, 2005 seeking information and clarification on several issues
which arose as a result of your Mutual Assistance request. Mr. Mahoney's agents have now
supplied answers to the questions raised, details as follows

Q. Did Helios Financial LLP know that you were not domiciled in Ireland?
A. Mr Mahoney's domicile was not discussed with Helios Financial LLP

Q. Where are you domiciled? Is this a domicile of origin?
A. Mr. Mahoney's domicile of origin is the United Kingdom.

Q. Was the capital contribution of $651,000 advanced on 24 November, 2001 made on your
own behalf and from your own resources or was it made by or on behalf of some other
person or entity?
A Mr. Mahoney has previously advised that the capital contribution of US$651,000 was
made on his behalf. Mr. Mahoney would now further confirm that the capital contribution
of US$651,000 was made on his behalf by Kilsture Limited, an Isle of Man company, and
that US$325,510 of this amount represented salary due to him as an employee of Kilsture
Limited and the balance of US$325,490 was a loan [from Kilsture Limited] to Mr. Mahoney
which was repaid by Mr. Mahoney in full on 7 November, 2001.

Tel +353-1-6792777    Ext 48638    Fax +353-1-6793314    Direct Line +353-1-6748639



# Revenue 

**THIS INFORMATION IS FURNISHED UNDER THE PROVISIONS OF AN INCOME TAX TREATY WITH A FOREIGN GOVERNMENT. ITS USE AND DISCLOSURE MUST BE GOVERNED BY THE APPLICABLE PROVISIONS.**

**Q.** Did you ever file a statement with the Partnership declaring domicile for US tax withholding tax purposes? If so, what country did you declare?
**A.** NO.

**Q.** What was your understanding as to why a foreign partner was being allowed into the Partnership?
**A.** Mr. Mahoney's understanding was that there were no restrictions on membership of Helios. Mr. Mahoney saw nothing unusual in his membership of Fidelity.

**Q.** Did you ever enter into the US for any purpose or reason in relation to this partnership?
**A.** NO.

**Q.** Did you ever have any prior knowledge or dealings with any of the other partners?
**A.** Helios was known to Mr. Mahoney for several years.

**Q.** Were you aware from the start of the partnership that your interest was going to be reduced almost immediately? If yes, please explain. If not, at what point did you become aware?
**A.** No. Although there was a provision in the Operating Agreement permitting either party to make an offer for all or part of the other members interest, there was no agreement or understanding to do so. Mr. Mahoney became aware that his interest was going to be reduced on or about 5 November, 2001.

**Q.** Where were the proceeds of $325,500 from the sale of your 88% interest forwarded?
**A.** See Question 3 above.

I confirm that the information above is provided is governed by the provisions of Article 27 of our Double Taxation Convention.

Yours sincerely,

Lorayne Ellison
Asst. Director & Competent Authority
Direct Taxes: Interpretation & International Division

---

Tel +353-1-6792777     Ext 48639     Fax +353-1-6793314     Direct Line +353-1-6748639

TOTAL P.03

# Exhibit B

Singer & Friedlander Trust Company (Isle of Man) Limited

P.O. Box 197
Samuel Harris House
5-11 St Georges Street
Douglas
Isle of Man
1M99 1SN

Tel  +44 (0)1624 699222
Fax· +44 (0)1624 699204
Telex·  627936 SF IOM G
E-mail Address
info@iom singer-friedlander.com

11 April 2005

123 Howth Road,
Clontarf,
Dublin 3.

Attn: Sam Mahoney

RE:  Fidelity International Currency Advisor A Fund LLC

Dear Sir,

We write to confirm that, on 24th October 2001 we advanced funds on your behalf to Refco Capital Markets (reference: Fidelity International Currency Advisor A Fund LLC Account 6477) in the amount of $651,000 from Singer & Friedlander Trust Company (Isle of Man) Limited client account no. 11270025.

Yours faithfully,

Robin Bates

THIS INFORMATION IS FURNISHED UNDER
THE PROVISIONS OF AN INCOME TAX
TREATY WITH A FOREIGN GOVERNMENT.
ITS USE AND DISCLOSURE MUST BE
GOVERNED BY THE PROVISIONS OF THAT
TREATY.

4IRS0046

# Exhibit C

# CARRUTH MANAGEMENT LLC

87 ELM STREET • HOPKINTON, MA 01748
(508) 497-0800 • Fax (508) 497-0877

November 6, 2001

Mr. George Whitney
Mellon Private Asset Management
One Boston Place, AIM #024-0021
Boston, MA 02108

Dear George:

Please transfer $325,500 (Three Hundred Twenty Five Thousand, Five Hundred
Dollars) from the RJEREVT:Personal Account #10632810099 to the following:

|  |  |
|---|---|
| Bank: | Chase Manhattan Bank, 1 Chase Manhattan Plaza, New York, NY, USA |
| Account Name: | Singer & Friedlander Limited |
| Account Number: | 001-1-949-245 |
| SWIFT: | CHASUS33 |
| Sub Account: | Singer & Friedlander Limited |
| Account Number: | 30123012 |
| Reference: | S&F Client A/C No 11270025 |
| Sender: | Richard J. Egan |

*ABA # C21·000031* (handwritten)

Please execute this transfer before as soon as possible today, November 6, 2001. These
proceeds will be used to purchase an additional interest in the Fidelity International
Currency Advisor A Fund, LLC. Please call with the Fed Ref # as soon as it is available
and send a confirmation of the completed transaction. Thank you for your assistance.

Sincerely,

Patrick W. Shea

PWS:jmi

*From RJE RevTR/ Personal Mellon*
*to Fidelity International*
*Currency Advisor A Fund LLC*
*11/6/01  $325,500 ✓*

*Note: to purchase Sam Mahoney's*
*interest in Fidelity International*
*Currency Advisor A Fund ___ QB*

Fidelity International Currency purchase additional interest 11-6-2001.doc

014047

# Exhibit D

William B. Wachtel (WW-4911)
Howard Kleinhendler (HK-5712)
Wachtel & Masyr, LLP
110 East 59th Street
New York, New York 10022
(212) 909-9500

*Attorneys for Respondent*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------x
UNITED STATES OF AMERICA,              :        M8-85
                                       :
                Petitioner,            :    DECLARATION OF JAMES
                                       :    HABER IN OPPOSITION TO
        v.                             :    PETITIONER'S MOTION TO
                                       :.   COMPEL PRODUCTION OF
THE DIVERSIFIED GROUP INCORPORATED,    :    PRIVILEGED DOCUMENTS
                                       :
                                       :    (Related to C.A. No. 05-40151, in the
                Respondent.            :    Dist. of Mass.)
-------------------------------------------------------x
```

JAMES HABER, pursuant to 28 U.S.C. § 1746, hereby declares:

1.  I am President of Respondent The Diversified Group Incorporated ("DGI") and

    submit this Declaration in support of DGI's Opposition to Petitioner's Motion to

    Compel the Production of Privileged Documents. I have first-hand knowledge of the

    facts set forth herein.

2.  The transactions at issue in this case occurred in 2001 in connection with a tax

    strategy that was executed by Richard Egan. After the IRS challenged Egan's tax

    deductions, Egan paid the deficiency and sought a refund in federal court in Boston.

    DGI is <u>not</u> a party to the underlying tax refund litigation between Richard Egan and

    the Government, and no claims are asserted in the refund case against DGI.

Moreover, DGI is not a party to any of the documents or transactions that facilitated the tax strategy that is the subject matter of that case.

3. DGI has provided the Government with more than 50 boxes of documents in a good faith effort to comply with the Government's overbroad, and extremely burdensome subpoena which contains 76 separate document requests that demand material that has no relation whatsoever to the Egan transaction. But, unfortunately, as the saying goes; "No good deed goes unpunished," and now DGI must expend time and resources to respond to the Government's instant motion which is primarily a fishing expedition for privileged documents that have nothing to do with the Egan transaction.

## The Egan Transaction

4. The tax-advantaged investment strategy that Egan pursued in 2001, and which forms the underlying basis for his 2001 tax deductions and the instant litigation in Boston federal court, has never been disapproved, declared invalid, or otherwise struck down by any United States court of law. While the Government is pressed to defend the positions taken against Egan by the Internal Revenue Service, the Government's mere protest does not render a tax strategy invalid or illegal.

5. The strategy Egan engaged in involved a series of offsetting option purchases and the transfer of those options to partnerships which had among its members an individual that is exempt from United States tax (the "Strategy"). Each of the option spreads were valid, real and documented transactions that afforded Egan a reasonable opportunity to earn a substantial economic profit without regard to tax benefits.

2

6.  Attached as Exhibit A is a summary of Egan's strategy that he and certain limited
    liability companies of which he was affiliated engaged in during 2001.

7.  On or about October 9, 2001, Egan, through Fidelity World Currency Advisor A
    Fund, LLC, ("Fidelity World"), a Delaware limited liability company of which Egan
    was a sole member, purchased from REFCO Capital Markets, Ltd. ("Refco"),[1] a 365-
    day European style digital option based on the 10-Year CMS (constant maturity
    swap) for a premium of $75,000,000, a strike price of 4.7620% and a possible payout
    of $306,736,486 (the "long position").  On the same day, Fidelity World sold to
    Refco a 365-day European style digital option based on the 10-Year CMS for a
    premium of $73,875,000, a strike price of 4.7570% and a possible payout of
    $303,368,823 (the "short position").  (See Ex. A).  The strike prices of both options
    were calculated by reference to the price of the Index between 3:00 and 3:15 pm New
    York City time on October 9, 2002 (the "Expiration Date").  (See Exhibit B).  At the
    time of the trades, the CMS spot price was 5.2670%.  (Ex. A).

8.  Egan had two ways to earn a pre-tax profit from the initial options trades.  First, there
    was a 25% probability under the Black-Scholes Model,[2] that on the Expiration Date
    the Index would be at or below the Reference Price for both options.  Had that
    occurred, Egan  would have received a $306,736,486 payoff from the long position
    and would have paid $303,368,823 on the short position.  (Ex. A).  This amounts to a
    $2,242,663 gross profit.

---

[1]  Refco was a Wall Street clearing broker.  See http://www.refco.com.

[2]  The Black-Scholes Model was developed in 1973 by Fisher Black and Myron Scholes to evaluate
European-style options on non-dividend paying stocks and has been modified over the years and extended
to evaluations of options on futures contracts and options.  See Andrea S. Cramer, Financial Products:
Taxation, Regulation, and Design § 5.04, n. 47 (3d ed. 2000).

9. Second, while remote, there was a possibility that on the Expiration Date the Reference Price would be more than 4.7570 but less than or equal to 4.7620. Under this scenario, Egan would realize a windfall recovery of $306,736,486. (Ex. A).

10. Egan entered into a second pair of options through Fidelity World. (See Ex. A).

11. Egan then contributed his interest in Fidelity World to Fidelity International Currency Advisor A Fund, LLC ("Fidelity International") in exchange for a member interest consisting of a small common interest and a large preferred interest. Other members were a foreign investor, Samuel Mahoney ("Mahoney); Alpha Consultants, LLC "(Alpha"); and Helios Trading LLC ("Helios Trading"). Mahoney owned the bulk of the common interests, and Alpha and Helios Trading each owned small common interests.

12. Fidelity International proceeded to engage in options trading that resulted in two pairs of options that had appreciated in value and two others that had depreciated in value. Fidelity International then disposed of the appreciated positions, recognized a tax and economic gain, and rebalanced the four remaining options with two options that had somewhat different terms and were legally distinct from the four options they replaced.

13. Egan then purchased the bulk of Mahoney's interest.

14. Fidelity International then engaged in additional trades, terminating options and recognizing losses. Under partnership tax accounting rules, the bulk of the tax gains were allocated to Mahoney and the bulk of the tax losses were allocated to Egan.

4

15. Egan contributed his interest in Fidelity World to Fidelity International pursuant to a

Contribution Agreement (attached as Exhibit C). In the Contribution Agreement,

which was signed by Egan, Egan as the "Contributor" represented that he:

> is not relying on any communication (written or oral) from the Company,
> any other Member, the Manager, or any of their respective financial
> advisors or representatives, as investment advice or as a recommendation
> to invest in the Membership Interests, it being understood that information
> and explanations related to the terms and conditions of the offer and
> issuance of the Membership Interests is not considered investment advice
> or a recommendation to invest in the Membership Interests and that no
> communications (written or oral) received from the Company, any other
> member, the manager or any of their respective financial advisors or
> representatives, is to be deemed to be an assurance or guarantee as to the
> expected results of acquiring the Membership Interests. None of the
> Company, any other member, the Manager or any representative affiliates
> and the respective agents of the foregoing is acting as a fiduciary for or an
> advisor to Contributor in connection with the offering and issuance of the
> Membership Interests."

Ex. C., Section 5.1 (xii), at pg. 9 (emphasis added)

16. Thus, by Egan's own admission, he never relied on DGI, Helios, any of their

principals or anyone acting on their behalf in connection with the Strategy.

17. Egan received a legal opinion from the law firm Brown & Wood LLP (now Sidley

Austin LLP), stating that tax losses related to the Strategy were legal and more likely

than not would survive challenge from the IRS.

18. KPMG, Egan's long-time accountants, prepared the relevant tax returns for tax year

2001 on which Egan claimed losses related to the Strategy. (See Gov't Exhibit 70).

DGI did not prepare, sign or in any way advise Egan with regard to his tax returns or

with his decision to claim tax losses on those returns. The IRS challenged these

losses, Egan paid the taxes, and then Egan filed for a refund. And, while the

Government wants to obfuscate matters by creating hysteria over all the tax-related

strategies that DGI allegedly promoted, this case is about one person--Richard Egan--the former United States ambassador to Ireland, whose refund claim for 2001 the Government is opposing.

19. The description of the Strategy, which the Government refers to as the "FDIS transaction," at pp. 14-15 of Petitioner's Memorandum is incorrect in significant particulars.

    a.   The pairs of digital options acquired by the partnership are incorrectly described as "offsetting." In fact, while the strike prices of the two options were very close, the premiums for the long and short options generally differed enough that they created a substantial net premium paid. This translates to a possibility of a substantial payoff. When taken together with the other options in the deal, there was a reasonable possibility of a net payoff substantially in excess of all transaction costs.

    b.   The options that replaced the terminated gain legs are incorrectly described as having "virtually the exact same terms." While the strike prices of the replacement positions were the same as those of the terminated gain legs, the values were different—Egan had to put up a total of $50,000 more to purchase the new positions—and the payoffs on the new positions were different as well. Moreover, the new positions were significantly different legally from the positions they replaced; a difference that in part led counsel to conclude that the original and replacement positions should be treated as different for federal income tax purposes.

c.  The customer is incorrectly described as purchasing the bulk of the foreign partner's common interest "for one-half of the foreign partner's purported capital contribution."  In fact, the operating agreement gave the customer the right to purchase all but 2% of the foreign investor's common interest for an amount equal to the percentage interest to be purchased multiplied by the greater of (i) 50% of the foreign investor's capital contribution or (2) the foreign investor's adjusted capital contribution, *i.e.*, the fair market value of his entire interest.

d.  The customer is incorrectly described as claiming "a paper loss on his personal return as a real economic loss."  In fact, the tax loss claimed by the customer was a real economic loss to the partnership on options that had decreased in value.  In any event, the claimed loss was a real tax loss, not a paper loss, and was claimed as a tax loss, not an economic loss.  To the best of my knowledge, the federal tax return permits one to report tax gains and tax losses.  It does not permit the taxpayer to report economic gains or economic losses.

20. Petitioner's Memorandum asserts at pp. 14-16 that Govt. Ex. 51 demonstrates that DGI reimbursed the foreign partners for their losses and paid them an additional $2 million.  It does no such thing and this never happened.  Govt. Ex. 51 was prepared by Alpha[3] for its own internal purposes, to compute the approximate overall profit on the transactions, on the pro forma assumption that the foreign partners would be paid

---

[3]  Alpha advised DGI on financial products related to various tax-advantaged strategies, such as how to price options and to determine their profit probability, to explain trades to prospective investors and to arrange for the execution of these options with financial intermediaries.

7

these amounts. In fact, no agreement ever existed to reimburse the foreign partners for their losses.

21. In sum, the Government's dispute is with Richard Egan, who allegedly underpaid the amounts he owed in federal taxes during tax year 2001. Egan represented in writing that he was not relying on anyone connected with the Strategy or the underlying deal documents when engaging in the Strategy. This is not DGI's dispute, and it should not be dragged into it.

### Orrin Tilevitz Is and Always Has Been DGI's Attorney

22. Through snippets of documents and deposition testimony taken out of context, the Government asks this Court to conclude as a matter of fact, that Orrin Tilevitz, DGI's long-time general counsel, did not function as an attorney but as a business advisor. The Government does not explain how Mr. Tilevitz's communications with DGI or with its business associates have any relation to Mr. Egan's Strategy. Instead, the Government merely hypothesizes that every transaction arranged with the help of DGI and/or Helios Trading was identical, had no economic substance, and thus has some relation to the specific transaction that Egan executed which is the subject of this proceeding. This is absurd, and the Government's demands should be rejected.

23. Every tax-advantaged strategy arranged with the help of DGI was unique. The customer had complete control over the amount of risk he would accept with regard to the option transactions, which currencies he wanted to trade, which law firms would provide opinion letters, and how much tax loss he wanted to generate. Further, different strategies had different tax implications.

24. Orrin Tilevitz's communications challenged by the Government are classic attorney/client communications which are not subject to disclosure. Orrin Tilevitz joined DGI as Vice President and General Counsel in January, 2000 and continues in that position to this day. He is a duly licensed member of the New York State Bar. His job has been to render legal advice, including tax advice, at my direction to, among others: DGI, entities that I manage, and individuals with whom DGI has a business relationship and with whom DGI collaborated on any given financial project. It is in this role that he has on occasion provided legal advice to, for example, Helios Financial, LLC, Helios Trading, Mox Tan, Martin Hawkes and Samuel Mahoney – all of whom are persons or entities that have collaborated with DGI on various business ventures. I do not consult Mr. Tilevitz for business advice, nor to my knowledge has he availed himself of such a service to any of my business colleagues. Mr. Tilevitz has not been paid by DGI to provide business advice to anyone.

25. Mr. Tilevitz was employed and paid by DGI in 2000 and 2001. Since then he has been employed and paid by another company that I manage. However, his job description remains unchanged, and his fiduciary responsibility to provide DGI with legal advice remains unchanged.

26. In the years 2000-2002, Mr. Tilevitz's duties to DGI included maintaining relationships with DGI's outside counsel, drafting legal memos, and commenting and opining on the tax law ramifications of tax-driven strategies that DGI or its business partners helped to arrange. From time to time he would prepare memoranda setting out the steps of particular transactions, normally with a summary discussion of the tax consequences, and monitored transactions to make sure they followed those steps.

9

On occasion, I asked him to circulate documents outside DGI with a view toward

obtaining comments from those associated with the transaction. Also, on occasion he

participated in calls where his job was to render tax advice when asked.

27. In short, there is no basis to conclude that Mr. Tilevitz provided business advice to

DGI, or to anyone affiliated with DGI. His communications, therefore, are

privileged.

### Other Attorneys' Communications are Also Privileged

28. The Government has challenged other communication between DGI and its counsel

as containing business advice. This too is unfounded and incorrect.

29. Elizabeth Jung was an attorney employed at one time by DGI. Her role was to check

facts in tax opinions prepared by outside counsel, facilitate the process of the issuance

of these opinions to clients, review options confirmations and prepare closing binders.

Her communications are related to her duties as an attorney providing legal advice.

They are privileged.

30. At the time the FDIS transaction was developed, the IRS had already issued Notices

99-59 and 2000-44, among other notices, on particular tax shelter transactions in

which the IRS challenged the deduction of noneconomic losses. While in the FDIS

strategy--unlike those strategies--the tax loss is an actual economic loss to the

partnership, it was evident to everybody involved that there was a risk that the IRS

would challenge deductions on audit and, if so, that litigation would ensue. This is

why the customer received a tax opinion.

10

### Draft Opinion Letters Are Privileged

31. From time to time I have engaged different lawyers and law firms to represent DGI. These include Thomas Long, Fulbright & Jaworski LLP and McDermott, Will & Emery LLP("MWE"). The law firm of Fulbright & Jaworski was first engaged by DGI in late 2000 to respond to a letter from the Internal Revenue Service asking about registration and customer lists.

32. MWE has represented DGI on numerous occasions and continues to represent it to this day. MWE has also represented Helios Financial, LLC and Helios Trading; and DGI and Helios waived any possible conflicts. Therefore, the statement at p. 8 of Petitioner's Memorandum that: "The law firm of McDermott, Will & Emory [sic] appears to have been engaged by Helios, not DGI," is incorrect.

33. DGI consulted with the law firm of Proskauer Rose LLP ("Proskauer") at the initial stage of developing various tax strategies. Additionally, the law firms Lord Bissell & Brook LLP (LBB), Bryan Cave LLP, and Brown & Wood provided legal advice to DGI in connection with the tax aspects and legality of various tax strategies. The firm Brown Raysman LLP drafted documents for transactions and advised DGI on certain legal matters. These firms rendered their advice directly to DGI. None of these law firms ever rendered business advice to DGI.

34. Proskauer, Brown & Wood, LBB and Bryan Cave eventually agreed to issue tax opinions relating to tax-advantaged investments to certain customers. However, until a final opinion was rendered by the firm to the customer, the firm still was providing ongoing legal advice to DGI in connection with the tax treatment of the various transactions underlying the strategy. Indeed, in many cases, the firm disclosed to the

11

customer that it had previously represented DGI. Firms may have from time to time

referred potential customers. However, none of these firms was ever engaged by DGI

to promote tax-advantaged strategies to potential customers and in fact they did not

ever promote DGI strategies to potential customers. To my knowledge, none of these

firms were involved in promoting any tax-advantaged strategy to Egan.

35. DGI often consulted attorneys at Proskauer, LBB, Bryan Cave, and Brown & Wood

to ascertain these firms' opinions on various technical tax issues in advance of

bringing a transaction to its customers. Therefore, the statement at p. 10 of

Petitioner's Memorandum that: "none of these law firms were providing legal advice

to DGI," is incorrect.

36. Throughout my career, I have managed business ventures having nothing to do with

tax shelters, and have often consulted lawyers for tax advice. On occasion my request

is phrased as: "I believe the following is the tax result, and that is the result I desire;

do you agree?" If the lawyer I consult believes that the facts I have given do not

achieve the desired tax aim, I expect the lawyer to set out facts that would, if possible,

achieve that aim. My experience is that this is how sophisticated clients expect their

lawyers to respond, and is in fact how law is practiced at the highest levels.

37. In my experience, when I ask a lawyer to write a legal opinion on a transaction, if

possible the lawyer does not begin from "scratch"; instead, the lawyer starts with an

existing legal opinion on a similar transaction and modifies it as necessary. (I can tell

this has been done because material that is not relevant to my transaction sometimes

is still in the first draft.) It follows then that legal opinions on substantially identical

transactions will be substantially identical.

38. The "FDIS Powerpoint" referred to at p. 11 of Petitioner's Memorandum was intended as training material for those who presented the transaction to potential customers. It was not intended as a "marketing" or "selling" piece. DGI wanted these customers to investigate the proposed transaction on their own, and not to rely on these materials. DGI told this to the accounting firms for whom these materials were primarily intended. DGI was unconcerned that the materials divulged "too much" of the transaction's structure. By mid-2001, when the Egan transaction was executed, many firms had been promoting the use of paired options to increase outside basis in partnership interests; the IRS had issued Notice 2000-44, and thus part of the structure was publicly available. Allocating income to foreign taxpayers and losses to U.S. taxpayers had been done many times before in a host of different tax scenarios. The handwritten notes referred to at footnote 30 of Petitioner's Memorandum were not written by me or anybody whose handwriting I recognize, and the language does not paraphrase anything that I said.

39. The law firm of Chamberlain, Hrdlicka, White, Williams & Martin and Charles Rettig, Esq. of the law firm of Hochman, Salkin, Rettig, Toscher & Perez P.C. were counsel to limited liability companies managed by DGI and rendered legal advice to DGI in its capacity as such. Mr. Rettig never invested in any transaction known to DGI.

40. The law firm of Wachtel & Masyr, LLP has represented DGI in litigation and is DGI's counsel in this matter.

13

## DGI Never Sent Documents Offshore

41. The Government points to an unsigned draft memorandum which contemplated a certain business structure involving Trilogy Financial Products as proof that DGI engaged is some type of fraudulent scheme to main its books and records offshore. This is nonsensical. Trilogy Financial Products was a London-based company. It is the company referred to in Government's Exhibit 52. Trilogy Investments LLC is or was based in the Isle of Man. The companies are unrelated. Martin Hawkes and Sam Mahoney were involved with the latter but not the former. The latter, but not the former, were involved in FDIS transactions in 2002. The statement at p. 17 of Petitioner's Memorandum that in 2002 DGI marketed FDIS transactions "through the façade of Trilogy Financial Products, Limited" is incorrect. The statement at fn. 50 that "DGI had a prior working relationship with Trilogy [Financial Products] going back as far as 1999" is true but irrelevant to this proceeding because the transaction at issue took place in 2001.

42. A memorandum from Mox Tan, Govt. Ex. 52, is referred to in the Petitioner's Memorandum at pp. 8 and 17-18. The plan set out in this memorandum, which suggested that documents be stored in Ireland, was never implemented. Documents responsive to the Government's subpoena to DGI were never placed offshore; and no one employed or affiliated with DGI ever held himself out as a consultant to Trilogy Financial Products.

Wherefore, I respectfully request that the Government's motion to compel the production of documents identified on DGI's privilege log be denied in its entirety.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April  11 , 2007

James Haber

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
UNITED STATES OF AMERICA,                 :          M8-85
                                          :
                          Petitioner,     :
                                          :    CERTIFICATE OF SERVICE
                                          :
          v.                              :
                                          :    (Related to C.A. No. 05-40151, in the
THE DIVERSIFIED GROUP INCORPORATED,       :    Dist. of Mass.)
                                          :
                                          :
                          Respondent.     :
-----------------------------------------------------------x
```

     I hereby certify that I am not a party to the above action and that on this date I caused a copy of the Declaration of James Haber and the Exhibits annexed thereto to be served by overnight mail, postage prepaid, to John A. Lindquist, III, U.S. Department of Justice, Tax Division, 555 4th Street, N.W., Room 7836, Washington, DC 20001.

Dated:  April 12, 2007

_____
Howard Kleinhendler

# Exhibit E

AO88  (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

| SOUTHERN | DISTRICT OF | NEW YORK |
|---|---|---|

Fidelity International Currency Advisor A Fund, LLC

V.

United States of America

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  05-40151-FDS (D. Mass.)

TO:  Kaupthing Singer & Friedlander plc
230 Park Avenue, Suite 1528
New York, NY 10169

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to
testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  |  |
|  | DATE AND TIME |
|  |  |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
|  |  |

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

See Attachment to Subpoena to Kaupthing Singer & Friedlander Group plc for the Production of Documents

| PLACE        United States Attorney's Office<br>300 Quarropas Street, White Plains, NY 10601 | DATE AND TIME<br>2/16/2007 10:00 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)   *Attorney for Defendant* | DATE<br>1/24/2007 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Barry E. Reiferson, Trial Attorney, Civil Trial Section, Northern Region, Tax Division, US Department of Justice,
P.O. Box 55, Ben Franklin Station, Washington, DC 20044  Tel: (202)514-6058

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Nos. 05-40151-FDS (D. Mass.) 06-40130-FDS (D. Mass.) |
| v. | ) ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) | |

## ATTACHMENT TO SUBPOENA TO KAUPTHING SINGER & FRIEDLANDER GROUP PLC FOR THE PRODUCTION OF DOCUMENTS

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, the Custodian of Records for Kaupthing Singer & Freidlander Group plc is hereby required to produce for inspection and copying the documents set forth below, from whichever office or location these documents may exist.

The production of the requested documents may be effected by mailing the originals or clear copies of each to Barry E. Reiferson, Trial Attorney, Tax Division, United States Department of Justice, Post Office Box 55, Ben Franklin Station, Washington, DC 20044.  If you are unwilling or unable to transmit originals or copies in the manner described above, you are requested to advise the undersigned counsel for the United States forthwith upon receipt hereof, in which event the documents requested herein will be produced for inspection and copying at the United States Attorney's Office, 300 Quarropas Street, White Plains, NY 10601, on February 16, 2007, at 10:00 a.m., and continuing from day to day thereafter for so long as is reasonably necessary to examine and copy them.

2176381.1

## DEFINITIONS

1. As used herein, (a) the singular shall include the plural, and vice versa, (b) masculine and feminine pronouns shall be deemed to be interchangeable, (c) the words "or" and "and" shall mean "and/or," and the word "or" shall not be interpreted to narrow the scope of any request and shall be interpreted in its broadest sense, as denoting "and/or," (d) the words "any" and "all" shall mean "any and all," and the word "any" shall not be interpreted to narrow the scope of any discovery or other request, and shall be interpreted in its broadest sense, as denoting "any and all."

2. The term "document," and derivatives and pluralizations of the same, is to be liberally construed to include all originals, copies, and nonidentical copies (whether by reason of handwritten notations thereon or otherwise) kept in any form including paper and electronic forms, including but not limited to the following: any letter, report, record, corporate minute, memorandum, contract, affidavit, agreement, appraisal, deed, lease, book, record, summary or record of personal conversation, routing slip, correspondence, communication of any nature, note, notebook of any character, ledger, financial statement, material, literature, brochure, publication, prospectus, offering, computation, check or other instrument, computer tape or disk, photograph, phonorecord, electronic transmission including but not limited to electronic mail, telegram, telex and telephone facsimile, and any other type of written or documentary or other tangible material on which information or data may be recorded, stored, or otherwise contained. As to any document that is written in another language, the term "document" also includes any translation of that document into English. As to any document in electronic form, the

2176381.1

term "document" includes all metadata associated with the document, as well as all printed versions of the document.

3.    A document "relating to" a given subject matter means a document or statement that relates to, constitutes, embodies, compromises, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, analyzes, contains information concerning, or is in any way pertinent to, that subject matter.

4.    The terms "possession," "custody," and "control" include actual and constructive possession, custody, or control.  These requests include any document or thing that you possess or have the right to obtain from a third party upon demand, or which otherwise may be secured from any other source for the purpose of fully responding to these requests, including attorneys, accountants or other agents.

5.    The term "person" shall be construed to mean and include an individual, trust, estate, partnership, company, corporation, governmental body, or other entity, whether domestic or foreign.

6.    The term "Kaupthing" refers to Kaupthing Singer & Friedlander Group plc and its subsidiaries.

7.    The term "The Diversified Group" or "DGI" refers to The Diversified Group, Incorporated, a Delaware corporation, and its affiliated companies, including, but not limited to, Diversified Financial Corp., Diversified Capital Corp., Diversified Capital Leasing Corp., and Diversified Capital International Inc., and to its employees, officers, and/or shareholders, including but not limited to James Haber, Orrin Tilevitz, and Steven F. Jacoby.

2176381.1

8.    The term "Helios" refers to Helios Financial LLC, Helios Group LLC, Helios Advisory

LLC, and Helios Trading LLC, each located at 401 N. Michigan Avenue, Suite 2950,

Chicago, IL, or at 225 West Washington Street, Suite 2200, Chicago, IL, or at 950 Third

Avenue, 23rd Floor, NY, NY, and to Helios Group, Inc., a Delaware corporation, and all

employees, members, and/or partners of any of those entities, including, but not limited

to, Mox Tan, Phil Kampf, James Haber and Orrin Tilevitz.

9.    The term "Alpha" refers to Alpha Consultants, LLC, a Florida limited liability company;

Alpha Consultants, Inc., a Florida corporation; Alpha Strategic Management, Ltd., a

Florida limited partnership; and Alpha Strategic Management, LLC, a Florida limited

liability company; and all employees, members, and/or partners thereof, including, but not

limited to, Ivan J. Ross, Robert H. Fasulu, G. Felix Cua, Yoshiyuki Nobumoto, Ronald

Buesinger, Michael G. Leonard, and Donald S. Uderitz.

10.    The term "Refco" refers to Refco Capital Markets, Ltd., which has or had an office at 200

Liberty Street, 23rd Floor, New York, NY 10281, and to Refco Securities, LLC, which has

or had an office at One World Financial Center, 24th Floor, New York, NY 10281, and all

employees, members, and/or partners thereof, including, but not limited to, Thomas

Yorke, Elizabeth Jung, Cathleen Scappatura, Miriam, LaFuente, Jim Behrmann, Angie

Lee, Alex Vojvodich, Mathew Hoff, David Weaver, and Walter Peters.

11.    The term "Trilogy" refers to Trilogy Financial Products, Ltd.; Trilogy Investments, Ltd;

and their related entities, including, but not limited to, any related entity which has or had

an office at 14 Athol Street, Douglas, Isle of Man, or at 5-11 St. Georges Street, Douglas,

Isle of Man; and to all employees and/or partners thereof, including, but not limited to,

Mox Tan, Phil Kampf, James Haber, Orrin Tilevitz, and John Huber.

2176381.1

12.     The term "Biosphere" refers to Biosphere Finance Ltd., Biosphere Finance, Biosphere

Holdings, and their related entities, and to all employees and/or partners thereof,

including, but not limited to, Samuel Mahoney, Martin Hawkes, and/or John Hussey.

13.     The term "Kilsture" refers to Kilsture Ltd. and its related entities, including, but not

limited to, any related entity which has or had an office at 14 Athol Street, Douglas, Isle

of Man, or at 5-11 St. Georges Street, Douglas, Isle of Man; and to all employees and/or

partners thereof, including, but not limited to, Samuel Mahoney, Martin Hawkes, and/or

John Hussey.

14.     The term "Carruth" refers to Carruth Management LLC and Carruth Associates LLC,

which have or had an office at 116 Flanders Rd., Westborough, MA 01581, and all

employees, members, and/or partners thereof, including, but not limited to, Robin

Calkins, Michael Egan, Carolyn Fiddy, David Henry, Judy Irvin, Jim Reiss, Melissa

Seaver, and Pat Shea.

15.     The term "Tequesta" refers to Tequesta Capital Advisors LP, Tequesta Fund LP, and their

related entities, which have or had an office at 4270 S Decatur Blvd., Las Vegas, NV

89103 and/or at 3801 PGA Blvd., Palm Beach Gardens, FL 33410, and all employees,

members, and/or partners thereof, including, but not limited to, Ron Buesinger, Gary

Helene, and Ivan Ross.

16.     The term "Brown & Wood" refers to the law firm of Brown & Wood and its successor in

interest, Sidley Austin Brown & Wood (n/k/a Sidley Austin LLP), and all employees

and/or partners thereof, including, but not limited to, R.J. Ruble, Jacob Amato, John

Felkamp, Susan L. Sodano, Thomas Humphries, Paul Cringle, and Eric Haueter.

2176381.1

17.    The term "Lord Bissell" refers to the law firm of Lord Bissell & Brook, LLP, 111 South
Wacker Drive, Chicago, IL 60606, and all employees and/or partners thereof, including,
but not limited to, John Trustkowski, John Hughes, and Sergei Mytko.

18.    The term "Proskauer Rose" refers to the law firm of Proskauer Rose, LLP, which has an
office at 1585 Broadway, New York, NY 10036-8299, and all employees and/or partners
thereof, including, but not limited to, Ira Akselrad and Matthew Sabloff.

19.    The term "Bryan Cave" refers to the law firm Bryan Cave, LLP, which has an office at
700 Thirteenth Street, N.W., Washington, DC 20005-3960, and all employees and/or
partners thereof, including, but not limited to, John Barrie, Kathleen M. Gamcana, and
Elizabeth Ann Smith.

20.    The term "KPMG" includes both KPMG, LLP, a Delaware Limited Liability Partnership,
and KPMG International, a Swiss association, and all employees and/or partners thereof,
including, but not limited to, Timothy Patrick Speiss, Stephen J. Spruck, Brent S.
Lipschultz, Holly T. Belanger, Monica M. Odoy, Deborah A. Fields, Daniel J. Coburn,
Rob Arthur, Robert Prifti, Leslie Kost, Steven Gremminger, Randall Bickham, Jeffrey
Stein, John Lanning, Richard Smith, Jeffrey Eischeid, Philip Weisner, Mark Watson,
Larry DeLap, David Greenberg, Carol Warley, Carl Hasting, Richard Rosenthal, and
Brian Rivotto.

21.    The term "BDO Seidman" refers to the accounting firm of BDO Seidman, LLP, and all
employees and/or partners thereof, including, but not limited to, Charles Bee, Pam
Packard, Larry Cohen, Michael Kerekes, Robert Greisman, and Paul Shanbrom.

2176381.1

22.    The term "Grant Thornton" refers to the accounting firm of Grant Thornton, LLP, 175 West Jackson Boulevard 20th Floor Chicago, IL 60604, and all employees and/or partners thereof, including, but not limited to, Israel Press and Joseph Machara.

23.    The term "RSM McGladrey" refers to the accounting firm of RSM McGladrey, Inc., and all employees and/or partners thereof, including, but not limited to, Ronald G. Wainwright, Jr.

24.    The term "Solomon and Weinberg" refers to the law firm of Solomon and Weinberg, located at 685 Third Avenue, New York, NY 10017, or at 900 Third Avenue, New York, NY 10022, and all employees and/or partners thereof, including, but not limited to Craig H. Solomon and Mark Weinberg.

25.    The term "BWM&S" refers to the law firm of Burke, Warren, McKay & Seritella, P.C., which has an office at  330 North Wabash Avenue, 22nd Floor, Chicago, Illinois 60611-3607, and all employees and/or partners thereof, including, but not limited to, Stephanie Denby.

26.    The term "Brown Raysman" refers to the law firm of Brown Raysman Millstein Felder & Steiner LLP, which has an office at 900 Third Avenue, New York, NY 10022-4728, and all employees and/or partners thereof, including, but not limited to, Thomas Levato.

## INSTRUCTIONS

1.    If a document was, but no longer is, in your possession, custody or control, state:

    a.    how the document was disposed of;

    b.    the name, current address, and telephone number of the person who currently has possession, custody or control over the document;

    c.    the date of disposition; and

2176381.1

    d.      the name, current address, and telephone number of each person who authorized

          said disposition or who had or has knowledge of said disposition.

2.     If a document cannot be located, describe with particularity the efforts made to locate the document and the specific reason for its disappearance or unavailability.

3.     If a document has information on both sides, provide copies of both sides or make available the original document.

4.     To the extent that any document is written both in English and another language, provide a copy of the document written in English.

5.     Please number the documents consecutively with a Bates-stamp identifier. We suggest you use Bates-stamp numbers beginning with the prefix "KS&F".

6.     We also request that the custodian of records for Kaupthing Singer & Freidlander Group plc certify the documents requested pursuant to Rule 902(11) of the Federal Rules of Evidence and Section 1746 of Title 28 of the United States Code. A proposed certification is enclosed. Please forward the certification as soon as possible, although its execution should in no way delay your production of the requested documents by the subpoena's return date.

7.     If any document is withheld under any claim of privilege or for any reason, list such documents by supplying separately as to each such document the following information:

    a.      the date of the document, the type of document (e.g. letter, notebook, etc.), and

          the number of pages of which it consists;

    b.      the date on which the document came into your possession or control, if different

          from the date appearing on the document itself;

2176381.1

c.    the name and title of the signer of the document (and if it was not signed, the answer shall so state and shall give the name and title of the person who prepared it, if known, and if not known, shall so state);

d.    the name and title of each recipient or addressees of such document (whether specifically named therein or not);

e.    the present whereabouts of the document and the name and address of the custodian thereof;

f.    an indication that you claim privilege therefor with a citation to the statute, regulation, or rule claimed to apply;

g.    a brief statement of the grounds on which the claim of privilege rests;

h.    a general statement of the subject matter; and

i.    the identity of each person (and his or her position) who received a copy of such document after the time of initial distribution.

All of the above is required so that the United States may have the factual basis to determine whether such documents are, in fact, privileged. If a claimed privilege applies to only a portion of any document, that portion only should be withheld and the remainder of the document should be produced. As used herein, "claim of privilege" includes, but is not limited to, any claim that a document either may or must be withheld from production pursuant to any statute or regulation.

10.    If a document in electronic form is password protected, the password protection is to be disabled and/or the password to overcome the password protection is also to be produced

11.    The documents shall be produced as they are kept in the usual course of business and shall be organized and labeled to correspond with the separately-numbered request(s) to which they are responsive.

2176381.1

## REQUESTS FOR PRODUCTION

The documents requested under this subpoena relate to any and all accounts held by Kilsture, Trilogy, and/or Biosphere with Kaupthing. No information, documents, or other records relating to accounts held *solely* in the name of Samuel Mahoney, Martin Hawkes, John Hussey, or any other individual (natural person) shall be produced in response to this subpoena.

1.  All account statements for all accounts held by Kilsture, Trilogy, and/or Biosphere with Kaupthing, including but not limited to any account with the identification number 11270025.

2.  All signature cards for all accounts held by Kilsture, Trilogy, and/or Biosphere with Kaupthing.

3.  All corporate authorizations and corporate resolutions relating to all accounts held by Kilsture, Trilogy, and/or Biosphere with Kaupthing.

4.  All account-opening and account-closing documents relating to all accounts held by Kilsture, Trilogy, and/or Biosphere with Kaupthing.

5.  All deposit slips and withdrawal slips relating to all accounts held by Kilsture, Trilogy, and/or Biosphere with Kaupthing.

6.  All documents relating to money transfers to or from any account held by Kilsture, Trilogy, and/or Biosphere with Kaupthing.

7.  All cancelled checks for all accounts held by Kilsture, Trilogy, and/or Biosphere with Kaupthing, including but not limited to checks relating to payments to DGI, Helios, Alpha, Refco, Carruth, Tequesta, Brown & Wood, Proskauer Rose, Lord Bissell, Bryan

2176381.1

Cave, KPMG, BDO Seidman, Grant Thornton, RSM McGladrey, Solomon and

Weinberg, BWM&S, or Brown Raysman.

Dated: January 24, 2007

BARRY E. REIFERSON
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044-0055
Telephone: (202) 514-6058
Facsimile: (202) 514-5238
E-mail: barry.e.reiferson@usdoj.gov

2176381.1

# Exhibit F

1   ROBERT P. FELDMAN, State Bar No. 69602
    JENNIFER A. OCHS, State Bar No. 174069
2   MAURA L. REES, State Bar No. 191698
    WILSON SONSINI GOODRICH & ROSATI
3   Professional Corporation
    650 Page Mill Road
4   Palo Alto, CA 94304-1050
    Telephone: (650) 493-9300
5   Facsimile: (650) 565-5100
    E-Mail: rfeldman@wsgr.com; jochs@wsgr.com;
6   mrees@wsgr.com

7   Attorneys for Defendant-Counterclaimant TOWNSHEND
    INTELLECTUAL PROPERTY, L.L.C., and Defendant BRENT
8   TOWNSHEND

9                           UNITED STATES DISTRICT COURT

10                        NORTHERN DISTRICT OF CALIFORNIA

11                               SAN JOSE DIVISION

12   IN RE TOWNSHEND PATENT LITIGATION    )   Master File No.: C-02-4833-JF (PVT)
                                          )
13   ─────────────────────────────────────)
                                          )
14   This document relates to:            )   This document relates to: C-01-1300-JF
                                          )
15   ESS TECHNOLOGY, INC., a California    )   **TOWNSHEND'S OPPOSITION TO**
     corporation,                         )   **ESS TECHNOLOGY'S MOTION**
16                                        )   **FOR ISSUANCE OF LETTER**
                    Plaintiff,            )   **ROGATORY**
17          v.                            )
                                          )   Date:  October 4, 2005
18   BRENT TOWNSHEND, an individual, and  )   Time:  10:00 am
     TOWNSHEND INTELLECTUAL PROPERTY,     )   Ctrm:  Hon. Patricia V. Trumbull
19   L.L.C., a California L.L.C.,          )
                                          )
20                    Defendants.         )
                                          )
21   ─────────────────────────────────────)
                                          )
22   TOWNSHEND INTELLECTUAL PROPERTY,     )
     L.L.C., a California L.L.C.,          )
23                                        )
                    Counterclaimant,      )
24          v.                            )
                                          )
25   ESS TECHNOLOGY, INC., a California    )
     corporation,                         )
26                                        )
                    Counterdefendant.     )
27   ─────────────────────────────────────)

28

     OPP. TO MOT. FOR LETTERS ROGATORY                              2720098_2.DOC
     C-02-4833 JF (PVT)

1            **MEMORANDUM OF POINTS AND AUTHORITIES**

2   **I.**      **INTRODUCTION**

3       Townshend opposes ESS's Motion for Letter Rogatory because ESS's motion relies on

4 incorrect factual assertions, both in the motion and declaration in support thereof. Indeed,

5 certain factual assertions in ESS's motion are directly contrary to assertions that ESS has made

6 in prior motions. While Townshend does not in principle oppose a deposition of Nortel

7 Networks, the Letters Rogatory as requested by ESS should not issue because they would

8 incorporate the incorrect and misleading factual assertions made by ESS. The authorities of

9 Canada should not be asked to authorize compulsory process based on such a misleading

10 submission. ESS's motion should be denied without prejudice to ESS withdrawing the current

11 motion and refiling it in a form that excludes factual assertions for which ESS has no good faith

12 basis.

13   **II.**      **STATEMENT OF FACTS**

14       On August 30, 2005, ESS filed the Motion for Issuance of Letter Rogatory. ESS did not

15 meet and confer with Townshend at all prior to filing its Motion for Letter Rogatory. Rees Decl.,

16 ¶ 4. While the motion would seem to fall within the literal scope of the Court's November 18,

17 2004 Order, requiring counsel to meet and confer in person before filing discovery motions, ESS

18 did not do so, and did not seek clarification from the Court about whether this motion was

19 subject to the in-person meet and confer requirement. Likewise, ESS failed to comply with the

20 San Jose General Order, which requires parties to notify opposing counsel prior to noticing a

21 hearing date. *See* Standing Order Regarding Case Management in Civil Cases ("Before selecting

22 a hearing date for a motion before any of the judges of the San Jose Division, counsel must

23 confer with opposing counsel to determine that the proposed hearing date will not cause undue

24 prejudice."). ESS did not confer with Townshend before noticing a hearing date on this motion.

25 *Id.*

26       In the motion, ESS seeks issuance of Letters Rogatory requesting the authorities of

27 Canada to allow ESS to use compulsory process to obtain discovery from Nortel Networks. The

28 Motion argues that Nortel Networks should be deposed and produce documents because it

1    purchased a company called Bay Networks, which was a former licensee of the Townshend

2    Patents.

3        ESS claimed in the motion, and in an accompanying declaration, that Townshend has

4    produced <u>only one document</u> relating to Bay Networks (a copy of the license agreement between

5    Townshend's licensee, US Robotics, and Bay Networks).  Mot. for Issuance of Letter Rogatory

6    at 4.  ESS claimed that "Townshend <u>has not produced any other documents</u> relating to this

7    license, or any other financial information relating to this license and the products sold pursuant

8    to this license." *Id.* (emphasis added).  In the supporting declaration, ESS's counsel claimed,

9    under oath, that "I have reviewed the Townshend document production in this case and <u>the only</u>

10   <u>document</u> Townshend has produced relating to Bay Networks, Inc. ("Bay Networks") is a copy

11   of the license agreement between Bay Networks and U.S. Robotics Access Corporation ("U.S.

12   Robotics") dated June 18, 1997."  Declaration of L. Scott Oliver in Support of ESS Technology's

13   Motion for Issuance of Letter Rogatory, ¶ 4 (filed Aug. 30, 2005) (emphasis added).

14   Accordingly, ESS seeks leave to obtain the "missing" documents via a subpoena to Bay

15   Networks' successor in Canada.

16       ESS's factual claims in this regard are demonstrably false.  In fact, it is indisputable that

17   Townshend has produced many other documents "relating to the [Bay Networks] license" and

18   "financial information relating to this license."  *See* Rees Decl., ¶ 2.  Indeed, ESS <u>admitted</u> in an

19   earlier motion that Townshend had produced documents relating to the Bay Networks license,

20   including royalty information covering nine fiscal quarters.  *Id.*, ¶ 3 & Ex. A.  Therefore, there is

21   no good faith basis on which ESS could have made the factual assertions in its motion <u>denying</u>

22   that such documents had been produced.[1]

23   _____

24      [1] This is not the first time ESS has falsely claimed that documents were not produced when,
      in fact, they had been produced long before.  On June 30, 2005, ESS filed a motion seeking leave

25   to file supplemental briefing regarding a motion to compel that had been taken under submission.
      *See* Docket No. 446.  The sole basis for ESS's motion was a claim that Townshend had just

26   produced a new document that was critical to its motion to compel, but that due to the "late"
      production, ESS had been deprived of the opportunity to use the document in support of the

27   motion to compel.  ESS's factual contention that the document had been produced "for the first
      time" after the hearing on the motion to compel was false.  *See* Docket No. 450-51.  In fact,

28   Townshend had previously produced a copy of the same document almost two years earlier, in
                                                      (continued...)

1   **III.   ARGUMENT**

2       ESS's proposed "Request for International Judicial Assistance" includes numerous

3 unsupported and incorrect statements. ESS's motion (about which it did not meet and confer

4 with Townshend at all prior to filing) should therefore be denied, perhaps without prejudice to

5 re-filing it in a form that does not include such misleading statements. The Canadian authorities

6 should not be asked to issue compulsory process against their citizens based on such

7 unsupported, incorrect assertions, and the imprimatur of the United States District Court for the

8 Northern District of California should not be placed on such a document.

9       <u>First</u>, ESS bases its motion largely on the claim that discovery is needed from Nortel

10 because "During discovery, Townshend has produced *only* the license agreement between Bay

11 Networks and U.S. Robotics for the patents-in-suit. Townshend has not produced any other

12 documents relating to this license. . ." Request for International Judicial Assistance at 3

13 (emphasis in original). This claim is not just unsupported, it is demonstrably false. In fact, as

14 ESS should be aware, Townshend has produced many other documents relating to the license.

15 Rees Decl., ¶ 2. ESS had only to read its own prior motion in this case from just four months

16 earlier, in which ESS submitted evidence that Townshend had produced documents relating to

17 the Bay Networks license, including royalty reports covering nine fiscal quarters. *Id.*, Ex. A.

18 ESS's opposite factual assertions in the instant motion should not be the basis for a Request for

19 International Judicial Assistance to the Canadian authorities.

20       <u>Second,</u> the proposed Request for International Judicial Assistance recites a number of

21 unsupported claims about a license previously granted to Bay Networks by US Robotics,

22 including a claim that "Nortel effectively became a sub-licensee of Townshend" when Nortel

23 acquired Bay Networks. ESS submitted no evidence supporting this assertion whatsoever.

24 There are any number of reasons why Nortel would not now be the successor of Bay Networks

25 _____

26      (...continued from previous page)

27 November 2003. ESS had the document in its possession all along, and its statement to the contrary was made without any basis whatsoever.

28

1   with respect to the license as claimed by ESS (including the structure of the Nortel-Bay

2   Networks transaction, the expiration date of the license at issue, and whether and when it was

3   assigned). ESS's mere unsupported claim that Nortel is currently the successor of Bay Networks

4   with respect to the license is insufficient to establish this fact. As this is the only connection

5   between Nortel and this lawsuit articulated by ESS, some minimal level of evidentiary

6   substantiation should be required.

7       Third, the proposed Request for International Judicial Assistance is misleading in other

8   ways, such as its recitation of this procedural history of this case. *See* Request for International

9   Judicial Assistance at 2. For example, ESS fails to mention that many of the claims ESS asserted

10  against Townshend in March 2001 were dismissed with prejudice, due to ESS's failure to state a

11  claim even after opportunities to amend. Townshend generally objects to a submission of this

12  type to foreign authorities that recites a procedural history drafted in such a one-sided, and

13  therefore misleading, manner.

14      Townshend does not, in principle, oppose a deposition of Nortel Networks. Indeed,

15  Nortel may well give testimony that would be quite favorable to Townshend, and, should ESS

16  obtain such testimony, Townshend would be entitled to use it at trial. The Court may wish to

17  deny ESS's motion, however, because it is not supported by competent evidence, and it recites

18  incorrect factual assertions that should not be adopted in a submission to foreign authorities.

19  **IV.    CONCLUSION**

20      For the foregoing reasons, Townshend respectfully requests that the Court deny ESS's

21  Motion for Issuance of Letter Rogatory without prejudice.

22  Dated: September 13, 2005                    WILSON SONSINI GOODRICH & ROSATI
23                                              Professional Corporation

24

25                                              By: _____/s/_____
26                                                          Maura L. Rees

27                                              Attorneys for Defendant/Counterclaimants
                                                BRENT TOWNSHEND AND TOWNSHEND
28                                              INTELLECTUAL PROPERTY, L.L.C.

1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10                            SAN JOSE DIVISION

11   IN RE TOWNSHEND PATENT          )    Case No.: C 02-4833 JF (PVT)
     LITIGATION,                     )    And Consolidated Cases
12                                   )
                                     )    **ORDER GRANTING ESS TECHNOLOGY,**
13   _____)    **INC.'S MOTION FOR ISSUANCE OF A**
                                     )    **LETTER ROGATORY**
14                                   )
                                     )
15   AND RELATED COUNTERCLAIMS       )
16   _____)

17        On October 4, 2005 the parties appeared before Magistrate Judge Patricia V. Trumbull for

18   hearing on ESS Technology, Inc.'s motion for issuance of a letter rogatory.[1] Based on the briefs

19   and arguments submitted,

20        IT IS HEREBY ORDERED that ESS' motion is GRANTED. However, the parties shall

21   meet and confer regarding the specific wording of the letter rogatory. If the parties cannot agree

22   on the wording, then no later than October 14, 2005 each side shall submit to the court its

23   proposed form of letter rogatory. The proposed form of letter rogatory shall include the correct

24   phone number for this court's chambers (408/535-5438).

25   Dated:  10/5/05

26                                        _Patricia V. Trumbull_
                                          PATRICIA V. TRUMBULL
27                                        United States Magistrate Judge

28   _____

          [1]     The holding of this court is limited to the facts and the particular circumstances
     underlying the present motion.

# Exhibit G

Westlaw.

739 PLI/Lit 1037                                                          Page 1
739 PLI/Lit 1037
**(Cite as: 739 PLI/Lit 1037)**

Practising Law Institute
Litigation and Administrative Practice Course Handbook Series
Litigation
PLI Order No. 8710
March, 2006
International Business Litigation & Arbitration 2006
**\*1037 U.S. DEPARTMENT OF STATE CIRCULAR: PREPARATION OF LETTERS ROGATORY**
**\*1039 PREPARATION OF LETTERS ROGATORY**

**DISCLAIMER:** THE INFORMATION IN THIS CIRCULAR RELATING TO THE LEGAL REQUIREMENTS OF SPE-
CIFIC FOREIGN COUNTRIES IS OBTAINED FROM PAST EXPERIENCE AND IS NOT NECESSARILY AUTHORIT-
ATIVE. QUESTIONS INVOLVING INTERPRETATION OF SPECIFIC FOREIGN LAWS SHOULD BE ADDRESSED
TO FOREIGN COUNSEL

**LEGAL AUTHORITY:** 28 U.S.C. 1781(a)(2); 28 U.S.C. 1696; Rule 28(b), Fed. R. Civ. P.; Rule 4(f)(2)(B), Fed. R. Civ. P.;
Rule 15d, Fed. R. Crim. P.22 C.F.R. 92.66(b)&(c); Article 5(j), Vienna Convention on Consular Relations, 21 U.S.T. 77, 596
UNTS 261; TIAS 6820 (where applicable); Bilateral Consular Conventions (where applicable). Letters rogatory have also
been issued under the "All Writs Act", 28 U.S.C. 1651.

**SELECTED CITATIONS:** For general information about letters rogatory see:

Wright and Miller, Federal Practice and Procedure, (1970), Section 2083 and Section 1134 and 1992 Supp. pp. 206-207);

8 Wigmore, Evidence (rev. McNaughton 1961), Sec. 2195a (ii);

Restatement (Second) Foreign Relations Law of the United States, Sec. 40 (1965);

Restatement (Third) Foreign Relations Law of the United States, Sec. 403 (1988).

**WHAT IS A LETTER ROGATORY:** A letter rogatory is a formal request from a court in one country to "the appropriate
judicial authorities" in another country requesting compulsion of testimony or documentary or other evidence or effect ser-
vice of process. Although statutory authority generally refers to the instrument as a "letter rogatory", the terms "letter rogat-
ory" and "letter of request" (which is used specifically in the Hague Evidence Convention) have come to be virtually syn-
onymous in actual practice. (See Epstein & Snyder, International Litigation, Practice & Strategy,
2nd. Sec. 10.09, p. 10.13 -10.14.; Black's Law Dictionary (6th ed. 1994), Fed. R. Civ. P. 4(f)(2)(B) Advisory Committee's
Note (West Supp. 1993).) In some countries which do not permit the taking of depositions of willing witnesses, letters rogat-
ory are the only method of obtaining evidence or serve process. Letters rogatory can be used in civil and criminal matters,
and have been used in administrative matters. The execution of a request for judicial assistance by the foreign court is based
on comity between nations, absent a specific treaty obligation such as the Hague Evidence Convention or Mutual Legal As-
sistance in Criminal Matters (MLAT) treaties. See our general flyer on "Obtaining Evidence Abroad" or the "Hague Evidence
Convention" for a further discussion of these subjects. Consular Conventions generally include language which authorizes
transmission of letters rogatory through diplomatic channels. This does not obligate the foreign country to execute the re-
quest, but simply provides a formal avenue by which the requests may be made. If there is no Consular Convention in force
between the United States and the foreign country, letters rogatory are received by foreign authorities on the basis of comity.
**Letters rogatory are a time consuming, cumbersome process and should not be** utilized unless there are no other options
available.

**HOW IS A LETTER ROGATORY EXECUTED:** The foreign court will execute a letter rogatory in accordance with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

laws and regulations of the foreign country. In obtaining evidence, for example, in **1040** most cases an American attorney will not be permitted to participate in such a proceeding. Occasionally a local, foreign attorney may be permitted to attend such a proceeding and even to put forth additional questions to the witness. Not all foreign countries utilize the services of court reporters or routinely provide verbatim transcripts. Sometimes the presiding judge will dictate his recollection of the witness's responses. See Born & Westin, 305, 308; Ristau, International Judicial Assistance, Sec. 3-2-1 (4), p. 79 (1995 supp.); Epstein & Snyder, Sec. 10.09, p. 10-13 - 10-16 (1994 supp). See discussion below on drafting a letter rogatory which takes these peculiarities into account.

**AUTHORITY FOR ISSUANCE OF A LETTER ROGATORY:** The power of federal courts to issue letters rogatory derives from 28 U.S.C. 1781 and from the court's "inherent" authority. See De Villeneuve v. Morning Journal Ass'n., 206 F. 70 (S.D.N.Y. 1913), Zassenhaus v. Evening Star Newspaper Co., 404 F. 2d 1361 (D.C. Cir. 1968). See also 28 U.S.C. 1651 ("All Writs Act"). But see, DBMS Consultants, Ltd. v. Computer Assocs. Int'l, Inc., 131 F.R.D. 367, 369 (D. Mass. 1990); United States v. Reagan, 453 F.2d 165, 171-173 (6th Cir. 1971), cert. denied, 406 U.S. 946 (1972); United States v. Strong, 608 F. Supp. 188, 192-194 (E.D. Pa. 1985); United States v. Staples, 256 F.2d 290 (9th Cir. 1958); B & L Drilling Electric v. Totco, 87 F.R.D. 543, 545 (W.D. Okla. 1978).

**Compulsion of Evidence:** When a witness is not willing to testify or produce documents or other evidence voluntarily, the assistance of foreign authorities generally must be sought. The customary method of compelling evidence is by letter rogatory. See Rule 28(b), Fed. R. Civ. P.; Born & Westin, 305-308; Cumulative Digest of United States Practice in International Law, 1981-1988, Department of State, Office of the Legal Adviser, 1450, 1509-1510 (1994); and Digest of United States Practice in International Law, 1977, 498-499, Department of State, Office of the Legal Adviser. See Ristau, Sec. 3-3-2, Application for the Issuance of a Letter of Request (Letter Rogatory). Consult our flyer "Obtaining Evidence Abroad" regarding other methods of extraterritorial discovery of documents in control of persons over whom the court has in personam jurisdiction.

**CRIMINAL CASES:** The Federal Rules of Criminal Procedure do not provide for the issuance of requests for judicial assistance. Consequently, Rule 57, Fed. R. Crim. P., applies. Rule 57 provides in pertinent part: "In all cases not provided for by rule, the district judges and magistrates may regulate their practice in any manner not inconsistent with these rules or those of the district in which they act". Evidence, including documents and the testimony of witnesses, may properly be sought by means of a request for judicial assistance before or after formal charges have been made. United States v. Reagan, supra, 453 F2d at 173 n.4; In Re Grand Jury 81-2, 550 F. Supp. 24, 29 (W.D. Mich. 1982); United States v. Strong, supra, 608 F. Supp. at 194.

**Administrative CASES:** Except as provided by statute, U.S. Administrative agencies do not have the power to compel persons outside the U.S. who have no contact with the U.S. (and therefore are not under a federal court's personal jurisdiction) to produce evidence for an investigation. Administrative agencies have succeeded in obtaining commissions to take depositions and letters rogatory using the "All Writs Act" (28 U.S.C. 1651). See: CFTC v. Nahas, 738 F.2d 487 (D.C. Cir. 1984); FTC v. Compagnie de Saint Gobain-Pont-a-Mousson, 636 F.2d 1300 (D.C. Cir. 1980). Congress has decided, since Saint Gobain, that the investigative demands of the FTC and the IRS are more in the nature of complaints than subpoenae. Thus, those two agencies have been expressly authorized to serve investigative demands in foreign states in a manner parallel to the service of process provisions of Rule 4 of the Rules of Federal Procedure. See 15 U.S.C. 57b-1 (F.T.C.) and 26 U.S.C. 982 (I.R.S.). All the federal securities statutes authorize the SEC to subpoena witnesses "from any place in the United States." This statutory language, commonly employed in the statutes governing most American regulatory agencies, has been construed by U.S. courts to be a broad and flexible authorization to require production of evidence from anywhere in the world, so long as service has been properly effected in the U.S. See, SEC v. Minas de Artemisa, S.A., 150 F. 2d 215 (9th Cir. 1945); **1041**Federal Maritime Commission v. DeSmedt, 366 F.2d 464 (2d Cir.), cert. denied, 385 U.S. 974 (1966); CAB v. Deutche Lufthansa A.G., 591 F.2d 951 (D.C. Cir. 1979); SEC v. Zanganeh, 470 F. Supp 1307 (D.D.C. 1978).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**SERVICE OF PROCESS:** 28 U.S.C. 1696 and Rule 4(f)(2)(B) Fed. R. Civ. P. provide for the use of letters rogatory for service of process. Service of a judicial summons, as set forth in Fed. R. Crim. P. 9 (c) may also be effected pursuant to a letter rogatory. See Ristau, Sec. 3-1-12, p. 71 (1995 supp.) for a form for application for the issuance of a Letter of Request (Letter Rogatory) to Serve a Judicial Document. See also, In Re Letters Rogatory Out of First Civil Court of City of Mexico, 261 Fed. 652 (S.D.N.Y. 1919); 44 Colum. L. Rev. 72 (1944); Note, 58 Yale L.J. 1193 (1949); Republic Int'l Corp. v. Amco Eng'rs, 516 F.2d 161, 164 (9th Cir. 1975). In some countries service by letters rogatory is the only recognized method of service. **If the laws of the foreign country permit other methods of service,** the use of letters rogatory is not recommended given the habitual time delays of up to a year or more in execution of the requests. **The letters rogatory** procedure is "complex, costly and time consuming" and should be avoided where possible. (See Casad, Jurisdiction in Civil Actions, 4.06(2) (1983 & Supp. 1986); Horlick, A Practical Guide to Service of United States Process Abroad, 14 Int'l Law. 637, 642 (1980).) If the laws of the foreign country only recognize service by letter rogatory and eventual enforcement of a U.S. judgment in the foreign country is envisioned, requesting counsel may determine that service pursuant to a letter rogatory is necessary. See Born & Westin, 123-125, 133-136; In re Letters Rogatory out of First Civil Court, 261 Fed. 652 (S.D.N.Y. 1919); Service of Process on Foreign Parties by Letters Rogatory, 52 Inter Alia F1 (May/June 1987); Longley, Serving Process, Subpoenas and Other Documents in a Foreign Country, Proc. A.B.A., Sec. of Int'l & Comp. L. 34, 35 (1959); Cumulative Digest of United States Practice in International Law, 1981-1988, Department of State, Office of the Legal Adviser, 1442, 1448 (1994).

**SAMPLE LETTERS ROGATORY:** There is annexed a basic sample letter rogatory, but see, 4 J. Moore, Moore's Federal Practice 28.05-08 (2d ed. 1991) (Caveat: Do not draft the letter rogatory as a request from the President of the United States, but rather as a request from the requesting court.); 3 J. Moore & L. Frumer, Moore's Manual, Federal Practice Forms, Nos. 15:21; 15:22 (2d ed. 1988); 2A Bender's Federal Practice Forms, Fed. R. Civ. P. 28(b) (1991); 8 Wigmore, Evidence, rev. (McNaughton 1961) Sec. 2195a (ii); B. Ristau, International Judicial Assistance, Vol. 1, Part III, Ch. 3, Section 3- 3-1/3-3-2, pp. 94-101 (1995 supp.); Epstein & Snyder, International Litigation, Section 10.09, 10-13 - 10-16 (2d ed. 1994); Born & Westin, International Civil Litigation in United States Courts, 308-309, (1989).

**GUIDELINES ON DRAFTING LETTERS ROGATORY:** Letters rogatory should be written in simple, non-technical English and should not include unnecessary information which may confuse court in the receiving foreign state. Avoid use of the term "discovery". Similarly, to avoid the appearance of a "fishing expedition" which may result in refusal of the foreign country to execute the request, try not to use phrases such as "any and all documents". Requests for documents should be as specific as possible. If particular procedures to be followed by the foreign court are preferable, include the specifics in the letter rogatory (for example, verbatim transcript, place witness under oath, permission for American or foreign counsel to attend or participate in proceedings if possible, etc.) For general guidance on drafting letters rogatory see Ristau, Sec. 3-3-2, 95- 96; 3-3-5, p. 103 (1995 supp.); Born & Westin 308.

The letter rogatory should be addressed "To Appropriate Judicial Authority of **(Insert name of Country).**" (See The Mandu, 11 F. Supp. 845, EDNY 1935). The essential elements of a letter rogatory are:

(a) a request for international judicial assistance is being made in the interests of justice;

(b) a brief synopsis of the case, including identification of the parties and the nature of the claim and relief sought to enable the foreign court to understand the issues involved;

**\*1042** (c) type of case [civil, criminal, administrative];

(d) the nature of the assistance required [compel testimony or production of evidence; service of process];

(e) name, address and other identifiers, such as corporate title, of the person abroad to be served or from whom evidence is to be compelled, documents to be served;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(f) list of questions to be asked, where applicable, generally in the form of written interrogatories;

(g) list of documents or other evidence to be produced;

(h) the requesting court should include a statement expressing a willingness to provide similar assistance to judicial authorities of the receiving state [28 U.S.C. 1782];

(i) the requesting court should include a statement expressing a willingness to reimburse the judicial authorities of the receiving state for costs incurred in executing the requesting court's letter rogatory.

**AUTHENTICATION REQUIREMENTS:** Letters rogatory must be issued under the seal of the court and the signature of the judge. The clerk should not sign on behalf of the judge. (See Ristau, Sec. 3-1-13, p. 73 at note 14, (1995 supp.); Born & Westin 307.) For most countries, the seal of the court and signature of the judge is sufficient. Consult our country-specific information via our autofax service or via our home page on the Internet for guidance about procedures for particular countries. Some countries require further authentication of letters rogatory. **Do not waste time and money on these** additional steps unless your local foreign counsel, this office, or some other authoritative source advises that it is necessary. **If there is no specific** flyer for the country in question, consult the geographic division of the Office of American Citizens Services and Crisis Management. See "Questions" below.

**TRIPLE CERTIFICATION, CHAIN AUTHENTICATION AND AUTHENTICATION BY THE FOREIGN** EMBASSY IN THE UNITED STATES: As noted above, these additional authentication steps are not required by most countries. **Some countries require Triple Certification of the letter rogatory which means that the judge signs the** documents; the clerk certifies that the judge is the judge; the judge certifies that the clerk is the clerk). This is also known as an exemplification certificate (A.O. form 132). In addition to the triple certification or exemplification process, some foreign countries require that the letter rogatory be authenticated by the embassy or consulate of the foreign country in the United States. This is accomplished by "chain authentication" summarized below. (See Ristau Sec. 3-1-13, 1994 Rev., p. 73 at note 14.)

**State Court Documents:**

1. Seal and Signature of the Judge;

2. State Secretary of State or other authority authenticates the seal of the State Court; (For a list of state authentication offices, see our information flyers on the "Hague Legalization Convention" (AUTOFAX document 1053) and "General Authentication Flyer" (AUTOFAX document 1046) available via our autofax service and our Consular Home Page on the Internet explained under "Additional Information" below. See also our Authentications Office Home Page at **authentication.html**.

3. U.S. Department of State Authentications Office authenticates the seal of the State Secretary of State or comparable authority as explained below;

**\*1043** 4. Embassy or Consulate or the foreign country in the U.S. authenticates the seal of the U.S. Department of State. (For the address and telephone number of foreign embassies see our country-specific consular information sheets on our Home Page on the Internet under "entry requirement" or our brochure "visa requirements of foreign governments" which also lists the phone numbers of the foreign consulates in the U.S.)

**Federal Court Documents:**

1. Seal and Signature of the Judge;

2. Seal of the U.S. Court is authenticated by the U.S. Department of Justice, Management Division, Security Program Staff,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Physical Security Office, 9th and Pennsylvania Avenue, Room 6531, Washington, D.C. 20530, tel: (202) 514-2314 or 514-4667 or the Administrative Office of the U.S. Courts.

3. U.S. Department of State Authentications Office authenticates the seal of the Department of Justice or the Administrative Office of the U.S. Courts as explained below;

4. Embassy or Consulate or the foreign country in the U.S. authenticates the seal of the U.S. Department of State.

**Expediting the Authentication Process:** It may be possible to authenticate the documents at the foreign consulate nearest you and avoid the interim steps if the foreign consulate has the court's seal or the state Secretary of State's seal on file. **This office will NOT undertake the task of obtaining the** authentications of the State, the Departments of Justice and State and the foreign embassies.

**U.S. State Department Authentication Office, 518 23rd St., N.W., Washington,** D.C. 20520, (202) 647-5002 Fee: $5.00. **For additional information, call the** Federal Information Center: 1-800-688-9889, and choose option 6 after you press 1 for touch tone phones. Walk-in service is available from the Authentications Office from 8 a.m. to 12 noon Monday-Friday, except holidays. Walk-in service is limited to 15 documents per person per day (documents can be multiple pages). Processing time for authentication requests sent by mail is 5 working days or less. An information flyer explaining the authentication process is available. See also the U.S. State Department's Authentications Office home page.

Further Authenticating the U.S. State Department Seal: Occassionally, foreign countries may request that after the embassy of the foreign country in the United States authenticates the seal of the U.S. Department of State, the documents be further authenticated in the foreign country by the U.S. embassy and/or the foreign country's Foreign Ministry. U.S. embassies abroad are authorized to authenticate the seal of the U.S. Department of State for a $10.00 fee. (See 22 C.F.R. 92.41(c); Schedule of Fees, 22 C.F.R. 22.1 item 45(f).)

**Hague Legalization Convention Countries:** If the country where the documents are to be used is a party to the Hague Legalization Convention, and that country requires further authentication of the documents beyond the seal and signature of the judge, consult our information flyer on the Hague Legalization Convention for guidance on how to obtain the Convention "apostille" certificate. See also the U.S. State Department's Authentications Office home page.

**TRANSLATION REQUIREMENTS:** The letters rogatory and any accompanying documents must be translated into the official language of the foreign country. The translator should execute an affidavit as **\*1044** to the validity of the translation before a notary. See Ristau, Sec. 2-2-2(2), p. 96-97 (1995 supp.)

**NUMBER OF COPIES REQUIRED:** Forward to the Department of State for transmittal to the foreign authorities: the original English version bearing the seal of the court and signature of the judge [or a certified copy]; a photocopy of the English; the original translation and a photocopy of the translation. The original documents will be served upon the designated recipient or deposited with the foreign court in connection with a request for evidence, and the copies returned to the court in the U.S. as proof of execution. See Ristau, Sec. 2-2-2(2), p. 96-97 (1995 supp.) For requests involving multiple witnesses in diverse locations, either prepare a separate letter rogatory for each witness, or provide a certified copy of the single letter rogatory (plus translation and duplicate copy noted above) for each witness. The foreign country may assign the matter to different courts. The U.S. embassy will endeavor to ensure that evidence obtained will be transmitted to the court in the U.S. as it is received from the Foreign Ministry rather than held by the Foreign Ministry until all the evidence has been obtained. The same procedures apply to requests involving service of process upon multiple persons.

**SERVICE VIA LETTERS ROGATORY UNDER SECTION 1608(B) OF THE FOREIGN SOVERIEGN** IMMUNITIES ACT: **Letters rogatory requesting service of process on an agency or** instrumentality of a foreign government pursuant to 28 U.S.C. 1608(b)(3)(A) must be transmitted to the Department of State, Office of American Citizens Services, Room

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4811A, 2201 C Street, N.W., Washington, D.C. 20520.

**TRANSMITTAL OF THE REQUEST:** Letters rogatory generally may be transmitted to foreign judicial authorities through the "diplomatic channel". The "diplomatic channel" is a circuitous route by which the documents are sent to the foreign court. Unless the foreign country accepts transmittal directly from court-to-court or through local foreign counsel, you will be confronted with the difficulties of at least some portion of the diplomatic channel described below. See Ristau, Sec. 3-3-3, p. 102 (1995 supp.) described below. If your local counsel in the foreign country advise that letters rogatory may be transmitted directly by your foreign counsel to the foreign court you may elect to avoid the time consuming diplomatic channel. If the Department of State information about a particular country reflects that use of the diplomatic channel is required, you may wish to seek clarification of contrary guidance from other sources.

**Cover Letter:** The letters rogatory and accompanying documents may be submitted to the Office of American Citizens Services and Crisis Management, Room 4811A N.S., Department of State, 2201 C Street N.W., Washington, D.C. 20520. Please write the name of the foreign country on the outside of the envelope. The documents should be accompanied by a letter along the following lines:

Foreign Country:

Name of Case:

Docket Number:

Nature of Request: (Service of Process; Compulsion of Testimony; Production of Documents, etc.)

Person to be Served or from Whom Evidence is to be Obtained: (name and address mandatory, phone number if possible.)

Mailing Address of American Court to Which executed Request Should be Returned:

**\*1045** Special Instructions: (Example, Federal Express Account Number; U.S. hearing/trial date, etc.)

Deposit Enclosed:

Statement of Responsibility for Additional Costs incurred in excess of the required deposit which accompanies the letter.

Local Foreign Counsel (if any): (name and address, phone number)

Name, Address, telephone and fax number of requesting attorney in U.S.:

**What is the Diplomatic Channel?:** The documents proceed along the following lines:

1. Drafted by American attorney ...

2. Issued Under Seal of American court and Signature of Judge ...

3. Returned by Issuing Court to American Attorney ...

4. Sent by Attorney to U.S. State Department or U.S. Embassy Abroad ...

5. Received by U.S. Embassy ...

6. Sent to Ministry of Foreign Affairs under cover of a diplomatic note ...

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7. Sent to foreign Ministry of Justice ...

8. Sent to by Ministry of Justice Foreign Court of Competent Jurisdiction ...

9. Executed by Foreign Court subject to Court's Calender ...

10. Returned to Ministry of Foreign Affairs ...

11. Returned to U.S. Embassy ...

12. Returned to U.S. Department of State ...

13. Returned to Requesting Court.

14. Requesting Attorney Receives Evidence from Requesting American Court.

**COSTS:** Effective June 1, 2002, there is a $650.00 consular fee for processing letters rogatory (See Federal Register, May 16, 2002, Volume 67, Number 95, Rules and Regulations, Pags 34831-34838; 22 CFR 22.1, item 51). Counsel are requested to submit a certified bank check in the amount of $650.00 payable to the U.S. Embassy (insert name of capital of the foreign country, for example, "U.S. Embassy Tokyo"). Corporate or personal checks are not acceptable. Foreign authorities may also charge a fee. Counsel will be notified by the U.S. embassy and/or the Office of American Citizens Services and Crisis Management in the Department of State if the Embassy is advised by foreign authorities of any applicable local fees. There is no consular fee for letters rogatory on behalf of federal, state or local government officials. (See 22 CFR 22.1, item 53). If the letter rogatory requests compulsion of evidence **\*1046** from more than one witness or service of process on more than one person, multiple fees may be charged if more than one foreign court is required to execute the request due to multiple jurisdictions. For letters rogatory for use in Taiwan, see our Taiwan specific flyer.

**RETAINING LOCAL FOREIGN COUNSEL:** 28 U.S.C. 1781(b)(2) permits American courts to transmit letters rogatory directly to the executing authority in the foreign country. Although many countries require that letters rogatory be transmitted to the foreign government through the "diplomatic channel" by the U.S. embassy, local counsel can be helpful in subsequent inquiries. Where the foreign government does not object to direct transmission, for example through a local foreign attorney, this can save time. While retention of the services of a foreign attorney to aid in the progress of a letter rogatory is not generally required (although some countries, such as the Bahamas mandate such assistance), requesting counsel in the U.S. may find it useful to retain local counsel to provide guidance on preparation of the request and to expedite the process. See Ristau, Sec. 3-3-3, at note 24, 102 and Sec. 3-3-5, p. 103 (1995 supp.); and Born & Westin 308.

**REFUSAL TO HONOR AMERICAN LETTERS ROGATORY:** Foreign countries have declined to honor American letters rogatory where a foreign domestic blocking statute prohibits release of the evidence requested. See Ristau, Sec. 3-3-4, p. 103 (1995 supp.)

**REQUESTS FROM STATE OR FEDERAL GOVERNMENT OFFICIALS:**

If the letter rogatory is being transmitted at the request of a state or federal official, please contact the Department of State, Office of American Citizens Services for special guidance. With respect to fees, no consular fee will be charged. However, local authorities in the foreign country may impose fees of their own which must be paid by the state or federal authority in the United States requesting the judicial assistance. You will be contacted if a federal appropriation number and fund code or remittance of monies to the Department of State are necessary.

**TIME REQUIRED TO EXECUTE A LETTER ROGATORY:** Generally letters rogatory worldwide, including those sent to the United States, take from six months to a year to execute. See Ristau, Sec. 3-3-3, p. 102-103 (1995 supp.); Born &

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westin 307.

**RETURN OF EXECUTED LETTER ROGATORY:** When a letter rogatory is executed by the foreign authorities, it is returned to the requesting court in the United States by this office via certified mail. Requesting counsel is also notified. At the request of the court, the executed letter rogatory and proof of service/evidence can be returned directly to requesting counsel. If transmittal by commercial express delivery service is preferred, please include your account number in the covering letter.

**Treaty Databases on the Internet:** Information about treaties in force is available on the Internet at the following web sites:

United States Department of State, Office of the Legal Adviser, Treaty Affairs, List of Treaties and Other International Agreements of the United States In Force:

United Nations (UN): Databases/Treaties

Council of Europe (COE): under Texts/Treaties

**\*1047** Organization of American States (OAS): under Public Information/Documents/Treaties.

**SELECTED REFERENCES:**

**Books:**

Born & Westin, International Civil Litigation in United States Courts, (1989).

Epstein & Snyder, International Litigation: A Guide to Jurisdiction, Practice and Strategy, 2d, Prentice Hall Law & Business (1994).

Grossman, Letters Rogatory: A Symposium Before the Consular Law Society, Federal Legal Publications, Inc., New York (1956).

Hackworth, Digest of International Law, Office of the Legal Adviser, Department of State, Vol. II, (1941).

Kos-Rabcewicz-Zubkowski, International Cooperation in Civil and Commercial Procedure: American Continent, Canadian Inter-American Research Institute; U. of Ottawa Press, (1975).

Lookofsky, Transnational Litigation and Commercial Arbitration, A Comparative Analysis of American, European, and International Law, 445-89 (1992).

Moore, A Digest of International Law 104 et seq., Sec. 189 - letters rogatory 1889-1890, (1906).

Nash, ed., Cumulative Digest of United States Practice in International Law, Department of State, Vol. II, 1409, 1424 (1994).

Ristau, International Judicial Assistance, Civil and Commercial, International Law Institute, (1995 supp.).

Smit, International Cooperation in Litigation: Europe, The Hague, Martinus Nijhoff, (1965).

Whiteman, Digest of International Law, Office of the Legal Adviser, Department of State, Vol 7, 573, 605 (1970).

**Articles:**

Doyle, Taking Evidence by Deposition and Letters Rogatory and Obtaining Documents in Foreign Territory, Proc. A.B.A., Sec. Int'l & Comp. L. 37 (1959).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Edwards, Taking of Evidence Abroad in Civil or Commercial Matters, 18 Int'l & Comp. L. Q. 646 (1969).

Heilpern, Procuring Evidence Abroad, 14 Rul. L. Rev. 29 (1939).

Houck, Restatement of the Foreign Relations Law of the United States (Revised): Issues and Resolutions, 20 Int'l Law. 1361 (1986).

Jones, International Judicial Assistance: Procedural Chaos and a Program for Reform, 62 Yale L.J. 515, **1048** 529-32 (1953).

McCawley, Compelled Production of Documents Located Abroad - Marc Rich and Co. v. U.S., 11 Tax Plan. Int'l Rev. 7 (No. 11, Nov. 1984).

McKay, Compelling Discovery and Disclosure in Transnational Litigation: A Selected Bibliography, 16 N.Y.U.J. Int'l L. and Pol. 1217 (No. 5, Summer 1984).

Maier, Extraterritorial Jurisdiction at a Crossroads: An Intersection Between public and Private International Law, 76 Am. J. Int'l L. 280 (1982).

Note, Letters Rogatory: Current Problems Facing International Judicial Assistance, 4 N.C. J. Int'l L. & Comm. Reg. 297 (1979).

Note, Reciprocity for Letters Rogatory Under the Judicial Code, 58 Yale L.J. 1193, 1193-94 (1949).

Note, Taking Evidence Outside of the United States, 55 B.U. L. Rev. 368, 374 (1975).

Plaster, The Hague Evidence Convention: The Need for Guidance on Procedures and Resolution of Conflicts in International Discovery, Vanderbilt Journal of Transnational Law, Vol. 27, No. 1, pp. 185-217 (1994).

Rafalko, Depositions, Commissions and Letters Rogatory in a Conflict of Laws Case (1965), 4 Dusquesne University Law Review 115.

Robinson, Symposia: Transnational Litigation, Part I, Compelling Discovery and Evidence in International Litigation, The Int'l Law., Vol. 18, No. 3, 533 (1984).

Rosenthal & Yale-Loehr, Two Cheers for the ALI Restatement's Provisions on Foreign Discovery, 16 N.Y.U.J. Int'l L. & Pol. 1075 (1984).;

Sklaver, Obtaining Evidence in International Litigation, 7 Cumberland L. Rev. 233 (1976).

Stern, International Judicial Assistance (Part II: Depositions under Letters Rogatory) (1969), 15 Practical Lawyer 55.

Sunderland, The Use of the Letter of Request (or Letter Rogatory) for the Purpose of Obtaining Evidence for Proceedings in England and Abroad, 31 Intl and Comp L. Q. 784 (1982).

Symposium, Compelling Discovery in Transnational Litigation, 16 N.Y.U.J. Int'l L. and Pol. 957-1156; 1217-1248 (No. 5, Summer 1984).

Symposium, Obtaining Foreign Discovery and Evidence for Use in Litigation in the United States, 13 Int'l L. 3, 46 (1979).

Van Brauman, Foreign Evidence Gathering and Discovery for U.S. Civil Tax Determination Purposes, 30 Int'l Law. 589, 619 (1996).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Von Mehren, Discovery of Documentary and Other Evidence in a Foreign Country, 77 Am. J. Int'l Law 896 (1983).

**\*1049** Von Mehren, Discovery Abroad: The Perspective of the U.S. Private Practitioner, 16 N.Y.U. J. Int'l L. & Pol. 985, 993 (1984).

**Selected Cases:**

DBMS Consultants, Ltd. v. Computer Assocs. Int'l, Inc., 131 F.R.D. 367, 369 (D. Mass. 1990); See, United States v. Zabady, 546 F. Supp. 35, 39 n. 9 (M.D. Pa. 1982); Rio Tinto Zinc Corp. V. Westinghouse Elec. Corp., (1978) 2 W.L.R. 81, 1All E.R. 434 (H.L. 1977); Reagan v. United States, 453 F.2d 165 (C.A. 6 1971); Re Raychem Corp. v. Canusa Coating Sys., Inc., (1970) 14 D.L.R. 3d 684; Zassenhaus v. Evening Star Newspaper Co., 404 F.2d 1361 (C.A.D.C. 1968); United States v. Paraffin Wax, 2255 Bags, 23 F.R.D. 298 (E.D.N.Y. 1959); Danisch, et al v. The Guardian Life Insurance Co., 19 F.R.D. 235 (1956); Re Radio Corp of America v. Rauland Corp., (1956) 5 D.L.R. 2d 424; Uebersee Finanz-Korporation, A.G. v. Brownell, 121 F. Supp. 420 (D.D.C. 1954); Wheeler v. West India S.S. Co., 22 Fed. Rules Decisions 396 (1951); The Edmund Fanning petition of Isbrandtsen Co., Inc., 89 Fed. Supp. 282 (1950); Ali Akber Kiachif et al. v. Philco International Corporation, 10 F.R.D. 277 (1950); The Signe, 37 F. Supp. 819, 820 (E.D. La. 1941); The Mandu, 11 F. Supp. 845 (E.D.N.Y. 1935); De Villeneuve v. Morning Journal Ass'n, 206 F.70 (S.D.N.Y. 1913)., Gross v. Palmer t al, C.C.N.D. Ill. 1900, 105 F. 833; Nelson v. United States, 17 Fed. Cas. 1340 (No. 10,116) (C.C.D.Pa. 1816); Winthrop v. Union Ins. Co., 30 Fed. Cas. 376 (No. 17901) (C.C.D.Pa. 1807.)

**ADDITIONAL INFORMATION:** The Office of American Citizens Services has available general information flyers on international judicial assistance.

**Using the Internet:** These are available on the Internet via the Department of State, Bureau of Consular Affairs home page under Judicial Assistance. See also, the Department of State, Office of the Legal Adviser for Private International Law home page for information regarding private international law unification. See also the home pages for many of our embassies.

**QUESTIONS:** Additional questions regarding letters rogatory should be addressed to the appropriate geographic division of the Office of American Citizens Services, Tel: (202) 647-5225 or (202) 647-5226.

**EXAMPLE - LETTER ROGATORY:**

SAMPLE REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
NAME OF COURT IN SENDING STATE REQUESTING JUDICIAL ASSISTANCE

```
NAME OF PLAINTIFF

            DOCKET NUMBER


V.


NAME OF DEFENDANT
```

REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTER ROGATORY)
(NAME OF THE REQUESTING COURT) PRESENTS ITS COMPLIMENTS TO THE APPROPRIATE JUDICIAL AUTHORITY OF (NAME OF RECEIVING STATE), AND REQUESTS **\*1050** INTERNATIONAL JUDICIAL ASSISTANCE TO (OBTAIN EVIDENCE/EFFECT SERVICE OF PROCESS) TO BE USED IN A (CIVIL, CRIMINAL, ADMIN-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ISTRATIVE) PROCEEDING BEFORE THIS COURT IN THE ABOVE CAPTIONED MATTER. A (TRIAL/HEARING) ON THIS MATTER IS SCHEDULED AT PRESENT FOR (DATE) IN (CITY, STATE, COUNTRY).

THIS COURT REQUESTS THE ASSISTANCE DESCRIBED HEREIN AS NECESSARY IN THE INTERESTS OF JUSTICE. THE ASSISTANCE REQUESTED IS THAT THE APPROPRIATE JUDICIAL AUTHORITY OF (NAME OF RECEIVING STATE) (COMPEL THE APPEAR OF THE BELOW NAMED INDIVIDUALS TO GIVE EVIDENCE/PRODUCE DOCUMENTS) (EFFECT SERVICE OF PROCESS UPON THE BELOW NAMED INDIVIDUALS).

(NAMES OF WITNESSES/PERSONS TO BE SERVED)
(NATIONALITY OF WITNESSES/PERSONS TO BE SERVED)
(ADDRESSED OF WITNESSES/PERSONS TO BE SERVED)
(DESCRIPTION OF DOCUMENTS OR OTHER EVIDENCE TO BE PRODUCED)

FACTS

(THE FACTS OF THE CASE PENDING BEFORE THE REQUESTING COURT SHOULD BE STATED BRIEFLY HERE, INCLUDING A LIST OF THOSE LAWS OF THE SENDING STATE WHICH GOVERN THE MATTER PENDING BEFORE THE COURT IN THE RECEIVING STATE.)

(QUESTIONS)

(IF THE REQUEST IS FOR EVIDENCE, THE QUESTIONS FOR THE WITNESSES SHOULD BE LISTED HERE).

(LIST ANY SPECIAL RIGHTS OF WITNESSES PURSUANT TO THE LAWS OF THE REQUESTING STATE HERE).

(LIST ANY SPECIAL METHODS OR PROCEDURES TO BE FOLLOWED).

(INCLUDE REQUEST FOR NOTIFICATION OF TIME AND PLACE FOR EXAMINATION OF WITNESSES/DOCUMENTS BEFORE THE COURT IN THE RECEIVING STATE HERE).

RECIPROCITY

THE REQUESTING COURT SHOULD INCLUDE A STATEMENT EXPRESSING A WILLINGNESS TO PROVIDE SIMILAR ASSISTANCE TO JUDICIAL AUTHORITIES OF THE RECEIVING STATE.

REIMBURSEMENT FOR COSTS

THE REQUESTING COURT SHOULD INCLUDE A STATEMENT EXPRESSING A WILLINGNESS TO REIMBURSE THE JUDICIAL AUTHORITIES OF THE RECEIVING STATE FOR COSTS INCURRED IN EXECUTING THE REQUESTING COURT'S LETTER ROGATORY.

*1051 SIGNATURE OF REQUESTING JUDGE
TYPED NAME OF REQUESTING JUDGE
NAME OF REQUESTING COURT
CITY, STATE, COUNTRY

DATE

(SEAL OF COURT)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit H

Westlaw.

FEDPROF § 23:261                                                    Page 1

8 Fed. Proc. Forms § 23:261

Federal Procedural Forms
Database updated July 2006

Chapter 23. Discovery and Depositions
II. Depositions
C. Persons Before Whom Depositions May be Taken; Depositions Taken Abroad
2. Procedural Forms
c. Letter Rogatory or Letter of Request for Deposition in Foreign Country

Summary Correlation Table

### § 23:261. Letter rogatory--For production of documents by, and deposition of, named witness in foreign country [Fed R Civ P Rule 28(b)]

[Caption, see § 23:255]

### LETTER ROGATORY

United States District Court, _____ District of _____ to the Appropriate Judicial Authority in _____ *[foreign country]*, Greetings:

WHEREAS, a certain action for _____ *[describe basis of action]* is pending in our District Court for the _____ District of _____, in which _____ *[names of plaintiffs]* are plaintiffs and _____ *[names of defendants]* are defendants, and it has been suggested to us that justice cannot be completely done between the parties without obtaining the testimony, for use at trial, of _____ *[name of witness]*, who does business at _____ *[address]* located within your jurisdiction; and

WHEREAS, the United States District Court, _____ District of _____ has jurisdiction to adjudicate the controversy pending before it, has the power to compel the attendance of witnesses and the production of documents, and is empowered to direct the taking of testimony both inside and outside of its jurisdiction; and

WHEREAS, _____ *[plaintiffs]*, by their counsel of record, have submitted an affidavit that: (i) they intend to use the testimony to be taken and/or the documents to be produced by offering them in evidence at the trial of the above-identified action; and (ii) the testimony and documents are not to be used only for a discovery purpose or to support the initiation of a foreign proceeding; and

WHEREAS, the admissibility of the offer in evidence of such testimony and documents will be ruled upon by this court at the trial; and

WHEREAS, _____ *[plaintiffs]*, contend in the action pending before us that _____ *[describe allegations relevant to testimony and documents sought]*; and

WHEREAS, the evidence sought from _____ *[witness]* is relevant to the matter now pending before this court concerning _____ *[describe matter]*; and

WHEREAS, _____ *[plaintiffs]* seek to obtain the documents described in the attached Appendix A;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and
WHEREAS, this District Court has issued this Letter Rogatory with the attached document request in Appendix A upon _____ *[witness]*; and while this District Court would consider, in the absence of any specific objections, the information sought by this Letter Rogatory to be within the parameters of Fed R Civ P Rule 26, this District Court has left the scope of testimony and documents to be produced to be determined by the appropriate court in _____ *[foreign country]*; and
WHEREAS, the evidence is required in order that a just and speedy trial in this matter may ensue and is necessary in the interests of justice to enable this District Court to determine the issues pending before it; and
WHEREAS, according to _____ *[plaintiffs]*, the evidence sought may be otherwise unavailable from any source within the United States of America.
WE, THEREFORE, REQUEST that in the interest of justice, you cause, by your proper and usual process, _____ *[witness]* to appear before you or some competent officer by you for that purpose authorized, at a time and place by you to be determined, and to bring with _____ */him or her]* all books, papers, or other articles as described in Appendix A attached, and to then and there make answer on oath (or solemn affirmation) the questions and interrogatories to be propounded by counsel by the respective parties, and that you will cause such testimony to be reduced to writing, and thereafter to be duly signed by the witness under oath or affirmation and such books, papers, or other articles that the witness may produce or identify be marked as Plaintiffs' Exhibits and that you will thereafter return the testimony to us under cover duly sealed and addressed to the Clerk of the United States District Court for the _____ District of _____, _____ *[address]*, and we shall be ready and willing to do the same for you in a similar case when required.
WITNESS, Honorable _____, Judge of the United States District Court for the _____ District of _____, this _____ day of _____ *[month]*, _____ *[year]*.


By:_____
CLERK




UNITED STATES OF AMERICA
_____ DISTRICT OF _____
    I, _____, Judge of the United States District Court in and for the _____ District of _____, do certify that _____, whose signature appears on the attached Letter Rogatory, was on the date stated the Clerk of the United States District Court in and for the _____ District of _____; that the official acts and doings of the Clerk are entitled to full faith and credit; and that the testation to the Letter Rogatory is in due form of law. I further testify that the seal attached to the Letter Rogatory is the seal of this Court.
    WITNESS my hand and seal of this Court in the City of _____, this _____ day of _____ *[month]*, _____ *[year]*.



_____

_____ UNITED STATES DISTRICT JUDGE


UNITED STATES OF AMERICA
_____ DISTRICT OF _____
    I, _____, Clerk in and for the United States District Court for the _____ District of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FEDPROF § 23:261                                                                                          Page 3

8 Fed. Proc. Forms § 23:261

_____, do certify that _____, whose name is signed to the accompanying papers, is now, and was at the time of signing the names, a United States District Judge in and for the _____ District of _____.

IN WITNESS WHEREOF, I have set the seal of this District Court at the City of _____, in the _____ District of _____, on this _____ day of _____ *[month]*, _____ *[year]*.


_____
Clerk

[Attach Appendix]

**Notes**

(See also notes in § 23:255)

**Editor's Notes**

This form was adapted from the pleadings in Philan Ins. Ltd. v. Frank B. Hall & Co., Inc., 138 F.R.D. 45 (S.D.N.Y. 1991).

© 2006 Thomson/West

FEDPROF § 23:261

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit I

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| INNOVATIVE PILEDRIVING PRODUCTS, LLC and HERCULES MACHINERY CORPORATION, INC., | ) ) ) ) |
| Plaintiffs/Counterclaim Defendants, | ) ) |
| v. | )   CASE: 1:04-CV-453 ) |
| UNISTO OY, YRJO RAUNISTO and AIRI RAUNISTO, | ) ) ) |
| Defendants/Counterclaimants. | ) ) |

**LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE IN CIVIL OR COMMERCIAL MATTERS**

To:     Finland Ministry of Justice
        PO Box 25
        Helsinki, FI-00023

The United States of America District Court for the Northern District of the State of Indiana, the City of Fort Wayne Division presents its compliments to the District Court of Tampere, Finland, and requests international judicial assistance to obtain evidence to be used in a civil proceeding before this Court in the above captioned matter. A trial on this matter is scheduled at present for March 7, 2006 in Fort Wayne, Indiana, United States of America.

The Court requests the assistance described herein as necessary in the interests of justice.

The assistance requested is that the District Court of Tempere compel the below named company to produce documents.

| Name: | Novatron Oy |
| --- | --- |
| Nationality: | a Finland Corporation |
| Address: | Juvankatu 6 |
| | 33710 Tampere, Finland |

**The documents requested to be produced:**

1. **All sales information, price lists and invoices for all parts or products sold by Novatron Oy or any of its subsidiaries to Unisto Oy from 1998 to 2001; and**

2. **All correspondence and/or agreements between Novatron Oy and Unisto Oy regarding steering mechanisms from 1998 to 2001.**

The nature and purpose of the proceedings and summary of the facts are as follows:

Plaintiffs and Defendants are involved in a lawsuit regarding the alleged breach of certain agreements between the parties. One such alleged breach is that Defendants overcharged Plaintiffs for machinery parts which Defendants had agreed to supply to Plaintiffs at cost/wholesale prices. Defendants purchased said parts from Novatron Oy.

This request for documents is made in accordance with United States of America Federal Rules of Civil Procedure 34 and 45.

The recipient of this request is entitled to security against damages or payment of damages resulting from this request. The recipient may respond to this request in any of the following ways:

1. By submitting to its terms;

2. By proposing different terms;

2

3. By objecting specifically or generally to the request, said objection to be evidenced by the service of a written response upon the Plaintiffs' attorney within thirty (30) days; or

4. By moving to quash as permitted by United States of America Federal Rules of Civil Procedure 45(c).

This Court, on behalf of the attorneys for Plaintiffs in this action, requests that copies the requested documents be sent to them at

> THEISEN BOWERS & BRADY, LLC
> 810 South Calhoun Street
> Suite 200
> Fort Wayne, Indiana, USA 46802

In the alternative, if copies of the requested documents are not able to be sent to attorneys for Plaintiffs, this Court requests notification of a time and place for the examination of the requested documents before the District Court of Tampere.

This Court, on behalf of the attorneys for Plaintiffs, informs the District Court of Tampere that they have secured the assistance of local counsel in Tampere who is available to assist the Court if needed. The contact information for local counsel is as follows:

> Mr. Vesa Turkki
> TURKKI KOKKO HELIÖ LTD
> Pyhäjärvenkatu 5B
> 33200 Tampere, Finland
> Tel: +358 3 3138 1900
> Fax: +358 3 3138 1910

This Court is willing to provide similar assistance to the District Court of Tampere, Finland should it be requested.

This Court, on behalf of the attorneys for Plaintiffs in this action, assures the District Court of Tampere that the attorneys for Plaintiffs will reimburse the District Court of Tampere for the costs incurred in executing this Letter of Request for Judicial Assistance.

This Court, on behalf of the attorneys for Plaintiffs in this action, assures the District Court of Tampere that the attorneys for Plaintiffs will reimburse Novatron Oy for the reasonable cost of producing the requested documents to the attorneys for Plaintiffs.

Respectfully submitted,

S/Theresa L. Springmann

Theresa L. Springmann, Judge
United States of America District Court
for the Northern District of the State of Indiana
City of Fort Wayne Division

Date: _Sept. 14, 2005_

(Seal of Court)

4

# Exhibit J

**FILED**

FEB - 3 2005

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, in its capacity as Trustee of Holders of 3 3/4% Convertible Secured Notes under Indenture Dated as of November 21, 2001, | Civil Action No.: 04-495 |
| Plaintiff, | **REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS: LETTER ROGATORY** |
| v. | |
| RIVERSTONE NETWORKS, INC., a Delaware Corporation, | Honorable James A. Ware |
| Defendant. | |

REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS: LETTER ROGATORY

**REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO
THE HAGUE CONVENTION OF 18 MARCH 1970 ON TAKING OF EVIDENCE
ABROAD IN CIVIL OR COMMERCIAL MATTERS**

The United States District Court for the Northern District of California presents its

compliments to the appropriate judicial authority of the Cayman Islands, and requests

international judicial assistance to obtain evidence to be used in a civil proceeding before

this court in the above captioned matter. A hearing on this matter is scheduled at present for

March 28, 2005 in San Jose, California, United States.

The court requests the assistance described herein as necessary in the interests of

justice. The assistance requested is that the appropriate judicial authority of the Cayman

Islands compel the below named individuals to produce documents.

Section I.

1.    Sender: Office of the Clerk, United States District Court for the Northern

District of California, 280 South First Street, San Jose, California 95113, U.S.A., Tel:

(408) 535-5363

2.    Central Authority in Requested State: His Excellency the Governor, Cayman

Islands, 4th Floor, Government Administration Building, George Town, Grand Cayman,

Cayman Islands.

3.    Person to whom the executed request is to be returned: Riverstone Networks,

Inc., c/o Carol Lynn Thompson, Heller Ehrman White & McAuliffe LLP, 333 Bush Street,

San Francisco, California 94104., U.S.A., Tel: (415) 772-6000.

Section II.

4.    In conformity with Article 3 of the Convention, the undersigned applicant has

the honour to submit the following request:

5.    a. Requesting judicial authority: United States District Court for the

Northern District of California, 280 South First Street, San Jose, California 95113

b. To the competent authority of: The Government of the Cayman Islands.

6.    Names and addresses of the parties and their representatives:

a. Plaintiff: U.S. National Bank Association, c/o Gregory Long, Sheppard

2

REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF
18 MARCH 1970 ON TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS: LETTER
ROGATORY

1    Mullin Richter & Hampton, 333 South Hope Street, 48th Floor, Los Angeles, California

2    90071.

3    　　　　　b. Defendant:  Riverstone Networks, Inc., c/o Carol Lynn Thompson, Heller

4    Ehrman White & McAuliffe LLP, 333 Bush Street, San Francisco, California  94104.

5    　　　　7.　　Nature and purpose of the proceedings and summary of the facts:  This is a

6    civil suit involving a dispute regarding the terms of an Indenture executed in connection

7    with the issuance of over $130 million in unsecured notes.  Plaintiff U.S. Bank N.A. ("US

8    Bank") is the Indenture Trustee, and defendant Riverstone Networks, Inc. ("Riverstone")

9    issued the notes. U.S. Bank claims that Riverstone breached the Indenture by not filing

10    certain reports with the Securities and Exchange Commission and not providing those

11    reports to the Trustee.  As a result, U.S. Bank declared a default and seeks to accelerate

12    repayment of the principal on the notes  (in the amount of $131,750,000), as well as interest

13    and liquidated damages.  In doing so, U.S. Bank acted at the direction of two majority

14    noteholders, Highbridge International LLC and MacKay Shields LLC.  Defendant

15    Riverstone denies that it breached the Indenture and has asserted a number of defenses to

16    the claim.

17    　　　　8.　　Evidence to be obtained or other judicial act to be performed:  It is requested

18    that a Cayman Islands judicial authority compel the party identified in paragraph 9 to copy

19    and produce the documents listed in paragraph 11.

20    　　　　Section III.

21    　　　　9.　　Identity and address of any person to be examined:  Custodian of Records,

22    Highbridge International LLC, c/o Maples & Calder, 309 Ugland House, George Town,

23    Grand Cayman, Cayman Islands.

24    　　　　10.　　Questions to be put to the person to be examined or statement of the subject

25    matter about which he is to be examined:  Not applicable

26    　　　　11.　　Documents or other property to be inspected:  Copies of the following

27    documents which are relevant to a number of issues underlying the Trustee's claim and

28    Riverstone's defenses, including whether the Trustee and majority noteholders acted

3

1    properly under the terms of the Indenture in declaring a default and accelerating the

2    indebtedness.  Please be advised that the United States District Court for the Northern

3    District of California has reviewed these requests for relevance to the pending proceeding.

4         a.  All documents relating to or concerning the decision by Highbridge

5    International LLC to purchase the notes, namely the notes in the outstanding principal

6    balance of $131,750,000 issued by Riverstone on or about November 21, 2001, due 2006.

7         b.  All documents relating to or concerning the purchase by Highbridge

8    International LLC of the notes, the notes in the outstanding principal balance of

9    $131,750,000 issued by Riverstone on or about November 21, 2001, due 2006.

10        c.  All documents constituting or relating to communications with U.S. Bank

11   relating to the notes, namely the notes in the outstanding principal balance of $131,750,000

12   issued by Riverstone on or about November 21, 2001, due 2006

13        d.  All documents constituting or relating to communications with U.S. Bank

14   relating to the declaration of a default.

15        e.  All documents relating to Riverstone's financial condition and/or ability to

16   repay the notes, namely the notes in the outstanding principal balance of $131,750,000

17   issued by Riverstone on or about November 21, 2001, due 2006.

18        f.  All documents relating to or concerning any agreement between U.S. Bank

19   and Highbridge International LLC relating to the filing of this lawsuit against Riverstone,

20   captioned *U.S. Bank National Association v. Riverstone Networks, Inc.*, Case No.: C04-

21   00495 (JW) (N.D. California).

22        g.  All documents constituting, relating to or concerning any communications

23   between Highbridge International LLC and Riverstone.

24        h.  All documents constituting, relating to or concerning any communications

25   between Highbridge International LLC and MacKay Shields LLC about Riverstone or the

26   notes, namely the notes in the outstanding principal balance of $131,750,000 issued by

27   Riverstone on or about November 21, 2001, due 2006.

28        i.  All documents constituting, relating to or concerning any communications

4

REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF
18 MARCH 1970 ON TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS: LETTER
ROGATORY

1   between Highbridge International LLC and the investors who purchased the Notes in the

2   outstanding principal balance of $131,750,000 issued by Riverstone on or about November

3   21, 2001 that refer or relate to Riverstone and/or the notes, namely the notes in the

4   outstanding principal balance of $131,750,000 issued by Riverstone on or about November

5   21, 2001, due 2006.

6       12.    Any requirement that the evidence be given on oath or affirmation and any

7   specific form to be used:  Not applicable.

8       13.    Special method or procedure to be followed:  It is requested that the custodian

9   of records, or someone who can verify that Highbridge has produced all documents

10   responsive to the categories listed in paragraph 11, sign an oath attesting thereto.  It is

11   further requested that Highbridge send these documents to Riverstone Networks, Inc., c/o

12   Carol Lynn Thompson, Heller Ehrman White & McAuliffe LLP, 333 Bush Street, San

13   Francisco, California  94104., U.S.A., Tel:  (415) 772-6000 by March 15, 2005.

14       14.    Request for notification of the time and place for the execution of the Request

15   and identity and address of any person to be notified:

16       a.    Riverstone Networks, Inc., Representative: Carol Lynn Thompson, Heller

17   Ehrman White & McAuliffe LLP, 333 Bush Street, San Francisco, California  94104;

18       b.    U.S. National Bank Association, Representative:  Gregory Long, Sheppard

19   Mullin Richter & Hampton, 333 South Hope Street, 48th Floor, Los Angeles, California

20   90071.

21       15.    Request for attendance or participation of judicial personnel of the requesting

22   authority at the execution of the Letter of Request:  None.

23       16.    Specification of privilege or duty to refuse to give evidence under the law of

24   the State of origin:  None.

25       17.    The fees and costs incurred which are reimbursable under the second

26   paragraph of Article 14 or under Article 26 of the Convention will be borne by:  Riverstone

27   Networks, Inc., c/o Heller Ehrman White & McAuliffe LLP, 333 Bush Street, San

28   Francisco, California  94104.

REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF
18 MARCH 1970 ON TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS: LETTER
ROGATORY

Section IV.

18.    Date of Request:    February 3, 2005.

19.    Signature and seal of the requesting authority:

_____
Hon. Howard R. Lloyd
United States Magistrate Judge

**ECF DOCUMENT**

I hereby attest and certify this is a printed copy of a
document which was electronically filed with the United States
District Court for the Northern District of California.

Date Filed: **FEB 0 3 2005**

RICHARD W. WIEKING, Clerk

By: _____, Deputy Clerk

6

REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF
18 MARCH 1970 ON TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS: LETTER
ROGATORY

# Exhibit K

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

STRATEGIC VALUE MASTER FUND,
LTD. and MAN MAC 3 LIMITED,

                            Plaintiffs,

       v.

CARGILL FINANCIAL SERVICES
CORPORATION,

                          Defendant.

05 Civ. 8546 (PKL) (MHD)

**REQUEST OF CARGILL FINACIAL
SERVICES CORPORATION FOR
INTERNATIONAL JUDICIAL
ASSISTANCE TO TAKE EVIDENCE
ABROAD OF NORTHERN ELECTRIC
GENERATION (TPL) LIMITED**

THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT

OF NEW YORK, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New

York, NY 10007-1312, presents its compliments to the Foreign and Commonwealth Office,

London SW1A 2AL, United Kingdom and pursuant to the Evidence (Proceedings in other

Jurisdictions) Act 1975 and Part 34 of the English Civil Procedure Rules requests international

judicial assistance to issue orders of subpoena duces tecum to require a witness to appear for

questioning and to produce documents so that evidence may be obtained for a civil proceeding in

the above-captioned action which is pending before this Court in which Strategic Value Master

Fund, Ltd. and Man Mac 3 Limited are the plaintiffs, and Cargill Financial Services Corporation

is the defendant. Counsel for plaintiffs is Boies Schiller & Flexner LLP, 570 Lexington Avenue,

16th Floor, New York, New York, 10022; and Counsel for defendant is Faegre & Benson LLP,

2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, Minnesota, 55402.

        Strategic Value Master Fund, Ltd. and Man Mac 3 Limited have alleged

that Cargill Financial Services Corporation breached a contract between the parties pursuant to

which the Defendant was obligated to transfer its equity interest in an English company called

Teesside Power Limited in exchange for valuable consideration. Documents in the possession of Northern Electric Generation (TPL) Limited, a company resident within your jurisdiction, would, at trial, aid in the establishment of the facts surrounding said breach of contract claim.

      WE THEREFORE REQUEST that in the interests of justice you issue an order by your proper and usual process to compel the production of documents and the appearance for deposition as described below. This Court requests the assistance described herein as necessary in the interests of justice. The assistance requested is that the appropriate judicial authority of the United Kingdom compel:

(I)     the appearance of the below-named individual, a representative of Northern Electric Generation (TPL) Limited to provide testimony:

    Phillip Eric Connor ("the Witness")

    Citizen of the United Kingdom,

    Lloyds Court, 78 Grey Street, Newcastle upon Tyne, NE1 6AF, England; and

(II)    the disclosure of documents and other evidentiary items (which are understood to be in the possession of either Mr. Connor or Northern Electric Generation (TPL) Limited, whose address is Lloyds Court, 78 Grey Street, Newcastle upon Tyne, NE1 6AF, England).

    The evidence to be produced is the following:

1.    All correspondence, whether by letter, fax or e-mail, passing between Phillip Eric Connor, Carol Ann Morgan, or Stephen John Lockwood on behalf of Northern Electric Generation (TPL) Limited and Victor Khosla or Jason Clarke from February 1, 2005 through December 31, 2005, relating to a proposed sale of equity of Teesside Power Limited.

2.      All correspondence, whether by letter, fax or e-mail, passing between Simon

Mansfield, James Ganley, or Sebastien Bourgeois of Goldman Sachs International and

Phillip Eric Connor, Carol Ann Morgan, or Stephen John Lockwood on behalf of

Northern Electric Generation (TPL) Limited from February 1, 2005 through December

31, 2005, relating to a proposed sale of equity of Teesside Power Limited.

3.      All correspondence, whether by letter, fax or e-mail, passing between Simon

Mullaly, Jason Granite, or Mubashir Mukadam of Deutsche Bank AG and Phillip Eric

Connor, Carol Ann Morgan, or Stephen John Lockwood on behalf of Northern Electric

Generation (TPL) Limited from February 1, 2005 through December 31, 2005, relating to

a proposed sale of equity of Teesside Power Limited.

4.      All correspondence, whether by letter, fax or e-mail, passing between John

Brice or Gregory Belonogoff of Cargill Financial Markets, PLC and Phillip Eric

Connor, Carol Ann Morgan, or Stephen John Lockwood on behalf of Northern

Electric Generation (TPL) Limited from February 1, 2005 through December 31,

2005, relating to a proposed sale of equity of Teesside Power Limited.

5.      All correspondence, whether by letter, fax or e-mail passing between Michael

Guy, Dean Hudson or Kevin Lydon of Credit Suisse First Boston and Phillip Eric

Connor, Carol Ann Morgan, or Stephen John Lockwood on behalf of Northern Electric

Generation (TPL) Limited from February 1, 2005 through December 31, 2005, relating to

a proposed sale of equity of Teesside Power Limited.

6.      All correspondence, whether by letter, fax or e-mail passing between Steven

Zander or Juan Ibinarriaga of Merrill Lynch International and Phillip Eric Connor, Carol

Ann Morgan, or Stephen John Lockwood on behalf of Northern Electric Generation

(TPL) Limited from February 1, 2005 through December 31, 2005, relating to a proposed sale of equity of Teesside Power Limited.

7.      All estimates or analyses of the value of the equity shares of Teesside Power Limited prepared after February 1, 2005.

Cargill Financial Services Corporation further requests that all original documents provided pursuant to this process be produced for inspection by the parties at the offices of Defendant's attorneys, Faegre & Benson, at 7 Pilgrim Street, London EC4V 6LB, England or some other place mutually agreeable to the parties, before the deposition of the witness and that a true and correct copy of any such document be provided to the parties, as either party may request, and at that party's expense. We further request that you issue your decision on this Request and give notice of the time and place for examination of the Witness and the production of documents, to this Honorable Court, and to Counsel for Cargill Financial Services Corporation and Counsel for plaintiffs as indicated above.

We further request that you make Orders for the examination under oath, for the appointment of an Examiner to oversee the examination of the Witness at a place and time to be determined by the Examiner, that counsel for plaintiffs and defendant be permitted to question the Witness, and that the examination be transcribed and recorded on videotape.

The examination of the Witness and production of documents sought herein is commensurate with the Laws of the United States of America, including the Federal Rules of Civil Procedure operative in this lawsuit, as are in effect for any person within the jurisdiction of this Court. It is anticipated and expected that this Court would extend the same consideration to like requests made to this Court as sought herein, and be willing and ready to do the same thing

sought herein for you, when required, for a person within our jurisdiction, consistent with due process and the law.

Cargill Financial Services Corporation has agreed to pay and undertake to reimburse any costs and expenses associated with this Request incurred by you in executing the same, as well as the reasonable costs and expenses incurred by Northern Electric Generation (TPL) Limited in compliance with the Order issued by you to the extent permitted or allowed under your law and procedure, or which you otherwise deem required under the circumstances.

WITNESS, Hon. *Michael H. Dolinger,* U.S. Magistrate Judge of the District Court of the United States for the Southern District of New York, this *14th* day of *February, 2006* .

Clerk of the United States District Court for the Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

I, _Michael H. Dolinger_, U.S. Magistrate Judge of the United States

District Court in and for the Southern District of New York, do hereby certify that

_J. Michael McMahon_, whose signature is attached to the letter hereto annexed, was at the date

thereof the Clerk of the United States District Court in and for the Southern District of New

York; that the official acts and doings of said Clerk are entitled to full faith and credit; and that

the attestation to said letter of request is in due form of law. I further certify that the seal

attached to said letter of request is the seal of this Court.

WITNESS my hand and seal of said Court in the City of New York on this

_14th_ day of _February_ in the year of our Lord _2006_.

_____
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

I, _J. Michael McMahon_ , Clerk in and for the United States District

Court for the Southern District of New York, do hereby certify that Honorable

_Michael H. Dolinger_ , whose name is signed to the accompanying papers, is now, and was at

the time of signing same, a United States Magistrate Judge in and for the Southern District

of New York.

　　　　IN WITNESS WHEREOF, I have hereunto set the seal of this District Court at the City

of New York in the Southern District of New York, this _14th_ day of _February_ in the year of our

Lord _2006_ .

_J. Michael McMahon_

Clerk of the Court

# Exhibit L

**F I L E D**
Clerk's ~~office~~
USDC
Date 7-27-90
By ~~mc~~
Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
DBMA CONSULTANTS LIMITED,           )
          Plaintiff                 )
                                    )     PLAINTIFF'S
v.                                  )     PROPOSED
                                    )     LETTER ROGATORY
COMPUTER ASSOCIATES                 )
INTERNATIONAL, INC. and             )
UCCEL CORPORATION,                  )
          Defendants                )
_____    )

TO THE SUPREME COURT OF NEW SOUTH WALES, AUSTRALIA

The United Sates District Court for the District of
Massachusetts, United States of America, respectfully requests
your assistance in ordering the witness identified herein to
appear in the New South Wales Supreme Court and to respond under
oath to questions set forth in this Letter Rogatory.  The
individual is:

          Mr. Paul Butler
          Unite 3
          107 St. George Crescent
          Drummoyne, New South Wales 2047

The discovery requested herein is in aid of a federal action
in which a Hong Kong corporation, DBMS Consultants Limited seeks
damages from a United States corporation, Computer Associates
International for, among other things, breach of a distribution
agreement between the two companies.

The proceedings in New South Wales are to be commenced on the
District Court's behalf by Mr. James William Dwyer, a partner in
the firm of Allen, Allen & Hemsley, MLC Centre, 19-29 Martin
Place, Sydney, NSW 2000.

65

The questions which this Honorable Court requests be directed to Mr. Butler are as follows:

1.   What is your full name, residential address, and business address?

2.   What is your present occupation and name of your employer?

3.   Are you presently affiliated in any way with Computer Associates, Inc. (hereafter referred to as "CA") or UCCEL Corporation (hereafter referred to as "UCCEL")?

4.   If your answer to the preceding question is anything other than "No", please respond to the following:

    a)   What is the nature of the affiliation?

    b)   How long has this affiliation existed?

5.   With regard to your prior employment at CA, please state:

        a)   the positions you held at CA;

        b)   the dates you held each position;

        c)   your responsibilities in each position.

6.   In 1987, what was your position at Computer Associates?

7.   What were your responsibilities in the position described in the preceding question.

8.   As of April of 1987, were you acquainted with an individual named David Wardle?

9.   When did you first become acquainted with David Wardle?

10.  What were the circumstances under which you became acquainted with David Wardle?

-2-

11.  When did you first become familiar with a Hong Kong software distributor known as DBMS Consultants Limited (hereafter referred to as "DBMS")?

12.  What were the circumstances under which you became familiar with DBMS?

13.  Did you ever receive or review a copy of the telex attached hereto as Exhibit A?

14.  If your answer to the preceding question is anything other than "No", when and under what circumstances did you receive the telex attached hereto as Exhibit A?

15.  What, if any, response did you make or steps did you take as a result of the sixth numbered paragraph on Exhibit A.

16.  At any time, did you discuss, or correspond with anyone from CA regarding, invoicing DBMS for moneys due to CA?

17.  If your answer to the preceding question is anything other than "No", please answer the following:

a)  With whom did you have each such discussion or correspondence?

b)  When did each such discussion or correspondence occur?

c)  To the best of your memory, what was said or written by each party to such discussion or correspondence?

d)  What, if anything, did you do as a result of such discussion or correspondence?

-3-

18.   Did David Wardle, or any other representative of CA, ever inform you that DBMS was to be invoiced for marketing fees against actual sales?

19.   If your answer to the preceding question is anything other than "No", please answer the following:

    a)   With whom did have each such discussion or correspondence?

    b)   When did each such discussion or correspondence occur?

    c)   To the best of your memory, what was said or written by each party to such discussion or correspondence?

    d)   What was the result, if any, of such discussion or correspondence?

20.   Did you prepare the Invoice attached hereto as Exhibit B?

21.   If you prepared the Invoice attached hereto as Exhibit B, did you prepare it in or around May 1987?

22.   If the answer to the preceding question is "No", when did you prepare the Invoice?

23.   Did you send the Invoice attached hereto as Exhibit B to DBMS, or cause it to be sent to DBMS?

24.   If the answer to the preceding question is anything other than "No", please answer the following:

    a)   To whom did you direct the Invoice?

    b)   To what address did you send the Invoice?

    c)   When did you send the Invoice?

25.  If you prepared the invoice attached hereto as Exhibit B, was it your intention to invoice DBMS for marketing fees against its actual sales for the month of April 1987?

26.  Did you prepare the Invoice attached hereto as Exhibit C?

27.  If you prepared the Invoice attached hereto as Exhibit C did you prepare it in or around June 1987?

28.  If the answer to the preceding question is "No", when did you prepare the Invoice?

29.  Did you send the invoice attached hereto as Exhibit C to DBMS, or cause it to be sent to DBMS?

30.  If the answer to the preceding question is anything other than "No", please answer the following:

    a)    To whom did you send the Invoice?

    b)    To what address did you send the  Invoice?

    c)    When did you send the Invoice?

31.  If you prepared the invoice attached hereto as Exhibit C, was it your intention to invoice DBMS for marketing fees against its actual sales for the month of May 1987?

32.  Did you prepare the Invoice attached hereto as Exhibit D?

33.  If you prepared the Invoice attached hereto as Exhibit D, did you prepare it in or around July 1987?

34.  If the answer to the preceding question is "No", when did you prepare the Invoice?

-5-

35.  Did you send the Invoice attached hereto as Exhibit D to DBMS, or cause it to be sent to DBMS?

36.  If the answer to the preceding question is anything other than "No", please answer the following:

    a)  To whom did you send the Invoice?

    b)  To what address did you send the Invoice?

    c)  When did you send the Invoice?

37.  If you prepared the invoice attached hereto as Exhibit D, was it your intention to invoice DBMS for marketing fees against its actual sales for the month of June 1987?

38.  Did you invoice DBMS in manner set forth in Exhibits B, C and D in accordance with instructions received from David Wardle, or any other representative of CA?

39.  If your answer to the preceding interrogatory is anything other an "No", please answer the following:

    a)  In detail, please describe the instructions you received regarding the invoicing of DBMS.

    b)  From whom did you receive these instructions?

    c)  When did you receive these instructions?

40.  Why and under what circumstances did you prepare the invoices attached hereto as Exhibit B, D and D?

41.  Have you discussed or corresponded about the subject matter of this deposition with anyone before answering the questions posed to you today?

42.  If your answer to the preceding question is other than "No", state:

a)    the identity of each person with whom you spoke or corresponded;

b)    when each discussion or communication occurred;

c)    what each person said or wrote;

d)    what documents you reviewed;

e)    whether and under what circumstances you were shown or read all or any part of these questions.

ANSWERS RECORDED UNDER OATH FOR THE SUPREME COURT OF NEW SOUTH

WALES, AUSTRALIA.

By:    _____

Dated:    _____

−7−

# Exhibit M

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case Nos.:  05-40151-FDS<br>06-40130-FDS |

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTER ROGATORY)

The United States District Court for the District of Massachusetts presents its compliments to the appropriate judicial authority of Ireland, and requests international judicial assistance to obtain evidence to be used in a civil proceeding before this Court in the above-captioned matter.

This Court requests the assistance described herein as necessary in the interests of justice. The assistance requested is that the appropriate judicial authority of Ireland compel the appearance of Samuel Mahoney to give testimony and produce documents. Based upon information submitted to this court, Samuel Mahoney appears to be a material witness who has knowledge of the facts relating to the issues in this case.

### Witness to Be Served

Samuel Mahoney
123 Howth Road                or        43 Ailesbury Road
Dublin 3                                         Dublin 4
Ireland                                           Ireland

## Facts

The parties are involved in a lawsuit regarding whether the proposed adjustments to the partnership items of Fidelity International Currency Advisor A Fund, L.L.C., ("FICA A Fund") as reported on FICA A Fund's federal income tax returns for the taxable years ending December 31, 2001 and December 31, 2002 by the United States taxing authority were proper under United States tax law.  Also at issue are whether the penalties asserted by the United States taxing authority were proper under United States tax law.  One of the partners of FICA A Fund during the 2001 and 2002 taxable years was Samuel Mahoney, an Irish national.  Mr. Mahoney continues to be a member of FICA A Fund.

# Exhibit N

Westlaw.

[1998] I.L.Pr. 170

Page 1

1997 WL 1105492 (CA (Civ Div)), [1998] I.L.Pr. 170

**(Cite as: [1998] I.L.Pr. 170)**

C

\*170 The State of Minnesota and Blue Cross and
Blue Shield of Minnesota v.
Philip Morris Incorporated and Others

Before the English Court of Appeal

CA

(Lord Woolf M.R., Peter Gibson, Otton L.JJ.)

30 July 1997

On appeal from the High Court, Queen's Bench
Division

(Owen J.)

[FN1]

**Evidence (Proceedings in Other Jurisdictions)
Act 1975. Letters of Request. Requirements.**

The approach of this court will be to seek to assist
a foreign court wherever it is appropriate. For that
reason the courts will seek to give effect to a Letter
of Request wherever this is practical. Comity
between jurisdictions demands no different an
approach. The court of request should not be astute
to examine the issues in the action and the
circumstances of the case with excessive
particularity for the purpose of determining in
advance whether the evidence of that person will be
relevant and admissible. That is essentially a matter
for the requesting court. When the court has to
choose between either giving effect to a Letter of
Request or refusing to do so, it will take into
account any limitations, corrections or conditions
which the party seeking the order is willing for the
court to take into account. It will, if appropriate, be
prepared to give the request an amended effect.
However, notwithstanding that, it is important to

bear in mind that fishing cannot be permitted as part
of a request. Furthermore, because of the need to
hold the balance between the requesting court and
the witnesses who are to be examined, if the request
is given effect, the court will not allow uncertain,
vague or other objectionable requests to be
implemented. A witness is entitled to know within
reasonable limits the matters about which he or she
is to be examined. Although there is the possibility
of matters coming back to the court for further
rulings, in general the court has to take into account
that once it makes an order it ceases to have any
control of the examination. [17]-[18], [71]

FN1 The judgment of Owen J., dated 8 July 1997,
is reported in this issue at p. 159.

The plaintiffs had brought proceedings in
Minnesota against the defendant cigarette
manufacturers. The claim was based on the
healthcare costs that had been incurred in the
treatment of smokers. The basis of the claim against
the defendants was that they had \*171 conspired to
conceal from the public the addictive and dangerous
effects of cigarettes. In the course of the Minnesota
proceedings it was sought to obtain evidence in the
form of oral depositions from certain former
officers of the defendant companies who were
resident in England. Originally the evidence was
sought on the basis of the Minnesota Rules of Civil
Procedure on the assumption that the officers were
within the control of the defendants, and subject to
the jurisdiction of the Minnesota courts. When it
emerged that some of them were no longer under
the control of the defendants, the evidence was
sought by means of a Letter of Request addressed to
the English courts. The witnesses in question
objected to providing evidence in accordance with
the letter of request, arguing that it sought
American-style discovery, that it constituted a
fishing expedition, and that it was too vague and
uncertain in its delimitation of the matters on which
depositions were sought.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1998] I.L.Pr. 170

1997 WL 1105492 (CA (Civ Div)), [1998] I.L.Pr. 170

(Cite as: [1998] I.L.Pr. 170)

At first instance, Owen J. concluded that he could give effect to the Letter of Request by imposing a number of limitations on the matters on which evidence could be sought and the way in which the evidence taking procedure should be conducted. On appeal, however, the Court of Appeal reluctantly took the view that the request lacked adequate specificity and that it could not be made acceptable without a degree of redrafting which it was inappropriate for the requested court to undertake. The request was therefore rejected with a view to its being remitted to the court in the State of origin for redrafting in the light of the comments of the English court.

**Representation**

Stanley Burnton Q.C., instructed by Herbert Smith, appeared for the appellant.

John Cherry Q.C. and Martin Seaward, instructed by Thompsons, appeared for the respondents.

The following cases were referred to in the judgment:

*English courts*

1. Rio Tinto Zinc Corporation v. Westinghouse Electric Corporation [1978] A.C. 547.

2. State of Norway's Application (No. 1), Re [1987] 1 Q.B. 433.

3. Radio Corporation of America v. Rauland Corporation [1956] 1 Q.B. 618.

**JUDGMENT**

Lord WOOLF M.R.:

[1] This is an appeal from a judgment of Owen J., given on 8 July 1997. He ordered four witnesses to attend to give evidence before an examiner pursuant to a Letter of Request of the Honourable Kenneth J. Fitzpatrick, a judge of the District Court in the State of Minnesota.

[2] The judge has the heavy responsibility of managing, and trying, an action between the State of Minnesota, by its Attorney General, and Blue Cross and Blue Shield of Minnesota against a variety of *172 Tobacco companies, including the British-American Tobacco Companies and the associated companies of British-American Tobacco.

[3] The claim is very substantial. If the action succeeds, the damages will obviously be very large indeed. It is hoped that the action will come on for hearing in January next year. In those circumstances, the matter dealt with by Owen J. is urgent and this appeal has therefore been expedited. Having heard very helpful argument from leading counsel on both sides yesterday, we give judgment this morning in order to reduce any delay to a minimum.

[4] The claims, of which we have been provided with copies, are very wide-ranging. They include claims for conspiracy. Owen J. in his judgment, cited from the plaintiffs' skeleton argument which described the claims as:
Including penal damages and other relief ... and based upon enormous cost to the plaintiffs of the care of a large number of people caused by the inhalation of cigarette smoke and the insinuation of nicotine and other substances into their bodies as a result of the deliberate and allegedly unlawful acts of the defendants in conspiring to conceal from the public, by deceit and misrepresentation and suppression, the results of research, the fact that nicotine is addictive and that cigarettes, when used as intended by the defendants, are lethal.
It is further the plaintiffs' case that the defendants, for profit, particularly targeted children and deliberately suppressed the development of a safer cigarette.

[5] The English companies deny that they are amenable to the jurisdiction of the Minnesota court. They also deny knowledge of matters alleged against them and any form of liability.

[6] The witnesses, who are the subject of Owen J.'s order, all held high office at different times in the British-American Tobacco group of companies.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1998] I.L.Pr. 170                                                                                    Page 3

1997 WL 1105492 (CA (Civ Div)), [1998] I.L.Pr. 170

(Cite as: [1998] I.L.Pr. 170)

Owen J.'s order was made under the provisions of the Evidence (Proceedings in Other Jurisdictions) Act 1975. That Act was, in part, to implement the Hague Evidence Convention of 1970. It is necessary to refer to some of the provisions of the Act because they were the centre of submissions which were advanced. Section 1 of the Act, so far as relevant, reads:

Where an application is made to the High Court ... for an order for **evidence** to be obtained in the part of the United Kingdom in which it exercises jurisdiction, and the court is satisfied:

(a) that the application is made in pursuance of a request issued by or on behalf of a court or tribunal ('the requesting court') exercising jurisdiction in any other part of the United Kingdom or in a country or territory outside the United Kingdom; and

(b) that the evidence to which the application relates is to be obtained for the purposes of civil proceedings which either have been *173 instituted before the requesting court or whose institution before that court is contemplated,

the High Court ... shall have the powers conferred on it by the following provisions of this Act.

[7] Mr Burnton Q.C., on behalf of the witnesses, draws attention to the use in section 1 of the word "evidence". Section 2 deals with the power of the United Kingdom court to give effect to an application for assistance. It provides:

Subject to the provisions of this section the High Court ... shall each have power, on any such application as is mentioned in section 1 above, by order to make such provision for obtaining **evidence** in the part of the United Kingdom in which it exercises jurisdiction as may appear to the court to be appropriate for the purpose of giving effect to the request in pursuance of which the application is made.

[8] I draw attention to the fact that it is the English court "giving effect to the request" which is of significance. I then draw attention to subsection (3) which provides:

An order under this section shall not require any particular steps to be taken unless they are steps which can be required to be taken by way of obtaining **evidence** for the purposes of civil proceedings in the court making the order [the English court]; but this subsection shall not preclude the making of an order requiring a person to give testimony (either orally or in writing) otherwise than on oath where this is asked for by the requesting court.

[9] In case of Rio Tinto Zinc Corporation v. Westinghouse Electric Corporation, [FN2] Lord Diplock emphasised that subsection (3) focused on the fact that the legislation in section 2(3) is confined to "direct evidence" for the hearing. In addition to the provisions to which I have already referred, section 3 contains protections for the privilege of witnesses. The Act is implemented, from a procedural point of view, by RSC , Ord. 39. For present purposes it is sufficient if I refer to Ord. 39, r. 5, which provides:

If any person, having been duly summoned by writ of subpoena to attend before the examiner, refuses or fails to attend or refuses to be sworn for the purpose of the examination or to answer any lawful question or produce any document therein, a certificate of his refusal or failure, signed by the examiner, must be filed in the District Registry (if any) in which the cause or matter is proceeding and otherwise in the Central Office, and upon the filing of the certificate the party by whom the attendance of that person was required may apply to the Court for an order requiring that person to attend, or to be sworn or to answer any question or produce any document, as the case may be.

FN2 [1978] A.C. 547.

This rule indicates that the order can be enforced against a witness who refuses to co-operate as a result of the process described in the rule.

[10] Rule 8 deals with the conduct of the examination. Rule 8(2) provides that: *174

The examiner may put any question to any person examined before him as to the meaning of any answer made by that person or as to any matter arising in the course of the examination.

[11] Rule 10 deals with objections. It is important

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 1105492 (CA (Civ Div)), [1998] I.L.Pr. 170

**(Cite as: [1998] I.L.Pr. 170)**

to note under that rule that, in respect of an objection, the examiner is required:
> ... to state to the parties his opinion thereon, and the statement of his opinion must be set out in the deposition or in a statement annexed thereto.

If an objection is taken, the deposition records the objection (the examiner's opinion) which will be transmitted to the requesting court. Ord. 70, r. 6 deals generally with the ability to claim privilege.

[12] If a witness refuses to answer and the procedure indicated is followed, then it seems to me that that would provide this court with an opportunity to determine whether or not the witness was justified in refusing to answer. If, for example, questions were put to a witness, which were outside the purposes permitted by the Act or by the order made by the court, protection could be provided to the witness as a matter of sensible practice. If such difficulties arise, it would be desirable for the examiner, where appropriate, to continue to the end of the examination in order that all the objections which are made to answering any question might be considered by the court, if necessary.

[13] The difficulty in the present case, as in previous cases, arises because of the difference in approach to discovery in this country and the United States. Their discovery procedures are not necessarily the same in all States. But in general in the United States there is a tradition of oral discovery which has never been developed in this country. Rightly or wrongly, we regard oral discovery as a form of discovery which generates unnecessary costs and complexity. There is another difference between the approach to discovery in this country and that in the United States. Generally, there it is possible to get much wider "non party" discovery. That is discovery against those who are not parties to the proceedings.

[14] This is a matter which was alluded to in passages from the speech of Lord Diplock (also by other members of the House), in Re Westinghouse. [FN3] Those passages read as follows:
> The difficulty involved in the application of subsection (3) to proceedings in the United States

courts lies in the fact that the examination for discovery of witnesses who are not parties to the action serves a dual purpose; the ordinary purpose of discovery with the wide line of inquiry which that permits and also the purpose of obtaining in the form of a deposition evidence from the witness which will be admissible at the trial in the event of the witness not being called in person.

FN3 Cited above, at p. 635.

...

The request for the production of documentary evidence by the two RTZ companies must not only satisfy the requirements of subsection (3) which exclude fishing discovery, but also the stricter requirements of subsection (4). Under the procedure of the High Court of England there is *175 no power to order discovery of documents by a person not a party to the action, but such a person can be required by subpoena *duces tecum* to produce documents to the court or, where his evidence is taken before an examiner prior to the trial, at such examination.

[15] The approach to discovery in jurisdictions such as the United States is sometimes categorised unattractively, and perhaps inappropriately, as "fishing" where advocates wish to prevent courts in this country making orders. The meaning of the allegation that an application is a "fishing" application is well-known to practitioners, but is difficult to put into words which adequately describe it. In this jurisdiction it is certainly not limited to cases where there are applications of the sort being considered here. However, in a case which did involve similar issues to those at present under consideration, the question of what constitutes "fishing" was considered by Kerr L.J. in Re State of Norway's Application (No. 1). [FN4] He said [FN5]:
> Although 'fishing' has become a term of art for the purposes of many of our procedural rules dealing with applications for particulars of pleadings, interrogatories and discovery, illustrations of the concept are more easily recognised than defined. It arises in cases where what is sought is not evidence as such, but

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 1105492 (CA (Civ Div)), [1998] I.L.Pr. 170

**(Cite as: [1998] I.L.Pr. 170)**

information which may lead to a line of inquiry which would disclose evidence. It is the search for material in the hope of being able to raise allegations of fact, as opposed to the elicitation of evidence to support allegations of fact, which have been raised bona fide with adequate particularisation. In the present context fishing may occur in two ways. First, the ' evidence' may be sought for a preliminary purpose, such as the process of pre-trial discovery in the United States. The fact that this is clearly impermissible for the purposes of the Act of 1975 is established in the Westinghouse case [1978] A.C. 547, and was equally so held by this court in relation to the Foreign Tribunals Evidence Act 1856 in Radio Corporation of America v. Rauland Corporation [1956] 1 Q.B. 618. This is irrelevant in the present context, since the 'evidence' is required for the trial itself. But fishing is in my view also relevant in another sense in the present context, as McNeill J. rightly indicated. It is perhaps best described as a roving inquiry, by means of the examination and cross-examination of witnesses, which is not designed to establish by means of their evidence allegations of fact which have been raised bona fide with adequate particulars, but to obtain information which may lead to obtaining evidence in general support of a party's case.

FN4 [1987] 1 Q.B. 433.

FN5 At p. 482.

[16] If a court comes to the conclusion in this jurisdiction that an application is a fishing application, then the application will be refused. If, in relation to a request of a court in a foreign jurisdiction, the conclusion of the court is that an application is fishing, then that has a more significant effect. In my judgment, the consequence is that the court does not have the power under the 1975 Act to make an order. It may be that, by curtailing the request the order can be cured. I express no final conclusion but I do regard this general position as a matter of some significance. Its signifance becomes apparent from a helpful *176 article written by Mr Lawrence Collins Q.C., which Mr Burnton adopted as part of his argument before

us. That article clarifies the position and explains the approach which was adopted by this country in relation to the Hague Convention .

[17] That situation apart, the approach of this court and other courts in this jurisdiction will be to seek to assist a foreign court wherever it is appropriate. For that reason the courts will seek to give effect to a Letter of Request wherever this is practical. Comity between jurisdictions demands no different an approach. It is again a matter which was dealt with in the Westinghouse case. I refer to the speech of Lord Wilberforce [FN6] and to the approach of Lord Keith whose words I adopt. He said [FN7]:

In the face of a statement in letters rogatory that a certain person is a necessary witness for the applicant, I am of opinion that the court of request should not be astute to examine the issues in the action and the circumstances of the case with excessive particularity for the purpose of determining in advance whether the evidence of that person will be relevant and admissible. That is essentially a matter for the requesting court. Should it appear necessary to apply some safeguard against an excessively wide-ranging examination, that can be achieved by making the order for examination subject to a suitably worded limitation.

FN6 At p. 612.

FN7 At p. 654.

[18] Because of the general approach, to which I have drawn attention, when the court has to choose between either giving effect to a Letter of Request or refusing to do so, it will take into account any limitations, corrections or conditions which the party seeking the order is willing for the court to take into account. It will, if appropriate, be prepared to give the request an amended effect. However, notwithstanding that, it is important to bear in mind that fishing still cannot be permitted as part of a request. Furthermore, because of the need to hold the balance between the requesting court and the witnesses who are to be examined, if the request is given effect, the court will not allow uncertain, vague or other objectionable requests to be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1998] I.L.Pr. 170                                                                                      Page 6

1997 WL 1105492 (CA (Civ Div)), [1998] I.L.Pr. 170

**(Cite as: [1998] I.L.Pr. 170)**

implemented. A witness is entitled to know within reasonable limits the matters about which he or she is to be examined. Although there is the possibility, to which I have already referred, of matters coming back to the court for further rulings, in general the court has to take into account that once it makes an order it ceases to have any control of the examination.

[19] Owen J. regarded this as a case which was by no means easy to resolve. He took the view that the request lacked "specificity" (his word). He said it was vague, but he also thought that if he imposed a limitation on the order, then he could achieve a situation where it was appropriate to uphold the request. In considering his conclusion, the starting point must be the terms of the Letter of Request.

[20] The Letter of Request starts off by describing the nature of the *177 proceedings in the United States in brief terms. It then sets out the representation of the parties and goes on to state in paragraph 3:

The lawsuit concerns claims made for recovery of health care costs plaintiffs expended resulting from defendants' manufacture, testing and sale of cigarettes and for other monetary and equitable relief. Defendants deny the plaintiffs' claim.

[21] Paragraph 4 identifies the witnesses and indicates their involvement which explains why they are sought to be examined. It says:

It is known that Sir Patrick Sheehy, Dr Ray Thornton, Mr Alan Heard and Dr Lionel C. F. Blackman, in their former employment with defendants BAT Industries Plc, British-American Tobacco Company Limited, and/or BAT (UK & Export) Limited may have obtained information regarding: smoking and health issues relating to tobacco and cigarettes; marketing of cigarettes; scientific research related to smoking and health issues; manipulation of nicotine by defendants BAT Industries Plc, British-American Tobacco Company Limited, and/or BAT (UK & Export) or their subsidiaries and affiliated companies including, but not limited to, [1] defendant Brown & Williamson Tobacco Corporation; [2] the exercise of control by defendants BAT Industries Plc, British-American

Tobacco Company Limited, and/or BAT (UK & Export) over their subsidiaries and affiliated companies including but not limited to, defendant Brown & Williamson Tobacco Corporation; [3] and the interactions of defendants BAT Industries Plc, British-American Tobacco Company Limited, and/or BAT (UK & Export) and their subsidiaries and affiliated companies including, but not limited to, defendant Brown & Williamson Tobacco Corporation.

[22] In paragraph 5 it is stated that:

It is necessary for the purposes of justice and for the due determination of the matters in dispute between the parties that you cause the following witnesses, who are residing in your jurisdiction, to be examined about the matters listed in Number 4 above.

(to which I have made reference).

[23] Mr Cherry Q.C., on behalf of the plaintiffs, attaches particular importance to a part of paragraph 6, which reads:

The witnesses should be examined in person upon oral examination with the witnesses under oath via a video tape deposition for use at trial in accordance with American practice before a stenographer and with counsel ...

[24] Mr Burnton attaches importance to the concluding words of paragraph 6 which read:

Such examinations shall be made pursuant to the Minnesota Rules of Civil Procedure and applicable orders of my court, or under such other procedures as may be acceptable to this court.

[25] The request then goes on to deal with matters which I do not *178 need to recite. It was hoped that the examination would take place during the last two weeks of this month, which, unfortunately, obviously is not possible. It also asks for evidence to be taken during the first two weeks of next month.

[26] Having referred to the Letter of Request, I should refer to the order made by the judge. Having set out the usual formalities, the order requires that the witnesses:

... do there submit to be examined upon oath or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 1105492 (CA (Civ Div)), [1998] I.L.Pr. 170

**(Cite as: [1998] I.L.Pr. 170)**

affirmation in connection with the matters identified in paragraph 4 of the Letter of Request save that the scope of questioning is hereby limited in that no question may be asked of any witness save only in respect of matters set out at paragraphs (i) and (ii) below, and in either case only to elicit evidence admissible at trial.

[27] The judge is seeking there to impose a limit on the Letter of Request. I draw attention, in particular, to the fact that it is "only to elicit evidence admissible at trial". Paragraphs (i) and (ii) read as follows:
    (i) matters referred to in such documents as have been produced in the Minnesota action and copies of which have been provided by the plaintiffs to the witnesses ... at least seven days prior to the commencement of each such examination; or
    (ii) matters testified to in such depositions as have already taken place in the Minnesota action and copies of the relevant portions of transcripts of which have been provided to the witnesses and the 4th, 5th and 6th defendants ... at least seven days prior to the commencement of each examination.

[28] In addition to those limitations, the judge also made certain incidental orders which are of relevance. I refer in particular to:
    (e) The examination to be conducted in the English mode; in respect of each examination, the times for examination in chief, cross-examination and re-examination be limited to 10 hours, two hours, and one hour respectively.
    (f) The witnesses be permitted to have legal representation at their examination for the purpose solely of taking any proper objection that might be taken to questions put to them in the course of the examination if they so wish.

[29] Following another provision there is a proviso which reads:
    Providing that nothing in the order shall require any of the witnesses to agree to be bound by the terms of the Protective Order dated 16 June 1995nor the terms of the Addendum dated 4 June 1996, as described in paragraph 8 of the Letter of Request.

The judge accordingly established significant safeguards for the protection of the witnesses. It is reasonably clear from the order that parts of its language reflect a general order which was made with regard to depositions and expert witnesses' provisions by the Honourable Kenneth J. Fitzpatrick on 13 March 1997. The order reproduces a draft which was prepared for the judge by the plaintiffs' solicitors.

*179 [30] Having referred to those documents and the relevant statutory framework, it seems to me that it is possible to identify three issues which arise on this appeal.
    1. Was the Letter of Request limited to obtaining evidence for the trial (the "fishing" point)?
    2. Is the Letter of Request too uncertain; in other words, does it fail to identify, within reasonable limits, the matters upon which the witnesses are required to be examined (the "uncertainty" point)?
    3. Did the limitations imposed by the judge remedy any defects in the Letter of Request, or are there further amendments we can make which will achieve that result if the judge has failed to do so (the "limitation" point)?

*The fishing point*

[31] This has two aspects: first, does the request itself amount to a request for American style discovery which is not within the scope of the 1975 Act; or, secondly, is the request one which is, in itself, objectionable, quite apart from the 1975 Act, because it is designed to achieve a fishing type of discovery on behalf of the plaintiffs?

[32] In considering this issue, it is useful to say something about the chronological background to the application. The history starts on 17 February 1997 with a request for the production of Sir Patrick Sheehy and others for depositions to be taken in the Minnesota action. As I understand the position, they were to be taken in accordance with the Minnesota Rules of Civil Procedure.

[33] The request refers to Rule 30.02(a) of the Minnesota Rules. There are two relevant rules, both of which come within part 5 of the rules which deal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 1105492 (CA (Civ Div)), [1998] I.L.Pr. 170

**(Cite as: [1998] I.L.Pr. 170)**

with depositions and discovery. They undoubtedly give effect to the type of American discovery to which I have made reference. There is no significant difference between Rule 30.02(a) and Rule 30.02(f). Both are concerned with the type of oral deposition to which I have referred.

[34] On 27 March 1997, lawyers for the 4th, 5th and 6th defendants (the "English companies"), responded to the plaintiffs' request. They indicated that the witnesses are no longer in their control, *i.e.* they could not be dealt with under Rule 30.02(f). That having been indicated, on 24 April the plaintiffs' lawyers notified their intention to apply for the issue of the Letter of Request, and on 5 May 1997 that Letter of Request was actually signed by the Honourable Kenneth J. Fitzpatrick.

[35] The judge did not accept the witnesses' argument that the genesis of the Letter of Request was American-style discovery. Having looked at the relevant rules, I consider that the judge was wrong in coming to that conclusion. It seems to me that there was a very clear *180 link between what happened in relation to the request for American-style discovery and the Letter of Request.

[36] Secondly, the witnesses contend that the lawyer acting for the plaintiffs in this matter, Martha K. Wivell, was under a mis-apprehension as to the position. They suggest that she was unaware of the difference between the type of discovery which is appropriate in this jurisdiction and what is appropriate within the jurisdiction of the Minnesota court. They refer to paragraph 12 of her affidavit in which she suggests that Mr Johnson was wrong in making a suggestion that what was contemplated here was American-style discovery.

[37] However at the end of that paragraph Ms Wivell goes on to indicate that she is aware of Rule 26.02 and:
... the plaintiffs intend to limit the evidence extracted from these witnesses to what is admissible at trial.

Argument was advanced before us as to what those words meant. Although oral discovery takes place

in the United States such as would not be accepted in this country as being appropriate, the exercise is one which is connected with extracting from the witnesses evidence which could be used at the trial. However, there is a dual purpose to the exercise. An indirect purpose is to discover from the oral examination other evidence which could be used at the trial. The final words in paragraph 12 do not necessarily mean that the exercise is going to be confined to one which does not involve going beyond what we would regard as the proper purposes for ordering an examination under the 1975 Act. Ms Wivell does, however, also indicate in her affidavit that this is not a fishing expedition. She says that the time-limits which they were offering to impose upon their examination would avoid any danger of a fishing expedition.

[38] When referring to the Letter of Request, I drew attention to paragraph 6 and the two different parts thereof which are respectively relied upon by the parties before us on this appeal. There is the reference "for use at trial" , to which I give full weight, while recognising that the whole of the American process is designed "to assist the trial" .

[39] I refer to the concluding words of the paragraph. When read with the surrounding documents before me, it does appear that there is good reason for counsel for the witnesses to contend that it would appear that the relevant Minnesota rules are being incorporated into the request, in particular the provisions of the order made by the judge in March of this year dealing with deposition and expert witness provisions.

[40] Looking at this matter as a whole, I consider that the witnesses make out a significant case which indicates that the Letter of Request, viewed through the eyes of this jurisdiction, is misconceived. However, I would not on that basis alone determine this appeal adversely to the plaintiffs. Reflecting the general approach that I have indicated, if *181 there is doubt on this matter, I should give the benefit of that doubt to the plaintiffs. I bear in mind that it is accepted that this is a case where the witnesses could give relevant evidence. I also bear in mind that it is accepted that if there was a properly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 1105492 (CA (Civ Div)), [1998] I.L.Pr. 170

**(Cite as: [1998] I.L.Pr. 170)**

drafted request, an order would and should be made. In that event, I would be reluctant indeed to send this Letter of Request back to the United States on the basis of technical grounds alone.

[41] I therefore turn to the remaining issues.

*The uncertainty point*

[42] I consider that it is only possible to give one answer to the question as to whether or not the Letter of Request is sufficiently certain. All the guidance that the Letter of Request gives the witnesses, as to the issues upon which they are going go be examined which would cover a great many years (the action itself extending over a period in excess of 40 years), is that provided by the sub-headings in paragraph 4 of the request. It mentions smoke and health issues relating to tobacco and cigarettes; marketing of cigarettes; scientific research related to smoking and health issues; manipulation of nicotine by the 4th, 5th and 6th defendants or their subsidiaries and affiliated companies; the exercise of control by those defendants over their subsidiary and affiliated companies; and the interaction of those companies and affiliated companies, including, but not limited to, the 3rd defendant. The Letter of Request, in its terms, is wholly unacceptable. It is too wide and uncertain in its scope and if the matter ended there, there could only be one outcome to this appeal.

[43] Having dealt shortly with the second issue, I turn to the third issue.

*The limitation issue*

[44] Have the limitations, to which I have made reference, achieved what they were intended to do, which was to put some control on the areas of the examination and put the witnesses in a position where they can appropriately be examined? That includes asking oneself whether the order which was made by the judge has clarified the situation so that the witnesses will know what they are to be faced with.

[45]    The    limitations    fall    within    different

categories. I do not propose to repeat them. However, I would point out that the identification of documents, while extremely helpful (being an exercise which is not to take place until after the judge's order), puts the witnesses in a position where the order which is made, is one, the precise ambit of which is not known. If this sort of limitation was going to be relied upon, in my judgment there was an obligation placed upon the plaintiffs to identify the documents and parts of the depositions upon which they were proposing to rely prior to the order, so that the witnesses could say that that cannot be a matter which is of direct relevance to the trial, it must *182 be of indirect relevance and, therefore, something upon which it is not appropriate for the courts to make an order.

[46] I take into account Mr Cherry's substantial submissions as to what could happen with regard to privilege and refusal to answer questions. I also take into account, which I do think is significant, the time-limits which are going to be imposed upon examination. It also seems valuable that the witnesses were to be allowed to have a lawyer sitting at their elbow which would give practical effect to the protections upon which Mr Cherry relies.

[47] I finally refer again to the affidavit filed on behalf of the plaintiffs. In that affidavit, there is a table of questions helpfully set out, which are to be the basis of the request. The deponent to the affidavit says:

I would like to question the witnesses on the above issues [already identified]. For the assistance of the court I set out below in the form of a schedule the matters I wish to address, the identity of the witness to whom I wish to put each question and the issue(s) to which it relates. The plaintiffs undertake to limit the scope of the examinations to matters evidenced either in documents disclosed in the action up to two days before the examination begins ... or referred to in depositions already taken.

The two days was subsequently extended. This seems to be a commendable and desirable effort on behalf of the plaintiffs to introduce the proper balance to which I have made reference. If no

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 1105492 (CA (Civ Div)), [1998] I.L.Pr. 170

**(Cite as: [1998] I.L.Pr. 170)**

proper objection could be made to that schedule, that would have been, in my judgment, a matter of the greatest significance.

[48] There are a number of issues identified as questions in the schedule which are acceptable. However, there are equally some questions which I regard as demonstrating the unsatisfactory nature of this request. I say that with reluctance because I am only too conscious that this was a genuine attempt by the plaintiffs to do what was correct. They make the effort and they then find that, with the assistance of lawyers, judges start criticising their effort. If I read out those which seem to me to fall within this category, I suggest they speak for themselves.
    (16) The deponent's interaction with the other deponents.
    (20) Interaction with other defendants.
    (27) Sale of cigarettes to children.

That is all that is said with regard to those questions.

[49] Those are topics of unlimited generality. I do not see how a witness can prepare himself to deal with matters that happened years ago in relation to questions of that sort. I think therefore that on this third point the plaintiffs are in the greatest possible difficulty. It is therefore necessary to consider whether this appeal should be allowed.

[50] If I thought that by undertaking the exercise this court could redraft the questions in a way which would be fair to both sides, although I would not have welcomed the task, I might have been **\*183** prepared to embark upon it. However, Kerr L.J. said in the Norway (no. 1) [FN8] case, "I do not know how to undertake that exercise".

FN8 Cited above.

[51] With regret, I have come to the conclusion that it is not for me, or this court, to undertake that exercise. That is a task which I must remit back to my American colleague so that he can address the matter again, if this is required, in the light of the judgments which this court has given. However, I emphasise in doing so, that I would only take that

course if I felt that there was no other appropriate course which could be taken. I hope it will be appreciated that in a matter such as this, the English courts will do whatever they can, with propriety, to assist the American courts. They do not wish to adopt a technical position which differs from that adopted in other jurisdictions. But, on the question of the proper place for pre-trial discovery, our system differs from the American system.

[52] The courts in this jurisdiction operate under the 1975 Act. That controls the ability of this court to assist, out of comity, another jurisdiction. We have to give effect to the proper application of that Act to this difficult subject.

[53] I would therefore allow this appeal.

PETER GIBSON L.J.:

[54] The proper approach of an English court to a request made under the Evidence (Proceedings in Other Jurisdictions) Act 1975 is made plain by the authorities. As was said by Lord Denning, M.R., in Re Westinghouse Uranium Contract [FN9] of a request by an American court:
    It is our duty and our pleasure to do all we can to assist that court, just as we would expect the United States court to help us in like circumstances. 'Do unto others as you would be done by'.

FN9 Cited above, at p. 560.

[55] Comity dictates that effect should be given to a Letter of Request if that is possible. But the English court's natural inclination to give effect to the request must be tempered both by the requirements of the Act, which limit the jurisdiction of the English court to applications for an order for evidence (*i.e.* factual material required to prove or disprove allegations at trial), and by the proper concern of the English court that those within its jurisdiction who are called upon to give evidence will be fairly dealt with in the evidence-gathering process, which the court may allow to be conducted here for the purposes of the foreign proceedings.

[56] It is unfortunate that English and American

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1998] I.L.Pr. 170

1997 WL 1105492 (CA (Civ Div)), [1998] I.L.Pr. 170

(Cite as: [1998] I.L.Pr. 170)

Page 11

lawyers confusingly use the term "discovery" in different ways, and that the practices in the two countries have diverged to such a great extent. Whilst the English and American lawyers start with the same concept of discovery, that is to elicit material under the supervision of the court which although not admissible at the trial for the purpose of proving or disproving facts and issues may lead to the discovery of admissible evidence, in the *184 United States the methods of discovery are wider than are permitted in this country, in particular, by including depositions by oral questioning in advance of trial, whereas in England the meaning of discovery is largely limited to the production of documents, the use of interrogatories being the other form of discovery permitted here.

[57] In Radio Corporation of America v. Rauland Corporation [FN10] Devlin J. commented on the practice in America. He referred to the fact that in England discovery of documents may be obtained not only because they are relevant in the case itself, but also because they may fairly lead to a line of inquiry which would disclose relevant material. He continued:

[I]t is plain that that principle has been carried very much further in the United States than it has been carried in this country. In the United States it is not restricted merely to obtaining a disclosure of documents from the other party to the suit, but there is a procedure which might be called a pre-trial procedure, in the courts of the United States which allows interrogation not merely of the parties to the suit but also of persons who may be witnesses in the suit, or whom it may be thought may be witnesses in the suit, and which requires them to answer questions and produce documents. The questions would not necessarily be restricted to matters which were relevant in the suit, nor would the production be necessarily restricted to admissible evidence, but they might be such as would lead to a train of inquiry which might itself lead to relevant material.

FN10 [1956] 1 Q.B. 618, at p. 643.

[58] The Federal and Minnesota Rules of Procedure expressly recognise this as the scope of discovery. I quote from Rule 26.02:

Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject-matter involved in the pending action, whether it relates to the claim or defense of the party, seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if that information appears reasonably calculated to lead to the discovery of admissible evidence.

[59] It is against that background that the court must look at the Letter of Request. It should do so bearing in mind what the Westinghouse case itself teaches. In that case the Letter of Request contained words deliberately intended to meet English concerns by being directed to the distinction between testimony for the trial itself and the discovery process. Nevertheless, what we are told in that case is that the court must look not merely at the words used by the draftsman, but also at the substance of the matter, to see whether objectively that which is requested is the over-wide American-style discovery. [FN11] As Lord Wilberforce said [FN12]: *185

The fact that any evidence obtained is intended to be put in at the trial, is quite consistent with the inquiry extending (impermissibly) to trains of inquiry which might produce such evidence.

FN11 See Rio Tinto Zinc Corporation v. Westinghouse Electric Corporation, cited above, at p. 610 per Lord Wilberforce, p. 624 per Viscount Dilhorne and p. 643 per Lord Fraser.

FN12 At p. 610.

[60] It is not in dispute that the Letter of Request, with which we are concerned, was drafted by the American attorneys for the plaintiffs and that draft was accepted by the judge. Nor is it in dispute that it followed chronologically an attempt by the plaintiffs to obtain the agreement of the English company defendants to the plaintiffs obtaining

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 1105492 (CA (Civ Div)), [1998] I.L.Pr. 170

**(Cite as: [1998] I.L.Pr. 170)**

depositions in America of six witnesses, only two of whom were current employees. The remaining four, the witnesses with whom we are concerned, are no longer under the control of the English companies because they are now only former employees.

[61] There is no reason to think that had the attempt been successful, ordinary American-style discovery would not have followed. In applying for the Letter of Request, the plaintiffs expressly said to the Minnesotan court that they have attempted to take the depositions without resort to that court. It seems to me that that intention was to obtain American pre-trial discovery in accordance with the Minnesota Rules of Procedure which is precisely what the judge in the Minnesotan court ordered.

[62] Mr Cherry Q.C., for the plaintiffs, suggested that the language of the Letter of Request disapplied the obnoxious part of Rule 26.02, which allowed what is not evidence to be obtained on discovery. He relied both on paragraph 6 of the Letter of Request, referring to depositions for use at trial, as well as to paragraph 9 with its reference to the evidence of the witnesses being reduced to writing.

[63] Ms Wivell, the Minnesotan attorney who has filed an affidavit on behalf of the plaintiffs, did not suggest that Rule 26.02 was in any way disapplied. When she said in her affidavit:

I am aware of Rule 26.02 ... and the plaintiffs intend to limit the evidence extracted from these witnesses to what is admissible at trial

it seems to me that she was in effect acknowledging that, without the limitation, the Letter of Request did go too wide in permitting what would not be acceptable to the courts of this country. It seems to me, therefore, that the Letter of Request itself is too wide in that respect.

[64] However, there is a further fatal defect in the Letter of Request in its failure to specify with sufficient particularity the matters upon which the witnesses are to be examined. As was held in Re Norway's Application (no. 1) , [FN13] where the matters, examination on which is requested by the Letter of Request to proceed, are too widely drawn, it will lead to the inference that the Letter of

Request was designed to elicit information which might lead to the obtaining of evidence rather than to establish allegations of fact, and that would amount to an impermissible fishing expedition.

FN13 Cited above.

[65] If one looks at what was requested in Re Norway's *186 application , [FN14] it can be seen that the matters, examination on which was sought, were rather more limited than the six headings which are contained in the Letter of Request and which consitute the only limit ascertainable by this court to the scope of the examination sought by the Letter of Request to be permitted. Mr Cherry stressed the extent of the subject-matter of the litigation and the length of the period over which the alleged conspiracy extended. The litigation in Minnesota is on a grand scale, but the wider the scope of the matters on which examination is sought, the more necessary it is for particulars to be given so as to indicate to the witnesses the scope of the matters on which they can lawfully be examined. The judge himself found that the Letter of Request lacked specificity. To my mind that is obviously correct. I am in entire agreement with my Lord, the Master of the Rolls, on this point.

FN14 Where details of the Letter of Request are given at p. 438.

[66] I would commend the attempt by Ms Wivell to limit the scope of the subject-matter of the examination. But that too seems to me to acknowledge that the Letter of Request is too wide. It is no part of the Letter of Request that there should be the limitations which she suggested, both in relation to the documentation forming the basis of the examination, and as to the more specific schedule to which, she deposes, she will be limiting her questioning if the Letter of Request was to proceed.

[67] Can the Letter of Request be saved, as the judge thought it could, by limiting the examination to eliciting only evidence admissible at trial, by limiting the questions that can be asked to matters referred to in the documents produced on discovery,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 1105492 (CA (Civ Div)), [1998] I.L.Pr. 170

**(Cite as: [1998] I.L.Pr. 170)**

and to matters testified to in depositions which have been taken in the Minnesota action, as well as by the other procedural directions to which my Lord has referred?

[68] I am unable to accept that the Letter of Request can be saved. The scope for examination is still enormously wide. Moreover, part of the attempted limitation is by reference to documents and depositions which it is for the plaintiffs' attorneys to select. We are told that the documentation runs to millions of documents, produced not only by the English company defendants but by other defendants. Even if the plaintiffs' attorneys selected only 1 per cent of the documents, for each million produced that would be 10,000 documents. One knows not what are the matters referred to in those documents. Moreover, the suggested limitation gives carte blanche to the plaintiffs' attorneys to choose the matters upon which they wish to examine as well as which documents and which depositions. True it is that they all have to come within the scope indicated in the Letter of Request. But as I have already said, to my mind the matters on which the witnesses could be examined have not been specified with sufficient particularity.

[69] Mr Cherry then submitted that, if we found that the judge's *187 order went too wide, we should ourselves limit the Letter of Request either by incorporating Ms Wivell's schedule or, if that itself was too wide, by excising with our blue pencil any headings which we found obnoxious. In my judgment, that would not be a satisfactory procedure. The schedule itself is too wide for the reasons which my Lord has given. Furthermore I take Mr Burnton's point that we are going too far away from the original Letter of Request of the Minnesotan court. Under the judge's order, the examination would be in English, not American, mode, something that the Minnesotan court had not envisaged; it would be limited only to evidence admissible at trial, and again that was not envisaged; it would be limited by reference to depositions and documents, which is a limitation not envisaged by the American judge; and, lastly, it would be limited by reference to the specific

matters which Ms Wivell identified in her schedule, and again that was not envisaged by the Minnesotan court. It seems to me that this would involve a redrafting of the Request, which this court in Re Norway's Application (no. 1) said should not be done.

[70] Accordingly, I also would allow the appeal. I also do so with some regret because I do not doubt that these witnesses can give important evidence which would be admissible at the trial. A reformulated proper Letter of Request would enable that evidence to be obtained.

OTTON L.J.:

[71] I also agree that this appeal should be allowed. I wish only to endorse the sentiments of my Lord, the Master of the Rolls, concerning comity. In the interests of comity, the courts of each country should strive, and be seen to strive, to give effect to the request of the courts of the other. In the vast majority of cases, the more so as the courts on both sides of the Atlantic ocean have become increasingly accustomed to requests of this nature, this object is achieved comfortably within the jurisprudence of both countries and to the satisfaction of the parties. On this rare occasion we are unable to give effect to the request. It must not be perceived that by this decision we are reluctant to co-operate with the United States' courts on account of the fact that this case is part of the high-profile tobacco litigation in the United States, and which has received some publicity in the United Kingdom.

[72] I have striven mightily to give effect to the request, but reluctantly, and for the reasons given, have been unable to do so. In my judgment this is not a case where blue pencilling is appropriate, or where the introduction by this court of a safeguard in the form of a suitably worded limitation can provide adequate protection for the witnesses. Given the width of the request, the formulation of a suitably worded limitation by this court is not, in my view, workable in the context of the proposed examinations. What is required is that the request should be redrafted in different terms.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1998] I.L.Pr. 170

1997 WL 1105492 (CA (Civ Div)), [1998] I.L.Pr. 170

**(Cite as: [1998] I.L.Pr. 170)**

**\*188** [73] However, my relucance is tempered by the knowledge that the Honourable Kenneth J. Fitzpatrick will readily understand the difficulties this court has faced.

Appeal allowed with costs.

(c) Sweet & Maxwell Limited

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit O

FOCUS - 21 of 30 DOCUMENTS

GRAHAM RALPH FRANKLAND

APPELLANT

AND

THE QUEEN

RESPONDENT

STEPHEN PHILIP MOORE

APPELLANT

AND

THE QUEEN

RESPONDENT

[APPEALS FROM THE STAFF OF GOVERNMENT DIVISION (CRIMINAL JURISDICTION)

OF THE HIGH COURT OF JUSTICE OF THE ISLE OF MAN]

[PRIVY COUNCIL]

*[1987] AC 576*

**HEARING-DATES:** 2, 3, February 3 March 1987

3 March 1987

**CATCHWORDS:**

Isle of Man - Crime - Homicide - Murder - Mental element - Juries directed in accordance with objective test of intent on charge of murder - Whether misdirection - Criminal Code Act 1872, s. 18 n1 - Criminal Code (Amendment) Act 1921, s. 12(1) (as amended by Criminal Appeal Act 1969 (c. 12), s. 8(c)) n2 - Evidence Act 1983 (c. 7), s. 6 n3

**HEADNOTE:**

The defendant F. was charged with murder in the Isle of Man, contrary to section 18 of the Criminal Code Act 1872, and

n1 Criminal Code Act 1872, s. 18: see post, pp. 584H - 585A.

n2 Criminal Code (Amendment) Act 1921, s. 12(1), as amended: see post, p. 594G-H.

n3 Evidence Act 1983, s. 6: "A court or jury, in determining whether a person has committed an offence - (a) shall not be bound in law to infer that he intended or foresaw a result of his actions by reason only of its

[1987] AC 576

being a natural and probable consequence of those actions; but (b) shall decide whether he did intend or foresee that result by reference to all the evidence, drawing such inferences from the evidence as appear proper in the circumstances."

tried in the Court of General Gaol Delivery in 1980. The case for the Crown was that F. went to the house of the deceased with whom he used to live, bound and gagged him and tied him to a bed and left him there not intending to return to release him for several days. The deceased, then aged 67, died about 48 hours later in that position. F.'s defence was that he did not intend to kill the deceased or cause him really serious injury but had merely sought to immobilise him until F.'s girlfriend had left the island to prevent the deceased from making false statements about F. to her. F. denied knowing that the deceased was unwell. The judge, in directing the jury in relation to the mental element necessary to sustain a charge of murder in accordance with Director of Public Prosecutions v. Smith[1961] A.C. 290, directed them that if they found that the defendant intended to do something unlawful to the deceased they were not concerned with what the defendant contemplated as the probable result of his unlawful act but were to apply the objective test of what an ordinary reasonable man would in all the circumstances contemplate as the natural and probable result, and if that was death or really serious bodily harm the defendant would be guilty of murder. F. was convicted of murder.

The defendant M. was charged with murder, contrary to section 18 of the Criminal Code Act 1872, and he was tried in the Court of General Gaol Delivery in 1982. The Crown's case was that he shared a flat in the Isle of Man with a girl and her 16 month old child, and that while she was at work he inflicted a blow to the child's abdomen with such force that the liver was split and the child later died. M.'s defence was that he was not the person who had caused the injury which killed the child. A different judge gave the jury substantially the same direction as to intent as that given in F.'s case. M. was convicted of murder.

Both F. and M. appealed against their convictions to the Staff of Government Division (Criminal Jurisdiction) of the High Court of Justice of the Isle of Man, who (differently constituted for each appeal) upheld the directions and dismissed the appeals. The objective test of intent was subsequently abolished in the Isle of Man by section 6 of the Evidence Act 1983, which came into operation on 17 May 1983.

On the defendants' consolidated appeals to the Judicial Committee:-

Held, allowing F.'s appeal and dismissing M.'s appeal (1) that before section 6 of the Evidence Act 1983 came into operation in the Isle of Man the common law of England was applicable to determine what constituted in Manx law the necessary mental element in murder, that although English decisions, while not binding on the Manx courts, were of high persuasive authority and should be followed unless there was some provision to the contrary in the local law or conditions which would give good reason for not following an English decision, the decision of the House of Lords in Director of Public Prosecutions v. Smith, if it did lay down that the test of intent in murder at common law was an objective test, was erroneous; and that, accordingly, the trial judges had misdirected the juries in leading them to believe that the intentions of the defendants could be ascertained by an objective test (post, pp. 585A-B, 593D-E, 594E-G).

Dicta of Lord Diplock in Reg. v. Hyam [1975] A.C. 55, 94, H.L.(E.), Lord Bridge of Harwich in Reg. v. Moloney[1985] A.C. 905, 921 and 928, H.L.(E.) and Lord Scarman in Reg. v. Hancock [1986] A.C. 455, 473, H.L.(E.) applied.

Director of Public Prosecutions v. Smith [1961] A.C. 290, H.L.(E.) disapproved.

(2) That in F.'s case the proviso to section 12(1) of the Criminal Code (Amendment) Act 1921 as amended by section 8(c) of the Criminal Appeal Act 1969 could not be applied, and so a verdict of manslaughter would be substituted for that of murder and the case remitted to the Staff of Government Division (Criminal Jurisdiction) to determine the appropriate sentence, but that despite the misdirection M. had properly been convicted of murder since intention had not been in issue so that no miscarriage of justice had occurred and the proviso to section 12(1) as

[1987] AC 576

amended would be applied (post, p. 596C-D,E-F, F-G).

Decision of the Staff of Government Division (Criminal Jurisdiction) of the High Court of Justice of the Isle of Man reversed in F.'s appeal but affirmed in M.'s appeal.

**INTRODUCTION:**

APPEALS (Nos. 30 and 34 of 1986) with special leave by the defendant, Graham Ralph Frankland, from a judgment of the Staff of Government

Division (Criminal Jurisdiction) of the High Court of Justice of the Isle of Man (Glidewell J.A. (President) and D. D Brown Q.C., Acting Deemster) given on 1 July 1980 dismissing his appeal against his conviction for murder, contrary to section 18 of the Criminal Code Act 1872, in the Court of General Gaol Delivery at Douglas on 17 April 1980 before Deemster Luft and a jury; and by the defendant, Stephen Philip Moore, from a judgment of the Staff of Government Division (Criminal Jurisdiction) of the High Court of Justice of the Isle of Man (Deemster Luft, Clerk of the Rolls, and Hytner J.A.) given on 18 February 1983 dismissing his appeal against his conviction for murder, contrary to section 18 of the Criminal Code Act 1872, in the Court of General Gaol Delivery at Douglas on 1 December 1982 before Deemster Corrin and a jury.

The facts are stated in the judgment of their Lordships.

**COUNSEL:**

George Carman Q.C. and Mario Addezio for the defendants. The defendants appeal by consolidated appeals from the judgments of the Staff of Government Division (Criminal Jurisdiction) of the High Court of Justice of the Isle of Man dismissing their appeals against their convictions for murder. These are the first appeals to the Privy Council from that court against convictions for murder. Both appeals raise the same issue, whether the two juries were misdirected as to the mental element necessary to constitute the offence of murder, the directions given being based on the decision of the House of Lords in Director of Public Prosecutions v. Smith [1961] A.C. 290. At the time of the defendants' trials and appeals against conviction section 6 of the Evidence Act 1983, incorporating section 8 of the English Criminal Justice Act 1967, had not been passed in the Isle of Man.

In the Isle of Man murder as a statutory offence is defined by section 18 of the Criminal Code Act 1872. That definition has been given the same meaning as the common law offence of murder in English law. These appeals should be approached on that basis.

The directions on malice aforethought in these cases contained three possible alternative types of intent: (1) an intention to kill or cause really serious harm; (2) an intention to do an act knowing that it is highly probable that it will cause death or really serious injury; and (3) an intention to do something unlawful knowing the circumstances, whether the defendant realised it or not, which would render it likely that the act would cause really serious harm. Directions (2) and (3) are based essentially on Director of Public Prosecutions v. Smith [1961] A.C. 290 and they are wrong in law.

The crime of murder is a crime of specific intent and requires a proof of intent to kill or to cause a really serious harm. This has always been the true position, and nothing less will suffice.

There has been a confusion in the authorities in the past in English law between foresight or appreciation or knowledge on the one hand, and intent on the other. Foresight and knowledge of consequences are different from intent. The true jurisprudential status of concepts of foresight or knowledge of consequences is that they form part of the law

of evidence and are matters for any jury to consider in deciding whether the inference of intent to kill or cause really serious harm can be drawn.

[1987] AC 576

In so far as Director of Public Prosecutions v. Smith [1961] A.C. 290 or other cases introduced foresight or contemplation of consequences as the test for the mental element in murder, that case and cases of the like kind were wrongly decided. That is the effect of the reasoning in Reg. v. Moloney [1985] A.C. 905 and Reg. v. Hancock [1986] A.C. 455. That reasoning does not depend upon the enactment of section 8 of the Criminal Justice Act 1967.

If the former submissions are well founded the Board should not apply to either case the proviso to section 12(1) of the Criminal Code (Amendment) Act 1921, as amended by section 8 of the Criminal Appeal Act 1969.

The directions given in relation to the necessary intent were wrong in law. Reliance is placed upon Reg. v. Moloney [1985] A.C. 905 and Reg. v. Hancock [1986] A.C. 455. These two cases show that in English law, both before and after section 8 of the Criminal Justice Act 1967, in murder foresight was part of the law of evidence whereas intent was a matter of substantive law. Section 8 was merely declaratory of the true common law position. There was considerable criticism of Director of Public Prosecutions v. Smith [1961] A.C. 290, and so section 8 of the Act of 1967 was enacted.

The true law of the Isle of Man at the time of the commission of the offences with which the defendants were charged depends upon what was the true law of England at that time disregarding any statutory alterations. If Reg. v. Hyam [1975] A.C. 55 is in conflict with Reg. v. Moloney [1985] A.C. 905 and Reg. v. Hancock [1986] A.C. 455 it has been departed from by the House of Lords, although not expressly. [Reference was made to the 14th Report of the Criminal Law Revision Committee, Offences against the Person (1980) (Cmnd. 7844), paras. 27, 30 and 31.]

The impact of Reg. v. Moloney [1985] A.C. 905 and Reg. v. Hancock[1986] A.C. 455 on these appeals is that the directions given at the defendants' trials were material misdirections because Director of Public Prosecutions v. Smith [1961] A.C. 290 was wrongly decided and the true law of England at the date of trial was as stated in Reg. v. Moloney[1985] A.C. 905.

Stuart McKinnon Q.C., Mark Strachan and William Cain A.-C., Isle of Man, for the Crown. With regard to the applicability of English law, there is no express provision in the Isle of Man applying English law to that jurisdiction. The law in the Isle of Man was and is customary law supplemented by statute. Where customary law is silent, the Manx courts for the past 200 years have adopted the common law of England, and so the Isle of Man is a common law jurisdiction by adoption. The Criminal Code Act 1872 sets out a series of offences based on English common law offences. In interpreting section 18 and other sections the Manx courts have applied English common law.

In Frankland's case Deemster Luft relying upon Director of Public Prosecutions v. Smith [1961] A.C. 290 directed the jury that in relation to intention they could apply an objective test. Sir Iain Glidewell in

giving the judgment of the Staff of Government Division (Criminal Jurisdiction), after referring to de Lasala v. de Lasala [1980] A.C. 546, held that the decision of the House of Lords in Director of Public Prosecutions v. Smith [1961] A.C. 290, although not binding on Manx courts, was of high persuasive authority and that the objective test applied in the Isle of Man. In the absence at that time of any statutory equivalent to section 8 of the English Criminal Justice Act 1967 that decision was correct. The application of Director of Public Prosecutions v. Smith was entirely consistent with Manx courts applying the common law of England where Manx law was silent and regarding English decisions as binding unless local conditions or provisions led to a contrary conclusion. It is accepted on behalf of the defendants that the English common law applies to these appeals.

If the House of Lords independently of any enactment had departed from Director of Public Prosecutions v. Smith before the defendants' trials and appeals it would have no longer been the common law of England. But where there has been statutory intervention, such as by section 8 of the Criminal Justice Act 1967, which changes the law, the position is different and although that is the law of England it is not the law in the Isle of Man until an equivalent statutory provision is enacted. The House of Lords recognised in Reg. v. Moloney [1985] A.C. 905 and Reg. v. Hancock [1986] A.C. 455 that Director of Public Prosecutions v. Smith [1961] A.C. 290 had been overruled by statute and the House of Lords then developed the law of England.

[1987] AC 576

If it is accepted that English law is to be applied and that it includes Director of Public Prosecutions v. Smith the Privy Council will consider itself bound to follow that House of Lords' decision: see Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. [1986] A.C. 80. Director of Public Prosecutions v. Smith [1961] A.C. 290 is high persuasive authority, and it has been applied in Trinidad for 26 years. The Board should be slow to say that it was wrongly decided. The proper way to change the position is by statute, and that was done in the Isle of Man by section 6 of the Evidence Act 1983.

It is uncertain what the House of Lords would have decided if section 8 of the Criminal Justice Act 1967 had not been passed. It is not certain that it would have invoked the Practice Statement (Judicial Precedent) [1966] 1 W.L.R. 1234 and have departed from Director of Public Prosecutions v. Smith [1961] A.C. 290, and the House of Lords might have considered that the matter should be corrected if necessary by statute. [Reference was made to Reg. v. Cunningham [1982] A.C. 566.]

It is not disputed by the defendants that if Director of Public Prosecutions v. Smith [1961] A.C. 290 was applicable the directions given in each trial were a correct reflection of what was decided in that case.

The contention that Director of Public Prosecutions v. Smith has been overruled, or correctly interpreted or explained, by Reg. v. Moloney [1985] A.C. 905 and Reg. v. Hancock [1986] A.C. 455 is incorrect. Reg. v. Moloney was based expressly on the fact that Director of Public Prosecutions v. Smith had been overruled by section 8 of the

Criminal Justice Act 1967 in respect of an objective test intent in murder. In neither Reg. v. Moloney nor Reg. v. Hancock was the House of Lords considering a direction involving an objective test of intent. The remarks of Lord Bridge of Harwich in Reg. v. Moloney [1985] A.C. 905 after his conclusion, at p. 920, that the verdict was unsafe and unsatisfactory were obiter dicta, and at pp. 921, 928 and 929 he referred to Director of Public Prosecutions v. Smith [1961] A.C. 290 as having been overruled by section 8 of the Criminal Justice Act 1967. Also, in Reg. v. Hancock [1986] A.C. 455, 473, Lord Scarman specifically referred to the intervention of Parliament by section 8 of the Act of 1967. There is no indication in section 8 that it was not changing the law but was merely declaratory of the true common law position before Director of Public Prosecutions v. Smith [1961] A.C. 290. With the passing of section 8 the House of Lords was free to develop the law, whereas otherwise it would have had to consider whether or not to depart from Director of Public Prosecutions v. Smith, and one can only speculate what it might have done. [Reference was made to Reg. v. Hyam [1975] A.C. 55.]

It was correctly held in Director of Public Prosecutions v. Smith[1961] A.C. 290 that in relation to an offence of murder the requirement of malice aforethought was satisfied if the ordinary responsible man would in the circumstances of the case have contemplated or foreseen that grievous bodily harm was the natural and probable result of the accused's unlawful and voluntary act. The ordinary responsible man has to be capable of forming an intent and not insane. In Director of Public Prosecutions v. Smith there was a particularly strong Committee and the decision was unanimous. The task their Lordships faced was not to create new law but to consider and apply what they considered to be the existing law. At that time the existing law propounded an objective and not a subjective test. There was then no House of Lords' decision on the matter, and the early authorities were considered: Reg. v. Ward [1956] 1 Q.B. 351, Rex v. Philpot (1912) 7 Cr.App.R. 140, Reg. v. Rymell [1954] Crim.L.R. 60, Rex v. Lumley (1911) 22 Cox C.C. 635 and Rex v. Steane[1947] K.B. 997. The decision was a serious attempt based on authority to state what the English law then was, and that was the position for six years until the enactment of section 8 of the Criminal Justice Act 1967. The directions given at the defendants' trials were correctly based on Director of Public Prosecutions v. Smith [1961] A.C. 290 because an objective test was part of the law of the Isle of Man at that time.

The test for applying the proviso to section 12(1) of the Criminal Code (Amendment) Act 1921, as amended by section 8 of the Criminal Appeal Act 1969, is whether if the jury had been properly directed they would have inevitably come to the same conclusion. In these two cases it is necessary for the Crown to show that any reasonable jury properly directed would have been bound to conclude that each defendant intended to cause the deceased serious bodily harm, or that in doing the acts causing death he knew it was highly probable that they would cause death or serious bodily harm.

[1987] AC 576

It is clear that Frankland did not intend or anticipate that anyone other than himself would release the deceased. It was inevitable that

anyone of the deceased's age, who was left bound up as he was for over three days, would suffer at least serious bodily harm. Frankland clearly intended to leave the deceased helplessly bound up at least until Frankland's girlfriend had left. Accordingly, the jury would have been bound inevitably to conclude either that Frankland intended to cause serious bodily harm or that he knew that what he did would have that result.

Moore was found by the jury to have struck a blow or blows of sufficient force to split the child's liver. His defence was that he had not struck the child at all, and so there was issue as to intent on the evidence. Inevitably the jury would have been bound to conclude either that Moore intended to cause serious bodily harm or that he knew his acts would cause serious bodily harm.

Strachan following. In his statement to the police Frankland said that he told the deceased that he would return about Monday night or Tuesday, and so when he committed the relevant act he intended to leave the deceased tied up for a minimum period of three days.

Carman Q.C. in reply. Director of Public Prosecutions v. Smith[1961] A.C. 290 and other cases upheld the objective test of foresight as one method of determining the requisite mental element in the crime of murder. The reason why that was wrong was stated by Lord Diplock in Reg. v. Hyam [1975] A.C. 55, 94. In that case Ackner J. had given a foresight direction, but it was a subjective foresight direction. Lord Hailsham of St. Marylebone L.C., at pp. 65-79, in giving the leading speech disapproved of that direction and drew a distinction between foresight of probable consequences and intention. That was the genesis of the reasoning in Reg. v. Moloney [1985] A.C. 905.

Intention alone should constitute the mental element in murder. It would be extremely difficult for juries if they had to consider degrees of probability and what the accused might have contemplated as probable. Foresight is an evaluation of future consequences and it involves no element of choice, whereas intention always involves a choice. In murder trials it is important that trial judges and juries should be confined to what the accused actually intended. The inference is that Reg. v. Hyam [1975] A.C. 55 has been overruled by Reg. v. Moloney[1985] A.C. 905 and Reg. v. Hancock [1986] A.C. 455. Those two recent decisions provide the clearest possible guidance to judges as to how juries should be directed.

At the time of the defendants' trials the applicable Manx law in relation to the mental element in murder was governed by the common law of England. By the date of Reg. v. Hyam [1975] A.C. 55 the law of England was that it was at least a subjective foresight test. Irrespective of section 8 of the Criminal Justice Act 1967 the House of Lords would have eventually overruled Director of Public Prosecutions v. Smith[1961] A.C. 290. The defendants' trials were about 20 years after that decision and by then the common law of England had changed. The way in which the law has developed shows that the subjective test does not depend upon section 8 of the Act of 1967. The true position is that foresight plays no part in the constituent elements of murder, and the

necessary mental element is an intention to kill or to cause really serious harm.

With regard to the application of the proviso to section 12(1) of the Criminal Code (Amendment) Act 1921, as amended by section 8 of the Criminal Appeal Act 1969, the second and third directions to the jury given at Frankland's trial were both serious and material misdirections, and so the Board should be hesitant to apply the proviso since he never had the opportunity of having a fair trial. The question was whether he intended to cause the deceased really serious harm when he tied up the deceased intending to return to release him on the Monday or Tuesday. It is difficult to say that the jury would inevitably have convicted him if they had been properly directed.

If the jury at Moore's trial had been properly directed they would have taken into account his youth. The injuries inflicted on the child were not as bad as in many baby battering cases in which verdicts of manslaughter have been returned. There was no evidence as to his intention once the jury found that he had struck the fatal blow, but

[1987] AC 576

nevertheless the Board should not apply the proviso.

Cur. adv. vult.

3 March. The judgment of their Lordships was delivered by

**PANEL:** Lord Mackay of Clashfern, Lord Elwyn-Jones,Lord Ackner, Lord Oliver of Aylmertonand Lord Goff of Chieveley

**JUDGMENTBY-1:** LORD ACKNER

**JUDGMENT-1:**

LORD ACKNER:

These consolidated appeals are from judgments of the Staff of Government Division (Criminal Jurisdiction) of the High Court of Justice of the Isle of Man. They are the first appeals from that court against convictions for murder to come before the Privy Council. Frankland was convicted on 17 April 1980 in the Court of General Gaol Delivery (Deemster Luft and a jury) of the murder between 27 September and 3 October 1979 of John Gale Bridson. His appeal was dismissed on 1 July 1980, the judgment being given by Glidewell J.A. (President). Moore was convicted on 1 December 1982 in the Court of General Gaol Delivery (Deemster Corrin and a jury) of the murder on 20 April 1982 of Brian Marcus Battista, a baby aged 16 months. His appeal was dismissed on 18 February 1983, the judgment being given by Hytner J.A. Both defendants had been sentenced to death but those sentences were subsequently commuted to life imprisonment.

Happily, murder is a rare offence in the Isle of Man. The last conviction prior to that of Frankland was in 1973. The last trial before that, and it resulted in an acquittal, was in 1943 and before that it seems unlikely that there had been a conviction for murder for very many years. Since the conviction in 1973 did not result in an appeal, the Frankland appeal was the first appeal against a conviction for murder to the Staff of Government Division (Criminal Jurisdiction) in the 61 years that that court has been in existence.

The essential issue

In the Isle of Man, murder is a statutory offence and is defined by section 18 of the Criminal Code Act 1872:

"Whosoever shall unlawfully and feloniously kill another, with malice aforethought, shall be guilty of murder, and being convicted thereof shall suffer death as a felon."

It is common ground that this definition has been given the same meaning in Manx law as the common law offence of murder in English law. Both trial judges in directing the jury on the meaning of "malice aforethought" informed the jury inter alia that they were not concerned with what the accused himself contemplated as the probable result of his unlawful act but were to apply the objective test of what an ordinary reasonable man would in all the circumstances contemplate as the natural and probable result - often described as "the D.P.P. v. Smithtest." The question at issue is whether that test was part of the common law of England, and therefore part of Manx law, until it was abolished by section 6 of the Isle of Man Evidence Act 1983, incorporating section 8 of the Criminal Justice Act 1967.

The facts

Frankland.

Glidewell J.A., in his judgment conveniently summarised the facts as follows:

"The defendant who, at the time of the trial, was aged 28 years, met Mr. Bridson in London when he, the defendant,

[1987] AC 576

was in his mid-teens. About 1970 Mr. Bridson, who came from the island, returned to live in Castletown and brought the defendant here to live with him and the relationship between them was such that the defendant knew him as Uncle Jack. The defendant in due course married and he left Mr. Bridson in about March 1978. But his wife left him at a date which in his evidence he put at December 1979 but must we think have meant Christmas 1978. In the summer of 1979 the defendant was working at an hotel in Douglas when he met and formed a friendship with a Miss Farrell. She was also working in the same hotel and that friendship continued for some months. At the end of September Miss Farrell returned to her home in Ireland, leaving the Isle of Man on Sunday 30 September. According to the defendant he was intending to marry Miss Farrell though she gave no sign that she was intending to marry him, and the defendant said Mr. Bridson was jealous of the fact that he was intending to marry Miss Farrell and said that he was going to take steps to stop the marriage by telling Miss Farrell that the defendant had been in borstal and was a 'queer' which is not true. I should say that in 1979 Mr. Bridson was aged 67 years or thereabouts. He was a man who was clearly not in good health. After his death a postmortem examination revealed that he was suffering from chronic bronchitis and a severe degenerative condition of the lungs and that he had hardening of the coronary arteries. It may well be, of course, that these facts were not known to the defendant, but when Miss Farrell was asked about his apparent state of health (and what was apparent to her was, of course, apparent to the defendant) she said 'He seemed to me to be a very weak man, he was coughing a lot and he looked very small and delicate.'

"On the evening of Friday 28 September last year the defendant visited Mr. Bridson at his home in Castletown. According to a statement which he made to the police after his arrest, he said he went to try to persuade Mr. Bridson not to speak to Miss Farrell about him and about his past. In that statement he said 'I asked him,' that is Mr. Bridson, 'if he was still going to the airport and he said yes. I said no you are not. I said I would stop him one way or another. We had a row. He said he was still going down to tell her that I was bent, about the cheques, about all my past. One thing led to another so I tied him up. It was in the bedroom. I told him if he did not lie down I would poke him. I threatened him. He lay on the bed. I tied his hands behind his back with a blue necktie, it had gold crests of some description as a pattern. I then tied his ankles together with another tie, I cannot remember that tie. I said just lie on the bed, you can get free. The reason I did this was to keep him there to give me a chance to get my girl away before he could talk to her. I went downstairs then. I thought he would be able to get free later himself. I opened the front door and closed it and waited in the hall to see what he would do. I heard him jump straight off the bed and heard him start screaming. He was not using any words, just yelling. I went upstairs again. I slapped him round the face. I did not punch him or knife him or anything, I just slapped him. I put him back on the bed. I think I then put two handkerchiefs on his mouth, one on his mouth and one across. I had lost my temper. I knew I was losing Monica and it was really getting to me. Then I went downstairs but before that I think I put a necktie around his mouth, but I do not know the colour. By this time I did not know what day it was. Downstairs I saw some lawn mower extension cable on a hook, it was white, it was in the kitchen. I took that. In the dining room on the bottom shelf of a table with a radio on I saw some double sided tape, the tape was brown but the backing was white. I took the tape and the cable upstairs. I used another tie and tied the feet to the hands behind his back. I looped the cable through his legs and tied it to the bed, then I carried on looping it through his arms and his legs and wrapped it round and under the bed. It looped twice right under the bed. This was to stop him getting off the bed and doing the same as before. I think I could demonstrate how I did it but it is hard to describe. Then I put the tape on Jack's mouth, about seven or eight pieces. I left his nose free so that he could breathe. Jack was not struggling then. After I had slapped him on the mouth he realised I was serious, probably saw I was half drunk and decided to be quiet. I told him it was only going to be until Sunday. I told him I was sorry and he nodded as if he understood. I told him I would be back about Monday night or Tuesday and that he could tell the police what had happened after that as it would be immaterial by then, my girl would have gone. He nodded that he understood. Before I left I checked that the lights were off. I took about oe70 from his wallet which was in his back pocket. I gave him all the oe1 notes back. I told him it would do for his food when he got loose. Jack saw me

doing this, I knew he would not mind. He often gave me money and I told him that when I came back we would sort the money out and everything. When I left it would be about nine o'clock.' And there tied up on that bed Mr. Bridson stayed, no doubt at first in discomfort, very shortly in pain and eventually, it is quite clear, in agony, and in due course he died. The medical evidence was that his death probably took place on the Sunday night, in which case he was

[1987] AC 576

there alone for 48 hours before he died, as lonely and as horrifying a death as one can imagine.

"Meanwhile the defendant took Mr. Bridson's car and he took Miss Farrell and some friends out on the Friday night and the Saturday and he spent the money that he had taken from Mr. Bridson on entertaining them and on Miss Farrell. On the Sunday afternoon he took Miss Farrell to the airport, he saw her leave for Ireland. He said about that period, 'On the Friday night I got drunk, the party finished about four o'clock in the morning. On Saturday I got drunk. I knew what I had done, not that I had killed him but that I had tied him up. I knew it was stupid but it was too late then. I felt I wanted to talk about it. On Sunday my girl left for Ireland in the afternoon, I saw her off. I thought of going to let Jack free, I went to the house and drove past twice but there were people about and I got panicky. I could not go in so I drove back to Douglas. Then I stayed in on Sunday night, Monday I drove round. I thought about Jack and that when I let him go he would not be too pleased about it and I was worried about what would happen to me. Today, Tuesday, I went for a drive and got some petrol. I thought I would wait until dark to go down to Jack.'

"In fact on the Tuesday during the morning a neighbour of Mr. Bridson's who had observed that the curtains were still drawn and that milk was standing on the front doorstep became concerned about him, informed the police and a police officer entered the house about mid-day on the Tuesday and found Mr. Bridson dead. The police kept watch in the vicinity and during the Tuesday evening the defendant drove up to the area in Mr. Bridson's car and he was duly arrested. [This is not quite accurate. The defendant was arrested that evening at his home.]

"At his trial he gave evidence which gave an account of these matters very similar to that contained in his statement which he made to the police after his arrest, except for the explanation as to why he took the money. In his statement he said 'When I went up to Jack's on the Friday it was only to reason with him, it was not to do him any malice, just to keep him away from my girl. When I tied him up and gagged him I did not intend him to die. I have been told that Jack is dead and it is a shock to me'."

Moore.

Moore shared a flat with an Italian girl, Clodi Battista, in Douglas. The deceased was Miss Battista's son, who lived with her at the time of his death. On 20 April 1982 Miss Battista went to work at about noon, leaving the deceased, a healthy child but suffering from a cold, in the

care of Moore. She returned at about 5.10 p.m., when the deceased appeared to be asleep. About a half an hour later Moore and Miss Battista had a violent argument, as a result of which Moore left the flat. Shortly afterwards Miss Battista went to the shops, returning five or 10 minutes later, and soon thereafter discovered that her son was dead. The deceased was examined in hospital where marks were found on his stomach, which according to Miss Battista had not been there when she dressed the child that morning. Death had been caused as a result of a blow delivered "with terrific force" to the child's stomach while his back was against some hard surface, causing the liver to split. Moore made three written statements, in the last of which he admitted punching the deceased in temper. He made two similar admissions. It was the Crown's case that only Moore or Miss Battista had had the opportunity to kill the deceased.

Moore's defence was limited to disputing that he was the person who injured and killed the child. He alleged that he had got on well with the deceased, but that Miss Battista had been violent towards her son on previous occasions. He stated in evidence that his second statement had been made as a result of pressure and his third as a result of physical violence and he denied the two oral admissions. He further stated in evidence that between noon and 5.10 p.m. on 20 April 1982 he had not touched the deceased so as to cause him injury.

The direction to the juries

It is common ground that there is no difference in substance between the summing up of the two trial judges. There is therefore no need to set out the relevant extracts from each. Their Lordships content themselves with the following quotation from the summing up of Deemster Corrin in the case of Moore:

[1987] AC 576

"In order to return a verdict of guilty of murder the prosecution has to prove malice aforethought, and in the absence of that the verdict would be manslaughter.

"Now you will remember that I told you earlier that malice aforethought exists when any one of three attitudes of mind is present. You will have to decide in this case on the evidence whether any one of those attitudes of mind was present, and if you are satisfied so as to be sure that one was present, then malice aforethought has been proved and the defendant would be guilty if you were sure it was the defendant who killed the child. The first attitude of mind is that there was an intention on the part of the defendant to kill the child or to cause him really serious bodily injury. The second attitude of mind is that there was an intention on the part of the defendant to do an act, that is, assault the child, knowing that it was highly probable that it would kill him or cause him really serious bodily injury. Now in both those attitudes of mind it is the defendant's intention which really counts. You would have to be satisfied so as to feel really sure that this defendant, Moore in this case, actually intended to kill or do really serious bodily injury to the child, or that he actually intended to attack him in such a way that it was highly probable that he would be killed.

But even if you are not sure of either of those attitudes of mind on the part of the defendant, there is the third attitude of mind for you to consider. It is the one which was emphasised by Mr. Moyle. If you are satisfied so as to feel sure that this third attitude of mind was present, then malice aforethought would be proved by the prosecution and the defendant would be guilty of murder. The third attitude of mind is different from the other two in that it does not depend throughout on the actual intention of the defendant. It is constituted if there was an intention on the part of the defendant to do something unlawful to the child knowing the circumstances which, whether he the defendant realised it or not, rendered the act likely to cause death or really serious bodily injury. So you would first have to feel sure that the defendant intended to do something unlawful to the child, that is, intended to assault him, and if you felt sure of that, then you would have to be satisfied that the defendant committed that unlawful act knowing the circumstances whether he, the defendant, realised it or not, rendered the act likely to cause death or really serious bodily injury. So in this third test there is no need of the proof of actual foresight on the defendant's part of either death or really serious injury. The defendant might have intended only a small degree of harm, and he the defendant might fail to foresee that his act was likely to cause death or really serious bodily injury, but in that case malice aforethought would be present. What has to be proved is that the defendant intended, that is, he formed the intention to do something unlawful to the child, it matters not what the defendant himself contemplated in fact as the probable result, or whether indeed he even contemplated the result, provided in law he was responsible for his actions. If he was responsible, the question is whether the unlawful act of the defendant was of such a type that really serious bodily injury or death was the actual and probable result, and the test for that is not what the defendant himself contemplated, but what the ordinary reasonable man or woman would in all the circumstances of the case have contemplated as the natural and probable result."

Director of Public Prosecutions v. Smith [1961] A.C. 290

The facts of that much discussed case, in which the victim was a police officer who clung to the side of the defendant's car to prevent the defendant driving off with stolen property, and subsequently fell off in front of another car thus receiving fatal injuries, are too well known to require detailed recapitulation. In the course of his summing up the trial judge Donovan J. said, as quoted at pp. 299-300:

"'The intention with which a man did something can usually be determined by a jury only by inference from the surrounding circumstances, including the presumption of law that a man intends the natural and probable consequences of his acts.'"

Byrne J., in giving the judgment of the Court of Criminal Appeal, commented, at p. 300, that the trial judge at no stage gave the jury any explanation of the meaning or effect of the word "presumption" or that any such presumption might be rebutted. He said, at p. 300:

"Whatever may have been the position last century when prisoners could not go into the witness box and the distinction between presumptions of law and presumptions of fact was not so well defined, it is now clear, as was

[1987] AC 576

naturally conceded by Mr. Griffith-Jones [for the prosecution], that the presumption embodied in the above maxim is not an irrebuttable presumption of law.

"The law on this point as it stands today is that this presumption of intention means this: that, as a man is usually able to foresee what are the natural consequences of his acts, so it is, as a rule, reasonable to infer that he did foresee them and intend them. But, while that is an inference which may be drawn, and on the facts in certain circumstances must inevitably be drawn, yet if on all the facts of the particular case it is not the correct inference, then it should not be drawn."

Accordingly the conviction was quashed.

When the case went to the House of Lords the Attorney-General, Sir Reginald Manningham-Buller Q.C., submitted, at pp. 306-307:

"The presumption that a man intends the natural and probable consequences of his acts is rebuttable only on proof of insanity, diminished responsibility or incapacity to form an intent. It is not rebuttable simply by evidence that, though the accused was sane and did the acts deliberately, he did not intend grievous bodily harm because he gave way to panic or lost his head or lost his temper. Apart from the exceptions stated, he must be taken to be a reasonable man."

He submitted, at p. 308:

"If he did acts which, in all the circumstances of the case, a reasonable man would say were calculated to cause grievous bodily harm to someone, that is enough to establish intent on his part, and he cannot be heard to say that he did not intend to do grievous bodily harm to the deceased."

He further submitted, at pp. 309-310:

"If a reasonable man would have concluded that the act was calculated or likely or certain to do grievous bodily harm, the jury are bound to conclude that the accused acted with the intent to do grievous bodily harm. ... While the presumption that a man intends the natural and probable consequences of his acts is rebuttable, it is not rebuttable in the case of acts deliberately done it is no defence that he did not actually foresee the consequences."

Those clear and forthright submissions were in substance accepted and resulted in the appeal by the Crown being allowed. In the course of the single speech, concurred in by Lord Goddard, Lord Tucker, Lord Denning and Lord Parker of Waddington, Viscount Kilmuir L.C. said, at p. 327:

"The jury must, of course, in such a case as the present make up their minds on the evidence whether the accused was unlawfully and voluntarily doing something to someone. The unlawful and

voluntary act must clearly be aimed at someone in order to eliminate cases of negligence or of careless or dangerous driving. Once, however, the jury are satisfied as to that, it matters not what the accused in fact contemplated as the probable result or whether he ever contemplated at all, provided he was in law responsible and accountable for his actions, that is, was a man capable of forming an intent, not insane within the M'Naghten Rules and not suffering from diminished responsibility. On the assumption that he is so accountable for his actions, the sole question is whether the unlawful and voluntary act was of such a kind that grievous bodily harm was the natural and probable result. The only test available for this is what the ordinary responsible man would, in all the circumstances of the case, have contemplated as the natural and probable result."

Although it has been suggested that the words "in such a case as the present" in the above quotation from the speech of Viscount Kilmuir L.C. made it clear that he was not propounding an objective test and that the test is always subjective (see in particular Hardy v. Motor Insurers' Bureau [1964] 2 Q.B. 745 per Lord Denning M.R., at pp. 758-759, and Pearson L.J., at p. 764) Mr. McKinnon for the Crown has throughout these appeals proceeded on the generally

accepted view that the House of Lords reversed the Court of Criminal Appeal, because the Court of Criminal Appeal had held that the test was a subjective one and not an objective one. Indeed the strength of the criticism of the decision (as so interpreted), resulted in Parliament imposing the subjective test, both as to foresight of the consequences and as to intention, by enacting section 8 of the Criminal Justice Act 1967.

In Reg. v. Hyam [1975] A.C. 55, 70-71, Lord Hailsham of St. Marylebone L.C. having referred in some detail to the many criticisms from different sources of the decision in Director of Public Prosecutions v. Smith [1961] A.C. 290, rejected the suggestion that their Lordships' House should make use of the Practice Statement (Judicial Precedent)[1966] 1 W.L.R. 1234 and depart from that decision. He considered that it was far better to recognise that Parliament in 1967 had appropriately dealt with the main criticism, be it right or wrong, of that decision. Viscount Dilhorne, at p. 85, saw no reason to review the decision because Hyam raised no question as to the applicability of the objective test since, in the light of the direction given to the jury and its verdict, the jury were to be taken to have found that the appellant herself knew that it was highly probable that serious bodily harm would be caused.

However, Lord Diplock in his speech took up the point which was made by Byrne J. giving the judgment of the Court of Criminal Appeal in Director of Public Prosecutions v. Smith and cited above. He said, at p. 94:

"It was, I venture to think, a comparable failure to appreciate the significance of the accidents of history in the development of English criminal law that led this House in the same case to adopt the objective test of intention as to the consequences of a voluntary act, i.e., that part of the decision that is now overruled by the Criminal Justice Act 1967. Intention can only be subjective. It was the actual

intention of the offender himself that the objective test was designed to ascertain. So long as the offender was not permitted to give evidence of what his actual intention was, the objective test provided the only way, imperfect though it might be, of ascertaining this. The Criminal Evidence Act 1898 changed all this. A defendant to a charge of felony became entitled to give evidence in his own defence. The objective test no longer provided the only means available in a criminal trial of ascertaining the actual intention of the offender; but it had been so for so long that this House overlooked the historical fact that the objective test did not define the relevant intention as to the consequences of a voluntary act. It was no more than one means of ascertaining the relevant intention, to which the Criminal Evidence Act 1898 added another - the defendant's own evidence of what his actual intention was."

Clearly, in Lord Diplock's judgment, Director of Public Prosecutions v. Smith had wrongly stated the common law.

Two recent decisions of the House of Lords are of particular relevance, although the observations which their Lordships will quote were clearly obiter. In Reg. v. Moloney [1985] A.C. 905 Lord Bridge of Harwich gave the sole speech with which all their Lordships agreed. At p. 921, he referred to Director of Public Prosecutions v. Smith, quoted the direction given by Donovan J. and stated that the effect of the decision of the House of Lords was:

"to declare the presumption that a man intends the natural and probable consequences of his acts to be irrebuttable, or, put in other language, to require juries, in deciding whether a person accused of murder had the necessary intention to kill or cause grievous bodily harm, to apply the objective test of the reasonable man, not the subjective test of what was in the mind of the accused man. In this respect the decision was never popular with the profession. It is said to have been widely disregarded by trial judges, directing juries in murder cases, until it was eventually overruled by section 8 of the Criminal Justice Act 1967 ..."

At p. 928, he again referred to Director of Public Prosecutions v. Smith and said:

"A rule of evidence which judges for more than a century found of the utmost utility in directing juries was expressed in the maxim: 'A man is presumed to intend the natural and probable consequences of his acts.' In Director of Public Prosecutions v. Smith [1961] A.C. 290 your Lordships' House, by treating this rule of evidence as creating an irrebuttable presumption and thus elevating it, in effect, to the status of a rule of substantive law, predictably provoked the intervention of Parliament by section 8 of the Criminal Justice Act 1967 to put the issue of intention back where it

[1987] AC 576

belonged, viz., in the hands of the jury, 'drawing such inferences from the evidence as appear proper in the circumstances.'"

Their Lordships view these observations as being consistent with and supporting the criticism made by Lord Diplock of Director of Public

Prosecutions v. Smith quoted above. Lord Scarman in giving the single speech in Reg. v. Hancock [1986] A.C. 455, 473, referred to Lord Bridge's comment on Smith's case accepting and paraphrasing it in these terms:

"that Parliament intervened by section 8 of the Criminal Justice Act 1967 to return the law to the path from which it had been diverted leaving the presumption as no more than an inference open to the jury to draw if in all the circumstances it appears to them proper to draw it."

Was the "objective test" part of Manx law until May 1983, when section 6 of the Evidence Act 1983 incorporated into the law of the Isle of Man section 8 of the Criminal Justice Act 1967?

Mr. Carman for the defendants submitted to their Lordships that if section 8 of the Act of 1967 had not been passed, the House of Lords would, pursuant to the Practice Direction of 1966, have departed from the decision in Director of Public Prosecutions v. Smith, insofar as it had laid down an objective test of intention, well before the defendants had committed these homicides. While their Lordships are prepared to accept that this might have been the case, they do not have to be so satisfied. Decisions of English courts, particularly decisions of the House of Lords and the Court of Appeal in England, are not binding on Manx courts, but they are of high persuasive authority, as was correctly pointed out by Glidewell J.A. in giving the judgment of the Staff of Government Division (Criminal Jurisdiction). Such decisions should generally be followed unless either there is some provision to the contrary in a Manx statute or there is some clear decision of a Manx court to the contrary, or, exceptionally, there is some local condition which would give good reason for not following the particular English decision. The persuasive effect of a judgment of the House of Lords, which has largely the same composition as the Judicial Committee of the Privy Council, the final Court of Appeal from a Manx court, is bound to be very high. Glidewell J.A. cited as authority for this position the well known case of de Lasala v. de Lasala [1980] A.C. 546, an appeal from the Court of Appeal of Hong Kong. Lord Diplock said, at pp. 557-558:

"It has become generally accepted at the present day that the common law is not unchanging but develops to meet the changing circumstances and patterns of society in which it is applied. In Australian Consolidated Press Ltd. v. Uren [1969] 1 A.C. 590 it was accepted by this Board that the common law as to the right to punitive damages for tort had of recent years developed in different ways in England and in New South Wales and that neither Australian courts themselves nor this Board sitting on an appeal from an Australian court were bound by the decision of the House of Lords in Rookes v. Barnard [1964] A.C. 1129 which limited the categories of cases in which punitive damages could be awarded in England. So too in Hong Kong, where the reception of the common law and the rules of equity is expressed to be 'so far as they are applicable to the circumstances of Hong Kong or its inhabitants' and 'subject to such modifications as such circumstances may

require,' a decision of the House of Lords on a matter which in Hong Kong is governed by the common law by virtue of the Application of English Law Ordinance is not ipso facto binding upon a Hong Kong court although its persuasive authority must be very great, since the Judicial Committee of the Privy Council, whose decisions on appeals from Hong Kong are binding on all Hong Kong courts, shares with the Appellate Committee of the House of Lords a common membership. This Board is unlikely to diverge from a decision which its members have reached in their alternative capacity, unless the decision is in a field of law in which the circumstances of the colony or its inhabitants make it inappropriate that the common law in that field should have developed on the same lines in Hong Kong as in England."

Glidewell J.A. correctly took the view that there was nothing in local conditions, much less in local statutes, that

[1987] AC 576

should lead the court to the view that the objective test as laid down in Director of Public Prosecutions v. Smith [1961] A.C. 290 was not the common law of England and therefore the law of the Isle of Man until Tynwald enacted the contrary in 1983. In reaching this conclusion, Glidewell J.A. expressed his awareness of the criticisms, particularly by academic writers, of Director of Public Prosecutions v. Smith. It does not appear, however, that his attention was drawn to Lord Diplock's clear view expressed in Reg. v. Hyam [1975] A.C. 55, 94, that the decision was erroneous and how that error came to be made, following in this regard the observations of Byrne J. when giving the judgment of the Court of Criminal Appeal in Director of Public Prosecutions v. Smith, at p. 300, which their Lordships have quoted. Moreover Glidewell J.A. did not have the benefit of the very recent observations made by Lord Bridge of Harwich in his speech in Reg. v. Moloney [1985] A.C. 905, 921 and 928, which their Lordships have set out above, and those of Lord Scarman in his speech in Reg. v. Hancock [1986] A.C. 455, 473, also quoted.

Their Lordships, having had the benefit of extended argument, and, particularly in the light of the recent cases, have concluded that the decision in Director of Public Prosecutions v. Smith [1961] A.C. 290, insofar as it laid down an objective test of the intent in the crime of murder, did not accurately represent the English common law. It therefore follows that the trial judges in both trials were in error in directing the jury that they were entitled to ascertain the intent of the accused by reference to an objective test.

The application of section 12(1) of the Criminal Code (Amendment) Act 1921 as amended by section 8 of the Criminal Appeal Act 1969

Section 12(1) lays down the duties and powers of the Court of Criminal Appeal on the hearing of an appeal against a verdict of a jury. It contains, in its amended form, the following proviso:

"Provided that the court may, notwithstanding that they are of opinion that the point raised in the appeal might be decided in favour of the appellant, dismiss the appeal if they consider that no miscarriage of justice has actually occurred."

In relation to these two appeals different considerations arise as to whether or not this proviso should be applied. Their Lordships will accordingly deal with each separately.

Frankland. As has already been made apparent from the statement of the facts of Frankland's case, as set out in the judgment of Glidewell J.A. quoted in extenso above, a post-mortem examination of Mr. Bridson revealed that he was suffering from chronic bronchitis and a severe degenerative condition of the lungs and that he had hardening of the coronary arteries. A very important question in the case was whether Frankland was aware that the deceased was in very poor health. If he was so aware, this would clearly provide strong support for a jury concluding that Frankland must have appreciated that to leave him trussed up and gagged as he did, even if he did so intending to release him on the Sunday evening after his girlfriend had departed, would inevitably cause him serious bodily injury. As to this aspect of the case Miss Farrell had told the jury, under cross-examination, that the deceased did not appear to be a man in normal health. He seemed to be a very weak man. He was coughing a lot and looked very small and delicate.

However, a Mrs. Holmes said he appeared to be in normal health and a Dr. Bourdillon said in evidence that these diseases do not always show symptoms apparent to the layman. Moreover, the deceased's cousin, Mr. J. Bridson, told the court that during the previous 10 years he had never known the deceased to be ill apart from the odd cold. Frankland's evidence was to the effect that he thought that the deceased was a healthy man and that it did not occur to him that the binding and gagging would cause him any really serious bodily injury. What he thought it would do was to make him feel sore. All he wished to do was to keep the deceased away from his girlfriend until she left the island. In directing the jury on the law, the trial judge gave what he described as three "examples" of malice aforethought. It is the third example that contained the objective test. He said:

"The third example is an intention on the part of the defendant to do something unlawful to a person knowing the circumstances which, whether he realised it or not, rendered the act likely to cause death or really serious bodily injury.

[1987] AC 576

Now in this third example there need be no proof of actual foresight on the defendant's part of either death or really serious bodily injury. The defendant might intend only a small degree of harm and he, the defendant, might fail to foresee that the act was likely to cause death or serious bodily harm, but in that case he would still be guilty. It must be proved that the defendant intended, that is, he formed the intention to do something unlawful to the victim. Now this third case, in that case, it matters not what the defendant himself contemplated in fact as the probable result or whether indeed he contemplated it at all, provided he was in law responsible and accountable for his actions, that is, he was capable of forming an intent, he was not insane. If he was so accountable, the question is whether the unlawful and voluntary

act was of such a kind that really serious bodily harm was a natural and probable result, and the test for that is what the ordinary reasonable man would in all the circumstances of the case, have contemplated as the actual and probable result."

Quite clearly on this direction it was open to the jury totally to ignore the defendant's evidence not only as to his intentions, but as to his knowledge and appreciation of the deceased's physical condition and to have convicted him of murder on the basis that an ordinary reasonable man would have foreseen that what he did was likely to cause serious bodily harm. That certainly would have been a miscarriage of justice. Their Lordships are not satisfied that, if the jury had not been so misdirected, they would inevitably have convicted Frankland of murder rather than manslaughter. If properly directed they could have concluded that he, Frankland, might not have been aware of the deceased's physical state of health and that in his desperation to prevent the deceased making serious and untrue allegations about him to his girlfriend he gave little or no thought to the serious consequences which his unlawful actions might or would involve. In these circumstances their Lordships do not consider that this is a proper case for the application of the proviso. Accordingly they will humbly advise Her Majesty that this appeal should be allowed, that the conviction for murder should be quashed, that a verdict of guilty of manslaughter should be substituted and that the appeal should be remitted to the Staff of Government Division (Criminal Jurisdiction) of the High Court of Justice of the Isle of Man for consideration of the appropriate sentence to be imposed.

Moore. Moore's defence raised only one issue namely whether or not it was he who had struck the blow to the child's abdomen, which because of its "terrific force" split his liver. The jury, by its verdict, rejected Moore's evidence and concluded that he killed the child. There was no evidence before the jury of what Moore intended when he so brutally struck the child. In such circumstances the jury were obliged to ask themselves what would a man of Moore's age and intelligence have realised would have been the result of his actions. Their Lordships have no hesitation in concluding that it was an irresistible inference that he would have realised that at least serious bodily harm to the child was inevitable.

Their Lordships are accordingly satisfied that, notwithstanding the misdirection in Moore's case, there was no miscarriage of justice and accordingly they will humbly advise Her Majesty that his appeal should be dismissed.

**SOLICITORS:**

Solicitors: Alan Taylor & Co.; Charles Russell & Co.

S.S.

(c)2001 The Incorporated Council of Law Reporting for England & Wales

# Exhibit P

Westlaw.

[1978] A.C. 547                                                            Page 1

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

**\*547** Rio Tinto Zinc Corporation and Others Appellants v. Westinghouse Electric Corporation Respondents, et a contra [1978] 2 W.L.R. 81

House of Lords

HL

Lord Wilberforce, Viscount Dilhorne, Lord Diplock, Lord Fraser of Tullybelton and Lord Keith of Kinkel

1977 Oct. 17, 18, 19, 20, 24, 25, 26, 27, 31; Dec. 1

Lord Denning M.R.,Roskill and Shaw L.JJ.

1977 May 25, 26 July 7, 8, 11

[On Appeal from In Re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (No. 1 and No. 2) ]

Evidence--Foreign tribunal, for--Jurisdiction of English court--Letters rogatory--Privilege against self--incrimination--Liability to fines under E.E.C. Treaty and American anti--trust legislation--Whether "penalties "--Testimony and documents--Whether required for use at trial--Civil Evidence Act 1968, s. 14 --Evidence (Proceedings in Other Jurisdictions) Act 1975 (c. 34), ss. 1, 2 (1) (2) (3) (4), 3 (1) --E.E.C. Treaty (Cmnd. 5179-- II), arts. 85, 189, 192--E.E.C. Council Regulation No. 17/62, art. 15

Practice--Discovery--Privilege --Self--incrimination--Uranium cartel--Order to produce company's documents to examiner--Company's fear of penalty proceedings

by E.E.C. Commission--Whether risk appreciable--Whether company privileged against self--incrimination--Civil Evidence Act 1968, s. 14 (1)--E.E.C. Treaty (Cmnd. 5179--II), arts. 85, 89, 192--E.E.C. Council Regulation No. 17/62, arts. 13, 14, 15 (2), 17

International Law--Letters rogatory--Extra--territorial investigations-- Attempt to extend U.S. grand jury's investigations extra--territorially-- Infringement of U.K. sovereignty

[FN1] [FN2] A United States corporation ("W") was sued in Virginia for breach of contract in relation to certain contracts to build **\*548** nuclear power stations. By their defence they alleged that the contracts had been made incapable of performance by reason of shortage of uranium and steeply rising prices which they attributed to the activities of an international cartel of uranium producers including two English companies, "R.T.Z." On the application of W, the judge of the Virginia court issued letters rogatory to the High Court in London asking it to order that named individuals appear before a U.S. consular officer in London to be examined in the litigation and that the two English companies, with which they were connected as officers or directors, should produce certain itemised documents or classes of documents. On October 28, 1976, a master made two orders giving effect to the letters rogatory. MacKenna J. and the Court of Appeal subsequently upheld his orders. R.T.Z. claimed privilege in respect of the documents on the basis that their production might render R.T.Z. liable to fines under the E.E.C. Treaty which was part of English law. MacKenna J. upheld the claim of privilege and on July 11, 1977, the Court of Appeal upheld his decision.

FN1 Civil Evidence Act 1968, s. 14: "(1) The right of a person in any legal proceedings other than

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                      Page 2

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

criminal proceedings to refuse to answer any question or produce any document or thing if to do so would tend to expose that person to proceedings for an offence or for the recovery of a penalty -- (a) shall apply only as regards criminal offences under the law of any part of the United Kingdom and penalties provided for by such law, ..."

FN2 "Evidence (Proceedings in Other Jurisdictions) Act 1975, s. 1 "Where an application is made to the High Court ... for an order for evidence to be obtained in the part of the United Kingdom in which it exercises jurisdiction, and the court is satisfied -- (a) that the application is made in pursuance of a request issued by or on behalf of a court ... ('the requesting court') exercising jurisdiction ... in a country or territory outside the United Kingdom; and (b) that the evidence to which the application relates is to be obtained for the purposes of civil proceedings which ... have been instituted before the requesting court ... the High Court ... shall have the powers conferred on it by ... this Act." S. 2: "( 1) ... the High Court, the Court of Session and the High Court of Justice in Northern Ireland shall each have power, on any such application as is mentioned in section 1 above, by order to make such provision for obtaining evidence in the part of the United Kingdom in which it exercises jurisdiction as may appear to the court to be appropriate for the purpose of giving effect to the request in pursuance of which the application is made; ... (2) ... an order under this section may, in particular, make provision --(a) for the examination of witnesses, either orally or in writing; (b) for the production of documents; ... (3) An order under this section shall not require any particular steps to be taken unless they are steps which can be required to be taken by way of obtaining evidence for the purposes of civil proceedings in the court making the order ... (4) An order under this section shall not require a person --(a) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power; or (b) to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely

to be, in his possession, custody or power."

On June 8, 1977, the judge of the Virginian court upheld a claim by the individual witnesses to privilege under the Fifth Amendment to the U.S. Constitution on the ground of self-incrimination. On June 15, 1977, the judge was informed by the U.S. Department of Justice that it required the evidence of the witnesses for the purposes of a grand jury investigation started in Washington in 1976 into possible violations of the U.S. anti-trust laws by members of the alleged uranium cartel so as to initiate criminal proceedings if it saw fit. On July 18, 1977, the Department of Justice applied to the judge for an order to compel testimony under U.S.C. sections 6002/3, applicable when a witness claimed privilege on the ground of self-incrimination but under which no testimony compelled might be used against the witness in a criminal case. The judge made the order.

On appeal from the decision of the Court of Appeal by R.T.Z. and the persons named, on the one hand, and by W., on the other:-

**Held:**

(1) (Viscount Dilhorne and Lord Fraser of Tullybelton dissenting), that the master's order rightly gave effect to the letters rogatory in respect of the production of documents, subject to amendments to confine their operation to areas allowed by English law and further (Viscount Dilhorne dissenting) that the order rightly gave effect to them as regarded the witnesses sought to be examined but (*per* Lord Wilberforce) subject to the disallowance of certain witnesses (post, pp. 611G - 612B, 636A - B, 652D, 654D, E).

Radio Corporation of America v. Rauland Corporation [1956] 1 Q.B. 618, D.C. considered.

**\*549** (2) That the companies were entitled to claim privilege against self-incrimination under section 14 (1) of the Civil Evidence Act 1968 in respect of the documents required to be produced, since production would tend to expose them to fines under articles 85, 189 and 192 of the European Economic Community Treaty, which cover

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

penalties imposed by administrative action and recoverable in England by "proceedings ... for the recovery of a penalty" within section 14 (1) (post, pp. 612B-E, G, 627A-C, 628C, 632C-D, F, 636F-H, 637F, 646E, F, 647G, 652D).

Triplex Safety Glass Co. Ltd. v. Lancegaye Safety Glass (1934) Ltd. [1939] 2 K.B. 395, C.A. applied.

(3) That, in accordance with the ruling of the judge of the Virginian court, upholding the right of the individual witnesses to claim privilege against self-incrimination under the Fifth Amendment to the U.S. Constitution, they could not, in consequence of section 3 (1) (b) of the Evidence (Proceedings in Other Jurisdictions) Act 1975, be compelled to give evidence (post, pp. 615C, D, 632E, 639B, C, 647E - 648B, 652D).

(4) That the intervention of the Department of Justice, converting the letters rogatory into a request for evidence for the purposes of a grand jury investigation, changed their character, seeking to use the Act of 1975 for purposes for which it was not intended by extending the grand jury's investigations internationally in a manner which was impermissible as being an infringement of United Kingdom sovereignty, a context in which the courts were entitled to take into account the declared policy of Her Majesty's Government (post, pp. 615E - 616A, 617B, 630H - 631A, F, G, 632F, 639F, 640D, E, 650G - 651A, D, G).

Decision of the Court of Appeal (post, p. 558H); [1977] 3 W.L.R. 430; [1977] 3 All E.R. 703, upholding the implementation of the letters rogatory, reversed.

Decision of the Court of Appeal (post, p. 572B); [1977] 3 W.L.R. 492; [1977] 3 All E.R. 717, upholding the claims of privilege, affirmed.

The following cases are referred to in their Lordships' opinions in the House of Lords:

British Nylon Spinners Ltd. v. Imperial Chemical Industries Ltd. [1953] Ch. 19; [1952] 2 All E.R. 780, C.A..

Burchard v. Macfarlane, Ex parte Tindall [1891] 2 Q.B. 241, C.A..

Fagernes, The [1927] P. 311, C.A..

Radio Corporation of America v. Rauland Corporation [1956] 1 Q.B. 618; [1956] 2 W.L.R. 281, 612 ; [1956] 1 All E.R. 260, 549, Barry J. and D.C..

Triplex Safety Glass Co. Ltd. v. Lancegaye Safety Glass (1934) Ltd. [1939] 2 K.B. 395; [1939] 2 All E.R. 613, C.A..

The following additional cases were cited in argument in the House of Lords:

Adams v. Adams (Attorney-General intervening) [1971] P. 188; [1970] 3 W.L.R. 934; [1970] 3 All E.R. 572.

Alterskye v. Scott [1948] 1 All E.R. 469.

American Banana Co. v. United Fruit Co. (1909) 213 U.S. 347.

American Express Warehousing Ltd. v. Doe [1967] 1 Lloyd's Rep. 222, C.A..

**\*550** Béguelin Import Co. v. G. L. Import Export S.A. [1972] C.M.L.R. 81.

Blunt v. Park Lane Hotel Ltd. [1942] 2 K.B. 253 ; [1942] 2 All E.R. 187, C.A..

Distillers Co. (Biochemicals) Ltd. v. Times Newspapers Ltd. [1975] Q.B. 613; [1974] 3 W.L.R. 728; [1975] 1 All E.R. 41.

Gibbons v. Waterloo Bridge Co. Proprietors (1818) 5 Price 491; 1 Coop. Temp.Cott. 385.

Goldstone v. Williams, Deacon & Co. [1899] 1 Ch. 47.

Huntington v. Attrill [1893] A.C. 150, P.C..

Imperial Chemical Industries Ltd. v. E.C. Commission [1972] C.M.L.R. 557.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547

Page 4

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

Jones v. Jones (1889) 22 Q.B.D. 425, D.C..

Lee v. Angas (1866) L.R. 2 Eq. 59.

Lotus, The (1927) P.C.I.J. Series A. No. 10, p. 29.

Maccallum v. Turton (1828) 2 Y. & J. 183.

McFadzen v. Liverpool Corporation (1868) L.R. 3 Ex. 279.

Newland v. Steere (1865) 13 W.R. 1014.

Panthalu v. Ramnord Research Laboratories Ltd. [1966] 2 Q.B. 173; [1965] 3 W.L.R. 682; [1965] 2 All E.R. 921, C.A..

Parkhurst v. Lowten (1819) 2 Swans. 194.

Penn-Texas Corporation v. Murat Anstalt [1964] 1 Q.B. 40; [1963] 2 W.L.R. 111; [1963] 1 All E.R. 258, C.A..

Penn-Texas Corporation v. Murat Anstalt (No. 2) [1964] 2 Q.B. 647; [1964] 3 W.L.R. 131; [1964] 2 All E.R. 594, C.A..

Reg. v. Andrews-Weatherfoil Ltd. [1972] 1 W.L.R. 118; [1972] 1 All E.R. 65, C.A..

Reg. v. Boyes (1861) 1 B. & S. 311.

Reg. v. Lewes Justices, Ex parte Secretary of State for the Home Department [1973] A.C. 388; [1972] 3 W.L.R. 279; [1972] 2 All E.R. 1057, H.L. (E.).

Reynolds v. Godlee (1858) 4 K. & J. 88.

Richardson v. Hastings (1844) 7 Beav. 354.

Riddick v. Thames Board Mills Ltd. [1977] Q.B. 881; [1977] 3 W.L.R. 63; [1977] 3 All E.R. 677, C.A..

Seyfang v. G. D. Searle & Co. [1973] Q.B. 148 ; [1973] 2 W.L.R. 17; [1973] 1 All E.R. 290.

Short v. Mercier (1851) 3 Mac. & G. 205.

Soul v. Inland Revenue Commissioners (Practice Note) [1963] 1 W.L.R. 112; [1963] 1 All E.R. 68, C.A..

Suffolk (Earl of) v. Green (1739) 1 Atk. 450.

The following cases are referred to in the judgments of the Court of Appeal on May 26, 1977:

American Express Warehousing Ltd. v. Doe [1967] 1 Lloyd's Rep. 222, C.A..

Colne Valley Water Co. v. Watford and St. Albans Gas Co. [1948] 1 K.B. 500; [1948] 1 All E.R. 104, C.A..

Comet Products U.K. Ltd. v. Hawkex Plastics Ltd. [1971] 2 Q.B. 67; [1971] 2 W.L.R. 361; [1971] 1 All E.R. 1141, C.A..

Mexborough (Earl of) v. Whitwood Urban District Council [1897] 2 Q.B. 111, C.A..

Radio Corporation of America v. Rauland Corporation [1956] 1 Q.B. 618; [1956] 2 W.L.R. 281, 612 ; [1956] 1 All E.R. 260, 549, D.C..

**\*551** Redfern v. Redfern [1891] P. 139, C.A..

Reg. v. Boyes (1861) 1 B. & S. 311.

The following additional cases were cited in argument:

Blunt v. Park Lane Hotel Ltd. [1942] 2 K.B. 253 ; [1942] 2 All E.R. 187, C.A..

Burchard v. Macfarlane, Ex parte Tindall [1891] 2 Q.B. 241, C.A..

Debtor (No. 7 of 1910) In re [1910] 2 K.B. 59, C.A..

Elder v. Carter Ex parte Slide and Spur Gold Mining Co. (1890) 25 Q.B.D. 194, C.A..

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

Hunnings v. Williamson (1883) 10 Q.B.D. 459.

Martin v. Treacher (1886) 16 Q.B.D. 507, C.A..

National Association of Operative Plasterers v. Smithies [1906] A.C. 434, H.L.(E.).

Panthalu v. Ramnord Research Laboratories Ltd. [1966] 2 Q.B. 173; [1965] 3 W.L.R. 682; [1965] 2 All E.R. 921, C.A..

Penn-Texas Corporation v. Murat Anstalt (No. 2) [1964] 2 Q.B. 647; [1964] 3 W.L.R. 131; [1964] 2 All E.R. 594, C.A..

Reg. v. Lewes Justices Ex parte Secretary of State for the Home Department [1973] A.C. 388; [1972] 3 W.L.R. 279; [1972] 2 All E.R. 1057, H.L. (E.).

Seyfang v. G. D. Searle & Co. [1973] Q.B. 148 ; [1973] 2 W.L.R. 17; [1973] 1 All E.R. 290.

Soul v. Inland Revenue Commissioners (Practice Note) [1963] 1 W.L.R. 112; [1963] 1 All E.R. 68, C.A..

The following cases were referred to in the judgments of the Court of Appeal on July 11, 1977:

Blunt v. Park Lane Hotel Ltd. [1942] 2 K.B. 253 ; [1942] 2 All E.R. 187, C.A..

Brebner v. Perry [1961] S.A.S.R. 177.

Lamb v. Munster (1882) 10 Q.B.D. 110.

National Association of Operative Plasterers v. Smithies [1906] A.C. 434, H.L.(E.).

Parry-Jones v. Law Society [1969] 1 Ch. 1; [1968] 2 W.L.R. 397; [1968] 1 All E.R. 177, C.A..

Quinine Cartel, In re [1969] C.M.L.R. D41.

Redfern v. Redfern [1891] P. 139, C.A..

Reg. v. Boyes (1861) 1 B. & S. 311.

Reg. v. Garbett (1847) 1 Den.C.C. 236.

Reynolds Ex parte (1882) 20 Ch.D. 294, C.A..

Short v. Mercier (1851) 3 Mac. & G. 205; 15 Jur. 93; 20 L.J.Ch. 289.

Triplex Safety Glass Co. Ltd. v. Lancegaye Safety Glass (1934) Ltd. [1939] 2 K.B. 395; [1939] 2 All E.R. 613, C.A..

No additional cases were cited in argument.

INTERLOCUTORY APPEALS from MacKenna J.

On October 21, 1976, Judge Merhige in the United States District Court for the Eastern District of Virginia, Richmond Division granted the applications of Westinghouse Electric Corporation ("Westinghouse") to issue two letters rogatory to the High Court asking that court to issue process causing named persons to appear before a consular officer *552 of the United States in London, to be examined orally, as witnesses in actions in Virginia and causing two English companies, Rio Tinto Corporation Ltd. and RTZ Services Ltd. ("RTZ "), with which the named persons were connected as officers or directors, to appear at the oral examination of the witnesses to produce itemised documents. Persuant to the letters rogatory and to the Evidence (Proceedings in Other Jurisdictions) Act 1975 and R.S.C., Ord. 70, Master Creightmore on October 28, 1976, made two orders (1) that Peter Daniel, Jean Loup Dherse, the Rt. Hon. Lord Shackleton of Burley, Sir Ronald Mark Cunliffe Turner and Roy William Wright to attend before the consul, vice-consul or consular officer of the United States Embassy on a named date to be examined on oath or affirmation touching evidence required for civil proceedings in Virginia, and that RTZ by its director and proper officer Andrew Edward Buxton produce at the oral examination the documents enumerated in Schedule B to the letter rogatory, (2) a similar order naming Andrew Edward Buxton and Kenneth E. Bayliss as witnesses and RTZ Services Ltd. by its director and proper officer Andrew Edward Buxton as the company to produce the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                              Page 6

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

documents enumerated in schedule B to the other letter rogatory.

On February 22, 1977, Master Jacob upheld the order of Master Creightmore and on May 10, 1977, MacKenna J. dismissed appeals from Master Jacob.

RTZ and the persons named appealed on the grounds that the judge erred: (1) in holding that the order sought for the production of documents was within section 2 (4) of the Evidence (Proceedings in Other Jurisdictions) Act 1975, for the following reasons; (a) the order would require RTZ to state what relevant documents were or had been in its possession, custody or power, contrary to section 2 (4) (a); (b) the documents sought were not "particular documents" within the meaning of section 2 (4) (b); (2) in holding that the onus on an applicant for the production of documents under the Act was only to show that the documents appeared to be likely to exist, and that the applicant need not show that they did in fact exist; (3) in finding that all the documents sought appeared to be likely to exist, and appeared to be likely to be in the possession, custody or power of RTZ; (4) in holding that the Act did not require that the documents sought be ancillary to the oral testimony of a witness at the trial; and erred in fact in finding that the documents sought were so ancillary; (5) in that he considered de novo the question of what directly relevant oral testimony the persons named in the letters rogatory would have to give; and ignored the fact that the judge who issued the letters rogatory had not considered the question whether the named persons did have such evidence to give, and that there was no evidence before that judge on which he could have answered that question in the affirmative; (6) in deciding for himself whether the named persons had directly relevant evidence to give. he erred in law in holding that the onus on an applicant under the Act was only to show that the named persons were likely to have such evidence to give, and that the applicant need not show that they did in fact have such evidence to give; and erred in fact in finding that *553 all the persons named in the letters rogatory were likely to have relevant evidence to give; (7) in holding and/or in finding

that the request, both for oral and documentary material, was not an application for discovery against persons not parties to the United States proceedings in respect of which the letters were issued. In particular, the judge failed to take any or any sufficient account of the breadth of the description of the documents sought; or of the fact that the judge who issued the letters had not decided that the material sought would be directly relevant at the trial of the action, and indeed stated that he did not know how relevant the material would be. The judge further attached undue importance to statements made on behalf of Westinghouse that they intended to use all the material sought at the trial of the action; (8) in holding that the request, both for oral and documentary material, was not objectionable by reason of the fact that it was made by the United States court as part of its pre-trial discovery procedure; (9) in the exercise of his discretion in ordering production of the documents sought in that he failed to take any or any proper account of the fact that the material, in so far as it tended to prove the issues to which Westinghouse alleged it related, would also be relevant in certain antitrust proceedings pending in the United States District Court for the Northern District of Illinois, Eastern Division, in which proceedings RTZ were defendants and in which they had elected to take no part on the ground that the Illinois court had no jurisdiction, and (10) in the exercise of his discretion in ordering that the named persons do attend to give oral testimony in that he failed to direct himself correctly in the application of the Fifth Amendment of the United States Constitution, or to consider adequately the implications thereof.

By a respondent's notice, Westinghouse contended that MacKenna J.'s judgment should be affirmed on the additional grounds that (1) under the provisions of the Act of 1975 there was no requirement that documents ordered to be produced must be ancillary to the oral evidence of witnesses; and (2) the privilege against exposure to proceedings for the recovery of a penalty under section 14 of the Civil Evidence Act 1968 did not confer any right to refuse to answer any question or produce any document on the grounds that to do so would tend

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

to expose the person claiming the privilege to the imposition of a fine under article 85 or 86 of the Treaty of Rome and articles 14 or 15 of E.E.C. Regulation No. 17/62.

The facts are stated in the judgment of Lord Denning M.R.

*Raymond Kidwell Q.C.* and *Richard Wood* for RTZ and the persons named in the orders. These letters rogatory were issued referring not only to the companies in England but also to companies in Canada and Australia (both of which have passed legislation on the matter). The court is concerned with a very wide ranging request. Comity comes into the issue and there may well be a predelction to do what the American courts wish. English courts only act where the documents are properly specified and not where there is an attempt to obtain discovery. The court has to inquire whether the American pre-trial procedure was *554 in the United States Court's mind. The appellants are not parties to the proceedings in that court and the request is oppressive.

Section 1 of the Foreign Tribunals Evidence Act 1856 (19 & 20 Vict., c. 113) provided for the examination of witnesses in this country in a cause pending before a foreign tribunal and section 5 gave a right of refusal to answer questions and produce documents tending to incriminate. See now the Evidence (Proceedings in Other Jurisdictions) Act 1975, ss. 2 and 3. Although the question of privilege does not at present arise, the common market legislation whereby the companies may be subject to penalties and the United States Fifth Amendment may have to be considered.

The intention of the Act of 1975 is that the documents requested to be produced should be ancillary to oral testimony (see sections 1 and 2). Section 2 (1) emphasises the court's discretion by twice using the word "may." Section 2 (4) gives effect to the judicial interpretation of the Act of 1856. Section 3 deals with privilege. R.S.C., Ord. 70, r. 6, is a new rule, "Claim to Privilege" (see The Supreme Court Practice 1976, Supplement No. 5,

para. 70/6) introduced to give effect to section 3 (1) . R.S.C., Ord. 70, gives teeth to the statute: see r. 4 on the taking of the examination and the note 70/4/3 thereto. R.S.C., Ord. 39, r. 5, shows how the question of a claim to privilege is dealt with in English law. R.S.C., Ord. 38 deals generally with our rules for obtaining evidence: r. 14 deals with writs of subpoena (see form No. 28 in Appendix A, *The Supreme Court Practice 1976,* vol. 2, p. 17). R.S.C., Ord. 38, r. 13 (order to produce document at proceeding other than trial) is taken from the former R.S.C., Ord. 37, r. 7.

The court has to ask whether this is a request for the production of specific documents or for ranging discovery. Persons who are not parties to an action should not be put into the position where they have to give discovery. Although comity must be considered, the English courts in applying the Act of 1975 must apply English principles and not American pre-trial procedure.

The letters rogatory partake of the nature of discovery and are not within the scope of the Act of 1975. They are not particular specified documents which must be shown to exist. The order is oppressive. It is open to the court to use a blue pencil. It is for Westinghouse to ensure that the letters rogatory are in the proper form. If the claim is too wide the court in its discretion can give nothing. Section 2 (4) of the Act of 1975 is very restrictive: even more so than the common law principles. The language used is the language of discovery.

If on a broad view the classification is an exercise in discovery the whole letters rogatory should be rejected. The important word in section 2 (4) of the Act of 1975 is "specified," and the Act separates oral testimony and documents. The production of documents should be limited to documents ancillary to the oral testimony and should also limit the numbers of specified documents to be produced. The shutter should be brought down as soon as it appears that what is sought is roving discovery. Under the Act of 1856 and in pre-Act of 1975 authorities documents were treated as ancillary to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                      Page 8

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

oral testimony. The order as it stands could lead to an unlimited inquiry into the whole uranium business conducted over *555 five years, such inquiry arising out of the documents. Though it may be difficult to limit examination of witnesses, the court should exercise a discretion as it has done in the past, despite the different words used in the Act of 1975. It is implicit in section 2 (4) that there cannot be a fishing inquiry by making an order on an oral witness where the first question to the witness could be: what documents have you got? or what documents are in the possession and power of your company?

The crucial question is whether the evidence asked for is for use at the trial or for discovery. This order is in such wide terms as to fall outside the scope of our interrogatories. The court should still prefer the approach in the old cases and should not lend its process under this Act to give discovery to the extent implicit in the letters rogatory where the order for documents is directed to the company and that for oral evidence is directed to a person. Under section 3 (1) the witness is not to be compelled to give evidence which he could not be compelled to give in civil proceedings in England.

*T. H. Bingham Q.C.* for Westinghouse intervening. The order only permits the asking of relevant questions and if a question is not relevant it will not be asked. It is the examiner who will rule on a refusal to answer a question on the ground that it is irrelevant.

*Kidwell Q.C.* continuing. In the English authorities the phrases "directly relevant" and "indirectly relevant" have been used; the present categories are "relevant" or "not relevant" to the civil proceedings. "Not relevant" should be limited as in the decided cases. Though the evidence permitted under the Act of 1975 is "for the purposes of civil proceedings" the courts have always refused to make an order where what is asked for is an exercise in pre-trial discovery.

The letters rogatory are so wide as they stand that they should be rejected.

[ROSKILL L.J. The whole purpose of the new Act is to widen the power to assist foreign courts.]

That could have been said of the Act of 1856. The courts had the power to make the orders but looked at each case on its merits: see Elder v. Carter, Ex parte Slide and Spur Gold Mining Co. (1890) 25 Q.B.D. 194.In Burchard v. Macfarlane, Ex parte Tindall [1891] 2 Q.B. 241, where only one small file was involved, the court held it had no jurisdiction to make the order because it was thought that inspection and discovery, not evidence, was sought. That attitude was maintained in Radio Corporation of America v. Rauland Corporation [1956] 1 Q.B. 618. [Reference was also made to Penn-Texas Corporation v. Murat Anstalt (No. 2) [1964] 2 Q.B. 647; Panthalu v. Ramnord Research Laboratories Ltd. [1966] 2 Q.B. 173; American Express Warehousing Ltd. v. Doe [1967] 1 Lloyd's Rep. 222 and Seyfang v. G. D. Searle & Co. [1973] Q.B. 148 .] The court has always exercised a discretion and should do so under the new Act, even while bearing in mind the desirability of respecting comity when a request has been made. There is a difference between pre-trial discovery and evidence on commission which will be available at the trial. The American procedure on documents is the same as ours though they may require wider disclosure of indirectly relevant *556 documents. Twenty five nations at the Hague Convention agreed that the proper meaning of "for the purposes of civil proceedings" is "for use in civil proceedings." There is a duty on the court to make only such limited orders as are proper under English procedure. [Reference was made to National Association of Operative Plasterers v. Smithies [1906] A.C. 434.]

The E.E.C. point on articles 85 and 86 is very important. The question is whether those articles can bite on the alleged cartel. A decision on the impact of those articles at the present stage would be based on inadequate information. Common market law is not the same as United States anti-trust law.

*T. H. Bingham Q.C.* and *Timothy Walker* for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

Westinghouse. What the United States judge is asking for is trial testimony, "the taking of that testimony and the production of documents" by June 3 for the trial in August in Virginia. Westinghouse face a suit for $200m. and believes it has a good defence so it is not surprising that this information is wanted. The distinction between "pre-trial" and "trial" discovery arises because this country and the United States may be divided by a common language; the Americans use the expression "pre-trial discovery" for what we call evidence on commission. The judge may be asking for evidence which could either be produced at the trial or which will open up a line of inquiry; but all the matters come under one umbrella. It was made clear to those making the application under the Act of 1975 that a fishing expedition would not be allowed by the English court and undertakings have been given that all the material obtained under the letters rogatory will be put in at the trial.

This court will be slow to go behind a request from a United States judge for material "for the trial." If the appellants' submissions were accepted it would put real obstacles in the way of a foreign state and would be contrary to the spirit of the Act of 1975.

The question is whether what the foreign court is asking for is something which by English notions goes further than what is permissible in domestic proceedings. Section 2 of the Act of 1975 does not restrict the principles on which the court will act. Each head in section 2 (2) has an analogy in terms of our own rules of court to bring into line with our own procedure what we are willing to do for others. Section 2 (4) is a prohibition of an order for discovery and sub-paragraph (b) has two requirements: that the documents shall be "specified" and also whether they are likely to be in the "possession, custody or power" of the person concerned. The court's observations in American Express Warehousing Ltd. v. Doe [1967] 1 Lloyd's Rep. 222, all apply to the present case. The list of documents, though long, is limited in the way it ought to be; they are sufficiently specified. [Reference was made to Soul v. Inland Revenue

Commissioners (Practice Note) [1963] 1 W.L.R. 112.] The documents in the list are "reasonably distinct," are shown to be likely to exist and to be in the possession of the appellants. The question is: is the United States court asking for something we call discovery and therefore will not grant, or is it something which in English terms we would call the taking of evidence on commission? What the judge has asked for is something different. It is a written application for material "for use at the trial. " The Radio Corporation case [1956] 1 Q.B. 618 is distinguishable for there *557 the letters rogatory were a pure fishing expedition, a general order for discovery without putting any burden on the parties to whom they were addressed to decide what was relevant: see also Burchard v. Macfarlane Ex parte Tindall [1891] 2 Q.B. 241, 247.

Equity, whose procedure led to the disclosure of documents, disliked helping common informers recover penalties. As to "Community Judgments Enforceable in the U.K.," see *The Supreme Court Practice* 1976, vol. 1, p. 1116, note 71/15- 24/2 to R.S.C., Ord. 71, r. 24. In an action to recover penalties the plaintiff was not entitled to administer interrogatories or to discovery under the old R.S.C, Ord. 31: Hunnings v. Williamson (1883) 10 Q.B.D. 459. In an action for penalties by a common informer leave would not ordinarily be given to the plaintiff to administer interrogatories: Martin v. Treacher (1886) 16 Q.B.D. 507. A large number of common informer actions were abolished by the Common Informers Act 1951.

The first safeguard is relevance. The Americans can designate a document "confidential" or "specially confidential": they have a clear procedure designed to see that confidentiality is not abused. R.S.C., Ord. 39, r. 5, deals with the refusal of a witness to attend or be sworn where evidence is given by deposition. Westinghouse are not interested in the contents of documents but in evidence of what happened. [Reference was made to section 51 of the Taxes Management Act 1970 and section 499 of the Income Tax Act 1952.] "Penalty" is a term of art to be construed in a strict historical context. The origin of Inland Revenue

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

enforcement lay with people employed as common informers. There must be a real risk of proceedings for the recovery of a penalty. It is E.E.C. Regulation No. 17/62 which provides that the Commission can impose fines on undertakings which intentionally or negligently break article 85 of the E.E.C. Treaty (article 15, para. 2). The Fifth Amendment applies to individuals only and does not apply to companies.

*Kidwell Q.C.* on privilege. If RTZ and those named in orders are heavily fined they will not be impressed by the argument that the ancient privilege against self-incrimination is not available to them. Ecclesiastical censure by being excluded from Holy Communion was once a ground for claiming privilege.

Forfeiture of a lease is a purely civil matter between landlord and tenant. This privilege against self-incrimination was stoutly asserted until It was abolished by section 16 (1) (a) of the Civil Evidence Act 1968: see in particular *per* Lord Esher M.R. in Earl of Mexborough v. Whitwood Urban District Council [1897] 2 Q.B. 111, 115.

Section 14 (1) (a) of the Civil Evidence Act 1968, recognising the privilege against self-incrimination applies to "a person" in "proceedings for an offence or for the recovery of a penalty." It is a fundamental principle of English law that a man cannot be compelled to incriminate himself out of his own mouth: see its application to bankruptcy in In re A Debtor (No. 7 of 1910) [1910] 2 K.B 59, 61, 63. The provisions of the Treaty of Rome, including articles 85 and 86, are now part of our law: see section 2 of the European Communities Act 1972. Section 3 of the Act of 1975 is concerned to protect these ancient privileges. [Reference was made to Blunt v. Park Lane Hotel Ltd. [1942] 2 K.B. 253, 256.] In Colne Valley *558 Water Co. v. Watford and St. Albans Gas Co. [1948] 1 K.B. 500 the principle was so well recognised that the whole case turned on whether it was a claim for damages or a penalty. Penalties like liquidated damages were the subject of privilege.

The     great     ancient     privilege     against

self-incrimination is not confined to criminal self-incrimination. The protection is against any process with a punitive element. A man may have a suit against me, either civil or criminal, but he may not make it out of my mouth. The European Communities (Enforcement of Community Judgments) Order 1972 (S.I. 1972 No. 1590) came into force when tqhe United Kingdom became a member of the European Communities. By article 15, paragraph 2 of General Regulations No. 17 of February 6, 1962 the Commission can impose fines on undertakings intentionally or negligently breaking article 85.

The wording of the orders is much too wide, the words "memoranda ..." should be out. Lord Denning M.R. in Comet Products U.K. Ltd. v. Hawkex Plastics Ltd. [1971] 2 Q.B. 67 , 74, said that "the genius of the common law" had prevailed since the days of Sir William Blackstone to prevent a defendant being a compellable witness in "contempt proceedings against him." See also *per* Bowen L.J. in Redfern v. Redfern [1891] P. 139, 147. [Reference was made to American Express Warehousing Ltd. v. Doe [1967] 1 Lloyd's Rep. 222 ; the Foreign Tribunals Evidence Act 1856, s. 1; and R.S.C., Ords. 24, r. 7 and 39, r. 5.] These are "pre-trial proceedings, proceedings by way of discovery ": see *per* Devlin J. in Radio Corporation of America v. Rauland Corporation [1956] 1 Q.B. 618, 646.

On the Fifth Amendment point, it is unsatisfactory that in American proceedings an untrained, unqualified, consular officer should be presiding at the examination. He will know nothing about the privilege against self-incrimination.

*Bingham Q.C.* in reply on privilege referred to the Radio Corporation case [1956] 1 Q.B. 618 case , 644, 648; Cross, Evidence, 4th ed. (1974), pp. 243-244 and Earl of Mexborough v. Whitwood Urban District Council [1897] 2 Q.B. 111, 114. The facts in In re A Debtor [1910] 2 K.B. 59 give the clue to the case. Blunt v. Park Lane Hotel Ltd. [1942] 2 K.B. 253 shows that the courts move with the times. In the Colne Valley Water Co. case

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

[1948] 1 K.B. 500, 504, Diplock for the gas company was not called upon to argue. [Reference was made to the Income Tax Act 1952, s. 499 (2) and (3) and the Taxes Management Act 1970, s. 100 .] "Penalty" has a specialised historical meaning and does not include everything that is penal. There is a difference between Revenue proceedings and European Commission proceedings. A tendency to expose a person to a penalty is different from tending to expose him to proceedings for a penalty. The maxim cessante ratione legis, cessat ipsa lex applies.

*Kidwell Q.C.* in further reply referred to Reg. v. Lewes Justices, Ex parte Secretary of State for the Home Department [1973] A.C. 388.

### LORD DENNING M.R.

As this is an urgent matter we will give judgment straight away. It arises out of a dispute now going on in the *559 United States of America. In the 1960s the Westinghouse Electric Corporation made contracts with power companies under which Westinghouse were to build nuclear power stations and to supply them with uranium as a fuel. The prices were stated in the contracts. There was an escalation clause to meet increases in the general cost of living, but not to meet changes in the market price of uranium.

At the time when Westinghouse agreed to supply this uranium, the price was comparatively low, but in the middle 1970s, especially after the raising of the oil prices, the price of uranium rose very sharply. In February 1973 it was only $6 a pound, but three years later it had risen to $41 a pound. The result was that Westinghouse found themselves in great difficulty, both in getting uranium and in supplying it to the power stations. So much so that they were unable to fulfil their contracts. They sought to excuse themselves on the ground that the performance of them was "commercially impracticable"; a line of defence with which we are familiar in England, and known as "frustration owing to supervening circumstances."

Then the power companies brought proceedings against Westinghouse in the States of Virginia and Pennsylvania. In addition there is an anti-trust suit in the State of Illinois. The amount in dispute is extremely large, $2,000 million or £1,000 million sterling.

At first sight this dispute seems to have nothing to do with England at all or any of us. But it appears that in Australia about a year ago someone surreptitiously got access to the files of an Australian uranium producer and Westinghouse got hold of those files. They disclosed the existence of an international cartel in uranium. This cartel was an association by which the big producers of uranium combined to regulate the output of uranium and the price of it. We are told that Australia, Canada, South Africa, France and the English company of Rio Tinto were parties to this cartel. Its object is said to have been to manipulate the market in uranium, to limit competition and to force prices up to excessively high levels. The files showed that in about 1972 there was formed a policy committee, an operating committee and a secretariat.

To aid their defence in America, Westinghouse want to prove the existence of this cartel and its dealings. They want to see all the documents which have been passing between the members and the notes of all the meetings. They desire to show the existence of this "conspiracy," as they would call it, to keep up prices. They have tried and failed in Australia, Canada, France and South Africa. We were told that in those countries regulations have been passed so as to forbid the documents of the cartel being disclosed. Now Westinghouse seek to get them from Rio Tinto in England.

There are no regulations in England forbidding access to these documents. The disclosure of them depends on our ordinary rules of law. We have before us a courteous request from the United States District Court for the Eastern District of Virginia, Richmond Division. It has asked us to order the Rio Tinto Zinc Corporation Ltd. and its principal directors, Sir Ronald Mark Cunliffe Turner, Lord Shackleton of Burley *560 and others, to produce

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

the documents relating to this cartel, and also to give evidence here in England. The federal judge, Judge Robert R. Merhige Jr., has issued two letters rogatory (which we call letters of request) addressed to us on October 21, 1976. The actual words are worth noting:

"The People of the United States of America to the High Court of Justice in England. Greetings:

"Whereas, certain actions are pending in our District Court for the Eastern District of Virginia, Richmond Division, in which the corporations listed in Schedule A attached hereto are plaintiffs and Westinghouse Electric Corporation is defendant, and it has been shown to us that justice cannot be done among the said parties without the testimony, which is intended to be given in evidence at the trial of the actions, of the following persons residing in your jurisdiction, being directors ... of the RTZ Services Ltd. ... nor without the production of certain documents in the possession of the RTZ Services Ltd. ... related to the existence and terms of various agreements, arrangements or concerted practices between RTZ Services Ltd. and the following entities ... Rio Tinto Zinc Corporation Ltd. (England) ... And whereas the existence and terms of such agreements, arrangements or concerted practices are relevant to the matters in issue in the actions at present in this court.

"We, therefore, request that in the interest of justice, you cause by your proper and usual process [Sir Ronald Mark Cunliffe Turner and others] ... to appear before any consul or vice-consul or other consular officer of the United States at London ... to be examined orally as witnesses ... and ... cause the said RTZ Services Ltd. ... to produce the documents enumerated in Schedule B hereto, being documents which appear to be or to be likely to be in the possession, custody or power of the RTZ Services Ltd. ..."

The letter rogatory finished with the assurance: "and we shall be ready and willing to do the same for you in a similar case when required."

A few days ago on May 20, Federal Judge

Merhige made a supplement to these letters in which he makes it clear that the letters rogatory are concerned with material that is required not merely for pre-trial procedure (as it is called in the United States of America) but for evidence and documents for actual use at the trial. He tells us that he has ordered that the trial of the proceedings in Virginia shall commence on August 22, 1977. He desires that all proceedings here be completed at the earliest possible date, so that the plaintiff shall have an adequate opportunity to consider such testimony and documents in connection with the presentation of their case.

Such is the request made by the United States Federal Court. It is our duty and our pleasure to do all we can to assist that court, just as we would expect the United States court to help us in like circumstances "Do unto others as you would be done by."

In answering this request, we have to go by our English statutes. Until 1975 the law on this subject was governed by the *561 Foreign TribunalsEvidence Act 1856. There have been many decisions on that Act. Notably, in our present context, is the Radio Corporation of America v. Rauland Corporation [1956] 1 Q.B. 618. The Divisional Court there made it quite plain that we should not accede to anything in the nature of a roving inquiry in which a party sought to "fish out" something. (It was thought that pre-trial discovery was of this nature.) But that case should not be read as putting any difficulty in the way of relevant evidence and ancillary documents. That was made clear by the latest case before the new Act. It was American Express Warehousing Ltd. v. Doe [1967] 1 Lloyd's Rep. 222.

The Act of 1856 has now been replaced by the Evidence (Proceedings in Other Jurisdictions) Act 1975. It was passed so as to give effect to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters 1968 (Cmnd. 3991 of 1969). It makes new provision for enabling the High Court to assist foreign courts in obtaining evidence here. Section 2 is expressed in much wider

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

language than the Act of 1856. The High Court is empowered to make provision for the examination of witnesses, for the production of documents, for the inspection of property and many other things which were not within the Act of 1856 at all. So long as the evidence is required for use in civil proceedings, the request of the foreign court should usually be granted; provided that the evidence is relevant to the issues in dispute in the foreign court. (The only limitations are those contained in section 2 (4) and section 3. They require separate consideration.)

Mr. Kidwell made, however, a general submission. He asked us to throw out these letters regatory altogether. He submitted that this case is just like the Radio Corporation case [1956] 1 Q.B. 618. The United States court, he said, want the documents for "pre-trial discovery" - in the sense in which that phrase was there used (see p. 620) - that is to discover documents which are not necessarily relevant in the trial, but they "might lead to a line of inquiry which would itself disclose relevant material": *per* Devlin J. at p. 643.

The first answer to this is given by Federal Judge Merhige himself. In his latest supplement to the letters rogatory he made it clear that that court requires the documents, not for pre-trial discovery, but for use at the actual trial itself which has been listed for August 22, 1977. The second answer is to be found in the Convention. It deals with pre-trial discovery in article 23 which said:

"A contracting state may at the time of signature, ratification or accession, declare that it will not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents as known in common law countries."
The United Kingdom, when it ratified this, did not make any such declaration. So I cannot accept Mr. Kidwell's general submission.

Turning now to the statutory limitations. Section 2 (4) (a) says:

"An order under this section shall not require a

person - (a) to state what documents relevant to the proceedings to which the application *562 for the order relates are or have been in his possession, custody or power."
That seems to me to exclude what we would call a "fishing inquiry". A witness cannot be required to make a general affidavit of documents. To that extent it excludes pre-trial discovery. Section 2 (4) (b) says that the order shall not require a person:

"to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power."
So the only documents which can properly be the subject of an order are

"particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power."
This also, in a way, excludes pre-trial discovery too.

We have had some discussion as to whether the documents in those letters rogatory are sufficiently specified. They are in Schedule B with sub-headings from 1 to 81. It contains many documents which are specified as being or likely to be in the possession of Rio Tinto. Most of them are particular documents which are specified sufficiently. For instance, all underlined in green and those underlined in pencil seem to me to be sufficiently specified. But some of the words in the subheadings seem to me to be rather too wide. They have these words, "and also all memoranda, letters and other documents in its files relating to" the foregoing. Those words were used in the American Express case [1967] 1 Lloyd's Rep. 222. They may have to be narrowed a bit. I think the words "relating thereto" cast the net too widely. It would be better to limit them more specifically, such as "referred to therein" or some such words. The point is that the documents should be specified with such distinctiveness as would be sufficient for a subpoena duces tecum. The description should be sufficiently specific to enable the person to put his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

hand on the documents or the file without himself having to make a random search - in short, to know specifically what to look for.

Going through the documents, no. 16 seems to me to be cast too widely. The person ought not to be required to chase through masses of documents to see whether this or that may or may not relate to the dispute. There may be other items too. On the whole the list seems to be valid, but it may need some modification so as to be sure the documents are sufficiently specified so as to satisfy the section of the statute.

There is no similar provision in regard to oral testimony. The limitation in section 2 (4) only applies to documents. So far as evidence is to be given, by word of mouth, the witnesses can, I think, be required to answer any questions which fairly relate to the matters in dispute in the foreign action. Mr. Kidwell asked us to disallow questions of a roving nature, but I do not think the order can or should be so limited. The only practical test of any question is: "Is it relevant? Does it *563 relate to the matters in question?" No one would wish the witnesses to be asked about irrelevant matters or to go into other things with which the dispute is not concerned. But it is said there is a difficulty. The witnesses are not conversant with the issues in the case. They do not know what is relevant, and what is not. Any difficulty on that score is readily overcome. By agreement (and I think even without agreement) these witnesses, when they are asked to give evidence, can and should have legal advisers at their elbow. There are very reputable and responsible advisers on each side. If a question is irrelevant the witness will be told and advised not to answer. So the point can and should be resolved by the responsible lawyers on each side without difficulty.

Now I come to the really troublesome question, that is, the question of privilege. We have a rule here against self-incrimination. The common law has for centuries held that a person is not bound to answer a question which may render him liable to punishment, penalty or forfeiture. In the United

States under the Fifth Amendment an individual (not a company) is entitled to a privilege by which he is not bound to answer questions by which he may incriminate himself.

Take fist our English position. We discussed it in the recent case of Comet Products U.K. Ltd. v. Hawkex Plastics Ltd. [1971] 2 Q.B. 67. I quoted at p. 73 Bowen L.J. as saying in Redfern v. Redfern [1891] P. 139, 147:

    "It is one of the inveterate principles of English law that a party cannot be compelled to discover that which, if answered, would tend to subject him to any punishment, penalty, forfeiture, ... 'no one is bound to criminate himself.'"

That privilege prevailed in England until an inquiry by the Law Reform Committee, 16th Report in 1967 (Cmnd. 3472). They recommended that the privilege in regard to forfeiture should be abolished. It had been upheld in Earl of Mexborough v. Whitwood Urban District Council [1897] 2 Q.B. 111. It was expressly abolished by the Civil Evidence Act 1968, section 16 (1) (a).

But the privilege in respect of penalties was not abolished. It was retained by section 14. It says:

    "(1) The right of a person in any legal proceedings other than criminal proceedings to refuse to answer any question or produce any document or thing if to do so would tend to expose that person to proceedings for an offence or for the recovery of a penalty (a) shall apply only as regards criminal offences under the law of any part of the United Kingdom and penalties provided for by such law; ..."

Mr. Bingham submitted that the word "penalties" should be confined to penalties in revenue cases. He referred us to the report of the Law Reform Committee which said in paragraph 13: "Actions for penalties are now obsolete except in revenue cases." He referred us also to a case about penalties in the Water Works Clauses Acts of Colne Valley Water Co. v. Watford and St. Albans Gas Co. [1948] 1 K.B. 500: he said that they, too, had become obsolete. He pointed out, quite rightly, *564 that in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

the old days common informers used to sue for penalties under various Acts but these had all been replaced by summary proceedings before the magistrates. I appreciate the force of these submissions, but I am afraid I do not feel able to give effect to them. The statute retains the privilege in respect of penalties provided for by "the" law of any part of the United Kingdom and I do not see that we can escape from it. There is, after all, good reason for retaining it - the same reason as lay behind its introduction centuries ago. No person should be compelled to expose himself to pains or penalties out of his mouth. If he is to be penalised for wrongdoing, it should be proved against him by those who accuse him.

Mr. Bingham did raise another argument of a semantic nature. He stressed the words proceedings "for the recovery of a penalty." He said that the privilege was allowed when a person was in danger of an action to recover a penalty; but not to a case in which a person might be liable to have a penalty imposed on him without an action. That is too fine a distinction for me. If he is liable to a penalty, it matters not whether it is recoverable by action or otherwise.

So in my view the word "penalty" includes a penalty to which a person may be subject under the law of any part of the United Kingdom.

Now I come to the community law. None of the witnesses in this case would be liable to a penalty under the old law of England. But since 1972 everything is different. We are now in the European Economic Community. The Treaty of Rome ("E.E.C." Treaty signed at Rome, March 25, 1957) and all its provisions are now part of the law of England. That is clear from section 2 of the European Communities Act 1972. We have to give force to the Treaty as being incorporated - lock, stock and barrel - into our own law here.

One of the most important of the provisions of the Treaty is article 85. It is wide enough to prohibit any cartel or association of producers by which they agree to keep up prices or to limit competition in a

way which affects the common market. It says:

"... all agreements between undertakings, decisions by associations of undertakings and concerted practices which may affect trade between member states and which have as their object or effect the prevention, restriction or distortion of competition within the common market, and in particular those which: (a) directly or indirectly fix purchase or selling prices or any other trading conditions; (b) limit or control production, markets, technical developments, or investment;"
and so on, are prohibited. It goes on to say that all those that are so prohibited are automatically void.

If the allegations made by Westinghouse are well-founded, it does look as if the Rio Tinto company and the French companies were parties to an agreement which had, as its object, the restriction of competition and the fixing of selling price; and that this would affect the trade between member states as interpreted by the European Court. So there would be a breach of article 85 by Rio Tinto.

**\*565** But what are the consequences? For these we have to turn to the regulations which are binding as part of English law. Article 189 says: "A regulation shall have general application. It shall be binding in its entirety and directly applicable in all member states." The material regulations are the General Regulations No. 17 of February 6, 1962. Article 15, paragraph 2 says that the Commission may impose fines on undertakings (not on individuals) who intentionally or negligently break article 85. The fines may be as much as 1,000 million units of account, or not exceeding 10 per cent. of the turnover in the preceding business year. In fixing the amount of the fine, regard shall be had both to the gravity and the duration of the infringement.

It is plain, therefore, that Rio Tinto may be exposed to a very large fine by the European Commission. Is it a penalty? I think it is. It is a penalty for entering into an agreement to restrict competition or to fix prices contrary to article 85. It is to be noted that article 15, paragraph 4 of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547

Page 16

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

General Regulations says: "The decisions taken under paragraphs 1 and 2 shall not entail any consequences under criminal law." That is inserted because the Treaty in article 192 provides that enforcement of fines and so forth "shall be governed by the rules of civil procedure in force in the state in the territory of which it is carried out." So the fines are not enforceable by the sanctions of criminal law. Only the civil procedures of the state. In this case, by the civil procedure of the English courts. Nevertheless they are clearly "penalties" just as much as the penalties under revenue law are penalties enforceable by civil procedures: see sections 93 to 100 of the Taxes Management Act 1970. And they are "provided for by" the "law of ... the United Kingdom," because the Treaty is part of our law. So liability to them is a ground for privilege against self-incrimination.

All I have said about "penalties" is, however, a preliminary view - given because the parties requested it. It is preliminary in case the company claims a privilege, on the ground that it may expose itself to penalties by the European Commission. If the company does claim privilege, the examiner must give effect to it. It is preserved by section 3 of the Evidence (Proceedings in Other Jurisdictions) Act 1975, which provides:

"(1) A person shall not be compelled by virtue of an order under section 2 above to give any evidence which he could not be compelled to give (a) in civil proceedings in the part of the United Kingdom in which the court that made the order exercises jurisdiction, ..."

Applied to this case, if Rio Tinto Zinc claim privilege saying: "We would be exposed to penalties at the instance of the European Commission" then they have a privilege against self-incrimination and can take the objection before the examiner.

If, however, circumstances arose so as to show that there is no "real or appreciable" danger to the Rio Tinto company of being fined or exposed to a penalty, the privilege would be lost: see Reg. v.

Boyes (1861) 1 B. & S. 311, 330. So if the European Commission said they *566 were not going to take any proceedings, there would not be any risk and the privilege would go.

Turning now to the American position. Section 3 (1) (b) of the Act of 1975 says that a person shall not be compelled to give evidence which he could not be compelled to give "in civil proceedings in the country or territory in which the requesting court exercises jurisdiction." So under these letters rogatory when an individual witness was asked to give evidence, he could claim the privilege given by the Fifth Amendment. He could say: "I am giving evidence for the purpose of being used in an American court. So I have a privilege against incriminating myself and making myself liable to proceedings in the United States if I go there." He has a privilege, therefore, which he can call in aid in an examination here under the Fifth Amendment in the United States. It only applies to individuals and not to companies - an interesting contrast to article 85 which only applies to undertakings and not to Individuals.

So far as procedure is concerned, if privilege is claimed because of the risk of a fine by the European Commission, the procedure is governed by R.S.D., Ord. 39, r. 5. If the witness refuses to answer the question an application can be made to the court to see whether he can be required to answer; and then the court will rule upon his claim. If privilege is claimed under the Fifth Amendment, the examiner will have to act under the new R.S.C., Ord. 70, r. 6. The examiner will have to take down the evidence, seal it up and send it across to the United States: and then the United States court will rule whether the claim is good or not.

The result will be that the order will be varied so as to make the variations I have indicated about the specification of the documents. So far as claims of privilege against self-crimination are concerned, they must await the examination of the witnesses to see if privilege is claimed or not: and then be dealt with on the lines I have stated.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                    Page 17

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

### ROSKILL L.J.

Subject to hearing counsel as to its form, I agree with the order which Lord Denning M.R. has proposed but I venture to add to his judgment for two reasons First, this appeal is of immense importance to the parties before this court, Westinghouse on the one hand and RTZ and the potential witnesses on the other; secondly, this is the first time that this court has had to consider the Evidence (Proceedings in Other Jurisdictions) Act 1975, a fact which makes this appeal of importance beyond its importance to the parties immediately concerned.

So far as the statute goes, Mr. Kidwell put in the forefront of his argument that MacKenna J. was wrong in having affirmed the order of Master Jacob because the letters rogatory were in truth designed to obtain discovery in this country against both the corporate witnesses and the individual witnesses. He put his submission thus: if, looking at the matter broadly, this was an exercise in discovery, then the whole request should be rejected. He founded much of his argument upon the line of cases which followed the *567 Foreign Tribunals Evidence Act 1856 which had governed matters of this kind until the Act of 1975 was passed. He invited us to approach our decision upon the construction of the Act of 1975 by reference to those earlier decisions. With all respect to the persuasive skill of that argument, I think it is a wholly erroneous approach to invite the court to consider the true construction of a statute passed in 1975 by reference to a line of judicial decisions, albeit of high authority, under a statute in different terms passed in different circumstances about 125 years ago.

The Act of 1975, as Lord Denning M.R. has already said, enacted the Hague Convention of 1968 as part of the law of this country. Whether or not it is legitimate to construe the Act of 1975 by reference to that Convention (it is only right to say that the Convention itself is not referred to in the statute) none the less, treating that Convention as what Lord Wilberforce recently called [Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen [1976] 1

W.L.R. 989, 997] part of the "factual matrix," it seems to me plain what the purpose of that Convention was, as indeed it states upon its face. It will be found in Command Paper 3991 and recites that the states signatory to the Convention desire "to facilitate the transmission and execution of letters of request and to further the accommodation of the different methods which they use for this purpose," and also that they desire "to improve mutual judicial co-operation in civil or commercial matters." We move in 1975 in a very different world from that of 1856.

When one sees that this Convention was signed on behalf of some 25 signatories, some of them common law countries and some of them countries with systems of law vastly different from those either of this country or of the United States of America or of any of its states, one realises how broad was its general intention. It is relevant, as Lord Denning M.R. pointed out both in his judgment and during argument, that article 23 of that Convention provides:

"A contracting state may at the time of signature, ratification or accession, declare that it will not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents as known in common law countries."

There is authority in this country under the Act of 1856, the Radio Corporation case [1956] 1 Q.B. 618, that this court will not facilitate what I can, with sufficient accuracy, call the United States pre-trial discovery procedure by allowing letters rogatory to be issued solely for the purpose of obtaining in this country pre-trial discovery in the strict sense of that phrase. It has been said that the evidence sought must be evidence directed to use at the trial itself.

Looking at the Act of 1975, I draw attention to the preamble. This, as Shaw L.J. pointed out during the argument, is no consolidating Act. It does not re-enact in any shape or form the Act of 1856 or any of the other Victorian statutes which touch upon this question. On the contrary, it is described as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

"An Act to make new provision for enabling the High Court ... *568 to assist in obtaining evidence required for the purposes of proceedings in other jurisdictions ..."
I need not read the rest of the preamble. It is obviously designed to give effect to the Convention.

This morning, during his reply, Mr. Kidwell said that we should not be astute to assist Westinghouse to obtain the relief which they seek in these proceedings. With respect, that submission is misconceived. We are not concerned with assisting or not assisting Westinghouse. We are concerned with and only concerned with assisting the Federal Court for the District of Richmond in Virginia. It is that court which has enlisted our assistance by letters rogatory and it is that court which, to use Lord Denning M.R.'s phrase, it is both our duty and our pleasure and our power under the Act of 1975 to assist, so far as we properly can. The limitations upon the power and the duty of this court to assist under that statute seem to me to be matters to be found not in decisions under the Act of 1856 at all, but within the language of the statute itself, bearing in mind that it is a statute designed to give effect to a convention to which many different countries with many different systems of law are parties.

Lord Denning M.R. referred in his judgment to a number of the sections of the Act of 1975, and I will not lengthen mine by repeating what he has said. It seems to me that Mr. Kidwell's argument that we should apply the construction placed upon the Act of 1856, and hold that documents to be produced under the present Act have to be ancillary to the oral evidence of witnesses, is wrong. Whatever the true construction of the Act of 1856, as to which there is abundant authority, we are now dealing with a completely different statute: when one looks at section 2 (1) and (2) of the Act of 1975, one finds that section 2 (2), which is described as being "without prejudice to the generality of subsection (1)" empowers the court to make provision for a number of matters (a) to (f) inclusive, of which (a) is "for the examination of witnesses, either orally or in writing" and (b) is "for the production of documents." Simply as a matter of

construction, it would be quite wrong, with all respect to Mr. Kidwell, to hold that the production of documents should be limited to documents ancillary to the evidence or oral testimony of witnesses whose evidence is to be adduced under the Act. That point, therefore, fails.

I think his other point, what he calls his "root and branch" point, also fails, indeed fails in limine, and for this reason. It was suggested, as I said a moment ago, that this was an attempt to obtain pre-trial discovery. One should ascertain what is the nature of the letters rogatory by looking at the letters rogatory themselves. They are exhibited to an affidavit of Mr. Watson of Freshfields. It seems to me to be plain - and Lord Denning M.R. has already mentioned this - that those letters rogatory are designed to obtain evidence for use at the trial. If there ever were any doubt about it - and I do not think there was - the matter is put beyond all doubt by an order of May 20 made by Judge Merhige for the benefit of this court. So that it seems to me that the first two grounds which Mr. Kidwell put forward, the "root *569 and branch "argument and the "ancillary" argument, both fail. To that extent, I find myself in complete agreement with the orders made in the courts below.

But the matter does not stop there, because in this court another matter has been fully argued which was not argued before MacKenna J. or Master Jacob. It is said that even if the orders issue in the form ordered below, none the less the corporate witnesses, by which I mean RTZ and RTZ Services, are entitled, as of right, to decline to produce the documents sought on the ground that they are privileged from production under the well known long standing rule in this country by virtue of which witnesses are entitled to protection from self-incrimination.

I do not propose in this judgment to discuss either the historical origin of this rule, or its possible historical links with the Fifth Amendment to which much reference has been made, nor whether it is right that at the present time there should be a continued right to silence in this country or not. We

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547

Page 19

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

are not concerned with anything other than the privilege against self-incrimination to the extent that that privilege has been preserved by section 14 of the Civil Evidence Act 1968.

The matter arises in this way. We are concerned here with the privilege accorded by the combined effect of section 3 of the Act of 1975, and section 14 of the Act of 1968. It was argued that the reference to penalties in the Act of 1968 should be given a strictly limited meaning and should be construed as limited to penalties such as those imposed by the Income Tax Act 1952 and the Taxes Management Act 1970.

It is true that when the law was altered in 1968 following the report of the Law Revision Committee in 1967 it appears that those penalties - those under the Act of 1952 - and those alone were intended to be the subject of preservation, the other protection against self-incrimination having been recommended for abolition. But whatever the original intention may have been, and whatever penalties may have been in mind at that time, we have to consider the position under the Act of 1968 and the Act of 1975 having regard to the entry of this country into the European Economic Community in 1972. As Lord Denning M.R. has pointed out, under the European Communities Act 1972 it is clear that the regulations of the E.E.C. and indeed the Treaty of Rome itself, and in particular article 85, are now a part of the law of this country. We were referred to articles 14 and 15 of Regulation No. 17/62. It is plain that fines which are penalties can be inflicted under article 15 for (among other matters) breaches of article 85 of the Treaty. It is also plain from article 15, paragraph 4, that decisions to impose fines taken under paragraphs 1 and 2 of the article shall not be of a criminal law nature.

Those fines or penalties can be enforced by proceedings in this country. After the Act of 1972 was passed, the European Communities (Enforcement of Community Judgments) Order 1972 (S.I. 1972 No. 1590) was enacted by Her Majesty in Council and rules of court were

thereafter made giving effect to those various pieces of legislation. It is **570** sufficient to refer to the note 71/15-24/2 in The Supreme Court Practice (1976), R.S.C., Ord. 71, r. 15, which reads:

"... The most likely Community judgments enforceable under the provisions of the Community Treaties which would require to be registered and enforced in the United Kingdom are decisions of the Commission of the European Communities imposing fines or penalties, either of lump sums expressed in units of account or percentages of the offending firm's turnover, ... under E.E.C. Regulation 17/62, relating to restrictive practices and monopolies."

Notwithstanding Mr. Bingham's ingenious argument this morning, I cannot see any legitimate reason for limiting the construction of the word "penalties" in the Act of 1968 to revenue penalties formerly imposed under the Act of 1952 and presently under the Act of 1970. Like Lord Denning M.R., I have reached this conclusion with a certain regret, because one has an instinctive feeling that there is an element of artificiality about this result, but that being the statutory position in this country, that being the express right of the persons concerned under the Act of 1975 which preserves the relevant privilege, including that preserved by the Act of 1968, I see no answer to the contention that this protection exists in principle. But it is important to remember, as Lord Denning M.R. pointed out, that there may be qualifications upon the right to the protection. Whether there are relevant qualifications in particular instances is something which must be dealt with at the hearing and cannot be determined in advance.

Accordingly, for those reasons, I agree with what Lord Denning M.R. has said about privilege. So far as the Fifth Amendment is concerned, I propose to say very little. Mr. Kidwell has said that we should make it a condition of the issue of the order that a master should act in place of the United States consul or vice-consul for the purpose of taking any evidence that may be given under the letters rogatory and that such a master should be appointed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                  Page 20

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

by the judge in Virginia. The purpose was that a ruling on this privilege on behalf of the judge might be given instantly so that no problem of delay would arise in connection with any witness who invoked the Fifth Amendment. All I would say is that I think it would be quite wrong for this court to presume to dictate before whom these proceedings should take place. That, it seems to me, must be a matter for the court in Virginia and not for this court. If the proceedings are to be held in the near future in London, it must be a matter for the judge in Virginia to say by his order who is to sit where; possibly either he himself or a master appointed on his behalf or a consul or vice-consul as the present order provides.

The only remaining point with which I have to deal is the width of the order. Lord Denning M.R. has referred to some matters arising on Schedule B. Like him, I think that some of the descriptions in Schedule B are too wide. If I may take one or two items as an example, I refer first to item 11. That seems to me to be a legitimate use of the phrase "memoranda, correspondence or other documents relating thereto" because those documents are sufficiently specific. On **\*571** the other hand, like Lord Denning M.R., I think number 16 is much too wide. Again, merely to take an example, I think number 7 is wide; although it only primarily refers to a single document I think the request must identify, for the protection of the person receiving it, with sufficient accuracy, the documents required either individually or generically so that that person concerned may know what it is he has to provide and does not have to search around among his files to make up his own mind whether or not he will be failing in his duty to the court if he does not produce a particular document. His task should be made easy and not difficult; I am sure that with goodwill, having regard to those who have charge of the matter on both sides, the order when issued will be sensibly operated.

For those reasons, as well as those given by Lord Denning M.R., I would in substance dismiss the appeal but with the qualifications on the existing order that Lord Denning M.R. has mentioned.

**SHAW L.J.**

I agree with both judgments and there is nothing I wish to add.

*Appeals dismissed with modifications varying order made by MacKenna J. Declaration that fines, if any, which might be imposed under E.E.C Treaty are penalties within section 14 of the Civil Evidence Act 1968. Each party to pay own costs in Court of Appeal. Order for costs below to stand. Leave to both sides to appeal: examination not to be held up. (A. H. B. )*

**Representation**

Solicitors: Linklaters & Paines; Freshfields.

On June 21, 1977, MacKenna J. dismissed an application by Westinghouse Electric Corporation ("Westinghouse") for an order requiring the Rio Tinto Corporation Ltd. and RTZ Services Ltd. (both companies being referred to as "RTZ") to produce and/or produce for inspection the documents set out in the schedules to the orders of the Court of Appeal of May 26, 1977.

Westinghouse appealed on the grounds that the judge erred in law and in fact in failing to hold that the production of the documents would not expose RTZ to any proceedings for the recovery of a penalty to which they were not already exposed and/or that there was no real or appreciable danger to RTZ being exposed to any such proceedings by reason of their production of the documents; that he failed to pay due regard to section 14 (1) of the Civil Evidence Act 1968; and that he held that the issue was decided against Westinghouse by Triplex **\*572** Safety Glass Co. Ltd. v. Lancegaye Safety Glass (1934) Ltd. [1939] 2 K.B. 395, which was wrongly decided.

The facts are stated by Lord Denning M.R.

**Representation**

T. H. Bingham Q.C. and Timothy Walker for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547

Page 21

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

Westinghouse.

Brian Neill Q.C., Michael Burton and Richard Wood for RTZ.

### LORD DENNING M.R.

To make this case clear, I must repeat one or two things we all know. On the information placed before us, there is ground for thinking that from 1972 onwards there was an international cartel in uranium. This cartel was an association by which the big producers of uranium combined to regulate the output of uranium and the price of it. Its object is said to have been to manipulate the price of uranium, to limit competition, and to force prices up to excessively high levels. The parties to this cartel included Australia, Canada, South Africa, France - and companies in those countries - and also the English company of Rio Tinto.

There is also ground for thinking that, in belonging to this cartel, France and its companies and the Rio Tinto companies ("RTZ") were infringing article 85 of the E.E.C. Treaty. That article prohibits all "concerted practices" which restrict or distort "competition within the common market." If RTZ have infringed article 85, they can be fined by the European Commission at Brussels. The fine may be very large indeed. The European Commission can impose this fine under Regulation No. 17 of 1962, article 15 (2). It can be imposed by the European Commission at Brussels without the English courts having any say in the matter at all. RTZ can appeal to the European Court at Luxembourg: see Regulation No. 17, article 17. But if that court affirms the fine, that is final. The only role of the English court is that of a rubber stamp. The fine can be enforced by process of execution issued by our courts.

There is evidence now before us that the European Commission in Brussels knew all about the cartel almost from the beginning in 1972. They made some inquiries of the governments involved. But they took no action to interfere with the cartel. Then in 1976 in Australia a society calling itself the "Friends of the Earth" got hold of the files of an Australian mining company which was concerned with the cartel. They sent the files to California. Thence they came into the possession of influential quarters in the United States; and in particular into the hands of the Westinghouse Electric Corporation ("Westinghouse"). The European Commission in turn got hold of the "Friends of the Earth" documents late in 1976. Questions were asked about it in the European Parliament. No doubt with the view of the European Commission taking action against the cartel. On September 15, 1976, the member of the Commission made this answer:

"Since 1972 the Commission has followed with interest the actions of the Uranium Club. The Commission is examining the information which has recently reached it on the subject and which is being studied also in the United States. It is continuing its analysis of the respective roles of the governments and the companies in the formation and operations of the club."

*573 A supplemental question was asked: "Does the Commission admit in principle the existence of a cartel in this affair?" The answer was: "We are not able, at this point, to come to a conclusion as to the existence of a cartel." This answer seems to have provoked some amusement because the official report notes down in French "sourires." I suppose this was due to the lack of action by the Commission.

*The present proceedings*

On the last occasion ante, p. 558H I described the litigation now pending in the United States in which the courts there had issued letters rogatory to the courts here in England. They have requested the English courts to compel RTZ to produce to an examiner their documents relating to the uranium cartel. On May 26, 1977, we gave a ruling that on the examination in England RTZ could claim the privilege given by the common law against self-incrimination. That is, that they had a right to refuse to produce the uranium documents "if to do so would tend to expose them to proceedings" for a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                          Page 22

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

fine or penalty by the European Commission. Before the examiner RTZ did claim this privilege. We now have to decide whether the privilege should be upheld or not. I will take the arguments in the order which the advocates took them before us.

First, *the common law as to self-incrimination.* If the privilege is good, it must satisfy the common law rule about it. It is to be noticed that RTZ are not parties to the litigation in the United States. They are reluctant witnesses who have been ordered to give evidence and to produce documents.

There is, I think, a distinction to be drawn between a witness and a party to a suit. It happens sometimes that a defendant is sued for a matter which not only gives rise to a civil cause but also gives rise to a criminal offence such as libel or fraudulent conversion. The plaintiff then seeks to administer interrogatories or get discovery from the defendant so as to support his charge. In such a case the defendant has on occasion taken objection on the ground that the answer or the discovery may tend to expose him to proceedings for a criminal offence: and the objection has been upheld. Such were the libel cases of Lamb v. Munster (1882) 10 Q.B.D. 110 and Triplex Safety Glass Co. Ltd. v. Lancegaye Safety Glass (1934) Ltd. [1939] 2 K.B. 395. I must say that I doubt if those cases would be decided in the same way today. The privilege should not be allowed in a libel case where there is no real risk of the defendant being prosecuted: and his objection is only put forward as a way of escaping his civil liability.

Today we are not dealing with a party to a cause: we are dealing with a witness. At common law, when a witness is being examined in the witness box or is subpoenaed to produce documents to the court, then, quite understandably, he may have something he wishes to keep secret to himself so that his neighbours or his competitors should not get to know of it. Something which he might reasonably believe he ought not to be compelled to disclose. Not, at any rate, if it exposes him to risk of some ill befalling him. The common law does in some *574 circumstances cast its protection over

him. It adopts the maxim nemo tenetur seipsum prodere. No one is bound to furnish evidence against himself. It says:

"If a witness claims the protection of the court, on the ground that the answer would tend to incriminate himself and there appears reasonable ground to believe that it would do so, he is not compellable to answer": see Reg. v. Garbett (1847) 1 Den.C.C. 236, 257 by nine judges after two arguments.

Note that a witness is only given this protection if he can satisfy the court that there is reasonable ground for it. Lord James of Hereford said so in National Association of Operative Plasterers v. Smithies [1906] A.C. 434, 438. (If the court thinks that he has no reasonable ground but is making it as an excuse - for instance, so as to help or hinder one side or the other - it will overrule his objection and compel him to answer. That was pointed out by Sir George Jessel M.R. in Ex parte Reynolds (1882) 20 Ch.D. 294, 300.) It is for the judge to say whether there is reasonable ground or not. Reasonable ground may appear from the circumstances of the case or from matters put forward by the witness himself. He should not be compelled to go into detail - because that may involve his disclosing the very matter to which he takes objection. But if it appears to the judge that, by being compelled to answer, a witness may be furnishing evidence against himself - which could be used against him in criminal proceedings or in proceedings for a penalty - then his objection should be upheld.

There is the further point: once it appears that a witness is at risk, then "great latitude should be allowed to him in judging for himself the effect of any particular question": see Reg. v. Boyes (1861) 1 B. & S. 311 , 330. It may only be one link in the chain, or only corroborative of existing material, but still he is not bound to answer if he believes on reasonable grounds that it could be used against him. It is not necessary for him to show that proceedings are likely to be taken against him, or would probably be taken against him. It may be improbable that they will be taken, but nevertheless, if there is some risk of their being taken - a real and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                          Page 23

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

appreciable risk - as distinct from a remote or insubstantial risk, then he should not be made to answer or to disclose the documents. That is, as I read it, the judgment of the court in Reg. v. Boyes. I am sure that in Blunt v. Park Lane Hotel Ltd. [1942] 2 K.B. 253, 257 Goddard L.J. did not mean to say anything different because he had referred in a previous sentence to Reg. v. Boyes itself. In applying that principle in Reg. v. Boyes, where a witness was given a pardon, he was under no appreciable risk and was made to answer. Again in Blunt v. Park Lane Hotel Ltd. [1942] 2 K.B. 253, where the offence had become obsolete, he was made to answer. And in the Australian case of Brebner v. Perry [1961] S.A.S.R. 177, where he had already given a like statement to the police - and by giving evidence there was no increase in risk by his being made to answer - he was made to answer. But where there is a real and appreciable risk - or an increase of an existing risk - then his objection should be upheld.

### *575 The powers of the European Commission

The powers of the European Commission are not directly relevant to this case. But they arose in the course of argument because it is said that the European Commission have large powers which they have not used: and that shows that they intend to take no action against the cartel.

On the face of it, this appeared to be the case where it is the duty of the European Commission to investigate. Article 89 of the Treaty says that "the Commission *shall* investigate cases of suspected infringement of these principles," that is, articles 85 and 86. If it finds that there has been an infringement, it *shall* propose appropriate measures to bring it to an end. In making the investigation, the European Commission is entitled to call upon the Director General of Fair Trading in England, and he is bound to give his assistance: no doubt by placing his officers at the disposal of the Commission.

In making an investigation, the European Commission is armed with great powers given by Regulation No. 17 of 1962, articles 11 to 20. These will come as a surprise to those of us who have been brought up in the common law. Long before any proceedings have been instituted - and before any prima facie case is shown - the European Commission is entitled to interrogate an undertaking like RTZ and require them to give any information which the Commission thinks is necessary: see article 11. If RTZ refuse to answer the interrogatories, or if they answer them incorrectly, the Commission can impose fines and penalties on RTZ. In addition the European Commission can require an undertaking like RTZ to disclose their books and business records, to take copies of them, to ask for oral explanation on the spot, and to enter any premises of RTZ: see article 14. Here again, if RTZ refuse, the Commission can impose fines and penalties on them.

There is a provision by which RTZ are entitled to be heard at the various stages: see article 19. But, after giving a hearing, the European Commission can impose a fine or penalty. RTZ could appeal to the Court of Justice at Luxembourg, but if they affirm the fine or penalty it is final.

The decision then is enforceable in England. Article 192 of the Treaty says: "Decisions of the Council or of the Commission which impose a pecuniary obligation on persons other than states shall be enforceable." The decision is equivalent to a judgment of an English court. It can be registered in England; and on registration can be enforced by writs of execution: see the European Communities (Enforcement of Community Judgments) Order 1972, S.I. 1972 No. 1590.

There is a provision that any information obtained is only to be used for the purpose of the investigation: see article 20. But under community law (differing herein from the common law) an undertaking like RTZ has no privilege by which it can refuse to answer the interrogatories, or refuse to disclose its books and records. Community law does not recognise any privilege against self-incrimination. It would obviously stultify an investigation if RTZ could say: "We fear this would

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

expose us to a fine for infringing article 85 of the Treaty." (Somewhat *576 similar to the investigation in Parry-Jones v. Law Society [1969] 1 Ch. 1.) So RTZ would be bound to answer and give discovery when requested by the European Commission.

In addition there is some doubt whether in community law (differing again from the common law) an undertaking like RTZ could rely on legal professional privilege - so as to protect it. In re Quinine Cartel [1969] C.M.L.R. D41 , D71, it appears that the European Commission looked at the record of a legal consultation so as to show the guilty mind of an infringer.

All this shows that the European Commission have great powers of investigation which they could exercise against RTZ if they so desired. They could compel RTZ to produce all these documents if they so desired.

### The facts

After all these digressions I come back to the question in the case. To what extent is there a real or appreciable risk that RTZ may be subjected to a fine or penalty by the European Commission?

It was submitted by Mr. Bingham that there was no real risk. The European Commission, he said, had known of the cartel for five years and had taken no action. It had known of the "Friends of the Earth" documents for 10 months and had made no investigation of either one. It had the great powers (which I have summarised) but it had not sought to interrogate RTZ or to require discovery of its documents. Its inaction has provoked amusement in the European Parliament. It may reasonably be inferred, said Mr. Bingham, that for some reason best known to itself the Commission has decided not to take any proceedings against RTZ. So RTZ are in no risk of being fined: and they should be compelled to give discovery of their documents.

But on the other hand, in answer, Mr. Neill relied on the affidavit of Mr. Jeremy Lever. He gives a

good deal of detail, but summarises his conclusions in these matters as a result of his discussions with some of the members of the staff of the Commission:

"(a) on the material at present available to it, the Commission still has an open mind whether the arrangements relating to uranium of which it is aware constituted a 'cartel' in the sense of a contravention of article 85 of the E.E.C. Treaty; (b) the Commission has not taken any decision to ignore such arrangements but, on the contrary, is keeping the position under constant review; (c) it is impossible for anyone to say whether disclosure of further information not already in the Commission's hands might lead the Commission to 'open proceedings' in respect of such arrangements ... (d) it is equally impossible for anyone to say whether if proceedings under article 85 of the E.E.C. Treaty were successfully taken by the Commission against RTZ and/or RTZS, the Commission would impose a fine upon either of those companies."

It is to be observed that no application has been made and the Commission *577 have not given "negative clearance" under article 2 of Regulation No. 17.

To this I would add, as I said at the beginning, that the European Commission are under a duty under the Treaty itself to investigate the cartel; and, if the evidence is sufficient, to take steps in respect of it. The Commission have no prerogative, so far as I know, to dispense with the law enacted by article 85.

In these circumstances, it seems to me that there is reasonable ground to believe that, if RTZ were compelled to disclose the documents requested by the United States courts, there is a risk of those documents being used against them in this way - they might be brought to the knowledge of the European Commission and be used by the Commission in support of proceedings for a fine or penalty. They might afford additional evidence of such cogency that the European Commission could no longer hold its hand: but would be bound to act under article 85 of the Treaty. Seeing that RTZ reasonably believe there is such a risk, I think they

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

are entitled to the privilege against self-incrimination. I would therefore dismiss the appeal.

### ROSKILL L.J.

The only question for decision on this appeal is whether the respective claims of RTZ and RTZ Services ("RTZS") for privilege from the production of the documents sought by the appellants should be upheld. It is important to remember that RTZ are not parties to the pending litigation against the present appellants, Westinghouse, who seek the order against them. RTZ say that such production will tend to expose them to proceedings for penalties in the form of fines exigible at the instance of the European Economic Community for breach of article 85 of the E.E.C. Treaty and that, having regard to our decision on the previous occasion on May 26, 1977, to which Lord Denning M.R. has referred, such fines are penalties within section 14 of the Civil Evidence Act 1968, and therefore they are entitled to the protection for which section 3 of the Evidence (Proceedings in Other Jurisdictions) Act 1975, from which the present proceedings arise, makes express provision.

Westinghouse say that such production will not tend to expose RTZ to any such penalties - or at least to any such penalties beyond those to which they already stand exposed in the light of the state of knowledge of the Commission at the present time. Mr. Bingham, for Westinghouse, pressed us on Friday with the argument that the documents sought were only those which Westinghouse thought were likely to exist, and that they had founded their demand upon, and only upon, those documents, copies of which they had already obtained from sources in Australia. He pointed out that there was now clear evidence before us that the existence of the so-called cartel (or "club," as the Commission's officials prefer to call it, claiming that the existence of a cartel properly so called has not yet been proved) has been known to the Commission and its staff since 1972, though copies of the documents to which I have just referred only

came into the Commission's possession last year, 1976. Mr. Bingham drew our attention to the question to which Lord Denning M.R. has just referred which was asked in the European Parliament on this subject and to the overt signs of scepticism - described in the official report in French as *578 "sourires" - with which the answer given was received, as if to emphasise that the truth as he claimed it to be was and had for some time been widely known both to the Commission and to the press, namely, that this agreement did infringe article 85; yet for some four years past or more nothing whatever had been done by the Commission. If that were the position today and no action had yet been taken by the Commission, either itself to investigate or to call for those documents and others under article 14 of Regulation No. 17 or to require the competent authorities of the British government to investigate the position under article 13 of Regulation No. 17, the overwhelming inference must be that the production of these further documents would not at this time lead to any action by the Commission. Mr. Bingham said that the privilege against self-incrimination could not be used to stultify the Commission's powers of investigation since the Commission were vested with powers to investigate a political mischief. The privilege, such as it was, was a privilege only in legal proceedings and not in an investigation which might or might not proceed. Mr. Neill made no admission that the privilege against self-incrimination could not be used to resist a demand by or at the instigation of the Commission for production of documents in any investigation under articles 13 or 14 of Regulation No. 17. The determination of this appeal does not involve the determination of that question, and I express no opinion whatever upon it. The determination of this appeal depends upon whether in these proceedings, which are legal proceedings, RTZ are entitled to the protection to which section 14 (1) of the Act of 1968 entitles them if production would "tend to expose" them to "proceedings ... for the recovery of a penalty."

It has long been a rule of English law, as Lord Denning M.R. has pointed out, that a person cannot

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                                Page 26

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

(subject only to certain statutory exceptions, of which Parry-Jones v. Law Society [1969] 1 Ch. 1 affords an interesting and modern example) be required to answer questions or produce documents which may lead to his being, if I may be forgiven a colloquialism, "convicted out of his own mouth." There is a long line of authorities dealing with this topic of which the earliest cited to us was Reg. v. Boyes, 1 B. & S. 311, a decision of the Court of the Queen's Bench subsequently expressly approved by this court in Ex parte Reynolds, 20 Ch.D. 294. Those two cases - and there are others to the same effect - show clearly that a mere assertion of a claim for privilege on the ground of an alleged risk of self-incrimination is not enough to enable the privilege to be successfully claimed. Nor, of course, will the court uphold such a claim for privilege when it is made in bad faith. Nor indeed, as the authorities show, will the courts automatically uphold every such claim for privilege when, as is of course accepted here, it is made by RTZ in complete good faith.

The first question which a court must ask itself is whether the facts proved in evidence disclose the commission of an offence - in some cases a criminal offence. The first question here is whether those facts disclose that there is a liability upon RTZ for what Mr. Neill called "a penalty offence." To my mind there can be no doubt but that they do, and indeed it was not seriously in dispute that the documents which we saw on the last occasion do disclose a breach of article 85.

*579 What then is the degree of risk of penalty proceedings following? It seems to me that once a party to legal proceedings who is resisting production of documents can show facts which establish the existence of a penalty offence (or in other cases the commission of a criminal offence) the courts should be slow to deprive that party of his privilege against self-incrimination, which the common law now for some three centuries and section 14 of the Civil Evidence Act 1968 today accords him. In the absence of bad faith, to say that there is no risk of proceedings may in all but the plainest cases involve a court claiming for itself a

degree of prescient foresight to which it would not be wise to pretend for if its forecast were wrong and if proceedings and penalties were to follow, damage will or at least may be done by an erroneous decision of the court which it would not be easy thereafter to undo or redress.

I do not propose in this judgment to go through all the cases which have been cited to us and which, with all respect to the authors of the various judgments, are not always helpful because of the varying language used from time to time in different cases to indicate where the dividing line comes. The problem is not made any easier for us because in the several reports of Short v. Mercier (1851) 3 Mac. & G. 205 where the claim for privilege was upheld, the language used by Lord Truro L.C. is not identical in the several reports. In the report in Macnaghten and Gordon, reproduced in 42 E.R. 239, 299, the language is different from that in both 15 Jur. 93 and 20 L.J.Ch. 289 . Nor is it necessary to consider whether certain passages in the judgment of du Parcq L.J. in the Triplex case [1939] 2 K.B. 395 (which plainly influenced MacKenna J.) are entirely reconcilable with Goddard L.J.'s later judgment in Blunt v. Park Lane Hotel Ltd. [1942] 2 K.B. 253 , during the argument in which the decision three years earlier in the *Triplex* case was seemingly not cited. Like Lord Denning M.R. I find it impossible to think that in the passage in Goddard L.J.'s judgment in *Blunt,* at p. 257, upon which Mr. Bingham relied both this morning and on Friday, where he asked whether there was any "reasonable likelihood" of the answers to the interrogatories in question exposing a person to ecclesiastical censure, Goddard L.J. was intending to substitute his phrase for the words used by Cockburn C.J., in Reg. v. Boyes, 1 B. & S. 311, 327-330, to which Goddard L.J. had referred a moment or two earlier in his judgment.

It cannot, I think, be right in these cases for the court to attempt a quantitative assessment of the probability one way or the other of the risk of proceedings ultimately being taken, and then to seek to draw the line, one way where the probabilities in the view of the court are thought to be more or less

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                            Page 27

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

evenly balanced and the other where the balance is more disparate. It is not for the court to resolve problems of this kind by calculating odds. I think that the right question to ask is that posed by Shaw L J. on Friday afternoon. Can exposure to the risk of penalties (or in other cases to the risk of prosecution for a criminal offence) be regarded as so far beyond the bounds of reason as to be no more than a fanciful possibility? Examples of such cases are Reg. v. Boyes, 1 B. & S. 311; Ex parte Reynolds, 20 Ch.D. 294 and Blunt v. Park Lane Hotel Ltd. [1942] 2 K.B. 253. Examples of cases where the claims have been upheld *580 are, to name but a few, Short v. Mercier, 3 Mac. & G. 205 and Triplex [1939] 2 K.B. 395.

Like Lord Denning M.R., I confess to a feeling of unease, sitting in this court in 1977, about cases where claims to privilege have been upheld because of the alleged risk of prosecution for criminal libel and wonder whether some of them would have been decided the same way today. Those cases might on some suitable occasion usefully be reconsidered by the appropriate tribunal, for times do change and the policy of the law changes with the times, just as this court in Blunt v. Park Lane Hotel Ltd. [1942] 2 K.B. 253 refused to follow the earlier decision of this court in Redfern v. Redfern [1891] P. 139 (a matrimonial dispute), and in particular a passage in the judgment of Bowen L.J. at p. 147 regarding the right to claim privilege because of the risk of ecclesiastical censure. In saying that, I have not lost sight of the figures of prosecutions for criminal libel which Mr. Neill gave us on Friday afternoon.

Asking myself the question which Shaw L.J. posed, I am afraid I am not persuaded by Mr. Bingham's argument that one should assume from the inaction to date which must be taken to have been on the basis of the Commission's present knowledge that there is no future risk of proceedings for an alleged breach of article 85. In his reply this morning Mr. Bingham stressed the position as it is today in Australia and Canada and indeed in France. Of course neither Australia nor Canada are parties to the E.E.C. Treaty, and we have been told that special legislation has been

passed in each of those countries to deal with the situation in relation to the Australian and Canadian corporations concerned. France is of course a member of the community but that does not affect the position we have to consider. Bureaucracy moves slowly, perhaps international bureaucracy may move even more slowly. These problems are immensely complex, and the present documents have only been available since 1976.

Even if I am wrong in that view on the basis of the documents which the Commission presently have, I am even less persuaded, with all respect to Mr. Bingham, that I should assume that these other documents, even though designed only to fill in the gaps in the existing documents, might not supply just that extra information which might move the Commission to decide to proceed further, a step which in the absence of seeing those other documents they would not or might not have taken. The fact, if it be the fact, that there may not be immediate damage to RTZ from the Commission's present possession of documents does not mean that there may not be some future damage from the production of the other documents presently sought. I do not think it is relevant that the Commission might be able by the use of their own inquisitorial powers to obtain some or all of these other documents for themselves. Unless and until they make a move either directly or through a member state, I think RTZ are entitled to maintain their claim of privilege in these legal proceedings, legal proceedings to which they are not directly parties they are merely being sought to be brought before the court as reluctant witnesses.

For those reasons, which I think substantially are in accord with those of Lord Denning M.R., I would dismiss the appeal.

## *581 SHAW L.J.

Mr. Bingham has contended for Westinghouse that the court must seek to reconcile two principles of law. The first is that which accords to a witness the privilege which entitles him to refuse to answer questions or to produce documents which will tend

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                              Page 28

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

to expose him to proceedings for an offence or for the recovery of a penalty. The second is that which requires that justice should be done between the parties to a cause.

He cited in support of this proposition passages from the respective judgments of Lord Truro L.C. in Short v. Mercier, 3 Mac. & G. 205; and Cockburn C.J. in Reg. v. Boyes, 1 B. & S. 311; Jessel M.R. in Ex parte Reynolds, 20 Ch.D. 294; Goddard L.J. in Blunt v. Park Lane Hotel Ltd. [1942] 2 K.B. 253 . I do not read any of those judgments as requiring a court to decide in a given case whether upholding a claim for privilege will do such a disservice to justice as to justify rejecting the claim for that reason. What does emerge from the passages cited is that before a claim for privilege is upheld the court must be satisfied that there is a real and genuine basis for the assertion by the witness that he will tend to be exposed to proceedings or penalties. The precise measure or degree of the risk to the witness is something which the court is not called upon to assess so long as there is a degree of risk which cannot be dismissed as tenuous or illusory or so improbable as to be virtually without substance. The question is, whether there is a recognisable risk? The principle which protects a witness from obligatory self-incrimination is not to be qualified by or weighed against any opposing principle or expedient consideration so long as the risk of self-incrimination is real in the sense that what is a potential danger may reasonably be regarded as one which may become actual if the witness is required to answer the questions or to produce the documents for which privilege is claimed.

In Short v. Mercier, 3 Mac. & G. 205, there is a passage in the judgment of Lord Truro L.C. where he says:

"Now, a defendant, in order to entitle himself to protection, is not bound to show to what extent the discovery sought may affect him, for to do that he might oftentimes of necessity deprive himself of the benefit he is seeking; but it will satisfy the rule if he states circumstances, consistent on the face of them

with the existence of the peril alleged, and which also render it extremely probable."
In my view the words "extremely probable" relate in that passage to the existence of the risk and not to the magnitude of the chance that proceedings may be brought. It is sufficient if it is shown that there is an appreciable chance that they may.

Accordingly I agree with the judgments which have been given by Lord Denning M.R. and Roskill L.J., and I too would dismiss the appeal.

**Representation**

Solicitors: Freshfields; Linklaters & Paines.

*Appeal dismissed with costs. Leave to appeal refused. (A. H. B. )*

*582 July 27, 1977. The Appeal Committee of the House of Lords (Lord Wilberforce, Lord Edmund-Davies and Lord Fraser of Tullybelton) allowed petitions by the persons named in the orders for leave to appeal.

On July 18, 1977, the Department of Justice of the United States applied to Judge Merhige for an order to compel testimony under U.S.C. sections 6002-6003 applicable when a witness claimed privilege on the ground of self-incrimination but under which no testimony compelled might be used against the witness in a criminal case. The judge made the order.

The two original appeals to the House of Lords were by Rio Tinto Zinc Corporation Ltd. and R.T.Z. Services Ltd. (both hereinafter called "R.T.Z. "). Peter Daniel, Jean Loup Dherse, Lord Shackleton of Burley, Sir Ronald Turner, Roy William Wright, Andrew Gilward Buxton and Kenneth Bayliss by leave of the Court of Appeal. The three cross-appeals of the respondents, Westinghouse Electric Corporation, concerned the interpretation of section 14 of the Civil Evidence Act 1968.

*Kenneth Rokison Q.C.* and *Michael Burton* for the appellants. The statute which is relevant to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                    Page 29

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

letters rogatory is the Evidence (Proceedings in Other Jurisdictions) Act 1975. Section 2 deals with the powers of the United Kingdom court, assuming that the requirements of section 1 are satisfied. Section 3 deals with privilege of witnesses. This gives them a double privilege, English law privilege and also any privilege which they would enjoy under the law of the requesting court. A corporation is not recognised as having any privilege under United States law, so the individuals in this case were claiming under United States law privilege against self-incrimination but the companies, in respect of the documents, were only claiming privilege under English law. There is a procedure under 18 U.S.C. sections 6002-6003 whereby the Department of Justice can in certain circumstances require a witness to testify if his evidence is necessary in the public interest. Evidence so given will not be the subject matter of any prosecution; immunity is granted in respect of it.

The witnesses attended before Judge Merhige and claimed privilege. He upheld the claim and that was an end of the matter. The English court should not require them to go back again just because the Department of Justice subsequently took another course.

The appellants' submissions fall under three heads: (1) discovery; (2) privilege and (3) other proceedings. As to those other proceedings, the order made under section 6002 pursuant to an application by the Department of Justice to obtain evidence for the purposes of the grand jury proceedings was made, not in respect of a civil proceeding, but in respect of a criminal investigation, and the immunity which followed from that order did so only if the evidence was given pursuant to that order. But no evidence could be given pursuant to that order.

The whole tenor of the Act of 1975 is against its being used for the purpose of "fishing." It replaced the Foreign Tribunals Evidence Act 1856. It was to some extent a product of the Convention on the Taking of Evidence Abroad in Civil and Commercial Matters signed at TheHague on March

18, 1970, and ratified by the Government on July 16, 1976.

Under the Act the court has a discretion and is not under an obligation. The application must be in respect of evidence "to be obtained for the purposes of civil proceedings," instituted or contemplated.

As to discovery: (1) The request by the Virginia court was not for an order for evidence to be obtained for the purpose of proceedings pending before that court but for discovery against persons not parties to the proceedings. It was not within the letter or the spirit of the Act and was contrary to the common law developed before and under the Act of 1956.

(2) The schedule of documents the production of which is requested in effect requires the companies to state what documents relevant to the proceedings are in their possession, custody or power and requires the production of documents other than particular documents specified in the letter of request.

(3) If the court is satisfied that, so far as the documents are concerned, the request seeks discovery and so should not be given effect to, the court should not in the exercise of its discretion order the oral examination of directors or employees of the companies since Westinghouse could then get by the back door what was denied by the front.

The Act of 1975 refers repeatedly to "evidence." The essence of discovery, when contrasted with evidence, is that it goes beyond material which is directly relevant to the matters in issue in the proceedings. Section 2 (3), embodying a reservation made in the ratification of the convention, says that no order shall require steps to be taken other than "steps which can be required to be taken by way of obtaining evidence for the purposes of civil proceedings." See also section 2 (4) in relation to documents. An order to answer questions in the course of a wide-ranging "fishing" expedition could be a breach of the subsection. If an examiner tried to insist on an answer, R.S.C., Ord. 70, r. 4, would provide the procedure to be adopted. See also note

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                    Page 30

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

70/4/3 and Order 39, r. 5. The English court would ultimately have to decide whether the question was lawful by applying English rules. It must be satisfied that the foreign court is seeking an order for evidence and should look at the material before it. This applies both to oral evidence and documents. If the foreign court did not consider what relevant evidence the witness could give, that would demonstrate that it was a "fishing" expedition. The applicant must show that he is seeking relevant material in that the documents are directly relevant to the existence of a cartel and that what he is seeking is the questioning of witnesses in relation to the activities, existence and effects of the cartel. But Westinghouse is seeking a "fishing " licence. One can go behind the form of the request and look at the realities. Reliance is placed on Burchard v. Macfarlane, Ex parte Tindall [1891] 2 Q.B. 241, 244-245, 246-247 and on Radio Corporation of America v. Rauland Corporation [1956] 1 Q.B. 618, 622, 626-627, 628-629, 633, 634, 635, 636, 637, 639-640, 640-641, 643-645, 646-649; Penn-Texas Corporation v. Murat Anstalt [1964] 1 Q.B. 40, 52, 53, 59, 60, 61-62, 62-63, 72-73, 75; Penn-Texas Corporation v. Murat Anstalt (No. 2) [1964] 2 Q.B. 647, 660, 663-664, 667-668; Panthalu v. Ramnord *584 Research Laboratories Ltd. [1966] 2 Q.B. 173, 184-185, 188, 189, 190-191, 192, 193; American Express Warehousing Ltd. v. Doe [1967] 1 Lloyd's Rep. 222 , 224-226, 226-227 and Seyfang v. G. D. Searle & Co. [1973] Q.B. 148, 151-152.

These cases establish (1) that English courts will not make an order on the request of a foreign court which is in substance or effect seeking discovery from a non-party and (2) that the test whether or not discovery is so sought is whether the application is for direct evidence as defined in the Radio Corporation case [1956] 1 Q.B. 618 or whether it extends to indirect evidence; so if the application is not limited to directly relevant material, the order should not be made even though in the course of the "fishing" fish may be caught; (3) that the test applies equally to documents and oral depositions; (4) that the court will be prepared to go behind the face of the letters rogatory; (5) that the court will

look at the matter as a whole to form a view of the substance of the request and (6) that if the court considers that discovery is sought against a non-party no order should be made.

The mere fact that one must use the "blue pencil" on one item does not demonstrate that the whole exercise is "fishing," but a "blue pencil" exercise may be sufficient to show it.

Apart from the fact that the Act of 1975 removed the requirement that the documentary evidence must be ancillary to the oral testimony, the common law principles still remain. There is no difference between the word "evidence " used in the Act of 1975 and the word "testimony" used in the Act of 1856.

The mere assertion by the applicant that he wants to get the evidence for the trial does not establish that it is not discovery. The following factors show that this is in substance an application for discovery: (1) The parties themselves regarded this as simply part of the American pre-trial discovery process. (2) The American judge in dealing with the application treated it as being for discovery. (3) He did so too in the terms in which he expressed his decision to issue the letters rogatory. (4) He did not decide what relevant evidence, if any, the witnesses could give or which, if any, of the listed documents existed or contained or were likely to contain relevant material. (5) Neither side invited him to consider these questions. If he had considered these questions on the evidence before him he would not have concluded that all the named persons had or were likely to have relevant evidence to give. The same is true of the documents.

A subpoena duces tecum will not be given effect to if it is in substance asking for discovery. That also applies to letters rogatory. In relation to them there is a requirement that the documents must be sufficiently specified: see section 2 (2) of the Act of 1975. Throughout the schedule there occur the words "and any memoranda, correspondence or other documents relating thereto. " That indicates "fishing," which the English courts should not assist

[1978] A.C. 547

Page 31

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

by making the order sought. It is an exercise in discovery to say: "Do you have any documents in relation to such and such? If so, produce them." The schedule is seeking discovery under a disguise, picking out every document which the applicants can identify and using it as a peg to hang a wide request on.

*585 A "fishing" expedition is not justified by the suggestion that other memoranda, letters or notes are, no doubt, in existence because that is discovery, in effect a query to the party asked to produce the documents whether they do in fact exist. The underlying principle that discovery will not be required of a person not a party to the action is based on a wider principle that a person's documents are his own, subject to the interests of justice.

Both under the Foreign Tribunals Evidence Act 1856 and under the Act of 1975 the English court must be satisfied that what the foreign court requires is evidence; otherwise the English court has no power to make an order. Under the Act of 1975 there are two areas of limitation. If the English court considers that the application is for discovery, section 1 (b) is not satisfied and if there is not a request for evidence the power under section 2 does not arise. If there is power under section 2 that power is limited by sub-sections (3) and (4).

As to the terms of the letters rogatory: (1) Their terms are not consistent one with the other and so it has not been shown to the court that justice cannot be done without the material requested. (2) In the context the reference to evidence being used at the trial is no more than a statement that the relevant parts of the depositions will be put in at the trial, as opposed to the witness being recalled. (3) The letters rogatory were drawn up in advance by Westinghouse and their terms were not discussed before the American judge. (4) The "meat" of the letters rogatory is more significant than the recitals in revealing the true nature of the application. (5) The House can and should go behind the face of the letters rogatory. (6) The most important factor in determining the nature of the exercise is what the

American judge said in the course of making the order. He regarded the application as extending to indirect material.

In this matter there are two steps. The first is whether discovery is being sought. Secondly, if it is not, and if a subpoena duces tecum is ordered the documents must be specified with sufficient particularity to inform the person receiving it what he must find. Section 2 (4) of the Act of 1975 is the parallel of the subpoena duces tecum in that respect but section 2 (3) goes much wider. No order should be made under section 2 (3) requiring discovery from a non-party, whether discovery by way of documents or. under the American procedure discovery by oral examination on depositions.

Should the "root and branch" argument that the order should be set aside altogether fail, there remains the "blue pencil" argument that the House should not confirm in form or in substance an order either "to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power" (section 2 (4) (a)) or "to produce any documents ... specified in the order as being documents appearing to the court ... to be, or to be likely to be, in his possession, custody or power" (section 2 (4) (b)). There are three requirements: (1) The order must not require a person to state what documents relevant to the proceedings he has. (2) An order must not require a person to produce documents other than the particular documents specified. (3) It must not require a person to produce other documents than *586 those appearing to the court to be, or to be likely to be in his possession. The mere possibility of the existence of the documents is not enough. The words "particular documents specified in the order " must be literally and strictly construed. The words are not "classes of documents." The word "specified" forbids one to describe types of documents. If the House confirms any order in relation to the documents it should be restricted to letters or other documents identified by reference to date, author and addressee or title. The House is not applying the common law but is construing the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547

Page 32

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

limitations in the Act of 1975. The documents asked for are not "particular documents specified." Merely because for the purposes of a subpoena it is enough to particularise the documents to such a degree that the person to where it is directed will know what to bring, it does not follow that the same applies under the Act of 1975 which introduced a greater degree of particularity. Minutes of identified meetings are "particular documents specified" but not agenda or "notes."

As to the rule in the case of a subpoena duces tecum, see Phipson on Evidence, 12th ed. (1976), p. 588, paras. 1464, 1465; and Newland v. Steere (1865) 13 W.R. 1014 where the principle is correctly stated. Soul v. Inland Revenue Commissioners (Practice Note) [1963] 1 W.L.R. 112 does not assist. So far as the witnesses are concerned a similar approach should be adopted under section 3 (3) of the Act of 1975 so that, unless the court is satisfied that they have or are likely to have relevant evidence to give, it is not permissible to order them to be examined on the chance that they may have something relevant to say.

If it is accepted that this is an exercise in discovery and no effect should be given to the application, so far as the documents are concerned, there remains the "back door" argument, in case the "root and branch" argument did not prevail as regarded the witnesses.

The main purpose of the application is to obtain the documents and the evidence of the witnesses is ancillary to that. The individuals are named in the letters rogatory as directors, employees, former directors or former employees. Now, though a company produces documents and answers interrogatories through its proper officers, it cannot give oral evidence. Otherwise the request would have been directed to R.T.Z. because the activities of the companies are in question. If the English court considered that no effect should be given to the request for discovery, it would be wrong for it in its discretion to order the individuals as officers or employees of the company to give evidence as to

the existence or contents of documents, secondary evidence of matters in respect of which the best evidence was denied: see the Radio Corporation case [1956] 1 Q.B. 618, 649, *per* Lord Goddard C.J.

As regards privilege of documents the companies have a privilege under English law against production of the documents sought because it might expose them to a penalty or alternatively proceedings for the recovery of a penalty under articles 15 and 17 of the E.E.C. Council Regulation No. 17/62 for infringement of article 85 of the treaty which is now part of English law as a result of section 2 of the European Communities Act 1972.

As regards the oral examination there are two heads of privilege: (1) The individuals have a privilege against self-incrimination under the *587 Fifth Amendment to the United States Constitution; Judge Merhige upheld it. (There has been no decision by an English court.) (2) In so far as the examination of witnesses is sought in their capacity as directors or employees or former directors or former employees of R.T.Z. and in so far as the main object is to get a complete record of the cartel's activities, if the companies are entitled to privilege in respect of their documents, then, as a matter of discretion, the court should not order the oral examination of the individuals in relation to those matters. Alternatively, as a matter of law there is a privilege which can be invoked either by the company or the individual.

The enactment which enables a witness to take a foreign claim of privilege is section 3 (1) (b) and (2) of the Act of 1975. Here the claim for privilege was taken by the witnesses and was referred to Judge Merhige who upheld it in the terms of the Act of 1975. Accordingly the letters rogatory had run their course so far as the individuals were concerned and they should not be required to return for further questioning. The judge had no power to make them subject to recall. Anything that happened subsequently could only give rise to new letters rogatory.

As to the application by the Department of Justice

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

for an order to compel testimony under U.S.C. sections 6002-6003 Judge Merhige had no power to make orders that an English court would recognise. It is an order compelling testimony for the purposes of a grand jury investigation. As a matter of American procedural law the judge was obliged to make the order and any testimony given pursuant to it would carry immunity. Since the immunity applies only to testimony given pursuant to the order, there is no immunity which the English courts will recognise, because there is no order which they will recognise. It does not follow from the order that the privilege claimed has been removed. The whole application for letters rogatory was tainted by this new order.

Under the Act of 1975 there is a discretion in relation to privilege (a) whether to make an order and (b) as to the terms on which it should be made: see section 2. There is also a discretion as to privilege at common law which survives the Act of 1968. Under section 14 (1) there is a right to claim privilege but that right is not exhaustive and there is a discretion to recognise privilege in other circumstances. The 16th report (Privilege in Civil Proceedings) of the Law Reform Committee 1967 (Cmnd. 3472) shows what was considered to be the state of the law before the Act: see p. 3, para. 1, p. 7, para. 11 and p. 17, para. 41.

Westinghouse are interested in the activities of the companies. The examination of the individuals is claimed because, it is said, they were involved in or had knowledge of the activities of the cartel of which the companies were members. If the officers and employees could be asked about the matters to which the documents relate, they could also be asked about the existence and contents of the documents which the company, through its proper officer, had declined to produce, the claim to privilege being then upheld. That would make the privilege useless and create an absurd situation. The company has a right to privilege and the court in its discretion may afford a privilege in respect of the oral examination of the company's officers and employees. If Westinghouse cannot get at the company's activities directly they ought not to be

able to get at them *588 indirectly. The judge could allow or disallow the privilege in a particular case. As there is a residual discretion which goes beyond section 14 of the Act of 1968, so there is a discretion in the court to take into account privilege beyond section 3 of the Act of 1975. Read in its context, it means that a witness should have the same privilege in an examination under the Act as he would in English proceedings.

In relation to privilege the relevant authorities are Halsbury's Laws of England, 4th ed., vol. 13 (1975), para. 92. p. 75; McFadzen v. Liverpool Corporation (1868) L.R.3 Ex. 279, 281-282; Bray on Discovery (1885), pp. 82-85, 342-344, Gibbons v. Waterloo Bridge Co. Proprietors (1818) 5 Price 491; 1 Coop.Temp.Cott. 385; Parkhurst v. Lowten (1819) 2 Swans. 194, 214-216, which support the submission that, once it is established that the company has privilege, it should not be circumvented, just as it would not be circumvented in relation to legal professional privilege.

As to the collateral use of materials obtained, even if the matters in respect of which Westinghouse, through the application to the Virginian court, sought evidence by the letters rogatory, were relevant to the issues in that court, they were also central to the anti-trust suit in Illinois and to the grand jury investigation. Since it is likely that the material obtained would be used by Westinghouse in these proceedings, the court should make no order pursuant to the letters rogatory. If documents are obtained by one person from another, whether by discovery or under subpoena, they must not be used for a collateral purpose by the party who obtains them. There is an implied undertaking to that effect and the court may refuse to order production if the party requiring the documents cannot or will not give such an undertaking: see *Bray on Discovery*, pp. 238-239; Richardson v. Hastings (1844) 7 Beav. 354, 355-356; Alterskye v. Scott [1948] 1 All E.R. 469; Distillers Co. (Biochemicals) Ltd. v. Times Newspapers Ltd. [1975] Q.B. 613 , 618-619, 620, 621; Riddick v. Thames Board Mills Ltd. [1977] Q.B. 881, 895-896, 901, 902. In the case of one who is not a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

party to the proceedings the court must balance the interests of justice against the principle that a party's documents are his own. It is an a fortiori case. In this case an English court could not supervise the carrying out of any undertaking given. R.T.Z. might well be prejudiced by the material being used in the anti-trust proceedings. In any event, the principle is that material obtained by compulsion of law should not be used for any collateral purpose, not merely one to the prejudice of the person supplying the documents.

The subpoena in the grand jury proceedings overrides any confidentiality order. It is inconceivable that this material, if provided pursuant to the letters rogatory, will not get into the hands of the Department of Justice for the purposes of the grand jury investigation involving an investigation into the activities of R.T.Z. inter alios.

As to the intervention of the Department of Justice, to compel production under the letters rogatory would be to compel something which R.T.Z. would not have to do in like circumstances in English proceedings. It would be in breach of section 2 (3) of the Act of 1975. The purpose of grand jury proceedings is to consider whether criminal proceedings should be instituted and no application has been made under section 5 of the Act, dealing with criminal proceedings. If material is sought for that \*589 purpose, it is not required solely for civil proceedings The material required must be for the purposes and only for the purposes of civil proceedings in the requesting court. No request could be made to the English courts for the purposes of the grand jury investigation.

Judge Merhige had no jurisdiction which the English courts would recognise to make the order under U.S.C. sections 6002-6003 and it should be ignored for the purposes of the letters rogatory. He had already ruled on the question of privilege. The examination is subject to the supervision of the English court, which is in overall charge of the examination and should not compel the witnesses to go back to answer questions.

The English courts should construe and apply the Act of 1975 in a spirit of comity but that does not require them to help the Department of Justice in relation to the activities of English companies outside the United States with a view to their possible prosecution in the United States or to confirm the order made under U.S.C. sections 6002-6003.

*Samuel Silkin Q.C., A.-G., Harry Woolf* and *Nicholas D. Bratza* for the Crown. Leave is sought to intervene and place before the House matters of public interest and importance involving the policy of Her Majesty's Government. Authorities establish the Attorney-General's right and, in some circumstances, duty to intervene in private litigation for this purpose. The relevant matter of public policy is one which is material to the exercise of the court's discretion in deciding whether or not to make an order under section 2 of the Act of 1975. Her Majesty's Government considers, as do the Governments of Canada, Australia and France, that the circumstances in which the United States is seeking evidence abroad through the Virginia proceedings give rise to a serious excess of sovereignty. The Attorney-General does not intervene in litigation concerning private rights unless there is an important public interest. The courts are most willing to accept the intervention where there would otherwise be a danger that the public interest represented by the courts and that represented by the executive would part company: see Adams v. Adams (Attorney-General intervening) [1971] P. 188, 197-198; Reg. v. Lewes Justices, Ex parte Secretary of State for the Home Department [1973] A.C. 388, 400, 405-406, 407, 412; The Fagernes [1927] P. 311, 323-324, 324-325, 329- 330.

Considerations of public policy relevant to the functions of the English courts under the Act of 1975 and in particular the exercise of the discretion conferred by section 2 arise.

In the exercise of its discretion the court and now the House are not confined to the facts and matters existing when the application to give effect to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547

Page 35

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

letters rogatory was first made. Subsequent events made it imperative for Her Majesty's Government to intervene.

The grand jury proceedings do not fall within the ambit of the Act of 1975, although they could lead ultimately to proceedings falling within the terms of section 5. Anti-trust proceedings are being simultaneously carried on in the Illinois court. The claim is for treble damages. Although the proceedings are in form civil, there is a strong penal element in them. Jones v. Jones (1889) 22 Q.B.D. 425, 427 was a case of somewhat analogous proceedings. The proceedings in the Illinois court are in personam and the principles which govern the matter are summarised in Dicey & Morris, The Conflict of Laws, 9th ed. (1973), rule 180, pp. 993-994. The *590 Fifth Case is proceedings under the Foreign Judgments (Reciprocal Enforcement) Act 1933. The draft convention between the United Kingdom and the United States providing for the "Reciprocal Recognition and Enforcement of Judgments in Civil Matters" 1977 (Cmnd. 6771) excludes from enforcement judgments "to the extent that they are for punitive or multiple damages" (article 2 (2) (b)), the very type of proceedings initiated in Illinois. The Illinois court would not be recognised as having jurisdiction over the appellants. Huntington v. Attrill [1893] A.C. 150, 157-158, 159, 161 was dealing with quite a different question. Even though the sanction of enforcement consists of a private remedy for multiple damages, the matter is still penal. The Illinois proceedings were commenced on the very day of the issue of the letters rogatory, indicating a close connection between the two. Clearly, the evidence was desired for the grand jury proceedings. The order under U.S.C. sections 6002-6003, even apart from the question of excess of jurisdiction, could not be regarded as made pursuant to the Act of 1975 and it could not be right to require the witnesses to comply with it. The United States government were not only seeking to use the machinery of the Act of 1975 to get material for the grand jury investigation but were also seeking thereby to get evidence which the witnesses had been held privileged from disclosing in the Virginia proceedings.

The following submissions are made: (1) Section 2 of the Act of 1975 leaves to the court a discretion whether not to make an order. (2) That discretion enables, and where relevant requires, the court to take into account whether the giving effect to the letters of request would amount to an invasion of, or would prejudice, United Kingdom sovereignty. (3) In deciding whether the making of an order would amount to an invasion of, or would prejudice, United Kingdom sovereignty, the court should have regard to the questions (a) whether the United Kingdom considers that its sovereignty would be prejudiced by the making of an order; and (b) whether, in the light of all material circumstances, the court itself considers that the making of an order would amount to such invasion or prejudice. (4) In relation to the question contained in (3) (a), the court will take judicial notice of the information given to it by the Attorney-General on behalf of Her Majesty's Government. (5) As Attorney-General, I inform the House, on behalf of Her Majesty's Government, that the United Kingdom considers that its sovereignty would be prejudiced by the making of an order in the instant case. (6) In its consideration of the matters material to the question contained in (3) (b), where the court itself considers the matters, the court will have regard (a) to the principles affecting jurisdiction recognised by English law and (b), subject thereto, to the principles accepted as a settled policy by Her Majesty's Government. (7) On each of the questions set out in (3) the court should, in the instant case, conclude that the making of an order would amount to an invasion of, or prejudice, United Kingdom sovereignty. (8) If, contrary to the preceding submission, the court is not satisfied on the material before it that the making of an order would amount to such invasion or prejudice, it should, in the exercise of its discretion, give very great weight and, so far as possible, effect to the considered view of Her Majesty's Government. (9) In balancing the public *591 interest for the purpose of the exercise of its discretion, the court should hold that the conclusions to be drawn in accordance with the foregoing statements outweigh any countervailing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

factors which may be apparent in the instant case. (10) The House should, in the exercise of that discretion, hold that effect should not be given to the order and should allow the appellants' appeal.

As to submission (1) reliance is placed on the plain meaning of sections 1 and 2 of the Act of 1975.

As to submission (2), what it means is that, when the court comes to decide whether it should make an order, it should ask itself whether the reality of the matter is that the foreign state is seeking, through this court, to invade or prejudice the sovereignty of the United Kingdom.

The purpose of the Act of 1975 was not simply the ratification of the convention. It applies on its face to requests from the courts of countries which have not signed or ratified the convention. It would be strange if Parliament had not intended the court's discretion to extend to the consideration of international factors brought to their notice by Her Majesty's Government. So far as the discretion is concerned the convention should be read in the light of the paramouncy of the United Kingdom: see articles 9 and 10 of the convention. Parliament cannot have intended to abandon the right to refuse to execute letters of request on the grounds of excess of sovereignty or prejudice to sovereignty. Although Her Majesty's Government did not take action under article 5 of the convention, that does not deprive the court of its discretion to decide whether it is proper for an order to be made. It is in accord with modern practice that the courts should assess competing claims of public interest.

As to submissions (3) and (4), in the context of the convention and this Act Her Majesty's Government speaks for the United Kingdom and the House will take judicial notice of the information the Attorney-General gives it.

As to submission (5) that information, given on behalf of Her Majesty's Government, is that the United Kingdom considers that the sovereignty would be prejudiced by the making of the order.

The United Kingdom cannot speak for itself. The information goes further, in that it is submitted that it is a proper view for the United Kingdom to take. Her Majesty's Government's view is not the only matter to be considered, but, given a conflict, the court should give it the greatest possible weight.

As to submissions (6) and (7), it is necessary to look at the relevant matters from the point of view of English law. The two organs of the Crown should speak, as far as possible, with one voice on matters affecting sovereignty and international relations. On this the following additional submissions are presented:

1. *U.S. Anti-Trust Laws.* (1) The anti-trust laws of the United States of America ("U.S.") should not provide jurisdiction for U.S. courts to investigate non-U.S. companies and non-U.S. individuals in respect of their actions outside the U.S., although the U.S. claims to have such jurisdiction. (2) For the purposes of United Kingdom sovereignty the U.K. does not recognise any such investigation as having any validity or as being proper. (3) The matters set out above are rendered a fortiori by *592 virtue of the penal character of the anti-trust laws. (4) Any use of the U.S. anti-trust laws or procedures for the above purposes, except with the authority of the U.K., is an invasion of and prejudicial to U.K. sovereignty. (5) In the instant case no such authority exists.

2. *The Grand Jury.* (1) The purpose of the grand jury is to investigate anti-trust activities related to uranium. (2) In the absence of evidence establishing that the R.T.Z. companies registered in the U.K. ("R.T.Z.-U.K. ") carried on anti-trust activities in the U.S., the grand jury has, so far as English law is concerned, no jurisdiction to investigate them. (3) For the purposes of U.K. sovereignty the U.K. does not recognise any such investigation as having any validity or as being proper. (4) The matters set out above are rendered a fortiori by virtue of the grand jury's power to initiate criminal proceedings based upon its investigation. (5) The grand jury proceedings are proceedings of an inquisitorial character and are not such proceedings, either civil

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547

Page 37

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

or criminal, as are within the contemplation of the Act of 1975.

3. *The U.S. Department of Justice.* (1) The proper inference to be drawn from all the evidence is that the U.S. Department of Justice is seeking to obtain for the purposes of the grand jury investigation evidence which is only obtainable through the Virginia proceedings. (2) Having regard to the claim to privilege upheld by Judge Merhige, that evidence cannot be obtained without the intervention in the Virginia proceedings of the Department of Justice. (3) The proper inference from that evidence is that the intervention of the Department of Justice in the Virginia proceedings is not for the purpose of enabling justice to be done between the parties to the Virginia proceedings, but for the purpose of the use of such evidence in the grand jury investigation; or alternatively that such is the predominant purpose. (4) The Department of Justice is seeking to enable evidence to be obtained through the Act of 1975 machinery for purposes other than those provided for by Parliament in that Act. (5) The Department of Justice is seeking to enable evidence to be obtained through the Act of 1975 machinery for purposes other than those provided for in the Hague Convention. (6) The Department of Justice is seeking to enable evidence to be obtained through the Act of 1975 machinery for purposes not recognised as proper by the U.K. and in the knowledge that the U.K. considers such purposes not to be proper. (7) The Department of Justice is seeking to enable evidence to be obtained through the Act of 1975 machinery for purposes for which and in circumstances in which there is no jurisdiction for the Department of Justice to obtain it, so far as English law is concerned. (8) For the said purpose the Department of Justice caused Judge Merhige to make a purported order which was ineffectual and an invasion of U.K. sovereignty and was penal in character in that in the U.S. disobedience to this order would be visited by penalties. (9) By its use in these circumstances of U.S.C. 6002- 6003, admitted to be unique or virtually unique for such a purpose, the Department of Justice placed the U.K. in a position of considerable embarrassment in respect of the proper protection of its nationals and companies, as will be explained in greater detail later. (10) But for the said action of the Department of Justice the present proceedings would *593 have become academic since the order made under the Act of 1975 would, even if still alive in law, have been exhausted in fact.

4. *The Illinois proceedings.* (1) There is no jurisdiction in the Illinois court to investigate the actions of or to pronounce judgment upon R.T.Z.-U.K. because (a) R.T.Z.-U.K. have not brought themselves within the jurisdiction of the Illinois court; (b) The proceedings have been brought for the purpose of enforcing U.S. anti-trust laws by penal provisions against R.T.Z.-U.K. which are not subject or amenable to such laws and provisions according to English law. (2) The machinery under the Act of 1975 could not lawfully be used to obtain evidence for the purposes of the Illinois proceedings, both for the reasons already explained and because in Her Majesty's Government's submission Illinois proceedings are not civil proceedings for the purposes of section 1 or criminal proceedings for the purposes of section 5 of the Act of 1975. (3) Notwithstanding the foregoing, evidence obtained in the present proceedings would be available for the purposes of the Illinois proceedings. (4) The proper inference to draw from the evidence as a whole is that the respondents are using the machinery of the Act of 1975 in the Virginia proceedings for the purpose, or predominantly for the purpose, of obtaining evidence in the Illinois proceedings.

When regard is had to the matters set out under paragraphs 1-4 as a whole to allow the order in the present proceedings to take effect would involve that evidence so obtained: (a) would be obtained for purposes other than those intended by Parliament; (b) would be obtained for purposes other than those for which there is jurisdiction to obtain it; (c) would be obtained for purposes and by methods which would amount to an invasion of or prejudice to U.K. sovereignty; (d) would be obtained for purposes and by methods which Her Majesty's Government considers to be improper and has represented to the U.S. to be improper and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

unjustifiable.

As to submission (8), on matters of sovereignty and international relations the Crown should not speak with two voices: The Fagernes [1927] P. 311, 313, 315-317, 319, 323, 324-325, 329-330. Even if the House is not wholly satisfied on submissions (6) and (7), it should, in exercising its discretion at the very least give the greatest possible weight to the considered view of Her Majesty's Government.

As to submission (9), what is in issue is a statute intended to give effect to a convention. The two states immediately concerned have long been at issue as to the use of the convention, to assist extra-territorial jurisdiction in anti-trust matters in a manner prejudicial to the sovereignty of another state. The United Kingdom has taken a clear stand and the United States are seeking to circumvent it. In the circumstances no consideration of comity should carry any substantial weight. Other states have taken steps to prevent what they too regard as an invasion of their sovereignty. If there is to be a choice of comities Her Majesty's Government must choose that which would be prejudiced if we unlocked the door which other states have bolted. Canada, Australia and France associate themselves with the Attorney-General's intervention. The following additional submissions are made: (a) Matters relating to sovereignty and the limits of jurisdiction of the U.K. and of foreign *594 countries are matters affecting the prerogative and are primarily for the executive to determine. (b) It is undesirable that the U.K. courts and Her Majesty's Government should take differing views on a question of this kind. Consequently unless Her Majesty's Government's conclusions are manifestly unreasonable or manifestly contrary to international law the courts should adopt the view taken by Her Majesty's Government. (c) Her Majesty's Government's conclusions are in fact reasonable for the reasons outlined in the principal submission and this is further confirmed by the fact that other governments agree and have adopted the same line as Her Majesty's Government.

No authority supports the United States claim to

exercise penal jurisdiction over the actions outside the United States of non-United States nationals or companies of another country's nationality. The Lotus (1927) Permanent Court of International Justice Series A, No. 10, p. 27 is not an analogous case. The European Court has never applied the effects doctrine to justify a situation of substantive legislation against a party situated outside the European Community: see Imperial Chemical Industries Ltd. v. E.C. Commission [1972] C.M.L.R. 557 ; Béguelin Import Co. v. G. L. Import Export S.A. [1972] C.M.L.R. 81; Brownlie, Principles of International Law, 2nd ed. (1973), pp. 305-306; American Banana Co. v. United Fruit Co. (1909) 213 U.S. 347, 356 and British Nylon Spinners Ltd. v. Imperial Chemical Industries Ltd. [1953] Ch. 19 , 24-25.

The application of the effects doctrine to found jurisdiction in penal matters is regarded by Her Majesty's Government as being particularly objectionable in the field of anti-trust legislation. (1) The formation of a cartel and other activities against which anti-trust legislation is directed are not universally recognised as unlawful. Offences in the anti-trust category are wholly different from such offences as piracy which are universally regarded as unlawful. (2) The assertion of extraterritorial jurisdiction in anti-trust matters represents an extension of the economic policy of one state which is likely to conflict with that of other states. (3) The effects doctrine is particularly uncertain in operation when applied in the field of anti-trust legislation. As the United States courts have recognised, almost any limitation of competition effected between economic units acting outside the United States may have repercussions, direct or indirect, on the economic interests of the United States; so the potential application by United States legislation of the United States courts of the effects doctrine introduces some insecurity into the relations of corporate bodies carrying on business outside United States jurisdiction; this is highly undesirable. (4) The penal sanctions attaching to violations of United States anti-trust legislation include severe criminal penalties and penal damages. In this respect no valid distinction can be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

drawn between proceedings brought by the State and those brought by private individuals to enforce a monetary penalty.

The objection of Her Majesty's Government to the assumption of United States extraterritorial jurisdiction in the field of anti-trust legislation is exemplified by section 2 of the Shipping Contracts and Commercial Documents Act 1964. Similar protective legislation exists in the Netherlands, Switzerland, Denmark, Australia and Canada. Through the Act a modus vivendi with the United States was achieved whereby **\*595** comity was preserved through their recognition of the primacy of territorial jurisdiction under that Act. It is important to establish a similar principle of comity and a modus vivendi operating through the discretion in the Act of 1975. This case presents such an opportunity. Here there are difficulties in the use of section 2 (1) (b) of the Act of 1964 but if at any stage it turned out to be available Her Majesty's Government would not hesitate to use it.

Here the considerations of comity are not of sufficient weight to justify the conclusion that the order should be upheld.

As to submission (10), the question of the discretion under section 2 of the Act of 1975 only arises if the respondents surmount the hurdle of section 1 of the Act. If the House is satisfied that the real and predominant purpose is to use the evidence in the Illinois or grand jury proceedings, the requirements of section I are not met. If the discretion under section 2 is invoked, again the House should consider the real and predominant purpose of the application. It is clear that the real and predominant purpose is to use the evidence in the grand jury and Illinois proceedings.

On all the material before the House the order should be set aside.

*John Vinelott Q.C.* and *Timothy Walker* for the respondents. There are three issues before the House: (a) Is the possible exposure to a fine under the E.E.C. regulations exposure to proceedings for

the recovery of a penalty within section 14 of the Civil Evidence Act 1968? On this the respondents lost and have leave to appeal. (b) If the respondents are wrong on the first question, would the production of the documents specified tend to expose the R.T.Z. companies to proceedings for a fine? The respondents lost and were refused leave to appeal. (c) Did the intervention of the United States Attorney-General have the result that the application for letters rogatory ceased to be an application for evidence to be obtained for the purposes of civil proceedings? This relates to oral evidence.

The respondents seek leave to appeal on the second question for five reasons: (1) With the help of R.T.Z. cases have been prepared and are ready to be lodged, so there will be no administrative delays.

(2) The construction of the word "penalty" and the "tendency" point are closely related. In the field of the E.E.C. the penalty is imposed by administrative action by a body with unrestricted powers to make its own inquiries. If that is a penalty for the purposes of section 14 of the Act of 1968, how could the production of evidence which the E.E.C. has power to obtain tend to expose anyone to a penalty? It could only be because the public production might result in political pressure. That would be an extension of the words "tend to expose" in section 14.

(3) The penalty point was argued when the application of section 14 was hypothetical, no privilege having then been claimed. When privilege Was claimed the "tendency to expose" point was argued later. The argument was split in two. If it had not been, leave to appeal on both points would have been given.

(4) The range of additional evidence is very small and would add little to the length of the hearing.

(5) The claim is very great and there is a very wide range of issues.

**\*596** *Rokison Q.C.* Five reasons were advanced for leave being given to pursue a fifth appeal: (1) The first was that cases had been prepared and exchanged in advance. Weight should not be given to that. The appellants only co-operated in that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                     Page 40

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

exercise to save time.

(2) The next was the "penalty" point, which is closely connected with the "tendency" point in that they both arise out of this dispute in relation to the letters rogatory and both arise in relation to the construction of section 14 of the Act of 1968. Under that there are three separate points: (a) Is the fine under the E.E.C. regulations a penalty? (b) Are the procedures for imposing or enforcing that fine a penalty? (c) Would the production of the documents requested tend to expose R.T.Z. to such proceedings? This last is the point of the fifth appeal. It was not raised in the Court of Appeal and depends on wholly separate evidence and argument. In the Court of Appeal Westinghouse were not handicapped by arguing the first two points and not the third.

(3) It was said that it was only by accident that Westinghouse did not have leave from the Court of Appeal to argue this point before the House of Lords. But that court, when it refused leave to appeal on the "tendency" point, was well aware that it had already given leave for the other points to be raised in the House.

(4) It was said that the range of additional evidence and the additional cost would be small and that it would add little time to the argument. But it would extend the hearing.

(5) Reliance was placed on the magnitude of the claim being made. But that in itself is not a ground for giving leave.

No real issue of principle arises on the fifth appeal. Westinghouse have not shown that they have a good arguable case on it.

On the assumption that the fine under the E.E.C. regulations is a penalty and that the procedure amounts to proceedings for the recovery of a penalty, the question, which is essentially one of fact, is: Would the production of the documents tend to expose the companies to that penalty? But if a party is seeking to obtain from the House of Lords leave to appeal when the Court of Appeal has refused leave the burden is on him to show that he has a good arguable case on a real point of principle. There is no point of substance to be raised here.

*Vinelott Q.C.* An important issue of principle is raised. The question is what test is to be applied. There is an unbroken line of authority from the early 19th century till 1939 to the effect that one who relies on privilege must show that there is a reasonable probability, a real risk, that the evidence, if disclosed, would lead to the imposition of a penalty: Triplex Safety Glass Co. Ltd. v. Lancegaye Safety Glass (1934) Ltd. [1939] 2 K.B. 395. There is no real difference between the parties as to the effect of the evidence. It is the test which would have to be considered. The real issue is whether *Triplex* was wrongly decided.

[LORD WILBERFORCE: Their Lordships think it right to give leave to appeal.]

There are two questions: (1) Is a fine imposed by the E.E.C. a penalty? (2) If so, would the imposition of a fine be the result of proceedings for the recovery of a penalty within section 14 (1) of the Act of 1968? Section 16 is also relevant. The section must be construed *597 in the context of the law as it was in 1968, when there was a very broad and ill-defined category of cases where privilege could be claimed extending to all cases where to produce a document or answer a question might tend to expose a witness to any penalty or forfeiture. See Mitford, Chancery Pleadings, 5th ed. (1847), pp. 229-235. A large area covered by the privilege was that of penalties recoverable in a civil action by common informers but they were abolished by the Common Informers Act 1951. There remained a vague field of penalties recoverable on the one side by the Crown and on the other by someone who had an interest in that he might have suffered by the offence. Sometimes a person injured is given a right, not simply to damages, but to a sum which bears no relation to actual damage, and that is a penalty: Jones v. Jones, 22 Q.B.D. 425. The only penalties remaining recoverable by the Crown in civil proceedings at the time of the Act of 1968 were those recoverable under section 499 (1) and (2) of the Income Tax Act 1952. The penalty under section 59 of that Act is imposed summarily,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547

Page 41

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

without proceedings, for a failure to appear and give evidence. It is hard to see how a question of privilege could arise in relation to it.

The rule was stated in very wide terms in the 19th century and applied to a penalty which might result from the disclosure of evidence, even though it did not result from any proceedings, e.g., deprivation of the Sacraments. Section 14, when it refers to "proceedings," in effect restricts the privilege to the case of penalties imposed as a result of proceedings. The draftsman may have had in mind the Act of 1952. The privilege should be construed in the limited sense.

The only question is whether the E.E.C. legislation relating to fines falls within or without the principle correctly defined. The relevant provisions are articles 85 and 86 of the E.E.C. Treaty. These are supplemented by E.E.C. Council Regulation No. 17, articles 1, 2, 11, 14, 15, 17. To imply in these provisions a rule against self-incrimination would stultify the power which is only to be used in cases where there is a suspected abuse of the treaty.

When a fine has been imposed by decision, the first stage, the person fined can appeal to the Court of Justice, an appeal against a penalty, liability for which has already arisen, the second stage. The third stage is that if, after an unsuccessful appeal, the fine is not paid, it can be recovered in this country by registration and an action founded on the registered entry: see the European Communities (Enforcement of Community Judgments) Order 1972 (S.I. 1972 No. 1590), paragraphs 1-4. A distinction must be drawn between proceedings which give rise to a liability for a penalty and ancillary proceedings under the orders which are necessary for the enforcement of a liability already created. The case of penalties under the revenue statute is different because the proceedings are necessary to establish the facts on proof of which the liability for a penalty becomes an immediate liability.

The E.E.C. can obtain the information by administrative action and in the circumstances it is unreal to apply the privilege on the ground of self-incrimination to the disclosure now sought. The E.E.C. have the Friends of the Earth documents and have known of the existence of the cartel since 1972.

*598 Should the construction submitted be rejected the effects in English law would be far reaching. In civil litigation there would be many cases where, before our entry into the Community, discovery would have been plainly relevant and necessary to justice, but after it the request would be met with the claim that the defendant might have been guilty of an infringement of article 85, incurring liability to a penalty.

On the "tendency" point two conflicting requirements of public policy must be reconciled: (a) that a witness should not be required to answer questions which might tend to expose him to criminal proceedings or to a penalty; (b) that parties to litigation should be free to obtain and adduce all relevant documentary or other evidence so that justice may be done between the parties. A witness who relied on the rule against self-incrimination had to show (1) that the facts which the document or answer would reveal would assist in proving something which would be a crime or which would expose him to a penalty and (2) that the production of the document or the giving of the answer would give rise to a reasonable probability that proceedings would result. In 1939 it was laid down that the witness can rely on the rule against self-incrimination if he can show that the facts which the document or answer would tend to establish would be an offence and that the risk of proceedings is not merely fanciful: the Triplex case [1939] 2 K.B. 395, 402-408. See also Blunt v. Park Lane Hotel Ltd. [1942] 2 K.B. 253, 257. The burden is on the person who relies on the self-incrimination rule, whatever the test may be. The rule in Reg. v. Boyes (1861) 1 B. & S. 311, was that a person relying on the rule must show a real risk.

Hitherto it has been easy for the court to weigh the necessary matters asking: (1) Is the suggested offence really an offence? and (2) Is what would

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                           Page 42

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

emerge relevant to proving it? If the answers are affirmative the court will allow great latitude in claiming the privilege. But here it is hard to evaluate the risk that the Commission will be stirred out of inaction by the effect of public opinion. Although it is the initiating body, it does not act without a direction from the Council of Ministers. The Commission having known of the cartel since 1972, how does the production of the documents in question increase the risk that action will be taken under article 85? The only risk would be the activation of the ComMission's powers. The question is how far the production of the documents involves a real risk that the Commission will be tempted to do what it can already do.

Two earlier cases on the rule were Short v. Mercier (1851) 3 Mac. & G. 205, 214, 217-218, and Reg. v. Boyes, 1 B. & S. 311, 312-313, 329-331. The test is that the judge must insist on a witness answering a unless he is satisfied that the answer will tend to put him in peril, not an unsubstantial danger, a bare, remote possibility by which no reasonable man would be affected, but one which, looking at the ordinary course of law and the nature of the offence, was not an imaginary risk. Other 19th century cases like Reynolds v. Godlee (1858) 4 K. & J. 88 state the rule in the same terms. It was not till Triplex [1939] 2 K.B. 395 that the court declined to enter into the possibilities, save to say that they must not be so negligible that no serious man would entertain them. That shifted the burden away from free disclosure.

*599 Article 85 (3) of the E.E.C. Treaty is inapplicable and the members of the cartel could not bring themselves within it. They cannot even be safe as a matter of legal theory. The question is whether in the context of this case, this is a foreseeable or real risk which could influence their conduct. The only explanation of the inactivity of the Commission is that this is a politically sensitive matter and if the extent and nature of the cartel becomes a matter of international debate, there may be political pressure on the Commission to do what article 85 requires. Article 89 provides that the

Commission shall ensure the application of the principles of articles 85 and 86. The production of the documents, resulting in their becoming public property, would not lead to the risk of the Commission doing anything it would not otherwise have done. That the publicity might give rise to political pressure is the sort of risk the courts cannot evaluate. It is a wholly novel situation that a prosecution or the imposition of a penalty feared should be by someone wholly free as to when and how he makes the investigation, what evidence he requires and what fine he imposes. Article 175 of the treaty deals with the persons who can bring proceedings against the Commission for breach of duty.

The purpose of the application for the letters rogatory was to obtain evidence for the Virginia proceedings. The complaint by Westinghouse is that the cartel had effect in the United States and deliberately aimed at injuring Westinghouse there. The system of tendering meant that no real competition existed and it was designed to mislead. The cartel set out to eliminate powerful middlemen like Westinghouse. The domestic market in the United States was affected.

On the discovery point, the main question under section 1 of the Act of 1975 is the meaning of the words "to be obtained for the purpose of civil proceedings." In section 2 (1) the words "to be appropriate" are related to subsection (2) which says in effect what steps are appropriate. When there is a request for evidence the court has power to give effect to it by making an order which is appropriate, having regard to the nature of the request. What must appear to the court to be appropriate is the means to give effect to the request. In the context the court referred to in subsection (3) would be an English court. It is not directed to discovery, which is dealt with in subsection (4). Under subsection (4) there can be no order for discovery or production save one which would satisfy a subpoena duces tecum. The sort of pre-trial discovery which is permissible in the United States is wholly outside the contemplation of the Act. Lines of inquiry by interrogatories are not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

evidence for the purposes of these proceedings; it is preliminary material for the purpose of getting evidence for the proceedings. The wide pre-trial discovery of the United States cannot be the subject of an order under this Act. The limits are production of documents in a form which would answer a subpoena duces tecum or interrogatories which do not answer some preliminary "fishing" purpose.

The evidence sought by Westinghouse falls within the Act of 1975. Judge Merhige deliberately framed his order in a normal form so as to comply with the requirements of English law. The documentary evidence is directly relevant to the defence in the Virginian proceedings and *600 Westinghouse intended to produce it. The oral evidence is equally relevant. The evidence passes the test in section 1 of the Act. The documents are sufficiently specified to form the subject matter for a subpoena duces tecum. They were so before the "blue pencil " used in the Court of Appeal, but, alternatively, they certainly are now. The Court of Appeal can make an order giving effect to the letters rogatory in part. If the court rejected the whole of the letters rogatory, they could be reissued in part. The court cannot widen the letters rogatory and, strictly speaking, it should not use a "blue pencil," but it can give effect to it in part.

For the purposes of a subpoena duces tecum a document must be specified with reasonable distinctiveness, giving the witness a description which will enable him to find the document sought with reasonable ease. If the person served with the subpoena has already identified and got together the documents requested (as is the case here) he cannot be heard to say that the description was too vague to enable him to do so. See Lee v. Angas (1866) L.R. 2 Eq. 59, 63-64. R.T.Z. cannot be asked to do more than search their records and files, see what they have which answers to the description and bring all those documents to the court. That they have already done. In the context of a subpoena duces tecum they can be compelled to produce precisely those documents. Having looked at section 1 of the Act and at section 2 (3) one must show that the letters rogatory sufficiently specify the documents:

section 2 (4) (b).

Judge Merhige's ruling on privilege on June 14, 1977, did not exhaust the letters rogatory, as the appellants contend. They could not be exhausted until the statutory machinery represented by R.S.C., Ord. 70, r. 6 had been put into operation.

The "back door" argument for the appellants is that if a company claims privilege and is entitled to do so its servants cannot be examined on matters which might disclose what the privileged documents would have disclosed. But there is no authority for the proposition that a company's privilege can spill over to its servants. There is no authority either way: see Gibbons v. Waterloo Bridge Co. Proprietors, 5 Price 491, 493; McFadzen v. Liverpool Corporation (1868) L.R. 3 Ex. 279 , 280, 281; Parkhurst v. Lowten, 2 Swans. 194, 215-217. The privilege against self-incrimination never applies to an agent, even one as confidential as a legal adviser.

The origin of the present letters rogatory is American Express Warehousing Ltd. v. Doe [1967] 1 Lloyd's Rep. 222, 224-247. It is plain from the background documents and the nature of the documents requested that they are directly relevant to the issues and the intention is to seek to adduce them in evidence. They are related to the existence and terms of the cartel, which are relevant to the matters in issue. Justice cannot be done without the testimony intended to be given at the trial; it is implicit that the documents will be produced at the trial. Admittedly it is not stated in the affidavit that the documents, when produced, will be admissible, but to require that it should be so stated would stultify any letters rogatory.

The appellants submitted that since the documents, if disclosed, would be used in the Illinois proceedings, the House of Lords has a discretion *601 whether or not to order their production. The Illinois proceedings are civil, not criminal. Though proceedings for double or treble damages are proceedings for a penalty for the purposes of the rule against self-incrimination, it does not follow

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

that proceedings for a penalty are no civil proceedings for the purposes of other rules, in particular the rule that English courts will not enforce penal laws of another state: see Huntington v. Attrill [1893] A.C. 150, 156, 157-158, 159. An action for treble damages given to a person who has suffered damage is remedial and not criminal.

Any documents and information obtained by a party to proceedings in the course of proceedings are privileged in the sense that that person is not bound to disclose them in other proceedings. They are privileged from disclosure in other proceedings and cannot be used for a collateral purpose. But once documents or depositions from interrogatories are actually read at the trial of an action, they enter the public domain and questions of privilege and duty disappear. See Goldstone v. Williams, Deacon & Co. [1899] 1 Ch. 47. There is an implied undertaking to the court not to use documents produced for a collateral purpose. But when documents are asked for by letters rogatory there can be no implied undertaking to the English court, which must leave it to the foreign court to say what use of the documents is to be permitted. Under American law Westinghouse, once it had got hold of the documents, could not be stopped effectively from using them in the Illinois proceedings. Westinghouse did not apply by letters rogatory in the Illinois proceedings as well as the Virginian proceedings because under American law the evidence was available for both.

As to the effect of the intervention of the United States Attorney-General, it is initially submitted: (1) The grand jury proceedings and later the subpoena of March 2, 1977, issued by the State Department to Westinghouse requiring production for the purposes of the grand jury of any documents in its possession are not a new factor. Once the evidence requested had been given in the Virginian proceedings it would be in the public domain and, subject to United States rules of admissibility, would be available in the grand jury proceedings.
(2) The Illinois proceedings are civil and not penal for the purposes of the rule of international law that one State does not enforce the penal laws

of another.
(3) Judge Merhige's ruling on privilege did not exhaust the letters rogatory.
(4) The question whether the order under 18 U.S.C. 6002 and 6003 was properly made and what was its effect is one of American law. It was never contemplated that, so far as it required witnesses to attend, it was enforceable in England.
(5) As regards the orders of Master Jacob upheld by MacKenna J. and the Court of Appeal, strictly on appeal the court should consider whether it was justifiable in the circumstances which existed at that time, but the respondents are willing that the House of Lords should consider the evidence as if the order had been made in a subsequent application.

The substantial question is whether if a litigant in country A applies to the local court for letters rogatory addressed to country B and the *602 person charged with the administration of the criminal law in country A, in order to make the examination under the letters rogatory more effective in extracting evidence or information of use to him, grants the witness immunity it can be said that the purpose of the letters rogatory is no longer that of obtaining evidence for use in civil proceedings. The answer is that the effect of the grant of immunity is that the purpose will be more effectively achieved and the motive of the person who granted the immunity is irrelevant.

Section 1 of the Act of 1975 is satisfied in the present case. Westinghouse applied for letters rogatory and judge Merhige issued them to obtain evidence in the Virginian proceedings. The fact that the request will be more effective because an order of immunity has been granted on the application of the State Department and the motive of the State Department is making that application are both irrelevant. The motive does not change the nature of the letters rogatory so as to make them no longer an application for evidence to be obtained in civil proceedings. The evidence was to be obtained for civil proceedings and for no other purpose.

There is a discretion under section 1, but this appeal should not be allowed on the ground that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

evidence will be used in the grand jury proceedings. There is no want of good faith in Westinghouse in trying to use the letters rogatory to get evidence for some other proceedings. It should not fail to get vital evidence only because the fetter on compelling answers has been removed by the United States Attorney-General for some different purpose.

No order made under the Act of 1975 can violate United Kingdom sovereignty because such an order and any evidence taken under it are enforced under the powers of the United Kingdom courts. The convention ratified by the United Kingdom in 1976 is a treaty between the States which adhered to it, ratified it and signed it. The United Kingdom in effect undertook to introduce legislation giving effect to the principles of the convention. It did so in a way which did not prejudice its sovereignty. Therefore there was no need for the Act of 1965 to make any reservation giving a right to refuse letters of request if it was considered that sovereignty would be infringed. But it was necessary to preserve the right to object on grounds of security: see section 3 (3). Everything had to be done through the courts of the United Kingdom and enforcement was for them. Sovereignty was preserved. If there were any difficulties as to whether a letter of request was proper or within the spirit of the convention that was to be dealt with at a diplomatic level: see article 36 of the convention.

The effect of article 2 (2) (b) of the draft convention between the United Kingdom and the United States providing for the "Reciprocal Recognition and Enforcement of Judgments in Civil Matters" 1977 (Cmnd. 6771) is that, by reason of the words "to the extent" the judgments referred to would be enforceable to the extent of damages but not in excess of what is properly considered damage. This would apply to any damages recovered by Westinghouse in the Illinois proceedings.

As to Imperial Chemical Industries Ltd. v. E.C. Commission [1972] C.M.L.R. 557, 628-629 the court there looked to see whether there was *603 a concerted practice and whether the conduct had

effects within the Common Market, holding that because it had such effects it was carried on within the Common Market. Thus, if the acts complained of in the Illinois proceedings had taken place within the Common Market while R.T.Z. were outside it, the Common Market would have asserted jurisdiction. Article 85 of the treaty does not bring into English domestic law the whole of the effects doctrine because England has its own restrictive practices law but if what is alleged to have taken place in the United States were alleged to have taken place in Europe that would constitute an infringement of article 85, which is part of English law. Accordingly the United States are not asserting a jurisdiction over commercial matters which English law would regard as wholly improper.

No question of comity is properly before the court. If public interest privilege is claimed, the claim must be supported by a certificate and affidavit of the Minister.

To satisfy the test the evidence must be shown to be required for the purpose of civil proceedings in the court issuing the letters rogatory. If that is the present purpose it is no objection that there is also a present intention to hand the evidence on, when it becomes public, to use it in other civil proceedings or even to hand it to the criminal authorities to enable them to start criminal proceedings, but if it can be shown that there is no real intention to use the evidence in the civil proceedings in the court issuing the letters rogatory, the test is not satisfied. But that is not the position here.

*Rokison Q.C.* in reply. The letters rogatory should not be looked at simply on their face value. Looking at the matter as a whole, this is a "fishing" operation not limited to directly relevant material for use at the trial.

On the claim of privilege under section 14 of the Act of 1968 the question is: Would the production of the documents requested by Westinghouse tend to expose the companies to proceedings for the recovery of a penalty? Two points are now raised: (1) whether the imposition of the fine results from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                 Page 46

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

"proceedings" and (2) whether the production of the documents would be likely to result in the imposition of a fine. The first question is misconceived. It should be whether R.T.Z. would be exposed to proceedings for the recovery of a penalty.

The method whereby any penalty imposed by the Commission would be enforced against R.T.Z. would be by proceedings for the recovery of the appropriate penalty. Before the Act of 1968 the privilege in respect of exposure to penalties was very wide and was not restricted to penalties which resulted from legal proceedings. There is a principle that a statute should be construed, as far as possible, as not altering the common law.

If the appellants are wrong on the point of proceedings for enforcement under the English order, then the imposition, as opposed to the recovery, of a fine in these circumstances would be the result of "proceedings" broadly construed.

On the point of "tendency to expose" the questions are: (a) What is the test? (b) Have R.T.Z. satisfied it? The test depends on two principles: (1) A witness claiming privilege must depose on oath or affirmation to a belief that the answer to the question or the production of *604 the document will or may tend to expose him to incrimination or a penalty; the mere assertion that advice has been received to that effect is not enough. (2) The oath will not be conclusive and the court must also be satisfied from the subjective point of view that the claim is not made in bad faith and also, objectively, that there is a reasonable apprehension of a real risk as opposed to an imaginary or fanciful risk. If these tests are satisfied the court will allow great latitude to the witness to judge for himself the extent of the exposure and will not balance the degree of likelihood that proceedings may result: see Maccallum v. Turton (1828) 2 Y. & J. 183; Reg. v. Boyes, 1 B. & S. 311; the Triplex case [1939] 2 K.B. 395. Here it cannot be said that there is only a fanciful risk, one of which a reasonable man would not take account.

Under the Act of 1975 there is a double filter. (1) If the request is not for the obtaining of evidence as there exposed the discretion of the court under section 2 does not arise, since the court has no power to make an order. (2) If it is a request for the obtaining of evidence, section 2 imposes limits on the orders the English court can make to steps which could be compelled in English proceedings. In any event, section 2 (3) precludes the making of an order for discovery in the wide sense from a non-party, whether oral or documentary, which section 2 (4) imposes a filter as to documents. The court has an overall discretion.

The important features in considering whether or not this is discovery: (1) The request was in effect at the time of the application for all the documents relating to uranium. The witnesses included "any other person with knowledge. " Clearly this is "fishing." (2) From what Judge Merhige said when he decided to issue the letters rogatory it appears that this was a fishing expedition not restricted to directly relevant material which might lead to the discovery of directly relevant material. (3) Westinghouse did not deny that this was pre-trial discovery. (4) The circumstances of the making of the application were that the cases were only consolidated before Judge Merhige for pre-trial purposes; the issues which would be before the court had not been finally determined and the process of discovery in a wide sense was going on among domestic producers. (5) The evidence Westinghouse were seeking from the foreign producers was regarded by them in the same light as the pre-trial discovery they were taking from the domestic producers. (6) The scope of the discovery has not been limited by the order of the court, nor is there anything in the letters rogatory in relation to the oral testimony limiting the scope of the examination. This is relevant to the stage of the first filter in section 1 when one is considering whether this is a fishing expedition. It is only when one reaches section 2 and the second filter that the court must consider whether to make an order and on what terms.

The extent to which the documents are sufficiently

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

specified is relevant to the question whether this is a "fishing" expedition. If the documents are of very broad categories that would indicate a "fishing" expedition. Under section 2 (4) (b) of the Act of 1975 the question arises whether the documents are "particular documents specified." The filter there is very fine. Cases before that Act are not helpful, since before it there was no definition of the degree to which documents had to be specified. *605 It is not helpful to consider whether the document would have been sufficiently specified for the purposes of a subpoena duces tecum.

If the appellants fail on the discovery point the order made should be limited to the minutes of meetings, with date and location, and letters, with dates and addressee. When Westinghouse ask for the reply to such a letter the onus is on them to show, on a balance of probabilities, the likelihood that there was a reply and that it is in the possession, custody or control of R.T.Z.

Lee v. Angas, L.R. 2 Eq. 59, 64, has no application to the present case. No question of waiver could arise in this case. Further the position there contrasts with the limitations of section 2 (4) of the Act of 1975.

On privilege in respect of the oral testimony, the letters rogatory were exhausted by the ruling of Judge Merhige. Even if they were not exhausted the examination of the witnesses who attended was completed. The Act of 1975 contemplates that they should face questioning once and that the requesting court should rule on privilege once: see section 3 (2) . The judge of the requesting court, so far as procedure under the Act is concerned, has one function only i.e. to rule on the question of privilege referred to him.

When purporting to sit in London as a judge of the Virginia court and purporting to keep the witnesses under recall Judge Merhige misunderstood his position and his powers. He had no power to keep them under recall. He was purporting to act in three capacities, ruling on privilege as judge of the requesting court, taking the examination of the

witnesses as examiner and making orders for the future conduct of the proceedings as judge of the Virginia court.

As to the point that it does not make sense, if one can get round a company's privilege by getting the same information out of its servants, its officers are no more than its mouthpiece; cf. Earl of Suffolk v. Green (1739) 1 Atk. 450 . Where the interest of the company and the individual are the same and the individual is being questioned because he is the very person alleged to have been concerned in the relevant activity of the company it is an abuse to ask for the material through his mouth. It is the company's privilege, but he can claim it on behalf of the company. Effect should be given to the company's privilege which it has claimed directly by allowing that privilege to be claimed indirectly.

The question in what circumstances the individual is to be identified with the company arises in other areas of the law. The admission of an employee is evidence against a company if he has overall control of its activities or is responsible for the particular business in question: see *Phipson on Evidence,* 12th ed., p. 316, para. 728, p. 317, para. 731, p. 318, para. 732; Reg. v. Andrews-Weatherfoil Ltd. [1972] 1 W.L.R. 118.

Apart from the discretionary privilege, there is the overall discretion vested in the court under the Act of 1975 and by virtue of the discretion the court would not confirm an order to testify if the individuals through their oral testimony would be likely to render the company's privilege nugatory.

As to the other proceedings in America, where it is apparent to the English courts that the material sought is also required for other purposes, *606 no order should be made. The court in the exercise of its discretion can prevent the material getting into the public domain by refusing to make the order sought. When an English defendant is not within the jurisdiction of the foreign court and has taken no part in the proceedings there the English court will not help the foreign court or the foreign plaintiff through it to get evidence from the defendant. That

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

is independent of the submission that the anti-trust proceedings which have been initiated are penal and will not be given effect to by an English court.

As to the intervention of the Department of Justice, it made it clear that the oral depositions are required for a collateral purpose, which is now the dominant one. It has also made the evidence compellable in the United States. Judge Merhige's order under U.S.C. sections 6002/3 may have been valid under American law but the question whether an English court will give effect to it is one of English law. Judge Merhige was purporting to exercise an extra-territorial jurisdiction by making an order compelling Englishmen to testify in England. The order compelling testimony has no effect in England and the English courts should not disregard the compulsion and concentrate on the immunity from prosecution given to the witnesses. Since the intervention of the Department of Justice the demand has been for evidence for the purposes of the grand jury investigation.

Westinghouse could not apply the letters rogatory procedure to the grand jury investigation because no proceedings were pending. Both Westinghouse and the Department of Justice were blocked in their tracks. Therefore they tried to ride on the back of the letters rogatory in the Virginia court, to get evidence which otherwise they could not.

*Vinelott Q.C.* in reply on the cross-appeal. The relevant words are "proceedings ... for the recovery of a penalty "in section 14 (1) of the Act of 1968. The question is whether they should be read as proceedings to impose liability to a penalty or proceedings for payment of a penalty. The Act plainly altered the pre-existing law. Section 14 looks to penalties imposed as a result of proceedings.

As to the "tendency" point, the documents sought would add nothing to what the Commission already knew and it is under a duty to act and has the power to act.

Their Lordships took time for consideration.

December 1, 1977.

LORD WILBERFORCE.

My Lords, on October 28, 1976, an ex parte order was made in the High Court, Queen's Bench Division, under section 2 of the Evidence (Proceedings in Other Jurisdictions) Act 1975, giving effect to letters rogatory issued out of the United States District Court for the Eastern District of Virginia Richmond Division, at the instance of Westinghouse Electric Corporation ("Westinghouse "). In the Richmond Court Westinghouse are defendants in a number of actions (civil proceedings) consolidated in that court, by utility companies producing electricity, alleging breaches of contract by Westinghouse for the supply of uranium and claiming very large sums *607 in damages. Westinghouse put forward (inter alia) a defence of commercial impracticability arising from an alleged uranium producers' cartel.

The letters rogatory, issued on October 21, 1976, and addressed to the High Court of Justice in England, seek the examination of nine named persons described as present or former directors or employees of two British companies, the Rio Tinto Zinc Corporation Ltd. ("R.T.Z.") and R.T.Z. Services Ltd. ("R.T.Z. Services") which collectively I shall refer to as "the R.T.Z. companies" or of "such other director or other person who has 'knowledge of the facts as to which evidence is desired'." The letters also seek the production of documents according to a lengthy schedule alleged to be in the possession of the R.T.Z. companies. The present appeals are brought by the R.T.Z. companies and seven of the nine named persons, the other two being out of the jurisdiction. In effect they seek to have the order giving effect to the letters rogatory set aside or discharged.

Since the order of October 28, 1976, there have been a number of applications to the English courts and appeals arising therefrom. The appellants sought to have the order set aside but their application to that effect was rejected by the High Court. On May 26, 1977, the Court of Appeal (1)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

dismissed the appellants' appeal against rejection but ordered that the schedule of documents attached to the letters rogatory should be amended by the deletion of certain categories of documents. The court also ruled (2) - in favour of the R.T.Z. companies - that penalties provided for by article 15 of regulation 17 of the General Regulations of the European Economic Community for breach of articles 85-86 of the Treaty of Rome (which deals with restrictive or concerted practices) constituted a "penalty" within the meaning of section 14 of the Civil Evidence Act 1968 so as to provide the foundation for a claim for privilege against the production of documents. The R.T.Z. companies now appeal against the first part of this order and Westinghouse against the second.

Since that decision of the Court of Appeal there have been two further developments. The first of these concerns a claim by the individual appellants to privilege under the law of the United States, viz., the Fifth Amendment to the Constitution (self-incrimination). I shall state the facts relevant to this claim later when I come to consider it. The second concerns the documents. On June 10, 1977, in proceedings under the letters rogatory at the United States Embassy in London, the R.T.Z. companies, pursuant to the judgment of the Court of Appeal of May 26, 1977, claimed privilege against production of all (save six) of the scheduled documents on the ground that production would tend to expose the R.T.Z companies to proceedings for the recovery of a penalty (section 14 of the Civil Evidence Act 1968). This claim was challenged by Westinghouse but on July 11, 1977, the Court of Appeal upheld it. By leave of this House Westinghouse now appeals against that judgment.

There are thus three main issues before the House.

1. Ought the order of October 28, 1976, giving effect to the letters rogatory to have been set aside?

2. Can the R.T.Z. companies claim privilege against production of the scheduled documents?

\*608  3. Can the individual appellants claim

privilege against self-incrimination under the law of the United States?

1. The law in England which provides for giving effect to letters rogatory is the Evidence (Proceedings in Other Jurisdictions) Act 1975 (the "Act of 1975 "). Before 1975 this matter was regulated by the Foreign Tribunals Evidence Act 1856, as amended and supplemented by various later statutes. The Act of 1975 was passed in order (inter alia) to give effect to the principles of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters of 1970 (Cmnd. 3991, 6727) which the United Kingdom ratified in 1976. The Act is, as I think, clear in its terms so that reference in aid of interpretation to previous statutes is not required. But one background matter requires mention in order that the Act - particularly section 2 - may be understood. This arises from the United States pre-trial procedure, as laid down in the Federal Rules of Civil Procedure and particularly rules 26 and 30. These rules give wide powers, wider than exist in England, of pre-trial discovery against persons not parties to a suit. (The R.T.Z. companies are not parties to the Richmond proceedings.) The nature of these powers was well summarised by Devlin J. as follows:

"... it is plain that that principle [of discovery] has been carried very much further in the United States of America than it has been carried in this country. In the United States of America it is not restricted merely to obtaining a disclosure of documents from the other party to the suit, but there is a procedure ... which allows interrogation not merely of the parties to the suit but also of persons who may be witnesses in the suit, or whom it may be thought may be witnesses in the suit, and which requires them to answer questions and produce documents. The questions would not necessarily be restricted to matters which were relevant in the suit, nor would the production be necessarily restricted to admissible evidence, but they might be such as would lead to a train of inquiry which might itself lead to relevant material": see Radio Corporation of America v. Rauland Corporation [1956] 1 Q.B. 618, 643-644.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                        Page 50

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

That case - not dissimilar on its facts from the present - arose under the Act of 1856, section 1 of which referred to the obtaining of "testimony." The decision was that there was a distinction between "direct" material immediately relevant to the issue in dispute, as to which testimony could be obtained, and "indirect" material by way of discovery, testimony for which could not be obtained.

There is no doubt that this distinction was in the mind of the draftsmen of the Act of 1975.

In the first place, the 1970 convention by article 23 enabled a contracting state to declare that it would not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents. The United Kingdom in fact made a declaration to this effect coinciding with section 2 (4) of the Act of 1975. In the Act itself, section 1 refers to "evidence" in place of "testimony" but if there is any difference between the two words it must be in the sense of "directness" rather than the reverse. The distinction drawn in the Radio Corporation case [1956] 1 Q.B. 618 *609 is preserved in section 2 (3) and (4). Subsection (3) states that an order (s.c. of the English High Court) giving effect to the request "shall not require any particular steps to be taken unless they are steps which can be required to be taken by way of obtaining evidence for the purposes of civil proceedings in the court making the order ..." and subsection (4) that an order under section 2

"shall not require a person - (a) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power; or (b) to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power."

These provisions, and especially the words "particular documents specified in the order" (replacing "documents to be mentioned in the order" in the Act of 1856) together with the expressed duty of the English court to decide that the documents are or are likely to be in the possession, custody or power of the person called

upon to produce, show, in my opinion, that a strict attitude is to be taken by English courts in giving effect to foreign requests for the production of documents by non-party witnesses. They are, in the words of Lord Goddard C.J., not to countenance "fishing" expeditions: Radio Corporation of America v. Rauland Corporation [1956] 1 Q.B. 618, 649.

My Lords, I have referred to these background matters because misinformation as to some of them appears to have influenced the Court of Appeal. Lord Denning M.R. referred to a submission for R.T.Z. that the case was similar to the *Radio Corporation* case, and that the letters rogatory ought to be rejected. He referred to the Hague Convention and said that the United Kingdom when it ratified the convention did not make any declaration under article 23. (Unfortunately the print of Cmnd. 3991 does not contain the reservation.) So he could not accept counsel's general submissions. Roskill L.J. seems to have been under the same impression for he too put the *Radio Corporation* case on one side. I think that the Court of Appeal, while correctly stating that the Act of 1975 was a new Act, may have been led to treat it as dealing more liberally than its predecessor with pre-trial discovery. I do not so regard the Act: on the contrary, it appears to me that it takes a stricter line.

The other argument accepted by the Court of Appeal against total rejection of the letters rogatory was based upon the terms of the letters rogatory and some observations by the learned United States District Judge at Richmond (Judge Merhige). The letters in relation to the R.T.Z. Corporation recite that,

"*it has been suggested to us* that justice cannot be done among the said parties without the testimony which is intended to be given at the trial of the actions, of the following persons ... nor without the production of certain documents in the possession of the Rio Tinto-Zinc Corporation Ltd. such testimony and such documents being related to the existence and terms of various agreements, arrangements or concerted practices between Rio

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                        Page 51

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

Tinto-Zinc Corporation **\*610** Ltd. and " (numerous other named companies) "and further that the existence and terms of such agreements, arrangements or concerted practices are relevant to the matters in issue in the actions at present in this court ...". (My emphasis.)

The letters in relation to R.T.Z. Services Ltd. are in similar form except that for the words "*it has been suggested to us*" there are substituted "*it has been shown to us*" - the difference suggesting that neither phrase is significant. Both letters rogatory were drafted by lawyers for Westinghouse and, as they frankly claimed, were drafted after consultation with eminent counsel from England. "The phrasing of the letters rogatory themselves ... are the product of those gentlemen's experience and knowledge." It does not take much percipience to see that the words italicised are directed to the distinction drawn by Devlin J. in the Radio Corporation of America case [1956] 1 Q.B. 618, 645 between "a process by way of discovery and testimony for that purpose" and "testimony for the trial itself." But which it is in fact is not to be determined by the drafting of Westinghouse's lawyers but objectively by the nature of the testimony sought. The fact that any evidence obtained is intended to be put in at the trial, is quite consistent with the inquiry extending (impermissibly) to trains of inquiry which might produce such evidence.

My Lords, I have much doubt whether the letters rogatory ought not to be rejected altogether. They range exceedingly widely and undoubtedly extend into areas, access to which is forbidden by English law. As regards some at least of the individual witnesses no grounds are given for supposing that they could have any relevant evidence to give - I have already commented on the words "it has been shown to us." As regards the schedule of documents, this extends far beyond "particular documents specified in the order," includes categories and classes of documents which, though obtainable under an English order for discovery, cannot be called for under the Act of 1975 and provides little or no material as to many of the scheduled documents, apart from the statement in

the letters rogatory themselves, which would enable the English court to form a view whether or not they are or are likely to be in the possession, custody or power of the R.T.Z. companies.

On the other hand, the schedule does list a number of particular and specified documents. These documents (many of which appear to be copies of originals not listed) came into the possession of Westinghouse from an environmentalist group in September 1976 and are claimed to amount to hard evidence of a uranium producers' cartel. Some of these, on the face of the descriptions, or copies, or originals of them, might be in the possession of one of the R.T.Z. companies or of a subsidiary over which they have power, and many of them appear on the face of the description to be relevant to the existence or terms of a uranium cartel. It is possible that the existence and terms of a uranium cartel may be relevant to Westinghouse's defence of commercial impracticability in the Richmond proceedings. The Court of Appeal, as regards the scheduled documents, applied a "blue pencil," i.e., it deleted (as under section 2 of the Act of 1975 it is entitled to do) a number of items, and (more doubtfully) **\*611** substituted for the words "relating thereto" the words "referred to therein." For my part I would have applied the blue pencil still more vigorously, so as to leave in the schedule only "particular documents specified" together with replies to letters where replies must have been sent. But this leaves the question whether any "blue-pencil" approach is appropriate in relation to this request or whether the whole request is so far-reaching and so far of the nature of "fishing" that, even though a portion of it can be salved it ought to be rejected out of hand, or should the court, which under the Act of 1975 has powers to limit its action to what it considers appropriate, make an order confined to what can be supported under the Act. Before I give my answer on this issue, I must deal with the position as regards the individual witnesses and with a separate argument.

As regards the named individual witnesses, the position can be broadly stated. There are some individuals employed by one or other of the R.T.Z.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                          Page 52

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

companies who appear from the scheduled documents to have attended or to have knowledge of meetings of uranium producers at which matters relevant to the existence of a cartel may have been discussed. In the case of others (a minority) no connection is shown between them and any such meeting or any scheduled document. So the question again is whether there is sufficient basis for the assertion that there is testimony of some identified individuals which is needed for the trial or whether the generality of the request invalidates the whole application.

The separate argument arises in this way. On October 15, 1976, soon after the "environmentalist" documents reached them, Westinghouse commenced in the United States District court for the Northern District of Illinois Eastern anti-trust proceedings against the R.T.Z. companies and 27 other alleged members of a uranium cartel. Westinghouse claimed, in accordance with United States anti-trust legislation, treble damages against all defendants. The R.T.Z. companies have not accepted jurisdiction in these proceedings and have taken no part in them. The letters rogatory in the Richmond actions were requested on the same day. This coincidence has given rise to a contention by the R.T.Z. companies that the real, or predominant purpose of the letters rogatory is to further the anti-trust proceedings, and that as those proceedings are of a penal character, because of the treble damages claim, the letters rogatory should not be acceded to. I need not express any opinion whether if the letters rogatory had been issued in the Illinois proceedings they could be implemented in England, for I am of opinion that the appellants' argument fails at an earlier stage. Unless a case of bad faith is made against Westinghouse (which is expressly disclaimed) it is impossible to deny that the letters rogatory were issued for the purposes of obtaining evidence in the Richmond proceedings. The fact, if it be so, that evidence so obtained may be used in other proceedings and indeed may be central in those proceedings is no reason for refusing to allow it to be requested: all evidence, once brought out in court, is in the public domain, and to accept the argument would largely stultify the letters rogatory

procedure. I must therefore reject this separate contention, and express my conclusion on the other factors. This is that, *612 on the whole, I am of opinion that following the spirit of the Act which is to enable judicial assistance to be given to foreign courts, the letters rogatory ought to be given effect to so far as possible: that it would be possible to give effect to them subject to a severe reduction in the documents to be produced, and to the disallowance of certain of the witnesses. Exactly what these should be I need not specify in view of my conclusions on other aspects of the case. It is enough to say that agreeing in principle, if not totally in detail, with the Court of Appeal, I would not set aside the order of October 28, 1976, on the ground that it provided for illegitimate discovery.

2. I now deal with the question whether the R.T.Z. companies can claim privilege against production of the documents requested under section 14 of the Civil Evidence Act 1968. This, as section 3 (1) (a) of the Act of 1975 makes clear, is a matter of English law. I shall deal with it briefly because I agree with the decisions of the Court of Appeal of May 26, 1977, and July 11, 1977, and I am satisfied with their reasoning. These judgments establish: (a) that fines imposable by the Commission of the European Communities under articles 85 and 86 of the Treaty of Rome and article 15 of general regulation 17 are penalties - this was not disputed in this House; (b) that section 14 of the Act of 1968 is not limited to such penalties as are imposed as the result of proceedings, but covers penalties imposed by administrative action and recoverable by proceedings; (c) that since these penalties are recoverable under English law by virtue of the European Communities Act 1972 they are "penalties provided for by such law" (Civil Evidence Act 1968, section 14 (1) (a)); (d) that production of the documents would tend to expose the R.T.Z. companies to proceedings for the recovery of a penalty, none the less though the Commission: (i) has knowledge of the "environmentalist " documents; (ii) has extensive powers of investigation; (iii) has a duty to enforce articles 85 and 86 - see article 89.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

I base that conclusion in part upon evidence which was before and considered by the High Court and the Court of Appeal and in part upon the proposition that the tendency to expose to a penalty would be increased if the documents in question were to be validated and connected with the R.T.Z. companies by sworn evidence, as opposed to being, as they are now, pieces of paper found in a file. The test of this proposition which was, in effect, and correctly, applied by the Court of Appeal was that laid down in Triplex Safety Glass Co. Ltd. v. Lancegaye Safety Glass (1934) Ltd. [1939] 2 K.B. 395.

In my opinion the R.T.Z. companies make good their claim to privilege against production of the scheduled documents except those conceded and quoad these documents the order cannot be implemented.

3. The individual witnesses claim privilege against giving any oral evidence on the ground that to do so might incriminate them. This claim attracts the protection of the Fifth Amendment to the United States Constitution. Since it is a claim for privilege under United States law, its validity has to be determined as if it had been made in civil proceedings in the United States of America (Act of 1975, section 3 (1) (b)).

It is necessary to state the facts in detail since this is a matter which has arisen since the judgment of the Court of Appeal.

*613 On June 8, 1977, one of the individual appellants, Kenneth Bayliss attended at the United States Embassy in London before a consular officer designated to take evidence under the letters rogatory. He claimed privilege under the Fifth Amendment. After argument, the officer did not direct the witness to answer as she had power to do so under section 3 (2) of the Act of 1975. Instead she permitted guidance to be sought from Judge Merhige - the judge in charge of the Richmond proceedings - by telephone. Judge Merhige came to London in order to rule upon this question and sat at the United States Embassy from June 13-16. All the

seven witnesses - appellants - claimed the Fifth Amendment privilege and on June 14, 1977, his Honour ruled that the privilege was well taken and that the witnesses need answer no questions except to give their names and addresses. There can be no doubt that this ruling has the status of a decision of the competent United States District Court.

On June 15, 1977, Judge Merhige received a letter from the United States Department of Justice stating that the department required the evidence of the witnesses for the purposes of a grand jury investigation. This investigation had been started early in 1976 into possible violations of United States anti-trust laws by members of the alleged uranium cartel. A grand jury had been empanelled in Washington D.C. in June 1976 to pursue this investigation and to initiate criminal proceedings if thought fit. It was represented in the letter that depositions taken pursuant to the letters rogatory might well be the sole opportunity for the grand jury to obtain information vital to its investigation. Further it was represented that the Department of Justice would not use the testimony of any of the named witnesses as the basis for a criminal prosecution of that witness in the United States. On June 16, 1977, a representative of the United States Attorney-General appeared before Judge Merhige and stated that it was the firm policy of the Department of Justice not to make any application in a civil case to which the United States Government was not a party for an order under 18 U.S.C. sections 6002-6003 (see below) and that accordingly such an order had not been sought and was not intended to be sought. However, Judge Merhige was invited to rule that, in the light of the representation contained in the letter, the Fifth Amendment privilege was no longer available. Judge Merhige declined to accede to this invitation and ruled that the privilege was still effective. This ruling also has the status of a decision of the competent United States District Court.

However, notwithstanding its "firm policy" the United States Department of Justice on July 18, 1977, made application to Judge Merhige in Richmond for an order to compel testimony under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

18 U.S.C. sections 6002-6003. These provisions are, so far as relevant, as follow:

"6002. Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to (1) a court or grand jury of the United States ... (3) ... and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his *614 privilege against self-incrimination; but no testimony or other information compelled under the order ... may be used against the witness in any criminal case, except ..." (not relevant)

"6003. (a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon the request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part. (b) A United States attorney may, with the approval of the Attorney-General, the Deputy Attorney-General, or any designated Assistant Attorney-General, request an order under subsection (a) of this section when in his judgment - (1) the testimony or other information from such individual may be necessary to the public interest; and (2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination."

The request was accompanied by two letters:

1. A letter dated July 11, 1977, signed by the Deputy Assistant Attorney-General, Anti-Trust Division to the United States Attorney, Eastern District of Virginia. It was headed "Grand Jury Investigation of the Uranium Industry." It authorised the addressee to apply to Judge Merhige,

pursuant to sections 6002- 6003, requiring a named witness "to give testimony or provide other information *in the above matter* and in any further proceedings resulting therefrom or ancillary thereto." (My emphasis.)

2. A letter dated July 12, 1977, signed by the Attorney-General of the United States also addressed to the U.S. Attorney Eastern District of Virginia, stating that the writer concurred in the request. This letter contained the following:

"These immunity requests are for the purpose of permitting testimony to be compelled in a civil litigation to which the United States is not a party. As you know, the Department of Justice has a firm policy against seeking such orders in private litigation except in the most extraordinary circumstances. In my judgment, the testimony of the individuals for whom orders are to be sought is necessary to the public interest. The extraordinary circumstances which led me to this conclusion include the following: (1) Those persons ... have refused to testify on the basis of their privilege against self-incrimination and they are outside the personal jurisdiction of the United States courts; ... (3) These persons are British subjects and we have determined that it is highly unlikely that their testimony could be obtained through existing arrangements for law enforcement co-operation between the United States and the United Kingdom ... (5) The testimony these persons give may well be indispensable to the work of the grand *615 jury, and (6) The subject matter of this grand jury is of particular importance."

On July 18, 1977, Judge Merhige, as he was obliged to do under section 6003 (a), made an order in respect of each of the witnesses named compelling his testimony in the terms provided for by sections 6002-6003. He expressed the opinion that the matter of sanctions might be tested in the English court and said that he encouraged that course. On July 25, 1977, the witness appellant Bayliss attended at the United States Embassy in London and declined to answer questions put to him on the ground that he wished to seek the assistance of the English court. It is now for this House, on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                          Page 55

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

these appeals, to decide whether, in the light of this situation, the letters rogatory should be given effect to so far as regards these witnesses.

My Lords, it is my clear opinion that effect should not be so given. The position is that so far as the civil proceedings in Richmond, Virginia, are concerned, a ruling was given by the learned District Judge that the witnesses were entitled to the Fifth Amendment privilege. Though the procedure followed was, in certain respects, which I need not particularise, short-circuited in the interest of time saving, there is no doubt that the course taken, with agreement of the parties, was in accordance with the Act of 1975. The ruling was given by the competent judicial authority that the evidence sought was evidence which the witnesses could not be compelled to give in civil proceedings in the country in which the requesting court exercises jurisdiction: section 3 (1) (b). I am not prepared to go so far as to say (as the appellants submitted) that thereafter the requesting court was functus officio, or the letters rogatory exhausted: the procedure allows of sensible flexibility. But when a considered ruling in law has been given and not displaced by appeal, it is necessary to look very carefully at action which is said to negative that ruling.

The action relied upon is the order made by the District Judge under the provisions of 18 U.S.C. sections 6002-6003. Looking at this order and the application for it, there is no doubt as to its character and purpose. This is shown beyond doubt by the letters of June 15 and July 11 and 12, documents of complete frankness and totally without subterfuge or disingenuousness. The evidence to obtain which the order was made and the immunity granted was on the face of these documents evidence required for the grand jury investigation set up by the United States Department of Justice, Anti-Trust Division. This is the first objection: the request for it does not comply with section 1 (b) of the Act of 1975, so that to use the procedure of the Act of 1975 in order to obtain the evidence is a misuse of that procedure. Secondly, the evidence, as the letters explicitly state, is sought for the purpose of a grand jury

investigation which may lead to criminal proceedings (see above). Now the Act of 1975, section 5, provides for the obtaining of evidence for criminal proceedings but expressly the section only applies to proceedings which have been instituted (none have been instituted), and impliedly, to a request by the court in which the proceedings have been instituted. The case is therefore not within section 5, and the procedure is an attempt to get the evidence in spite of that fact. Thirdly, the evidence is sought *616 for the purpose of an anti-trust investigation into the activities of companies not subject to the jurisdiction of the United States. I think that in such circumstances the courts would properly, in accordance with accepted principle refuse to give effect to the request on the grounds that the procedure of the Act of 1975 was being used for a purpose for which it was never intended and that the attempt to extend the grand jury investigation extra-territorially into the activities of the R.T.Z. companies was an infringement of United Kingdom sovereignty - see British Nylon Spinners Ltd. v. Imperial Chemical Industries Ltd. [1953] Ch. 19. But in the present case, there has been an intervention by H.M. Attorney-General on behalf of the Government of the United Kingdom. In this intervention the Attorney-General brought to the notice of your Lordships the following matters.

1. Her Majesty's Government considers that the wide investigatory procedures under the United States anti-trust legislation against persons outside the United States who are not United States citizens constitute an infringement of the proper jurisdiction and sovereignty of the United Kingdom.

2. That the grand jury have issued a subpoena to Westinghouse requiring that company to produce to the grand jury documents and testimony obtained in discovery in the Virginia proceedings. Therefore evidence given in pursuance of the letters rogatory will be available to the United States Government for use against a United Kingdom company and United Kingdom nationals in relation to activities occurring outside United States territory in anti-trust proceedings of a penal character.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547

Page 56

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

3. That the intervention of the United States Government followed by the grant of the order and immunity of July 18, 1977, shows that the execution of the letters rogatory is being sought for the purposes of the exercise by United States courts of extra-territorial jurisdiction in penal matters which in the view of Her Majesty's Government is prejudicial to the sovereignty of the United Kingdom.

My Lords, I think that there is no doubt that, in deciding whether to give effect to letters rogatory, the courts are entitled to have regard to any possible prejudice to the sovereignty of the United Kingdom - that is expressly provided for in article 12 (b) of the Hague Convention. Equally, that in a matter affecting the sovereignty of the United Kingdom, the courts are entitled to take account of the declared policy of Her Majesty's Government, is in my opinion beyond doubt. Indeed, this follows as the counterpart of the action which the United States Government has taken. For, as the order of July 18, 1977, and the letter of July 12, 1977, make plain, the order compelling testimony and granting immunity is made in extraordinary circumstances relating to the public interest of the United States. That the making of the order is a matter of government policy, and not related to the civil proceedings in Richmond, is confirmed beyond doubt by the statement made before Judge Merhige on June 16, 1977, and repeated in the letter of the Attorney-General of the United States of July 12, 1977, that there is a firm policy against seeking orders under sections 6002-6003 in private litigation. *617 It appears that the present is the only case in which such an order has been made. (One other instance cited is not comparable.) But if public interest enters into this matter on one side, so it must be taken account of on the other: and as the views of the executive in the United States of America impel the making of the order, so must the views of the executive in the United Kingdom be considered when it is a question of implementing the order here. It is axiomatic that in anti-trust matters the policy of one state may be to defend what it is the policy of another state to attack.

The intervention of Her Majesty's Attorney-General establishes that quite apart from the present case, over a number of years and in a number of cases, the policy of Her Majesty's Government has been against recognition of United States investigatory jurisdiction extraterritorially against United Kingdom companies. The courts should in such matters speak with the same voice as the executive (see The Fagernes [1927] P. 311): they have, as I have stated, no difficulty in doing so.

For these reasons, I am of opinion that recognition should not be given to the order of July 18, 1977, granting immunity to the individual witnesses, that the matter should be treated as governed by the ruling - properly given in the civil proceedings in question - of June 14, 1977, that the witnesses were entitled to privilege under the Fifth Amendment.

A further point was taken by the appellants that the individual witnesses should not be compelled to give evidence which would, in effect, remove the corporate privilege of their company against production of documents - an argument, in effect, that evidence that cannot be obtained directly from the companies, should not be obtainable indirectly through their employees. This raised some novel and interesting contentions which may merit consideration in another case, or by the Law Commission. It is unnecessary, and therefore inappropriate, to decide upon it now.

I would allow the appeals of the R.T.Z. companies and of the individual appellants and order that the order giving effect to the letters rogatory be discharged. I would dismiss the appeals of Westinghouse. I would order Westinghouse to pay the appellants' costs of the appeals and cross-appeals in this House.

VISCOUNT DILHORNE.

My Lords, on March 18, 1970, the United Kingdom signed at The Hague a convention "on the Taking of Evidence Abroad in Civil or Commercial Matters " designed "to improve mutual judicial co-operation in civil or commercial matters"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                      Page 57

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

(Cmnd. 6727). It was ratified on July 16, 1976. Among the other states which signed and ratified the convention was the United States. Article 1 of the convention stated that a letter of request should not be used to obtain evidence not intended for use in judicial proceedings commenced or contemplated. Article 12 stated that the execution of a letter of request might be refused only to the extent that the execution of the letter did not fall within the functions of the judiciary of the state to which the request was directed, or that state considered that its sovereignty or security *618 would be prejudiced thereby: and article 23 stated that a contracting state might at the time of signature, ratification or accession declare that it would not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents as known in common law countries.

Pursuant to that article, Her Majesty's Government on ratifying the convention, declared that the United Kingdom would "not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents " (Reservations and Declarations, United Kingdom, paragraph 3) and understood letters which required a person

"(a) to state what documents relevant to the proceedings to which the letter of request relates are or have been in his possession, custody or power; or (b) to produce any documents, other than particular documents specified in the letter of request, as being documents appearing to the requested court to be, or to be likely to be, in his possession, custody or power"
to be "letters of request issued for the purpose of obtaining pre-trial discovery of documents."

To enable the United Kingdom's obligations under the convention to be implemented, the Evidence (Proceedings in Other Jurisdictions) Act 1975 (hereafter referred to as "the Act of 1975") was passed. That Act went further than was necessary for the purposes of the convention for it made provision for the taking of evidence not only for civil or commercial proceedings but also for criminal.

In the interests of comity, it is, and I trust will continue to be, as Lord Denning M.R. said in this case in the Court of Appeal (ante, p. 560H) "our duty and our pleasure to do all that we can to assist" the requesting court.

The powers possessed by United Kingdom courts in this regard are now contained and defined in the Act of 1975 which, its long title states, was
"to make new provision for enabling the High Court ... to assist in obtaining evidence required for the purposes of proceedings in other jurisdictions."

Section 1 of that Act provides that where an application is made for an order for evidence to be obtained in the United Kingdom
"and the court is satisfied - (a) that the application is made in pursuance of a request issued by or on behalf of a court or tribunal ('the requesting court') exercising jurisdiction ... in a country or territory outside the United Kingdom; and (b) that the evidence to which the application relates is to be obtained for the purposes of civil proceedings which either have been instituted before the requesting court or whose institution before that court is contemplated,"
then, and I stress only then, has the court the powers conferred by the following provisions of the Act and able to give effect to the request.

*619 So the first question that a court must consider when such an application is made, is whether it is satisfied that each of these conditions is fulfilled.

In Radio Corporation of America v. Rauland Corporation [1956] 1 Q.B. 618 the letters rogatory, which emanated from the President of the United States, stated that "the testimony of the following witnesses" (and then followed a long list of members of boards of directors of English companies), was "necessary in the trial of the issues in the said cause and without the testimony of whom justice cannot be completely done between the parties." The production of documents was also asked for.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                      Page 58

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

Despite the statement in the letters rogatory that such testimony was necessary at the trial, the Court of Appeal held that what was being sought was material relating to pre-trial discovery, material which might lead to a line of inquiry which itself would disclose relevant material, and that it had not been shown that the United States court was desirous of obtaining "testimony " (the word in the Foreign Tribunals Act 1856, section 1, now replaced by "evidence" in the Act of 1975) "which is in the nature of proof for the purpose of the trial": and that consequently the court had no jurisdiction to make the order sought.

In the course of the argument Lord Goddard C.J. said at p. 641 that the court had to look at the substance of the matter and regard was had to what was said in the court in Illinois when the letters rogatory were issued. In his judgment, he said that it was an endeavour to get in evidence by examining people who may be able to put the parties in the way of getting evidence. "That," he said, at p. 649, "is mainly what we should call a 'fishing' proceeding which is never allowed in the English courts."

I do not think that "evidence" in the Act of 1975 has a different meaning to "testimony" in the Act of 1856. The distinction drawn in that case and in the cases cited therein between the obtaining of evidence for use in a trial and the obtaining of information which might lead to the procurement of evidence is equally relevant in construing the Act of 1975. In that Act and in the convention the emphasis is on the obtaining of evidence. If the court is not satisfied that evidence is required, direct evidence for use at a trial as contrasted with information which may lead to the discovery of evidence, however much the court may be disposed to accede to the request, it has no power to do so. As I see it, it has no discretion in the matter.

In this case no difficulty arises with regard to section 1 (a). It is clearly satisfied.

The appellants contend that section 1 (b) is not. They say that the letters rogatory are directed to

obtaining information from and discovery by persons not parties to the litigation in Richmond, Virginia, which might lead to the procurement of evidence; that it is sought primarily for the purpose of civil proceedings brought by the respondents against the appellant companies and others in Illinois and now also for a grand jury empanelled in Washington D.C.

The material put before us does not suffice to enable me to decide *620 that use in the Illinois proceedings is the respondents' predominant purpose. If it is - and it may well be - that would not in my opinion prevent section 1 (b) being satisfied for it is not disputed that what is being sought is for the purpose of the civil proceedings in Richmond, and the proceedings in Illinois are civil proceedings.

Between 1966 and 1974 the respondents entered into a number of contracts under which they undertook to supply 79 million 1bs. of uranium in the period up to and including 1994. They were fixed price contracts subject to escalation with increases in the cost of living. By 1976 the price of uranium had risen from about $6 a 1b. in 1973 to about $41 a 1b. The respondents had not covered themselves against this liability and by September 1975 were short of approximately 75 million 1bs. of uranium. In that month they gave notice to the other parties to the contracts that they would be unable to carry them out with the consequence that 16 utility companies started actions against them in which a sum in the region of $2,000 million was claimed. On the respondents' application 13 of these actions were consolidated in the United States District Court at Richmond for the purpose of the pre-trial procedures.

In their defence to these actions the respondents relied on the defence of "commercial impracticability" under section 2-615 of the United States Uniform Commercial Code and asserted the existence of an international cartel of uranium producers which they alleged had had a serious impact on the uranium market and had caused artificially high prices. They admit that at that time they had not any hard evidence of the existence and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                           Page 59

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

activities of the cartel.

In March 1976 the United States Department of Justice started an investigation into possible violations of the United States anti-trust laws by members of the cartel and in June 1976 a grand jury was empanelled to pursue this investigation and to initiate criminal proceedings should that be warranted.

The convention made no provision for obtaining evidence for the purpose of criminal proceedings and under section 5 of this Act an order can only be made for the purpose of obtaining evidence for criminal proceedings where proceedings have been instituted. So no order could be made for the obtaining of evidence to go before the grand jury.

In September 1976 the respondents received through an organisation called "The Friends of the Earth" documents relating to the existence and activities of such a cartel, of which the appellant companies, with uranium producers (including governments) from France, Canada, Australia and South Africa, were members.

On October 15, 1976, the respondents started civil proceedings for breach of anti-trust laws in Illinois against the appellant companies and many others. In that action they claimed treble damages, a sum in the region of $6,000 million.

On the same day, in the course of the pre-trial proceedings in Richmond, they filed applications for the issuance of letters rogatory seeking the taking of depositions and the production of documents in Canada, Australia and the United Kingdom. The plaintiffs in the actions in Virginia lodged a memorandum in opposition in which they alleged (1) that the court *621 had a discretion whether to issue the letters; (2) that the information sought was irrelevant, one ground for that assertion being that the cartel deliberately excluded the United States market and its existence had been known to the respondents for more than four years; (3) that the issuance of the letters would cause substantial delay in the preparation of the cases for

trial; (4) that the depositions and documents sought were "really in aid of Westinghouse's claim ... in its anti-trust action"; and (5) on the ground that the granting of the letters rogatory would be a futile act as, if the letters rogatory were issued in the form sought, they would not be honoured by the courts of England.

The application was heard by Judge Merhige at Richmond on October 21. It was contended for the respondents that the issuance of the letters was a matter of routine and that the court had no discretion as to it. In the course of the argument their counsel said: "As far as exploring areas of possible evidence abroad is concerned, it would be done with despatch," and: "We are here seeking to discover critical evidence to the defence in this case from several of the international giants in the mining and milling business."

It appears that American pre-trial discovery operates over a far wider field than discovery in this country. Parties may obtain discovery regarding any matter not privileged
    "including the existence, description, nature, custody, condition and location of any books, documents or other tangible things and the identity and location of persons having knowledge of discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

And such discovery may be obtained from persons not parties to the action.

The applications were made in the course of pre-trial proceedings and the shorthand notes of the hearing do not reveal that there was any consideration of the law of England or regard to the difference between the obtaining of evidence in the strict sense and the obtaining of information which might lead to the obtaining of evidence. Counsel for the respondents told the judge that the phrasing of the letters was in accordance with the advice of eminent counsel and that their form was "acceptable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                       Page 60

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

in these foreign jurisdictions. " Most of the discussion appears to have been on the effect the issuing of the letters would have in causing delay in the trial.

The judge who said that he did not see the relevance of the material sought and who did not say whether or not he had any discretion in the matter, issued the letters in the form submitted by the respondents.

In the circumstances it seems to me probable that the issuing of the letters was regarded as a step in the normal process of discovery in American courts which included the obtaining of material which might lead to the obtaining of evidence; in other words, what we would call a "fishing" operation. Support for this view is to be found in the observations of the respondents' counsel cited above.

The two letters rogatory were similar in all material respects. It will suffice to consider one of them and I must do so in some detail in view of their importance.

*622 Each contained recitals, one saying:
    "It has been suggested to us that justice cannot be done among the said parties without the testimony, which is intended to be given in evidence at the trial of the actions, of the following persons ... being directors and/or employees and/or former directors and/or former employees of the Rio Tinto Zinc Corporation ..."

Then five persons are named and the recital goes on
    "or such other director or other person who has knowledge of the facts as to which evidence is desired as hereinafter stated, nor without the production of certain documents in the possession of" that company "such testimony and such documents being related to the existence and terms of various agreements, arrangements or concerted practices, between" that company "as well as others whose identities are presently unknown."
Then follow the names of 40 companies of which 26 were Canadian, Australian, South African,

French and English. The letter goes on:
    "Said agreements, arrangements or concerted practices identities relate to past, present and future uranium prices, uranium supply, uranium demand, allocation of uranium markets, relationships of uranium producers with ' middlemen,' including their willingness or lack, of same to make sales to ' middlemen' and the terms and conditions under which such sales should be made, if at all, the terms of contracts for the sale of uranium to uranium consumers and the United States embargo on the importation of enriched uranium. and whereas the existence and terms of such agreements, arrangements or concerted practices are relevant to the matters in issue in the actions at present in this court."
These recitals were followed by the request that the persons named "or other person having knowledge of the facts" should be caused to appear before any consul or other consular officer of the United States "to be examined orally as a witness in the above entitled actions" as to "the existence and terms of the above-mentioned agreements, arrangements or concerted practices."

This was followed by the request that the proper officer of the Rio Tinto Zinc Corporation should be ordered to produce "the documents enumerated in schedule B hereto, being documents which appear to be or to be likely to be in the possession, custody or power of" that company. Schedule B contains 73 paragraphs of which no less than 57 ended with the words "and any memoranda, correspondence or other documents relating thereto."

I do not propose to refer in any detail to the contents of each paragraph. The pattern followed appears to have been to relate each paragraph to a letter or meeting or agenda etc. of which the respondents had received information from the Friends of the Earth organisation, and then to request the production of anything that might be connected therewith. I will only cite paragraph 16 which asked for the production of
    "copies of all contracts, letters of intent, enquiries and quotations *623 together with invoices of actual deliveries of uranium, thorium and their ores and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                    Page 61

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

compounds provided by members of the organisation or organisations known variously as the 'Uranium Marketing Research Organisation,' the 'Uranium Producers' Club,' the 'Secretariat' and ' Société D'Études et de Recherches D'Uranium ('s.E.R.U.')."

The wide ranging and at the same time vague description of the documents sought makes it to my mind even clearer than it was in the Radio Corporation of America case [1956] 1 Q.B. 618 that this was a fishing operation.

In that case, as in this, oral testimony was sought as well as the production of documents. The letters rogatory asked that Sir George Nelson and Mr. Nelson should be examined on "such of the above-mentioned agreements and documents and the conversations, transactions, activities and negotiations referred to therein as may be within the knowledge of them or either of them." In this case the letters rogatory asked that the persons named "or other persons having knowledge of the facts" be examined as to "the existence and terms of the above-mentioned agreements, arrangements or concerted practices."

In that case Barry J. had affirmed the order giving effect to the letters rogatory to the extent that Sir George Nelson and Mr. Nelson were to be required to give oral testimony but allowed the appeal against the order in so far as it related to the production of documents. On appeal Devlin J., with whose judgment Lord Goddard C.J. and Hilbery J. agreed, expressed the view [1956] 1 Q.B. 618, 648 that Barry J. ought logically to have gone on and disallowed the order for the examination of Sir George Nelson and Mr. Nelson,

"because exactly the same principle applies to both. If he had not power to do one he had not power to do the other, and the reason why he had not power to do it was because it was not made clear to him that the foreign court was desirous of obtaining ... evidence which may be used at the trial and not in proceedings for inspection and discovery before the trial."

In my view Devlin J.'s observations apply to this

case.

In the Court of Appeal it was held that the words which so often appear in schedule B "any memoranda, correspondence, or other documents relating thereto " were too wide and the words "relating thereto" were struck out. In their place the words "referred to therein" were inserted.

The court thus recognised that a part of the letters was of a fishing character. Letters of request may take a variety of forms. Some, it may clearly appear, are wholly directed to the obtaining of evidence; some, it may equally clearly appear are not; one part of a request may be for evidence and the remainder not. The language of others may be such that it is not possible with any degree of certainty to decide into which category they fall.

If it is clear that part of the request is for the obtaining of evidence and that part is severable from the rest, it might be right to hold that *624 that part satisfies section 1 of the Act. If it is clear that the request is substantially for the obtaining of evidence although a minor part is not, again it might be right to hold that the barrier imposed by that section was passed. The order made by the court could ignore the fishing part.

In this case, as in the Radio Corporation of America case [1956] 1 Q.B. 618, the request for the examination of named persons is linked with the request for the production of documents. One is supplementary to the other. The witnesses would be examined on the very matters to which the documents, of which production is sought, relate. In the Radio Corporation case Barry J., as I have said, sought to sever the examination of witnesses from the production of documents and it was held that he was wrong to do so. It would, I think, be equally wrong to do so in this case.

Nor can it be said that the amendments made by the Court of Appeal were of a minor character. With those amendments made and paragraph 16 of schedule B deleted, it appears that the court thought that the letters were restricted to the obtaining of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                              Page 62

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

evidence and that the "fishing" elements were eliminated. I do not think they were but that is by the way. The amendment of no less than 57 paragraphs of the schedule and the deletion of paragraph 16 was a substantial alteration. It is not, in my opinion, open to the courts of this country to convert letters rogatory into letters which comply with section 1 by the use of a "blue pencil" or to insert words in place of those struck out, though, as I have said, where it is clear that the letters are substantially for the obtaining of evidence, a minor part which is not might be ignored.

In relation to section 1 of the Act of 1975 the letters have to be considered in the form in which they are received.

In this case, as in the *Radio Corporation of America* case, the letters stated that without the evidence of the named persons justice could not be done between the parties. I do not ignore the fact that in this case, unlike that, it is said that it is intended that the "evidence" shall be given at the trial. Whether or not that was inserted on the advice of eminent counsel, one does not know but, as Lord Goddard C.J. said at p. 641 in that case, one must look "at the substance of the matter."

I have naturally carefully considered the judgments of Lord Denning M.R., of Roskill L.J. and of MacKenna J. and I regret that I cannot come to the conclusion to which they came. That the ultimate object was to obtain evidence for use at the trial, I do not doubt but that substance of the letters, in my opinion, shows that the discovery and examination of the named persons sought was of a fishing character. It might produce some direct evidence and it might result in getting information which would lead to the securing of evidence.

Looking at the letters alone, I cannot say that I am satisfied that they were directed to the obtaining of evidence either only or mainly. What occurred in the court at Richmond when they were issued, in my opinion strongly supports the conclusion that they were not. Even if they were not issued as a matter of routine, there are a number of indications that their

issue was part of the normal American pre-trial discovery, *625 which, as I have said, includes discovery of matters which may lead to the securing of evidence.

Not being so satisfied, as section 1 requires the court to be, I do not think the court had power to make orders giving effect to the requests and in my opinion it was wrong to do so.

On this ground I would allow the appeals.

It was also contended on behalf of the appellants that if section 1 of the Act was satisfied and the court was entitled to exercise the powers contained in its later provisions, nevertheless, in the exercise of its discretion, it should have refused to make the order. The following provisions of the Act give the court powers, subject to certain restrictions, and impose no duty. The court is clearly entitled to exercise its discretion whether or not to make an order.

Before I consider the exercise of discretion it is necessary to refer to other provisions of the Act.

Section 2 (1) gives the court power by order
    "to make such provision for obtaining evidence ... as may appear to the court to be appropriate for the purpose of giving effect to the request ..."

Section 2 (3) and (4) contain restrictions on the exercise of that power, subsection (3) providing that:
    "An order under this section shall not require any particular steps to be taken unless they are steps which can be required to be taken by way of obtaining evidence for the purposes of civil proceedings in the court making the order. ..."

Subsection (4) reads as follows:
    "An order under this section shall not require a person - (a) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power; or (b) to produce any documents other than particular documents specified in the order as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                    Page 63

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power."
This subsection states in statutory form the reservation made by Her Majesty's Government on the signing of the convention.

It was argued that if documents were sufficiently specified for the purposes of the subpoena duces tecum, they were sufficiently specified in a letter of request for the court to be able to make an order for their production. I do not agree. The only documents which a person can be ordered to produce under section 2 of the Act are particular documents.

It follows that, if it were the case that the court was satisfied that the application for the order was for the purpose of obtaining evidence for civil proceedings, the court could only order the production of particular documents which it specified. It could not order the production of "any memoranda, correspondence or other documents relating thereto" or, in my opinion, of "any memoranda, correspondence or other documents referred to therein," for those formulae do not specify particular *626 documents. Subsection (3) is of general application. As Lord Goddard said in the Radio Corporation of America case [1956] 1 Q.B. 618"fishing" proceedings are never allowed in the English courts; and, if one concludes, as I do, that this was a fishing operation, then the consequence is that no order should, even if section 1 of the Act is satisfied, have been made for the examination of any witness or for the production of any documents.

On October 28, 1976, Master Creightmore ordered the examination of the persons named in the letters rogatory and the production of the documents asked for in schedule B.

On February 22, 1977, Master Jacob refused to set aside his order and MacKenna J. dismissed the appeal from his decision. On May 26, 1977, the Court of Appeal as I have said, amended schedule B, and subject thereto, allowed the order to stand.

On June 8, consequently, three of the persons named attended before a consular officer at the United States Embassy and on June 10 the appellant companies appeared by their proper officer. Those persons and the companies claimed privilege.

Section 3 (1) of the Act provides that
"A person shall not be compelled by virtue of an order under section 2 above to give any evidence which he could not be compelled to give - (a) in civil proceedings in the part of the United Kingdom in which the court that made the order exercises jurisdiction; or (b) subject to subsection (2) below, in civil proceedings in the country or territory in which the requesting court exercises jurisdiction."

Subsection (2) reads as follows:
"Subsection (1) (b) above shall not apply unless the claim of the person in question to be exempt from giving the evidence is either - (a) supported by a statement contained in the request ...; or (b) conceded by the applicant for the order; and where such a claim made by any person is not supported or conceded as aforesaid he may (subject to the other provisions of this section) be required to give the evidence to which the claim relates but that evidence shall not be transmitted to the requesting court if that court, on the matter being referred to it, upholds the claim."

The three named persons claimed that under the Fifth Amendment to the United States Constitution they could not be compelled to give evidence and the companies claimed privilege under section 14 of the Civil Evidence Act 1968 on the ground that to produce the documents "would tend to expose" them to "proceedings ... for the recovery of a penalty" being a penalty provided for by the law of England.

It will be convenient to consider this latter claim first.

Article 85 of the Treaty of Rome (E.E.C. Treaty) prohibits it.
"1. ... incompatible with the common market: all agreements between undertakings, decisions by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547

Page 64

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

associations of undertakings and concerted practices which may affect trade between member states and which have as their object or effect the prevention, restriction or distortion of competition within the common market ..."
*627 For infringement of this article the Commission may impose a fine of "from 1,000 to one million units of account, or a sum in excess thereof but not exceeding 10 per cent. of the turnover in the preceding business year" of the infringing undertaking: see E.E.C. Council Regulation No. 17 of February 6, 1962, article 15, paragraph 2.

In this House it was not contended that a fine imposed for breach of article 85 was not a penalty within the meaning of section 14 of the Civil Evidence Act 1968. But two points were taken on behalf of the respondents. First it was contended that the privilege recognised by that section did not extend to cases where the penalty could be imposed without an action or proceedings and that it could only be claimed where there were proceedings to establish liability to the penalty and for its recovery. This argument when advanced in the Court of Appeal was rejected and in my view rightly. A person may be exposed to proceedings for the recovery of a penalty consequent upon the imposition of a penalty by a body such as the Commission.

Secondly, it was argued that the discovery of the document would not in the circumstances tend to expose the appellant companies to such proceedings. It was said that as the Commission had knowledge from the Friends of the Earth documents for a considerable time of the existence of the cartel and had taken no action, there was no real risk of such proceedings if the documents in the possession of the companies were disclosed.

In Triplex Safety Glass Co. Ltd. v. Lancegaye Safety Glass (1934) Ltd. [1939] 2 K.B. 395 the judgment of the Court of Appeal, of which Sir Wilfrid Greene M.R. was a member, was delivered by du Parcq L.J. He said at p. 404 that it was not in doubt that the power of the court to insist on an

answer to interrogatories extended to any case in which it was not made to appear to the court "that there is reasonable ground to apprehend danger to the witness from his being compelled to answer: Reg. v. Boyes per cur. (1861) 1 B. & S. 330. " That was the test applied in the Triplex case and the same test is to be applied in relation to the discovery of documents. In the present case Lord Denning M.R. said p (ante, p. 573F-G) that he doubted whether that case would be decided in the same way today. It may be that it would now be held that answering interrogatories as to libel would not be a reasonable ground for apprehending a prosecution for criminal libel. I do not read Lord Denning as criticising the reasoning in the Triplex case but only its application.

Lord Denning M.R. went on to say at p. 574 that if it appears that a witness's answer could be used against him in criminal proceedings, his objections should be upheld; and that if it appears that a witness is at risk "'great latitude should be allowed to him in judging for himself the effect of any particular question.'" He went on to say:
"It may be improbable that they "(proceedings)" will be taken, but nevertheless, if there is some risk of their being taken - a real and appreciable risk - as distinct from a remote or insubstantial risk, then he should not be made to answer or to disclose the documents."
With these observations I respectfully agree. It was suggested that the *628 reasoning in the Triplex case had reduced the burden which formerly lay on a person claiming privilege but I do not think that that is the case. In his judgment du Parcq L.J. reviewed the earlier cases and based his conclusions on them. Lord Denning contrasted a real and appreciable risk with a remote or insubstantial one, and once it appears that the risk is not fanciful, then it follows that it is real. If it is real, then there must be a reasonable ground to apprehend danger, and, if there is, great latitude is to be allowed to the witness and to a person required to produce documents.

If the appellant companies are compelled to produce the documents which they were asked to produce, I cannot reach the conclusion that it would be fanciful to suppose that that would expose them

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

to no greater risk than at present of proceedings for the recovery of a penalty being brought against them. The documents might well authenticate and support the information now in the hands of the Commission. They might afford conclusive proof of a breach of article 85 and, when in possession of such evidence, the Commission might decide to take action.

In my opinion the decision of the Court of Appeal was right on this and it follows that the respondents' cross-appeal should be dismissed.

I now turn to the claims of privilege under the Fifth Amendment. Instead of the procedure laid down by R.S.C., Ord. 70, r. 6 being followed Judge Merhige came to London to the United States Embassy and there, on June 14, 1977, ruled that the claims to privilege were well taken. In so doing he must have acted as judge of the Richmond court. He appears to have been under the impression that the witnesses who had appeared at the United States Embassy in obedience to the order of the High Court, had become subject to his jurisdiction. I do not think that that was so but it matters not.

On June 15, 1977, Judge Merhige received a letter from the Deputy Assistant Attorney-General, Anti-Trust Division, of the United States in the following terms:

"Dear Judge Merhige,

"The United States Department of Justice ('Department') has been informed by counsel for Westinghouse Electric Corporation that to date the depositions of certain employees of the Rio Tinto Zinc Corporation, which are being taken in England pursuant to letters rogatory issued by your court ... have been totally unproductive due to assertions of the United States Fifth Amendment privilege by the witnesses. We have also been informed that counsel for the letters rogatory deponents have indicated that all future witnesses will likewise assert their privilege against self-incrimination and refuse to testify.

"As you undoubtedly know, the department is currently conducting a grand jury investigation into certain aspects of the domestic and international

uranium industry, including the possibility that non-U.S. uranium producers, one of which is Rio Tinto Zinc Corporation Ltd., have engaged in conduct violative of United States anti-trust laws. In the course of this investigation the Department has attempted, with little or no success, to obtain information directly from foreign uranium *629 producers and their officers and employees. We therefore believe that the depositions taken pursuant to the letters rogatory issued by this court might well be the sole opportunity for our grand jury to obtain information vital to its investigation and deem it necessary to its orderly functioning that full discovery pursuant to the letters rogatory be had.

"Accordingly to eliminate what may be a major obstacle to discovery in the letters rogatory proceedings, the Government represents to this court and to the letters rogatory deponents listed below that it will not utilise, either directly or indirectly, the deposition testimony of a witness which is given pursuant to letters rogatory issued by this court as a basis for criminal prosecution of that witness for a violation of any United States law. This representation applies to the following individuals."

Then the individuals are named and the letter concludes with the sentence: "If you have any questions, please feel free to contact C. Forrest Bannan."

On June 16, 1977, Mr. Bannan appeared on behalf of the United States Department of Justice at a resumed hearing before Judge Merhige at the United States Embassy. In the course of his observations, Mr. Bannan stated that it was the firm policy of the Department of Justice not to grant immunity to a witness "in a private litigation - in any litigation to which it is not a party " and that only government witnesses would be granted immunity. He went on to say that the investigation by the department was considered to be of paramount importance and to stress the importance of the evidence of those it was wished to examine, pointing out that efforts to obtain such evidence in Canada, Australia, South Africa and France had not been successful. At the conclusion of the hearing Judge Merhige ruled that the witnesses should not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

be required to answer any questions which they deemed might incriminate them.

During the course of the argument it is to be noted that Judge Merhige stated that, when he issued the letters rogatory, he gave no thought as to the use of the evidence for any purpose except civil litigation and that he doubted, if the Justice Department had asked him to issue letters rogatory, whether he would not have done so as there was no case before his court of a criminal nature.

An aide-mémoire dated June 27 was delivered to the State Department expressing Her Majesty's Government's concern at this attempt by the Department of Justice to obtain evidence for a criminal anti-trust investigation by intervening in a civil case, stressing the great importance to be attached to the strict observance of agreed procedures as a protection for the rights of individuals and expressing the "strong hope that the Department of Justice will desist from its attempts to undermine these procedures and discontinue its intervention. ..."

In spite of this aide-mémoire, on July 11, 1977, the United States Deputy Assistant Attorney-General, Anti-Trust Division, authorised an application to Judge Merhige at Richmond for an order under U.S.C. paragraphs 6002-6003 that Lord Shackleton should give evidence.

U.S.C. paragraph 6003 provides that a United States District Court shall, on the request of the United States Attorney for the district, issue an *630 order requiring a witness to testify despite his refusal to do so on the ground that it might incriminate him; and U.S.C. paragraph 6002 provides that on such an order being communicated to the witness, he may not refuse to comply with it on the ground that to do so might incriminate him, but that evidence so given cannot be used against the witness in any criminal case except a prosecution for perjury or for a similar offence.

On July 12 the Attorney-General for the United States wrote to the United States authority for the

district a letter which, so far as material, reads as follows:

"These immunity requests are for the purpose of permitting testimony to be compelled in a civil litigation to which the United States is not a party. As you know, the Department of Justice has a firm policy against seeking such orders in private litigation except in the most extraordinary circumstances. In my judgment, the testimony of the individuals for whom orders are to be sought is necessary to the public interest. The extraordinary circumstances which led me to this conclusion include the following: (1) Those persons whose testimony is sought have refused to testify on the basis of their privilege against self-incrimination, and they are outside the personal jurisdiction of the United States courts; (2) These persons are not likely to come within the personal jurisdiction of United States courts so long as the Department of Justice continues a sitting grand jury investigation of the international uranium industry; (3) These persons are British subjects and we have determined that it is highly unlikely that their testimony could be obtained through existing arrangements for law enforcement co-operation between the United States and the United Kingdom; (4) The Department of Justice has been largely unable to obtain information from these foreign persons about the subject matter of this investigation; (5) The testimony these persons give may well be indispensable to the work of the grand jury and (6) the subject matter of this grand jury is of particular importance. It is on this basis that I approve of the requests for orders requiring these individuals to give testimony."

On July 18 Judge Merhige made the order sought by the United States Attorney. Whether or not he had a discretion in the matter I do not know, but I observe that in the course of the proceedings at the United States Embassy on June 16 he said that he had no discretion.

This action by the United States Attorney-General led to the intervention of the Attorney-General before the House, an intervention which, if I may say so, it was, in my opinion, not only his right but

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

also his duty to make on the ground that despite the representations made by Her Majesty's Government, the sovereignty of this country, had been prejudiced and that there had been "an excess of sovereignty or an excess of jurisdiction" on the part of the United States.

But for the intervention of the United States Attorney-General, it is clear that the claims to privilege under the Fifth Amendment would have been upheld. That intervention materially altered the character of the proceedings under the letters rogatory. Whether or not such letters would have been issued in the first place by Judge Merhige on the application of the United *631 States Attorney, it is clear that the High Court could not, if they had been issued on his application, have made an order under section 2 of the Act of 1975 to give effect to them for it had no power to do so.

The convention to which the United States was a party only relates to evidence for civil or commercial proceedings. It cannot be right for a state to seek to avail itself for the purpose of securing evidence for criminal proceedings, of the obligations accepted by another state in respect of the furnishing of evidence for civil or commercial proceedings. While, as I have said, the Act of 1975 goes beyond the convention in providing for the supplying of evidence when criminal proceedings have been instituted, no such proceedings have been instituted.

In this case if the proceedings had ended on June 16, it is clear that the persons named could not have been compelled to testify. The question now is, should they now be required to do so consequent upon the intervention of the United States Attorney-General who wants to compel the giving of evidence by persons who, his letter of July 12, 1967, recognises, are British subjects and outside the jurisdiction of the United States courts.

I have no hesitation in expressing the opinion that in these circumstances it would be wrong for the High Court even if it had power under section 2 of the Act to make an order compelling them to give

evidence, to make such an order in the exercise of its discretion even if in consequence of the United States Attorney-General's intervention, they would no longer be in peril of prosecution on account of such evidence and so not entitled under American law to rely on the Fifth Amendment.

In this case it is now clear beyond all doubt that the evidence is required for the grand jury. Indeed it may have been throughout for, as I have said, the grand jury was empanelled in June 1976 and in March 1977 the respondents were served with a subpoena duces tecum to produce to the grand jury documents obtained by them as part of the discovery in the actions in Richmond, the letters rogatory having been issued in October of that year.

In other cases it may not be so clear that one of the main purposes which the issue of letters rogatory seeks to achieve - and whatever may have been the purpose when they were issued, it is now one of the main purposes of the letters in this case - is the securing of evidence for a grand jury in an anti-trust investigation from British nationals and British companies not subject to United States jurisdiction. But I hope that the courts of this country will always be vigilant to prevent a misuse of the convention and will not make an order requiring evidence to be given by such persons unless it is clearly established that even if it is required for civil proceedings, it is not also sought for criminal.

For many years now the United States has sought to exercise jurisdiction over foreigners in respect of acts done outside the jurisdiction of that country. This is not in accordance with international law and has led to legislation on the part of other states, including the United Kingdom, designed to protect their nationals from criminal proceedings in foreign courts where the claims to jurisdiction by those courts are excessive and constitute an invasion of sovereignty.

*632 Having reached these conclusions I do not find it necessary to consider whether the intended use by the respondents in the Illinois proceedings of the evidence, if secured, should have led the High

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                              Page 68

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

Court to refuse to make orders under section 2 of the Act of 1975, or whether the fact that those proceedings are penal and against, among others, the appellant companies not subject to United States jurisdiction, justifies the conclusion that they constitute an invasion of sovereignty of the United Kingdom in so far as they relate to those companies.

Mr. Rokison advanced the interesting argument that the privilege to which the appellant companies were entitled and which was claimed by their proper officers, could not be evaded by seeking the evidence which the companies could not be compelled to give, from officers and servants of the company through, as he said, "the back door." He was unable to cite any authority for that proposition and I express no opinion on it, save to say that it renders a company's privilege of little value if it can be got round in that way. This appears to me to be a proper matter for consideration when a revision of company law is being considered.

My conclusions can be summarised as follows:

1. The orders should not have been made requiring the giving of evidence and the production of documents.

2. If the view of the majority of the House is that those orders were properly made, then the appellant companies could not be compelled to produce the documents requested as to do so would tend to expose them to proceedings for the recovery of a penalty.

3. If the orders were properly made, the other appellants' claims to privilege upheld by Judge Merhige on June 16 meant that, in consequence of section 3 (1) (b) of the Act of 1975, they could not then be compelled to give evidence.

4. If the order made by Judge Merhige at the instance of the United States Attorney-General destroyed their privilege by granting them immunity from prosecution, that order materially changed the character of the letters rogatory from requests for the obtaining of evidence for civil proceedings into

requests for the obtaining of evidence for criminal and civil proceedings, and the High Court should consequently, in the exercise of its discretion rescind the order.

LORD DIPLOCK.

My Lords, the jurisdiction and powers of the High Court to make the orders that are the subject of this appeal are to be found in sections 1 and 2 of the Evidence (Proceedings in Other Jurisdictions) Act 1975, and nowhere else. The Act of 1975 was passed, in part (which includes sections 1, 2 and 3), to enable the United Kingdom to ratify the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters done at The Hague on March 18, 1970. Ratification by the United Kingdom took place on July 16, 1976, with certain reservations and declarations. The convention had previously been ratified by the United States of America.

Your Lordships have been invited to construe the Act of 1975 in conformity with previous decisions of English courts as to the meaning of different words used in a previous statute, the *633 Foreign Tribunals EvidenceAct 1856, which was repealed by the Act of 1975. For my part, I do not think that any assistance is to be gained from those decisions. The jurisdiction of English courts to order persons within its jurisdiction to provide oral or documentary evidence in aid of proceedings in foreign courts has always been exclusively statutory. There is no presumption that Parliament, in repealing one statute and substituting another in different terms, intended to make the minimum changes in the previous law that it is possible to reconcile with the actual wording of the new statute, particularly where, as in the instant case, the new statute is passed to give effect to a new international convention.

So disregarding any previous authorities, I turn to the actual terms of the Act of 1975. Section 1 is the section which confers upon the High Court jurisdiction to make an order under the Act; section 2 defines what provisions the court has power to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

include in such an order; while section 3 deals with the right of witnesses to refuse to give oral or documentary evidence under the order.

Under section 1, three conditions precedent must be fulfilled before the court has jurisdiction to make any order under the Act. First, there must be an application for an order for evidence to be obtained in England and Wales, and secondly, the application must be made pursuant to the request of a court exercising jurisdiction outside England and Wales. The third condition precedent as to which the court must be satisfied is in the following terms:

"(b) that the evidence to which the application relates is to be obtained for the purposes of civil proceedings which either have been instituted before the requesting court or whose institution before that court is contemplated."

My Lords, I would not be inclined to place any narrow interpretation on the phrase "evidence ... to be obtained for the purposes of civil proceedings." The Act applies to civil proceedings pending or contemplated in courts and tribunals of all countries in the world. It is not confined to countries that are parties to the Hague Convention of March 18, 1970; nor is it limited to courts of law. It extends to tribunals. These courts and tribunals make use of a wide variety of different systems of procedure and rules of evidence in civil matters. In many of these systems it is not possible to draw a distinction between what would be regarded in England as the actual trial of a civil action and what precedes the trial. I do not think that in relation to those countries the expression "civil proceedings" in section 1 (b) can have the restricted meaning of the actual trial or hearing of a civil action; and, if this be so, it cannot bear a more restricted meaning in relation to those countries such as the United States of America, where as in England, it is possible to draw a distinction between the trial and what precedes the trial. In my view, "civil proceedings" includes all the procedural steps taken in the course of the proceedings from their institution up to and including their completion and, if the procedural system of the requesting court provides for the examination of witnesses or the production of

documents for the purpose of enabling a party to ascertain whether there exists admissible evidence to support his own case or to contradict that of his opponent, the High Court has jurisdiction to make an order under the *634 Act. Any limitation on the use of this procedure for the purpose of "fishing" discovery is, in my view, to be found in section 2.

The English court cannot be expected to know the systems of civil procedure of all countries from which request for an order under the Act of 1975 may come. It has to be satisfied that the evidence is required for the purpose of civil proceedings in the requesting court but, in the ordinary way in the absence of evidence to the contrary, it should, in my view, be prepared to accept the statement by the requesting court that such is the purpose for which the evidence is required.

The letters of request from the United States District Court for the Eastern District of Virginia ("the letters rogatory") contained in the preamble what on a fair reading is, in my view, an adequate statement to this effect; so the High Court had jurisdiction to make an order. It was not bound to do so, but I think that the court should hesitate long before exercising its discretion in favour of refusing to make an order unless it was satisfied that the application would be regarded as falling within the description of frivolous, vexatious or an abuse of the process of the court.

The letters rogatory requested the oral examination of directors and employees of the two R.T.Z. companies and the production of documents by these companies. The relevant limitations on the power of the court to grant these requests are contained in subsections (3) and (4) of section 2 of the Act of 1975. They read as follows:

"(3) An order under this section shall not require any particular steps to be taken unless they are steps which can be required to be taken by way of obtaining evidence for the purposes of civil proceedings in the court making the order (whether or not proceedings of the same description as those to which the application for the order relates); but this subsection shall not preclude the making of an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                Page 70

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

order requiring a person to give testimony (either orally or in writing) otherwise than on oath where this is asked for by the requesting court. (4) An order under this section shall not require a person - (a) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power; or (b) to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power."

Subsection (3) applies to both oral and documentary evidence. It is this provision which prohibits the making of an order for the examination of a witness not a party to the action for the purpose of seeking information which, though inadmissible at the trial, appears to be reasonably calculated to lead to the discovery of admissible evidence. This is permitted by rule 26 of the United States Federal Rules of Civil Procedure. Under the procedure of the High Court of England depositions of witnesses, either at home or abroad, may be taken before examiners for use at the trial, but the subject matter of such depositions is restricted to the evidence admissible at the trial. So the evidence requested in the letters rogatory can only be ordered to the extent that it is confined to evidence which will be admissible at the trial of the action in Virginia.

*635 The difficulty involved in the application of subsection (3) to proceedings in the United States courts lies in the fact that the examination for discovery of witnesses who are not parties to the action serves a dual purpose; the ordinary purpose of discovery with the wide line of inquiry which that permits and also the purpose of obtaining in the form of a deposition evidence from the witness which will be admissible at the trial in the event of the witness not being called in person.

Westinghouse and the United States District Court Judge (Judge Merhige) appear to have done their best to limit the request to evidence admissible at the trial; and, as respects the oral evidence of the named directors and employees of the two R.T.Z.

companies, I think that, in the main, they have succeeded. To ask for oral evidence from "such other person who has knowledge of the facts" is obviously excessive, but this has never been part of the order as originally made by Master Creightmore. As regards the named witnesses, however, Westinghouse were in possession of photostat copies of documents of considerable probative weight, even if technically inadmissible at the trial in the Virginia proceedings, which linked the two R.T.Z. companies and the named persons with operations of an international cartel of uranium producers and gave strong prima facie grounds for believing that those persons could give admissible evidence about the operations; a belief which has been confirmed by their subsequent claims to privilege against self-incrimination.

The request for the production of documentary evidence by the two R.T.Z. companies must not only satisfy the requirements of subsection (3) which exclude fishing discovery, but also the stricter requirements of subsection (4). Under the procedure of the High Court of England there is no power to order discovery of documents by a person not a party to the action, but such a person can be required by subpoena duces tecum to produce documents to the court or, where his evidence is taken before an examiner prior to the trial, at such examination. There is a good deal of authority cited by Lord Denning M.R. in his judgment as to how specific the reference to documents must be in subpoena duces tecum. Classes of documents provided the description of the class is sufficiently clear, may be required to be produced on subpoena duces tecum.

The requirements of subsection (4) (b), however, are not in my view satisfied by the specification of classes of documents. What is called for is the specification of "particular documents" which I would construe as meaning individual documents separately described.

In the letters rogatory most of the many requests for particular documents are followed by a request for "any memoranda, correspondence or other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

documents relevant thereto." This is far too wide and these words were struck out wherever they appeared by the Court of Appeal in its order of May 26, 1977. The Court of Appeal were, in my view, bound by subsection (4) (b) to strike from the master's order the words referred to. However, they did not limit themselves to using a blue pencil. In a number of cases they substituted the phrase "any memoranda, correspondence, or other documents referred to therein " - s.c. in the particular document specified. Quite apart from the fact that although it may be sufficient for a subpoena duces tecum I do not think that this is sufficiently specific to *636 satisfy the requirements of subsection (4) (b), I do not consider that the court had any power to substitute a different category of documents for the category which had been requested by the United States court.

Subject, however, to this minor amendment which in the events that have happened has ceased to be of any significance, I think that the order of the Court of Appeal of May 26, 1977, was right. Accordingly, Westinghouse were entitled to proceed with the examination of witnesses and production of documents under Master Creightmore's order subject to any claim to privilege upon which the R.T.Z. companies or the individual witnesses were entitled to rely under section 3 (1) (a) or (b) of the Act of 1975. This reads as follows:

"(1) A person shall not be compelled by virtue of an order under section 2 above to give any evidence which he could not be compelled to give - (a) in civil proceedings in the part of the United Kingdom in which the court that made the order exercises jurisdiction; or (b) subject to subsection (2) below, in civil proceedings in the country or territory in which the requesting court exercises jurisdiction."
When the examination was held, the companies claimed privilege under paragraph (a), - the individual witnesses under paragraph (b).

The privilege claimed by the companies under paragraph (a) is a privilege under English law. It arises under section 14 of the Civil Evidence Act 1968, which provides as follows:

"(1) The right of a person in any legal

proceedings other than criminal proceedings to refuse to answer any question or produce any document or thing if to do so would tend to expose that person to proceedings for an offence or for the recovery of a penalty - (a) shall apply only as regards criminal offences under the law of any part of the United Kingdom and penalties provided for by such law; ..."
So far as it relates to offences and penalties provided for by the law of the United Kingdom this provision is declaratory of the common law. Its purpose is to remove the doubt as to whether the privilege against self-incrimination extends to offences and penalties under foreign law - a question on which the previous authorities were not wholly consistent: see Law Reform Committee 16th Report (1967) Cmnd. 3472.

The penalty to which, the companies claim, discovery of documents would tend to expose them is a fine imposed by the Commission of the European Communities under article 15 of regulation 17 of February 6, 1962, for intentionally or negligently acting in breach of article 85 of the Treaty of Rome. This article of the Treaty prohibits cartels which have as their object or effect the prevention, restriction or distortion of competition within the common market. It is directly applicable in the member states; it forms part of the law of England; so does regulation 17. For the reasons given by the Court of Appeal in their judgments of May 26, 1977, I agree that a fine imposed by the Commission under the regulation is a "penalty" for the purposes of section 14 of the Civil Evidence Act 1968, and that it is enforced by proceedings for recovery of a penalty under the European Communities (Enforcement of Community Judgments) Order 1972.

The companies took their claim to privilege under section 3 (1) (a) *637 before the examiner. It was upheld by MacKenna J. and on appeal by the Court of Appeal in their judgment of July 11, 1977. The argument for Westinghouse, rejected by the Court of Appeal, that has been pressed in this House was that whatever risk the R.T.Z. companies ran of having a fine imposed upon them by the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                      Page 72

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

Commission it would be in no wise enhanced by the production in the United States proceedings of documents that constituted evidence of their participation in a cartel prohibited by article 85 (1) of the Treaty of Rome. The argument does not involve the proposition that the companies are not infringing article 85 (1) of the Treaty. On the contrary Westinghouse not only assert that they are but also deny that the cartel could be brought within article 85 (3), which empowers the Commission to declare article 85 (1) to be inapplicable to cartels which satisfy certain conditions.

My Lords, article 89 of the Treaty imposes upon the Commission the duty of seeing to the application of article 85, of investigating infringements and of taking steps to remedy the situation. If contrary to their duty the Commission fail to act they may be called upon to do so under article 175 by any other institution of the Community including the European Parliament, or by any member state, and on continued failure may be proceeded against before the European Court of Justice. It is not for your Lordships to speculate why the Commission have hitherto remained quiescent in the matter, nor what might stir them into activity. Under regulation 17 they have wide powers of investigation under which they could, if they thought fit, themselves compel the companies to produce the very documents of which Westinghouse seek to obtain production in the instant proceedings. This may be so, but there is a proverb "let sleeping dogs lie" which may have some application in the international politics of uranium production and enrichment which it would be disingenuous to pretend are not lurking in the background of this case.

I do not think that your Lordships are entitled to dismiss as fanciful the risk that if the documents relating to the cartel were produced at the trial in the Virginia proceedings and came, as they then would, into the public domain, the resulting publicity in this sensitive political field might result in pressure on the Commission to take against the companies speedier and severer action than they might otherwise have done and that such action

might well include the imposition of penalties under article 15 of regulation 17. The Court of Appeal in my opinion were right in upholding the refusal of the two R.T.Z. companies to produce the documents requested in the letter rogatory.

It was submitted that since the companies were entitled to withhold the documents from production, they had a privilege in English law to require their officers and servants to refuse to answer questions that might lead to the disclosure of the contents of the documents or provide evidence that would tend to expose the companies to a penalty. At common law, as declared in section 14 (1) of the Civil Evidence Act 1968, the privilege against self-incrimination was restricted to the incrimination of the person claiming it and not anyone else. There is no trace in the decided cases that it is of wider application; no textbook *638 old or modern suggests the contrary. It is not for your Lordships to manufacture for the purposes of this instant case a new privilege hitherto unknown to the law.

There remains to be considered what effect the recent events that have occurred in relation to the named persons' claim to privilege under section 3 (1) (b) of the Act of 1975 ought to have on the order of Master Creightmore requiring them to give oral evidence. Their right to claim this Fifth Amendment privilege depends on United States federal law, and under the Act of 1975, it was for Judge Merhige to rule on the validity of the claim.

In order to obtain a speedy ruling from him the parties, by mutual consent, departed from the procedure laid down in R.S.C., Ord. 70, r. 6. In view of the imminence of the trial in Virginia they took short cuts. This has led to some degree of procedural confusion as to the capacity in which Judge Merhige was doing the various things he did. This has led to technical disputes about such matters as to whether and if so, at what point the letters rogatory were exhausted and as to the legal nature and effect in England of the orders made by Judge Merhige in Virginia on July 18, 1977, ostensibly under the Organised Crime Control Act

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                              Page 73

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

of 1970, 18 U.S.C., section 6003. I would not wish to decide this part of the case on mere technical errors of procedure that could be cured by the issue of fresh letters rogatory. In my view the events that happened enable me to base my decision upon principles which transcend any irregularities in procedure.

The essential facts are:

(1) On June 14, 1977, Judge Merhige upheld the claim of the named persons to Fifth Amendment privilege and ruled that they need not answer any questions save as to their names and addresses.

(2) On June 15, 1977, a letter was received by Judge Merhige from the United States Department of Justice stating that the oral evidence of the named persons that was requested in the letters rogatory was required by the department for the purpose of a grand jury investigation into alleged offences against the anti-trust laws of the United States. It contained an assurance that the department would not use the testimony of the named persons as the basis for criminal prosecution of them in the United States.

(3) On July 16, 1977, a representative of the Department of Justice appeared before Judge Merhige and asked him, on the strength of the letter, to rule that the named persons were no longer entitled to claim their Fifth Amendment privilege. The judge declined. He confirmed his previous ruling; but added that if an application were to be made to him under 18 U.S.C., sections 6002 and 6003 for an order requiring the named persons to give evidence on terms that it could not be used against them in any criminal case, he, Judge Merhige, would feel compelled to rule that they were no longer entitled to refuse to answer the questions.

(4) On July 18, 1977, applications were made to Judge Merhige, with the written approval of the United States Attorney-General, for orders under sections 6002 and 6003 in respect of each of the named persons; *639 and on the same day the judge

issued orders which ordered each of them to "give testimony or provide other information in response to questions pronounced pursuant to letters rogatory issued by this court."

Whatever their procedural defects I am prepared to treat these orders as a ruling by the United States court under section 3 (2) of the Act of 1975, that the Fifth Amendment privilege claimed by the named persons is no longer available to them.

My Lords, it is clear from Judge Merhige's rulings of June 14 and 16, 1977, that so long as the evidence in respect of which Fifth Amendment privilege was claimed was to be used for the purposes of civil proceedings only, it could not in the events that happened be obtained under an order made under sections 1 and 2 of the Act of 1975. In so far as the evidence was intended to be used for the purposes of criminal proceedings in the United States, which were not yet instituted but were only at the stage of investigation by a grand jury, section 5 (1) (b) of the Act of 1975 excludes the jurisdiction of the High Court to make an order requiring the evidence to be given.

The United States is not a party to the civil proceedings in which the letters rogatory have been issued. Those proceedings in the words of the United States Attorney-General are "private litigation." The intervention of the Department of Justice to seek an order under sections 6002 and 6003 in private litigation pending in the United States is, we have been told, unprecedented. It is acknowledged by the United States Attorney-General in his letter to be contrary to the firm policy of the Department "except in the most extraordinary circumstances."

The extraordinary circumstances listed, in addition to the Attorney's General's belief that the testimony sought may well be indispensable to the work of the grand jury, include the following statement:
"These persons are British subjects and we have determined that it is highly unlikely that their testimony could be obtained through existing arrangements for law enforcement co-operation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

between the United States and the United Kingdom."

This is a reference to the long-standing controversy between Her Majesty's Government and the Government of the United States as to the claim of the latter to have jurisdiction to enforce its own anti-trust laws against British companies not carrying on business in the United States in respect of acts done by them outside the territory of the United States. As your Lordships have been informed by Her Majesty's Attorney-General it has long been the policy of Her Majesty's Government to deny this claim. Her Majesty's Government regards as an unacceptable invasion of its own sovereignty the use of the United States courts by the United States Government as a means by which it can investigate activities outside the United States of British companies and individuals which it claims infringe the anti-trust laws of the United States. Section 2 of the Shipping Contracts and Commercial Documents Act 1944 was passed in an attempt to thwart this practice. Past attempts by the United States Government to use the United States courts in this investigatory role have been the subject of diplomatic protests. One such protest was made *640 in respect of the intervention of the Department of Justice in the proceedings in the instant case before Judge Merhige on June 16, 1977.

My Lords, what follows from the essential facts I have recounted is: First, that the evidence sought from the named persons could not be obtained by Westinghouse so long as the only purposes for which it was required were civil proceedings. Secondly, that it was only when that evidence was called for by the United States Department of Justice for the purposes of an investigation by a grand jury in the United States with a view to discovering whether there were grounds for instituting criminal proceedings against someone, that under United States law the named persons would become compellable to give it. Thirdly, that the purpose for which the Department of Justice was seeking to obtain the evidence was not one for which it could have been obtained by them under the Act of 1975 since no criminal proceedings had yet been instituted. Fourthly, that the evidence was

required for the purpose of investigating the activities outside the United States of British companies and individuals for alleged infringements of anti-trust laws of the United States, a procedure which, as the department knew, Her Majesty's Government regards as an unwarrantable invasion of its sovereignty.

My Lords, I have no hesitation in holding that with the intervention of the Department of Justice and its obtaining of the orders under sections 6002-6003 on July 18, 1977, the continued enforcement of Master Creightmore's order as respects the oral evidence of the named persons would amount to an abuse of the process of the High Court under the Act of 1975. The letters rogatory issued in the civil proceedings in the Virginia court on Westinghouse's application are manifestly being made use of by the Department of Justice for the ulterior purpose of obtaining evidence for a grand jury investigation which it is debarred from obtaining directly by section 5 (1) (b) of the Act of 1975. I do not find it necessary to inquire whether the action taken by the department was in connivance with Westinghouse or against its wishes. If the latter, Westinghouse will not be prejudiced by the order of Master Creightmore being now set aside; for in the absence of the department's intervention the oral evidence of the named persons whose claim to Fifth Amendment privilege was upheld by Judge Merhige before July 18, 1977, could not have been obtained by them under that order.

Since the rest of Master Creightmore's order, which relates to the production of documents by the two R.T.Z. companies, is also spent by reason of their claim to privilege being upheld by this House, I would discharge the whole order as from July 18, 1977.

LORD FRASER OF TULLYBELTON.

My Lords, on October 21, 1976, Judge Merhige, sitting in the United States District Court for the Eastern District of Virginia at Richmond, Virginia, issued two letters rogatory addressed to the High Court of Justice in England seeking the examination

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                    Page 75

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

on oath of nine named individuals, and of other persons not named, and the production of documents alleged to be in the possession of Rio Tinto Zinc, in the case of one of the letters, and of R.T.Z. Services Limited in the case of the other letter. Both these companies ("the R.T.Z. companies") are registered in England and neither of them is a party to the *641 proceedings in Virginia. All the persons named as witnesses are British subjects resident in England or, at least, outside the United States of America, and none of them is a party to the proceedings in Virginia. Judge Merhige was dealing with 13 actions which had been initiated in different federal courts in the United States of America and had been consolidated in his court. Each action was at the instance of a different plaintiff, but in all of them the defendants were Westinghouse, who are the respondents in two of the instant appeals and the appellants in three appeals. On October 28, 1976, Master Creightmore upon the ex parte application of Westinghouse, made orders under section 2 of the Evidence (Procedure in Other Jurisdictions) Act 1975 ("the Act of 1975") giving effect to the letters rogatory. He ordered the nine named individuals (but no others) to attend before an American consular officer in the United States Embassy in London, and ordered each of the R.T.Z. companies to produce the documents described in a schedule to the letter rogatory relating to that company. A fundamental objection to the making of the order of October 28, 1976, has been taken by the companies and by the individuals on the ground that, as they maintain, the requests made by the letters rogatory do not fall within the terms of the Act of 1975. There is no difference between the objections taken by the two R.T.Z. companies, but somewhat different considerations apply to the companies' objections to producing documents on the one hand, and to the individuals' objections to giving oral evidence on the other hand.

One of the main purposes of the Act of 1975 was to make new provision for enabling the High Court in England to assist in obtaining evidence required for the purposes of proceedings in other jurisdictions, and it repealed several earlier Acts

including the Foreign Tribunals Evidence Act 1856. It gives legal effect in the United Kingdom to the principles of the Hague Convention of March 18, 1970, on the Taking of Evidence Abroad in Civil or Commercial Matters, though in one respect at least, it goes beyond the convention - see section 5 of the Act dealing with evidence for the purposes of foreign criminal proceedings. Section 1 of the Act of 1975 provides as follows:

"Where an application is made to the High Court ... for an order for evidence to be obtained in the part of the United Kingdom in which it exercises jurisdiction, and the court is satisfied - (a) that the application is made in pursuance of a request issued by or on behalf of a court or tribunal ('the requesting court') exercising jurisdiction ... in a country or territory outside the United Kingdom; and (b) that the evidence to which the application relates is to be obtained for the purposes of civil proceedings which either have been instituted before the requesting court or whose institution before that court is contemplated, the High Court ... shall have the powers conferred on it by the following provisions of this Act."

The first question in the instant appeals is whether the court should be satisfied, as required by paragraph (b) of section 1, that the requests made in the letters rogatory are for "evidence" in the sense in which that word is used in the paragraph or whether they are truly for a wider discovery. *642 Unless the application passes through this filter no order can be made to give effect to it. The distinction between evidence and discovery in this context was explained in Radio Corporation of America v. Rauland Corporation [1956] 1 Q.B. 618. That was a case under the, now repealed, Foreign Tribunals Evidence Act 1856, where the word was "testimony" but I do not consider that there is any difference material to the instant appeal between that word and "evidence" in section 1 of the Act of 1975. Devlin J. said, at p. 646:

"In [Burchard v. Macfarlane, Ex parte Tindall [1891] 2 Q.B. 241] the distinction is made plain between discovery or 'indirect' material on the one hand and proof or 'direct' material on the other hand, and that is the true distinction with which one

[1978] A.C. 547                                                                Page 76

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

must approach the word 'testimony' in this Act. Testimony which is in the nature of proof for the purpose of the trial is permissible. Testimony, if it can be called 'testimony,' which consists of mere answers to questions on the discovery proceedings designed to lead to a train of inquiry, is not permissible. Into which category does the present fall? It is perhaps enough to say that it is plain from what I have said of the nature of the proceedings in the court of Illinois that they fall into the latter category; they are pre-trial proceedings, proceedings by way of discovery. But if there be any doubt about that I do not think that one need do more than to look at the reasons which Judge Igoe, in the District Court of Illinois, gave when he granted the letters rogatory in this case. One passage is sufficient for my purpose. He said: 'I can find no authority, and none has been cited, for the proposition that a party must show what relevant and material evidence proposed witnesses have in their possession as a condition precedent to taking of depositions of alleged co-conspirators in an anti-trust case. It seems obvious that examination of the officers and agents of alleged co-conspirators may lead to the discovery of relevant evidence, and that is all that is required.' That shows, I think, plainly enough what the object of this procedure is."

The distinction between evidence and discovery is recognised in article 23 of the Hague Convention, and in section 2 (4) of the Act of 1975, and was fully accepted by counsel for Westinghouse who did not dispute that, if the letters rogatory were *merely* seeking discovery, they ought not to receive effect. This issue was decided in favour of Westinghouse by Master Jacob, by MacKenna J. and by the Court of Appeal, and counsel for Westinghouse argued that their decisions turned on the evidence and that there was no reason of principle that would justify your Lordships' House in coming to a different conclusion. I recognise, of course, that great weight must be given to the judgments in these courts but I have felt entitled and bound to re-examine the issue. In the forefront of the evidence relied on by the Court of Appeal was the statement in the recital at the beginning of the letters rogatory that "justice cannot be done among

the said parties without the testimony, which is intended to be given in evidence at the trial of the actions, of the following persons." (My emphasis.) But in my opinion it would *643 be wrong to place reliance on that recital because it was drafted by the legal advisers of Westinghouse with the object of meeting the requirements of the English courts, and it cannot be regarded as stating the considered opinion of the American court. Judge Merhige's order of May 20, 1977, which was relied on by Lord Denning M.R. and Roskill L.J. (ante, pp. 560F-H, 568H) was also drafted by Westinghouse's advisers and is open to the same comment. No doubt any testimony elicited in response to the letters, so far as it is relevant and admissible, would be used as evidence at the trial, but I think we have to consider whether the letters are not calculated to elicit also a substantial quantity of material that would not be direct evidence. In judging of that the main weight must be given to the substance of the letters rogatory and to the circumstances in which they were issued. They were issued as part of the pre-trial discovery process in the 13 consolidated actions raised by Westinghouse's customers in federal courts. Part of Westinghouse's defence was commercial impracticability based on the allegation that the price of uranium had been forced up by a cartel of producers. It was in support of that defence that they wanted production of the documents and the oral evidence. At the stage of discovery American courts will compel persons within their jurisdiction who are not parties to the proceedings to produce documents and to submit to oral examination if such procedure appears reasonably likely to lead to the discovery of admissible evidence, even though the information disclosed is not itself such evidence. Thus they allow a range of inquiry much wider than would be allowed in England. I think that the Court of Appeal may have underestimated the importance of this factor, because Lord Denning M.R. (ante, p. 561G-H) referred to article 23 of The Hague Convention which provides:

"A contracting state may at the time of signature, ratification or accession, declare that it will not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                              Page 77

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

known in common law countries."
He said that the United Kingdom when it ratified the convention did not make any such declaration. But unfortunately he was misinformed. Roskill L.J., at p. 567F, also referred to article 23 and was apparently under the same misapprehension. The instrument of ratification of the United Kingdom contains a declaration that in accordance with article 23 Her Majesty's Government will not execute letters of request "issued for the purpose of obtaining pre-trial discovery of documents," and adding that Her Majesty's Government understand that description as including any letter of request which requires a person to make statements or produce documents that would now be struck at by section 2 (4) of the Act of 1975. Of course the mere fact that letters rogatory have been issued at the pre-trial discovery stage does not necessarily mean that they are not seeking for evidence in the sense of section 1 of the Act of 1975 but it does, so to speak, put one on one's guard. In the present case Judge Merhige when he issued the letters rogatory is reported to have said that he was not sure whether the information would be relevant but that "it may lead to something." I *644 think I am entitled to have regard to that statement, just as the court in the Radio Corporation case [1956] 1 Q.B. 618 had regard to a statement by the American judge, and it seems to show that Judge Merhige regarded the letter as being for the purpose of discovery.

But the matter which is, in my opinion, of decisive importance is the operative part of the letter rogatory. The requests for production of documents and for taking oral testimony have to be considered separately. The description of the documents sought is in schedule B to each of the letters and it is, I think, conceded on behalf of Westinghouse, and is in any event clear, that the description is at least in part too extensive to pass through the filter of section 1 of the Act of 1975. A typical specimen of the objectionable matter is in paragraph 1 which calls for minutes of certain meetings and then for "any memoranda, correspondence or other documents relating thereto." Wide sweeping-up words in practically the same terms are found at the end of many other paragraphs in the schedule.

These words would include any letters or telex messages reserving accommodation, hotel bills and many other trivial documents relating to arrangements for representatives of R.T.Z. to attend the meetings referred to. Such matters cannot be necessary or even useful as evidence in support of Westinghouse's case.

A separate though related objection to the terms of many of the items in the schedule is that they could not, in my opinion, receive effect under an order of the English court without contravening section 2 (4) of the Act of 1975. That subsection provides as follows:

"(4) An order under this section shall not require a person - (a) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power; or (b) to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power."

The reference to "any" documents in the sweeping-up words in the schedule to the letters rogatory suggests to me that the draftsmen did not know whether such documents were in existence or not. Accordingly the words seem to be an attempt to circumvent paragraph (a) of section 2 (4) of the Act of 1975, an attempt which should not be allowed to succeed. Moreover, I think that many of the items in schedule would be contrary to paragraph (b) of section 2 (4) in respect that they call for production not of "particular documents specified " but of classes or descriptions of documents.

The Court of Appeal declined to make an order containing these wide words and they amended the order made by Master Creightmore by deleting them, and by substituting words such as "all other documents referred to therein." No doubt the intention was to narrow the range of documents to be produced, although one cannot be sure whether that would be the effect of the substitution. In any case the amended form is still not limited to particular documents specified. Several paragraphs of the schedule were also deleted. But in judging

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                    Page 78

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81,
(1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

the nature of *645 the letters rogatory as a whole the court must in my opinion look at them in the unamended form in which they were received from the American court. I do not say that, if they were found to include a few relatively minor items which could not qualify under section 1 or under section 2 (4) of the Act of 1975, the whole request in the letters would have to be refused. The court has to look at the substance of the matter: see Radio Corporation of America v. Rauland Corporation [1956] 1 Q.B. 618, 641 *per* Lord Goddard C.J. In this case, having regard to the very wide range of documents that would fall within the description in schedule B, I am not satisfied that, so far as the documents are concerned, the letters are substantially limited to obtaining "evidence" in the sense of section 1 of the Act of 1975. On the contrary I think they call for discovery of information far beyond what is necessary or even relevant to Westinghouse's defence. An order to give effect to them would also be contrary to section 2 (4). I am therefore of opinion that the order of October 28, so far as it orders production of the documents, ought not to have been issued. Further, the whole substance of the letters seems to me so far outside the limits permitted by the Act of 1975, that they ought not to receive effect, even in an amended form. I would therefore set aside the order of October 28 so far as it relates to production of documents.

The position of the witnesses whose oral evidence is sought is different and I regard it as a narrow question whether the part of the order relating to them was rightly made. The letters rogatory clearly go too far in requesting oral evidence from "other persons having knowledge of the facts." But that part was omitted from the order of October 28, and I do not consider that its inclusion in the letters rogatory necessarily shows that their purpose was for discovery. The named witnesses are all described as "being directors and/or employees and/or former directors and/or former employees" of the companies and it seems fairly clear that their evidence is sought either because of the positions they held in the companies or because they are named in one or other of the documents sought to

be recovered. It seems reasonable to assume that they will have some knowledge about the existence and terms of the agreements, and I therefore agree with the Court of Appeal that the order, so far as it directs the named witnesses to attend for examination, should stand.

I go on to consider the privilege issues raised in these appeals. The issues concerning the production of documents by the R.T.Z. companies are quite different from those affecting the oral evidence of the named witnesses. So far as the documents are concerned, MacKenna J. held that the companies were not bound to produce the documents because they were entitled to rely on privilege against self-incrimination under English law, and the Court of Appeal dismissed an appeal by Westinghouse against his decision. Westinghouse are now appealing to your Lordships' House in what was referred to as the fifth appeal. It turns upon section 14 (1) of the Civil Evidence Act 1968 which provides as follows:

"The right of a person in any legal proceedings other than criminal proceedings to refuse to answer any question or produce any document *646 or thing if to do so would tend to expose that person to proceedings for an offence or for the recovery of a penalty - (a) shall apply only as regards criminal offences under the law of any part of the United Kingdom and penalties provided for by such law; ..."

The R.T.Z. companies rely on that subsection because they say that production of the documents called for in schedule B would tend to expose them to proceedings for recovery of a penalty, namely a fine under General Regulation 17 of the European Economic Community, which was passed in implementation of articles 85 and 86 of the Treaty of Rome. Regulation 17 now forms part of the law of England by virtue of article 189 of the Treaty of Rome, and the European Communities Act 1972 section 2 and therefore the penalty would be a penalty provided for by the law of a part of the United Kingdom. Accordingly, privilege would exist under English law in civil proceedings in England and the same privilege applies to proceedings under the letters rogatory: see section 3

[1978] A.C. 547                                                                                      Page 79

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

(1) (a) of the Act of 1975. In the Court of Appeal, Westinghouse argued that a fine imposed by the Common Market was not a "penalty" in the sense of section 14 of the Act of 1968, but the court rejected that argument and it was not repeated in this House.

Two other arguments were advanced on behalf of Westinghouse to show that the decision of the Court of Appeal was wrong. First it was said that the privilege only exists where a person would tend to be exposed to "proceedings ... for the recovery of a penalty" and that no "proceedings" were required for the imposition of fines by the European Commission because under article 15 (2) of regulation 17 the Commission have power to impose fines for infringement of article 85 of the Treaty summarily by "decision." I have some doubt whether that part of the argument is well founded, because the European Court of Justice has power under article 17 of regulation 17 to review decisions of the Commission imposing fines and, whatever the position may be while the Commission is considering a "decision," a review by the court would involve a resort to proceedings of some sort. But, even if the argument were right so far, it breaks down at the next stage because a fine imposed by the Commission could only be enforced by legal proceedings in the English courts. It was argued that proceedings for *recovery* of a penalty in terms of section 14 did not include proceedings for its *enforcement* as distinct from imposition, but I cannot see why that should be. I think that the Court of Appeal rightly rejected this argument.

The second argument is more formidable. Mr. Vinelott said that production of the documents would not tend to expose the company to proceedings for recovery of a penalty because they were already fully exposed by reason of the following facts: (1) the European Commission is already aware of the existence and terms of many of the documents - viz. those of which copies have been disclosed by the Friends of the Earth; (2) the Commission has wide power under article 14 of regulation 17 to investigate and to compel the disclosure of documents that might be evidence of infringement of article 85 of the Treaty; (3) the

Commission has a duty under article 89 of the Treaty to ensure the application of the principles of article 85 against cartels, to investigate cases of *647 suspected infringement and to propose appropriate means to bring it to an end; (4) there is machinery under article 175 of the Treaty for member states and other persons and organisations to bring to the notice of the Court of Justice of the Community any failure by the Commission to act; (5) no "negative clearance" under article 2 of regulation 17 has been given, and (6) notwithstanding all these circumstances, the Commission has made no move to investigate the alleged cartel.

In the light of these facts, the present case is unusual if not unique. The question might I think be stated thus: Whether the production of the documents would tend to increase the risk, to which the companies are already exposed, of proceedings for recovery of penalties.

There is force in Mr. Vinelott's contention that the answer should be in the negative, but I have reached the opinion that the Court of Appeal were right in taking the opposite view. We know that the Commission have the question of investigating the possible infringement of article 85 constantly under review and, although it has not yet taken action to initiate proceedings, or even to investigate, it is not unreasonable to think that it might decide to act if it saw that there was hard evidence of infringement. Moreover, production of the documents might lead to one of the member states of the Community or to some other party taking action under article 175 of the Treaty to force the Commission to act.

Mr. Vinelott suggested that the Court of Appeal had applied the wrong test in judging whether production would tend to expose the companies to proceedings in that they had imposed too low an onus upon them. In my opinion that criticism was not justified. The test was stated in Triplex Safety Glass Co. Ltd. v. Lancegaye Safety Glass (1934) Ltd. [1939] 2 K.B. 395, 403-404, where du Parcq L.J. said:

"Since the decision of the Court of Appeal in Ex

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

parte Reynolds (1882) 20 Ch.D. 294 approving the decision of the Court of Queen's Bench in Reg. v. Boyes, 1 B. & S. 311, it has not been in doubt that the power of the court to insist on an answer is not limited to a case of mala fides. It extends to any case in which it is not made to appear to the court 'that there is reasonable ground to apprehend danger [of proceedings for a penalty] to the witness from his being compelled to answer': Reg. v. Boyes, per cur."

Although the members of the Court of Appeal expressed themselves in various words they all purported to follow the decision in *Triplex*. The test is not a rigorous one. All that is necessary is that it should be reasonable to believe that production would "tend to expose" (not "would expose") the possessor of the documents to proceedings. I agree with the Court of Appeal that that test is satisfied in the present case.

The nine individual witnesses claimed privilege under the Fifth Amendment to the United States Constitution and their claim was upheld by Judge Merhige on June 14, 1977. For the purpose of giving this ruling Judge Merhige came to London and sat in the United States Embassy here. After giving the ruling he heard some further evidence and in the course of the argument in this House a careful analysis was made of the capacity *648 in which the learned judge made various rulings and orders whilst sitting in London - whether as a judge of the United States court or as examiner acting under the orders of an English court. Some of the procedure was criticised. There may be room for doubt whether it was all strictly regular but the short-circuiting of the procedure was with the laudable object of expediting the proceedings in England in order not to delay the beginning of the trial in America which was then imminent and I do not consider that it has resulted in prejudice to any of the parties.

On June 16, 1977, two days after Judge Merhige had ruled that the privilege plea was well taken, he sat again in the United States Embassy in London and stated that on the previous day he had received a letter from the Department of Justice of the United States Government the effect of which was to offer an informal undertaking that the United States Government would not utilise the deposition testimony of any of the named witnesses as a basis for criminal prosecution of that witness for the violation of any United States law. The explanation of the letter is that since about March 1976 the Department of Justice had been carrying on an investigation into possible infringements of United States anti-trust laws by members of an alleged cartel of uranium producers, and at some date before June 16, 1977, a federal grand jury had been empanelled to pursue the investigations and to initiate criminal proceedings if they were considered appropriate. The letter is important because it discloses fully the reasons for the offer of immunity from prosecution. It has already been quoted fully by my noble and learned friend, Viscount Dilhorne, and I do not repeat the quotation. On the same occasion counsel for the Department of Justice appeared and explained to Judge Merhige that the reason why the department had made only an informal offer of immunity instead of requesting the court to make a formal order under paragraphs 6002-6003 of the Organised Crime Control Act 1970, 18 U.S.C., was that:

"There is a firm Department of Justice policy that it will not consider seeking immunity for a witness in a private litigation - in any litigation to which it is not a party."

He also said:

"We are firmly convinced that we would not have even considered this letter if we had had an opportunity to get further direct information on this alleged cartel, but at present that opportunity seems slim, perhaps not at all."

Later on June 16, Judge Merhige declined to give effect to the letter or to require the witnesses to answer questions which they considered might incriminate them, but he said that if a formal application under paragraphs 6002-6003 were made he would have no option but to make an order and grant immunity. The result was that his ruling of June 14 holding the privilege plea well taken remained unaffected. That was how the matter stood

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

when the instant proceedings were last before the Court of Appeal on July 11, 1977.

*649 Since that date an event has occurred which has profoundly altered the situation. On July 18 the Department of Justice departed from its firm policy and made a formal application to Judge Merhige for an order to compel the testimony of each of the witnesses under paragraph 6002. The application was made with the authority of the Attorney-General of the United States of America and we have seen copies of two letters relating to it. One was a formal letter dated July 11, 1977, from the Department of Justice bearing the significant heading "Re: Grand Jury Investigation of the Uranium Industry." The other letter was dated July 12, 1977, addressed to the United States District Attorney for the Eastern District of Virginia and signed by the Attorney-General of the United States of America in which he explained the reasons for departing from the firm policy of the Department of Justice against seeking such an order in a private litigation, "except in the most extraordinary circumstances." His letter includes the following passage:

"In my judgment, the testimony of the individuals for whom orders are to be sought is necessary to the public interest. The extraordinary circumstances which led me to this conclusion include the following: (1) Those persons whose testimony is sought have refused to testify on the basis of their privilege against self-incrimination, and they are outside the personal jurisdiction of the United States courts; (2) These persons are not likely to come within the personal jurisdiction of the United States courts so long as the Department of Justice continues a sitting grand jury investigation of the international uranium industry; (3) These persons are British subjects and we have determined that it is highly unlikely that their testimony could be obtained through existing arrangements for law enforcement co-operation between the United States and the United Kingdom; (4) The Department of Justice has been largely unable to obtain information from these foreign persons about the subject matter of this investigation; (5) The testimony these persons give may well be

indispensable to the work of the grand jury; and (6) The subject matter of this grand jury is of particular importance."

I draw particular attention to numbered paragraph (3) of these reasons.

Judge Merhige on July 18, 1977, made an order that each of the named witnesses should give evidence and granting them immunity. The operative part of each order was in the following terms:

"Therefore it is hereby ordered that: in accordance with the Organised Crime Control Act of 1970, 18 U.S.C. paragraph 6001 et seq., [the named witness] give testimony or provide other information in response to questions propounded pursuant to letters rogatory issued by this court and that any testimony given by [the named witness] *pursuant to this order* shall be subject to the immunity provisions of that Act as provided in 18 U.S.C. paragraph 6002."

Mr. Rokison submitted that any evidence given by a witness before the consular officer in London would not be given pursuant to the order of July 18 by Judge Merhige as that order could not have extra-territorial *650 effect in England on a British subject. Any evidence, he said, would be given pursuant to an order of the English court giving effect to the letter rogatory and therefore the witness would not enjoy immunity from prosecution in the United States in respect of his evidence. If the matter fell to be decided by English law, that submission might have considerable force. But the question of immunity is a question of American law and Judge Merhige has plainly indicated that in his view the witness would have immunity although I do not understand that he has heard argument on the matter nor that he has given a formal decision upon it. It may therefore be that the position in American law is not free from doubt. But as a practical matter, having regard to the indication of opinion given by Judge Merhige, I think we must proceed on the footing that each witness would have immunity from prosecution in the United States of America in respect of any evidence given by him in response to the letters rogatory.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1978] A.C. 547                                                                                        Page 82

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

(Cite as: [1978] A.C. 547)

The question therefore which has to be decided, and which owing to the sequence of events that I have mentioned, has unfortunately not been considered by any of the courts below, is whether the witnesses should be ordered to appear again before the American consular official as examiner and to answer questions propounded under the letters rogatory. On this important matter we have had the assistance of the Attorney-General. He explained that Her Majesty's Government consider that in this case, as in some other cases in recent years, the United States courts have claimed a jurisdiction which is excessive and constitutes an infringement of the proper jurisdiction and sovereignty of the United Kingdom. In particular, they have asserted jurisdiction in the enforcement of anti-trust legislation, and also in requiring the giving of information to facilitate investigatory procedure under that legislation, where the activities complained of have been carried out by British subjects and have taken place exclusively outside the territory of the United States, on the ground that those activities have taken effect within that territory. Her Majesty's Government consider these claims to extra-territorial jurisdiction particularly objectionable in the field of antitrust legislation because, among other reasons, such legislation reflects national economic policy which may not coincide, and may be indirectly in conflict, with that of other states. The Attorney-General also brought to our attention article 12 (b) of the Hague Convention which provides:

"The execution of a letter of request may be refused only to the extent that - ... (b) The state addressed considers that its sovereignty or security would be prejudiced thereby ..."

The exception relating to security is given statutory effect by section 3 (3) of the Act of 1975, but there is no statutory exception for cases where the Government of the United Kingdom considers that its sovereignty would be prejudiced as in the present case. Nevertheless I can hardly conceive that if any British court, or your Lordships' House sitting in its judicial capacity, was informed by Her Majesty's Government that they considered the sovereignty of the United Kingdom would be

prejudiced by execution of a letter of request in a particular case it would *651 not be its duty to act upon the expression of the Government's view and to refuse to give effect to the letter. The principle that ought to guide the court in such a case is that a conflict is not to be contemplated between the courts and the Executive on such a matter: see The Fagernes [1927] P. 311, 324 *per* Atkin L.J.

In the present case however I consider that the matter can be disposed of on a narrower ground. The power of the English courts to give effect to the letters rogatory depends upon the Act of 1975 and section 1 (b) of that Act provides that the power exists where the court is satisfied inter alia that the evidence is to be obtained for the purpose of civil proceedings before the requesting court. When the letters rogatory were presented in England the "evidence" undoubtedly was to be obtained for the purpose of civil proceedings in the Virginia court. In fact it was, and is (if given) likely to be used also in other proceedings for damages for infringement of anti-trust legislation in a court in Illinois. But although the Illinois proceedings include a claim for treble damages, they are in my opinion civil proceedings, and the fact that the evidence may be used for the purpose of those proceedings seems to me irrelevant so long as it also is bona fide intended to be used in the proceedings in Virginia.

But the use of the evidence for the investigatory procedure before a grand jury is a different matter. The English courts have no power under the Act of 1975, or otherwise, to make orders for giving effect to requests for evidence to be used for such investigatory purposes. They do have power, under section 5 of the Act of 1975, to make orders in relation to obtaining evidence for the purposes of criminal proceedings abroad but only for "proceedings which have been instituted." But the grand jury proceedings are not criminal proceedings and the evidence is not said to be required for any criminal proceedings that have yet been instituted. The submission of counsel for the Department of Justice to Judge Merhige and the letters from the Department and from the Attorney-General of the United States of America already mentioned show

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

that the department is seeking the evidence of these witnesses only for the purposes of the Grand Jury proceedings. Moreover paragraph 3 of the Attorney-General's letter of July 12, shows that their evidence probably could not be obtained for that purpose through the existing machinery. Accordingly what is being attempted is to use the machinery provided by the Act of 1975 for obtaining evidence for civil proceedings for the quite different purpose of investigatory proceedings before a grand jury. That is a purpose altogether outside the Act of 1975 and is one to which the English courts ought not in my opinion to lend assistance, particularly having regard to the objections stated by Her Majesty's Government. No hardship will be caused to Westinghouse if we refuse to compel the witnesses to answer as that was already the position under Judge Merhige's ruling upholding their privilege. In my opinion therefore the order made by the Court of Appeal on May 26, before Judge Merhige's ruling and before the application by the Department of Justice, should be reversed.

An interesting submission was made by Mr. Rokison on a question *652 that would have arisen if your Lordships had held that the witnesses have no privilege but that the R.T.Z. companies have privilege. In such an event the privilege of the companies could be rendered useless if its directors and officers could be compelled to give evidence incriminating the company. Mr. Rokison submitted that the privilege of a company, which would allow it to refuse to answer written interrogatories by the hand of its proper officer, should apply also to oral evidence by its directors and officers if such evidence might tend to incriminate the company. The submission is unsupported by authority but it has much logical force and if it had been relevant to do so I would have wished to consider it more carefully.

I would set aside the order of October 28, 1976, made by Master Creightmore so far as it relates to production of documents by the R.T.Z. companies. If that course does not commend itself to your Lordships, I would agree with the order proposed

by my noble and learned friend on the Woolsack.

LORD KEITH OF KINKEL.

My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Diplock. I agree with it subject to certain observations which I shall endeavour to express.

I agree that MacKenna J. and the Court of Appeal were right in refusing to set aside completely the order of October 28, 1976, giving effect to the letters rogatory. The Court of Appeal was also right, in my view, in holding that the letters should not receive effect in their entirety as regards the documents, production of which was thereby sought. The terms of schedule B to the letters make it clear that the respondents were originally seeking to enforce against persons not party to the Virginia proceedings a general discovery of documents which might or might not constitute evidence in these proceedings. Such a course is not permitted under English law (Burchard v. Macfarlane, Ex parte Tindall [1891] 2 Q.B. 241 and Radio Corporation of America v. Rauland Corporation [1956] 1 Q.B. 618). Thus it was not open to the court, in view of the terms of section 2 (3) of the Evidence (Proceedings in Other Jurisdictions) Act 1975, to make an order allowing this to be done. Further, section 2 (4) provides that a person shall not be required (a) to "state what documents relevant to the proceedings" are or have been in his possession, or (b) to "produce any documents other than particular documents specified in the order as being documents appearing to the court ... to be, or to be likely to be, in his possession." The terms of schedule B are such that an unqualified order giving effect to these letters rogatory would necessarily have required both these things to be done. On the other hand there can be no doubt that schedule B does specify a certain number of particular documents which can in the circumstances reasonably be regarded as relevant evidence in the Virginia proceedings, and as likely to be in the possession of the R.T.Z. companies. I refer in particular to the originals of certain documents

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

copies of which are included in the Friends of the Earth collection.

So the question comes to be whether the proper course was to reject *653 completely the letters rogatory, so far at least as they sought the recovery of documents, on the ground that in substance the applicants were seeking a licence for a fishing expedition, or to give effect thereto as regards the particular documents specified therein which appeared likely to be in the possession of the R.T.Z. companies.

The answer to this question depends, in my opinion, upon the balance of a number of considerations. On the one hand it may be regarded as undesirable that an applicant for letters rogatory should receive any encouragement to think he may properly include therein a wide-ranging schedule of documents in the expectation that the court of request will carry out a pruning operation and allow him as much as he is properly entitled to demand. On the other hand it is the duty of the court of request to do its best, consistently with the provisions of the statute, to assist the processes of justice in the court from which the request comes, and to do so in such a way as will cause the minimum of delay. If in the present case the letters rogatory were to be entirely rejected, so far as they relate to the recovery of documents, it would presumably be open to applicants to obtain from the Virginia court fresh letters limited to the particular documents specified and come back for an order giving effect to them. This would involve considerable delay, and the end result would be the same as if the court of request had itself cut down the scope of the original letters rogatory. Therefore I am of the opinion that the right course, in circumstances such as those of the present case, is for the court of request to issue an order limited to those documents the production of which, in its judgment, ought properly to be enforced. I have no doubt that on a proper construction of section 2 of the Act of 1975, having regard in particular to subsections (3) and (4), it is within the power of the court, in its discretion, to proceed in that way.

I consider this conclusion to be in accordance with the policy of the Act of 1975. That policy was to improve the arrangements in each of the United Kingdom jurisdictions for obtaining evidence to be used in certain proceedings before the courts of other jurisdictions. The major purpose of the Act was to give effect to the 1970 Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters. It repealed the Foreign Tribunals Evidence Act 1856, as amended, which previously operated in this field. At the same time the opportunity was taken to repeal and replace with the same new provisions the Evidence by Commission Act 1859, which previously regulated matters as between the different jurisdictions of the United Kingdom. The necessity of close collaboration between these jurisdictions is obvious, and exactly the same rules now govern the position as regards jurisdictions abroad. Under the Act of 1859 a somewhat narrow view was taken by the English courts in connection with the enforcement in England of a Scottish commission and diligence for the recovery of documents. (See Burchard v. Macfarlane [1891] 2 Q.B. 241.) It was held that the production of documents by third parties could only be ordered as ancillary to the examination of the parties concerned as witnesses in the case. The decision was generally regarded by the Scottish legal profession as having the effect *654 that no commission and diligence for the recovery of documents could ever be enforced against a third party in England. The essential feature of the commission and diligence procedure is that it enables documents which constitute evidence in the cause to be made available in advance of the trial so that they may receive due consideration and not be sprung on the other party in the course of the trial. It thus offers much convenience and is conducive to the better administration of justice. In the present case the Court of Appeal has taken the view that on a proper construction of the Act of 1975 the production of documents by a third party may be ordered though not ancillary to the oral examination of that party as a witness. That view is not now challenged and is plainly right. I would further observe that, although commission and diligence to recover documents is part of pre-trial procedure, I

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1977 WL 58879 (HL), [1978] A.C. 547, [1978] 1 All E.R. 434, [1978] 1 C.M.L.R. 100, [1978] 2 W.L.R. 81, (1978) 122 S.J. 32, 12-02-1977 Times 58,879

**(Cite as: [1978] A.C. 547)**

can see no justification in the terms of the Act of 1975 for refusing effect to it on that ground. Thus there is now greater scope for collaboration among the different jurisdictions of the United Kingdom, and also between these jurisdictions and those of countries abroad. So any letters rogatory should be approached in the spirit that they should receive effect to the fullest extent possible under our law. That was the approach adopted by the Court of Appeal in this case.

The Court of Appeal deleted from schedule B certain categories of documents, and altered the description of certain other categories. In my opinion it was not within the power of the court to take the latter course, and I would, for my part, have carried the blue pencil exercise rather further than did the Court of Appeal, with a view to securing that the provisions of section 2 (4) of the Act of 1975 were properly satisfied. It is unnecessary in the circumstances to particularise the further deletions which, in my view, would have been appropriate.

As regards the oral evidence sought to be obtained under the letters rogatory, I am of opinion that the Court of Appeal acted rightly in sustaining the order for examination of the persons named therein as witnesses. On the material made available I consider that there were reasonable grounds for the view that these persons might be in a position to give evidence relevant to Westinghouse's defence in the Virginia proceedings. In the face of a statement in letters rogatory that a certain person is a necessary witness for the applicant, I am of opinion that the court of request should not be astute to examine the issues in the action and the circumstances of the case with excessive particularity for the purpose of determining in advance whether the evidence of that person will be relevant and admissible. That is essentially a matter for the requesting court. Should it appear necessary to apply some safeguard against an excessively wide-ranging examination, that can be achieved by making the order for examination subject to a suitably worded limitation.

There is nothing which I can usefully add upon the question of privilege against self-incrimination arising under section 3 (1) of the Act of 1975, or upon the appropriateness, in the light of the intervention by the United States Department of Justice, of executing the letters rogatory.

My Lords, I agree that the appeals of the R.T.Z. companies and the *655 individual appellants should be allowed, that the order giving effect to the letters rogatory should be discharged, and that the appeals of Westinghouse should be dismissed.

**Representation**

Solicitors: Linklaters & Paines; Freshfields; Treasury Solicitor.

Appeals allowed. Cross-appeals dismissed. (F. C. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit Q

1 of 1 DOCUMENT

Novell Inc. v M.C.B. Enterprises

Supreme Court

*2001 1 IR 608, [2002] 1 ILRM 350*

30 January 2001

**CATCH-WORDS:** Evidence - Request for evidence from foreign court - Concurrent proceedings in Irish courts - Whether request for documents and examination oppressive where allegations of fraud - Whether request for documents amounted to discovery - Rules of the Superior Courts, 1986 (SI No 15), O. 39, R 39 - Foreign Tribunal's Evidence Act, 1856 (19 & 20 Vict., 113), ss. 1 and 5.

**HEADNOTE:**

The applicant brought proceedings in Ireland against the respondents for damages for negligence, fraud and dealing in stolen property. The applicant was also proceeding against various companies in the Unites States arising out of the same matters. For the purposes of those proceedings, the applicant sought, by letters of request to the High Court in this jurisdiction, to obtain evidence from the respondents.

The High Court (O'Sullivan J), made an order against the respondents requiring them to be examined on oath and to produce documents. The respondents appealed that order, on the grounds, inter alia, that since the respondents were facing proceedings in Ireland brought by the applicant where allegations of fraud were being made against them, the order was in breach of fair procedures.

Held by the Supreme Court (Murray, Geoghegan, and Denham JJ.), in allowing the respondents' appeal, 1, that the making of the order would not in normal circumstances be refused on the basis that the testimony sought could be used in another case. However, where there were allegations of fraud, that constituted a special circumstance that warranted the refusal of the application.

First American Corp. v Zayed [1999] 1 DPP 1154 followed.

2. That, under the principle of the comity of nations, the court would be slow to refuse to make such an order where a letter of request was received from a court of another jurisdiction.

3. That the court must have regard to the guarantee of fair procedures under the Constitution afforded to parties so that they are able to bring their cases on an equal footing. It would be oppressive to permit the applicant to examine the respondents in advance of the hearing of the fraud action against them in Ireland.

Obiter dicta: The court would be inclined to make an order to obtain evidence that could be used either for the purpose of summary judgment or at the final trial and was not akin to discovery in the Irish sense.

**CASES-REF-TO:**

Cases mentioned in this report:-

In re Chomutov Savings Bank [1957] IR 355.

First American Corp. v Zayed [1999] 1 DPP 1154; [1998] 4 All ER 439.

2001 1 IR 608, [2002] 1 ILRM 350

Novell Inc. v Rainey (Unreported, Supreme Court, 11th April, 2000).

Radio Corporation of America v Rouland Corporation [1956] 1 Q.B. 618; [1956] 2 DPP 612; [1956] 1 All ER 260.

Sabretech v Shannon All ERospace Ltd. [1999] 2 IR 468.

In re Westinghouse Uranium Contract [1978] AC 547; [1978] 2 DPP 81; [1978] 1 All ER 434.

**COUNSEL:**

Frank Clarke SC (and with him Patrick Hunt) for the respondents.

John Trainor SC (and with him Donal Seligman) for the applicant.

Cur. adv. vult.

**PANEL:** Murray, Geoghegan, and Denham JJ

**JUDGMENTS:**

Denham J

1. Issue

This is an appeal by Sean Rainey and Jacqueline Rainey, hereinafter referred to as the respondents, against an order made by the High Court (O'Sullivan J) on the 18th October, 1999, and the subsequent refusal to discharge the same order on the 30th November, 1999, for the examination on oath of the respondents before an examiner, Paul McGarry, barrister at Law, pursuant to the Foreign Tribunal's Evidence Act, 1856, and O. 39, r. 39 of the Rules of the Superior Courts, 1986. The respondents ask this court to exercise its discretion under the Foreign Tribunal's Evidence Act, 1856, and refuse the application that there be an examination of the respondents on oath or affirmation and production of documents for the benefit of court proceedings in Utah.

2. The High Court

On the 18th October, 1999, the High Court (O'Sullivan J) ordered that P.J. Kennedy, and the respondents attend before Paul McGarry, barrister at law, who was appointed examiner, and to submit to being examined on oath or affirmation touching the testimony so required and do then and there produce:-

1) all documents that refer or relate to any IntranetWare for small business or other applicant software that AUI P.J. Kennedy first respondent and/or second respondent received from Modus Media International or any other person or company in 1997, such as invoices, order forms, purchase order packing slips, inventory lists or reports, purchase or acquisition reports, receipts, correspondence, documents evidencing payment, accounting reports and so forth;

2) all documents that refer or relate to any IntranetWare for small business or other applicant software that AUI P.J. Kennedy first respondent and/or second respondent sent to MBC Enterprises LLC and/or James Craghead in 1997, 1998 or 1999, such as invoices, order forms, purchase orders, packing slips, inventory lists or reports, purchase or acquisition reports, receipts, correspondence, documents evidencing payment, accounting reports and so forth;

3) all documents that refer or relate to any IntranetWare for small business or other applicant Software that MBC Enterprises LLC and/or James Craghead returned to AUI P.J. Kennedy first respondent and/or second respondent in 1997, 1998 or 1999, such as invoices, order forms, purchase orders, packing slips, inventory lists or reports, purchase or

2001 1 IR 608, [2002] 1 ILRM 350

acquisition reports, receipts, correspondence, documents evidencing payment, accounting reports and so forth;

4) all documents that refer to any IntranetWare for small business or other applicant Software that AUI P.J. Kennedy first respondent and/or second respondent sent to Computer Commodity Inc. and/or Michael Jacobson in 1997, 1998 or 1999, such as invoices, order forms, purchase orders, packing slips, inventory lists or reports, purchase or acquisition reports, receipts, correspondence, documents evidencing payment, accounting reports and so forth;

5) all documents that refer or relate to any IntranetWare for small business or other applicant Software that Computer Commodity Inc. and/or Michael Jacobson returned to AUI P.J. Kennedy first respondent and/or second respondent in 1997, 1998 or 1999, such invoices, order forms, purchase orders, packing slips, inventory lists or reports, purchase or acquisition reports, receipts, correspondence, documents evidencing payment, accounting reports and so forth;

6) all documents including but not limited to letters, facsimiles, e-mail and other correspondence whether electronic or written both draft and final versions between AUI P.J. Kennedy first respondent and/or second respondent and MBC Enterprises LLC James Craghead Computer Commodity Inc. and/or Michael Jacobson in 1997, 1998 or 1999, that refer or relate to any IntranetWare for small business or other applicant software;

7) all copies of IntranetWare for small business or other applicant software that MBC Enterprises LLC James Craghead Computer Commodity Inc. and/or Michael Jacobson returned to AUI P.J. Kennedy first respondent and/or second respondent."

The High Court ordered that the examiner take down in writing the evidence of the said witnesses and when completed transmit same to the Master of the High Court for transmission to the president of the tribunal desiring the evidence of such witnesses.

3. Appeal

Against that order the respondents have appealed to this court on the grounds that:-

1. the learned High Court Judge erred in law and failed to give any or any sufficient weight to the submission on behalf of the respondents that the affidavit upon which the order was granted was not a full and frank affidavit and did not disclose to the court matters which were material to the plaintiff, in particular that there were proceedings in Ireland between the plaintiff and the respondents arising from the same matters which were the subject of the said proceedings in Utah; that there was a criminal investigation taking place in Ireland arising from matters common to the Irish and Utah proceedings;

2. that having regard to the foregoing the applicant was manoeuvring itself into a position whereby it could cross-examine the respondents before the Irish proceedings came on for plenary hearing and thereby circumvent the normal procedure in a common law jurisdiction and the respondents' right to fair procedures under the Constitution that the defendants can elect to testify or not to testify in the course of proceedings and if that they do elect to testify that the normal procedure would be that they give their evidence direct before cross-examination.

4. Stay

On the 7th December, 1999, this court ordered that the order of the High Court dated the 18th October, 1999, insofar as it relates to the respondents be stayed until after the determination of the appeal. The court noted the undertaking of counsel on behalf of the respondents to expedite the lodgment in the office of the registrar of all relevant books of appeal and that the appeal be listed for mention before this court on the 14th January, 2000.

5. Amendment of notice of appeal

2001 1 IR 608, [2002] 1 ILRM 350

The respondents then brought a motion to the Supreme Court seeking to amend their notice of appeal by the addition of a number of grounds. In an ex tempore judgment on the 11th April, 2000, the Supreme Court, (Murphy J, with whom the other members concurred) held:-

"This is an application in the first instance by the respondents for liberty to amend the notice of appeal served by them herein. Effectively, it might be said that the original notice of appeal sought to make the case that the learned trial judge, in making the order which he did under the Foreign Tribunals Evidence Act, 1856, had erred in the exercise of his discretion. Now it is sought to make the case that he had no jurisdiction to make the order. Whilst this may seem a radical amendment that is not quite the case and indeed the need for the amendment is explained by the circumstances which have evolved since the hearing before O'Sullivan J

Effectively at issue is the nature of the process which it was intended to conduct in this jurisdiction pursuant to the letter of request issued by the United States District Court, Central District of Utah, on the 17th August, 1999. It is contended by counsel on behalf of the applicant that what they seek is to record evidence which would be admissible in the first instance in summary proceedings in the United States and if that is unsuccessful in the plenary proceedings there. As a result of information which became available since the hearing before O'Sullivan J as to the nature of the proceedings in the United States and indeed as to the relevant United States law the respondents now explain that the proceedings in this jurisdiction pursuant to the order of O'Sullivan J would be in the nature of an investigative process sometimes described a 'a discovery process', they seek to make that argument in this court conceding that it was not agreed in the court below that such a process would not fall within the terms or provisions of the Act of 1856. I am of opinion that the amendment should be allowed. It is in a sense the obverse of the case already made. It is an inquiry or an argument as to the nature of the order to be made by O'Sullivan J in the High Court and it seems to me that this is a proper issue for the parties to ventilate in this court. Accordingly, I would allow the amendment but of course on terms that the applicant be afforded an adequate opportunity to meet it. This would necessitate at least a brief adjournment and I would propose that the amendment be allowed and the matter be adjourned to the next list to fix dates."

6. Letter of request

This action arises from a letter of request dated the 18th August, 1999, signed by the Honourable Dee Benson, judge of the United States District Court, Central District of Utah.

This request states:-

"The United States District Court for the District of Utah, Central Division, presents its compliments to the Registrar of the High Court and other appropriate judicial authorities of the Republic of Ireland and requests international judicial assistance to issue orders of subpoena duces tecum to require witnesses to appear for questioning and produce documents so that evidence may be obtained for a civil proceeding before this court in the above-captioned matter.

This court requests the assistance described herein as necessary in the interests of justice in order to obtain evidence needed in the above-captioned proceeding before this court."

The proceeding is the consolidated case and the letter sets out the names and addresses of the parties to the proceeding and their representatives; these include Novell Inc., plaintiff, Gregory M. Hess, Esq., attorney for the plaintiff, MBC Enterprises, LLC, defendants, Michael Jacobson and Computer Commodity Inc., defendants, the attorneys for the defendants, MBC Enterprises, Computer Recyclers Inc., defendants, and the attorneys for the defendants, Computer Recyclers Inc. and others. The nature of the proceedings is described as:-

"This is a civil action in which the plaintiff, Novell Inc., alleges, among other things, that more than 2000 copies of its copyrighted IntranetWare for small business software (the "Software") were sent for destruction and recycling by a company in the Republic of Ireland called Modus Media International ("Modus"). Novell Inc. further alleges that the

2001 1 IR 608, [2002] 1 ILRM 350

Software was stolen or otherwise wrongfully diverted from Modus and ended up in the hands of an Irish company named AU Industries, Ltd ("AUI"). Novell Inc. contends that AUI sent the Software to defendants MBC Enterprises, LLC, Computer Commodity Inc., and associated individuals in the United States, who sold quantities of the Software to other companies, including defendant Computer Recyclers Inc. Based on these allegations, Novell Inc. asserts claims against defendants for copyright and trademark infringement and seeks to recover damages and other relief."

The names and addresses of witnesses to be examined are listed and they include P.J. Kennedy, Sean Rainey and Jacqueline Rainey. The Sean Rainey and Jacqueline Rainey named are the respondents in this action.

Under the heading "Subject Matter of Examination and Items to be Produced" the letter of request states:-

"Applicant seeks to examine the above-referenced witnesses concerning all matters relating to the IntranetWare for small business software that was allegedly diverted from Modus Media International and sent to the United States, including but not limited to the following specific topics:-

1. Any IntranetWare for small business or other applicant software that AUI, P.J. Kennedy, first respondent, and/or second respondent received from Modus Media International or any other person or company in 1997 or 1998.

2. Any IntranetWare for small business or other applicant software that AUI, P.J. Kennedy, first respondent, and/or second respondent sent to MBC Enterprises, LLC, and/or James Craghead in 1997, 1998 or 1999.

3. Any IntranetWare for small business or other applicant software that MBC Enterprises, LLC, and/or James Craghead returned to AUI, P.J. Kennedy, first respondent, and/or second respondent in 1997, 1998 or 1999.

4. Any IntranetWare for small business or other applicant software that AUI, P.J. Kennedy, first respondent, and/or second respondent sent to Computer Commodity Inc. and/or Michael Jacobson in 1997, 1998 or 1999.

5. Any IntranetWare for small business or other applicant software that Computer Commodity, Inc. and/or Michael Jacobson returned to AUI, P.J. Kennedy, first respondent and/or second respondent in 1997, 1998 or 1999.

6. Any conversations or other communications that AUI, P.J. Kennedy, first respondent, and/or second respondent had with MBC Enterprises, LLC, James Craghead, Computer Commodity Inc. and/or Michael Jacobson in 1997, 1998 and/or 1999, referring or relating to any IntranetWare for small business or other applicant software.

7. The sources, amount, and division between the parties of all revenues and profits obtained by AUI, P.J. Kennedy, first respondent, second respondent, MBC Enterprises, LLC, James Craghead, Computer Commodity Inc., and/or Michael Jacobson from IntranetWare for small business or other applicant software in 1997, 1998 or 1999.

The applicant also seeks the production of all documents and tangible things in the witnesses' possession or control that relate to the IntranetWare for small business software that was allegedly diverted from Modus Media International and sent to the United States, including but not limited to the following specific categories of documents:-

i) All documents that refer or relate to any IntranetWare for small business or other applicant software that AUI, P.J. Kennedy, first respondent and/or second respondent received from Modus Media International or any other person or company in 1997, such as invoices, order forms, purchase orders, packing slips, inventory lists or reports, purchase or acquisition reports, receipts, correspondence, documents evidencing payment, accounting reports and so forth.

ii) All documents that refer or relate to any IntranetWare for small business or other applicant software that AUI, P.J. Kennedy, first respondent and/or second respondent sent to MBC Enterprises, LLC, and/or James Craghead in 1997, 1998 or 1999, such as invoices, order forms, purchase orders, packing slips, inventory lists or reports, purchase or acquisition reports, receipts, correspondence, documents evidencing payment, accounting reports, and so forth.

2001 1 IR 608, [2002] 1 ILRM 350

iii) All documents that refer or relate to any IntranetWare for small business or other applicant software that MBC Enterprises, LLC, and/or James Craghead returned to AUI, P.J. Kennedy, first respondent, and/or second respondent in 1997, 1998, or 1999, such as invoices, order forms, purchase orders, packing slips, inventory lists or reports, purchase or acquisition reports, receipts, correspondence, documents evidencing payment, accounting reports, and so forth.

iv) All documents that refer or relate to any IntranetWare for small business or other applicant software that AUI, P.J. Kennedy, first respondent, and/or second respondent sent to Computer Commodity Inc. and/or Michael Jacobson in 1997, 1998, or 1999, such as invoices, order forms, purchase orders, packing slips, inventory lists or reports, purchase or acquisition reports, receipts, correspondence, documents evidencing payment, accounting reports, and so forth.

v) All documents that refer or relate to any IntranetWare for small business or other applicant software that Computer Commodity Inc. and/or Michael Jacobson returned to AUI, P.J. Kennedy, first respondent and/or second respondent in 1997, 1998 or 1999, such as invoices, order forms, purchase orders, packing slips, inventory lists or reports, purchase or acquisition reports, receipts, correspondence, documents evidencing payment, accounts reports, and so forth.

vi) All documents, including but not limited to letters, facsimiles, e-mail, and other correspondence, whether electronic or written, both draft and final versions, between AUI, P.J. Kennedy, first respondent and/or second respondent, and MBC Enterprises, LLC, James Craghead, Computer Commodity Inc., and/or Michael Jacobson in 1997, 1998 or 1999, that refer or relate to any IntranetWare for small business or other applicant software.

vii) All copies of IntranetWare for small business or other applicant software that MBC Enterprises, LLC, James Craghead, Computer Commodity Inc., and/or Michael Jacobson returned to AUI, P.J. Kennedy, first respondent and/or second respondent.

This court therefore respectfully requests that the registrar of the High Court or other appropriate judicial authority of the Republic of Ireland issue orders of subpoena duces tecum to the above-named witnesses, in such form as is appropriate requiring that the above-named witnesses submit to such examination and produce such documents and tangible things."

Arising out of that request and after the hearing before the High Court (O'Sullivan J) made the order the subject of this appeal. The said order is set out previously in this judgment.

7. Chronology of events

The chronology of events as presented by the respondents, which was not contested, is as follows:-

1) On the 13th May, 1997, the applicant supplied a large quantity of IntranetWare for small Business software to Modus Media International, Kildare for "reworking". It is alleged by the applicant that they had agreed with Modus Media that the "( diskettes contained in the said consignment would be destroyed". The applicant alleges that the diskettes were in turn transported to the premises of AU Industries Ltd. in Cork for destruction. The applicant alleges that AU Industries Ltd. transported the diskettes to, inter alia, Computer Company Inc. ("CCI") of Fort Lauderdale, Florida, in breach of applicant's copyright in the software (see paras. 3 to 6 of the applicant's statement of claim against AU Industries in the proceedings delivered the 20th March, 1998). These events took place on or after the 26th May, 1997 (see applicant's reply to particulars dated the 2nd June, 1999 - reply No 8").

2) On the 12th March, 1998, a plenary summons was issued in an action by the applicant against A.U. Industries Ltd. in Ireland (the High Court, 1998, Record No 3240P).

3) On the 20th March, 1998, the applicant commenced its first set of proceedings in the United States District Court, Central District of Utah, against MBC Enterprises plc et al.

2001 1 IR 608, [2002] 1 ILRM 350

4) On the 20th March, 1998, the applicant served the statement of claim in their Irish proceedings against A.U. Industries Ltd.

5) On the 27th March, 1998, A.U. Industries Ltd. enter an appearance in the Irish proceedings.

6) On the 16th April, 1998, the applicant commenced its second set of proceedings before the United States District Court, District of Utah, against C.C.I. and others.

On the 16th April, 1998, two members of the gardai seized applicant's products at the premises of AU Industries Ltd., at Mallow Road, Cork. (See applicant's replies to particulars dated the 25th February, 1999, filed in the Irish proceedings.)

7) On the 20th July, 1998, the applicant applied to join the respondents as additional defendants in their Irish proceedings and delivered an amended plenary summons and statement of claim alleging fraud against the respondents and their company, A.U. Industries Ltd., and also alleged that the respondents had been involved in the handling of stolen property (see paras. 6 to 10 of the amended statement of claim dated the 20th July, 1998). In replies to particulars dated the 4th November, 1998, (Reply No 17) the applicant contends that the handling of stolen property spans the period from May, 1997 to December, 1997.

8) On the 9th September, 1998, the two sets of United States proceedings are consolidated.

9) On the 18th December, 1998, first scheduling order is made in the United States proceedings.

10) On the 12th March, 1999, the applicant deposes Michael Jacobson of CCI in the United States proceedings.

11) On the 5th March, 1999, the applicant deposes James Craghead of MBC and a defendant in his own right in the United States District Court proceedings.

12) On the 17th August, 1999, United States District Court issues a letter of request to the Irish courts. The said letter of request is set out previously in this judgment.

13) On the 18th October, 1999, the High Court (O'Sullivan J) orders enforcement of letters of request. The terms of this judgment have been set out previously in this judgment.

14) The 9th November, 1999, is the original date set for the examination of the respondents and P.J. Kennedy. The examination was adjourned to the 24th November, 1999.

15) On the 24th November, 1999, the examination of the respondents was further adjourned. However, the deposition of P.J. Kennedy proceeded. Mr Kennedy claimed privilege against incrimination by way of answer to most questions.

16) On the 30th November, 1999, the High Court (O'Sullivan J) refused to set aside the order of the 18th October, 1999, insofar as it concerns the respondents.

17) On the 2nd December, 1999, the respondents made an application to the Supreme Court for an order giving leave to abridge time for the service of a notice of motion seeking a further stay on the order of the High Court made the 18th October, 1999, pending the determination of an appeal. The Supreme Court abridged time for the service of a notice of motion to this effect returnable for the 7th December, 1999.

18) On the 7th December, 1999, the Supreme Court placed a stay on the order of O'Sullivan J made on the 18th

October, 1999, pending the determination of the appeal to the Supreme Court and listed the case for mention before the Supreme Court on Friday, the 14th January, 2000, with a view to fixing a date for the hearing. The respondents undertook to lodge the books of appeal in the Supreme Court with all possible speed. The applicant was directed to file an affidavit from their United States lawyers setting forth the purposes of the inquiry and the use to which the evidence in answer would be put, along with an affidavit of United States law in this regard.

19) On the 14th January, 2000, the matter was put back for mention to the 21st January, 2000.

20) On the 20th January, 2000, the applicant filed an affidavit of United States law and an affidavit of their United States legal agents: (see affidavits of Clarke Waddoups dated the 15th January, 2000 and affidavit of Gregory M. Hess dated the 15th January, 2000).

21) On the 21st January, 2000, the Supreme Court directed that further affidavits from the respondents be filed by the 29th February, 2000; legal submissions to be filed in exchange between the parties by the 31st March, 2000, and the appeal was listed for the 11th April, 2000.

22) Early April, 2000, the respondents file affidavits of Gifford W. Price (on United States law), and fourth affidavit of first respondent (sworn on the 3rd April, 2000).

23) On the 3rd April, 2000, the respondents delivered their legal submission.

24) On the 3rd April, 2000, the respondents filed a motion to be allowed amend notice of appeal to add two additional grounds of appeal.

25) On the 11th April, 2000, the respondents' appeal was listed for hearing before the Supreme Court. The respondents informed the court that they had learned indirectly of information suggesting that one or both sets of the applicant's United States litigation had settled, possibly thereby rendering the appeal moot. Counsel for the applicant confirmed that there had been some settlement in the matter, although the details were unknown. After hearing submissions, the Supreme Court directed the respondents to move its motion to be allowed file additional grounds of appeal, and having done so, the Supreme Court directed:

(i) leave for the respondents to amend the grounds of appeal;

(ii) an adjournment of the balance of the appeal, with leave to the applicant to file a further affidavit should they wish, with the matter to appear in the next list to fix dates. The Supreme Court did not direct the applicant to file an affidavit setting out details of the settlement but suggested that that be the subject of correspondence inter partes with leave to the respondents to apply to the court, if needs be, for an order directing the applicant to furnish an affidavit setting out particulars of the settlements.

26) On the 31st October, 2000, the respondents, in their capacity as defendants to the High Court proceedings brought by the applicant, moved an application to the High Court for an order disallowing the claim by the applicant to privilege in respect of certain documents discovered in their High Court proceedings. As a result of this application, privilege is conceded or directed to be conceded in respect of all bar two documents.

27) The 4th December, 2000, the second date listed for hearing of the substantive appeal by respondents. The respondents informed the court that the applicant had settled its United States proceedings against M.B.C. Enterprises, but that the status of the second United States proceedings was unclear. Counsel for the applicant confirmed this, and states that he had received instructions that his clients wish the matter to proceed in respect of the second United States action. However, details of the status of the second United States proceedings are unclear, and the court adjourned the matter pending the making of further inquiries by the applicant, to the next list to fix dates.

2001 1 IR 608, [2002] 1 ILRM 350

28) End December, 2000, the applicant's High Court action was listed in High Court list to fix dates. The applicant failed to appear and the action was struck out of the list to fix dates. The applicant intimated an intention to apply to have the matter re-listed.

29) January, 2001, the respondents intimate intention to issue High Court proceedings of their own against the applicant.

30) The 12th January, 2001, the third listed date for substantive hearing of the appeal in the Supreme Court.

## 8. Irish proceedings

The applicant's proceedings in Ireland are against A.U. Industries Limited, the first respondent and the second respondent. In the proceedings the applicant claims that the respondents are directors of A.U. Industries Limited. The applicant's claim is for damages for negligence, damages for fraud and dealing in stolen property and it also seeks injunctions. The applicant claims that the diskettes in issue were transported to A.U. Industries Limited for destruction and that A.U. Industries Limited were under the personal control of the respondents. The applicant claims that wrongfully, fraudulently, negligently and in breach of the applicant's copyright over the diskettes, A.U. Industries Limited, on the instructions of the respondents, transported the diskettes, which had been entrusted to them for destruction, to the United States and/or sold them, inter alia, to Computer Company Inc., Fort Lauderdale, United States. The shipment was in breach of the applicant's copyright. And it is claimed that there were losses and damage to the applicant.

These facts overlap those set out in the letter of request, which is set out earlier in this judgment. Both allege wrongful actions by AU Industries Limited in relation to diskettes of the same software.

## 9. Submissions on behalf of the respondents

Counsel for the respondents, made two central submissions in support of the application to have the order of the 18th October, 1999, set aside. First, he submitted that there was oppression. He submitted that it was oppressive against the respondents in that he and/or she can be examined on an issue in the action pending in this jurisdiction; that the applicant would be in a preferred position for knowing the information; that it is an inequality as it puts the applicant in a position it otherwise would not be in; that it unfairly gives the applicant an advantage. He argued that as there were allegations of fraud against his clients, the proposed procedure was particularly oppressive. Furthermore, a lodgment had already been made in the Irish proceedings.

Secondly, counsel submitted that even allowing for the different nature of pre-trial proceedings in the United States courts the request was essentially for discovery of documents rather than "testimony" within the meaning of the Act of 1856. This would be impermissible (see inter alia the judgment of Devlin J (as he then was) in Radio Corporation of America v Rowland Corporation [1956] 1 Q.B. 618 and in this jurisdiction McCracken J in Subretch v Shannon All ERospace [1999] 2 IR 468.

## 10. Submissions of the applicant

Counsel on behalf of the applicant submitted that it was the practice of the courts to give effect to such requests, in conformity with international practice and the comity of nations. He submitted that the court should not depart from normal procedure. Insofar as there is any concern about self-incrimination he submitted that the provisions of s. 5 of the Foreign Tribunals Evidence Act, 1856, provides sufficient safeguards. It was submitted that there was no lack of candour on the part of the applicant who applied to the High Court on the 18th October, 1999, for the order on foot of the request of Judge Dee Benson of the United States District Court for the District of Utah; that the Irish proceedings are unaffected by the existence of the United States proceedings and their existence is irrelevant to the original

application. There was therefore no intention to conceal them. It was submitted that the approach of the court should be in accordance with the decision In re Chomutov Savings Bank [1957] IR 355 where Maguire CJ stated at p. 357:-

"The order will require Mary Samuel (formerly Mary Pienart) to appear before District Justice Patrick D. O'Grady on 21st November, 1957, to give evidence and produce documents touching the testimony required by the said letter of request. Her attitude before the court and her decision to give evidence or withhold or produce documents is a matter for herself."

Counsel submitted that the application should be treated as a subpoena duces tecum in proceedings before the court. However, he pointed out that in assessing the matter the court should take note of the fact that the word "discovery" has a different meaning in Ireland and Utah.

Counsel stated that if there is a problem with the order of the High Court, if the documents indicated are too broad, then the order could be amended appropriately. Thus, the order could refer only to the software the subject of the claim as set out in the complaint, and be limited to the topics and documents which could be proved under Irish rules of evidence.

Finally he pointed out that the matter is listed for the 7th February, 2001, in Utah.

11. Law

The Foreign Tribunals Evidence Act, 1856, provides, in section 1:

"Where, upon an application for this purpose, it is made to appear to any court or judge having authority under this Act that any court or tribunal of competent jurisdiction in a foreign country, before which any civil or commercial matter is pending, is desirous of obtaining the testimony in relation to such matter of any witness or witnesses within the jurisdiction of such first mentioned court, or of the court to which such judge belongs, or of such judge, it shall be lawful for such court or judge to order the examination upon oath, upon interrogatories or otherwise, before any person or persons named in such order, of such witness or witnesses accordingly; and it shall be lawful for the said court or judge, by the same order, or for such court or judge or any other judge having authority under this Act, by any subsequent order, to command the attendance of any person to be named in such order, for the purpose of being examined, or the production of any writings or other documents to be mentioned in such order, and to give all such directions as to the time, place, and manner of such examination, and all other matters connected therewith, as may appear reasonable and just; and any such order may be enforced in like manner as an order made by such court or judge in a cause depending in such court or before such judge."

A protection against self-incrimination is afforded in s. 5 which provides that:-

"Provided also, that every person examined under any order made under this Act shall have the like right to refuse to answer questions tending to criminate himself, and other questions, which a witness in any cause pending in the court by which or by a judge whereof or before the judge by whom the order for examination was made would be entitled to; and that no person shall be compelled to produce under any such order as aforesaid any writing or other document that he would not be compellable to produce at a trial of such a cause."

Order 39, R 39 of the Rules of the Superior Courts, 1986, provides:-

"Where under the Foreign Tribunals Evidence Act, 1856, ( any civil or commercial matter, or any criminal matter, is pending before a court or tribunal of a foreign country, and it is made to appear to the Court, by commission rogatoire, or letter of request or other evidence as hereinafter provided, that such court or tribunal is desirous of obtaining the testimony in relation to such matter of any witness or witnesses within the jurisdiction, the Court may, on the ex parte application of any person shown to be duly authorised to make the application on behalf of such foreign court or tribunal, and on production of the commission rogatoire, or letter of request, or other evidence pursuant to the

2001 1 IR 608, [2002] 1 ILRM 350

Foreign Tribunals Evidence Act, 1856, s. 2, or such other evidence as the Court may require, make such order or orders as may be necessary to give effect to the intention of the Acts above mentioned in conformity with the Foreign Tribunals Evidence Act, 1856, section 1."

12. Decision

There are essentially two matters which this court has to decide. The first is whether in all the circumstances the proposed examination of the respondents at this stage would be oppressive. If the court were of the view that the High Court order would not be oppressive, or that a more limited order to be worked out by this court would not be oppressive, the next question which would have to be considered is whether the purpose of the proposed examination is essentially for discovery of documents in the Irish sense rather than for the purposes of testimony whether on an application for summary judgment under the Utah procedures or a full contested trial in Utah. In other words is the applicant promoting these procedures essentially seeking evidence to be directly used or is the applicant essentially seeking documentary information to enable it to obtain evidence. An examination for the latter purpose would be impermissible under the Act of 1856. The modern English case law in these matters is based on the English Act of 1975 which in turn arose out of an international treaty. The English courts have made it quite clear that the principles under the new Act are not the same as those which applied under the Act of 1856 which is repealed in England. The Irish courts are bound by the Act of 1856 as it is still the law in this jurisdiction.

Under the principle of comity, the courts of this jurisdiction would always be favourably disposed towards complying with such a letter of request from a court of another jurisdiction. The courts should be slow to refuse such an order. There is nevertheless a settled jurisprudence as to the circumstances in which it would be appropriate for a court to exercise its discretion against making the order. One instance of this is where the order would be oppressive in all the circumstances. The two issues involved in this decision are not entirely disconnected in that it is well established that the extent of the documentation required may itself be an element of oppression. These principles are well set out by Sir Richard Scott v-C. in First American Corp. v Zayed [1999] 1 DPP 1154, although the English Court of Appeal presided over by Sir Richard Scott V.-C. was applying the more liberal Act of 1975 now enacted in England. After referring to the importance in general of acceding to letters of request by foreign courts, Sir Richard Scott commented at p. 1165 that this was particularly so "where the litigation arises out of a fraud practised on an international scale". He pointed out that a civil action in any part of the world based upon an aspect of that fraud will be an action in respect of which there are likely to be individuals in many different countries who are potential witnesses with relevant evidence to give. It is significant that in this case (and this is one of the complaints of the respondents) no mention of the Irish proceedings was made in the original grounding affidavit. The cases therefore are not internationally entwined in the sense referred to by Sir Richard Scott but the court has little doubt that information gleaned as a consequence of the examination would be extremely useful or at least could be extremely useful to the applicant in the Irish proceedings. There is a much more relevant passage later in the judgment of Sir Richard Scott. In that case evidence was being sought from Price Waterhouse, the well known accountancy firm. On p. 1168 of the judgment, Sir Richard Scott stated as follows:-

"First American have given no undertaking that they will not join Price Waterhouse in a civil action, whether the existing action or a new action, in an attempt to recover damages for Price Waterhouse's alleged knowing complicity in the fraud. First American's lawyers plainly believe that they already have material that justifies them in making public allegations to that effect. It is, it seems to me, inherently oppressive to hold over the head of two witnesses serious allegations of complicity in fraud and the real possibility of being joined as defendants in a civil action based on that alleged complicity, while at the same time requesting an opportunity for a wide examination of the two witnesses on the very topics that would be relevant in an action against them. For the reasons I have endeavoured to give, I would not refuse to give effect to these letters of request on the ground that the main purpose underlining them was not to obtain evidence for the existing action but was to obtain evidence for a contemplated action against Price Waterhouse. In re Westinghouse Electric Corp. Uranium Contract [1978] AC 547 at 611 Lord Wilberforce commented:

'The fact, if it be so, that evidence so obtained may be used in other proceedings and indeed may be central in those

2001 1 IR 608, [2002] 1 ILRM 350

proceedings is no reason for refusing to allow it to be requested ('

I accept that, in general, that would be so. But allegations of fraud raise special considerations and so long as First American hold themselves free to use any information they may obtain from these two witnesses in a civil action for fraud in which the witnesses, or their firm, are defendants, the requests are, in my judgment oppressive."

While the judgment cited is that of another jurisdiction it has persuasive authority. Moreover, in having regard to the constitutional guarantee of fair procedures the court must ensure that parties to litigation are allowed to bring their cases on an equal and fair footing. This means that the court, when exercising discretion must take into account whether an order sought in favour of one party would be oppressive of another in the same or related proceedings. As previously noted there are already proceedings in being before the High Court between the applicant and the respondents arising from the same subject matter as the proceedings in Utah. There are clear allegations of fraud against the respondents in the Irish proceedings. If the applicant was permitted to examine the respondents on the very subject of the Irish proceedings (albeit for the purpose of the proceedings in Utah), it would give them an advantage and potentially place the respondents in an invidious position with regard to preparing and advancing their own defence to the case of fraud being made against them by the applicant. It would, in all the circumstances, be oppressive to permit the applicant to examine the respondents in advance of the hearing of the fraud action against them in Ireland. If the proceedings in Utah were adjourned until after the Irish proceedings the position would then be quite different.

Since the court would allow the appeal on this ground it is reluctant to consider in any detail the second ground since it may be more appropriate for this court to reconsider the parameters of the Act of 1856 in some case where it arises directly. It has been explained to the court that in pre-trial procedures in the District Court in Utah the evidence if obtained could be used by either side to establish that they had an unlosable case, in which event summary judgment could be obtained. On the other hand, if the case went on to a full trial the evidence could be used at the trial. On the face of it there would seem to be nothing in the Act of 1856 which would preclude the evidence being used for an application for summary judgment in those circumstances. The evidence in that event would itself be "testimony" and not information with a view to obtaining evidence analogous to discovery in the Irish sense. Given the limitations on the High Court order to which counsel for the applicant was prepared to agree, which would have the effect that the evidence obtained would be confined to evidence which could be used in an Irish court but that such evidence having been obtained could be used either for the purpose of summary judgment or at the final trial, the members of the court would incline to the view that there would be no legal obstacle in the way of the court approving such an order. But it is not necessary to express a final opinion on the matter as it does not arise in the light of the view the court takes on the oppression issue.

The court will allow the appeal.

Murray J

I agree with the judgment of Denham J

Geoghegan J

I also agree.

**DISPOSITION:**

Appeal allowed

# Exhibit R

## Objectionable Requests in Isle of Man Letter Rogatory

| Basis for Objection | Deposition Topic No. | Document Request No. |
|---|---|---|
| Requested information is not limited to FICA A Fund or the facts in this case | 1-2, 5-10 | 1-17 |
| Scope of Deposition Topic or Document Request is overly broad in that it is not limited by time or subject matter | 2, 5-9 | 2-5, 14-17 |
| Deposition Topic or Document Request lacks clarity | 1-3, 5-6 | 13-14 |
| No objections | 3-4 | |

## Objectionable Requests in Ireland Letters Rogatory

| Basis for Objection | Deposition Question No. | Document Request No. |
|---|---|---|
| Requested information is not limited to FICA A Fund or the facts in this case | 1-55, 61-63, 72, 75, 78, 80-114 | 1-14, 3(SM)[1] |
| Scope of Deposition Question or Document Request is overly broad in that it is not limited by time or subject matter | 6, 9-10, 12, 14, 16, 20, 23, 25, 27, 31, 33, 35, 37, 40-41, 43, 45, 47, 50-54, 84, 85, 102, 104, 106, 109-113 | 2-5, 14, 1-4(SM) |
| Deposition Question or Document Request lacks clarity or is argumentative | 6, 16, 27, 37, 47, 54, 60-63, 65-66, 71, 75-76, 78, 91, 94, 106, 113-114 | 13-14 |
| Information more properly obtained from Samuel Mahoney or domestic sources | 56-60, 64-71, 74, 77, 79 | |
| No objections | 73 | |

---

[1] "SM" indicates a Document Request or Deposition Question directed to only Samuel Mahoney.

Exhibit S

**Isle of Man Letter Rogatory**
**Breakdown of Compound Inquiries to Their Constituent Parts**

Documents to be Produced by Nigel Scott and Oliver Peck
(102 discrete categories)

1.  Company-formation and registration documents for Kilsture Ltd., Maddox Ltd.,
    Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd.,
    Trilogy Financial Products Ltd., and Biosphere Finance Ltd.
    a.  Company-formation documents for Kilsture Ltd.
    b.  Company-formation documents for Maddox Ltd.
    c.  Company-formation documents for Cumberdale Investments Ltd. (including all
        subsidiaries)
    d.  Company-formation documents for Cumberdale Holdings Ltd.
    e.  Company formation documents for Trilogy Financial Products Ltd.
    f.  Company-formation documents for Biosphere Finance Ltd.
    g.  Registration documents for Kilsture Ltd.
    h.  Registration documents for Maddox Ltd.
    i.  Registration documents for Cumberdale Investments Ltd. (including all
        subsidiaries)
    j.  Registration documents for Cumberdale Holdings Ltd.
    k.  Registration documents for Trilogy Financial Products Ltd.
    l.  Registration documents for Biosphere Finance Ltd.

2.  Minutes for each meeting of the directors of Kilsture Ltd., Maddox Ltd., Cumberdale
    Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy
    Financial Products Ltd., and/or Biosphere Finance Ltd.
    a.  Minutes for each meeting of the directors of Kilsture Ltd.
    b.  Minutes for each meeting of the directors of Maddox Ltd.
    c.  Minutes for each meeting of the directors of Cumberland Investments Ltd.
        (including all subsidiaries).
    d.  Minutes for each meeting of the directors of Cumberdale Holdings Ltd.
    e.  Minutes for each meeting of the directors of Trilogy Financial Products Ltd.
    f.  Minutes for each meeting of the directors of Biosphere Finance Ltd.

3.  Company resolutions for Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd.
    (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd.,
    and Biosphere Finance Ltd.
    a.  Company resolutions for Kilsture Ltd.
    b.  Company resolutions for Maddox Ltd.
    c.  Company resolutions for Cumberdale Investments Ltd. (including all
        subsidiaries).
    d.  Company resolutions for Cumberdale Holdings Ltd.
    e.  Company resolutions for Trilogy Financial Products Ltd.
    f.  Company resolutions for Biosphere Finance Ltd.

4.     Financial statements for Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., and Biosphere Finance Ltd.
   a.     Financial statements for Kilsture Ltd.
   b.     Financial statements for Maddox Ltd.
   c.     Financial statements for Cumberdale Investments Ltd. (Including all subsidiaries).
   d.     Financial statements for Cumberdale Holdings Ltd.
   e.     Financial statements for Trilogy Financial Products Ltd.
   f.     Financial statements for Biosphere Finance Ltd.

5.     Marketing materials for all Helios and The Diversified Group transactions in which Messrs. Scott and/or Peck participated.
   a.     Marketing materials for all Helios transactions in which Mr. Scott participated.
   b.     Marketing materials for all Helios transactions in which Mr. Peck participated.
   c.     Marketing materials for all The Diversified Group transactions in which Mr. Scott participated.
   d.     Marketing materials for all The Diversified Group transactions in which Mr. Peck participated.

6.     Partnership agreements for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.
   a.     Partnership agreements for each partnership in which Samuel Mahoney was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.
   b.     Partnership agreements for each partnership in which Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

7.     Contribution agreements for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.
   a.     Contribution agreements for each partnership in which Samuel Mahoney was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.
   b.     Contribution agreements for each partnership in which Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

8.     Buy-sell notices for each transaction entered into by each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.
   a.     Buy-sell notices for each transaction entered into by each partnership in which Samuel Mahoney was a purported partner and in which a U.S. taxpayer purchased

          sets of offsetting options and then transferred the offsetting options to the partnership.

    b.    Buy-sell notices for each transaction entered into by each partnership in which Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

9.    Operating agreements for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

    a.    Operating agreements for each partnership in which Samuel Mahoney was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

    b.    Operating agreements for each partnership in which Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

10.    Tax returns for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

    a.    Tax returns for each partnership in which Samuel Mahoney was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

    b.    Tax returns for each partnership in which Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

11.    Opinion letters for each transaction for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

    a.    Opinion letters for each transaction for each partnership in which Samuel Mahoney was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

    b.    Opinion letters for each transaction for each partnership in which Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

12.    Outlines of transactions for each transaction for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

    a.    Outlines of transactions for each transaction for each partnership in which Samuel Mahoney was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

      b.      Outlines of transactions for each transaction for each partnership in which Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

13.    Contracts for each partnership in which Samuel Mahoney or Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

      a.      Contracts for each partnership in which Samuel Mahoney was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

      b.      Contracts for each partnership in which Martin Hawkes was a purported partner and in which a U.S. taxpayer purchased sets of offsetting options and then transferred the offsetting options to the partnership.

14.    Contracts between Nigel Scott, Oliver Peck, Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander), Samuel Mahoney, Martin Hawkes, and/or John Hussey, and / Helios, The Diversified Group Inc., Kilsture Ltd., Maddox Limited, Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., and/or Biosphere Finance Ltd.

      a.      Contracts between Nigel Scott and Helios.
      b.      Contracts between Nigel Scott and The Diversified Group Inc.
      c.      Contracts between Nigel Scott and Kilsture Ltd.
      d.      Contracts between Nigel Scott and Maddox Limited.
      e.      Contracts between Nigel Scott and Cumberdale Investments Ltd. (including all subsidiaries).
      f.      Contracts between Nigel Scott and Cumberdale Holdings Ltd.
      g.      Contracts between Nigel Scott and Trilogy Financial Products Ltd.
      h.      Contracts between Nigel Scott and Biosphere Finance Ltd.
      i.      Contracts between Oliver Peck and Helios.
      j.      Contracts between Oliver Peck and The Diversified Group Inc.
      k.      Contracts between Oliver Peck and Kilsture Ltd.
      l.      Contracts between Oliver Peck and Maddox Limited.
      m.      Contracts between Oliver Peck and Cumberdale Investments Ltd. (including all subsidiaries).
      n.      Contracts between Oliver Peck and Cumberdale Holdings Ltd.
      o.      Contracts between Oliver Peck and Trilogy Financial Products Ltd.
      p.      Contracts between Oliver Peck and Biosphere Finance Ltd.
      q.      Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and Helios.
      r.      Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and The Diversified Group Inc.
      s.      Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and Kilsture Ltd.
      t.      Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and Maddox Limited.

u.  Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and Cumberdale Investments Ltd. (including all subsidiaries).

v.  Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and Cumberdale Holdings Ltd.

w.  Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and Trilogy Financial Products Ltd.

x.  Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and Biosphere Finance Ltd.

y.  Contracts between Samuel Mahoney and Helios.

z.  Contracts between Samuel Mahoney and The Diversified Group Inc.

aa. Contracts between Samuel Mahoney and Kilsture Ltd.

bb. Contracts between Samuel Mahoney and Maddox Limited.

cc. Contracts between Samuel Mahoney and Cumberdale Investments Ltd. (including all subsidiaries).

dd. Contracts between Samuel Mahoney and Cumberdale Holdings Ltd.

ee. Contracts between Samuel Mahoney and Trilogy Financial Products Ltd.

ff. Contracts between Samuel Mahoney and Biosphere Finance Ltd.

gg. Contracts between Martin Hawkes and Helios.

hh. Contracts between Martin Hawkes and The Diversified Group Inc.

ii. Contracts between Martin Hawkes and Kilsture Ltd.

jj. Contracts between Martin Hawkes and Maddox Limited.

kk. Contracts between Martin Hawkes and Cumberdale Investments Ltd. (including all subsidiaries).

ll. Contracts between Martin Hawkes and Cumberdale Holdings Ltd.

mm. Contracts between Martin Hawkes and Trilogy Financial Products Ltd.

nn. Contracts between Martin Hawkes and Biosphere Finance Ltd.

oo. Contracts between John Hussey and Helios.

pp. Contracts between John Hussey and The Diversified Group Inc.

qq. Contracts between John Hussey and Kilsture Ltd.

rr. Contracts between John Hussey and Maddox Limited.

ss. Contracts between John Hussey and Cumberdale Investments Ltd. (including all subsidiaries).

tt. Contracts between John Hussey and Cumberdale Holdings Ltd.

uu. Contracts between John Hussey and Trilogy Financial Products Ltd.

vv. Contracts between John Hussey and Biosphere Finance Ltd.

15. Loan documents for loans from Kilsture Ltd. to Samuel Mahoney.

16. Proof of Samuel Mahoney's repayment of any loans from Kilsture Ltd.

17. Bank records of Kilsture Ltd. showing trans-Atlantic payments to or from Kilsture Ltd.

a.  Bank records of Kilsture Ltd. showing trans-Atlantic payments to Kilsture Ltd.

b.  Bank records of Kilsture Ltd. showing trans-Atlantic payments from Kilsture Ltd.

<u>Topics of Inquiry of Nigel Scott and Oliver Peck</u>
(174 discrete categories)

1.  Singer & Friedlander's relationship with Biosphere Finance Ltd., Kilsture Ltd., Maddox
    Ltd., Cumberdale Investments Ltd., and Cumberdale Holdings Ltd.
    a.      Singer & Friedlander's relationship with Biosphere Finance Ltd.
    b.      Singer & Friedlander's relationship with Kilsture Ltd.
    c.      Singer & Friedlander's relationship with Maddox Ltd.
    d.      Singer & Friedlander's relationship with Cumberdale Investments Ltd.
    e.      Singer & Friedlander's relationship with Cumberdale Holdings Ltd.

2.  The purpose, management, and operations of Biosphere Finance Ltd., Kilsture Ltd.,
    Maddox Ltd., Cumberdale Investments Ltd., and Cumberdale Holdings Ltd.
    a.      The purpose, management, and operations of Biosphere Finance Ltd.
    b.      The purpose, management, and operations of Kilsture Ltd.
    c.      The purpose, management, and operations of Maddox Ltd.
    d.      The purpose, management, and operations of Cumberdale Investments Ltd.
    e.      The purpose, management, and operations of Cumberdale Holdings Ltd.

3.  The business purpose(s) and design of Fidelity International Currency Advisor A Fund.
    a.      The business purpose(s) of Fidelity International Currency Advisor A Fund.
    b.      The design of Fidelity International Currency Advisor A Fund.

4.  Payments to Samuel Mahoney for his role as a purported partner in Fidelity International
    Currency Advisor A Fund.

5.  The business purpose(s) and design of the Financial Derivatives Investment Strategy.
    a.      The business purpose(s) of the Financial Derivatives Investment Strategy.
    b.      The design of the Financial Derivatives Investment Strategy.

6.  Contracts between Nigel Scott, Oliver Peck, Singer & Friedlander (n/k/a Kaupthing
    Singer & Friedlander), Samuel Mahoney, Martin Hawkes, and/or John Hussey, and
    Helios, The Diversified Group Inc., Kilsture Ltd., Maddox Limited, Cumberdale
    Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy
    Financial Products Ltd., and/or Biosphere Finance Ltd.

    a.      Contracts between Nigel Scott and Helios.
    b.      Contracts between Nigel Scott and The Diversified Group Inc.
    c.      Contracts between Nigel Scott and Kilsture Ltd.
    d.      Contracts between Nigel Scott and Maddox Limited
    e.      Contracts between Nigel Scott and Cumberdale Investments Ltd. (including all
            subsidiaries).
    f.      Contracts between Nigel Scott and Cumberdale Holdings Ltd.
    g.      Contracts between Nigel Scott and Trilogy Financial Products Ltd.
    h.      Contracts between Nigel Scott and Biosphere Finance Ltd.
    i.      Contracts between Oliver Peck and Helios.

j.      Contracts between Oliver Peck and The Diversified Group Inc.

k.      Contracts between Oliver Peck and Kilsture Ltd.

l.      Contracts between Oliver Peck and Maddox Limited.

m.      Contracts between Oliver Peck and Cumberdale Investments Ltd. (including all subsidiaries).

n.      Contracts between Oliver Peck and Cumberdale Holdings Ltd.

o.      Contracts between Oliver Peck and Trilogy Financial Products Ltd.

p.      Contracts between Oliver Peck and Biosphere Finance Ltd.

q.      Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and Helios.

r.      Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and The Diversified Group Inc.

s.      Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and Kilsture Ltd.

t.      Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and Maddox Limited.

u.      Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and Cumberdale Investments Ltd. (including all subsidiaries).

v.      Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and Cumberdale Holdings Ltd.

w.      Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and Trilogy Financial Products Ltd.

x.      Contracts between Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) and Biosphere Finance Ltd.

y.      Contracts between Samuel Mahoney and Helios.

z.      Contracts between Samuel Mahoney and The Diversified Group Inc.

aa.      Contracts between Samuel Mahoney and Kilsture Ltd.

bb.      Contracts between Samuel Mahoney and Maddox Limited.

cc.      Contracts between Samuel Mahoney and Cumberdale Investments Ltd. (including all subsidiaries).

dd.      Contracts between Samuel Mahoney and Cumberdale Holdings Ltd.

ee.      Contracts between Samuel Mahoney and Trilogy Financial Products Ltd.

ff.      Contracts between Samuel Mahoney and Biosphere Finance Ltd.

gg.      Contracts between Martin Hawkes and Helios.

hh.      Contracts between Martin Hawkes and The Diversified Group Inc.

ii.      Contracts between Martin Hawkes and Kilsture Ltd.

jj.      Contracts between Martin Hawkes and Maddox Limited.

kk.      Contracts between Martin Hawkes and Cumberdale Investments Ltd. (including all subsidiaries).

ll.      Contracts between Martin Hawkes and Cumberdale Holdings Ltd.

mm.      Contracts between Martin Hawkes and Trilogy Financial Products Ltd.

nn.      Contracts between Martin Hawkes and Biosphere Finance Ltd.

oo.      Contracts between John Hussey and Helios.

pp.      Contracts between John Hussey and The Diversified Group Inc.

qq.      Contracts between John Hussey and Kilsture Ltd.

rr.      Contracts between John Hussey and Maddox Limited.

ss.    Contracts between John Hussey and Cumberdale Investments Ltd. (including all subsidiaries).

tt.    Contracts between John Hussey and Cumberdale Holdings Ltd.

uu.    Contracts between John Hussey and Trilogy Financial Products Ltd.

vv.    Contracts between John Hussey and Biosphere Finance Ltd.

7.    Payments to or from Nigel Scott, Oliver Peck, Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander), Samuel Mahoney, Martin Hawkes, John Hussey, Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., and/or Biosphere Finance Ltd., to or from Helios, The Diversified Group Inc., James Haber, Mox Tan, or John Huber.

a.    Payments to or from Nigel Scott to Helios.

b.    Payments to or from Nigel Scott to The Diversified Group Inc.

c.    Payments to or from Nigel Scott to James Haber.

d.    Payments to or from Nigel Scott to Mox Tan.

e.    Payments to or from Nigel Scott to John Huber.

f.    Payments to or from Oliver Peck to Helios.

g.    Payments to or from Oliver Peck to The Diversified Group Inc.

h.    Payments to or from Oliver Peck to James Haber.

i.    Payments to or from Oliver Peck to Mox Tan.

j.    Payments to or from Oliver Peck to John Huber.

k.    Payments to or from Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) to Helios.

l.    Payments to or from Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) to The Diversified Group Inc.

m.    Payments to or from Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) to James Haber.

n.    Payments to or from Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) to Mox Tan.

o.    Payments to or from Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander) to John Huber.

p.    Payments to or from Samuel Mahoney to Helios.

q.    Payments to or from Samuel Mahoney to The Diversified Group Inc.

r.    Payments to or from Samuel Mahoney to James Haber.

s.    Payments to or from Samuel Mahoney to Mox Tan.

t.    Payments to or from Samuel Mahoney to John Huber.

u.    Payments to or from Martin Hawkes to Helios.

v.    Payments to or from Martin Hawkes to The Diversified Group Inc.

w.    Payments to or from Martin Hawkes to James Haber.

x.    Payments to or from Martin Hawkes to Mox Tan.

y.    Payments to or from Martin Hawkes to John Huber.

z.    Payments to or from John Hussey to Helios.

aa.    Payments to or from John Hussey to The Diversified Group Inc.

bb.    Payments to or from John Hussey to James Haber.

cc.    Payments to or from John Hussey to Mox Tan.

dd.     Payments to or from John Hussey to John Huber.
ee.     Payments to or from Kilsture Ltd. to Helios.
ff.     Payments to or from Kilsture Ltd. to The Diversified Group Inc.
gg.     Payments to or from Kilsture Ltd. to James Haber.
hh.     Payments to or from Kilsture Ltd. to Mox Tan.
ii.     Payments to or from Kilsture Ltd. to John Huber.
jj.     Payments to or from Maddox Ltd. to Helios.
kk.     Payments to or from Maddox Ltd. to The Diversified Group Inc.
ll.     Payments to or from Maddox Ltd. to James Haber.
mm.     Payments to or from Maddox Ltd. to Mox Tan.
nn.     Payments to or from Maddox Ltd. to John Huber.
oo.     Payments to or from Cumberdale Investments Ltd. (including all subsidiaries) to Helios.
pp.     Payments to or from Cumberdale Investments Ltd. (including all subsidiaries) to The Diversified Group Inc.
qq.     Payments to or from Cumberdale Investments Ltd. (including all subsidiaries) to James Haber.
rr.     Payments to or from Cumberdale Investments Ltd. (including all subsidiaries) to Mox Tan.
ss.     Payments to or from Cumberdale Investments Ltd. (including all subsidiaries) to John Huber.
tt.     Payments to or from Cumberdale Holdings Ltd. to Helios.
uu.     Payments to or from Cumberdale Holdings Ltd. to The Diversified Group Inc.
vv.     Payments to or from Cumberdale Holdings Ltd. to James Haber.
ww.     Payments to or from Cumberdale Holdings Ltd. to Mox Tan.
xx.     Payments to or from Cumberdale Holdings Ltd. to John Huber.
yy.     Payments to or from Trilogy Financial Products Ltd. to Helios.
zz.     Payments to or from Trilogy Financial Products Ltd. to The Diversified Group Inc.
aaa.     Payments to or from Trilogy Financial Products Ltd. to James Haber.
bbb.     Payments to or from Trilogy Financial Products Ltd. to Mox Tan.
ccc.     Payments to or from Trilogy Financial Products Ltd. to John Huber.
ddd.     Payments to or from Biosphere Finance Ltd. to Helios.
eee.     Payments to or from Biosphere Finance Ltd. to The Diversified Group Inc.
fff.     Payments to or from Biosphere Finance Ltd. to James Haber.
ggg.     Payments to or from Biosphere Finance Ltd. to Mox Tan.
hhh.     Payments to or from Biosphere Finance Ltd. to John Huber.

8.     Payments to or from Samuel Mahoney and/or Martin Hawkes, to or from John Hussey, Nigel Scott, Oliver Peck, Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander), Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., and/or Biosphere Finance Ltd.

a.     Payments to Samuel Mahoney from John Hussey.
b.     Payments to Samuel Mahoney from Nigel Scott.
c.     Payments to Samuel Mahoney from Oliver Peck.

d.     Payments to Samuel Mahoney from Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander).

e.     Payments to Samuel Mahoney from Kilsture Ltd.

f.     Payments to Samuel Mahoney from Maddox Ltd.

g.     Payments to Samuel Mahoney from Cumberdale Investments Ltd. (including all subsidiaries).

h.     Payments to Samuel Mahoney from Cumberdale Holdings Ltd.

i.     Payments to Samuel Mahoney from Trilogy Financial Products Ltd.

j.     Payments to Samuel Mahoney from Biosphere Finance Ltd.

k.     Payments to Martin Hawkes from John Hussey.

l.     Payments to Martin Hawkes from Nigel Scott.

m.     Payments to Martin Hawkes from Oliver Peck.

n.     Payments to Martin Hawkes from Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander).

o.     Payments to Martin Hawkes from Kilsture Ltd.

p.     Payments to Martin Hawkes from Maddox Ltd.

q.     Payments to Martin Hawkes from Cumberdale Investments Ltd. (including all subsidiaries).

r.     Payments to Martin Hawkes from Cumberdale Holdings Ltd.

s.     Payments to Martin Hawkes from Trilogy Financial Products Ltd.

t.     Payments to Martin Hawkes from Biosphere Finance Ltd.

u.     Payments from Samuel Mahoney to John Hussey.

v.     Payments from Samuel Mahoney to Nigel Scott.

w.     Payments from Samuel Mahoney to Oliver Peck.

x.     Payments from Samuel Mahoney to Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander).

y.     Payments from Samuel Mahoney to Kilsture Ltd.

z.     Payments from Samuel Mahoney to Maddox Ltd.

aa.    Payments from Samuel Mahoney to Cumberdale Investments Ltd. (including all subsidiaries).

bb.    Payments from Samuel Mahoney to Cumberdale Holdings Ltd.

cc.    Payments from Samuel Mahoney to Trilogy Financial Products Ltd.

dd.    Payments from Samuel Mahoney to Biosphere Finance Ltd.

ee.    Payments from Martin Hawkes to John Hussey.

ff.    Payments from Martin Hawkes to Nigel Scott.

gg.    Payments from Martin Hawkes to Oliver Peck.

hh.    Payments from Martin Hawkes to Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander).

ii.    Payments from Martin Hawkes to Kilsture Ltd.

jj.    Payments from Martin Hawkes to Maddox Ltd.

kk.    Payments from Martin Hawkes to Cumberdale Investments Ltd. (including all subsidiaries).

ll.    Payments from Martin Hawkes to Cumberdale Holdings Ltd.

mm.    Payments from Martin Hawkes to Trilogy Financial Products Ltd.

nn.    Payments from Martin Hawkes to Biosphere Finance Ltd.

9.    The location of bank records of Biosphere Finance Ltd., Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd., and Cumberdale Holdings Ltd.
   a.    The location of bank records of Biosphere Finance Ltd.
   b.    The location of bank records of Kilsture Ltd.
   c.    The location of bank records of Maddox Ltd.
   d.    The location of bank records of Cumberdale Investments Ltd.
   e.    The location of bank records of Cumberdale Holdings Ltd.

10.    The transfer of records of Helios and The Diversified Group to Trilogy Financial Products Ltd., and the current location and custodian of those records.
   a.    The transfer of records of Helios to Trilogy Financial Products Ltd.
   b.    The transfer of records of The Diversified Group to Trilogy Financial Products Ltd.
   c.    The current location of records of Helios to Trilogy Financial Products Ltd.
   d.    The current location of records of The Diversified Group to Trilogy Financial Products Ltd.
   e.    The custodian of records of Helios to Trilogy Financial Products Ltd.
   f.    The custodian of records of The Diversified Group to Trilogy Financial Products Ltd.

# Exhibit T

## Herbert Smith

Search: Enter you

| Home | About us | Locations | Services | Publications | People | News | Careers |

Home > People | Christopher Rees

Printe



# Christopher Rees

## Partner, co-head of the TMT group
London

email
**+44 20 7466 2299**

Christopher co-heads Herbert Smith's Technology Media and Telecoms practice group. He has nearly 30 years experience across a broad range of transactional, advisory and contentious matters, mostly in the technology sector. His practice covers system supply, outsourcing, M&A, IPOs, joint venture and financing transactions. He has guided clients through High Court litigation and mediation as well as ICC arbitration. Christopher has represented many of the world's leading companies including Applied Materials, BAT, BP, Groupe Bull, EMC, Huawei, IMS Health, PwC, Toshiba and Time Warner and has acted for government agencies such as the Department of Health, the Department of Trade and Industry and the Nuclear Decommissioning Authority.

Christopher has been ranked in the top three of the world's IT lawyers (Euromoney "Best of the Best") and is a regular writer and lecturer on the subject of Data Privacy and Information Law. He is the co-editor of "Database Law" and has contributed chapters to Law Society publications on Data Protection and Freedom of Information. Christopher has been the Chairman of the Computer and Database Committee of the International Bar Association since 1996 and is a Trustee of the IBA Charitable Trust.

### Credentials

> outsourcings for **Cable & Wireless, EMC, GE Capital, AGCO, Northern Regional Health Authority, NHS Executive** and **Sita**

> **AstraZeneca, Scottish & Southern** and **Watson Wyatt** on large systems acquisitions

> setting up the **aircraft industry's** global on-line registry for the filing of financial interests in aircraft

> mandates for the acquisition or sale of companies or businesses from leading high tech businesses such as **Applied Materials, Cadence, EMC** and **Phillips**

> **Groupe Bull** in the successful two year long defence of the action brought against it by Kwik-fit, which involved one of the first mediations of a system supply dispute

> data privacy reviews for **Colgate, IPC** and **IMS Health** (involving 11 jurisdictions over a three year project) and **Toshiba**

| Practic |
| Mediati |
| ADR |
| Merger: |

| Indust |
| Accoun |
| and bus |
| Content |
| Energy |
| Financi: |
| Health |
| Life scie |
| Media a |
| Networl |
| Regulat |
| Techno |
| TMT |
| Transac |



Herbert Smith in association with
Gleiss Lutz and Stibbe

legal notices and disclaimers | privacy | sitemap | contact us | accessibility policy | © Herbert Smith LLP 2007