UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY BRIEF IN FURTHER SUPPORT OF
UNITED STATES' MOTION FOR ISSUANCE OF LETTERS ROGATORY
REQUESTING INTERNATIONAL JUDICIAL ASSISTANCE**

In making its opposition, the plaintiff ignores the United States' detailed evidence,

mischaracterizes the United States' requests, mischaracterizes the issues in this case,

mischaracterizes the foreign evidence-gathering standards, and continues to wrongly assert that

Samuel Mahoney's foreign associates and collaborators have no relevant evidence to offer. The

United States has amply demonstrated the relevance of the foreign evidence we seek, and further

demonstrates it in this reply.

**A.   Introduction**

In our opening memorandum, we set forth in minute detail evidence demonstrating that

the promoters of the FDIS transaction engaged in extraordinary efforts to shroud their funding of

the two purported foreign partner/investors, Samuel Mahoney and Martin Hawkes, in this tax-

shelter scheme. We stressed that the various foreign evidence we sought was critically relevant

to prove that the promoters were in fact paying Mahoney and Hawkes to participate in these

purported FDIS partnerships. Rather than attempting to counter our extremely specific evidence

with evidence of its own, plaintiff ignores our evidence entirely and instead falls back on its repeatedly-rejected position that the United States has failed to show a requisite nexus between virtually all of our requested foreign evidence and Fidelity International. Put simply, plaintiff is renewing its twice-rejected argument that evidence relating to the design, development, and implementation of the FDIS tax strategy is not relevant to the issues in this case unless it can be shown that such evidence directly relates to its specific FDIS transaction. After extensive briefing and careful deliberation, the Court previously rejected this argument and, we respectfully submit, should do so once again. Furthermore, the United States demonstrates that this evidence directly relates to Fidelity International.

Specifically, plaintiff describes Martin Hawkes, John Hussey, Biosphere Finance Ltd., Singer & Friedlander, Trilogy Financial Products, Kilsture Ltd., Maddox Ltd., Nigel Glazier Scott, and Oliver Peck as complete strangers to Fidelity International. It thus concludes that the United States is on a fishing discovery expedition in two foreign jurisdictions. With the exception of obtaining a limited amount of foreign evidence as to Mr. Mahoney, plaintiff argues that our remaining requests should be denied because they are at odds with the purpose of letters rogatory, which is to assist a party in obtaining evidence in a foreign jurisdiction for use at trial and not to engage in American-style discovery. (Pl. Resp. at 1 ,3-5, 10.) This allegation is meritless. The foreign evidence we seek with respect to the Irish and Manx (*i.e.*, of the Isle of Man) individuals and entities is highly specific and is directly relevant to whether Mahoney was a sham partner in plaintiff's FDIS transaction as well as multiple other issues in this case.

Significantly, the applicable test is whether the information requested may help the United States' defense at trial. *See, United States v. Kincaid*, 712 F.2d 1, 4 (1st Cir. 1983). In

2443177.1

*Kincaid* it was held that there was no error in a district court's refusal to authorize the issuance of letters rogatory where the information requested was irrelevant. The party seeking the foreign evidence in *Kincaid* sought to show that the British neither consented to the search nor asked the United States to check the ship's registration. *Id.* The First Circuit held that there was no error because the evidence seized during the high seas search at issue in *Kincaid* would have been admissible even if Britain had not consented to the search. *Id.* In short, the standard in this Circuit in determining the appropriateness for the issuance of letters rogatory appears to be whether the foreign evidence can be shown to be relevant to the issues that a party seeks to prove at trial.[1]

This Court has repeatedly ruled that it will allow the United States' discovery in order to develop and present evidence at trial relating to the design, development, and implementation of the FDIS transaction. This evidence will in part show that the promoters implemented 46 FDIS transactions in 2001 and 12 such transactions in 2002, and that it arranged for Samuel Mahoney or Martin Hawkes to be the purported foreign partner in each of these deals. While the Court has not yet ruled on the admissibility of this evidence, it is sufficient for purposes of this motion that the United States represents, as it has done, that it plans to present such pattern and other evidence at trial. That evidence relates directly to this case.

