UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)   Civil Nos. 05-40151-FDS (D. Mass.)<br>)               06-40130-FDS (D. Mass.)<br>)<br>)   Judge Saylor<br>)<br>)<br>)<br>) |

**REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTER ROGATORY)**

The United States District Court for the District of Massachusetts presents its compliments to the appropriate judicial authority of Ireland, and requests international judicial assistance to obtain evidence to be used in a civil proceeding before this court in the above-captioned matter.

This court requests the assistance described herein as necessary in the interests of justice. This court requests that the appropriate judicial authority of Ireland compel the appearance of Samuel Mahoney, Martin Hawkes, and John Hussey to give testimony and produce documents.

**Witnesses to be Served**

1.   Samuel Mahoney
     123 Howth Road         and/or     43 Ailesbury road
     Dublin 3                          Dublin 4
     Ireland                           Ireland

2.   Martin Hawkes
     5 Bushfield Avenue
     Donnybrook

>   Dublin 4
>   Ireland

3.   John Hussey
>    Taormina, Silchester Road
>    Glenageary
>    Co. Dublin
>    Ireland

## Facts

This case involves a set of transactions occurring in 2001 and engaged in by a U.S. taxpayer in a purported partnership with, among others, an Irish citizen named Samuel Mahoney.[1] That purported partnership is called Fidelity International Currency Advisor A Fund ("Fidelity International"). Mr. Mahoney is alleged to have contributed $651,000 for a 93% share of the common interests in the "partnership." Shortly after making his alleged contribution, Mr. Mahoney sold 88% of his common interests in the "partnership" to the U.S. taxpayer for approximately half of what he had "contributed." Samuel Mahoney claims that his $651,000 contribution to Fidelity International was made on his behalf by Kilsture Ltd., an Isle of Man entity, of which he claims to be an employee.

On its U.S. partnership tax return for 2001, Fidelity International allocated the purported gains on this set of transactions to Mr. Mahoney as the foreign "partner," and the purported losses to the U.S. taxpayer. Based on the partnership tax return, Samuel Mahoney made an alleged profit of approximately $163.8 million on the transactions. Because Mr. Mahoney was not a U.S. citizen or resident, he was not required to pay U.S. taxes on that alleged profit. From the same set of transactions, the U.S. taxpayer allegedly lost more than $158 million. The United

---

[1] As discussed later, the United States alleges that identical sets of these marketed transactions were engaged in by 57 other U.S. taxpayers.

States's taxing authority disallowed the claimed losses, adjusting the partnership items for U.S. tax purposes. The plaintiff seeks readjustment of the partnership items for tax purposes, pursuant to Title 26 of the United States Code, Section 6226.

One of the primary legal issues in this case is whether Samuel Mahoney is a real partner in Fidelity International. On this issue, the United States contends that Mr. Mahoney was not a real partner in Fidelity International because he did not fund his own investment in this company. The United States alleges that the U.S. promoters of this transaction, in addition to funding Mr. Mahoney's investment, also paid him a fee to allow his name and foreign residency to be misused on these transactions. The United States further alleges that the U.S. promoters paid these amounts to Mr. Mahoney by way of various joint-venture accounts which were in the name of Mahoney and his business partner, Martin Hawkes, also an Irish Citizen. The United States alleges that these accounts were held at the Singer & Friedlander merchant bank (n/k/a Kaupthing Singer & Friedlander) on the Isle of Man. According to the United States, the account holder of these joint-venture accounts was an Irish company by the name of Biosphere Finance Ltd, of which Mahoney, Hawkes, and John Hussey, another Irish citizen, were directors.

