# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | Case Nos.: 05-40151-FDS |
| v. | ) ) | 06-40130-FDS |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION OF THE COURT'S MAY 10, 2007 AMENDED MEMORANDUM AND ORDER

On May 10, 2007, this Court issued an Amended Order (hereinafter "Order") denying Plaintiff's Motion to Compel.  A critical category of information Plaintiff sought to compel relates to the merits of the IRS's position that the investments at issue in this case are "substantially similar" to a transaction described in Notice 2000-44, 2000-2 C.B. 255.[1]  The Court denied the discovery, stating that it "is not likely to lead to the production of admissible evidence."  (Order at 4.)  The Court erroneously relied on a 1970 case interpreting superseded language in Federal Rule of Civil Procedure 34, which was subsequently amended and broadened, and the Court then went on to apply a discovery standard that is fundamentally different (and more restrictive) than the standard that has been applied to Defendant's discovery.

---

[1] (*See* Mem. in Support of Pl.'s Mot. to Compel Produc. of Docs. and Meaningful Answers to Interrogs., Ex. A at 5, Interrogatory No. 3; Ex. B at 8, Request for Production No. 15, Mar. 5, 2007.)

The Court also stated that "[t]he relevance is not at all clear to me."  (Status Conference Tr.

17:38, May 2, 2007.)  Plaintiff now respectfully moves for reconsideration of the Court's May

10, 2007 Order in order to seek correction of the disparity in discovery standards and to clarify

the relevance of this important discovery in this case.  Specifically, the discovery in question is

relevant to the merits of the "substantially similar" issue before the Court and is particularly

relevant and needed by Plaintiff because of Defendant's unprecedented "pattern evidence"

discovery.

**ARGUMENT**

Courts have "'inherent power . . . to afford such relief from interlocutory judgments . . .

as justice requires.'"  *Greene v. Union Mut. Life Ins. Co.*, 764 F.2d 19, 22 (1st Cir. 1985)

(quoting *Dow Chem., USA v. Consumer Prod. Safety Comm'n*, 464 F. Supp. 904, 906 (W.D. La.

1979)).[2]  The "interests of justice" standard applies to a motion for reconsideration.  *Id*. at 23.

The interests of justice require that the proper standard for discovery as set forth in the Federal

Rules of Civil Procedure be applied to Plaintiff's requested discovery and that the same standard

be applied to Plaintiff and Defendant.  When the appropriate discovery standard is applied to

Plaintiff's requests regarding the IRS's Notice 2000-44 determination, Defendant should be

compelled to respond because the discovery is "reasonably calculated to lead to the discovery of

admissible evidence."  Fed. R. Civ. P. 26(b)(1).

**I.      The Court's Reliance On *Detroit Screwmatic* Is Misplaced**

In holding that Plaintiff's discovery into the IRS's Notice 2000-44 determination should

not be allowed because it "is not likely to lead to the production of admissible evidence," the

---

[2] *See also* Fed. R. Civ. P. 60(b) advisory committee's note ("[I]nterlocutory judgments are not brought within the restrictions of the rule, but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires.").

Court cited *Detroit Screwmatic Co. v. United States*, 49 F.R.D. 77 (S.D.N.Y. 1970).  (Order at

4.)  The Government had cited this case in its opposition papers.  (Def.'s Resp. to Pl.'s Mot. to

Compel at 8.)  *Detroit Screwmatic*, however, was decided under the pre-1970 version of Rule 34

of the Federal Rules of Civil Procedure, which required that a party demonstrate "good cause"

when seeking the production of documents from another party.  49 F.R.D. at 78.  The *Detroit*

*Screwmatic* court found that "good cause" did not exist because "[t]he government has informed

plaintiff of the precise basis for the deficiency."  *Id.* at 79.  Even if the *Detroit Screwmatic*

standard were the correct standard to apply, which it is not, that case is not applicable to FICA A

Fund because the IRS never issued a notice of proposed adjustment to FICA A Fund setting forth

the rationale for its proposed adjustments and thus denied Plaintiff his administrative appeal

rights.[3]

Moreover, other courts applying the old "good cause" standard with respect to IRS

administrative files came to conclusions opposite that of *Detroit Screwmatic*.[4]  Unlike the district

court in *Detroit Screwmatic*, the Fifth Circuit Court of Appeals correctly observed that

"[u]sually, when the taxpayer is seeking a refund . . . the United States is just another litigant.  In

such cases we start with the feeling that fundamental fairness to both sides . . . requires

recognition of the taxpayer's right to pre-trial discovery of the reports of the Internal Revenue

---

[3] A notice of proposed adjustment is issued at the end of an examination if the taxpayer and the Examination
function of the IRS cannot agree.  This letter generally includes a copy of the revenue agent's report , which
explains in detail the agent's findings and the basis for the proposed liability.  The taxpayer is then given a period of
time within which to either agree to the proposed adjustments or request a conference with the IRS Appeals
Division.  Here, the Plaintiff was denied those appeal rights.

[4] *See, e.g., United States v. San Antonio Portland Cement Co.*, 33 F.R.D. 513, 514-15 (W.D. Tex. 1963) (finding
that "good cause" existed for the production of "intra-office reports, memoranda, or other documents of the Internal
Revenue Service" that "relate only to the allowance of a refund of taxes" because those documents provided "the
exact factual and legal basis on which the Government claims the refund was erroneously paid."); *Frazier v.*
*Phinney*, 24 F.R.D. 406, 410 (S.D. Tex. 1959) (holding that "good cause" existed for the production of a revenue
agent's report because "[i]t cannot be argued that the basis for their alleged tax deficiencies is peculiarly within the
knowledge of plaintiff taxpayers and that they know . . . why deficiencies were assessed against them.  Plaintiffs are
entitled to know what defendant's claims and contentions may be.").

Agents who examined the taxpayer's books and records." *Campbell v. Eastland,* 307 F.2d 478, 485 (5th Cir. 1962).

The old "good cause" requirement, which was designed to protect trial preparation materials, was removed from Rule 34 because "it has furnished an uncertain and erratic protection to the parties from whom production is sought and is now rendered unnecessary by virtue of the more specific provisions added to Rule 26(b)." Fed. R. Civ. P. 34 advisory committee's note (1970 amendments). Accordingly, the much broader discovery standard of Rule 26(b)(1), allowing discovery of "relevant" information that is "reasonably calculated to lead to the discovery of admissible evidence" applies today.

After the 1970 amendments to the Federal Rules of Civil Procedure, courts applied Federal Rule of Civil Procedure 26(b)(1) to find that internal IRS documents are not only relevant to the issues in the case, but also that such documents are not protected as trial preparation materials. In *Abel Investment Co. v. United States*, the court observed that "[n]ew Rule 26 has removed [the "good cause"] requirement and obviously contemplates discovery of documents without intervention of the court." 53 F.R.D. 485, 487 (D. Neb. 1971). With respect to the IRS documents sought by the plaintiff in *Abel*,[5] the court found that the "documents here sought are relevant, because they relate 'to the claim or defense of the party seeking discovery, or to the claim or defense of any other party.'" *Id*. at 488 (quoting Fed. R. Civ. P. 26(b)(1)).[6]

---

[5] The documents sought by the plaintiff included, *inter alia*, "a copy of the revenue agent's report . . . together with all schedules and exhibits attached thereto, all worksheets used in preparing said report, and all notes of conversations held between [the revenue agent] and others in the course of preparing said report." *Abel Inv. Co.*, 53 F.R.D. at 487.

[6] The *Abel Investment* court further held that the documents requested by the plaintiff were not protected by Federal Rule of Civil Procedure 26(b)(3) as trial preparation materials. In so holding, the court observed,

> To some extent the government seems to be taking the position that because continuity can be shown from audit to litigation, in that each report is submitted to the person who must make the next determination in a process which may lead to trial, any report or document prepared by any link in the chain is prepared in anticipation of litigation. If this court were to so hold, it would

4

Similarly, the court in *Peterson v. United States* compelled answers to interrogatories seeking, *inter alia*, "a detailed description of the contents and subject matter of the audits prepared by IRS field agents of the plaintiffs' income tax returns for the years in question." 52 F.R.D. 317, 319 (S.D. Ill. 1971). In holding that under the amended discovery rules "IRS appellate conferee reports and IRS field agent reports are not prepared in anticipation of litigation or for trial," the court observed that "[t]he Government, through its objections to Interrogatories Nos. 6 and 8, is seeking a favored position under the discovery rules. In a tax refund case, however, it should be treated as any other litigant." *Id.* at 320-22 (citations omitted). The observation applies with equal, if not greater, force to the Government in this TEFRA litigation.

In addition, the Court's reference to the "de novo" standard of review to preclude discovery into the administrative file is inconsistent with the broad discovery to which Plaintiff is entitled under the Federal Rules of Civil Procedure and First Circuit law. As explained in Section IV, the use of the phrase "de novo" in connection with discovery in tax cases originates in an effort by the Tax Court to *expand*, not limit, the scope of discovery. This concept was not applied for purposes of determining what evidence may be relevant for discovery purposes under the Federal Rules of Civil Procedure, which do not apply in the Tax Court. Accordingly, calling this a "de novo proceeding" does not operate to limit Plaintiff's discovery rights under the Federal Rules of Civil Procedure.

---

indeed put the government in a position markedly advantageous to that of a private litigant. . . . [T]o hold that any intra-agency or inter-agency report which eventually could be relayed to the attorney who must try the case for the government is a report or document prepared in anticipation of litigation would be effectively to shield all government reports. This is, I think, clearly contrary to the intent of Rule 26.

53 F.RD. at 490.

II.    **Fairness Requires That the Same Standard For Discovery Be Applied To Plaintiff's and Defendant's Discovery**

As a result of its ruling, the Court has effectively imposed two different standards of discovery in this case:  a restrictive one for information that Plaintiff seeks with respect to the IRS's Notice 2000-44 determination and a broad one for Defendant's "pattern evidence" discovery.  The Federal Rules, however, have created a single standard to allow discovery of "relevant" information, which consists of information  "*reasonably calculated* to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1) (emphasis added).  The First Circuit has applied that rule broadly:  "Rule 26(b)(1) contemplates wide-ranging discovery to the fullest possible extent."  *Klonoski v. Mahlab*, 156 F.3d 255, 267 (1st Cir. 1998).  In denying Plaintiff's Motion to Compel, the Court applied Rule 26(b)(1) unduly narrowly, thereby denying Plaintiff discovery of relevant information that he needs.

In disallowing Plaintiff's discovery, the Court held that Plaintiff's discovery was "not *likely* to lead to the production of admissible evidence."  (Order at 4 (emphasis added).)  In contrast, with respect to Defendant's discovery regarding other taxpayers, the Court stated that this information is discoverable if it is "potentially relevant."  (Order at 9.)  The Court also has allowed Defendant's "pattern evidence" discovery on the grounds that it is "conceivably relevant" and noted with respect to that evidence that "we are quite a ways away from admissibility at trial."  (Status Conference Tr. 27:5, 31:6-7, May 11, 2006.)  The standard of discovery that the Court applied to "pattern evidence," which does not require that it be relevant in and of itself, is potentially broader than the "*reasonably calculated* to lead to the discovery of admissible evidence" standard in the Federal Rules, and clearly allows broader discovery than the "*likely* to lead to the production of admissible evidence" standard that has been applied to Plaintiff's discovery into the IRS's Notice 2000-44 determination.

6

Certain similarities between the information that Plaintiff seeks regarding the IRS's Notice 2000-44 determination made in his own case and the "other taxpayer" facts that Defendant has been allowed to discover regarding complete strangers help demonstrate the illogical and unfair consequences of the application of such disparate discovery standards in this case. With respect to facts regarding the IRS's Notice 2000-44 determination in FICA A Fund's case, the Court put some weight on the assumption that there is no evidence that Plaintiff or his advisors "were aware of the internal deliberations of the IRS, or relied on them in any way" and denied the discovery because of this lack of knowledge or reliance.[7] (Order at 4.) However, the fact that Plaintiff did not know of or rely on the "other taxpayers" has not put Defendant's broad discovery of those strangers and their taxes beyond the scope of permitted discovery in this case. In short, the Court has put Plaintiff in a position where he can only discover what Plaintiff specifically knew or relied on, but the Defendant can discover a great deal of information about total strangers that Plaintiff did not know or rely on. This serious imbalance in the Court's discovery approach is underscored by the fact that Plaintiff sought but so far has been denied discovery about his own tax case and about the "substantially similar" issue that has been put at issue by the Government in its FPAA. Another illustrative similarity between the "substantially similar" discovery denied Plaintiff and the "pattern evidence" allowed Defendant is occasioned by the Court's comment that the Notice 2000-44 "decision-making process at the IRS that led to the FPAA was apparently entirely non-public." (Order at 4.) Here again, the same can be said of the Government's discovery into the tax returns and tax planning of other taxpayers, none of

---

[7] There is evidence that Plaintiff's advisors were aware of the internal deliberations of the IRS. The Revenue Agent in charge of the audit, William Conway, discussed with Plaintiff's advisors on at least two occasions the fact that a memo was sent to IRS Counsel regarding whether FICA A Fund was substantially similar to Notice 2000-44. (Ex. A, Sept. 14, 2004 and Sept. 15, 2004 entries.) Defendant has withheld the memo itself from production under a claim of privilege. There is a serious question, however, of whether the privilege was waived by discussing the memo with Plaintiff's representatives.

which was public or available to Plaintiff.  The similarities between these targeted areas of

discovery end when we reach the issue of the amount of discovery that each party has been

allowed.  Whereas Defendant has been allowed wide-ranging and voluminous discovery from

and about third parties regarding over two hundred other taxpayers, approximately one-quarter of

which constitute its supposed "pattern" of fifty-seven taxpayers, Plaintiff has been allowed no

discovery into the facts underlying the IRS's disputed determination that FICA A Fund is

substantially similar to a transaction described in Notice 2000-44, despite its clear relevance and

similarities to Defendant's proposed "pattern evidence."

III.    **Plaintiff's Discovery Regarding the IRS's Notice 2000-44 Determination Is
        Reasonably Calculated To Lead To the Discovery Of Admissible Evidence**

The relevance of the information sought regarding the IRS's Notice 2000-44

determination in this case merits further explication in light of the Court's comment that its

relevance was not clear.  This suit is predicated on the IRS's adjustments to FICA A Fund's 2001

and 2002 tax returns, which include adjustments based on the IRS's determination that the FICA

A Fund investment is "substantially similar" to Notice 2000-44.  That important determination, if

correct, literally changes the applicable law in this case.  Therefore, understanding the basis for

that determination is critical to defending against the IRS's proposed adjustments, including its

assertions as to what law should apply.

A.    **The Significance and Substance Of Notice 2000-44**

The IRS's disputed determination that FICA A Fund is substantially similar to Notice

2000-44 has already had harsh consequences for Plaintiff, especially in light of the IRS's

reversal of its long-standing position that short positions are not liabilities for the purpose of

computing basis.  The Tax Court adopted the IRS's original position in *Helmer v. Commissioner*,

34 T.C.M. (CCH) 727, 731 (1975).  Under *Helmer*, Plaintiff's treatment of the short positions on

8

its 2001 and 2002 tax returns was proper.  In Notice 2000-44, which was issued in August 2000, the IRS took a position contrary to the one it advocated and the court adopted in *Helmer*. Because the IRS's change in position was contrary to its own regulations, a change in the Treasury Regulations was necessary, and the IRS rewrote its regulation with retroactive applicability in June 2003.[8]  26 C.F.R. § 1.752-6.  Importantly, this regulation is only retroactive with respect to transactions that are "substantially similar" to Notice 2000-44.  26 C.F.R. § 1.752-6(b).  Because FICA A Fund's investments took place in 2001, it would be subject to this retroactive regulation if the IRS correctly decided that it is "substantially similar" to Notice 2000-44.  Obviously, the IRS would be strongly predisposed to pigeon-hole an investment as a Notice 2000-44 transaction because the retroactive regulation benefits the Government to the detriment of the taxpayer.

In May 2004, the IRS announced a settlement initiative for transactions "substantially similar" to Notice 2000-44.  Announcement 2004-46, 2004-21 I.R.B. 964.  This initiative precluded non-settling taxpayers from appealing the IRS decision to the IRS Appeals Office, even if the IRS had not determined that a taxpayer's transaction was substantially similar to Notice 2000-44 prior to the closing of the settlement initiative.  Announcement 2004-46, 2004-21 I.R.B. 964.  Because the Government determined that FICA A Fund is substantially similar to Notice 2000-44, albeit eight months after the close of the settlement initiative, Plaintiff was denied the appeal rights to which taxpayers are normally entitled and could only contest the IRS's adjustments through litigation.

---

[8] Retroactive regulations generally are prohibited by the Internal Revenue Code.  *See* 26 U.S.C. § 7805(b). Moreover, the court in *Klamath* questioned the retroactive applicability of the section 752 regulations.  *Klamath Strategic Inv. Fund, LLC v. United States*, 440 F. Supp. 2d 608, 622-25 (E.D. Tex. 2006).

The question of whether FICA A Fund is substantially similar to a transaction described in Notice 2000-44, which both parties acknowledge is an important issue before this Court, is both a factual and a legal inquiry.[9]  *See Duke Energy Corp. v. United States*, 49 F. Supp. 2d 837, 844-45 (W.D.N.C. 1999) (allowing experts to testify regarding factual issues to aid in the determination of whether an investor was short "substantially similar" property within the meaning of Internal Revenue Code section 246(c)(1)(B)).  The term "substantially similar" appears frequently in the Internal Revenue Code, Treasury Regulations, and IRS guidance, but there is virtually no guidance regarding the definition of this term as applied in this case. "Substantially similar" is not defined for purposes of Treasury Regulation section 1.752-6 and there is no published IRS guidance on what "substantially similar" means in this context.  Notice 2000-44 references transactions that are "substantially similar," but does not define the term.[10] Plaintiff's discovery is necessary and very relevant to uncovering facts as to how this term was applied in this case and on what facts the determination was made.

Notice 2000-44 describes two transactions.  The Government's position is that the transaction at issue in this case is substantially similar to the second transaction.  The elements of this transaction are the following:  (1) "a taxpayer purchase and writes options," (2) the "option positions are then transferred to a partnership," and (3) there is a "disposition of the partnership interest."  Notice 2000-44, 2000-2 C.B. 255, 255.  The IRS determined, and Defendant continues to assert in this suit, that FICA A Fund is substantially similar to Notice 2000-44 despite the fact

---

[9]  The Treasury Department Tax Legislative Counsel recently stated that identifying what is "substantially similar" to a listed transaction is an "extremely factual matter."  Sheryl Stratton, *Current and Former IRS, Treasury Officials Disagree Over OPR Procedures*, Tax Notes Today, Nov. 17, 2006.

[10] The Notice arguably makes an implicit reference the definition found in the disclosure regulations.  *See* Notice 2000-44, 2000-2 C.B. 255, 256 (stating that transactions that are "substantially similar" to Notice 2000-44 are "listed transactions" for purposes of Treasury Regulation section 1.6011-4(b)(2)); Treas. Reg. § 1.6011-4(c)(4) (defining "substantially similar").

that Plaintiff never disposed of his interest in FICA A Fund. (Compl. in Case No. 05-40151

¶ 43; Compl. in Case No. 06-40130 ¶ 40.) It is not apparent from the face of the FPAAs on what

basis or facts the IRS determined that FICA A Fund is substantially similar to Notice 2000-44.

Plaintiff's discovery is calculated to find information explaining and demonstrating this

fundamental inconsistency.

> **B.      This Suit Is Predicated On IRS Adjustments To FICA A Fund's Tax Returns**

In this case, the adjustments made by the IRS are squarely at issue and this Court will

decide whether each one is right or wrong. Those adjustments were made to FICA A Fund's

2001 and 2002 tax returns and were based on the Government's determination that FICA A Fund

is substantially similar to Notice 2000-44. Statutorily, these cases are petitions for the

"readjustment" of partnership items as determined by the IRS in the FPAAs.[11]  *See* 26 U.S.C.

§ 6226(a). Once an FPAA is issued, a taxpayer must bring suit within 150 days, or the IRS may

assess the tax. *See* 26 U.S.C. § 6225. There is no possibility of a traditional refund suit. 26

U.S.C. § 7422(h). While the taxpayer is the nominal plaintiff, it is in substance in the position of

a civil defendant.[12]  Because it is the Government's adjustment of partnership items that gave

rise to this action, fairness requires that Plaintiff be permitted to obtain information that will

assist in understanding the basis for those adjustments. This is particularly true of the

"substantially similar" determination, which was made unilaterally by the Government based on

---

[11] An FPAA, which adjusts partnership items, is considered the equivalent of a statutory notice of deficiency for purposes of providing the notice required to institute litigation. *See Clovis I v. Comm'r*, 88 T.C. 980, 982 (1987) ("The FPAA is to the litigation of partnership items and affected items . . . what the statutory notice of deficiency is to tax controversies . . . i.e., it is the notice to affected taxpayers that respondent has made a final administrative determination for particular tax years.").

[12] *See, e.g., Frazier v. Phinney*, 24 F.R.D. 406, 408-09 (S.D. Tex. 1959) ("By assessing and collecting the alleged income tax deficiencies, penalties, and interest, defendant laid the necessary basis upon which plaintiffs could invoke the jurisdiction of this court.").

facts in its possession and based on a standard ("substantially similar") that the Government has not defined, except by its actions.

