# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, ) ) ) ) | |
| Plaintiff, ) | |
| v. ) | Case Nos.: 05-40151-FDS 06-40130-FDS |
| UNITED STATES OF AMERICA, ) | |
| Defendant. ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION AND MEMORANDUM OF LAW FOR ISSUANCE OF AN AMENDED LETTER ROGATORY REQUESTING INTERNATIONAL JUDICIAL ASSISTANCE FROM AUTHORITIES OF IRELAND**

In its third attempt at presenting this Court with a letter rogatory to an Irish court, on June 5, 2007, Defendant filed a motion asking the Court to amend its letter rogatory directed to Ireland ("Defendant's Motion").[1]  The Court had signed the pending letter on May 22, 2007. The amended letter rogatory now urged on the Court includes what Defendant claims is a newly disclosed special procedure that would allow U.S. lawyers to directly question Irish witnesses in an Irish court.[2]  In its amended form, the proposed letter rogatory is both inaccurate and unclear in its description of the so-called alternative procedure.  Plaintiff's fundamental concern is that

---

[1] References to "Defendant's Motion" means Defendant's Motion and Memorandum of Law for Issuance of an Amended Letter Rogatory Requesting International Judicial Assistance from Authorities of Ireland.

[2] On June 5, 2007, Defendant filed its motion for issuance of an amended letter rogatory, which made reference to a declaration that was not filed until the following day.  That declaration relies heavily on and quotes from a "diplomatic note" from the Irish Department of Foreign Affairs to the Embassy of the United States of America in Dublin in connection with some other unidentified matter.  Plaintiff requested a copy of that note; Defendant stated that it could not provide the note because it did not have a copy of the note itself.  (Ex. A.)

this "new" procedure, as described in the letter rogatory, fails to ensure that Plaintiff will be afforded equal treatment with Defendant. To ensure equal treatment of the parties, Plaintiff requests that the Court revise the letter rogatory by correcting the following three deficiencies in the Special Procedures section of the amended letter. First, the proposed procedures do not clearly permit Plaintiff's counsel to ask his own questions. Second, Defendant has stated on the record that the Irish court may permit only one U.S. lawyer to ask questions, which would deprive Plaintiff of its right of cross-examination. Third, the new procedure appears to require that the testimony be taken in an Irish court and before a High Court judge, a limitation that will unnecessarily delay the process and is not in keeping with the practice in Ireland.

In order to ensure equal treatment and that the deficiencies mentioned above are corrected, Plaintiff asks that the Court include in its letter rogatory additional questions submitted by Plaintiff and a request that counsel on both sides of this case be permitted to ask questions. Importantly, Plaintiff also asks the Court to request that more typical Irish procedures be employed if the Irish judicial authority[3] will not permit U.S. lawyers for both parties to question the witnesses, specifically, that a neutral lawyer pose all questions. Finally, Plaintiff suggests that the Court clarify its request to the High Court to make clear that this Court is not asking that the testimony be taken before a High Court judge in that judge's court. Implementing these minor modifications in the final letter rogatory ensures that Plaintiff will receive equal treatment and will conform this Court's letter to Irish practice.

Plaintiff also suggests that the Court address certain other issues not raised by Defendant to ensure that the next letter rogatory it issues to the High Court is technically accurate.

---

[3] The relevant Irish judicial authority that receives letters of request and issues orders regarding the same is the High Court of the Republic of Ireland ("High Court"). (*See* Ex. B, Form No. 1 in Part III of Appendix D to the Irish Rules of the Superior Courts.) The High Court's website is found on the website for Ireland's court system, *available at* http://www.courts.ie/ (follow "The Courts" hyperlink; then follow "High Court" hyperlink) (last visited June 15, 2007).

## I.     Defendant Has Mischaracterized the "New" Procedure

The procedure Defendant proposes is not new, and could have been requested in either of its prior iterations of the letter rogatory.  Defendant bases its Motion on what it claims is a "newly disclosed alternative procedure."  (Def.'s Mot. at 1.)  Defendant claims that this procedure was called to its attention through a "diplomatic note" received by the U.S. Embassy in Dublin concerning another matter.  However, Defendant does not have this note.  (Ex. A.)  Moreover, the Declaration offered by Defendant describes and quotes from this note and is offered to this Court as a clear and correct statement of some new Irish procedure.  (*See* Decl. of Edward A. Betancourt,  Def.'s Mot.)  Defendant has simply inserted in the revised letter rogatory the language of the Declaration, which in turn purports to quote a single diplomatic note issued in one other matter.  Unfortunately, the procedure passed from the note to the Declaration to this Court is neither clear nor correct, thus requiring the changes suggested here.

In Ireland, a procedure whereby U.S. lawyers pose questions to Irish witnesses pursuant to letters rogatory is not new.  (*See* Ex. C (proposed letter rogatory to Ireland issued in another case requesting that U.S. lawyers conduct the deposition).)  The practice of direct questioning by lawyers from the U.S. has evolved over time, and in recent years it has become more common.  The Foreign Tribunals Evidence Act of 1856 and Order 39 (particularly Rules 39-44) of Ireland's Superior Court Rules contain the applicable Irish rules that govern these matters.  (*See* Exs. D and E, respectively.)  These procedural rules are not mentioned in Defendant's Motion or the Declaration, raising some doubts as to the accuracy and authoritativeness of Defendant's description of the letters rogatory process in Ireland.

If the letter rogatory requests direct questioning by U.S. counsel for both sides, there is nothing in Irish law or practice that prohibits the High Court from granting the request.  The High Court generally makes an effort to accommodate the special procedures set forth by the

requesting foreign court. (*See* Ex. E.) Under Rule 43 of Order 39, the Irish Court "may direct that said examination to be taken in such manner as may be requested by the *commission rogatoire* or letter of request from the foreign court or tribunal, or therein signified to be in accordance with the practice or requirements of such court or tribunal." (Ex. E, Rule 43.) As set forth below, the special procedures to be requested by this Court should be amended in a manner that is both acceptable to the High Court and that accommodates Plaintiff's concerns that the special procedures provide equal treatment.

## II.     Plaintiff's Proposed Changes Ensure Equal Treatment and Are Valid Under Irish Law

Under both United States and Irish law, both parties are entitled to elicit testimony from a witness. The procedures now being proposed in Defendant's third version of the letter rogatory, however, fail to ensure that equal treatment is afforded to Plaintiff. This Court's letter rogatory must include certain changes to address this issue.

### A.     Plaintiff Is Entitled to Put Its Own Questions to the Witnesses

Defendant's proposed new special procedures state that "[t]he plaintiff, Fidelity International, requests that a U.S. attorney acting on its behalf, Mr. David Curtin, also travel to Ireland to *ask questions arising from the answers given to the United States' questions.*" (Amended Letter Rogatory[4] at 16 (emphasis added).) Because letters rogatory are issued by a United States court, they must accommodate the discovery needs of both parties, rather than reflect the discovery sought by a single party. Accordingly, and in light of the direct-questioning procedure now being sought, Plaintiff asks that the Special Procedures section of the letter rogatory be amended to make it clear that this Court requests that both parties be permitted to put the listed questions to the witnesses and ask questions arising from the answers given. Language

---

[4] "Amended Letter Rogatory" means the Letter Rogatory filed with Defendant's Motion.

to this effect is included in Plaintiff's proposed amended letter rogatory, attached as Exhibit F.

Specific questions are included in Plaintiff's proposed amended letter rogatory. (Ex. F at 14-

18.)[5]

> **B.      The Letter Rogatory Should Strive for Parity Between the Parties**

It is not clear that the parties will be treated equally under the letter rogatory as currently

written. While the special procedures proposed by Defendant provide that both Defendant's and

Plaintiff's U.S. counsel will be permitted to ask questions of the Irish witnesses (Amended Letter

Rogatory at 16), in the June 5, 2007 status conference, Defendant stated that "what we were

informed is . . . that United States Attorney could ask questions. They didn't say anything about

more than one, and – but we thought that if anyone was going to be permitted, it should – it

would be a representative from both sides that would be permitted to ask the questions." (Status

Conference Tr. 35:15-20.) This risk recognized by Defendant can be avoided by modifying this

Court's request for special procedures as Plaintiff suggests.[6] If this Court makes a clear request,

the High Court is likely to accommodate the request.

A procedure whereby only counsel for Defendant would be permitted to ask questions

would be highly prejudicial to Plaintiff. To ensure that both parties have an equal opportunity to

examine the witnesses, and to protect Plaintiff's right of cross-examination, the Court should

include language in the Special Procedures section of the letter rogatory providing that, if the

---

[5] While Plaintiff continues to object both as to the statement of facts and the scope of Defendant's inquiry, Plaintiff has left those sections unaltered.

[6] During the status conference on June 5, 2007, Plaintiff's counsel advised the Court that Plaintiff would not agree to a procedure under which Plaintiff's counsel would be required to allow Defendant's counsel to ask Plaintiff's questions. (Status Conference Tr. 40:25-41:8.)

High Court will not permit U.S. lawyers for both parties to examine the witnesses, the typical procedures under Irish law should govern the examination.[7]

Ireland's Superior Court Rules provide, "In the absence of any such special directions being given in the order for examination, the same shall be taken in the manner prescribed in *Part II of this Order.*"  (Ex. E, Rule 43.)  Part II of the Order provides the typical procedures for taking a deposition.  It is our understanding that in the absence of a request by this Court for special procedures, the Irish State Solicitors Office will appoint an Irish lawyer (probably a barrister) to pose the questions to the witnesses, and that "the person taking the examination shall be furnished by the party on whose application the order was made . . . with a copy of the documents necessary to inform the person taking the examination of the questions at issue between the parties."  (Ex. E, Rule 9.)  Under such circumstances, "[t]he examination shall take place in the presence of the parties, their counsel, solicitors, or agents, and the witnesses shall be subject to cross-examination and re-examination."  (Ex. E, Rule 10.)

Accordingly, if the High Court cannot accommodate this Court's requested special procedure whereby U.S. counsel for both parties are permitted to question the witnesses, Plaintiff requests that the special procedures for the letter rogatory be modified to request that the examination be taken pursuant to Ireland's default procedures under which a single Irish lawyer does all the questioning.

---

[7] Though Plaintiff cannot conceive of a reason why the High Court would order that U.S. counsel for only one party may directly question the witness, which is neither the default procedure nor the procedure requested, and which would be inconsistent with the normal practice in Ireland of accommodating requested procedures, Defendant's raising of this issue makes such precautionary language necessary to ensure that these depositions are undertaken in a manner that is fundamentally fair to both parties.

C.     **The Examination Should Be Taken at a Place Most Convenient and Expeditious**

Finally, Plaintiff strongly suggests altering the language in the Special Procedures section to request that the Irish judicial authority designate the most appropriate place for taking the examination, rather than the current language which appears to request that the examination take place in the High Court.  Providing the High Court with such flexibility is in keeping with typical practice, avoids burdening the High Court with a foreign request for a judge and a courtroom, and will enable the completion of these depositions in a more timely manner.  Thus, this modification of the letter rogatory will be in accordance with the Court's expressed desire to move discovery in this case forward.

In its proposed amended letter rogatory, Defendant would have this Court request that counsel "put the listed questions to the witnesses in court."  (Amended Letter Rogatory at 16.) Ireland's Superior Court Rules, however, do not require the High Court to give up its courtroom and the standard practice is not to do the examination in the court.  Instead, the Rules provide that "[t]he Court may . . . make any order for the examination upon oath before the Court, or any officer of the Court, or any other person, and at any place . . . ." (Ex. E, Rule 4.)  It is typical in Ireland that such examinations take place, not in court, but in a lawyer's office.  Moreover, the High Court is closed for the months of August and September.  (Ex. G.)[8]

Plaintiff requests that the Special Procedures section of the letter rogatory include language requesting that the High Court order that the examination be taken in a place that will be most convenient and expeditious.  Language to this effect is included in the Special Procedure section of Plaintiff's proposed amended letter rogatory.  (Ex. F at 19.)

---

[8] The High Court's calendar is attached as Exhibit G; *see also* http://www.courts.ie/ (follow "Terms and Sittings" hyperlink; then follow "High Court" hyperlink) (last visited on June 15, 2007).

### III.    Irregularities in the Letter Rogatory Should Be Corrected

Defendant's description of Irish procedure is incorrect in some respects and should be corrected to avoid confusion and further delays.

