UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR ISSUANCE OF AN
AMENDED LETTER ROGATORY REQUESTING INTERNATIONAL JUDICIAL
ASSISTANCE FROM AUTHORITIES OF IRELAND**

While called a "Response to Defendant's Motion," the plaintiff's filing is really an

affirmative motion for an entirely new letter rogatory. The plaintiff's use of this platform to

argue for a new letter is inappropriate. If the plaintiff wishes to conduct its own examination-in-

chief of the foreign witnesses, it should move to do so. It should not in essence hold the United

States' motion to amend procedure hostage to its own surreptitious motion to amend the

substance of our requested letter rogatory. That is particularly so where, as here, it was the

United States that made the affirmative effort, with no help from the plaintiff, to ensure that the

plaintiff also has cross-examination rights. The choice has all along been the plaintiff's to either

assist in gathering foreign evidence or to impede. It has consistently chosen the latter. If now the

plaintiff really seeks to obtain evidence from foreign witnesses rather than just to impede the

United States' efforts, it would be, and would all along have been, well served by joining our

foreign-evidence-gathering efforts. Instead, the plaintiff has chosen to continue its fight, make

unwarranted demands, and snipe at, among others, those at the Department of State who are

responsible for receiving and transmitting requests for international judicial assistance.

The United States merely seeks to obtain evidence from Irish witnesses, and to do so using the best available means.  The best available means is through questioning by the domestic attorneys most familiar with this case.  That procedure is atypical, and was only recently disclosed in a diplomatic note by the Irish authorities as a potential alternative and one that, if desired, should be requested by the foreign party in the letter rogatory.  The United States immediately acted upon the new information and took it upon itself, in the interest of fairness, to request that plaintiff also be allowed to cross examine the witnesses.

The plaintiff, however, appears to demand additional rights in the form of a separate direct-examination in chief to which it is not entitled even in the U.S.[1]  The plaintiff couples its unwarranted demands with a so-called default position whereby an Irish examiner with virtually no knowledge of the case would do all of the questioning– which is what would occur without the amendment.  There is no reason why the preferable procedure, which would provide the United States with direct-examination rights and the plaintiff with cross-examination rights, should give way to the plaintiff's inappropriate demands.

I.    **The United States Correctly Described the Alternative Procedure.**

The plaintiff appears to agree that the procedure contemplated in the United States' motion, whereby the examinations would be conducted by U.S. lawyers, is accurately described

---

[1]The plaintiff makes its demand for its own direct examination clear by stating that "in light of the direct-questioning procedure now being sought, Plaintiff asks that the Special Procedures section of the letter rogatory be amended to make it clear that this Court requests that both parties be permitted to put the listed questions to the witnesses and ask questions arising from the answers given."  (Pl. Resp. at 4.)  The plaintiff's demands are restated in its proposed amended letter rogatory.  Many of the plaintiff's proposed questions (listed in its exhibit F) appear to be direct-examination questions to which it is not entitled, instead of cross-examination questions to which it is entitled.

2

and may be allowed by the Irish High Court.  For no apparent purpose, however, the plaintiff

argues that the alternative procedure is not new, and that the United States did not cite the

applicable Irish rules.  The applicable Irish rules simply give the Irish courts wide discretion "to

give all such Directions as to the Time, Place, and Manner of . . . [an ordered] Examination, and

all other Matters connected therewith, as may appear reasonable and just[.]"[2]  The Irish court may

also "make such order or orders as may be necessary to give effect to the intention of the"

Foreign Tribunals Evidence Act, 1856.[3]  In short, the Irish courts have wide discretion to grant

the use of the alternative procedure the United States seeks.  As described in the United States'

motion, the Irish authorities recently made known that this alternative procedure would be

considered in another matter, and the United States wishes to use that alternative procedure here.[4]

The United States' proposed amended letter would also advise the Irish courts that the

parties seek to ask questions with the assistance of an Irish barrister.  (Prop. Am. Letter Rogatory

at 16.)  The plaintiff deleted that provision in its proposal.  The assistance of Irish counsel is

important and would make it more likely for the requested alternative procedure to be granted.

Irish counsel working in conjunction with U.S. counsel would ensure that the parties comply

---

[2]Foreign Tribunals Evidence Act, 1856, section 1.

[3]Rules of the Superior Courts, Order 39, rule 39.

[4]The plaintiff cites one case in the Southern District of New York for the proposition that the requested procedure is not new.  The plaintiff's allegation is beside the point and wrong. First, the Irish courts have long had broad discretion in these matters, and it may well be that others have requested this alternative procedure in the past.  (We note that there is no indication that the proposed letter rogatory filed as plaintiff's exhibit C was issued as proposed).  But, the typical procedure is as envisaged in the initial letter rogatory.  Second, the expressed willingness of the Irish Government to recommend to the Irish High Court that this alternative procedure be granted to foreign attorneys and the conveyance of that willingness to the U.S. Department of State in an official communication and, more importantly, the relay of that official communication to the Department of Justice is quite new.  The United States acted immediately upon that new information.

with Irish procedural rules and practice. There is no reason for deletion of that provision other than to make allowance of the request less likely.

