UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Nos. 05-40151-FDS (D. Mass.) 06-40130-FDS (D. Mass.) |
| v. | ) ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

**MOTION FOR LEAVE TO SERVE ADDITIONAL REQUESTS FOR ADMISSION**

The United States of America moves this Court for leave to serve the attached proposed requests for admission. These requests would bring the United States over the presumptive limit in the local rules and the scheduling order, but would be in line with the goals of Federal Rule of Civil Procedure 36 which does not limit the number of requests for admission. A memorandum of law is being filed contemporaneously with this motion.

2801576.1

**Certification**

I certify that counsel for the United States conferred by telephone on October 9, 2007

with counsel for the plaintiff and attempted in good faith to resolve or narrow the issues raised in

this motion.  The plaintiff opposes the relief sought.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

 /s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER L. Vann
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044-0055
Telephone: (202) 307-6561
Facsimile:  (202) 514-5238
E-mail:  john.a.lindquist@usdoj.gov
         barry.e.reiferson@usdoj.gov
         heather.vann@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants identified on the Notice of Electronic Filing and copies will be sent to
those indicated as non registered participants on October 12, 2007.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

2801576.1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FIDELITY INTERNATIONAL CURRENCY )
ADVISOR A FUND, L.L.C., by the Tax )
Matters Partner, )
         )
          Plaintiff, )    Civil Nos. 05-40151-FDS (D. Mass.)
         )                  06-40130-FDS (D. Mass.)
     v. )
         )    Judge Saylor
UNITED STATES OF AMERICA, )
         )
         Defendant. )

**UNITED STATES OF AMERICA'S THIRD SET OF REQUESTS FOR ADMISSION**

The United States requests that the plaintiff, within thirty (30) days after service of this request, make the admissions below for purposes of this action only.

The requests contained herein are made pursuant to the provisions of Rules 26 and 36 of the Federal Rules of Civil Procedure.

Unless admitted, the answer shall specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify an answer or deny only a part of the matter on which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder.

Pursuant to Rule 36(a) of the Federal Rules of Civil Procedure, the matters below will be deemed admitted unless you serve an answer or objection to the office of the undersigned counsel for the United States within thirty (30) days after service of this request.

**Definitions:**

A.     The term "detection" means the detection by the Internal Revenue Service of the fact that the loss claimed by Richard and Maureen Egan (collectively, "the Egans") on their 2001 and 2002 joint Form 1040s ultimately resulted, in part, from Richard Egan's use of offsetting pairs of options to create the greatly inflated tax basis that he claimed to have had in Fidelity International Currency Advisor A Fund ("Fidelity International") at the time Fidelity International created the losses that were allocated to and deducted by Richard Egan in computing the Egans' 2001 and 2002 federal income tax liabilities.

C.     The term "Fidelity High Tech transaction" means the transaction at issue in *Fidelity High Tech Advisor A Fund v. United States*, Civ. Nos. 06-40243 and 06-40244 (D. Mass.).

D.     The term "interest rate options" means, collectively, the options purchased by Fidelity World Currency Advisor A Fund on October 9, 2001 for a total of $150,000,000 and the options sold by Fidelity World Currency Advisor A Fund on October 9, 2001 for a price of $147,750,000.

E.     The term "Fidelity International" means "Fidelity International Currency Advisor A Fund, LLC".

F.     The term "Fidelity World" means "Fidelity World Currency Advisor A Fund, LLC".

## ADMISSIONS

1.    Admit that the transaction at issue in this case ("the Fidelity International transaction")

was designed to generate a tax loss.

Response:

2.    Admit that the plaintiff knew, before entering into the transaction, that the Fidelity

International transaction was designed to generate a tax loss.

Response:

3.    Admit that Richard Egan knew, before entering into the transaction, that the Fidelity

International transaction was designed to generate a tax loss.

Response:

4.    Admit that Helios knew, before entering into the transaction, that the Fidelity

International transaction was designed to generate a tax loss.

Response:

5.    Admit that Alpha knew, before entering into the transaction, that the Fidelity International

transaction was designed to generate a tax loss.

Response:

6.     Admit that Samuel Mahoney knew, before entering into the transaction, that the Fidelity

International transaction was designed to generate a tax loss.

Response:

7.     Admit that the plaintiff's primary purpose in entering into the Fidelity International

transaction was to generate a tax loss.

Response:

8.     Admit that Richard Egan's primary purpose in entering into the Fidelity International

transaction was to generate a tax loss.

