UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Nos. 05-40151-FDS (D. Mass.) 06-40130-FDS (D. Mass.) |
| v. | ) ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

## UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, CARRUTH MANAGEMENT, CARRUTH ASSOCIATES, AND AFFILIATES

The United States moves to compel production of documents from the plaintiff and from the so-called Carruth entities (Carruth Associates, Carruth Management, Carruth Capital, and Carruth Partners).[1]  The documents sought here have so far been withheld under claims of privilege.  Despite the claims, the withheld documents are not privileged in the first instance, or privilege has been waived.

---

[1]The United States moves to compel all of these entities in a single motion because the plaintiff has produced documents from itself and from each of the Carruth entities as if they were a single party, making separation for purposes of this motion impossible.  In fact, the Carruth entities and the plaintiff share counsel, and their counsel has consistently treated subpoenas served upon the Carruth entities as requests for production under Federal Rule of Civil Procedure 34.  Treatment of a subpoena under Rule 45 of the Federal Rules of Civil Procedure as a Rule 34 request for production is in direct contravention of the Federal Rules.  The treatment was also over the United States' objection.

Because the United States is moving to compel production from a party and from non-parties, the motion is made pursuant to both Rule 37(a) and Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure.  Of course, the plaintiff is alleging that it has possession, custody, and/or control over all documents at issue, so it alone could be compelled to produce them all.

# INTRODUCTION

The United States served requests for production on the plaintiff, and served subpoenas on the Carruth entities. The requests and subpoenas demanded documents relating to the SOS and FDIS tax-shelter products, and, specifically the FDIS tax-shelter product employed here by Richard Egan. The Carruth entities, according to the plaintiff, "manage Richard Egan's assets and investments." Also, based on the documents and testimony obtained during discovery so far in this case, the Carruth entities (hereinafter referred to as "Carruth") prepared Richard Egan's tax returns, helped prepare the plaintiff's tax returns, and were intimately involved in the purchase and implementation of the FDIS tax shelter the plaintiff employed. The plaintiff and the Carruth entities produced documents jointly. They also jointly withheld documents and produced a privilege log and redaction log.[2] Those logs briefly describe the subject matter of the withheld documents. The subject matter includes documents relating to the legal opinions the plaintiff and Richard Egan purport to have relied on in entering into the FDIS tax shelter. The subject matter also includes documents relating to the legal opinions that Richard Egan purports to have relied upon in failing to disclose the FDIS tax shelter on his 2001 and 2002 federal joint income tax returns. Plaintiff and Carruth assert that these documents relate to legal advice rendered to them, and are therefore protected from disclosure by the attorney-client privilege. Additionally, the subject matter of the withheld documents includes matters relating to work performed by KPMG and Sidley Austin. The plaintiff and Carruth allege that the KPMG and

---

[2]The privilege log and redaction log are attached to the accompanying Declaration of Barry E. Reiferson and marked as Appendices A and B, respectively. The privilege log shows that 1,457 documents were withheld on grounds of attorney-client and/or attorney-work-product privilege. The redaction logs list additional documents produced with selected text redacted, also on grounds of attorney-client and/or attorney-work-product privilege.

2805462.7

Sidley matters related to potential litigation against those firms for their work on the Fidelity

International Currency Advisor A Fund matter and thus also constitute attorney work product.

As explained below, these documents are not privileged in the first instance because they

do not contain true legal advice, but rather business advice– the business being the promotion

and implementation of tax shelters.  Additionally, any privilege has been waived, as the plaintiff

attempts to use the "advice" of counsel as both a sword and a shield.  That is, the plaintiff

purports to have relied on the advice of counsel and other "advisors," but withholds documents

relating to that so-called advice.  At the same time, the plaintiff handpicks what "advice" it is

willing to disclose.  Finally, the purportedly privileged documents have been shared with

numerous third parties, thereby destroying any privilege that may have attached.

## I.    The Plaintiff Cannot Use Attorney-Client Privilege and Work-Product Privilege as Both a Sword and Shield.

The plaintiff and Richard Egan have put at issue the purportedly "independent" opinions

of their so-called advisors.  While putting the opinions at issue, the plaintiff withholds, under

privilege claims, documents relating to those opinions.  Such an attempted dual use of privilege

claims is inappropriate.  When a party puts at issue its legal advice (as it is called here), it

impliedly waives privilege as to that advice.  As the First Circuit held, "such waivers are almost

invariably premised on fairness concerns," and encompass the subject matter of the allegedly

privileged communications.[3]  As the First Circuit also explained,

> Implying a subject matter waiver in such a case ensures fairness because it disables
> litigants from using the attorney-client privilege as both a sword and a shield. Were
> the law otherwise, the client could selectively disclose fragments helpful to its cause,

---

[3]*XYZ Corp. v. United States (In Re Keeper of the Records)*, 348 F.3d 16, 24 (1st Cir. 2003).

2805462.7

entomb other (unhelpful) fragments, and in that way kidnap the truth-seeking process.[4]

The First Circuit identified the "'common denominator in [this so-called] waiver by implication: in each case, the party asserting the privilege placed protected information in issue for personal benefit through some affirmative act, and the court found that to allow the privilege to protect against disclosure of that information' would have been unfair to the opposing party."[5]

That affirmative act– putting the purported legal advice at issue– has occurred here, and it operates as a subject-matter waiver of privilege as to all documents relating to the advice. The plaintiff put the advice at issue at the outset of this case– in the Complaint. In the Complaint, the plaintiff and Egan claim to have relied on various opinions in entering into and failing to disclose the FDIS tax shelter at issue here. For example, the plaintiff claims that

> Plaintiff and Mike Egan [(Richard Egan's son and Carruth principal)] would not participate in a transaction unless it was likely to be upheld if challenged by the IRS. Accordingly, Plaintiff and Mike Egan required that a reputable law firm be able to provide an independent opinion that the strategy did not constitute a "listed transaction" and that the expected tax consequences of the strategy would more likely than not be upheld if challenged by the IRS.  *Plaintiff obtained such opinions*.

