UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FIDELITY INTERNATIONAL CURRENCY       )
ADVISOR A FUND, L.L.C., by the Tax     )
Matters Partner,                                         )
                                                                   )
                            Plaintiff,                      )        Civil Nos. 05-40151-FDS (D. Mass.)
                                                                   )                     06-40130-FDS (D. Mass.)
            v.                                                  )
                                                                   )        Judge Saylor
UNITED STATES OF AMERICA,           )
                                                                   )
                            Defendant.                   )

## UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM PROSKAUER ROSE LLP

The United States moves to compel production of documents subpoenaed from the law firm Proskauer Rose LLP ("Proskauer").  The documents sought here have been withheld under claims of attorney-client and/or work-product privilege.[1]

The attorney-client privilege claims, as described by Proskauer, are based on its purported attorney-client relationships with various tax-shelter participants.[2]  As discussed below, Proskauer did not have a true attorney-client relationship with any of these participants.  Instead, its client in each instance was one of the promoters of the tax shelter who paid to Proskauer a fee for its participation in the tax-shelter scheme.  The withheld documents also do not reflect legal

---

[1] The United States and Proskauer continue to discuss a means of resolution of the dispute over these privilege claims.  Nonetheless, after a series of discussions, the issues remain unresolved and the deadline set by the Court for the filing of motions to compel is October 31, 2007.  If the United States and Proskauer are able to resolve all or some of the issues without Court intervention, the United States will withdraw or modify this motion as appropriate.

[2] It is the United States' understanding based on representations from both Proskauer and the plaintiff that the plaintiff has waived privilege with respect to Proskauer and no communications between them are withheld.

advice.  They were created to provide, at most, business advice.  That business was the design and implementation of the tax shelter to be employed by the promoters' clients.

Proskauer's work-product claims are based on what Proskauer describes as its "anticipation of the prospect of litigation."  That remote possibility of litigation is not the standard for work-product claims in this Circuit, and the claims are inappropriate here under that improper standard or even under the proper standard.  These documents were not created in anticipation of litigation.

Even if one or the other privilege did attach– which it did not– the privilege would have been waived by third-party disclosures.  Those disclosures were to co-promoters who worked with Proskauer to produce boilerplate "opinions" and related documents.  As such, the withheld documents are not privileged in the first instance, or privilege has been waived.

## INTRODUCTION

The United States served a subpoena *duces tecum* on Proskauer on October 19, 2006.  The subpoena demanded the relevant documents relating to the SOS and FDIS tax-shelter products designed, sold, opined upon, and/or implemented by Proskauer and other professional firms, individuals, and promoters.  Proskauer produced responsive documents and withheld hundreds based on privilege claims.  Proskauer served its revised privilege log on June 14, 2007, listing the hundreds of withheld documents over 48 pages.[3]  Proskauer asserts these claims, it says, on behalf of many of its so-called clients, who were the wealthy individual "targets" who were marketed these abusive tax shelters.  Proskauer and other law firms were paid a fee by the promoters for providing "opinion letters" blessing the tax-shelter transactions for federal tax

_____

[3]The privilege log is attached to the accompanying Declaration of Barry E. Reiferson as Ex. 1.

purposes and/or blessing the non-disclosure on their personal income tax returns of the use of the

tax shelters to generate accounting losses  (*i.e.*, failing to disclose the transaction in accordance

with Treas. Reg. 1.60114T).  Those fees to the law firms were aggregated, and not paid in any

individual amounts relating to the individual "clients."  In marketing the shelter, the promoters

provided to prospective purchasers a choice of one of four firms, including Proskauer, from

which to receive a "model" opinion letter.[4]  Wealthy prospective clients were then allowed to

select which law firm's opinion to use to support the transaction's  tax shelter losses.  In fact, the

plaintiff here was given such a choice of law firms.[5]  In reality, these so-called legal opinions

were therefore used as a tool by the promoters to market the transaction.  And, the opinion letters

were for the most part boilerplate letters drafted in part by and in conjunction with the tax-shelter

promoters.  Nonetheless, Proskauer claims the privilege on behalf of the individuals for whom

the tax shelters were implemented and to whom the letters were ultimately provided.  Proskauer

alleges that those individuals were its clients.  While there were at least three other law firms

used by the promoters to facilitate the FDIS tax shelter, Proskauer is the only one to allege an

attorney-client relationship with the individuals and not the promoters.[6]

---

[4]The other law firms were Bryan Cave, Brown Raysman (n/k/a Thelen Reid Brown Raysman & Steiner) and Lord Bissell & Brook (n/k/a Locke Lord Bissell & Liddell).

