UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' REPLY MEMORANDUM IN SUPPORT OF ITS
MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM FIDELITY
INTERNATIONAL CURRENCY ADVISOR A FUND, CARRUTH MANAGEMENT,
CARRUTH ASSOCIATES, AND AFFILIATES**

The non-privileged documents sought here essentially fall into two categories: (1)

documents related to the structuring of the FDIS tax-shelter product at issue, and (2) documents

related to the purportedly independent opinion letters blessing the product for federal income tax

purposes and approving its non-disclosure to the IRS.  The documents in both categories were

not privileged in the first instance, and, in any event, any claimed privilege was waived when the

plaintiff disclosed the documents before and during this litigation, and when the plaintiff put

them directly at issue.  While a lawyer may have a privileged relationship and communications

with a client and then maintain those confidential communications throughout the relationship,

that is simply not what happened here.

I.    **The "Legal Opinions" and Related Documents Were Put Directly at Issue by the Plaintiff in this Case, and Must Be Produced.**

The plaintiff put the Sidley Austin and Proskauer Rose ("Proskauer") opinion letters– and related documents– directly at issue by claiming reliance on them.[1]  The plaintiff claimed reliance on the advice of Sidley Austin, Proskauer, and various advisors, including KPMG, Helios, and Alpha.[2]  The plaintiff cannot now handpick which related documents it wishes to disclose.  Such handpicking is precisely the type of dual sword-and-shield use the courts disallow.

As the Federal Circuit described the waiver principle in a patent-infringement case, "Once a party announces that it will rely on advice of counsel . . . the attorney-client privilege is waived."[3]  The scope of that waiver covers the related communications sought here.  In fact, the "widely applied standard for determining the scope of a waiver of attorney-client privilege is that the waiver applies to all other communications relating to the same subject matter."[4]  The waiver also extends to "documents that discuss a communication between attorney and client concerning the subject matter of the case but are not themselves communications to or from the client."[5]  Indeed, "the waiver of attorney-client privilege extend[s] not only to other communications and opinions of the attorney rendering the opinion on which a  . . . [party] relies, but also attorney-client information from other counsel involving the same subject."[6]  The waiver extends

---

[1]*See* Def. Mem. in Support of Mot. to Compel at 3-5, and documents cited therein.

[2]*See* Def. Mem. in Support of Mot. to Compel at 5, and documents cited therein.

[3]*In re Echostar Communs. Corp.*, 448 F.3d 1294, 1299 (Fed. Cir. 2006).

[4]*Id.*

[5] *Id.* at 1302-04

[6]*Beck Sys. v. Managesoft Corp.*, 2006 U.S. Dist. LEXIS 53963 (N.D. Ill. 2006)(citing
(continued...)

2871183.1

to all documents *related in any way* to the subject matter in the opinion letters.[7]  Fairness dictates

this result.[8]  Essentially, by asserting reasonable reliance, the plaintiff placed the substance of the

purportedly independent opinion letters at issue.  "To permit the [plaintiff] to disclose only

. . . [the] opinion[s] and not any communications of information . . . that may or should have

influenced the cited opinion[s] would permit the . . . [the plaintiff] to engage in selective

disclosure of privileged materials, allowing . . . [it] to reveal only information that is favorable to

its case while concealing what may be unfavorable."[9]

Given the broad application of the subject-matter waiver here, and even without so broad

an application, the withheld documents clearly fall within the waived subject matter.  The

documents withheld here are part and parcel of the advice upon which the plaintiff claims to have

relied.  As described at length in the opening memorandum, Denby was immersed in the opinion-

writing process– along with the other "advisors"–  and her advice, however it is categorized, is

inextricably linked to the final opinions.[10]

First, Denby was involved at the outset of the shopping for, settling on, and implementing

the FDIS tax shelter here.  As described above, she was involved in the due diligence on James

---

[6](...continued)
*Beneficial Franchise Co., Inc. v. Bank One N.A.*, 205 F.R.D. 212 (N.D. Ill. 2001)).

[7]*VLT, Inc. v. Artesyn Techs., Inc.*, 198 F. Supp. 2d 56, 58 (D. Mass. 2002).

[8]*See, e.g.*, *Blackhawk Molding Co. v. Portola Packaging, Inc.*, 2004 U.S. Dist. LEXIS 19850 at *4-*5 (N.D. Ill. 2004)(holding that it would be unfair in that patent-infringement suit to take a narrow view of subject-matter waiver to include less than the subject matter of the opinion and the underlying patent).

