# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
-----------------------------------------------------------------x
FIDELITY INTERNATIONAL CURRENCY          )
ADVISOR A FUND, L.L.C., by the Tax       )
Matters Partner,                         )
                                         )     Civil Nos. 05-40151-FDS (D. Mass.)
              Plaintiff,                  )               06-40130-FDS (D. Mass.)
       v.                                )
                                         )     Judge Saylor
UNITED STATES OF AMERICA                 )
                                         )
              Defendant.                  )     ORAL ARGUMENT REQUESTED
-----------------------------------------------------------------x
```

## PROSKAUER ROSE LLP'S MEMORANDUM IN OPPOSITION
## TO THE UNITED STATES' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Proskauer Rose LLP ("Proskauer") respectfully submits this memorandum, and the Affidavit of Lawrence M. Hill, Esq. dated November 19, 2007 ("Hill Aff."), in opposition to the United States' ("U.S.") Motion to Compel Production of Documents from Proskauer.

## PRELIMINARY STATEMENT

Proskauer is a law firm that is not a party here. In response to a subpoena dated October 19, 2006, issued by the U.S. in this action, Proskauer produced more than 25,000 pages of documents from its files that relate to more than 50 of its current and former clients, including Richard Egan. Mr. Egan is the only one of Proskauer's clients that has an interest in this litigation by virtue of his membership in the plaintiff entity. Mr. Egan instructed Proskauer not to withhold any documents as privileged or as work product, and thus Proskauer produced all documents pertaining to Mr. Egan, his related entities, and their transactions. At issue on this motion, accordingly, are the documents of *other* clients that Proskauer, as their lawyer, has withheld from production based upon the attorney-client privilege and/or work product doctrine.

Each of those clients whose documents are at issue received a legal opinion from Proskauer, although such opinions involved transactions and issues different than those covered

by the advice rendered to Mr. Egan. The Proskauer legal opinion directed to Mr. Egan involved a tax disclosure issue--whether Mr. Egan was required to disclose the transaction at issue on his 2001 federal income tax return--rather than substantive tax and penalty issues. However, the legal opinions issued to both Egan and Proskauer's other clients discussed facts, case law, statutes, regulations, and issues pertaining to the underlying transactions. Each of these legal opinions rests on classical legal analyses that are the familiar grist of a lawyer's daily work. Each legal opinion has one prime, ultimate focus: what would the outcome be if the IRS became an adversary and challenged the tax benefits and asserted penalties? The opinions and the material generated in the course of working on them should plainly be protected as work product and as privileged. These are, after all, detailed memoranda of law issued by seasoned tax law specialists to their clients.

This motion to compel has an atypical feature: Mr. Egan has instructed Proskauer to produce all his documents, and Mr. Egan's lawyer at Proskauer, Janet Korins, has been examined in this action. We will thus demonstrate, through Mr. Egan's documents and Ms. Korins' testimony, that the work Proskauer performed was classic work product and attorney-client advice. While the legal and factual issues with respect to the non-Egan opinions were client-specific, there are no material differences with regard to the process for rendering the legal advice by Proskauer or the nature of the documents withheld with respect to the other clients. The record, accordingly, presents an opportunity to supply an unusually detailed and open look at what the lawyers actually did without resort to *in camera* inspection. It will be apparent that the lawyers did lawyers' work, and their opinions were work product and attorney-client advice.

The motion of the U.S. to compel should be denied because:

1.      It is undisputed that Proskauer issued legal opinions to its clients.  The U.S. has

not cited a single case in which a legal opinion issued to a taxpayer-client was held not to be

protected by the work product doctrine.  The two cases that squarely address the issue both hold

that legal opinions are work product and were *not* subject to production on a motion to compel.

*See United States v. Roxworthy*, 457 F.3d 590, 592 (6th Cir. 2006); *Long Term Capital Holdings*

*v. United States*, 2003 U.S. Dist. LEXIS 7826, at *32 (D. Conn. Feb. 14, 2003).

2.      The recipients of Proskauer's legal opinions were, in fact, clients of Proskauer and

Proskauer, in fact, served as their lawyer.  The U.S. contends that Proskauer's services were

rendered to promoters, not the taxpayer-clients, in the form of "business advice."  (*See* U.S.

Mem. at 8-12.)  The record, however, makes plain that Proskauer entered into an attorney-client

relationship with the taxpayers who received Proskauer legal opinions.  Those opinions, in turn,

are replete with analyses of applicable statutory provisions, IRS regulations, and other relevant

authorities that answer the question of what the likely outcome would be if the IRS were to

litigate against the client.  Proskauer advised its clients of potential arguments that the IRS might

make to challenge its clients' tax treatment, and the opinions embody the lawyers' mental

processes and thinking.  As the record will make plain, these documents do not represent, as the

U.S. contends, "business advice" to promoters.

The documents on Proskauer's privilege log should therefore be shielded from disclosure

by the work product doctrine and the attorney-client privilege.

* * * * *

This is not a garden variety discovery motion.  At issue are documents concerning 50

non-party clients of the Proskauer law firm.  A holding that the documents are not protected from

discovery will forever destroy their confidentiality.  We respectfully submit that the U.S.'s

motion papers are woefully inadequate to warrant 50 clients, who are not parties and have not

appeared, losing the long-fixed confidentiality protections that are a critical mainstay of the attorney-client relationship.[1]

## FACTS

Proskauer is a law firm with a tax department comprised of over 40 attorneys nationwide. As part of its tax practice, Proskauer regularly renders legal advice concerning the anticipated tax consequences of transactions engaged in by its clients. Proskauer rendered such legal advice to clients who engaged in the transactions responsive to the U.S.'s subpoena issued to Proskauer.

In response to the U.S.'s subpoena, Proskauer made an extensive production of 8,381 client-specific documents totaling 25,086 pages. (*See* Hill Aff. Exs. A and B.) Proskauer's production consisted, *inter alia*, of transaction documents, engagement letters, correspondence, invoices, and fee-remittance information relating to more than 50 Proskauer clients who engaged in transactions described by the U.S. as "SOS" and "FDIS" transactions. Also included in Proskauer's production were documents protected by the attorney-client privilege and work-product doctrine related to legal advice Proskauer provided to Mr. Egan.[2]

The documentary and testimonial evidence produced by Proskauer in this action establishes that Proskauer's relationship with the clients at issue, as exemplified by Mr. Egan, had all the hallmarks of a prototypical attorney-client relationship. Proskauer was hired by Mr. Egan in 2002 to analyze whether he was required, under applicable IRS regulations, to disclose on his tax return a transaction that he undertook in 2001 that the U.S. describes as an FDIS

---

[1]    This confidentiality is severely jeopardized by the burden placed on Proskauer because the privileges belong to the clients, not Proskauer. *Kevlik v. Goldstein*, 724 F.2d 844, 850 (1st Cir. 1984). As such, the court must consider the nexus between the fourth-party documents sought by the U.S. and the elements underlying the cause of action. *See Coltec Indus., Inc. v. United States*, No. 01-72T (Fed. Cl. 2003) (unpublished order at 7-8) (ruling that client records of third party accounting firm showing marketing of similar tax shelter product not required to be produced because documents not sufficient to establish relevancy to taxpayer's business purpose of transaction).

[2]    It is Proskauer's understanding that Mr. Egan has not asserted any privileges applicable to the documents reflecting the legal advice rendered to him by Proskauer.

transaction.  Proskauer did just that.  Proskauer engaged in a careful, reasoned analysis of the legal issues presented by Mr. Egan's transaction, and rendered its advice to Mr. Egan in the form of an opinion letter dated September 4, 2002.  (*See* Hill Aff. Ex. E.)  Proskauer was likewise engaged by the other clients at issue to render legal advice with respect to their respective transactions, and Proskauer likewise generated thoughtful and reasoned legal analyses of the relevant issues in opinion letters to such clients.

Janet Korins was the Proskauer tax partner who worked on the legal opinion that Proskauer issued to Mr. Egan (*see* Hill Aff. Ex. C at 17:8-14; 18:1-3; 26:11-18).  Ms. Korins has extensive expertise in various areas of tax law, having practiced for over 14 years.  (*Id.* at 14:11-21.)  Ms. Korins is a magna cum laude graduate of Harvard College and the Harvard Law School.  (*Id.* at 11:16-22; 12:1-6)  She clerked for a federal judge and was an associate at Cravath, Swaine & Moore, and a partner at Goodwin Procter and Proskauer.  (*Id.* at 12:12-22.)  Ms. Korins is currently an adjunct professor in real estate tax at Hofstra Law School.  (*Id.* at 13:18-21.)  She was elected by her peers to serve on the Executive Committee of the Tax Division of the New York State Bar Association.  (*Id.* 15:19-22; 16:1-22.)  To be elected, one must be regarded as an expert in tax law.  (*Id.* at 16:16-22; 17:1-7.)

Ms. Korins testified that Mr. Egan retained Proskauer for legal advice because "Mr. Egan wanted to know whether the transaction that he entered into [was] what was referred to as a listed transaction or substantially similar to a listed transaction" for purposes of determining whether he was required to disclose the transaction on his tax return.[3]  (*See id.* at 31:15-22; 32:1-

---

[3]    Contrary to the U.S.'s contention that Proskauer was engaged in rendering "business advice" (*see* U.S. Mem. at 8-12), Ms. Korins testimony made clear that Proskauer provided legal advice to Mr. Egan, not "business advice" to Diversified.  Ms. Korins testified that Mr. Egan consulted Proskauer for legal advice regarding his disclosure obligations only *after* he had completed his transaction.  (*See id.* at 90:16-22.)  Furthermore, Ms. Korins stated that she had "no involvement in the development of [Mr. Egan's] transaction."  (*See id.* at 59:18-21.)

3.)  Mr. Egan executed an engagement letter with Proskauer dated August 16, 2002.  (See Hill

Aff. Ex. D.)   The engagement letter makes apparent that Mr. Egan hired Proskauer "in

connection with certain investment transactions that [Mr. Egan] conducted in 2001."  (*Id.*)  The

engagement letter provided for a fixed fee of $50,000.  (*Id.*)  Ms. Korins testified uncategorically

that Mr. Egan was Proskauer's client.  (*See* Hill Aff. Ex. C at 47:22; 48:1-2.)

Ms. Korins testified that, in connection with preparing Proskauer's opinion for Mr. Egan,

she reviewed "the regulations that had been issued, the [IRS] notices, and the facts, [and]

compar[ed] those to the facts of Mr. Egan's transaction."  (*See id.* at 35:21-22; 36:1-3; *see also*

*id.* at 157:17-22.)  Ms. Korins testified that she exercised her informed judgment in reaching an

"independent opinion" as to whether Mr. Egan was required under the applicable regulations to

disclose the transaction on his tax return.  (*See id.* at 26:5-18; 100:1-2; 157:10-13.)  Ms. Korins

testified that her conclusions were not pre-ordained, and that she had no recollection of using a

generic opinion in drafting Mr. Egan's opinion.  (*See id*. at 48:8-17; 50:13-31; 98:6-17.).  Indeed,

as she testified, Mr. Egan's opinion underwent multiple revisions.  (*See id*. at 21:4-9.)

To determine whether the applicable regulations required Mr. Egan to disclose the

transaction, Ms. Korins examined whether Mr. Egan's transaction was "substantially similar" –

as defined in Treasury Regulation § 1.6011-4T(b) – to listed transactions described in two

relevant IRS publications, Notices 2000-44 and 2002-50.  (*See* Hill Aff. Ex. E. at 4-10.)  Ms.

Korins analyzed, in accordance with the two-part test set forth in Treasury Regulation § 1.6011-

4T(b)(1)(i), whether Mr. Egan's transaction was factually similar to, or based on a similar

strategy as, a listed transaction, and resulted in a similar tax benefit.  (*See* Hill Aff. Ex.E at 3; Ex.

C at 36:13-22; 37:1-5.)  After careful review of the "overall facts and the overall structure of

[Mr. Egan's] transaction," Ms. Korins concluded that there were "significant differences"

6

between Mr. Egan's transaction and the transactions described in IRS Notices 2000-44 and 2002-50.  (*See* Hill Aff. Ex. C at 37:18-22; 38:1-18; 40:7-15.)[4]

Thus, based on what Ms. Korins believed to be her "reason[ed] judgment," she concluded that it was more likely than not that Mr. Egan's transaction was not subject to disclosure, because it was not substantially similar to a listed transaction.  (*See* Hill Aff. Ex. E at 11; Ex. C at 32:4-16; 35:13-20; 45:4-13.)  Ms. Korins testified that her analysis was "thorough" and "complete." (*See* Hill Aff. Ex. C at 158:13-17.)

Ms. Korins' conclusion is reflected in the opinion Proskauer provided to Mr. Egan, dated September 4, 2002.  (*See* Hill Aff. Ex. E.)  Ms. Korins considered Proskauer's opinion to be "written advice that a client could rely upon."  (*See* Hill Aff. Ex. C at 32:17-22; 33:1.)  Indeed, the very first page of Proskauer's opinion makes clear that Proskauer's advice was rendered at Mr. Egan's request:

> You [Mr. Egan] have requested our opinion (the "Opinion") regarding whether Richard J. Egan (the "Investor") would be subject to the disclosure requirements under Section 6011 . . . for Investor's involvement in various investment transactions (the "Transactions").

(Hill Aff. Ex. E at 1.)  And the penultimate paragraph of Proskauer's opinion establishes that Proskauer's advice was rendered "solely for [Mr. Egan's] use in determining the federal income tax consequences of the transactions. . . ."  (*See id.* at 11.)

This testimony establishes that Ms. Korins was performing legal services for Mr. Egan.

Nor can there be any doubt that Proskauer's legal opinion to Mr. Egan was issued in anticipation of litigation:  namely, the IRS's taking an adverse position on the disclosure issue

---

[4]    Ms. Korins found that, unlike the transaction described in Notice 2000-44, Mr. Egan's transaction did not involve a "determination of basis that was derived from an interpretation of Section 752."  (*See* Hill Aff. Ex. C at 44:1-11.)  Proskauer's opinion also concluded that, unlike the transaction described in Notice 2002-50, Mr. Egan's transaction did not utilize "a tiered partnership structure," or generate a "deferred loss."  (*See* Hill Aff. Ex. E at 9.)

addressed in the opinion.  Proskauer's opinion set forth potential arguments that the IRS might

make as to why Mr. Egan's transaction was "substantially similar" to a listed transaction.  (*See,

e.g.*, Hill Aff. Ex. E at 4 (identifying notices that "the IRS may argue are the same as or

substantially similar to the Transactions"); 9 (describing potential similarities between Mr.

Egan's transaction and Notice 2002-50).)  Proskauer's opinion also addressed whether Mr. Egan

would be assessed a penalty "if a court were to find that [Mr. Egan] was required to disclose the

Transactions. . . ."  (*Id.* at 11.)  In the event that the IRS successfully challenged Mr. Egan's tax

treatment of the transaction in court, Proskauer's opinion concluded that it was "more likely than

not" that Mr. Egan would not be assessed penalties because he "receive[d] a reasoned opinion of

counsel . . . and could rely on that opinion" in good faith.  (*See* Hill Aff. Ex. C at 45:8-13.)  Ms.

Korins testified that Proskauer's opinion addressed the issue of penalties because Proskauer "felt

it was important for the taxpayer to comply with the law, and their legal obligations[,] which is

why they came to us."  (*See id.* at 45:17-21.)

By check dated September 11, 2002, Mr. Egan paid Proskauer a $50,000 fee for services

rendered.  (*See* Hill Aff. Ex. F; Ex. C at 48:12-13.)

The process by which Proskauer rendered legal advice to Mr. Egan was similar for each

of the clients identified on Proskauer's privilege log.

