UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES OF AMERICA'S REPLY TO PLAINTIFF'S CONSOLIDATED OPPOSITION TO MOTIONS TO COMPEL PRODUCTION OF DOCUMENTS FROM LORD BISSELL & BROOK (N/K/A LOCKE LORD BISSELL & LIDDELL), BRYAN CAVE, BROWN RAYSMAN (N/K/A THELEN REID BROWN RAYSMAN & STEINER), AND PROSKAUER ROSE LLP**

The plaintiff has many times already failed in its attempts to halt discovery of documents held by professional firms involved in the design, development, marketing, implementation, and/or reporting of the FDIS tax-shelter transaction. Despite the Court's finding each time that the evidence is potentially relevant and worthy of discovery, the plaintiff is renewing its same old argument. It is renewing the argument now under the guise of an opposition on behalf of four law firms served with subpoenas and subsequent motions to compel. The plaintiff is again, as it did more than a year ago with respect to KPMG, filing its discovery-related papers without standing to do so.[1] If the plaintiff wished to argue on others' behalf with respect to these

---

[1] In that instance, the plaintiff moved to quash the subpoena served upon KPMG. There, as here, the plaintiff argues that the subpoena was overbroad and sought to "investigate the tax shelter industry." That allegation was deemed untrue then, and it is similarly untrue now. The United States seeks to obtain relevant evidence to be used in this case to counter the allegations made in the Complaint. As explained in the KPMG matter, The Senate Permanent Subcommittee on Investigations has already investigated the tax-shelter industry, and published a report detailing widespread abuses by various professionals who sold prepackaged, generic tax

(continued...)

subpoenas, it should have sought a protective order. Even had it sought a protective order, however, the plaintiff could not do what it attempts to do here– assert others' purported-privilege claims. Now, more than a year after service of the subpoenas, any motion for a protective order would be untimely. Furthermore, a consolidated opposition to four distinct motions is inappropriate, and, as described below, is intended simply to hide the true nature of the firms' involvement with the plaintiff and the FDIS product the plaintiff bought.[2]

Beyond the obvious procedural defects here, the plaintiff's factual allegations are false. As shown in the evidence obtained thus far– often over the plaintiff's objections– the plaintiff did in fact have a relationship with these law firms. Moreover, so did their so-called "advisors" and "partners." The relationships were based on the nature of the coordinated design, development and implementation of the FDIS tax-shelter product, and on other tax-shelter products.[3] Significantly, each of the law firms played a role in the implementation of the FDIS

---

[1](...continued)
shelters to willing buyers. The Senate investigated a number of accounting firms, law firms, financial institutions, investment advisors, and tax shelters. The United States is not seeking discovery from or relating to the great bulk of them in connection with this litigation. Furthermore, the United States is not seeking transactional documents with respect to any tax shelter other than SOS and its variants. The United States does seek, and is entitled to, marketing and other information relating to generic tax shelters that were merely prior models of the tax shelter the plaintiff bought. The United States also seeks and is entitled to documents evidencing what the plaintiff's so-called advisors knew about the FDIS tax-shelter they marketed and participated in.

[2]Three of the four law firms on whose behalf the plaintiff opposes (Brown Raysman, Lord Bissell, and Bryan Cave) assert privilege on behalf of The Diversified Group, Inc. ("DGI"). The United States is in negotiations with DGI to resolve the issues in dispute. The fourth law firm, Proskauer Rose, filed its own response on November 19, 2007. (The United States will reply separately to Proskauer Rose's response). As such, none of these firms is in need of the plaintiff's opposition, and the plaintiff has no standing to oppose on their behalf.

[3]The subpoenas being enforced sought documents relating only to the tax-shelter products known as SOS and its subset FDIS. Presumably no documents unrelated to SOS and FDIS were
(continued...)

tax-shelter product, and the plaintiff's FDIS product in particular.

The plaintiff's consolidated opposition is particularly inappropriate here because it hides the central roles the firms played with respect to Fidelity International, and paints them with the broad brush of "pattern evidence." While pattern evidence is important and discoverable, the evidence from these firms goes well beyond it. The firms have evidence going directly to the heart of the FDIS tax shelter the plaintiff implemented and what the plaintiff knew about the FDIS tax-shelter product when shopping for, implementing, and failing to properly disclose it.

## I.    The Plaintiff and its So-Called Advisors Had a Relationship With Each of These Law Firms, and the Documents Sought are Highly Relevant.

