UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM PROSKAUER ROSE LLP

Proskauer Rose ("Proskauer") is withholding documents, some of which seem to have no relationship at all to its purported individual taxpayer "clients." Those clients include participants in FDIS tax shelters who are suing Proskauer and its former partner Ira Akselrad for fraud and other counts relating to those FDIS tax shelters.[1] The United States has supplied Proskauer with a short list of "clients," including those known to be suing Proskauer, who are believed to have expressly waived privilege. Proskauer has failed to act on that list, failed to verify waiver or assertion of privilege, and failed to produce any of the withheld documents.[2] Proskauer appears to be withholding documents to protect itself from litigation (or to protect itself during litigation), rather than to protect any of its so-called clients who may not even know

---

[1]See *McNeill et al. v. RSM McGladrey et al.* (first page of Complaint attached hereto as Govt. Ex. 5.

[2]Proskauer has failed even to produce the documents it claims to have removed from its original privilege log and "deemed appropriate for production . . . ." (Hill Aff. at ¶ 10.)

of, much less approve of, Proskauer's assertions of attorney-client relationships, and work-product protections.[3]

Proskauer's opposition is a series of unsupported and contradictory allegations. While withholding documents purportedly on behalf of "more than 50 of its current and former clients,"[4] excluding Richard Egan,[5] it bases its opposition on facts relating only to Richard Egan. It presents no evidence of an attorney-client relationship with any of the other "clients," and provides no details about the communications with those other "clients." In fact, it presents no declaration, testimony, or documents from any of its attorneys who worked with those other "clients." It attempts to overcome its evidentiary problem by merely asserting, with no support whatsoever, that, as compared to its relationship with Richard Egan, "there are no material differences with regard to the process for rendering the legal advice by Proskauer or the nature of the documents withheld with respect to the other clients."[6] It then, in turn, argues that the Court can determine "what the lawyers actually did," and presumably determine the propriety of the privilege claims with respect to other so-called clients, "without resort to *in camera* inspection."[7]

---

[3]Proskauer's documents are subject to a protective order which would prevent "destr[uction] of confidentiality," the harm Proskauer alleges to be concerned about (*see* Proskauer Opp. at 3). As with other protected documents, including tax returns, identities can be protected before the documents enter the public domain.

[4]Proskauer Opp. at 1.

[5]As discussed in our opening memorandum, the plaintiff is not claiming privilege as to the Proskauer legal opinion issued to Richard Egan or related documents.

[6]Proskauer Opp. at 2.

[7]*Id.*

The privilege claims are facially deficient because Proskauer has not demonstrated, as the party asserting privilege, an attorney-client relationship with the individuals, the requisite anticipation of litigation to support a work-product claim, non-waiver of privilege to the extent any existed, or even, in some cases, a timely assertion of privilege. In the absence of any *evidence* to support Proskauer's factual allegations, its privilege claims are unsustainable. The evidentiary problems certainly cannot be overcome absent *in camera* review of the documents.

## I.    Proskauer Presents No Evidence With Respect to the Withheld Documents and Misstates the Record.

Despite Proskauer's unsupported allegations to the contrary, reliance on Egan's non-privileged "opinion letter" to support the nearly one thousand privilege claims is not a workable solution.[8] There are numerous problems with this approach, including that Richard Egan, unlike the other so-called clients, had at least some prior contacts with Proskauer, some of which dated back to 2000 – before the FDIS product was designed around Notice 2000-44.[9] As such, Egan's

---

[8]The United States believes, however, that an *in camera* review of all of the approximately 950 withheld documents is unnecessary. The parties to this motion can confer and randomly select opinion letters, representation letters, and accompanying documents– which make up the vast majority of withheld documents– and submit them for *in camera* review. Alternatively, the United States has suggested to Proskauer that it allow a "sneak peek" at the withheld documents (wherein there would be no assertion by the parties of waiver) to allow the United States to determine which of the documents it continues to seek, and perhaps work out an alternative arrangement. The United States made that suggestion both before and after Magistrate Judge Hillman suggested it in connection with the motion to compel the plaintiff's production. Proskauer has not allowed that "sneak peek."

