# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No.: 05-40151-FDS |
| v. | ) ) | 06-40130-FDS |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL DEPOSITION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)

Pared down to its bare essentials, the issue for the Court to decide is straightforward and very important to Plaintiff's case: whether one party should be able to depose its adversary concerning the facts upon which that adversary relies in putting forth its claims or defenses.

This consolidated case is predicated on adjustments asserted by the IRS in two Notices of Final Partnership Administrative Adjustment ("FPAAs"). Among the various alternative positions set forth in the FPAAs, the IRS asserted that FICA A Fund is (or was involved in) a transaction that is substantially similar to a transaction described in Notice 2000-44. In these FPAAs, however, the IRS did not explain the basis for its conclusion that FICA A Fund was involved in a Notice 2000-44 transaction.

Whether FICA A Fund was involved in a Notice 2000-44 transaction is central to this case.[1] A regulation promulgated in 2005 defining the term "liability" for certain partnership tax

---

[1] In its tutorial, Defendant identified issues it believed the Court would need to address, including, "Whether the transaction at issue was the same as or substantially similar to the offsetting option transaction described in IRS

purposes applies to this case only if this matter involves "a transaction described in, or a transaction that is substantially similar to a transaction described in, Notice 2000-44."[2] Defendant, perpetuating the position of the IRS, asserts that FICA A Fund was involved in a Notice 2000-44 transaction.

Plaintiff issued a notice of deposition under Federal Rule of Civil Procedure 30(b)(6) calling for a representative of the IRS, effectively the Department of Justice's client in this matter, to appear and testify.[3] The subject matter of the requested testimony principally relates to the facts underlying various transactions that the IRS has claimed or determined are, or are not, substantially similar to Notice 2000-44, including those facts upon which the IRS relied in asserting that FICA A Fund is substantially similar to Notice 2000-44. The government objected and refused to present a witness for the deposition.

## I.     BACKGROUND

### A.     Procedural History

A short review of the history and facts of this case will help the Court understand why Defendant should not be permitted to prevent this deposition from going forward.

This is not a typical tax refund proceeding. In 1982, Congress enacted the Tax Equity and Fiscal Responsibility Act ("TEFRA"), which (among other things) added to the Internal Revenue Code a series of procedural provisions relating to the audit and litigation of partnership

---

Notice 2000-44, with the effect that the sold options here must be treated as liabilities within the meaning of Section 752, thereby requiring taxpayer's basis in Fidelity International to be equal to the net premium paid by him in acquiring the interest rate options."

[2] Treas. Reg. § 1.752-6(b)(2).

[3] While the Department of Justice appears as the attorneys in this litigation, the government is the party. *See* 28 U.S.C. § 516; *see also* Order at 3-4, *Deseret Mgmt. Corp. v. United States,* No. 06-86T (Fed. Cl. Oct. 18, 2006) (Ex. A).

tax issues.[4]  Prior to TEFRA, tax matters involving partnerships required that the IRS issue

separate notices of deficiency to the various partners.[5]  If any of the partners wanted to challenge

the adjustments set forth in those notices, the partners could, individually, choose either to file a

petition with the United States Tax Court or pay the tax and sue for a refund.  The TEFRA

provisions consolidate all partners into a single proceeding, and all partners are bound by the

outcome of that single proceeding.[6]  To avoid multiple proceedings, the TEFRA provisions call

for the issuance of a single notice (the FPAA).[7]  If any partner disagrees with the adjustments set

forth in that notice, the partner must file a petition directly with a court and all partners become

parties to that proceeding; if no proceeding is brought, the adjustments set forth in the FPAA

become final.[8]  As contemplated by section 6226, this proceeding is a "proceeding for

readjustment" of those items adjusted in the FPAA.  This motion concerns discovery regarding

one of the adjustments made by the IRS and perpetuated in this proceeding that Plaintiff

challenges.

### B.     Notice 2000-44

Notice 2000-44 sets forth the IRS's position concerning the tax treatment of two types of

transactions and further defines those transactions as "listed transactions."[9]  The principal target

---

[4] *See* I.R.C. §§ 6221-6232.

[5] For a discussion of the background of TEFRA, see generally H.R. 97-760 at 599.

[6] *See*, *e.g.*, I.R.C. § 6226(c).

[7] I.R.C. § 6223(a)(2).

[8] A partner cannot pay the tax, file a claim for refund, and later sue for a refund as is typical.  *See* I.R.C. § 7422(h).
It is also for this reason that this proceeding is not brought under 28 U.S.C. § 1346(a)(1), but rather, it is brought
under 28 U.S.C. § 1346(e).

[9] 2000-2 C.B. 255.  Notably, "a ruling or other interpretation by the Commissioner is only as persuasive as her
reasoning and the precedents upon which she relies."  *Halliburton Co. v. Comm'r*, 100 T.C. 216, 232 (1993), *aff'd,*
25 F.3d 1043 (5th Cir. 1994).  An administrative pronouncement such as an IRS Notice is entitled to no judicial
deference, but "is eligible to claim respect according to its persuasiveness."  *United States v. Mead Corp.*, 533 U.S.
218, 221 (2001).

of the Notice is a transaction commonly called "BLIPS" that involves premium loans. The

Notice also refers to a transaction involving options:

> In another variation, a taxpayer purchases and writes options and purports
> to create substantial positive basis in a partnership interest by transferring those
> option positions to a partnership. For example, a taxpayer might purchase call
> options for a cost of $ 1,000X and simultaneously write offsetting call options,
> with a slightly higher strike price but the same expiration date, for a premium of
> slightly less than $1,000X. Those option positions are then transferred to a
> partnership which, using additional amounts contributed to the partnership, may
> engage in investment activities.

> Under the position advanced by the promoters of this arrangement, the
> taxpayer claims that the basis in the taxpayer's partnership interest is increased by
> the cost of the purchased call options but is not reduced under § 752 as a result of
> the partnership's assumption of the taxpayer's obligation with respect to the
> written call options. Therefore, disregarding additional amounts contributed to
> the partnership, transaction costs, and any income realized and expenses incurred
> at the partnership level, the taxpayer purports to have a basis in the partnership
> interest equal to the cost of the purchased call options ($1,000X in this example),
> even though the taxpayer's net economic outlay to acquire the partnership interest
> and the value of the partnership interest are nominal or zero. On the disposition
> of the partnership interest, the taxpayer claims a tax loss ($1,000X in this
> example), even though the taxpayer has incurred no corresponding economic loss.

To obtain a tax benefit from the above-described option transaction, three elements are essential:

(1) the purchase of offsetting options; (2) the contribution of offsetting options to a partnership;

and (3) the disposition of the partnership interest. The tax benefit is obtained only upon

disposition of the partnership interest.

### C.    Application of Notice 2000-44 to FICA A Fund

In the transactions at issue here, Plaintiff hedged his interest rate exposure by purchasing

and selling put options and call options on interest rates and then contributed those options to

FICA A Fund. FICA A Fund later purchased and sold options based on foreign currency

exchange rates. FICA A Fund recognized gains and losses from these currency options, which it

allocated among its partners. The losses at issue in this case resulted from FICA A Fund's

investments in currency options, not from the interest rate options Plaintiff initially contributed

to FICA A Fund. Moreover, unlike the transaction described in Notice 2000-44, Plaintiff has not disposed of his interest in FICA A Fund.

At the time of entering into the FICA A Fund transaction, Plaintiff was aware of Notice 2000-44, which was initially released on August 11, 2000.[10] KPMG and Helios both advised that FICA A Fund was not substantially similar to Notice 2000-44.[11] Later, after KPMG came under IRS scrutiny for a wide array of transactions, KPMG abruptly changed its position and advised without explanation that it would require disclosure of any transaction that "could be considered" a listed transaction.[12] Plaintiff had engaged Proskauer Rose LLP, which opined that the FICA A Fund transaction was not a listed transaction, and more specifically, was not substantially similar to Notice 2000-44.[13] Plaintiff retained RSM McGladrey to prepare his return, and RSM signed as preparer without requiring disclosure. In light of the foregoing, Plaintiff reasonably believed that FICA A Fund was not substantially similar to Notice 2000-44.

The question of whether FICA A Fund is substantially similar to Notice 2000-44 affected the course of the IRS's examination. During the examination, the IRS issued a settlement

---

[10] *See* Ex. B (fax from John Schrier to Pat Shea and Stephanie Denby attaching Notice 2000-44, Aug. 11, 2000); *see also* Ex. C (memo from Richard Egan to Mike Egan, Pat Shea, and Jim Reiss attaching article about "Son of Boss," Aug. 11, 2000).

[11] Ex. D (letter from Tim Speiss to Pat Shea stating that the FICA A Fund transaction is not a tax shelter, Mar. 8, 2002); Ex. E (e-mail from Tim Speiss to Stephanie Denby stating that he and certain law firms are of the view that disclosure is not required, June 26, 2002); Ex. F (memo by Tim Speiss outlining arguments concerning why FICA A Fund is not "substantially similar" to Notice 2000-44); Ex. G at 047939-40 (memorandum from Orrin Tilevitz to James Haber from the files of Stephanie Denby discussing T.D. 9000, June 18, 2002) (concluding that the transactions are "fundamentally different from that in the Notice because, unlike the transaction in the Notice, in none of the techniques was any loss realized on the sale of a partnership interest. . . . Furthermore, the investor's net investment in each transaction was sufficiently large that it was not 'nominal or zero.'")

[12] Ex. H (memorandum from Melissa Seaver to Pat Shea and Jim Reiss, Aug. 28, 2002). The KPMG partner advising Plaintiff, however, did not agree with this conclusion. *Id.* at 037236 (stating, "Despite the fact that the Egans have a signed engagement letter and legal opinions that indicate a position to the contrary, Tim suggested that KPMG is requiring disclosure. He indicated that he does not agree with this position and feels that the Brown & Wood legal opinion is accurate in its assessment that no disclosure is necessary.")

[13] Ex. I at 036430 (opinion letter by Proskauer Rose, Sept. 4, 2002) ("Based on the foregoing analysis and discussion, it is more likely than not that the Transactions would not be considered substantially similar to the transaction described in Notice 2002-50 or Notice 2000-44.")

initiative for Notice 2000-44 transactions, stating that there were "several thousand" such transactions.[14]  The Revenue Agent assigned to the FICA A Fund examination was unsure whether the standard settlement letter, which was to be sent to all taxpayers who entered into Notice 2000-44 transactions, should be sent with respect to FICA A Fund.[15]  The Revenue Agent examining FICA A Fund questioned whether the transaction was substantially similar to Notice 2000-44, in part because the answer to that question would affect Plaintiff's appeal rights.[16]  After the IRS National Office considered the question for more than five months, the IRS advised Plaintiff that FICA A Fund was substantially similar to Notice 2000-44.[17]  No explanation was provided, and the IRS's assertion is squarely in issue in this case.

### D.    The Effect of a Notice 2000-44 Determination

Whether FICA A Fund is substantially similar to Notice 2000-44 is material to the outcome of this case, and important to this Court in deciding this case.

Plaintiff's position on the application of the technical tax rules to FICA A Fund is fairly straightforward.  The loss allocated to Plaintiff was derived from his share of the economic loss

---

[14] IR-2004-64 (May 5, 2004).  If a transaction was considered a Notice 2000-44 transaction, the taxpayer was required to pay a penalty; administrative appeal rights were denied to any taxpayer who failed to accept the offer.  Announcement 2004-46, 2004-21 I.R.B. 964.

[15] Ex. J at 1IRS1129 (Examining Officer's Activity Record) (entry dated May 17, 2004 states, "Taxpayer (Egan) will be sent settlement offer.  Not sure if what version Son of Boss Case but offer will be sent per direction Tax Rod Oakes.")

[16] Ex. K at 13IRS00303 (notes by examining revenue agent, William Conway) ("Taxpayer will not be allowed any appeal rights on this issue."); Ex. J at 1IRS1135 (Examining Officer's Activity Record) (entry dated Feb. 22, 2005 states, "Decision received regarding request for advice whether it was determined that this case was substantially similar to notice 2000-44.  It was determined that it was.  Taxpayer will not be allowed to apprise themselves of appeal rights.")

[17] *See* Ex. J (Examining Officer's Activity Record) (indicating that the request for advice was sent to counsel on September 20, 2004 (1IRS1131), but the decision was not made until February 22, 2005 (1IRS1135)).  On several occasions, the Activity Record notes the delays in determining whether Plaintiff's transaction is substantially similar to Notice 2000-44.  *See, e.g.*, entries dated Oct. 19, 2004 ("Determination should be made with [sic] a few weeks"); Nov. 1, 2004 ("No determination made to date"); Nov. 22, 2004 ("Determination as to whether taxpayer is Son of Boss has not been made"); Dec. 1, 2004 ("No determination made"); Jan. 4, 2005 ("Called Pat Shea.  Discussed that no decision was made and no decision is expected anytime soon").

on specific option transactions entered into by the partnership. A partner can only claim

partnership losses, however, to the extent of that partner's basis in his partnership interest.[18] A

partner's basis in his partnership interest is determined, in part, by the partner's basis in assets

contributed to the partnership.[19] In this case, Plaintiff's basis in his partnership interest was

determined, in part, by his contribution of both long and short option positions to FICA A Fund.

Based on existing case law, Plaintiff was required to increase his basis by the amount of the

purchased options, but could not reduce the basis by the amount of the sold options because any

liability regarding those options was contingent and thus not required to be taken into account.[20]

In 2003, the IRS changed the rules. On June 24, 2003, Treasury promulgated temporary

regulations regarding the treatment of partnership liabilities and stated that it would apply those

regulations retroactively to transactions entered into after October 18, 1999 and before June 24,

2003.[21] The regulations provide that if a partnership assumes a contingent liability from a

partner, the partner's basis in the partnership must be reduced by the amount of the liability.[22]

An exception to this rule applies if substantially all of the assets with which the liability is

associated are transferred to the partnership.[23] This exception does not apply, however, if a

partnership assumed a liability "as part of a transaction described in, or a transaction that is

---

[18] I.R.C. § 704(d).

[19] I.R.C. § 722.

[20] *Helmer v. Comm'r*, 34 T.C.M. (CCH) 727, 731 (1975). In *Helmer*, the Tax Court followed the position advocated by the IRS.

[21] *See* Temp. Treas. Reg. § 1.752-6T (T.D. 9062, 2003-2 C.B. 46). Treasury introduced final regulations on May 26, 2005. *See* Treas. Reg. § 1.752-6 (T.D. 9207, 2005-1 C.B. 1344). The final regulations applied retroactively to transactions after October 18, 1999 and before June 24, 2003. Treas. Reg. § 1.752-6(d).

[22] Treas. Reg. § 1.752-6(a) (referring to the definition of liability in I.R.C. § 358(h)(3), which defines "liability" to include any fixed or contingent obligation to make payment).

[23] Treas. Reg. § 1.752-6(b)(1), (2) (referring to the exceptions in I.R.C. § 358(h)(2)(B)).

substantially similar to the transactions described in, Notice 2000-44."[24]  Whether a transaction is substantially similar to a Notice 2000-44 transaction, therefore, determines whether the exception to the basis-reduction regulation applies when calculating a partner's outside basis in a partnership and thus the amount of loss that partner may claim.

Whether FICA A Fund is substantially similar to Notice 2000-44 will also bear on the issues presented by the IRS's assertion of penalties.  In its FPAA, the IRS proposed accuracy-related penalties for, in the alternative, negligence, substantial understatement, and valuation misstatement.  Accuracy-related penalties generally may be overcome by "reasonable cause and good faith."[25]  Reasonable cause and good faith is a loosely defined standard that takes into account "all pertinent facts and circumstances."[26]  In responding to the IRS's penalty assertions, Plaintiff must be permitted to develop evidence that this transaction was not a Notice 2000-44 transaction.  The deposition of the IRS is critical to developing that evidence.

### E.    The Requested Testimony

On September 27, 2007, Plaintiff served Defendant with a notice of deposition calling for a representative of the IRS to appear on October 19 and testify pursuant to Federal Rule of Civil Procedure 30(b)(6).[27]  Plaintiff principally sought testimony relating to facts underlying three types of transactions discussed by the IRS in various IRS documents:  Homer, Pico, and Dad.[28]  Additionally, Plaintiff sought testimony concerning guidance issued by the IRS concerning the

---

[24] Treas. Reg. § 1.752-6(b)(2).  Treasury did not define substantially similar in this regulation, which is notable because the Treasury Department has specifically referred to the definition in Treas. Reg. § 1.6011-4T when it intended to make that definition applicable.  *See, e.g.*, Treas. Reg. § 1.6664-2(c)(3)(ii) (explicitly referring to the definition of "substantially similar" in Treas. Reg. § 1.6011-4(c)(4)); Treas. Reg. § 1.6112-1(c)(4) (same).

[25] I.R.C. § 6664(c); Treas. Reg. § 1.6662-3(b)(3).

[26] Treas. Reg. § 1.6664-4(b)(1).

[27] Ex. L.

[28] These transactions are discussed in greater detail in section II.A.3, *infra*.

phrase "substantially similar" as used in either Notice 2000-44 or Treasury Regulation Section 1.752-6.  More specifically, Plaintiff sought testimony concerning guidance or statements to the public and the processes, procedures, and persons involved in making determinations regarding "substantially similar."  By letter dated October 17, Defendant formally advised that it objected to the notice of deposition because "all matters listed by plaintiff are improper" and further advised that it would not provide a witness.[29]  The parties met and conferred as required by Local Rule 37.1 on December 21.[30]

## II.    DISCUSSION

Discovery may be sought as to "any nonprivileged matter that is relevant to any party's claim or defense."[31]  Relevant discovery is not limited to admissible evidence, but includes discovery "reasonably calculated to lead to the discovery of admissible evidence."[32]  The First Circuit has interpreted this broadly to include "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."[33]  And as Rule 26(b)(1) states, in addition to eliciting testimony that might be admissible at trial, Plaintiff may

---

[29] Ex. M at 8.

[30] The discovery conference was held beginning at 10 a.m. on December 21 in Plaintiff's counsel's office in Washington, D.C. and lasted approximately 40 minutes.  David Curtin, Lena Amanti, Michelle Abroms, and Kiara Rankin represented Plaintiff and John Lindquist, Barry Reiferson, and Heather Vann represented Defendant.  The parties were unable to reach agreement on any of the issues presented in this motion.

[31] Fed. R. Civ. P. 26(b)(1) (Dec. 1, 2007).  Although the rule was amended effective after the notice of deposition and the government's failure to appear, the amendments to Rule 26 "are intended to be stylistic only."  Fed. R. Civ. P. 26 advisory committee's note (2007 amendments).

[32] *Id.*

[33] *Klonoski v. Mahlab*, 156 F.3d 255, 267 (1st Cir. 1998) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).

inquire into "the existence, description, nature, custody, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter."[34]

Whether a transaction is substantially similar to Notice 2000-44 necessarily involves questions of both law and fact. Interpreting the phrase "substantially similar" is a question of law that the Court will need to decide in this case. That legal definition will need to be applied to the facts. To do so, the Court, aided by experts, will need to examine and compare the facts underlying each of the transactions, including, at a minimum, their structures and the manner in which their tax benefits were derived.

The same analysis that the Court will likely undertake is one that the IRS has already performed in this and other cases, both as to specific taxpayers' transactions and to generic types of transactions. In this case, the IRS performed this analysis concerning the FICA A Fund transaction, and the Court has previously denied Plaintiff discovery of a specific document concerning that analysis.[35] In contrast to that one document, which may have included legal analysis, the testimony being sought focuses on the facts underlying a variety of transactions that the IRS has (or has not) analyzed in relation to Notice 2000-44. In addition, the testimony seeks the identity and location of documents and persons who may have discoverable information.

### A.    The Testimony Sought Is Relevant

Defendant asserted penalties in its FPAA and continues to assert them in this litigation. In its FPAA, the IRS proposed accuracy-related penalties for, in the alternative, negligence, substantial understatement, and valuation misstatement. Accuracy-related penalties generally

---

[34] *Id.*

[35] Elec. Order (Oct. 2, 2007) (denying Plaintiff's Motion to Compel Production of IRS Request for Advice).

may be overcome by "reasonable cause and good faith."[36]  Reasonable cause and good faith is a loosely defined standard that takes into account "all pertinent facts and circumstances."[37]

### 1.    Plaintiff Seeks Testimony on Factual Issues

A fundamental precept of our legal system is that judges determine the law, and juries—or judges sitting as fact-finders—evaluate the facts.[38]  The distinction between legal and factual issues, however, is not always clear.[39]  Factual issues can be adjudicative or legislative. Adjudicative facts are those "'concerning the immediate parties—who did what, where, when, how, and with what motive or intent.'"[40]  Legislative facts "do not usually concern the immediate parties but are the general facts which help the tribunal decide questions of law and policy and discretion."[41]  Legal issues are, broadly speaking, "conclusions about the existence and content of governing legal rules, standards, and principles."[42]  In the IRS 30(b)(6) Notice, Plaintiff seeks testimony on factual, not legal, issues.

### 2.    Whether Plaintiff's Transaction Is Substantially Similar to Notice 2000-44 Involves Questions of Fact

Plaintiff seeks testimony from an IRS representative regarding the facts of FICA A

---

[36] I.R.C. § 6664(c); Treas. Reg. § 1.6662-3(b)(3).

