# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) |
| Plaintiff, | ) Case No.:  05-40151-FDS ) 06-40130-FDS |
| v. | ) ) |
| UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) ) ) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE PROPOSED EXPERT TESTIMONY AND REPORTS OF DAVID LARUE

FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, Plaintiff

David J. Curtin, D.C. Bar #281220
Ronald L. Buch, Jr., D.C. Bar #450903
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email:  dcurtin@mckeenelson.com
        rbuch@mckeenelson.com
        lamanti@mckeenelson.com

John O. Mirick, BBO #349240
MIRICK, O'CONNELL, DEMALLIE
& LOUGEE, LLP
100 Front Street
Worcester, MA 01608
Telephone:  (508) 791-8500
Facsimile:  (508) 791-8502
Email:  jomirick@mirickoconnell.com

# TABLE OF CONTENTS

BACKGROUND ...................................................................................................................1

ARGUMENT ......................................................................................................................3

   I.   LaRue's Opinions Regarding State of Mind Should Be Excluded.....................................4

   II.  LaRue's Opinions on the Actual Risk of Detection and Audit Should Be Excluded
      Because He Is Not Qualified to Opine on These Issues ........................................................7

      A.  LaRue Is Not Qualified to Opine on IRS Return Selection .........................................10

          1.   LaRue Is Not Qualified to Opine on the DIF Selection Process...........................11

          2.   LaRue Is Not Qualified to Opine on the District Office Review Process .............13

      B.  LaRue Is Not Qualified to Opine on Tax Return Preparation ....................................15

   III.  LaRue's Testimony and Reports Should Be Excluded Because He Is a Partisan
      Advocate ............................................................................................................................16

      A.  LaRue Impermissibly Summarizes Factual Evidence and Provides Misleading
         "Observations" That Do Not Relate to His Opinions ...................................................17

      B.  LaRue Has a Financial Incentive To Be a Partisan Advocate ....................................24

CONCLUSION.....................................................................................................................26

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )    Case Nos.:  05-40151-FDS<br>)                    06-40130-FDS |
| UNITED STATES OF AMERICA, | )<br>) |
| Defendant. | )<br>)<br>) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE PROPOSED <u>EXPERT TESTIMONY AND REPORTS OF DAVID LARUE</u>

The issues presented in this motion are (1) whether an expert should be permitted to testify regarding states of mind; (2) whether an expert is qualified to testify regarding the IRS return selection process where he has never worked for the IRS, studied the process, or had access to the IRS's confidential audit criteria; and (3) whether the expert testimony of a partisan advocate is helpful to the Court.

## BACKGROUND

Defendant's expert, David LaRue, addresses how the FICA A Fund transaction was reported on FICA A Fund's and Plaintiff's tax returns.  This motion addresses three categories of opinions and observations offered by LaRue:  (1) opinions regarding the states of mind and motivations of those involved in preparing the tax returns of FICA A Fund and Plaintiff; (2) opinions addressing whether the manner of reporting the FICA A Fund transaction reduced

the risk of detection and audit by the IRS; and (3) "observations" regarding the tax reporting of the FICA A Fund transaction.

First, LaRue opines that, based on his review of the record, "it would be reasonable to conclude" that the transaction was reported "in a manner that was designed to reduce or minimize the actual or perceived risk of detection and audit by the IRS."[1]  In other words, LaRue opines that it "would be reasonable" to think that someone may have perceived a risk of detection and audit and, acting on that perception, designed the reporting of the FICA A Fund transaction to reduce that risk.

Second, LaRue provides a very tentative conclusion regarding the actual risk of audit: "In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS may have increased significantly if [the amounts reported on FICA A Fund's Schedules L and M-2 and the Form K-1s of the members] had been properly adjusted and reported."[2]

Finally, LaRue's reports are replete with factual statements and "observations."  Most of these factual statements and observations, which are based on LaRue's review of the documents produced in discovery in this case, are irrelevant to his opinion.

With a few exceptions, LaRue does not opine that FICA A Fund or Plaintiff improperly or incorrectly reported any items on their tax returns or omitted any information required to be included on their tax returns.[3]  And he does not opine that the manner of reporting on FICA A

---

[1] Ex. A at ¶¶ 226, 229 (Expert Report of David W. LaRue, Ph.D., Aug. 7, 2007 with Corrections of Errata).

[2] *Id.* at ¶¶ 227, 228.

[3] The exceptions are "the amounts reported on Fidelity International's Schedules L, M-2, and the Schedule K-1s of the members," Ex. A at ¶¶ 91, 227; where FICA A Fund should have reported foreign currency losses on its Form 1065, *Id.* at ¶¶ 143, 217; Ex. B at 194:10-12, 195:19-22 (David W. LaRue Deposition, Nov. 26, 2007); where Plaintiff should have reported the FICA A Fund losses on his Form 1040, Ex. A at ¶¶ 198-202; Ex. B at 194:10-195:18, 279:17-19; and the Partner Summary of FICA A Fund's 2001 Form 1065, Ex. A at ¶ 138; Ex. B at 196:9-14.

Fund's and Plaintiff's returns *actually* reduced the risk of audit or was in fact intended to reduce

that risk.  LaRue's actual opinions occupy only a very small portion of his reports.

## ARGUMENT

The Supreme Court has instructed trial judges to act as "gatekeepers" with respect to

expert testimony, requiring that trial judges evaluate a proffered expert's testimony for its

relevance and reliability.[4]  Federal Rule of Evidence 702 provides that expert testimony is

permitted "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to

understand the evidence or to determine a fact in issue."  Further, the expert witness must be

"qualified as an expert by knowledge, skill, experience, training, or education."[5]

In the landmark case of *Daubert*, the Supreme Court examined the reliability of scientific

testimony.[6]  Whether an expert's testimony is reliable depends on its trustworthiness.[7]  The

Supreme Court has subsequently emphasized that the factors used in *Daubert* "neither

necessarily nor exclusively applie[d] to all experts or in every case,"[8] and that those factors were

merely "meant to be helpful, not definitive."[9]  In the case of proposed non-scientific testimony,

"the relevant reliability concerns may focus upon personal knowledge or experience."[10]

---

[4] *See Daubert  v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 594-95, 597 (1993); *see also* Fed. R. Evid. 702 advisory committee's note ("The amendment affirms the trial court's role as gatekeeper . . . ."); *United States v. Vargas*, 471 F.3d 255, 261 (1st Cir. 2006) (stating that the judge has a gatekeeping role to ensure the reliability and relevance of expert testimony).

[5] Fed. R. Evid. 702.

[6] *Daubert*, 509 U.S. at 593-94.

[7] *See id.* at 590 n.9 ("[O]ur reference here is to *evidentiary* reliability—that is, trustworthiness.").

[8] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

[9] *Id.* at 151.

[10] *Id.* at 149.

As required for all evidence, expert testimony must be relevant under Federal Rules of Evidence 401 and 402, and must not be unfairly prejudicial, confusing, a waste of time, or needlessly cumulative under Federal Rule of Evidence 403. Further, the proponent of the expert testimony must demonstrate admissibility by a preponderance of the evidence.[11]

## I.    LaRue's Opinions Regarding State of Mind Should Be Excluded

A person's state of mind is an issue on which an expert may not opine because determinations as to state of mind are "committed exclusively to the finder of fact."[12] Thus, courts have held that it is inappropriate for an expert to speculate on an individual's or a company's state of mind or motivations.[13] The rationale for this rule is that determining state of mind or intent does not require "scientific, technical, or other specialized knowledge."[14] Opinions that "reflect no special expertise" and that are "routine inference[s] that the jury could draw on its own . . . add[] little or nothing."[15]

For example, the Seventh Circuit found that the district court erred in allowing an expert to testify that General Motors had reduced the amount of padding in the sun visors on its

---

[11] *Daubert*, 509 U.S. at 592 n.10; *see also* Fed. R. Evid. 702 advisory committee's note (2000 amendments) (stating that, under Federal Rule of Evidence 104(a), "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence"); *Bourjaily v. United States*, 483 U.S. 171, 176 (1987) (holding the offering party must prove admissibility requirements by a preponderance of the evidence).

[12] 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.03[3] (2d ed. 2007).

