# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No.: 05-40151-FDS |
|  | ) | 06-40130-FDS |
| v. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE PROPOSED EXPERT TESTIMONY AND REPORTS OF GORDON RAUSSER

FIDELITY INTERNATIONAL CURRENCY ADVISOR
A FUND, L.L.C., by the Tax Matters Partner, Plaintiff

David J. Curtin, D.C. Bar #281220
Ronald L. Buch, Jr., D.C. Bar #450903
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone: (202) 775-1880
Facsimile: (202) 775-8586
Email: dcurtin@mckeenelson.com
        rbuch@mckeenelson.com
        lamanti@mckeenelson.com

John O. Mirick, BBO #349240
MIRICK, O'CONNELL, DEMALLIE
& LOUGEE, LLP
100 Front Street
Worcester, MA 01608
Telephone: (508) 791-8500
Facsimile: (508) 791-8502
Email: jomirick@mirickoconnell.com

# TABLE OF CONTENTS

Background ..........................................................................................................................2

   I.  Gordon Rausser..............................................................................................2

   II.  Laura Craft ...................................................................................................4

   III. OnPoint Analytics, Inc..................................................................................5

   IV. Judicial Criticism ........................................................................................7

Argument .............................................................................................................................8

   I.  Rausser Tries to Supplant the Role of Counsel in Presenting the Defendant's View of the Evidence ..............................................................10

   II.  Rausser's Opinions on the Business Purposes, Motivations, and States of Mind of the Parties and Other Witnesses Are Inappropriate ........................14

   III. Rausser Inappropriately Renders Opinions on Legal Issues.............................18

      A.  Opinions Regarding Contract Interpretation................................................18

      B.  Opinion on Order of Transactions ..............................................................22

      C.  Use of Specialized Legal Terms .................................................................22

   IV. Rausser's Use of "Similar Transactions" to Test His Conclusions Is Merely Counsel's Means of Presenting Inadmissible Evidence .........................25

   V.  Rausser's Opinions Are Unreliable Because He Repeatedly Asserts Unsupportable Inferences .........................................................................27

   VI. The Court Should Exclude Rausser's Testimony Because Tendering the Report and Rebuttal Report As His Own Is a Breach of Duty to the Court ................................28

   CONCLUSION.................................................................................................32

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case Nos.: 05-40151-FDS 06-40130-FDS |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE PROPOSED <u>EXPERT TESTIMONY AND REPORTS OF GORDON RAUSSER</u>

This motion requests the Court to use its "gatekeeper" powers in evaluating whether the proposed testimony of Gordon Rausser is (1) trustworthy, reliable, and independent, (2) based on sufficient and complete facts, (3) helpful to the Court, (4) relevant, and (5) not unduly cumulative. Drafted by his own lawyer, Rausser's reports are advocacy pieces that are tainted by their reliance on unsupported factual assumptions and inferences, aggressive advocacy of Defendant's inferences and version of the facts, and legal opinions. Rausser's opinions do not pass the "gatekeeper" test. Admission of his testimony and reports would be inappropriate under the Federal Rules of Evidence and the substantial body of case law governing the admissibility of expert opinions.

## BACKGROUND

Defendant seeks to offer Rausser's testimony on a combination of legal issues and ultimate issues of fact that are for this Court to decide. Rausser has submitted a report (the "Initial Report")[1] and a rebuttal report in response to the reports of Plaintiff's experts Andrew Carron and Ethan Yale (the "Rebuttal Report").[2] (The Initial Report together with the Rebuttal Report are collectively referred to as the "Rausser Reports".) The Rausser Reports do not reflect the careful, considered analysis of an objective economist. Instead, they read like legal briefs. This should come as no surprise: his firm, OnPoint Analytics, Inc., which drafted them, advertises itself as being "managed by trial lawyers,"[3] such as Laura Craft, the California lawyer who is president of OnPoint. The documents that Rausser and OnPoint have produced to Plaintiff demonstrate that Rausser has crossed the line that separates independent expert analysis from partisan advocacy.

## I.    Gordon Rausser

Rausser began his career as an expert witness when he founded the Law and Economic Research Group (LECG) with several other Berkeley professors in 1989.[4] Rausser remained at LECG until October 2000, when he became a senior consultant at Charles River Associates.[5]

---

[1] Ex. 1 (Expert Report of Gordon Rausser, Ph.D., Aug. 7, 2007).

[2] Ex. 2 (Expert Rebuttal Report of Gordon Rausser, Ph.D., Sept. 11, 2007).

[3] *See* Ex. 3 (OnPoint, http://www.onpointanalytics.com (last visited Jan. 15, 2008)). Rausser claims the OnPoint website is out of date, *see* Ex. 4 at 100:14-17 (Gordon Rausser Dep., Nov. 30, 2007), and that OnPoint is no longer managed by trial lawyers, *see* Ex. 4 at 102:9-18. Notwithstanding this testimony, the president of OnPoint, Craft, is an attorney who continues to represent Rausser in his personal litigation, *see* Ex. 4 at 91:6-10, 92:10-12, and OnPoint's website has not changed.

[4] *See* Ex. 4 at 67:17-68:22; *see also* Jonathan Marshall, *Signing Up Laura Tyson*, San Francisco Chron., Apr. 26, 1997, at D1.

[5] *Charles River Associates Acquires Consulting Practice; Expands West Coast Expertise and Provides Penetration into Southwest Region*, Bus.Wire, Oct. 23, 2000.

Rausser brought three other consultants with him when he moved to Charles River.[6]  These other consultants brought suit in Utah against Rausser in 2004 in *Kearl v. Rausser* for, among other things, breach of contract and fraud in connection with the parties' agreement to share stock granted to Rausser by Charles River.[7]  After a jury trial in 2006, these former colleagues were awarded $5.17 million in damages for breach of contract.[8]  Rausser continued to provide his expert consulting services through Charles River through 2005;[9] interestingly, however, the resume attached to the Rausser Report omitted his five years of service at Charles River.[10]

In 2004, Rausser and Craft created OnPoint, with Rausser owning 60% and Craft owning 40%.[11]  Rausser and Craft had gone into business together once before, when they formed Opt4 Derivatives, Inc. in 2000.[12]  Rausser described Opt4 as "an organization actively engaged in structured contracts, designing the contracts, and then developing OTC platforms for trading those contracts."[13]  Craft held several different offices at Opt4, including President, CEO, and General Counsel.[14]  In 2004, due to Opt4's cash flow problems, Rausser loaned Opt4 over $2 million.[15]  When Opt4 defaulted on this and other loans, its assets were sold at a foreclosure

---

[6] *See id.*; *see also* Ex. 4 at 88:18-89:14.

[7] *See Kearl v. Rausser*, No. 04-00175 (D. Utah filed Feb. 17, 2004); *see also* Ex. 5.

[8] Ex. 6 (Judgment, *Kearl v. Rausser*, No. 04-00175 (D. Utah filed Oct. 6, 2006)).

[9] *See* Ex. 4 at 72:5-9.

[10] *See* Ex. 4 at 74:13-75:6.

[11] *See* Ex. 4 at 75:7-12; 56:3-13.

[12] *See* Ex. 4 at 82:1-5.

[13] *See* Ex. 4 at 55:15-19.

[14] *See* Ex. 4 at 55:14-15; *see also* Ex. 7 (Dec. of Laura R. Craft in Opp'n to Mot. for Leave to Amend, *AT&T Corp. v. Opt4 Derivatives, Inc.*, No. 04-03699 (N.D. Cal. filed Apr. 14, 2005)).

[15] *See* Ex. 7 at ¶ 8.

auction in October 2004.[16]  Rausser and a co-investor acquired Opt4's intellectual property at

this sale.[17]

## II.    Laura Craft

Laura Craft serves as OnPoint's president and was the "project manager" for the FICA A

Fund matter.[18]  Craft is an attorney with considerable trial experience.  She has represented

Rausser in at least five actions since 1994,[19] including acting as his lead counsel in the August

2006 jury trial of *Kearl v. Rausser*.[20]  Although Rausser claimed in his deposition that Craft does

not practice law out of OnPoint's offices,[21] the evidence is to the contrary:  the address and

phone number used by Craft at OnPoint are identical to those repeatedly listed for her on filings

in *Kearl*.[22]

The documents produced by OnPoint show that Craft was the primary drafter of the

Rausser Reports.  She was assisted by Chandra Wallace, another California lawyer.[23]  At the

same time Craft and Wallace were drafting the reports for the FICA A Fund matter, they were

also working on the appellant's brief to be filed with the United States Court of Appeals for the

Tenth Circuit on behalf of Rausser in the *Kearl* case.  The Rausser Reports are as much advocacy

---

[16] *See* Ex. 7 at ¶¶ 9, 10.

[17] *See* Ex. 7 at ¶ 10.

[18] *See* Ex. 4 at 56:3-7; 10:15-16.

[19] *AT&T v. Opt4 Derivatives, Inc.*, No. 04- 03699 (N.D. Cal. filed Sept. 1, 2004); *Kearl  v. Rausser*, No. 04-00175 (D. Utah filed Feb. 17, 2004); *Rausser v. Bachner Tally Polevo*, No. 98- 04843 (N.D. Cal. filed Dec. 18, 1998); *Rausser v. Duke & Co.*, No. 95-1186 (N.D. Cal. filed Apr. 7, 1995); *Rausser v. Duke & Co.*, No. 94-03256 (N.D. Cal. filed Sept. 13, 1994).

[20] Ex. 5.

[21] Ex. 4 at 94:8-9 ("*Q*. Does [Laura Craft] practice law out of OnPoint? *A*. No.").

[22] *Compare* Ex. 8 (email from L. Craft to C. Wallace (July 24, 2007)) (including signature block with Craft's address and phone number) *with* Exs. 5, 9 (listing Craft's address and phone number on the attorney report for *Kearl v. Rausser*, No. 04-00175 (D. Utah filed Feb. 17, 2004) and the docket report for *Kearl v. Rausser*, No. 07-4021 (10th Cir. filed Jan. 23, 2007)); *see also* Ex. 4 at 95:14-19 (admitting that OnPoint and Craft had the same address).

[23] *See* Ex. 4 at 26:22-27:12.

pieces as was Rausser's brief on appeal.  In a July 5, 2007 email, Wallace wrote to Craft that she

was "working on Gordon's brief now."[24]  On July 24, two weeks before the due date of the

Initial Report, Craft wrote to Wallace, "I know you are buried with Utah Fact Statement."[25]

Two days after the submission of the Initial Report, Wallace wrote that she was about "to finish

moving sections and filling in facts for the Stoel brief so I can get that to you by the end of the

day."[26]  It is evident that "Gordon's brief," the "Utah Fact Statement," and the "Stoel brief" all

refer to the *Kearl* appellate brief, which was filed on August 29, 2007, shortly after the Initial

Report was submitted in this case.[27]  Remarkably, when presented with these emails during his

deposition, Rausser denied having any knowledge as to what Craft and Wallace were referring to

by "Gordon's brief," the "Utah Fact Statement," or the "Stoel brief."[28]

## III.    OnPoint Analytics, Inc.

It appears that Craft, Rausser, and others at OnPoint have provided a variety of services

to Defendant, including the tutorial presented to the Court on March 15, 2007.[29]  In a January

10, 2008 meeting with Plaintiff's counsel, government counsel disclosed that, in addition to

Rausser serving as a testifying expert, OnPoint served as a "consulting expert."  One internal

OnPoint document estimates that the total amount that will be paid to OnPoint for its FICA A

Fund work will exceed $1.2 million—an amount so high as to suggest that Craft, Rausser, and

---

[24] *See* Ex. 10 (email from C. Wallace to L. Craft, cc to J. Galindo (July 5, 2007)).

[25] *See* Ex. 8 (email from L. Craft to C. Wallace (July 24, 2007)).

[26] *See* Ex. 11 (email from C. Wallace to L. Craft (Aug. 9, 2007)).

[27] The law firm of Stoel Rives LLP was local counsel for Rausser at the trial and is co-counsel with Craft in the pending appeal. *See* Ex. 9.

[28] *See* Ex. 4 at 111:12-14; 112:21-113:7; 113:22-114:12.  Rausser's inability to identify the "Stoel brief" is particularly surprising given his insistence that Stoel Rives LLP, not Craft, was representing him on appeal.  *See* Ex. 4 at 91:6-16; 116:2-18.

[29] *See* Ex. 4 at 22:16-21 (tutorial work); 54:10-55:6 (stating that Craft and Wallace assisted Defendant in preparing for fact witness depositions).

others at OnPoint were working simultaneously as both advocating experts and trial expert.[30] The level of advocacy contained in the Rausser Reports is further evidence of OnPoint's blended-expert role in this litigation.

OnPoint's invoices reveal the extent of the services it has provided to Defendant. For example, descriptions of OnPoint's work include:

- "review and analysis of Brattle presentation;"[31]

- "analysis of document redactions by plaintiffs;"[32]

- "review motion papers and exhibits re motion to compel production of documents from DGI/Haber;"[33]

- "receive, review and summarize production received from other experts;"[34]

- "Research [Andrew] Carron engagement letters and invoices;"[35] and

- "Coordinate data entry of Carron attorney invoices."[36]

OnPoint's refusal to produce expert work product and communications responsive to Plaintiff's discovery requests and subpoenas for the first six months of OnPoint's engagement— during which OnPoint and Rausser performed nearly $500,000 worth of work—is apparently based on Defendant's claim that the expert role of Craft, Rausser, and others at OnPoint can be

---

[30] *See* Ex. 12 at OPA003735 (email from C. Wallace to G. Rausser, L. Craft (Sept. 13, 2007) (attaching updated budget)). It should be noted that the first sentence of OnPoint's September 15, 2006 budget proposal states, "[T]his memo sets forth the proposed budget for expert services . . . in connection with the *Son of Boss tax shelter litigation* identified as *Fidelity International Currency Advisor A Fund LLC v. United States of America.*" *See* Ex. 13 at OPA008258 (emphasis added). Such a loaded statement shows how, prior to any analysis, Rausser and the OnPoint staff accepted Defendant's hotly disputed claim that Plaintiff participated in a Son of Boss tax shelter, and it demonstrates a willingness to advocate that position.

[31] Ex. 14 at OPA008270 (Invoice #1376 (Dec. 31, 2006)).

[32] Ex. 15 at OPA008276 (Invoice #1452 (Mar. 31, 2007)).

[33] Ex. 16 at OPA008303 (Invoice #1517 (July 30, 2007)).

[34] Ex. 17 at OPA008321 (Invoice #10069 (Nov. 29, 2007)).

[35] Ex. 17 at OPA008322.

[36] Ex. 17 at OPA008322.

neatly bifurcated between trial expert and consulting, or advocacy, expert.  This practice of using one firm to provide consulting and testifying experts has been admonished as "playing with fire."[37]  Indeed, Craft and Rausser (OnPoint's owners), as well as Defendant, are playing with the rules governing expert discovery.  OnPoint has only one office location at 2000 Powell Street, in Emeryville, California, and as Rausser admitted, he has access to all materials received and generated by OnPoint.[38]  In short, the services provided by OnPoint were not bifurcated; they were performed by the same people, the files were maintained at the same place, and the same people (Craft and Rausser) who produced the Rausser Reports also performed the "consulting" expert services.

## IV.    Judicial Criticism

This is not the first case in which Rausser's opinions have fallen short of what is expected from an expert witness.  Several courts and administrative law judges have criticized Rausser for basing his opinions on unsupportable inferences and assumptions and "questionable" methodology.[39]  In a case in the Northern District of New York, the court described most of Rausser's testimony as being "speculative and [having] insufficient evidentiary support."[40]  Likewise, the Court of Appeals for the Eighth Circuit criticized Rausser's opinion in an antitrust class action suit involving allegations that a conspiracy among potash producers resulted in

---

[37] *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 280 (E.D. Va. 2001).

[38] *See* Ex. 4 at 49:2-9 (stating that Rausser had access to OnPoint's "P" drive, where client materials were stored); Ex. 4 at 133:12-134:2 (stating that Rausser had access to Craft's computer, where draft reports were stored).

[39] *See, e.g., In the Matter of Mark B. Fisher,* C.F.T.C. No. 93-2, 2004 CFTC LEXIS 49, at*47 (Comm. Fut. Trading Comm'n Mar. 24, 2004) ("The ALJ also commented that Rausser's methodology was 'questionable,' and criticized him for failing to address how often the wash result pattern he evaluated should randomly appear in the context of open and competitive trading.").

[40] *Oxygenated Fuels Ass'n. v. Pataki*, 293 F. Supp. 2d 170, 181 (N.D.N.Y. 2003) (referring to  Rausser's assumption that the supply of reformulated gasoline would decline by 5 to 10 percent if New York state banned the use of a certain type of fuel.); *see also See Oyster Software, Inc. v. Forms Processing, Inc.*, No. 00-0724, 2001 U.S. Dist. LEXIS 22520, at *16-18 (N.D. Cal. 2001) (criticizing Rausser for *assuming* that a decrease in visitors to the plaintiff's website resulted in a decrease in the plaintiff's revenue).

higher prices.[41]  There, the Eighth Circuit concluded that Rausser's report was unreliable

because of "his heavy (if not exclusive) reliance on evidence that is not probative of conspiracy,

coupled with his failure to consider significant external forces that served to raise the price of

potash."[42]  Most strikingly, in a case requiring the calculation of future profits, the Southern

District of New York held that Rausser's model "appears not grounded in reality."[43]

## ARGUMENT

Judge Posner has famously complained that expert witnesses are often "the mere paid

advocates or partisans of those who employ and pay them, as much so as the attorneys who

conduct the suit."[44]  In response to such concerns, the Supreme Court has instructed trial judges

to act as "gatekeepers" with respect to expert testimony.[45]  Specifically, trial judges must

evaluate a proffered expert's testimony for both "relevance and reliability."[46]  Federal Rule of

Evidence 702 provides that expert testimony is relevant if it "will assist the trier of fact to

understand the evidence or to determine a fact in issue."  The examination of the reliability of an

expert's testimony requires an inquiry into its trustworthiness.[47]  As required for all evidence,

expert testimony must be relevant under Federal Rules of Evidence 401 and 402 and must not be

unfairly prejudicial, confusing, a waste of time, or needlessly cumulative under Federal Rule of

---

[41] *See Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1038 (8th Cir. 2000).

[42] *Id.*

[43] *Tractebel Energy Mktg., Inc.  v. AEP Power Mktg., Inc.*,  No. 03-6731, 2005 U.S. Dist. LEXIS 15972, at *47 (S.D.N.Y. Aug. 8, 2005), *amended in part by* 2006 U.S. Dist. LEXIS 1702 (S.D.N.Y. Jan. 20, 2006), *aff'd in part, vacated in part*, 487 F.3d 89 (2d Cir. 2007).

[44] *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 382 (7th Cir. 1986) (quoting *Keegan v. Minneapolis & St. Louis R.R.*, 76 Minn. 90, 95, 78 N.W. 965, 966 (1899)).

[45] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993); *see also* Fed. R. Evid. 702 advisory committee's note ("The amendment affirms the trial court's role as gatekeeper . . . .").

[46] *See Daubert*, 509 U.S. at 594-95.

[47] *See id.* at 590 n.9 ("[O]ur reference here is to *evidentiary* reliability—that is, trustworthiness.").

Evidence 403.  Further, the proponent of the expert testimony must demonstrate admissibility by a preponderance of the evidence.[48]

A court's evaluation of the relevance and reliability of an expert's testimony is meant to be flexible and "there is no particular procedure [the judge] is required to follow."[49]  In the landmark case of *Daubert v. Merrell Dow*, the Supreme Court examined the reliability of scientific testimony by considering whether the expert's methodology had been tested, peer-reviewed, and accepted in the scientific community.[50]  The Supreme Court has emphasized that the factors used in *Daubert* "neither necessarily nor exclusively appl[y] to all experts or in every case"[51] and that those factors were merely "meant to be helpful, not definitive."[52]

Trial courts react when the "witness ceases to be an expert whose testimony is valuable because he or she is not an advocate and becomes, instead, just another legal practitioner for the client."[53]  When an expert's "opinions cross the line between expert analysis and advocacy," the proffered testimony is no longer helpful to the court and should be excluded.[54]  Most

---

[48] *Id.* at 592 n.10; *see also* Fed. R. Evid. 702 advisory committee's note (2000 amendments) (stating that, under Federal Rule of Evidence 104(a), "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence"); *Bourjaily v. United States*, 483 U.S. 171, 176 (1987) (holding the offering party must prove admissibility requirements by a preponderance of the evidence).

[49] *United States v. Vargas*, 471 F.3d 255, 261 (1st Cir. 2006);  *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."); *United States v. Sebaggala*, 256 F.3d 59, 65-66 (1st Cir. 2001) (discussing a trial court's considerable latitude in the admission and exclusion of expert testimony under Fed. R. Evid. 702).

[50] *Daubert*, 509 U.S. at 593-94.

[51] *Kumho Tire*, 526 U.S. at 141.

[52] *Id.* at 151.

[53] *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 290 (E.D. Va. 2001); *see also United States v. Allerheiligen*, No. 97-40090-01, 1998 WL 918841, at *7 (D. Kan. Nov. 19, 1998) (excluding expert testimony because it "lack[ed] objectivity").

[54] *United States v. Ramirez*, 495 F. Supp. 2d 92, 123 (D. Me. 2007).  The court in *Ramirez* was troubled by the fact that the expert had changed his opinions through the course of his work, selectively omitted certain facts, and copied full sentences from other sources without citation.  *Id.* at 122-23.

importantly, an expert must not "supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence."[55]

## I.    Rausser Tries to Supplant the Role of Counsel in Presenting the Defendant's View of the Evidence

Experts are not permitted to become partisan advocates by providing, in the guise of expert "opinion," a summary or overview of otherwise admissible factual evidence.  In *Fisher v. Ciba Specialty Chemicals Corp.*, the court made clear that an expert report that "offers a synopsis of facts . . . does not state expert opinions at all, but simply provides the witness's slant on facts."[56]  In *Fisher*, in connection with a motion for class certification, the plaintiffs sought to offer into evidence the written report of their expert on environmental regulations.[57]  Much of the report was a narrative of events that "simply summarize[d] and state[d] [the expert's] advocacy-based interpretation of documents in the record."[58]  For example, based on her review of existing documents, the expert concluded that the defendant produced hazardous chemicals, contaminated the environment by releasing those chemicals, and failed to take remedial action.[59] The court concluded that such a report would not assist it in evaluating the issues at bar:

> The document reads like the fact section of a brief . . . .  Is she not simply acting as another advocate for plaintiffs in arguing the facts in a manner that is most beneficial to her clients?  How does this purported expert report differ from a supplemental brief submitted by another lawyer for plaintiffs? . . . the Court does not perceive [the witness's] report as an "expert report" at all, but rather as written

---

[55] *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001), *amended on unrelated grounds by* 137 F. Supp. 2d 438 (S.D.N.Y. 2001).

[56] *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 280 (S.D. Ala. 2006); *see also* Order at 5-6, *Muskat v. United States*, No. 06-30 (D.N.H. Jan. 10, 2008) (stating that "observations . . . are not matters of expert opinion").

[57] *Fisher*, 238 F.R.D. at 280.

[58] *Id.* at 281.

[59] *Id.* at 280-81.

advocacy by a lawyer, akin to a supplemental brief on the facts presented by another attorney . . . .[60]

In excluding the report, the court noted that the standard for admitting an expert opinion in a class certification proceeding is a "low hurdle" because the Federal Rules of Evidence "are not stringently applied at the class certification stage."[61] The court found that the expert's report could not even meet this low hurdle due to the "one-sided recitation of record facts."[62]

Similarly, in *In re Rezulin*, the plaintiff's expert proposed to testify on the history of events surrounding the controversial approval of the drug Rezulin by United States and foreign regulators.[63] The court agreed with the defendants that the expert's narrative did nothing more than rehash the facts of the case with the expert's own "spin" on them.[64] The court held that evidence of the facts is "properly presented through percipient witnesses and documentary evidence"[65] and that such narrative testimony by an expert "does no more than counsel for plaintiff will do in argument, *i.e.*, propound a particular interpretation of [the defendant]'s conduct."[66]

---

[60] *Id.* at 281; *see also Highland Capital Mgmt., LP v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005) (excluding an expert's testimony in part because the fact section of his report did nothing more than summarize otherwise admissible evidence.); *Occulto v. Adamar of N.J., Inc.*, 125 F.R.D. 611, 616 (D.N.J. 1989) ("Experts participate in a case because, ultimately, the trier of fact will be assisted by their opinions . . . . They do not participate as the alter-ego of the attorney who will be trying the case.").

[61] *Fisher*, 238 F.R.D. at 279, 281 (quotation omitted).

[62] *Id.* at 281.

[63] *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004).

[64] *Id.*

[65] *Id.*

[66] *Id.* (quoting *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-7242, 2002 U.S. Dist. LEXIS 12975, at *6 (S.D.N.Y. July 16, 2002)).

As in *Fisher* and *In re Rezulin*, the Rausser Reports present a detailed, brief-like narrative of the FICA A Fund transactions.[67]  This narrative is not based on Rausser's personal knowledge of the case, nor is it informed by any special expertise that he possesses; rather, it is derived from information gleaned from documents obtained by Defendant during the course of discovery.  The narrative reads like a legal brief, offering one litigant's "spin" on the evidence.  Rausser admits as much when he writes "[the options] were part of an overall tax strategy which provides the lens through which the transaction must be viewed."[68]  For example, throughout his report, Rausser (and Craft) argue Defendant's case:

- "The documents I reviewed indicate that the transaction which is the subject of this litigation was specifically designed to generate approximately $150 million of tax losses . . . ."[69]

- "The documents I reviewed indicate that the two required entities were formed by the taxpayer specifically in contemplation of entering into a tax-advantaged strategy."[70]

- "[T]he fees charged by the promoters were calculated as a percentage of the tax loss expected to be generated for the taxpayer."[71]

- "[I]n anticipation of implementing a number of Helios-structured transactions, the taxpayer's counsel created two limited liability companies . . . ."[72]

- "Alpha Consultants . . . and Helios Trading . . . both of whom were promoters of the transaction . . . ."[73]

- "Fundamental to the transaction here was the separation of gains from losses, with the gains experienced first so that they could be allocated to the foreign partner prior to the taxpayer's purchase of most of the foreign partner's interests."[74]

---

[67] Rausser devotes nearly twenty pages of the Initial Report to a factual narrative.  *See* Ex. 1 at 13-34.

