# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, ) ) ) ) | |
| Plaintiff, ) ) | Case No.:  05-40151-FDS<br>06-40130-FDS |
| v. ) ) | |
| UNITED STATES OF AMERICA, ) ) | |
| Defendant. ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE PROPOSED EXPERT TESTIMONY AND REPORTS OF A. LAWRENCE KOLBE, OR, IN THE ALTERNATIVE, TO EXCLUDE OPINIONS ON SPECIFIC TOPICS

FIDELITY INTERNATIONAL CURRENCY ADVISOR
A FUND, L.L.C., by the Tax Matters Partner, Plaintiff

David J. Curtin, D.C. Bar #281220
Ronald L. Buch, Jr., D.C. Bar #450903
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email: dcurtin@mckeenelson.com
        rbuch@mckeenelson.com
        lamanti@mckeenelson.com

John O. Mirick, BBO #349240
MIRICK, O'CONNELL, DEMALLIE
& LOUGEE, LLP
100 Front Street
Worcester, MA 01608
Telephone:  (508) 791-8500
Facsimile:  (508) 791-8502
Email:  jomirick@mirickoconnell.com

# TABLE OF CONTENTS

Background ..................................................................................................................2

Argument ...................................................................................................................2

    I.    Kolbe Supplants the Role of Counsel in Presenting Defendant's View of the
        Evidence....................................................................................................4

    II.    Kolbe Inappropriately Renders Opinions Regarding Contract Interpretation ................7

    III.    Kolbe's Discussion of the *Dewees* Case Is Unhelpful, Irrelevant, and
        Demonstrates Kolbe's Partisan Advocacy....................................................10

    IV.    The Court Should Exclude Kolbe's Testimony Because He is Unqualified to
        Opine on the Economic Attributes of Digital Options Transactions ...........................13

    V.    Kolbe's Use of "Similar Transactions" to Test His Conclusions Is Merely
        Counsel's Means of Presenting Inadmissible Evidence ................................................14

    VI.    Kolbe's Opinion that Each Pair of Long and Short Options Are, Economically,
        a Single Investment Is Unreliable ...............................................................18

    VII.    Kolbe's Opinions Are Unduly Cumulative....................................................21

CONCLUSION..........................................................................................................23

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case Nos.:  05-40151-FDS 06-40130-FDS |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE PROPOSED EXPERT TESTIMONY AND REPORTS OF A. LAWRENCE KOLBE, OR, IN THE ALTERNATIVE, TO EXCLUDE OPINIONS ON SPECIFIC TOPICS

This motion requests the Court to exercise its powers as a "gatekeeper" in evaluating whether the proposed expert testimony of A. Lawrence Kolbe is (1) trustworthy and reliable, (2) based on sufficient facts, (3) helpful to the Court, (4) relevant, and (5) not unduly cumulative. Kolbe's reports are tainted with deliberate attempts to advocate Defendant's interpretation of the facts and are undermined both by Kolbe's lack of experience with financial options and by his employment of unreliable methodology.  Admission of such testimony is inappropriate under the Federal Rules of Evidence and the substantial body of case law governing expert witnesses. Accordingly, Plaintiff respectfully requests that the Court exclude Kolbe's proposed testimony and his reports.  As particular matters, Plaintiff requests that the Court exclude Kolbe's testimony on (1) the *Dewees* case and (2) similar transactions engaged in by other taxpayers.

## BACKGROUND

Defendant, represented by the Tax Division of the United States Department of Justice (the "Tax Division"), seeks to offer the expert testimony of Kolbe on a combination of legal issues and ultimate issues of fact that are for this Court to decide. Kolbe has submitted a report (the "Initial Report")[1] and a rebuttal report in response to the reports of Plaintiff's experts Andrew Carron and Ethan Yale (the "Rebuttal Report").[2] (The Initial Report and Rebuttal Report are collectively referred to as the "Kolbe Reports".) The Kolbe Reports are less objective and empirical than one would expect from an independent expert economist. Instead, Kolbe has sought to appease his client, the Tax Division, by including irrelevant and unhelpful analyses. What is more, Kolbe attempts to supplant the role of counsel in advocating a particular interpretation of the facts. In short, Kolbe's opinions are unhelpful, unreliable, and irrelevant. Accordingly, Plaintiff requests that the Court exclude Kolbe's testimony and the Kolbe Reports.

## ARGUMENT

The Supreme Court has instructed trial judges to act as "gatekeepers" with respect to expert testimony.[3] Specifically, trial judges must evaluate a proffered expert's testimony for both relevance and reliability.[4] Federal Rule of Evidence 702 provides that expert testimony is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." The examination of the reliability of an expert's testimony requires an inquiry into its trustworthiness.[5] As required for all evidence, expert testimony must be relevant under Federal

---

[1] Ex. A (Expert Report of A. Lawrence Kolbe, Aug. 7, 2007).

[2] Ex. B (Rebuttal Report of A. Lawrence Kolbe, Sept. 11, 2007).

[3] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993); *see also* Fed. R. Evid. 702 advisory committee's note ("The amendment affirms the trial court's role as gatekeeper . . . .").

[4] *See Daubert*, 509 U.S. at 594-95.

[5] *See id.* at 590 n.9 ("[O]ur reference here is to *evidentiary* reliability—that is, trustworthiness.").

Rules of Evidence 401 and 402 and must not be unfairly prejudicial, confusing, a waste of time, or needlessly cumulative under Federal Rule of Evidence 403. Further, the proponent of the expert testimony must demonstrate admissibility by a preponderance of the evidence.[6]

A court's evaluation of the relevance and reliability of an expert's testimony is meant to be flexible and "there is no particular procedure [the judge] is required to follow."[7] In the landmark case of *Daubert v. Merrell Dow*, the Supreme Court examined the reliability of scientific testimony by considering whether the expert's methodology had been tested, peer-reviewed, and accepted in the scientific community.[8] The Supreme Court has emphasized that the factors used in *Daubert* "neither necessarily nor exclusively appl[y] to all experts or in every case"[9] and that those factors were merely "meant to be helpful, not definitive."[10]

While it is not unusual for expert witnesses to be biased in favor of the party retaining them, it is inappropriate and unhelpful when the "witness ceases to be an expert whose testimony is valuable because he or she is not an advocate and becomes, instead, just another legal practitioner for the client."[11] When an expert's "opinions cross the line between expert analysis and advocacy," the proffered testimony is no longer helpful to the court and should be

---

[6] *See id.* at 592 n.10; *see also* Fed. R. Evid. 702 advisory committee's note (2000 amendments) (stating that, under Federal Rule of Evidence 104(a), "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence"); *Bourjaily v. United States*, 483 U.S. 171, 176 (1987) (holding the offering party must prove admissibility requirements by a preponderance of the evidence).

[7] *United States v. Vargas*, 471 F.3d 255, 261 (1st Cir. 2006); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."); *United States v. Sebaggala*, 256 F.3d 59, 65-66 (1st Cir. 2001) (discussing a trial court's considerable latitude in the admission and exclusion of expert testimony under Fed. R. Evid. 702).

[8] *Daubert*, 509 U.S. at 593-94.

[9] *Kumho Tire*, 526 U.S. at 141.

[10] *Id.* at 151.

[11] *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 290 (E.D. Va. 2001); *see also United States v. Allerheiligen*, No. 97-40090-01, 1998 WL 918841, at *7 (D. Kan. Nov. 19, 1998) (excluding expert testimony because it "lack[ed] objectivity").

excluded.[12]  Most importantly, an expert must not "supplant the role of counsel in making

argument at trial, and the role of the jury [in] interpreting the evidence."[13]

## I.    Kolbe Supplants the Role of Counsel in Presenting Defendant's View of the Evidence

Experts are not permitted to become partisan advocates by providing, in the guise of

expert "opinion," a summary or overview of otherwise admissible factual evidence.  In *Fisher v.

Ciba Specialty Chemicals Corp.*, the court made clear that an expert report that "offers a

synopsis of facts . . . does not state expert opinions at all, but simply provides the witness's slant

on facts."[14]  In *Fisher*, in connection with a motion for class certification, the plaintiffs sought to

offer into evidence the written report of their expert on environmental regulations.[15]  Much of

the report was a narrative of events that "simply summarize[d] and state[d] [the expert's]

advocacy-based interpretation of documents in the record."[16]  For example, based on her review

of existing documents, the expert concluded that defendant produced hazardous chemicals,

contaminated the environment by releasing those chemicals, and failed to take remedial action.[17]

The court concluded that such a report would not assist it in evaluating the issues at hand:

> The document reads like the fact section of a brief . . . .  Is she not simply acting
> as another advocate for plaintiffs in arguing the facts in a manner that is most
> beneficial to her clients?  How does this purported expert report differ from a
> supplemental brief submitted by another lawyer for plaintiffs? . . . [T]he Court
> does not perceive [the witness's] report as an "expert report" at all, but rather as

---

[12] *United States v. Ramirez*, 495 F. Supp. 2d 92, 123 (D. Me. 2007).  The court in *Ramirez* was troubled by the fact that the expert had changed his opinions through the course of his work, selectively omitted certain facts, and copied full sentences from other sources without citation.  *Id.* at 122-23.

[13] *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001), *amended on unrelated grounds by* 137 F. Supp. 2d 438 (S.D.N.Y. 2001).

[14] *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 280 (S.D. Ala. 2006); *see also* Order at 5-6, *Muskat v. United States*, No. 06-30 (D.N.H. Jan. 10, 2008) (stating that "observations . . . are not matters of expert opinion").

[15] *Fisher*, 238 F.R.D. at 280.

[16] *Id.* at 181.

[17] *Id.* at 280-81.

written advocacy by a lawyer, akin to a supplemental brief on the facts presented
by another attorney . . . .[18]

In excluding the report, the court noted that an expert opinion in a class certification proceeding

only has to meet a "low hurdle" because the Federal Rules of Evidence "are not stringently

applied at the class certification stage."[19]  The court found that the expert's report could not even

meet this "low hurdle" due to the "one-sided recitation of record facts."[20]

Similarly, in *In re Rezulin*, the plaintiff's expert proposed to testify on the history of

events surrounding the controversial approval of the drug Rezulin by United States and foreign

regulators.[21]  The court agreed with the defendants that the expert's narrative did nothing more

than rehash the facts of the case with the expert's own "spin" on them.[22]  The court held that

evidence of the facts is "properly presented through percipient witnesses and documentary

evidence"[23] and that such narrative testimony by an expert "does no more than counsel for

plaintiff will do in argument, *i.e.*, propound a particular interpretation of [defendant]'s

conduct."[24]

---

[18] *Id.* at 281; *see also Highland Capital Mgmt., LP v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005) (excluding an expert's testimony in part because the fact section of his report did nothing more than summarize otherwise admissible evidence.); *Occulto v. Adamar of N.J., Inc.*, 125 F.R.D. 611, 616 (D.N.J. 1989) ("Experts participate in a case because, ultimately, the trier of fact will be assisted by their opinions . . . .  They do not participate as the alter-ego of the attorney who will be trying the case.").

[19] *Fisher*, 238 F.R.D. at 279, 281 (quotation omitted).

[20] *Id.* at 281.

[21] *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004).

[22] *Id.*

[23] *Id.*

[24] *Id.* (quoting *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-7242, 2002 U.S. Dist. LEXIS 12975, at *6 (S.D.N.Y. July 16, 2002)).

