UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES OF AMERICA'S COMBINED RESPONSE IN OPPOSITION
TO PLAINTIFF'S MOTION TO EXCLUDE THE EXPERT TESTIMONY AND
REPORTS OF DR. A. LAWRENCE KOLBE AND DR. GORDON RAUSSER**

Plaintiff's attempts to exclude the reports and testimony of the United States' expert
witnesses represent three more unsupported and unsupportable motions in a long line of
groundless motions. Due to the similarity of plaintiff's motions to exclude A. Lawrence Kolbe
(Dr. Kolbe) and Gordon Rausser (Dr. Rausser), the United States combines its opposition in
response to those two motions below.[1] Even the most cursory reading of the painstakingly-
detailed, superbly-supported and professionally-written reports of Dr. Rausser and Dr. Kolbe
make it eminently clear that plaintiff's attacks on these two extremely well-qualified, indeed
distinguished, experts are unfounded and unwarranted.[2] What is more, plaintiff's motions

---

[1] We address plaintiff's motion to exclude the report and testimony of David W. LaRue in
a separate response since his report is focused on a separate subject matter, *i.e.*, the tax reporting
of the transactions.

[2] When plaintiffs filed their motions to exclude Dr. Kolbe and Dr. Rausser, they filed
under seal only the reports of the experts. At the January 25, 2008 status conference in this case,
counsel for the United States suggested that the Court would benefit from the bounded hard-
copies of its experts' reports, which contained numerous tables, charts, and graphs. Moreover,
plaintiff noticeably failed to provide the Court with the exhibits and appendices relating to these
(continued...)

unfortunately amount in certain respects to specious, irrelevant and needless character assassination.

## ARGUMENT

### PLAINTIFF'S CRITICISMS OF DR. RAUSSER'S AND DR. KOLBE'S REPORTS ARE MERITLESS

A.    **Dr. Kolbe and Dr. Rausser Do Not Attempt to Supplant the Role of Counsel in Presenting Defendant's View of the Evidence in Their Factual Synopses**.

1.    **The Inclusion of Planning and Transactional Facts in Dr. Kolbe's and Dr. Rausser's Reports Is Required by the Federal Rules as Well as Their Own Discipline as Economists**.

Plaintiff's first attack flies in the face of the Federal Rules of Evidence as well as the Federal Rules of Civil Procedure.  Plaintiff complains that Dr. Kolbe's and Dr. Rausser's inclusion of a factual summary of the transactions at issue in their expert reports is outside the scope of admissible expert testimony.[3]  To begin with, this assertion simply ignores the fundamental requirements imposed on experts by the Federal Rules.  Significantly, the Federal Rules of Evidence not only permit, but indeed require, experts to base their testimony on "sufficient facts or data."  Rule 702 expressly provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) **the testimony is based upon sufficient facts or data,** (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. (Emphasis added.)

---

[2](...continued)
reports and we also requested to provide these essential materials to the Court and the Court agreed.  Accordingly, the United States provided the full expert reports under seal of each of its three experts, Dr. Kolbe, Dr. Rausser and Dr. David Wayne LaRue, on January 28, 2008.

[3]Plaintiff's Memorandum to Exclude Kolbe (hereinafter "Kolbe Memorandum"), p. 7; Plaintiff's Memorandum to Exclude Rausser (hereinafter "Rausser Memorandum"), p. 14.

3068362.11

Rule 703 is even more instructive. That rule provides, in part, that:

> The **facts or data in the particular case upon which an expert bases an opinion or inference** may be those perceived by or made known to the expert at or before the hearing. If of a **type reasonably relied upon** by experts in the particular field in forming opinions or inferences upon the subject, **the facts or data** need not be admissible in evidence in order for the opinion or inference to be admitted. (Emphasis added.)

*See also Highland Capital Management, L.P. v. Schneider*, 379 F.Supp.2d 461, 469 (S.D.N.Y. 2005) ("an expert must of course rely on facts or data in formulating an expert opinion," citing Rule 703.)

Finally, Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires an expert to specify in his or her report the "data or information" considered by the expert in formulating his or her opinions. The Rule provides in pertinent part that:

> The [expert] report must contain:
>
> (i) a complete statement of all opinions the witness will express **and the basis and reasons for them**;
>
> (ii) **the data or other information considered by the witness in forming them**. (Emphasis added.)

Moreover, both Dr. Rausser and Dr. Kolbe make it clear that as economists opining on the attributes of extremely-complex financial transactions, it was essential for them to provide the complete facts upon which their opinions were based. As Dr. Rausser states in his Declaration:

> Plaintiff complains that I should not have considered, or at least should not have reported on, the contents of numerous transaction planning and preparation documents that various participants produced in discovery. Professional standards required that I do so.[4]

---

[4]Government Exhibit 2, Declaration of Dr. Gordon Rausser (hereinafter "Rausser

(continued...)

3068362.11

Dr. Kolbe is equally clear, saying in his Declaration:

> The economic nature of the transactions in this dispute is not obvious on its face, and no single document explains everything that occurred. Therefore, the only way to understand the transactions from an economic perspective is to review the record and analyze what happened.[5]

And as Dr. Rausser also points out, "[t]he documents cited in my reports consist of largely-contemporaneous memoranda, emails, notes and explanatory presentations prepared by the taxpayer's advisors and are certainly the type of documents upon which an economic expert analyzing the transaction would ordinarily rely."[6]

Moreover, the facts and data set forth in Dr. Kolbe's and Dr. Rausser's reports are inextricably related to their economic analyses and opinions. Dr. Kolbe was asked, *inter alia*, to analyze the non-tax business purpose and the economic profit potential of the *transactions at issue* from the perspective of a financial economist.[7] Dr. Rausser was asked, *inter alia*, to analyze the non-tax business purpose and the economic profit potential of the *transactions at*

---

[4](...continued)
Declaration"), p. 7. The United States has submitted declarations of both Dr. Kolbe and Dr. Rausser in support of this opposition. These declarations, to the extent appropriate, respond in detail to each of plaintiff's various assertions. During the January 25, 2008 status conference, the Court set February 29, 2008 as a date for argument on all three of plaintiff's motions to exclude the United States' expert witnesses. See Tr., p. 32, l.18-25. However, the Court noted that it may take the motions under advisement and may require live testimony. See Tr., p. 66, l.19-23. In the event the Court needs additional information beyond that contained in the declarations, the United States welcomes the opportunity for its experts to testify before the Court.

[5]Government Exhibit 1, Declaration of A. Lawrence Kolbe (hereinafter "Kolbe Declaration"), p. 11.

[6]Rausser Declaration, ¶9 (internal footnotes omitted).

[7]See Plaintiff's Exhibit A, Expert Report of A. Lawrence Kolbe (hereinafter "Kolbe Report"), p. 1-2; See also Kolbe Declaration, p. 3.

*issue* from the perspective of an options expert.[8]  Consistent with Rules 702 and 703 of the

Federal Rules of Evidence and Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, Dr.

Kolbe's and Dr. Rausser's opinions on "economic profit potential" and "business purpose" are

directly based on the planning and transactional facts and data set forth in their reports.[9]  In fact,

their opinions would have been impossible to understand fully and intelligibly without their

rendition of the essential facts underlying the transactions at issue.

    Finally, neither Dr. Rausser nor Dr. Kolbe set forth the complex and intricate facts

relating to the transactions at issue as a pretext for advocacy.  Both were given full and complete

access to all documents and materials produced in discovery as well as deposition testimony

obtained or taken in discovery.[10]  This database is immense and consists of over 2.4 million

pages of documents and materials.  Dr. Kolbe and Dr. Rausser ably and professionally

summarized these complex and technical materials in their reports, which, in turn, allow the

reader to fully understand the bases of their analyses and opinions.  As Dr. Rausser points out, he

"fully cited and reported the facts derived from [the transaction and planning] documents not

because it would be good 'advocacy' to do so, but because those facts are essential to applying

the principles of financial and economic analysis set forth in my report."[11]

    Plaintiff's examples of how Dr. Kolbe and Dr. Rausser supplant the role of counsel are

quotations from the expert reports that are incomplete, taken out of context and misleading.

---

[8]See Plaintiff's Exhibit 1, Expert Report of Gordon Rausser (hereinafter "Rausser
Report"), p.4-5; Rausser Declaration, p. 3-4.

[9]Kolbe Declaration, p. 10-11; Rausser Declaration, ¶9.

[10]Kolbe Declaration, p.15, fn. 36; Rausser Declaration, ¶8, fn.2.

[11]Rausser Declaration, ¶ 11.

3068362.11

In their declarations, Dr. Kolbe and Dr. Rausser provide the proper context for the plaintiff's selected quotations.[12]  As their declarations make clear, Dr. Kolbe and Dr. Rausser have in no way supplanted the role of counsel by including facts in their expert reports.[13]  As Dr. Kolbe observed: "in order to draw valid economic conclusions, the analyst must have a clear understanding of the underlying economic facts of the problem or situation being researched."[14]

What plaintiff really finds fault with is not Dr. Rausser's and Dr. Kolbe's accurate and faithful summary of the transactional facts.  Rather, plaintiff objects to the planning and transactional materials themselves which were obtained only after arduous and highly-contentious discovery.  These documents are replete with highly-revealing and incriminating notes, statements and admissions that describe in detail the essential *tax-driven* nature of the design, marketing and implementation of the transactions.  Plaintiff would have preferred that Dr. Rausser and Dr. Kolbe – instead of faithfully summarizing these materials – sanitize these planning and transactional materials to eliminate any reference to the highly *tax-driven* attributes of the transactions.

Indeed that is the same objection that plaintiff's counsel repeatedly voiced to the United States' tutorial which likewise accurately reported the transactions as reflected in the plaintiff's and the promoters' enormous database of documents.  But plaintiff cannot expect independent

---

[12]Kolbe Declaration, pp. 9-14; Rausser Declaration, ¶12 and 13.

[13]As Dr. Kolbe stated in his deposition, *see* Plaintiff's Exhibit 4 (hereinafter "Kolbe Deposition") p. 92, l.10-16: "I have very strong feelings, which I communicate to my staff, that we are not and must not ever become advocates in our work.  And so anything that -- anybody who would use the word 'attack' in this sort of thing would earn my -- some negative reaction from me, because that's not how we work.").

[14]Kolbe Declaration, p.10.

6

experts – whether the United States' or his own[15] – to "close their eyes" to the essential and fundamental facts of his own transactions. This is what really lies at the heart of plaintiff's claim that Dr. Rausser's and Dr. Kolbe's factual descriptions are a pretext for advocacy. Put simply, plaintiff's objection actually rests with the many highly revealing and incriminating documents that Dr. Rausser and Dr. Kolbe were required to describe as part of their assignments – not with their accurate summary of those critical documents and materials.

In sum, the transactional facts and data contained in Dr. Kolbe's and Dr. Rausser's reports were required by the Federal Rules of Evidence, the Federal Rules of Civil Procedure and the professional rules applicable to Dr. Kolbe's and Dr. Rausser's training and discipline as economists. Moreover, these planning and transactional facts provide an essential contextual framework to their analysis and opinions and are particularly critical to set forth in this highly-complex and very fact-intensive case.

### 2. The Cases Cited by Plaintiff Are Totally Inapposite.

To support his proposition that Dr. Kolbe's and Dr. Rausser's factual recitations are improper, plaintiff relies upon a series of cases where lawyers exploited their role as experts to summarize facts having nothing to do with their opinions. *Fisher v. Ciba Specialty Chemicals Corp*oration,[16] the primary case relied upon by plaintiff, is one such case and is distinguishable on so many grounds that it has no applicability whatsoever to this litigation. In *Fisher*, an administrative law attorney submitted an expert report on the 'general environmental, regulatory

---

[15]In the past, the United States has referred to plaintiff, pursuant to the caption of this case, as Fidelity International. However, opposing counsel refers to plaintiff as Richard Egan and thus the United States will so refer to plaintiff herein and in the future.

[16]238 F.R.D. 273 (D. Ala. 2006).

history' of defendant's chemical manufacturing facility.[17]  After commenting that "much" of the

attorney's report contained a narrative of facts,[18] the court stated that:

> *The vast majority* of McFaddin's report simply summarizes and states her
> advocacy-based interpretation of documents in the record concerning Ciba's
> historical conduct. These statements of alleged fact do not appear to benefit from,
> or to be based to any extent on, McFaddin's status as a regulatory expert. . . . She
> does not show that she has special skills that render her reading of record
> documents concerning the history of the Ciba plant, and her conclusions as to
> what Ciba has or has not done, any more or less persuasive than that of a
> layperson. . . . What special ken does an administrative law attorney have to
> render expert opinions as to existence and causes of environmental
> contamination?[19] (Emphasis added.)

In this case, "much" or a "vast majority" of Dr. Kolbe's or Dr. Rausser's reports do not

contain factual narrative but instead consist of an extensive and acute analysis of the

transactional facts.  Indeed, their respective summaries of the transactional facts are the essential

predicate to their economic and/or option-based analyses.  Moreover, their respective summaries

of facts are firmly supported by the underlying documents and materials in the record.  In

addition, the planning and transactional facts summarized by Dr. Rausser and Dr. Kolbe are

directly related and fundamental to the opinions which they are rendering.  Finally, both Dr.

Rausser and Dr. Kolbe are eminently well-qualified to summarize the economic attributes of the

planning and transaction documents based on their specialized knowledge, training, and

experience.[20]  In short, *Fisher* has no relevance at all to this litigation and the other cases cited by

plaintiff are similarly inapposite.

---

[17]*Fisher* at 280.

[18]*Id*.

[19]*Fisher* at 281.

[20]Kolbe Report, p.1 and Kolbe Declaration, pp., 1-2 and 4-5; Rausser Report, p.1-4 and
Rausser Declaration, ¶¶2 and 3.

**B.    Dr. Rausser Does Not Improperly Opine on the Business Purpose, Motivations and States of Mind of the Parties and Other Witnesses**.

Plaintiff also claims that "[t]he Rausser Reports are replete with impermissible commentary on the business purpose and state of mind of Plaintiff and other participants in the [Fidelity International] transactions."[21]  These assertions are also meritless.

**1.    Dr. Rausser Does Not Improperly Opine on the Business Purpose of the Transactions**.

One of Dr. Rausser's fundamental assignments was to opine as to whether there was a legitimate business purpose, *aside from tax consequences*, for the series of coordinated and interrelated transactions at issue.[22]  This assignment required Dr. Rausser to analyze the entire transaction, and each of its various components, and to segregate its tax aspects from its non-tax aspects.[23]  It was therefore essential for Dr. Rausser to review the database of materials to determine what were the rationally anticipated tax benefits and what were the rationally anticipated non-tax benefits of the transactions.

Plaintiff argues that Dr. Rausser makes various advocacy-oriented references to the tax planning and the projected tax consequences of the Fidelity International transactions.[24]  Plaintiff therefore concludes that Dr. Rausser is improperly opining on Fidelity International's "real purpose" for entering the transactions, which, according to plaintiff, constitutes impermissible

---

[21]Rausser Memorandum, p. 16.

[22]Rausser Declaration, ¶5.

[23]As Dr. Rausser notes, separating out tax and non-tax attributes of a transaction "is a common form of analysis for financial economists to undertake."  Rausser Declaration, ¶12.

[24]Rausser Memorandum, p. 16.

3068362.11

comments by him on plaintiff's state of mind.  In his Declaration, Dr. Rausser states in no

uncertain terms that this allegation is not true.  Dr. Rausser states that:

> Plaintiff's memorandum states that I opined on Fidelity International's "real
> purpose" for entering into the transaction, and places that phrase in quotes as
> though it came directly from my report.  No citation is provided.  In fact, I never
> used this phrase and never expressed an opinion on Fidelity International's "real
> purpose."[25]

In his Declaration, Dr. Rausser also explains why it was so essential for him to review

and analyze materials reflecting any anticipated tax consequences of the transactions, as well as

emphasizes that any such references in his report were supported by extensive documentary

materials in the record:

> The four quotes Plaintiff provides that actually **do** come from my reports
> (extracted from 160 pages of text) indicate only that the transaction resulted from
> a search for a tax-advantaged strategy which specifically contemplated generating
> a tax loss.  As discussed in the preceding section of this Declaration, such facts
> are directly relevant to evaluating the structure, terms and rationally anticipated
> outcome of the transaction. ... In addition, in two of the four quotes, Plaintiff
> extracts selected language from my report while omitting the citation to extensive
> documentary evidence supporting that language. For instance, Plaintiff quotes my
> statement that '[t]he documents I reviewed indicate that this transaction was the
> result of a concerted search for 'tax advantaged strategies' by the taxpayer . . .' ...
> The citation omits to point out that the internally quoted 'tax advantaged
> strategies' comes directly from documents produced by Plaintiff, and [also]
> ignores the twenty additional documents cited in support of my statement.[26]

Accordingly, contrary to plaintiff's assertion, Dr. Rausser does not testify as to the "real

purpose" of the transactions.  What Dr. Rausser does do – by making reference to numerous

planning documents showing, *inter alia*, plaintiff's concerted search for tax-advantaged

transactions – is to evaluate the "structure, terms, and rationally anticipated outcome of the

transaction," from both a tax and non-tax perspective.  This analysis is a critical part of his

---

[25]Rausser Declaration, ¶15.

[26]Rausser Declaration, ¶15.

3068362.11

assignment and one to which he, as an economist and an expert in options, derivatives, and other financial instruments, is particularly well-qualified to render an opinion.[27]

### 2.    *Lippe* and Other Cases Cited by Plaintiff Are Inapplicable.

To support his position that Dr. Rausser is impermissibly opining on Fidelity International's "real purpose" of the transactions, plaintiff once again relies upon case law involving inappropriate advocacy by an attorney appearing as an expert witness. In particular, plaintiff summarizes the holding of *Lippe v. Bairnco Corporation*[28] by noting that the Court there held "that it was wholly inappropriate for the expert to opine on the asbestos company's alleged 'real purpose' for the transactions because he was essentially telling the jury what result to reach."[29] What plaintiff fails to mention is that the expert in *Lippe*, Mr. Carney, was an attorney who originally was engaged by a party as counsel, and acted as and considered himself to be counsel, and then transitioned to be an expert witness for that party.[30] The Court found Mr. Carney's testimony altogether unreliable, stating that:

---

[27]Some of plaintiff's quotes of Dr. Rausser's report not only do not support his argument but in fact are paraphrased in such a way to be misleading. For example, Dr. Rausser did not say "Plaintiff was "[interested in] a structure driven entirely by the desired tax outcome." Instead, he stated that:

> [t]he acquisition of offsetting pairs of options, the use of binary payouts, and the early termination of all of the positions within weeks of inception (and prior to the close of the tax year) all strongly point to a disinterest in actual hedging and, instead, a structure driven entirely by the desired tax outcome.

Rausser Report, p. 66.

[28]288 B.R. 678 (S.D.N.Y. 2003).

[29]Rausser Memorandum, p. 15.

[30]*Lippe* at 683-684.

3068362.11

As he made clear at his deposition, the entire focus of his report was his thesis that defendants' 'real purpose' in entering the transaction was to hide assets and it was still his belief that the 'business purpose' of the transactions was going to be the substance of his trial testimony. . . . Moreover, because of his advocacy on behalf of plaintiffs as counsel and legal advisor, I do not believe that he can now testify with the detachment and independence that one would expect from an expert witness offering views as a professional.[31]

This holding has no applicability here.  In the first place, Dr. Rausser was not retained to advocate, and makes no attempt to advocate any particular position in his reports.  He was retained as an independent expert with immense knowledge, training, and experience in options and related areas of finance.  Moreover, he was asked to conduct an analysis of all financial aspects of the transactions at issue with independence and detachment and regardless of how that analysis may affect any particular party in this litigation.[32]  Secondly, Dr. Rausser is not opining on the plaintiff's or Fidelity International's "real purpose" for entering the transactions.  In fact, he does not even use that term in his reports. Thirdly, the references that Dr. Rausser does make to planning documents reflecting a search for tax-advantaged transactions are not a commentary on plaintiff's state of mind.  Rather, they are an essential aspect of his assignment of analyzing the rationally anticipated business purpose of the transactions, *aside from tax consequences*.[33]

---

[31]*Lippe* at 688.

[32]Rausser Declaration, ¶14, fn.18.  See also Kolbe Declaration, p. 14.

[33]Plaintiff obviously believes that any reference by Dr. Rausser or Dr. Kolbe to the tax consequences of the transactions constitutes improper advocacy and thus constitutes inappropriate commentary on his state of mind. Plaintiff is wrong.  As Dr. Kolbe points out, "the need to understand and analyze both the tax and non-tax implications of investment decisions is central to finance theory and practice."  Kolbe Declaration, p. 12.  As he further notes, it was essential for him to understand both the tax and non-tax implications of the transactions in order to enable him to distinguish these two separate implications of the transactions, from an economic perspective.  Kolbe Declaration, p. 12.

3068362.11

Plaintiff's reliance on *DePaepe v. GMC*,[34] is equally misplaced.  In *DePaepe*, the court found that it was improper for the plaintiff's expert to be asked why General Motors reduced the padding in its sun visors and for the expert to have answered that it was in order to save money.[35] The court found that the expert

> lacked any scientific basis for an opinion about the motives of GM's designers. He *could* give an opinion as an engineer that reducing the padding saved a particular amount of money; he *might* testify as an engineer that GM's explanation for the decision was not sound (from which the jury might infer that money was the real reason); but he could not testify as an expert that GM had a particular motive.  (Emphasis added.)[36]

First, unlike the expert in *DePaepe*, Dr. Rausser's analysis of documents reflecting the search for tax advantaged transactions was critical to his financial analysis and was consistent with fundamental financial theory and practice.[37]  Second, the court in *DePaepe* made clear that an expert can, of course, testify on matters which lie within the expert's field of expertise.  That is exactly what Dr. Rausser did and that is obviously not improper.[38]

---

[34]141 F.3d 715 (7th Cir. 1998).

[35]*DePaepe* at 720.

[36]*Id.*

[37]Rausser Declaration, ¶9.

[38]The other cases plaintiff cites in support of its conclusion that Dr. Rausser improperly opines on state of mind and/or motivations of plaintiff are similarly unavailing and will not be discussed further as they also are inapposite to the facts here.

3068362.11

### 3.    Dr. Rausser does not make improper inferences regarding plaintiff's state of mind, his credibility or any other person's credibility.

Plaintiff also claims that Dr. Rausser makes inappropriate conclusions regarding plaintiff's state of mind, including his credibility and the credibility of certain deposition witnesses.[39]  These assertions are equally untrue.  As Dr. Rausser emphasizes:

> Plaintiff misconstrues my report on the rationally predictable economic outcome of the transaction as conjecture regarding the taxpayer's "state of mind."  I express no opinion as to what may have been in the taxpayer's mind.  As a financial economist, I am, however, capable of determining what a rational, prudent investor would have expected the financial outcome of the transaction to have been.  That is precisely the information contained in my reports and it is based on statistical and econometric analysis rather than speculation about a subjective state of mind.[40]

To support his position that Dr. Rausser is commenting on plaintiff's credibility, plaintiff takes completely out of context two statements made by Dr. Rausser, one of which was not even found in his report, but made in response to a question at his deposition.  Plaintiff first cites Dr. Rausser's conclusion on page 108, the last page, of his report where he states: "In sum, I have concluded that the business purposes tendered by Fidelity International and the taxpayer bear no credibility."  But Dr. Rausser was not offering commentary on the believability or truthfulness of any witness with that conclusion – instead he was expressing a professional difference in opinion based on an extensive and highly-reasoned economic analysis.  As he states:

> at the conclusion of several pages of detailed analysis supported by exhaustive references to both analytical methods and documentary evidence, I observed that the business purposes of profit and hedging "bear no credibility." By this, I meant not to comment on the believability or truthfulness of any witness, but to express my reasoned conclusion, based on my experience and expertise in financial

---

[39]Rausser Memorandum, p. 14-18.

[40]Rausser Declaration, ¶14.

3068362.11

contracting and options, that neither profit nor effective hedging was a rationally anticipatable outcome of the transaction.[41]

Plaintiff's second and only other example, which is not even contained in Dr. Rausser's Report, is Dr. Rausser's response to a question by plaintiff's counsel at his deposition.  In his response, he stated that, based on his own economic analysis, a witness's testimony was "not credible."[42]  It appears that plaintiff is arguing that Dr. Rausser's use of the term "not credible" must mean that he was making conclusions as to the credibility of witnesses.  Clearly, he was not.  Rather, as explained in his Declaration, he was expressing a professional difference in opinion with the witness regarding the likelihood of the so-called "head of the pin risk."  As he states in his Declaration, if there was in fact a so-called "head of the pin risk," the theoretical premium charged would have been much higher.  Dr. Rausser explains that:

> My opinion was based upon my application of professionally recognized options pricing algorithms to replicate the pricing arrived at by the participants using the inputs specified in their documents, followed by a comparison of those results with similar pricing using publicly available market inputs.[43]

Dr. Rausser's observations, which are based on the facts in the record and his expertise in economics and the trading of options, derivatives and other financial instruments, as well as in forecasting and quantifying the risk associated with traded instruments, had nothing to do with commenting on the witnesses' credibility.  Again, he was using the term "credible" to express a professional difference in opinion with a witness' conclusion.  Plaintiff's dredging up these two isolated instances of Dr. Rausser's use of the term "credible," one in response to a question by plaintiff's counsel at a deposition, hardly belongs in a motion to exclude an expert's testimony.

---

[41]Rausser Declaration, ¶16.

[42]Rausser Memorandum, p. 17.

[43]Rausser Declaration ¶ 16.

3068362.11

C.    **Dr. Kolbe and Dr. Rausser Do Not Attempt to Render Opinions
        on Legal Issues**.

Pursuant to Rule 704 of the Federal Rules of Evidence, "testimony in the form of an

opinion or inference otherwise admissible is not objectionable because it embraces an ultimate

issue to be decided by the trier of fact."  The Advisory Committee Notes on Rule 704 make clear

that "to allay any doubt on the subject, the so-called 'ultimate issue' rule is specifically abolished

by [Rule 704]."  The Advisory Committee Notes also state that "[t]he basis usually assigned for

the rule, to prevent the witness from 'usurping the province of the jury,' is aptly characterized as

'empty rhetoric.'" (Citation omitted.)[44]

Plaintiff fails to appreciate the difference between a financial economic analysis of, for

example, substance over form and the legal analysis of substance over form.  The former is a

sub-issue of the latter.  As set forth more fully below, neither Dr. Rausser nor Dr. Kolbe has

conducted legal analysis.  Neither offers nor attempts to offer legal conclusions.  Their proffered

testimony and reports are being offered to the finder-of-fact in order to assist it with an

understanding of the financial and economic implications of the transactions at issue.

1.    **Dr. Kolbe and Dr. Rausser Do Not Attempt to Interpret Refco Contracts**

Contrary to plaintiff's suggestion,[45] neither Dr. Kolbe nor Dr. Rausser make inappropriate

legal conclusions by attempting to interpret the Refco contracts.  Rather, they observed, using

their expertise in their respective fields, that based on the language in the Refco contracts, it was

---

[44]The Advisory Committee Notes on Rule 704 also warn that "the abolition of the
ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702,
opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence
which wastes time."

[45]Kolbe Memorandum, p. 7; Rausser Memorandum, p.18.

possible for Refco to manage the "head of the pin risk."[46]  As Dr. Rausser points out, it is a critical part of an economist's task to review and understand the terms of a transaction, including any pertinent contractual terms.  Indeed, as he notes, "[p]eer reviewed literature on financial economics stresses the importance of understanding transaction terms and mechanics as well as the role of individual participants in evaluating a particular financial structure."[47]  Without a thorough understanding of the contract terms and conditions, it would literally be impossible for an economist to evaluate the financial implications and financial consequences of a transaction.

In his Declaration, Dr. Kolbe also made clear why it was so essential for him to take into account the terms of the options contracts.  As he explained, after he analyzed the value of the option pairs, the actual transaction prices and Refco's stated bid-ask fees and made and tested certain conclusions, he looked to the actual terms of the Refco contracts to see if the terms of the contracts cast doubt on his conclusions.[48]  Instead of casting doubt, he found that the terms of the contracts provided Refco with great flexibility as to the determination of the designated strike price.  That is because the contracts provided Refco with a fifteen-minute window in which it could get quotes from three banks.  Since such quotes vary from bank to bank and since financial markets are highly volatile, relative to the size of the strike price differences in these options, the

---

[46]In fact, Dr. Kolbe's and Dr. Rausser's observations about Refco's ability to manage the head of the pin risk is supported by the testimony of Ronald Buesinger of Alpha.  Although Mr. Buesinger did not testify that Refco could manage the head of the pin risk through its selection of favorable quotes, he did testify that Refco, and other companies that were powerful enough, could manage the risk by actually moving the markets so that, at the designated time, no bank would be quoting the strike price that related to the head of the pin risk.  See Government Exhibit 3, Deposition of Ronald Buesinger, taken October 11, 2007, p. 194, l.6-p.196, l.12.

[47]*See*, Rausser Declaration,  ¶10 where he cites various treatises supporting this position.

