UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Nos. 05-40151-FDS (D. Mass.) 06-40130-FDS (D. Mass.) |
| v. | ) ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

## UNITED STATES OF AMERICA'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE THE EXPERT TESTIMONY AND REPORTS OF DR. DAVID LARUE

The plaintiff's motion is simply the plaintiff's early commencement of a cross-examination, coupled with an airing of its unhappiness with the expert conclusions described and supported in Dr. David LaRue's expert reports. The plaintiff attempts to support its motion with nothing more than inappropriate and frequent misrepresentations of Dr. LaRue's reports and testimony, and even more inappropriate (and untrue) personal attacks. Given its unhappiness, the plaintiff is sure to, and of course free to, cross examine Dr. LaRue at trial. But, a motion to exclude is not a substitute for that cross examination, and the plaintiff's attempt to make it so should be rejected and its motion denied.

The tax returns Dr. LaRue examined and opined on in this case, which are Fidelity International's 2001 and 2002 federal income tax returns (Forms 1065) and the Egans' (Richard's and Maureen's) 2001 and 2002 federal income tax returns (Forms 1040), are exceptionally complex returns, each 50 to more than 150 pages, with numerous schedules and attachments. The tax returns were used to report income-related and loss-related items including

those resulting from the transaction at issue in this case (the Fidelity International transaction),

which itself was exceptionally complex.  It would be impossible for a non-expert, without the

assistance of an expert like Dr. LaRue, to properly examine the tax returns and to make informed

decisions about the manner in which they were prepared and the items therein reported.[1]

Specifically, it would be impossible, without the assistance of an expert, for a layperson

to determine the following: (1) how the Fidelity "gains" and "losses" of approximately $160

million arising from paired "foreign currency" option trades – which trades consisted of only one

component of the Fidelity International transaction – and the over $4.7 million in fees paid to the

promoters of this transaction were reported on Fidelity International's federal partnership returns

for 2001 and 2002 and the Egans' individual income tax returns for 2001 and 2002; (2) whether,

based solely on the information on or with the tax returns, either individually or collectively, the

Internal Revenue Service ("IRS") could have determined that the deduction of the Fidelity

International "losses" at issue in this case were also being based on another set of paired

offsetting options – "interest rate" trades – which were being used to generate a greatly inflated

tax basis in Richard Egan's membership interest in Fidelity International; (3) whether the tax

returns, individually or collectively, disclosed (or otherwise provided any reasonably discernable

indication) that Fidelity International incurred and paid transaction-related fees of $4,745,000 to

[accounting firm] KPMG and to [transaction promoter] Helios Financial LLC in connection with

the implementation of a strategy that Richard Egan purchased in 2001, that generated

---

[1] As stated by James Reiss, a certified public accountant ("CPA") and the Chief Financial Officer of the plaintiff's so-called management firm Carruth Management, "The complexity of option transactions and partnerships are beyond the domain for most CPAs."  (Reiss Dep. Tr. at 103:1-2).  As such, at least according to Mr. Reiss, an expert in accounting with expertise beyond that of even most CPAs is necessary here.

$160,409,044 in permanent ordinary tax losses that Richard and Maureen Egan claimed on their

years 2001 and 2002 joint Form 1040s; and (4) whether, based on objective factors, it would be

reasonable to conclude that the various elements of the Fidelity International transaction were

reported on the tax returns in a manner that was designed to reduce, minimize, or eliminate the

actual or perceived risk of detection and audit by the IRS.

    As explained in greater detail below and in the attached declaration, Dr. LaRue is a

supremely qualified accounting and federal-taxation expert (and a finance expert).[2]  He has

decades of academic and professional experience, which has enabled him to gain an in-depth

knowledge and understanding of, among many other things, the manner in which transactions

and activities are to be reported on the relevant tax returns (*i.e.*, "tax compliance"), and how

those tax returns would be evaluated by knowledgeable and experienced tax professionals.[3]  Dr.

LaRue has an impressive academic background which includes a Ph.D. degree (with honors)

with major fields of study in accounting and taxation, and a supporting field of study in

economics.[4]  His decades of professional experience include teaching accounting to students and

---

    [2]Government Exhibit 1, Declaration of Dr. David W. LaRue in Opposition to Plaintiff's
Motion to Exclude, (hereinafter, "LaRue Declaration"), ¶¶ 1, 20-26.  The United States has
submitted the declaration of Dr. LaRue in support of this opposition.  This declaration, to the
extent appropriate, responds in detail to each of plaintiff's various assertions.  During the January
25, 2008 status conference, the Court set February 29, 2008 as a date for argument on all three of
plaintiff's motions to exclude the United States' expert witnesses.  *See* Tr., p. 32, l.18-15.
However, the Court noted that it may take the motions under advisement and may require live
testimony.  *See* Tr., p. 66, l.19-23.  In the event the Court needs additional information beyond
that contained in the expert-witness declarations, the United States welcomes the opportunity for
its experts to testify before the Court.

    [3]LaRue Declaration, ¶ 22.

    [4]LaRue Declaration, ¶ 21.

professionals.  Dr. LaRue's consulting experience includes retention by three of the "Big-4"

international public accounting firms– KPMG, Ernst & Young, and Deloitte & Touche.[5]  The

consulting also included engagements by Arthur Andersen and by the Washington National

Office of the IRS Chief Counsel.[6]  Dr. LaRue has also testified before Congress,[7] and has been

recognized as an expert in tax, accounting, and/or finance in nine court cases.  No challenge to

his recognition as an expert has ever been successful.[8]

Given Dr. LaRue's academic and professional background, he is supremely qualified to

assist the Court in making its determinations as to how this transaction and the transaction-

related fees were reported on Fidelity International's and the Egan's returns and whether this

transaction was in fact reported in such a manner as to reduce, minimize, or eliminate the actual

or perceived risk of detection.  Such determinations are essential to a full adjudication of this

---

[5]LaRue Declaration, ¶ 24.

[6]LaRue Declaration, ¶ 24.

[7]LaRue Declaration, p. 27, n. 47.

[8]LaRue Declaration, ¶ 25.

case, and are impossible without the assistance of a qualified expert. [9]

The plaintiff's challenges to Dr. LaRue's conclusions and the manner in which he

prepared his reports are just as misguided as the plaintiff's attempts to convince the Court that

---

[9]The manner of reporting of the Fidelity International transaction on the various federal tax returns is critical to many issues in this case, including whether there is evidence that the plaintiff knew he had engaged in an abusive tax shelter and took steps to conceal it. The manner of reporting is also critically relevant to any determination of Fidelity International's already-proffered good-faith and reasonable-reliance defense to penalties. "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." 26 C.F.R 1.6664-4 (b)(1). "Reliance on professional advice . . . or other facts . . . constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Id.; *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 206 (D. Conn. 2004); *aff'd by unpublished order*, 150 Fed. Appx. 40 (2d Cir. 2005). The *Long Term Capital Holdings* court rejected Long Term's "good faith" defense to penalties because of Long Term's attempt to conceal the transaction on its partnership tax return. *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d at 192-193. That court described the plaintiff's "apparent steps to conceal the tax losses . . . on the tax returns to thereby potentially win the audit lottery and evade IRS detection." *Id.* at 193. The "apparent steps to conceal" included Long Term's reporting of its tax losses as "Net Unrealized Gains" on line 6 of Schedule M-1 of its 1997 tax return. *Id.* The court described the purpose of Schedule M-1 "to notify the IRS of differences in book income/loss and tax income/loss," and describes the process by which Long Term combined on one line of a tax return the income recorded on the books not included in tax income and deductions not charged against book income, which should have been separately reported. *Id.*

For this Court to determine whether similar acts of concealment or misstatements exist on various lines and in various portions of Fidelity International's and the Egans' federal tax returns, it is essential to have the assistance of an expert who can testify as to the hundreds of pages of tax returns and attachments.

We note, for the sake of completeness, that this Court may lack jurisdiction to determine whether, in defense to penalties, Richard Egan acted with reasonable cause and in good faith. In short, a court presiding over a TEFRA partnership-level case like this one does not have jurisdiction to consider partner-level defenses to any penalty. Treas. Reg. § 301.6226(f)-1(a); *See also*, *Jade Trading, LLC v. United States*, 80 Fed. Cl. 11, *7, *163 (Ct. Cl. 2007). Partner-level defenses are limited to those that are personal to the partner or are dependent on the partner's separate return. Temp. Treas. Reg. § 301.6221-1T(d) (1999). In that regard, a partner's reasonable belief that the tax treatment of an item was more likely than not the proper treatment is in the nature of a partner-level defense, the availability of which this Court may not have jurisdiction to determine.

Dr. LaRue is not an expert.  The allegations, largely attacking the reports and Dr. LaRue as biased, are baseless, or worse, reckless.  The allegations are based on misrepresentations of fact and/or law, and are often manufactured out of whole cloth to create the appearance of impropriety.  Almost nine full pages of the plaintiff's motion are based on its own misunderstanding and/or misrepresentation of the IRS's tax-return-review processes.[10]  But, even if the allegations were true, they would merely affect the weight to be given to Dr. LaRue's testimony and reports, not their admissibility.  Even so, for the reasons described below, Dr. LaRue's reports are of the highest quality and impartiality, and are based on unrestricted access to all of the available documentary evidence and are the unbiased opinions of a supremely qualified professional.  The expert reports, like Dr. LaRue's testimony, are entitled to full weight.

The Court certainly has a "gatekeeper" role, but that role is not as urged by the plaintiff– which is less a keeper of the gate than that of a fence, used to keep out all expert testimony the plaintiff dislikes.  The gatekeeper's role is to ascertain whether the provisions of Federal Rule of Evidence 702 are met.  They are certainly met here, where there is no doubt that Dr. LaRue's reports and testimony are reliable and relevant.  As such, the plaintiff's motion should be denied.

**Argument**

**I.**   **Dr. LaRue's Expert Reports and Testimony are Admissible, and the Proper Means of Challenging Them are Cross-Examination and Competing-Expert Testimony**.

Federal Rule of Evidence ("Rule") 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in

---

[10]The plaintiff's misunderstanding of the complexities of tax-return review and selection for audit is yet another indicator that an expert, like Dr. LaRue, is essential to this case.

the form of an opinion or otherwise.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[11] the Supreme Court applied Rule 702 to the proposed testimony of a scientific expert witness and established a two prong test for admissibility of expert witness testimony – (1) relevance and (2) reliability. In *Kuhmo Tire Co., Ltd. v. Carmichael*,[12] the Supreme Court concluded that ths two-prong test was equally applicable to expert testimony based on "technical" and "other specialized" knowledge. With regard to the "relevance" prong, the Supreme Court referred to Rule 702.[13] With regard to the "reliability" prong, the Supreme Court stated that the

> Proposed testimony must be supported by appropriate validation – i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.[14]

The reliability determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[15]

There is no doubt whatsoever, as described in detail below and in the expert reports, that Dr. LaRue has technical and specialized knowledge gained during decades of academic and professional experience. He put that knowledge to work here to come to his opinions and conclusions about the manner in which the Fidelity International transaction was reported on the

---

[11]509 U.S. 579, 589 (1993).

[12]526 U.S. 137, 119 S.Ct. 1167 (1999).

[13]*Daubert*, 509 U.S. 579, 591.

[14]*Daubert*, 509 U.S. at 590.

[15] *Daubert*, 509 U.S. at 592-93.

Egans' and on Fidelity International's tax returns.

The manner in which this transaction was reported is of extreme relevance, and indeed importance to this case, which involves Richard Egan's entitlement to claimed tax benefits resulting from his participation in the Fidelity International transaction. Whether the transaction was disclosed in a meaningful way on the tax returns is at the heart of this case. Indeed, the plaintiff himself submitted a request for admission asking the United States to admit that Fidelity International's 2001 Form 1065 and accompanying schedules *disclosed* that [Fidelity International] had allocated a large taxable gain to a foreign partner and a large taxable loss to" Richard Egan.[16] The United States appropriately denied that request because the bifurcation of these gains and losses were not disclosed on the face of the returns in any meaningful way.[17] It is precisely that type of issue that requires Dr. LaRue's assistance to this Court.

As relevant and reliable, Dr. LaRue's testimony is admissible. The United States need not prove now that Dr. LaRue's opinions are correct, and the plaintiff's allegations that they are incorrect will be proven wrong another day. Right now, so long as Dr. LaRue's opinions rest upon "good grounds, based on what is known,"[18] they "should be tested by the adversary process

---

[16]Plaintiff's Request for Admission no. 33 (emphasis added).

[17]In marketing the FDIS product, The Diversified Group Inc. highlighted the fact that the face of the partnership return, *i.e.*, Form 1065 reporting the offsetting options transactions, "did not show a large net loss." Email dated 4/10/01, Govt. Ex. 26 attached to Decl. of John Lindquist filed with the Court in *United States of America v. The Diversified Group, Inc.*, civ. no. 07-40004 (transferred from S.D.N.Y.) The application of this design is illustrated on the Form 1065 that was filed for the Fidelity International transaction, Govt. Ex. 70 attached to Decl. of John Lindquist filed with the Court in *United States of America v. The Diversified Group, Inc.*

[18]*Daubert*, 509 U.S. at 590 (internal quotation marks omitted).

