UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) | |
| | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| Plaintiff, | ) | 06-40130-FDS (D. Mass.) |
| | ) | |
| v. | ) | Judge Saylor |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Leave to File Attached Exhibits Granted |
| | ) | on April 17, 2008 |
| Defendant. | ) | |

**DECLARATION OF BARRY E. REIFERSON IN SUPPORT OF THE
UNITED STATES OF AMERICA'S MOTION TO COMPEL PRODUCTION
OF DOCUMENTS FROM PROSKAUER ROSE LLP**

I, Barry E. Reiferson, pursuant to the provisions of 28 U.S.C. §1746, certify as follows:

1.     I am a Trial Attorney with the U.S. Department of Justice, employed in the Tax Division,

Northern Region, with a post of duty at Washington, D.C.

2.     I am one of the assigned trial attorneys for defendant United States in this case.

3.     I make this declaration based upon my personal knowledge and the documents referenced

herein.

4.     The documents filed as Government Exhibits 18 through 23 in support of this motion are

true and correct copies of documents obtained by the United States in discovery in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, D.C., on this 18th day of April 2008.

/s/ Barry E. Reiferson
BARRY E. REIFERSON
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 514-6058

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants identified on the Notice of Electronic Filing and copies will be sent to those
indicated as non registered participants on April 18, 2008.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

Feb 28 2007 10:51      P.01

~6CV00990J

**COPY**

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
06 CVS _____

| | | |
|---|---|---|
| JOHN A. MCNEILL, JR., RONALD B. MCNEILL, SM TRADING LLC, SM EQUITIES LLC, RM TRADING LLC, RM EQUITIES LLC, and MCNEILL FAMILY LIMITED PARTNERSHIP, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | COMPLAINT (Jury Trial Demanded) |
| RSM MCGLADREY, INC., RONALD G. WAINWRIGHT, JR., THE DIVERSIFIED GROUP INCORPORATED, JAMES HABER, PROSKAUER ROSE LLP, and IRA AKSELRAD, | ) ) ) ) ) ) | |
| Defendants. | ) | |

NOW COME plaintiffs, John A. (Sandy) McNeill, Jr., Ronald B. McNeill, SM Trading LLC,

SM Equities LLC, RM Trading LLC, RM Equities LLC, and McNeill Family Limited Partnership,

for their Complaint against defendants, RSM McGladrey, Inc. and Ronald G. Wainwright, Jr. (the

"McGladrey defendants"), The Diversified Group Incorporated and James Haber (the "DGI

defendants"), and Proskauer Rose LLP and Ira Akselrad (the "Proskauer defendants") (all defendants

are sometimes hereinafter collectively referred to as the "defendants"), and hereby allege as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction in that the defendants are present and transact business

in this State and have committed tortious acts within this State, all as more fully described herein.

LR050384.WPD

**GOVERNMENT
EXHIBIT
18**

2.     Venue is proper in Wake County in that defendant Ronald G. Wainwright Jr. ("Wainwright") is, upon information and belief, a resident of Wake County, and Wake County is where a substantial portion of the events occurred out of which this cause of action arose.

3.     This Court has personal jurisdiction over each of the defendants. Each of the defendants either has a place of business in the State of North Carolina, has committed a tort in whole or in part in North Carolina, or has otherwise done business in North Carolina, or entered into a civil conspiracy with a defendant over which this State has jurisdiction, all as more fully described herein below.

## PARTIES

4.     Plaintiff John A. (Sandy) McNeill, Jr. ("Sandy McNeill") is a citizen and resident of Whiteville, North Carolina. Plaintiff Ronald B. McNeill ("Ron McNeill") is a citizen and resident of Wilmington, North Carolina. Sandy and Ron McNeill are sometimes referred to as "the McNeills."

5.     SM Trading LLC and SM Equities LLC are Delaware limited liability companies that are solely owned and/or controlled by Sandy McNeill, either individually or through the McNeill Family Limited Partnership ("MFLP," a North Carolina limited partnership). RM Trading LLC and RM Equities LLC are Delaware limited liability companies that are solely owned by Ron McNeill. SM Trading LLC, SM Equities, LLC, RM Trading LLC, RM Equities LLC, and MFLP (collectively the "LLCs") conducted a significant portion of their relevant business activities in North Carolina.

6.     Defendant RSM McGladrey, Inc. ("McGladrey") is an accounting and consulting firm and is a Delaware corporation with its principal place of business located at 3600 W. 80th Street, Suite 500, Bloomington, MN  55431-4510. McGladrey has multiple offices located in North

LR050384.WPD                    2

Carolina, including an office located in Raleigh. This defendant is continuously and systematically engaged in business in the State of North Carolina, as further described herein, and thus may be found in the State of North Carolina, has agents doing business in the State of North Carolina, and has committed tortious acts within the State of North Carolina.

7.    Defendant Ronald G. Wainwright, Jr. ("Wainwright") is, upon information and belief, a citizen and resident of Raleigh, North Carolina. Wainwright is a certified public account and is the Senior Managing Director of Tax at McGladrey. Wainwright is sued in his individual capacity and in his capacity as an agent or employee of McGladrey. At all relevant times, Wainwright acted within the course and scope of his agency or employment at McGladrey.

8.    Defendant The Diversified Group Incorporated ("DGI") purports to be an "investment advisor" and is a Delaware Corporation with its principal place of business located at 950 Third Avenue, 23rd  Floor, New York, New York 10022.  This defendant has continuously and systematically engaged in business in the State of North Carolina, as further described herein, and thus may be found in the State of North Carolina, and has committed tortious acts within the State of North Carolina.

9.    Upon information and belief, defendant James Haber ("Haber") is a citizen and resident of the State of New York. Haber is the president of DGI. Haber is sued in his individual capacity and in his capacity as an agent or employee of DGI. At all relevant times, Haber acted within the course and scope of his agency or employment at DGI.

10.    Defendant Proskauer Rose LLP ("Proskauer") is a law firm and is a New York limited . liability partnership with its principal place of business located at 1585 Broadway, New York, New York, 10036. This defendant has continuously and systematically engaged in business in the State

of North Carolina, as further described herein, and thus may be found in the State of North Carolina,

has agents doing business in the State of North Carolina, and committed tortious acts within the State

of North Carolina .

11.     Upon information and belief, defendant Ira Akselrad is a citizen and resident of the

State of New York. Akselrad is a Proskauer law partner in the firm's New York office. Akselrad

is sued in his individual capacity and in his capacity as an agent or employee of Proskauer. At all

relevant times, Akselrad acted within the course and scope of his partnership, agency or employment

at Proskauer.

## NON-PARTY CO-CONSPIRATOR

12.     BDO Seidman LLP ("BDO") is a New York limited liability partnership with its

principal executive office located at One Prudential Plaza, 130 East Randolph, Suite 2800, Chicago,

Illinois, 60601. BDO has multiple offices located throughout North Carolina. BDO is continuously

and systematically engaged in business in the State of North Carolina, and is named herein as a non-

party co-conspirator.

## BACKGROUND FACTS

### A.     THE DEVELOPMENT OF THE SCHEME - GENERAL BACKGROUND

#### 1.     About the McGladrey Defendants

13.     McGladrey is a U.S. member of RSM International, the sixth largest worldwide

accounting and consulting organization with more than 600 offices in 70 countries. McGladrey is

part of RSM McGladrey Business Services, an H&R Block wholly owned subsidiary. McGladrey

is a business services firm offering mid-sized companies business and tax consulting, wealth

management, retirement services, payroll services, and corporate finance.

McGladrey touts its "Core Values" as follows:

> *Client Focused*
>
> We are passionate about helping our clients. Their success is a big measure of our success.
>
> *Excellence*
>
> We take pride in doing our best in everything we do. We embrace chances to learn and grow.
>
> *Integrity*
>
> We are honest and ethical in everything we do.

McGladrey is also associated with more than 70 independently owned accounting and business consulting firms in 39 states and Puerto Rico through the "RSM McGladrey Network." Wainwright is the Senior Managing Director of Tax at McGladrey; in this capacity, Wainwright promoted and sold so-called investment tax strategies - which were, in reality, illegal and abusive tax shelters, to unsuspecting and trusting clients of McGladrey across the country. Prior to August 22, 2000, BDO and McGladrey formed a "strategic alliance" to jointly market investment tax strategies, such as those sold to the McNeills.

## 2.   About the BDO/McGladrey "Joint Venture"

14.   BDO is a national professional services firm providing tax, financial advisory and consulting services to private and publicly traded businesses. BDO claims to have provided quality service and leadership through the active involvement of experienced and committed professionals for more than 90 years. BDO maintains more than 35 offices and 250 alliance firm locations nationwide. As a member firm of BDO International, BDO claims to serve clients by "leveraging

a global distribution network of resources comprised of nearly 600 member firm offices in 99
countries." BDO International generated fee income of $2.6 billion in 2003, of which 45.06% was
attributable to the North American operations of BDO Seidman, LLP.

15.     On or about December 5, 2000, BDO was notified by the Internal Revenue Service
("the IRS") that "the Service believed that BDO was promoting potentially abusive tax shelters
substantially similar to those described in Notice 2000-44." The IRS had learned, through a
confidential informant, that BDO's "Tax Solutions Group" was marketing a series of transactions
characterized by BDO as "Capital Gains Eliminators." By Memorandum dated May 5, 2000, BDO
announced to all of its partners that its Tax Solutions Group had, year-to-date, generated revenues
in the amount of $77,089,425 from its tax shelter related sales. The Memorandum indicated that the
Tax Solutions Group was aiming to generate tax shelter revenues of $100 million by year end 2000.
During the months of May and June 2002, under the banner "Tax $ell$," BDO sent e-mails to all of
its employees announcing revenue received toward its $100 million revenue target. *This "Tax $ell$"*
*Memorandum included $2,448,000 in revenues for June 8, 2000 from, among others, Ron*
*Wainwright of RSM McGladrey.*

16.     By August of 2000, BDO was aware that the IRS was pursuing the purveyors of tax
shelters identified as "abusive" or illegal. In fact, by August of 2000, BDO had recognized internally
that the tax shelters it was marketing were subject to the federal government's "list requirements,"
that its tax shelters would be considered abusive and illegal by the IRS, and that the shelters lacked
economic substance. In sum, by at least August of 2000, if not sooner, BDO knew that the IRS
would reject these "tax solutions" or "tax products," and would reject any income tax deductions

made by a taxpayer who purchased one. By way of its "joint venture" with BDO, and otherwise, these facts were also known to the McGladrey defendants.

17.    By August 2000, with various governmental investigations underway, and according to BDO-related documents subpoenaed by the government, Deutsche Bank "put a moratorium on the FX options trading" associated with tax shelter sales. Likewise BDO recognized that "all of the Big-5 [accounting firms] will get out of the business." Despite such events, BDO did not follow suit. Instead, as one BDO official put it:

> *[N]o matter what happens now, BDO is not getting out, Its chairman is a tax partner <u>and they just formed a joint venture with McGladrey (owned by HR Block) for the purpose of expanding the tax consulting business . . . BDO considers itself the distribution channel and they are desperate for product.</u>*

### 3.    About Diversified

18.    Haber made a business proposal to attorney Paul Daugerdas in 1997.  Haber is president of The Diversified Group Incorporated (DGI), a New York company that devises and sells tax shelters. At the time, Daugerdas was a partner in the tax department at Chicago's Altheimer & Gray law firm. The two had known each other since the early 1990s. Haber had an idea for a tax shelter that he wanted Daugerdas to help create and Daugerdas expressed interest. Haber sent him some materials about the shelter so he could "get comfortable" with the deal. The two subsequently entered into a business arrangement, described by Haber this way: Daugerdas would work with Haber to develop and sell the shelter, eventually called COBRA. Daugerdas would then write opinion letters for the buyers, giving them legal backing for the deal. The pair would split the profits fifty-fifty. The venture was a great success. In 1997 Haber wrote to Daugerdas: "I want to express my sincere and heartfelt gratitude for the manner in which we have worked together over the past

year. I greatly appreciate the mutual respect and trust that we have developed for each other, and look forward to greater successes with you in the future." But in 2000 DGI sued Daugerdas, claiming that he was using DGI's idea but not giving DGI its cut. Daugerdas, who had since moved to the law firm Jenkens & Gilchrist, responded that no agreement prohibited him from using the shelter, adding that it was based on a nonproprietary strategy that anyone familiar with the tax code could figure out. At his deposition in the DGI case, Haber referred to Daugerdas as both his "marketing partner" and his lawyer. Haber testified that, "We would have conversations at least weekly, maybe more frequently, in which we would discuss where we were in the marketing of that particular idea." Upon information and belief, both Haber and Daugerdas are currently under investigation by the United States Department of Justice for their roles in creating and promoting tax shelters deemed illegal by the IRS.

19.    As reflected by documents subpoenaed by the United States Department of Justice, Haber and DGI later formed an alliance with BDO Seidman to produce, market and implement tax shelters. Haber also formed various entities to facilitate his tax shelter sales, such as "Alpha Consultants LLC" and "Helios Financial." BDO's formation of its joint venture with McGladrey led to the initiation of a referral and business relationship between DGI and McGladrey.

### 4.    About Proskauer Rose

20.    Proskauer Rose was one of a small group of carefully selected law firms used by BDO and McGladrey to write "opinion letters" supporting the legality, IRS compliance and *bona fides* of the various tax shelters they sold. By virtue of this relationship, Proskauer allowed BDO, McGladrey and DGI to use a template "marketing opinion letter" as a sales tool with prospective clients like the McNeills. If a deal was consummated, Proskauer would then receive a fee, paid directly or indirectly

by the client, for the rendering of an "independent" opinion letter "blessing" the actual transaction.

Upon information and belief, Proskauer also received fees from McGladrey and/or DGI, based on a percentage of the total value of the subject transaction. This was a secret fee, not disclosed to Proskauer's client. Moreover, at all relevant times, Proskauer, and the other law firms used to provide "marketing tax opinions" on BDO/McGladrey/DGI transactions, maintained an attorney-client relationship with DGI. This relationship, which created an unambiguous conflict of interest, destroyed Proskauer's "independence" from the shelter promoters.

### 5.    About Digital Options

21.    An option gives a buyer the right to buy or sell something at a definite price for a definite period of time, regardless of that something's then market price on the open market. That "something" may be stock, bonds, commodities (such as coffee or pork bellies), or intangible market valuations such as the Standard & Poors composite value. Options are said to be "in the money" if the price of the underlying "something" makes exercising the option profitable. Similarly, options are said to be "out of the money" when exercising the option would result in no gain or a loss. While options were originally and primarily developed as a "hedge" against declines in other investments, "plain vanilla" options have spawned a host of derivatives which are almost completely independent from any underlying investment or in some cases are not even tied to any underlying investment.

22.    Options may be either "American-style" or "European-style," depending upon whether the option purchaser has the right to exercise the option at any time before expiration or *only upon* the designated expiration date. Under an American-style option, the option holder can exercise the option by purchasing the shares at any time before the designated expiration date. Under a

European-style option, the option holder can elect to exercise the option only on the designated expiration date, and perhaps, as was true in this case, only at a certain time on that date.

23.    Digital options are "digital" in the sense that the investor wins or loses a pre-determined amount in full, *but only* if the strike price is met - thus, the option is either on or off, like a digital (binary) 1 or 0. As a result, they provide an investor with the same payout no matter how far above the strike price the underlying price goes. For example, a digital option may be presented as follows: an investor will receive $1,000 if ABC Corp. closes at or above $12 per share on June 24, 2003. If the price of ABC Corp. is at or above $12 per share on the closing date, the investor is paid $1,000. If ABC does not close at or above $12 per share, the investor gets nothing and loses what he originally paid for the option. No matter the outcome, however, stock in ABC Corp. never changes hands. Digital options are, in reality, nothing more than wagers that a certain commodity or equity price will be at or beyond (or beneath) a given price on a certain date.

24.    Digital options are ordinarily less expensive to purchase than standard options. A Digital option price is influenced by many of the same factors as any other option, such as the price of the underlying commodity (here, the S&P 500 INDEX), the exercise price, the time to maturity, the volatility of the underlying commodity, and short-term interest rates. A key disadvantage of digital options is limited profit potential.

### 6.    Defendants Develop the Plan to Market the Digital Options Strategy

25.    A plan to market a tax strategy employing digital options (the "Digital Options Strategy" or "Strategy") was developed by the DGI defendants in the mid- to late-90s. The Digital Options Strategy was a tax strategy where a taxpayer purchases and sells options and transfers these option positions to a limited liability company that is also owned by the client. As a result, the

taxpayer typically claims that the basis of the taxpayer's interest in the limited liability company is increased by the cost of the purchased options, but is *not reduced* by the taxpayer's obligation with regard to the sold options. The use of European-styled digital options in the subject transactions is essential because it permits significant leverage to be obtained at a relatively modest cost and minimum risk.

26.    Indeed, to hold the risk and the resulting profit potential to a minimum, the defendants structured Digital Options Contracts generally as follows: The client enters into two opposing transactions - one where the client would be PAID if the spot rate on a particular INDEX was at or above a certain Strike Price, and one where the client would have to PAY OUT if the spot rate on a particular INDEX was at or above a certain Strike Price. The two Strike Prices that were set (one where the client would be PAID and one where the client would PAY OUT) were different by only *fractions of a dollar.* On all of the Digital Options Contracts, the trigger occurred when the Spot Price on the underlying INDEX was at or above a certain Strike Price *at expiration.* Thus, there was almost no chance of only one position being acted upon. Either the Spot Price would be above both Strike Prices, so both were acted upon, or the Spot Price would be below both Strike Prices, so neither was acted upon.

27.    To further ensure control of the transaction (that either both options or neither of the options were acted upon), the ability to determine when and if the event was triggered was retained by the counter-party, Refco Capital Markets ("Refco"), with the stipulation that Refco could choose to accept or disregard any Spot Price at expiration.[1] When you combine these two elements - the

---

[1] The form Refco Digital Options Contract provides that the Spot Rate can be determined by Refco acting in "good faith and in a commercially reasonable manner."

incredibly close proximity of the trigger Strike Prices and Refco's ability to choose the Spot Price

that determines if the trigger occurred - the transactions had virtually no risk of just one of the paired

transactions being exercised. Indeed, unbeknownst to the plaintiffs, the small chance of this

occurring was no better than the plaintiffs' winning the lottery. All of defendants were aware of

these facts. Refco, though not a defendant, conspired with DGI and McGladrey to design the digital

options used to facilitate the tax strategy. Of course, the defendants never informed the plaintiffs

that they had as good of a chance of winning the lottery as they had of earning a profit on the Digital

Options Contracts.

        28.     An examination of the movement, according to Bloomberg, of the S&P 500 INDEX

between 9:30 and 9:45 a.m., New York City time, on June 16, 2005, illustrates the Digital Options

Contracts' highly speculative nature. For instance, the range of prices between 9:30 and 9:45 a.m.

