**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                        )
FIDELITY INTERNATIONAL CURRENCY         )
ADVISOR A FUND, L.L.C.,                  )
By the Tax Matters Partner,             )
                                        )       Civil Action Nos.
        Plaintiff,                      )       05-40151-FDS
                                        )       06-40130-FDS
            v.                          )       06-40243-FDS
                                        )       06-40244-FDS
UNITED STATES OF AMERICA,               )
                                        )
        Defendant.                      )
_____)
```

**MEMORANDUM AND ORDER ON**
**DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM**
**PROSKAUER ROSE LLP**

**SAYLOR, J.**

This is an action challenging the adjustment of various partnership tax returns by the

Internal Revenue Service.  Plaintiff Fidelity International Currency Advisor A Fund, LLC, is a

limited liability company organized under Delaware law.  Richard J. Egan is the Tax Matters

Partner for plaintiff within the meaning of 26 U.S.C. § 6231(a).

In the lead case, plaintiff timely filed a U.S. Return of Partnership Income (Form 1065)

with the IRS for the 2001 tax year.  On April 6, 2005, the IRS issued a Notice of Final

Partnership Administrative Adjustment ("FPAA") with respect to that return.  In substance, the

IRS determined that plaintiff's tax liabilities for 2001 were understated by more than $62 million.

Plaintiff deposited the disputed amount with the United States Treasury and filed a thirteen-count

complaint seeking readjustment of the disputed partnership items and a return of the deposited

amount.[1]

The government contends, in substance, that the transactions at issue involved improper tax shelters. The matter is presently in the discovery stage. The government has moved to compel production of documents subpoenaed from a third party, the law firm of Proskauer Rose LLP ("Proskauer"), concerning the records of other taxpayers who may have participated in similar transactions. The documents have been withheld under claims of attorney-client privilege and/or work-product privilege. For the following reasons, defendant's motion to compel will be granted in part.

## I.    Background

### A.    The Litigation

This matter involves the tax treatment of certain transactions entered into by the plaintiff partnership. The underlying taxpayers are Richard and Maureen Egan; Mr. Egan is the co-founder and former chairman of EMC Corporation and the former ambassador to Ireland.

Plaintiff contends that the transactions at issue were legitimate investments intended to serve, among other things, as hedges to reduce certain market risks. The government contends that the transactions, which created large losses that were used to shelter income, were sham transactions without any economic substance. It further contends that plaintiff participated in an essentially pre-packaged tax shelter that was developed, promoted, or sold by three entities (Diversified Group, Inc., Alpha, and Helios) with the assistance of four accounting firms (KPMG,

---

[1] In June 2006, plaintiff filed a similar action for the tax year 2002. The two matters were consolidated in September 2006. In November 2006, another Egan-related entity, Fidelity High Tech Advisor A Fund, LLC, filed two additional actions for the tax years 2001 and 2002. On April 1, 2008, the Court consolidated the two additional related matters for trial purposes.

BDO Seidman, RSM McGladrey, and Grant Thornton), and four law firms (Proskauer Rose, Brown & Wood, Lord Bissell, and Bryan Cave).[2]  The government contends that the tax shelter was sold in substantially identical form to more than 50 other taxpayers (or groups of taxpayers).

The government served a subpoena *duces tecum* on Proskauer requiring, in essence, that it produce documents relating to the tax-shelter products designed, sold, opined upon, and/or implemented by Proskauer and other professional firms, individuals, and promoters.  In response, Proskauer produced more than 25,000 pages of documents from its files.  Plaintiff instructed Proskauer not to withhold any documents as privileged or as work product, and thus Proskauer contends that it has produced all documents concerning Mr. Egan, his related entities, and his transactions.

Proskauer did, however, withhold a substantial number of requested documents and served a privilege log listing the documents.  The government has moved to compel production of the withheld documents.

### B.    The Relevance and Discoverability of the Documents

According to the government, the discovery is relevant, among other things, to the issue of whether the Egan transactions were economic shams.  Economic shams are transactions that actually occur but lack non-tax economic substance.  *See, e.g., ACM Partnership v. Commissioner*, 157 F.3d 231, 247 n.30 (3d Cir. 1998); *Knetsch v. United States*, 364 U.S. 361, 364-365 (1960).  The test for whether a transaction is an economic sham is "whether the transaction had any practicable economic effects other than the creation of income tax losses."

---

[2] Certain of the firms have subsequently merged with other entities and operate under new names.  For the sake of simplicity, the former names will be used herein.

*See, e.g., Rose v. Commissioner*, 868 F.2d 851, 853 (6th Cir. 1989).  This analysis is guided by the related factors of whether the transaction can produce economic benefits apart from the generation of tax losses (an objective analysis) and whether the taxpayer possessed a non-tax business purpose (a subjective analysis).  *Id.* at 853; *accord Sochin v. Commissioner*, 843 F.2d 351, 354 (9th Cir. 1988).

The government contends that the discovery is necessary to determine whether the transactions were structured identically for all participants or were "cookie cutter" transactions. According to the government, evidence concerning similar or identical transactions by other investors is relevant to the economic substance analysis.  At least some courts have held that evidence concerning other investor transactions involving the same tax shelter product is relevant. *See, e.g., Sochin v. Commissioner*, 843 F.2d at 355; *Jade Trading, LLC v. United States*, 65 Fed. Cl. 188, 191-192 (2005).

The Court has not, however, made any ruling as to relevance here; the issue at this stage is discoverability.  Proskauer does not assert that the subpoena is overbroad, but rather that the documents are protected from disclosure by the attorney-client privilege, the work product doctrine, or both.

