UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## UNITED STATES OF AMERICA'S SECOND MOTION TO COMPEL
## PRODUCTION OF DOCUMENTS FROM RSM McGLADREY[1]

The United States of America files this second motion, pursuant to Federal Rule of Civil

Procedure 45(c)(2)(B), to compel production of documents from accounting firm RSM

McGladrey LLP ("RSM").  The subject documents were withheld by RSM under claims of

attorney-client privilege, but, these documents were not made in confidence and even assuming

some of them were, any privilege was waived when RSM shared them routinely with, at least,

the promoters of the FDIS (Financial Derivative Investment Strategy) and Stock Dribble

transactions.[2]  RSM also shared the communications or their subject matter with prospective

---

[1]The Court waived the 20-page limit for filings in this case.

[2]The FDIS and Stock Dribble product are variants of the Short-Option Strategy tax-shelter product commonly referred to as SOS, a strategy utilizing offsetting options to inflate a partner's basis in a partnership by not taking account of the offsetting proceeds credited to the partner from the short option.  The Internal Revenue Service refers to the strategy and its various variants as Son of Boss transactions.  *See*, *Kligfield Holdings v. Commissioner*, 128 T.C. 192, 194 (2007).

customers.  Because of the sharing of these communications, the documents must be produced in unredacted form.

## INTRODUCTION

After the Court granted the United States' first motion to compel RSM's production in this case, RSM produced documents but withheld or redacted forty responsive documents under claims of attorney-client privilege.  Those withheld documents relate primarily to communications RSM had with the law firm Bryan Cave regarding the FDIS and Stock Dribble transactions at issue in the *Fidelity International* and *Fidelity High Tech* cases, respectively.

RSM is a central figure in this case, and its complete production of documents is essential.  RSM signed Richard Egan's and Maureen Egan's joint 2001 Form 1040 U.S. Individual Income Tax Return, and then also signed the Egans' 2002 Form 1040.  RSM also signed Fidelity International's and Fidelity High Tech's 2002 Forms 1065 Partnership Returns, all at issue in this case.  RSM also widely marketed to its own clients, in conjunction with The Diversified Group Inc. ("DGI"), the FDIS and Stock Dribble tax-shelter products, which it called, respectively, the Partnership Derivative Strategy and the Basis Enhancement Strategy.

RSM's direct involvement with the Egans appears to have begun when the Egans fired KPMG for refusing to sign the Egans' personal tax returns without the requisite tax-shelter-disclosure statements, at which time RSM was retained to take over KPMG's tax return preparation responsibilities and sign the tax returns without disclosure.  RSM's own public policy was to advise clients to disclose these transactions, unless the clients obtained an "independent opinion" to the contrary.  Those purportedly independent opinions each came from one of the four law firms arranged by DGI and RSM to provide opinion letters– including Bryan

2

Cave.  These withheld documents are essential to determining, among other things, why RSM signed the Egans' tax returns without disclosure, when RSM's own public policy required it. Because the communications were never intended to be kept confidential, and then were not kept confidential, these essential documents must be produced.

Bryan Cave was not providing confidential legal advice to RSM with respect to the FDIS and Stock Dribble transactions.  Any advice it provided was part of a well coordinated group effort between those organizations responsible for designing, marketing, and implementing the transactions.  Bryan Cave was one of four law firms (along with Lord Bissell & Brook, Brown & Wood, and Proskauer Rose) offered by the promoters here, including DGI, to wealthy taxpayers seeking so-called legal opinions for use in the event that their tax-shelter transactions were discovered by the IRS.  The opinions provided the necessary penalty insurance to the tax-shelter purchasers and were thus an essential marketing tool in the promotion of the tax shelters.  Bryan Cave worked closely with DGI to opine on the tax attributes of the transactions and the applicable disclosure requirements.  Bryan Cave also worked with the accounting firms that marketed the transactions, including BDO Seidman and RSM.  Bryan Cave also provided, through DGI, opinion letters to the purchasers of the transactions.  Each role, from opining to marketing to implementing, was integral, and each co-promoter collected its share of the booty. In the case of RSM, that came in the form of a fee calculated as a percentage of the expected tax savings.

The analysis of the lack of confidentiality and waiver issues here is similar to the analysis conducted by the Court in its decision in this case on the United States' motion to compel production from Proskauer Rose.  There, as here, the law firm's communications were not

intended to remain confidential; they were shared with others necessary for the promotion of the tax shelter.  In deciding the motion to compel Proskauer Rose, the Court found that Proskauer Rose's "opinion letters were prepared as part of a sophisticated effort to induce taxpayers to invest in the strategy developed by DGI."[3]  Bryan Cave's so-called advice to RSM, at issue here, and RSM's and Bryan Cave's sharing of that advice with the promoters and potential customers, was just another part of that "sophisticated effort."  RSM and DGI each purport to have engaged Bryan Cave to provide separate advice.  A scratch below the surface, however, reveals that RSM, DGI, and Bryan Cave were part of the same group effort as Proskauer Rose was, and none of this so-called advice was intended to remain– or did remain– confidential.

## STATEMENT

The subjects of the withheld communications were routinely shared with DGI, and were also shared with other promoters and potential customers.  That sharing makes its eminently clear that these communications were not, and were not intended to be, confidential, and even to the extent some of them may have initially been confidential, any attorney-client privilege that may have arisen was thereafter waived.

### A.    DGI's Relationship With Bryan Cave.

The sharing of communications by Bryan Cave with DGI is not all surprising considering that DGI– not RSM– first engaged Bryan Cave on March 22, 2000, before any of the withheld communications were made.  That engagement is memorialized in an engagement letter signed by Bryan Cave.[4]  The engagement is for Bryan Cave's provision of "services to . . . [DGI] in

---

[3]Mem. and Order on Mot. to Compel Produc. of Docs. from Proskauer Rose LLP at p. 27.

[4]Govt. Ex. 1.  The copy produced by Bryan Cave is not countersigned by DGI.

connection with tax strategy advice and opinions and such future matters that . . . [they] mutually agree[d] to undertake."[5]  The "advice and opinions" that Bryan Cave provided to DGI during the following years related to what RSM called DGI's development of "tax planning strategies"– that is, tax shelters.[6]

During that time, after DGI engaged Bryan Cave to assist it in developing the tax-shelter products that RSM and others would market, Bryan Cave performed the necessary work for its client– or business partner– DGI.  As shown on the July 23, 2001 invoice from Bryan Cave to DGI, it billed DGI for time spent on "Tax Structuring / Tax Opinion."[7]  That July invoice included a charge from June 13, 2001 for "Work on finalizing draft of tax opinion."  Not coincidentally, Grant Thornton, another accounting firm, received a draft of that Bryan Cave opinion dated that same date– June 13, 2001.[8]  DGI, through its president, James Haber, described both Grant Thornton and RSM as "referral sources" for the FDIS product.[9]  Bryan Cave continued to advise DGI on various "Tax Structuring / Tax opinion" issues, including so-called "6112 listing issues."  Those issues related to the requirement, under 26 U.S.C. § 6112, that advisors of so-called reportable transactions maintain lists of those they advised on the reportable transactions.[10]  On September 25, 2001, Bryan Cave billed DGI for earlier conferences

---

[5]Id. at ¶ 1.

[6]Govt. Ex. 2 at ¶ 2.

[7]Govt. Ex. 4.

[8]Govt. Ex. 5.

[9]Govt. Ex. 49, Haber Dep. Tr.; *In the Matter of: United States Internal Revenue Service, Diversified Group Inc., & Subsidiaries*; 290:10-25.

[10]On February 28, 2000, the IRS issued temporary and proposed regulations regarding Internal Revenue Code (26 U.S.C.) Section 6112. On August 11, 2000, the IRS issued temporary and proposed regulations regarding Section 6112, which were then published in the Federal

(continued...)

involving the "6112 listing issues."[11]  (As discussed further below, RSM claims privilege as to

contemporaneous communications with Bryan Cave on those same issues.)  The DGI-Bryan

Cave relationship continued, and in January 2002 DGI forwarded to Bryan Cave a "list of tax

opinions . . . [DGI] propose[d] to be prepared" by Bryan Cave and the list of "agreed[-]to

compensation for such preparation."[12]  The list of proposed tax opinions included one for Ronald

Wainwright of RSM, who engaged in his own FDIS tax shelter.  DGI agreed to pay for those

Bryan Cave opinions, including the one for Mr. Wainwright, at a total cost of $560,000, with one

opinion to be paid directly by "client" in the amount of $40,000.[13]  That payment was made by

DGI around April 3, 2002, at which time Bryan Cave acknowledged that it had received DGI's

$560,000 "due with respect to the opinions . . . [Bryan Cave had] agreed to provide . . . ."[14]

        Once the tax-year 2001 transactions were completed and the Bryan Cave opinion letters

were provided to the tax-shelter purchasers, the interaction between Bryan Cave and DGI turned

to the matter of avoiding IRS scrutiny.  In July 2002, DGI contacted Bryan Cave to express its

concern over what it believed to be Bryan Cave's advice to RSM that RSM's clients disclose

---

[10](...continued)
Register (65 FR 49909; 65 FR 49955) on August 16, 2000, modifying the previous regulations.
These amendments to the temporary regulations required tax-shelter promoters, as broadly
defined, to maintain lists of individuals, corporations, trusts, and partnerships who engaged in tax
shelters as defined in 26 U.S.C. 6111, which were defined as any "entity, plan, arrangement, or
transaction a significant purpose of the structure of which is the avoidance or evasion of Federal
income tax."

        [11]Govt. Ex. 6.

        [12]Govt. Ex. 7.

        [13]Govt. Ex. 7, p. 3.

        [14]Govt. Ex. 8.

their participation in 2001 FDIS transactions.[15]  Attempting to deflect DGI's concern, Bryan

Cave cryptically responded that it was RSM [not it] who was advising to "disclose absent an

opinion from outside counsel to the contrary."[16]  (Bryan Cave's response was copied to RSM,

and RSM's position on the disclosure issue is discussed further below.)  Also in mid-2002, Bryan

Cave contacted DGI to describe the Internal Revenue Service's "disclosure initiative" and the

"reg[ulation] projects" relating to disclosure and list maintenance.[17]  Bryan Cave was also

advising DGI on the status of various U.S. Senate bills, including the "tax shelter bill."[18]  Once

DGI was no longer concerned that Bryan Cave was providing advice that taxpayers had to

disclose their FDIS transactions, DGI arranged with Proskauer Rose, one of its other four

available law firms, to issue opinions concluding that DGI's clients need not disclose those FDIS

transactions.  To that end, DGI forwarded a template Proskauer Rose "non-disclosure" opinion

letter to RSM,[19] and asked RSM for "a list of clients that may wish to engage Proskauer for the

[non] disclosure opinion."[20]

> **B.    RSM's Relationship With DGI and Others to Develop So-Called Tax Strategies**.

Once DGI developed the "tax planning strategies," the accounting firms, like RSM, could

market them to their own clients using the law firms' cookie-cutter opinion letters, drafted in

---

[15]Govt. Ex. 9.

[16]Govt. Ex. 9.

[17]Govt. Ex. 10.

[18]Govt. Ex. 11.  Interestingly, DGI forwarded the Bryan Cave email on the subject to
Stephanie Denby, the Egans' attorney at Burke Warren.

[19]Govt. Ex. 12.

[20]Govt. Ex. 13.

conjunction with DGI, as a marketing tool.[21]  RSM was eager to reap huge profits by marketing these tax products to its clients and taking a fee.  RSM pursued that end with various partners.

One of those partners was BDO Seidman.  As Ronald Wainwright of RSM's "Tax Solutions Group" explained, RSM in 2000 was part of a joint venture with BDO Seidman "whereby BDO Seidman had various tax strategies that they were presenting into the marketplace, presenting to [RSM] McGladrey clients[,]" and RSM would work "with them in regards to RSM clients who chose to potentially implement those tax strategies."[22]

In addition to the joint venture, RSM worked to implement tax strategies with other professional firms.  RSM referred to these other firms as "intermediaries."[23]  RSM's Complex Solutions Group discussed the need to "continue to develop and expand . . . relationships with intermediaries[, specifically DGI,] and thereby develop new strategies to offer to . . . [RSM] clients."[24]  DGI was one of those so-called intermediaries with whom RSM began to work after its BDO Seidman joint venture began to be viewed negatively by RSM personnel.[25]  By no later than December 2000, RSM was discussing its dissatisfaction with its joint-venture partner and the related promoter(s).  In a December 15, 2000 email from one RSM employee to another, the author says that RSM "may find that [its] . . . financial return from Tax Solutions is enhanced by working with other alliances."[26]  He goes on to write that he plans "to introduce the next Midco

---

[21]The joint effort among professional firms was described in detail in the United States' memorandum in support of its motion to compel production of documents from Proskauer Rose (Docket Entry No. 197, pp. 8-12), which is incorporated by reference here.

[22]Govt. Ex. 50, Wainwright Dep. Tr., *Fidelity High Tech v. United States*, at 6:20-7:15.

[23]Govt. Ex. 51, Wainwright Dep. Tr., *Fidelity High Tech v. United States*, at 46:8-12.

[24]Govt. Ex. 2.

[25]Govt. Ex. 51, Wainwright Dep. Tr., *Fidelity High Tech v. United States*, at 46:13-16.

[26]Govt. Ex. 14.

deal [(Midco being another tax-shelter product)] to Diversified ["DGI"] . . . ."[27]  That use of DGI

would "be outside the BDO [Seidman] joint venture."[28]  The possible "alliance" with DGI was

described as one that "could increase . . . [RSM's] revenue by 50-60% on each deal . . . [which]

assumes that they [sic] are a quality provider, we have a reliable tax opinion writer and whether

. . . [the RSM] team is prepared to take on this challenge."[29]  RSM claims to have conducted due

diligence with respect to DGI, that due diligence having included consultation with Bryan Cave.[30]

 (Ronald Wainright of RSM refused to answer, on privilege grounds, a question at his

deposition aimed at what Bryan Cave told him about DGI as part of that due diligence.)[31]

Apparently satisfied with what it was told about DGI, RSM worked with DGI on "a number of

transactions that . . . [DGI] as an intermediary offered in the marketplace."[32]  Those DGI

transactions included the tax-shelter products at issue here, FDIS and Stock Dribble.[33]  By 2001,

RSM was meeting with DGI and describing FDIS as "only one of their strategies but where they

are focused . . . ."[34]  RSM also described DGI's "concern" over BDO Seidman's fees for the

transaction and how that "impacts Pre-Tax Profit."

    RSM recognized that these "tax planning strategies" had to be disguised as investments,

and therefore further described the need to keep "in check the Pre-Tax Profit [sic] potential that

---

[27]Id.

[28]Id.

[29]Id.

[30]Govt. Ex. 52, Wainright Dep. Tr., *Fidelity High Tech v. United States*, at 61:4-8.

[31]Govt. Ex. 52, Wainright Dep. Tr., *Fidelity High Tech v. United States*, at 61:9-25.

[32]Govt. Ex. 53, Wainright Dep. Tr., *Fidelity High Tech v. United States*, at 51:2-4.

[33]Id. at 51:9-12.

[34]Govt. Ex. 15.

the client should achieve through the strategy."[35]  It is that "Pre-Tax Profit," or at least the facial

appearance of the possibility of a pre-tax profit, that was essential in order to make these tax

shelters look to the outside like real investments.  RSM made sure that DGI was "very

comfortable with  . . . [RSM] and . . . [its] thoughts on Pricing and . . . [its] focus on Pre-Tax

Profit . . . ."[36]  RSM was quite aware that a key component of these tax shelters was the

plausibility, at least at first glance, of a profit potential.  It and DGI recognized that if their fees

were too high, even a remote possibility of profit on these transactions, to the extent there was

one, would disappear.  As Mr. Wainwright stated,

> . . . we're very focused on the fact that *after all the fees were paid* and income was
> derived based upon the investments, that there was a pre-tax profit motive that the
> fees were not so excessive, that without the tax benefit, the taxpayer would not have
> a return on their investment.[37]

Moreover, at the same time RSM sought to disguise the tax shelters as investments, it analyzed

each client's "profit" potential "as a percentage of Federal Tax Savings" the "tax planning

strategies" would generate.[38]  It also calculated its own fees– that is, its own and DGI's respective

shares of the fees charged to the tax-shelter participants– as a percentage "of the tax savings"

generated for its clients.[39]  As Karen Bowman of RSM wrote to Ronald Wainwright, relaying a

conversation she had with an RSM client, that client believed that "a fee that equates to approx.

25% of the tax savings, that's more than fair."[40]  The fees for that client, William "Bill" Theis,

---

[35]Govt. Ex. 2.

[36]Govt. Ex. 15.

[37]Govt. Ex. 54, Wainwright Dep. Tr., *Fidelity High Tech v. United States*, at 102:10-19.
(Emphasis added)

[38]Govt. Ex. 3.

[39]Govt. Ex. 44.

[40]Id.

were clearly described on the "Outline of Proposed Transaction,"[41] and the client was clearly advised that it was a percentage of the expected tax savings.

These efforts at selling more product and keeping the sold tax-shelter products free from Internal Revenue Service scrutiny defined the relationship of RSM with Bryan Cave during the 2000-2003 time frame.  In short, that relationship amounted to RSM being part of a group effort with Bryan Cave to market and implement tax shelters and then to conceal their existence.

### C.    RSM's Dealings with Bryan Cave Were Not, and Were Not Intended to Be Kept, Confidential.

RSM's relationship with Bryan Cave as it relates to these transactions was not a confidential attorney-client relationship.  It was a product of the group effort between the promoters, accounting firms, and law firms.  The "advice" going to RSM from Bryan Cave was shared routinely with other members of the group.

RSM's dealings with Bryan Cave, as they relate to these transactions, began in connection with its relationship with, most importantly, DGI.[42]  Those dealings also predated any engagement letter between RSM and Bryan Cave relating to these tax shelters.  The development of the tax-shelter products and the subsequent sale of them required the garnering of opinion letters.  RSM indeed used the promise of the opinion letters to sell the tax shelters to its clients.  For example, RSM advised one customer in 2001 that it would "assist . . . in engaging a law firm

---

[41]Govt. Ex. 45.  The "Outline" showed a "Long Call Premium," which was one-half of an option pair, in the amount of $24.4 million.  In the FDIS transactions, it was this long option that equaled the amount of the client's income that he wished to shelter from taxation.  At the capital-gains tax rate of 20%, the tax savings on $24.4 million was $4.88 million.  The fees were $1.22 million (see page 3 of "Outline of Proposed Transaction"), which is precisely 25% of the tax savings, as Ms. Bowman had discussed with Mr. Theis.

[42]RSM argues that it had a long-standing relationship with Bryan Cave that predated these transactions.  Even taking that as true, the prior relationship appears to have had nothing to do with the tax-shelter products at issue here, and certainly in no way changes the total lack of confidentiality and/or waiver that defined its dealings with Bryan Cave with respect to these tax shelter transactions.

to provide . . . [the customer] with a tax opinion regarding the tax consequences of" a planned transaction,[43] that customer agreeing to enter into a so-called basis enhancement transaction (like that in *Fidelity High Tech*).[44]  RSM's internal "Agenda" listed the four law firms available to provide opinions through DGI (Bryan Cave, Lord Bissell & Brook, Sidley Austin, and Proskauer Rose).[45]  Two of RSM's clients, the McNeills, were told by Ronald Wainwright in August 2001 that Bryan Cave was available to write opinions, and that "opinions [would be] rendered [in the] first part of the following year . . . ."[46]

RSM's initial communications with Bryan Cave in relation to these tax-shelter products were in fact made through DGI.  On September 7, 2001, Ronald Wainwright of RSM forwarded to his colleagues at RSM documents received from DGI relating to these products.[47]  Specifically, he forwarded a memorandum on the use of 26 U.S.C. § 754, which relates to the step-up in basis of a partner's share in partnership assets pursuant to a Section 754 election– which strategy DGI referred to as a stock dribble transaction.[48]  Section 754 was an integral part of the later opinion letters on the stock dribble transaction sent through DGI to RSM's (and others') customers.  He also forwarded a so-called designation agreement.[49]  Designation agreements pertain to who would maintain the required customer lists under the applicable Internal Revenue Code provisions.  Both of these forwarded documents were sent to RSM by

---

[43]Govt. Ex. 21.

[44]Govt. Ex. 55, Wainwright Dep. Tr., *Fidelity High Tech v. United States*, at 213:8-10.

