**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Case Nos.: 05-40151-FDS <br> 06-40130-FDS |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S SECOND MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM RSM McGLADREY**

Defendant's recent motion practice, driven by aggressiveness, misrepresents facts before the Court. In addition, this motion practice too often represents as established facts those that remain in dispute. Plaintiff has no position on the privilege issues raised by Defendant's Motion.[1] Plaintiff files this response pursuant to his obligation to protect the record and alert the Court to factual misrepresentations in Defendant's Motion. Specifically, Defendant has misrepresented facts about Plaintiff's relationship with RSM, Plaintiff's relationship with Bryan Cave, the alleged "coordinated group effort" between and among the various professional firms identified by Defendant as "promoters," and the transactions at issue in this case and the *Fidelity High Tech* case.

---

[1] "Defendant's Motion" and "Def.'s Mot." refer to Mem. of Law in Supp. of Def.'s Second Mot. to Compel Produc. of Docs. from RSM McGladrey.

I.   **Plaintiff's Relationship with RSM**

Defendant's Motion is simply inaccurate in suggesting that "RSM's direct involvement with the Egans appears to have begun when the Egans fired KPMG for refusing to sign the Egans' personal tax returns without the requisite tax-shelter-disclosure statements." (Def.'s Mot. at 2.) A significant portion of the discovery process has focused on Plaintiff's relationship with RSM. Defendant has submitted interrogatories inquiring as to why Plaintiff engaged RSM and inquired about that engagement in depositions. As explained in response to Defendant's Second Set of Interrogatories, Plaintiff asked RSM to review his returns after KPMG inexplicably and abruptly took a position that was inconsistent with its prior position and the legal opinion letters received by Plaintiff:

> In 2001, Plaintiff engaged the accounting firm of KPMG to provide a variety of services, including tax and investment planning in connection with FICA A Fund. Timothy Speiss, a partner at KPMG, was involved in this engagement. As part of this engagement, KPMG had promised and agreed to prepare, review, and sign FICA A Fund's 2001 and 2002 tax returns and to review and sign Richard and Maureen Egan's 2001 individual federal and state tax returns. The law firm of Sidley Austin Brown & Wood LLP provided Plaintiff with an opinion letter dated March 8, 2002 regarding the FICA A Fund transaction. Sidley Austin Brown & Wood LLP distinguished FICA A Fund from Notice 2000-44, thus, disclosure under Temporary Treasury Regulation section 1.6011-4T was not required. KPMG agreed. Mr. Speiss signed FICA A Fund's 2001 partnership tax return on April 12, 2002 with no disclosure statement. Mr. Speiss also reiterated that KPMG was not required to register the FICA A Fund investment under Internal Revenue Code section 6111(c) in a letter sent to Plaintiff's representatives in March 2002.
>
> On June 14, 2002, the IRS issued new disclosure regulations. Beginning in June, Mr. Speiss and Plaintiff's advisors discussed the affect of the new regulations on the filing of Mr. Egan's 2001 individual return. On June 26, 2002, Mr. Speiss advised that he and "certain law firms" believed that no disclosure of FICA A Fund was required and that FICA A Fund was distinguishable from listed transactions. In July 2002, Plaintiff's representatives decided to engage the law firm of Proskauer Rose to opine on whether the new regulations required disclosure of FICA A Fund. Proskauer Rose opined that it was more likely than not that FICA A Fund is not substantially similar to Notice 2000-44, and thus no disclosure was required.

