UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Nos. 05-40151-FDS 06-40130-FDS |
| v. | ) ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| FIDELITY HIGH TECH ADVISOR A FUND, L.L.C., by the Tax Matters Partner | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Nos. 06-40243-FDS Civil Nos. 06-40244-FDS |
| v. | ) ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

**UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM BURKE WARREN
MACKAY & SERRITELLA, FIDELITY INTERNATIONAL CURRENCY ADVISOR A
FUND, FIDELITY HIGH TECH ADVISOR A FUND, CARRUTH MANAGEMENT,
CARRUTH ASSOCIATES, AND AFFILIATES**

The United States seeks production, in unredacted form, of all invoices to the plaintiff by

the law firm Burke, Warren, MacKay & Serritella for services rendered relating to the two tax-

shelter products – FDIS and Stock Dribble – at issue in this consolidated litigation.[1]  That

information is essential to the United States' defense, which seeks to rebut the plaintiffs' claims:

(1) that their partnerships had a reasonable possibility of non-tax profit from these transactions,

---

[1]The FDIS product is at issue in the *Fidelity International* cases and the Stock Dribble product is at issue in *Fidelity High Tech* cases.

taking into account all transaction costs, fees, and expenses, and (2) that, for purposes of I.R.C. (26 U.S.C.) § 165(c), the plaintiffs entered into these transactions with the primary motivation of realizing an economic profit.[2]  There is (or should be) no dispute that plaintiffs and/or their so-called wealth-management company, Carruth Management, paid fees to Burke Warren for an array of services rendered to the plaintiffs and Carruth with respect to these two tax strategies. Accordingly, the United States is clearly entitled to complete and unrestricted access to these invoices in order to determine the nature of the work performed and the amounts billed for such work.  Alternatively, the plaintiffs should be precluded from arguing that there was a reasonable possibility of profit from the Fidelity International and Fidelity High Tech transactions and also that they were primarily motivated by economic profit in entering into these transactions.

---

[2]The United States moves to compel production from Burke,Warren, Mackay & Serritella; Fidelity International Currency Advisor A Fund; Fidelity High Tech Advisor A Fund; Carruth Management; Carruth Associates; and affiliates in a single motion because the plaintiffs have produced documents from themselves, Burke Warren, and from each of the Carruth entities as if they were a single party, making separation for purposes of this motion impossible.  The Carruth entities and the plaintiffs share counsel, and their counsel has consistently treated subpoenas served upon the Carruth entities as requests for production under Federal Rule of Civil Procedure 34. Treatment of a subpoena under Rule 45 of the Federal Rules of Civil Procedure as a Rule 34 request for production is in direct contravention of the Federal Rules.  The treatment was also over the United States' objection.

Because the United States is moving to compel production from a party and from non-parties, the motion is made pursuant to both Rule 37(a) and Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure.  Of course, the plaintiffs are alleging that they have possession, custody, and/or control over all documents at issue, so they alone could be compelled to produce them all.

**STATEMENT**

A.    **Issue of Reasonable Possibility of Profit**

The issue of whether the plaintiffs' partnerships had, with respect to each transaction, a reasonable possibility of a non-tax profit, is one of the central issues in these cases. It is fundamental that the substance, not the form, of a transaction controls for tax purposes. *Gregory v. Helvering*, 293 U.S. 465 (1935). One incarnation of the basic substance-over-form principle is the sham-transaction doctrine. Courts have recognized two types of sham transactions: shams in fact and shams in substance. *ACM Partnership v. Commissioner*, 157 F.3d 231, 247 n.30 (3d Cir. 1998), *cert. denied*, 526 U.S. 1017 (1999). Shams in fact are transactions that are created on paper but in reality never occur. Shams in substance, or economic shams, are transactions that actually occur but lack non-tax economic substance. *Ibid.* If a transaction lacks either the factual or economic substance that its form represents, then purported losses claimed on the transaction are not deductible. *Kirchman v. Commissioner*, 862 F.2d 1486, 1490 (11th Cir. 1989).

