**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, LLC, by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151 |
| | ) | 06-40130 |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | Magistrate Judge Hillman |
| | ) | |
| Defendant | ) | |

## RSM MCGLADREY, INC.'S OPPOSITION TO UNITED STATES'
## SECOND MOTION TO COMPEL PRODUCTION OF DOCUMENTS

It is undisputed that RSM McGladrey ("RSMM") retained the law firm Bryan Cave to advise it on the legal aspects of various tax-related transaction strategies that RSMM was considering offering to its clients beginning in 2001. RSMM did so in order to help to satisfy itself that the proposed transaction strategies were, based on RSMM's own independent judgment, consistent with the Internal Revenue Code.   The advice RSMM requested and received was classic legal advice:  interpretations of federal law and regulations, and application of those interpretations to particular factual scenarios.  Through a series of unwarranted assumptions and inferential leaps, the Government now urges that RSMM's communications with its retained counsel, for which it paid considerable sums, were not privileged, or that RSMM waived the privilege by revealing its communications to a third party.  The evidence shows otherwise.  Because RSMM retained Bryan Cave to provide confidential legal advice, and because RSMM did not reveal the substance of Bryan Cave's advice to anyone except senior-level RSMM personnel, RSMM's communications with Bryan Cave are protected by the attorney-client privilege and the Government's motion to compel should be denied.

- 1 -

The Government's motion – which  follows months of discussions with counsel for RSMM – reflects a cavalier approach to attorney-client privilege.  It appears that the Government views RSMM as not being entitled to maintain any privilege for advice from its retained outside tax counsel (which it paid for handsomely) based on the mere fact that it participated in some transaction strategies that the Government believes were improper.

The factual background allegations in the Government's memorandum are for the most part either unsupported or mistaken.  A significant number of the statements in this colorful but unsupported narrative have no citation at all, and thus constitute mere speculation and conjecture by the Government that cannot be considered when evaluating the merits of this motion.  Many of the Government's exhibits were produced by other parties – and never revealed to RSMM previously – and their admissibility is suspect.  A great many other documents the Government has submitted lack any proper foundation and constitute hearsay that is not admissible against a third party in a discovery dispute like this one.  In sum, most of the "facts" alleged by the Government have no evidentiary value, and the exhibits cited in many instances should be stricken and not considered by this Court.[1]

Remarkably, the Government fails to cite any actual testimony by an RSMM employee (they deposed Ronald Wainwright of RSMM on two occasions, often on the same topics, as well as a former RSMM employee, Don Dwight) or a Bryan Cave attorney related to RSMM's privilege claims.  To the contrary, the Government's examination of Mr. Wainwright and of John Barrie of Bryan Cave with regard to the relationship between Bryan Cave and RSMM, and any possible waivers of legal advice by disclosure to others, was at best superficial.  And the answers that were provided simply confirm that RSMM hired Bryan Cave to provide it with outside legal advice, and did not share that advice with anyone else.

---

[1] RSMM will not address these evidentiary deficiencies in detail, as doing so would require a separate, lengthy memorandum.

What is even more remarkable is that the Government refused to share a single shred of the so-called "evidence" it relies on with RSMM in the context of this privilege dispute. RSMM's counsel participated in many lengthy telephone conferences with the Government on this issue. From the very first discussion, the Government simply declared that none of RSMM's communications with Bryan Cave were privileged because Bryan Cave's legal advice had been shared with the Diversified Group, Inc. ("DGI"), RSMM clients, or other third parties. In each discussion, RSMM's counsel requested that the Government share its "evidence" of a purported waiver so that they could independently assess the waiver issue and decide whether or not to reconsider RSMM's privilege claims. Indeed, counsel for RSMM went out of their way to assure the Government that they did not want to claim privilege if the Government was aware of evidence that would undermine RSMM's position, and clearly did not wish to litigate a dispute if there was no merit to RSMM's position. Despite these repeated requests over more than six months, the Government refused to share any testimony or documents that they claimed would support their position. The Government then filed a motion to compel with 60 exhibits purporting to demonstrate that RSMM had waived its privilege.

The Government's recitation of the meet and confer discussions on this dispute is also misstated. The parties' final telephone conference, on July 21, was not an attempt by the Government to narrow any issues or resolve the dispute. The Government simply announced that it planned to go ahead with its motion, after having not raised the privilege issue since April. In the interim, the Government redeposed Mr. Wainwright in the *High Tech* case (he was also deposed in this case) and asked only a handful of basic questions on the privilege issue. In that last telephone call on July 21, RSMM's counsel once again urged the Government to share its so-called waiver evidence before launching yet more motion practice in this Court. RSMM's counsel followed up this request in a lengthy email that in turn triggered a response from the

Government that distorted the facts relating to this dispute.[2]  This was a very disappointing outcome.

**INTRODUCTION**

RSMM is a tax and accounting firm.  It is undisputed that RSMM was not involved in designing the "FDIS" or "stock dribble" transactions that are at issue in this case and the Fidelity High Tech case, or in marketing or implementing the particular transactions that Plaintiffs undertook in 2001.[3]  Beginning in late 2002, RSMM provided tax preparation services to Plaintiffs, including signing Plaintiffs' 2001 and 2002 Form 1040 individual tax returns, and signing the 2002 Form 1065 partnership returns for the Fidelity International and Fidelity High Tech partnerships.  RSMM also offered transaction strategies similar to the FDIS and stock dribble transactions to some of its own clients, several of whom entered into such transactions in 2001 and 2002.

In response to the Government's subpoenas in this case and the Fidelity High Tech case, RSMM produced more than 74,000 pages of documents relating to Plaintiffs, to the transactions at issue in the consolidated cases, and to RSMM's clients who participated in similar transactions.  RSMM also withheld or redacted approximately 40 documents on the basis of the attorney-client privilege, none of which relate to the Plaintiffs or their transactions at issue in the consolidated cases.  All of the withheld materials represent communications between RSMM and its retained outside counsel, the law firm Bryan Cave LLP.  RSMM described these documents in a privilege log, the sufficiency of which the Government has never challenged.[4]  As the privilege log and the attached Declaration of Mr. Wainwright demonstrate, none of the withheld

---

[2]  Ex. 1.

[3]  "FDIS" and "stock dribble" are the Government's preferred terms for the transactions at issue in this case and the Fidelity High Tech case, respectively.  RSMM did not refer to the strategies by those terms, but will use them here for the sake of clarity.

[4]  RSMM privilege log, Ex. 1 to Govt. Mot. To Compel.

or redacted documents was sent to, received from, or distributed to anyone outside of senior-level RSMM personnel and their lawyers at Bryan Cave.[5]

## BACKGROUND FACTS

Beginning in approximately 1999, RSMM considered offering certain transaction strategies to its clients.  RSMM did not create or design any transaction strategies of its own, so it decided to work with firms that did design such strategies.[6]  In 2000, RSMM entered into a joint venture with another accounting firm, BDO Seidman, in which BDO Seidman agreed to assist RSMM in offering particular transaction strategies to several of RSMM's clients.[7]  Because RSMM was unsatisfied with some aspects of its relationship with BDO Seidman, it terminated the joint venture shortly thereafter.[8]

In late 2000, Mr. Wainwright, the leader of RSMM's Structured Transactions Group, was introduced to James Haber, the president of the Diversified Group ("DGI").  DGI was a firm that was in the business of designing and implementing various transaction strategies.  RSMM and DGI engaged in discussions regarding DGI's strategies, as RSMM considered whether it was interested in offering any transactions that DGI had designed to its own clients.[9]  Mr. Wainwright viewed DGI as a professional firm that designed legitimate transactions that had reasonable profit potential and were supported by the Internal Revenue Code.[10]

---

[5]  Declaration of Ronald G. Wainwright, Jr. ("Wainwright Decl.") ¶¶ 15, 17-19.  *See also* Ex. 2, a chart identifying the individuals whose names appear on RSMM's privilege log.

[6]  Wainwright Decl. ¶ 3.

[7]  Ex. 50 to Govt. Memorandum of Law In Support Of Second Motion To Compel Production Of Documents From RSM McGladrey, Wainwright Dep. Tr., *Fidelity High Tech v. U.S.*, at 7:5-15.  The Government's Memorandum of Law will hereafter be cited as "Govt. Mem."

[8]  Ex. 8, Wainwright Dep. Tr., *Fidelity High Tech v. U.S.*, at 26:3-29:13.

[9]  Ex. 5, Wainwright Dep. Tr., *Fidelity International Currency Advisor  v. U.S.*, at 52:9-53:5.

[10]  Govt. Mem. Ex. 2.

However, in the wake of its experience with BDO Seidman, RSMM decided to proceed with caution.  Among other things, RSMM decided to engage outside tax counsel to provide advice and help RSMM satisfy itself that the strategies were appropriate under the Internal Revenue Code.[11]  To that end, Mr. Wainwright approached John Barrie, a tax lawyer at Bryan Cave LLP, in approximately the summer of 2001.[12]

Mr. Wainwright had good reason to seek advice from Bryan Cave.  RSMM is a subsidiary of H&R Block, Inc., which has other indirect subsidiaries making up the world's largest tax-preparation firm.[13]  Like H&R Block, Bryan Cave is based in Missouri, and Bryan Cave has a longstanding relationship with H&R Block, having represented it since its formation in the 1950s.  Mr. Wainwright was aware of the long-term relationship between Bryan Cave and H&R Block.[14]  Although Mr. Wainwright had no personal experience with Bryan Cave attorneys at that time, he decided it would be a good idea to retain the firm because of H&R Block's long experience with it.[15]  As the leader of RSMM's Structured Transactions Group, Mr. Wainwright was authorized to retain outside counsel to represent RSMM.[16]

Mr. Wainwright first contacted Mr. Barrie about the possibility of representing RSMM in tax matters in around the summer of 2001.[17]  At that time, Mr. Wainwright was not aware that Bryan Cave already represented DGI in similar matters.[18]

---

[11]  Wainwright Decl. ¶¶ 4, 6.

[12]  *Id.* ¶ 6.

[13]  *See* http://www.rsmmcgladrey.com/About-Us/Our-History/

[14]  Wainwright Decl. ¶ 7.

[15]  *Id.*

[16]  *Id.* ¶ 6.

[17]  *Id.*

[18]  *Id.* ¶ 9.

The first legal work relating to transaction strategies for which Bryan Cave billed RSMM occurred in August 2001.[19] A review of this invoice is instructive. Among other tax matters, during August and September, Bryan Cave provided legal advice to RSMM regarding the list maintenance requirements found in I.R.C. § 6112, the possibility of using a designation agreement to comply with those requirements, and the technical merits of certain transactions RSMM was considering offering to its clients.[20] Bryan Cave's invoices demonstrate that its lawyers performed many hours of traditional legal work for RSMM, including meetings and telephone conferences, drafting memoranda analyzing Internal Revenue Code provisions, and reviewing and advising on technical materials from other firms (including DGI).[21] With the exception of a single meeting on August 30, 2001, at which a DGI employee was present along with Mr. Wainwright and Bryan Cave lawyers, the invoice indicates that all communications were between RSMM and Bryan Cave personnel exclusively.

