# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | Case Nos.:  05-40151-FDS |
| v. | ) ) ) | 06-40130-FDS |
| UNITED STATES OF AMERICA, | ) ) ) | |
| Defendant. | ) ) ) ) | |

|  |  |  |
|---|---|---|
| FIDELITY HIGH TECH ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) ) | Case Nos.:  06-40243-FDS |
| v. | ) ) ) | 06-40244-FDS |
| UNITED STATES OF AMERICA, | ) ) ) | |
| Defendant. | ) ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING
## INVALIDITY OF TREASURY REGULATION § 1.752-6

David J. Curtin, D.C. Bar #281220
Ronald L. Buch, Jr., D.C. Bar #450903
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036

Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email:  dcurtin@mckeenelson.com
        rbuch@mckeenelson.com
        lamanti@mckeenelson.com

John O. Mirick, BBO #349240
MIRICK, O'CONNELL, DEMALLIE
& LOUGEE, LLP
100 Front Street
Worcester, MA 01608
Telephone:  (508) 791-8500
Facsimile:  (508) 791-8502
Email:  jomirick@mirickoconnell.com

ATTORNEYS FOR PLAINTIFF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... 4

QUESTIONS PRESENTED ................................................................................................... 7

STANDARD OF REVIEW .................................................................................................... 7

STATEMENT OF THE CASE............................................................................................... 8

    I.      Introduction................................................................................................... 8

    II.    Statement of Facts...................................................................................... 10

          A.    The High Tech Transaction ................................................... 10

          B.    The FICA A Fund Transaction ............................................. 12

    III.   The Case Law Treatment of Short Option Positions and Other Contingent Obligations ............................................................................................... 13

    IV.   The Treasury's Efforts to Change the Law................................................. 17

ARGUMENT ...................................................................................................................... 20

    I.      Treasury Regulation 1.752-6 Is Not a Valid Legislative Regulation .......... 20

          A.    Regulation 1.752-6 Does Not Provide "Comparable Rules" to Those Described in Section 358(h) of the Code ....................................................... 22

          B.    Regulation 1.752-6 Is Invalid Because It Applies to Contingent Liabilities That Do Not Cause Any "Acceleration or Duplication" of Loss......................................... 24

          C.    Section 1.752-6 Is Invalid Because It Applies to Liabilities That Are Not Described in Section 358(h)(3) of the Code .......................................................... 26

    II.    Regulation 1.752-6 Was Issued in Violation of the Administrative Procedure Act and Thus Is Invalid ......................................................................................... 28

    III.   The Government Cannot Recharacterize the Regulation as Interpretive .................... 32

    IV.   The Effective Date of Treasury Regulation 1.752-6 Violates Section 7805's Prohibition Against Retroactive Regulations .............................................................. 34

          A.    Subject to Rare Exceptions, Section 7805 Imposes a Blanket Prohibition on Retroactive Tax Regulations................................................................. 34

          B.    Treasury Regulation 1.752-6 Fails to Satisfy the Exceptions of Section 7805(b).. 35

CONCLUSION.................................................................................................................... 39

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988)..................................................39

*Brountas v. Commissioner*, 692 F.2d 152 (1st Cir. 1982) ............................................................16

*CWT Farms, Inc. v. Commissioner*, 755 F.2d 790 (11th Cir. 1985)...........................................34

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................7

*Cemco Investors, LLC v. United States*, 515 F.3d 749 (7th Cir. 2008) ......................................19

*Chevron U.S.A. Inc. v. Natural Resource Defense Council, Inc.,* 467 U.S. 837 (1984)..........20, 32

*Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir. 1971)....................................38

*Dresser Industrial v. Commissioner*, 911 F.2d 1128 (5th Cir. 1990) ..........................................32

*Federal  Deposit Insurance Corp. v. Municipality of Ponce*, 904 F.2d 740 (1st Cir. 1990) ...........7

*Fla. Department of Revenue v. Picadilly Cafeterias, Inc.*, 128 S. Ct. 2326 (2008).......................22

*Gehl Co. v. Commissioner*, 795 F.2d 1324 (7th Cir. 1986) ..........................................................34

*Gibson Products Co. v. United States*, 460 F. Supp. 1109 (N.D. Tex. 1978), *aff'd*, 637
   F.2d 1041 (5th Cir. 1981) .......................................................................................................16

*Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975) .......................................................14, 15

*Klamath Strategic Investment Fund, LLC v. United States*, 440 F. Supp. 2d 608 (E.D.
   Tex. 2006) ..................................................................................................................... *passim*

*Kollett v. Harris*, 619 F.2d 134 (1st Cir. 1980)................................................................29, 30, 31

*La Rue v. Commissioner*, 90 T.C. 465 (1988) .........................................................................15, 16

*Lemery v. Commissioner*, 52 T.C. 367 (1969), *aff'd on other grounds*, 451 F.2d 173 (9th
   Cir. 1971) ...............................................................................................................................16

*Levesque v. Block*, 723 F.2d 175 (1st Cir. 1983) ..............................................................29, 30, 32

*Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129 (1936) ...............................33

*Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5 (1st Cir. 1990) ...................................7

*Nalle v. Commissioner*, 997 F.2d 1134 (5th Cir. 1993)................................................................32

*Paulsen v. Daniels*, 413 F.3d 999 (9th Cir. 2005) ......................................................................29

*R.R. Co. v. United States*, 505 F.2d 1266 (Ct. Cl. 1974) ............................................................16

*Rowan Cos. v. United States*, 452 U.S. 247 (1981) ......................................................................32

*Sala v. United States*, 552 F. Supp. 2d 1167 (D. Colo. 2008) ............................................ *passim*

*Sanchez v. Alvarado*, 101 F.3d 223 (1st Cir. 1996) ......................................................................7

*Schuler Industrial, Inc. v. United States*, 109 F.3d 753 (Fed. Cir. 1997) .....................................32

*Stobie Creek Investments, LLC v. United States*, No. 05-748T, 2008 WL 2968170 (Fed. Cl. July 31, 2008) ......................................................................................................... *passim*

*Union Carbide Corp. v. United States*, 612 F.2d 558 (Ct. Cl. 1979) ............................................ 33

*Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749 (D.C. Cir. 2001) ........................ 29, 30

*United States v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982) ........................................................... 32

*Wendland v. Commissioner*, 739 F.2d 580 (11th Cir. 1984) ........................................................ 34

*Woods Psychiatric Inst. v. United States*, 20 Cl. Ct. 324 (1990), *aff'd*, 925 F.2d 1454 (Fed. Cir. 1991) ..................................................................................................................... 31

# FEDERAL STATUTES

5 U.S.C. § 553(b),(c) ................................................................................................................. 29, 32

5 U.S.C. § 706(2)(D) ....................................................................................................................... 29

I.R.C. § 358(a)(h) ..................................................................................................................... *passim*

I.R.C. § 704(d) ................................................................................................................................ 13

I.R.C. § 708(b)(1)(B) ...................................................................................................................... 11

I.R.C. § 722 ...................................................................................................................................... 13

I.R.C. § 731(a)(1) ...................................................................................................................... 13, 14

I.R.C. § 733(1) ................................................................................................................................. 13

I.R.C. § 743(b) ........................................................................................................................... 11, 13

I.R.C. § 752 ............................................................................................................................... *passim*

I.R.C. § 754 ...................................................................................................................................... 11

I.R.C. § 7805(b)(1) ................................................................................................................... *passim*

# ADMINISTRATIVE MATERIALS

Assumption of Partner Liabilities (Final Regulations), 70 Fed. Reg. 30334 (May 26, 2005) ...................................................................................................................................... 17, 22

Assumption of Partner Liabilities (Notice of Proposed Rulemaking), 68 Fed. Reg. 37434 (proposed June 24, 2003) ............................................................................... 14, 26, 31, 37

Assumption of Partner Liabilities (Temporary Regulations), 68 Fed. Reg. 37414 (June 24, 2003) ............................................................................................................................ *passim*

Chief Counsel Notice CC-2003-020 (released June 25, 2003) .................................................... 38

Notice 2000-44, 2000-2 C.B. 255 .......................................................................................... *passim*

Notice 2001-17, 2001-1 C.B. 730 ................................................................................................. 21

Treas. Reg. § 1.358-7 ...........................................................................................27, 28

Treas. Reg. § 1.752-6 ................................................................................. *passim*

Treas. Reg. § 1.752-7 ...................................................................................18, 29, 37

Treas. Reg. § 301.7701-2(c) ...............................................................................10, 12

## LEGISLATIVE MATERIALS

H. Rep. No. 104-506, at 44 (1996) ...............................................................35

Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763A-638 (2000)............................................................................................20

S. Rep. No. 79-752 (1945), *reprinted in* Legislative History of the Administrative Procedure Act, 1944-46 at 200 (1946)............................................................30

Staff of the Joint Comm. on Taxation, 104th Cong., *Background and Information Relating to the Taxpayer Bill of Rights* (Comm. Print 1995) ....................36

Staff of the Joint Comm. on Taxation, 107th Cong., *General Explanation of Tax Legislation Enacted in the 106th Congress* (Comm. Print 2001).....................21, 23

## OTHER AUTHORITY

Arthur Willis, John Pennell & Phillip Postlewaite, Partnership Taxation ¶ 6.01[2] (6th ed. 2008 Cum. Supp. No. 2) ..........................................................25

Fed. R. Civ. P. 56(c) ..................................................................................7

Order Closing Proofs & Setting Briefing Schedule, *Stobie Creek Investments, LLC v. United States*, No. 05-748T (Fed. Cl. filed Apr. 30, 2008) .....................19

## QUESTIONS PRESENTED

1.      Whether Treasury Regulation § 1.752-6 is a valid exercise of legislative rulemaking authority delegated by Congress.