Based on our detailed presentation in our opening memorandum and as further supported by the following discussion, it is without question that the requested letters rogatory to the

---

[1] *See also,  DBMS Consultants v. Computer Assocs. Int'l,*, 131 F.R.D. 367, 369 (D. Mass. 1990), where this Court held that, "[c]ourts and commentators take the position that some good reason must be shown by the opposing party for a court to deny an application for a letter rogatory." *Id., citing B & L Drilling Electronics v. Totco*, 87 F.R.D. 543, 545 (W.D.Okla.1978) and 26A C.J.S. Depositions § 28, at 318 (1956). Plaintiff has made no such showing here.

2443177.1

individuals and entities in Ireland and Isle of Man are directly relevant to the United States' proof at trial that Samuel Mahoney was nothing more than a sham partner, that Fidelity International was a sham partnership, that Egan's specific FDIS transaction was meticulously preplanned and that this tax shelter was utterly lacking in economic substance.  To further support these respective positions, and in rebuttal to plaintiff's reliance upon the Declaration of James Haber (Pl. Ex. D), the United States relies upon its rebuttal papers to the Haber Declaration, including Govt. Exs. R-1 through R-68, and the Second Declaration of John Lindquist being filed herewith, to which is attached Appendix E and Govt. Exs. R-69 through R-72.[2]

**B.    The Requested Letters Rogatory are Relevant to the United States' Proof that Samuel Mahoney was a Sham Partner, and that Fidelity International was a Sham Partnership and Lacked Economic Substance.**

The foreign evidence will round out the United States' proof at trial that Samuel Mahoney was not a real partner, Fidelity International was not a real partnership, and this tax shelter lacked economic substance.  As detailed in the United States' opening papers, DGI's own financial records are lynchpin proof that DGI's development, marketing, and implementation of the FDIS tax shelter were part of a massive scheme.  DGI's own records, Govt. Exs. 50 and 51,[3] show that DGI not only fully funded the purportedly independent foreign partners, Samuel Mahoney and Martin Hawkes, but it also paid them $2 million for playing the role of a

---

[2]  The Haber Declaration, marked by plaintiffs as Ex. D, was filed by DGI in opposition to the United States' Motion to Compel DGI to produce documents.  The United States' rebuttal papers and rebuttal exhibits, which are also referenced herein, including Govt. Exs. R-1 through R-68, are not being refiled herewith because that matter is in the process of being transferred to this Court as a related matter.  However, a complete courtesy copy of those motion papers has been sent to the Court.

[3]Attached to the United States' opening brief.

partner/investor on these deals. As shown by Government Exhibit 51, the reality was that these purported foreign partners/investors were neither real partners nor real investors, but instead were being handsomely paid to allow their names and foreign residency to be misused on these abusive transactions.

In an attempt to challenge the validity of Government Exhibit 51, plaintiff cites and attaches the Declaration of James Haber, the president of DGI, (Haber Decl. at ¶ 20, Pl. Ex. D.) In his Declaration Haber attested that "this never happened" and asserts that Ex. 51 "*was prepared by Alpha for its own internal purposes, to compute the approximate overall profit on the transactions on a pro forma assumption that the foreign partners would be paid these amounts*." The sequence of communications that preceded Exhibit 51, which include an email dated May 3, 2002 by Haber with a spreadsheet attachment showing Alpha's net profit share, demonstrates that Haber's allegation is demonstrably false. Indeed, these prior communications show that Haber reviewed and then endorsed the financial information in the spreadsheet attached to his email:

1.     By email dated March 8, 2002, Ivan Ross of Alpha sent James Haber an email on the subject "Fees" with a spreadsheet attachment named "2001-Customers-Ivan-#2xls" stating:

> Attached is the fee schedule excluding Egan and BDO. This schedule, as well as the other schedule I just sent you, does not include PDM and CTN. It also assumes we would own 50% of all funds including RM Porfolio and co-investor equity. This is based on each of us getting fully reimbursed on our investments in these funds out of the fees.