Another primary legal issue in this case is whether Fidelity International, in which Samuel Mahoney was purportedly a partner, should be recognized as a partnership for U.S. tax purposes. A partnership will be respected for U.S. tax purposes only if the partners in good faith and acting with a business purpose intend to join together in the conduct of the enterprise. *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949). The United States alleges that Mr. Mahoney had no intent to join together in the conduct of Fidelity International and further that Fidelity International had no non-tax business purpose. The determination of intent of the

partners requires testimonial and documentary evidence from the purported partners and others. The testimony of Mr. Mahoney's alleged business associates, Messrs. Hawkes and Hussey, may also be relevant to the determination as to why Mr. Mahoney became a partner in Fidelity International.

Another of the primary issues in this litigation is whether the transactions employed here had economic substance. Under the economic substance doctrine, transactions that are invented solely to create tax deductions and otherwise have no economic substance, even though formally complying with the letter of the U.S. Internal Revenue Code, will not be recognized. *Knetsch v. United States*, 364 U.S. 361 (1960); *Dewees v. Commissioner*, 870 F2d 21, 32, 35 (1st Cir. 1989). There is a two-prong test for determining economic substance. The first prong examines whether the transaction has a reasonable possibility of a profit (an objective inquiry). *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778, 781-82 (5th Cir. 2001) (internal citation omitted; emphasis added). The second prong looks to whether there existed a tax-independent business purpose for the transaction (a subjective inquiry). *Id.*

On this issue, the determination of whether Fidelity International had a reasonable possibility of profit and a tax-independent business purpose may focus on how the set of transactions at issue was designed, marketed, and implemented, and the purpose behind the formation of Fidelity International. The resolution of these issues will require testimonial and documentary evidence from the purported partners, including Mr Mahoney, as the alleged foreign partner of Fidelity International.

When it is determined that taxpayers have engaged in a generic tax shelter, evidence regarding similar or identical transactions may be relevant to the determination of the

deductibility of the U.S. taxpayer's losses. *Douglas v. United States*, 410 F. Supp. 2d 292, 297-98 (S.D.N.Y. 2006), appeal dismissed, 448 F.3d 507 (2d. Cir 2006). The United States alleges that Samuel Mahoney engaged in 32 similar or identical transactions through various entities, and that Martin Hawkes engaged in 24 such transactions. The United States alleges that Messrs. Mahoney and Hawkes were paid for their participation in each of these deals by the U.S promoters. According to the United States, the U.S. promoters paid these fees to Mahoney and Hawkes through their joint-venture accounts at Singer & Friedlander on the Isle of Man, which accounts the United States alleges were held by their Irish company, Biosphere Finance Ltd.

The United States also alleges that Messrs. Mahoney and Hawkes were employees of two Isle of Man entities, Kilsture Ltd. (which, as stated above, purportedly made a $651,000 contribution to Fidelity International on Mahoney's behalf) and Maddox Ltd., which allegedly also received substantial payments from the U.S. promoters. The United States further alleges that the purported payments made directly and indirectly to Mahoney and Hawkes were for their respective participation in an abusive tax shelter. Kilsture and Maddox were shareholders of Cumberdale Holdings, also an Isle of Man entity. John Hussey was a director of both Biosphere Finance and Cumberdale Holdings. As such, each has evidence that may be used to support the United States' contentions at trial.

**Documents to be Produced by Samuel Mahoney, Martin Hawkes, and John Hussey**

1. Minutes of each meeting of the directors of Biosphere Finance Ltd., Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., Trilogy Financial Investments Ltd. and/or Trilogy Investments Ltd., referencing Fidelity International or any of its participants, or any of the other 57 FDIS

"partnerships" or any of the participants of the other 57 FDIS "partnerships."[2]

2. Company resolutions for Biosphere Finance Ltd., Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., Trilogy Financial Investments Ltd. and/or Trilogy Investments Ltd., referencing Fidelity International or any of its participants, or any of the other 57 FDIS "partnerships" or any of the participants of the other 57 FDIS "partnerships."

3. Financial statements for Biosphere Finance Ltd., Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., Trilogy Financial Investments Ltd. and/or Trilogy Investments Ltd.

4. All outlines of proposed transaction received by Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey with respect to Fidelity International or any other FDIS "partnerships."