In order to defend against the misapplication of what Plaintiff considers the Government's secret law of "substantially similar," discovery must be allowed to Plaintiff in order to dispute and challenge the Government on this point. Why should the IRS be allowed to make the determination, invoke the retroactive benefits of the regulation, and keep the rationale for its decision a secret from the taxpayer who is directly harmed by the decision? The answer clearly is not that Federal Rule 34 precludes such discovery. Rather, this situation is like the situation the U.S. Claims Court faced in *Flamingo Fishing Corp. v. United States*, 22 Cl. Ct. 625 (1991). In that case, the taxpayers did not pay FICA taxes for their crew members, relying on a statute that exempts crew members from qualifying as employees "if the operating crew of such boat . . . is normally made up of fewer than 10 individuals." *Id.* at 627 (quoting 26 U.S.C. § 3121(b)(20)). The IRS assessed FICA taxes claiming that the crew "normally" consisted of greater than 10 members as defined by the IRS. The taxpayers sought discovery into how the IRS defined "normally" because the court would have to decide (1) how to define "normally" and (2) if it found the IRS definition of "normally" to be correct, did the IRS apply that standard correctly to the taxpayer. *Id.* at 627-28. The Court held, over the Government's "de novo" objections, that the taxpayers should have discovery into how the IRS defined "normally" because "the IRS definition of 'normally' may not have been known," thus the taxpayers may not have been on notice that they should pay FICA taxes. *Id*. at 629. Similarly, because "substantially similar" has not been defined by the IRS, Plaintiff did not have IRS guidance regarding how to apply this term as used in Notice 2000-44 and in the Treasury regulations at issue.

The FPAAs for FICA A Fund's 2001 and 2002 tax years contain thirteen adjustments, all of which Plaintiff challenges in this suit.  (Exs. B-C.)  In particular, the Government determined that "the obligations under the short positions (written call options) transferred to [FICA A Fund] constitute liabilities for purposes of Treasury Regulation § 1.752-6T."[13]  (Ex. B.)  Invoking this regulation presupposed that the FICA A Fund investment is substantially similar to Notice 2000-44.  In addition, both FPAAs bear the heading "Notice 2000-44 Case," which is an explicit assertion by the Government that the tax benefits of the investments should be disallowed for the reasons set forth in Notice 2000-44.  In Count IV of Plaintiff's Complaints, Plaintiff asserts that the FPAAs erroneously determine that short positions are not liabilities for purposes of section 752 of the Internal Revenue Code, 26 U.S.C. § 752; that the FPAAs erroneously apply Treasury Regulation section 1.752-6, 26 C.F.R. § 1.752-6, to Plaintiff's contributions of short positions to FICA A Fund; and that the contributions were not part of a transaction that is described in or substantially similar to a transaction described in Notice 2000-44.

While the FPAAs set forth the IRS's determination with respect to the application of certain Treasury Regulations and Code provisions to the transactions at issue in this case, the FPAAs do not provide any support for the IRS's determination that this is a "Notice 2000-44 Case."  Accordingly, with respect to the IRS's Notice 2000-44 determination, this is not a case, as stated earlier, where "[t]he government has informed plaintiff of the precise basis for the deficiency."  *Detroit Screwmatic*, 49 F.R.D. at 79.  In addition, Plaintiff believes that members of the IRS examination team indicated that they did not consider the FICA A Fund transaction "substantially similar" to Notice 2000-44 during the audit (Ex. D at 1), and other evidence shows

---

[13] The 2002 FPAA language is identical except for the removal of the "T" after the citation to a Temporary Treasury Regulation that is now final.  (Ex. C.)

that the IRS thought the investment was similar to transactions covered in an entirely different Notice. (Ex. E, Mar. 23, 2004 and Feb. 22, 2005 entries.)

During the discovery phase, Plaintiff is not asking this Court to review the correctness of an IRS determination but to allow discovery of facts relevant to the preparation of Plaintiff's case. As recognized by the *Jade Trading* court, such materials are "clearly relevant." *Jade Trading LLC v. United States*, 65 Fed. Cl. 487, 491 (2005) ("The documents in Plaintiffs' Administrative Files are clearly relevant because they formed the underpinnings of the FPAA or contain data considered by the IRS in issuing the FPAA, challenged in this action."). In order for Plaintiff to support his case, Plaintiff must know the facts upon which the IRS relied and the criteria the IRS used to determinate that FICA A Fund's investments were "substantially similar" to Notice 2000-44. Accordingly, the requested discovery is relevant, as Rule 26 provides, to the claims and defenses of the parties and fairness requires that Plaintiff be allowed discovery of the information in the Government's possession regarding its assertion that FICA A Fund is substantially similar to Notice 2000-44.

The Court assumes that this evidence would be relevant if Plaintiff had relied on it. (Order at 4.) Plaintiff's discovery rights, however, extend well beyond this type of potential reliance evidence. This discovery is relevant to the factual correctness of the Government's "substantially similar" claim, which has been put directly at issue by the FPAA.

C.    **The IRS's Notice 2000-44 Determination With Respect To FICA A Fund**

The documents produced in discovery and in response to a Freedom of Information Act request, which Plaintiff submitted prior to the filing of this lawsuit, provide important (but incomplete) facts showing how the IRS determined that FICA A Fund is substantially similar to Notice 2000-44. These known facts demonstrate why the unknown facts that Plaintiff seeks are relevant at least for discovery purposes. First, the three elements of a Notice 2000-44

14

transaction, outlined above, appear in internal IRS documents as the essential criteria for deciding the substantially similar issue. (*See, e.g.*, Ex. F at 80.)  This is significant because, since Plaintiff never disposed of his interest in FICA A Fund, there must have been other facts or internal IRS guidance that led the IRS to conclude that FICA A Fund is substantially similar to Notice 2000-44.  To defend against the Government's attack, Plaintiff must first understand the facts upon which the Government relies.

Second, the documents reveal facts showing inconsistency and doubts within the IRS regarding whether FICA A Fund and transactions similar to FICA A Fund were substantially similar to Notice 2000-44.  FICA A Fund was identified as a "Son of Boss (SOB) shelter with aspects of Short Option Strategy (SOS) and Personal Investment Corporation (PICO)" at the beginning of the audit in May 2004.  (Ex. G.)[14]  The IRS National Office communicated its substantially similar decision to the examination team on February 22, 2005, approximately nine months later.  (Exs. A, E.)  One member of the exam team indicated that the National Office decided that FICA A Fund is substantially similar to Notice 2000-44 (Ex. A, Feb. 22, 2005 entry), while another indicated that it decided that FICA A Fund is substantially similar to both Notice 2000-44 and Notice 2002-65 (PICO) (Ex. E, Feb. 22, 2005 entry).  Further, an internal IRS email from a Program Manager dated February 22, 2005 stated that, with respect to the Son of Boss/PICO hybrids, the IRS Office of Chief Counsel "needs to decide which listed transaction these belong to and not be so wishy washy and say both."  (Ex. H at 62.)  With respect to the FDIS cases, an IRS Son of Boss Coordinator noted that "[t]hese aren't son of boss cases in the strict sense."  (Ex. I at 253.)  An IRS Counsel who worked on the examination of FICA A Fund

---

[14] Plaintiff and his advisors, throughout the audit, sought to demonstrate to the IRS that FICA A Fund is not substantially similar to Notice 2000-44.  Contemporaneous with the transaction at issue in this case, Plaintiff's advisors had assured Plaintiff that the investments were not substantially similar to Notice 2000-44.  During the audit phase, different advisors confirmed this advice and communicated their analyses to the IRS.  (*See, e.g.*, Ex. D.)

stated that the FDIS "transactions are by no means uniform." (Ex. I at 252.). These facts showing a lack of uniformity are certainly relevant to Plaintiff's penalty defense as well as potentially relevant to Defendant's claim of a pattern.

Facts showing that the IRS was undecided and that it took nine months to finally claim that FICA A Fund is substantially similar to Notice 2000-44 are relevant during discovery to Plaintiff's development of his penalty defense. In the 2001 and 2002 FPAAs, the Government imposed accuracy-related penalties on Plaintiff under Code section 6662, 26 U.S.C. § 6662. (Exs. B-C.) In imposing these penalties, the FPAAs stated that "there was no showing of reasonable belief by [FICA A Fund] or its partners that the position taken was more likely than not the correct treatment." (Exs. B-C.) The fact that the employees of the IRS, the agency that issued the Notice, had difficulty deciding whether Notice 2000-44 applied tends to show that Plaintiff's return position was reasonable, regardless of whether Plaintiff was aware of the internal IRS discussions.[15] Moreover, Plaintiff received legal advice that his investment was not substantially similar to Notice 2000-44. In anticipation of the Government arguing that this legal advice was wrong, unreliable, and clearly without basis, Plaintiff should be allowed discovery of the IRS materials to counter those arguments.

Third, the known facts indicate that the IRS did in fact review similar transactions of other taxpayers, both at the examination level and above. In short, "pattern evidence" was considered in making the determination. Discovery of that evidence is important to Plaintiff because it would provide evidence of patterns that may be different or even inconsistent with the

---

[15] Documents received to date indicate that the IRS exam team utilized a plethora of materials in analyzing the application of Notice 2000-44 to FICA A Fund, and still needed advice from the National Office, where the decision makers had the opportunity to review not only FICA A Fund, but also other transactions the IRS believed to be similar to FICA A Fund. Conversely, Plaintiff did not have access to such a wide range of materials in deciding how to report the transactions and instead relied on the advice of well-respected accounting firms and law firms who, after careful analysis, opined that the transactions engaged in by FICA A Fund were not substantially similar to Notice 2000-44.

"pattern evidence" the Government will seek to offer in this case.  The IRS Case Development

Reminder for Son of Boss Examiners instructs examiners to ascertain the existence of "'pattern

evidence' regarding the promoter's sale of the same shelter to other parties."  (Ex. J at 52.)  The

FICA A Fund examination team appears to have followed this suggestion.  It appears that the

examination team received information from the IRS's KPMG and Helios "Promoter Projects."

(Ex. K.)  Additionally, William Conway, the Revenue Agent assigned to the FICA A Fund

examination, and another Revenue Agent working on a "similar case" discussed the "basic

fac[ts] of transactions."[16]  (Ex. A, Sept. 17, 2004 entry.)  Those who worked on the audit of

FICA A Fund above the examination level also had access to facts of other similar transactions.

For example, Richard Gannon, an IRS Counsel attorney assigned to FICA A Fund, participated

in at least one conference call with the "Son of Boss Cadre."  (Ex. E, Nov. 19, 2004 entry.)

James Fee, an IRS Counsel attorney who worked on FICA A Fund, was aware of a list the IRS

had of FDIS cases (a list that would seem to be relevant to a "pattern evidence" inquiry).  (Ex. I

at 252.)  Mr. Fee also was involved, at the same time he was involved in the audit of FICA A

Fund, with deciding what is substantially similar to Notice 2000-44 (Son of Boss) and suggested

the preparation of "a briefing paper for each of the subject transactions" to assist in consideration

of the substantially similar issue.  (Ex. L at 28.)  What emerges from this picture is that the

decision that FICA A Fund is substantially similar to Notice 2000-44 was based not only on the

facts of FICA A Fund, which are distinguishable from the facts described in Notice 2000-44, but

also on the facts of other taxpayer's transactions.  In short, the discovery sought is calculated to

lead to facts concerning "pattern evidence" the IRS used in making the substantially similar

---

[16] Defendant did not allow the Revenue Agent to testify at his deposition regarding this conversation even though the Agent's work on the other taxpayer's transaction is directly related to the examination of FICA A Fund.

determination and will be potentially relevant to challenging that determination as well as the Government's "pattern evidence".

Thus, it is clear that the facts underlying the IRS's determination that FICA A Fund is substantially similar to Notice 2000-44, a determination on which this lawsuit is based, may lead to the discovery of admissible evidence regarding what other transactions exist that the IRS considered to be similar to either FICA A Fund or to Notice 2000-44, in other words, the same type of "pattern evidence" Defendant has been allowed to pursue. Further, since "substantially similar" is not defined for purposes of Notice 2000-44 or Treasury Regulation section 1.752-6, discovery regarding the fact of what criteria the IRS used to reach its Notice 2000-44 determination with respect to FICA A Fund may lead to the discovery of admissible evidence regarding what facts in Notice 2000-44 are significant for deciding this issue.

## IV. The De Novo Standard Of Review Does Not Preclude Discovery Under the Federal Rules Of Civil Procedure

The Court's reference to the "de novo" standard of review, at the urging of the Government, to preclude discovery of the administrative file on relevancy grounds is a misapplication of the "de novo" standard, improperly resulting in special treatment for the Government during discovery. The "de novo" standard is not a discovery standard and should not be employed as one in this case to tip the discovery scale in the Government's favor.

"De novo" is a standard of review and does not directly implicate the broad standard for discovery under Federal of Civil Procedure 26(b)(1). *See Klonoski v. Mahlab*, 156 F.3d 255, 267 (1st Cir. 1998) ("Rule 26(b)(1) contemplates wide-ranging discovery to the fullest possible extent.") Rather, its relationship to discovery in tax cases originated with the Tax Court, as an explanation as to why the Tax Court was permitted to consider at trial documents outside the administrative record. As explained by the Tax Court in 1952, "Being a de novo proceeding, we

are not *restricted* to a review of the administrative steps taken below." *Martin Wunderlich Co. v.*

*Sec'y of War*,  Nos. 520-R & 521-R, 1952 WL 10333 (T.C. Jan. 21, 1952) (emphasis added).

The Tax Court adopted the "de novo" standard of review to permit consideration of outside

records because it did not have formal discovery rules at that time and continues to this day to

operate under more restrictive discovery rules than the Federal Rules of Civil Procedure.  Harold

Dubroff, *The United States Tax Court:  An Historical Analysis* 299-304 (1979).  Furthermore,

the "de novo" standard of review signified that the IRS's determination was not subject to the

Administrative Procedure Act, which requires the court to review the administrative decision of

an agency.  *See O'Dwyer v. Comm'r,* 266 F.2d 575, 580-81 (4th Cir. 1959) (finding that the APA

does not apply to Tax Court proceedings, thus, "the Tax Court was not required to review the

'record' before the Commissioner.")  Instead, the "de novo" standard of review preserved the

ability of the Tax Court to consider evidence outside of the administrative record and had no

relationship to relevancy for discovery purposes under the Federal Rules.

        Subsequently, courts applied the "de novo" standard to preclude *admission* of the

administrative file when the taxpayer was seeking to challenge the procedures employed by the

IRS during examination, "in contrast to confronting the merits of the tax liability."  *Ruth v.*

*United States*, 823 F.2d 1091, 1094 (7th Cir. 1987) (concluding that the district court did not

abuse its discretion "in declining to admit evidence of mere procedural improprieties in the

assessment").[17]  Conversely, in cases where the discovery has focused on the merits of the

assessment, rather than the procedures employed, the courts have found such discovery to be

relevant.  *See, e.g.*, *Flamingo Fishing Corp. v. United States*, 22 Cl. Ct. 625, 629-30 (1991)

---

[17] *See also Katz v. United States*, No. 91-5623, 1992 U.S. Dist. LEXIS 7394, at *2-3 (E.D. Penn. May 6, 1992) (precluding admission of documents from IRS administrative file because, under the "de novo" standard, "it is not necessary to have any ancillary determination as to the procedures employed by the government in levying their assessment against plaintiff").

(allowing taxpayer discovery into the revenue agent's report and into the IRS's interpretation of the word "normally" as used in the applicable statute because such discovery went to the merits of the taxpayer's position, and rejecting the Government's claim that in a "de novo" proceeding such discovery is irrelevant.) As this case illustrates, the "de novo" standard of review does not preclude a taxpayer from obtaining discovery into its administrative file when such information is relevant to the merits of the taxpayer's case.

Defendant cited the unpublished decision of *United States v. Nordberg* in its sur-reply. Nordberg is inapposite. It is an erroneous refund case brought by a pro se taxpayer who was attempting to challenge the IRS's procedures. The court cited *Ruth v. United States*, which applied the "de novo" standard of review to preclude admission of such evidence, rather than discovery. No. 93-12681, 1996 U.S. Dist. LEXIS 5259, at *5 (D. Mass. Apr. 8, 1996), *aff'd without opinion*, 97 F.3d 1445 (1st Cir. 1996).

The court also relied on cases cited by Defendant in this case, *Greenberg's Express, Inc. v. Comm'r*, 62 T.C. 324, 328 (1974), and *Garity v. United States*, No. 9-72624, 1980 WL 1765, at *2 (E.D. Mich. May 20, 1980). Both of those cases, however, dealt with taxpayers who were trying to look at the IRS's process, rather than information underlying the merits of the adjustments. In *Greenberg's Express*, a Tax Court case in which the Federal Rules of Civil Procedure do not apply, two members of the Gambino crime family were seeking discovery of documents from the IRS, the Secretary of the Treasury, and the Attorney General of the United States. The Gambinos claimed that such documents would show that the IRS assessment of their liabilities "arose from official actions violating their [C]onstitutional rights." 62 T.C. at 326. The court stated that it would not look behind a deficiency notice for purposes of declaring the notice null and void. *Id.* at 328. Similarly, in *Garity v. United States,* an unpublished decision

from the Eastern District of Michigan, the taxpayers argued that the requested IRS materials were relevant to their claims of abuse of discretion. The court held that "conclusions and reasoning of IRS agents are irrelevant to the validity of the assessment." No. 9-72624, 1980 WL 1765, at *2 (E.D. Mich. May 20, 1980). These holdings are inapplicable to the current case, where the material sought is relevant to the merits of whether FICA A Fund is substantially similar to Notice 2000-44 and not in an attempt to challenge the validity of the notice.

The Court misapplied the "de novo" standard to preclude discovery of IRS administrative records where those records were sought in relation to the underlying merits. The applicable standard as to whether documents and testimony is discoverable should be made in accordance with broad standard set forth in Federal Rule of Civil Procedure 26(b)(1).

## CONCLUSION

The interests of justice require that the Court reconsider its May 10, 2007 order vis-à-vis the IRS's Notice 2000-44 determination. Plaintiff should be allowed to discover the evidence that will allow Plaintiff to defend itself against the assertions made by Defendant. The correct discovery standard should be applied to Plaintiff's discovery and the same standard should be applied to discovery sought by Plaintiff and Defendant. For these reasons, Plaintiff's Motion for Reconsideration of the Court's May 10, 2007 Amended Memorandum and Order should be granted and the Court should compel Defendant to produce documents and provide meaningful answers to interrogatories regarding the IRS's determination that FICA A Fund is substantially similar to Notice 2000-44.

Dated this 22nd day of May 2007.