Defendant's new version of the letter has this Court requesting that "the State's Law Office make an ex parte application to the High Court." (Amended Letter Rogatory at 16). The problem is that, according to Plaintiff's research, there is no "State's Law Office." Defendant's reference to the "State's Law Office" appears to be taken from the Declaration, which in turn took the reference from the diplomatic note that neither the parties nor the Court has seen. Plaintiff understands that the correct reference is to the Chief State Solicitor.[9] Accordingly, the letter should be revised to ensure that this Court is correctly describing the office that will be submitting the letter rogatory to the High Court.

Finally, the Court may wish to consider the issue of costs, which is addressed in a discrete section of its letter. As currently written by Defendant, the letter rogatory would have the United States District Court for the District of Massachusetts pay the costs of the Irish courts. (Amended Letter Rogatory at 17.) It is customary for the party seeking the letter rogatory to pay the costs, and hence, the Department of Justice should do so here rather than this Court.[10]

---

[9] *Available at* http://www.attorneygeneral.ie/csso/english/roleandfunction.htm (last visited June 15, 2007).

[10] Letters rogatory issued by other courts attached as Exhibits I, J, and K to Plaintiff's Response to Defendant's Motion for Issuance of Letters Rogatory Requesting International Judicial Assistance demonstrate that the requesting party generally bears the costs. (*See* Pl.'s Resp. to Def.'s Mot. for Issuance of Letters Rogatory Request Int'l Judicial Assistance, Exs. I, J, K.) Moreover, in the one letter rogatory seeking a deposition, the letter requested that United States counsel for both parties be permitted to ask questions. (*See id.,* Ex. K at 40 ("We further request . . . that counsel for plaintiffs and defendant be permitted to question the Witness . . . .").)

Plaintiff has modified the cost provision of the letter rogatory to conform to the customary practice. (Ex. F at 21.)[11]

## <u>Conclusion</u>

The letter rogatory should contain procedures that treat the parties equally. To ensure equal treatment, the letters rogatory should be modified to request the following: (1) both parties are permitted to put questions to the witnesses, (2) counsel for both parties are permitted to conduct the examination and if that is not acceptable, an appointed Irish lawyer would conduct the examination, and (3) the examination be conducted at a time and a place ordered by the High Court, not necessarily in the court. Furthermore, the Court should ensure that all irregularities are corrected before issuing the letters.

Respectfully submitted this 15th day of June 2007.

PLAINTIFF
FIDELITY INTERNATIONAL CURRENCY ADVISOR
A FUND, L.L.C., by the Tax Matters Partner

/s/ Lena Amanti
David J. Curtin, D.C. Bar #281220
Ronald L. Buch, Jr., D.C. Bar #450903
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone: (202) 775-1880
Facsimile: (202) 775-8586
Email: dcurtin@mckeenelson.com
        rbuch@mckeenelson.com
        lamanti@mckeenelson.com

---

[11] Similar to the language regarding costs, the boiler-plate statement concerning reciprocity should be considered by the Court. (Amended Letter Rogatory at 17.) The Court should be comfortable that the procedures requested of the High Court are procedures it would be able and prepared to provide to Irish litigants.

John O. Mirick, BBO #349240
MIRICK, O'CONNELL, DEMALLIE
& LOUGEE, LLP
100 Front Street
Worcester, MA 01608
Telephone:  (508) 791-8500
Facsimile:  (508) 791-8502
Email:  jomirick@mirickoconnell.com

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those those indicated as non registered participants on June 15, 2007.

/s/ Lena Amanti
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email: lamanti@mckeenelson.com

# Exhibit A



**U.S. Department of Justice**

**Tax Division**

*Please reply to:*  Civil Trial Section, Northern Region

*Facsimile No. (202) 514-5238*                                    P.O. Box 55
*Trial Attorney: Barry E. Reiferson*                          Ben Franklin Station
*Attorney's Direct Line: (202) 514-6058*                  Washington, D.C.  20044

5-36-10254
CMN 2005106280

June 13, 2007

Via Federal Express and Facsimile (202) 775-8586

David J. Curtin, Esq.
McKee Nelson LLP
Suite 800
1919 M Street, NW
Washington, DC 20036

Re:    *Fidelity Int'l v. United States*, Civ. Nos. 05-40151 and 06-40130 (D. Mass.)

Dear Mr. Curtin:

This is in response to your June 11, 2007 request for a "complete copy" of the diplomatic note sent from the Irish authorities to the U.S. Embassy in Dublin and referred to in a declaration filed in support of our motion for issuance of an amended letter rogatory in this case. This diplomatic note was not provided to the Department of Justice. Thus, we are unable to provide it to you.

As we stated in our motion papers, this diplomatic note was an official communication between the governments of Ireland and the United States, and was sent in connection with an unrelated case. If you still desire to obtain a copy of this material and believe you have a legal basis for its production, it is our understanding that you may request it under 22 C.F.R. 172 from the Executive Office of the Office of the Legal Adviser at the U.S. Department of State.

Please feel free to call me at the number above with any questions or comments.

Sincerely yours,

BARRY E. REIFERSON
Trial Attorney
Civil Trial Section, Northern Region

# Exhibit B

**APPENDIX D**

**TO**

**THE RULES OF THE SUPERIOR COURTS**

**S.I. NO. 15 OF 1986**

## PART III. FOREIGN PROCEEDINGS.

No. 1.

**O. 39, r. 40**

### ORDER UNDER THE FOREIGN TRIBUNALS EVIDENCE ACT, 1856.

### THE HIGH COURT.

In the matter of Foreign Tribunals Evidence Act, 1856 and in the matter of a [*civil or commercial or criminal*] proceeding now pending before [*description of foreign tribunal*] entitled as follows:—

Between                              , Plaintiff
                                                                } (or as the case may be)
and                              Defendant

Upon reading the affidavit (*if any*) of        filed the  day of  , 19 , and the *commission rogatoire* [*or as the case may be*]

It is ordered that

do attend before [*name and address of the examiner*], who is hereby appointed examiner herein, at [*place appointed for examination*], on the   day of   ,19

,at   o'clock, or such other day and time as the said examiner may appoint, and do there submit to be examined upon oath, or affirmation, touching the testimony so required, as aforesaid, and do then and there produce [description of document (if any) required to be produced].

And it is further ordered that the said examiner do take down in writing the evidence of the said witness (*or witnesses*) according to the rules and practice of this Court pertaining to the examination and cross-examination of witnesses [*or as may be otherwise directed*]; and do cause such witness to sign his deposition in the presence of the examiner; and do sign the depositions taken in pursuance of this order, and when so completed do transmit the same, together with this order, to the Master of the High Court, for transmission to the President of the said Tribunal desiring the evidence of such witness or witnesses.

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Starr International Company, Inc., <br><br> Plaintiff- <br> Counterclaim Defendant, <br><br> v. <br><br> American International Group, Inc., <br><br> Defendant- <br> Counterclaim Plaintiff. | Civil Action No. 05 CV 6283 (BSJ) <br><br> **[PROPOSED LETTER OF REQUEST]** |

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE TO THE APPROPRIATE JUDICIAL AUTHORITY IN IRELAND

This request is made by the Honorable Barbara S. Jones, of the United States District Court for the Southern District of New York, which is located at the United States Courthouse, 40 Centre Street, New York, New York, United States of America, to the Master of the High Court, Dublin, Ireland.

The Executed Request should be returned to American International Group, Inc. ("AIG") at the address of its representative, the New York law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP, located at 1285 Avenue of the Americas, New York, New York, 10019-6064, U.S.A.

In light of international law and the comity that exists between the United States and Ireland, the undersigned applicant respectfully submits the following Request:

## Introduction

This Request seeks evidence for use in a civil action presently pending before this Court that alleges a claim arising under the Declaratory Judgment Act, 28 U.S.C. § 2201, and other claims arising under non-federal laws. The purpose of this Request is to obtain documentary evidence for use as evidence in a trial of this civil action in this Court. The Court has not yet made a determination of the merits of the claims asserted in this action. The information provided in this Request is based upon information contained in the parties' pleadings and other proceedings in this action.

## The Parties and their Representatives

The parties to this action and their representatives are as follows:

(a)     Plaintiff/Counterclaim-Defendant is Starr International Company, Inc. ("SICO"), a privately held corporation organized and existing under the laws of Panama, with offices in Bermuda and Ireland.  SICO is represented in this action by Boies, Schiller & Flexner LLP, 570 Lexington Avenue, New York, New York, 10022, United States, and Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, United States.

(b)     Defendant/Counterclaim-Plaintiff is AIG, a holding company organized and existing under the laws of the State of Delaware in the United States, with its principal place of business in New York, New York, that through its subsidiaries provides insurance, financial and retirement services in more than 130 countries and jurisdictions.  AIG is represented in this

action by Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of

the Americas, New York, New York 10019-6064, United States.

<u>Nature and Purpose of the Proceedings</u>

This civil action arises under the laws of the United States and the State of

New York. The parties to this case have had a long-standing integrated relationship,

including, *inter alia*, shared physical space, directors and managers in common, and

ownership by SICO of approximately 12% of the outstanding AIG common stock.

In its counterclaim, AIG pleads that beginning in the 1970s, SICO agreed

to use its primary asset, shares of AIG common stock, in connection with a compensation

plan under which SICO is required to distribute AIG shares to AIG employees. AIG

alleges that SICO has breached its obligations to AIG and has been unjustly enriched by

the attempted conversion of the AIG shares for SICO's benefit, in violation of the long-

standing agreement between AIG and SICO to retain and use such shares for the benefit

of AIG and AIG employees.

AIG also alleges that SICO has breached the fiduciary duty it owes to AIG

by seeking to retain for itself these AIG shares; that SICO has unlawfully converted these

shares; and that AIG is entitled to a constructive trust upon these assets. AIG requests

that the court issue a declaratory judgment to require SICO to use these assets for the

benefit of AIG employees and to require that a majority of the SICO board consist of

AIG employees.

The parties are in the process of gathering evidence relating to the claims,

defenses, and counterclaims raised in the parties' pleadings. AIG has stated to this Court

that, in the interests of justice, there is a need for evidence from the offices of

PricewaterhouseCoopers ("PwC") located within your jurisdiction at Wilton Place, Dublin 2, Ireland.

<u>Request for Judicial Assistance</u>

This Court requests that you cause, by proper and usual process of your authority, (1) PwC to produce and make available to AIG's above-named representatives the documents enumerated below, and (2) Ms. Mary Walsh to appear before you (or some competent officer authorized by you for that purpose) to be examined orally as a witness in the above action by counsel for AIG concerning the subject matters enumerated below.  This Court further requests that the witness' oral testimony be recorded verbatim, transcribed and returned under seal to the clerk of the United States District Court for the Southern District of New York, along with any documents that this witness may produce or identify during her testimony.

A.    <u>Documents Requested</u>

It is hereby requested that you cause PwC to make available for inspection and copying by defendants' legal representatives the following:

1.    The fully-executed July 28, 2003 Engagement Letter signed by PwC and SICO ("the Engagement Letter").

2.    All documents relating to the Engagement Letter.

3.    The fully-executed version, and all other copies and drafts, of the Letter dated February 26, 2004 from Mary Walsh of PwC to Frank Mullen of the Office of the Revenue Commissioners in Dublin ("the Mullen Letter").

4.     All documents relating to the Mullen Letter, including, without limitation, all drafts, work papers, memos, and correspondence relating to the Mullen Letter.

5.     All documents relating to services performed by PwC on behalf of AIG or SICO in connection with the relocation of SICO's tax residence and/or its business operations to Ireland.

6.     All documents relating to services performed by PwC on behalf of AIG or SICO relating to Part 13 Chapter 1 TCA 1997 (the "Close Company Legislation") or any other Irish legislation affecting AIG or SICO.

7.     All documents relating to services performed by PwC on behalf of AIG or SICO relating to the establishment of the Starr International Charitable Trust (Ireland) (the "Ireland Trust") or any other Irish charitable trust.

8.     All documents relating to communications with the Office of the Revenue Commissioners or any other Irish governmental entity on behalf of or relating to AIG or SICO.

9.     All documents relating to communications with SICO or with any director, officer, employee, or representative of SICO, including but not limited to Greenberg, Murphy, and Matthews.

10.     All documents relating to communications with AIG or with any director, officer, employee, or representative of AIG.