## II.    The United States' Proposed Procedure Ensures Fundamental Fairness to Both Parties.

The United States, in seeking to use the alternative procedure, attempted to ensure that the plaintiff would be granted all rights it would have in the United States to cross examine the witnesses whose testimony is to be taken by the defendant. The plaintiff is entitled to no more either here or in Ireland. Indeed, as stated in the Irish rules the plaintiff cites, "[t]he examination shall take place in the presence of the parties, their counsel, solicitors, or agents, and the witness shall be subject to cross-examination and re-examination."[5] The plaintiff is not entitled to conduct its own examination in chief, unless it too seeks the testimony of the witnesses by moving for issuance of a letter rogatory on its own behalf (which it has not done) or by obtaining the witnesses' voluntary appearances.[6] In either event, the plaintiff can then seek such direct testimony, thereby reversing its earlier professed assertions, which the Court rejected, that the witnesses have no relevant evidence to offer. But, it cannot and should not seek such direct testimony through its own amendment to our requested letter rogatory or as a pretext to oppose our motion to amend.[7]

---

[5]Rules of the Superior Courts, Order 39, rule 10.

[6]Requiring the plaintiff to move for issuance of a letter of request would not be an unnecessary undertaking. An affirmative motion, if granted, confers rights otherwise not afforded, such as the right to direct examination. It also creates the responsibility associated with costs, discussed later in this brief. Additionally, a foreign court presented with the request by means of ex parte application should be given an accurate view of the procedural history, including whether the evidence is sought by only one or by both of the parties.

[7]The plaintiff's proposed list of questions to the Irish witnesses strongly suggests that the plaintiff does not wish even now to obtain evidence from the foreign witnesses. The plaintiff appears simply to wish to rehash its already-rejected arguments on relevance.

III. **The Typical Procedure, Based on the Irish Court's Broad Discretion and the New Information, Is Not a "Default" Procedure, and Should Not Be the Fallback Position If the Irish High Court Does Not Order the Examination Entirely as Requested.**

The plaintiff's description of a "default" procedure, (Pl. Resp. at 6), is wrong.  There is no default procedure as described under either the Foreign Tribunals Evidence Act, 1856 or the Irish Rules of the Superior Courts.  There is a common procedure which has evolved out of the broad latitude provided to the Irish courts.  That common procedure, as described in the proposed amended letter rogatory, whereby the Chief State Solicitor's office would appoint a lawyer to pose written questions to the witnesses, should not be the first fallback position here.[8]

If for some reason the Irish High Court does not allow the proposed examinations by counsel for both parties in this litigation, then that Court can allow various alternatives.  Those alternatives include allowing the United States' attorney to ask both sets of questions.  The Irish court may also allow an Irish lawyer to ask the plaintiff's questions, or may itself ask the plaintiff's questions.  Each of these alternatives would allow the United States to efficiently gather the foreign evidence it seeks, and at the same time would provide the plaintiff with its cross-examination rights.  The Irish High Court can, of course, refuse all alternatives and order the common procedure with which it is quite familiar.  Were that to occur, the plaintiff's demands in this regard would be rendered moot.

The United States has sought this foreign evidence over the plaintiff's constant objections.  The newly disclosed and requested alternative procedure is the most efficient means of obtaining that evidence.  There is no reason to revert to a less efficient means of evidence

---

[8]The United States agrees with the plaintiff that it is unlikely that the Irish High Court will allow counsel for only one party to directly examine the witnesses.

gathering so long as the plaintiff's cross-examination rights are protected.[9]

## IV.     There Is No Basis for the Plaintiff's Suggestion That the Examination Take Place out of Court, and an In-Court Examination Is More Appropriate Here.

It is the United States' understanding, contrary to the plaintiff's assertion, that the common practice in Ireland is for this type of witness examination to take place in the Irish District Court at the direction of the Irish High Court.  The United States' proposed amended letter rogatory requests appropriately that the examination take place in court.  Here again, the Irish rules provide for broad discretion in allowing an in-court examination.[10]  There is no reason to depart from the allowed and common practice.  To the contrary, an in-court examination in Ireland, as here, is more likely to elicit accurate and complete testimony.

## V.     There Is No Basis for the Plaintiff's Suggestion That the Parties Modify the Cost-Payment Section of the Letter Rogatory.

The issued letter rogatory describes the Court's willingness to reimburse the costs incurred by the Irish courts in executing the request.  That is common practice in letters rogatory, as this Court is making the request upon application of, in this case, the United States.[11]  The common practice is then for the applying party to pay costs incurred by the U.S. court for its reimbursement of the foreign court.  The United States is prepared to do so, but that responsibility should be met outside of the letter rogatory, and is of no concern to the foreign courts.  Furthermore, here the plaintiff seeks essentially its own letter rogatory.  While such a backdoor application is inappropriate, if the plaintiff is granted coequal status, it should share the

---

[9]Indeed, we note that Irish principles of natural justice demand that the plaintiff be given a right of cross-examination, and it would seem apparent that the Irish High Court would protect that right.  *In re Haughey* [1971] I.R. 217

[10]Foreign Tribunals Evidence Act, 1856, section 1.