Response:

9.     Admit that Richard Egan's purpose in generating a tax loss by engaging in the Fidelity

International transaction was to eliminate most or all of his taxable income relating to his

exercise of EMC stock options in 2001.

Response:

2802184.1

10.     Admit that the plaintiff did not enter into the Fidelity International transaction for the

primary purpose of hedging risk.

Response:

11.     Admit that Richard Egan did not enter into the Fidelity International transaction for the

primary purpose of hedging risk.

Response:

12.     Admit that the plaintiff did not enter into the Fidelity International transaction for the

primary purpose of providing protection against possible declines in longer term interest

rates and increases in the market value of Richard Egan's fixed-rate debt.

Response:

13.     Admit that Richard Egan did not enter into the Fidelity International transaction for the

primary purpose of providing protection against possible declines in longer term interest

rates and increases in the market value of Richard Egan's fixed-rate debt.

Response:

2802184.1

14.     Admit that the plaintiff did not enter into the Fidelity International transaction for the

primary purpose of mitigating the financial risks associated with his liabilities, including

the risk of a flattening yield curve.

Response:

15.     Admit that Richard Egan did not enter into the Fidelity International transaction for the

primary purpose of mitigating the financial risks associated with his liabilities, including

the risk of a flattening yield curve.

Response:

16.     Admit that the plaintiff did not enter into the Fidelity International transaction for the

primary purpose of mitigating the EMC's foreign-operations exposure.

Response:

17.     Admit that Richard Egan did not enter into the Fidelity International transaction for the

primary purpose of mitigating the EMC's foreign-operations exposure.

Response:

18.     Admit that the plaintiff did not enter into the Fidelity International transaction for the

primary purpose of earning a non-tax profit.

Response:


19.     Admit that Richard Egan did not enter into the Fidelity International transaction for the

primary purpose of earning a non-tax profit.

Response:


20.     Admit that the plaintiff entered into the Fidelity International transaction primarily

expecting to lose money after taking into account all transaction costs and fees including

all direct or indirect legal fees, exclusive of tax savings.

Response:


21.     Admit that Richard Egan entered into the Fidelity International transaction primarily

expecting to lose money after taking into account all transaction costs and fees including

all direct or indirect legal fees, exclusive of tax savings.

Response:

7

22.    Admit that taken as a whole, the Fidelity International transaction was not primarily

entered into to act as a  hedge against any of the risks the plaintiff claims to have hedged.

Response:

23.    Admit that prior to entering into the Fidelity International transaction, the plaintiff

performed no in-depth analysis as to the transaction's effectiveness as a hedge.

Response:

24.    Admit that prior to entering into the Fidelity International transaction, none of the

plaintiff's partners, advisors, or representatives performed an in-depth analysis as to the

transaction's effectiveness as a hedge.

Response:

25.    Admit that by transferring of the interest rate options from Fidelity World Currency

Advisor A Fund to Fidelity International Currency Advisor A Fund, Richard Egan's

proportionate share of the profits and losses from the interest rate options went from

100% to 7%.

Response:

2802184.1

26.     Admit that the primary purpose of transferring the interest rate options from Fidelity
        World Currency Advisor A Fund to Fidelity International was to allow Richard Egan to
        increase his basis in Fidelity International.

        Response:

27.     Admit that Richard Egan's claimed losses from the Fidelity International transaction was
        limited to his basis in Fidelity International.

        Response:

28.     Admit that Fidelity International Currency Advisor A Fund and Fidelity World Currency
        Advisor A Fund were created in 2000 to implement strategies intended to generate tax
        losses.

        Response:

29.     Admit that because of the promulgation of IRS Notice 2000-44, Richard Egan did not
        enter into a transaction or transactions for which he intended in the year 2000 to use
        Fidelity World Currency Advisor A Fund and Fidelity International Currency Advisor A
        Fund to generate tax losses.

        Response:

2802184.1

30.    Admit that the primary purpose for Fidelity World Currency Advisor A Fund's

participation in the Fidelity International transaction in 2001 was to enable Richard Egan

to inflate his outside basis in Fidelity International by acquiring options and transferring

them to a multi-member LLC.

Response:

31.    Admit that Fidelity World Currency Advisor A Fund engaged in no other business

activity besides the entry into the four 2001 interest rate options.

Response:

32.    Admit that the primary purposes of Fidelity World's contribution of Stockton Holdings

Limited and Mariner Horizon 6A to Fidelity International was to increase Richard Egan's

basis in Fidelity International and to provide the appearance of a non-tax business

purpose for Fidelity International.