(Compl. at ¶27.)[6]  (Emphasis added.)  They also claim that the accounting firm they also purportedly relied on "reviewed the legal opinions and advised Plaintiff that the opinions fairly analyzed the law as applied to the facts and that it would be *reasonable for Plaintiff to rely on the opinions*."[7]  (*Id.* at ¶ 28)(emphasis added).  Moreover, plaintiff again put at issue its advisors' legal opinions in its responses to the United States' First Set of Interrogatories.  In its response to

---

[4]*Id.* at 24.

[5]*Id.* at 23 (*quoting* Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 503.41[1] (Joseph M. McLaughlin ed. 1997).

[6]Case No. 05-40151 (D. Mass.).

[7]Case No. 05-40151 (D. Mass.).

4

2805462.7

Interrogatory No. 22, inquiring as to why it is not liable for accuracy-related penalties pursuant to 26 U.S.C. § 6662, plaintiff responded in pertinent part as follows:

> Plaintiff and Fidelity International had reasonable cause for, and acted in good faith with respect to, the tax treatment of items for which adjustments are proposed in the FPAA. *** Plaintiff and Fidelity International reasonably relied in good faith on KPMG and Sidley Austin, who advised that the tax treatment reported by Fidelity International more likely than not would be upheld if challenged by the IRS. Plaintiff and Fidelity International were advised that the transactions in which Plaintiff and Fidelity International engaged were real transactions with real economic effects, and Plaintiff and his advisors believed them to be so. Plaintiff and his advisors took tax into account, as well as Plaintiff's investment objectives, in evaluating whether to engage in the transaction proposed by KPMG, Helios, and Alpha.[8]

The law firm Sidley Austin provided at least one of the opinions upon which the plaintiff and Richard Egan purport to have relied.[9] That opinion related to the propriety of the tax shelter itself. Another opinion upon which the plaintiff and Richard Egan claim to have relied related to the treatment of the tax-shelter transaction on Richard Egan's 2001 Form 1040 federal income tax return, and was prepared by the law firm Proskauer Rose. That 2001 tax return did not contain a Disclosure Statement under Temporary Regulation § 1.6011-4T, which would have disclosed this offsetting-option tax shelter to the IRS. Such a disclosure would have alerted the IRS that Richard Egan had generated a tax loss through the use of a transaction like the one described in IRS Notice 2000-44. Documents produced in discovery show that KPMG required the use of the disclosure statement, (leading to Carruth's firing of KPMG and engagement of

---

[8]Plaintiff's responses to the United States' First Set of Interrogatories, pp. 43-44, Resp. to Interrogatory no. 22. The Plaintiff's responses are attached to the Reiferson Declaration as Exhibit 1.

[9]As discussed below, though the opinion letter was addressed to Richard Egan and was purportedly independent, it was really provided to The Diversified Group and hardly independent. It was worked out in concert by The Diversified Group, managed by James Haber; Carruth; Stephanie Denby, counsel to Richard Egan and/or Carruth; KPMG; and others.

RSM McGladrey to prepare and sign the tax return).[10]  In the Complaint, the plaintiff alleges that "the Partnership and Plaintiff [(which the plaintiff defines as Richard Egan)] *reasonably relied in good faith* on the Accounting Firm and the opinions of qualified tax professionals who advised that the tax treatment reported by the Partnership more likely than not would be upheld if challenged by the IRS."  (Compl. at 49.)[11]  It is unclear from the face of the Complaint which "Accounting Firm" the plaintiff claims reviewed the purportedly independent legal opinion, but here again the plaintiff has put at issue the opinion and all communications relating to it.  That includes communications discussing the reasons for firing KPMG.[12]

The plaintiff made these claims, no doubt, for its own benefit.  It did so to lay the foundation for a good-faith-reliance defense against applicable penalties.  The attempted use of the opinions to generate a good-faith-reliance defense is shown in a document produced by the plaintiff.  That "Discussion Outline" says that it "would be highly likely that an IRS audit would result where a disclosure statement is properly filed."[13]  The "Discussion Outline" goes on to say

---

[10]*See*, *e.g.*, document Bates numbered by the plaintiff as 058505, renumbered as 7CARRUTH058505 (handwritten note stating, "Haber - Could get a firm to sign [r]eturn - [RSM] McGladrey - will sign return w/out disclosure") and document Bates stamped by Burke Warren as BWMS 03721, renumbered 1BWMS03721 (memorandum from Pat Shea of Carruth stating "We retained the national Accounting firm of McGladrey Pullen LLC to review and sign the return without disclosure[,]" and "KPMG will not sign the return with out [sic] the disclosure forcing us to find another firm (McGladrey)-- personally I think that not having KPMG sign the return is in our favor as KPMG is under tight IRS scrutiny").  Reiferson Decl., Exs. 2, 3.

[11]Case No. 05-40151 (D. Mass.).

[12]It appears that the plaintiff and Richard Egan are relying in part on KPMG's purported review of the Sidley Austin opinion, while ignoring– and in fact refusing to follow– KPMG's position on the disclosure issues discussed in the later Proskauer Rose opinion, which later opinion plaintiff is relying upon.

[13]Document Bates numbered by the plaintiff as 036545, renumbered as 3EGAN036545 (the document is undated, but contains information relating to June 14, 2002 regulations, and therefore must have been created on or after that date). Reiferson Decl., Ex. 4.

that "Reasonable cause for non-disclosure should be demonstrated," and "One way to establish reasonable cause would be evidenced [sic] by obtaining and in good faith relying upon, a tax opinion from a qualified tax advisor (Sec 6664)."[14]  In other words, the "independent" opinions the plaintiff and Richard Egan claim now to have relied on in good faith were part of a plan to avoid disclosure and assert a good-faith defense to the application of penalties pursuant to 26 U.S.C. § 6664 if the IRS discovered the tax shelter and disallowed the claimed losses.

Beyond penalties, the opinions are also potentially relevant insofar as the plaintiff attempts to use them as evidence that the statements contained in them are true and/or correct. They are also potentially relevant when examining what the plaintiff knew about the transaction and its impropriety under the law.