[5]Ex. 2 attached to Declaration of Barry E. Reiferson, Email from James Haber of DGI to Pat Shea of Carruth giving a choice of four law firms, including Proskauer, for the delivery of an "opinion" supporting the tax shelter.

[6]Law firms Bryan Cave and Brown Raysman (n/k/a Thelen Reid Brown Raysman & Steiner) assert privilege on behalf of The Diversified Group Inc. ("DGI").  Lord Bissell & Brook (n/k/a Locke Lord Bissell & Liddell) asserts privilege in some instances on behalf of DGI and in others on behalf of the individuals who implemented the tax shelter.  Proskauer alleges a privileged relationship only with the individuals.

2840013.1

**ARGUMENT**

I.    **The Documents Withheld Under Attorney-Client Privilege Claims are Not Privileged in the First Instance Because They Reflect Business Advice, Not Legal Advice.**

Because they contain business and not legal advice, the withheld communications merely involving Proskauer (*i.e.*, all of the communications withheld under claims of privilege and relating to the abusive SOS and FDIS tax shelters for which the only purpose was to generate a tax loss) should be produced.[7]

The attorney-client privilege "is one of the oldest recognized privileges for confidential communications."[8]  The privilege, designed to "encourage full and frank communication between attorneys and their clients," shields from discovery advice given by the attorney as well as communications from the client to the attorney, made in pursuit of or in facilitation of the provision of legal services.[9]

> The broad outlines of the attorney-client privilege are clear:  '(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.'

*United States v. International Bhd. of Teamsters,* 119 F.3d 210, 214 (2d Cir.1997).  A corporation's "in-house counsel" may be afforded the same protection as an outside counsel with respect to this privilege.[10]  In all instances, the privilege must be "strictly confined within the

---

[7]It is not possible from the face of the privilege log to determine if any of the withheld documents relate to any tax shelter other than SOS and/or FDIS.  If so, those documents are not responsive to the subpoena and are not sought here.

[8]  *Swidler Berlin v. United States,* 524 U.S. 399, 403 (1998).

[9]  *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981).

[10]  *Upjohn Co. v. United States,* 449 U.S. 383; *Lugosh v. Congel*, 2006 WL 931687 (2006 (continued...)

2840013.1

narrowest possible limits consistent with the logic of the principle" insofar as it is in derogation

of the search for truth.[11]

The party asserting the attorney-client privilege bears the burden of proof.[12]  Making

statements to an attorney, in and of itself, does not render the communication or the advice

privileged.  This is because "[a]ttorneys frequently give to their clients business or other advice

which, at least insofar as it can be separated from their essentially professional legal services,

gives rise to no privilege whatever."[13]  "When a lawyer acts merely to implement a business

---

[10](...continued)
N.D.N.Y.). The privilege may also protect communications between in-house counsel and a corporation's outside counsel.  *United States Postal Serv. v. Phelps Dodge Refining Corp.,* 852 F.Supp. 156, 160 (E.D.N.Y.1994) (citing *Upjohn Co. v. United States,* 449 U.S. at 395).  The same is true for partnerships' internal attorneys.  *In re Bieter Co.,* 16 F.3d 929, 935 (8th Cir.1994) (reasoning that the rules regarding the attorney-client privilege of corporations are no less instructive when applied to a partnership or some other client entity not an individual); *Denney v. Jenkens & Gilchrist,* 362 F.Supp.2d 407, 414 n. 34 (S.D.N.Y.2004) (citing, *inter alia, United States v. Campbell,* 73 F.3d 44 (5th Cir.1996) and holding that "there is no logical reason to distinguish partnerships from corporations or other legal entities in determining the client a lawyer represents" and that "the rules regarding the attorney-client privilege of corporations are no less instructive when applied to a partnership")).