[9]*In re Omnicom Group Inc., Sec. Litig.*, 233 F.R.D. 400, 414 (S.D.N.Y. 2006)(citing *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *Garfinkle v. Arcata Nat'l Corp.*, 64 F.R.D. 688, 689 (S.D.N.Y. 1974)).

[10]Def. Mem. in Support of Mot. to Compel at 10-12.

Haber as a "facilitator" of the FDIS transaction.  Then, Haber gave Denby and her clients a choice of four law firms, including Sidley Austin and Proskauer, from which to choose for provision of opinion letters.[11]

After involving herself in the early stages of the tax-shelter implementation, Denby was involved in the details of the FDIS transaction to the extent they exceeded the pre-planned steps and were designed to reverse-engineer a business purpose.  For example, On October 15, 2001, Carolyn Fiddy (of Carruth) sent an email to Michael Egan stating that "Stephanie Denby and Tim Speiss of KPMG think that the assignment of Stockton Holdings is appropriate with the documentation to show it meets the goals of the new entity"– presumably Fidelity International.[12] There is no indication given as to the goal of the new entity– which was to generate a tax loss– and no indication of why documentation was necessary to show it actually met the stated non-tax business purpose.  That is because the real purpose was to give the appearance of real business being conducted by Fidelity International.  Sure enough, the assignment of Stockton Holdings made it into the transaction description in the Proskauer opinion, and at least into the draft description in the Sidley opinion.

The plaintiff's "advisors," including Denby, were involved in the planning of the tax-shelter structure, and also the details of the opinion letters.[13]  As explained in the opening brief, payment for the opinion letters was contingent upon *satisfactory completion*– that is, drafting to the satisfaction of Carruth and Stephanie Denby.[14]  Putting aside for now the question of whether

---

[11]*See* Reiferson Decl., Ex. 21.

[12]Reiferson Decl., Ex. 22.

[13]*See* Pl. Mem. in Support of Mot. to Compel at 10-13.

[14]*See* Reiferson Decl., Ex. 9 (filed with opening memorandum).

2871183.1

a legal opinion for which payment is contingent on the recipient's satisfaction could ever be relied upon in good faith, it provides the context for Denby's and others' involvement in the opinion-writing process.

That collective opinion-writing process included drafts and re-drafts, and frequent correspondence and suggestions from various promoters and other "advisors," including Denby. The drafting process spanned months.  On January 24, 2002, Pat Shea of Carruth emailed Haber asking to discuss completion of the Fidelity International FDIS transaction and making sure all documents were "complete– including legal opinion letters."[15]  Haber responded that the opinions (presumably the opinions for the Fidelity High Tech and Fidelity International transactions) would "be available for draft review no later than 2/10."[16]  Just more than two weeks after that promised draft date, Stephanie Denby forwarded a draft Sidley Austin opinion letter she had received that day from James Haber.[17]  Haber had sent the draft to Denby, Shea and Reiss of Carruth, and Tim Speiss.[18]  In so doing, he said that he and his associates were "reviewing" it, as he believed the recipients were.[19]  Denby expressed uncomfortableness with at least one of the draft Sidley Austin opinion letters.  She asked Haber why the "last version" omitted "the discussion on tax shelter registration . . . ."[20]  The breadth of the coordination is shown in a March 1, 2002 email from Pat Shea to Tim Speiss, copied to Denby, Haber, and James Reiss of Carruth, wherein Shea asks to meet to "review the opinion letters . . . to be sure

---

[15]Reiferson Decl., Ex. 23.

[16]Reiferson Decl., Ex. 23.

[17]Reiferson Decl., Ex. 24.

[18]*Id.*

[19]*Id.*

[20]Reiferson Decl., Ex. 25.

2871183.1

they are on point."[21]  Shea takes the opportunity to reiterate that once he is "comfortable" and the

outstanding "items," including the opinion letters, "are resolved," payment would be released.[22]

Handwritten notes, appearing to be Pat Shea's, were later added to the March 1 email saying that

the opinion-letter discussions would include "Stephanie [Denby] over [the] phone."[23]  On March

12, 2002, an email was sent by Tim Speiss (of KPMG) demonstrating KPMG's heavy hand in

the opinion-writing process.  Speiss wrote to Denby that he had "drafted a detailed

narrative . . . outlining the business purpose of the investment"– that is, the FDIS tax shelter– and

suggested insertion of the narrative "in the opinion on page 1 . . . ."[24]  Speiss then asked Denby to

provide her "thoughts" on the proposed insertion.[25]  The purpose of the narrative, according to

Speiss, was, among other things, to "help document Investor's business purpose."[26]  Two days

later, on March 14, Denby emailed Haber to say she "just got Tim's [that is, Tim Speiss's]

[changes] for the 2nd opinion (Sidley)."[27]  She promised to "integrate" Speiss's changes into the

draft opinion and "send tomorrow."  When tomorrow came, Orrin Tilevitz of DGI sent to R.J.