## <u>ARGUMENT</u>

## I.    THE DOCUMENTS ON PROSKAUER'S PRIVILEGE LOG ARE SHIELDED FROM DISCLOSURE BY THE WORK PRODUCT PROTECTION.

The U.S. argues that the documents that Proskauer seeks to protect from production are

not work product because they were not created because of the prospect of litigation.  Contrary

to the U.S.'s assertion, Proskauer's legal opinions expressly contemplated litigation with the IRS,

and were written to advise its clients what the likely outcome would be.  As the courts held in

*Long Term Capital*, 2003 U.S. Dist. LEXIS 7826, at *32, and in *Roxworthy*, 457 F.3d at 592,

legal opinions, such as those at issue here, are prepared precisely because the client anticipates that the IRS might litigate against it and wishes to understand the merits and risks of its position. The opinions that so advise the client are thus are covered by the work product protection. Moreover, the documents underlying the opinions reflect Proskauer's legal analysis, strategic thinking, and mental processes, which also fall within the "zone of privacy" that the work product doctrine has long protected from intrusion.

   A.    The Documents Are Subject To The Protection Of The Work Product Doctrine.

   The work product protection shields from disclosure "(1) documents or other tangible things, (2) prepared in anticipation of litigation, (3) by or for a party or a party's representative." *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 190 F.R.D. 287, 290 (D. Mass. 2000).  The work product protection applies to an attorney's "mental impressions, conclusions, opinions, or legal theories." *Flynn v. Church of Scientology Int'l*, 116 F.R.D. 1, 3 (D. Mass. 1986).

   The work product protection is designed to create a "'zone of privacy' in which a party, his attorney, and in many cases his non-attorney 'representative' can prepare for litigation, 'free from unnecessary intrusion by his adversaries.'"  *In re Grand Jury Subpoena*, 220 F.R.D. 130, 141 (D. Mass. 2004) (quoting *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998)). The "zone of privacy" serves "to protect the privacy of the attorney's mental processes."  *Id.* at 142.  The "'zone of privacy' is necessary to permit an attorney to pursue his responsibilities in 'work[ing] for the advancement of justice while faithfully protecting the rightful interests of his clients."  *Id.* (quoting *Hickman v. Taylor*, 329 U.S. 495, 510 (1947)).  Analysis of the merits of a client's case is a "classic example" of work product.  *Adlman*, 134 F.3d at 1196-97.

   The proponent of the work product protection "need not establish that the document was prepared 'primarily or exclusively to assist in litigation'; rather, he need only show that 'in light of the nature of the document and the factual situation in the particular case, the document can be

fairly said to have been prepared or obtained *because of* the prospect of litigation.'"[5]  *Maine v. United States Dep't of Interior*, 298 F.3d 60, 68 (1st Cir. 2002) (emphasis original).  A document does not lose work product protection merely because it assists in making a business decision. *Adlman*, 134 F.3d at 1197-98.  The proponent of the work product protection need only establish that the protection applies by a fair preponderance of the evidence.  *See In re Polymedica Corp.*, 235 F.R.D. 28, 31 (D. Mass. 2006); *Grand Jury Subpoena*, 220 F.R.D. at 140.

As the opinion that Proskauer issued to Mr. Egan demonstrates, Proskauer's legal opinions were created because of the prospect of the IRS mounting a challenge to the client's anticipated tax treatment of the transactions.  The Proskauer opinion issued to Mr. Egan anticipated litigation with the IRS over the disclosure issue, and accordingly sets forth arguments that the IRS might assert as to why disclosure was required and the potential impact on the application of penalties.  (*See, e.g.*, Hill Aff. Ex. E at 4 ("there are two notices that the IRS may argue are the same as or substantially similar to the Transactions"); 6 ("Even if the IRS were to argue that the tax benefit resulting from the Transactions is similar . . ., the facts and tax strategy are different.").)  The legal opinions issued to the clients identified on Proskauer's privilege log, although addressing different transactions, facts and legal issues, were likewise created because of the prospect of litigation with the IRS.

The U.S. argues that the work product protection should not extend to Proskauer's legal opinions because Proskauer issued favorable opinions to its clients, and "therefore litigation should not have been expected."  (*See* U.S. Mem. at 14.)  This argument is unavailing.  Courts have held that legal opinions analyzing the anticipated tax treatment of transactions such as the

---

[5]    The U.S. asserts that Proskauer's work product claims are somehow deficient because Proskauer alleged that the withheld documents were created "in anticipation of the prospect of litigation."  (*See* U.S. Mem. at 12-13.)  The U.S. fails to explain why this use of syntax eviscerates the work product protection. To the extent that there is a meaningful distinction to be made, Proskauer's privilege log has been revised to indicate that the documents were created "because of the prospect of litigation."  (*See* Hill Aff. ¶ 9.)

opinions Proskauer issued to its clients are created in anticipation of litigation and thus are entitled to work product protection. In a case precisely on point here, *Long Term Capital*, 2003 U.S. Dist. LEXIS 7826, at *32, the court held that a law firm's legal opinion addressing "possible tax consequences that may have resulted" from its client's transaction was shielded from disclosure by the work product protection because it "was issued with an eye toward litigation and clearly includes 'mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.'"

Similarly, in *Roxworthy*, 457 F.3d at 592, the court held that two KPMG memoranda "analyzing the tax consequences of certain transactions . . . including possible arguments that the IRS could mount against the [company's] chosen tax treatment of the transactions" were properly withheld as work product in response to an IRS summons. The court stated that "[t]he company's decision to obtain a legal opinion only after it had completed a series of transactions could easily lead to the conclusion that the opinion was *more* likely to be in anticipation of litigation as opposed to being used for ordinary business purposes." *Id.* at 597 (emphasis original). *See also United States v. Textron, Inc.*, 507 F.Supp. 2d 138, 149-50 (D.R.I. 2007) (opinions of client's counsel and accountants "regarding items that might be challenged by the IRS, their estimated hazards of litigation percentages, and their calculation of tax reserve amounts" entitled to work product protection).

The U.S. fails to cite any authority, in the First Circuit or elsewhere, holding that legal opinions such as the opinions issued by Proskauer are not entitled to work product protection.[6]

---

[6]     The U.S. also argues that the work product protection is inapplicable to Proskauer's privilege log because Proskauer's clients received favorable advice from Proskauer prior to entering into their transactions. (*See* U.S. Mem. at 14.) This contention is belied by the evidence produced in this action by Proskauer. Ms. Korins testified that Mr. Egan consulted Proskauer with regard to his disclosure obligations *after* his transaction had been completed. (*See* Hill Aff. Ex. C at 31:15-22; 32:1-3; 90:16-22; *see also id.* at 52:15-19.) As Mr. Egan's engagement letter with Proskauer makes evident, he sought

Nor does the U.S. cite support for its implied assertion that a document loses work product status when it advises a client of a possible favorable outcome in litigation. Instead, the U.S. cites a case that directly undermines its position. In *Adlman*, 134 F.3d at 1195 (cited in U.S. Mem. at 13), the court stated that "a document created because of anticipated litigation, which tends to reveal mental impressions, conclusions, opinions, or theories concerning the litigation, does not lose work product protection merely because it is intended to assist in the making of a business decision influenced by the likely outcome of litigation." The court remanded for the district court to apply the proper standard in determining whether work product protection extended to "a 58-page detailed legal analysis of likely IRS challenges" to a taxpayer's planned reorganization that "contained discussion of statutory provisions, IRS regulations, legislative history, and prior judicial and IRS rulings relevant to the claim," in light of the fact that "[t]here is little doubt under the evidence that [taxpayer] had the prospect of litigation in mind when it directed the preparation of the Memorandum. . . ." *Id.* at 1195, 1204.

Proskauer's legal opinions reflect similarly detailed analyses of applicable statutes, regulations, and other relevant authorities, as reflected in the opinion issued to Mr. Egan. (*See* Hill Aff. Ex. E.) Proskauer's legal opinion to Mr. Egan clearly contemplated litigation with the IRS, as evidenced by the opinion's discussion of whether penalties would be assessed in the event that the IRS prevailed in court. (*See* Hill Aff. Ex. E at 11) Because Proskauer's opinions were clearly prepared because of the prospect of litigation with the IRS, they are entitled to work product protection.

The documents on Proskauer's privilege log underlying Proskauer's legal opinions are equally entitled to work product protection. These documents, including certificates of fact from

---

Proskauer's advice a year after he completed the transaction discussed in Proskauer's opinion. (*See* Hill Aff. Ex. D.) Likewise, Proskauer was generally retained to advise the clients at issue on the tax treatment of their respective transactions only after their transactions were completed.

Proskauer's clients and correspondence relating to the legal issues addressed in Proskauer's opinions, reflect communications between Proskauer and its clients or its clients' advisors revealing the strategic analysis and mental processes underlying Proskauer's legal opinions. (*See* Hill Aff. Ex. G.)   The privilege log also identifies attorney notes, internal Proskauer correspondence, legal memoranda, and draft legal opinions that were created within Proskauer's "zone of privacy."   It is well-established that the documents underlying attorney work product are shielded from disclosure.   *See Polymedica*, 235 F.R.D. at 32-33 (holding that documents underlying work product were shielded from disclosure); *Long Term Capital*, 2003 U.S. Dist. LEXIS 7826, at *34 (holding that the work product protection extended to documents underlying law firm's legal opinion).

      B.     The Work Product Protection Has Not Been Waived By Disclosure To Parties Aligned In Interest With Proskauer's Clients.

The U.S. argues that disclosure of the documents on Proskauer's privilege log to third parties, such as employees of Diversified, waived the attorney-client privilege. (*See* U.S. Mem. 14-16.)   Without regard to such argument, it is well-established that the work product protection is waived only by disclosure to an *adverse* party.   *See United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997); *In re Raytheon Secs. Litig.*, 218 F.R.D. 354, 360 (D. Mass. 2003). Ms. Korins testified that she was unaware of any adversarial relationship between Proskauer and Diversified at the time Mr. Egan's opinion was issued (*See* Hill Aff. Ex. C at 140:6-12), and there is no evidence of any such adversarial relationship between Proskauer and Diversified at any other relevant time period with respect to Proskauer's other clients.   The work product protection applicable to the documents on Proskauer's privilege log was not waived by disclosure to Diversified or any other party aligned in interest with its clients.

## II.   DOCUMENTS ON PROSKAUER'S PRIVILEGE LOG REFLECTING COMMUNICATIONS WITH ITS CLIENTS ARE SHIELDED FROM DISCLOSURE BY THE ATTORNEY-CLIENT PRIVILEGE.

The U.S. argues that Proskauer's communications with its clients are not privileged because Proskauer's services were rendered to promoters in the form of business advice relating to the marketing of tax shelters to potential investors and approving of the transactions prior to the investors' decision to undertake them.  (*See* U.S. Mem. at 8-12.)  The U.S. also contends that there was no attorney-client relationship between Proskauer and its taxpayer-clients because, in some instances, Diversified paid Proskauer's legal fees.[7]  (*See id.* at 11.)  These arguments fail on all fronts.  As the evidence demonstrates, Proskauer rendered legal services and advice to its taxpayer-clients.  The mere fact that a third party paid Proskauer's legal fees does not undermine the attorney-client relationship.[8]   Moreover, the U.S.'s conclusory allegations regarding Proskauer's role in marketing tax shelters are both unsupported and irrelevant.

### A.   Proskauer Had an Attorney-Client Relationship and Its Communications With Its Clients Were Made For The Purpose Of Obtaining Legal Advice.

Proskauer was retained by the clients at issue to render advice with respect to the tax treatment of the transactions previously completed, as reflected by the engagement letters produced to the U.S. in this case.  Mr. Egan's engagement letter, like many of the others executed by Proskauer's clients, made apparent that he retained Proskauer "in connection with

---

[7]    In support of its contention that the attorney-client privilege was lost as a result of Diversified's payment of Proskauer's legal fees, the U.S. cites Exhibits 23, 39, 41, 42, 43, and 51.  (*See* U.S. Mem. at 11-12 nn. 24-27.)  Exhibit 43 merely indicates that, in some instances, Diversified paid Proskauer's legal fees, which, as set forth in the footnote below, is insufficient to negate the attorney-client privilege.  In other cases, the clients paid Proskauer directly.  The remaining exhibits cited by the U.S. on this point have nothing to do with Proskauer.

[8]    "In such cases, it is clear that the attorney's ethical duty, as well as the attorney-client privilege, is owed to the person who is being represented, not to the fee payor."  *United States v. Buitrago-Dugand*, 712 F. Supp. 1045, 1051 (D. P.R. 1989).  *See also Dole v. Milonas*, 889 F.2d 885, 888 n.5 (9th Cir. 1989) ("The [attorney-client] relationship and the privilege may exist even though the attorney's fees are paid by a third person."); *United States v. Fisher*, 692 F. Supp. 488, 491 (E.D. Pa. 1988) ("[T]he fact that a third-party pays the fee for the lawyer's services does not necessarily mean that there is no attorney-client relationship.").

rendering tax advice in connection with certain investment transactions that [Mr. Egan] conducted in 2001." (Hill. Aff. Ex. D.) Such documentation is strong evidence of the existence of an attorney-client relationship in and of itself. *See F.D.I.C. v. Ogden Corp.*, 202 F.3d 454, 463 (1st Cir. 2000) ("The entries of appearance and the engagement letters alone constitute powerful proof, and the correspondence evinces a coordinated legal strategy sufficient to lead a reasonable person standing in NEMLC's shoes to infer that Dickstein had become its attorney").

Moreover, an implied attorney-client relationship exists by the fact that Proskauer was retained to provide legal advice, such advice was within the scope of knowledge of Proskauer's tax department, and was rendered to the client. *See, e.g., DeVaux v. Am. Home Assurance Co.*, 444 N.E.2d 355, 357 (Mass. 1983) (*quoting Kurtenbach v. TeKippe*, 260 N.W.2d 53, 56 (Iowa 1977)) (attorney-client relationship exists "when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the advice or assistance."). Such is the case here. With respect to each client, Proskauer was asked to render legal advice within the scope of its knowledge and skill, as reflected in the extensive education, training and experience of Ms. Korins who prepared the legal opinion for Mr. Egan.

Moreover, in each instance, Proskauer in fact rendered such legal advice to the clients at issue, preparing and issuing legal opinion letters in some cases more than 100 pages long to its clients. The undisputed facts demonstrate that Proskauer rendered legal advice to, and at the request of, Mr. Egan, and other Proskauer clients, regarding the anticipated tax consequences of their respective transactions. The legal opinion that Proskauer issued to Mr. Egan, like the other legal opinions identified on Proskauer's privilege log, reflects Proskauer's advice regarding the outcome of litigation with the IRS over the anticipated tax consequences of a transaction. (*See*

15

Hill Aff. Exs. E and G.)  This is sufficient to form an attorney-client relationship.[9]  *See Maloney v. County of Nassau*, 2007 WL 2815811, at *15 (E.D.N.Y. Sept. 25, 2007) (finding allegation that attorney provided advice orally was sufficient to support a claim that an attorney-client relationship existed); *Rodriguez v. Montalvo*, 337 F. Supp. 2d 212, 219 (D. Mass. 2004) (finding attorney-client relationship based on evidence that legal advice was provided to client).

Due to the attorney-client relationship, it is axiomatic that Proskauer's communications with its clients were made in connection with rendering legal advice and thus fall within the scope of the attorney-client privilege.[10]  "The attorney-client privilege protects communications made between an attorney and a client for the sake of obtaining legal advice."  *Amgen*, 190 F.R.D. at 289 (citing *United States v. United Shoe Machinery Corp.*, 89 F. Supp. 357, 358-59 (D. Mass. 1950)).[11]

It is undisputed that advice from an attorney regarding the tax consequences of a transaction are legal communications within the scope of the attorney-client privilege.  *See Textron*, 507 F. Supp. 2d at 146-47 (holding that workpapers that contained "counsel's opinions regarding items that might be challenged because they involve areas in which the law is uncertain" and an assessment of potential litigation were privileged).  As the court stated in

---

[9]    Indeed, Ms. Korins testified that Mr. Egan was Proskauer's client.  (*See* Hill Aff. Ex. C at 47:22; 48:1-2.)