The evidence discovered so far in this case demonstrates that the plaintiff had a relationship with each of the law firms from whom the United States seeks to compel the production of withheld documents, and each of those relationships related to the FDIS tax-shelter product at issue here. The creation and implementation of the FDIS tax shelter was a collective effort that included the plaintiff's so-called advisors. The plaintiff's relationships with the firms began when the plaintiff first sought a tax shelter in approximately 2000. On May 19, 2000, James Reiss wrote to Carol Remillard (both of Carruth)[4] to say that Stephanie Denby had set up a meeting with "an organization called Helios . . . to discuss their tax reduction strategy."[5] Presumably, this is what the plaintiff was referring to in the Complaint when it alleged that it was

_____

[3](...continued)
withheld under claims of privilege, as they were not responsive to the subpoena. As such, they are not sought here.

[4]Carruth is owned by Richard Egan's three sons, and purportedly manages his "investments."

[5]_See, e.g._, Govt. Ex. 46 attached to Declaration in Support of U.S. Mot. to Compel Carruth, Docket Entry No. 207.

referred by an accounting firm, presumably KPMG, to Helios Trading, which, in turn, recommended Alpha Consultants to help "design and customize" what became the instant FDIS transaction.[6] Then, according to the evidence, KPMG did a background check on Helios and one of its purported principals, James Haber, which was described to Carruth.[7] KPMG told Carruth that Haber had been involved in a lawsuit brought by a disgruntled participant in a "tax shelter deal."[8] Carruth also learned that Haber had another business, DGI, that was involved in "similar deals"– that is, "tax shelter deal[s]."[9] Helios and Alpha became so-called "partners" in Fidelity International Currency Advisor A Fund ("Fidelity International").[10]

According to the plaintiff, each of the entities it consulted with *directly* to implement its FDIS tax shelter was an advisor. That list of so-called advisors includes KPMG, Carruth, DGI, Helios, Alpha, James Haber, RSM McGladrey, Sidley Austin, and Proskauer Rose. The list does not include, again according to the plaintiff, Bryan Cave and Lord Bissell.[11] The plaintiff's position as to Brown Raysman is unclear, as it simply says that Brown Raysman did not represent it.[12] But the plaintiff did take the deposition in this case of a Brown Raysman partner, during which that partner testified that Brown Raysman's client, DGI, retained the firm to effectuate

---

[6]Compl. (Case No. 05-40151) at ¶ 25.

[7]Govt. Ex. 43 to Decl. in Supp. of Mot. to Compel Plaintiff, et al., Docket Entry No. 207.

[8]*Id.*

[9]*Id.*

[10]Compl. at ¶ 34.

[11]Pl. Opp. to Motion to Compel Four Law Firms at 3.

[12]Pl. Opp. to Motion to Compel Four Law Firms at 3, FN 10.

2894087.1

documents for transactions including the Fidelity International transaction.[13]

Part of the FDIS-implementation strategy was to obtain an opinion letter to act as so-called penalty insurance in the event the IRS discovered the transaction and disallowed the claimed losses.[14]  The need to have an opinion letter is evidenced in the marketing presentation the plaintiff received before entering into this transaction.  That presentation states that "Brian [sic] Cave or Proskauer Rose or Sidley Austin or Lord Bissell" was available to issue a "more likely than not level tax opinion at two dates– (i) contemporaneously with the transaction, and (ii) at the 2001 tax returns filing date."[15]  Later, in October 2001, Haber sent to Pat Shea of Carruth an email asking if the plaintiff had chosen from among those four firms.[16]  Tellingly, Burke Warren has redacted, as privileged "legal advice," the subsequent email exchange between it and Pat Shea of Carruth[17] in which they presumably discussed which of those firms to select.[18]

Each of these four 'opining-writing' law firms provided to the plaintiff had already

---

[13]Unger Dep. Tr. at 17:5, 19:2-8.

[14]*See, e.g.*, Govt. Ex. 4 appended to the Declaration of Barry Reiferson in Support of Mot. To Compel Plaintiff, et al., Docket Entry No. 177; Memorandum produced by the plaintiff stating that "One way to establish reasonable cause [to avoid penalties] would be evidenced [sic] by obtaining and in good faith relying upon, a tax opinion . . . ."

[15]Govt. Ex. 1.  (Emphasis omitted). The "tax opinion" issued "contemporaneously with the transaction" was issued by Sidley Austin.  When Sidley was unable or unwilling to issue a later "tax opinion" on the separate issue as to whether the transaction was required to be disclosed on the taxpayer's tax return, the plaintiff selected a second of the four firms on the list– Proskauer Rose– to provide that opinion letter

[16]Govt. Ex. 2.