[9]See Govt. Ex. 6, Memorandum dated July 21, 2000 in which Pat Shea of Carruth (which plaintiff claims to be its management company) contacted Ira Akselrad of Proskauer to obtain a reference on Helios "as a facilitator" of a "significant transaction," and stating that Proskauer had "done several deals with Jim Haber and . . . Helios– many larger than 100m[, and] [a]ll have gone off without a hitch." See also, Govt. Ex. 7, facsimile dated September 5, 2000 to Stephanie Denby from James Haber of DGI forwarding a "section of a Proskauer opinion relating to the contribution of options to an S Corp.," and to be filed with "Proskauer old opinion letters."

is not the typical Proskauer case.  Additionally, with respect to Egan, Proskauer bases its allegations almost entirely on the deposition testimony of Janet Korins, who did not testify about a relationship with any so-called client other than Richard Egan.  Even then, Proskauer misstates the record with respect to Korins.  Proskauer alleges, again without any support, that Janet Korins was "Egan's lawyer at Proskauer."  It appears, however, that Ira Akselrad and others, and not Janet Korins, were the primary attorneys assigned to production of the Egan non-disclosure opinion letter.[10]  Nonetheless, Proskauer relies on Janet Korins's testimony for the proposition that non-Egan documents are privileged and were generated and handled identically to the Egan documents.  Proskauer makes this assertion even though Korins claims that the Egan opinion was unique.  She claims that the Egan "opinion was a specific opinion on disclosure" and that she "was involved in other Proskauer opinions on different types of transactions."[11]  Korins further claims that she has no "specific recollection of other opinions."  Despite Korins's limited testimony, Proskauer relies entirely on her.  There is no reason given for Proskauer's failure to produce a declaration or testimony from Ira Akselrad or any other Proskauer lawyer (past or present) who may know something of the transactions relating to the withheld documents.  One can assume that Akselrad's testimony would be more informed and more harmful to Proskauer's cause.

Proskauer's assertion that Egan's opinion letter is representative of the other opinion letters also undermines Proskauer's privilege claims.  Egan alleges that no privilege ever attached

---

[10]*See, e.g.,* engagement letter signed by Ira Akselrad, Hill Aff. Ex. D.

[11]Korins Dep. Tr. at 62:7-10.

to his Proskauer opinion letter.[12]  Proskauer, in contrast, claims that it will "demonstrate, through Mr. Egan's documents and Ms. Korins' [sic] testimony, that work Proskauer performed was classic work product and attorney-client advice."[13]  Thus, Proskauer alleges that dozens of so-called clients claim privilege, have valid privilege claims, and have not waived privilege, all based on Egan's documents and deposition of Janet Korins, even though Egan himself alleges that his Proskauer opinion was never privileged.  Proskauer aims to make this showing without a shred of evidence from any of the other so-called clients or from it own employees or former employees who actually worked on the withheld documents.[14]

## II.     The Withheld Documents Are Not Protected by Attorney-Client Privilege in the First Instance.

Proskauer withheld approximately 950 documents under various privilege claims, leading to the United States' motion to compel production.  The withheld documents fall essentially into three categories: (1) internal documents relating to the FDIS product[15]; (2) FDIS-related correspondence with the FDIS promoters; and (3) "Opinion Letters," participant representations (purportedly factual representations), and accompanying documents relating to FDIS and addressed to various FDIS participants.

---

[12]Pl. Opp. to Mot. to Compel Pl. and Affiliates at 5.

[13]Proskauer Opp. at 2.

[14]As described in the opening memorandum, Proskauer is also alone among law firms in claiming that the privilege claims belong exclusively to the individual "clients" rather than the promoters.

[15]The privilege log does not describe the transaction as FDIS, but rather simply as the "transaction."  The subpoena sought only FDIS-related documents, and, as such, in the absence of a more complete privilege log, the United States must assume that the withheld documents relate to FDIS.