[37] Treas. Reg. § 1.6664-4(b)(1).

[38] *See, e.g.*, *Jones v. United States*, 526 U.S. 227, 248 n.8 (1999) ("The principle that the jury were the judges of fact and the judges the deciders of law was stated as an established principle as early as 1628 by Coke.")

[39] *See Pullman-Standard, v. Swint*, 456 U.S. 273, 288 (1982) ("The Court has previously noted the vexing nature of the distinction between questions of fact and questions of law. . . . [W]e [do not] know of any other rule or principle that will unerringly distinguish a factual finding from a legal conclusion." (citation omitted)).

[40] Fed. R. Evid. 201(a) advisory committee's note (quoting 2 Kenneth Davis, *Administrative Law Treatise* 353 (1958)); *see also Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F.3d 312, 322 n. 12 (1st Cir. 2004) (Lipez, J., concurring).

[41] *Gebremichael v. INS*, 10 F.3d 28, 37 n.25 (1st Cir. 1993).

[42] Henry P. Monaghan, *Constitutional Fact Review*, 85 Colum. L. Rev. 229, 235 (1985).

Fund's transaction that are, or are not, substantially similar to the Notice 2000-44 transaction.[43]
The comparison of the FICA A Fund transaction to the Notice 2000-44 transaction involves
questions of fact, and the testimony sought relates to the facts upon which Defendant relies.

It is not uncommon for a trier-of-fact to compare two things to one another.[44]  For
example, a fact-finder may be called upon to compare two works of art or writing in a copyright
case or two devices in a patent case.  Copyright law is instructive.  Illicit copying is determined
via a two-part test:  first, the plaintiff must prove that the defendant copied the work, and second,
"that the copying . . . was so extensive that it rendered the infringing and copyrighted works
'substantially similar.'"[45]  Likewise, here the IRS claims that Plaintiff's transaction is
substantially similar to a transaction it has described.  Plaintiff merely seeks to elicit testimony
concerning the facts upon which the IRS bases its claim.

### 3.    Homer, Dad, and Pico Are Relevant

Plaintiff's notice of deposition also seeks relevant testimony regarding three transactions
and their relationship to either Notice 2000-44 or FICA A Fund.  Specifically, the topics
identified in the notice of the deposition included the facts underlying the Homer, Pico, and Dad
transactions, and what similarities exist between those transactions and either Notice 2000-44
transactions or FICA A Fund.[46]

Facts regarding the Homer transaction are relevant to this case.  The IRS has publicly
stated that Homer is not a listed transaction, which, by definition, means that Homer is not

---

[43] *See* Ex. L (notice of deposition topic 3).

[44] *See, e.g., United States v. Vargas*, 471 F.3d 255 (1st Cir. 2006) (fingerprints); *United States v. Monteiro*, 407 F. Supp. 2d 351, 354 (D. Mass. 2006) (ballistics).

[45] *Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 33 (1st Cir. 2001) (quoting *Segrets, Inc. v. Gillman Knitwear Co.*, 207 F.3d 56, 60 (1st Cir. 2000)).

[46] *See* Ex. L (notice of deposition topics 5-10).

substantially similar to Notice 2000-44.[47]  The IRS, however, has not publicly described what it considers to be a Homer transaction.  Publicly available documents indicate that Homer involves a transaction in which a taxpayer generates gains and losses through the use of offsetting European-style digital options.[48]  Plaintiff's discovery seeks information concerning the facts of the Homer transaction, including those facts that make it substantially similar (or not) to FICA A Fund and those that make it not substantially similar to Notice 2000-44.[49]

    Facts regarding the Dad transaction are relevant to this case.  On April 18, 2007, the IRS issued a Coordinated Issue Paper on "distressed asset/debt" ("Dad") transactions.[50]  The IRS instructed that Dad transactions are not substantially similar to Notice 2000-44.  Like the FICA A Fund transaction, a Dad transaction may result in a loss that a taxpayer can utilize only to the extent of that taxpayer's basis in the partnership interest.  In order to create a sufficiently high basis to absorb the entire loss, the IRS acknowledged that the U.S. taxpayer "may purchase and sell economically offsetting option positions and contribute such positions to the partnership."[51] Plaintiff's discovery seeks information concerning the facts of the Dad transaction, including those facts that make it substantially similar (or not) to FICA A Fund and those that prevent Dad from being substantially similar to Notice 2000-44.

---

[47] *See* IR-2007-71 (Mar. 29, 2007) (stating that Homer and its predecessor, Bart, are not listed transactions).

[48] *See* Compl. ¶ 67, *Wilson v. Deutsche Bank AG*, No. 05-CH-08002 (Ill. Cir. Ct. May 9, 2005) (describing steps of purported Homer transaction).

[49] *See* Ex. L (notice of deposition topics 5 and 9).

[50] *See* LMSB-04-0407-031 (Apr. 18, 2007).  The IRS Large and Mid-Size Business Division issues Coordinated Issue Papers to its field examiners to "coordinate and resolve complex and significant industry wide issues . . . and [ensure] uniform application of the law."  Coordinated Issue Papers – LMSB, http://www.irs.gov/businesses/article/0,,id=96445,00.html (last visited Dec. 20, 2007).

[51] LMSB-04-0407-031, n.4 (Apr. 18, 2007).  In such a case, the contribution of offsetting option positions implicates Treasury Regulation section 1.752-6.  As discussed above, section 1.752-6 requires that a partner's outside basis be reduced by the amount of any contingent liability assumed by the partnership, and the application of that rule is affected by whether the Dad transaction is substantially similar to Notice 2000-44.

Facts regarding the Pico transaction are relevant to this case.  Notice 2002-65 described the Pico transaction, in which an S corporation enters into a foreign currency straddle.  The taxpayer holds only a small interest in the S corporation, which terminates the gain leg of the straddle resulting in a small portion of the gain being allocated to the taxpayer.  The S corporation then redeems the other shareholder, so that the taxpayer is the sole shareholder.  After the redemption, the S corporation terminates the loss leg of the straddle and allocates the entire loss to the taxpayer, who is the only remaining shareholder.  The IRS identified Pico as being substantially similar to Notice 2002-50, but not Notice 2000-44.[52]  Plaintiff's discovery seeks information concerning the facts of the Pico transaction, including those facts that make it substantially similar (or not) to FICA A Fund and those that make it not substantially similar  to Notice 2000-44.

**4.    Whether Plaintiff's Transaction Is Substantially Similar to Notice 2000-44 May Be  Relevant to the Issue of Penalties**

The notice of deposition seeks relevant evidence relating to IRS guidance on the issue of substantially similar.  The topics of testimony do not seek any internal, privileged communications.  To the contrary, the notice requests testimony about where the term is defined, identification of published guidance defining the term, and identification of public statements by IRS and Treasury officials concerning the meaning of substantially similar and the application of that definition.

The mere existence, or lack thereof, of IRS guidance is relevant and Plaintiff should be permitted to discover it.  Through its deposition questioning and motion papers, Defendant has

---

[52] Notably, documents produced by Defendant suggest that the IRS viewed FICA A Fund as substantially similar to the PICO transaction.  Ex. N at 1CORRIGAN-000205 (Examining Officer's Activity Record) (entry dated Feb. 22, 2005 stating, "The National Office determined that this case is 'substantially similar' to both the Son of Boss Transactions (Notice 2000-44) and the Eliminator 2 (Notice 2002-65).")

made much of the fact that Plaintiff did not disclose the FICA A Fund transaction as being

substantially similar to Notice 2000-44.[53]  Moreover, one of Defendant's experts commented

that "the fact that the disclosure statement was not included in the ultimate return of the Egans"

is an "objective indicator[] of the subjective state of mind of the taxpayer."[54]  Plaintiff, backed

by return preparers and lawyers, believed—and still believes—that FICA A Fund and the Notice

2000-44 transactions are not factually similar and thus that no disclosure was required.  Given

this contrast in positions, this Court will need to address the reasonableness of Plaintiff's conduct

and the factual basis for Defendant's claims.

IRS statements and documents showing that there is no meaningful standard of

substantially similar would be relevant to whether Plaintiff acted reasonably.  Although this

Court denied Plaintiff's discovery into IRS determinations concerning Plaintiff's own

transaction, documents obtained from the IRS's response to FOIA requests show that IRS

insiders characterized the decision-makers as "wishy washy" because of their seeming inability

to reach a decision on the substantially similar issue.[55]  Another IRS official speaking publicly

referred to the listed transaction determination as "like pornography.  There are no published

standards."[56]  Similar public statements, or an absence of guidance on the definition of this

---

[53] *See, e.g.,* James Reiss Dep. 101:25-102:2, Aug. 28, 2007 (Defendant asked, "Why did you believe at that time that the Fidelity International transaction did not have to be disclosed."); *see also* Def.'s Opp'n to Pl.'s Mot to Compel at 15-16, Mar. 26, 2007 (mischaracterizing Plaintiff's decision not to attach a disclosure statement); Patrick Shea Dep. 228:5-7, Oct. 16, 2007 (Defendant inquiring, "You retained the law firm of Proskauer Rose to issue the second opinion to the effect that disclosure was not required.").

[54] David LaRue Dep. 163:15-19, Nov. 26, 2007.  He makes this claim while also stating that he does not opine on either the taxpayer's subjective intent or whether disclosure was required.  *Id.* at 163:5-6, 287:16-288:5.

[55] Ex. O (internal IRS e-mail string regarding Son of Boss PICO Hybrids).

[56]*ESOPS:  IRS Warns Employee Benefit Plans to Avoid Prohibited S Corporation Deals*, Daily Tax Rep. (BNA), Mar. 25, 2003, at G-9 (quoting Thomas Terry).  Presumably this is a reference to the famous concurrence of Justice Stewart in *Jacobellis v. Ohio*, 378 U.S. 184 (1964), wherein the Court was called upon to apply an obscenity law.  In his concurrence, Justice Stewart wrote:  "I shall not today attempt further to define the kinds of material I understand

phrase, would be relevant to the reasonableness of Plaintiff's conduct, and this is what Plaintiff seeks to learn through its deposition of an IRS representative.

### B.    Failing to Appear Is Improper

Simply choosing not to appear in response to a deposition is improper.  The rules are explicit that failing to appear for a deposition under Rule 30(b)(6) "is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under Rule 26(c)."[57]  Even notifying the party that has issued the notice of deposition that no one will appear is insufficient.  "Such notification does not excuse a party's failure to appear, and will not serve as a substitute for a motion for a protective order."[58]  In this, the drafters were explicit:  "If he desires not to appear or not to respond, he must apply for a protective order."[59]

## III.    Conclusion

The phrase "substantially similar" is central to this case.  The IRS has defined, applied, and spoken publicly about this term.  Plaintiff's discovery does not seek the IRS's rationale, but rather the facts underlying transactions the IRS has explicitly or implicitly acknowledged are not substantially similar to Notice 2000-44.  To the extent the IRS is "wishy washy" or applies a "know it when I see it" approach, this discovery is relevant to the reasonableness of Plaintiff's

---

to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so.  But I know it when I see it."  *Id.* at 197.

[57] Fed. R. Civ. P. 37(d)(2) (Dec. 1, 2007).  While the rules were amended effective after the notice of deposition and the government's failure to appear, the amendments to Rule 37 "are intended to be stylistic only."  Fed. R. Civ. P. 37 advisory committee's note (2007 amendments).

[58] 7 James Wm. Moore, *Moore's Federal Practice* § 37.91[1] (3d ed. 2007).

[59] Fed . R. Civ. P. 37 advisory committee's note (1970 amendments).  The importance the drafters placed on appearing for the deposition is reinforced by the presumptive application of sanctions:  "the court *must* require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. (d)(3) (emphasis added).

conduct.  Accordingly, Defendant should be ordered to produce an appropriate IRS witness for a

deposition pursuant to the notice of deposition.

> PLAINTIFF
> FIDELITY INTERNATIONAL CURRENCY ADVISOR
> A FUND, L.L.C., by the Tax Matters Partner
>
>
> /s/ Lena Amanti
> David J. Curtin, D.C. Bar #281220
> Ronald L. Buch, Jr., D.C. Bar #450903
> Lena Amanti, D.C. Bar #490791
> MCKEE NELSON LLP
> 1919 M Street, N.W., Suite 200
> Washington, D.C. 20036
> Telephone:  (202) 775-1880
> Facsimile:  (202) 775-8586
> Email: dcurtin@mckeenelson.com
>         rbuch@mckeenelson.com
>         lamanti@mckeenelson.com
>
> John O. Mirick, BBO #349240
> MIRICK, O'CONNELL, DEMALLIE
> & LOUGEE, LLP
> 100 Front Street
> Worcester, MA 01608
> Telephone:  (508) 791-8500
> Facsimile:  (508) 791-8502
> Email: jomirick@mirickoconnell.com

**Certificate of Service**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on December 21, 2007.

> /s/ Lena Amanti
> Lena Amanti, D.C. Bar #490791
> MCKEE NELSON LLP
> 1919 M Street, N.W., Suite 200
> Washington, D.C. 20036
> Telephone:  (202) 775-1880
> Facsimile:  (202) 775-8586
> Email: lamanti@mckeenelson.com

# Exhibit A

# In the United States Court of Federal Claims

No. 06-86 T
(E-Filed: October 18, 2006)

|  |  |  |
|---|---|---|
| DESERET MANAGEMENT | ) | Tax Practice and Procedure; |
|    CORPORATION, | ) | Motion to Strike Answer; RCFC |
|  | ) | 8(b); Remedy for Failure of |
|        Plaintiff, | ) | Answer to Comply with |
|  | ) | Requirements of Law; Removal |
|    v. | ) | by Court of Limitation on |
|  | ) | Discovery by Plaintiff by Means |
| THE UNITED STATES, | ) | of Interrogatories |
|  | ) |  |
|        Defendant. | ) |  |
|  | ) |  |
|  | ) |  |

Eric C. Olson, Salt Lake City, UT, for plaintiff.

Jennifer Dover Spriggs, with whom were Eileen J. O'Connor, Assistant Attorney General, and David Gustafson, Chief, Court of Federal Claims Section, Tax Division, U.S. Department of Justice, Washington, DC, for defendant. Steven I. Frahm, Assistant Chief, Court of Federal Claims Section, Tax Division, U.S. Department of Justice, of counsel.

## ORDER

I.    Background

Plaintiff Deseret Management Corporation (DMC) alleges that the United States, acting through the Internal Revenue Service (IRS or government), erroneously assessed and illegally collected income taxes. Pl.'s Compl 1. Plaintiff filed its complaint against defendant on February 3, 2006. Id. The complaint contains 119 numbered paragraphs that describe the parties, jurisdictional grounds, procedural history, valuation methodologies, and specific allegations of miscalculations by the IRS. Pl.'s Compl. passim. The complaint also attached the following seven documents as exhibits: Thirty-day Letter dated March 28, 2003 issued by the government; Notice of Deficiency dated April 4, 2005 issued by the government; Amended DMC Tax Return for 1995; Amended DMC Tax Return for 1996; Amended DMC Tax Return for 1997; Amended DMC Tax

Return 1998; and Waiver of Statutory Notification of Claim Disallowance dated
November 10, 2005. Pl.'s Compl. Exs. A-G.

Defendant filed its answer on June 30, 2006, Def.'s Answer 1, which was 147 days
after plaintiff filed its complaint. The Rules of the Court of Federal Claims (RCFC)
require that defendant file its answer within 60 days of the complaint. RCFC 12(a)(1).
Defendant requested four enlargements of time, see Motions to Extend Time dated Mar.
28, 2006, May 17, 2006, June 19, 2006, and June 21, 2006 (collectively, Motions to
Extend Time), and the court granted each extension, see Orders dated Mar. 28, 2006, May
19, 2006, June 21, 2006, and June 23, 2006. Defendant's counsel requested enlargements
of time in order to obtain the relevant records from the IRS and prepare a "meaningful"
response, Motion to Extend Time dated Mar. 28, 2006, review the supplemental materials
provided by defendant, Motion to Extend Time dated May 17, 2006, and allow for a
supervising attorney to review the response, Motions to Extend Time dated June 19, 2006
and June 21, 2006.

Defendant's answer follows the 119 paragraph format of plaintiff's complaint.
Def.'s Answer passim. In response to sixty-nine of plaintiff's allegations, defendant
avers that its attorneys presently lack sufficient information to form a belief as to the truth
of the allegations. Id. With respect to the exhibits attached to plaintiff's complaint,
defendant "admits only that a copy of a document is attached to the complaint." Def.'s
Answer ¶¶ 8, 15, 22, 46; accord id. at ¶ 21.

Now before the court are Plaintiff's Motion to Strike Answer (Pl.'s Mot.),
plaintiff's Memorandum in Support of Plaintiff's Motion to Strike Answer (Pl.'s Mem.),
Defendant's Opposition to Plaintiff's Motion to Strike Defendant's Answer (Def.'s
Opp.), and plaintiff's Reply Memorandum in Support of Plaintiff's Motion to Strike
Answer (Pl.'s Reply). Plaintiff alleges that defendant's Answer violates RCFC 8(b)
because its responses to sixty-nine of the allegations speak only to the attorneys'
knowledge, not that of the party defendant. Pl.'s Mot. ¶ 3. Plaintiff also alleges that
defendant's responses to the exhibits attached to the complaint are "non-responsive and
immaterial." Id. at ¶ 6. For the following reasons, plaintiff's motion is GRANTED.

II.    Discussion

Plaintiff moves pursuant to RCFC 12(f) to strike defendant's Answer. Pl.'s Mot.
1. RCFC 12(f) grants the court the ability to "order stricken from any pleading any
insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."
RCFC 12(f). A motion to strike should be granted when required "to avoid unnecessary
time and money in litigating invalid, spurious issues." Anchor Hocking Corp. v.

<u>Jacksonville Elec. Auth.</u>, 419 F. Supp. 992, 1000 (M.D. Fla. 1976) (citations omitted). Indeed, a motion to strike "serve[s] a useful purpose by eliminating insufficient defenses and saving the time and expense which would otherwise be spent in litigating issues which would not affect the outcome of the case." <u>United States v. Marisol, Inc.</u>, 725 F. Supp. 833, 836 (M.D. Pa. 1989). "[A] defense that might confuse the issues in the case and would not, under the facts alleged, constitute a valid defense to the action can and should be deleted." <u>United States v. Fairchild Indus., Inc.</u>, 766 F. Supp. 405, 408 (D. Md. 1991) (quotation omitted).

Plaintiff argues that defendant's responses to sixty-nine of plaintiff's allegations fail to conform to the requirements of RCFC 8(b). Pl.'s Mem. 1-2. Plaintiff asserts that defendant's answer, that its "attorneys presently lack knowledge or information sufficient to form a belief as to the truth of the . . . allegations . . . .," <u>id.</u> at 1 (quoting Def.'s Answer <u>passim</u>), is "generally non-responsive." <u>Id.</u> Plaintiff argues that the RCFC "require a party to answer as to its own knowledge or available information, not that of its attorneys." <u>Id.</u> at 2. Plaintiff argues that "an attorney's knowledge or information is 'immaterial' as a response to the allegations of the [c]omplaint." <u>Id.</u> Defendant responds by stating that its answers to sixty-nine of plaintiff's allegations are valid because, under 28 U.S.C. § 516 (2006), the attorneys of the Department of Justice present the government's answer to a complaint and, under RCFC 11, when submitting an answer, an attorney "certifies to its legitimacy[] 'to the best of the person's knowledge, information, and belief.'" Def.'s Opp. 3 (citing RCFC 11(b)).

The language of RCFC 8(b) specifies that a party's defenses to each claim asserted should be based upon the knowledge or belief of the party itself. The rule states, "If a <u>party</u> is without knowledge or information sufficient to form a belief as to the truth of an averment, the <u>party</u> shall so state and this has the effect of a denial." RCFC 8(b) (emphasis added). The entirety of RCFC 8, which governs the general rules of pleading, speaks only about "a party," never about a party's counsel. <u>See</u> RCFC 8.

RCFC closely follows the Federal Rules of Civil Procedure (FRCP), and Rule 8(b) under both regimes is identical. RCFC 8 rules committee note. FRCP 8(b) has been held to be "quite specific" in delineating acceptable defenses to a plaintiff's complaint. <u>Gilbert v. Johnston</u>, 127 F.R.D. 145, 145 (N.D. Ill. 1989) (<u>Gilbert</u>). The court in <u>Gilbert</u> held that, under a plain language reading of FRCP 8(b), the only circumstances under which a pleader can do something other than either admit or deny an allegation is when "a <u>party</u> is without knowledge or information sufficient to form a belief." <u>Gilbert</u>, 127 F.R.D. at 145 (citing FRCP 8(b) (emphasis added)). The court believes that a similar, plain language reading applies to RCFC 8(b) and holds that the rule's consistent specification of "a party" means that the defendant's response must speak to the <u>party's</u>

3

knowledge or belief.

Moore's Federal Practice underscores that FRCP 8(b) refers specifically to the knowledge or belief of the party, not of the party's counsel. In its descriptions of defenses and denials that are governed by FRCP 8(b), see 2 James Wm. Moore et al., Moore's Federal Practice, § 8.06 (Matthew Bender 3d ed. 2004) (Moore's), the text always refers to the party and to the knowledge or belief of the party, see id. Therefore, based upon a plain language reading of RCFC 8(b), the holding in Gilbert, and the understanding of FRCP 8(b) presented by Moore's, the court determines that RCFC 8(b) requires that a party must answer a complaint based upon the knowledge or belief of the party itself, not of the party's counsel.