[13] *See, e.g.,* Order at 10, *Muskat v. United States*, No. 06-30 (D.N.H. Jan. 10, 2008) (stating that an expert witness will not be permitted to testify about the intent of the parties with respect to agreements and transactions); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005) (excluding proposed expert testimony regarding the states of mind of the defendants and non-parties); *Robinson v. Hartzell Propeller Inc.*, 326 F. Supp. 2d 631, 648 (E.D. Pa. 2004) ("[I]ntent is not a proper subject for expert testimony."); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003) ("Expert testimony is not relevant if the expert is offering a personal evaluation of . . . the motivations of the parties."), *aff'd*, 99 F. App'x 274 (2d Cir. 2004); *In re Diet Drugs*, No. MDL 1203, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000) ("The question of intent is a classic jury question and not one for experts . . . .").

[14] *See, e.g., In re Rezulin*, 309 F. Supp. 2d at 541.

[15] *United States v. Weiner*, 3 F.3d 17, 22 (1st Cir. 1993).

automobiles to save money.[16]  Judge Easterbrook stated that the expert "lacked any scientific

basis for an opinion about the motives of GM's designers" and "could not testify *as an expert*

that GM had a particular motive."[17]  In *In re Rezulin*, the court prohibited experts from testifying

that a pharmaceutical company's conduct had been motivated by a desire to increase profits,

reasoning that such inferences should be made by the jury, not expert witnesses.[18]  According to

the court, the proffered testimony had "no basis in any relevant body of knowledge or expertise"

and "describes 'lay matters which a jury is capable of understanding and deciding without the

expert's help.'"[19]  The court illustrated its point by describing one expert's proposed testimony:

> At times [the expert] merely repeated facts or opinions stated by other potential
> witnesses or in documents produced in discovery, as with his reiteration of Dr.
> Misbin's view as to what the FDA might have done with different information.
> Elsewhere, he drew simple inferences from documents produced in discovery, as
> when he said he "knows for sure" that Glaxo took Rezulin off the market for
> safety reasons because "the chairman of the company" allegedly wrote this in a
> letter.  Similar repetitions of facts and speculative inferences about intent appear
> throughout the challenged testimony.[20]

The testimony and reports offered by LaRue rely on the same type of inferences and

suggestions regarding states of mind and motivations excluded in *DePaepe* and *In re Rezulin*.[21]

Specifically, LaRue opines that it would be "reasonable to conclude" that the parties reported the

---

[16] *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998).

[17] *DePaepe*, 141 F.3d at 720 (emphasis in original).

[18] *In re Rezulin*, 309 F. Supp. 2d at 547; *see also Highland Capital Mgmt.*, 379 F. Supp. 2d at 469-70 (holding that it was inappropriate for an expert to speculate on a party's state of mind, motivations, or knowledge possessed by a party, and excluding expert testimony that an investor was "likely aware" of insider information and was "likely concerned" that the stock price would fall).

[19] *In re Rezulin*, 309 F. Supp. 2d at 546 (quoting *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989)).

[20] *Id.* at 546-47 (footnote omitted).

[21] *See also In re Diet Drugs*, 2000 WL 876900, at *9 ("If the witnesses' bases for the opinions concerning improper intent come from other evidence such as letters, admissions of AHP officers or employees, or other admissible evidence, *that* is what the jury should hear and the question of AHP's intent would flow from such evidence to be determined by the jury.").

FICA A Fund transaction "in a manner that was designed to reduce or minimize the actual or perceived risk of detection and audit by the IRS."[22]  Like the experts in *In re Rezulin*, LaRue bases this conclusion on his "review of the record and the analysis and discussion presented in [his] *Report*."[23]  LaRue bases his conclusions regarding FICA A Fund's and Plaintiff's intent on an examination of "all of the objective evidence."[24]  LaRue describes this evidence as "objective indicators of the subjective state of mind of the taxpayer."[25]

LaRue's analysis is within the province of the finder of fact.  His analysis and advocacy require no special expertise.  LaRue purportedly based his opinions as to an individual's state of mind or motivations on his review of documents.  Such opinions do not involve the application of scientific, technical, or other specialized knowledge, as required by Rule 702.[26]  LaRue's testimony would "'supplant the role of the [finder of fact in] interpreting the evidence,'" which no expert may do.[27]

LaRue himself acknowledges that determinations as to a person's subjective state of mind is "up to the Court, I suppose, at the end of the day."[28]  LaRue tries to finesse the issue by making suggestions and inferences regarding intent while, at the same time, denying that he is offering any opinion as to state of mind or intent.  Indeed, in LaRue's deposition he insisted that

---

[22] Ex. A at ¶¶ 226, 229.

[23] Ex. A at ¶¶ 226, 229.

[24] Ex. B at 163:8-9.

[25] *Id.* at 163:18-19.

[26] *See, e.g., In re Rezulin*, 309 F. Supp. 2d at 546 ("[T]he opinions of these witnesses on the intent, motives or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise.").

[27] *Highland Capital Mgmt.*, 379 F. Supp. 2d at 469 (quoting *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001)); *see also United States v. Casas*, 356 F.3d 104, 120 (1st Cir. 2004) (stating that expert testimony is improper if it usurps the jury's role).

[28] Ex. B at 163:7-8.

"[n]owhere in this report have I expressed an opinion as to the subjective state of mind of the taxpayers in terms of how they reported this return."[29]  While such denials may be technically correct, they are misleading and disingenuous.  LaRue's conclusions that someone "perceived" the risk of detection and audit and then "designed" the tax reporting to minimize that risk necessarily encompass the state of mind and motivation of one or more of the persons responsible for preparing the returns of FICA A Fund and Plaintiff.  LaRue's testimony and reports are not helpful to the trier of fact, are beyond the appropriate scope of expert testimony, and should be excluded.

## II.     LaRue's Opinions on the Actual Risk of Detection and Audit Should Be Excluded Because He Is Not Qualified to Opine on These Issues

LaRue opines that FICA A Fund improperly completed three schedules to its Form 1065 and that it "would be reasonable" to conclude that reporting the FICA A Fund transaction "properly" on these schedules "may" have increased the risk of detection and audit.[30]  LaRue's reliance on weasel words such as "reasonable to conclude" and "may" is understandable.  He cannot offer any opinion as to whether completing the three schedules differently would have increased the risk of audit, because such an opinion would extend well beyond his expertise. LaRue's limited and tentative conclusions on audit risk are nothing more than idle speculation, conjecture, and advocacy.  His hesitant conclusions are an implicit acknowledgement that he

---

[29] Ex. B at 162:13-16; *see also id*. at 171:8-9 ("I have not expressed an opinion as to the subjective state of mind of any taxpayer."); *id*. at 213:2-4 ("[T]here's nothing in this report where I have expressed an opinion as to the subjective state of mind of any of the taxpayers.").

[30] Ex. A at ¶ 228.  While Plaintiff disputes LaRue's conclusions regarding the manner in which the FICA A Fund transaction is reported on the three schedules, these conclusions are not at issue in this motion.

does not have the expertise necessary to render any meaningful opinion on audit risk.  In fact,

LaRue himself concedes that he is not opining on the *actual* risk of detection and audit.[31]

A witness may be qualified as an expert on the basis of "knowledge, skill, experience,

training, or education."[32]  "[A] district court acts properly by excluding opinions that are beyond

the witness's expertise."[33]  Offering an expert to provide opinions beyond his expertise renders

the testimony unreliable and inadmissible under Federal Rule of Evidence 702 and Supreme

Court precedents.[34]  In essence, a court must ask, "[W]hat is [the expert] an expert about?"[35]

While an expert "need not have overly specialized knowledge to offer opinions,"[36] it must be

"specific to the matters he proposes to address as an expert."[37]

The First Circuit upheld the decision of a district court excluding the expert testimony of

an appraiser regarding a clock's origin in the Regence period.[38]  The expert "demonstrated

insufficient experience or training in authenticating Regence furniture from visual examination.

By excluding [the expert's] opinion on authenticity but allowing him to testify to appraisal value

---

[31] *See* Ex. B at 170:16-21 (stating that he is not opining on "actual detection or selection through the DIF score process"); *id*. at 172:3-4 ("It's hard to say whether [how the FICA A Fund transaction was reported] would actually reduce their risk of audit.").

[32] Fed. R. Evid. 702.

[33] *See Levin v. Dalva Bros.*, 459 F.3d 68, 78 (1st Cir. 2006); *see also Storie v. Duckett Truck Ctr., Inc.*, No. 06-1238, 2007 WL 4454297, at *8 (E.D. Mo. Dec. 14, 2007) ("As part of its gatekeeping function, a court must not allow an expert witness to testify to matters beyond the scope if his expertise.").

[34] *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001).

[35] *Id.*

[36] *Levin*, 459 F.3d at 78.