[68] Ex. 2 at 5.

[69] Ex. 1 at 13.

[70] Ex. 1 at 15.

[71] Ex. 1 at 14.

[72] Ex. 1 at 18.

[73] Ex. 1 at 21.

- "[C]ontrary to all common business judgement, the taxpayer had given away 95% of the bookkeeping 'profits' but chosen to take 93% of the bookkeeping 'losses.'"[75]

- "The use of European-style options formed the basis of several of the tax strategies promoted by James Haber . . . . In Haber's view, the use of European-style options provided a better business purpose rationale for the transaction and made it easier to show the possibility for a pre-tax profit."[76]

- "The use of offsetting options ensured that one option in each pair could be used to produce a gain, while the other would be guaranteed to become, as James Haber called it, 'a loser option.'"[77]

- "From the documents produced, it appears that DGI and Alpha had a profit-sharing agreement in place for deals on which they worked together[78]. . . . From the documents produced it appears that DGI and the Helios entities also had a profit-sharing agreement in place for deals on which they worked together."[79]

- "[T]he promoters' own documents provide strong evidence that it was they who funded the equity contributions supposedly made by the foreign partners."[80]

Not only does Rausser improperly argue Defendant's narrative of the facts, but he exaggerates and colors the existing facts to support his (and Defendant's) slant on what occurred. For example, Rausser claims that EMC Corporation was "*aggressively* hedging its currency exchange risk."[81] In support of this claim, Rausser cites EMC's SEC filings, in which the company stated that "[w]e use foreign currency forward and option contracts to *manage* the risk of exchange rate fluctuations . . . [and] to *reduce* our foreign exchange risk."[82] What is more,

---

[74] Ex. 1 at 24.

[75] Ex. 1 at 33.

[76] Ex. 1 at 17 n.18.

[77] Ex. 1 at 18 n.19.

[78] Ex. 1 at 21 n.37.

[79] Ex. 1 at 21 n.38.

[80] Ex. 1 at 99.

[81] Ex. 1 at 75 (emphasis added); *see also* Ex. 2 at 23 ("EMC had already undertaken an aggressive hedging program.").

[82] *See* Ex. 18 at 29 (emphasis added) (SEC Form 10-K Annual Report for EMC Corp. for the Fiscal Year Ended Dec. 31, 2001), *quoted in* Ex. 1 at 75-76, Ex. 2 at 23 n.55.

Rausser argues that EMC had structured its hedging program to "decouple its stock values from *any* movement in the targeted foreign currencies"—a claim that is not supported by any evidence in the record—and that "any effort by the taxpayer to [hedge foreign exchange risk] would be purely redundant."[83]  Translating EMC's efforts to "manage" and "reduce" foreign exchange risk into "aggressive" hedging activity that renders any incremental hedging activity "redundant" is a misleading characterization of the facts and is, at best, advocacy better suited to a legal brief than an expert report.

As the court in *In re Rezulin* concluded, the presentation of one litigant's version of the facts is the responsibility of counsel, to be fulfilled through the introduction of documentary evidence and the questioning of witnesses with first-hand knowledge of the events.  Reviewing documents and narrating a story of the events does not involve the application of scientific, technical, or other specialized knowledge, as required by Rule 702.  Rausser's rendition of the facts, therefore, is unhelpful and irrelevant, and well outside the scope of admissible expert testimony.  Rausser is a conduit for Defendant's arguments and his reports are government briefs, drafted by Rausser's own lawyer.  Defendant should not be permitted to crash through the *Daubert* gates with Rausser's testimony in this case.

## II.     Rausser's Opinions on the Business Purposes, Motivations, and States of Mind of the Parties and Other Witnesses Are Inappropriate

A person's state of mind is an issue on which an expert may not opine because determinations as to state of mind are "committed exclusively to the finder of fact."[84]  Thus, courts have held that it is inappropriate for an expert to speculate on an individual's or a

---

[83] Ex. 2 at 23 (emphasis added); *see also* Ex. 1 at 76.  In fact, EMC reported that in 2001 foreign exchange rates "negatively impacted revenues by approximately 3%," *see* Ex. 18 at 14, *quoted in* Ex. 1 at 76 n.163, a result that would not have occurred if, as Rausser argues, EMC had completely eliminated its foreign currency risk.

[84] 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.03[3] (2d ed. 2007).

company's state of mind or motivations.[85]  The rationale for this rule is that determining state of mind or intent does not require "scientific, technical, or other specialized knowledge."[86] Opinions that "reflect no special expertise" and that are "routine inference[s] that the jury could draw on its own . . . add[] little or nothing."[87]

For example, the court in *Lippe v. Bairnco Corporation* did not permit expert testimony on whether allegedly fraudulent transactions lacked a business purpose.[88]  The litigation in *Lippe* arose from a series of transactions entered into by an asbestos company to remove assets from the reach of creditors.[89]  Upon the asbestos company's bankruptcy, its creditors sought access to the protected assets by challenging the transactions as fraudulent.[90]  The creditor's expert opined that "the primary purpose . . . [and] only logical motivating factor in these transactions was the attempt to remove assets from the reach of . . . creditors."[91]  The court held that it was wholly inappropriate for the expert to opine on the asbestos company's alleged "real purpose" for the transactions because he was essentially telling the jury what result to reach.[92]

---

[85] *See, e.g.,* Order at 10, *Muskat v. United States*, No. 06-30 (D.N.H. Jan. 10, 2008) (stating that an expert witness will not be permitted to testify about the intent of the parties with respect to agreements and transactions); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005) (excluding proposed expert testimony regarding the states of mind of the defendants and non-parties); *Robinson v. Hartzell Propeller Inc.*, 326 F. Supp. 2d 631, 648 (E.D. Pa. 2004) ("[I]ntent is not a proper subject for expert testimony."); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."); *In re Diet Drugs*, No. MDL 1203, 2000 U.S. Dist. LEXIS 9037, at *29 (E.D. Pa. June 20, 2000) ("The question of intent is a classic jury question and not one for experts . . . ."); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003) ("Expert testimony is not relevant if the expert is offering a personal evaluation of . . . the motivations of the parties."), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).

[86] *See, e.g., In re Rezulin*, 309 F. Supp. 2d at 541.

[87] *United States v. Weiner*, 3 F.3d 17, 22 (1st Cir. 1993).

[88] *Lippe*, 288 B.R. at 681.

[89] *Id.*

[90] *Id.*

[91] *Id.* at 682 n.1.

[92] *Id.* at 682.

Likewise, the Seventh Circuit found that the district court erred in allowing an expert to testify that General Motors had reduced the amount of padding in the sun visors on its automobiles to save money.[93]  Judge Easterbrook stated that the expert "lacked any scientific basis for an opinion about the motives of GM's designers" and "could not testify *as an expert* that GM had a particular motive."[94]  In *In re Rezulin,* the court prohibited an expert from testifying that a pharmaceutical company's conduct had been motivated by its desire to increase profits, reasoning that such inferences should be made by the jury, not the expert witness.[95]

The Rausser Reports violate the rules set forth in *Lippe*, *DePaepe*, and *In re Rezulin*. Rausser opines on what he believes was Plaintiff's "real purpose" for the FICA A Fund transactions:  "The documents I reviewed indicate that this transaction was the result of a concerted search for 'tax advantaged strategies' by the taxpayer . . . ."[96]  Rausser again comments on the motivations of the taxpayer when he asserts that Plaintiff was "disinterest[ed] in actual hedging and, instead, [interested in] a structure driven entirely by the desired tax outcome."[97]  As support for this proposition, he asserts that the documents he reviewed "make clear . . . the specific objective of generating tax losses."[98]  Later, Rausser argues that "[h]ad hedging truly been the taxpayer's objective," Plaintiff could have used other investments.[99]  The Rausser Reports are replete with impermissible commentary on the business purpose and state of mind of Plaintiff and other participants in the FICA A Fund transactions.

---

[93] *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998).

[94] *Id.*

[95] *In re Rezulin*, 309 F. Supp. 2d at 545, 547.

[96] Ex. 1 at 13.

[97] Ex. 1 at 66.

[98] Ex. 1 at 66 n.141.

[99] Ex. 1 at 82.

Additionally, conclusions as to the credibility of parties or fact witnesses should be drawn exclusively by the trier of fact.[100]  It is not an expert's role to opine on, or even comment on, the credibility of witnesses.[101]  The *Lippe* court explained that "[e]xpert testimony is not relevant if the expert is offering a personal evaluation of the testimony and credibility of others or the motivations of the parties."[102]

In blatant disregard of the rule against expert opinions on credibility, Rausser concludes his report by stating:  "In sum, I have concluded that the business purposes tendered by Fidelity International and the taxpayer *bear no credibility*."[103]  Continuing his role as advocate, Rausser testified that statements made by fact witnesses regarding the existence of the "head of the pin" risk were not credible.[104]  Rausser disregarded the fact witnesses' testimony that was inconsistent with his conclusions:

> Q.  Do you recall the testimony of Mr. York[e] from Refco and Mr. Ivan Ross, Mr. Buesinger, and Mr. [Helene], to the effect that there was a head of the pin risk in the transactions?
>
> . . .
>
> A.  I believe that they thought on paper that it existed.  *I also believe that their testimony on this specific matter is not credible*, because if that were the case, the premium, the theoretical premium would have been much different than it was.[105]

---

[100] *See, e.g., Crowe v. Bolduc*, 334 F.3d 124, 133 (1st Cir. 2003) ("[I]t was the province of the jury, not the court, to evaluate the credibility of the witnesses.").

[101] *See, e.g., United States v. Welch*, 368 F.3d 970, 975 (7th Cir. 2004) (stating that a witness's credibility is "'not an appropriate subject matter for expert testimony'" (quoting *United States v. Hall*, 165 F. 3d 1095, 1107 (7th Cir. 1999))), *vacated and remanded on unrelated grounds*, 543 U.S. 1112 (2005).

[102] 288 B.R. at 687.

[103] Ex. 1 at 108 (emphasis added).

[104] The "head of the pin" risk refers to the possibility that the options would expire in such a way as to entitle FICA A Fund to receive a large payment from Refco, its counterparty.  Rausser opined that the "head of the pin" risk did not exist.  *See* Ex. 1 at 46.

[105] *See* Ex. 4 at 237:7-238:9 (emphasis added).

17

Rausser's personal opinions on the credibility of the parties and other witnesses are unrelated to any appropriate category of "specialized knowledge" and are unhelpful to the trier of fact. Moreover, such statements demonstrate Rausser's attempt to supplant the Court's role in evaluating the veracity of witnesses and interpreting the facts. By opining on Plaintiff's business purpose and on the credibility of fact witnesses, Rausser "seeks to supplant the role of counsel in making argument at trial, and the role of [trier of fact in] interpreting the evidence."[106]  No scientific, technical, or other specialized knowledge, as required by Rule 702, is involved in reviewing documents and forming beliefs as to an individual's motivations, state of mind, or potential incentives for action or inaction.[107]  It is one thing for Rausser to examine the economic attributes of a transaction; it is another thing entirely for him to draw legal conclusions and speculate on other individuals' states of mind. Reviewing the evidence and making arguments about the credibility of witnesses is the role of counsel, not experts.

## III.    Rausser Inappropriately Renders Opinions on Legal Issues

### A.    Opinions Regarding Contract Interpretation

An expert makes an inappropriate legal conclusion when opining on the proper interpretation of a contract. Rausser based his opinion that Refco Capital Management, the broker that executed and acted as counterparty for FICA A Fund's options trades, had no "head of the pin" risk on his conclusion that Refco could determine the termination price of the options so as to eliminate the risk of a one-sided payout:

> Q.    [W]hat's the basis for your statement that Refco was protected against the
>        risk of a one-sided payout?

---

[106] *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001), *amended on unrelated grounds by* 137 F. Supp. 2d 438 (S.D.N.Y. 2001).

[107] *See, e.g., In re Rezulin*, 309 F. Supp. 2d at 546 ("[T]he opinions of these witnesses on the intent, motives or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise.").

. . .

A.    [I]f a particular customer ever came back to them and said . . . I think it
actually hit the sweet spot, they would have a commercial justification for
why it didn't based on their selection of the money center banks.[108]

In his Initial Report, Rausser writes, "The contract terms also embed a functional assurance that
there would be no one-sided payout on the currency options. . . .  Refco could easily manage the
outcome merely by selecting the banks whose quotes it used."[109]

The court in *Primavera Familienstiftung v. Askin* held that it was inappropriate for an
expert witness to testify on whether a party acted in accordance with its obligations under a
contract.[110]  In *Primavera*, investors in a bankrupt hedge fund sued Merrill Lynch, one of the
brokers who liquidated the fund's portfolios causing a significant loss of investments.[111]  Merrill
Lynch lent money to the hedge fund in exchange for collateral in the form of securities.[112]  If the
securities lost value, Merrill Lynch was entitled to make a margin call, that is, to demand
additional collateral.[113]  If the fund could not supply the additional collateral, Merrill Lynch
could liquidate the existing securities.[114]  In liquidating the securities, Merrill Lynch was
required to act in a "commercially reasonable" manner under Article 9 of the Uniform
Commercial Code and in "good faith" under general contract law.[115]  Merrill Lynch did, in fact,

---

[108] Ex. 4 at 233:2-234:7.

[109] Ex. 1 at 49.

[110] *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 528-30 (S.D.N.Y. 2001), *amended on unrelated grounds by* 137 F. Supp. 2d 438 (S.D.N.Y. 2001); *see also Sparton Corp. v. United States*, 77 Fed. Cl. 1, 8 (Fed. Cl. 2007) ("In the absence of specialized trade usage, expert testimony regarding proper contract interpretation is inadmissible, as is expert testimony regarding the legal significance of the contract language.").

[111] *Primavera*, 130 F. Supp. 2d at 462.

[112] *See id.* at 461.

[113] *See id.* at 462, 473-74.

[114] *See id.* at 474.

[115] *See id.* at 459, 486.

liquidate the fund's portfolio at an auction after the fund failed to supply additional capital upon

a margin call.[116]  The investors attempted to offer expert testimony that Merrill Lynch had not

acted in a commercially reasonable manner and in good faith because it only solicited auction

bids from other broker-dealers and not institutional customers, who would likely have paid more

for the securities.[117]  The expert opined that Merrill Lynch "could have looked for additional,

more competitive purchasers, [but] it had little incentive to do so."[118]  The court excluded this

opinion as conclusory and unhelpful.[119]  The court explained that while there was "evidence in

the record regarding Merrill's actual conduct . . . [the expert] does no more than counsel for the

Funds will do in argument, *i.e.*, propound a particular interpretation of Merrill's conduct."[120]

Rausser's opinion that Refco could eliminate the risk of a one-sided payout on the

options trades is likewise conclusory and unhelpful.  Rausser opines that Refco did not assume

any risk in the trades because its contract with FICA A Fund allowed it to calculate the options'

values by averaging the spot prices quoted by three "money center" banks in a fifteen-minute

period.[121]  Refco's ability to choose quotes from several banks afforded it the ability, Rausser

concludes, to pick those quotes most favorable to Refco's position as counterparty, thereby

eliminating any risk associated with the transactions.[122]  However, the terms of the option

confirmation between FICA A Fund and Refco required Refco to act in a "commercially

---

[116] *See id.* at 480-81.

[117] *See id.* at 480-81, 486-87.

[118] *See id.* at 487.

[119] *See id.* at 530.  The court further concluded that such a report "illustrates 'how vital it is that judges not be deceived by the assertions of experts who offer credentials rather than analysis.'"  *Id.* at 529 (quoting *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997)).

[120] *See id.* at 530.

[121] *See* Ex. 1 at 49 ("Refco could easily manage the outcome merely by selecting the banks whose quotes it used.").

[122] *See* Ex. 1 at 49-50.  Rausser asserts that "[t]he contract terms also embed a functional assurance that there would be no one-sided payout in currency options."  Ex. 1 at 49.

reasonable" manner and with "good faith" when choosing the quotes from money center banks.[123]  Rausser's opinion that this language would not have inhibited Refco from cherry picking quotes is nothing short of an opinion of the meaning of the confirmations under New York law.[124]  Rausser's opinion implies the same type of conclusion that the expert in *Primavera* advocated:  that Refco could have chosen riskier quotes more favorable to its counterparty, FICA A Fund, but it had little incentive to do so.  Rausser's opinion is conclusory and unhelpful, as was the expert's opinion in *Primavera*.

Similarly, Rausser devotes a considerable portion of the Initial Report to a discussion of Refco's "extraordinary" fees for executing the Fidelity World and FICA A Fund options.[125] Rausser does not take into account, however, that Refco assumed an extraordinary risk that the options would expire on the "head of the pin," requiring an enormous payout.[126]  In fact, his conclusions suggest that if the head of the pin risk had really existed, Refco would have charged more.  Moreover, Rausser can only argue that the fees were "extraordinary"; he did no empirical comparative analyses and merely claims that the fees were extraordinary as to other fees.[127]

---

[123] *See, e.g.*, Ex. 19 at 000113 (Digital Option Confirmation, Oct. 24, 2001).

[124]  Rausser denies that he is opining on the legal meaning of "commercially reasonable."  *See* Ex. 4 at 239:5-240:16.

[125] *See* Ex. 1 at 38-45.

[126] The "head of the pin" risk refers to the possibility that the options would expire in such a way as to entitle FICA A Fund to receive a large payment from Refco, its counterparty.

[127] *See* Ex. 4 at 190:20-206:2.  Rausser testified that his opinion that Refco's fees were extraordinarily high was based on his personal experience and casual telephone conversations with his own brokers.  *See* Ex. 4 at 191:22-200:11.

### B.    Opinion on Order of Transactions

Rausser opines that "[i]n order to achieve this tax result, the sequence and timing of each event was critically important."[128]  The income tax consequences of each step of the Fidelity World and FICA A Fund transactions, whether considered separately or together, is not an appropriate topic for an economics expert to opine on, as these issues require the application of tax law to the facts of each transaction.  Rausser's opinion, moreover, is based on the judicially created "step transaction" doctrine, under which "interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction."[129]  Accordingly, Rausser's opinion regarding the order of transactions is an inappropriate legal conclusion.

### C.    Use of Specialized Legal Terms

An expert witness crosses the line by explicitly or implicitly using a legal standard to instruct the trier of fact in how to interpret the evidence.[130]  In *Hygh v. Jacobs*, the Court of Appeals for the Second Circuit held that it was improper for an expert to testify that a police officer's excessive force was not "justified under the circumstances," not "warranted under the circumstances," and "totally improper."[131]  Conclusory opinions such as these should be excluded because they "merely [tell] the jury what result to reach."[132]  By using specialized legal terms, an expert implicitly makes a legal conclusion.  For instance, in *United States v. Scop*,

---

[128] Ex. 1 at 33-34; *see also* Ex. 2 at 49 n.110 (The "tax outcome [was dependent] upon the properly sequenced execution of each of the[] pre-defined steps.")

[129] *Comm'r. v. Clark*, 489 U.S. 726, 738 (1989); *see also Penrod v. Comm'r*, 88 T.C. 1415, 1428 (1987) ("The step transaction doctrine is in effect another rule of substance over form; it treats a series of formally separate 'steps' as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result.").

[130] *See Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992).

[131] *Id.* (citing *Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 709 (2d Cir. 1989) (holding that an expert's testimony that defendant's conduct was "negligent" was improper)).

[132] *Id.* (quoting Fed. R. Evid. 704 advisory committee's note).

an insider trading case, an expert witness testified that "[i]t is my opinion that the stock . . . was manipulated and that certain individuals . . . engaged in a manipulative and fraudulent scheme in furtherance of that manipulation."[133]  The Second Circuit explained that although Federal Rule of Evidence 704 permits expert testimony on ultimate issues, it does not allow experts to draw legal conclusions.[134]  Terms such as "manipulation," "scheme to defraud," and "fraud" are legally specialized terms that, when used by an expert witness, give rise to an implicit legal conclusion.[135]  The court noted that the meanings of these terms had "been the subject of diverse judicial interpretations."[136]

   The Rausser Reports use numerous specialized legal terms that one would not expect an objective financial economist to use.  Rausser "conclude[s] that the termination and replacement of the gain-generating options had no economic consequences and places *form over substance*."[137]  "Substance over form" is a judicially created doctrine in the area of tax law.[138]  While Rausser insisted in his deposition that he has used this phrase in his economic writing and did not intend to comment on the legal consequences of the transaction,[139] in the context of this litigation the use of this terminology is intended to argue Defendant's litigating position rather than provide useful economic analysis.  Further, Rausser refers to KPMG, Helios, Alpha, and

---

[133] *United States v. Scop*, 846 F.2d 135, 138 (2d Cir. 1988), *amended on reh'g*, 856 F.2d 5 (2d Cir. 1988).  Had the expert "merely testified that controlled buying and selling of the kind alleged here can create artificial price levels," the testimony would have been permissible.  *Id.* at 140.

[134] *Id.* at 139.

[135] *See id.* at 140.  The Second Circuit described these terms as "legally specialized" in its discussion of *Scop* in *United States v. Duncan*, 42 F.3d 97, 102 (2d Cir. 1994).

[136] *Scop*, 846 F.2d at 140 (citations omitted).

[137] *See* Ex. 1 at 28 n.62 (emphasis added).

[138] *See, e.g., Gregory v. Helvering*, 293 U.S. 465 (1935) (affirming that the Internal Revenue Service may tax a transaction based on its substance, rather than its form); *Rogers v. United States*, 281 F.3d 1108 (10th Cir. 2002) (discussing the substance-over-form doctrine and citing cases).

[139] *See* Ex. 4 at 174:3-175:2.

Diversified as "promoters."[140]  The term "promoter," as applied to marketers of tax shelters, is used by laypersons, but is also defined in Internal Revenue Code Section 6700 and is used by tax professionals only when they intend to convey a specific meaning.[141]  Whether or not Rausser intends to conclude that KPMG, Helios, Alpha, and Diversified are indeed "promoters" in the legal sense, his use of this term inappropriately advocates Defendant's interpretation of the facts in the guise of expert opinion.[142]

Additionally, the Rausser Reports attempt to advocate and spin the facts by employing terminology used by tax professionals, not financial economists.  Rausser characterizes the October 9, 2001 interest rate options as "basis trades."[143]  "Basis" is a tax concept used by tax professionals, not financial economists, and Rausser's characterization serves no purpose but to advocate a particular interpretation of the facts.[144]  It is improper for Rausser to advocate a specific interpretation of the facts by applying the terms "substance over form" or "promoter" to the facts of this case.  The use of these legally specialized terms demonstrates how Rausser has willingly abandoned his role as an independent expert and, instead, acts as an advocate for Defendant.

---

[140] *See, e.g.,* Ex. 1 at 7, 14, 21, 25, 58; Ex. 2 at 51, 52.  In his deposition, Rausser explained that "anybody that markets a particular product is in the business of promoting that product."  Ex. 4 at 141:2-12.  This statement shows Rausser does not understand the legal significance of this term.

[141] *See, e.g.,* Thomas Jaworski, *IRS Official Highlights Progress, Agenda of SB/SE Division*, 117 Tax Notes (TA) 663 (Nov. 12, 2007) (referring to promoters of abusive tax shelters); Jeremiah Coder, *Tax Analysts Exclusive: Conversations: Eileen Mayer*, 116 Tax Notes (TA) 738 (Aug. 27, 2007) (same); United States Dep't of the Treasury, *2007 Performance and Accountability Report* 51, 304, 320 (2007) (referring to promoters of abusive tax shelters and other tax avoidance schemes), *available at* http://www.ustreas.gov/offices/management/dcfo/accountability-reports/index.shtml.

[142] When questioned on his use of this term, Rausser tried to avoid the fact that he has adopted Defendant's vocabulary by testifying that anybody selling anything is a promoter, including himself.  *See* Ex. 4 at 139:22-141:12.

[143] *See, e.g.,* Ex. 1 at 10-11, 19.  From as early as March 2007, the OnPoint staff were referring to the "basis creating" options.  *See* Ex. 20 at OPA005531 (email from C. Wallace to G-M. You (Mar. 28, 2007) (attaching outline of report)).

[144] For example, a neutral party might describe these as the "October 9" or "interest rate" options.

IV.     **Rausser's Use of "Similar Transactions" to Test His Conclusions Is Merely
        Counsel's Means of Presenting Inadmissible Evidence**

Government counsel provided Rausser with information on numerous transactions that

Defendant has determined are similar to, and contemporaneous with, the FICA A Fund

transactions.[145]  Rausser claims that his staff at OnPoint selected forty-seven similar transactions

from information provided by Defendant.[146]  The facts show, however, that government counsel

provided Rausser and Craft with materials concerning the transactions that counsel considered

most similar to the FICA A Fund transactions.  For instance, OnPoint received a DVD labeled

"2001 FDIS Closing Binders" from Defendant in April 2007.[147]  OnPoint likely only received

information on certain transactions, as an internal memo stated that OnPoint staff should

"[c]ompare our results to John Lindquist's and reconcile."[148]  Rausser admitted that OnPoint did

not consider the thousands of alleged "Son of Boss" transactions, [149]  but only those involving

certain "promoters."[150]

        The facts suggest that government counsel provided OnPoint with data on pre-selected

transactions as a way to present this information to the Court even though it should be excluded

as hearsay.  An expert's opinion may be based on hearsay if it is "of a type reasonably relied

upon by experts in the particular field in forming opinions or inferences upon the subject."[151]

---

[145] *See* Ex. 4 at 138:19-139:10.