As in *Fisher* and *In re Rezulin*, Kolbe presents a detailed narrative of the FICA A Fund transactions.[25]  This narrative is not based on Kolbe's personal knowledge of the case, nor is it informed by any special expertise that he possesses; rather, it is derived from information gleaned from documents produced by Defendant during the course of discovery.  Kolbe uses the factual narrative and the remainder of his reports to propound, in the guise of an expert's "opinion," Defendant's interpretation of the evidence.  For example, Kolbe makes statements such as:

- "Various documents . . . show that the transactions that give rise to this lawsuit arose, at least in part, as an effort to save taxes for the Taxpayer."[26]

- "My understanding is that these options ultimately give rise to the tax basis claimed by the taxpayer . . . , so I henceforth refer to them as the 'basis-creating' options."[27]

- "It is hard to see why the Foreign Party would participate in such a venture."[28]

- "[The contribution of Fidelity World's interest rate options to FICA A Fund] is a 'no brainer' if there ever was one, despite the non-tax economic harm the contribution does to the stated hedging motivation, since the size of the claimed tax benefits dwarfs any value associated with non-tax returns."[29]

- "[T]he stated value of the basis-creating options was not 'tangential' to Helios and KPMG, since the size of their fees varied directly with the stated premium for the long option in each pair."[30]

As the court in *In re Rezulin* concluded, the presentation of one litigant's version of the facts is the responsibility of counsel, to be fulfilled through the introduction of documentary evidence and the questioning of witnesses with first-hand knowledge of the events.  Reviewing documents

---

[25] Kolbe devotes nearly twenty pages of the Initial Report to a factual narrative.  *See* Ex. A at 12-28.

[26] Ex. A at 12.

[27] Ex. A at 15.

[28] Ex. A at 75.

[29] Ex. A at 78.

[30] Ex. B at 17 n.38.

and narrating a story of the events does not involve the application of scientific, technical, or

other specialized knowledge, as required by Rule 702. Kolbe's rendition of the facts, therefore,

is unhelpful, irrelevant, and beyond the scope of admissible expert testimony. It is properly

excluded.

## II.    Kolbe Inappropriately Renders Opinions Regarding Contract Interpretation

An expert also makes an inappropriate legal conclusion when opining on the proper

interpretation of a contract. Going beyond his report, Kolbe testified during his deposition that

the contract between FICA A Fund and Refco Capital Management, the broker that executed and

acted as counterparty for FICA A Fund's options trades, could be interpreted in such a way as to

allow Refco to manage the "head of the pin" risk:[31]

> A.    Refco was confident that it could manage the position in such a way that it would
> never have to pay out what is known as the head of the pin in the depositions,
> what is sometimes called the sweet spot, the single option payout possibility. And
> *just looking at the contracts, it certainly is possible that that was entirely within
> their control*.[32]
>
>          . . .
>
> A.    But these contracts each give you a 15-minute window to get three money
> center banks that will agree with you that the sweet spot, the head of the
> pin has not been hit. And for a potential liability in this case of $1.4
> billion, in the case of a sweet spot, I bet Refco believed it could man the
> phones and find three such banks sometimes in that 15 minute window
> and be *strictly within the letter of the contract*.[33]
>          . . .
>
> A.    [T]he *four square corners of the option description [i.e., the contract],* as
> we've discussed at some length, give Refco a great deal of flexibility with

---

[31] The "head of the pin" risk refers to the possibility that the options would expire in such a way as to entitle FICA A Fund to receive a large payment from Refco, its counterparty.

[32] Ex. C at 190:6-13 (A. Lawrence Kolbe Dep., Nov. 15, 2007) (emphasis added); *see also* Ex. A at 80 n.157 ("[T]he terms governing the spot price to be used to see if the options pay off do not specify the relevant spot price with complete precision. For example, they include a fifteen-minute window.").

[33] Ex. C at 193:9-17 (emphasis added).

respect to deciding whether the options have paid off and what the
termination strike price is.[34]

. . .

Q.    Just so I'm clear, is it your view and opinion that the head of the pin risk
      did exist, although it was going to be managed by Refco?

A.    The head of the pin risk doesn't exist if it's managed away.  It exists on
      paper.  I agree the *four square corners of the document exist on paper, but
      the same documents give Refco the effective power to make sure it never
      happens*.  Refco agreed to fees that only make sense if Refco believes it's
      never going to happen and that it can prevent it from ever happening.[35]

. . .

Q.    And if that's true, then why would they have to manage that risk?  If they
      eliminated it in the calculation of the bid-ask?

A.    You eliminate it in the calculation of the bid-ask because you believe you
      can manage it one way or the other in the event, because *the terms of the
      contract let you do it* or you think you can buy out the party if you want to
      avoid conflict.[36]

The court in *Primavera Familienstiftung v. Askin* held that it was inappropriate for an

expert witness to testify on whether a party acted in accordance with its obligations under a

contract.[37]  In *Primavera*, investors in a bankrupt hedge fund sued Merrill Lynch, one of the

brokers who liquidated the fund's portfolios causing a significant loss of investments.[38]  Merrill

Lynch lent money to the hedge fund in exchange for collateral in the form of securities.[39]  If the

securities lost value, Merrill Lynch was entitled to make a margin call, that is, to demand

---

[34] Ex. C at 248:10-15 (emphasis added).

[35] Ex. C at 249:2-12 (emphasis added).

[36] Ex. C at 254:15-22 (emphasis added).

[37] *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 528-30 (S.D.N.Y. 2001), *amended on unrelated
grounds by* 137 F. Supp. 2d 438 (S.D.N.Y. 2001); *see also Sparton Corp. v. United States*, 77 Fed. Cl. 1, 8 (Fed. Cl.
2007) ("In the absence of specialized trade usage, expert testimony regarding proper contract interpretation is
inadmissible, as is expert testimony regarding the legal significance of the contract language.").

[38] *Primavera*, 130 F. Supp. 2d at 462.

[39] *See id.* at 461.

additional collateral.[40]  If the fund could not supply the additional collateral, Merrill Lynch could

liquidate the existing securities.[41]  In liquidating the securities, Merrill Lynch was required to act

in a "commercially reasonable" manner under Article 9 of the Uniform Commercial Code and in

"good faith" under general contract law.[42]  Merrill Lynch did, in fact, liquidate the fund's

portfolio at an auction after the fund failed to supply additional capital upon a margin call.[43]  The

investors attempted to offer expert testimony that Merrill Lynch had not acted in a commercially

reasonable manner and in good faith because it only solicited auction bids from other broker-

dealers and not institutional customers, who would likely have paid more for the securities.[44]

The expert opined that Merrill Lynch "could have looked for additional, more competitive

purchasers, [but] it had little incentive to do so."[45]  The court excluded this opinion as

conclusory and unhelpful.[46]  The court explained that while there was "evidence in the record

regarding Merrill's actual conduct . . . [the expert] does no more than counsel for the Funds will

do in argument, *i.e.*, propound a particular interpretation of Merrill's conduct."[47]

Kolbe's opinion that Refco could eliminate the risk of a one-sided payout on the options

trades is likewise conclusory and unhelpful.  Kolbe opines that Refco did not assume any risk in

the trades because its contract with FICA A Fund allowed it to calculate the options' values by

---

[40] *See id.* at 462, 473-74.

[41] *See id.* at 474.

[42] *See id.* at 459, 486.

[43] *See id.* at 480-81.

[44] *See id.* at 480-81, 486-87.

[45] *See id.* at 487.

[46] *See id.* at 530.  The court further concluded that such a report "illustrates 'how vital it is that judges not be deceived by the assertions of experts who offer credentials rather than analysis.'"  *Id.* at 529 (quoting *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997)).

[47] *See id.* at 530.

averaging the spot prices quoted by three "money center" banks in a fifteen-minute period.[48]

Kolbe concludes that the "four square corners" and "terms" of the contract afforded Refco the

ability to cherry-pick the quotes most favorable to Refco's position as counterparty, thereby

eliminating any risk associated with the transactions.[49]  Interpreting the "four square corners"

and "terms" of a contract are legal analyses that should not be made by an economics expert.

Moreover, the terms of the option confirmations between FICA A Fund and Refco required

Refco to act in a "commercially reasonable" manner and with "good faith" when choosing

quotes from money center banks.[50]  Kolbe does not have the real-world experience to opine on

the meaning or significance of these terms in the industry.[51]  Kolbe has never advised clients on

trading financial options and has only once invested in options himself.[52]  In his interpretation of

the "four square corners" and "terms" of Refco's contracts with FICA A Fund, it appears that

Kolbe does not even recognize the significance of the "commercially reasonable" and "in good

faith" language.  Accordingly, Kolbe's opinions as to Refco's contracts with FICA A Fund are

irrelevant and unhelpful, and should be excluded.

## III.  Kolbe's Discussion of the *Dewees* Case Is Unhelpful, Irrelevant, and Demonstrates Kolbe's Partisan Advocacy

Experts are required to express their own opinions and not "merely express the opinions

of the lawyers who hired them."[53]  The court in *United States E.E.O.C. v. Rockwell International*

---

[48] *See* Ex. C at 190:6-13; 193:9-17; 248:10-15; 249:2-12; 254:15-22, quoted at notes 32 to 36, *supra*.

[49] *See* Ex. C at 190:6-13; 193:9-17; 248:10-15; 249:2-12; 254:15-22, quoted at notes 32 to 36, *supra*.

[50] *See, e.g.*, Ex. D at 000113 (Digital Option Confirmation, Oct. 24, 2001).

[51] On this issue, Plaintiff's economics expert, Dr. Andrew Carron, explained that "from my experience in the markets, dealers have procedures and they follow those procedures.  And again, in my experience, it's not acceptable behavior to make decisions solely on the basis that they benefit the bank at the expense of the customer when they are governed by prior agreements."  Ex. E (Andrew Carron Dep. 84:20-85:2, Nov. 20, 2007).

[52] *See* Ex. C at 59:10-60:22.

[53] *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 294 (E.D. Va. 2001).

*Corp.* explained that "[i]t is one thing for lawyers to make authorized revisions to an expert's prepared report. . . . It is quite another for an expert to include calculations upon which he did not rely and he would not rely on simply to appease his client's attorney."[54]  Likewise, the court in *Marek v. Moore* emphasized that "[a]ny changes in the preparation of a report [by counsel] must be what the expert himself has freely authorized and adopted as his own and not merely for appeasement or because of intimidation or some undue influence by the party or counsel who has retained him."[55]

Government counsel asked Kolbe to "review the calculations in a numerical example" in the First Circuit's opinion in *Dewees v. Commissioner*, 870 F.2d 21 (1st Cir. 1989).[56]  *Dewees* was an appeal from a Tax Court decision disallowing a deduction for a loss generated from a "straddle" transaction.[57]  The First Circuit affirmed the Tax Court and explained its decision through "the use of a hypothetical example . . . that both captures the essence of the actual transactions and permits us, by varying certain assumptions, to deal more easily with the legal arguments."[58]  Kolbe does not explain, however, why this analysis is relevant to the FICA A Fund transactions or helpful to the trier of fact.  While government counsel was keenly interested

---

[54] *United States E.E.O.C. v. Rockwell Int'l Corp.*, 60 F. Supp. 2d 791, 797 (N.D. Ill. 1999) (citations omitted); *see also Trigon*, 204 F.R.D. at 291-95 (discussing the appropriate extent of attorney involvement in expert reports); *Baxter Int'l. Inc. v. McGaw, Inc.*, No. 95-2723, 1996 U.S. Dist. LEXIS 3768, at *10 (N.D. Ill. Mar. 27, 1996)*, aff'd in part and rev'd in part on other grounds*, 149 F.3d 1321 (Fed. Cir. 1998) (disregarding expert testimony because expert "did not independently prepare his expert report, allowing himself to be a 'mouthpiece' for plaintiffs' attorneys."); *Marbled Murrelet v. Pac. Lumber Co.*, 880 F. Supp. 1343, 1365 (N.D. Cal. 1995), *aff'd,* 83 F.3d 1060 (9th Cir. 1996).

[55] *Marek v. Moore*, 171 F.R.D. 298, 302 (D. Kan. 1997).

[56] Ex. A at 2.

[57] *See* 870 F.2d at 22.