[48]Kolbe Declaration, p. 7-8.

language of the contracts did not on their face challenge the conclusion Dr. Kolbe reached by other means.[49]

As Dr. Kolbe points out in his Rebuttal Report, if the head of the pin risk really existed, rather than receiving $1.4 million in fees from Fidelity International, Refco would have provided a gift of $2.7 million to Fidelity International, an economically irrational action.[50] Refco's actions would only be economially rational if they could avoid the head of the pin risk.[51] As stated by Dr. Rausser with respect to Refco's ability to choose the price quotations in a fifteen-minute window, based on his professional experience, "such quotations, even over such a short time period, are subject to wide variation" such that it would be possible for Refco to avoid the head of the pin risk.[52] Further, as discussed above, if Refco did not manage the head of the pin risk, it would potentially owe Fidelity International over $1 billion, such that Refco had a financial interest in exercising the terms of the contracts in its favor.

In short, plaintiff attempts to conflate the fundamental difference between, on the one hand, reviewing, understanding and taking into account the terms and conditions of a contract and, on the other, an attempt to provide a legal interpretation of a contract. To be able to conduct a thorough and complete financial analysis, an economist can and is, in fact, required to do the former, and that is all that Dr. Rausser and Dr. Kolbe have done here.

---

[49]Kolbe Declaration, p. 8.

[50]Plaintiff's Exhibit B, Rebuttal Expert Report of A. Lawrence Kolbe (hereinafter "Kolbe Rebuttal"), p. 3-9.

[51]Kolbe Declaration, p. 8-9.

[52]Rausser Declaration, ¶17.

18

## 2.     Plaintiff's Reliance on *Primavera* Is Misplaced.

Plaintiff citation of *Primavera Familienstifung v. Askin*[53] in support of his argument that Dr. Kolbe and Dr. Rausser are attempting to interpret the Refco contracts does not support his position, as plaintiff's own recitation of the case makes clear.  First, plaintiff's analysis of *Primavera* begins with the proposition that the court held that, "it was inappropriate for an expert witness to testify on whether a party acted in accordance with its obligations under a contract."[54] But neither Dr. Kolbe nor Dr. Rausser attempt to offer an opinion on whether Refco acted in accordance with its obligations under the contracts.  Secondly, plaintiff also cites *Primavera* and similar case law for the proposition that "[i]n the absence of specialized trade usage, expert testimony regarding proper contract interpretation is inadmissible."[55]  But, as previously discussed, Dr. Kolbe and Dr. Rausser are not construing or providing a legal interpretation to any term or terms in the Refco contracts.  Thirdly, plaintiff fails to note why the court excluded the expert's opinion as to the meaning of the specialized term of the contract at issue in *Primavera*.[56] As stated by the court:

> Similarly, when Malkiel states with respect to Merrill's resale of certain securities to TCW that Merrill "had little incentive to [look for other customers] ... when it could immediately resell to TCW, satisfy a customer, and make the profits noted above," *he fails to state any evidentiary basis for his opinion as to Merrill's incentives*.[57]  (Emphasis added.)

---

[53] 130 F.Supp.2d 450 (S.D.N.Y. 2001), *amended on unrelated grounds*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001).

[54] Kolbe Memorandum, p.8; Rausser Memorandum, p.19.

[55] Kolbe Memorandum, p. 8, n. 37.

[56] Kolbe Memorandum, p. 9; Rausser Memorandum, p. 20.

[57] *Primavera* at 530.

19

Thus, even if Dr. Kolbe and Dr. Rausser were proffering a legal definition as to the provision of the Refco contract dealing with Refco's ability to select differing banks' spot prices during a fifteen-minute window (which they are not), Dr. Kolbe and Dr. Rausser are certainly able, by virtue of their training and experience, to provide a meaning for such specialized language. Finally, unlike the expert in *Primavera*, Dr. Kolbe and Dr. Rausser have supported their ultimate conclusion that Refco was able to manage the head of pin risk with charts, workpapers and exhaustive citations to the documentary record.[58]

In conclusion, Dr. Kolbe's and Dr. Rausser's reports make clear that they did not attempt to offer a legal interpretation of the Refco contracts. Rather, they made observations regarding Refco's ability to manage the head of the pin risk based on their taking into account the terms in the Refco contracts in their financial analysis. In fact, Dr. Kolbe's and Dr. Rausser's conclusions are consistent with the valuation techniques used by the taxpayer's advisors, who did not assign a probability or value to the head of the pin risk.[59] Moreover, as stated by Dr. Rausser, it would have been a "breach of professional standards to simply ignore these terms and conditions of the financial contracts."[60] Thus, plaintiff's argument must be rejected.

### 3.   Dr. Rausser Does Not Attempt to Render Legal Opinions on The Order of the Transactions.

Plaintiff claims that Dr. Rausser should not opine on "the income tax consequences of each step" of the transactions at issue since that requires "the application of tax law to the facts of

---

[58]Kolbe Report, p. 34-37. See also Kolbe Report, p. 30-32 and Kolbe Rebuttal, p. 4-9. Rausser Report, p. 46-50.

[59]See e.g., Rausser Declaration, ¶18, citing Rausser Report, p.49-50.

[60]Rausser Declaration, ¶7b.

each transaction."[61]  Plaintiff's citations of Dr. Rausser's opening and rebuttal reports do not support his conclusion that Dr. Rausser opines on the income tax consequences of the transactions at issue.  Even if he did, it would not necessarily be improper as courts specifically allow expert opinions on the application of complex tax or accounting concepts.[62]  Finally, plaintiff's argument that Dr. Rausser's opinion is based on the "step transaction" doctrine borders on the ridiculous.  Not only does Dr. Rausser not mention or allude to the step transaction doctrine in his reports, but as he explains in his Declaration:

> I am [] as a financial economist, capable of determining the way in which the outcome would have been altered if the various trades, transfers and investments that make up the transaction had been carried out in a different order. My assignment in this case called upon me to evaluate the actual and reasonably expected pre-tax economic impacts of the transaction and to compare them with the after-tax results claimed by Plaintiff.  My opinion is limited to those fundamental observations: what their implications may be for the application of the 'Step Transaction Doctrine' is beyond the scope of my reports and any testimony I might offer at trial.[63]

### 4.    Dr. Rausser Does Not Use Legal Terms to Offer a Legal Opinion.

Plaintiff's argument that Dr. Rausser improperly uses "specialized" legal terms is difficult to respond to, mostly because it makes little, if any, sense.  Plaintiff's argument starts with the proposition that "[a]n expert witness crosses the line by explicitly or implicitly using a legal standard to instruct the trier of fact in how to interpret the evidence."[64]  Plaintiffs argument is that "[t]he Rausser Reports use numerous specialized legal terms that one would not expect an objective financial economist to use," and cites Dr. Rausser's use of "form over substance,"

---

[61]Rausser Memorandum, p. 22.

[62]See 29 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure* § 6284 & fn. 24 (2007) and the cases cited in that footnote.

[63]Rausser Declaration, ¶19.

[64]Rausser Memorandum, p. 22.

"promoter," and "basis."[65]  Plaintiff concludes that Dr. Rausser's use of those terms shows that

he "willingly abandoned his role as an independent expert and, instead, acts as an advocate for

Defendant."[66]  It is unclear how, through the use of those words, Dr. Rausser "crosses the line by

explicitly or implicitly using a legal standard to instruct the trier of fact in how to interpret the

evidence."

Dr. Rausser's single use of the phrase "form over substance" in one footnote in over 160

pages of text can hardly be characterized as legal advocacy.  As he explained in his deposition,

his use of the phrase "form over substance" was not meant to convey an opinion as to the legal

consequences of the transactions at issue.[67]  Rather, the phrase was used to convey an opinion as

to the economic consequences of the transactions at issue which is the way he had used the

phrase in the past in his own research.[68]  As set forth above, plaintiff fails to appreciate the

difference between a financial economic analysis of substance over form and the legal analysis of

substance over form.[69]

Plaintiff claims that the term "promoter" "is used by tax professionals only when they

intend to convey a specific meaning" and that Dr. Rausser's use of the term "inappropriately

---

[65]Rausser Memorandum, p. 23.

[66]Rausser Memorandum, p. 24.

[67]Plaintiff's Exhibit 4 (hereinafter "Rausser Deposition"), p.174, l.3-p.175, l.2.

[68]Rausser Declaration, ¶23.

[69]With respect to the difference, see *Internal Revenue Service v. CM Holdings, Inc.*, No. 97-695, unpublished Memorandum Opinion of March 17, 1999 (D. Del. 1999), attached as Government Exhibit 4, at pp.35-36 ("The Court accepts IRS's proffer that Dr. Hoag is giving an opinion on the 'economic substance' of the transaction according to the financial definition of the term, rather than the legal definition of the term.").

advocates Defendant's interpretation of the facts."[70]  However, plaintiff then strangely claims that Dr. Rausser does not understand the legal significance of the term "promoter."[71]  Regardless of the confusion in plaintiff's argument, as Dr. Rausser explained at his deposition and in his Declaration, he did not intend to use the term "promoter" to connote a specialized legal meaning.[72]

Finally, there is nothing surprising or improper about Dr. Rausser's use of the phrase "basis trades."  In fact, plaintiff's representatives themselves used the term "basis creation options" to describe the interest rate option trades.[73]  Dr. Rausser's professional use of "form over substance," "promoter," and "basis" can not fairly be compared to experts' opining on the legal meaning of contractual terms in the cases plaintiff cites.  Dr. Rausser neither explicitly nor implicitly attempts to use words with specialized legal definition in order to try to influence the trier of fact and plaintiff's argument to that effect does not hold water.[74]

---

[70]Rausser Memorandum, p.24.

[71]Rausser Memorandum, p. 24, fn. 140.  Perhaps plaintiff is trying to argue that Dr. Rausser misused the term promoter because it has a specialized legal definition and Dr. Rausser used that term in its non-specialized, non-legal sense.  If that is his argument, then plaintiff's point would still be meritless since the term promoter clearly has a ordinary and common meaning, and Dr. Rausser was, in fact, intending only that meaning and not some specialized legal meaning.

[72]Rausser Deposition, p.139-141; Rausser Declaration, ¶20.

[73]Rausser Declaration, ¶22, fn.31.

[74]Plaintiff's argument in the Kolbe Memorandum that Dr. Kolbe supplants the role of counsel also appears to imply there is something wrong with Dr. Kolbe's use of the phrase "basis-creating" in referring to the interest rate option trades at issue.  See Kolbe Memorandum, p.6.  Dr. Kolbe was also questioned about this subject at his deposition and the following exchange occurred between plaintiff's counsel (Q) and Dr. Kolbe (A):

> Q:    First of all, you use some language here, 'Basis-Creating Options' and 'Gain/Loss-Generating Options.' That's tax jargon, is it not?

(continued...)

3068362.11

**D.     Dr. Kolbe's and Dr. Rausser's Use of "Similar Transactions" to Test Their Conclusions is Not an Attempt to Present Inadmissible Evidence.**

**1.     Plaintiff's Various Attacks on Dr. Kolbe's and Dr. Rausser's Use of Similar Transactions Are Specious.**

From the beginning of this case, plaintiff has strongly resisted any use of similar FDIS transactions, known legally as "pattern evidence," likely because plaintiff knows how damaging such evidence will be to various aspects of his case.  In the instant motions, plaintiff tries to argue why Dr. Kolbe's and Dr. Rausser's analysis of similar transactions should be excluded. Plaintiff's arguments should be rejected because they are based on misunderstandings or misrepresentations.

For example, plaintiff's description of the process by which Dr. Kolbe and Dr. Rausser identified the forty-six transactions as being similar to the transactions at issue is misleading and

---

[74](...continued)
A:     Well, I define -- it is based on the transactions before me.  I explain the reasons early in my report that I use those locutions.

Q:    You could use, as I think you did later on in one of your tables, interest rate options, LIBOR, CMS, or currency options?

A:    I could.  Then the judge or whoever reads this has to keep track of which is which for purposes of the underlying steps being gone through in the transaction. This seemed like an easy way to help the reader keep track of which that we're talking about.

Kolbe Deposition, p.168, l.3-18.  Assuming plaintiff is making such an argument with respect to Dr. Kolbe, that argument should be rejected for the very logical reasons stated by Dr. Kolbe in his deposition.

incomplete. As explained by Dr. Kolbe[75] and Dr. Rausser[76] in both their depositions and their

Declarations, counsel for the United States provided documentation obtained in discovery

regarding similar transactions and Dr. Kolbe and Dr. Rausser (and their staff) independently

examined the other transactions and determined which ones they found to be similar. Thus,

plaintiff's assertion that the United States "pre-selected transactions" is not true.[77]

     Plaintiff's assertion that "[i]t appears that the only economists who test their conclusions

on the economic attributes of a particular transaction by examining numerous *unrelated*[78]

---

[75]See generally Kolbe Deposition, p.88, l.5-p.91, l.9 and specifically Kolbe Deposition, p. 91, l.7-8, where Dr. Kolbe stated "it was an iterative process to narrow it to these 47."; Kolbe Declaration, p. 16 ("We did not passively accept 'data on pre-selected transactions' from the government. To the contrary, we critically reviewed all data provided by the government.").

[76]Rausser Deposition, p.137, l.22-p.139, l.10; Rausser Dec., ¶24 ("I instructed my staff to compare the list of transactions we had independently identified to those separately identified by counsel when it later became apparent there were differences.").

[77]Plaintiff also complains that the United States did not provide information about the thousands of the other "Son of Boss" transactions to Dr. Kolbe and Dr. Rausser. Kolbe Memorandum, p.14-15; Rausser Memorandum, p.25. However, the provision of such information would not have been helpful since the other "Son of Boss" transactions were not comparable enough to plaintiff's transactions. See Kolbe Dec., p.15 ("I would have immediately rejected [other potential "Son of Boss" transactions] as not comparable for purposes of my analysis."). See also Rausser Declaration, ¶24, setting forth several of the various attributes that were common to plaintiff's transactions and the 46 other similar transactions identified by Dr. Kolbe and Dr. Rausser that would not have been similar to thousands of other "Son of Boss" transactions.

[78]It is unclear why plaintiff believes that the other 46 transactions are unrelated to plaintiff's transactions, especially since all of the transactions are structured in virtually the identical fashion, including the same promoters, offsetting option structures with insignificantly different strike prices, very similar probabilities associated with each possible outcome, consistent calculations of the bid/ask fee payable to Refco, a diminution in reported value the day after execution of the initial options, the same foreign partners (either Mahoney or Hawkes), comparable changes to the percentage ownership interests for the multi-member LLC before and after gain realization, and the separation and immediate replacement of the paired options in a manner claimed to generate a gain and lock in a loss. See Rausser Declaration, ¶24.

transactions are economists hired by the Tax Division"[79] is not true.  The fact is that the comparison of similar transactions is "an essential tool used by financial economists in their work"[80] and is a "mainstream activit[y] of financial economics."[81]  Citing certain deposition testimony out of context, plaintiff asserts that "Kolbe admits that the only other instances where he has used information on other transactions have been in work performed in connection with other pending cases in which the Tax Division is trying to use so-called 'pattern evidence.'"[82]  That is false.  The question asked by plaintiff's counsel in the cited deposition testimony was about "tax cases."[83]  Thus Dr. Kolbe's response dealt only with "tax cases."  In fact, as set forth in his Declaration, he routinely makes use of evidence of similar transactions when he is aware that it exists.[84]  Plaintiff similarly mischaracterizes Dr. Rausser's experience when plaintiff asserts that "it does not appear that Dr. Rausser has previously required the use of similar, but unrelated, transactions to test his analysis of one particular transaction."[85]  That assertion is dead wrong.  Since most of Dr. Rausser's reports are subject to various protective orders and can not

---

[79]Kolbe Memorandum, p.17; Rausser Memorandum, p.27 (emphasis added).

[80]Rausser Declaration, ¶26.

[81]Kolbe Declaration, p.14.

[82]Kolbe Memorandum, p.17, citing Kolbe Deposition, p.179, l.3-16.

[83]Kolbe Deposition, p.179, l.5.

[84]Kolbe Declaration, p.17.

[85]Rausser Memorandum, p.26.

3068362.11

be disclosed,[86] it is unclear how plaintiff can make such a statement.  In any event, Dr. Rausser

has used analysis of similar transactions in the past.[87]

>   **2.    The First Circuit Has Upheld the Use of Similar Transactions to
>   Support a Finding of Lack of Economic Substance.**

In addition, courts have frequently recognized the utility of comparing similar

transactions.  Significantly, in *Dewees v. Commissioner*,[88] the First Circuit upheld the Tax

Court's use of 1,100 similar transactions to support its finding that the straddle transaction at

issue there lacked economic substance, stating "[t]he Tax Court was free to draw reasonable

conclusions from the general pattern of the transactions before it."[89]  Even more importantly, the

First Circuit in *Dewees* then went on to cite and rely upon such evidence of similar transactions

to support its own holding.[90]  In this regard, the First Circuit first concluded "[t]hat basic pattern

[of 1,100 transactions] is the one we have described ...   And, this pattern is one designed to

produce tax gains; *it is not designed to produce real gains.*"[91]

To support this holding, the Court then frequently compared the transaction there at issue

to the 1,100 similar transactions all containing essentially the same facts as the Dewees'

transaction, first noting:

---

[86]Rausser Declaration, ¶26.

[87]Rausser Declaration, ¶26 (Setting forth several instances in which he uses a comparison
of similar benchmarks to compare the transaction he is working on to other transactions and
stating that: "Disciplined academics regularly look for such comparisons to ground their
analysis.").

[88]870 F.2d 21 (1st Cir. 1989).

[89]*Id.*  In *Dewees*, the First Circuit noted there were 1,100 similar cases before the Tax
Court which evidence was offered through an IRS summary witness.  *Id.* at 31.

[90]*E.g., id.* at 31.

[91]*Id.*  (Emphasis added.)

3068362.11

none of the 1,100 investors *ever* received a "margin call" from his broker, asking that he pay more, so as to maintain a margin adequate to cover the losses and risks of his account. This fact is evidence that the brokers did not believe any investor would lose more money than his initial margin deposit would cover.[92]

The Court also used its reliance on similar transactions to confirm another fundamental conclusion of its holding when it stated:

> We cannot imagine that the case before us could be an instance of real contango speculation that, by chance, worked out adversely to the investors to the extent of losing their margin deposit. We cannot imagine this because *none* of the 1,100 London options investors' trading records shows any evidence of the real risks, profits, and losses that genuine contango speculation would create. And the odds against the trades of 1,100 genuine speculators, seeking real profits, just happening to fit the pattern of Jane's trading, and just happening to lose exactly the amount of their margin deposits, must be phenomenal. It might not be reasonable to think a coin was unbalanced because it lands 'heads' once, but that conclusion becomes far more reasonable when 'heads' turns up 1,100 times in a row.[93]

In short, the use of similar transactions is clearly permissible and such similar transactions can certainly be admissible in evidence and, in fact, may be an essential and integral aspect of a court's determination, *inter alia*, that a transaction lacks (or, for that matter, has) economic substance.

### 3. Plaintiff's Reliance on Other Authority to Support His Position That Similar Transactions are Inadmissable in Evidence is Unavailing.

Ignoring the First Circuit's clear holding in *Dewees*, plaintiff attempts to draw support for his position that similar transactions are inadmissible in evidence by reference to totally

---

[92]*Id*. at 32. (Emphasis in original.)

[93]*Id*. at 32.(Emphasis in original.)

inapposite authority.  First, *United States v. Frabizio*[94] is not at all similar to the instant facts.[95]

In *Frabizio*, although the court did, in *dicta*, find the proposed expert witnesses' technique to be

improper in part because it was not generally accepted outside the FBI,[96] the court's holding was

that it was not proper for an expert witness, or a lay jury, to determine whether pictures were real

photographs or computer-generated images.[97]  The court also stated that "[i]f photographic

experts as a general matter are inadequate to the task of identifying computer-generated images,

then no level of experience in that field will suffice to qualify one as an expert."[98]  In the instant

case, plaintiff can not seriously be arguing that experts in financial economics and options can

never be qualified to testify as to the economic issues in the case.

Plaintiff's conclusion that "any opinions based on 'other taxpayer' information should be

excluded under Rule 703 as hearsay not reasonably relied upon by experts in this field"[99] must

also be rejected.  As discussed above, contrary to plaintiff's arguments, evidence of similar

transactions is useful and is the type of data that experts in Dr. Kolbe's and Dr. Rausser's fields

reasonably rely on in forming opinions or inferences on the subject.[100]  In fact, as Dr. Rausser

---

[94]445 F. Supp. 2d 152 (D. Mass. 2006).

[95] In relying upon this case, plaintiff asserts that "the technique of using other transactions here is nothing more than the Tax Division's experts copying each other's work." Kolbe Memorandum, p. 18. But, as noted above, this assertion is untrue.

[96]*Id.* at 168.

[97]*Id.* at 155.

[98]*Id.* at 159.

[99]Kolbe Memorandum, p.18; Rausser Memorandum, p.27.

[100]Kolbe Declaration, p.17 ("I routinely use sample evidence in situations where I know relevant data are available."); Rausser Declaration, ¶26 (setting forth several instances in which he uses a comparison of similar benchmarks to compare the transaction he is working on to other

(continued...)

points out, "[a]ny peer reviewed analysis of this transaction would be severely criticized if it disregarded other transactions by the same promoters in the same period whose results, terms and configuration could be compared."[101]

### E.    Dr. Kolbe's and Dr. Rausser's Opinions are Not Unduly Cumulative.

Plaintiff asserts that Dr. Kolbe's and Dr. Rausser's opinions are unduly cumulative, per Rule 403 of the Federal Rules of Evidence, because of the overlap in their opinions.  What plaintiff fails to recognize is that each expert analyzed the transactions at issue from a different perspective.  In *Treaster v. Healthsouth Corporation*,[102] the plaintiff claimed that the presentation of both of defendant's expert witnesses would be cumulative since the experts would testify as to the same issue.[103]  The defendant countered that the experts had different fields of expertise and would testify from different perspectives.[104]  The court reviewed the reports and the qualifications of each of the experts and concluded that they each had a different area of expertise and thus found no reason to exclude one of the experts.[105]

While both Dr. Kolbe are Dr. Rausser are by training and experience economists, they both have vastly different specializations and experiences as economists.  On the one hand, Dr. Rausser is an options expert with immense experience in the trading of options, derivatives and

---

[100](...continued)
transactions and stating that: "Disciplined academics regularly look for such comparisons to ground their analysis.").

[101]Rausser Declaration, ¶25.

[102]2006 WL 1580980 (D.Kan. 2006).

[103]*Id.* at *2.

[104]*Id.*

[105]The court noted that plaintiff's remedy would be to object at trial if it appeared the two experts were providing unduly cumulative testimony.  *Id.*

3068362.11

other financial instruments, as well as the financial forecasting and quantifying of the various risks associated with traded instruments.[106]  On the other hand, Dr. Kolbe is, by training and experience, a financial economist, which field (finance) is a subset of the field of economics and is primarily devoted to the study and understanding of the workings of capital markets and the supply and the pricing of capital assets (which of course, includes financial derivatives such as options.)[107]

Thus, Dr. Rausser has analyzed the economics of the transactions and option trades at issue from the perspective of an options expert.  By contrast, Dr. Kolbe has analyzed the economics of the transactions at issue through the application of basic principles and tools of finance and financial analysis.  As a result, both experts are providing a totally different level of analysis and also offering opinions and conclusions from a considerably different perspective. Moreover any reading of Dr. Rausser's and Dr. Kolbe's separate reports and supporting exhibits and tables and charts make it eminently clear that, although they are necessarily analyzing the same transaction, they base their conclusions on an array of differing considerations and opinions.  These differences stem from their differing specializations and experiences.

In sum, the testimony of Dr. Kolbe and Dr. Rausser can in no way be viewed as "unduly cumulative."  Accordingly, we respectfully believe that the Court will be significantly aided by the testimony of both experts, as the testimony will come from different levels of analysis and differing perspectives.[108]

---

[106]Rausser Report, p.14 and Exhibit 1 to the Rausser Report; Rausser Declaration, ¶2 and 3.

[107]Kolbe Declaration, p. 1-2.

[108]The First Circuit reviews a district court's ruling on the admissibility of expert testimony under Rule 403 of the Federal Rules of Evidence for abuse of discretion.  *See e.g.,*

(continued...)

**F.** **Dr. Kolbe is Eminently Qualified to Opine on the Economic Attributes of Digital Options Transactions**.

Plaintiff asserts that Dr. Kolbe is unqualified to opine on the economic attributes of the digital options at issue.[109]  Quite frankly, this argument is absurd.  With a Ph.D. in economics from the Massachusetts Institute of Technology and having been the co-author of three books in the field of financial economics, Dr. Kolbe has specialized in financial economics for almost three decades.[110]  As such, he is more than qualified to apply the principles and tools of finance to analyze the economic consequences of the digital options at issue.  As he states in his Declaration:

> With respect, I am plainly qualified to evaluate the economic attributes of the digital options in this dispute. The formula used to do so is well known in finance and is a simplification of the original Black-Scholes model, published 35 years ago. The same formula was used by the parties in this dispute to value the options in this case at the time....The formula for these options is simpler than the original Black-Scholes model because the digital payoff is a fixed cash amount, not a stock with an uncertain future value, and no exercise price need be paid. In fact, the term in the Black-Scholes formula usually used to value the exercise price of an ordinary -- "vanilla" --European option constitutes the entire formula for a digital option, except that the sign is changed because the fixed cash payoff is an inflow to the owner rather than an outflow, as the payment of the exercise price is for a vanilla option.[111]

Indeed, Dr. Kolbe was qualified as an expert in financial economics, investment, leverage and capital market principles by the United States Court of Federal Claims in *Jade Trading, LLC v.*

---

[108](...continued)
*Rubert-Torres v. Hospital San Pablo, Inc.*, 205 F.3d 472, 479 (1st Cir. 2000).

[109]Kolbe Memorandum, p.13-14.

[110]Kolbe Report, p. 1 and Kolbe Declaration, p.4-5.

[111]Kolbe Declaration, p.6.

*United States,*[112] where he performed a financial analysis involving offsetting options similar to those at issue here. Pointedly, the Court of Federal Claims cited and relied upon Dr. Kolbe's testimony numerous times throughout its recent opinion.[113]

In support of his position that Dr. Kolbe is unqualified to analyze the economic attributes of digital options, plaintiff quotes Dr. Kolbe's deposition testimony where he states that he has infrequently calculated the expected rate of return on options.[114] However, plaintiff fails to quote or cite the testimony just before the quoted testimony where Dr. Kolbe states that calculating the expected rate of return on options is usually not done and is not normally required by the Black-Scholes model. The reality is that Dr. Kolbe had a great deal of experience in estimating expected rates of return.[115]

Plaintiff's argument that Dr. Kolbe is unqualified should be rejected outright.[116] Dr. Kolbe is plainly qualified under Rule 702 of the Federal Rules of Evidence by knowledge, skill, experience, training and education to testify as to the economic attributes of digital options transactions.

G.    **Dr. Kolbe's Opinion that Each Pair of Long and Short Options Are, Economically, a Single Investment is Reliable**.

Plaintiff's argument regarding Dr. Kolbe's opinion that each pair of long and short options are, economically, a single investment demonstrates a misunderstanding of economics, of

---

[112]80 Fed. Cl. 11 (Fed. Cl. 2007).

[113]See id. at 38.

[114]Kolbe Memorandum, p. 14, fn. 70, citing Kolbe Deposition, p. 206, l.7-11.

[115]Kolbe Deposition, p.205, l.13-p. 206, l.6. *See also* Kolbe Declaration, p. 6, fn.13. ("Estimation of expected rates of return is a longstanding specialty of mine.").

[116]The cases cited by plaintiff to support his position are so inapposite to Dr. Kolbe's qualifications and experience that they do not even warrant discussion.

Kolbe's report, or of both.  In forming that conclusion, Dr. Kolbe only changed one thing about the actual facts of the case, the one thing being that the sets of options were traded by different brokers.  All of Refco's practices remained the same in Dr. Kolbe's analysis.  It is plaintiff who changes the terms of the Refco contracts in their argument.[117]  As is more fully set forth in Dr. Kolbe's Declaration, plaintiff's suggested alternatives would not have affected his basic findings.[118]

Plaintiff also claims that Dr. Kolbe's analysis is one that he only uses in connection with the Tax Division.  As explained by Dr. Kolbe, "[m]y conclusion is the result of the application of basic economic principles and tools – thought experiments, the importance of tradeoffs in product attributes and the use of indifference curves to analyze those tradeoffs, the importance of transaction costs, investment project valuation principles, and the concept of opportunity cost – to a specific situation."[119]  As discussed above, the fact that this issue may not come up in other contexts does not mean that Dr. Kolbe should not be opining on it when it does arise in connection with tax cases.  And, contrary to plaintiff's suggestion, Dr. Kolbe's conclusion is testable.[120]  Plaintiff's argument that Dr. Kolbe's opinion that each pair of long and short options are, economically, a single investment should be excluded, is meritless.

---

[117]For this reason, plaintiff's citation of *Coleman v. DeMinico*, 730 F.2d 42 (1st Cir. 1984), see Kolbe Memorandum, p. 20, fn.95, for the proposition that an expert could opine on hypothetical facts as long as the facts were not contrary to the record and his related argument that Kolbe is "creating an entirely hypothetical alternative transaction that has no basis in the facts" is difficult to understand.

[118]Kolbe Declaration, p. 18-21.

[119]Kolbe Declaration, p.21.

[120]Kolbe Declaration, p. 21-22.