– competing expert testimony and active cross-examination – rather than excluded . . . ."[19]  That

is because the plaintiff's allegations, even if true, which they are not, go only to the weight to be

accorded to, and not to the admissibility of, Dr. LaRue's reports and testimony.[20]  Nonetheless, it

will become clear to the Court, if it is not already, that Dr. LaRue's reports and testimony should

be afforded full weight.

II.    **Dr. LaRue Is Supremely Qualified to Opine on Tax-Return Preparation and on the IRS's Tax-Return-Selection Process, and the Plaintiff Misrepresents the Relevant Processes and Dr. LaRue's Conclusions in Those Regards.**

A.    **The Plaintiff's Misrepresentations**

The plaintiff's allegations that Dr. LaRue is not qualified to opine on the "actual risk of

detection and audit" is based on either a straw man the plaintiff set up to knock down, or on a

genuine misunderstanding of Dr. LaRue's conclusions and the IRS's processes.  Either way, the

arguments should be rejected.  The plaintiff argues that Dr. LaRue is not qualified to opine on the

"actual risk of detection and audit" because he is "not qualified to opine on IRS return selection"

for audit.[21]  The plaintiff then, in turn, argues that to be qualified to opine on the return selection

---

[19]*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998).

[20]*See, e.g.*, *Int'l Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 544-545 (1st Cir. 1988) ("The burden is on opposing counsel through cross-examination to explore and expose any weaknesses in the underpinnings of the expert's opinion."  "When the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony. . . .") (internal citations omitted).  *See also*, *United States v. Mahone*, 453 F.3d 68, 72 (1st Cir. 2006) (Admissible expert testimony need not be unassailable, and cross-examination and competing expert testimony are the proper methods of testing admissible expert testimony).

[21]Plaintiff's Memorandum in Support of Plaintiff's Motion to Exclude the Proposed Expert Testimony and Reports of David LaRue, ("Plaintiff's Memorandum" or "Pl. Mem."), pp. 7, 9.

process, one must be qualified to opine on the so-called DIF scoring process and the IRS District Office review process.[22]  The fatal flaws in these arguments include the facts that Dr. LaRue's opinions do not in any way relate to the DIF scoring process or what the plaintiff describes as the "[IRS] district office review process," (which does not exist in the form described by the plaintiff).

To understand the complete fallacy of the plaintiff's predicate here, it is important to understand the actual process the IRS follows in reviewing a tax return, and to understand the portion of that process relevant to Dr. LaRue's conclusions.  When a tax return is filed, the IRS Service Center assigns a so-called DIF score.  As Dr. LaRue stated in response to questions asked of him at deposition, the specific types of tax-return information and data that is captured and used in calculating a tax return's DIF score and the formula for calculating that score are closely guarded secrets within the IRS and are not otherwise publicly available or independently ascertainable.[23]

While the DIF process is a highly classified computer formula and very few people inside or outside of the IRS know anything about how the formula operates or how it is derived, the next part of the selection process is well known.  Tax returns receiving a high DIF score are then reviewed at the IRS Service Center by what are known as classifiers.  The plaintiff's memorandum refers to this stage of the process as the District Office's review process.  That is not entirely correct.  This review process initially takes place at the Service Center level.  This review process by classifiers can be relatively quick.  Classifiers may be able to review many tax

---

[22]Pl. Mem., pp. 11-15.

[23]LaRue Dep. Tr., 130:21-131:4.

returns in a day to determine whether any of them merit further review.  The classifiers determine whether a return is to be accepted as filed or sent on for possible further review (and also determine the nature of that further review, each level of that review process making a similar determination as to whether further review or audit may be warranted and the nature of any further review or audit, e.g., correspondence audit, office audit, field audit, *et cetera*), and potential full-scale audit.  Importantly, this IRS Service Center classification process is a different stage of the review selection process than the district office review and audit procedure. The IRS district office review process is the next step of the process but it only reviews returns that are first selected for further review at the classification stage.  Under the old nomenclature, each district office can order a certain number of returns (in the batch selected by classifiers) from the Service Center for audit.  At the district office (or sub offices), there is another level of review of the returns – with Case Managers ultimately reviewing the batch of tax returns sent from the Service Centers and deciding which tax returns should be assigned for an office or a full-scale field audit – or even whether the tax return should be audited at all.[24]

Dr. LaRue's opinion that it would be reasonable to conclude, based on objective factors, that Fidelity International's and the Egans' tax returns were prepared in a manner to minimize the risk of detection and audit is referring to this multiple-level review process at the IRS Service Center and at the district office level.  Here, the plaintiff argues that its expert, Mr. Dougherty, unlike Dr. LaRue, has actual IRS experience and, based on his IRS experience, concluded that the tax consequences of the Fidelity International transaction (as well as their origin) would have

---

[24]Michael I. Saltzman, *IRS Practice and Procedure* (2d ed. 2005) ¶ 8.03; U.S. Gen. Accounting Office, *Tax Administration: IRS' Return Selection Process* (1999), at pp. 3-5; LaRue Declaration, ¶¶ 28-31.

been spotted *on an actual audit* of these returns.[25]  We do not dispute that Mr. Dougherty has

experience regarding the audit of tax returns.  Nor does Dr. LaRue dispute that *if* Fidelity

International's and the Egans' returns were assigned to a *full-scale field audit* (the sole subject

Mr. Dougherty' rebuttal report), the tax consequences of the transaction would likely have been

"picked up."  But, that has nothing whatsoever to do with Dr. LaRue's opinions.  Dr. LaRue

opines on whether the reporting on the various components of the transaction on Fidelity

International's and the Egans' tax returns made it more difficult or impossible to detect at the

multi-level-review selection process and before a return is actually assigned for a full-scale field

audit.

Conversely, the plaintiff's expert assumes that Fidelity International's and the Egan's

returns has already been selected for a full-scale field audit.  Yet such an audit may never take

place in the first instance because of the manner as to how the transaction's various tax

consequences were reported on the returns. Thus, plaintiff's expert opines on *if* the returns had

been audited, what such an audit would have revealed – which is not an issue here.[26]  On the

other hand, Dr. LaRue's opinion is properly focused on a totally different aspect of the return

selection process – whether or not it would be reasonable to conclude, based on objective factors,

that the reporting of the tax consequences of the transaction was done in such a manner to reduce

detection and thus possible audit at the multi-level review process of these tax returns, and prior

---

[25]Pl. Mem., pp. 14-15.

[26]Indeed, at his deposition, Mr. Dougherty admits to these assumptions, and even admits that there is nothing in Dr. LaRue's Report which is to the contrary of Mr. Dougherty's opinion. Dougherty Dep. Tr.; 70:1-70:8, 70:24-71:8; 72:16-75:5.

to any potential full-scale audit of the returns.[27]

The plaintiff's complete misunderstanding of the matter is at the root of most of its misguided arguments.[28]

In sum, Dr. LaRue opined on the manner in which the Fidelity International transaction and activities were reported on the tax returns, and whether, on the multi-level review of those returns by knowledgeable and experienced tax professionals, it would be objectively reasonable to conclude that the reporting was done in such a way as to reduce the actual or perceived risk of detection and potential audit. Despite the contrary allegations, Dr. LaRue's expertise in these areas speaks for itself.

### B.    Dr. LaRue's Qualifications

Dr. LaRue is supremely qualified to render opinions regarding preparation of tax returns and the tax-return review/selection process. Dr. LaRue has considerable experience with the preparation of, and with the rules and procedures relating to the preparation of, all types of tax

---

[27]The IRS selects returns for audit in various other ways than the DIF-scoring process. For example, an audit may result from IRS "projects," which include audits that focus on specific types of issues or types of taxpayers. An audit may also result from involvement in abusive tax shelters which may have been uncovered in summons proceedings against the promoters of tax shelters. See U.S. Gen. Accounting Office, Tax Administration: IRS' Return selection Process (1999), pp. 4-5. These non-DIF-related audits may therefore occur regardless of how well the purchaser of an abusive tax shelter conceals on his tax returns his involvement in a tax shelter.

[28]Even if the plaintiff were not so terribly wrong about its allegations that specific IRS experience is essential, the law is clear that a lack of such experience would not affect admissibility. As described by the Seventh Circuit Court of Appeals, "The notion that *Daubert* . . . requires particular credentials for an expert witness is radically unsound. The Federal Rules of Evidence, which *Daubert* interprets rather than overrides, do not require that expert witnesses be academics or PhDs, or that their testimony be 'scientific' (natural scientific or social scientific) in character. Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness. Fed.R.Evid. 702; Advisory Committee's Notes to 1972 Proposed Rule 702." (Italicization added, internal citations omitted).

returns, whether for partnerships, individuals, or other entity types.  He is also quite familiar with

the audit selection process for tax returns.  The plaintiff simply ignores Dr. LaRue's vast

experience in favor of attacking him for failure to work with the IRS.[29]

The education, training, knowledge, skill, and experience that Dr. LaRue has gained in

over thirty years of study and practice in this field includes regular, sustained professional

interactions with hundreds of graduate and undergraduate accounting students, and with

thousands of tax professionals and tax return preparers working for three of the largest public

accounting firms in the world and for others.  A brief summary of Dr. LaRue's academic and

professional education and experience is presented in his Report at pages one through three.  His

Curriculum Vita is attached to that Report as Appendix A.  Some of the highlights of the

descriptions set forth in Dr. LaRue's report are set out below.

Dr. LaRue holds a Bachelor of Business Administration degree (majoring in production

logistics management); a Master of Science in Accountancy degree, majoring in accounting and

federal taxation; and a Ph.D. degree (with honors), with major fields of study in accounting and

taxation, and a supporting field of study in economics.[30]  Throughout his career, he has

consistently engaged in a wide range of academic and professional activities to further develop,

refine, and expand his knowledge, skill, and experience in his fields of expertise.[31]  Those

---

[29]It is unclear how many, if any, of the "advisors" the plaintiff claims to have relied on in preparing its and Richard Egan's tax returns worked at the IRS at any time.  But, as described later in this section, Dr. LaRue taught many of the professionals at KPMG and perhaps other of those "advisor" firms.

[30]LaRue Declaration, ¶ 21.

[31]LaRue Declaration, ¶ 22.

activities have enabled him to gain an in-depth knowledge and understanding of, among much

else, the manner in which transactions and activities are to be reported on tax returns ("tax

compliance") and how those returns would be evaluated by knowledgeable and experienced tax

professionals.[32]

Dr. LaRue is currently an Associate Professor of Commerce at the McIntire School of

Commerce at the University of Virginia, where, throughout the past twenty-four years, he has

taught graduate and undergraduate courses on a wide range of subjects in the fields of taxation,

accounting, and finance.[33]  He also served as the Director of the Graduate Accounting Program

from 2000 through 2005.[34]  In May, 2008, he will retire with promotion to Professor Emeritus of

the University of Virginia.[35]

Each of the graduate and undergraduate tax courses Dr. LaRue has developed and taught

at the University of Virginia have included lectures and case studies that have addressed the

manner in which the covered transactions and activities were required to be reported and

disclosed on the various federal income tax returns and attachments thereto.[36]  Some of those

classes addressed the procedures and processes used by the IRS to determine which returns it will

select for audit.[37]  In this context, Dr. LaRue taught, reviewed, and evaluated hundreds of tax

---

[32]LaRue Declaration, ¶ 22.

[33]LaRue Declaration, ¶ 23.

[34]LaRue Declaration, ¶ 23.

[35]LaRue Declaration, ¶ 23.

[36]LaRue Declaration, ¶ 23.

[37]LaRue Declaration, ¶ 23.

returns, tax schedules, and other disclosures required by the various provisions of the Internal

Revenue Code, the Treasury Department Regulations, and IRS instructions.[38]

Since 1979, Dr. LaRue has been retained as a consultant by three of the "Big-4"

international public accounting firms.[39]  Those retaining firms are KPMG, Ernst & Young, and

Deloitte & Touche.[40]  He was also retained by Arthur Andersen, by the Washington National

Office of the IRS Chief Counsel (retained by NYU Graduate School of Law), by the American

Institute of CPAs, by Citigroup, and by several others.[41]  His work for these firms primarily

involved the teaching and/or development of over two hundred 1-day, 3-day, and 5-day technical

in-house training programs in the fields of individual income taxation, taxation of property

transactions, partnership taxation, corporate taxation, international taxation, taxation of corporate

mergers and acquisitions, taxation of consolidated corporate tax returns, accounting periods and

methods, and in other subject areas.[42]  Most or all of these programs included coverage of the

manner in which the transactions and activities were to be reported on the tax returns and

coverage of other compliance issues.  Some programs covered the IRS tax administration and the

process by which tax returns are reviewed and selected for audit.[43]  Most of these programs were

developed and taught to the staff-level and senior-level accountants who were responsible for the

---

[38]LaRue Declaration, ¶ 23.

[39]LaRue Declaration, ¶ 24.

[40]LaRue Declaration, ¶ 24.

[41]LaRue Declaration, ¶ 24.

[42]LaRue Declaration, ¶ 24.