(New York time) on June 16, 2005, was from approximately $1205.50 to $1208.00 during this 15

minute time period. As an example, the Strike Price for one option contract the plaintiffs purchased

was $1280.20 and the Strike Price for the option contract plaintiffs sold was $1280.23 – a spread of

three (3) cents. Given that the Spot Prices shown above between 9:30 a.m. and 9:45 a.m., a window

of only fifteen (15) minutes, exceeded $2.50, or over 83 times this three-cent spread, the payout of

the Digital Options Contract was clearly wholly up to Refco.

        29.     Under the McNeills' Trade Confirmations, Refco, as the Calculating Party, was

authorized to use discretion in selecting the Spot Price on expiration. The range of the Spot Prices

of the Index for the sample fifteen (15) minute window, between 9:30 a.m. and 9:45 a.m., plainly

demonstrates how the selection of the Defining Event is subject to the pleasure of the Calculating

Party. The Calculating Party can unilaterally pick from a range of Spot Prices that are beyond the

narrow range of "winning" Strike Prices defined in the Digital Options Contract. Thus, it is

exclusively the Calculating Party who determines whether the Digital Options Contract pays out.

30.    Upon information and belief, defendants typically structured the overall Digital

Options Strategy so that the total of their fees was between five and one-half percent (5.5%) and nine

and one-half percent (9.5%) of the increased tax basis or deductions the client desired to achieve.

Of this amount, a certain percentage went to Refco as the "spread" between the two option positions

in each Digital Options Contract (*i.e.*, the difference between what was paid for buying one position

and what was received for selling the other), a certain percentage went to DGI for having

"developed" the Digital Options Contract as a tax strategy and acting as the "Advisor" for the

Strategy, a certain percentage went to the law firm writing an opinion letter on the transaction, and

a certain percentage went to the McGladrey defendants, who (for example) participated in the

transaction by introducing and recommending the Digital Options Strategy to clients who trusted

them and who acted as plaintiffs' tax and investment advisor (and often, a percentage went to BDO

for its background role as McGladrey's joint venturer).

31.    Unbeknownst to the plaintiffs, in or about 2000, BDO entered into a joint venture

with McGladrey to develop, market and sell products known as "tax solutions" to clients of

McGladrey, products BDO and McGladrey knew were, in reality, illegal tax shelters that had been

expressly disapproved by the IRS. Through this joint venture relationship, BDO introduced

McGladrey to other members of the "tax solutions" sales team, which included four nationally

known law firms (including defendant Proskauer), the DGI defendants, Refco, and others. At the

time BDO and McGladrey became joint venturers to sell the subject tax shelters, each of them knew

that such shelters were considered "listed transactions" by the IRS, which would be disallowed by

the IRS upon discovery. By way of this joint venture, BDO and McGladrey agreed to share in profits

derived from the sales of the tax shelters previously disallowed by the IRS. BDO and McGladrey

also developed business arrangements with DGI and Proskauer to sell and market the tax shelters,

through which each of the defendants agreed to split fees generated by the tax shelters according to

various defined percentages. McGladrey's clients (including the McNeills) were not informed of

these business and fee splitting relationships, and in fact, defendants went to great lengths to make

clients believe that each of them was independent from the other - ostensibly providing objective and

unbiased advice to the client. None of the defendants ever disclosed the secret fee-splitting

agreements or business arrangements that existed between and among them.

### 7.   Defendants' Unlawful Promotion of the Strategy to Plaintiffs

32.   Defendants promoted and sold a two-stage tax investment plan to the McNeills (both

stages will be collectively referred to as the "Strategy," unless otherwise indicated). The McNeills

and MFLP held multi-million-dollar stock positions in Pharmaceutical Product Development, Inc.

(the "Stock" or "Pharmaceutical stock"), which had little or no income tax cost basis. Over time, the

Pharmaceutical stock appreciated significantly. Because the McNeills' and MFLP's basis in the

Pharmaceutical stock was low, selling the appreciated stock would trigger large capital gains tax

obligations. Defendant Wainwright of McGladrey and Haber of DGI advised the McNeills that,

through proper tax planning, the stock could be sold with minimal tax liability. This advice was

accepted by the McNeills, who are and were successful businessmen, but who are unsophisticated

about tax matters. The McNeills were told that this tax advice had been employed successfully by

many others to lawfully minimize capital gains tax exposure.

33.     Put simply, the first stage of the Strategy employed digital options that would, through a series of maneuvers, ultimately inflate the "basis" in certain investments that would be acquired for the McNeills as part of the Strategy, which would then create tax deductible losses when these high basis investments were liquidated. The second stage of the Strategy was similar, but operated to "step up" or create basis in the otherwise low basis Pharmaceutical stock held by the McNeills. By virtue of the Strategy's two stages, purportedly lawful tax deductions would be created that would offset gains realized by the sale of the Pharmaceutical stock. To effectuate the two-stage Strategy promoted to the McNeills by defendants, the plaintiffs entered into Digital Options Contracts. Due to the manner in which the Strategy was designed, Refco retained the net premium plaintiffs paid for the Digital Options Contracts. Plaintiffs also paid multi-million-dollar fees to the other defendants, including fees to the McGladrey defendants for preparing tax returns utilizing the Strategy and providing consulting services (DGI also bore responsibility for preparing Schedules K-1 and other tax information related to the Strategy's implementation). Upon information and belief, Refco and the DGI defendants paid the McGladrey defendants an additional "fee," gleaned from the net premium ostensibly paid to Refco and elsewhere; this fee was never disclosed to the plaintiffs.

34.     Defendants and other non-parties, such as Refco, singly and in concert, directly or indirectly, engaged in a common plan, transaction and course of conduct described herein in connection with the purchase and sale of the Digital Options Contracts and Strategy, pursuant to which they knowingly, intentionally and recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon plaintiffs. Further, defendants made various false statements of material fact, and failed to disclose material facts, all of which were relied upon and which misled plaintiffs.

LR050384.WPD                    15

35.    The purpose and effect of defendants' plan, transaction, and course of conduct was to generate huge fees by co-promoting and serving as a counter-party (with respect to Refco) for the Digital Options Contracts as part of the alleged tax-savings Strategy.

B.    THE STRATEGY TEAM IS FORMED AND THE SCHEME IS PUT IN ACTION

36.    Upon information and belief, BDO and the DGI defendants recruited the other defendants to assist them in marketing the Strategy to the wealthy clients of the defendants and others. Because of the enormous fees generated by the tax shelter sales, the McGladrey defendants, DGI and Proskauer became full partners in the enterprise.

37.    BDO and the DGI defendants knew that law, accounting, and investment firms had an established market for the Strategy. The DGI defendants knew that if an accounting firm recommended an "investment tax strategy" or "tax advantaged investment" to their wealthy clients, the clients would more than likely participate in the transactions without questioning the *bona fides* of the Strategy. Accordingly, when BDO began looking to expand its "tax solutions" client base, it turned to McGladrey. McGladrey was more then happy to oblige, and the BDO/McGladrey "joint venture" became a reality. Before long, McGladrey's successes in tax shelter sales were counted in and with the revenue goals the BDO "Tax Solutions" group set for itself.

38.    The fee to each of the participants in the Strategy was not based on an hourly rate or time spent working on the deal; rather, the fee was based solely on "the size" of the transaction. In other words, the bigger the deal, the larger the fee (on commissions, in substance) shared by the defendants. Thus, these defendants had a motive to sell as many tax shelters as possible, as large as possible, and the client's best interest was completely irrelevant.

39.    Upon information and belief, Proskauer prepared template opinion letters opining to the propriety of the Digital Options Strategy (in several variations) long before the defendants began to solicit clients. Proskauer permitted the other defendants to use these template opinion letters, or a verbal description of them, in order to market the Strategy. The opinion letters were "canned," "prefabricated" forms that were utilized, with minor changes based on the particular client. Wainwright used such an opinion letter to market the Strategy to the McNeills.

C.    THE STRATEGIES TEAM SOLICITS THE PLAINTIFFS

40.    On or about December 14, 2000, the McNeills were invited to a meeting at McGladrey's Wilmington, North Carolina offices ("the December 14 meeting"). Mark Stanley of McGladrey's Wilmington office had been a close friend of the McNeills since childhood. The McGladrey defendants were therefore aware of the substantial Pharmaceutical stock owned by the McNeills, as well as their potential for significant capital gains related to any sale of the stock.

41.    At the December 14 meeting, McGladrey representatives David Smith, Mark Stanley and Bob Warwick introduced Wainwright and stated that Wainwright could explain a tax strategy offered by McGladrey, which the McNeills should consider in connection with any sale of the Pharmaceutical stock. The December 14 meeting was an introductory meeting in which Wainwright discussed, in general terms, a tax strategy which, according to Wainwright, would create legal tax deductible losses which could offset the taxable gains on the sale of the Pharmaceutical stock. At the conclusion of the meeting, Wainwright advised the McNeills that if they were interested in pursuing a tax strategy related to their Pharmaceutical stock, the McGladrey representatives would schedule a future meeting to discuss the specifics of the tax Strategy.

42.    Following the initial meeting with Wainwright, McGladrey's representatives encouraged the McNeills to speak further with Wainwright about the tax Strategy, and a meeting was held on or about April 9, 2001 at McGladrey's Wilmington, North Carolina offices ("the April 9 meeting"). The April 9 meeting was attended by the McNeills, David Smith, Bob Warwick and Wainwright. Wainwright began the April 9 meeting by stating that the tax strategy he would describe was highly confidential and proprietary in nature.

43.    At the April 9 meeting, Wainwright described the Strategy in detail. Wainwright explained that by investing in digital options, and by transferring these options into a partnership LLC, a large "step-up" in the McNeill's basis in the Pharmaceutical stock would lawfully occur, and the taxable gain on the sale of the stock and other capital gains exposure would be greatly minimized.

44.    Upon information and belief, Wainwright's explanation of the Strategy at the April 9 meeting was based upon instructions, directions and paperwork provided to him by the DGI defendants and BDO Seidman. During the April 9 meeting, Wainwright repeatedly emphasized that the Strategy was entirely legitimate and complied with all IRS guidelines. Wainwright informed the plaintiffs that the Strategy was the product of intensive study and investigation by his accounting firm, and that the Strategy was backed by four separate nationally-known Wall Street law firms - all of which stood ready to validate it with their professional reputations and high level of legal expertise.

45.    At the April 9 meeting, Wainwright assured the McNeills that the Strategy met IRS guidelines and that a "more-likely-than-not" legal opinion, issued by a reputable law firm, would validate the strategy and insulate the McNeills from the remote possibility of IRS penalties.

46.    To implement the Strategy, McGladrey's Wainwright recommended that plaintiffs

utilize DGI, and Wainwright scheduled another meeting for on or about May 3, 2001 (the "May 3

meeting"). The May 3 meeting occurred at McGladrey's Wilmington offices and was attended by

the McNeills, Wainwright and Haber. McGladrey's Mark Stanley and Bob Warwick also attended

portions of the meeting.

47.    When questioned about his qualifications at the May 3 meeting, Haber described

himself as "a master of tax." During the May 3 meeting, Haber also repeated many of the things that

Wainwright had previously stated. Haber also discussed specific legal precedents and how these

precedents fully supported the Strategy. Haber confirmed the previous representations made by

Wainwright that the Strategy fully complied with all IRS requirements and was entirely legal. Haber

and Wainwright again explained to the McNeills that a national law firm, Proskauer, with special

expertise in this highly specialized tax planning area, would prepare and issue "independent" opinion

letters supporting the tax treatment of the two-stage Strategy. Haber and Wainwright emphasized to

plaintiffs that Proskauer's willingness to issue the "independent" opinion letters was a testament to

the Strategy's validity, legality and soundness. Once again, the McGladrey and DGI defendants also

emphasized that, as a result of the independent opinion letters, there was an extremely low chance

of plaintiffs having liability for IRS penalties.

48.    During the May 3 meeting, Haber of DGI explained the mechanisms of the two-stage

Strategy. The DGI defendants, through Haber, as well as Wainwright of McGladrey, spoke in depth

about the most advantageous timing of the purchase of the options, and the different entities that

needed to be created to properly implement both stages of the Strategy. At the conclusion of the May

3 meeting, Wainwright and other McGladrey representatives again stated that the Strategy was a "good deal" which the McNeills should pursue.

49.    On or about July 31, 2001, the McNeills attended another meeting at McGladrey's Wilmington, North Carolina offices ("the July 31 meeting"). In addition to plaintiffs, Wainwright, Mark Stanley and David Smith attended the July 31 meeting. At the July 31 meeting, Wainwright stated that he wanted to "go over recent events" and mentioned several legal opinions, which he stated fully supported the Strategy. Wainwright stated that because the Strategy complied with all IRS requirements, the IRS could not upset the Strategy, and only a change in the law by Congress could invalidate the Strategy. Wainwright advised plaintiffs that "the environment was favorable" for the Strategy and emphasized that the plaintiffs should move forward promptly with the Strategy while the environment remained "favorable."

50.    On or about August 30, 2001, the McNeills attended another meeting at McGladrey's Wilmington, North Carolina offices ("the August 30 meeting"). The August 30 meeting was attended by the McNeills and Wainwright and, upon information and belief, Haber participated telephonically. Haber and Wainwright discussed with plaintiffs their basis in the Pharmaceutical stock and again explained the advantages of the Strategy in reducing plaintiffs' tax liability. Haber walked the plaintiffs through the various steps of the overall Strategy, and recommended each of the various transactions that comprised the investment components of the Strategy.

51.    As plaintiffs were considering the Strategy following these meetings, Wainwright contacted the plaintiffs' existing advisors and explained the Strategy. Because of defendants' claims of über expertise and their having done extensive research and analysis of pertinent tax authorities

and because all relevant facts were not revealed by defendants, the McNeills' advisors also relied upon the claimed special expertise and representations of defendants.

52.    The steps of stage one of the Strategy, as represented by the McGladrey and DGl defendants, were as follows:

(a)    First, plaintiffs, through a wholly-owned LLC ("LLC A") formed on their behalf, would sell and purchase options from Refco with extremely close strike prices, in almost identical amounts, on a specified INDEX (such as the S&P 500). The cost of the long option, though large, would be largely (although not entirely) offset by the premium earned on the sale of the short option(s);

(b)    Second, plaintiffs, through LLC A, would contribute their "paired" options to an entity taxable as a partnership (i.e., RM Investments 2001 LLC and SM Investments 2001 LLC (collectively "LLC B")) formed for plaintiffs, DGI, Alpha Consultants LLC and other "investors," for the purpose of carrying out stage one of the Strategy. DGl was responsible for the investments carried out by LLC B. Other offsetting options were bought and sold based on the S&P 500 INDEX. Ultimately, the long and short options would expire either "in or out of the money," resulting in a gain or loss, depending upon the INDEX price at the relevant time; and

(c)    Third, all remaining financial instruments were sold, closed out or expired at termination.

53.    The steps of stage two of the Strategy, as represented by the McGladrey and DGl defendants, were as follows:

(a)    First, a limited liability company ("LLC A") is formed on behalf of the client and is solely owned by the client. The client, through LLC A, sells Short Options and purchases Long Options with almost identical payouts involving a particular Index (*e.g.* S&P 500 INDEX) with different (but narrow) strike prices. The cost of the Long Options, though large, is almost entirely offset by the premium earned on the sale of the Short Options;

(b)    Second, the client contributes his/her interest in LLC A (as well as the stock for which the basis will be "stepped-up," such as the Pharmaceutical stock) to another LLC ("LLC B," i.e., RM Portfolio LLC and SM Portfolio 2001 LLC) in exchange for a certain membership interest in LLC B. Once the client contributes his interests in LLC A, which consists of the Long and Short Options, and the stock to LLC B, the client receives an interest in LLC B. The stock is assigned and/or reissued in the name of LLC B;

(c)    Third, after all of the options owned by LLC B have expired, client contributes his membership interest in LLC B to an entity taxable as a corporation ("S Co C," i.e., SD-AJR Investments, Inc. and RC-E Investments, Inc.), for an interest in S Co C, purportedly constituting a "sale or exchange" under U.S. tax law, and causing a "technical termination" of LLC B for federal income tax purposes but not for purposes of state law;

(d)    Fourth, LLC B makes an Internal Revenue Code § 754 election ("a § 754 election") for LLC B when LLC B's tax return is filed for the year, based on the

client's exchange of the interest in the LLC B for the newly acquired interest in S Co
C [This step never occurred in the McNeills' transaction.];

(e)    Fifth, the § 754 election would purportedly adjust LLC B's basis in its
property, such as the Pharmaceutical stock. Accordingly, as the capital assets (*i.e.*,
the stock) would theoretically be sold over time by LLC B, the portion of the
proceeds that passed through to the individual plaintiffs would be completely offset
by LLC B's increased basis in its assets, resulting in a zero net taxable gain or even
a net capital loss. [This step never occurred in the McNeills' transaction.]

54.    Each of the steps proposed by the McGladrey and DGI defendants, for both stage one
and stage two of the Strategy, were made pursuant to an undisclosed arrangement between the
defendants, and were planned in advance to reduce or eliminate tax liability for the plaintiffs'
otherwise substantial capital gains.

55.    Wainwright and Haber informed the plaintiffs that, in addition to the tax savings,
there was a reasonable chance of realizing a pre-tax gain on the Digital Options Contracts, although
a pre-tax loss might also occur. However, the defendants assured the plaintiffs that the tax benefits
of the Strategy as a whole, resulting from the generation of enhanced basis to reduce gains, far
outweighed any losses that might be incurred as a result of the Digital Options Contracts.

56.    Wainwright and Haber further advised the plaintiffs that if the IRS audited their tax
returns as a result of the Strategy, Proskauer's "independent" opinion letter would confirm the
propriety of the Strategy and the tax treatment associated with booking the resulting losses on their
tax returns. This "independent" opinion letter would enable the plaintiffs to satisfy the IRS auditors
as to the propriety of the tax returns. On information and belief, Proskauer had already prepared the

"canned" and "prefabricated" opinion letters approving the Strategy, and needed only to fill in several blanks for each of the many clients to which they rendered such opinion letters.

57.    Wainwright and Haber, at the heretofore alleged meetings, repeatedly advised the plaintiffs that the enhanced and stepped-up basis created by the stages of the Strategy was legitimate and in accordance with all applicable tax laws, rules, and regulations. In particular, the defendants advised the plaintiffs that the Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes and that the "independent" opinion letters from Proskauer would confirm this.

58.    On or about September, 10, 2001, the McNeills again met with Wainwright at McGladrey's Wilmington, North Carolina offices ("the September 10 meeting"). Upon information and belief, McGladrey's Mark Stanley was in attendance for part of the meeting. Wainwright went to great lengths in explaining that the Strategy was not a Son of BOSS transaction, subject to any IRS notice such as 1999-59 or 2000-44, or anything like a Son of BOSS transaction. Wainwright encouraged the plaintiffs to move forward promptly with the Strategy.

59.    On or about September 27, 2001, the McNeills again met with Wainwright at McGladrey's Wilmington, North Carolina offices. Wainwright advised the McNeills that the Strategy was not required to be listed as a tax shelter under IRS requirements and again advised plaintiffs about the required fees and nature of the investments involved.