### C.    The Proskauer Privilege Log

The privilege log prepared by Proskauer lists 944 items.  Proskauer claims work-product protection for every item on the list, and attorney-client privilege as to most of the remainder. The overwhelming majority of the items on the log are described as (1) "legal opinions" for clients (approximately 380 items) and (2) "certificates of facts" for (a) "clients," (b) "client affiliates,"

4

and (c) "co-investors" (approximately 357 items).[3]  The clients appear to be the taxpayers who participated in the strategy; the nature of the "client affiliates" is unclear, although Proskauer asserts an attorney-client privilege on behalf of both its clients and the  "client affiliates."[4]  It appears that most or all of the transactions involved one or two foreign individuals who are said to be "co-investors"; the co-investors, Martin Hawkes and Samuel Mahoney, are not clients, and no privilege is claimed as to communications with co-investors.

The remaining items appear to fall into four general categories:  (1) correspondence, memoranda, and e-mails from DGI to Proskauer; (2) correspondence from Proskauer to particular taxpayer clients; (3) internal memoranda from Proskauer, sent from one lawyer to another; and (4) internal Proskauer attorney notes.  Proskauer does not claim the attorney-client privilege for any materials exchanged between DGI and Proskauer, only work-product protection.

D.    **The Evidence Submitted by the Government**

The government has submitted evidence to the following effect.

At some point before 2001, DGI (and related entities, such as Alpha Consultants LLC and Helios Financial) devised a product that the government characterizes as a tax shelter and the plaintiff characterizes as an investment strategy.  The strategy had multiple variants; for present purposes, the details of the strategy are unimportant.  By at least March 2001, Ira Akselrad, an attorney at Proskauer, was working with DGI and accountants and attorneys at other firms to

---

[3] On April 18, 2008, the day this opinion issued, Proskauer submitted a revised privilege log that reflects, among other things, the fact that at least four groups of taxpayers (Whiteside, Elbaum, Weis, and McNeill) have waived any applicable privileges and that their documents will be produced to the government.  The total number of opinion letters and certificates of facts has therefore been reduced below the numbers indicated above.

[4] The government contends that the taxpayers are not in fact actual clients of Proskauer.  For present purposes, the Court need not resolve that issue.

refine the strategy.  (Gov't Ex. D; Lindquist Ex. 18, 20).[5]

By April 2001, DGI had prepared and circulated marketing materials for the strategy to lawyers at four firms:  Proskauer, Sidley Austin, Lord Bissell, and Bryan Cave.  (Lindquist Ex. 18, 20).  The draft marketing materials described the strategy (at least as it was to be pitched to taxpayer-investors) and gave the background of the key personnel at DGI and Alpha.  (*Id.*).  The draft marketing materials also stated the following:

> . . . we view our ability to firmly manage and control the process of getting two to four sets of attorneys and accountants to expeditiously reach the desired conclusions as being one of our most valuable contributions to our clients.

(*Id.*).

The strategy included, among other things, the preparation of individual opinion letters for each taxpayer and each investment.  Some combination of DGI, the law firms, and the accounting firms together created model, or template, opinion letters.[6]  Those opinion letters either discussed

---

[5] The government's evidence was submitted principally through affidavits of Barry Reiferson, with exhibits, and an affidavit of John Lindquist, also with exhibits, filed under seal in a related matter seeking to enforce a subpoena against DGI.  The government also submitted a notebook containing certain additional exhibits at the hearing.

[6] Proskauer had a role in developing the strategy and the model opinions, but its precise involvement is unclear.  For example, an e-mail dated February 7, 2002, from a lawyer at Sidley Austin to DGI states as follows:

> I've been through the Proskauer draft for the new deal.  Ira [Akselrad] has done an excellent job of paring down a number of the discussion [*sic*] from what we have said in the past.  In a perfect world I would probably adopt many of the changes Ira made, but it's hard to get changes to boilerplate here.  Do you have a problem if we continue to use our form of discussion on most of these issues?

(Lindquist Ex. 45).  An e-mail from DGI to Michael Swiader at Proskauer dated March 19, 2002, states:

> I am now faxing you the proposed changes to the model opinion.  Call to discuss or if you can't read what I want.

(Reiferson Ex. 11).

the tax consequences of the strategy or whether the transactions needed to be disclosed to the IRS as "tax shelters."  It was part of the strategy that each taxpayer would receive one or more opinion letters specifically directed to that taxpayer and his or her transaction from any of the four law firms (including Proskauer) that the taxpayer chose.  (Reiferson Ex. 21).  It appears that individual law firms made changes to the models from time to time.  (Gov't Ex. C).

The strategy was successfully pitched to dozens of taxpayers, including Richard Egan. (Reiferson Ex. 46).  A DGI document from May 2002 lists 61 "2001 customers."  (Lindquist Ex. 51).  The same document indicates that the transactions of those customers totaled more than $1.5 billion; it is unclear whether that total represents the amount of income sheltered, the amount invested in the strategy, or some other number.  (*Id.*).  DGI's fees were listed as more than $32 million.  (*Id.*).

The legal fees of the four law firms for the opinion letters were generally paid by DGI as an expense.  (Lindquist Ex. 41, 42, 43; Reiferson Ex. 21).  An internal e-mail at BDO Seidman expressed some concern with this approach:

> I feel strongly that the client should pay the attorney's fees directly.  The advice would appear to be more independent.

(Lindquist Ex. 34).  At least some clients paid the legal fees directly, but this was not the usual practice.   (Lindquist Ex. 41, 42, 43).

In January 2002, DGI sent memoranda to attorneys at different firms that stated the following:

> Below is a list of tax opinions we propose to be prepared by your firm and proposed [or agreed to] compensation for such preparation.