[45]Govt. Ex. 20.

[46]Govt. Ex. 22.

[47]Govt. Ex. 16.

[48]Id.

[49]Id.

DGI.[50]  Most importantly, both were described by Mr. Wainwright as having been "discussed last week with Bryan Cave and utilized by Diversified[, that is, DGI,] with other firms."[51]  That discussion with Bryan Cave post-dated DGI's engagement letter with Bryan Cave, but predated RSM's.

Similarly, other communications with Bryan Cave and DGI related to various applicable U.S. Code provisions.  In September 2001, RSM was discussing the application of the list-maintenance requirements found in 26 U.S.C. § 6112.  Bryan Cave forwarded to RSM a "draft" memorandum relating to Section 6112, contemporaneously with the proposed "designation agreement" with DGI.[52]  Significantly, RSM asked Bryan Cave to discuss the designation agreement directly with DGI.[53]  That is no-doubt because RSM viewed its relationship with Bryan Cave as existing through its business partner DGI.  It is noteworthy that, as described above, Bryan Cave was at that time billing DGI for work performed on Section 6112 issues, while it did not yet have a formal engagement letter with RSM.

On December 5, 2001, more than two months after Bryan Cave's work with DGI *and* RSM on the Section 6112 issues, and more than two years after obtaining an engagement letter from DGI, Bryan Cave executed an engagement letter with RSM.[54]  A review of the preceding communications to and from Bryan Cave sheds light on the reason for this tardy engagement. The reason appears to be that Bryan Cave believed that the FDIS tax-shelter product was subject

---

[50]Id.

[51]Id.

[52]Govt. Ex. 17.

[53]Id.

[54]Govt. Ex. 43.  As discussed, *infra*, apparently due to using the DGI/Bryan Cave engagement letter as a template for RSM/Bryan Cave engagement letter, the letter's year of execution was not changed – and thus the RSM/Bryan Cave letter contains a mistaken year of execution of 2000, instead of 2001.

to the list-maintenance requirements in Section 6112, for which "advice" it had just billed DGI. Before RSM's execution of the engagement letter, Bryan Cave and DGI had a "disagreement" over whether the FDIS transaction triggered the list-maintenance requirements. In an email exchange between DGI and Bryan Cave, they each discuss the relevant portions of an opinion from another law firm, Pryor Cashman, relating to those requirements, which ultimately concluded that there is "a reasonable basis for the position that the customer list rules of Section 6112 do not apply to"[55] certain "sponsored" transactions[56]– which included the FDIS transaction.[57] In the email exchange, DGI takes the position that FDIS is a "technique" rather than a "transaction," and therefore does not trigger the list-maintenance requirements.[58] In contrast, John Barrie of Bryan Cave takes the position that, among other things,

> while [an] investor obviously has . . . options[,] he/she is paying a fee to invest in a DG[I] created structure - he has been 'presented' a set of documents, [a] series of possible steps, which structure is complete and as presented provides a potential tax benefit and that, I think, is a 'transaction' as defined in [the] 6112 . . . [regulations].[59]

DGI simply responds that "reasonable minds can differ . . . ."[60] To allow RSM to circumvent this fundamental disagreement between it and Bryan Cave and thereby avoid the need to comply with the "list maintenance" requirements, DGI suggested to RSM that it:

> tell[] the client only that Diversified [(DGI)] has a strategy that can be tailor-made to fit the client's specific parameters, without elaborating further. The client then meets with Diversified and McGladrey . . . [where] Diversified presents a technique, offering to work with the client to fill in the blanks, and McGladrey discusses general

---

[55] Govt. Ex. 60 at p. 32 (Bates No. 6BRY0019436).

[56] Govt. Ex. 60 at p. 1.

[57] Govt. Ex. 56, Barrie Dep. Tr., *Fidelity International v. United States*, at 114:15-115:2.

[58] Govt. Ex. 18.

[59] Id. at p. 1.

[60] Id. at p. 1.

14

tax considerations.  So, while McGladrey knows the client's parameters, it never presents anything, and Diversified presents a technique, not a transaction.[61]

Shortly after DGI and Bryan Cave agreed to disagree, so to speak, on the list-maintenance requirements, and in light of Bryan Cave's meeting with RSM on that same subject, DGI and RSM entered into the so-called designation agreement, designating DGI as the "person" who would maintain any required lists.[62]  That agreement was executed on September 27, 2001.  At that time, of course, DGI did not intend to maintain any lists;[63] so, RSM was able to shift the list-maintenance responsibility to DGI, knowing that DGI would not put the entire tax-shelter-sales operation at risk.

Up to and beyond this date, DGI was part of all discussions with Bryan Cave on these products.  Bryan Cave was billing DGI for its work, and it had yet to enter into an engagement letter relating to these products with RSM.[64]

Of course, Bryan Cave's and DGI's agreement to disagree about the applicability of 26 U.S.C. § 6112 to these tax shelter products, and the subsequent designation of DGI as the party responsible for list maintenance, did not solve the problem of Bryan Cave's dissent.  It would have been a cause for concern to DGI and RSM if Bryan Cave's views as to the list-maintenance requirements were presented to the rest of the participants.  But the problem was resolved when RSM executed its engagement letter with Bryan Cave.

---

[61]Govt. Ex. 23.

[62]Govt. Ex. 19.

[63]*See, e.g.*, Govt. Ex. 46 at p. 1, Govt. Ex. 47, and Govt. Ex. 48 at p. 1.

[64]Nine of the entries on RSM's privilege log here relate to communications predating November 13, 2001, despite the lack of any RSM/Bryan Cave engagement letter until that date.

15

Thus, the RSM/Bryan Cave engagement letter appears to have been a product of DGI's and RSM's efforts to keep Bryan Cave's sensitive views from becoming more broadly known. RSM obviously realized that to achieve that end, Bryan Cave's views would have to be cloaked in privilege – a concept with which RSM was well familiar.  In fact, the issue of privilege was a continuing concern of RSM and the promoters.  For example, in March 2002, Bryan Cave sent to RSM confirmation that it had issued "final tax opinions" to RSM clients.[65]  RSM responded that it would not "get a copy of the Final opinion so the tax opinion falls under Client Attorney Privilege."[66]  DGI discussed with various lawyers the promoters' "colorable argument" on which they "may not prevail" that the "draft of opinions" which DGI "reviewed on behalf of investors" may retain privilege because of "'common interest.'"[67]  DGI apparently decided that it was not a winnable argument, and advised RSM the following year that "[r]eviewing a draft [opinion] blows the privilege for that opinion . . . ."[68]  RSM decided that it "need[ed] to review the Opinion" anyway.[69]  Based on subsequent RSM emails, it appears that RSM intended to argue that if the "Opinion" were modified to be a "Memorandum" from a law firm rather than an "Opinion," the privilege would not be waived as to the "Opinion."[70]  According to Ronald Wainwright, the difference between an opinion and a memorandum is that

---

[65]Govt. Ex. 37 at p. 2.

[66]Govt. Ex. 37 at p. 2.

[67]Govt. Ex. 38.

[68]Govt. Ex. 39.

[69]Govt. Ex. 39.

[70]Govt. Ex. 40.

> a memorandum walks through the technical matters and may draw a conclusion but no opinion in regards to the standard opinions [sic] given. No opinion is given with respect to the technical document.[71]

A comparison of the "Memorandum"[72] to an opinion, such as the Egan disclosure opinion from Proskauer Rose,[73] which are essentially similar in content and language, illustrates the transparency of this position. It was this semantic ploy which allowed RSM to maintain that its clients had "independent" opinions which were confidential and thus privileged, while RSM could nevertheless still obtain full access to the content of the opinions.

The RSM/Bryan Cave engagement letter itself appears to be a DGI product.[74] A comparison of this RSM engagement letter and the year 2000 DGI letter (Govt. Ex. 1) reveals that each has an execution date on the second page in the year 2000, even though the RSM letter was dated on November 15, 2001. It appears that the earlier DGI letter was used as a template for the newer RSM letter. Moreover, RSM's engagement letter misspells RSM McGladrey each of the four times it is typed in the letter. More importantly, the execution of the letter does not seem to have altered the group's practice of sharing with each other the substance of the communications from Bryan Cave.

The engagement letter between RSM and Bryan Cave appears to have changed nothing, other than to give RSM and DGI a pretext to argue that RSM, who would not maintain a list of its tax shelter clients, could prevent Bryan Cave from disseminating its views as to the list-maintenance requirements by claiming privilege. Before the "engagement," DGI knew quite well that Bryan Cave was going to issue so-called tax opinions. It already had a copy of a Bryan Cave

---

[71]Govt. Ex. 57, Wainwright Dep. Tr., *Fidelity High Tech v. United States*, at 211:7-12.

[72]Govt. Ex. 41.

[73]Govt. Ex. 42.

[74]Govt. Ex. 43.

"draft [FDIS] opinion" dated June 13, 2001.[75]  As described above, DGI had worked with Bryan

Cave to determine Bryan Cave's position on list maintenance and assured itself that no list would

be maintained.  After the RSM "engagement," DGI still proposed to John Barrie the "list of tax

opinions" for Bryan Cave to provide.[76]  RSM continued to work through DGI, advising its clients

that they did not need a separate DGI agreement, but that they would need a separate Bryan Cave

agreement letter.[77]

      **D.**      **Bryan Cave's Advice to RSM on the 2002 Treasury Disclosure Requirements**
            **Was Also Not Kept Confidential.**

While RSM, DGI, and Bryan Cave continued to work together on the so-called tax

opinions that supported the transactions, a further rift developed, this time regarding the need to

disclose the transactions to the Internal Revenue Service.  In June 2002, the Treasury Department

issued temporary regulations relating to the requirement for taxpayers to disclose their use of tax

shelters to the Internal Revenue Service.[78]  Bryan Cave relayed its views on those regulations and

the disclosure requirements to RSM and DGI.  Around that time in 2002, Bryan Cave "made a

decision that . . . if . . . [it] were involved, that . . . [it] would require full disclosure" of these

transactions."[79]  Based on Bryan Cave's views, RSM adopted a policy– at least publicly– on the

---

      [75]Govt. Ex. 5.

      [76]Govt. Ex. 7.

      [77]Govt. Ex. 24.

      [78]On June 18, 2002, the Treasury issued Treas. Reg. §1.6011-4T (26 C.F.R.) expanding
the definition of persons required to disclose their participation in potentially abusive tax shelters
to include individuals, trusts, partnerships, and S corporations.  Previously, this disclosure
requirement had been limited to Subchapter C corporations.  Additionally, the requirement to
disclose was expanded to include transactions "substantially similar" to listed transactions (such
as those listed as abusive in IRS Notice 2000-44).  The preamble to these new regulations also
indicated that they were to be "broadly construed in favor of disclosure." C.F.R. 301..6111-2T;
T.D. 9000; 2002-28 I.R.B. 87.

      [79]Govt. Ex. 58, Barrie Dep. Tr., *Fidelity High Tech v. United States*, at 92:1-5.

disclosure of "a transaction [entered into] after 1/1/01 that is possibly similar to those identified in Temp. Treas. Reg. Section 1.6011-4T . . . ."[80]  RSM's public policy was that it would not sign a tax return unless the client "agrees to disclose the Transaction in accordance with Temp. Treas. Reg. Section 1.6011-4T."[81]

Of course, any disclosure of these widely marketed products would have put the entire enterprise at risk.  So, RSM and DGI continued to work together, as they had done with the list-maintenance requirements, to ensure that they could continue to promote these lucrative tax-shelter products.  RSM's public policy provided an escape; RSM stated that for

> a client who . . . independently determined that the Transaction is not subject to the disclosure mandates of . . . [the Regulations], the Policy will not apply, and RSM will prepare and sign the client's federal income tax return, *only if* the client provides to RSM a well-reasoned legal opinion that the Transaction is not substantially similar to any of the transactions identified in Temp. Treas. Reg. Section 1.6011-4T.[82]

The so-called independent determinations by the tax-shelter clients were predestined.  DGI had already provided RSM with a template non-disclosure opinion from Proskauer Rose,[83] who ended up issuing a slightly-modified version of the opinion to Richard Egan and others.  In August 2002, DGI had provided RSM with a "redacted Proskauer [non]disclosure opinion for the 2001 partnership deals."[84]  RSM was to "study[]" the template opinion and "keep . . . Orrin [Tilevitz and] Jimmie [Haber] posted."[85]  A few days after DGI provided the template Proskauer

---

[80]Govt. Ex. 27.

[81]Govt. Ex. 27.

[82]Govt. Ex. 27.

[83]Govt. Ex. 12.

[84]Govt. Exs. 12 and 25.

[85]Govt. Ex. 25.

Rose opinion letter to RSM, and almost nine months after the RSM "engagement," DGI asked

RSM for a "list of clients that may wish to engage Proskauer for the [non] disclosure opinion."[86]

     Bryan Cave's "advice" to RSM was revealed to DGI by both Bryan Cave and RSM.  On

July 20, 2002, Bryan Cave emailed DGI stating that RSM was advising its own clients "to

disclose absent an opinion from outside counsel to the contrary."[87]  Then, RSM's Ronald

Wainwright requested a discussion regarding Bryan Cave's "thoughts and conclusions [regarding

disclosure] and how they may have changed or stay[ed] the same from . . . [the] last

conference call. . . ."[88]  That prior "conference," according to RSM, was after Bryan Cave's

review of DGI's memorandum on the subject, and after Bryan Cave's "discussion with Orrin

[Tilevitz] . . . [and] Jimmie [sic] [Haber,]" both of DGI.[89]  RSM's Ronald Wainwright even

wrote of his "need to speak to Jimmie [sic] [Haber] and resolve this matter . . . as we move

forward."[90]  As such, even according to RSM, the respective positions on non disclosure were

discussed between RSM, DGI, and Bryan Cave– as a group.

     The coordinated effort was highlighted in a late-2002 email exchange between DGI and

RSM.  In that email exchange, RSM's Ronald Wainwright asks about "closing [ a

client's] . . . tax planning strategy."[91]  He proposes a meeting to include DGI in "Bryan-Cave's

[sic] office in NY . . . ."[92]  Mr. Wainwright then tells DGI's Jimmy Haber that it is his "call as to

---

[86]Proskauer Rose provided Richard Egan with his non disclosure opinion letter, which gave Egan and RSM an escape from RSM's public policy.

[87]Govt. Ex. 26 at p. 2.

[88]Id. at p. 1.

[89]Id. at 1.

[90]Id. at p. 1.

[91]Govt. Ex. 28 at p. 2.

[92]Id. at p. 1.

who we should use- BC or PR[,]" that is, Bryan Cave or Proskauer Rose.[93]  Mr. Haber responds

that he is "ok with Bryan Cave if you're ok with Bryan Cave[,] but remember last year when the

going got tough, they left the building."[94]  There was nothing confidential about Bryan Cave's

advice to RSM.  It was shared with DGI, and DGI and RSM jointly planned their activities with

Bryan Cave in mind.

       **E.**     **RSM Continued to Share its Communications with Bryan Cave with DGI and Other Co-Promoters in Late 2002 and 2003.**

      RSM's, DGI's, and Bryan Cave's group effort continued into late 2002 and 2003.  In

December 2002, RSM discussed the fee-sharing arrangement between them.  RSM wanted to

discuss the need to readjust the fee structure, as "even aggressive clients understanding all the

pros/cons of a complex tax strategy are focused on the cost of transactions given the 'noise' in

the market- and are not willing to move forward on last year[']s % . . . ."[95]  RSM went on to say

that it "had BC[, that is, Bryan Cave,] speaking to Orrin [Tilevitz, of DGI,] yesterday so we can

move forward."[96]  Here again, Bryan Cave was dealing with both RSM and DGI, and there was

nothing confidential about the RSM/Bryan Cave relationship and communications.  Then, in

June 2003, RSM passed along to DGI an email from Bryan Cave regarding the Internal Revenue

Service's settlement offers on so-called Son-of-Boss transactions, which included those products

at issue here.[97]  At that point, RSM was unsure as to whether the "advice" was coming from

Bryan Cave or from DGI "and being passed on via" Bryan Cave.[98]  Shortly after that, RSM

---

[93]Id. at p. 1.

[94]Id. at p. 1.

[95]Govt. Ex. 29.

[96]Id.

[97]Govt. Ex. 30.

[98]Id.

received an email from DGI informing RSM that by that time even "Proskauer and Lord Bissell

. . . [would] not render opinions for transactions in which short options are used for basis."[99]

DGI also asked whether RSM had "heard back from Bryan Cave[,"] and asked for "suggestions

of firms" they could "approach."[100]  RSM responded with a description of Bryan Cave's non-

confidential position, which, according to RSM, was that Bryan Cave would "only write opinions

for long[-]standing clients . . . ."[101]  A few months later, another promoter of these tax shelters,

Helios Financial, relayed to DGI the particulars of a conference call and meeting between some

tax-shelter clients, RSM, Bryan Cave, and Helios Financial (a sister company to DGI, a

purported partner in Fidelity International, and a co-promoter of the subject tax-shelter products).

According to Helios Financial, during that conference, RSM "went through all of the risks . . .

which included . . . no opinion writer . . ., no guaranty [sic] that [RSM] McGladrey will sign the

return, IRS response to a second strategy . . . etc."[102]  There again, and exactly two years after

RSM's execution of an engagement letter with Bryan Cave, there was nothing to suggest that

RSM's relationship and communications with Bryan Cave were confidential or anything but a

group effort with the promoters.

---

[99]Govt. Ex. 31.

[100]Id.

[101]Id.

[102]Govt. Ex. 32 at p. 2.

## ARGUMENT

## THE WITHHELD DOCUMENTS WERE NOT INTENDED TO BE CONFIDENTIAL AND THUS ARE NOT PRIVILEGED, AND EVEN IF THEY WERE, ANY PRIVILEGE WAS CLEARLY WAIVED

### A.    The Applicable Law.

The communications between RSM and Bryan Cave were part of a group effort to market and implement tax-shelter products. As such, they were not privileged in the first instance. Even assuming, *arguendo*, that the communications were initially privileged, disclosure of the communications to DGI and other outside persons and entities destroyed confidentiality and thereby waived attorney-client privilege.

As stated earlier, the Court has already addressed the issues of attorney-client privilege and waiver in connection with Proskauer Rose.[103] Because the law applicable to this motion is the same as the law applicable to that motion, the United States will cite at length the Court's earlier Memorandum. As the Court held,[104]

> The First Circuit has adopted Wigmore's formulation of the elements of the attorney-client privilege:
>
>> (1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.
>
> 8 J.H. Wigmore, Evidence § 2292, at 554 (McNaughton rev. 1961) (quoted in *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 684 (1st Cir. 1997)). The privilege is to be construed narrowly, "because it comes with substantial costs and stands as an obstacle of sorts to the search for truth." *In re Keeper of Records* (*Grand Jury Subpoena Addressed to XYZ Corp.*), 348 F.3d 16, 22 (1st Cir. 2003). The party who invokes the privilege "bears the burden of establishing that it applies to the communications at issue and that it has not been waived." *Id.*

---

[103] *See* Mem. and Order on Mot. to Compel Produc. of Docs. from Proskauer Rose LLP.

[104] Id. at 15-16.

"For the attorney-client privilege to attach to a communication, it must have been made in confidence and for the purpose of securing or conveying legal advice." *In re Keeper* (*XYZ Corp*), 348 F.3d at 23; *see also Mass. Inst. of Tech.*, 129 F.3d at 684.

\* \* \*

It is well-established that "voluntary disclosure to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communications to anyone else." *See, e.g., In re Lupron Marketing and Sales Practices Litigation*, 313 F. Supp. 2d 8, 10 (D. Mass. 2004); *Mass. Inst. of Tech.*, 129 F.3d at 687. "Where privilege is claimed and the opponent alleges a specific disclosure, the burden of proof is upon the claimant to show nondisclosure wherever that is material to the disposition of the claim." *Mass. Inst. of Tech.*, 129 F.3d at 686.