Although Plaintiff's representatives had been advised that KPMG did not believe disclosure was required, KPMG changed position on the disclosure issue. KPMG was receiving media attention because the Department of Justice had filed a petition in the federal district court for the District of Columbia to enforce nine IRS summonses on July 9, 2002. These summonses were issued to KPMG in January, March, and May 2002. Plaintiff was aware of these summonses and of the enforcement action. By August 20, 2002, KPMG, as an institution, still had not reached a conclusion regarding whether the firm would require disclosure. There was internal disagreement within KPMG, at levels above that of Mr. Speiss, regarding whether Notice 2000-44 was applicable to FICA A Fund, even though Proskauer Rose opined that it was not. In an outline emailed to Plaintiff's advisors on August 23, 2002, Mr. Speiss recommended that the "appropriateness of continuing to retain KPMG LLP to sign the 2001 individual income tax return considering the attention the firm has received regarding controversies with the IRS as described in the media" should be assessed.

On August 23, 2002, Mr. Speiss met with Plaintiff's representatives for the purpose of signing Plaintiff's return. At that time, Mr. Speiss informed Plaintiff's representatives that he had been instructed by others in KPMG not to sign and file the return without a disclosure statement attached. This was contrary to the advice Mr. Speiss had been giving Plaintiff's representatives for the two months since the regulations had been issued. Mr. Speiss further informed Plaintiff's representatives that he believed it would be appropriate for them to file the return without a disclosure statement. Robert Prifti, who worked with Mr. Speiss, stated that Mr. Speiss "thought that leadership was incorrect, but he followed leadership's direction." (Prifti Deposition Tr. 145:5-146:7, Feb. 27, 2007.)

Because KPMG had, on numerous occasions, stated that disclosure was not required, and because Proskauer Rose was providing a written opinion explaining why the FICA A Fund transaction was not required to be disclosed, which had been reviewed by KPMG, on August 26, 2002, Plaintiff's representative requested that Mr. Speiss provide a detailed explanation in writing regarding why he could not sign the return without a disclosure statement. Although Mr. Speiss said that he would fax Plaintiff's representative a document that day, he did not do so. On August 28, 2002, Mr. Speiss and Plaintiff's representatives had a teleconference to discuss why KPMG required a disclosure statement. Mr. Speiss explained KPMG's refusal to sign the return without a disclosure statement by reference to Circular 230. Plaintiff's representatives were confused by KPMG's reliance on Circular 230 and did not believe that Circular 230 justified KPMG's refusal to permit Mr. Speiss to sign Plaintiff's return without a disclosure statement. Mr. Speiss also stated that he did not agree with KPMG's revised position that disclosure was required, but was not able to provide an explanation as to why KPMG had changed its position.

Because KPMG failed to provide Plaintiff with an explanation for its change in position, and because Mr. Speiss, the KPMG partner in charge of the

3

> engagement, stated that he disagreed with KPMG's position that disclosure was required, Plaintiff lost faith in KPMG's advice and had concerns about KPMG's motives in requiring Plaintiff to attach a disclosure statement to his return. In light of KPMG's inexplicable change in position and media scrutiny, Plaintiff sought the advice of another accounting firm. RSM was asked to review Plaintiff's return and provide its view as to whether a disclosure statement was required. After reviewing Plaintiff's return, RSM informed Plaintiff that it did not believe disclosure was required. RSM's position was consistent with the advice provided by Proskauer Rose and Sidley Austin Brown & Wood. Plaintiff then retained RSM to review and sign Plaintiff's return.

(Pl.'s Objections and Resp. to Def.'s Second Set of Interrogs. at 6- 8, June 4, 2007.) The deposition testimony in this case is consistent with this response. Moreover, both the documents and testimony produced in this case show that KPMG continued to provide services to the Egans and Carruth through the end of 2002.

Despite all the evidence Defendant has obtained to the contrary, Defendant continues to claim that "RSM's direct involvement with the Egans appears to have begun when the Egans fired KPMG for refusing to sign the Egans' personal tax returns without the requisite tax-shelter-disclosure statements." (Def.'s Mot at 2.) As explained above, discovery in this case shows that KPMG was not fired for refusing to sign the return, nor was KPMG fired at that time. While Defendant has apparently amassed a great deal of information concerning the relationship between RSM and Bryan Cave (a firm that had no involvement in either of the transactions at issue in this case), Defendant has failed to accurately present to this Court the facts underlying Plaintiff's relationship with RSM or to inform the Court that the facts are in dispute. Defendant's allegation as to the reasons why Plaintiff engaged RSM are not consistent with the discovery produced in this case.