Under the economic substance doctrine, transactions that are invented solely to create tax deductions and otherwise have no economic substance, even though formally complying with the letter of the Internal Revenue Code, will not be recognized. *Knetsch v. United States*, 364 U.S. 361 (1960); *Dewees v. Commissioner*, 870 F.2d 21, 32, 35 (1st Cir. 1989).[3] There is a two-prong test for determining economic substance. The first prong examines whether the transaction has a

_____

[3]*See also*, *Coltec Indus., Inc. v. United States,* 454 F.3d 1340, 1352-58 (Fed. Cir. 2006), cert. denied, 127 S. Ct. 1261, 167 L. Ed. 2d 76 (2007); *Black & Decker Corp. v. United States,* 436 F.3d 431, 441-42 (4th Cir. 2006)*; Yosha v. Commissioner*, 861 F.2d 494, 497 (7th Cir. 1988); *Dow Chemical Co. v. United States,* 435 F.3d 594, 599 (6th Cir. 2006), cert. denied, 127 S. Ct. 1251, 167 L. Ed. 2d 74.

reasonable possibility of a profit (an objective inquiry). *See Dewees* , 870 F.2d 32 (citing

*Killingsworth v. Commissioner*, 864 F.2d 1214, 1218 (5th Cir. 1989); *Compaq Computer Corp.*

*v. Commissioner*, 277 F.3d 778, 781-82 (5th Cir. 2001) (internal citation omitted;); *Black &*

*Decker Corp.,* 436 F.3d 441-42.  The second prong looks to whether there existed a tax-

independent business purpose for the transaction (a subjective inquiry).  *Id.*  The fundamental

question for a court is therefore not whether the mere possibility of profit exists, but whether a

*reasonable* possibility of profit exists.  Critically, and at the heart of this matter, in determining

profit potential, all expenses and costs associated with the transaction that produces the tax

benefits must be taken into account.[4]

### B.    Issue of Whether Plaintiffs Were Primarily Motivated for Profit.

A determination of whether the two tax-shelter transactions were entered into for profit

must also be made here for purposes of ascertaining whether the losses from these transactions

are deducible under I.R.C § 165 – which is the tax code's basic loss provision.  And to deduct a

loss under § 165(c), the plaintiffs must show that, in entering into the transaction, they and their

partnerships were primarily motivated by the desire to make a profit.  *Dewees*, 870 F.2d at 33.

As the First Circuit noted in *Dewees*, "[t]his 'profit motive' test originated in *Helvering v.*

*National Grocery Co.,* 304 U.S. 282, 289 n. 5, (1938), where the Supreme Court said that 'the

deductibility of losses under § 23(e)' (the predecessor of § 165(c)) 'may depend on whether the

taxpayer's motive in entering into the transaction was primarily profit.'" *Id.*  Since then, the

courts have consistently applied this test in construing § 165(c). *See, e.g., United States v.*

---

[4] *See Long-Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 175-84 (D. Conn. 2004) (fees relating to the transaction but disguised or cloaked as being paid for some other reason are properly charged as transaction costs) *aff'd* ,in unpublished opinion, 150 Fed. Appx. 40.

*Generes,* 405 U.S. 93, 105 (1972) (§ 165 requires dominant profit motive); *Dewees*, 870 F2d. 33

(and cases cited therein).(under § 165(c) taxpayer must show profit was primary motivation).

   Thus, an equally fundamental question for the Court in this litigation is whether the

plaintiffs were primarily motivated by profit in entering these so-called tax advantaged

transactions.  Once again, in determining profit motivation, fees paid to a law firm for services

rendered in assisting in the design and implementation of these tax shelter transactions are highly

relevant to the question as to whether the plaintiffs' primary motivation in entering the

transaction was to make an economic profit.

## ARGUMENT

### THIS COURT HAS ALREADY RULED THAT PLAINTIFFS CANNOT, AS THEY ARE TRYING TO DO HERE, USE ATTORNEY-CLIENT PRIVILEGE AND WORK-PRODUCT PRIVILEGE AS BOTH A SWORD AND SHIELD.