On November 15, 2001, after RSMM received Bryan Cave's first invoices for legal services that began the previous August, Mr. Wainwright executed a formal engagement letter with Bryan Cave on behalf of RSMM.[22] While the letter was not executed until November, Bryan Cave had been representing RSMM since at least August.[23] Mr. Wainwright and Bryan Cave decided to execute the engagement letter in order to formalize their relationship.[24]

During the first six months of 2002, Bryan Cave provided RSMM with legal advice on a wide variety of tax matters, very little of which related to transactions similar to those at issue

---

[19]  Wainwright Decl. Ex. A, Bryan Cave invoice dated 10/12/01, at 3.

[20]  *Id.* at 2-6.

[21]  *Id.*

[22]  Ex.3.

[23]  Wainwright Decl. Ex. A, 10/12/01 Invoice at 2.

[24]  Wainwright Decl. ¶ 13.

here.[25]  Then, on June 14, 2002, the Treasury Department issued temporary regulations related to the requirement that taxpayers disclose certain listed transaction strategies to the IRS.  In response to the temporary regulations, RSMM requested and received legal advice from Bryan Cave regarding the interpretation of the proposed regulations and their potential application to RSMM clients who had implemented transaction strategies.[26]  Bryan Cave relayed this advice in telephone calls, e-mails, and meetings.[27]  Based upon its consultations with Bryan Cave and upon its independent review of the temporary regulations, RSMM's Technical Standing Group, based upon its own independent judgment, formulated a business policy in response to the June 14 regulations.[28]

RSMM's business policy was to advise its clients who participated in transactions similar to the FDIS or stock dribble transaction to disclose the transactions on their tax returns.[29]  The sole exception to the policy of disclosure provided that, if the client did not want to disclose his or her transaction, and the client obtained what RSMM considered to be a well-reasoned opinion from a law firm that the regulations did not require disclosure, RSMM would sign the client's tax return without disclosure.[30]  RSMM also required the law firm rendering the non-disclosure opinion to be independent, meaning that it could not be the same law firm that offered the client an opinion on the merits of the transaction.[31]  The ultimate decision whether to disclose the transaction was left to the client.

---

[25] Wainwright Decl. ¶ 20.

[26] Wainwright Decl. Ex. B, 7/25/02 Invoice at 5-8; Wainwright Decl. Ex. C, 8/29/02 Invoice at 2-5; Wainwright Decl. Ex. D, 9/25/02 Invoice at 2-6.

[27] *See id.*

[28] Ex. 6, Wainwright Dep. Tr. in *Fidelity International Currency Advisor v. U.S.*, at 65:8-68:4; *see also* Ex.9, Wainwright Dep. Tr. in *Fidelity High Tech v. U.S.*, at 131:12-20.

[29] Ex. 4; *see also* Ex. 6, Wainwright Dep. Tr. in *Fidelity International Currency Advisor v. U.S.*, at 65:8-68:4.

[30] *Id.*

[31] Ex. 6, Wainwright Dep. Tr. in *Fidelity International Currency Advisor v. U.S.*, at 66:16-68:4.

RSMM's disclosure policy was a business policy that it implemented based on its independent business judgment and expertise as tax professionals, after consultation with Bryan Cave and others.[32]  RSMM disclosed the policy to clients who did not want to follow RSMM's advice to disclose their strategies.  RSMM did not disclose any of its confidential communications with Bryan Cave that RSMM considered when developing the policy to any third party, including DGI.[33]

In about September 2002, RSMM was retained by Carruth Management, Plaintiff's family accounting firm, to provide tax preparation services.[34]  With respect to Plaintiffs' transactions at issue in these cases, RSMM requested no legal advice from Bryan Cave, and Bryan Cave provided no legal advice.[35]

Bryan Cave continued to advise RSMM on various tax matters until 2004.  Before presenting any potential transaction strategy to its clients, RSMM's practice was to request that Bryan Cave review the proposed transaction strategy and advise whether Bryan Cave believed that the strategy, inter alia, had technical merit.[36]  In addition, RSMM sought Bryan Cave's advice on a wide variety of other federal tax matters, very few of which related to the "FDIS" or "stock dribble" or similar transactions.  Instead, Bryan Cave advised RSMM on such issues as the technical aspects of transaction strategies developed by other professionals, the interpretation of new and proposed IRS regulations, and the substance of tax legislation proposed in

---

[32] Ex. 4; *see also* Ex. 12, Wainwright Dep. Tr. in *Fidelity High Tech v. U.S..*, at 131:21-132:20.

[33] Wainwright Decl. ¶¶ 16-17.

[34] Ex. 7, Wainwright Dep. Tr., *Fidelity International v. U.S.*, at 88:2-7.

[35] Barrie Dep. Tr., *Fidelity International v. U.S.*, *quoted in* Plaintiffs' Response to U.S. Motion to Compel to RSMM (Dckt. 319), at 3; Wainwright Decl. ¶ 23.

[36] Wainwright Decl. ¶¶ 4, 20.

Congress.[37]  Between August 2001 and March 2003, Bryan Cave billed RSMM more than $1 million for legal advice on these various tax matters.[38]

In addition to its attorney-client relationship with RSMM, Bryan Cave also provided tax opinions to some of RSMM's clients who implemented FDIS transactions.  These tax opinions advised that the client's transaction had technical merit and that the client should prevail in any IRS challenge (and that the client should not be subject to penalties if he or she did not prevail).  Bryan Cave's fees for rendering these opinions were paid by DGI.[39]  RSMM typically told clients who where considering transactions like the FDIS or stock dribble transactions that Bryan Cave was one of several law firms that the client could engage to provide an opinion.[40]  Clients who decided to retain Bryan Cave entered into their own engagement letters with Bryan Cave directly.  Lawyers from Bryan Cave were not present at meetings between RSMM and its clients who were considering these transactions, and RSMM did not reveal to its own clients any of the legal advice it received from Bryan Cave regarding the FDIS or stock dribble transactions or any related issue.[41]

After August 2001, Mr. Wainwright would occasionally communicate with Bryan Cave and DGI simultaneously.[42]  RSMM has not claimed the attorney-client privilege with respect to communications during which DGI (or any other third party) was present, nor has it withheld or redacted any communications among RSMM, Bryan Cave, and DGI.  But when RSMM received legal advice from Bryan Cave under circumstances in which no third party was present or

---

[37]  Wainwright Decl. ¶ 20.

[38]  Wainwright Decl. ¶ 21.

[39]  Ex. 7 to Govt. Mem.

[40]  Wainwright Decl. ¶ 14.

[41]   Wainwright Decl. ¶ 15; *see also* Ex. 10, Wainwright Dep. Tr., *Fidelity High Tech v. U.S.*, at 62:1-21; Ex. 11, Wainwright Dep. Tr., *Fidelity High Tech v. U.S.*, 106:22-107:16.

[42]  Wainwright Decl. ¶ 19.

received a document, RSMM regarded that advice as confidential and kept it confidential.[43]  The substance of the confidential legal advice RSMM received from Bryan Cave was not revealed outside of the small group of RSMM senior personnel to whom it was directed and for whom it was intended.[44]

## ARGUMENT

The First Circuit has adopted Wigmore's formulation of the elements of the attorney-client privilege:  (1) where legal advice of any kind is sought, (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected, (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.[45]  RSMM has submitted a privilege log describing the documents it withheld (or the communications it redacted from produced documents).  RSMM's privilege log fully complies with the requirements of Fed. R. Civ. P. 26(b)(5), and the Government apparently does not contend otherwise.  Instead, the Government takes exception to two of these elements: the requirement that a communication be made in confidence, and the requirement that the privilege not be waived by revealing the communication to a third party.[46]  Neither argument withstands scrutiny.

Two matters warrant discussion at the outset.  First, it is unnecessary for the Court to review the withheld documents in camera.  The withheld communications consist entirely of communications between senior RSMM tax professionals and Bryan Cave, and thus are confidential in the first instance.  The Government argues that RSMM waived the privilege by disclosing its communications, and submits what it purports to be evidence that it contends

---

[43]  Wainwright Decl. ¶¶ 17-19.

[44]  *Id.*, *see also* Ex. 10, Wainwright Dep. Tr., *Fidelity High Tech v. U.S.,*at 62:1-21;  Ex. 11, Wainwright Dep. Tr., *Fidelity High Tech v. U.S.*, 106:22-107:16.

[45]  *United States v. Mass. Inst. Of Tech.*, 129 F.3d 681, 684 (1st Cir. 1997).

[46]  Govt. Mem. at 1.

supports this argument.  Under these circumstances, the Court can determine the applicability of the privilege based upon "revie[w] [of] the privilege log and the arguments of counsel,"[47] and in camera review is unnecessary.  Should the Court nonetheless decide to undertake an in camera review, RSMM is confident that the Court will conclude that these documents reflect the type of attorney-client communications and legal advice that one would ordinarily encounter in the routine conduct of a business like RSMM.

Second, the Government wrongly urges that the analysis the Court followed in deciding the Government's motion to compel production of documents from Proskauer Rose ("Proskauer") is equally applicable here.[48]  In fact, the analysis is significantly different, as RSMM's claims of privilege are not at all comparable with the more than 900 privilege claims made by Proskauer Rose on behalf of its clients.  In support of that motion (unlike this one), the Government submitted evidence demonstrating that preliminary and final drafts of the opinion letters for taxpayer clients at issue were routinely shared by Proskauer with DGI, accounting firms, and others.   Thus, in determining that no privilege attached to the opinion letters withheld by Proskauer, the court found that the opinion letters were "not kept confidential between the law firm and taxpayers" but instead were "circulated to DGI and one or more of the accounting firms" as a matter of routine practice.[49]  Here, by contrast, the withheld and redacted documents were *never* circulated outside of RSMM and Bryan Cave.  Nor has the Government demonstrated that RSMM had a "practice" of disseminating the substance of its communications with Bryan Cave to any third parties.  The mere fact that RSMM and DGI discussed and at times

---

[47]    *Apsley v. Boeing Co*., No. 05-1368, 2008 WL 191418, *2 (D. Kan. Jan. 22, 2008) (holding in camera review unwarranted); *see also Saint-Goban/Norton Indus. Ceramics Corp. v. General Electric*, 884 F. Supp. 31, 34 (D. Mass. 1995) (denying motion for in camera inspection).

[48]    Govt. Mem. at 3-4.

[49]    Mem. and Order on Mot. to Compel Prod. of Documents From Proskauer (Dckt. 287) at 9, 20.

disagreed over how to interpret various tax regulations does not mean that RSMM revealed the legal advice it received from Bryan Cave.

Also significant in the Government's motion to compel against Proskauer was the fact that "the opinion letters were not intended simply to be private attorney-client communications of legal advice."[50]  Instead, they were form or template opinions, paid for by DGI in which Proskauer purported to maintain a proprietary interest.  In addition, the text of the letters contemplated possible disclosure to the IRS.[51]  RSMM's withheld communications, on the other hand, were "intended . . .  to be private attorney-client communications of legal advice."  RSMM sought legal advice on various tax issues, and received it both in the form of classic legal work product such as memoranda, and in less formal e-mails.  In either case, the advice sought was individualized and not pro forma, and RSMM and Bryan Cave did not contemplate disclosure of that legal advice to third parties.