2.      Whether Treasury Regulation § 1.752-6 is a valid interpretive regulation.

3.      Whether the retroactive effective date of Treasury Regulation § 1.752-6 is valid.

## STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[1]  The moving party bears the initial burden of establishing that there is no genuine issue of material fact.[2]  "Thereafter, the burden shifts to the nonmovant to establish the existence of a genuine material issue."[3] An issue is genuine if it is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant[,] would permit a rational factfinder to resolve the issue in favor of either party."[4]  A fact is material if it has "the potential to affect the outcome of the suit under the applicable law."[5]  There are no facts that are material to the resolution of the validity of Treasury Regulation § 1.752-6.[6]  Accordingly, it is appropriate for the Court to decide this purely legal issue on a motion for partial summary judgment.

---

[1]  Fed. R. Civ. P. 56(c).

[2]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[3]  *Fed. Deposit Ins. Corp. v. Municipality of Ponce*, 904 F.2d 740, 742-743 (1st Cir. 1990).

[4]  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).

[5]  *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (quotations omitted).

[6]  It is for this reason that Plaintiff does not include a "concise statement of the material facts of record as to which [Plaintiff] contends there is no genuine issue to be tried," as required by Local Rule 56.1.

## STATEMENT OF THE CASE

### I.     Introduction

A central issue in these consolidated cases is whether short option positions are liabilities for purposes of Internal Revenue Code section 752.[7]  Although Fidelity High Tech Advisor A Fund, L.L.C. ("High Tech") and Fidelity International Currency Advisor A Fund, LLC ("FICA A Fund") entered into different transactions, those transactions contain one common element: the contribution of long and short option positions to a limited liability company. Characterization of the short positions as section 752 liabilities would, 1) in the High Tech case, eliminate adjustments made to the bases of assets held by High Tech, and 2) in the FICA A Fund case, suspend the deductibility of losses allocated to Plaintiff.

Prior to 2001, the IRS's consistent litigating position had been that short option positions and other contingent obligations were *not* liabilities for purposes of section 752, and courts had consistently agreed with that interpretation.  Relying on that history, Plaintiff took the position that the short option positions contributed to High Tech and FICA A Fund were not liabilities under section 752.

In 2003, well after the transactions at issue in this case, the IRS and the Treasury Department issued a new regulation:  Treasury regulation section 1.752-6T, which was later finalized as regulation 1.752-6.[8]  The Regulation purportedly changed the established treatment of short option positions for partnership tax purposes by requiring taxpayers to reduce their bases

---

[7]  Internal Revenue Code sections, found in Title 26, are hereinafter cited as "I.R.C. §" and referred to as "section."  Unless otherwise specified, such citations and references refer to the Internal Revenue Code as currently in effect.

[8]  Treasury regulations, which can be found at 26 C.F.R, are hereinafter cited as "Treas. Reg. §" and referred to as "regulation."  Unless otherwise specified, such citations and references refer to the Treasury regulations currently in effect.  References to the "Regulation" refer specifically to regulation 1.752-6.

in their partnership interests by the amount of their short option positions assumed by the partnership. [9]

The Regulation is an invalid exercise of the Treasury's rulemaking authority because it exceeds the authority delegated by Congress and was issued in violation of the Administrative Procedure Act. Moreover, the Regulation cannot be sustained as an interpretive regulation; in fact, even the IRS has acknowledged that the Regulation imposes unreasonable results and therefore has issued different interpretive rules for future transactions. Finally, the Regulation is impermissibly retroactive. The substantive provisions of the Regulation and the circumstances surrounding its promulgation lead inexorably to the conclusion that its sole purpose was to bolster the IRS's litigating position in what it characterizes as "Son of BOSS" cases.

Whether the Regulation is valid is a legal issue that is ripe for summary judgment. A determination that the Regulation is invalid would greatly simplify the issues to be decided at trial. By contrast, a determination that the Regulation is valid would require the Court to resolve numerous ancillary issues, including (1) determining whether the High Tech and FICA A Fund transactions are "substantially similar" to the transactions described in Notice 2000-44; (2) determining whether the short option positions contributed to High Tech and FICA A Fund were "liabilities" within the meaning of the Regulation; and (3) determining the "adjusted value" of the Egans' interests in High Tech and FICA A Fund at the time of the transfers of the short option positions.

---

[9] Treas. Reg. § 1.752-6 applies to option positions contributed to partnerships between October 18, 1999 and June 24, 2003; there s no dispute that the contributions at issue in this case occurred within this timeframe.

## II.    Statement of Facts

### A.    The High Tech Transaction

Mr. and Mrs. Egan formed High Tech in 2000 and capitalized it with more than two million shares of EMC stock, with Mrs. Egan owning a 99% interest and Mr. Egan owning a 1% interest.  As a limited liability company with multiple members, High Tech was classified as a partnership for federal income tax purposes.

On January 31, 2001, Mr. and Mrs. Egan each separately entered into two European-style digital put options with Refco Capital Markets, Ltd.[10]  The underlying reference asset on the options was the NASDAQ 100 index.  The Egans each sold one put option to Refco and purchased the other put option from Refco, applying the premium receivable in respect of the sold option against the premium payable on the purchased option and making a cash payment to Refco equal to the difference between the two.

On February 7, 2001, the Egans contributed their Refco option positions to High Tech. Immediately after those contributions, High Tech held 2,020,000 shares of EMC stock with an aggregate value of $141,400,000 and four options with an aggregate value of $3,437,107.

On February 12, 2001, High Tech and Refco terminated the options by entering into offsetting option contracts.  Because the NASDAQ 100 had declined in value, High Tech received a net premium of $4,901,000 on the new options.  The entry into the two new options eliminated High Tech's exposure to future gain or loss while generating a cash payment in excess of the net amount previously paid by it to Refco.

Throughout 2001, Mr. and Mrs. Egan contributed additional securities to High Tech.

---

[10] While the options were, in fact, entered into by single member LLCs, such entities are disregarded for federal tax purposes.  *See* Treas. Reg. § 301.7701-2(c).  Accordingly, this summary treats all transactions entered into by a single member LLC as having been entered into directly by its owner.

On December 21, 2001, Mrs. Egan transferred her 99% interest in High Tech to MEE Holdings LP, a limited partnership. For federal income tax purposes, High Tech treated the contribution of Mrs. Egan's 99% interest to MEE Holdings as a "sale or exchange" of that interest for purposes of sections 708(b)(1)(B) and 743(b). Pursuant to section 708(b)(1)(B), High Tech treated the transfer as resulting in a "technical" termination that closed its taxable year.[11] High Tech filed a tax return for the taxable year ending December 21, 2001 and it filed an additional tax return for the period beginning December 22 and ending December 31, 2001.

On its federal income tax return for the period ending December 21, 2001, High Tech made an election under section 754.[12] Pursuant to this election, under section 743(b), High Tech adjusted its tax bases in the portion of its assets attributable to the 99% interest transferred to MEE Holdings. In computing the amount of the section 743(b) adjustment, High Tech computed MEE Holdings' basis in its High Tech interest by taking into account Mrs. Egan's tax basis in the purchased option she contributed to High Tech on February 7, 2001, without making any adjustment in respect of the sold option position.

On its federal income tax return for the period ending December 31, 2001, High Tech made another election under section 754. Under section 743(b), High Tech adjusted its tax bases in the portion of its assets attributable to the 1% interest held by Mr. Egan. In computing the amount of the basis adjustment under section 743(b), High Tech computed Mr. Egan's basis in his High Tech interest by taking into account his tax basis in the purchased option he contributed

---

[11]   Section 708(b)(1)(B) provides that a partnership "terminates" upon the sale or exchange of 50% or more of the total interests in its capital and profits within a 12-month period.

[12]   Under section 754, a partnership may elect to adjust the basis of its assets upon certain transfers of interests in the partnership and certain distributions of partnership assets. If a partnership interest is transferred in a sale or exchange, the adjustment is made pursuant to sections 743(b) and 755.

to High Tech on February 7, 2001, without making any adjustment in respect of the sold option position.

### B.    The FICA A Fund Transaction

FICA A Fund also involved the contribution of short option positions to a limited liability company.  On October 9, 2001, Mr. Egan and Refco entered into four options.[13]  Mr. Egan sold two options and used the premiums, plus additional cash, to purchase two other options.  On October 22, 2001, Mr. Egan contributed all four options, along with cash, to FICA A Fund in exchange for a 5% common interest and 100% of the preferred interests in FICA A Fund.  The other members of FICA A Fund were Alpha Consultants, LLC, and Helios Trading LLC, each of which had a 1% common interest, and Samuel P. Mahoney, a citizen of Ireland who initially held a 93% common interest.