(See email dated 3/18/02, with attachment, Govt. Ex. R-64.) Egan was excluded because he had not yet paid. Egan's fee was not payable until he received an opinion blessing the

2443177.1

transaction.  (See Haber letter to RJ Ruble dated 1/9/02, Govt. Ex. R-24.)

2.       By email dated March 8, 2002, James Haber responded to the email of Ivan Ross,

stating:

>       Since we are all getting reimbursed for our investments, don't you think the split should be 40:40:20?  *I won't have time to review the accounting closely until Wednesday* because I'll be with Wainwright all day on Monday and with Ira Greenberg in Philadelphia all day on Tuesday.

(See email dated 3/8/02, with attachment, Govt. Ex. R-65) (Emphasis added).

3.       By email dated March 15, 2002, at 10:50 a.m., Ron Buesinger of Alpha sent

James Haber and Ivan Ross an updated version of the spreadsheet Ivan Ross sent to

Haber on March 8, 2002.  The spreadsheet file had essentially the same file name, now

referred to as "2001-Customers-Ivan-3-15-02.xls."  In his email, Buesinger asked Haber

to "Please Review."  (See email dated 3/15/02, 10:50 a.m., with attachment, Govt. Ex. R-

66.)

4.       By email dated March 15, 2002, at 2:18 p.m., Ron Buesinger sent James Haber

and Ivan Ross a further updated version of the spreadsheet file named "2001-Customers-

Ivan-3-15-02.xls" again with the request, "Revised.  Please Review."  (See email dated

3/15/02, 2:18 p.m., with attachment, Govt. Ex. R-67.)

5.       By email dated May 3, 2002, James Haber returned to Ron Buesinger of Alpha the

spreadsheet file that Buesinger forwarded to Haber on March 8, 2002 at 2:18 p.m.  The

returned spreadsheet still had the same file name of "2001-Customers-Ivan-3-15-02.xls".

In his email, Haber stated:  *"This is the one I worked off."*  (See email dated 3/15/02, with

attachment, Ex. R-68 (emphasis added) (previously filed as Ex. 51).)

6

These communications leave no doubt that Haber not only carefully reviewed and endorsed these financial workpapers, but also that Mahoney and Hawkes did not fund their own purported "investments," were paid a huge fee for their services, and were not independent investors but mere nominees of the promoters, including DGI and Haber, with no money at risk.

There is an array of other evidence to support the fact that the promoters were paying a fee to Mahoney and Hawkes to buy their participation in these tax shelters. For example, by email dated July 10, 2002, Mox Tan of Helios reminded James Haber that DGI and Helios could "do deals" with Martin Hawkes and Samuel Mahoney, and advised him of what to expect as their fee:

> [Orrin Tilevitz] indicated that we would be no better off working with [Jim Lewis] than with a foreigner (Martin or Sam), and in fact with Martin and Sam we know we can do deals, and we know what they expect from a pricing perspective.

(See email dated July 10, 2002, Govt. Ex. R-48.) By email dated December 6, 2002, Martin Hawkes wrote to James Haber proposing "a reckoning on fees in relation to fund structures, Irish companies and Trilogy transactions." (See chain email dated 12/6/02, Govt. Ex. R-53.) By email dated December 18, 2002, Haber wrote to Samuel Mahoney and Martin Hawkes stating "Trilogy monies are to be held until tax opinions are delivered to clients and a final accounting is compiled (usually the end of February)." (See chain email dated 12/18/02, Govt. Ex. R-54.) These emails confirm that Mahoney and Hawkes were paid a fee on the 2001 and 2002 FDIS tax shelter deals. Given this contemporaneous evidence, the United States is certainly entitled to present direct evidence from the foreign individuals and entities who collaborated in this enterprise.