---

[2]The other 57 FDIS "partnerships" are as follows: Gupta Investments LLC, Kealakekua [a/k/a Kutler or JPK] Investments LLC, Cowan Investments LLC, Acajoux Trading LLC, Acajoux Investments LLC, Acajoux Equities LLC, AHG Investments LLC, Cliffside Investments LLC, GT Investments 2001 LLC, Geewax Terker & Company (721 Exchange), Anbar Investments LLC, WFT Investments LLC, RAS Investments 2001 LLC, JRF Investments LLC, JHT Investments LLC, JLS Investments LLC, RJP Investments LLC, TFT Investments 2001 LLC, AN Investments LLC, GN Investments LLC, RN Investments LLC, SN Investments LLC, FX Investments LLC, SJD Investments LLC, RJS Investments LLC, RT Investments LLC, NDC Investments LLC, TAB Investments 2001 LLC, AFFCO Investments 2001 LLC, DJR Investments LLC, CFPT Investments LLC, RC Investments LLC, RWC Investments LLC, DWT Investments LLC, RAG Investments LLC, RM Investments 2001 LLC, SM Investments LLC, CSH Investments LLC, Theis Investments LLC, RGC Investments LLC, EGC Trading LLC, RGW Investments LLC, Europa Investments LLC, Europa International Inc. (351 Contribution), Sheridan Investments LLC, Corporex Investments LLC, SEBFS Investments LLC, DWT Investments 2002 LLC, Provident Capital Partners LLC, E_P Investments LLC, CMC Investments LLC, Fund Investments LLC, Pettus Investments LLC, GAMA Investments LLC, LF Investments 2002 LLC, WFTSR Investments 2002 LLC, JBEJW Investments LLC, Whiteside Investments LLC, and Whiteside Investments 2002 LLC.

5. All account statements and/or communications referencing any of the following four accounts:

> Sub Account: Singer & Friedlander (Isle of Man) Limited
> Account no: 30123012
> Reference: 11270012 (Please ensure reference is quoted on payment).
>
> Sub Account: Singer & Friedlander Limited
> Account no: 30123012
> Reference: The H&M Joint Venture account number 20195700 (Please ensure reference is quoted on payment).
>
> Sub Account: Singer & Friedlander Limited
> Account no: 30123012
> Reference: S&F Client A/C No. 11270025 (Please ensure reference is quoted on payment).
>
> Sub Account: Singer & Friedlander (Isle of Man) Ltd.
> Account no: 30123012
> Reference: Trilogy Investments Limited - account No: 20282910 (Please ensure reference is quoted on payment).

6. All email received by Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey concerning Fidelity International or any other FDIS "partnership."

7. All communications addressed from Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey to The Diversified Group Inc. or to its principals or employees including but not limited to James Haber and/or Orrin Tilevitz, concerning Fidelity International or any other FDIS "partnership."

8. All communications addressed from Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey to Helios Financial or its principals or employees including but not limited to Mox Tan and/or Phil Kampf, concerning Fidelity International or any other FDIS "partnership."

9. All communications addressed from Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey to Alpha Financial or its principals or employees including but not limited to Ron Buesinger, concerning Fidelity International or any other FDIS "partnership."

10. All records of payments received by Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey from The Diversified Group Inc. or from its principals and employees including but not limited to James Haber and/or Orrin Tilevitz, relating to Fidelity International or any other FDIS "partnership."

11. All records of payments received by Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey from Helios Financial or its principals or employees including but not limited to Mox Tan and/or Phil Kampf, relating to Fidelity International or any other FDIS "partnership."

12. All records of payments received by Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey from Alpha Financial or its principals or employees including but not limited to Ron Buesinger, relating to Fidelity International or any other FDIS "partnership."

13. All communications concerning Fidelity International or any other FDIS "partnership."

14. All communications concerning the funding of Biosphere Finance, Samuel Mahoney and/or Martin Hawkes for any person's or entity's participation in Fidelity International or any other FDIS "partnership."