PLAINTIFF
FIDELITY INTERNATIONAL CURRENCY ADVISOR
A FUND, L.L.C., by the Tax Matters Partner

/s/ Lena Amanti
David J. Curtin, D.C. Bar #281220
Ronald L. Buch, Jr., D.C. Bar #450903
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email: dcurtin@mckeenelson.com
        rbuch@mckeenelson.com
        lamanti@mckeenelson.com

John O. Mirick, BBO #349240
MIRICK, O'CONNELL, DEMALLIE
& LOUGEE, LLP
100 Front Street
Worcester, MA 01608
Telephone:  (508) 791-8500
Facsimile:  (508) 791-8502
Email:  jomirick@mirickoconnell.com

**Certificate of Service**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on May 22, 2007.

/s/ Lena Amanti
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email: lamanti@mckeenelson.com

Exhibit A



# Examining Officer's Activity Record

| EXAMINING OFFICER'S ACTIVITY RECORD | Examining Officer William Conway | Date Assigned/Opened |
|---|---|---|
| **Taxpayer (use preprinted label if possible)**<br>Name    Fidelity International Currency Advisor A Fund ,LLC<br>Address   C/O Michael J. Egan, Manager<br>      116 Flanders Road. Suite 3000<br>      Westboro, Ma. 01581<br>Business Name: Same<br>Address<br><br><br>Phone Business ( 508  )898-3800 ext 352<br>      Fax ( ) | **Taxpayer's Representative.**<br>Patrick Shea CPA  See Form 2948 for additional POA/,<br>Name<br>Address<br><br><br>     ____  TP Auth/ | |

### Contacts and Activities

| Date | Loc. | Cont. | Time on Activity | Remarks, Notes, Actions Taken |
|---|---|---|---|---|
| 5/7/2004 | | | 8 | Case assigned. Referrals made by Team Manç for international and Financial Products. Read through information provided with case file. Call received from Chief Counsel Atty John Aletta. He will be assigned counsel on case. Copy of Partnership return faxed to  John Alet Discussed case with manager. Researched possible Son of Boss issues and transactions |
| 5/11/04 | | | | Case assigned to Mark Corrigan financial specialist. Per discussion with manager Peter McIntyre will be international agent assigned t case. Appointment letter prepared. Appt to be scheduled for 6/21/04 Pub 1 and Noitce sent tc taxpayer |
| 5/17/04 | | | 8 | Taxpayer (Egan) will be sent settlement offer. Not sure if what version Son of Boss Case but offer will be sent per direction Tax Rod Oakes. |
| 5/19/2004 | | | 4 | Started researching 988 losses. Son of Boss transactions. |
| 06/01/2004 | | | | Started preparing audit plan. Planning meetinç will be held prior to initial interview.  Started preparing initial letters. NBAP will be delivered on first day of appointment.<br>Appt Letter for TMP returned undeliverable.<br>Appt letter for Ptr. Returned undeliverable.<br><br>New address 116 Flanders Rd. Westboro, Ma.<br>Appt. Letter prepared with current date and |




# Examining Officer's Activity Record

| | | | | |
|---|---|---|---|---|
| | | | | hand delivered to 116 Flanders Rd.<br><br>Research Halt memo and effect on case. |
| 6/1/04 | | | 4 | Disk received from Tim Erickson. Copied and mailed to John Aletta. |
| | | | 7 | Telephone call from John Aletta. He received t disk. Discussed transaction. Transaction has some elements of Son of Boss. Advised John Aletta that I would be sitting down with Mark Corrigan *Financial Products Specialist* on Jun 14. |
| 6/14/04 | | | 4 | Telephone call made to Pat Shea. Requested corrected address for TMP. Appointment scheduled for June 21, 2004 will be cancelled. Mr. Shea stated that he is putting together information. Agent will call on June 21, 2004 to get status of information.<br><br>Met with Revenue Agents Mark Corrigan and Berny Kaufman financial specialist agents. We through case with agents. Went through transactions. |
| 6/15/04 | | | 6 | Researching currency options. Went through information that Mark Corrigan put together. Mark will analyze the specific option transactions and underlying currency transactions and brokerage statements. He wi put the information into program to address th economic reality issue of the transaction. |
| 6/21/04 | | | | Related taxpayer will file settlement offer on tl transaction. Discussed case with Pat Shea taxpayers POA. Requested that the examinati be scheduled in August do to vacations and end of quarter reports. Mr. Shea stated it will take some time to get all the information completed but wants it to be complete when I out. He suggested August 16th but called bacl requestiung August 23rd. Advised POA that it will be expected that all information be provided. Appt will be August 16th |
| 7/21/04 | | | 8 | Pre-Planning meeting held with International, Financial Products , Counsel along with Group Manager Debra Morrill, International Manager Denis McSweeney and International Territory manager Stan Locke. Case discusse along with discussion on duties of each specialist. Went through KPMG information |

1IRS1130




# Examining Officer's Activity Record

| | | | | | |
|---|---|---|---|---|---|
| | | | | | received with Counsel John Aletta |
| 7/2204 | | | | 4 | Continued reading through information in case |
| 8/16 | | | | 8 | Interview held at Partnership address. Pat She Stephanie Denby and John Monaco of PWC. Started going through records presentede |
| 8/17 | | | | 8 | Audit continued at Patnership. A meeting will I scheduled which financial products and International can discuss issues. |
| 8/30/04 | | | | 8 | Met with Mark Corrigan and Peter MacIntyre to plan for meeting on the 2nd. Went over case file and information received to date. |
| 9/2/ | | | | 6 | Appointment held at taxpayer with audit team along with Group Manager Debra Morrill and International Group Manager Denis McSweene Taxpayer were represented by Mox Tan of Helios Financial. Pat Shea, John Monacco, Stephine Denby. Along with Michael Egan. Discussion held on the transaction. |
| 9/3 | | | | 2 | Discussed case with Mark Corrigan and Questions which need to be developed. Questions will be sent to John Aletta. |
| 9/13 | | | | 8 | Prepared memo to be sent to counsel to determine whether case is a son of boss case. |
| 9/14 | | | | 2 | CONFERENCE CALL HELD WITH john MONACCO AND PAT SHEA TO GO OVER STATUS OF ISSUE. ADVISED THAT MEMO WA GOING TO BE SENT TO COUNCIL FOR DETERMINATION. |
| 9/15 | | | | | CONFERENCE CALL HELD WITH MONACO SHEA DEBRA MORRILL AND MYSELF. Discussing memo that was prepared and sent up. |
| 9/17 | | | | 4 | WORKED ON CASE FILE  Conference call with Group Manager Sidney Saewitz of Cincinnati. Group has a similar case. Went over basic fac of transactions. |
| 9/20 | | | | 4 | MEMO E-MAILED TO JOHN ALETTA DISCUSSED MEMO WITH JOHN. HE WILL FORWARD THE REQUEST UP THE CHAIN. Worked on IDR's which will need to be approved. |
| 9/22 | | | | | Corrected IDR's as directed by John Aletta. |
| 9/27 | | | | 4 | Went through case file. |
| 10/5 | | | | 1 | Discussed status of memo. |
| 10/6 | | | | 1 | Checked recent information on Son of Boss. |



# Examining Officer's Activity Record

| | | | | |
|---|---|---|---|---|
| 10/18 | | | 6 | Planning meeting held with Debra Morrill Deni McSweeney, Mark Corrigan and Peter McIntyre Meeting scheduled for 10/19 at taxpayers with Jim Fee. |
| 10/19/04 | | | 8 | Meeting held at taxpayers . Discussion of fact to determine whether Fidelity is a Son of Bos Case or other type shelter/transaction and whether taxpayer will have appeal rights.Jim Fee of Chief Counsel attended the meeting in order to help in making determination as to whether this is a Son of Boss Case. See notes in history section. Determination should be made with a few weeks. |
| 10/26'04 | | | 2 | Spoke with Pat Shea will be faxing letter letter received. Lists out taxpayers position on Son Boss. |
| 11/1/04 | | | 8 | No determination made to date. Prepared Form 872 P and sent to partnership, TMP and the Power of attorneys. Read through letter sent previously. |
| 11/22/04 | | | 4 | Determination as to whether taxpayer is Son o Boss has not been made. Prepared follow up letter for 872 P. Mailed on the 24th. Call to be made to Pat Shea. It is taxpayers intentions to sign an extension if it is detemined that they a not a son of boss transaction. If they are not going to be given appeal rights they will not sign statute extension. Decision may be made by Dec 1st. |
| 12/1/04 | | | 1 | No determination made. Taxpayer reiterated that they would sign a statute extension when determination is made. |
| 12/2/04 | | | 1 | Worked on case file. |
| 12/14/04 | | | 8 | Worked on case file. Continued working throu information obtained through audit. |
| 12/16/04 | | | 8 | Individual outside basis calculation has been provided. Went through corporate records to determine numbers are accuarately reflected. No determination made as to whether taxpaye will be apprised of there appeal rights. |
| 1/4/05 | | | 2 | Called Pat Shea. Discussed that no decision was made and no decision is expected any tin soon. |
| 1/10/05 | | | 8 | Worked on case. Researched closing of case and specific procedures relating to |

 

# Examining Officer's Activity Record

| | | | | | Son of Boss |
|---|---|---|---|---|---|
| 1/14/05 | | | | | Conference call with John Monaco. John was looking for information so he can convince his TEAM to sign extension. Advised John that no determination was made and probably will not be made before the FPAA is sent out. |
| 1/18/05 | | | | 4 | Researched information on bonds  presented information to Patrick Shea. Discussed bond procedure with Shea. Met with Pat Shea |
| 1/25/04 | | | | 8 | Met with Pat Shea and received copies of 2002 and 2003 1040 returns. Examination will be initiated. Advised Patrick Shea that FPAA will prepared and issued shortly. Pat Shea presented <br> Agent with letter that was faxed to Jim Fee and and Johnathan Zelnik. |
| 1/26 | | | | 8 | Worked on FPAA. Received Mark Corrigans wwiteup  Worked on RGS, Required adjustments needed to be listed on RAR cann be done with RGS program.  Printed and Save RAR to adobe file. "DO NOT USE RAR DISK F( REPORTS" <br> USE ADOBE 4605a FOR ANY CHANGES" |
| 1/27 | | | | 10 | WORKED on FPAA. Pat Shea called stating that they will be making a payment in form of cash bond. Payment will be 30 Million dollars. Emailed preliminary FPAA and writeup to John Aletta and Rick Gannon.  Rick Gannon will review and make corrections and additions. A prepare argument on case. |
| 1/28 | | | | 9 | Picked up payment from Pat Shea. Discussed letter.  Went back to office processed check. Mailing documents checked. <br> Rick Gannon will work on case this weekend and should have draft maybe on Monday.. |
| 1/31 | | | | 10 | Spoke to Rick Gannon.  Continue working on Writeup.  Continued working the case for closing. FPAA is being worked on by John Aletta <br> Discussed case with  Counsel. |
| 2/1 | | | | 9 | Continued working case. Draft Form 886a sent by John Aletta. Started reviewing. Worked on penalty writeup for individual closing. Penalty applicable at investor level. |
| 2/2 | | | | 9 | Continued working case file. Organized workpapers, Read through Form 886a |

1IRS1133

# Examining Officer's Activity Record

| 2/3 | | | 9 | Continued preparing case for closing. |
|---|---|---|---|---|
| 2/4 | | | 6 | CAsE completid. |
| | | | | submittd 10 Mgr - |
| | | | | CAllEd Ror Douglas |
| | | | | No Return call. |

1IRS1134

# Examining Officer's Activity Record

| | | | | |
|---|---|---|---|---|
| 2/4 | | | | Case given to manager Called Rod Douglas re tefra linkage. |
| 2/11 | | | | Spoke to Ron Douglas tefra coordinator in Ogden. Case has been established and NBAP was sent out on Feb 7.\ |
| 2/22/05 | | | | Decision received regarding request for advice whether it was determined that this case was substantially similar to notice 2000-44.<br>It was determined that it was. Taxpayer will not be allowed to apprise themselves of appeal rights. Pat Shea was called and informed of the decision. |
| 2/24/05 | | | | Penalty IDR prepared and sent to counsel for approval. Investor level |
| 3/1 | | | | Emailed Richard Gannon requesting status of Penalty IDR along with status of FPAA and 886. |
| 3/3 | | | | Met with Pat Shea and Michael Egan. Went over status of partnership. Letter presented requesting agent to give them a written analysis as to how decision was met. |
| 3/7/05 | | | 8 | Updated files and closing documents. No response from taxpayer.Printed the last revised FPAA and 886A. |
| | | | | |
| | | | | |
| | | | | |

# Exhibit B



U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

Postmark
Here

APR 06 2005

Postage | $
Certified Fee
Return Receipt Fee
(Endorsement Required)
Restricted Delivery Fee
(Endorsement Required)
Total Postage & Fees | $

Sent To
Street, Apt. No.;
or PO Box No.
City, State, ZIP+4

PS Form 3800, June 2002    See Reverse for Instructions

7004 2510 0004 7627 2704

1IRS0822

**Certified Mail Provides:**
- A mailing receipt
- A unique identifier for your mailpiece
- A record of delivery kept by the Postal Service for two years

*Important Reminders:*
- Certified Mail may ONLY be combined with First-Class Mail® or Priority Mail®.
- Certified Mail is not available for any class of international mail.
- NO INSURANCE COVERAGE IS PROVIDED with Certified Mail. For valuables, please consider Insured or Registered Mail.
- For an additional fee, a *Return Receipt* may be requested to provide proof of delivery. To obtain Return Receipt service, please complete and attach a Return Receipt (PS Form 3811) to the article and add applicable postage to cover the fee. Endorse mailpiece "Return Receipt Requested". To receive a fee waiver for a duplicate return receipt, a USPS® postmark on your Certified Mail receipt is required.
- For an additional fee, delivery may be restricted to the addressee or addressee's authorized agent. Advise the clerk or mark the mailpiece with the endorsement "Restricted Delivery".
- If a postmark on the Certified Mail receipt is desired, please present the article at the post office for postmarking. If a postmark on the Certified Mail receipt is not needed, detach and affix label with postage and mail.

**IMPORTANT: Save this receipt and present it when making an inquiry.**
Internet access to delivery information is not available on mail addressed to APOs and FPOs.

PS Form 3800, June 2002 (Reverse)

1IRS0823

**Internal Revenue Service**

316 North Robert Street
St. Paul, Minnesota 55101

Date.    **APR 0 6 2005**

Tax Matters Partner
Fidelity International Currency Advisor A Fund, LLC
116 Flanders Road, Suite 2000
Westborough, MA. 01581

**Department of the Treasury**

Refer To
    ESB Stop 4020BK
Taxpayer Identifying Number
    36-4381795
Name of Partnership
    Fidelity International Currency Advisor A
Partnership Identifying Number
    36-4381795
Tax Year Ended
    December 31, 2001
Date FPAA Mailed to Tax Matters Partner
    **APR 0 6 2005**
Person to Contact
    Bill Kahnke
    41-03606
Contact Hours
    8 00 am to 4 30 pm
Contact Telephone Number
    (651) 312-7909

## NOTICE OF FINAL PARTNERSHIP ADMINISTRATIVE ADJUSTMENT

The law requires us to send a Notice of Final Partnership Administrative Adjustment (FPAA) to the partnership named above, for the tax year shown above, and to each partner who is entitled to receive this notice

We are proposing adjustments to the partnership items of the partnership and tax year shown above  We will send the examination report outlining these adjustments to the Tax Matters Partner (TMP) of the partnership. (The TMP is the partner designated by the partnership to deal with the IRS ) He/she is also authorized to act for the partners who are not entitled to receive this notice. Any partner who wants a copy of the examination report should request it from the TMP. If the TMP is unable to provide you with a copy of the examination report, please contact the person named in the heading of this letter.

Taxable Years Ending Before August 6, 1997·

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease to the tax liability on your individual return. Form 870-P, *Agreement to Assessment and Collection of Deficiency in Tax for Partnership Adjustments*, is a summary of the proposed adjustments to the partnership return  You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.

Taxable Years Ending After August 5, 1997:

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease in the tax liability on your individual return. The adjustments may include partnership level determinations regarding penalties and additions to tax that relate to adjustments to partnership items. Form 870-PT, *Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts*, is a summary of the proposed adjustments to the partnership return  You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.

**Letter 1830 (DO) (Rev. 3-2001)**
Catalog Number 61242U

1IRS0824

You have three options available to you:

**1. If you agree with the adjustments:**

Sign and return the enclosed Form 870-P/Form 870-PT. When you sign Form 870-P/Form 870-PT, you are agreeing to pay any additional tax and interest resulting from the adjustments to the partnership return. For tax years ending after August 5, 1997, you are also agreeing to any partnership level determination as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items, if any. In addition, you are waiving your rights to participate in any administrative or judicial proceeding affecting partnership items and in partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items for the tax year in question. This is a binding settlement only if you sign and return Form 870-P/Form 870-PT and we sign on behalf of the Commissioner of Internal Revenue Service. When we sign the agreement form, the one-year extension of the period of limitations on assessments will begin under Internal Revenue Code section 6229(f). Once the agreement is signed by both parties, you may not file a claim to change the items in question or claim a refund/credit based on a readjustment.

Note: If you are the TMP of the partnership, see the section of this letter entitled, *"For the Tax Matters Partner of the Partnership"*.

**2. If you do not agree with the adjustments:**

If you are the TMP of the partnership and want to contest the adjustments in court, you must file a petition within 90 days from the date of this letter. During this 90-day period, no other partner may file a petition for judicial review. You can file your petition for readjustment of partnership items with:

1. the United States Tax Court;
2. the United States Court of Federal Claims; or
3. the District Court of the United States, in the district of the partnership's principal place of business.

A petition filed by the TMP precludes all other actions. If the TMP doesn't file a petition by the 90th day from the date the FPAA was mailed, any partner or any 5 percent group entitled to receive this notice may petition one of these courts. A "5 percent group" includes any group of partners who together have an interest of five percent or more in profits of the partnership. The petition must be filed after the 90th day, but on or before the 150th day from the date the FPAA was mailed to the TMP. If more than one petition is filed in Tax Court, the first petition filed will go forward. All other petitions (even those filed earlier in one of the other courts) will be dismissed. If no one files a petition in Tax Court, the first petition filed in one of the other courts will go forward and subsequent petitions will be dismissed.

Petitions filed with the United States Tax Court must be mailed to:

**United States Tax Court**
**400 Second Street, NW**
**Washington, DC 20217**

Attach a copy of this letter to the petition. The time in which you must file a petition with the court is fixed by law and the court cannot consider your case if your petition is filed late. If this letter is addressed to both a husband and wife and both want to petition the Tax Court, both must sign the petition or each must file a separate signed petition.

**Letter 1830 (DO) (Rev. 3-2001)**
Catalog Number 61242U

When a partner (including each member of a 5 percent group that files a petition) files a petition in either the appropriate District Court or the Court of Federal Claims, the partner filing the petition must deposit the amount that the partner's tax liability would be increased if the treatment of the partnership items on the partner's return were made consistent with the treatment of partnership items under the FPAA. If you reported the partnership items the way the partnership reported them on its return, you can generally determine the amount to deposit by taking your pro rata share of the partnership adjustments into account in recomputing your tax. You must deposit the appropriate amount with the IRS on or before the day you file your petition.

**3. If you do nothing:**

If a petition for readjustment is not filed in any of the courts listed in this letter, the FPAA becomes final, and we will bill you for any additional tax plus interest that you may owe under the FPAA. You will not be permitted to contest the treatment of the partnership items of the partnership under the FPAA in any refund claim or suit. The law allows the Service to bill you after 150 days from the mailing date of the FPAA to the TMP.

However, if a petition is filed in the Tax Court, and the Tax Court upholds the adjustments in whole or in part, we will not bill you until the Tax Court decision is final.

You may wish to contact the TMP of the partnership or your tax advisor to discuss this matter.

If you have any questions, please write to the person whose name and address are shown in the heading of this letter. If you write, attach a copy of this letter to help identify your account. Also, include your telephone number and the most convenient time for us to call you in case we need additional information.

If you prefer, you may call the IRS contact person at the telephone number shown in the heading of this letter. If this number is outside your local calling area, there will be a long distance charge to you.

Thank you for your cooperation.

Sincerely,

Kevin Harris

Kevin Harris
Technical Services Territory Manager, Midwest Area

Enclosures:
Form 870-P/Form 870-PT
Copy of this letter

Letter 1830 (DO) (Rev. 3-2001)
Catalog Number 61242U

1IRS0826

## FOR THE TAX MATTERS PARTNER OF THE PARTNERSHIP

If you are the Tax Matters Partner (TMP), you are entitled to make an agreement to bind non-notice partners to the treatment of the partnership items as shown on the enclosed schedule of adjustments. You must add the following statement above the signature blocks on the Form 870-P or Form 870-PT:

"The undersigned Tax Matters Partner is signing this offer on behalf of himself (herself) and all other partners whom he (she) has the authority to bind; a final agreement resulting from the co-signature of the Commissioner of Internal Revenue will be binding on all such other partners."

As the TMP, you may submit a petition, as described above for the partnership on behalf of all partners.

If you have any questions, you can call the IRS contact person at the telephone number shown in the heading of this letter. Thank you for your cooperation.

**Letter 1830 (DO) (Rev. 3-2001)**
Catalog Number 61242U

1IRS0827

| Form **870-PT**<br>(8-2004) | DEPARTMENT OF THE TREASURY – INTERNAL REVENUE SERVICE<br>**Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts** | IN REPLY<br>REFER TO<br><br>ESB Stop 4020 |
| --- | --- | --- |

| Taxpayer(s) name(s), address and ZIP code<br><br>Tax Matters Partner<br>Fidelity International Currency Advisor A Fund, LLC<br>116 Flanders Road, Suite 2000<br>Westborough, MA. 01581<br><br>Taxpayer Identifying Number: 36-4381795 | Name of Partnership:<br>**Fidelity International Currency Advisor A Fund, LLC**<br><br>Taxpayer Identifying Number  **36-4381795**<br><br>Name of Tax Matters Partner<br><br>**Helios Trading, LLC** | Tax Year(s) Ended<br><br>**December 31, 2001** |
| --- | --- | --- |

## Offer of Agreement to Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts
### &
## Waiver of Restrictions on Assessment for Partnership Items, Penalties, Additions to Tax, and Additional Amounts

Under sections 6224(c) and 7121 of the Internal Revenue Code (IRC) of 1986, the Commissioner of the Internal Revenue Service and the undersigned taxpayer(s) agree to the determination of partnership items and partnership level determinations as to penalties, additions to tax, and additional amounts that relate to adjustments to partnership items as shown on the attached schedule of adjustments

The undersigned taxpayer(s), in accordance with IRC sections 6224(b) and 6213(d), also waive the restrictions provided by IRC sections 6225(a) and 6213(a) and consent to the assessment and collection of any deficiency attributable to partnership items, penalties, additions to tax, and additional amounts that relate to partnership items, as determined in this agreement; plus any interest provided by law.