It is further requested that the documents sought by AIG be produced by PwC no later than 20 days following receipt of this request.

To the extent possible, the above requested documents shall include any and all forms of recorded information, whether handwritten, printed, typed, or otherwise visually reproduced, electronically recorded or orally recorded, including all originals, drafts, revisions, copies, non-identical copies, and markups of drafts, and all files, documents, databases, e-mails, and other data maintained in computer-readable form. The term "document" specifically includes, but is not limited to: communications, including intracompany communications; minutes, notes and records of meetings; letters; facsimile transmissions; telegrams; telephone bills and records; cables; records; books; summaries or records of personal conversations or interviews; legal pleadings; affidavits; deposition transcripts; trial transcripts; forecasts; statistical statements; accountants' work papers; brochures; pamphlets; circulars; press releases; agreements; contracts; telephone messages, slips and logs; diary entries; electronic mail and messages of every kind; calendars; reports; evaluations; assessments; analyses; test results; correspondence; memoranda; notes; video recordings of every kind; audio recordings of every kind; electronic recordings of every kind; drawings; graphics; graphs; maps; diagrams; charts; photographs; tables; indices; recordings; tapes; microfilms; reports of investigations; opinions or reports of consultants; data processing and computer printouts, tapes, disks, and data and information stored in computers or data processing equipment, together with programs and program documentation necessary to utilize or retrieve such data or information; all other mechanical or electronic means of storing or recording data or information; and any other data compilation from which information can be obtained and translated through detection devices into reasonably usable form. The term "document" also includes copies of all documents that are not identical duplicates of the originals, and

copies of documents if the originals are not in the possession, custody or control of PwC or its agents or representatives.

The term "communication" has the same full meaning as in Local Civil Rule 26.3(c)(1) of the Southern District of New York, and includes, without limitation, every manner of transmitting, transferring, exchanging or sharing information, facts, opinions or thoughts in any form, whether orally, in writing or otherwise, by any means whatsoever, including without limitation by oral communication, face-to-face meeting, memorandum, letter, note, mail, telephone, facsimile transmission, telex, telecopy, e-mail or any other means.

The term "concerning" has the same full meaning as in Local Civil Rule 26.3(c)(7) of the Southern District of New York.

The term "relating to" means, without limitation, constituting, showing, concerning, relating to or referring to in any way, directly or indirectly, regarding, referencing, reflecting, describing, discussing, evidencing, indicating, stating, mentioning, embodying, pertaining to, setting forth, commenting on, assessing, recording, comprising, touching upon, summarizing, or having any logical or factual connection whatsoever to the subject matter in question, and includes, among other material, documents underlying, supporting, now or previously attached or appended to, or used in the preparation of any material called for by this Request.

The term "including" means including without limitation.

The term "any" means any and all.

The term "all" means any and all.

The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this Request all responses that might otherwise be construed to be outside its scope.

The use of the singular form of any word includes the plural and vice versa, except as the context may otherwise require.

The use of a verb in any tense shall be construed as the use of the verb in all other tenses, as necessary, to bring within the scope of this Request all documents and responses which might otherwise be considered to be beyond its scope.

The term "representative" or "representatives" means any agent, official, director, employee, trustee, officer, attorney, attorney-in-fact, consultant, accountant, servant, limited partner, general partner, investigator, investment advisor, analyst, broker, broker-dealer, dealer, current and former subsidiaries, affiliates, parents, predecessors, successors, divisions, departments, operating units, partners, directors, shareholders, employees, officers, agents, officials, representatives, associates, consultants, brokers, attorneys, advisors, accountants and all persons and entities acting or purporting to act on another's behalf.

"Person" shall mean, without limitation, natural persons, corporations, companies, partnerships, associations, joint ventures, sole proprietorships, firms, entities, businesses, enterprises, contractors, stock exchanges, governmental or regulatory agencies or boards, as well as all divisions, subdivisions, bureaus, offices or other units thereof.

"AIG" shall mean American International Group, Inc. and includes, without limitation, current and former subsidiaries, affiliates, parents, predecessors,

successors, divisions, departments, operating units, partners, directors, shareholders,

employees, officers, agents, officials, representatives, associates, consultants, brokers,

attorneys, advisors, accountants and all persons and entities acting or purporting to act on

its behalf.

"SICO" shall mean Starr International Company, Inc. and includes,

without limitation, current and former subsidiaries, affiliates, parents, predecessors,

successors, divisions, departments, operating units, partners, directors, shareholders,

employees, officers, agents, officials, representatives, associates, consultants, brokers,

attorneys, advisors, accountants and all persons and entities acting or purporting to act on

its behalf.

"PwC" shall mean PricewaterhouseCoopers, and includes, without

limitation, current and former subsidiaries, affiliates, parents, predecessors, successors,

divisions, departments, operating units, partners, directors, shareholders, employees,

officers, agents, officials, representatives, associates, consultants, brokers, attorneys,

advisors, accountants and all persons and entities acting or purporting to act on its behalf.

"Ireland Trust" shall mean Starr International Charitable Trust (Ireland)

and includes, without limitation, current and former subsidiaries, affiliates, parents,

predecessors, successors, divisions, departments, operating units, partners, directors,

shareholders, employees, officers, agents, officials, representatives, associates,

consultants, brokers, attorneys, advisors, accountants and all persons and entities acting

or purporting to act on its behalf.

"Greenberg" shall mean Maurice R. Greenberg and includes, without

limitation, companies, predecessors, successors, divisions, departments, partners,

employees, agents, officials, representatives, associates, consultants, brokers, attorneys, advisors, accountants and all persons and entities acting or purporting to act on his behalf.

"Murphy" shall mean L. Michael Murphy and includes, without limitation, companies, predecessors, successors, divisions, departments, partners, employees, agents, officials, representatives, associates, consultants, brokers, attorneys, advisors, accountants and all persons and entities acting or purporting to act on his behalf.

"Matthews" shall mean Edward Matthews and includes, without limitation, companies, predecessors, successors, divisions, departments, partners, employees, agents, officials, representatives, associates, consultants, brokers, attorneys, advisors, accountants and all persons and entities acting or purporting to act on his behalf.

B.    Testimony Requested

It is hereby requested that you cause Ms. Walsh to give testimony on the following subjects:

1.    The Letter dated February 26, 2004 from Mary Walsh of PwC to Frank Mullen of the Office of the Revenue Commissioners in Dublin ("the Mullen Letter"), including all communications with AIG or SICO relating to the Mullen letter.

2.    All services performed by PwC on behalf of AIG or SICO in connection with the relocation of SICO's tax residence and/or its business operations to Ireland.

3.    All services performed by PwC on behalf of AIG or SICO relating to Part 13 Chapter 1 TCA 1997 (the "Close Company Legislation") or any other Irish legislation affecting AIG or SICO.

4.      All services performed by PwC on behalf of AIG or SICO relating to the establishment of the Starr International Charitable Trust (Ireland) (the "Ireland Trust") or any other Irish charitable trust.

5.      All communications with the Office of the Revenue Commissioners or any other Irish governmental entity on behalf of or relating to AIG or SICO.

6.      All communications with SICO or with any director, officer, employee, or representative of SICO, including but not limited to Greenberg, Murphy, and Matthews.

7.      All communications with AIG or with any director, officer, employee, or representative of AIG.

<u>Costs</u>

All fees and costs incurred in the execution of this Request shall be borne by defendant.

<u>Conclusion</u>

This Court expresses its appreciation for this assistance and states that the courts of the United States are authorized by statute, section 1782, title 28 of the United States Code, to extend similar assistance to the tribunals of Ireland and shall be ready and willing to provide reciprocal assistance in a similar case when required.

The Court extends to the judicial authorities of Ireland the assurances of the highest consideration.

Dated: June \_\_\_, 2006

_____

The Honorable Barbara S. Jones
United States District Judge
United States District Court
    for the Southern District of New York

Attest:               J. Michael McMahon, Clerk
United States District Court
    for the Southern District of New York

By:        _____

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Starr International Company, Inc., <br><br>      Plaintiff- <br>     Counterclaim Defendant, <br><br>         v. <br><br> American International Group, Inc., <br><br>      Defendant- <br>     Counterclaim Plaintiff. | Civil Action No. 05 CV 6283 (BSJ) |

## REQUEST FOR SERVICE ABROAD PURSUANT TO THE HAGUE CONVENTION OF 15 NOVEMBER 1965 ON THE SERVICE ABROAD OF JUDICIAL OR EXTRAJUDICIAL DOCUMENTS IN CIVIL OR COMMERCIAL MATTERS

The applicant AIG, by its attorneys Paul, Weiss, Rifkind, Wharton & Garrison, located at 1285 Avenue of the Americas, New York, New York, 10019-6064, United States, has the honor to transmit — in duplicate — the Request for International Judicial Assistance to The Master of the High Court and, in conformity with Article 5 of the above-mentioned Convention, requests prompt service of the Executed Request on the addressee:

PricewaterhouseCoopers
Wilton Place
Dublin 2, Ireland

in accordance with the provisions of Article 5 of the Convention.

The Registrar of the Supreme Court, Bermuda is requested to return or to have returned to the applicant a Certificate of Service in conformity with Article 6 of the

above-mentioned Convention.

Dated: New York, New York
      June 9, 2006

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:_____
Martin Flumenbaum (MF-9067)
Roberta A. Kaplan (RK-3771)
Robert A. Atkins (RA-9709)
Eric A. Stone (ES-1395)
1285 Avenue of the Americas
New York, New York  10019-6064
Tel. (212) 373-3000
Fax. (212) 757-3990

Attorneys for Defendant-Counterclaim Plaintiff
American International Group, Inc.

EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Starr International Company, Inc.,<br><br>      Plaintiff-<br>      Counterclaim Defendant,<br><br>      v.<br><br>American International Group, Inc.,<br><br>      Defendant-<br>      Counterclaim Plaintiff. | Civil Action No. 05 CV 6283 (BSJ) |

## CERTIFICATE OF SERVICE PURSUANT TO THE HAGUE CONVENTION OF 15 NOVEMBER 1965 ON THE SERVICE ABROAD OF JUDICIAL AND EXTRAJUDICIAL DOCUMENTS IN CIVIL OR COMMERCIAL MATTERS

The undersigned has the honor to certify, in conformity with Article 6 of the above-mentioned Convention, that one copy of the Executed Request for International Judicial Assistance has been served on:

PricewaterhouseCoopers
Wilton Place
Dublin 2, Ireland

in accordance with the provisions of Article 5 of the Convention.

In conformity with the second paragraph of Article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement.

Dated: Dublin, Ireland
_____, 2006

_____
Master of the High Court, Ireland

SEAL:

# Exhibit D

Case 4:05-cv-40151-FDS    Document 150-2    Filed 06/15/2007    Page 23 of 57

16/05 2007 WED 16:24  FAX 0035316724970 Law Society Library                    ☒002/003

*[left margin fragments]*

"Rental" for the

added " Rateable
the Purposes of

ited by the said
special Purpose
fixed on or near
napels within the
ugh the Post or
Vestry, to each
? Abode in *Eng-*
e, and the special
ty appointed for
ne Time Notice
where the said
e necessary that
otherwise signed

whether the Pro-
of the said Act
politan Board of
ther Powers are
the Improvement
habitants thereof,
at Purpose, and
lication may be
oard, extends to
such Board for
unds, Places of
edient to remove
d Board to make
for the Expenses
plications to Pre-
leasure Grounds,
Improvement of
nabitants thereof,

, by Agreement
: or over Land,
such Terms and
ose of such Land
kept and main-
Benefit of the
Enactment shall
by Rates, except
nting, and other-

d this Act shall

---

## CAP. CXIII.

An Act to provide for taking Evidence in Her Majesty's
Dominions in relation to Civil and Commercial Matters
pending before Foreign Tribunals. [29th *July* 1856.]