[11]See U.S. State Department website for description of common letter-rogatory provisions. http://www.travel.state.gov/law/info/judicial/judicial_683.html (last visited June 25, 2007).

costs associated with the letter rogatory.  Nonetheless, the letter rogatory's description of the

reimbursement procedure should not be changed.

**VI.    The United States Does Not Object to Making Certain Modifications to the Amended Letter Rogatory in Accordance with the Plaintiff's Wishes, and Therefore Attaches a Second Proposed Amended Letter Rogatory.**

While there are no "irregularities" requiring correction as described in the plaintiff's

response, the United Stated does not oppose a few clarifying changes.  Accordingly, the United

States submits herewith a second proposed amended letter rogatory.  The United States has

amended the qualification-descriptions of plaintiff's counsel, and has copied those descriptions

from the plaintiff's proposed amended letter rogatory filed as exhibit F to the plaintiff's response.

The United States also removes reference in the letter rogatory to the diplomatic note.  The

Unites States also clarifies that the State's Law Office that will make the ex parte application is

called the Chief State Solicitor's office.  Finally, the United States describes alternative

procedures to ensure the plaintiff's right of cross examination, and makes clear that the United

States requests a right of re-examination as allowed under Irish law (the equivalent of re-direct

examination in the U.S.).[12]

Conclusion

There is no basis for the plaintiff's opposition or its new demands.  The United States'

proposed amendments to the special procedures section of the letter rogatory seek efficient

foreign-evidence collection while protecting the plaintiff's right of cross-examination.  Insofar as

the plaintiff's proposed clarifications are not objectionable, the United States has included them

as described above.  Because the proposed amended letter rogatory seeks employment of the

---

[12]Rules of the Superior Courts, Order 39, rule 10.

most efficient evidence-gathering procedure, is in accordance with Irish and U.S. laws and

procedures, and protects the parties' rights, the United States' motion should be granted.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

 /s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER L. RICHTARCSIK
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044-0055
Telephone: (202) 307-6561
Facsimile:  (202) 514-5238
E-mail: john.a.lindquist@usdoj.gov
      barry.e.reiferson@usdoj.gov
      heather.l.richtarcsik@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants identified on the Notice of Electronic Filing and copies will be sent to those
indicated as non registered participants on June 26, 2007

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTER ROGATORY)

The United States District Court for the District of Massachusetts presents its

compliments to the appropriate judicial authority of Ireland, and requests international judicial

assistance to obtain evidence to be used in a civil proceeding before this court in the above-

captioned matter.

This court requests the assistance described herein as necessary in the interests of justice.

This court requests that the appropriate judicial authority of Ireland compel the appearance of

Samuel Mahoney, Martin Hawkes, and John Hussey to give testimony and produce documents.

### Witnesses to be Served

1.  Samuel Mahoney
    123 Howth Road          and/or          43 Ailesbury road
    Dublin 3                                 Dublin 4
    Ireland                                  Ireland

2.  Martin Hawkes
    5 Bushfield Avenue
    Donnybrook

Dublin 4
Ireland

3.    John Hussey
      Taormina, Silchester Road
      Glenageary
      Co. Dublin
      Ireland

## Facts

This case involves a set of transactions occurring in 2001 and engaged in by a U.S. taxpayer in a purported partnership with, among others, an Irish citizen named Samuel Mahoney.[1]  That purported partnership is called Fidelity International Currency Advisor A Fund ("Fidelity International").  Mr. Mahoney is alleged to have contributed $651,000 for a 93% share of the common interests in the "partnership."  Shortly after making his alleged contribution, Mr. Mahoney sold 88% of his common interests in the "partnership" to the U.S. taxpayer for approximately half of what he had "contributed."  Samuel Mahoney claims that his $651,000 contribution to Fidelity International was made on his behalf by Kilsture Ltd., an Isle of Man entity, of which he claims to be an employee.

On its U.S. partnership tax return for 2001, Fidelity International allocated the purported gains on this set of transactions to Mr. Mahoney as the foreign "partner," and the purported losses to the U.S. taxpayer.  Based on the partnership tax return, Samuel Mahoney made an alleged profit of approximately $163.8 million on the transactions.  Because Mr. Mahoney was not a U.S. citizen or resident, he was not required to pay U.S. taxes on that alleged profit.  From the same set of transactions, the U.S. taxpayer allegedly lost more than $158 million.  The United

_____

[1]As discussed later, the United States alleges that identical sets of these marketed transactions were engaged in by 57 other U.S. taxpayers.

States's taxing authority disallowed the claimed losses, adjusting the partnership items for U.S. tax purposes.  The plaintiff seeks readjustment of the partnership items for tax purposes, pursuant to Title 26 of the United States Code, Section 6226.