Response:

33.    Admit that Fidelity World and Fidelity International had no intention of entering into

each option of their respective pairs of interest rate and foreign currency options with

separate financial institutions.

Response:

34.    Admit that each of the plaintiff's pairs of interest rate and foreign currency options should

in substance be properly viewed as single positions.

Response:

35.    Admit that the theoretical value of the four JPY/USD options was greater than the initial

premium of $2,835,212 credited to Fidelity International Currency Advisor A Fund.

Response:

36.    Admit that the plaintiff agreed to accept a premium at the outset for the JPY/USD options

which was less than their true theoretical value.

Response:

37.    Admit that the difference between the theoretical value of the four JPY/USD options on

the date they were entered into and the amount of initial net premium Fidelity

International Currency Advisor A Fund was credited with was a fee paid by Fidelity

2802184.1

International to Refco.

Response:

38.    Admit that the theoretical value of the four USD/EUR options was greater than the initial premium of $2,835,212 credited to Fidelity International Currency Advisor A Fund.

Response:

39.    Admit that the plaintiff agreed to accept a premium at the outset for the four USD/EUR options which was less than their true theoretical value.

Response:

40.    Admit that the difference between the theoretical value of the four USD/EUR options on the date they were entered into and the amount of initial net premium Fidelity International Currency Advisor A Fund was credited with was a fee paid by Fidelity International to Refco.

Response:

41.    Admit that for the combined LIBOR and CMS options, the stated initial premiums

2802184.1

charged to Fidelity World Currency Advisor A Fund was greater than the combined

theoretical value of those options on the same date.

<u>Response:</u>

42.    Admit that the additional amount charged to Fidelity World Currency Advisor A Fund for

the combined LIBOR and CMS options in excess of the combined theoretical value of

those options on the same date was a fee paid by Fidelity International to Refco.

<u>Response:</u>

43.    Admit that if the Fidelity International transaction's options had been acquired and

terminated at their true theoretical values, Refco would not have received any fees

represented by the difference between the options' true theoretical values and the

premiums paid or received.

<u>Response:</u>

44.    Admit that upon entering into the Fidelity International transaction, the plaintiff's primary

purpose in entering into the transaction was to generate a tax loss and it only considered a

hedging purpose to attempt to demonstrate a non-tax business purpose.

<u>Response:</u>

13

45.     Admit that the plaintiff's purported hedging purpose for entering into the Fidelity

International transaction was conceived of by the same entities who promoted the

transaction to the plaintiff as a tax-loss-generation plan.

Response:

46.     Admit that the plaintiff's purported hedging purposes for entering into the Fidelity

International transaction were conceived of after its entry into the transaction.

Response:

47.     Admit that KPMG, Alpha, Helios, DGI, and Sidley Austin promoted the transaction to

the plaintiff as a tax-loss-generation plan.

Response:

48.     Admit that a foreign partner was included in the Fidelity International transaction because

he was U.S. tax indifferent, and therefore bookkeeping gains could be allocated to him

without any U.S. tax consequences, while bookkeeping losses could be allocated to

Richard Egan.

Response:

14

49.     Admit that Fidelity International incurred an economic net loss on the termination of the foreign currency options of approximately $549,000 (without taking into account fees) for its 2001 tax year.

Response:

50.     Admit that on its Form 1065, Schedule K, Statement 1, Fidelity International reported an economic net loss on the termination of the foreign currency options of approximately $4,138,000 (taking fees into account) for its 2001 tax year.

Response:

51.     Admit that although Fidelity International incurred an economic net loss of approximately $4,138,000 (taking fees into account) for its 2001 tax year, the plaintiff allocated a bookkeeping gain of approximately $163 million to a tax-indifferent foreign partner and a bookkeeping loss of approximately $165 million to Richard Egan in the same taxable periods.

Response:

52.     Admit that Richard Egan claimed on his 2001 personal income tax return a loss from the

15

Fidelity International transaction that was materially greater than his economic loss from that transaction.

Response:

53.    Admit that Richard Egan followed DGI's recommendation that RSM McGladrey be retained to prepare Richard Egan's 2001 Form 1040 because plaintiff believed that RSM McGladrey, unlike KPMG, would not require a Disclosure Statement under Temporary Regulation Section 1.6011-4T disclosing the Fidelity International transaction.

Response:

54.    Admit that Richard Egan followed Helios's recommendation that RSM McGladrey be retained to prepare Richard Egan's 2001 Form 1040 because plaintiff believed that RSM McGladrey, unlike KPMG, would not require a Disclosure Statement under Temporary Regulation Section 1.6011-4T disclosing the Fidelity International transaction.