While holding the opinion letters out as the subjects of their reliance, the plaintiff and Richard Egan withhold documents relating to those opinions.  The withheld documents include the following:

1.    An email from Stephanie Denby (of Burke Warren) to Pat Shea and James Reiss (of Carruth) relating to "Legal opinion for Richard Egan's tax return." (Withheld under attorney-client-privilege claim) (log-entry number 70);

2.    Two email strings from James Reiss and Stephanie Denby to Stephanie Denby, Pat Shea, and James Reiss relating to "Legal opinion for Richard Egan's tax return." (Withheld under attorney-client-privilege claim) (log-entry numbers 71 and 74);

3.     An email from Stephanie Denby (of Burke Warren) to Michael Egan, Pat Shea, and Carolyn Fiddy (of Carruth) relating to "Legal opinion to be provided in connection

---

[14]*Id.*

7

with assets to be held by FICA A Fund." (Withheld under attorney-client-privilege claim) (log-entry number 250);

4.　　　An email from Melody Dunn and Stephanie Denby (both of Burke Warren) to Pat Shea, Carolyn Fiddy, and Stephanie Denby (sic), relating to "Legal opinion to be provided in connection with assets to be held by FICA A Fund." (Withheld under attorney-client-privilege claim) (log-entry number 257);

5.　　　A letter from Stephanie Denby to Michael Egan, John Egan, and Pat Shea relating to "Disclosure regulations and tax legislation." (Withheld under attorney-client-privilege claim) (log-entry number 270);

6.　　　An email from Terrence Stein to Stephanie Denby (both of Burke Warren) relating to "Disclosure regulations". (Withheld under attorney-client-privilege claim) (log-entry number 271);

7.　　　An email from Terrence Stein to Stephanie Denby relating to "Legal opinion for investment". (Withheld under attorney-client-privilege claim) (log-entry number 288);

8.　　　Five email strings from Pat Shea and Stephanie Denby to Stephanie Denby, Pat Shea, and James Reiss relating to "Legal opinion for Richard Egan's tax return." (Withheld under attorney-client-privilege claim) (log-entry numbers 72, 73, 297, 298, and 360);

9.　　　Two email strings from James Reiss and Stephanie Denby to Stephanie Denby, Pat Shea, and James Reiss relating to "Legal opinion for Richard Egan's tax return." (Withheld under attorney-client-privilege claim) (log-entry numbers 299 and 361);

8

10.     A letter from Stephanie Denby to Michael Egan, John Egan, and Pat Shea relating to "Disclosure regulations and tax legislation." (Withheld under attorney-client-privilege claim) (log-entry number 303);

11.     Three emails from Stephanie Denby to Pat Shea and David Bohan (of Sachnoff & Weaver Ltd.) relating to "Activities of Sidley Austin; attachment produced." (Withheld under attorney-client-privilege and work-product claims) (log-entry numbers 333, 450, and 655);

12.     A handwritten note by Pat Shea relating to "Services to be provided by counsel." (Withheld under attorney-client-privilege claim) (log-entry number 363);

13.     An email from Stephanie Denby to Pat Shea relating to "Legal opinions for Fidelity High Tech and FICA A Fund." (Withheld under attorney-client-privilege claim) (log-entry number 431);

14.     An email from Steven Drew to Pat Shea and Donna Kaufman (all of Carruth) relating to "Legal opinions for FICA A Fund." (Withheld under attorney-client-privilege claim) (log-entry number 461); and

15.     An email string from Pat Shea and Steven Drew to Pat Shea, Steven Drew, and Donna Kaufman relating to "Legal opinions for FICA A Fund." (Withheld under attorney-client-privilege claim) (log-entry number 463).


Because the plaintiff put the opinions at issue, going so far as to claim good-faith reliance on them, the United States is entitled to review the withheld documents relating to the opinions. Otherwise, as the First Circuit said, the plaintiff could selectively disclose documents while withholding others harmful to its case, "and in that way kidnap the truth-seeking process."

2805462.7

Indeed, by selecting the documents to be disclosed, the plaintiff is doing exactly what the waiver rule exists to prevent.

The documents obtained in discovery demonstrate that the plaintiff did not actually rely on the opinions for the "advice" contained in them, but instead intended to use the opinions as a defense if it lost the so-called audit lottery ("taking undisclosed questionable reporting positions and gambling that they [will] not be audited"[15]).  For example, in a handwritten note produced by the plaintiff, it says "We will pay fees [to Helios,  the tax-shelter promoter who sold the shelter to plaintiff] once we have the desired results[, the generation of a tax loss,] and when we get the Legal Opinion."[16]  That note apparently relates to the Sidley Austin opinion, while another handwritten note relates to the Proskauer Rose opinion.  In that second note, a Carruth representative writes, "We need signed opinion letter before doing return."[17]

The discovered documents also demonstrate that the opinion letters were not written independently by the law firms that signed them.  Quite the opposite, Stephanie Denby of Burke Warren, counsel to Carruth and/or Richard Egan, made alterations to the draft opinions and corresponded with the letter writers to discuss the opinions.  As such, Burke Warren's "advice" is inextricably linked to and is part of the subject matter of the opinion letters.  Burke Warren's invoices, though heavily redacted, indicate Attorney Denby's immersion in the opinion-writing process.  The April 2002 invoice, showing March 2002 charges, bills for "REVISING OPINION LETTERS," "REVIEW[ING] OPINION LETTERS," "RESEARCH RE: CASES CITED IN

---

[15]*Karpa v. Commissioner*, 909 F.2d 784, 786 (4th Cir. 1990).

[16]Document Bates numbered by plaintiff as 011979, renumbered as 2EGAN011979. Reiferson Decl., Ex. 5.

[17]Document Bates numbered by Carruth as 045924, renumbered as 1CARRUTH045924. Reiferson Decl., Ex. 6.