[11]  There is the general maxim that the public, particularly within the judicial forum, is entitled to be exposed to "everyman's evidence." 8 Wigmore, Evidence § 2317 (McNaughton rev. ed.1961). The quest is for the truth of the matter to flow forward before the court, and "[t]he suppression of truth is a grievous necessity at best ... [only justified] when the opposed private interest is supreme." *In re Megan-Racine Assocs., Inc.*, 189 B.R. 562, 570 (Bankr. N.D.N.Y. 1995) (*citing McMann v. Sec. and Exch. Comm'n*, 87 F.2d 377, 378 (2d Cir.1937)); *Nixon v. United States*, 418 U.S. 683, 709 (1974).  But since the attorney-client privilege "stands in derogation of the public's right to everyman's evidence, ... it ought to be strictly confined within the narrowest possible limits consistent with the logic of the principle."  *In re Grand Jury Proceedings v. John Doe*, 219 F.3d 175, 182 (2d Cir.2000) (*citing United States v. Int'l Bhd. of Teamsters*, 119 F.3d at 214).

[12]  *See In re Grand Jury Subpoena Dated Dec. 19, 1978,* 599 F.2d 504, 510 (2d Cir.1979).

[13]  *Colton v. United States*, 306 F.2d 633, 638 (2d Cir. 1962), *citing Lowy v. Commissioner*, 262 F.2d 809 (2d Cir. 1959); *Olender v. United States*, 210 F.2d 795 (9th Cir. 1954); *Pollock v. United States*, 202 F.2d 281 (5th Cir.), *cert. denied*, 345 U.S. 993 (1953); 8 Wigmore, Evidence § 2296 (McNaughton rev. 1961).

2840013.1

transaction or provides accounting services, the lawyer is like any other agent of the corporation whose communications are not privileged." *United States v. KPMG LLP,* 237 F. Supp. 2d 35, 40 (D.D.C. 2002) (finding no attorney-client relationship between Sidley Austin and KPMG in their marketing of DGI tax shelters).[14]

   The courts have made clear that only those communications related to "legal, as contrasted with business, advice" are protected.  See *In Re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1037 (2d Cir.1984); *In re John Doe Corp.,* 675 F.2d 482, 488 (2d Cir.1982); *TVT Records v. Island Def Jam Music Group,* 214 F.R.D. 143, 144 (S.D.N.Y.2003) (quotation in original); see also *Altronic Intern., GMBH v. SAI Semispecialists of Am.*, 232 F.R.D. 160, 163 (E.D.N.Y. 2005).  Therefore, the request for legal advice must be distinctly clear and void of nuances of business consultation or instruction, if it is to be privileged.[15]

   To ensure that the attorney-client privilege remains affixed to the communication and/or advice, the entity has the burden of establishing that the communication was for the purpose of procuring legal advice.  *In re Grand Jury Subpoena,* 599 F.2d at 510.  To evaluate such a claim of privilege, "a court may have to parse not only the words but their intent in order to glean the

---

[14]  *See also Diversified Group, Inc. v. Daugerdas,* 2003 WL 22077466, *4 (S.D.N.Y. 2003) (finding DGI's tax shelter marketing materials were not privileged); *Doe v. Wachovia,* 268 F. Supp.2d 627, 634-635 (W.D.N.C. 2003) (finding law firm promoting tax shelter was not in a protected relationship with investors).

[15]  *United States v. Millman*, 822 F.2d 305, 310 (2d Cir.1987) (the party has to show that attorney-client communications were not related to his role as business advisor); *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d at 1037 ("[T]he privilege is triggered only by a client's request for legal, as contrasted with business advice."); *United States Postal Serv. v. Phelps Dodge Refining Corp.,* 852 F.Supp. at 160 (stating that "if the communication is made to the attorney in her capacity as a business adviser ... it ought not be privileged"); *Rattner v. Netburn,* 1989 WL 223059, at *6 (S.D.N.Y. June 20, 1989) (ruling that the communication must be characterized as predominately legal in order for the privilege to apply).