Ruble of Sidley Austin a redlined version of the "Egan opinion, redlined against  . . . [Sidley

Austin's] most recent version."  The new redlined version "reflect[ed] changes . . . proposed by

Egans' [sic] lawyer, Stephanie Denby."[28]  At this stage of the process, Tilevitz describes Denby's

---

[21]Reiferson Decl., Ex. 26.

[22]*Id.*

[23]Reiferson Decl., Ex. 27.

[24]Reiferson Decl., Ex. 28.

[25]*Id.*

[26]*Id.* at ¶ 6.

[27]Reiferson Decl., Ex. 29.

[28]Reiferson Decl., Ex. 30.

*latest* changes as mostly "nits, except for some substantive changes to the reps [(the factual representations)] (and the reasoning based thereon) and a couple of changes necessitated by the fact that the LLC's manager is not Helios by [sic] the Egans' son."[29]  On March 27, Haber asked about payment for the Sidley Austin opinion letter.[30]  Shea responded that he hadn't had a chance to review and wanted to review carefully "in light of the changes that were made on the last final draft" (sic).[31]  Haber fired back, copying Denby, that "further delays" were, in his opinion, inappropriate, and "payment for" the Fidelity International FDIS transaction "should be forthcoming."[32]  While stating that the opinion was "final," Haber made clear that "to the extent . . . [Shea found] further changes," Haber was "sure the law firm [would] be cooperative."[33]  At least some change was necessary, since, on April 4, Denby informed Haber that the "revised page looks fine" and she would "send back the prior opinion."[34]  Haber then asked Pat Shea to also return the prior draft.[35]

A similar process was followed for the Proskauer opinion.  In February 2002, Shea asked Tim Speiss to meet to discuss, among other things, assurances that Egan's identity will not be disclosed to the IRS as a person engaging in a listed transaction, and a "tax opinion will state the investment was not a listed transaction."[36]  In June that year, Speiss wrote to Denby saying that

---

[29]*Id.*

[30]Reiferson Decl., Ex. 31.

[31]*Id.*

[32]*Id.*

[33]*Id.*

[34]Reiferson Decl., Ex. 32.

[35]*Id.*

[36]Reiferson Decl., Ex. 33.

2871183.1

he "and certain law firms . . . are of the view [that] no disclosure is required and the [Fidelity International FDIS] transaction is distinguishable from listed transactions."[37]  Denby received a draft of that opinion on August 2, 2002.[38]  As described in the opening memorandum, Denby billed for her revisions to the Proskauer opinion and supporting documents.[39]

This volume of activity and coordination makes clear that the "advisors," including Denby, were heavily involved in the generation of the opinion letters and the facts cited in them. That involvement was prolonged and consistent.  Each "advisor's" input was part of a collective effort to put the FDIS transaction together.  That transaction included the ultimate opinion letters that were to serve as penalty insurance.  As such, the letters were part of the deal, and, as described, had to be approved by the plaintiff before payment for any of the transaction would be released.  Furthermore, Denby's advice was inextricably linked to the opinion letters and to the advice of others, as well as to the underlying structure described in the opinion letters.  As such, it would be unfair, and contrary to the weight of authority, to allow the plaintiff to assert reliance on advice of counsel but to withhold all documents related to, and in fact part of, that advice.[40]

---

[37]Reiferson Decl., Ex. 34.

[38]Reiferson Decl., Ex. 35.

[39]Def. Mem. in support of Mot. to Compel at 11.

[40]Plaintiff's argument that, in the face of all of documentary evidence to the contrary, a single sentence in a single email from James Haber demonstrates the independence of Sidley Austin is hardly worth a response.  (*See* Ex. C attached to Pl. Opp.)  Nonetheless, it is worth pointing out that even that one sentence is cited by the plaintiff out of context.  Haber was writing to R.J. Ruble of Sidley Austin attaching a "b[l]ackline copy" of Ruble's Egan opinion, "compared" to the "generic form of opinion" previously provided.  The changes were "substantial and for the most part a better approach."  Ruble responded that he had some problems with the "better approach."  He noted that he had problems with some of the changed language, and with others in his firm who did not necessarily believe that Sidley Austin could opine that the Fidelity International FDIS transaction was not substantially similar to a Notice 2000-44 transaction.  That, incidentally, is the subject of the later Proskauer opinion upon which the plaintiff claims to rely.  It is also the subject of some of the emails described above in which

(continued...)