[10]    The U.S.'s assertions regarding the privilege claims of other law firms (*see* U.S. Mem. at 3 n.6) have no relevance to this motion, which relates solely to Proskauer.

[11]    As set forth by the First Circuit, the attorney-client privilege applies: "(1) [w]here legal advice of any kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived." *United States v. Bisanti*, 414 F.3d 168, 171 (1st Cir. 2005).  The attorney-client privilege protects "not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 883 (1st Cir. 1995) (quoting *Upjohn v. United States*, 449 U.S. 383, 389 (1981)).  The purpose of the privilege is "to encourage full and frank communications between attorneys and their clients. . . ." *Texaco*, 60 F.3d at 883.  The party asserting the attorney-client privilege need only establish by a fair preponderance of the evidence that the privilege applies. *Amgen*, 190 F.R.D. at 290.

*United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002), "[d]etermining the tax consequences of a particular transaction is rooted entirely in the law . . . and, *when solicited from or given by a client's attorney*, it constitutes *legal* advice as contemplated by the attorney-client privilege." *Id.* (emphasis original).

As the evidence demonstrates, Proskauer formed an attorney-client relationship with its clients for the purpose of rendering legal advice in connection with potential litigation with the IRS. Thus, communications between Proskauer and its clients are privileged.

> B.    The U.S.'s Contention That Proskauer Was Engaged In Rendering "Business Advice" Is Baseless.

The U.S. contends that Proskauer's relationship was with the promoters, not its clients, and that Proskauer's legal opinions were "business advice" rendered to promoters. (*See* U.S. Mem. at 4-12.) That unsupported and broad-brush supposition is directly contradicted by the evidence discussed at pp. 14-17, demonstrating that Proskauer's opinions were legal advice rendered to clients, not business advice rendered to promoters. In support of its claim, the U.S. relies on almost entirely on evidence that has nothing to do with Proskauer. Moreover, the existence of a relationship between Proskauer and Diversified has no bearing on whether Proskauer had an attorney-client relationship with its clients to whom it issued opinions.

> 1.    The U.S.'s Generalized And Conclusory Allegations Regarding Other Law Firms Have No Bearing On This Motion.

In support of its contention that Proskauer was engaged in rendering "business advice," the U.S. advances a lengthy exposition of evidence of Diversified's dealings with the Brown & Wood law firm and the accounting firm BDO Seidman. None of this evidence has anything to do with Proskauer; it is entirely irrelevant. (*See* U.S. Mem. at 10-11 (describing Diversified's dealings with BDO Seidman); 11-12 (discussing correspondence between Diversified and Brown

& Wood).)[12]  Indeed, it is a powerful demonstration of how unsupported the U.S.'s motion is that it can do no better than cite evidence of what BDO and Brown & Wood did, but not Proskauer.

        2.      Proskauer's Relationship With Diversified Is Irrelevant To Whether
                <u>Proskauer Had An Attorney-Client Relationship With The Taxpayers.</u>

        In support of its contention that Proskauer's relationship with Diversified was a "business" relationship that precluded the existence of an attorney-client relationship between Proskauer and its taxpayer-clients, the U.S. alleges that Proskauer assisted Diversified in the development of "marketing materials," "cookie-cutter" opinions[13] and "boilerplate" transaction documents.  (*See* U.S. Mem. at 8-9.)  The exhibits cited by the U.S. in support of these allegations, however, are either inconclusive or show no participation by Proskauer in the development process.[14]  Moreover, the allegations that Proskauer reviewed Diversified's marketing materials and drafted transaction documents have no bearing on whether Proskauer formed an attorney-client relationship with its taxpayer clients and rendered legal advice to them.

        The evidence submitted by Proskauer belies any contention that Proskauer marketed the transactions to its clients.  Indeed, Ms. Korins testified that Mr. Egan consulted Proskauer for legal advice regarding his disclosure obligations only *after* he had completed his transaction.

---

[12]      Indeed, U.S. Exhibits 7, 8, 10, 11, 12, 22, 23, 29, 30, 32, 36, and 41 (cited at U.S. Mem. at 9-11 nn. 18-27) make no mention of Proskauer whatsoever.

[13]      The U.S.'s contention that Proskauer issued "cookie-cutter" opinions is flatly contradicted by Ms. Korins testimony that Proskauer's opinion issued to Mr. Egan underwent multiple revisions and reflected the firm's "independent" conclusions.  (*See* Hill Aff. Ex. C at 21:4-9; 26:5-18; 100:1-2; 157:10-33.)  Ms. Korins also had no recollection of using a generic opinion in connection with drafting the opinion issued to Mr. Egan.  (*See id.* at 50:13-21; 98:6-17.)

[14]      The U.S. relies on exhibits 8, 10, 11, 12, 18, 20, 30, and 45 for its "marketing" allegations.  (*See* U.S. Mem. at 9 nn. 18-19.)  Exhibit 18 is an April 5, 2002 email, distributing draft marketing materials to Proskauer, Brown & Wood, and Lord Bissell & Brook.  Importantly, the U.S. does not provide any evidence that Proskauer was involved in commenting on these materials.  The evidence submitted by the U.S. shows only that Brown & Wood suggested modifications to the marketing materials.  (*See* U.S. Ex. 20.)  Exhibit 45, an email from Brown & Wood to an unidentified recipient dated February 7, 2002, refers to an unidentified "Proskauer draft" that implemented changes that were not "boilerplate."  To the extent that any conclusions can be drawn from this nebulous document, it would appear to belie the U.S.' contention that Proskauer was involved in drafting "boilerplate" materials.  (*See* U.S. Mem. at 9.)  The remaining exhibits submitted by the U.S. on this point have nothing to do with Proskauer.

(*See* Hill Aff. Ex. C at 90:16-22.)  Furthermore, Ms. Korins stated that she had "no involvement in the development of [Mr. Egan's] transaction."  (*See id.* at 59:18-21.)

The cases that the U.S. cites are similarly unavailing.  The U.S. mischaracterizes *United States v. KPMG*, 316 F. Supp. 2d 30, 40 (D.D.C. 2004), as standing for the proposition that "there could not have been a true attorney client relationship" here "because some of the promoters here were engaged in the business of marketing tax shelters. . . ."  (U.S. Mem. at 7.) The court's holding in *KPMG* addressed whether the relationship between a law firm and an accounting firm fell within the scope of the attorney-client privilege.  When it came to that law firm's taxpayer clients, however, the court in *KPMG* expressly *declined* to hold that the attorney-client privilege did not apply to the legal opinions that the law firm issued those clients.  316 F. Supp. 2d at 40.   The only consideration on this motion is whether Proskauer's communications with its taxpayer clients were privileged.  To the extent that the U.S. relies on the *KPMG* decision to assert that there is no attorney-client privilege between Proskauer and *Diversified*, the case is simply inapplicable because Proskauer asserts the privilege on behalf of its taxpayer clients, not Diversified.  In all other respects, the case has no bearing on the present motion.

The other cases cited by the U.S. are entirely inapposite.  The law firm in *Doe v. Wachovia Corp.*, 268 F. Supp. 2d 627, 632-34 (W.D.N.C. 2003) (cited at U.S. Mem. at 6 n.14), provided potential investors with a generic memorandum setting forth the anticipated tax consequences of a proposed transaction, along with marketing materials that expressly disclaimed any fiduciary obligation on the part of the law firm.  The documents at issue in *Diversified Group, Inc. v. Daugerdas*, 304 F. Supp. 2d 507, 514 (S.D.N.Y. 2003) (cited at U.S. Mem. at 6 n.14) were marketing materials, not legal opinions.  The U.S. also cites *Lugosch v. Congel*, 2006 WL 931687, at *14 (N.D.N.Y. Mar. 7, 2006), as support for the proposition that

"business advice" is not privileged.  In *Lugosch*, the court addressed privilege in the context of communications with in-house counsel and noted that, because of the "curious character" of in-house counsel, who are frequently consulted on non-legal matters, legal advice must be distinguished from business advice in evaluating the privilege.  *Id*.  That case has no application here, where the attorney-client relationship at issue is between individual clients and an outside law firm providing legal advice on tax matters.  None of the cases cited by the U.S. apply here.

## CONCLUSION

For these reasons, the U.S.'s motion to compel should be denied in its entirety.

## REQUEST FOR ORAL ARGUMENT

Proskauer believes that oral argument may assist the Court in deciding the questions presented, and respectfully requests that the Court permit oral argument.

Dated: November 19, 2007

Respectfully submitted,

PROSKAUER ROSE LLP

*/s/ Lawrence M. Hill*
Lawrence M. Hill, NYS OCA #1965201
Mark D. Allison, NYS OCA #2739209
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-6866
Facsimile: (212) 259-6333

Christopher L. DeMayo, BBO#653481
DEWEY & LEBOEUF LLP
260 Franklin Street
Boston, MA 02110
Telephone: (617) 748-6851
Facsimile: (617) 897-9051

David M. Lederkramer, NYS OCA #1945765
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036
Telephone: (212) 969-3995
Facsimile: (212) 969-2900

*Attorneys for Proskauer Rose LLP*

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and copies will be sent to those indicated as non registered participants on November 19, 2007. Additionally, Exhibit G of the Affidavit of Lawrence M. Hill, Esq. has been filed under seal pursuant to Judge Saylor's order of November 5, 2007.

_/s/ Christopher L. DeMayo_ _____

Christopher L. DeMayo, BBO#653481
DEWEY & LEBOEUF LLP
260 Franklin Street
Boston, MA 02110
Telephone: (617) 748-6851
Facsimile: (617) 897-9051
cdemayo@dl.com

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x

FIDELITY INTERNATIONAL CURRENCY    )    Civil Nos. 05-40151-FDS (D. Mass.)
ADVISOR A FUND, L.L.C., by the Tax    )             06-40130-FDS (D. Mass.)
Matters Partner,    )

    )    Judge Saylor

    Plaintiff,    )

v.    )

    )    **AFFIDAVIT OF**

UNITED STATES OF AMERICA    )    **LAWRENCE M. HILL**

    )

    Defendant.    )

-------------------------------------------------------------x

STATE OF NEW YORK    )

    ) ss.:

COUNTY OF NEW YORK    )

LAWRENCE M. HILL, being duly sworn, states:

1.    I am a member of Dewey & LeBoeuf LLP, counsel to third party Proskauer Rose LLP ("Proskauer"). I submit this affidavit in support of Proskauer's response in opposition to the United States' Motion to Compel the Production of Documents from Proskauer. I have personal knowledge of all matters set forth herein.

2.    The United States served a subpoena on Proskauer dated October 19, 2006 (the "subpoena").

3.    Annexed hereto as Exhibit A is a true and correct copy of my letter to Barry E. Reiferson, Esq., dated November 21, 2006, enclosing Proskauer's initial production of documents to the United States in response to the subpoena.

4.      Annexed hereto as Exhibit B is a true and correct copy of my letter to Barry Reiferson, Esq., dated November 30, 2006, enclosing Proskauer's supplemental production of documents to the United States in response to the subpoena.

5.      Annexed hereto as Exhibit C is a copy of excerpts from the transcript of Janet Korins' deposition testimony in the above-captioned action provided on October 24, 2007.

6.      Annexed hereto as Exhibit D is a true and correct copy of the fully-executed engagement letter between Proskauer and Richard J. Egan, dated August 16, 2002, and produced to the United States in response to the subpoena at PR(EGAN) 0025014-0025015.

7.      Annexed hereto as Exhibit E is a true and correct copy of the legal opinion letter issued by Proskauer to Richard J. Egan, dated September 4, 2002, and produced to the United States in response to the subpoena at PR(EGAN) 0024347-0024358.

8.      Annexed hereto as Exhibit F is a true and correct copy of the check issued by the Richard J. Egan 1986 Revocable Trust to Proskauer, dated September 11, 2002, and produced to the United States in response to the subpoena at PR(EGAN) 0025019.

9.      Annexed hereto as Exhibit G is a true and correct copy of a revised privilege log submitted on behalf of Proskauer in response to the subpoena. This version of the privilege log replaces the privilege log originally submitted by Proskauer to the United States on June 4, 2007. Exhibit G has been filed under seal pursuant to Judge Saylor's Order of November 5th, 2007. A paper copy of such document has been served on the parties and the Court.

10.     The revisions to the privilege log annexed as Exhibit G reflect the addition of attorney-client privilege and work product assertions that were inadvertently omitted from

Proskauer's June 4, 2007 privilege log.  The revisions to the privilege log also reflect that the

documents on the log were prepared "because of the prospect of litigation."  The revisions also

reflect the removal of documents that Proskauer has deemed appropriate for production to the

United States or otherwise that Proskauer has determined not to be responsive to the subpoena.

11.     Annexed hereto as Exhibit H is a true and correct copy of the discovery order in

*Coltec Indus., Inc. v. United States*, No. 01-72T (Fed. Cl. May 14, 2003).


LAWRENCE M. HILL

Sworn to before me this
    19th day of November, 2007


Notary Public

DAPHNE E. CUMMINGS
Notary Public, State of New York
No. 01CU6040022
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires April 17 2010

**Exhibit A to the Affidavit of Lawrence M. Hill, sworn to on November 19, 2007**

# DEWEY BALLANTINE LLP

1301 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6092
TEL  212 259-8000   FAX  212 259-6333

LAWRENCE M. HILL
212 259 8330
lhill@deweyballantine.com

November 21, 2006

VIA U.S. MAIL

Barry E. Reiferson
U.S. Department of Justice, Tax Division
Civil Trial Section, Northern Region
P.O. Box 55
Ben Franklin Station
Washington, DC 20044

> Re:   *Fidelity Int'l v. United States*, Civ. No. 05-40151 (D. Mass.)
>        Subpoena to Proskauer Rose LLP

Dear Mr. Reiferson:

Pursuant to our letter dated November 17, 2006, please find enclosed a set of the non-privileged documents responsive to the subpoena served on non-party Proskauer Rose LLP on October 19, 2006. The responsive documents are included on the enclosed three CDs with Bates numbers PR(EGAN) 0000001 through PR(EGAN) 0024120.

Proskauer is still in the process of reviewing its files and any supplemental production will be forthcoming. Additionally, a privilege log is being prepared and will be submitted in due course.

If you have any questions or would like to discuss the enclosed, please do not hesitate to contact me at 212/259-8330.

Very truly yours,

*Lawrence M. Hill*

Lawrence M. Hill

Enclosures

cc:   David M. Lederkramer
       Mark D. Allison

**Exhibit B to the Affidavit of Lawrence M. Hill, sworn to on November 19, 2007**

# DEWEY BALLANTINE LLP

1301 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6092
TEL 212 259-8000  FAX 212 259-6333

LAWRENCE M. HILL
212 259 8330
lhill@deweyballantine.com

November 30, 2006

<u>VIA U.S. MAIL</u>

Barry E. Reiferson
U.S. Department of Justice, Tax Division
Civil Trial Section, Northern Region
P.O. Box 55
Ben Franklin Station
Washington, DC 20044

Re:   *Fidelity Int'l v. United States*, Civ. No. 05-40151 (D. Mass.)
      <u>Subpoena to Proskauer Rose LLP</u>

Dear Mr. Reiferson:

        Pursuant to our letter dated November 21, 2006, please find enclosed a set of supplemental non-privileged documents responsive to the subpoena served on non-party Proskauer Rose LLP on October 19, 2006. The responsive documents are included on the enclosed two CDs with Bates numbers PR(EGAN) 0024121 through PR(EGAN) 0025086. A privilege log is being prepared and will be submitted in due course.

        If you have any questions or would like to discuss the enclosed, please do not hesitate to contact me at 212/259-8330.