[17]*Id.*

[18]The United States has filed a separate motion to compel the production of the documents listed on Carruth's privilege log.  Plaintiff represents that the resolution of our objections with respect to Carruth's privilege log will also resolve our objections with respect to the Burke Warren privilege log..

2894087.1

signaled its willingness to provide a "more likely than not level" opinion on the plaintiff's

transaction to the tax-shelter promoters.[19]  The law firms were also made available to other

taxpayers to whom the FDIS product was marketed.  The availability of all four law firms– and

only those four– to each of the promoters' FDIS customers is evidenced by the list of "2001

Customers," including Egan, to whom the FDIS transaction was marketed.[20]  That list includes

the promoters' "Expenses," which, in turn, include expenses related to the same four law firms–

Sidley Austin, Proskauer Rose, Bryan Cave, and Lord Bissell.[21]

The law firms were each involved in the design, development, marketing,

implementation, and/or reporting of the FDIS tax-shelter product purchased by the plaintiff.

Furthermore, the plaintiff's carefully crafted arguments here cloak its significant relationships

with these law firms.  The argument that Bryan Cave did not "represent[]" the plaintiff,[22] for

example, hides the special relationship that plaintiff had with the various promoters of this

scheme.  That relationship was directly related to tax shelters in general, and to this FDIS tax

shelter in particular.  In June 2002, a Bryan Cave attorney advised Orrin Tilevitz and James

Haber of DGI that he had "attended the Senate Finance Committee's markup of the . . . tax

---

[19]Govt. Exs. 1 and 2.  *See also*, govt. Exs. 10 and 11 (listing customers DGI "proposed" would receive an opinion from Bryan Cave and Sidley Austin, respectively)(the Sidley Austin list includes Richard and Maureen Egan); Govt. Ex. 4 attached to Declaration in Support of Mot. to Compel Proskauer, Docket Entry No. 197 (listing customers DGI "proposed" would receive an opinion from Proskauer Rose).

[20]Govt. Ex. 3 attached to Declaration in Support of Mot. to Compel Proskauer, Docket Entry No. 197.

[21]*Id.*

[22]Pl. Opp. to Motion to Compel Four Law Firms at 3.

shelter bill."[23]  Bryan Cave went on to describe that "markup."  The advice pre-dated the issuance

of the Proskauer opinion letter opining that the transaction was not required under amended

Treasury Regulations (amended in June 2002) to be disclosed on Richard Egan's tax return.

James Haber then forwarded the email to Stephanie Denby, the plaintiff's and/or Carruth's

attorney.[24]  Separately, a few months later, Bryan Cave attorney John Barrie, whose deposition

the plaintiff has noticed in this case for December 9, 2007, sent an email to Ronald Wainwright

of RSM McGladrey (whose firm had signed the plaintiff's 2002 Form 1065 and Richard Egan's

2001 and 2002 Forms 1040 and who was a purchaser of his own FDIS tax-shelter product).  In

that e-mail, Barrie advised, among other things, that the  "Head of [the] Tax Shelter Office"

"expect[ed] to see a couple of additional new listed transactions in [the] very near future–

[though there was] no info[rmation] [on] what strategies."[25]  Ronald Wainwright, meanwhile,

was described by Carruth as RSM McGladrey's "head of planning" who had "*marketed* this

[FDIS] strategy."[26]  Wainwright then forwarded that tax-shelter-related email to Pat Shea of

Carruth, writing that he was forwarding the message "[a]s discussed this a.m. . . . ."[27]

    Even the Sidley Austin attorney who wrote the "Egan opinion" recognized the inter-firm

coordination of the letters and the supporting "facts."  In an email from Sidley Austin to DGI, the

attorney asked if he could be provided with a Bryan Cave "model" for use "setting up the

---

[23]Govt. Ex. 3.

[24]*Id.*

[25]Govt. Ex. 4.

[26]Govt. Ex. 5.  (Emphasis added).

[27]*Id.*

facts."[28]  Sidley Austin claimed to have an "old version" it worked on with Orrin Tilevitz of DGI, but that "old version" supposedly "went only to the legal arguments."[29]  In short, according to this email, Sidley Austin was using an old boilerplate opinion letter from DGI for the so-called legal arguments in the Egan opinion letter, and used a later boilerplate opinion letter from DGI for the "fact" section of the Egan opinion letter.