As to the first two categories, Proskauer fails to present any facts or even argument as to why the documents are allegedly privileged.  The internal documents do not appear to be related to any specific tax-shelter participants, which Proskauer refers to as its clients.[16]  Instead, they appear to be related to the generic tax-shelter documents prepared to assist the promoters in the design, development and marketing of the FDIS transaction.  That is, they would have been prepared in anticipation– not of litigation– but of receiving a huge fee from the tax-shelter promoters to provide a marketing incentive to the promoters' clients to purchase the tax shelter transaction.  This incentive took the form of canned and boilerplate legal opinions which were prepared by Proskauer and issued through DGI to the promoters' clients solely as penalty insurance in the event the IRS discovered the transaction.

Indeed, until early January 2002, Proskauer appears to have had no idea who its future so-called clients receiving FDIS opinion letters would be.  As shown in a memorandum from James Haber of The Diversified Group, Inc. ("DGI") to Ira Akselrad of Proskauer, DGI proposed the preparation of specific opinion letters, and did so on January 2, 2002.[17]  At least before that date, and undoubtedly even after that date, any Proskauer documents were prepared for DGI and the other promoters.  To the extent Proskauer generated documents for the promoters, including DGI, only the promoters have any possible privilege claim.  As such, any privilege claims are the promoters' to waive, and DGI has proven amenable to waiving privilege in this case (to the extent privilege attached in the first instance, which we contend it did not).  Proskauer does not appear to have even inquired as to whether DGI or any other promoter would waive privilege as

---

[16]*See, e.g.,* privilege log entries 131, 136, 137, 141, 177, 178, 143, 153, 206, 225, 233, 241, 245, 246, 332, 480, 483, 484, 494, 496, 741, 753, and 916.  (Proskauer's "Revised Privilege Log," Hill Aff. Ex. G.)

[17]Govt. Ex. 4 attached to Reiferson Decl., Docket Entry no. 197.

to any document, and its privilege claims on behalf of only others prevents the United States from seeking waivers from the promoters.

Similarly, Proskauer even withholds correspondence between it and the promoters which also apparently do not relate to any specific individual so-called client.  It withholds those generic communications on behalf of unnamed other "clients."  For example, Proskauer withholds an email from Orrin Tilevitz of DGI to Proskauer dated August 28, 2001 (before the memorandum from Haber to Akselrad listing opinions DGI wanted Proskauer to prepare (Govt. Ex. 4)) and copied to no one.  The description on the privilege log is simply "Correspondence prepared because of the prospect of litigation and reflecting counsel's mental impressions."[18] Similar withheld correspondence from John Huber of DGI to Proskauer are logged with identical descriptions and were created in early 2001.[19]

As to the third category of documents, *i.e.*, opinion letters and related documents, Proskauer has failed to demonstrate an attorney-client relationship, privileged communications, or the anticipation of litigation.  Assuming, *arguendo*, that attorney-client and work-product privileges attached in the first instance, any privileges were waived.

Here Proskauer argues that engagement letters are proof that an attorney-client relationship existed, and that Egan's engagement letter was "like many of the others executed by Proskauer's clients."  As an initial matter, the argument lacks any evidentiary support.  There is no demonstration that Proskauer has an engagement letter from each of those on whose behalf it claims a privilege.  Additionally, there is no demonstration that the engagement letters Proskauer

---

[18] Entry No. 162, Proskauer's "Revised Privilege Log," Hill Aff. Ex. G.

[19] *See, e.g.,* entry Nos. 584 and 588, Proskauer's "Revised Privilege Log," Hill Aff. Ex. G.

2933977.11

does have relate to the FDIS transaction.  Also, there is no demonstration that the withheld documents and the purported legal advice contained therein postdate the execution of any of the engagement letters.  For example, the Egan engagement letter attached to the opposition as Exhibit D is dated September 3, 2002, while the opinion letter (Opp. Ex. E), purportedly containing well-thought-out legal advice, and which purportedly "underwent multiple revisions," is dated September 4, 2002– just one day later.[20]