Defendant's Answer does not conform to the requirements of RCFC 8(b). In response to sixty-nine of plaintiff's 119 allegations, defendant states that "its attorneys presently lack knowledge or information." Def.'s Answer passim. The document does not give any indication as to the level of knowledge or information of the government, only that of the government's counsel. Id. Because RCFC 8(b) requires that the Answer concern the party's knowledge or belief, Defendant's Answer does not comply with the requirements of the rule.

The court does not find defendant's defenses regarding 28 U.S.C. § 516 or RCFC 11(b) persuasive. See Def.'s Opp. 3-4. Section 516 of Title 28 of the United States Code simply reserves the powers of litigation to "officers of the Department of Justice [(DOJ)]," meaning that, whenever the United States is a party, the attorneys of the DOJ serve as the government's counsel. The statute has no bearing on the interpretation of RCFC 8(b). As the government's attorneys, defendant's counsel must speak on behalf of the party, as instructed by RCFC 8(b). Nor does the language of RCFC 11(b) change the language of RCFC 8(b). Defendant argues that, because RCFC 11(b) requires attorneys to certify to the legitimacy of an answer "to the best of the person's knowledge, information, and belief," RCFC 8(b) should be interpreted to encompass the attorneys' knowledge, information, and belief. Def.'s Opp. 3. Defendant's argument is misguided. RCFC 11(b) applies when a party seeks sanctions against another party's counsel because that counsel has acted for an "improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation." RCFC 11(b)(1). Plaintiff has not moved for sanctions pursuant to RCFC 11; rather, plaintiff has moved to strike defendant's Answer pursuant to RCFC 8(b) because defendant's Answer does not meet the rule's requirement that an answer reflect the party's knowledge or belief. Because defendant's Answer does not conform to RCFC 8(b), the court strikes every response in which defendant refers to the attorneys' lack of knowledge or belief instead of the party's knowledge or belief.

4

Plaintiff attached the following seven documents as exhibits to its Complaint: Thirty-day Letter dated March 28, 2003 issued by the government; Notice of Deficiency dated April 4, 2005 issued by the government; Amended DMC Tax Return for 1995; Amended DMC Tax Return for 1996; Amended DMC Tax Return for 1997; Amended DMC Tax Return for 1998; and Waiver of Statutory Notification of Claim Disallowance dated November 10, 2005. Pl.'s Compl. Ex. A-G. In response to each of these documents, defendant stated that it "admits only that a copy of a document is attached to the complaint." Def.'s Answer ¶¶ 8, 15, 22, 46; accord id. at ¶ 21. Plaintiff asserts in its Motion to Strike that such an answer is "non-responsive and immaterial." Pl.'s Mot. ¶ 6. Defendant claims that it "responded appropriately" in its Answer because it "observed a variance between plaintiff's [e]xhibits . . . and the documents retained by the IRS." Def.'s Opp. 4.

Exhibits to a pleading are considered to be a part of that pleading. See RCFC 10(c). RCFC 10(c) specifies that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Id. The contents of an exhibit are considered in determining the party's claim for relief or defense. See Hall v. Bellmon, 935 F.2d 1106, 1112 (10th Cir. 1991) (holding that a written document attached to a complaint and incorporated as an exhibit may be considered in a motion to dismiss the complaint).

The court determines that defendant failed properly to respond to the documents that plaintiff had attached as exhibits to its Complaint. All seven documents appear either to have been issued by the government or to have been submitted by DMC to the government. Defendant's response to those documents in its Answer, stating merely that the government "admits only that a copy of a document is attached to the complaint," Def.'s Answer ¶¶ 8, 15, 22, 46; accord id. at ¶ 21, does not treat the exhibits as part of the pleading.

Defendant's Answer does not speak from the knowledge or belief of the party, and it does not appear reasonably to address the documents that plaintiff attached as exhibits to the Complaint on the basis of the knowledge or belief of the party. For the foregoing reasons, plaintiff's Motion to Strike Answer is GRANTED.

III.    Remedy

Defendant's failure to comply with RCFC 8(b) makes the discovery process more difficult for plaintiff. In order to provide redress for that difficulty and to avoid delay, the court will provide plaintiff with additional rights to conduct discovery. In particular, plaintiff shall be entitled to serve interrogatories numbering in excess of 25,

notwithstanding the provisions of RCFC 33(a). Defendant shall file an amended answer to plaintiff's Complaint in compliance with RCFC 8(b) on or before November 8, 2006.


IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge

# Exhibit B

AUG-11-00  12:52  FROM:KPMG PFP DEPT          ID:2129542102          PAGE  12

## KPMG

Stratecon

757 Third Avenue          Telephone   212 758 9700
New York, NY 10017        Fax         212 872 3001

| | | | |
|---|---|---|---|
| **To** | PATRICK W. SHEA<br>STEPHANIE H. DENBY | **From** | John V Schrier |
| **Organization** | CARRUTH MANAGEMENT LLC; BuRKE, WARREN, MAcKAY & SERRITELLA, P C. | **Department** | Stratecon |
| **Fax** | (508) 497-0877; (312) 840-7900 | **Telephone**<br>**Fax** | (212) 872-5906<br>(212) 954-2577 |
| **Date** | August 11, 2000 | **Ref**   Sheafax | Page 1 of  7 |
| **Subject** | **Notice 2000-44** | | |

Please see attached.

*Call Len Schneidman (with Stephanie)*

Our advice in this facsimile transmission is limited to the conclusions specifically set forth herein and is based on the completeness and accuracy of the above-stated facts, assumptions and representations.  If any of the foregoing facts, assumptions or representations is not entirely complete or accurate, it is imperative that we be informed immediately, as the inaccuracy or incompleteness could have a material effect on our conclusions.  In rendering our advice, we are relying upon the relevant provisions of the Internal Revenue Code of 1986, as amended, applicable state and local tax statutes, the regulations thereunder, and the judicial and administrative interpretations thereof. These authorities are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of our conclusions.  We will not update our advice for subsequent changes or modifications to the law and regulations or to the judicial and administrative interpretations thereof.

The information contained in this facsimile message is privileged and confidential and intended solely for the use of the addressee listed above. If you are neither the intended recipient nor the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of the telefaxed information is strictly prohibited. If you have received this telefax in error, please immediately notify us by telephone (call collect to the number listed above) to arrange for the return of the original document to us.

KPMG LLP. KPMG..I P. a U.S. limited liability partnership, is a member of KPMG International, a Swiss association.

043422

IG-11-00 12:53 FROM:KPMG PFP DEPT              ID:2129542102              PAGE    2/7

1

Part III - Administrative, Procedural, and Miscellaneous

Tax Avoidance Using Artificially High Basis

Notice 2000-44

In Notice 99-59, 1999-52 I.R.B. 761, the Internal Revenue Service and the
Treasury Department described certain transactions that were being marketed to
taxpayers for the purpose of generating artificial tax losses. This notice concerns other
similar transactions that purport to generate tax losses for taxpayers.

As stated in Notice 99-59, a loss is allowable as a deduction for federal income
tax purposes only if it is bona fide and reflects actual economic consequences. An
artificial loss lacking economic substance is not allowable. See ACM Partnership v.
Commissioner, 157 F.3d 231, 252 (3d Cir. 1998), cert. denied, 526 U.S. 1017 (1999)
("Tax losses such as these . . . which do not correspond to any actual economic losses,
do not constitute the type of 'bona fide' losses that are deductible under the Internal
Revenue Code and regulations."); Scully v. United States, 840 F.2d 478, 486 (7th Cir.
1988) (to be deductible, a loss must be a "genuine economic loss"); Shoenberg v.
Commissioner, 77 F.2d 446, 448 (8th Cir. 1935) (to be deductible, a loss must be
"actual and real"); § 1.165-1(b) of the Income Tax Regulations ("Only a bona fide loss is
allowable. Substance and not mere form shall govern in determining a deductible
loss.").

Notice 99-59 describes an arrangement that purported to give rise to deductible
losses on disposition of stock by applying the rules relating to distributions of
encumbered property to shareholders in order to create artificially high basis in the

043423

2

stock. The Service and the Treasury have become aware of similar arrangements that have been designed to produce noneconomic tax losses on the disposition of partnership interests. These arrangements purport to give taxpayers artificially high basis in partnership interests and thereby give rise to deductible losses on disposition of those partnership interests.

One variation involves a taxpayer's borrowing at a premium and a partnership's subsequent assumption of that indebtedness. As an example of this variation, a taxpayer may receive $3,000X in cash from a lender under a loan agreement that provides for an inflated stated rate of interest and a stated principal amount of only $2,000X. The taxpayer contributes the $3,000X to a partnership, and the partnership assumes the indebtedness. The partnership thereafter engages in investment activities. At a later time, the taxpayer sells the partnership interest.

Under the position advanced by the promoters of this arrangement, the taxpayer claims that only the stated principal amount of the indebtedness, $2,000X in this example, is considered a liability assumed by the partnership that is treated as a distribution of money to the taxpayer that reduces the basis of the taxpayer's partnership interest under § 752 of the Internal Revenue Code. Therefore, disregarding any additional amounts the taxpayer may contribute to the partnership, transaction costs, and any income realized or expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the excess of the cash contributed over the stated principal amount of the indebtedness, even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. In this example, the taxpayer purports to have

3

a basis in the partnership interest of $1,000X (the excess of the cash contributed ($3,000X) over the stated principal amount of the indebtedness ($2,000X)). On disposition of the partnership interest, the taxpayer claims a tax loss with respect to that basis amount, even though the taxpayer has incurred no corresponding economic loss.

In another variation, a taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.

Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under § 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

UG-11-00 12:54 FROM:KPMG PFP DEPT          ID:2129542102          PAGE  5/7

4

The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of § 165. The purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes. The purported tax benefits from these transactions may also be subject to disallowance under other provisions of the Code and regulations. In particular, the transactions may be subject to challenge under § 752, or under § 1.701-2 or other anti-abuse rules. In addition, in the case of individuals, these transactions may be subject to challenge under § 165(c)(2). See Fox v. Commissioner, 82 T.C. 1001 (1984). Furthermore, tax losses from similar transactions designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for federal income tax purposes.

Appropriate penalties may be imposed on participants in these transactions or, as applicable, on persons who participate in the promotion or reporting of these transactions, including the accuracy-related penalty under § 6662, the return preparer penalty under § 6694, the promoter penalty under § 6700, and the aiding and abetting penalty under § 6701.

Transactions that are the same as or substantially similar to the transactions described in this Notice 2000-44 are identified as "listed transactions" for the purposes of § 1.6011-4T(b)(2) of the Temporary Income Tax Regulations and § 301.6111-2T(b)(2) of the Temporary Procedure and Administration Regulations. See also

043426

5

§ 301.6112-1T, A-4. It should be noted that, independent of their classification as "listed transactions" for purposes of §§ 1.6011-4T(b)(2) and 301.6111-2T(b)(2), the transactions described in this Notice 2000-44 may already be subject to the tax shelter registration and list maintenance requirements of §§ 6111 and 6112 under the regulations issued in February 2000 (§§ 301.6111-2T and 301.6112-1T, A-4), as well as the regulations issued in 1984 and amended in 1986 (§§ 301.6111-1T and 301.6112-1T, A-3). Persons required to register these tax shelters who have failed to register the shelters may be subject to the penalty under § 6707(a) and to the penalty under § 6708(a) if the requirements of § 6112 are not satisfied.

   In addition, the Service and the Treasury have learned that certain persons who have promoted participation in transactions described in this notice have encouraged individual taxpayers to participate in such transactions in a manner designed to avoid the reporting of large capital gains from unrelated transactions on their individual income tax returns (Form 1040). Certain promoters have recommended that taxpayers participate in these transactions through grantor trusts and use the same grantor trusts as vehicles to realize the capital gains. Further, although each separate capital gain and loss attributable to a portion of a trust that is treated as owned by a grantor under the grantor trust provisions of the Code (§ 671 and following) is properly reported as a separate item on the grantor's individual income tax return (see § 1.671-2(c) and the Instructions to Form 1041, U.S. Income Tax Return for Estates and Trusts), the Service and the Treasury understand that these promoters have advised that the capital gains and losses from these transactions may be netted, so that only a small net capital gain or loss is reported on the taxpayer's individual income tax return. In addition to other

6

penalties, any person who willfully conceals the amount of capital gains and losses in

this manner, or who willfully counsels or advises such concealment, may be guilty of a

criminal offense under §§ 7201, 7203, 7206, or 7212(a) or other provisions of federal

law.

*willfully conceal nothing on the returns*

The principal authors of this notice are David A. Shulman of the Office of

Associate Chief Counsel (Passthroughs and Special Industries) and Victoria S. Balacek

of the Office of Associate Chief Counsel (Financial Instruments and Products). For

further information regarding this notice, contact Mr. Shulman at (202) 622-3080 or Ms.

Balacek at (202) 622-3930 (not toll free calls).

# Exhibit C



# The Boston Globe

**FRIDAY, AUGUST 11, 2000**

```
To:      Mike Egan
         Pat Shea
         Jim Reiss

From:    Dick Egan
```

## 'Son of BOSS' tax shelter on US hit list

The Clinton administration is shutting down a new kind of corporate tax shelter, continuing attacks on tax schemes the government contends are depriving taxpayers of billions in lost revenue. The object of the notice being issued today by the Treasury Department and the Internal Revenue Service is a shelter the administration dubbed "Son of BOSS." The administration said the shelter was an offshoot of a Bond and Option Sales Strategy shelter the government moved to shut down in December. The government's action spells out the practices the IRS has found objectionable and puts taxpayers on notice that they cannot use those practices to avoid paying taxes. As in the BOSS shelter, Treasury officials said the new tax avoidance scheme uses a series of steps involving assets and liabilities of partnerships to generate artificial tax losses that are designed to offset income from other transactions. A Treasury official, who briefed reporters on condition of anonymity, said the new tax shelter was being marketed by "one or two of the Big Five" major accounting firms — PricewaterhouseCoopers, Arthur Andersen, KPMG, Deloitte & Touche and Ernst & Young. He refused to name the firms involved. But the official said the fact that this offshoot of the December tax shelter had arisen so quickly showed the strengths to which accountants will go to devise tax avoidance schemes for wealthy corporations and individuals. (AP)

057583

# Exhibit D



345 Park Avenue
New York, NY 10154

Telephone 212 758 9700
Fax 212 758 9819

March 8, 2002

**_PRIVATE & CONFIDENTIAL_**

Mr Patrick W. Shea, CPA
Chief Operating Officer
Carruth Associates LLC
87 Elm Street
Hopkinton, Massachusetts 01748

Dear Pat,

Our tax services rendered on behalf of Fidelity International Currency Advisor A Fund, LLC as cited in our engagement letter dated September 27, 2001 are not required to be disclosed on a KPMG LLP Engagement Information Form (list). No disclosure is required because we were engaged to render tax return preparation services, as described in the referenced engagement letter. Accordingly, our services and engagement with Fidelity International Currency Advisor A Fund, LLC as described in the September 27, 2001 engagement letter has not been disclosed on a KPMG Engagement Information Form.

The tax opinion issued by Sidley, Austin, Brown & Wood LLP states that it is more likely than not the transaction to which KPMG was engaged to prepare income tax returns is not a tax shelter within the meaning of code section 6111 ( c )( 1 ) and therefore would not be required to be registered under code section 6111 ( c ).

**KPMG LLP**

Timothy Patric Speiss

KPMG LLP KPMG LLP, a U.S. limited liability partnership, is
a member of KPMG International, a Swiss association.

010287

# Exhibit E



**Denby, Stephanie H.**

| | |
|---|---|
| **From:** | Speiss, Timothy P [tpspeiss@kpmg.com] |
| **Sent:** | Wednesday, June 26, 2002 6:10 PM |
| **To:** | 'SDENBY@burkelaw.com' |
| **Subject:** | RE: disclosure |

Let's speak, since as of today, me and certain law firms I spoke with are of
the view no disclosure is required and the transaction is distinguishable
from listed transactions (as the opinions stated). This is the discussion I
had with Pat Shea on 6/24, I want to update him as well.

Further, as of today, there are no specific penalty regimes wrt
non-disclosure however the 25% accuracy related most likely would be
asserted.

Finally, I advise and have told my colleagues the individual tax returns
should be filed as soon as possible. We can speak now if you are able.

TPS
*********************************************************************
The information in this email is confidential and may be legally privileged.
It is intended solely for the addressee. Access to this email by anyone else
is unauthorized.

If you are not the intended recipient, any disclosure, copying, distribution
or any action taken or omitted to be taken in reliance on it, is prohibited
and may be unlawful. When addressed to our clients any opinions or advice
contained in this email are subject to the terms and conditions expressed in
the governing KPMG client engagement letter.
*********************************************************************

1

# Exhibit F

**T. Speiss Observations Regarding Egan Non Disclosure Arguments – Arguments Prepared by Proskauer Rose**

**Subject Matter:** T.D. 9000 Regulations dated June 14, 2002 ("the Regulations") addressing disclosure requirements by taxpayers of (i) listed transactions and substantially similar transactions, and (ii) reportable transactions, and the interpretation of the term "Substantially Similar Transactions" as described at Item 3. of the Regulations in comparison to Notice 2000-44.

I have reviewed the following:

- Arguments prepared by Proskauer Rose law firm with regard to tax return disclosure not being required,

- Technical commentary from a second law firm addressing the inapplicability of Notice 2000-44 to the taxpayer's transaction,

- T.D. 9000 Modification of Tax Shelter Rules and Taxpayer Disclosure Rules dtd 6/14/02,

- Proposed and Temporary Regulations section 1.6011-4T (considering the modifications by T.D. 9000,

- Notice 2000-44,

- Notice 2002-50,

- IRC Secs. 6664 and 6662,

- Other technical resource material(s),

- KPMG has been engaged to sign 2001 individual income tax returns and needs to make reasonable efforts to ascertain whether transactions may be reportable under Temp. Treas. Reg. Sec. 1.6011-4T,

- KPMG LLP has not issued a tax opinion in connection with any transactions or investments that are reported on the taxpayer's 2001 individual income tax returns,

- LLCs in which the taxpayer was a member entered into a 2001 transaction which is the subject of my review, and such transaction was reported on a 2001 form 1065, where the 2001 for 1065 was filed on or about March 23, 2002. The 2001 form 1065 was prepared and signed by KPMG LLP.

- In 2001 the taxpayer contributed assets valued at $ 12 million to the LLCs in connection with an overall investment plan (see taxpayer's separate documentation and memorandum outlining the business purpose of this investment).

I have discussed with the Proskauer Rose Law firm my observations as follows.

As cited in the T.D. 9000 Regulations ("Regulations") "substantially similar includes any transaction that is expected to obtain the same or similar types of tax benefits and that is either factually similar or based on the same or similar tax strategy". The definition of "tax strategy" is not cited in the Regulations. The Regulations cite Notice 2000-44 as an example of a listed transaction which involved offsetting options transferred to a partnership (by a taxpayer), and in citing Notice 2000-44 ("the Notice"), the Regulations state:

> "Transactions using short sales, futures, derivatives or any other type of offsetting obligations to inflate basis in a partnership interest would be the same or substantially similar to the transaction described in Notice 2000-44".

Notice 2000-44 described a transaction that had a purpose of generating tax losses. The tax losses described in the Notice resulted from taxpayers' "claim that the basis in a partnership interest is increased by the cost of purchased call options, but not reduced under IRC Sec 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options". Then as further cited in the Notice, "on the disposition of the partnership interest, the taxpayer claims a tax loss ($1000 in this example)". The tax loss cited in the Notice arises due to the fact that (i) the value of the partnership interest considers the call option obligation, which also results in a nominal value ascribed to the total partnership interest disposed (sold), (ii) this nominal value is offset against the partnership interests' high tax basis, which was created by the contribution of the purchased call option, and (iii) a tax loss results (when partnership interest sales proceeds are matched against the partnership interest tax basis). It would appear that Notice 2000-44 was intended to attack transactions resulting in a tax loss from the disposition of a high tax basis partnership interest resulting in the tax benefit (a tax loss) in a manner described in, or similar to, Notice 2000-44.

Therefore, when reviewing the T.D. 9000 Regulations, Notice 2000-44, and the sentence in the Regulations intending to describe transactions substantially similar to Notice 2000-44 (cited as "Transactions using short sales, futures, derivatives or any other type of offsetting obligations to inflate basis in a partnership interest would be the same as or substantially similar to the transaction described in Notice 2000-44") this sentence appears to be expanding beyond call options (the financial instrument described in the example in Notice 2000-44), and including additional types of financial instruments or products that would be prohibited to be used by a taxpayer, and (or) contributed to a partnership to (i) inflate basis in a partnership which results in a nominal value ascribed to the partnership interest, (ii) offset this nominal partnership interest value against the partnership interests' high tax basis, which was created by the contribution of the purchased financial instrument or product, and (iii) result in a tax loss (when partnership interest sales proceeds are matched against the partnership interest tax basis).