[37] *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1232 (N.D. Okla. 2007); *see also Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 322 (3d Cir. 2003) ("While the background, education, and training may provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions.").

[38] *Levin*, 459 F.3d at 78-79.

and his visual observations of the clock, the court reasonably limited [the expert] to offering

opinions only in those areas in which he was qualified."[39]

    In another case, the Fourth Circuit reversed the district court's decision to allow expert

testimony because the proposed expert's expertise was not specific to the matters she proposed to

address.[40]  The appellate court found that the proposed expert, who planned to testify that the

defendant's shift in credit practices was unjustified credit and price discrimination, did not meet

the standard of Federal Rule of Evidence 702 because the expert admitted she had no experience

in making credit decisions and because "[t]here was no indication . . . that [the expert's] general

business education included *any* training in the area of antitrust or credit.  Similarly, [the expert]

admitted that she lacked *any* other experience in such matters."[41]  Thus, "[t]he issue with regard

to expert testimony is not the qualifications of a witness in the abstract, but whether those

qualifications provide a foundation for a witness to answer a specific question."[42]  In the present

case, LaRue's background and qualifications do not provide a foundation for him to address

questions regarding the actual risk of an IRS audit.

---

[39] *Id.*

[40] *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989).

[41] *Id.* at 799-800.

[42] *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994); *see also Storie v. Duckett Truck Ctr., Inc.*, No. 06-1238, 2007 WL 4454297, at *8 (E.D. Mo. Dec. 14, 2007) (allowing an expert to testify on bodywork and mechanics and the cost of repairing damaged vehicles, but not on valuing used and damaged vehicles because "[e]xpertise in one area of the motor vehicle field does not necessarily translate into expertise in another"); *Silva v. Am. Airlines*, 960 F. Supp. 528, 530-31 (D.P.R. 1997) (excluding the expert testimony of a civil engineer who proposed to testify about interior aircraft safety standards, stating that "[a]lthough [the expert's] background might permit him to learn faster than others about the design and safety aspects of an aircraft's interiors, an expert must have specific knowledge, not mere capacity to acquire knowledge" and that "[t]o qualify to provide expert testimony in this case, an expert must have specifically worked with, tested or in some fashion studied aircraft interior safety hazards and warnings").

## A.     LaRue Is Not Qualified to Opine on IRS Return Selection

LaRue is not an expert in the IRS return selection process.  He has never worked for the IRS.[43]  He has never advised the IRS on how it might design a system for selecting returns for audit.[44]  He has never consulted with the IRS on preparing examination procedures,[45] and he has never been involved in the development of IRS audit procedures.[46]  He has never been involved in the development of IRS forms.[47]  LaRue admits that he has not studied IRS auditing procedures.[48]  In short, LaRue lacks experience or expertise on which to base an opinion that reporting a transaction in a certain way increases or decreases the risk of audit.

When asked whether he considers himself to be an expert in IRS return selection, LaRue responded, variously:

> I'm familiar with the selection process.[49]
>
> I know about as much as, I believe, the public could know about the return selection process.[50]
>
> I'm as much of an expert as public knowledge about the internal practices of the Internal Revenue Service regarding the selection of returns for audit can be.[51]

---

[43] Ex. B at 59:5-7.  The extent of LaRue's experience with the IRS is testifying before the IRS Office of Chief Counsel, *id*. at 58:6-18, teaching several programs for the IRS Office of Chief Counsel attorneys, *id*. at 59:8-12, and teaching one course in 1995 for IRS auditors, *id*. at 60:14-61:1.

[44] *Id.* at 166:6-12.

[45] *Id.* at 166:13-18.

[46] *Id.* at 61:2-4.

[47] *Id.* at 61:5-6.

[48] *Id.* at 132:17-133:8.

[49] *Id.* at 130:19.

[50] *Id.* at 134:2-3.

[51] *Id.* at 134:9-12.

What LaRue does know about the IRS return selection process, he learned because "it's something that pops up from time to time"[52] and some of the articles he has read "probably dealt with the return selection process."[53]  In his deposition, LaRue referred to a GAO report on the return selection process,[54] which he read for the first time after the submission of his expert report in this case.[55]  The study outlines two basic steps in the return selection process: (1) returns are filed and a DIF[56] score is calculated and (2) returns are reviewed by IRS district offices.[57]  LaRue explained that when he is referring to the audit selection process, he is referring to these steps.[58]  LaRue's qualifications do not provide an adequate foundation for him to testify regarding the DIF selection process or the district office review process.

### 1.    LaRue Is Not Qualified to Opine on the DIF Selection Process

LaRue is not qualified to opine on the DIF score process because that process is highly secretive and LaRue has no specialized knowledge or expertise.

---

[52] *Id.* at 135:14-15.

[53] *Id.* at 135:17-21.

[54] U.S. Gen. Accounting Office, *Tax Administration:  IRS' Return Selection Process* (1999).

[55] Ex. B at 136:1-4, 137:15-19.

[56] DIF stands for "discriminant function" and it is "an automated system for scoring individual tax returns according to their audit potential."  U.S. Gen. Accounting Office, *supra* note 54, at 1.

[57] U.S. Gen. Accounting Office, *supra* note 54, at 23.  While all individual returns are given a DIF score, the returns that do not receive a high enough score to go through the DIF review process may still be reviewed in the IRS district offices based on other selection criteria.  *Id.* at 3-5, 23.

[58] Ex. B at 168:9-170:1.  LaRue stated that the GAO report contains a "summary depiction that was used by the GAO in explaining or summarizing the [audit selection] process," *id.* at 167:4-10, and that he doubted that there was anything inaccurate in the summary, *id.* at 167:11-13.

The IRS develops DIF formulas that are "designed to indicate the returns that have the highest probability of a tax change if audited."[59]  Plaintiff's rebuttal expert—who, unlike LaRue, spent more than thirty years working for the IRS—testified:

> I was in the service [Internal Revenue Service], pretty high up in the service, I had no knowledge of what that formula was, and I couldn't tell you.  You could keep me here for a month, and I couldn't tell you what the formula was.  I don't believe that Dr. LaRue can tell you or anybody else can tell you what the formula is in how returns come out.[60]

In his subsequent deposition, LaRue conceded that whether certain items from a return are picked up for DIF scoring is a "closely guarded secret within the Internal Revenue Service."[61]  LaRue described the DIF scoring and selection process as "highly secretive"[62] and a "black box."[63]  According to his testimony, he does not know which items on a partnership return are used in DIF scoring,[64] whether any items on Schedule L or Schedule K are picked up for DIF scoring,[65] or even whether partnership returns are subject to the DIF scoring process.[66]  Thus, LaRue admitted that he is not opining on the actual risk of detection or selection through the DIF scoring process,[67] nor could he.

---

[59] U.S. Gen. Accounting Office, *supra* note 54, at 3.

[60] James Dougherty Dep. 70:13-20, Nov. 21, 2007.

[61] Ex. B at 176:5-6.

[62] *See id.* at 130:20 ("Most of the selection process is highly secretive.").

[63] *See id.* at 134:3-6 ("[M]ost of [the return selection process], a lot of that is a black box, how the DIF score is computed and all of the things that I've listed.  Most of that is a black box.").

[64] *Id.* at 175:17-20.

[65] *Id.* at 175:21-176:4.

[66] *See id.* at 175:14-16 (stating, "I believe they do," in response to the question, "Do you know whether forms 1065 go through the DIF scoring process?"); *id.* at 180:8-12 (stating, "I don't know for certain," in response to the question, "[D]o you have an understating whether or not partnership returns were subject to DIF scoring?").  LaRue later stated, "This report does not address the scoring – I don't believe it addresses the scoring of partnership returns; it does individual returns."  *Id.* at 181:6-8.

[67] *Id.* at 170:16-21.

## 2.    LaRue Is Not Qualified to Opine on the District Office Review Process

According to LaRue, his opinion on the risk of audit pertains to the district office review

process.[68]  LaRue admits, however, that "[i]t's hard to say whether [how the FICA A Fund

transaction was reported] would actually reduce their risk of audit."[69]  LaRue has difficulty

reaching a conclusion because he is speculating about the district office review process, which he

may not do.[70]  When describing how a district office reviewer would review FICA A Fund's and

Plaintiff's returns, he used words like "[i]t's possible," "presumably," "may," "I have an

impression," and "I don't know."[71]  According to LaRue, whether a return will be selected for

audit is inherently unpredictable:

> You're talking about different people.  Let's say you've gotten reviewers or
> classifiers in the service center.  Some of them may be CPAs.  Some of them may
> have years of experience, some less experience.  Some may be more experienced
> in partnership matters, some less in partnership matters.  Some may have more
> time on their hands than others.  Some may have -- you know, are better at what
> they do.  You're talking about individuals who, as a general matter as described in
> the GAO report, are experienced auditors who have been appointed to the position
> of reviewing these returns visually, manually, and using their judgment to
> determine what next step to proceed with a particular return, to accept as filed or
> to have someone else look at it.  And this is a multistep process.  In the process of
> that, you have a number of different people with a number of different
> backgrounds, different workloads, different abilities to spot problems or issues or

---

[68] *Id.* at 171:10-17.