[146] *See* Ex. 4 at 138:19-139:10; 158:10-167:11.

[147] *See* Ex. 21 at OPA003869 (email from B. Mobley to L. Craft, cc to C. Wallace, J. Mouledous, H. Bellson (Apr. 3, 2007) (attaching letter from government counsel)).

[148] *See* Ex. 22 at OPA003890 (email from L. Craft to C. Wallace, G-M. You, S. Mohan (May 28, 2007) (attaching to-do lists)); *see also* Ex. 23 at OPA004067 (email from C. Wallace to L. Craft, S. Mohan (June 1, 2007)) ("Copies of the [Outlines of Proposed Transactions] are all in John Lindquist's binder on my desk.").

[149] The IRS has stated that there were "several thousand" Notice 2000-44 transactions—a type of transaction to which they assert FICA A Fund is "substantially similar."  IR 2004-64 (May 5, 2004).

[150] *See* Ex. 4 at 139:2-21.

[151] Fed. R. Evid. 703.

However, Rule 703 "'was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'"[152]  Rausser's atypical reliance on this "other taxpayer" information necessarily relies on hearsay, and any opinions related to this information should be excluded pursuant to Rule 703.

Rausser claims he considered these other transactions to determine whether they were "useful in testing, supporting or rejecting" his conclusions.[153]  These other transactions, Rausser concludes, were "instructive in forming my opinions,"[154] and he claims confirmed his opinions.[155]  However, the value of the options transactions entered into by Fidelity World and FICA A Fund and their potential for profit or loss are not affected by, or dependent on, the value or profit potential of unrelated transactions.  In fact, from Rausser's prior depositions and expert reports, it does not appear that Rausser has previously required the use of similar, but unrelated, transactions to test his analyses of one particular transaction.  Moreover, Rausser has not cited any other instances where an economist "tested" his analyses in this way.  This method, therefore, does not appear to have been tested, peer-reviewed, or accepted by other financial economists. [156]  Significantly, A. Lawrence Kolbe, Defendant's other economics expert in this litigation, also claims to have used information on the same government-selected transactions to

---

[152] *Brace v. United States*, 72 Fed. Cl. 337, 352 (Fed. Cl. 2006) (quoting *Loeffel Steel Prods. Inc. v. Delta Brands Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005)), *aff'd*, 2007 U.S. App. LEXIS 23752 (Fed. Cir. 2007).

[153] Ex. 1 at 5.

[154] Ex. 1 at 82.

[155] Ex. 1 at 7.

[156] The *Daubert* factors for testing the reliability of an expert's methodology are (1) whether the expert's methodology has been tested; (2) whether the expert's methodology has been peer-reviewed; (3) the methodology's rate of error; and (4) the level of acceptance of the methodology within the relevant scientific community.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993).

"test" his conclusions.[157]  It appears that the only economists who test their conclusions on the economic attributes of a particular transaction by examining numerous unrelated transactions are economists hired by the Tax Division of the Department of Justice.

Accordingly, any opinions based on the "other taxpayer" information should be excluded under Rule 703 as hearsay not "reasonably relied upon" by experts in this field.

## V.    Rausser's Opinions Are Unreliable Because He Repeatedly Asserts Unsupportable Inferences

Rausser makes numerous inferences without any support or basis in the facts.  His long career as a professional expert may give him some credentials, but it does not relieve him of the rules governing experts before this Court.  In his Rebuttal Report, Rausser attempts to show that the fees associated with the FICA A Fund transaction were so high that the transaction had no profit potential.[158]  To this end, he allocates all "tax planning" fees paid to the law firm Burke, Warren, MacKay & Serritella to the option investments entered into by FICA A Fund, even though the effect of his approach is to allocate fees incurred as much as one year prior to the initial proposal of the FICA A Fund transaction.[159]  Rausser ignores the possibility that such fees were attributable to numerous other transactions or estate planning services, information that would not have been produced in this litigation.  Moreover, he assumes that fees associated with tax planning are properly allocated to the underlying investments.  Similarly, with respect to the FICA A Fund partner Samuel Mahoney, Rausser opines that "[l]acking any other economic justification [for] Mr. Mahoney's participation, *it must be concluded* that [it was] . . . necessary

---

[157] *See* Memorandum of Law in Support of Plaintiff's Motion to Exclude the Proposed Testimony and Reports of A. Lawrence Kolbe, or, in the Alternative, to Exclude Opinions on Specific Topics, Ex. A at 27-28 (Expert Report of A. Lawrence Kolbe, Aug. 7, 2007).

[158] Ex. 2 at 19-20.

[159] Ex. 2 at 19.

to generate the desired tax outcome."[160]  Rausser has not identified any information in his

possession regarding Mr. Mahoney's personal portfolio or motivations for his participation.

Therefore, Rausser does not have sufficient facts to conclude that the only explanation for Mr.

Mahoney's participation was to generate a particular tax outcome and he may not argue the facts

for Defendant.

## VI.   The Court Should Exclude Rausser's Testimony Because Tendering the Report and Rebuttal Report As His Own Is a Breach of Duty to the Court

An expert witness's report must not be ghost-written because Federal Rule of Civil

Procedure 26 requires an expert to prepare his own report.[161]  The court in *Trigon Insurance Co.*

*v. United States* defined ghost-writing as "the preparation of the substan[tive] writing of the

report by someone other than the expert purporting to have written it."[162]  In *Trigon*, the plaintiff

argued that the defendant's litigation consultants played a significant part in writing the

defendant's experts' reports.[163]  The *Trigon* court reviewed the case law on ghost-written expert

reports and observed that some courts permitted lawyers to assist the expert, and even make

revisions to the report, as long as the expert authorized and adopted the opinions as his own.[164]

Other courts, however, rejected the reports of experts who "merely express[ed] the opinions of

the lawyers who hired them" or otherwise did not independently prepare their reports.[165]  The

---

[160] Ex. 1 at 104 (emphasis added).

[161] Fed. R. Civ. P. 26(a)(2)(B) ("[T]his disclosure must be accompanied by a written report—prepared and signed by the witness."); *see also See Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 291-95 (E.D. Va. 2001).

[162] *Trigon*, 204 F.R.D. at 291.

[163] *Id.*

[164] *See id.* at 291-95 (citing *Marek v. Moore*, 171 F.R.D. 298, 302 (D. Kan. 1997) (distinguishing between opinions adopted by an expert and those forced onto an expert by intimidation or undue influence)).

[165] *See id.* at 294 (citing *Marbled Murrelet v. Pac. Lumber Co.*, 880 F. Supp. 1343, 1365 (N.D. Cal. 1995), *aff'd*, 83 F.3d 1060 (9th Cir. 1996); *Baxter Int'l. Inc. v. McGaw, Inc.*, No. 95- 2723, 1996 U.S. Dist. LEXIS 3768, at *10 (N.D. Ill. Mar. 27, 1996) (disregarding expert testimony because expert "did not independently prepare his expert

*Trigon* court noted that, while it is the opponent's burden to prove a report was ghost-written, "absent evidence to support the expert's testimony that the report is his own, the court would be justified in refusing to credit the expert on that issue."[166]

The United States Tax Court has also addressed the issue of ghost-written expert reports and has required the proponent of the expert report to prove that the report actually contains the work of the expert. In *Bank One Corp. v. Commissioner*, for instance, the Tax Court excluded the rebuttal report of the petitioner's expert because the petitioner's counsel was heavily involved in its preparation and the expert "never explained to our satisfaction that the words, analysis, and opinions in that report were his own work."[167]  In *Estate of Noble v. Commissioner*, the Tax Court again excluded a report that had been written by three individuals, only one of which was available to testify at trial.[168]  The court held that it was "not persuaded by a preponderance of proof that the words, analysis, and opinions in the . . . report were the work of [the testifying expert]."[169]

The internal communications produced to date by OnPoint show that the OnPoint staff, not Rausser, performed the substantive work preparing the Reports. There are nearly four hundred OnPoint emails detailing the staff's work drafting and editing the reports, performing analyses, and evaluating arguments. Nowhere in these emails is there evidence of Rausser's thoughts, analyses, or input. Indeed, the evidence shows how much work was allocated to staff

---

report, allowing himself to be a 'mouthpiece' for plaintiffs' attorneys"), *amended on other grounds by* 958 F. Supp. 1313 (N.D. Ill. 1997), *aff'd in part and rev'd in part on other grounds*, 149 F.3d 1321 (Fed. Cir. 1998)).

[166] *Id.* at 293 n.14.  On this point, the court explained that it is important to preserve drafts of the expert report in case it is necessary for the expert to demonstrate that the opinions therein were his own.  *Id.* (citing *Ind. Ins. Co. v. Hussey Seating Co.*, 176 F.R.D. 291 (S.D. Ind. 1997)).

[167] *Bank One Corp. v. Comm'r*, 120 T.C. 174, 278 (2003), *aff'd in part, vacated in part on other grounds sub nom. JPMorgan Chase & Co. v. Comm'r*, 458 F.3d 564 (7th Cir. 2006).

[168] *Estate of Noble v. Comm'r*, 89 T.C.M. (CCH) 649, 650 (2005).

[169] *Id.*  The court, however, permitted the expert to write a second report on his own.  *Id.*

members and how little work was allocated to Rausser.  For instance, a May 2007 email

allocated certain tasks among the OnPoint staff.  For example, Guey-Mei You was assigned to

"[a]nalyze each pair of options," determine if "Egan [could] have earned a better return in CDs

or elsewhere," perform a "basic probability analysis for each outcome (above, below, and in

sweet spot)," "[f]ind five cheaper, easier ways to do the same thing," and "analyze the value of

foreign partner's interest."[170]  Of the twenty six discrete tasks assigned, only one—"Were Refco

transactions real?"—was assigned to Rausser.[171]

    With respect to the Rebuttal Report, a memo attached to a September 4, 2007 email lists

the primary and secondary reviewers for each section of the report.[172]  The memo states that "the

Primary Reviewer is the person who wrote the section."[173]  Of the fifteen sections listed, none

indicate that Gordon Rausser was the Primary Reviewer, and thus, it appears he did not play a

substantial role in drafting the Rebuttal Report.[174]  Furthermore, Laura Craft, in a

contemporaneous email to OnPoint staff, suggests that "each *author* check all numbers in their

sections."[175]

    Numerous other emails detail the contributions of OnPoint staff members and highlight

the lack of contributions from Rausser:

---

[170] Ex. 24 at OPA003929, OPA003931 (email from C. Wallace to L. Craft, S. Mohan, cc to B. Mobley, G-M. You (May 4, 2007) (attaching to-do lists)).

[171] Ex. 24 at OPA003932. Rausser testified that "I authored the report.  I designed the report.  And I worked with staff, including Laura Craft.  Parts of it were drafted by her, the initial drafts.  Parts of it were drafted by Saumya. Parts of it were drafted by Ms. You.  Parts of it were drafted by Chandra . . . ."  Ex. 4 at 104:17-22.

[172] Ex. 25 at OPA004850 (email from L. Keating to L. Craft, C. Wallace, S. Mohan, N. McCartin, J. Qamar, cc to J. Galindo (Sept. 4, 2007) (attaching schedule of tasks)).

[173] Ex. 25 at OPA004850.

[174] Ex. 25 at OPA004850. Rausser explained that his name was not there because "I'm not an employee of OnPoint.  This is only for employees that are engaged in supporting my preparation of the report."  Ex. 4 at 121:20-22.

[175] Ex. 26 at OPA007238 (emphasis added) (email from L. Craft to S. Mohan (Sept. 3, 2007)).

- "I am attaching the new draft that includes [Saumya's] and Chandra's changes."[176]

- "Tomorrow, I'll recompute the theoretical put value after I getting [sic] the historic volatility for the 10Yr CMS rate.  I'll then create Table (11) (on page 36)."[177]

- "I have incorporated the sections sent to me by Jaffer and Saumya, and completed my own."[178]

- "I am attaching the updated probability tables based on Guey-Mei's new calculations for both interest rate and [foreign exchange] options."[179]

- "I wrote up my first draft of hedge eff[ectiveness].  Laura is going to expand on some of it and then paste it into her document . . . ."[180]

- "I think Laura wants to include all of Guey-Mei's spreadsheets and calculations as exhibits."[181]

- "I am attaching the new section on alternative hedges. . . . I have written/edited some parts of this but some of it is still in the form of Jaffer's notes and need[s] to be rewritten."[182]

After Rausser claimed at his deposition that OnPoint had already produced its invoices for its work on the FICA A Fund matter,[183] these invoices were finally produced on January 8, 2008.  In these invoices, Rausser recorded that he worked on "drafting" the Reports for several hours nearly every day in July, August, and September.[184]  Yet, Rausser has nothing to show for all these hours of work.  Of the nearly four-hundred internal OnPoint emails and thirty-three full or partial draft reports produced, only ten emails—three of which transmitted a draft report—

---

[176] Ex. 27 (email from S. Mohan to L. Craft, C. Wallace (May 21, 2007)).

[177] Ex. 28 (email from J. Qamar to L. Craft, C. Wallace (Sept. 5, 2007)).

[178] Ex. 29 (email from C. Wallace to S. Mohan, L. Craft, J. Qamar, L. Keating (Sept. 6, 2007)).

[179] Ex. 30 at OPA005551 (email from S. Mohan to L. Craft, cc to C. Wallace, G-M. You (May 17, 2007)).

[180] Ex. 31 (email from S. Mohan to C. Wallace (May 18, 2007)).

[181] Ex. 32 (email from C. Wallace to L. Keating (Aug. 3, 2007)).

[182] Ex. 33 (email from S. Mohan to L. Craft, cc C. Wallace (Aug. 31, 2007)).

[183] *See* Ex. 4 at 24:7-16.

[184] *See, e.g.*, Ex. 34 (Invoice #10000 (Aug. 28, 2007)).

were sent to Rausser.[185]  There are no communications from Rausser.  Moreover, Rausser's

former colleagues at Charles River Associates were skeptical about the accuracy of his billing

practices.  A supervisor at Charles River wrote, "Because of Gordon's propensity to bill large

amounts of time in relation to the work done, even after I spoke with him about it, I am not keen

to vouch for him to attorneys I know and work with."[186]  Despite the voluminous evidence

documenting the work of the OnPoint staff in researching, drafting, and editing the reports, there

is little evidence of Rausser's role in analyzing the issues or in writing the reports.[187]  This lack

of evidence for Rausser's work, coupled with Rausser's own colleague's opinion of his billing

practices, raises significant doubts as to Rausser's role in writing the Reports.  For Rausser to

tender the Reports as his own, therefore, is a breach of duty to the court.

## CONCLUSION

Rausser has crossed the line separating independent expert witnesses from partisan

advocates.  The Rausser Reports are not merely biased in favor of Defendant, but are written and

designed by the attorneys working at OnPoint to operate as legal briefs, that is, to persuade the

---

[185] Rausser was a recipient in the following internal OnPoint communications:  email from B. Mobley to L. Craft, cc's to G. Rausser, C. Wallace (Apr. 20, 2007) (notifying recipients that documents had been received from government counsel); email from J. Galindo to G. Rausser, cc to L. Craft (July 6, 2007) (attaching a DOJ form for contract modification); email from G-M. You to G. Rausser, cc to L. Craft (July 17, 2007) (attaching probability graphs for Rausser's review); email from L. Craft to G. Rausser (July 31, 2007) (asking if he will be at OnPoint the next day); email from L. Craft to G. Rausser (Aug. 6, 2007) (asking for a list of publications for his CV); email from S. Mohan to G. Rausser, cc to L. Craft (Aug. 31, 2007) (forwarding J. Qamar's hedging analysis); email from C. Wallace to OnPoint staff members, cc to G. Rausser (Sept. 6, 2007) (attaching a draft of the Rebuttal Report); email from L. Craft to G. Rausser and staff (Sept. 7, 2007) (attaching a draft of the Rebuttal Report); email from L. Keating to L. Craft, G. Rausser and staff (Sept. 8, 2007) (attaching a draft of the Rebuttal Report); email from C. Wallace to G. Rausser, L. Craft (Sept. 13, 2007) (attaching an updated budget).

[186] Ex. 35 (email from Bob Larner to Phil Cooper, Monica Noether (Jan. 14, 2003), originally produced in connection with *Kearl v. Rausser*, No. 04-00175 (D. Utah, filed Feb. 17, 2004)).

[187] There are only three emails that evidence Rausser's role in writing the report:  Ex. 26 at OPA007238 (email from L. Craft to S. Mohan (Sept. 3, 2007) ("Gordon is still making revisions which I will collect in a few minutes.")); Ex. 36 (email from L. Craft to S. Mohan, J. Qamar, C. Wallace (Sept. 2, 2007) ("Attached is the current draft . . . which Gordon and I rewrote this week-end.")); Ex. 37 (email from L. Craft to L. Keating, S. Mohan, C. Wallace (Sept. 11, 2007) ("[T]here are more changes from Gordon waiting on the fax machine which I will address when I arrive shortly.")).

trier of fact to adopt a particular interpretation of the facts and view of Defendant's position.  To

this end, Rausser opines on legal topics, advocates against the credibility of witnesses, speculates

on Plaintiff's state of mind and attempts to use his credentials to convince the trier of fact that

Defendant's version of the facts is correct.  Rausser also makes unprecedented use of

information on other taxpayers purportedly to "test" his conclusions, although it is nothing more

than an attempt to circumvent the hearsay rules and Federal Rule of Evidence 1006.  In sum,

Rausser's opinions are unhelpful, unreliable, and irrelevant, and Plaintiff respectfully requests

that this Motion to Exclude the Proposed Expert Testimony and Reports of Gordon Rausser be

granted.

Respectfully submitted this 17th day of January 2008.

PLAINTIFF
FIDELITY INTERNATIONAL CURRENCY ADVISOR
A FUND, L.L.C., by the Tax Matters Partner


/s/ Lena Amanti
David J. Curtin, D.C. Bar #281220
Ronald L. Buch, Jr., D.C. Bar #450903
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email:  dcurtin@mckeenelson.com
        rbuch@mckeenelson.com
        lamanti@mckeenelson.com


John O. Mirick, BBO #349240
MIRICK, O'CONNELL, DEMALLIE
& LOUGEE, LLP
100 Front Street
Worcester, MA 01608
Telephone:  (508) 791-8500
Facsimile:  (508) 791-8502
Email:  jomirick@mirickoconnell.com

**Certificate of Service**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 17, 2008.

/s/ Lena Amanti
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email: lamanti@mckeenelson.com

# Exhibit 1
## Filed Under Seal

# Exhibit 2
## Filed Under Seal

# Exhibit 3



## PUTTING DATA TO WORK

Back to Page



OnPoint Analytics delivers state of the art data management and analytic systems to the legal and business community. Generations beyond mere document management products, OnPoint incorporates real time statistical analysis with the latest in search and retrieval features. The live database architected specifically for each case allows sophisticated comparisons across data sources, time periods, products, geography and hundreds of other attributes.

Counsel and their experts are given secure web access to explore data ramifications, identify key exhibits and generate demonstratives before or during a live proceeding. Alternatively, OnPoint's statistical analysts can perform these services and deliver the results at any time, day or night. Using OnPoint's proprietary "PinPoint" function, the highest level graphic instantly maps to individual data points and numbered exhibits. Unique access restrictions enable aligned parties to contribute to a unified database, without risk that their confidential information will be disclosed to co-parties.

OnPoint is managed by trial lawyers and seasoned paralegals who have spent their careers handling bet the business litigation. Continually frustrated by the limitations of litigation support technology, they set out to re-design the playing field through instantly accessible data intelligence. The result is OnPoint's comprehensive service offering that gives any trial team or business unit a provable advantage.

Copyright © 2004 OnPoint Analytics, Inc. All rights reserved. Legal Notices

# Exhibit 4
## Filed Under Seal

# Exhibit 5

**2:04-cv-00175-BSJ** Kearl, et al vs. Rausser
Bruce S. Jenkins, presiding
**Date filed:** 02/17/2004 **Date of last filing:** 09/06/2007

# Attorneys

**Laura Craft**
2000 POWELL ST STE 860
EMERYVILLE, CA 94608
(510)463-0133
*Assigned: 03/22/2005*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

representing

**Gordon C. Rausser**
*(Defendant)*

**David L. Mortensen**
STOEL RIVES (UT)
201 S MAIN ST STE 1100
SALT LAKE CITY, UT 84111-4904
(801)328-3131
dlmortensen@stoel.com
*Assigned: 04/21/2004*

representing

**Gordon C. Rausser**
*(Defendant)*

**D. Carolina Nunez**
383 N 1340 E
PROVO, UT 84606
(801)429-9429
*Assigned: 12/05/2005*

representing

**Gordon C. Rausser**
*(Defendant)*

**Stanley J. Preston**
SNOW CHRISTENSEN & MARTINEAU
10 EXCHANGE PLACE 11TH FLOOR
PO BOX 45000
SALT LAKE CITY, UT 84145-5000
(801)521-9000
intakeclerk@scmlaw.com
*Assigned: 02/17/2004*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

representing

**Gregory D. Adams**
*(Plaintiff)*

**James R. Kearl**
*(Plaintiff)*

|  |  | **Steven N. Wiggins**<br>*(Plaintiff)* |
|---|---|---|
| **Marc T. Rasich**<br>STOEL RIVES (UT)<br>201 S MAIN ST STE 1100<br>SALT LAKE CITY, UT 84111-4904<br>(801)328-3131<br>mtrasich@stoel.com<br> *Assigned: 04/21/2004*<br> *LEAD ATTORNEY*<br> *ATTORNEY TO BE NOTICED* | representing | **Gordon C. Rausser**<br>*(Defendant)* |
| **Maralyn M. Reger**<br>SNOW CHRISTENSEN & MARTINEAU<br>10 EXCHANGE PLACE 11TH FLOOR<br>PO BOX 45000<br>SALT LAKE CITY, UT 84145-5000<br>(801)521-9000<br>intakeclerk@scmlaw.com<br> *Assigned: 02/17/2004*<br> *ATTORNEY TO BE NOTICED* | representing | **Gregory D. Adams**<br>*(Plaintiff)* |
|  |  | **James R. Kearl**<br>*(Plaintiff)* |
|  |  | **Steven N. Wiggins**<br>*(Plaintiff)* |
| **Cameron L. Sabin**<br>STOEL RIVES (UT)<br>201 S MAIN ST STE 1100<br>SALT LAKE CITY, UT 84111-4904<br>(801)328-3131<br>clsabin@stoel.com<br> *Assigned: 04/21/2004*<br> *ATTORNEY TO BE NOTICED* | representing | **Gordon C. Rausser**<br>*(Defendant)* |
| **Bryan M. Scott**<br>SNOW CHRISTENSEN & MARTINEAU | representing | **Gregory D. Adams**<br>*(Plaintiff)* |

10 EXCHANGE PLACE 11TH FLOOR
PO BOX 45000
SALT LAKE CITY, UT 84145-5000
(801)521-9000
intakeclerk@scmlaw.com
*Assigned: 08/22/2006*
*ATTORNEY TO BE NOTICED*

**James R. Kearl**
*(Plaintiff)*

**Steven N. Wiggins**
*(Plaintiff)*

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| | | | |
| | | | |
| 01/16/2008 09:39:42 | | | |
| **PACER Login:** | mn0129 | **Client Code:** | kr |
| **Description:** | Attorney List | **Search Criteria:** | 2:04-cv-00175-BSJ |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| ) | |
| ) | |
| JAMES R. KEARL; GREGORY D. ) | Civil No.  2:04-CV-00175 BSJ |
| ADAMS; AND STEVEN N. WIGGINS, ) | |
| ) | |
| Plaintiffs, ) | **JUDGMENT** |
| ) | |
| vs. ) | |
| ) | |
| GORDON C. RAUSSER, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

\* \* \* \* \* \* \* \* \*

This action came on for trial before the court and a jury from August 21, 2006 through

August 31, 2006, the Honorable Bruce S. Jenkins, United States Senior District Judge,

presiding.  Plaintiffs James R. Kearl, Gregory D. Adams, and Steven N. Wiggins (collectively

"Plaintiffs") were represented by Stanley J. Preston, Maralyn M. Reger, and Bryan M. Scott of

Snow, Christensen & Martineau.  Defendant Gordon C. Rausser ("Defendant") was

represented by Laura R. Craft, and by Cameron L. Sabin and D. Carolina Nunez of Stoel Rives

LLP.  Prior to trial, the court dismissed Plaintiffs' claims for equitable estoppel, promissory

estoppel, and negligent misrepresentation.  During trial, on August 30, 2006, the court granted

judgment as a matter of law in favor of the Defendant on Plaintiffs' claims for fraud,

promissory fraud, negligent misrepresentation, breach of fiduciary duty, and breach of the

covenant of good faith and fair dealing.  On August 31, 2006, the jury rendered its Special

Verdict on Plaintiffs' breach of contract claim.  Now, in accordance with the jury's Special

Verdict, the court's rulings, and for other good cause appearing, **IT IS ORDERED, ADJUDGED AND DECREED AND JUDGMENT IS HEREBY ENTERED AS FOLLOWS**:

    1.      Breach of Contract Claim:

         a.      In favor of Plaintiff James R. Kearl and against Defendant in the amount of $1,648,087.85, plus prejudgment interest (at the statutory rate set forth in Utah Code Ann. § 15-1-1(2)) in the amount of $451.53 per day from August 21, 2006 to the date this Judgment is entered;

         b.      In favor of Plaintiff Gregory D. Adams and against Defendant in the amount of $1,152,229.24, plus prejudgment interest (at the statutory rate set forth in Utah Code Ann. § 15-1-1(2)) in the amount of $315.68 per day from August 21, 2006 to the date this Judgment is entered;

         c.      In favor of Plaintiff Steven N. Wiggins and against Defendant in the amount of $2,370,593.30, plus prejudgment interest (at the statutory rate set forth in Utah Code Ann. § 15-1-1(2)) in the amount of $649.48 per day from August 21, 2006 to the date this Judgment is entered;

         d.      Pursuant to Rule 54(d) of the Federal Rules of Civil Procedure, Plaintiffs are each awarded their proportionate share of the taxable costs; and

         e.      Plaintiffs shall be entitled to receive post-judgment interest on the judgment amount at the applicable legal rate until paid.