[58] *Id.*

in *Dewees* and collaborated with Brattle Group staff in preparing a memo on the *Dewees* case,[59] the case was not relevant to Kolbe's opinions regarding the FICA A Fund transactions. Indeed, Kolbe admits that the *Dewees* case played no role in his opinions on the FICA A Fund transactions.[60] It appears that Kolbe included a discussion of the *Dewees* case not because he relied upon it or thought it was relevant to an economic understanding of FICA A Fund, but merely because government counsel requested it.

Kolbe's conclusion regarding the hypothetical example used by the court in *Dewees* is that the example's "slight inconsistency . . . has no effect on the economic logic of the decision."[61] While couched in "economic" terms, Kolbe's opinion amounts to a legal conclusion on what facts were material to the court's decision. Such an analysis necessarily involves a legal conclusion that is beyond the province of an expert witness. An assertion that a change in the court's example would not have altered the court's reasoning is the type of argument attorneys make when addressing legal issues, but is not a proper topic for expert testimony. Kolbe's opinion regarding the *Dewees* case serves no purpose other than to provide a delivery vehicle for the presentation of one of Defendant's legal arguments. Therefore, Kolbe's opinion regarding *Dewees* must be excluded.

---

[59] *See* Ex. F (email from D. Donohue to J. Litvinova, M. Vilbert, cc to J. Lindquist, B. Reiferson (Dec. 6, 2006) (attaching *Dewees* memo with D. Donohue's edits)); *see also* Ex. C at 129:7-130:6.

[60] Ex. C at 130:7-11 ("*Q.* Does this case, Dewees versus Commissioner, play a role in your opinions expressed here? *A.* Well, the last section of my report talks about this case. Other than that, no.").

[61] Ex. A at 83.

**IV.    The Court Should Exclude Kolbe's Testimony Because He is Unqualified to Opine on the Economic Attributes of Digital Options Transactions**

Federal Rule of Evidence 702 requires an expert witness to be "qualified as an expert by knowledge, skill, experience, training, or education."[62]   A witness may be qualified as an expert if the witness has "achieved a meaningful threshold of expertise" in the subject matter upon which expert testimony is proffered.[63]   Although expert witnesses "need not have overly specialized knowledge to offer opinions[,] . . . a district court acts properly by excluding opinions that are beyond the witness's expertise."[64]   For example, in *Levin v. Dalva Brothers*, the First Circuit affirmed the District of Massachusetts's decision to permit an expert to testify on the appraised value of an antique clock, but not to testify on whether the clock originated in the Regence period.[65]   The expert was qualified to appraise the clock because he had performed over three hundred appraisals during his career.[66]   The expert had not previously authenticated furniture as originating in the Regence-era, so the district court refused to qualify him as an expert on that subject.[67]   In *United States v. Mahone*, the First Circuit affirmed the District of Maine's qualification of an expert to testify on forensic footwear impressions over objections that she did not have special certification in footwear analysis.[68]   The court reasoned that, even

---

[62] *See Diefenbach v. Sheridan Transp.*, 229 F.3d 27, 30-31 (1st Cir. 2000) (upholding lower court's allowance of sea captain's expert testimony even though captain was unfamiliar with particular type of vessel).

[63] *Levin v. Dalva Bros.*, 459 F.3d 68, 78 (1st Cir. 2006) (quoting *Prado Alvarez v. R.J. Reynolds Tobacco Co.*, 405 F.3d 36, 40 (1st Cir. 2005)).

[64] *Id.* (internal citations omitted) (citing *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Fam.*, 345 F. 3d 15, 24-25 (1st Cir. 2003) (upholding lower court's allowance of a general practitioner's testimony on ectopic pregnancies despite lack of gynecologic specialty)).

[65] *Id.* at 78-79.

[66] *Id.* at 78.

[67] *Id.* at 78-79.

[68] *United States v. Mahone*, 453 F.3d 68, 71 (1st Cir. 2006).

without special certification, the expert gained enough experience from over 11,000 footwear comparisons to qualify her as an expert.[69]

Kolbe is unqualified to opine on the economic attributes of the digital options involved in the FICA A Fund transactions. Kolbe's experience in valuing financial options has come almost exclusively from his work for the Tax Division in six other tax cases.[70] Prior to his work for the Tax Division, Kolbe once wrote an opinion on the fairness of a warrant attached to a company's issue of debt.[71] Except for his opinion on the warrant, all of Kolbe's experience with options based on the value of another financial asset comes from his work as an expert witness for the Tax Division. Kolbe's experience with options, therefore, is limited to the transactions in six other tax cases. Such limited and narrow experience falls far short of the three hundred appraisals performed by the expert in *Levin*, or the 11,000-plus footprint comparisons performed by the expert in *Mahone*.

## V. Kolbe's Use of "Similar Transactions" to Test His Conclusions Is Merely Counsel's Means of Presenting Inadmissible Evidence

Government counsel provided Kolbe with information on numerous transactions that Defendant has determined are similar to, and contemporaneous with, the FICA A Fund transactions.[72] Kolbe claims that his staff at The Brattle Group selected forty-six similar transactions from information provided by Defendant.[73] It appears, however, that out of the

---

[69] *Id.*

[70] *See* Ex. C at 63:1-16, 206:7-11 ("*Q:* [Y]our experience in determining expected return on options is experience gained in the litigation matters that you've been hired by the Justice Department on? *A:* That's correct.").

[71] Ex. C at 25:16-20. Kolbe also used "option pricing techniques" to evaluate real options. Ex. C at 25:7-15, 36:2-12. Real options are… cite Brealey]

[72] Ex. C at 174:22-176:9.

[73] *See* Ex. C at 174:22-176:9.

thousands of potential Son of Boss transactions,[74] government counsel selected those it wants to

argue are similar to the FICA A Fund transactions and provided Kolbe with information on these

selected transactions and no others:

> Q.    Is it your recollection that you were provided with this group of 47 partnerships
> by the government?
>
> A.    We asked the government for everything they could give us that might be useful
> in helping us understand the structure and the economics of this deal, and this is
> what they gave us.
>
> Q.    So in response to your request, your testimony is they gave us these 47
> partnerships?
>
> A.    Yeah.  We wanted to understand what was going on, and we asked if there was
> something that would help, and they gave us these.
>
> Q.    I take it it's true they didn't give you 100 partnerships and you cut it down to 47?
>
> A.    I can't swear to that.  I don't know exactly the process that went on between my
> staff and the government as we sorted this issue out.[75]

It appears that government counsel provided Kolbe with data on pre-selected transactions

in order to get before the Court information that should properly be excluded as hearsay.  An

expert's opinion may be based on hearsay if it is "of a type reasonably relied upon by experts in

the particular field in forming opinions or inferences upon the subject."[76]  However, Rule 703

"'was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving

expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or

opinions the expert purports to base his opinion.'"[77]  Kolbe's reliance on this "other taxpayer"

---

[74] The IRS has stated that there were "several thousand" Notice 2000-44 transactions—a type of transaction to which they assert FICA A Fund is "substantially similar."  IR 2004-64 (May 5, 2004).

[75] Ex. C at 89:21-90:15.

[76] Fed. R. Evid. 703.

[77] *Brace v. United States*, 72 Fed. Cl. 337, 352 (Fed. Cl. 2006) (quoting *Loeffel Steel Prods. Inc. v. Delta Brands Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005)), *aff'd*, 2007 U.S. App. LEXIS 23752 (Fed. Cir. 2007).

information necessarily relies on hearsay, and any opinions related to this information should be excluded pursuant to Rule 703.

Kolbe purportedly examined these government-selected transactions to help him identify the "essential elements" of the FICA A Fund transactions.[78]  Kolbe does not explain what makes these elements essential; rather, it appears that he is merely observing that FICA A Fund has some elements in common with other transactions.  But, whether a particular element of the FICA A Fund transactions was "essential" does not depend on what other, unrelated investors were doing during the same time period.  This observation, therefore, is irrelevant to Kolbe's opinions regarding the economics of FICA A Fund, and it is unhelpful to the Court.

Kolbe also claims that he used these forty-six transactions "as a baseline to test my conclusions . . . and to check whether or not my calculations seemed to be consistent with what was going on elsewhere."[79]  However, Kolbe could not have determined the economic rationality of these other transactions because he had no information on the financial circumstances of the parties to these other transactions:

> Q.      Did you look at evidence regarding these 46 other transactions to determine the financial circumstances of the taxpayer involved?
>
> A.      I'm not sure what you mean by that.
>
> Q.      Did you look at the 46 other transactions to determine what the financial circumstances were of the investor, the taxpayer who was involved in the transaction?
>
> A.      I don't know what you mean by looking for "financial circumstances."
>
> Q.       Did you look to see what assets they owned?
>
> A.      No.

---

[78] Ex. A at 5, 27-28.

[79] Ex. C at 175:9-12; *see also* Ex. A at 5 ("[D]ata on the other sets of transactions are a potential source of information to check conclusions I might reach about the present set of transactions.").

Q. Did you look to see where they lived?

A. That may have been a part of the database. I don't recall.

Q. Did you look at what they did for a living or what they had invested in?

A. Let me back up. I personally did not. I shouldn't be answering for my staff in this regard, because I don't know exactly what they looked at. I did not personally look at those things.

Q. Would it be fair to say that you didn't personally look at what the purposes presented by these other taxpayers were for doing these other transactions?

A. I don't believe we had data on that. If we did, it was spotty.[80]

The value of the options transactions entered into by Fidelity World and FICA A Fund and their potential for profit or loss are not affected by, or dependent on, the value or profit potential of unrelated transactions. In fact, Kolbe admits that the only other instances where he has used information on other transactions have been in work performed in connection with other pending cases in which the Tax Division is trying to use so-called "pattern evidence."[81] Significantly, Gordon Rausser, Defendant's other proffered economic expert in this litigation, also used information on the same unrelated transactions to "test" his conclusions.[82]

It appears that the only economists who test their conclusions on the economic attributes of a particular transaction by examining numerous unrelated transactions are economists hired by the Tax Division. This method, therefore, does not appear to have been tested, peer-reviewed, or accepted by any financial economists *not* providing expert services to the Tax Division. The circumstances are similar to those in *United States v. Frabizio*, where this District refused to qualify an expert to testify on whether pornographic photos of children contained real or

---

[80] Ex. C at 177:5-178:10.

[81] Ex. C at 179:3-16.

[82] *See* Memorandum of Law in Support of Plaintiff's Motion to Exclude the Proposed Expert Testimony and Reports of Gordon Rausser, Ex. 1 at 5, 7, 82 (Expert Report of Gordon Rausser, Ph.D., Aug. 7, 2007).

computer-generated images.[83]  The potential expert's method of "eyeballing" the photos for

certain characteristics had never been tested or peer-reviewed and had an unknown error rate.

Significantly, the court concluded that the "technique is apparently the product of a group of FBI

employees who endorse one another's work."[84]  As the technique in *Fabrizio* was only

employed by a few FBI agents who endorsed each other's work, the technique of using other

transactions here is nothing more than the Tax Division's experts copying each other's work.

What is more, this method does not even appear to be useful to the experts' analyses and was

likely employed at counsel's request so as to circumvent Rule 703.  Accordingly, any opinions

based on "other taxpayer" information should be excluded under Rule 703 as hearsay not

reasonably relied upon by experts in this field.

## VI.    Kolbe's Opinion that Each Pair of Long and Short Options Are, Economically, a Single Investment Is Unreliable

Kolbe opines that each pair of long and short options that Plaintiff and FICA A Fund

purchased and sold were not two separate investments, but one single investment.[85]  For

purposes of his analysis, Kolbe "splits" the long and short options by "consider[ing] what would

happen if the two legs of a pair were written separately, with two independent banks, instead of

with Refco as a common counterparty."[86]  Kolbe concludes that if two different brokers

executed the long and short options, the transaction would have been costlier and riskier, and

therefore "a rational investor could not be indifferent between keeping the options together and

---

[83] *United States v. Frabizio*, 445 F. Supp. 2d 152, 168 (D. Mass. 2006).