**H.    Dr. Rausser Does Not Repeatedly Assert Unsupportable Inferences**

Although plaintiff claims Dr. Rausser "repeatedly" uses unsupportable inferences, plaintiff cites only two examples of such allegedly unsupportable inferences:  (1) Dr. Rausser's allocation of legal fees for tax planning to the transactions in his rebuttal expert report and (2) a statement by Dr. Rausser regarding Samuel Mahoney's role in generating plaintiff's desired tax outcome.[121]  With respect to Dr. Rausser's allocation of legal fees for tax planning to the transactions, plaintiff misleadingly states that Dr. Rausser "ignores the possibility that such fees were attributable to numerous other transactions or estate planning services."[122]  That is not true. In fact, Dr. Rausser specifically states in his rebuttal report that determining precisely which legal fees were attributable to the transactions at issue in this case was difficult since the invoices for the fees were redacted and since plaintiff did not submit invoices for several periods.[123]  As Dr. Rausser also points out in his rebuttal report, as a result of the redactions and incomplete record of invoices, it is possible that the legal fees could be materially higher than he calculated.[124]  In addition, he says that there may be other fees involved that have not yet been identified.[125] Moreover, even if a portion of the legal expenses that Dr. Rausser allocated to the transactions at issue were belatedly shown by plaintiff to be related to other legal work, that would not

---

[121]Rausser Memorandum, p.27-28.

[122]Rausser Memorandum, p. 27.

[123]Plaintiff's Exhibit D, Rebuttal Expert Report of Gordon Rausser (hereinafter "Rausser Rebuttal"), p.15, n.25.  See also Rausser Declaration, ¶27.

[124]Plaintiff's Exhibit 2, Rebuttal Expert Report of Gordon Rausser (hereinafter "Rausser Rebuttal"), p.15, fn.25.

[125]See Rausser Rebuttal, p.19-20.

fundamentally affect Dr. Rausser's conclusion that Fidelity International's and plaintiff's profit potential on the transactions was negligible or non-existent.[126]

Plaintiff claims that Dr. Rausser's statement that "[l]acking any other economic justification [for] Mr. Mahoney's participation, it must be concluded that [it was] necessary to generate the desired tax outcome" is unsupportable.[127]  According to plaintiff, this is because Dr. Rausser did not identify information regarding Mr. Mahoney's portfolio or motivations for participating in the transactions at issue.[128]  Thus, plaintiff concludes that Dr. Rausser does not have sufficient facts to conclude that the only reason for Mr. Mahoney's participation was to generate a specific tax outcome.

In the first place, plaintiff simply ignores the fact that Dr. Rausser qualified his conclusion regarding the reason for Mr. Mahoney's participation in the transactions.  As he said, his conclusion assumed there was no other economic justification for Mr. Mahoney's participation in the transactions.  More importantly, however, plaintiff fails to recognize that Dr. Rausser based his conclusion regarding the reason for Mr. Mahoney's participation in part on the critical facts that Mr. Mahoney and his partner, Mr. Hawkes, had participated in approximately 46 other similar transactions where it could be rationally projected at the outset that the two of them would lose (and, in fact, did lose) approximately half the money they allegedly contributed.

---

[126]Rausser Declaration, ¶27.

[127]Rausser Memorandum, p. 27-28, citing Rausser Deposition, p. 104.

[128]Rausser Memorandum, p. 27-28.  It is true that Dr. Rausser made no attempt to divine the personal motivations of Mr. Mahoney's participation.  *See* Rausser Declaration, ¶28 ("I was careful not to conclude what Mr. Mahoney's personal motivations may have been.").

3068362.11

As stated by Dr. Rausser, "[r]ational investors will not ordinarily repeat unprofitable experiences for which only expected losses could be justified."[129]

Despite asserting that Dr. Rausser makes "numerous" unsupportable inferences, plaintiff only cites two such purported examples. As set forth above, those two examples are not examples of unsupportable inferences. In fact, the two examples show how careful Dr. Rausser is in his analysis of various aspects of the transactions at issue. Plaintiff's argument that Dr. Rausser relies on any unsupportable inferences is itself unsupportable.

## I.    Dr. Kolbe's Discussion of the *Dewees* Case Should Not be Excluded.

The fact that Dr. Kolbe was asked by the United States to review an economic example in a legal case does not mean that he is giving a legal opinion. Plaintiff's suggestion that Dr. Kolbe included an analysis of *Dewees v. Commissioner* to appease counsel for the United States or because he was intimidated or unduly influenced by the United States to perform the analysis is false.[130] Very simply, Dr. Kolbe was asked to perform an economic analysis of a hypothetical contained in a legal case, he was qualified to do so and he did it. In performing his analysis, Dr. Kolbe opined that the example given by the First Circuit in *Dewees* contained an inconsistency between the straddle pricing the court initially hypothetically specified and the hypothetical size of the gain and loss the court posited, but concluded that the inconsistency did not affect the ultimate economic logic of the example.[131]

---

[129]See Rausser Declaration, ¶28.

[130]Kolbe Memorandum, p. 11. See also Kolbe Declaration, p, 23.

[131]The fact that counsel for the United States initially requested Dr. Kolbe's staff to make the same type of analysis had no effect on Dr. Kolbe's opinion since he had no part in drafting that memorandum, and, in fact, never even read it. Kolbe Declaration, p. 23, fn. 53.

3068362.11

The United States intends Dr. Kolbe's objective economic analysis of the First Circuit's hypothetical in *Dewees* to be helpful to the Court. Such an analysis may be particularly helpful to the Court if it concludes that the *Dewees* decision has applicability to the resolution of issues in this case. Critically, an understanding of the hypothetical example in *Dewees* is essential to an understanding of the First Circuit's holding in *Dewees*. And because it appears that there is a mistake in the First Circuit's hypothetical example, an economic analysis of the error could be of great assistance to the Court.

The United States recognizes that Dr. Kolbe's economic analysis of the hypothetical example in the *Dewees* opinion does not relate to the facts of the instant case and that it likely would be inadmissible in a jury trial. However, in a bench trial the Court has more flexibility to allow such testimony.[132] Expert testimony will assist the trier of fact if there is a logical relationship between the expert opinion and the factual and legal issues in the case.[133] In the instant case, a logical relationship exists between Dr. Kolbe's analysis of the *Dewees* opinion and the legal issues in this case.

**J.     Dr. Rausser's Reports Are His Own Expert Reports and He Has Not Breached His Duty to the Court**.

Plaintiff appears to complain that Dr. Rausser's staff at OnPoint Analytics, Inc., drafted either all or too much of his report.[134] Plaintiff admits that they have the burden of proof on this issue and cites *Trigon Insurance Company v. United States*, for the proposition that "absent

---

[132]*See e.g., Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000)("Most of the safeguards provided for in *Daubert* are not as essential in a case [] where a district judge sits as the trier of fact in place of a jury.").

[133]*In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 743 (3d Cir. 1994).

[134]The implication that Dr. Rausser was forced by "intimidation or undue influence", see Rausser Memorandum, p. 28, n.164 and that Dr. Rausser is a "mouthpiece" for counsel for the United States, p. 29, n.165, is preposterous and unsupported.

evidence to support the expert's testimony that the report is his own, the court would be justified in refusing to credit the expert on that issue."[135]   In this case, there is overwhelming evidence in Dr. Rausser's deposition and in Dr. Rausser's Declaration to support the fact that Dr. Rausser's reports are most definitely his own reports.

To begin with, Dr. Rausser's reliance on professional staff to assist him in his broad-ranged economic and option-oriented analyses and also to assist him in drafting his reports was not improper.  Indeed, in a case involving facts and technical issues of this complexity, it was absolutely essential for him to have professional assistance. *See Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002) ("an expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify") (Internal citations omitted.); *McReynolds v. Sodexho Marriott Services, Inc.*, 349 F.Supp.2d 30, 36 (D.D.C. 2004) (expert may rely on his "assistants to carry out analyses that the expert designed,"), *citing  Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*, 222 F.Supp.2d 423, 492 (S.D.N.Y.2002) for the proposition that "there is no requirement that an expert must run his own tests."[136]

Plaintiff relies in part on the absence of emails between Dr. Rausser and his staff for the proposition that Dr. Rausser's staff "performed the substantive work preparing the Reports."[137] Even if true (which it is not), as noted, there is nothing improper about an expert relying, even if extensively, upon staff to assist in the analysis and drafting of the reports.  What is critical is that

---

[135]204 F.R.D. 277, 293 n.14 (E.D. Va. 2001).

[136]*Cf. Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 9 (1st Cir. 2001) (expert permitted to rely on deceased expert's work product where he previously worked on the case with the deceased).

[137]Rausser Memorandum, pp.29, 31-32.

3068362.11

the analysis and conclusions be those of the expert (*i.e.*, that his report be his *own* report) and not someone else's conclusions and opinions.[138] In any event, as set forth in his Declaration, Dr. Rausser "almost never" uses email to communicate with his staff but rather prefers face-to-face meetings.[139] Thus, the absence of emails to or from Dr. Rausser regarding the preparation of his expert reports shows his preference against using email and nothing else.

Indeed, this is the same type of baseless innuendo that plaintiff used in his motion to compel *non-existent* documents from Dr. Rausser and On Point Analytics. What is more, Dr. Rausser made clear at his deposition, which plaintiff chose not to cite, that he was, in fact, the primary drafter of both of his expert reports. As Dr. Rausser explained at his deposition, when questioned about Plaintiff's Exhibit 24 to the Rausser Memorandum which relates to Dr. Rausser's Report:

> I am the author of the report. Each of the staff members are given specific assignments, taking what I have written and then being the responsible party for maintaining that portion of the report. And in this instance, that role would be served by the primary reviewer. And then there's fact checks and analytical

---

[138]In fact, even counsel can assist the expert in the preparation of the expert report. The Advisory Committee Notes to the 1993 amendments to Rule 26 of the Federal Rules of Civil Procedure provide in part that:

> Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness.

And various courts have also so held. *See e.g. Marek v. Moore,* 171 F.R.D. 298, 301 (D.Kan.1997) "[s]uch assistance [by counsel] is permitted, though the report should be written in a manner that reflects the testimony to be given by the expert witness and must be signed by the expert."

[139]Rausser Declaration ¶31. Plaintiff also argues that certain internal OnPoint communications show that the report was written by OnPoint staff.

checks that are done by other staff members for accuracy that had nothing to do with preparing the original section.[140]

Shortly thereafter, the following exchange occurred between plaintiff's counsel (Q) and Dr. Rausser (A), in which plaintiff's counsel attempted to draw the same inferences from Exhibit 24 to the Rausser Memorandum with respect to Dr. Rausser's Report as they try to draw in their motion:

Q:    According to this document, I think you'll agree, the primary reviewers who are listed on that column are the persons who wrote the section that is identified?

A:    They are people who wrote and worked with me on preparing the section, yes, but they are the employees who were collaborators on those sections.

Q:    So you agree that where we see LRC, the first four blocks, Ms. Craft did, indeed, write those sections?

A:    No.  She worked with me in preparing those sections.

Q:    Did she draft portions of those sections?

A:    Jointly with me, yes.

Q:    And the rest of the people listed there as primary reviewers, is it your testimony that they, too, drafted with you those sections?

A:    Yes.[141]

Plaintiff also argues that Dr. Rausser did not have sufficient input in drafting his rebuttal report, citing Plaintiff's Exhibit 26 to the Rausser Memorandum.  With respect to that exhibit, at his deposition Dr. Rausser (A) testified in response to questions from plaintiff's counsel (Q) as follows:

Q:    Again, here, Ms. Craft, I take it, was engaged in drafting the rebuttal report?

_____

[140]Rausser Deposition, p. 121, l.2-11.

[141]Rausser Deposition, p. 122, l.1-18.

41

> A:   Once again, it was a joint drafting.  All of the drafting took place under my
> control.  Anything that was drafted she did so under my instructions.[142]

There can be no doubt that Dr. Rausser's reports are his own reports.[143]  Dr. Rausser's

Declaration is consistent with his deposition testimony.  In his Declaration, he states that

"Plaintiff's assertion that I did not draft the two reports I signed is flatly untrue" and then he

explains the extensive role he played in the drafting of his expert reports.[144]

In sum, plaintiff's argument that Dr. Rausser breached a duty to the Court because the

reports he signed are not his own reports is an unwarranted and baseless attack on his personal

character. Given that Dr. Rausser  made crystal clear at his deposition that his reports in this

litigation were his own reports, plaintiff's argument to the contrary based on innuendo and

unsupported inferences borders on the unprofessional.

---

[142]Rausser Deposition, p. 155, l.11-16.

[143]Plaintiff also claims that Dr. "Rausser's own colleague's opinion of his billing practices"... "raises significant doubts as to Rausser's role in writing the Reports."  Rausser Memorandum, p.32.  This is just one more groundless and unwarranted personal attack on a distinguished professional that has no place in a motion to exclude an expert witness. The short answer to this allegation is that plaintiff took an isolated statement out of context and attempted to spin it into something it is not.  In fact, if anything, the statement – made five years ago by an employee of a consulting firm for which Dr. Rausser performed expert witness work – is a fitting commentary on Dr. Rausser's independence in conducting his expert witness work.  The statement was made by someone who would not recommend Dr. Rausser since Dr. Rausser billed a lot of time for his own work relative to the time his staff worked, which caused the author of the email to receive a lower finder's fee and for the firm he worked for to receive less income. Here again, Dr. Rausser provided this explanation at his deposition, but, once again, plaintiff chose to ignore the explanation.  Rausser Deposition, p. 98-99.

[144]Rausser Declaration, ¶29.

3068362.11

### K.     The Alleged "Judicial Criticism" of Dr. Rausser Is Misleading.

Out of more than one hundred instances in which Dr. Rausser has testified as an expert

witness,[145] plaintiff chose to focus on five instances in which he thought he could show that Dr.

Rausser's credibility had been questioned.  Plaintiff failed miserably.  Briefly,[146] two of the cases

were reversed on appeal with the higher tribunal directly undercutting the lower tribunal's

criticism of Dr. Rausser;[147] the methodology used by Dr. Rausser in one of the cases was later

approved by the Seventh Circuit;[148] and the other two cases were instances in which Dr. Rausser

was forced to deal with limited data as he fully set forth in his reports accompanying those

cases.[149]  Dr. Rausser's Declaration sets forth more completely what happened in the five cases

that plaintiff cites and the facts will not be repeated here.  Suffice it to say that plaintiff owes Dr.

Rausser an apology for attempting to sully his reputation with what can only be described as

careless research.

---

[145]Rausser Declaration, ¶33.

[146]The five cases plaintiff cites are summarized in Rausser's Declaration, ¶¶33-37.

[147]*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, No. 03-6731 (S.D.N.Y Aug. 8, 2005), amended in part (S.D.N.Y. Jan. 20, 2006), aff'd in part, vacated in part, 487 F.3d 89 (2d Cir. 2007) and *In the Matter of Mark B. Fisher*, C.F.T.C. No. 93-2, March 24, 2004.

[148]*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028 (8th Cir. 2000).   The Seventh Circuit case was *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651 (7th Cir. 2002).

[149]*Oxygenated Fuels Ass'n v. Pataki*, 293 F. Supp. 2d 170 (N.D.N.Y. 2003) and *Oyster Software, Inc. v. Forms Processing, Inc.*, No. 00-0724 (N.D. Cal. 2001).

3068362.11

**L.     Plaintiff's Personal Attacks on Dr. Rausser and the Staff at On Point Analytics Are Irrelevant and Do Not Warrant a Response.**

Plaintiff's incomplete and incorrect[150] "summary" of Dr. Rausser's professional career and other personal matters has no relevance to Dr. Rausser's role as an expert witness in this case.  Similarly, plaintiff's recitation of selected facts regarding OnPoint Analytics, Inc., and some of its other staff members is not relevant and does not advance plaintiff's claim that Dr. Rausser should be excluded as an expert witness.

Given that plaintiff's counsel devoted nearly four hours of a seven hour deposition of Dr. Rausser on topics – including an array of personal matters – having nothing to do with Dr. Rausser's incredibly detailed analyses and conclusions in his two reports consisting of over 160 pages,[151] this line of personal attacks is not surprising.  Whatever the merit of such personal attacks for purposes of impeachment (and we submit they have none whatsoever), they certainly are not, and should never have been, included as grounds in a motion to exclude the report and testimony of an expert.  Such attacks are simply designed to impugn the personal and business reputation of a distinguished professional prior to the trial.  Accordingly, we respectfully submit that plaintiff's selective narrative recitation regarding Dr. Rausser's and OnPoint Analytics, Inc., and some of its staff members is manifestly irrelevant to any issue on this motion and should be rejected outright.

---

[150]See Rausser Declaration, footnote 58, pointing out certain errors plaintiff made relating to Dr. Rausser's background.

[151]See Rausser Deposition, p. 168, l.6-11 (showing the point where plaintiff's counsel begins questioning Dr. Rausser on the Rausser Report).

3068362.11

## CONCLUSION

Plaintiff's motions to exclude the reports and testimony of Dr. Kolbe and Dr. Rausser are groundless. In fact, many of plaintiff's arguments simply have no place in a motion to exclude expert testimony. We respectfully request the Court to read Dr. Kolbe's and Dr. Rausser's reports in their entirety. The Court will find the qualifications of the authors to be outstanding, their analysis to be thorough and the conclusions to be proper and well-supported such that it will be clear Dr. Kolbe and Dr. Rausser will assist the Court in this case and we respectfully submit that plaintiff's motions should be summarily denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

/s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER L. VANN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044-0055
Telephone: (202) 307-6561
Facsimile: (202) 514-5238
E-mail: john.a.lindquist@usdoj.gov
          barry.e.reiferson@usdoj.gov
          heather.vann@usdoj.gov

3068362.11

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and copies will be sent to those indicated as non registered participants on February 15, 2008.

/s/ Heather L. Vann
Trial Attorney, US Department of Justice, Tax Division

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) | Case No.: 05-40151-FDS |

DECLARATION OF
A. LAWRENCE KOLBE

ON

RESPONSE TO STATEMENTS MADE IN PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE PROPOSED EXPERT
TESTIMONY AND REPORTS OF A. LAWRENCE KOLBE, OR, IN THE ALTERNATIVE,
TO EXCLUDE OPINIONS ON SPECIFIC TOPICS

Prepared for the
U.S. Department of Justice

*The Brattle Group*
44 Brattle Street
Cambridge, MA 02138-3736
617.864.7900 voice
617.864.1576 fax

February 15, 2008

GOVERNMENT
EXHIBIT

PENGAD 800-631-6989

1

# Table of Contents

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE CONTEXT OF THIS DECLARATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Field of Expertise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Material Prepared . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Questions Addressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Expertise and Experience . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Claims Made by the Memorandum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

QUALIFICATIONS TO OPINE ON THE ECONOMIC ATTRIBUTES OF DIGITAL OPTIONS . . . . . . . . . . 6

OPINIONS REGARDING "CONTRACT INTERPRETATION" . . . . . . . . . . . . . . . . . . . . . . . . 7
    Context . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

"SUPPLANT" THE ROLE OF COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Purposes of My Summary of the Present Transactions . . . . . . . . . . . . . . . . . . . . 10
    Specific Quotations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

MY ANALYSIS OF THE OTHER SETS OF TRANSACTIONS . . . . . . . . . . . . . . . . . . . . . . 14

OPINION THAT EACH PAIR OF LONG AND SHORT OPTIONS IS SINGLE INVESTMENT, ECONOMICALLY
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    The Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Criticisms in the Memorandum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

DISCUSSION OF THE *DEWEES* OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## I.    INTRODUCTION

My name is A. Lawrence Kolbe. My business address is The Brattle Group, 44 Brattle Street, Cambridge, Massachusetts 02138. I prepared an expert report in this matter dated August 7, 2007 ("Kolbe Report") and an expert rebuttal report dated September 11, 2007 ("Kolbe Rebuttal"). My deposition in this matter was taken on November 15, 2007 ("Kolbe Deposition").

The Plaintiff in this matter has filed a "Memorandum of Law in Support of Plaintiff's Motion to Exclude the Proposed Expert Testimony and Reports of A. Lawrence Kolbe, or, in the Alternative, to Exclude Opinions on Specific Topics," dated January 17, 2008 ("Memorandum"). In this Declaration, I have been asked by counsel for the U.S. Department of Justice ("DOJ") to address the content of the Memorandum, and in particular:

- To place the issues in context, by:
  - ▸ Stating my field of expertise with respect to this litigation;
  - ▸ Identifying the reports I have prepared and my deposition in this matter;
  - ▸ Briefly describing the questions I was asked to address;
  - ▸ Summarizing the expertise and experience that qualifies me to address these questions; and
  - ▸ Briefly stating the specific claims the Memorandum makes about my reports and deposition; and

- To address the merits of the Memorandum's claims one by one.

## II.    THE CONTEXT OF THIS DECLARATION

This section places the issues in context by addressing the above points in the order shown.

### A.    Field of Expertise

I hold a B.S. from the U.S. Air Force Academy (1968) and a Ph.D. from the Massachusetts Institute of Technology (1979), both in economics. I have specialized in financial economics for almost three decades, since starting my first post-Air Force job at the firm of Charles River Associates in late

1978.  Financial economists study and practice in the field of "finance."[1]  This field is described in

*The New Palgrave Dictionary of Money and Finance* in an entry introduced as follows:[2]

> ... The primary focus of finance is the workings of the capital markets and the supply
> and the pricing of capital assets.  The methodology of finance is the use of close
> substitutes to price financial contracts and instruments.  This methodology is applied
> to value instruments whose characteristics extend across time and whose payoffs
> depend upon the resolution of uncertainty. ...

After the introduction, the entry goes on to discuss the main topics in finance under four headings:

"Efficient Markets" (pp. 26-29), "Risk and Return" (pp. 29-33), "Substitution and Arbitrage:  Option

Pricing" (pp. 33-36), and "The Whole is the Sum of the Parts:  Corporate Finance" (pp. 36-39).

### B.    Material Prepared

As noted at the outset, I have prepared two expert reports and had my deposition taken.  The Kolbe

Report, dated August 7, 2007, consists of 83 pages of text, to which I have supplied one page of

errata.  It is supported by five contemporaneous appendices, the first two listing my qualifications

and the material I have considered, and the last three containing 42 pages of analyses and tables

drawn on in the text of the report.  The Kolbe Rebuttal, dated September 11, 2007, consists of 18

pages of text.  It is supported by three appendices, the first two updating the lists of my

qualifications and material considered, and the third supplying three additional tables drawn on in

the text of the rebuttal report.  The November 15, 2007 Kolbe Deposition consists of 260 pages of

actual transcript, to which I have supplied eight pages of errata.

---

[1]    The field now is variously known as "finance," "modern finance," and "financial economics."

[2]    *The New Palgrave Dictionary of Money and Finance*, Volume 2, pp. 26-39; quotation from p. 26.

## C.     Questions Addressed

In the Kolbe Report, I was asked by DOJ counsel to:[3]

- review the transactions at issue in this dispute from an economic perspective;

- analyze the risk-return characteristics of various pairs of offsetting option transactions involved in this dispute *independently of any claimed tax benefits*, and, viewing the offsetting option transactions objectively, to determine whether a reasonable possibility of profit existed *apart from any tax benefit*, taking into account all transaction costs;

- assess the economic rationality of the stated *non-tax* business purposes for these transactions and of two entities involved in them, a single-member limited liability company ("LLC"), Fidelity World Currency Advisor A Fund, LLC ("Fidelity World"), and a multi-member LLC, Fidelity International Currency Advisor Fund A, LLC ("Fidelity International");

- assess the economic position of Mr. Samuel Mahoney (the "Foreign Party"), an individual involved in these transactions;

- examine, *both before and after taxes*, the economic implications of a decision by Mr. Richard J. Egan (the "Taxpayer") to contribute his interests in Fidelity World, which included offsetting option positions bought through Fidelity World, to Fidelity International;

- analyze whether, *from an economic perspective*, each corresponding pair of the Fidelity World and Fidelity International offsetting option positions is one or two investments; and

- review the calculations in a numerical example in a legal decision, *David Dewees and Anne Dewees, Petitioners, Appellants, v. Commissioner of Internal Revenue, Respondent, Appellee*, United States Court of Appeals, First Circuit, 870 F.2d 21, Decided March 15, 1989 ("*Dewees* decision").

In the Kolbe Rebuttal, I was asked by DOJ counsel "to review the Expert Report of Andrew S. Carron ('Carron Report'), filed contemporaneously with my own, and to comment on the economic analyses therein as warranted." I was also asked "to review the accuracy and *completeness* of

---

[3]     Kolbe Report, Section I, pp. 1-2, emphases (other than the reference to the legal decision) added.

3

certain passages in the Expert Report of Professor Ethan Yale ('Yale Report') in the light of my analyses of the transactions in this dispute, from an economic rather than a legal perspective."[4]

### D.    Expertise and Experience

I have learned and applied general principles of economics since my undergraduate education. This includes six years assigned to the Pentagon (1971-77) analyzing economic tradeoffs in Air Force and joint-service personnel policies, as well as many general assignments in my consulting career. My understanding of finance comes from study and experience in the course of my three-decade consulting career and by working on projects with leading experts in the field. In the process, I have co-authored three books in the field and published a number of articles.[5]  I have been accepted as an expert in financial economics in income tax disputes twice before the U.S. Court of Federal Claims, the second time after denial of a motion to exclude my testimony that also cited the "*Daubert*" decision mentioned in the Memorandum at p. 2.[6]

Option pricing is an integral part of financial economics, as indicated in the *New Palgrave* article cited above, and one with which I am well acquainted.[7]

---

[4]    Kolbe Rebuttal, Section I, p. 1, for both quotations; emphasis added.

[5]    The first two books focus on the application of the principles of finance to rate-regulated industries, but the principles themselves are general.  The third is more general still.  It adapts half of the leading graduate textbook in the field -- now Richard A. Brealey, Stewart C. Myers, and Franklin A. Allen, *Principles of Corporate Finance*, 8th ed., New York: McGraw-Hill/Irwin (2006), but then with only Profs. Brealey and Myers as authors -- for a business rather than student audience, listing "The Brattle Group" as third author:  Richard A. Brealey and Stewart C. Myers, with The Brattle Group, *Capital Investment and Valuation*, New York:  McGraw-Hill (2003).

[6]    The cases were *Coltec Industries, Inc. v. The United States of America*, Fed. Cl. No. 01-72T, and *Jade Trading, LLC, by and through Robert W. Ervin and Laura Kavanaugh Ervin on Behalf of Ervin Capital, LLC, Partners Other than the Tax Matters Partner, v. The United States*, Case No. 03-2164T ("*Jade Trading*").

[7]    For example, the "asset-side" half of the Brealey and Myers textbook, *Capital Investment and Valuation*, includes two chapters on options, "Spotting and Valuing Options" and "Real Options."  ("Real" options involve the application of exactly the same set of principles, but to options created by corporate
(continued...)

4

I am not an attorney, something that I have been at pains to point out; I have also pointed out repeatedly that nothing I say or have said is intended to offer a legal option.[8] Nonetheless, I am generally familiar with the intersection of law and economics from my professional work.[9] Additionally, the understanding of the economic implications of financial contracts is central to the field of finance. Thus, I have a good deal of experience in doing financial economic analyses related to legal issues, and I am well aware of the distinction between economic and legal conclusions.

### E.    Claims Made by the Memorandum

The Memorandum makes a number of claims about my reports and deposition. They are that:[10]

- I am unqualified to opine on the economic attributes of digital option transactions;

- I inappropriately render opinions regarding contract interpretation;

- I supplant the role of counsel in presenting Defendant's view;

- My analysis of the other, contemporaneous sets of transactions is merely a way for counsel to present inadmissable evidence;

---

[7]    (...continued)
investment opportunities instead of by the terms of a financial agreement.)

[8]    For example, the Kolbe Report, Section I, p. 2 and Section II, p. 15.

[9]    For example, I am a co-author of two articles in a law journal and two in a journal on law and economics, all involving applications of the principles of finance: A. Lawrence Kolbe and William B. Tye, "The *Duquesne* Opinion: How Much '*Hope*' Is There for Investors in Regulated Firms?", *Yale Journal on Regulation*, Winter 1991, 113-157; _____, "The Fair Allowed Rate of Return with Regulatory Risk," *Research in Law and Economics* 15, 129-169 (1992); William B. Tye, Stephen H. Kalos and A. Lawrence Kolbe, "How to Value a Lost Opportunity: Defining and Measuring Damages from Market Foreclosure," *Research in Law and Economics* 17, 83-125 (1995), and A. Lawrence Kolbe, William B. Tye and Stewart C. Myers, "Response to Book Review," *Yale Journal on Regulation*, Vol. 13 (Winter 1996), 414-417. (The third of these has just been republished in *The Economics of Antitrust Injury and Firm-Specific Damages*, Kevin S. Marshall, ed., Tucson, Arizona: Lawyers & Judges Publishing Company, Inc. (2008).)

[10]    See, for example, the Memorandum's Table of Contents. The Memorandum also has a section on whether my report is "unduly cumulative" with other evidence. I understand that to be purely a legal issue, so I do not comment on it.

5

- My opinion that each pair of long and short options is a single investment, economically, is unreliable; and

- My discussion of the *Dewees* case is "unhelpful, irrelevant, and demonstrates [my] partisan advocacy."

The remainder of this Declaration discusses these claims in the above order.