[43]LaRue Declaration, ¶ 24.

initial preparation and review of the tax returns prepared for the firms' individual, corporate, and partnership clients.[44]  Some of these programs were developed and taught to management-level and partner-level tax accountants, whose responsibilities typically included the final review of the clients' tax returns and the signing of those returns on behalf of the firm.[45]  Many of these participants, particularly manager-level and partner-level participants, were involved in tax controversies with the IRS and represented the firms' clients at various levels before the IRS.[46]  In this context, Dr. LaRue taught, reviewed, and evaluated hundreds of tax returns, tax schedules, and other disclosures required by the various provisions of the Internal Revenue Code, the Treasury Department Regulations, and IRS instructions.[47]  Additionally, participants to these seminars regularly sought Dr. LaRue's advice on various technical and tax-compliance issues that arose in connection with pending client-related tax returns, tax controversies, and other projects.[48]  Over the years, Dr. LaRue evaluated and informally advised on hundreds of client-specific issues for the tax professionals who attended his seminars.[49]

Since 1994, Dr. LaRue has been retained as an expert in several cases, many of which were settled prior to trial, and some of which are still pending.[50]  In each if the cases for which he

---

[44]LaRue Declaration, ¶ 24.

[45]LaRue Declaration, ¶ 24.

[46]LaRue Declaration, ¶ 24.

[47]LaRue Declaration, ¶ 24.

[48]LaRue Declaration, ¶ 24.

[49]LaRue Declaration, ¶ 24.

[50]LaRue Declaration, ¶ 25.

agreed to serve as an expert, it has been with the explicit understanding that he would review the facts and render his opinions objectively, independently, and without bias.[51]  Dr. LaRue was retained as an expert by various government agencies including the IRS Chief Counsel's Office, but also by private firms such as Ernst & Young and the law firms Clifford Chance, Fox Rothschild, Heller Ehrman, and Lash & Goldberg.[52]  Dr. LaRue has been recognized as an expert in tax, accounting, and/or finance in nine cases.[53]

As the above discussion demonstrates, Dr. LaRue is supremely qualified to opine on the issues he addressed in his Report and in his Rebuttal Report.  His education, knowledge, training, skill, and experience are the product of his graduate and post-graduate education and study, and of the wide range of sustained academic and professional activities and accomplishments that have characterized the past thirty years of his professional career.[54]

In preparing his reports in this case, Dr. LaRue applied his knowledge, training, skill, experience, and cumulative insights, particularly the insights gained from the regular, sustained professional interactions he had with hundreds of graduate and undergraduate accounting students, and with thousands of tax professionals and tax-return preparers throughout the past thirty years to: (1) review the various tax returns and other documents in this case; (2) analyze and evaluate the manner in which the Fidelity International transaction (and the various elements of the transaction) and "losses" were respectively reported on the Fidelity International and Egan

---

[51]LaRue Declaration, ¶ 25.

[52]LaRue Declaration, ¶ 25.

[53]LaRue Declaration, ¶ 25.

[54]LaRue Declaration, ¶ 26.

tax returns for 2001 and 2002; (3) determine whether or not a reasonably diligent and independent review of the information disclosed on or with these respective returns by an experienced tax professional would have or should have revealed or provided any reasonably discernable indication of certain specified elements of the Fidelity International transaction and "losses" (*e.g.*, existence and magnitude of the transaction-related fees that were accrued and paid, the source of the Egans' tax basis in Fidelity International, etc.); (4) opine as to whether or not, taking into account all of these factors, it would be objectively reasonable to conclude that these returns were, from the perspective of a knowledgeable and experienced tax professional, prepared in a manner that could reasonably be expected to reduce or to minimize the actual or perceived risk that the tax consequences of the transaction would be detected by the IRS, and, ultimately, that the tax returns would be selected for audit by the IRS;  and (5) opine as to whether or not certain amounts were properly reported on Fidelity International's Schedules L, M-2, and the Schedule K-1s of its members, and whether or not the manner in which these amounts were reported could have reasonably been expected to increase the risk of detection and audit by the IRS.[55]

Thirty years at the highest levels of the profession have more than qualified Dr. LaRue to lend his expertise to this case.  Only by misrepresenting Dr. LaRue's conclusions does the plaintiff manage to challenge his qualifications.

**III.    Dr. LaRue Does Not Opine, Contrary to the Plaintiff's Allegations, as to the Subjective State of Mind of the Tax-Return Preparers; Rather, He Opines, Based on the Application of an Objective Standard, on the Significance or Potential Significance of the Information That Was or Was Not Disclosed on the Tax Returns (And How and Where That Information Was or Was Not Disclosed).**

---

[55]LaRue Declaration, ¶ 24.

Dr. LaRue supports in his report two opinions with which the plaintiff takes issue: (1) that "based on [a] review of the record and the analysis and discussion presented in [Dr. LaRue's] Report, it would be reasonable to conclude that Fidelity International reported the Transaction on its Form 1065s in a manner that was designed to reduce or minimize the actual or perceived risk of detection and audit by the IRS;" and (2) that "based on [a] review of the record and the analysis and discussion presented in [Dr. LaRue's] Report, it would be reasonable to conclude that Fidelity International Losses were reported on the Egans' Form 1040s in a manner that was designed to reduce or minimize the actual or perceived risk of detection and audit by the IRS."  But, in taking issue with these two opinions, the plaintiff mischaracterizes the opinions as " . . . opinions regarding the states of mind and motivations of those involved in preparing the tax returns . . .," and as "[LaRue's] . . . conclusions regarding FICA A Fund's and Plaintiff's intent . . . ."[56]

Dr. LaRue rendered no opinion as to the state of mind or the motivation of the plaintiff or those involved in the preparation and filing of the tax returns.[57]  This is clearly shown by the unambiguous language used in Dr. LaRue's Report to express his opinions, by the analyses and descriptions presented in his Report in support of his opinions, by his conclusions and opinions regarding whether or not various other elements of the Fidelity International transaction were reasonably ascertainable from the disclosures made on or with the tax returns, and by his deposition testimony in which he stated, without qualification or equivocation, that he was not testifying as to the subjective state of mind of the plaintiff or of any of the individuals involved in

---

[56]Pl. Mem., pp. 1, 6.

[57]LaRue Declaration, ¶ 34.

the preparation and filing of the tax returns.[58]  At the same time, the plaintiff accuses Dr. LaRue

of trying to "finesse the issue by making suggestions and inferences regarding intent while, at the

same time, denying that he is offering any opinion as to state of mind or intent."  It is the plaintiff

who is guilty of trying to finesse issues.  The plaintiff admits that Dr. LaRue has not opined as to

any subjective state of mind, and admits that Dr. LaRue's denials in the face of the plaintiff's

accusations are "technically correct,"[59] while at the same time seeking to have Dr. LaRue's

testimony and reports excluded on that very basis.

      The plaintiff does not appear to challenge the accuracy or completeness of the facts set

forth anywhere in Dr. LaRue's Report and on which he based his opinions and conclusions.

Nor does the plaintiff appear to assert or suggest that Dr. LaRue ignored or omitted facts that

might have supported contrary conclusions and opinions.

      As stated above, Dr. LaRue's opinions described above in this section are based on the

application of an objective standard that looks to the decision processes and perceptions of

knowledgeable and experienced tax professionals.[60]  In applying this standard, Dr. LaRue

evaluated the significance or potential significance of the information that was disclosed on the

tax returns, evaluated how and where that information was disclosed.[61]  He also evaluated the

significance or potential significance of information that could have, or should have, been

---

[58]LaRue Declaration, ¶ 34.

[59]Pl. Mem., p. 7.

[60]LaRue Declaration, ¶ 37.

[61]LaRue Declaration, ¶ 37.

21

disclosed on or with those tax returns, but that was not disclosed.[62]  Based on that review and

analysis, Dr. LaRue concluded that the manner in which the Fidelity International transaction and

"losses" were reported on the tax returns was not sufficiently complete, descriptive, or, in some

cases, accurate, to have enabled a knowledgeable and experienced tax professional to determine

the nature of the transaction and the source of the "loss" from an independent review of the filed

tax returns.[63]  On that basis, Dr. LaRue concluded that it would be objectively reasonable to

conclude that the Fidelity International transaction and "losses" were reported on the tax returns

in a manner that could reasonably be expected to reduce or to minimize the actual or the

perceived risk that they would be detected by the IRS,[64] and, ultimately, that the tax returns

would be selected for audit by the IRS.[65]

---

[62]LaRue Declaration, ¶ 37.

[63]LaRue Declaration, ¶ 37.

[64]LaRue Declaration, ¶ 37.

[65]An analogy, though perhaps an imperfect one, may be helpful in demonstrating the difference between opinions as to subjective state of mind and opinions, like Dr. LaRue's, of the application of objective criteria to reach a conclusion.  Suppose you see a man walking on the street on a cloudy day wearing what appears to be a raincoat.  Based on the objective criteria that it is cloudy and the coat appears to be a raincoat, it may be reasonable to conclude that the man's coat selection was designed to keep him from getting wet.  To come to that conclusion, we took no notice of and did not base our conclusion on any subjective state of mind.  Now, suppose that it is unclear as to whether the coat is actually a raincoat.  Perhaps an expert is needed to opine on whether the coat is actually waterproof.  Again, the expert would be looking only to objective criteria, but an expert *is necessary* to opine on the objective criteria.

This analogy may also assist in understanding why it was so necessary for Dr. LaRue to determine, based on *objective* factors, the effect the reporting had on the actual risk or *perceived* risk of detection.  Back to the coat analogy: suppose it is determined that the coat actually is a raincoat.  It would not be necessary to determine the actual risk of rain on the cloudy day (which may be unknowable) to evaluate whether it would be reasonable to conclude that the man wore the raincoat to reduce the chances that he would get wet.  It makes no difference whether there

(continued...)

22

Dr. LaRue used his decades of experience in applying objective standards to the facts of this case, which are contained in millions of pages of documents. That bears no resemblance to the facts of the cases the plaintiff relies on, albeit wastefully and incompletely, in its motion to exclude. The cases the plaintiff relies on primarily with respect to this arguments are so easily distinguished from the instant case that one is left to question only the plaintiff's motives in not fully describing them and their inapplicability. For example, *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) deals with three doctors opining on ethical standards and breaches of those standards. In each instance, the witness admitted that his opinion concerning ethical standards are based on personal, subjective views or "personal opinions," and lacked any reliable foundation. That court also found that the proffered testimony was unhelpful because the ethical considerations were irrelevant to the case, and related only perhaps to liability in the "court of public opinion . . . or before a divine authority."[66] In short, the *Rezulin* testimony

---

[65](...continued)

was a 1% chance or a 100% chance of rain when looking at the objective factors to opine on what the objective criteria suggests about the man's coat selection. The objective factors are clearly relevant to a fact finder's determination of whether the man perceived a risk of rain and whether his decision to wear a raincoat reduced his risk of getting wet, regardless of what the actual chance of rain was. Indeed, it is far more important to have an expert look at the fabric than to have someone look at the actual chance of rain for purposes of determining the man's perceived risk of getting wet.

Applied to the instant case, Dr. LaRue similarly did not engage in an exercise of divining the plaintiff's or anyone else's subjective state of mind in determining whether the reporting was done in such a way as to reduce an actual or perceived risk of detection. Rather, he focused exclusively on an array of objective factors which, when considered together, allowed him to reach a rationally-based conclusion to this question. What is more, his analysis did not just focus on factors that may tend to demonstrate the likelihood of an actual risk of detection, but also on factors that could also show the perceived risk of detection. In either instance, though, he focused on objective – not subjective – criteria.

[66]*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 542-544.

failed both the relevance and reliability tests of *Daubert*.

Similarly, a second case the plaintiff relies on, *DePaepe v. GMC*, 141 F.3d 715, 720 (7th Cir. 1998), stands only for the proposition that an expert cannot opine on motivation of designers of, in that case, a car visor, when such testimony lacks any scientific basis, though the expert can give an opinion as an engineer that reducing the padding saved a particular amount of money or that the explanation for the decision was not sound, which could then lead to inferences about the motivation. That witness offered testimony about motivation which failed a prong of the *Daubert* test under Rule 702. Those cases have no relevance to this case where Dr. LaRue *does not* opine on any subjective state of mind, but does look at objective factors to draw reliable conclusions that may assist the Court in drawing its own inferences.

**IV.    Dr. LaRue's Analyses, Reports, and Testimony Have Been Entirely Unbiased, And He Is in No Way a "Partisan Advocate" as the Plaintiff Alleges.**

The plaintiff's allegations of partisan advocacy are based principally on four false and legally incorrect allegations: (1) that Dr. LaRue impermissibly summarized factual evidence; (2) that a "slant" or "spin" was placed on the facts; (3) that some of the observations were "misleading" and do not relate to any expert opinion; and (4) that Dr. LaRue has a financial incentive to be and therefore must be a partisan advocate.

The descriptions in the Report and Rebuttal Report of the tax returns and other related documents were essential for the sake of the readers. Dr. LaRue's Report contains detailed descriptions of the tax returns and certain of the participants' own documents that he deemed relevant to his analyses, conclusions, and opinions. Dr. LaRue appropriately included those descriptions and factual summaries in his Report for two essential reasons: to provide the context, background, and support for his analyses, conclusions, and opinions; and to provide the

transparency that would enable the plaintiff, its attorneys, and its proffered experts to independently evaluate the accuracy and the completeness of the facts on which Dr. LaRue's analyses, conclusions, and opinions are based.[67]  The plaintiff does not challenge either the accuracy or the completeness of the facts Dr. LaRue relied on in conducting his analyses, in arriving at his conclusions, or in forming his opinions.  Nor does the plaintiff challenge the authenticity or reliability of the referenced source documents.