60.    Based on the representations of the McGladrey and DGI defendants, as well as the promised independent opinion letters from Proskauer, the plaintiffs agreed to engage in the Strategy. Soon thereafter, the McGladrey defendants took the lead in structuring and forming the various entities to be utilized in the Strategy. The McGladrey defendants, with the assistance of DGI,

prepared or arranged for the preparation of all of the necessary transactional paperwork for the various steps of the Strategy.

61.    The following day, on September 28, 2001, the McNeills, as directed by McGladrey, wired the necessary funds to pay the required "Consulting Fee." The McGladrey defendants charged the McNeills a $6.4 million "Consulting Fee" for implementing the Strategy and for preparing the plaintiffs' 2001 and 2002 tax returns to reflect the deductions created by the Strategy (with DGI preparing transactional records and IRS Schedules K-1 and assuming other tax preparation duties). Upon information and belief, McGladrey then shared this fee with the other defendants, based on previously agreed percentages.

62.    On or about October 23, 2001, the McNeills funded the investment portion of the first stage of the Strategy. Thereafter, in November 2001, the McNeills funded the investment portion of the second stage of the Strategy. The plaintiffs paid approximately $4 million dollars for the investment components of the Strategy (in addition to the so-called "Consulting Fee"). Upon information and belief, the McGladrey defendants also provided and received "kick-backs" from the DGI defendants and other party and non-party co-conspirators for "introducing" the plaintiffs to them and for assisting in the marketing, promoting, and selling of the tax Strategy. Such fees were not disclosed to the plaintiffs.

63.    The plaintiffs' decision to engage in the Strategy was based upon the defendants' advice, and the promised "independent" opinion letters of Proskauer confirming the propriety of the Strategy. Plaintiffs' decision to engage in the Strategy was also based in large measure on their long-term relationship with partners who worked for the McGladrey defendants and the fact that these defendants and Proskauer were all willing to put their reputations behind the Strategy.

64.    After convincing the plaintiffs to engage in the Strategy, the McGladrey and DGI defendants engaged Refco to enter into the Digital Options Contracts. Refco failed to perform the due diligence required by NYSE Rule 405 with respect to the Digital Options Contracts. DGI and Proskauer further represented that the option purchases were made at arms length with Refco and that material terms of the options "were standard in options customarily entered by the bank [Refco]." These representations were false and were known to be false when made.

65.    The defendants advised and instructed the plaintiffs about the particular Index and amounts to be invested in each option. Upon information and belief, the defendants had calculated the basis the plaintiffs needed for tax purposes and the option positions (including the "strike prices" to be used) necessary to achieve such basis before the options were purchased. The plaintiffs did as they were told, thinking they were following correct and truthful advice. Plaintiffs also signed many documents presented by defendants, believing their contents were also true.

66.    The plaintiffs were not told that the options were not an "investment" but, in reality amounted to nothing more than a private contractual bet between them and Refco, and that Refco had the power to control the outcome of the wager by choosing whatever spot price it wanted and ignoring the numerous spot prices that would have otherwise triggered the contingent payments. In fact, in certain opinion letter drafts circulated at BDO, the digital options were actually referred to as "bet options." Because of the obvious negative connotations associated with the term "bet options," an internal BDO memorandum dated March 14, 2000 states: "(would prefer the options to be referred to throughout [the opinion letters] just as options rather than digital options and certainly not as bet options.)" The defendants never advised the plaintiffs that their realistic chance

of making a profit on the options, taking into account the fees and costs associated with the Strategy, was virtually nil.

67.    Upon information and belief, Proskauer's fee to prepare the legal opinions regarding the overall Strategy was paid out of the $6.4 million fee paid to McGladrey. At no point did Proskauer contact the plaintiffs to discuss the facts of their business, their tax situation, or the Strategy. The McNeills were promised that they would each receive two opinion letters, one opining to the propriety of the first stage of the overall Strategy with respect to the transactions undertaken by the SM Trading LLC/SM Investments 2001 LLC and RM Trading LLC/RM Investments 2001 LLC entities, and the second addressing the propriety of transactions undertaken by the SM Equities LLC/SM Portfolio 2001 LLC  and RM Equities LLC/RM Portfolio LLC entities.

68.    The opinion letter for the first stage of the Strategy, involving the SM Trading LLC and RM Trading LLC entities, was received by plaintiffs on or about April 12, 2002. At this point, the $6.4 million fee had been paid to McGladrey, and the Digital Option purchases for the first and second stage of the Strategy had occurred. However, the final stage of the strategy, implemented through the related tax returns, had not. The plaintiffs primarily reviewed the 3-page "Conclusions" portion of the 77-page legal opinion and noted nothing that concerned them. In fact, Proskauer's "Conclusions," as Wainwright and Haber had previously represented, reinforced defendants' assurances that the Strategy was a completely legal tax-savings investment strategy.    The "Conclusions" portion of the legal opinion made no mention whatsoever of IRS Notice 99-59 and IRS Notice 2000-44. (These IRS Notices informed tax professionals that the IRS would disallow both stages of the Strategy if it became aware of plaintiffs' participation in it. In fact, the only reference to Notice 2000-44 in the entire opinion letter is contained in a two-paragraph section

buried at the back of the opinion letter, wherein Proskauer stated that the transactions entered into by the plaintiffs "are not 'the same as or substantially similar to'... the transactions set out in the Notice" and that "the Notice would likely not apply to the Transactions.")

69.    Other than as stated in the Proskauer opinion letters, none of the defendants ever discussed with the plaintiffs the application and true significance of Notice 99-59 (published in December 1999) and Notice 2000-44 (published on August 11, 2000) - both of which were published during the year *before* the defendants began to promote the Strategy to the plaintiffs. In fact, Wainwright specifically represented to plaintiffs, and their advisors, that the facts of the McNeill transactions were different from those contained in Notice 2000-44. Wainwright specifically advised plaintiffs that Notice 2000-44 was wholly inapplicable to the Strategy. Wainwright made these statements during the September 10 meeting described above, and repeatedly made similar statements through, at least, late in 2004. Despite Wainwright's assertions, the IRS Notices did in fact apply to both stages of the Strategy defendants marketed, sold and implemented, and unbeknownst to plaintiffs, the Strategy had been declared illegal by the IRS *before* defendants ever approached the McNeills. These facts were known to defendants, who chose not to divulge this information to the McNeills.

70.    Upon information and belief, prior to consummating the Strategy, McGladrey and BDO had internally acknowledged that the Strategy constituted a "listed transaction," subject to IRS Notice 2000-44, and the tax shelter list-keeping and registration requirements of the IRS. Upon further information and belief, rather than assume the role of list keeper, McGladrey secretly delegated that duty to DGI - who, in turn, upon further information and belief, failed to create such

a list. In letters to certain clients, but not to the McNeills, McGladrey, through Wainwright, made

the following statement:

> We are writing clients that entered into certain investment
> transactions during calendar year 2001.
>
> As outlined in our engagement letter, [t]here are certain list
> maintenance and reporting requirements that RSM McGladrey, Inc.
> ("RSM") is subject to under the Internal Revenue Code and
> regulations. Pursuant to these requirements, RSM, or a designee, was
> required to maintain a list of investors who entered into certain
> investment transactions during calendar year 2001. RSM designated
> responsibility for maintaining such a list to The Diversified Group
> Incorporated ("DGI").

Wainwright and Haber, during the aforementioned meetings at McGladrey's Wilmington offices,

advised plaintiffs that the Strategy was not a tax shelter (subject to the IRS listing requirements). At

the same time, McGladrey and DGI marketed the transactions to the McNeills, using the Proskauer

opinion letters, which declared, falsely, that the transactions were not "tax shelters' subject to the

IRS's registration requirements.

71.    The McGladrey defendants prepared and signed (as preparer) the McNeills' federal

tax returns for the year 2001, which implemented over $40 million in (purported) deductions

(denominated as capital losses) generated by the first stage of the Strategy. DGI prepared, or caused

to be prepared, the transactional records and Schedules K-1 necessary to document and support the

tax losses purportedly created through the Strategy. The tax returns were signed by McGladrey and

were represented to be accurate, to the IRS, under "penalty of perjury." (Unbeknownst to the

McNeills, the 2001 returns failed to contain any information related to the second stage of the

Strategy and also failed to contain any information about or deduction of the fees paid by the

McNeills to the defendants, which generally would be deductible if they were legitimate tax advice

expenses.) At this point, in 2002, McGladrey and the other defendants were aware that the United States Department of Justice and the IRS had begun formally investigating firms that sold the Strategy (or similar strategies). Moreover, by this time IRS Notices 99-59 and 2000-44 were two years old. Also, by this time, defendants had long since concluded that the IRS would reject deductions generated through the Strategy. Even so, none of the defendants ever discussed with the McNeills their internal conclusions about the Strategy, including the true significance of Notice 99-59 and/or Notice 2000-44, before McGladrey signed, and submitted to the McNeills as ready to file, the McNeills' 2001 tax returns. By this time, McGladrey and DGI were well aware that they were filing or facilitating the filing of tax returns containing false and fraudulent deductions. Proskauer also knew that it was facilitating the filing of a false tax return.

72.    On or about March 26, 2003, at or about the time the McNeills' 2002 tax return was due, defendant Akselrad, on behalf of Proskauer, wrote Ron McNeill a letter regarding the opinion letter for the second stage of the Strategy. This letter states that, "[p]ursuant to our agreement, [Proskauer] will represent you in connection with the Transaction for a fixed fee of $100,000, inclusive of all disbursements and charges, *which [fee] has been paid previously.*" Then, incredibly, and despite the fact that Proskauer had already taken its fee, defendant Akselrad stated:

> *We have advised you that we also represent The Diversified Group*
> and Helios Financial [a firm affiliated with defendant Haber] . . . You
> acknowledged and expressly agreed that we would be free to continue
> to represent The Diversified Group . . . including an adverse
> representation, *and you waived any conflict resulting from or*
> *attributable to such representation. Such adverse representation by*

*our firm may specifically include the bringing of litigation and other*

*proceedings against you.*

73.    ***Prior to the McNeills' entering the Strategy, Proskauer did not inform plaintiffs***
***that Proskauer represented DGI and that a conflict of interest existed.*** In fact, for the McNeills,
the whole point of obtaining the Proskauer opinion letters, in both a practical and legal sense, was
to procure an independent evaluation of the *bona fides* of the Strategy itself. Moreover, as Proskauer
well knew, the "independence" of its evaluation was necessary for the opinion letters to have any
standing with the IRS (for penalty protection, reasonableness of the tax deductions, etc.). Without
this independence, the opinion letters were valueless. Plaintiffs were unaware, even at this time, that
Proskauer had entered into a secret business arrangement with defendants to back the Strategy.

74.    Ron McNeill, concerned about the previously undisclosed conflict reflected by the
March 26, 2003 Proskauer letter, declined to waive it. As a result, Proskauer refused to issue the
opinion letters for the second stage of the Strategy - even though it had already taken money for the
full amount of its fee from the McNeills. Proskauer accepted the McNeill representation without
fully disclosing its conflicts with DGI, facilitated the filing of false tax returns,  then refused to
perform the services it promised, and then kept the fee paid by its client. Proskauer never produced
the promised opinion letters for the second stage of the Strategy. Upon information and belief,
Proskauer did not provide the opinion letters for the Strategy's second stage because, by this time,
the United States Senate, the United States Department of Justice, and the IRS were all conducting
civil and criminal investigations of tax shelter promoters such as KPMG, McGladrey, BDO and
Proskauer. (The McNeills would never have purchased the Strategy without the promised opinion
letters.)

LR050384.WPD                                31

75.     Not appreciating the true significance of Proskauer's actions, the McNeills continued to expect that McGladrey would cause all the actions to be taken that were necessary to implement the second stage of the Strategy through their 2002 tax returns (which would include Schedules K-1, § 754 elections for LLC B and other tax information provided by DGI). McGladrey took no such action, despite having been paid a multi-million dollar fee to do so. Instead, McGladrey informed the accountant preparing the McNeills' 2002 tax returns that "there were no material transactions from the Diversified deals to report for 2002." McGladrey took a multi-million dollar fee to undertake the second stage of the Strategy, then, through its actions, abandoned its responsibility to complete the Strategy. None of this was disclosed or explained to the McNeills by any defendant, and McGladrey has refused to return its ill-gotten fees to the McNeills.

76.     On or about July 2, 2004, H&R Block, McGladrey's parent company, announced, through its Annual Report, that, at least *since 2003*, it had been the subject of an IRS investigation into "tax planning strategies that some RSM McGladrey clients used from fiscal years 2000 through 2003." In particular, the IRS was investigating whether the tax shelters McGladrey sold complied with the IRS's "list keeping" and "registration" regulations. With this investigation (and the other related investigations) under way, McGladrey knew, that without the Proskauer opinion letters "blessing" the legality of the second stage of the Strategy, McGladrey would have no one else to blame if the IRS challenged the McNeills' tax deductions. Implementing the Strategy, without the "cover" of the Proskauer opinion letter, directly exposed McGladrey to civil and criminal penalties from the government. So, rather than alert the McNeills to the problem, McGladrey and DGI hid it from them. Hence, the McNeills paid McGladrey millions of dollars for the second stage of the

Strategy - which McGladrey and DGI did not even attempt to prepare the documentation necessary to implement.

77.    In the summer of 2004, the McNeills learned, for the first time, that McGladrey had not implemented the second stage of the Strategy on their 2001 and 2002 tax returns. The McNeills, through counsel, went to McGladrey and asked for an explanation. Rather than accept responsibility, McGladrey blamed DGI for the situation. In an exchange of emails between defendants Wainwright and Haber, on July 11, 2004, Wainwright discussed the fact that the "2nd tax opinion was not issued by Proskauer and at this time they are not inclined to issue [the 2nd opinion]." In response, Haber wrote: *"If you'll recall Ron McNeill refused to sign the Proskauer conflict letter. I don't know what we can do for them now. The fox is already in the hen house."* After making the "hen house" reference, an apparent reference to the governmental investigations, Haber further informed Wainwright that: "The opinion [from Proskauer] is not outstanding. It is not happening with Proskauer. The moment has passed."

78.    It was later learned that neither DGI nor McGladrey ever prepared or filed 2002 partnership tax returns for the underlying LLC entities, known as RM Portfolio LLC and SM Portfolio 2001 LLC, through which the McNeills and MFLP invested, and through which the stepped-up basis in the Pharmaceutical stock would be generated. McGladrey and DGI were responsible for shepherding the entire process, from the transactions underlying the Strategy, to the obtaining of "independent" opinion letters, to preparing the tax return information implementing the Strategy. All of these items were necessary components of the Strategy, paid for by the McNeills, and the McNeills were promised that each would be timely, lawfully and properly completed. Thus, without the 2002 partnership returns (including timely § 754 elections) for RM Portfolio LLC and

SM Portfolio 2001 LLC and without the Proskauer opinion letters for the second stage of the Strategy, the Strategy was a dead letter (notwithstanding the fact that defendants had known, all long, that the Strategy was unlawful).

79.    In October of 2004, the McNeills elected to participate in an IRS settlement program offered to taxpayers who had participated in so-called "Son of BOSS" tax shelter transactions. The settlement program was set forth in "Announcement 2004-46, titled the "Son of Boss Settlement Initiative" ("2004-46 Settlement"). The IRS notified the McNeills that their 2004-46 Settlement had been approved in late 2004. Under the settlement, more than $40 million in Strategy deductions were disallowed, a ten-percent (10%) penalty was assessed, and the McNeills were assessed interest at an above-market rate. The McNeills have paid all amounts due and owing to the IRS and amounts for state income taxes to the North Carolina Department of Revenue.

## Plaintiffs Relied On The "Expertise" of The Defendants

80.    Plaintiffs are successful business people; however, they do not have knowledge about complex tax and legal matters. Plaintiffs relied on the defendants for their "expertise."

81.    None of defendants ever advised plaintiffs that the Strategy had been under scrutiny by the IRS as early as December of 1999. Defendants also failed to advise plaintiffs that in August of 2000, the IRS had issued Notice 2000-44, which actually applied to the McNeills' Strategy and indicated that the Strategy was considered illegal by the IRS *before* the time the defendants initially pitched the Strategy to the plaintiffs. None of the defendants ever advised the plaintiffs of the fee-sharing arrangements among the defendants or of the actual roles and relationships among the defendants.

82.    The roles of the McGladrey and DGI defendants in the scheme were not limited to investment advice. To the contrary, these defendants discussed various aspects of the Strategy with the plaintiffs, including the profit potential and the alleged tax benefits of the Strategy.

**D.    IRS NOTICE 99-59: TRANSACTIONS LACKING IN "ECONOMIC SUBSTANCE" ARE ILLEGAL**

83.    On December 27, 1999, the IRS issued IRS Notice 99-59, entitled "Tax Avoidance Using Distributions of Encumbered Property." In this Notice, the IRS stated that "[t]he Internal Revenue Service and Treasury Department have become aware of certain types of transactions as described below, that are being marketed to taxpayers for the purpose of generating tax losses. This Notice is being issued to alert taxpayers and their representatives that the purported losses arising from such transactions are not properly allowable for Federal income tax purposes. . . . Through a contrived series of steps, taxpayers claimed tax losses for capital outlays that they have in fact recovered. Such artificial losses are not allowable for Federal income tax purposes." The clear message from the IRS to defendants was that purported losses arising from transactions wholly lacking in "economic substance" (e.g., the Strategy) are not properly allowable for Federal income tax purposes. The defendants failed to discuss with the plaintiffs and analyze the application and significance of this IRS Notice on the Strategy. Indeed, the defendants simply ignored this Notice.

84.    As a result of Notice 99-59, the defendants knew or certainly should have known that the IRS would assert that the purported tax treatment arising from the Digital Options Strategy was improper and not allowable for tax purposes; however, based on information and belief, the defendants intentionally failed to disclose this information to plaintiffs and, indeed, told them the exact opposite.

E.    IRS NOTICE 2000-44: THE IRS CONTENDS THE DIGITAL OPTIONS STRATEGY IS ILLEGAL

85.    In August 2000, the IRS once again clearly and unequivocally informed accountants and tax attorneys across the country that it believed the Strategy was illegal. Specifically, on August 11, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis." This Notice concerned "similar transactions [to those described in Notice 99-59] that purport to generate tax losses for taxpayers," thus indicating the IRS believed it had also addressed transactions like the Strategy in Notice 99-59 (issued before Proskauer had issued its marketing and final opinion letters, and before plaintiffs had, in reliance on those letters and the other advice received from the defendants, purchased the Strategy and filed their tax returns).

86.    Most importantly, Notice 2000-44 described the precise transaction marketed by the defendants to plaintiffs, under which the taxpayer purchases call options and simultaneously writes offsetting call options, transfers the option positions to a partnership, and ultimately claims that the basis in his partnership interest "is increased by the cost of the purchased call options but is not reduced under [Internal Revenue Code] §752 as a result of the partnership's assumption of the taxpayer's obligation." The IRS stated that "[t]he purported losses from these transactions (and **from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest)** are not allowable as deductions for Federal income tax purposes." (emphasis added). The clear message from the IRS to defendants was that the purported tax treatment arising from the Strategy was not lawful for federal income tax purposes. These defendants, however, purposefully ignored the IRS and the implications of this Notice to the detriment of plaintiffs. None of the defendants discussed the true significance of Notice 2000-44

with the plaintiffs before, during, or after the implementation of the Strategy. Instead, defendants

told plaintiffs that the Notice was irrelevant and not applicable to the Strategy.