(Lindquist Ex. 41, 42, 43).  The memorandum to Ira Akselrad at Proskauer listed 28 opinions for

19 "clients," including Richard and Maureen Egan, and various "opinion types," such as "standard partnership" or "stock dribble." (Lindquist Ex. 43).[7] That memorandum also states that there were two clients who would pay Proskauer's fees directly, for total fees of $225,000, and that the remainder of the fees (totaling $1,170,000) would be paid by DGI. (*Id.*).[8] A similar memorandum sent to R.J. Ruble at Sidley Austin lists 30 opinions for 22 clients, again including Richard and Maureen Egan. (Lindquist Ex. 42). Again, the bulk of the legal fees were paid to the law firm by DGI. (*Id.*).[9]

The opinion letters were apparently based on "certificates of facts" that were executed by the clients. Those certificates were prepared by DGI and delivered to Proskauer and the other law firms after execution by the clients. (Reiferson Ex. 14, 15).

The opinion letters do not appear to have been designated on their face as "privileged" or "work product," or even "confidential." (Reiferson Ex. 20; Hill Ex. E). After Proskauer executed its opinions, they were transmitted to DGI for delivery to the clients, at least for some period of time. (Reiferson Ex. 12). Thus, for example, the government has produced a copy of the following e-mail sent to DGI by attorney Apryl Hand at Proskauer on September 10, 2002:

> I just had Ira [Akselrad] sign the Elbaum and Schutt opinions. He asked me to email you and ask you if we were going to continue with the system of sending the

---

[7] Proskauer's privilege log lists approximately several hundred "legal opinions," so it appears that the 28 listed were only a portion of the total.

[8] The document listing the "2001 customers" also listed various "expenses." (Lindquist Ex. 51). Among the "expenses" were payments to "SM-MH" (presumably, payments to the two foreign investors, Samuel Mahoney and Martin Hawkes) and to the four law firms (Proskauer, Sidley Austin, Lord Bissell, and Bryan Cave). (*Id.*). The expense payments to Proskauer (listed separately as "Proskauer," "Proskauer Alpha," and "Proskauer CFC Deals") totaled more than $1.2 million. (*Id.*).

[9] A further similar memorandum was sent to John Barrie at Bryan Cave, listing 24 opinions for 12 clients. (Lindquist Ex. 41). The record does not include any similar memorandum for Lord Bissell.

> opinions to you to be sent to the client, or rather if we should start binding them
> and sending them out ourselves given the privilege issues.  Any thoughts on this?

(*Id.*).  Similarly, Proskauer prepared an opinion letter for another client, Joseph Francis, on April

5, 2002.  (Hill Ex. G, entry no. 308).  Six days later, on April 11, James Haber of DGI advised

Michael Kerekes of BDO Seidman (an accounting firm) that it was "sending out" the opinion

letter to Francis at his home in Nevada.  (Reiferson Ex. 13).[10]

The degree of contact between Proskauer and the taxpayers is unclear.  At least one

purported set of Proskauer clients, the McNeills, have filed suit against DGI, Proskauer, and

others, in North Carolina, claiming various damages arising out of their participation in the tax

strategy marketed by DGI and others.  (Reiferson Ex. 18).  The complaint alleges, among other

things, the following:

> Upon further information and belief, Proskauer's fee to prepare the legal opinions
> regarding the overall Strategy was paid out of the $6.4 million fee paid to
> McGladrey [an accounting firm].  At no point did Proskauer contact the plaintiffs
> to discuss the facts of their business, their tax situation, or the Strategy.  . . .
>
> Proskauer never had a single oral communication with the McNeills before or after
> the opinion letters were prepared and sent to the plaintiffs.

(*Id.*, §§ 67, 91).

It appears that the opinion letters were not kept confidential between the law firm and the

taxpayers; instead, the opinions appear to have been circulated to DGI and one or more of the

accounting firms.  A review of the evidence concerning the preparation of one or more Sidley

---

[10] Michael Swiader at Proskauer also appears to have consulted with DGI in the preparation of the Francis opinion.  (Reiferson Ex. 11).

Austin opinion letters for Mr. Egan is illustrative.[11]

On October 8, 2001, an Egan representative e-mailed DGI with a number of questions, including the following: "When will we get the opinion letters and do I have to contact anyone or will you take care of that?" (Reiferson Ex. 21). DGI responded, "We work with the law firm. Opinions will be delivered in January. Have you decided on a law firm[?] Choices are: [Proskauer, Sidley Austin, Bryan Cave, or Lord Bissell]." (*Id.*).

On January 24, 2002, an Egan representative e-mailed DGI with a list of discussion items, including "What is timing of legal opinion letters." (Reiferson Ex. 23). DGI responded, "We hope that the two opinions will be available for draft review no later than 2/10." (*Id.*).

On February 22, a lawyer at Sidley Austin circulated a document (apparently a draft opinion) concerning "Egan" to DGI, seeking "sign off" on the document, and indicating that after DGI approved it he would sign the signature page and issue the document. (Lindquist Ex. 46).

On February 27, DGI e-mailed Egan representatives and KPMG, stating the following: "Enclosed please find a draft tax opinion for [a transaction] as prepared by [Sidley Austin]. We are reviewing it as you are." (Reiferson Ex. 24).

On March 1, an Egan representative e-mailed KPMG, with a copy to DGI, listing various discussion items for an upcoming meeting; among the items were "[r]eview the legal opinion letters from [KPMG's] perspective to be sure they are on point." (Reiferson Ex. 26).