## B.     The Withheld Communications Were Not Made in Confidence.

The withheld communications must be produced because RSM cannot meet the elements of the attorney-client privilege. The communications were never intended to be confidential legal advice. As extensively discussed in the Statement, these communications were part of a highly coordinated marketing plan. RSM was concerned with increasing its revenues, and worked with DGI– which it called an intermediary– to implement that business plan. The lack of confidentiality is demonstrated by the routine sharing of its communications with Bryan Cave and/or their subject matter with DGI and potential customers.[105] That sharing clearly demonstrates that its communications with Bryan Cave were not made in confidence in the first instance and even assuming, *arguendo*, they were, any privilege that may have initially existed,

---

[105]Even Ronald Wainwright of RSM, who, again, entered into his own FDIS tax shelter, received purportedly confidential Bryan Cave-RSM advice for his personal use. He claimed in his deposition that "the only legal advice he received from Bryan Cave in regards to . . . [his] individual partnership derivative strategy was in the context of the opinion that they rendered to . . . [him]." Govt. Ex. 59, Wainwright *Fidelity High Tech* Dep. Tr. at 178:16-21. But, almost every entry on the RSM privilege log relates to a communication to or from Ronald Wainwright. Thus, any communications by Wainwright listed on the RSM privilege log had to be made in his capacity as an employee as RSM – and not in his individual capacity. And, as discussed above, none of the RSM communications – by Wainwright or anyone else – were made in confidence or, alternatively, even if a privilege did initially arise as to one or more of them, it was clearly waived.

was waived by the RSM and/or Bryan Cave continually sharing such communications with DGI, other promoters, and potential customers.

### C.     Each of the Specific Withheld or Redacted Documents must Be Disclosed.

The withheld communications, and those with portions redacted, can be broken down into four basic categories: (1) communications predating RSM's execution of an engagement letter with Bryan Cave, a subset of which relates to "Section 6112 listing issues;" (2) communications relating to unnamed transactions, which presumably are FDIS and/or Stock Dribble, as those were the subjects of the subpoena to which these withheld documents were deemed responsive; (3) communications relating to "Section 6011 temporary regulations" and "disclosure issues;" and (4) four other documents, each relating to a distinct and relevant issue.[106]

The following chart identifies the specific documents at issue by category, using RSM's log-entry "document number[s]." Each of the withheld documents must be disclosed in unredacted form because it was not intended to be confidential, thereby failing the test for privilege in the first instance, or because any privilege was waived.[107]

---

[106]The United States specifies the categories and documents relating to those categories to conform to Local Rule 37.1. It does not restate the applicable law and facts discussed already in this memorandum, and incorporates the earlier sections by reference here.

[107]Documents identified with a Document Number beginning with RSM-F were produced with redactions. Those identified by a one or two-digit number were withheld.

| Category | Document Number(s) |
|---|---|
| (1) communications predating RSM's execution of an engagement letter with Bryan Cave, a subset of which relates to "Section 6112 listing issues." | 1, 2, 3, 6, RSM-F 070955-070956, 9, 10, and 11. |
| (2) communications relating to unnamed transactions, which presumably are FDIS and/or Stock Dribble, as those were the subjects of the subpoena to which these withheld documents were deemed responsive. | 13, 14, 15, 16, 17, 18, 19, 22, 23, and RSM-F 071308-071311. |
| (3) communications relating to "Section 6011 temporary regulations" and "disclosure." | 20, 24, 26, 27, RSM-F 070969-070970, 29, 36, 39, 40, and 43. |
| (4) other - four communications relating, respectively, to "proposed tax regulations," "consulting agreement," "designation agreement issue," and "Section 752 regulations," | 21, 25, 31, and 45. |

As to the first category of withheld documents, the communications all predated RSM's

engagement of Bryan Cave as to these matters. They, of course, postdated DGI's engagement of

Bryan Cave as to these matters, and, unsurprisingly, they were all the subject of frequent

communications with DGI. Bryan Cave had for more than a year been communicating with DGI

about the transactions. Bryan Cave and DGI together worked with RSM as part of the DGI-RSM

"alliance" to market these tax-shelter products. Moreover, the "6112 listing issues" had been

discussed at length between Bryan Cave and DGI, and Bryan Cave even billed DGI for the

"advice." One of the documents in this category, RSM-F 070955,[108] was produced in redacted

form. But, there is little doubt the subject matter of the redacted portion was relayed to DGI.

The disclosed portion states that "Or[r]in [Tilevitz, of DGI,] commented he had not heard from

[RSM's] Technical Standing [Group] re: Opinion, so [he] commented [he] would relay all the

_____

[108]Govt. Ex. 33.

above, ect.[sic]." Apparently, RSM relayed – or intended to relay – all of the redacted portion to DGI, and more. It is therefore impossible that attorney-client privilege could remain even if it attached at the outset. Given that each of these withheld communications was the subject of discussions with DGI, they were not confidential to RSM, and are not privileged.

As to the second category of documents, a similar analysis leads to the same conclusion. DGI routinely consulted with Bryan Cave about the FDIS and Stock Dribble products. DGI lined up Bryan Cave and other law firms to provide opinion letters on the transactions. DGI then entered into an "alliance" with RSM, whereby RSM would help market the products to its own clients. Any communications from Bryan Cave to RSM were routinely conveyed to DGI, RSM's business partner.

As to the third category of documents, once again the analysis leads to the same conclusion. 26 U.S.C. § 6011 and accompanying Treasury Regulations, relate, in part, to the requirement to disclose potentially abusive tax-shelter transactions. The Treasury Regulations and disclosure requirements were the subject of discussions between Bryan Cave, RSM, and DGI. The group discussed Bryan Cave's views on disclosure, after Bryan Cave reviewed DGI's memorandum on the matter. RSM and DGI worked closely together to overcome any obstacle to the marketing of these transactions; they obtained a template opinion on non-disclosure from Proskauer Rose, and proceeded to market that opinion. RSM and DGI continued to work together to find a role for Bryan Cave to play, considering its views on disclosure. In short, there was nothing confidential about Bryan Cave's views on disclosure and Section 6011.[109]

---

[109]See *supra*, pp 18-19.

The fourth category is essentially a miscellaneous category with four relevant documents, each relating to a separate issue. As they related to the tax shelters that were designed and marketed by the group, these issues were similarly the subject of the group effort of RSM, DGI, and Bryan Cave. One document (privilege-log entry number 21) relates to "proposed tax regulations." The communication appears to relate to the proposed Treasury Regulations under Section 6011, discussed above. If so, the communications from Bryan Cave on that topic were far from confidential. Beyond what has already been described in that regard, Bryan Cave's memorandum on the regulations was forwarded to, among others, Sidley Austin, another law firm involved in these transactions.[110] Helios Financial also relayed to DGI in June 2002 that Todd Jackson of RSM "said that they were waiting to hear from Betsy Smith and John Barrie [(both of Bryan Cave)] with regard to . . . [DGI's] memo on the proposed regs."[111]

A second miscellaneous document (privilege-log entry number 25) relates to the "form of [a] consulting agreement," and is dated June 21, 2002. The consulting agreements were typically, in this context, agreements between RSM and tax-shelter clients relating to the services RSM would provide and the reciprocal obligations. In this case, RSM forwarded a template "Consulting Agreement" to DGI in October 2002.[112] RSM provided that template after a conversation on the matter between RSM and DGI.[113] Given the coordination between RSM and DGI on this and virtually every other relevant matter, it is highly unlikely that RSM kept this communication and its subject matter confidential. In fact, just days after this purportedly

---

[110]Govt. Ex. 34.

[111]Govt. Ex. 35.

[112]Govt. Ex. 36.

[113]Id. at p. 1.

privileged and confidential communication was made, RSM's Ronald Wainwright informed a colleague that, with respect to the Consulting Agreements, "no separate agreement for Diversified" is necessary for the client.[114]  In other words, despite the fact that the entire process was highly coordinated with DGI, DGI's interests were protected in the RSM Consulting Agreement.  Again, it is extremely unlikely that DGI would have been kept out of the process.

A third document in this category (privilege-log entry number 31) relates to a "designation agreement issue."  As described above (beginning on page 12), RSM asked Bryan Cave to discuss the designation agreement with DGI.[115]  The designation agreement, again, designated DGI as the "person" who would maintain lists of tax-shelter clients in accordance with the regulations, thereby allowing RSM to avoid having to do so in accordance with the advice it had received.  Again, given the level of coordination between RSM, DGI, and Bryan Cave on this issue, it is highly unlikely that RSM kept this communication and its subject matter confidential.

The fourth miscellaneous document (privilege-log entry number 45), relates to the "Section 752 regulations."  The Internal Revenue Code Section 752 regulations relate to the treatment of certain liabilities, and were discussed at length in the opinion letters provided to the tax-shelter clients.  Of particular interest is the discussion of those regulations in the draft Bryan Cave opinion provided to Grant Thornton.  While not at all confidential, the Bryan Cave draft opinion letter has an entire subsection devoted to Section 752.[116]  Given the importance placed on Section 752 by the opinion writers and the promoters, including DGI and its "referral source"

---

[114]Govt. Ex. 24.

[115]Govt. Ex. 17.

[116]Govt. Ex. 5 at pp. 16-18.

RSM, it is again highly unlikely that Bryan Cave's communication to RSM here was held in confidence.

## CONCLUSION

RSM was one of the principal participants in the marketing and implementation of the Stock Dribble and FDIS tax-shelter products at issue.  RSM also signed the relevant tax returns for the Egans in this case, which returns failed to disclose the transactions and thus were not in accordance with even its own internal policy which required  a non-disclosure opinion from an "independent" law firm.  RSM was well aware that Proskauer Rose was obviously not an independent law firm.  It continually worked in a highly coordinated manner with other co-promoters for the purpose of concealing the true nature of the abusive tax shelters from the Internal Revenue Service while selling the products for huge fees based on the amount of its clients' expected tax savings.  This highly coordinated effort touched on every subject found in the withheld communications.  As such, these communication were not privileged in the first instance as they were never intended to be confidential.  Even assuming, *arguendo*, that the communications were privileged, the privilege was waived when they and their subject matter were shared, often as a matter of routine, with third parties.

RSM should be compelled to produce these non-privileged documents in unredacted form.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

/s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Tax Division, U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER L. VANN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044-0055
Telephone: (202) 307-6561
Facsimile: (202) 514-5238
E-mail: john.a.lindquist@usdoj.gov
            barry.e.reiferson@usdoj.gov
            heather.vann@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and copies will be sent to Proskauer and those indicated as non registered participants on July 22, 2008.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF BARRY E. REIFERSON**

I, Barry E. Reiferson, pursuant to the provisions of 28 U.S.C. §1746, certify as follows:

1.      I am a Trial Attorney with the U.S. Department of Justice, employed in the Tax Division,

Northern Region, with a post of duty at Washington, D.C.

2.      I am one of the assigned trial attorneys for defendant United States in this case.

3.      I make this declaration based upon my personal knowledge and the documents referenced

herein.

4.      The documents filed as Government Exhibits 1 through 60 in support of this motion are

true and correct copies of documents obtained by the United States in discovery in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, D.C., on this 22nd day of July, 2008.

/s/ Barry E. Reiferson
BARRY E. REIFERSON
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 514-6058

# Govt. Exhibit 1-

# Document Filed Under Seal

Govt. Exhibit 2-

Document Filed
Under Seal

3450232.1

Govt. Exhibit 3-

Document Filed
Under Seal

3450233.1

Govt. Exhibit 4-

Document Filed
Under Seal

3450234.1

# Govt. Exhibit 5-

# Document Filed Under Seal

Govt. Exhibit 6-

Document Filed
Under Seal

3450236.1

# MEMORANDUM
## Via Email

**TO:**    John Barrie, Esq.       **DATE:**    January 2, 2002

**FROM:**    James Haber

Below is a list of tax opinions we propose to be prepared by your firm and agreed to compensation for such preparation:

| | Client Name | Opinion Type | Notes |
|---|---|---|---|
| 1. | Ronald G. Wainwright, Jr.<br>205 Cranborne Lane<br>Apex, NC 26702 | Standard Partnership | |
| 2. | Jai N. Gupta Revocable Trust<br>1173 Dolley Madison Boulevard<br>McLean, VA 22101 | Standard Partnership | |
| 3. | Shashi A. Gupta Revocable Trust<br>1173 Dolley Madison Boulevard<br>McLean, VA 22101 | Standard Partnership | Same LLC |
| 4. | DRG Irrevocable Trust<br>1173 Dolley Madison Boulevard<br>McLean, VA 22101 | Standard Partnership | |
| 5. | DSG Irrevocable Trust<br>1173 Dolley Madison Boulevard<br>McLean, VA 22101 | Standard Partnership | |
| 6. | James H. Taylor<br>4040 Winberie Avenue<br>Naperville, IL 60564 | Standard Partnership | |
| 7. | Thomas A. Buske<br>#3 Pinebrook Court<br>Edwardsville, IL 62025 | Standard Partnership | |
| 8. | Dr. Rudy Ciccarello<br>473 Willow Lane<br>Palm Harbor, FL 34683 | Standard Partnership | |
| 9. | Europa International Inc.<br>2586 Camino Entrada<br>Santa Fe, NM 87507 | Standard Partnership | Fee to be paid directly by client $40,000. Owned by David Holland |
| 10. | David T. Holland<br>24 Old Agua Fria Road West<br>Santa Fe, NM 87508 | Basis Only Sec. 351 Exchange | Owns Europa |

GOVERNMENT EXHIBIT

7

ALPHA0000000248

ALPHA1_PRIV000860

| | | | |
|---|---|---|---|
| 11. | Robert A. Garvy<br>200 Esplanade Way<br>Palm Beach FL 33480 | Standard Partnership | |
| 12. | Dennis W. Thies<br>879 N.E. 78th Street<br>Boca Raton, FL 33487 | Standard Partnership | |
| 13. | Irrevocable Trust of Dennis P. Thies<br>c/o Wm. Thies & Sons, Inc.<br>791 Park of Commerce Boulevard<br>Suite 300<br>Boca Raton, FL 33487-3620 | Standard Partnership | Same LLC |
| 14. | Irrevocable Trust of Christopher J. Thies<br>c/o Wm. Thies & Sons, Inc.<br>791 Park of Commerce Boulevard<br>Suite 300<br>Boca Raton, FL 33487-3620 | Standard Partnership | |
| 15. | William F. Thies Sr.<br>1207 Hillsboro Mile<br>Hillsboro Beach, FL 33062 | Standard Partnership | ] |
| 16. | William F. Thies Jr.<br>68 Fiesta Way<br>Fort Lauderdale, FL 33301 | Standard Partnership | ] |
| 17. | James H. Thies<br>2732 N.E. 27th Court<br>Fort Lauderdale, FL 33305 | Standard Partnership | ]    Same LLC |
| 18. | Thomas J. Thies<br>7315 Timberline Overlook<br>Cumming, GA 30040 | Standard Partnership | ] |
| 19. | Reagan M. Crawford<br>12328 Michaels Ford Road<br>Cockeysville, MD 21030 | Standard Partnership | Same LLC |
| 20. | James E. Slevin<br>809 Katesford Road<br>Cockeysville, MD 21030 | Standard Partnership | |
| 21. | Albert B. Cheris<br>513 Kelburn Road<br>Deerfield, IL 60015 | Basis Only Sec. 351<br>Exchange | Owns Tenex |
| 22. | Tenex Corporation<br>2400 Arthur Avenue<br>Elk Grove Village, IL 60007 | Standard Partnership | Owned by Cheris |
| 23. | Curtis Francois<br>943 Hyacinth Drive<br>Del Ray Beach, FL 33483 | Standard Partnership | Same LLC |
| 24. | Paul Thomas<br>8552 Prestonmill Ct.<br>Dublin, OH 43017 | Standard Partnership | |

ALPHA0000000248.0002

ALPHA1_PRIV000861

PRODUCED BY ALPHA TO UNITED STATES ON 7/27/06

## Summary

12 Clients
22 Standard Partnership Opinions
 2 Basis Only Opinions
24 Total Opinions

| Agreed Fee Arrangement | |
|---|---|
| To be paid by DGI | $560,000 |
| To be paid by Client (Europa) | 40,000 |
| Total Fees to be Paid | $600,000 |

ALPHA0000000248.0003

ALPHA1_PRIV000862

PRODUCED BY ALPHA TO UNITED STATES ON 7/27/06

# Govt. Exhibit 8-

# Document Filed Under Seal

3450237.1

# Govt. Exhibit 9-

# Document Filed Under Seal

3450238.1

**Div**

| | |
|---|---|
| **From:** | "James Haber" <jhaber@divgroup.com> |
| **To:** | "Ira Akselrad, Esq." <iakselrad@proskauer.com> |
| **Sent:** | Tuesday, May 28, 2002 3:58 PM |
| **Subject:** | Fw: IRS disclosure |

FYI

----- Original Message -----
**From:** Barrie, John
**To:** 'jhaber@divgroup.com' ; 'otilevitz@divgroup.com'
**Cc:** Smith, Elizabeth Ann
**Sent:** Tuesday, May 28, 2002 2:50 PM
**Subject:** IRS disclosure

Update on IRS disclosure initiative -

IRS is still processing mail from April 23 deadline - have received over 1600 disclosures so far - most dealing with one or two transactions - over 1000 relate to listed transactions (perhaps more but identification problems) - more than 50% from individuals - there are processing issues and looking at how to evaluate and prioritize - cases are being assigned to field counsel for review (feeling is that field may have a better grasp on transactions than National Office staff)

IRS is receiving some "hot" line calls - not too helpful because of need for more information

They did indicate that they received a lot of useful information on promoters in disclosures - expect to see followup with promoters in addition to followup with taxpayers - a lot of cases are being opened - but still subject to prioritization

Penalty anaylsis is still uneven in the field

On Treasury front - development of Tax Shelter Task Forces to analyze  transactions - goal is to get more public disclosure of transactions on more expedited basis - also looking to change procedures for designation of cases for litigation - taxpayers will be advised that  a case is being considered as a designated litigation vehicle -  presumably with an opportunity for imput - designation is not suppose to affect other similar cases - normal appeal process is suppose to remain available - although obviously some likely perameters - expect to see greater use of issue specialists at appeals

**DGI 79085**

Finally, regarding regulation projects based on March proposals -

There are two reg projects - a small technical project dealing with existing regulations under sections 6011, 6111 and 6112 - these will likely come out in temporary form - unclear whether "substantially similar" issue will be addressed in this set or in larger project (noted below) - although no time deadline - we can expect these out soon

The other project is a major project which they hope to get out soon - a high priority - outside date is February 2003 although they hope to have them out much sooner - again - likely in temporary form which because of effective date issues a lot of time being spent to fine tune so



12/23/2004

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-09-54-106717

that they will be useful

This proposal will likely have a single definition of transaction; disclosure rules will likely be expanded to non-corporate taxpayers (to extent they can under existing statute)

On disclosure - looking at 4 different "triggers" - section 165 losses over a specified minimum; short holding period transaction (eg less than 45 days) with a likely monetary threshold; book tax differences of probably $10 million or greater; and confidential transactions


John P. Barrie
Bryan Cave LLP
700 13th Street, NW, Suite 700
Washington, DC 20005
202-508-6051 (DC - direct)
212-692-1847 (NY - direct)
202-508-6200 (DC - fax)
212-692-1900 (NY - fax)
jbarrie@bryancave.com


**DGI 79086**

12/23/2004

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-09-54-106718

## Div

**From:** "James Haber" <jhaber@divgroup.com>
**To:** "Orrin Tilevitz" <otilevitz@divgroup.com>
**Sent:** Monday, June 17, 2002 2:13 PM
**Subject:** Fw: Senate Finance Markup (UPDATE)

----- Original Message -----
**From:** SDENBY@burkelaw.com
**To:** jhaber@divgroup.com
**Sent:** Monday, June 17, 2002 11:21 AM
**Subject:** RE: Senate Finance Markup (UPDATE)

Do you have the mark up yet.  What is the the latest effective date?

Thanks

Stephanie

> -----Original Message-----
> **From:** James Haber [mailto:jhaber@divgroup.com]
> **Sent:** Thursday, June 13, 2002 3:09 PM
> **To:** Stephanie Denby; Ira Akselrad, Esq.
> **Subject:** Fw: Senate Finance Markup (UPDATE)

> ----- Original Message -----
> **From:** Ludwig, Mark
> **To:** 'otilevitz@divgroup.com' ; 'jhaber@divgroup.com'
> **Cc:** Barrie, John
> **Sent:** Thursday, June 13, 2002 3:49 PM
> **Subject:** Senate Finance Markup (UPDATE)

GOVERNMENT
EXHIBIT

11

Mr. Tilevitz and Mr. Haber:

This morning I attended the Senate Finance Committee's markup of the charitable
giving bill, the inversion bill and the tax shelter bill.  The charitable giving bill was
indeed offered with the inversion and tax shelter bills attached to it.  The inversion
and tax shelter bills were also offered separately.  The session lasted for
approximately 2.5 hours and was recessed subject to the call of the chair.
Therefore, final votes did not occur on any of the three bills.  A variety of
amendments were offered, discussed and voted on, however.  Final votes on the
three bills were expected to occur later today or tonight.  However, I just spoke to a
staffer on the Senate Finance Committee who indicated that votes on those bills
would not occur today.  That is yet another indication of controversy and trouble for
the bills.  Final votes could not be taken during the markup because seven
members of the committee were not present at the time.  That may not have been
entirely coincidental.  No more substantive changes are likely to occur between
now and the time of the final votes because the great majority of the committee's
business was taken care of this morning.  However, anything is possible.