**II.     Plaintiff's Relationship with Bryan Cave**

Defendant's Motion is also misleading in suggesting that Bryan Cave advised Plaintiff, or advised RSM with respect to Plaintiff's transactions. Plaintiff did not have any relationship with

4

Bryan Cave, nor was Bryan Cave ever aware of the work RSM performed for Plaintiff. As John Barrie, a partner at Bryan Cave, made clear in his deposition:

> Q    In 2002, can you tell us if you represented a man named Richard Egan?
> A    No.
> Q    Have you ever represented Richard Egan?
> A    Not to my knowledge.
> Q    All right. Would you expect to know if you did represent Richard Egan?
> A    I would expect I would.
> Q    And in terms of your firm, Bryan Cave, can you tell us, to the extent you are aware, whether your law firm, Bryan Cave, has represented Richard Egan?
> A    Not to my knowledge.
> Q    Has your law firm had a relationship with Richard Egan?
> A    Not to my knowledge.
> Q    And I'll ask you, has your law firm or you had a relationship with the Egan family at large?
> A    Not to my knowledge.
> Q    In -- do you know who Stephanie Denby is?
> A    No.
> Q    Have you done any work with a firm by the name of Burke Warren that you're aware of?
> A    No.
>
>                                          ***
>
> Q    And were you ever apprised by RSM McGladrey that it had been specifically been engaged by Mr. Egan to sign his personal income tax return for the year 2001?
> A    No.

(John Barrie Dep. Tr. 25:9-26:10; 221:3-7, Jan. 8, 2008.)

Consistent with Mr. Barrie's testimony, none of the documents produced to date show that any advice Plaintiff was receiving was from Bryan Cave, or indicate that RSM was seeking advice from Bryan Cave with respect to Plaintiff's transactions.

Despite the testimony and evidence to the contrary, Defendant continues to claim that RSM communicated with "Bryan Cave regarding the FDIS and Stock Dribble transactions at issue in the *Fidelity International* and *Fidelity High Tech* cases," and makes assertions about "RSM's dealings with Bryan Cave, as they relate to these transactions." (Def.'s Mot. at 2, 11.)

Mr. Barrie's testimony confirms that RSM did not have any communications or dealings with Bryan Cave with respect to the Egans or the transactions at issue in this case. Defendant's suggestion to the contrary is inconsistent with the discovery produced in the *Fidelity International* and *Fidelity High Tech* cases and reflects a fact that remains in dispute.

### III.    "Coordinated Group Effort" of Various Professional Firms

Defendant has focused much of its and the Court's attention on what it believes to be a vast conspiracy among multiple professional firms, many of whom are strangers to Plaintiff and Plaintiff's transactions. Defendant's alleged "well coordinated group effort" among these firms is contrary both to the testimony of the representatives of these firms and contrary to Defendant's own pleadings. (Def.'s Mot. at 3.) In short, the alleged facts are in dispute. No such conspiracy has been established as a fact in this case and the Court should not accept Defendant's allegations as representing established facts.

At the time Plaintiff entered into the FICA A Fund and Fidelity High Tech transactions, Plaintiff was told that each of these transactions were customized and that they were not widely marketed. Robert Prifti of KPMG, who advised Plaintiff with respect to these transactions, confirms that he had no knowledge of other firms promoting the transactions or other taxpayers entering into the transactions, as stated in his deposition in response to Defendant's questioning:

> Q   Do you have any recollection of the taxpayer ever asking you or anyone at KPMG whether any other KPMG clients had purchased [a FICA A Fund]-type transaction?
> A   I'm not aware of any others.
> Q   You're not aware of any other [FICA A Fund]-type transactions?
> A   That I'm aware of.
> 
> ***
> 
> Q   You indicated that the [FICA A Fund] transaction was not a cookie cutter transaction, and my question is did anyone ever tell you that?
> A   Tim Speiss did.
> Q   He expressly used those words?