   The Burke Warren expenses are associated with the transactions, and must be taken into

account in determining whether, as the plaintiff claims, there was a reasonable possibility of

profit from the transactions and whether they were primarily motivated by profit in entering into

these transactions.  Accordingly, the invoices fall squarely within the category of documents the

Court already ordered produced.  The United States' first motion to compel production of

documents from the plaintiff and its hired wealth-management company (Carruth Management

and affiliates) and other affiliates, was based largely on the plaintiff's use of the attorney-client

privilege as both a sword and a shield.[5]  In an order dated May 9, 2008, Magistrate Judge

Hillman ordered production of some of the withheld documents on that basis.  The documents

the Court ordered produced included "any documents or materials from . . . counsel which go to

---

[5]The United States incorporates by reference its memorandum in support of its first
motion to compel (*Fidelity Int'l v. United States*, Docket Entry No. 175).

the Plaintiff's reliance on the subject matters addressed in the Sidley Austin and Proskauer Rose opinions and conclusions by such other counsel which cast doubt on such opinions."[6]  (Ord. at 9.) The Court then looked at the disputed documents to determine whether immediate production was warranted.  It decided with respect to the Burke Warren invoices that attorney-client privilege attached – apparently because it did not see any impermissible use of these invoices by the plaintiff with respect to its reliance on the Sidley Austin and Proskauer Rose legal opinions. (Ord. at 13.)  However, that ruling did not end the matter with respect to whether the privilege was waived by the plaintiffs' invoking it as both a sword and shield with respect to any other claims and defenses.

The Court made it clear that to the extent the plaintiff was raising other claims and defenses that can only be rebutted by discovery of attorney-client communications, the United States should bring the matter to its attention.  In that regard, the Order stated as follows:

> The attorney-client privilege will be deemed waived where the client raises an advice of counsel defense, or where the client "'affirmatively raises[s] a claim that can only be effectively disproven through discovery of attorney client-communications'". *Evergreen Trading, LLC v. United States*, 80 Fed.Cl. 122, 140 (Fed. Cl. 2007)(citation to quoted case omitted).  Plaintiff asserts in his memorandum that as an affirmative defense he has asserted that he relied on the non-privileged legal opinions of Sidley Austin and Proskauer Rose and that he has not otherwise asserted any claims or defenses that would bring the contested documents into the case. Accordingly, I am assuming for purposes of this opinion that none of the claims or defenses which Plaintiff may raise during future proceedings would directly or indirectly rely on legal advice contained in the contested documents (other than

---

[6]The plaintiff claims that it has produced all such documents.  That claim is not true. The invoices that are the subject of this motion go directly "to the Plaintiff's reliance on the subject matters addressed in the Sidley Austin and Proskauer Rose opinions," and to the "conclusions by such other counsel which cast doubt on such opinions."  It is not possible for the United States to, at least at this time, determine how many other documents the plaintiff should have produced under the Court's Order.  Accordingly, the United States requests that the plaintiff certify or state on the record that it has complied with the Court's Order as to all documents other than the subject invoices.

6

Plaintiff's reliance on the Proskauer Rose and Sidley Austin opinions). If at some point during the proceedings it becomes apparent that Plaintiff will attempt to rely on other claims/defenses that would impliedly waive the privilege with respect to the Designated Documents, then it would be appropriate for the Government to file a motion requesting that the Court reconsider whether any documents that it has ordered withheld based on the attorney-client/work product privilege should be disclosed, or that the Plaintiff not be allowed to assert such claim/defense.

(Ord. at p. 9, n. 4.)

The plaintiff put at issue the expenses and costs associated with these transactions by claiming that the transactions had a reasonable possibility of generating a non-tax profit. In its *Fidelity International* Complaint, for example, the plaintiff claimed that Michael Egan (plaintiff Richard Egan's son) worked with Helios and Alpha– two promoters of, and purported partners in, the Fidelity International transaction– to design a ". . . strategy that was economically substantial and provided a reasonable opportunity to make an economic profit." (Compl., Case No. 05-40151, at ¶ 29; Compl., Case No. 06-40130, at ¶ 27 .) The plaintiff made exactly the same claim in *Fidelity High Tech*. (Compl., Case Nos. 06-40243 and 06-40244, at ¶ 30.) Then, the plaintiff's expert-witness, Andrew Carron, made similar claims with respect to supposed economic-profit potential. Mr. Carron opines in *Fidelity International* that "It was plausible to anticipate that the [Fidelity International] [t]ransactions would be profitable," (Carron Report at p. 1), and that "it was reasonable to expect possibility of profit in the" transactions. (Carron Report at ¶¶ 58, 74.) Mr. Carron made exactly the same claims with respect to Fidelity High Tech. (Carron Report at p. 2; ¶ 45.)