### A.    The Withheld Communications Were Made In Confidence For The Purpose of Obtaining Legal Advice, And Were Intended To Be Kept Confidential.

For the attorney-client privilege to attach, a communication must be made in confidence and the client must intend to keep the communication confidential.[52]  As a review of RSMM's privilege log demonstrates, the withheld materials consist entirely of communications between Bryan Cave attorneys and RSMM personnel.[53]  No communications between RSMM and any third party have been withheld.  Thus, all of the communications were confidential in the first instance.

---

[50]  *Id.* at 20.

[51]  *Id.* at 20-22.

[52]  *United States v. Windsor Capital Corp.*, 524 F. Supp. 2d 74, 81 (D. Mass. 2007).

[53]  RSMM Privilege Log, Ex. 1 to Govt. Mot. to Compel; *see also* Ex. 2, Chart of Individuals Listed in Privilege Log.

"If a person hires a lawyer for advice, there is a rebuttable presumption that the lawyer is hired as such to give legal advice."[54] The Government nonetheless argues that the attorney-client privilege never attached to the confidential communications, because, the argument goes, the communications were not *intended* to be kept confidential but were instead in the nature of business communications, part of a "group effort to market and implement" transaction strategies along with DGI, Bryan Cave, and others.[55] The Government attaches numerous exhibits to its brief (many of which are documents that RSMM neither created nor received, and is thus seeing for the first time in connection with this motion) that it purports will support this theory. But none of this "evidence" demonstrates that RSMM hired Bryan Cave for any purpose other than for legal advice, or that RSMM intended to disclose the legal advice it received to others. The Government's contention is simply based on a series of inferential leaps that are unsupported by the documents it submitted.

The Government first argues that DGI retained Bryan Cave to provide legal advice before RSMM retained Bryan Cave in connection with similar matters, and that RSMM's initial "dealings" with Bryan Cave "predated any engagement letter between RSM and Bryan Cave."[56] As an initial matter, it is well-settled that the attorney-client privilege is not dependent upon the execution of a formal contract or upon the payment of a fee; the relevant inquiry is whether the client sought confidential legal advice.[57] In any event, RSMM requested, received, and paid for

---

[54] *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996).

[55] Govt. Mem. at 23. The Government drops the names of several other members of this "group," but identifies only DGI as the party to whom RSMM allegedly expected to disclose Bryan Cave's legal advice.

[56] Govt. Mem. at 11.

[57] *United States v. Costanza*, 625 F.2d 465, 468 (3d Cir. 1980); *see also Nat'l Credit Union Admin. Bd. v. Stone*, No. 92-12277, 1994 WL 175044, *2 (D. Mass. Apr. 21, 1994) ("A formal contract or retainer agreement is not required to impose a duty; the parties' conduct governs the existence and scope of an attorney-client relationship.").

Bryan Cave's legal advice as early as August 2001, well before the formality of executing an engagement letter, and contrary to the Government's claim that RSMM's initial communications with Bryan Cave were made through DGI.[58]

From the unremarkable fact that DGI retained Bryan Cave before RSMM separately retained Bryan Cave, the Government makes the remarkable assertion that RSMM hired Bryan Cave not as its legal counselor but *for the express purpose* of creating a phony attorney-client relationship that it could use to conceal a supposed disagreement between DGI and Bryan Cave over the interpretation of federal tax regulations.[59]  This alleged scheme is purportedly memorialized in communications between Bryan Cave and DGI to which RSMM was not a party and of which RSMM was not even aware.[60]  These communications have nothing to do with RSMM; they are entirely irrelevant.  More importantly, nothing in the putative evidence submitted by the Government supports the idea that RSMM, several months after it began receiving privileged (and expensive) legal advice from Bryan Cave, suddenly decided to execute an engagement letter so it could conceal that advice in bad faith.  That accusation is simply made up.

The Government further contends that RSMM sought advice from Bryan Cave regarding the June 14, 2002 temporary Treasury Regulations not in order to help itself conform its conduct to the requirements of the law, but so that it could "continue to promote" its transaction

---

[58]  Wainwright Decl. ¶ 13; Wainwright Decl. Ex. A, 10/12/01 Invoice.

[59]  Govt. Mem. at 16-17.

[60]  Govt. Mem. Ex. 18.

strategies.[61]   Again, this allegation is simply not supported.  In the days immediately after the

IRS released these regulations, Bryan Cave was reviewing them, interpreting them, and assessing

their impact on the transaction strategies RSMM offered its clients.  This was classic legal

advice, and Bryan Cave billed RSMM for it (and RSMM paid for it) as such.[62]  The fact that

RSMM took Bryan Cave's legal advice into consideration when reaching its own independent

*business decision* as to how to advise and deal with its own clients regarding the disclosure

requirements does not affect this analysis.

       The Government overlooks the fact that RSMM itself is in the business of providing tax

advice to clients.  Its own professionals are competent to review and assess the tax laws.  Bryan

Cave simply provided additional outside legal guidance on issues that RSMM could consider

when reaching its own conclusions regarding the Internal Revenue Code and related regulations.

In any event, courts have recognized that "legal and business considerations may frequently be

inextricably intertwined . . . when legal advice is rendered in the context of commercial

transactions or in the operations of a business in a corporate setting."[63]  For that reason, "[t]he

mere fact that business considerations are weighed in the rendering of legal advice does not

vitiate the attorney-client privilege."[64]

       RSMM does not contest the fact that it worked with DGI to offer transaction strategies

similar to the FDIS and stock dribble transactions to RSMM clients, or that it took Bryan Cave's

advice into account when it made its own business decisions regarding whether to offer the

---

[61]  Govt. Mem. at 19.

[62]  Wainwright Decl. Ex. B, 7/25/02 Invoice.

[63]  *Coleman v. Am. Broadcasting Companies, Inc.*, 106 F.R.D. 201, 206 (D. D.C. 1985).

[64]  *Id.*

transactions and how to comply with the statutory and regulatory requirements associated with them. But Bryan Cave's role as RSMM's retained outside legal counsel who assisted RSMM in making business decisions does not convert Bryan Cave from RSMM's attorney to a participant in a "group effort" to promote the transactions. This is true even if Bryan Cave also separately advised DGI on similar matters. The existence of a relationship between Bryan Cave and DGI simply has no bearing on RSMM's separate client relationship with Bryan Cave.[65] That is because – as the evidence demonstrates – RSMM independently satisfied the elements of the attorney-client privilege by hiring Bryan Cave to provide confidential legal advice on these transactions and other tax matters, with the intent to keep the legal advice confidential. RSMM did not intend to disseminate Bryan Cave's advice as part of a group effort to sell the transactions; rather, it hired Bryan Cave to assure itself that its business decisions rested on a sound legal foundation.[66] Indeed, the facts alleged by the Government suggest that DGI's views on the relevant federal tax regulations frequently diverged markedly from those of RSMM and Bryan Cave. That hardly demonstrates an agreement to jointly pursue allegedly improper tax transactions.

### B. RSMM Did Not Disclose The Substance Of The Withheld Communications To Any Third Party.

Voluntary disclosure of a privileged communication waives the privilege, and in the First Circuit the burden of establishing non-waiver lies with the proponent of the privilege.[67] It is

---

[65] To the extent that the Government would argue that Bryan Cave had a conflict in representing more than one party, RSMM notes that a law firm is responsible for monitoring its own conflicts, and that RSMM's own communications with its lawyers at Bryan Cave remain privileged regardless of any potential conflict for Bryan Cave.

[66] Wainwright Decl. ¶¶ 6,11.

[67] *In re Raytheon Securities Lit.*, 218 F.R.D. 354, 357 (D. Mass. 2003).

axiomatic that the attorney-client privilege belongs to the client, and only the client can waive the privilege.[68]  Therefore, a third party may not waive the proponent's attorney-client privilege by disclosing advice the third party may have received from the same lawyer on the same or a similar matter.[69]

Because RSMM requested Bryan Cave's legal advice with respect to various legal requirements of certain transaction strategies, RSMM acted to ensure that its confidential communications with Bryan Cave remained confidential.[70]  To that end, RSMM limited direct communications with Bryan Cave to senior tax professionals who considered Bryan Cave's advice in the course of making their own decisions on behalf of RSMM.  When RSMM employees communicated with third parties – including DGI and RSMM's own clients – they did not reveal the substance of their communications with Bryan Cave.[71]  On the few occasions that RSMM employees communicated with Bryan Cave and DGI simultaneously, RSMM employees also did not disclose their confidential Bryan Cave communications with DGI.[72]  Because RSMM adhered to this policy of non-disclosure, it did not waive the attorney-client privilege by revealing its communications with Bryan Cave to any third parties.

Despite its copious submissions, the Government fails to demonstrate a single instance in which RSMM disclosed a specific privileged communication with Bryan Cave to DGI or any other third party.  Fixated on its theory that *all* of RSMM's communications with Bryan Cave were part of a "group effort" to market improper tax transactions, the Government simply speculates that RSMM must have "routinely" shared its confidential communications with Bryan

---

[68] *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 90 (3rd Cir. 1992).

[69] *See, e.g.*, *John Morrell & Co. v. United Food & Comm. Workers, AFL-CIO*, 913 F.2d 544, 556 (8th Cir. 1990).

[70] Wainwright Decl. ¶¶ 17-19.

[71] *Id.*

[72] *Id.* ¶ 19, *see also* Ex. 10, Wainwright Dep. Tr., *Fidelity High Tech v. U.S.*,at 62:1-21; Ex. 11, Wainwright Dep. Tr., *Fidelity High Tech v. U.S.*, 106:22-107:16.

Cave with DGI, without adducing any real evidence that it did so.  To the extent that the
Government can show that *any* RSMM-Bryan Cave communications were shared with third
parties, the communications it points to were not privileged in the first instance, because they
were not made for the purpose of providing legal advice, and are therefore irrelevant to the
waiver analysis.[73]   The Government asks the Court to make the unsubstantiated inference that
RSMM routinely shared its attorney-client privileged communications based on the fact that (i)
both DGI and RSMM received (and paid for) legal advice from Bryan Cave; and (ii) DGI and
RSMM worked together on some transactions for several RSMM clients.

DGI apparently has waived its own attorney-client privilege and has produced its own
confidential communications with Bryan Cave.  The Government therefore knows the advice
that Bryan Cave gave DGI, and apparently seeks to confirm that Bryan Cave gave RSMM the
same advice as part of the "group effort."  Even if this were true, the fact that RSMM separately
consulted Bryan Cave for advice on many similar matters as DGI is irrelevant to the waiver
analysis, since each client holds and controls the privilege individually.[74]   Indeed, it is common
knowledge that tax lawyers frequently give the same advice to different clients who may have
similar needs for such advice, and charge them separately for that advice.  That does not
constitute a waiver of privilege for all these clients.