Additional transactions occurred during the year that are not relevant for purposes of this motion.[14]

On its 2001 tax returns, FICA A Fund allocated the gains and losses recognized during the year based on the varying interests of its members, resulting in substantial losses being allocated to Mr. Egan.  In computing Mr. Egan's basis in his FICA A Fund interest, he took into

---

[13]  The options were, in fact, entered into by a single member LLC, which is disregarded for federal income tax purposes.  *See* Treas. Reg. § 301.7701-2(c).  As with High Tech, this summary treats all transactions entered into by the single member LLC as though they were entered into directly by the owner.

[14]  Specifically, on October 22, 2001, FICA A Fund entered into eight European-style 179-day digital foreign currency options with Refco.  On October 29, 2001, FICA A Fund terminated two of those options at a gain of approximately $117,934,920.  FICA A Fund used the proceeds, together with additional assets, to purchase a 112-day complex multi-variate barrier option or "CMBO."  On October 30, 2001, FICA A Fund terminated two more options at a gain.  FICA A Fund recognized total taxable gain of $57,688,164 on these two trades and used the proceeds to acquire a 111-day CMBO.

On November 5, 2001, Mr. Egan purchased an 88% interest in FICA A Fund from Mr. Mahoney, increasing Mr. Egan's ownership of the common membership interests to 93% and reducing Mr. Mahoney's share of the common interests to 5%.

On December 3, 2001, FICA A Fund terminated the remainder of the October 22 options as well as the October 30 CMBOs.  As a result of these transactions, FICA A Fund recognized a taxable loss of $176,152,349.

account his tax basis in the purchased options he contributed to FICA A Fund on October 22, 2001, without making any adjustment for the sold option positions.  As a result, Mr. Egan had sufficient basis in his FICA A Fund interest to deduct the losses that had been allocated to him.[15]

## III.     The Case Law Treatment of Short Option Positions and Other Contingent Obligations

The tax consequences of the High Tech and FICA A Fund transactions both depend on the determination of the partners' outside bases in their membership interests.[16]  In High Tech, the computation of the partnership's section 743(b) adjustments to its inside basis in its assets depends on the calculation of the Egans' outside bases in their partnership interests.  In the FICA A Fund transaction, Mr. Egan's ability to deduct the taxable losses allocated to him by FICA A Fund in 2001 will be limited to his outside basis in FICA A Fund.[17]

Under section 752(a), an increase in a partner's share of partnership liabilities is treated as a contribution of money by the partner to the partnership, resulting in an increase in the partner's basis in its partnership interest.[18]  Conversely, section 752(b) provides that a decrease in a partner's share of the partnership's liabilities, or a partnership's assumption of a partner's separate liabilities, is treated as a distribution of money by the partnership to the partner that reduces the partner's basis in the partnership interest and may require the partner to recognize taxable gain.[19]

---

[15]  Losses allocated to a partner generally are deductible only to the extent of the partner's outside basis.  I.R.C. § 704(d).

[16]  "Outside basis" refers to a partner's basis in his partnership interest; "inside basis" refers to the partnership's basis in its assets.

[17]  *See id.* § 704(d).

[18]  *See id.* §§ 722, 752(a).

[19]  *See id.* §§ 731(a), 733(1), 752(b).

Thus, whether a partnership obligation is a liability for purposes of section 752 may have significant tax consequences for its partners. Because partners' outside bases in their partnership interests are increased by their shares of the partnership's liabilities, characterization of an obligation as a partnership liability increases the amount of money the partners can receive as tax-free distributions from the partnership.[20] In addition, characterization of an obligation as a liability increases the amount of partnership losses the partners can report on their individual tax returns.

At the time of the transactions at issue in this case, neither the Code nor the Treasury Regulations thereunder defined the term "liabilities" for purposes of section 752.[21] In a series of cases going back more than a quarter of a century, the IRS had successfully asserted that contingent obligations, including short option positions, did not constitute "liabilities" for purposes of section 752.

In *Helmer v. Commissioner*, a partnership sold an option to purchase real property that it owned, thereby obligating itself to deliver the optioned property to the purchaser of the option upon exercise.[22] It distributed the premium that it received from the sale of the option to its partners.[23] The partners argued that the distribution of the option premium was not taxable under section 731(a) because the obligation created by the partnership's sale of the option was a section 752 liability that increased their bases in their partnership interests.[24] The IRS argued,

---

[20]  *See id.* § 731(a)(1).

[21]  Regulation 1.752-1(a)(4) now contains a definition of liabilities, effective for transactions incurred or assumed by a partnership on or after June 24, 2003. Because of its effective date, this definition does not apply to transactions within the effective date of regulation 1.752-6.

[22]  34 T.C.M. (CCH) 727, 728 (1975).

[23]  *Id.* at 729.

[24]  *Id.* at 730-31.

however, that the option obligation was not a section 752 liability and that, as a result, the

distribution of the proceeds was taxable.[25]  The Tax Court agreed with the IRS, finding that

"[t]he option agreement . . . created no liability on the part of the partnership to repay the funds

paid nor to perform any services in the future."[26]  Therefore, the court concluded, "no liability

arose under section 752 and the partners' bases cannot be increased by such amounts."[27]

   In *La Rue v. Commissioner*, the Tax Court once again agreed with the IRS that partners

could not treat a partnership's contingent obligations as liabilities for purposes of increasing their

outside bases in their partnership interests under section 752(a).[28]  In *La Rue*, the taxpayers were

partners in a stock brokerage partnership ("Goodbody")  that incurred large "back-office"

obligations to its customers, including obligations to deliver securities to its customers.[29]

Because these problems created the potential for large losses, subordinated lenders withdrew

capital from Goodbody, triggering concerns that Goodbody could violate the minimum capital

requirements of the New York Stock Exchange.[30]  To prevent the financial collapse of the firm,

Merrill Lynch assumed all of Goodbody's assets and liabilities.[31]  At issue was whether

Goodbody's partners, in calculating the amount of their loss, could include the back-office

obligations in the bases of their partnership interests.[32]  The Tax Court agreed with the IRS that

because the back-office liabilities "were not a fixed obligation of the partnership sufficiently

---

25   *Id.* at 731.

26   *Id.*

27   *Id.*

28   90 T.C. 465, 479-80 (1988).

29   *Id.* at 468-69.

30   *Id.* at 469.

31   *Id.* at 470.

32   *Id.* at 477-78.

determinable in amount" during the relevant period, they could not be included in the partners' bases.[33]

In *Gibson Products Co. v. United States*, the taxpayer invested in a partnership that acquired oil and gas assets by paying cash and issuing a $660,000 promissory note.[34]  The taxpayer sought to increase its basis in its partnership interest by its proportionate share of the note.[35]  The trial court disallowed this increase, holding that because the partnership's obligation to pay was contingent on its oil and gas production from the purchased assets, the obligation was not a liability under section 752.[36]  In a similar case, *Brountas v. Commissioner*, the First Circuit held that contingent or speculative obligations should not increase a partner's outside basis under section 752.[37]  As in *Gibson Products*, the taxpayer in *Brountas* had invested in a partnership that acquired oil and gas assets using cash and a promissory note that was contingent on whether the assets actually produced oil and gas.[38]  Noting that a "line of decisions holds that highly contingent or speculative obligations are not includible in basis before the uncertainty surrounding them is resolved,"[39] the First Circuit held that the promissory note was not a liability that could increase the taxpayer's outside basis in the partnership interest.[40]

---

[33]  *Id*. at 479-80.

[34]  460 F. Supp. 1109, 1111-12 (N.D. Tex. 1978), *aff'd*, 637 F.2d 1041 (5th Cir. 1981).

[35]  *Id.* at 1115.

[36]  *Id.* at 1117.

[37]  692 F.2d 152, 158 (1st Cir. 1982) (Breyer, J.).

[38]  *Id.* at 154-55.

[39]  *Id.* at 157 (citing *R.R. Co. v. United States*, 505 F.2d 1266, 1269-70 (Ct. Cl. 1974); *Lemery v. Comm'r*, 52 T.C. 367, 377-78 (1969), *aff'd on other grounds*, 451 F.2d 173 (9th Cir. 1971)).

[40]  *Id.* at 158, 161.

After reviewing *Helmer*, *La Rue*, *Gibson*, and other cases, the *Klamath* court observed that these cases "adopt the [IRS]'s consistent view that contingent or non-executory obligations are not liabilities under Section 752."[41]   In each of these cases, the taxpayer sought to characterize a contingent obligation as a liability for purposes of section 752 in order to increase the basis of a partnership interest.  The courts consistently rejected that interpretation.[42]

## IV.    The Treasury's Efforts to Change the Law

As used in section 752, the term "liabilities" is neutral:  depending on the circumstances, treating a contingent obligation as a section 752 liability may help or hurt partners.[43]   In order to deny partners the benefit of a neutral interpretation of the term, in 2003 the Treasury issued temporary regulation 1.752-6T.[44]   The temporary regulation purported to apply this new rule to transactions going back as far as October 18, 1999.[45]   Effective May 26, 2005, the Treasury promulgated final regulations, replacing Temporary Regulation 1.752-6T with Treasury Regulation 1.752-6.[46]   Like the temporary regulation, final regulation 1.752-6 purportedly

---

[41]  *Klamath Strategic Inv. Fund, LLC v. United States*, 440 F. Supp. 2d 608, 617 (E.D. Tex. 2006).