Those foreign collaborating witnesses have evidence, and the United States has

7

demonstrated a nexus between them and the domestic promoters and customers. We have

evidence that the proposed outlines for the FDIS transactions were emailed to Biosphere Finance

for FDIS transactions involving Mahoney as a purported foreign investor and for FDIS

transactions involving Hawkes as a purported foreign investor (See email dated 11/16/01, with

four attached FDIS outlines, Govt. Ex. R-72).[4]  That these outlines were shared with Mahoney

and Hawkes through Biosphere Finance further supports the fact that Biosphere Finance, and all

of its directors, including Mahoney, Hawkes, and Hussey, have relevant information concerning

not only the Fidelity transaction, but also the preplanned steps of all of the FDIS transactions.

We have even traced the foreign bank accounts used by Mahoney and Hawkes to wire

payments for the FDIS transactions.  As detailed in Appendix E, the wire payments to and from

Mahoney and Hawkes were made through accounts at the Singer & Friedlander merchant bank

(n/k/a Kaupthing Singer & Friedlander) on the Isle of Man.  These included the following four

accounts (as disclosed in discovered documents):

> Sub A/c:Singer & Friedlander (Isle of Man); Account no: 30123012; Reference:
> 11270012
>
> Sub A/c:Singer & Friedlander (Isle of Man); Account no: 30123012; Reference:
> The **H&M Joint Venture -** account number 20195700 (emphasis added)
>
> Sub A/c:Singer & Friedlander Limited; Account no: 30123012; Reference: S&F
> Client A/C NO. 11270025
>
> Sub A/c:Singer & Friedlander (Isle of Man); Reference: Trilogy Investments
> Limited; Account # 20282910

--------------------------------

[4]These proposed outlines of transaction appears to have served as a substitute for an
engagement letter. (See Govt. Ex. R-4.)   As detailed in the United States' opening papers, and
summarized in Appendices C and D, just such an outline was prepared for each of the 56 FDIS
transactions.

As summarized in Appendix E, it appears that the first traunch of FDIS transactions utilized Singer & Friedlander Acct. 11270012.  The second traunch of FDIS transactions utilized Singer & Friedlander Acct. 20195700, which was also referenced as "The H&M Joint Venture" account. The third traunch of FDIS transactions, which included the Egan FDIS transaction as well as at least two other FDIS transactions, utilized Singer & Friedlander Acct. 11270025.

It appears, based upon the following, that all of these accounts were controlled through Biosphere Finance: 1) the wire instructions indicate that both Hawkes and Mahoney used Account numbers 11270012 and 20195700 to receive payments on FDIS transactions; 2) Biosphere Finance is a listed recipient for the emailed wire instructions for one of the FDIS transactions implemented through Account # 11270012; 3) Biosphere Finance is also a listed recipient for one of the FDIS transactions through Account # 11270025; 4) The phrase "H&M" in the name of the "H&M Joint Venture" Account # 20195700 appears to be a reference to Hawkes and Mahoney; 5) Biosphere Finance similarly appears to be a joint venture of Hawkes and Mahoney; 6) the H&M Joint Venture Account # 20195700 was used to implement both 2001 and 2002 FDIS transactions; and 7) two of the 2002 FDIS transactions utilized both the "H&M Joint Venture" Account # 20195700 and the "Trilogy Investments Limited" Account # 20282910 for wire transfers, suggesting that the funds in these two accounts were commingled.  The above further evidences not only the integral role of Hawkes and Mahoney in these transactions as co-promoters, but also the connection between Biosphere Finance and Singer & Friedlander.

Here, Hawkes, Mahoney, and Hussey were the three directors of Biosphere[5] and thus each would have personal knowledge of the FDIS payments routed through Biosphere's Singer &

---

[5]  See Govt. Ex. 55, Form B1 for Biosphere Finance.