15. All communications concerning the payment of $2 million to Biosphere Finance, Samuel Mahoney and/or Martin Hawkes.

16. All communications and/or other documents concerning any "reckoning on fees in relation to fund structures, Irish companies and Trilogy transactions."

17. All communications and/or other documents, including documents relating to payments, concerning the Collaboration Agreement between The Diversified Group Inc. and Trilogy Financial Products, Ltd.

18. All contracts between Samuel Mahoney, Martin Hawkes, and/or John Hussey, and Helios Financial, The Diversified Group Inc., Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Biosphere Finance Ltd., Trilogy Financial Products Ltd., Trilogy Financial Investments Ltd. and/or Trilogy Investments Ltd.

## Additional Documents to be Produced by Samuel Mahoney

1. All loan documents for all loans from Kilsture Ltd. to Samuel Mahoney, including, but not limited to, documents concerning renegotiation of such a loan.

2. All documents relating to Samuel Mahoney's repayment of any loan from Kilsture Ltd.

3. All Bank records of Kilsture Ltd. showing any payment to or from Kilsture Ltd. concerning Fidelity International or any other FDIS "partnership."

## Questions to Samuel Mahoney, Martin Hawkes, and John Hussey

1. Was Biosphere Finance Ltd. engaged in business?

2. What business was Biosphere Finance Ltd. engaged in at inception?

3. What business was Biosphere Finance Ltd. engaged in from January 1, 2000 through January 1, 2003?

4. Were you an employee of Biosphere Finance Ltd.?

5. What were your duties as an employee of Biosphere Finance Ltd.?

6. When did you become a Director of Kilsture?

7. Was Kilsture Ltd. engaged in business?

8. What business was Kilsture Ltd. engaged in at inception?

9. What business was Kilsture Ltd. engaged in from January 1, 2000 through January 1, 2003?

10. What were your duties as an employee of Kilsture Ltd.?

11. What was your annual salary from Kilsture Ltd. during each year of its existence?

12. Was Maddox engaged in business?

13. What business was Maddox engaged in at inception?

14. What business was Maddox engaged in from January 1, 2000 through January 1, 2003?

15. What were your duties as an employee of Maddox Ltd.?

16. Was Cumberdale Investments engaged in business?

17. What business was Cumberdale Investments engaged in at inception?

18. What business was Cumberdale Investments engaged in from January 1, 2000 through January 1, 2003?

19. What were your duties as an employee of Cumberdale Investments Ltd.?

20. Was Cumberdale Holdings engaged in business?

21. What business was Cumberdale Holdings engaged in at inception?

22. What business was Cumberdale Holdings engaged in from January 1, 2000 through January 1, 2003?

23. What were your duties as an employee of Cumberdale Holdings Ltd.?

24. Why were each of Cumberdale Investments Ltd.'s dissolved subsidiaries dissolved?

25. Why did you agree to be a purported partner in Fidelity International Currency Advisor A Fund?

26. Did you believe when a $651,000 initial contribution was made by you or on your behalf

into Fidelity International Advisor A Fund that your interest was going to be bought by Richard Egan?

27.    Did you believe when a $651,000 initial contribution was made by you or on your behalf into Fidelity International Advisor A Fund that your interest was not going to be bought by Richard Egan?

28.    When did you become aware that your interest in Fidelity International Currency Advisor A Fund was to be reduced?

29.    When did you become aware that, upon reduction of your interest in Fidelity International Currency Advisor A Fund, you would lose approximately 50% of your initial contribution to Fidelity International Currency Advisor A Fund?

30.    During the time period June 1, 2001 to August 1, 2002, how many so-called partnerships did you enter into in which you lost approximately 50% of your initial contribution within the first month after your initial contribution?

31.    During the time period June 1, 2001 to August 1, 2002, how many so-called partnerships did you enter into in which you did not lose approximately 50% of your initial contribution within the first month after your initial contribution?