This agreement is conditional and will not become effective or final until this agreement form is returned to the Commissioner and is signed on his or her behalf. The one-year extension of the period of limitations on assessments under IRC section 6229(f) will not begin to run until the date the Commissioner's representative signs this form on the Commissioner's behalf.  If this is a partial agreement, the period of limitations for assessing any tax attributable to the settled items shall be determined as if this agreement had not been entered into

If this part of this agreement form is signed for the Commissioner, the treatment of partnership items and partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items under this agreement will not be reopened in absence of fraud, malfeasance, or misrepresentation of fact  In addition, no claim for an adjustment of partnership items, refund or credit based on any change in the treatment of partnership items or partnership level determinations as to penalties, additions to tax and additional amounts may be filed or prosecuted.

| Signature of Taxpayer | Date Signed |
| --- | --- |
| Signature of Taxpayer | Date Signed |
| By (Signature and Title) | Date Signed |

| FOR<br>INTERNAL<br>REVENUE<br>USE ONLY | Date accepted for Commissioner | Signature |
| --- | --- | --- |
| | Office | Title |

| Cat. No. 57315H | www.irs.gov | (See Instructions for Signing Agreement) | Form **870-PT** (8-2004) |
| --- | --- | --- | --- |

1IRS0828

## INSTRUCTIONS FOR SIGNING FORM 870-PT

1. If a JOINT RETURN OF A HUSBAND AND WIFE was filed and both spouses intend to agree, both spouses should sign Form 870-PT. One spouse may sign as agent for the other if acting under a power of attorney, which, if not previously filed, must accompany this form. The IRS may accept the signature of only one spouse at its discretion. However, the agreement will only be binding on the signing spouse.

2. If the taxpayer is a corporation, the agreement should be signed with the corporate name followed by the signature and title of the officer authorized to sign Form 870-PT.

3. Your attorney or agent may sign for you if this action is specifically authorized by a power of attorney, which if not previously filed, must accompany this form.

4. If this offer is signed by a trust, the agreement must be signed with the trust name, followed by the signature and title of the person authorized to sign on behalf of the trust.

5. If this offer is with respect to the tax liability for the consolidated return year, the agreement should be signed in the name of the common parent of the consolidated group for the consolidated return year. The common parent corporation signs the agreement in its own name. The signature and title of a current officer of the common parent corporation, who is authorized to bind the corporation, should be displayed in the signature block.

6. If the Tax Matters Partner signs this offer, please include the title with the signature.

7. If this offer is signed by a Tax Matters Partner that is a subsidiary corporation, then an officer authorized to sign this agreement for the year(s) indicated on the form must sign for the parent corporation. An authorized officer for the subsidiary corporation should also sign if the Tax Matters Partner is binding non-notice partners under the agreement. See Treas. Reg. 1.1502-77(a)(3)(v).

Cat. No. 57315H                    www.irs.gov                    Form **870-PT** (8-2004)

1IRS0829

DEPARTMENT OF THE TREASURY – INTERNAL REVENUE SERVICE

**Agreement for Partnership Items and Partnership Level Determinations
as to Penalties, Additions to Tax, and Additional Amounts**

SCHEDULE OF ADJUSTMENTS

| NAME OF PARTNERSHIP | TAX YEAR(S) ENDED | | |
|---|---|---|---|
| Fidelity International Currency Advisor A Fund, LLC | 12/31/2001 | | |
| TAXPAYER IDENTIFYING NUMBER:  36-4381795 | | | |
| DETAIL OF ADJUSTMENTS TO ORDINARY INCOME | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| TOTAL ADJUSTMENTS TO ORDINARY INCOME | 0.00 | | |
| OTHER ADJUSTMENTS | | | |
| A.  CAPITAL CONTRIBUTIONS | | | |
| (1)  ADJUSTMENT | (164,702,351) | | |
| (2)  AS REPORTED | 164,702,351 | | |
| (3)  CORRECTED | 0.00 | | |
| B.  PORTFOLIO INCOME (LOSS) – INTEREST INCOME | | | |
| (1)  ADJUSTMENT | (4,712 00) | | |
| (2)  AS REPORTED | 4,712.00 | | |
| (3)  CORRECTED | 0 00 | | |

REMARKS

- **Reference Exhibit A Attached.**

**Accuracy Penalties under IRC Section 6662 are included as a partnership level determination.
See Exhibit A, Paragraph 13, for a description of the penalties.**

**\* See Exhibit A, Paragraph 4.**

1IRS0830

## Form 870-PT, Other Adjustments (Continued)

| | Page     of |
|---|---|

| NAME OF PARTNERSHIP | TAX YEAR(S) ENDED | | |
|---|---|---|---|
| Fidelity International Currency Advisor A Fund, LLC | 12/31/2001 | | |
| TAXPAYER IDENTIFYING NUMBER  36-4381795 | | | |
| **C  OUTSIDE PARTNERSHIP BASIS** | | | |
| (1)  ADJUSTMENT | (147,750,000.00) | | |
| (2)  AS REPORTED | 147,750,000.00 | | |
| (3)  CORRECTED | **0.00\*** | | |
| **D  OTHER INCOME (LOSS)** | | | |
| (1)  ADJUSTMENT | 4,138,665 00 | | |
| (2)  AS REPORTED | (4,138,665.00) | | |
| (3)  CORRECTED | 0.00 | | |
| **E.  DEDUCTIONS RELATED TO PORTFOLIO INCOME** | | | |
| (1)  ADJUSTMENT | 34 00 | | |
| (2)  AS REPORTED | 34.00 | | |
| (3)  CORRECTED | 0.00 | | |
| **F.  INVESTMENT INCOME INCLUDED IN PORTFOLIO INCOME** | | | |
| (1)  ADJUSTMENT | (4,712.00) | | |
| (2)  AS REPORTED | 4,712.00 | | |
| (3)  CORRECTED | 0 00 | | |
| **G.  INVESTMENT EXPENSES INCLUDED IN DEDUCTIONS RELATED TO PORTFOLIO INCOME** | | | |
| (1)  ADJUSTMENT | 34.00 | | |
| (2)  AS REPORTED | 34 00 | | |
| (3)  CORRECTED | 0 00 | | |
| **H.  TAX-EXEMPT INTEREST INCOME** | | | |
| (1)  ADJUSTMENT | (5,926.00) | | |
| (2)  AS REPORTED | 5,926.00 | | |
| (3)  CORRECTED | 0 00 | | |
| **I.  NONDEDUCTIBLE EXPENSES** | | | |
| (1)  ADJUSTMENT | 290 00 | | |
| (2)  AS REPORTED | 290 00 | | |
| (3)  CORRECTED | 0 00 | | |

Cat. No 57315H                    www.irs.gov                    Form **870-PT** (8-2004)

1IRS0831

## Form 870-PT, Other Adjustments (Continued)

Page _____ of _____

| NAME OF PARTNERSHIP | TAX YEAR(S) ENDED | | |
|---|---|---|---|
| Fidelity International Currency Advisor A Fund, LLC<br><br>TAXPAYER IDENTIFYING NUMBER   36-4381795 | 12/31/2001 | | |

| J.  DISTRIBUTIONS OF MONEY | | | |
|---|---|---|---|
| (1)  ADJUSTMENT | (6,408.00) | | |
| (2)  AS REPORTED | 6,408.00 | | |
| (3)  CORRECTED | 0.00 | | |

1IRS0832

"Notice 2000-44 Case"

## FPAA
## EXHIBIT A

1. It is determined that neither Fidelity International Currency Advisor A Fund, LLC nor its purported partners have established the existence of Fidelity International Currency Advisor A Fund, LLC as a partnership as a matter of fact.

2. Even if Fidelity International Currency Advisor A Fund LLC existed as a partnership, this purported partnership was formed and/or availed of solely for purposes of tax avoidance by artificially overstating basis in the partnership interests of its purported partners and engaging in the options transactions. The formation of Fidelity International Currency Advisor A Fund, LLC, the acquisition of any interest in this purported partnership by its purported partners, its purchase and sale of offsetting options, its transactions involving said options, the transfer of offsetting options to Fidelity International Currency Advisor A Fund, LLC in return for a partnership interest, and the transfer of partnership interests in Fidelity International Currency Advisor A Fund, LLC among its partners, had no business purpose other than tax avoidance, lacked economic substance, and, in fact and substance, constitutes an economic sham for federal income tax purposes. Accordingly, Fidelity International Currency Advisor A Fund, LLC and the transactions described above shall be disregarded in full and (1) any purported losses resulting from these transactions are not allowable as deductions; (2) increases to the adjusted basis of partnership interests are not allowed for federal income tax purposes; and (3) the splitting of gains and losses from these options transactions among the partners of Fidelity International Currency Advisor A Fund, LLC is not allowed.

3. It is determined that Fidelity International Currency Advisor A Fund, LLC was a sham, lacked economic substance and, under § 1.701-2 of the Income Tax Regulations, was formed and/or availed of in connection with a transaction or transactions in taxable year 2001, a principal purpose of which was to reduce substantially the present value of its partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code. It is consequently determined that:

   a. Fidelity International Currency Advisor A Fund, LLC is disregarded and that all transactions engaged in by this purported partnership are treated as engaged in directly by its purported partners. This includes the determination that the assets purportedly acquired by FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC, including but not limited to options, were acquired directly by its purported partners.

   b. the option(s), purportedly contributed to, acquired by, or assumed by FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC, are treated as never having been contributed to, acquired by, or assumed by said partnership and any gains or losses purportedly realized by FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC on the option(s) are treated as having been realized by its

1

1IRS0833

"Notice 2000-44 Case"

**FPAA**
EXHIBIT A

partners.

c. the purported partners of FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC should be treated as not being partners in FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC.

d. contributions to FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC will be adjusted to reflect clearly the partnership's or purported partners' income.

e. Allocating gains and losses from the options transactions among the partners of Fidelity International Currency Advisor A Fund, LLC will not be recognized.

4. It is determined that the obligations under the short positions (written call options) transferred to FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC constitute liabilities for purposes of Treasury Regulation §1.752-6T, the assumption of which by FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC shall reduce the purported partners' bases in FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC in the amount of $147,750,000, but not below the fair market value of the purported partnership interest.

5. It is determined that neither FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC nor its purported partners entered into the option(s) positions with a profit motive for purposes of § 165(c)(2).

6. It is determined that, even if the option(s) are treated as having been contributed to FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC, the amount treated as contributed by the partners under section 722 of the Internal Revenue Code is reduced by the amounts received by the contributing partners from the contemporaneous sales of the call option(s) to the same counter-party. Thus, the basis of the contributed option(s) is reduced, both in the hands of the contributing partner(s) and FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC. by $147,750,000. Consequently, any corresponding claimed increases in the outside basis in FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC resulting from the contributions of the option(s) are disallowed.

7. It is determined that the adjusted bases of the long call positions (purchased call options), and other contributions purportedly contributed to FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC by its partners has not been established under I.R.C. § 723. It is consequently determined that the partners of FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC have not established adjusted bases in their respective partnership interests in an amount greater than zero (-0-).

8. It is determined that the purchase of each option by a contributing partner and the simultaneous sale of an offsetting option to the same counterparty constituted, in fact, the acquisition of a single, unitary

2

1IRS0834

"Notice 2000-44 Case"

## FPAA
### EXHIBIT A

position by the contributing partner and that, as such, the contributing partner's basis in the partnership interest created on the contribution of the offsetting position to the partnership is limited to the difference between the amount paid on the purported purchase of one option and the amount credited on the purported sale of the offsetting option.

9.  It is determined that the purported termination of the gain legs of the option spreads acquired by the partnership and the immediate replacement of the purportedly terminated legs with legs providing the partnership with the same legal entitlements as those provided by the terminated legs did not constitute a sale or exchange for federal income tax purposes. No gain or loss was realized on the purported termination of the legs in question and the partnership's adjusted basis in the purportedly terminated legs is decreased to reflect the non-recognition of the gain.

10. It is determined that the Section 988 loss of $4,138,665 claimed by Fidelity International Currency Advisor A Fund, LLC from its options' transactions is disallowed as it has not been established that such loss was incurred and is deductible under any provision of the Internal Revenue Code including, but not limited to, I.R.C. Section 165.

11. It is determined that the loss of $158,630,921, claimed by Fidelity International Currency Advisor A Fund, LLC from its options' transactions and reported on Schedule K-1 for its partner, Richard J. Egan is disallowed as it has not been established that such loss was incurred and is deductible under any provision of the Internal Revenue Code including, but not limited to, I.R.C. Section 165.

12. It has not been established that Samuel Mahoney became a partner in FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC or that he contributed $651,000 in exchange for an interest in the partnership.

13. It is determined that the adjustments of partnership items of FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC are attributable to a tax shelter for which no substantial authority has been established for the position taken, and for which there was no showing of reasonable belief by the partnership or its partners that the position taken was more likely than not the correct treatment of the tax shelter and related transactions. In addition, all of the underpayments of tax resulting from those adjustments of partnership items are attributable to, at a minimum, (1) substantial understatements of income tax, (2) gross valuation misstatement(s), or (3) negligence or disregarded rules or regulations. There has not been a showing by the

3

1IRS0835

"Notice 2000-44 Case"

**FPAA**
EXHIBIT A

partnership or any of its partners that there was reasonable cause for any of the resulting underpayments, that the partnership or any of its partners acted in good faith, or that any other exceptions to the penalty apply.   It is therefore determined that, at a minimum, the accuracy-related penalty under Section 6662 of the Internal Revenue Code applies to all underpayments of tax attributable to adjustments of partnership items of FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC.   The penalty shall be imposed on the components of underpayment as follows:

A.  a 40 percent penalty shall be imposed on the portion of any underpayment attributable to the gross valuation misstatement as provided by Sections 6662(a), 6662(b)(3), 6662(e), and 6662(h) of the Internal Revenue Code.

B.  a 20 percent penalty shall be imposed on the portion of the underpayment attributable to negligence or disregard of rules and regulations as provided by Sections 6662(a), 6662(b)(1), 6662(c) of the Internal Revenue Code.

C.  a 20 percent penalty shall be imposed on the underpayment attributable to the substantial understatement of income tax as provided by sections 6662(a), 6662(b)(2), and 6662(d) of the Internal Revenue Code.

D.  a 20 percent penalty shall be imposed on the underpayment attributable to the substantial valuation misstatement as provided by Sections 6662(a), 6662(b)(3),  and 6662(e) of the Internal Revenue Code.


It should not be inferred by the determination of the Accuracy Related Penalty in this notice that fraud penalties will not be sought on any portion of an underpayment subsequently determined to be attributable to fraud or that prosecution for criminal offenses will not be sought under IRC § 7201, 7206 or other provisions of federal law if determined to be appropriate.

4

1IRS0836

# Exhibit C

Notice 2000-44 Case

**Internal Revenue Service**

**Department of the Treasury**

30 East 7th Street
St. Paul, Minnesota 55101

*File Copies*

Refer To:
ESB Stop 4020BK
Taxpayer Identifying Number:
36-4381795
Name of Partnership:
Fidelity International Currency Advisor A Fund
Partnership Identifying Number:
36-4381795
Tax Year Ended:
December 31, 2002
Date FPAA Mailed to Tax Matters Partner:

Date: APR 2 6 2006

Tax Matters Partner
Fidelity International Currency Advisor A Fund, LLC
116 Flanders Road, Suite 2000
Westborough, MA. 01581

Person to Contact: APR 2 6 2006
Bill Kahnke
41-03606
Contact Hours:
8:00 am to 4:30 pm
Contact Telephone Number:
(651) 312-7909

## NOTICE OF FINAL PARTNERSHIP ADMINISTRATIVE ADJUSTMENT

The law requires us to send a Notice of Final Partnership Administrative Adjustment (FPAA) to the partnership named above, for the tax year shown above, and to each partner who is entitled to receive this notice.

We are proposing adjustments to the partnership items of the partnership and tax year shown above. We will send the examination report outlining these adjustments to the Tax Matters Partner (TMP) of the partnership. (The TMP is the partner designated by the partnership to deal with the IRS.) He/she is also authorized to act for the partners who are not entitled to receive this notice. Any partner who wants a copy of the examination report should request it from the TMP. If the TMP is unable to provide you with a copy of the examination report, please contact the person named in the heading of this letter.

Taxable Years Ending Before August 6, 1997:

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease to the tax liability on your individual return. Form 870-P, *Agreement to Assessment and Collection of Deficiency in Tax for Partnership Adjustments*, is a summary of the proposed adjustments to the partnership return. You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.

Taxable Years Ending After August 5, 1997:

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease in the tax liability on your individual return. The adjustments may include partnership level determinations regarding penalties and additions to tax that relate to adjustments to partnership items. Form 870-PT, *Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts*, is a summary of the proposed adjustments to the partnership return. You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.

**Letter 1830 (DO) (Rev. 3-2001)**
Catalog Number 61242U

**Internal Revenue Service**

Notice 2000-44 Case

*File*
*~~~~*

**Department of the Treasury**

30 East 7th Street
St. Paul, Minnesota  55101

Refer To:
    ESB Stop 4020BK
Taxpayer Identifying Number:
    36-4381795
Name of Partnership:
    Fidelity International Currency Advisor A Fund
Partnership Identifying Number:
    36-4381795
Tax Year Ended:
    December 31, 2002
Date FPAA Mailed to Tax Matters Partner:

Date: **APR 2 6 2006**

Tax Matters Partner
Fidelity International Currency Advisor A Fund, LLC
116 Flanders Road, Suite 2000
Westborough, MA.  01581

Person to Contact: **APR 2 6 2006**
    Bill Kahnke
    41-03606
Contact Hours:
    8:00 am to 4:30 pm
Contact Telephone Number:
    (651) 312-7909

### NOTICE OF FINAL PARTNERSHIP ADMINISTRATIVE ADJUSTMENT

The law requires us to send a Notice of Final Partnership Administrative Adjustment (FPAA) to the partnership named above, for the tax year shown above, and to each partner who is entitled to receive this notice.

We are proposing adjustments to the partnership items of the partnership and tax year shown above. We will send the examination report outlining these adjustments to the Tax Matters Partner (TMP) of the partnership. (The TMP is the partner designated by the partnership to deal with the IRS.) He/she is also authorized to act for the partners who are not entitled to receive this notice. Any partner who wants a copy of the examination report should request it from the TMP. If the TMP is unable to provide you with a copy of the examination report, please contact the person named in the heading of this letter.

Taxable Years Ending Before August 6, 1997:

The adjustments to the partnership items reported on the partne[...] decrease to the tax liability on your individual return. Form 870-P[...] *Deficiency in Tax for Partnership Adjustments*, is a summary of t[...] return. You can compute your share of the proposed adjustments [...] by your percentage interest for that partnership item.

Taxable Years Ending After August 5, 1997:

The adjustments to the partnership items reported on the partne[...] decrease in the tax liability on your individual return. The adjustm[...] determinations regarding penalties and additions to tax that relate [...] Form 870-PT, *Agreement for Partnership Items and Partnership L[...] Additions to Tax, and Additional Amounts*, is a summary of the pro[...] You can compute your share of the proposed adjustments by multi[...] your percentage interest for that partnership item.

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

**O F F I C I A L   U S E**

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To

Street, Apt. No.; or PO Box No.

City, State, ZIP+4

PS Form 3800, June 2002                    See Reverse for Instructions

**Letter 1830 (DO) (Rev. 3-2001)**
Catalog Number 61242U

13IRS00004

You have three options available to you:

**1. If you agree with the adjustments:**

Sign and return the enclosed Form 870-P/Form 870-PT. When you sign Form 870-P/Form 870-PT, you are agreeing to pay any additional tax and interest resulting from the adjustments to the partnership return. For tax years ending after August 5, 1997, you are also agreeing to any partnership level determination as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items, if any. In addition, you are waiving your rights to participate in any administrative or judicial proceeding affecting partnership items and in partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items for the tax year in question. This is a binding settlement only if you sign and return Form 870-P/Form 870-PT and we sign on behalf of the Commissioner of Internal Revenue Service. When we sign the agreement form, the one-year extension of the period of limitations on assessments will begin under Internal Revenue Code section 6229(f). Once the agreement is signed by both parties, you may not file a claim to change the items in question or claim a refund/credit based on a readjustment.

Note: If you are the TMP of the partnership, see the section of this letter entitled, *"For the Tax Matters Partner of the Partnership"*.

**2. If you do not agree with the adjustments:**

If you are the TMP of the partnership and want to contest the adjustments in court, you must file a petition within 90 days from the date of this letter. During this 90-day period, no other partner may file a petition for judicial review. You can file your petition for readjustment of partnership items with:

1. the United States Tax Court;
2. the United States Court of Federal Claims; or
3. the District Court of the United States, in the district of the partnership's principal place of business.

A petition filed by the TMP precludes all other actions. If the TMP doesn't file a petition by the 90th day from the date the FPAA was mailed, any partner or any 5 percent group entitled to receive this notice may petition one of these courts. A "5 percent group" includes any group of partners who together have an interest of five percent or more in profits of the partnership. The petition must be filed after the 90th day, but on or before the 150th day from the date the FPAA was mailed to the TMP. If more than one petition is filed in Tax Court, the first petition filed will go forward. All other petitions (even those filed earlier in one of the other courts) will be dismissed. If no one files a petition in Tax Court, the first petition filed in one of the other courts will go forward and subsequent petitions will be dismissed.

Petitions filed with the United States Tax Court must be mailed to:

**United States Tax Court**
**400 Second Street, NW**
**Washington, DC 20217**

Attach a copy of this letter to the petition. The time in which you must file a petition with the court is fixed by law and the court cannot consider your case if your petition is filed late. If this letter is addressed to both a husband and wife and both want to petition the Tax Court, both must sign the petition or each must file a separate signed petition.