WHEREAS it is expedient that Facilities be afforded
for taking Evidence in Her Majesty's Dominions in
' relation to Civil and Commercial Matters pending before
' Foreign Tribunals:' Be it enacted by the Queen's most Ex-
cellent Majesty, by and with the Advice and Consent of the
Lords Spiritual and Temporal, and Commons, in this present
Parliament assembled, and by the Authority of the same, as
follows:

I. Where, upon an Application for this Purpose, it is made *Order for*
to appear to any Court or Judge having Authority under this *Examination*
Act that any Court or Tribunal of competent Jurisdiction in *of Witnesses*
a Foreign Country, before which any Civil or Commercial *in this Country*
Matter is pending, is desirous of obtaining the Testimony in *in relation to*
relation to such Matter of any Witness or Witnesses within the *any Civil or*
Jurisdiction of such first-mentioned Court, or of the Court to *Commercial*
which such Judge belongs, or of such Judge, it shall be lawful *Matter pending*
for such Court or Judge to order the Examination upon Oath, *before a*
upon Interrogatories or otherwise, before any Person or Persons *Foreign Tri-*
named in such Order, of such Witness or Witnesses accordingly; *bunal.*
and it shall be lawful for the said Court or Judge, by the same
Order, or for such Court or Judge or any other Judge having
Authority under this Act, by any subsequent Order, to com-
mand the Attendance of any Person to be named in such
Order, for the Purpose of being examined, or the Production
of any Writings or other Documents to be mentioned in such
Order, and to give all such Directions as to the Time, Place,
and Manner of such Examination, and all other Matters con-
nected therewith, as may appear reasonable and just; and any
such Order may be enforced in like Manner as an Order made
by such Court or Judge in a Cause depending in such Court
or before such Judge.

II. A Certificate under the Hand of the Ambassador, *Certificate of*
Minister, or other Diplomatic Agent of any Foreign Power, *Ambassador,*
received as such by Her Majesty, or in case there be no such *&c. sufficient*
Diplomatic Agent, then of the Consul General or Consul of *Evidence in*
any such Foreign Power at *London,* received and admitted as *support of*
such by Her Majesty, that any Matter in relation to which an *Application.*
Application is made under this Act is a Civil or Commercial
Matter pending before a Court or Tribunal in the Country of
which he is the Diplomatic Agent or Consul having Jurisdiction
in the Matter so pending, and that such Court or Tribunal
is desirous of obtaining the Testimony of the Witness or Wit-
nesses to whom the Application relates, shall be Evidence of the
Matters so certified; but where no such Certificate is produced
other Evidence to that Effect shall be admissible.

3 D 2                                                III. It

J5 2007 WED 16:24  FAX 0035316724970 Law Society Library                    ☑003/003

788                 Cap. 113, 114.    *Evidence in Foreign Suits.*    19 & 20 Vict.

Examination
of Witnesses
to be taken
upon Oath.

III. It shall be lawful for every Person authorized to take
the Examination of Witnesses by any Order made in pursuance
of this Act to take all such Examinations upon the Oath of
the Witnesses, or Affirmation in Cases where Affirmation is
allowed by Law instead of Oath, to be administered by the
Person so authorized; and if upon such Oath or Affirmation any
Person making the same wilfully and corruptly give any false
Evidence, every Person so offending shall be deemed and taken
to be guilty of Perjury.

Persons giving
false Evidence
guilty of Per-
jury.

Payment of
Expenses.

IV. Provided always, That every Person whose Attendance
shall be so required shall be entitled to the like Conduct Money
and Payment for Expenses and Loss of Time as upon Attend-
ance at a Trial.

Persons to
have Right
of Refusal to
answer Ques-
tions and to
produce Docu-
ments.

V. Provided also, That every Person examined under any
Order made under this Act shall have the like Right to refuse
to answer Questions to criminate himself, and other
Questions, which a Witness in any Cause pending in the Court
by which or by a Judge whereof or before the Judge by whom
the Order for Examination was made would be entitled to,
and that no Person shall be compelled to produce under any
such Order as aforesaid any Writing or other Document that
he would not be compellable to produce at a Trial of such a
Cause.

Certain Courts
and Judges to
have Autho-
rity under this
Act.

Lord Chan-
cellor, &c. to
frame Rules,
&c.

VI. Her Majesty's Superior Courts of Common Law at
*Westminster* and in *Dublin* respectively, the Court of Session
in *Scotland*, and any Supreme Court in any of Her Majesty's
Colonies or Possessions abroad, and any Judge of any such
Court, and every Judge in any such Colony or Possession who
by any Order of Her Majesty in Council may be appointed
for this Purpose, shall respectively be Courts and Judges
having Authority under this Act: Provided, that the Lord
Chancellor with the Assistance of Two of the Judges of the
Courts of Common Law at *Westminster*, shall frame such
Rules and Orders as shall be necessary or proper for giving
Effect to the Provisions of this Act, and regulating the Pro-
cedure under the same.

## CAP. CXIV.

An Act to prevent false Packing and other Frauds in
the Hay and Straw Trade.        [29th *July* 1856.]

'WHEREAS many Frauds and Abuses are committed in
'the Cities of *London* and *Westminster*, and other Places
'in the Vicinity thereof, in binding and false Packing Hay and
'Straw, and the Laws are insufficient for preventing the
'same:' Be it therefore enacted by the Queen's most Excellent
Majesty, by and with the Advice and Consent of the Lords
Spiritual and Temporal, and Commons, in this present Parlia-
ment assembled, and by the Authority of the same, as follows:

No Sand, &c.
to be put in
any Truss of

I. No Person shall mix or put, or cause to be mixed or put,
any Water, Sand, Earth, or other Matter or Thing whatsoever
in

---

1856.

in any Bundle or
within the Cities
Miles thereof, with
thereof, nor sell, or
offered, or expose
which any Water
or mixed, with su

II. Every Sale
Market or Place
Hay or Straw for
Sale or at the De
therewith to the l
Number of Truss
and Address of su

III. Where an
in any public Ha
said, if any Comp
of any such Mar
Quantity, or has
visions of this Ac
the Reign of Kir
shall be lawful for
examine the same
any such Hay or
Quantity, or mi
Provisions of this
Clerk or Collect
summon the Offe
Peace having Ju
is situated, and o
convict the Offer
by this Act or th

IV. For every
visions of this A
Justice before w
to any Penalty n
by such Justice.

V. This Act s
Act passed in t
*George* the Third
of the same are
nothing herein c
to any Action c
commenced prov

An Act to pr
Bishops of I

'WHEREA
'annual S
'the Right Ho

# Exhibit E

# Consolidated Superior Court Rules (Release 4, up-to-date to August 2006)

## Order 39  Evidence

1 In the absence of any agreement in writing between the solicitors of all parties, and subject to these *Rules* , the witnesses at the trial of any action, or at any assessment of damages, shall be examined *viva voce* and in open court, but the Court may, at any time for sufficient reason, order that any particular fact or facts may be proved by affidavit, or that the affidavit of any witness may be read at the hearing or trial, on such conditions as the Court may think reasonable, or that any witness whose attendance in Court ought for some sufficient cause to be dispensed with be examined by interrogatories or otherwise before a commissioner or examiner; provided that, where it appears to the Court that the other party, *bona fide* , desires the production of a witness for cross-examination, and that such witness can be produced, an order shall not be made authorising the evidence of such witness to be given by affidavit.

2 An order to read evidence taken in another cause or matter shall not be necessary, but such evidence may, saving all just exceptions, be read on *ex parte* applications by leave of the Court, to be obtained at the time of making any such application, and in any other case, upon the party desiring to use such evidence giving two days previous notice to the other parties of his intention to read such evidence.

3 Attested copies of all documents filed in the High Court shall be admissible in evidence in all causes and matters and between all persons or parties to the same extent as the originals would be admissible.

4 The Court may, in any cause or matter where it shall appear necessary, make any order for the examination upon oath before the Court, or any officer of the Court, or any other person, and at any place, of any witness, and may allow the deposition of such witness to be adduced in evidence on such terms (if any) as the Court may direct.

5

1.  If in any case the Court shall so order, there shall be issued a request to examine witnesses in lieu of a commission; the forms Nos. 1 and 3 in Appendix D, Part II, shall be used for such order and request, respectively.
2.  Where an order is made for the issue of a request to examine a witness or witnesses in any foreign country, with which a convention in that behalf has been or shall be made, the following procedure shall be adopted:—

1.
2.  Where an order is made for the examination of a witness or witnesses before the Irish Consular authority in any foreign country with which a convention in that behalf has been or shall be made, such order shall be in the Form No. 4 in Appendix D, Part II.
3.  the party obtaining such order shall file in the Central Office an undertaking in the Form No. 2 in Appendix D, Part II.
4.  such undertaking shall be accompanied by—
5.
1.  a request in the Form No. 3 in Appendix D, Part II, with such variations as may be directed in the order for the issue thereof, together with a translation of such request into the language of the country in which the same is to be executed;
2.  a copy of the interrogatories (if any) to accompany the request and a translation thereof;
3.  a copy of the cross-interrogatories (if any) and a translation thereof.

6 The Court may in any cause or matter, at any stage of the proceedings, order the attendance of any person for the purpose of producing any writings or other documents named in the order which the Court may think fit to be produced; provided that no person shall be compelled to produce under any

such order any writing or other document which he could not be compelled to produce at the hearing or trial.

7 Any person wilfully disobeying any order requiring his attendance for the purpose of being examined or producing any document, shall be deemed guilty of contempt of Court, and may be dealt with accordingly.

8 Any person required to attend for the purpose of being examined, or of producing any document, shall be entitled to the like conduct money and payment for expenses and loss of time as upon attendance at a trial in Court.

9 Where any witness or person is ordered to be examined before any officer of the Court, or before any person appointed for the purpose, the person taking the examination shall be furnished by the party on whose application the order was made with a copy of the summons, and pleadings, if any, or with a copy of the documents necessary to inform the person taking the examination of the questions at issue between the parties.

10 The examination shall take place in the presence of the parties, their counsel, solicitors, or agents, and the witnesses shall be subject to cross-examination and re-examination.

11 The depositions taken before an officer of the Court, or before any other person appointed to take the examination, shall be taken down in writing by or in the presence of the examiner, so as to represent as nearly as may be the statement of the witness, and when completed shall be read over to the witness and signed by him in the presence of the parties, or such of them as may think fit to attend. If the witness shall refuse to sign the depositions, the examiner shall sign the same. The examiner may put any question to the witness as to the meaning of any answer, or as to any matter arising in the course of the examination. Any questions which may be objected to shall be taken down by the examiner in the depositions, and he shall state his opinion thereon to the counsel, solicitors, or parties, and shall refer to such statement in the depositions, but he shall not have power to decide upon the materiality or relevancy of any question.

12 If any person duly summoned by *subpoena* to attend for examination shall refuse to attend, or if having attended, he shall refuse to be sworn or to answer any lawful question, a certificate of such refusal, signed by the examiner, shall be filed in the Central Office, and thereupon the party requiring the attendance of the witness may apply to the Court *ex parte* or on the notice for an order directing the witness to attend, or to be sworn, or to answer any question, as the case may be.

13 If any witness shall object to any question which may be put to him before an examiner, the question so put, and the objection of the witness thereto, shall be taken down by the examiner, and transmitted by him to the Central Office to be there filed, and the validity of the objection shall be decided by the Court.

14 In any case under *rules 12 and 13* , the Court shall have power to order the witness to pay any costs occasioned by his refusal or objection.

15 When the examination of any witness before any examiner shall have been concluded, the original depositions, authenticated by the signature of the examiner, shall be transmitted by him to the Central Office, and there filed.

16 The person taking the examination of a witness under this *Order* may, and if need be shall make, a special report to the Court touching such examination, and the conduct or absence of any witness or other person thereon, and the Court may direct such proceedings and make such order as upon the report it may think just.

17 Except where by this *Order* otherwise provided or directed by the Court no deposition shall be given in evidence at the hearing or trial of the cause or matter without the consent of the party against whom the same may be offered, unless the Court is satisfied that the deponent is dead, or beyond the jurisdiction of the Court, or unable from sickness or other infirmity to attend the hearing or trial, in any of which cases the depositions certified under the hand of the person taking the examination shall be

admissible in evidence saving all just exceptions without proof of the signature to such certificate.

18 Any officer of the Court or other person, directed to take the examination of any witness or person, may administer oaths.

19 Any party in any cause or matter may by *subpoena ad testificandum* or *duces tecum* require the attendance of any witness before an officer of the Court, or other person appointed to take the examination, for the purpose of using his evidence upon any proceeding in the cause or matter in like manner as such witness would be bound to attend and be examined at the hearing or trial; and any party or witness having made an affidavit to be used or which shall be used on any proceeding in the cause or matter shall be bound on being served with such *subpoena* to attend before such officer or person for cross-examination.