One of the primary legal issues in this case is whether Samuel Mahoney is a real partner in Fidelity International.  On this issue, the United States contends that Mr. Mahoney was not a real partner in Fidelity International because he did not fund his own investment in this company. The United States alleges that the U.S. promoters of this transaction, in addition to funding Mr. Mahoney's investment, also paid him a fee to allow his name and foreign residency to be misused on these transactions.  The United States further alleges that the U.S. promoters paid these amounts to Mr. Mahoney by way of various joint-venture accounts which were in the name of Mahoney and his business partner, Martin Hawkes, also an Irish Citizen.  The United States alleges that these accounts were held at the Singer & Friedlander merchant bank (n/k/a Kaupthing Singer & Friedlander) on the Isle of Man.  According to the United States, the account holder of these joint-venture accounts was an Irish company by the name of Biosphere Finance Ltd, of which Mahoney, Hawkes, and John Hussey, another Irish citizen, were directors.

Another primary legal issue in this case is whether Fidelity International, in which Samuel Mahoney was purportedly a partner, should be recognized as a partnership for U.S. tax purposes.  A partnership will be respected for U.S. tax purposes only if the partners in good faith and acting with a business purpose intend to join together in the conduct of the enterprise. *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949).  The United States alleges that Mr. Mahoney had no intent to join together in the conduct of Fidelity International and further that Fidelity International had no non-tax business purpose.  The determination of intent of the

3

partners requires testimonial and documentary evidence from the purported partners and others.
The testimony of Mr. Mahoney's alleged business associates, Messrs. Hawkes and Hussey, may
also be relevant to the determination as to why Mr. Mahoney became a partner in Fidelity
International.

Another of the primary issues in this litigation is whether the transactions employed here
had economic substance.  Under the economic substance doctrine, transactions that are invented
solely to create tax deductions and otherwise have no economic substance, even though formally
complying with the letter of the U.S. Internal Revenue Code, will not be recognized.  *Knetsch v.
United States*, 364 U.S. 361 (1960); *Dewees v. Commissioner*, 870 F2d 21, 32, 35 (1st Cir.
1989).  There is a two-prong test for determining economic substance.  The first prong examines
whether the transaction has a reasonable possibility of a profit (an objective inquiry).  *Compaq
Computer Corp. v. Commissioner*, 277 F.3d 778, 781-82 (5th Cir. 2001) (internal citation
omitted; emphasis added).  The second prong looks to whether there existed a tax-independent
business purpose for the transaction (a subjective inquiry).  *Id.*

On this issue, the determination of whether Fidelity International had a reasonable
possibility of profit and a tax-independent business purpose may focus on how the set of
transactions at issue was designed, marketed, and implemented, and the purpose behind the
formation of Fidelity International.  The resolution of these issues will require testimonial and
documentary evidence from the purported partners, including Mr Mahoney, as the alleged foreign
partner of Fidelity International.

When it is determined that taxpayers have engaged in a generic tax shelter, evidence
regarding similar or identical transactions may be relevant to the determination of the

deductibility of the U.S. taxpayer's losses. *Douglas v. United States*, 410 F. Supp. 2d 292, 297-98 (S.D.N.Y. 2006), appeal dismissed, 448 F.3d 507 (2d. Cir 2006). The United States alleges that Samuel Mahoney engaged in 32 similar or identical transactions through various entities, and that Martin Hawkes engaged in 24 such transactions. The United States alleges that Messrs. Mahoney and Hawkes were paid for their participation in each of these deals by the U.S promoters. According to the United States, the U.S. promoters paid these fees to Mahoney and Hawkes through their joint-venture accounts at Singer & Friedlander on the Isle of Man, which accounts the United States alleges were held by their Irish company, Biosphere Finance Ltd.

The United States also alleges that Messrs. Mahoney and Hawkes were employees of two Isle of Man entities, Kilsture Ltd. (which, as stated above, purportedly made a $651,000 contribution to Fidelity International on Mahoney's behalf) and Maddox Ltd., which allegedly also received substantial payments from the U.S. promoters. The United States further alleges that the purported payments made directly and indirectly to Mahoney and Hawkes were for their respective participation in an abusive tax shelter. Kilsture and Maddox were shareholders of Cumberdale Holdings, also an Isle of Man entity. John Hussey was a director of both Biosphere Finance and Cumberdale Holdings. As such, each has evidence that may be used to support the United States' contentions at trial.

### Documents to be Produced by Samuel Mahoney, Martin Hawkes, and John Hussey

1. Minutes of each meeting of the directors of Biosphere Finance Ltd., Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., Trilogy Financial Investments Ltd. and/or Trilogy Investments Ltd., referencing Fidelity International or any of its participants, or any of the other 57 FDIS

"partnerships" or any of the participants of the other 57 FDIS "partnerships."[2]

2.     Company resolutions for Biosphere Finance Ltd., Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., Trilogy Financial Investments Ltd. and/or Trilogy Investments Ltd., referencing Fidelity International or any of its participants, or any of the other 57 FDIS "partnerships" or any of the participants of the other 57 FDIS "partnerships."