Response:

55.    Admit that Richard Egan followed James Haber's recommendation that RSM McGladrey be retained to prepare Richard Egan's 2001 Form 1040 because plaintiff wanted to avoid attaching a Disclosure Statement under Temporary Regulation Section 1.6011-4T to this

2802184.1

return disclosing the Fidelity International transaction.

<u>Response:</u>

56.    Admit that Richard Egan and/or Carruth fired KPMG because KPMG would not sign

Richard Egan's 2001 Form 1040 without a Disclosure Statement under Temporary

Regulation Section 1.6011-4T disclosing the Fidelity International transaction.

<u>Response:</u>

57.    Admit that Richard Egan and/or Carruth fired KPMG because the required inclusion of a

Disclosure Statement under Temporary Regulation Section 1.6011-4T disclosing the

Fidelity International transaction would have increased the likelihood of an IRS audit.

<u>Response:</u>

58.    Admit that Richard Egan engaged RSM McGladrey to prepare his Form 1040s for 2001

because RSM McGladrey, unlike KPMG, did not require a Disclosure Statement under

Temporary Regulation Section 1.6011-4T disclosing the Fidelity International transaction

<u>Response:</u>

2802184.1

59.     Admit that a reason that Patrick Shea instructed Tim Speiss of KPMG to remove any

record of Richard Egan from KPMG's files was to reduce the likelihood of detection of

the Fidelity International transaction by the IRS.  (See document produced by Burke

Warren and Bates numbered BWMS 03965).

Response:


60.     Admit that the gross premium "paid"/credited on the two options that Fidelity World

Currency Advisor A Fund purchased on October 9, 2001 was structured as it was to

create a $150,000,000 "Ordinary Loss From Investments" that was expected to generate

over $60 million  "Permanent Tax Benefits" that the Fidelity International transaction

was designed to generate.  (See document produced by Egan and Bates numbered

011532).

Response:


61.     Admit that the fees accrued and paid by Fidelity International Currency Advisor A Fund

to KPMG and to Helios Financial were determined as a fixed percentage of the total

stated premiums for the long interest rate options.

Response:

18

62.    Admit that the total stated premiums for the long interest rate options was based on
       Richard Egan's desired tax loss for the Fidelity International transaction. .

       <u>Response:</u>

63.    Admit that the plaintiff's fees accrued and paid to KPMG for the Fidelity International
       transaction amounted to 1% of the total stated premiums for the long interest rate options.

       <u>Response:</u>

64.    Admit that plaintiff's fees accrued and paid to KPMG for the Fidelity International
       transaction was no less than $1,370,000.

       <u>Response:</u>

65.    Admit that the plaintiff's fees accrued and paid to Helios for the Fidelity International
       transaction initially was set to equal 2.5% of the total stated premiums for the long
       interest rate options.

       <u>Response:</u>

66.    Admit that Helios reduced  plaintiff's fee the for the Fidelity International transaction by

                                        19

.25% to reflect  Richard and Maureen Egan's reduced tax benefit on the Fidelity High

Tech transaction.

<u>Response:</u>

67.    Admit that plaintiff's fees accrued and paid to Helios for the Fidelity International

transaction .totaled $3,375,000.

<u>Response:</u>

68.    Admit that the plaintiff's fees paid to KPMG and Helios for the Fidelity International

transaction were capitalized in the basis of Richard Egan's interest in Fidelity

International.

<u>Response:</u>

69.    Admit that the Sidley, Austin, Brown & Wood and Proskauer Rose legal opinions issued

to Richard Egan on the Fidelity International transaction did not provide for a more-

likely-than-not opinion as to the correctness of the capitalization of the fees paid by

plaintiff to KPMG and Helios on this transaction.

<u>Response:</u>

2802184.1

70.    Admit that the effect of the capitalization of plaintiff's fees paid to KPMG and Helios for

the Fidelity International transaction was to cause these fees to be reflected as undisclosed

components of the ordinary losses reported on Fidelity International's 2001 and 2002

Form 1065s.

<u>Response:</u>


71.    Admit that the effect of the capitalization of plaintiff's fees paid to KPMG and Helios for

the Fidelity International transaction was to reduce the likelihood of detection of the

Fidelity International transaction by the IRS.