2805462.7

OPINION LETTER," "WORK ON OPINION LETTERS," "RESEARCH RE CASES AND

STATUTES CITED IN TAX OPINION[-] RAN WESTCHECK AND COMPARED RESULTS

TO CITES; CORRECTED ERRORS," "REVISING OPINION LETTERS," "CONFERENCE

WITH KPMG REGARDING OPINION LETTERS," "FURTHER EDITS ON LETTERS,"

"EDITING OPINION LETTER," "REVISE OPINION LETTERS[-] CONFERENCE WITH

TIM SPEISS [OF KPMG] REGARDING SAME," "CONFERENCE ALL [sic] ON OPINION

LETTERS," and "REVIEWING OPINION LETTER."[18]   The following invoice has more of the

same, including "REVIEW SIDLEY OPINION LETTER," "REVIEWING SIDLEY OPINION

AND PROSKAUER UPDATES," REVISING PROSKAUER OPINION AND CERTIFICATE

OF FACTS," "REVIEW OF HELIOS RETURNS," "REVISING CLOSING STATEMENT OF

FACTS," and "FINALIZING TAX OPINIONS[-] CONFERENCE WITH PATRICK SHEA [of

Carruth] REGARDING SAME."[19]   The September and October 2002 invoices, those around the

time Proskauer Rose's opinion letter was furnished, show similar activity.  They include billing

for "RESEARCH REGARDING TAX OPINION," and "ISSUES REGARDING TAX

PREPARATION AND OPINION."   Again, these invoices are heavily redacted, making it

difficult to glean additional insight from them.  But, even as they are, they show Burke Warren's

coordination with Helios (the tax-shelter promoter and a purported partner of Fidelity

International), Carruth, KPMG, and the purportedly independent legal-opinion providers.  That

showing is further evidenced by an email from Pat Shea of Carruth to Mox Tan of Helios on

April 3, 2002.  In that email, Mr. Shea writes that he plans

---

[18]Document Bates numbered by Burke Warren as BWMS 05865-67, renumbered as
3BWMS05865-67.  Reiferson Decl., Ex. 7.

[19]Document Bates numbered by Burke Warren as BWMS 05868-69, renumbered as
3BWMS05868-69.  Reiferson Decl., Ex. 8.

2805462.7

on wiring [(presumably funds)] this week provided Stephanie [Denby] gets all the issues resolved with the opinion letters-- it appears your law firm[, not Carruth's law firm,] made several changes after Stephanies [sic] review - changes were made that were not brought to our attention -- it seems as though Brown and Wood [(n/k/a Sidley Austin)] tried to slide things past us -- it is a good thing Stephanie is so astute because there was a significant change without our knowledge---

My consistent position is the fees will be wired upon satisfactory completion of the legal opinion letters-- *Stephanie is working diligently and not sitting on them to get them completed*-- however each draft we get there are more changes-- and no "redline" drafts[. . .] -- (wait until I charge you for Stephanies [sic] third or fourth review of the same docs)--"[20]

Helios's Mox Tan then replied that, in his opinion, "the law firms were [not] being cute, just sloppy."[21]

The withheld documents, and portions of redacted documents, relating to the opinion letters must be produced.  Production of these documents is vital– and required now that the plaintiff has put them at issue– so that the plaintiff's and Richard Egan's defense to penalties based upon reliance on allegedly independent legal opinions can be challenged.  By withholding these documents, the plaintiff is, in fact, "kidnap[ing]" the truth-seeking process.  The First Circuit held that such a sword-and-shield use of privilege is not allowed.  In fact, the First Circuit referred to such use as a "paradigmatic example" of waiver.[22]  That "paradigmatic example" fits squarely into the facts in this case, as it refers to the assertion of reliance on an attorney's advice as an element of a claim or defense, putting "the nature of [the] lawyer's advice squarely at

---

[20]Document Bates numbered by Burke Warren as BWMS 00050, renumbered as 1BWMS00050 (emphasis added).  Reiferson Decl., Ex. 9.

[21] *Id.*

[22]*XYZ Corp. v. United States (In re Keeper of the Records)*, 348 F.3d at 24.

issue," thereby waiving privilege as to "communications embodying the subject matter of the advice. . . ."[23]

## II.    Given Counsels' Role in the Creation of the Tax Shelter Opined Upon, the Related Documents are Not Privileged in the First Instance Because They Reflect Business Advice, Not Legal Advice.

Because they contain business and not legal advice, the withheld communications merely involving counsel (*i.e.*, all of the communications withheld under claims of privilege and relating to Fidelity International Currency Advisor A Fund, for which the only purpose was to generate a tax loss) should be produced.

To understand the business nature of the advice, it is necessary to first understand the business relationship of the promoters, and then to examine their dealings with the plaintiff, Richard Egan, and their counsel.

### A.    Business Relationship of The Diversified Group Inc., Alpha, and Helios

The Diversified Group Inc. ("DGI") is located in New York, NY, [24] and holds itself out as a "boutique investment banking firm."[25]   James Haber is the President and Director of DGI.[26]

---

[23]*Id.*

[24]   Haber Dep. Tr. 5/12/03, at 9:15 - 9:17, Govt. Ex. 63 (attached to Decl. of John Lindquist and filed with the Court in *United States v. The Diversified Group*, Civ. No. 4:07-mc-400004-FDS, transferred from the Southern District of New York).  Haber testified on 6/29/01 that DGI's office in New York was its only office.  *See* Haber Dep. Tr. 6/29/01 at 29:23 - 30:2, Govt. Ex. 37 (attached to Decl. of John Lindquist and filed with the Court in *United States v. The Diversified Group*, Civ. No. 4:07-mc-400004-FDS).

**Unless otherwise indicated as attached to the Reiferson Declaration, all exhibits cited in Argument II are already on file with the Court and were attached to the Declaration of John Lindquist filed in *United States v. The Diversified Group*, Civ. No. 4:07-mc-400004-FDS.**

[25]   *See* FDIS PowerPoints, Govt. Exs. 18, 20.

[26]   Haber Dep. Tr. 5/12/03, at 9:18 - 9:21, Govt. Ex. 63; Haber Dep. Tr. 8/12/03, at 17:10 - 17:15, Govt. Ex. 58.  DGI was formed at the direction of James Haber by the law firm Brown

(continued...)