2840013.1

authentic purpose of the communication." *Lugosh v. Congel*, 2006 WL 931687 (2006 N.D.N.Y)

(footnote omitted).  As discussed in *Lugosh*:

> Because of the duality of the advice, a court must assume the very complicated
> task of inquiring into the subject matter of the communication in order to
> determine its true characteristic.  *Elliot Assocs., L.P. v. Republic of Peru,* 176
> F.R.D. 93, 97 (S.D.N.Y.1997) (citing *Colton v. United States,* 306 F.2d at 636)
> (opining that the inquiry should be of a "sufficient abstract level so as to not
> reveal the substance of the advice"). When the ultimate decision is based upon
> both legal and business considerations, the business and management aspect of the
> discussion will not be as fortunate in receiving protection by the privilege.  *TVT
> Records v. Island Def Jam Music Group,* 214 F.R.D. 143, 144 (S.D.N.Y.2003)
> (*citing In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d
> at 1037 (protects legal advice not business)); *Fine v. Facet Aerospace Prod. Co.,*
> 133 F.R.D. 439, 444 (S.D.N.Y.1990); *Hardy v. New York News, Inc.,* 114 F.R.D.
> 633, 643-44 (S.D.N.Y.1987); *United States v. Schenectady Sav. Bank,* 525
> F.Supp. 647, 650 (N.D.N.Y. Oct.28, 1981) (citing *Colton v. United States,* 306
> F.2d at 638, for the proposition that tax advice is not protected).

*Lugosh v. Congel*, 2006 WL 931687 (2006 N.D.N.Y.) (footnote omitted). "The party seeking to

invoke a privilege has the burden of establishing non-waiver of the privilege."[16]

A prior court has already ruled that, because some of the promoters here were engaged in

the business of marketing tax shelters, there could not have been "a true attorney client

relationship."  *United States v. KPMG LLP*, 316 F.Supp.2d 30, 39 (D.D.C.,2004).  That case

involved KPMG's claims of attorney-client privilege in opposition to IRS promoter summonses.

KPMG is one of the four accounting firms through which DGI marketed the FDIS product.

---

[16]  *Nikkal Industries, Ltd. v. Salton, Inc.*, 689 F. Supp. 187, 191 (S.D.N.Y. 1988).  *See
also United States v. Lewis*, 943 F.2d 58 (unpublished), 1991 WL 172666 at *3 (10th Cir. 1991)
("the proponent of the attorney-client privilege bears the burden of establishing both that
communications at issue are privileged and that the privilege was not waived "); *United States v.
Bay State Ambulance and Hosp. Rental Service*, 874 F.2d 20, 27-28 (1st Cir. 1989) (same); *New
York State Teamsters Council v. Primo & Centra*, 159 F.R.D. 386, 388 (N.D.N.Y. 1995) (same).

Judge Hogan, after conducting an extensive *in camera* review, also found that Sidley Austin's

tax shelter opinion letters had "little indication" that they were:

> independent opinion letters that reflect any sort of legal analysis, reasoned or
> otherwise.  In fact, when examined as a group, the letters appear to be nothing
> more than an orchestrated extension of KPMG's marketing machine.

*United States v. KPMG LLP*, 316 F.Supp.2d 30, 40 (D.D.C.2004).  Sidley Austin is one of the

law firms which provided FDIS "opinions," including one to the plaintiff.  Judge Hogan further

found that KPMG had misrepresented its "unprivileged tax shelter marketing activities as

privileged communications" and that KPMG's privilege logs had been shown to be "inaccurate,

incomplete, and even misleading regarding a very large percentage of the documents."  *United*

*States v. KPMG LLP*, 316 F.Supp.2d 30, 44 (D.D.C.,2004).  Proskauer's privilege log contains

similar defects.

     As described in the United States motion to compel production of documents from the

plaintiff, The Diversified Group Inc. ("DGI"), Alpha, and Helios had a longstanding relationship

and together designed, promoted, and implemented abusive tax shelters.[17]  Together, these firms

are referred to as the tax-shelter promoters.