2871183.1

There is no support for the plaintiff's assertion that its use of the opinion letters as a sword does not waive privilege as to the related documents because the plaintiff now claims that the opinions themselves are not privileged.  As an initial matter, the plaintiff's argument is a non-starter, since it is arguing from a facially incorrect premise– that "Privilege Never Attached to the Disclosed Documents" because the plaintiff disclosed them to "his return preparers . . ., to the IRS . . ., and in the present litigation."[41]  The plaintiff appears to be confusing non-attachment of privilege with waiver of that privilege.  To the extent any of the disclosed opinions and the related documents were ever privileged, the plaintiff is merely asserting that it waived that privilege some time ago.

Whether the letters themselves are privileged or not, the plaintiff's claimed reliance on them placed the substance of the communications at issue.  By putting the substance at issue, the plaintiff waived any privilege that may have applied to the withheld communications.[42]  "If the substance of the opinion -- whether privileged or not -- must be produced, so too must any

---

[40](...continued)
Denby asks about the omission from the Sidley opinion of the not-substantially-similar determination.  It took, of course, more than one month more to finalize the Sidley Austin opinion, with significant additional changes from Denby and others.  It also took months longer than that to get a Proskauer opinion letter on the substantial-similarity issue Denby noticed was missing from the Sidley Austin final opinion, as opposed to the earlier drafts.

[41]Pl. Opp. Mem. at 22, Part C (Section heading and ¶ 1).

[42]*In re Omnicom Group Inc., Sec. Litig.*, 233 F.R.D. at 414.  The District Court of Connecticut, cited by the plaintiff, is of no help to the plaintiff here.  That court agrees that one "may not selectively assert and/or waive the attorney-client privilege because voluntary disclosure of otherwise privileged material will likely lead to compelled disclosure of the remainder."  *Long-Term Capital Holdings v. United States*, 2003 U.S. Dist. LEXIS 7826 (D. Conn. 2003)(citing *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993); *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 294 (6th Cir. 2002); *Westinghouse Elec. Corp. v. Phillippines*, 951 F.2d 1414, 1424-25 (3d Cir. 1991).  That court merely found that, in that case, reliance on a non-privileged document did not result in "an effort to 'shield'" other documents from scrutiny.  *Id.*

2871183.1

otherwise privileged communications that would be needed to judge its provenance and reliability.  In effect . . . those communications [have been placed] in issue as well."[43]

The documents relating to the opinions upon which the plaintiff bases its good-faith-reliance defense are critically important, and not privileged.  The plaintiff is alleging reasonable and good faith reliance to avoid imposition of accuracy-related penalties under 26 U.S.C. 6664(c)(1), which provides that no "penalty shall be imposed . . . with respect to an underpayment [of tax] if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."  To determine whether the plaintiff satisfies the threshold requirements of reasonable good-faith reliance on advice of counsel, the Court must examine that advice and the analyses that purportedly went into the advice.  As one court held in a similar tax-shelter case involving alleged reasonable reliance on a King & Spalding opinion, the burden of proof on reasonable reliance can only be carried with evidence of the analyses and explanations relating to the ultimate opinion.[44]  That evidence should include "companion memoranda" discussing the application of the applicable law to the instant facts.[45]  The evidence should also include specifics of the factual representations made, and the analysis of the accuracy and reasonableness of those representations.[46]  By withholding documents that reveal the background for the ultimate opinions upon which the plaintiff claims to have relied, the plaintiff is keeping the essential evidence from the Court.

The plaintiff's attempt to rely on final opinion letters while shielding related documents from scrutiny is not allowed, and should not be countenanced here.  Such a dual use would be

---

[43]*Id.*

[44]*Long-Term Capital Holdings v. United States*, 330 F.Supp.2d 122, 211 (D. Conn. 2004).

[45]*Id.* at 210-211.

[46]*Id.* at 210.