                                    Very truly yours,

                                    Lawrence M. Hill

Enclosures

cc:   David M. Lederkramer
      Mark D. Allison

NEW YORK  WASHINGTON, D.C.  LOS ANGELES  EAST PALO ALTO  HOUSTON  AUSTIN
LONDON  WARSAW  FRANKFURT  MILAN  ROME  BEIJING

**Exhibit C to the Affidavit of Lawrence M. Hill, sworn
to on November 19, 2007**

# Transcript of the Testimony of **Janet Korins**



**Date:** October 24, 2007
**Volume:** 1

**Case:** Fidelity International Currency Advisor A Fund LLC v. The United
States of America

Printed On: 10/30/2007



ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

Page 11

1      viewing it and determining whether you will

2      sign it.

3                MR. LEDERKRAMER:  We will agree.

4                MS. AMANTI:  For the record,

5      plaintiff's position is that the Proskauer

6      information is subject to the protective order

7      as provided for in the order.

8                        EXAMINATION BY

9      BY MS. AMANTI:

10          Q.  Good morning, can you please state

11     your name and address?

12          A.  Janet Korins, 49 Ogden Road,

13     Scarsdale, New York.

14          Q.  Are you represented by counsel today?

15          A.  Yes.

16          Q.  Ms. Korins, where did you attend

17     college?

18          A.  Harvard College.

19          Q.  What was your degree in?

20          A.  Social studies.

21          Q.  Did you receive any honors?

22          A.  Magna cum laude.

Janet Korins - October 24, 2007
Fidelity International Currency Advisor A Fund LLC v.The United States of America

Page 12

1      Q.  Where did you attend law school?

2      A.  Harvard Law School.

3      Q.  When did you graduate?

4      A.  1991.

5      Q.  Did you receive any honors?

6      A.  I did, also magna cum laude.

7      Q.  Let's go back, when did you graduate

8   from college?

9      A.  1988.

10     Q.  Can you describe your work for me

11  following law school?

12     A.  Following law school, I worked for

13  one year as a law clerk for the District

14  Court, Federal District Court, Eastern

15  District of New York, in Brooklyn.

16         After that, I joined Cravath Swain &

17  Moore as an associate in the tax department

18  for about five or six years.

19         I then joined Goodwin Proctor for

20  three or four years.

21         And in spring of 2001, joined

22  Proskauer.

Janet Korins - October 24, 2007
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 13

1      Q.  Were you a partner at Goodwin

2  Proctor?

3      A.  I was.

4      Q.  Did you join Proskauer Rose as a

5  partner?

6      A.  I did.

7      Q.  Can you describe for me your legal

8  practice, the area that you work in?

9      A.  I worked in many different areas.

10         I did corporate work, real estate

11  work, partnership work, securities work,

12  REITs, many different -- representing

13  individuals, corporations, businesses.

14         It was varied in that respect.

15      Q.  Do you do tax work?

16      A.  Now?

17      Q.  Now.

18      A.  Now I am an adjunct professor at

19  Hofstra Law School.   I teach a course on real

20  estate tax, which I intend to teach again next

21  spring.

22      Q.  What is your current position at

Janet Korins - October 24, 2007
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 14

1    Proskauer?

2       A.   I'm a consultant at Proskauer.

3       Q.   What does that mean?

4       A.   If there are issues or work that

5    Proskauer would like my services for, I'm

6    available to them.

7       Q.   When you were a partner at Proskauer,

8    did your work involve tax work?

9       A.   Yes.

10       Q.   What types of tax work?

11       A.   Again, all different types of tax

12    work, from M&A, partnership securities,

13    representing individuals, representing

14    businesses in all kinds of investments and

15    other individual or business transactions.

16          It's hard to identify one particular

17    area.

18       Q.   How many years would you say you have

19    been working in the tax area?

20       A.   14, 15, 16.   I'm getting my math

21    wrong.

22              (JK Exhibit Number 3

Janet Korins - October 24, 2007
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 15

1              was marked for

2              identification.)

3      Q.  I'm handing you what's been marked as

4  Exhibit JK 3.

5         Do you recognize this document as

6  your biography from Proskauer Rose's publicly

7  available website?

8      A.  I do.

9      Q.  Is the information in this biography

10  accurate?

11      A.  The information is accurate with one

12  minor exception, it hasn't been updated to

13  reflect that I was but am no longer a member

14  of the executive committee of the tax section

15  of the state bar.

16         I'm still a member of the state bar,

17  but I stepped off the executive committee

18  within the past year.

19      Q.  How long were you a member of the

20  executive committee of the tax division?

21      A.  I don't remember.  It was at least

22  five years, possibly six years, I have to

Page 16

1   confess I don't remember the exact date I

2   stepped on.   It might have been 2000 through

3   2006.   But -- roughly.

4       Q.   What is the executive committee, what

5   does it do?

6       A.   The executive committee of the state

7   bar writes reports that comment on proposed

8   legislative changes, regulations, some tax

9   policy issues, to give comments to the

10  government about the tax law.

11      Q.   And is it an elected position?

12      A.   No.

13         I believe it was nominated, I believe

14  I was selected or approved by some group of

15  individuals.

16      Q.   Do you know what the selection

17  criteria is?

18      A.   My understanding, it would be someone

19  who had attained a certain level of experience

20  and knowledge in the practice area.   But I'm

21  not aware of reading any specific criteria

22  other than that.

Janet Korins - October 24, 2007
Fidelity International Currency Advisor A Fund LLC v.The United States of America

Page 17

1          But in New York, not just Manhattan,

2     but tax practitioners -- most of the major law

3     firms in New York, Albany, Buffalo.  Other

4     cities in New York.

5          Q.  So you were recognized by your peers

6     as an expert in the area?

7          A.  Yes.   I was.

8          Q.  Did there come a time in the summer

9     of 2002 when Richard Egan engaged Proskauer

10    Rose to render tax advice?

11         A.  Yes.

12         Q.  Were you involved in providing that

13    advice?

14         A.  I was.

15         Q.  Did Proskauer Rose ultimately issue

16    an opinion to Richard Egan?

17         A.  Yes.

18         Q.  In 2002, what was the procedure that

19    Proskauer Rose used for drafting tax opinions?

20         A.  Normally a tax opinion might be

21    actually drafted by an associate, but had to

22    be approved by two partners in the department.

Page 18

1    Q.  Which two partners approved the

2    opinion that was issued to Richard Egan?

3    A.  Myself and Ira Akselrad.

4              (JK Exhibit Number 4

5               was marked for

6               identification.)

7    Q.  I'm handing you what's been marked as

8    Exhibit JK 4.

9         It's Bates numbered PR Egan 0025061

10   through 72.

11        This is an E-mail dated July 31, 2000

12   attaching the Egan draft disclosure opinion.

13        The second sentence of the E-mail

14   says:  Please note that this draft has not

15   yet been fully reviewed internally.

16        What were Proskauer Rose's internal

17   review procedures in 2002?

18   A.  I think as I said, the opinion would

19   have had to be reviewed and approved by two

20   partners.

21        So I think that this would indicate

22   that the internal review had not yet been

Page 21

1    exactly who Orrin Tilevitz was.

2       Q.  Did you review this draft of the

3    opinion before it was sent to Mr. Tilevitz?

4       A.  I did review drafts of this opinion,

5    whether I reviewed this particular draft, I

6    actually don't -- I reviewed this particular

7    draft.  But I don't remember the timing of

8    whether I reviewed it before or after this

9    E-mail went out.

10          I do remember this draft.

11       Q.  Were drafts generally reviewed by

12    partners before they were sent outside the

13    firm?

14          MR. ALLISON:  Just generally.

15       A.  Generally what Proskauer's practice

16    was?

17       Q.  Just generally, yes?

18       A.  I would say generally, yes.

19          But I don't remember in this

20    particular case the timing.

21          MR. LINDQUIST:  Objection, lack of

22    foundation.

Page 26

1      discussing in Exhibit JK 7?

2          A.  Yes.

3          Q.  The additions to the opinion letter?

4          A.  Yes.

5          Q.  Back on Exhibit JK 7, when you added

6      this language to the opinion letter, did

7      Proskauer Rose independently evaluate the

8      merits of the argument?

9          A.  Yes, I independently evaluated the

10     merits of the argument.

11         Q.  Do you recall who wrote this section?

12         A.  I recall that I had some part in

13     writing and/or revising.   But I generally

14     wrote in conjunction with an associate who I

15     was working with.

16         Q.  And you ultimately approved this

17     language?

18         A.  Yes, I did.

19         Q.  And Mr. Akselrad approved the

20     language as well?

21         A.  Yes.

22                      (JK Exhibit Number 8

Page 31

1      A.  I did.

2                  (JK Exhibit Number 11

3                  was marked for

4                  identification.)

5      Q.  I'm handing you what has been marked

6   as Exhibit JK 11.   This is the September 4th,

7   2002 opinion issued to Richard Egan.

8           If you look at the last page --

9           MS. AMANTI:  The Bates number is PR

10  Egan 0024347.

11          MR. LINDQUIST:  Thank you.

12     Q.  If you look at the last page, 24358

13  you will see that it is signed by Proskauer

14  Rose.

15          What was the purpose of issuing this

16  opinion?

17     A.  The purpose was Mr. Egan wanted to

18  know whether the transaction that he entered

19  into what was referred to as a listed

20  transaction or substantially similar to a

21  listed transaction so that there were specific

22  disclosure requirements for purposes of

Page 32

1    reporting that on his tax return and he wanted

2    to know whether his transaction fell within

3    those rules.

4        Q.  What was the opinion that Proskauer

5    Rose reached?

6        A.  That the transaction was not

7    substantially similar to a listed transaction.

8        Q.  With what level of certainty did you

9    reach that opinion?

10       A.  More likely than not.

11       Q.  Can you explain what "more likely

12   than not" means?

13       A.  More likely than not would mean it's

14   more than 50 percent the better

15   interpretation, not certain, but more likely

16   yes than no on balance.

17       Q.  What is the significance of the fact

18   that the opinion was signed by the firm rather

19   than an individual?

20       A.  Well, the fact that it was signed by

21   the firm meant it was an opinion, that it had

22   gone through a review process, and it was

Page 33

1    written advice that a client could rely upon.

2         Q.  If you look at the first page of the

3    opinion, Bates number ending in 347, in the

4    second paragraph, the opinion states that

5    you've provided us with certain documents.

6              Do you recall what documents were

7    reviewed?

8         A.  I do not specifically recall which

9    documents were reviewed.

10        Q.  What type of documents would

11   typically be reviewed in preparing this type

12   of opinion?

13             MR. LINDQUIST:  Objection, lack of

14   foundation.

15        Q.  You can answer.

16        A.  Well, for purposes of an opinion --

17   for each opinion you would review the

18   documents that you felt appropriate.

19             So for this opinion we would want to

20   review documents so that we would understand

21   the transaction structure and the facts

22   relevant to this particular transaction.

Page 35

1    provided to the firm about what the facts

2    were.    And then we would assume those facts

3    to be -- we would take those facts and apply

4    them to law.

5        Q.  Did you review and approve this

6    section of the opinion?

7        A.  I did.

8        Q.  If you will turn for me to page

9    ending in Bates number 350?

10       A.  Yes.

11       Q.  This is the analysis section of the

12   opinion.

13            What was the conclusion that

14   Proskauer Rose reached with respect to Notice

15   2000-44?

16       A.  That the transaction was more likely

17   than not "not substantially similar" to the

18   Notice 2000-44 transaction, more likely than

19   not would not be treated as substantially

20   similar.

21       Q.  What did you base that opinion on?

22       A.  We base, our judgment is based on the

Janet Korins - October 24, 2007
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 36

1    regulations that had been issued, the notice,

2    and the facts, comparing those to the facts of

3    Mr. Egan's transaction.

4        Q.  If you would turn for me to Bates

5    number ending in 352?

6        A.  Yes.

7        Q.  The first paragraph, the first

8    sentence says that, "The transactions more

9    likely than not would not be considered

10   substantially similar to Notice 2000-44"?

11       A.  Yes.

12       Q.  What does substantially similar mean?

13       A.  Substantially similar was defined in

14   the regulations that had been issued shortly

15   before the date of this opinion, a few months

16   before.

17       So the regulations defined

18   substantially similar as resulting in a

19   similar type of tax benefit and either

20   factually similar or based on a similar

21   strategy.

22       So it was a two-part test.

Page 37

 1          You had to compare the transaction to

 2    a transaction identified in a notice or

 3    otherwise by the service, and apply that test

 4    to determine whether it was substantially

 5    similar.

 6       Q.  Just for reference, when you were

 7    talking about the standard for substantially

 8    similar, were you looking at Bates numbered

 9    page ending in 349?

10       A.  Just now I was looking -- actually, I

11    was looking at similar language that was on

12    page 352.

13       Q.  We're back on page 352, the second

14    sentence says, "There are a number of factual

15    differences between the transactions and the

16    transaction in Notice 2000-44"?

17       A.  Yes.

18       Q.  What were those factual differences?

19       A.  There were -- a Notice 2000-44, the

20    taxpayer sells his interest in a partnership,

21    where the basis has been determined for that

22    asset that had been sold using a technical

Page 38

1  reading of Section 752, the partnership

2  interest in this transaction was not sold.

3  It was a different asset that had been sold.

4       Also, Notice 2000-44, the investor

5  has a nominal or zero investment in the

6  transaction, in this transaction the investor

7  invested a significant amount of money, both

8  in the options and with other stock and

9  property.

10      Q.  So it was these factual differences

11  that led Proskauer Rose to conclude that the

12  transactions at issue in this opinion were not

13  substantially similar to Notice 2000-44?

14      A.  Yes.  Those were among the

15  significant -- yes.  Those are discussed in

16  the opinion.  Those were, we felt,

17  significant differences in the facts of the

18  transaction.

19      Q.  I'm now down in the last full

20  paragraph on Bates page ending in 352.

21       Here the opinion discusses the tax

22  benefit of Notice 2000-44?

Page 40

1    Q.   The opinion in that same paragraph

2    also states that the facts in tax strategy

3    different?

4    A.   Yes.

5    Q.   How were the facts and tax strategy

6    different in the transactions versus 2000-44?

7    A.   We felt factually the overall facts

8    and the overall structure of this transaction

9    was different from the transaction described

10   in the notice, in that again the asset that

11   was being sold in the case of Mr. Egan to

12   trigger the loss had a basis that was not

13   affected by any of the technical partnership

14   arguments that had been used in Notice

15   2000-44.

16       So we felt that the overall strategy

17   and the factual -- the facts as a whole were

18   very different.

19   Q.   The last paragraph on page 352

20   carries over onto the next page, it talks

21   about, we touched on this earlier, the

22   language in the example in the disclosure

Page 44

1    Q. And what facts in the transaction led

2    you to believe that the example did not apply

3    to the transactions?

4    A. In the transaction that we were

5    looking at for Mr. Egan, the asset that was

6    sold was sold at a loss.

7    There was no determination of basis

8    of that particular asset that was derived from

9    an interpretation of Section 752.   There was

10   no sale of a partnership interest where basis

11   was determined in that respect.

12   Q. If you'll turn for me to page ending

13   in Bates number 356.

14   Here, Section 4, there is a

15   discussion of penalties.