Similarly, Lord Bissell was also directly involved with the plaintiff's so-called advisors. RSM McGladrey informed its clients that "their [sic] are two Firms [sic] - as we understand - clients can obtain opinions from regarding the disclosure question."[30]  Those firms were Proskauer Rose and Lord Bissell.[31]  The RSM clients were also told that they "need to obtain these opinions directly from counsel as an independent counsel to their transaction."[32]  (There, the groundwork had been laid for arguments like Proskauer's that the clients, shepherded through the process by the promoters, were really the law firms' clients).  RSM's Ronald Wainwright even offered to "discuss the logistics of who" the customers "need to call to engage these Firms for an opinion, etc."[33]  Wainwright indeed described the opinion-obtaining process neatly in an email to another FDIS customer.  In that email, Wainwright describes how the customer received two opinions– one dealing "with the overall structure of the transaction," and the other dealing

---

[28]Govt. Ex. 6.

[29]*Id.*

[30]Govt. Ex. 7.

[31]*Id.*

[32]*Id.*

[33]*Id.*

"with disclosure."[34]  In that instance, the opinions came from Bryan Cave and Lord Bissell, respectively.[35]  Similarly, DGI contacted Lord Bissell attaching a draft "disclosure opinion."[36] DGI asked Lord Bissell if it could "issue an opinion along these lines for paying clients."[37]  Lord Bissell responded that it could.[38]

It is clear from these documents that tax-shelter information and strategy was being shared between the tax-shelter promoters (including these law firms and RSM McGladrey), Carruth, and Stephanie Denby.  As described at length in the motion to compel production of documents from the plaintiff and Carruth, Denby was also intimately involved in the drafting of the Egan opinion letters that were modified from the boilerplates, including the Proskauer Rose opinion letter that followed her Bryan Cave correspondence.  Because the entire FDIS-tax-shelter transaction was a collective effort and, as Carruth noted, a "marketed" product, the information exchanged between the participants and their so-called advisors is directly relevant to the issues in this case.  Those issues include whether the FDIS transaction– as designed and "marketed" by these firms and others– entitle the plaintiff to the tax treatment claimed on its tax returns.  As such, discovery must extend to the design and implementation of FDIS product.

## II.     The Plaintiff Lacks Standing to Assert the Privilege Claims of Others.

The plaintiff inappropriately opposes four motions not aimed at it.  Its opposition is aimed at preventing the production of documents that are responsive to subpoenas issued to four

---

[34]Govt. Ex. 8.

[35]*Id.*

[36]Govt. Ex. 9.

[37]*Id.*

[38]*Id.*

2894087.1

others in 2006.   Those subpoenas requested documents relating to SOS and its subset FDIS tax-shelter products such as the one the plaintiff implemented.  Any documents withheld by the four law firms, therefore, are responsive to those subpoenas, related to SOS and/or FDIS, and are withheld under claims of privilege.  As such, for the second time in this case, the plaintiff is attempting to assert the privilege claims of others.  The first time the plaintiff tried to assert another's privilege claims was in April 2006 and related to the plaintiff's motion to quash a subpoena issued to KPMG.  In response, the United States pointed out that the plaintiff lacked standing, and the plaintiff could not move to quash.[39]  The Court denied the plaintiff's motion because of the plaintiff's lack of standing.[40]  Nonetheless, the plaintiff repeats its error here.

Even if the plaintiff's opposition were deemed to be a motion for a protective order, and even if the plaintiff were deemed to have standing to make such a motion, it would be untimely.  Although Federal Rule of Civil Procedure ("Rule") "26(c) is silent as to the time within which the movant must file for a protective order," it must do so "in a timely manner."[41]  The general rule is that the motion for protective order must be filed before the date set for production.[42]  Here, the times set for production were all in 2006, and actual production commenced and, but for the withheld documents, finished some time ago.

---

[39]U.S. Opp. to Mot. to Quash KPMG Subpoena, Docket Entry No. 19, at pp. 6-12.

[40]May 11, 2006 Tr. at 15:10-24.

[41]*Velasquez v. Frontier Med., Inc.*, 229 F.R.D. 197, 200 (D.N.M. 2005).