Rather than demonstrating an attorney-client relationship with the FDIS participants, the evidence demonstrates that even Proskauer considered the promoters to be its clients.  The Egan engagement letter, for example, warns Egan that Proskauer "also represent[s] The Diversified Group and Helios Financial and their affiliated entities in connection with various matters."[21] Moreover, Proskauer's internal records demonstrate that the promoters, such as DGI and Helios, were really the only clients.  Internal filekeeping documents produced by Proskauer in fact show that Helios Financial LLC ("Helios") and DGI were considered Proskauer's clients. These documents reflect that Proskauer rendered services to each of these clients with respect to matters described as  "Tax Advice" and "Tax Product Advice."  Each matter for DGI and Helios Financial had individual documents, such as the withheld opinion letters, which identified the individual taxpayers in the document titles.  So, for example, Proskauer kept Harold Akselrad's opinion letter in Helios' client file, under the matter of "Tax Advice," with the document title "Opinion Letter - Harold E. Akselrad."[22]  Nonetheless, Proskauer withholds Harold Akselrad's opinion letter, which it maintains for client Helios, under claims of privilege on Harold

---

[20]Proskauer Opp. at 6.

[21]Proskauer Opp. Ex. D at p. 1, ¶ 3.

[22]Govt. Ex. 8.

Akselrad's behalf.[23]  Furthermore, some of the opinions are apparently drafts unrelated to any

individual.  Those are also kept by Proskauer in promoter client-files.  Proskauer keeps one file

for client DGI, with a matter called "Tax Product Advice," and a document called "Tax Opinion

- Final Version - Unsigned - February 7, 2000."[24]  Similarly, client Helios has a "Tax Advice"

matter containing unspecific "Drafts."[25]  As further evidence of its consideration of the promoters

as the real clients, DGI forwarded to Proskauer "proposed changes to the *model opinion*" for use

in the Francis opinion letter, which Proskauer has withheld.[26]  As such, it is clear that Proskauer

simply used a template opinion from DGI and made minor modifications to satisfy DGI's clients

on whose behalf Proskauer now claims privilege.  Additionally, as demonstrated in the opening

memorandum, and seemingly admitted in the opposition, (at p. 14, FN 7), DGI paid Proskauer's

legal fees in most all instances.[27]  Combined, these facts indicate that at best it can be argued that

an attorney-client relationship existed between Proskauer and DGI– as alleged by the other three

opinion-writing law firms.[28]

Proskauer's work-product claims suffer from a similar lack of supporting evidence.  They

also suffer from a lack of timeliness.

---

[23]*See* Privilege Log entry no. 196.

[24]Govt. Ex. 9.

[25]Govt. Ex. 10.

[26]Govt. Ex. 11.  (Emphasis added).

[27]Govt. Ex. 4.

[28]Of course, as indicated in our motion to compel with respect to these firms, for a
number of separate reasons there was no attorney-client relationship even with respect to these
firms.  The cases cited by Proskauer for the proposition that the existence of an attorney-client
relationship is unaffected by the payment of fees by a third party miss the mark.  Those cases
merely stand for the proposition that payment by a third party does not necessarily mean there is
no attorney client relationship.

9

III.    **Proskauer's New Work-Product Claims, Made Five Months After Service of the First Privilege Log and During the Pendency of this Motion, are Untimely, and Made Only to Attempt to Bolster its Defense of this Motion.**

Many of Proskauer's work-product claims were made more than one year after service of the subpoena and approximately five months after service of responsive documents and the initial privilege log.  This so-called revised privilege log was submitted in opposition to the motion to compel, primarily to bolster otherwise, and still, weak claims.  During the pre-motion consultation, Proskauer maintained that it had valid privilege claims as to all documents, and that any third-party disclosure did not destroy work-product protection.  The United States pointed out during the consultation that many documents were withheld only under claims of attorney-client privilege.  Proskauer's response was twofold: (1) it argued, albeit incorrectly, that disclosure of documents to third parties in this case may waive attorney-client privilege but not work-product protection; and (2) it filed with its opposition to the motion to compel a "revised privilege log"– more than one year after service of the subpoena– adding a work-product claim to every withheld document that did not have one before.  The untimely new privilege claims allow Proskauer to belatedly argue that all of its withheld documents were created in anticipation of litigation, and, as such, what would have been a waiver under its original claims are not now. The untimely new privilege claims should be rejected out of hand as untimely and pure gamesmanship.[29]