005988

Based upon an understanding of the Regulations and Notice 2000-44, a conclusion could result that the taxpayer did not engage in a transaction described in, or substantially similar to, Notice 2000-44.

Also in reference to Notice 2000-44 the Regulations contain the sentence:

> "Moreover, use of the inflated basis in the partnership interest to diminish gain that would otherwise be recognized on the transfer of a partnership asset would also be the same as or substantially similar to the transaction described in Notice 2000-44"

In reviewing this description and Notice 2000-44, the taxpayer (or FICAA LLC) has no gain that would otherwise be recognized on the transfer of a partnership asset. Therefore, the question of whether there was "use of inflated basis to diminish gain" in a manner described in (or similar to) Notice 2000-44 is not an issue required to be addressed by the taxpayer. This "gain diminishment" factually never occurred in 2001 in any transaction entered into by the taxpayer or related LLC..

Notice 2002-50 is not substantially similar to the taxpayer's transaction.

As a result of the above interpretation, no disclosure appears to be required as described in T.D. 9000 in comparing the transaction to that described in Notice 2000-44.

# Exhibit G

*Tm 914-478-4473*

950 Third Avenue, 23rd Floor
New York, NY 10022
Phone: (212) 688-2700
Fax: (212) 688-7908

## THE DIVERSIFIED GROUP INCORPORATED

**MEMORANDUM**

# DRAFT

**TO:**      James Haber

**FROM:**   Orrin Tilevitz, Esq.

**DATE:**   June 18, 2002

# Confidential— Attorney-Client Privilege

**SUBJECT:**   6/14/02 Tax Shelter Disclosure Amendments

You asked me to discusses T.D. 9000, issued June 14, 2002, amending the temporary tax shelter disclosure regulations, and how these amendments might apply to certain transactions (the "2001 investor transactions").

**Scope.** T.D. 9000 make four principal changes to the existing disclosure rules.

1. Individuals, trusts, partnerships, S corporations, and partners and S corporation shareholders must now disclose their participation in listed transactions. Previously, disclosure was required only of C corporations investing in listed transactions and other transactions meeting a 2-of-5 factors test. The IRS announced that it plans to issue other regulations extending the requirement to disclose to other transactions entered into by noncorporate taxpayers.

2. "Indirect participants" required to disclose are defined as including anyone who knows or has reason to know that their claimed tax benefits are derived from a reportable transaction. For example, if the taxpayer takes property whose inflated basis was derived from a reportable transaction (known to the taxpayer) and obtains thereby high basis in corporate stock, that taxpayer must disclose the initial transaction. Also, a partner and an S corporation shareholder are indirect participants in transactions entered into by the partnership or the S corporation.

3. A transaction that is "substantially similar" to a listed transaction is now defined to include any transaction that

    (a) is expected to obtain the same or similar types of tax benefits and

    (b) is either

        (i) factually similar or

BWMS 03134

(ii)  based on the same or similar "tax strategy".

The regulations added that the term "must be broadly construed in favor of disclosure".
Two examples follow. The first example notes that Notice 2000-44 describes a listed
transaction in which "offsetting options" are transferred to a partnership, resulting in an
outside basis equal to the premium paid for the purchased option. The example states that
transactions using short sales, futures, derivatives or "any other type of offsetting
obligations" to inflate outside basis, as well as the use of inflated basis to "diminish gain
that would otherwise be recognized on transfer of a partnership asset", would be "the same
as or substantially similar" to that transaction. The second example notes that in the
intermediary transaction described in Notice 2001-16 and designed to "prevent the
recognition of gain that [the target] would otherwise report", the intermediary is a member
of a consolidated group with a loss within the group or is tax-exempt. The example states
that transactions using "different intermediaries" to "prevent recognition of gain", such as
a non-consolidated corporation that buys the target, liquidates its, sells its assets, and
offsets the gain "recognized" with current losses, would be the same as or substantially
similar to that transaction.

4.  The "projected effect" test no longer applies to listed transactions. Therefore, a
    "participant" in a transaction (presumably, although the term is not defined explicitly, one
    whose tax liability the transaction "affected") must disclose the transaction even if the
    transaction does not reduce his tax liability by a regulatory threshold, or at all.

In addition, a corresponding definition of "substantially all", which cross-references the
examples in the disclosure regulations, is added to the definition of "listed transaction" in the
regulations requiring registration of confidential corporate tax shelters. Regs. § 301.6111-
2T(a)(3). Since the customer list maintenance rules incorporate this definition by reference,
Regs. § 301-6112-2T, A-4, it now applies for this purpose as well.

**Penalty.** The amendments are silent on penalties. No specific statutory authority currently
exists for the IRS to impose a penalty for failing to disclose under the section 6011
regulations. The IRS previously asserted in the preamble to the first set of disclosure
regulations that the "reasonable cause" exception under in section 6664(c)(1) to the
understatement penalty required both "reasonable cause" and for the taxpayer to act in "good
faith", and that the failure to disclose could indicate that the taxpayer lacked "good faith" even
if he had secured an opinion of counsel. For corporate taxpayers only, the IRS arguably has
some leeway because a special rule (whose authority on this point is doubtful) for corporate
tax shelter investors purports to permit unidentified facts and circumstances other than the
taxpayer's legal justification to be taken into account in determining whether the taxpayer
acted with reasonable cause and good faith. Presumably, the IRS could argue that the failure
to disclose was such a "fact and circumstance". But this special rule implies that for a
noncorporate taxpayer, legal justification in the form of an opinion of counsel ought to be
sufficient. The generally applicable regulations make this clear by using the "good faith"
requirement in conjunction with a legal opinion only to require that *the reliance itself* must be
in good faith. Regs. § 1.6664-4(c)(1). Therefore, although the IRS can be expected to argue
otherwise, little or no existing authority appears to permit the IRS to deny a noncorporate

2

BWMS 03135

taxpayer a "reasonable cause" penalty exemption based solely on reasonable reliance on a tax opinion.

**Effective dates.**

*Disclosure.* Amended Regs. § 1.60111-4T(g) now provides, in relevant part, that the rules which, as amended, require non-corporate taxpayers to disclose and define "substantially similar", apply to any transaction entered into on or after January 1, 2001 *unless it is reported on the taxpayer's return filed on or before June 14, 2002.* Taxpayers *may rely* on the amended regulations for returns filed after February 28, 2000 (i.e., the effective date of the original disclosure regulations). Otherwise, the regulations that apply to transactions either (i) entered into before January 1, 2001 or (ii) entered into on or after January 1, 2001 and reported[1] on the taxpayer's return filed on or before June 14, 2002, are those in effect *before* June 14, 2002. [Emphasis added.] The regulation then cross-references 26 CFR as revised as of April 1, 2002.

In other words, if the taxpayer reported the transaction on a return filed on or before June 14, 2002, the regulations that apply are those *in print before June 14, 2002.* Since these regulations contained no definition of "substantially similar", whether a transaction is a "listed transaction" for purposes of whether disclosure is required on a pre-June 15 return is determined without regard to this definition. Also, noncorporate taxpayers who filed a return on or before June 14 reporting a transaction for which disclosure would be required by a corporate taxpayer need not disclose it on that return. Thus, in determining whether any punitive consequence applied to a taxpayer who failed to disclose a transaction reported on a return filed on or before June 14, the regulations that would apply would be those (i) limiting disclosure to corporate taxpayers and (ii) not defining "substantially similar".

Regs. § 1.6011-4T(d) provides (in relevant part) that "if a transaction becomes a reportable transaction" on or after the date the taxpayer has filed the return for which the transaction affected the taxpayer's tax liability, the disclosure statement must be filed as an attachment to the taxpayer's next return. A "reportable transaction" is defined in Regs. § 1.6011-4T(b) as a transaction that is either listed or meets the 2-of-5 test. The new requirement in Regs. § 1.6011-4T(a) that noncorporate taxpayers disclose merely expands the class of taxpayers subject to the disclosure requirements; it does not affect the definition of a "reportable transaction". Therefore, if a particular transaction was already a reportable transaction under the pre-June 14 regulations, a noncorporate taxpayer who had already reported the transaction on a pre-June 14 return would not be obligated to disclose the transaction on his return merely because *that taxpayer* had subsequently become subject to the disclosure requirement. It should follow *a fortiori* that a non-"reportable" transaction reported by a noncorporate taxpayer on a pre-June 15 return need not be disclosed on a subsequent return even if it became a reportable transaction (either pursuant to the amendments or because the IRS issued a notice making it a listed transaction). That is, the obligation to disclose on a subsequent

---

[1] Mere "reporting" is different from "disclosure" in that disclosure must include detailed information about the transaction and must be filed with the Office of Tax Shelter Analysis.

3

BWMS 03136

return applies *only* where the *sole* intervening event is a transaction's becoming a reportable transaction.

Moreover, even for a corporate taxpayer who had reported a transaction on a pre-June 15 return, which transaction has become a listed transaction *by virtue of the new regulations*, and who therefore is theoretically obligated to disclose it on a subsequent return, the failure to do so should have no punitive consequences. This is because, as noted earlier, if the transaction, reported on the pre-June 15 return, were before a court, the only applicable disclosure regulations would be those, the pre-June 14 regulations, in which the transaction was not listed.[2]  Of course, there would be no penalty for the subsequent year because there would be no deficiency in that year.

Accordingly, (i) a noncorporate taxpayer who filed a return on or before June 14 reporting a transaction should have no obligation to disclose that transaction either on an amended return or a subsequent return, even if the transaction became listed by virtue of the amendments or in an IRS notice issued at a later date, and (ii) while a corporate taxpayer who filed a return on or before June 14 for a transaction that was not a listed transaction under the prior regulations might in theory be obligated to disclose that transaction on a subsequent return if it became listed by virtue of the amendments, the IRS should have no argument that the failure to do so potentially triggers a penalty.

*Registration and customer lists.* Revised Regs. § 301.6111-2T(h) provides that the added definition of "substantially similar" is effective for "confidential corporate tax shelters in which any interests are offered for sale after June 14, 2002." No special effective date is set out for the incorporation of this provision into by cross-reference into the customer list regulations, but presumably the incorporation by cross-reference is similarly effective for interests offered for sale after June 14, 2002.

**Effects on 2001 investor transactions.** The 2001 investor transactions were based on three different techniques. Each technique used, among other aspects, an investor's purchase of an option (the "long" option), the sale of an option with a different strike price (the "short" option), and the contribution of the two options to a partnership or S corporation, resulting in an increased basis equal to the premium paid for the purchased option. In each case, the net premium paid for the options was at least one percent of the gross premium paid for the long option and in any event not less than $50,000.

- In the "partnership-options" technique, the partnership that received the options then bought and sold other options, resulting in realized loss (allocated to the investor) and gain (allocated to a tax-exempt partner). The investor's increased outside basis in the partnership permitted him to use the loss under section 704(d).

- In the "CFC" technique, an S corporation shareholder increased his basis in the shares by contributing a long and short option. Thereafter, the corporation bought a foreign

---

[2] In any event, whatever the regulations purport to require, the IRS might be hard-pressed, on equitable grounds, to convince a judge that the failure to disclose on a later return should mean that the taxpayer lacked good faith in filing an earlier return in accordance with then-applicable law.

4

corporation which then bought and sold other options, resulting in realized gain and loss. The gain was realized offshore and, through a timely entity classification election treated as a section 332 liquidation, the loss was realized by the S corporation. The increased outside basis permitted the shareholder to deduct the loss under section 1366(d)(1).

- In the "stock sale" technique, the investor contributed appreciated stock together with long and short options to a partnership. The investor later transferred his partnership interest to a second entity, and the initial partnership then sold the stock. The initial transfer of the options resulted in an increased outside basis in the partnership. As a result of a section 754 election, the transferee's share of the partnership's inside basis in its assets was increased to its new, increased outside basis, so gain on sale of the stock was reduced.

In the relevant transaction in Notice 2000-44, a taxpayer buys an option, sells an option for "slightly less", and contributes the two options to a partnership. The options are said to be "offsetting", presumably because (in the words of the Notice) the "taxpayer's net economic outlay to acquire the partnership interest [i.e., the net amount paid to acquire the options] and the value of the partnership interest are nominal or zero." The taxpayer then sells the partnership interest. The taxpayer takes the position that his outside basis equals the premium paid for the purchased option so that the investor recognized a loss. To review, a transaction must be disclosed only if the tax benefits are the same (or similar) *and* either the transaction is factually similar or is based on the same (or similar) "tax strategy". Using the analysis in the amendments, this transaction arguably can be divided into "facts" (the investor purchases and sells "offsetting" options), a "tax strategy" (the investor contributes them to a partnership and sells the partnership interest),[3] and a "tax benefit" (increased outside basis in a partnership, resulting in a loss on sale of the partnership interest). Under the new regulatory injunction to construe the term "substantially similar" broadly in favor of disclosure, a transaction using a different type of "offsetting obligation" to increase outside basis in a partnership, as in the example, is "substantially similar" to the transaction in the Notice because the tax benefit is similar (increased outside basis in a partnership) and the facts are similar (all offsetting obligations are economically similar). This would be true even though the tax strategy (again in the example, somehow using the increased outside basis to reduce gain on sale of partnership assets) is different, again *because the tax benefit and the facts are the same or similar.*

One tax benefit of each 2001 investor transaction was an increased outside basis. In the CFC technique, the outside basis was to corporate stock, not a partnership interest, but again construing the term "substantially similar" broadly, this tax benefit was "similar". Each technique also entailed the purchase and sale of options. However, in all three techniques, the "tax strategy" was fundamentally different from that in the Notice because, unlike the transaction in the Notice, in none of the techniques was any loss realized on the sale of a

---

[3] The IRS appears to have previously used the term "tax strategy" in only two published context. LTR 9328022 refers to a "tax strategy" of purchasing taxpayers' initial inventory from discounters' suppliers at the end of their initial abbreviated tax year, marking on higher retail prices (fully expecting to sell nothing at the prices marked on the merchandise) thereby locking in a low valued inventory base. FSA 199952001 refers to a consolidated group's "tax strategy" of selling a subsidiary's stock but retaining investment assets.

BWMS 03138

partnership interest. Moreover, in the partnership-option and CFC techniques, the loss was realized in a wholly unrelated strategy, to which the contributed option technique was secondary because it simply permitted the investor to deduct the loss currently. Accordingly, a reasonable position that in those two techniques, the basic "tax benefit" is a loss generated from a transaction wholly unlike that in the Notice.[4] If so, these techniques are not "substantially similar" to the transaction in the Notice because the tax benefits are not the same or similar.

Furthermore, the investor's net investment in each transaction was sufficiently large that it was not "nominal or zero". This is a substantial variation from the facts of the transaction in the Notice because the Notice attacks that transaction not on technical grounds but by citing cases which stand for the proposition that transactions may be disregarded for tax purposes if they lack economic substance. Implicit is the conclusion that, by contrast, transactions which have economic substance, for example where there is an economic investment and an opportunity for gain, may not be disregarded.

The Notice neither defines nor offers any guidance as to what constitutes a "nominal" net economic outlay. "In interpreting the meaning of the words in a revenue Act, [the court must] look to the ordinary, everyday senses of the words." "When Congress does not define a word, its 'common and ordinary usage may be obtained by reference to a dictionary.'" *True Oil Co. v. Comm'r*, 170 F.3d 1294, 1299 (10th Cir. 1999) (citations omitted) (in ascertaining a definition for the word "determination," the court looked to Black's Law Dictionary and Webster's Third New International Dictionary). Black's Law Dictionary defines "nominal," in part, as "often with the implication that the thing named is so small, slight, or the like, in comparison to what might properly be expected, as scarcely to be entitled to the name; *e.g.*, a nominal price." The online Merriam-Webster Collegiate Dictionary defines "nominal" as "of, being, or relating to a designated or theoretical size that may vary from the actual: approximate: *trifling, insignificant*."[5]

The word "nominal" seems to have a similar connotation when used by the IRS or by courts deciding tax cases. For example, an important factor in determining whether a purported lease arrangement with an option to purchase is a true lease for federal income tax purposes is whether the option price is "nominal." *See, Transamerica Corp. v. United States*, 15 Cl. Ct. 420, 62 A.F.T.R. 2d 88-5489 (Cl. Ct. 1988), *aff'd on other issue*, 902 F.2d 1540, 65 A.F.T.R. 2d 90-1074 (Fed. Cir. 1990), where the court characterized option prices of $25,000 as being a sum that "is not nominal," citing by comparison *Oesterreich v. Comm'r*, 226 F.2d 798 (9th Cir. 1955) (purchase option of $10 – building worth $350,000); and *Watson v. Comm'r*, 62 F.2d 35 (9th Cir. 1932) (additional sum of $1, a mere formality in a transaction involving

---

[4] That is, even if the partnership bought and sold options that are "offsetting", the *tax benefit* derived from those trades, a nontaxable gain and deductible loss, is wholly unlike that in the Notice. That the partners are indirect participants is irrelevant because they need not disclose unless they indirectly participate in a transaction that is itself subject to disclosure.

[5] *See also* Online WordNet (defining "nominal," in part, as "*insignificantly small*; a matter of form only").

6

$109,900).[6]  The property that was the subject of each of the options was materials used in a
title abstracting business for which the lessee paid total rentals of $220,006 over a 17½ year
period prior to exercise of the purchase option, and $448,509 over the same period in rentals
for the other property.  Also considered in the "true lease" analysis is whether the purported
lease is structured such that the purported lessee pays substantial rentals at the beginning of the
lease term and nominal rentals at the back end of the lease term.  *See* Rev. Rul. 55-540, 1955-
2 C.B. 39.  For example, in one instance, the taxpayer entered into a 13 year rental agreement
for equipment that had a 10-15 year useful life.  After the first three years of the rental
agreement the annual rentals paid would total more than the manufacturers list price for the
property.  Then, for the remaining 10 years the taxpayer would pay an annual rent equal to
1/10 of the list value of the property.  Rev. Rul. 55-541, 1955-2 C.B. 19.

In addition, for purposes of determining whether an investment is a tax shelter, section
6111(c)(4) defines an investment as a "substantial investment" if (A) the aggregate amount
which may be offered for sale exceeds $250,000, and (B) there are expected to be 5 or more
investors.  Thus, under this definition, an average $50,000 investment by each of five investors
would constitute a "substantial investment."  An investment that is "substantial" presumably
cannot also be "nominal".

If the options were not "offsetting", then the facts of the transactions were not factually similar
to that in the Notice.  None of the tax strategies are similar to that in the Notice.  Accordingly,
none of the transactions were "the same as or substantially similar to" that in the Notice, and
therefore are not subject to disclosure under the amendments.

## Summary

1. A noncorporate (individual, trust, partnership, or S corporation) participant, direct or
   indirect (e.g., a partner or S corporation shareholder) in a listed transaction (but not a
   transaction meeting the 2-of-5 test) must now disclose the transaction.

2. Nonetheless, the noncorporate participant need not *disclose* the transaction if the
   participant reported the transaction on a return filed on or before June 14, 2002.  This
   is true even if the transaction

- Became a listed transaction by virtue of the June 14 amendments or

- Subsequently becomes a listed transaction in an IRS pronouncement.

3. If a corporate participant reported its participation in a transaction in a return filed on
   or before June 14 and the transaction became a listed transaction by virtue of the June
   14 amendments, the corporation must in theory disclose that transaction on its next
   return.  However, there no punitive consequences should result from a failure to
   disclose in this situation.

---

[6] While we believe that while the Notice 2000-44 uses the word "nominal" in the absolute sense, the amounts of
$10 and $1 in the context of option premiums are "nominal" amounts both in the absolute sense and when
compared to the total size of the transaction.

7

BWMS 03140

4. Positions consistent with the June 14 amendments may be taken that none of the partnership-option technique, the CFC technique, or the stock sale technique need be disclosed:

- In the case of the CFC and partnership-option techniques, the fundamental tax benefit of the "transaction" is a loss from a transaction not described in Notice 2000-44 (or any other IRS pronouncement on listed transactions); the increased outside basis is secondary.

- In the case of all three techniques, the tax strategy is dissimilar and the facts are different because the options are not "offsetting" (unlike those in Notice 2000-44) in the sense that the net premium invested is not "zero or nominal".

8

BWMS 03141

# Exhibit H



| | |
|---|---|
| **To:** | Pat Shea |
| | Jim Reiss |
| **From:** | Melissa Seaver |
| **Date:** | August 28, 2002 |
| **Re:** | Telecon with Tim Speiss of KPMG |

Tim Speiss called at 11:12 a.m. on Wednesday, August 28, 2002.

- Jim previously requested that Tim document KPMG's reason for disclosure of relevant items on Richard and Maureen Egan 2001 tax return. Tim refused to provide such documents. As a result, Pat requested a telephone conversation to give an oral statement as to why Tim, and KPMG, required said disclosure.

To follow are the notes that summarize the key points of that conversation:

- KPMG has taken a consistent, firm-wide position that it disclose any transaction which could be considered similar to those listed in Regulation 2000-44. Despite the fact that the Egans have a signed engagement letter and legal opinions that indicate a position to the contrary, Tim suggested that KPMG is requiring disclosure. He indicated that he does not agree with this position and feels that the Brown & Wood legal opinion is accurate in its assessment that no disclosure is necessary. KPMG does not agree with the Proscow & Rose legal opinion.