[69] *Id.* at 172:3-4; *see also id.* at 174:8-11 (responding, "That's hard to say," to the question, "[A]re you opining here that there was an actual reduction in the risk of audit?").

[70] *See* Fed. R. Evid. advisory committee's note (2000 amendments) ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted."); *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) ("[T]he whole point of *Daubert* is that experts can't 'speculate.'"); *Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1474 (1st Cir. 1996) (stating that an expert should not be permitted to give an opinion that is based on speculation).

[71] *See* Ex. B at 177:3-5 ("Is it possible that a classifier would have dug through all of that to find a $158 million loss?  It's possible . . . ."); *id.* at 177:10-11 ("If I'm a reviewer of a return, presumably, I'm going to start on page 1 . . . ."); *id.* at 177:16-22 ("I may flip through the return.  I may look at it in detail.  I may – this is a 180-page return.  I have an impression – and it's only an impression – that classifiers don't dig through every number on every line or necessarily review every page on a 180-page . . . return."); *id.* at 178:21-179:2 ("Would that cause someone to put it into the 'do not accept as filed' stack?  I don't know.  Would they have looked beyond the Schedule K and the 1065 to the K-1s?  I don't know.").

potential issues who are going to be reviewing this return.  You're not looking at a monolithic process where you have one standard and one set of capabilities, one size fits all.[72]

LaRue does not appear to have studied the district office review process by, for example, interviewing district office employees or systematically studying how specific ways of reporting have affected whether a filed tax return is audited.  Moreover, from LaRue's description of the review process, it seems unlikely that studying this process would materially inform his analysis, given the inherent uncertainty of the process.

Not only has LaRue never studied the district review process, but he has never sat in the chair of an IRS auditor in a district office reviewing returns.  Courts have often allowed individuals who have gained specialized knowledge of a certain area through years of experience to testify as experts.  For example, the First Circuit has allowed expert testimony regarding the proper method of docking and undocking sea-going vessels, based on the fact that the proposed expert

> ha[d] spent years on the water, often evaluated and trained crews and was responsible for the safety of the crews and the ships[,] . . . trained crews to better handle lines, gear and other equipment on vessels[, and] . . . was responsible for supervising the lifting and pulling of different objects, including numerous types of chains, chock lines on pennants and nylon lines of different weights and force.[73]

Similarly, drug enforcement agents are often permitted to testify as experts regarding whether seemingly innocuous language is drug code, based on many years of investigating drug crimes.[74]

---

[72] *Id.* at 174:12-175:13; *see also id.* at 132:9-19 ("[M]ost of that information is . . . a function of the people reviewing, the level of experience, the amount of time that they have to review a return, what is it about the return that causes me to spend more time or less time, what is obvious on a return.  What about those things that are not obvious, how much time do I want to spend looking at those to determine whether this return should be audited. That's going to vary from person to person.").

[73] *Diefenbach v. Sheridan Transp.*, 229 F.3d 27, 31 (1st. Cir. 2000).

[74] *See, e.g.*, Fed. R. Evid. 702 advisory committee's note (2000 amendments) ("The method used by the [law enforcement] agent is the application of *extensive experience* to analyze the meaning of drug conversations."

In such cases, the expert has spent years in the trenches gaining first-hand knowledge and experience in a particular field. Likewise, Plaintiff's rebuttal expert worked as a revenue agent, rose through the IRS ranks, and has the requisite experience to opine on the risk of audit. With that experience, he concluded that a revenue agent reviewing the return would have spotted the auditing issue.[75]

In contrast, LaRue does not have years—or even months—of experience with the IRS return selection process. He has no day-to-day experience reviewing returns as an IRS employee. The extent of his "experience" appears to be teaching one course to IRS auditors in 1995 on a topic that he does not remember.[76] In short, LaRue does not have the background or expertise to be able to testify regarding whether reporting an item or transaction in a certain way would increase or decrease the risk of audit. As a result, for him, it is "hard to say" whether the manner of reporting the FICA A Fund transaction "would actually reduce their risk of audit."[77] Because of LaRue's lack of relevant expertise, he is unqualified to opine on the risk of audit.

**B.     LaRue Is Not Qualified to Opine on Tax Return Preparation**

While LaRue testified that he considers himself to be an expert in return preparation,[78] he has never been engaged in return preparation in any meaningful way. He is not a CPA,[79] he has

---

(emphasis added)); *United States v. Garcia*, 447 F.3d 1327, 1335 (11th Cir. 2006) ("[The expert] had been a DEA agent for several years and had received training regarding the operation and structure of drug trafficking organizations and how those organizations transport and distribute drugs. [The expert] had been involved in at least 50 drug investigations . . . . [The expert] also had participated in numerous wiretap investigations and was familiar with the coded language that some drug trafficking organizations use."); *United States v. Hoffman*, 832 F.2d 1299, 1310 (1st Cir. 1987) ("[The expert] was a veteran DEA agent who had worked in law enforcement for some twelve years, much of it as a narcotics agent. He had participated in hundreds of investigations. He had specialized police training and extensive practical experience in the field.").

[75] James Dougherty Dep. 44:18-23, Nov. 21, 2007.

[76] Ex. B at 60:14-61:1.

[77] *Id.* at 172:3-4.

[78] Ex. B at 128:20-129:10.

never been employed as a tax return preparer,[80] and he has never prepared a partnership tax return to be filed.[81]  LaRue's experience actually preparing tax returns is limited to preparing returns for himself and members of his family,[82] and he has never even received a Form K-1.[83]  LaRue's limited experience in return preparation pales in comparison to the preparation of Plaintiff's 2001 tax return, which reported information from over 100 Forms K-1 and involved the participation of two public accounting firms.  LaRue has no relevant experience in preparing returns or in representing clients whose returns are being audited by the IRS.  Accordingly, LaRue is not qualified to opine on tax return preparation and his opinions that address this topic should be excluded.

## III.    LaRue's Testimony and Reports Should Be Excluded Because He Is a Partisan Advocate

While an expert witnesses may tend to favor the party retaining him, it is highly inappropriate and unhelpful when the "witness ceases to be an expert whose testimony is valuable because he or she is not an advocate and becomes, instead, just another legal practitioner for the client."[84]  When an expert "assumes the position of an advocate,"  the purpose of expert testimony ("to assist the trier of fact to understand evidence that will determine

---

[79] *Id.* at 107:15-16.

[80] *Id.* at 120:21-22.

[81] *Id.* at 123:16-124:1.

[82] *Id.* at 126:1-5.

[83] *Id.* at 125:15-16.

[84] *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 290 (E.D. Va. 2001); *see also United States v. Ramirez*, 495 F. Supp. 2d 92, 123 (D. Me. 2007) (excluding an expert's opinion because, in part, it "cross[ed] the line between expert analysis and advocacy"); *United States v. Allerheiligen*, No. 97-40090-01, 1998 WL 918841, at *7 (D. Kan. Nov. 19, 1998) (excluding expert testimony because it "lack[ed] objectivity").

the fact in issue") is "jeopardized."[85]  Most importantly, an expert must not "supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence."[86] LaRue's partisan advocacy is demonstrated by his summarizing factual evidence and making misleading factual observations that do not relate to his opinions.  His strong tendency to advocate the government's position can be attributed to the fact that he receives the majority of his compensation from the government.