    2.      Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the court determines that there is no just reason for delay and directs the entry of this Judgment as a final judgment as to Plaintiffs' First Claim for Relief for Breach of Contract, Second Claim for

Relief for Breach of the Covenant of Good Faith and Fair Dealing, Third Claim for Relief for

Promissory Estoppel, Fourth Claim for Relief for Equitable Estoppel, Seventh Claim for Relief

for Fraud, Eighth Claim for Relief for Negligent Misrepresentation, Ninth Claim for Relief for

Promissory Fraud, and Tenth Claim for Relief for Breach of Fiduciary Duty and/or Self

Dealing.  The court stays further proceedings concerning Plaintiffs' Fifth Claim for Relief for

Unjust Enrichment/Unjust Impoverishment and Sixth Claim for Relief for Constructive Trust

and the parties' related motions seeking judgment based on unjust enrichment and constructive

trust until further order of the court.  Consideration of the same is premature at this time,

pending action by the Court of Appeals or the expiration of the time for appeal.

DATED this _6_ day of October, 2006.

BY THE COURT:

Bruce S. Jenkins
United States Senior District Judge

# Exhibit 7

1  LAURA R. CRAFT, BAR no. 95717
2  1900 Powell Street, Suite 150
   Emeryville, CA 94608
3  Telephone: (510) 463-0133
   Facsimile: (510) 463-0131
4  lcraft@onpointanalytics.com

5  Attorney for Defendant, Opt4 Derivatives, Inc.

6

7

8                UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10

11
   AT&T CORP., a New York Corporation,        Case No. C04-03699 FMS
12
                Plaintiff,                     **DECLARATION OF LAURA R. CRAFT**
13                                             **IN OPPOSITION TO MOTION FOR**
                                               **LEAVE TO AMEND**
       vs.
14
   OPT4 DERIVATIVES, INC., a Delaware
15 Corporation,
                                               Date: April 14, 2005
16              Defendant.                     Time: 2:00 p.m.
                                               Ctrm: 5
17

18

19 I, Laura R. Craft, declare:

20      1. I am an attorney at law licensed to practice before the Courts of the State of California

21 and the United States District Court for the Northern District of California. From early 2000

22 through late June, 2004 I was continuously employed as General Counsel of Opt4 Derivatives,

23 Inc. ("Opt4") a Delaware corporation with its principal place of business in Berkeley California.

24 The facts set forth in this Declaration are true based upon my personal knowledge, except where

25 stated on information and belief in which case I believe them to be true. If called as a witness, I

26
   could and would testify competently as set forth herein.
27

28
                                               Declaration of Laura R. Craft
                                               Case No. C04-03699

2. Opt4 was a software developer focused on providing innovative trading applications supplied to the market on a fully hosted basis. In my role as General Counsel to Opt4, I became involved in attempting to resolve a commercial dispute with AT&T which had contracted to supply Opt4 with comprehensive network services consisting of leased hardware, leased software, physical facilities at two locations, maintenance, security, bandwidth and various skilled professional services. Opt4 had numerous problems with AT&T's performance under this contract that resulted in delays, cost overruns and down time. The quality and timeliness of these services were a critical element in Opt4's business plan and its offering to its clients. Ultimately, AT&T's failures impaired Opt4's relationships with its clients and its ability to market.

3. After almost eighteen months spent attempting to remedy these problems, Opt4 notified AT&T that it was terminating the contract due to AT&T's material breach. A true and correct copy of this notice dated February 13, 2004 is attached hereto as Exhibit A. I attempted to reach a resolution with AT&T's in house counsel but the matter was ultimately referred out and, in late March 2004 I began dealing with Pamela Evans of Assayag Mauss, AT&T's current counsel.

4. For more than three months I attempted diligently, but unsuccessfully, to reach a resolution with AT&T through Assayag Mauss. I explained both the problems AT&T's poor service had caused Opt4 and their economic consequences. Starting in February 2004, at least three cash settlement offers were made by Opt4 to AT&T. These offers were in declining amounts because, as I explained to AT&T, Opt4's cash resources were dwindling rapidly. In addition, AT&T refused (and I am informed and believe still refuses) to return hardware belonging to Opt4 which was loaded with highly sensitive client data and proprietary applications. A true and correct copy of my March 26, 2004 demand to Ms. Evans for the return of such equipment is attached hereto as Exhibit B.

5. On numerous occasions I warned Ms. Evans that there was a risk Opt4 might not be able to make any payment if the matter was not promptly resolved. I reiterated this risk, and the fact that Opt4 was almost out of money, when I called her in late June 2004 to let her know that I was leaving Opt4's employ. I was subsequently retained by Opt4 as outside counsel and became familiar with the security interests and foreclosure proceeding which are the subject of AT&T's proposed amendment.

6. Due to the lack of response, I became concerned that AT&T might not be receiving full information about Opt4's finances or its settlement offers. I attempted to reach another attorney at Assayag Mauss and Ms. Evans returned my call. She assured me that AT&T was fully informed and that it merely needed additional time to reach any decisions.

7. Ms. Evans periodically requested confirming information about Opt4 which was promptly supplied. This included financial statements and banking information. In addition, immediately upon her request, I supplied documents pertaining to the conduct of the foreclosure sale and the security interest that had been foreclosed.

8. On March 29, 2004 Gordon Rausser loaned Opt4 the sum of $2,000,000. On August 13, 2004, he loaned Opt4 an additional $46,500 as bridge financing in anticipation of a subsequent third party financing that never materialized. That loan was secured by a first priority security interest on all of Opt4's assets, with the exception of equipment or software previously acquired by the company using purchase money financing, which was therefore already encumbered. On August 30, 2004, Rausser and Peak6 each entered into written agreements to loan Opt4 up to $300,000 ( a total of $600,000), once again in expectation of an alternative source of financing or significant new revenue source which never arrived. As with the earlier loan that month, these loans were expressly subject to a blanket security interest in Opt4's assets which was thoroughly documented in the Agreements. At the time each of these four loans was made,

3    Declaration of Laura R. Craft
Case No. C04-03699

1   the proceeds were required to pay ordinary working capital expenses such as employee salaries

2   and rent. The funds were, in fact, used for these purposes.

3         9. Opt4 defaulted under the $300,000 Notes and Peak6 served notice of its intention to

4   foreclose its security interest.  Notice of a public foreclosure sale describing the assets to be sold

5   was published in the local newspaper for three consecutive days over a week-end in accordance

6   with the Uniform Commercial Code.  Copies of the Notice of Sale were served on all other

7   secured creditors, once again in conformity with the Uniform Commercial Code. AT&T was not

8   a secured creditor and had not, in fact, ever requested or been granted a lien on Opt4's assets.  As

9   such, it was not served with (and had no legal right to be served with) a Notice of the Sale.

10        10.  The foreclosure sale was conducted on October 11, 2004 by a licensed auctioneer in

11   accordance with the terms of the notice.  Based upon advice from the auctioneer, the property was

12   sold in five lots.  There were only three bidders present of whom one was Rausser.  Pursuant to

13   written instruction from Peak6, Rausser was authorized to jointly credit bid the debt of Peak6

14   with his own. Ultimately, Rausser and/or Peak6 were the successful bidders for only two of the

15   five lots offered.  They purchased through credit bid 1) the proprietary software developed by

16   Opt4 including any associated patent rights (acquired jointly by Rausser and Peak6 for $350,000)

17   and 2) the contract rights, receivables and other accounts of Opt4 (acquired by Rausser for

18   $20,000). These purchases reduced the amount of Opt4's secured indebtedness by $370,000.

19   However, there remained approximately  $2.5 million  in secured debt that would have to be

20   satisfied before there would be even a dollar available to distribute to unsecured creditors such as

21   AT&T.

22        11. The $2,000,000 loan from Rausser was junior to the other loans described above and

23   did not comprise any portion of the indebtedness bid at the foreclosure sale. The loans which

24   provided the basis for the purchase were those made in August 2004, each of which was accorded

                       4    Declaration of Laura R. Craft
                          Case No. C04-03699

1  a blanket lien at the time it was made and the cash disbursed to Opt4. Those loans involved a

2  contemporaneous exchange of value in which the security interest was granted as consideration

3  for, and at the time of, the making of the loan.

4      12. Matthew Hulsizer, whom plaintiffs seek to join as a defendant through the proposed

5  amendment did not loan money to Opt4 and was not one of its creditors.  He did not participate in

6  the sale, bid or have others bid for him, or acquire any assets of Opt4.  The proposed amended

7  complaint appears to allege only that he is a partner in Peak6, a Limited Liability Partnership, and

8  not that he took any other actions or received any benefit personally from Opt4's assets.

9      I declare under penalty of perjury under the laws of the United States that the foregoing is

10  true and correct and that this Declaration was executed in Berkeley California on March 24, 2005.

11

12

13

14  /s/_____
    Laura R. Craft

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    5    Declaration of Laura R. Craft
                                         Case No. C04-03699

# Exhibit 8

## Chandra Wallace

| | |
|---|---|
| **From:** | Laura Craft |
| **Sent:** | Tuesday, July 24, 2007 6:18 PM |
| **To:** | Chandra Wallace |
| **Subject:** | Dreaded Fidelity |
| **Attachments:** | Circulation Draft v.2 7 24 07.doc |

Chandra: How was the baby visit?  Hope everyone is doing well. Attached is a copy of the most recent version of the Fidelity Report sent to Dennis.  He will be here with me all day Thursday to review. I know you are buried with Utah Fact Statement, but I desperately need you to give it a thorough read for content and accuracy and to add citations where appropriate.  There is a reasonable amount of new material. Can you do this?

Saumya: I think there are 2 footnotes that have your name on them (literally, not figuratively) looking for info.

Let's do everything with track changes since I will not be sending to Dennis again prior to his arrival.

**Laura Craft**
President
OnPoint Analytics, Inc.
2000 Powell Street – Suite 860
Emeryville, CA 94608
510.463.0133 (Direct)
510.463.0131 (Fax)
lcraft@onpointanalytics.com

9/27/2007

OPA006583

# Exhibit 9

**General Docket**
**Tenth Circuit Court of Appeals**

**Court of Appeals Docket #:** 07-4026                                    **Filed:** 02/02/2007
**Nsuit:** 4190 Other Contract Actions
Kearl, et al v. Rausser
**Appeal From:** United States District Court for the District of Utah

**Case Type Information:**
  1) civil
  2) private
  3) -

**Originating Court Information:**
  **District:** 1088-2 : 2:04-CV-175-BSJ
  **Court Reporter:** Reeve Butler -
  **Court Reporter:** Michelle Mallonee -, Court Reporter
  **Court Reporter:** Patti Walker -
  **Sentencing Judge:** Bruce S. Jenkins -, Senior U.S. District Judge
  **Date Filed:** 02/17/2004
  **Date NOA Filed:**
  01/29/2007

**Prior Cases:**
None

**Current Cases:**
| | Lead | Member | Start | End |
|---|---|---|---|---|
| Cross-appeal | | | | |
| | 07-4021 | 07-4026 | 02/02/2007 | |

**Panel Assignment:**
  Not available

| JAMES R. KEARL | Stanley J. Preston |
|---|---|
| Plaintiff - Appellant | [NTC Retained] |
| | Snow, Christensen & Martineau |
| | Firm: 801/521-9000 |
| | 10 Exchange Place, 11th Floor |
| | P.O. Box 45000 |
| | Salt Lake City, UT 84145-0000 |

|                                              | Maralyn M. Reger<br>[COR NTC Retained]<br>Snow, Christensen & Martineau<br>Firm: 801/521-9000<br>10 Exchange Place, 11th Floor<br>P.O. Box 45000<br>Salt Lake City, UT 84145-0000 |
|                                              |                                              |
| **GREGORY D. ADAMS**<br>        Plaintiff - Appellant | Stanley J. Preston<br>[NTC Retained]<br>(see above) |
|                                              | Maralyn M. Reger<br>[COR NTC Retained]<br>(see above) |
|                                              | Bryan M. Scott<br>[COR NTC Retained]<br>Snow, Christensen & Martineau<br>Firm: 801/521-9000<br>10 Exchange Place, 11th Floor<br>P.O. Box 45000<br>Salt Lake City, UT 84145-0000 |
| **STEVEN N. WIGGINS**<br>        Plaintiff - Appellant | Stanley J. Preston<br>[NTC Retained]<br>(see above) |
|                                              | Maralyn M. Reger<br>[COR NTC Retained]<br>(see above) |
|                                              | Bryan M. Scott<br>[COR NTC Retained]<br>(see above) |
| v.                                           |                                              |
| **GORDON C. RAUSSER**<br>        Defendant - Appellee | Charles F. Adams<br>[COR NTC Retained]<br>Stoel Rives<br>Firm: 503/294-9665<br>900 SW 5th Avenue, Suite 2600<br>Portland, OR 97204-1268 |

Laura Craft
[COR NTC Retained]
Firm: 510/463-0133
2000 Powell Street
Suite 860
Emeryville, CA 94608-0000

David J. Jordan
[COR NTC Retained]
Stoel, Rives, Boley, Jones & Grey
Firm: 801/578-6956
201 S. Main Street
Suite 1100
Salt Lake City, UT 84111-4904

Cameron L. Sabin
[COR NTC Retained]
Stoel Rives, LLP
Firm: 801/328-3131
201 S. Main St.
Suite 1100
Salt Lake City, UT 84111-0000

Bryan M. Scott
[COR NTC Retained]
(see above)

---

JAMES R. KEARL; GREGORY D. ADAMS; STEVEN N. WIGGINS,

     Plaintiffs - Appellants,

  v.

GORDON C. RAUSSER,

     Defendant - Appellee.

---

| 02/02/2007 | [1997929] Civil case docketed. Preliminary record filed. DATE RECEIVED: 2/1/07. Transcript order form due 2/16/07 for Reeve Butler, for Patti Walker and for Michelle Mallonee pursuant to R.42.1. Docketing statement due 2/16/07 for Steven N. Wiggins, for Gregory D. Adams and for James R. Kearl. Notice of appearance due 2/16/07 for Gordon C. Rausser, for Steven N. |

|  | Wiggins, for Gregory D. Adams and for James R. Kearl. |
|---|---|
| 02/07/2007 | [1999592] Docketing statement filed by James R. Kearl, Gregory D. Adams, and Steven N. Wiggins in 07-4026. Original and 4 copies. c/s: y. |
| 02/07/2007 | [1999593] Acknowledgement of transcript order filed by James R. Kearl, Gregory D. Adams, and Steven N. Wiggins in 07-4026. Transcript order due 2/21/07 for Patti Walker (2/1/06 pre-trial conference). |
| 02/20/2007 | [2002869] Notice of appearance filed by Maralyn M. Reger and Stanley J. Preston in 07-4026 as attorney for James R. Kearl, Gregory D. Adams, and Steven N. Wiggins. CERT. OF INTERESTED PARTIES (y/n): n. |
| 02/28/2007 | [2005383] Appellees' response to the court's 2/6/07 order filed by James R. Kearl, Gregory D. Adams and Steven N. Wiggins in 07-4021 and Gordon C. Rausser in 07-4026 Original and 3 copies. c/s: y |
| 02/28/2007 | [2005385] [2005383-1] Appellees' response to the court's 2/6/07 order filed by Appellees James R. Kearl, Gregory D. Adams, Steven N. Wiggins and Gordon C. Rausser in 07-4021, [2005383-1] and in 07-4026 submitted to Appeals Expeditors (err). |
| 03/02/2007 | [2006155] Order filed by Clerk (err) - The court reserves judgment on the issue raised in this court's 2/6/07 jurisdictional show cause order. Parties served by mail. Briefing in these appeals shall proceed in accordance with the 10th Circuit Rules. |
| 03/08/2007 | [2007964] Notice filed that the transcript was filed by Patti Walker in 07-4026 in district court on 3/2/07. Notice due that record is complete 3/13/07 for D. Mark Jones. |
| 03/09/2007 | [2008113] Order filed by Clerk notice of appearance form due 3/19/07 for Gordon C. Rausser. Parties served by mail. |
| 03/09/2007 | [2008434] Filed notice record is complete 3/9/07. |
| 03/09/2007 | [2008435] Cross-appeal schedule set. First brief on cross appeal and appendix due 4/18/07 for Gordon C. Rausser in 07-4021 and in 07-4026. |
| 03/21/2007 | [2011537] Notice of appearance filed by Charles F. Adams and David J. Jordan as attorneys for Gordon C. Rausser in 07-4026. CERT. OF INTERESTED PARTIES (y/n): n. |
| 04/19/2007 | [2022601] E-Brief received from Appellant Gordon C. Rausser in 07-4021 and 07-4026. Submission Type: email. |
| 04/19/2007 | [2022602] E-attachment to first brief on cross-appeal received from Gordon C. Rausser in 07-4021 and 07-4026. Submission type: email. |
| 04/20/2007 | [2022603] First brief on cross-appeal filed by Gordon C. Rausser in 07-4021 and 07-4026. Original and 7 copies. c/s: y. Served on 4/18/07. Oral Argument? y. Appendix filed. Original and 1 appendix copy. Appendix Pages: 4628 (in 11 |

|            | volumes). 2nd cross-appeal brief due 5/21/07 for Steven N. Wiggins, Gregory D. Adams, and James R. Kearl in 07-4021 and 06-4026. |
|------------|---------------------------------------------------------------------------------------------------------------------------------|
| 04/24/2007 | [2023344] Oversized record stored. Record can be located at Section: KK Shelf: 2 |
| 05/15/2007 | [2029746] E-Motion (Motion for Extension of Time) received from James R. Kearl, Gregory D. Adams, and Steven N. Wiggins in 07-4021 and 07-4026. Submission type: email. |
| 05/15/2007 | [2029872] Appellees/cross-appellants' motion to extend time to file second brief on cross-appeal until 6/20/07 in 07-4021 and 07-4026 filed by James R. Kearl, Gregory D. Adams, and Steven N. Wiggins. Original and 3 copies. c/s: y. |
| 05/15/2007 | [2029876] Order filed by Clerk - Granting Appellees/cross appellants' motion to extend time to file second brief on cross appeal until 06/20/07 (30 days) [2029872-1] in 07-4021 and 07-4026. Second brief on cross appeal due 06/20/07 for appellees/cross appellants' James R. Kearl, Gergory D. Adams, and Steven N. Wiggins Parties. NO FURTHER EXTENSIONS WILL BE GRANTED ON THE CLERK'S AUTHORITY. served by mail. |
| 05/16/2007 | [2030215] Appellee's corrected motion to extend time to file second brief on cross-appeal [07-4021, 07-4026] filed by James R. Kearl, Gregory D. Adams, Steven N. Wiggins. Original and 3 copies. c/s: y |
| 06/05/2007 | [2035984] E-Motion to file an oversized second brief on cross-appeal received from James R. Kearl, Gregory D. Adams, and Steven N. Wiggins in 07-4021 and in 07-4026. Submission type: email |
| 06/06/2007 | [2035986] Appellee's motion to file an oversized second brief on cross appeal consisting of 19,000 words [07-4021, 07-4026] filed by James R. Kearl, Gregory D. Adams, and Steven N. Wiggins in 07-4021 and 07-4026. Original and 3 copies. c/s: y. |
| 06/06/2007 | [2035989] Appellees' motion to file an oversized second brief on cross-appeal submitted to court. |
| 06/06/2007 | [2036172] Case mediation conferencing terminated. |
| 06/07/2007 | [2036131] Order filed by Judges Kelly and McConnell granting Appellee's motion to file an oversized second brief on cross-appeal in 07-4021 and 07-4026 containing no more than 19,000 words. [2035986-1] Parties served by mail. |
| 06/08/2007 | [2036664] Notice of appearance filed by Bryan M. Scott in 07-4026 as attorney for James R. Kearl, Gregory D. Adams, and Steven N. Wiggins. CERT. OF INTERESTED PARTIES (y/n): n. |
| 06/20/2007 | [2039986] E-Brief (Second brief on cross-appeal) received from Appellees James R. Kearl, Gregory D. Adams, and Steven N. Wiggins in 07-4021 and in |

| | | |
|---|---|---|
| | | 07-4026. Submission Type: email (Corrected on 6/26/07). |
| 06/20/2007 | 🖹 | [2039988] E-attachment to second brief on cross-appeal received from Gregory D. Adams, Steven N. Wiggins and Gordon C. Rausser in 07-4021 and in 07-4026. Submission type: email (Corrected on 6/26/07). |
| 06/21/2007 | | [2040138] Deficient second brief on cross-appeal filed by James R. Kearl, Gregory D. Adams, and Steven N. Wiggins in 07-4021 and 07-4026 (no prior/related statement, no oral argument statement, footnotes too small - Supplemental Appendix ok). Corrected second brief on cross-appeal due 7/2/07. |
| 06/27/2007 | | [2041675] Second brief on cross-appeal filed by James R. Kearl, Gregory D. Adams, and Steven N. Wiggins in 07-4021, and 07-4026. Original and 7 copies. Served on 6/26/07. Oral Argument? y. Appendix filed. Original and 1 appendix copy. Appendix Pages: 174 (in 1 volume). Third brief on cross appeal due 7/30/07. |
| 06/29/2007 | | [2042327] E-Motion to extend time to file the third brief on cross-appeal received from appellant Gordon C. Rausser in 07-4021 and in 07-4026. Submission type: email |
| 07/02/2007 | | [2042813] Appellant's motion filed by Appellant Gordon C. Rausser to extend time to file third brief on cross-appeal until 8/29/07 [07-4021, 07-4026]. Original and 3 copies. c/s: y. |
| 07/02/2007 | | [2042814] Order filed by Clerk granting Appellant's motion to extend time to file third cross-appeal brief [2042813-1] (30 days). Third cross-appeal brief due 8/29/07 in 07-4021 and 07-4026. No further extensions of time may be granted on the clerk's authority. Parties served by mail. |
| 08/17/2007 | 🖹 | [2055439] E-Motion (Unopposed Motion for Leave to File Overlength Response and Reply Breif) received from Gordon C. Rausser in 07-4021 and 07-4026. Submission type: Email. |
| 08/17/2007 | 🖹 | [2055441] E-attachment to appellant/cross-appellee's motion to file an overlength response and reply brief received from Gordon C. Rausser in 07-4021 and 07-4026. Submission type: Email. |
| 08/20/2007 | | [2055759] Appellant's/Cross-Appellee's motion filed by Gordon C. Rausser in 07-4021 and 07-4026 to file an oversize brief (19,000 words). [07-4021, 07-4026] . Original and 3 copies c/s: y. |
| 08/20/2007 | | [2055760] Appellant/Cross-Appellee's motion to file an oversize brief in 07-4021 and 07-4026 submitted to court. |
| 08/21/2007 | | [2055972] Order filed by Judges Kelly andMcConnell granting Appellant/Cross-Appellee's motion to file an oversize brief in 07-4021 and 07-4026 containing no more than 19,000 words [2055759-1]. Parties served by mail. |

| 08/29/2007 | 🖺 | [2058578] E-Brief (Third Cross-Appeal Brief) received from Appellant Gordon C. Rausser in 07-4021 and 07-4026. Submission Type: email. |
|---|---|---|
| 08/31/2007 | | [2059196] Third brief on cross-appeal filed by Gordon C. Rausser in 07-4021, 07-4026. Original and 7 copies. Served on 8/29/07. Xap4 brief due 9/17/07 for Steven N. Wiggins, Gregory D. Adams and James R. Kearl in 07-4021, 07-4026. |
| 09/06/2007 | 🖺 | [9510542] Motion to extend time to file fourth brief on cross-appeal until 10/17/2007 filed by Appellees Mr. Gregory D. Adams, Mr. James R. Kearl and Mr. Steven N. Wiggins in 07-4021 and 07-4026. Original and 1 copy. Served on 09/05/2007. Manner of Service: US Mail. |
| 09/07/2007 | 🖺 | [9511003] Order filed by Clerk of the Court granting Appellees/Cross-Appellants' motion to extend time to file fourth brief on cross-appeal until 10/17/2007 (30 days). Fourth brief on cross-appeal due on or before 10/17/2007 for Steven N. Wiggins, Gregory D. Adams and James R. Kearl in cases 07-4021 and 07-4026. No further extensions of time will be granted on the clerk's authority. Served on 09/07/2007. [07-4021, 07-4026] |
| 10/03/2007 | 🖺 | [9517506] Appellee's motion to file an oversize brief 14,000 words long filed by Mr. Gregory D. Adams, Mr. James R. Kearl and Mr. Steven N. Wiggins in 07-4021. Original and 0 copies. Served on 10/02/2007. Manner of Service: US Mail. [07-4021, 07-4026] |
| 10/03/2007 | 🖺 | [9517562] Response to Appellee's motion to file oversized brief filed by Mr. Gordon C. Rausser in 07-4021, 07-4026. Original and 0 copies. Served on 10/03/2007. Manner of Service: US Mail. [07-4021, 07-4026] |
| 10/03/2007 | 🖺 | [9517815] Reply filed by Mr. Gregory D. Adams, Mr. James R. Kearl and Mr. Steven N. Wiggins in 07-4021, 07-4026 to [9517562-2], response to appellee's motion for file oversized brief. Original and 0 copies. Served on 10/03/2007. Manner of Service: US Mail. [07-4021, 07-4026] |
| 10/04/2007 | 🖺 | [9518018] Order filed by Kelly; McConnell granting Appellees' motion to file oversized brief. Appellees' reply brief shall not exceed 10,000 words. Served on 10/04/2007. [07-4021, 07-4026] |
| 10/16/2007 | 🖺 | [9520744] Errata sheet filed by Mr. Gordon C. Rausser in 07-4021, 07-4026. Original and 7 copies. Served on 10/15/2007. Manner of Service: Email, Hand, 3rd Party. [07-4021, 07-4026] |
| 10/17/2007 | 🖺 | [9521254] Cross-appeal reply brief filed by Mr. Gregory D. Adams, Mr. James R. Kearl and Mr. Steven N. Wiggins in 07-4021 and 07-4026. Original and 7 copies. Served on: 10/17/2007. Manner of service: U.S. Mail. [07-4021, 07-4026] |
| 01/09/2008 | 🖺 | [9539983] Calendar notice sent to counsel. Arguments to be held Monday, March 17, 2008, at 2:00 p.m. at University of Colorado, School of Law, Boulder, Colorado. Counsel is required to go to http://www.ca10.uscourts.gov |

under the argument calendar tab to obtain an important notice regarding calendared cases and required forms that must be completed and returned to the clerk's office within 10 days. [07-4021, 07-4026]

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| | | | |
| 01/16/2008 09:42:44 | | | |
| **PACER Login:** | mn0129 | **Client Code:** | kr |
| **Description:** | Full Docket Report | **Search Criteria:** | 07-4026 |
| **Billable Pages:** | 4 | **Cost:** | 0.32 |

# Exhibit 10

## John Galindo

| | |
|---|---|
| **From:** | Chandra Wallace |
| **Sent:** | Thursday, July 05, 2007 11:02 AM |
| **To:** | Laura Craft |
| **Cc:** | John Galindo |
| **Subject:** | follow-up |

The air-conditioner was out at Kristen's daycare when I went to drop her off today, and it's already almost 100 degrees, so I wouldn't leave her there. (What are they thinking not calling parents about this?? It's forecast to be 104 in Concord today. Grr.)
I took her to Blockbuster to stock up on movies for the day, and cranked up the air, and I'll be working from here.