[84] *Id.* The court, moreover, was unimpressed that the potential expert had only testified in child pornography cases four times and other members of his unit had testified a combined total of only twelve times. *See id.*

[85] Ex. A at 11, 78-81.  Kolbe notes that he is not opining on "the number of securities (documents) used" in the trades.  Ex. A at 81. n.159.

[86] Ex. A at 78; *see also* Ex. C at 235:20-236:2 (confirming that Kolbe focuses heavily on the fact that in the FICA A Fund transactions Refco was the only counterparty).

splitting them."[87]  The implication is that a rational investor would prefer not to execute the long and short options with separate brokers, so therefore the long and short options must be one investment, not two.[88]  This standard does not appear to have been used by other financial economists in academia or industry, and, indeed, Kolbe cites no authority or examples in support of his methodology.[89]  Kolbe merely cites two introductory economics textbooks to support his proposition that the concept of "indifference" between two alternatives is a "fundamental tool of economics."[90]  While the concept of "indifference" is a significant concept in economics, Kolbe's analysis flawed for several reasons.[91]

First, Kolbe splits the long and short options by analyzing what would happen if the short options were sold to a hypothetical broker, independent from Refco.[92]  Kolbe does not consider other methods for splitting the long and short options, or explain why this is the only method for analyzing the options separately.  Second, Kolbe assumes that the hypothetical separate broker would "cop[y] Refco's practice" with respect to margin requirements.[93]  Kolbe fails to consider whether the investors could have negotiated different terms with the other broker.  Alternatively, the investors could have sold the short options to a broker with whom they had enough assets in other accounts to cover any margin requirements.  Third, Kolbe assumes that two independent

---

[87] Ex. A at 80.  In other words, according to Kolbe, "it is impossible to believe that anybody would see the separated investments as equivalent and substitutable for the combined investments."  Ex. C at 234:4-7.

[88] *See* Ex. A at 80-81.

[89] The *Daubert* factors for testing the reliability of an expert's methodology are (1) whether the expert's methodology has been tested; (2) whether the expert's methodology has been peer-reviewed; (3) the methodology's rate of error; and (4) the level of acceptance of the methodology within the relevant scientific community.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993).

[90] *See* Ex. A at 80 n.158 (citing Paul A. Samuelson, *Economics* 441-42 (9th ed. 1973); Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 67-71 (6th ed. 2005)).

[91] Kolbe admits that his application of "indifference" is novel.  Ex. C at 237:1.

[92] *See* Ex. A at 78.

[93] Ex. A at 78.

brokers could have disagreed as to the strike price on the settlement date, creating the risk that the investors lost on both the short and long options.[94]   Again, Kolbe assumes that the investors' contracts with the other broker would have provisions for calculating the strike price identical to those in their contracts with Refco.[95]   Kolbe does not consider other common methods for calculating the spot price that may not have created this risk.

Finally, this method of using indifference to determine whether long and short options are a single investment has only been used once before:  in Kolbe's expert opinion on behalf of the government on this same issue in the case of *Jade Trading v. United States*, No. 03-2164 (Fed. Cl. filed Sept. 12, 2003).  Kolbe admits that he has applied his one-investment-or-two analysis only in his work for the Tax Division.[96]   Kolbe's use of this method exclusively on behalf of the Tax Division, and his inability to demonstrate its application by other financial economists, is further evidence of his partisan advocacy.  Kolbe's response to questions regarding the application of his "methodology" to other common transactions involving pairs of securities demonstrates that his untested approach has been devised solely as part of Defendant's litigating strategy in various tax cases:

> Q.     If you entered into a short sale of GM stock . . . and used the proceeds from that short sale to buy Ford Motor Company stock, is that one investment or two?
>
> A.     Well, this is flying a bit.  It's not a question I've analyzed in depth. . . . This is not a question that I've considered before.  Give me one second . . . .  I think the circumstance you describe is two investments, and the distinction is from the

---

[94] Ex. A at 80.

[95] It should be noted that the First Circuit, in *Coleman v. De Minico*, held that an expert witness could testify as to conclusions based on facts assumed in a hypothetical situation, as long as those facts were "not contrary to the facts established in the record." 730 F.2d 42, 45-46 (1st Cir. 1984).  The facts in *Coleman* are distinguished from the facts here because the expert in *Coleman*, a doctor, assumed that the injuries suffered by an assault victim resulted from a two-fisted blow and the impact of the victim's face against a fence.  *Id.* Kolbe, however, is not seeking to explain the cause-and-effect of a certain event, but is creating an entirely hypothetical alternative transaction that has no basis in the facts.

[96] *See* Ex. C at 239:9-240:15.

present case that when you sell short . . . [y]ou would get the cash for the sale subject to the margin requirement and could then use that cash to make your long buy Ford, which you cannot do here because you wouldn't get the cash, and you'd have to post the margin beside.[97]

. . .

Q.    [I]s it your view that a cashless collar is a single transaction or is it two transactions?

A.    Oh, I don't know.  It would depend on the same kinds of factors we talked about here. . . .  I don't know . . . I suppose, it's convenient to do it together.  I don't know that I can confidently say as I sit here which it is that are sufficiently different.  I haven't analyzed, I haven't applied the tool to that situation.[98]

. . .

Q.    Where you have a situation where a corporation issues a bond and a warrant[,] . . . [a]re they a single investment, or are they two investments?  Do you have a view on that?

A.    My inclination would be they would be two because they're immediately tradable and there's none of this kind of extra risk or capital requirement we're talking about here. . . .  I'm sort of doing on the fly something that I have thought fairly hard about in the actual application.  So I can't swear that if I thought about it for a long time I would come up with the same conclusion.[99]

Kolbe's opinion that the pair of long and short options is really one investment should be excluded because it is based on untested, unreviewed, and flawed methodology.  Again, as the technique in *Fabrizio* was only employed by a few FBI agents who "endorsed each other's work," Kolbe's method here appears only to be employed by him in his work on Tax Division cases.  Accordingly, the testimony of Kolbe should be excluded.

## VII.    Kolbe's Opinions Are Unduly Cumulative

Kolbe offers substantially the same opinions as Professor Gordon Rausser, Defendant's other proposed expert on economics.  Testimony from both experts is needlessly cumulative and

---

[97] Ex. C at 240:16-242:7

[98] Ex. C at 258:11-259:9.

[99] Ex. C at 260:12-261:8.

a waste of time.[100]  A brief review of Kolbe's and Rausser's reports demonstrates the substantial overlap in their opinions:

- Both reports begin with a detailed narrative of the facts of each transaction entered into by Fidelity World and FICA A Fund.  Kolbe divides this discussion into eight steps,[101] while Rausser divides it into seven steps.[102]

- Both reports attempt to support the relevance of forty-six or forty-seven "similar transactions" to "test" their conclusions.[103]

- Both reports address the contribution of the interest-rate options from Fidelity World to FICA A Fund.[104]

- Both reports address whether each option pair was one investment or two.[105]

- Both reports attempt to calculate the expected returns on Fidelity World's and FICA A Fund's investments.[106]

- Both reports evaluate the hedging effectiveness of the foreign currency and interest rate options.[107]

- Both reports conclude there is no economic justification for the existence of Fidelity World.[108]

- Both reports analyze the position of FICA A Fund's foreign partner and conclude there is no economic justification for the existence of a foreign partner in FICA A Fund.[109]

---

[100] *See* Fed. R. Evid. 403.

[101] *See* Ex. A at 12-28.

[102] *See* Memorandum of Law in Support of Plaintiff's Motion to Exclude the Proposed Expert Testimony and Reports of Gordon Rausser, Ex. 1 at 13-14 (Expert Report of Gordon Rausser, Ph.D., Aug. 7, 2007) [hereinafter "Rausser Ex. 1"].

[103] *See* Ex. A at 27-28; Rausser Ex. 1 at 82-90.

[104] *See* Ex. A at 77-78; Rausser Ex. 1 at 90-91.

[105] *See* Ex. A at 79-81; Rausser Ex. 1 at 104-106.

[106] *See* Ex. A at 52-59; Rausser Ex. 1 at 36-66.

[107] *See* Ex. A at 59-72; Rausser Ex. 1 at 66-82.

[108] *See* Ex. A at 72-73; Rausser Ex. 1 at 91-97.

[109] See Ex. A at 75-77; Rausser Ex. 1 at 97-104.

From these examples, it is evident that Defendant has engaged two economic experts to offer the same opinions. Testimony from both experts would be irrelevant and unhelpful to the Court.

## CONCLUSION

Kolbe has crossed the line separating independent expert witnesses from partisan advocates. The Kolbe Reports are not merely biased in favor of Defendant, but were deliberately designed to persuade the trier of fact to adopt a particular interpretation of the facts. To this end, Kolbe inappropriately opines on legal topics, makes unprecedented use of information on other transactions to "test" his conclusions, and inserts commentary at the request of counsel even though it is irrelevant to his opinions. Moreover, Kolbe's opinions are unduly cumulative and a waste of time. Accordingly, Kolbe's opinions are unhelpful, unreliable, and irrelevant, and Plaintiff respectfully requests that the Court exclude Kolbe's proposed testimony and reports. In the alternative, Plaintiff requests that this Court exclude Kolbe's testimony on (1) the *Dewees* case, and (2) similar transactions engaged in by other taxpayers.

Respectfully submitted this 17th day of January 2008.

PLAINTIFF
FIDELITY INTERNATIONAL CURRENCY ADVISOR
A FUND, L.L.C., by the Tax Matters Partner


/s/  Lena Amanti
David J. Curtin, D.C. Bar #281220
Ronald L. Buch, Jr., D.C. Bar #450903
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email: dcurtin@mckeenelson.com
        rbuch@mckeenelson.com
        lamanti@mckeenelson.com


John O. Mirick, BBO #349240
MIRICK, O'CONNELL, DEMALLIE
& LOUGEE, LLP
100 Front Street
Worcester, MA 01608
Telephone:  (508) 791-8500
Facsimile:  (508) 791-8502
Email: jomirick@mirickoconnell.com


**Certificate of Service**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 17, 2008.

/s/  Lena Amanti
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email: lamanti@mckeenelson.com

24

# Exhibit A
## Filed Under Seal

# Exhibit B
## Filed Under Seal

# Exhibit C
## Filed Under Seal

# Exhibit D

<u>**Digital Option Confirmation**</u>

October 24, 2001

To:　　**Fidelity International Currency Advisor A Fund, LLC** ("Counterparty")
　　　　c/o Carruth Management LLC
　　　　87 Elm Street
　　　　Hopkinton, MA 01748
Attention:　Ms. Carolyn Fiddy
Telephone No.:　508-497-0800
Facsimile No.:　508-497-0877

From:　　**Refco Capital Markets, Ltd.** ("Refco")
　　　　Thomas Yorke, Senior Vice President
　　　　200 Liberty Street, 23rd Floor
　　　　New York, New York 10281
Telephone No.:　212-693-7856
Facsimile No.:　212-390-8708

Re:　　RCM 2001-10-22-08

Ladies and Gentlemen:

　　　1.　　The purpose of this letter agreement is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

　　　The definitions and provisions contained in the 1991 ISDA Definitions, as supplemented and amended by the 1998 Supplement to 1991 Definitions and the 2000 ISDA Definitions, and the 1996 ISDA Equity Derivative Definitions (each as published by the International Swap Derivatives Association, Inc. formerly the International Swap Dealers Association, Inc.) are incorporated into this Confirmation (except that references to "Swap Transaction" in the 1991 ISDA Definitions will be deemed to be references to "Transaction"). In the event of any inconsistency between those definitions and provisions and this Confirmation, this Confirmation will govern

　　　This Confirmation shall supplement, form a part of, and be subject to the 1992 ISDA Master Agreement, dated as of October 5, 2001 between Refco and the Counterparty.