### III.    QUALIFICATIONS TO OPINE ON THE ECONOMIC ATTRIBUTES OF DIGITAL OPTIONS

The Memorandum claims that I am unqualified to opine on the economic attributes of digital options.[11]  With respect, I am plainly qualified to evaluate the economic attributes of the digital options in this dispute.  The formula used to do so is well known in finance and is a simplification of the original Black-Scholes model, published 35 years ago.  The same formula was used by the parties in this dispute to value the options in this case at the time.[12]  The formula for these options is simpler than the original Black-Scholes model because the digital payoff is a fixed cash amount, not a stock with an uncertain future value, and no exercise price need be paid.  In fact, the term in the Black-Scholes formula usually used to value the exercise price of an ordinary -- "vanilla" -- European option constitutes the entire formula for a digital option, except that the sign is changed because the fixed cash payoff is an inflow to the owner rather than an outflow, as the payment of the exercise price is for a vanilla option.[13]

---

[11]    Memorandum, p. 14.

[12]    See, for example, the Deposition of Ivan J. Ross, November 7, 2007, pp. 141-47, 231.  This fact is also apparent from the values in the closing binders.

[13]    I would also note that the Memorandum's footnote 70, p. 14, does not recognize that the Black-Scholes model does not normally require you to calculate the expected rate of return on an option or its underlying asset, as indicated in the deposition answer immediately preceding the one it quotes.  See, for example, Brealey, Myers and Allen, *op. cit.*, pp. 565-66.  Estimation of expected rates of return is a longstanding specialty of mine.  For example, my first book addressed this topic, in the context of utility investments but discussing general principles: A. Lawrence Kolbe and James A. Read, Jr., with George R. Hall, *The Cost of Capital:  Estimating the Rate of Return for Public Utilities*, Cambridge, MA:  The MIT Press (1984).  I since have analyzed this issue for many industries, regulated and unregulated alike, both in the U.S. and internationally.

In short, I am well qualified to offer the opinions I do on the economic attributes of the digital options at issue in this dispute, and I offer no opinions for which my background or my research does not qualify me.[14]

## IV.  OPINIONS REGARDING "CONTRACT INTERPRETATION"

At pp. 7-10, the Memorandum cites various quotations from my deposition regarding the exercise terms of the option contracts, and particularly the fact that they involve a fifteen-minute window, to conclude that I am "inappropriately" offering a legal option on contract interpretation. As noted above, I well understand that I am not qualified to offer a legal opinion, and I have never attempted to do so. To see why I have not done so here, it is necessary to supply the context that underlies the passages quoted in the Memorandum.

### A.    Context

The option pairs in this dispute and the other, contemporaneous sets of transactions all contain a very small difference between the strike prices of the long and short options. This raises the theoretical possibility that the long option could pay off while the short option did not.[15] If this were to happen, the Taxpayer in the present dispute would receive a payout of between $330 million and $1.41 *billion*, at Refco's expense, depending on which option pair had such an outcome. In analyzing the economics of the non-tax returns on the option positions, one of my assignments, it was necessary for me to explore this possibility.

I did so by analyzing the economic (i.e., Black-Scholes) values of the option pairs, the dollar prices at which they actually transacted, and Refco's stated bid-ask fees. I concluded that Refco

---

[14]  For an example of an area in which I declined to offer an opinion, see the Kolbe Deposition, pp. 134-36.

[15]  This possibility has been referred to at various times as a "single-option payout," a "sweet spot," or the "head of the pin." The last of these phrases came from depositions of participants taken after my reports were filed and is the phrase used in the Memorandum and my deposition.

received economically material "bid-ask" fees in the form of a difference between the cash paid for a given set of options and the value of the options received in exchange. These fees are listed in various record documents, and their magnitude is explainable if and only if Refco valued each option pair with the same strike price, that of the long option in the pair. I tested and confirmed this economic conclusion in the present case by analysis of the option pairs in the other, contemporaneous sets of transactions. The conclusion is also confirmed by documents for one type of options (the "gain/loss-generating options"[16]) used in this and these other sets of transactions.

As a final check, before stating this conclusion in my report, I reviewed the plain English of the option agreements themselves, to see if my logic might run afoul of contract language that, to lay eyes, appeared to produce a unique and inescapable value for the strike price to be used to determine the payout. Instead, I found language that, on its face, implies as a matter of *economic* reality that there was a great deal of flexibility in determining what the designated strike price would be. In particular, given the volatility of financial markets, a fifteen-minute window necessarily implies fluctuations that are large relative to the strike price differences in these options. Also, it is a simple fact that spot price quotes at any given time vary from bank to bank.

The economic implications of the possibility of a single-option payout were further explored in my rebuttal report. My rebuttal concludes that if the single-option payout possibility were real, Refco would have made a gift of $2.7 million to Fidelity World and Fidelity International, rather than collecting $1.4 million in fees from them.[17] That would be economically irrational, i.e., against Refco's economic self-interest, and Refco would certainly be aware of this fact. Refco's actions in

---

[16]    Kolbe Report, Section II, p. 24, referencing earlier analyses.

[17]    Kolbe Rebuttal, Section II, pp. 3-9.

8

making these transactions are economically rational only if it believed the "head-of-the-pin" risk was something it could avoid, one way or another.

### B.   Discussion

The Memorandum states that I am inappropriately attempting to offer a legal interpretation of the contract in my deposition. I am not. The ability to read financial contracts and to understand their *economic* implications is central to the theory and practice of finance.[18] As the preceding section shows, that is all I have done. Moreover, I reviewed this language only as a check of the conclusion I had already reached by my earlier analysis.

## V.   "SUPPLANT" THE ROLE OF COUNSEL

The Memorandum claims that my reports and testimony supplant the role of counsel, evidently based (1) on the fact that my report starts with a description and analysis of the details of the transactions and (2) on five quotations from my reports.[19] The Memorandum does not address the analyses that led to the five quotations, and the missing context makes the quotations materially incomplete and therefore potentially misleading. The Memorandum's interpretation of the nature of my section on the details of the transactions demonstrates a misunderstanding of my reports, the nature of financial economics and economics generally, or both.

This section first describes the actual reasons for the initial description of the transactions in the Kolbe Report. Then it reviews the analyses that lead to the Memorandum's five specific quotations from my reports, to supply the missing context.

---

[18]   The *New Palgrave* article cited above, for example, explains on p. 26 that it was only after a "piece of paper or computer entry that describes and legally binds the borrower to repay the loan [could] trade on its own as a 'bearer' instrument ... that capital markets and the subject of finance began."

[19]   Memorandum, pp. 4-7.

## A.    Purposes of My Summary of the Present Transactions

The Memorandum does not manifest awareness of the fact that in order to draw valid economic

conclusions, the analyst must have a clear understanding of the underlying economic facts of the

problem or situation being researched.  The Memorandum is correct that Section II of my report

provides a detailed discussion of the present transactions.[20]  The Memorandum is incorrect that its

purpose is "to propound, in the guise of an expert's 'opinion,' Defendant's interpretation of the

evidence."[21]

As noted earlier, among the things I was asked to do were:[22]

- review the transactions at issue in this dispute from an economic perspective;

- analyze the risk-return characteristics of various pairs of offsetting option transactions involved in this dispute *independently of any claimed tax benefits*, and, viewing the offsetting option transactions objectively, to determine whether a reasonable possibility of profit existed *apart from any tax benefit*, taking into account all transaction costs;

- assess the economic rationality of the stated *non-tax* business purposes for these transactions and of two entities involved in them, a single-member limited liability company ("LLC"), Fidelity World Currency Advisor A Fund, LLC ("Fidelity World"), and a multi-member LLC, Fidelity International Currency Advisor Fund A, LLC ("Fidelity International");

- assess the economic position of Mr. Samuel Mahoney (the "Foreign Party"), an individual involved in these transactions; ... [and]

- examine, *both before and after taxes*, the economic implications of a decision by Mr. Richard J. Egan (the "Taxpayer") to contribute his interests in Fidelity World, which included offsetting option positions bought through Fidelity World, to Fidelity International.

---

[20]    Memorandum, p. 6.

[21]    *Ibid.*

[22]    Kolbe Report, Section I, pp. 1-2, emphases added.

10

Section II of the Kolbe Report shows the results of work on the first of these tasks and identifies information needed to accomplish the other four. The economic nature of the transactions in this dispute is not obvious on its face, and no single document explains everything that occurred. Therefore, the only way to understand the transactions from an economic perspective is to review the record and analyze what happened. That analysis not only sets the stage for the later parts of my own work, it presents my conclusions in this area so that they can be tested, and if necessary challenged, by others.

In short, Section II or its functional equivalent is essential to the performance of my economic analyses.

## B.   Specific Quotations

In support of its statements on this topic, the Memorandum on p. 6 includes five quotations, four from my report and one from my rebuttal report. All five omit material aspects of the context that underlies the statement, and so might prove misleading. This section supplies the missing context.

**Quotation 1:** "Various documents ... show that the transactions that give rise to this lawsuit arose, at least in part, as an effort to save taxes for the Taxpayer."

**Context:** This statement is footnoted in my report as follows:[23]

> For example, see 2EGAN011978-80 (handwritten notes), 7IRS00311-17 ("2001 Partnership Option Strategy" memorandum dated March 23, 2001 to Jimmy Haber from Orrin Tilevitz, Esq.) and 2EGAN024897-4905 ("Egan Family Entities Tax Advantaged Investment Structure," September 13, 2001, KPMG LLP). (Two later versions of this presentation also exist, 2EGAN024938-48, September 17, 2001, and 2EGAN011543-51, September 21, 2001, which lacks the KPMG identification on the cover and contains handwritten notes.) *That part of the motivation is tax savings does not appear to be in dispute:  see Plaintiff's Objections and Responses to Defendant's First Set of Interrogatories, served June 26, 2006, Response to Interrogatory No. 3* (hereafter "Response to Interrogatory X", where "X" is the number of the interrogatory).

---

[23]   Kolbe Report, Section II, footnote 4, pp. 12-13, emphasis added.

11

The statement quoted in the Memorandum directly relates to my assignments. As just noted, I was asked to address both the tax- and non-tax implications of various issues. To do so, it was critical that I understand both, to enable me to distinguish the tax and non-tax implications of the transactions, from an economic perspective. Moreover, the need to understand and analyze both the tax and non-tax implications of investment decisions is central to finance theory and practice.[24]

Thus, it would have been impossible for me to answer the questions I was asked if I did not consider the claimed tax effects of these transactions.

**Quotation 2:** "My understanding is that these options ultimately give rise to the tax basis claimed by the taxpayer ..., so I henceforth refer to them as the 'basis-creating' options."

**Context:** This term is intended only to help the reader keep track of the various parts of a complex set of transactions. The issue of my use of the terms "basis-creating options" and "gain/loss-generating options" came up in my deposition:[25]

> **Q  I see. [Use of these terms is] not at all advocating a position?**
> A    Well, I don't think so. These are, in fact, as I understand it, the options that, in the plaintiff's view of the case, create the basis, and in the plaintiff's view of the case, create the gains and losses that we were just talking about in the previous table. I think they're descriptive.
> **Q    And in appearing as an expert, an independent expert, as I understand this, is it your practice to use the plaintiff's view in expressing your opinions?**
> A    When it helps the reader understand where we are in the process. I mean, this is plenty complex; right? This is not a trivial series of transactions to understand and to keep track of.

**Quotation 3:** "It is hard to see why the Foreign Party would participate in such a venture."

---

[24] See, for example, Brealey, Myers and Allen, *op. cit.*, Chapter 6, "Making Investment Decisions with the Net Present Value Rule" (particularly pp. 121-25, which explicitly analyze the consequences of tax depreciation on project value). See also Chapter 19, "Financing and Valuation", much of which is about how the tax shields on debt affect project value and how to take that into account when valuing a project. This is necessary because, as the introduction to the chapter says (p. 503), "[o]ne reason that financing and investment decisions interact is taxes. Interest is a tax-deductible expense."

[25] Kolbe Deposition, pp. 168-69.

**Context:** The statement in question comes right after the observation that the Foreign Party lost half his investment in a very short time, an event that was predictable due to Refco's bid-ask fees.[26] It introduces an analysis to see if perhaps the Foreign Party was simply surprised by the loss. This hypothesis was tested and rejected by analyzing the other sets of transactions. The test shows that the Foreign Party not only would rationally expect to lose a large fraction of his investment on average due to Refco's bid-ask fees, but also that the Foreign Party in this transaction and another individual involved in some of the other transactions between them actually lost $1.3 million in the combined sets of 2001 transactions I analyze (which did not all happen simultaneously).

**Quotation 4:** "[The contribution of Fidelity World's interest rate options to FICA A Fund] is a 'no brainer' if there ever was one, despite the non-tax economic harm the contribution does to the stated hedging motivation, since the size of the claimed tax benefits dwarfs any value associated with non-tax returns."

**Context:** The statement in question comes on p. 78 of my report. It sums up the results of an immediately preceding review of the implications of Sections II (pp. 12-28), IV (pp. 51-59) and V (pp. 59-74) of my report for the economic merits, before and after taxes, of a decision to contribute the options. The statement may use a popular current expression for emphasis, but it is completely supported by the extensive economic analysis that precedes it.

**Quotation 5:** "[T]he stated value of the basis-creating options was not 'tangential' to Helios and KPMG, since the size of their fees varied directly with the stated premium of the long option in each pair."

---

[26]    Kolbe Report, p. 75

**Context:** The quoted statement comes from a footnote[27] in my review of the Yale Report; the Yale Report uses the word "tangential" to describe the Fidelity World transactions.[28] The statement notes that an additional way in which the Yale Report is incomplete in its discussion of whether these transactions were "tangential" is that it does not address the fact that the fees that Helios and KPMG received from the Taxpayer were percentages of the stated premium for the "long" Fidelity World options.[29]

In summary, I well understand that my role as an expert witness is to report conclusions that are objective and that are reached independently of their impact on any party, not to serve as an advocate.[30]

## VI.    MY ANALYSIS OF THE OTHER SETS OF TRANSACTIONS

The observation of financial practices, the use of the tools of economics to understand their underlying economic logic, and the testing of that understanding where possible with a sample that is determined to be useful in that effort, are mainstream activities of financial economics.[31]

My review of the record concludes that these transactions involve eight basic steps. I test this conclusion by reference to data on 46 other, similar sets of transactions undertaken at about the same time under the guidance of the same advisors.[32] The fact that these transactions have so much

---

[27]    Kolbe Rebuttal, Section III, footnote 38, p. 17.

[28]    Yale Report, p. 11.

[29]    See the Kolbe Rebuttal, Section II, p. 11, for additional discussion of this point in the context of my response to the Carron Report.

[30]    This topic came up briefly in my deposition, at p. 92.

[31]    For example, the *New Palgrave* introduction notes at p. 26 that "[t]he modern tradition in finance began with the development of well-articulated models and theories to explore [the field's central] intuitions and render them susceptible to empirical testing."

[32]    Kolbe Report, Section II, pp. 12-28 and Appendix C.

in common, economically, not only verifies my understanding of these transactions,[33] it also permits me to test later hypotheses using this data set.[34]    Thus, the ability to analyze the other sets of transactions was very valuable to my analysis.

I would also note that the Memorandum's statements in this area contain passages with which I disagree.

First, the Memorandum's characterization of the sample selection process is incomplete. At p. 15, it quotes a part of a discussion on this topic from my deposition and concludes, "[i]t appears that government counsel provided Kolbe with data on pre-selected transactions [for a legal purpose]." That is not an accurate summary of either my deposition or the actual process.[35] We did not passively accept "data on pre-selected transactions" from the government. To the contrary, we critically reviewed all data provided by the government. As I said in my deposition (p. 91), the process by which we and the government narrowed the data to the current sample was an iterative one.[36]

Second, the Memorandum at p. 15 suggests that there were "thousands of potential Son of Boss transactions" that we might have used in the analysis. I have been involved in the analysis of

---

[33]    For example, at one point I hypothesized that the fact that the intra-day parameter values at which the Fidelity International "gain legs" were terminated were so different from the daily values (Kolbe Report, Section III, pp. 42-49) was a general feature of these sets of transactions. I tested and rejected that hypothesis using data from the other sets of transactions.

[34]    For example, my understanding of the economics of Refco's bid-ask fees, the topic of Section IV of this declaration, was confirmed by testing that understanding with data from the other transactions. As noted in the previous section, the data set also permitted me to test and reject one explanation for the Foreign Party's engaging in a transaction with a large, predictable loss (i.e., that he was nonetheless surprised by the loss); it also suggests a possible explanation for what otherwise is economically irrational behavior by the Foreign Party, a matter discussed in the Kolbe Report, Section VI, pp. 75-77.

[35]    Kolbe Deposition, pp. 88-91.

[36]    More generally, I have been assured by counsel that my staff and I were given access to the entire discovery record, including copies of all depositions as they became available.

some so-called "Son of Boss" transactions (e.g., the *Jade Trading* case mentioned above), and I can state unambiguously that I would have immediately rejected such cases as not comparable for purposes of my analysis here. The analysis requires as homogeneous a sample as possible, to minimize the influence of unobserved differences, while still being as comprehensive as possible with respect to transactions that are truly similar, to avoid mistaken impressions based on incomplete data. Even after narrowing the sample to the 47 transactions commencing in 2001, there are some differences in the details of these transactions, which my report explicitly flags.[37] I am confident that the iterations here have produced a sound sample for my analysis.

Third, the Memorandum at p. 16 states that I do not explain what makes the eight steps I identified "essential," quoting a passage from the end of Section II of my report. However, I believe the Memorandum may be misinterpreting the meaning of "essential" in this passage. Section II starts as follows: "[t]his section first describes what appear to be the main elements of the transactions that give rise to this lawsuit. It then tests whether this particular delineation of the elements involved does capture the main parts of the transactions."[38] My conclusion at the end of the section that I have determined the "essential elements" of the transactions is intended in this sense of the word.

Fourth, the Memorandum at pp. 16-17 notes that I do not have information on the stated non-tax business purposes of the other transactions. That is correct, but that does not affect the validity of my analysis. There is no reason to expect the non-tax business purposes of the participants in the other transactions to have any particular relationship to the non-tax business purposes in this transaction, and no reason to test for such a relationship. However, my analysis shows that there are

---

[37] See the Kolbe Report, Appendix C. Also, one of the transactions did not finish in 2001 and is treated separately in some of my calculations.

[38] Kolbe Report, Section II, p. 12.

16

marked commonalities among the financial structures of the transactions: all involve the eight steps identified in Section II of my report, all permit Refco to receive its stated bid-ask fees by valuing the short option in each pair at the long-option's strike price, and so on. The sample is very helpful in the areas where I do make use of it.[39]

Finally, the Memorandum states at p. 17, "[i]n fact, Kolbe admits that the only other instances where he has used information on other transactions have been in work performed in connection with other pending cases in which the Tax Division is trying to use so-called 'pattern evidence'", and cites a portion of my deposition transcript. This is not correct. First, the words "pattern evidence" do not appear in my reports or deposition transcript. Second, I routinely use sample evidence in situations where I know relevant data are available. As my deposition makes clear, the reason I did not analyze such a sample in earlier cases is either that such a sample definitely was not available or that I did not think of the possibility that such a sample might be available in this type of setting.[40] If I had been informed that such data were available, as they are here and as they were in the set of "pending cases" referenced in the Memorandum, I would have used them in the earlier cases, also.

The selection of a sample for understanding financial practices and/or for testing hypotheses is a mainstream activity in financial economics. That process *necessarily* is specific to the questions

---

[39] For example, at one point I hypothesized that the $1.4 million in Refco bid-ask fees discussed in Section IV above were equal to the difference between (1) the net Black-Scholes value of the option positions with the stated, slightly different strike prices, and (2) the net Black-Scholes value of the option positions with the strike prices equated. If this had been true, Refco would have received zero fees with the stated strike prices. However, as also discussed above, this turned out not to be true in the present set of transactions (that is, as also discussed, Refco would have received negative fees, not zero fees, with the stated strike prices), and testing revealed it was not true generally in the transactions, either. Further analysis permitted me to derive the actual basis of the Refco fees here and to verify that understanding by showing that that mechanism explained the fees in the other transactions, also.

[40] Kolbe Deposition, pp. 179-81.

being analyzed, because economics relies overwhelmingly on natural rather than laboratory experiments. I have implemented that process here in a way that both enhances my understanding of the economics of these transactions and permits me to test and verify or reject hypotheses about that understanding.

VII.    OPINION THAT EACH PAIR OF LONG AND SHORT OPTIONS IS SINGLE INVESTMENT, ECONOMICALLY

The Memorandum at pp. 18-21 states that my analysis of the economic nature of the options pairs together or separated is flawed in several ways. To analyze these criticisms, it is first necessary to understand the actual nature of my analysis. Since it has been challenged, I first briefly explain my approach.

A.    The Analysis

The basic approach I use to explore the economic nature of these option pairs as investments is a "thought experiment":[41] what would happen if the two actual options in each pair were traded separately, with separate counterparties, instead of together with a single counterparty? My analysis showed that the costs and risks to the Taxpayer would be vastly different. Given the alternative outcomes revealed by the thought experiment, I applied standard economic tools to see whether the options together were economically the same as the options separated.

B.    Criticisms in the Memorandum

One reason the Memorandum states that my analysis is flawed is because of a failure to consider alternative assumptions in the analysis: whether the investors might engage in the transaction with a broker with whom they already had enough margin, whether the hypothetical alternative broker

---

[41]    Thought experiments are a well-established scientific tool. See, for example, the Stanford Encyclopedia of Philosophy, which defines thought experiments and characterizes them as of "enormous influence and importance in the sciences". See http://plato.stanford.edu/entries/thought-experiment/.

would have copied Refco's practice with respect to margin requirements, and whether the investors could have negotiated different terms with the brokers.[42]

The first of these criticisms regarding alternative assumptions is simply incorrect. I did consider the only economically important issue with regard to whether the margin was already available, since my report refers to "*potentially* material transaction costs" in coming up with the extra $4 billion in capital required.[43] If the extra $4 billion were already available in a highly liquid form, whether by already being on deposit or in any other way, the material transaction costs would not arise, which is why I identified them as "potential." This is the only economically important issue because with the exception of any such differences in transaction costs, the $ 4 billion has the same opportunity cost whether already deposited or obtained from the liquidation of other assets.[44]

With respect to the other two identified alternative assumptions, my analysis considered the terms of the actual transaction, not of an alternative transaction. That said, the suggested alternatives would not affect my basic findings, for reasons I now explain.

---

[42] Memorandum, pp. 19-20. That section also raises the possibility of "other methods for splitting the long and short options" than trading them separately with different brokers. However, the Memorandum does not identify what alternative method for splitting the options might exist, if any. Additionally, at pp. 20-21, the Memorandum quotes a section of my deposition in which I was asked about whether other combinations of assets constituted one or two investments. I would note that the inability to answer such questions definitively "on the fly" is not a defect in my methodology. My methodology consists of analyzing the specific situation using a thought experiment and standard tools of economics. That methodology necessarily requires sufficient time to think through the issues and perform the analysis. Additionally, it is the nature of thought experiments that sometimes the answers turn out to be clear and sometimes not, even after long consideration.

[43] Kolbe Report, pp. 11, 80, emphasis added. See Table 20, p. 79, for derivation of the $4 billion figure, $3.1 billion in margin to one broker for the short options and $0.9 billion to another broker to buy the long options, versus about $5 million (i.e., $0.005 billion) in capital for the actual transactions. (See the Kolbe Report, pp. 57-58, for the source of the $5 million figure.)

[44] "Opportunity cost" is another standard tool of economics. It recognizes that the cost of using a resource for one thing is the value it might have had in an alternative use. Opportunity cost is central to the definition of the cost of capital, for example: "the expected rate of return prevailing in capital markets on alternative investments of equivalent risk." (Kolbe, Read and Hall, *op. cit.*, p. 13.)

19

Regarding the use of Refco's margin practices, recall that Fidelity International was a net seller in the options it wrote with Refco, which meant that it would owe Refco money if the options were exercised.[45] To insure it would be paid, Refco retained the $5.7 million it owed Fidelity International for the combined option positions and required the deposit of an additional $3 million in margin.[46] The assumption that the broker buying the short parts of the separated options (which would imply that the Taxpayer might owe it billions of dollars on the exercise date) would have copied all the details of this particular margin practice reflects the actual transaction as far as possible within the thought experiment, and it is convenient. But it is not important. Recall that under the assumption that the broker would adopt Refco's actual margin requirement, the counterparty for the short options would require $3,098,968,182 in margin.[47] It would be economically irrational for a counterparty to buy options that might leave an investor owing it billions of dollars without adequate assurance that it would be paid in that event. If an alternative bank had adopted somewhat different margin procedures, the exact number might vary somewhat from the value just quoted, but the $3 billion order of magnitude of the cash required as margin would have been unchanged.

The Memorandum's third criticism regarding alternative assumptions, that the investors might have negotiated different terms for the options, again ignores the fact that my analysis focused on the actual options and their actual terms. Even so, unless the Memorandum has in mind options completely unlike the actual options, there is only one area of my analysis that might be affected by alternative terms: the possible concern about an adverse single-option payoff decision due to a

---

[45]  Kolbe Report, Section II, pp. 17-18.

[46]  Kolbe Report, Section III, pp. 55-56.

[47]  Kolbe Report, Table 20, p. 79.

disagreement among the counterparties, which could cost the Taxpayer the entire $4 billion in capital.[48] However, even if alternative terms that completely avoided this concern had been negotiated, the difference in the cash required would still put the investments on materially different indifference curves, and my basic finding would be unaffected.

In addition to suggesting that I should have considered alternative assumptions, the Memorandum also objects to my analysis because it "does not appear to have been used by other financial economists in academia or industry" and because I have used it "exclusively on behalf of the Tax Division."[49] Textbooks teach analytical principles and tools. They do not try to apply these principles and tools to every situation. My conclusion is the result of the application of basic economic principles and tools -- thought experiments, the importance of tradeoffs in product attributes and the use of indifference curves to analyze those tradeoffs, the importance of transaction costs, investment project valuation principles, and the concept of opportunity cost -- to a specific situation. It is true that this particular application of these tools does not arise in other contexts, to my knowledge, but there are always more problems than tools. Tools evolve precisely because they have general applicability to classes of problems, including those not before analyzed.

That said, I would note that while this particular application of the tools does not appear to have come up in other contexts, a test of my conclusion is possible.[50] Economics relies overwhelmingly on natural experiments, and there is a natural experiment with an outcome that is

---

[48]    Kolbe Report, pp. 79-80.

[49]    Memorandum, pp. 19 and 20. The Memorandum states that my opinion in the *Jade Trading* case is the only instance in which this type of analysis has been done before. That is not completely accurate, because the same issue arose in the pending tax disputes identified in Appendix A-R to my rebuttal report. However, those matters have not yet gone to trial.

[50]    The Memorandum notes at p. 3 that a consideration is "whether the expert's methodology had been tested, peer-reviewed, and accepted in the scientific community." The tools I use are fully accepted methods in economics, but here a test is possible, also.

consistent with the conclusions that I draw from the application of these tools to this problem: the process followed in the present and the other sets of transactions after the termination of the "gain legs" (which were one option from each pair in the multi-member LLC option quartets).[51]

Specifically, at the point of termination, the various multi-member LLCs, including Fidelity International, and Refco were jointly exposed to the possibility of large fluctuations in the value of the two remaining, now unpaired options in each original quartet.[52] To avoid this exposure, the multi-member LLCs needed to replace those options. My analysis predicts that they would not choose to do so by entering into new option agreements with a bank other than Refco, since that would expose them to the costs and risks discussed in Section VIII of my report. In the case of Fidelity International and of the other, contemporaneous sets of transactions, all of the multi-member LLCs did in fact choose to replace the options immediately by transactions with Refco, not with another bank. Had even one chosen to transact with a bank other than Refco, it would have demonstrated my analysis to be incorrect or materially incomplete, since this would have split the matched pairs between two banks. Thus, my analysis is falsifiable, a hallmark of a scientific theory, but it is not falsified by the outcome of this natural experiment.[53]

---

[51] See the Kolbe Report, Section II, pp. 18-21, for a description of the process for Fidelity International and Appendices C and E for verification that this process was followed in the other sets of transactions.

[52] See the Kolbe Report, Section III, Figures 5 and 6, pp. 41-42, for depictions of the size of these value fluctuations in the unterminated options -- the "loss legs" -- in the case of Fidelity International.

[53] Of course, this is not a definitive test, because, as usual with the natural experiments on which economics primarily relies, more factors affect the decision than just the one under study. But it is a genuine test, because this natural experiment was not part of the analysis used in the thought experiment. (Nor did this test arise in the other cases in which I have analyzed the issue of pairs of options together versus the same options separated, such as the *Jade Trading* case.) Thus, the thought experiment does provide an independent, falsifiable prediction about the parties' actions following termination of the gain legs.

22

## VIII.  DISCUSSION OF THE *DEWEES* OPINION

DOJ counsel asked me to review the economic logic of a numerical example in a legal opinion.  I did so and reported my conclusions.  The Memorandum claims that this discussion is "unhelpful, irrelevant and demonstrates [my] partisan advocacy."[54]

I have no opinion on whether my answer to the question is or is not in any sense "helpful" or "relevant"; it is simply my answer to the question asked me by counsel.

I will state that I do not understand, as a native speaker of the English language, how my answering the question I was asked could possibly demonstrate "partisan advocacy."[55]  I will also state that my answer in no way constitutes a legal opinion on the example, which I am unqualified to form.  I am, however, both qualified and experienced in the preparation and evaluation of numerical examples of economic points, which is what I do in answering this question.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  This declaration was executed in Cambridge, Massachusetts on February 14, 2008.