Given the accuracy of the cited facts, the plaintiff's only option is to complain, as he does, that the comprehensiveness of the facts suggests some sort of "slant" or "spin."  In that regard, the plaintiff goes so far as to complain that some of the descriptive terms that Dr. LaRue used in the Report suggest advocacy.  Nevermind that those terms are perfectly descriptive and in many or most cases are taken directly from documents produced in discovery in this case, including by the plaintiff.  For example, the following descriptive terms came from the documents obtained in discovery and provided to Dr. LaRue:

- "Desired Loss."  *See* document Bates numbered 2EGAN011979, produced by the plaintiff, which uses the term "desired result" to refer to the claimed loss at issue in this case.  *See also* Exhibit D to plaintiff's Motion at page Bates numbered 011549, which shows the desired loss to be $150,000,000, the "transaction size."[68]

- "Transaction size."  This is the term used by James Haber at Exhibit E to plaintiff's Motion:  "Helios 2 transaction size is $150 million."[69]

---

[67]LaRue Declaration, ¶ 40.

[68]LaRue Declaration, ¶ 46.

[69]LaRue Declaration, ¶ 46.

Where terms are facially neutral but entirely accurate, the plaintiff still complains. For example, the plaintiff states that Dr. LaRue's choice of the term "basis trades" serves no purpose other than to advocate a particular interpretation of the facts. That is untrue. First, this term is an accurate description of the options.[70] It is irrefutable that these options were in fact used to create the tax basis used by the plaintiff to determine the amount of the claimed loss.[71] Consequently, there is nothing false, misleading, or biased about the choice of that term to describe them.[72] Notwithstanding the neutrally descriptive nature of the term, the plaintiff asserts that a "neutral party" might describe these as "interest rate options." That is true. But a neutral party could also describe them as "basis options."[73] This term is not an "inflammatory" term and it is not inaccurate or misleading.[74] It accurately describes the effect these options had in creating the paper-loss deductions claimed by Fidelity International and the Egans.[75] Similarly, the plaintiff complains that Dr. LaRue "asserts" that the Fidelity International transaction was "designed to generate" a loss. That was not an assertion– it was and is a fact.[76] That fact is based on, *inter alia*, the Transaction Presentation cited at footnote 34 of Dr. LaRue's report and included in

---

[70]LaRue Declaration, ¶ 46.

[71]LaRue Declaration, ¶ 46.

[72]LaRue Declaration, ¶ 46.

[73]LaRue Declaration, ¶ 46.

[74]LaRue Declaration, ¶ 46.

[75]LaRue Declaration, ¶ 46.

[76]LaRue Declaration, ¶ 46.

Exhibit D to the plaintiff's Motion.[77]  In that vain, the plaintiff also complains that the report

describes the transaction-related fees as a fixed percentage of the claimed loss.  According to the

plaintiff, "the documents upon which LaRue purports to rely do not so state."  First, the

documents Dr. LaRue cited at footnote 131 of his Report are the documents on which he relied,

not "purported" to rely.[78]  Second, the "Outline of Proposed Transaction" (attached to the

plaintiff's Motion at Exhibit C, Bates number 011353) and the document attached to the Motion

as Exhibit E, express the fees as a "% of $150M," the transaction size.[79]  Finally, the plaintiff

claims that Dr. LaRue's reference to "the '$325,[5]00 amount that Plaintiff paid to purchase a

portion of Samuel Mahoney's common interests . . ." was misleading because the dollar amount

is not set forth in the Operating Agreement.[80]  Here, the plaintiff misstates the Report, which

states the following: that the "$325,[5]00 amount that Mr. Egan paid for this interest was the

same amount as the purchase price specified in the Transaction Outlines and the Transaction

Presentation," that the "$325,[5]00 amount was established in Section 14.6 of Fidelity

International's Operating Agreement," and that "Each of the Transaction Outlines stated that,

after the purchase of the Gain/Loss Options, Mr. Mahoney 'will sell a portion of his common

interests . . . [to] Richard J. Egan . . . [for] $325,500.'"[81]  As can be seen from these excerpts,

there is nothing false, misleading, or inflammatory about the way Dr. LaRue described the

---

[77]LaRue Declaration, ¶ 46.

[78]LaRue Declaration, ¶ 46.

[79]LaRue Declaration, ¶ 46.

[80]LaRue Declaration, ¶ 46.

[81]LaRue Declaration, ¶ 46.

amount paid to Mahoney to purchase Mahoney's interest. The amount that was actually paid to Mahoney was the same amount that the Transaction Outlines and Transaction Presentations stated would be paid to him, and the formula for determining that amount was set forth in the Operating Agreement.[82]

Dr. LaRue's analyses and conclusions, and the terms used and facts reported, were entirely unbiased. The Fidelity International transaction was extremely complex and more than two-million pages of documents were produced and provided to Dr. LaRue for review and analysis. In analyzing the record, Dr. LaRue endeavored to provide an accurate, complete, readable, understandable, and objective description of these complex facts in order to provide the background and support for his analyses, conclusions, and opinions.[83] No doubt, had he failed to do so, the plaintiff would be arguing that the conclusions were unsupported.

The factual support is required by the Federal Rules of Evidence and the Federal Rules of Civil Procedure. The Federal Rules of Evidence require experts to base their testimony on "sufficient facts or data." Rule 702 expressly provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) **the testimony is based upon sufficient facts or data,** (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. (Emphasis added).

Rule 703 is even more instructive. That rule provides, in part, that:

> The **facts or data in the particular case upon which an expert bases an opinion**

---

[82]LaRue Declaration, ¶ 46.

[83]LaRue Declaration, ¶¶ 44-45.

**or inference** may be those perceived by or made known to the expert at or before the hearing. If of a **type reasonably relied upon** by experts in the particular field in forming opinions or inferences upon the subject, **the facts or data** need not be admissible in evidence in order for the opinion or inference to be admitted.

*See also*, *Highland Capital Management, L.P. v. Schneider*, 379 F.Supp.2d 461, 469 (S.D.N.Y.

2005) ("an expert must of course rely on facts or data in formulating an expert opinion," (citing

Rule 703)).

Finally,  Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires an expert to

specify in his or her report the "data or information" considered by the expert in formulating his

or her opinions. The Rule provides in pertinent part that

> The [expert] report must contain:
>
> (i) a complete statement of all opinions the witness will express **and the basis and reasons for them**;
> (ii) **the data or other information considered by the witness in forming them**.

(Emphasis added).

While the rules require inclusion of facts in the reports, the plaintiff attacks Dr. LaRue's

inclusion of facts.  It does so with, typically, inapposite case citations.  For example, the plaintiff

relies heavily on *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273 (S.D. Alabama

2006), a case in which an administrative law attorney submitted an expert report on the "general

environmental, regulatory history" of a defendant's chemical manufacturing facility.[84]  That court

held that:

> *The vast majority* of McFaddin's report simply summarizes and states her advocacy-based interpretation of documents in the record concerning Ciba's historical conduct. These statements of alleged fact do not appear to benefit from, or to be based to any extent on, McFaddin's status as a regulatory expert. . . . She does

---

[84]*Fisher* at 280.

> not show that she has special skills that render her reading of record documents concerning the history of the Ciba plant, and her conclusions as to what Ciba has or has not done, any more or less persuasive than that of a layperson. . . . What special ken does an administrative law attorney have to render expert opinions as to existence and causes of environmental contamination? [85] [Emphasis added.]

The court also pointed out that the proffered expert used terms like "hardball tactics" and "substantial ecological/environmental threat." In sum, that court concluded that an administrative law attorney could not be used as an expert by trying to pass off a "supplemental brief" as an expert report.[86]

*Fisher* has not even the most remote relevance to this case. First, "much" or a "vast majority" of Dr. LaRue's reports do not contain factual narrative but instead consist of an extensive and acute analysis of the facts germane to his analyses and conclusions, and, again, are required by the Federal Rules of Evidence and of Civil Procedure. Second, Dr. LaRue's analyses are indeed based on expertise in accounting and taxation. He is well-qualified, unlike the *Fisher* expert, to provide expert testimony on the tax issues and accounting issues in this case. Third, Dr. LaRue does not attempt to draw any legal conclusions like those the *Fisher* court complained of. Moreover, Dr. LaRue's summary of facts that are germane to his conclusions is firmly supported by the underlying documents and materials in the record.

The plaintiff also finds ground to attack Dr. LaRue professionally because he chose to pursue an academic career with non-academic side engagements, including expert-witness engagements. The allegation that Dr. LaRue must be a partisan advocate because his extra-curricular activities, including those as an expert witness, pay better than his professorship is a

---

[85] *Id.* at 281.

[86] *Id.* at 281.

non-starter, and is, quite frankly, shameful.  There is nothing whatsoever in Dr. LaRue's testimony or reports that hints at partisanship.[87]

Quite opposite from partisanship, Dr. LaRue specifically avoids making any legal conclusion.  Nonetheless, that does not prevent the plaintiff from attacking Dr. LaRue for using what the plaintiff calls "weasel words."  That is, the plaintiff actually attacks Dr. LaRue for using words like "may," "[i]t's possible," "presumably," "I have an impression," and others.  The plaintiff claims that Dr. LaRue's use of these terms reflects a lack of requisite knowledge and experience.  To the contrary, Dr. LaRue used these terms and phrases in connection with outcomes involving the decision processes and judgments of knowledgeable and experienced tax professionals.[88]  It is axiomatic that such outcomes, however likely, cannot, by their nature, be definitively stated with mathematical precision.[89]  For Dr. LaRue to have done so *would have been* inaccurate and misleading.[90]  This does not, of course, mean that whether or not a return will be selected for audit is "inherently unpredictable,"  but it does mean that the outcome cannot generally be predicted with certainty.[91]  Where it was possible, given the nature of the issue, for Dr. LaRue to make definitive statements of the conclusions and opinions resulting from his

---

[87]Please see Dr. LaRue's declaration at paragraphs 56 through 58 wherein he addresses these allegations of partisanship.

[88]LaRue Declaration, ¶ 61.

[89]LaRue Declaration, ¶ 61.

[90]LaRue Declaration, ¶ 61.

[91]LaRue Declaration, ¶ 61.

analyses, he did so.[92]  For example, see the conclusions and opinions set for at 224, 225, 227,

228, 230, and 231 of his Report.  But, the plaintiff's attack of Dr. LaRue for stopping short of

expressing a definite opinion on matters than cannot be determined with precision reflects, at

best, a misunderstanding of the issues, analyses, and conclusions.

## V.    Dr. LaRue's Expert Observations Are Germane to His Analyses, Conclusions, and Opinions, and Are Not Remotely Misleading.

Here again, the plaintiff simply attacks Dr. LaRue for using evidence and analyses of that

evidence to support his expert conclusions.  While not contending, because he can't, that any of

Dr. LaRue's observations are incorrect, the plaintiff asserts that the observations are irrelevant to

the conclusions, and that the "cumulative effect" is to "imply" that the returns were filed in "bad

faith."[93]

Dr. LaRue's observations were part of his description of the tax returns, and they form the

background and support for the analyses, conclusions, and opinions set forth in the Report.[94]

Almost all of these observations related directly to Dr. LaRue's opinions, particularly to those

opinions at paragraphs 226 and 229 of his Report.[95]  Many were intended to point out that

evidence of a different interpretation of the facts, *which would have supported the plaintiff's side

of the case*, is lacking.[96]  For example, Dr. LaRue did not opine on the legal issue of whether or

---

[92]LaRue Declaration, ¶ 62.

[93]Pl. Mem., p. 20.

[94]LaRue Declaration, ¶ 49.

[95]LaRue Declaration, ¶ 50.

[96]*See*, LaRue Declaration, ¶ 50.

not a Form 8264 should have been filed by Fidelity International.[97]  Instead, he simply observed

that the Form was not filed.[98]  The significance of this observation is that if this form had been

filed, even if it was not required to have been filed, it would be reasonable to conclude that the

risk of detection and audit would have increased and would have therefore been indicative

(possibly conclusive) that the manner in which the Fidelity International transaction was reported

on the Fidelity International return was *not* designed to reduce or minimize the risk of detection

and audit.[99]

     Similarly, Dr. LaRue did not opine on the legal issue of whether or not the transaction-

related fees should have been capitalized to the options.[100]  He instead observed that the fees

were capitalized and that, as a result, it would not have been possible for an experienced IRS

classifier/examiner to have discerned the fact that these fees had been paid.[101]  The significance

of this observation is that, regardless of whether or not separate disclosure of these fees was

required by law, if the fees had been separately disclosed, it would be reasonable to conclude that

the risk of detection and audit would have increased and would have therefore been indicative

that the manner in which the Fidelity International transaction was reported on the Fidelity

International tax return was *not* designed to reduce or minimize the risk of detection and audit.[102]

---

[97]LaRue Declaration, ¶ 50.