87.     Defendants knew or should have known, that, as a result of IRS Notices 99-59 and

2000-44, if not earlier, the purported tax treatment arising from the plaintiffs' participation in the

Strategy would be disallowed upon discovery by the IRS and state revenue agencies; however, upon

information and belief, the defendants intentionally failed to inform the plaintiffs of this fact to their

detriment. More importantly, defendants failed to retract, modify, or qualify in any way their advice

to plaintiffs, the representations made in the Proskauer opinion letters, or their advice in connection

with the preparation of the plaintiffs' tax returns confirming the propriety of claiming as an increase

in basis the cost of the Long Options on plaintiffs' tax returns.

88.     The defendants consistently represented that the Strategy was a legal tax-advantaged

investment plan, despite the fact that IRS Notices 99-59 and 2000-44 expressly and unequivocally

stated that the type of transactions the plaintiffs undertook, based on the advice and recommendation

of defendants, was illegal. The defendants simply ignored the clearly stated implications of IRS

Notices 99-59 and 2000-44 and, therefore, knowingly deceived and misled the plaintiffs to their

detriment.

89.     Defendants actually promoted the Strategy to the plaintiffs and implemented the

Strategy for the plaintiffs **after** Notice 2000-44 was issued expressly stating that these transactions

were invalid in the eyes of the IRS. Unfortunately, the defendants did not disclose the applicability

of this important development to the plaintiffs, despite having internally concluded that the IRS had

invalidated it, because the defendants knew the plaintiffs would thereafter refuse to participate in the

Strategy. Likewise, defendants did not reveal their mutual financial interests in the Strategy to

LR050384.WPD                          37

plaintiffs, the fact that the defendants were not independent from each other, or the fact they were splitting fees in an undisclosed manner. Moreover, defendants represented that the Strategy investments were real, had economic substance, and stood a reasonable chance of making a profit - knowing that each of these representations was false. If any of these facts had been fully disclosed to the plaintiffs, they would never have undertaken the Strategy.

90.     As a result of IRS Notice 2000-44 issued on August 11, 2000, if not earlier, the defendants knew or should have known that they were illegally promoting an unregistered tax shelter by marketing the Strategy to the plaintiffs, and that the purported tax treatment arising from the Strategy would be disallowed in toto by the IRS; however, the defendants intentionally failed to inform plaintiffs of this and, in fact, advised them to the contrary. Simply stated, the defendants repeatedly deceived and knowingly misled the plaintiffs and placed their greed over the best interests of their clients.

F.     THE OPINION LETTER FOR THE PLAINTIFFS' 2001 TAXES

91.     Proskauer never had a single oral communication with the McNeills before or after the opinion letters were prepared and sent to the plaintiffs. Proskauer never provided full and fair disclosure of its relationships with the other defendants, much less its profound and on-going conflict vis-a-vis DGI (in addition to Proskauer's relationship with other defendants, such as BDO and McGladrey). The plaintiffs remained under the mistaken belief that the Proskauer opinion letter set forth the "independent" and unbiased opinions of a law firm on the propriety of the Digital Options Strategy.

92.    The Proskauer opinion letters for stage one of the Strategy were authored and prepared based, in part, on representations made by defendants. These opinion letters advised the plaintiffs that, among other things:

(1)    RM Trading and SM Trading would be disregarded as entities separate from the McNeills or RM Investments 2001 LLC and SM Investments 2001 LLC;

(2)    RM Investments 2001 and SM Investments 2001 would be classified as partnerships;

(3)    Each Long Option and related Short Option would be treated as a separate instrument;

(4)    Plaintiffs would not recognize any taxable gain or any taxable loss upon the contribution of the Long Options or the assignment of the Short Options to RM Investments 2001 and SM Investments 2001;

(5)    The Short Options would not be considered liabilities;

(6)    Each plaintiff's basis in RM Investments 2001 and SM Investments 2001 would be equal to his basis in the contributed Long Option;

(7)    The sham transaction and step transaction doctrines would not apply to disallow the results of the Strategy;

(8)    Treasury Regulation section 1.701-2 would not apply to the Transaction;

(9)    There was a greater than 50% likelihood that the tax treatment of the Strategy will be upheld if challenged by the IRS;

(10)    The IRS *should* not be successful were it to assert a penalty against the plaintiffs for positions taken on plaintiffs' U.S. federal income tax returns with respect to the Strategy; and

(11)    It was more likely than not that the Strategy would not constitute a tax shelter within the meaning of the Code and, therefore, would not be required to be registered under the Code.

93.    The draft Proskauer opinion letter for stage two of the Strategy (which Proskauer ultimately refused to issue) was authored and prepared based, in part, on representations made by defendants. This draft opinion had been promised to plaintiffs through the use of the "marketing" opinion, and representations by Wainwright and Haber that it would be timely provided. This draft opinion letter provided to Ron McNeill, for example, advised these plaintiffs that, among other things:

(1)    RM Equities would be disregarded as an entity separate from plaintiff, and from RM Portfolio, after the interests in RM Equities were contributed to RM Portfolio;

(2)    RM Portfolio would be classified as a partnership;

(3)    Each Long Option and related Short Option would be treated as a separate instrument;

(4)    Plaintiff Ron McNeill would not recognize any taxable gain or any taxable loss upon the contribution of the Long Options or the assignment of the Short Options to RM Portfolio;

(5)    The Short Options would not be considered liabilities;

(6)    Plaintiff Ron McNeill's basis in RM Portfolio would equal his basis in the
Stock plus his basis in the Long Option contributed to RM Portfolio;

(7)    Plaintiff Ron McNeill would recognize no taxable gain or loss on the
contribution of the Stock to RM Portfolio;

(8)    Plaintiff Ron McNeill's basis in RM Portfolio would equal his basis in the
Stock plus his basis in the Long Option contributed to RM Portfolio;

(9)    RM Portfolio's basis in the Stock would initially equal plaintiff Ron
McNeill's basis in the Stock;

(10)    As the result of the deemed "sale or exchange" by Ron McNeill to RC-E
Investments, Inc. ("RC-E") of his interest in RM Portfolio and the section
754 election that was to be made for RM Portfolio (the "new RM Portfolio"),
RM Portfolio's basis in the Stock would be increased to equal RC-E's basis
in its interest in RM Portfolio, which would be a carryover basis equal to Ron
McNeill's basis in his RM Portfolio interest before the exchange;

(11)    The sham transaction and step transaction doctrines would not apply to
disallow the results of the Strategy;

(12)    Treasury Regulation section 1.701-2 would not apply to the transaction;

(13)    There is a greater than 50% likelihood that the tax treatment of the Strategy
would be upheld if challenged by the IRS;

(14)    The IRS *should* not be successful were it to assert a penalty against the
plaintiffs for positions taken on plaintiffs' U.S. federal income tax returns
with respect to the Strategy; and

(15)   It was more likely than not that the Strategy would not constitute a tax shelter within the meaning of the Code and, therefore, would not be required to be registered under the Code.

94.    Upon information and belief, at the time Proskauer authorized the other defendants to use the "marketing" opinion letters with plaintiffs to facilitate the sale of the Strategy, and to make representations on its behalf, Proskauer knew that these marketing opinion letters contained false and inaccurate information and that the conclusions and opinions reached therein were materially false and would not be supported by the IRS. The Proskauer opinion letters failed to address the existence and true significance of Notice 99-59 and Notice 2000-44 on the Strategy in the "Summary" and "Conclusions" sections of the opinion letters. The opinion letters also state in an analysis barely spanning one page, that "Notice [2000-44] would likely not apply to the Transactions." Upon information and belief, the defendants knew that Notices 99-59 and 2000-44 completely invalidated the Strategy, but defendants intentionally failed to fully discuss the existence and significance of these Notices on the Strategy with the plaintiffs. The defendants intentionally failed to accurately analyze and communicate to the plaintiffs the significance of these Notices on the Digital Options Strategy.

G.   DEFENDANTS' REPEATED FAILURES TO GIVE PLAINTIFFS FULL DISCLOSURE

95.    Defendants either had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them. In this regard, defendants' fraudulent acts and omissions included *inter alia*:

(a)     Failing to disclose the true likelihood that the Digital Options Contracts would not pay out;

(b)     Failing to disclose that Refco retained virtually unlimited discretion to determine whether the Digital Options Contracts would pay out and, therefore could ensure, if they so chose, that the Digital Options Contracts would *not* pay out; and

(c)     Failing to apprise the plaintiffs that the Digital Options Contracts had no reasonable possibility of a profit (certainly not in excess of the fees paid), and that, in reality, the net effect of the Digital Options they were purchasing and selling was nothing more than a wager, like buying a lottery ticket, on where the price of the underlying INDEX would be at the time of option expiration.

96.     As a result of and in reliance on these misrepresentations, omissions, and promises, the plaintiffs purchased the Digital Options Contracts and engaged in the Strategy.

97.     Had plaintiffs known of the material adverse information which defendants did not disclose, they would not have purchased the Digital Options Contracts or engaged in the Strategy.

98.     The defendants owed duties to the plaintiffs.  These duties included the duty to:

(a)     Exercise prudence, caution and care in recommending and entering into the Digital Options Contracts for and with the plaintiffs;

(b)     Exercise their responsibility to deal fairly and in good faith, in a manner consistent with their fiduciary responsibilities of care and loyalty to and with the plaintiffs; and

(c)    Exercise prudence, caution, and care in recommending and implementing the

Strategy.

99.    Defendants intended to deceive the plaintiffs, as evidenced by the aggressive push

the defendants took to convince the plaintiffs to enter into the Digital Options Contracts and engage

in the Strategy. In combination with the relatively short time the plaintiffs were given to consider

the Strategy and the Strategy's complete failure to achieve its intended purpose, there is no

reasonable explanation for the defendants' behavior other than intentional deceit.

100.    It is evident that defendants chose to defraud the plaintiffs for personal gain in the

form of outrageous fees from unsuspecting "clients."

101.    At no time prior or subsequent to plaintiffs' implementation of the Strategy did the

defendants inform the plaintiffs that the IRS contended that the Strategy constituted a tax shelter

within the meaning of § 6111 of the Internal Revenue Code of 1986, as amended ("the Code") or

otherwise, and that the defendants were therefore illegally promoting an unregistered tax shelter by

marketing the Strategy to the plaintiffs. The defendants failed to inform the plaintiffs of these facts

and, in fact, advised them to the contrary.

102.    Between the time the defendants advised, recommended, and pressured the plaintiffs

to enter into the Strategy, and the time the plaintiffs' tax returns were prepared, signed and filed, the

defendants never disclosed to the plaintiffs or their advisors the true significance of IRS Notices 99-

59 and 2000-44, as applied to these transactions (in fact, McGladrey and Proskauer repeatedly

represented that 2000-44 was irrelevant). The defendants failed to advise plaintiffs that the Strategy

lacked business purpose and economic substance and, in fact, advised plaintiffs and their advisors

to the contrary. Moreover, upon information and belief, defendants also knew that some or all of

the transactions, with Refco as the counter-party, did not actually occur as the documentation reflects. Upon information and belief, defendants intentionally failed to disclose these material facts to the plaintiffs.

103.    As a result of IRS Notice 99-59 issued on December 27, 1999, and IRS Notice 2000-44 issued on August 11, 2000, and otherwise, the defendants knew or should have known, before Proskauer issued plaintiffs' opinion letters and the McGladrey defendants prepared the plaintiffs' 2001 tax returns (and took responsibility for preparing the 2002 tax year documents implementing the stage two deductions), that the IRS would determine that the purported tax treatment arising from the Strategy was not allowable for Federal or State income tax purposes. However, the defendants intentionally failed to inform plaintiffs of this and, indeed, informed them to the contrary.

104.    The defendants failed to retract, modify, or qualify in any way their advice and opinions expressed to the plaintiffs confirming the propriety of the Strategy.

1.    **The Defendants Fail to Advise the Plaintiffs to Enter Into the IRS Amnesty Program.**

105.    In late 2001, the IRS issued Announcement 2002-2, which offered the "Disclosure Initiative for Certain Transactions..." (the "2001 Amnesty Program"), a voluntary disclosure and amnesty program for individuals and entities that participated in tax strategies like the Digital Options Strategy (this amnesty was different from the settlement program later used by plaintiffs, i.e., Announcement 2004-46). Under the 2001 Amnesty Program, taxpayers who disclosed their involvement in such strategies would avoid any liability for penalties for underpayment of taxes without conceding liability for back-taxes or interest. Upon information and belief, each defendant had knowledge of the 2001 Amnesty Program and its availability to the plaintiffs.

106.    Despite their knowledge of the 2001 Amnesty Program, none of the defendants ever
informed the plaintiffs of the IRS 2001 Amnesty Program and certainly none of the defendants ever
advised the plaintiffs to take advantage of the 2001 Amnesty Program. Rather, despite the millions
of dollars paid as a "consulting fee," the defendants continued to abandon their duties to the plaintiffs
and left the plaintiffs fully exposed to the damages they eventually incurred.  As a result of the
defendants' failure to inform the plaintiffs of the 2001 Amnesty Program and to advise them to take
advantage of the Amnesty Program, the plaintiffs became liable to the IRS for substantial penalties
they could have otherwise avoided.

## 2.    Plaintiffs Learn of Fraud and Illegality

107.    After retaining other tax and legal advisors and at substantial expense, plaintiffs
discovered for the first time that the defendants had, among other things:

(1)    Fraudulently induced them to participate in bogus tax transactions that could succeed
only if the IRS and state tax authorities neglected to audit their tax returns or
otherwise failed to discover that they had engaged in the Strategy;

(2)    Abused their fiduciary relationship with plaintiffs and committed professional
malpractice by providing advice that they knew or should have known was wrong
and directly contradicted by published IRS positions;

(3)    Exposed plaintiffs to substantial additional tax liability including interest and
penalties due to the filing of inaccurate returns based on the Strategy;

(4)    Caused the plaintiffs to pay a substantial amount of money in fees to the defendants
for their improper, wrong, false and fraudulent advice, to incur substantial additional

costs and expenses for engaging in unnecessary options transactions, and for
retaining other tax and legal advisors to investigate and rectify the situation;

(5)    Kept the fees and other payments paid by plaintiffs to defendants for the second stage
of the Strategy, and then did not even attempt to perform the acts necessary to
implement it, all the while hiding the fact that steps necessary to enact the Strategy
had not even occurred; and

(6)    Caused plaintiffs to forego other legitimate tax-saving opportunities.

## H.    FEE SPLITTING AMONG THE DEFENDANTS

108.    Upon information and belief, the defendants conspired to devise, promote, sell, and
implement the Strategy for the purpose of receiving and splitting millions of dollars in fees (the
"defendants' Arrangement"). The receipt of these fees was the primary, if not sole, motive in the
development and execution of the transaction. In addition to the fees actually disclosed, it is alleged
upon information and belief that those fees were secretly split, in agreed-upon percentages, between
the investment advisor (DGI), the law firm issuing the opinion letters (Proskauer), the bank that
executed the investments (Refco), and the party that sold and shepherded the Strategy and was to
sign the plaintiffs' tax returns (McGladrey).

109.    The receipt of fees and pecuniary gain from those fees was the primary motive for the
defendants' conduct; the provision of professional services to clients was merely an incidental
byproduct of, not a motivating factor for, defendants' conduct alleged herein. Further, the
defendants' Arrangement gave each of the participating defendants a significant pecuniary interest
in the advice and professional services they would render.

110.    The defendants had a financial interest in inducing the plaintiffs, as well as other clients, to enter into the Strategy, and to do so, promised, opined and assured plaintiffs that the Strategy would provide a reasonable opportunity to make a profit on the options and at the same time legally reduce their taxes.

111.    Upon information and belief, the defendants entered into the defendants' Arrangement, whereby they agreed they would solicit each other's clients.

112.    Upon information and belief, pursuant to the defendants' Arrangement, the defendants split the fee to be charged clients that undertook the Strategy, including plaintiffs. Such conduct on the part of Proskauer, including its abject and brazen failure to reveal its multiple conflicts of interest, violated the applicable rules of conduct for attorneys acting on behalf of clients in North Carolina and elsewhere.

1.    RECENT PRONOUNCEMENTS FROM THE IRS REGARDING THE DIGITAL OPTIONS STRATEGY

113.    In June of 2003, the IRS re-stated its position regarding the Strategy and other 2000-44 transactions and issued new regulations (the "Regulations") retroactive to October 18, 1999, and explained these actions through Office of Chief Counsel Notice CC-2003-020 (the "OCC Notice"). The Regulations invalidate the Strategy, and the OCC Notice explains the IRS' position why. For example, in the OCC Notice, the IRS stated its position that:

(1)    For written options assumed by partnerships after October 18, 1999, but before June 24, 2003, the Service will apply § 1.752-6T of the Income Tax Regulations to reduce the outside basis in the partnership of the taxpayer from whom the written call option was assumed.

. . .

48

(3)     For an individual partner, the loss that a partner claims resulting from the artificial inflation of the partner's outside basis in a partnership used in a Son of Boss transaction may be disallowed under § 165(c)(2) [of the Code] because the partner lacked the requisite economic profit objective.

(4)     Under Code § 465(c)(4) [of the Code], taxpayers are not considered at risk for amounts invested in the economically offsetting option positions contributed to and assumed by a partnerships [sic] formed or availed of in connection with a Son of Boss transaction as such amounts are protected against loss.

As was true with Notice 2000-44, although the IRS names these transactions as "Son of Boss" in reference to a name given by another promoter, the description of the transaction makes it clear that the Strategy promoted and sold to plaintiffs is included.

114.    The Regulations, retroactive to before the date of plaintiffs' Strategy, totally invalidate the Strategy implemented by plaintiffs.

115.    In the OCC Notice, the IRS has also indicated it will not be relying only upon the Regulations to invalidate the plaintiffs' transactions, but will also be taking the position that the losses generated by such transactions may be disallowed under §§ 165(c) and 465(c)(4) of the Code. The Proskauer opinion letters flatly opined that Code § 165(c) was inapplicable to the Strategy. Such argument presumes the possibility of hitting the "sweet spot" in the paired options, which was, in reality, nearly impossible under the circumstances.

116.    The Proskauer opinion letters also construed Code § 465(c)(4) in a manner totally at odds with the IRS in the OCC Notice.

117.    Finally, the IRS also takes the position in the OCC Notice, again contrary to what plaintiffs were told in the Proskauer opinion letters provided by defendants, that the transaction may be set aside as violative of the partnership "anti-abuse" rules.

118.    In sum, the IRS has taken multiple positions in the OCC Notice, any one of which would completely invalidate the Digital Options Strategy and cause disallowance of all losses created thereby.