On March 12, KPMG gave detailed comments on one of the draft opinion letters to an

---

[11] It is unclear how many opinions were provided to Mr. Egan or to his entities; at a minimum, Mr. Egan received opinion letters from both Proskauer and Sidley Austin. (*See, e.g.,* Reiferson Ex. 41, referring to Sidley Austin opinion dated March 8, 2002). The e-mail traffic cited appears to reflect multiple opinions, but is not always clear which opinion is involved.

Egan representative.  (Reiferson Ex. 28).  On March 14, DGI sent an e-mail to the same

representative asking "when I can expect your comments on both Fidelity opinions."  (Reiferson

Ex. 29).   The representative responded as follows:

> I am done. I just got [KPMG's] for the 2nd opinion (Sidley).  I had understood
> that he was still reviewing it.  Based on an email I got this morning I am assuming
> that he has completed his review.  I will integrate them and send tomorrow.  I have
> not seen anything from KPMG on the first opinion.

(*Id.*).

On March 15, DGI sent an e-mail to Sidley Austin, copied to an Egan representative,

stating as follows:  "Attached is the Egan opinion, redlined against your most recent version to

reflect changes (I think all of them) proposed by the Egan's lawyer . . . ."  (Reiferson Ex. 30).

On March 27, DGI sent an e-mail to an Egan representative requesting payment on one of

the tax shelter investments.  (Reiferson Ex. 31).  The representative responded, "payment will be

made as soon as we finish reviewing the opinion letters . . . ."  (*Id.*).  On March 28, DGI sent the

following e-mail in response:

> While I respect your desire for a thorough review of the opinion, the opinion has
> been issued in final (to the extent you find further changes I'm sure the law firm
> will be cooperative) and I feel that payment for Helios 2 should be forthcoming at
> this time.  Further delays at this point I do not believe to be appropriate.

(*Id.*).

On April 14, DGI requested that Egan's representatives "return the opinion."  (Reiferson

Ex. 32).

In short, draft opinion letters from Sidley Austin were circulated repeatedly to DGI (the

promoter of the strategy) and to KPMG (an accounting firm) for comment and review.  None of

the e-mails in the record suggest that any of the parties to those communications believed that the

opinions were privileged or constituted attorney work product.

It appears that Proskauer draft opinions were likewise disclosed to DGI and KPMG. For example, on September 5, 2000, James Haber at DGI sent a fax to an Egan representative that stated, "enclosed please find a section of a Proskauer opinion . . . ." (Reiferson Ex. 7). On September 20, 2000, Mox Tan at Helios sent an e-mail to an Egan representative that stated, "Jimmy [Haber of DGI] has received a draft of the Proskauer opinion and is in the process of reviewing it and making comments on it." (Reiferson Ex. 47). On November 27, 2001, an Egan representative sent an e-mail to Haber at DGI that stated, "You are coordinating with Preskauer [*sic*] to get an opinion . . . ." (Reiferson Ex. 44). On August 2, 2002, KPMG sent the following e-mail to an Egan representative:

> As prepared by the Proskauer Rose law firm, please see the attached draft disclosure opinion letter for Mr. Egan.
>
> Please call me after your review and we can discuss comments.

(Reiferson Ex. 35).[12]

Proskauer contends that it represented both DGI (and its affiliates, such as Helios) and various individual taxpayers (and their affiliates). As noted below, Proskauer has produced various engagement letters for individual taxpayers (including Mr. Egan) in which the individual was required to waive any conflict concerning such dual representation. It is unclear how

---

[12] In addition, on June 26, 2002, KPMG sent an e-mail to an Egan representative stating the following:

> Let's speak, since as of today, me and certain law firms I spoke with are of the view no disclosure is required and the transaction is distinguishable from listed transactions (as the opinions stated).

(Reiferson Ex. 34). Presumably, Proskauer was one of the "certain law firms" that was communicating with KPMG.

carefully Proskauer maintained the distinctions between its clients; for example, the government has produced a copy of a file folder label in which the client is identified as "Helios Financial LLC" and the contents are identified as "Opinion Letter – Harold E. Akselrad."  (Reiferson Ex. 8).[13]

### E.    The Evidence Submitted by Proskauer

In opposition to the government's motion to compel, Proskauer submitted the following evidence:

First, and as noted, Proskauer submitted a privilege log listing various items that are claimed to be privileged or work-product.  (Hill Ex. G).

Second, it submitted a copy of an engagement letter dated August 16, 2002, between Proskauer and Mr. Egan, signed by Ira Akselrad at Proskauer and countersigned by Mr. Egan. (Hill Ex. D).   The letter states the following:

> We were asked to represent you (the "Investor") in connection with rendering tax advice in connection with certain investment transactions that the Investor conducted in 2001.  We are writing to confirm that agreement regarding such representation.
>
> . . .
>
> We have advised you that we also represent The Diversified Group and Helios Financial and their affiliated entities in connection with various matters.  You acknowledged and expressly agreed that we would be free to continue to represent The Diversified Group and Helios Financial and you waived any conflict resulting from or attributable to such representation.

Third, it submitted an opinion letter dated September 4, 2002, from Proskauer to Richard J. Egan.  The letter is more than eleven pages long, single-spaced, and addressed the issue

---

[13] Another file folder label identifies the client as "Diversified Group Incorporated"; the contents are identified as "Tax Opinion – Final Version – Unsigned."  (Reiferson Ex. 9).