Aside from some minor technical changes and barring any further alterations before

**DGI 80054**

12/23/2004

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

# Govt. Exhibit 12-

# Document Filed
# Under Seal

3450239.1

## Div

**From:**    "James Haber" <jhaber@divgroup.com>
**To:**    <ronald_wainwright@rsmi.com>
**Sent:**    Monday, August 12, 2002 8:25 AM
**Subject:**    Re: Disclosure opinion

Please get me a list of clients that may wish to engage Proskauer for the disclosure opinion.

----- Original Message -----
**From:** ronald_wainwright@rsmi.com
**To:** Orrin Tilevitz
**Cc:** Haber Jimmy
**Sent:** Saturday, August 10, 2002 7:05 AM
**Subject:** Re: Disclosure opinion


Orrin -

Thanks for passing along - we myself and our STG Technical Standing Group will be studying over the weekend and speaking on Monday.

Will keep you and Jimmie posted on our review.

Thanks

Ron

Ronald G. Wainwright, Jr.
Managing Director - Tax
RSM McGladrey, Inc.
2418 Blue Ridge Rd.
Raleigh, NC 27607-6480
Phone: (919) 645-1543
Fax: (919) 781-9270
Ronald_Wainwright@rsmi.com


**Orrin Tilevitz <otilevitz@divgroup.com>**

08/09/2002 11:12 AM

**To:**    wainwright ronald <ronald_wainwright@rsmi.com>
**cc:**    Haber Jimmy <jhaber@divgroup.com>
**Subject:**    Disclosure opinion


Attached at Jimmy's request is a redacted Proskauer disclosure opinion for the 2001 partnership deals.

**DGI 79655**

GOVERNMENT
EXHIBIT

13

12/23/2004

Govt. Exhibit 14-

Document Filed
Under Seal

3450241.1

# Govt. Exhibit 15-

# Document Filed
# Under Seal

3450242.1

# Govt. Exhibit 16-

# Document Filed
# Under Seal

3450243.1

# Govt. Exhibit 17-

# Document Filed Under Seal

3450244.1

# Govt. Exhibit 18-

# Document Filed
# Under Seal

3450245.1

# Govt. Exhibit 19-

# Document Filed
# Under Seal

# Govt. Exhibit 20-

# Document Filed Under Seal

3450247.1

# Govt. Exhibit 21-

# Document Filed Under Seal

3450248.1

# Govt. Exhibit 22-

# Document Filed
# Under Seal

3450249.1

# Govt. Exhibit 23-

# Document Filed Under Seal

3450250.1

# Govt. Exhibit 24-

# Document Filed Under Seal

3450251.1

# Govt. Exhibit 25-

# Document Filed
# Under Seal

3450252.1

# Govt. Exhibit 26-

# Document Filed Under Seal

3450253.1

Govt. Exhibit 27-

Document Filed
Under Seal

3450254.1

**Div**

| | |
|---|---|
| **From:** | "James Haber" <jhaber@divgroup.com> |
| **To:** | <ronald.wainwright@rsmi.com> |
| **Sent:** | Thursday, November 07, 2002 5:54 PM |
| **Subject:** | Re: Pettus Follow-up |

I'm ok with Bryan Cave if you're ok with Bryan Cave but remember last year when the going got tough, they left the building.

----- Original Message -----

**From:** ronald.wainwright@rsmi.com
**To:** James Haber
**Sent:** Thursday, November 07, 2002 5:22 PM
**Subject:** Re: Pettus Follow-up

Jimmy -

We have set the meeting for Tuesday at 11:00 a.m.  - tentavily in Bryan-Cave's office in NY -  cross-checked with them and they will write the Opinion - your call as to who we should use - BC or PR -  let me know.

Thanks

Ron

Ronald G. Wainwright, Jr.
Managing Director - Tax
RSM McGladrey, Inc.
2418 Blue Ridge Rd.
Raleigh, NC 27607-6480
Phone:  919.645.1543
Fax:  919.781.9270
ronald.wainwright@rsmi.com

| "James Haber" <jhaber@divgroup.com> | | **To:** | <ronald.wainwright@rsmi.com> |
|---|---|---|---|
| 11/06/2002 09:16 AM | | **cc:** | |
| | | **Subject:** | Re: Pettus Follow-up |

I will be out of the office in meetings until 1:00pm (EST).
----- Original Message -----
**From:** ronald.wainwright@rsmi.com
**To:** James Haber
**Sent:** Tuesday, November 05, 2002 7:57 PM
**Subject:** Re: Pettus Follow-up

**DGI 81622**

GOVERNMENT
EXHIBIT
28

12/23/2004

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-09-55-109253

Jimmy -

Called as to the below time - sorry we did not connect - know we have mutual Agenda's to review as we both have alot of good things happening.

Will call you in the a.m. on Wed..

On another matters - know you called Mr. Jerry Pettus, Sr. - but would you along with atty's from PR or LBB be able to meet with Jerry Pettus if he were to come to NY Friday or Monday - Jerry Sr. would like to meet with you all in person - must have done a good job indicating how great you guys are - this is important to closing this tax planning strategy.

Thanks and speak to you on Wed. a.m..

Ron

Ronald G. Wainwright, Jr.
Managing Director - Tax
RSM McGladrey, Inc.
2418 Blue Ridge Rd.
Raleigh, NC 27607-6480
Phone: 919.645.1543
Fax: 919.781.9270
ronald.wainright@rsmi.com

| "James Haber" <jhaber@divgroup.com> | To: | <ronald.wainwright@rsmi.com> |
| 11/05/2002 09:33 AM | cc: | |
| | Subject: | Re: |

You can reach me in the office between 11:00am and 12:00pm (EST).
----- Original Message -----
**From:** ronald.wainright@rsmi.com
**To:** James Haber
**Sent:** Monday, November 04, 2002 5:58 PM
**Subject:** Re:

Jimmie -

Will give you a call on Tuesday a.m..

Thanks

Ron

Ronald G. Wainwright, Jr.
Managing Director - Tax
RSM McGladrey, Inc.
2418 Blue Ridge Rd.
Raleigh, NC 27607-6480

**DGI 81623**

12/23/2004

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-09-55-109254

From: ronald.wainwright@rsmi.com
Date: 12/19/2002 12:12:49 PM
Subj: Re: Fees

Agree - I will call early p.m. - Ron

Ronald G. Wainwright, Jr.
Managing Director - Tax
RSM McGladrey, Inc.
2418 Blue Ridge Rd.
Raleigh, NC 27607-6480
Phone: 919.645.1543
Fax: 919.781.9270
ronald.wainwright@rsmi.com


"James Haber" <jhaber@divgroup.com>
12/19/2002 10:54 AM

        To:     <ronald.wainwright@rsmi.com>
        cc:     <PKampf@heliosfinancial.com>
        Subject:    Re: Fees


We need to speak about this today.  I am available all day today,
beginning after 11:30am (EST).  Please call as early as possible.
----- Original Message -----
From: ronald.wainwright@rsmi.com
To: James Haber
Cc: PKampf@heliosfinancial.com
Sent: Wednesday, December 18, 2002 6:30 PM
Subject: Re: Fees


Jimmie -

We do need to discuss - not disputing last year numbers and levels - but
as you know the world has become more difficult and changed substantially
from last year -  even aggressive clients understanding all the pros/cons
of a complex tax strategy are focused on the cost  of transactions given
the "noise" in the market -  and are not willing to move forward on last
years % -  if the reduction is all from RSM then at these % it makes no
sense for RSM  - we need to agree to share the pain - so we create a
win/win here.

We need to agree something is better than nothing and RSM honored the 2.5%
on the 1st three transactions.  We can discuss the specifics on those -
let's also not forget about the large transaction we currently working on
and the future oppy's with the newer strategies.

We had BC speaking to Orrin yesterday so we can move forward.

Speak to you on H.

Ron

Ronald G. Wainwright, Jr.

GOVERNMENT
EXHIBIT

29

DGI 027684

1DGI-06-37-064103

From:  ronald.wainwright@rsmi.com
Date:  6/28/2003 10:00:26 AM
Subj:  FYI - Below - Regarding the Thursday meeting with the IRS
       concerning Son of Boss Settlement Offers

Jimmie -

FYI - below - this may be coming from you and being passed on via BC - but
FYI just in case.

Ron

Ronald G. Wainwright, Jr.
Managing Director - Tax
RSM McGladrey, Inc.
2418 Blue Ridge Rd.
Raleigh, NC 27607-6480
Phone:  919.645.1543
Fax:  919.781.9270
ronald.wainwright@rsmi.com
----- Forwarded by Ronald Wainwright/Raleigh/MP/RSMi on 06/28/2003 09:59
AM -----

Ronald Wainwright
06/27/2003 05:25 PM

       To:    Roger Neumann/Waterloo/MP/RSMi@RSMi, Joe Gevock/CedarRapids/MP/RSMi@RSMi,
John Thompson/Davenport/MP/RSMi@RSMi, Rick
Klahsen/Bloomington/MP/RSMi@RSMi
       cc:    Pete Wilson, Kimpa Moss
       Subject:    FYI - Below - Regarding the Thursday meeting with the IRS concerning Son
of Boss Settlement Offers

To: Technical Standing Group

From a law firm we work with we received the following:

Several tax litigation practioners met yesterday with Bob Brazille of IRS
Examinations to discuss the potential forthcoming settlement offer.  The
bottom line was that Exams is foreclosed from offering any tax concession
due to the recent regulations.  As such, it appears that the settlement
offer will be 100% payment of the tax plus interest, deductibility of some
or all of transaction costs, and penalties will be waived at the Appeals
level.  Of course, the IRS was advised that this is a recipe for mass
litigation.  However, the IRS seems to want the litigation.  They seem to
see 2000-44 as a crusade.

Please also note the prior e:mail today after our Technical Standing Call
regarding today's Son-of-Boss which outlined the Department of Justices
Litigation Positions.

Ron

Ronald G. Wainwright, Jr.
Managing Director - Tax
RSM McGladrey, Inc.
2418 Blue Ridge Rd.



GOVERNMENT
EXHIBIT
30

DGI 027900

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-06-37-064319

From:   ronald.wainwright@rsmi.com
Date:   7/15/2003 2:03:06 PM
Subj:   Re: Follow-up

Jimmie -

BC's position from John is they will only write opinions for long standing clients to BC.

I have several thoughts on law firms and will call you to discuss.

On Mr. Garvy - you were copied on my e:mail to Fred Cohen of this week - to date he has not returned my phone calls or the e:mail. As an FYI - I specifically copied Bob Garvy so he could see we have been trying to resolve with Fred and to date he has been non responsive.

A question - assume the decision by PR and LBB also toward the 734 strategy - we have two clients who want to proceed if we can obtain an opinion. Let me know.

Thanks

Ron

Ronald G. Wainwright, Jr.
Managing Director - Tax
RSM McGladrey, Inc.
2418 Blue Ridge Rd.
Raleigh, NC 27607-6480
Phone:  919.645.1543
Fax:  919.781.9270
ronald.wainwright@rsmi.com


"James Haber" <jhaber@divgroup.com>
07/15/2003 12:14 PM


        To:     "Ronald Wainwright" <ronald_wainwright@rsmi.com>
        cc:
        Subject:


Both Proskauer and Lord Bissell will not render opinions for transactions in which short options are used for basis.  Have you heard back from Bryan Cave?  Do you have any other suggestions of firms we should approach?

I have turned the Garvy matter over to counsel.  Please let me know if you hear something.

GOVERNMENT
EXHIBIT

31

DGI 027919

From:  Phil Kampf <philkampf@heliosfinancial.com>
Date:  11/10/2003 4:29:26 PM
Subj:  links

I talked to John Hermeier, the CFO, at links and told him what you and I
had talked about previously.  His comment was that based on this
information he could not make a decision without the Links.  He said
that Jack, Jay and Troy Link will all be in the office together on
Thursday when they meet with Wainwright, Flemmer and John Barrie and
they will make a decision then as to whether to proceed or not.

He did ask what the likelihood of getting another opinion writer was and
when we would know if we could get one and I said that I did not know,
but that I thought it was going to be difficult in this environment.

I will follow-up with them on Thursday.


----

          Clean   Clean   DocumentEmail                    MicrosoftInternetExplorer4        /* Style Definitions */  t
able.MsoNormalTable {mso-style-name:"Table Normal"; mso-tstyle-rowband-size:0; mso-tstyle-colband-size:0; mso-styl
e-noshow:yes; mso-style-parent:""; mso-padding-alt:0in 5.4pt 0in 5.4pt; mso-para-margin:0in; mso-para-margin-bottom:.
0001pt; mso-pagination:widow-orphan; font-size:10.0pt; font-family:"Times New Roman";}      I talked to John Hermeie
r , the CFO, at links and told him what you and I had talked about previously.  His comment was that based on this infor
mation he could not make a decision without the Links.  He said that Jack, Jay and Troy Link will all be in the office toget
her on Thursday when they meet with Wainwright, Flemmer and John Barrie and they will make a decision then as to wh
ether to proceed or not.      He did ask what the likelihood of getting another opinion writer was and when we would kno
w if we could get one and I said that I did not know, but that I thought it was going to be difficult in this environment.      I
will follow-up with them on Thursday.

GOVERNMENT
EXHIBIT

32

DGI 35773

From:  Phil Kampf <philkampf@heliosfinancial.com>
Date:  11/13/2003 4:14:01 PM
Subj:  links

I was on a conference call today with two of the Links (Jay and Jack, his father), the cfo of the company, John Hermeier, McGladrey (wainwright, Flemmer and Score) and John Barrie from Bryan Cave, all of whom were in the Link's offices.  McGladrey went through all of the risks with Links which included; no opinion writer at this time, no guaranty that McGladrey will sign the return, IRS response to a second strategy, potential legislative changes, Congressional hearings, etc... Jay and his father said they understood the risks and will speak to the third member of the family on Saturday, but they are of the opinion that they still want to proceed.

They understand the use of the currency options that they are potentially buying as they do significant business in all of the countries (Australia, Canada and Europe).  They understand the risk of loss and potential gain with the options.

Based on what I heard today, my prior experience with the Links and assuming the third member of the family agrees, I am convinced that they understand what the downside is and are still willing to proceed.

How shall we proceed?

Phil


----

Clean  Clean  DocumentEmail              MicrosoftInternetExplorer4    st1\:*{behavior:url(#defa
ult#ieooui) }        /* Style Definitions */  table.MsoNormalTable {mso-style-name:"Table Normal"; mso-tstyle-rowband-siz
e:0; mso-tstyle-colband-size:0; mso-style-noshow:yes; mso-style-parent:""; mso-padding-alt:0in 5.4pt 0in 5.4pt; mso-par
a-margin:0in; mso-para-margin-bottom:.0001pt; mso-pagination:widow-orphan; font-size:10.0pt; font-family:"Times New
Roman";}        I was on a conference call today with two of the Links (Jay and Jack, his father), the cfo of the company,
John Hermeier , McGladrey ( wainwright , Flemmer and Score) and John Barrie from Bryan Cave, all of whom were in th
e Link□s offices.  McGladrey went through all of the risks with Links which included; no opinion writer at this time, no gu
aranty that McGladrey will sign the return, IRS response to a second strategy, potential legislative changes, Congressio
nal hearings, etc&..  Jay and his father said they understood the risks and will speak to the third member of the family on
Saturday, but they are of the opinion that they still want to proceed.        They understand the use of the currency options
 that they are potentially buying as they do significant business in all of the countries ( Australia , Canada and Europe ).
They understand the risk of loss and potential gain with the options.        Based on what I heard today, my prior experien
ce with the Links and assuming the third member of the family agrees, I am convinced that they understand what the do
wnside is and are still willing to proceed.        How shall we proceed?        Phil

DGI 35774

Govt. Exhibit 33-

Document Filed
Under Seal

3450255.1

From:   Ruble, R.J. <rruble@sidley.com>
Date:   6/17/2002 9:54:00 AM
Subj:   RE: New Regulations -- 6011-4T

thanks.  I've been out of pocket on "real" deals and am trying to go over
the regs now.  The S corp thing is still under review.

> -----Original Message-----
> From: James Haber [SMTP:jhaber@divgroup.com]
> Sent: Monday, June 17, 2002 9:37 AM
> To:   R.J. Ruble
> Subject:      Fw: New Regulations -- 6011-4T
>
>
> ----- Original Message -----
> From: Smith, Elizabeth Ann <mailto:easmith@BryanCave.com>
> To: Smith, Elizabeth Ann <mailto:easmith@BryanCave.com> ; Barrie, John
> <mailto:jpbarrie@bryancave.com>
> Cc: Meisels, Naomi P. <mailto:npmeisels@BryanCave.com> ; Phillips, Lana
> <mailto:lmphillips@BryanCave.com> ; Appel, Alan
> <mailto:aiappel@BryanCave.com>
> Sent: Sunday, June 16, 2002 11:36 PM
> Subject: New Regulations -- 6011-4T
>
> The new temporary and proposed regulations which were issued on Friday,
> June 14, 2002, under Code section 6011 raise significant concerns now for
> individuals and for transactions completed in 2001 for which disclosure
> has not been made.
>
> The new regs. appear to apply to individuals who participate in a
> reported transaction as it is now defined in the regs at -4T(b)(2), which
> incorporates an expanded definition of "substantially similar".   The
> newly expanded definition will pick up transactions which are executed
> with instruments which are offsetting --- greatly expanding the scope of
> Notice 2000-44.   Thus, it appears that if a transaction were completed
> with options (or other financial instruments) which were offsetting the
> new regs.' definition would subject the taxpayer participating in such a
> transaction to disclosing the transaction on his or her return ( as well
> as filing a disclosure statement with the Office of Tax Shelter Analysis).
>
> If the taxpayer did not already disclose the transaction on his 2001
> return ( and we assume most individual taxpayers would not have disclosed)
> the regs. now appear to require that taxpayer to disclose a 2001
> transaction ( which now falls with in the definitional purview of
> "reported transaction" because it meets the definition of a "listed
> transaction" because it is "substantially similar" to a listed transaction
> ) on his or her 2002 return.  If a taxpayer does not disclose, it would
> seem to follow that reliance on an opinion of tax counsel would no longer
> provide penalty relief in such situations.  If one did not believe
> disclosure were appropriate, a disclosure of a position contrary to
> published regs. would be in order.  In any case where a transaction was
> executed with financial instruments which are offsetting. the regs. now
> seem very clear that disclosure is expected.
>
> In addition, the list maintenance requirement under Code section 6112
> would seem to now apply to transactions involving offsetting instruments.
> The new regs. don't directly deal with the listing requirements but by
> implication they seem to apply and the preamble to the new -4T notes that
> 6112 will be affected.  The preamble also indicates that more regulations

GOVERNMENT
EXHIBIT

34

DGI 30902

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06          1DGI-06-37-064901

> will be forthcoming. The listing requirement as expanded could
> conceivably apply to 2001 transactions although it is not absolutely clear
> from the regs as issued thus far.
>
> We are available this week to discuss the impact of these changes to the
> regs. at your convenience.  b

"<mail.sidley.com>" made the following
 annotations on 06/17/02 09:52:51
----------------------------------------------------------------
----------------------------------------------------------------------

This e-mail is sent by a law firm and may contain information that is privileged or confidential.  If you are not the intende
d recipient, please delete the e-mail and any attachments and notify us immediately.

======================================================================

DGI 30903

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-06-37-064902

From:   Phil Kampf <philkampf@heliosfinancial.com>
Date:   6/27/2002 11:01:20 AM
Subj:   Bricolage/McGladrey

This may be old news, but Todd Jackson told me that Bricolage had
received an information request for what he believed were the year 2000
transactions.  Todd also said that they were waiting to hear from Betsy
Smith and John Barrie with regard to Orrin's memo on the proposed regs.