>   A   Not cookie cutter. He said the transaction is a highly customized transaction, and it's not one that is similar to the short option transaction that they use to market.

(Prifti Dep. Tr. 84:14-21; 104:13-21, Feb. 27, 2007.)

Similarly, Mr. Barrie, a prominent tax attorney with over 20 years of experience in the tax field, testified that Bryan Cave undertook independent research of the technical tax aspects of the transactions presented by DGI. In addition, Mr. Barrie testified that Bryan Cave did not communicate with the other law firms in a "group effort to market and implement tax-shelter products" (Def.'s Mot. at 23):

>   Q   And the -- now, you had mentioned earlier -- well, let me ask you, in doing your analysis as to the tax issues here, did your firm and you, in particular, invest time in reviewing the tax law issues?
>   A   I'm not sure I understand the question.
>   Q   Well, then let me give you the question again. In looking at these tax issues, did you personally invest time and effort in looking at these issues?
>   A   For compensation?
>   Q   Yes.
>   A   Yes.
>   Q   And did you and members of your team that we've talked about, including Ms. Smith, actually research the tax law in forming your views?
>   A   We did.
>                                   ***
>   Q   Did Mr. Tilevitz write your opinions that were issued by Bryan Cave?
>   A   No.
>   Q   You mentioned Mr. Haber. Did Mr. Haber in any way write your opinions?
>   A   No.
>                                   ***
>   Q   In formulating your views that ultimately went into your written opinions . . . , were you influenced in your thinking by lawyers from other law firms?
>   A   We were provided other opinions to look at.
>   Q   All right.
>   A   It formed a basis for the research that we did.
>   Q   And in forming your opinions, did you form your own independent views?
>   A   We did.
>   Q   And are those views expressed in your opinions that you gave . . . ?
>   A   They are.
>   Q   In forming your opinions on these tax issues -- and I'm focused on the tax law here – did you have any communications that you can recall with a lawyer by

>    the name of R. J. Ruble, who was at Brown, Wood or Sidley Austin Brown & Wood?
> A  Not to my recollection or knowledge.
> Q  Do you have any recollection of meeting Mr. Ruble?
> A  I don't believe I've ever met him.

(Barrie Dep. Tr. 34:3-19; 36:15-20; 37:3-22; 37:3-38:3, Jan. 8, 2008).

Finally, Defendant's elaborate conspiracy theories are undermined by its own pleadings. Defendant simultaneously claims that "Bryan Cave worked closely with DGI to opine on the tax attributes of the transactions . . . [and as a result] collected its share of the booty," while also acknowledging a "fundamental disagreement between [DGI] and Bryan Cave" as to the list maintenance requirements for the transactions. (Def.'s Mot. at 3, 14.) The apparent differences of opinion undermine Defendant's purported "coordinated group effort" to promote tax-shelter transactions. (Def.'s Mot. at 3.)

## IV.  Transactions at Issue

Finally, Defendant asks the Court to accept as fact its characterization of various transactions according to the ambiguous and undefined terms of "SOS," "FDIS," and "Stock Dribble." Throughout this litigation, Defendant has suggested multiple terms to describe the FICA A Fund and Fidelity High Tech transactions. In Defendant's Motion, it apparently settles on the monikers "FDIS" and "Stock Dribble," which Defendant has used in previous pleadings. Contrary to its previous filings, however, Defendant now claims that both FDIS and Stock Dribble "are variants of the Short-Option Strategy tax shelter product commonly referred to as SOS." (Def.'s Mot. at 1 n.2.) Whether either of the transactions at issue are "FDIS," "Stock Dribble," or "SOS" remains in dispute. In addition, the elements of an "FDIS," "Stock Dribble," or "SOS" transaction also remain in dispute since these terms were raised by Defendant, who has not been consistent in defining or applying them.