The economic-substance case law, described above (at pp. 3-4), makes clear that all expenses and costs must be taken into account when determining whether there was a reasonable possibility of profit. It is axiomatic that profit equals revenues minus costs. As Professor

Rausser, one of the United States' experts, describes it, "economic profits represent the difference between the costs of a transaction and the revenue it generates." (Rausser *Fidelity High Tech* Report at p. 25.)[7]  The plaintiff's expert witness, Mr. Carron, described economic profit more colloquially, but substantially the same, as "that the amount that you get back is more than the amount you pay." (Carron *Fidelity Int'l* Dep. Tr. at 185:7-11.)[8]

While the law and the expert witnesses seem to agree on the definition of economic profit as taking into account the costs and expenses of the transactions, the plaintiff and its expert stand alone excluding the Burke Warren and other professional expenses from the analysis.  They appear to do so on the theory that the Burke Warren (and other) expenses are not, in their view, necessarily allocable to the transactions.  As Mr. Carron testified, he was "not asked to make . . . [the] assumption" that accounting fees, fees paid to the marketers of the transactions, and legal fees were associated with the transactions.  (Carron *Fidelity Int'l* Dep. Tr. at 34:6-23.)[9]  But, Mr. Carron testified that as a financial economist, he would take into account the "fees that would not have occurred but for the transaction."  (Id. at 35:3-7.)[10]  More significantly, the "legally material consideration" in determining whether fees and expenses should be taken into account in determining reasonable possibility of profit is whether the costs were incurred to "plan and accomplish the transaction." *Long-Term Capital Holdings*, 330 F. Supp. 2d 177, n. 73.  If they

---

[7] See also, e.g., Merriam-Webster's Online Dictionary at http://www.merriam-webster.com/dictionary/profit (last viewed July 30, 2008) (defining profit as "the excess of returns over expenditure in a transaction or series of transactions"); *Durasys, Inc. v. Leyba*, 992 F.2d 1465, 1469 (7th Cir. 1993) (calculating lost profits by subtracting avoided costs from lost revenue).

[8] Govt. Ex. 1.

[9] Govt. Ex. 2.

[10] Govt. Ex. 3.

8

can be so classified, they are transaction costs which must be taken into account in determining whether, objectively viewed, the transaction had a reasonable possibility of profit. *Id.* By refusing disclosure of these invoices, the plaintiffs are preventing any determination of whether these fees were incurred in planning and accomplishing the transaction or even meet Mr. Carron's own self-styled but-for test.

As an initial matter, the determination of whether the Burke Warren fees must be taken into account is the Court's to make, upon presentation of evidence at trial. The plaintiffs cannot conceal the nature and magnitude of these expenses to assist its legal position. The plaintiff's concealment prevents the calculation of the profit– or loss– that should have been expected from these transactions. As Dr. Kolbe, another of the United States' experts, described, "there are . . . transaction costs that cannot presently be quantified." (Kolbe *Fidelity High Tech* Report at p. 22.) Those costs include those "incurred for services from the firm of Burke, Warren, MacKay & Serritella." (Id. at 22-23.) The United States must be allowed to demonstrate to the Court the insufficiency of the plaintiff's carefully crafted calculations. Even Mr. Carron testified that he made his own calculations ignoring all fees beyond the broker/dealer (REFCO) fees, (Carron *Fidelity Int'l* Dep. Tr. at 185:12-21)[11], and inclusion of other expenses may affect his analysis. (*See* Id. at 185:22-186:7.) He described as "rather obvious" the premise that inclusion of other fees, including those of Burke Warren, would affect his opinion as to profitability. (Carron *Fidelity High Tech* Dep. Tr. at 53:5-11.)[12] He so testified because it is "rather obvious" that "any fees that are added to what is considered to be the transaction would reduce the actual and

---

[11]Govt. Ex. 1.

[12]Govt. Ex. 4.

expected return from the transaction." (Id. at 51:22-52:12.)[13]  On that point the United States

agrees.  And, under the law, those other expenses must be included in the analyses.