In addition, that DGI was aware that RSMM had consulted Bryan Cave on these matters,
and discussed that fact with RSMM, certainly does not establish that RSMM disclosed its
confidential communications with Bryan Cave to DGI.  That is because "[a] client does not
waive his attorney client privilege merely by disclosing a subject which he had discussed with
his attorney.  In order to waive the privilege, the client must disclose *the communication with the*

---

[73] *E.g.*, Govt. Ex. 9 (e-mail from John Barrie to DGI and RSMM personnel, discussing RSMM's *business* policy of
recommending disclosure of transactions absent a legal opinion to the contrary).

[74] *See Haines*, 975 F.2d at 90.

*attorney itself.*"[75]  As noted, RSMM has produced and/or offered testimony regarding all of its communications with Bryan Cave in which DGI also was involved.  It has withheld only its own confidential communications with Bryan Cave.  It is not enough for the Government to point out that RSMM and DGI shared the same lawyer and that DGI has disclosed its own communications:  it must also overcome Mr. Wainwright's uncontradicted testimony that the withheld RSMM communications were made in confidence and remained confidential.[76]  The Government has failed to do so.

     The Government also makes much of the fact that RSMM and DGI worked together to offer transaction strategies to some RSMM clients in 2001 and 2002.  Again, the Government speculates that in the course of working with DGI, RSMM must have disclosed its confidential communications with Bryan Cave to DGI, but presents no evidence that it actually did so.  The Government's submissions suggest only that DGI was aware of certain RSMM business policies, and that Bryan Cave had some role in advising RSMM when it was in the process of formulating those policies.  For example, DGI (and certain RSMM clients) were aware of RSMM's formally adopted policy, following the June 2002 disclosure regulations, of recommending disclosure of certain transactions unless the client obtained what RSMM considered to be a well-reasoned legal opinion to the contrary.[77]  DGI also was aware that RSMM sought Bryan Cave's legal advice in the context of RSMM formulating its business policies with respect to Section 6112 list maintenance requirements in 2001, and negotiating an agreement with DGI on that topic.[78]  However, the client does not waive the attorney-client privilege merely by considering his lawyer's legal advice when reaching a business decision and

---

[75]  *United States v. O'Malley*, 786 F.2d 786, 794 (7th Cir. 1986) (emphasis added; internal citations omitted).

[76]  Wainwright Decl. ¶¶ 17-19; Ex. 10, Wainwright Dep. Tr., *Fidelity High Tech v. U.S.*,at 62:1-21; Ex. 11, Wainwright Dep. Tr., *Fidelity High Tech v. U.S.*, 106:22-107:16.

[77]  Ex. 4.

[78]  Govt. Mem. Exs. 17, 19, 23.

then acting on that decision, unless by doing so the client reveals the communication itself.[79]  To
hold otherwise would eviscerate the privilege, because the principal reason that a business entity
seeks legal advice is to help ensure that its business activities, including interactions with third
parties such as clients and business partners, comply with the requirements of the law.[80]  As the
First Circuit has recognized, a rule that discourages businesses from consulting with their
counsel "would provide perverse incentives:  parties would leave attorneys out of commercial
negotiations for fear that their inclusion would later force wholesale disclosure of confidential
communications.  This would strike at the heart of the attorney-client relationship."[81]

    Nor does the fact that no privilege may have attached to communications in which
RSMM, DGI, and Bryan Cave all participated imply a waiver of RSMM's confidential
communications with Bryan Cave on the same subject matter as the non-privileged
communications.[82]  In *In re Keeper of Records*, the First Circuit held that "the extrajudicial
disclosure of attorney-client communications, not thereafter used by the client to gain adversarial
advantage in judicial proceedings, cannot work an implied waiver of all confidential
communications on the same subject matter."[83]  In *Keeper of Records*, XYZ, which

---

[79]  *In re Grand Jury Subpoena Dated Sept. 15, 1983*, 731 F.2d 1032, 1037-38 (2nd Cir. 1984) (holding that
documents "memorialize[ing] client confidences obtained in the pursuit of legal advice concerning the mechanics
and consequences" of business strategies were subject to the attorney-client privilege, and "the possibility that some
of the information contained in [the privileged] documents may ultimately be given to [a third party] does not vitiate
the privilege"); *see also In re Ford Motor Co.* 110 F.3d 954, 966 (3rd Cir. 1997) (holding that discussion contained
in meeting minutes was subject to attorney-client privilege even where business decision was disclosed because
discussion was "infused with legal concerns" and decision was reached "only after securing legal advice.").

[80]  *U.S. ex rel. Fago v. M&T Mortgage Corp.*, 238 F.R.D. 3, 12 (D.D.C. 2006) (recognizing that "privileged advice
does not lose its protection when the client adopts it.  To allow a litigant to probe beyond the assertion of privilege to
the substance of the legal advice because the client takes the legal advice to heart and acts on it would effectively
circumvent the protection of the privilege."); *see also In re Keeper of Records(Grand Jury Subpoena Addressed to
XYZ Corp.)*, 348 F.3d 16, 24 (1st Cir. 2003).

[81]  *In re Keeper of Records*, 348 F.3d at 24 (1st Cir. 2003).

[82]  *Id.*

[83]  *Id.*

manufactured medical products, and its outside counsel participated in a conference call with XYZ's co-venturer in which they discussed XYZ's intent to withdraw a defective product from the market.  Because of the presence of the third party co-venturer, no privilege attached to this discussion.[84]  A grand jury subsequently issued a subpoena to XYZ, which did not contend that the call was privileged, but did assert the attorney-client privilege for confidential communications with its outside counsel regarding the same subject matter as was discussed in the call.  The Government argued – just as it has argued here – that by participating in the call with both its outside counsel and its co-venturer,  XYZ had waived the privilege for all confidential communications with its counsel on the same subject matter.[85]

The First Circuit rejected this sweeping waiver argument.  It noted that XYZ had not placed its confidential communications with its counsel at issue in the litigation by raising an advice of counsel defense, by selectively disclosing certain confidential communications in litigation while withholding others, or by attempting to use its communications with its counsel as both a "sword and a shield."  Thus, XYZ was not asserting a selective privilege for its "personal benefit" and not undermining the fundamental fairness of the proceedings.[86]

The Government has established that RSMM and Bryan Cave had certain communications in which a third party was present, and now seeks disclosure of all of RSMM's confidential communications with its counsel.  But as in *Keeper of Records*, RSMM (which, again, is not a party in this case) has not placed Bryan Cave's advice at issue in this litigation by asserting an advice of counsel defense to any claim, or by selectively disclosing some confidential communications and withholding others.  In other words, RSMM is not attempting to use the attorney-client privilege as a sword; it seeks only to maintain the secrecy of its confidential communications with its counsel.  Thus, RSMM has not waived the privilege for its

---

[84]  *Id.* at 23.

[85]  *Id.*

[86]  *Id.* at 24.

confidential communications with Bryan Cave by involving third parties in certain communications regarding the same subject matter.

## CONCLUSION

RSMM retained and paid Bryan Cave to provide legal advice to help RSMM evaluate the transaction strategies it was considering offering its clients were valid and to determine the legal requirements applicable to its business. RSMM's communications with Bryan Cave were for the purpose of securing legal advice, and RSMM did not reveal its confidential communications with Bryan Cave to DGI or to any other third party and thereby waive its attorney-client privilege. The Government's motion to compel should be denied.

Dated: August 12, 2008                    RSM MCGLADREY, INC.

                                          By: /s/  Matthew M. Neumeier
                                              One of its Attorneys

Robert L. Kann                            Matthew M. Neumeier
BROMBERG & SUNSTEIN  LLP                  HOWREY LLP
125 Summer Street                         321 N. Clark Street
Boston, MA 02110                          Suite 3400
(617) 443-9292                            Chicago, Illinois 60654
(617) 443-0004 (fax)                      (312) 595-1239
                                          (312) 595-2250 (fax)


Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified in the Notice of Electronic Filing and copies will be sent to those indicated as non-registered participants on August 12, 2008.

/s/  Matthew M. Neumeier

# Exhibit 1

| From: | Neumeier, Matthew |
|---|---|
| Sent: | Monday, July 21, 2008 5:42 PM |
| To: | Reiferson, Barry E. (TAX); Fouts, Gregory; Robert Kann |
| Subject: | RE: Motion to Compel RSM |

Barry:

My last minute e-mail follows on your notification that you were in fact going to move to compel on this issue today or tomorrow, which until your email earlier today, was not definitively proclaimed to us at any prior point in time. We met and conferred at considerable length many times over this issue, and in each instance, respectfully requested that you share with us the facts you claim to have to support your waiver assertions. We made that request after we demonstrated uniquivocally that Bryan Cave had been formally retained by RSM McGladrey to provide legal advice on federal tax issues, and did just that at considerable cost to our client. Significant periods of time elapsed between each such discovery conference. Based on a glance at my notes, the last occasion was April 28, 2008, when your side suggested that Mr. Barrie acted essentially in the same manner as Mr. Axelrod at Proskauer Rose. Having reviewed the Court's ruling on the Proskauer privilege claim at your suggestion, however, it is evident that the privilege issues pertaining to the "form" opinions that Proskauer prepared for DGI's transaction clients differ markedly from the specific legal advice that RSM McGladrey sought and received from Bryan Cave to assist them in its own business decisions. That's what I told you at the time, and still believe today.

Needless to say, I disagree with your characterizations of our conversations and our alleged duties. I agree that you have asserted in conversations at various times that our client "disclosed its communications and the subject of them to DGI and potential customers." But you have never provided any factual support (either documents or testimony) beyond making this conclusory factual assertion that lacks any specificity as to times, dates, places and individuals. I was very candid in advising you that if you showed me that, we would very seriously reconsider our privilege assertions as we have no intention to simply assert claims that lack any basis in fact or law. The testimony you elicited from Mr. Wainwright does not contradict our views on this topic.

What I stated today is that if RSM McGladrey advised DGI or others that it took a certain business or legal position with regard to various provisions of the tax laws -- such as a disclosure regulation -- that did not constitute a waiver of any legal advice it may have received on that topic from outside counsel if (i) the position was a business or legal position adopted by RSM McGladrey, based on its own evaluation of the tax laws and all the various input it may have received internally and externally, and (ii) RSM McGladrey did not state that it adopted this position based on reliance on advice of outside counsel or otherwise reveal that it had obtained such advice. As Mr. Neumann pointed out, RSM McGladrey's internal tax experts formed their own views as to the applicability of various tax rules and regulations. While they often solicited advice from outside counsel, the policies and procedures they ultimately adopted were based on their own legal and business judgment. If a business cannot consider advice from outside counsel prior to adopting its own business practices without waiving all its privileges, the notion of attorney client privilege would simply be illusory.

As for reviewing our own documents, we did just that prior to gathering and producing them at extraordinary expense in response to your subpoenas. We did it again in preparation for Mr. Wainwright's two (and repetitive) depositions. We have not come across documents that, based on our review, suggest that RSM McGladrey disclosed the substance of any legal advice it sought and received from Bryan Cave to third parties. You apparently interpret these same documents differently than we do -- and I respect your right to view them in a different light. Yet you have never identified a single document produced by RSM McGladrey that you contend supports your waiver contention despite my repeated requests made in the interest of resolving this dispute. Given these circumstances, I am at a loss as to how we are to conclude that such alleged waivers -- and apparently many of them, based on your assertions over time -- ever occurred. I have not asked that you conduct any investigation for us. I simply asked for you to show me factual support for your contentions so I could properly evaluate them as required by Rule 37 and general practice.