[42]  Although the IRS now complains that transactions such as the FICA A Fund and High Tech transactions create disparity between inside and outside basis, this complaint is inconsistent with the IRS's previous positions.  *See id.* at 619 ("The positions the government took in [*Helmer*, *La Rue*, and *Gibson Products*] resulted in the same disparity between inside and outside basis that it protests will occur here under Plaintiff's position.").

[43]  *See id.* ("[T]he government has often and consistently relied on the principle that a 'liability' under Section 752 does not include an obligation that is contingent.  The government has applied this principle when it works to its benefit (to increase taxes owed).  This Court will consistently apply these same principles even if they sometimes work to the benefit of taxpayers (to decrease taxes owed).  This Court's analysis of 'liability' under Section 752 will not vary in meaning simply based on whose ox is being gored.").

[44]  *See* Assumption of Partner Liabilities (Temporary Regulations), 68 Fed. Reg. 37414 (June 24, 2003).

[45]  Temp. Treas. Reg. § 1.752-6T(d)(1), 68 Fed. Reg. at 37417.

[46]  *See* Assumption of Partner Liabilities (Final Regulations), 70 Fed. Reg. 30334, 30343 (May 26, 2005).

applies to assumptions of liabilities occurring after October 18, 1999, and before June 24,

2003.[47]

      The Regulation provides:

> If, in a transaction described in section 721(a), a partnership assumes a liability
> (defined in section 358(h)(3)) of a partner *(other than a liability to which section
> 752(a) and (b) apply)*, then, after application of section 752(a) and (b), the
> partner's basis in the partnership is *reduced* (but not below the adjusted value of
> such interest) by the amount (determined as of the date of the exchange) of the
> liability. For purposes of this section, the adjusted value of a partner's interest in a
> partnership is the fair market value of that interest increased by the partner's share
> of partnership liabilities under §§ 1.752-1 through 1.752-5.[48]

      Notably, regulation 1.752-6 does not interpret the term "liabilities" for purposes of

section 752. To the contrary, regulation 1.752-6 applies only to the assumption of an obligation

"*other than* a liability to which section 752(a) and (b) apply."[49]  Moreover, the Regulation is a

one-way street. By its terms, however, section 752 is a two-way street. A partnership's

assumption of a partner's section 752 liability triggers two adjustments to the partners' outside

bases in their interests: (1) a decrease in the outside basis of the partner whose liability is

assumed (I.R.C. § 752(b)), and (2) an *increase* in the outside bases of all partners (including the

partner whose liability has been assumed) by their proportionate shares of the assumed liability

(I.R.C. § 752(a)).[50]  Regulation 1.752-6 ignores section 752's reciprocal mandate: it reduces the

outside basis of the partner whose contingent obligation has been assumed by the partnership,

---

[47]  Treas. Reg. § 1.752-6(d)(1). For transactions occurring on or after June 24, 2003, the Treasury promulgated a separate regulation that applies a different set of rules. *See id.* § 1.752-7.

[48]  *Id.* § 1.752-6(a)(1) (emphases added).

[49]  *Id.* (emphasis added).

[50]  *See id.* § 1.752-1(f) (netting increases and decreases to outside basis that result from a partnership's assumption of a liability).

but does not permit partners to increase their outside bases by their shares of the same contingent obligation assumed by the partnership.[51]

The provisions of the Regulation and the circumstances surrounding its promulgation establish that its purpose was to provide the government with an additional weapon with which to attack transactions that already were, or soon would be, in litigation.[52]

To date, three courts have held the Regulation to be invalid, in whole or in part.  In *Klamath*, the District Court for the Eastern District of Texas held that the Regulation's application, at least to transactions occurring between October 18, 1999 and August 11, 2000, was invalid.[53]  Subsequently, in *Sala v. United States*, the District Court for the District of Colorado held that "even if the regulation was not contrary to the underlying statutes[,] the Treasury would still lack the authority to make the regulation retroactive."[54]  More recently, the United States Court of Federal Claims held that the Regulation "exceeds the scope of Congress's specific authorization of retroactivity in Section 309."[55]

---

[51] The Regulation provides for an increase to the "adjusted value" of the contributing partner's basis for the partner's share of partnership liabilities, but limits the increase to the partner's share of partnership liabilities described in regulations 1.752-1 through -5, thus excluding the contingent liabilities governed by regulation 1.752-6.  *See id.* § 1.752-6(a)(1).

[52] *See Sala v. United States*, 552 F. Supp. 2d 1167, 1203 (D. Colo. 2008) (characterizing the Regulation as "an obvious effort to bootstrap the government's litigating position with respect to so-called 'Son of Boss' cases").

[53] 440 F. Supp. 2d at 625.  The court left open the issue of whether the Regulation was valid for transactions occurring after August 11, 2000.  *Id.*

[54] 552 F. Supp. 2d at 1203.  One case summarily upheld the regulation.  *See Cemco Investors, LLC v. United States*, 515 F.3d 749, 751-52 (7th Cir. 2008).  The *Sala* court characterized the *Cemco* opinion as "curiously lacking substantive analysis," 552 F. Supp. 2d at 1203, and the Court of Federal Claims commented that "the analysis of the Seventh Circuit [in *Cemco*] was both superficial and more disdainful than analytical," Order Closing Proofs & Setting Briefing Schedule at 2, *Stobie Creek Invs., LLC v. United States*, No. 05-748T (Fed. Cl. filed Apr. 30, 2008).  As such, *Cemco* is not helpful to this Court's analysis, but is cited for completeness.

[55] *Stobie Creek Invs., LLC v. United States*, No. 05-748T, 2008 WL 2968170, at *35 (Fed. Cl. July 31, 2008).

**ARGUMENT**

**I.     Treasury Regulation 1.752-6 Is Not a Valid Legislative Regulation**

A legislative regulation—*i.e.*, a regulation issued pursuant to "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation"—is given "controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute."[56]

In promulgating regulation 1.752-6, the Treasury purported to rely on a delegation of rulemaking authority set forth in section 309(c) ("Section 309(c)") of the Community Renewal Tax Relief Act of 2000 (the "2000 Act").[57]  But Section 309(c) provides no such authority. Congress enacted Section 309(c) in connection with the enactment of section 358(h) of the Code (Section 309(a) of the 2000 Act), which applies to the assumption of liabilities in certain tax-free transfers to corporations.  Under the corporate tax rules of subchapter C of the Code, if a shareholder transfers property to a corporation in exchange for stock and, in connection with the transfer, the corporation assumes a liability of the shareholder, the shareholder must treat the assumption of the liability as money received on the exchange, which reduces the shareholder's basis in the stock received and may result in the recognition of taxable gain by the shareholder.[58] (Unlike the partnership rules, the corporate rules do not provide for a reciprocal increase to shareholders' bases in their stock for their shares of the liabilities incurred or assumed by a corporation.)  Because contingent liabilities were not treated as liabilities for purposes of section 358(d), Congress became concerned that taxpayers could take advantage of the two-tier tax regime applicable to corporations and shareholders to structure transactions that accelerated and duplicated a single economic loss:

---

[56]  *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984).

[57]  *See* Pub. L. No. 106-554, 114 Stat. 2763A-638 (2000) (the "2000 Act").

[58]  *See* I.R.C. § 358(a), (d).

The Congress was concerned about a type of transaction in which taxpayers seek to accelerate, and potentially duplicate, deductions involving certain liabilities. As an example, assume a transferor corporation transfers assets with a fair market value basis in exchange for preferred stock of the transferee corporation, plus the transferee's assumption of a contingent liability that is deductible in the future. The transferor claims a basis in the stock received equal to the basis of the assets. However, the value of the stock is reduced by the amount of the liability, creating a potential loss. The transferor may then attempt to accelerate the deduction that would be attributable to the liability by selling or exchanging the stock. Furthermore, the transferee might take the position that it is entitled to deduct the payments on the liability, effectively duplicating the deduction attributable to the liability.[59]

In response, Congress enacted section 358(h). Under section 358(h), if property transferred to the corporation has a basis exceeding its fair market value, any contingent liabilities must be taken into account to reduce the shareholder's basis in the stock received.[60] Except as provided in regulations, this general rule does not apply if (1) the trade or business with which the liability is associated is transferred to the person assuming the liability as part of the exchange, or (2) substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange.[61]

Congress anticipated that it would be necessary to coordinate the rules of section 358(h) with the rules of subchapter K for transfers of partnership assets or partnership interests to corporations. Accordingly, Section 309(c) of the 2000 Act authorizes the Treasury to prescribe rules that make "appropriate adjustments" to prevent the "acceleration or duplication of losses" in transactions involving partnerships:

> (c)    Application of Comparable Rules to Partnerships and S Corporation.—
> The Secretary of the Treasury or his delegate—

---

[59]  Staff of the Joint Comm. on Taxation, 107th Cong., *General Explanation of Tax Legislation Enacted in the 106th Congress* 154 (Comm. Print 2001). The IRS identified, and "listed," this type of corporate transaction in Notice 2001-17, 2001-1 C.B. 730.