2443177.1

Friedlander accounts on the Isle of Man.  Nigel Scott and Oliver Peck were both employees of

Singer & Friedlander Isle of Man and both appear to have been involved in the structuring and

transfer of funds through these four accounts.  Therefore, based on bank records, they would

have knowledge of the uses of these four accounts, including the sources of any wire deposits

and payments relating to the FDIS transactions.   Based upon their utilization of these accounts,

it is clear that Hawkes and Mahoney were representing themselves to be and in fact were joint

venturers on the FDIS transactions.  Thus, even though Martin Hawkes does not purport to have

been a partner in Fidelity International, his participation as a joint venturer with Samuel Mahoney

is obviously highly relevant to the United States' proof that Mahoney was a sham partner.

Moreover, Nigel Scott and Oliver Peck, who were involved in establishing and maintaining

Mahoney's and Hawkes's joint-venture bank accounts, would also have personal knowledge of

Mahoney's and Hawkes's joint venture arrangement.  As such, they also would have relevant

evidence to the United States' position that Mahoney was a sham partner.

        Nigel Scott, Oliver Peck, and Singer & Friedlander are directly related to FDIS, including

the FDIS tax shelter purchased by Richard Egan.  They were fully immersed in the foreign aspect

of the tax shelters.  As explained in detail in both this reply and in the United States' opening

brief, the money flowed between the United States and the foreign entities through Singer &

Friedlander.  Nigel Scott, while an employee of Singer & Friedlander, received on behalf of tax-

shelter participants hundreds of letters and other correspondence.[6]  That correspondence was

usually sent to an Isle of Man address shared by Singer & Friedlander.  Nigel Scott was

---

        [6]The United States has received from multiple third parties and produced to the plaintiff
hundreds of documents showing Nigel Scott's and Singer & Friedlander's involvement.

simultaneously an employee of Singer and Friedlander and a principal of Cumberdale Holdings,

Maddox, and Kilsture (which is also the entity which, according to Mahoney, fronted

approximately half of Mahoney's "investment" in Fidelity International).  Also at that time,

Oliver Peck was Managing Director of Singer & Friedlander Isle of Man.[7]  As Managing

Director of Singer & Friedlander and a manager of Nigel Scott, there is little doubt that Oliver

Peck has valuable evidence to offer here.

Finally, even if these individuals and entities did not participate directly in structuring

Egan's FDIS transaction, they all have relevant evidence regarding the joint venture arrangement

of Mahoney and Hawkes.  That joint venture arrangement lies at the heart of one of the

fundamental issues in this litigation: *viz.*, whether Mahoney was a real or sham partner/investor

in Fidelity International.  That arrangement is equally relevant to the United States' proof that

Egan's FDIS transaction was preplanned from the outset to adhere meticulously to a very precise

order of steps, and also that Fidelity International was woefully lacking in economic substance.

---

[7]The plaintiff suggest that all relevant evidence from Singer & Friedlander is already subject to subpoena, and attaches the Singer & Friedlander subpoena to its response as Exhibit E. However, no documents were produced in response to that subpoena.  The subpoena recipient, Kaupthing New York Inc., a sibling of Singer & Friedlander, refused service.  The United States has not moved to compel production because Kaupthing New York is a domestic subsidiary of Kaupthing Bank hf, and Kaupthing Singer & Friedlander is a U.K. subsidiary of that bank.  As such, the United States does not believe it can successfully compel production from the New York subsidiary.

It is unsurprising that there are few documents mentioning Oliver Peck by name. Nonetheless, the plaintiff disingenuously argues that Oliver Peck cannot have relevant information because it only finds one document mentioning Oliver Peck.  While there is more in the productions than that one document, and hundreds more mentioning Singer & Friedlander, the number of documents already produced and mentioning a witness by name cannot be the test for whether the witness has evidence to offer.