32.    Why did you continue to enter into partnerships during 2001 and 2002 for which you were almost certain to lose 50% of your initial contribution?

33.    Did you earn any money from your role as a purported partner in Fidelity International Currency Advisor A Fund?

34.    How much money did you earn from your role as a purported partner in Fidelity International Currency Advisor A Fund?

11

35. Was all of the money you earned from your role as a purported partner in Fidelity International Currency Advisor A Fund a fee to be earned regardless of the performance of the option trades entered into by Fidelity International Currency Advisor A Fund?

36. How much money did you earn from your role as a purported partner in Fidelity International Currency Advisor A Fund as a result of the performance of the option trades entered into by Fidelity International Currency Advisor A Fund?

37. What was the amount of each payment you received either directly or indirectly as a result of your participation in Fidelity International Currency Advisor A Fund?

38. What was the original source of each payment made to you as a result of your participation in Fidelity International Currency Advisor A Fund?

39. What attributes, skills, or value did you bring to Fidelity International Currency Advisor A Fund?

40. Was Fidelity International Currency Advisor A Fund designed so that you would be allocated the majority of the gains and sell a majority of your interest before realization of a loss?

41. What is the Financial Derivatives Investment Strategy?

42. What is the Helios product known as H2?

43. Did you report any income from your participation in Fidelity International Currency Advisor A Fund?

44. Did you report any income from your participation in any Financial Derivatives Investment Strategy?

45. Did you report any income from your participation in any FDIS partnership?

46. Have you ever met or spoken with Richard Egan?

47. Have you ever met or spoken with any partner in any FDIS partnership?

48. Have you ever met or spoken with any employee of Carruth Management?

49. Have you ever received money from Helios?

50. Did you ever receive any money from The Diversified Group Inc.?

51. Why did The Diversified Group Inc. pay more than $1,000,000 to Cumberdale Holdings Ltd. in December 2001?

52. Was any of the more than $1,000,000 paid by The Diversified Group Inc. to Cumberdale Holdings Ltd. in December 2001 paid directly or indirectly to you? If so, how much was paid to you?

53. Why did The Diversified Group Inc. pay $50,000 to Biosphere Finance Ltd on February 15, 2002 purportedly for "Administration and Agency Services?"

54. What administration and agency services did Biosphere Finance Ltd. perform to earn the $50,000 paid to it by The Diversified Group Inc. on February 15, 2002?

55. Why did The Diversified Group Inc. pay $570,000 to Maddox Ltd. on February 22, 2002 purportedly for "Consultancy services?"

56. Was any of the $570,000 paid by The Diversified Group Inc. to Maddox Ltd. on February 22, 2002 paid directly or indirectly to you? If so, how much was paid to you?

57. What consultancy services did Maddox Ltd. perform to earn the $570,000 paid to it by The Diversified Group Inc. on February 22, 2002?

58. Why did The Diversified Group Inc. pay $380,000 to Kilsture Ltd. on February 22, 2002 purportedly for "Consultancy fees?"

59. Was any of the $380,000 paid by The Diversified Group Inc. to Kilsture Ltd. on February

22, 2002 paid directly or indirectly to you? If so, how much was paid to you?

60. What consultancy services did Kilsture Ltd. perform to earn the $380,000 paid to it by The Diversified Group Inc. on February 22, 2002?

61. Why did The Diversified Group Inc. pay $952,000 to Biosphere Finance Ltd. on March 23, 2001?

62. Was any of the $952,000 paid by The Diversified Group Inc. to Biosphere Finance Ltd. on March 23, 2001 paid directly or indirectly to you? If so, how much was paid to you?

63. Why did The Diversified Group Inc. pay $120,000 to Kilsture Ltd. on March 23, 2001?

64. Was any of the $120,000 paid by The Diversified Group Inc. to Kilsture Ltd. on March 23, 2001 paid directly or indirectly to you? If so, how much was paid to you?