**Letter 1830 (DO) (Rev. 3-2001)**
Catalog Number 61242U

13IRS00005

When a partner (including each member of a 5 percent group that files a petition) files a petition in either the appropriate District Court or the Court of Federal Claims, the partner filing the petition must deposit the amount that the partner's tax liability would be increased if the treatment of the partnership items on the partner's return were made consistent with the treatment of partnership items under the FPAA. If you reported the partnership items the way the partnership reported them on its return, you can generally determine the amount to deposit by taking your pro rata share of the partnership adjustments into account in recomputing your tax. You must deposit the appropriate amount with the IRS on or before the day you file your petition.

**3. If you do nothing:**

If a petition for readjustment is not filed in any of the courts listed in this letter, the FPAA becomes final, and we will bill you for any additional tax plus interest that you may owe under the FPAA. You will not be permitted to contest the treatment of the partnership items of the partnership under the FPAA in any refund claim or suit. The law allows the Service to bill you after 150 days from the mailing date of the FPAA to the TMP.

However, if a petition is filed in the Tax Court, and the Tax Court upholds the adjustments in whole or in part, we will not bill you until the Tax Court decision is final.

You may wish to contact the TMP of the partnership or your tax advisor to discuss this matter.

If you have any questions, please write to the person whose name and address are shown in the heading of this letter. If you write, attach a copy of this letter to help identify your account. Also, include your telephone number and the most convenient time for us to call you in case we need additional information.

If you prefer, you may call the IRS contact person at the telephone number shown in the heading of this letter. If this number is outside your local calling area, there will be a long distance charge to you.

Thank you for your cooperation.

Sincerely,

Timothy M. Conley
Technical Services Territory Manager, Western Area

Enclosures:
Form 870-P/Form 870-PT
Copy of this letter

Letter 1830 (DO) (Rev. 3-2001)
Catalog Number 61242U

13IRS00006

### FOR THE TAX MATTERS PARTNER OF THE PARTNERSHIP

If you are the Tax Matters Partner (TMP), you are entitled to make an agreement to bind non-notice partners to the treatment of the partnership items as shown on the enclosed schedule of adjustments. You must add the following statement above the signature blocks on the Form 870-P or Form 870-PT:

"The undersigned Tax Matters Partner is signing this offer on behalf of himself (herself) and all other partners whom he (she) has the authority to bind; a final agreement resulting from the co-signature of the Commissioner of Internal Revenue will be binding on all such other partners."

As the TMP, you may submit a petition, as described above for the partnership on behalf of all partners.

If you have any questions, you can call the IRS contact person at the telephone number shown in the heading of this letter. Thank you for your cooperation.

**Letter 1830 (DO) (Rev. 3-2001)**
Catalog Number 61242U

13IRS00007

| Form **870-PT** (Rev. 8-2004) | Department of the Treasury — Internal Revenue Service<br>**Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts** | IN REPLY REFER TO:<br><br>ESB Stop 4020 |
|---|---|---|

| Taxpayer(s) name(s), address and ZIP code:<br><br>Tax Matters Partner<br>Fidelity International Currency Advisor A Fund, LLC<br>116 Flanders Road, Suite 2000<br>Westborough, MA. 01581<br><br>Taxpayer Identifying Number:  36-4381795 | Name of Partnership:<br>Fidelity International Currency<br>Taxpayer Identifying Number:<br>36-4381795<br>Name of Tax Matters Partner:<br><br>Richard J. Egan | Tax Year(s) Ended:<br><br>December 31, 2002 |
|---|---|---|

### Offer of Agreement to Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts
### &
### Waiver of Restrictions on Assessment for Partnership Items, Penalties, Additions to Tax, and Additional Amounts

Under sections 6224(c) and 7121 of the Internal Revenue Code (IRC) of 1986, the Commissioner of the Internal Revenue Service and the undersigned taxpayer(s) agree to the determination of partnership items and partnership level determinations as to penalties, additions to tax, and additional amounts that relate to adjustments to partnership items as shown on the attached schedule of adjustments.

The undersigned taxpayer(s), in accordance with IRC sections 6224(b) and 6213(d), also waive the restrictions provided by IRC sections 6225(a) and 6213(a) and consent to the assessment and collection of any deficiency attributable to partnership items, penalties, additions to tax, and additional amounts that relate to partnership items, as determined in this agreement, plus any interest provided by law.

This agreement is conditional and will not become effective or final until this agreement form is returned to the Commissioner and is signed on his or her behalf. The one-year extension of the period of limitations on assessments under IRC section 6229(f) will not begin to run until the date the Commissioner's representative signs this form on the Commissioner's behalf. If this is a partial agreement, the period of limitations for assessing any tax attributable to the settled items shall be determined as if this agreement had not been entered into.

If this part of this agreement form is signed for the Commissioner, the treatment of partnership items and partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items under this agreement will not be reopened in the absence of fraud, malfeasance, or misrepresentation of fact. In addition, no claim for an adjustment of partnership items, refund or credit based on any change in the treatment of partnership items or partnership level determinations as to penalties, additions to tax, and additional amounts may be filed or prosecuted.

| Signature of Taxpayer | Date Signed |
|---|---|
| Signature of Taxpayer | Date Signed |
| By (Signature and Title) | Date Signed |

| FOR INTERNAL REVENUE USE ONLY | Date accepted for Commissioner | Signature |
|---|---|---|
| | Office | Title |

| Catalog Number 57315A | www.irs.gov | (See instructions for Signing Agreement) | Form **870-PT** (Rev. 8-2004) |
|---|---|---|---|

13IRS00008

## INSTRUCTIONS FOR SIGNING FORM 870-PT

1. If a JOINT RETURN OF A HUSBAND AND WIFE was filed and both spouses intend to agree, both spouses should sign Form 870-PT. One spouse may sign as agent for the other if acting under a power of attorney, which, if not previously filed, must accompany this form. The IRS may accept the signature of only one spouse at its discretion. However, the agreement will only be binding on the signing spouse.

2. If the taxpayer is a corporation, the waiver must be signed with the corporate name followed by the signature and title of the officer authorized to sign Form 870-PT.

3. Your attorney or agent may sign for you if this action is specifically authorized by a power of attorney, which if not previously filed, must accompany this form.

4. If this offer is signed by a trust, the agreement must be signed with the trust name, followed by the signature and title of the person authorized to sign on behalf of the trust.

5. If this offer is with respect to the tax liability for the consolidated return year, the agreement should be signed in the name of the common parent of the consolidated group for the consolidated return year. The common parent corporation signs the agreement in its own name. The signature and title of a current officer of the common parent corporation, who is authorized to bind the corporation, should be displayed in the signature block.

6. If the Tax Matters Partner signs this offer, please include the title with the signature.

7. If this offer is signed by a Tax Matters Partner that is a subsidiary corporation, then an officer authorized to sign this agreement for the year(s) indicated on the form must sign for the parent corporation. An authorized officer for the subsidiary corporation should also sign if the Tax Matters Partner is binding non-notice partners under the agreement. See Treas. Reg. 1.1502-77(a)(3)(v).

13IRS00009

Department of the Treasury — Internal Revenue Service

## Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts

### SCHEDULE OF ADJUSTMENTS

| NAME OF PARTNERSHIP | TAX YEAR(S) ENDED | | |
|---|---|---|---|
| Fidelity International Currency | 12/31/2002 | | |
| TAXPAYER IDENTIFYING NUMBER   36-4381795 | | | |
| DETAIL OF ADJUSTMENTS TO ORDINARY INCOME | | | |
| | | | |
| TOTAL ADJUSTMENTS TO ORDINARY INCOME | -0- | | |
| OTHER ADJUSTMENTS | ▓▓▓▓▓▓▓▓▓▓ | | |
| A. Capital Contributions | | | |
| (1) ADJUSTMENT | (336,419) | | |
| (2) AS REPORTED | 336,419 | | |
| (3) CORRECTED | -0- | | |
| B. Other Decreases | ▓▓▓▓▓▓▓▓▓▓ | | |
| (1) ADJUSTMENT | 135,775,584 | | |
| (2) AS REPORTED | (135,775,584) | | |
| (3) CORRECTED | -0- | | |

REMARKS
* Reference Exhibit A attached.

Accuracy Penalties under IRC Section 6662 are included as a partnership level determination.
See Exhibit A, Paragraph 12 for a description of the penalties.

* See Exhibit A, Paragraph 4.

Catalog Number 57315A                    www.irs.gov                    Form **870-PT** (Rev. 8-2004)

| Form 870-PT, Other Adjustments (Continued) | Page ____ of ____ |
|---|---|
| NAME OF PARTNERSHIP | TAX YEAR(S) ENDED |

| NAME OF PARTNERSHIP | TAX YEAR(S) ENDED | | |
|---|---|---|---|
| Fidelity International Currency | 12/31/2002 | | |
| TAXPAYER IDENTIFYING NUMBER  36-4381795 | | | |
| C.  Portfolio Income - Interest Income | | | |
| (1) ADJUSTMENT | (3,451) | | |
| (2) AS REPORTED | 3,451 | | |
| (3) CORRECTED | -0- | | |
| D.  Other Income (Loss) | | | |
| (1) ADJUSTMENT | 1,911,959 | | |
| (2) AS REPORTED | (1,911,959) | | |
| (3) CORRECTED | -0- | | |
| E.  Deductions Related to Portfolio Income | | | |
| (1) ADJUSTMENT | (168,233) | | |
| (2) AS REPORTED | 168,233 | | |
| (3) CORRECTED | -0- | | |
| F.  Investment Income Included in Portfolio Income | | | |
| (1) ADJUSTMENT | (3,451) | | |
| (2) AS REPORTED | 3,451 | | |
| (3) CORRECTED | -0- | | |
| G.  Investment Expense on Investment Debt | | | |
| (1) ADJUSTMENT | (168,233) | | |
| (2) AS REPORTED | 168,233 | | |
| (3) CORRECTED | -0- | | |
| H.  Other Adjustments and Tax Preference Items | | | |
| (1) ADJUSTMENT | (44,823) | | |
| (2) AS REPORTED | 44,823 | | |
| (3) CORRECTED | -0- | | |
| I.  Tax-Exempt Interest Income | | | |
| (1) ADJUSTMENT | (44,823) | | |
| (2) AS REPORTED | 44,823 | | |
| (3) CORRECTED | -0- | | |

Catalog Number 57315A                     www.irs.gov                     Form **870-PT** (Rev. 8-2004)

13IRS00011

EXHIBIT A – Explanation of Items
**Fidelity International Currency Advisor A Fund , LLC**
Final Partnership Administrative Adjustment Letter
Tax Year Ended: **December 31, 2002**     TIN: 36-4381795

1. It is determined that neither Fidelity International Currency Advisor A Fund, LLC nor its purported partners have established the existence of Fidelity International Currency Advisor A Fund, LLC as a partnership as a matter of fact.

2. Even if Fidelity International Currency Advisor A Fund LLC existed as a partnership, this purported partnership was formed and/or availed of solely for purposes of tax avoidance by artificially overstating basis in the partnership interests of its purported partners and engaging in the options transactions. The formation of Fidelity International Currency Advisor A Fund, LLC, the acquisition of any interest in this purported partnership by its purported partners, its purchase and sale of offsetting options, its transactions involving said options, the transfer of offsetting options to Fidelity International Currency Advisor A Fund, LLC in return for a partnership interest, and the transfer of partnership interests in Fidelity International Currency Advisor A Fund, LLC among its partners, had no business purpose other than tax avoidance, lacked economic substance, and, in fact and substance, constitutes an economic sham for federal income tax purposes. Accordingly, Fidelity International Currency Advisor A Fund, LLC and the transactions described above shall be disregarded in full and (1) any purported losses resulting from these transactions are not allowable as deductions; (2) increases to the adjusted basis of partnership interests are not allowed for federal income tax purposes; and (3) the splitting of gains and losses from these options transactions among the partners of Fidelity International Currency Advisor A Fund, LLC is not allowed.

3. It is determined that Fidelity International Currency Advisor A Fund, LLC was a sham, lacked economic substance and, under § 1.701-2 of the Income Tax Regulations, was formed and/or availed of in connection with a transaction or transactions in taxable year 2002, a principal purpose of which was to reduce substantially the present value of its partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code. It is consequently determined that:

    a. Fidelity International Currency Advisor A Fund, LLC is disregarded and that all transactions engaged in by this purported partnership are treated as engaged in directly by its purported partners. This includes the determination that the assets purportedly acquired by Fidelity International Currency Advisor A Fund, LLC, including but not limited to options, were acquired directly by its purported partners.

    b. the option(s), purportedly contributed to, acquired by, or assumed by Fidelity International Currency Advisor A Fund, LLC, are treated as never having been contributed to, acquired by, or assumed by said partnership and any gains or losses purportedly realized by Fidelity International Currency Advisor A Fund, LLC on the option(s) are treated as having been realized by its partners.

I

13IRS00012

EXHIBIT A – Explanation of Items
**Fidelity International Currency Advisor A Fund , LLC**
Final Partnership Administrative Adjustment Letter
Tax Year Ended: **December 31, 2002**    **TIN: 36-4381795**

c.  the purported partners of Fidelity International Currency Advisor A Fund, LLC should be treated as not being partners in Fidelity International Currency Advisor A Fund, LLC.

d.  contributions to Fidelity International Currency Advisor A Fund, LLC will be adjusted to reflect clearly the partnership's or purported partners' income.

e.  Allocating gains and losses from the options transactions among the partners of Fidelity International Currency Advisor A Fund, LLC will not be recognized.

4.  It is determined that the obligations under the short positions (written call options) transferred to Fidelity International Currency Advisor A Fund, LLC constitute liabilities for purposes of Treasury Regulation §1.752-6, the assumption of which by Fidelity International Currency Advisor A Fund, LLC shall reduce the purported partners' bases in Fidelity International Currency Advisor A Fund, LLC in the amount of $147,750,000, but not below the fair market value of the purported. partnership interest.

5.  It is determined that neither Fidelity International Currency Advisor A Fund, LLC nor its purported partners entered into the option(s) positions with a profit motive for purposes of § 165(c)(2).

6.  It is determined that, even if the option(s) are treated as having been contributed to Fidelity International Currency Advisor A Fund, LLC, the amount treated as contributed by the partners under section 722 of the Internal Revenue Code is reduced by the amounts received by the contributing partners from the contemporaneous sales of the call option(s) to the same counter-party.   Thus, the basis of the contributed option(s) is reduced, both in the hands of the contributing partner(s) and Fidelity International Currency Advisor A Fund, LLC. by $147,750,000.  Consequently, any corresponding claimed increases in the outside basis in Fidelity International Currency Advisor A Fund, LLC resulting from the contributions of the option(s) are disallowed.

7.  It is determined that the adjusted bases of the long call positions (purchased call options), and other contributions purportedly contributed to Fidelity International Currency Advisor A Fund, LLC by its partners has not been established under I.R.C. § 723.   It is consequently determined that the partners of Fidelity International Currency Advisor A Fund, LLC have not established adjusted bases in their respective partnership interests in an amount greater than zero (-0-).

8.  It is determined that the purchase of each option by a contributing partner and the simultaneous sale of an offsetting option to the same counterparty constituted, in fact, the acquisition of a single, unitary position by the contributing partner and that, as such, the contributing partner's basis in the partnership interest created on the contribution of the offsetting position to the partnership is limited to the difference

2

13IRS00013

EXHIBIT A – Explanation of Items
**Fidelity International Currency Advisor A Fund , LLC**
Final Partnership Administrative Adjustment Letter
Tax Year Ended: **December 31, 2002**    TIN: 36-4381795

between the amount paid on the purported purchase of one option and the amount credited on the purported sale of the offsetting option.

9.  It is determined that the purported termination of the gain legs of the option spreads acquired by the partnership and the immediate replacement of the purportedly terminated legs with legs providing the partnership with the same legal entitlements as those provided by the terminated legs did not constitute a sale or exchange for federal income tax purposes.  No gain or loss was realized on the purported termination of the legs in question and the partnership's adjusted basis in the purportedly terminated legs is decreased to reflect the non-recognition of the gain.

10. It is determined that the Section 988 loss of $1,911,959 claimed by Fidelity International Currency Advisor A Fund, LLC from its options' transactions is disallowed as it has not been established that such loss was incurred and is deductible under any provision of the Internal Revenue Code including, but not limited to, I.R.C. Section 165.

11. It is determined that the loss of $1,778,122 claimed by Fidelity International Currency Advisor A Fund, LLC from its options' transactions and reported on Schedule K-1 for its partner, Richard J. Egan is disallowed as it has not been established that such loss was incurred and is deductible under any provision of the Internal Revenue Code including, but not limited to, I.R.C. Section 165.

12. It is determined that the adjustments of partnership items of Fidelity International Currency Advisor A Fund, LLC are attributable to a tax shelter for which no substantial authority has been established for the position taken, and for which there was no showing of reasonable belief by the partnership or its partners that the position taken was more likely than not the correct treatment of the tax shelter and related transactions.  In addition, all of the underpayments of tax resulting from those adjustments of partnership items are attributable to, at a minimum, (1) substantial understatements of income tax, (2) gross valuation misstatement(s), or (3) negligence or disregarded rules or regulations.  There has not been a showing by the partnership or any of its partners that there was reasonable cause for any of the resulting underpayments, that the partnership or any of its partners acted in good faith, or that any other exceptions to the penalty apply.    It is therefore determined that, at a minimum, the accuracy-related penalty under Section 6662 of the Internal Revenue Code applies to all underpayments of tax attributable to adjustments of partnership items of Fidelity International Currency Advisor A Fund, LLC.  The penalty shall be imposed on the components of underpayment as follows:

3

13IRS00014

EXHIBIT A – Explanation of Items
**Fidelity International Currency Advisor A Fund , LLC**
Final Partnership Administrative Adjustment Letter
Tax Year Ended: **December 31, 2002**    **TIN: 36-4381795**

A. a 40 percent penalty shall be imposed on the portion of any underpayment attributable to the gross valuation misstatement as provided by Sections 6662(a), 6662(b)(3), 6662(e), and 6662(h) of the Internal Revenue Code.

B. a 20 percent penalty shall be imposed on the portion of the underpayment attributable to negligence or disregard of rules and regulations as provided by Sections 6662(a), 6662(b)(1), 6662(c) of the Internal Revenue Code.

C. a 20 percent penalty shall be imposed on the underpayment attributable to the substantial understatement of income tax as provided by sections 6662(a), 6662(b)(2), and 6662(d) of the Internal Revenue Code.

D. a 20 percent penalty shall be imposed on the underpayment attributable to the substantial valuation misstatement as provided by Sections 6662(a), 6662(b)(3), and 6662(e) of the Internal Revenue Code.

It should not be inferred by the determination of the Accuracy Related Penalty in this notice that fraud penalties will not be sought on any portion of an underpayment subsequently determined to be attributable to fraud or that prosecution for criminal offenses will not be sought under IRC § 7201, 7206 or other provisions of federal law if determined to be appropriate.

13IRS00015

# Exhibit D

# FAX

**CARRUTH ASSOCIATES LLC**
**116 Flanders Rd., Suite 3000**
**Westborough, MA  01581**

**Date:**   October 26, 2004

Number of pages including cover sheet   9

**To:Debbie Morrill & Bill Conway**                    **From:Pat Shea**

Phone
Fax Phone   **508-460-1947**                Phone        **(508) 898-3800**
CC:                                         Fax Phone   **(508) 898-2266**

**REMARKS:**

☐ Urgent      ☐ For your review      ☐ Reply ASAP      ☐ Please comment

Hi Debbie & Bill,

Here is the letter to Jim Fee.

Keeping you in the loop.

Thanks, Pat.

## NOTICE OF CONFIDENTIALITY

This transmission may contain information that is privileged and confidential and is intended only for the use of the individual or entity named above.  If the reader of this transmittal is not the intended recipient or the employee or the agent of the recipient responsible for delivering this transmittal to recipient, you are hereby notified that any dissemination, distribution, copying or other communication of the contents of this transmittal is strictly prohibited, and appropriate legal redress will be undertaken if necessary.  If you have received this communication in error, please notify us immediately by telephone to arrange for instructions and advice

A-12-

1IRS1250

**Sutherland**
• **Asbill &** •
**Brennan** LLP

ATTORNEYS AT LAW

999 Peachtree Street, NE
Atlanta, GA 30309-3996
404.853.8000
fax 404.853.8806
www.sablaw.com

October 26, 2004

VIA FEDERAL EXPRESS
AND FACSIMILE

James C. Fee, Esq.
Office of Chief Counsel
Internal Revenue Service Center
701 Market Street
Suite 2200
Philadelphia, PA  19106

     Re:   Mr. Richard Egan

Dear Jim:

     We appreciated the opportunity to discuss with you and the Examination Team the matter involving Richard Egan.  Our purpose here is to explain why Mr. Egan's investments are **NOT** a "Notice 2000-44" transaction, so that the matter can be resolved with the Examination Team or Appeals.

     We understand that you have previously decided that transactions similar to the investments made by Mr. Egan are not within the scope of Notice 2000-44, and we certainly are not trying to dissuade you from that view.  We also have been told that the case manager and examining agent do not believe that the transaction that they are examining is within the scope of the Notice.  We are writing this letter to do our part to support that position in your discussion with Jonathan Zelnick.

     *A.*    *A Broad Interpretation of Notice 2000-44 Would be Bad Tax Policy*

     It is imperative that notices which "list" transactions not be construed so broadly that they could be read to encompass other listed transactions, or even every day investments.  As a matter of tax policy it is vitally important to preserve the tools provided to the Service in the Jobs Act.  We have no doubt that the Service will face serious challenges to its classification of a transaction as a listed transaction if it casts too wide a net, now that monetary penalties and an open-ended statute of limitations depend on such classification.