20 Evidence taken subsequently to the hearing or trial of any cause or matter shall be taken as nearly as may be in the same manner as evidence taken at or with a view to a trial.

21 The practice with reference to the examination, cross-examination, and re-examination of witnesses at a trial shall extend and be applicable to evidence taken in any cause or matter at any stage.

22 The practice of the Court with respect to evidence at a trial, when applied to evidence to be taken before an officer of the Court or other person in any cause or matter after the hearing or trial, shall be subject to any special directions which may be given in any case.

23 No affidavit or deposition filed or made before issue joined in any cause or matter shall without special leave of the Court be received at the hearing or trial thereof, unless within one month after issue joined or within such longer time as may be allowed by special leave of the Court, notice in writing shall have been given by the party intending to use the same to the opposing party of his intention in that behalf.

24 All evidence taken at the hearing or trial of any cause or matter may be used in any subsequent proceedings in the same cause or matter.

25 Where it is intended to apply for the issue of a *subpoena* , a *praecipe* for that purpose, in the Form No. 1 in Appendix D, Part I, and containing the name or firm and the registered place of business of the solicitor so applying, shall in all cases be delivered and filed at the Central Office.

26 A *subpoena* shall be in one of the Forms Nos. 2 to 5 in Appendix D, Part I.

27 A *subpoena* for the attendance of a witness before the Master or the Examiner may issue from the Central Office upon a note from the Master or Examiner as the case may be.

28 Every *subpoena* other than a *subpoena duces tecum* shall contain three names where necessary or required, but may contain any larger number of names.

29 No more than three persons shall be included in one *subpoena duces tecum* , and the party applying for the same shall be at liberty to apply for a *subpoena* for each person if it shall be deemed necessary or desirable.

30 No *subpoena* shall issue for the production of any record in the custody of the Paymaster-General, or other officer of the State, without an order of the Court; and such officer having the custody of any such record shall not be obliged to remove the same under such order from the depository where same is placed without such order, to be served upon him with the *subpoena duces tecum* . [This rule shall not apply to any action to which *section 1 (1) end (2) of the Courts Act, 1988* applies.]

### Amendment history
*Rule 30* was amended by the *Rules of the Superior Courts (No. 2) 1997* (S.I. No.166 of 1997), which came into effect on April 28, 1997.

31 Any officer of the Court required to attend with any record or document at any court or place, elsewhere than in Dublin, shall be entitled to require that the solicitor or party desiring his attendance shall deposit with him a sufficient sum of money to answer his just fees, charges and expenses, in respect of such attendance, and undertake to pay any further just fees, charges, and expenses which may not be fully answered by such deposit.

32 In the interval between the issue and service of any *subpoena* the party applying for the same may correct any error in the names of parties or witnesses, and may have it re-sealed upon leaving a corrected *praecipe* for such *subpoena* marked with the words "altered and re-sealed" and signed with the name and registered place of business of the solicitor applying.

33 The service of a *subpoena* shall be effected by delivering a copy thereof, indorsed with the name and address of the solicitor or party issuing the same, and at the same time producing the original.

34 The service of any *subpoena* shall be of no validity if not made within twelve weeks after its date.

35 Any person who would under the circumstances alleged by him to exist become entitled, upon the happening of any future event, to any honour, title, dignity, or office, or to any estate or interest in any property, real or personal, the right or claim to which cannot by him be brought to trial before the happening of such event, may commence an action to perpetuate any testimony which may be material for establishing such right or claim.

36 In all actions to perpetuate testimony touching any honour, title, dignity, or office, or any other matter or thing in which the State may have any estate or interest, the Attorney General may be made a defendant, and in all proceedings in which the depositions taken in any such action, in which the Attorney General was so made a defendant, may be offered in evidence, such depositions shall be admissible notwithstanding any objection to such depositions upon the ground that the State was not a party to the action in which such depositions were taken.

37 Witnesses shall not be examined to perpetuate testimony unless an action has been commenced for the purpose.

38 No action to perpetuate the testimony of witnesses shall be set down for trial.

39 Where under the *Foreign Tribunals Evidence Act, 1856* , or the *Extradition Act, 1870* , *section 24* , any civil or commercial matter, or any criminal matter, is pending before a court or tribunal of a foreign country, and it is made to appear to the Court, by *commission rogatoire* , or letter of request or other evidence as hereinafter provided, that such court or tribunal is desirous of obtaining the testimony in relation to such matter of any witness or witnesses within the jurisdiction, the Court may, on the *ex parte* application of any person shown to be duly authorised to make the application on behalf of such foreign court or tribunal, and on production of the *commission rogatoire* , or letter of request, or other evidence pursuant to the *Foreign Tribunals Evidence Act, 1856* , *section 2* , or such other evidence as the Court may require, make such order or orders as may be necessary to give effect to the intention of the Acts above mentioned in conformity with the *Foreign Tribunals Evidence Act, 1856* , *section 1* .

40 An order made under *rule 39* shall be in the *Form No. 1 in Appendix D , Part III* .

41 The examination may be ordered to be taken before any fit and proper person nominated by the person applying, or before one of the officers of the Court, or such other qualified person, as to the Court may seem fit.

42

1.    Unless otherwise provided in the order for examination, the person before whom the examination is taken shall, on its completion forward the same to the Master, and on receipt thereof the Master shall append thereto a certificate, in the *Form No. 2 in Appendix D , Part III* , duly certified for use out of the jurisdiction and shall forward the depositions so certified, and the *commission rogatoire* or letter of request (if any) to the Minister for Foreign Affairs for

transmission to the foreign court or tribunal requiring the same,

2. Where the foreign court or tribunal so desires, the deposition shall be sent direct by the Master to the Consul or other official of the foreign government in Ireland for transmission to the foreign court or tribunal.

43 An order made under *rule 39* may direct the said examination to be taken in such manner as may be requested by the *commission rogatoire* or letter of request from the foreign court or tribunal, or therein signified to be in accordance with the practice or requirements of such court or tribunal, or which may, for the same reason, be requested by the applicant for such order. In the absence of any such special directions being given in the order for examination, the same shall be taken in the manner prescribed in *Part II of this Order* .

44 Where a *commission rogatoire* , or letter of request, as mentioned in *rule 39* , is transmitted to the Chief State Solicitor by the Minister for Foreign Affairs with an intimation that it is desirable that effect should be given to the same without requiring an application to be made to the Court by the agents in Ireland of any of the parties to the action or matter in the foreign country, the Chief State Solicitor may make such applications and take such steps as may be necessary to give effect to such *commission rogatoire* , or letter of request, in accordance with *rules 39 to 43* (inclusive).

45.

1.

1. "action" *includes any claim for damages in respect of any personal injuries to a person howsoever caused (including a claim for fatal injuries brought pursuant to section 48 of the Civil Liability Act, 1961 ) but does not include an action to which section 1(3) of the Courts Act, 1988 applies so as to entitle a party to trial by jury in that action* .
2. "the Act" *means the Courts and Court Officers Act, 1995* .
3. "parties" *includes a plaintiff or co-plaintiff, defendant or co-defendant or any third party, counterclaimant or notice party to the action save where the context otherwise requires* .
4. "personal injuries" *includes any disease and any impairment of a person's physical or mental condition* .
5. "report" *means a report or reports or statement from accountants, actuaries, architects, dentists, doctors, engineers, occupational therapists, psychologists, psychiatrists, scientists, or any other expert whatsoever intended to be called to give evidence in relation to an issue in an action and containing the substance of the evidence to be adduced and shall also include any maps, drawings, photographs, graphs, charts, calculations or other like matter referred to in any such report. Any copy report (including a copy report in the form of a letter), copy statement or copy letter however made, recorded or retained from any such expert mentioned above intended to be called to give evidence in relation to an issue or action and containing the substance of the evidence to be adduced, the original of which has been concealed, destroyed, lost, mislaid or is not otherwise readily available, shall also be deemed to be a report for the purposes of this rule* .
6. "the section" *means section 45 of the Courts and Court Officers Act, 1995* .

46

1. The plaintiff in an action shall furnish to the other party or parties or their respective solicitors (as the case may be) a schedule listing all reports from expert witnesses intended to be called within one month of the service of the notice of trial in respect of the action or within such further time as may be agreed by the parties or permitted by the Court.
2. Within seven days of receipt of the plaintiff's schedule, the defendant or any other party or parties shall furnish to the plaintiff or any other party or parties a schedule listing all reports from expert witnesses intended to be called. Within seven days of the receipt of the schedule of the defendant or other party or parties, the parties shall exchange copies of the reports listed in the relevant schedule.
3.
4. The parties in an action shall exchange with the other party or parties or their respective solicitors (as the case may be) the information and statements referred to in *section 45 (1) (a) (iii), (iv) and (v)* within one month of the service of the notice of trial or within such further time as

may be agreed by the parties or permitted by the Court.

5. In any case where a party or his solicitor certifies in writing that no report exists which requires to be exchanged pursuant to *subrule 1* , any other party shall, on the expiry of the time fixed, agreed or permitted (as the case may be) deliver any report within the meaning of the *section* to all other parties to the proceedings.

6. Any party who, subsequent to the delivery required by *subrule (1)* above, obtains any report within the meaning of the *section* or the name and address of any further witness, shall forthwith deliver a copy of any such report or statement or details of the name and address of any such witness (as the case may be) to the other party or parties or their respective solicitors (as the case may be).

7. Service of any report, statement or information requiring to be exchanged or delivered may be effected by letter in writing enclosing the report, statement or information required to be delivered by virtue of the *section* and may be sent by ordinary pre-paid post or in any other manner in which service is authorised by these rules. Such letter shall specifically state that the service is for the purpose of complying with the requirements of *section 45 of the Act* and these rules. The Court may on application to it by any party to an action or of its own motion require that an affidavit or affidavits be filed by any party in relation to proof of disclosure and service required by these rules in any case in which it appears to the Court necessary so to do.

8. Any party who has previously delivered any report or statement or details of a witness may withdraw reliance on such by confirming by letter in writing that he does not now intend to call the author of such report or statement or such witness to give evidence in the action. In such event the same privilege (if any) which existed in relation to such report or statement shall be deemed to have always applied to it notwithstanding any exchange or delivery which may have taken place.

47 When any party alleges that any other party to an action has failed to comply with the requirements of *rule 46* or any provision thereof application may be made to the Court by motion on notice seeking the directions of the Court in relation to any such alleged default. Such motion shall be grounded upon the affidavit of the party concerned and on the hearing of such motion the court may, if satisfied that the party alleged to be in default has failed to comply with all or any of the requirements of the *section* or these rules, direct compliance with such requirement(s) forthwith or within such period as the Court may fix or may make such other order as the justice of the case may require including an order providing that in default of such compliance the party in default be prohibited from adducing such evidence or that in default of such compliance the claim or defence (as the case may be) be struck out and may make such further order in relation to costs as seems meet.

48 If at any stage of the hearing of an action it appears to the Court that there has been non-compliance with any provision of the *section* or these rules, the Court may, having heard any such evidence as may be adduced by the parties in relation to such non-compliance, make such order as it deems fit including an order prohibiting the adducing of evidence in relation to which such non-compliance relates or may adjourn the action to permit compliance with the provisions of the *section* or these rules (as the case may be), and on such terms and conditions as seem appropriate and may make such order as to costs as appears just in the circumstances.

49 In relation to any actions transferred from the Circuit Court into the High Court the parties shall within one month of the order adopting the proceedings exchange a schedule of reports and the reports in the manner provided for in *rule 46(1)* and the provisions of this *Part* shall apply *mutatis mutandis* .

50

1. In any case application may be made to the Court by motion on notice by any party for an order that in the interests of justice the provisions of *rule 46* shall not apply in relation to any particular report or statement (or portion thereof), which is in the possession of such party and which he maintains should not be disclosed and served as required. The Court may, upon such application, make such order as to it seems just.

2. In any case in which there has been non-compliance by any party with any relevant requirement of the *section* or these rules, such party, in the absence of the consent of the other party or parties may apply by motion on notice to the Court for an order seeking the leave of the Court

permitting the adducing of such evidence as has not been disclosed and the Court may make such order on such application as appears just in the circumstances.

51 *Rules 45 to 50* inclusive shall not apply to proceedings instituted before the 1st day of September, 1997 or to any report or statement coming into existence before that date for the purposes of any proceedings (whether instituted before or after that date).]