3.     Financial statements for Biosphere Finance Ltd., Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Trilogy Financial Products Ltd., Trilogy Financial Investments Ltd. and/or Trilogy Investments Ltd.

4.     All outlines of proposed transaction received by Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey with respect to Fidelity International or any other FDIS "partnerships."

---

[2]The other 57 FDIS "partnerships" are as follows: Gupta Investments LLC, Kealakekua [a/k/a Kutler or JPK] Investments LLC, Cowan Investments LLC, Acajoux Trading LLC, Acajoux Investments LLC, Acajoux Equities LLC, AHG Investments LLC, Cliffside Investments LLC, GT Investments 2001 LLC, Geewax Terker & Company (721 Exchange), Anbar Investments LLC, WFT Investments LLC, RAS Investments 2001 LLC, JRF Investments LLC, JHT Investments LLC, JLS Investments LLC, RJP Investments LLC, TFT Investments 2001 LLC, AN Investments LLC, GN Investments LLC, RN Investments LLC, SN Investments LLC, FX Investments LLC, SJD Investments LLC, RJS Investments LLC, RT Investments LLC, NDC Investments LLC, TAB Investments 2001 LLC, AFFCO Investments 2001 LLC, DJR Investments LLC, CFPT Investments LLC, RC Investments LLC, RWC Investments LLC, DWT Investments LLC, RAG Investments LLC, RM Investments 2001 LLC, SM Investments LLC, CSH Investments LLC, Theis Investments LLC, RGC Investments LLC, EGC Trading LLC, RGW Investments LLC, Europa Investments LLC, Europa International Inc. (351 Contribution), Sheridan Investments LLC, Corporex Investments LLC, SEBFS Investments LLC, DWT Investments 2002 LLC, Provident Capital Partners LLC, E_P Investments LLC, CMC Investments LLC, Fund Investments LLC, Pettus Investments LLC, GAMA Investments LLC, LF Investments 2002 LLC, WFTSR Investments 2002 LLC, JBEJW Investments LLC, Whiteside Investments LLC, and Whiteside Investments 2002 LLC.

5.    All account statements and/or communications referencing any of the following four

accounts:

> Sub Account:  Singer & Friedlander (Isle of Man) Limited
> Account no: 30123012
> Reference: 11270012 (Please ensure reference is quoted on payment).

> Sub Account:  Singer & Friedlander Limited
> Account no: 30123012
> Reference: The H&M Joint Venture account number 20195700 (Please ensure reference
> is quoted on payment).

> Sub Account:  Singer & Friedlander Limited
> Account no: 30123012
> Reference: S&F Client A/C No. 11270025  (Please ensure reference is quoted on
> payment).

> Sub Account:  Singer & Friedlander (Isle of Man) Ltd.
> Account no: 30123012
> Reference: Trilogy Investments Limited - account No: 20282910 (Please ensure reference
> is quoted on payment).

6.    All email received by Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or

John Hussey concerning Fidelity International or any other FDIS "partnership."

7.    All communications addressed from Biosphere Finance Ltd., Samuel Mahoney, Martin

Hawkes, and/or John Hussey to The Diversified Group Inc. or to its principals or employees

including but not limited to James Haber and/or Orrin Tilevitz, concerning Fidelity International

or any other FDIS "partnership."

8.    All communications addressed from Biosphere Finance Ltd., Samuel Mahoney, Martin

Hawkes, and/or John Hussey to Helios Financial or its principals or employees including but not

limited to Mox Tan and/or Phil Kampf, concerning Fidelity International or any other FDIS

"partnership."

9.     All communications addressed from Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey to Alpha Financial or its principals or employees including but not limited to Ron Buesinger, concerning Fidelity International or any other FDIS "partnership."

10.     All records of payments received by Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey from The Diversified Group Inc. or from its principals and employees including but not limited to James Haber and/or Orrin Tilevitz, relating to Fidelity International or any other FDIS "partnership."

11.     All records of payments received by Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey from Helios Financial or its principals or employees including but not limited to Mox Tan and/or Phil Kampf, relating to Fidelity International or any other FDIS "partnership."

12.     All records of payments received by Biosphere Finance Ltd., Samuel Mahoney, Martin Hawkes, and/or John Hussey from Alpha Financial or its principals or employees including but not limited to Ron Buesinger, relating to Fidelity International or any other FDIS "partnership."

13.     All communications concerning Fidelity International or any other FDIS "partnership."

14.     All communications concerning the funding of Biosphere Finance, Samuel Mahoney and/or Martin Hawkes for any person's or entity's participation in Fidelity International or any other FDIS "partnership."

15.     All communications concerning the payment of $2 million to Biosphere Finance, Samuel Mahoney and/or Martin Hawkes.

16.     All communications and/or other documents concerning any "reckoning on fees in relation to fund structures, Irish companies and Trilogy transactions."

17.    All communications and/or other documents, including documents relating to payments, concerning the Collaboration Agreement between The Diversified Group Inc. and Trilogy Financial Products, Ltd.