<u>Response:</u>


72.    Admit that the plaintiff's fees paid to KPMG and Helios for the Fidelity International

transaction, and specially re-allocated to Richard Egan in 2001, were reported by Richard

Egan as an undisclosed component of the Fidelity International loss he deducted on his

2001 and 2002 Form 1040s.

<u>Response:</u>


73.    Admit that the effect of including the fees paid to KPMG and Helios for the Fidelity

International transaction as an undisclosed component of the Fidelity International loss

2802184.1

deducted by Richard Egan on his 2001 and 2002 Form 1040s was to reduce the likelihood

of detection of the Fidelity International transaction by the IRS.

<u>Response:</u>

74.    Admit that the plaintiff's fees paid to KPMG and Helios for the Fidelity International

transaction, and specially re-allocated to Richard Egan in 2001, were not identified,

described, explained, or separately disclosed or deducted on Richard Egan's 2001 or 2002

Form 1040s.

<u>Response:</u>

75.    Admit that the $158,630,992 ordinary loss allocated to Richard Egan on his Fidelity

International 2001 Schedule K-1 was not reported on the Schedule E of Richard Egan's

1001 Form 1040.

<u>Response:</u>

76.    Admit that the $158,630,992 ordinary loss allocated to Richard Egan on his Fidelity

International 2001 Schedule K-1 was not deducted on the Schedule E filed with Richard

Egan's 1001 Form 1040, but was instead deducted as one of several amounts described as

"Miscellaneous" income and loss that were netted out to the $6,053,457 amount of

2802184.1

income reported on Line 21 of the form 1040.

Response:

77.    Admit that the effect of the reporting of the various elements of the Fidelity International

transaction on Fidelity International's Form 1065 and Richard Egan's Form 1040s was to

reduce, minimize, or eliminate the actual or perceived risk of detection and audit by the

IRS.

Response:

78.    Admit that as a founder of the publicly traded data storage company EMC Corporation

("EMC"), Richard Egan exercised options to acquire 2,000,000 shares of EMC common

stock in January 2001.

Response:

79.    Admit that Richard Egan's exercise of options to acquire 2,000,000 shares of EMC

common stock in January 2001 resulted in a taxable gain to him of $150,687,400.

Response:

2802184.1

80.    Admit that the transaction that is the subject of this litigation ("The Fidelity International transaction") was specifically structured and intended to generate approximately $150 million of tax losses for Richard Egan, thus effectively offsetting his taxable income from his exercise of EMC options.

Response:

81.    Admit that the Fidelity International transaction was first presented to Carruth Management.

Response:

82.    Admit that before entering into the Fidelity International transaction, Richard Egan and/or Carruth was aware that the transaction's structure had been used by other taxpayers to generate a tax loss, as it was intended to do.

Response:

83.    Admit that the Fidelity International transaction, as designed, called for the execution of a series of options trades through two different entities, the first a single member LLC to be owned wholly by the taxpayer, and the second a multi-member LLC to be owned by the taxpayer, a foreign partner beyond the reach of U.S. taxation, and the transaction's

2802184.1

promoters.

Response:

84.    Admit that the structure and sequence of steps to be followed in implementing the

Fidelity International transaction, which generated a tax loss, were planned in advance of

the inception of the transaction.

Response:

85.    Admit that the structure and sequence of steps to be followed in implementing the

Fidelity International transaction, which generated a tax loss, were laid out in two

documents entitled "Outline of Proposed Transaction" dated September 20, 2007 and

September 27, 2001.  (See documents produced by Richard Egan and Bates numbered

011552-011554 and 011351-011353.)

Response:

86.    Admit that Fidelity World Currency Advisor A Fund and Fidelity International Currency

Advisor A Fund were established in 2000 and their formation was the first prearranged

step of the Fidelity International transaction.

Response:

2802184.1

87.    Admit that in another step of the Fidelity International transaction, Fidelity

World Currency Advisor A Fund purchased two interest rate options for a stated premium

of $150,000,000, and sold two nearly offsetting interest rate options for a stated premium

of $147,750,000.

Response:


88.    Admit that in another step of the Fidelity International transaction, Richard Egan

transferred his interest in Fidelity World Currency Advisor A Fund to Fidelity

International Currency Advisor A Fund LLC.

Response:


89.    Admit that as a result of Richard Egan's transfer of his interest in Fidelity World Currency

Advisor A Fund to Fidelity International Currency Advisor A Fund LLC, Richard Egan

claimed a tax basis in Fidelity International Currency Advisor A Fund that was

$147,750,000 more than his actual economic cost to acquire the interest he had

transferred.