2805462.7

John Huber was DGI's Chief Financial Officer.[27]  Orrin Tilevitz was DGI's Vice-President and

General Counsel.[28]  "Diversified Group, Inc. is a business engaged in conceiving and marketing

products and methods for the minimization of corporate and personal income taxes in New York

and the United States."[29]  Since about 1998, Helios and Alpha Consultants, LLC ("Alpha") have

assisted DGI in the development and marketing of tax shelters.  Alpha is a Florida limited

liability company which purports to be engaged in trading and trade consulting for structured

options and foreign currencies, lead by Ivan Ross.[30]  Helios is a partnership formed by Mox Tan

and Phil Kampf, Jr., under a marketing agreement with DGI to market DGI strategies.[31]  Both

---

[26](...continued)
Raysman.  Haber Dep. Tr. 8/12/03, at 17:16 - 17:17, Govt. Ex. 64.  Haber appears to have
transferred his stock ownership of DGI to a trust for the benefit of his children.  Haber Dep. Tr.
8/12/03, at 19:19 - 20:2, Govt. Ex. 5.

[27]  *See* FDIS PowerPoints, Govt. Exs. 18, 20.  John Huber was employed by DGI for two
years.  Haber Dep. Tr. 5/12/03, at 10:19 - 11:1, Govt. Ex. 63.

[28]  *See* FDIS PowerPoint, Govt. Exs. 18, 20 (describing Orrin Tilevitz as DGI's Vice-
President and General Counsel).  However, Tilevitz only worked for DGI from 1999 until the
end of 2001.  *See* Haber Dep. Tr. 8/12/03, at 61:21 - 62:7, Exhibit 64.

[29]  Govt. Ex. 5, Haber Dep. Tr. 9/7/00, at 7:25 - 8:6 (Haber admitted that this was a fair
statement of DGI's business).  *See also*, Govt. Ex. 65, Haber Dep. Tr. 8/12/03, at 21:9 - 21:20
(Haber testified that prior to 8/12/03, "[DGI] was effectuating structured tax transactions.")

[30]  *See* FDIS PowerPoints, Govt. Exs. 18, 20, and 21.

[31]  DGI has produced a copy of a marketing agreement with Helios which reflects that
Helios was formed in 1998 by Mox Tan and Phil Kampf, Jr., to market DGI tax strategies. *See*
Govt. Ex. 1; *see also*, Haber Dep. Tr. 6/29/01 at 72:19 - 72:25, Ex. 37.  The marketing agreement
reflects that by letter dated November 1, 1998, Helios Group, LLC, confirmed and set forth the
terms and conditions by which it would be engaged by DGI as an independent contractor to
market DGI products.  *See* DGI/Helios Agreement, Govt. Ex. 1.  In furtherance of that business
relationship, on or about November 16, 1998, Mox Tan and Phil Kampf formed Helios Financial
LLC ("Helios") as the entity to be used to market DGI products.  DGI/Helios Agreement, Govt.
Ex. 1.  According to Haber, this written agreement is the only version of DGI's marketing
agreement with Helios.  Haber Dep. Tr. 6/29/01 at 74:10 - 74:14, Ex. 37.  Haber has testified that
he was also a director of Helios. *See* Haber Dep. Tr. 8/12/03, Ex. 64, at 31:3 - 31:8. In fact,
Helios marketing materials reflect that he was the managing director of Helios.  Govt. Ex. 6, at
p.5.

2805462.7

Helios and Alpha have a profit sharing arrangement with DGI.[32]  Under the DGI/Helios

marketing agreement, Helios was to market and implement DGI products and was to be paid a

percentage portion of DGI's net fee.[33]  Helios had offices in Chicago, but Tan and Kampf would

come to DGI's New York office from time to time for a few days to prepare closing binders for

DGI's tax shelter products.[34]  Haber has testified that neither Tan nor Kampf were DGI

employees.[35]

    **B.**    **Business Relationship of the Tax-Shelter Promoters With the Plaintiff,
Richard Egan, and Counsel**

The relationship between these tax-shelter promoters and their "clients" are symbiotic,

and business in nature.  The promoters targeted high-net-worth customers, and the individuals

looked for promoters to save them a hefty tax bill.  As described by DGI in its FDIS marketing

materials, by their very nature, the design, development, marketing, and implementation of tax

shelters interweave both legal and business advice.[36]  Here, the advice was largely business

_____

[32]  Haber has testified that Ivan Ross, of Alpha, was integral to DGI's development and
marketing of tax shelters and also had a profit sharing agreement with DGI. Haber Dep. Tr.
9/7/00, at 57:5 -23, 58:9 -15, Govt. Ex. 5; *see also,* Govt. Ex. 1 (marketing agreement between
DGI and Helios) and Govt. Exs. 50 and 51 (providing a reconciliation of aggregate fees and
expenses for purposes of computing the profit split between DGI, Alpha and Helios).

[33]  Govt. Ex. 1, ¶¶ I a., and II; Haber Dep. Tr. 8/12/03, at 32:7 - 32:21; 32:22 - 33:6,
177:16 - 178:22 Govt. Ex. 64.

[34]  Haber Dep. Tr. 8/12/03 at 60:20 - 61:5, Govt. Ex. 64.  It appears that under the
marketing agreement between DGI and Helios, DGI was allowed to use Helios's logo and Helios
was allowed to use DGI's logo.  *See* DGI/Helios Agreement, Ex. 1.  Helios was apparently also
allowed to use DGI letterhead.  Haber Dep. Tr. 8/12/03 at 60:16 - 60:19, Ex. 64.

[35]  Haber Dep. Tr. 8/12/03 at 61:6 - 61:8, Ex. 64.

[36]  DGI describes its process of interweaving legal and business concerns as follows:

    We apply our expertise in structuring transactions that typically
    involve all of the following seven disciplines:

(continued...)

2805462.7

related.  It was also goal oriented, as described in the aforementioned handwritten note produced

by the plaintiff in which the plaintiff and/or Carruth stated it would "pay fees once we have the

desired results[, the generation of a tax loss,] and when we get the Legal Opinion."[37]  Here, there

was some modification to the standard cookie-cutter opinions doled out by the promoters.  Those

modifications were requested, or demanded, by the plaintiff and Richard Egan.  At the end of the

process, the plaintiff, Richard Egan, and Burke Warren had given their input into the allegedly

"independent" legal opinions.  Moreover, the plaintiff and Richard Egan paid a fee to the

promoters for, *inter alia*, the receipt of the purported independent opinion letters that were

tailored to their exact specifications. What is more, such fees to the promoters were calculated as

a percentage of Richard Egan's desired tax loss.  Such activity is quintessentially business

activity.  It  is clearly not the type of activity that the attorney-client and work-product privileges

are designed to protect.