     Proskauer's relationship was with the tax-shelter promoters, and not with any of its

purported clients.  That relationship with the promoters was a business relationship, and therefore

gave rise only to business advice.  Before the engagement of any DGI customers, the law firms,

including Proskauer, assisted DGI in the design and development of the FDIS marketing

---

[17]The United States incorporates herein pages 13-15, section IIA from its memorandum of
law in support of its motion to compel production of documents from the plaintiff (docket entry
no. 175).

2840013.1

materials.[18]  In addition to receiving the draft FDIS marketing materials from the promoters for
review and comment, these same law firms then also assisted in the drafting of the boilerplate
implementation documents for the FDIS transaction as well as drafting purportedly independent
– but actually cookie cutter – opinions blessing the very FDIS transactions which they had helped
to design.[19]  These law firms appear to have provided these services to DGI in exchange for the
promise that they would then be paid for issuing opinions to the targeted DGI customers.  As
such, during this development phase, these law firms were providing DGI nothing more than
business advice, not legal advice.

---

[18]  Govt. Ex. 18 (Helios Email dated 4/4/01 forwarding FDIS marketing materials for
review and comment) (attached to Decl. of John Lindquist and filed with the Court in *United
States v. The Diversified Group*, Civ. No. 4:07-mc-400004-FDS (D. Mass.)); Govt. Ex. 20
(Ruble email dated 4/5/01, "I have made some modification to the slides which I hope come out
when you open them.  Basically, I have eliminated the term "Foreign Investor" and replaced it
with the term "Investor(s) II")  (attached to Decl. of John Lindquist and filed with the Court in
*United States v. The Diversified Group*, Civ. No. 4:07-mc-400004-FDS (D. Mass.)).  RJ Ruble of
Sidley Austin was also involved in the design and development of the FDIS product prior to this.
See Govt. Exs. 8, 10, 11 and 12  (attached to Decl. of John Lindquist and filed with the Court in
*United States v. The Diversified Group*, Civ. No. 4:07-mc-400004-FDS (D. Mass.)).  Ruble was
also involved in the design and development of other DGI tax shelter products in prior years.  See
Govt. Ex. 7 (Ruble Affidavit, ¶¶8-12, describing how Ruble previously also assisted DGI to
develop its Option Partnership Strategy)  (attached to Decl. of John Lindquist and filed with the
Court in *United States v. The Diversified Group*, Civ. No. 4:07-mc-400004-FDS (D. Mass.)).

    **Unless otherwise indicated as attached to the Reiferson Declaration, all exhibits
cited in Argument I are already on file with the Court and were attached to the Declaration
of John Lindquist filed in *United States v. The Diversified Group*, Civ. No. 4:07-mc-400004-
FDS (D. Mass.).**

[19]  See email dated 4/24/01, Govt. Ex. 30 (Orrin Tilevitz of DGI preparing draft of
opinion for the 2001 option spread partnerships); email dated 4/26/01, Govt. Ex. 30 (forwarding
partnership opinion from Orrin Tilevitz of DGI to R.J. Ruble of Sidley Austin); email dated
2/7/02 Govt. Ex. 45 ("I've been through the Proskauer draft for the new deal.  Ira has done an
excellent job pairing down a number of the discussion from what we have said in the past.  In a
perfect world I would probably adopt many of the changes Ira made, but it hard to get changes to
boilerplate here.  Do you have a problem if we continue to use our form of discussion on most of
these issues??")