2871183.1

particularly egregious in a case like this, where the plaintiff intended at the outset to maintain the confidentiality of the opinion letters and only chose to disclose them when the IRS spotted the activity the plaintiff tried to hide.  It appears, for example, that the tax-shelter promoters and Carruth intentionally kept from KPMG the final Sidley Austin opinion.  The so-called closing binder for the Fidelity International transaction was sent to KPMG, but the opinion was sent under separate cover.[47]  The opinion was not sent, to our knowledge, to KPMG, presumably because documents provided to a tax-return preparer are not privileged.  While guarding the opinion, Egan also guarded his identity as a tax-shelter participant, which KPMG did, of course, have.  In August 2003, Richard Egan's counsel sent a letter to KPMG urging KPMG not to disclose in response to an IRS summons Richard Egan's identity.[48]  Then, on October 2, 2003, Sidley Austin informed Richard Egan that it intended to disclose Richard Egan's identity to the IRS as one of the persons to whom Sidley Austin provided an opinion "in connection with certain transactions."[49]  Sidley intended to disclose Egan's identity on October 13.[50]  Egan's counsel sent a letter to Sidley Austin before the disclosure date stating, among other things, that Sidley Austin should continue to assert "appropriate objections and/or privileges" on Egan's behalf.[51]  In January 2004, Sidley Austin notified Egan that it would not disclose his identity to the IRS.[52]  Then, in March 2004, Egan and Sidley Austin entered into a "tolling agreement" whereby the parties agreed to toll the applicable statutes of limitations as to claims Egan may

---

[47]Reiferson Decl., Ex. 36.

[48]Reiferson Decl., Ex. 37.

[49]Reiferson Decl., Ex. 38.

[50]*Id.*

[51]Reiferson Decl., Ex. 39.

[52]Reiferson Decl., Ex. 40.

2871183.1

assert against Sidley Austin.[53]  In that agreement, Egan memorialized his allegation that he "may have suffered damages as a result of the [Sidley Austin] Opinion . . . and alleged disclosure of confidential information relating to his engagement of Sidley to provide the Opinion . . . ."[54] Finally, the parties to the agreement bound themselves to preserving all documents in their custody or control "relating directly and specifically to Sidley's disclosure of Richard Egan's identity to the Internal Revenue Service or the United States Department of Justice, or relating to the Opinion . . . ."[55]

## II.     The Advice Here Was, At Most, Business Advice, and in Any Event is Not Privileged.

As the plaintiff readily admits, as the party asserting privilege, it bears the burden of proof, and it must demonstrate that the advice given was legal and not business advice.[56]  The plaintiff errs in its assertion that "only a modicum of evidence" is sufficient to meet its burden.[57] Even so, the plaintiff offers virtually no evidence at all.

The plaintiff's burden is not low, and is not met here.  The "modicum of evidence" standard the plaintiff cites was erroneously taken from a 1956 Yale Law Journal article, and has never been adopted in this, or to our knowledge, any other Circuit.  In fact, the case the plaintiff cites for that proposition simply repeated the words from the Journal and rejected the use of the standard in that case.[58]  Armed with its inappropriately low standard, the plaintiff simply concludes that the documents here are privileged.  The insufficient basis of the conclusion is

---

[53]Reiferson Decl., Ex. 41.

[54]*Id.*

[55]*Id.*

[56](Pl. Opp. Mem. at 10.)

[57](Pl. Opp. Mem. at 10, 13.)

[58]*Borase v. M/A COM*, 171 F.R.D. 10, 14-15 (D. Mass. 1997).

2871183.1

essentially that Ms. Denby is a lawyer who had been retained by Richard Egan and Carruth for many years.[59]  Meanwhile, the conclusion is unsupported by any documents or other evidence.

While making these unfounded assertions of privilege, the plaintiff controls the documents, and it is therefore difficult to obtain any evidence of the nature of the advice. Fortunately, due to an erroneous privilege claim on the plaintiff's part, which document it later produced, we get a glimpse into the type of business advice Denby was giving and to which the plaintiff originally claimed a privilege.  On July 24, 2006, the plaintiff produced a memorandum from the files of Pat Shea (of Carruth) describing its due diligence on Helios Financial LLC ("Helios").  In the memorandum, Helios was described as a "facilitator" of the transaction.[60] That memorandum had a portion redacted from it.  More than one year later, Carruth produced the same document, only without redactions.[61]  The portion the plaintiff had redacted described how Stephanie Denby "spoke with an attorney that has done some legal work on one of their transactions and was told they performed everything they promised and the deal took place without a hitch."  The memorandum also recorded that Denby "felt comfortable with them based on the information [Carruth] . . . had and the fact that [Carruth] . . . got them through KPMG." The "due diligence" Denby performed was, in this instance, no more than a reference check on one or more of the tax-shelter promoters– Helios– and possibly the related entity DGI and its principal James Haber.  It was not legal advice.  Also, the same memorandum describes a lawsuit brought earlier against James Haber by an "unhappy participant in a tax shelter deal."  The portion was initially redacted apparently because Denby is a lawyer.  Indeed, that redacted

---

[59](Pl. Opp. Mem. at 10-13.)