16   What was Proskauer Rose's conclusion

17   with respect to penalties?

18   A. I think that we felt that -- a sum of

19   things.

20   We felt while there was no specific

21   penalty for failing to disclose at that point

22   in time under Section 6111, we felt that

Page 45

1    obviously it was important for a taxpayer to

2    report accurately on their tax return anything

3    that was required to be reported.

4         And so we felt that -- which is why

5    we felt that if the taxpayer got sort of --

6    which is why the taxpayer came to us for our

7    reason judgment as to whether or not reporting

8    was required.  And so we felt that a taxpayer

9    who receives a reasoned opinion of counsel, a

10   more likely than not opinion and could rely on

11   that opinion, and that they should not be --

12   should not have any penalties imposed if they

13   rely in good faith on an opinion.

14   Q.  Did the fact that no penalties were

15   applicable at the time effect the opinion that

16   you rendered with respect to penalties?

17   A.  I think that -- yes, there were no

18   penalties at the time but we still felt it was

19   important for the taxpayer to comply with the

20   law, and their legal obligations which is why

21   they came to us.

22         So I think that the fact that there

Page 47

1          This witness is not a 30(b)(6)

2     witness.

3          A.   Not to my knowledge.

4          Q.   Did you communicate to Mr. Egan or

5     his representatives any opinion that was

6     contrary to the one that's marked as Exhibit

7     11?

8          A.   I did not, no.

9                    (JK Exhibit Number 12

10                    was marked for

11                    identification.)

12         Q.   I'm handing you what has been marked

13    as Exhibit JK 12.

14              It is Bates numbered PR Egan 0024344

15    through 45.

16              What is this document?

17         A.   I don't remember seeing this document

18    at the time, but I can see what it is on the

19    page.   It's an engagement letter from

20    Proskauer to Mr. Egan for -- to render tax

21    advice.

22         Q.   Who did Proskauer Rose represent in

Page 48

1      rendering this opinion?

2          A.  Mr. Egan.

3          Q.  In the second paragraph it refers to

4      a $50,000 fee.

5              Was the fee billed directly to Mr.

6      Egan?

7          A.  I really have no knowledge of that.

8          Q.  Was the fee contingent on Proskauer

9      Rose reaching a certain conclusion?

10         A.  I have no knowledge that it would

11     have been.   I have no knowledge -- I had no

12     knowledge at the time of the fee.   It was a

13     fee for services rendered.

14         Q.  Does the engagement letter say that

15     the fee was contingent upon reaching any

16     particular conclusion?

17         A.  No, it does not.

18             MS. AMANTI:  I'm finished.   Thank

19     you.

20             MR. HILL:  Why don't we take a short

21     break, John, if that is okay with you.

22             10 minutes.

Janet Korins - October 24, 2007
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 50

1    joined Proskauer Rose, I believe in the summer

2    of 2002, do you recall exactly what date?

3        A.  I joined Proskauer Rose in May of

4    2001.

5        Q.  May 2001.

6            And prior to becoming involved with

7    the Egan transaction, had you previously had

8    any working relationship with a client by the

9    name of DGI, The Diversified Group?

10           MR. LEDERKRAMER:  Objection to form.

11       A.  No, I don't recall having any

12   relationship with that client.

13       Q.  Did you ever have any involvement

14   with the issuance of a model opinion with

15   respect to the Egan transaction?

16       A.  I'm not sure what you mean.   I'm

17   sorry, model opinion?

18       Q.  Yes.

19           Have you ever worked with model

20   opinions?

21       A.  I'm not sure -- I used opinions as --

22   just like any document, precedence for other

202-347-3700              Ace-Federal Reporters, Inc.              800-336-6646

Page 52

1      A.  I don't recall whether I personally

2   reviewed -- I'm sorry, the factual

3   representations?

4      Q.  Any factual representations by

5   Richard Egan with respect to the Fidelity

6   International transaction?

7      A.  I don't recall exactly which

8   documents I personally reviewed that outlined

9   the facts in this transaction.

10      Q.  You indicated on direct testimony

11   something about the reason why you believed

12   Mr. Egan came to Proskauer Rose for an

13   opinion.   And I think you said because he

14   wanted to follow the law.

15         Is that your understanding of why he

16   came to Proskauer Rose?

17      A.  Well, specifically he wanted advice

18   on a legal question as to whether disclosure

19   was required for this particular transaction.

20      Q.  Did you ever have any discussions

21   with Mr. Egan as to why he had come to the law

22   firm of Proskauer Rose for an opinion?

Janet Korins - October 24, 2007
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 59

Q.   Why not?

A.   Because partners -- as a partner, I
did not have access to any billing records at
the firm.

Q.   So if you wanted to access them, you
weren't authorized to?

A.   I never tried to access any billing
records.

Q.   Did Mr. Akselrad ever have any
discussions with you concerning the
development of the Egan transaction?

MR. LEDERKRAMER:   Objection to form.

A.   I didn't know -- when you talk about
development, could you be more specific?   Are
you talking about development of the actual
transaction structure?

Q.   Yes.

A.   I didn't know about the transaction
-- I found out about the transaction after it
was entered into, so I had no involvement in
the development of the transaction.

Q.   Did you ever know who the foreign

Page 90

1       those outlines of the proposed transaction?

2              MR. HILL:  Objection.

3              MR. LEDERKRAMER:  Objection to form.

4              MS. AMANTI:  Objection.

5              MR. LEDERKRAMER:  Are you asking her

6       whether she was involved in the transaction

7       before the opinion was written or whether she

8       saw the documents you appear to be referencing

9       contemporaneously with the drafting of the

10      opinion.

11             MS. AMANTI:  I object as well.

12          Q.  I'm asking broadly whether or not you

13      ever saw what was entitled:   Outline of

14      proposed transaction with respect to Fidelity

15      International transaction.

16          A.  I don't remember seeing any specific

17      document like that.   And I didn't have any

18      knowledge of this transaction until it had

19      already been done, so I wouldn't have been

20      involved in a proposed transaction.   It was a

21      completed transaction by the time I knew about

22      it.

Page 98

1          A.   I'm not sure.   I wasn't aware that

2     there was a generic form that anyone -- that

3     was provided to Mr. -- that Mr. Ruble signed

4     off on.   I'm not aware of that.

5               I've never seen this before.

6          Q.   Do you have any knowledge as to

7     whether or not Proskauer had a generic form of

8     opinion with respect to a transaction that the

9     Egans had engaged in?

10              MR. LEDERKRAMER:   Objection to form.

11              You may answer.

12         A.   By generic, I'm not sure what you

13    mean by generic opinion.   Often you would

14    use, as in anything, you would use language

15    that you may have seen elsewhere.

16              But I'm not aware of a generic

17    opinion.

18         Q.   Let me now draw your attention to the

19    response by Ruble on February 17, '02, which

20    is the top of this page, in which Mr. Ruble

21    indicates that there is one quasi-substantive

22    issue.

Page 100

1      A.   I wasn't aware of any of this, but we

2   reached our independent conclusion.

3      Q.   In reaching that independent

4   conclusion, did you have any input from Mr.

5   Haber at DGI for purposes of formulating that

6   opinion?

7      A.   What I recall from the time is that I

8   recall that the opinion was -- we did receive

9   some input or feedback from Mr. Egan's

10  representatives on the opinion.

11      I don't remember Mr. Haber being

12  involved.   I just don't specifically recall

13  that.

14      Q.   Let me ask you to turn to Exhibit

15  Number 919.

16      I would direct your attention to what

17  is marked here as number 6 in the middle of

18  the document, and for purposes of putting this

19  in context, this is an E-mail that has been --

20  I don't want to mislead you, I don't know that

21  it's fully clear here, I'm going to give you

22  the context.

Janet Korins - October 24, 2007
Fidelity International Currency Advisor A Fund LLC v.The United States of America

Page 140

1          THE WITNESS:    Yes.

2          MR. HILL:  It has nothing to do with

3     Mr. Egan?

4          THE WITNESS:    It has nothing to do

5     with Mr. Egan.

6          MR. HILL:  At the time that this

7     letter, the Bates stamps are DGI 39803 to

8     39804, at the time this was written, were you

9     aware of any adversarial relationship between

10     Proskauer and The Diversified Group or

11     Diversified or any part of Diversified?

12          THE WITNESS:    No.

13          MR. HILL:  Thank you.

14     Q.  Do you know if the form of this

15     letter was also sent prior clients of

16     Proskauer for whom Proskauer had issued

17     opinions in 2002?

18          MR. LEDERKRAMER:  I'm going to object

19     and direct the witness not to answer on the

20     ground of the attorney/client privilege.

21     Q.  If you would take a look at Exhibit

22     902.

Janet Korins - October 24, 2007
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 157

1        A.  I have it.

2        Q.  Did your firm follow the established

3  procedures in reviewing and issuing the

4  opinion to Mr. Egan?

5        MR. LINDQUIST:  Objection, lack of

6  foundation.  The witness is not a 30(b)(6)

7  representative of Proskauer.

8        MR. LEDERKRAMER:  You may answer.

9        A.  Yes.

10       Q.  In rendering the opinion, did you

11  exercise your experience and informed judgment

12  as to the issues in front of you?

13       A.  I did.

14       Q.  And were you directed or told what

15  the results should be?

16       A.  I was not.

17       Q.  Did you review the regulations

18  referenced in the opinion?

19       A.  I did.

20       Q.  And did you review Notice 2000-44?

21       A.  I did.

22       Q.  You personally read and reviewed both

Page 158

1    of these?

2        A.  I, personally read the regulations

3    and the notices discussed in the opinion.

4        Q.  Was the Proskauer Rose opinion based

5    on the view at all that Notice 2000-44 was

6    invalid?

7        A.  No.   Again, I don't remember

8    focusing on or discussing that issue.

9        Q.  Did anyone from KPMG advise you that

10   KPMG disagreed with your firm's opinion?

11       A.  I don't remember anyone advising me

12   of that.

13       Q.  Was the Proskauer Rose opinion

14   thorough?

15       A.  I believe it was thorough.

16       Q.  Was it complete?

17       A.  Yes.

18           MS. AMANTI:   No further questions.

19           MR. LINDQUIST:  Objection, lack of

20   foundation.

21           MS. AMANTI:  No further questions.

22               FURTHER EXAMINATION

# Exhibit D to the Affidavit of Lawrence M. Hill, sworn to on November 19, 2007

# PROSKAUER ROSE LLP

1585 Broadway
New York, NY 10036-8299
Telephone 212.969.3000
Fax 212.969.2900

LOS ANGELES
WASHINGTON
BOCA RATON
NEWARK
PARIS

**Ira Akselrad**
Member of the Firm

Direct Dial 212.969.3880
iakselrad@proskauer.com

August 16, 2002

Mr. Richard J. Egan
87 Elm Street
Hopkinton, MA 01748

Re:    Investment Transaction Engagement Letter

Dear Mr. Egan:

We were asked to represent you (the "Investor") in connection with rendering tax advice in connection with certain investment transactions that the Investor conducted in 2001. We are writing to confirm that agreement regarding such representation.

Pursuant to that agreement, we would represent the Investor in connection with the investment transactions for a fixed fee of $50,000.00 payable upon your execution of this engagement letter. In the event a dispute arises between us relating to our fee, you may have the right to arbitration of the dispute pursuant to Part 137 of the Rules of the Chief Administrator of the Courts of New York State, a copy of which will be provided to you upon request.

We have advised you that we also represent The Diversified Group and Helios Financial and their affiliated entities in connection with various matters. You acknowledged and expressly agreed that we would be free to continue to represent The Diversified Group and Helios Financial and you waived any conflict resulting from or attributable to such representation.

If you agree that the foregoing accurately reflects our understanding, please sign and return the enclosed copy of this letter.

For your convenience, enclosed is a copy of our wire instructions.

8/16/02 4:01:03 PM (17330)

**E-0002785**

CONFIDENTIAL

PR(EGAN)0025014

PROSKAUER ROSE LLP

Investment Transaction Engagement Letter
August 16, 2002
Page 2

We look forward to working with you.

Very truly yours;

By: _____
Ira Akselrad


THIS INVESTMENT TRANSACTION ENGAGEMENT LETTER IS HEREBY
AGREED TO AND ACCEPTED:


_3ʳᵈ_ day of _Sattambre_, 2002

_____
RICHARD J. EGAN


IA:yb

CONFIDENTIAL

**E-0002786**

PR(EGAN)0025015

**Exhibit E to the Affidavit of Lawrence M. Hill, sworn
to on November 19, 2007**

# PROSKAUER ROSE LLP

1585 Broadway
New York, NY 10036-8299
Telephone 212.969.3000
Fax 212.969.2900

LOS ANGELES
WASHINGTON
BOCA RATON
NEWARK
PARIS

September 4, 2002

Mr. Richard J. Egan
116 Flanders Road
West Borough, MA
01581

Dear Mr. Egan:

You have requested our opinion (the "Opinion") regarding whether Richard J. Egan (the "Investor") would be subject to disclosure requirements under Section 6011 of the Internal Revenue Code of 1986, as amended (the "Code")[1], for Investor's involvement in various investment transactions (the "Transactions"). For purposes of this discussion, we assume that Investor is a United States individual.

You have provided us with certain documents summarizing the Transactions. We assume that all pertinent facts, circumstances and representations relevant to the Transactions were thereby disclosed to us and such documents were, in relevant part, true, accurate and complete.

I.       The Transactions

In the Transactions, Fidelity World Currency Advisor A Fund, LLC ("World") is a limited liability company whose membership interests are solely owned initially by Investor.[2]

Fidelity International Currency Advisor A Fund, LLC ("International") is a limited liability company with four members, one of whom is the Investor. International was formed to buy and sell options and to conduct other investment activities.

International's operating agreement establishes two sets of membership interests, common and preferred. Only common interest holders share in International's profits and losses and each preferred interest carries a guaranteed annual return of 12 %, independent of

---

[1]     All sections references herein are to the Code, unless otherwise indicated. All references to Regulations herein are to the Treasury Regulations promulgated pursuant to the Code, unless otherwise indicated.

[2]     Based on our understanding that World is a single member LLC that has not filed an election to be treated as a corporation, it should be treated as a disregarded entity for federal income tax purposes.

**B 0037893**

September 4, 2002
Page 2

International's profits. International maintains capital accounts for its members in accordance with Regulations under section 704(b). The operating agreement also provides that when members' interest change during the year, their distributive shares are determined using the interim "closing of the books" method.

On October 9, 2001, World entered into a pair of European-style digital call options and a pair of European-style digital put options (together, the "World Options"). In each pair, World purchased a call option (or put option) and sold a call option (or put option) based on the same underlying interest rate derivative or index but having different strike prices. The net premium paid by World to acquire the World Options was $2,250,000.

On October 22, 2001, Investor contributed his interest in World to International in exchange for 5% of the common interest and 100% of the preferred interests of International. On the same date, another member ("Co-Investor") contributed cash in exchange for 93% of International's common interests[3]. The other members contributed cash and obtained the remaining common interests in International.

On the same date, International invested in a number of foreign currency options contracts. On October 29 and October 30, 2001 International closed certain of these contracts and acquired new foreign currency-based instruments. These trading activities resulted in a realized gain.

On October 31, 2001, Investor acquired additional preferred membership interests in International by contributing shares of Stockton Holdings.