[42]See *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 669 F.2d 620, 622 n.2 (10th Cir. 1982)(citing *United States v. Int'l Bus. Mach. Corp.*, 70 F.R.D. 700, 701 (S.D.N.Y. 1976)); See also *Anderson v. Avco Embassy Pictures Corp.*, 1984 U.S. Dist. LEXIS 17663 at *2 (D. Mass. 1984) (motion for protective order not timely when filed one day before the first deposition was to commence and approximately seven weeks after the notices of deposition had been filed).

### III. The United States Seeks Relevant Evidence Here in Accordance With the Court's Prior Rulings.

The evidence sought here includes direct evidence contradicting the plaintiff's allegations made in the Complaint, including, but not limited to, its allegations that it "reasonably relied in good faith" on two so-called independent legal opinions,[43] that it was "not interested" in a product that had been "mass-marketed,"[44] and that the FDIS product, as designed and marketed, had a primary business purpose and economic substance.[45]  The evidence sought also includes so-called pattern evidence.  There is simply no merit to the plaintiff's argument that the motions to compel "seek[] numerous communications between the Four Law Firms and other professional firms, which would not be part of the Defendant's summary chart."[46]  In the first place, the United States is not limited to presenting relevant evidence of other FDIS transaction in the form of a summary chart.  More to the point, however, we have not seen the withheld evidence, nor, presumably, has the plaintiff.  As such, neither party is in a position to say how the evidence would be used.[47]

---

[43]Compl. at ¶ 49.

[44]Compl. at ¶ 23.

[45]Compl. at ¶ 58-65.

[46]Pl. Opp. to Motion to Compel Four Law Firms at 4.

[47]The plaintiff's suggestion that the so-called closing binders produced for some of the transactions contain all of the documents needed to prove that the Fidelity International transaction was a cookie-cutter version of more than fifty others, (Pl. Opp. at 4), is also wrong. Discovery is not limited to the amount of evidence the plaintiff deems necessary.  If, however, the plaintiff wishes to discuss a stipulation that the plaintiff's FDIS transaction was designed identically to all others, that is a subject worthy of exploration.

2894087.1

**IV.     Conclusion**

The evidence sought here is highly relevant to numerous issues in this case.  All of the evidence relates to the very product the plaintiff bought to reduce his tax liabilities.  Some of that evidence relates to the plaintiff's so-called advisors who designed and implemented the– as the plaintiff calls it, "marketed" – FDIS product.  Some of the evidence relates to the design of the product itself.  Some of that evidence comes in the form of pattern evidence.  The plaintiff has never articulated a reason why pattern evidence should be deemed less important than other evidence.  It is not.  Pattern evidence is particularly valuable in a case like this where the plaintiff claims on one hand to have entered into a customized investment transaction, and on the other that the transaction is a "marketed" "tax shelter."  The plaintiff cannot simply make allegations and then prevent the discovery of evidence that would demonstrate the falsity of them.  It

certainly cannot prevent discovery here by rehashing already-rejected arguments it lacks standing to make.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

/s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER L. VANN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044-0055
Telephone: (202) 307-6561
Facsimile: (202) 514-5238
E-mail: john.a.lindquist@usdoj.gov
        barry.e.reiferson@usdoj.gov
        heather.vann@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and copies will be sent to those indicated as non registered participants on November 26, 2007.

/s/ Heather L. Vann
Trial Attorney, US Department of Justice, Tax Division

2894087.1

# Egan Family 2001 LLC Investment
## Proposed Structure Comments

- Brian Cave or Proskauer Rose or Sidley Austin or Lord Bissell – more likely than not level tax opinion at two dates – (i) contemporaneously with the transaction, and (ii) at the 2001 tax returns filing date

- Daily allocation cut off method, with regard to partnership gains and losses, see IRC Sec. 704(c)

  - No technical termination of LLC as Richard Egan owns more than 50% of the capital of the LLC before and after the acquisition of the 85% (considering ownership of the preferred interest)

- 2000 Salina case distinguishes the Helmer case. Option sale proceeds do not result in IRC Sec. 752 liabilities. Short sale proceeds do result in IRC Sec. 752 liabilities. The transaction is not a short sale. ACM and 2000-44 distinguishable; 2001-45 does not apply; cite also IRC Secs. 701, 465

- Unencumbered investments post transaction, with no investment restrictions

- There is no requirement or document that infers or states that RJE will possess or acquire an option to obtain the Co-investor's LLC interest. Instead, the LLC agreement will not prohibit arms length transactions between members, including the ability of members to transfer member interests

- Consider distributing long option positions to RJE before option sale or expiration