---

[29]A significant delay in making privilege claims requires a showing of good cause to avoid a waiver.  See *Ventre v. Datronic Rental Corp.*, 1995 U.S. Dist. LEXIS 1199 (N.D. Ill. 1995).  Additionally, determination of waiver should include a "holistic reasonableness analysis, intended to forestall needless waste of time and resources, as well as tactical manipulation of the rules and the discovery process."  *Burlington Northern & Santa Fe Ry. v. United States Dist. Court*, 408 F.3d 1142, 1149 (9th Cir. 2005).  Here, Proskauer is engaged in nothing more than tactical manipulation of the process.

2933977.11

**IV.    The Withheld Documents are Not Protected Work Product.**

As to those work-product claims that were timely, they fail because the withheld documents were not prepared in anticipation of litigation.  "[T]he party asserting an applicable privilege has the burden of establishing that it applies."[30]  "The privilege's applicability must be demonstrated by a fair preponderance of the evidence."[31]  Here, Proskauer lacks any evidence at all.  Proskauer simply alleges that it can meet its burden of proof, and then declares that it has.  In fact, according to Janet Korins, in response to questioning by Proskauer's own attorney at the parties' deposition of her, Proskauer did not seem to anticipate litigation even in June 2003. Despite Proskauer counsel's loaded question as to "what extent, if any, . . . [on June 5, 2003,] Proskauer [was] concerned with anticipated litigation with the IRS," Korins believed there "could be" some "adversity."[32]  That belief that there "could be" some "adversity" fails to meet the test for anticipation of litigation.  It also post-dates the documents withheld as work product in anticipation of litigation.

As Chief Judge Young made clear in a 2004 opinion, the "'anticipation of litigation' question contains three important concepts: 'litigation,' 'anticipation,' and 'causation.'"[33] The contemplated litigation must be more than a mere governmental investigation.[34]  Additionally, "'the lawyer must at least have had a subjective belief that litigation was a real possibility, and

---

[30]*In re Grand Jury Subpoena*, 220 F.R.D. 130, 140 (D. Mass. 2004)(citing *FDIC v. Ogden Corp.*, 202 F.3d 454, 460 (1st Cir. 2000).

[31]*Id.*

[32]Korins Dep. Tr. at 136:1-12.

[33]*In re Grand Jury Subpoena*, 220 F.R.D. 130, 146 (D. Mass. 2004).

[34]*Id.* at 147.

2933977.11

that belief must have been objectively reasonable.'"[35] Finally, Chief Judge Young adopted the Third and Fifth Circuits' use of "sliding scales for the 'anticipation' and 'causation' requirements, allowing a stronger showing on one to compensate for a weaker showing on the other."[36]  Here, there was no showing of the anticipation of any litigation, or even investigation. At least until June 2003, Proskauer was advising so-called clients not to disclose the transaction, making even an audit highly unlikely.  Similarly, there was no showing that any lawyer or client had a subjective belief that any "adversity" was a real possibility, nor that any such belief would have been objectively reasonable.  Similarly, there was no showing that there was either anticipation or causation, making the use of a sliding scale impossible.  The absence of any of these showings makes the work-product doctrine inapplicable here.[37]

## V.    Any Privilege Attaching to the Withheld Documents Was Waived.

Proskauer has already disclosed at least the opinion letters to the tax-shelter promoters. As such, it has waived attorney-client and work-product protection on behalf of its clients, whoever they may be.  Glaringly missing from the opposition is any assertion that attorney-client

---

[35]*Id.* at 147 (quoting *In re Sealed Case*, 330 U.S. App. D.C. 368, 146 F.3d 881, 884 (D.C. Cir. 1998).

[36]*Id.* at 148.