- Tim bases KPMG's position on a section in IRS Circular 230 (section 10.34). Tim stated that KPMG has reviewed the June 14, 2002 Regulations and they believe that KPMG is not at a "realistic possibility" (a more than 1 and 3 chance) to avoid disclosure because some basis issues described in the June 14, 2002 Notice are substantially similar to those described in the 2000-44 Regulations, thus disclosure is required. Tim went on to say that because some basis issues could be construed as substantially similar to those described in Regulation 2000-44 this does not, in and of itself, cause the underlying transaction to be "bad" or unsupportable. Instead, he referred to Circular 230, Section 10.34, stating that under these circumstances, Circular 230 requires a tax practitioner to sign a return only with disclosure. He stated that KPMG is managing its risk of audit by disclosing. He considers disclosing a show of a "best faith effort" on behalf of the practitioner and creates an opportunity to remove any penalties that may charged to the taxpayer. He stated this despite the fact that an approved legal letter states that disclosure is not required and no penalties should be charged. He agreed that there is probably a 100% chance of audit if disclosure is done.

- Tim also indicated that the IRS may issue a second set of Regulations that would have additional disclosure rules. He then suggested that we file the return as soon as possible because the IRS would probably expand the items and level of detail that must be disclosed.

037236



- When asked about the risk of exposure from the FHTAA and FICAA returns, Tim indicated that the ultimate transaction would be reported at the Richard and Maureen Egan level and therefore the risk did not lie within those returns. He went on later to say that he could not promise that if the IRS required KPMG to provide a list of entities that involved similar basis issues to the 2000-44 Regulations, that he could exclude FHTAA and FICAA from that list.

- The option to not have KPMG sign the returns and to file without disclosure was brought up. Tim indicated that if such an option was utilized that he would request that his previously signed copy of Richard & Maureen's return be returned to him. He would take that copy, his copy and the associated workpapers and destroy this information, as it represents a return that was never filed, similar to a "draft". He intends to discuss this set of circumstances with Bill Connelly and will provide us with the results of those conversations.

- Tim indicated that he was not aware of any agreements made between KPMG and the IRS concerning KPMG's firm-wide decision to disclose transactions on returns. He also indicated that within KPMG only 3 taxpayers entered into transactions similar to the Egans in 2001 and that 2 had substantially dissimilar facts than those of the Egans. He provided this information to indicate that he did not believe that there was a high level of exposure that would require KPMG to provide a list to the IRS.

# Exhibit I

# PROSKAUER ROSE LLP

1585 Broadway
New York, NY 10036-8299
Telephone 212.969.3000
Fax 212.969.2900

LOS ANGELES
WASHINGTON
BOCA RATON
NEWARK
PARIS

September 4, 2002

Mr. Richard J. Egan
116 Flanders Road
West Borough, MA
01581

Dear Mr. Egan:

You have requested our opinion (the "Opinion") regarding whether Richard J. Egan (the "Investor") would be subject to disclosure requirements under Section 6011 of the Internal Revenue Code of 1986, as amended (the "Code")[1], for Investor's involvement in various investment transactions (the "Transactions"). For purposes of this discussion, we assume that Investor is a United States individual.

You have provided us with certain documents summarizing the Transactions. We assume that all pertinent facts, circumstances and representations relevant to the Transactions were thereby disclosed to us and such documents were, in relevant part, true, accurate and complete.

## I.    The Transactions

In the Transactions, Fidelity World Currency Advisor A Fund, LLC ("World") is a limited liability company whose membership interests are solely owned initially by Investor.[2]

Fidelity International Currency Advisor A Fund, LLC ("International") is a limited liability company with four members, one of whom is the Investor. International was formed to buy and sell options and to conduct other investment activities.

International's operating agreement establishes two sets of membership interests, common and preferred. Only common interest holders share in International's profits and losses and each preferred interest carries a guaranteed annual return of 12 %, independent of

---

[1]    All sections references herein are to the Code, unless otherwise indicated. All references to Regulations herein are to the Treasury Regulations promulgated pursuant to the Code, unless otherwise indicated.

[2]    Based on our understanding that World is a single member LLC that has not filed an election to be treated as a corporation, it should be treated as a disregarded entity for federal income tax purposes.

006264

September 4, 2002
Page 2

International's profits. International maintains capital accounts for its members in accordance with Regulations under section 704(b). The operating agreement also provides that when members' interest change during the year, their distributive shares are determined using the interim "closing of the books" method.

On October 9, 2001, World entered into a pair of European-style digital call options and a pair of European-style digital put options (together, the "World Options"). In each pair, World purchased a call option (or put option) and sold a call option (or put option) based on the same underlying interest rate derivative or index but having different strike prices. The net premium paid by World to acquire the World Options was $2,250,000.

On October 22, 2001, Investor contributed his interest in World to International in exchange for 5% of the common interest and 100% of the preferred interests of International. On the same date, another member ("Co-Investor") contributed cash in exchange for 93% of International's common interests[3]. The other members contributed cash and obtained the remaining common interests in International.

On the same date, International invested in a number of foreign currency options contracts. On October 29 and October 30, 2001 International closed certain of these contracts and acquired new foreign currency-based instruments. These trading activities resulted in a realized gain.

On October 31, 2001, Investor acquired additional preferred membership interests in International by contributing shares of Stockton Holdings.

On November 5, 2001, Investor purchased all but 5% of Co-Investor's total 93% common membership interest.

On November 6, 2001, World entered into new options contracts, eliminating its economic risk of gain or loss from its October 9 trades, and recognizing a small net loss.

On November 29, 2001, Investor made an additional contribution of $5,000,000 to International in exchange for additional preferred membership interests.

On December 3, 2001, International closed out its remaining options (the "Remaining Options") and recognized losses.

On December 14, 2001, Investor made an additional contribution of $2,000,000 to International in exchange for additional preferred membership interests.

We understand that Investor has obtained an opinion of counsel that the intended tax treatment of the Transactions would more likely than not be sustained if challenged, and we

---

[3]    Co-Investor was a foreign resident individual.

September 4, 2002
Page 3

assume that Investor has reasonably relied on such opinion for purposes of reporting the Transactions on his federal income tax return.

## II.    Disclosure Requirements

As relevant here, Section 6011(a) requires every person liable for any tax under the Code to make a return according to the forms and regulations provided by the Secretary including all information required by the forms and regulations. Every individual, trust, partnership, and S corporation that has participated, directly or indirectly, in a "reportable transaction" that is a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4T(b)(2) must attach to its return for the taxable year of the transaction a disclosure statement in the form prescribed by Treasury Regulation Section 1.6011-4T(c).[4]

The preamble to the revised regulations states that the IRS plans to issue future guidance extending the disclosure requirement to other reportable transactions (i.e., non-listed transactions)[5] entered into by individuals, partnerships, trusts and S corporations. However, no such guidance has been issued to date. Therefore to date, individuals, such as Investor, have no obligation to disclose their participation in "other reportable transactions," as defined in Treasury Regulation Section 1.6011-4T(b)(3)(i).

A "listed transaction" is any transaction which is the same as or "substantially similar" to one of the types of transactions that the Internal Revenue Service (the "IRS") has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction for purposes of Section 6011.[6]

A transaction will be treated as being the same as or "substantially similar" to one of the types of transactions that the IRS has determined to be a tax avoidance transaction if the transaction is expected to obtain the same or similar types of tax benefits and is either factually similar or is based on the same or a similar tax strategy.[7] The term "substantially similar" is to be broadly construed in favor of disclosure.[8] The Regulations do not define what is meant by "tax strategy."[9]

---

[4]    Treas. Reg. § 1.6011-4T(a)(1). T.D. 9000 (June 18, 2002) revised the temporary Regulations under Section 6111(d) to include this disclosure requirement for individuals who participate in "listed transactions."

[5]    Treas. Reg. § 1.6011-4T(b)(3)(i).

[6]    Treas. Reg. § 1.6011-4T(b).

[7]    Treas. Reg. § 1.6011-4T(b)(1)(i).

[8]    Treas. Reg. § 1.6011-4T(b)(1)(i).

[9]    The IRS appears to have previously used the term "tax strategy" very rarely in published guidance; as a result, it is difficult to discern what the term means specifically. For example, Private Letter Ruling 9328022 (March 5, 1993) refers to a "tax strategy" of purchasing taxpayers' initial inventory from discounters' suppliers at the end of their initial abbreviated tax year, marking on higher retail prices (fully expecting to sell nothing at the prices marked on the merchandise), thereby locking in a low valued inventory base. Field Service Advice

September 4, 2002
Page 4

A taxpayer will be considered to have indirectly participated in a "listed transaction" if the taxpayer's Federal income tax liability is affected by the transaction, even if the taxpayer does not participate in the transaction itself. For example, where the "listed transaction" is consummated through a partnership, the taxpayer will be treated as an indirect participant if the taxpayer is a partner and the taxpayer's Federal income tax liability is likely to be affected by the partnership's participation in the transaction.[10]

## III.    Analysis

The IRS has published a number of notices describing various listed transactions. See, e.g., Notice 2000-61, 2000-2 C.B. 569; Notice 2001-16 (February 26, 2001), 2001-1 C.B. 730. The majority of these notices have no bearing on the Transactions. However, there are two notices that the IRS may argue are the same as or substantially similar to the Transactions, in which case the IRS would contend that Investor is required to disclose his participation in the Transactions. These two notices are Notice 2000-44, 2000-2 C.B. 255, and Notice 2002-50 (June 26, 2002). For the reasons discussed below, it is more likely than not that the Transactions would not be considered "listed transactions" as they are not substantially similar to any listed transactions.

### A.    Notice 2000-44

In Notice 2000-44, the IRS addressed two fact patterns, including the following:

> [A] taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.
>
> Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under Section 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income

---

199952001 (September 29, 1999) refers to a consolidated group's "tax strategy" of selling a subsidiary's stock but retaining investment assets.

[10]    Treas. Reg. § 1.6011-4T(a)(1).

006267

September 4, 2002
Page 5

realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of Section 165. The purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for Federal income tax purposes. The purported tax benefits from these transactions may also be subject to disallowance under other provisions of the Code and regulations. In particular, the transactions may be subject to challenge under Section 752, or under [Treas. Regs.] § 1.701-2 or other anti-abuse rules. In addition, in the case of individuals, these transactions may be subject to challenge under § 165(c)(2). See Fox v. Commissioner, 82 T.C. 1001 (1984). Furthermore, tax losses from similar transactions designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for Federal income tax purposes.

T.D. 9000 added the definition of "substantially similar" and the following example to illustrate when a transaction is the same as or substantially similar to a listed transaction. The example states:

Notice 2000-44 (2000-2 C.B. 265) (see § 601.601(d)(2) of this chapter), sets forth a listed transaction involving offsetting options transferred to a partnership where the taxpayer claims basis in the partnership for the cost of the purchased options but does not reduce basis under section 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the options. Transactions using short sales, futures, derivatives or any other type of offsetting obligations to inflate basis in a partnership interest would be the same as or substantially similar to the transaction described in Notice 2000-44. Moreover, use of the inflated basis in the partnership interest to diminish gain that would otherwise be recognized on the transfer of a partnership asset

September 4, 2002
Page 6

would also be the same as or substantially similar to the transaction described in Notice 2000-44 (the "Example").[11]

The Transactions more likely than not would not be considered "substantially similar" to Notice 2000-44. There are a number of factual differences between the Transactions and the transaction in Notice 2000-44. The Transactions did involve the Investor contributing his membership interest in World to International and claiming basis in International[12] based upon the World Options. However, the important difference is that the World Options did not produce a loss, or reduce any gain to be recognized, as was the case in Notice 2000-44. Rather, the loss in the Transactions results from an actual depreciated asset, the Remaining Options.

In contrast, the transaction in Notice 2000-44 results in an artificial, non-economic loss. In the Notice 2000-44 transaction, the taxpayer artificially inflates his basis in his partnership interest by including the cost of the purchased call options but not reducing his basis for the written call options under Section 752. When the taxpayer disposes of his partnership interest he has a non-economic loss, as a result of his previous basis manipulation.

In addition, the taxpayer in the Notice 2000-44 transaction had a net economic outlay that was nominal or zero. Here, Investor acquired the World Options for $2,250,000, a significant investment. The Investor also contributed stock valued at over $4,600,000 and $7,000,000 of cash to International in exchange for additional membership interests. Thus, Investor had a substantial economic outlay with respect to the Transactions.

Applying the test in Treasury Regulation Section 1.6011-4T(b)(1)(i), a transaction will be substantially similar to the transaction in Notice 2000-44 if it is expected to result in a similar type of tax benefit <u>and</u> is either factually similar or is based on a similar tax strategy. The tax benefit of the Notice 2000-44 transaction would appear to be the non-economic loss generated by the inflated basis in the partnership created through the use of offsetting options, which is lacking with respect to the Transactions. Even if the IRS were to argue that the tax benefit resulting from the Transactions is similar to that described in Notice 2000-44, the facts and tax strategy are different. Although the Investor used offsetting positions to claim basis in a partnership interest, Investor did not use that as a strategy to create an artificial loss. Instead, the loss arose from separate transactions entered into by International. In addition, Investor's investment in the Transactions was not nominal. Accordingly, the Transactions are likely neither factually similar to, nor based on a similar tax strategy as, the transactions described in Notice 2000-44.

The language in the Example is consistent with this conclusion. The purpose of the Example is to illustrate when a transaction is the same as or substantially similar to a listed transaction. The introductory language to the Example in Treasury Regulation Section 1.6011-4T(b)(1)(ii) uses this explicit language. The preamble to the revised regulations explains that:

---

[11]    Treas. Reg. § 1.6011-4T(b)(1)(ii), Example 1.

[12]    A portion of Investor's basis in International is also the result of contributions of cash and stock.

September 4, 2002
Page 7

> Some taxpayers and promoters have applied the <u>substantially similar</u> standard in an overly narrow manner to avoid disclosure. For instances, some taxpayers and promoters have made subtle and insignificant changes to a listed transaction in order to claim that their transactions are not subject to disclosure.... The IRS and Treasury believe that these interpretations are improper.

While the scope of some of the language in the Example is not entirely clear, we believe it would likely be interpreted in light of its express purpose to illustrate the definition of "substantially similar." For instance, the Example states that transactions using short sales, futures, derivatives or other offsetting obligations to inflate basis would be the same as or substantially similar to the transactions in Notice 2000-44. We do not interpret this sentence to mean that <u>every</u> transaction "using short sales ... to inflate basis in a partnership interest" is a listed transaction. Instead, we interpret this sentence, in light of the purpose of the Example, to mean that transactions that are described in Notice 2000-44, apart from the fact that they used short sales or futures instead of options (as was the case in Notice 2000-44), are listed transactions. Our interpretation is based on the regulatory framework, which provides that whether a transaction is a "listed transaction" is determined by testing the transaction against the transaction described in the Notice, and also on the fact that the express purpose of the Example was to illustrate the meaning of "substantially similar" and not to modify the Notice itself.

The Example also states that "the use of the inflated basis in the partnership interest to diminish gain that would otherwise be recognized on the transfer of a partnership asset" would be the same as or substantially similar to the transaction described in Notice 2000-44. This statement would appear to encompass an attempt to shift an artificially high partnership basis to an appreciated asset and thereby diminish gain recognized on the disposition of that asset. The sentence does not appear to apply to the Transactions, since they do not involve the use of an inflated basis to reduce the amount of gain recognized on the transfer of a partnership asset.

Based on the foregoing analysis and discussion, it is more likely than not that the Transactions would not be considered to be substantially similar to the transactions in Notice 2000-44.

**B.    Notice 2002-50**

Notice 2002-50 describes a transaction which uses "a straddle, a tiered partnership structure, a transitory partner, and the absence of a 754 election to allow [the] Taxpayer to claim a permanent non-economic loss." Notice 2002-50 identifies the following fact pattern as a listed transaction:

> This transaction involves partnerships manipulated through a series of steps carried out in the following order. No § 754 election is in effect at any relevant time. Step 1: Corporation acquires a majority interest in an upper tier partnership (UTP) at fair market value. Step 2: UTP acquires a majority interest in a lower tier partnership

September 4, 2002
Page 8

(LTP) at fair market value.  Step 3: LTP enters into straddles on foreign currencies and may acquire other assets.  Step 4: LTP terminates the gain leg of a foreign currency straddle.  LTP allocates a pro rata share of the gain to UTP, which in turn allocates a pro rata share of the gain to Corporation.  This gain increases the basis of each partnership interest.  Step 5: Corporation sells its interest in UTP to Taxpayer at fair market value.  This results in a loss to Corporation sufficient to offset the gain that was allocated to Corporation.  Step 6: Taxpayer purchases UTP's interest in LTP at fair market value.  UTP realizes a loss on this sale, but the loss is disallowed under § 707(b)(1)(A)[13] because Taxpayer owns more than 50% of UTP.  Step 7: LTP engages in a transaction that is intended to increase Taxpayer's basis in the LTP interest.  For example, LTP may incur a liability that Taxpayer guarantees.  LTP then terminates the loss leg of the foreign currency straddle and allocates a pro rata share of the loss to Taxpayer.  Step 8: Taxpayer sells the interest in LTP at its fair market value and realizes gain (for example, from the relief of liability).  Taxpayer then claims that this gain is offset under § 267(d)[14] by the amount of the loss that was disallowed to UTP under § 707(b)(1)(A).

ANALYSIS

The transaction described in this notice has been designed to use a straddle, a tiered partnership structure, a transitory partner, and the absence of a section 754 election to allow Taxpayer to claim a permanent non-economic loss.

Notice 2002-50 concludes that because the gain realized by the taxpayer on the sale of its interest in LTP does not correspond to any increase in the value of the assets within LTP, the loss previously disallowed on the sale of the LTP interest by the UTP cannot be used to offset the taxpayer's gain.  Notice 2002-50 also provides that a transaction will be considered "substantially similar" to the transaction described therein even if the last step of the transaction has not been completed, _i.e.,_ the partnership interest has not yet been sold.

The Transactions more likely than not would not be considered substantially similar to the transactions in Notice 2002-50.  As stated above, the key features of a Notice 2002-50 transaction are that it uses "a straddle, a tiered partnership structure, a transitory partner, and the

---

[13]    Section 707 disallows losses arising from sales or exchanges of property between a partnership and a person or other partnership that owns more than 50% of the interests in the partnership.

[14]    Generally, Section 267(d) allows the recapture of deductions previously disallowed due to the relationship between the parties to the transaction.

September 4, 2002
Page 9

absence of a 754 election to allow [the] Taxpayer to claim a permanent non-economic loss." Thus, the elements of a Notice 2002-50 transaction are (i) a straddle, (ii) a tiered partnership structure, (iii) a transitory partner, (iv) the absence of a Section 754 election and (v) a permanent non-economic loss.

Reviewing these factors there are some superficial similarities between the Transactions and the Notice 2002-50 transaction. First, the World Options in the Transaction may constitute a "straddle" for Federal income tax purposes as may some of the investments made by International. Second, there is no Section 754 election made in the Transactions.

However, the Notice 2002-50 transaction is distinguishable in certain crucial respects. First and foremost, the Transactions did not utilize a tiered partnership structure, a factor which was fundamental in generating the permanent non-economic loss described in the Notice. In the Notice 2002-50 transaction, when the gain from the options is recognized it is allocated to UTP and thus increases UTP's basis in the LTP (and in turn it increases the corporation's basis in UTP). Upon the sale of the interest in LTP to taxpayer, the offsetting loss is disallowed under Section 707. However, that loss remains available to offset the taxpayer's gain when he sells his LTP interest, or if he causes LTP to distribute or sell its assets. Thus, the tiered partnership structure is used to create a permanent non-economic loss.

In contrast, in the Transactions there is only one partnership,[15] International. There is no increase in basis arising from gain in a lower-tier partnership, and no corresponding deferred loss on the sale of the lower-tier partnership that will be available to offset taxpayer's future gain.

In addition, unlike the Notice 2002-50 transaction, there are no "transitory partners" in the Transactions. The four members of International do change their percentage ownership in the common and preferred interests of International during the Transactions but every member retains a more than nominal interest in International. Therefore, in the Transactions it is unlikely any of the parties would be characterized as transitory partners.

Notice 2002-50 states that a transaction will be considered to be the same as, or substantially similar to the Notice 2002-50 transaction even if the taxpayer has not engaged in the final step of the transaction, the sale of the partnership interest. Therefore, a transaction is covered by Notice 2002-50 even if the deferred loss created in Step 6 of Notice 2002-50 is not yet applied to offset gain. However, the creation of a deferred loss through the use of a tiered partnership remains the fundamental premise of Notice 2002-50, and that aspect is lacking in the Transactions.

Treasury Regulation Section 1.6011-4T(b)(1)(i) states that a transaction will be considered substantially similar to a listed transaction where the taxpayer is expected to obtain similar tax benefits and the transaction is factually similar or is based on a similar tax strategy.

---

[15] At all relevant times, World is a limited liability company with a single member and thus is treated as an entity disregarded from its member. Even if World is treated as a separate entity for these purposes, no lower tier is acquired or disposed of, as occurs in Notice 2002-50. Additionally, no loss is disallowed in the Transactions.