### A.    LaRue Impermissibly Summarizes Factual Evidence and Provides Misleading "Observations" That Do Not Relate to His Opinions

Experts are not permitted to become partisan advocates by providing, in the guise of expert "opinion," a summary or overview of otherwise admissible factual evidence.  An expert report that "offers a synopsis of facts . . . does not state expert opinions at all, but simply provides the witness's slant on facts."[87]  In *Fisher v. Ciba Specialty Chemicals Corp.*, in connection with a motion for class certification, the plaintiffs sought to offer into evidence the written report of their expert on environmental regulations.[88]  Much of the report was a narrative of events that "simply summarize[d] and state[d] [the expert's] advocacy-based interpretation of documents in the record."[89]  For example, based on her review of existing documents, the expert concluded that the defendant produced hazardous chemicals, contaminated the environment by

---

[85] *Wagner Constr., Inc. v. Comm'r*, No. 3819-99, 2001 WL 739234, at *21 (T.C. June 29, 2001); *see also Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003) ("An expert's role is to assist the trier of fact by providing information and explanations; the expert's role is not to be an advocate."), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).

[86] *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001), *amended on unrelated grounds by* 137 F. Supp. 2d 438 (S.D.N.Y. 2001).

[87] *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 280 (S.D. Ala. 2006); *see also* Order at 5-6, *Muskat v. United States*, No. 06-30 (D.N.H. Jan. 10, 2008) (stating that "observations . . . are not matters of expert opinion").

[88] *Fisher*, 238 F.R.D. at 278, 280.

[89] *Id.* at 281.

releasing those chemicals, and failed to take remedial action.[90]  The court concluded that such a

report would not assist it in evaluating the issues at bar:

> The document reads like the fact section of a brief . . . .  Is she not simply acting
> as another advocate for plaintiffs in arguing the facts in a manner that is most
> beneficial to her clients?  How does this purported expert report differ from a
> supplemental brief submitted by another lawyer for plaintiffs? . . . [T]he Court
> does not perceive [the witness's] report as an "expert report" at all, but rather as
> written advocacy by a lawyer, akin to a supplemental brief on the facts presented
> by another attorney . . . .[91]

In excluding the report, the court noted that an expert opinion in a class certification proceeding

only has to meet a "low hurdle" because the Federal Rules of Evidence "are not stringently

applied at the class certification stage."[92]  The court found that the expert's report could not even

meet this "low hurdle" due to the "one-sided recitation of record facts."[93]

Similarly, in *In re Rezulin*, the plaintiff's expert proposed to testify on the history of

events surrounding the controversial approval of the drug Rezulin by United States and foreign

regulators.[94]  The court agreed with the defendants that the expert's narrative did nothing more

than rehash the facts of the case with the expert's own "spin" on them.[95]  The court held that

evidence of the facts is "properly presented through percipient witnesses and documentary

evidence,"[96] and that such narrative testimony by an expert "does no more than counsel for

---

[90] *Id.* at 280-81.

[91] *Id.* at 281; *see also Highland Capital Mgmt., LP v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005)
(excluding an expert's testimony in part because the fact section of his report did nothing more than summarize
otherwise admissible evidence.); *Occulto v. Adamar of N.J., Inc.*, 125 F.R.D. 611, 616 (D.N.J. 1989) ("Experts
participate in a case because, ultimately, the trier of fact will be assisted by their opinions . . . .  They do not
participate as the alter-ego of the attorney who will be trying the case.").

[92] *Fisher*, 238 F.R.D. at 279, 281 (quotation omitted).

[93] *Id.* at 281.

[94] *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004).

[95] *Id.*

[96] *Id.*

plaintiff will do in argument, *i.e.*, propound a particular interpretation of [the defendant]'s conduct."[97]

In his report, LaRue constructs a narrative of the history of the FICA A Fund transaction that is based not on his personal knowledge, but on his review of documents produced in discovery in this case. LaRue's narrative contains numerous examples of an expert placing his own "slant" or "spin" on the facts. For example, he uses the term "Desired Loss" throughout his report to refer to the "transaction size"[98] and asserts that the FICA A Fund transaction was "designed to generate [a loss]."[99] He also states that the fees paid to KPMG and Helios Financial were a fixed percentage of the loss,[100] even though the documents upon which LaRue purports to rely do not so state,[101] no fact witness has so testified, and that factual issue is contested. LaRue also refers to the interest rate options throughout his report as the "Basis Trades" or "Basis Options."[102] "Basis" is a tax concept and LaRue's characterization serves no purpose but to advocate for a particular interpretation of the facts.[103] LaRue also writes that the "$325,[5]00 amount" that Plaintiff paid to purchase a portion of Samuel Mahoney's common interests in FICA A Fund "was established in Section 14.6 of Fidelity International's *Operating*

---

[97] *Id.* (quoting *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002)).

[98] Ex. A at ¶¶ 33, 44, 121, 123, 124.

[99] *Id.* at ¶ 33.

[100] *Id.* at ¶¶ 33, 123.

[101] *See* Ex. C at 011353 (stating that the fees are 3.5% of $150 million); Ex. D at 011547 (stating that fees are 3.5% and referring to an attached outline); Ex. E at 011975 (stating that the FICA A Fund transaction size is $150 million and the fee is 2.5%).

[102] Ex. A at ¶ 27.

[103] For example, a neutral party might describe these as the "interest rate options." While LaRue does use the term "Interest-Rate Options" in his report, he does so only twice in the body of his report and once in the footnotes. He uses the term "Basis Trades" and "Basis Options" approximately seventy times.

*Agreement*"[104] when, in fact, as he conceded at his deposition, "the amount is not stated [in the Operating Agreement], but the formula is."[105]  Finally, in discussing where Plaintiff reported the FICA A Fund loss on his 2001 return, LaRue cites a statement from a document produced in discovery in this case that is an agenda and notes from a July 2000 meeting.[106]  As LaRue acknowledged in his deposition, the FICA A Fund transaction was not proposed to Plaintiff until more than a year later.[107]  As the court in *In re Rezulin* concluded, a narrative of the facts should be presented by counsel through the introduction of documentary evidence and the questioning of witnesses with first-hand knowledge of the events.  LaRue's rendition of the facts, therefore, is unhelpful and must be excluded.

Additionally, LaRue's reports are replete with "observations" that are misleading and have no probative value because they do not relate to any of his opinions.  The cumulative effect of these observations is to imply that FICA A Fund and Plaintiff filed their returns in bad faith and with improperly reported items.  In particular, LaRue frequently offers observations regarding how the FICA A Fund transaction was reported without directly opining on whether that reporting was improper.  The following nine examples are just a few of the many that exist throughout LaRue's reports and testimony:

(1)    LaRue observes that on FICA A Fund's partnership return, FICA A Fund answered, "No," to the question, "Has this partnership filed, or is required to file, Form 8264, Application for Registration of a Tax Shelter."[108]  When asked at his deposition, "Are you

---

[104] Ex. A at ¶ 85.

[105] Ex. B at 230:17-18.

[106] Ex. A at ¶ 207.

[107] Ex. B at 284:20-285:2.

[108] Ex. A at ¶ 136.

intending to suggest that a form 8264 was required?" LaRue answered, "This is an observation, not an opinion."[109]

(2)    LaRue observes that FICA A Fund's Operating Agreement states that FICA A Fund will use the cash method of accounting, but that FICA A Fund "elected" to use the accrual method of accounting on its initial tax return.[110]  While this statement implies that FICA A Fund's "election" of the accrual method was inappropriate, at his deposition, LaRue testified that he did not know whether FICA A Fund's use of the accrual method was inappropriate; in fact, he said it was possible that FICA A Fund was required to use the accrual method.[111]

(3)    LaRue's opinion states, "The Fees allocated to the Gain/Loss Options (totaling $3,589,400) were recognized in 2001 as unidentified components of the gains and losses reported on the early termination of these options on Fidelity International's 2001 Form 1065."[112]  At his deposition, LaRue explained that what he meant by this is that "[t]he legal fees that were capitalized to the options were in no way identified as components of the bases used to calculate the gains and losses."[113]  When pressed on this statement, however, he admitted that, as a general matter, when a taxpayer disposes of an asset the various costs making up the taxpayer's basis in the asset are not separately identified on the tax return.[114]

(4)    In his report, LaRue states, "Fidelity International's Form 1065 (including the accompanying forms, schedules, statements, and attachments) did not disclose the fact that

---

[109] Ex. B at 251:22-252:2.

[110] Ex. A at ¶ 101.

[111] *See* Ex. B at 239:2-16 (stating that FICA A Fund may have been precluded from using the cash method of accounting by the Internal Revenue Code).

[112] Ex. A at ¶ 106.

[113] Ex. B at 243:19-22.

[114] *Id*. at 245:4-22.