I'm working on Gordon's brief now, and prepared to fill in cites for any new material in the Fidelity report as needed. If you want to have a call to prepare for Dennis's visit on Monday, I'm here.
Sorry for the inconvenience!
Chandra

9/27/2007

OPA004175

# Exhibit 11

## Chandra Wallace

| | |
|---|---|
| **From:** | Chandra Wallace |
| **Sent:** | Thursday, August 09, 2007 9:58 AM |
| **To:** | Laura Craft |
| **Subject:** | Update on Fidelity stuff |

I spoke to Chris Young (DOJ paralegal) this morning about the redaction issue and about the Carron mortgage document.

On the redactions, apparently there were a few documents throughout the IRS documents we got which should have been redacted versions, but were not. He mentioned that Barry was going to file some kind of protective order to resolve this issue.

On the mortgage document, Chris ran searches through their databases for this document also and, like me, came up with nothing. (phew!) He also confirmed that the document was not included with the copy of Carron's report he has, and that he would double-check this with Barry and Heather. I left a brief message for Barry following up on my email last night. Given than neither Chris nor I were able to find this document through several permutations of searches, I feel confident enough that it was not produced to recommend elevating this to Dennis. If the other side is going to fight releasing this document, that process needs to start soon so that we have time to do the analysis for the rebuttal report. Do you agree?

BTW: I've read both of the reports (Carron and Yale) and am ready to discuss them whenever is convenient for you. I'm taking advantage of the peace and quiet of the house now to finish moving sections and filling in facts for the Stoel brief so I can get that to you by the end of the day.

9/27/2007

# Exhibit 12

⚠ Attachments can contain viruses that may harm your computer. Attachments may not display correctly.

**Laura Craft**

| From: | Chandra Wallace | Sent: | Thu 9/13/2007 6:23 PM |
|---|---|---|---|
| To: | Gordons Berkeley Email; Laura Craft | | |
| Cc: | | | |
| Subject: | Fidelity Budget Breakout | | |
| Attachments: | 📄 FICAA Budget update 9.13.07.xls(31KB) | | |

Gordon and Laura—

I'm attaching a 2-page breakdown of the budget I think we'll need to complete this project, including a brief sum of the complete cost of the project and an estimate of expected hours from this point forward for each team member.

I'll let you know as soon as I've talked to Barry Reiferson.
Chandra

| Expected Fees 9/13-End | | Hrs | Billing Rate | Resulting Cost | | |
|---|---|---|---|---|---|---|
| GCR Trial Testimony and Travel | GCR | 30 | 650 | 19500 | | |
| Preparation for GCR Trial Testimony | GCR | 24 | 650 | 15600 | | |
| | LRC | 20 | 350 | 7000 | | |
| | SM/JQ | 30 | 300 | 9000 | | |
| | CSW | 20 | 200 | 4000 | | |
| GCR Deposition Testimony and Travel | GCR | 20 | 650 | 13000 | | |
| Preparation for GCR Depo Testimony: Assemble Prep Binders | CSW | 15 | 200 | 3000 | | |
| | SM/JQ | 30 | 300 | 9000 | | |
| | LK | 15 | 200 | 3000 | | |
| Preparation for GCR Depo Testimony: Meeting to prep GCR | GCR | 24 | 650 | 15600 | | |
| | LRC | 8 | 350 | 2800 | | |
| | SM/JQ | 13 | 300 | 3900 | | |
| | CSW | 8 | 200 | 1600 | | |
| Attend and prepare questions for opposing expert depositions | LRC | 10 | 350 | 3500 | | |
| | GCR | 5 | 650 | 3250 | | |
| | CSW | 10 | 200 | 2000 | | |
| Prepare for fact witness depos: gather docs, prepare and review questions | LRC | 10 | 350 | 3500 | | |
| | CSW | 40 | 200 | 8000 | | |
| Prepare for fact witness depos: meet with Barry and Heather | LRC | 20 | 350 | 7000 | | |
| | SM | 5 | 300 | 1500 | | |
| | CSW | 20 | 200 | 4000 | | |
| Analysis to respond to Carron arguments | GCR | 10 | 650 | 6500 | | |
| | LRC | 10 | 350 | 3500 | | |
| | SM/JQ | 25 | 300 | 7500 | | |
| | CSW | 20 | 200 | 4000 | $161,250 | September 13--End |

**Fees for August and First Half of September**

| | | | | | | |
|---|---|---|---|---|---|---|
| August Bill | | | | 170,290 | 170,290 | August 1-31 |
| September Time through 9/12/07 | GCR | 40 | 650 | 26000 | | |
| | LRC | 92 | 350 | 32200 | | |
| | SM | 60 | 300 | 18000 | *** estimate | |
| | CSW | 80 | 200 | 16000 | | |
| | LK | 48 | 200 | 9600 | | |
| | JQ | 77 | 300 | 23100 | 124900 | Sept 1-12 |
| | | | **August 1--END** | | 456,440 | |
| | | | Remaining budget as of 8/1 | | ($69,741) | |
| | | | What we need to finish the project --> | | **386,699** | |

OPA003734

**Cost of Project**

| Prior approvals | $895,167 |
| New Request | $386,699 |
| TOTAL Cost of Project | $1,281,866 |

**Expected Time after 9/12 by Timekeeper**

| GCR | 113 hours |
|---|---|
| Laura | 78 hours |
| Saumya | 68 hours |
| Jaffer | 35 hours |
| Chandra | 133 hours |
| Lisa | 15 hours |

OPA003735

# Exhibit 13


**OnPoint**

***Privileged and Confidential***     ***Fidelity International Currency Advisor***
Work Plan and Budget
9.15.06

To: Matthew Hicks, Esq.
      Department of Justice, Tax Division
From: Laura R. Craft
      OnPoint Analytics, Inc.
Date: September 15, 2006

As requested, this memo sets forth the proposed budget for expert services of Gordon C. Rausser, Ph.D., and all supporting staff in connection with the Son of Boss tax shelter litigation identified as *Fidelity International Currency Advisor A Fund LLC. v. United States of America*, USDC D. Mass. No. 05-40151 FDS.

Work will proceed in six phases: 1) Assessment, 2) Conclusions, 3) Reports, 4) Deposition, and 5) Trial Testimony Preparation, and 6) Trial Testimony. After completion of each of the first four phases, a product and progress review will be conducted with you before proceeding with the next phase. The budget contained herein is the best estimate of cost based upon the currently available information, but may change as additional information becomes available. OnPoint will communicate regularly with you regarding project status and billings in proportion to budget. This budget pertains to professional fees and does not include out of pocket expenses for items such as data acquisition and travel. These items will be passed through at cost. OnPoint does not charge clients for internal expenses such as copying, printing, telephone, facsimile and computer usage, and treats these items as part of its normal operating overhead. We are familiar with and will comply with government guidelines regarding expenses such as travel.

We understand that some initial work may have already been performed by another firm or expert. If you own the results as accessible work product, and if they can effectively be incorporated into our analysis, this may have a positive effect on the budget. With regard to the second phase of our work ("Conclusions"), the ultimate charges will depend heavily upon how many individual transactions comprise the overall structure and the form and specificity of detail contained in the available transactional documents. Our budget does not include extensive data entry services. With regard to the fourth phase ("Reports"), the scope of the included rebuttal report is highly dependent upon whether initial reports are filed simultaneously, or whether the plaintiffs file their report with sufficient lead time for us to thoroughly respond in our initial report. In addition, we have not accounted for the cost of attending the opposing expert(s) deposition(s) in the event that you wish us to do so. Finally, the budget for the fifth phase ("Trial Testimony") presumes that graphs, charts and other visuals appearing in the Reports are sufficient for use at trial. This phase of the budget therefore does not incorporate the cost of developing extensive new demonstratives for use at trial.

Subject to revision based on new information, our current estimate of the total cost of the project, expected to span approximately 13 months, is $368,720, as itemized below.

         **1. Phase One: *Assessment and Model Design***
             Time Period: 9/15/06 – 11/15/06
             Total Estimated Hours: 285
             Total Estimated Cost: $98,750

During this initial phase, we will review all of the contract documents and related tax opinion(s) and design the analytical model for evaluating potential economic returns and risk profile of each of the proposed transactions, individually and collectively.

OPA008258



**2. *Phase Two: Data Analysis, Simulations and Conclusions***
Time Period: 11/16/06 – 2/15/07
Total Estimated Hours: 380
Total Estimated Cost: $123,120

In this second phase, we will collect and load all relevant market data, extract and load all transactional data, code and run all models and simulations, and form conclusions about both the prospective (ex ante) and actual (ex post) economic returns and risk. We will also set up benchmark risk/return comparisons with other recognized, legitimate investment structures.

**3. *Phase Three: Reports***
Time Period: 2/16/07 – 5/31/07
Total Estimated Hours: 245
Total Estimated Cost: $80,115

In the third phase we will draft an initial and one rebuttal report, including graphs, charts, tables and illustrations as appropriate. Back-up of the reports (for later reference) will contain complete source footnoting as well as data extracts and model outputs for future reference in deposition and trial preparation. We will also compile and supply an Appendix of materials relied upon.

**4. *Phase Four: Deposition and Preparation***
Time Period: 6/1/07 – 8/1/07
Total Estimated Hours: 67
Total Estimated Cost: $29,915

Actual deposition testimony time is estimated at 8 hours. The balance of the time in this phase is comprised of materials preparation, review, meetings with you, and travel.

**5. *Phase Five: Trial Preparation***
Time Period: 8/1/07 – 10/1/07
Total Estimated Hours: 50
Total Estimated Cost: $23,820

Phase five, preparation for trial testimony, includes assembly and review of materials, internal preparation sessions, and preparation directly with you.

**6. *Phase Six: Trial Testimony***
Time Period: 10/1/07 – 11/1/07
Total Estimated Hours: 20
Total Estimated Cost: $13,000

Phase six, trial testimony, includes travel, and actual testimony and court waiting time.

**Professional Services Rate Schedule**
- Testifying Expert (Dr. Gordon C. Rausser) - $650
- Project Manager - $350
- Database Architect and Statistician - $ 300
- Financial/Derivatives Analyst - $300
- Staff Economist - $250
- Junior Analyst - $200
- Project Assistant - $90
- Data Technician - $50

OPA008259

# Exhibit 14



## OnPoint Analytics
2000 Powell Street
Suite 860
Emeryville, CA  94608
(510) 463-0130

**Invoice for Services: # 1376**

Dated: December 31, 2006
Matter: Fidelity Int'l. Currency Advisor A Fund LLC v. United States of America

**Contract #: 6WTAX - 136153**

Mr. Barry E. Reiferson, Esq.
U.S. Department of Justice
Tax Division
P.O. Box 813
Ben Franklin Station
Washington. DC 20044

Services from November 1 through 30, 2006:  Meetings with staff; review and evaluate documents:                                    : travel and review documents for court hearing: attend plaintiffs' tutorial; meetings with Dennis Donohue; calls with DOJ attorneys; review draft correspondence: review and analysis of Brattle presentation; prepare transaction chronology: perform accounting analysis regarding trades; search/download EMC stock price and foreign currency exchange rate data: graph price series, volatilities, and correlation coefficients over time: analysis of payoffs of various vertical option spreads and option combos along with the percents of historical data points within the relevant price ranges; obtain and analyze historical price data of 10-year swap rates: analysis of theoretical probabilities associated with payoffs; download/compile historical LIBOR data; review public EMC SEC filings; review and index documents produced by Egan and related entities; draft search terms for Refco documents;

locate and digest pattern evidence from Helios documents; review Alpha documents; review Plaintiffs' tutorial presentation slides: review Dewees decision; generate and revise graphs.

| Title | Hours | Rate | Fee |
|---|---|---|---|
| Testifying Expert (G. Rausser) | 75.80 | $650 | $ 49,270.00 |
| Project Manager (L. Craft) | 62.10 | $350 | $ 21,735.00 |
| Statistician (G. You) | 28.30 | $300 | $  8,490.00 |
| Database Architect (J. Mouledous) | 4.25 | $280 | $  1,190.00 |
| Analyst (C. Wallace) | 91.75 | $200 | $ 18,350.00 |
| Analyst (H. Greiner) | 162.60 | $200 | $ 32,520.00 |
| Project Assistant (H. Bellson) | 9.50 | $ 90 | $    855.00 |
| Project Assistant (B. Mobley) | .50 | $ 90 | $     45.00 |
| Data Entry (K. Cummins) | 2.00 | $ 50 | $    100.00 |

Total Current Fees:                                                                $132,555.00

OPA008270



**Reimbursable Costs at Cost:**

| | |
|---|---|
| Airfare – G. Rausser | $ 724.30 |
| Hotel Marriott – G. Rausser | $ 111.33 |
| Taxis/Car Service – G. Rausser | $ 99.55 |
| Meals While Traveling – G. Rausser | $ 42.20 |
| Meals – Working Meeting – Rausser/Craft/Greiner | $ 76.77 |
| FedEx | $ 71.28 |

**Total Reimbursable Costs at Cost:**                              $   1,125.43

**Total Current Charges:**                                        $ 133,680.43

**Previous Balance Due:**        **(CORRECTED)**
                                 Invoice #1365 Dated 11/27/06    $  81,930.00

**Total Balance Due:**                                           $ 215,610.43

**No other costs have been incurred through the billing period for this invoice. Information about anticipated costs for future periods may be obtained from Laura R. Craft at (510) 463-0133 and are in accordance with the previously executed contract.**

---

2000 Powell Street, Suite 860, Emeryville, CA  94608                Accounting:  510-463-0137

OPA008271

# Exhibit 15



## OnPoint Analytics
2000 Powell Street
Suite 860
Emeryville, CA  94608
(510) 463-0130

Invoice for Services: # 1452

Matter: Fidelity Int'l. Currency Advisor A Fund LLC v. United States of America

Contract #: 6WTAX - 136153

  Mr. Barry E. Reiferson, Esq.
  U.S. Department of Justice
  Tax Division
  P.O. Box 55
  Ben Franklin Station
  Washington, DC 20044

Services Rendered Through March 31, 2007

... aft expert declaration outline; research and prepare annotations; review of 2002 Fidelity International tax return; prepare spreadsheet regarding option contract comparisons; review and index documents produced by Refco to the DOJ; calls with B. Reiferson; call with Chris Young re: additional documents; create annotated table of key documents; review correspondence and comments from D. Donohue; generate probability estimation for various payouts; provide description of option valuation techniques; analysis of document redactions by plaintiffs.

| Title | Hours | Rate | Fee |
|---|---|---|---|
| Testifying Expert (G. Rausser) | 49.90 | $650 | $ 32,435.00 |
| Project Manager (L. Craft) | 112.75 | $350 | $ 39,462.50 |
| Statistician (G. You) | 20.70 | $300 | $  6,210.00 |
| Analyst (C. Wallace) | 113.00 | $200 | $ 22,600.00 |
| Project Assistant (H. Bellson) | 10.75 | $ 90 | $    967.50 |
| Project Assistant (B. Mobley) | 4.00 | $ 90 | $    360.00 |

Total Current Fees:          $ 102,035.00

OPA008276



**Reimbursable Costs at Cost:**

| | |
|---|---|
| Airfare – SFO/Denver - L. Craft | $ 2,749.81 |
| Hotel – L. Craft | $ 297.46 |
| Transportation – L. Craft | $ 458.75 |
| Airport Parking – L. Craft | $ 39.00 |
| Airfare – G. Rausser | $ 1,878.81 |
| Hotel – G. Rausser | $ 97.83 |
| Transportation – G. Rausser | $ 262.00 |
| Meals While Traveling – G. Rausser | $ 169.09 |
| FedEx | $ 14.56 |

| | |
|---|---|
| **Total Reimbursable Costs at Cost:** | $    5,967.31 |
| **Total Current Charges:** | $ 108,002.31 |
| **Previous Balance Due:** | $       0.00 |
| **Total Balance Due:** | $ 108,002.31 |
| 07/09/07    Payment by ACH | $ 102,100.30 |
| Finance Charge – Past Due Invoice | $      65.30 |
| Balance Due | $   5,967.31 |

**No other costs have been incurred through the billing period for this invoice. Information about anticipated costs for future periods may be obtained from Laura R. Craft at (510) 463-0133 and are in accordance with the current contract.**

OPA008277

# Exhibit 16



**OnPoint Analytics**
2000 Powell Street
Suite 860
Emeryville, CA 94608
(510) 463-0130

**Invoice for Services: # 1517**

Date:  July 30, 2007
Matter: Fidelity Int'l. Currency Advisor A Fund LLC v. United States of America

Contract #:  6WTAX - 136153

> Mr. Barry E. Reiferson, Esq.
> U.S. Department of Justice
> Tax Division
> P.O. Box 55
> Ben Franklin Station
> Washington, DC 20044

**Services Rendered June 1 through 30, 2007**

**Client Communications:**
Telephone conferences with D. Donohue; telephone conferences with B. Reiferson; telephone conferences with C. Young; follow up on Refco document discovery; review and execute new protective order.

**Report Preparation:**
Reorganize and edit draft report; internal conferences re same; footnoting and providing textual support within Report; incorporate additional materials and references into draft of initial report.

**Data Analysis and Calculations:**
Review and evaluate probabilistic and economic analysis; review underlying pricing parameters; analysis of day one discounts and impact on fees; analysis of various hedge alternatives; collect and analyze quotes on currency and interest rate options from various exchanges to assess hedge alternatives; compute option values using various parameters and various combinations; perform comparison with values reported by promoters; extract and data enter daily values and pricing inputs used by promoters.

**Document Analysis:**
Manage incoming documents; load new material to database; review and analysis of new documents; revisions and additions to chart summarizing similar transactions; review and index Refco account statements for similar transactions and for Egan accounts; update chart of option trades to include additional information; review motion papers and exhibits re motion to compel production of documents from DGI/Haber.

OPA008303



| Title | Hours | Rate | Fee |
|---|---|---|---|
| Testifying Expert (G. Rausser) | 51.10 | $650 | $ 33,215.00 |
| Project Manager (L. Craft) | 45.65 | $350 | $ 15,977.50 |
| Financial Economist (S. Mohan) | 23.00 | $300 | $ 6,900.00 |
| Statistician (G. You) | 19.00 | $300 | $ 5,700.00 |
| Analyst (C. Wallace) | 58.50 | $200 | $ 11,700.00 |
| Project Assistant (J. Galindo) | 1.50 | $ 90 | $ 135.00 |
| Project Assistant (W. O'Neil) | 3.50 | $ 90 | $ 315.00 |

**Total Current Fees:**                                   $ 73,942.50

**Reimbursable Costs at Cost:**
FedEx                                                        $ 25.14

**Total Current Charges:**                                $ 73,967.64

**Previous Balance Due:**
    Invoice # 1452   Balance              $ 5,967.31

**Total Balance Due:**                                    $ 79,934.95

**No other costs have been incurred through the billing period for this invoice. Information about anticipated costs for future periods may be obtained from Laura R. Craft at (510) 463-0133 and are in accordance with the current contract.**

---

2000 Powell Street, Suite 860, Emeryville, CA 94608          Accounting: (510) 463-0137

OPA008304

# Exhibit 17



**OnPoint Analytics, Inc.**
2000 Powell Street, Suite 660
Emeryville, CA 94608
Federal Tax ID #: 77-0637795
(510) 463-0130

Invoice submitted to:
US Department of Justice, Tax Division
Attn: Barry Referson, Esq.
P.O Box 813
Ben Franklin Station
Washington DC 20044

November 29, 2007

In Reference To:Fidelity Int'l. Currency Advisor A Fund LLC v.
            USA:#:6WTAX-136153

Invoice #10069

Professional Services Rendered October 1 through 31, 2007:

| | | | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 10/1/2007 | SM | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | 7.00 | 300.00 | 2,100.00 |
| | CW | Prepare for client meeting, assemble and organize materials for same | 13.25 | 200.00 | 2,650.00 |
| | LRC | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | 5.20 | 350.00 | 1,820.00 |
| 10/2/2007 | LK | Annotations for G. Rausser's deposition preparation binder | 2.50 | 200.00 | 500.00 |
| | AXT | Copy and compile case materials | 9.75 | 90.00 | 877.50 |
| | LRC | ▓▓▓▓▓▓▓▓▓▓▓ prepare for meeting with B. Reiferson and H. Vann | 6.50 | 350.00 | 2,275.00 |
| 10/3/2007 | LK | Plan and prepare for client meeting; prepare supporting calculations for G. Rausser's review materials for deposition preparation | 9.00 | 200.00 | 1,800.00 |
| | CW | Prepare for and attend client meeting, assemble and organize materials for same | 9.50 | 200.00 | 1,900.00 |
| | AXT | Copy and compile case materials | 8.50 | 90.00 | 765.00 |
| | LRC | Prepare for and attend meeting with B. Reiferson and H. Vann; document review and analysis▓▓▓▓▓▓▓ | 9.40 | 350.00 | 3,290.00 |
| 10/4/2007 | LK | Prepare G. Rausser's review materials for deposition including supporting calculations | 4.75 | 200.00 | 950.00 |
| | CW | Prepare for and attend client meeting, assemble and organize materials for same | 9.25 | 200.00 | 1,850.00 |
| | SM | Review Mathematica model to analyze calculations for annotations | 7.00 | 300.00 | 2,100.00 |
| | AXT | Copy and compile case materials | 3.50 | 90.00 | 315.00 |
| | LRC | Prepare for and attend meeting with B. Reiferson and H. Vann; document review and analysis▓▓▓▓▓▓▓ | 8.75 | 350.00 | 3,062.50 |
| 10/5/2007 | CW | Organize materials to be sent to client | 0.50 | 200.00 | 100.00 |
| | LK | Deposition preparation for G. Rausser | 3.50 | 200.00 | 700.00 |
| 10/7/2007 | CW | Organize materials to be sent to client | 2.00 | 200.00 | 400.00 |
| 10/8/2007 | CW | Organize and send materials to client; prepare redactions for supplemental production | 8.50 | 200.00 | 1,700.00 |
| | LK | Deposition preparation | 1.50 | 200.00 | 300.00 |
| | GCR | Review documents; evaluate rebuttal reports | 7.10 | 650.00 | 4,615.00 |
| | AXT | Copy and compile case materials | 6.00 | 90.00 | 540.00 |
| | LRC | Telephone conference with D. Donohue | 0.20 | 350.00 | 70.00 |
| 10/9/2007 | LK | Oversee deposition binder compilation and redacted emails | 0.25 | 200.00 | 50.00 |