　　　The Counterparty and Refco each represents to the other that it has entered into this Transaction in reliance upon such tax, accounting, regulatory, legal, and financial advice as it deems necessary and not upon any view expressed by the other. With respect to this Transaction, the parties act as arms' length counterparties.

　　　The Agreement and each Confirmation thereunder will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine.

　　　2.　　The terms of the Option to which this Confirmation relates are as follows:

Payout Amount:　　　USD 328,877,361.00

Trade Date:　　　October 22, 2001

Seller:　　　Refco

Buyer:　　　Counterparty

RCM 2001-10-22-08
REFCO CAPITAL MARKETS, LTD.
FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC – ACCT. 6477

**X 016928**

| | |
|---|---|
| Expiration Date: | April 19, 2002, subject to adjustment in accordance with the Modified Following Business Day Convention |
| Expiration Time: | The close of trading on the New York Stock Exchange on the Expiration Date. |
| Settlement Date: | Shall be two (2) New York and London Business Days following the Expiration Date, if the Option is exercised, as set forth in the Exercise Procedures. |
| Total Premium: | USD 197,706,830.00 |
| Premium Payment Date: | October 24, 2001, subject to adjustment in accordance with the Modified Following Business Day Convention |
| Automatic Exercise: | Applicable, as described in the Exercise Procedures below. |
| Strike Price: | 0.8653 USD/EUR |
| Reference Price: | The Reference Price shall mean the average of the midpoints of the bid and offer closing prices of the USD/EUR Spot Rate as quoted by three (3) Money Center Banks between 10:00 A.M. and 10:15 A.M., New York City time on the Expiration Date, subject to adjustment in accordance with the Preceding Business Day Convention, and determined by the Calculation Agent, in good faith and in a commercially reasonable manner. |
| Exercise Procedures: | If on the Expiration Date the Reference Price is equal to or greater than the Strike Price then Refco shall pay the Counterparty USD 328,877,361.00. |
| | Should the Calculation Agent determine that the option has been exercised, the Calculation Agent shall provide notice to the Counterparty, in writing or orally and confirmed in writing, *provided, however*, that failure to provide such notice shall not prejudice or invalidate the occurrence or effect of the exercise. |
| Business Day: | New York and London |

3.  Calculation Agent:     Refco

4.  Account Details:

      Payments to Refco:

                Harris Trust and Savings Bank
                ABA# 071000288
                For Account:  Refco Capital LLC
                A/C# 390-4406
                Ref: Refco Capital Markets, Ltd. 13-006

      Payments to Counterparty:     *please provide*

X 016929

5. Offices:

   (a)   The Office of Refco for the Transaction is Bermuda; and

   (b)   The Office of Counterparty for the Transaction is Massachusetts

6. Additional representations which will be made by both parties:

   (a)   **Eligible Swap Participant.** It is an "eligible swap participant" as such term is defined in Section 35.1(b)(2) of the Regulations (17 CFR Part 35) promulgated under the Commodity Exchange Act, as amended and it has entered into this Agreement (including each Transaction) in conjunction with its line of business (including financial intermediation services) or the financing of its business.

   (b)   **Transactions are Arm's Length.** It is entering into this Agreement and each Transaction in reliance upon its own judgment and upon any tax, accounting, regulatory and financial advice as it has deemed necessary and not upon any view expressed by the other party, and all trading decisions are and will be the result of arm's length negotiations between the parties.

   (c)   **Risks are Fully Understood.** It is entering into this Agreement and each Transaction with full understanding of all material risks thereof, and it is capable (including having the financial wherewithal) of assuming and willing to assume those risks.

Counterparty hereby agrees (a) to check this Confirmation (**Reference No.: RCM 2001-10-22-08**) carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified and (b) to confirm that the foregoing correctly sets forth the terms of the agreement between us with respect to the particular Transaction to which this Confirmation relates, by manually signing this Confirmation and providing any other information requested herein and immediately returning an executed copy to Compliance Department via Fax (212) 390-8708. Hard copies should be returned to Refco Capital Markets, Ltd., One World Financial Center, Tower A, 24th Floor, New York, New York 10281, Attention: Mathew Hoff.

Yours sincerely,

**Refco Capital Markets, Ltd.**

By: _____
Name: Elizabeth Y. Jung
Title: Authorized Signatory
Date: October 25, 2001

Confirmed as of the date first above written:

**Fidelity International Currency Advisor A Fund, LLC**

By: _____
Name: Michael J. Egan
Title: Manager
Date: October 26, 2001

RCM 2001-10-22-08
REFCO CAPITAL MARKETS, LTD.
FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC – ACCT. 6477

           3

X 016930

000114

# Exhibit E

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
-----------------------------X
FIDELITY INTERNATIONAL CURRENCY
ADVISOR A FUND, LLC., by the
Tax Matters Partner,

    Plaintiff.

v.         Nos. 05-40151 and 06-40130

UNITED STATES OF AMERICA,

    Defendant.
-----------------------------X
Volume I

       November 20, 2007
       New York, New York


   Deposition of ANDREW CARRON, taken on behalf of the

Defendants, at McKee Nelson, One Battery Park Plaza, New

York, New York, commencing at 10:06 a.m., November 20, 2007,

before Anthony Armstrong, a Notary Public and Certified

Shorthand Reporter of the State of New York.

ANDREW CARRON

Page 84

|  | 1 | Andrew Carron |
|--|---|---------------|

12:33:23  2    economics in commerce are closely related in this

12:33:26  3    regard.

12:33:27  4        Q.    But do you recall for example what the

12:33:30  5    notional payouts of these options were?

12:33:33  6        A.    Very little.

12:33:33  7        Q.    Some of them were over a billion dollars,

12:33:36  8    correct?

12:33:37  9        A.    Yes.

12:33:37  10       Q.    Wouldn't that be -- a billion dollars,

12:33:39  11   wouldn't that be a reason that one party through

12:33:42  12   contract would use the terms of the contract to ensure

12:33:44  13   that, in fact, they were not exposed to such a

12:33:48  14   liability?

12:33:50  15       A.    I'm going to answer your question.  Let me go

12:33:52  16   back to my previous answer.  I don't want to say from

12:33:55  17   memory it was over a billion dollars.  The numbers are

12:33:58  18   in my report.  They are what they are.  They are large

12:34:01  19   numbers.

12:34:02  20            I understand what you're saying, but from my

12:34:10  21   experience in the markets, dealers have procedures and

12:34:19  22   they follow those procedures.  And again, in my

12:34:26  23   experience, it's not acceptable behavior to make

12:34:32  24   decisions solely on the basis that they benefit the bank

12:34:38  25   at the expense of the customer when they are governed by

ANDREW CARRON

Page 85

|  |  |  |
|---|---|---|
|  | 1 | Andrew Carron |
| 12:34:43 | 2 | prior agreements. |
| 12:34:44 | 3 | Q.    But what I don't understand is if they are |
| 12:34:46 | 4 | under the agreement can select a spot price from a -- |
| 12:34:52 | 5 | three different money center banks and decided to |
| 12:34:57 | 6 | choose a spike price in the terms of agreement which, |
| 12:35:00 | 7 | in fact, would allow the sweet spot not to occur.  What |
| 12:35:03 | 8 | would be commercially unreasonable about that? |
| 12:35:05 | 9 | A.    Well, the question is what would be their |
| 12:35:07 | 10 | basis for picking that.  If they had one department |
| 12:35:11 | 11 | that was aware of the terms of the contract and a |
| 12:35:14 | 12 | completely separate department unaware of the terms of |
| 12:35:17 | 13 | the contract making that decision, that would be fine, |
| 12:35:20 | 14 | but if the basis of the decision is that it's the |
| 12:35:25 | 15 | number that helps the bank at the expense of the |
| 12:35:28 | 16 | customer, then that's not commercially reasonable.  If |
| 12:35:31 | 17 | there is some other reason for picking the bank, let's |
| 12:35:34 | 18 | say they look at three banks and two of them have the |
| 12:35:38 | 19 | same number and one happens a different number and they |
| 12:35:40 | 20 | pick the one with the majority of the banks have, |
| 12:35:46 | 21 | that's a reasonable way to do it. |
| 12:35:47 | 22 | Q.    Where are you getting your basis for saying |
| 12:35:49 | 23 | what's commercially reasonable and what's not? |
| 12:35:52 | 24 | A.    Well, it would be -- |
| 12:35:54 | 25 | Q.    In selecting a spot price in terms of the |

# Exhibit F

Blank

**Fischer, Marjorie**

| | |
|---|---|
| **From:** | Donohue, Dennis (TAX) [Dennis.Donohue@usdoj.gov] |
| **Sent:** | Wednesday, December 06, 2006 11:12 PM |
| **To:** | Litvinova, Julia; Vilbert, Michael |
| **Cc:** | Lindquist, John; Reiferson, Barry |
| **Subject:** | Brattle memo re error in Dewees.with my notes..PDF |
| **Attachments:** | Brattle memo re error in Dewees.with my notes..PDF |

Mike and Julia: The memo was excellent  I added a few notes.  Let me know if you agree with them.  Dennis

9/24/2007

TBG006887

*Privileged and Confidential*
*Prepared at the Request of Counsel*
*Preliminary Work Product*

# MEMORANDUM

**TO:**    Department of Justice

**FROM:**    The Brattle Group

**SUBJ:**    Explanatory Notes of the Dewees vs. Commissioner Case, 870 F.2d 21

**DATE:**    December 6, 2006

---

This memorandum explains details of the Dewees vs. Commissioner Case, 870 F.2d 21 ("Deewes") from an economic viewpoint. This memorandum should be viewed as a supplement to the document cited above.

Spreadsheets with the calculations to illustrate the main points of the analysis are included together with this memorandum.

Below are several excerpts from the document cited above (in small font) with detailed economic explanations of each transaction step (in larger font).

### A. *The Options Straddle*

In this first step of the overall trading strategy, Jane uses an options straddle to create an ordinary loss with an offsetting capital gain.

A *straddle* is an option trading strategy which involves buying a call option and a put option with the same strike price and expiration date. It is also sometimes referred to as a *bottom straddle* or *straddle purchase*. A *top straddle* or *straddle write* is the reverse position. It is created by selling a call and a put with the same exercise price and expiration date. A straddle is appropriate when an investor is expecting a large move in the underlying asset's price, but does not know which direction the move will be.[1]

In this case Jane enters into the straddle purchase and the straddle write. Each straddle involves options with the same strike prices and expiration dates  For the analysis purposes, four options involved in purchase and write straddles are re-grouped into a "call option straddle" which involves buying and selling two call options and a "put option straddle" which involves buying and selling two put options. These straddles are "time" straddles, where the expiration dates on the purchased and sold options are different as well as the strike prices.

However, the difference in expiration dates does not play important role in the analysis due to the simplifying assumption that contango[2] between silver prices for successive months remains

---

[1] Hull, John C. *Options, Futures, and Other Derivatives,* 6th ed. 2006.
[2] *Contango* is a futures market term. It is the situation where, and the amount by which, the price of a commodity for future delivery is higher than the spot price or a far future delivery price higher than a nearer future delivery. A contango is normal for a non-perishable commodity which has a cost of carry (such costs will be warehousing fees

TBG006888

*Privileged and Confidential*
*Prepared at the Request of Counsel*
*Preliminary Work Product*

constant (see page 4 of the Dewees document). In other words silver prices change on a dollar-to-dollar basis for each month. For instance, if (in line with the further analysis) the silver price is assumed to change by 50 pence per ounce in March, prices in all further months are assumed to change by the same amount (50 pence per ounce).

Assume that it is January 1 (Year One). Silver prices are as follows:

| Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. |
|------|------|------|------|-----|------|------|------|
| 250  | 255  | 260  | 265  | 270 | 275  | 280  | 285  |

First, Jane enters into a "call option straddle." She will *buy* call options on 5 lots of May silver with a strike price of 270, (*i.e.*, each option gives her the right to buy 10,000 ounces of May silver at a price of 270 pence per ounce).