A. Lawrence Kolbe

---

[54]  Memorandum, pp. 10-12; quotation from the header on p. 10.

[55]  Apparently in support of this section, the Memorandum attaches a memorandum prepared by my staff regarding the *Dewees* decision and an email from counsel about that memorandum.  I was asked about this email and Brattle memorandum in my deposition (pp. 127-30), and I explained that I had no part in drafting the memorandum and I had not read either it or the email before writing my report, or through the date of the deposition.  Neither the email nor the memorandum played any part in my answer to the question I was asked about the decision.

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No.: 05-40151-FDS 06-40130-FDS |
| v. | ) ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF DR. GORDON RAUSSER IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE

I, Gordon Rausser, Ph.D, declare:

1. I am an expert in economics and the trading of options, derivatives and other financial instruments, as well as in forecasting and quantifying the risk associated with traded instruments. I was designated as an expert witness for the United States government in these consolidated cases and submitted two written reports: the first on August 7, 2007 and the second on September 11, 2007. I was deposed on November 30, 2007. I submit this Declaration to respond to certain inaccuracies and mischaracterizations contained in Plaintiff's Motion to Exclude my testimony and reports.

2. Inasmuch as Plaintiff does not appear to challenge my credentials, professional training or experience to render the opinions which are the subject of my reports, I will



GOVERNMENT
EXHIBIT
2

1

not repeat those qualifications at length here but will only briefly summarize them.[1] I am an economist with expertise in the structuring, execution and valuation of options. In my academic career, I have held positions teaching economics and statistics at many universities including the University of Chicago, Harvard University, Hebrew University, University of Illinois, Iowa State University, and the University of California at Davis, and I currently serve as the Robert Gordon Sproul Distinguished Professor at the University of California at Berkeley.

3. In my professional career, one major focus of my research has been on organized futures and options markets and their regulation. I have been engaged as an expert by a number of regulated exchanges to advise on risk analytics, portfolio analysis, and futures markets as an asset class. I have also testified before the Commodity Futures Trading Commission on the proposed introduction of new commodity futures contracts. I was engaged by the American Enterprise Institute as a consultant on the reauthorization of the Commodity Exchange Act in the 1980s. Two of my national research awards pertain to analyses of futures and forward market behavior and performance. I have been, and continue to be, an active trader on organized futures and options markets, serving as a commodity trading advisor through much of the 1970s and early 1980s. In addition, I have extensive experience in the creation and execution of structured contracts outside of the regulated exchange environment, in what is referred to as the over-the-counter ("OTC") market. These structured contracts frequently involve combinations of options, and my work involves an analysis of the combined effect of those options on both risk and value.

---

[1] My detailed curriculum vita, including all publications, is attached as Exhibit 1 to my initial report.

4.  This is the first engagement I have had on behalf of the United States Government Tax Division, although I have previously testified on behalf of a taxpayer in a position adverse to the Government.

5.  I was engaged by the United States Department of Justice in this matter to evaluate a group of paired options transactions entered into by Fidelity World Currency Advisor A Fund LLC and Fidelity International Currency Advisor A Fund LLC, and to consider the involvement in these transactions of the taxpayer Richard Egan (the "taxpayer"). More specifically, I was asked to address nine issues:

   a.  The actual economic consequences of the transaction for Fidelity International Currency Advisor A Fund LLC;

   b.  The probability of a one-sided payout occurring, in which a single option from a closely matched pair would have value at expiration while the other option in the pair would not;

   c.  Whether there was any reasonable possibility that the transaction would generate a profit, before consideration of tax consequences;

   d.  Whether the transaction might reasonably have been used to offset or hedge certain financial risks faced by the taxpayer;

   e.  Whether other contemporaneous transactions assembled by the same promoters were useful in testing, supporting or rejecting my conclusions;

   f.  Whether there appears to have been any legitimate business purpose, aside from tax consequences, for the formation and separate existence of the single-member limited liability company and the multi-member limited liability company, and the transfer of assets between them;

3

g. The role played in the transaction by the foreign partner, Samuel Mahoney, and whether his participation had any economic justification other than to create a non-taxable recipient for the anticipated gains;

h. Whether, from an economic point of view, the two sides of each option pair should be treated as a single position; and

i. Whether, there was any actual economic loss underlying the tax loss claimed by Fidelity International as a result of the 2002 recorded termination of its interest rate options.

6. Plaintiff does not appear to raise any challenge to the statistical, economic and econometric methods I employed in analyzing these questions, and I therefore will not restate them here. Instead, Plaintiff raises a series of challenges that are principally directed to the proposition that I am a partisan advocate rather than an independent expert. This is not true. My two reports thoroughly set forth not only the methodologies employed in my analyses and the professional literature supporting them, but the data, documents and facts upon which I relied in reaching my conclusions.

<u>Scope of This Declaration</u>

7. Plaintiff raises the following six inter-related challenges to my testimony and reports, and two additional challenges to prior testimony and personal matters, each of which I will address in this Declaration. Plaintiff contends that:

a. *Criticism #1: I report too much of the underlying documentary evidence and, by doing so, am supplanting the role of counsel.* I will explain in this Declaration why, as a financial economist, it was essential that I become familiar with and incorporate into my analysis not only the mechanical

4

and contractual details of the transaction but the structure of the financial commitments underlying the transactions.

b. *Criticism #2: I express opinions about the "state of mind" or motivation of the parties and the business purpose for their transaction.* At no point have I speculated about the participants' subjective state of mind. Instead, my conclusions go to the rationally expected outcome of the transaction. My reports do cite extensively to the participants' own documents containing straightforward and unequivocal descriptions of their expectations, plans and objectives for the transaction. This information was important in understanding the financial commitments and the specification of certain of the transaction's terms and conditions. As a result, it would have been a breach of professional standards to simply ignore these terms and conditions of the financial contracts.

c. *Criticism #3: My analysis of the financial and economic implications of various contract provisions and my use of common words that might also have legal connotations (e.g., the use of the terms "step" and "promoters"), rise to the level of impermissible legal opinions.* I use these terms with their common English meanings and without any intention to draw a legal inference. At no time have I expressed a legal conclusion. For example, I do not opine on, or even mention, the application of the step transaction doctrine referred to in Plaintiff's motion. Instead, the observations I make are purely economic and are fundamental to financial contracting and how this extraordinarily complex transaction operates.

5

d. *Criticism #4: I should have disregarded the 45 substantially similar transactions structured by the same individuals and entities in the same period.* Due to their repetitive (nearly identical) structure, terms, and sequencing, these other financial contract transactions were professionally useful in analyzing this individual transaction and the reasonable expectations for its outcome. Any professional peer review of an economic analysis such as mine would have been deeply critical of ignoring such available data.

e. *Criticism #5: I have drawn unsupported inferences.* Contrary to Plaintiff's assertion, I have drawn no inferences and instead have expressed opinions about how a financially rational person would view the transaction given the facts available at the time of its execution. I expressly leave it entirely to the Court to determine what this factually determinable set of rational expectations should mean in terms of the legal standards for assessing a possible tax shelter.

f. *Criticism #6: Plaintiff seeks to imply that I did not write, and am not responsible for the authorship of, my reports.* This is flatly untrue. I devoted more than six hundred hours to this case prior to my deposition, the vast majority of which was related to the preparation of my reports. The fact that two of the more than ten staff members working under my supervision on this matter have law degrees does nothing to undermine my independence or my control of the ultimate work product. Nor does the

6

fact that I rarely communicate via email and do little of my own typing mean that I am not responsible for drafting.

g.  *Criticism #7: Judicial Decisions.* Plaintiff also cites selected judicial decisions to suggest that my prior work has been disapproved. These published opinions, derived from less than 5% of the cases in which I have provided expert trial testimony, are inaccurately characterized by Plaintiff who fails even to note where they have been reversed on appeal

h.  *Criticism #8: Personal Background.* Finally, Plaintiff's memorandum leads with a discussion of some of my personal prior investments and entrepreneurial activities, hand-picking only one start-up company that turned out to be financially unsuccessful. Plaintiff also points out that one of the staff working on this matter previously acted as an attorney for me. Although I am unclear about the relevance of any of this discussion, or why it bears on my professional competence to assess the transaction being litigated here, I provide in this Declaration some clarifying facts which (despite being stated in my deposition) Plaintiff has chosen to omit from its motion.

<u>Criticism #1: Reference to Documents and Facts</u>

8.  Plaintiff complains that I should not have considered, or at least should not have reported on, the contents of numerous transaction planning and preparation documents that various participants produced in discovery.  Professional standards required that I do so.  The transaction being considered is unquestionably very complex.  It involves many steps, multiple layered entities who entered and exited the transaction in a pre-arranged

7

sequence, and the use of binary, European-style options on differing underlying assets and on different calendar schedules. The more than 2.1 million pages of documents produced in discovery were key to understanding how the transaction was structured and priced and what its rationally expected outcome would have been.[2]

9. I understand that the taxpayer contends his business purpose was predicated on a particular (profitable) outcome to the transaction which did not, in fact, occur. My own analysis of the transaction reveals that a profitable outcome could not rationally have been expected to occur at the time the transaction was executed. It was relevant to my analysis that the transaction planning documents confirm this assessment by targeting and accurately predicting the losses and by assigning no probability to the only scenario in which a significant gain might be generated.[3] These documents also represented the only way to ascertain the costs associated with the transaction which directly impacted its potential to generate a profit. The documents cited in my reports consist of largely-contemporaneous memoranda,[4] emails,[5] notes[6] and explanatory presentations[7] prepared

---

[2] This page count is as of the date my rebuttal report was filed in September 2007. Since that time, additional documents have been produced. My staff and I were given access to this large database of documents on a rolling basis as documents were produced. My staff conducted independent searches and review of the contents of this document database under my direction, and without direction from the Department of Justice. In addition, my staff and I received access to the transcripts of deposition testimony in this matter as those transcripts became available.

[3] As I stated in my initial report, the structure and sequence of steps to be followed in generating the tax loss were set forth weeks in advance in several documents entitled "Outline of Proposed Transaction." See Outline of Proposed Transaction dated September 20, 2001, at 2EGAN011552-11554; Outline of Proposed Transaction dated September 27, 2001 at 1EGAN011351-353; Outline of Transaction, dated October 16, 2001, at 1EGAN009217-9219.

[4] See, e.g., 1EGAN001028-1036; 2EGAN012055-56; 2EGAN012066-67; 1EGAN010122-010124; 1EGAN010472-474; 2EGAN011974.

[5] See, e.g., 1CARRUTH037356; 1ALPHA-DISK03-000669-671; 2CARRUTH048781; 1ALPHA-DISK03-000236; 2EGAN011975; 1CARRUTH044982-983; 1CARRUTH045157; 1CARRUTH045158-159; 1CARRUTH045236-237.

[6] See, e.g., Handwritten Notes - "Generate 150 Million Loss," undated, 2EGAN011555-11560; 1CARRUTH043259; 2EGAN011980.

[7] For example, see 2EGAN011543-11551, a presentation entitled "Egan Family Entity Tax Advantaged Investment Structure" and dated September 21, 2001. At page 7 of this presentation (2EGAN011549), a table calculates the "Expected Permanent Tax Benefits" of the proposed transaction by assuming a

by the taxpayer's advisors and are certainly the type of documents upon which an economic expert analyzing the transaction would ordinarily rely.

10. Peer reviewed literature on financial economics stresses the importance of understanding transaction terms and mechanics as well as the role of individual participants in evaluating a particular financial structure. For example, Oliver Hart's professionally well-regarded treatise, *Firms, Contracts and Financial Structure*, explains at length the significance of correctly analyzing the principal/agency relationships in multi-party transactions and identifying where control (and the control premium) lie in each phase of the transaction.[8] This point is made again in an article which he authored in the *Journal of Economic Literature*.[9]

11. These concepts (and the due diligence process which they dictate) are directly pertinent to the transaction being litigated here. Without a thorough understanding of the contract terms and conditions, and thus the transaction mechanics and sequencing, it would literally be impossible to understand why or how a single-member LLC would be utilized in the first phase of the transaction, followed by a multi-member LLC with a majority foreign partner in the later phase of the transaction, followed by a restructured LLC with a reduced foreign partner interest once gains had been distributed, followed by a distribution of the vast majority of losses directly to the taxpayer. To determine the rationally expected outcome for each of these parties at the time the transaction was

---

$150,000,000 "ordinary loss from investments" by engaging in the FPS (presumably, Foreign Partner Strategy). The expected permanent tax benefits described are $62,250,000.
[8] Hart, Oliver D. 2001. "Financial Contracting," *Journal of Economic Literature*, Vol. 39, pp. 1079-1100; Hart, Oliver D. *Firms, Contracts, and Financial Structure*, Oxford: Clarendon Press, 1995.
[9] Hart, Oliver D. 2002. "Incomplete Contracts and Public Ownership: Remarks, and an Application to Public-Private Partnerships," *The Economic Journal*, Vol. 1132001. "Financial Contracting," *Journal of Economic Literature*, Vol. 39, pp. C69-C76.1079-1100. *See also* Jensen, Michael and William Meckling. 1976. "Theory of the Firm: Managerial Behavior, Agency Costs, and Ownership Structure," *Journal of Financial Economics*, Vol. 3, pp. 305-360.

executed, it is essential to understand how the taxpayer was assured of control at each step and why the short-lived majority interest of the foreign partner did nothing to disrupt that control and only constituted a fixed cost of the transaction. This is the type of analysis that financial economists are trained to perform. In doing so, they must necessarily have recourse to historical transaction and planning documents. The clear enumeration of the financial economist's conclusions calls for an explanation of their factual foundation, including references to those source documents. I fully cited and reported the facts derived from these documents not because it would be good "advocacy" to do so, but because those facts are essential to applying the principles of financial and economic analysis set forth in my reports.

12. This point is made clearer by examining a few of the factual observations that Plaintiff claims were improperly included in my reports. It does not appear that Plaintiff challenges the accuracy of any of these statements, or the reliability of the cited source documents, but merely objects to the fact that they have been included in my reports.

- *"The documents I reviewed indicate that the transaction which is the subject of this litigation was specifically designed to generate $150 million of tax losses...."* As set forth in Paragraph 5, above, I was asked to analyze the entire transaction and to separate out its tax aspects from its non-tax aspects. This is a common form of analysis for financial economists to undertake. For example, standard undergraduate texts, including Brealey, Myers and Marcus, *Fundamentals of Corporate Finance*, present pro forma financial analysis based on both pre- and post-tax impacts.[10] On a more sophisticated level, the

---

[10] See, e.g., Brealey, Myers and Marcus, *Fundamentals of Corporate Finance*, McGraw-Hill/Irwin, Fourth Edition, at p. 237.

graduate textbook from the same authors undertakes a separate analysis of tax

impacts on financial transactions of capital gains, dividend policy, leasing,

mergers and several other issues.[11] Numerous financial models specifically

isolate the tax impact upon other aspects of financial transactions.[12] Moreover,

important to my analysis of these issues was an understanding of how the size

of the option premiums and their potential payouts was determined.  Taxpayer

contends that the options were designed to provide revenue to offset possible

losses on his EMC stock and his interest rate exposure.  Ordinarily, such

options would be structured based around the amount of their potential payout

and the circumstances under which such a payout would occur, with the

objective to arrive at an effective correspondence between the risk and the

possible offsetting payout.  However, in this case, the documents indicate that

all of the other values were derived from the initial premium of $150 million

for the purchased interest rate options, a figure which effectively capped and

expressed the targeted tax loss but could not rationally be used as the

foundation for structuring an effective hedge.[13]  As a result, the initial

objective to generate a $150M tax loss (clearly and repeatedly stated in the

documents) is directly relevant to an assessment of business purpose.

---

[11] See, e.g., Brealey and Myers, *Principles of Corporate Finance*, McGraw-Hill/Irwin, Sixth Edition, at pp.504-510, where the authors analyze the economic choice between paying out operating income as interest or as a dividend, each of which causes different tax treatment and consequences.
[12] See, e.g., M.H. Miller, "Debt and Taxes," *Journal of Finance* 32 (May 1977), pp. 261-276.
[13] See 2EGAN011543-11551, "Egan Family Entity Tax Advantaged Investment Structure" and dated September 21, 2001, at 2EGAN011549 (discussed above); 2EGAN011555-60 at 2EGAN011555 ("Non-U.S. Party 93% Common Interest" and "Generate 150 million loss -> Sell off gain." See also 2EGAN011552-11554 at 2EGAN011552: Handwritten notes on the September 20, 2001 Outline of Proposed Transaction include an arrow from the $150,000,000 long put premium listed, pointing to notes indicating "gives us Basis under Helmer Basis for tax"; and 2EGAN011671-73 at 2EGAN011672: handwritten notes on the same September 20, 2001 Outline of Proposed Transaction include: "creates outside basis $150M, premium of put."

11

- *"The documents I reviewed specifically indicate that the two required entities were formed by the taxpayer specifically in contemplation of entering into tax advantaged strategies"* and *"[I]n anticipation of implementing a number of Helios-structured transactions, the taxpayer's counsel created two limited liability companies."* These fact statements are taken directly from the emails and memoranda of taxpayer's lawyers and representatives, which refer to the establishment of the two Fidelity entities to engage in this transaction. [14] These facts are key to my understanding of the structure of the transaction, and I gather there is no dispute about their accuracy. Instead, the objection appears to be that these facts should not appear at all in my reports and should be excluded from my analysis.

- *"Fundamental to the transaction here was the separation of gains from losses, with the gains experienced first so that they could be allocated to the foreign partner prior to the taxpayer's purchase of most of the foreign partner's interest."* This description of the temporal separation between gains and losses with the intervening buy-back of the foreign partner is not only accurate, it is fundamental to an understanding of the terms and conditions of the financial transaction and how it might operate to generate large bookkeeping losses and could not rationally be expected to generate economic gains to the taxpayer. The importance of this admittedly pre-planned

---

[14] Regarding the concerted search for the "tax advantaged strategies" and "elimination strategies," see, e.g.: 1EGAN011354-62, 2EGAN011543-51, 2EGAN011555-60, 2EGAN011572-602, 2EGAN011603, 2EGAN011690, 2EGAN011704, 2EGAN011727, 2EGAN011741, 2EGAN024832-34, 2EGAN024835-37, 2EGAN024930-31, 2EGAN024932-35, 2EGAN024949, 2EGAN025053, 2EGAN025063, 2EGAN025083, 2EGAN025092-93, 2EGAN025094, 2EGAN025095. Regarding the purpose underlying creation of the entities, see, e.g., 2EGAN012458 (email from Stephanie Denby to Pat Shea: "We created the 2 LLCs last year since Mike intended to do several more Helios 1 deals.")

12

sequence of events and the financial consequences of momentarily separating

the option pairs is far from obvious to a lay observer and requires explanation.

- *"The promoters' own documents provide strong evidence that it was they who
  funded the equity contributions supposedly made by the foreign partner."* I
  understand that Plaintiff contends the foreign partner who received 93% of the
  claimed gains and only 5% of the claimed losses was a legitimate business
  investor. I express no opinion on this ultimate conclusion. However, among
  the facts that a financial economist would consider relevant to such a
  determination (and that the Court may also wish to consider) is the foreign
  partner's at-risk position. The degree to which the foreign investor is at risk is
  directly affected by the amount of capital that he has invested in the venture,
  the extent of his management control and the terms of any prior arrangement
  for his removal from the transaction. Under these circumstances, it would be
  professionally irresponsible to ignore the documentary evidence that the
  capital contribution credited to foreign partner Samuel Mahoney's account
  was actually funded not by him but by the promoters, and that he was paid a
  fee for his participation in the transaction.[15] As the previously cited
  publications by Hart and others make clear, such information is essential to a
  proper determination of the financial implications of the transaction.

13. Plaintiff similarly objects to my description of the currency hedging activity

undertaken by EMC. In so doing, Plaintiff misquotes and misconstrues the statements in

my reports. At no time did I assert that EMC had perfectly hedged *all* of its currency

risk, thus entirely insulating its stock values from any impact of adverse change in

---

[15] Rausser Initial Report at pp. 98-101; Rausser Deposition at p. 214.

13

exchange rates. I did, however, make the point that EMC had increasingly reduced its exposure to currency risk through its own hedging. Moreover, this could explain why there was virtually no correlation between the selected currencies and EMC stock values. To the extent that a corporate currency risk is fully hedged, it ceases to have any impact upon that company's stock values and thus any effort to hedge the underlying risk through currency transactions would be, as stated in my reports,[16] redundant and of no risk mitigating value.[17] My analysis of EMC's hedging activity was essential to exploring and explaining why its stock values were not, in fact, correlated with movements in the foreign exchange rates to which the taxpayer's options were tied. As is clear from my reports, my analysis of these topics was based on professionally accepted statistical and econometric techniques, which are specialized knowledge not ordinarily accessible to the lay public. I strongly dispute Plaintiff's assertion that this type of empirical analysis was merely "narrating a story."

### Criticism #2: Motivations, State of Mind and Business Purpose

14. Plaintiff misconstrues my report on the rationally predictable economic outcome of the transaction as conjecture regarding the taxpayer's "state of mind." I express no opinion as to what may have been in the taxpayer's mind.[18] As a financial economist, I am, however, capable of determining what a rational, prudent investor would have expected the financial outcome of the transaction to have been. That is precisely the

---

[16] Rausser Initial Report at pp. 74-80.
[17] The observation and quotation at footnote 83 of Plaintiff's Memorandum misses the point. That footnote reports in 2001 a 3% negative impact on EMC's revenue of currency exchange rate changes. It does *not* report any impact upon EMC's stock value which is the risk that taxpayer claims to have been hedging. My own empirical analysis indicates that EMC's stock prices were not, in fact, correlated with these currency exchange rate changes.
[18] Nor was I asked to express such an opinion. Rather, I was asked by the United States to conduct an analysis of all financial aspects of the taxpayer's transaction, and to form an independent conclusion based on the application of my education and experience to the analysis performed.

14

information contained in my reports and it is based on statistical and econometric analysis rather than speculation about a subjective state of mind. For example, I reported that:

> The two key determinants of any rational investing decision are expected return and risk.[19] Return is the total gain or loss experienced on an investment over a given period of time. Risk, the other important dimension of an investment, is the chance that the actual return will be different from the expected return. Rational investors base their decisions on both of these factors.[20] . . . Expected return denotes the probability-weighted average of all of the likely outcomes of the investment.[21]

15. Plaintiff's memorandum states that I opined on Fidelity International's "real purpose" for entering into the transaction, and places that phrase in quotes as though it came directly from my report. No citation is provided. In fact, I never used this phrase and never expressed an opinion on Fidelity International's "real purpose." The four quotes Plaintiff provides that actually *do* come from my reports (extracted from 160 pages of text) indicate only that the transaction resulted from a search for a tax-advantaged strategy which specifically contemplated generating a tax loss. As discussed in the preceding section of this Declaration, such facts are directly relevant to evaluating

---

[19] See, for instance, Brealey, Myers and Marcus, *Fundamentals of Corporate Finance,* cited above.
[20] One of the seminal papers that discussed individuals' attitude to choices involving risk is M. Friedman and L.P. Savage, "The Utility Analysis of Choices involving Risk", *Journal of Political Economy*, Vol. 56 (1948), p.279-304. Since then, experimental studies have documented individuals' risk-averse behavior in decisions involving a choice between different alternatives of varying risk and return.
[21] Rausser Initial Report, pp. 36-37.

the structure, terms and rationally anticipated outcome of the transaction. Similarly, my observation that any hedging objective could have been less expensively and more efficiently accommodated through the purchase of other readily available instruments is not a commentary on taxpayer's state of mind but a professionally disciplined comparison of market alternatives. In addition, in two of the four quotes, Plaintiff extracts selected language from my report while omitting the citation to extensive documentary evidence supporting that language. For instance, Plaintiff quotes my statement that "[t]he documents I reviewed indicate that this transaction was the result of a concerted search for 'tax advantaged strategies' by the taxpayer . . ."[22] The citation omits to point out that the internally quoted "tax advantaged strategies" comes directly from documents produced by Plaintiff, and ignores the twenty additional documents cited in support of my statement. In the other similar instance, Plaintiff rewrites my statement that specific aspects of the options and transaction structure "all strongly point to a disinterest in actual hedging . . ." and omits any reference to the multitude of documents produced by Plaintiff and his advisors that support this statement and are cited in my report.[23] These documents provided part of the analytical basis and framework necessary to evaluate the economic aspects of taxpayer's transaction, and specific reference to them was included to provide a fact-finder with an opportunity to review the basis for my conclusions.

16. I do not, and did not, offer opinions on the credibility of witnesses, a topic which I fully acknowledge to be outside the scope of my responsibilities or of my training. The two quotes which Plaintiff offers as its only examples of this point are taken out of context and misconstrued. First, at the conclusion of several pages of detailed analysis

---

[22] Plaintiff's Memorandum at p. 16.
[23] Compare Plaintiff's Memorandum at p. 16, to Rausser Initial Report at p. 66.

16

supported by exhaustive references to both analytical methods and documentary evidence, I observed that the business purposes of profit and hedging "bear no credibility."[24] By this, I meant not to comment on the believability or truthfulness of any witness, but to express my reasoned conclusion, based on my experience and expertise in financial contracting and options, that neither profit nor effective hedging was a rationally anticipatable outcome of the transaction. The second quote is one from my deposition and is not an observation that appears in either of my reports. When specifically asked by counsel to comment on testimony from other witnesses regarding the possibility of a one-sided payout occurring (referred to in documents as "hitting the head of the pin") I explained that the theoretical premium charged would have been much higher if this risk had been accounted for.[25] Because the option pricing agreed upon by the participants specifically excluded any premium attributable to such a risk, I responded in my deposition that a contrary conclusion was "not credible."[26] In short, I was basing my observation on empirical and analytical data which led to a contrary conclusion than that expressed by the witnesses; I was not commenting on the witness' credibility, but instead, expressing a difference with his conclusion. My opinion was based upon my application of professionally recognized options pricing algorithms to replicate the pricing arrived at by the participants using the inputs specified in their documents, followed by a comparison of those results with similar pricing using publicly available market inputs. I disagree with Plaintiff's assertion that this process involved "[n]o scientific, technical, or other specialized knowledge."

---

[24] Rausser Initial Report at p. 108.
[25] Rausser Deposition at pp. 237-238.
[26] Rausser Deposition at p. 238.

<u>Criticism #3: Rendering Legal Opinions</u>

17. Plaintiff misinterprets my financial application of the plainly stated option contract terms as an expression of legal opinion about their meaning. As explained in my reports, the transaction confirmations for each of the currency options designate Refco as the Calculating Agent and give it the right to select the Money Center Banks whose quotations during the specified 15-minute window it will use to determine whether the options are in the money or out of the money at expiration.[27]  Based upon my professional experience (and as described in my reports) such quotations, even over such a short time period, are subject to wide variation.  As a result, it would be *possible* for Refco to avoid making a one-sided payment through its selection of banks.  Given that the one-sided payout on some of the option pairs would be more than a billion dollars, I pointed out the economic incentive that would exist for Refco to exercise this contractual provision in its favor.

18. In attempting to characterize this financial observation as a "legal conclusion," Plaintiff describes a case in which there was a question about whether Merrill Lynch had acted in good faith when liquidating collateral under the Uniform Commercial Code. Unlike the issue in that case, I have expressed no opinion as to whether Refco would have been acting in bad faith or entirely within its rights in making such a selection—I merely observe the financial implications of the option contract terms, again a needed assessment in any sound financial economic analysis. Further, I note that the conclusion I reached through this analysis was completely consistent with the valuation techniques applied by the taxpayer and his advisors which assigned no probability or value to the

---

[27] Rausser Initial Report at pp. 49-50.

18

possibility of a one-sided payout.[28] In arguing with my characterization of Refco's bid/ask fee as "extraordinary" (a term meant to indicate non-market-based or atypical compensation) Plaintiff's memorandum assumes (without explaining why) that Refco in fact bore the risk of such a one-sided payout.   I presume the Court will ultimately decide this issue, but any disciplined financial analysis on my part required me to take into account the option contract terms which would have enabled Refco to avoid this risk.

19. Plaintiff also misstates my report in suggesting that I impermissibly offered a legal opinion on the "Step Transaction Doctrine," a doctrine nowhere mentioned or alluded to in my reports. I am neither a tax lawyer nor an expert in taxation, and have never attempted to express any such opinion. I am, however, as a financial economist, capable of determining the way in which the outcome would have been altered if the various trades, transfers and investments that make up the transaction had been carried out in a different order. My assignment in this case called upon me to evaluate the actual and reasonably expected pre-tax economic impacts of the transaction and to compare them with the after-tax results claimed by Plaintiff.  My opinion is limited to those fundamental observations: what their implications may be for the application of the "Step Transaction Doctrine" is beyond the scope of my reports and any testimony I might offer at trial.

20. Plaintiff also contends that it was inappropriate for me to use the words "promoter," "step," "basis," and "substance over form" because they might be subject to specialized legal interpretation.  As I explained in my deposition, my use of the term promoter was intended to refer to anyone who markets or sells a transaction, and thus

---

[28] Rausser Initial Report at p. 48.

"promotes" it.[29] I am not aware of whether there are any special legal implications associated with this term, but it served as a convenient way of referring collectively to DGI, Alpha, Helios and KPMG, each of whom appears from the documents to have participated in explaining and marketing the transaction to taxpayer. Indeed, Plaintiff states in its Motion that I do "not understand the legal significance of this term," which would make it impossible for me to use the term to express a legal conclusion. (Motion, footnote 140.)