[98]LaRue Declaration, ¶ 50.

[99]LaRue Declaration, ¶ 50.

[100]LaRue Declaration, ¶ 50.

[101]LaRue Declaration, ¶ 50.

[102]LaRue Declaration, ¶ 50.

Regarding Dr. LaRue's commentary on the treatment of the fees, the plaintiff states in its Motion that "When pressed on this statement, however, [LaRue] admitted that, as a general matter, when a taxpayer disposes of an asset the various costs making up the taxpayer's basis in the asset are not separately identified on the tax return."[103]  This mischaracterizes Dr. LaRue's testimony and suggests that he was "pressed" into "admit[ting]" something that was false or misleading in his Report.[104]  That is simply not true, and the plaintiff's own spin on the facts is inappropriate.  The observations that are listed at paragraphs numbered 4, 5, 6, 8, and 9 at pages 21 through 23 of the plaintiff's Memorandum similarly relate directly to Dr. LaRue's opinions and the rationale for them.[105]  These are factual observations that are based on Dr. LaRue's review and analysis of the tax returns, the accompanying workpapers, and other documents.[106]  If any or all of these disclosures had been made, whether or not required by law or by IRS instructions, the disclosures would have most likely had the effect of increasing the risk of detection and audit and would therefore have been indicative (or possibly conclusive) that the manner in which the Fidelity International transaction and claimed losses were reported on the tax returns was *not* designed to reduce or minimize the risk of detection and audit.[107]

The plaintiff even takes issue with Dr. LaRue's observation that Fidelity International

---

[103]Pl. Mem., p. 21.

[104]LaRue Declaration, ¶ 50.

[105]LaRue Declaration, ¶ 51.

[106]LaRue Declaration, ¶ 51.

[107]LaRue Declaration, ¶ 51.

elected the accrual method of accounting.[108]  According to the plaintiff, that innocuous

observation "implies that FICA A Fund's 'election' of the accrual method was inappropriate."[109]

The plaintiff's assertion mischaracterizes Dr. LaRue's observation, and is contradicted by the

plain language of the Report, which does not affirmatively state, and does not in any way

suggest, that this election was or may have been improper.  Rather, this observation notes an

inconsistency between Fidelity International's Operating Agreement and its 2001 tax return;

describes the effect of the election on the amounts reported its 2001 and 2002 tax returns; and

helps to explain some of the amounts presented in Table 2 of Dr. LaRue's Report.[110]

    Similarly nonsensical is the plaintiff's issue with Dr. LaRue's observations that "Michael

Egan signed the Egans' 2001 and 2002 Returns under a Power of Attorney."[111]  Dr. LaRue was

clear at his deposition when asked if I was opining on the propriety of Michael Egan signing

those tax returns, stating "I don't see anything here that would remotely suggest that I'm opining

there was anything proper or improper about his having signed that return."[112]  It is unclear

exactly why the plaintiff believes that recitation of this fact is in some way improper.

    Despite the lack of clarity to the plaintiff's arguments, it appears that the principal

complaint with respect to Dr. LaRue's observations is that, as the plaintiff puts it, "these

---

[108]Pl. Mem., p. 21.

[109]Pl. Mem., p. 21.

[110]LaRue Declaration, ¶ 52.  That Table describes and summarizes the gain/loss options
and trades, the ordinary gains and losses that were recognized and reported by Fidelity
International on its 2001 Form 1065, and the allocation of these gains and losses between Egan
and the other members of Fidelity International.

[111]Pl. Mem., p. 22.

[112]LaRue Declaration, ¶ 53; LaRue Dep. Tr., 203:13-18.

observations, and others, are misleading because LaRue does not disclose in his reports that he is not opining on whether the reporting was proper or improper."[113]  We are aware of no law or rule, or even a logical argument for the proposition, that an expert cannot make a neutral observation that is not essential to a particular opinion or opinions.  Regardless, it cannot be stated more clearly than Dr. LaRue stated it at his deposition: he was not opining on the propriety or impropriety of these observations.[114]  Moreover, these observations are presented in the section of Dr. LaRue's report that describes the tax returns.  None of them are presented in the section of his report titled "Summary of Conclusions."[115]  Furthermore, there is no affirmative statement, or pretense, or suggestion in the wording of any of these observations that Dr. LaRue is opining on whether or not the reporting was proper or improper.[116]

All of the observations challenged by the plaintiff are part of the background description of the tax returns, and with the exception of the observation that Michael Egan signed the Egans' 2001 and 2002 tax returns, all of these observations provide background factual support for Dr. LaRue's conclusions and opinions.[117]

## CONCLUSION

The United States retained Dr. LaRue to testify as an expert in return preparation, reporting, and return compliance and in accounting to assist the Court in making its own

---

[113]Pl. Mem., p. 23.

[114]LaRue Dep. Tr., 203:13-18.

[115]LaRue Declaration, ¶ 54.

[116]LaRue Declaration, ¶ 54.

[117]LaRue Decl., ¶ 55.

determinations relating to the manner in which certain transaction-related items were reported on the year 2001 and year 2002 federal income tax returns of Fidelity International and the Egans. Informed determinations relating to the reporting on these complex tax returns would be impossible without an expert's assistance, and those determinations lie at the heart of this tax case.

Dr. LaRue was provided with, and in fact demanded, access to all evidence obtained in discovery in this case. He examined the evidence without interference. He thoroughly examined the 2001 and 2002 federal income tax returns of Fidelity International and the Egans, along with other documents in the vast database of documents. Based on his review and analysis, Dr. LaRue reached his conclusions, and presented them in an unbiased fashion and in accordance with the applicable rules which require the inclusion in reports of supporting data. Where Dr. LaRue uses what the plaintiff calls "weasely words," he merely alerts the reader that an item in his report cannot be stated with precision. Such word choice should be commended, as it demonstrates a recognition of the different roles of the fact finder and the expert.

The plaintiff's allegations are baseless and unfortunately, too many are personal. Even so, at best they go to the weight and not the admissibility of Dr. LaRue's testimony and reports. We respectfully request the Court to read Dr. LaRue's reports in their entirety.[118] The Court will find Dr. LaRue's qualifications, outlined in the Appendices and in the attached Declaration of Dr.

---

[118]When the plaintiff filed its motions to exclude Dr. Kolbe, Dr. Rausser, and Dr. LaRue, they filed under seal only the reports of the experts. At the January 25, 2008 status conference in this case, counsel for the United States suggested that the Court would benefit from the bounded hard-copies of its experts' reports, which contained numerous tables, charts, and graphs. The Court agreed. Accordingly, the United States provided the full expert reports under seal of each of its three experts, Dr. Kolbe, Dr. Rausser and Dr. David Wayne LaRue on January 28, 2008.

LaRue, to be outstanding.  It will also be clear that Dr. LaRue's clear and well-reasoned and well-supported conclusions will assist the Court in making important determinations in this case. Finally, it will be clear that the plaintiff's allegations are meritless, and that its motion to exclude should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

 /s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER L. VANN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044-0055
Telephone: (202) 307-6561
Facsimile:  (202) 514-5238
E-mail: john.a.lindquist@usdoj.gov
        barry.e.reiferson@usdoj.gov
        heather.vann@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and copies will be sent to those indicated as non registered participants on February 15, 2008.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by Tax Matters Partner, | ) ) ) | |
| Plaintiff | ) ) | Case No.:  05-40151-FDS 06-40130-FDS |
| v. | ) ) ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**DECLARATION OF DR. DAVID W. LARUE
IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE**

I, David W. LaRue, Ph.D., declare:

1.   I am an expert in the fields of accounting, taxation, and finance.  My expertise in the field of taxation includes tax compliance and reporting of transactions and events on federal income tax returns, including the Form 1065 (Partnership) and the Form 1040 (Individual).

2.   I was retained by the Department of Justice and designated as an expert in the above-styled consolidated cases.

## My Assignment in These Consolidated Cases

3.   I was asked to examine the 2001 and 2002 federal income tax returns (including all accompanying forms, schedules, statements, and attachments) of Fidelity International (Form 1065) and the Egans (Form 1040s) [the "**Returns**"], and the other documents produced in this case, and based on that examination:

- To determine how the Fidelity International "gains" and "losses" of approximately $160 million arising from paired "foreign currency" option

trades – which trades consisted of only one component of the Transaction-at-Issue [the "**Transaction**"] – and the over $4.7 million in fees paid to the promoters of the Transaction were reported on Fidelity International's federal partnership returns for 2001 and 2002 and the Egans' individual income tax returns for 2001;

- To determine whether or not, based solely on the information included on or with the Returns, either individually or collectively, the Internal Revenue Service [the "**IRS**"] could have determined that the deduction of the Fidelity International "losses" at issue in this case [the "**Losses**"] were also being based on another set of paired offsetting options – the "interest rate" trades – which were used to generate a greatly inflated tax basis in Richard Egan's membership interest in Fidelity International;

- To determine whether or not the Returns, either individually or collectively, disclosed (or otherwise provided any reasonably discernable indication) that Fidelity International incurred and paid Transaction-related Fees of $4,745,000 [the "**Fees**"] to KPMG, the accounting firm, and to Helios Financial LLC, the promoter, in connection with the implementation of a strategy that Mr. Egan purchased in 2001, that generated $160,409,044 in permanent ordinary tax losses that Richard and Maureen Egan claimed on their 2001 and 2002 joint Form 1040s; and

- To determine whether or not, based on objective factors, it would be reasonable to conclude that the various elements of the Transaction were reported on the Returns in a manner that was designed to reduce, minimize, or eliminate the actual or perceived risk of detection and audit by the IRS.

4.    I submitted two written reports in these consolidated cases:  an opening *Report* submitted on August 7, 2007 (and subsequently corrected for errata), and a *Rebuttal Report,* dated September 11, 2007, to the *Expert Report of Stuart A. Smith*, dated August 3, 2007.

5.   I was deposed in this case on Monday, November 26, 2007 in Washington, D.C. at the offices of McKee Nelson, LLP.  This deposition lasted approximately eight hours.

## Scope of Declaration

6.   I submit this Declaration to respond to the criticisms set forth in the *Plaintiff's Motion* to exclude my testimony and my reports.[1]

### Criticism #1

7.   In his *Motion*, Plaintiff challenges my qualifications and experience as an expert in this case.

- As I explain in this Declaration, I am well qualified to opine on the issues that I have addressed in my *Report* and in my *Rebuttal Report.*  My education, my knowledge, my training, my skill, and my experience are the product of my graduate and post-graduate education and study, and of the wide range of sustained academic and professional activities and accomplishments that have characterized the past thirty years of my professional career.

### Criticism #2

8.   Plaintiff asserts that I have expressed opinions as to the state of mind and motivation of the parties involved in preparing the Returns.

- As the Plaintiff himself acknowledges,[2] nowhere in my *Report*, in my *Rebuttal Report*, or in my deposition do I express any opinion or conclusion regarding the "state of mind" or "motivation[s]" of the Plaintiff, of those involved in the preparation of any of the Returns, or of any other individual.

- The opinions that are the object of this challenge are based on my review and analysis of the Returns and certain other related documents,

---

[1]   "MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE PROPOSED EXPERT TESTIMONY AND REPORTS OF DAVID LARUE", filed January 17, 2008.

[2]   *Infra.*, ¶35.

and on my application of an objective standard that looks to the decision processes of a knowledgeable and experienced tax professional.

**Criticism #3**

9.  Plaintiff asserts that I have "impermissibly summarized factual evidence."[3]

- My *Report* contains detailed descriptions of the Returns and certain of the participants' own documents that I found to be relevant to my analyses, conclusions, and opinions.

- I included these descriptions and factual summaries in my *Report* for two reasons:

  o To provide the context, background, and support for my analyses, conclusions, and opinions, and, as I stated in my deposition,

  o To provide the transparency that would enable the Plaintiff, its attorneys, and its experts to independently evaluate the accuracy and the completeness of the facts on which my analyses, conclusions, and opinions are based.[4]

- It does not appear that *Plaintiff's Motion* challenges either the accuracy or the completeness of the facts on which I relied in conducting my analyses or in forming my opinions.

- Nor does it appear that Plaintiff challenges the authenticity or reliability of any of the source documents referenced in my reports.

**Criticism #4**

10. Plaintiff also takes issue with a few of the many descriptive terms that I used in my *Report* and claims that my use of these terms, rather than, in some cases, alternative terms suggested by the Plaintiff in his *Motion*, supports his assertion that I am a "partisan advocate."  This is simply not true.

---

[3]     *Plaintiff's Motion*, at pp. 17-20.

[4]     *Infra.*, footnote 40.

- The Transaction in this case was extremely complex and over two million pages of documents were produced and provided to me for review and analysis.

- In writing my *Report*, I endeavored to provide an accurate, complete, readable, understandable, and objective description of these complex facts in order to provide the background and support for my analyses, conclusions, and opinions.

- Furthermore, many of the terms listed in *Plaintiff's Motion* as indicative of bias are actually terms that are similar or identical to those used in the participants' own documents.