119.    On or about May 5, 2004, in Announcement 2004-46, the IRS, in furtherance of its previous pronouncements, offered to "settle" with plaintiffs and other like-situated taxpayers by those parties paying to the IRS (a) all of the taxes avoided by use of these transactions, (b) all interest due, (c) a 10% or 20% penalty, and (d) an ordinary loss of 50%, or a capital loss of 100%, of the fees and other "out of pocket" costs actually incurred. If taxpayers did not accept this offer, then the IRS indicated they would be assessed all tax and interest, lose all deductions for out-of-pocket costs and losses, and be assessed a 40% penalty. Faced with no other real option, plaintiffs settled with the IRS in or about late 2004. Through this settlement, plaintiffs paid millions of dollars in back taxes, penalties and interest.

## J.    THE COST OF THE DIGITAL OPTIONS STRATEGY

120.    The plaintiffs lost millions of dollars in carrying out the Strategy. For the Strategy and preparation of the tax returns in connection therewith, the plaintiffs paid fees to the defendants of more than $6 million. Plaintiffs were also induced to purchase investment products which they would not otherwise have purchased, but for the Strategy, and they have lost a substantial portion (over one half) of those amounts. Plaintiffs have, as part of their settlement with the IRS, been required to pay substantial penalties and interest. The plaintiffs also incurred, and will continue to

incur, significant legal, accounting, and other advisory fees in connection with rectifying the wrongs that have been perpetrated against them.

## FIRST CLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTY

### (AGAINST ALL DEFENDANTS)

121.    The foregoing and following allegations are realleged.

122.    The defendants, as the plaintiffs' attorneys, accountants, and financial advisors, were plaintiffs' fiduciaries, and thus owed plaintiffs the duties of honesty, loyalty, care and compliance with the applicable codes of professional responsibility. Defendants, because of their exclusive access to the relevant facts, the command they had over the implementation of the Strategy, and the plaintiffs' reliance upon their unique expertise, were in a position to dominate and control the actions of plaintiffs.

123.    These defendants breached their fiduciary duties to plaintiffs by advising plaintiffs to implement the Strategy and to sign and file the tax returns prepared by the McGladrey defendants in reliance on the defendants' advice, representations, recommendations, instructions, and opinions, which the defendants knew or should have known to be improper and illegal, for the purpose of generating huge fees for the defendants. Defendants also made representations to plaintiffs about the profitability, intent and purpose of the Strategy (i.e., that it would generate tax benefits and produce a reasonable likelihood of a profit) knowing that those statements were made for the purpose of misleading plaintiffs. Then, based upon these misleading statements and representations, defendants fraudulently induced plaintiffs to sign papers and make representations, which plaintiffs believed to be true, in support of the Strategy.

LR050384.WPD                    51

124.    The defendants breached their fiduciary duties to plaintiffs through the following intentional and malicious wrongful acts:

(1)    Taking advantage of a relationship of trust and confidence and using their knowledge of plaintiffs' finances to solicit plaintiffs for the Strategy;

(2)    Taking advantage of a relationship of trust and confidence in recommending the Strategy;

(3)    Advising and recommending that plaintiffs engage in the Strategy;

(4)    Charging and collecting unreasonable, excessive, and unethical fees;

(5)    Failing to disclose the actual roles, relationships and conflicts of interest of each defendant in the Strategy;

(6)    Failing to disclose that the defendants were secretly and unlawfully splitting and/or sharing fees;

(7)    Failing to fully explain the true details of the Strategy to assure that plaintiffs understood the Strategy before inducing plaintiffs to enter into the Strategy;

(8)    Recommending, advising, instructing, and assisting plaintiffs in carrying out each of the steps of the Strategy;

(9)    Recommending that plaintiffs purchase the Digital Options Contracts;

(10)    Abandoning plaintiffs by failing to implement the second stage of the Strategy, or by failing to take remedial action once it became apparent that the Strategy was not lawful; and by

(11)    Other acts to be proven at trial.

125.    As a result of the defendants' intentional and malicious conduct as set forth herein, plaintiffs have suffered injury in that they paid defendants substantial fees for services defendants knew were for an unlawful purpose; they unnecessarily purchased the Digital Options Contracts to effectuate the Strategy; they have incurred tax penalties and interest and disallowance of certain tax favorable treatment; they lost the opportunity to avail themselves of other legitimate tax-savings strategies; they sold the Stock and thereby lost the additional gain they would have realized due to the continued increase in the value of the Stock; and they have incurred substantial additional costs in hiring other tax and legal advisors to rectify the situation.

126.    As a direct and proximate cause of the foregoing, plaintiffs have been damaged in an amount in excess of Ten Thousand Dollars ($10,000.00), said amount to be proven at the trial of this action, and to include, without limitation, those damages alleged with more particularity in Paragraph 125, above. Plaintiffs are further entitled to recover punitive damages from defendants pursuant to N.C. Gen. Stat. §§ 1D-1, *et seq.*

## SECOND CLAIM FOR RELIEF

## CONSTRUCTIVE FRAUD

### (AGAINST ALL DEFENDANTS)

127.    The foregoing and following allegations are realleged.

128.    As alleged herein, the attendant facts and circumstances giving rise to this action created a relationship of trust and confidence (a fiduciary relationship) between plaintiffs and the defendants, and this relationship surrounded and led up to the consummation of the financial and tax planning involving the tax strategy sold to plaintiffs, which was implemented by the defendants. The

defendants advantaged and benefitted themselves in a pecuniary fashion by virtue of their fiduciary relationship with plaintiffs and by the conduct alleged herein.

129.    The breaches of fiduciary duty alleged herein constituted a constructive fraud upon plaintiffs, and, as a direct and proximate result of defendants' constructive fraud, plaintiffs have been damaged in an amount in excess of ten thousand dollars ($10,000), said amount to be proven at the trial of this action and to include, without limitation, those damages alleged with more particularity in Paragraph 125, above. The aforesaid breaches of fiduciary duty and constructive fraud committed against plaintiffs were intentional, willful and wanton. Plaintiffs are further entitled to recover punitive damages from defendants pursuant to N.C. Gen. Stat. § 1D-1, *et seq*. In the alternative, plaintiffs are entitled to double compensatory damages pursuant to N.C. Gen. Stat. § 84-13, due to the fraudulent conduct of co-conspirators Proskauer and defendant Akselrad.

### THIRD CLAIM FOR RELIEF

### FRAUD

#### (AGAINST ALL DEFENDANTS)

130.    The foregoing and following allegations are realleged.

131.    In order to induce the plaintiffs to pay them substantial fees, and to fraudulently induce them to enter into certain contracts (such as the McGladrey engagement letter) and to sign certain papers associated with the transactions, the defendants made numerous knowingly false affirmative representations and intentional omissions of material facts to plaintiffs, including but not limited to:

(1)    Failing to disclose the actual roles, relationships and conflicts of interest of each defendant in the Strategy;

LR050384.WPD                                    54

(2)  Failing to disclose that the defendants were splitting and/or sharing fees;

(3)  Representing to plaintiffs that the tax benefits of the Strategy far outweighed any potential loss that might be incurred on the Digital Options Contracts;

(4)  Advising plaintiffs that the Proskauer opinion letters were "independent" and unbiased legal opinions from an "independent" law firm;

(5)  Failing to advise plaintiffs that Proskauer opinion letters were not "independent" legal opinions from an "independent" law firm;

(6)  Advising plaintiffs that the Proskauer opinion letters could be relied upon to protect plaintiffs from incurring penalties if audited;

(7)  Advising plaintiffs that the Proskauer opinion letters could be relied upon to satisfy the IRS as to the propriety of the Strategy if audited;

(8)  Creating, designing, implementing, promoting, advising, recommending, and/or selling illegal, improper, and invalid tax shelters that defendants knew were disallowed and/or prohibited by the IRS;

(9)  Failing to advise plaintiffs that Proskauer had already prepared a "form" opinion letter approving the Strategy and needed to only fill in several blanks for each of the many clients to which it rendered such opinion letters;

(10)  Failing to disclose to plaintiffs that defendants, in essence, were illegally promoting and marketing an unregistered tax shelter (i.e., the Strategy) to plaintiffs;

(11)  Failing to disclose to plaintiffs that if they filed tax returns based on the Strategy they would be liable for penalties and interest;

(12)  Advising plaintiffs that the basis created by the Strategy was legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(13)  Recommending, advising, instructing, and/or assisting plaintiffs in implementing and carrying out all phases of the Strategy;

(14)  Representing and advising plaintiffs that the Strategy had business purpose and economic substance;

(15)  Making and endorsing the statements and representations in the "marketing" opinion letters and opinion letters authored by Proskauer, including the false statement that the Strategy was not a tax shelter within the meaning of Code § 6111 and did not have to be registered under Code § 6111;

(16)  Making and endorsing the statements and representations contained in the Proskauer opinion letters, in defendants' oral advice, instructions, and recommendations, and in the tax returns and related information prepared by DGI and the McGladrey defendants;

(17)  Failing to advise plaintiffs of each defendant's role in the Strategy and the fee each defendant received for assisting and carrying out the Strategy through the Digital Options Contracts and other aspects of the Strategy;

(18)  Recommending, advising, instructing, and assisting plaintiffs in carrying out each of the steps of the Strategy, and representing that each step of the Strategy was lawful and would pass muster with the IRS;

(19)  Recommending that plaintiffs purchase the Digital Options Contracts;

(20)  Recommending, advising, instructing, and assisting plaintiffs in the Digital Options
Contracts;

(21)  Failing to accurately and fully explain the Digital Options Contracts to plaintiffs to
ensure they understood the Digital Options before plaintiffs engaged in the Strategy;

(22)  Failing to accurately and fully advise plaintiffs that the Digital Options Contracts
were a private bet with Refco, that Refco could control the outcome of the bet by
picking the spot price and ignoring other spot prices, that Refco could manipulate the
results to ensure plaintiffs did not make money and that the Options were designed
to expire out of the money and result in a loss for plaintiffs;

(23)  Failing to advise plaintiffs that the design of the Strategy and the Digital Options
Contracts made no economic or investment sense and had no business purpose or
economic substance;

(24)  Advising plaintiffs that the design of the Strategy and the Digital Options Contracts
made economic and investment sense and had business purpose and economic
substance;

(25)  Informing plaintiffs that they had an opportunity of making a profit on the Digital
Options Contracts when, in fact, it was virtually impossible to make a profit taking
into account the fees and costs of the Strategy, that the Options were designed to
result in a loss, and that Refco controlled the outcome and could manipulate the
results to ensure plaintiffs did not make money;

(26)  Failing to learn the facts as to whether the Digital Options Contracts were appropriate
for the plaintiffs, either as an investment or as part of a tax strategy;

(27)    Failing to fully and properly inform and advise plaintiffs of IRS Notice 99-59 and its
        implications on the Strategy;

(28)    Failing to advise plaintiffs that IRS Notice 99-59 identified transactions lacking in
        "economic substance" (like the Strategy) as improper and illegal and purported to
        disallow any reduction in taxes generated through such transactions;

(29)    Advising plaintiffs that IRS Notice 99-59 did not apply to the Strategy and/or did not
        impact the propriety of the Strategy;

(30)    Failing to revise, alter, amend, or modify the advice, recommendations, instructions,
        opinions, and representations made to plaintiffs, orally or in opinion letters, regarding
        the propriety of the Strategy in light of IRS Notice 99-59;

(31)    Advising, instructing, and assisting in the preparation of filing of plaintiffs' tax
        returns, utilizing the reduction in taxes generated by the Strategy;

(32)    Advising, confirming, and/or ratifying that Proskauer's marketing, draft and final
        opinion letters were accurate and correct;

(33)    Advising plaintiffs that their tax returns, which utilized the reduction in taxes
        generated by the Strategy, were prepared in accordance with professional standards
        and pursuant to IRS guidelines and established legal authorities;

(34)    Failing to fully and properly inform and advise the plaintiffs of IRS Notice 2000-44
        and its implications on the Strategy;

(35)    Failing to advise plaintiffs that in IRS Notice 2000-44, the IRS had identified the
        Strategy as improper and illegal and planned to disallow the reduction in taxes
        generated by the Strategy;

(36)    Failing to advise plaintiffs that IRS Notice 2000-44 described and identified the

Strategy as being improper and illegal;

(37)    Advising plaintiffs that IRS Notice 2000-44 did not apply to the Strategy and/or

impact the propriety of the Strategy;

(38)    Failing to revise, alter, amend, or modify the advice, recommendations, instructions,

representations, and opinions made to plaintiffs, orally or in opinion letters, regarding

the propriety of the Strategy in light of IRS Notice 2000-44;

(39)    Advising plaintiffs that the Strategy was valid and proper in spite of IRS Notice 99-

59 and IRS Notice 2000-44;

(40)    Failing to disclose existing published authority that the purported tax consequences

for this particular Strategy were improper and not allowable for income tax purposes;

(41)    Failing to recommend and advise the plaintiffs to enroll in the 2001 Amnesty

Program in order to prevent penalties and interest on those penalties;

(42)    Failing to ensure that the Strategy the defendants advised plaintiffs to enter complied

with the applicable State and Federal laws and regulations;

(43)    Failing to inform plaintiffs that some or all of the transactions undergirding the

Strategy were not real and/or did not actually occur in the manner represented in the

documents presented to plaintiffs;

(44)    Providing intentionally erroneous opinions and advice regarding the legality of the

Strategy;

(45)    Engaging in professional relationships and operating despite known and undisclosed
conflicts of interest in a fashion that violated their respective professional and ethical
rules of conduct;

(46)    Advising the plaintiffs that the step transaction, sham transaction, and economic
substance doctrines would not apply to disallow the results of the Strategy;

(47)    Advising the plaintiffs that Treasury Regulation Section 1.701-2 would not apply to
the Strategy;

(48)    Advising the plaintiffs that the Short Options will not be a liability within the
meaning of Section 752 of the Code;

(49)    Advising, recommending, instructing, and assisting plaintiffs in entering into a
transaction in which they were advised that the step transaction, sham transaction,
and/or economic substance doctrines did not apply to disallow the results of the
Strategy;

(50)    Advising plaintiffs that each of the various steps of the Strategy were meaningful and
imbued with non-tax considerations;

(51)    Informing the plaintiffs that the Strategy was not a "sham transaction" that would be
ignored or disallowed for tax purposes;

(52)    Informing the plaintiffs that the Proskauer opinion letters would confirm that the
Strategy was not a "sham transaction" that would be ignored or disallowed for tax
purposes;

(53)    Advising, recommending, instructing, and assisting plaintiffs in engaging in a Strategy, which the plaintiffs were advised had business purpose and economic substance and made investment sense;

(54)    Failing to advise plaintiffs that the Strategy had no business purpose and no economic substance and made no business sense;

(55)    Recommending, instructing, and advising plaintiffs to enter into the Digital Options Contracts as an investment and/or part of a tax strategy;

(56)    Advising, recommending, instructing, and assisting plaintiffs in entering into transactions that, unbeknownst to the plaintiffs, were illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions," and violated the step transaction, sham transaction, and economic substance doctrines;

(57)    Failing to advise plaintiffs of other legitimate tax-savings and investment opportunities available to them;

(58)    Advising plaintiffs that the options transactions were undertaken at "arm's length," knowing that this was not the case; and

(59)    Making the other misrepresentations or omissions of material facts stated elsewhere in this Complaint.

132.    The above intentional omissions of material fact and/or affirmative representations made by each defendant were false when made, and the defendants knew these representations to be false when made, but nonetheless made them with the intention that plaintiffs rely upon them in entering into the Strategy and paying them substantial fees. In addition, the above affirmative

misrepresentations and/or intentional omissions of material fact were made knowingly by the defendants, with the intent to induce plaintiffs to enter into the Strategy and pay them substantial fees. Moreover, due to the nature of defendants' scheme to sell the Strategy, defendants falsely represented or allowed the others to falsely represent that the accountants (McGladrey and BDO), the lawyers (Proskauer), and the "investment advisor" (DGI), were each performing specifically defined independent roles in the Strategy. As a result, defendants intentionally concealed the fact that they were not independent from one another, and were, instead, operating collaboratively to sell the Strategy to plaintiffs. Through this process, and upon information and belief, each defendant authorized the other to make whatever statements were necessary to sell the transactions. In this way, and others, each defendant adopted and endorsed the statements of the other, all for the purpose of furthering the unlawful scheme.

133.    In reasonable reliance on the defendants' false affirmative representations and intentional omissions of material facts regarding the Strategy, plaintiffs paid substantial fees to defendants for tax and investment advice, paid additional amounts to execute the Strategy, unnecessarily purchased the Digital Options Contracts to effectuate the Digital Options Strategy, did not enter the 2001 Amnesty Program, did not disclose the transaction on their federal tax returns as a tax shelter, and filed federal and state tax returns that reflected improper tax treatment resulting from the Strategy.

134.    But for defendants' intentional misrepresentations and material omissions described above, plaintiffs would never have hired defendants for advice on the Digital Options Strategy, engaged in the Strategy, utilized an improper tax basis on their income tax returns, filed tax returns prepared in reliance on the defendants' advice and/or did not disclose the transactions on their federal

tax returns as a tax shelter. After discovering the defendants' fraud, plaintiffs incurred and will continue to incur substantial additional costs in hiring other tax and legal advisors to rectify the situation.

135.    As a direct and proximate result of defendants' intentional, willful and wanton, and malicious conduct set forth herein, plaintiffs have been damaged in an amount in excess of Ten Thousand Dollars ($10,000.00), said amount to be proven at the trial of this action, and to include, without limitation, those damages alleged with more particularity in Paragraph 125, above.

136.    The defendants' misrepresentations and concealment of material facts were intentional, willful and wanton. Therefore plaintiffs are entitled to recover punitive damages from defendants pursuant to N.C. Gen. Stat. § 1D-1, *et seq.* In the alternative, plaintiffs are entitled to double compensatory damages pursuant to N.C. Gen. Stat. § 84-13, due to the fraudulent conduct of Proskauer and defendant Akselrad.

## FOURTH CLAIM FOR RELIEF

### CIVIL ACTION PURSUANT TO N.C. GEN. STAT. § 1-538.2
### FOR OBTAINING MONEY THROUGH EMBEZZLEMENT AND FALSE PRETENSE

#### (AGAINST ALL DEFENDANTS)

137.    The foregoing and following allegations are realleged.

138.    Defendants knowingly, systematically, intentionally, and designedly, via the conduct alleged above, obtained money from plaintiffs through embezzlement, false pretense and cheating. Such embezzlement, false pretenses and cheating related to subsisting facts as well as the fulfillment of future acts, and violated N.C. Gen. Stat. § 14-90 and § 14-100(a), and are actionable pursuant to N.C. Gen. Stat. § 1-538.2.