whether Mr. Egan "would be subject to disclosure requirements [of the Internal Revenue Code] for investor's involvement in various investment transactions . . . ." (Hill Ex. E). (In simple terms, a section of the Internal Revenue Code, 26 U.S.C. § 6111, requires the disclosure of certain defined "tax shelters.") The letter concludes that it is "more likely than not" that the transactions at issue would not need to be disclosed to the IRS. It is not signed by any individual lawyer, but by "Proskauer Rose LLP."

That letter does not state anywhere that it contains attorney-client privileged information or attorney work product. It also contains the following paragraph:

> The opinions expressed herein are furnished by us solely for your benefit and thus may not be relied upon or delivered to any other person without our express, prior written approval. This opinion is furnished to you solely for your use in determining the federal income tax consequences of the transactions described above and is not to be used, circulated, quoted, or otherwise referred to for any other purpose without our express written permission. Our permission is not required in connection with any examination conducted or required by a governmental or regulatory body, including disclosure to your outside accountants or lawyers in order to allow them to assist with such an examination on your behalf.

(*Id.*).

Fourth, it submitted a copy of a check for $50,000 from an Egan-controlled entity, payable to Proskauer Rose. (Hill Ex. F).

Fifth, it submitted excerpts from the deposition testimony of Janet Korins, a Proskauer tax partner. Ms. Korins testified that she reviewed the September 4, 2002 opinion letter to Egan; that she found out about the transaction after it had been entered into; that she considered Egan to be Proskauer's client; that she was not aware of any "generic opinion"; and that she does not recall what documents she relied upon in conducting her review. (Hill Ex. C).

14

Finally, it submitted copies of nine executed engagement letters, eight of which were executed by Ira Akselrad and one by Mitchell Gaswirth, a partner in Proskauer's Los Angeles office. The seven Akselrad letters are essentially identical, except for client names and fees.

Proskauer argues that "[t]he process by which Proskauer rendered legal advice to Mr. Egan was similar for each of the clients identified on Proskauer's privilege log." (Proskauer Mem. at 8). It has not, however, submitted any affidavit or other evidence in support of that statement.

## II.     Analysis

### A.     General Principles

#### 1.     Attorney-Client Privilege

The First Circuit has adopted Wigmore's formulation of the elements of the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

8 J.H. Wigmore, *Evidence* § 2292, at 554 (McNaughton rev. 1961) (quoted in *United States v. Mass. Inst. of Tech.,* 129 F.3d 681, 684 (1st Cir. 1997)). The privilege is to be construed narrowly, "because it comes with substantial costs and stands as an obstacle of sorts to the search for truth." *In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22 (1st Cir. 2003). The party who invokes the privilege "bears the burden of establishing that it applies to the communications at issue and that it has not been waived." *Id*.

"For the attorney-client privilege to attach to a communication, it must have been made in

confidence and for the purpose of securing or conveying legal advice." *In re Keeper (XYZ Corp)*, 348 F.3d at 23; *see also Mass. Inst. of Tech.*, 129 F.3d at 684. When information is supplied to a lawyer with the intent that it be disclosed in a required filing, such as a tax return or securities filing, the information is not confidential and therefore not protected by the privilege. *United States v. Mubayyid*, 2007 WL 2475872 *1, *4 (D. Mass. 2007) (citing *Denius v. Dunlap*, 209 F.3d 944, 952 (7th Cir. 2000)).

It is well-established that "voluntary disclosure to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communications to anyone else." *See, e.g., In re Lupron Marketing and Sales Practices Litigation*, 313 F. Supp. 2d 8, 10 (D. Mass. 2004); *Mass. Inst. of Tech.*, 129 F.3d at 687. "Where privilege is claimed and the opponent alleges a specific disclosure, the burden of proof is upon the claimant to show nondisclosure wherever that is material to the disposition of the claim." *Mass. Inst. of Tech.*, 129 F.3d at 686.

The waiver rule is subject to two general exceptions. First, because "the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others," the privilege "must include all the persons who act as the attorney's agents." *Cavallaro v. United States*, 284 F.3d 236, 247 (1st Cir. 2002) (quoting *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961)). Second, the privilege is not waived when communications to a third party are "part of an on-going and joint effort to set up a common defense strategy." *United States v. Bay State Ambulance and Hosp. Rental Serv.*, 874 F.2d 20, 28 (1st Cir. 1989) (quoting *In re Bevill, Bresler & Schulman Asset Management Corp.*, 805 F.2d 120, 126 (3d Cir. 1986)). If a party can make this showing, such communications are privileged even if the attorney represents another client with some adverse interests. *Bay State Ambulance*, 874 F.2d at 28

16

(quoting *Eisenberg v. Gagnon*, 766 F.2d 770, 787-788 (3d Cir. 1985)).

### 2.      The Work-Product Doctrine

The work product doctrine "is not designed to protect a confidential relationship, but rather to promote the adversary system by protecting the product of an attorney's work." *Ken's Foods, Inc. v. Ken's Steak House, Inc.*, 213 F.R.D. 89, 96 (D. Mass. 2002). The doctrine protects the following: "(1) a document or tangible thing, (2) which was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for a party's representative." *Colonial Gas Co. v. Aetna Cas. and Sur. Co.*, 139 F.R.D. 269, 274 (D. Mass. 1991) (quoting *Pasteris v. Robillard*, 121 F.R.D. 18, 20 (D. Mass. 1988)); *see* Fed. R. Civ. P. 26(b)(3). The test is "whether in light of the nature of the document and the factual situation in the particular case the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998); *see Maine v. U.S. Dept. of Interior*, 298 F.3d 60, 68 (1st Cir. 2002). The party invoking the doctrine bears the burden of proof. *In re Lernout & Hauspie Sec. Litig.*, 222 F.R.D. 29, 36 (D. Mass. 2004).