On another note, Jef Flemmer said that Ron Wainwright was the third
highest paid person at McGladrey this year.  Only the CEO and President
were paid more.

Phil Kampf
Helios Financial LLC
225 W. Washington, Suite 2200
Chicago, IL 60606
(O) 312-419-6151
(F) 312-419-6153


----

Clean   DocumentEmail               MicrosoftInternetExplorer4    st1\:*{behavior:url(#default#ie
oooui) }      /* Style Definitions */  table.MsoNormalTable {mso-style-name:"Table Normal"; mso-tstyle-rowband-size:0;
mso-tstyle-colband-size:0; mso-style-noshow:yes; mso-style-parent:""; mso-padding-alt:0in 5.4pt 0in 5.4pt; mso-para-ma
rgin:0in; mso-para-margin-bottom:.0001pt; mso-pagination:widow-orphan; font-size:10.0pt; font-family:"Times New Rom
an";}        This may be old news, but Todd Jackson told me that Bricolage had received an information request for what
he believed were the year 2000 transactions.  Todd also said that they were waiting to hear from Betsy Smith and John
Barrie with regard to Orrin□s memo on the proposed regs.    On another note, Jef Flemmer said that Ron Wainwright w
as the third highest paid person at McGladrey this year.  Only the CEO and President were paid more.    Phil Kampf  He
lios Financial LLC  225 W. Washington, Suite 2200  Chicago , IL 60606  (O) 312-419-6151  (F) 312-419-6153

GOVERNMENT
EXHIBIT

35

DGI 025895

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06                1DGI-06-36-062680

From:   ronald.wainwright@rsmi.com
Date:   10/17/2002 2:14:53 PM
Subj:   Consultancy Agreement

Jimmie -

Per our conversation Tuesday a.m..

Ron

Ronald G. Wainwright, Jr.
Managing Director - Tax
RSM McGladrey, Inc.
2418 Blue Ridge Rd.
Raleigh, NC 27607-6480
Phone: (919) 645-1543
Fax: (919) 781-9270
Ronald_Wainwright@rsmi.com

**GOVERNMENT
EXHIBIT**

**36**

DGI 027728

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06          1DGI-06-37-064147

# CONSULTING AGREEMENT

This Consulting Agreement dated the 12th day of July, 2002 (the "Effective Date"), (this "Agreement") by and between the ...................., (the "Client"), ................. and RSM McGladrey, Inc. ("RSM"), a Delaware corporation with offices at 801 Nicollet Avenue, STE 1300, Minneapolis, MN 55402 (together, the "Parties", or individually, a "Party").

## WITNESSETH

WHEREAS, the Client is interested in making certain investments (the "Transaction");

WHEREAS, RSM is in the business of providing accounting and consulting services; and

WHEREAS, the Client desires RSM to provide certain accounting and consulting services in connection with the Transaction, and RSM desires to provide such services to the Client, all upon the terms and conditions herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

1.  <u>Term</u>. Unless earlier terminated as provided hereunder, the term of this Agreement shall commence on the Effective Date and continue through April 15, 2003 when this Agreement shall automatically expire (the "Term").

2.  <u>Services</u>.

    (a)  During the Term, RSM agrees to provide the following consulting services (collectively, the "Services") to the Client: assistance in determining the overall effects of potential sales price(s) and allocations related to the sale of certain equity interests; assisting the Client and/or his advisors in attaining the most efficient tax structure and assisting the Client and/ or his representatives, and his advisors, in its discussions and/or negotiations with potential purchasers or sellers, on a specifically requested basis. Additionally, RSM agrees to provide assistance to the Client and/or his representatives with certain income and estate planning as well as assisting with certain income tax, estate tax, and other financial aspects of various anticipated activities.

NY01DOCS\286074.7

**DGI 027729**

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

(b) **While RSM is a registered investment advisor pursuant to the Investment Advisors Act of 1940, RSM is not providing investment advice or services, pursuant to this engagement; thus, none of the Services provided for under this Agreement in Paragraph 2.(a), include investment advice and shall not be considered as investment advice. Client acknowledges that is has arranged to receive investment advice and investment-related services from Alpha Investors Inc., registered investment advisors, and has entered into an agreement directly with Alpha Investors Inc. for that advice, separate and apart from this agreement. Client acknowledges that it is relying exclusively upon Alpha Investors Inc. for investment advice regarding the Transaction, and Client understands that it is not relying upon RSM for investment advice or investment-related services and shall hold RSM harmless from any liabilities arising out of or relating to such advice or services.**

3.  <u>Fees</u>.

(a) In consideration for the Services, the Client shall pay RSM the following fee:

$525,000 (the "Consulting Fee"). If the Client's account is past due and RSM has notified the Client of the past due balance, RSM may, without further notice, immediately cease providing any and all further Services without any liability for interruption of pending work or breach of this Agreement. If the Client's account, after default, is referred to an attorney or collection agency for collection, the Client shall pay all of RSM's expenses incurred in such collection efforts including, without limitation, court costs and reasonable attorneys' fees.

(b) The total Consulting Fee shall be due and payable from the Client to RSM in one installment of $........... on or before July 31, 2002, which shall be non-refundable even in the event a Transaction is proposed and fails to close during the term of this Agreement. Such payments shall be made, at RSM's election, either by wire transfer to an account designated by RSM or by Client check.

4.  <u>Termination</u>.

(a) Either Party shall have the right to terminate this Agreement if -

(i) the other Party breaches or defaults under this Agreement and fails to cure such breach or default within seven (7) days after receiving notice from the non-breaching Party;

(ii) the other Party becomes insolvent or makes an assignment for the benefit of creditors, or a receiver or similar officer is appointed to take charge of all or part of such other Party's assets; or

(iii) the other Party assigns this Agreement, or any obligation or right hereunder, except as permitted in accordance with Section 7.

2

DGI 027730

1DGI-06-37-064149

(b)    The terms and conditions of Paragraphs 3, 5, 6, 7, 8, 9, 11 and 14 through 18 shall survive any expiration or termination of this Agreement.

5.    Indemnification.  The Client, at its own expense, shall release and indemnify, defend and hold RSM and its affiliates, along with their respective managing directors, employees, agents, advisors, designees, insurers and assignees, harmless from and against, all losses, claims, damages, liabilities, costs and expenses (including reasonable legal or other out-of-pocket expense) incurred, caused by or arising out of the Services, the Transaction, or any transaction related thereto, or the Client's breach of this Agreement.  This indemnity excludes a final adjudication that RSM engaged in gross negligence or willful misconduct in providing the Services that gave rise to the loss, claim, damage, liability, cost or expense sought to be recovered.  Pending any such final decision, the indemnification and reimbursement provisions of this Agreement shall apply and the Client shall perform its obligations to reimburse RSM for its expenses.

6.    No Warranty.  **RSM makes no representations or warranties, express or implied, under this Agreement and Client specifically acknowledges that RSM is not making any representation or warranties regarding the final outcome of the strategies that Client may elect to implement in connection with the Transaction.   Client acknowledges that it is relying upon the advice of non-parties to this Agreement, including but not limited to Client's attorney, regarding the likely tax outcome of the Transaction. RSM expressly disclaims any implied warranty of merchantability or fitness for a particular purpose or use.**  Additionally, RSM expressly disclaims any warranty whatsoever that the Services will include or provide for accurately processing date-related data (including, without limitation, calculating, comparing and/or sequencing) from, into and between the twentieth and twenty-first centuries, including leap year calculations, and the Client expressly assumes all risks associated with such date-related failures.  The Services hereunder do not include, and RSM assumes no responsibility whatsoever for, any legal and/or tax opinions or any adverse tax rulings, decisions or findings regarding any strategies that may be implemented, and has advised the Client to retain a law firm for legal and/or tax opinions on any strategies or transactions Client enters into.  The Client's exclusive remedy, and RSM sole liability to the Client, for any cause whatsoever shall be limited to the fees actually paid to RSM by the Client under this Agreement.  The foregoing limitation shall apply regardless of the form of action, whether contract or tort, including without limitation, negligence.  In no event shall RSM be liable for any loss or profit, revenue, or other commercial injury or any special, incidental, indirect or consequential damages suffered by the Client or any third party, whether or not RSM has been advised of the possibility of such loss, injury, damages or third party claim, under any cause of action arising out of or relating to this Agreement.

3

DGI 027731

1DGI-06-37-064150

7.   <u>No Assignment</u>.  Neither Party shall assign or delegate this Agreement or any rights, duties or obligations hereunder without the express written consent of the other, which shall not be unreasonably withheld.  Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the successors, legal representatives and assignees of the Parties hereto.

8.   <u>Dispute Resolution</u>.

(a)   Any controversy, claim, or dispute arising out of or relating to this Agreement or any breach thereof, including without limitation any dispute concerning the scope of the arbitration clause set forth below, shall be resolved as set forth below.

(b)   In the event a dispute arises relating to this Agreement, any Party may demand mediation by notifying the American Arbitration Association ("AAA") in the location where any arbitration would be conducted as set forth below, in writing with copies to all other Parties involved in the dispute.  The notification will state with specificity the nature of the dispute and the amount of any claims.  Upon receipt of the mediation demand, the AAA will immediately convene a pre-mediation telephone conference of the Parties hereto.  The Parties will make a representative, with full authority to settle, available for such a conference within five (5) business days of being contacted by the AAA or its designated mediator ("Mediator").  During the pre-mediation telephone conference, the parties will agree on mediation procedures or, in the event they cannot agree, Mediator will set the mediation procedures.  The mediation procedures will provide for the mediation to be completed within sixty (60) business days of the date of the initial demand for mediation.  The Parties will participate in good faith in the mediation and will use their best efforts to reach a resolution within the sixty (60) day time period.  Each party will make available in a timely fashion a representative with authority to resolve the dispute.  In the event that the dispute has not been resolved within thirty (30) days, the mediation may continue if the parties so desire.  If not, the Mediator will so notify the parties and declare the mediation terminated.  In the event that the mediation continues beyond thirty (30) days, but is not resolved within what Mediator believes is a reasonable time thereafter, the Mediator will so notify the parties, and declare the mediation terminated.  Fees of the mediator shall be split equally between the Parties.

(c)   After the mediation has been declared terminated, the matters in dispute shall be settled by binding arbitration in accordance with the Rules as supplemented herein and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.  The governing law of this Agreement shall be the law used by the arbitrators in rendering their award, except that the Federal Rules of Evidence shall apply.  There shall be three arbitrators.  Each Party shall choose one (1) arbitrator, and the two (2) chosen arbitrators shall choose the third arbitrator.  Pending final award, the arbitrators' compensation and expenses shall be advanced equally by the Parties.  The AAA shall hold an administrative conference with counsel for the Parties within twenty (20) days after the filing of

4

DGI 027732

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-06-37-064151

the demand for arbitration by any one or more of the Parties. The Parties and the AAA shall thereafter cooperate in order to complete the appointment of three arbitrators as quickly as possible. Within fifteen (15) days after all three arbitrators have been appointed, an initial meeting (which, if the arbitrators so determine, may be by phone) among the arbitrators and counsel for the Parties shall be held for the purpose of establishing a plan for administration of the arbitration, including: (i) definition of issues; (ii) scope, timing, and types of discovery, which may at the discretion of the arbitrators include production of documents in the possession of the Parties, but may not without consent of all Parties include depositions; (iii) exchange of documents and filing of detailed statements of claims, prehearing memoranda and dispositive motions; (iv) schedule and place of hearings; and (v) any other matters that may promote the efficient, expeditious, and cost-effective conduct of the proceeding. Each Party shall have the right to request that the arbitrators make specific findings of fact.

(d)     The majority decision of the arbitrators shall contain findings of facts on which the decision is based, including any specific factual findings requested by either Party, and shall further contain the reasons for the decision with reference to the legal principles on which the arbitrators relied. Such decision of the arbitrators shall be final and binding upon the Parties. The arbitration shall take place in Raleigh, North Carolina. The final award shall award to the prevailing Party its reasonable attorneys' fees and costs incurred in connection with the arbitration (but if the prevailing party is not awarded all of the damages sought, only to the extent, pro rata, of its award compared to the damages sought) and may grant such other, further, and different relief as authorized by the Rules, including damages and out-of-pocket costs, but which may not include exemplary, consequential or punitive damages.

9.     Enforceability. If any provision of this Agreement is declared invalid or unenforceable, such provision shall be deemed modified to the extent necessary and possible to render it valid and enforceable. In any event, the unenforceability or invalidity of any provision shall not affect any other provision of this Agreement, and this Agreement shall continue in full force and effect, and be construed and enforced, as if such provision had not been included, or had been modified as above provided, as the case may be. The Parties acknowledge and agree that this Agreement allocates risk between them as authorized by any applicable law and that the amount of the fees charged for the Services reflects this allocation of risk and other limitations of liability contained in this Agreement. If any remedy hereunder is determined to have failed of its essential purpose, all limitations of liability and exclusion of damages set forth in this Agreement shall remain in full force and effect.

10.     Independent Contractor. RSM and the Client acknowledge that the relationship between the Parties to this Agreement is exclusively that of an independent contractor and that RSM obligations to the Client are exclusively contractual in nature. Nothing herein contained shall be construed to imply a joint venture, partnership or principal-agent

5

DGI 027733

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06        1DGI-06-37-064152

relationship between RSM and the Client, and neither Party shall have the right, power or authority to obligate or bind the other to any third party in any manner whatsoever.

11.    <u>Governing Law</u>. This Agreement shall be governed and construed in accordance with the laws of the State of Delaware, except for its conflict of law principles.

12.    <u>Entire Agreement</u>. This Agreement sets forth the entire agreement between the Parties with respect to the subject matter herein, superseding all prior agreements, negotiations or understandings, whether oral or written, with respect to such subject matter. This Agreement may not be amended or modified except in a writing signed by duly authorized representatives of the Client and RSM.

13.    <u>Other Parties</u>. Client acknowledges that in the performance of the Services outlined in Section 2.(a) above, RSM at its discretion, may use the employees of McGladrey & Pullen, LLP ("M&P"). To facilitate these Services, Client authorizes RSM to allow employees of M&P access to Client files, financial information and other confidential information as requested by RSM.

14.    <u>Notice</u>. Any notice, demand, request, statement or other writing required or permitted by this Agreement shall be deemed to have been sufficiently given either when personally delivered, delivered by receipted courier service, or mailed, postage prepaid, by registered or certified mail, return receipt requested, or sent by facsimile (confirmed by personal delivery, receipted courier service, or prepaid registered or certified mail, return receipt requested), to the individual representatives identified below at the addresses specified herein, and in any case shall be effective when received. The individuals designated below shall, unless and until otherwise provided in writing by the appropriate party, are the only Individuals eligible to receive any and all written notices under this Agreement.

If to RSM:                 RSM McGladrey, Inc.
                          Attention: Mr. Thomas G. Rotherham
                          Suite 500
                          3600 West 80th St.
                          Bloomington, MN 55431-1082

If to Client:

Notice shall be deemed to be given on the date personally delivered or deposited with the US Mail or receipted courier service.

6

DGI 027734

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-06-37-064153

15. <u>Reportable, Registerable and Listed Transactions</u>.     The Client understands and acknowledges the following:

    (i)    the Transaction may be subject to the reporting, registration and/or listing requirements under section 6011, 6111 or 6112, respectively, the Internal Revenue Code of 1986, as amended and in effect (the "Code");

    (ii)    new Temporary and Proposed Treasury Regulations under Code section 6011 were issued on June 14, 2002 which require the Client to disclose participation in the Transaction if the Transaction is a "listed transaction," as that term is defined under Temporary Treasury Regulations section 1.6011-4T(b)(2), or if the Transaction is the same as or "substantially similar" to a listed transaction, as now defined under Temporary Treasury Regulations section 1.6011-4T(b)(1)(i);

    (iii)    Code section 6111 and the Treasury Regulations promulgated thereunder require a "tax shelter organizer," as that term is defined under Code section 6111(e)(1)(A), to register a "tax shelter," as that term is defined under Code section 6111(c), with the Internal Revenue Service no later than the day on which the first interest in the shelter is offered for sale; and

    (iv)    Code section 6112 and Temporary Treasury Regulation section 301.6112-1T require any person who organizes or sells any interest in a "potentially abusive tax shelter," as that term is defined in Code section 6112(b), to maintain a list identifying each investor sold an interest in the potentially abusive shelter.

16. <u>Client Acknowledgements</u>.

    (a)    The Client understands and acknowledges the following:

    (i)    there are legal and financial risks associated with the Transaction, including the possibility that the Internal Revenue Service may deny all tax benefits claimed by the Client which could result in an increased tax liability with interest assessed on any such liability at the statutory rate in effect and calculated from the time of the underpayment of the tax;

    (ii)    accuracy-related penalties could be imposed against the Client under Code section 6662 if the Internal Revenue Service were successful in challenging the claimed tax treatment of the Transaction;

    (iii)    RSM has advised the Client to seek independent legal counsel in connection with entering into this Agreement and participating in any Transaction;

7

DGI 027735

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-06-37-064154

(iv)    as a result of potential disclosure requirements, participation in the Transaction may increase the likelihood that the Client will be audited by the Internal Revenue Service, and that as a consequence of any such audit, other items on the Client's Federal income tax return could be challenged by the Internal Revenue Service;

(v)    if a challenge by the Internal Revenue Service is not resolved during field examination or administrative appeal, the Client may be required to litigate in order to prevail against the Internal Revenue Service, and that depending on the judicial forum, the Client may be required to pay the Federal income tax amount in dispute prior to pursuing the litigation in such forum;

(vi)    even if the Client engages in litigation over the claimed tax treatment with respect to the Transaction, there is no assurance that the Client will ultimately prevail; and

(vii)    the Client will be responsible for the legal costs and expenses arising out of any action that relates to the Transaction.

(b)    In connection with RSM's performance of the Services outlined in Section 2.(a) above and in recognition of RSM's good faith reliance on the Client's intentions, understandings and representations with respect to the Transaction, immediately following completion of any Transaction the Client agrees to execute a Client Representation Letter in a form substantially similar to the attached Exhibit A and revised as necessary to accurately reflect the actual facts of the Client's participation in such Transaction. In addition to the other remedies for a default hereunder, final Transaction closing documents shall not be released to Client until such letter is provided to RSM.

17.    <u>Confidentiality.</u>

(a)    A confidentiality privilege as provided for under section 7525 of the Code, does not pertain to certain communications between RSM and the Client regarding the Services as provided for in Section 2.(a) of this Agreement. The Client understands that RSM, makes no representation, warranty or promise and offers no opinion with respect to the applicability of such confidentiality privilege, if any, and the Client agrees to hold RSM its managing directors, principals, employees and agents harmless in this regard should such privilege be determined not to apply in any circumstance.

(b)    Notwithstanding anything to the contrary herein, RSM hereby expressly authorizes the Client to disclose any and all aspects of the Transaction to any and all persons, without limitation of any kind.

8

DGI 027736

1DGI-06-37-064155

18.   Miscellaneous.

(a)    Each Party hereby represents to the other that (i) it has the full power and authority to enter into this Agreement and to carry out the Transaction provided for herein, (ii) the execution and performance of this Agreement will not conflict with or result in a breach of the terms or provisions of, or constitute a default under, any contract, covenant, indenture, mortgage, deed of trust, instrument or other agreement to which it is a party or by which it is bound, or any statute, order, law, rule or regulation applicable to it, and (iii) the Agreement has been duly and validly authorized, executed and delivered by such party and is a valid and binding agreement, enforceable in accordance with its terms against such party except as enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting the enforcement of creditors' rights generally.

(b)    Client is (i) an "accredited investor" as defined in Rule 501 under the Securities Act and (ii) is financially sophisticated and has such knowledge and experience so as to be aware of the risks and uncertainties inherent in the Transaction.

(c)    In addition, the Client represents that it has not entered into, and it will not enter into, any agreement regarding the subject matter hereunder with any other party that covers the period during which RSM is authorized to act and provide Services hereunder.

(d)    The failure of either Party to require performance by the other of any provision hereof shall in no way affect the right to require performance at any time thereafter, nor shall the waiver of a breach of any provision hereof be taken to be a waiver of any succeeding breach of such provision or as a waiver of the provision itself.

(e)    The paragraph headings set forth in this Agreement are for the convenience of the Parties, and in no way define, limit, or describe the scope or intent of this Agreement and are to be given no legal effect.