As noted above, Mr. Prifti has testified that the transactions were highly customized. Similarly, representatives of Plaintiff have testified that they were told that the transactions were customized and not mass-marketed. Other fact witnesses, including Ronald Buesinger (formerly of Alpha), Donald Dwight (formerly of RSM) and Robert Unger (of Brown Raysman) have testified that they are not familiar with the term "FDIS" or its application to the transactions in this case. Similarly, multiple fact witnesses have testified that they have never heard the term "Stock Dribble," including Janet Korins (of Proskauer Rose), Robert Fasulo (of Alpha), John Barrie, and Robert Prifti.

The confusion with respect to these terms stems from Defendant's failure to consistently define them. Defendant's current claim that FDIS and Stock Dribble are variants of SOS is inconsistent with its previous assertions that "Fidelity High Tech . . . did not involve an SOS or FDIS transaction. Rather, it involved a Stock Dribble transaction." (Def.'s Opp'n. to Pl.'s Mot. to Consolidate at 11, Apr. 23, 2007.) Defendant's experts have also encountered difficulty in applying Defendant's monikers to the "pattern evidence" creating groups of "FDIS" and "Stock Dribble" transactions that are inconsistent with the groups created by Defendant.

In sum, Defendant's assertions regarding "Stock Dribble," "FDIS," and "SOS" represent facts that the parties continue to dispute, are not agreed upon between Defendant and its experts, and are not even agreed upon by Defendant from one hearing to the next. These terms are ambiguous, vague, and foreign to almost all of the fact witnesses in this case. As such, any assertions as to the involvement of professional firms in "Stock Dribble," "FDIS," or "SOS" transactions should not be taken as fact, nor should the application of these terms to the transactions at issue in this case.

**Conclusion**

When this case goes to trial in less than two months, the Court, as the ultimate finder of fact, will have the opportunity to hear all the evidence presented and determine the facts and law with respect to this case and the *Fidelity High Tech* case. Prior to that time, the Court should not accept Defendant's one-sided assertions of facts as true, established, or agreed upon by the parties. Plaintiff takes no position on the privilege issues raised in Defendant's Motion, but does take the position the Court should have all relevant facts available for its consideration in determining Defendant's Motion.

Respectfully submitted this 31st day of July 2008.

        PLAINTIFF
        FIDELITY INTERNATIONAL CURRENCY ADVISOR
        A FUND, L.L.C., by the Tax Matters Partner


        /s/ Lena Amanti
        David J. Curtin, D.C. Bar #281220
        Ronald L. Buch, Jr., D.C. Bar #450903
        Lena Amanti, D.C. Bar #490791
        MCKEE NELSON LLP
        1919 M Street, N.W., Suite 200
        Washington, D.C. 20036
        Telephone: (202) 775-1880
        Facsimile: (202) 775-8586
        Email: dcurtin@mckeenelson.com
              rbuch@mckeenelson.com
              lamanti@mckeenelson.com

        John O. Mirick, BBO #349240
        MIRICK, O'CONNELL, DEMALLIE
        & LOUGEE, LLP
        100 Front Street
        Worcester, MA 01608
        Telephone: (508) 791-8500
        Facsimile: (508) 791-8502
        Email: jomirick@mirickoconnell.com

**Certificate of Service**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 31, 2008.

                /s/ Lena Amanti
                Lena Amanti, D.C. Bar #490791
                MCKEE NELSON LLP
                1919 M Street, N.W., Suite 200
                Washington, D.C. 20036
                Telephone: (202) 775-1880
                Facsimile: (202) 775-8586
                Email: lamanti@mckeenelson.com