Mr. Carron did not even attempt to determine whether non-REFCO fees, such as

promoter fees and Burke Warren's fees, are allocable to these transactions.  (*See* Carron *Fidelity*

*Int'l* Dep. Tr. at 35:8-22.)[14]  The United States is entitled to make that determination.

## CONCLUSION

The plaintiffs put at issue the purported reasonableness of the possibility of profit they

could earn on these transactions.  But, the plaintiffs are impermissibly shielding from discovery

evidence that would demonstrate that there was no reasonable possibility of profit once all

expenses and costs are taken into account.  The inclusion of all fees and costs is prescribed by

law, and demanded by economic principles.  The plaintiffs, needing to at least try to demonstrate

a reasonable possibility of profit in order to prevail, have chosen to ignore certain costs,

including those of Burke Warren.  But, the United States must be able to look beyond what the

plaintiffs chooses to disclose.  Without a close examination of the fees paid by the plaintiff to

Burke Warren in relation to these transactions, a complete analysis is impossible.  This is the

classic dual sword-shield use of privilege the courts disallow and which this Court has

disallowed.

Because the plaintiff cannot use privilege as both a sword and a shield, these Burke

Warren invoices must be disclosed in unredacted form.[15]  Alternatively, if the plaintiff insists on

---

[13]Govt. Ex. 5.

[14]Govt. Ex. 3.

[15]The Burke Warren invoices logged by the plaintiff are listed by Bates numbers in
Appendix 1.  These are the invoices to which the plaintiff has raised, and logged, specific claims
of privilege.  To the extent there are other Burke Warren invoices relating to the Fidelity
International and Fidelity High Tech transactions, the United States also moves here for
production of those invoices.

maintaining confidentiality of the invoices, the plaintiff must be precluded from arguing that there existed, with respect to the Fidelity International and Fidelity High Tech transactions, a reasonable possibility of profit, and also that they were primarily motivated by economic profit in entering into these transactions.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

 /s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Tax Division, U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER L. VANN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044-0055
Telephone: (202) 307-6561
Facsimile:  (202) 514-5238
E-mail:  john.a.lindquist@usdoj.gov
            barry.e.reiferson@usdoj.gov
            heather.vann@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and copies will be sent to those indicated as non registered participants on July 31, 2008.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

11

00185

1

2   A.   It depends on what you mean by that.  I'm not

3  viewing it as expected value or net present value.  I'm

4  viewing it as saying there are states of the world with

5  a nontrivial probability that results in material

6  payoffs.  That's all I'm saying here.

7   Q.   What's your definition of profit for purposes

8  of this conclusion?

9   A.   That looked at purely as standalone

10  transactions that the amount that you get back is more

11  than the amount you pay.

12   Q.   And what are you consider -- are you taking

13  into account cost for purposes of this profit analysis?

14   A.   I'm taking into account the factors that are

15  in Exhibit 14, which are the bid/ask -- whatever

16  processing fees are built into the REFCO terms of the

17  transaction.

18   Q.   So you're not taking into account any other

19  fees that may have been incurred in connection with the

20  transaction; am I correct?

21   A.   Correct.

22   Q.   If you had to take into account other fees

23  that were paid in connection with the transaction,

24  would this affect your opinion as to whether or not it

25  was reasonable to expect a possibility of profit on the



00186

1

2  currency transactions?

3    A.   I think we talked about this point before.

4  And I said it would depend upon the amount of the fees

5  and what was obtained by payment of the fees.  I

6  haven't done the analysis, so I can't predict what the

7  outcome would be.

8    Q.   Let's turn to a different subject.  Let me

9  direct your attention to the interest rate options.

10       You mentioned that you did regression analysis

11  with respect to the interest rate options; am I correct?

12    A.   In terms of the relationships among the

13  indexes.

14    Q.   Why is it that you did regression analysis

15  with respect to the interest rate options but you did

16  not do so with respect to the currency options?

17    A.   Because of the nature of the linkage between

18  the index and what is being hedged, there is a market

19  linkage for the interest rate options.  There is not a

20  market linkage for -- between the currency options and

21  the EMC stock.  That was a view that Mr. Egan and his

22  advisors took about what they believed the mechanism

23  would be in the future.