Your further suggestion that I am not acting in good faith because I refused to reveal to you the substance of conversations we have had with Mr. Wainwright in the course of our representation merely illustrates the vast chasm between our differing views on privilege.

In sum, I reiterate that we have cooperated extensively and in good faith from the start. We have no desire to be devoting resources on discovery disputes for which we have no plausible basis to support our position. But when it comes to our client's privileged communications we cannot just abdicate our well-grounded position. That's all I ever said before.

At this point I have said more than I need to, since it is clear that you intend to file your motion no matter what.

Matt

---

**From:** Reiferson, Barry E. (TAX) [mailto:Barry.E.Reiferson@usdoj.gov]
**Sent:** Monday, July 21, 2008 4:45 PM
**To:** Neumeier, Matthew; Fouts, Gregory; Robert Kann
**Subject:** RE: Motion to Compel RSM

Dear Mr. Neumeier,

I am disappointed that you chose to send this last-minute email rather than to attempt to take any affirmative step to review your own documents or speak with your own client to determine if there was indeed a waiver of privilege. We have advised you and your local counsel, and also the Court, that we are considering and have been considering filing a motion to compel. We have described to you over the course of months that RSM routinely disclosed its communications and the subject of them to DGI and potential customers, and also often involved DGI in its communications. When we first asked you to confirm this, you suggested that we already had an opportunity to depose Mr. Wainwright, and you had no duty to ask him. You stated further that even if you had asked your own client(s) about waiver, we were not entitled to know. You even claimed before and today that the disclosure of the purportedly privileged subject matter is not a waiver unless RSM also explicitly disclosed its source. You said repeatedly, including today, that you have no duty to conduct any investigation whatsoever into the accuracy of your own privilege claims. We disagree. That is particularly so where most of the evidence of non-privilege and waiver is in your own documents. You demanded and demand now that we conduct your investigation, and provide you with all supporting evidence, which, for the reasons you have described in each of the conferences, is unlikely to change your mind; that early disclosure would give you more time than you are allowed to oppose a motion which could have been avoided if you had investigated your own privilege claims.

Sincerely,
Barry Reiferson

**From:** Neumeier, Matthew [mailto:NeumeierM@howrey.com]
**Sent:** Monday, July 21, 2008 5:14 PM
**To:** Reiferson, Barry E. (TAX); Fouts, Gregory; rbuch@mckeenelson.com; Amanti, Lena; Robert Kann
**Subject:** RE: Motion to Compel RSM

Barry:

This will confirm our conversation in which I advised you that we do not object to your filing of a motion to file RSM McGladrey documents under seal in conjunction with your anticipated motion to compel on our privileged documents.

I reiterate that I am disappointed that you are moving to compel on this issue and putting our client through considerable additional expense. We have repeatedly requested over the past six months that you provide us with copies of any documents or testimony that you believe demonstrate any improper sharing of Bryan Cave's legal advice to RSM McGladrey with any third party, including Diversified Group, Inc. As I said before and again today, if you had such evidence and shared it with us, we would reconsider our privilege assertions. To date, however, you have not identified any specific documents or testimony to support your waiver contention, and instead insisted that we affirmatively prove the negative that there was no waiver, without knowing what your contentions are based upon beyond surmise and speculation. Indeed, in your two examinations of Mr. Wainwright, you did not reveal any sharing of that legal advice with anyone else, and your examinations on this topic were at best perfunctory and only confirmed that no waiver occurred. Your recent interview of Mr. Neumann likewise confirmed that Bryan Cave was retained as outside counsel to advise RSM McGladrey on a variety of tax law issues, and their legal advice was not shared outside the company.

I understand that you intend to attach your "proof" on your waiver contention with your motion papers. But that is an after-the-fact disclosure that is not helpful to us in attempting to resolve a discovery dispute *prior* to filing a motion to compel.

As I just noted in our conversation, there has been no complaint by your side as to the sufficiency of our privilege log itself, following certain changes that we made at Mr. Lindquist's request some time ago. So I am assuming that your motion will only be raising the issue of alleged waivers by the disclosure of the legal advice to others.

Please provide us with copies of your motion papers and exhibits by e-mail to ensure that we are able to promptly respond.

Again, I am very disappointed at this development. We have tried diligently to comply with all our discovery obligations as a third party in this litigation. This is best exemplified by our not challenging your second deposition of Mr. Wainwright even though the subject matter -- his tax return work for the Egan family and RSM McGladrey's business transactions with DGI -- overlapped completely and he had been deposed for a full seven hours the first time.

Matt

Matthew M. Neumeier

Partner

**HOWREY** LLP
321 North Clark Street, Suite 3400
Chicago, IL 60654-2402
Direct: +1 312.846.5640
Fax: +1 312.595.2250
NeumeierM@howrey.com
www.howrey.com

Amsterdam  Brussels  **Chicago**  East Palo Alto  Houston  Irvine  London  Los Angeles  Madrid
Munich  New York  Northern Virginia  Paris  Salt Lake City  San Francisco  Taipei  Washington DC

---

**From:** Reiferson, Barry E. (TAX) [mailto:Barry.E.Reiferson@usdoj.gov]
**Sent:** Monday, July 21, 2008 11:01 AM
**To:** Neumeier, Matthew; Fouts, Gregory; rbuch@mckeenelson.com; Amanti, Lena
**Subject:** Motion to Compel RSM

Counsel,

We intend to file today or tomorrow a motion to compel production of withheld documents from RSM McGladrey. Many of the exhibits we will use are subject to one of the various protective orders entered in this case, most frequently RSM's protective order.  Do you assent to a motion to file those protected exhibits under seal?

Sincerely,
Barry Reiferson

------------------------------------------------------------------------------------------------------
This email and any attachments contain information from the law firm of Howrey LLP, which may be confidential and/or privileged. The information is intended to be for the use of the individual or entity named on this email. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this email is prohibited. If you receive this email in error, please notify us by reply email immediately so that we can arrange for the retrieval of the original documents at no cost to you. We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our expre permission. If you receive an attachment containing metadata, please notify the sender immediately and replacement will be provided. Howrey LLP consists of two separate limited liability partnerships, one formed in the United States (Howrey US) and one formed in the United Kingdom (Howrey UK). Howre; registered in England and Wales under number OC311537 and regulated by the Solicitors Regulation A (http://www.sra.org.uk/code-of-conduct.page). Howrey's London and Paris offices are operated as part o Howrey UK. A list of the partners of Howrey UK is available for inspection at its registered office: 22 Tudor Street, London EC4Y 0AY. A consolidated list of all Howrey US and Howrey UK attorneys and jurisdictions where they are authorized to practice and/or are registered can be obtained by contacting emailrequest@howrey.com.
------------------------------------------------------------------------------------------------------

# Exhibit 2

### Individuals Listed In RSM McGladrey's ("RSMM") Privilege Log

| Name | Organization | Title/Role[1] |
|---|---|---|
| Appel, Alan | Bryan Cave | Attorney |
| Barrie, John | Bryan Cave | Partner |
| Gevock, Joe | RSMM | Managing Director; Member of Technical Standing Group |
| Meisels, Naomi | Bryan Cave | Associate |
| Moss, Kimpa | RSMM | Exec. VP, National Tax Services |
| Murphy, Pat | RSMM | Managing Director, Member of Structured Transactions Group |
| Neumann, Roger | RSMM | Sr. Managing Director; Member of Technical Standing Group |
| Phillips, Lana | Bryan Cave | Associate |
| Ruby, Scott | RSMM | Director, Tax |
| Sarcuni, Marion | Bryan Cave | Secretary to E. Smith |
| Sansone, James | RSMM | Managing Director |
| Schamberger, Steve | RSMM | Managing Director; Member of Technical Standing Group |
| Smith, Elizabeth ("Betsy") | Bryan Cave | Partner |
| Thompson, John | RSMM | Managing Director; Member of Technical Standing Group |

---

[1] As of the date of the privilege log document(s) on which their names appear.

| Tyler, Duane | RSMM | Senior VP, Member of Structured Transactions Group |
|---|---|---|
| Wainwright, Ron | RSMM | Managing Director; Leader of Structured Transactions Group |

# Exhibit 3

# FILED UNDER SEAL

# Exhibit 4

# FILED UNDER SEAL

# Exhibit 5

Ronald G. Wainwright - October 29, 2007
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                   DISTRICT OF MASSACHUSETTS

3

4    FIDELITY INTERNATIONAL            )

5    CURRENCY ADVISOR A FUND,          )

6    L.L.C., by the Tax Matters        )

7    Partner,                          )

8          Plaintiff,                  )

9          -vs-                        )  Nos. 05-40151

10   UNITED STATES OF AMERICA,         )        06-40130

11         Defendant.                  )

12         The deposition of RONALD G. WAINWRIGHT

13   JR. called for examination pursuant to Notice

14   and the Rules of Civil Procedure for the United

15   States District Courts pertaining to the taking

16   of depositions, taken before Gina Callahan, a

17   notary public within and for the County of

18   Iroquois and State of Illinois, at 321 North

19   Clark Street, 34th Floor, Chicago, Illinois, on

20   the 29th day of October, 2007, at the hour of

21   10:00 a.m.