[60]  I.R.C. § 358(h)(1).

[61]  *Id.* § 358(h)(2).

>    (1)    shall prescribe rules which provide appropriate adjustments under
>           subchapter K of chapter 1 of the Internal Revenue Code of 1986 to
>           prevent the acceleration or duplication of losses through the
>           assumption of (or transfer of assets subject to) liabilities described
>           in section 358(h)(3) of such Code (as added by subsection (a)) in
>           transactions involving partnerships . . . .

In promulgating regulation 1.752-6, the Treasury invoked Section 309(c);[62] however, regulation 1.752-6 exceeds the scope of the authority delegated by Section 309(c).  In *Sala*, the court identified three substantive flaws in the Regulation:  (1) it establishes rules for partnerships that are not "comparable" to those that apply to corporations under section 358(h); (2) it applies to transactions that "do not involve accelerated or duplicated losses;" and (3) it applies to liabilities that are not described in section 358(h)(3).[63]  Accordingly, the *Sala* court held that regulation 1.752-6 exceeds the rulemaking authority delegated by Congress.[64]

## A.    Regulation 1.752-6 Does Not Provide "Comparable Rules" to Those Described in Section 358(h) of the Code

While Section 309(c)(1) does not explicitly define "appropriate" in the context of the statute, the heading of the statute refers to "comparable rules."  Hence, the "appropriate adjustments" authorized by Section 309(c)(1) must be "comparable to" the general rules provided for transactions subject to section 358(h).[65]

---

[62]  *See* Assumption of Partner Liabilities (Final Regulations), 70 Fed. Reg. 30334, 30335 (May 26, 2005).

[63]  *See Sala v. United States*, 552 F. Supp. 2d 1167, 1199-1201 (D. Colo. 2008).

[64]  *See id.* at 1201.  When regulation 1.752-6 was first issued, commentators recognized that the Regulation exceeds the scope of congressional authority.  *See Klamath Strategic Inv. Fund, LLC v. United States*, 440 F. Supp. 2d 608, 622 n.11 (E.D. Tex. 2006) (citing various articles).

[65]  *See Sala*, 552 F. Supp. 2d at 1199 ("Section 309(c) authorizes the Treasury to issue 'comparable rules' to be applied to transactions involving partnerships."); *see also Fla. Dep't of Revenue v. Picadilly Cafeterias, Inc.*, 128 S. Ct. 2326, 2336 (2008) ("Statutory titles and sections headings 'are tools available for the resolution of a doubt about the meaning of a statute.'" (quoting *Porter v. Nussle*, 543 U.S. 516, 528 (2002))).

As the court noted in *Sala*, "[e]ven a cursory look at the authorizing statute demonstrates § 1.752-6 is not a 'comparable' rule."[66]  Section 358(h)(2) contains two exceptions, one for liabilities assumed in connection with a transfer of a trade or business, and a second for liabilities assumed in connection with a transfer of "substantially all of the assets with which the liability is associated."[67]  Section 358(h)(2) created these two exceptions even though Congress understood that a transfer of assets and liabilities to a corporation could result in a duplication of losses due to the two-tier tax regime applicable to corporations.[68]

Regulation 1.752-6(b) overrules these two statutory exceptions for partnership transactions described in Notice 2000-44.[69]  Thus, for this select category of transactions, the Treasury chose to ignore the congressional mandate to prescribe rules comparable to those contained in section 358(h).  The creation of a different set of rules for Notice 2000-44 transactions might make sense if those transactions created greater potential for abuse than the corporate transactions described in section 358(h).  But as explained below, while Congress enacted section 358(h) in large part due to its concern over the potential for loss duplication, Notice 2000-44 transactions create no potential for loss duplication.  In other words, the Treasury's regulation imposes harsher rules on a select category of transactions that present less potential for abuse than the transactions that led to the enactment of the statute in the first place.

---

66  *Sala*, 552 F. Supp. 2d at 1199.

67  I.R.C. § 358(h)(2)(A), (B).

68  *See* Staff of the Joint Comm. on Taxation, 107th Cong., *General Explanation of Tax Legislation Enacted in the 106th Congress* 154 (Comm. Print 2001) ("Furthermore, the transferee might take the position that it is entitled to deduct the payments on the liability, effectively duplicating the deduction attributable to the liability.").

69  *See* Treas. Reg. § 1.752-6(b)(2) (providing that the exception described in section 358(h)(2)(B) does not apply to transactions substantially similar to the transactions described in Notice 2000-44).

**B.**     **Regulation 1.752-6 Is Invalid Because It Applies to Contingent Liabilities That Do Not Cause Any "Acceleration or Duplication" of Loss**

Section 309(c) directs the Treasury to promulgate rules that "provide appropriate adjustments . . . to prevent the acceleration or duplication of losses . . . in transactions involving partnerships."  The statute's focus on the acceleration and duplication of losses was not accidental:  as explained above, Congress enacted section 358(h) in response to corporate transactions in which taxpayers sought to take advantage of the treatment of corporations as separate taxable entities to accelerate and duplicate recognition of tax losses.[70]

The loss duplication that prompted the enactment of section 358(h) cannot occur in partnership transactions because partnerships, unlike corporations, are pass-through entities that are not separately taxable.  Suppose, for example, that a shareholder contributes $100 to a corporation and the corporation assumes a contingent obligation valued at $99.  Prior to section 358(h), the shareholder would receive stock having a basis of $100 and a value of $1.  Upon payment of the obligation, the corporation would deduct $99.  In addition, the shareholder would recognize a $99 loss on the sale of the stock for $1.  Thus, the $99 payment would be deducted twice.  In the partnership context, however, any loss deducted by the partnership that assumed the contingent obligation will reduce the partners' outside bases in their partnership interests, thereby preventing duplication of the loss on the partners' sale of their partnership interests.

The transactions described in Notice 2000-44 cannot result in two deductions for a single liability, nor do they enable the taxpayer to accelerate a loss.  As the District Court in *Sala* recognized:  "[t]he transactions described in Notice 2000-44 do not involve accelerated or duplicated losses."[71]  Similarly, in *Stobie Creek* the Court of Federal Claims stated that "[t]he

---

70   *See supra* note 59 and accompanying text.

71   552 F. Supp. 2d at 1200.

transfers of the contingent liabilities in the cases at bar resulted in increasing each partner's outside basis, but did not cause any acceleration or duplication of losses."[72]   Commentators have reached the same conclusion.  For example, a leading treatise observes that "it is questionable whether the improper 'acceleration' or 'duplication' of losses can arise in a pure partnership setting in the context of Subchapter K."[73]   As the *Klamath* court noted, neither the 2000 Act nor its legislative history mention section 752 or "suggests that Congress was even aware of the partnership transactions described in Notice 2000-44 when the legislation that became Section 309 was proposed."[74]

By attacking these transactions, regulation 1.752-6 prevents the deduction of losses that have been neither duplicated nor accelerated and may eliminate the taxpayer's ability to claim even one deduction when a contingent obligation is paid.[75]   Thus, the Regulation exceeds the mandate of Section 309(c).

Even the Treasury has effectively acknowledged that regulation 1.752-6 produces inappropriate results.  Thus, when it proposed regulations governing future transactions, the Treasury came up with a different set of rules, reasoning:

> If, at the time of an assumption of a § 1.752-7 liability by a partnership from a partner . . . the partner's outside basis were reduced by the amount of the § 1.752-7 liability, then the partner would not have sufficient outside basis to absorb any deduction with respect to the § 1.752-7 liability that passed through the partnership.

---

[72]   *Stobie Creek Invs., LLC v. United States*, No. 05-748T, 2008 WL 2968170, at *35 (Fed. Cl. July 31, 2008).

[73]   Arthur Willis, John Pennell & Phillip Postlewaite, Partnership Taxation ¶6.01[2] (6th ed. 2008 Cum. Supp. No. 2, at S6-6).

[74]   *Klamath Strategic Inv. Fund, LLC v. United States*, 440 F. Supp. 2d 608, 622 (E.D. Tex. 2006).

[75]   *See* Willis, *supra* note 73, at S6-7 ("Instead of avoiding 'duplication' of a loss, Temporary Regulation § 1.752-6T in many circumstances will prohibit any deduction for the loss in the first instance. . . . Only in transactions where acceleration and duplication occur should the legislative safeguard apply.").

For this reason, these proposed regulations do not reduce the outside basis of the § 1.752-7 liability partner upon the partnership's assumption of the § 1.752-7 liability.[76]

In summary, when it promulgated regulation 1.752-6, the Treasury exceeded its authority to draft rules that prevent the "acceleration or duplication" of losses. Moreover, its creation of a regime that treats contingent obligations more harshly than section 752 liabilities violates the statutory mandate to provide "appropriate adjustments." The only plausible explanation for the Treasury's failure to follow the statutory directive and congressional intent is that it was seeking to use the Regulation to bootstrap the IRS litigating position set forth in Notice 2000-44.