**C.      The Letters Rogatory Are Just and Appropriate and Not a Fishing Expedition.**

Most of the plaintiff's remaining arguments stem from its mischaracterizations of the available evidence, as just discussed, and of this case.  Once it incorrectly labeled the foreign witnesses as irrelevant, the plaintiff simply threw out the litany of available objections to letters rogatory seeking evidence from those witnesses.  Once its mischaracterizations are corrected, the plaintiff is left without any valid argument against the issuance of the proposed letters rogatory.

First, plaintiff objects that the proposed letters rogatory are not "Just and Appropriate" for a variety of alleged reasons including undue burden and collateral inquiry.  (Pl. Resp. at 16-24.)  As discussed above, these allegations rest on the incorrect allegation that the foreign witnesses have no evidence to offer.  Despite the plaintiff's contrary assertions, there is a demonstrated nexus between Martin Hawkes, John Hussey, Biosphere Finance Ltd., Singer & Friedlander, Trilogy Financial Products, Kilsture Ltd., Maddox Ltd., Nigel Glazier Scott, and Oliver Peck. There is also a demonstrated nexus between those entities and this case.

Second, plaintiff's reliance on *State of Minnesota v. Philip Morris Inc*. is misplaced. (Pl. Resp. at 13; Ex N.)  That U.K. case merely stands for a proposition that we do not dispute– that a "fishing expedition" is not allowed.  That is why the United States is seeking specific trial evidence based on a highly detailed set of facts.  That is also why the proposed letters rogatory provide a recitation of facts necessary for the foreign tribunals to understand the nexus between the foreign witnesses and this case.

Third, in its proposed letters rogatory, the plaintiff mischaracterizes the issues in this case as "whether the *proposed* adjustments to the partnership items of Fidelity International . . . were proper" and "whether the penalties asserted . . . were proper . . . ."  (Pl. Ex. M at 2.)  (Emphasis

12

added.)  The plaintiff knows quite well that the adjustments have been made, and are therefore no longer proposed.  The plaintiff also knows, as the Court recently stated, that this is a *de novo* proceeding and not a review of the adjustments made by the IRS at the administrative level.  (*See* May 2, 2007 Tr. at 17.)  In this proceeding, the plaintiff has the burden of showing that the partnership items on the return of Fidelity International were proper.  The plaintiff has alleged that its claimed tax treatment is correct.  Consequently, the United States is entitled to defend that allegation.  It intends to do so by presenting evidence of, among other things, a sham partner, a sham partnership, and a complete lack of economic substance.

**D.      Plaintiff's Reliance on Foreign Case Law Is Similarly Misplaced.**

Similarly misleading is the plaintiff's citation of *Novell Inc. v. M.C.B. Enterprises*, an Irish case attached to plaintiff's response.  (Pl. Ex. Q.)  The Irish court allows a party to obtain evidence in accordance with guidelines similar to those of the U.K. courts.  It allows a party to obtain "evidence to be directly used" but not "documentary information to enable it to obtain evidence."  *Id.* at 11.  The United States has demonstrated that the evidence sought is for direct use.  Furthermore, the Irish court went further than would be necessary here in its deference to foreign requests.  It adopted the following principles: (1) It is important to accede to letters of request by foreign courts, and particularly important "'where the litigation arises out of a fraud practiced on an international scale;'" and (2) An Irish court will generally not refuse a request simply because evidence obtained may be used in other proceedings.  Here, while there may very well be fraud, the United States is seeking evidence of an abusive tax shelter.  It also intends at this point to use the evidence obtained in Ireland only in this case.  Given the Irish tribunal's adopted principles, it is clear that the United States is well within Ireland's limits in making its

2443177.1

request.