65. Was Trilogy Financial Products Ltd. engaged in business?

66. What business was Trilogy Financial Products Ltd. engaged in at inception?

67. What business was Trilogy Financial Products Ltd. engaged in from January 1, 2000 through January 1, 2003?

68. What were your duties as an employee of Trilogy Financial Products Ltd.?

69. What was Nigel Scott's role with Trilogy Financial Products Ltd.?

70. What was Oliver Peck's role with Trilogy Financial Products Ltd.?

71. What was Singer & Friedlander's relationship to Trilogy Financial Products Ltd.?

72. Why were records of Helios's and The Diversified Group Inc.'s transactions sent to Trilogy Financial Products Ltd.? Where were those records sent? Where are those records now? Who has custody and control of those records now?

**Additional Questions to Samuel Mahoney**

1. Did Kilsture Ltd. pay on your behalf your $651,000 initial contribution into Fidelity International Currency Advisor A Fund?

2. How much, if any, of Kilsture Ltd.'s payment to Fidelity International Currency Advisor A Fund on your behalf was salary due to you?

3. During what period did you earn the salary that represented any and all portions of Kilsture Ltd.'s payment to Fidelity International Currency Advisor A Fund on your behalf?

4. What duties did you perform to earn the salary that represented any and all portions of Kilsture Ltd.'s payment to Fidelity International Currency Advisor A Fund on your behalf?

**Special Procedures**

This court requests testimony under oath, or the submission of a declaration by the custodian of records for each entity that produces documents in response to this request, attesting to the authenticity of documents produced. Under the United States's Federal Rules of Evidence, which apply in this lawsuit and in all civil proceedings in the United States district courts, certain business records may be received into evidence only if a competent representative of the business appears at trial as a witness and testifies as to the authenticity of the records and the manner in which they are prepared and maintained at the business. However, with respect to foreign business records, the appearance and testimony at trial of a representative of a foreign entity may not be required if a representative of the foreign entity gives testimony under oath as to the authenticity of the records (or true copies thereof) or if the records (or true copies thereof) are accompanied by a written declaration certifying the authenticity of the business records. Therefore, this court considers it necessary in the interests of justice that testimonial evidence

and/or written declarations certifying the authenticity of business records be obtained from the producing entities and/or their representatives. To be of value to this court, the written declaration(s) must comply with the requirements of Title 28 of the United States Code, section 1746. A proposed declaration is attached to this letter of request.

### Reciprocity

The courts of the United States are authorized by statute codified at Title 28 of the United States Code, Section 1782 to extend similar assistance to the tribunals of Ireland and will gladly reciprocate the courtesies shown by the judicial authorities of Ireland.

### Reimbursement of Costs

The United States District Court for the District of Massachusetts is prepared to reimburse your Court for all costs incurred in executing this request. The court extends to the judicial authorities of Ireland the assurances of its highest consideration.

DATE: _____

_____
HON. F. DENNIS SAYLOR, IV
U.S. District Judge
U.S. District Court for the District of Massachusetts
Worcester, Massachusetts

CERTIFICATION OF BUSINESS RECORDS

I, the undersigned, _____, with the understanding that I am subject to criminal penalty under the laws of Ireland for an intentionally false declaration, declare that I am:

employed by/associated with _____ in the position of _____

_____ and by reason of my position am authorized and qualified to make this declaration.

I further declare that the documents attached hereto are original records or true copies of records identified as Exhibit(s) _____ (list all exhibits as appropriate), and:

1. were made at or near the time of the occurrence of the matters set forth therein, by (or from information transmitted by) a person with knowledge of those matters;

2. were kept in the course of regularly conducted business activity;

3. were made by the said business activity as a regular practice; and,

4. if not original records, are duplicates of original records.

The originals or duplicates of these records are maintained in the country of _____

_____.

Date of execution: _____

Place of execution: _____

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signature: _____