     We also believe this decision of what is "substantially similar to" is critical to the Service on the broad issue of fundamental taxpayer rights to appeal tax and penalty issues, as well as the burden placed on the Courts, and certainly the Egans.  The global settlement offer in connection with Notice 2000-44 is unprecedented in that it deprives taxpayers of the fundamental right to

AO 1216314.1

Atlanta  ■  Austin  ■  Houston  ■  New York  ■  Tallahassee  ■  Washington, DC

*A-12-1*

1IRS1251

James C. Fee, Esq.
October 26, 2004
Page 2

both the Examination and Appeal processes. Rights are deprived in the Examination process, as penalties are being automatically assessed without any fact finding or discussion with taxpayers. Taxpayers are also being denied the Appeal process with respect to both tax and penalties. Accordingly, it is extremely important that the IRS not be overbroad and include transactions that are meaningfully distinguishable from Notice 2000-44 transactions.

An additional concern that needs to be addressed is one raised by the Service. We now understand from the Service that this investment structure was not unique to Fidelity International Currency Advisor A Fund ("the partnership") and Mr. Egan. The Service has told us that there are some 30 or more similar transactions. However, Mr. Egan at the time believed that this investment structure was unique to his circumstances. The idea was not mass marketed to him, third-party reputable law firms acknowledged the contemplated tax treatment to be valid, and the professional advisor who recommended the investments continued to assure Mr. Egan that the tax reporting did not come within the scope of Notice 2000-44. The fact that there may be some 30 somewhat similar transactions does not suggest that they fall within Notice 2000-44, and we believe that Mr. Egan's business purpose would set him apart from even these transactions.

We are more concerned about the statement made in our meeting that settlement letters were sent to these 30 taxpayers offering them the opportunity to settle under the Notice 2000-44 Settlement Initiative and that some of these taxpayers opted into the initiative. It was then stated that the Service would have an obligation to be consistent and, since some taxpayers considered their transaction to fall within Notice 2000-44, all must be considered Notice 2000-44 taxpayers.

We completely disagree with this thought process. It is common knowledge that Notice 2000-44 letters were sent (in error) to participants in the PICO listed transaction (Notice 2002-65). We do not believe that this is sufficient to make all PICO transactions also Notice 2000-44 transactions, even if a few sign a closing agreement. Similarly, Foreign Leveraged Investment Program ("FLIP") (Notice 2001-45) agreements were sent to Notional Principal Contract (Notice 2002-35) investors. If the investors agreed to the settlement would the Service accept the agreement? Would these Notional Principal Contract listed transactions now be considered FLIP transactions? We think not. Likewise, the fact that some taxpayers, whose motives are unknown, agree to a settlement that might work to their advantage should not be a factor in determining whether these transactions are similar to Notice 2000-44.

Of course, the duty of consistency only requires that similarly situated taxpayers be treated in the same manner. The IRS and Courts continually look at the facts in each case to determine if they are similarly situated. Here the business purpose becomes extremely critical and it is important that we elaborate on Mr. Egan's situation, which we do below. In short, we are confident the examination team, while perhaps differing in viewpoint as to the tax consequences of the investments, would acknowledge the significant business purposes

AO 1216314.1

A-12-2

1IRS1252

James C. Fee, Esq.
October 26, 2004
Page 3

surrounding the underlying need for planning to hedge, insure and protect the combined family wealth which was concentrated in the value of BMC stock.

**B.**  *Mr. Egan's Investments are NOT Substantially Similar to Those Described in Notice 2000-44*

Mr. Egan's investments are **NOT** substantially similar to the investments described in Notice 2000-44. It is true that Mr. Egan, through a single member-LLC, contributed both long and short option positions to a partnership, and that he took the position that his basis in the partnership equaled the amount paid for the long options, unreduced by the cost of the short options under Section 752 of the Internal Revenue Code of 1986, as amended (the "Code"). Any similarity to Notice 2000-44 ends there, and that is not enough to make Mr. Egan's investments a Notice 2000-44 transaction.

**i)**  How the Loss is Developed Should Be the Determinative Factor

The primary issue here is the loss claimed by Mr. Egan, not his basis in the partnership. If Mr. Egan had never claimed a loss, we would not be having this dialogue. For example, assume that Mr. Egan had contributed long and short options to the partnership but never generated a loss. Yes, he would have a large basis in the partnership – but of what concern is that to the Service if that basis never results in a loss? The principal consideration should be how the loss in question was developed, and whether it has any similarity to what is described in Notice 2000-44.

Notice 2000-44 describes a transaction where taxpayers claim "deductible losses on the disposition of . . . partnership interests." **Mr. Egan has not disposed of any portion of his partnership interest in the partnership.** Mr. Egan is still a partner in the partnership with a substantial partnership interest that holds approximately $14 million in value. Thus, Mr. Egan did not claim a loss that is similar in any manner to the loss that is described in Notice 2000-44.

More generally, it seems to us that the essence of a Notice 2000-44 transaction is one in which the partner's basis in the partnership is itself used to generate a loss. Indeed, the Examination Guide on Abusive Tax Shelters further explains this: "On distribution of the partnership interest, the taxpayer claims a tax loss with respect to that basis amount, even though the taxpayer has incurred no corresponding economic loss." Mr. Egan's tax position is entirely different. He did not use his basis to generate a loss.

Any losses claimed by Mr. Egan were generated inside the partnership – his basis in the partnership served only to allow him to use a loss that was allocated to him by the partnership from results of separate investment activities. Unlike the transaction described in Notice 2000-44, no high-basis asset was sold or liquidated. Moreover, the loss allocated to Mr. Egan by the partnership was offset by gain allocated to a foreign partner. What would be the position of the

AO 1216314.1

A-12-3

1IRS1253

James C. Fee, Esq.
October 26, 2004
Page 4

Service if the foreign partner were a U.S. taxpayer?  Would it still be a Notice 2000-44 transaction?  We think certainly not, and it is therefore difficult for us to believe that classification as a Notice 2000-44 transaction depends on the nationality of one partner, when Notice 2000-44 does not even mention a foreign partner.  Indeed, the Service when listing a transaction in the past has always taken great care to explain the role of a foreign participant, when it has been a factor.  We do not understand why the Service would depart from this path in this case.

When we focus on the partnership's allocation of loss to Mr. Egan and gain to Mr. Mahoney, we find that the Service has issued several notices pursuant to which it has listed transactions with somewhat similar structures, such as:

- Notice 2003-81 - Tax Avoidance Using Offsetting Foreign Currency Option Contracts;

- Notice 2003-54 - allocation of foreign currency straddle gains to a foreign person, then readjust trust percentages, then allocate loss legs to US taxpayer; and

- *ACM Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998) (transactions using methodology to allocate income to a foreign partner and to allocate losses to another partner).

We do not think that the transaction at issue is substantially similar to any of these listed transactions, but the manner in which the gains and losses were generated and allocated is certainly more similar to these transactions than Notice 2000-44.  If we label this transaction Notice 2000-44, how do you avoid also classifying it as any or all of the above, which are supposedly discrete notices?  We do not think that you can, which will result in significant confusion and inconsistent results.

ii)  <u>Contributing Long and Short Options to a Partnership and Not Counting the Cost of the Short Option as a Liability Under Code Section 752 Is Not Always Covered by Notice 2000-44</u>

Even if the Service were to broadly construe Notice 2000-44, Mr. Egan's investment structure would still not be covered by such Notice.  The mere contribution of long and short options to a partnership, coupled with the position taken under Code section 752, will not always result in classification as a Notice 2000-44 transaction.

By its own terms, Notice 2000-44 only applies where the long and short options contributed to the partnership are "offsetting" and where the net economic outlay is "nominal or zero."  That the mere contribution of long and short options to a partnership coupled with the position under Code section 752 taken here should not always result in classification as Notice 2000-44 is demonstrated by two examples.  First, Notice 2000-44 would of course not apply

AO 1216314 1

A-12-4

James C. Fee, Esq.
October 26, 2004
Page 5

where the long and short options were written on different indexes. Second, assume that the long and short options have a significant spread, such that the amount paid for the long option is $100, while the cost of the short option is $1. If the taxpayer takes the position that his basis is $100, is that a Notice 2000-44 transaction? Clearly not, because Notice 2000-44 considers a transaction where the options are "offsetting" and the investment in the options is "nominal or zero."

Mr. Egan's investment in the option positions was not "nominal," as they cost several million dollars. The options were also not "offsetting." Indeed, the cost was a function of the targeted spread, since the cost will increase with the size of the spread, as will the potential profit. The spread and profit potential, in turn, was based entirely on the needs of the family business to hedge on defined risk factors that could negatively impact the family's portfolio. That is the reason the spread on Mr. Egan's options was substantial and why the options are not "offsetting."

There are several other differences between Mr. Egan's investments and what is described in Notice 2000-44, some of which have already been discussed:

- Notice 2000-44 describes a transaction where taxpayers claim "deductible losses on the disposition of . . . partnership interests." Mr. Egan did not dispose of his partnership interests.

- Notice 2000-44 specifically cautions taxpayers about arrangements that are "being marketed for the purpose of generating artificial tax losses" (emphasis added). This was not a marketed transaction. It was developed by professional advisors around the various business circumstances and risks confronting the Egan family as well as the personal circumstances facing Mr. Egan with his significant restrictions on disposing of EMC stock. Due diligence was exercised before, during and after this transaction by the Egan's, obtaining legal opinion letters from several non-promoters as to the propriety of this tax planning approach. We are confident that the IRS examination team would acknowledge the significant business and personal reasons of the partnership.

- Notice 2000-44 does not include or contemplate the involvement of any foreign party. The partnership had a substantial partner, Mr. Mahoney who is an Irish citizen. His participation in the partnership was meaningful to the Egan's as the contribution of capital by an outsider demonstrated validity of the business and tax planning approach recommended by the professional advisors. In addition, this partner's participation had a substantial impact on the allocation of investment gains and losses and, accordingly, on how those items will be reported for tax purposes.

AO 1216314.1

A-12-5

1IRS1255

James C. Fee, Esq.
October 26, 2004
Page 6

    iii)    <u>Surrounding Circumstances</u>

        Notice 2000-44 also describes a transaction with little or no economic reality and, by its reference to Code section 165, one that is solely motivated by tax avoidance. We therefore think that it important for you to have a complete understanding of the circumstances and business purpose surrounding this transaction.

        At the time of these investments, Mr. Egan was in the process of being nominated as ambassador to Ireland. At the same time he was stepping back from his role as Chairman of EMC Corporation. Mr. Egan founded EMC in 1979 and, in the 1990's, EMC had been the highest growth company in the S&P.

        As an insider, Mr. Egan was barred from hedging his EMC stock directly. He was subject to significant blackout periods where he could not sell the stock. With the nomination for ambassador there were significant financial restrictions and requirements that had to be met. All financial filings were public information such that between the SEC requirements and financial disclosures required of public officials, Mr. Egan's dealings were public information. If for no other reason, this level of public scrutiny required that Mr. Egan not be involved in any tax planning idea that would not pass the scrutiny of the Service and public eye.

        In addition to being in the precarious position of owning a huge block of stock that was subject to significant sales limitations, Mr. Egan had abnormally high debt that could not be reduced until he was able to sell a significant amount of EMC stock. The stock market was moving into a recession, and was further shaken by September 11th, anthrax attacks, and the bombing of Afghanistan. With the significant limitations in divesture of EMC, Mr. Egan's investment team created the partnership as an investment partnership to focus on indirect hedging strategies to protect Mr. Egan's stock portfolio and commercial real estate holdings from devaluation and to protect against a jump in interest rates given his unusually high debt situation. Specifically, the partnership was created to find methods of hedging "secondary" business risks embedded within Mr. Egan's portfolios which include:

    (a)    To protect against interest rate fluctuations when Mr. Egan has significant amounts of floating rate loans outstanding that are pegged to LIBOR rates.

    (b)    To protect against large swings in targeted foreign currencies that will negatively impact a large single-issue stock holding (such as EMC) when direct hedging is not available.

    (c)    To protect against devaluation of leveraged commercial real estate that was in Mr. Egan's portfolio when the commercial real estate was significantly leveraged at a fixed rate.

AO 1216314.1

A-12-6

1IRS1256

James C. Fee, Esq.
October 26, 2004
Page 7

      (d)      To hedge against the market risk inherent in a portfolio comprised mostly of stock holdings.

Is this not the normal and prudent business action anyone would consider?

Creating a partnership to conduct business affairs is the normal way of doing business for Mr. Egan. Unlike many of the Notice 2000-44 investors, Mr. Egan had approximately 40 partnerships and this was a normal way of establishing and conducting business.

As his investment team was structuring the hedging strategies, his accountants advised Mr. Egan of some additional tax benefits he could utilize if the strategies were tweaked to accommodate tax opportunities. After careful due diligence, including hiring two different law firms to advise on whether the partnership was a reasonable tax structure and having the law firms both confirm the propriety of Mr. Egan's tax position, Mr. Egan opted to take advantage of the tax opportunities that were available because they complimented his investment needs. Mr. Egan was therefore implementing a meaningful investment strategy with meaningful economic benefits with effective tax planning.

Given the long legal history of importance of business purpose and economic substance surrounding transactions and tax planning, evinced in the recently decided cases of *Black & Decker*, *Compaq*, and *IES*, these factors can not be ignored in distinguishing this transaction from Notice 2000-44.

In summary, unlike the transactions described in Notice 2000-44, Mr. Egan's transactions had substantial business purpose, no use of his basis in the partnership to create a loss, the investment of a foreign taxpaying partner, and the investment structure was not mass marketed to him. The only similarity to Notice 2000-44 is the contribution of options to a partnership, and such similarity is merely superficial. In contrast to what the Service characterizes as the artificial tax-driven Notice 2000-44 transaction, the partnership was driven by a substantial non-tax business purpose. The consequences of the IRS taking a broad approach to the interpretation can, and in all likelihood will, bring on criticisms which may unravel all the many accomplishments the IRS has achieved in combating abusive tax shelters, including recent legislation. This is not an issue that requires a technical decision of the merits, but a question of reasonable interpretation of Notice 2000-44, an effort not to overlap in definition existing listed transactions and a conscientious, thoughtful attention to administering the tax law and taxpayer rights.

Mr. Egan is hopeful that he will have the opportunity to resolve this matter with the Examination Team or, if necessary, in Appeals. We think it would be unfortunate if the Service

AO 1216314.1

A-12-7

1IRS1257

Case 4:05-cv-40151-FDS Document 126-3 Filed 05/22/2007 Page 10 of 24

James C. Fee, Esq.
October 26, 2004
Page 8

decides that this is a Notice 2000-44 transaction, which would deny Mr. Egan that opportunity, and would force him to litigate the case. While litigation is not Mr. Egan's first choice, he is prepared to do so using all available resources.

Sincerely,

N. Jerold Cohen

John Monaco
Pricewaterhouse Coopers

cc:     Jonathan R. Zelnik, Esq.
        Ms. Deborah Morrill
        Mr. William Conway
        Mr. Richard Egan

AO 1216314 1

# Exhibit E

| EXAMINING OFFICER'S ACTIVITY RECORD | Examining Officer Mark A. Corrigan | Date Assigned/Opened |
|---|---|---|

**Taxpayer** (use preprinted label if possible)
Name:  Fidelity International Currency Advisor

Address:

Business Name:
Address

Phone Business (  )
            Fax (  )

**Taxpayer's Representative.**

Name
Address

Phone:
FAX:
Does this case meet PRP Criteria?
           Yes _____  No _____

Representative has: _____ POA
                _____ TP Auth/

**Contacts and Activities**

| Date | Loc | Cont. | Time On Activity | Remarks, Notes, Actions Taken |
|---|---|---|---|---|
| March 23, 2004 | O | 1 | | FPS was assigned this Son of Boss Tax Shelter/ PICO / SOS Case. <br><br> Case Agent – Bill Conway (508)481-3387 <br> Group Manager – Debbie Morrill (508)481-3387 <br><br> FPS spoke with Case Agent.  He will be setting up a Strategy Meeting on this case.  Case Agent will keep FPS posted. |
| June 14, 2004 | O | 5 | 8 hours | FPS met with Case Agent at the Southboro POD (new FPS Bernie Kaufman also participated). <br><br> We discussed the case and the information that the Case Agent has received from the Taxpayer.  The Case Agent believes that this case qualifies for the Son of Boss Tax Shelter and has sent out the appropriate letters. <br><br> FPS won't perform too much work on this case until it is determined whether or not the Taxpayer requests the Son of Boss Tax Shelter Settlement.  However, Case Agent would like to better understand these transactions and has requested FPS to explain them, so FPS began making photocopies and going over the transactions. |

LOC= Location of activity: T=Taxpayer      R=Representative      O=Other
CONT=Contact Codes  1. Telephone    2. T/P's office    3. Representative's Office
                4. Correspondence         5. Other (explain)

ICORRIGAN-000199

| EXAMINING OFFICER'S ACTIVITY RECORD | Examining Officer Mark A. Corrigan | Date Assigned/Opened |
|---|---|---|

| Taxpayer (use preprinted label if possible) Name:  Fidelity International Currency Advisor Address: Business Name: Address Phone Business (  ) Fax (  ) | Taxpayer's Representative. Name Address Phone: FAX: Does this case meet PRP Criteria?  Yes _____  No _____ Representative has: _____ POA _____ TP Auth/ |

| June 15, 2004 | O | 5 | 8 hours | FPS finished the initial review of the available records pertaining to the 2 Tax Shelter Transactions in question. FPS prepared a sheet with some definitions of terms for the Case Agent. FPS prepared a couple of sheets with various questions and comments regarding the 2 Tax Shelter Transactions. FPS sat down with the Case Agent and went over the "economics" of the Digital Options, etc..  FPS discussed what additional information will be needed to analyze these transactions (i.e. Brokerage Statements). FPS and Case Agent discussed the case with the Case Manager, set up a Strategy Meeting for 6/30. |
|---|---|---|---|---|
| July 21, 2004 | O | 5 | 9 hours | Strategy Meeting was rescheduled from 6/30 to 7/21. FPS participated in Strategy Meeting with the Audit Team. Also present (John Alletta – SB/SE Case Counsel; Stan Locke – IE Territory Manager; Dennis McSweeney – IE Manager; Peter McIntyre – IE (via the telephone); Debbie Morrill – Case Manager and Bill Conway – TC). FPS sent an e-mail to FPS Team Manager with case update. FPS began reviewing some additional information on this case, recently received from KPMG. |

LOC= Location of activity: T=Taxpayer        R=Representative        O=Other
CONT=Contact Codes  1. Telephone      2. T/P's office        3. Representative's Office
                    4. Correspondence                        5. Other (explain)

Form 9984 (7-86)                        Department of the Treasury - Internal Revenue Service
                                                                PAGE 2

1CORRIGAN-000200

| EXAMINING OFFICER'S<br>ACTIVITY RECORD | Examining Officer<br>Mark A. Corrigan | Date<br>Assigned/Opened |
|---|---|---|

**Taxpayer (use preprinted label if possible)**
Name  Fidelity International Currency Advisor

Address:

Business Name:
Address

Phone Business ( )
          Fax ( )

**Taxpayer's Representative.**

Name
Address

Phone:
FAX:
**Does this case meet PRP Criteria?**
          Yes _____  No _____

Representative has: _____ POA
                              _____ TP Auth/

| Date | LOC | CONT | Time | Description |
|---|---|---|---|---|
| August 18, 2004 | O | 5 | 3 hours | FPS returned Case Agent's call.  An interview with the Taxpayer is set up for 9/2 at 116 Flanders Road, Westboro, MA (Carruth Management Company – owned by the Taxpayer).<br><br>FPS, Case Agent and IE will meet on 8/30 and 8/31 to prepare for this meeting with the Taxpayer.<br><br>FPS reviewed some of the case information in anticipation of the upcoming meetings. |
| August 30, 2004 | O | 5 | 9 hours | FPS went to Southboro POD, met with TC, IE and IE Manager.  We reviewed the case and discussed upcoming meeting with Taxpayer, scheduled for 9/2.<br><br>FPS reviewed and analyzed documentation and prepared for upcoming meeting. |
| August 31, 2004 | O | 5 | 4 hours | FPS continued preparing for upcoming meeting. |
| September 2, 2004 | T | 2 | 5 hours | FPS participated in a meeting with the Taxpayer at the Taxpayer's place of business. |
| September 3, 2004 | O | 5 | 9 hours | FPS met with Audit Team at the Southboro POD for a Strategy Meeting.<br><br>FPS prepared a summary of yesterday's meeting.  FPS e-mailed Case Agent some additional questions to be incorporated with his IDR to the Taxpayer. |

LOC:: Location of activity: T=Taxpayer                    R=Representative                    O=Other
CONT=Contact Codes  1. Telephone          2. T/P's office          3. Representative's Office
                                   4. Correspondence                    5. Other (explain)

Form 9984 (7-96)                              Department of the Treasury - Internal Revenue Service
                                                                              PAGE 3