### Amendment history
*Part VI* was inserted by the *Rules of the Superior Courts (No. 7), 1997* (S.I. No. 348 of 1997), which came into effect on September 1, 1997. It originally comprised *rules 45 to 52* , with a rule 53 being added by the *Rules of the Superior Courts (No. 8) (Disclosure and Admission of Reports and Statements) (Amendment), 1997* (S.I. No. 471 of 1997) with effect from September 1, 1997.

*Part VI* was substituted, as from October 14, 1998, by the *Rules of the Superior Courts (No. 6) (Disclosure of Reports and Statements), 1998* (S.I. No. 391 of 1998), with effect from September 1, 1997.

52

1. In this Part:
2.
3. A document which purports to be a public document within the meaning of *Article 1 of the Convention* shall, without proof of any formal procedure for certifying the authenticity of a signature, the capacity in which the person signing the document has acted, or where appropriate, the identity of the seal or stamp which it bears, be admissible in evidence as such if otherwise admissible.
4. In any case in which the Court has serious doubts, with good reason, in relation to any document which is produced as to the authenticity of the signature, the capacity in which the person signing the document has acted, or the identity or seal of the stamp which it bears, it may direct that such information as it thinks relevant be requested in accordance with *Article 4 of the Convention* from the Central Authority of the State from which the act or document emanated. In any such case the Court shall in its directions set out the grounds upon which they are based.
5. The provisions of *Order 40, rule 7* shall apply *mutatis mutandis* , where applicable and to the extent required in relation to the taking of judicial notice of the seat or signature as the case may be, of any diplomatic or consular representative or agent, judge, court or notary public lawfully authorised to administer oaths in any of the Contracting States.
6. This *Part* shall apply to any document to which the *Convention* applies and *Parts VIII and IX* shall not apply thereto.
   - "Central Authority" *means the Central Authority of a Contracting State designated in accordance with Article 5 of the Convention* ;
   - "the Convention" *means the Convention Abolishing the Legalisation of Documents in the Member States of the European Communities done at Brussels on the 25th May, 1987* ;
   - "a Contracting State" *means a State which is a party to the Convention other than the State and includes a State which has made a declaration pursuant to Article 6 (3) of the Convention* ;
   - "document" *means and includes any document or documents which are public documents within the meaning of Article 1 of the Convention* .

53

1. In this Part:
2.
3. A document which purports to have been executed by the diplomatic agents or consular officers of a Contracting State shall, without proof of any formality used to certify the authenticity of the signature on such a document, the capacity in which the person signing such a document has acted, and where appropriate, the identity of the seal or stamp which such document bears, be admissible without such proof if otherwise admissible.
4. The Court may, where necessary, give such directions as to the verification of the authenticity of any document as it thinks fit.

5.    This *Part* shall not apply to any document to which *Part VII* applies.
·    "the Convention" *means the European Convention on the Abolition of Legalisation of Documents Executed by Diplomatic Agents or Consular Officers done at London on the 7th June, 1968* ;
·    "a Contracting State" *means a State which is a party to the Convention other than the State* ;
·    "document" *means and includes any document or documents to which Article 2 of the Convention applies* .

54

1.    In this *Part* :
2.
·    "an apostille" *means an apostille issued in pursuance of the Convention and conforming to the model set out in the annex to the Convention* ;
·    "the Convention" *means the Convention Abolishing the Requirement of Legalisation for Foreign Public Documents done at The Hague on the 5th October, 1961* ;

"a Contracting State" means a State which is a party to the Convention other than the State.

(2) A document which purports to be an apostille duly issued and executed in a Contracting State in accordance with the Convention shall without further proof be deemed to be such and shall be admissible as evidence of the facts stated therein unless the contrary is shown.

(3) This Part shall not apply to any document to which Part VII or VIII applies.]

### Amendment history
Parts VII, VIII and IX were inserted by the *Rules* of the Superior Courts (No.1) (Proof of Foreign Diplomatic, Consular and Public Documents) 1999 (S.I. 1999 No. 3) which came into effect on March 9, 1999.

### Cases in which Order 39 is mentioned or considered
*Phonographic Performance (Ireland) Ltd v Cody* [1994] 2 I.L.R.M. 241

*Voluntary Purchasing Groups Inc. v Insurco International Limited* [1995] 2 I.L.R.M. 145

*Carey v D.J. Hussey and the DPP* [2000] 2 I.L.R.M. 401

*Galvin v Murray, Cork C.C.* [2001] 2 I.L.R.M. 234

*Novell Inc. v MCB Enterprises, Novell Inc. v Computer Recyclers et al* [2002] 1 I.L.R.M. 350

*McConnell v Commissioner of An Garda Síochána* , Unreported, HC, January 31, 2003

*Doherty (a minor) v North Western Health Board* [2006] 1 I.L.R.M. 282

# Exhibit F

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Nos. 05-40151-FDS (D. Mass.) 06-40130-FDS (D. Mass.) |
| v. | ) ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) | |

**PROPOSED REQUEST FOR
INTERNATIONAL JUDICIAL ASSISTANCE (LETTER ROGATORY)**

The United States District Court for the District of Massachusetts presents its

compliments to the appropriate judicial authority of Ireland, and requests international judicial

assistance to obtain evidence to be used in a civil proceeding before this court in the

above-captioned matter.

This court requests the assistance described herein as necessary in the interests of justice.

This court requests that the appropriate judicial authority of Ireland compel the appearance of

Samuel Mahoney, Martin Hawkes, and John Hussey to give testimony and produce documents.

**Witnesses to be Served**

1.      Samuel Mahoney
        123 Howth Road        and/or        43 Ailesbury road
        Dublin 3                              Dublin 4
        Ireland                               Ireland

2.      Martin Hawkes
        5 Bushfield Avenue
        Donnybrook
        Dublin 4
        Ireland

3.      John Hussey
        Taormina, Silchester Road
        Glenageary
        Co. Dublin
        Ireland

## **Facts**

This case involves a set of transactions occurring in 2001 and engaged in by a U.S.

taxpayer in a purported partnership with, among others, an Irish citizen named Samuel

Mahoney.[1] That purported partnership is called Fidelity International Currency Advisor A Fund

("Fidelity International"). Mr. Mahoney is alleged to have contributed $651,000 for a 93% share

of the common interests in the "partnership." Shortly after making his alleged contribution, Mr.

Mahoney sold 88% of his common interests in the "partnership" to the U.S. taxpayer for

approximately half of what he had "contributed." Samuel Mahoney claims that his $651,000

contribution to Fidelity International was made on his behalf by Kilsture Ltd., an Isle of Man

entity, of which he claims to be an employee.

On its U.S. partnership tax return for 2001, Fidelity International allocated the purported

gains on this set of transactions to Mr. Mahoney as the foreign "partner," and the purported

losses to the U.S. taxpayer. Based on the partnership tax return, Samuel Mahoney made an

alleged profit of approximately $163.8 million on the transactions. Because Mr. Mahoney was

not a U.S. citizen or resident, he was not required to pay U.S. taxes on that alleged profit. From

the same set of transactions, the U.S. taxpayer allegedly lost more than $158 million. The United

---

[1] As discussed later, the United States alleges that identical sets of these marketed transactions were engaged in by
57 other U.S. taxpayers.

States's taxing authority disallowed the claimed losses, adjusting the partnership items for U.S. tax purposes. The plaintiff seeks readjustment of the partnership items for tax purposes, pursuant to Title 26 of the United States Code, Section 6226.

One of the primary legal issues in this case is whether Samuel Mahoney is a real partner in Fidelity International. On this issue, the United States contends that Mr. Mahoney was not a real partner in Fidelity International because he did not fund his own investment in this company. The United States alleges that the U.S. promoters of this transaction, in addition to funding Mr. Mahoney's investment, also paid him a fee to allow his name and foreign residency to be misused on these transactions. The United States further alleges that the U.S. promoters paid these amounts to Mr. Mahoney by way of various joint-venture accounts which were in the name of Mahoney and his business partner, Martin Hawkes, also an Irish Citizen. The United States alleges that these accounts were held at the Singer & Friedlander merchant bank (n/k/a Kaupthing Singer & Friedlander) on the Isle of Man. According to the United States, the account holder of these joint-venture accounts was an Irish company by the name of Biosphere Finance Ltd, of which Mahoney, Hawkes, and John Hussey, another Irish citizen, were directors.

Another primary legal issue in this case is whether Fidelity International, in which Samuel Mahoney was purportedly a partner, should be recognized as a partnership for U.S. tax purposes. A partnership will be respected for U.S. tax purposes only if the partners in good faith and acting with a business purpose intend to join together in the conduct of the enterprise. *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949). The United States alleges that Mr. Mahoney had no intent to join together in the conduct of Fidelity International and further that Fidelity International had no non-tax business purpose. The determination of intent of the partners requires testimonial and documentary evidence from the purported partners and others.

3

The testimony of Mr. Mahoney's alleged business associates, Messrs. Hawkes and Hussey, may also be relevant to the determination as to why Mr. Mahoney became a partner in Fidelity International.

Another of the primary issues in this litigation is whether the transactions employed here had economic substance. Under the economic substance doctrine, transactions that are invented solely to create tax deductions and otherwise have no economic substance, even though formally complying with the letter of the U.S. Internal Revenue Code, will not be recognized. *Knetsch v. United States*, 364 U.S. 361 (1960); *Dewees v. Commissioner*, 870 F.2d 21, 32, 35 (1st Cir. 1989). There is a two-prong test for determining economic substance. The first prong examines whether the transaction has a reasonable possibility of a profit (an objective inquiry). *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778, 781-82 (5th Cir. 2001) (internal citation omitted; emphasis added). The second prong looks to whether there existed a tax-independent business purpose for the transaction (a subjective inquiry). *Id.*

On this issue, the determination of whether Fidelity International had a reasonable possibility of profit and a tax-independent business purpose may focus on how the set of transactions at issue was designed, marketed, and implemented, and the purpose behind the formation of Fidelity International. The resolution of these issues will require testimonial and documentary evidence from the purported partners, including Mr. Mahoney, as the alleged foreign partner of Fidelity International.

When it is determined that taxpayers have engaged in a generic tax shelter, evidence regarding similar or identical transactions may be relevant to the determination of the deductibility of the U.S. taxpayer's losses. *Douglas v. United States*, 410 F. Supp. 2d 292, 297-98 (S.D.N.Y. 2006), appeal dismissed, 448 F.3d 507 (2d. Cir 2006). The United States

alleges that Samuel Mahoney engaged in 32 similar or identical transactions through various entities, and that Martin Hawkes engaged in 24 such transactions. The United States alleges that Messrs. Mahoney and Hawkes were paid for their participation in each of these deals by the U.S. promoters. According to the United States, the U.S. promoters paid these fees to Mahoney and Hawkes through their joint-venture accounts at Singer & Friedlander on the Isle of Man, which accounts the United States alleges were held by their Irish company, Biosphere Finance Ltd.

The United States also alleges that Messrs. Mahoney and Hawkes were employees of two Isle of Man entities, Kilsture Ltd. (which, as stated above, purportedly made a $651,000 contribution to Fidelity International on Mahoney's behalf) and Maddox Ltd., which allegedly also received substantial payments from the U.S. promoters. The United States further alleges that the purported payments made directly and indirectly to Mahoney and Hawkes were for their respective participation in an abusive tax shelter. Kilsture and Maddox were shareholders of Cumberdale Holdings, also an Isle of Man entity. John Hussey was a director of both Biosphere Finance and Cumberdale Holdings. As such, each has evidence that may be used to support the United States' contentions at trial.

### Documents to be Produced by Samuel Mahoney, Martin Hawkes, and John Hussey

1.    Minutes of each meeting of the directors of Biosphere Finance Ltd., Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., Trilogy Financial Investments Ltd. and/or Trilogy Investments Ltd., referencing Fidelity International or any of its participants, or any of the other 57 FDIS "partnerships" or any of the participants of the other 57 FDIS "partnerships."[2]

---

[2] The other 57 FDIS "partnerships" are as follows: Gupta Investments LLC, Kealakekua [a/k/a Kutler or JPK] Investments LLC, Cowan Investments LLC, Acajoux Trading LLC, Acajoux Investments LLC, Acajoux Equities LLC, AHG Investments LLC, Cliffside Investments LLC, GT Investments 2001 LLC, Geewax Terker & Company (721 Exchange), Anbar Investments LLC, WFT Investments LLC, RAS Investments 2001 LLC, JRF Investments

2.      Company resolutions for Biosphere Finance Ltd., Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., Trilogy Financial Investments Ltd. and/or Trilogy Investments Ltd., referencing Fidelity International or any of its participants, or any of the other 57 FDIS "partnerships" or any of the participants of the other 57 FDIS "partnerships."