18.    All contracts between Samuel Mahoney, Martin Hawkes, and/or John Hussey, and Helios Financial, The Diversified Group Inc., Kilsture Ltd., Maddox Ltd., Cumberdale Investments Ltd. (including all subsidiaries), Cumberdale Holdings Ltd., Biosphere Finance Ltd., Trilogy Financial Products Ltd., Trilogy Financial Investments Ltd. and/or Trilogy Investments Ltd.

**Additional Documents to be Produced by Samuel Mahoney**

1.    All loan documents for all loans from Kilsture Ltd. to Samuel Mahoney, including, but not limited to, documents concerning renegotiation of such a loan.

2.    All documents relating to Samuel Mahoney's repayment of any loan from Kilsture Ltd.

3.    All Bank records of Kilsture Ltd. showing any payment to or from Kilsture Ltd. concerning Fidelity International or any other FDIS "partnership."

**Questions to Samuel Mahoney, Martin Hawkes, and John Hussey**

1.    Was Biosphere Finance Ltd. engaged in business?

2.    What business was Biosphere Finance Ltd. engaged in at inception?

3.    What business was Biosphere Finance Ltd. engaged in from January 1, 2000 through January 1, 2003?

4.    Were you an employee of Biosphere Finance Ltd.?

5.    What were your duties as an employee of Biosphere Finance Ltd.?

6.    When did you become a Director of Kilsture?

7.    Was Kilsture Ltd. engaged in business?

9

8.    What business was Kilsture Ltd. engaged in at inception?

9.    What business was Kilsture Ltd. engaged in from January 1, 2000 through January 1, 2003?

10.    What were your duties as an employee of Kilsture Ltd.?

11.    What was your annual salary from Kilsture Ltd. during each year of its existence?

12.    Was Maddox engaged in business?

13.    What business was Maddox engaged in at inception?

14.    What business was Maddox engaged in from January 1, 2000 through January 1, 2003?

15.    What were your duties as an employee of Maddox Ltd.?

16.    Was Cumberdale Investments engaged in business?

17.    What business was Cumberdale Investments engaged in at inception?

18.    What business was Cumberdale Investments engaged in from January 1, 2000 through January 1, 2003?

19.    What were your duties as an employee of Cumberdale Investments Ltd.?

20.    Was Cumberdale Holdings engaged in business?

21.    What business was Cumberdale Holdings engaged in at inception?

22.    What business was Cumberdale Holdings engaged in from January 1, 2000 through January 1, 2003?

23.    What were your duties as an employee of Cumberdale Holdings Ltd.?

24.    Why were each of Cumberdale Investments Ltd.'s dissolved subsidiaries dissolved?

25.    Why did you agree to be a purported partner in Fidelity International Currency Advisor A Fund?

26.    Did you believe when a $651,000 initial contribution was made by you or on your behalf

into Fidelity International Advisor A Fund that your interest was going to be bought by Richard Egan?

27.     Did you believe when a $651,000 initial contribution was made by you or on your behalf into Fidelity International Advisor A Fund that your interest was not going to be bought by Richard Egan?

28.     When did you become aware that your interest in Fidelity International Currency Advisor A Fund was to be reduced?

29.     When did you become aware that, upon reduction of your interest in Fidelity International Currency Advisor A Fund, you would lose approximately 50% of your initial contribution to Fidelity International Currency Advisor A Fund?

30.     During the time period June 1, 2001 to August 1, 2002, how many so-called partnerships did you enter into in which you lost approximately 50% of your initial contribution within the first month after your initial contribution?

31.     During the time period June 1, 2001 to August 1, 2002, how many so-called partnerships did you enter into in which you did not lose approximately 50% of your initial contribution within the first month after your initial contribution?

32.     Why did you continue to enter into partnerships during 2001 and 2002 for which you were almost certain to lose 50% of your initial contribution?

33.     Did you earn any money from your role as a purported partner in Fidelity International Currency Advisor A Fund?

34.     How much money did you earn from your role as a purported partner in Fidelity International Currency Advisor A Fund?

11

35.     Was all of the money you earned from your role as a purported partner in Fidelity International Currency Advisor A Fund a fee to be earned regardless of the performance of the option trades entered into by Fidelity International Currency Advisor A Fund?

36.     How much money did you earn from your role as a purported partner in Fidelity International Currency Advisor A Fund as a result of the performance of the option trades entered into by Fidelity International Currency Advisor A Fund?

37.     What was the amount of each payment you received either directly or indirectly as a result of your participation in Fidelity International Currency Advisor A Fund?

38.     What was the original source of each payment made to you as a result of your participation in Fidelity International Currency Advisor A Fund?

39.     What attributes, skills, or value did you bring to Fidelity International Currency Advisor A Fund?

40.     Was Fidelity International Currency Advisor A Fund designed so that you would be allocated the majority of the gains and sell a majority of your interest before realization of a loss?