Response:

26

90.    Admit that on the same date of Richard Egan's transfer of his interest in Fidelity World

Currency Advisor A Fund to Fidelity International Currency Advisor A Fund LLC,

Fidelity International Currency Advisor A Fund entered into another step of the

transaction– a quartet of USD/EUR options (a pair of puts and another pair of calls) and

another quartet of JPY/USD options (also a pair of puts and a pair of calls).

Response:

91.    Admit that approximately one week after entering into a quartet of USD/EUR options (a

pair of puts and another pair of calls) and another quartet of JPY/USD options (also a pair

of puts and a pair of calls) (collectively, "the currency options"), Fidelity International

terminated four of the eight currency options to produce a bookkeeping gain of

$173,985,828 and simultaneously replaced them with four virtually identical options.

Response:

92.    Admit that Fidelity International's termination of four of the eight currency options to

produce a bookkeeping gain of $173,985,828 and simultaneously replacement of them

with four virtually identical options left its risk exposure entirely unchanged.

Response:

2802184.1

93.     Admit that 93% of the bookkeeping gain of $173,985,828 from Fidelity International's

termination of four of the eight currency options was allocated to Samuel Mahoney, a

US-tax-indifferent foreign party.

Response:

94.     Admit that the allocation to Samuel Mahoney of 93% of the gains from Fidelity

International's termination of four of the eight currency options was a prearranged step of

the Fidelity International transaction.

Response:

95.     Admit that once 93% of the gains from Fidelity International's termination of four of the

eight currency options had been allocated to Samuel Mahoney, Mahoney's interests were

largely bought out by Richard Egan at a prearranged minimum price equal to one-half of

Mahoney's  purported capital contribution.

Response:

96.     Admit that Richard Egan's purchase of Samuel Mahoney's interest in Fidelity

International Currency Advisor A Fund at a prearranged price was a prearranged step of

the Fidelity International transaction.

2802184.1

Response:

97.    Admit that in another prearranged step of the Fidelity International transaction, with
Richard Egan now holding 93% of the common interests in Fidelity International
Currency Advisor A Fund, all of the option positions were terminated or closed out by
entering into the perfectly offsetting options prior to the end of the tax year and in
advance of their stated maturity.

Response:

98.    Admit that Refco Capital Markets was the counterparty to each of Fidelity International
Currency Advisor A Fund's options trades.

Response:

99.    Admit that all of Fidelity International Currency Advisor A Fund's options were European
style digital options.

Response:

100.   Admit that European style digital options have no agreed upon value or liquidation rights

until their specified expiration date and can only result in a single, fixed sum payment if the specified targets are met on that expiration date.

Response:

101.   Admit that the Fidelity International transaction consisted of pairs of options organized as pairs of offsetting positions making up each pair, with the terms of the options within each pair identical with the exception of trivial differences in their strike price and digital payout amounts, and the fact that one side was a purchase and the other a sale, thus offsetting each other.

Response:

102.   Admit that all of the options in the Fidelity International transaction were terminated or closed out early.

Response:

103.   Admit that Richard Egan capitalized Fidelity World Currency Advisor A Fund on October 9, 2001 with $2,250,000.

Response:

2802184.1

104.   Admit that the Fidelity International Currency Advisor A Fund Operating Agreement was

signed on October 22, 2001.

<u>Response:</u>

105.   Admit that Fidelity International Currency Advisor A Fund was capitalized as of October

22, 2001.

<u>Response:</u>

106.   Admit that Fidelity World Currency Advisor A Fund entered into the first two pairs of

option trades on October 9, 2001 ("the Basis Trades").

<u>Response:</u>

107.   Admit that one pair of the Basis Trades was based on the 3-month LIBOR and the other

pair was based on the 10-Year CMS.

<u>Response:</u>

108.   Admit that the 3-month LIBOR and the 10-year CMS are interest-rate products with daily

published prices.

2802184.1

<u>Response:</u>

109.    Admit that for the Basis Trades Fidelity World Currency Advisor A Fund paid a stated

premium of $75,000,000 for each option it purchased and received a stated premium of

$73,875,000 for each option it sold, resulting in an actual economic cost for these four

options of $2,250,000, which was attributed $1,125,000 to the LIBOR pair and

$1,125,000 to the CMS pair.

<u>Response:</u>

110.    Admit that on October 22, 2001, less than two weeks after the Basis Trades were entered

into, Richard Egan contributed to Fidelity International Currency Advisor A Fund his

entire 100% interest in Fidelity World Currency Advisor A Fund.