The plaintiff's, Richard Egan's, and Burke Warren's coordination of the opinion-writing

effort with the promoters and "independent" law firms is evidenced in many of the documents

---

[36](...continued)

| tax law | book accounting |
|---------|-----------------|
| legal analysis | equity investment |
| debt placement | economic analysis |
| administration | |

* * * *

There is as much art as science involved in reaching a solution.

* * * *

Because our transactions are "document intensive", we view one of
our most valuable contributions to our clients is to firmly manage and
control the process of getting 2-4 sets of attorneys and accountants to
expeditiously reach a conclusion.

*See* FDIS PowerPoints, Govt. Exs. 18 and 20.

[37]Document Bates numbered by plaintiff as 011979, renumbered as 2EGAN011979.
Reiferson Decl., Ex. 10.

2805462.7

obtained in discovery so far, including those cited above.  Additionally, there are many other documents showing a long-standing pattern of coordination.  On October 19, 2001, Pat Shea of Carruth sent an email to Carruth's Chief Financial Officer, James Reiss, saying that he had met with James Haber in New York and they "discussed and decided that [Carruth] should file tax returns for the Fidelity Funds that were set up in 2000- - although the filings will be late we want to file to establish history for the funds- and start the statute running----."[38]  On December 4, 2001, James Haber sent to Carruth, Denby, and Tim Speiss of KPMG an email attaching a "summary of all of the trades that Fidelity International Currency Advisor A Fund, LLC effectuated *and the resulting tax consequences to Richard Egan of such trades*."[39]  On December 6, 2001, Haber sent an email to Pat Shea of Carruth in which he proposed "that Helios be paid a fee of 1% [of the desired tax loss] which includes you receiving a tax opinion from Proskauer Rose" on one $160 million transaction, and reiterates the agreement that Helios be paid a fee "of 2.5%"of the desired $150 million tax loss on a second transaction.[40]  On March 14, 2002, Attorney Denby sent a letter to James Haber of DGI (and to DGI in New York) enclosing her "comments on both of the opinion letters."[41]  Denby goes on to say that she had "not yet received any comments from Tim Speiss [of KPMG] on the Helios I opinion."[42]  Just two weeks earlier,

---

[38]Document Bates numbered by the plaintiff as 018878, renumbered as 2EGAN018878. Reiferson Decl., Ex. 11.

[39]Document Bates numbered by the plaintiff as 020852, renumbered as 2EGAN020852. (Emphasis added).  Reiferson Decl., Ex. 12.

[40]Document Bates numbered by the plaintiff as 011975, renumbered as 2EGAN011975. Reiferson Decl., Ex. 13.

[41]Document Bates numbered by Burke Warren as BWMS 00042, renumbered as 1BWMS00042 (emphasis added).  Reiferson Decl., Ex. 14.

[42]The two opinion letters referred to here are presumably the transaction-related opinion letters for the Fidelity International and Fidelity High Tech transactions.  Helios I is a shorthand

(continued...)

2805462.7

Denby and Carruth exchanged emails in "[p]reparation for meetings with KPMG and Haber."[43]

That email string is withheld by the plaintiff and Richard Egan as privileged.[44]  It should be

produced, and is specifically sought here.  Less than three weeks after the Haber-meeting

preparation, and just four days after Denby's comments on the opinions that were forwarded to

Haber at DGI, Haber sent, from Helios and to Carruth, a "complete[d]" tax opinion.[45]  Less than

a week later, Pat Shea notified Stephanie Denby that he had "received the final opinion letter"

and that he had "the rep letter that" he "will have Dick [i.e., Richard Egan] sign on Friday."[46]

Unbelievably, the "rep letter" Egan had yet to sign appears to be the letter containing the

representations he would then make to support the tax opinion that had already been completed.

The next day, on March 19, Pat Shea emailed Haber to say he was meeting with Richard Egan a

few days later so Egan could sign the rep letter.  Thereafter, Shea would send payment after he

reviewed the purportedly independent opinion letter and got "blessings from Stephanie

[Denby]."[47]  The coordination is made crystal clear in an undated email from Stephanie Denby to

Tim Speiss, copied to Pat Shea and James Haber.  In that email, Denby says that she had

"completed . . . review of the Helios 2 opinion letter. . . [,]" and once she "incorporate[d]"

---

[42](...continued)
reference given to the Fidelity High Tech transaction, though it is sometimes mistakenly
interchanged with Helios II, the shorthand reference given to the Fidelity International
transaction.

[43]As discussed further below, the disclosure of so-called legal advice to Mr. Haber and
DGI is a waiver of privilege.

[44]Privilege log entry 242.

[45]Document Bates numbered by Burke Warren as BWMS 00035, renumbered as
1BWMS00035.  Reiferson Decl., Ex. 15.

[46]Document Bates numbered by Burke Warren as BWMS 00056, renumbered as
1BWMS00056.  Reiferson Decl., Ex. 16.

[47]Document Bates numbered by plaintiff as 036028, renumbered as 3EGAN036028.
Reiferson Decl., Ex. 17.

Speiss's comments, she would "forward to Jimmy H.[,] [that is, James Haber], to coordinate with Sidley."[48]

The withheld documents and portions of documents are withheld on grounds of attorney-client and/or work-product privilege.  Each was run through or contains information purportedly relayed to or from counsel.  But, that does not create privilege, and none exists here.  As demonstrated by the documents already produced, Burke Warren was a participant in the design, implementation, and reporting of the tax-shelter deal.  Indeed, the privilege log itself shows counsel's involvement.  An entry for a document dated May 2000 (entry no. 261), more than one year before the Fidelity International trades were executed, relates to a "Proposed investment."[49] Another from July 2000 relates to "Proposed organizational structure of investments and proposed investment strategies."[50]  Continuing down the timeline, another entry is for an email dating September 26, 2001– just before entry into the opening trades of the transaction– relating to "Assets to be held by FICA A Fund."[51]  Still later, many of the entries relate to "Potential distributions by FICA A Fund."[52]  It must be pointed out that in November 2001, Carruth was scheduling a meeting "with KPMG" to establish "a business purpose and reason for entering in to the option trades" it had "*put on earlier*" that month.[53]  Such reverse-engineering of business

---

[48]Document Bates numbered by Burke Warren as BWMS 00045, renumbered as 1BWMS00045.  Reiferson Decl., Ex. 18.