Instructively, DGI records also show that other professional firms– specifically, accounting firms– also had a role in the design and development of the FDIS product which they then marketed.[20]  In targeting potential customers, these accounting firms were directed not to leave the customer with a copy of the FDIS PowerPoint because it "show[ed] too much of the structure."[21]  The fee for these accounting firms, like the fee for DGI, was computed as a fixed percentage of the tax loss to be generated.[22]  In the instance of BDO, DGI's fee was collected by BDO and paid through Helios.  As confirmed by the following internal BDO email, this was nothing more than an attempt to create the facade of a privileged relationship:

> There may be an argument that if we pay Helios, Helios derives some protection from our accountant-client privilege (something of a long shot, but I wouldn't mind litigating it for a couple of years while the statutes run)[23]

---

[20]  See fax dated 6/17/01, Govt. Ex. 36 (transmitting FDIS powerpoint to Grant Thorton); Govt. Exs. 21 and 22 (FDIS powerpoints produced by BDO).  See also Govt. Ex. 28 (DGI email dated 4/18/01 to Akselrad of Proskauer Rose and Ruble of Sidley Austin, confirming that the referenced attachment named "Transitory Preferred" had also been sent to Charlie Bee of BDO); Govt. Ex. 29 (Fax dated 4/23/01 from BDO to Haber of DGI confirming a conference call for 4/26/01).  Haber has previously testified that DGI's "referral sources" included KPMG, BDO Seidman, Grant Thornton and RSM McGladrey. Haber Dep. 2/28/03 at 290:21 - 291: 6, Govt. Ex. 62.

[21]  See Govt. Exs. 21 (Handwritten cover notes on front page of FDIS marketing materials read "(1) Confirm that this will not be left with client (i) if it is left…shows too much of the structure (ii) if not left, should have some investment-oriented material to leave (2) we need to decide about fee inside or out -- (3) if out - how do we justify it...").  See also Govt. Exs. 22 (FDIS powerpoints produced by BDO) and Govt. Ex. 36 (transmitting FDIS powerpoint to Grant Thorton and stating "This is to confirm that the enclosed materials will not be distributed to anybody").

[22]  Govt. Ex. 23 (BDO email dated 4/5/01, describing the proposed fee split with DGI)

[23]  BDO email dated 4/27/01, Govt. Ex. 32.

2840013.1

To make the law firms appear to be in a privileged relationship with the customer, BDO also wanted to have the law firms paid directly by the client, even though the fee to the law firm would still come out of DGI's split.[24]

The payment for that business advice came from the businesspeople who sold the tax shelters. DGI's records reflect that Proskauer and other law firms were paid by DGI for the opinions that they issued to DGI's customers. In fact, DGI considered the fees to the law firms, including Proskauer, to be nothing more than an expense. As such, that expense was treated in the same manner as the promoters' payments to Samuel Mahoney and Martin Hawkes (the purported foreign partners), referenced in DGI documents as "SM-MH," for their participation in the tax shelters.[25] As an expense, the fees to Proskauer appear to have been aggregated by DGI, and not determined based on the individual customer to whom the opinion would later be provided.[26]

The promoters' payments to Proskauer were part of a marketing effort. Each of the targeted customers appear to have been apprised that DGI had arranged for four law firms from which to pick who would issue an opinion blessing the FDIS transaction, the selected firm would be paid by DGI.[27] As candidly disclosed in an email exchange between R.J. Ruble of Sidley

---

[24]  See BDO email dated 9/25/01, Govt. Ex. 39. While DGI collected and paid most of the fees for the opinions that were issued to its customers, some customers paid their legal fees directly. See Govt. Exs. 41, 42, and 43.

[25] Ex. 3 attached to Declaration of Barry E. Reiferson. The 2001 reconciliation of net fees and expenses reflects that DGI paid Sidley Austin $800,000, Proskauer $1,020,000, Bryan Cave $560,000, Lord Bissell & Brook $75,000, and Brown Raysman $250,000.

[26] *Id.*

[27]  DGI confirmed the amounts payable by it to Sidley Austin, Proskauer and Bryan Cave for their issuance of opinions by memo dated 1/2/02. See Govt. Exs. 41, 42, and 43. The 2001 reconciliation of net fees and expenses reflects that DGI paid Sidley Austin $800,000, Proskauer $1,020,000, Bryan Cave $560,000, Lord Bissell & Brook $75,000, and Brown Raysman

(continued...)

2840013.1

Austin and James Haber of DGI, the pretense that these law firms were independent was mere

play acting:

> Ruble: just got my lunch invitation from larry cohen [sic] [of BDO]. I'll act
> surprised when he hands me the memo.