[60]Reiferson Decl., Ex. 42.

[61]Reiferson Decl., Ex. 43.

2871183.1

portion demonstrates, again, that Denby's functions included background checks on known tax-shelter promoters in anticipation of the plaintiff's purchase of one.

This business-related advice is consistent with the other documents that have been disclosed. As explained in the opening memorandum, the plaintiff and Carruth were shopping for tax shelters for some time before purchasing the Fidelity International FDIS tax shelter employed here.[62] After deciding on implementing this FDIS tax shelter, the plaintiff utilized Stephanie Denby as a liaison between the plaintiff and the various tax-shelter promoters. Together, they all worked out the final details of the transaction– within the pre-arranged structure. In conjunction with the promoters, Attorney Denby worked hand-in-hand with Sidley Austin and Proskauer Rose ("Proskauer") in generating the "legal" opinions, and worked hand-in-hand with Carruth, which has been described as the plaintiff's investment-management company.[63]

For example, the promoters advised participants of the tax shelter to put other "investments" in the tax shelter partnerships to give the appearance of legitimacy to the transactions.[64] Consistent with this advice, Denby relayed to James Haber the type of "investments" which Carruth has contributed to Fidelity International on taxpayer's behalf. Acting as a liaison, Denby had many other business-type communications with the promoters and Carruth. On another occasion, she emailed to Haber that Jim Reiss (of Carruth) did not "want Fidelity to collapse as a single member LLC" and wanted "KPMG to file a separate return for

---

[62](Mem. in Supp. of Mot. to Compel at 19.)

[63]Reiss Dep. Tr. at 6:5-9.

[64]*See* Reiferson Decl., Ex. 20 (filed with opening memorandum).

2871183.1

Fidelity so that the accounting doesn't come back to Carruth on the Holdings level."[65]  Denby then tells Haber that she thinks it "makes sense to keep Dick's [that is, Richard Egan's] Fidelity outside" and asks if Haber agrees.[66]  This sort of coordination of a business structure is not privileged activity, and the conversations Denby had with Carruth on the matter are not privileged.

Another example involves correspondence between Pat Shea (of Carruth) and James Haber.  Shea asks Haber to set up a call with Stephanie Denby to discuss, among other things, the buyout of the so-called Irish partners in this transaction– Samuel Mahoney and associates– and the closeout of the options traded within Fidelity International.[67]  Here again, Denby is being used as a sounding board to give her opinion as to the appropriateness of James Haber's business advice.

This liaison role is clear in an early email, during the tax-shelter shopping phase, from James Reiss to Carol Remillard (both of Carruth).  In that email, Reiss writes that "Stephanie [Denby] is trying to coordinate a meeting between us and an organization called Helios . . . to discuss their tax reduction strategy."[68]  Just months later, Denby sent an email to Mox Tan of Helios saying she "can wait to see a second draft" of the Proskauer opinion letter, and just wants "assurance" from James Haber that the opinion was in "fairly good shape & that we will be getting a usable product."[69]  In short, here Denby is simply relaying purported legal advice from

---

[65]Reiferson Decl., Ex. 44.

[66]*Id.*

[67]Reiferson Decl., Ex. 45.

[68]Reiferson Decl., Ex. 46.

[69]Reiferson Decl., Ex. 47.

2871183.1

the promoters to her clients and vice versa.  She is doing so in her capacity as a business facilitator.

The plaintiff fails to come forward with a shred of documentary evidence to show that the withheld documents concern legal advice, or to counter the evidence that they do not.  To support its assertion that Denby provided legal advice that is reflected in the withheld documents, the plaintiff instead uses deposition testimony for the proposition that Denby's advice is legal in nature because she was not part of the decision-making team.[70]  That logical leap does not satisfy the plaintiff's burden.  Indeed, it appears that James Haber was also not part of the plaintiff's and Carruth's internal decision-making team.  Yet he certainly wasn't giving legal advice– he was giving business advice on how to implement a tax shelter.  He was doing that in conjunction with Denby and others.

### III.    The Plaintiff Disclosed the Withheld Documents to Third Parties, Thereby Waiving Any Privilege that May Have Attached.