On November 5, 2001, Investor purchased all but 5% of Co-Investor's total 93% common membership interest.

On November 6, 2001, World entered into new options contracts, eliminating its economic risk of gain or loss from its October 9 trades, and recognizing a small net loss.

On November 29, 2001, Investor made an additional contribution of $5,000,000 to International in exchange for additional preferred membership interests.

On December 3, 2001, International closed out its remaining options (the "Remaining Options") and recognized losses.

On December 14, 2001, Investor made an additional contribution of $2,000,000 to International in exchange for additional preferred membership interests.

We understand that Investor has obtained an opinion of counsel that the intended tax treatment of the Transactions would more likely than not be sustained if challenged, and we

---

[3]    Co-Investor was a foreign resident individual.

**B 0037894**

CONFIDENTIAL                                            PR(EGAN)0024348

September 4, 2002
Page 3

assume that Investor has reasonably relied on such opinion for purposes of reporting the Transactions on his federal income tax return.

## II.     Disclosure Requirements

As relevant here, Section 6011(a) requires every person liable for any tax under the Code to make a return according to the forms and regulations provided by the Secretary including all information required by the forms and regulations. Every individual, trust, partnership, and S corporation that has participated, directly or indirectly, in a "reportable transaction" that is a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4T(b)(2) must attach to its return for the taxable year of the transaction a disclosure statement in the form prescribed by Treasury Regulation Section 1.6011-4T(c).[4]

The preamble to the revised regulations states that the IRS plans to issue future guidance extending the disclosure requirement to other reportable transactions (i.e., non-listed transactions)[5] entered into by individuals, partnerships, trusts and S corporations. However, no such guidance has been issued to date. Therefore to date, individuals, such as Investor, have no obligation to disclose their participation in "other reportable transactions," as defined in Treasury Regulation Section 1.6011-4T(b)(3)(i).

A "listed transaction" is any transaction which is the same as or "substantially similar" to one of the types of transactions that the Internal Revenue Service (the "IRS") has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction for purposes of Section 6011.[6]

A transaction will be treated as being the same as or "substantially similar" to one of the types of transactions that the IRS has determined to be a tax avoidance transaction if the transaction is expected to obtain the same or similar types of tax benefits and is either factually similar or is based on the same or a similar tax strategy.[7] The term "substantially similar" is to be broadly construed in favor of disclosure.[8] The Regulations do not define what is meant by "tax strategy."[9]

---

[4]    Treas. Reg. § 1.6011-4T(a)(1).  T.D. 9000 (June 18, 2002) revised the temporary Regulations under Section 6111(d) to include this disclosure requirement for individuals who participate in "listed transactions."

[5]    Treas. Reg. § 1.6011-4T(b)(3)(i).

[6]    Treas. Reg. § 1.6011-4T(b).

[7]    Treas. Reg. § 1.6011-4T(b)(1)(i).

[8]    Treas. Reg. § 1.6011-4T(b)(1)(i).

[9]    The IRS appears to have previously used the term "tax strategy" very rarely in published guidance; as a result, it is difficult to discern what the term means specifically. For example, Private Letter Ruling 9328022 (March 5, 1993) refers to a "tax strategy" of purchasing taxpayers' initial inventory from discounters' suppliers at the end of their initial abbreviated tax year, marking on higher retail prices (fully expecting to sell nothing at the prices marked on the merchandise), thereby locking in a low valued inventory base.  Field Service Advice

**B 0037895**

CONFIDENTIAL

PR(EGAN)0024349

September 4, 2002
Page 4

    A taxpayer will be considered to have indirectly participated in a "listed transaction" if the taxpayer's Federal income tax liability is affected by the transaction, even if the taxpayer does not participate in the transaction itself.  For example, where the "listed transaction" is consummated through a partnership, the taxpayer will be treated as an indirect participant if the taxpayer is a partner and the taxpayer's Federal income tax liability is likely to be affected by the partnership's participation in the transaction.[10]

## III.   Analysis

    The IRS has published a number of notices describing various listed transactions.  See, e.g., Notice 2000-61, 2000-2 C.B. 569; Notice 2001-16 (February 26, 2001), 2001-1 C.B. 730.  The majority of these notices have no bearing on the Transactions.  However, there are two notices that the IRS may argue are the same as or substantially similar to the Transactions, in which case the IRS would contend that Investor is required to disclose his participation in the Transactions.  These two notices are Notice 2000-44, 2000-2 C.B. 255, and Notice 2002-50 (June 26, 2002).  For the reasons discussed below, it is more likely than not that the Transactions would not be considered "listed transactions" as they are not substantially similar to any listed transactions.

### A.   Notice 2000-44

    In Notice 2000-44, the IRS addressed two fact patterns, including the following:

> [A] taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership.  For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X.  Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.
>
> Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under Section 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options.  Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income

---

    199952001 (September 29, 1999) refers to a consolidated group's "tax strategy" of selling a subsidiary's stock but retaining investment assets.

[10]   Treas. Reg. § 1.6011-4T(a)(1).

**B 0037896**

CONFIDENTIAL
PR(EGAN)0024350

September 4, 2002
Page 5

realized and expenses incurred at the partnership level, the
taxpayer purports to have a basis in the partnership interest equal
to the cost of the purchased call options ($1,000X in this example),
even though the taxpayer's net economic outlay to acquire the
partnership interest and the value of the partnership interest are
nominal or zero. On the disposition of the partnership interest, the
taxpayer claims a tax loss ($1,000X in this example), even though
the taxpayer has incurred no corresponding economic loss.

The purported losses resulting from the transactions described
above do not represent bona fide losses reflecting actual economic
consequences as required for purposes of Section 165. The
purported losses from these transactions (and from any similar
arrangements designed to produce noneconomic tax losses by
artificially overstating basis in partnership interests) are not
allowable as deductions for Federal income tax purposes. The
purported tax benefits from these transactions may also be subject
to disallowance under other provisions of the Code and
regulations. In particular, the transactions may be subject to
challenge under Section 752, or under [Treas. Regs.] § 1.701-2 or
other anti-abuse rules. In addition, in the case of individuals, these
transactions may be subject to challenge under § 165(c)(2). See
Fox v. Commissioner, 82 T.C. 1001 (1984). Furthermore, tax
losses from similar transactions designed to produce noneconomic
tax losses by artificially overstating basis in corporate stock or
other property are not allowable as deductions for Federal income
tax purposes.

T.D. 9000 added the definition of "substantially similar" and the following example to
illustrate when a transaction is the same as or substantially similar to a listed transaction. The
example states:

Notice 2000-44 (2000-2 C.B. 265) (see § 601.601(d)(2) of this
chapter), sets forth a listed transaction involving offsetting options
transferred to a partnership where the taxpayer claims basis in the
partnership for the cost of the purchased options but does not
reduce basis under section 752 as a result of the partnership's
assumption of the taxpayer's obligation with respect to the options.
Transactions using short sales, futures, derivatives or any other
type of offsetting obligations to inflate basis in a partnership
interest would be the same as or substantially similar to the
transaction described in Notice 2000-44. Moreover, use of the
inflated basis in the partnership interest to diminish gain that would
otherwise be recognized on the transfer of a partnership asset

**B 0037897**

CONFIDENTIAL

PR(EGAN)0024351

September 4, 2002
Page 6

would also be the same as or substantially similar to the transaction described in Notice 2000-44 (the "Example").[11]

The Transactions more likely than not would not be considered "substantially similar" to Notice 2000-44. There are a number of factual differences between the Transactions and the transaction in Notice 2000-44. The Transactions did involve the Investor contributing his membership interest in World to International and claiming basis in International[12] based upon the World Options. However, the important difference is that the World Options did not produce a loss, or reduce any gain to be recognized, as was the case in Notice 2000-44. Rather, the loss in the Transactions results from an actual depreciated asset, the Remaining Options.

In contrast, the transaction in Notice 2000-44 results in an artificial, non-economic loss. In the Notice 2000-44 transaction, the taxpayer artificially inflates his basis in his partnership interest by including the cost of the purchased call options but not reducing his basis for the written call options under Section 752. When the taxpayer disposes of his partnership interest he has a non-economic loss, as a result of his previous basis manipulation.

In addition, the taxpayer in the Notice 2000-44 transaction had a net economic outlay that was nominal or zero. Here, Investor acquired the World Options for $2,250,000, a significant investment. The Investor also contributed stock valued at over $4,600,000 and $7,000,000 of cash to International in exchange for additional membership interests. Thus, Investor had a substantial economic outlay with respect to the Transactions.

Applying the test in Treasury Regulation Section 1.6011-4T(b)(1)(i), a transaction will be substantially similar to the transaction in Notice 2000-44 if it is expected to result in a similar type of tax benefit and is either factually similar or is based on a similar tax strategy. The tax benefit of the Notice 2000-44 transaction would appear to be the non-economic loss generated by the inflated basis in the partnership created through the use of offsetting options, which is lacking with respect to the Transactions. Even if the IRS were to argue that the tax benefit resulting from the Transactions is similar to that described in Notice 2000-44, the facts and tax strategy are different. Although the Investor used offsetting positions to claim basis in a partnership interest, Investor did not use that as a strategy to create an artificial loss. Instead, the loss arose from separate transactions entered into by International. In addition, Investor's investment in the Transactions was not nominal. Accordingly, the Transactions are likely neither factually similar to, nor based on a similar tax strategy as, the transactions described in Notice 2000-44.

The language in the Example is consistent with this conclusion. The purpose of the Example is to illustrate when a transaction is the same as or substantially similar to a listed transaction. The introductory language to the Example in Treasury Regulation Section 1.6011-4T(b)(1)(ii) uses this explicit language. The preamble to the revised regulations explains that:

---

[11]    Treas. Reg. § 1.6011-4T(b)(1)(ii), Example 1.

[12]    A portion of Investor's basis in International is also the result of contributions of cash and stock.

**B 0037898**

CONFIDENTIAL

PR(EGAN)0024352

September 4, 2002
Page 7

> Some taxpayers and promoters have applied the <u>substantially similar</u> standard in an overly narrow manner to avoid disclosure. For instances, some taxpayers and promoters have made subtle and insignificant changes to a listed transaction in order to claim that their transactions are not subject to disclosure.... The IRS and Treasury believe that these interpretations are improper.

While the scope of some of the language in the Example is not entirely clear, we believe it would likely be interpreted in light of its express purpose to illustrate the definition of "substantially similar." For instance, the Example states that transactions using short sales, futures, derivatives or other offsetting obligations to inflate basis would be the same as or substantially similar to the transactions in Notice 2000-44. We do not interpret this sentence to mean that <u>every</u> transaction "using short sales ... to inflate basis in a partnership interest" is a listed transaction. Instead, we interpret this sentence, in light of the purpose of the Example, to mean that transactions that are described in Notice 2000-44, apart from the fact that they used short sales or futures instead of options (as was the case in Notice 2000-44), are listed transactions. Our interpretation is based on the regulatory framework, which provides that whether a transaction is a "listed transaction" is determined by testing the transaction against the transaction described in the Notice, and also on the fact that the express purpose of the Example was to illustrate the meaning of "substantially similar" and not to modify the Notice itself.

The Example also states that "the use of the inflated basis in the partnership interest to diminish gain that would otherwise be recognized on the transfer of a partnership asset" would be the same as or substantially similar to the transaction described in Notice 2000-44. This statement would appear to encompass an attempt to shift an artificially high partnership basis to an appreciated asset and thereby diminish gain recognized on the disposition of that asset. The sentence does not appear to apply to the Transactions, since they do not involve the use of an inflated basis to reduce the amount of gain recognized on the transfer of a partnership asset.

Based on the foregoing analysis and discussion, it is more likely than not that the Transactions would not be considered to be substantially similar to the transactions in Notice 2000-44.

**B.    Notice 2002-50**

Notice 2002-50 describes a transaction which uses "a straddle, a tiered partnership structure, a transitory partner, and the absence of a 754 election to allow [the] Taxpayer to claim a permanent non-economic loss." Notice 2002-50 identifies the following fact pattern as a listed transaction:

> This transaction involves partnerships manipulated through a series of steps carried out in the following order. No § 754 election is in effect at any relevant time. Step 1: Corporation acquires a majority interest in an upper tier partnership (UTP) at fair market value. Step 2: UTP acquires a majority interest in a lower tier partnership

CONFIDENTIAL

**B 0037899**

PR(EGAN)0024353

September 4, 2002
Page 8

(LTP) at fair market value. Step 3: LTP enters into straddles on foreign currencies and may acquire other assets. Step 4: LTP terminates the gain leg of a foreign currency straddle. LTP allocates a pro rata share of the gain to UTP, which in turn allocates a pro rata share of the gain to Corporation. This gain increases the basis of each partnership interest. Step 5: Corporation sells its interest in UTP to Taxpayer at fair market value. This results in a loss to Corporation sufficient to offset the gain that was allocated to Corporation. Step 6: Taxpayer purchases UTP's interest in LTP at fair market value. UTP realizes a loss on this sale, but the loss is disallowed under § 707(b)(1)(A)[13] because Taxpayer owns more than 50% of UTP. Step 7: LTP engages in a transaction that is intended to increase Taxpayer's basis in the LTP interest. For example, LTP may incur a liability that Taxpayer guarantees. LTP then terminates the loss leg of the foreign currency straddle and allocates a pro rata share of the loss to Taxpayer. Step 8: Taxpayer sells the interest in LTP at its fair market value and realizes gain (for example, from the relief of liability). Taxpayer then claims that this gain is offset under § 267(d)[14] by the amount of the loss that was disallowed to UTP under § 707(b)(1)(A).

ANALYSIS

The transaction described in this notice has been designed to use a straddle, a tiered partnership structure, a transitory partner, and the absence of a section 754 election to allow Taxpayer to claim a permanent non-economic loss.

Notice 2002-50 concludes that because the gain realized by the taxpayer on the sale of its interest in LTP does not correspond to any increase in the value of the assets within LTP, the loss previously disallowed on the sale of the LTP interest by the UTP cannot be used to offset the taxpayer's gain. Notice 2002-50 also provides that a transaction will be considered "substantially similar" to the transaction described therein even if the last step of the transaction has not been completed, _i.e._, the partnership interest has not yet been sold.

The Transactions more likely than not would not be considered substantially similar to the transactions in Notice 2002-50. As stated above, the key features of a Notice 2002-50 transaction are that it uses "a straddle, a tiered partnership structure, a transitory partner, and the

---

[13] Section 707 disallows losses arising from sales or exchanges of property between a partnership and a person or other partnership that owns more than 50% of the interests in the partnership.

[14] Generally, Section 267(d) allows the recapture of deductions previously disallowed due to the relationship between the parties to the transaction.

**B 0037900**

CONFIDENTIAL

PR(EGAN)0024354

September 4, 2002
Page 9

absence of a 754 election to allow [the] Taxpayer to claim a permanent non-economic loss." Thus, the elements of a Notice 2002-50 transaction are (i) a straddle, (ii) a tiered partnership structure, (iii) a transitory partner, (iv) the absence of a Section 754 election and (v) a permanent non-economic loss.

Reviewing these factors there are some superficial similarities between the Transactions and the Notice 2002-50 transaction. First, the World Options in the Transaction may constitute a "straddle" for Federal income tax purposes as may some of the investments made by International. Second, there is no Section 754 election made in the Transactions.

However, the Notice 2002-50 transaction is distinguishable in certain crucial respects. First and foremost, the Transactions did not utilize a tiered partnership structure, a factor which was fundamental in generating the permanent non-economic loss described in the Notice. In the Notice 2002-50 transaction, when the gain from the options is recognized it is allocated to UTP and thus increases UTP's basis in the LTP (and in turn it increases the corporation's basis in UTP). Upon the sale of the interest in LTP to taxpayer, the offsetting loss is disallowed under Section 707. However, that loss remains available to offset the taxpayer's gain when he sells his LTP interest, or if he causes LTP to distribute or sell its assets. Thus, the tiered partnership structure is used to create a permanent non-economic loss.