- Sec 704 inapplicability and no income recognition upon option settling

- Total investment in Egan Family 2001 LLC will be approximately $ 15 million

- Review the size of the 2001 currency option trades, considering investment reporting requirements

- Total funding ("Out of Pocket") is 7% for (i) 3.5% transaction fees and (ii) cost of currency options and (iii) purchase of Co-investor interest (3.5%) – see item 7. on attached outline



GOVERNMENT EXHIBIT

011358
EGAN011358

**Denby, Stephanie H.**

| | |
|---|---|
| **To:** | Shea, Pat |
| **Subject:** | RE: our trades |

Redacted

Stephanie

-----Original Message-----
From: Shea, Pat [mailto:PatS@cmllc.com]
Sent: Monday, October 08, 2001 3:20 PM
To: Denby, Stephanie (Internet)
Subject: FW: our trades

Hey counselor---

Redacted

-----Original Message-----
From:      James Haber [mailto:jhaber@divgroup.com]
Sent: Monday, October 08, 2001 4:13 PM
To:    Shea, Pat
Cc:    Stephanie Denby; Fiddy, Carolyn
Subject:    Re: our trades

Pat,
Thank you for your good wishes. If you do not have them, let me
know. I am available on the18th, pick a time. We work with the law firm.
Opinions will be delivered in January. Have you decided on a law firm.
Choices are: Proskauer Rose LLP, Sidley Austin Brown & Wood LLP, Bryan Cave
or Lord Bissell & Brook.
Jimmy
----- Original Message -----
From: "Shea, Pat" <PatS@cmllc.com>
To:    <jhaber@divgroup.com>
Cc:    "Fiddy, Carolyn" <Carolyn@cmllc.com>
Sent: Monday, October 08, 2001 11:14 AM
Subject:    our trades

>
> Jimmy---
>
> I spoke with Ron this morning and he was running the examples of trades
for
> us -- he will forward them to you to reformat them and get them to us--
>
> I don't know what effect, if any,  the attack on Aphganistan will have on
> our strategy or timing but we are looking to do the trades Tues or Wed--
we
> have wired the $$$ to Refco ---
>
> When will we get the opinion letter and do I have to contact anyone or
will
> you take care of that ??
>

1

GOVERNMENT
EXHIBIT
2

Produced by Burke, Warren, MacKay, and Serritella to United States on 01/09/07

BWMS 05597

3BWMS05597

I will be in NY October 16-18 and have asked  Tim Speiss if the three of
> can meet on the morning of the 18th -- does that work on your schedule--
mid
> morning best for me---
>
> Is there anything else you need from us for this trade this week---
>
> Thanks--
>
> Hope you had a nice trip--
>
> Hope you and yours stay safe in these scary times
>
> pat
>
>
>

2

Produced by Burke, Warren, MacKay, and Serritella to United States on 01/09/07

**Denby, Stephanie H.**

**To:**    James Haber

**Subject:** RE: Senate Finance Markup (UPDATE)

Do you have the mark up yet. What is the the latest effective date?

Thanks

Stephanie



-----Original Message-----
**From:** James Haber [mailto:jhaber@divgroup.com]
**Sent:** Thursday, June 13, 2002 3:09 PM
**To:** Stephanie Denby; Ira Akselrad, Esq.
**Subject:** Fw: Senate Finance Markup (UPDATE)

----- Original Message -----
**From:** Ludwig, Mark
**To:** 'otilevitz@divgroup.com' ; 'jhaber@divgroup.com'
**Cc:** Barrie, John
**Sent:** Thursday, June 13, 2002 3:49 PM
**Subject:** Senate Finance Markup (UPDATE)

Mr. Tilevitz and Mr. Haber:

This morning I attended the Senate Finance Committee's markup of the charitable
giving bill, the inversion bill and the tax shelter bill. The charitable giving bill was
indeed offered with the inversion and tax shelter bills attached to it. The inversion
and tax shelter bills were also offered separately. The session lasted for
approximately 2.5 hours and was recessed subject to the call of the chair.
Therefore, final votes did not occur on any of the three bills. A variety of
amendments were offered, discussed and voted on, however. Final votes on the
three bills were expected to occur later today or tonight. However, I just spoke to a
staffer on the Senate Finance Committee who indicated that votes on those bills
would not occur today. That is yet another indication of controversy and trouble for
the bills. Final votes could not be taken during the markup because seven
members of the committee were not present at the time. That may not have been
entirely coincidental. No more substantive changes are likely to occur between
now and the time of the final votes because the great majority of the committee's
business was taken care of this morning. However, anything is possible.