[37]Contrary to Proskauer's assertion, the *Long Term Capital Holdings* decision is not "precisely on point here."  (Opp. at 11.)  That case merely stands for the proposition that an opinion letter may be protected by the work-product doctrine if it is *shown* to be issued in anticipation of litigation.  There, the Court held that the "bare assertion within the privilege log" that the withheld document is an "'Opinion' and it is protected" as work product "is a '"mere conclusory or ipse dixit assertion[]."'" *Long-Term Capital Holdings v. United States*, 2002 U.S. Dist. LEXIS 23224, *30, n16 (D. Conn. 2002)(quoting *Bowne v. AmBase Corp.*, 150 F.R.D. 465, 474 (S.D.N.Y.).  That court found that the withholding party there had "supplied adequate *details* in its brief for the Court to determine that the work product doctrine applie[d] . . . ." *Id.*  Here, Proskauer has provided no facts whatsoever.

privilege has not been waived, which is undoubtedly why Proskauer has made sure that it now

has a work-product claim for every privilege-log entry.

Proskauer disclosed the opinion letters to DGI as a matter of practice. In a telling email

sent on September 10, 2002 from Proskauer to Elizabeth Jung of DGI, Proskauer inquires as to

whether it should "*continue with the system* of sending the opinions to [DGI] . . . to be sent to the

client . . . ."[38]  Proskauer recognizes in that email that the practice of disclosing the opinions to

DGI affects privilege claims. In fact, the subject of the email is "Privilege Issues," and the email

asks whether Proskauer "should start binding them and sending them out . . . given the privilege

issues."[39]  Additional proof of waiver is found in an email from James Haber of DGI to Michael

Kerekes of BDO Seidman. In that email Haber informs BDO that DGI is "sending out" on April

11, 2002 Joseph Francis's tax opinion.[40]  The opinion being sent by DGI was withheld here by

Proskauer and was dated almost a week earlier– April 5.[41]  Clearly, Proskauer was forwarding

opinions to DGI for the purpose of DGI then forwarding them to the individuals.

Similarly, the factual representations, which Proskauer calls Certificates of Facts, were

also routinely sent to and collected by DGI. In an email from Elizabeth Jung of DGI to

Proskauer on May 9, 2002, DGI advises that a messenger was on his way to Proskauer from DGI

to "drop off the majority of the outstanding Certificates of Facts."[42]  Similarly, DGI sent to

Proskauer the Helios "Certificates of Facts" for the transactions.[43]  Additionally, James Haber

---

[38]Govt. Ex. 12.  (Emphasis added).

[39]*Id.*

[40]Govt. Ex. 13.

[41]Privilege Log entry no. 308.

[42]Govt. Ex. 14.

[43]*See, e.g.,* Govt. Ex. 15.

2933977.11

sent to Martin Hawkes a factual-representation letter to be returned to Haber upon execution.[44]
As such, it is clear that the individuals and co-promoters (or, as Proskauer calls them, "co-investors") were sending to DGI their "certificates of facts" so DGI could forward them to Proskauer.  As such, any privilege was waived.

There is no merit to Proskauer's argument that its admitted disclosures to DGI and Helios did not waive any work-product protection that might have existed.  Work-product protection is waived upon disclosure of the underlying document to a *potential* adversary.  *United States v. Massachusetts Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997).  "'[T]he work product privilege may be waived by disclosures to third parties in a manner which substantially increases the opportunity for potential adversaries to obtain the information.'"[45] Protection is waived if the document is disclosed "in a way inconsistent with keeping it from an adversary."[46]  Here, DGI was not only a potential adversary, it became an actual adversary for at least one set of "investors"– the McNeills.  The McNeills sued DGI and Haber, alleging fraud and other counts in relation to this transaction.[47]  Proskauer recognized the potential adversary relationship between DGI (and Helios) on the one hand and Proskauer on the other.  In the Egan engagement letter, for example, Proskauer "advised" Egan that it also represented DGI and Helios, and required Egan to waive "any conflict resulting from or attributable to such representation."[48]  Its engagement letters to others contains a more obvious disclosure of an adversarial relationship.

---

[44]Govt. Ex. 17.

[45]*United States v. Textron Inc.*, 507 F. Supp. 2d 138, 152 (D.R.I. 2007)(quoting *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 237 F.R.D. 176, 183.)

[46]*United States v. Massachusetts Inst. of Tech.*, 129 F.3d at 687.

[47]Govt. Ex. 5 (first page of Complaint against DGI, Haber, et al.).