September 4, 2002
Page 10

However, as discussed above the Transactions would likely not be considered factually similar to the Notice 2002-50 transaction as they are lacking a key feature, the use of a tiered partnership to create a deferred loss and thus achieve a permanent non-economic loss. For the same reason, the tax strategy used in the Transactions is likely not similar to the tax strategy used in Notice 2002-50. Accordingly, it is more likely than not that the Transactions would not be considered substantially similar to the Notice 2002-50 transaction.

## IV.    Penalties

Neither the Code nor the Regulations impose any specific penalty for failing to disclose under Treasury Regulation Section 1.6011-4T.

Section 6664(c)(1) states that the underpayment penalty does not apply if there was "reasonable cause" for the underpayment and the taxpayer "acted in good faith". The IRS asserted in the preamble to the February 28, 2000 regulations[16], citing Treasury Regulation Section 1.6664-4(b)(1), that a failure to disclose when required "could indicate" that the taxpayer had not acted in "good faith" depending on all facts and circumstances (including why the taxpayer had not disclosed) and if so the reasonable cause exception would not apply even if the taxpayer had relied on professional advice, such as an opinion of counsel, relating to the underlying transaction.[17] The IRS apparently reads the statute to impose separate requirements of good faith and reasonable cause. If the IRS's reading of the statute is correct, this opinion would likely supply any required "good faith". However, Treasury Regulation Section 1.6664-4(c)(1), which the IRS does not quote, uses the "good faith" requirement in conjunction with a legal opinion to require only that the reliance itself must be in good faith (e.g., that the opinion correctly sets out all facts known to the taxpayer).[18] This regulation suggests that there is no independent "good faith" requirement and that the reasonable cause defense would apply as long as the taxpayer's reliance on the tax opinion on the underlying transaction is in good faith.

Moreover, taxpayers that are not C corporations need not rely on the reasonable cause exception to the substantial understatement penalty. For these taxpayers under section 6662(d)(2)(C), the understatement is reduced by any portion attributable to the tax treatment of an item (i) for which there was substantial authority and (ii) which the taxpayer reasonably

---

[16]    *See*, T.D. 8877 (March 2, 2000).

[17]    The IRS did not assert that the failure to disclose meant the taxpayer had not filed a return at all and so would be liable for a failure-to-file penalty under section 6651(a)(1). "Summary on Corporate Tax Shelter Disclosure Regs Clarified", 2000 TNT 41-15 (Feb. 29, 2000); *see also* Lee Sheppard, News Analysis -- Corporate Tax Shelter Disclosure: But Will It Work?, 2000 TNT 44-2 (Mar. 3, 2000).

[18]    Regs. § 1.6664-4(b) states: "Reliance on . . . professional advice . . constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. (See paragraph (c) of this section for certain rules relating to the advice of others.)" Regs. § 1.6664-4(c) then begins: "All facts and circumstances must be taken into account in determining whether a taxpayer has reasonably *relied in good faith* on advice (including the opinion of a professional tax advisor) . . . . [emphasis added]"

September 4, 2002
Page 11

believed was more likely than not proper.[19]  Treasury Regulation Section 1.6662-4(g)(4)(i)B)
states that the taxpayer may meet the "reasonable belief" test if he "relies in good faith" on a
more-likely-than-not tax opinion.  While the regulation also requires that the requirements of
Treasury Regulations Section 1.6664-4(c)(1) be met, unlike section 6664(c), neither section
6662(d)(2)(C) nor this latter regulation even arguably impose a separate "good faith
requirement".

     For the foregoing reasons, we believe that even if a court were to find that Investor was
required to disclose the Transactions, it is more likely than not that Investor would not be subject
to penalties under the Code, directly or indirectly, for his failure to disclose the Transactions.

## III.  Conclusions

     Based on the foregoing analysis and discussion, it is more likely than not that the
Transactions would not be considered substantially similar to the transaction described in Notice
2002-50 or Notice 2000-44, and therefore the Transactions more likely than not would not be
considered a "listed transaction" for the purposes of the disclosure requirements under section
6011.  We also believe that even if a court were to find that Investor was required to disclose the
Transactions, it is more likely than not that Investor would not be subject to penalties under the
Code, directly or indirectly, for his failure to disclose the Transactions.

     The opinions expressed herein are furnished by us solely for your benefit and thus may
not be relied upon by or delivered to any other person without our express, prior written
approval.  This opinion is furnished to you solely for your use in determining the federal income
tax consequences of the transactions described above and is not to be used, circulated, quoted, or
otherwise referred to for any other purpose without our express written permission.  Our
permission is not required in connection with any examination conducted or required by a

---

[19]  This reasoning does not apply to the substantial valuation misstatement penalty under section 6662(b)(3); since
the exception in section 6662(d) is limited to the understatement penalty, the taxpayer must rely on the
reasonable cause exception.  However, notwithstanding the IRS's contention in several recent field service
advice memoranda, FSA 200134002 (Mar. 23, 2001); FSA 200150001 (Aug. 2, 2001); FSA 200224011 (Mar.
5, 2002), the Transactions should not be subject to this penalty because, unlike the situation at which section
6662(e) was aimed, any misstatement of basis would result from a legal, not factual, dispute.  *See* Joint
Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981 at 332.  These FSAs
cite *Gilman v. Comm'r*, 933 F.2d 143 (2d Cir. 1991), *aff'g* T.C. Memo. 1989-684, *cert. denied*, 502 U.S. 1031
(1992), for the proposition that the overvaluation penalty could apply even where tax benefits were disallowed
entirely because a transaction lacked economic substance.  Although the court's opinion does not specifically
address this point, the facts indicated that the lack of economic substance bore directly on the fact that the
property was overvalued when it was acquired, *i.e*, the purchase price was so high that in the court's view it
was impossible for the taxpayer to make a profit from the transaction without regard to tax benefits. Thus,
*Gilman* ought to be read, consistent with the legislative history noted above, to permit the imposition of the
penalty in those cases in which an overvaluation of property as a matter of fact, as opposed to as a matter of
law, was the cause of, and was integral to, the lack of economic substance.  Other appellate courts have also
upheld the imposition of the penalty in such a case.  *See, e.g., Massengill v. Comm'r*, 876 F.2d 616 (8th Cir.
1989); *Merino v. Comm'r*, 196 F.3d 147 (3d Cir. 1999).

006274

September 4, 2002
Page 12

governmental or regulatory body, including disclosure to your outside accountants or lawyers in order to allow them to assist with such an examination on your behalf.

In addition, our opinion is based on the law and other authorities in effect on the date hereof, which are subject to change, possibly with retroactive effect. Any such changes could affect the opinions expressed herein. We assume no obligation to update our opinion in light of any subsequent changes in law. All opinions expressed herein relate solely to the federal income taxes discussed. No opinions are expressed or implied as to any other federal income tax issues or any foreign, state or local tax issues.

Very truly yours,

Proskauer Rose LLP

Proskauer Rose LLP

006275

# Exhibit J


# Examining Officer's Activity Record

| EXAMINING OFFICER'S ACTIVITY RECORD | Examining Officer William Conway | Date Assigned/Opened |
|---|---|---|
| **Taxpayer (use preprinted label if possible)**<br>Name   Fidelity International Currency Advisor A Fund ,LLC<br>Address   C/O Michael J. Egan, Manager<br>    116 Flanders Road. Suite 3000<br>    Westboro, Ma. 01581<br>**Business Name: Same**<br>**Address**<br><br>**Phone Business ( 508 )898-3800 ext 352**<br>    **Fax ( )** | **Taxpayer's Representative.**<br>Patrick Shea CPA   See Form 2948 for additional POA/,<br>Name<br>Address<br><br>   \_\_\_\_ TP Auth/ | |

## Contacts and Activities

| Date | Loc. | Cont. | Time on Activity | Remarks, Notes, Actions Taken |
|---|---|---|---|---|
| 5/7/2004 | | | 8 | Case assigned. Referrals made by Team Mang for international and Financial Products. Read through information provided with case file. Call received from Chief Counsel Atty John Aletta. He will be assigned counsel on case. Copy of Partnership return faxed to John Alet Discussed case with manager. Researched possible Son of Boss issues and transactions |
| 5/11/04 | | | | Case assigned to Mark Corrigan financial specialist. Per discussion with manager Peter McIntyre will be international agent assigned t case. Appointment letter prepared. Appt to be scheduled for 6/21/04 Pub 1 and Noitce sent to taxapayer |
| 5/17/04 | | | 8 | Taxpayer (Egan) will be sent settlement offer. Not sure if what version Son of Boss Case but offer will be sent per direction Tax Rod Oakes. |
| 5/19/2004 | | | 4 | Started researching 988 losses. Son of Boss transactions. |
| 06/01/2004 | | | | Started preparing audit plan. Planning meeting will be held prior to initial interview. Started preparing initial letters. NBAP will be delivered on first day of appointment.<br>Appt Letter for TMP returned undeliverable Appt letter for Ptr. Returned undeliverable.<br><br>New address 116 Flanders Rd. Westboro, Ma. Appt. Letter prepared with current date and |

1IRS1129

# Examining Officer's Activity Record

| | | | | |
|---|---|---|---|---|
| | | | | hand delivered to 116 Flanders Rd.<br><br>Research Halt memo and effect on case. |
| 6/1/04 | | | 4 | Disk received from Tim Erickson. Copied and mailed to John Aletta. |
| | | | 7 | Telephone call from John Aletta. He received disk. Discussed transaction. Transaction has some elements of Son of Boss. Advised John Aletta that I would be sitting down with Mark Corrigan Financial Products Specialist on Jun 14. |
| 6/14/04 | | | 4 | Telephone call made to Pat Shea. Requested corrected address for TMP. Appointment scheduled for June 21, 2004 will be cancelled. Mr. Shea stated that he is putting together Information. Agent will call on June 21, 2004 to get status of information.<br><br>Met with Revenue Agents Mark Corrigan and Berny Kaufman financial specialist agents. We through case with agents. Went through transactions. |
| 6/15/04 | | | 6 | Researching currency options. Went through information that Mark Corrigan put together. Mark will analyze the specific option transactions and underlying currency transactions and brokerage statements. He wi put the information into program to address th economic reality issue of the transaction. |
| 6/21/04 | | | | Related taxpayer will file settlement offer on th transaction. Discussed case with Pat Shea taxpayers POA. Requested that the examinati be scheduled in August do to vacations and end of quarter reports. Mr. Shea stated it will take some time to get all the information completed but wants it to be complete when I out. He suggested August 16th but called bacl requestiung August 23rd. Advised POA that it will be expected that all information be provided. Appt will be August 16th |
| 7/21/04 | | | 8 | Pre-Planning meeting held with International, Financial Products , Counsel along with Group Manager Debra Morrill, International Manager Denis McSweeney and International Territory manager Stan Locke. Case discusse along with discussion on duties of each specialist. Went through KPMG information |



# Examining Officer's Activity Record

| | | | | | |
|---|---|---|---|---|---|
| | | | | | received with Counsel John Aletta |
| 7/2204 | | | | 4 | Continued reading through information in case |
| 8/16 | | | | 8 | Interview held at Partnership address. Pat She Stephanie Denby and John Monaco of PWC. Started going through records presentede |
| 8/17 | | | | 8 | Audit continued at Patnership. A meeting will scheduled which financial products and International can discuss issues. |
| 8/30/04 | | | | 8 | Met with Mark Corrigan and Peter MacIntyre to plan for meeting on the 2nd. Went over case file and information received to date. |
| 9/2/ | | | | 6 | Appointment held at taxpayer with audit team along with Group Manager Debra Morrill and International Group Manager Denis McSweene Taxpayer were represented by Mox Tan of Helios Financial. Pat Shea, John Monacco, Stephine Denby. Along with Michael Egan. Discussion held on the transaction. |
| 9/3 | | | | 2 | Discussed case with Mark Corrigan and Questions which need to be developed. Questions will be sent to John Aletta. |
| 9/13 | | | | 8 | Prepared memo to be sent to counsel to determine whether case is a son of boss case. |
| 9/14 | | | | 2 | CONFERENCE CALL HELD WITH john MONACCO AND PAT SHEA TO GO OVER STATUS OF ISSUE. ADVISED THAT MEMO WA GOING TO BE SENT TO COUNCIL FOR DETERMINATION. |
| 9/15 | | | | | CONFERENCE CALL HELD WITH MONACO SHEA DEBRA MORRILL AND MYSELF. Discussing memo that was prepared and sent up. |
| 9/17 | | | | 4 | WORKED ON CASE FILE  Conference call with Group Manager Sidney Saewitz of Cincinnati. Group has a similar case. Went over basic fac of transactions. |
| 9/20 | | | | 4 | MEMO E-MAILED TO JOHN ALETTA DISCUSSED MEMO WITH JOHN. HE WILL FORWARD THE REQUEST UP THE CHAIN. Worked on IDR's which will need to be approved. |
| 9/22 | | | | | Corrected IDR's as directed by John Aletta. |
| 9/27 | | | | 4 | Went through case file. |
| 10/5 | | | | 1 | Discussed status of memo. |
| 10/6 | | | | 1 | Checked recent information on Son of Boss. |

# Examining Officer's Activity Record

| Date | | | | | |
|---|---|---|---|---|---|
| 10/18 | | | | 6 | Planning meeting held with Debra Morrill Deni McSweeney, Mark Corrigan and Peter McIntyre Meeting scheduled for 10/19 at taxpayers with Jim Fee. |
| 10/19/04 | | | | 8 | Meeting held at taxpayers . Discussion of fact to determine whether Fidelity is a Son of Bos Case or other type shelter/transaction and whether taxpayer will have appeal rights.Jim Fee of Chief Counsel attended the meeting in order to help in making determination as to whether this is a Son of Boss Case. See notes in history section. Determination should be made with a few weeks. |
| 10/26'04 | | | | 2 | Spoke with Pat Shea will be faxing letter letter received. Lists out taxpayers position on Son Boss. |
| 11/1/04 | | | | 8 | No determination made to date. Prepared Form 872 P and sent to partnership, TMP and the Power of attorneys. Read through letter sent previously. |
| 11/22/04 | | | | 4 | Determination as to whether taxpayer is Son o Boss has not been made. Prepared follow up letter for 872 P. Mailed on the 24th. Call to be made to Pat Shea. It is taxpayers intentions to sign an extension if it is detemined that they a not a son of boss transaction. If they are not going to be given appeal rights they will not sign statute extension. Decision may be made by Dec 1st. |
| 12/1/04 | | | | 1 | No determination made. Taxpayer reiterated that they would sign a statute extension when determination is made. |
| 12/2/04 | | | | 1 | Worked on case file. |
| 12/14/04 | | | | 8 | Worked on case file. Continued working throu information obtained through audit. |
| 12/16/04 | | | | 8 | Individual outside basis calculation has been provided. Went through corporate records to determine numbers are accuarately reflected. No determination made as to whether taxpaye will be apprised of there appeal rights. |
| 1/4/05 | | | | 2 | Called Pat Shea. Discussed that no decision was made and no decision is expected any tin soon. |
| 1/10/05 | | | | 8 | Worked on case. Researched closing of case and specific procedures relating to |

1IRS1132

# Examining Officer's Activity Record

| | | | | | Son of Boss |
|---|---|---|---|---|---|
| 1/14/05 | | | | | Conference call with John Monaco. John was looking for information so he can convince his TEAM to sign extension. Advised John that no determination was made and probably will not be made before the FPAA is sent out. |
| 1/18/05 | | | | 4 | Researched information on bonds presented information to Patrick Shea. Discussed bond procedure with Shea. Met with Pat Shea |
| 1/25/04 | | | | 8 | Met with Pat Shea and received copies of 2002 and 2003 1040 returns. Examination will be initiated. Advised Patrick Shea that FPAA will prepared and issued shortly. Pat Shea presented Agent with letter that was faxed to Jim Fee and and Johnathan Zelnik. |
| 1/26 | | | | 8 | Worked on FPAA. Received Mark Corrigans wwiteup  Worked on RGS, Required adjustments needed to be listed on RAR cann be done with RGS program.  Printed and Save RAR to adobe file. *DO NOT USE RAR DISK FC REPORTS" USE ADOBE 4605a FOR ANY CHANGES" |
| 1/27 | | | | 10 | WORKED on FPAA. Pat Shea called stating tha they will be making a payment in form of cash bond. Payment will be 30 Million dollars. Emailed preliminary FPAA and writeup to John Aletta and Rick Gannon.  Rick Gannon will review and make corrections and additions. A prepare argurment on case. |
| 1/28 | | | | 9 | Picked up payment from Pat Shea. Discussed letter.  Went back to office processed check. Mailing documents checked. Rick Gannon will work on case this weekend and should have draft maybe on Monday.. |
| 1/31 | | | | 10 | Spoke to Rick Gannon.  Continue working on Writeup.  Continued working the case for closing. FPAA is being worked on by John Aletta Discussed case with  Counsel. |
| 2/1 | | | | 9 | Continued working case. Draft Form 886a sen: by John Aletta. Started reviewing. Worked on penalty writeup for individual closing. Penalty applicable at investor level. |
| 2/2 | | | | 9 | Continued working case file. Organized workpapers, Read through Form 886a |

# Examining Officer's Activity Record

| 2/3 | | | | 9 | Continued preparing case for closing. |
|-----|---|---|---|---|---|
| 2/4 | | | | 6 | CASE completed. |
| | | | | | Submitted to MGR - |
| | | | | | CALLED Ron Douglas |
| | | | | | No Return call. |

# Examining Officer's Activity Record

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| 2/4 | | | | | Case given to manager Called Rod Douglas re tefra linkage. |
| 2/11 | | | | | Spoke to Ron Douglas tefra coordinator in Ogden. Case has been established and NBAP was sent out on Feb 7.\ |
| 2/22/05 | | | | | Decision received regarding request for advice whether it was determined that this case was substantially similar to notice 2000-44. It was determined that it was. Taxpayer will not be allowed to apprise themselves of appeal rights. Pat Shea was called and informed of the decision. |
| 2/24/05 | | | | | Penalty IDR prepared and sent to counsel for approval. Investor level |
| 3/1 | | | | | Emailed Richard Gannon requesting status of Penalty IDR along with status of FPAA and 886 |
| 3/3 | | | | | Met with Pat Shea and Michael Egan. Went over status of partnership. Letter presented requesting agent to give them a written analysis as to how decision was met. |
| 3/7/05 | | | | 8 | Updated files and closing documents. No response from taxpayer.Printed the last revised FPAA and 886A. |
| | | | | | |
| | | | | | |
| | | | | | |

# Exhibit K

Fidelity International Currency Advisor A Fund LLC
1065 200112
**History**        — *CoPy*

POA- filed by Patrick Shea and Stephanie Denby.

Richard Egan -- founder of EMC corporation.  Mr Egan served as Ambassador to Ireland in 2001.

Michael Egan  Richard Egan son  signed the Form 1040 under power of attorney  filed with tax return.
Discussed POA with  Counsel John Aletta who stated that this POA is valid..

his case assigned for potential Son of Boss issue.

8/16/04  Interview held with Stephanie Denby, Pat Shea , John Monaco .
Stephanie Denby is an attorney who has assisted the Egan family with both legal and financial advice since 1994.

Audit Process/ Appeals rights explained to POA's

Fidelity International Currency Advisor A fund llc History- Fidelity was formed in 2001. In 2001 Mr Egan joined with other partners formed the partnership  as part of his risk management strategies considering Stock Holdings   and how it is effected by world econonmy and foreign currency fluctuations.

In order accomplish this Mr. Egan approached KPMG to develop  a stratedgy to hedge his investments.
Per Pat Shea and Stephanie Denby they told KPMG that they did not want to be involved in any types of shelters or any investment that could be characterized as shelter.

Fidelity International Currency Advisor Fund A- set up alternative investments.-  Mainly  hedging protection.

POA was questioned as to the name of the partnership.  Partnership was named Fidelity for privacy reasons.
In todays internet world they did not want Mr. Egans investments to become public knowledge so they used a name they would be relatively inconspicuous.

They stated that they were mystified that KPMG had to  turn over this investment to the Government.  They were told by KPMG that their investments would not be on any lists or anything to do which may be construed a tax shelter.
At this point they just want to show that the transactions have both economic substance and true ongoing business purpose and to Clear Mr. Egans reputation.

WC
June 15, 2004
9/2/2004
10/10/04
4/21/05

*CoPy*

WP REFERENCE B **27**

13IRS00296

Fidelity International Currency Advisor A Fund LLC
1065 200112
**History**    C o P y

Partnership financial plan was to diverse his exposure from his position within EMC. EMC has entered the world wide market which is effected by both world economy and currency fluctuations. In order to protect his wealth he hedging Foreign Currency transactions to accomplish this goal. Thus Fidelity was formed.

KPMG put Mr Egan in touch with Helios Trading LLC. – Helios was a spin-off of Bank of America.
Helios is a large financial firm. Helios brought in Sam Mahoney Irish Citizen and Alpha which is a option trading firm.

Mr. Egan was founder and chairman of the Board of EMC. During his years he had many restrictions on when and how much stock he could sell. In 2001 Mr. Egan became Ambassador to Ireland which required him to divest his portfolio.

As part of overall strategy and tax planning.

Discussion was held pertaining to tax Advice on the transactions. Tax advice was obtained from Wood Brown Namely Raymond Ruble who no longer works at the firm.

Per POA's Although tax planning was involved with the transaction it was not the purpose for setting up this entitiy. And not the purpose today. It was repeated that the partnership has a firm business purpose.