$1,674,435 of the Fees had been specially allocated to Mr. Egan."[115]  In response to the question, "Are you suggesting here that such a disclosure was required to be included in the form 1065?" LaRue answered, "I made an observation here."[116]

(5)     In his report, LaRue states, "Line 25 of each of the members' Schedule K-1 was left blank."[117]  He testified, however, "That's an observation.  I didn't opine that that line should have been completed."[118]

(6)     In his report, LaRue states, "The Section 988 Summary does not present subtotals reflecting the amounts allocable before and after Mr. Egan's purchase of an 88% Common Membership Interest from Mr. Mahoney."[119]  He testified, however, that his observation is not a suggestion that this allocation was required to be reflected on FICA A Fund's partnership return.[120]

(7)     In his report, LaRue states, "Michael Egan signed the Egans' 2001 and 2002 Returns under a Power of Attorney."[121]  LaRue testified, however, that this is an "observation," that he is not opining that it was improper for Michael Egan to sign the returns, and that he does not know that this observation is relevant to any of his conclusions.[122]

---

[115] Ex. A at ¶ 112.

[116] Ex. B at 246:11-14.

[117] Ex. A at ¶ 137.

[118] Ex. B at 197:4-5.

[119] Ex. A at ¶ 146.

[120] *See* Ex. B at 267:2-6 (answering, "I'm not saying that it was required to be reflected," to the question, "[A]re you intending to suggest here that this allocation should have been reflected [on FICA A Fund's partnership return]?").

[121] Ex. A at ¶ 17.

[122] Ex. B at 203:12-204:1.

(8)     LaRue wrote in his report that Plaintiff filed a Form 8271 (Investor Reporting of Tax Shelter Registration Number) that listed ten tax shelters, but that did not list FICA A Fund.[123]  He testified, however, that "I'm making an observation that . . . Fidelity International was not listed on the form 8271.  Whether that was correct or incorrect is for others to determine."[124]

(9)     Both in his report and in his rebuttal report, LaRue makes the observation that KPMG "refused to sign the Egans' 2001 Form 1040 without the Disclosure Statement."[125] LaRue testified, however, that this is an "observation" and he is not opining that a disclosure statement was required.[126]

These observations, and others, are misleading because LaRue does not disclose in his reports that he is not opining on whether the reporting was proper or improper.  The cumulative effect (and apparent purpose) of these observations, which are irrelevant to LaRue's conclusions, is to insinuate that FICA A Fund and Plaintiff improperly reported the FICA A Fund transaction and attempted to hide the transaction from the IRS.  This partisan advocacy is impermissible. LaRue should not be permitted to testify regarding "observations" that have no relevance to his opinions or to summarize factual evidence that is more properly introduced through percipient witnesses and documentary evidence.

---

[123] Ex. A at ¶ 194.

[124] Ex. B at 279:6-9.

[125] Ex. A at ¶ 186; *see also* Ex. F (Rebuttal Report of David W. LaRue, Ph.D., Sept. 11, 2007) at ¶ 29 ("KPMG refused to sign, as preparer, the Egans 2001 Form 1040 without the inclusion of a Disclosure Statement for the Transaction-at-Issue.").

[126] Ex. B at 287:21-288:5.

### B.    LaRue Has a Financial Incentive To Be a Partisan Advocate

The fact that an expert "spends substantially all of his time consulting with attorneys and testifying" may be evidence of an "expert whose opinions are available to the highest bidder" and whose testimony has "no place" in a court of law.[127]  The amount of fees received from a party and the fact that an expert witness receives fees from the same party in connection with other cases affects the expert's credibility.[128]  "An expert witness should never become solely one party's expert advocate nor a 'gun for hire.'  Rather, an expert witness should be an advocate of the truth with testimony to help the jury and the Court reach the ultimate truth in a case, which is the basis of any verdict."[129]  While financial incentive to testify in favor of the hiring party alone may not be sufficient to exclude the testimony of an expert, a combination of factors that demonstrates partisan advocacy may justify the exclusion of an expert.

LaRue has a financial incentive to advocate on behalf of Defendant given the vast amount of work he does for the Tax Division of the Department of Justice and the Internal Revenue Service.  LaRue derives the lion's share of his income from acting as an expert for the government.  Over the last two years, LaRue has either served or been hired to serve as an expert for the Department of Justice or the IRS in twelve cases.[130]  In 2006, the government paid

---

[127] *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1234 (5th Cir. 1986).

[128] *See Reynolds v. Gen. Motors Corp.*, No. 04-0106, 2007 U.S. Dist. LEXIS 73101, at *6 (N.D. Fla. Sept. 28, 2007) ("Whether an expert has an ongoing relationship with a party and whether the expert earns a significant amount of income from testifying on behalf of that party is relevant and discoverable information.  Such information is certainly relevant to a witness's credibility and may be useful in cross-examination of an expert witness."); *Beckner v. Bayer Cropscience, L.P.*, No. 05-00530, 2006 U.S. Dist. LEXIS 44197, at *12 (S.D.W.V. June 28, 2006) ("Just as the amount a party pays in expert fees may tend to show bias in the expert, any additional monies or benefits the expert receives through a party may also show bias.  That bias may well influence the jury's view of [an expert's] opinions.").

[129] *Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*, 762 F. Supp. 1016, 1018 (D.P.R. 1991), *aff'd*, 958 F.2d 1169 (1st Cir. 1992).

[130] Ex. B at 84:12, 98:12-99:4, 100:13-20.  LaRue has not yet been disclosed as an expert in two of those cases.  *Id.*  In addition to the four cases listed in Appendix B of his report, LaRue has also been hired by the government in *In*

LaRue approximately $300,000 in connection with various cases in which he served as an expert for the government.[131]  In 2007, LaRue earned approximately $400,000 in expert witness fees from the government.[132]  The earnings LaRue has received working for the government in the last two years far surpass the $90,000 annual salary he receives as an Associate Professor from the University Virginia (by approximately 3 times for 2006 and approximately 4.5 times for 2007).[133]  LaRue lacks credibility because it appears that, in the past two years, he received the vast majority of his annual income from the government.  The large proportion of his income that he receives from the government provides an incentive to LaRue to opine in favor of the government.

It is fair to say that LaRue's primary occupation is being an expert consultant for the government.  He is not "an advocate of the truth,"[134] but an advocate for the government.  Nowhere is this more apparent than in his slanted recitation of the factual evidence and in his misleading observations that do not relate to his opinions and have the cumulative effect of implying that the reporting of FICA A Fund was improper.  The Court should exclude LaRue's

---

*re COBRA Tax Shelters Litig.*, No. 05-ml-09727 (S.D. Ind. filed Dec. 12, 2005); *JZ Buckingham Inv., LLC v. United States*, No. 05-00231 (Fed. Cl. filed Feb. 18, 2005); *Murfam Farms, LLC v. United States*, No. 06-00245 (Fed. Cl. filed Mar. 28, 2006); *Schering-Plough Corp. v. United States*, No. 05-02575 (D.N.J. filed May 16, 2005); and *Consol. Ed. Co. v. United States*, No. 06-00305 (Fed. Cl. filed Apr. 16, 2006).  Ex. B at 89:16-22, 94:3-4, 96:14-20. The government hired LaRue as an expert in two of the cases that are part of the *In re COBRA Tax Shelters Litigation*: *Carmel Partners v. United States*, No. 04-1661 (S.D. Ind. filed Oct. 13, 2004), and *Woods v. United States*, Nos. 05-216 & 05-217 (W.D. Tex. filed Mar. 18, 2005).

[131] Ex. B at 101:12-16.

[132] *Id.* at 101:17-102:2.

[133] *Id* at 17:18-22.  LaRue testified that, at the most, he earned $130,000 to $140,000 in one, two, or three years working at the University of Virginia due to extra duties he undertook or extra courses he taught.  *Id.* at 21:16-18, 22:1-6; *see also id.* at 18:9-20.  LaRue has not had these extra duties in the past couple years.  *See id.* at 18:21-19:7, 20:10-17; Ex. A at App. A.  LaRue also earns a director's fee and a fee for being chairman of the audit committee from MicroStrategy.  Ex. B at 102:3-11.

[134] *Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*, 762 F. Supp. 1016, 1018 (D.P.R. 1991) , *aff'd*, 958 F.2d 1169 (1st Cir. 1992).

testimony and reports because he is a partisan advocate whose opinions will not be helpful to the trier of fact.