OPA008320

US Department of Justice, Tax Division

| Date | | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 10/9/2007 | GCR | Continue with review of documents and evaluation of rebuttal reports | 6.30 | 650.00 | 4,095.00 |
| | AXT | Copy and compile case materials | 5.50 | 90.00 | 495.00 |
| | AP | Copy and compile case materials | 4.00 | 90.00 | 360.00 |
| 10/10/2007 | CW | Organize and send materials to client; review transcripts and additional documents received from client | 7.50 | 200.00 | 1,500.00 |
| | LRC | Telephone conference with D. Donohue and J. Lindquist; document review and discussion; | 3.45 | 350.00 | 1,207.50 |
| 10/11/2007 | JG | Arranging travel for G. Rausser to Washington, D.C. | 0.50 | 90.00 | 45.00 |
| | CW | Organize and send materials to client | 5.00 | 200.00 | 1,000.00 |
| | AXT | Copy and compile case materials | 4.50 | 90.00 | 405.00 |
| 10/12/2007 | AXT | Copy and compile case materials | 2.00 | 90.00 | 180.00 |
| 10/15/2007 | LK | Prepare materials for G. Rausser trip to DC; prepare deposition materials | 6.00 | 200.00 | 1,200.00 |
| | CW | Telephone conference with clients regarding documents, prepare materials for transmission to clients | 8.75 | 200.00 | 1,750.00 |
| | JG | | 3.00 | 90.00 | 270.00 |
| | LRC | Telephone conference with D. Donohue and J. Lindquist; review historical trade information; | 4.25 | 350.00 | 1,487.50 |
| 10/16/2007 | LK | Fidelity report annotations for G. Rausser testimony preparation | 3.75 | 200.00 | 750.00 |
| | JG | Logistics for G. Rausser deposition | 0.50 | 90.00 | 45.00 |
| | LRC | Telephone call and email with P. Black; | 0.75 | 350.00 | 262.50 |
| 10/17/2007 | LK | Report annotations for G Rausser testimony prep | 4.75 | 200.00 | 950.00 |
| | CW | | 8.00 | 200.00 | 1,600.00 |
| | JG | Manage subpoenaed materials and data | 4.00 | 90.00 | 360.00 |
| | LRC | Analysis of Carron rebuttal report; review and analysis of documents poduced by Nera; comparison of changes from earlier drafts | 2.00 | 350.00 | 700.00 |
| 10/18/2007 | LK | Calculation annotations for G. Rausser testimony preparation | 4.75 | 200.00 | 950.00 |
| | CW | Review and summarize deposition transcripts; organize deposition materials for client | 7.75 | 200.00 | 1,550.00 |
| | GCR | Review rebuttal reports; preparation for meeting with client | 5.30 | 650.00 | 3,445.00 |
| | JG | Manage incoming client data | 0.50 | 90.00 | 45.00 |
| 10/19/2007 | GCR | Meeting with D. Donohue; conference call with staff | 7.80 | 650.00 | 5,070.00 |
| 10/20/2007 | GCR | Prepare framework for tasks that need to be completed prior to deposition | 7.10 | 650.00 | 4,615.00 |
| 10/22/2007 | LK | Testimony preparation materials for G. Rausser; review Carron Deposition | 7.50 | 200.00 | 1,500.00 |
| 10/23/2007 | JG | Prepare materials for client meeting | 6.00 | 90.00 | 450.00 |
| | LK | Finish reviewing Carron deposition; receive, review and summarize production received from other experts | 8.25 | 200.00 | 1,650.00 |
| | CW | Review and analyze documents detailing fixed rate and variable rate indebtedness, guaranty obligations | 1.25 | 200.00 | 250.00 |
| 10/24/2007 | LK | Review and analyze Carron production; organize Carron supporting materials | 7.50 | 200.00 | 1,500.00 |
| | CW | Review and analyze documents detailing fixed rate and variable rate indebtedness, guaranty obligations; prepare tables summarizing indebtedness and guaranty obligations | 7.75 | 200.00 | 1,550.00 |

US Department of Justice, Tax Division                                                                      Page    3

| | | | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 10/25/2007 | CW | Review and analyze documents detailing fixed rate and variable rate indebtedness, guaranty obligations; prepare tables summarizing indebtedness and guaranty obligations | 8.25 | 200.00 | 1,650.00 |
| | JG | Logistics for G. Rausser deposition | 1.00 | 90.00 | 90.00 |
| 10/26/2007 | LK | Review and analyze Carron production; brief L. Craft; organize key documents | 7.50 | 200.00 | 1,500.00 |
| 10/27/2007 | LRC | Review deposition transcripts; emails with counsel; review plaintiffs' discovery requests | 3.25 | 350.00 | 1,137.50 |
| 10/29/2007 | LK | Research Carron engagement letters and invoices; assist S. Mohan with notations for deposition preparation materials | 0.75 | 200.00 | 150.00 |
| | SM | Review annotations to provide more detailed explanation; refer to Mathematica program to determine volatility and probability calculation methodologies; summarize steps and include in annotations | 6.00 | 300.00 | 1,800.00 |
| | CW | Review and analyze documents detailing fixed rate and variable rate indebtedness, guaranty obligations; prepare tables summarizing indebtedness and guaranty obligations | 7.50 | 200.00 | 1,500.00 |
| | MW | Manage incoming documents and data | 1.20 | 90.00 | 108.00 |
| | LRC | Review Carron documents and report; telephone conference with B. Reiferson | 1.20 | 350.00 | 420.00 |
| 10/30/2007 | CW | Prepare for client meeting, assemble and organize materials for same | 0.50 | 200.00 | 100.00 |
| | GCR | Review and evaluate opposing expert reports; preparation for meeting with client | 6.20 | 650.00 | 4,030.00 |
| | JG | ███████████████████ | 2.00 | 90.00 | 180.00 |
| | JG | Logistics and coordination for client meeting | 1.75 | 90.00 | 157.50 |
| | LRC | Preparation for client meeting; review documents produced by Carron; email with D. Donohue | 2.60 | 350.00 | 910.00 |
| 10/31/2007 | CW | Prepare for client meeting, assemble and organize materials for same | 6.25 | 200.00 | 1,250.00 |
| | MW | Create invoice spreadsheet; compile documents | 4.55 | 90.00 | 409.50 |
| | LK | Coordinate data entry of Carron attorney invoices | 0.25 | 200.00 | 50.00 |
| | GCR | Review additional documents; prepare statistical analysis for review with client | 6.40 | 650.00 | 4,160.00 |
| | JG | Coordination and logistics for client meeting | 2.50 | 90.00 | 225.00 |
| | JQ | Preparation of mathematical annotations for deposition preparation | 2.00 | 300.00 | 600.00 |

|  |  |
|---|---|
| **Total Current Fees** | **$96,395.00** |
| **Previous balance** | **$640,732.13** |
| **Total Balance Due** | **$737,127.13** |

| Current | 30 Days | 60 Days | 90 Days | 120 Days |
|---|---|---|---|---|
| 96,395.00 | 312,262.18 | 0.00 | 118,712.50 | 209,757.45 |

### Timekeeper Summary

| Name | Hours | Rate | Amount |
|---|---|---|---|
| Analyst (C. Wallace) | 111.50 | 200.00 | $22,300.00 |
| Analyst (L. Keating) | 72.50 | 200.00 | $14,500.00 |
| Financial/Derivatives Analyst (J. Qamar) | 2.00 | 300.00 | $600.00 |

OPA008322

US Department of Justice, Tax Division                                    Page    4

| Name | Hours | Rate | Amount |
|------|------:|-----:|-------:|
| Finanical Economist (S. Mohan) | 20.00 | 300.00 | $6,000.00 |
| Project Assistant (J. Galindo) | 20.75 | 90.00 | $1,867.50 |
| Project Manager (L. Craft) | 47.55 | 350.00 | $16,642.50 |
| Testifying Expert (G. Rausser) | 46.20 | 650.00 | $30,030.00 |
| Project Assistant (A. Pewtherer) | 4.00 | 90.00 | $360.00 |
| Project Assistant (A. Tepperman) | 39.75 | 90.00 | $3,577.50 |
| Project Assistant (M. Weger) | 5.75 | 90.00 | $517.50 |

OPA008323

# Exhibit 18

10-K405 1 d10k405.htm 2001 FORM 10-K

# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

### ANNUAL REPORT UNDER SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

For the Fiscal Year Ended: December 31, 2001                 Commission File Number 1–9853

# EMC CORPORATION
#### (Exact name of registrant as specified in its charter)

| **Massachusetts** | 04–2680009 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

#### 35 Parkwood Drive
#### Hopkinton, Massachusetts 01748
#### (Address of principal executive offices, including area code)

#### (508) 435-1000
#### (Registrant's telephone number, including area code)

#### Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class: | Name of Each Exchange on Which Registered: |
|---|---|
| Common Stock, par value $.01 per share | New York Stock Exchange |

#### Securities registered pursuant to Section 12(g) of the Act:

None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☒

The aggregate market value of voting stock held by nonaffiliates of the registrant was $36,305,140,512 as of January 31, 2002.

The number of shares of the registrant's Common Stock, par value $.01 per share, outstanding as of January 31, 2002 was 2,220,671,780.

#### DOCUMENTS INCORPORATED BY REFERENCE

Information required in response to Part III of Form 10-K (Items 10, 11, 12 and 13) is hereby incorporated by reference to the specified portions of the registrant's Proxy Statement for the Annual Meeting of Stockholders to be held on May 8, 2002.

increased sales volume resulting from the continued demand for our Symmetrix and CLARiiON products and the successful introduction of new products within those existing product lines.

Information storage software revenues were $1,560.0, $1,435.1 and $821.7 in 2001, 2000 and 1999, respectively, representing increases of $124.9, or 9%, from 2000 to 2001, and $613.4, or 75%, from 1999 to 2000. The increases were primarily due to increased licenses of information storage software on both newly shipped and already installed systems and the successful introduction of new and enhanced software products.

Information storage services revenues were $972.3, $612.1 and $361.8 in 2001, 2000 and 1999, respectively, representing increases of $360.2, or 59%, from 2000 to 2001, and $250.3, or 69%, from 1999 to 2000. The increases were primarily due to an increased number of professional services contracts and an increased number of maintenance contracts for information storage systems and software.

Total information storage revenues were $6,839.5, $8,293.0 and $5,748.5 in 2001, 2000 and 1999, respectively, representing a decrease of $1,453.5, or 18%, from 2000 to 2001, and an increase of $2,544.5, or 44%, from 1999 to 2000.

Other businesses revenues were $251.1, $579.8 and $967.1 in 2001, 2000 and 1999, respectively, representing a decrease of $328.7, or 57%, from 2000 to 2001, and a decrease of $387.3, or 40%, from 1999 to 2000. Other businesses revenues consist of revenues from AViiON server products and related services. The decreases in other businesses revenues were due to refocusing efforts on lines of business within the storage segments. In the third quarter of 2001, we stopped selling the AViiON server products. Accordingly, in the fourth quarter of 2001 and thereafter, other businesses revenues are and will be comprised only of AViiON services revenues. These revenues are expected to decline in 2002.

Revenues on sales into the North American markets were $4,185.4, $5,436.2 and $4,257.1 in 2001, 2000 and 1999, respectively, representing a decrease of $1,250.8, or 23%, from 2000 to 2001, and an increase of $1,179.1, or 28%, from 1999 to 2000. Revenues on sales into the European, Middle East and African markets were $1,774.9, $2,351.8 and $1,844.3 in 2001, 2000 and 1999, respectively, representing a decrease of $576.9, or 25%, from 2000 to 2001, and an increase of $507.5, or 28%, from 1999 to 2000. Revenues on sales into the Asia Pacific markets were $893.4, $880.1 and $439.0 in 2001, 2000 and 1999, respectively, representing increases of $13.3, or 2%, from 2000 to 2001 and $441.1, or 100%, from 1999 to 2000. Revenues on sales into the Latin American markets were $237.0, $204.7 and $175.2 in 2001, 2000 and 1999, respectively, representing increases of $32.3, or 16%, from 2000 to 2001, and $29.5, or 17%, from 1999 to 2000.

The decline in revenues in 2001 compared to 2000 in the North American markets and the European, Middle East and African markets was attributable to the global economic slow down, the impact of the terrorist attacks of September 11, 2001 and price reductions. The increase in revenues in 2001 compared to 2000 in the Asia Pacific and the Latin American markets resulted from our efforts to expand our sales infrastructure throughout the world to meet demand for information storage products and services. While revenues increased in these markets, the increases were lower than anticipated due to the aforementioned factors affecting the other regions. The increase in revenues in all markets in 2000 compared to 1999 was attributable to increases in sales volume resulting from the worldwide increase in demand for information storage products and services.

Changes in exchange rates in 2001 compared to 2000 negatively impacted revenues by approximately 3%. The impact was most significant in Japan, Brazil and Germany. Changes in exchange rates in 2000 compared to 1999 negatively impacted revenue by approximately 2%. The impact was most significant in Germany, Japan, France, Belgium and the United Kingdom.

**Gross Margins**

Gross margin dollars decreased to $2,843.6 in 2001 from $5,143.1 in 2000, a decrease of $2,299.5, or 45%. The 2001 amount reflects a charge of $320.1 for excess and obsolete inventory and impaired capitalized

14

## ITEM 7A:   *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK*

**Market Risk**

We are exposed to market risk, primarily from changes in foreign exchange rates, interest rates and credit risk. To manage the volatility relating to these exposures, we enter into various derivative transactions pursuant to our policies to hedge against known or forecasted market exposures.

**Foreign Exchange Risk Management**

As a multinational corporation, we are exposed to changes in foreign exchange rates. Any foreign currency transaction, defined as a transaction denominated in a currency other than the U.S. dollar, will be reported in U.S. dollars at the applicable exchange rate. The primary foreign currency denominated transactions include revenues and expenses and the resultant accounts receivable and accounts payable balances reflected on our balance sheet. Therefore, the change in the value of the U.S. dollar as compared to foreign currencies will have either a positive or negative effect on our financial position and results of operations. We enter into derivative contracts with the sole objective of decreasing the volatility of the impact of currency fluctuations. These exposures may change over time and could have a material adverse impact on our financial results. Historically, our primary exposure related to sales denominated in the Euro, the Japanese yen and the British pound. Additionally, our exposure to emerging market economies, particularly in Latin America and South East Asia, continues to increase as we further expand our presence in these markets. Despite the relative size of our exposure in these markets, the inherent volatility of these economies could negatively impact our financial results.

We use foreign currency forward and option contracts to manage the risk of exchange rate fluctuations. In all cases, we use these derivative instruments to reduce our foreign exchange risk by essentially creating offsetting market exposures. The instruments we hold are not leveraged and are not held for trading or speculative purposes.

We use a combination of option and forward contracts to hedge our net asset and anticipated cash flow positions. The hedging activity is intended to offset the impact of currency fluctuations on assets, liabilities and cash flows denominated in foreign currencies. The success of the hedging program depends on forecasts of transaction activity in the various currencies. To the extent that these forecasts are overstated or understated during periods of currency volatility, we could experience unanticipated currency gains or losses.

We employ a variance/covariance model to calculate value-at-risk for our combined foreign exchange position. This model assumes that the relationships among market rates and prices that have been observed over the last year are valid for estimating risk over the next trading day. Estimates of volatility and correlations of market factors are drawn from the RiskMetrics dataset as of December 31, 2001. This model measures the potential loss in fair value that could arise from changes in market conditions, using a 95% confidence level and assuming a one-day holding period. The value-at-risk on the combined foreign exchange position was $1.1 million as of December 31, 2001 and $2.2 million as of December 31, 2000. The average, high and low value-at-risk amounts for 2001 and 2000 were as follows (in millions):

|      | Average | | High | | Low | |
|------|--------:|--|-----:|--|----:|--|
| 2001 | $ | 1.8 | $ | 2.2 | $ | 1.1 |
| 2000 |   | 2.1 |   | 2.9 |   | 1.2 |

The average value represents an average of the quarter-end values. The high and low valuations represent the highest and lowest values of the quarterly amounts.

**Interest Rate Risk**

We maintain an investment portfolio consisting of debt securities of various issuers, types and maturities. The investments are classified as available for sale and are all denominated in U.S. dollars. These securities are

29

# Exhibit 19

**Digital Option Confirmation**

October 24, 2001

To:        **Fidelity International Currency Advisor A Fund, LLC** ("Counterparty")
           c/o Carruth Management LLC
           87 Elm Street
           Hopkinton, MA 01748
Attention:        Ms. Carolyn Fiddy
Telephone No.:    508-497-0800
Facsimile No.:    508-497-0877

From:        **Refco Capital Markets, Ltd.** ("Refco")
             Thomas Yorke, Senior Vice President
             200 Liberty Street, 23rd Floor
             New York, New York 10281
Telephone No.:    212-693-7856
Facsimile No.:    212-390-8708

Re:        **RCM 2001-10-22-08**

Ladies and Gentlemen:

        1.        The purpose of this letter agreement is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

        The definitions and provisions contained in the 1991 ISDA Definitions, as supplemented and amended by the 1998 Supplement to 1991 Definitions and the 2000 ISDA Definitions, and the 1996 ISDA Equity Derivative Definitions (each as published by the International Swap Derivatives Association, Inc. formerly the International Swap Dealers Association, Inc.) are incorporated into this Confirmation (except that references to "Swap Transaction" in the 1991 ISDA Definitions will be deemed to be references to "Transaction"). In the event of any inconsistency between those definitions and provisions and this Confirmation, this Confirmation will govern

        This Confirmation shall supplement, form a part of, and be subject to the 1992 ISDA Master Agreement, dated as of October 5, 2001 between Refco and the Counterparty.

        The Counterparty and Refco each represents to the other that it has entered into this Transaction in reliance upon such tax, accounting, regulatory, legal, and financial advice as it deems necessary and not upon any view expressed by the other. With respect to this Transaction, the parties act as arms' length counterparties.

        The Agreement and each Confirmation thereunder will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine.

        2.        The terms of the Option to which this Confirmation relates are as follows:

           Payout Amount:            USD 328,877,361.00

           Trade Date:               October 22, 2001

           Seller:                   Refco

           Buyer:                    Counterparty

RCM 2001-10-22-08
REFCO CAPITAL MARKETS, LTD.
FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC – ACCT. 6477

**X 016928**

| | |
|---|---|
| Expiration Date: | April 19, 2002, subject to adjustment in accordance with the Modified Following Business Day Convention |
| Expiration Time: | The close of trading on the New York Stock Exchange on the Expiration Date. |
| Settlement Date: | Shall be two (2) New York and London Business Days following the Expiration Date, if the Option is exercised, as set forth in the Exercise Procedures. |
| Total Premium: | USD 197,706,830.00 |
| Premium Payment Date: | October 24, 2001, subject to adjustment in accordance with the Modified Following Business Day Convention |
| Automatic Exercise: | Applicable, as described in the Exercise Procedures below. |
| Strike Price: | 0.8653 USD/EUR |
| Reference Price: | The Reference Price shall mean the average of the midpoints of the bid and offer closing prices of the USD/EUR Spot Rate as quoted by three (3) Money Center Banks between 10:00 A.M. and 10:15 A.M., New York City time on the Expiration Date, subject to adjustment in accordance with the Preceding Business Day Convention, and determined by the Calculation Agent, in good faith and in a commercially reasonable manner. |
| Exercise Procedures: | If on the Expiration Date the Reference Price is equal to or greater than the Strike Price then Refco shall pay the Counterparty USD 328,877,361.00.

Should the Calculation Agent determine that the option has been exercised, the Calculation Agent shall provide notice to the Counterparty, in writing or orally and confirmed in writing, *provided, however*, that failure to provide such notice shall not prejudice or invalidate the occurrence or effect of the exercise. |
| Business Day: | New York and London |

3.    Calculation Agent:      Refco

4.    Account Details:

           Payments to Refco:          Harris Trust and Savings Bank
                                              ABA# 071000288
                                              For Account: Refco Capital LLC
                                              A/C# 390-4406
                                              Ref: Refco Capital Markets, Ltd. 13-006

           Payments to Counterparty:       *please provide*

5.    Offices:

    (a)    The Office of Refco for the Transaction is Bermuda: and

    (b)    The Office of Counterparty for the Transaction is Massachusetts

6.    Additional representations which will be made by both parties:

    (a)    **Eligible Swap Participant.**  It is an "eligible swap participant" as such term is defined in Section 35.1(b)(2) of the Regulations (17 CFR Part 35) promulgated under the Commodity Exchange Act, as amended and it has entered into this Agreement (including each Transaction) in conjunction with its line of business (including financial intermediation services) or the financing of its business.

    (b)    **Transactions are Arm's Length.**  It is entering into this Agreement and each Transaction in reliance upon its own judgment and upon any tax, accounting, regulatory and financial advice as it has deemed necessary and not upon any view expressed by the other party, and all trading decisions are and will be the result of arm's length negotiations between the parties.

    (c)    **Risks are Fully Understood.**  It is entering into this Agreement and each Transaction with full understanding of all material risks thereof, and it is capable (including having the financial wherewithal) of assuming and willing to assume those risks.

      Counterparty hereby agrees (a) to check this Confirmation **(Reference No.:  RCM 2001-10-22-08)** carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified and (b) to confirm that the foregoing correctly sets forth the terms of the agreement between us with respect to the particular Transaction to which this Confirmation relates. by manually signing this Confirmation and providing any other information requested herein and immediately returning an executed copy to Compliance Department via Fax (212) 390-8708.  Hard copies should be returned to Refco Capital Markets, Ltd., One World Financial Center. Tower A,  24th Floor, New York, New York 10281, Attention: Mathew Hoff.

Yours sincerely.

**Refco Capital Markets. Ltd.**

By:
Name:    Elizabeth Y. Jung
Title:    Authorized Signatory
Date:    October 25, 2001

Confirmed as of the date first above written:

**Fidelity International Currency Advisor A Fund, LLC**

By:
Name:    Michael J. Egan
Title:    Manager
Date:    October 26, 2001

# Exhibit 20

**Chandra Wallace**

| | |
|---|---|
| **From:** | Chandra Wallace |
| **Sent:** | Wednesday, March 28, 2007 5:36 PM |
| **To:** | Guey-Mei You |
| **Subject:** | Rough outline for Fidelity International report |
| **Attachments:** | Expert Declaration Outline 03.19.07.doc |

Sorry it's taken me awhile to get this to you. Thanks for helping me tomorrow. I really appreciate it!
Chandra

9/27/2007

OPA005530

Privileged and Confidential

**Expert Declaration Outline (03.19.07)**

| | |
|---|---|
| **I.** | **Qualifications and Background** |
| **II.** | **Scope of Analysis** |

    A. Questions Examined

    B. Materials Reviewed

    C. Rates Charged

| | |
|---|---|
| **III.** | **Summary of Transaction** |
| **IV.** | **Summary of Principal Conclusions** |
| **V.** | **Analysis of Business Purpose:** The "basis creating" and "gain/loss generating" pairs of offsetting option transactions lacked economic substance because the offsetting option transactions had no tax-independent business purpose. |

    **A. There was no tax-independent business purpose for offsetting option transactions**

        1. The offsetting legal obligations effectively eliminate any real economic significance of the transaction.

        2. The real economic impact of the transactions was infinitesimally nominal and vastly insignificant when considered in comparison with the claimed losses.

        3. Taken together, each pair of long and short options had only nominal, incidental effects on the partnership's net economic position, and thus on the taxpayer's net economic position.

        4. The offsetting option transactions did not appreciably affect the taxpayer's beneficial interest, except to reduce tax.

        5. The offsetting option transactions lack any significant economic consequences other than the creation of tax benefits.

        6. Business Purposes Advanced by the Taxpayer

            a) Hedging risk of EMC stock deterioration attributable to currency rate changes?

                (1) EMC was already hedging the risk attributable to foreign currency rate fluctuations. (Refer to statements in SEC filings for EMC Corp.)

            b) Hedging exposure to interest rate risk associated with real estate and airplane leasing businesses?

    **B. Questions/Economic Analysis:**

        **1. Was the transaction an effective hedge against EMC stock value deterioration attributable to currency rate changes?**

OPA005531

Privileged and Confidential

**2. Was the transaction an effective hedge against exposure to interest rate risk associated with real estate and airplane leasing businesses?**

**3. What was the taxpayer's exposure to risk on the transaction?**

**4. What other legitimate business functions did this scheme and/or the Fidelity International entity perform?**

**VI. Analysis of Profit Motive:** The "basis creating" and "gain/loss generating" pairs of offsetting option transactions lacked economic substance because, viewed objectively, there was no reasonable possibility they would generate a profit.

**A. There was no reasonable possibility of profit.**

1. Any prospect of profit was so remote as both to make the transactions shams, and to warrant the conclusion that they were not entered into for profit.

2. Promoters described the investment structure in terms of its tax benefits and tax advantages, rather than in terms of its real profit potential.

3. Taxpayer advanced only the net premiums for the initial options, creating a margin account, the amount of which, in genuine trading, should reflect the risk of loss to which the investor's account was exposed This is evidence that the brokers did not believe the taxpayer would lose more money than his initial margin deposit would cover. The taxpayer and the partnership were not exposed to real risks and gains.

4. Correct assessment of net economic effect of transaction.

5. Evaluate stated probabilities in Sidley Austin opinion.

6. Corrected probability analysis.

7. Relationship of costs to potential upside.

8. Examination of other transactions offered by the same promoters shows that the trading pattern and resulting tax loss allocations were typical, even identical. This evidence leads to the reasonable conclusion that the transaction structure is designed to produce tax benefits, rather than real gains.

**B. Questions/Economic Analysis:**

**1. What was the correct methodology to determine reasonable expected returns?**

**2. Was that correct methodology used (by investor, by advisors, by KPMG, by Sidley Austin)?**

**3. Using the correct methodology, what would the reasonably/rationally expected returns have been (for each step and/or for the scheme as a whole)?**

**4. Compare the reasonably/rationally expected returns calculated using the correct methodology with the probability**

OPA005532

Privileged and Confidential

analysis in the Sidley Austin opinion. Also compare with any
other quantitative assessments we can find.

**VII.   Fidelity International as a Sham Entity**

A.   <u>Conclusion</u>: The Fidelity International entity should be disregarded for federal
income tax purposes because the primary purpose for its existence was to
generate paper tax losses to allocate to the taxpayer.

B.   Fidelity International had no other bona fide business activities; the other
investments placed in it were merely warehoused there.

C.   Following the completion of the enumerated steps, there was no longer any
business for the Fidelity International partnership to do

D.   The taxpayer's interest in any potential gain from the partnership's
investments was in its view at all times dwarfed by its interest in the tax benefit.

E.   Any risks inherent in the investments by taxpayer and by Fidelity
International were de minimis (acknowledging that no investment is entirely
without risk).

**VIII.   Analysis of Foreign Partner Involvement (Sam Mahoney)**

A.   Key Points:

1.   Fidelity International should be disregarded for federal income
purposes because Samuel Mahoney was not in reality an actual partner
but simply an accommodation partner or nominee who was paid a fee for
his participation in the transaction.

2.   The allocation of the partnership profits of 93% to Samuel Mahoney
and 5% to taxpayer should be disregarded because this allocation does
not have substantial economic effect.

B.   Accommodation Partner

1.   Pattern evidence: Examination of other transactions offered by the
same promoters shows that the trading pattern and resulting tax loss
allocations were typical, even identical. In all of these transactions, the
foreign investor was either Sam Mahoney or his business partner in
Biosphere Finance Ltd., Martin Hawkes.