Jane acquires the right to buy 5 lots of silver (or 5 · 10,000 ounces = 50,000 ounces) at a price of 270 pence per ounce. Her potential gross payoff therefore is 50,000 ounces · 270 pence/ounce = 13,500,000 pence = £135,000 if she decides to exercise the option.

The grantor charges her, say, £ 8,000 for these options.

She pays a premium for this call option in the amount of £8,000 or about 5.9% of the gross payoff potential. This premium costs about 16 pence per ounce: 16 pence/ounce = 5.9% · 270 pence/ounce.

Jane will, simultaneously, *sell* (grant) call options on 5 lots of July silver with a strike price of 280. She charges the buyer, say, £ 12,000 for the options. (The premium is higher because the options are open longer, so the grantor is exposed to more risk.)

Jane sells the right to buy 5 lots of silver (or 5 · 10,000 ounces = 50,000 ounces) at a price of 280 pence per ounce. If the buyer exercises this option, Jane is obligated to sell silver with the potential gross payoff of 50,000 ounces · 280 pence/ounce = 14,000,000 pence = £140,000. She receives a premium for this sold call option in the amount of £12,000 or about 8.6% of the gross payoff potential. This premium costs about 24 pence per ounce: 24 pence/ounce = 8.6% · 280 pence/ounce.

Jane will also, at about the same time, enter into a "put option straddle." Assuming that the call option straddle and the put option straddle are executed within a few days, the prices involved will be similar. (For simplicity, we assume the prices are identical in this example.) To start the put option straddle, Jane will *buy* put options on 5 lots of May silver with a strike price of 270, (*i.e.*, each option gives her the right to sell 10,000 ounces of May silver at a price of 270 pence per ounce). The grantor will charge her £ 8,000 for these options. Jane will simultaneously *sell* put options on 5 lots of July silver with a strike price of 280. She charges the buyer £ 12,000 for the options.

The same calculations apply to the put options' premiums and payoffs. All numbers are the same according to the simplifying assumption that call and put option prices are identical if executed within few days.

For the purposes of this example, we have assumed that all the options Jane buys and sells have a strike price "on the money," that is, equal to the market price for that month's future silver. It is also possible to buy and sell options whose strike price differs from the market price; the premium paid for such options would be higher or lower, depending on whether the strike price favors the buyer or the grantor. "On the money" options are simpler,

---

and interest forgone on money tied up, less income from leasing out the commodity if possible (e.g. gold)). For more information on contango, see http://www.reference.com/browse/wiki/Contango

2

*The Brattle Group*

TBG006889

*Privileged and Confidential*
*Prepared at the Request of Counsel*
*Preliminary Work Product*

because their premiums depend only on their time value; we have assumed that the premiums cost £ 2,000 for every month the option is to remain open.

On-the-money options have value which is changing with the time even if the price of silver does not change. For instance, if the premium for the purchased May call options is £8,000 in January (at the time of purchase), its value would decrease by £2,000 to £6,000 in February should the price of silver remain the same. The premium would decrease by another £2,000 to £4,000 in March. It would decrease to £2,000 in April and would drop to zero at the expiration date in May should the price of silver remain the same.

The premium for the sold July call option is £12,000 in January (at the time of purchase). Similarly, it would decrease in value by £2,000 for every month the option remains open and eventually would drop to zero at the expiration date in July (after remaining open for 6 months) should the price of silver remain the same.

At this point, we must consider two possibilities; silver prices may either rise or fall, and Jane's strategy will vary accordingly.

       1. Assume that by March silver prices have gone up by 50 pence per ounce.

Prices now (in March) look like this:

|       | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. |
|-------|------|------|------|------|-----|------|------|------|
| old   | 250  | 255  | 260  | 265  | 270 | 275  | 280  | 285  |
| new   |      |      | 310  | 315  | 320 | 325  | 330  | 335  |

Jane now sells the May call options that she bought.   They have become more valuable by about 50 pence per ounce, because the premium she can get for them will rise along with the silver price. (For simplicity, we assume that the premium varies directly with the price fluctuations of silver; in reality the relation between premium price and commodity price is somewhat more complex.)   She owned options on 5 lots (50,000 ounces), so she will be able to sell her options at about £ 25,000 more than the £ 8,000 premium she originally paid.   She has made a gain of £ 25,000, which counts as a capital gain under the IRS rulings.

Recall that the original premium paid for the purchased call option cost about 16 pence per ounce in January. According to the assumption that the premium varies directly with the price fluctuations of silver, it costs now 66 pence/ounce = 16 pence/ounce + 50 pence/ounce. Therefore, Jane will be able to sell her option at 66 pence/ounce · 50,000 ounces = 3,300,000 pence = £33,000. Since she has paid a £8,000 premium in January, her net gain is £25,000 = £33,000 - £8,000. See line [i] in Workpapers 1 and 2 for further details.

Jane now must buy call options on 5 lots of July silver at a strike price of 280, to "close out" the other "leg" of her "straddle," so as to liquidate her position as grantor of the 5 call options on July silver.   Since the price of silver has gone up 50 pence per ounce, she will have to pay about £ 25,000 more for these options than the premium she originally received.   So, she has a loss of £ 25,000, an ordinary loss under IRS rules.

Recall that the original premium she received for the sold call option cost was about 24 pence per ounce in January. According to the same assumption that the premium varies directly with the price fluctuations of silver, it costs now 74 pence/ounce = 24 pence/ounce + 50 pence/ounce. Therefore, the new premium Jane has to pay to "close out" her sold option is 74 pence/ounce · 50,000 ounces = 3,700,000 pence = £37,000. Since she has received a £12,000 premium in

3

*The Brattle Group*

TBG006890

*Privileged and Confidential*
*Prepared at the Request of Counsel*
*Preliminary Work Product*

January, her net ordinary loss is (-£25,000) = £12,000 - £37,000. See line [j] in Workpapers 1 and 2 for further details.

Since the price went up quite a lot, the put options are nearly worthless in March. No one will pay much to buy her options to sell May silver at so low a price; and Jane can cancel out the July put options she sold, for a low premium. So, her £ 25,000 gain from the bought call options is reduced by most of the £ 12,000 premium she paid for her put options; she has a net short-term capital gain of, say, £15,000. Also, it costs only, say, a £ 2000 premium to buy put options on July silver with a strike price of 280 (now far below the current market price), to cancel out the put options Jane sold for £ 12,000. Her £ 25,000 loss on the sold call options is mitigated by a £ 10,000 gain on her sold put options, for a net ordinary loss of £ 15,000.

Jane is left with approximately £ 15,000 of ordinary loss and £ 15,000 of short-term capital gain.

It appears that the phrase highlighted in yellow is incorrect. Her £25,000 gain from the bought call options is reduced by most of the £8,000 (not £12,000) premium she paid for her purchased put options. Therefore, we have slightly modified few numbers in the original document without changing the analysis qualitatively to make sure the analysis is correct.

Recall the assumption made earlier that the premiums cost £2,000 for every month the option is to remain open. In March Jane's May put option is two months before its expiration, hence, we assume its value is 2 · £2,000 = £4,000 in March. So her short-term capital gain should be £21,000 = £25,000 - £4,000. See line [m], "Short-Term Capital Gain," in Workpapers 1 and 2 for further details.

Jane received the £12,000 premium for July put option she sold. We assume that she has to pay £8,000 in March (£2,000 for four months the option remains open) to buy a July put option to "close out" her short position since the option is out-of-money. Her net ordinary gain on her sold put options is £4,000 = £12,000 - £8,000. Her total net ordinary loss is reduced by this net gain to (-£21,000) = - £25,000 + £4,000. See line [n], "Ordinary Loss," in Workpapers 1 and 2 for further details.

Now Jane has closed all of her positions.

> 2. Assume that by March silver prices have fallen by 50 pence per ounce.

The same calculations apply to this case since Jane holds a portfolio of similar put and call options and can cancel the opposite leg in each pair of options with the same payoff (recall the assumption about put and call options having similar values). See Workpapers 3 and 4 for further details.

Jane's payoff is the same irrespective of the direction of change in the silver price by 50 pence per ounce.

### B. The Futures Straddle

The next step, a futures straddle, enables Jane to generate a capital loss in Year One that will offset her £ 15,000 short-term capital gain. Assume that it is now October of Year One. The market has returned to January prices:

| Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May |
|------|------|------|------|------|------|------|------|
| 250  | 255  | 260  | 265  | 270  | 275  | 280  | 285  |

4

*The Brattle Group*

TBG006891

*Privileged and Confidential*
*Prepared at the Request of Counsel*
*Preliminary Work Product*

Jane now buys 5 lots of April silver at a price of 280 pence per ounce.   She also sells 5 lots of May silver at a price of 285 pence per ounce.   She then waits to see what happens to the price of silver.

Again, we must consider two possibilities;   silver prices may either rise or fall and Jane's strategy will vary accordingly.

1. Assume that, by November, silver prices have risen 30 pence per ounce.

Jane is now looking at the following prices:

|     | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June |
|-----|------|------|------|------|------|------|------|-----|------|
| old | 250  | 255  | 260  | 265  | 270  | 275  | 280  | 285 | 290  |
| new |      | 285  | 290  | 295  | 300  | 305  | 310  | 315 | 320  |

Jane now (in November) realizes that her contract to sell May silver has become far less valuable.   The 5 lots she sold at 285 are worth much more than what she sold them for.   She "closes out" this transaction by buying 5 lots of May silver (which she can use to fulfill her side of the sale bargain).   She must pay 315 pence per ounce.   She therefore loses 30 pence per ounce on the transaction.   She has lost £ 15,000.   This £ 15,000 short-term capital loss will offset the short-term capital gain she created through her options straddle.

We need to change the amount of price increase to make sure the numbers are right. Assume that, by November, silver prices have risen 42 pence per ounce instead of 30 pence per ounce. The new table of prices Jane faces is

|     | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June |
|-----|------|------|------|------|------|------|------|-----|------|
| old | 250  | 255  | 260  | 265  | 270  | 275  | 280  | 285 | 290  |
| new |      | 297  | 302  | 307  | 312  | 317  | 322  | 327 | 332  |

Jane loses money on her May contract to sell silver at 285 pence per ounce. According to the new prices, she has to buy silver at 327 pence per ounce to fulfill her contractual obligation to sell silver at 285 pence per ounce. Hence, she loses (- 42 pence/ounce) · 50,000 ounces = (-2,100,000 pence) = (-£21,000). See line [q] in Workpapers 1 and 3 for further details.

2. Assume that, by November, silver prices have fallen 30 pence per ounce.

The same calculations as above apply to this case with a corrected assumption of fall in prices by 42 pence per ounce. See line [q] in Workpapers 2 and 4 for further details.

Either way, Jane has a short-term capital loss.   She has disposed of the "loss leg" of her straddle, and she has kept the leg with the corresponding gain.

See line [r] in all Workpapers for further details on the unrealized gain on futures positions.

### C. *Futures Switch*

Jane "locks in" the gain on the profitable leg of her futures straddle in November, by buying or selling an offsetting new futures contract.   In case "1" above, where the price of silver went up, Jane disposed of her May "sale" leg at a loss of £ 15,000.   She kept the 5 lots of April silver that she had bought at 280.   As we mentioned, by November that silver was worth 310 per ounce.   She protects that gain by immediately selling 5 lots of June silver at the present (November) price of 320 pence per ounce.

5

*The Brattle Group*

TBG006892

*Privileged and Confidential*
*Prepared at the Request of Counsel*
*Preliminary Work Product*

We need again to change few numbers. In case "1" above, where the price of silver went up, Jane disposed of her May "sale" leg at a loss of (-£21,000). She kept the 5 lots of April silver that she had bought at 280. According to the new table with prices, by November that silver was worth 322 per ounce. She protects that gain by immediately selling 5 lots of June silver at the present (November) price of 332 pence per ounce.