21. Similarly, the term "step" was used in accordance with its common English meaning, which the American Heritage Dictionary provides, alternatively, as "a stage in a process." The planning as well as closing documents repeatedly specify the sequence in which various actions were to be taken, from the first LLC formation to the last distribution of losses, and it was therefore reasonable for me to refer to them as "steps" or stages in a process.

22. My reports make clear that my understanding of the term "basis" was not derived from any claimed skill in the field of income taxation.[30] However, as previously discussed, financial economists are routinely called upon to analyze the effect of transactions on an after-tax basis and the application of this principle is therefore common. It is impossible to undertake a meaningful discussion of the transaction in this case, much less an objective analysis of its characteristics, without referring to the term "basis." Hundreds of the participants' planning and execution documents use the term.[31] Further, some of those documents specifically refer to the interest rate options as the

---

[29] Rausser Deposition at pp. 139-141.
[30] Rausser Initial Report at p. 20.
[31] See, e.g., 2EGAN011552-54 at 2EGAN011552 ("$150,000,000 → gives us Basis under Helmer Basis for Tax") and at 2EGAN011553 ("creates outside Basis 150 million"), 2EGAN011671-73 at 2EGAN011672 ("creates outside basis $150M, premium of put").

"basis creation options"[32] and dozens of them make clear the purpose of these options to generate $150M of basis that would be transferred from the single-member LLC Fidelity World to the multi-member LLC Fidelity International.[33] My reports refer to these options by their functional purpose (as reflected in the contemporaneous transaction documents) in order to aid the reader in the comprehension of this extremely complex transaction.

23. Finally, Plaintiff objects to a single footnote in 160 pages of text where the phrase "form over substance" appears. As explained in my deposition, this concept is frequently applied in financial economics and has been used in my own research.[34] In this case, it was intended to analyze the economic significance of the transaction and its practical economic consequences and to convey content rather than argument.

<u>Criticism #4: Other Transactions</u>

24. Plaintiff misrepresents how I analyzed other transactions structured by the same individuals and entities during the same period. These other transaction documents were

---

[32] See, e.g., 12CARRUTH059639. This email from Phil Kampf of Helios to Stephanie Denby, an attorney working with the plaintiff, was sent in August 2004 and appears to explain the taxpayer's transaction. "I looked at the language and spoke with [J]immy [Haber] and the way he suggested that you think about it is that the World Options were the *basis creation options* and consequently were not involved in the *loss creation*. The Remaining Options create the loss. When the gain was triggered, the Irish received 95% of the gain prior to the time your client bought out the irish. When the irish were bought out by your client the ownership changed and your client was then entitled to 95% of whatever gain or loss was in the pship. The Remaining Options were the depreciated asset as the loss was built in to the options which remained in the pship."

[33] For example, see 2EGAN011543-11551, a presentation entitled "Egan Family Entity Tax Advantaged Investment Structure" and dated September 21, 2001, attached to Rausser Initial Report as Exhibit 7. At page 7 of this presentation (1EGAN011549), a table calculates the "Expected Permanent Tax Benefits" of the proposed transaction by assuming a $150,000,000 "ordinary loss from investments" by engaging in the FPS (presumably, Foreign Partner Strategy). The expected permanent tax benefits are $62,250,000.

See also 2EGAN011552-54 at 2EGAN011552 ("$150,000,000 → gives us Basis under Helmer Basis for Tax") and at 2EGAN011553 ("creates outside Basis 150 million"), Exhibit 12 to Rausser Initial Report, Annotated Investment Summary; 2EGAN011555-560 at 2EGAN011555 ("Generate 150 million loss → Sell off gain. Buy Replacement Options. Egan buys 85% interest. FMV or <u>50%</u> of Capital foreigner put in. We now have 90% common interest—allows us to realize the loss."), Exhibit 13 to Rausser Initial Report, Notes re Targeted Loss; 2EGAN011671-73 at 2EGAN011672 ("creates outside basis $150M, premium of put"), Exhibit 16 to Rausser Initial Report, Investment Summary.

[34] Rausser Deposition at pp. 174-175.

obtained in discovery and supplied to me by counsel to the United States. However,

neither I nor my staff received any direction as to which transactions to review or what

characteristics to search for in those transactions.[35] I instructed my staff to compare the

list of transactions we had independently identified to those separately identified by

counsel when it later became apparent there were differences. This type of cross-check is

a normal and prudent process when performing a complex financial analysis. As it turns

out, the list of transactions my staff and I had identified was correct.[36] Plaintiff's

speculation that this means counsel were directing my work is unfounded and wrong. I

had no access to the other "thousands of alleged 'Son of Boss' transactions" that Plaintiff

suggests I might have reviewed. Further, even if I had access to such transactions

structured by entirely different participants, it is not clear that they would be relevant.

---

[35] Rausser Deposition at pp. 137-139.
[36] Closing books for at least 44 similar transactions, including that of the taxpayer, were produced by DGI and Helios: IDGI-02-18-025144 et seq and IDGI-02-17-024854 et seq (Akselrad/Stein); IDGI-02-16-023077 et seq (Buske); IDGI-02-11-015168 et seq and IDGI-02-11-015059 et seq (Corporex/Butler); IDGI-02-14-019724 et seq (Caputo); IDGI-03-21-029284 et seq and IDGI-03-21-029194 et seq (Cheris/Tenex); IDGI-02-15-020510 et seq (Robert Ciasulli); IDGI-02-14-020245 et seq (Ronald Ciasulli); IDGI-02-18-026267 et seq (Ciccarello); IDGI-02-15-021058 et seq (Cole); IDGI-02-17-024359 et seq (Cowan); IDGI-02-18-025719 et seq and IDGI-02-18-025993 et seq (Crawford/Slevin); IDGI-03-21-030578 et seq (Dziedzic); IEGAN000001 et seq (Egan); IDGI-02-14-019964 et seq (Francis); IDGI-02-15-022255 et seq and IDGI-02-15-022520 et seq (Francois/Thomas); IDGI-02-20-028953 et seq (Garvy); IDGI-02-11-015580 et seq, IDGI-02-11-015687 et seq, and IDGI-02-11-015794 et seq (Geewax/Terker); IHELIOS-04471 et seq (Giffen/Geisecke); IHELIOS-03476 et seq (Ginsburg); IDGI-02-13-017757 et seq, IDGI-02-12-016973 et seq, IDGI-02-12-016583 et seq, and IDGI-02-13-017365 et seq (Gupta); IDGI-03-21-029524 et seq and IDGI-03-21-029612 et seq (Holland/Europa); IHELIOS-08507 et seq, IHELIOS-09038 et seq, and IHELIOS-08930 et seq (Hoyt/Jarmel); IDGI-01-09-011685 et seq (Kutler); IDGI-02-15-021560 et seq (Ronald McNeill); IDGI-02-15-022016 et seq (John McNeill); IDGI-02-13-018149 et seq (A. Nussdorf); IDGI-02-13-018570 et seq (G. Nussdorf); IDGI-02-13-018989 et seq (R. Nussdorf); IDGI-02-14-019303 et seq (S. Nussdorf); IDGI-02-11-014163 et seq and IDGI-01-09-012515 et seq (S. Paley/Zaretsky); IDGI-01-09-012077 et seq (D. Paley); IDGI-02-11-014633 et seq (W. Paley); IDGI-02-16-023356 et seq (Portillo); IHELIOS-09373 et seq, IHELIOS-09840 et seq, IHELIOS-09783 et seq, and IHELIOS-09725 et seq (Affco/Powers/La Git); IDGI-02-15-021313 et seq (Reid); IDGI-02-15-020779 et seq (Sabella); IDGI-02-17-023648 et seq (Schostak); IHELIOS-05926 et seq (Scommenga); IHELIOS-06376 et seq (Tafeen); IDGI-02-16-022768 et seq (Taylor); IDGI-02-19-027567 et seq, IDGI-02-19-027213 et seq, IDGI-02-19-026860 et seq, and IDGI-02-19-026506 et seq (Thies); IDGI-02-20-027921 et seq, IDGI-02-20-028265 et seq, and IDGI-02-20-028609 et seq (Thies Trusts); IDGI-03-21-030317 et seq (Wainwright); IHELIOS-06785 et seq (Wolff). Closing books were not produced to me for the Civello and Tschetter transactions; for these transactions I reviewed other documents, including: ALPHA2-Z08684-686 and SIDL0308850-853 (Civello), and SIDL0306559-6562 (Tschetter).

The significance of my review of the 46 transactions (including taxpayer's) described in my reports was that, among other things, they had the following common attributes:[37]

- Offsetting option structures with insignificantly different strike prices;

- Very similar probabilities associated with each possible outcome,

- Consistent calculations of the bid/ask fee payable to Refco,

- Diminution in reported value the day after execution of the initial options,

- The same foreign partners (either Mahoney or Hawkes),

- Comparable changes to the percentage ownership interests for the multi-member LLC before and after gain realization, and

- Separation and immediate replacement of the paired options in a manner claimed to generate a gain and lock in a loss.

In my experience, these similarities are inconsistent with a group of 46 differently situated investors constructing effective hedges. Moreover, the probabilities articulated in the various closing documents are consistent with each other, but inconsistent with a rational expectation of profit.

25. Any peer reviewed analysis of this transaction would be severely criticized if it disregarded other transactions by the same promoters in the same period whose results, terms and configuration could be compared.[38]

26. In addition, Plaintiff's assertion that I have not "previously required the use of similar, but unrelated, transactions to test [my] analysis of one particular transaction" is completely inaccurate.[39] Although most of my reports are subject to Protective Orders and can not be disclosed, the vast majority of my work involves the application of

---

[37] Rausser Initial Report at pp. 82-89.
[38] See also discussion of this analysis, Rausser Deposition at pp. 162-163.
[39] Rausser Deposition at pp. 162-166.

benchmarks which are used to compare other transactions to the subject transactions. For example, antitrust disputes, an area in which I have frequently provided expert testimony in courts across the land, routinely involve the comparison of transactions in different time periods or locations to evaluate the difference in their pricing, financial terms or outcomes. Investment disputes, another area in which I have significant expert testimony experience, typically involve a comparison of the disputed transaction or portfolio outcome with the outcome of prior or subsequent transactions between the same parties, or transactions involving entirely different parties in the same period of time. I have also consulted repeatedly in cases involving environmental tort damages, all of which involve a comparison of other properties, time periods or economic transactions to identify and quantify any differences that may be attributable to the impact of a particular set of events or transactions. Disciplined academics regularly look for such comparisons to ground their analysis. Plaintiff's assertion that "the only economists who test their conclusions on the economic attributes of a particular transaction by examining numerous *unrelated* transactions are economists hired by the Tax Division of the Department of Justice" is based on a manifestly false premise. In this case, my analysis reveals that the 45 other transactions discussed in my reports are far from "unrelated." Moreover, as previously discussed, the comparison of the financial attributes of similar transactions is an essential tool used by financial economists in their work.

<u>Criticism #5: Use of Inferences</u>

27. Plaintiff points to two allegedly improper "inferences" in my reports. The first of these is the allocation to the transaction of legal fees imposed by Burke, Warren, MacKay & Serritella. The Motion incorrectly states that I "ignore the possibility that such fees

were attributable to numerous other transactions or estate planning services, information that would not have been produced in this litigation." On the contrary, my reports specifically make clear that, because of redactions and the absence of clarifying information, it was impossible to allocate such fees with perfect precision.[40] I understand that a critical issue in this case is the profit potential of the transaction. Profits can not be evaluated without taking into account costs associated with the transaction. I was required to make the best estimate I could of these expenses, given the limitations on available evidence. If a portion of the expenses paid to the Burke, Warren firm (which total more than $500,000) were ultimately proven to be attributable to other matters, this would not fundamentally change my conclusion that the profit potential after expenses was negligible or non-existent.

28. The second statement that Plaintiff characterizes as an unsupported assumption has to do with foreign partner Mahoney's role in generating the claimed tax outcome. Without the foreign partner's allocation of bookkeeping gains (unsupported by any cash distributions to him) the transaction would have had a dramatically different tax impact but without changing the pre-tax economic consequences for the taxpayer. The documents I reviewed revealed no economic incentives, profit potential or business motivation for Mahoney's participation, other than the fee which he apparently received for doing so. This was particularly true given the fact that Mahoney and his partner had repeatedly participated in other, similar transactions structured by the same promoters all resulting in an actual economic loss to them (assuming they paid for their own

---

[40] Rausser Rebuttal Report at pp. 14-15, in particular at fn. 25, which states in part: "Note that it is difficult to determine from the redacted invoices precisely what portion of the fees are attributable to this transaction; my staff reviewed the invoices, removed tasks and costs that were clearly unrelated to the Fidelity International matter from the face of the invoice, and summed the remaining fees and costs. The task of estimating these legal fees was further complicated by the incomplete record of invoices."

investments) accompanied by a large distribution of bookkeeping gains. Rational investors will not ordinarily repeat unprofitable experiences for which only expected losses could be justified. I was careful not to conclude what Mr. Mahoney's personal motivations may have been and, instead, merely stated that "*lacking any other economic justification* for [his] participation, it must be concluded that [it] . . . was necessary to generate the desired tax outcome."[41] My statement was expressly conditioned on the absence of any alternative economic motivations which may not yet have been revealed.[42] If Plaintiff has any other economic or business justification or motivation for Mahoney's role, that explanation will presumably be tendered at or before the time of trial and will be incorporated into my analysis. At the present, I am not aware that any such explanation has been provided.

<u>Criticism #6: Authorship of Reports</u>

29. Plaintiff's assertion that I did not draft the two reports I signed is flatly untrue. Prior to September 11, 2007 (the date my second report was filed), I personally devoted 593 hours to this matter. Approximately 20% of those hours were devoted to the tutorial process. The remainder (approximately 475 hours) were spent developing the analytical framework used in my analysis; analyzing documents and data; overseeing and redirecting or refining all interim stages of the work; reviewing all statistical and empirical results; determining the content and structure of the reports; drafting, revising and finalizing the reports. At no time in my deposition was I asked any question on the substance of my reports that I was not able to address. I stand by the conclusions and

---

[41] Rausser Initial Report at p. 104.
[42] Rausser Initial Report at pp. 97-104

observations set forth in both of my reports, and I note that Plaintiff's motion presents no substantive challenge to them.

30. Further, my services accounted for approximately 35% of the total fee billings in this matter up to the date of my second report, and a considerably higher proportion thereafter. In my thirty years of experience as an economic consultant, this is not at all an unusual distribution among staff and a testifying expert. Particularly in cases such as this, where voluminous documents are delivered over a period of more than a year, sensible use of staff is essential.

31. Given the extensive time I devoted to this matter, Plaintiff's argument that I did not write my own reports appears to hinge on the absence of email to and from me. The rate of email traffic has absolutely nothing to do with my control over and authorship of my reports. Although I pride myself on the quality of my economic and financial analysis, I am not now and never have been a very good typist. As a result, to the extent possible I avoid authoring emails. It has been my experience over the years that the best and most thorough supervision occurs in person.[43]  When working on a large project, I find it helpful to meet regularly with my staff on a face to face basis. This allows us to discuss observations, conclusions and approaches and for me to redirect efforts wherever appropriate. Such meetings were a fundamental part of the process for developing the content of the reports I filed in this case. I almost never provide directions, guidance or feedback via email, but the absence of such emails is no measure of my involvement in or control over my reports.

32. Finally, Plaintiff drags in an email apparently written five years ago by Bob Larner, someone with whom I worked at Charles River Associates ("CRA") but who was

---

[43] Cf. Rausser Deposition at pp. 121-130, 145-148, 155.

certainly not my "supervisor" as Plaintiff's Motion states. The Motion makes an assertion

it attributes to my "former colleagues," plural, but cites to only a single comment in an

email by a single former colleague over the course of my more than thirty year career.

Further, the email itself is completely misconstrued. As I explained in my deposition

(facts that Plaintiff omits from its Motion) CRA made its money from the degree of staff

leverage each of its experts used.[44]  Generally speaking, testifying experts who work with

support firms like CRA receive all or nearly all of their fees as a direct pass-through; the

support firm receives income only through the billings of its own support staff. As I

explained in my deposition, it was "[Mr.] Larner's responsibility to increase the amount

of staff billings relative to expert billings, because that's how Charles River makes

money."[45] It was therefore to Mr. Larner's advantage to see to it that as much of the work

as possible on each engagement be performed by staff, rather than by the testifying

expert, because this increased CRA's profitability. In addition, principals in CRA were

also eligible to receive as a "finder's fee" a portion of the staff billings resulting from

cases on which others were the designated experts. The quote Plaintiff relies on from

Larner's email states that, in his opinion, I had a "propensity to bill large amounts of time

in relation to the work done" and that he would therefore be disinclined to recommend

me to attorneys he knew.   In other words, the more of the work I did myself and did not

delegate to CRA staff, the less money CRA earned on my projects, and the lower

"finder's fee" Mr. Larner might be eligible to receive on a case where I was selected as

the expert. Hence, Mr. Larner's comment is not difficult to understand and serves as no

commentary on my authorship of the Fidelity International reports five years later.

---

[44] Rausser Deposition at pp. 98-99.
[45] Rausser Deposition at pp. 98-99.

Criticism #7: Judicial Decisions

33. From the more than one hundred matters in which I have been engaged as an expert witness providing trial testimony, Plaintiff has identified five that generated judicial criticism from a trial judge. The Plaintiff fails to mention that two of these decisions were reversed on appeal in a manner that directly undercuts the trial judge's criticism. Plaintiff also fails to mention that precisely the same methodology criticized in the third case it cites were approved by the Seventh Circuit in a subsequent decision authored by Judge Richard Posner discussing my work. In the two remaining cases, the trial court's objection was based not on my credentials or skill, but on the limitations of the data that I was required to use in generating a probabilistic forecast, which I clearly specified in my expert reports. None of these decisions have anything to do with the present case.

34. In the *Tractebel* matter,[46] the taxpayer quotes the trial court on a point later reversed and heavily criticized by the Second Circuit Court of Appeals. The case involved damage claims flowing from the termination of a twenty-year contract for power co-generation. The trial judge rejected testimony of future profits from *both* sides' experts, concluding that it was simply impossible to project that far down the road. On appeal, the Second Circuit decided the trial court was wrong in selecting the legal standard and in disregarding both sides' expert analyses as speculative. The statement from the trial judge that Plaintiff quotes, likening economic analysis of future lost profits to "consult[ing] tealeaves or a crystal ball"[47] was specifically rejected by the Second

---

[46] *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, No. 03-6731 (S.D.N.Y Aug. 8, 2005), *amended in part* (S.D.N.Y. Jan. 20, 2006), *aff'd in part, vacated in part*, 487 F.3d 89 (2d Cir. 2007).
[47] *Tractebel*, 487 F.3d at 112.

Circuit: "If it is true that projecting profits over twenty years is so absurdly speculative that economists can do no better than fortune tellers, it would have been imprudent for the parties to enter a contract for such a long period in the first place. The reality, however, is that long-term contracts are entered into regularly, and a degree of speculation is acceptable in the business community."[48]

35. Regarding the *Fisher* matter,[49] Plaintiff's motion quotes a paraphrase of a comment by the Administrative Law Judge but fails to point out that the quoted ALJ was—in that very opinion—reversed by the Commodity Futures Trading Commission for several reasons. Among those reasons was the ALJ's improper refusal to allow parties to subpoena additional data that was necessary for me to assess a key conclusion by an opposing expert.[50] Obtaining the requested data would have made my analysis even stronger and clearer, and the Commission concluded that the ALJ's improper denial of the subpoena also "deprived respondents of a fair opportunity to impeach [an opposing expert]'s testimony."[51] Finally, the Commission expressed some differences with *all* of the experts from both sides, but said its concerns affected only the weight of each analysis, not the qualifications of the experts.[52] The Commission agreed with the ALJ's determination that all of the experts presented, myself included, were "'eminently qualified'" to testify as expert witnesses.[53] The Commission concluded that, "[i]n this instance, we acknowledge that there are a great many suspicious circumstances disclosed on the record, but conclude that they don't fit together in a manner that produces a

---

[48] *Tractebel*, 487 F.3d at 112, fn. 26.
[49] *In the Matter of Mark B. Fisher*, C.F.T.C. No. 93-2, March 24, 2004. The text of this opinion is available on the Commission website at: http://www.cftc.gov/files/ogc/oporders04/ogcfisher032404.pdf.
[50] *Fisher* at 33-34.
[51] *Fisher* at 34.
[52] *Fisher* at 41-42.
[53] *Fisher* at 18.

coherent, compelling picture."[54] This was precisely one of the major opinions expressed in my report. Ultimately, the party on whose behalf my testimony had been presented prevailed.

36. In the *Potash* matter before the Eighth Circuit,[55] the taxpayer cites a 2000 decision questioning my analysis. However, the principal reason for that rejection was neither my qualifications nor the methodology or approach I applied. Instead, the problem was with the adequacy of the available data. I was forced to rely upon a general survey instrument known as the "Green Sheet" because actual transaction data was not produced in discovery and was not available. Plaintiff fails to note that in another matter, applying the very same analytical approach but in which transaction data was available, my analysis was upheld by the Seventh Circuit in an opinion by Judge Richard Posner, *High Fructose Corn Syrup Antitrust Litigation*.[56] The trial court in *High Fructose Corn Syrup* originally relied on the Eighth Circuit's *Potash* decision to reject my analysis; however, the Seventh Circuit and Judge Posner specifically disagreed with that decision and approved my work. At Judge Posner's recommendation on remand, the trial court retained a neutral economic expert to evaluate the expert analysis on both sides. That neutral expert also accepted my methodology.

37. In the last two cases, *Oxygenated Fuels*[57] and *Oyster Software*,[58] I was specifically asked to perform a probabilistic forecast and did so. In *Oxygenated Fuels*, I was directed to forecast gasoline prices in the State of New York over a ten-year period. In *Oyster Software*, I was asked to forecast the number of customers who might be lost as

---

[54] *Fisher* at 42.
[55] *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028 (8th Cir. 2000).
[56] *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651 (7th Cir. 2002).
[57] *Oxygenated Fuels Ass'n v. Pataki*, 293 F. Supp. 2d 170 (N.D.N.Y. 2003).
[58] *Oyster Software, Inc. v. Forms Processing, Inc.*, No. 00-0724 (N.D. Cal. 2001).

a result of software designed to trick search engines into wrongfully redirecting web traffic. My testimony in both matters specifically acknowledged that there was a speculative element to any probabilistic forecast. In both *Oxygenated Fuels* and *Oyster Software,* the courts concluded not that the methodology employed was wrong but that probabilistic forecasting itself was inherently speculative. Ultimately, historical data following conclusion of the *Oxygenated Fuels* matter showed that my probabilistic forecast turned out to be correct.

<u>Criticism #8: Personal Background</u>

38. In an attempt to cast me in an unfavorable light, Plaintiff spends many pages of its Motion inaccurately and misleadingly describing three issues that have nothing to do with my qualifications, my reports, my analytical methods or conclusions. Similarly, in my full day deposition, it was past 1:30 in the afternoon before Plaintiff's counsel asked me anything remotely hinging on the substance of my conclusions: instead, the bulk of the time was spent exploring entirely unrelated personal matters many of which are now inaccurately rehashed in the Motion to Exclude.[59] Plaintiffs report on a contractual dispute I had with three former colleagues, the fact that I invested money in a start-up business that failed, and the fact that OnPoint's staff includes an attorney who previously represented me and who had a role almost four years ago in another business of which I was a founder and investor.

39. In 2003, a dispute arose between me and three other consultants at CRA regarding whether (and, if so, to what extent) we had agreed to share the gains in certain stock

---

[59] Despite all of this time spent on my personal background, Plaintiff persists in getting the facts wrong. For example, although I co-founded LECG, my consulting career began many years earlier as should have been clear from my deposition. Compare Plaintiff's Motion at pp. 2-3 with Rausser Deposition at p. 13. Further, when I moved my consulting practice to Charles River I recruited more than just three individuals to come with me. Compare Plaintiff's Motion at pp. 2-3 with Rausser Deposition at pp. 88-89.

granted to me by CRA and which was pledged as collateral for a loan from CRA that I personally had to repay.[60]  We were unable to resolve the dispute and it ultimately ended up in litigation.  Although Plaintiff mentions that the three consultants accused me of fraud, these claims were dismissed by the trial judge on the basis that they lacked any factual basis and were unsupported by any credible evidence. The contract judgment against me is currently up on appeal but has absolutely nothing to do with this case or with my credentials as an expert witness.

40. Plaintiff also points out that I loaned a large amount of money to a start-up that I had helped found, known as Opt4 Derivatives.  As I explained in my deposition, but Plaintiff omits from its motion, the motivation for the loan was to cover ongoing payroll and benefits and to protect the jobs of individuals employed by Opt4.[61]  The Company ultimately defaulted on this and numerous other obligations and had to be liquidated.  As one of its creditors, I chose with the Chicago options trading firm Peak6 LLC to acquire Opt4's proprietary software at the public foreclosure auction. It is unclear why Plaintiff considers any of these facts to have the slightest relevance to my expert services in the current litigation.

41. Finally, Plaintiff makes much of the fact that Laura Craft, a lawyer who has previously represented me, was also employed at Opt4 and helped me to co-found OnPoint Analytics.  Ms. Craft's expertise (and her more than 25 years of professional experience) is principally in financial products including financial guarantees,

---

[60] Plaintiff infers that there is something suspicious about the fact that the reference to CRA was later omitted from my OnPoint resume.  As I explained at my deposition, the reference to CRA appeared continuously on my *publicly posted* academic resume and was omitted from the OnPoint resume as a result of a clerical error when I was transitioning firms; this clerical error has since been corrected. Rausser Deposition at pp. 74-75. My testimony list has always been accurate and complete and anyone investigating any of these cases could have determined my affiliation at particular points in time. See Exhibit 3 to Rausser Initial Report.

[61] Rausser Deposition at pp. 85-86, 214-216.

collateralized loans, securities, commodities and options. At Opt4 she structured and

finalized a definitive agreement with the Board of Trade Clearing Corporation for the

trade processing, clearing and settlement of over-the-counter options. She was

responsible for negotiating business arrangements with regulated exchanges, unregulated

exchanges and private market makers for the joint trading of over-the-counter options.

These exchanges included the Chicago Mercantile Exchange, the Chicago Board of

Trade, the American Stock Exchange, the London Futures Exchange and others. Her

work in this regard had nothing to do with the practice of law, and instead was based on a

comprehensive understanding of over-the-counter options trading. As such, her

experience is directly relevant to this case.

42. OnPoint is a statistical and economic analysis firm whose clients include financial

firms as well as attorneys.[62] This does not mean, however, that the company is "engaged

in the practice of law." It is not unusual for such firms to engage JDs. Indeed Tom Jorde,

one of the individuals with whom I co-founded LECG, was an attorney and a professor at

Boalt Hall School of Law. Ms. Craft's work on this engagement never involved

practicing law, rendering legal opinions or drafting legal arguments. Instead, she did

what project managers customarily do in such cases, coordinating the services of PhD

economists, PhD statisticians, experienced database architects and others whose skills

were needed. Any other legal work performed by Ms. Craft for me after the formation of

OnPoint Analytics, Inc. was the residual of work that pre-dated the formation of OnPoint

Analytics and was typically performed in a co-counsel or consulting role.

---

[62] For instance, OnPoint performed economic consulting work for the Stoel Rives firm during the same time period the Fidelity International matter has been active. Plaintiff suggests I was being disingenuous in my deposition when I could not conclusively identify what someone referred to as the "Stoel brief" in an email I had never seen. But given the other Stoel Rives-related work pending at that time, the uncertainty is understandable.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that his Declaration was executed in Berkeley California on February 14, 2008.

Gordon Rausser

Gordon Rausser, Ph.D.

Case 4:05-cv-40151-FDS    Document 272-4    Filed 02/15/2008    Page 1 of 3
Ronald Buesinger - October 11, 2007
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 194

1          Q.    And you indicate that you prepared

2     this in this way at the direction of James Haber

3     without including any value for the head of the

4     pin.

5          A.    That is correct.

6          Q.    Do you know why·James Haber did not

7     want you to put any value in there for the head

8     of the pin?

9          A.    Because early on he had -- basically

10    he in that PowerPoint presentation says

11    Diversified and Alpha designed it.  Basically

12    Alpha, we don't have any tax or accounting

13    expertise.  He would come up with can we do this,

14    can we do this.  What would the securities look

15    like.

16               So very early on he started working

17    with these call spreads or put spreads, the

18    long/short option.  So we started running

19    examples, and I don't know if he told me, but as

20    I understood it, what Ivan relayed to me is we

21    definitely pointed out to Jim that, look, there's

22    value, in fact we know there's value because

GOVERNMENT
EXHIBIT
3

Ronald Buesinger - October 11, 2007
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 195

1    certain dealers won't price it.  They think it's

2    too risky, they think your customers are getting

3    too good of a deal.  But other dealers, Lehman

4    was willing to price it, Sumitomo was willing to

5    price it, UBS was willing to price it, and then

6    ultimately Refco became the best counterparty

7    that we found.  But other dealers like HSBC wound

8    up in the end, they wouldn't price it.