### Criticism #5

11.  Plaintiff asserts I have made several observations that are (1) misleading and that (2) do not relate to any of my analyses, conclusions, or opinions.[5]

12.  Plaintiff's assertions are incorrect:  these observations were part of my description of the Returns and they form the background and support for the analyses, conclusions, and opinions set forth in my *Report*.

13.  Plaintiff does not appear to contend that any of these observations are incorrect, only that they are misleading because their "cumulative effect" is to "imply" that the returns were filed in "bad faith."

### Criticism #6

14.  Plaintiff challenges my independence and objectivity as an expert retained by the government in this case.  This allegation is untrue.

- As an academic and as a member of the profession, there is nothing more important to me than my reputation for honesty, integrity, and competence—in the classroom, in my research and writing, in my consulting work, and in my expert witness engagements.

- In all of my expert witness engagements, including this one, I have made it explicitly clear to the attorneys seeking to retain me that, if retained, I

---

[5]  *Plaintiff's Motion*, pp. 20-23.

would "let the chips fall where they may," that I would be independent, unbiased, and objective in my review the facts, in the design and execution of my analyses, and in the expression of my conclusions and opinions.

**Criticism #7**

15. Plaintiff takes issue with my use of words like "may," "[i]t's possible," "presumably," "I have an impression," etc.  He characterizes these as "weasel words," and claims that my use of them reflects a lack of requisite knowledge and experience.

- These assertions misconstrue my *Report* and my deposition testimony.

- I used these terms and phrases in connection with outcomes resulting from the decision processes of knowledgeable and experienced tax professionals, outcomes which, however likely, cannot by their nature be definitively stated with mathematical precision.

**Limited Scope of *Plaintiff's Motion***

16. In my *Report* and in my *Rebuttal Report*, I expressed several opinions and conclusions.  Aside from his challenges to my qualifications and to his allegation that I am a "partisan advocate," it appears that the only opinions that the Plaintiff takes any specific issue with are those set forth in ¶226[6] and ¶229,[7] and in ¶228[8] of my *Report*.

- The *Plaintiff's Motion* does not otherwise specifically refer to, discuss, or criticize any of the conclusions and opinions at ¶224, ¶225, ¶227, ¶230, or ¶231 of my *Report*.

---

[6]    "226.  In my opinion, based on my review of the record and the analysis and discussion presented in this *Report*, it would be reasonable to conclude that Fidelity International reported the Transaction on its Form 1065s in a manner that was designed to reduce or minimize the actual or perceived risk of detection and audit by the IRS."

[7]    "229.  In my opinion, based on my review of the record and the analysis and discussion presented in this *Report*, it would be reasonable to conclude that the Fidelity International Losses were reported on the Egans' Form 1040s in a manner that was designed to reduce or minimize the actual or perceived risk of detection and audit by the IRS."

[8]    "228.  In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS may have increased significantly if these amounts had been properly adjusted and reported."

Plaintiff's criticism of this opinion is that I use the "very tenuous" (Plaintiff's term) word "may" in that opinion. *Plaintiff's Motion*, p. 7.

- The only specific reference that Plaintiff makes to anything in my *Rebuttal Report* is the fact that I pointed out that Mr. Smith did not consider or otherwise make any reference to the fact that KPMG refused to sign the Egans' 2001 Form 1040 in rendering his opinions.[9]  The *Motion* does not refer to, discuss, question, or otherwise criticize anything else in my *Rebuttal Report*.

## Response to Criticism #1:
## My Qualifications as an Expert

17.  Plaintiff asserts that I am "not qualified to opine on the IRS return selection process," that my "background and qualifications do not provide a foundation for [me] to address questions regarding the actual risk of an IRS audit."  This assertion appears to be based on the fact that I have never worked for, advised, or consulted with the IRS regarding the tax return development, selection, or auditing processes.

18.  Plaintiff also asserts that I do not have the requisite "knowledge, skill, experience, training or education"[10] to opine on tax return preparation since I have "never been engaged in return preparation in any meaningful way."[11]

19.  Finally, Plaintiff asserts that I am "not qualified to opine on the DIF selection process."[12]

- As I stated in my responses to questions I was asked in my deposition, the specific types of tax return information and data that is captured and used in calculating a tax return's DIF score and the formula for calculating that score are closely guarded secrets within the IRS and are not otherwise publicly available or independently ascertainable.

---

[9]    *LaRue Rebuttal Report*, ¶29, first sentence.

[10]   *Plaintiff's Motion*, pp. 3, 15-16.

[11]   *Plaintiff's Motion*, p. 15.

[12]   As stated in footnote 56 of *Plaintiff's Motion*, "DIF" stands for "discriminant function" and it is "an automated system for scoring individual tax returns according to their audit potential.  *Plaintiff's Motion*, pp. 11-12.

- Plaintiff mischaracterizes my *Report* when he suggests that some or all of my opinions are based on a knowledge or a claimed knowledge of the actual DIF scoring process.  Clearly they are not.[13]

- However, as I will discuss below, I am very knowledgeable regarding the manner in which transactions and activities are to be reported on the tax returns and how these returns would be evaluated by knowledgeable and experienced tax professionals.

**Educational Background,
Professional Training, and
Experience**

20. A brief summary of my academic and professional education and experience in presented in my *Report* at ¶1 through ¶3.  My Curriculum Vita is attached to that *Report* as Appendix A.

21. **Formal Education:**  I hold a Bachelor of Business Administration degree (majoring in production logistics management), a Master of Science in Accountancy degree (majoring in accounting and federal taxation), and a Ph.D. degree (with honors) (with major fields of study in accounting and taxation, and a supporting field of study in economics).

22. **Post-Doctoral Education, Research, Publication, and Service:**  Throughout my career, I have consistently engaged in a wide range of academic and professional activities to further develop, refine, and expand my knowledge, skill, and experience in my fields of expertise.  These activities are described in some detail below, as well as in my Curriculum Vita.  These activities have enabled me to gain an in-depth knowledge and understanding of, among much else, the manner in which transactions and activities are to be reported on the tax returns ("tax compliance") and how these returns would be evaluated by knowledgeable and experienced tax professionals.

---

[13]  See, for example, *LaRue Deposition* at 170:16-21:

"Q  Are you opining - -  I'll cut straight to the chase.  I think you referred to this earlier as a highly secretive process, the DIF score process.  Are you referring to the actual detection or selection through the DIF score process?"

"A  Of course not."

23. **University of Virginia:**  I am currently an Associate Professor of Commerce at the McIntire School of Commerce at the University of Virginia, where, throughout the past twenty-four years I have taught graduate and undergraduate courses on a wide range of subjects in the fields of taxation, accounting, and finance.[14]  I also served as the Director of the Graduate Accounting Program from 2000 through 2005.  In May, 2008, I will retire with promotion to Professor Emeritus of the University of Virginia.

- Each of the graduate and undergraduate tax courses that I have developed and taught at the University of Virginia have included lectures and case studies that have addressed the manner in which the covered transactions and activities were required to be reported and disclosed on the various federal income tax returns and attachments thereto.  Some of these classes addressed the procedures and processes used by the IRS to determine which returns it will select for audit.

- In this context, I have taught, reviewed, and evaluated hundreds of tax returns, tax schedules, and other disclosures required by the various provisions of the Internal Revenue Code, the Treasury Department Regulations, and IRS instructions.

24. **Consulting Experience (Development and Teaching of Continuing Professional Education Programs)**:  Since 1979, I have been retained as a consultant by three of the "Big-4" international public accounting firms (KPMG, Ernst & Young, and Deloitte & Touche), by Arthur Andersen, by the Washington National Office of the IRS Chief Counsel (retained by NYU Graduate School of Law), by the American Institute of CPAs, by Citigroup, and by several others.

- My work for these firms primarily involved the teaching and/or development of over two hundred 1-day, 3-day, and 5-day technical in-house training programs in the fields of individual income taxation, taxation of property transactions, partnership taxation, corporate

---

[14]  Prior to joining the faculty of the University of Virginia, I taught undergraduate tax and accounting classes at the University of Maryland and the University of Houston.

taxation, international taxation, taxation of corporate mergers and acquisitions, taxation of consolidated corporate tax returns, accounting periods and methods, and in other subject areas.

- Most or all of these programs included coverage of the manner in which the transactions and activities were to be reported on the tax returns and coverage of other compliance issues. Some programs covered IRS tax administration and the process by which tax returns are reviewed and selected for audit.

- Most of these programs were developed and taught to the staff-level and senior-level accountants who were responsible for the initial preparation and review of the tax returns prepared for the firms' individual, corporate, and partnership clients. Some of these programs were developed and taught to management-level and partner-level tax accountants, whose responsibilities typically included the final review of the clients' tax returns and the signing of those returns on behalf of the firm. Many of these participants, particularly manager-level and partner-level participants, were involved in tax controversies with the IRS and represented the firm's clients at various levels before the IRS.

- In this context, I have taught, reviewed and evaluated hundreds of tax returns, tax schedules, and other disclosures required by the various provisions of the Internal Revenue Code, the Treasury Department Regulations, and IRS instructions. Additionally, participants to these seminars regularly sought my advice on various technical and compliance issues that arose in connection with pending client-related tax returns, tax controversies, and other projects. Over the years, I have evaluated and informally advised on literally hundreds of client-specific issues for the tax professionals who attended my seminars.

- The education, training, knowledge, skill, and experience that I have gained in over thirty years of study and practice in this field includes regular, sustained professional interactions with hundreds of graduate

and undergraduate accounting students, and with literally thousands of tax professionals and tax return preparers working for three of the largest public accounting firms in the world and for others.

25. **Consulting Experience (Expert Witness)**:  Since 1994, I have been retained as an expert in several cases, many of which were settled prior to trial, and some of which are still pending.  In each if the cases for which I have agreed to serve as an expert, it has been with the explicit understanding that I would review the facts and render my opinions objectively, independently, and without bias.

- I have been retained as an expert by the IRS Chief Counsel's Office, the Department of Justice (Tax Division), Department of Justice (Economic Crimes), Ernst & Young, and the law firms of Clifford Chance, Fox Rothschild, Heller Ehrman, and Lash & Goldberg.

- I have been recognized as an expert in tax, accounting, and/or finance in nine cases.[15]  As of the date of this Declaration, my recognition as an expert was challenged in four of these cases[16] and in two others that have yet to go to trial.[17]  Each of these challenges was denied by the presiding court.

26. As the above discussion has shown, I am well qualified to opine on issues that I have addressed in my *Report* and in my *Rebuttal Report.*  My education, my knowledge, my training, my skill, and my experience are the product of my graduate and post-graduate education and study and of the wide range of sustained academic and professional activities and accomplishments that have characterized the past thirty years of my professional career.

---

[15]  *Consolidated Edison Company of New York, Inc. & Subsidiaries v. U.S.* (2007), U.S. Federal Claims Court; *Tyson Foods, Inc. and Subsidiaries v. U.S.* (2006), U.S. Tax Court; *TransCapital Leasing Associates 1990-II, L.P. v. U.S.* (2005), Federal District Court; *Ernst & Young, arbitration panel* (2002); *Coggin Automotive Corporation v. Commissioner* (1999), U.S. Tax Court; *Wal-Mart v. Commissioner* (1996), U.S. Tax Court *U.S. v. Perlman* (1996), U.S. Federal District Court; *The Kroger Company v. Commissioner* (1995), U.S. Tax Court; *Dayton Hudson Corporation v. Commissioner* (1994), U.S. Tax Court.

[16]  *Consolidated Edison* (at trial); *TransCapital Leasing Associates 1990-II* (pre-trial motion); *Coggin Automotive Corporation* (pre-trial motion), *Dayton Hudson Corporation* (at trial).

[17]  *Schering-Plough Corporation v. U.S.* (2007 – trial pending), U.S. Federal District Court; and *Procter & Gamble v. U.S.* (2006 – trial pending), U.S. Federal District Court.

**My Methodology**

27. In preparing my reports in this case, I applied my knowledge, training, skill, experience, and cumulative insights, particularly the insights gained from the regular, sustained professional interactions that I have had with hundreds of graduate and undergraduate accounting students, and with thousands of tax professionals and tax return preparers throughout the past thirty years:

- To impartially review the various tax returns and other documents in this case;

- To impartially analyze and evaluate the manner in which the Transaction (and the various elements of the Transaction) and Losses were respectively reported on the Fidelity International and Egan tax returns for 2001 and 2002;

- To determine whether or not a reasonably diligent and independent review of the information disclosed on or with these respective returns by an experienced tax professional would have or should have revealed or provided any reasonably discernable indication of certain specified elements of the Transaction and Losses (e.g., existence and magnitude of the Transaction-related Fees that were accrued and paid, the source of the Egans' tax basis in Fidelity International, etc.);[18]

- To opine as to whether or not, taking into account all of these factors, it would be objectively reasonable to conclude that these returns were, from the perspective of a knowledgeable and experienced tax professional who is not an IRS classifier or examiner,[19] prepared in a manner that could reasonably be expected to reduce or to minimize the risk that the Transaction or Losses would be detected by the IRS, and, ultimately, that the Returns would be selected for audit by the IRS;[20,21] and

---

[18]  See, for example, the conclusions and opinions set forth in my Report at ¶224, ¶225, ¶227, ¶230, and ¶231.

[19]  That is, a tax professional who would be preparing or reviewing tax returns for filing with the IRS.