139.   As a result of defendants' conduct, plaintiffs have been damaged in an amount in excess of ten thousand dollars ($10,000), said amount to be proven at the trial of this action and to include, without limitation, those damages alleged with more particularity in Paragraph 125, above. Plaintiffs are also entitled to recover attorneys' fees pursuant to N.C. Gen. Stat. § 1-538.2(a). Plaintiffs are further entitled to recover punitive damages from defendants pursuant to N.C. Gen. Stat. §§ 1D-1, *et seq.*

### FIFTH  CLAIM FOR RELIEF

### REMEDY OF RESCISSION AND/OR DISGORGEMENT OF UNETHICAL, EXCESSIVE AND ILLEGAL FEES AND RECOVERY IN QUANTUM MERUIT

#### (AGAINST ALL DEFENDANTS)

140.   The foregoing and following allegations are realleged.

141.   Regardless of the merits of the legal and tax advice and the opinion letters that defendants provided to plaintiffs, the fees charged by defendants, which plaintiffs paid, were unethically excessive and in violation of the applicable rules of professional conduct for lawyers and accountants. This is evident from the facts, *inter alia,* that: Proskauer and Akselrad and McGladrey and Wainwright purported to represent the interests of plaintiffs, despite knowing, all the while, that irreconcilable conflicts of interest existed that prevented them from acting in the best interests of their clients, and that the Proskauer defendants' opinion letters were replete with knowingly false statements and were "canned" and "prefabricated" and used with numerous other clients. Upon information and belief, defendants charged their clients the same or similar fees for the same service and expended little, if any, additional time or effort in providing opinion letters and advice to plaintiffs.

LR050384.WPD                             64

142.    Further, since defendants did not disclose information that they were required to disclose - *e.g.*, the fact that the providers of the purported opinion letters were not "independent" (since Proskauer had a significant pecuniary interest in the strategy and had undisclosed relationships with the other defendants), and the fact that defendants' representation of plaintiffs and their arrangements with other defendants violated applicable rules of professional conduct and applicable standards of care - their fee agreements and similar agreements with plaintiffs are not enforceable.

143.    Accordingly, defendants have been unjustly enriched and should be compelled to disgorge the fees wrongfully exacted from plaintiffs. Alternatively, all such fee contracts and the like should be rescinded. The amount of such excessive and unethical fees exceeds ten thousand dollars ($10,000), said amount to be proven at the trial of this action.

### SIXTH CLAIM FOR RELIEF

### NEGLIGENCE

### (AGAINST ALL DEFENDANTS)

144.    The foregoing and following allegations are realleged.

145.    As plaintiffs' lawyers, accountants, tax advisors, and investment advisors, the defendants owed plaintiffs duties of care, loyalty and honesty, a duty to comply with the applicable standards of care, and a duty to comply with the applicable provisions of their codes of professional responsibility.

146.    The defendants also had a duty to plaintiffs to meet the applicable standards of care for lawyers, accountants, and advisors. The defendants failed to meet those applicable standards of care. The defendants' failure to meet the standard of care caused damages to the plaintiffs as set forth elsewhere in this Complaint.

147.   These defendants were grossly negligent in their acts and breached the applicable standard of care in, among others, the following manner:

(1)   Taking advantage of a relationship of trust and confidence and using their knowledge of plaintiffs' finances to solicit plaintiffs for the Strategy;

(2)   Taking advantage of a relationship of trust and confidence in recommending the Strategy;

(3)   Advising and recommending that plaintiffs engage in the Strategy;

(4)   Charging and collecting unreasonable, excessive, and unethical fees;

(5)   Failing to disclose the actual roles, relationships and conflicts of interest of each defendant in the Strategy;

(6)   Failing to disclose that the defendants were splitting and/or sharing fees;

(7)   Soliciting plaintiffs on behalf of the other defendants;

(8)   Failing to fully explain the true details of the Strategy and failing to assure that plaintiffs understood the Strategy before inducing plaintiffs to enter into the Strategy;

(9)   Representing to plaintiffs that the tax benefits of the Strategy far outweighed any potential loss that might be incurred on the Digital Options Contracts;

(10)   Advising plaintiffs that the Proskauer opinion letters were "independent" and unbiased legal opinions from an "independent" law firm;

(11)   Failing to advise plaintiffs that the Proskauer opinion letters were not "independent" legal opinions from an "independent" law firm;

(12)   Advising plaintiffs that the Proskauer opinion letters could be relied upon to protect plaintiffs from incurring penalties if audited;

(13)   Advising plaintiffs that the Proskauer opinion letters could be relied upon to satisfy
the IRS as to the propriety of the Strategy if audited;

(14)   Creating, designing, implementing, promoting, advising, recommending, and/or
selling illegal, improper, and invalid tax shelters that defendants knew were
disallowed and/or prohibited by the IRS;

(15)   Failing to advise plaintiffs that Proskauer had already prepared a "form" opinion
letter approving the Strategy and needed to only fill in several blanks for each of the
many clients to which it rendered such opinion letters;

(16)   Illegally promoting an unregistered tax shelter by marketing the Strategy to plaintiffs;

(17)   Failing to disclose to plaintiffs that if they filed tax returns based on the Strategy
they would be liable for penalties and interest;

(18)   Advising plaintiffs that the basis created by the Strategy was legitimate, proper,
and in accordance with all applicable tax laws, rules, and regulations;

(19)   Recommending, advising, instructing, and/or assisting plaintiffs in implementing
and carrying out all phases of the Strategy;

(20)   Representing and advising plaintiffs that the Strategy had business purpose and
economic substance;

(21)   Making and endorsing the statements and representations in the "marketing" opinion
letters and opinion letters authored by Proskauer, including the false statement that
the Strategy was not a tax shelter within the meaning of Code § 6111 and did not
have to be registered under Code § 6111;

(22)    Making and endorsing the statements and representations contained in the Proskauer opinion letters, in defendants' oral advice, instructions, and recommendations, and in the tax returns and related information prepared by DGI and the McGladrey defendants;

(23)    Failing to advise plaintiffs of each defendant's role in the Strategy and the fee each defendant received for assisting and carrying out the Strategy through the Digital Options Contracts and other aspects of the Strategy;

(24)    Recommending, advising, instructing, and assisting plaintiffs in carrying out each of the steps of the Strategy, and representing that each step of the Strategy was lawful and would pass muster with the IRS;

(25)    Recommending that plaintiffs purchase the Digital Options Contracts;

(26)    Recommending, advising, instructing, and assisting plaintiffs in the Digital Options Contracts;

(27)    Failing to accurately and fully explain the Digital Options Contracts to plaintiffs to ensure they understood the Digital Options before plaintiffs engaged in the Strategy;

(28)    Failing to accurately and fully advise plaintiffs that the Digital Options Contracts were a private bet with Refco, that Refco could control the outcome of the bet by picking the spot price and ignoring other spot prices, that Refco could manipulate the results to ensure plaintiffs did not make money and that the Options were designed to expire out of the money and result in a loss for plaintiffs;

(29)  Failing to advise plaintiffs that the design of the Strategy and the Digital Options Contracts made no economic or investment sense and had no business purpose or economic substance;

(30)  Advising plaintiffs that the design of the Strategy and the Digital Options Contracts made economic and investment sense and had business purpose and economic substance;

(31)  Informing plaintiffs that they had an opportunity of making a profit on the Digital Options Contracts when, in fact, it was virtually impossible to make a profit taking into account the fees and costs of the Strategy, that the Options were designed to result in a loss, and that Refco controlled the outcome and could manipulate the results to ensure plaintiffs did not make money;

(32)  Failing to learn the facts as to whether the Digital Options Contracts were appropriate for the plaintiffs, either as an investment or as part of a tax strategy;

(33)  Failing to fully and properly inform and advise plaintiffs of IRS Notice 99-59 and its implications on the Strategy;

(34)  Failing to advise plaintiffs that IRS Notice 99-59 identified transactions lacking in "economic substance" (like the Strategy) as improper and illegal and purported to disallow any reduction in taxes generated through such transactions;

(35)  Advising plaintiffs that IRS Notice 99-59 did not apply to the Strategy and/or did not impact the propriety of the Strategy;

(36)  Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to plaintiffs, orally or in opinion letters, regarding the propriety of the Strategy in light of IRS Notice 99-59;

(37)  Advising, instructing, and assisting in the preparation of filing of plaintiffs' tax returns, utilizing the reduction in taxes generated by the Strategy;

(38)  Advising, confirming, and/or ratifying that Proskauer's marketing, draft and final opinion letters were accurate and correct;

(39)  Advising plaintiffs that their tax returns, which utilized the reduction in taxes generated by the Strategy, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(40)  Failing to fully and properly inform and advise the plaintiffs of IRS Notice 2000-44 and its implications on the Strategy;

(41)  Failing to advise plaintiffs that in IRS Notice 2000-44, the IRS had identified the Strategy as improper and illegal and planned to disallow the reduction in taxes generated by the Strategy;

(42)  Failing to advise plaintiffs that IRS Notice 2000-44 described and identified the Strategy as being improper and illegal;

(43)  Advising plaintiffs that IRS Notice 2000-44 did not apply to the Strategy and/or impact the propriety of the Strategy;

(44)  Failing to revise, alter, amend, or modify the advice, recommendations, instructions, representations, and opinions made to plaintiffs, orally or in opinion letters, regarding the propriety of the Strategy in light of IRS Notice 2000-44;

(45)    Advising plaintiffs that the Strategy was valid and proper in spite of IRS Notice 99-
59 and IRS Notice 2000-44;

(46)    Failing to disclose existing published authority that the purported tax consequences
for this particular Strategy were improper and not allowable for income tax purposes;

(47)    Failing to recommend and advise the plaintiffs to enroll in the 2001 Amnesty
Program in order to prevent penalties and interest on those penalties;

(48)    Advising the plaintiffs not to enroll in the 2001 Amnesty Program;

(49)    Failing to ensure that the Strategy the defendants advised plaintiffs to enter complied
with the applicable State and Federal laws and regulations;

(50)    Failing to inform plaintiffs that some or all of the transactions undergirding the
Strategy were not real and/or did not actually occur in the manner represented in the
documents presented to plaintiffs;

(51)    Failing to comply with their ethical obligations to plaintiffs;

(52)    Violating their respective professional rules of conduct;

(53)    Providing intentionally erroneous opinions and advice;

(54)    Engaging in professional relationships and operating despite known and undisclosed
conflicts of interest in a fashion that violated their respective professional and ethical
rules of conduct;

(55)    Advising the plaintiffs that the step transaction, sham transaction, and economic
substance doctrines would not apply to disallow the results of the Strategy;

(56)    Advising the plaintiffs that Treasury Regulation Section 1.701-2 would not apply to
the Strategy;

(57)    Advising the plaintiffs that the Short Options will not be a liability within the meaning of Section 752 of the Code;

(58)    Advising, recommending, instructing, and assisting plaintiffs in entering into a transaction in which they were advised that the step transaction, sham transaction, and/or economic substance doctrines did not apply to disallow the results of the Strategy;

(59)    Advising plaintiffs that each of the various steps of the Strategy were meaningful and imbued with non-tax considerations;

(60)    Informing the plaintiffs that the Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(61)    Informing the plaintiffs that the Proskauer opinion letters would confirm that the Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(62)    Advising, recommending, instructing, and assisting plaintiffs in engaging in a Strategy, which the plaintiffs were advised had business purpose and economic substance and made investment sense;

(63)    Failing to advise plaintiffs that the Strategy had no business purpose and no economic substance and made no business sense;

(64)    Recommending, instructing, and advising plaintiffs to enter into the Digital Options Contracts as an investment and/or part of a tax strategy;

(65)    Advising, recommending, instructing, and assisting plaintiffs in entering into transactions that, unbeknownst to the plaintiffs, were illegal and improper and would

be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions," and violated the step transaction, sham transaction, and economic substance doctrines;

(66)    Failing to advise plaintiffs of other legitimate tax-savings and investment opportunities available to them;

(67)    Advising plaintiffs that the options transactions were undertaken at "arm's length," knowing that this was not the case; and

(68)    Making the other misrepresentations or omissions of material facts stated elsewhere in this Complaint.

148.    The defendants' negligence rises to the level of gross negligence and/or malice. The defendants' negligence proximately caused plaintiffs' damages.

149.    In reasonable reliance on the defendants' negligent and grossly negligent advice regarding the Digital Options Strategy, plaintiffs paid substantial fees to defendants for tax, legal, and investment advice, paid additional fees to execute the Strategy, unnecessarily purchased the Digital Options Contracts to effectuate the Strategy, did not enter the Amnesty Program, and filed federal and state tax returns that reflected deductions for losses resulting from the Strategy.

150.    But for the defendants' negligence and gross negligence described above, plaintiffs would never have hired defendants for advice on the Strategy, engaged in the Strategy, unnecessarily purchased the Digital Options Contracts to effectuate the Strategy, failed to enter the 2001 Amnesty Program and filed federal tax returns that reflected improper tax treatment resulting from the Strategy.

151.   After discovering the defendants' negligence, plaintiffs incurred and will continue to
incur substantial additional costs in hiring other tax and legal advisors to rectify the situation.

152.   As a proximate result of the foregoing, plaintiffs have been damaged in an amount
in excess of Ten Thousand Dollars ($10,000.00), said amount to be proven at the trial of this action,
and to include, without limitation, those damages alleged with more particularity in Paragraph 125,
above.

## SEVENTH CLAIM FOR RELIEF

## NEGLIGENT MISREPRESENTATION

### (AGAINST ALL DEFENDANTS)

153.   The foregoing and following allegations are realleged.

154.   As plaintiffs' lawyers, tax advisors, accountants, and investment advisors, the
defendants owed plaintiffs duties of care, loyalty and honesty; a duty to comply with the applicable
standards of case; and a duty to comply with the applicable provisions of their codes of professional
responsibility.

155.   During the course of their representation of plaintiffs, these defendants each made
numerous knowingly or negligently false affirmative representations, and intentional or negligently
misleading omissions of material fact, including but not limited to:

   (1)   Taking advantage of a relationship of trust and confidence and using their knowledge
         of plaintiffs' finances to solicit plaintiffs for the Strategy;

   (2)   Taking advantage of a relationship of trust and confidence in recommending the
         Strategy;

   (3)   Advising and recommending that plaintiffs engage in the Strategy;

(4)   Charging and collecting unreasonable, excessive, and unethical fees;

(5)   Failing to disclose the actual roles, relationships and conflicts of interest of each
      defendant in the Strategy;

(6)   Failing to disclose that the defendants were splitting and/or sharing fees;

(7)   Soliciting plaintiffs on behalf of the other defendants;

(8)   Failing to fully explain the true details of the Strategy and failing to assure that
      plaintiffs understood the Strategy before inducing plaintiffs to enter into the Strategy;

(9)   Representing to plaintiffs that the tax benefits of the Strategy far outweighed any
      potential loss that might be incurred on the Digital Options Contracts;

(10)  Advising plaintiffs that the Proskauer opinion letters were "independent" and
      unbiased legal opinions from an "independent" law firm;

(11)  Failing to advise plaintiffs that Proskauer opinion letters were not "independent"
      legal opinions from an "independent" law firm;

(12)  Advising plaintiffs that the Proskauer opinion letters could be relied upon to protect
      plaintiffs from incurring penalties if audited;

(13)  Advising plaintiffs that the Proskauer opinion letters could be relied upon to satisfy
      the IRS as to the propriety of the Strategy if audited;

(14)  Creating, designing, implementing, promoting, advising, recommending, and/or
      selling illegal, improper, and invalid tax shelters that defendants knew were
      disallowed and/or prohibited by the IRS;

(15)    Failing to advise plaintiffs that Proskauer had already prepared a "form" opinion
letter approving the Strategy and needed to only fill in several blanks for each of the
many clients to which it rendered such opinion letters;

(16)    Illegally promoting an unregistered tax shelter by marketing the Strategy to plaintiffs;

(17)    Failing to disclose to plaintiffs that if they filed tax returns based on the Strategy
they would be liable for penalties and interest;

(18)    Advising plaintiffs that the basis created by the Strategy was legitimate, proper,
and in accordance with all applicable tax laws, rules, and regulations;

(19)    Recommending, advising, instructing, and/or assisting plaintiffs in implementing
and carrying out all phases of the Strategy;

(20)    Representing and advising plaintiffs that the Strategy had business purpose and
economic substance;

(21)    Making and endorsing the statements and representations in the "marketing" opinion
letters and opinion letters authored by Proskauer, including the false statement that
the Strategy was not a tax shelter within the meaning of Code § 6111 and did not
have to be registered under Code § 6111;

(22)    Making and endorsing the statements and representations contained in the Proskauer
opinion letters, in defendants' oral advice, instructions, and recommendations, and
in the tax returns and related information prepared by DGI and the McGladrey
defendants;

(23)    Failing to advise plaintiffs of each defendant's role in the Strategy and the fee each
        defendant received for assisting and carrying out the Strategy through the  Digital
        Options Contracts and other aspects of the Strategy;

(24)    Recommending, advising, instructing, and assisting plaintiffs in carrying out each of
        the steps of the Strategy, and representing that each step of the Strategy was lawful
        and would pass muster with the IRS;

(25)    Recommending that plaintiffs purchase the Digital Options Contracts;

(26)    Recommending, advising, instructing, and assisting plaintiffs in the Digital Options
        Contracts;

(27)    Failing to accurately and fully explain the Digital Options Contracts to plaintiffs to
        ensure they understood the Digital Options before plaintiffs engaged in the Strategy;

(28)    Failing to accurately and fully advise plaintiffs that the Digital Options Contracts
        were a private bet with Refco, that Refco could control the outcome of the bet by
        picking the spot price and ignoring other spot prices, that Refco could manipulate the
        results to ensure plaintiffs did not make money and that the Options were designed
        to expire out of the money and result in a loss for plaintiffs;

(29)    Failing to advise plaintiffs that the design of the Strategy and the Digital Options
        Contracts made no economic or investment sense and had no business purpose or
        economic substance;

(30)    Advising plaintiffs that the design of the Strategy and the Digital Options Contracts
        made economic and investment sense and had business purpose and economic
        substance;

(31)    Informing plaintiffs that they had an opportunity of making a profit on the Digital
Options Contracts when, in fact, it was virtually impossible to make a profit taking
into account the fees and costs of the Strategy, that the Options were designed to
result in a loss, and that Refco controlled the outcome and could manipulate the
results to ensure plaintiffs did not make money;

(32)    Failing to learn the facts as to whether the Digital Options Contracts were appropriate
for the plaintiffs, either as an investment or as part of a tax strategy;

(33)    Failing to fully and properly inform and advise plaintiffs of IRS Notice 99-59 and its
implications on the Strategy;

(34)    Failing to advise plaintiffs that IRS Notice 99-59 identified transactions lacking in
"economic substance" (like the Strategy) as improper and illegal and purported to
disallow any reduction in taxes generated through such transactions;

(35)    Advising plaintiffs that IRS Notice 99-59 did not apply to the Strategy and/or did not
impact the propriety of the Strategy;

(36)    Failing to revise, alter, amend, or modify the advice, recommendations, instructions,
opinions, and representations made to plaintiffs, orally or in opinion letters, regarding
the propriety of the Strategy in light of IRS Notice 99-59;

(37)    Advising, instructing, and assisting in the preparation of filing of plaintiffs' tax
returns, utilizing the reduction in taxes generated by the Strategy;

(38)    Advising, confirming, and/or ratifying that Proskauer's marketing, draft and final
opinion letters were accurate and correct;

(39)    Advising plaintiffs that their tax returns, which utilized the reduction in taxes
generated by the Strategy, were prepared in accordance with professional standards
and pursuant to IRS guidelines and established legal authorities;