### B.      Whether the Records Are Protected by the Attorney-Client Privilege

The first issue is whether the records are protected by the attorney-client privilege. As noted, Proskauer bears the burden of proving that the documents are privileged.[14]

The government makes essentially two arguments against the assertion of the privilege. First, it argues that Proskauer did not have a "true attorney-client relationship" with any of the taxpayers who received opinion letters, based on the peculiar circumstances under which those

---

[14] The privilege, of course, belongs to the client; for present purposes, however, this memorandum will simply refer to "Proskauer" as the proponent of the privilege.

relationships were created.  *See, e.g., United States v. KPMG LLP*, 316 F. Supp. 2d 30, 39-40 (D.D.C. 2004) ("[Sidley Austin] was not engaged in rendering true legal advice, but was rather a partner with KPMG in its tax shelter marketing strategy . . . . when examined as a group, the [Sidley Austin opinion] letters appear to be nothing more than an orchestrated extension of KPMG's marketing machine.").  Second, it argues that the withheld documents reflect business advice, not legal advice.

The Court believes that the issue is more properly analyzed from a somewhat different perspective:  whether the documents were created and maintained in confidence between the clients (the taxpayers) and the law firm (Proskauer).  The analysis will focus first on the opinion letters, which are the key documents at issue.

The government has submitted evidence that the opinion letters were based on model or template opinion letters that were not created at Proskauer, and that specific individual opinions (and facts on which they were based) were reviewed and edited by individuals at DGI (and possibly others) after they were created.  That evidence largely (but not exclusively) involves the opinion letters of other law firms, not Proskauer.  The issue, therefore, is whether it can be reasonably inferred from the available evidence that the 380 Proskauer opinion letters were created and circulated to third parties in the same manner.

Proskauer argues that the evidence as to opinion letters created at other law firms is simply not relevant.  It also argues—without elaboration and with little additional evidence—that its 380 other opinion letters were "similar" to the September 2002 opinion letter created for Mr.

18

Egan and therefore should be analyzed identically.[15]

The evidence submitted by Proskauer is very limited.  It relies heavily, if not entirely, on

the deposition testimony of Janet Korins, who was one of the Proskauer attorneys who reviewed

the September 2002 opinion to Mr. Egan.  Ms. Korins, however, provided no testimony of any

kind about any of the hundreds of other opinions, and certainly did not indicate that those

opinions were handled in a "similar" manner.  Significantly, there is no affidavit or other evidence

from Ira Akselrad, the Proskauer partner who was most heavily involved in the strategy and the

firm's relationship with DGI.  Likewise, Proskauer has not submitted evidence from Michael

Swiader, Mitchell Gaswirth, or any other Proskauer attorney who worked on any of the other

opinion letters, or from any client who received any opinion letter.[16]

Furthermore, Proskauer's evidence as to the preparation of the September 2002 Egan

letter does not substantially contradict the government's evidence.  For example, Ms. Korins did

not testify that she had no contact with DGI, only that she did not "recall having any relationship

with that client" and that she didn't "specifically recall" whether James Haber of DGI was

involved in the formulation of the opinion.  (Korins Dep. at 50, 100).  However, Proskauer

partner Ira Akselrad also worked on the opinion (Korins Dep. at 18) and there is substantial

evidence that he did, in fact, have a relationship with DGI.  Ms. Korins likewise did not testify

that she wrote the opinion, only that she had "some part in writing and/or revising" it and

ultimately approved its language (along with Mr. Akselrad).  She also did not deny that the

---

[15] Specifically, Proskauer argues the following:  "The process by which Proskauer rendered legal advice to Mr. Egan was similar for each of the clients identified on Proskauer's privilege log."  (Proskauer Mem. at 8).

[16] Proskauer has *not* argued that it attempted to obtain evidence from its current or former attorneys or clients but was unable to do so.

opinion letter was based on a model, only that she was "not aware of a generic opinion." (Korins Dep. at 98).[17]

Proskauer argues that the evidence submitted by the government is inconclusive, or that it involves other firms and is therefore irrelevant. But it is Proskauer—not the government—that bears the burden of proof as to the assertion of the privilege. Of course, the fact that a document containing legal advice was sent from an attorney to an apparent client is *prima facie* proof that the document is privileged. If no other evidence is offered, the proponent of the privilege has met its burden. But here, the government has offered substantial—if incomplete—evidence that the participants in the strategy did not treat the opinion letters as confidential. Proskauer has done little or nothing to rebut that proof. If the letters were privileged, it should have been easy enough for Proskauer to produce an affidavit or other evidence stating, in substance, that the 380 opinion letters issued by Proskauer were held in strictest confidence and were never disclosed to or discussed with outsiders. It did not do so. In light of the government's evidence that opinion letters concerning the strategy were routinely disclosed to DGI and accounting firms, Proskauer's failure to do so speaks volumes.

The evidence that it was the practice of Proskauer and the participants in the strategy to circulate opinion letters to non-lawyers for review and comment is, itself, sufficient to overcome any claim of privilege. That conclusion is reinforced, however, by other evidence that the opinion letters were not intended simply to be private attorney-client communications of legal advice.

---

[17] Ms. Korins was asked at her deposition, "Do you know if the form of this letter [i.e., the September 2002 Egan opinion letter] was also sent [to] prior clients of Proskauer for whom Proskauer had issued opinions in 2002?" (Hill Ex. C at 140). She was instructed by her counsel not to answer on grounds of attorney-client privilege. (*Id.*).