(f)    This Agreement may be executed by telecopy in multiple counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument.   Transmission by telecopier of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart.  Each fully executed counterpart of this Agreement and any other Operative Document shall be deemed to be a duplicative original.  Any party transmitting its signature by facsimile shall follow up by delivering the executed original by overnight mail or personal delivery.

9

DGI 027737

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06    1DGI-06-37-064156

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.


RSM McGladrey, Inc.


By: _____        By: _____

Name: Jefry D. Flemmer              Name:

Title:  Managing Director           Title: _____


Enclosures

10

DGI 027738

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06                1DGI-06-37-064157

# Govt. Exhibit 37-

# Document Filed
# Under Seal

3450256.1

## Div

| | |
|---|---|
| **From:** | "James Haber" <jhaber@divgroup.com> |
| **To:** | "Orrin Tilevitz" <otilevitz@divgroup.com>; <esilverman@MWE.com> |
| **Cc:** | "Taylor Jasper" <jtaylor@fulbright.com> |
| **Sent:** | Tuesday, December 17, 2002 9:44 AM |
| **Subject:** | Re: Drafts of Opinions |

Jack, what do you think?

----- Original Message -----
**From:** esilverman@MWE.com
**To:** Orrin Tilevitz
**Cc:** Haber Jimmy ; Taylor Jasper
**Sent:** Monday, December 16, 2002 7:53 PM
**Subject:** Drafts of Opinions

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* PRIVILEGED AND CONFIDENTIAL \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

With respect to drafts of opinions which Orrin reviewed on behalf of investors' law firms, the Government will certainly argue that the opinions were never privileged because disclosure to Diversified robbed them of confidentiality. Cf. US v Jones, 696 F2d 1069, 1072-73 (4th Cir 1982). We could argue that they were reviewed in confidence pursuant to a "common interest" privilege. See, e.g., US v United technologies, 979 F Supp 108 (D. Conn. 1997). Some courts, however, limit the "common interest" rule to documents involving litigation. E.g., Bank of America v Terra Nova Ins Co.,211 F Supp2d 493 (SDNY 2002).

On balance, I think we have a colorable argument, although we may not prevail. We would certainly need to list these documents on a new privilege log.

Elliot Silverman
McDermott, Will & Emery
18191 Von Karman Avenue
Suite 500
Irvine, CA 92612-7102
949-757-7105
Fax: 949-851-9348
 -or-
50 Rockefeller Plaza
New York, New York 10020
212-547-5539
Fax: 212-547-5444

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message is a PRIVILEGED AND CONFIDENTIAL communication.  If you are not the intended recipient, please do not read, copy, or use it, and do not disclose it to others.  Please notify the sender of the delivery error by replying to this message, and then delete it from your system.  Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

For more information on McDERMOTT, WILL & EMERY please visit our website at: http://www.mwe.com/

**DGI 82241**

GOVERNMENT
EXHIBIT
38

12/23/2004

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-09-55-109872

From:  ronald.wainwright@rsmi.com
Date:  4/1/2003 5:09:10 PM
Subj:  Re:

Jimmie -

We need to review the Opinon - please forward to my attention on Wed. when you return.

We will ultimately obtain the Final Opinion from the client as we rely on the Opinion to sign the clients return.

Thanks in Advance.

Ron


Ronald G. Wainwright, Jr.
Managing Director - Tax
RSM McGladrey, Inc.
2418 Blue Ridge Rd.
Raleigh, NC 27607-6480
Phone:  919.645.1543
Fax:  919.781.9270
ronald.wainwright@rsmi.com


"James Haber" <jhaber@divgroup.com>
04/01/2003 12:51 PM

        To:      <ronald.wainwright@rsmi.com>
        cc:
        Subject:      Re:

Reviewing a draft blows the privilege for that opinion.  If you still want to see it, please let me know.
----- Original Message -----
From: ronald.wainwright@rsmi.com
To: jhaber@divgroup.com
Sent: Tuesday, April 01, 2003 9:30 AM
Subject: Re:


Jimmie -

Can you send "Draft" today -  it is important we have the oppy. to review.

Thanks

Ron

Ronald G. Wainwright, Jr.
Managing Director - Tax



GOVERNMENT
EXHIBIT

39

DGI 027786

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

1DGI-06-37-064205

2418 Blue Ridge Rd.
Raleigh, NC 27607-6480
Phone: 919.645.1543
Fax: 919.781.9270
ronald.wainwright@rsmi.com
----- Forwarded by Ronald Wainwright/Raleigh/MP/RSMi on 04/01/2003 09:29 AM -----

Ronald Wainwright
03/31/2003 09:47 AM

> To:      "James Haber" <jhaber@divgroup.com>
> cc:
> Subject:    Re:Link

Jimmie -

I wanted us to see the "Draft" only.

Please forward.

Ron

Ronald G. Wainwright, Jr.
Managing Director - Tax
RSM McGladrey, Inc.
2418 Blue Ridge Rd.
Raleigh, NC 27607-6480
Phone: 919.645.1543
Fax: 919.781.9270
ronald.wainwright@rsmi.com

"James Haber" <jhaber@divgroup.com>
03/31/2003 09:41 AM

> To:      <ronald.wainwright@rsmi.com>
> cc:
> Subject:    Re:

I thought we decided you should not see the opinion.
----- Original Message -----
From: ronald.wainwright@rsmi.com
To: James Haber
Sent: Saturday, March 29, 2003 10:21 AM
Subject: Re:

Jimmie - Where is the Draft Opinion ??

Ron

Ronald G. Wainwright, Jr.
Managing Director - Tax
RSM McGladrey, Inc.

DGI 027787

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06          1DGI-06-37-064206

# Govt. Exhibit 40-

# Document Filed Under Seal

3450257.1

# Govt. Exhibit 41-

# Document Filed Under Seal

3450258.1

# PROSKAUER ROSE LLP

1585 Broadway
New York, NY 10036-8299
Telephone 212.969.3000
Fax 212.969.2900

LOS ANGELES
WASHINGTON
BOCA RATON
NEWARK
PARIS

September 4, 2002

Mr. Richard J. Egan
116 Flanders Road
West Borough, MA
01581

Dear Mr. Egan:

    You have requested our opinion (the "Opinion") regarding whether Richard J. Egan (the "Investor") would be subject to disclosure requirements under Section 6011 of the Internal Revenue Code of 1986, as amended (the "Code")[1], for Investor's involvement in various investment transactions (the "Transactions"). For purposes of this discussion, we assume that Investor is a United States individual.

    You have provided us with certain documents summarizing the Transactions. We assume that all pertinent facts, circumstances and representations relevant to the Transactions were thereby disclosed to us and such documents were, in relevant part, true, accurate and complete.

## I.   The Transactions

    In the Transactions, Fidelity World Currency Advisor A Fund, LLC ("World") is a limited liability company whose membership interests are solely owned initially by Investor.[2]

    Fidelity International Currency Advisor A Fund, LLC ("International") is a limited liability company with four members, one of whom is the Investor. International was formed to buy and sell options and to conduct other investment activities.

    International's operating agreement establishes two sets of membership interests, common and preferred. Only common interest holders share in International's profits and losses and each preferred interest carries a guaranteed annual return of 12 %, independent of

---

[1] All sections references herein are to the Code, unless otherwise indicated. All references to Regulations herein are to the Treasury Regulations promulgated pursuant to the Code, unless otherwise indicated.

[2] Based on our understanding that World is a single member LLC that has not filed an election to be treated as a corporation, it should be treated as a disregarded entity for federal income tax purposes.

GOVERNMENT
EXHIBIT
42

006264

065021

PRODUCIED BY EGAN TO UNITED STATES ON 10/22/07    14CARRUTH065021

September 4, 2002
Page 2

International's profits. International maintains capital accounts for its members in accordance with Regulations under section 704(b). The operating agreement also provides that when members' interest change during the year, their distributive shares are determined using the interim "closing of the books" method.

On October 9, 2001, World entered into a pair of European-style digital call options and a pair of European-style digital put options (together, the "World Options"). In each pair, World purchased a call option (or put option) and sold a call option (or put option) based on the same underlying interest rate derivative or index but having different strike prices. The net premium paid by World to acquire the World Options was $2,250,000.

On October 22, 2001, Investor contributed his interest in World to International in exchange for 5% of the common interest and 100% of the preferred interests of International. On the same date, another member ("Co-Investor") contributed cash in exchange for 93% of International's common interests[3]. The other members contributed cash and obtained the remaining common interests in International.

On the same date, International invested in a number of foreign currency options contracts. On October 29 and October 30, 2001 International closed certain of these contracts and acquired new foreign currency-based instruments. These trading activities resulted in a realized gain.

On October 31, 2001, Investor acquired additional preferred membership interests in International by contributing shares of Stockton Holdings.

On November 5, 2001, Investor purchased all but 5% of Co-Investor's total 93% common membership interest.

On November 6, 2001, World entered into new options contracts, eliminating its economic risk of gain or loss from its October 9 trades, and recognizing a small net loss.

On November 29, 2001, Investor made an additional contribution of $5,000,000 to International in exchange for additional preferred membership interests.

On December 3, 2001, International closed out its remaining options (the "Remaining Options") and recognized losses.

On December 14, 2001, Investor made an additional contribution of $2,000,000 to International in exchange for additional preferred membership interests.

We understand that Investor has obtained an opinion of counsel that the intended tax treatment of the Transactions would more likely than not be sustained if challenged, and we

---

[3]   Co-Investor was a foreign resident individual.

006265

PRODUCED BY EGAN TO UNITED STATES ON 10/22/07

065022
14CARRUTH065022

September 4, 2002
Page 3

assume that Investor has reasonably relied on such opinion for purposes of reporting the Transactions on his federal income tax return.

## II.     Disclosure Requirements

As relevant here, Section 6011(a) requires every person liable for any tax under the Code to make a return according to the forms and regulations provided by the Secretary including all information required by the forms and regulations. Every individual, trust, partnership, and S corporation that has participated, directly or indirectly, in a "reportable transaction" that is a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4T(b)(2) must attach to its return for the taxable year of the transaction a disclosure statement in the form prescribed by Treasury Regulation Section 1.6011-4T(e).[4]

The preamble to the revised regulations states that the IRS plans to issue future guidance extending the disclosure requirement to other reportable transactions (i.e., non-listed transactions)[5] entered into by individuals, partnerships, trusts and S corporations. However, no such guidance has been issued to date. Therefore to date, individuals, such as Investor, have no obligation to disclose their participation in "other reportable transactions," as defined in Treasury Regulation Section 1.6011-4T(b)(3)(i).

A "listed transaction" is any transaction which is the same as or "substantially similar" to one of the types of transactions that the Internal Revenue Service (the "IRS") has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction for purposes of Section 6011.[6]

A transaction will be treated as being the same as or "substantially similar" to one of the types of transactions that the IRS has determined to be a tax avoidance transaction if the transaction is expected to obtain the same or similar types of tax benefits and is either factually similar or is based on the same or a similar tax strategy.[7] The term "substantially similar" is to be broadly construed in favor of disclosure.[8] The Regulations do not define what is meant by "tax strategy."[9]

---

[4] Treas. Reg. § 1.6011-4T(a)(1).  T.D. 9000 (June 18, 2002) revised the temporary Regulations under Section 6111(d) to include this disclosure requirement for individuals who participate in "listed transactions."

[5] Treas. Reg. § 1.6011-4T(b)(3)(i).

[6] Treas. Reg. § 1.6011-4T(b).

[7] Treas. Reg. § 1.6011-4T(b)(1)(i).

[8] Treas. Reg. § 1.6011-4T(b)(1)(i).

[9] The IRS appears to have previously used the term "tax strategy" very rarely in published guidance; as a result, it is difficult to discern what the term means specifically.  For example, Private Letter Ruling 9328022 (March 5, 1993) refers to a "tax strategy" of purchasing taxpayers' initial inventory from discounters' suppliers at the end of their initial abbreviated tax year, marking on higher retail prices (fully expecting to sell nothing at the prices marked on the merchandise), thereby locking in a low valued inventory base.  Field Service Advice

006266

PRODUCED BY EGAN TO UNITED STATES ON 10/22/07

065023
14CARRUTH065023

September 4, 2002
Page 4

A taxpayer will be considered to have indirectly participated in a "listed transaction" if the taxpayer's Federal income tax liability is affected by the transaction, even if the taxpayer does not participate in the transaction itself. For example, where the "listed transaction" is consummated through a partnership, the taxpayer will be treated as an indirect participant if the taxpayer is a partner and the taxpayer's Federal income tax liability is likely to be affected by the partnership's participation in the transaction.[10]

### III.    Analysis

The IRS has published a number of notices describing various listed transactions. <u>See</u>, <u>e.g.</u>, Notice 2000-61, 2000-2 C.B. 569; Notice 2001-16 (February 26, 2001), 2001-1 C.B. 730. The majority of these notices have no bearing on the Transactions. However, there are two notices that the IRS may argue are the same as or substantially similar to the Transactions, in which case the IRS would contend that Investor is required to disclose his participation in the Transactions. These two notices are Notice 2000-44, 2000-2 C.B. 255, and Notice 2002-50 (June 26, 2002). For the reasons discussed below, it is more likely than not that the Transactions would not be considered "listed transactions" as they are not substantially similar to any listed transactions.

#### A.    Notice 2000-44

In Notice 2000-44, the IRS addressed two fact patterns, including the following:

> [A] taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.
>
> Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under Section 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income

---

199952001 (September 29, 1999) refers to a consolidated group's "tax strategy" of selling a subsidiary's stock but retaining investment assets.

[10]     Treas. Reg. § 1.6011-4T(a)(1).

006267

PRODUCED BY EGAN TO UNITED STATES ON 10/22/07

065024
14CARRUTH065024

realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of Section 165. The purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for Federal income tax purposes. The purported tax benefits from these transactions may also be subject to disallowance under other provisions of the Code and regulations. In particular, the transactions may be subject to challenge under Section 752, or under [Treas. Regs.] § 1.701-2 or other anti-abuse rules. In addition, in the case of individuals, these transactions may be subject to challenge under § 165(c)(2). See Fox v. Commissioner, 82 T.C. 1001 (1984). Furthermore, tax losses from similar transactions designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for Federal income tax purposes.

T.D. 9000 added the definition of "substantially similar" and the following example to illustrate when a transaction is the same as or substantially similar to a listed transaction. The example states:

Notice 2000-44 (2000-2 C.B. 265) (see § 601.601(d)(2) of this chapter), sets forth a listed transaction involving offsetting options transferred to a partnership where the taxpayer claims basis in the partnership for the cost of the purchased options but does not reduce basis under section 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the options. Transactions using short sales, futures, derivatives or any other type of offsetting obligations to inflate basis in a partnership interest would be the same as or substantially similar to the transaction described in Notice 2000-44. Moreover, use of the inflated basis in the partnership interest to diminish gain that would otherwise be recognized on the transfer of a partnership asset

006268

065025
14CARRUTH065025

September 4, 2002
Page 6

would also be the same as or substantially similar to the transaction described in Notice 2000-44 (the "Example").[11]

The Transactions more likely than not would not be considered "substantially similar" to Notice 2000-44. There are a number of factual differences between the Transactions and the transaction in Notice 2000-44. The Transactions did involve the Investor contributing his membership interest in World to International and claiming basis in International[12] based upon the World Options. However, the important difference is that the World Options did not produce a loss, or reduce any gain to be recognized, as was the case in Notice 2000-44. Rather, the loss in the Transactions results from an actual depreciated asset, the Remaining Options.

In contrast, the transaction in Notice 2000-44 results in an artificial, non-economic loss. In the Notice 2000-44 transaction, the taxpayer artificially inflates his basis in his partnership interest by including the cost of the purchased call options but not reducing his basis for the written call options under Section 752. When the taxpayer disposes of his partnership interest he has a non-economic loss, as a result of his previous basis manipulation.

In addition, the taxpayer in the Notice 2000-44 transaction had a net economic outlay that was nominal or zero. Here, Investor acquired the World Options for $2,250,000, a significant investment. The Investor also contributed stock valued at over $4,600,000 and $7,000,000 of cash to International in exchange for additional membership interests. Thus, Investor had a substantial economic outlay with respect to the Transactions.

Applying the test in Treasury Regulation Section 1.6011-4T(b)(1)(i), a transaction will be substantially similar to the transaction in Notice 2000-44 if it is expected to result in a similar type of tax benefit and is either factually similar or is based on a similar tax strategy. The tax benefit of the Notice 2000-44 transaction would appear to be the non-economic loss generated by the inflated basis in the partnership created through the use of offsetting options, which is lacking with respect to the Transactions. Even if the IRS were to argue that the tax benefit resulting from the Transactions is similar to that described in Notice 2000-44, the facts and tax strategy are different. Although the Investor used offsetting positions to claim basis in a partnership interest, Investor did not use that as a strategy to create an artificial loss. Instead, the loss arose from separate transactions entered into by International. In addition, Investor's investment in the Transactions was not nominal. Accordingly, the Transactions are likely neither factually similar to, nor based on a similar tax strategy as, the transactions described in Notice 2000-44.

The language in the Example is consistent with this conclusion. The purpose of the Example is to illustrate when a transaction is the same as or substantially similar to a listed transaction. The introductory language to the Example in Treasury Regulation Section 1.6011-4T(b)(1)(ii) uses this explicit language. The preamble to the revised regulations explains that:

---

[11]    Treas. Reg. § 1.6011-4T(b)(1)(ii), Example 1.

[12]    A portion of Investor's basis in International is also the result of contributions of cash and stock.

006269

065026
PRODUCED BY EGAN TO UNITED STATES ON 10/22/07    14CARRUTH065026

September 4, 2002
Page 7

> Some taxpayers and promoters have applied the <u>substantially</u>
> <u>similar</u> standard in an overly narrow manner to avoid disclosure.
> For instances, some taxpayers and promoters have made subtle and
> insignificant changes to a listed transaction in order to claim that
> their transactions are not subject to disclosure.... The IRS and
> Treasury believe that these interpretations are improper.

While the scope of some of the language in the Example is not entirely clear, we believe it would likely be interpreted in light of its express purpose to illustrate the definition of "substantially similar." For instance, the Example states that transactions using short sales, futures, derivatives or other offsetting obligations to inflate basis would be the same as or substantially similar to the transactions in Notice 2000-44. We do not interpret this sentence to mean that <u>every</u> transaction "using short sales ... to inflate basis in a partnership interest" is a listed transaction. Instead, we interpret this sentence, in light of the purpose of the Example, to mean that transactions that are described in Notice 2000-44, apart from the fact that they used short sales or futures instead of options (as was the case in Notice 2000-44), are listed transactions. Our interpretation is based on the regulatory framework, which provides that whether a transaction is a "listed transaction" is determined by testing the transaction against the transaction described in the Notice, and also on the fact that the express purpose of the Example was to illustrate the meaning of "substantially similar" and not to modify the Notice itself.

The Example also states that "the use of the inflated basis in the partnership interest to diminish gain that would otherwise be recognized on the transfer of a partnership asset" would be the same as or substantially similar to the transaction described in Notice 2000-44. This statement would appear to encompass an attempt to shift an artificially high partnership basis to an appreciated asset and thereby diminish gain recognized on the disposition of that asset. The sentence does not appear to apply to the Transactions, since they do not involve the use of an inflated basis to reduce the amount of gain recognized on the transfer of a partnership asset.

Based on the foregoing analysis and discussion, it is more likely than not that the Transactions would not be considered to be substantially similar to the transactions in Notice 2000-44.