24    Q.   So are you saying that for purposes of the

25  interest rate options, you were looking to historical

**Carron, Andrew  11-20-07**                    **Page 186**

00034

1

2  the following issues.  And if you have, whether or not

3  this is something that is in your report.

4       Do you understand that?

5  A.   Yes.

6  Q.   Are you rendering a professional opinion on

7  the amount of profit available from the option

8  transactions after accounting for all fees and costs of

9  the transactions?

10  A.   What do you mean by "all fees and costs"?

11  Q.   I mean for all fees and cost taking into

12  account, for example, all costs that were associated

13  with the transaction, including accounting fees, legal

14  fees, fees that were paid to the, quote/unquote,

15  marketers of the transaction.  So after taking into

16  account all fees and costs, are you rendering an

17  opinion as to the amount of profit that would have been

18  available on the transaction?

19  A.   You're asking -- you're posing the question

20  with the assumption that all of the fees that you have

21  described are associated with the transactions.  I was

22  not asked to make that assumption, so I did not conduct

23  such an analysis.

24  Q.   What assumption were you not asked to make?

25  A.   That those fees that you listed were

GOVERNMENT
EXHIBIT

2

**Carron, Andrew  11-20-07**                    **Page 34**

00035

1

2  associated with the transaction.

3    Q.    As an economist, financial economist, what

4  fees do you ordinarily take into account with respect

5  to a transaction?

6    A.    The fees that would not have occurred but for

7  the transaction.

8    Q.    And, for example, for the transaction at

9  issue, were you aware that there was a promoter that

10  charged a fee of over three million dollars in

11  connection with services provided in the transaction?

12  Were you aware of that fee?

13    A.    I'm aware that there was -- that there were

14  fees charged by Financial Advisors and other advisors.

15  I do not know whether those fees would not have been

16  charged if in the end, the transactions had not been

17  executed.

18    Q.    Did you make any attempt to determine that?

19  You said you didn't know.

20    A.    No.

21    Q.    You made no attempt to determine that?

22    A.    No.

23    Q.    So I want to make sure then.  Taking into

24  account all fees, including legal accounting, and any

25  other transaction fees that were associated with this

**GOVERNMENT EXHIBIT**

**3**

**Carron, Andrew  11-20-07**                    **Page 35**

ANDREW S.   CARRON

Page 53

1    economic costs, that they are linked to the

2    transaction in the way that Refco's costs were

3    linked to the transaction, yes, then it would

4    change my conclusions and my opinions.

5         Q.    So you don't feel comfortable if

6    you're essentially ordered by the court to do so,

7    but if you assume -- if I ask the question, if you

8    assume these are economic costs related to the

9    transaction like the Refco fee, then your testimony

10   is it would effect your opinion?

11        A.    Yes.  Well, it's rather obvious.

12        Q.    Do you know, as you're sitting here

13   today, whether or not you would still conclude that

14   it would be reasonable to expect a profit on the

15   transaction if you assume these are economic costs

16   of the transaction?

17        A.    I don't know.

18        Q.    You have not made that analysis?

19        A.    Correct.

20        Q.    Let me ask you to look in your report

21   at Page 11 --

22                   THE WITNESS:  If we're moving to

23   a different subject would this be a good time for a

24   break?

25                   MR. DONOHUE:  It would indeed.



GOVERNMENT
EXHIBIT
4

781e68d2-04c6-4a13-8ba9-102a2b51a1d8

ANDREW S.  CARRON

Page 51

1   part of the transaction, from your perspective if
2   there were costs associated with that facet of the
3   overall transaction, they don't relate to the
4   transaction that you're analyzing; is that a fair
5   statement?
6        A.   Yes.
7        Q.   If you were required for purposes of
8   your economic analysis to take into account fees
9   paid to Helios, to KPMG, to Carruth, to the law
10  firm, if you were required to take to account those
11  costs, could that effect your opinion?
12       A.   Well, you said if I were required to
13  take these into account for my economic analysis.
14       Q.   Yes.
15       A.   If I were required to take it into my
16  analysis, it would no longer be an economic
17  analysis; it would be bookkeeping.  And it wouldn't
18  change my opinion; it would change the result.
19       Q.   Why would it be just bookkeeping?
20       A.   Because to be required to add certain
21  numbers together is not an economic analysis.
22       Q.   Well, for example, what if the court
23  said, I admire you, Dr. Carron, you're a
24  distinguished individual, however, the law requires
25  these costs be taken into account in your economic