22

**Ronald G. Wainwright - October 29, 2007**
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 52

| | | |
|---|---|---|
| 1 | Is that a fair characterization? | 11:22AM |
| 2 | **A.** Yes. | 11:22AM |
| 3 | **Q.** On the page ending with Bates number -- | 11:22AM |
| 4 | with Bates number ending in 505, appears to be | 11:22AM |
| 5 | an e-mail from Mox Tan to you, among others. | 11:22AM |
| 6 | The list of recipients is on Bates number ending | 11:22AM |
| 7 | in 504. This e-mail refers to a meeting in New | 11:22AM |
| 8 | York. | 11:23AM |
| 9 | Do you recall being at a meeting with | 11:23AM |
| 10 | Mox Tan in New York concerning something | 11:23AM |
| 11 | referred to as the Financial Derivatives | 11:23AM |
| 12 | Investment Strategy? | 11:23AM |
| 13 | **A.** Yes. | 11:23AM |
| 14 | **Q.** Was this strategy presented or | 11:23AM |
| 15 | discussed with you at that meeting? | 11:23AM |
| 16 | **A.** Yes. | 11:23AM |
| 17 | **Q.** And what did -- who presented this | 11:23AM |
| 18 | strategy to you? | 11:23AM |
| 19 | **A.** Jimmy Haber, the president of the | 11:23AM |
| 20 | Diversified Group, presented this strategy. | 11:23AM |
| 21 | **Q.** What was the purpose for this meeting? | 11:23AM |
| 22 | **A.** We had been as a firm referred to the | 11:23AM |

Page 53

1    Diversified Group, and the purpose of the                11:24AM

2    meeting was to -- it was an initial meeting to           11:24AM

3    see what strategies the Diversified Group had            11:24AM

4    developed and created and were in the market             11:24AM

5    with from a tax strategy perspective.                    11:24AM

6        Q.   On the first page of this document,             11:24AM

7    Bates number ending in 503, there is a reference         11:24AM

8    to the Complex Solutions Group.                          11:24AM

9             Were you attending this meeting as a            11:24AM

10   member of the Complex Solutions Group?                   11:24AM

11       A.   Yes.                                            11:25AM

12       Q.   In the to section of the e-mail that            11:25AM

13   you've -- that this shows that you sent, are             11:25AM

14   these other members of the Complex Solutions             11:25AM

15   Group?                                                   11:25AM

16       A.   Yes.                                            11:25AM

17       Q.   And who are the folks on the cc line in         11:25AM

18   this e-mail?                                             11:25AM

19       A.   Other partners within the firm that --         11:25AM

20   other partners within the firm.                          11:25AM

21       Q.   Were they serving in any particular             11:25AM

22   capacity that caused you to forward this to them         11:25AM

# Exhibit 6

Case 4:05-cv-40151-FDS   Document 326-7   Filed 08/12/2008   Page 2 of 6

Ronald G. Wainwright - October 29, 2007
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3

4    FIDELITY INTERNATIONAL          )

5    CURRENCY ADVISOR A FUND,        )

6    L.L.C., by the Tax Matters      )

7    Partner,                        )

8         Plaintiff,                 )

9         -vs-                       )   Nos. 05-40151

10   UNITED STATES OF AMERICA,       )        06-40130

11        Defendant.                 )

12        The deposition of RONALD G. WAINWRIGHT

13   JR. called for examination pursuant to Notice

14   and the Rules of Civil Procedure for the United

15   States District Courts pertaining to the taking

16   of depositions, taken before Gina Callahan, a

17   notary public within and for the County of

18   Iroquois and State of Illinois, at 321 North

19   Clark Street, 34th Floor, Chicago, Illinois, on

20   the 29th day of October, 2007, at the hour of

21   10:00 a.m.

22

Page 65

| | |
|---|---|
| 1 | being vague and impossible to answer. | 11:44AM |
| 2 | MR. LINDQUIST:  I will also object. | 11:44AM |
| 3 | MR. NEUMEIER:  He lacks foundation to be able | 11:45AM |
| 4 | to do that on behalf of RSM McGladrey. | 11:45AM |
| 5 | MR. LINDQUIST:  I will also object as to | 11:45AM |
| 6 | time. | 11:45AM |
| 7 | BY MR. BUCH: | 11:45AM |
| 8 | Q.  You may answer if you can. | 11:45AM |
| 9 | A.  It was the policy, the firm policy of | 11:45AM |
| 10 | RSM McGladrey and the Structured Transactions | 11:45AM |
| 11 | Group that upon the issuance of the June 14th, | 11:45AM |
| 12 | 2002 IRS disclosure regulations, that we would | 11:45AM |
| 13 | recommend and did recommend to all of our | 11:45AM |
| 14 | clients to disclose transactions that were | 11:45AM |
| 15 | substantially similar or essentially similar to, | 11:46AM |
| 16 | i.e., the most conservative position listed | 11:46AM |
| 17 | transaction. | 11:46AM |
| 18 | Q.  Did the receipt of an outside opinion | 11:46AM |
| 19 | from a law firm influence whether RSM required | 11:46AM |
| 20 | disclosure? | 11:46AM |
| 21 | MR. LINDQUIST:  Objection, vague. | 11:46AM |
| 22 | MR. NEUMEIER:  I'm going to object again to | 11:46AM |

Ronald G. Wainwright - October 29, 2007
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 66

| | |
|---|---|
| 1    foundation, and I don't know what you're | 11:46AM |
| 2    referring to here. | 11:46AM |
| 3       MR. LINDQUIST:  I'll also object to the | 11:46AM |
| 4    extent you're characterizing this particular | 11:46AM |
| 5    opinion from Proskauer, Rose as an independent | 11:47AM |
| 6    outside law firm. | 11:47AM |
| 7       THE WITNESS:  Our firm policy and in the | 11:47AM |
| 8    policy of the Structured Transactions Group | 11:47AM |
| 9    posted June 14th, 2002, disclosure regs issued | 11:47AM |
| 10   by the IRS was to disclose recommend disclosure | 11:47AM |
| 11   to all of our clients.  And without | 11:47AM |
| 12   disclosure -- let me step back. | 11:47AM |
| 13          If a client, for whatever reason, | 11:47AM |
| 14   believed technically that a transaction should | 11:48AM |
| 15   not be disclosed, we would only agree and sign a | 11:48AM |
| 16   return upon a well reasoned legal opinion by an | 11:48AM |
| 17   independent law firm from -- independent to the | 11:48AM |
| 18   client and to McGladrey, an independent law | 11:48AM |
| 19   firm. | 11:48AM |
| 20   BY MR. BUCH: | 11:48AM |
| 21      Q.   What steps did you take to determine | 11:48AM |
| 22   whether such an opinion was well reasoned? | 11:48AM |

**Ronald G. Wainwright - October 29, 2007**
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 67

| | | |
|---|---|---|
| 1 | **A.**   Well, referring back to this e-mail of | 11:48AM |
| 2 | August 9th, we understood a number of firms | 11:49AM |
| 3 | would render opinions in regards to | 11:49AM |
| 4 | non-disclosure, and the reason that we received | 11:49AM |
| 5 | this e-mail was we needed to technically review | 11:49AM |
| 6 | opinions that would be written and were being | 11:49AM |
| 7 | written to understand the technical merits of | 11:49AM |
| 8 | the opinion. | 11:49AM |
| 9 | **Q.**   And what steps did you take to | 11:49AM |
| 10 | determine whether the law firm was independent? | 11:49AM |
| 11 | MR. NEUMEIER:  Objection, vagueness as to | 11:49AM |
| 12 | time and firms for transactions. | 11:49AM |
| 13 | MR. LINDQUIST:  Objection as vague. | 11:50AM |
| 14 | THE WITNESS:  Clients who completed tax | 11:50AM |
| 15 | strategies independently were receiving legal | 11:50AM |
| 16 | opinions in regard to the technical merits of | 11:50AM |
| 17 | that transaction. | 11:50AM |
| 18 | Our definition of independence in | 11:50AM |
| 19 | regards to the disclosure opinion was that it -- | 11:50AM |
| 20 | if a client did not wish to disclose a | 11:50AM |
| 21 | transaction, the client had to seek out an | 11:50AM |
| 22 | independent law firm, independent law firm being | 11:50AM |

**Ronald G. Wainwright - October 29, 2007**
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 68

| | |
|---|---|
| 1   defined as a separate law firm from the -- from | 11:50AM |
| 2   their General Counsel, as well as from a | 11:50AM |
| 3   different law firm who rendered them their | 11:51AM |
| 4   initial tax opinion. | 11:51AM |
| 5                    (Whereupon, Deposition Exhibit | 11:51AM |
| 6                    No. RW-6 was marked for | 11:51AM |
| 7                    identification.) | 11:51AM |
| 8   BY MR. BUCH: | 11:51AM |
| 9     Q.   I'm handing you what's been marked as | 11:51AM |
| 10   Plaintiff's Exhibit RW-6 which appears to be an | 11:51AM |
| 11   e-mail from you to Pat S at CM LLC. | 11:51AM |
| 12       Who do you understand Pat S to be? | 11:51AM |
| 13     A.   Pat Shea. | 11:51AM |
| 14     Q.   Was this sent in preparation for your | 11:52AM |
| 15   first meeting with the client, if you recall? | 11:52AM |
| 16     A.   Yes. | 11:52AM |
| 17     Q.   In this e-mail you request -- you | 11:52AM |
| 18   appear to request a number of documents. | 11:52AM |
| 19       Do you recall receiving those materials | 11:52AM |
| 20   to review? | 11:52AM |
| 21     A.   Yes. | 11:52AM |
| 22     Q.   There is a specific reference here to | 11:52AM |

# Exhibit 7

Case 4:05-cv-40151-FDS    Document 326-8    Filed 08/12/2008    Page 2 of 3

**Ronald G. Wainwright - October 29, 2007**
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3

4    FIDELITY INTERNATIONAL            )

5    CURRENCY ADVISOR A FUND,          )

6    L.L.C., by the Tax Matters        )

7    Partner,                          )

8         Plaintiff,                   )

9         -vs-                         )   Nos. 05-40151

10   UNITED STATES OF AMERICA,         )        06-40130

11        Defendant.                   )

12        The deposition of RONALD G. WAINWRIGHT

13   JR. called for examination pursuant to Notice

14   and the Rules of Civil Procedure for the United

15   States District Courts pertaining to the taking

16   of depositions, taken before Gina Callahan, a

17   notary public within and for the County of

18   Iroquois and State of Illinois, at 321 North

19   Clark Street, 34th Floor, Chicago, Illinois, on

20   the 29th day of October, 2007, at the hour of

21   10:00 a.m.

22

**Ronald G. Wainwright - October 29, 2007**
Fidelity International Currency Advisor A Fund LLC v. The United States of America

Page 88

1    **A.**    No.                                                      01:28PM

2    **Q.**    You indicated that you were introduced         01:28PM

3    to the plaintiff, plaintiff's representatives by        01:28PM

4    a James Haber.  About when was that?                    01:29PM

5    **A.**    It was in the obviously 2001, 2002            01:29PM

6    timetable.  It would have been late August,             01:29PM

7    early September 2002.                                   01:29PM

8    **Q.**    And is there any reference point that         01:29PM

9    you're thinking of that pinpoints that time             01:29PM

10   period for you?                                         01:29PM

11   **A.**    The signing of the tax return on             01:29PM

12   September 12th, 2002, and the recognition that          01:29PM

13   it was a very short timetable upon when we were         01:30PM

14   introduced and when I first visited to propose          01:30PM

15   on the work.                                            01:30PM

16   **Q.**    What did Mr. Haber tell you about the         01:30PM

17   Egans as to why he was recommending that you            01:30PM

18   contact them?                                           01:30PM

19   **A.**    Mr. Haber indicated that the Egans had       01:30PM

20   had a disagreement with KPMG Peat Marwick, their        01:30PM

21   current service providers, and that the Egans           01:30PM

22   were exploring other service providers for              01:30PM

# Exhibit 8

# FILED UNDER SEAL

# Exhibit 9

RONALD WAINWRIGHT

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

FIDELITY HIGH TECH ADVISOR     )

A FUND, L.L.C., by the Tax     )

Matters Partner,               )

        Plaintiff,             )

    vs.                        ) Civil Nos.

                           ) 06-40243 & 06-40244

UNITED STATES OF AMERICA,      )

        Defendant.             )


        The videotaped deposition of

RONALD WAINWRIGHT, called as a witness for

examination, taken pursuant to the Federal

Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before KELLY M. FITZGERALD,

a Certified Shorthand Reporter of said state,

at Suite 3400, 321 North Clark Street, Chicago,

Illinois, on the 30th day of May, A.D. 2008, at

10:22 a.m.