### C.    Section 1.752-6 Is Invalid Because It Applies to Liabilities That Are Not Described in Section 358(h)(3) of the Code

The courts in *Sala* and *Stobie Creek* determined that regulation 1.752-6 exceeds the scope of the authority delegated by Congress by applying to liabilities not described in section 358(h)(3) of the Code.[77] A careful reading of the statute and legislative history confirms that the courts' interpretation is correct.

First, Section 309(c) authorizes the Treasury to promulgate rules applying to "liabilities described in section 358(h)(3)." As *Sala* and *Stobie Creek* both emphasize, Section 358(h) applies only to liabilities assumed in "an exchange or series of exchanges" to which sections 351, 354, 355, 356, or 361 of the Code apply.[78] Thus, the language in Section 308(c) authorizing the Treasury to issue regulations relating to "assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3)" refers only to liabilities assumed in an exchange involving a

---

[76] Assumption of Partner Liabilities (Notice of Proposed Rulemaking), 68 Fed. Reg. 37434, 37436-37 (proposed June 24, 2003).

[77] *See Stobie Creek,* 2008 WL 2968170, at *35; *Sala*, 552 F. Supp. 2d at 1200-01; *cf.* I.R.C. § 358(h)(1) (referring to exchanges described in section 358(a)).

[78] *See Stobie Creek*, 2008 WL 2968170, at *35; *Sala*, 552 F. Supp. 2d at 1200-01; *cf.* I.R.C. § 358(h)(1) (referring to exchanges described in section 358(a)).

corporation.  This is the only interpretation that gives any substantive effect to the statutory

authorization of regulations promulgated under Section 309(c) to "prevent the acceleration or

duplication of losses . . . in transactions involving partnerships."  As explained above,

transactions between partnerships and partners such as those described in Notice 2000-44 do not

create the potential for duplication of losses.

　　　The only plausible interpretation of Section 309(c) is that Congress intended the Treasury

to promulgate rules that would coordinate the partnership rules with the rules of section 358(h) in

transactions in which partnership assets or partnership interests are transferred to corporations.

In fact, the Treasury has promulgated a separate regulation that implements the authority

delegated by Section 309(c) in just those cases.[79]  Regulation 1.358-7, entitled "Transfers by

partners and partnerships to corporations," addresses contributions of partnership interests to

corporations,[80] the appropriate adjustments that must be made at the partnership level when a

partnership contributes property to a corporation in which it is a shareholder,[81] and the

application of the exceptions contained in section 358(h) in the partnership context.[82]

　　　Regulation 1.358-7 is the type of regulation contemplated by Section 309(c).[83]  The

adjustments required by regulation 1.358-7 fulfill the statutory mandate of making appropriate

adjustments under the partnership tax rules to ensure that corporate transactions do not result in

the acceleration or duplication of losses.  For example, assume that a partnership contributes

property subject to a contingent liability to a corporation.  Under the general rule of section

---

[79]　*See* Treas. Reg. § 1.358-7.

[80]　*See id.* § 1.358-7(a).

[81]　*See id.* § 1.358-7(b).

[82]　*See id.* § 1.358-7(c).

[83]　*See Klamath Strategic Inv. Fund, LLC v. United States*, 440 F. Supp. 2d 608, 622 (E.D. Tex. 2006)
　　　("[Regulation 1.358-7] is plainly the type contemplated by the Act.").

358(h), the partnership would reduce its basis in the stock of the corporation, but the partners'
bases in their partnership interests would be unaffected.  Thus, the transfer could result in the
duplication of the loss on the contingent liability, once when the partners sell their partnership
interests and again when the corporation pays the liability.  Section 1.358-7 eliminates the
potential duplication of loss, by requiring that the reduction in the stock basis at the partnership
level under section 358(h) is treated as a nondeductible expenditure that reduces the partners'
bases in their partnership interests under section 705(a)(2)(B).[84]

In contrast to regulation 1.358-7, regulation 1.752-6 applies to transactions that have
nothing to do with section 358(h) and that create no potential for loss duplication.  Accordingly,
the government cannot shoehorn regulation 1.752-6 into Section 309(c)'s grant of legislative
rulemaking authority.  As the *Sala* court observed:

> The overbreadth of § 1.752-6 is especially evident in light of the fact that
> § 358(h) is a corporate provision.  Had Congress intended to make a sea
> change in the law with respect to transactions between partners and their
> partnerships, it would have done so directly.  It certainly would not have
> authorized Treasury to do so by regulation in a statute that fails to even
> mention § 752.  Nothing in the Act or its legislative history suggest this was
> Congress's intent.[85]

## II.    Regulation 1.752-6 Was Issued in Violation of the Administrative Procedure Act and Thus Is Invalid

Even if regulation 1.752-6 were within the scope of Section 309(c), it would still be
invalid, because the Treasury failed to comply with the notice-and-comment requirements of the
Administrative Procedure Act (the "APA").

---

84    *See* Treas. Reg. § 1.358-7(b).

85    *Sala*, 552 F. Supp. 2d at 1201 (internal citations omitted); *see also Stobie Creek*, 2008 WL 2968170, at *35
("The lack of correspondence in the reach of the Treasury Regulation relative to the statutory mandate is
apparent.").

In the case of a legislative regulation, the APA generally requires federal agencies to publish a general notice of proposed rulemaking in the Federal Register at least thirty days prior to the proposed rule's effective date.[86]  The APA also mandates that federal agencies give interested persons an opportunity to participate in the rulemaking process through submission of written data, views, or arguments.[87]  Subject to limited exemptions, rules that are not promulgated in accordance with the notice and comment requirements are invalid.[88]

The Treasury gave no notice and provided no opportunity for comment prior to issuing Temporary Regulation 1.752-6T on June 24, 2003.[89]  Nor did it provide an opportunity for comment before finalizing the Regulation without change on May 26, 2005.  The Treasury attempted to justify these procedural failures by invoking the "good cause" exception contained in the APA.[90]  The APA's good cause exception applies when "the agency for good cause finds . . . that notice and public procedure . . . are impracticable, unnecessary, or contrary to the public interest."[91]  The good-cause exception is "narrowly construed."[92]

---

[86]  5 U.S.C. § 553(b), (d).

[87]  *Id.* § 553(c).

[88]  *Id.* § 706(2)(D) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law"); *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) ("Ordinarily, when a regulation is not promulgated in compliance with the APA, the regulation is invalid.").

[89]  *See* Assumption of Partner Liabilities (Temporary Regulations), 68 Fed. Reg. 37414, 37416 (June 24, 2003) ("[G]ood cause is found for dispensing with notice and public procedure . . . .").

[90]  *See id.*

[91]  5 U.S.C. § 553(b)(B).

[92]  *Levesque v. Block*, 723 F.2d 175, 184 (1st Cir. 1983) (citing *Kollett v. Harris*, 619 F.2d 134, 145 (1st Cir. 1980)); *see also Util. Solid Waste Activities Group v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (good cause exception is to be "narrowly construed and only reluctantly countenanced" (internal citations omitted)).

Courts have held that adherence to notice-and-comment procedures is "impracticable" if compliance with the APA would impede the agency's ability to execute its statutory duties.[93] "Public procedures are 'unnecessary' . . . when the regulation is technical or minor."[94] According to the First Circuit, the third category—when compliance would be contrary to the public interest—"'supplements the terms "impracticable" or "unnecessary"; it requires that public rule-making procedures shall not prevent an agency from operating and that, on the other hand, lack of public interest in rule-making warrants an agency to dispense with public procedure.'"[95]

In its recitation that good cause existed for failing to adhere to the APA's notice-and-comment requirements, the Treasury asserted that the Regulation was necessary to "prevent abusive transactions of the type described in the Notice 2000-44."[96]  While it did not identify which of the three grounds for good cause it was relying on, its position appears to be that compliance with the normal procedures would have been impracticable.[97]  In essence, the Treasury's explanation amounts to a contention that the time delay resulting from adherence to the notice-and-comment procedures would have hampered its ability to prevent future Notice 2000-44 transactions.

---

[93]  *See Levesque*, 723 F.2d at 184 (citing *Kollett*, 619 F.2d at 145); *Util. Solid Waste*, 236 F.3d at 754-55.

[94]  *Levesque*, 723 F.2d at 184 (citation omitted).

[95]  *Id.* at 184 (quoting S. Rep. No. 79-752 (1945), *reprinted in* Legislative History of the Administrative Procedure Act, 1944-46, at 200 (1946)).

[96]  Assumption of Partner Liabilities (Temporary Regulations), 68 Fed. Reg. at 37416.

[97]  Given the importance it has placed on the Regulation, the Government cannot plausibly characterize the Regulation as a minor or technical rule for which notice-and-comment procedures are unnecessary. Furthermore, the stated grounds for dispensing with the APA's notice-and-comment procedures do not suggest any lack of public interest in the rulemaking as contemplated by the First Circuit's decisions in *Levesque* and *Kollett*.