The United States' requests are also squarely within the boundaries of the Isle of Man's law, which corresponds with the law of England on this issue.  As described by the U.K. courts, "fishing" is the "search for material in the hope of being able to raise allegations of fact, as opposed to the elicitation of evidence to support allegations of fact which have been raised with bona fide and adequate particularization."  *Id.* at 4-5.   Here, the United States has made highly specific allegations and demonstrations of fact.  It seeks now to obtain foreign evidence to establish those facts at trial.

**E.     The United States's Proposed Letters Rogatory Are Perfectly Proper**.

Finally, the plaintiff's complaints with respect to the form of our proposed letters rogatory are meritless.  Plaintiff takes issue with the breadth of the factual presentation to the foreign tribunals, and proposes instead to remove all facts– even those reported as allegations of fact– from the requests.  (Pl. Resp. at 7-10; Ex. M.)  The plaintiff's approach would deprive the foreign tribunals of any context for the requests.  Stripped of all essential background facts and our fundamental factual allegations, the requests would then appear to be more like plaintiff's asserted improper fishing expedition than what they are– the proper seeking of trial evidence.  As such, they would most assuredly be denied, which would be the only purpose served by adopting the plaintiff's suggested revisions.

Contrary to plaintiff's assertions, it is not improper to set forth factual allegations in letters rogatory.  Such factual allegations are typically essential to the foreign court's understanding of the reasons for the request.  Rather, what is improper is to mistake or unfairly summarize a party's allegations  *See, e.g., Globe X. Mgmt., Ltd. v. Cinar Corp*, No. 03-1831,

2004 U.S. Dist. LEXIS 21480, at *2 (E.D.Pa. 2004). There the plaintiff likewise objected to letters rogatory upon the grounds that it did not "fairly summarize the claims of Plaintiffs," and "is a loaded one consisting of numerous assertions/characterizations of fact by counsel for Defendants which have not been found as fact by the Court, nor has the Court had opportunity to make any such determination." *Id*. After the letter was amended to accurately reflect the plaintiff's allegations, however, the court found these revisions to be appropriate because they accurately summarized the plaintiff's contentions. Here, the United States has not mischaracterized either the plaintiff's or our factual contentions. To the contrary, we have carefully and accurately set forth our key series of factual contentions which clearly establish the need and justification for this foreign evidence gathering.

Indeed, this case has a number of issues and therefore requires the gathering of a wide breadth of evidence for trial. As the *Philip Morris* court stated, "the wider the scope of the matters on which the examination is sought, the more necessary it is for particulars to be given so as to indicate to the witnesses the scope of the matters on which they can lawfully be examined." *Minnesota v. Philip Morris* at 12. While the Isle of Man tribunal will not "examine the issues . . . and the circumstances of the case with excessive particularity for the purpose of" determining relevance and admissibility of the requested evidence," *Id.* at 5, it does require a certain level of background information for each witness to ensure that the requests are pursing a proper line of inquiry.

The United States' proposed letters rogatory give ample facts, accurate factual allegations and a correct recitation of governing law for the foreign tribunals to make an educated decision to

grant the proposed requests.[8]  Nevertheless, in order to attempt to address any possible concerns

regarding the form of the letters rogatory, while continuing to provide sufficient facts and law to

the foreign tribunals, the United States has amended its proposed letters rogatory, which are

attached.

**F.      Submission of the Isle of Man Request to the Appropriate Court Through Foreign
         Counsel is Expressly Envisaged by Isle of Man Law.**

Isle of Man law specifically provides for submission of the letter rogatory to the Isle of

Man court by application of local counsel.[9]  The Evidence (Proceedings in Other Jurisdictions)

Act 1975 ("the 1975 Act") of the U.K. parliament was enacted to enable U.K. courts to assist

foreign courts in obtaining evidence required for cases in foreign jurisdictions.  Section 2 of the

1975 Act gives U.K. courts the power to "make such provision for obtaining evidence . . . as may

appear to the court to be appropriate for the purpose of giving effect to the request in pursuance

of which" an application for judicial assistance is made.  The 1975 Act was applied to the Isle of