1CORRIGAN-000201

| EXAMINING OFFICER'S ACTIVITY RECORD | Examining Officer<br>Mark A. Corrigan | Date<br>Assigned/Opened |
|---|---|---|
| Taxpayer (use preprinted label if possible)<br>Name  Fidelity International Currency Advisor<br><br>Address:<br><br>Business Name:<br>Address<br><br><br>Phone Business (  )<br>        Fax (  ) | Taxpayer's Representative.<br><br>Name<br>Address<br><br><br><br>Phone:<br>FAX:<br>Does this case meet PRP Criteria?<br>        Yes ____ No ____<br><br>Representative has: ____ POA<br>                ____ TP Auth/ | |

| Date | LOC | CONT | Hours | Activity |
|---|---|---|---|---|
| September 7, 2004 | O | 1 | | FPS spoke with FPS Team Manager, discussed the status of this case. |
| October 18, 2004 | O | 5 | 9 hours | FPS went to Southboro POD to meet with the Audit Team.<br><br>The Taxpayer recently contacted the National Office and has requested to give a presentation to the National Office Attorneys explaining why they believe that this Taxpayer should not be considered a "Son of Boss Tax Shelter". National Office Attorney (James Fee) has agreed to listen to the Taxpayer's presentation.   Meeting is scheduled for October 19th at the Taxpayer's place of business.  The Audit Team has been invited to participate.<br><br>FPS and the Audit Team discussed the upcoming meeting and various facts that we want brought out.  FPS spoke with Case Counsel (John Alietta), who requested a summary of the option transactions from FPS.  FPS prepared and e-mailed this summary to Case Counsel.<br><br>FPS continued preparing notes for the upcoming meeting. |
| October 19, 2004 | T | 2 | 9 hours | FPS went to case site to participate in meeting with the Taxpayer, National Office Attorney – James Fee, and the rest of the Audit Team.<br><br>FPS prepared some additional IDR questions and e-mailed them to the Case Agent, who will put them in an IDR format and issue it to the Taxpayer (after getting approval from John Alietta). |

LOC= Location of activity: T=Taxpayer        R=Representative        O=Other
CONT=Contact Codes  1. Telephone      2. T/P's office        3. Representative's Office
                    4. Correspondence              5. Other (explain)

1CORRIGAN-000202

| EXAMINING OFFICER'S ACTIVITY RECORD | Examining Officer Mark A. Corrigan | Date Assigned/Opened |
|---|---|---|
| Taxpayer (use preprinted label if possible) Name   Fidelity International Currency Advisor<br><br>Address:<br><br>Business Name:<br>Address<br><br>Phone Business ( )<br>          Fax ( ) | Taxpayer's Representative.<br><br>Name<br>Address<br><br><br><br>Phone:<br>FAX:<br>Does this case meet PRP Criteria?<br>          Yes ____  No ____<br><br>Representative has: ____ POA<br>                    ____ TP Auth/ | |

| | | | | |
|---|---|---|---|---|
| November 1, 2004 | O | 5 | 6 hours | FPS went to Southboro POD.  Met with TC, Case Manager, IE and IE Manager.  We discussed the case and the process of getting IDR questions approved and issued to the Taxpayer, etc..<br><br>We held a conference call with Case Counsel (John Alietta) and new Case Counsel (Richard Gannon -- from Boca Raton Florida -- who was assigned to assist the Audit Team by Jim Fee). |
| November 18, 2004 | O | 5 | 5 hours | FPS worked on case.  FPS reviewed and analyzed e-mail from Richard Gannon, which has several questions related to the option contracts, etc..  FPS performed some additional research on some of the terminology (i.e. CMS option, 10 year swap yield, etc..) |
| November 19, 2004 | O | 5 | 4 hours | FPS discussed case with TC, discussed various strategies, administrative roadblocks, etc..<br><br>FPS spoke with Richard Gannon, discussed the case, various ways to attack the option contracts, partnerships, etc..  We also discussed the current roadblocks (i.e. HALT memo, determination as to whether or not this is Son of Boss, etc..).  Richard will be on a conference call with the Son of Boss Cadre next Tuesday and will raise some of our concerns and see if they can be addressed.<br><br>FPS continued reviewing and analyzing the case documents. |

LOC= Location of activity: T=Taxpayer          R=Representative          O=Other
CONT=Contact Codes  1. Telephone          2. T/P's office          3. Representative's Office
                          4. Correspondence          5. Other (explain)

Form 9984 (7-96)                    Department of the Treasury - Internal Revenue Service
                                                                              PAGE 5

1CORRIGAN-000203

| EXAMINING OFFICER'S ACTIVITY RECORD | | | | Examining Officer Mark A. Corrigan | Date Assigned/Opened |
|---|---|---|---|---|---|

Taxpayer (use preprinted label if possible)
Name   Fidelity International Currency Advisor

Address:

Business Name:
Address

Phone Business ( )
            Fax ( )

Taxpayer's Representative.

Name
Address

Phone:
FAX:
Does this case meet PRP Criteria?
            Yes _____ No _____

Representative has: _____ POA
                    _____ TP Auth/

| January 7, 2005 | O | 1 | | FPS spoke with Case Agent and Case Manager. The Taxpayer has refused to sign the Statute Extension and the statute expires on 4/15/05. FPS set aside the week of January 24 thru 28 to work with Case Agent at preparing the Stat Notice. |
|---|---|---|---|---|
| January 12, 2005 | O | 5 | 4 hours | FPS continued analyzing and summarizing digital option transactions in anticipation of preparing the Stat Notice. |
| January 24, 2005 | O | 5 | 8 hours | FPS met with Case Agent at the Southboro POD. FPS worked on preparing a write-up of the economics of the option transactions that the Case Agent will include in his Stat Notice. |
| January 25, 2005 | O | 5 | 9 hours | FPS met with Case Agent at the Southboro POD. FPS continued working on preparing a write-up of the economics of the option transactions that the Case Agent will include in his Stat Notice. |
| January 26, 2005 | O | 5 | 3 hours | FPS finished write-up of the economics of the option transactions that the Case Agent will include in his Stat Notice. FPS discussed with Case Agent and e-mailed write-up. Case Agent will keep FPS posted as to when the Stat Notice will be sent out so FPS can close out this referral. |

LOC= Location of activity: T=Taxpayer          R=Representative          O=Other
CONT=Contact Codes  1. Telephone          2. T/P's office          3. Representative's Office
                    4. Correspondence          5. Other (explain)

Form 9984 (7-96)                Department of the Treasury - Internal Revenue Service
                                                    PAGE 6

1CORRIGAN-000204

| EXAMINING OFFICER'S ACTIVITY RECORD | Examining Officer Mark A. Corrigan | Date Assigned/Opened |
|---|---|---|

Taxpayer (use preprinted label if possible)
Name   Fidelity International Currency Advisor

Address:

Business Name:
Address

Phone Business ( )
        Fax ( )

Taxpayer's Representative.

Name
Address

Phone:
FAX:
Does this case meet PRP Criteria?
        Yes _____ No _____

Representative has: _____ POA
                    _____ TP Auth/

| Date | LOC | CONT | | Activity |
|---|---|---|---|---|
| February 10, 2005 | O | 1 | | Both John Aletta and Rich Gannon called FPS yesterday wanting to discuss the FPAA that is going to be issued on this case, both left a voice mail. |
| | | | | FPS returned both calls today and left voice mails. |
| | | | | FPS later spoke with John Aletta and discussed various aspects of the FPAA. |
| February 22, 2005 | O | 1 | | FPS spoke with TC.  The National Office determined that this case is "substantially similar" to both the Son of Boss Transactions (Notice 2000-44) and the Eliminator 2 (Notice 2002-65). |
| | | | | Based on this determination, the Taxpayer will not be offered Appeal Rights and therefore will not sign a statute extension. |
| | | | | The case will be stat noticed very shortly, using the Fact write-up prepared by FPS and the law write-up prepared by Counsel. |
| | | | | No additional work is required by FPS.  FPS prepared case closing memo and e-mailed to FPS Team Manager for his review and approval. |

LOC= Location of activity: T=Taxpayer        R=Representative        O=Other
CONT=Contact Codes  1. Telephone      2. T/P's office        3. Representative's Office
                    4. Correspondence                      5. Other (explain)

Form 9984 (7-96)                    Department of the Treasury - Internal Revenue Service
                                                    PAGE 7

1CORRIGAN-000205

# Exhibit F

**Transactions having similarities to Son of Boss and Partnership Straddle Shelters**

It has come to the attention of the partnership technical advisors that certain transactions having similarities to the Son of Boss (Notice 2002-44) and the Partnership/Pass-through Straddles Tax Shelter (Notices 2002-50 and 2002-65) have been marketed to high income taxpayers. This transaction will hereafter be referred to as the "Son of Boss/Straddle Shelter" although it is labeled differently by different promoters. Also, the facts may vary from case to case but often follow the following fact pattern.

The Son of Boss/Straddle Shelter transaction consists of several steps. First, an Investor forms a single-member limited liability company (SMLLC) with a cash contribution. The SMLLC uses the cash contribution to enter into two European-style digital options ("option spread"): it purchases a call option (long position) and writes an offsetting call option (short position), with the premium of the short position slightly less than the premium of the long position. The net premium amount is approximately equal to the cash contribution by Investor to the SMLLC.

Second, the Investor assigns his membership interest in the SMLLC and contributes additional cash to a limited liability company treated as a partnership for federal income tax purposes, (hereafter referred to "Investment LLC") in exchange for a small percentage of the common membership interests (typically 1%-5%) and a majority of the preferred membership interests (typically 97%-99%). The Investor receives a tax basis in Investment LLC equal to the long position premium plus the amount of additional cash contributed. The Investor's tax opinion takes a position that the tax basis in Investment LLC is not reduced under I.R.C. sec. 752 for the assumption of the obligation under the written call option.

Third, simultaneously, a tax-indifferent Co-Investor, (generally a foreign person not subject to the U.S. taxation or a U.S. taxpayer with sufficient tax attributes to be tax indifferent), contributes cash in exchange for a majority of the common interests (typically 95%-99%), while a promoter affiliate contributes equal amounts of cash in exchange for the remaining preferred interests. The preferred interests have a fixed return of on investment (typically 8-10%), payable semi-annually, and convertible at any time into common interests on a dollar-for-dollar basis at the net asset value of the partnership. The preferred interests do not share in partnership profits or losses.

Fourth, Investments LLC enters into other off-setting options spreads. Then, Investments LLC closes the gain position(s) allocating the realized gain 1%-5% to the Investor and 95%-99% to the Co-Investor. Co-Investor's outside basis in the Investments LLC is increased by his portion of the gain. Investments LLC immediately replaces the closed position with an option instrument that balances the investment portfolio of the partnership.

Fifth, the Investor converts his preferred interest into a common interest. This is done through the Investor's purchase of the majority (90% or more) of the common interests from the Co-Investor, with the purchase price based on the partnership's asset value at the time of purchase. Since the partners' capital accounts were booked down on the

conversion of the partnership interest, and the Co-Investor's capital account was reduced by his portion of unrecognized losses the purchase price is minimal. The outside basis of the Co-Investor is reduced by the cash he received. The Investments LLC does not make a I.R.C. sec. 754 election.

Sixth, Investments LLC then closes the loss position(s), realizes the losses, and allocates its gains and losses using the interim closing-of-the-books method under Treas. Reg. Sec. 1.706-1(c)(2)(ii). This method requires partnership income and loss to be allocated to partners based on their interests in the partnership when the income or loss was recognized. Since the Investor owns the majority of the partnership interest, the majority of losses are allocated to him.

Finally, the Investor resigns as a member of Investments LLC. Such resignation is effective immediately (or relatively soon after the recognition of the straddle loss) with Investor receiving the FMV of the LLC's net asset value at the time of resignation. Payment is made soon thereafter in cash or in foreign currency. When the Investor receives cash in distribution, he recognizes a capital loss, equal to the difference between the amount received and the Investor's basis in his LLC's interest. When the Investor receives foreign currency or options in distribution of the assets and property of Investments LLC, such currency or options will have a tax basis in the hands of the Investor equal to the Investor's tax basis in the LLC. The Investor will realize ordinary loss on disposition or expiration of the transferred options, and disposition of foreign currency, unless the election under I.R.C. sec. 988(a)(1)(A) is made to treat the loss as capital. The amount of the loss is the difference between the value of the distributed assets and the Investor's basis in his LLC's interest. After the Investor's resignation from Investment LLC, he may wait until the distributed options expire in the SMLLC, or close the positions.

**The following is an example.**

On November 15, 2001, the Taxpayer formed a SMLLC, with the Promoter as the LLC's manager, and funded it with initial contribution of $320,000. On the same day, the SMLLC entered into 2 European-style digital call options with Investment Bank, paying an out-of-pocket net premium of $320,000, the difference between the long position premium of $16,000,000 and offsetting short position premium of $15,680,000.

On November 22, 2001, the Taxpayer assigned his membership interest in SMLLC, worth $204,504 at the time to the pre-existing Investments LLC, plus contributed $289,600 in exchange for 5% of the common interests and 97.46% of the preferred interests. Simultaneously, Foreign Person, contributed $60,800 in exchange for 95% of the common interests, and the Promoter affiliates contributed $6,400 each in exchange for the remaining preferred interests.

On November 27, 2001, Investments LLC entered into several spread options. On December 5, 2001, it closed two of the positions realizing a gain of $11,137,176, and closed other two positions realizing a gain of $6,688,396. The same day, Investments

79

LLC re-invested $10,739,628 and $6,454,752 of the proceeds into two options to close the positions.

On December 7, 2001, Investments LLC purchased all but 5% of the Foreign Person's 95% common member interest for $30,400.  On December 18, 2001, Investments LLC closed three positions realizing a loss of $11,262,650, the SMLLC resigned from Investments LLC and received a distribution of foreign currency that was disposed of with overall realized loss of $13,909,686.  As of the end of the tax year 2001, Investments LLC held the positions with an unrealized loss of $6,407,298 open.

In sum, the benefits of entering into the Son of Boss/Straddle Shelter transactions for a taxpayer include the generation of ordinary loss that does not constitute an economic loss, with relatively low out-of-pocket amounts invested.

The above described transaction is substantially similar to that described in the Notice 2000-44 because they have the same essential elements:

   (1) artificial increase in the partner's outside basis by the amount of the long position premium when the option spread is contributed to the partnership;

   (2)  short position premium is not treated as a liability under I.R.C. sec. 752, and, therefore, it does not reduce the partner's outside basis; and

   (3) the partner's interest in the partnership is liquidated at a loss due to the high basis of distributed partnership assets and their relatively low fair market value.

A proforma 886-A and FPAA are available.  These should be followed as closely as possible, but of course, must be modified to fit the facts of a particular case.  FPAAs for this transaction should be reviewed by one of the Son of Boss Cadre Counsel.

**However, before relying on Notice 2000-44 invoke the section 701 partnership anti-abuse rules, examiners must contact one of the partnership technical advisors for concurrence.**

80

# Exhibit G




# MEMORANDUM

**Date:** May 3, 2004

**TO:** Director of Field Operations, Northeast

**THRU:** Territory Manager, L:F:4

**FROM:** Team Manager, L:F:4:1545

**RE:** Request for Permission to initiate a TEFRA Case with Less than Twelve Months Remaining on the Statute of Limitations

**FIDELITY INTERNATIONAL CURRENCY ADVISORS FUND A - 200112**

The subject return was received by the team on April 8, 2004. Its current statute of limitations is April 21, 2005. There was initial uncertainty as to what type of tax shelter it is and whether assignment to this team was appropriate. The final decision to keep the return here was made April 26, 2004.

The case is classified as a Son of Boss (SOB) shelter with aspects of Short Option Strategy (SOS) and Personal Investment Corporation (PICO).

Consequently, as required by the IRM, permission is being requested to initiate this TEFRA examination with less than one year remaining on the statute of limitation.

Debra E. Morrill

Team Manager

Concurrence: _Cheryl P. Claybrough, Acting DFO-NE_

Director of Field Operations, Northeast

L:F:DFO:N

A-10

1IRS1204

# Exhibit H

## Russ Cary

**From:**   Wilson Bill

**Sent:**   Thursday, June 09, 2005 9:45 AM

**To:**    Russ Cary

**Subject:** FW: Son of Boss PICO Hybrids

Cary:

Here is an email where I am asking for guidance on FPAAs on the hybrid.

Bill Wilson
Partnership Technical Advisor, LMSB
Mail Stop 4200:MSRO, Room 1130
4050 Alpha Rd.
Dallas, TX 75244-4201
Phone: 972-308-1573
Fax: 972-308-1594

-----Original Message-----
**From:** Poindexter Carol J
**Sent:** Tuesday, February 22, 2005 1:58 PM
**To:** Wilson Bill
**Cc:** Fee James C
**Subject:** RE: Son of Boss PICO Hybrids

If an FPAA is issued, then it is issued for the entire tax return, not a specific issue. Therefore, no Appeals.

Are the transactions separate transactions or the same transaction? I would say that if they are separate transactions, then they MIGHT be able to go to fast track on the PICO issue, but ONLY if the PICO issue champion allows it. If they don't agree with the SOB transaction, however, then they are going to get FPAA's anyway and it's a moot point - FPAA both issues. If they are one transaction, then I don't see any way to separate out the 2 issues and treat them separately.

CC needs to decide which listed transaction these belong to and not be so wishy washy and say both, especially if they are one transaction and not two separate transactions on the same tax return.

    -----Original Message-----
    **From:** Wilson Bill
    **Sent:** Tuesday, February 22, 2005 1:47 PM
    **To:** Poindexter Carol J
    **Cc:** Fee James C
    **Subject:** Son of Boss PICO Hybrids

On the unagreed Son of Boss PICO Hybrids, I understand that if the taxpayer does not sign an extension, we issue and FPAA by default to protect the statute. No appeal (although could be settled by counsel/appeals in the post FPAA period). But what about cases where they are willing to sign 872-Ps in order to get appeals rights, assuming, at least, that the PICO portion will be appealable? Most well represented taxpayers are not going to sign extensions unless they have a chance for appeal rights. In some cases, this question is being asked specifically.

Chief Counsel has opined that these are similar to both SOB and PICO, but has left the determination with respect to administrative appeal rights with compliance.  I vote for Jim's recommendation (no appeal rights - not practical to bifurcate the transactions), but we need to advise the field soon as to what to be advising taxpayers when requesting these extensions.  Reps will surely ask if signing an extension will allow them to go to appeals.

# Exhibit I

**Russ Cary**

| | |
|---|---|
| **From:** | Fee James C [James.C.Fee@IRSCOUNSEL.TREAS.GOV] |
| **Sent:** | Tuesday, April 05, 2005 4:54 PM |
| **To:** | Wilson Bill; Fee James C |
| **Cc:** | Kiger Cheryl R |
| **Subject:** | RE: hybrid son of boss cases` |

Looks good, Bill.

----Original Message----
| | |
|---|---|
| **From:** | Wilson Bill [mailto:Bill.H.Wilson@irs.gov] |
| **Sent:** | Tuesday, April 05, 2005 5:39 PM |
| **To:** | Fee James C |
| **Cc:** | Kiger Cheryl R |
| **Subject:** | RE: hybrid son of boss cases` |

I think for now it is probably best to send it out to the known FDIS cases.  The latest list I have is as of February.  I'll see if Cheryl can send me an update (if there is one). What about the transaction description I sent you (copy attached).  Do you think its OK to post that?

Bill Wilson
Partnership Technical Advisor, LMSB
Mail Stop 4200:MSRO, Room 1130
4050 Alpha Rd. << File: Son of Boss-Straddle Shelter.doc >>
Dallas, TX 75244-4201
Phone: 972-308-1573
Fax: 972-308-1594


-----Original Message-----
**From:** Fee James C [mailto:James.C.Fee@IRSCOUNSEL.TREAS.GOV]
**Sent:** Tuesday, April 05, 2005 9:58 AM
**To:** Wilson Bill
**Cc:** Letkewicz Larry C; Woods Jadie T
**Subject:** RE: hybrid son of boss cases`

If you know the inventory of FDIS cases, I would send the FPAA language to the agents and their cadre attorneys.    If you post it on the Web, you will need to be specific in describing the cases or transactions to which it relates.  I have attached a list of attorney assignment.
   << File: SOB COUNSEL ATTORNEY ASSIGNMENTS 3 11.doc >>
Make sure that whatever you send out is the version drafted by Larry and reviewed by Jadie Woods.  Instruct the agents that this is a model that must be conformed to the facts of each case as the transactions are by no means uniform.

----Original Message----
| | |
|---|---|
| **From:** | Letkewicz Larry C |
| **Sent:** | Monday, April 04, 2005 11:33 AM |
| **To:** | Fee James C |
| **Cc:** | Wilson Bill |
| **Subject:** | FW: hybrid son of boss cases` |

Jim, what do you think?