3.      Financial statements for Biosphere Finance Ltd., Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., Trilogy Financial Investments Ltd. and/or Trilogy Investments Ltd.

4.      All outlines of proposed transaction received by Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey with respect to Fidelity International or any other FDIS "partnerships."

5.      All account statements and/or communications referencing any of the following four accounts:

Sub Account: Singer & Friedlander (Isle of Man) Limited
Account no: 30123012
Reference: 11270012 (Please ensure reference is quoted on payment).

Sub Account: Singer & Friedlander Limited
Account no: 30123012
Reference: The H&M Joint Venture account number 20195700 (Please ensure reference is quoted on payment).

---

LLC, JHT Investments LLC, JLS Investments LLC, RJP Investments LLC, TFT Investments 2001 LLC, AN Investments LLC, GN Investments LLC, RN Investments LLC, SN Investments LLC, FX Investments LLC, SJD Investments LLC, RJS Investments LLC, RT Investments LLC, NDC Investments LLC, TAB Investments 2001 LLC, AFFCO Investments 2001 LLC, DJR Investments LLC, CFPT Investments LLC, RC Investments LLC, RWC Investments LLC, DWT Investments LLC, RAG Investments LLC, RM Investments 2001 LLC, SM Investments LLC, CSH Investments LLC, Theis Investments LLC, RGC Investments LLC, EGC Trading LLC, RGW Investments LLC, Europa Investments LLC, Europa International Inc. (351 Contribution), Sheridan Investments LLC, Corporex Investments LLC, SEBFS Investments LLC, DWT Investments 2002 LLC, Provident Capital Partners LLC, E_P Investments LLC, CMC Investments LLC, Fund Investments LLC, Pettus Investments LLC, GAMA Investments LLC, LF Investments 2002 LLC, WFTSR Investments 2002 LLC, JBEJW Investments LLC, Whiteside Investments LLC, and Whiteside Investments 2002 LLC.

Sub Account: Singer & Friedlander Limited
Account no: 30123012
Reference: S&F Client A/C No. 11270025 (Please ensure reference is quoted on payment).

Sub Account: Singer & Friedlander (Isle of Man) Ltd.
Account no: 30123012
Reference: Trilogy Investments Limited - account No: 20282910 (Please ensure reference is quoted on payment).

6.    All email received by Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey concerning Fidelity International or any other FDIS "partnership."

7.    All communications addressed from Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey to The Diversified Group Inc. or to its principals or employees including but not limited to James Haber and/or Orrin Tilevitz, concerning Fidelity International or any other FDIS "partnership."

8.    All communications addressed from Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey to Helios Financial or its principals or employees including but not limited to Mox Tan and/or Phil Kampf, concerning Fidelity International or any other FDIS "partnership."

9.    All communications addressed from Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey to Alpha Financial or its principals or employees including but not limited to Ron Buesinger, concerning Fidelity International or any other FDIS "partnership."

10.    All records of payments received by Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey from The Diversified Group Inc. or from its principals and employees including but not limited to James Haber and/or Orrin Tilevitz, relating to Fidelity International or any other FDIS "partnership."

7

11.     All records of payments received by Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey from Helios Financial or its principals or employees including but not limited to Mox Tan and/or Phil Kampf, relating to Fidelity International or any other FDIS "partnership."

12.     All records of payments received by Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey from Alpha Financial or its principals or employees including but not limited to Ron Buesinger, relating to Fidelity International or any other FDIS "partnership."

13.     All communications concerning Fidelity International or any other FDIS "partnership."

14.     All communications concerning the funding of Biosphere Finance, Samuel Mahoney and/or Martin Hawkes for any person's or entity's participation in Fidelity International or any other FDIS "partnership."

15.     All communications concerning the payment of $2 million to Biosphere Finance, Samuel Mahoney and/or Martin Hawkes.

16.     All communications and/or other documents concerning any "reckoning on fees in relation to fund structures, Irish companies and Trilogy transactions."

17.     All communications and/or other documents, including documents relating to payments, concerning the Collaboration Agreement between The Diversified Group Inc. and Trilogy Financial Products, Ltd.

18.     All contracts between Samuel Mahoney, Martin Hawkes, and/or John Hussey, and Helios Financial, The Diversified Group Inc., Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Biosphere Finance Ltd.,

Trilogy Financial Products Ltd., Trilogy Financial Investments Ltd. and/or Trilogy Investments Ltd.

### Additional Documents to be Produced by Samuel Mahoney

1.      All loan documents for all loans from Kilsture Ltd. to Samuel Mahoney, including, but not limited to, documents concerning renegotiation of such a loan.

2.      All documents relating to Samuel Mahoney's repayment of any loan from Kilsture Ltd.

3.      All Bank records of Kilsture Ltd. showing any payment to or from Kilsture Ltd. concerning Fidelity International or any other FDIS "partnership."

### Defendant's Questions to Samuel Mahoney, Martin Hawkes, and John Hussey

1.      Was Biosphere Finance Ltd. engaged in business?

2.      What business was Biosphere Finance Ltd. engaged in at inception?

3.      What business was Biosphere Finance Ltd. engaged in from January 1, 2000 through January 1, 2003?

4.      Were you an employee of Biosphere Finance Ltd.?

5.      What were your duties as an employee of Biosphere Finance Ltd.?

6.      When did you become a Director of Kilsture?

7.      Was Kilsture Ltd. engaged in business?

8.      What business was Kilsture Ltd. engaged in at inception?

9.      What business was Kilsture Ltd. engaged in from January 1, 2000 through January 1, 2003?

10.     What were your duties as an employee of Kilsture Ltd.?

11.     What was your annual salary from Kilsture Ltd. during each year of its existence?

12.     Was Maddox engaged in business?

13.     What business was Maddox engaged in at inception?

14.     What business was Maddox engaged in from January 1, 2000 through January 1, 2003?

15.     What were your duties as an employee of Maddox Ltd.?

16.     Was Cumberdale Investments engaged in business?

17.     What business was Cumberdale Investments engaged in at inception?

18.     What business was Cumberdale Investments engaged in from January 1, 2000 through January 1, 2003?

19.     What were your duties as an employee of Cumberdale Investments Ltd.?

20.     Was Cumberdale Holdings engaged in business?

21.     What business was Cumberdale Holdings engaged in at inception?

22.     What business was Cumberdale Holdings engaged in from January 1, 2000 through January 1, 2003?

23.     What were your duties as an employee of Cumberdale Holdings Ltd.?

24.     Why were each of Cumberdale Investments Ltd.'s dissolved subsidiaries dissolved?

25.     Why did you agree to be a purported partner in Fidelity International Currency Advisor A Fund?

26.     Did you believe when a $651,000 initial contribution was made by you or on your behalf into Fidelity International Advisor A Fund that your interest was going to be bought by Richard Egan?

27.     Did you believe when a $651,000 initial contribution was made by you or on your behalf into Fidelity International Advisor A Fund that your interest was not going to be bought by Richard Egan?

28.     When did you become aware that your interest in Fidelity International Currency Advisor A Fund was to be reduced?

29.     When did you become aware that, upon reduction of your interest in Fidelity International Currency Advisor A Fund, you would lose approximately 50% of your initial contribution to Fidelity International Currency Advisor A Fund?

30.     During the time period June 1, 2001 to August 1, 2002, how many so-called partnerships did you enter into in which you lost approximately 50% of your initial contribution within the first month after your initial contribution?

31.     During the time period June 1, 2001 to August 1, 2002, how many so-called partnerships did you enter into in which you did not lose approximately 50% of your initial contribution within the first month after your initial contribution?

32.     Why did you continue to enter into partnerships during 2001 and 2002 for which you were almost certain to lose 50% of your initial contribution?

33.     Did you earn any money from your role as a purported partner in Fidelity International Currency Advisor A Fund?

34.     How much money did you earn from your role as a purported partner in Fidelity International Currency Advisor A Fund?

35.     Was all of the money you earned from your role as a purported partner in Fidelity International Currency Advisor A Fund a fee to be earned regardless of the performance of the option trades entered into by Fidelity International Currency Advisor A Fund?

36.     How much money did you earn from your role as a purported partner in Fidelity International Currency Advisor A Fund as a result of the performance of the option trades entered into by Fidelity International Currency Advisor A Fund?

37.     What was the amount of each payment you received either directly or indirectly as a result of your participation in Fidelity International Currency Advisor A Fund?

11

38.    What was the original source of each payment made to you as a result of your participation in Fidelity International Currency Advisor A Fund?

39.    What attributes, skills, or value did you bring to Fidelity International Currency Advisor A Fund?

40.    Was Fidelity International Currency Advisor A Fund designed so that you would be allocated the majority of the gains and sell a majority of your interest before realization of a loss?

41.    What is the Financial Derivatives Investment Strategy?

42.    What is the Helios product known as H2?

43.    Did you report any income from your participation in Fidelity International Currency Advisor A Fund?

44.    Did you report any income from your participation in any Financial Derivatives Investment Strategy?

45.    Did you report any income from your participation in any FDIS partnership?

46.    Have you ever met or spoken with Richard Egan?

47.    Have you ever met or spoken with any partner in any FDIS partnership?

48.    Have you ever met or spoken with any employee of Carruth Management?

49.    Have you ever received money from Helios?

50.    Did you ever receive any money from The Diversified Group Inc.?

51.    Why did The Diversified Group Inc. pay more than $1,000,000 to Cumberdale Holdings Ltd. in December 2001?

52.    Was any of the more than $1,000,000 paid by The Diversified Group Inc. to Cumberdale Holdings Ltd. in December 2001 paid directly or indirectly to you? If so, how much was paid to you?

53.    Why did The Diversified Group Inc. pay $50,000 to Biosphere Finance Ltd. on February 15, 2002 purportedly for "Administration and Agency Services?"

54.    What administration and agency services did Biosphere Finance Ltd. perform to earn the $50,000 paid to it by The Diversified Group Inc. on February 15, 2002?

55.    Why did The Diversified Group Inc. pay $570,000 to Maddox Ltd. on February 22, 2002 purportedly for "Consultancy services?"

56.    Was any of the $570,000 paid by The Diversified Group Inc. to Maddox Ltd. on February 22, 2002 paid directly or indirectly to you?  If so, how much was paid to you?

57.    What consultancy services did Maddox Ltd. perform to earn the $570,000 paid to it by The Diversified Group Inc. on February 22, 2002?

58.    Why did The Diversified Group Inc. pay $380,000 to Kilsture Ltd. on February 22, 2002 purportedly for "Consultancy fees?"

59.    Was any of the $380,000 paid by The Diversified Group Inc. to Kilsture Ltd. on February 22, 2002 paid directly or indirectly to you?  If so, how much was paid to you?

60.    What consultancy services did Kilsture Ltd. perform to earn the $380,000 paid to it by The Diversified Group Inc. on February 22, 2002?

61.    Why did The Diversified Group Inc. pay $952,000 to Biosphere Finance Ltd. on March 23, 2001?

62.    Was any of the $952,000 paid by The Diversified Group Inc. to Biosphere Finance Ltd. on March 23, 2001 paid directly or indirectly to you?  If so, how much was paid to you?

63.    Why did The Diversified Group Inc. pay $120,000 to Kilsture Ltd. on March 23, 2001?

64.    Was any of the $120,000 paid by The Diversified Group Inc. to Kilsture Ltd. on March 23, 2001 paid directly or indirectly to you?  If so, how much was paid to you?

65.     Was Trilogy Financial Products Ltd. engaged in business?

66.     What business was Trilogy Financial Products Ltd. engaged in at inception?

67.     What business was Trilogy Financial Products Ltd. engaged in from January 1, 2000

through January 1, 2003?

68.     What were your duties as an employee of Trilogy Financial Products Ltd.?

69.     What was Nigel Scott's role with Trilogy Financial Products Ltd.?

70.     What was Oliver Peck's role with Trilogy Financial Products Ltd.?

71.     What was Singer & Friedlander's relationship to Trilogy Financial Products Ltd.?

72.     Why were records of Helios's and The Diversified Group Inc.'s transactions sent to

Trilogy Financial Products Ltd.?  Where were those records sent?  Where are those records now?