41.     What is the Financial Derivatives Investment Strategy?

42.     What is the Helios product known as H2?

43.     Did you report any income from your participation in Fidelity International Currency Advisor A Fund?

44.     Did you report any income from your participation in any Financial Derivatives Investment Strategy?

45.     Did you report any income from your participation in any FDIS partnership?

46.     Have you ever met or spoken with Richard Egan?

12

47.    Have you ever met or spoken with any partner in any FDIS partnership?

48.    Have you ever met or spoken with any employee of Carruth Management?

49.    Have you ever received money from Helios?

50.    Did you ever receive any money from The Diversified Group Inc.?

51.    Why did The Diversified Group Inc. pay more than $1,000,000 to Cumberdale Holdings Ltd. in December 2001?

52.    Was any of the more than $1,000,000 paid by The Diversified Group Inc. to Cumberdale Holdings Ltd. in December 2001 paid directly or indirectly to you?  If so, how much was paid to you?

53.    Why did The Diversified Group Inc. pay $50,000 to Biosphere Finance Ltd on February 15, 2002 purportedly for "Administration and Agency Services?"

54.    What administration and agency services did Biosphere Finance Ltd. perform to earn the $50,000 paid to it by The Diversified Group Inc. on February 15, 2002?

55.    Why did The Diversified Group Inc. pay $570,000 to Maddox Ltd. on February 22, 2002 purportedly for "Consultancy services?"

56.    Was any of the $570,000 paid by The Diversified Group Inc. to Maddox Ltd. on February 22, 2002 paid directly or indirectly to you?  If so, how much was paid to you?

57.    What consultancy services did Maddox Ltd. perform to earn the $570,000 paid to it by The Diversified Group Inc. on February 22, 2002?

58.    Why did The Diversified Group Inc. pay $380,000 to Kilsture Ltd. on February 22, 2002 purportedly for "Consultancy fees?"

59.    Was any of the $380,000 paid by The Diversified Group Inc. to Kilsture Ltd. on February

13

22, 2002 paid directly or indirectly to you?  If so, how much was paid to you?

60.    What consultancy services did Kilsture Ltd. perform to earn the $380,000 paid to it by The Diversified Group Inc. on February 22, 2002?

61.    Why did The Diversified Group Inc. pay $952,000 to Biosphere Finance Ltd. on March 23, 2001?

62.    Was any of the $952,000 paid by The Diversified Group Inc. to Biosphere Finance Ltd. on March 23, 2001 paid directly or indirectly to you?  If so, how much was paid to you?

63.    Why did The Diversified Group Inc. pay $120,000 to Kilsture Ltd. on March 23, 2001?

64.    Was any of the $120,000 paid by The Diversified Group Inc. to Kilsture Ltd. on March 23, 2001 paid directly or indirectly to you?  If so, how much was paid to you?

65.    Was Trilogy Financial Products Ltd. engaged in business?

66.    What business was Trilogy Financial Products Ltd. engaged in at inception?

67.    What business was Trilogy Financial Products Ltd. engaged in from January 1, 2000 through January 1, 2003?

68.    What were your duties as an employee of Trilogy Financial Products Ltd.?

69.    What was Nigel Scott's role with Trilogy Financial Products Ltd.?

70.    What was Oliver Peck's role with Trilogy Financial Products Ltd.?

71.    What was Singer & Friedlander's relationship to Trilogy Financial Products Ltd.?

72.    Why were records of Helios's and The Diversified Group Inc.'s transactions sent to Trilogy Financial Products Ltd.?  Where were those records sent?  Where are those records now? Who has custody and control of those records now?

**<u>Additional Questions to Samuel Mahoney</u>**

1.      Did Kilsture Ltd. pay on your behalf your $651,000 initial contribution into Fidelity

International Currency Advisor A Fund?

2.      How much, if any, of Kilsture Ltd.'s payment to Fidelity International Currency Advisor

A Fund on your behalf was salary due to you?

3.      During what period did you earn the salary that represented any and all portions of

Kilsture Ltd.'s payment to Fidelity International Currency Advisor A Fund on your behalf?

4.      What duties did you perform to earn the salary that represented any and all portions of

Kilsture Ltd.'s payment to Fidelity International Currency Advisor A Fund on your behalf?

**<u>Special Procedures</u>**

A.      This court requests testimony under oath, or the submission of a declaration by the

custodian of records for each entity that produces documents in response to this request, attesting

to the authenticity of documents produced.  Under the United States's Federal Rules of Evidence,

which apply in this lawsuit and in all civil proceedings in the United States district courts, certain

business records may be received into evidence only if a competent representative of the business

appears at trial as a witness and testifies as to the authenticity of the records and the manner in

which they are prepared and maintained at the business.  However, with respect to foreign

business records, the appearance and testimony at trial of a representative of a foreign entity may

not be required if a representative of the foreign entity gives testimony under oath as to the

authenticity of the records (or true copies thereof) or if the records (or true copies thereof) are

accompanied by a written declaration certifying the authenticity of the business records.

Therefore, this court considers it necessary in the interests of justice that testimonial evidence

15

and/or written declarations certifying the authenticity of business records be obtained from the producing entities and/or their representatives. To be of value to this court, the written declaration(s) must comply with the requirements of Title 28 of the United States Code, section 1746. A proposed declaration is attached to this letter of request.