<u>Response:</u>

111.    Admit that after his contribution of his 100% interest in Fidelity World Currency Advisor

A Fund to Fidelity International Currency Advisor A Fund, in determining his partnership

basis in Fidelity International Currency Advisor A Fund Richard Egan counted only the

premium of $75,000,000 he had been debited for each of the two purchased options, and

failed to take into account the premium of $73,875,000 he had been credited for each of

2802184.1

the two matching options he had sold.

Response:

112.   Admit that Fidelity International Currency Advisor A Fund had four members and each

was assigned a partnership common and preferred interest share as reflected on Fidelity

International Currency Advisor A Fund's books and records.  (See documents produced

by Richard Egan and Bates stamped 010079-010121 and 010450; See also document

Bates stamped 1IRS1328-1339.)

Response:

113.   Admit that Alpha Consultants, LLC ("Alpha") and Helios Trading, LLC ("Helios") were

listed in Fidelity International Currency Advisor A Fund's books and records as investing

$7,000 apiece in Fidelity International Currency Advisor A Fund, and each was assigned

a 1% share of the common interests.

Response:

114.   Admit that Samuel Mahoney is listed in Fidelity International Currency Advisor A Fund's

books and records as having contributed $651,000 to Fidelity International Currency

Advisor A Fund, and received a 93% share of its common interests.

<u>Response:</u>

115.    Admit that Richard Egan was credited with contributing the four interest rate options,

which at the time were assigned a collective market value of $1,559,439, as well as

$2,674,500 of cash for a total initial contribution to Fidelity International Currency

Advisor A Fund of $4,233,939.42.

<u>Response:</u>

116.    Admit that Richard Egan's initial contribution to Fidelity International Currency Advisor

A Fund was allocated between common and preferred interests, with the Richard Egan

receiving 5% of Fidelity International Currency Advisor A Fund's common interests for

$35,000 and 100% of its preferred interests for $4,198,939.43

<u>Response:</u>

117.    Admit that the express provisions of Fidelity International Currency Advisor A Fund's

Operating Agreement state that the common shares alone would be used to allocate gains

and losses, and that the preferred interests would play no part in this calculation.

<u>Response:</u>

118.    Admit that on the same day that it received the four interest rate options, Fidelity

International Currency Advisor A Fund entered into eight additional option agreements

with Refco Capital Markets ("Refco"), each of which was based on a foreign currency

exchange rate (the "currency options").

Response:

119.    Admit that four of the currency options (consisting of two matched pairs) were based on

the rate at which the U.S. Dollar converts into one Euro, referred to as USD/EUR.

Response:

120.    Admit that four of the currency options (consisting of two matched pairs) were based on

the rate at which the Japanese Yen converts into one U.S. Dollar, referred to as JPY/USD.

Response:

121.    Admit that Fidelity International's net premium for the currency trades was positive,

meaning that the premium on the options it sold was larger than the premium on the

options it purchased.

Response:

2802184.1

122.    Admit that for the currency options, Refco reflected a premium credit to Fidelity

International Currency Advisor A Fund of $2,832,828 on the USD/EUR options and

$2,835,212 on the JPY/USD options.

Response:


123.    Admit that Refco required Fidelity International Currency Advisor A Fund ("Fidelity

International") to leave the funds credited to Fidelity International on deposit with Refco

and to post an additional $3 million of cash collateral in case Fidelity International  lost

money on the currency options.

Response:


124.    Admit that on October 22, 2001 Fidelity International Currency Advisor A Fund owned

twelve options consisting of six pairs: two pairs in interest rates, two pairs in the

USD/EUR and two pairs in the JPY/USD.

Response:


125.    Admit that the Fidelity International transaction was designed and implemented in a

manner to ensure that the recorded gains from the gain legs of the foreign currency

2802184.1

options were experienced first so that they could be allocated to the foreign partner,

Samuel Mahoney, before the taxpayer's purchase of most of the foreign partner's interests.

Response:

126.    Admit that Richard Egan and/or his advisors were monitoring the value of the individual

options on at least a daily basis.

Response:

127.    Admit that Richard Egan and/or his advisors' selection of pairs of foreign currency

options with $300 million to $1 billion dollar payoffs with the strike prices of the call and

put options separated by only 3 to 5 pips as the underlying assets made those options

especially amenable to generating large gains and losses for bookkeeping purposes, but

without any net economic consequences.