[49]It appears that the "investment" was a tax shelter that was to be implemented in 2000 but was put on hold because of the issuance of Notice 2000-44.  *See also*, *e.g.*, log-entry numbers 21-61.

[50]Log-entry number 375.

[51]Log-entry number 464.

[52]*See*, *e.g.*, log-entry numbers 246-248.

[53]Document Bates numbered by plaintiff as 020892, renumbered 2EGAN020892. (Emphasis added).  Reiferson Decl., Ex. 19.

purpose is clearly relating to business advice.  The additional activity that was the subject of much of the communication through counsel pertained to this reverse-engineered business purpose.  Fidelity International Currency Advisor A Fund engaged in additional activity for some limited time, but that was simply to attempt to demonstrate the post hoc business purpose it had concocted.  The communications with counsel largely appear to relate to that activity.[54]  Some of the communications were in 2003, and relate to "Distribution of FICA A Fund. . . ."[55]  Those contemplated distributions in 2003 from a tax-shelter entity remaining from the 2001 initial implementation was also intended to demonstrate the post hoc business purpose, as evidenced by a handwritten note produced by the plaintiff.  That note says, "Longer outstanding the better for business purpose."[56]

Each of these communications– and all communications between any of Carruth, Burke Warren, and Richard Egan– relating to the Fidelity International transaction, related to business advice.  As such, they should be produced unredacted.

The party asserting the attorney-client privilege bears the burden of proof.[57]  Making statements to an attorney, in and of itself, does not render the communication or the advice privileged.  This is because "[a]ttorneys frequently give to their clients business or other advice which, at least insofar as it can be separated from their essentially professional legal services,

---

[54]*See, e.g.*, log-entry number 241 relating to "Operations of FICA A Fund and Fidelity High Tech," and log-entry number 664 relating to "Assets held by FICA A Fund.."

[55]*See, e.g.*, log-entry numbers 672-674.

[56]Document Bates numbered by plaintiff as 011981, renumbered as 2EGAN011981. Reiferson Decl., Ex. 20.

[57]  *See In re Grand Jury Subpoena Dated Dec. 19, 1978,* 599 F.2d 504, 510 (2d Cir.1979).

2805462.7

gives rise to no privilege whatever."[58]  "When a lawyer acts merely to implement a business transaction or provides accounting services, the lawyer is like any other agent of the corporation whose communications are not privileged."  *United States v. KPMG LLP,*  237 F. Supp. 2d 35, 40 (D.D.C. 2002) (finding no attorney-client relationship between Sidley Austin and KPMG in their marketing of DGI tax shelters).[59]

KPMG and Sidley Austin were also involved in the design, marketing, implementation, and reporting of the instant tax strategy.  Pointedly, a court has already ruled that, because these firms were engaged in the business of marketing tax shelters, there could not have been "a true attorney client relationship."  *United States v. KPMG LLP*, 316 F. Supp. 2d 30, 39 (D.D.C. 2004).  That case involved KPMG's claims of attorney-client privilege in opposition to IRS promoter summonses. In that case, the District Court found that KPMG had misrepresented its "unprivileged tax shelter marketing activities as privileged communications" and that KPMG's privilege logs had been shown to be "inaccurate, incomplete, and even misleading regarding a very large percentage of the documents."  *United States v. KPMG LLP*, 316 F. Supp. 2d 30, 44 (D.D.C. 2004).  Moreover, after conducting an extensive *in camera* review, the court further found that Sidley Austin's tax shelter opinion letters had "little indication" that they were:

> independent opinion letters that reflect any sort of legal analysis, reasoned or otherwise.  In fact, when examined as a group, the letters appear to be nothing more than an orchestrated extension of KPMG's marketing machine.

---

[58]  *Colton v. United States*, 306 F.2d 633, 638 (2d Cir. 1962), *citing Lowy v. Commissioner*, 262 F.2d 809 (2d Cir. 1959); *Olender v. United States*, 210 F.2d 795 (9th Cir. 1954); *Pollock v. United States*, 202 F.2d 281 (5th Cir.), *cert. denied*, 345 U.S. 993 (1953); 8 Wigmore, Evidence § 2296 (McNaughton rev. 1961).

[59]  *See also, Diversified Group, Inc. v. Daugerdas,* 2003 WL 22077466, *4 (S.D.N.Y. 2003) (finding DGI's tax shelter marketing materials were not privileged); *Doe v. Wachovia,* 268 F. Supp.2d 627, 634-635 (W.D.N.C. 2003) (finding law firm promoting tax shelter was not in a protected relationship with investors).

21

*United States v. KPMG LLP*, 316 F.Supp.2d 30, 40 (D.D.C. 2004). Plaintiff's and Carruth's

privilege logs are replete with similar defects.

Here, KPMG is the same accounting firm through which the tax shelter in issue was

purchased by the taxpayer, Richard Egan. Sidley Austin is the same law firm that issued the tax

shelter opinion to Richard Egan on his FDIS transaction. The withheld documents all appear to

relate to the design, development and implementation of tax shelters and plaintiff and Carruth

appear to have misrepresented their unprivileged tax-shelter activities as privileged. These

privilege logs are misleading in that none of the attorneys party to these communications were

providing confidential legal advice to plaintiff and/or Carruth. Instead, they all involve

unprivileged business activities.

### III.   Disclosure of the Subject of the Withheld Communications Was an Explicit Waiver of Attorney-Client Privilege.

As described above, the plaintiff disclosed the purportedly confidential attorney-client

communications to a number of outside persons and entities. Those disclosures destroyed

confidentiality and thereby waived attorney-client privilege. As the First Circuit held, the law

carves out only a small "magic circle" of others with whom information may be shared without

the loss of the privilege. That "magic circle" includes only those "closely related persons who

are appropriate, even if not vital, to a consultation."[60] But, "where the client chooses to share

communications outside this magic circle, the courts have usually refused to extend the

privilege."[61] The narrow confinement of the privilege is "because it hinders the courts in the

---

[60]*United States v. Massachusetts Inst. of Tech.*, 129 F.3d 681, 683 (1st Cir. 1997).

[61] *Id.* at 684.

2805462.7

search for truth."[62]   The First Circuit explains that "[f]airness is also a concern where a client is permitted to choose to disclose materials to one outsider while withholding them from another."[63]

    **A.**    **Disclosure to the Tax-shelter Promoters Before Litigation**

        Here, the plaintiff disclosed the subject matter of its purportedly confidential communications to, at least, James Haber, DGI, KPMG, and Helios.  None of these entities were necessary for the conveyance of advice from lawyer to client.

    **B.**    **Disclosure to Other Entity in the Course of Litigation**

        In the course of this litigation, the plaintiff and Carruth have shared purportedly confidential documents, thereby each waiving privilege.  During discovery, the United States served upon the plaintiff Requests for Production under Rule 34 of the Federal Rules of Civil Procedure ("Rule 34").  It also served upon non-party Carruth subpoenas under Rule 45 of the Federal Rules of Civil Procedure.  ("Rule 45").  Presumably for efficiency sake, Carruth retained plaintiff's counsel to prepare its subpoena responses.  Then, in contravention of the Federal Rules of Civil Procedure, Carruth insisted, over the United States' objection, on treating the Rule 45 subpoenas as Requests for Production under Rule 34.  Carruth sent a letter to the defendant on July 26, 2007 in which it stated that for "purposes of discovery in this matter, Carruth (and its employees), Richard Egan, and FICA A Fund [(the plaintiff)] *draw from the same repository of documents.*"  (Emphasis added).  That assertion was repeated in another letter dated September 10, 2007.  In the second letter, Carruth stated that it "is not a party to" this case.  While that is a basic and undisputable fact in this litigation, this letter demonstrates that Carruth too understands

---

[62]*Id.* at 685 (citing *Fisher v. United States*, 425 U.S. 391, 403, 48 L. Ed. 2d 39, 96 S. Ct. 1569 (1976); 8 Wigmore, supra, § 2291, at 554).

[63] Id. at 685 (citing *Permian Corp. v. United States*, 214 U.S. App. D.C. 396, 665 F.2d 1214, 1221 (D.C. Cir. 1981)).

the difference between a party and a non-party.  As such, it is inexplicable that non-party Carruth and the plaintiff would exchange documents and place them in a single repository.  It is also inexplicable as to how each can then continue to claim privilege as to documents they disclosed to each other.  As in the instance where otherwise confidential communications are disclosed to the tax-shelter promoter, confidentiality– and therefore privilege– has been destroyed as to all documents exchanged.

### C.    Waiver of Privilege as it Relates to Proskauer Rose

The plaintiff explicitly waived privilege as to all communications with Proskauer Rose and responsive to the Carruth and Proskauer Rose subpoenas and the Requests for Production in this case.  Proskauer Rose ("Proskauer") has averred that it received an explicit waiver of privilege from the plaintiff, and the plaintiff avers that it has not claimed privilege as to any communications with Proskauer.[64]  But, the waiver goes beyond the communications between the plaintiff and Proskauer.  It extends to the related subject matter.  From the privilege log, it is difficult or impossible to identify all of the communications that relate to the same subject matter as the Proskauer communications.  As described above, many of the log entries relate to unnamed opinions.  At least some of those almost certainly relate to the Proskauer opinion, and privilege as to those communications has been waived.[65]  Here again, we also have another

---

[64]Reiferson Decl. at ¶¶ 7-10.

[65]Plaintiff claims that it has not asserted privilege as to any communication with Proskauer Rose, or to any communication relating to communication with Proskauer Rose. Because of the limited information on the plaintiff's privilege log, it is impossible to verify that claim.  Proskauer Rose's role was to provide an opinion on the tax returns and non-disclosure issues.  It appears from the face of the privilege log that some of the withheld information relates to the same subject matter.  For example, as cited earlier, privilege-log entries 297-299 relate to "Legal opinion for Richard Egan's tax return."  This appears to contradict the plaintiff's assertion that it is not withholding, and has in fact waived privilege to, all documents relating to the

(continued...)

2805462.7

Case 4:05-cv-40151-FDS     Document 175     Filed 10/16/2007     Page 25 of 26

example of the plaintiff apparently attempting to use privilege as both a sword and a shield.  By waiving privilege as to presumably innocuous documents sent between it and Proskauer, it can bolster its case.  At the same time, it can withhold documents that went through or reflect communications with Burke Warren and others on the very same subject matter.  That is particularly egregious in an instance like this where the plaintiff was Proskauer Rose's client in name only, as the plaintiff worked through a tax-shelter promoter who acted as an intermediary.

## IV. Conclusion

The withheld communications relate to business and not legal advice, and are therefore not privileged.  Additionally, the plaintiff cannot use the privilege as both a sword and a shield.  Having put the opinions of Proskauer Rose and Sidley Austin squarely at issue, it cannot claim privilege to any communication related to those opinions.  Finally, even if privilege had attached to any of these documents, it was waived because the plaintiff disclosed the communications to numerous third parties, including Carruth, DGI, James Haber, KPMG, and Helios.  Accordingly, all withheld communications on both the plaintiff's and Carruth's privilege logs should be

---

[65](...continued)
Proskauer Rose communications.

2805462.7

produced in unredacted form because they were either never privileged in the first instance, or if privileged, it has long since been waived.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

/s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Tax Division, U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER L. VANN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044-0055
Telephone: (202) 307-6561
Facsimile:  (202) 514-5238
E-mail:  john.a.lindquist@usdoj.gov
          barry.e.reiferson@usdoj.gov
          heather.vann@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and copies will be sent to those indicated as non registered participants on October 16, 2007.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

2805462.7