> Haber: You don't have to rely on your acting skills because I have already told him
> that you have it and that we are working together to enhance the opinion.[28]

The withheld documents relating to this business advice are not confidential. Nor were

they intended to be confidential. In fact, the "opinion letters" were used as a marketing tool by

the promoters.

**II.    The Documents Withheld Under Work-Product Privilege Claims are Not Privileged
Because They Were not Generated In Anticipation of Litigation.**

In order for Proskauer to sustain each claim of work-product privilege, it must show that

"'in light of the nature of the document and the factual situation in the particular case, the

document can be fairly said to have been prepared or obtained because of the prospect of

litigation.'" *In re Grand Jury Subpoena*, 220 F.R.D. 130, 146 (D. Mass. 2004)(citing, *Maine v.

United States Dep't of Interior*, 298 F.3d at 68 298 F.3d at 68 (*quoting*, 8 Wright, Miller &

Marcus, supra, § 2024, at 343)). Here, Proskauer falls woefully short of demonstrating that the

withheld documents were created because of the prospect of litigation. In fact, Proskauer does

not even allege that the documents were created because of the prospect of litigation, but rather

---

[27](...continued)
$250,000. See email dated 5/3/02, with attached 2001 reconciliation, Govt. Ex. 51. The general
understanding was that these legal fees would be paid by DGI out of the money that it collected
from the taxpayers as part of the "all-in" cost which was a fixed percentage of the deal, namely
the desired tax loss. See BDO email dated 4/5/01, Govt. Ex. 23.

[28]  See DGI email dated 1/25/02, Govt. Ex. 44.

2840013.1

one step further removed; Proskauer alleges instead that the withheld documents were created in *anticipation* of the *prospect* of litigation.

As with the attorney-client-privilege claims, Proskauer, as the party asserting the work-product privilege, has the burden of demonstrating that the e-mails were prepared in anticipation of litigation. *See, e.g., In re Lernout & Hauspie Sec. Litig.*, 222 F.R.D. 29, 36 (D. Mass. 2004) (citing *Amica Mutual Insurance Co. v. W.C. Bradley Co.*, 217 F.R.D. 79, 82-3 (D. Mass., 2003)). To meet its burden, Proskauer must demonstrate in each instance in which its claimed work-product protection that the withheld document was created because of the prospect of litigation. In *Maine v. United States DOI*, 298 F.3d 60 [**22] (1 Cir., 2003), the First Circuit adopted the "because of" test set out by the Second Circuit in *United States v. Adlman*.[29] The adopted test is whether "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."[30] The test is not, as Proskauer asserts, whether Proskauer and its "clients" anticipated that one day there might exist the prospect of litigation.

Here, the documents were not prepared because of the prospect of litigation. They were prepared to assist in the making of a business decision– the entry into a tax shelter. Indeed, Proskauer's privilege log describes these documents, for the most part, as "regarding the federal

---

[29]134 F.3d 1194 (2 Cir., 1998).

[30]*United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998)(*quoting* Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 Federal Practice & Procedure § 2024, at 343 (1994); citing *In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir.1979); *National Union Fire Ins. Co. v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 984 (4th Cir.1992); *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1118-19 (7th Cir.1983); *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 [**23] (8th Cir.), cert. denied, 484 U.S. 917, 108 S. Ct. 268, 98 L. Ed. 2d 225 (1987); *Senate of Puerto Rico v. United States Dep't of Justice*, 262 U.S. App. D.C. 166, 823 F.2d 574, 586 n. 42 (D.C.Cir.1987).

2840013.1

income tax consequences of the client's transaction." Also according to the privilege log, those documents are "legal opinion[s]," "certificate[s] of facts" for the "opinions," and emails relating to the "opinions." Even if those assertions are true, the "opinions" were not in anticipation of litigation, but rather in anticipation of the entry into a tax shelter. In fact, Proskauer's "clients" entered into the transactions with Proskauer's opinion blessing them. As such, Proskauer appears to have informed them that the transactions were not abusive tax shelters, and therefore litigation should not have been expected.

III.    **Disclosure of the Subject of the Withheld Communications Was an Explicit Waiver of Attorney-Client Privilege.**

The withheld communications all appear to have been disclosed to the tax-shelter promoters. At best, those promoters, rather than the individual taxpayers, were Proskauer's real clients– although the promoters appear really to be Proskauer's business associates. Assuming, as Proskauer claims and the evidence suggests, that the promoters were not its clients, then the disclosure of the documents to them was an explicit waiver of any privilege that might have attached.

The disclosure of the purportedly confidential attorney-client communications to a number of outside persons and entities destroyed confidentiality and thereby waived attorney-client privilege. As the First Circuit held, the law carves out only a small "magic circle" of others with whom information may be shared without the loss of the privilege. That "magic circle" includes only those "closely related persons who are appropriate, even if not vital, to a consultation."[31] But, "where the client chooses to share communications outside this magic

---

[31]*United States v. Massachusetts Inst. of Tech.*, 129 F.3d 681, 683 (1st Cir. 1997).

2840013.1

circle, the courts have usually refused to extend the privilege."[32]  The narrow confinement of the privilege is "because it hinders the courts in the search for truth."[33]  The First Circuit explains that "[f]airness is also a concern where a client is permitted to choose to disclose materials to one outsider while withholding them from another."[34]

Here, Proskauer disclosed the subject matter of its purportedly confidential communications with its "clients" to, at least, DGI, who it contends was not its client.  As such, those disclosures to DGI eviscerated privilege, to the extent privilege attached in the first place. Those disclosures are even logged by Proskauer.  For example, Proskauer withholds as privileged communications between it and a purported client named Ronald Ciasulli, but copies DGI on the communication.[35]  Proskauer similarly withholds purportedly confidential communications between it and Steven Paley that it copied to DGI.[36]  There are additional disclosures to DGI listed throughout the privilege log.

While failing to acknowledge the repeated waivers, Proskauer is also improperly withholding documents sent between it and DGI, who it claims is not its client.  For example, Proskauer withholds as privileged communications between Orrin Tilevitz of DGI and itself.[37] Similarly, it withholds emails between Elizabeth Jung of DGI and itself.[38]

---

[32] *Id.* at 684.

[33] *Id.* at 685 (citing *Fisher v. United States*, 425 U.S. 391, 403, 48 L. Ed. 2d 39, 96 S. Ct. 1569 (1976); 8 Wigmore, supra, § 2291, at 554).

[34] Id. at 685 (citing *Permin Corp. v. United States*, 214 U.S. App. D.C. 396, 665 F.2d 1214, 1221 (D.C. Cir. 1981)).

[35] Privilege Log at 19.

[36] Privilege Log at 23.

[37] *See, e.g.*, Privilege Log at 8.

[38] *See, e.g.*, Privilege Log at 34.

The disclosures to DGI are unsurprising, given that Proskauer's relationship was really with DGI and not the individual letter recipients. DGI and Proskauer worked out the purported legal advice even before Proskauer was made aware of which of the individuals would later receive it. As shown in a memorandum from James Haber to Ira Akselrad of Proskauer in April 2002, DGI provided in 2002 a list of its customers to whom DGI wanted Proskauer to issue an "opinion."[39]

## IV. Conclusion

The withheld communications relate to business and not legal advice, and are therefore not privileged attorney-client communications. Moreover, DGI, and not the individuals, was Proskauer's "client" or business associate. Even if privilege had attached to any of these documents, it was waived because the documents were disclosed to at least DGI.

---

[39]Ex. 4 attached to Declaration of Barry E. Reiferson.

2840013.1

Accordingly, all withheld communications on should be produced because they were either never privileged in the first instance, or if privileged, it has long since been waived.

<div style="margin-left: 50%;">

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

 /s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Tax Division, U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER L. VANN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044-0055
Telephone: (202) 307-6561
Facsimile:  (202) 514-5238
E-mail:  john.a.lindquist@usdoj.gov
        barry.e.reiferson@usdoj.gov
        heather.vann@usdoj.gov

</div>

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and copies will be sent to Proskauer and those indicated as non registered participants on October 31, 2007.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

2840013.1