The plaintiff admits quite clearly that the Sidley Austin and Proskauer Rose "opinion letters, which were reviewed at [p]laintiff's request by third parties, *could not be subject to attorney-client privilege*"[71] or any other privilege.[72]  The plaintiff's disclosures were not limited to the opinion letters, as plaintiff routinely disclosed to third parties, even before this litigation, the substance of its communications with Stephanie Denby.  Furthermore, the plaintiff and

---

[70](Pl. Opp. Mem. at 12-13.)

[71](Pl. Opp. Mem. at 22-23.)  Emphasis added.

[72]As explained in the opening memorandum and below, the United States agrees that the opinion letters are not subject to privilege because they were disclosed to numerous third parties, but also contends that they and the supporting documents were not privileged in the first instance, and any privilege would have been waived by the disclosures and the plaintiffs reliance on the letters here.

2871183.1

Carruth have no common legal interest here, and their sharing of documents in this litigation waives any privilege that may ever have attached.

As described in detail above and in the opening memorandum, the plaintiff routinely involved Denby, KPMG, Haber and his affiliates, in collective efforts to generate the FDIS tax shelter transaction and the opinion letters. The plaintiff disclosed Stephanie Denby's advice to those third parties and ultimately to the opinion-letter-providing law firms. To retain privilege, a third-party disclosure must be for the purpose of obtaining legal advice from the lawyer.[73] In contrast, the disclosure of lawyer's advice to an accountant or financial advisor for the purpose of obtaining non-legal advice from the recipients waives privilege.[74] Here, the plaintiff disclosed Stephanie Denby's advice to the accountants and other "advisors" so that those others could complete the implementation of the tax-shelter scheme. The disclosures were certainly not for the purpose of obtaining Denby's legal advice.

Moreover, the plaintiff's disclosure of its entire database of documents to Carruth is an explicit waiver. First, contrary to the plaintiff's assertion, the intent of the disclosing party that a communication remain confidential is not suggestive of a common interest.

> An intent to maintain confidentiality is ordinarily necessary to continued protection, but it is not sufficient.

> On the contrary, where the client chooses to share communications outside this magic circle, the courts have usually refused to extend the privilege.[75]

---

[73]*Cavallaro v. United States*, 284 F.3d 236, 247 (1st Cir. 2002)(citing *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961).

[74]*Id.*

[75]*United States v. Massachusetts Inst. of Tech.*, 129 F.3d 681, 684 (1st Cir. 1997

2871183.1

Second, the plaintiff erroneously claims that it has a common interest with Carruth in this

litigation, and that the purported common interest prevents waiver.  But, the Plaintiff and Carruth

have no common interest in this litigation, as Carruth has no legal interest here at all.

The common interest doctrine, also known as the joint defense doctrine, has been

described as an extension of the attorney-client privilege.[76]  The doctrine "'generally allows a

defendant to assert the attorney-client privilege to protect his statements made in confidence not

to his own lawyer, but to an attorney for a co-defendant for a common purpose related to the

defense of both.'"[77]  "The same general rule (sometimes going by the name 'common defense

rule') protects 'communications by a client to his own lawyer . . . when the lawyer subsequently

shares them with co-defendants for purposes of a common defense.'"[78]  "Some form of joint

strategy is necessary to establish a [joint defense agreement], rather than merely the impression

of one side . . .."[79]  Thus, the claimant must demonstrate an agreement to enter into a joint

defense.[80]

While the Seventh Circuit has extended the common-interest doctrine to situations in

which "parties undertake a joint effort with respect to a common legal interest" and disclose

---

[76]  *United States v. Evans,* 113 F.3d 1457, 1467 (7th Cir. 1997); *United States v. Schwimmer*, 892 F.2d 237, 243-44 (2d Cir. 1989).

[77]*Evans*, 113 F.3d at 1467, *quoting*, *United States v. Keplinger*, 776 F.2d 678, 701 (7th Cir. 1985).

[78]  *Id.* (quoting *United States v. McPartlin*, 595 F.2d 1321, 1336-37 (7th Cir. 1979)).

[79]*United States v. Weissman*, 195 F.3d 96, 100 (2d Cir. 1999).

[80]*See, e.g.*, *In re Grand Jury Subpoena*, 415 F.3d 333, 341 (4th Cir. 2005) (privilege did not apply where parties had not entered into agreement regarding their joint defense); *Grand Jury Proceedings v. United States*, 156 F.3d 1038, 1042-43 (10th Cir. 1998), (declining to apply joint-defense privilege where intervenor failed to produce evidence of joint defense agreement); *Matter of Bevill, Bresler & Shulman Asset Mgmt. Corp.*, 805 F.2d 120, 126 (3d Cir. 1986) (where no evidence was produced that parties had agreed to pursue joint defense strategy, burden of proving applicability of privilege was not met).

communications "to further an ongoing enterprise,"[81] that expansive rule is not applicable here. First, the disclosure here took place after the end of the Fidelity International enterprise. The disclosure took place during this litigation. Second, the expansive rule has not been adopted by the First Circuit. The rule in this Circuit is applicable here.

The applicable rule here is that, although it is not necessary that there be actual litigation in progress in order for the doctrine to apply, "there must be a palpable threat of litigation at the time of the communication, rather than a mere awareness that one's questionable conduct might some day result in litigation, before communications between one possible future co-defendant and another . . . could qualify for protection."[82]  The First Circuit's opinion in *In re Grand Jury Subpoena*, 274 F.3d 563 (1st Cir. 2001) is illustrative. In that case, a lawyer claimed to have entered into an oral agreement to jointly represent certain clients, at which time no particular litigation or investigation was in prospect.[83]  Later, in response to a subpoena issued by a grand jury, he claimed that various documents were privileged on account of the joint defense agreement. The court held, however, that such a joint defense agreement could not form the basis for a claim of a "joint defense" privilege, because "a primary requirement of a joint defense agreement is that there be something against which to defend."[84]  The court noted that the rationale for recognizing joint defense agreements is that they permit parties to share information pertinent to each other's defenses, and that a party's entitlement to this enhanced veil of

---

[81]United States v. BDO Seidman, LLP, 492 F.3d 806, 816 (7th Cir. 2007the

[82]*In re Santa Fe Int'l Corp.*, 272 F.3d 705, 711 (5th Cir. 2001).

[83]274 F.3d at 575.

[84]  *Id.*

confidentiality can be justified only with respect to an adversarial proceeding.[85]  The court

recognized, however, that "outside the context of actual or prospective litigation, there is more

vice than virtue in such agreements."  The court therefore declined to "create a judicially

enforced code of silence," by countenancing a "rolling" joint defense agreement of "limitless

breadth."[86]  The court concluded by stating that "[c]ommon sense suggests that there can be no

joint defense agreement when there is no joint defense to pursue."[87]

Here, the plaintiff and Carruth have no joint defense to pursue.  They also have no joint

claim to prosecute.  In short, Carruth has no legal interest here at all.  Its personal interest in

seeing the plaintiff prevail is not grounds for expanding the common interest doctrine to an

outsider.  In fact, it is quite likely that, absent a familial relationship between the owners of

Carruth– Michael, John, and Christopher Egan– and Fidelity International's Richard Egan, the

plaintiff may have a cause of action against Carruth, not with it.[88]  In that regard, Carruth here is

no different than KPMG, DGI, Helios, and Alpha.  Certainly the plaintiff is not sharing its

documents with those firms.  The plaintiff's waiver of any conflict of interest its attorneys may

have with respect to Carruth does not eliminate the application of waiver provisions upon

disclosure.

---

[85]*Id.*

[86]*Id.*

[87]*Id.*

[88]Of course, that assumes that Richard Egan didn't know precisely what Carruth was
getting into– an abusive tax shelter.

2871183.1

**IV. Conclusion**

The plaintiff put all of the documents related to the Sidley Austin and Proskauer opinions at issue by claiming reasonable good-faith reliance on them. As such, it cannot now pick and choose which documents it discloses to the United States and to the Court. It must disclose all documents related to those opinions so that the plaintiff's assertions of reasonable and good-faith reliance can be analyzed. Because Stephanie Denby and other "advisors" were deeply immersed in the opinion-drafting process, the communications between Denby and Carruth are related to, and are in fact inextricably linked to, the ultimate opinions. Moreover, the plaintiff waived privilege when it disclosed in their entirety all withheld documents to Carruth. Similarly, Carruth waived privilege when it disclosed the withheld documents to the plaintiff. Finally, the withheld documents are not privileged in the first instance because they reflect business, and not legal

2871183.1

advice.  Because the documents were either not privileged in the first place, or any privilege has

been waived, all withheld documents must be produced.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

 /s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Tax Division, U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER L. VANN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044-0055
Telephone: (202) 307-6561
Facsimile:  (202) 514-5238
E-mail:  john.a.lindquist@usdoj.gov
             barry.e.reiferson@usdoj.gov
             heather.vann@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants identified on the Notice of Electronic Filing and copies will be sent to
those indicated as non registered participants on November 13, 2007.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

2871183.1