In contrast, in the Transactions there is only one partnership,[15] International. There is no increase in basis arising from gain in a lower-tier partnership, and no corresponding deferred loss on the sale of the lower-tier partnership that will be available to offset taxpayer's future gain.

In addition, unlike the Notice 2002-50 transaction, there are no "transitory partners" in the Transactions. The four members of International do change their percentage ownership in the common and preferred interests of International during the Transactions but every member retains a more than nominal interest in International. Therefore, in the Transactions it is unlikely any of the parties would be characterized as transitory partners.

Notice 2002-50 states that a transaction will be considered to be the same as, or substantially similar to the Notice 2002-50 transaction even if the taxpayer has not engaged in the final step of the transaction, the sale of the partnership interest. Therefore, a transaction is covered by Notice 2002-50 even if the deferred loss created in Step 6 of Notice 2002-50 is not yet applied to offset gain. However, the creation of a deferred loss through the use of a tiered partnership remains the fundamental premise of Notice 2002-50, and that aspect is lacking in the Transactions.

Treasury Regulation Section 1.6011-4T(b)(1)(i) states that a transaction will be considered substantially similar to a listed transaction where the taxpayer is expected to obtain similar tax benefits and the transaction is factually similar or is based on a similar tax strategy.

---

[15]    At all relevant times, World is a limited liability company with a single member and thus is treated as an entity disregarded from its member. Even if World is treated as a separate entity for these purposes, no lower tier is acquired or disposed of, as occurs in Notice 2002-50. Additionally, no loss is disallowed in the Transactions.

CONFIDENTIAL

**B 0037901**

PR(EGAN)0024355

September 4, 2002
Page 10

However, as discussed above the Transactions would likely not be considered factually similar to the Notice 2002-50 transaction as they are lacking a key feature, the use of a tiered partnership to create a deferred loss and thus achieve a permanent non-economic loss. For the same reason, the tax strategy used in the Transactions is likely not similar to the tax strategy used in Notice 2002-50. Accordingly, it is more likely than not that the Transactions would not be considered substantially similar to the Notice 2002-50 transaction.

## IV.    Penalties

Neither the Code nor the Regulations impose any specific penalty for failing to disclose under Treasury Regulation Section 1.6011-4T.

Section 6664(c)(1) states that the underpayment penalty does not apply if there was "reasonable cause" for the underpayment and the taxpayer "acted in good faith". The IRS asserted in the preamble to the February 28, 2000 regulations[16], citing Treasury Regulation Section 1.6664-4(b)(1), that a failure to disclose when required "could indicate" that the taxpayer had not acted in "good faith" depending on all facts and circumstances (including why the taxpayer had not disclosed) and if so the reasonable cause exception would not apply even if the taxpayer had relied on professional advice, such as an opinion of counsel, relating to the underlying transaction.[17] The IRS apparently reads the statute to impose separate requirements of good faith and reasonable cause. If the IRS's reading of the statute is correct, this opinion would likely supply any required "good faith". However, Treasury Régulation Section 1.6664-4(c)(1), which the IRS does not quote, uses the "good faith" requirement in conjunction with a legal opinion to require only that the reliance itself must be in good faith (e.g., that the opinion correctly sets out all facts known to the taxpayer).[18] This regulation suggests that there is no independent "good faith" requirement and that the reasonable cause defense would apply as long as the taxpayer's reliance on the tax opinion on the underlying transaction is in good faith.

Moreover, taxpayers that are not C corporations need not rely on the reasonable cause exception to the substantial understatement penalty. For these taxpayers under section 6662(d)(2)(C), the understatement is reduced by any portion attributable to the tax treatment of an item (i) for which there was substantial authority and (ii) which the taxpayer reasonably

---

[16]    *See*, T.D. 8877 (March 2, 2000).

[17]    The IRS did not assert that the failure to disclose meant the taxpayer had not filed a return at all and so would be liable for a failure-to-file penalty under section 6651(a)(1). "Summary on Corporate Tax Shelter Disclosure Regs Clarified", 2000 TNT 41-15 (Feb. 29, 2000); *see also* Lee Sheppard, News Analysis -- Corporate Tax Shelter Disclosure: But Will It Work?, 2000 TNT 44-2 (Mar. 3, 2000).

[18]    Regs. § 1.6664-4(b) states: "Reliance on . . . professional advice . . constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. (See paragraph (c) of this section for certain rules relating to the advice of others.)" Regs. § 1.6664-4(c) then begins: "All facts and circumstances must be taken into account in determining whether a taxpayer has reasonably *relied in good faith* on advice (including the opinion of a professional tax advisor) . . . . [emphasis added]"

**B 0037902**

CONFIDENTIAL                                                              PR(EGAN)0024356

September 4, 2002
Page 11

believed was more likely than not proper.[19]  Treasury Regulation Section 1.6662-4(g)(4)(i)B) states that the taxpayer may meet the "reasonable belief" test if he "relies in good faith" on a more-likely-than-not tax opinion.  While the regulation also requires that the requirements of Treasury Regulations Section 1.6664-4(c)(1) be met, unlike section 6664(c), neither section 6662(d)(2)(C) nor this latter regulation even arguably impose a separate "good faith requirement".

For the foregoing reasons, we believe that even if a court were to find that Investor was required to disclose the Transactions, it is more likely than not that Investor would not be subject to penalties under the Code, directly or indirectly, for his failure to disclose the Transactions.

III.    Conclusions

Based on the foregoing analysis and discussion, it is more likely than not that the Transactions would not be considered substantially similar to the transaction described in Notice 2002-50 or Notice 2000-44, and therefore the Transactions more likely than not would not be considered a "listed transaction" for the purposes of the disclosure requirements under section 6011.  We also believe that even if a court were to find that Investor was required to disclose the Transactions, it is more likely than not that Investor would not be subject to penalties under the Code, directly or indirectly, for his failure to disclose the Transactions.

The opinions expressed herein are furnished by us solely for your benefit and thus may not be relied upon by or delivered to any other person without our express, prior written approval.  This opinion is furnished to you solely for your use in determining the federal income tax consequences of the transactions described above and is not to be used, circulated, quoted, or otherwise referred to for any other purpose without our express written permission.  Our permission is not required in connection with any examination conducted or required by a

---

[19]   This reasoning does not apply to the substantial valuation misstatement penalty under section 6662(b)(3); since the exception in section 6662(d) is limited to the understatement penalty, the taxpayer must rely on the reasonable cause exception.  However, notwithstanding the IRS's contention in several recent field service advice memoranda, FSA 200134002 (Mar. 23, 2001); FSA 200150001 (Aug. 2, 2001); FSA 200224011 (Mar. 5, 2002), the Transactions should not be subject to this penalty because, unlike the situation at which section 6662(e) was aimed, any misstatement of basis would result from a legal, not factual, dispute.  *See* Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981 at 332.  These FSAs cite *Gilman v. Comm'r*, 933 F.2d 143 (2d Cir. 1991), *aff'g* T.C. Memo. 1989-684, *cert. denied*, 502 U.S. 1031 (1992), for the proposition that the overvaluation penalty could apply even where tax benefits were disallowed entirely because a transaction lacked economic substance.  Although the court's opinion does not specifically address this point, the facts indicated that the lack of economic substance bore directly on the fact that the property was overvalued when it was acquired, *i.e*, the purchase price was so high that in the court's view it was impossible for the taxpayer to make a profit from the transaction without regard to tax benefits.  Thus, *Gilman* ought to be read, consistent with the legislative history noted above, to permit the imposition of the penalty in those cases in which an overvaluation of property as a matter of fact, as opposed to as a matter of law, was the cause of, and was integral to, the lack of economic substance.  Other appellate courts have also upheld the imposition of the penalty in such a case.  *See, e.g., Massengill v. Comm'r*, 876 F.2d 616 (8th Cir. 1989); *Merino v. Comm'r*, 196 F.3d 147 (3d Cir. 1999).

**B 0037903**

CONFIDENTIAL

PR(EGAN)0024357

September 4, 2002
Page 12

governmental or regulatory body, including disclosure to your outside accountants or lawyers in order to allow them to assist with such an examination on your behalf.

    In addition, our opinion is based on the law and other authorities in effect on the date hereof, which are subject to change, possibly with retroactive effect. Any such changes could affect the opinions expressed herein. We assume no obligation to update our opinion in light of any subsequent changes in law. All opinions expressed herein relate solely to the federal income taxes discussed. No opinions are expressed or implied as to any other federal income tax issues or any foreign, state or local tax issues.

Very truly yours,

Proskauer Rose LLP

B 0037904

CONFIDENTIAL

PR(EGAN)0024358

**Exhibit F to the Affidavit of Lawrence M. Hill, sworn to on November 19, 2007**

RICHARD J. EGAN
1966 REVOCABLE TRUST
C/O CARRUTH MANAGEMENT LLC.
87 ELM STREET, HOPKINTON, MA 01748

THE BOSTON CO. BOSTON SAFE
DEPOSIT & TRUST CO.
BOSTON, MASSACHUSETTS
5-123-110

5365

PAY TO
THE ORDER
OF    Proskauer Rose LLP

Date    9/11/2002
$**50,000.00

Fifty Thousand and 00/100********************************************************************    DOLLARS

⑈011001234⑈ ⑈02⑈961⑈0⑈ 5365

CONFIDENTIAL

**Exhibit G to the Affidavit of Lawrence M. Hill, sworn to on November 19, 2007**

**FILED UNDER SEAL PURSUANT TO JUDGE
SAYLOR'S ORDER OF NOVEMBER 5, 2007**

**Exhibit H to the Affidavit of Lawrence M. Hill, sworn to on November 19, 2007**

# In the United States Court of Federal Claims

Case No. 01-72T
(Filed: May 14, 2003)

***************************************************

COLTEC INDUSTRIES, INC.,
*Plaintiff,*

v.

THE UNITED STATES OF AMERICA,
*Defendant.*

***************************************************

FILED

MAY 1 4 2003

U.S. COURT OF
FEDERAL CLAIMS

LIT ROLL COPY

## DISCOVERY ORDER

Pending before the Court are several discovery-related motions. Each is discussed and resolved below.

## I.    Defendant's First Motion to Compel

### A.    Background

The first issue before the Court is the Defendant's Motion to Compel Discovery against non-party Arthur Andersen, LLP (Andersen), filed March 29, 2002. As the Plaintiff's public accounting firm, Andersen advised Coltec Industries, Inc. (Coltec) on tax issues and other matters related to certain reorganization transactions the Plaintiff completed in 1996 and 1997.

The First Motion to Compel seeks to enforce a November 8, 2001, subpoena *duces tecum* that the Government served upon Andersen. Specifically, the Defendant seeks Andersen's Coltec-related (1) billing records; (2) electronic files and messages (emails); (3) the remainder of paper documents not already produced; and (4) all documents Andersen or Coltec claimed were protected by the work product privilege. In addition, the Defendant seeks (5) records related to Andersen's other clients who had engaged in similar transactions.

In Orders dated July 15, July 29, and August 9, 2002, we addressed, and in some cases, resolved, each of these issues. Specifically, we note that the parties represented to the Court that they had settled their dispute over the billing records and Andersen's other clients' files.

B.    **Paper Documents – 18 Boxes**

As to the paper documents not already produced, the Court issued a separate Order on August 9, 2002, requiring Andersen to Maintain and Safeguard All Paper Documents Related to Coltec Industries.  That Order required Andersen to store the documents – which the parties identified as filling eighteen (18) boxes – with a document custodian until further notice.

The Court also ordered Andersen to file an affidavit executed by an official of Iron Mountain, Inc., the official Andersen document custodian, indicating that Andersen had caused the files to be safeguarded in accordance with the Court's Order.  **To date, Andersen has not yet filed that affidavit.  It shall do so forthwith.**

C.    **39 Contested Documents**

The Defendant's motion originally sought to compel discovery of 93 documents which were withheld from Coltec's original production but are related to the transactions at issue in this case.  While these documents are in Andersen's control, the Plaintiff and its law firm, Kronish, Lieb, Wiener & Hellman, claim that the work product privilege protects them from discovery.  The Plaintiff has since tendered 54 of the requested documents, and continues to claim privilege for only 39 documents.

In a July 29, 2002, Order, we rejected the Defendant's contention that the Plaintiff did not claim the privilege in a timely fashion, and ordered that the contested documents be submitted for an *in camera* review.  The documents were originally submitted on August 9, 2002.  On January 7, 2003, the Plaintiff notified the Court that its original submission was not arranged in the manner ordered by the Court, and therefore submitted a revised version *in camera.*

The Plaintiff's privilege contention rests upon Rule 26 of the Rules of the Court of Federal Claims.  In pertinent part, the rule states:

> [A] party may obtain discovery of documents and tangible things otherwise discoverable under. . . this rule and prepared in anticipation of litigation or trial by or for another party or by or for that other party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials in preparation of the party's case and that the party is unable without undue

hardship to obtain the substantial equivalent of the materials by other means.

RCFC 26(b)(3).

The parties have briefed this issue exhaustively, and cite competing precedents in support of their positions, none of which are binding in this Circuit.

Upon review of the 39 contested documents, we note that all of them were created before the occurrence of the corporate transaction now being challenged. Because they were created before the corporate reorganization event had occurred, in this respect they were not created in contemplation of imminent or probable actual litigation. Moreover, the eventuality of the event, and therefore of any litigation, was entirely in the control of the client. Prior to a decision to proceed, these are business planning documents, and litigation is purely hypothetical.

On the other hand, legal analyses and judgments by or to an attorney about the likelihood and potential outcome of litigation from a proposed course of conduct are properly protected from discovery.

We also conclude that informational and background material of a factual nature concerning the structure of a proposed transaction do not constitute legal judgments. Consequently, we will not afford that material the protection sought by the Plaintiff. Restatements of current law or identification of issues presented are also not deserving of work product protection. Finally, if the document or material was required or prepared for a regulatory or other governmental purpose it will not be privileged.

Accordingly, some of the 39 documents may be protected in whole. For others, in most instances, only portions will be within the Court's application of the work product privilege. Therefore, **only those portions of a document containing the risk assessment and legal analysis of the proposed transaction may be redacted.**

**The Defendant's First Motion to Compel as respects this issue is thus GRANTED-in-part and DENIED-in-part, and the Plaintiff is ORDERED to produce those non-privileged documents consistent with this Order.** The Plaintiff must also comply with the provisions of Rule 26(b)(5) for any documents withheld from the Government.

Page 3

### D.    Electronic Records

As to the electronic files issue, the Court held Status Conferences on July 10, 2002, and August 8, 2002.  During both Status Conferences, the parties stated that they would attempt to seek a compromise on the Defendant's discovery request, and that in the interim, Andersen would not destroy any Coltec-related electronic files and emails (together, "Electronic Records.")

After the last Status Conference, the Court believed that the parties were in essential agreement on how to best handle Andersen's Coltec-related Electronic Records as well as several limitations to the Government's broad electronic discovery demands.  *See* Order, Aug. 9, 2002, at p. 2-3.

In order to complete the agreement, which called for Andersen to safeguard, but not retrieve or produce the files, we requested that Andersen answer five specific questions concerning its protocols for storing and saving electronic records.  Before Andersen answered these questions, it obtained new representation.  Andersen then reported back to the Court by courtesy copies of two letters sent to the parties – September 10 and September 30, 2002 – and the parties filed a Joint Status Report proposing two alternate solutions on October 4, 2002.

Before the Court had an opportunity to act on this matter, the Defendant filed a Second Motion to Compel again seeking that the Court issue an Order requiring Andersen to perform an extensive and wide-ranging search through all of Andersen's electronic files, servers, and backup tapes in all of Andersen's domestic offices, for all Coltec-related Electronic Records.  The Government has not explained satisfactorily why a motion to compel – either the first or the second – was warranted at this stage.

The Court is persuaded that the agreement reached in the August 8, 2002, Status Conference remains the most appropriate method for resolving the Defendant's discovery request.

Accordingly, the Court will issue an Order embodying that resolution. Andersen shall be required to maintain the Electronic Records for six (6) named individuals, who served in four (4) of Andersen's domestic offices, covering a sixteen (16) month period.  **We RESERVE ruling on the Defendant's request that Andersen produce these files.**

Page 4

## II.    Defendant's Motion for Leave to Serve its Second Set of Interrogatories

On December 3, 2002, the Defendant filed a Motion for Leave to serve its second set of interrogatories on Coltec.  These interrogatories relate to another count in the Plaintiff's Complaint concerning a claimed tax credit for research and development.  Leave of Court is required because the Plaintiff has objected to the Defendant's second set of interrogatories as exceeding the limitations contained the Court's Special Procedures Order (SPO).

By an Order dated August 5, 2002, the Court, at the request of the Defendant over Coltec's objections, modified its SPO to permit the parties to "take no more than 25 depositions and 40 interrogatories (including subparts)."

The Defendant's first set of interrogatories as to the first count of the Complaint, the capital loss issue, contained some 84 interrogatories, including subparts.  In a valiant attempt at cooperation, the Plaintiff did not object to the Defendant's numerous questions.  Therefore, despite the length, and in the interests of avoiding a debate over the meaning of the word "subpart," we granted the Defendant leave to serve the first set by an Order dated September 5, 2002.

We are reluctant to grant such permission again.  However, because the second set contains only two questions, we will allow the Government to serve these interrogatories on the Plaintiff.  **Thus, the Defendant's December 3rd motion is GRANTED.  Any further motions for interrogatories will be disfavored.**

## III.    Defendant's Second Motion to Compel

As noted, the Defendant filed a Second Motion to Compel Discovery against Andersen on January 24, 2003.  This Second Motion requests that the Court order Andersen to produce (1) documents relating to Andersen's clients other than Coltec, and (2) Coltec-related electronic files and emails.

### A.    Electronic Files and Emails

The Court has ruled on this identical issue presented in the First Motion to Compel.  We **DENY AS MOOT this portion of the Defendant's Second Motion.**

Page 5

### B.    Other Clients' Files

The Defendant's Second Motion also raises an issue that the parties settled prior to the July 10, 2002, Status Conference. In fact, the Court's July 15th Order denied as moot this aspect of the First Motion to Compel on the grounds that the Government was no longer pursuing this portion of its subpoena. The Government again has not explained in a satisfactory manner why it is reversing that representation.

The Second Motion states that the Defendant is seeking "all documents relating to transactions described in [IRS] Notice 2001-17" (the IRS Notice describing a "contingent liability tax shelter"). In other words, the Defendant's motion requests that Andersen, a non- or third-party to this litigation, produce documents of taxpayers wholly-unrelated to the Plaintiff and wholly-unrelated to this litigation. Courts have described similar discovery requests by the Government as "fourth-party" discovery. *See, e.g., Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007 (D.C. Cir. 1997).

Both Andersen and Coltec oppose this request. First, they argue that the motion does not demonstrate why the requested documents are relevant or necessary to the Court's resolution of this case. Second, Andersen asserts that the request is overbroad, and will place an undue burden on Andersen, a non-party. Finally, Andersen notes that the Defendant is asking the Court to order discovery from Andersen which the Department of Justice is prohibited by Federal law from otherwise obtaining from its own agency, the IRS.

The Plaintiff and Andersen are correct that the party seeking the discovery has the burden of demonstrating the relevance of the requested materials. *See Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993). Furthermore, the U.S. Court of Appeals for the Federal Circuit has held that an entity's nonparty status weighs against permitting extensive discovery by a litigant. *See American Standard, Inc. v. Pfizer, Inc.*, 828 F.2d 734, 738 (Fed. Cir. 1987); *see also Bio-Vita, Ltd. v. Biopure Corp.*, 138 F.R.D. 13, 17 (D. Mass 1991) (noting that the standard for discovery from nonparties is different, and that they are entitled to "significant protection" from "intrusive discovery").

As to the issue of relevance, the Defendant argues that the "production of the requested documents will demonstrate that Andersen marketed similar tax shelter products to many other corporations." While this may be true, the Defendant does not state why this fact is relevant to the central issue before the Court as presented in Coltec's Complaint – namely, whether Coltec's 1996

Page 6

contingent liability transaction had a business purpose. The only statement of relevance from the Government is its unsupported allegation that the Plaintiff and Andersen "[f]ailed to retain many of the documents they exchanged relating to the Transactions." This allegation alone does not support the Defendant's motion for such a wide-ranging discovery request.

As to the issue of confidentiality, the Defendant concedes that the reason for the subpoena and the two motions to compel these materials is because "it cannot simply obtain these documents from the Service because of 26 U.S.C. § 6103(h)(2), which limits the authority of the Service to provide tax return information to the Justice Department." Here, too, the Government offers no reason why the Court should issue an Order permitting discovery which Congress by statute has forbidden.

In response to Andersen's argument that this request would unduly burden Andersen, the Defendant notes that Andersen has had to compile this data for other litigation, and that the only expenses involved are duplication and shipping costs. Andersen's response indicates that while a summons was issued for Notice 2001-17 transaction documents in *United States v. Arthur Andersen LLP*, No. 02C-6790 (N.D. Ill. 2003), very little, if any, production of documents has actually occurred to date.

The Court believes that the *Food Lion* case is instructive to this dispute. In *Food Lion*, the U.S. Court of Appeals for the District of Columbia Circuit overturned the District Court's decision to enforce a subpoena seeking identical discovery – namely documents prepared by a nonparty (a public relations firm who advised the defendant) about other clients (so-called "fourth parties") of the public relations firm. The D.C. Circuit held that the fourth-party documents, even if they showed a pattern of behavior that would unfavorably reflect on the nonparty or the defendant, would have no relevance to the central issue in the underlying litigation, which, as here, was the "intent" of one of the parties.

The D.C. Circuit further stated that allowing such discovery would create a precedent that –

> would presumably allow a plaintiff-client suing a tax or accounting firm for malpractice to obtain access to thousands of other people's confidential records, on the sole ground that the nonparties had the misfortune of employing the same tax or accounting firm.

*Id.* at 1014.

Andersen correctly notes that the hypothetical problem raised by the D.C. Circuit is "one step removed" from the present situation, because here the accounting firm is not the Defendant, but rather a nonparty to this litigation. In prohibiting the "fourth-party" discovery request at issue, the Court concluded: "[s]uch wide-ranging, intrusive, and ultimately irrelevant discovery must undeniably be found to cross the legitimate boundaries of Rule 26." *Id.*

Thus, we conclude that the Defendant has not met its burden of demonstrating why these requested documents are "relevant" or "likely to lead to admissible evidence" (Rule 26(b)(1)), or why the "burden or expense of the proposed discovery outweighs its likely benefit" (Rule 26(b)(2)).

Accordingly, **the Court DENIES this aspect of the Defendant's Second Motion to Compel.**

## IV.    Defendant's Third Motion to Compel

On March 17, 2003, the Defendant filed its Third Motion to Compel Discovery. This time, however, the motion is aimed at Coltec. The Defendant alleges that the Plaintiff has not cooperated during the discovery process, and that it has failed to respond fully to interrogatories and document requests, and that is has failed to properly assert its claims of privilege. Each contention is addressed below.

### A.    Failure to Respond to Interrogatories & Document Requests

The Defendant broadly argues that the Plaintiff has failed to respond properly to the Defendant's contention interrogatories and to its document requests. The Plaintiff adamantly denies these allegations, and states that it has answered every one of the Defendant's interrogatories and has produced over 100,000 pages of documents in response to the Defendant's 128-item document request.

The crux of this dispute involves the form of the Defendant's interrogatories and document requests, and the Plaintiff's duty to correlate its answers to the many thousand of documents it produced.

Rule 34(b) states that:

> A party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request.

The Court is persuaded that the Plaintiff has complied with the Court's rules as to interrogatories and the discovery of business records. Contrary to the Defendant's allegations, this massive production was not a disorganized "document dump."

Rather, it is clear that the Plaintiff and its attorneys organized a thorough production from several business locations, and that it grouped and organized the documents in a logical and easily understood fashion. Each of the 84 contention interrogatories were answered. Furthermore, the Defendant took three Rule 30(b)(6) depositions during the production process – all designed to ensure that the discovery was proceeding according to its wishes. Finally, the record is clear that the parties exchanged myriad correspondence about these issues, and that the Plaintiff attempted to accommodate each of the Defendant's multiple requests.

The Plaintiff is quite right when it states that the Court's discovery rules do not "require" the Plaintiff to do the "Defendant's own work for it." **Thus, this aspect of the Third Motion to Compel is DENIED.**

## B.    Coltec's Electronic Files and Emails

The Defendant's discovery requests sought production of all the relevant Coltec electronic files and emails. The Plaintiff responded to that request, in a letter from its counsel to the Defendant's counsel, by stating that when it was acquired by the Goodrich Corporation in 1999, Goodrich replaced Coltec's computer system with its own.

Coltec maintains that when the new computer system was set up, there was no systematic transfer of electronic versions of paper documents from the old system to the present system in use today. While some individuals may have saved individual documents from 1986-1998, the time period in question, onto the new system and its computers, it will be technologically challenging to search for those documents. As to the old Coltec computers and back-up tapes, the Plaintiff states that the computers were "cleaned" and donated to charity.

Page 9

Second, Coltec states that it did not have a company-wide external/internal email system in place during the years in question. Coltec apparently used an internal system called "ccmail" for internal communications. Employees used America OnLine (AOL) accounts for external emails. Thus, there is no current database or even record of Coltec emails from the period in question.

The Defendant's motion states that:

> [I]f plaintiff insists that the electronic data is not available, it should [so state] (in the form of a sworn affidavit, which it has not done. Alternatively, in the absence of such an affidavit, the Court should require plaintiff to produce the requested electronic mail and electronic file data.

In support of its various claims that no such data exists, Coltec offered the declaration of Mr. Thomas B. Tenfelde, the Chief Tax Counsel of Goodrich. Mr. Tenfelde was formerly the Tax Counsel for Coltec, where he served from 1979-1999. Mr. Tenfelde's declaration supports the Plaintiff's response that Coltec has no emails from that time period. Further, Mr. Tenfelde states that he contacted eleven individuals named by the Defendant as having potentially responsive email communications. None of these individuals currently have emails from that time period or can access their old email accounts.

Thus, the Plaintiff has stated, without refutation by the Defendant, that such files – namely, Coltec emails from 1996-1998 – do not exist. **The Defendant's Third Motion to Compel as respects this request is DENIED.**

However, Mr. Tenfelde's declaration also states that a substantial amount of electronic data is stored in Goodrich's computer system, and that some of it may be responsive to the Defendant's discovery request. Mr. Tenfelde states that identification and retrieval of potentially responsive documents will be expensive and time-consuming.

This may be so. Nevertheless, the Court believes that the parties can come to some agreement as to limitations on the search effort not unlike the other document agreements. For example, they may limit the search to certain individuals, certain years, or certain "named" documents or certain "buzzwords" in the universe of documents.

Page 10

**Therefore, we DENY AS PREMATURE this aspect of the Third Motion to Compel. The Court ORDERS the parties to advise the Court as to the status of these discussions in a Joint Status Report no later than June 10, 2003.**

The JSR shall jointly propose a recommendation for how to proceed with this request. If the Plaintiff further objects to this discovery, it shall file an sworn affidavit from a corporate designee as to the electronic discovery issues involved, and specify why such a search should be prohibited.

C.    **Privilege Claims**

The third aspect of the Defendant's Third Motion to Compel involves its allegation that Coltec has not "established a factual predicate for its privilege claims." The parties agree that Coltec has withheld a number of documents from the Defendant on grounds of attorney-client and work product privilege.

As a preliminary matter, the Court notes that these logs are prepared in the same manner as previous Coltec logs. The Defendant had no difficulty challenging the privilege claims on those logs, and never sought more specificity. It ill behooves the Government to raise the specificity issue at this point. Further, the Government has not indicated in what manner the logs are deficient, preferring to leave it to the Court to guess.

The Court's Rules state that to withhold documents on account of privilege, a party "shall make the claim expressly and shall describe the nature of the documents . . . in a manner that . . . will enable other parties to assess the applicability of the privilege or protection." Rule 26(b)(5).

The Court notes that Coltec has stated in several different briefs on these discovery matters that, while it has withheld additional documents (above and beyond the 39 documents discussed above) on the work product privilege, it will abide by the Court's ruling on that issue. The Court has now construed that privilege. **The Defendant's motion as to other withheld documents based on the work product privilege is DENIED AS MOOT. The Plaintiff is ORDERED to produce all documents consistent with this Order.**

Second, as regards documents withheld on the basis of the attorney-client privilege, Coltec states in response that it has served the Defendant with detailed privilege logs which list, on a document-by-document basis, the type of document, the date, the author(s), the addresse(s), the subject matter, and the privilege(s) asserted. Moreover, Coltec has submitted separate privilege logs for each of its business locations. Finally, Coltec states that even though it believes the Government's "blanket challenge" is "without merit," it has reviewed and reevaluated all of its privilege assertions and related logs and has submitted revised logs.

**The Defendant's motion as respects this request is DENIED.**

## V.    Defendant's Motion for Enlargement of Discovery

The Defendant filed a motion on December 20, 2002, seeking a 75-day extension of fact discovery, which is due to expire on May 16, 2003. The Plaintiff consents to this motion. **The Court GRANTS the Defendant's motion and ORDERS the following:**

**A) Fact Discovery will continue until July 31, 2003; and**

**B) Expert Discovery will commence immediately thereafter and conclude no later than December 30, 2003.**

## VI.    Defendant's Motion for a Status Conference

The Defendant filed a motion on November 12, 2002, requesting that the Court hold a Status Conference to discuss the progress of discovery. At the time, the Plaintiff opposed the request. **This Order resolves all pending motions. The Defendant's motion is DENIED.**

## VII.   Future Discovery Disputes

As stated several previous times, **the Court expects and requires that the parties resolve future discovery disputes without recourse to the Court. The Court also expects that parties will not seek to re-litigate discovery issues that have previously been resolved.** Many aspects of the Second and Third Motions to Compel were either resolved earlier, or would have been unnecessary had earlier resolutions been extended to analogous issues.

In their briefs on the various motions, the litigants have cited the Advisory Committee Notes to the Federal Rules of Civil Procedure, which are substantially similar to the Rules of our Court. The Court agrees that the Notes are instructive to these disputes. As the Advisory Committee stated:

> The purpose of discovery is to provide a mechanism for making relevant information available to the litigants. . . . Thus *the spirit of the rules is violated when advocates attempt to use discovery tools as tactical weapons* rather than to expose the facts and illuminate the issues by overuse of discovery or unnecessary use of defensive weapons or evasive responses. *All of this results in excessively costly and time-consuming activities. . . .*

> [T]here are many opportunities, if not incentives, for attorneys to engage in discovery that, although authorized by the broad, permissive terms of the rules, nevertheless result in delay. . . . *These practices impose costs on an already overburdened system and impede the fundamental goal of the "just, speedy, and inexpensive determination of every action."*

*Notes,* 1983 Amendments to FRCP 26 (citations omitted) (emphasis added).

We firmly believe that **each of the issues raised in these motions could and should have been resolved without Court intervention. This Court will not tolerate abuse of the discovery process and unnecessary recourse to the Court's authority.**

Page 13

VIII.   <u>Joint Status Report</u>

The Plaintiff and Defendant shall submit a Joint Status Report (JSR) updating the Court as to the status of the case at the close of fact discovery, but **no later than August 20, 2003.**


IX.   <u>Service</u>

**The Clerk of Court is directed to serve copies of this Order upon counsel for both parties and Arthur Andersen.**

IT IS SO ORDERED.

LAWRENCE M. BASKIR
Judge