Aside from some minor technical changes and barring any further alterations before
the final votes occur, there was only one major modification to the tax shelter bill.
The modification was made prior to the start of the markup and thus did not require
an actual amendment and vote. Basically, the modification clarifies the reasoning
in the Rite Aid decision on the issue of loss disallowance rules. I will forward you
the full text of the revision as soon as possible.

While that was the only tax shelter modification, Senator Bon Graham (D-FL)
announced that he would offer a tax shelter amendment once the bill reaches the
Senate floor. Graham feels that the Baucus-Grassley tax shelter bill does not go

6/17/02

GOVERNMENT
EXHIBIT
3

PRODUCED BY EGAN TO UNITED STATES ON 06/04/2007

far enough. His amendment would mandate that there be "economic relief" for all
tax shelters. Therefore, there would have to be a benefit to the economy in
general, not just a tax break for an individual or corporation. He stated that his
amendment would in essence "insert an economic standard [for tax shelters] into
codified tax law." He feels that, if enacted, the amendment would go a long way
toward paying for the price of the charitable giving bill.

On the issue of inversions, Senators Fred Thompson (R-TN) and Bob Graham (D-
FL) and Orrin Hatch (R-UT) made it very clear that the committee is rushing in this
area and that they feel the Grassley-Baucus bill likely doesn't go far enough.
Thompson demanded that there be a hearing on the subject. Baucus promised
that there would be future hearings on "international tax issues."

Many members expressed concern that the offsets aren't nearly enough to pay for
the charitable bill.

Several committee staffers and lobbyists in the room seemed to be of the opinion
that the tax shelter bill will have tremendous problems in the House. Chairman
Thomas just doesn't have an interest in it yet. The inversion bill could be a different
story as more political pressure can be felt from it. Anything is possible, however,
and there are still many months left before Congress adjourns for the year.

I will keep you updated on further actions of the Senate Finance Committee and will
obtain the amended texts of all three bills as soon as they are available.

All the best,


Mark


Mark N. Ludwig
Congressional Liaison
Bryan Cave LLP
700 13th Street, N.W.
Washington, D.C. 20005
mnludwig@bryancave.com
202-508-6208 (phone)
202-508-6200 (fax)
703-598-9673 (cell)

This electronic mail message contains information which is (a) LEGALLY
PRIVILEGED, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY
LAW FROM DISCLOSURE, and (b) intended only for the use of the Addressee (s)
names herein. If you are not the Addressee (s), or the person responsible for
delivering this to the Addressee (s), you are hereby notified that reading, copying,
or distributing this message is prohibited. If you have received this electronic mail
message in error, please contact us immediately at the telephone number shown
below and take the steps necessary to delete the message completely from your
computer system. Thank you.


6/17/02


PRODUCED BY EGAN TO UNITED STATES ON 06/04/2007

**From:**      ronald.wainwright@rsmi.com
**Sent:**      Tuesday, September 10, 2002 1:29 PM
**To:**        pats@cmllc.com
**Subject:**   Re: Update on Legislative/Regulatory Matters
**Importance:** High


Pat -

As discussed this a.m. - please see below.

If you have any specific questions as to below - please let me know.

Thanks

Ron


Ronald G. Wainwright, Jr.
Managing Director - Tax
RSM McGladrey, Inc.
2418 Blue Ridge Rd.
Raleigh, NC 27607-6480
Phone: (919) 645-1543
Fax: (919) 781-9270
Ronald_Wainwright@rsmi.com
----- Forwarded by Ronald Wainwright/Raleigh/MP/RSMi on 09/10/2002 01:05 PM -----

   "Barrie, John" <jpbarrie@bryancave.com>

09/09/2002 02:44 PM

To:      "'ronald_wainwright@rsmi.com'" <ronald_wainwright@rsmi.com>
cc:      "Smith, Elizabeth Ann" <easmith@BryanCave.com>
Subject:  update on legislative/regulatory matters


Ron - I attended one of my monthly government relations meetings today - not a lot new to report -

1. Legislation - there seems to be a consensus (which you have probably already noted) - that any tax legislation this year will likely use the pending pension bill - if it goes forward - likely guess is that it must be on Senate floor within next two weeks - as has already been noted publicly, tax shelter provisions are a possible addon for a revenue raiser - from a political standpoint democrats may push Thomas revenue rasiers - assuming the pension bill does get through Senate - likely will be a very difficult conference - there is also a school of thought that there are higher items on agenda which need to be addressed first - Home Security legislation and the various appropiations bills - the expected recess date is October 4 - but that may slip a little (but not much because of the election).  The President's charitable bill still will likely not go anywhere since it needs unanimous consent to get to floor (unlikely).

2. Regulations - Head of Tax Shelter Office has indicated that we can expect to see a couple of additional new listed transactions in very near future - no info what strategies

9/10/2002



GOVERNMENT
EXHIBIT
4

PRODUCED BY EGAN TO UNITED STATES ON 06/04/2007

057097
6CARRUTH057097

we can expect to see regs on contingent liabilities - likely dealing more with environment liabilities than longs and shorts - although there are still some administrative issues

Similarly, with respect to next version of tax shelter regs - suspect we will not see anything until end of session at earliest

Still waiting on Circular 230 proposals with respect to tax opinions (I am chairing a panel on that in October with Julian Kim from Treasury who has primary line responsibility for these amendments)

3. IRS audits - IRS Research group intends to send out audit letters first week in October - goal is 50,000 audits to get research info - 48,000 will go out first week, the remaining 2000 they are waiting for more complicated returns that will be filed on October 15.  Audits will range from purely internal, by telephone, office audits - approximately 2000 will be subject to line by line (like old TCMP)

4. CEO signature on tax returns - there are a lot of technical issues on this legislation -but this may get passed.  If passed, will likely see greater need for outside opinions on returns.

John P. Barrie
Bryan Cave LLP
700 13th Street, NW, Suite 700
Washington, DC 20005
202-508-6051 (DC - direct)
212-692-1847 (NY - direct)
202-508-6200 (DC - fax)
212-692-1900 (NY - fax)
jbarrie@bryancave.com

9/10/2002

PRODUCED BY EGAN TO UNITED STATES ON 06/04/2007

057098
6CARRUTH057098

508 248 3093

if not filing KPMG Return - send original back to
Tom Spriss — he will destroy

3 transactions only done and the other 2 were
different transactions

Tuesday FTL 9/3
AM

Wed PM Fly to Tampa

Stay in Tampa WED Nite Thurs Nite
Fri night Fly home 9/6

12 742 8/08 Huber    917-251-4003   cell phone   available 1-6:30 8/08

Huber
8/8    Ron Wainright — North Carolina

- 1 head of fin Planning
  Marketing KPG Strategy

- Huber sees no upside in Disclosing
  Disagrees w/ KPMG that by should
  disclose

Mathes   508 376 6317

GOVERNMENT
EXHIBIT
5

**Div**

| | |
|---|---|
| **From:** | "James Haber" <jhaber@divgroup.com> |
| **To:** | "Hirsh, Bobbe" <BHirsh@lordbissell.com> |
| **Sent:** | Monday, August 19, 2002 2:49 PM |
| **Subject:** | Re: Disclosure opinioni |

Please provide for me, an estimate as to what a client's fees would be if you
were rendering such an opinion.
----- Original Message -----
From: "Hirsh, Bobbe" <BHirsh@lordbissell.com>
To: "Orrin Tilevitz" <otilevitz@divgroup.com>
Cc: "Haber Jimmy" <jhaber@divgroup.com>; "Truskowski, John"
<JTruskowski@lordbissell.com>
Sent: Thursday, August 15, 2002 9:22 PM
Subject: RE: Disclosure opinioni


Dear Orrin,

Please be advised that we would be able to to issue an for paying clients
along the lines described.

Thank you.

Bobbe

Bobbe Hirsh
Lord, Bissell & Brook
115 S. LaSalle Street
Chicago, IL 60045
Telephone  (312) 443-0210
Fax       (312) 443-0336
PC Fax    (312) 896-6210
bhirsh@lordbissell.com <mailto:bhirsh@lordbissell.com>


-----Original Message-----
From: Orrin Tilevitz [mailto:otilevitz@divgroup.com]
Sent: Friday, August 09, 2002 10:16 AM
To: Hirsh, Bobbe
Cc: Haber Jimmy
Subject: Disclosure opinioni


Attached as described in my voicemail message is a redacted disclosure
opinion for the 2001 partnership deals; you wrote one substantive
opinion.  Please let me know at your earliest convenience whether you
would be willing and able to issue an opinion along these lines for
paying clients.

**DGI 79689**

GOVERNMENT
EXHIBIT
9

12/23/2004

1DGI-09-54-107321