[48]Proskauer Opp. Ex. D.

2933977.11

For example, in the McNeill engagement letter, Proskauer advises that it also represents DGI, Helios, and their affiliated entities.[49]  It requires McNeill to acknowledge and agree that Proskauer is "free to continue" to represent those promoters "in connection with any and all controversies and disputes, *including an adverse representation* . . . ."[50]  The letter further advises that Proskauer's "adverse representation" may include bringing suit against McNeill (and, in other instances, other individuals).[51]  The letter even requires McNeill to waive any argument that Proskauer could be disqualified from an adverse representation.[52]  It is in the face of this evidence of potential adversary relationships that Proskauer merely alleges that disclosure was made to parties "aligned in interest."  Even if Proskauer could make some showing, and it has not begun to do so, the issue is not whether there is some possible common interest– such as the common interest in implementing the transaction which saves the taxpayer money and provides a hefty fee to the accommodating law firm.  The issue is whether the disclosure "substantially increased the opportunities for potential adversaries to obtain the information."[53]

---

[49]Govt. Ex. 16.

[50]*Id.* (Emphasis added).

[51]*Id.*

[52]*Id.*

[53]*In re Raytheon Secs. Litig.*, 218 F.R.D. 354, 360 (D. Mass. 2003)(*citing* 8 Wright, Miller & Marcus, Federal Practice and Procedure, § 2024).

2933977.11

Having been required to acknowledge that DGI and Helios may become adversaries, there can be no doubt that disclosure to them increased the chances of an adversary obtaining the information.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

/s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Tax Division, U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER L. VANN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044-0055
Telephone: (202) 307-6561
Facsimile: (202) 514-5238
E-mail: john.a.lindquist@usdoj.gov
        barry.e.reiferson@usdoj.gov
        heather.vann@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and copies will be sent to Proskauer and those indicated as non registered participants on December 14, 2007.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF BARRY E. REIFERSON**

I, Barry E. Reiferson, pursuant to the provisions of 28 U.S.C. §1746, certify as follows:

1.      I am a Trial Attorney with the U.S. Department of Justice, employed in the Tax Division,

Northern Region, with a post of duty at Washington, D.C.

2.      I am one of the assigned trial attorneys for defendant United States in this case.

3.      I make this declaration based upon my personal knowledge and the documents referenced

herein.

4.      The documents attached as Government Exhibits 5 through 17 are true and correct copies

of documents obtained by the United States in discovery in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, D.C., on this 14th day of December 2007.

/s/ Barry E. Reiferson
BARRY E. REIFERSON
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 514-6058

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants identified on the Notice of Electronic Filing and paper copies will be sent to
counsel for Proskauer Rose and those indicated as non registered participants on December 14, 2007.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

2933668.1

MEMO RE. Due Diligence Helios Financial LLC

TO· file
FROM: Pat Shea
DATE: July 21, 2000

Objective – before entering in to a significant transaction with Helios as a facilitator we wanted reasonable assurance they were experienced in transactions of this size and could handle our deal.

References—

KPMG- John Schrier, Partner has worked with Jim Haber for several years.  He assured me that :
Helios has handled deals this size.
They have a great reputation in the field.
They have the necessary financing relationships.
KPMG did an internal background check on them. He could not provide me a copy but assured me that it was a very favorable report.  KPMG does an extensive check in to the business practices and personal backgrounds of businesses that they partner with.They found that Jim Haber had some litigation against him as a result of a messy divorce. KPMG was not too concerned because it was personal and brought by disgruntled ex-spouse.
 In late 80's early 90's litigation was brought against Haber by unhappy participant in a tax shelter deal that went sour. Everyone involved was sued (including Jim Haber). The suit was dropped and determined without merit.
Jim is involved in another business Diversified Partners that runs similar deals.
He has a second company because he has different partners. My references were positive for either entity and Jim Haber individually.

Stephanie made a couple of calls to Bank Of America and received glowing reports.
Highly reputable
Well respected in financial circles
High level of integrity

She also spoke with an attorney that has done some legal work on one of their transactions and was told they performed everything they promised and the deal took place without a hitch.

She felt a comfort level with them based on the information that we had  and the fact  that we got them through KPMG.

I spoke w Jordan Dickstein of Paine Webber in NY who has handled some deals with Helios and Haber
Very efficient
Very reliable organization



GOVERNMENT
EXHIBIT

6

036036

PRODUCED BY EGAN TO UNITED STATES ON 10/09/07                    13CARRUTH036036

Have worked together on several deals and have never had any problems
This is a larger deal in size than he has personally worked on but much less complicated than some of the others.
Highly recommend Helios


Ira Akselrad
Proskauer Rose LLP (large NY law firm)
They have done several deals with Jim Haber and his group Helios—many larger than 100m
All have gone off without a hitch
They refer firm clients to them on a regular basis
Very timely with delivering all paperwork and reports
Very thorough and a straight dealer
Very favorable reference

036037

SEP-05-2000  10:19       DIVERSIFIED GROUP                    12127523972    P.01

950 Third Avenue, 23rd Floor
New York, NY 10022
Phone: (212) 688-2700
Fax: (212) 688-7908

**THE DIVERSIFIED GROUP**
**INCORPORATED**

# Fax

| **To:** | Stephanie Denby, Esq. | **From:** | James Haber |
|---|---|---|---|
| | Burke, Warren, MacKay & Serritella, PC | | |
| **Fax:** | 312 840-7900 | **Date:** | September 5, 2000 |
| **Phone:** | 312 840-7068 | **Pages:** | 12 |
| **Re:** | | **CC:** | Mox Tan |

☐ **Urgent**    ☐ **For Review**    ☐ **Please Comment**    ☐ **Please Reply**    ☐ **Please Recycle**

•**Comments:**

Pursuant to your discussion with Mox Tan, enclosed please find a section of a Proskauer opinion relating to the contribution of options to an S Corp.

If you have any questions, please do not hesitate to contact me.



**GOVERNMENT**
**EXHIBIT**

**7**

BWMS 00970

Produced by Burke, Warren, MacKay, and Serritella to United States on 11/08/06

1BWMS00970

**Div**

| | |
|---|---|
| **From:** | "James Haber" <jhaber@divgroup.com> |
| **To:** | "Michael Kerekes" <mkerekes@bdo.com> |
| **Sent:** | Thursday, April 11, 2002 10:22 AM |
| **Subject:** | Joseph Francis |

FYI - We are sending out today via Airborne Express the tax opinion for Joseph Francis to his address in Incline Village, NV.

GOVERNMENT
EXHIBIT

13

DGI 77697

12/21/2004

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-09-54-105333

**Apryl Hand - CERTIFICATES OF FACTS**

| | |
|---|---|
| **From:** | "ELIZABETH JUNG" <EJUNG@DIVGROUP.COM> |
| **To:** | "Apryl Hand" <AHand@proskauer.com> |
| **Date:** | 5/9/02 3:54 PM |
| **Subject:** | CERTIFICATES OF FACTS |

Hello Apryl,

Robert, the office messenger, should be approaching your office shortly. He will be dropping off the majority of the outstanding Certificates of Facts. The Egan original is missing - I think that Ambassador and Mrs. Egan are still touring Europe.

Regards,
Elizabeth

REDACTED

GOVERNMENT
EXHIBIT

**14**

005375
1EGAN005375

Produced by Richard Egan to United States on 4/27/06

**Div**

| | |
|---|---|
| **From:** | "James Haber" <jhaber@divgroup.com> |
| **To:** | "Biosphere Finance" <bfi@indigo.ie> |
| **Sent:** | Wednesday, April 03, 2002 11:55 AM |
| **Attach:** | REP LETTER HAWKES -RJC.DOC |
| **Subject:** | Fw: HAWKES REP LETTER |

Please sign and fax me a copy of the attached.  Please forward the original in mail.

Thanks

----- Original Message -----
**From:** ELIZABETH JUNG
**To:** JAMES HABER
**Sent:** Wednesday, April 03, 2002 11:43 AM
**Subject:** HAWKES REP LETTER

**DGI 78970**

GOVERNMENT
EXHIBIT

17

12/23/2004

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-09-54-106602