Listed Transactions- It was discussed in detail whether taxpayer has entered into any listed transactions as described in notice 2000-44.
In response to Listed Transaction IDR - **Per POA's they have not entered into any listed transactions and they were not required to disclose.**

To their knowledge no disclosures were ever mailed in or attached to tax return. They reiterated that Mr. Egan and Fidelity is getting caught up in the shelter problems of KPMG and from the beginning they were told that they were not involved in any listed transactions or similar transactions and that this investment would not be classified by KPMG as entity that would not be on any lists that would remotely link them to a shelter transaction.
They believe that the transctions and Fideltiy in general has sound business purpose and everything is done to the letter of the law.

WC
June 15, 2004
9/2/2004
10/10/04
4/21/05

WP REFERENCE B

β²·⁸

Fidelity International Currency Advisor A Fund LLC
1065 200112
**History**

C o p 7

The following were related to meeting held with examination group and taxpayers representatives. As the meeting related to both Mr. Egan and Fidelity International Currency Advisor Fund A, LLc the notes will be included with the individual return and The partnership return.


9/2/04
meeting
Attendence – John  Monaco
              Stephanie Denby
              Pat Shea
              Mox Tan   Helios Financial
              Mike Egan manager Fidelity
              Mark Corrigan- Financial Products Specialist
              Peter McIntyre- Intl Agent
              Bill Conway- Team Member
              Denis McSweeney Intl Team Manager
              Debra Morrill  Team manager
              John Aletta  Chief Counsel
              Alpha – on phone
Meeting held at taxpayers for discussion of whether this case falls under Son of Boss.   Taxpayer to present Business purpose Of transactions.

Michael Egan requested that he gives background and reason for investments.

Michael Egan explained that he handles business investments for the Egan Family.  This includes a Huge portfolio Of investments and that Fidelity was formed to protect the investments mainly investment in EMC stock which Mr. Egan is one of the founders and board member. .

                                       WC
                           June 15, 2004
                             9/2/2004
                             10/10/04
                             4/21/05

                  WP REFERENCE  B

B 2 1

13IRS00298

Fidelity International Currency Advisor A Fund LLC
1065 200112
**History**

*Copy*

Michael Egan stated that his father was the type of person to put all his money in a checking account and not be concerned about investing money. Michael Egan – who stated he is a graduate of U Mass with a engineering degree. It was decided that Michael Egan would handle the investments for the Egan Family

During 2001 Mr. Egan became Ambassador of Ireland. – As part of becoming ambassador Mr. Egan had to Diversify his EMC holdings which a good portion of Mr. Egans wealth was tied up in EMC stock. As a Board member Mr. Egan had very strict restrictions on when he could sell EMC stock.

Part of the overall strategy was to invest in a way to diversify his portfolio so all the wealth was not tied up in EMC stock Family started to diversify in the 90's. Investing in real estate and became a major player in real estate in the area. As wealth started to grow their was a need to to spend more time and energy in managing investments. Michael Egan stated that he became the financial manager for the Family Wealth.

As part of his overall planning and concerns especially with much of the wealth tied up in EMC stock he stated he contacted the accountants- KPMG and asked for a investment plan that would meet the overall goals of the family. KPMG developed Fidelity. KPMG involved both Helios and Alpha. Helios brought in Mr. Mahoney as a partner. This was done since Mr. Mahoney had international exposure . Richard Egan did not know Mr. Mahoney prior to transaction.

Michael Egan stated that they told KPMG that they did not want to get involved in any tax shelters or any investment that could be considered a shelter. Mr. Egan stated that they would be "declaring war" on KPMG if it is determined that this is a shelter.

Taxpayer believed that this partnership was specifically set up for them and they believed was not part of any packaged shelter.

* Agent clarified the point that Egans approached KPMG and asked for the overall plan.

As part of the meetings with KPMG a plan was developed to set up Fidelity International Currency Advisor Fund A. The overall stratedgy was to find an instrument that would protect family wealth especially the heavy exposure they have in EMC company and with the strict restrictions MR. Egan had on selling and buying stock and that they were trying risk control.

Michael Egan presented background on EMC and what happened in 2001. EMC is a publicly traded internet company that makes a product. Servers and misc computer communication equipment. In 2001 Value of EMC stock declined as the stock market in general especially in the internet area declined. - Michael Egan stated that he did not understand this since they made an actual product. At one time they were one of the largest companies and in 2001 the stock crashed.

WC
June 15, 2004
9/2/2004
10/10/04
4/21/05

WP REFERENCE  B

*B 30*

13IRS00299

Fidelity International Currency Advisor A Fund LLC
1065 200112
**History**

*Copy*

Business Purpose- Michael Egan stated that one of his concerns was that EMC was expanding in Foreign Countries and they were developing a plan to protect Dollar Fluctuation in the world economy and the effect the dollar fluctuation had on the value of EMC stock.

They decided that the best was to invest in foreign currency options as way to hedge against the dollar fluctuation and the effect it would have on EMC stock. They felt this would be a good way to approach risk control since they were holding essentially a single stock position with EMC.

- Mark Corrigan the Financial products specialist – discussed why an individual would be concerned in investing in currency options to hedge the foreign currency market for a publicly traded company which most likely enters into their own hedges to protect the dollar fluctuation.

No proof could be offered that the value of EMC stock was effected by the dollar fluctuation in the Foreign markets. Taxpayer position was that this hedge was a win/win proposition.

Business purpose of the Interest rate transactions. The second investment in the interest rate transactions was also part of their overall investment strategy and risk control.

In 2001 the Egans were involved with financing mainly through Citibank on certain capital leases which had inherent LIBOR risk. One of their investments Westship which holds helicopter and jet leases has a line of credit that is directly linked to LIBOR . Westship had approximately 100 million dollars of debt.
They felt that a good way to reduce the risk in interest rate changes were to enter transactions that were effected by LIBOR rate were they could be in a win/win situation. Thought behind these transactions were that if the interest rate goes up they would make money on the hedge. If the interest rate goes down they would save money on the leases.

Michael Egan stated that all these transactions had a chance of making money. And that they had sound business purpose. All investments were made using

Michael Egan stated that he controlled when transactions were made subject to agreements.

- Tax Opinion- Michael Egan stated that they did not just hop into this partnership without getting opinions. Mr. Egan stated that KPMG provided firm Sidney Austin Brown to provide tax opinion of the transaction. They also went out to second firm Proskaueer Rose also provided a tax opinion. Over and above that they said they contacted several different firms to get an opinion. ( no response was provided as to why no opinion was provided.

WC
June 15, 2004
9/2/2004
10/10/04
4/21/05

WP REFERENCE B

*B81*

13IRS00300

Fidelity International Currency Advisor A Fund LLC
1065 200112
**History**

COPY

Samuel Mahoney- discussion was held on Samuel Mahoney – Irish citizen who became partner in Fidelity- Mr. Mahoney was brought in since he was known in international markets and it was felt that he would be a good partner. Samuel was known to Helios and Helios got Mahoney to investment in the partnership. Mr Egan did not know Mr. Mahoney prior to formation of the partnership. Mox Tan stated that Mr. Mahoney was known to Helios.

-    Stephanie Denby stated that Mr. Tan was here to discuss the business purpose of the transaction and not discuss Mr. Mahoney.

Meeting reconvened with Michael Egan stating that they will answer any questions they can as it pertains to Fidelity and Mr. Mahoney. Taxpayers stated that it was business strategy that drove their need to purchase some of Mahoney's interest in Fidelity.

Michael Egan stated that he believes that they did not enter this deal to in order to purchase a shelter. They believe they had sound business purpose in investing this partnership.

Discussion held on next step. -    Determination will need to be made as to whether this is a Son of Boss transaction and how the case is processed.

September 17,2004 Request for Advice Memo submitted to counsel for determination as to whether this is a Son of Boss Case.

WC
June 15, 2004
9/2/2004
10/10/04
4/21/05

WP REFERENCE B

B3a

13IRS00301

Fidelity International Currency Advisor A Fund LLC
1065 200112
**History**

*Cu ρ₃*

October 19, 2004 - meeting

Attendence – John  Monaco
                Tom Cullinane
                N. Gerold Cohen
                Stephanie Denby
                Pat  Shea
                Mike Egan
                Mark Corrigan
                Peter McIntyre
                Bill Conway
                 Mark Chan
                Denis McSweeney
                Debra Morrill
                James Fee
                John Aletta

Mike Egan  started off the meeting with background which was presented on September 2nd for the benefit of Jim Fee and new POA,s.  The purpose of the meeting pertained to whether this case and similar cases are Son of Boss case and whether it is substantially different then Son of Boss case. Taxpayer states is that they want to be able to go to appeals and To mitigate the penalty and maybe the tax.

Mr. Cohen and  Tom Cullinane  presented that this case was not substantially similar in may aspects then a son of boss case. They stated that in fact it has aspects of several different listed transaction  and not particularly to Son of Boss. Fact are that the transactions are not Substantially similar and that settlement letter should never had been issued to Mr. Egan or any other investor in this type of transactions. Settlement offer was to be used strictly for Son of Boss Cases.


Mark Corrigan – illustrated on the board the entire transaction for the group. In particular he pointed out the  portion of the transaction that made it a son of boss – case. Namely the stepped up basis on one leg of the transaction in order to give Mr. Egan Basis.

---------------------------------------------------------------------------------------------------------------------

WC
June 15, 2004
9/2/2004
10/10/04
4/21/05

WP REFERENCE  B

*β3 ᴊ*

Fidelity International Currency Advisor A Fund LLC
1065 200112
**History**

*Co/7*

**Transaction was deemed to be a Hybrid  Son of Boss listed transaction by counsel. Taxpayer will not be allowed any appeal rights on the issue.  See E-mail for additional information.**

4/21/05- Dual procedures- dual procedures for the Son of Boss issue are no longer being pursued. All items relating to the Son of Boss issue  appear on Partnership return.  FPAA issued on partnership return.   Indivdual return will be closed to TEFRA unit if no other issues exist.

**See workpaper for additional information.**

WC
June 15, 2004
9/2/2004
10/10/04
4/21/05

WP REFERENCE  B

*B-34*

13IRS00303

# Exhibit L

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner,　　　) ) ) ) | |
| Plaintiff,　　) ) | Case Nos.:  05-40151-FDS & 06-40130-FDS |
| v.　　) ) | |
| UNITED STATES OF AMERICA,　　) ) | September 27, 2007 |
| Defendant.　　) ) ) | |

## PLAINTIFF'S NOTICE OF DEPOSITION PURSUANT TO F.R.C.P. 30(b)(6)

Please take notice that, on October 19, 2007, commencing at 10:00 a.m., at the offices of McKee Nelson LLP, 1919 M St., NW, Suite 200, Washington, DC, Plaintiff will take the deposition of the Internal Revenue Service pursuant to Fed. R. Civ. P. 30(b)(6).  The deposition will be recorded by stenographic means before a person duly commissioned to administer oaths in the jurisdiction where the deposition will be taken.

Defendant is directed to designate one or more agents from the Internal Revenue Service to testify on its behalf on the matters enumerated in Attachment A.  Plaintiffs request that Defendant identify its designee(s) at least five days prior to the deposition.

Dated this 27th day of September 2007.

PLAINTIFF
FIDELITY INTERNATIONAL CURRENCY ADVISOR
A FUND, L.L.C., by the Tax Matters Partner

*Lena Amanti*

David J. Curtin, D.C. Bar #281220
Ronald L. Buch, Jr., D.C. Bar #450903
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone: (202) 775-1880
Facsimile: (202) 775-8586
Email: dcurtin@mckeenelson.com
        rbuch@mckeenelson.com
        lamanti@mckeenelson.com


John O. Mirick, BBO #349240
MIRICK, O'CONNELL, DEMALLIE
& LOUGEE, LLP
100 Front Street
Worcester, MA 01608
Telephone: (508) 791-8500
Facsimile: (508) 791-8502
Email: jomirick@mirickoconnell.com

## ATTACHMENT A

## DEFINITIONS

1.  "DAD" means the distressed asset/debt transaction described in the IRS coordinated issue paper LMSB-04-0407-031 (Apr. 18, 2007).

2.  "FICA A Fund" means Fidelity International Currency Advisor A Fund, LLC.

3.  "HOMER" means Hedge Option Monetization of Economic Remainders.

4.  "IRS" means the Internal Revenue Service and the IRS Office of Chief Counsel, including each of their respective internal divisions.

5.  "PICO" means Personal Investment Company and the transaction described in IRS Notice 2002-65, 2002-2 C.B. 690.

## TOPICS OF TESTIMONY

1.  The definition of "substantially similar," as found in Notice 2000-44, 2000-2 C.B. 255, including where that term is defined, if it is, by the IRS, if and how it has been defined by the IRS, and the identity of all guidance provided or public statements made by the IRS (or the U.S. Department of Treasury) or its representatives to the public concerning the term's definition, its application, or the factual nature of the term or its application.

2.  The definition of "substantially similar," as found in Treas. Reg. § 1.752-6(b)(2), including where that term is defined, if it is, by the IRS, if and how it has been defined by the IRS, and the identity of all guidance provided or public statements made by the IRS (or the U.S. Department of Treasury) or its representatives to the public concerning the term's definition, its application, or the factual nature of the term or its application.

3.  The facts of the FICA A Fund transaction that make it substantially similar, as asserted in this case, to the facts of a transaction described in Notice 2000-44.

4.  The facts of the FICA A Fund transaction that make it substantially similar to the facts of transactions described in any IRS Notice other than Notice 2000-44 and the identity of each of those other notices.

5.  The facts of the FICA A Fund transaction that make it substantially similar or not substantially similar to the facts of the HOMER transaction.

6.  The facts of the FICA A Fund transaction that make it substantially similar or not substantially similar to the facts of the PICO transaction.

7.    The facts of the FICA A Fund transaction that make it substantially similar or not substantially similar to the facts of the DAD transaction.

8.    The facts of the PICO transaction that make it substantially similar or not substantially similar to the facts of a transaction described in Notice 2000-44.

9.    The facts of the HOMER transaction that make it not substantially similar to the facts of a transaction described in Notice 2000-44.

10.   The facts of the DAD transactions that make it not substantially similar to the facts of a transaction described in Notice 2000-44.

11.   The facts of the FICA A Fund transaction that make it substantially similar or not substantially similar to the transactions in the pending case of *Fidelity High Tech Advisor A Fund, LLC v. United States*, Nos. 06-40243 & 06-40244 (D. Mass. filed Nov. 13, 2006).

12.   The process, procedures, standards, and IRS positions or titles involved in determining whether a transaction is substantially similar to a transaction described in Notice 2000-44.

13.   The process, procedures, standards, and persons involved in determining that the FICA A Fund transaction is substantially similar to a transaction described in Notice 2000-44.

**Certificate of Service**

I hereby certify that on September 27, 2007 a copy of the above document, PLAINTIFF'S NOTICE OF DEPOSITION, was mailed by First Class U.S. mail postage paid, and properly addressed, to the following:

Dennis M. Donohue
U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C.  20044

Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email: lamanti@mckeenelson.com

# Exhibit M



**U.S. Department of Justice**

**Tax Division**

*Facsimile No. (202) 514-5238*
*Trial Attorney: Heather L. Vann*
*Attorney's Direct Line: (202) 307-2822*

*Please reply to:  Civil Trial Section, Northern Region*
*P.O. Box 55*
*Ben Franklin Station*
*Washington, D.C.  20044*

5-36-10254
CMN 2005106280

October 17, 2007

Via E-Mail and Federal Express

Ronald L. Buch, Jr., Esquire
McKee Nelson LLP
Suite 200
1919 M Street, NW
Washington, DC 20036

        Re:    *Fidelity Int'l v. United States*, Civ. No. 05-40151 (D. Mass.)

Dear Mr. Buch:

        Enclosed please find the United States' Objections to Plaintiff's Notice of Deposition of the IRS Pursuant to F.R.C.P. 30(b)(6).  If you have any questions or comments, please call me at the number above.

                        Sincerely,

                        *Heather L. Vann*

                        HEATHER L. VANN
                        Trial Attorney
                        Civil Trial Section, Northern Region

IN THE UNITED STATES COURT FOR THE
DISTRICT OF MASSACHUSETTS

FIDELITY INTERNATIONAL CURRENCY   )
ADVISOR A FUND, L.L.C., by the Tax Matters )
Partner,                                  )
                                       )
             Plaintiff,             )
                                       )
        v.                           ) Civil Nos. 05-40151-FDS & 06-40130-FDS
                                       )
UNITED STATES OF AMERICA       )
                                       )
           Defendant.          )

### UNITED STATES' OBJECTIONS TO PLAINTIFF'S NOTICE
### OF DEPOSITION OF THE IRS PURSUANT TO F.R.C.P. 30(b)(6)

The United States objects as follows to plaintiff's Notice of Deposition (the "Notice of

Deposition") of the IRS pursuant to Fed. R. Civ. Pro. 30(b)(6), dated September 27, 2007, on the

grounds that each and every matter listed on Exhibit A of the Notice is an improper subject for

testimony.

### GENERAL OBJECTIONS

1. The United States objects to the Notice of Deposition as the testimony sought is not

relevant to this action or is not reasonably calculated to lead to the discovery of admissible

evidence as is required by Rule 26(b)(1) of the Federal Rules of Civil Procedure.

2. The United States objects to the Notice of Deposition because it seeks to elicit

testimony on a pure issue of law or the application of facts to a legal issue rather than on factual

matters.

3. The United States objects to the Notice of Deposition because it effectively seeks to

inquire into the legal contentions of the United States. Discovery into the contentions of parties

2806353.1

- 2 -

are properly examined through contention interrogatories, not Rule 30(b)(6) depositions. *See*

*SEC v. Buntrock*, 2004 U.S. Dist. LEXIS 12036 (N.D. Ill. 2004). Plaintiff already has an

outstanding contention interrogatory asking: "Does Defendant contend that the Transactions are

the same as or substantially similar to a transaction described in IRS Notice 2000-44, 2000-2

C.B.255? If so, set forth the bases for, and all facts and evidence supporting, Defendant's

position." *See* Plaintiff's Fourth Set of Interrogatories, No. 26.

4. The United States objects to the Notice of Deposition because the testimony sought

attempts to circumvent the Court's past orders that information regarding internal IRS

procedures, policy, discussions, analyses and/or conclusions is not discoverable. Specifically, on

May 4, 2007, the Court issued a Memorandum and Order (which was Amended on May 10, 2007

but to which no substantive changes were made) denying plaintiff's motion to compel filed

March 2, 2007 and on October 2, 2007, the Court issued an oral opinion denying plaintiff's

motion to compel an IRS memorandum. Both of plaintiff's motions to compel were denied, in

part, because the information plaintiff sought was not relevant to the instant case. Plaintiff's

March 2007 motion to compel sought, *inter alia*, to compel the production of "documents

relating to the Internal Revenue Service's ("IRS") determination that the transaction in this case

is the same as or substantially similar to a transaction described in Notice 2000-44." On May 4,

2007, the Court issued a Memorandum and Order denying that motion and finding that the

relevance of such documents was "dubious at best." And, in the Court's oral opinion of October

2, 2007 denying plaintiff's motion to compel an IRS memorandum, the Court stated that "as I

indicated in my earlier memorandum, I have substantial doubt that documents of this nature are

2806353.1

- 3 -

relevant, at least as to the liability issues, or that their disclosure is likely to lead to the production of relevant evidence." (Tr., p.3-4).

5. The United States further objects to the Notice of Deposition because it seeks testimony protected by the deliberative process privilege.

6. The United States also objects to the Notice of Deposition because it seeks testimony protected by the attorney work product privilege.

7. The United States further objects to the Notice of Deposition to the extent it seeks testimony protected by the attorney-client privilege.

8. The United States objects to the Notice of Deposition to the extent it seeks testimony relating to return information that is protected under 26 U.S.C. § 6103.

9. The United States objects to the extent the Notice of Deposition is *effectively* seeking testimony from Defendant's counsel. Such a request would be improper because, while counsel is not absolutely immune from such a notice of deposition, it is permitted only "where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel . . . ; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986). Plaintiff has made no such showing. A Rule 30(b)(6) subpoena is improper if it would necessarily lead to the deposition of opposing counsel, even if the subpoena does not specifically request this. *S.E.C. v. Buntrock, et al.*, 217 F.R.D. 441 (N.D. Ill. 2003). *See also In re Linerboard Antitrust Litig.*, 237 F.R.D. 373, 385 (E.D. Pa. 2006). It appears that the Notice of Deposition at bar fails the *Shelton* test and also improperly seeks

2806353.1

- 4 -

attorney work product. Moreover, because the United States did not participate in the disputed

transaction or in the preparation of FICA A's partnership returns for 2001 and 2002, no IRS

personnel also have personal knowledge of these matters and examining an IRS deponent

pursuant to Fed. R. Civ. Pro. 30(b)(6) will yield no competent testimony respecting any fact at

issue.

10. The United States objects to the Notice of Deposition to the extent that the testimony

sought is overbroad, unduly burdensome, and/or vague or ambiguous.

## SPECIFIC OBJECTIONS TO TOPICS OF TESTIMONY

1. The definition of "substantially similar," as found in Notice 2000-44, 2000-2 C.B. 255,
   including where that term is defined, if it is, by the IRS, if and how it has been defined by
   the IRS, and the identity of all guidance provided or public statements made by the IRS
   (or the U.S. Department of Treasury) or its representatives to the public concerning the
   term's definition, its application, or the factual nature of the term or its application.

**RESPONSE:** The United States incorporates its General Objections as specific objections to

this topic.


2. The definition of "substantially similar," as found in Treas. Reg. § 1.752-6(b)(2),
   including where that term is defined, if it is, by the IRS, if and how it has been defined by
   the IRS, and the identity of all guidance provided or public statements made by the IRS
   (or the U.S. Department of Treasury) or its representatives to the public concerning the
   term's definition, its application, or the factual nature of the term or its application.

**RESPONSE:** The United States incorporates its General Objections as specific objections to

this topic.

2806353.1

- 5 -

3.    The facts of the FICA A Fund transaction that make it substantially similar, as asserted in this case, to the facts of a transaction described in Notice 2000-44.

**RESPONSE:** The United States incorporates its General Objections as specific objections to this topic.

4.    The facts of the FICA A Fund transaction that make it substantially similar to the facts of transactions described in any IRS Notice other than Notice 2000-44 and the identity of each of those other notices.

**RESPONSE:** The United States incorporates its General Objections as specific objections to this topic.

5.    The facts of the FICA A Fund transaction that make it substantially similar or not substantially similar to the facts of the HOMER transaction.

**RESPONSE:** The United States incorporates its General Objections as specific objections to this topic.

6.    The facts of the FICA A Fund transaction that make it substantially similar or not substantially similar to the facts of the PICO transaction.

**RESPONSE:** The United States incorporates its General Objections as specific objections to this topic.

2806353.1

- 6 -

7.    The facts of the FICA A Fund transaction that make it substantially similar or not substantially similar to the facts of the DAD transaction.

**RESPONSE**: The United States incorporates its General Objections as specific objections to this topic.

8.    The facts of the PICO transaction that make it substantially similar or not substantially similar to the facts of a transaction described in Notice 2000-44.

**RESPONSE**: The United States incorporates its General Objections as specific objections to this topic.

9.    The facts of the HOMER transaction that make it not substantially similar to the facts of a transaction described in Notice 2000-44.

**RESPONSE**: The United States incorporates its General Objections as specific objections to this topic.

10.    The facts of the DAD transactions that make it not substantially similar to the facts of a transaction described in Notice 2000-44.

**RESPONSE**: The United States incorporates its General Objections as specific objections to this topic.

2806353.1

- 7 -

11.    The facts of the FICA A Fund transaction that make it substantially similar or not substantially similar to the transactions in the pending case of *Fidelity High Tech Advisor A Fund, LLC v. United States*, Nos. 06-40243 & 06-40244 (D. Mass. Filed Nov. 13, 2006).

**RESPONSE**: The United States incorporates its General Objections as specific objections to this topic.

12.    The process, procedures, standards, and IRS positions or titles involved in determining whether a transaction is substantially similar to a transaction described in Notice 2000-44.

**RESPONSE**: The United States incorporates its General Objections as specific objections to this topic.

13.    The process, procedures, standards, and persons involved in determining that the FICA A Fund transaction is substantially similar to a transaction described in Notice 2000-44.

**RESPONSE**: The United States incorporates its General Objections as specific objections to this topic.

2806353.1

- 8 -

## CONCLUSION

The United States objects to the Notice of Deposition in its totality and will not provide a

witness or witnesses as all matters listed by plaintiff are improper as a subject of a Fed. R. Civ.

Pro. 30(b)(6) deposition.


Dated: October 17, 2007

*Heather L. Vann*
HEATHER L. VANN
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-2822
Heather.Vann@usdoj.gov

2806353.1

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the UNITED STATES' OBJECTIONS TO

PLAINTIFF'S NOTICE OF DEPOSITION OF THE IRS PURSUANT TO F.R.C.P. 30(b)(6) has

been made upon the following via Federal Express this 17th day of October, 2007:


Ronald Buch, Jr.
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C.  20036


*Heather L. Vann*
HEATHER L. VANN
Trial Attorney, Tax Division

# Exhibit N

| EXAMINING OFFICER'S ACTIVITY RECORD | Examining Officer Mark A. Corrigan | Date Assigned/Opened |
|---|---|---|
| **Taxpayer (use preprinted label if possible)** Name» Fidelity International Currency Advisor<br><br>Address:<br><br>Business Name:<br>Address<br><br><br>Phone Business ( )<br>       Fax ( ) | **Taxpayer's Representative.**<br><br>Name<br>Address<br><br><br><br><br>Phone:<br>FAX:<br>**Does this case meet PRP Criteria?**<br>       Yes ____  No ____<br><br>Representative has: ____ POA<br>                ____ TP Auth/ | |

## Contacts and Activities

| Date | Loc | Cont. | Time On Activity | Remarks, Notes, Actions Taken |
|---|---|---|---|---|
| March 23, 2004 | O | 1 | | **FPS was assigned this Son of Boss Tax Shelter/ PICO / SOS Case.**<br><br>**Case Agent – Bill Conway (508)481-3387**<br>**Group Manager – Debbie Morrill (508)481-3387**<br><br>**FPS spoke with Case Agent. He will be setting up a Strategy Meeting on this case. Case Agent will keep FPS posted.** |
| June 14, 2004 | O | 5 | 8 hours | **FPS met with Case Agent at the Southboro POD (new FPS Bernie Kaufman also participated).**<br><br>**We discussed the case and the information that the Case Agent has received from the Taxpayer. The Case Agent believes that this case qualifies for the Son of Boss Tax Shelter and has sent out the appropriate letters.**<br><br>**FPS won't perform too much work on this case until it is determined whether or not the Taxpayer requests the Son of Boss Tax Shelter Settlement. However, Case Agent would like to better understand these transactions and has requested FPS to explain them, so FPS began making photocopies and going over the transactions.** |

LOC= Location of activity: T=Taxpayer          R=Representative          O=Other
CONT=Contact Codes  1. Telephone      2. T/P's office      3. Representative's Office
                4. Correspondence          5. Other (explain)

Form 9984 (7-96)                    Department of the Treasury - Internal Revenue Service
                                                PAGE 1

1CORRIGAN-000199

| EXAMINING OFFICER'S ACTIVITY RECORD | | | | Examining Officer Mark A. Corrigan | Date Assigned/Opened |
|---|---|---|---|---|---|
| Taxpayer (use preprinted label if possible) Name: Fidelity International Currency Advisor | | | | Taxpayer's Representative. | |
| Address: | | | | Name Address | |
| Business Name: Address | | | | | |
| Phone Business (  ) Fax (  ) | | | | Phone: FAX: Does this case meet PRP Criteria? Yes ____  No ____ Representative has: ____ POA ____ TP Auth/ | |

| | | | | |
|---|---|---|---|---|
| June 15, 2004 | O | 5 | .8 hours | FPS finished the initial review of the available records pertaining to the 2 Tax Shelter Transactions in question.

FPS prepared a sheet with some definitions of terms for the Case Agent.

FPS prepared a couple of sheets with various questions and comments regarding the 2 Tax Shelter Transactions.

FPS sat down with the Case Agent and went over the "economics" of the Digital Options, etc.. FPS discussed what additional information will be needed to analyze these transactions (i.e. Brokerage Statements).

FPS and Case Agent discussed the case with the Case Manager, set up a Strategy Meeting for 6/30. |
| July 21, 2004 | O | 5 | 9 hours | Strategy Meeting was rescheduled from 6/30 to 7/21.

FPS participated in Strategy Meeting with the Audit Team. Also present (John Alletta – SB/SE Case Counsel; Stan Locke – IE Territory Manager; Dennis McSweeney – IE Manager; Peter McIntyre – IE (via the telephone); Debbie Morrill – Case Manager and Bill Conway – TC).

FPS sent an e-mail to FPS Team Manager with case update.

FPS began reviewing some additional information on this case, recently received from KPMG. |

LOC= Location of activity: T=Taxpayer          R=Representative          O=Other
CON1=Contact Codes  1. Telephone     2. T/P's office          3. Representative's Office
                    4. Correspondence                    5. Other (explain)

Form 9984 (7-96)                    Department of the Treasury - Internal Revenue Service
                                                                    PAGE 2

1CORRIGAN-000200

| EXAMINING OFFICER'S ACTIVITY RECORD | Examining Officer Mark A. Corrigan | Date Assigned/Opened |
|---|---|---|

**Taxpayer** (use preprinted label if possible)
Name  Fidelity International Currency Advisor

Address:

Business Name:
Address

Phone Business (  )
          Fax (  )

**Taxpayer's Representative.**

Name
Address

Phone:
FAX:
**Does this case meet PRP Criteria?**
          Yes _____  No _____

Representative has: _____ POA
                    _____ TP Auth/

| August 18, 2004 | O | 5 | 3 hours | FPS returned Case Agent's call.  An interview with the Taxpayer is set up for 9/2 at 116 Flanders Road, Westboro, MA (Carruth Management Company – owned by the Taxpayer).  FPS, Case Agent and IE will meet on 8/30 and 8/31 to prepare for this meeting with the Taxpayer.  FPS reviewed some of the case information in anticipation of the upcoming meetings. |
|---|---|---|---|---|
| August 30, 2004 | O | 5 | 9 hours | FPS went to Southboro POD, met with TC, IE and IE Manager.  We reviewed the case and discussed upcoming meeting with Taxpayer, scheduled for 9/2.  FPS reviewed and analyzed documentation and prepared for upcoming meeting. |
| August 31, 2004 | O | 5 | 4 hours | FPS continued preparing for upcoming meeting. |
| September 2, 2004 | T | 2 | 5 hours | FPS participated in a meeting with the Taxpayer at the Taxpayer's place of business. |
| September 3, 2004 | O | 5 | 9 hours | FPS met with Audit Team at the Southboro POD for a Strategy Meeting.  FPS prepared a summary of yesterday's meeting.  FPS e-mailed Case Agent some additional questions to be incorporated with his IDR to the Taxpayer. |

LOC= Location of activity: T=Taxpayer          R=Representative          O=Other
CONT=Contact Codes  1. Telephone     2. T/P's office     3. Representative's Office
                    4. Correspondence                   5. Other (explain)

Form 9984 (7-96)                    Department of the Treasury - Internal Revenue Service
                                                    PAGE 3

1CORRIGAN-000201

| **EXAMINING OFFICER'S ACTIVITY RECORD** | | Examining Officer<br>Mark A. Corrigan | Date<br>Assigned/Opened |
|---|---|---|---|
| Taxpayer (use preprinted label if possible)<br>Name  Fidelity International Currency Advisor<br><br>Address:<br><br>Business Name:<br>Address<br><br><br>Phone Business (   )<br>            Fax (   ) | | Taxpayer's Representative.<br><br>Name<br>Address<br><br><br><br>Phone:<br>FAX:<br>Does this case meet PRP Criteria?<br>       Yes ____  No ____<br><br>Representative has: ____ POA<br>                  ____ TP Auth/ | |

| Date | LOC | CONT | Hours | Activity |
|---|---|---|---|---|
| September 7, 2004 | O | 1 | | FPS spoke with FPS Team Manager, discussed the status of this case. |
| October 18, 2004 | O | 5 | 9 hours | FPS went to Southboro POD to meet with the Audit Team.<br><br>The Taxpayer recently contacted the National Office and has requested to give a presentation to the National Office Attorneys explaining why they believe that this Taxpayer should not be considered a "Son of Boss Tax Shelter". National Office Attorney (James Fee) has agreed to listen to the Taxpayer's presentation.  Meeting is scheduled for October 19th at the Taxpayer's place of business.  The Audit Team has been invited to participate.<br><br>FPS and the Audit Team discussed the upcoming meeting and various facts that we want brought out.  FPS spoke with Case Counsel (John Alietta), who requested a summary of the option transactions from FPS.  FPS prepared and e-mailed this summary to Case Counsel.<br><br>FPS continued preparing notes for the upcoming meeting. |
| October 19, 2004 | T | 2 | 9 hours | FPS went to case site to participate in meeting with the Taxpayer, National Office Attorney – James Fee, and the rest of the Audit Team.<br><br>FPS prepared some additional IDR questions and e-mailed them to the Case Agent, who will put them in an IDR format and issue it to the Taxpayer (after getting approval from John Alietta). |

LOC= Location of activity: T=Taxpayer          R=Representative          O=Other
CONT=Contact Codes  1. Telephone          2. T/P's office          3. Representative's Office
                            4. Correspondence          5. Other (explain)

Form 9984 (7-96)                    Department of the Treasury - Internal Revenue Service
                                                                 PAGE  4

1CORRIGAN-000202

| EXAMINING OFFICER'S ACTIVITY RECORD | | Examining Officer Mark A. Corrigan | Date Assigned/Opened |
|---|---|---|---|
| Taxpayer (use preprinted label if possible) Name   Fidelity International Currency Advisor | | Taxpayer's Representative. | |
| Address: | | Name Address | |
| Business Name: Address | | | |
| | | Phone: FAX: | |
| Phone Business (  ) | | Does this case meet PRP Criteria? | |
| Fax (  ) | | Yes ____ No ____ | |
| | | Representative has: ____ POA ____ TP Auth/ | |

| | LOC | CONT | Time | Activity |
|---|---|---|---|---|
| November 1, 2004 | O | 5 | 6 hours | FPS went to Southboro POD. Met with TC, Case Manager, IE and IE Manager. We discussed the case and the process of getting IDR questions approved and issued to the Taxpayer, etc.. <br><br> We held a conference call with Case Counsel (John Alletta) and new Case Counsel (Richard Gannon – from Boca Raton Florida – who was assigned to assist the Audit Team by Jim Fee). |
| November 18, 2004 | O | 5 | 5 hours | FPS worked on case. FPS reviewed and analyzed e-mail from Richard Gannon, which has several questions related to the option contracts, etc.. FPS performed some additional research on some of the terminology (i.e. CMS option, 10 year swap yield, etc..) |
| November 19, 2004 | O | 5 | 4 hours | FPS discussed case with TC, discussed various strategies, administrative roadblocks, etc.. <br><br> FPS spoke with Richard Gannon, discussed the case, various ways to attack the option contracts, partnerships, etc.. We also discussed the current roadblocks (i.e. HALT memo, determination as to whether or not this is Son of Boss, etc..). Richard will be on a conference call with the Son of Boss Cadre next Tuesday and will raise some of our concerns and see if they can be addressed. <br><br> FPS continued reviewing and analyzing the case documents. |

LOC= Location of activity: T=Taxpayer            R=Representative            O=Other
CONT=Contact Codes  1. Telephone       2. T/P's office        3. Representative's Office
                    4. Correspondence                         5. Other (explain)

Form 9984 (7-96)                    Department of the Treasury - Internal Revenue Service
                                                        PAGE 5

1CORRIGAN-000203

| EXAMINING OFFICER'S ACTIVITY RECORD | Examining Officer Mark A. Corrigan | Date Assigned/Opened |
|---|---|---|

**Taxpayer (use preprinted label if possible)**
Name   Fidelity International Currency Advisor

Address:

Business Name:
Address

Phone Business (   )
         Fax (   )

**Taxpayer's Representative.**

Name
Address

Phone:
FAX:
Does this case meet PRP Criteria?
         Yes ____  No ____

Representative has: ____ POA
                    ____ TP Auth/

| Date | LOC | CONT | Hours | Activity |
|---|---|---|---|---|
| January 7, 2005 | O | 1 | | FPS spoke with Case Agent and Case Manager.  The Taxpayer has refused to sign the Statute Extension and the statute expires on 4/15/05.  FPS set aside the week of January 24 thru 28 to work with Case Agent at preparing the Stat Notice. |
| January 12, 2005 | O | 5 | 4 hours | FPS continued analyzing and summarizing digital option transactions in anticipation of preparing the Stat Notice. |
| January 24, 2005 | O | 5 | 8 hours | FPS met with Case Agent at the Southboro POD.  FPS worked on preparing a write-up of the economics of the option transactions that the Case Agent will include in his Stat Notice. |
| January 25, 2005 | O | 5 | 9 hours | FPS met with Case Agent at the Southboro POD.  FPS continued working on preparing a write-up of the economics of the option transactions that the Case Agent will include in his Stat Notice. |
| January 26, 2005 | O | 5 | 3 hours | FPS finished write-up of the economics of the option transactions that the Case Agent will include in his Stat Notice.  FPS discussed with Case Agent and e-mailed write-up.  Case Agent will keep FPS posted as to when the Stat Notice will be sent out so FPS can close out this referral. |

LOC= Location of activity: T=Taxpayer          R=Representative          O=Other
CONT=Contact Codes  1. Telephone     2. T/P's office     3. Representative's Office
                    4. Correspondence              5. Other (explain)

Form 9984 (7-96)                    Department of the Treasury - Internal Revenue Service
                                                    PAGE 6

1CORRIGAN-000204

| EXAMINING OFFICER'S ACTIVITY RECORD | Examining Officer<br>Mark A. Corrigan | Date<br>Assigned/Opened |
|---|---|---|
| **Taxpayer (use preprinted label if possible)**<br>Name  Fidelity International Currency Advisor<br><br>Address:<br><br>Business Name:<br>Address<br><br><br>Phone Business ( )<br>        Fax ( ) | **Taxpayer's Representative.**<br><br>Name<br>Address<br><br><br><br>Phone:<br>FAX:<br>Does this case meet PRP Criteria?<br>        Yes _____ No _____<br><br>Representative has: _____ POA<br>                    _____ TP Auth/ | |

| | LOC | CONT | | Activity |
|---|---|---|---|---|
| February 10, 2005 | O | 1 | | **Both John Aletta and Rich Gannon called FPS yesterday wanting to discuss the FPAA that is going to be issued on this case, both left a voice mail.**<br><br>**FPS returned both calls today and left voice mails.**<br><br>**FPS later spoke with John Aletta and discussed various aspects of the FPAA.** |
| February 22, 2005 | O | 1 | | **FPS spoke with TC.  The National Office determined that this case is "substantially similar" to both the Son of Boss Transactions (Notice 2000-44) and the Eliminator 2 (Notice 2002-65).**<br><br>**Based on this determination, the Taxpayer will not be offered Appeal Rights and therefore will not sign a statute extension.**<br><br>**The case will be stat noticed very shortly, using the Fact write-up prepared by FPS and the law write-up prepared by Counsel.**<br><br>**No additional work is required by FPS.  FPS prepared case closing memo and e-mailed to FPS Team Manager for his review and approval.** |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

LOC= Location of activity: T=Taxpayer        R=Representative        O=Other
CONT=Contact Codes  1. Telephone        2. T/P's office        3. Representative's Office
                    4. Correspondence        5. Other (explain)

Form 9984 (7-96)                Department of the Treasury - Internal Revenue Service
                                        PAGE  7

1CORRIGAN-000205

# Exhibit O

Message                                                                              Page 1 of 2

## Russ Cary

**From:**    Wilson Bill
**Sent:**    Thursday, June 09, 2005 9:45 AM
**To:**      Russ Cary
**Subject:**  FW: Son of Boss PICO Hybrids

Cary:

Here is an email where I am asking for guidance on FPAAs on the hybrid.


Bill Wilson
Partnership Technical Advisor, LMSB
Mail Stop 4200:MSRO, Room 1130
4050 Alpha Rd.
Dallas, TX 75244-4201
Phone: 972-308-1573
Fax: 972-308-1594


-----Original Message-----
**From:** Poindexter Carol J
**Sent:** Tuesday, February 22, 2005 1:58 PM
**To:** Wilson Bill
**Cc:** Fee James C
**Subject:** RE: Son of Boss PICO Hybrids

If an FPAA is issued, then it is issued for the entire tax return, not a specific issue.  Therefore, no Appeals.

Are the transactions separate transactions or the same transaction?  I would say that if they are separate transactions, then they MIGHT be able to go to fast track on the PICO issue, but ONLY if the PICO issue champion allows it.  If they don't agree with the SOB transaction, however, then they are going to get FPAA's anyway and it's a moot point - FPAA both issues.  If they are one transaction, then I don't see any way to separate out the 2 issues and treat them separately.

CC needs to decide which listed transaction these belong to and not be so wishy washy and say both, especially if they are one transaction and not two separate transactions on the same tax return.

    -----Original Message-----
    **From:** Wilson Bill
    **Sent:** Tuesday, February 22, 2005 1:47 PM
    **To:** Poindexter Carol J
    **Cc:** Fee James C
    **Subject:** Son of Boss PICO Hybrids

    On the unagreed Son of Boss PICO Hybrids, I understand that if the taxpayer does not sign an extension, we issue and FPAA by default to protect the statute.  No appeal (although could be settled by counsel/appeals in the post FPAA period).  But what about cases where they are willing to sign 872-Ps in order to get appeals rights, assuming, at least, that the PICO portion will be appealable?  Most well represented taxpayers are not going to sign extensions unless they have a chance for appeal rights.  In some cases, this question is being asked specifically.

055358

Chief Counsel has opined that these are similar to both SOB and PICO, but has left the determination with respect to administrative appeal rights with compliance. I vote for Jim's recommendation (no appeal rights - not practical to bifurcate the transactions), but we need to advise the field soon as to what to be advising taxpayers when requesting these extensions. Reps will surely ask if signing an extension will allow them to go to appeals.