## CONCLUSION

LaRue's reports violate the rules applicable to experts. Experts are not permitted to opine on the states of mind of individuals and companies. LaRue opines on the states of mind and motivations of those involved in preparing FICA A Fund's and Plaintiff's tax returns. Experts are required to have adequate qualifications and a sufficient foundation on which to base their opinions. LaRue lacks expertise in IRS return selection and tax return preparation, yet attempts to opine on the risk of detection and audit by the IRS. Experts are meant to be advocates for the truth, not partisan advocates. LaRue provides a one-sided factual summary of the evidence and misleading observations. For these reasons, the Court should grant Plaintiff's Motion to Exclude the Proposed Expert Testimony and Reports of David LaRue.

Respectfully submitted this 17th day of January 2008.

PLAINTIFF
FIDELITY INTERNATIONAL CURRENCY ADVISOR
A FUND, L.L.C., by the Tax Matters Partner

/s/ Lena Amanti
David J. Curtin, D.C. Bar #281220
Ronald L. Buch, Jr., D.C. Bar #450903
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone: (202) 775-1880
Facsimile: (202) 775-8586
Email: dcurtin@mckeenelson.com
        rbuch@mckeenelson.com
        lamanti@mckeenelson.com

John O. Mirick, BBO #349240
MIRICK, O'CONNELL, DEMALLIE
& LOUGEE, LLP
100 Front Street
Worcester, MA 01608
Telephone:  (508) 791-8500
Facsimile:  (508) 791-8502
Email: jomirick@mirickoconnell.com

### Certificate of Service

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 17, 2008.

/s/ Lena Amanti
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email: lamanti@mckeenelson.com

# Exhibit A
## Filed Under Seal

# Exhibit B
## Filed Under Seal

# Exhibit C

**Fidelity International Advisor A Fund LLC Investment**

9/27/01
*Updated @ CMLLC*

<u>**Outline of Proposed Transaction**</u>

1.  Richard J. Egan will form a single member limited liability company.  Proposed name is
    Fidelity World Currency Advisor A Fund, LLC ("World Currency Fund").  The World
    Currency Fund will be capitalized with $2,250,000.

2.  The World Currency Fund will enter into a Yen Put Spread (purchase of a put and the sale of a
    put) as follows:

    | | | |
    |---|---|---|
    | Long Put Premium | $150,000,000 | |
    | Short Put Premium | 147,750,000 | |
    | Net Investment | $ 2,250,000 | (1.5%) |

    | | **Two Examples of Possible Trades** | |
    |---|---|---|
    | | 25% Probability | 25% Probability |
    | Gross Potential Payoff | $ 6,455,815 | $6,554,069 |
    | Net Investment | (2,250,000) | (2,250,000) |
    | Net Potential Return Before Fees | $ 4,205,815 | $4,304,069 |
    | | | |
    | Current Spot | 115.93 | 115.93 |
    | Strike Price | 120.53 & below | 124.04 & above |
    | Option Term | 90 days | 360 days |
    | Movement Necessary | 3.97 % | 7% |
    | # of Times in Last 2 Years Movement Necessary Occurred | 215 times | 396 times |
    | Bid/Ask Spread | $645,582 | $655,407 |

3.  $2,250,000 should be wired as follows:

    Harris Trust and Savings Bank
    Chicago, IL
    | | |
    |---|---|
    | ABA #: | 071 000 288 |
    | Account: | RefCo Capital LLC |
    | Account #: | 390 4406 |
    | Ref: | RefCo Capital Markets Account 13-006 |
    | Further Ref: | Fidelity World Currency Advisor A Fund  LLC |
    | Account #: | To be supplied |

R:\Investments\Projects\Helios2-TAB\Outline of Proposed 2001 Transaction 9.20.01 corrected.doc

4.  Approximately 7 days later, Fidelity International Advisor A Fund LLC, a limited liability company taxable as a partnership, is formed and capitalized as follows:

   (a)  Richard Egan will contribute his member interest in the World Currency Fund (assumed value of $1,500,000) and cash of $2,674,500.

   (b)  Alpha Consultants LLC will contribute $7,000.

   (c)  Helios will contribute $7,000.

   (d)  SM, an Individual Investor will contribute $651,000.

The following is a summary of the capital structure after the initial contribution:

|  | Common Cash Contribution | Preferred Cash & Property * Contribution | Total Cash & Property | Capital Share | Profit/Loss Share |
|---|---|---|---|---|---|
| Richard J. Egan | $35,000 | $4,139,500 | $4,174,500 | 86.25% | 5% |
| Alpha | 7,000 | | 7,000 | .15 | 1 |
| Helios | 7,000 | | 7,000 | .15 | 1 |
| SM | 651,000 | | 651,000 | 13.45 | 93 |
| TOTAL | $700,000 | $4,139,500 | $4,839,500 | 100.00% | 100% |

\* Values Fidelity World Currency Advisor A Fund LLC interests are estimated. To the extent values differ the preferred interests will be adjusted accordingly.

5.  Fidelity International Advisor A Fund LLC will enter into a series of trades which can be summarized as follows:

| Trade Type | Yen Range | Yen Range |
|---|---|---|
| Probability of Profit | 25% | 25% |
| Gross Potential Payoff | $8,610,010 | $8,649,788 |
| Net Investment | (3,000,000) | (3,000,000) |
| Net Potential Return Before Fees | $5,610,010 | $5,649,788 |
| Current Spot | 115.93 | 115.93 |
| Strike Price for Profitability | 118.00 to 124.63 | 118.00 to 126.61 |
| Option Term | 90 days | 180 days |

The above are examples of trades that may be entered into.

011352

6.  After approximately 30 days, SM will sell a portion of his common interests as follows:

| Purchaser | Percentage Interest | Purchase Price * |
|---|---|---|
| Richard J. Egan | 85% | $325,500 |

\*  Will be at FMV with a minimum ( stated above - is 50% of original investment).

7.  <u>Summary of Out of Pocket Expenditures</u>

|  | **Total** | **% \*\*** |
|---|---|---|
| Fidelity World Currency Advisor A Fund LLC Capital Contribution | $2,250,000 | 1.5% |
| Cash Contribution to Fidelity International Advisor A Fund  LLC | 2,674,500 | 2.0 |
| Buy Out of SM | 325,500 | |
| Fees | 5,250,000 | 3.5 |
|  | | |
| Total Out of Pocket Costs | $10,500,000 | 7.0% |

\*\* Represents % of  $150M
Does **NOT** include additional investment needed of $9.75 million. (See Number 9 below)
Total cash needed is $10,500,000 + $9,750,000 = $20,250,000

8.  <u>Richard J. Egan – Pre-Tax Profit Potential</u>

Gross Payoff Options        $15,065,825        $15,203,857

<u>Potential Share for Richard J. Egan</u>

|  | **Short Term Trades** | **Longer Term Trades** |
|---|---|---|
|  | **Total** | **Total** |
| Preferred Interest | $ 4,139,500 | $ 4,139,500 |
| Common Interest (1) | 9,833,693 | 9,957,921 |
|  | | |
| Total | $13,973,193 | $14,097,421 |
|  | | |
| Out of Pocket Costs | (10,500,000) | (10,500,000) |
|  | | |
| Net Potential Return | $3,473,193 | $3,597,421 |

(1)  Gross return less preferred interests of $4,139,500 times his respective common interest (90%).

9.  After above trading activity is completed Mr. Egan will make an additional contribution of $9.75 million (6.5%) (less the amount already invested in Mariner Horizon 6A Fund) to Fidelity International Currency Advisor A Fund LLC to further the investment activities of the LLC. Amount for Mariner Horizon 6A would have been contributed at the same time as the $2,674,500 cash contribution to the Fidelity International Advisor A Fund. (#4 above).

# Exhibit D

# Egan Family Entity
# Tax Advantaged Investment Structure

**September 21, 2001**

# Tax Advantaged Investment Structures
## As Discussed September 7, 2001

- Egan family office entities desire access to individually tailored strategic investments focused on alternative investments, comprised of hedge, venture capital, leveraged buyout, and other private investment funds

- A long-term objective is to attain significant pre-tax profits through participation in investment structures that traditionally have had high rates of return

- These investment structures may result in favorable tax consequences to the Egan family, providing deferral or elimination opportunities

- As a result of our review, we have designed a tax-advantaged Egan family office customized investment structure, considering the long-term investment objectives of an Egan Family 2001 LLC

2

3

# Egan Family 2001 LLC Investment Structure

*September 21, 2001*

011545

# Egan Family 2001 LLC Investment
## Proposed Structure

- By October 8, 2001 Richard J. Egan (RJE) forms a single member limited liability corporation, RJE Trading Company LLC (RJE LLC)

- RJE's initial investment in RJE LLC is $ 2.25 million which is used to acquire a foreign currency option spread (see separate economic depiction of the terms of this trade)

- On approximately October 15, RJE contributes to Egan Family 2001 LLC (a new entity) the RJE LLC and cash of approximately $ 2.65 million. another entity manages LLC investments

- RJE initially has a 5% common interest and a convertible preferred interest in Egan Family 2001 LLC. Preferred interest has a guaranteed 8% return, with shared appreciation on common interests owned by other common members

- The remaining 95% common interest in Egan Family 2001 LLC is owned by Alpha (1%), Helios (1%), and a Co-investor (93%), with cash contributed in the amount of $ 665,000 by these members

- Egan Family 2001 LLC then enters into a series of option trades (see separate economic depiction)

- On November 15, RJE may purchase an 85% common interest from Co-investor under the LLC agreement (estimated purchase price is $ 325,000)

- The 85% common interest purchase price is determined on a mark to market basis (net value considers unrealized losses)

- Before December 31, 2001 and after currency option trading is completed, RJE will make an additional capital contribution of $ 9.75 million to Egan Family 2001 LLC, so the LLC can continue investment activities

- Egan Family 2001 LLC continues investment activities through 2003

011546

# Egan Family 2001 LLC Investment
## Proposed Structure Comments

- Brian Cave or Proskauer Rose or Sidley Austin or Lord Bissell – more likely than not level tax opinion at two dates – (i) contemporaneously with the transaction, and (ii) at the 2001 tax returns filing date

- Daily allocation cut off method, with regard to partnership gains and losses, see IRC Sec. 704(c)

  - No technical termination of LLC as Richard Egan owns more than 50% of the capital of the LLC before and after the acquisition of the 85% (considering ownership of the preferred interest)

- 2000 Salina case distinguishes the Helmer case. Option sale proceeds do not result in IRC Sec. 752 liabilities. Short sale proceeds do result in IRC Sec. 752 liabilities. The transaction is not a short sale. ACM and 2000-44 distinguishable; 2001-45 does not apply; cite also IRC Secs. 701, 465

- Unencumbered investments post transaction, with no investment restrictions

- There is no requirement or document that infers or states that RJE will possess or acquire an option to obtain the Co-investor's LLC interest. Instead, the LLC agreement will not prohibit arms length transactions between members, including the ability of members to transfer member interests

- Consider distributing long option positions to RJE before option sale or expiration

- Sec 704 inapplicability and no income recognition upon option settling

- Total investment in Egan Family 2001 LLC will be approximately $ 15 million

- Review the size of the 2001 currency option trades, considering investment reporting requirements

- Total funding ("Out of Pocket") is 7% for (i) 3.5% transaction fees and (ii) cost of currency options and (iii) purchase of Co-investor interest (3.5%) – see item 7. on attached outline

011547

# Egan Family 2001 LLC Investment
## Proposed Structure

RJE's initial common interest is 5%. After acquiring the 85% common interest, RJE retains a convertible, 8% preferred interest, with shared appreciation on the 10% common interests owned by other investors. RJE contributes $9.75 million to the Egan Family 2001 LLC in December, 2001

Helios Fund Manager

Alpha Investment Advisor

Co-Investor

1% Common
$7,000

1% Common
$7,000

$651,000

93% Common

Egan Family 2001 LLC
(a new Entity)

Acquire 85% Common (11/15)

Obtain 5% Common (10/15)

Short option to increase outside basis

RJE Creates SMLLC On 10/8

SMLLC interest with cash of $ 2.65 million is contributed to Egan Family 2001 LLC on 10/15

Single Member LLC (holds long and short option position), acquired for $ 2.25 million on 10/8

• Sell 85% Common interest to RJE; retain 8% common

$9.75 Million

Other Alternative Investments

Gain and Loss Straddles $.5 Million

• $150 Million gain and loss position, plus SMLLC options

011548

# Expected Income Tax Consequences of
# Egan Family 2001 LLC Investment

| | Sale without FPS | Sale with FPS |
|---|---|---|
| Ordinary Income Recognized in 2001 | $150,000,000 | $150,000,000 |
| Ordinary Loss From Investments | 0 | (150,000,000) |
| Net Gain/(Loss) | $150,000,000 | $0 |
| Ordinary Income Rate | 43.5% | 43.5 |
| Income Tax Liability | $65,250,000 | $0 |
| **Expected Permanent Tax Benefits** | | **$62,500,000** |

65,250,000

8

# Egan Family 2001 LLC Investment
## Proposed Structure – Investment Considerations

- Currency options to consider in the current economic environment
  - Euro, Yen, other currencies
  - Smaller trades (and sales and expirations) compared to larger trades
  - Reporting issues
  - Probability and profitability relationships and payoffs based upon risk tolerance
  - Other factors

- Alternative investments to consider in the current economic environment
  - Equities
  - Fixed Income
  - Equities/Fixed Income
  - Risk Tolerance
  - Desired Rates of Return
  - Investment Duration
  - Other factors

# Egan Family 2001 LLC Investment Implementation Timeline

- 9/13 - Follow up from September 7, 2001 to discuss investment structure, economics, timeline, investments, transaction costs

- 9/17 – Commence FOCus investment review, investment options, and modeling probability and profitability outcomes

- 9/17 – Commence alternative investment review, risk tolerance, desired rates of return

- 9/24 – Agree on engagement letter terms, investment structure, transaction costs

- 10/1 – Complete investment review of options. Commence investment structure implementation

- 10/8 through 10/15 – Commence funding investments, select option duration, other attributes

- 10/22 – Review daily investment activity timeline, look to factors impacting option values through December 31, 2001 and beyond 2001



FIDELITY ENTITIES

9

# Exhibit E

**Shea, Pat**

| | |
|---|---|
| **From:** | James Haber [jhaber@divgroup.com] |
| **Sent:** | Thursday, December 06, 2001 4:11 PM |
| **To:** | Shea, Pat |
| **Subject:** | Re: open items |

*[handwritten: Less the charged offset Clocks]*     *[handwritten: 160m x 1.5% 2400,000]*

As to fees:

Helios 1 was for $160 million.  We are proposing that Helios be paid a fee     *[handwritten: $1,600,000  1600,000.]*
of 1% which includes you receiving a tax opinion from Proskauer Rose.  The
transaction will be complete from our perspective once the member interests
are transferred and a section 754 election is triggered.

Helios 2 transaction size is $150 million.  Our agreement was for a fee of     *[handwritten: 3750,000   3,750,000]*
2.5%.  Again, we are indifferent as to whether it is paid from the Fund or     *[handwritten: $5,750,000   1975,000]*
directly.
*[handwritten: 2.5%]*
We will forward wire instructions once you are prepared to pay. If you have     *[handwritten: Reduced 375,000]*
any questions please feel free to contact me.


----- Original Message -----     *[handwritten: 2400  Down to]*
From: "Shea, Pat" <PatS@cmllc.com>     *[handwritten: 1225]*
To: <jhaber@divgroup.com>
Sent: Thursday, December 06, 2001 3:18 PM     *[handwritten circled: 1,175,000]*
Subject: open items


>
> Jimmy--
> We never got to discuss the fees and how to disburse--
> On Helios 2 your fee was to be a% of the fund payable prior to 12/31--
>
> What is the % and what is the fund amount??
>
> Helios 1 -- that transaction is completely different to what was supposed
to
> happen--what is the fee and how do you want payment for that transaction--
> Will we get an opinion letter on the merit of the transaction ??  I need
an
> understanding of the completion of this trade--
>
>
> KPMG is suggesting that we pay yhe fees directly from the fund and not
with
> outside $$$$--- Dick will put $$$ in to the fund and we will pay from the
> partnership-- you stated that was ok with you --- however you stated that
> most clients paid outside the fund-- am I missing anything ?? does it
> matter??
>
> KPMG is also requesting that we have a telcon with Sam Mahoney or at least
> establish a reason that we entered in to this transaction with him-- what
> are your comments on that subject??     *[handwritten: original   Final]*
>
> Let's discuss     *[handwritten: Total Fees For the 2 Deals Haber]*
>
> Thanks     *[handwritten: Helios 1    2400,000   1600,000]*
>
> pat     *[handwritten: Helios 2    3750,000   3325,000]*
>
     *[handwritten: 6150,000   4975,000]*
                                        1     *[handwritten: Reduction   $1,175,000]*
     *[handwritten: Fees KPMG   1+1   H2]*     *[handwritten: -   200,000   1,500,000   1,700,000]*

# Exhibit F
## Filed Under Seal