2.   Taxpayer had never met, and never spoken, with Sam Mahoney until
after November 2001, if ever.

C.   Analysis of Economic Effect of Allocations within Fidelity International

1.   The shifting gain/loss allocations within Fidelity International did not
appreciably affect the taxpayer's beneficial interest, except to reduce tax.

2.   The shifting gain/loss allocations within Fidelity International lack any
significant economic consequences other than the creation of tax
benefits.

**D.   Questions/Economic Analysis:**

OPA005533

Privileged and Confidential

> **1. What was the correct methodology to determine reasonably/rationally expected returns to the foreign partner?**
>
> **2. Using the correct methodology, what would the reasonably/rationally expected returns to the foreign partner have been?**
>
> **3. Discuss similarity of this transaction to others in which Mahoney and Hawkes served as foreign partners, and calculate the reasonably expected returns in those transactions.**

## IX.    Analysis of Step Integration and Outcome Determination

A.  The steps of the transaction in which 93% of the accounting gains were allocated to Samuel Mahoney and 93% of the accounting losses were allocated to the taxpayer should be integrated into one unified allocation to taxpayer under the step transaction doctrine because:

1.  The steps of this transaction were totally interdependent. and

2.  This was the preplanned end result of the transaction from its outset.

B.  The steps of this transaction were mutually interdependent, and each would have been fruitless without the completion of all of the other steps in the correct sequence.

1.  Factual recitation of the steps.

2.  Transaction outlines: The documents themselves show the interdependence of the steps.

3.  What would have happened if some steps were omitted or taken out of order?

C.  The steps of this transaction were prearranged parts of a single transaction intended to produce a specific amount of taxable loss to taxpayer.

1.  Enumerate the circumstances creating the taxable gain to taxpayer in January 2001 and the amount of that gain.

2.  Refer to the documents showing the prior planning of all the steps and their intended consequence, including the transaction outlines circulated in September and October 2001.

D.  Net Effect of Offsetting Option Pairs: Single Position in the Amount of the Net Premium

1.  The long and short options within each pair were, in substance, a single position with the result that taxpayer's basis in Fidelity International would be the net premiums paid by taxpayer for the two options.

2.  The total amount paid by the taxpayer to Refco, was the net premium for the two pairs of interest rate options: $2,250,000.

## X.    Analysis of Transaction against the Offsetting Option Transaction Described in IRS Notice 2000-44

OPA005534

**Privileged and Confidential**

A.  The transaction at issue was the same or similar to the offsetting option transaction described in IRS Notice 2000-44, with the effect that the short options here must be treated as liabilities within the meaning of Section 752, thereby requiring taxpayer's basis in Fidelity International to be equal to the net premium paid by him in acquiring the interest rate options.

B.  Comparison to Option Transaction in IRS Notice 2000-44

      1.  Structure

      2.  Outcomes

OPA005535

Exhibit 21

**Chandra Wallace**

| | |
|---|---|
| **From:** | Brittany Mobley |
| **Sent:** | Tuesday, April 03, 2007 5:57 PM |
| **To:** | Laura Craft |
| **Cc:** | Chandra Wallace; John Mouledous; Heather Bellson |
| **Subject:** | DOJ/Fidelity Int'l CD |
| **Attachments:** | Cover Letter 4.03.07.pdf |

Hi Laura,

We received a DVD that included "2001 FDIS Closing Binders" data. I've attached the cover letter, and I have logged and saved the data in the following location.

P:\Client Materials\Client Specific\DOJ (Fidelity International)\08. Data\Received 4.3.07

**Brittany L. Mobley**
**OnPoint Analytics, INC.**
**2000 Powell Street, Ste. 860**
**Emeryville, CA 94608**
**Main:510.463.0130**
**Direct: 510.463.0147**
**Fax: 510.463.0131**

9/27/2007

OPA003869



**U.S. Department of Justice**

**Tax Division**

*Facsimile No. (202) 307-2504*
*Trial Attorney:*
*Attorney's Direct Line:*

*Please reply to:*  *Office of Civil Litigation*
                    *P.O. Box 403*
                    *Ben Franklin Station*
                    *Washington, D.C.  20044*

5-36-10254
CMN2005106280

April 2, 2007

**Via Federal Express Mail**
Laura Craft
OnPoint Analytics
Watergate Towers 1
1900 Powell Street, #150
Emeryville, CA 94608

RE:    Fidelity International Currency v. United States
       Case No. 05-40151 (D. Mass.)

Dear Ms. Craft:

Enclosed please find a DVD titled "2001 FDIS Closing Binders" in the above-referenced case.

If you have any questions, please contact John Lindquist at (202) 307-6561 or Barry Reiferson at (202) 514-6058.

Sincerely

Prudence Black
Litigation Assistant

# Exhibit 22

**Chandra Wallace**

| | |
|---|---|
| **From:** | Laura Craft |
| **Sent:** | Monday, May 28, 2007 5:09 PM |
| **To:** | Chandra Wallace; Guey-Mei You; Saumya Mohan |
| **Subject:** | Additional Fidelity Work |
| **Attachments:** | Further Analysis Required 5.28.07.doc |

Please take a look at the attached which is the by-product of our meeting with Dennis today. It lists a number of tasks that need to be undertaken, and who will need to do them. Please see me right away with any questions. Guey-Mei, please note that there are two for you. We have to get a completely re-worked draft to him by this Friday.

9/27/2007

OPA003889

Further Analysis Required—DOJ/Fidelity (5.28.07)

<u>Saumya</u>

1. Comparison of daily theoretical value of each a) individual option b) pair of options and c) option quartet *(Guey-Mei)*:
   i. Alpha's values (use initial premium as value for date of purchase/sale)
   ii. Our values
   iii. Display results in both table and line graph form.
   iv. Be sure to include in table presentation the strikes used and highlight any discrepancy between their strike and ours.
2. Establish variability in Money Center foreign exchange closing price quotes. Need authoritative data on spread or at least a lot of quotes.
3. Convert stated dollar returns to % return as ratio (rather than IRR). Calculate first without fees and second with fees. Provide technical narrative description for approved methods.
4. Determine cost of acquiring vanilla options to accomplish same payouts. Try CME traded options.
5. Generate illustrations of very small movement in underlying generating a large change in the theoretical value of the individual currency options here*(Guey-Mei)*.
6. Obtain S&P beta (possibly substitute for R-squared).

<u>Chandra</u>

1. Finish analysis of other 47 transactions.
   a. Do all of them incorporate a discount to the option values on Day 1?
   b. Compare our results to John Lindquist's and reconcile (one of our 48 was deemed to be a 2002 closing—find out which one).
2. Obtain from Reiferson additional documents:
   a. emails pertaining to instances in which taxpayer was charged more than 50% to buy out foreign partner
   b. Document listing fees paid in all 47 2001 transactions
   c. Document referring to an additional $2 million fee
   d. Exhibits 50 and 51 to the Motion for Letter Rogatory

OPA003890

# Exhibit 23

## John Galindo

| | |
|---|---|
| **From:** | John Galindo |
| **Sent:** | Friday, June 01, 2007 6:30 PM |
| **To:** | Laura Craft |
| **Subject:** | RE: Revised Pattern Evidence chart |
| **Attachments:** | Pattern_Evidence_Chart_06_01_07 further revised v2.xls |

Here's the updated version.

- J

**From:** Laura Craft
**Sent:** Friday, June 01, 2007 1:31 PM
**To:** John Galindo
**Subject:** FW: Revised Pattern Evidence chart

Can we discuss this when I get back into the office? I should be there in about 20 minutes.

**From:** Chandra Wallace
**Sent:** Fri 6/1/2007 11:52 AM
**To:** Laura Craft; Saumya Mohan
**Subject:** RE: Revised Pattern Evidence chart

I've added another column, to show the "assumed value" of the contributed SMLLC, as shown in the Outlines of Proposed Transaction for each transaction. The column is placed next to the column showing the actual value assigned to each SMLLC upon contribution, for easy comparison.

In a few instances, no such "assumed value" was given; I have noted these as "none given" in the chart.

In a few more instances, I do not have the Outline of Proposed Transaction (OPT), so I've noted these as "need OPT" in the chart.

Possible delegation project, with instructions to pass on to delegate (or is it delegee?):
Copies of the OPTs are all in John Lindquist's binder on my desk (a white binder with a fuschia post-it on the front, entitled something like "F1 and F2 Transaction Outlines"), if John or someone has time to look them up and fill in the remaining "assumed" values.

The information they're looking for is in the documents entitled "Outline of Proposed Transaction," usually on the second page, and looks like this:

"(a)     Investor will contribute his member interest in SMLLC (assumed value of $12,000) and cash of $22,625."

That "assumed value" number is the one they need.

I really am going to sleep now. :)

**From:** Laura Craft

9/27/2007

OPA004067

**Sent:** Fri 6/1/2007 11:21 AM
**To:** Chandra Wallace
**Subject:** RE: Revised Pattern Evidence chart

Exactly! I think you will find this in all of the transactions—a planned discount that then matches up well with the value they actually assigned at time of transfer. That is really the key issue.

---

**From:** Chandra Wallace
**Sent:** Friday, June 01, 2007 11:10 AM
**To:** Laura Craft
**Subject:** RE: Revised Pattern Evidence chart

Yes, there are proposed transaction outlines too; I didn't focus as much on those because I wanted to capture what actually happened in the transactions--

Oh my.

I just looked at one of the proposed transaction outlines.

In the relevant part it says: "Joseph R. Francis will contribute his member interest in JRF (assumed value of $270,000) and cash of $416,300."
The net premium Mr. Francis paid was $405,000.

The transaction summary shows that at contribution, Mr. Francis' member interest in JRF was valued at $288,207.

This just gets interesting-er and interesting-er . . .

---

**From:** Laura Craft
**Sent:** Fri 6/1/2007 10:53 AM
**To:** Chandra Wallace
**Subject:** RE: Revised Pattern Evidence chart

By all means, you know how I love footnotes! Are there no Transaction Outlines that look forward, such as the ones we have in Fidelity?

---

**From:** Chandra Wallace
**Sent:** Friday, June 01, 2007 10:44 AM
**To:** Laura Craft
**Subject:** RE: Revised Pattern Evidence chart

The transaction summaries look backward, not forward, so they say "investor contributed SMLLC, which was then worth $x, along with $Y cash . . ."

I'm in the document right now, but I'll get out in a couple of minutes. I wanted to get as much in as possible before I gave it back to you. :) The footnotes for the pattern evidence are going to be a bit voluminous (citing to 47 separate transaction summaries, or Exhibit A's, etc.). Is that ok? We can always bump it out to an exhibit, I guess?

---

**From:** Laura Craft
**Sent:** Fri 6/1/2007 10:36 AM

9/27/2007

OPA004068

**To:** Chandra Wallace
**Subject:** RE: Revised Pattern Evidence chart

Do the transaction summaries state the amount for which the basis trades will be transferred to the new partnership entity? (i.e., the automatic discounting of value)?

---

**From:** Chandra Wallace
**Sent:** Friday, June 01, 2007 10:24 AM
**To:** Laura Craft; Saumya Mohan
**Subject:** Revised Pattern Evidence chart

Hello there,
I'm attaching a revised version of the pattern evidence chart, which adds two columns: one for the stated probability of profit on the initial basis trades, and one for the stated probability of profit on the initial LLC trades. In all cases, I pulled these stated probabilities from the transaction summaries prepared by the promoters, and included in the closing books.

Quick summary:
I looked at 47 transactions (omitting the 2002 Elbaum/Schut txn, but including #22, the Grossinger txn that I think does not fit--see my explanation notes ("Points of Interest") sent earlier this morning).
In all but one of the transactions (#3 Corporex), the stated probabilities were uniform across the transaction. In other words, the basis trade probability always matches the LLC trade probability, and in multi-taxpayer transactions, the basis trade probabilities always match each other.

In 24 transactions, the stated probability for both sets of initial trades was **20%**.
In 20 transactions, (including #22 Grossinger), it was **25%**.
In 1 transaction (#3 Corporex), one basis trade was **25%**, the other basis trade and the LLC trade were **20%**.
In 2 transactions (#13 Dziedzic and #47 Wainwright), the stated probability was **30%**.
For the one remaining transaction (#4 Caputo), there was a page missing from the produced transaction summary; I'll see if I can find this information elsewhere.

Phew. :)

I did make a few changes to the draft last night, but the footnoting is not complete. I need to go recharge my brain before I can complete it.

Chandra

9/27/2007

OPA004069

# Exhibit 24
## Filed Under Seal

Exhibit 25

## Chandra Wallace

| | |
|---|---|
| **From:** | Lisa Keating |
| **Sent:** | Tuesday, September 04, 2007 5:24 PM |
| **To:** | Laura Craft; Chandra Wallace; Saumya Mohan; Nora McCartin; temp06 |
| **Cc:** | John Galindo |
| **Subject:** | Fidelity International Schedule |
| **Attachments:** | GENERAL SCHEDULE OF TASKS 9.4.07.doc |

As everyone is aware, the Fidelity Supplemental Report needs to go out next Tuesday, September 11th.

Attached is a schedule of the tasks that need to be completed.

All dates are important, but please keep these particular ones in mind:

Wednesday night – Second Draft to Client
Friday night – Draft to Client and G. Rausser
Monday 5pm – FedEx Exhibits to client

Please let me know if there are any mistakes or clarifications needed. The first page has the general timeline and the second page specifies who is the Primary and Secondary Reviewer for each section.

There is a copy of this document in P:\Client Materials\Client Specific\DOJ (Fidelity International)

Lisa G. Keating
Analyst
OnPoint Analytics, Inc.
lkeating@onpointanalytics.com
Direct: 510.338.4257
Mobile: 415.342.7066

9/27/2007

**Fidelity Supplemental Report**
Schedule Tuesday September 4 - Tuesday September 11
FINAL DRAFT SHOULD BE DONE BY FRIDAY, September 7 with only Exhibits and cite checking to be finished over the weekend/Monday

**GENERAL SCHEDULE OF TASKS**

The general schedule of tasks is as follows:

| Completion | | Task | Person Responsible |
|---|---|---|---|
| Date | Day/Time | | |
| 5-Sep | Wed/ 5PM | Finish cost collection and edit/add to description to finalize the numbers | CW |
| 5-Sep | Wed/ 5PM | All Primary Review and changes COMPLETE except for a) Joint and conditional probability analyses; b) comparison (or correlation) of changing hedge instrument (option) value and hedged asset (loan) values. | ALL |
| 5-Sep | Wed/ 9PM | Second drafted emailed to client | LRC |
| 6-Sep | Thurs/ 5PM | Complete and insert b) comparison (or correlation) of changing hedge instrument (option) value and hedged asset (loan) values. | SM/JQ |
| 7-Sep | Fri/AM | Add footnotes throughout | CW |
| 7-Sep | Fri/ noon | Complete and insert a) Joint and conditional probability analyses | SM/JQ |
| 7-Sep | Fri/ 5PM | Finish all Second Reviews | ALL |
| 7-Sep | Fri/PM | Formatting - caption, appropriate tables, signature block | LK |
| 7-Sep | Fri/PM | Select any new hot docs | CW |
| 10-Sep | Mon/AM | Prepare Exhibit A list of additional materials received and reviewed (collect additional materials from SM and JQ) | CW |
| 10-Sep | Mon/AM | Table of Exhibits, convert to highlighted (boxed) PDF and convert the internal citations | LK |
| 10-Sep | Mon/AM | Finish checking citations | LK |
| 10-Sep | Mon/ 5PM | Ship Exhibits to client via FedEx | LK |
| 10-Sep | All day Mon | Insert Revisions by Client and G. Rausser | JG/LK |
| 10-Sep | Mon/PM - post rev | Reformatting - caption, appropriate tables, signature block | LK |

OPA004849

**Fidelity Supplemental Report**
Schedule Tuesday September 4 - Tuesday September 11
FINAL DRAFT SHOULD BE DONE BY FRIDAY, September 7 with only Exhibits and cite
checking to be finished over the weekend/Monday


**DRAFTING AND REVIEWING**

The report has been divided into sections and a Primary and Secondary Reviewer has been
assigned to each section.
*Unless otherwise specified, the Primary Reviewer is the person who wrote the section
Primary Reviewer Responsibilities:
1. Review all text for accuracy and clarity
2. Check all numbers against citations
3. Replicate all calculations (keep record)
4. Confirm that the argument in the text makes sense
5. Generate all graphs or tables to be used for illustrative purposes

Secondary Reviewer Responsibilities:
1-4 of Primary Reviewer responsibility list

The schedule for drafting and reviewing not specified by section but each primary review needs
to be done by Wednesday at 5pm.  Secondary reviews need to be complete by 5PM Friday,
September 7th.

Draft and Review Schedule
To be completed by Friday PM

| Status (9/4) | Section | Section Title | Primary Reviewer | Secondary Reviewer |
|---|---|---|---|---|
| Drafted | Section 1 | Qualifications and Background | LRC | CW |
| Drafted | Section 2 | Scope of Work Secondary Review | LRC | CW |
| Drafted | Section 3 | Summary of Conclusions Primary Review | LRC | CW |
| Drafted | Section 4 | Analysis Supporting Conclusions | | |
| Drafted | Section 4A | Failure to Observe the Transaction Structure | LRC | CW |
| Drafted | Section 4B1 | No Material Profits Available | SM | JQ |
| Drafted | Section 4B1 | Additional costs assured there could be no profit | CW | LK |
| Drafted | Section 4C | Wrong Correlations Used to Evaluate Hedge Potential | SM | JQ |
| Drafted | Section 4C1 | Dr Carron Performed No Analysis of the Currency Options | SM | JQ |
| Drafted | Section 4C2 | Incorrect Correlations Were Used to Evaluate Claimed Interest Rate Hedges | SM | JQ |
| Drafted | Section 4D | Disregarding Taxpayer's Already Well Diversified Debt Portfolio | JQ | SM |
| Drafted | Section 4E | Effective, Inexpensive Hedge Alternatives | JQ | SM |
| Drafted | Section 4F | No Non-Tax Justifications for Early Termination | SM | JQ |
| In process | Section 4G | Mr Yale's Report Misrepresents the Economic Realities of the Transaction | LRC | CW |
| In process | Section 5 | Conclusion | LRC | CW |

OPA004850

**Fidelity Supplemental Report**
Schedule Tuesday September 4 - Tuesday September 11
FINAL DRAFT SHOULD BE DONE BY FRIDAY, September 7 with only Exhibits and cite
checking to be finished over the weekend/Monday

OPA004851

# Exhibit 26

⚠ Attachments can contain viruses that may harm your computer. Attachments may not display correctly.

**Laura Craft**

| From: | Laura Craft | Sent: | Mon 9/3/2007 7:07 PM |
|-------|-------------|-------|----------------------|
| To: | Saumya Mohan | | |
| Cc: | | | |
| Subject: | RE: Revised summary spreadsheet and write-up word document | | |
| Attachments: | 📄 Rebuttal Draft 9.2.07.doc(312KB) | | |

Thanks Saumya. I am largely done with everything but the Yale section, but Gordon is still making revisions which I will collect in a few minutes. Attached is my current draft which will have to go to the client tonight. You will see that there are lots of blanks and several tables and graphs needed. I have flipped around your CMS hedge argument as I thought it did not adddress the NPV change Carron has claimed was hedged and is inconsistent with the argument in Jaffer's section. Absolutely every number in every section needs to be double checked (twice) as I supplied many of them and I may ahve misunderstood others. It would be nice to know what error Jaffer is now correcting so I don't have to review the whole spreadsheet and try to find it. Do you know? I have been working on this for two days non-stop and don't have the energy to go hunting for things. I think the most intellectually challenging remaining piece of work is calculating the joint or conditional probabilites for CMS and LIBOR payouts, taking into account the volatility, duration and initial spot of the options rather than just historical price frequencies. I found that approach scary as it assigned an 80%+ payoff probability to the LIBOR options (a number none of us would support; not even the other side). Also, because CMS got a zero marginal probabaility the joint probabilities don't treally tell us anything other than that any number times zero equals zero. Let's talk about how to do this tomorrow. On the number checking, I suggest each author check all numbers in their sections first and then circulate to a second person to check again.

**From:** Saumya Mohan
**Sent:** Sun 9/2/2007 10:02 PM
**To:** Laura Craft
**Subject:** FW: Revised summary spreadsheet and write-up word document

Hi Laura,
Jaffer said he has made some changes and also corrected an error in his excel table with the costs of the alternate hedge. Please see the attachment (excel sheet).
Hope your writing is going well, do you need any help?

Saumya

-----Original Message-----
**From:** Jaffer Qamar [mailto:jq@calcuscribe.com]
**Sent:** Sun 9/2/2007 1:02 PM
**To:** Saumya Mohan
**Subject:** Re: Revised summary spreadsheet and write-up word document

Hi Saumya,

I plugged in the correct option costs in the Summary spreadsheet. I also made an improvement: I've now supplied additional cases of interest rates (LIBOR and CMS) changing by 50 bps or 300 bps, instead of only by 100 or 200 bps.

I provided these additional fictitious cases to show that the variable rate loans are virtually fully covered to the interest rate exposure by the 12 stacked call options; whereas the fixed-rate loans are not fully hedged with the put option, which expires on 10/9/2002 (a year from the perspective date.)

OPA007238

I had to make some approximate estimates (since I don't have access to the P: drive right now) to show that if the CMS interest rate fallen by either more than or less than the "expected" amount, the two base cases of expectations I assumed were 1% and 2% over a period of a year, the change in the portfolio's PV would be different than what the put would pay-off on 10/9/2002, the option expiry date.  Numbers in the spreadsheet which are in italics are approximations. Exact numbers can be computed in 10-15 minutes on Tuesday morning.

If you would like to discard the approximations then just remove the 2 lines from each of the two tables related to the fixed-rate liabilities. I provided these numbers more for our team to see that the put does not fully hedge the fixed-rate portfolio for different changes in the CMS rate that end up being different than what the borrower might have expected to happen between 10/9/2001 and 10/9/2002. These estimates are not so much for the opposing side.

This way, on 10/9/02, if the CMS-rate had fallen Fidelity could take delivery of a T-Note Futures contract, the price of which would change in a similar non-linear fashion, with the rate, as the changes in the PV of Fidelity's fixed-rate liabilities in a declining interest rates environment. It would provide a better hedge but valuing such a call option requires me acquiring knowledge of the terms of contract for the Futures on T-Notes, especially which different notes can be delivered by the counterparty in the Futures contract and more importantly, it requires historic data for the Futures prices on the 5-Yr note, which i would need to compute volatility estimates. I am not sure where such data could be purchased from and whether there is extensive data or just very sparse data.


Jaffer

OPA007239

Exhibit 27

**Chandra Wallace**

| | |
|---|---|
| **From:** | Saumya Mohan |
| **Sent:** | Monday, May 21, 2007 8:51 PM |
| **To:** | Laura Craft; Chandra Wallace |
| **Subject:** | Draft including hedge effectiveness |
| **Attachments:** | Draft Initial Report 5.21.07 v2.doc |

Hi,
I am attaching the new draft that includes mine and Chandra's changes. This is saved as Draft Initial Report 5.21.07 v2 in the same folder. I saved it as a new version because I accepted all changes in this document as per your suggestion, Laura, but if you want to you can still go back and look at the earlier version with the changes tracked.
Let me know what you think.
Saumya


Saumya Mohan
Financial Economist
OnPoint Analytics, Inc.
510-463-0168


9/27/2007

# Exhibit 28

**Chandra Wallace**

| | |
|---|---|
| **From:** | temp06 |
| **Sent:** | Wednesday, September 05, 2007 11:33 PM |
| **To:** | Laura Craft; Chandra Wallace |
| **Cc:** | temp06 |
| **Subject:** | proposed changes made to the draft |
| **Attachments:** | Rebuttal Draft 9 4 07 jq.doc |

Hi Chandra and Laura,

I've made the changes. Tommorrow, I'll recompute the theoretical put value after I getting the historic volatility for the 10Yr CMS rate. I'll then create Table (11) (on page 36).

Please review the document. I have highlighted certain numbers in my section, with the yellow marker, to bring to your attention that these will change tomorrow.

I also have made some comments on some pages, before pg. 25. It would be best if you read and reject but make a note of those comments that you like, for your own version.

see you tomorrow around noon.

Jaffer

9/27/2007

OPA007317

# Exhibit 29

**Lisa Keating**

| | |
|---|---|
| **From:** | Chandra Wallace |
| **Sent:** | Thursday, September 06, 2007 9:39 AM |
| **To:** | Saumya Mohan; Laura Craft; temp06; Lisa Keating |
| **Subject:** | Master Draft attached for Fidelity Rebuttal |
| **Attachments:** | Rebuttal Draft MASTER 9.6.07.doc |

I have incorporated the sections sent to me by Jaffer and Saumya, and completed my own. I have also incorporated some of the footnote citations; that process will continue through today.

I'll save this draft to the P drive in the Drafts/Rebuttal Drafts folder.

9/27/2007

OPA007359

# Exhibit 30

**Chandra Wallace**

| | |
|---|---|
| **From:** | Saumya Mohan |
| **Sent:** | Thursday, May 17, 2007 6:55 PM |
| **To:** | Laura Craft |
| **Cc:** | Chandra Wallace; Guey-Mei You |
| **Subject:** | RE: Probabilities of CMS and LIBOR |
| **Attachments:** | Probability Table Combined v5.xls |

Hi,
I am attaching the updated probability tables based on Guey-Mei's new calculations for both interest rate and forex options. These are also saved in Drafts\Report\Reasonable Expectations of profits\Estimates of Profits (latest version is v5).

Saumya

---

**From:** Guey-Mei You
**Sent:** Thursday, May 17, 2007 6:23 PM
**To:** Laura Craft
**Cc:** Saumya Mohan; Chandra Wallace
**Subject:** Probabilities of CMS and LIBOR

The updated probabilities for CMS and LIBOR are in
"Probability of CMS & LIBOR values 10-09-01 2007.05.17.xls"
P:\Client Materials\Client Specific\DOJ (Fidelity International)\11. Work Product\Data Analyses\Probabilities

The footnotes of the other file also have been updated.

Guey-Mei

---

**From:** Guey-Mei You
**Sent:** Thursday, May 17, 2007 1:54 PM
**To:** Laura Craft
**Cc:** Saumya Mohan; Chandra Wallace
**Subject:** Probabilities of Currencies

The updated probabilities for currencies EURO and YEN are in
"Probability of Euro & Yen values 10-22-01 2007.05.17.xls"
P:\Client Materials\Client Specific\DOJ (Fidelity International)\11. Work Product\Data Analyses\Probabilities

The methodology (method 2) and interest rates used are described in the footnotes in the result file mentioned above. I have double checked the numbers using John Hull's pricing software, and they appear to be accurate.

The methodology described in HELIOS 02940 is not correct in many ways:
    (1)  Spot price (not forward price) should be used in the pricing formula
    (2)  It should be Spot Price over Strike Price inside the LN (natural LOG) function (they flipped the numerator and denominator)
    (3)  (Domestic and Foreign) Interest rates are not included in the formula

Black-Scholes option pricing formula is not "one fits all". The formula varies depending on the underlying instrument and many other factors. You can find the Black-Scholes pricing formula for binary option on equity via the following link. For currency, simply ignore q (dividend rate) and replace r (risk-free rate) with the difference between domestic interest rate

9/27/2007

OPA005551

and foreign interest rate.
http://www.answers.com/topic/binary-option

For options on interest rates CMS and LIBOR, the formula would vary a bit and would involve forward rate. It will take some time to gather data needed (for forward rates and corresponding volatility) for a correct model. We may have to work with approximation. I'll continue working on this and let you know if we have any updated results.

Please let me know if you have any question.

Guey-Mei

9/27/2007

OPA005552

# Exhibit 31

## Chandra Wallace

| | |
|---|---|
| **From:** | Saumya Mohan |
| **Sent:** | Friday, May 18, 2007 12:57 PM |
| **To:** | Chandra Wallace |
| **Subject:** | RE: More footnotes |

Hi,
I wrote up my first draft of hedge eff. Laura is going to expand on some of it and then paste it into her document, and then send it to you to footnote all together.
So I'm not sending it to you right now, but in case you want a peek later its in Drafts\Report\Hedge Effectiveness\Fidelity Hedge Effectiveness.doc (latest version).
I'll leave the rest of the paper docs I used to write up the report on your chair, and anyway they're all in the hedge effectiveness folder (and various subfolders).
Have a fun weekend!

**From:** Chandra Wallace
**Sent:** Friday, May 18, 2007 12:06 PM
**To:** Laura Craft; Saumya Mohan
**Cc:** Brittany Mobley
**Subject:** More footnotes

Hello there,
I've added more footnotes and a few changes (based on the record documents in the footnotes) to "Draft Initial Report 5.18.07 footnoted" and saved it in the Drafts folder. However, in an abundance of caution, I'm also attaching a copy of it to this email.
Chandra

9/27/2007

OPA003901

# Exhibit 32

## Lisa Keating

| | |
|---|---|
| **From:** | Chandra Wallace |
| **Sent:** | Friday, August 03, 2007 8:41 PM |
| **To:** | Lisa Keating |
| **Subject:** | RE: Exhibits |

Yes, I think Laura wants to include all of Guey-Mei's spreadsheets and calculations as exhibits.

---

**From:** Lisa Keating
**Sent:** Fri 8/3/2007 2:50 PM
**To:** Chandra Wallace
**Subject:** Exhibits

Are Guey-Mei's Excel spreadsheets (ie. Compare EURO Option Values 10-23-01 to 12-3-01 07.17.2007.xls) going to be included as exhibits?

I have referenced one – since one of the graphs uses numbers from there – but I will take out the reference if you weren't planning on including these as exhibits.

Lisa


Lisa G. Keating
Analyst
OnPoint Analytics, Inc.
lkeating@onpointanalytics.com
Direct: 510.338.4257
Mobile: 415.342.7066

9/27/2007

OPA004548

# Exhibit 33

**Chandra Wallace**

| | |
|---|---|
| **From:** | Saumya Mohan |
| **Sent:** | Friday, August 31, 2007 5:20 PM |
| **To:** | Laura Craft |
| **Cc:** | Chandra Wallace |
| **Subject:** | Section IV.D. (edits/additions) |
| **Attachments:** | IV.D. Alternative Hedges.doc |

Hi Laura,

I am attaching the new section on alternative hedges. Part of it is included in the document you have, but you do not have the section on fixed-rate obligations which is included here. Please replace the entire section (IV.D.) with what I have attached to this email.

I have written/edited some parts of this but some of it is still in the form of Jaffer's notes and need to be rewritten. I wanted to send it to you soon in case you were going to make any edits this evening. I have also included his tables addressing the question you had asked – to show how his alternate hedging mechanisms actually work (change in interest rates – what happens to his loans – what happens to the hedges – how they offset). However these tables too need to be reformatted and I will work on that.

Saumya

_____

Saumya Mohan
Financial Economist
OnPoint Analytics, Inc.
510-463-0168
_____

9/27/2007

OPA007166

# Exhibit 34



**OnPoint Analytics, Inc.**
2000 Powell Street, Suite 660
Emeryville, CA 94608
Federal Tax ID #: 77-0637796
(510) 463-0130

Invoice submitted to:
US Department of Justice, Tax Division
Attn: Barry Reiferson, Esq.
P.O. Box 813
Ben Franklin Station
Washington DC 20044

August 28, 2007

In Reference To:Fidelity Int'L Currency Advisor A Fund LLC v.
USA #:6WTAX-136153

Invoice #10000

For Services Rendered July 1 through 31, 2007:
Preparation and revision of initial expert report; meetings and telephone conferences with D. Donohue; telephone
conferences with B. Reiferson; review and analysis of new incoming documents; empirical analysis including option
valuations, probabilities and rate of return;  literature research; evaluation of hedging alternatives.

| | | | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 7/2/2007 | CW | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | 2.25 | 200.00 | 450.00 |
| | LRC | Implement revisions and updates to expert report; review additional documents identified; confirm valuation calculations | 3.75 | 350.00 | 1,312.50 |
| 7/3/2007 | SEM | Review and QA data for Japanese Yen | 1.50 | 50.00 | 75.00 |
| | GY | QA parameter and option values of JPY binary options extracted from EGAN document; add graphs comparing option values computed using various parameter settings; interpret comparison results | 2.50 | 300.00 | 750.00 |
| | LRC | Revisions to report; review of underlying calculations | 4.25 | 350.00 | 1,487.50 |
| 7/4/2007 | LRC | Revisions to report and incorporation of additional documents and statistical information | 4.75 | 350.00 | 1,662.50 |
| 7/5/2007 | JG | Prepare for D. Donohue meeting | 3.00 | 90.00 | 270.00 |
| | LRC | Develop graphics and tables for initial report | 2.50 | 350.00 | 875.00 |
| 7/6/2007 | JG | Revise expert report | 4.50 | 90.00 | 405.00 |
| | JG | Plan and prepare for D. Donohue meeting; document preparation | 2.00 | 90.00 | 180.00 |
| | JG | Contract modification | 0.50 | 90.00 | 45.00 |
| | GY | Create and modify graphs of option value comparison to be inserted in the report | 7.00 | 300.00 | 2,100.00 |
| | GCR | Drafting and revision of report | 6.75 | 650.00 | 4,387.50 |
| | GCR | Meeting with staff | 3.50 | 650.00 | 2,275.00 |
| | LRC | Revisions and additions to initial report; conference with Rausser and staff re same; modification of graphics for use in report | 8.40 | 350.00 | 2,940.00 |
| 7/7/2007 | GCR | Drafting of Fidelity report; conference with Craft | 4.25 | 650.00 | 2,762.50 |
| | LRC | Review new valuation comparisons; revisions to report; conference with Rausser re same | 7.50 | 350.00 | 2,625.00 |
| 7/8/2007 | GCR | Continue with drafting of report; review and evaluate analysis; conference with Craft | 7.50 | 650.00 | 4,875.00 |
| | LRC | Ongoing revisions to report; emails with D. Donohue; conference with Rausser re draft | 6.75 | 350.00 | 2,362.50 |

OPA008305

US Department of Justice, Tax Division                                      Page    2

|          |     |                                                                                                                                                                 | Hours | Rate   | Amount   |
|----------|-----|-----------------------------------------------------------------------------------------------------------------------------------------------------------------|-------|--------|----------|
| 7/9/2007 | SM  | Empirical analysis of cost of replicating options strategy using CMS and LIBOR futures                                                                            | 3.00  | 300.00 | 900.00   |
|          | SM  | Empirical analysis of new probabilities of option outcomes, create tables and summarize outcomes in report text                                                  | 3.00  | 300.00 | 900.00   |
|          | CW  | Prepare for client meeting with Dennis Donohue; review and revise draft initial report                                                                           | 12.75 | 200.00 | 2,550.00 |
|          | JG  | Assistance with client meeting in office                                                                                                                         | 1.50  | 90.00  | 135.00   |
|          | GY  | Review draft report; QA option value and probability calculations; update probability calculations using 250 trade days in computing annualized volatilities     | 5.50  | 300.00 | 1,650.00 |
|          | GCR | Review and evaluate analysis; drafting report; meeting with counsel                                                                                              | 7.25  | 650.00 | 4,712.50 |
|          | LRC | Review and revise new tables; ongoing work on report, meeting with D. Donohue; conferences with staff re numerical and document analysis                          | 4.25  | 350.00 | 1,487.50 |
| 7/10/2007| SM  | Empirical analysis and create probability tables and rate of return calculation tables for Report                                                                 | 2.75  | 300.00 | 825.00   |
|          | JG  | Plan and prepare for D. Donohue meeting                                                                                                                          | 0.50  | 90.00  | 45.00    |
|          | JG  | Assist with client meeting preparations                                                                                                                          | 0.50  | 90.00  | 45.00    |
|          | JG  | Revise tables in Fidelity report                                                                                                                                 | 0.50  | 90.00  | 45.00    |
|          | GY  | Revise footnotes in the draft report regarding option pricing methods; discuss new document regarding Fidelity's EURO and JPY option values and trade info on the option inception date to be incorporated into valuation | 2.75  | 300.00 | 825.00   |
|          | GCR | Review and evaluate analysis; drafting report; meeting with counsel                                                                                              | 7.25  | 650.00 | 4,712.50 |
|          | LRC | Meeting with D. Donohue and G. Rausser; review and revisions to draft report; conference with staff re additional analysis                                        | 6.60  | 350.00 | 2,275.00 |
| 7/11/2007| CW  | Plan and prepare for revised draft of initial report; gather similar transaction evidence to add to report analysis.                                              | 3.25  | 200.00 | 650.00   |
|          | SM  | Draft and revise probability numbers, merge into revised document with edits by other project members.                                                           | 2.00  | 300.00 | 600.00   |
|          | GY  | Review option parameters on the documents of CMS and LIBOR options trade confirmation, duplicate Fidelity's options calculations, and review the bid-ask option spread, forward price and volatility data | 2.50  | 300.00 | 750.00   |
|          | LRC | Further analysis of pattern evidence; revisions to report; review of additional documents                                                                        | 3.80  | 350.00 | 1,330.00 |
| 7/12/2007| GY  | Review option parameters used in EURO and JPY options trade confirmation, duplicate Fidelity's options calculations, and review the bid-ask option spread, forward price and volatility data | 2.00  | 300.00 | 600.00   |
|          | GCR | Review analysis                                                                                                                                                  | 4.50  | 650.00 | 2,925.00 |
|          | LRC | Oversee data entry to capture promoter's pricing parameters and valuations; comparison of composite values; review of additional documents for inclusion in report | 2.50  | 350.00 | 875.00   |
| 7/13/2007| SEM | Data entry of Euro rates                                                                                                                                         | 0.50  | 50.00  | 25.00    |
|          | SM  | Statistical analysis and draft sections of report                                                                                                               | 2.00  | 300.00 | 600.00   |
|          | GY  | Validate the option values and other relevant values of EURO, JPY, CMS, and LIBOR binary options presented on discovery documents HELIOS 05379, HELIOS 05380, HELIOS 05358, HELIOS 05359 | 6.00  | 300.00 | 1,800.00 |
|          | GCR | Draft report                                                                                                                                                    | 3.75  | 650.00 | 2,437.50 |
|          | LRC | Revisions and additions to draft report; review pricing parameter analysis; review and import information from pattern evidence table                             | 2.00  | 350.00 | 700.00   |

OPA008306

US Department of Justice, Tax Division

| | | | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 7/14/2007 | GY | Update description of option pricing methodologies and calculations to compare with Fidelity's option values of EURO, JPY, CMS, and LIBOR binary options | 1.25 | 300.00 | 375.00 |
| 7/15/2007 | GY | Update the Excel worksheets for comparing option parameters and option valuations of EURO, JPY, CMS, and LIBOR binary options | 4.75 | 300.00 | 1,425.00 |
| | GCR | Draft report; conferences with; review valuation methodologies | 3.00 | 650.00 | 1,950.00 |
| | LRC | Review methodology for arriving at various composite valuations; analyze difference between purchase or termination pricing and theoretical value; communications with Rausser and G. You | 1.50 | 350.00 | 525.00 |
| 7/16/2007 | SM | Office conference with expert and project team members regarding probabilities calculation, rate of return calculation and new sections to be added to report. | 1.50 | 300.00 | 450.00 |
| | SM | Gather facts regarding rational investing behavior, return vs. risk for inclusion in report; research standard treatise materials. | 4.00 | 300.00 | 1,200.00 |
| | SM | Draft of standard investing behavior | 1.00 | 300.00 | 300.00 |
| | GY | Meeting with Rausser to discuss option pricing methodologies, data issues, and additional tasks; QA JPY option parameter data and update JPY option pricing calculations; plot probability graph of EURO option quartet | 6.00 | 300.00 | 1,800.00 |
| | LRC | Review Refco bankruptcy examiner report; meeting with Rausser; analysis of probability of generating targeted loss before year end | 3.50 | 350.00 | 1,225.00 |
| 7/17/2007 | GY | Update option pricing calculations using Fidelity's parameters but OnPoint's volatility; compute probabilities of positive net gains for EURO option quartet, JPY option quartet, CMS option pair, and LIBOR option pair; create line graphs and bar chart of positive net gain probabilities | 5.50 | 300.00 | 1,650.00 |
| | GCR | Draft report | 3.00 | 650.00 | 1,950.00 |
| | LRC | Review adjusted probabilities; incorporate into draft report | 1.00 | 350.00 | 350.00 |
| 7/18/2007 | SM | Gather sources on traditional vs. behavioral finance investing behavior. | 2.00 | 300.00 | 600.00 |
| | SM | Draft section of report on investing behavior under the traditional and the behavioral paradigm. | 2.00 | 300.00 | 600.00 |
| | CW | Draft and revise new sections for initial expert report; locate additional sources and references. | 6.00 | 200.00 | 1,200.00 |
| | GY | Analyze the probability of generating $171M gain from selected legs of EURO and JPY quarters | 6.50 | 300.00 | 1,950.00 |
| | GCR | Draft report | 1.75 | 650.00 | 1,137.50 |
| | LRC | Telephone interview of Yorke from Refco; telephone conference with B. Reiferson; revisions to report | 2.25 | 350.00 | 787.50 |
| 7/19/2007 | SM | Draft and revise section of report on investing behavior under the traditional and the behavioral paradigm. | 3.00 | 300.00 | 900.00 |
| | SM | Draft and revise section on rate of return calculations in Report. | 3.00 | 300.00 | 900.00 |
| | CW | Draft and revise new sections for initial expert report; locate additional sources and references. | 7.50 | 200.00 | 1,500.00 |
| | GY | Analyze the probability of generating $171M option value from the combined option EURO and JPY combos - evaluate the probability increase and price movement needed | 5.25 | 300.00 | 1,575.00 |
| | JG | Revise G. Rausser expert report per L. Craft instructions | 6.50 | 90.00 | 585.00 |
| | GCR | Draft report | 1.25 | 650.00 | 812.50 |
| | LRC | Supplement report with information about rational investor behavior; review new documents; revisions to tables and graphics | 2.00 | 350.00 | 700.00 |

OPA008307

US Department of Justice, Tax Division

Page    4

| | | | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 7/20/2007 | SM | Draft and revise additional paragraphs in rate of return calculation section in report using margin payments as initial premium paid. | 1.00 | 300.00 | 300.00 |
| | GY | Compute the probabilities of EURO moving above the price needed and JPY moving below the price needed to generate $171M any time during the 70 days time window | 1.25 | 300.00 | 375.00 |
| | GCR | Draft report | 1.25 | 650.00 | 812.50 |
| | LRC | Review new payoffs and returns with alternative probability estimates; review new documents for inclusion in report | 1.10 | 350.00 | 385.00 |
| 7/23/2007 | JG | Revise expert report of G. Rausser per L. Craft instructions. | 5.00 | 90.00 | 450.00 |
| | GCR | Meeting with staff; draft report | 2.50 | 650.00 | 1,625.00 |
| | LRC | Revisions and additions to report; conference with Rausser re same | 7.25 | 350.00 | 2,537.50 |
| 7/24/2007 | SM | Draft and revise changes to probability of profit and expected rate of return sections. | 1.50 | 300.00 | 450.00 |
| | JG | Revise export report of G. Rausser per L. Craft edits | 5.00 | 90.00 | 450.00 |
| | GCR | Meeting with staff; draft report | 2.50 | 650.00 | 1,625.00 |
| | LRC | Revisions to report and inclusion of additional analysis; conferences with Rausser; emails and telephone conference with D. Donohue | 12.25 | 350.00 | 4,287.50 |
| 7/25/2007 | CW | Review and analyze new draft of initial expert report. | 3.00 | 200.00 | 600.00 |
| | GY | Prepare a list of documents reviewed | 0.50 | 300.00 | 150.00 |
| | JG | Assisting with DOJ meeting prep | 1.25 | 90.00 | 112.50 |
| | LRC | Revisions to report; oversee additional analysis needed from staff | 1.75 | 350.00 | 612.50 |
| 7/26/2007 | SM | Gather data on probability tables including margin payments. Compare two methods of accounting for margin and premium received. Discuss with project manager, select one method and calculate values in Tables 11 through 13. | 2.00 | 300.00 | 600.00 |
| | SM | Draft and revise Tables 11 through 13 with probability calculations. | 1.00 | 300.00 | 300.00 |
| | CW | Prepare for client meeting; review proposed changes to draft report. | 1.25 | 200.00 | 250.00 |
| | JG | L. Craft and D. Donohue meeting prep | 0.50 | 90.00 | 45.00 |
| | JG | Pick up breakfast for D. Donohue | | 90.00 | NO CHARGE |
| | JG | Prepare for client meeting with D. Donohue and collect documents | 0.50 | 90.00 | 45.00 |
| | LRC | Prepare for and attend meeting with D. Donohue; begin further revisions to report; conference with Rausser; direct additional probability analysis for other transactions | 7.25 | 350.00 | 2,537.50 |
| 7/27/2007 | GCR | Meeting with staff; draft report | 2.00 | 650.00 | 1,300.00 |
| | LRC | Oversee additional analysis required for report; conference with Rausser | 2.50 | 350.00 | 875.00 |
| 7/30/2007 | CW | Compile data to calculate probability of profit in similar transactions; calculate probabilities; draft table showing calculations and probabilities. | 8.25 | 200.00 | 1,650.00 |
| | SM | Empirical analysis of rate of return for Report; search for literature on appropriate accounting treatment of fees and transaction costs. | 1.00 | 300.00 | 300.00 |
| | LRC | Rewrite sections of report; conference with Rausser; check ROR calculations; review and integrate new documents | 3.80 | 350.00 | 1,330.00 |
| 7/31/2007 | SM | Empirical analysis of rate of return calculations. revise and edit draft Report. | 1.00 | 300.00 | 300.00 |
| | LK | Review, cite and index Fidelity Report | 4.00 | 200.00 | 800.00 |
| | JG | Managing incoming new data | 0.50 | 90.00 | 45.00 |
| | LRC | Revise sections of Report; call with Rausser; call with Reiferson; conference with Mohan re partnership interest valuation | 2.50 | 350.00 | 875.00 |
| | | **Total Current Fees** | | | $118,712.50 |

OPA008308

US Department of Justice, Tax Division

Page     5

| | Amount |
|---|---|
| Total Balance Due | $118,712.50 |

### Timekeeper Summary

| Name | Hours | Rate | Amount |
|---|---|---|---|
| Analyst  (C. Wallace) | 44.25 | 200.00 | $8,850.00 |
| Analyst  (L. Keating) | 4.00 | 200.00 | $800.00 |
| Data Entry (S. Moravel) | 2.00 | 50.00 | $100.00 |
| Financial Economist (S. Mohan) | 36.75 | 300.00 | $11,025.00 |
| Project Assistant (J. Galindo) | 32.25 | 90.00 | $2,902.50 |
| Project Manager (L. Craft) | 105.60 | 350.00 | $36,960.00 |
| Statistician (G. You) | 59.25 | 300.00 | $17,775.00 |
| Testifying Expert (G. Rausser) | 62.00 | 650.00 | $40,300.00 |

OPA008309

# Exhibit 35

| | |
|---|---|
| From: | Cooper, Phil |
| Sent: | Tuesday, January 14, 2003 3:17 PM |
| To: | Larner, Bob |
| Subject: | RE: Marketing expenses |

**The issue is only that his contract requires us to approve (on a prior basis) reasonable marketing / business development expenses.,
REGARDLESS of how we deal with other outside consultants.**

-----Original Message-----
| | |
|---|---|
| From: | Larner, Bob |
| Sent: | Tuesday, January 14, 2003 4:19 PM |
| To: | Cooper, Phil; Noether, Monica |
| Subject: | RE: Marketing expenses |

There are separate issues here. If CRA is contractually obligated to provide Gordon with a half-time marketing person, we should fulfill that obligation directly. However, I do not think it is appropriate to attempt to compensate for not satisfying that obligation by approving, without question, any marketing request he makes, subject only to a budget constraint. Instead, we should respond to his requests as we think each particular situation warrants. Because of Gordon's propensity to bill large amounts of time in relation to the work done, even after I spoke with him about it, I am not keen to vouch for him to attorneys I know and work with.

-----Original Message-----
| | |
|---|---|
| From: | Cooper, Phil |
| Sent: | Tuesday, January 14, 2003 2:33 PM |
| To: | Noether, Monica |
| Cc: | Larner, Bob |
| Subject: | RE: Marketing expenses |

**Gordon may not have complied by making a prior request.  But neither has CRA perfectly complied with the contract either.**

**I negotiated the deal.  These types of expenses were precisely what that clause was about.,
If he seeks prior approval, the answer is <u>unquestionably</u> "yes", but also  "let's set a budget for the activity".**

Phil

-----Original Message-----
| | |
|---|---|
| From: | Noether, Monica |
| Sent: | Tuesday, January 14, 2003 2:26 PM |
| To: | Cooper, Phil |
| Cc: | Larner, Bob |
| Subject: | RE: Marketing expenses |

He definitely didn't ask for prior approval so he is not compliant with his contract, moreover I think it is still questionable as to whether this should be included in the category of "reasonable" business development expenses (but he didn't give us the option to have that discussion.)  And, as I noted in the earlier email, if you discussed recruitment with him that had anything to do with the competition practice (which would be the only situation in which I would think that practice should reimburse for those expense), someone from the practice should have been involved.

-----Original Message-----
| | |
|---|---|
| From: | Cooper, Phil |
| Sent: | Tuesday, January 14, 2003 2:18 PM |
| To: | Noether, Monica |
| Cc: | Larner, Bob |
| Subject: | RE: Marketing expenses |

**CRA002497**

Monica

From Section 1 (b) of Gordon Rausser's contract, previously attached, for your convenience:

1

# Exhibit 36

## Chandra Wallace

| | |
|---|---|
| **From:** | Laura Craft |
| **Sent:** | Monday, September 03, 2007 10:59 PM |
| **To:** | Chandra Wallace |
| **Subject:** | FW: Draft Fidelity Report |
| **Attachments:** | Rebuttal Draft 9.2.07.doc |

---

**From:** Laura Craft
**Sent:** Mon 9/3/2007 10:57 PM
**To:** Saumya Mohan; jq@calcuscribe.com; cwallace@onponointanalytics.com; temp 3
**Subject:** Draft Fidelity Report

Attached is the current draft of the Fidelity report which Gordon and I rewrote this week-end.  It has been sent to the client.
Please read it from front to back.  I welcome each of your comments but there are a number of targeted tasks that will need to be done as rapidly as possible.  I will send you an email regarding those tasks and their priorities first thing tomorrow (Tuesday) morning.

9/27/2007

OPA007278

# Exhibit 37

**Chandra Wallace**

| | |
|---|---|
| **From:** | Laura Craft |
| **Sent:** | Tuesday, September 11, 2007 9:13 AM |
| **To:** | Lisa Keating; Saumya Mohan; Chandra Wallace |
| **Subject:** | Fidelity Updated Draft |
| **Attachments:** | Rebuttal Draft 9 11 07 8pm.doc |

The attached revision is the one we should all be working from today. Although I have thoroughly edited, we need to double check all numbers in the text, graphs, tables and footnotes. I found a number of errors over the course of last night and this morning. Saumya, please remove your internal title from Figure 19 (it is a decrease rather than increase), remove the caption at the bottom that says "Date" and make sure the numbers on top of the bar are correctly spaced. Also, would you please be sure Jaffer has a copy of this draft? The signature must leave our office absolutely no later than 2:00 today. I understand that there are more changes from Gordon waiting on the fax machine which I will address when I arrive shortly.

9/27/2007

OPA007953