Now, whatever happens, she is protected. For every penny the price of silver goes up, her contract to sell becomes less valuable but her contract to buy becomes more valuable, by just one penny. For every penny the price of silver goes down, her contract to buy becomes less valuable, but her contract to sell becomes more valuable, by just one penny.

Jane "locks in" her gain. For instance, assume that, by December, silver prices have increased further, say, by 5 pence per ounce.

|  | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June |
|---|---|---|---|---|---|---|---|---|---|
| old | 250 | 255 | 260 | 265 | 270 | 275 | 280 | 285 | 290 |
| November prices |  | 297 | 302 | 307 | 312 | 317 | 322 | 327 | 332 |
| December prices |  |  | 307 | 312 | 317 | 322 | 327 | 332 | 337 |

Jane loses money on her contract to sell silver in June at 332 pence per ounce because she would need to buy silver to meet her contractual obligations at a higher price of 337 pence per ounce. Her loss is (- 5 pence/ounce) · 50,000 ounces = (-£2,500). See line [u] in Workpapers 1 and 3 for further details.

She gains exactly the same amount of money on her April contract to buy because in December this contract becomes more valuable by 5 pence per ounce relative to November price.

Jane gains money on her contract to buy in April at 280 pence per ounce because she can sell this silver at a higher price of 327 pence per ounce realizing a gain of (327 − 280) pence/ounce · 50,000 ounces = 47 pence/ounce · 50,000 ounces = £23,500. Her total net position in futures is £23,500 - £2,500 = £21,000. See line [v] in Workpapers 1 and 3 for further details

Calculations are similar in case silver price would decrease by 5 pence per ounce from November to December. See lines [w] through [y] in Workpapers 1 and 3 for further details.

For case "2", a similar analysis can be done, as detailed in Workpapers 2 and 4, lines [t] through [y].

In either case Jane's £21,000 profit is safe. The same result is illustrated in the Dewees document using slightly different numbers:

If, for example, the price of silver rises by another 50 pence per ounce, (so that June silver sells for 370 pence), she will have to pay 370 pence per ounce to satisfy her contracts to sell 5 lots of June silver for 320; but, her contracts to buy 5 lots of April silver at a price of 280 will be correspondingly more valuable, because April silver will now sell for 360. If the price of silver falls by 50 pence per ounce, she will have to buy April silver at 280, when its current price is only 260; but her contracts to sell June silver at 320 pence per ounce will be correspondingly more valuable, because June silver will sell at 270. What Jane has lost on the swings, she has gained on the roundabouts; her £ 15,000 profit is safe.

*The Brattle Group*

TBG006893

*Privileged and Confidential*
*Prepared at the Request of Counsel*
*Preliminary Work Product*

Note that Jane has never purported to hold these contracts to expiration (see discussion on page 9 of the Dewees document). She is purported to sell all her futures contracts, after holding contracts to buy for 6 months.

Jane sells all her futures contracts, after holding the contracts to buy for 6 months. That is, in case "1" she waits until April, when she will have held her contracts to buy 5 lots of April silver from October to April; in case "2" she waits until May, when she will have held her contract to buy June silver from November to May. The reason for waiting 6 months is that a capital gain qualifies as "long-term," and is taxed at a lower rate, if it results from the sale of an asset held for 6 months or longer (that was true in all the tax years in question). However, Jane still cannot be certain that her gain will count as long-term, because silver prices may have changed such that her profit, when she closes out all her contracts, comes instead from the sale of her contracts to *sell*, which under IRS rules is classified as a short-term capital gain no matter how long the contracts are held. 26 U.S.C. § 1233; *see Miller v. Commissioner of Internal Revenue*, 836 F.2d 1274, 1277 n. 2 (10th Cir.1988) *(long-term capital gain, under the Code, can result only from the sale of contracts to buy, not contracts to sell)*.

*The Brattle Group*

7

TBG006894

Privileged and Confidential
Prepared at the Request of Counsel
Preliminary Work Product

Replication of Dewees Transaction
Workpaper No. 1
Assuming Prices in March Increase
Assuming Prices in November Increase

[Amounts are in Ounces, Prices are in Pence/Ounce, All Other Values are in Pounds (£)]

| Assumption 1 | Price in March: | Increase |
| Assumption 2 | Prices in November: | Increase |

## Stage 1
### a. Options Straddle Trades in January

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Strike Price | Premium | |
|---|---|---|---|---|---|---|---|
| Call | Buy | January | May | 50000 | 270 | -8000 | [a] |
| Call | Sell | January | July | 50000 | 280 | 12000 | [b] |
| Put | Buy | January | May | 50000 | 270 | -8000 | [c] |
| Put | Sell | January | July | 50000 | 280 | 12000 | [d] |

### b. Options Straddle Offsetting/Terminating in March

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Strike Price | Premium | |
|---|---|---|---|---|---|---|---|
| Call | Sell | March | May | 50000 | 320 | 33000 | [e] |
| Call | Buy | March | July | 50000 | 330 | -37000 | [f] |
| Put | Sell | March | May | 50000 | 320 | -4000 | [g] |
| Put | Buy | March | July | 50000 | 330 | -8000 | [h] |

### c. Net Positions of January Trades (net of Stage 1a & 1b)

| Type | Initial Buy/Sell | Current Month | Expire Month | Amount | Change in Price | Net Gain/Loss | |
|---|---|---|---|---|---|---|---|
| Call | Buy | March | May | 50000 | 50 | 25000 | [i] |
| Call | Sell | March | July | 50000 | 50 | -25000 | [j] |
| Put | Buy | March | May | 50000 | 50 | -6000 | [k] |
| Put | Sell | March | July | 50000 | 50 | 6000 | [l] |
| Short-Term Capital Gain | | | | | | 21000 | [m] |
| Ordinary Loss | | | | | | -21000 | [n] |

## Stage 2
### a. Futures Straddle Trades in October

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Price | Underlying Notional | |
|---|---|---|---|---|---|---|---|
| Future | Buy | October | April | 50000 | 280 | -140000 | [o] |
| Future | Sell | October | May | 50000 | 285 | 142500 | [p] |

### b. Futures Straddle Offsetting/Terminating in November - Offsets Gain in Stage 1c

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Original Price | New Price | Change in Value | |
|---|---|---|---|---|---|---|---|---|
| Future | Buy | November | May | 50000 | 285 | 327 | -21000 | [q] |

TBG006895

Privileged and Confidential
Prepared at the Request of Counsel
Preliminary Work Product

Replication of Dewees Transaction
Workpaper No. 1
Assuming Prices in March Increase
Assuming Prices in November Increase

(Amounts are in Ounces, Prices are in Pence/Ounce, All Other Values are in Pounds (£))

### c. Unrealized Gain on Futures Straddle Position in November

| Type | Initial Buy/Sell | Current Month | Expire Month | Amount | Original Price | New Price | Change in Value |
|---|---|---|---|---|---|---|---|
| Future | Buy | November | April | 50000 | 280 | 322 | 21000 [z] |

### Stage 3

### a. Futures Switch Trades In November

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Price |
|---|---|---|---|---|---|
| Future | Sell | November | June | 50000 | 332 |

[a]

### b. Final "Locked - In" Position in Futures (net of Stage 2 and Stage 3a)

| Type | Buy/Sell | Current Month | Expire Month | Amount | Original Price | New December Price | Change in Value |
|---|---|---|---|---|---|---|---|
| Future | Buy | December | April | 50000 | 280 | 327 | 23500 [t] |
| Future | Sell | December | June | 50000 | 332 | 337 | -2500 [u] |
| Net Position | | | | | | | 21000 [v] |
| Future | Buy | December | April | 50000 | 280 | 317 | 18500 [w] |
| Future | Sell | December | June | 50000 | 332 | 327 | 2500 [x] |
| Net Position | | | | | | | 21000 [y] |

### Sources and Notes:

[e]+[f]: Dewees v Commissioner of Internal Revenue, No. 87-1763.
[q]: Assumes that there are two months remaining on option x 2000 Pounds/Month.
[r]: Assumes that there are four months remaining on option x 2000 Pounds/Month.
[t]: [q] + [e].
[u]: [r] + [f].
[v]: [t] + [u].
[w]: [q] + [g].
[x]: [r] + [h].
[y]: [w] + [x].
[a]: [j] + [l].
[e]+[f]: Assumes that instead of an increase (decrease) of 30 pence, the increase (decrease) is 42 pence.
[g]: Dewees v Commissioner of Internal Revenue, No. 87-1763.
[f]: [f] + Increase in price of 42 pence + an assumed increase of 5 pence.
[g]: [g] + an assumed increase of 5 pence.
[h]: [e] + [u].
[w]: [e] + Increase in price of 42 pence + an assumed increase of 5 pence.
[x]: [f] + an assumed decrease of 5 pence.
[y]: [w] + [x].

Privileged and Confidential
Prepared at the Request of Counsel
Preliminary Work Product

Replication of Dewees Transaction
Workpaper No. 2
Assuming Prices in March Increase
Assuming Prices in November Decrease

[Amounts are in Ounces, Prices are in Pence/Ounce, All Other Values are in Pounds (£)]

| Assumption 1 | Price in March: | Increase |
| Assumption 2 | Prices in November: | Decrease |

## Stage 1

### a. Options Straddle Trades in January

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Strike Price | Premium | |
|---|---|---|---|---|---|---|---|
| Call | Buy | January | May | 50000 | 270 | -8000 | [a] |
| Call | Sell | January | July | 50000 | 280 | 12000 | [b] |
| Put | Buy | January | May | 50000 | 270 | -8000 | [c] |
| Put | Sell | January | July | 50000 | 280 | 12000 | [d] |

### b. Options Straddle Offsetting/terminating in March

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Strike Price | Premium | |
|---|---|---|---|---|---|---|---|
| Call | Sell | March | May | 50000 | 320 | 33000 | [e] |
| Call | Buy | March | July | 50000 | 330 | -37000 | [f] |
| Put | Sell | March | May | 50000 | 320 | 4000 | [g] |
| Put | Buy | March | July | 50000 | 330 | -8000 | [h] |

### c. Net Positions of January Trades (net of Stage 1a & 1b)

| Type | Initial Buy/Sell | Current Month | Expire Month | Amount | Change in Price | Net Gain/Loss | |
|---|---|---|---|---|---|---|---|
| Call | Buy | March | May | 50000 | 90 | 25000 | [i] |
| Call | Sell | March | July | 50000 | 50 | -25000 | [j] |
| Put | Buy | March | May | 50000 | 50 | -4000 | [k] |
| Put | Sell | March | July | 50000 | 50 | 4000 | [l] |
| Short-Term Capital Gain | | | | | | 21000 | [m] |
| Ordinary Loss | | | | | | -21000 | [n] |

## Stage 2

### a. Futures Straddle Trades in October

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Price | Underlying/Neutral | |
|---|---|---|---|---|---|---|---|
| Future | Buy | October | April | 50000 | 280 | -140000 | [o] |
| Future | Sell | October | May | 50000 | 285 | 142500 | [p] |

### b. Futures Straddle Offsetting/terminating in November - Offsets Gain in Stage 1c

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Original Price | New Price | Change in Value | |
|---|---|---|---|---|---|---|---|---|
| Future | Sell | November | April | 50000 | 280 | 238 | -21000 | [c] |

Privileged and Confidential
Prepared at the Request of Counsel
Preliminary Work Product

Replication of Dewees Transaction
Workpaper No. 2
Assuming Prices in March Increase
Assuming Prices in November Decrease

[Amounts are in Ounces, Prices are in Pence/Ounce, All Other Values are in Pounds (£)]

**c. Unrealized Gain on Futures Straddle Position in November**

| Type | Initial Buy/Sell | Current Month | Expire Month | Amount | Original Price | New Price | Change in Value |
|---|---|---|---|---|---|---|---|
| Future | Sell | November | May | 50000 | 285 | 243 | 21000 [r] |

**Stage 3**

**a. Futures Switch Trades In November**

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Price | | |
|---|---|---|---|---|---|---|---|
| Future | Buy | November | June | 50000 | 248 | | [s] |

**b. Final "Locked - In" Position in Futures (net of Stage 2 and Stage 3a)**

| Type | Buy/Sell | Current Month | Expire Month | Amount | Original Price | New December Price | Change in Value |
|---|---|---|---|---|---|---|---|
| Future | Sell | December | May | 50000 | 285 | 248 | 18500 [t] |
| Future | Buy | December | June | 50000 | 248 | 253 | 2500 [u] |
| Net Position | | | | | | | 21000 [v] |
| Future | Sell | December | May | 50000 | 285 | 238 | 23500 [w] |
| Future | Buy | December | June | 50000 | 248 | 243 | -2500 [x] |
| Net Position | | | | | | | 21000 [y] |

Sources and Notes:
[a]-[f]: Dewees v Commissioner of Internal Revenue, No. 87-1763.
[g]: Assumes that there are two months remaining or option x 2000 Pounds/Month.
[h]: Assumes that there are four months remaining on option x 2000 Pounds/Month.
[i]: [a] + [e].
[j]: [b] + [f].
[k]: [c] + [g].
[l]: [d] + [g].
[m]: [i] + [k].
[n]: [j] + [l].
[o]-[p]: Assumes that instead of an increase (decrease) of 30 pence, the increase (decrease) is 42 pence.
[q]: Dewees v Commissioner of Internal Revenue, No. 87-1763.
[r]: [d] + Decrease in price of 42 pence + an assumed increase of 5 pence.
[s]: [d] + an assumed increase of 5 pence.
[t]: [b] + [q].
[u]: [q] + Decrease in price of 42 pence + an assumed decrease of 5 pence.
[x]: [a] + an assumed decrease of 5 pence.
[y]: [w] + [x].

TBG006898

Privileged and Confidential
Prepared at the Request of Counsel
Preliminary Work Product

Replication of Dewees Transaction
Workpaper No. 3
Assuming Prices in March Decrease
Assuming Prices in November Increase

[Amounts are in Ounces, Prices are in Pence/Ounce, All Other Values are in Pounds (£)]

| Assumption 1 | Price in March: | Decrease |
| Assumption 2 | Prices in November: | Increase |

## Stage 1

### a. Options Straddle Trades in January

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Strike Price | Premium | |
|------|----------|-------------|--------------|--------|--------------|---------|---|
| Call | Buy | January | May | 50000 | 270 | -8000 | [a] |
| Call | Sell | January | July | 50000 | 280 | 12000 | [b] |
| Put | Buy | January | May | 50000 | 270 | -8000 | [c] |
| Put | Sell | January | July | 50000 | 280 | 12000 | [d] |

### b. Options Straddle Offsetting/Terminating in March

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Strike Price | Premium | |
|------|----------|-------------|--------------|--------|--------------|---------|---|
| Call | Sell | March | May | 50000 | 220 | 4000 | [e] |
| Call | Buy | March | July | 50000 | 230 | -8000 | [f] |
| Put | Sell | March | May | 50000 | 220 | 33000 | [g] |
| Put | Buy | March | July | 50000 | 230 | -37000 | [h] |

### c. Net Positions of January Trades (net of Stage 1a & 1b)

| Type | Initial Buy/Sell | Current Month | Expire Month | Amount | Change in Price | Net Gain/Loss | |
|------|------------------|---------------|--------------|--------|-----------------|---------------|---|
| Call | Buy | March | May | 50000 | -50 | -4000 | [i] |
| Call | Sell | March | July | 50000 | -50 | 4000 | [j] |
| Put | Buy | March | May | 50000 | -50 | 2500 | [k] |
| Put | Sell | March | July | 50000 | -50 | -25000 | [l] |
| Short-Term Capital Gain | | | | | | 21000 | [m] |
| Ordinary Loss | | | | | | -21000 | [n] |

## Stage 2

### a. Futures Straddle Trades in October

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Price | Underlying Notional | |
|------|----------|-------------|--------------|--------|-------|---------------------|---|
| Future | Buy | October | April | 50000 | 280 | -140000 | |
| Future | Sell | October | May | 50000 | 285 | 142500 | [o] |

### b. Futures Straddle Offsetting/Terminating in November – Offsets Gain in Stage 1c

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Original Price | New Price | Change in Value | |
|------|----------|-------------|--------------|--------|----------------|-----------|-----------------|---|
| Future | Buy | November | May | 50000 | 285 | 327 | -21000 | [q] |

TBG006899

Privileged and Confidential
Prepared at the Request of Counsel
Preliminary Work Product

## Replication of Dewees Transaction
### Workpaper No. 3
Assuming Prices in March Decrease
Assuming Prices in November Increase

[Amounts are in Ounces, Prices are in Pence/Ounce, All Other Values are in Pounds (£)]

### c. Unrealized Gain on Futures Straddle Position in November

| Type | Initial Buy/Sell | Current Month | Expire Month | Amount | Original Price | New Price | Change in Value |
|---|---|---|---|---|---|---|---|
| Future | Buy | November | April | 50000 | 280 | 322 | 21000 [c] |

## Stage 3
### a. Futures Switch Trades In November

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Price | |
|---|---|---|---|---|---|---|
| Future | Sell | November | June | 50000 | 332 | [a] |

### b. Final "Locked - In" Position in Futures (net of Stage 2 and Stage 3a)

| Type | Buy/Sell | Current Month | Expire Month | Amount | Original Price | New December Price | Change in Value |
|---|---|---|---|---|---|---|---|
| Future | Buy | December | April | 50000 | 280 | 327 | 23500 [f] |
| Future | Sell | December | June | 50000 | 332 | 337 | -2500 [u] |
| Net Position | | | | | | | 21000 [v] |
| Future | Buy | December | April | 50000 | 280 | 317 | 18500 [w] |
| Future | Sell | December | June | 50000 | 332 | 327 | 2500 [x] |
| Net Position | | | | | | | 21000 [y] |

Sources and Notes:
[a]-[f]: Dewees v Commissioner of Internal Revenue, No. 87-1763.
[g]: Assumes that there are two months remaining on option x 2000 Pounds/Month.
[h]: Assumes that there are four months remaining on option x 2000 Pounds/Month.
[i]: [a] + [c].
[j]: [b] + [f].
[k]: [e] + [g].
[l]: [d] + [g].
[m]: [i] + [k].
[n]: [j] + [l].
[o]: [i] + [l].
[s]-[t]: Assumes that instead of an increase (decrease) of 30 pence, the increase (decrease) is 42 pence.
[t]: Dewees v Commissioner of Internal Revenue, No. 87-1763.
[f]: [f] + increase in price of 42 pence + an assumed increase of 5 pence.
[u]: [h] + an assumed increase of 5 pence.
[v]: [f] + [u].
[w]: [c] + increase in price of 42 pence + an assumed decrease of 5 pence.
[x]: [u] + an assumed decrease of 5 pence.
[y]: [w] + [x].

TBG006900

Privileged and Confidential
Prepared at the Request of Counsel
Preliminary Work Product

Replication of Dewees Transaction
Workpaper No. 4
Assuming Prices in March Decrease
Assuming Prices in November Decrease

[Amounts are in Ounces, Prices are in Pence/Ounce, All Other Values are in Pounds (£)]

| Assumption 1 | Price in March: | Decrease |
| Assumption 2 | Prices in November: | Decrease |

## Stage 1

### a. Options Straddle Trades in January

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Strike Price | Premium | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Call | Buy | January | May | 50000 | 270 | -8000 | [a] |
| Call | Sell | January | July | 50000 | 280 | 12000 | [b] |
| Put | Buy | January | May | 50000 | 270 | -8000 | [c] |
| Put | Sell | January | July | 50000 | 280 | 12000 | [d] |

### b. Options Straddle Offsetting/Terminating in March

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Strike Price | Premium | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Call | Sell | March | May | 50000 | 220 | 4000 | [e] |
| Call | Buy | March | July | 50000 | 230 | -8000 | [f] |
| Put | Sell | March | May | 50000 | 220 | 33000 | [g] |
| Put | Buy | March | July | 50000 | 230 | -37000 | [h] |

### c. Net Positions of January Trades (net of Stage 1a & 1b)

| Type | Initial Buy/Sell | Current Month | Expire Month | Amount | Change in Price | Net Gain/Loss | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Call | Buy | March | May | 50000 | -50 | -4000 | [i] |
| Call | Sell | March | July | 50000 | -50 | 4000 | [j] |
| Put | Buy | March | May | 50000 | -50 | 29000 | [k] |
| Put | Sell | March | July | 50000 | -50 | -25000 | [l] |
| Short-Term Capital Gain | | | | | | 21000 | [m] |
| Ordinary Loss | | | | | | -21000 | [n] |

## Stage 2

### a. Futures Straddle Trades in October

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Price | Underlying Notional | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Future | Buy | October | April | 50000 | 280 | -140000 | [o] |
| Future | Sell | October | May | 50000 | 285 | 142500 | [p] |

### b. Futures Straddle Offsetting/Terminating in November – Offsets Gain in Stage 1c

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Original Price | New Price | Change in Value | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Future | Sell | November | April | 50000 | 280 | 238 | -21000 | [q] |

Privileged and Confidential
Prepared at the Request of Counsel
Preliminary Work Product

# Replication of Dewees Transaction
## Workpaper No. 4
### Assuming Prices in March Decrease
### Assuming Prices in November Decrease

(Amounts are in Ounces, Prices are in Pence/Ounce, All Other Values are in Pounds (£))

## c. Unrealized Gain on Futures Straddle Position in November

| Type | Initial Buy/Sell | Current Month | Expire Month | Amount | Original Price | New Price | Change in Value |
|---|---|---|---|---|---|---|---|
| Future | Sell | November | May | 50000 | 285 | 243 | 21000 [r] |

## Stage 3

### a. Futures Switch Trades in November

| Type | Buy/Sell | Trade Month | Expire Month | Amount | Price |
|---|---|---|---|---|---|
| Future | Buy | November | June | 50000 | 248 [a] |

### b. Final "Locked-In" Position in Futures (net of Stage 2 and Stage 3a)

| Type | Buy/Sell | Current Month | Expire Month | Amount | Original Price | New December Price | Change in Value |
|---|---|---|---|---|---|---|---|
| Future | Sell | December | May | 50000 | 285 | 248 | 18500 [t] |
| Future | Buy | December | June | 50000 | 248 | 253 | 2500 [u] |
| Net Position | | | | | | | 21000 [v] |
| Future | Sell | December | May | 50000 | 285 | 238 | 23500 [w] |
| Future | Buy | December | June | 50000 | 248 | 243 | -2500 [x] |
| Net Position | | | | | | | 21000 [y] |

Sources and Notes:
[a]-[f]: Dewees v Commissioner of Internal Revenue, No. 87-1763.
[g]: Assumes that there are two months remaining on option x 2000 Pounds/Month.
[h]: Assumes that there are four months remaining on option x 2000 Pounds/Month.
[i]: [a] + [e].
[j]: [b] + [f].
[k]: [c] + [g].
[l]: [d] + [h].
[m]: [j] + [k].
[n]: [i] + [l].
[o]-[r]: Assumes that instead of an increase (decrease) of 30 pence, the increase (decrease) is 42 pence.
[s]: Dewees v Commissioner of Internal Revenue, No. 87-1763.
[t]: [i] + Decrease in price of 42 pence + an assumed increase of 5 pence.
[u]: [d] + an assumed increase of 5 pence.
[v]: [t] + [u].
[w]: [i] + Decrease in price of 42 pence + an assumed decrease of 5 pence.
[x]: [d] + an assumed decrease of 5 pence.
[y]: [w] + [x].

TBG006902