9         We said, look, there is value, do you

10   want us to calculate what we call the theoretical

11   value of the head of the pin, and Jim said, well,

12   so he said something along the lines of what's

13   the likelihood of it actually landing on the head

14   of the pin, and we told him the dealer, whoever

15   the counterparty was, whether it be Refco,

16   Lehman, UBS, they would do -- and they've got

17   enough money to do it, they would move the market

18   one way or the other to get it off that strike

19   the head of the pin because they couldn't run the

20   risk of having to make that huge payout.

21        So Jim was like, you know what, if

22   you're telling me it's probably not going to

Ronald Buesinger - October 11, 2007
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 196

1    happen and we said, yeah, it probably won't, but

2    you'll have data that might prove and an

3    arbitration might find that you owe your customer

4    something.  He said, you know what, realistically

5    it's just going to be the net payout, so just run

6    the numbers off the net and that's just an added

7    benefit.

8            So that's how -- so we never -- we

9    always knew there was -- you could assign a value

10   to it.  Jim Haber pretty much never, every once

11   in a while he would say what is the value of that

12   but he never really asked us to run it.  So I'm

13   sorry for that.  We're never going to get out of

14   here.

15           Q.   Did you have any understanding that

16   these initial trades were not going to be held to

17   full term?

18           MS. PAKENHAM:  You're talking about

19           this specific example?

20           MR. LINDQUIST:  Yes.

21           A.   This example just in general?

22           Q.   These?

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

INTERNAL REVENUE SERVICE,    )
    )
       Petitioner,    )
    )
         v.    )    Civil Action No. 97-695 MMS
    )
CM HOLDINGS, INC.,    )
    )
       Respondent.    )

---

Carl Schnee, Esquire, United States Attorney, and Ellen W. Slights, Esquire, Assistant United States Attorney, United States Department of Justice, Wilmington, Delaware; Of Counsel: Dennis M. Donohue, Esquire, Alan J.J. Swirski, Esquire, and Joseph A. Sergi, Esquire, United States Department of Justice, Washington, D.C.; attorneys for petitioner.

S. David Peress, Esquire, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Of Counsel: Michael I. Saltzman, Esquire, Lawrence M. Hill, Esquire, Richard A. Nessler, Esquire, Amy L. Robinson, Esquire, White & Case LLP, New York, New York; attorneys for respondent.

---

## MEMORANDUM OPINION

Argued:    March 13, 1999
Dated:    March 17, 1999
Wilmington, Delaware



GOVERNMENT EXHIBIT

4

PENGAD 800-631-6989

*Murray M. Schwartz*

**SCHWARTZ, Senior District Judge**

## I.   Introduction

Respondent CM Holdings, Inc. ("CM") filed two Motions in Limine to exclude evidence

that Petitioner Internal Revenue Service ("IRS") seeks to introduce at trial.  Docket Items

("D.I.") 58, 60.  In one motion ("First Motion"), CM seeks to exclude the "testimony of John F.

Gies, Francis J. O'Connor, Stan Kaltenborn and Neil Vance, and any expert testimony and all

documentary evidence relating to the regulation of insurance by states other than Georgia" (the

"Non-Georgia Regulation Evidence").  D.I. 60 at 1.  Second, CM seeks to exclude "all

documentary evidence which relate to [corporate owned life insurance ("COLI") policies issued

by Mutual Benefit Life Insurance Company ("MBL")] that are not at issue in this case" (the

"Predecessors to COLI-VIII Evidence").  *Id.*  CM contends that each category of evidence is

irrelevant under Fed. R. Evid. 401 and 402.  CM further asserts that, even if the evidence is

relevant, under Fed. R. Evid. 403, the probative value of each piece of evidence is substantially

outweighed by danger of confusion of the issues, undue delay, waste of time, or needless

presentation of cumulative evidence.

The Court will deny the First Motion as to the Predecessors to COLI-VIII Evidence.  The

Court will also deny the First Motion as to the Non-Georgia Regulation Evidence insofar as it

relates to the states of Ohio, New Jersey, and Connecticut.  This evidence may be relevant in

determining whether CM's COLI-VIII policy qualifies as a life insurance contract under I.R.C.

§ 7702.  The Court will grant the First Motion as to all other aspects and uses of the Non-Georgia

Regulation Evidence.

In the other motion ("Second Motion"), CM seeks to exclude the trial testimony, deposition testimony, and expert report (collectively "testimony") of James W. Hoag, Ph.D. ("Dr. Hoag"), an expert witness testifying on behalf of IRS. D.I. 58. CM first asserts that Dr. Hoag's testimony must be excluded under Fed. R. Evid. 702 because Dr. Hoag is not qualified, his testimony is unreliable, and his testimony will not assist the trier of fact. In addition, CM asserts that Dr. Hoag's testimony is inadmissible pursuant to Fed. R. Evid. 704(a) because he is offering only a legal opinion on how the case should be decided. The Court will deny the Second Motion because Dr. Hoag's testimony is admissible under both Rule 702 and Rule 704(a).

## II.    Facts

IRS brought this action against CM, the successor to Camelot Music, Inc. ("Camelot"), claiming that Camelot wrongfully deducted interest it purportedly paid on policy loans it obtained under COLI policies. Camelot purchased these COLI policies, known as COLI-VIII policies, from Mutual Benefit Life Insurance Company ("MBL") in 1990. These policies were whole life insurance policies on the lives of approximately 1,400 of Camelot's employees and officers. Camelot was the sole owner and beneficiary of these policies.[1]

The mechanics of these COLI-VIII policies was explained in this Court's opinion in *Internal Revenue Service v. CM Holdings, Inc.*, 221 B.R. 715, 717-18 (D.Del. 1998) ("*CM Holdings I*"). Rather than pay cash for the vast majority of the premiums on the policies, Camelot took out loans against the stated policy value and paid the loans with interest. *See id.* "As time [went] on, premium and interest charges [were] discharged principally through a combination of

---

[1]As a result, if an employee should die while covered by this COLI plan, the death benefits go to Camelot, not to the employee.

policy-generated 'dividends' and 'surrenders' of policy value, which value [was] largely created by premiums 'paid' previously by borrowed funds." *Id.* Camelot would also receive death benefits as the beneficiary of the policy. *See id.* On its 1991-1993 federal tax returns, Camelot claimed a deduction for the interest that it paid on the policy loans. *See id.*

      IRS asserts that this COLI-VIII policy was a sham transaction which generated no economic benefit to Camelot other than the tax benefit from the interest deductions:

> The IRS contends that this COLI plan which Camelot operates is a "no pay" COLI plan. Under a "no pay" COLI, over the projected life of the plan, the policyholder does not part with any of its own funds to pay the premium and interest due under the policies. . . . Corporations which employ "no pay" COLI plans typically derive an overall positive cash flow as a result of the tax benefit which accrues from interest deductions on policy loans. In the end, the policyholder pays nothing for the insurance through a circular flow of internally-generated policy funds to pay premiums.
>
> The IRS asserts "no-pay" COLI plans represent another attempt by life insurance companies and American corporations to circumvent the restrictions placed by Congress on the deductibility of interest on loans taken out in connection with life insurance policies. Because the IRS believes this practice is widespread in corporate America, the IRS maintains the outcome of this case will have a large impact on the United States Treasury, as the total interest on loans taken out in connection with COLI plans is in excess of two billion dollars. However, if these interest payments on loans are found to be non-tax deductible, the COLI will lose its tax-saving benefits and may completely cease to exist.

*Id.* (footnotes omitted).

## A.    Predecessors to COLI-VIII

      The MBL COLI-VIII product was developed over a period of years from 1985 through 1990. MBL designed the product with the assistance of the actuarial consulting firm, Milliman and Robertson ("M&R"). Developed in 1985, the original product, known as COLI I, was an extension of the "key-man" life insurance policies that corporations traditionally purchased on the lives of their senior management and employees. The COLI I policy was designed to take

advantage of favorable interest deductions allowed under the federal tax code for loans on these types of policies. Over the next few years, as the tax code was amended by Congress, MBL modified its COLI policies, developing new products known as COLI III, COLI III.5, COLI V, COLI VII, COLI VIII, and COLI X. IRS has proffered that Camelot considered the purchase of various COLI policies between 1987 and 1990. *See* Expert Report of James W. Hoag ("Hoag Report"), D.I. 66, Exhibit 1 at 22. Camelot ultimately purchased the COLI-VIII policies in 1990.

CM Holdings seeks to exclude the following evidence related to the Predecessors to COLI-VIII:

1) Documents dealing with predecessors to COLI-VIII [listed in CM Holdings Exhibit ("CM-X") 5; some documents at IRS Exhibit ("IRS-X") 1(A)-(D), 1(I)];

2) Testimony of Steven Eisenberg, Timothy Millwood [deposition at CM Holdings Reply Exhibit ("CMR-X") B], Daniel McCarthy, Jack Branscomb, and Albert Easton, employees of Milliman & Robertson, Inc., an actuarial consulting firm that helped develop the COLI policies;

3) Testimony of James Van Etten and Wendell Bossen, employees of MBL that Camelot had no contact with;

4) Testimony of Henry McCamish, Gordon Beckham, Jr., and Sam Thomas.

D.I. 61 at 17-18. This documentary and testimonial evidence relates to the design, development, sale, and approval of the predecessors to MBL's COLI-VIII policy, including COLI I, COLI III, COLI III.5, COLI V, and COLI VII.

4

**B.     Other State Regulation of COLI Plans**

All COLI policies, like any life insurance policies, are subject to review and approval by various state regulatory agencies.  MBL filed for approval of the COLI-VIII plan in all 50 states, and eventually received approval in 40 states.  IRS has admitted that "Camelot's COLI-VIII policies were issued in the state of Georgia," one of the 40 states that approved the COLI-VIII plan.  D.I. 72, Exhibit C, ¶ 13.  Camelot had its principal place of business in Ohio.  MBL has its principal place of business in New Jersey.  In 1992, Hartford Life Insurance Company ("Hartford Life"), a corporation with its principal place of business in Connecticut, assumed MBL's COLI policies, including those purchased by Camelot.

CM Holdings seeks to exclude the following Non-Georgia Regulation Evidence:

1) Documents showing administrative review of COLI-I through COLI-VIII in CT, MI, NJ, NY, OR, PA, TX, WA, VT [listed in CM-X 1; some documents contained in IRS-X 1(E)-(G), 1(J)-(K); one document contained in CMR-X 4];

2) Testimony of Stan Kaltenborn, an employee of New York State Department of Insurance;

3) Testimony of Neil Vance, an employee of New Jersey Department of Banking and Insurance;

4) Testimony of Frances O'Connor, employee of Connecticut Department of Insurance [deposition at CM-X 2];

5) Testimony of Jack Gies, Connecticut Department of Insurance [deposition at CM-X 3];

6) Testimony of "a state regulatory expert."

D.I. 61 at 9.  This evidence relates to the review and regulation of MBL's COLI policies by states

other than Georgia, including the review and regulation of MBL's COLI I, COLI III, COLI III.5,

COLI V, COLI VII, COLI VIII, and COLI X policies.

C.    **Dr. Hoag**

Dr. Hoag is a financial economist serving as an expert witness for IRS.  Dr. Hoag

submitted an expert report titled "An Evaluation of the Purchase of Corporate-Owned Life

Insurance by Camelot Music" ("Hoag Report").  He also submitted a rebuttal report titled "A

Rebuttal to Expert Reports Evaluating the Purchase of Corporate-Owned Life Insurance by

Camelot Music" ("Hoag Rebuttal Report").  In addition, he was deposed by CM on August 4,

1999 ("Hoag Deposition"), submitted a declaration ("Hoag Declaration"), and testified at a

*Daubert*[2] *in limine* hearing on March 13, 1999.  Dr. Hoag has rendered an opinion on whether

CM's COLI-VIII policies and loans have "economic substance."  Dr. Hoag's experience,

qualifications, and methods are detailed in the discussion section below.


### III.    Discussion

A.    **First Motion – Non-Georgia Regulation Evidence and Predecessors to COLI-VIII Evidence**

CM's request that these two broad categories of evidence be excluded is somewhat

problematic because the Court has not seen the documents nor received a proffer of the testimony

which CM seeks to exclude.  The Court has only received a list of objected to documents (CM-X

1, 5), a handful of the actual documents (CM-X 4; IRS-X 1(A)-(G), 1(I)-(K); CMR-X D-F),

---

[2]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

portions of deposition transcripts for a few witnesses (CM-X 2,3; IRS-X 1(H); CMR-X B), and a few witness declarations (IRS-X 2-4). Moreover, it would be impractical for the Court to receive a proffer of the evidence as this would involve a mini-trial which could extend for several weeks. Basically, CM has requested the Court to rule on the admissibility of evidence in a vacuum without the benefit of seeing the evidence.

Thus, the Court must rule on the First Motion based on its very limited knowledge about the substance of the evidence which CM seeks to have excluded. The Court's analysis is necessarily limited to the very broad question of whether the two classes of evidence should be categorically excluded. For the reasons set forth in detail below, the Court will not categorically exclude the Predecessors to COLI-VIII Evidence as it likely contains at least some relevant evidence, the probative value of which is not substantially outweighed by danger of confusion of the issues, undue delay, waste of time, or needless presentation of cumulative evidence. Similarly, the Court will not exclude the Non-Georgia Regulation Evidence related to the states of Ohio, New Jersey, and Connecticut, insofar as this evidence relates to determining whether CM's COLI-VIII policy qualifies as a life insurance contract under I.R.C. § 7702. However, the Court will exclude all other aspects and uses of the Non-Georgia Regulation Evidence as being irrelevant, and because any marginal relevance is substantially outweighed by confusion of the issues, undue delay, and/or waste of time.

1.    **Relevance**

Under Rule 402, only "relevant evidence" is admissible. Fed. R. Evid. 402. Rule 401 defines "relevant evidence" as:

> evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Fed. R. Evid. 401. In other words, relevant evidence is any evidence which alters the probability of a consequential fact being true. *See* Weinstein's Federal Evidence § 401.04[2][a] (2d ed. 1999) ("Weinstein") (citing *Huddleston v. United States*, 485 U.S. 681, 687 (1988); *United States v. Sriyuth*, 98 F.3d 739, 945-47 (3d Cir. 1996)). A consequential fact is any fact that "is of consequence to the determination of the action." Fed. R. Evid. 402 (Advisory Committee Note).

The Court uses a lenient standard in making a relevance determination. *See Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 109-10 (3d Cir. 1999). Determining whether evidence is relevant is a decision within the discretion of the trial court. *See Livingstone v. North Belle Vernon Borough*, 91 F.3d 515, 523 (3d Cir. 1996); Weinstein § 401.03[1]. Moreover, in a case such as this, "a trial judge sitting without jury is entitled to even greater latitude concerning the admission or exclusion of evidence." *In re Unisys Savings Plan Litigation*, 173 F.3d 145, 155 (3d Cir. 1999) (quoting *Goodman v. Highland Ins. Co.*, 607 F.2d 655, 668 (5th Cir. 1979)).

To determine whether evidence pertains to a fact of consequence, the Court may first consider how the evidence pertains to the underlying substantive legal issues. *See* Weinstein § 401.04[3][b] (citing *Tellum v. E. F. Hutton Credit Corp.*, 859 F.2d 835, 838 (10th Cir. 1988)). Second, even if evidence does not directly prove a fact of consequence, it may be admissible as background information which helps the Court determine the probative value of other evidence. *See id.* § 401.04[4][a] (citing *United States v. Scarfo*, 850 F.2d 1015, 1018-21 (3d Cir. 1988)). Finally, evidence may be relevant to evaluating the credibility of witnesses. *See id.* § 401.04[4][b]

8

(citing *Scarfo*, 850 F 2d at 1018-21)  The Court will examine these three possible grounds for relevance in turn.

### a.    Substantive Legal Issues

The Court first turns to whether the two categories are of evidence are relevant to proving the substantive legal issues  The parties agree on three of the legal issues in this case: (1) whether CM's COLI-VIII plan is a sham in fact or a sham in substance, barring interest deductions under I R C § 163(a); (2) whether CM's COLI-VIII plan falls under the "four out of seven" safe harbor for life insurance policy borrowing in I R C § 264(d)(1), and, (3) whether CM's COLI-VIII plan qualifies as a "life insurance contract" under I R C § 7702  D 1 84 at 3   In addition, IRS contends there is an additional legal issue as to whether the policy loans were part of a "generic tax shelter." *Id.*  CM asserts there is an additional legal issue as to whether the pre-tax economic substance analysis applies to a life insurance policy  None of these legal issues has been fully briefed at this time  Nonetheless, the Court now analyzes whether the disputed evidence is relevant to each of these legal issues

### (1)    Whether COLI-VIII Transaction is Sham Under I.R.C. § 163(a)

On its 1991 through 1993 federal income tax returns, CM claimed tax deductions for interest payments it made in connection with loans it received on its COLI-VIII insurance policies  The deductions were made pursuant to I R C § 163(a), which provides

> There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness

26 U S C § 163(a)  However, the deduction is not allowed if the interest is paid or accrued as part of a sham transaction  *ACM Partnership v. Commissioner*  157 F 3d 231, 246 (3d Cir 1998)

(citing *Gregory v. Helvering*, 293 U.S. 465, 468 (1935)). There are two types of sham transactions. A "sham in fact" occurs when a transaction never occurred in reality, but only existed on paper. *See id.* at 247 n.30 (citing *Kirchman v. Commissioner*, 862 F.2d 1486, 1492 (11th Cir. 1989)). A "sham in substance" occurs when the transaction has actually taken place but is "devoid of economic substance." *Id.* IRS contends that CM's COLI-VIII plan was both a sham in fact and a sham in substance, for which no deduction is allowed. D.I. 65 at 18. Moreover, IRS contends that both categories of evidence are relevant to proving these legal issues. *Id.*

First, neither contested category of evidence will be relevant to proving whether the transaction was a sham in fact. For this issue the Court must evaluate whether CM's loan transactions ever occurred in reality, as opposed to simply occurring on paper. *ACM Partnership*, 157 F.3d at 247 n.30. The Non-Georgia Regulation Evidence is irrelevant because evidence of how states approved COLI plans like the COLI-VIII that CM purchased will not prove whether CM actually took out loans on its COLI-VIII policy. The Predecessors to COLI-VIII Evidence is irrelevant because the development of the predecessors to COLI-VIII do not tend to show whether the actual transaction took place in this case.

The Predecessors to COLI-VIII Evidence may be relevant to proving whether the transaction was a sham in substance. Whether a transaction is a sham in substance "turns on both the 'objective economic substance of the transactions' and the 'subjective business motivation' behind" the transaction. *Id.* at 247.[1]

---

[1] As discussed in *CM Holdings I*, there is an unsettled issue of first impression in the Third Circuit on what constitutes the transaction in this analysis. *See CM Holdings I*, 221 B.R. at 722. The courts are split on whether the transaction includes both the purchase of the underlying

### (a)    Objective Economic Substance

Only the Predecessors to COLI-VIII Evidence contains potentially relevant evidence to determining the objective economic substance of the transaction. The Court must determine "whether the transaction has any practical economic effects other than the creation of income tax losses." *ACM Partnership*, 157 F.3d at 248 (citations and internal quotations omitted). The Court must discern the objective economic intent of the transaction rather than its form. *See id.* at 250.

The Predecessors to COLI-VIII Evidence may contain evidence which helps the Court determine the objective economic substance of the transaction. First, at this stage, the Court accepts IRS's proffer that the COLI-VIII plan is not materially different from the predecessor plans and that it is necessary to admit evidence of the prior plans to understand the COLI-VIII plan. In addition, the methods by which the plans were designed in response to changes in the tax code could shed light on the objective intent behind the plans. Also, IRS has proffered evidence that CM considered purchasing the predecessor plans, which could shed light on its objective intent in purchasing COLI-VIII. The fact that CM, as the taxpayer in this case, had no involvement in the development of any of the plans does not matter because, on this issue, the Court is discerning the objective substance of the plans, not CM's subjective intent. Moreover, CM could have relied on MBL's representations of the financial benefits and risks of the COLI-VIII plan. Accordingly, the Court will not categorically exclude this evidence.

---

insurance and the loan financing arrangement on that insurance, or includes only the purchase of the underlying insurance. *See id.* (and cases cited therein). For purposes of this Motion in Limine, the Court will assume, without deciding, that the transaction includes both the insurance and the loan because that will potentially allow for the admission of a greater quantum of evidence.

However, the Non-Georgia Regulation Evidence does not contain relevant evidence of the objective economic substance of the COLI-VIII plan. The fact that other states approved or disapproved of COLI-VIII, or other COLI, plans will not shed light on the objective economic substance of the transactions. It will be almost impossible for the Court to discern whether a given state based its decision on whether the COLI-VIII had economic substance. Moreover, to the extent the state decisions are based on economic substance, a legal decision in a state on economic substance for purposes of state insurance law is in no way helpful to a federal court attempting to discern whether a transaction has economic substance for purposes of federal tax law. Finally, the fact that both IRS's experts, Bartlett and McGill, and CM's experts, Schact and Schwartz, relied, at least in part, on the Non-Georgia Regulation Evidence in making their determination of the objective economic substance does not bind this Court to consider that evidence. Therefore, the Georgia and Non-Georgia Regulation Evidence has no relevance to this legal issue.

### (b)    Subjective Business Motivation

Likewise, only the Predecessors to COLI-VIII Evidence potentially contains evidence relevant to determining the subjective business motivation of CM. For this issue, the Court must evaluate whether the taxpayer had a subjective business motive to enter into the transaction other than tax avoidance. *See ACM Partnership*, 157 F.3d at 253. In making this determination, the Court may consider evidence of how the plan was presented to the taxpayer and how the taxpayer reacted to the presentation. *See id.* at 254; *see also Winn-Dixie Stores, Inc. v. Commissioner*, 113 T.C. No. 21, 1999 WL 907566, p. 17 (U.S. Tax. Ct. 1999).

12

The Predecessors to COLI-VIII Evidence may be relevant to determining CM's intent. It also could be relevant to explain how certain provisions of the COLI-VIII policy found their way into that policy. Since IRS has proffered evidence that CM considered and rejected several prior versions of the COLI-VIII plan, this evidence may tend to prove CM's intent with respect to CM's subsequent purchase of COLI-VIII. However, the Georgia and Non-Georgia Regulation Evidence will not be helpful in discerning the subjective intent of CM. The state approval process will not tend to prove the subjective intent of CM in choosing to purchase the policies and take out the loans.

### (2)    Whether CM's COLI-VIII Plan Falls Under Safe Harbor in I.R.C. § 264(d)(1)

Even if CM's transaction is not a sham under I.R.C. § 163(a), CM's COLI-VIII plan must also fall under the safe harbor provision in I.R.C. § 264(d)(1). I.R.C. § 264(a)(3) generally disallows interest deductions on amounts systematically borrowed on an insurance policy to finance the payment of premiums. *See* 26 U.S.C. § 264(a)(3).[4] However, I.R.C. § 264(d)(1) provides an exception to this rule, known as the "four out of seven" safe harbor test:

> Subsection (a)(3) shall not apply to any amount paid or accrued by a person during a taxable year on indebtedness incurred or continued as part of a plan referred to in subsection (a)(3). . . if no part of 4 of the *annual premiums due* during the 7-year period (beginning with the date the first premium on the contract to which such plan relates was paid) is paid under such plan by means of indebtedness.

---

[4]This section provides:
No deduction shall be allowed for. . . any amount paid or accrued on indebtedness incurred or continued to purchase or carry a life insurance, endowment, or annuity contract (other than a single premium contract or a contract treated as a single premium contract) pursuant to a plan of purchase which contemplates the systematic direct or indirect borrowing of part or all of the increases in the cash value of such contract (either from the insurer or otherwise).
*Id.*

26 U.S.C. § 264(d)(1) (emphasis added).

The parties dispute the meaning of "annual premiums due" in the four out of seven test. CM asserts that "annual premiums due" refers to the gross annual premiums specified in the COLI-VIII policy. If this is correct, IRS concedes that CM's policies pass the test. IRS contends that "annual premiums due" means the gross annual premiums minus the loading dividends. If IRS is correct, then the COLI-VIII policies fail the test. As this Court stated in its withdrawal of reference opinion, this issue is one of first impression in the Third Circuit. *See CM Holdings I*, 221 B.R. at 723.

CM correctly observes that this issue is a matter of statutory interpretation, which is a question of law for the Court. *See, e.g., Smith v. Magras*, 124 F.3d 457, 460 (3d Cir. 1997). In interpreting a statute, the Court will consider the plain meaning of the text of the statute, and in some cases the legislative history, in order to determine the intended meaning of the statute. *See, e.g., U.S. v. Sanders*, 165 F.3d 248, 251 (3d Cir. 1999). In this case, the Court must determine whether Congress intended "annual premiums due" to mean the gross annual premiums or the gross annual premiums minus loading dividends.

The Non-Georgia Regulation Evidence bears no logical relationship to the meaning of the statutory language "annual premiums due." It follows this category of evidence is irrelevant to this issue. Similarly, the Predecessors to COLI-VIII Evidence is irrelevant because evidence of how the other COLI plans were developed will not assist the Court in determining Congress' intent in using the term "annual premiums due."

       (3)      **Whether COLI-VIII Plan Qualifies as "Life Insurance Contract" Under I.R.C. § 7702**

14

Under the tax code, taxpayers can only deduct interest for debt on a life insurance policy if the policy also qualifies as a life insurance contract under I.R.C. § 7702. *See* IRS Technical Advice Memorandum, 1999 WL 5679, pp. 36-37 (Jan. 8, 1999). I.R.C. § 7702 states in pertinent part:

> the term "life insurance contract" means any contract which is a life insurance contract *under the applicable law*. . .

26 U.S.C. § 7702 (emphasis added). CM argues that, in this case, the term "applicable law" refers to only Georgia state law because that is the state where, according to an IRS admission, the policies were issued. CM therefore asserts that Non-Georgia Regulation Evidence is irrelevant to this issue. IRS contends that, although the policies were issued in Georgia, Georgia state law may not be the "applicable law" for determining whether the policies qualify as life insurance contracts. Accordingly, IRS contends that the Non-Georgia Regulation Evidence is relevant to proving whether the COLI-VIII plan qualifies as a life insurance contract.[5]

The parties have not yet meaningfully briefed what law is "applicable law" under § 7702. As far as the Court can determine, the definition of "applicable law" is an open question which has not yet been addressed by the Third Circuit Court of Appeals. The plain meaning of § 7702 sheds little light on what law is the applicable law. The legislative history of the section states that the applicable law is "the applicable State or foreign law" but does not explain how to determine which state's or foreign jurisdiction's law would govern a given insurance contract. *See* House

---

[5]Neither party makes any argument that the Predecessors to COLI-VIII Evidence is relevant to this legal issue. Even if the "applicable law" includes law other than Georgia state law, the Court also cannot fathom how the Predecessors to COLI-VIII Evidence would be relevant to this issue. Therefore, this category of evidence will be inadmissible for the purpose of proving this legal issue.

Rep. No. 100-39(II), at 1552 (1987) (reprinted in 4 U.S.C.C.A.N. 2313-1137 to 2313-1138); *see also* Charles C. Morgan, Group Term Life Insurance Medical Benefits Definition of Life Insurance Continuation of Health Care Coverage under COBRA, 395 PLI/Comm 103, 186 (1986).

At least one case has held that the applicable state law is the state where the "insurance activities took place." *Wickum v. Commissioner*, T.C. Memo 1998-270, 1998 WL 419431, pp. 4-5 (U.S. Tax Ct. 1998). At least one author has written that the applicable state law is the state "controlling the delivery of the contract." Joseph F. McKeever, III, Income Tax Treatment of Variable Life Insurance and Annuity Contracts, 783 PLI/Comm 85, 101 (1999). However, there is a pragmatic reason dictating that only one state's law should govern whether CM's COLI-VIII policy is an insurance contract.

From the above discussion, there appears to be two possible types of applicable law: the law of the state "controlling the delivery of the contract," or the law of the state where the "insurance activities took place." If the applicable law is the law of the state "controlling delivery of the contract," the Non-Georgia Regulation Evidence is also irrelevant because the IRS has admitted that the insurance contracts were issued in Georgia. However, if the applicable-law is the law of the state where the "insurance activities took place," some of the Non-Georgia Regulation Evidence may be relevant, as insurance activities may have occurred in several other states. Camelot and MBL had their principal places of business in Ohio and New Jersey, respectively. Moreover, Hartford Life, which took over the policies from MBL, had its principal place of business in Connecticut. Because insurance activities could have occurred in these three states, the regulation evidence from these three states *only* will be relevant for proving whether

16

there was a life insurance contract for purposes of § 7702.[6] The remainder of the Non-Georgia Regulation Evidence is irrelevant to this legal issue.

### (4)    Whether COLI-VIII Transaction Constitutes Generic Tax Shelter

IRS contends there is a legal issue as to whether the COLI-VIII transaction constitutes a generic tax shelter. For purposes of the First Motion, the Court will assume this is a legal issue in the case. In *Rose v. Commissioner*, 88 T.C. 386, 412 (1987), *aff'd* 868 F.2d 851 (6th Cir. 1989), the Tax Court coined the term "generic tax shelter" as a transaction devoid of economic substance, which is disregarded for tax purposes. The Tax Court outlined five characteristics of generic tax shelters:

> (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance.

*Id.* The Tax Court then went on to define four factors to analyze:

> (1) the dealings between petitioners and the promoters; (2) the relationship between the sales price and the fair market value; (3) the structure of the financing; and (4) perceived congressional intent.

*Id.*

---

[6]IRS argues Non-Georgia Regulation Evidence from other states are also relevant because Camelot had insured employees in 30 states and because the record does not yet reveal where the policies were delivered, kept, or premiums paid. If IRS is asserting the law of 30 states is the "applicable law," that contention is rejected as either unworkable or as yielding inconsistent results.

17

Some Courts of Appeals have refused to adopt this test, instead relying only on the two prong objective/subjective test for economic substance discussed earlier. *See Matheson v. Commissioner*, 993 F.2d 883, 1993 WL 169070, at *2 (9th Cir. 1993); *Hunt v. Commissioner*, 938 F.2d 466, 471 n.5 (4th Cir. 1991); *Smith v. Commissioner*, 937 F.2d 1089, 1094 (6th Cir. 1991). Others have upheld use of the test, but only as part of the broader inquiry into whether a transaction has economic substance, as discussed above. *See Nickeson v. Commissioner*, 962 F.2d 973, 976 (10th Cir. 1992); *Karr v. Commissioner*, 924 F.2d 1018, 1023 (11th Cir. 1991); *Shriver v. Commissioner*, 899 F.2d 724, 727 (8th Cir. 1990). The Third Circuit Court of Appeals has not spoken.

In any event, the "generic tax shelter" analysis is substantially the same as the economic substance analysis discussed earlier. Therefore, the relevance of the evidence will be the same as for the economic substance analysis, as discussed above. It follows that the Predecessors to COLI-VIII Evidence is relevant and the Georgia and Non-Georgia Regulation Evidence is irrelevant to this issue.

> **(5)    Whether the Pre-Tax Economic Substance Analysis Applies to a Life Insurance Policy**

CM argues that there is an additional legal issue of whether the pre-tax economic substance analysis applies to a life insurance policy. Since this issue has not been briefed, it is not clear what is meant by it. However, it appears that CM is arguing that the Court should not apply the economic substance analysis, discussed above, to a loan on a life insurance policy. Whether or not to perform that analysis is a pure legal question for which neither category of disputed

18

evidence is relevant. However, the disputed evidence will still have the same relevance or irrelevance as to the other legal issues, as discussed above.

### b.     Background Information

Even if evidence does not directly prove a fact of consequence, it may be admissible as background information which helps the Court determine the probative value of other evidence. *See* Weinstein § 401.04[4][a] (citing *Scarfo*, 850 F.2d at 1018-21). For example, in this case, evidence that helps the Court understand the pertinent provisions and mechanics of the COLI-VIII policies and loans would be relevant as background evidence. The Non-Georgia Regulation Evidence is not relevant as background evidence because evidence of whether other states approved the policies will not help the Court understand how the policies work. On the other hand, the Predecessors to COLI-VIII Evidence may be relevant as background evidence because COLI provisions which were derived from prior COLI policies may help the Court understand the operation and effects of CM's COLI-VIII policies. However, pursuant to Rule 403, as discussed below, IRS is forewarned that the Court may limit at trial the amount of background evidence in order to avoid unduly extending the length of the trial.

### c.     Credibility of Witnesses

Evidence may also be relevant to evaluating the credibility of witnesses. *See* Weinstein § 401.04[4][b] (citing *Scarfo*, 850 F.2d at 1018-21). In this case, the parties have proffered several witnesses who will testify regarding the design and operation of the COLI-VIII policy. The Non-Georgia Regulation Evidence will in no way assist the Court in evaluating the credibility of these witnesses because state regulation had nothing to do with the design of the policies. On the other hand, the Predecessors to COLI-VIII Evidence may be relevant because evidence of policy design

19

could be used to impeach the testimony or bolster the credibility of the witnesses who designed the policies.

* * *

In conclusion, the Predecessors to COLI-VIII Evidence likely contains at least some relevant evidence. Because it is unknown at this juncture whether Georgia, Ohio, New Jersey, or Connecticut will be the "applicable law" in determining whether the CM's COLI-VIII policy qualifies as a life insurance contract under I.R.C. § 7702, all four states must be considered at this time. However, all other aspects and uses of the Non-Georgia Regulation Evidence is irrelevant.

### 2.    Rule 403 Balancing Test

CM next argues that, even if the categories of disputed evidence are relevant, they are nonetheless inadmissible under the balancing test articulated in Rule 403 (known as the "Rule 403 balancing test"):

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403. CM urges that the probative value of the two categories of evidence is substantially outweighed by four of these factors: (1) confusion of the issues; (2) undue delay; (3) waste of time; and (4) needless presentation of cumulative evidence.

Rule 403 requires the judge to weigh the probative value of the evidence against the prejudicial factors listed in the rule. *See* Weinstein § 403.02[2][b] (citing *Old Chief v. United States*, 519 U.S. 172, 184 (1997)). The Court has discretion whether to admit or exclude evidence pursuant to Rule 403. *See id.* § 403.02[2][d] (citing *Sriyuth*, 98 F.3d at 745). Rule 403

is a "powerful tool" and the Court should exercise this discretion to exclude evidence only in "rare situations." *Id.* at § 403.02[2][a]. Instead, the Court should "rely on the lawyers for decisions on what will be useful." *Id.* The Rule 403 balance tends to tip towards inadmissibility only when the evidence has limited probative value. *Id.* at § 403.02[2][c] (citing *United States v. Dowling*, 855 F.2d 114, 122023 (3d Cir. 1988)). If there is any doubt as to whether evidence is admissible, the Court should admit the evidence. *Id.* The Court will now consider the four prejudicial factors in Rule 403 to determine whether the balance tips towards admission or exclusion of each category of evidence.

First, the probative value of evidence must not be substantially outweighed by the danger of confusion of the issues. This factor is generally only raised as a prejudicial factor in the context of jury trials. *See* Weinstein § 403.05[1]. Nonetheless, there is a danger of confusion of the issues when the evidence relates to a collateral issue which would distract the trier of fact from the central issues. *See id.* (citing *Langer v. Monarch Life Ins. Co.*, 966 F.2d 786, 789 (3d Cir. 1992)).

As discussed with respect to relevance, *supra*, the Predecessors to COLI-VIII Evidence has at least some logical relation to the central legal issues in the case, as background material, and to determine the credibility of witnesses. Moreover, to the extent that this evidence relates to collateral issues of the development of the COLI products, the Court finds that the evidence would not so confuse the Court so as to substantially outweigh its potential probative value. Similarly, Georgia, Ohio, New Jersey, and Connecticut may have probative value to the I.R.C. § 7702 legal issue. This evidence is admissible and should not so confuse the Court to as to substantially outweigh its probative value.

21

However, the other Non-Georgia Regulation Evidence has little, if any, probative value. Any marginal probative value of this evidence would be substantially outweighed by the danger of confusing the legal issues in this case, by bringing up collateral and irrelevant issues of whether states approved the policies and whether the processes leading up to approval or disapproval considered the issues relevant to this tax case. As such, this evidence will be inadmissible at trial.

Second, the probative value of the evidence must not be substantially outweighed by undue delay or waste of time. The Court treats these two factors together as they generally encompass the same consideration of avoiding the admission of minimally relevant evidence, such as that related to a collateral issue, which would significantly increase the length of the trial. *See id.* § 403.06[2]. As discussed *supra*, the Predecessors to COLI-VIII Evidence and the Ohio, New Jersey, and Connecticut evidence potentially have more than minimal relevance to the central issues before the Court. Although the Court is skeptical of IRS's purported need for four to six weeks to try this case, at this stage the Court cannot effectively rule that every single item of evidence in these two categories will be of such minimal relevance, and cause such delay, that the prejudicial value substantially outweighs their probative value. Therefore, at this time, the Court will not exclude this evidence. At trial, the Court will entertain renewed objections under Rule 403 to specific evidence that is causing an undue delay or waste of time.

In contrast, as discussed *supra*, the other Non-Georgia Regulation Evidence is at best minimally relevant to the central issues in this case. This minimal relevance is substantially outweighed by the need to avoid extending the length of an already lengthy trial. Therefore, this evidence will be inadmissible.

22

Finally, the probative value of the evidence must not be substantially outweighed by needless presentation of cumulative evidence. Ruling evidence inadmissible for this reason is appropriate when the evidence merely repeats other evidence that has already been admitted. *See* Weinstein § 403.06[1]. In this case, there has been no proffer that any piece of disputed evidence needlessly duplicates any other piece of evidence. At this time, it would be inappropriate to exclude any evidence on this basis. However, the Court will entertain renewed objections on this basis at trial.

In conclusion, the Court holds that even if the Non-Georgia Regulation Evidence, other than the Ohio, New Jersey, and Connecticut evidence related to I.R.C. § 7702, is relevant, its relevance is marginal and the Rule 403 balancing test weighs against admissibility of this evidence. On the other hand, the Court also holds that, as to the Predecessors to COLI-VIII Evidence and the Ohio, New Jersey, and Connecticut evidence, the Rule 403 balancing test weighs in favor of admissibility. CM may renew any Rule 403 objection to a specific piece of evidence at trial, at which time the Court may reconsider its ruling, based upon a more informed review of the evidence. *See id.* at § 403.02[1][b].

**B.     Second Motion – Dr. Hoag's Expert Testimony**

CM has moved to exclude Dr. Hoag's testimony pursuant to Fed. R. Evid. 702, contending that Dr. Hoag is not qualified, that his testimony is unreliable, and that it will not assist the trier of fact. In addition, CM asserts that Dr. Hoag's testimony is inadmissible under Fed. R. Evid. 704(a) because he is offering only a legal opinion on how the case should be decided. The Court addresses each of these grounds for exclusion in turn and determines that Dr. Hoag's

23

testimony is admissible at trial. In order to make this determination, the Court considered Dr.

Hoag's expert report, Dr. Hoag's rebuttal expert report, Dr. Hoag's deposition transcript, Dr.

Hoag's declaration,[7] and Dr. Hoag's testimony at the *in limine* hearing.

     1.    **Rule 702**

     Rule 702 of the Federal Rules of Evidence governs the admissibility of expert evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702. Rule 702 has three intertwined requirements for admissibility: (1) qualification

– the witness must be "qualified as an expert by knowledge, skill, experience, or education;"

(2) reliability – the expert's testimony must be based on "scientific, technical, or other specialized

knowledge;" and, (3) fit – the expert's testimony must "assist the trier of fact." *Id.*; *see also In re*

*Unysis Savings Plan Litigation*, 173 F.3d 145, 155-56 (3d Cir. 1999); *accord Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-90 (1993).

     IRS, the proponent of Hoag's testimony, bears the burden of proving the admissibility of

Dr. Hoag's testimony by a preponderance of the evidence. *See Padillas v. Stork-Gamco, Inc.*,

---

[7]CM urges the Court not to consider this declaration because it simply represents a supplemental expert report, which is impermissible now that discovery is closed. CM provides no legal citation to support this argument. IRS, on the other hand, represents that this declaration is simply a written statement of what Dr. Hoag would testify to in an *in limine* hearing and at trial. The Third Circuit Court of Appeals, not only permits, but encourages district courts to consider the testimony of an expert witness at an *in limine* hearing before making a determination about admissibility. *See In re TMI Litigation*, 199 F.3d 158, 158-59 (3d Cir. 2000) ("*TMI II*") (citing *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999)). The Court sees little difference between considering the declaration and the testimony of Dr. Hoag at the *in limine* hearing held on March 13, 2000. CM had the opportunity at the hearing to point out any shortcomings in Dr. Hoag's declaration through cross-examination. Therefore, the Court has considered the declaration.

186 F.3d 412, 417 (3d Cir. 1999) (citing *Daubert*, 509 U.S. at 592 n. 10). The decision on whether to admit expert evidence under Rule 702 is within the discretion of the trial court. *See Unysis*, 173 F.3d at 155-56 (citing *General Electric Co. v. Joiner*, 522 U.S. 136 (1997)). Moreover, in a bench trial, such as this case, the Court has even greater latitude to allow the admission of expert evidence. *See id.* For the following reasons, the Court concludes Dr. Hoag's testimony meets all three requirements for admissibility.

      a.    **Qualification**

     The first requirement of Rule 702 is that the expert be "qualified" to testify about the pertinent subject matter based upon his "knowledge, skill, experience, or education." Fed. R. Evid. 702; *see also In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 741 (3d Cir. 1994). The Third Circuit Court of Appeals has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." *See Paoli*, 35 F.3d at 741. This is an inherently fact specific inquiry that must be resolved on a case by case basis. *See id.* Moreover, although the experts qualifications must be related to the subject matter about which he testifies, there need not be a perfect fit between his qualifications and testimony. *See id.* It is an abuse of discretion for the Court to declare an expert unqualified simply because he lacks "the degree or training which the district court [thinks] would be most appropriate." *Id.*

     Dr. Hoag will be testifying on behalf of IRS, opining on the economic substance of the transactions involving CM's COLI-VIII plan purchased from MBL, which is at the heart of the dispute. For the following reasons, the Court finds that Dr. Hoag has sufficient expertise in the field of financial economics to enable him to testify about the economic substance of a wide variety of financial transactions, including the ones in this case.

First, Dr. Hoag has received extensive education and academic experience in the field of financial economics, including an M.B.A. in General Management (1972), an M.S. in Engineering Economic Systems (1978), and a Ph.D. in Financial Economics (1978), all from Stanford University. From 1978 through 1985, he served on the faculty of the University of California-Berkeley, Stanford University, and the Federal University of Rio de Janeiro, teaching courses in the various fields of finance and economics, including investment management, corporate finance, commodity futures markets, options markets, and econometrics. Throughout his academic career, Dr. Hoag received numerous awards and honors including being named a Fulbright Scholar. Moreover, he has published several articles on financial economics, including a doctoral dissertation on the financial economics of commodity transactions.

Second, Dr. Hoag has extensive practical experience in the field of financial economics. Since 1970, Dr. Hoag has performed research and consulting in financial economics, with application to forensic economics. He has applied his knowledge of financial economics to a wide array of businesses and transactions, including: commodity accounts, investment strategies, structure notes, agricultural products, stock and bond transactions, government securities, government research projects, stock markets, interest rates, currencies, mortgage inventories, leasing, transfer pricing, and systems and computer engineering. He is also a member of several pertinent professional associations, including the American Economic Association and the American Finance Association. In addition, Dr. Hoag serves as director, trustee, or advisor to a variety of financial and management entities.

Finally, several other federal courts have found Dr. Hoag qualified to testify in the field of financial economics and on the economic substance of a wide variety of business transactions.

26

Given Dr. Hoag's extensive education, experience, and knowledge in the field of financial

economics, the Court finds that he is qualified to testify and give opinions regarding the economic

substance of CM's COLI-VIII insurance and loan transactions.

CM's argument that Hoag is not qualified because he lacks knowledge, skill, experience,

or education in the fields of law, life insurance, corporate owned life insurance, insurance

regulation, accounting and taxation, is not persuasive. As previously rehearsed, there need not be

a perfect fit between Dr. Hoag's area of expertise and his testimony. *See Paoli*, 35 F.3d at 741.

In *Voilas v. General Motors Corp.*, 73 F.Supp.2d 452, 457 (D.N.J. 1999), the court ruled that an

economist was qualified to testify about the economic costs and benefits of deciding whether or

not to close or sell an automobile plant. The court held that even though he lacked specific

expertise in the automotive industry or in creating and evaluating business plans, his extensive

education, experience, and prior expert testimony in the general field of economics of transactions

qualified him to testify. *See id.* Similarly, even though Dr. Hoag may lack expertise in insurance,

law, and taxation, his extensive education, experience, and expert testimony in the general field of

financial economics qualifies him to testify about the financial economics of the transactions in this

case.

### b.    Reliability

The requirement of reliability is grounded in the language of Rule 702 which requires that

the expert's testimony be based upon "scientific, technical, or other specialized knowledge." *See*

*Kumho Tire Co., Ltd. v. Carmichael*, 119 S.Ct. 1167, 1174 (1999); *Daubert*, 509 U.S. at 589-90;

*In re TMI Litigation*, 193 F.3d 613, 663 (3d Cir. 1999) ("*TMI I*"). In *Daubert*, the Supreme

Court held that this language requires the judge to act as a gatekeeper and evaluate the reliability

27

of expert evidence based on "scientific knowledge." *See Daubert*, 509 U.S. at 589-90. In *Kumho Tire*, the Supreme Court expanded the judge's gatekeeping role to evaluating the reliability of all types of expert evidence, including evidence based on "technical or other specialized knowledge." *See Kumho Tire*, 119 S.Ct. at 1174.

In order to evaluate reliability, the Court must ensure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 1176; *see also Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). This inquiry focuses on the "principles and methodology" employed by the expert rather than the results. *See TMI I*, 193 F.3d at 664 (quoting *Daubert*, 509 U.S. at 595).

In *Daubert*, the Supreme Court set forth four "general observations," or factors, which may be pertinent to evaluating the reliability of expert evidence: (1) whether the method used is susceptible to testing; (2) whether the method has been published or is otherwise susceptible to peer review; (3) the potential error rate of the method; and, (4) whether the method has gained general acceptance in the scientific community. *See Daubert*, 509 U.S. at 593-94. Prior to *Daubert*, the Third Circuit Court of Appeals utilized an additional four factors, which it maintains are also still pertinent to evaluating the reliability of expert testimony: (5) the existence of standards controlling the method's operation; (6) the relationship of the method used to other methods which have been established to be reliable; (7) the qualifications of the expert testifying based on the methodology; and, (8) non-judicial uses to which the method has been put. *See Paoli*, 35 F.3d at 742.

Depending on the facts of the case, a district court may employ none, some, or all of the eight enumerated factors, or may employ relevant unenumerated factors. *See id.* In *Daubert*, the

28

Supreme Court emphasized that the inquiry is "a flexible one" and that the factors serve as "guideposts," not as a "definitive checklist." *See Daubert*, 509 U.S. at 592. In like vein, the *Kumho Tire* Court reiterated that the four *Daubert* factors need not be strictly applied. *See Kumho Tire*, 119 S.Ct. at 1176. Similarly, the Third Circuit Court of Appeals has admonished the district courts against applying these factors too strictly. *See United States v. Velasquez*, 64 F.3d 844, 849-50 (3d Cir. 1995). Instead, the district court has a wide latitude to determine which, if any of these factors, may be relevant to determining reliability. *See TMI I*, 193 F.3d at 664; *see also Kumho Tire*, 119 S.Ct. at 1175.

Moreover, the four *Daubert* factors need not be strictly applied when evaluating expert testimony not based on experimental scientific knowledge, i.e. the "process for proposing and refining theoretical explanations about the world that are subject to further testing and refinement." *Daubert*, 509 U.S. at 590. Since Dr. Hoag's testimony is not based upon experimental scientific knowledge, these four factors need not be strictly applied in this case. Nonetheless, the Court finds several of the eight factors dictate that Dr. Hoag has employed the same level of intellectual rigor as other experts in the field of financial economics.

### (1)    Testability

Dr. Hoag used a testable hypothesis to analyze whether the policy loan transaction had economic substance. His hypothesis was that a transaction with economic substance would have certain fundamental economic characteristics and that a transaction lacking economic substance would lack these characteristics. He then analyzed the empirical data of the transaction to determine whether these characteristics were present.

29

Dr. Hoag hypothesized that in a real financial transaction, one would expect to find the following bedrock financial characteristics: (1) some amount of risk, Hoag Report at 16; (2) the borrower attempting to minimize the interest rate, *id.* at 17-18; (3) lower interest rates for lower risk financial transactions, *id.*; (4) the premium payment and loan funds actually changing hands, *id.* at 16; (5) a growing net equity in the life insurance policy, *id.* at 13; (6) some initial financial outlay by the policy holder, *id.*; and (7) no backdating of a loan, *id.* at 9.

Dr. Hoag then did an empirical analysis of the policy loans and determined that they lacked all of these financial characteristics: (1) the loans were designed to lack all types of risk, including market, reinvestment, timing, call, credit, default, maturity, marketability, liquidity, volatility, legal, operational, event, and sector risk, *id.* at 16; (2) CM chose the highest possible interest rate, *id.* at 17-18; (3) this zero risk investment had a very high interest rate, *id.*; (4) the premium funds and loan funds never changed hands, *id.* at 16; (5) the policies were designed to have a net equity of zero at the end of every year, *id.* at 13; (6) there was no initial financial outlay by CM, *id.*; and, (7) MBL backdated the loan for CM, *id.* at 9.

Thus, Dr. Hoag's method of analysis involved formulating a hypothesis and then subjecting the hypothesis to empirical testing. Moreover, this hypothesis could be subjected to similar testing by others skilled in this field. Indeed, Dr. Clifford Smith, an expert for CM, used a similar hypothesis which he tested by analyzing similar financial characteristics.

### (2)    Publication and Peer Review

The IRS and Dr. Hoag concede that Dr. Hoag's method of analysis in this case has not been published or otherwise subject to peer review. However, if a method has never before been of interest to anyone in the field, it need not be subject to publication or peer review to be reliable.

30

*See Kumho Tire*, 119 S.Ct. at 1175; *see also Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 155 (3d Cir. 1999) (although not subject to publication and peer review, testimony involving an emerging field of knowledge held reliable). Dr. Hoag's method of determining whether a transaction has economic substance has not been subject to publication or peer review because the financial economics literature is only concerned with real, not illusory, transactions and according to Dr. Hoag this transaction was illusory. This is especially true in this case because publication and peer review is a factor peculiar to testimony based on experimental scientific knowledge, which Dr. Hoag admittedly does not employ. Therefore, one would not reasonably expect to find Dr. Hoag's method published in a peer reviewed journal.

Even if this factor is pertinent to the inquiry, Dr. Hoag testified that he relied on peer reviewed financial economics literature and his extensive experience in this field to develop the list of bedrock characteristics and to analyze each of those characteristics. Although his method does not explicitly appear in the literature, the factors and analysis of those factors are regularly used by financial economists and appear in the literature. Finally, Dr. Hoag has published extensively in the field of financial economics, including a doctoral dissertation applying these characteristics to analyzing the economics of certain commodity trades. *See* Hoag CV at 7. Therefore, to the extent that this factor is pertinent to the inquiry, Dr. Hoag's methods are based on published and peer reviewed methods.

### (3)    Rate of Error

The rate of error is not applicable to Dr. Hoag's method of analysis. Rate of error is a factor that is peculiar to testimony based on experimental science. In those cases the error rate can be calculated in terms of instrument or sampling error. However in a more observational

31

field, such as financial economics, it makes no sense to talk about rates of error. Financial economists, employing the method used by Dr. Hoag in this case, are not able to place a numeric, or even a qualitative, description on the amount of error in their opinions. Any dispute in the accuracy of Dr. Hoag's opinion goes to its weight rather than its reliability. Thus, the Court will not find Dr. Hoag's methods to be unreliable simply because the error rate cannot be quantified.

### (4) General Acceptance

Like rate of error, general acceptance is a factor peculiar to testimony based on experimental science, and is not relevant to determining the reliability of Dr. Hoag's testimony. However, to the extent this factor is pertinent, Dr. Hoag's methods have achieved some general acceptance in the field of financial economics. As previously rehearsed, the list of factors used by Dr. Hoag in his analysis was gleaned from the methods that are generally used by financial economists in analyzing the financial benefits of a transaction. Moreover, Dr. Smith utilized similar factors in his analysis of the economic substance of this transaction but reached a different conclusion. It follows, Dr. Hoag's method has achieved at least some general acceptance in the field of financial economics.

### (5) Standards

Dr. Hoag employed the standards or bedrock characteristics which are generally used by financial economists in analyzing the financial benefit of a transaction. As discussed above, Dr. Hoag looked to a wide variety of financial characteristics and determined that, since none of these characteristics were present, the transaction lacked economic substance. These standards are the ones generally employed in all financial analysis.

(6)     **Relationship to Other Reliable Methods**

Dr. Hoag's analysis technique in this case is similar to other reliable financial economic methods. He has used similar methods to analyze other transactions, which have been held reliable in other cases before federal courts. *See* Hoag CV at 3-4. Moreover, Dr. Smith, an expert for CM, analyzed similar factors in his expert report in this case. Therefore, Dr. Hoag's methods are related to other methods already held to be reliable.

(7)     **Expert Qualifications**

This factor is similar to determining whether the expert is qualified to testify under Rule 702. As discussed above, Dr. Hoag possesses ample qualifications to testify as an expert in the field of financial economics and to reliably perform the analysis in this case.

(8)     **Non-Judicial Uses of Method**

As Dr. Hoag testified, and as evidenced in his curriculum vitae, he has employed these methods of financial analysis in numerous non-judicial settings, analyzing the financial economics of transactions in a variety of fields. *See* Hoag CV at 4-7. Thus, Dr. Hoag's methods have proven reliable in settings other than the courtroom.

\* \* \*

While no single factor is dispositive, the foregoing analysis reveals that Dr. Hoag's testimony is based on sufficiently reliable methods. Accordingly, the Court will not exclude his testimony on this basis.

c.     **Fit**

In addition to qualification and reliability, Rule 702 requires that expert's testimony "assist the trier of fact." Fed. R. Evid. 702. In other words, the testimony must "fit" or be relevant to

33

the issues in the case. *Paoli*, 35 F.3d at 743 (citing *Daubert*, 509 U.S. at 591). Expert testimony

"fits" if there is a logical relationship between the expert opinion and the factual and legal issues in

the case. *See Paoli*, 35 F.3d at 743.

As discussed above, there is an issue in this case of whether CM's COLI-VIII plan was a

"sham in substance," making the interest non-deductible under I.R.C. § 163(a). One prong of the

"sham in substance" test is whether the transaction has objective economic substance, i.e. "any

practical economic effects other than the creation of income tax losses." *ACM Partnership*, 157

F.3d at 248. Dr. Hoag's testimony on whether the transactions have economic substance, from an

economic, not a legal, perspective, is directly related to and probative of this issue.[8] Therefore,

Dr. Hoag's testimony fulfills the requirement that it "assist the trier of fact."

2.    **Rule 704**

Fed. R. Evid. 704 provides that "testimony in the form of opinion or inference otherwise

admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of

fact." CM argues that Dr. Hoag's testimony is not "otherwise admissible" under Rule 704

because it embraces an ultimate question of law, whether CM's COLI-VIII transactions had

"economic substance." The Court holds that Dr. Hoag's testimony is not excludable on this basis.

Adopted in 1975, Rule 704 abolished the common law of evidence rule which prohibited a

witness from giving an opinion on any ultimate issue. *See* Weinstein § 704.02. Specifically, Rule

702 permits a witness to give an opinion on an ultimate issue of fact. *See id.* Courts of Appeals

have retained a prohibition against witnesses giving opinions on ultimate issues of law. *See*

---

[8]As discussed in the next section, there is no merit to CM's argument that Dr. Hoag will
invade the province of the Court by rendering an opinion on a legal issue. Dr. Hoag will testify
whether the transaction was real or illusory from an economic, not a legal, perspective.

34

Weinstein § 704.04[1] (cases cited in note 1); *Saldana v. Kmart Corp.*, --- F.Supp.2d ---, 1999 WL 1483356, *11, n. 3 (D.V.I. 1999) (and cases cited therein). Prior to the adoption of Rule 702, the Third Circuit Court of Appeals also prohibited witness opinions on ultimate legal issues. *See United States v. Provenzano*, 334 F.2d 678, 687-88 (3d Cir. 1964). However, since the adoption of Rule 702, the Third Circuit Court of Appeals has remained silent as to whether the prohibition on opinion testimony on ultimate legal issues survives. *See Saldana*, --- F.Supp.2d at ---, 1999 WL 1483356 at *11, n. 3. This Court need not decide whether this prohibition exists because the Court finds that Dr. Hoag is not testifying about an ultimate legal issue.

Admittedly, as discussed above, one of the issues in this case is whether CM's COLI-VIII transactions had economic substance. This issue involves deciding "whether the transaction has any practical economic effects other than the creation of income tax losses." *ACM Partnership*, 157 F.3d at 248 (citations and internal quotations omitted). Given the extremely fact specific nature of this inquiry, this is a question of fact, or at least a mixed question of fact and law, not a question of law. *See generally id.*; *Winn-Dixie Stores, Inc. v. Commissioner*, 113 T.C. No. 21, 1999 WL 907566 (U.S. Tax. Ct. 1999). Rule 704 explicitly permits an expert witness to testify as to ultimate issues of fact. *See* Fed. R. Evid. 704. Accordingly, to the extent that Dr. Hoag will opine on the ultimate factual question of whether the transactions had "economic substance," the testimony will be admissible under Rule 704.

Even if the determination of whether the transactions have "economic substance" is a pure question of law, Dr. Hoag is still not rendering an opinion on an ultimate question of law. The Court accepts IRS's proffer that Dr. Hoag is giving an opinion on the "economic substance" of

35

the transaction according to the financial definition of the term, rather than the legal definition of the term. Therefore, his testimony will not be excluded for embracing an ultimate legal issue.

## IV.   Conclusion

The Court will deny the First Motion as to the Predecessors to COLI-VIII Evidence. The Court will also deny the First Motion as the Non-Georgia Regulation Evidence with respect to the states of Ohio, New Jersey, and Connecticut, because at this juncture this evidence could relate to determining whether the CM's COLI-VIII policy qualifies as a life insurance contract under I.R.C. § 7702. The Court will grant the First Motion as to all other aspects and uses of the Non-Georgia Regulation Evidence. The Court will deny the Second Motion to exclude Dr. Hoag's testimony.