[20]  See ¶226 and ¶229 of my *Report*, reproduced *supra.*, at footnotes 6 and 7, respectively.

- To opine as to whether or not certain amounts were properly reported on Fidelity International's Schedules L, M-2, and the Schedule K-1s of its members,[22] and whether or not the manner in which these amounts were reported could have reasonably been expected to increase the risk of detection and audit by the IRS.[23]

28. Although the DIF scoring process is highly classified and very few people inside or outside the IRS know anything about how the formula operates or how it is derived, the next part of the selection process is well-known. Tax returns that receive a high DIF score are then reviewed at the IRS Service Center by "classifiers." The Plaintiff's *Motion* refers to this stage of the process as the District Office's review process. That is not entirely correct. This review process initially takes place at the Service Center level. Classifiers may be able to review many tax returns in a day to determine which of them merit further inspection and review. The classifiers determine whether a return is to be accepted as filed or sent on for possible further inspection and review at the District Office (or sub-district office) level, and, ultimately, whether or not the return will be subjected to an actual audit (and, if so, what type of audit (e.g., office audit, field audit) that return will be subjected to).

29. Thus, the tax return selection process is a multi-step process that involves (a) quantitative and qualitative factors, such as the DIF score, and (b) the judgment and subjective decision processes of one or more IRS classifiers and examiners, each with his or her own unique educational background, scope and depth of experience, aptitude, etc.

---

[21] Of course, if the Returns had been selected for a full audit, the Transaction and the Losses would almost certainly have been detected. But that is not an issue that I addressed anywhere in my reports.

[22] See ¶227 of my *Report:*

"In my opinion, the amounts reported on Fidelity International's Schedules L, M-2, and the Schedule K-1s of the members were not properly reported and were misleading."

[23] See ¶228 of my *Report:*

"In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS may have increased significantly if these amounts had been properly adjusted and reported."

Here, I opine that it would be objectively reasonable to conclude that the risk of detection and audit may have increased significantly if a Return showing the correct amounts (¶147 through ¶180 of my *Report*) had been filed and subsequently reviewed by a knowledgeable and experienced IRS tax professional.

30. While DIF scores and other tools and techniques are used by the IRS to help identify many of the tax returns that should be manually reviewed and considered for an IRS audit, the decision to either accept a particular tax return "as filed" or, conversely, to select that return for further evaluation and possible audit, is ultimately made by IRS personnel who are knowledgeable and experienced tax professionals.

31. Although the manner in which a taxpayer's transactions and activities are reported and disclosed (or not disclosed) on the tax return will affect the "actual" likelihood that that particular return will be selected for an IRS audit, it is generally impossible to know with certainty whether any specific disclosure (or nondisclosure) or whether the cumulative or combined effect of two or more disclosures (and/or nondisclosures) will necessarily increase the actual risk of detection and audit (and, if so, by what order of magnitude), decrease the actual risk of detection and audit (and, if so, by what order of magnitude), or have no effect on the risk of detection and audit. This is because:

- The specific types of tax return information and data that is captured and used in calculating a return's DIF score and the formula for calculating that score are closely guarded secrets within the IRS and are not otherwise publicly available or independently ascertainable, and, as noted above,

- The tax return selection process is ultimately based on the judgments and subjective decision processes of knowledgeable and experienced tax professionals.

32. In my *Report*, I examined the Returns and opined on whether or not the reporting of the various components of the Transaction on the Returns made it more difficult, or impossible, to detect at the multi-level-review selection process and before a return is actually chosen for a full-scale audit.

### Response to Criticism #2:
### I Do Not Express any Opinion or Conclusion
### As to State of Mind or Motivation

33.  Plaintiff mischaracterizes the opinions expressed in my *Report* at ¶226 and

¶229 when he refers to these opinions as " . . . opinions regarding the states

of mind and motivations of those involved in preparing the tax returns . . .

."[24] and as "[LaRue['s] . . . conclusions regarding FICA A Fund's and

Plaintiff's intent . . . ."[25]

34.  I rendered no opinion as to the state of mind or the motivation of the Plaintiff

or those involved in the preparation and filing of the Returns.  This is clearly

shown:

- By the unambiguous language used in my *Report* to express my
  opinions;

- By the analyses and descriptions presented in my *Report* in support of
  my opinions;

- By my conclusions and opinions regarding whether or not various other
  elements of the Transaction were reasonable ascertainable from the
  disclosures made on or with the Returns; and

- By my deposition testimony in which I stated, without qualification or
  equivocation, that I was not testifying as to the subjective state of mind
  of the Plaintiff or of any of the individuals involved in the preparation and
  filing of the Returns.

35.  The Plaintiff himself seems to recognize this in his *Motion*.

- "[LaRue] . . . <u>does not opine</u> that the manner of reporting on the
  [Returns] . . .*actually* reduced the risk of audit or was in fact intended to
  reduce [the risk of audit]."[26]

- "*LaRue tries to finesse* the issue by making suggestions and inferences
  regarding intent while, at the same time, denying that he is offering any
  opinion as to state of mind or intent.  Indeed, *in LaRue's deposition he
  insisted that '[n]owhere in this report have I expressed an opinion as to*

---

[24]  *Plaintiff's Motion*, at p. 1.

[25]  *Plaintiff's Motion*, at p. 6.

[26]  *Plaintiff's Motion*, at pp. 2-3.  Underlined emphasis supplied, italicized emphasis in original.

*the subjective state of mind of the taxpayers* in terms of how they reported this return.' *While such denials may be technically correct*, they are misleading and disingenuous."[27]

36.  Plaintiff's sole basis for making his assertions is that:

> ". . . conclusions that someone 'perceived' the risk of detection and audit and then 'designed' the tax reporting to minimize that risk necessarily encompass the state of mind and motivation of one or more of the persons responsible for preparing the returns of FICA A Fund and Plaintiff."[28]

- Plaintiff does not appear to challenge the accuracy or completeness of the facts set forth anywhere in my *Report* and on which I based my opinions and conclusions.

- Plaintiff does not appear to assert or suggest that I have ignored or omitted facts that might have supported contrary conclusions and opinions.

37.  As I stated above, my opinions at ¶226 and ¶229 of my *Report* are based on the application of an objective standard that looks to the decision processes and perceptions of knowledgeable and experienced tax professionals.

- In applying this standard:

  o  I evaluated the significance or potential significance of the information that was disclosed on the Returns (and how and where that information was disclosed); and

  o  I evaluated the significance or potential significance of information that could have, or should have, been disclosed on or with those Returns, but that was not disclosed.

- Based on this review and analysis, I concluded that the manner in which the Transaction and Losses were reported on the Returns was not sufficiently complete, descriptive, or, in some cases, accurate, to have enabled a knowledgeable and experienced tax professional to determine

---

[27]    *Plaintiff's Motion*, at pp. 6-7.  Emphasis supplied and footnote omitted.

[28]    *Plaintiff's Motion* p. 7.

the nature of the Transaction and the source of the Loss from an independent review of the filed Returns.

- On this basis, I concluded that it would be objectively reasonable to conclude that the manner in which the Transaction and Losses were reported on the Returns was designed to reduce or to minimize the actual or the perceived risk that the Transaction and Losses would be detected by the IRS, and, ultimately, that the Returns would be selected for audit by the IRS.[29]

## Response to Criticisms #3 through #6:
## I Am Not a "Partisan Advocate"

38.  Plaintiff alleges that I am a "partisan advocate" for the government in this case.  He bases this criticism on four assertions:

- First, that I have impermissibly summarized factual evidence,

- Second, that I have placed a "slant" or "spin" on the facts,

- Third, that I have provided "misleading observations" that do not relate to my opinion; and

- Fourth, that I have a financial incentive to be a partisan advocate and that it necessarily follows that I am therefore a partisan advocate.

## Response to Criticism #3:
## My Descriptions of the Returns and Other Related Documents
## Were Essential To Understanding the Rationale and Support For
## My Analyses, Conclusions, and Opinions

39.  My *Report* contains detailed descriptions of the Returns and certain of the participants' own documents that I found to be relevant to my analyses, conclusions, and opinions.

40.  I included these descriptions and factual summaries in my *Report* for two reasons:

---

[29]  As previously observed, if the Returns had been selected for a full audit, the Transaction and the Losses would almost certainly have been detected.  But that is not an issue that I addressed anywhere in my reports.

- To provide the context, background, and support for my analyses, conclusions, and opinions; and

- To provide the transparency that would enable the Plaintiff, his attorneys, and his experts to independently evaluate the accuracy and the completeness of the facts on which my analyses, conclusions, and opinions are based.

41. It does not appear that Plaintiff challenges either the accuracy or the completeness of the facts that I relied on in conducting my analyses, in arriving at my conclusions, or in forming my opinions.

- Nor does it appear that Plaintiff challenges the authenticity or reliability of the referenced source documents.

42. For these reasons, my descriptions of the Returns and other related documents were included in my *Report* to provide the background and support for my analyses, conclusions, and opinions.

- Plaintiff's assertions that these descriptions are misleading, that they are indicative of advocacy, that they are one-sided, and that they do not relate to my analyses, conclusions, and opinions are untrue.

### Response to Criticism #4:
### My Descriptions of the Returns and Other Related Documents Were Accurate and Did Not "Slant" Or "Spin" the Facts

43. Plaintiff also takes issue with a few of the many descriptive terms that I used in my *Report* and claims that my use of these terms, rather than alternative terms suggested by the Plaintiff in his *Motion*, supports his assertion that I am a "partisan advocate." I disagree.

44. The Transaction in this case was extremely complex and over two million pages of documents were produced and provided to me for review and analysis.

45. In writing my *Report*, I endeavored to provide an accurate, complete, readable, understandable, and objective description of these complex facts

in order to provide the background and support for my analyses, conclusions, and opinions.

46.   Furthermore, many of the terms listed in *Plaintiff's Motion* as indicative of bias are actually terms that are similar or identical to those used in the participants' own documents.  For example:

- **"Desired Loss."**  See Bates 2EGAN011979, which uses the term "desired result" to refer to the Loss at issue in this case.  See also Exhibit D to *Plaintiff's Motion* at Bates 011549 which shows the desired loss to be $150,000,000, the "transaction size."

- **"Transaction size."**  This is the term used by James Haber (Exhibit E to *Plaintiff's Motion*:  "Helios 2 transaction size is $150 million."

- "[LaRue] asserts that the FICA A Fund transaction was 'designed to generate [a loss].'"[30]

  o  This is not an assertion, it is a fact that is based on the *Transaction Presentation* cited at footnote 34 of my *Report*[31] and included in Exhibit D to the *Plaintiff's Motion*.

- "[LaRue] also states that the fees . . . were a fixed percentage of the loss, even though the documents upon which LaRue purports to rely do not so state."

  o  The documents that I cited at footnote 131 of my *Report* are the documents on which I relied, not "purported" to rely.

  o  See "Outline of Proposed Transaction" attached to *Plaintiff's Motion* (at Exhibit C, Bates 011353) and Exhibit E, which express the fees as a "% of $150M," the transaction size.

- **"Basis Trades."**  Plaintiff states that my choice of this term serves no purpose other than to advocate a particular interpretation of the facts.

  o  First, this term is an accurate description of the options:  it is irrefutable that these options were in fact used to create the tax basis used by the

---

[30]   *Plaintiff's Motion*, p. 19.
[31]   Bates: 2EGAN011549.

Plaintiff to determine the amount of the Loss.  Consequently, there is nothing false, misleading, or biased about my choice of that term to describe them.

o   Plaintiff asserts that a "neutral party" might describe these as "interest rate options."  That is true.  But a neutral party could also describe them as "basis options."  This term is not an "inflammatory" term and it is not inaccurate or misleading.  It accurately describes the effect that these options had in creating the Loss deductions claimed by Fidelity International and the Egans.

o   See also an e-mail to Stephanie Denby, in which Phil Kampf of Helios refers to these options as the "basis creation options."[32]

- Plaintiff claims that my reference to "the '$325,[5]00 amount' that Plaintiff paid to purchase a portion of Samuel Mahoney's common interests . . ." was misleading because the dollar amount is not set forth in the *Operating Agreement*.

o   Plaintiff misstates my Report.  What I stated in my *Report* was:

"84.  This $325,[5]00 amount that Mr. Egan paid for this interest was the same amount as the purchase price specified in the *Transaction Outlines* and the *Transaction Presentation*.

"85.  This $325,[5]00 amount was *established* in Section 14.6 of Fidelity International's *Operating Agreement*.

"86.  Each of the *Transaction Outlines* stated that, after the purchase of the Gain/Loss Options, Mr. Mahoney '*will sell* a portion of his common interests . . . [to] Richard J. Egan . . . [for] $325,500.'[33]  [Emphasis supplied.]"

o   As can be seen from these excerpts, there is nothing false, misleading, or inflammatory about the way I described the amount paid to Mr. Mahoney to purchase his interest.  The amount that was actually paid to him was the same amount that the *Transaction Outlines* and

---

[32]    Bates:  12CARRUTH059639.

[33]    Bates: 2EGAN011618 (September 20), 1EGAN011353 (September 27), 2EGAN012449 (October 16), and 2EGAN011963 (October 25).  The 85% referred to in the three earlier outlines was increased to 88% in the October 25 outline.

*Transaction Presentations* stated would be paid to him, and the formula for determining that amount was set forth in the *Operating Agreement*.

o   The Plaintiff's assertion that at my deposition I "conceded"[34] that only the formula, and not the actual amount, was set forth in the *Operating Agreement* suggests that I was correcting a misleading or false statement made in my *Report*.  That is not true, as the above-quoted passages make clear.

### Response to Criticism #5:
### "Observations" Are Not Misleading and
### They Are Germane to My Analyses, Conclusions, and Opinions

47.   Plaintiff asserts I have made several observations that are (1) misleading and that (2) do not relate to any of my analyses, conclusions, or opinions.

48.   Plaintiff does not appear to contend that any of these observations are incorrect, only that they are misleading because their "cumulative effect" is to "imply" that the returns were filed in "bad faith."

49.   These observations were part of my description of the Returns and they form the background and support for the analyses, conclusions, and opinions set forth in my *Report*.

50.   Most of these observations related directly to my opinions, particularly to my opinions at ¶226 and ¶229.  For example:

•   Regarding item (1) at p. 20 of *Plaintiff's Motion*, as I stated in my deposition, I did not opine on the legal issue of whether or not a Form 8264 should have been filed by Fidelity International.  In my *Report*, I simply observed that this Form was not filed.

o   The significance of this observation is that *if this form had been filed*, even if it was not required to have been filed, it would be reasonable to conclude that the risk of detection and audit would have increased and would have therefore been indicative (possibly conclusive) that

---

34   *Plaintiff's Motion*, p. 20.

the manner in which the Transaction was reported on the Fidelity International return was not designed to reduce or minimize the actual or perceived risk of detection and audit.

- Similarly, regarding item (3) at page 21 of *Plaintiff's Motion*, as I stated in my deposition, I did not opine on the legal issue of whether or not the Fees should or should not have been capitalized to the options.

  o I observed that they were capitalized and that, as a result, it would not have been possible for an experienced IRS classifier/examiner to have discerned the fact that these Fees had been paid.

  o The significance of this observation is that regardless of whether or not separate disclosure of these Fees was required by law, if they had been separately disclosed, it would be reasonable to conclude that the risk of detection and audit would have increased and would have therefore been indicative that the manner in which the Transaction was reported on the Fidelity International Return was not designed to reduce or minimize the actual or perceived risk of detection and audit.

  o Regarding my commentary on the treatment of the Fees, Plaintiff states in his *Motion* that "When pressed on this statement, however, [LaRue] admitted that, as a general matter, when a taxpayer disposes of an asset the various costs making up the taxpayer's basis in the asset are not separately identified on the tax return."

    ▪ This mischaracterizes my testimony and suggests that I was "pressed" into "admit[ting]" something that was false or misleading in my *Report*. This is simply not true.

51. The observations that are listed at paragraphs numbered 4, 5, 6, 8, and 9 at pages 21 through 23 of *Plaintiff's Motion* similarly relate directly to my opinions and to the rationale for them.

- These are factual observations that are based on my review and analysis of the Return, the accompanying workpapers, and other documents.

- If any or all of these disclosures had been made, whether or not required by law or by IRS instructions, the disclosures would, in my opinion, have been indicative (or possibly conclusive) that the manner in which the Transaction and Losses were reported on the Returns was *not* designed to reduce or minimize the actual or perceived risk of detection and audit.

52.  At paragraph (2) Plaintiff states that my observation that Fidelity International election of the accrual method ". . . implies that FICA A Fund's 'election' of the accrual method was inappropriate."[35]

- Plaintiff's assertion mischaracterizes this observation and is contradicted by the plain language of ¶135 of my *Report*, which does not affirmatively state, and does not in any way suggest, that this election was or may have been inappropriate.

- Rather, this observation:

    o  Notes an inconsistency between Fidelity International's *Operating Agreement* and its 2001 Return;

    o  Describes the effect of the election on the amounts reported its 2001 and 2002 Returns; and

    o  As set forth in footnote 142 of ¶135, helps to explain some of the amounts presented in Table 2 of my *Report*.

53.  At paragraph (7) on page 22 of his *Motion*, Plaintiff quotes a passage from my background description of the Returns that observes that "Michael Egan signed the Egan's 2001 and 2002 Returns under a Power of Attorney."[36]

- As I stated in my deposition when asked if I was opining on the propriety of Michael Egan signing those Returns, "I don't see anything here that

---

[35]  *Plaintiff's Motion*, p. 21.

[36]  *Plaintiff's Motion*, p. 22.

would remotely suggest that I'm opining there was anything proper or improper about his having signed that return."[37]

54. Plaintiff further alleges that "these observations, and others, are misleading because LaRue does not disclose in his reports that he is not opining on whether the reporting was proper or improper."[38]

- This assertion is clearly contradicted by my *Report*.

- First, these observations are presented in the section of my *Report* that describes the Returns. None of them are presented in the section of my *Report* titled "Summary of Conclusions."

- Second, there is no affirmative statement, or pretense, or suggestion in the wording of any of these observations that I am opining on whether or not the reporting was proper or improper.

55. Plaintiff further asserts that "The cumulative affect (and apparent purpose) of these observations, which are irrelevant to LaRue's conclusions, is to insinuate that TICAA A Fund and Plaintiff improperly reported the FICA A Fund transaction and attempted to hide the transaction from the IRS."[39]

- As stated above, all of the observations challenged by Plaintiff in his *Motion* are part of my background description of the Returns, and with the exception of my observation at paragraph (7) that Michael Egan signed the Egan's 2001 and 2002 Returns, all of these observations provide crucial factual support for my conclusions and opinions.

## Response to Criticism #6:
## "Partisan Advocate" Allegation is Untrue

56. As an academic and as a member of the profession, there is nothing more important to me than my reputation for honesty, integrity, and competence — in the classroom, in my research and writing, and in my expert witness

---

[37] *LaRue Deposition*, 203:13-18.

[38] *Plaintiff's Motion*, p. 23.

[39] *Plaintiff's Motion*, p. 23.

engagements.  I am not, never have been, and never will be a so-called "hired gun."

57.  In all of my expert witness engagements, including this one, I have made it explicitly clear to the attorneys seeking to retain me that, if retained, I would "let the chips fall where they may," that I would be independent, unbiased, and objective in my review the facts, in the design and execution of my analyses, and in the expression of my opinions.

- In this regard, I do not, for example, accept externally imposed scope limitations regarding my access to the all of the documents produced in a case, and I do not accept externally imposed scope limitations regarding the analyses that I conduct or the opinions that I render in my reports.

- I make every effort to write reports that clearly describe my understanding of the facts on which I ultimately base my analyses, conclusions, and opinions.  One of my objectives in doing so is to provide the transparency that should enable opposing counsel and its experts to independently evaluate the accuracy and the completeness of the facts on which my analyses, conclusions, and opinions are based.[40]

  o  If, notwithstanding my best efforts, I am in some way mistaken in my understanding of the facts, or if I have inadvertently overlooked a relevant fact, I want any such mistakes or oversights to be evident to anyone that might peruse and evaluate that report.

- In this case, as in all others, I have made every effort to inform the Court with analyses, conclusions, and opinions that are competent, unbiased, understandable, and complete.

---

[40]  "A . . . Also, I try to make my reports as transparent as I possibly can, and to that end, I cite in the footnotes to the report as I discuss my understanding of the facts and circumstances those documents on which I principally relied in preparing my report. And of course, the purpose of that is transparency, both in terms of the attorneys for the government reviewing and making sure that my understanding of the facts is complete and correct, that there are no errors or omissions. It's also there so that you and your experts have an opportunity to review my facts, the facts and circumstances on which I am relying for the purposes of identifying any mistakes or omissions that there may be. It's particularly important where you have a case that involves over 2 million pages of documents." *LaRue Deposition*, 138:20-22 and 139:1-14.

58.  As I stated in my *Report* at ¶13, I have no personal interest or bias with respect to any of the parties involved in this litigation and my compensation is not in any way contingent upon the nature of my findings, the opinions expressed in this *Report*, or the outcome of this case.

**"Primary Occupation"**

59.  Plaintiff asserts that "It is fair to say that LaRue's primary occupation is being an expert consultant for the government."[41]

- First, and most importantly, even if serving as an expert consultant for the government were my primary occupation, which it is not, it would not mean that I was therefore a "partisan advocate."

- Second, when asked at my deposition whether I considered consulting or my position as a professor at the University of Virginia to be my principal occupation, I stated that I considered them both to be.[42]

- Third, and for the reasons stated below, I simply disagree with Plaintiff's interpretation and conclusion as expressed in the above-quoted sentence from his *Motion*.

  o  **University of Virginia.**  Although my compensation at UVa has more or less consistently been less, or in some years, substantially less than my compensation as a consultant, in any given year, the total amount of the time that I spend preparing for and teaching my classes, on research and publication,[43] on internal service and administrative activities,[44] and on noncompensatory external

---

[41]  *Plaintiff's Motion*, p. 25.

[42]  *LaRue Deposition* at 85:9-22 and 86:1.

[43]  Items listed and described under the headings of "Publications," "Proceedings," and "Research In Process" of my Curriculum Vita.

[44]  Items listed and described under the headings of "Internal (University of Virginia)," and "Other" ("Faculty Advisor" listings), and Professional Organization Memberships (faculty advisor to honorary accounting fraternity for seven years).

academic and professional service activities[45] has almost always far exceeded the amount of time I have devoted to my consulting work.[46]

o **Expert Consultant to Nongovernmental Firms**.  As previously stated, my expert consulting has included several engagements in which I was retained by nongovernmental clients.[47]

o **MicroStrategy Corporation.**  Since 2006, I have served as an outside director on the Board of Directors of MicroStrategy Corporation.  I also serve as chairman and designated "financial expert" of its Audit Committee.  I am compensated for this work, and, in addition to the four Board meetings and the five Audit Committee meetings each year, I devote a substantial amount of my time throughout the year to fulfilling my obligations as the firm's Audit Committee chairman.

o **Strategic Pathways, LLC.**  I am the co-founder and co-owner of a small start-up firm.  Strategic Pathways was formed in 2001 and is licensed by the National Association of State Boards of Accountancy to offer Continuing Professional Education programs to CPAs. Strategic Pathways was formed to develop high quality, distance-learning continuing professional and legal programs to CPAs, attorneys, certified financial analysts, and others on a wide range of technical topics in the fields of tax compliance, strategic tax planning, financial and cost accounting, and finance.  Since 2001, I have devoted well over 2,000 hours to this project.

o **Consulting to Public Accounting Firms and Others.**  From 1980 to 2004, I was retained as a consultant to three of the "Big-4" international public accounting firms (KPMG, Ernst & Young, and

---

[45] Items listed and described under the headings of "Invited Congressional Testimony," "Testimony Before Internal Revenue Service Office of Chief Counsel," "External Committee Memberships," "Article Reviewer," and "Tax Institute, Etc. Presentations."

[46] Although research and publication and, to some extent, external service activities, are expected of university professors (and may result in tenure, promotion and relatively small salary increases), I receive no direct compensation for thousands of hours that I have devoted to these activities and that I continue to devote to these activities.

[47] *Supra.*, ¶25.

Deloitte & Touche), to Arthur Andersen, to the Washington National Office of the IRS Chief Counsel (retained by NYU Graduate School of Law, which sponsored these programs), to the American Institute of CPAs, to Citigroup, and to several others.  I was retained to teach and/or develop a wide range of courses in the field of taxation.  Since 1979, I have developed and/or taught over two hundred such programs.

60.    My "primary occupation" has not been serving as an expert consultant for the government.

## Response to Criticism #7:
## "Partisan Advocate" Allegation is Untrue

61.    Throughout his *Motion*, Plaintiff takes issue with my use of words like "may," "[i]t's possible," "presumably," "I have an impression," etc.  He characterizes these as "weasel words," and claims that my use of them reflects a lack of requisite knowledge and experience.[48]

- These assertions misconstrue my *Report* and my deposition testimony.

- I used these terms and phrases in connection with outcomes involving the decision processes and judgments of knowledgeable and experienced tax professionals.

- It is axiomatic that such outcomes, however likely, cannot, by their nature, be definitively stated with mathematical precision.  For me to have done so would have been inaccurate and misleading.

- This does not, of course, mean that whether or not a return will be selected for audit is "inherently unpredictable,"[49] but it does mean that the outcome cannot generally be predicted with certainty.

---

[48]    *Plaintiff's Motion*, p. 13.

[49]    At *Plaintiff's Motion*, p. 13, Plaintiff states: "According to LaRue, whether a return will be selected for audit is inherently unpredictable:"  Here, as elsewhere, he is using terms that I never used and he is attributing to me statements, conclusions, or opinions that I never made and that are contradicted by what I actually said in my *Report* and/or in my deposition.

62. Note further that where, given the nature of the issue, it was possible for me to make definitive statements of the conclusions and opinions resulting from my analyses, I did so.

63. For example, see the conclusions and opinions set for at ¶224, ¶225, ¶227, ¶228, ¶230, and ¶231 of my *Report*.

-----

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

David W. LaRue, Ph.D.
February 15, 2008