(40)    Failing to fully and properly inform and advise the plaintiffs of IRS Notice 2000-44
and its implications on the Strategy;

(41)    Failing to advise plaintiffs that in IRS Notice 2000-44, the IRS had identified the
Strategy as improper and illegal and planned to disallow the reduction in taxes
generated by the Strategy;

(42)    Failing to advise plaintiffs that IRS Notice 2000-44 described and identified the
Strategy as being improper and illegal;

(43)    Advising plaintiffs that IRS Notice 2000-44 did not apply to the Strategy and/or
impact the propriety of the Strategy;

(44)    Failing to revise, alter, amend, or modify the advice, recommendations, instructions,
representations, and opinions made to plaintiffs, orally or in opinion letters, regarding
the propriety of the Strategy in light of IRS Notice 2000-44;

(45)    Advising plaintiffs that the Strategy was valid and proper in spite of IRS Notice 99-
59 and IRS Notice 2000-44;

(46)    Failing to disclose existing published authority that the purported tax consequences
for this particular Strategy were improper and not allowable for income tax purposes;

(47)    Failing to recommend and advise the plaintiffs to enroll in the 2001 Amnesty
Program in order to prevent penalties and interest on those penalties;

(48)    Advising the plaintiffs not to enroll in the 2001 Amnesty Program;

(49)    Failing to ensure that the Strategy the defendants advised plaintiffs to enter complied
        with the applicable State and Federal laws and regulations;

(50)    Failing to inform plaintiffs that some or all of the transactions undergirding the
        Strategy were not real and/or did not actually occur in the manner represented in the
        documents presented to plaintiffs;

(51)    Failing to comply with their ethical obligations to plaintiffs;

(52)    Violating their respective professional rules of conduct;

(53)    Providing intentionally erroneous opinions and advice;

(54)    Engaging in professional relationships and operating despite known and undisclosed
        conflicts of interest in a fashion that violated their respective professional and ethical
        rules of conduct;

(55)    Advising the plaintiffs that the step transaction, sham transaction, and economic
        substance doctrines would not apply to disallow the results of the Strategy;

(56)    Advising the plaintiffs that Treasury Regulation Section 1.701-2 would not apply to
        the Strategy;

(57)    Advising the plaintiffs that the Short Options will not be a liability within the
        meaning of Section 752 of the Code;

(58)    Advising, recommending, instructing, and assisting plaintiffs in entering into a
        transaction in which they were advised that the step transaction, sham transaction,
        and/or economic substance doctrines did not apply to disallow the results of the
        Strategy;

(59)    Advising plaintiffs that each of the various steps of the Strategy were meaningful and imbued with non-tax considerations;

(60)    Informing the plaintiffs that the Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(61)    Informing the plaintiffs that the Proskauer opinion letters would confirm that the Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(62)    Advising, recommending, instructing, and assisting plaintiffs in engaging in a Strategy, which the plaintiffs were advised had business purpose and economic substance and made investment sense;

(63)    Failing to advise plaintiffs that the Strategy had no business purpose and no economic substance and made no business sense;

(64)    Recommending, instructing, and advising plaintiffs to enter into the Digital Options Contracts as an investment and/or part of a tax strategy;

(65)    Advising, recommending, instructing, and assisting plaintiffs in entering into transactions that, unbeknownst to the plaintiffs, were illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions," and violated the step transaction, sham transaction, and economic substance doctrines;

(66)    Failing to advise plaintiffs of other legitimate tax-savings and investments opportunities available to them;

(67)    Advising plaintiffs that the options transactions were undertaken at "arm's length,"
knowing that this was not the case; and

(68)    Making the other misrepresentations or omissions of material facts stated elsewhere
in this Complaint.

156.    The defendants either knew or reasonably should have known that their
representations, recommendations, advice, instructions, and opinions were false.

157.    In reasonable reliance on the defendants' affirmative representations and negligent
omissions of material facts regarding the Strategy, plaintiffs paid substantial fees to defendants for
tax, legal, and investment advice, paid additional fees to execute the Strategy, unnecessarily
purchased the Digital Options Contracts to effectuate the Strategy, did not enter the 2001 Amnesty
Program, and filed federal and state tax returns that reflected deductions for losses resulting from
the Strategy.

158.    But for the defendants' negligent misrepresentations and material omissions described
above, plaintiffs would never have hired defendants for advice on the Strategy, engaged in the
Strategy, unnecessarily purchased the Digital Options Contracts to effectuate the Strategy, failed to
enter the Amnesty Program and filed federal tax returns that reflected improper tax treatment
resulting from the Strategy.

159.    As a proximate result of the foregoing, plaintiffs have been damaged in an amount
in excess of Ten Thousand Dollars ($10,000.00), said amount to be proven at the trial of this action,
and to include, without limitation, those damages alleged with more particularity in Paragraph 125,
above.

## EIGHTH CLAIM FOR RELIEF

## CLAIM FOR FACILITATION OF FRAUD
## AND DAMAGES ARISING FROM CIVIL CONSPIRACY

### (AGAINST ALL DEFENDANTS)

160.    The foregoing and following allegations are realleged.

161.    As described more fully above, the defendants knowingly acted in concert to market, facilitate and implement the fraudulent and illegal Strategy. In doing so, the defendants acted with full knowledge and awareness that the transactions were designed to give the false impression that a complex series of financial maneuvers were legitimate business transactions that had economic substance from an investment standpoint, when they in fact lacked those features (which were necessary for a successful and lawful tax strategy).

162.    The defendants acted in the respective roles as described above according to a predetermined, agreed upon, and commonly understood and accepted plan of action (*i.e.*, the defendants' Arrangement), all for the purposes of obtaining professional fees from clients, including the plaintiffs. The defendants committed numerous overt acts, as described with specificity elsewhere in this Complaint, in furtherance of the conspiracy.

163.    The acts of the defendants were contrary to numerous provisions of law, as stated above.

164.    There was a meeting of the minds between and among the defendants, and other individuals and entities, both known and unknown, to commit the unlawful acts alleged herein. This conspiracy to commit these unlawful, overt acts, proximately caused and continues to cause plaintiffs' damages as previously set forth herein.

165.    As a result of the defendants' conduct set forth herein, the plaintiffs have suffered injury to their business and property in that plaintiffs have paid defendants more than $6 million in fees, have lost in excess of $4 million in bogus investments; have incurred other actual damages and losses in an amount to be proven at trial; have incurred tax penalties and interest and disallowance of other certain tax treatment; have incurred and will continue to incur substantial additional fees and costs in hiring other tax and legal advisors to rectify the situation; and have foregone legitimate tax savings and investment opportunities.

166.    As a proximate result of the foregoing, plaintiffs have been damaged in an amount in excess of Ten Thousand Dollars ($10,000.00), said amount to be proven at the trial of this action, and to include, without limitation, those damages alleged with more particularity in Paragraph 125, above.  Plaintiffs are further entitled to recover punitive damages from defendants pursuant to N.C. Gen. Stat. §§ 1D-1, *et seq.*

## CONDITIONS PRECEDENT

167. All conditions precedent have been met by plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully pray the Court that:

(1)    Pursuant to the First Claim for Relief, plaintiffs recover damages against defendants, jointly and severally, for defendants' BREACH OF FIDUCIARY DUTY in an amount in excess of ten thousand dollars ($10,000), said amount to be proven at the trial of this action, together with punitive damages pursuant to §§ 1D-1, *et seq.*, and/or damages pursuant to N.C. Gen. Stat. § 84-13;

(2)    Pursuant to the Second Claim for Relief, that plaintiffs recover damages against defendants, jointly and severally, for their CONSTRUCTIVE FRAUD in an amount in excess of ten

thousand dollars ($10,000), said amount to be proven at the trial of this action, together with punitive damages pursuant to N.C. Gen. Stat. §§ 1D-1, *et seq.*, and/or damages pursuant to N.C. Gen. Stat. § 84-13;

(3)   Pursuant to the Third Claim for Relief, plaintiffs recover damages against defendants, jointly and severally, for their FRAUDULENT REPRESENTATIONS AND OMISSIONS in an amount in excess of ten thousand dollars ($10,000), said amount to be proven at the trial of this action, together with punitive damages pursuant to N.C. Gen. Stat. §§ 1D-1, *et seq.*, and/or damages pursuant to N.C. Gen. Stat. § 84-13;

(4)   Pursuant to the Fourth Claim for Relief, plaintiffs recover damages against defendants, jointly and severally, for defendants' obtaining money through EMBEZZLEMENT AND FALSE PRETENSE, in an amount in excess of ten thousand dollars ($10,000), together with punitive damages pursuant to N.C. Gen. Stat. §§ 1D-1, *et seq.*, and an award of attorneys' fees under N.C. Gen. Stat. § 1-538.2;

(5)   Pursuant to the Fifth Claim for Relief, that plaintiffs recover damages against defendants, jointly and severally, for defendants' charge of unethical, excessive and illegal fees and that defendants be required to DISGORGE OR RESCIND ALL SUCH FEES, or pay recovery in QUANTUM MERUIT, in an amount in excess of $10,000, said amount to be proven at the trial of this action;

(6)   Pursuant to the Sixth Claim for Relief, that plaintiffs recover damages against defendants, jointly and severally, for defendants' NEGLIGENCE AND PROFESSIONAL MALPRACTICE, in an amount in excess of ten thousand dollars ($10,000), said amount to be proven at the trial of this action;

(7)    Pursuant to the Seventh Claim for Relief, that plaintiffs recover damages against defendants, jointly and severally, for defendants' NEGLIGENT MISREPRESENTATION, in an amount in excess of ten thousand dollars ($10,000), said amount to be proven at the trial of this action;

(8)    Pursuant to the Eighth Claim for Relief, that plaintiffs recover damages against defendants, jointly and severally, for defendants' FACILITATION OF FRAUD AND CIVIL CONSPIRACY in an amount in excess of ten thousand dollars ($10,000), said amount to be proven at the trial of this action, together with punitive damages pursuant to N.C. Gen. Stat. §§ 1D-1, *et seq.*, and/or damages pursuant to N.C. Gen. Stat. § 84-13;

(9)    That the costs of this action, including plaintiffs' reasonable attorneys' fees, be taxed against defendants;

(10)    That plaintiffs have trial by jury on all issues so triable; and

(11)    For such other and further relief as the Court deems just and proper.

This is the 7th day of July, 2006.

# ORIGINAL SIGNATURE REDACTED

1305 Navaho Drive, Suite 400
Raleigh, NC 27619-7529
Telephone:    919/981-0191
Facsimile:    919/981-0199

# ORIGINAL SIGNATURE REDACTED

5960 Fairview Road, Suite 102
Charlotte, NC 28210
Telephone:    704/347-8990
Facsimile:    704/347-8929



**THE DIVERSIFIED GROUP INCORPORATED**

950 THIRD AVENUE, 23RD FLOOR, NEW YORK, NEW YORK 10022   TEL: (212) 688-2700   (800) 841-1132   FAX: (212) 688-7908

## AD FX Portfolio LLC

Ira Akslerad

AD FX Portfolio LLC ("Fund LLC") was formed on November 1, 2000. Initially it had two members who also acted as managers, Alpha Consultants Inc. ("Alpha") and The Diversified Group Incorporated ("DGI"). Prior to forming Alpha, principals of Alpha were portfolio managers to hedge funds having approximately $30 billion in assets. On November 8, 2000 each member/manager contributed $1,500, for an aggregate of $3,000. Each received a 50% interest in Fund LLC.

On July 31, 2000, Ira Akselrad ("Investor") formed Windsor Newport Investments LLC ("Investor LLC"). On November 1, 2000, Investor LLC entered into two option trades involving the Australian Dollar, each with a 44-day term, with Lehman Brothers summarized as follows:

|  | Option Premium | Payoff Amount (U.S. $ Equivalent)* | Strike Price |
|---|---|---|---|
| Long Position (option # 1139063) | $1,000,000 | $3,450,922 | 0.5399 |
| Short Position (option # 1139062) | 990,000 | 3,425,675 | 0.5400 |
| Net Position | $    10,000 | $    25,247 | |

Spot at the time of the trades was 0.5242. Therefore, for the trades to be profitable a movement of 0.0157 Australian Dollars was necessary. In the last two years (523 data points) such movement occurred approximately 259 times for any 44-day period.

On November 10, 2000, Investor contributed Investor LLC to Fund LLC in exchange for a 35.24% member interest in the LLC. The net value of the positions at the time of transfer was $7,497.

On December 15, 2000, Investor resigned as member of Fund LLC and received 18,898 Australian Dollars in full redemption of his member interest. The distribution at the time of such resignation had an aggregate fair market value of $10,320.

On December 15, 2000, Investor contributed the 18,898 Australian Dollars to Prose Investments LLC ("Prose"), for a 33 1/3% interest in Prose.

On December 22, 2000, Prose converted 12,216 Australian Dollars into US$6,783.54, with a settlement date of December 27, 2000.

\* All actual payoffs were in Australian Dollars

GOVERNMENT EXHIBIT

19

CONFIDENTIAL

M0209836
SIDL123010

# B R O W N  &  W O O D LLP

ONE WORLD TRADE CENTER
NEW YORK, NY 10048-0557
TELEPHONE: 212-839-5300
FACSIMILE: 212-839-5599

December 31, 2000

Mr. Ira Akselrad
1585 Broadway
New York, N.Y. 10036

## Re: Investment Transactions

Dear Mr. Akselrad:

You, ("Investor") have requested our opinion regarding certain U.S. federal income tax consequences of various investment transactions ("Transactions"), described more fully below, that Investor has made directly and through the use of options.

## I.   Summary of the Transactions

### A.   Fund

AD FX Portfolio LLC, is a domestic limited liability company that we have assumed has not and will not elect to be treated as a corporation for U.S. federal income tax purposes ("Fund"). Fund was formed for the purpose of acquiring financial investments, buying and selling options on foreign currency, and conducting other investment activities. Fund initially had two members, Alpha Consultants, Inc., a domestic corporation ("Alpha")[1] and The Diversified Group Incorporated, a domestic corporation, ("DGI"). Alpha and DGI were both Managers of Fund. (Alpha and DGI are hereinafter collectively referred to as the "Managers".)

### B.   Investment in Foreign Currency Options

On November 1, 2000, Investor through, Windsor Newport LLC ("SMLLC"), a domestic

**SABWZ 0321413**

---

[1]   Based on materials provided by the Managers, Alpha was formed in 1999. Prior to forming Alpha, principals of Alpha were portfolio managers of hedge funds having approximately $30 billion in assets.

LOS ANGELES · SAN FRANCISCO · WASHINGTON DC · BEIJING · TOKYO REPRESENTATIVE OFFICE
AFFILIATED WITH BROWN & WOOD, A MULTINATIONAL PARTNERSHIP WITH OFFICES IN LONDON AND HONG KONG

GOVERNMENT
EXHIBIT
20

BROWN & WOOD LLP

Mr. Ira Akselrad
December 31, 2000
Page 2

limited liability company of which Investor is the sole member, entered into two over-the-counter, non-publicly traded foreign currency option transactions with an independent financial institution ("Bank").[2] The first was the purchase of a European-style cash-settled digital call option having a 44 day term, reference number 1139063, for a premium of $1,000,000 ("Long Option"). The second was the sale of a European-style cash-settled digital call option, having a 44 day term, reference number 1139062, for a premium of $990,000 ("Short Option"). (The forgoing transactions are hereinafter individually referred as an "Option" and collectively as the "Options".) The aggregate net cost to Investor from entering into the Options was $10,000.

Managers have advised us in connection with rendering this opinion that although the Options by their terms did not provide for transferability, it was and is common market practice for options such as the Options to be sold or otherwise transferred separately from each other (subject to satisfying the Bank's credit requirements).

### C.   Contribution to Fund

On November 10, 2000, Investor contributed all of Investor's membership interest in SMLLC to Fund in exchange for a 35.24% interest in Fund. We have been advised by the Managers that at the time of such contribution (i) the net value of the Options, SMLLC's only assets, was $7,497, and (ii) the Short Option was out of the money.

### D.   Fund Investments

In addition to the Options contributed by Investor, Fund entered into a series of similar foreign currency options involving additional foreign currencies.

### E.   Withdrawal from Fund

On December 15, 2000, Investor withdrew from Fund. In exchange for its membership interest Investor received foreign currency of 18,898 Australian dollars ("Foreign Currency")

---

[2]    As discussed in the text below, it is more likely than not that SMLLC would be disregarded as an entity separate from Investor or, (after its transfer to Fund) Fund, for U.S. federal income tax purposes. Consequently, except to the extent SMLLC is specifically referred to herein, all references to Investor prior to the transfer of SMLLC to Fund, or to Fund following the transfer SMLLC to Fund, will encompass SMLLC.

NYLIB1/803903/5

SABWZ 0321414

BROWN & WOOD LLP

Mr. Ira Akselrad
December 31, 2000
Page 3

with an aggregate fair market value at time of withdrawal of $10,320. We have been advised by
the Managers that such amounts equaled the fair market value of Investor's membership interest
in Fund.

Managers have advised that following the withdrawal of Investor, Fund remained in
existence and continued its investment activities.

### F.    Subsequent Events

On December 15, 2000, Investor contributed 18,898 Australian dollars to Prose
Investments LLC, a domestic limited liability company ("Partnership") in exchange for a 33
1/3% interest in Partnership. On December 22, 2000, Partnership sold 12,216 Australian Dollars
of the contributed Foreign Currency for $6,783.54. The sale settled on December 27, 2000.

### II.    Representations:

#### A.    Investor Representations:

For purpose of rendering our opinion, Investor has represented as follows:

1.    Investor entered into the Options for substantial non-tax business reasons,
       including to produce an overall economic profit from the movement of foreign
       currency against the U.S. dollar.

2.    Based upon Investor's own independent evaluation and upon the advice of
       Managers, Investor believed that by entering into the Options Investor could
       significantly leverage Investor's investment in such currencies.

3.    Based upon advice of the Managers as to the probability of the foreign currency
       reaching certain levels at which the Options would be profitable, and upon
       Investor's own independent evaluation, Investor believed that Investor had a
       reasonable opportunity to earn a reasonable profit, in excess of all fees and
       transaction costs, from the Transactions, without regard to tax benefits.

4.    Based on the advice of Managers, and upon Investor's own independent
       evaluation, Investor had an opportunity to make an aggregate gross return in
       excess of the sum of Investor's net investment in the Options.

5.    Investor contributed the membership interest in SMLLC to Fund for substantial
       non-tax business reasons, including diversification of Investor's portfolio without

NYLIB1:403903/3

**SABWZ 0321415**

**BROWN & WOOD** LLP

Mr. Ira Akselrad
December 31, 2000
Page 4

the need for additional investment, the professional management provided by the Managers, and the desire to create larger pool of capital through the involvement of other investors such as the Managers.

6.  SMLLC has not elected under Treas. Reg. §301.7701-3 to be classified as a corporation.

7.  Investor has not hedged Investor's risks with respect to the Options with Bank.

8.  Investor has not identified, and will not identify, any of the Options as being part of a hedging transaction under Treas. Reg.§1.446-4.

9.  Investor, SMLLC, and Partnership each uses the U.S. dollar as such person's functional currency.

10. Investor has dealt with the Fund and each of its other members at arm's length and intends to continue to do so in the future.

11. Whether and when Investor terminated Investor's investment in Fund was within Investor's sole discretion and control.

12. There existed no understanding, agreement, obligation, or arrangement pursuant to which any of the parties described herein committed to undertake all or any of the transactions described herein upon the happening of any other transaction, except to the extent that Investor/SMLLC (and Fund as transferee of Investor) and Bank were contractually obligated to perform under the Options in accordance with their stated terms.

13. Investor has not entered into a confidentiality agreement or otherwise agreed (orally or in writing) to any obligations of confidentiality with respect to the Transactions.

14. Investor is an individual whose "tax home" as defined in Section 911(d)(3) of the Internal Revenue Code of 1986, as amended ("Code"). is the United States.

15. Investor together with the other members of Partnership has a 100% interest in Partnership and all such persons actively participate in the management of Partnership's activities.

16. Partnership maintains its capital accounts and allocates items of income, gain, deduction, loss and credit in accordance with the relevant provisions of the Code and the Regulations promulgated thereunder.

NYLIB1/801903/3

**SABWZ 0321416**

**BROWN & WOOD** LLP

Mr. Ira Akselrad
December 31, 2000
Page 5

17.  At the time of the contribution of the Foreign Currency to Partnership the Foreign
     Currency was not subject to any liabilities, and Partnership assumed no liabilities
     and distributed or paid no money or other property to Investor in connection with
     such contribution.

18.  Partnership has not elected under Treas. Reg. §301.7701-3 to be classified as a
     corporation.

19.  Partnership has not elected, and will not elect, under Treas. Reg. §1.988-3(b) to
     treat exchange gain or loss on any forward contracts, futures contracts or option
     contracts as capital gain or loss.

20.  Investor has reviewed the description of the Transactions as set forth herein and
     such description is accurate and complete, and there are no pertinent facts relating
     to the Transactions that have not been set forth in such description.

**B.**   **Fund Representations:**

For purpose of rendering our opinion, Fund has represented as follows:

1.  Fund has not hedged its risks with respect to the Options with Bank.

2.  Fund has not identified, and will not identify, any of the Options as being part of a
    hedging transaction under Treas. Reg.§1.446-4.

3.  Fund will determine its members' distributive shares income, gain, loss,
    deduction, or credit and will maintain its members' capital accounts in accordance
    with Code Section 704 and the Treasury Regulations promulgated thereunder.

4.  Fund has not made an election under Code Section 754 and will not do so for the
    taxable year or years in which the Transactions occur.

5.  Fund has not elected, and will not elect, under Treas. Reg. §301.7701-3 to be
    classified as a corporation.

6.  Fund entered into the Transactions for substantial non-tax business reasons,
    including to produce an overall profit from investments in foreign currency and
    foreign currency options.

7.  Based upon the advice of Managers, the Options are not listed on or subject to the
    rules of a qualified board or exchange as those terms are used in Code Section
    1256(g)(5).

NYLIB1/809KDG

**SABWZ 0321417**

BROWN & WOOD LLP

Mr. Ira Akselrad
December 31, 2000
Page 6

8.   Fund has not elected, and will not elect, under Treas. Reg. §1.988-3(b) to treat
     exchange gain or loss on any forward contracts, futures contracts or option
     contracts as capital gain or loss.

9.   Fund uses the U.S. dollar as its functional currency.

10.  Fund has not and will not caused SMLLC to elect under Treas. Reg. §301.7701-3
     to be classified as a corporation.

III.   **Conclusions**

In rendering our opinions, we have reviewed representations and advice, including
financial information, from various parties to the Transactions and made certain assumptions,
which representations, advice and assumptions are referred to below. In rendering our opinions,
we have also examined such agreements, certificates, instruments and documents, and we have
made such other inquires of officers, owners and representatives of the entities involved in the
Transactions as we have considered necessary to render the opinions set forth herein. We have
made no independent verification of such representations, advice, assumptions, records,
agreements, certificates, instruments, documents, and responses to such inquiries. If any such
representations, advice, assumptions, records, agreements, certificates, instruments, documents,
or responses is inaccurate in any material respect, or any such agreements, certificates,
instruments, and documents prove not to be authentic, the opinions contained herein may not be
relied upon. In rendering our opinion, we have reviewed the applicable provisions of the Code
and of the final, temporary, and proposed Treasury Regulations ("Treas. Reg.", "Treasury
Regulations", or "Regulations") promulgated thereunder; relevant decisions of the U.S. federal
courts; published Revenue Rulings ("Rev. Rul.") and Revenue Procedures ("Rev. Proc.") of the
Internal Revenue Service ("IRS"); and such other materials as we have considered relevant. In
certain instances we have determined that there is no authority directly on point, and in such
instances we have reached our opinion reasoning from such other authority as we believe to be
relevant to the issues addressed.

Although we are not representing DGI in connection with the Transactions, in the past we
have represented DGI and persons affiliated with DGI with respect to certain matters and may
continue to do so in the future. You have agreed to waive any legal conflict that may arise from
such past or future representation.

NYLB1/10)90))

**SABWZ 0321418**

SIDL 0358398

Received: 11/23/01 1:09PM; -> BDO SEIDMAN LLP; Page 1
NOV-23-2001 14:17     DIVERSIFIED GROUP     12127523972   P.01

950 Third Avenue, 23rd Floor
New York, NY 10022
Phone: (212) 688-2700
Fax: (212) 688-7908

## THE DIVERSIFIED GROUP INCORPORATED



# Fax

| To: | Robert Jones | From: | James Haber |
|---|---|---|---|
| | BDO Siedman LLP | | |
| Fax: | 312 240-3329 | Date: | November 23, 2001 |
| Phone: | | Pages: | 6 |
| Re: | | CC: | Robert Greisman – 312 856-1379 |

Urgent For Review     Please Comment     Please Reply     Please Recycle

• Comments:

CONFIDENTIAL

DGI 74504

BDO 000443

GOVERNMENT
EXHIBIT
21



## THE DIVERSIFIED GROUP INCORPORATED

950 THIRD AVENUE, 23ᴿᴰ FLOOR, NEW YORK, NEW YORK 10022 TEL: (212) 688-2700 (800) 641-1132 FAX: (212) 688-7908

**Via Facsimile**
**(312) 240-3329**

Mr. Robert Jones
BDO Seidman LLP
180 Stetson Avenue, Suite 4300
Chicago, IL 60601

### INVOICE

For services provided on the following transaction:

| Client | Size of Transaction | DGI Fee * |
|---|---|---|
| Joseph Francis | $23,000,000 | $517,500 |

Please wire $517,500 as follows:

**Wire Instructions**

Signature Bank
950 Third Avenue
New York, NY 10022
Tel: (212) 822-1501

Contact: John D. Gonzalez
         Sandra Alvarado

Account Name:    The Diversified Group Incorporated
Account #:       1500162526
ABA #:           026013576

\* Assumes that DGI is responsible for legal fees associated with tax opinion.

cc: Robert Greisman

**DGI 74505**

**CONFIDENTIAL**

**BDO 000444**

Received: 11/23/01  1:10PM;    -> BDO SEIDMAN LLP;  Page 3
NOV-23-2001  14:17        DIVERSIFIED GROUP                    12127523972    P.03

 **THE DIVERSIFIED GROUP INCORPORATED**
950 THIRD AVENUE, 23ᴿᴰ FLOOR, NEW YORK, NEW YORK 10022 TEL: (212) 688-2700  (800) 841-1132 FAX: (212) 688-7908

**Via Facsimile**
**(312) 240-3329**

Mr. Robert Jones
BDO Seidman LLP
180 Stetson Avenue, Suite 4300
Chicago, IL 60601

### INVOICE

For services provided on the following transaction:

| Client | Size of Transaction | DGI Fee * |
|---|---|---|
| Nussdorf Family | $110,000,000 | $2,000,000 |

Please wire $2,000,000 as follows:

*Wire Instructions*

Signature Bank
950 Third Avenue
New York, NY 10022
Tel: (212) 822-1501

Contact:  John D. Gonzalez
          Sandra Alvarado

| Account Name: | The Diversified Group Incorporated |
|---|---|
| Account #: | 1500162526 |
| ABA #: | 026013576 |

* Assumes that DGI is responsible for legal fees associated with tax opinion.

cc: Robert Greisman

**DGI 74506**

**CONFIDENTIAL**

**BDO  000445**

Received: 11/23/01  1:10PM;   -> BDO SEIDMAN LLP;  Page 4
NOV-23-2001  14:18      DIVERSIFIED GROUP                    12127523972   P.04

 **THE DIVERSIFIED GROUP INCORPORATED**

950 THIRD AVENUE, 23RD FLOOR, NEW YORK, NEW YORK 10022 TEL: (212) 688-2700 (800) 641-1132 FAX: (212) 688-7908

<u>**Via Facsimile**</u>
<u>**(312) 240-3329**</u>

Mr. Robert Jones
BDO Seidman LLP
180 Stetson Avenue, Suite 4300
Chicago, IL 60601

## INVOICE

For services provided on the following transaction:

| <u>**Client**</u> | <u>**Size of Transaction**</u> | <u>**DGI Fee \***</u> |
|---|---|---|
| Ed Caputo | $20,000,000 | $450,000 |

Please wire $450,000 as follows:

*<u>Wire Instructions</u>*

Signature Bank
950 Third Avenue
New York, NY 10022
Tel: (212) 822-1501

Contact:  John D. Gonzalez
          Sandra Alvarado

Account Name:    The Diversified Group Incorporated
Account #:       1500162526
ABA #:           026013576

\* Assumes that DGI is responsible for legal fees associated with tax opinion.

cc: Robert Greisman

**DGI 74507**

CONFIDENTIAL

**BDO 000446**

 **THE DIVERSIFIED GROUP INCORPORATED**
950 THIRD AVENUE, 23ᴿᴰ FLOOR, NEW YORK, NEW YORK 10022 TEL: (212) 688-2700  (800) 841-1132 FAX: (212) 688-7908

**Via Facsimile
(312) 240-3329**

Mr. Robert Jones
BDO Seidman LLP
180 Stetson Avenue, Suite 4300
Chicago, IL 60601

## INVOICE

For services provided on the following transaction:

| Client | Size of Transaction | DGI Fee * |
|---|---|---|
| Robert Ciasulli | $10,000,000 | $225,000 |

Please wire $225,000 as follows:

### *Wire Instructions*

Signature Bank
950 Third Avenue
New York, NY 10022
Tel: (212) 822-1501

Contact:  John D. Gonzalez
          Sandra Alvarado

| Account Name: | The Diversified Group Incorporated |
|---|---|
| Account #: | 1500162526 |
| ABA #: | 026013576 |

* Assumes that DGI is responsible for legal fees associated with tax opinion.

cc: Robert Greisman

**DGI 74508**

**CONFIDENTIAL**

**BDO 000447**

Received: 11/23/01 1:10PM; -> BDO SEIDMAN LLP; Page 6
NOV-23-2001 14:18     DIVERSIFIED GROUP                    12127523972    P.06

 **THE DIVERSIFIED GROUP INCORPORATED**

950 THIRD AVENUE, 23RD FLOOR, NEW YORK, NEW YORK 10022 TEL: (212) 688-2700 (800) 841-1132 FAX: (212) 688-7908

**Via Facsimile**
**(312) 240-3329**

Mr. Robert Jones
BDO Seidman LLP
180 Stetson Avenue, Suite 4300
Chicago, IL 60601

### INVOICE

For services provided on the following transaction:

| Client | Size of Transaction | DGI Fee * |
|---|---|---|
| Ronald Ciasulli | $8,000,000 | $180,000 |

Please wire $180,000 as follows:

*Wire Instructions*

Signature Bank
950 Third Avenue
New York, NY 10022
Tel: (212) 822-1501

Contact:  John D. Gonzalez
              Sandra Alvarado

Account Name:     The Diversified Group Incorporated
Account #:          1500162526
ABA #:               026013576

* Assumes that DGI is responsible for legal fees associated with tax opinion.

cc: Robert Greisman

TOTAL P.06

**CONFIDENTIAL**

BDO 000448

DGI 74509



JUL 15 2003 12:47PM  HP LASERJET 3200

JUL. 15. 2003 10:06AM 16     DIVERSIFIED GROUP     NO. 003 2397 P. 4 P.03

P.2

 THE DIVERSIFIED GROUP INCORPORATED
880 THIRD AVENUE, 33ᵀᴴ FLOOR, NEW YORK, NEW YORK 10022 TEL (212) 888-8700  (800) 341-1122 FAX (212) 888-7808



Via Facsimile
(312) 240-3329

Mr. Robert Jones
BDO Seidman LLP
180 Stetson Avenue, Suite 4300
Chicago, IL 60601

RECEIVED
NOV 2 3 2001

## INVOICE

For services provided on the following transaction:

| Client | Size of Transaction | DGI Fee * |
|---|---|---|
| Nussdorf Family | $110,000,000 | $2,000,000 |

Pay $1,000,000

Please wire $2,000,000 as follows:

**Wire Instructions**

Signature Bank
950 Third Avenue
New York, NY 10022
Tel: (212) 822-1501

Contact: John D. Gonzalez
         Sandra Alvarado

Approved: ___Jones___     Date: 1-9-02

Office #: 048 792

| GL# | Loc: | BL: | Corp: | Amount |
|---|---|---|---|---|
| 40521000 | 782 | 81 | 008 | 1,000,000. |

Account Name:  The Diversified Group Incorporated
Account #:     1500162526
ABA #:         026013576

\* Assumes that DGI is responsible for legal fees associated with tax opinion.

cc: Robert Greisman

DGI 74510

CONFIDENTIAL

BDO 000449

p.3

JUL 15 2003 12:47PM    HP LASERJET 3200

OCT-09-2001  13:18        DIVERSIFIED GROUP            12127523972  P.03



THE DIVERSIFIED GROUP INCORPORATED
950 THIRD AVENUE, 23RD FLOOR, NEW YORK, NEW YORK 10022 TEL: (212) 688-2700 (800) 641-1132 FAX: (212) 688-7908

**Via Facsimile**
**(312) 240-3329**

Mr. Robert Jones
BDO Seidman LLP
180 Stetson Avenue, Suite 4300
Chicago, IL 60601

## INVOICE

For services provided for the Cowan transaction:    $600,000

Please wire as follows:

**Wire Instructions**
Signature Bank
950 Third Avenue
New York, NY 10022
Tel: (646) 822-1501

Contact:    John D. Gonzalez
            Sandra Alvarado

Account Name:   The Diversified Group Incorporated
Account #:      1500162526
ABA #:          026013576

cc: Robert Greisman

| Approved: | | | Date: | 10/9/01 |
|---|---|---|---|---|
| Office #: | 782 | | | |
| GL # | Loc: | BL: | Corp: | Amount: |
| 4052/000 | 782 | 21. | 008 | 600,000.00 |
| | | | | |
| | | | | |
| | | | | |

JUL 15 2003 10:29AM

NO. 004   P. 4

**CONFIDENTIAL**

BDO 000450

**DGI 74511**

JUL 15 2003 12:47PM  HP LASERJET 3200                    P.4

# IBDO

BDO Seidman, LLP
Accountants and Consultants

130 East Randolph, Suite 2600
Chicago, IL 60601
Telephone: (312) 240-1236
Fax: (312) 240-3329

## FAX COVER SHEET

| Date: 10/09/01 | Number of pages: 2 + Cover Sheet |
| From: Bob Jones | Sender's Tel No: 312-729-7965 |

To: Patti Schraad          Company: CIM                    Fax Number: 616-776-3690

**COMMENTS:**

OK to Pay the attached invoices.

DGI 74512

BDO SEIDMAN, LLP an international accounting firm with offices throughout the U.S., provides tax, accounting and management consulting services.

CONFIDENTIAL
BDO 000451

P.5

JUL 15 2003 12:47PM  HP LASERJET 3200

OCT-09-2001  13:18        DIVERSIFIED GROUP              12127523972   P.02

 THE DIVERSIFIED GROUP INCORPORATED
950 THIRD AVENUE, 23ᴿᴰ FLOOR, NEW YORK, NEW YORK 10022 TEL: (212) 888-2700  (800) 841-1132 FAX (212) 888-7808

**Via Facsimile**
**(312) 240-3329**

Mr. Robert Jones
BDO Seidman LLP
180 Stetson Avenue, Suite 4300
Chicago, IL 60601

## INVOICE

For services provided for the Gupta transaction:    $1,125,000

Please wire as follows:

*Wire Instructions*
Signature Bank
950 Third Avenue
New York, NY 10022
Tel: (646) 822-1501

Contact:    John D. Gonzalez
            Sandra Alvarado

Account Name:   The Diversified Group Incorporated
Account #:      1500162526
ABA #:          026013576

cc: Robert Greisman

| Approved: | | | | Date: 10/9/01 |
|---|---|---|---|---|
| Office #: 985 782 | | | | |
| GL # | Loc: | BL: | Corp: | Amount: |
| 40521000 | 782 | 01 | 008 | 1,125,000. |
| | | | | |
| | | | | |
| | | | | |

**DGI 74513**

NC. 004    P. 2

JUL. 15. 2003 10:28AM

CONFIDENTIAL    BDO 000453

| From: | Gary Helene |
|---|---|
| Sent: | Tuesday, October 21, 2003 03:59 PM |
| To: | Phil Kampf |
| Subject: | RE: info |

let me know if you need more info. i have to leave for an hour. (doctor....I'm getting my head examined)
hopefully this will do for today

-----Original Message-----
**From:** Phil Kampf [mailto:philkampf@heliosfinancial.com]
**Sent:** Tuesday, October 21, 2003 3:23 PM
**To:** gary@tequestafund.com
**Subject:** info

| Name | Intial Inv | Contrib |
|---|---|---|
| DXM Trading | $450,000 | $251,167   Mandell,AD Managed fund |
| GTB Trading | $450,000 | $208,001   Barmore, AH Investment Fund |
| JXS Trading | $500,000 | $291,405[] Stechler, AD Equity Fund 2000LLC |
| RRT Trading | $920,000 | $681,300  Thurston, AH Hedged Equity Fund |
| WLE trading | $700,000 | $330,283  Edwards, AD Equity Trading 2000 Fund |
| RXK Trading | $500,000 | $253,061   Kay, AD Equity Trading Fund LLC |
| Judd Enterprises | $10,000 | $7,371  Proskauer, AD FX Portfolio LLC |
| Charlotte Inv LLC | $10,000 | $3,419 Proskauer, AD FX Portfolio LLC |
| Windsor Newport | $10,000 | $7,497  Proskauer, AD FX Portfolio LLC |
| Churchwind Inv | $350,000 | $273,745  E & Y, AD International FX Fund |
| Beaver Group LLC | $143,000 | $37,786   ??? |
| EAK Trading | $20,000 | $5,023 Hanover North ?? |
| AEK Trading | $35,000 | $26,254  Hanover North |

GOVERNMENT
EXHIBIT
22

1ALPHA-DISK04-033198

# Exhibit 23-

# Document Filed Under Seal

3210806.1