First, the September 2002 Egan opinion letter is not marked anywhere on its face as "attorney-client privileged." That fact is not, by itself, controlling. *See United States v. Roxworthy*, 457 F.3d 590, 597 (6th Cir. 2006). Under the circumstances, however, it has substantial significance. The Egan opinion letter was created by a prominent and highly sophisticated law firm, with the participation of at least two partners (Janet Korins and Ira Akselrad) and apparently at least one associate. (Hill Ex. C at 17-18). The subject matter of the letter is complex, and the fee charged ($50,000 for an 11-page letter) is commensurate with both the sophistication of counsel and the complexity of the issue. It can hardly be an oversight that the letter is not marked "privileged." Rather, it appears that the authors of the letter either (1) did not believe that the document was privileged or (2) consciously chose not to label it "privileged."

Second, the fees of the taxpayers were generally (but not always) paid by DGI, the designers and promoters of the strategy.[18] Again, that fact alone is not controlling. *See, e.g., Dole v. Milonas*, 889 F.2d 885, 888 n.5 (9th Cir. 1989). Again, however, that fact is not insignificant. Among other things, it is consistent with the fact that the taxpayers were not simply receiving confidential and independent legal advice, but instead receiving opinion letters as part of a complex strategy devised by DGI, for which the taxpayers generally paid a fee to DGI.

Third, Proskauer apparently had a client relationship with DGI at the same time it issued the opinion letters to the taxpayers; indeed, a single attorney (Ira Akselrad) represented both DGI and the taxpayers. Again, that fact alone is not controlling; a law firm may legitimately represent

---

[18] As noted, Mr. Egan paid the $50,000 fee for the September 2002 opinion letter.

multiple clients, even those with potential conflicts (assuming the conflicts are waived).[19]  The existence of the multiple representation, however, tends to support the government's view of the evidence.

Fourth, the September 2002 Egan opinion letter states that it cannot be "used, circulated, quoted, or otherwise referred to for any other purpose" without Proskauer's "express written permission," except in connection with a government examination.  In other words, even though Mr. Egan paid $50,000 for the letter, Proskauer retained a proprietary interest in its content.  Such a provision is more consistent with the protection of the intellectual property of a business enterprise, rather than the provision of confidential, independent legal advice to a client.

Finally, and as noted, the text of the Egan opinion letter appears to contemplate possible disclosure to the IRS—presumably, and at a minimum, as a protection against the imposition of a tax penalty.  The mere fact that the attorney contemplates possible future disclosure of his or her advice does not mean the privilege does not attach, but nonetheless is suggestive of a non-confidential communication.

Thus, the evidence clearly indicates that the opinion letters were created pursuant to a common plan or scheme involving the same participants, and that both draft and executed letters were not kept in confidence.[20]  While it is certainly possible that the Proskauer opinion letters were handled differently than those at other firms, there is no evidence that they were, and little

---

[19] The firm generally may not, however, circulate privileged documents among its different clients without breaching the attorney-client privilege.  There is no suggestion here that DGI was in a joint defense arrangement, or that disclosure to DGI was necessary for Proskauer to render legal services to the taxpayers.  *See Mass. Inst. of Tech.*, 129 F.3d at 684.

[20] The government notes that certain Proskauer clients, such as the McNeills, are now actually adverse to the firm and appear to have waived the privilege as a result.  To the extent, of course, that any such client has independently waived the privilege, in litigation or otherwise, that waiver is equally applicable here.

reason to draw such an inference.  Under the circumstances, the Court has little difficulty drawing the inference that the attorney-client privilege did not attach to the Proskauer opinion letters.

Proskauer does not claim that the "certificates of facts" upon which the opinion letters were based are privileged.  Furthermore, and in any event, if the opinion letters are not privileged, related documents involving the same subject matter are likewise not privileged.  *See, e.g., In re Grand Jury Subpoena (Zerendow)*, 925 F. Supp. 849, 855 (D. Mass. 1995).  For the same reason, correspondence and other documents concerning those items are not privileged under basic principles of subject matter waiver.

There remains the issue whether an *in camera* review is appropriate to resolve any doubts as to the privileged nature of the materials.  Ordinarily, such a procedure may be invoked where there are substantial factual issues as to the existence or waiver of a privilege.  *See, e.g., In re Grand Jury Proceedings*, 417 F.3d 18, 22 & n.3 (1st Cir. 2005).  Here, however, Proskauer has *not* sought *in camera* review, and has indeed suggested that it is not necessary.[21]  Certainly the Court sees no reason to undertake the tedious task of reviewing several hundred opinion letters, and voluminous associated correspondence and e-mails, if neither party finds it necessary or desirable.  Nonetheless, it is possible that one or more of the documents set forth in the privilege log were produced under circumstances such that the foregoing analysis does not apply.  For

---

[21] Specifically, Proskauer argues as follows:

> While the legal and factual issues with respect to the non-Egan opinions were client-specific, there are no material differences with regard to the process for rendering the legal advice by Proskauer or the nature of the documents withheld with respect to the other clients.  The record, accordingly, presents an opportunity to supply an unusually detailed and open look at what the lawyers actually did without resort to *in camera* inspection.

(Proskauer Mem. at 2).

example, certain of the documents are identified only as "attorney notes" or "e-mail," and it is not possible to ascertain whether those documents relate to the creation of the opinion letters or some other topic.  Accordingly, the Court will give Proskauer a further opportunity to request *in camera* review as to any specific document listed in the privilege log that it believes remains privileged notwithstanding the Court's analysis as to the opinion letters.

### C.     Whether the Records Are Protected by the Work-Product Doctrine

The work product issue requires a different analysis, as the confidentiality requirement is less stringent than in the privilege context.  Work-product protection "is not as easily waived as the attorney-client privilege." *Mass. Inst. of Tech*, 129 F.3d at 687.  Although the attorney-client privilege may be waived or destroyed by disclosure to any party outside the attorney and client, work-product protection is waived only when material is disclosed "in a way inconsistent with keeping it from an adversary" or a "potential adversary." *Id.*; *In re Raytheon Sec. Lit.*, 218 F.R.D. 354, 359-60 (D. Mass. 2003).

The question instead is whether the opinion letters were prepared in anticipation of litigation.  As noted, a document is subject to the work-product protection if, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Adlman*, 134 F.3d at 1202.  Documents that are prepared in the ordinary course of business, or for other non-litigation purposes, are not work product. *See Maine*, 298 F.3d at 70.  There is both a subjective and an objective component to the inquiry; a party must "have had a subjective belief that litigation was a real possibility, and that belief must have been reasonable." *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998); *see also In re Polymedica Corp. Sec. Lit.*, 235 F.R.D. 28,

24

30-31 (D. Mass. 2006).

Proskauer contends that the opinion letters were prepared in anticipation of litigation—specifically, "the prospect of the IRS mounting a challenge to the client's anticipated tax treatment of the transactions." (Proskauer Mem. at 10). As noted, it bears the burden of proof as to that issue for each such document.

Obviously, it is commonplace for lawyers to provide opinions or memoranda to clients who seek advice on tax matters. Such advice is, of course, normally privileged. Where the advice is given in anticipation of litigation with the IRS, or a tax audit or investigation, the advice may also be subject to the protections of the work product-doctrine. *See, e.g., Roxworthy*, 457 F.3d 590; *United States v. Textron, Inc.*, 507 F. Supp. 2d 138, 148 (D.R.I. 2007).

Viewed in isolation, the opinion letters in the present matter could be construed as materials prepared in anticipation of litigation: the IRS was a potential adversary, and the law firm rendered opinions as to the likely tax consequences and the likelihood that the taxpayer would have to pay a penalty. The documents cannot, however, be considered separately from the circumstances of their creation. Those circumstances are outlined above, and need not be repeated here. The evidence indicates that the letters were drafted by multiple parties, over multiple months or years, based in large part on generic or boilerplate opinions. Their purpose was not to analyze pending or imminent claims; instead, it was to induce the taxpayers to invest in the strategy (or, put differently, to provide comfort to those investors, particularly with respect to the possible imposition of future tax penalties).[22] Taken in context, therefore, the opinion letters

---

[22] It is commonplace for law firms to prepare opinion letters to third parties (for example, to limited partners in an investment partnership) to induce them to invest in a particular transaction. *See generally* M. JOHN STERBA, JR., LEGAL OPINION LETTERS (3d Ed. 2006).

were not specifically connected to any actual or potential litigation, audit, or IRS investigation.

Of course, it was always possible that the IRS might challenge the taxpayer's position in the future, and it is true that the opinion letters addressed the possibility of such a challenge. But that is true of virtually any advice or opinion given by any tax lawyer—the IRS is always a potential (and usually the only possible) adversary. There must be a closer nexus between the lawyer's advice and a specific potential claim for the work-product doctrine to apply. The mere fact that the taxpayer is taking an aggressive position, and that the IRS might therefore litigate the issue, is not enough.

Two additional points deserve note. First, the subject matter of some of the opinion letters was whether the taxpayers were required to disclose the transactions to the IRS; Proskauer concluded that they did not. The content of the letters, therefore, was geared toward concealing the transaction from the IRS, making the prospect of an audit or investigation, or subsequent litigation, that much less likely. Second, Proskauer did not at first assert work-product protection as to *any* of the items on its privilege log. It asserted only attorney-client privilege in its initial version of the log, and did not assert any work product claims until more than one year after the service of the subpoena. The government contends that the assertion of work-product protection was untimely, and therefore the protection was waived. Without deciding the issue, the Court notes that, at a minimum, the issue of work-product protection was hardly the foregone conclusion that Proskauer now contends it is.

-------

Such opinion letters might address any number of issues (e.g., the legal status of the entity, its powers and authority, compliance with various legal requirements, or tax-related issues). *Id.* The opinion letters here, as a practical matter, more closely resemble such a third-party opinion rather than a true attorney-client opinion.

In short, the opinion letters were prepared as part of a sophisticated effort to induce taxpayers to invest in the strategy developed by DGI, not because of a specific and identifiable threat or prospect of litigation with the IRS. The opinion letters are therefore not protected by the work-product doctrine. The "certificates of facts" created in connection with those opinions, and the associated correspondence and other related documents, are likewise not protected. As with the privilege issue, Proskauer will be given a further opportunity to seek *in camera* review as to particular documents that do not fall within the scope of the Court's ruling.

**III.    Conclusion**

For the foregoing reasons, Defendant's Motion to Compel Production of Documents from Proskauer Rose LLP is GRANTED in part.

On or before May 9, 2008, Proskauer Rose LLP shall:

(1)    as to any records identified as a "legal opinion" or "certificate of facts" in its privilege log, produce the records to the United States; and

(2)    as to any other record identified in its privilege log, either produce the records to the United States or, as to each specific document that it seeks to withhold from production, provide to the Court:

(a)    a copy of the document for *in camera* inspection;

(b)    competent evidence, by affidavit or otherwise, specifically detailing the reasons why the document should not be produced in accordance with this memorandum and order.

Any further disputes as to the discoverability of such records shall be referred to the United States Magistrate Judge for resolution consistent with the terms of this memorandum.

27

**So Ordered.**

                                       /s/ F. Dennis Saylor
                                       F. Dennis Saylor IV

Dated: April 18, 2008              United States District Judge