**B.    Notice 2002-50**

Notice 2002-50 describes a transaction which uses "a straddle, a tiered partnership structure, a transitory partner, and the absence of a 754 election to allow [the] Taxpayer to claim a permanent non-economic loss." Notice 2002-50 identifies the following fact pattern as a listed transaction:

> This transaction involves partnerships manipulated through a series
> of steps carried out in the following order. No § 754 election is in
> effect at any relevant time. Step 1: Corporation acquires a majority
> interest in an upper tier partnership (UTP) at fair market value.
> Step 2: UTP acquires a majority interest in a lower tier partnership

006270

PRODUCED BY EGAN TO UNITED STATES ON 10/22/07

065027
14CARRUTH065027

September 4, 2002
Page 8

(LTP) at fair market value. Step 3: LTP enters into straddles on
foreign currencies and may acquire other assets. Step 4: LTP
terminates the gain leg of a foreign currency straddle. LTP
allocates a pro rata share of the gain to UTP, which in turn
allocates a pro rata share of the gain to Corporation. This gain
increases the basis of each partnership interest. Step 5:
Corporation sells its interest in UTP to Taxpayer at fair market
value. This results in a loss to Corporation sufficient to offset the
gain that was allocated to Corporation. Step 6: Taxpayer
purchases UTP's interest in LTP at fair market value. UTP
realizes a loss on this sale, but the loss is disallowed under §
707(b)(1)(A)[13] because Taxpayer owns more than 50% of UTP.
Step 7: LTP engages in a transaction that is intended to increase
Taxpayer's basis in the LTP interest. For example, LTP may incur
a liability that Taxpayer guarantees. LTP then terminates the loss
leg of the foreign currency straddle and allocates a pro rata share of
the loss to Taxpayer. Step 8: Taxpayer sells the interest in LTP at
its fair market value and realizes gain (for example, from the relief
of liability). Taxpayer then claims that this gain is offset under §
267(d)[14] by the amount of the loss that was disallowed to UTP
under § 707(b)(1)(A).

ANALYSIS

The transaction described in this notice has been designed to use a
straddle, a tiered partnership structure, a transitory partner, and the
absence of a section 754 election to allow Taxpayer to claim a
permanent non-economic loss.

Notice 2002-50 concludes that because the gain realized by the taxpayer on the sale of its
interest in LTP does not correspond to any increase in the value of the assets within LTP, the loss
previously disallowed on the sale of the LTP interest by the UTP cannot be used to offset the
taxpayer's gain. Notice 2002-50 also provides that a transaction will be considered
"substantially similar" to the transaction described therein even if the last step of the transaction
has not been completed, i.e., the partnership interest has not yet been sold.

The Transactions more likely than not would not be considered substantially similar to
the transactions in Notice 2002-50. As stated above, the key features of a Notice 2002-50
transaction are that it uses "a straddle, a tiered partnership structure, a transitory partner, and the

---

[13]    Section 707 disallows losses arising from sales or exchanges of property between a partnership and a person or
other partnership that owns more than 50% of the interests in the partnership.

[14]    Generally, Section 267(d) allows the recapture of deductions previously disallowed due to the relationship
between the parties to the transaction.

006271

065028

PRODUCED BY EGAN TO UNITED STATES ON 10/22/07                    14CARRUTH065028

September 4, 2002
Page 9

absence of a 754 election to allow [the] Taxpayer to claim a permanent non-economic loss."
Thus, the elements of a Notice 2002-50 transaction are (i) a straddle, (ii) a tiered partnership
structure, (iii) a transitory partner, (iv) the absence of a Section 754 election and (v) a permanent
non-economic loss.

Reviewing these factors there are some superficial similarities between the Transactions
and the Notice 2002-50 transaction. First, the World Options in the Transaction may constitute a
"straddle" for Federal income tax purposes as may some of the investments made by
International. Second, there is no Section 754 election made in the Transactions.

However, the Notice 2002-50 transaction is distinguishable in certain crucial respects.
First and foremost, the Transactions did not utilize a tiered partnership structure, a factor which
was fundamental in generating the permanent non-economic loss described in the Notice. In the
Notice 2002-50 transaction, when the gain from the options is recognized it is allocated to UTP
and thus increases UTP's basis in the LTP (and in turn it increases the corporation's basis in
UTP). Upon the sale of the interest in LTP to taxpayer, the offsetting loss is disallowed under
Section 707. However, that loss remains available to offset the taxpayer's gain when he sells his
LTP interest, or if he causes LTP to distribute or sell its assets. Thus, the tiered partnership
structure is used to create a permanent non-economic loss.

In contrast, in the Transactions there is only one partnership,[15] International. There is no
increase in basis arising from gain in a lower-tier partnership, and no corresponding deferred loss
on the sale of the lower-tier partnership that will be available to offset taxpayer's future gain.

In addition, unlike the Notice 2002-50 transaction, there are no "transitory partners" in
the Transactions. The four members of International do change their percentage ownership in
the common and preferred interests of International during the Transactions but every member
retains a more than nominal interest in International. Therefore, in the Transactions it is unlikely
any of the parties would be characterized as transitory partners.

Notice 2002-50 states that a transaction will be considered to be the same as, or
substantially similar to the Notice 2002-50 transaction even if the taxpayer has not engaged in
the final step of the transaction, the sale of the partnership interest. Therefore, a transaction is
covered by Notice 2002-50 even if the deferred loss created in Step 6 of Notice 2002-50 is not
yet applied to offset gain. However, the creation of a deferred loss through the use of a tiered
partnership remains the fundamental premise of Notice 2002-50, and that aspect is lacking in the
Transactions.

Treasury Regulation Section 1.6011-4T(b)(1)(i) states that a transaction will be
considered substantially similar to a listed transaction where the taxpayer is expected to obtain
similar tax benefits and the transaction is factually similar or is based on a similar tax strategy.

---

[15]   At all relevant times, World is a limited liability company with a single member and thus is treated as an entity
disregarded from its member. Even if World is treated as a separate entity for these purposes, no lower tier is
acquired or disposed of, as occurs in Notice 2002-50. Additionally, no loss is disallowed in the Transactions.

006272

PRODUCED BY EGAN TO UNITED STATES ON 10/22/07

065029
14CARRUTH065029

September 4, 2002
Page 10

However, as discussed above the Transactions would likely not be considered factually similar to the Notice 2002-50 transaction as they are lacking a key feature, the use of a tiered partnership to create a deferred loss and thus achieve a permanent non-economic loss. For the same reason, the tax strategy used in the Transactions is likely not similar to the tax strategy used in Notice 2002-50. Accordingly, it is more likely than not that the Transactions would not be considered substantially similar to the Notice 2002-50 transaction.

## IV.   Penalties

Neither the Code nor the Regulations impose any specific penalty for failing to disclose under Treasury Regulation Section 1.6011-4T.

Section 6664(c)(1) states that the underpayment penalty does not apply if there was "reasonable cause" for the underpayment and the taxpayer "acted in good faith". The IRS asserted in the preamble to the February 28, 2000 regulations[16], citing Treasury Regulation Section 1.6664-4(b)(1), that a failure to disclose when required "could indicate" that the taxpayer had not acted in "good faith" depending on all facts and circumstances (including why the taxpayer had not disclosed) and if so the reasonable cause exception would not apply even if the taxpayer had relied on professional advice, such as an opinion of counsel, relating to the underlying transaction.[17] The IRS apparently reads the statute to impose separate requirements of good faith and reasonable cause. If the IRS's reading of the statute is correct, this opinion would likely supply any required "good faith". However, Treasury Regulation Section 1.6664-4(c)(1), which the IRS does not quote, uses the "good faith" requirement in conjunction with a legal opinion to require only that the reliance itself must be in good faith (e.g., that the opinion correctly sets out all facts known to the taxpayer).[18] This regulation suggests that there is no independent "good faith" requirement and that the reasonable cause defense would apply as long as the taxpayer's reliance on the tax opinion on the underlying transaction is in good faith.

Moreover, taxpayers that are not C corporations need not rely on the reasonable cause exception to the substantial understatement penalty. For these taxpayers under section 6662(d)(2)(C), the understatement is reduced by any portion attributable to the tax treatment of an item (i) for which there was substantial authority and (ii) which the taxpayer reasonably

---

[16]   See, T.D. 8877 (March 2, 2000).

[17]   The IRS did not assert that the failure to disclose meant the taxpayer had not filed a return at all and so would be liable for a failure-to-file penalty under section 6651(a)(1). "Summary on Corporate Tax Shelter Disclosure Regs Clarified", 2000 TNT 41-15 (Feb. 29, 2000); see also Lee Sheppard, News Analysis -- Corporate Tax Shelter Disclosure: But Will It Work?, 2000 TNT 44-2 (Mar. 3, 2000).

[18]   Regs. § 1.6664-4(b) states: "Reliance on . . . professional advice . . constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. (See paragraph (c) of this section for certain rules relating to the advice of others.)" Regs. § 1.6664-4(c) then begins: "All facts and circumstances must be taken into account in determining whether a taxpayer has reasonably *relied in good faith* on advice (including the opinion of a professional tax advisor) . . . . [emphasis added]"

006273

065030
PRODUCED BY EGAN TO UNITED STATES ON 10/22/07                    14CARRUTH065030

September 4, 2002
Page 11

believed was more likely than not proper.[19]  Treasury Regulation Section 1.6662-4(g)(4)(i)B) states that the taxpayer may meet the "reasonable belief" test if he "relies in good faith" on a more-likely-than-not tax opinion.  While the regulation also requires that the requirements of Treasury Regulations Section 1.6664-4(c)(1) be met, unlike section 6664(c), neither section 6662(d)(2)(C) nor this latter regulation even arguably impose a separate "good faith requirement".

        For the foregoing reasons, we believe that even if a court were to find that Investor was required to disclose the Transactions, it is more likely than not that Investor would not be subject to penalties under the Code, directly or indirectly, for his failure to disclose the Transactions.

**III.   Conclusions**

        Based on the foregoing analysis and discussion, it is more likely than not that the Transactions would not be considered substantially similar to the transaction described in Notice 2002-50 or Notice 2000-44, and therefore the Transactions more likely than not would not be considered a "listed transaction" for the purposes of the disclosure requirements under section 6011.  We also believe that even if a court were to find that Investor was required to disclose the Transactions, it is more likely than not that Investor would not be subject to penalties under the Code, directly or indirectly, for his failure to disclose the Transactions.

        The opinions expressed herein are furnished by us solely for your benefit and thus may not be relied upon by or delivered to any other person without our express, prior written approval.  This opinion is furnished to you solely for your use in determining the federal income tax consequences of the transactions described above and is not to be used, circulated, quoted, or otherwise referred to for any other purpose without our express written permission.  Our permission is not required in connection with any examination conducted or required by a

---

[19]   This reasoning does not apply to the substantial valuation misstatement penalty under section 6662(b)(3); since the exception in section 6662(d) is limited to the understatement penalty, the taxpayer must rely on the reasonable cause exception.  However, notwithstanding the IRS's contention in several recent field service advice memoranda, FSA 200134002 (Mar. 23, 2001); FSA 200150001 (Aug. 2, 2001); FSA 200224011 (Mar. 5, 2002), the Transactions should not be subject to this penalty because, unlike the situation at which section 6662(e) was aimed, any misstatement of basis would result from a legal, not factual, dispute.  *See* Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981 at 332.  These FSAs cite *Gilman v. Comm'r*, 933 F.2d 143 (2d Cir. 1991), *aff'g* T.C. Memo. 1989-684, *cert. denied*, 502 U.S. 1031 (1992), for the proposition that the overvaluation penalty could apply even where tax benefits were disallowed entirely because a transaction lacked economic substance.  Although the court's opinion does not specifically address this point, the facts indicated that the lack of economic substance bore directly on the fact that the property was overvalued when it was acquired, *i.e*, the purchase price was so high that in the court's view it was impossible for the taxpayer to make a profit from the transaction without regard to tax benefits.  Thus, *Gilman* ought to be read, consistent with the legislative history noted above, to permit the imposition of the penalty in those cases in which an overvaluation of property as a matter of fact, as opposed to as a matter of law, was the cause of, and was integral to, the lack of economic substance.  Other appellate courts have also upheld the imposition of the penalty in such a case.  *See, e.g., Massengill v. Comm'r*, 876 F.2d 616 (8th Cir. 1989); *Merino v. Comm'r*, 196 F.3d 147 (3d Cir. 1999).

006274

065031

PRODUCED BY EGAN TO UNITED STATES ON 10/22/07

14CARRUTH065031

September 4, 2002
Page 12

governmental or regulatory body, including disclosure to your outside accountants or lawyers in order to allow them to assist with such an examination on your behalf.

In addition, our opinion is based on the law and other authorities in effect on the date hereof, which are subject to change, possibly with retroactive effect. Any such changes could affect the opinions expressed herein. We assume no obligation to update our opinion in light of any subsequent changes in law. All opinions expressed herein relate solely to the federal income taxes discussed. No opinions are expressed or implied as to any other federal income tax issues or any foreign, state or local tax issues.

Very truly yours,

Proskauer Rose LLP

006275

065032

PRODUCED BY EGAN TO UNITED STATES ON 10/22/07                    14CARRUTH065032

# Govt. Exhibit 43-

# Document Filed Under Seal

3450259.1

# Govt. Exhibit 44-

# Document Filed Under Seal

11/13/01

**William F. Thies, Sr.**
**Outline of Proposed Transaction**

1.  William F. Thies, Sr. (Fed. ID # 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) will form a single member limited liability company. Proposed name is WFTSR Trading LLC ("WFTSR"). WFTSR will be capitalized with $366,000.

2.  WFTSR will enter into an S&P 500 Call Spread (purchase of a call and the sale of a call) as follows:

| | |
|---|---|
| Long Call Premium | $ 24,400,000 |
| Short Call Premium | (23,034,000) |
| Net Investment | $ 366,000 (1.5%) |

| | 20% Probability |
|---|---|
| Gross Potential Payoff | $ 1,243,567 |
| Net Investment | (366,000) |
| Net Potential Return | $ 877,567 |
| | |
| Current Spot | 1118.33 |
| | |
| Strike Price | 1202.07 & above |
| | |
| Option Term | 60 days |
| | |
| Movement Necessary | 7.49 % |
| | |
| # of Times in Last 2 Years Movement Necessary Occurred | 149 times |
| | |
| Bid/Ask Spread | $118,139 |

3.  $366,000 should be wired as follows:

Harris Trust & Savings Bank
Chicago, IL

| | |
|---|---|
| ABA #: | 071 000 028 |
| Account: | RefCoCapital LLC |
| Account #: | 390 4406 |
| Ref: | RefCo Capital Markets Account 13-006 |
| Further Ref: | WFTSR Trading LLC |
| Account #: | To be supplied |

GOVERNMENT
EXHIBIT

45

1ALPHA-DISK03-006100

PRODUCED BY ALPHA TO UNITED STATES ON 7/13/06

4.    Approximately 7 days later, William F. Thies, Sr. will contribute WFTSR to Thies Investments LLC (Proposed Fund Name) in conjunction with similar contributions by William F. Thies, Jr., James H. Thies and Thomas J. Thies.

5.    Thies Investments LLC, a limited liability company taxable as a partnership, is formed and capitalized as follows:

(a)    Willliam F. Thies, Sr. will contribute his member interest in WFTSR Trading LLC (assumed value of $240,000) and cash of $441,645.

(b)    William F. Thies, Jr. will contribute his member interest in WFTJR Trading LLC (assumed value of $40,000) and cash of $76,018.

(c)    James H. Thies will contribute his member interest in JHT Trading LLC (assumed value of $40,000) and cash of $74,209.

(d)    Thomas J. Thies will contribute his member interest in TJT Trading LLC (assumed value of $30,000) and cash of $59,727.

(e)    Alpha Consultants LLC will contribute $14,400 in cash.

(f)    Diversified will contribute $14,400 in cash.

(e)    MH, an Individual Investor will contribute $136,800 in cash.

The following is a summary of the capital structure after the initial contribution:

| | Common Cash Contribution | Preferred Cash & Property * Contribution | Total Cash & Property | Capital Share | Profit/Loss Share |
|---|---|---|---|---|---|
| Willliam F. Thies, Sr | $4,880 | $676,765 | $681,645 | 58.36% | 3.39% |
| Willliam F. Thies, Jr. | 840 | 115,178 | 116,018 | 9.93 | 0.58 |
| James H. Thies | 820 | 113,389 | 114,209 | 9.85 | 0.57 |
| Thomas J. Thies | 660 | 89,067 | 89,727 | 7.68 | 0.46 |
| Alpha | | 14,400 | 14,400 | 1.23 | |
| Diversified | | 14,400 | 14,400 | 1.23 | |
| MH | 136,800 | | 136,800 | 11.71 | 95% |
| TOTAL | $144,000 | $1,023,199 | $1,168,019 | 100.00% | 100% |

*    Values of SMLLC interests are estimated. To the extent values differ the preferred interests will be adjusted accordingly.

1ALPHA-DISK03-006101

PRODUCED BY ALPHA TO UNITED STATES ON 7/13/06

6.    Thies Investments LLC will enter into a series of trades which can be summarized as follows:

| Trade Type | S&P 500 Range |
|---|---|
| Probability of Profit | 20% |
| Gross Potential Payoff | $2,446,329 |
| Net Investment | 720,000 |
| Net Potential Return Before Fees | $1,726,329 |
| Current Spot | 1118.33 |
| Strike Price for Profitability | 1150.00to 1220.09 |
| Option Term | 60 days |

7.    After approximately 30 days, MH will sell a portion of his common interests as follows:

| Purchaser | Percentage Interest | Purchase Price * |
|---|---|---|
| William F. Thies, Sr. | 61% | 46,355 |

*    Will be at FMV with a minimum, which is stated above.

8.    <u>Summary of Out of Pocket Expenditures</u>

|  | **Total** | **%** |
|---|---|---|
| SMLLC Capital Contribution | 366,000 | 1.5% |
| Cash Contributions to Thies Investments LLC | 441,645 | 2.0 |
| Buy Out of MH | 46,355 | |
| Fees | $1,220,000 | 5.0 |
|  |  |  |
| Total Out of Pocket Costs | $2,074,000 | 8.5 % |

9.    <u>William F. Thies, Sr. – Pre-Tax Profit Potential</u>

Gross Payoff Options        $4,282,348

<u>Potential Share for  William F. Thies, Sr.</u>

|  | **Total** |
|---|---|
| Preferred Interest | $  676,765 |
| Common Interest (1) | 2,097,712 |
|  |  |
| Total | $ 2,774,530 |

1ALPHA-DISK03-006102

PRODUCED BY ALPHA TO UNITED STATES ON 7/13/06

| | |
|---|---|
| Out of Pocket Costs | 2,074,000 |
| | |
| Net Potential Return | $700,530 |

_____

(1) Gross return less preferred interests of $1,023,199 times his respective common interest (64.38%).

1ALPHA-DISK03-006103

PRODUCED BY ALPHA TO UNITED STATES ON 7/13/06

# Govt. Exhibit 46-

# Document Filed
# Under Seal

3450261.1

From:   Mox Tan <moxtan@heliosfinancial.com>
Date:   3/14/2002 3:00:45 PM
Subj:   Customer List and Non-Registration Opinions

Orrin,

Jimmy and I discussed that Helios and Diversified should have opinions (separate) that we do not need to maintain customer lists or register with respect to the CFC transactions.  I guess the opinion should cover the Alpine (corporation acquiring Parent/Sub) and the Perles/Solomon (individual owns S-corp acquiring Irish company) iterations.  Would the opinion also need to cover any variations in the deals done at the end of 2000 (Tucker, Hechler etc.) I guess the opinion would come from Pryor Cashman.

Thanks,

Mox


Mox Tan
moxtan@heliosfinancial.com
225 West Washington Street, 22nd Floor
Chicago, IL 60606
Phone: (312) 419-6150
Fax: (312) 419-6153
Mobile: (312) 399-3620

GOVERNMENT
EXHIBIT

47

DGI 024664

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06    1DGI-06-36-061668

From:   Mox Tan <moxtan@heliosfinancial.com>
Date:   8/12/2002 1:46:56 PM
Subj:   Nassau

Jimmy,

Izzy got me on a phone call at 1:30 pm today to "answer a couple of simple and general questions about how midcos work, and disclosure issues" with "a couple of guys at Goldman Sachs". No big deal. He said it was for a midco deal you closed on Friday, but that you were not available at 1:30 pm. He said the Goldman guys were helping the client arrange financing.

Instead of the couple of guys, there were nine people from four different firms, wanting to know our thoughts on whether the transaction was a "listed transaction". I sidestepped the ambush and immediately said that you were the man to discuss these issues in more detail, since I was not involved in the Nassau transaction. Izzy indicated you were available tomorrow at 1 pm and 4 pm.

They started asking Izzy questions about how Grant Thornton views disclosure issues in these cases. Rather than let Izzy flounder around, I stepped up and said that although I did not participate on the Nassau deal, that based on my experience on how we structure transactions, that we distinguish ourselves from Notice 2001-16 in that we do not use an intermediary with beneficial tax attributes (i.e. tax-exempt or with losses usable by a consolidated group) and that we do not liquidate the Target in a 332 liquidation. Since neither of these are present in our strategies, we are not listed or substantially similar to listed. Izzy reiterated that that was the way Grant Thornton viewed these transactions. I also noted that the transaction would not meet the 2-of-5 test.

They seemed satisfied for the moment with that response. They had the following other general questions:

1.      How long has Diversified been in business - I indicated since the early 90's.
2.      What is Diversified's position on registering midcos as a tax shelter or maintaining customer lists? I indicated that we view midcos as ordinary M&A transactions in the ordinary course of business that did not need to be registered or maintain customer list, but that you would be in a better position to discuss this.
3.      How many midcos has DGI done? I indicated between a dozen and two dozen, and that I personally had been involved in a handful
4.      Are any DGI midcos under audit? I indicated that I was aware of a couple of midco acquisition vehicles from the early 90's that were in the very early stages of information gathering, but that they had not been identified as a participant in a midco strategy, i.e. it was an audit of the vehicle, not the strategy itself.

People on the call included (I'm uncertain of the spelling of the names):

From Gardere Wynne & Sewell
1.      Gary Clark
2.      Barry Driess
3.      Mike Donoghe

GOVERNMENT
EXHIBIT
48

DGI 026768

From Skadden Arps (No questions)
1.    Kirk Wallace
2.    Ronan Wicks

From Goldman Sachs Tax Department (asked most of the questions) - Mary Harmon

From Nassau: Peter Toms

From RTV Ventures - Ted Bartley


They asked Izzy if Grant Thornton had an internal memo on Grant's views on whether midcos are listed.  Izzy indicated he had one that he was going to fax to John Caverlee at Gardere under conditions of confidentiality and limited distribution.  They may want to do the 1 pm call tomorrow.  I'll stay out of it.



---

       Clean   Clean   DocumentEmail           MicrosoftInternetExplorer4    st1\:*{behavior:url(#defa
ult#ieooui) }     /* Style Definitions */  table.MsoNormalTable {mso-style-name:"Table Normal"; mso-tstyle-rowband-siz
e:0; mso-tstyle-colband-size:0; mso-style-noshow:yes; mso-style-parent:""; mso-padding-alt:0in 5.4pt 0in 5.4pt; mso-par
a-margin:0in; mso-para-margin-bottom:.0001pt; mso-pagination:widow-orphan; font-size:10.0pt; font-family:"Times New
Roman";}     Jimmy,    Izzy got me on a phone call at 1:30 pm today to ▢answer a couple of simple and general quest
ions about how midcos work, and disclosure issues▢ with ▢a couple of guys at Goldman Sachs▢.  No big deal. He said
it was for a midco deal you closed on Friday, but that you were not available at 1:30 pm.  He said the Goldman guys wer
e helping the client arrange financing.     Instead of the couple of guys, there were nine people from four different firms,
wanting to know our thoughts on whether the transaction was a ▢listed transaction▢.  I sidestepped the ambush and im
mediately said that you were the man to discuss these issues in more detail, since I was not involved in the Nassau tran
saction. Izzy indicated you were available tomorrow at 1 pm and 4 pm .     They started asking Izzy questions about ho
w Grant Thornton views disclosure issues in these cases.  Rather than let Izzy flounder around, I stepped up and said th
at although I did not participate on the Nassau deal, that based on my experience on how we structure transactions, that
we distinguish ourselves from Notice 2001-16 in that we do not use an intermediary with beneficial tax attributes (i.e. tax
-exempt or with losses usable by a consolidated group) and that we do not liquidate the Target in a 332 liquidation.  Sinc
e neither of these are present in our strategies, we are not listed or substantially similar to listed.  Izzy reiterated that that
was the way Grant Thornton viewed these transactions. I also noted that the transaction would not meet the 2-of-5 test.
    They seemed satisfied for the moment with that response. They had the following other general questions:     How
long has Diversified been in business ▢ I     indicated since the early 90▢s.  What is     Diversified▢s position on regi
stering midcos as a tax shelter or maintaining customer     lists?  I indicated that we    view midcos as ordinary M&A tr
ansactions in     the ordinary course of business that did not need to be registered or     maintain customer list, but that
you would be in a better position to    discuss this.  How    many midcos has DGI done?  I indicated between a dozen
and two     dozen, and that I personally had been involved in a handful  Are any DGI midcos     under audit?  I indicated
that    I was aware of a couple of midco acquisition     vehicles from the early 90▢s that were in the very early stages
of    information gathering, but that they had not been identified as a     participant in a midco strategy, i.e. it was an
audit of the vehicle, not the strategy itself.     People on the call included (I▢m uncertain of the spelling of the names):
   From Gardere Wynne & Sewell  Gary    Clark Barry Driess  Mike Donoghe  John Caverlee     From Skadden Arps (
No questions)  Kirk    Wallace Ronan    Wicks     From Goldman Sachs Tax Department (asked most of the questio
ns) - Mary Harmon     From Nassau : Peter Toms     From RTV Ventures ▢ Ted Bartley     They asked Izzy if Grant Th
ornton had an internal memo on Grant▢s views on whether midcos are listed.  Izzy indicated he had one that he was goi
ng to fax to John Caverlee at Gardere under conditions of confidentiality and limited distribution.  They may want to do t
he 1 pm call tomorrow.  I▢ll stay out of it.

DGI 026769

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06          1DGI-06-36-063448

Page 289

*J. Haber*

[2] **Q**: The numbers obviously were different
[3] for each investor but compared to the premiums
[4] of the options, what was the amount out of the
[5] pocket?
[6] **A**: Again, I don't recall.
[7] It would have varied again investor by
[8] investor. There may have been some investors
[9] that had similar percentages but I don't recall.
[10] **Q**: Did you ever request a ruling from the
[11] IRS on whether the OPS transaction is a
[12] corporate tax shelter?
[13] **A**: No.
[14] **Q**: We have another exhibit. We are coming
[15] to Exhibit Number 1.
[16] **A**: Do you want to refer back to Exhibit
[17] Number 1? Is that what you are saying?
[18] **Q**: We want to ask follow-up questions
[19] getting back to the financial derivative
[20] investment strategy, but the question now is:
[21] Did investors typically invest cash to acquire
[22] options by the single member LLC through the
[23] single member LLC?
[24] **A**: I am unaware of any investor that did
[25] it with something other than cash.

Page 290

*J. Haber*

[2] **Q**: Could we turn to Exhibit Number 1?
[3] **A**: Certainly.
[4] **Q**: It was a PowerPoint presentation on
[5] financial derivative investment strategies that
[6] I will refer to as the FDIS strategy.
[7] Are you familiar with this document?
[8] **A**: I familiarized myself with it
[9] yesterday.
[10] **Q**: How did DGI use this type of document?
[11] **A**: Well, it was used to present the
[12] strategy to potential referral sources. I am
[13] unaware, I was never firsthand involved in
[14] presenting it to any clients directly or
[15] indirectly, but I believe it was used to present
[16] the idea to referral sources.
[17] **Q**: So was it presented to investors?
[18] **A**: I am unaware of that. I mean, it
[19] could have been but it certainly wasn't used by
[20] me at any time.
[21] **Q**: With regard to this FDIS strategy
[22] transaction, what referral sources are you
[23] talking about?
[24] **A**: BDO Seidman, Grant Thornton, RSM
[25] McGladrey.

Page 291

*J. Haber*

[2] **Q**: Did it have any other relationship with
[3] other accounting firms?
[4] **A**: Relative to the strategy or in general?
[5] **Q**: Relative to this strategy.
[6] **A**: There may have been, but I don't recall
[7] right now.
[8] **Q**: You mentioned that this PowerPoint
[9] presentation was presented to the referral
[10] sources.
[11] Who did that on behalf of DGI?
[12] **A**: I did.
[13] **Q**: Who developed this transaction?
[14] **A**: DGI did.
[15] **Q**: I would like to ask some specific
[16] questions just going through the PowerPoint
[17] presentation, if you don't mind.
[18] Could you look at, I guess it is Page
[19] 6, where the sample option trades are presented.
[20] **A**: When you say "Page 6," you mean P-0006,
[21] the one that says Bates Stamp 6 on it?
[22] **Q**: It is 7 actually.
[23] **A**: In the lower left-hand corner is a
[24] number I am talking about.
[25] **Q**: It is 6.

Page 292

*J. Haber*

[2] So the PowerPoint presentation shows
[3] different sample option trades that the investor
[4] could choose from designing the investment,
[5] particularly options which he wants to choose?
[6] **A**: Is that question or statement?
[7] **Q**: That's a statement.
[8] **A**: Because if it was a question, I would
[9] disagree with that.
[10] **Q**: How would you disagree?
[11] **A**: This was merely done as an example to
[12] show, again, I believe it is shown to referrals,
[13] but we can say investor generically now, but it
[14] was merely done as an example to show how
[15] options worked relative to how their pay-off
[16] would differ based on their probability of
[17] profit.
[18] It was not meant to be a specific
[19] example of a particular trade that would be
[20] available to clients, because as an example
[21] this, the S & P market movement in the Standard
[22] & Poors Index, is an ever changing by the second
[23] market so there is no way this could be examples
[24] of an actual potential trade, but rather it is
[25] representative of at a certain point in time.

GOVERNMENT
EXHIBIT
**49**

8IRS0077

00006

1    importantly, paragraph 4h and agrees to be

2    bound by the terms of the protective order.

3        THE COURT REPORTER:  Yes, I did.

4        MR. REIFERSON:  And I'll also note

5    for the record that Mr. Wainwright has

6    signed the acknowledgment to the protective

7    order relating to RSM McGladrey.  There

8    were discussions off the record with

9    counsel.  And as of now, Mr. Wainwright

10    will not execute acknowledgments for other

11    protective orders in this case,

12    specifically those relating to Bryan Cave

13    and Proskauer Rose.

14        RONALD WAINWRIGHT,

15  called as a witness herein, having been first

16  duly sworn, was examined and testified as

17  follows:

18        EXAMINATION

19  BY MR. REIFERSON:

20    Q.   Mr. Wainwright, in the year 2000,

21  were you a member of RSM McGladrey's tax

22  solutions group?

23    A.   Yes.

24    Q.   What were the responsibilities of

25  the tax solutions group as a whole?

GOVERNMENT
EXHIBIT

50

00007

1     A.   It was a group of tax partners that

2   were identified by the firm in the context of a

3   joint venture that the firm had entered into

4   with the firm BDO Seidman.

5     Q.   What was that joint venture?

6     A.   The firm had entered into a joint

7   venture agreement, whereby BDO Seidman had

8   various tax strategies that they were

9   presenting into the marketplace, presenting to

10   McGladrey clients.  Their responsibilities, as

11   I understood it in the context of the joint

12   venture, was to share those strategies with us,

13   work with us, and in turn, we would work with

14   them in regards to RSM clients who chose to

15   potentially implement those tax strategies.

16     Q.   When did that joint venture begin?

17        MR. NEUMEIER:  Objection.

18     Foundation.

19   BY THE WITNESS:

20     A.   I became involved in the joint

21   venture in May of 2000 pursuant to a meeting

22   that was held in Chicago.  When the actual

23   joint venture began was certainly prior to

24   that, but I don't recall the date.

25

**Wainwright, Ronald   5-30-08**                    **Page 7**

00046

1 BY MR. REIFERSON:

2     Q.   How about after the termination of

3 the joint venture?

4          MR. NEUMEIER:  Same objections.

5 BY THE WITNESS:

6     A.   Yes.

7 BY MR. REIFERSON:

8     Q.   With whom was RSM McGladrey working

9 to implement tax strategies after the

10 termination of the joint venture?

11     A.   With a number of what we referred to

12 as intermediaries in the marketplace.

13     Q.   Who were those intermediaries?

14     A.   Twenty-First Securities, the

15 Diversified Group, Peachtree Financial

16 Solutions.  Those are the ones that I recall.

17     Q.   Do you recall a firm called Helios?

18     A.   Yes.

19     Q.   Was Helios an intermediary, as you

20 use that term?

21     A.   Yes.

22     Q.   Do you recall any other firms that

23 you considered intermediaries at that time?

24     A.   The ones I recall I cited earlier.

25     Q.   With whom did you work at



GOVERNMENT
EXHIBIT

51

00061

1    Q.    Specifically who did you contact

2  about Alpha's reputation?

3    A.    I don't recall.

4    Q.    You mentioned earlier that you had

5  worked with outside counsel in doing your due

6  diligence on the Diversified Group.  Which

7  outside counsel?

8    A.    Bryan Cave.

9    Q.    What did Bryan Cave tell you about

10  the Diversified Group when you were doing your

11  due diligence?

12        MR. NEUMEIER:  Okay.  We're now at

13    the point of inquiring into discussions

14    between the outside counsel for the firm

15    for which they were retained and paid and

16    going into attorney privilege

17    communications.

18        MR. REIFERSON:  Are you instructing

19    the witness not to answer?

20        MR. NEUMEIER:  I am.

21  BY MR. REIFERSON:

22    Q.    Mr. Wainwright, are you following

23  counsel's advice that you not answer that

24  question?

25    A.    Yes.



GOVERNMENT
EXHIBIT

52

**Wainwright, Ronald   5-30-08**                    **Page 61**

00051

1  the Diversified Group on?

2     A.    There were a number of transactions

3  that the Diversified Group as an intermediary

4  offered in the marketplace.

5     Q.    Which transactions?

6     A.    They had a number of transactions in

7  the marketplace.

8     Q.    Which do you recall?

9     A.    The transaction, the partnership

10  derivative strategy, the basis enhancement

11  strategy.  Those were -- those were the ones

12  that I recall.

13     Q.    How did you become aware that DGI

14  was offering these strategies in the

15  marketplace?

16     A.    We as a firm were introduced to the

17  Diversified Group by an individual at

18  Twenty-First Securities, and that's how we were

19  introduced to the Diversified Group.

20     Q.    How did you become aware that they

21  were offering these strategies in the

22  marketplace?

23        MR. NEUMEIER:  Yeah, I just want to

24     point out my objection here.

25     Mr. Wainwright is being deposed by the same



**Wainwright, Ronald   5-30-08**                    **Page 51**

00102

1  BY MR. REIFERSON:

2      Q.   If you look at the next paragraph

3  which begins we, the solutions group?

4      A.   Yes.

5      Q.   You state in there that from a

6  technical standpoint, a certain fee destroys

7  the taxpayer's business purpose in entering

8  into the transaction.  What do you mean by

9  that?

10      A.   In the context of these type of

11  transactions, we, in the context of the

12  taxpayer making decisions to move forward with

13  the transaction, we're very focused on the fact

14  that after all the fees were paid and income

15  was derived based upon the investments, that

16  there was a pre-tax profit motive that the fees

17  were not so excessive, that without the tax

18  benefit, the taxpayer would not have a return

19  on their investment.

20          As I've highlighted here and that I

21  wrote this e-mail, the joint venture partner

22  continued to push the fees at a level that in

23  our assessment destroyed, as I said, the

24  taxpayer's pre-tax profit motive and that the

25  transaction was not, in theory, economically

GOVERNMENT
EXHIBIT
54

**Wainwright, Ronald   5-30-08**                    **Page 102**

00213

1  BY MR. REIFERSON:

2      Q.    Were the Grossingers RSM McGladrey

3  clients?

4      A.    Grossinger.

5      Q.    Grossinger.

6      A.    Yes, the Grossingers were RSM

7  McGladrey clients.

8      Q.    Did the Grossingers enter into a

9  basis enhancement strategy?

10     A.    Based on my recollection, yes.

11     Q.    Did they enter into a partnership

12  derivative strategy?

13     A.    I don't recall.  I was not involved.

14  I was not involved in those transactions.

15         MR. REIFERSON:  Turn the witness

16     over to the plaintiff.

17         MS. ABROMS:  All right.  Thank you.

18  BY MS. ABROMS:

19     Q.    Mr. Wainwright, I'll try and be as

20  brief as possible.

21     A.    Thank you.

22     Q.    Because I know you're trying to

23  catch a flight and I know it's been a long day

24  for all of us.

25         I just want to ask you a couple of

**GOVERNMENT EXHIBIT**

**55**

**Wainwright, Ronald   5-30-08**                    **Page 213**

00113

1    Q.    It goes on to say as an FYI,

2  Diversified concluded transactions last year

3  with Grant Thornton and E&Y partners.

4        Do you see that?

5    A.    Yes.

6    Q.    What transactions were you referring

7  to there?

8    A.    The partnership derivative strategy.

9    Q.    How did you come to the conclusion

10  that in both instances, the structure was

11  similar?

12      A.    It was based on representations that

13  were made to myself.

14    Q.    By who?

15    A.    Diversified.

16    Q.    Who specifically in Diversified

17  represented that to you?

18    A.    If I recall correctly, Jimmie Haber.

19    Q.    Is that also how you know that 20

20  partners participated?

21    A.    Yes.

22    Q.    Which partners are you referring to

23  there, the 20 partners?

24        THE WITNESS:  Can you read back the

25    question?

GOVERNMENT
EXHIBIT

56

**Wainwright, Ronald   5-30-08**                    **Page 113**

00211

1     Q.   About two-thirds of the way down the

2   page, your e-mail that begins to the technical

3   standing group, do you see that?

4     A.   Yes.

5     Q.   What is the difference between a

6   memorandum and opinion in that context?

7     A.   In the context of my comments within

8   my -- with respect to the e-mail, a memorandum

9   walks through technical matters and may draw a

10   conclusion but no opinion in regards to the

11   standard opinions given.  No opinion is given

12   with respect to the technical document.

13     Q.   Is there any other difference?

14     A.   An opinion in my assessment has more

15   technical analysis than a memorandum.

16     Q.   Why was it necessary to discuss the

17   thought process toward disclosure toward 2002

18   transactions in light of this memorandum?

19     A.   Post the June 14, 2002 disclosure

20   regulations, we, I, along with others,

21   constantly were looking towards subsequent

22   listed transactions and what impact those would

23   have in regards to our policy, in regards to,

24   you know, various strategies or transactions

25   clients were entering into.

GOVERNMENT
EXHIBIT

57

**Wainwright, Ronald   5-30-08**                    **Page 211**

JOHN P. BARRIE

Page 92

1    mean by "problem."  We made a decision in

2    2002 not to give tax opinions.  We made a

3    decision that not -- that if we were

4    involved, that we would require full

5    disclosure.

6  BY MR. LINDQUIST:

7    Q.  And when you used the phrase, "Longstanding

8  clients of BC," would that pick up anyone who was a

9  client of RSM McGladrey or would they have had to

10  have been a longstanding client directly of --

11    A.  Directly of Bryan Cave.

12    Q.  This e-mail by Mr. Wainwright goes on to

13  state that he has several thoughts on law firms.

14    Did you suggest any law firms to

15  Mr. Wainwright?

16    A.  I don't believe so.

17    Q.  It goes on to -- Mr. Wainwright goes on to

18  state, "On Mr. Garvy -- you were copied on my e-mail

19  to Fred Cohen of this week -- to date, he's not --

20  he has not returned my phone calls, calls or the

21  e-mail.  As an FYI, I specifically copied Bob Garvy

22  so he can see we have been trying to resolve with

23  Fred and to date -- and to date he has been

24  nonresponsive."

25    Were you involved in any communications with

GOVERNMENT
EXHIBIT
58

02888859-a309-4498-aade-c2735e65697a

00178

1  partnership derivative strategy outside of an

2  opinion letter from Bryan Cave?

3      A.   And just to clarify, when you say my

4  professional capacity, you mean as an employee

5  of RSM McGladrey, Inc. and a partner?

6      Q.   That is what I mean.

7      A.   Yes, Bryan Cave was our outside

8  legal counsel for the firm and they gave us tax

9  legal counsel in regards to the partnership

10  derivative strategy.

11      Q.   For the partnership derivative

12  strategy, how did you distinguish between

13  whether you were getting legal advice from

14  Bryan Cave in your personal capacity or in your

15  capacity as an employee of RSM McGladrey?

16      A.   I believe I answered that question

17  earlier, in that the only legal advice that I

18  received from Bryan Cave in regards to my

19  individual partnership derivative strategy was

20  in the context of the opinion that they

21  rendered to me.

22      Q.   Was any of the legal advice that you

23  received from Bryan Cave in your capacity as an

24  employee of RSM McGladrey different in any way

25  than that you received in your personal



GOVERNMENT
EXHIBIT

59

**Wainwright, Ronald   5-30-08**                          **Page 178**

# Govt. Exhibit 60-

# Document Filed
# Under Seal

3450262.1