GOVERNMENT
EXHIBIT
5

781e68d2-04c6-4a13-8ba9-102a2b51a1d8

ANDREW S.   CARRON

Page 52

1    analysis.  Consequently, tell me now what your

2    analysis would be in terms of a reasonable

3    expectation of profit if these costs are taken into

4    account?  Would that effect your opinion?

5         A.    Same answer as before.  It would not

6    change -- it would change the result, but it

7    wouldn't change my opinion.

8         Q.    How would it change the result?

9         A.    Well, any fees that are added to what

10   is considered to be the transaction would reduce

11   the actual and the expected return from the

12   transaction.

13        Q.    So is it possible if you did take into

14   account those fees your conclusions, that it would

15   be reasonable to expect a profit on the transaction

16   may change?

17        A.    Well, I'm making a distinction here

18   between the result and my opinion, because with all

19   respect to the court, the court says that something

20   is an economic cost and as an economist I don't

21   think it's the economic cost, I'm not going to

22   agree that it's an economic cost and changes my

23   economic result.

24             Now just to kind of move this along,

25   if you're asking me to assume that these fees are

781e68d2-04c6-4a13-8ba9-102a2b51a1d8

## Contested Redaction Log Items

| Begin Bates | End Bates | Subject Matter | Privilege Basis | Privilege Status |
|---|---|---|---|---|
| 48830 | 48831 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided | AC |
| The United States contends that this document must be produced in unredacted form because the plaintiff has put at issue whether there was a reasonable possibility of economic profit from the Fidelity International and Fidelity High Tech transactions, and whether they entered into those transactions for a primary purpose of realizing a non-tax economic profit.  The refutation of the plaintiff's claims of reasonable possibility of profit and non-tax profit motive requires a complete look at all costs and expenses related to the transactions, including those so far redacted from this document.  The plaintiff's classic dual sword and shield use of the attorney-client and work-product privileges is not allowed. | | | | |
| 48832 | 48834 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided | AC |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |
| 48835 | 48838 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided | AC |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |
| 48839 | 48842 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided | AC |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |
| 48843 | 48847 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided | AC |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |
| 48848 | 48851 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided | AC |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |
| 48852 | 48854 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided | AC |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |

Note: The Burke Warren invoices logged by the plaintiff are listed here by Bates numbers.  These are the invoices to which the plaintiff has raised, and logged, specific claims of privilege.  To the extent there are other Burke Warren invoices relating to the Fidelity International and Fidelity High Tech transactions, the United States also moves here for production of those invoices.

## Contested Redaction Log Items

| Begin Bates | End Bates | Subject Matter | Privilege Basis | Privilege Status |
|---|---|---|---|---|
| 48855 | 48856 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided | AC |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |
| 48857 | 48859 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided | AC |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |
| 48860 | 48862 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided | AC |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |
| 48863 | 48864 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided | AC |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |
| 48865 | 48867 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided | AC & WP |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |
| 48868 | 48869 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided Work product prepared in anticipation of litigation | AC & WP |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |
| 48870 | 48871 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided Work product prepared in anticipation of litigation | AC & WP |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |
| 48872 | 48874 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided Work product prepared in anticipation of litigation | AC & WP |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |

## Contested Redaction Log Items

| Begin Bates | End Bates | Subject Matter | Privilege Basis | Privilege Status |
|---|---|---|---|---|
| 48875 | 48877 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided Work product prepared in anticipation of litigation | AC & WP |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |
| 48878 | 48880 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided Work product prepared in anticipation of litigation | AC & WP |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |
| 48881 | 48882 | Legal services provided to client | Confidential communication from counsel to client reflecting legal services provided Work product prepared in anticipation of litigation | AC & WP |
| The United States incorporates by reference the above entry for document Bates numbered 048830-048831. | | | | |