RONALD WAINWRIGHT

1    BY MR. REIFERSON:

2        Q.    How did you determine that certain

3    investment transactions entered into by clients

4    could be viewed by the IRS as substantially

5    similar to the transactions set forth in

6    temporary treasury regulations

7    Section 1.6011-4T?

8            MR. NEUMEIER:  Okay.  I'm going

9        object to the vagueness of this.  You don't

10       specify any transaction.

11   BY MR. REIFERSON:

12       Q.    You can answer.

13       A.    The service pronounced approximately

14   June 2002 underneath decided temporary treasury

15   regulations disclosure requirements with

16   respect to tax returns that would be signed

17   post June 14, 2002, if memory serves me.  The

18   technical standing group reviewed the treasury

19   regs and made the determinations as outlined in

20   this memorandum.

21       Q.    Which transactions specifically

22   were -- did you determine could be viewed by

23   the IRS as substantially similar as described

24   here?

25           MR. NEUMEIER:  I'm going to object

# Exhibit 10

RONALD WAINWRIGHT

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

FIDELITY HIGH TECH ADVISOR    )

A FUND, L.L.C., by the Tax    )

Matters Partner,              )

        Plaintiff,            )

    vs.                       )  Civil Nos.

                          )  06-40243 & 06-40244

UNITED STATES OF AMERICA,      )

        Defendant.            )


       The videotaped deposition of

RONALD WAINWRIGHT, called as a witness for

examination, taken pursuant to the Federal

Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before KELLY M. FITZGERALD,

a Certified Shorthand Reporter of said state,

at Suite 3400, 321 North Clark Street, Chicago,

Illinois, on the 30th day of May, A.D. 2008, at

10:22 a.m.

RONALD WAINWRIGHT

Page 62

1      Q.    Did you relay any of the information

2    that Bryan Cave gave you with respect to the

3    Diversified Group to anyone outside RSM

4    McGladrey?

5            MS. ABROMS:  I'll object to the

6        form.

7    BY THE WITNESS:

8      A.    No.  To my knowledge, no.

9    BY MR. REIFERSON:

10     Q.    Did you relay any of the information

11   Bryan Cave gave you with respect to DGI to any

12   of RSM's clients when discussing potential DGI

13   transactions?

14           MS. ABROMS:  Objection.  Asked and

15       answered.

16           THE WITNESS:  If I can trouble you

17       to read back the question.

18           (WHEREUPON, the record was read by

19       the reporter as requested.)

20   BY THE WITNESS:

21     A.    No, to my knowledge.

22   BY MR. REIFERSON:

23     Q.    What did you tell RSM McGladrey

24   clients when you approached them with respect

25   to the partnership derivative strategy?

# Exhibit 11

RONALD WAINWRIGHT

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

FIDELITY HIGH TECH ADVISOR  )

A FUND, L.L.C., by the Tax  )

Matters Partner,            )

        Plaintiff,          )

    vs.                     )  Civil Nos.

                    )  06-40243 & 06-40244

UNITED STATES OF AMERICA,    )

        Defendant.          )


        The videotaped deposition of

RONALD WAINWRIGHT, called as a witness for

examination, taken pursuant to the Federal

Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before KELLY M. FITZGERALD,

a Certified Shorthand Reporter of said state,

at Suite 3400, 321 North Clark Street, Chicago,

Illinois, on the 30th day of May, A.D. 2008, at

10:22 a.m.

RONALD WAINWRIGHT

Page 106

```
 1    then also our outside tax counsel.

 2         Q.    Who is the technical standing group?

 3               MS. ABROMS:  Objection.

 4               MR. NEUMEIER:  You covered this in

 5         your prior deposition.

 6               MS. ABROMS:  Same objection.  I

 7         believe the names were listed then.

 8    BY THE WITNESS:

 9         A.    The technical standing group was a

10    separate, distinct group that was formed as a

11    technical oversight to the structure

12    transactions group who was responsible for

13    internal technical reviews by our firm of all

14    strategies.

15    BY MR. REIFERSON:

16         Q.    Which law firm, which outside law

17    firm verified the analyses?

18               MR. NEUMEIER:  I'm going to object

19         to your characterization of it being as

20         verified.

21    BY MR. REIFERSON:

22         Q.    Which outside law firm reviewed the

23    analyses?

24         A.    Bryan Cave.

25         Q.    How was -- how was it relayed to you
```

RONALD WAINWRIGHT

Page 107

1    that Bryan Cave reviewed the analyses?

2        A.    Orally and in written format.

3        Q.    When you say written format, was it

4    an e-mail, a report, how was that done?

5        A.    Memorandum.

6        Q.    Who specifically at Bryan Cave did

7    that review?

8        A.    The two lead partners were Mr. John

9    Barry and Ms. Betsy Smith, but there were other

10   attorneys I'm sure that were involved in the

11   review and analysis.

12       Q.    Did you then share the Bryan Cave

13   memoranda with Diversified?

14       A.    No.

15       Q.    Did you share it with your clients?

16       A.    No.

17       Q.    Handing you what's been marked as

18   Exhibit 3573.

19       A.    Uh-huh.

20       Q.    First of all, is this your

21   handwriting in the margins?

22       A.    Yes.

23       Q.    So you've seen this document before

24   obviously?

25       A.    Yes.

# Exhibit 12

RONALD WAINWRIGHT

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


FIDELITY HIGH TECH ADVISOR    )

A FUND, L.L.C., by the Tax    )

Matters Partner,              )

       Plaintiff,            )

   vs.                        ) Civil Nos.

                    ) 06-40243 & 06-40244

UNITED STATES OF AMERICA,      )

       Defendant.            )


       The videotaped deposition of

RONALD WAINWRIGHT, called as a witness for

examination, taken pursuant to the Federal

Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before KELLY M. FITZGERALD,

a Certified Shorthand Reporter of said state,

at Suite 3400, 321 North Clark Street, Chicago,

Illinois, on the 30th day of May, A.D. 2008, at

10:22 a.m.

RONALD WAINWRIGHT

Page 131

```
 1   BY MR. REIFERSON:

 2        Q.    How did you determine that certain

 3   investment transactions entered into by clients

 4   could be viewed by the IRS as substantially

 5   similar to the transactions set forth in

 6   temporary treasury regulations

 7   Section 1.6011-4T?

 8             MR. NEUMEIER:  Okay.  I'm going

 9        object to the vagueness of this.  You don't

10        specify any transaction.

11   BY MR. REIFERSON:

12        Q.    You can answer.

13        A.    The service pronounced approximately

14   June 2002 underneath decided temporary treasury

15   regulations disclosure requirements with

16   respect to tax returns that would be signed

17   post June 14, 2002, if memory serves me.  The

18   technical standing group reviewed the treasury

19   regs and made the determinations as outlined in

20   this memorandum.

21        Q.    Which transactions specifically

22   were -- did you determine could be viewed by

23   the IRS as substantially similar as described

24   here?

25             MR. NEUMEIER:  I'm going to object
```

RONALD WAINWRIGHT

Page 132

1          to the extent it assumes facts that aren't

2          in evidence.

3     BY THE WITNESS:

4          A.    The temporary treasury regulations,

5     as I recall, I haven't looked at them in some

6     time, required disclosure for any transaction

7     that was substantially similar to a listed

8     transaction at that time.

9              So in our review, as so stated, we

10    adopted the policy that given the regulations

11    indicated to error in favor of disclosure, we

12    adopted a policy that, you know, we would

13    disclose any and all transactions that, you

14    know, were viewed as similar or substantially

15    similar to any listed transactions.  So we

16    adopted a policy full disclosure, in essence.

17         Q.    Viewed by who?

18         A.    Viewed by ourselves as the return

19    preparer and signers of the tax return, in

20    combination with the client.

21         Q.    Did that include basis enhancement

22    transaction?

23         A.    I don't recall.  At the time, all of

24    the listed transactions that have been

25    pronounced, you know, prior to June 14, 2002, I

# Exhibit 13

**Appendix:  Deposition Testimony Regarding**
**Attorney-Client Relationship Of RSM McGladrey, Inc. and Bryan Cave**

    **A.**    **Deposition of Ronald Wainwright,** *Fidelity High Tech v.*
                *United States***, 01/08/2008.**

*P. 62:*

1    Q.  Did you relay any of the information
2    that Bryan Cave gave you with respect to the
3    Diversified Group to anyone outside RSM
4    McGladrey?

5    MS. ABROMS: I'll object to the
6    form.

7    BY THE WITNESS:

8    A.  No. To my knowledge, no.

9    BY MR. REIFERSON:

10    Q.  Did you relay any of the information
11    Bryan Cave gave you with respect to DGI to any
12    of RSM's clients when discussing potential DGI
13    transactions?

14    MS. ABROMS: Objection. Asked and
15    answered.

16    THE WITNESS: If I can trouble you
17    to read back the question.

18    (WHEREUPON, the record was read by
19    the reporter as requested.)

20    BY THE WITNESS:

21    A.  No, to my knowledge.

*P. 106-107:*

21    BY MR. REIFERSON:

22    Q.  Which outside law firm reviewed the
23    analyses?

24    A. Bryan Cave.

25    Q. How was -- how was it relayed to you
1     that Bryan Cave reviewed the analyses?

2     A. Orally and in written format.

3     Q. When you say written format, was it
4     an e-mail, a report, how was that done?

5     A. Memorandum.

6     Q. Who specifically at Bryan Cave did
7     that review?

8     A. The two lead partners were Mr. John
9     Barry and Ms. Betsy Smith, but there were other
10    attorneys I'm sure that were involved in the
11    review and analysis.

12    Q. Did you then share the Bryan Cave
13    memoranda with Diversified?

14    A. No.

15    Q. Did you share it with your clients?

16    A. No.

*Page 135:*

1     Q. Which counsel are you referring to
2     that you conferred with on the partnership
3     derivative strategy and the need to disclose or
4     lack thereof? 4 Q. Why was it not concluded?

5     A. Bryan Cave. They were our outside
6     tax counsel.

*P. 151-52:*

22    Q. Which outside advisors did you have
23    discussions with regarding this opinion?

24    A. We sought the counsel of our outside

25    tax counsel, Bryan Cave, and certainly had
1     internal discussions within the technical
2     standing group.

      C.    **Deposition of John Barrie,** *Fidelity International Currency Advisor v. United States,* **01/08/2008.**

*P. 57-58:*

19    Q.  And how is it that you first became
20    familiar with Mr. Wainwright?

21    A.  I became familiar with him in, I believe,
22    August of 2001 when he came to engage us on behalf
1     of McGladrey with respect to a matter.

2     Q.  And can you tell me what that matter was?

3     A.  Yeah, involving the list designation of
4     the Diversified transaction.

*P. 113:*

      Q.  Why -- do you know why Mr. Tilevitz was
11    sending you an excerpt from the Pryor Cashman
12    opinion?

13    A.  Yes.

14    Q.  And what was that?  Why was that?

15    A.  We were meeting with another client that
16    was also a person dealing with the Diversified Group
17    as to whether or not they could rely upon an opinion
18    like this for list maintenance.

19    Q.  And who was that other person or entity?

20    A.  RSM McGladrey.

*P. 123:*

21    BY MR. LINDQUIST:

22    Q.  Were you aware of -- did you ever advise

*P. 124:*

1    RSM McGladrey of your position with respect to list
2    maintenance as reflected in your communications with
3    Mr. Tilevitz?

4    A. Can you rephrase that question?  I'm not
5    sure I --

6    Q.  Certainly.  Let's go back to Government
7    Exhibit 2402.  Did you ever provide a copy of --
8    forward a copy of that e-mail to anyone at RSM
9    McGladrey?

10    A.  Not to my knowledge.

*P. 215-216:*

BY MR. LINDQUIST:

16    Q.  As of the date of this e-mail exchange,
17    June 26, '02, was RSM McGladrey a client of Bryan
18    Cave?

19    A.  Yes.

20    Q.  Had they -- was there any type of an
21    engagement letter with RSM McGladrey?

22    A.  Yes.

1    Q.  And when had that engagement first begun?

2    A.  2001.

3    Q.  And is it within that context that you
4    were sending this notice to Mr. Wainwright?

5    A.  Yes.

6    Q.  And were you billing RSM McGladrey on a
7    regular basis --

8    A.  Yes.

9    Q. -- for your time?

10   A. Yes.

*P. 237:*

3    Q. Do you know the -- in 2001 and 2002, was
4    RSM McGladrey in existence?

5    A. Yes.

6    Q. Was it owned by any other entity at that
7    time?

8    A. 2001, 2002, it was owned by H&R Block.

9    Q. Do you know when it was owned by H&R
10   Block?

11   A. I don't recall when they were acquired,
12   but it was sometime prior to probably 2001.

13   Q. Were you ever engaged by H. R. Block?

14   A. Bryan Cave has been engaged by H&R Block.

15   Q. Was Bryan Cave engaged by H. R. Block with
16   respect to the FDIS transactions?

17   A.   No.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, LLC, by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151 |
| | ) | 06-40130 |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | Magistrate Judge Hillman |
| | ) | |
| Defendant | ) | |

**DECLARATION OF RONALD G. WAINWRIGHT, JR. IN SUPPORT**
**OF RSM MCGLADREY, INC'S OPPOSITION TO UNITED STATES'**
**SECOND MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

I, Ronald G. Wainwright Jr., hereby submit this declaration in support of RSM

McGladrey, Inc.'s Opposition To United States' Second Motion To Compel Production

Of Documents, and declare as follows.

1.    I am a Managing Director, Tax at RSM McGladrey, Inc. ("RSMM").  I

am a Certified Public Accountant, and I have been employed by RSMM or its affiliates

since 1996.

2.    Early in 2001, I became the leader of RSMM's Structured Transactions

Group ("STG").  The STG was a group of managing directors, located in various RSMM

offices, who were responsible for offering certain transaction strategies to RSMM clients

who were interested in pursuing them, and assisting other RSMM employees who were

considering offering them to their clients.

3.    RSMM did not create or develop any of these transaction strategies itself.

Both prior to and during the time when I was the leader of the STG, RSMM was

approached by various firms in the marketplace, who did develop such strategies, and

- 1 -

were interested in offering their strategies to RSMM clients. I referred to these firms as intermediaries.

4.    RSMM and the STG made a business decision very early on that, prior to offering any potential strategy to an RSMM client, they would ensure that the technical merits of the strategy had been reviewed both internally by RSMM tax professionals and by outside tax counsel, and that RSMM ultimately concluded that the proposed strategy had technical merit and appeared to comply with any applicable requirements of the Internal Revenue Code.

5.    To that end, RSMM took several steps. RSMM formed a Technical Standing Group ("TSG"), which consisted of Senior Managing Directors, who were very highly regarded within the firm and who had long tenure and significant tax expertise. The TSG independently reviewed proposed transactions to determine whether they had technical merit. I was a non-voting member of the TSG; the other members were not members of the Structured Transactions Group, and did not participate in offering any of these strategies to clients.

6.    As leader of the STG, I consulted with the members of the TSG and decided that RSMM should retain outside tax counsel to review and advise us on proposed strategies, as well as to advise RSMM generally on technical issues such as the interpretation of the Internal Revenue Code and existing and proposed treasury regulations, and other tax matters. I was authorized to retain outside counsel on behalf of RSMM. Therefore, in the late spring or early summer of 2001, I contacted John Barrie, a partner and tax attorney at Bryan Cave LLP, who was a well-known and respected tax lawyer.

7.    RSMM is an indirect, wholly-owned subsidiary of H&R Block, Inc. The reason I contacted Mr. Barrie was because I understood that Bryan Cave had been primary outside counsel to H&R Block, with a longstanding professional relationship dating back several decades. Therefore, I believed it would be a good idea to retain the

same law firm that had a longstanding relationship with RSMM's parent company. Throughout the time Bryan Cave advised RSMM on transaction strategy matters, I was Bryan Cave's primary contact person at RSMM for these matters.

8.    RSMM also retained Bryan Cave to represent it an arbitration brought by BDO Seidman, its former joint venture partner with respect to a business dispute regarding certain transaction strategies that RSMM & BDO Seidman previously had offered.

9.    RSMM hired Bryan Cave for the purpose of providing legal advice on various tax matters. At the time Bryan Cave began advising RSMM, I was not aware that Mr. Barrie had an existing professional client relationship with the Diversified Group, Inc. ("DGI").

10.    Late in 2000, RSMM had been introduced to James Haber of DGI. I was aware that DGI was a firm that was in the business of developing strategies and offering them to investors. Mr. Haber and I discussed, in general terms, transactions that DGI had developed. DGI referred to one such strategy as the FDIS.

11.    After consulting with the members of the TSG, one thing I did in connection with deciding whether RSMM would offer the FDIS or similar strategies to interested RSMM clients was to ask Bryan Cave to review and advise us on the strategies.

12.    Beginning in August 2001, Bryan Cave began providing legal advice to RSMM on various tax matters. Bryan Cave provided legal advice in the form of formal memoranda, as well as in e-mails and telephone conversations. In August and September 2001, the advice focused on the requirements of Section 6112 of the Internal Revenue Code and related issues.

13.    On November 15, 2001, RSMM and Bryan Cave executed an engagement letter, which I signed on behalf of RSMM. At that time, Bryan Cave already had been acting as RSMM's counsel for several months, providing legal advice for which it billed

RSMM and for which RSMM ultimately paid. RSMM decided to execute the engagement letter shortly after receiving Bryan Cave's first invoices for legal services, to formalize the existing attorney-client relationship.

14.    In 2001 and 2002, RSMM offered transactions developed by DGI similar to the FDIS transaction to several of its clients. Bryan Cave did not participate in any meetings between RSMM and RSMM clients. RSMM advised its clients that they should retain a law firm to provide a legal opinion on the transaction. The decision as to which law firm to retain was left to the client, but RSMM mentioned Bryan Cave as one firm among several others that the client could consider retaining.

15.    Bryan Cave did provide legal opinions for several RSMM clients who implemented transactions with DGI similar to the FDIS transaction. RSMM did not disclose the separate legal advice it received from Bryan Cave to any of its clients, nor did anyone at RSMM participate in any meetings or conversations between Bryan Cave and the clients for whom it was providing separate opinions.

16.    Bryan Cave also advised RSMM with respect to the IRS' temporary regulations on disclosure that were issued on June 14, 2002. In response to these regulations, RSMM's Technical Standing Group evaluated the regulations and independently formulated a business policy under which it would recommend to clients who had participated in transactions similar to the FDIS transaction for whom RSMM prepared tax returns to disclose the transactions on their returns. If the client did not wish to disclose the transaction, than RSMM would only sign the return if the client obtained what RSMM considered to be a well-reasoned opinion from a law firm advising that disclosure was not required.

17.    This disclosure policy was formalized as a nationwide RSMM tax policy, and disclosed to RSMM clients who did not wish to disclose a transaction. RSMM did not reveal any of its confidential communications with Bryan Cave on this issue to DGI, to RSMM's clients, or to any other third parties.

- 4 -

18.    I was the principal contact with Bryan Cave within RSMM, and to my knowledge I initiated, received, was copied on, or was generally aware of all communications between Bryan Cave and RSMM personnel. I did not disclose the substance of any confidential communications with Bryan Cave in which RSMM requested legal advice to DGI or to any other third party, and I am not aware of any occasion on which any such communications were disclosed by anyone else at RSMM to any other parties.

19.    The vast majority of RSMM's communications with Bryan Cave involved only RSMM and Bryan Cave personnel. However, because RSMM and DGI were working together on various matters, RSMM, DGI, and Bryan Cave would occasionally have joint phone calls or meetings at which people from all three firms participated, and during which issues related to the FDIS transaction and similar transactions, list keeping, and disclosure were discussed. To my knowledge, I participated in all such meetings or calls. During these meetings or calls, neither I nor any one else from RSMM or Bryan Cave disclosed RSMM's confidential communications with Bryan Cave, in which Bryan Cave provided legal advice to RSMM.

20.    The specific issues described above represented only a small part of the overall tax and other advice that RSMM received from Bryan Cave. Bryan Cave was RSMM's legal advisor on a wide array of tax issues, including interpretation of the Internal Revenue Code and treasury regulations and their application to particular fact scenarios; alerts on and interpretations of proposed and temporary regulations and proposed legislation; the technical details of various strategies that had been presented to RSMM by numerous intermediaries, and which in some instances RSMM was considering offering to its clients; and many other issues. Most of this legal advice had little or nothing to do with transactions similar to the Fidelity International Currency Advisor or Fidelity High Tech transactions, or with DGI.

- 5 -

21.    Between 2001 and 2003, Bryan Cave billed RSMM, and RSMM paid, more than $1 million for tax-related legal advice.

22.    Attached to this Declaration are true and correct copies of invoices dated October 12, 2001 (Exhibit A); July 25, 2002 (Exhibit B); August 29, 2002 (Exhibit C); and September 25, 2002 (Exhibit D). These invoices were sent by Bryan Cave to James A. Ingraham, the former general counsel of H&R Block, Inc. Each of these invoices was forwarded to me, in my capacity as the leader of the STG, for review and approval.

23.    Beginning in September 2002, RSMM provided services to the Plaintiff in this case, Richard Egan. I was the managing director with principal responsibility for the engagement. These services consisted of reviewing and signing individual tax returns for Mr. Egan and his wife and signing the 2002 Form 1065 partnership returns for Fidelity International Currency Advisor and Fidelity High Tech, the partnerships at issue in this case. Bryan Cave provided no legal advice to RSMM in connection with its work for Mr. Egan.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 12, 2008

Ronald G. Wainwright, Jr.

# Wainwright Declaration

# Exhibit A

# FILED UNDER SEAL

# Wainwright Declaration

# Exhibit B

# FILED UNDER SEAL

# Wainwright Declaration

# Exhibit C

# FILED UNDER SEAL

# Wainwright Declaration

# Exhibit D

# FILED UNDER SEAL