This assertion is incredible. The Treasury waited nearly three years after passage of the 2000 Act and the issuance of Notice 2000-44 to promulgate Temporary Regulation 1.752-6T. That glacial pace refutes any suggestion that there was insufficient time to comply with the normal APA procedures.[98] The suggestion that swift action was necessary to "*prevent* abusive transactions" is especially disingenuous. Since regulation 1.752-6 applies only to transactions that had already occurred when the temporary regulation was first issued, the Regulation cannot—and never could have—prevented *any* transaction. Indeed, another regulation finalized on the same date, regulation 1.752-7, changed the technical rules for transactions occurring on or after June 24, 2003. Unlike regulation 1.752-6, regulation 1.752-7 actually has the potential of *preventing* a Notice 2000-44 transaction from occurring. Interestingly, however, in issuing regulation 1.752-7 the Treasury followed the notice-and-comment procedures of the APA, thereby demonstrating that compliance with the APA was entirely consistent with the stated rationale of preventing Notice 2000-44 transactions.[99]

The lengthy delay in issuing the Regulation, its exclusively retroactive effective date, and the Treasury's concession that the Regulation should not apply to future transactions demonstrate that the Treasury's failure to follow the notice-and-comment procedures of the APA had nothing to do with the prevention of abusive transactions. While paying lip service to the good-cause exception, the government seeks to turn that exception into "an all-purpose escape clause."[100]

---

[98] *See Kollett*, 619 F.2d at 145 (rejecting agency's assertion that adherence to the APA was impracticable where there was a 14-month gap between enactment of a statute and its effective date).

[99] *See* Assumption of Partner Liabilities (Notice of Proposed Rulemaking), 68 Fed. Reg. 37434, 37434 (proposed June 24, 2003) (giving notice of scheduled hearing and deadline for receiving comments).

[100] *Woods Psychiatric Inst. v. United States*, 20 Cl. Ct. 324, 332 (1990) (noting the need to interpret the good cause exception narrowly) (internal citations omitted), *aff'd*, 925 F.2d 1454 (Fed. Cir. 1991).

Because the Treasury issued the Regulation in violation of APA Section 553(b), (c) and (d), the Regulation is not a valid legislative regulation.

## III.    The Government Cannot Recharacterize the Regulation as Interpretive

Since regulation 1.752-6 is not a valid legislative regulation, its validity may depend on whether the government can recharacterize it as an interpretive regulation promulgated under the general statutory authority of section 7805(a).[101]  Courts generally afford interpretive regulations less deference than legislative regulations.[102]  An interpretive regulation is valid if it is a reasonable interpretation of the statute and if it "harmonize[s] with the plain language of the statute, its origin, and its purpose."[103]

The government cannot plausibly characterize regulation 1.752-6 as interpretive.  First, the Treasury initially characterized the Regulation as legislative.  In a similar circumstance, where an administrative agency defending a legislative regulation sought to reclassify the regulation as interpretive, the First Circuit rejected the agency's position as "unfair and disingenuous."[104]

Second, the Regulation does not even purport to interpret section 752 or any other provision of subchapter K of the Code.  In fact, the Regulation applies only to obligations that

---

[101] *See Klamath Strategic Inv. Fund, LLC v. United States*, 440 F. Supp. 2d 608, 622 (E.D. Tex. 2006) ("[T]o the extent that Congress' grant of authority was exceeded, the Regulation should be reviewed as an 'interpretive regulation' rather than a 'legislative regulation.'").

[102] *See, e.g., Schuler Indus., Inc. v. United States*, 109 F.3d 753, 754-55 (Fed. Cir. 1997) (applying a "more deferential review to legislative regulations" than interpretive regulations (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984); *Nat'l Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 476 (1979))); *Nalle v. Comm'r*, 997 F.2d 1134, 1138 (5th Cir. 1993) (same (citing *Rowan Cos. v. United States*, 452 U.S. 247, 253 (1981); *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24 (1982))).

[103] *Dresser Indus. v. Comm'r*, 911 F.2d 1128, 1138 (5th Cir. 1990) (quoting *Rowan*, 452 U.S. at 253); s*ee also Vogel Fertilizer Co.*, 455 U.S. at 25 ("We consider first whether the Regulation harmonizes with the statutory language.").

[104] *Levesque v. Block*, 723 F.2d 175, 181 (1st Cir. 1983); *see also id.* ("[A]lthough the courts may make the final determination of whether a rule is legislative or interpretative, a highly relevant datum in the determination is the agency's contemporaneous characterization of its action.").

are *not* liabilities for purposes of section 752(a) and (b).  Moreover, the Regulation produces results that are irreconcilable with the plain language of section 752.  As explained above, under section 752, a partnership's assumption of a partner's liability in a section 721 transaction has two reciprocal consequences for the partners' outside bases in their partnership interests:  (1) the outside basis of the partner whose liability has been assumed by the partnership is reduced,[105] and (2) the outside bases of all partners (including the partner whose liability has been assumed by the partnership) are increased by their respective shares of the liability assumed by the partnership.[106]  Nothing in section 752 remotely suggests that the term "liabilities" has one meaning when used in section 752(b) and a different meaning when used in section 752(a).  Yet that is the impact of the Regulation.  It reduces the basis of the partner whose obligation has been assumed by the partnership, but does not provide for the offsetting increase in partner-level basis that section 752(a) would require if the obligation were a liability.  Thus, the Regulation creates results that could never happen if the regulation 1.752-6 liability were a liability under section 752.

In promulgating regulation 1.752-6, the Treasury sought to change the underlying statutory regime without express authority.  It is fundamental that Congress, not the Treasury, makes the law.[107]  The government cannot save the Regulation by rebranding it as interpretive.

---

[105] I.R.C. § 752(b).

[106] *Id.* § 752(a).

[107] *See Manhattan Gen. Equip. Co. v. Comm'r*, 297 U.S. 129, 134 (1936) ("The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law, for no such power can be delegated by Congress, but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute."); *Union Carbide Corp. v. United States*, 612 F.2d 558, 563 (Ct. Cl. 1979) (legislative regulations invalid where they conflict with the language of the statute).

IV.    **The Effective Date of Treasury Regulation 1.752-6 Violates Section 7805's Prohibition Against Retroactive Regulations**

In addition to its failure to satisfy the requirements for validity as either a legislative or interpretive regulation, regulation 1.752-6 is invalidly retroactive. The Regulation was first issued as a temporary regulation in 2003, well after the consummation of the transactions at issue in this case, but purports to apply to transactions entered into after October 18, 1999 and before June 24, 2003. This effective date violates the statutory prohibition on retroactive regulations contained in section 7805(b).

A.    **Subject to Rare Exceptions, Section 7805 Imposes a Blanket Prohibition on Retroactive Tax Regulations**

Prior to 1996, section 7805(b) gave the Treasury and IRS the power to prescribe the extent to which any ruling or regulation would be applied without retroactive effect.[108] The courts interpreted section 7805(b) as establishing a presumption that regulations are to be applied retroactively.[109] Even with this presumption, however, the failure to limit a regulation to prospective application was reviewable for an abuse of discretion.[110] Such an abuse occurred when "the retroactive regulation alter[ed] settled prior law or policy upon which the taxpayer justifiably relied and if the change causes the taxpayer to suffer inordinate harm."[111]

In 1996, however, Congress amended section 7805(b) to reverse the statutory presumption and to prohibit retroactive regulations, based on its determination that it is

---

[108] *See* I.R.C. § 7805(b) (1994) ("The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.").

[109] *See, e.g., Gehl Co. v. Comm'r*, 795 F.2d 1324, 1331 (7th Cir. 1986) ("[Section 7805(b)] establishes a presumption that regulations are to be applied retroactively." citations omitted)); *CWT Farms, Inc. v. Comm'r*, 755 F.2d 790, 802 (11th Cir. 1985) ("Internal Revenue Regulations are presumed to have retroactive effect." (citations omitted)).

[110] *See, e.g., CWT Farms*, 755 F.2d at 802 (holding that retroactive regulations are reviewable for abuse of discretion (citing *Wendland v. Comm'r*, 739 F.2d 580, 581 (11th Cir. 1984))).

[111] *Id.*

"generally inappropriate" for the Treasury to issue retroactive regulations.[112]  Under the general

rule, no tax regulation may apply to any taxable period ending prior to the date the regulation (or

a predecessor temporary or proposed regulation) is filed with the Federal Register or, if earlier,

the date on which a notice describing the expected contents of the regulation is released.[113]

### B.    Treasury Regulation 1.752-6 Fails to Satisfy the Exceptions of Section 7805(b)

In the preamble to Temporary Regulation 1.752-6T (the predecessor of regulation 1.752-

6), the Treasury acknowledged the statutory bar against retroactive regulations, but claimed that

the Regulation satisfied two exceptions under section 7805(b).[114]  First, it alleged that the

Regulation satisfied section 7805(b)(6), which permits the Treasury to apply a regulation

retroactively pursuant to a legislative grant of authority from Congress (the legislative-grant

exception).[115]  Second, the Treasury claimed that the Regulation satisfied section 7805(b)(3),

which permits the use of a retroactive effective date to prevent abuse (the anti-abuse

exception).[116]

Neither exception invoked by the Treasury applies, and the Regulation's retroactive

effect is therefore barred by section 7805(b).  Because regulation 1.752-6 is purely retroactive,

with no prospective application, this renders the entire Regulation invalid.

In relying on the legislative-grant exception, the Treasury cited section 309(d)(2) of the

2000 Act.[117]  Section 309(d)(2) authorizes an effective date for rules promulgated under Section

---

[112] H. Rep. No. 104-506, at 44 (1996).

[113] I.R.C. § 7805(b)(1).

[114] Assumption of Partner Liabilities (Temporary Regulations), 68 Fed. Reg. 37414, 37416 (June 24, 2003).

[115] *Id.*

[116] *Id.*

[117] *Id.*

309(c) of October 18, 1999, "or such later date as may be prescribed in such rules." But this authorization applies only to regulations that implement the authority granted under Section 309(c).[118] As explained above, Section 309(c) does not authorize regulation 1.752-6. Accordingly, the legislative-grant exception of section 7805(b)(6) does not apply to the Regulation.

Similarly, the Regulation does not satisfy the criteria for retroactivity under the anti-abuse exception. Section 7805(b)(3) states merely that the Secretary may provide that any regulation may take effect or apply retroactively to "prevent abuse." The statute does not clarify the meaning of the term "abuse."[119] According to the Staff of the Joint Committee on Taxation, the "abuse" referred to by section 7805(b)(3) is "abuse of the statute."[120]

The Treasury's unsupported assertion that the anti-abuse exception applies does not withstand analysis. As the *Stobie Creek* court noted,

> it would be an incongruous result to defer to Treasury's determination that a particular regulation must apply retroactively in order to prevent abuse, when Congress saw fit to decree the end of one named abuse on a retroactive basis (acceleration and duplication of losses), but not all potential abuses related to transfers of partnership assets.[121]

Moreover, the Regulation does not protect section 752 from abuse (for example, by treating a contingent obligation as a liability for purposes of section 752(a) and (b)). Instead, it creates an immediate reduction in the contributing partner's outside basis (much like section 752(b) would require), with no correlative increase to the outside basis of any partner (which section 752(a)

---

[118] *See* 2000 Act § 309(d)(2).

[119] *See, e.g., Sala v. United States*, 552 F. Supp. 2d 1167, 1201 (D. Colo. 2008) ("The question of what constitutes 'abuse' is not clarified by the statute.").

[120] Staff of the Joint Comm. on Taxation, 104th Cong., *Background and Information Relating to the Taxpayer Bill of Rights* 22 (Comm. Print 1995).

[121] *Stobie Creek Invs., LLC v. United States*, No. 05-748T, 2008 WL 2968170, at *35 (Fed. Cl. July 31, 2008).

36

ordinarily would require).  Thus, it directly contradicts the underlying statutory provisions that it

supposedly is protecting from abuse.[122]

That the retroactive rules of regulation 1.752-6 were not necessary to protect the statute

from abuse becomes clear when they are compared to the prospective rules of regulation 1.752-7.

Rather than require an immediate reduction in the contributing partner's outside basis, regulation

1.752-7 defers any reduction to outside basis until an indeterminate future event.[123]  The

Treasury explained this result by reasoning that the immediate reduction of a partner's basis

would be  inappropriate for pass-through entities.[124]  In other words, in promulgating regulation

1.752-7 the Treasury acknowledged that applying the rules of regulation 1.752-6 to future

transactions would produce inappropriate and unreasonable results.[125]  This explanation begs the

question:  How can the Treasury assert that prospective application of the regulation 1.752-6

regime would have produced unreasonable results, while simultaneously maintaining that

retroactive application of the same regime is necessary to protect the statute?  If regulation

1.752-6 were necessary to prevent abuse of the statute, why did the Treasury not apply it

prospectively?

Finally, the Treasury's reliance on the anti-abuse exception is hard to square with the

time that it took the Treasury to issue the temporary regulation.  Invocation of the anti-abuse

exception may be appropriate if it otherwise would not be possible for the Treasury to move fast

---

[122] *See Sala*, 552 F. Supp. 2d at 1203 (holding that the Regulation is "contrary to the statutes it supposedly protects from abuse").

[123] *See* Treas. Reg. § 1.752-7(a) ("These rules also prevent the acceleration of loss by deferring the partner's deduction or loss attributable to the obligation (if any) until the satisfaction of the § 1.752-7 liability.").

[124] *See* Assumption of Partner Liabilities (Notice of Proposed Rulemaking), 68 Fed. Reg. 37434, 37436-37 (proposed June 24, 2003).

[125] *See id.* (explaining that if a partner's outside basis were reduced by the amount of a liability when it was assumed, the partner would not have sufficient outside basis to absorb deductions for that liability).

enough to close a loophole or to respond to newly enacted legislation. That is not the case here. Almost three years passed between the issuance of Notice 2000-44 and the initial issuance of the Regulation as a temporary regulation in June 2003.[126] The lackadaisical pace with which the Treasury moved in promulgating the Regulation, and the Treasury's concession that the Regulation produces results that are so inconsistent with the purposes of section 752 that they should not be applied prospectively, are enough to refute any argument that the Regulation is necessary to prevent abuse of the statute.

The Regulation's narrow window of applicability, and its creation of a special rule for Notice 2000-44 transactions shows that the real purpose of the Regulation was not to prevent abuse but to "bootstrap the government's litigating position with respect to so-called 'Son of Boss' cases."[127] Indeed, the day after the promulgation of Temporary Regulation 1.752-6T, the IRS directed its attorneys to use the regulation to challenge taxpayers' claimed losses.[128] The mere desire to support a litigating position is insufficient grounds for issuing a retroactive regulation.[129]

---

[126] The 2000 Act was enacted on December 21, 2000, and temporary regulation 1.752-6T was promulgated on June 24, 2003. *See* Assumption of Partner Liabilities (Temporary Regulations), 68 Fed. Reg. 37414, 37415 (June 24, 2003).

[127] *Sala*, 552 F. Supp. 2d at 1203; *see also Klamath Strategic Inv. Fund, LLC v. United States*, 440 F. Supp. 2d 608, 625 (E.D. Tex. 2006) ("A narrow time frame, coupled with conduct that the [IRS] specifically calls out in the preamble of the Regulation, is a strong indication that the promulgation of the Regulation was to buttress the government litigation position in this and similar cases.").

[128] *See* Chief Counsel Notice CC-2003-020 (released June 25, 2003).

[129] *See Sala*, 552 F. Supp. 2d at 1203 ("Such a procedure is generally improper, and such make-weight regulations are frequently disregarded by the courts." (citations omitted)); *see also Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300, 303 (2d Cir. 1971) ("[T]he Commissioner may not take advantage of his power to promulgate retroactive regulations during the course of a litigation for the purpose of providing himself with a defense . . . ."). When *Chock Full O'Nuts* was decided, the presumption under section 7805 was that regulations are retroactive. *See supra* notes 108-113 and accompanying text. The argument against retroactive "fighting regulations" is even stronger under current section 7805, which contains a presumption against retroactivity. *See* I.R.C. § 7805(b)(1).

## CONCLUSION

The Treasury promulgated regulation 1.752-6 to bolster the government's litigating position in so-called "Son of Boss" cases. As a "fighting regulation," regulation 1.752-6 warrants no deference.[130]

Regulation 1.752-6 exceeds the authority delegated in Section 309(c) of the 2000 Act. The text of the statute, which is completely consistent with the legislative history, makes it clear that Congress was concerned about the potential for acceleration and duplication. The Regulation, however, applies to transactions that do not create such potential. Furthermore, in issuing regulation 1.752-6, the Treasury failed to comply with the notice-and-comment requirements of the APA. Thus, regulation 1.752-6 is not a valid legislative regulation.

Nor is regulation 1.752-6 a valid interpretive regulation. In fact, the Regulation explicitly applies only to obligations that do not constitute liabilities within the meaning of section 752, and even then only to obligations created in transactions that had already occurred when the Regulation was promulgated.

Even if its substantive provisions were valid, the Regulation is impermissibly retroactive.

Respectfully submitted this 15th day of August, 2008.

PLAINTIFF
FIDELITY INTERNATIONAL CURRENCY ADVISOR
A FUND, L.L.C., by the Tax Matters Partner

PLAINTIFF
FIDELITY HIGH TECH ADVISOR A FUND, L.L.C., by
the Tax Matters Partner

---

[130] *See, e.g., Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

/s/ Ronald L. Buch, Jr.
David J. Curtin, D.C. Bar #281220
Ronald L. Buch, Jr., D.C. Bar #450903
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email: dcurtin@mckeenelson.com
       rbuch@mckeenelson.com
       lamanti@mckeenelson.com

John O. Mirick, BBO #349240
MIRICK, O'CONNELL, DEMALLIE
& LOUGEE, LLP
100 Front Street
Worcester, MA 01608
Telephone:  (508) 791-8500
Facsimile:  (508) 791-8502
Email: jomirick@mirickoconnell.com

**Certificate of Service**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 15, 2008.

/s/ Ronald L. Buch, Jr.
Ronald L. Buch, Jr., D.C. Bar #450903
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email: rbuch@mckeenelson.com