Man by Order in Council (SI 1979 No. 1711).  Applications to an Isle of Man court under the

provisions of the 1975 Act are made according to procedures described in an Isle of Man High

Court Directive, number IV(3), which provides as follows:

---

[8]Also, contrary to plaintiff's position, it is perfectly appropriate to cite in the letters
rogatory applicable law governing the issues to be resolved.  The plaintiff's reliance on the
United States Department of States' web site failed to note that the website suggested that a
letters rogatory should contain "a list of those laws of the sending state which govern the matter
pending before the court in the receiving state."  *See*,
http://www.travel.state.gov/law/info/judicial/judicial_683.html (last visited May 1, 2007); (Pl.
Resp. Ex. G.)

[9]According to local counsel retained by the United States, this is the expected procedure,
and it is unclear whether an alternative procedure, such as transmission of letters rogatory
directly from a U.S. court to an Isle of Man court as proposed by the plaintiff, is available in the
Isle of Man.

16

2443177.1

> . . . all applications for an Order under section 2 of the [1975] Act shall be made ex
> parte by Petition to the Common Law Division and must be supported by affidavit.
> In appropriate cases an order will then issue from the court for the examination of a
> witness before a person appointed by the Court.

The United States has moved for issuance of the Isle of Man letter rogatory in accordance with

these provisions, to be submitted to the Isle of Man court by local counsel retained by the United

States.  Upon issuance of this letter rogatory, the United States will arrange for the ex parte

petition with the appropriate affidavit.

**G.     The United States is Permitted to Choose its Solicitor in the Isle of Man**

Finally, plaintiff objects that the United States retained Herbert Smith LLP as solicitor in

the Isle of Man, and that Herbert Smith formerly represented EMC Corporation.  While there

appears to be no conflict, upon plaintiff's objection, the United States and Herbert Smith LLP

agreed that Herbert Smith will not continue its representation of the United States in this matter.

The United States has retained other counsel.  Plaintiff is not otherwise entitled to participate in

the United States' selection of its counsel.

**Conclusion**

Plaintiff's objections to the United States' proposed letters rogatory are without merit

both as to form and substance.  The United States' proposed letters rogatory are well-founded

and seek evidence for use at trial.  The trial evidence is intended to and will show that Fidelity

International was a sham partnership with a sham foreign partner, and was void of economic

substance.  While the original proposed letters rogatory were proper and well-founded, the

United States is submitting with this reply revised letters rogatory in an attempt to address the

plaintiff's concerns.

Dated:   May 4, 2007

                                          Respectfully submitted,

                                          MICHAEL J. SULLIVAN
                                          United States Attorney

                                           /s/ Dennis M. Donohue
                                          DENNIS M. DONOHUE
                                          CHIEF SENIOR LITIGATION COUNSEL
                                          OFFICE OF CIVIL LITIGATION
                                          Tax Division, U.S. Department of Justice
                                          P.O. Box 403, Ben Franklin Station
                                          Washington, D.C.  20044
                                          Telephone: (202) 307-6492
                                          Facsimile: (202) 307-2504
                                          E-mail: dennis.donohue@usdoj.gov

                                          JOHN A. LINDQUIST
                                          BARRY E. REIFERSON
                                          HEATHER L. RICHTARCSIK
                                          Trial Attorneys, Tax Division
                                          U.S. Department of Justice
                                          P.O. Box 55, Ben Franklin Station
                                          Washington, D.C.  20044-0055
                                          Telephone: (202) 307-6561
                                          Facsimile:  (202) 514-5238
                                          E-mail: john.a.lindquist@usdoj.gov
                                                      barry.e.reiferson@usdoj.gov
                                                      heather.l.richtarcsik@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants identified on the Notice of Electronic Filing and copies will be sent to
those indicated as non registered participants on May 4, 2007.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

2443177.1