----Original Message----
| | |
|---|---|
| **From:** | Wilson Bill [mailto:Bill.H.Wilson@irs.gov] |
| **Sent:** | Monday, April 04, 2005 10:23 AM |
| **To:** | Gannon Richard H; Letkewicz Larry C |
| **Subject:** | FW: hybrid son of boss cases` |

252

Please see below

Bill Wilson
Partnership Technical Advisor, LMSB
Mail Stop 4200:MSRO, Room 1130
4050 Alpha Rd.
Dallas, TX 75244-4201
Phone: 972-308-1573
Fax: 972-308-1594

-----Original Message-----
**From:** Wilson Bill
**Sent:** Wednesday, March 30, 2005 9:15 AM
**To:** Fee James C; Letkewicz Larry C
**Cc:** Merkle William G; Wilson Bill; Kiger Cheryl R; Gannon Richard H
**Subject:** RE: hybrid son of boss cases`

Larry/Rick:

I took the FPAA language you drafted and sanitized it and sent a copy to Jadie Woods (Son of Boss Counsel) to check and make sure I didn't miss anything in the process.

Do you think it would be ok to send a sanitized draft to others with the FDIS cases?  I am getting a lot of calls on these.  Alternatively and/or in addition we could put this on the Son of Boss web site.  These aren't son of boss cases in the strict sense, but are being worked under the Son of Boss executive champion.

Bill Wilson
Partnership Technical Advisor, LMSB
Mail Stop 4200:MSRO, Room 1130
4050 Alpha Rd.
Dallas, TX 75244-4201
Phone: 972-308-1573
Fax: 972-308-1594

-----Original Message-----
**From:** Fee James C [mailto:James.C.Fee@IRSCOUNSEL.TREAS.GOV]
**Sent:** Wednesday, March 30, 2005 8:14 AM
**To:** Letkewicz Larry C
**Cc:** Merkle William G; Wilson Bill; Kiger Cheryl R; Gannon Richard H
**Subject:** RE: hybrid son of boss cases`

Thanks, Larry.  Bill Wilson is a Technical Advisor who is responsible for these cases and will provide you with a description of the issue and anything else you need.  I think Bill has a copy of the . . . FPAA.  I have copied Cheryl Kiger, another TA with responsibility over some short statute cases.  Jim Hill is working a similar issue in a docketed cases and has a workplan with CC:Intl input.   Gannon is also available to help.

While we may have a short fuse on some of these cases, please don't feel locked into the FPAA template if it should be changed.

Thanks for your help.

-----Original Message-----
**From:**        Letkewicz Larry C
**Sent:**        Tuesday, March 29, 2005 12:10 PM

2

**To:**        Fee James C
**Cc:**        Merkle William G
**Subject:**    hybrid son of boss cases`

I discussed this with Bill Merkle this morning, and I am available to render any assistance which may be needed in drafting appropriate FPAA language beginning on Thursday, March 31.  I will need the RAR or some other thorough description of the issues and adjustments for any assistance to be meaningful.

254

3

# Exhibit J

## Case Development Reminders for Son of Boss Examiners

The following is intended as a reminder to examiners of specific procedures to be followed in developing evidence for files of Son of BOSS investors who did not elect to participate in the Son of Boss settlement initiative, or who were deemed to be ineligible for it. It is not intended to replace generally applicable examination procedures or to imply that they are not to be followed. Instead, it is designed to emphasize unique Son of BOSS aspects and procedures.

### Son of BOSS

The type of transaction (or series of transactions) referred to as the "Son of BOSS" (SOB) transaction is a "listed" transaction outlined in Notice 2000-44, 2000-36 C.B. 225 (September 5, 2000). It generally refers to certain transactions that are marketed to generate tax losses through the taxpayer's purported creation of artificially high basis in partnership interests. The taxpayer then attempts to recognize deductible losses on the disposition of the partnership interest or assets coming out of the partnership, even though no economic loss is incurred.

The Son of BOSS transactions have many variations. Two of them are mentioned in the Notice. The first variation is called Loan Premium or BLIPS (Bond Linked Issue Premiums), usually involving one primary promoter and an accounting firm. The second variation involves different financial products (digital options and short sales) and usually involves several promoters and accounting firms.

### The Need for Complete Case Development by Examiners

As a result of Announcement 2004-46, all Son of BOSS investors who did not elect to settle or were found to be ineligible for the settlement initiative are to be denied Appeals Office consideration for Son of BOSS transactions, and their cases are to be treated as if they were designated for litigation under Chief Counsel procedures for designating cases for litigation. Such taxpayers have been told that the Service will (a) develop the cases, (b) disallow all tax benefits and attributes claimed from the Son of BOSS transaction, including out-of-pocket costs and fees, (c) determine appropriate penalties, including those under section 6662 or section 6663, and (d) issue a Notice of Deficiency or Notice of Final Partnership Administrative Adjustment, as appropriate. This portion of the settlement initiative, and the Service's credibility in future similar endeavors, depend on effective and complete case development by examiners.

In addition to the Service's pronouncements concerning Son of BOSS, there is another crucial reason for complete and effective case development by examiners. Most of the Son of BOSS cases brought to court so far have been

48

2

filed in the United States Tax Court and the United States Court of Federal Claims. Both of those courts currently have low caseloads, and are setting cases for trial much sooner after filing than has been their practice in the past. This means that there simply is not time to find facts and evidence concerning a case after it already has been filed in court.

Finally, the courts have repeatedly stressed over the years that the Internal Revenue Service should not use the courts' discovery processes in lieu of the examination and case development powers given to the Service in I.R.C. section 7601 et seq. Most of the attorneys representing taxpayers in Son of BOSS litigation cases are experienced, aggressive counsel who will not hesitate to attack the notices of deficiency and FPAAs as "arbitrary" when a less-than-adequate examination preceded issuance of the notice. Failure by the Service to sufficiently develop a case before it is filed in court will serve only to enhance their ability to mount such attacks.

Limitations on Certain Examination Activities

In an attempt to appropriately balance the Government's interests in non-civil investigations of certain parties involved in promoting and investing in Son of BOSS shelters with civil examinations of Son of BOSS investors, the IRS executive designated the "champion" of Son of BOSS issues has issued a series of "Directions to Halt Certain Activities" that place some limits on the scope of the activities a revenue agent may undertake in examining a Son of BOSS investor. These directions do **not** in any way prevent a revenue agent from obtaining documents, whether from the taxpayer, from promoter's, or from the Service's own files. For the most part, the only limits they provide involve questioning of the taxpayer about the activity.

These directions have been widely disseminated throughout SBSE, LMSB, and Counsel, and are available on the IRS Intranet's Son of BOSS website. If in doubt as to their application, an examiner should contact the appropriate Son of BOSS technical advisor or the Counsel Son of BOSS cadre attorney assigned to assist the examiner's group. Despite these directions, full and expeditious case development is still needed and expected.

What Is Needed for the Case to be Sufficiently Developed

A sufficiently developed case file will contain information and evidence addressing the following questions:

1. **Who?** Before a deficiency notice or FPAA is issued, the file should contain background information on the taxpayer and the taxpayer's business and personal history, and information on the formation and use of every related partnership or other flow-through entity used by the taxpayer in effecting the Son of BOSS transaction. It should also

Son of BOSS Case Development
March 21, 2005

49

3

contain the identity and a description of the involvement of every promoter, accounting firm, law firm, bank and similar party who participated in any way in the transaction. It should also contain the names and other identifying information concerning other potential witnesses.

2.   **What?**  Before a deficiency notice or FPAA is issued, the file should contain a description and analysis of what was reported by the taxpayer on the taxable return and all related returns. It should also contain information about the transactions and income that the taxpayer used Son of BOSS to offset.

3.  **How?**  Before a deficiency notice or FPAA is issued, the file should contain a description and analysis of how the taxpayer's Son of BOSS transaction allegedly worked, including the steps, their timing, and the parties involved.

4.  **When?**  Before a deficiency notice or FPAA is issued, the file should contain a clear analysis of when the taxpayer realized any income offset or sought to be offset by the Son of BOSS transaction, when the taxpayer became involved with Son of BOSS promoters or transactions, and when the benefits of Son of BOSS were used or may still be used by the taxpayer.

5.  **Where?**  Before a deficiency notice or FPAA is issued, the file should contain information as the location of any records, documents, or other evidence that cannot be made part of the file.

6.  **Why?**  Before a deficiency notice or FPAA is issued, the file should contain a clear statement of what penalty or penalties apply, and why.

<u>Contacts With the Taxpayer</u>

The initial contact with the taxpayer is by way of Letter 3907, enclosing an Information Document Request. The sample Letter 3907 and sample IDRs may be found at http://lmsb.irs.gov/hq/pftg/p_ships/son_of_boss.asp.
In consultation with the assigned Counsel Son of BOSS cadre attorney, the sample IDRs should be expanded and tailored to suit a specific case.

If the taxpayer's response to the IDR is insufficient, a summons usually should be issued. Your Counsel Son of BOSS cadre attorney should be contacted to assist in preparing the summons.

Son of BOSS Case Development
March 21, 2005

50

4

<u>Documents to be Gathered During the Examination</u>

A Son of BOSS case cannot be litigated successfully without complete documentation of what the taxpayer did and why the taxpayer did it. As noted above, although there are some limits on the scope of the activities a revenue agent may undertake in examining a Son of BOSS investor, there generally is no limit on obtaining documents.

1. <u>Sources of Documents</u>

One source of documents, already mentioned above, is the taxpayer. IDRs and summonses should be issued in every case to obtain documents.

The second source of documents is the IRS itself. Proper case development is not complete until all necessary tax returns are gathered and made part of the file. The identity and status of any related cases should be made part of the file. In addition, the file must contain account information concerning the taxpayer and all entities whose records are relevant to the case. Finally, the source of the Service's knowledge that the case is a Son of BOSS case should be documented in the file.

An additional important group of documents may be available within the IRS. In addition to Son of BOSS investor examinations, the Service also has conducted Son of BOSS promoter investigations. It is crucial for the examiner to determine the identities of <u>all</u> promoters involved in the taxpayer's transaction, such as

    a. Brokers
    b. Accounting firms
    c. Banks/financial institutions
    d. Law firms that issued opinion letters
    e. Other promoters

2. <u>Documents to be Obtained and Included in the File</u>

A. The Son of BOSS website contains a page called the Son of BOSS - Financial Products Tool Kit. This page, in turn, contains a list and checksheet called the SOB Document Inventory. A copy is attached to this document. It is a very good general guide of the documents used in a Son of BOSS transaction. It should be consulted by the examining agent in every case, and the documents it lists, or similar documents as used in the particular case, should be obtained and made part of the file.

B. Many of these documents should be obtained from the taxpayer through use of IDRs and summonses. However, crucial documents also are, in most instances, contained in promoter investigation files. In every case, steps

Son of BOSS Case Development
March 21, 2005

51

5

must be taken to obtain records from appropriate promoter investigation files. Because of the importance of these records, efforts are underway to develop a system for scanning the documents on many promoter investigations to make them available electronically to investor examination teams. However, until that system is developed and perfected, the examiner may be required to visit one or more promoter investigation sites to obtain records if the promoter investigation team is unable to locate specific relevant files on the investor examiner's behalf. Promoter investigation files contain information falling into two general categories:

1. General information about the creation of the shelter, including such materials as promotional materials, internal memoranda of each promoter (such as marketing plans, reports on the number of transactions, reports on anticipated or realized revenue, etc.); communications among promoters, especially co-promoters that may be financial institutions that established credit lines for the investor, and any credit files or similar documents describing the transaction to credit-authorizing officials; and

2. Information about the sale of the shelter to the particular investor in your case; of special significance is any information concerning side deals or indemnification agreements that may have been offered or concluded between a particular investor and promoter or co-promoter.

C. The promoter team also probably will have in its possession "pattern evidence" regarding the promoter's sale of the same shelter to other parties, and this type of evidence may be useful in your case. However, there are unanswered section 6103 questions regarding the use of this type of evidence. While you may ascertain the existence of this type of evidence, you should not obtain or attempt to use it without resolving the disclosure issues, in consultation with your assigned Son of BOSS Counsel cadre attorney.

D. On February 8, 2005, the Permanent Subcommittee on Investigations of the Senate Committee on Homeland Security and Governmental Affairs issued a report on "The Role of Professional Firms in the U.S. Tax Shelter Industry." 2005 TNT 28-2. This report and its underlying documents contain information on the tax shelter activities of several firms, including KPMG, Ernst and Young, PricewaterhouseCoopers, Sidley Austin Brown & Wood, Sutherland Asbill & Brennan, Presidio Advisory Services, Quellos Group, Deutsche Bank, HVB Bank, UBS Bank, First Union National Bank, and Wachovia Bank. In cases where KPMG is a promoter, additional information may be available from the hearings of the Senate Permanent Subcommittee on Investigations; the most pertinent information is in "Hot Docs," which is seven boxes of documents culled from over 200 boxes. The seven boxes have been scanned to a CD with an Excel index

Son of BOSS Case Development
March 21, 2005

6

file. You may contact Revenue Agent Mike Halpert, phone number 202-874-0068, and request the index and any other pertinent KPMG information.

E. Investors commonly used Son of BOSS transactions to shelter gains they had realized from legitimate business or investment activities. While the examiner usually will not be directly examining those transactions, information regarding those transactions could be very relevant to issues involving the taxpayer's motives and actions regarding Son of BOSS, such as economic substance and penalty issues. Also relevant to those issues is evidence of the taxpayer's general (non-Son of BOSS business and investment) activities. In order to adequately explore these areas, the examiner should seek information regarding:

1. Names of persons who provided investment advice, financial planning advice, tax and financial accounting services, and tax planning and tax preparation services for years before and after the year of the Son of BOSS transaction;

2. If the gain came from sale of an asset, due diligence materials, appraisals or valuations, tax opinions or tax planning documents, legal opinions or advice, and sale transaction closing binders or materials; and

3. All information given by the taxpayer regarding the income or gain-producing transaction(s) to the Son of BOSS promoter(s), broker(s), accountant(s), or law firm(s).

Technical and Legal Assistance

Examiners developing Loan Premium (BLIPS) cases may obtain technical assistance from Robert Gee, SBSE Abusive Schemes Manager, at 415-522-6119. Examiners developing any other Son of BOSS case may obtain technical assistance from Bill Wilson, Technical Advisor, Partnerships, LMSB SOB Coordinator at 972-308-1573 or Lenny Smathers, LMSB Partnership Technical Advisor at 828-345-1036 ext. 139.

Chief Counsel has designated a cadre of Son of BOSS attorneys who are available to assist in case development, including drafting of IDRs and summonses. SBSE Senior Counsel Tom Mackinson and SBSE Senior Attorney Julie Vandersluis are the attorneys assigned to assist on Loan Premium (BLIPS) cases. Approximately 20 other attorneys, supervised by LMSB Associate Area Counsel Jim Fee (East), LMSB Associate Area Counsel Matt Fritz (Central), and SBSE Associate Area Counsel Paul Zamolo (West) have been assigned to assist agents from specific SBSE and LMSB examination groups.

Son of BOSS Case Development
March 21, 2005

7

A Son of BOSS website is on the IRS Intranet.  Examiners may find information Investor and Promoter Examination protocols and procedures at http://lmsb.irs.gov/hq/pftg/p_ships/son_of_boss.asp.

54

# Exhibit K

IRS-1947

<u>71d1 — Meetings</u>

Notice 2002-44-50n  } Hybrid
Notice 2002-50        } of all
Notice 2002-65        } 3

John Alletta ( SB/SE Case Counsel)

Steve Lock   (IE Territory Manager)
Dennis McSweeney ( IE Manager)
Peter McIntyre (IE) — via telephone

Bill Conway (TC)

Debbie Morrill (Case Manager)

1) Some additional KPMG info came in  (Promoter Project)

2) Some info come via C.I.

3) Info from Helios Trading LLC (Promoter Project) - Responded to IDR
   * TMP of LLC
   * Partner in LLC

4) Sam Mahoney - Irish guy

5) Sidley, Austin, Brown and Wood - Tax Opinion

6) Alpha also Partner in LLC

7) Complex Multi-Variate Barrier Option  ?? Check ISDA website

8) "CMS" Digital Call option

1CORRIGAN-000304

# IDRs go thru John Alletta

1CORRIGAN-000305

# Exhibit L



**Russ Cary**

| | |
|---|---|
| **From:** | Wilson Bill |
| **Sent:** | Thursday, June 09, 2005 9:41 AM |
| **To:** | Russ Cary |
| **Subject:** | FW: Cases with Son of Boss Features - "Substantially Similar" Issue |

**Importance:**  High

Bill Wilson
Partnership Technical Advisor, LMSB
Mail Stop 4200:MSRO, Room 1130
4050 Alpha Rd.
Dallas, TX 75244-4201
Phone: 972-308-1573
Fax: 972-308-1594

-----Original Message-----
**From:** Fee James C [mailto:James.C.Fee@IRSCOUNSEL.TREAS.GOV]
**Sent:** Thursday, October 28, 2004 9:27 AM
**To:** Wilson Bill; Lin S Katy; Woods Jadie T; Smathers Lenny T; Kiger Cheryl R
**Cc:** Fee James C; Weinger Larry A; Whalin Michael M
**Subject:** RE: Cases with Son of Boss Features - "Substantially Similar" Issue
**Importance:** High

You may also wish to talk with Larry Weinger who is familiar with some of these transactions.

Larry, if you have a concise write-up on the deals with SoB features, will you send it around to us. We are under tight deadlines for tomorrow's meeting.

> -----Original Message-----
> **From:** Fee James C
> **Sent:** Wednesday, October 27, 2004 5:06 PM
> **To:** Smathers Lenny T; Whalin Michael M; Lin S Katy; Woods Jadie T
> **Cc:** Smathers Lenny T; Fee James C; Singleton Henry V; Rule Peggy C; Maselli Joseph F; Zamolo Paul R
> **Subject:** RE: Cases with Son of Boss Features - "Substantially Similar" Issue
> **Importance:** High
>
> As we discussed with Peggy on Monday's call, it is imperative that we have materials that will concisely present the subject transactions for consideration of the substantially similar issue. In this regard, she made assignments of the SoS Version III hybrid transaction, the distressed debt deal ( _____ ), ... I think we agreed that toggle trusts are not SoB and will not be presented. I agreed to present the S Corp version of the SoB, which we have also decided is not SoB.
>
> When can I expect the write-ups and charts so that I can package them for distribution?  I need them with sufficient time to review them with Joe Maselli before I send them out.

b3
(6)03a

> > -----Original Message-----
> > **From:** Fee James C
> > **Sent:** Saturday, October 23, 2004 2:47 PM
> > **To:** Wilson Bill; Fee James C; Whalin Michael M; Lin S Katy; Woods Jadie T
> > **Cc:** Gannon Richard H
> > **Subject:** RE: Cases with Son of Boss Features - "Substantially Similar" Issue
> > **Importance:**    High



I left Mike Whalin a voicemail message. It would be helpful, and actually, essential to have a briefing paper for each of the subject transactions. I would suggest a description of the transaction with no more than 1 1/2 to 2 pages each, including a statement of our authority for disallowance. Also I think a chart comparing the transactions features and relevant law compared to the specific transaction and law in Announcement 2000-44, the CCDM Notices, and the CIP to compare what features are similar and what are not.

I am asking the TA's and their Issue Counsel to take the lead on this. Confer with whomever you think is appropriate. Rick Gannon is always a good resource, and in fact he knows something about the distressed debt scenario. Do you think something could be put together by COB Wednesday?

-----Original Message-----
**From:** Wilson Bill [mailto:Bill.H.Wilson@irs.gov]
**Sent:** Friday, October 22, 2004 5:15 PM
**To:** Fee James C
**Subject:** RE: Cases with Son of Boss Features - "Substantially Similar" Issue

Let me know what I can do. Also, please advise when you have the call in number.

-----Original Message-----
**From:** Fee James C [mailto:James.C.Fee@IRSCOUNSEL.TREAS.GOV]
**Sent:** Friday, October 22, 2004 10:04 AM
**To:** Rule Peggy C; Singleton Henry V; Zamolo Paul R; Poindexter Carol J; Whalin Michael M; Wilson Bill
**Cc:** Hill James D; Maselli Joseph F; Sterner Christopher B; Lanning James C; LaBelle Peter J
**Subject:** FW: Cases with Son of Boss Features - "Substantially Similar" Issue

Right now we have tentatively scheduled Friday, October 29 at 1 for our meeting and call as a time that works for Jon Zelnick, P&SI (Donna Young and maybe Heather), and me. They suggest two hours, which will be tight in my opinion. A lot will depend on the quality and timing of the briefing materials I can submit and I will work with Mike Whalin and Bill Wilson, and perhaps Katy and Jadie in that regard.

How is this for you? Please let me know who will participate and whether it will be by phone or in person.

-----Original Message-----
**From:** Fee James C
**Sent:** Wednesday, October 20, 2004 4:09 PM
**To:** Zelnik Jonathan R; Young Donna Marie
**Cc:** Maselli Joseph F; Lanning James C; Sterner Christopher B; LaBelle Peter J; Zamolo Paul R; Fee James C
**Subject:** Cases with Son of Boss Features - "Substantially Similar" Issue

Jon, following up with or conversation last week, I would like to schedule a meeting or call to nail down the critical question of what is substantially similar to Son of Boss. During an Issue Champion conference call on Monday, which I missed, I understand that Paul Zamolo and I have been asked to seek resolution on this issue.

b3/6103a

28



JAMES C. FEE, Jr.

Associate Area Counsel
OFFICE OF CHIEF COUNSEL - IRS
LARGE AND MID-SIZE BUSINESS DIVISION
701 Market Street, Suite 2200
Philadelphia, PA 19106
(215) 597-3442
FAX (215) 597-3008 or 597-2150