Who has custody and control of those records now?

### Defendant's Additional Questions to Samuel Mahoney

1.      Did Kilsture Ltd. pay on your behalf your $651,000 initial contribution into Fidelity

International Currency Advisor A Fund?

2.      How much, if any, of Kilsture Ltd.'s payment to Fidelity International Currency Advisor

A Fund on your behalf was salary due to you?

3.      During what period did you earn the salary that represented any and all portions of

Kilsture Ltd.'s payment to Fidelity International Currency Advisor A Fund on your behalf?

4.      What duties did you perform to earn the salary that represented any and all portions of

Kilsture Ltd.'s payment to Fidelity International Currency Advisor A Fund on your behalf?

### Plaintiff's Questions to Samuel Mahoney, Martin Hawkes, and John Hussey

1.      Was Biosphere Finance directly involved in the Fidelity International transaction?

2.      Was Kilsture Ltd. directly involved in the Fidelity International transaction?

3.      Was Maddox Ltd. directly involved in the Fidelity International transaction?

4.    Was Cumberdale Investments Ltd. directly involved in the Fidelity International transaction?

5.    Was Cumberdale Holding Ltd. directly involved in the Fidelity International transaction?

6.    Was Trilogy Financial Products Ltd. directly involved in the Fidelity International transaction?

7.    Was Nigel Scott directly involved in the Fidelity International transaction?

8.    Was Oliver Peck directly involved in the Fidelity International transaction?

9.    Was Singer & Friedlander directly involved in the Fidelity International transaction?

10.    Did you profit from your investments in any United States entity in 2001 and 2002, including those identified in footnote 2?

11.    Do you continue to hold any interests in any of the United States entities in which you invested in 2001 and 2002, including those identified in footnote 2?

12.    You were previously asked if you reported any income from your participation in any Financial Derivatives Investment Strategy, if you did not, why not?

13.    You were previously asked if you reported any income from your participation in any FDIS partnership, if you did not, why not?

14.    Were the records of Helios's and DGI's transactions ever sent to Trilogy Financial Products?

15.    Was it your understanding that the reporting of the gains and losses from the United States entities in which you invested was proper under United States tax law?

16.    Prior to 2001, did you invest in any United States entities, including partnerships?

17.    Prior to 2001, did you invest in any entity that engaged in foreign currency trading?

18.    Is your testimony today influenced directly or indirectly by the actions of the United States government or Irish government?

## Plaintiff's Questions to Samuel Mahoney

1.    Where did you attend school and what degrees did you receive?

2.    What was your area of study?

3.    Where were you employed after you completed school?

4.    Did you receive any specialized certifications, and if so, what were they?

5.    What is the Institute of Bankers in Ireland, and what kind of accreditation does one receive upon graduation?

6.    Did you receive such accreditation?

7.    What were your responsibilities at Banque Nationale de Paris?

8.    What kind of investments and financial instruments did you work with during your employment at Banque Nationale de Paris?

9.    What were your responsibilities at Shannon International Leasing?

10.    What kind of investments and financial instruments did you work with during your employment at Banque Nationale de Paris?

11.    What is your investment experience directly or indirectly with foreign currency options?

12.    What is your investment experience directly or indirectly with digital options?

13.    At the time you acquired your membership interest in Fidelity International, was there a binding commitment that your interest would be bought by Richard Egan?

14.    Was it certain that a portion of your interest in Fidelity International would be bought by Richard Egan?

16

15.    At the time you became a member of Fidelity International, did you inform Mr. Egan of any of your other investments in United States entities?

16.    At the time you became a member of Fidelity International, did you inform Mr. Egan that you were a partner in or member of any other United States partnerships or entities, including those identified in footnote 2?

17.    You were previously asked if you reported any income from your participation in Fidelity International, if you did not, why not?

18.    Was the purported payment by the Diversified Group Inc. ("DGI") of more than $1,000,000 to Cumberdale Holdings Ltd. in December 2001 directly related to your investment in Fidelity International?

19.    Did you inform Mr. Egan of the purported payment referenced in the previous question?

20.    Was the purported payment of $50,000 to Biosphere Finance Ltd. on February 15, 2002 directly related to your investment in Fidelity International?

21.    Did you inform Mr. Egan of the purported payment referenced in the previous question?

22.    Was DGI's purported payment of $570,000 to Maddox Ltd. on February 22, 2002 directly related to your investment in Fidelity International?

23.    Did you inform Mr. Egan of the purported payment referenced in the previous question?

24.    Was DGI's purported payment of $380,000 to Kilsture Ltd. on February 22, 2002 directly related to your investment in Fidelity International?

25.    Did you inform Mr. Egan of the purported payment referenced in the previous question?

26.    Was DGI's purported payment of $952,000 to Biosphere Finance Ltd. on March 23, 2001 directly related to your investment in Fidelity International?

27.    Did you inform Mr. Egan of the purported payment referenced in the previous question?

17

28.    Was DGI's purported payment of $120,000 to Kilsture Ltd. on March 23, 2001 directly
related to your investment in Fidelity International?

29.    Did you inform Mr. Egan of the purported payment referenced in the previous question?

## **Special Procedures**

A.    This Court requests that the High Court of the Republic of Ireland order the special
procedures described herein in accordance with Rule 43 of Order 39 of the Superior Court Rules
of Ireland.  This Court requests testimony under oath, or the submission of a declaration by the
custodian of records for each entity that produces documents in response to this request, attesting
to the authenticity of documents produced.  Under the United States's Federal Rules of Evidence,
which apply in this lawsuit and in all civil proceedings in the United States district courts, certain
business records may be received into evidence only if a competent representative of the
business appears at trial as a witness and testifies as to the authenticity of the records and the
manner in which they are prepared and maintained at the business.  However, with respect to
foreign business records, the appearance and testimony at trial of a representative of a foreign
entity may not be required if a representative of the foreign entity gives testimony under oath as
to the authenticity of the records (or true copies thereof) or if the records (or true copies thereof)
are accompanied by a written declaration certifying the authenticity of the business records.
Therefore, this court considers it necessary in the interests of justice that testimonial evidence
and/or written declarations certifying the authenticity of business records be obtained from the
producing entities and/or their representatives.  To be of value to this court, the written
declaration(s) must comply with the requirements of Title 28 of the United States Code, section
1746.  A proposed declaration is attached to this letter of request.

18

B.      This Court requests that the High Court of the Republic of Ireland order the special

procedures described herein in accordance with Rule 43 of Order 39 of the Superior Court Rules

of Ireland.  This Court requests that the High Court issue an order to cause the witnesses

identified herein to be summoned to attend an examination, at such place and time as the High

Court shall appoint, before such person who, according to the procedure of the High Court, is

competent to preside over the examination of witnesses under oath.  This Court further requests

that the High Court permit such witnesses to be examined orally by Plaintiff's and Defendant's

counsel identified herein, and that such counsel be permitted to put forth the listed questions to

the witnesses and ask questions arising from the answers given.  If the High Court will not

permit counsel for both parties identified herein to orally examine the witnesses, this Court

requests that the typical procedures for an examination pursuant to letters rogatory be employed

whereby the listed questions are put to the witnesses by an Irish lawyer appointed for that

purpose, with counsel for both parties in attendance.  Defendant's and Plaintiff's counsels'

respective qualifications are as follows.

**Defendant's Counsel**

1.      Mr. Donohue holds a Juris Doctorate and a Masters of Tax Law.  He is an active
        member of the Ohio State Bar (admitted 1969) and an inactive member of the
        California State Bar.  As an attorney for the United States, Mr. Donohue
        is permitted to practice law on behalf of the United States in all U.S. jurisdictions.
        He is a member of the U.S. Supreme Court Bar, and numerous appellate and
        district court bars.  He has been an attorney with the U.S. Department of Justice
        for 36 years.

2.      John Lindquist holds a Juris Doctorate from the University of Pittsburgh School
        of Law and a Masters of Laws in Taxation from Georgetown.  He has been a
        member of the District of Columbia Bar since 1983.  As an attorney for the
        United States, Mr. Lindquist is permitted to practice law on behalf of the United
        States in all U.S. jurisdictions.  He is a member of the U.S. Supreme Court Bar
        and the Court of Federal Claims Bar.

19

**Plaintiff's Counsel**

3.     David J. Curtin received a Juris Doctorate, with honors, from the Saint Louis University School of Law in 1972. He is an active member of District of Columbia Bar. He is also admitted to practice before the United States Supreme Court and Third Circuit Court of Appeals. Mr. Curtin was a trial attorney for the United States Department of Justice Tax Division from 1972 until 1978. He has been in private practice in Washington, D.C., since 1979 and is a Fellow in the American College of Trial Lawyers.

2.     Ronald L. Buch holds a Juris Doctorate and a Masters of Tax Law. He is an active member of the Florida Bar and the District of Columbia Bar. He is also admitted to practice before the United States Supreme Court, the United States Court of Federal Claims, and the United States Tax Court. Mr. Buch was senior legal counsel for the Internal Revenue Service prior to moving into private practice in 2001.

## Reciprocity

The courts of the United States are authorized by statute codified at Title 28 of the United States Code, Section 1782 to extend similar assistance to the tribunals of Ireland and will gladly reciprocate the courtesies shown by the judicial authorities of Ireland.

## Reimbursement of Costs

The Defendant is prepared to reimburse your Court for all costs incurred in executing this request. The court extends to the judicial authorities of Ireland the assurances of its highest consideration.

DATE:_____

_____

HON. F. DENNIS SAYLOR, IV
U.S. District Judge
U.S. District Court for the District of Massachusetts
Worcester, Massachusetts

## CERTIFICATION OF BUSINESS RECORDS

I, the undersigned,_____ , with the understanding that

I am subject to criminal penalty under the laws of Ireland for an intentionally false declaration,

declare that I am:

employed by/associated with_____ in the position of _____

_____ and by reason of my position am authorized and qualified to make

this declaration.

I further declare that the documents attached hereto are original records or true copies of

records identified as Exhibit(s) _____(list all exhibits as appropriate), and:

1.    were made at or near the time of the occurrence of the matters set forth therein, by (or
      from information transmitted by) a person with knowledge of those matters;

2.    were kept in the course of regularly conducted business activity;

3.    were made by the said business activity as a regular practice; and,

4.    if not original records, are duplicates of original records.


The originals or duplicates of these records are maintained in the country of_____

_____.


Date of execution:    _____

Place of execution:   _____

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Signature:    _____

# Exhibit G

# Terms & Sittings
## High Court Sittings: Law Terms

**Related Links**
Legal Diary: High Court lists

| | |
|---|---|
| **2007** | **Hilary sittings:** 11th January to 30th March |
| | **Easter sittings:** 16th April to 24th May |
| | **Trinity sittings:** 6th June to 31st July |
| | **Michaelmas sittings:** 1st October to 21st December |
| **2008** | **Hilary sittings** 11th January - 14th March |
| | **Easter sittings** 31st March - 8th May |
| | **Trinity sittings** 21st May - 31st July |
| | **Michaelmas sittings** 6th October - 21st December |
| **2009** | **Hilary sittings** 11th January - 3rd April |
| | **Easter sittings** 20th April - 28th May |
| | **Trinity sittings** 10th June - 31st July |
| | **Michaelmas sittings** 5th October - 21st December |
| **2010** | **Hilary sittings** 11th January - 26th March |
| | **Easter sittings** 12th April - 20th May |
| | **Trinity sittings** 2nd June - 31st July |
| | **Michaelmas sittings** 4th October - 21st December |

The High Court sits each day during term in the Four Courts, Dublin. It also sits on scheduled sitting days at provincial venues.

| Vacation | Begins | Ends |
|---|---|---|
| Christmas | 24th December | 6th January |
| Easter | Monday of the week preceding Easter week | Saturday of Easter week |
| Whitsun | Friday of the week preceding Whitsun | Saturday of Whitsun week |
| Long vacation | 1st August | 30th September |

Vacation sittings are held twice monthly during the Long Vacation. A judge is available during all vacations to hear matters of sufficient urgency. Consult the Central Office at tel: +353 (0)1 888 6503 / 6508 / 6505 for further details.

*This page updated: 2nd January 2007*