B.      The United States District Court for the District of Massachusetts requests that attorneys from the United States be permitted to put questions directly to the witnesses in an Irish court. In accordance with that procedure, this court requests that Mr. Dennis Donohue or Mr. John Lindquist of the United States Department of Justice, representing the defendant United States, be permitted to put the listed questions to the witnesses in an Irish court, and ask questions arising from the answers given, all with the assistance of an Irish barrister. Additionally, this court requests that a U.S. attorney acting on the plaintiff's behalf, Mr. David Curtin or Mr. Ronald Buch, also be permitted to put to the witnesses questions arising from the answers given to the United States' questions, also with the assistance of an Irish barrister. This court further requests that the Chief State Solicitor make an ex parte application to the High Court for an order allowing the above-named attorneys to examine the witnesses in accordance with the procedure described. The attorneys' respective qualifications are as follows:

1.      Mr. Donohue holds a Juris Doctorate from the University of Cincinnati Law School and a Masters of Tax Law from the George Washington University Law School. He is an active member of the Ohio State Bar (admitted 1969) and an inactive member of the California State Bar. As an attorney for the United States, Mr. Donohue is permitted to practice law on behalf of the United States in all U.S. jurisdictions. He is a member of the U.S. Supreme Court Bar, and numerous

16

appellate and district court bars.  He has been a trial attorney litigating tax cases with the U.S. Department of Justice for 36 years.  His current position is Chief Senior Litigation Counsel.

2.    John Lindquist holds a Juris Doctorate from the University of Pittsburgh School of Law and a Masters of Laws in Taxation from Georgetown.  He has been a member of the District of Columbia Bar since 1983.  As an attorney for the United States, Mr. Lindquist is permitted to practice law on behalf of the United States in all U.S. jurisdictions.  He is a member of the U.S. Supreme Court Bar and the Court of Federal Claims Bar.

3.    David J. Curtin received a Juris Doctorate, with honors, from the Saint Louis University School of Law in 1972.  He is an active member of the District of Columbia Bar.  He is also admitted to practice before the United States Supreme court and Third Circuit Court of Appeals.  Mr. Curtin was a trial attorney for the United States Department of Justice Tax Division from 1972 until 1978.  He has been in private practice in Washington, D.C. since 1979 and is a Fellow in the American College of Trial Lawyers.

4.    Ronald L. Buch holds a Juris Doctorate and a Masters of Tax Law.  He is an active member of the Florida Bar and the District of Columbia Bar.  He is also admitted to practice before the United States Supreme Court, the United States Court of Federal Claims, and the United States Tax Court.  Mr. Buch was senior legal counsel for the Internal Revenue Service prior to moving into private practice in 2001.

17

If the High Court does not permit the preferred procedure and instead allows only the defendant, as the party requesting direct testimony, to have its U.S. attorney put questions to the witnesses in court, the United States District Court for the District of Massachusetts requests that the High Court exercise its discretion in allowing the plaintiff the right of cross-examination by directing that the plaintiff's questions (to be provided by the plaintiff), and questions arising from the answers given to those questions, be put to the witnesses by counsel for the defendant, or preferably by a Judge or local counsel before an Irish Judge.

In summary, the preferred procedure is for the defendant's U.S. counsel to directly examine and re-examine the witnesses with the assistance of an Irish barrister in an Irish court, and for the plaintiff's U.S. counsel to cross examine the witnesses with the assistance of an Irish barrister in an Irish court.  The preferred procedure should be carried out in accordance with rules of natural justice.

## Reciprocity

The courts of the United States are authorized by statute codified at Title 28 of the United States Code, Section 1782 to extend similar assistance to the tribunals of Ireland and will gladly reciprocate the courtesies shown by the judicial authorities of Ireland.

**<u>Reimbursement of Costs</u>**

The United States District Court for the District of Massachusetts is prepared to

reimburse your Court for all costs incurred in executing this request.  The court extends to the

judicial authorities of Ireland the assurances of its highest consideration.


DATE: _____


_____
HON. F. DENNIS SAYLOR, IV
U.S. District Judge
U.S. District Court for the District of Massachusetts
Worcester, Massachusetts

## CERTIFICATION OF BUSINESS RECORDS

I, the undersigned, _____, with the understanding that

I am subject to criminal penalty under the laws of Ireland for an intentionally false declaration,

declare that I am:

employed by/associated with _____ in the position of _____

_____ and by reason of my position am authorized and qualified to make

this declaration.

I further declare that the documents attached hereto are original records or true copies of

records identified as Exhibit(s) _____ (list all exhibits as appropriate), and:

1.     were made at or near the time of the occurrence of the matters set forth therein, by (or
       from information transmitted by) a person with knowledge of those matters;

2.     were kept in the course of regularly conducted business activity;

3.     were made by the said business activity as a regular practice; and,

4.     if not original records, are duplicates of original records.

The originals or duplicates of these records are maintained in the country of _____

_____.

Date of execution:                        _____

Place of execution:                       _____

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Signature:  _____