Response:

128.    Admit that the high volatility and large underlying notional size of the currencies

underlying the currency options meant that price movement was inevitable and that even

small movements would be sufficient to produce large changes in the liquidation value of

an individual option.

Response:

129.    Admit that Fidelity International Currency Advisor A Fund's position was not comprised

of individual options, but was instead comprised of carefully balanced pairs in which a

sold option was matched with a purchased option on almost identical terms, so that as the

market price moved closer to or beyond the strike price specified in one of the purchased

options, it would gain value, which would then be counterbalanced by a simultaneous

loss in value on the paired option with its closely matching terms.

Response:

130.    Admit that on November 6, 2001, Fidelity International Currency Advisor A Fund closed

out the four interest rate options that had initially given rise to Richard Egan's basis in it.

Response:

131.    Admit that the closing out on November 6, 2001 of Fidelity International Currency

Advisor A Fund's interest rate options was accomplished by contracting with Refco for a

2802184.1

new pair of LIBOR options and a new pair of CMS options on precisely the same terms
as the existing options, with the exception that a purchase became a sale and a sale
became a purchase.

Response:

132. Admit that all of Fidelity International Currency Advisor A Fund's foreign currency
option positions were terminated by agreement with Refco by or on December 3, 2001.

Response:

133. Admit that the termination of the remaining foreign currency options on December 3,
2001 was accomplished by Refco debiting the account of Fidelity International Currency
Advisor A Fund to reflect bookkeeping losses on these transactions, resulting in a
recorded loss on the Euro transactions of $118,290,922, and a recorded loss on the Yen
transactions of $57,861,427.76 .

Response:

134. Admit that as a result of the termination of all the foreign currency options remaining on
December 3, 2001, Fidelity International Currency Advisor A Fund reflected on its books
a combined loss on the currency trades of $178,124,493 less the net premium of

2802184.1

$5,668,040 it had been credited when it entered into the options.

<u>Response:</u>

135.    Admit that the net loss on the currency trades of $178,124,493 less the net premium of

$5,668,040 was the amount of the loss that had effectively been pre-determined when the

gain legs were earlier terminated and replaced.

<u>Response:</u>

136.    Admit that shortly after making his alleged $651,000 contribution to Fidelity International

Currency Advisor A Fund, Samuel Mahoney sold 88% of his common interests in

Fidelity International to Richard Egan for approximately half of what he had purportedly

"contributed."

<u>Response:</u>

137.    Admit that Richard Egan had never met Samuel Mahoney before October 9, 2001.

<u>Response:</u>

138.    Admit that Richard Egan had never met Samuel Mahoney before 2003.

2802184.1

Response:

139.    Admit that Richard Egan and/or his advisors had never communicated with Samuel

before October 9, 2001.

Response:

140.    Admit that Richard Egan and/or his advisors had never communicated with Samuel

Mahoney before 2003.

Response:

141.    Admit that on the Fidelity International Currency Advisor A Fund U.S. partnership tax

return for 2001, Samuel Mahoney was allocated an alleged profit of approximately

$163.8 million and Richard Egan was allocated an alleged loss of more than $158 million

on the same Fidelity International transaction.

Response:

142.    Admit that Samuel Mahoney did not fund his own capital investment in Fidelity

International Currency Advisor A Fund.

2802184.1

Response:

143.    Admit that Samuel Mahoney received a fee for his participation in the Fidelity

International transaction.

Response:

144.    Admit that the U.S. promoters of the Fidelity International transaction, in addition to

funding Samuel Mahoney's investment, also paid him a fee to allow his name and foreign

residency to be used on the transaction.

Response:

145.    Admit that the U.S. promoters paid Samuel Mahoney for his participation in the Fidelity

International transaction by way of various joint-venture accounts which were in the

name of Samuel Mahoney and his business partner, Martin Hawkes, also an Irish Citizen.

Response:

146.    Admit that Samuel Mahoney's and Martin Hawkes's joint-venture accounts were held at

the Singer & Friedlander merchant bank (n/k/a Kaupthing Singer & Friedlander) on the

Isle of Man.

Response:

147.    Admit that Fidelity International Currency Advisor A Fund should not be recognized as a

partnership for U.S. tax purposes because the partners did not act in good faith and with a

business purpose intending to join together in the conduct of the enterprise.

Response:

148.    Admit that Samuel Mahoney engaged in approximately 32 transactions that were similar

or identical to the Fidelity International transaction, and that Martin Hawkes engaged in

24 such transactions, each of which used pairs of offsetting options to artificially inflate

the taxpayers basis and generate large non-economic tax losses.

Response: