# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, ) ) ) ) | |
| Plaintiff, ) ) | Case No.:  05-40151-FDS |
| v. ) | 06-40130-FDS |
| UNITED STATES OF AMERICA, ) ) ) | |
| Defendant. ) ) ) | |

|  |  |
|---|---|
| FIDELITY HIGH TECH ADVISOR A FUND, L.L.C., by the Tax Matters Partner, ) ) ) | |
| Plaintiff, ) ) | Case No.:  06-40243-FDS |
| v. ) | 06-40244-FDS |
| UNITED STATES OF AMERICA, ) ) | |
| Defendant. ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION IN LIMINE TO EXCLUDE "OTHER TAXPAYER" EVIDENCE

FIDELITY INTERNATIONAL CURRENCY ADVISOR
A FUND, L.L.C., by the Tax Matters Partner, Plaintiff;
FIDELITY HIGH TECH ADVISOR A FUND, L.L.C., by
the Tax Matters Partner, Plaintiff

David J. Curtin, D.C. Bar #281220
Ronald L. Buch, Jr., D.C. Bar #450903
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone: (202) 775-1880
Facsimile: (202) 775-8586
Email: dcurtin@mckeenelson.com
        rbuch@mckeenelson.com
        lamanti@mckeenelson.com


John O. Mirick, BBO #349240
MIRICK, O'CONNELL, DEMALLIE
& LOUGEE, LLP
100 Front Street
Worcester, MA 01608
Telephone: (508) 791-8500
Facsimile: (508) 791-8502
Email: jomirick@mirickoconnell.com

# TABLE OF CONTENTS

BACKGROUND ..................................................................................................................3

ARGUMENT ....................................................................................................................3

I.  Defendant's Other Taxpayer Evidence Is Inadmissible Under Rule 404(b) ......................4

II.  The Other Taxpayer Evidence Should Be Excluded Under Rule 403................................6

    A.  Defendant's Selection of Other Taxpayers Is Unreliable .......................................7

    B.  Defendant's Other Taxpayer Evidence Is Incomplete ...........................................11

        1.  Defendant Has Refused to Produce Information Relating to Other Taxpayers..........................................................................................................13

        2.  Productions by Third Parties Are Incomplete..............................................15

    C.  Other Taxpayer Evidence Is Prejudicial Because It Creates Confusion of the Issues ...........................................................................................................16

III.  The Other Taxpayer Evidence Cannot Be Admitted Through Defendant's Experts.........18

IV.  Defendant's Other Taxpayer Evidence Is Not Relevant Under the First Circuit's Interpretation of the Economic Substance Doctrine .......................................................20

    A.  Defendant's Other Taxpayer Evidence Is Irrelevant to the Business Purpose Issue ......................................................................................................21

    B.  Defendant's Other Taxpayer Evidence Is Irrelevant to Whether the FICA A Fund and High Tech Transactions Had Objective Economic Substance..........24

CONCLUSION................................................................................................................27

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No.: 05-40151-FDS |
| | ) | 06-40130-FDS |
| v. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) ) | |

|  |  |  |
|---|---|---|
| FIDELITY HIGH TECH ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No.: 06-40243-FDS |
| v. | ) | 06-40244-FDS |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION IN LIMINE TO EXCLUDE "OTHER TAXPAYER" EVIDENCE

This motion requests that the Court exclude evidence gathered by Defendant regarding taxpayers who are not before this Court.  While Defendant has represented to this Court that the "other taxpayer" materials challenged in this motion are relevant and admissible, Defendant has failed to support its claims.  For the reasons explained below, Defendant's other taxpayer evidence should be excluded under Rules 401, 403, 404(b), and 703 of the Federal Rules of

1

Evidence because it is inadmissible propensity evidence, because it is highly prejudicial, unreliable, and incomplete, and because it is irrelevant to the issues in this case. Moreover, Defendant should not be permitted to circumvent the Federal Rules of Evidence by seeking to introduce this evidence through its experts.

The lack of connection between Defendant's other taxpayer evidence and the issues in this case is further evidenced by the fact that, to this point, Defendant has relied on general claims of relevance and admissibility to obtain discovery concerning other taxpayers. It is well recognized in tax cases that a taxpayer's case should be decided on the taxpayer's facts. Efforts by either the government or a taxpayer to inject evidence about non-party taxpayers should be viewed skeptically and in all but the rare case rejected.[1] While Plaintiff explains in this motion why this evidence is inadmissible, Plaintiff hastens to point out that Defendant has the burden, indeed a very high one, to demonstrate that this evidence about strangers is admissible.

Defendant has carefully avoided identifying where this evidence fits, if at all, under the Federal Rules of Evidence. This is not surprising, because no Federal Rule of Evidence permits admission of this evidence. Essentially, Defendant's evidence is "other act" evidence, which the Federal Rules of Evidence view with skepticism, especially when the other acts are those of strangers to the case. Rule 404(b) explicitly precludes admission of this type of evidence. Ignoring the limitations imposed by Rule 404(b), Defendant has gravitated over time toward two alternative positions for admissibility: one is based on the use of its experts as delivery vehicles for this evidence, and the other is based on the First Circuit decision in *Dewees*.[2] But the rules

---

[1] The IRS has consistently fought efforts by taxpayers seeking to introduce evidence that other taxpayers engaged in the same type of transaction as the taxpayer. *See, e.g., Peerless Corp. v. United States*, 185 F.3d 922 (8th Cir. 1999); *Hostar Marine Transp. Sys., Inc. v. United States*, No. 06-10834, 2008 U.S. Dist. LEXIS 43800 (D. Mass. June 23, 2008).

[2] *Dewees v. Comm'r*, 870 F.2d 21 (1st Cir. 1991), is discussed *infra*, Part IV.B.

governing expert testimony (Federal Rules of Evidence 702, 703, and 705) do not support Defendant's position, and *Dewees* does not give Defendant the green light to introduce its other taxpayer evidence

## BACKGROUND

This case presents the issue of whether the Egans' tax treatment of certain transactions in 2001 and 2002 was proper under then-existing federal income tax law.  In support of his position, Plaintiff will present evidence demonstrating that, among other things, (i) Plaintiff had significant financial risks as a result of a concentrated stock position in EMC Corporation and debt associated with a large real estate portfolio, (ii) the transactions entered into by Plaintiff were designed to hedge these risks, (iii) the transactions entered into by Plaintiff had significant profit potential in addition to hedging qualities, and (iv) Plaintiff relied on numerous professional advisors who supported both the business purpose and the tax treatment of the transactions.

Initially, the Court allowed discovery into the transactions of non-parties while reminding the parties of the difference between what is discoverable and what is admissible.[3]  Now that discovery has closed in the consolidated High Tech and FICA A Fund cases, it is clear that introduction of Defendant's other taxpayer evidence would unfairly prejudice Plaintiff.

## ARGUMENT

Defendant is preparing to introduce incomplete facts concerning the transactions and conduct of strangers to this case.  This evidence about other taxpayers is being packaged as "pattern evidence."  Defendant is asking this Court to infer conclusions regarding Plaintiff's motives and profit potentials from those unrelated transactions.  Plaintiff has consistently taken the position that such material is not relevant and prejudicial.  The merits of Plaintiff's

---

[3] *See* Status Conference Tr. 31:6-7, May 11, 2006 (observing "we are quite a ways away from admissibility at trial").

3

transactions should be determined by reference to evidence concerning Plaintiff's transactions and not by looking to an incomplete record concerning the transactions of strangers, particularly when Plaintiff had no contemporaneous knowledge of these transactions.

The entire process by which Defendant has assembled its evidence about other taxpayers, while thwarting Plaintiff's efforts to obtain discovery regarding those taxpayers and their transactions, exacerbates the prejudicial impact of this already prejudicial evidence. The production of documents, by both Defendant and third parties, relating to Defendant's selected group of non-party taxpayers remains prejudicially incomplete. In addition, Defendant's other taxpayer evidence is highly unreliable. Defendant's pattern has morphed over time, ranging from a high of over 1,800 taxpayers to a much smaller number that, at last report, was hovering at approximately 50 in the FICA A Fund[4] case and oscillating between two and five in the High Tech[5] case. The shortcomings and prejudices associated with Defendant's other taxpayer evidence outweigh whatever limited probative value it might have.

## I.     Defendant's Other Taxpayer Evidence Is Inadmissible Under Rule 404(b)

The other taxpayer evidence is, essentially, propensity evidence being offered to show Plaintiff acted in conformity with the pattern taxpayers.[6] Federal Rule of Evidence 404(b) provides that evidence of other acts "is not admissible to prove the character of a person in order

---

[4] References to "FICA A Fund" mean Fidelity International Currency Advisor A Fund, L.L.C.

[5] References to "High Tech" mean Fidelity High Tech Advisor A Fund, L.L.C.

[6] Defendant alleges that its pattern shows that the taxpayers had no business purpose other than obtaining tax benefits. *See* Def.'s Mem. of Law in Supp. of Its Mot. to Compel Prod. of Docs. from Proskauer Rose LLP at 4, *Fid. Int'l Currency Advisor A Fund, L.L.C. v. United States*, Nos. 05-40151 & 06-40130 (D. Mass. Oct. 31, 2007) (claiming that "the only purpose" for the "abusive SOS and FDIS tax shelters . . . was to generate a tax loss"). The purposes of these other taxpayers remains in dispute, and the incomplete record regarding their purposes for entering into the other transactions means that this factual question will remain unresolved.

4

to show action in conformity therewith."[7]  The advisory committee's note explains that the underlying policy for excluding such evidence "is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice."[8]  In the First Circuit, admissibility of Rule 404(b) evidence depends on satisfaction of two requirements:  first, the proponent must show that the evidence has "some 'special' probative value."[9]  If the first requirement is satisfied, the trial judge "then must weigh the special relevance against the prejudicial risk."[10]  This second requirement is essentially the application of Rule 403.[11]

Although the other taxpayer evidence has nothing to do with Plaintiff's own prior acts,[12] the evidence is being offered to prove Plaintiff's intent or motives (1) through the alleged actions, intent, or motives of other taxpayers, or (2) through the alleged actions, intents, or motives of certain professional firms, including DGI, Helios, Alpha, Sidley Austin Brown & Wood, and Proskauer Rose.  In either case, Defendant cannot show that its other taxpayer evidence has any "special relevance" that would permit its admission for this purpose.  In fact, for the reasons set forth below, Defendant's other taxpayer evidence has no relevance, let alone

---

[7] This provision has been interpreted to mean that acts of third parties cannot be introduced into evidence to show the propensity of the accused.  *See United States v. McCourt,* 925 F.2d 1229, 1232 (9th Cir. 1991).

[8] Fed. R. Evid. 404(b) advisory committee's note (2006) (quoting *Michelson v. United States,* 335 U.S. 469, 476 (1948)).  The committee's note further clarifies that 404(b) applies in both criminal and civil cases.

[9] *United States v. Moccia,* 681 F.2d 61, 63 (1st Cir. 1982).  Evidence has "special relevance" if "it is offered not to show a defendant's evil inclination but rather to establish some material fact."  *Veranda Beach Club Ltd. P'ship v. Western Sur. Co.,* 936 F.2d 1364, 1373 (1st Cir. 1991).

[10] *Moccia*, 681 F.2d at 63.

[11] *United States v. Sebaggala*, 256 F.3d 59, 67 (1st Cir. 2001) ( "Rule 404(b) incorporates *sub silentio* the prophylaxis of Federal Rule of Evidence 403.  This means that the evidence, although relevant, nonetheless must be rejected if its likely prejudicial impact substantially outweighs its likely probative worth.").

[12] The Ninth Circuit has explained that Rule 404(b) requires exclusion of evidence of prior acts, including acts of persons other than the individual against whom the evidence is offered.  *McCourt*, 925 F.2d at 1232 ("It . . . appears that Congress knew how to delineate subsets of 'persons' when it wanted to, and that it intended 'a person' and 'an accused' to have different meanings when the Rules speak of one rather than the other.  Because Rule 404(b) plainly proscribes other crimes evidence of 'a person,' it cannot reasonably be construed as extending only to 'an accused.'").

the special relevance required to satisfy Rule 404(b).  Accordingly, Defendant's other taxpayer evidence should be excluded under Rule 404(b).

## II.    The Other Taxpayer Evidence Should Be Excluded Under Rule 403

Even if marginally relevant, Defendant's evidence about strangers is not admissible due to the prejudice, confusion, and waste of time it will cause.  Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues . . . or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[13]

The First Circuit and other circuits have consistently held that, under Rule 403, evidence concerning the actions of others is inadmissible to show the intent of the party against whom it is offered due to the prejudicial impact of such evidence.  For example, in *United States v. St. Michael's Credit Union*, the First Circuit held that evidence of a third party's activities was prejudicial and must be excluded when there was no evidence that the party against whom such evidence was offered had knowledge of those activities.[14]  In that case, the trial court admitted evidence of a father's gambling activities to prove the intent of the daughter.  The Court of Appeals held that the trial court had erred and remanded the case, explaining that "if the evidence shows, directly or by inference, that [the daughter] knew or 'must have known' of [the father's] gambling activities, it would be relevant to establishing both her intent and her motive."[15]  Where there is no connection between the third parties' acts and the party against whom the evidence is offered, the First Circuit required exclusion, explaining "[e]ven were we to afford some minimal probative significance to the gambling evidence, we would still find its

---

[13] Fed. R. Evid. 403.

[14] 880 F.2d 579 (1st Cir. 1989).

[15] *Id.* at 600.

6

admission to be an abuse of discretion because its 'probative value (if any) is substantially outweighed by the danger of unfair prejudice.'"[16]   The First Circuit, like other circuits, finds such evidence highly prejudicial because it is based "on a theory of guilt by association."[17]

Similarly, the non-party evidence Defendant seeks to introduce is prejudicial and warrants exclusion under the Federal Rules.  "Little discussion is needed to demonstrate that prior similar acts of misconduct performed by one person cannot be used to infer guilty intent of another person who is not shown to be in any way involved in the prior misconduct."[18]   Because such evidence is so prejudicial its admission constitutes an abuse of discretion.[19]   Evidence regarding these other taxpayers, would serve no other purpose than to impute the alleged motives of strangers to Plaintiff or to denigrate Plaintiff's choice of professional firms on which he relied.[20]   Despite Defendant's insinuations, the other taxpayers were complete strangers to Plaintiff at the time of the transactions at issue and the professional firms advising Plaintiff, including Sidley Austin Brown & Wood, Proskauer Rose, and KPMG, were and continue to be highly respected institutions.

## A.    Defendant's Selection of Other Taxpayers Is Unreliable

The IRS has characterized both the FICA A Fund transaction and the High Tech transaction as substantially similar to the transactions described in Notice 2000-44.  Defendant

---

[16] *Id.* at 601 (quoting *United States v. Koger,* 646 F.2d 1194, 1998 (7th Cir. 1981)).

[17] *Id.* at 602.

[18] *United States v. DeCicco,* 435 F.2d 478, 483 (2d Cir. 1970); *see also United States v. Lightle*, 728 F.2d 468, 470 (10th Cir. 1984) ("[A]cts of misconduct performed by one person cannot be used to imply the guilt of another who is not shown in any way to be involved in the misconduct of that other person.")

[19] *DeCicco*, 435 F.2d at 483.

[20] Defendant clearly hopes to use the other taxpayer evidence to unfairly and improperly taint Plaintiff at trial.  For example, the scripted deposition testimony authored by Defendant unfairly and inappropriately highlights as a similar taxpayer one of the other taxpayers, Joe Francis, the founder of a notorious video business.  This "guilt by association" use of the other taxpayer evidence has no probative value and is highly prejudicial to Plaintiff.

continues to advance that position in the consolidated cases, while simultaneously claiming that the High Tech transaction is "entirely different from"[21] the FICA A Fund transaction. The IRS has claimed that more than 1,800 transactions engaged in by taxpayers are substantially similar to the transactions described in Notice 2000-44.[22] Defendant's group of other taxpayers, however, consists of an ever-changing number of individuals that Defendant has chosen to include or **exclude** from its pattern based, in part, on information solely in the possession of Defendant. This unilateral selection of strangers is highly prejudicial to Plaintiff because it imposes on him the task of challenging Defendant's evidence while depriving him of the evidence needed to do so.[23]

Defendant claims that certain patterns or similarities exist among certain taxpayers it believes engaged in Notice 2000-44 transactions. Those "similarities," however, are unclear as Defendant has repeatedly revised the list of other taxpayers that it considers to be part of the pattern it wishes to introduce in this case. Beginning in March 2006, Defendant identified over 50 individuals and entities (including High Tech) as part of its pattern in the FICA A Fund case.[24] Two months later, Defendant claimed that the FICA A Fund transaction was part of a set of 165 transactions.[25] Six months later, in October 2006, Defendant issued a round of

---

[21] Def.'s Opp'n. to Pl.'s Mot. to Consolidate at 2, *Fid. Int'l Currency Advisor A Fund, L.L.C. v. United States*, Nos. 05-40151 & 06-40130 (D. Mass. Apr. 23, 2007).

[22] *See Everson Testifies on IRS Efforts to Close Tax Gap*, Tax Notes Today at 6 (Oct. 27, 2005) (2005 TNT 207-24) (emphasis added) (attached as Ex. A).

[23] For example, Defendant did not include the transaction at issue in *Sala v. United States*, 552 F. Supp. 2d 1167 (D. Colo. 2008), as part of its "pattern," although the IRS determined that the *Sala* transaction, the FICA A Fund transaction, and the High Tech transaction are all "substantially similar" to Notice 2000-44 (and, presumably, substantially similar to each other).

[24] *See* Def.'s Subpoena to KPMG at app. A (Mar. 31, 2006) (attached as Ex. B). Notably, while only 50 or so individuals and entities were specifically identified, the subpoena issued to KPMG resulted in the production of tax returns for over 500 taxpayers.

[25] *See* Status Conference Tr. 16:24, May 11, 2006.

subpoenas to unrelated third parties that identified 252 taxpayers, including High Tech, as part of

the same pattern as FICA A Fund.[26]  Another subpoena issued in November 2006 identified two

additional taxpayers as part of the pattern.

After gradually expanding the group of other taxpayers, Defendant began to pick and

choose the ones that it deemed most useful to its case.  By the November 14, 2006 status

conference, Defendant had winnowed to 63 the list of other taxpayers or taxpayer entities.[27]  In

its March 15, 2007 tutorial, Defendant claimed that 58 other taxpayers had engaged in

"substantially identical" transactions.[28]  Subsequently, in the expert report of Gordon Rausser,

Defendant again revised its selection of pattern taxpayers, identifying 45 "similar

transactions,"[29] while Defendant's other expert, A. Lawrence Kolbe, identified 46 "similar sets

of transactions."[30]

Likewise, Defendant's selection of its pattern taxpayers in the High Tech case has been

haphazard and unreliable.  The subpoenas initially issued by Defendant in the High Tech case

identified seven individuals and eleven entities as engaging in pattern transactions.[31]  One month

later, in response to Plaintiff's Second Set of Interrogatories seeking identification of pattern

taxpayers, Defendant identified eight individuals and twenty-eight entities as having engaged in

"similar transactions."[32]  The following month, Plaintiff sought additional information about

---

[26] *See* Def.'s Subpoena to Bryan Cave LLP at app. A (Oct. 24, 2006) (attached as Ex. C).

[27] Status Conference Tr. 19:3, Nov. 14, 2006.

[28] Tutorial Tr. 31:23, Mar. 15, 2007.

[29] Expert Report of Gordon Rausser at 44 (Aug. 7, 2007).

[30] Expert Report of A. Lawrence Kolbe at 27 (Aug. 7, 2007).

[31] Def.'s Subpoena to RSM McGladrey Inc. at 8 (Mar. 14, 2008) (attached as Ex. D).

[32] Def.'s Resp. to Pl.'s Second Set of Interrogs. at 24-25 (Apr. 10, 2008) (attached as Ex. E).

these pattern transactions in Plaintiff's Third Set of Interrogatories, asking Defendant to identify, *inter alia*, the date the transactions were entered into, the types of options purchased or sold by those taxpayers, the amount of gain or loss recognized by the taxpayers, how the gains or losses were reported by the taxpayers, and who advised these taxpayers with respect to their transactions.  In response, Defendant identified only ***five*** pattern transactions and stated that it was unable to provide all the information requested by Plaintiff with respect to any of those five transactions.[33]  Ultimately, Defendant's experts identified only ***two*** other pattern transactions.[34] Defendant provided no explanation for the multiple adjustments of its pattern, though its expert explained that "[f]our [pattern] transactions were identified, but after review only two turn out to be sufficiently similar to offer a useful check for aspects of my work."[35]

The constant shifting of Defendant's unilateral selection of other taxpayers, coupled with Defendant's refusal to provide information concerning its selection process, underscores the inherent unreliability of Defendant's pattern evidence.  It is prejudicial for Defendant to introduce evidence about a group of other taxpayers that it has selected based on evidence that it refuses to disclose to Plaintiff.[36]  It would be inherently prejudicial to allow Defendant to admit its other taxpayer evidence while depriving Plaintiff of the ability and opportunity to understand how Defendant selected its group, why its pattern has changed over time, and what transactions

---

[33] *See* Def.'s Resp. to Pl.'s Third Set of Interrogs. at 3-5 (May 12, 2008) (attached as Ex. F).

[34] Expert Report of Gordon Rausser at 49 (Mar. 31, 2008); Expert Report of A. Lawrence Kolbe at 9 (Mar. 31, 2008).

[35] Expert Report of A. Lawrence Kolbe at 9 (Mar. 31, 2008).

[36] To the extent Defendant's experts have testified as to the criteria they applied, those explanations have been vague and elusive, especially with respect to what elements caused them to reject certain transactions.  *See, e.g.*, Kolbe Dep. Tr. 251:13-252:16, June 18, 2008 (attached as Ex. G); Kolbe Dep. Tr 174:17-178:10, Nov. 15, 2007 (attached as Ex. H).

it has now excluded.  Accordingly, Defendant should be precluded from introducing any
evidence relating to other taxpayers.

### B.    Defendant's Other Taxpayer Evidence Is Incomplete

While the information produced to date relating to other taxpayers has been voluminous,
it is, at the same time, woefully incomplete.  Almost all the information has been produced by
third parties, with very little coming from the government's own files due to numerous
objections asserted by Defendant.  Without more information about these other taxpayers,
including information about their individual financial positions and their personal reasons for
entering into transactions that Defendant claims are similar, Plaintiff has been denied the ability
to fully challenge the circumstantial evidence to be offered by Defendant.

In another case before this Court in which other taxpayer evidence was being introduced,
this Court expressed similar concerns about the incompleteness of other taxpayer information:

> There remains the 403 issue.  There's a very significant problem there.
> Each of these [other taxpayer's] applications presents its own often complex set of
> facts. . . .  And to make matters worse, these files don't look to me like they're all
> complete.  That is, there seems to be things that are missing.  So there's a
> substantial possibility of waste of time or jury confusion to the extent that we're
> wallowing in the details as to what some other [taxpayer] did.[37]

Under similar circumstances, the Tax Court rejected the IRS's effort to introduce
evidence regarding other taxpayers and entities:

> [T]he evidence respondent seeks to introduce with regard to these other entities is
> sketchy and incomplete.  To consider fairly the profit history of these other
> partnerships, we would have to examine the underlying cause of the financial
> results in each partnership.  This would greatly expand the scope of our inquiry
> and, in effect, require us to try the cases of all these other partnerships
> simultaneously with the case of the instant two partnerships.  Principles of
> efficient judicial administration would not be served by such a course, especially
> since the evidence relating to these other . . . partnerships is only of collateral

---

[37] Trial Tr. 7:3-17, Dec. 3, 2007, *United States v. Mubayyid*, No. 05-40026 (D. Mass. 2007).

significance.  Consequently, we hold that while the evidence relating to other partnerships may be relevant, it will . . . not be considered.[38]

Defendant has admitted that its other taxpayer information is incomplete.  In assessing the appropriateness of Defendant's pattern, Plaintiff asked Defendant to admit whether any of its other pattern taxpayers had a concentrated position in EMC stock in 2000 and 2001.  Such information is significant because one of Plaintiff's purposes for entering into the High Tech and FICA A Fund transactions was to hedge against a decline in value of EMC stock. [39]  Information like this about other taxpayers would be relevant to distinguishing these strangers from Plaintiff.  In response to Plaintiff's request, however, Defendant stated that "the United States is not qualified to attest to the accuracy of the statements made in this Request."[40]  By Defendant's own admission, therefore, the other taxpayer evidence produced to date does not provide complete information as to the financial circumstances of the other taxpayers or the non-tax financial reasons these non-parties may have had for purchasing certain option contracts.

By introducing the other taxpayer evidence, Defendant seeks to have this Court draw an inference upon an inference.  First, Defendant seeks an inference that these other taxpayers entered into their transactions for tax purposes only; based on that inference, Defendant wants the Court to infer that Plaintiff did the same.  Plaintiff would be prejudiced by his inability to present evidence (because none has been produced) to counter Defendant's compound inferences.

---

[38] *Fox v. Comm'r*, 80 T.C. 972, 1005 (1983).  In *United States v. Stein,* Judge Kaplan also excluded evidence of other tax shelters because the evidence was incomplete and because "[t]his evidence risks confusion of the issues and undue delay."  521 F. Supp. 2d 226, 270 (S.D.N.Y 2007).

[39] Def.'s Resp. to Pl.'s Second Set of Req. for Admis. at 2 (Jan. 8, 2008) (attached as Exhibit I).

[40] *Id.*  Defendant gave the same answer in the High Tech case.

### 1.     Defendant Has Refused to Produce Information Relating to Other Taxpayers

The other taxpayer evidence is also prejudicial because Defendant has consistently refused to produce documents relating to the taxpayers that it has identified as part of its pattern. The collection of pattern evidence has essentially operated like a scavenger hunt, where Defendant offers clues about which taxpayers it deems to be part of its pattern and Plaintiff tries to find information about those taxpayers, often meeting significant resistance.  In response to Defendant's assertions that other taxpayers are relevant to this case, Plaintiff has consistently attempted to obtain from Defendant information relating to other taxpayers through discovery. All such attempts have been met with objections, delayed productions, and incomplete information.

In May 2006, after Defendant first announced its intention to investigate not only Plaintiff's transaction but other people's transactions, Plaintiff served requests for production seeking documents relating to the other taxpayers and transactions Defendant claimed were similar.  In its second set of Requests for Production, Plaintiff sought, *inter alia*:

- Records, documents, and materials collected or created by the IRS in connection with the individuals and entities identified in the KPMG subpoena,

- Opinion letters prepared by professional firms regarding the tax treatment or reporting requirements of transactions identified by Defendant,

- Expert reports obtained by Defendant in connection with its examination of transactions identified by Defendant,

- Materials from promoter examination files referring to transactions identified by Defendant, and

- Transcripts, reports, recordings, or notes of interviews from promoter examinations of various professional firms. [41]

---

[41] *See* Def.'s Resp. to Pl.'s Second Set of Req. for Prod. of Docs. at 6-7, 12-13 (Aug. 10, 2006) (attached as Ex. J).

Defendant refused to produce any of the requested documents and asserted numerous grounds for withholding the information.[42]

In the following months, Plaintiff continued to request that Defendant produce documents and information relating to its growing and shrinking group of pattern taxpayers and promoters. In response, Defendant consistently refused to produce documents or information, with the exception of a limited number of documents produced from promoter files that Defendant had unilaterally determined were subject to an exception to section 6103. Essentially, Defendant applied its own criteria (which remain unknown to Plaintiff and appear to have morphed over time) to determine the taxpayers that met its pattern and, accordingly, qualified under an exception to section 6103.[43]

Subsequently, on the day discovery closed in the FICA A Fund case, which was over a year after Plaintiff's first discovery request relating to pattern taxpayers, Defendant produced selected partnership tax returns relating to fewer than 50 taxpayers from its initial list of 252 and its winnowed-down list of 63.[44] This much-delayed production was incomplete and served Defendant's strategic purpose of keeping this evidence as elusive as possible during discovery.

---

[42] *See Id.*

[43] To the extent Defendant produced documents relating to specific taxpayers under an exception to section 6103, Defendant withheld other documents relating to those same taxpayers and transactions that would be potentially useful for Plaintiff, including audit notes and work papers. Withholding such documents evidences an inconsistent application of the exceptions to section 6103.

[44] Defendant did not, however, produce Form 1040s, which would show how the taxpayers reported the gains and losses from the transactions. More significantly, Defendant did not produce any documents from those taxpayers' administrative files that would have shed light on their financial situation and their purposes for entering into certain option contracts. Such information is crucial for Plaintiff to respond to Defendant's other taxpayer evidence. For example, one of Defendant's selected taxpayers entered into options for heating oil. Another entered into options for lumber. Without additional information about these taxpayers, Plaintiff is unable to examine the transactions they implemented or to determine how those transactions resemble, or differ from, the FICA A Fund and High Tech transactions.

Similarly, in the High Tech case, Defendant responded to Plaintiff's interrogatories by stating that it was unable to provide complete information with respect to its alleged pattern transactions.  In addition, Defendant failed to produce any records relating to the alleged High Tech pattern taxpayers.

As predicted by Plaintiff, this wild goose chase for other taxpayer evidence has prejudiced Plaintiff, with only incomplete information being produced after the close of discovery. [45]  In sum, Defendant has kept Plaintiff in the dark as to what information it has used in developing its pattern.  Because the production of pattern evidence by Defendant has been woefully inadequate for purposes of rebutting any proposed use of pattern evidence, the prejudice of admitting such evidence significantly outweighs any possible relevance it may have.  Therefore, the evidence should be excluded.

## 2.     Productions by Third Parties Are Incomplete

In its efforts to develop a pattern of taxpayers, Defendant has sought documents from third parties who had no involvement in the FICA A Fund of High Tech transactions.[46]  While those productions have been voluminous, a thorough review of those productions reveals that they are missing information that would be critical to evaluating any supposed pattern.  The only

---

[45] As summarized by Plaintiff at the November 8, 2007 status conference:

> Back in July, I mentioned to you that we had been told by the government that we were going to be getting discovery of materials concerning these so-called other taxpayers, part of this pattern; and I had said that, you know, it's coming, it's coming, but we never seem to get it.  And I told you at that time that, you know, I'm not getting it, and I don't want to be in the position at the end of discovery where all of a sudden my adversary says, Well, here you go.  Here is some of that stuff.  Well, that happened on November 1st [the day after the close of discovery].

Status Conference Tr. 14:6-14, Nov. 8, 2007.

[46] Documents sought by Defendant from these third parties do not relate solely to the "pattern evidence" taxpayers.  Rather, Defendant also seeks internal communications from each of the third parties and communications between the third parties.  The purpose of such evidence, when it has no relationship to Plaintiff or Plaintiff's transactions is unclear, and if offered, greatly expands the "pattern" contemplated by this motion.  Should Defendant express an intention to introduce that evidence into the record, Plaintiff would also seek to exclude it for many of the same reasons as set forth in this motion.

remedy to these incomplete productions would be direct discovery from all the pattern taxpayers,

an extremely costly and intrusive option.

The evidence missing from the third party productions includes:

- Opinion letters and investor representation letters, which would shed light on why these other taxpayers entered into their transactions. While some opinion letters have been produced, it appears that many are missing.

- Memoranda of advice reflecting conversations between the advisors and the other taxpayers. These memoranda would shed light on how the taxpayers determined their reporting positions.

- Complete sets of tax returns filed by the other taxpayers (particularly Forms 1040, which would provide more information about the taxpayer's overall financial position).

- Documents relating to other taxpayers not targeted by Defendant.

Without this information from the third parties, Plaintiff and this Court cannot fully evaluate

Defendant's pattern taxpayers.

With Defendant's unwillingness to provide discovery of its records, the only other source

to gather a complete record of the pattern taxpayers would be directly from the ever-changing

group of pattern taxpayers, an impractical proposition.[47]  Therefore, this other taxpayer evidence

should be excluded because the incomplete set of materials deprives Plaintiff of the ability to

fairly challenge Defendant's pattern evidence.

### C.    Other Taxpayer Evidence Is Prejudicial Because It Creates Confusion of the Issues

In addition to being incomplete, the pattern evidence is also prejudicial because it

confuses the issues.  Specifically, it confuses Plaintiff's transaction, purpose, and profit potential

---

[47] Notably, Defendant has recently subpoenaed two of the alleged pattern taxpayers from the FICA A Fund and High Tech cases, who are complete strangers to Richard Egan and are not involved at all in the facts of this case. This new means of litigation imposes a heavy and unnecessary burden on unrelated parties and sets a precedent whereby a taxpayer who chooses to settle his case may, nonetheless, be subject to the time and expense of engaging in discovery as if that taxpayer had taken his case to trial.

with the transactions, purposes, and profit potentials of other taxpayers. The incomplete information relating to these other taxpayers creates additional confusion.

Confusion inevitably arises when applying the pattern evidence to the actual facts of this case. John Barrie, an accomplished tax attorney at Bryan Cave who was not involved in Plaintiff's transaction, testified that the transactions he reviewed did have economic substance and were not substantially similar to Notice 2000-44.[48] Defendant, however, seeks to offer evidence relating to those exact same transactions to show that Plaintiff's transaction lacked economic substance and was substantially similar to Notice 2000-44. By injecting these other taxpayer transactions into this case, Defendant would be confusing this case with disputes between non-parties and Defendant over those other transactions.

Defendant's wide-ranging discovery from individuals and firms, who had no involvement in the FICA A Fund or High Tech transactions, has also created confusion as to what transactions, whose business purposes, and which advisors are involved in these cases. The answer, however, is clear from the Complaints: the only transactions at issue are the transactions involving Richard Egan. Bringing into evidence other taxpayers, other entities, and other transactions distracts the Court's attention from the issues to be decided in this case, and confuses the facts that the Court will need to consider in deciding those issues.

---

[48] Barrie Dep. Tr. 48:14-49:2, Jan. 8, 2008 (testifying that Bryan Cave opined that the other taxpayer transactions were not substantially similar to Notice 2000-44) (attached as Exhibit K).

17

**III.     The Other Taxpayer Evidence Cannot Be Admitted Through Defendant's Experts**

Defendant has fed its team of economic experts (Rausser, Kolbe, and DeRosa) the other taxpayer evidence, and each has obligingly referred to these materials in his report.[49]  In reality, however, Defendant is using its experts to deliver otherwise inadmissible evidence.

The rules governing expert testimony are not intended to allow counsel to use experts to put into evidence hearsay or other inadmissible evidence.[50]  While Rule 703 does allow an expert to form his opinion based on inadmissible facts or data, there is nothing in the rules, including particularly Rule 703, that allows an expert to be used as a delivery vehicle for inadmissible evidence.  Indeed, Rule 703 includes important restrictions on the use of inadmissible evidence by an expert.  First, the rule limits an expert's use of inadmissible facts or data to those instances where it is demonstrated that the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions."[51]  Further, even if the inadmissible facts or data can be relied upon in forming the opinion, the rules do not allow the inadmissible facts or data to be admitted into evidence, or even disclosed to the fact finder, absent a determination by the court that the probative value of the inadmissible facts or data "substantially outweighs" the prejudice of admitting the inadmissible evidence.[52]

Other courts in this Circuit agree with this interpretation of Rule 703:

---

[49]Interestingly, one expert even went so far as to discuss the *Dewees* case in his report.  When asked, Kolbe explained that *Dewees* was included at Defendant's counsel's request and that its inclusion was not his idea.  (Ex. H at 128:8-130:18.).

[50] As explained by the advisory committee's note, Rule 703 was amended "to emphasize that when an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted."  Fed. R. Evid. 703 advisory committee's note (2000 amendments).

[51] Fed. R. Evid. 703.

[52] *Id.*

> Although undisputed that an expert may base his or her testimony on inadmissible facts or data, Rule 703 'does not allow the data itself.'. . . In other words, the rule simply permits an expert witness to rely on this type of information . . . but does not . . . allow the admittance of the evidence otherwise inadmissible.[53]

Defendant's attempt to use its team of economics experts to deliver the other taxpayer evidence is inconsistent with the restrictions of Rule 703. There is no credible evidence that reliance on other taxpayer evidence is an accepted and routine practice recognized by the field of economics. In High Tech, both Rausser and DeRosa testified that the other taxpayer evidence was not relevant to their respective conclusions.[54] Similarly, in FICA A Fund, Kolbe acknowledged that he had not used other taxpayer information in prior engagements as a government expert, explaining that he included the other taxpayer evidence in his FICA A Fund report because a *Daubert* challenge had been made against him in another tax case. According to Kolbe, after reading the *Daubert* case he concluded that a reference to other taxpayers would help him defend against a *Daubert* motion in this case.[55] An exercise that is developed only in response to a *Daubert* challenge in another case does not meet the standards for admissibility under Rule 703.

Moreover, other taxpayer evidence should not be admitted through Defendant's experts when those experts acknowledge that the evidence is incomplete and irrelevant. For example, when asked about the financial position of the other taxpayers, Kolbe admitted, "I don't believe we had data on that. If we did, it was spotty."[56] Defendant's experts admitted that while they

---

[53] *Fiorentino v. Rio Mar Assoc. LP.,* 381 F. Supp. 2d 43, 48 (D.P.R. 2005) (quoting *Bados-Santana v. Ford Motor Co.*, 364 F.Supp. 2d 79, 91-92 (D.P.R. 2005)).

[54] Rausser Dep. Tr. 196:10-16, June 30, 2008 (attached as Ex. L); DeRosa Dep. Tr. 207:17-208:10, July 29, 2008 (attached as Ex. M).

[55] Ex. H at 179:17-181:17.

[56] Ex. H at 178:9-10.

reviewed this other taxpayer evidence, they had limited information and did not know if each

taxpayer actually did the transaction as outlined in the documents the experts had reviewed.[57]

The other taxpayer evidence is highly prejudicial because it is cherry-picked from a

larger group that Plaintiff cannot access, and it is incomplete, unreliable, and not relevant to the

issues in this case. As such, Rule 703 precludes the admission of other taxpayer information,

both because it is otherwise inadmissible and because Defendant has not made the required

showing that its probative value "substantially outweighs" its prejudicial effect.

## IV. Defendant's Other Taxpayer Evidence Is Not Relevant Under the First Circuit's Interpretation of the Economic Substance Doctrine

Defendant has argued that the "other taxpayer" evidence is relevant to the application of

the "economic substance" doctrine in the FICA A Fund and High Tech cases.[58]   Under the First

Circuit's application of the economic substance doctrine, however, other taxpayer evidence

would not assist the fact-finder.

Under the Federal Rules of Evidence, evidence that is not relevant is not admissible.

Relevance for admissibility at trial under Rule 401 is a stricter standard than it is for discovery.

Defendant's evidence of other taxpayers should be excluded as irrelevant under the stricter

standard.  Rule 401 defines "relevant evidence" to be "evidence having any tendency to make the

existence of any fact that is of consequence to the determination of the action more probable or

less probable than it would be without the evidence."[59]   In contrast to Federal Rule of Civil

Procedure 26(b), which defines "relevance," Rule 401 defines "relevant evidence."  The First

Circuit has distinguished the scope of relevancy as used in the two rules, explaining that "[w]hile

---

[57] Ex. G at 258:16-21; Ex. L at 196:17-197:1.

[58] Def.'s Opp. to Pl.'s Mot. to Quash Third-Party Subpoena Issued to KPMG at 13-17,  *Fid. Int'l Currency Advisor A Fund, L.L.C. v. United States*, Nos. 05-40151 & 06-40130 (D. Mass. April 28, 2006).

[59] Fed. R. Evid. 401.

trial evidence is relevant only if it is probative of a consequential fact, *see* Fed. R. Evid. 401, evidence is relevant for discovery purposes even if it only 'appears reasonably calculated to lead to the discovery' of evidence which would be admissible at trial."[60]

The First Circuit has held that the party seeking to introduce the evidence must demonstrate its relevance.[61]  Defendant cannot demonstrate that its other taxpayer evidence is relevant to Plaintiff's case.  As outlined below, Defendant's other taxpayer evidence is not probative of any facts and should be excluded under the applicable standard of relevance for admissibility at trial.

### A.    Defendant's Other Taxpayer Evidence Is Irrelevant to the Business Purpose Issue

Defendant has claimed that its evidence about other taxpayers is relevant to "whether the transaction could possibly have had any business purpose separate from tax savings."[62] Defendant's argument is wrong for at least three reasons.  First, the business purpose inquiry is a subjective inquiry that focuses on the specific purposes of a particular taxpayer.  Hence, evidence pertaining to activities of other taxpayers whom Plaintiff does not know can provide no relevant evidence as to Plaintiff's specific purpose or intent.  Indeed, despite Defendant's argument, at least one of Defendant's experts has acknowledged that its other taxpayer evidence is not relevant to questions of business purpose:

---

[60] *N.L.R.B. v. New England Newspapers, Inc.*, 856 F.2d 409, 414 n.4 (1st Cir. 1988) (quoting Fed. R. Civ. P. 26(b)(1)).  *See also, In re The Bible Speaks*, 69 B.R. 643, 648 (Bankr. D. Mass. 1987) (observing that the scope of relevance for discovery purposes "is broader than that of the evidentiary principle of relevance, which generally confines evidence to that which tends to support or negate a cause of action").

[61] *See DesRosiers v. Moran*, 949 F.2d 15, 23 (1st Cir. 1991).

[62] Def.'s Opp. to Pl.'s Mot. to Quash Third-Party Subpoena Issued to KPMG at 15, *Fid. Int'l Currency Advisor A Fund, L.L.C. v. United States*, Nos. 05-40151 & 06-40130 (D. Mass. April 28, 2006).  Defendant cannot use the pattern evidence to determine the objective profit potential of Plaintiff's option contracts because its pattern taxpayers entered into different option contracts, with different profit points and potentials.

> I didn't attempt to use these transactions to test any of my conclusions on
> business purpose which after all, are more or less necessarily unique to the
> transaction.  You can only test common things.[63]

Second, the First Circuit has repeatedly recognized that a transaction may have economic

substance for tax purposes even if it was not motivated by a non-tax business purpose, *i.e.*, *even*

*if its sole purpose was tax avoidance.*  For example, in *Granite Trust Company v. United States*,

the taxpayer transferred common stock of its wholly owned subsidiary to a third party in

anticipation of the liquidation of the subsidiary. [64]   The taxpayer conceded that its sole purpose

in making the transfers was to position itself to claim a taxable loss on the liquidation of the

subsidiary.[65]   Nevertheless, the First Circuit rejected the government's effort to disallow the

transfers under the economic substance doctrine, stating:  "Why the parties may wish to enter

into a sale is one thing, but that is irrelevant under the Gregory case so long as the consummated

agreement was no different from what it purported to be."[66]  According to the First Circuit,

> [Al]though the facts in this case show a tax avoidance, they also show legal
> transactions not fictitious or so lacking in substance as to be anything different
> from what they purported to be, and we believe they must be given effect in
> the administration of [the statute] as well as for all other purposes.[67]

Several years later, in *Fabreeka Products Co. v. Commissioner*, the First Circuit applied

the economic substance doctrine to three companion cases that followed a similar pattern.[68]   In

each case, the Tax Court had upheld the IRS's challenge to the transaction, finding that the

---

[63] Ex. G at 254:11-15.  Similarly, in the FICA A Fund case, Kolbe testified that he did not look into the purposes
presented by the "pattern taxpayers" for entering into the transactions.  (Ex. H at 178:5-10.)

[64] 238 F.2d 670 (1st Cir. 1956).

[65] *Id.* at 673.

[66] *Id.* at 677.

[67] *Id.* at 678.

[68]  294 F.2d 876 (1st Cir. 1961)

taxpayer's sole purpose in engaging in the transaction had been to achieve a tax benefit.[69]  On

appeal, the First Circuit reversed.  After acknowledging that "[a] number of subsidiary facts

support the Tax Court's finding that taxpayer entered into this transaction only to accomplish this

proposed tax savings," the First Circuit said:

> The brightness of the motive cannot be permitted to blind our eyes to the
> existence of substantive events.  The government's charge that there was 'no
> reality to the transaction as an investment' amounts only to saying that it was
> not entered into for what it describes as 'investment motives.'  It argues that
> there were 'sophisticated and elaborate tax avoidance schemes where taxpayers
> (were) willing to pay money out-of-pocket or to take some measure of risk to
> establish a claim to tax benefits in a much larger amount.'  But this describes
> neither a sham transaction, nor one unmarked by events or risks beyond the
> control of the taxpayer, nor one different in substance and effect from what it
> appeared to be on its face.[70]

Upon reviewing the actual facts of the transactions, the First Circuit then concluded that

"[w]hatever their ultimate purpose, the taxpayers made actual 'investments' in the ordinary sense

of the word."[71]  The First Circuit reached this conclusion even though the taxpayers'

transactions followed a similar "pattern."  Nothing in its opinion even remotely suggests that the

similarity of the taxpayers' transactions had any relevance to whether a particular taxpayer's

transaction was a "sham."

Five years later, in *Stone v. Commissioner*, the First Circuit addressed a series of

transactions that followed the same pattern used by one of the taxpayers in *Fabreeka*, the

principal difference being that, in *Stone*, the taxpayers repeated the same pattern transaction four

times a year for several years.[72]  Once again, the First Circuit upheld the transactions as having

---

[69] *Id* at 877.

[70] *Id.* at 877-78 (citations and footnote omitted).

[71] *Id.* at 878.

[72] 360 F.2d 737 (1st Cir. 1966).

sufficient substance to be recognized for tax purposes, stating that although the taxpayers "were shrewd and well advised, we cannot say . . . that 'there was nothing of substance to be realized . . . from this transaction beyond a tax deduction.'"[73]

In summary, as confirmed by Defendant's own expert, because of the subjective nature of the inquiry, Defendant's other taxpayer evidence is not helpful in determining Plaintiff's business purposes for the FICA A Fund and High Tech transactions. Moreover, under First Circuit precedent, the relevance of such evidence to Defendant's economic substance arguments is, at best, questionable.

**B.    Defendant's Other Taxpayer Evidence Is Irrelevant to Whether the FICA A Fund and High Tech Transactions Had Objective Economic Substance**

Defendant has also represented that it will seek to introduce its "other taxpayer" evidence for the objective component of the economic substance inquiry.[74] In support of its position, Defendant relies heavily on *Dewees v. Commissioner*, in which the First Circuit addressed the tax consequences of option transactions in the so-called "London metals" cases.[75] The First Circuit considered the objective facts showing that there was no potential for profit or loss and disregarded the evidence as to intent.[76] The court found that the objective elements evidenced

---

[73] *Id.* at 739 (citation omitted).

[74] *See* Def.'s Opp. to Pl.'s Mot. to Quash Third-Party Subpoena Issued to KPMG at 15, *Fid. Int'l Currency Advisor A Fund, L.L.C. v. United States*, Nos. 05-40151 & 06-40130 (D. Mass. April 28, 2006) (stating that "evidence regarding the potential economic benefits of similar cookie-cutter transactions by other investors is highly relevant to the objective economic substance analysis"). The other taxpayer evidence cannot, however, have any probative value with respect to Plaintiff's transactions because transactions entered into by the other taxpayers differed in both the substance of the option contracts and the end result of entering into those contracts (i.e., whether the taxpayer realized a profit or loss).

[75] 870 F.2d 21 (1st Cir. 1989).

[76] *Id.* at 32 (explaining, that "'viewed objectively,' the London options transactions 'appear to be devoid of profit making potential'" (quoting *Killingsworth v. Comm'r*, 864 F.2d 1214, 1218 (5th Cir. 1989))).

no possibility of profit.[77]   In holding that the objective lack of profit potential meant that the

transactions were not entered into for profit, the court explained:

> [T]axpayers may lawfully structure transactions that seek real gains in a way that
> also maximizes tax advantages.  But this is not such a case. . . .  We cannot
> imagine this because *none* of the 1,100 London options investors' trading records
> shows any evidence of the real risks, profits, and losses that genuine . . .
> speculation would create.[78]

While Defendant cites *Dewees* as support for consideration of other taxpayer evidence in

economic substance cases, the procedural posture of *Dewees* is very different and readily

distinguishable from that of the FICA A Fund and High Tech cases.  *Dewees* was one of 1,100

cases that were ***consolidated*** by agreement in the Tax Court in a single proceeding.  All parties to

the Tax Court proceeding agreed that their transactions fell within one of a very few patterns, all

of which realized the same result, and the Tax Court determinations applied to all parties,

including the IRS.[79]   In contrast, Defendant here is seeking to introduce evidence regarding

other taxpayers who are not parties to this proceeding.  The other taxpayers entered into different

option contracts with different underlying assets as disparate as foreign currencies, stock indices,

heating oil, and lumber.  Furthermore, Defendant's other taxpayers realized different economic

results:  some realized a gain, while others realized a loss.

To the extent the economic substance doctrine requires an examination of profit potential,

the other taxpayer evidence is irrelevant.  That inquiry requires "an objective determination of

whether a reasonable possibility of profit from *the transaction* existed apart from tax benefits."[80]

---

[77] *Id.* at  30.

[78] *Id.* at 32 (internal citations omitted).

[79] *Id.* at 27-28.

[80] *Black & Decker Corp. v. United State*s, 436 F.3d 431, 441 (4th Cir. 2006) (quoting *Rice's Toyota World, Inc .v. Comm'r*, 752 F.2d 89, 94 (4th Cir. 1985)).

But there is no dispute between Defendant's experts and Plaintiff's expert that a possibility of a positive payout existed, nor is there any dispute as to the amount of the payout Plaintiff would receive depending on which options expired in the money.[81]

Moreover, unlike *Dewees*, in which all 1,100 investors realized a net loss equal to their initial investment, the other taxpayer transactions selected by Defendant show some variation. For example, in 12 of the 46 transactions chosen by Defendant for its pattern group in the FICA A Fund case, the option transactions entered into by the partnership resulted in a gross profit.[82]

Therefore, evidence of other taxpayer transactions is not only unnecessary for purposes of evaluating the profit potential of the FICA A Fund or High Tech transactions, it is inappropriate under the judicially established economic substance doctrine. Moreover, *Dewees* does not stand for the proposition that Defendant can inject non-party strangers into a taxpayer's case in order to prove that taxpayer's purposes or expectations.

Whether offered to infer Plaintiff's business purpose or to examine the objective economic substance of Plaintiff's transactions, Defendant's pattern evidence is irrelevant. As the First Circuit's decisions in *Fabreeka Products* and *Stone* demonstrate, the mere fact that other taxpayers invested in similar transactions in a manner designed to produce favorable tax results is irrelevant to whether Plaintiff's investment should be respected for tax purposes. Simply because one or more other taxpayers may have sought to take advantage of certain provisions in the Internal Revenue Code provides no evidence that Plaintiff's transactions were unreal or that

---

[81] Defendant's expert Gordon Rausser, did, however calculate a different probability of payout after adjusting certain parameters. Gordon Rausser calculated the probability of the LIBOR options expiring in the money to be between 7.37% and 24.7%, and the probability of the CMS options expiring in the money to be between 17.37% and 25.02%. Expert Report of Gordon Rausser at 51-54 (Aug. 7, 2007). With respect to the High Tech options, Gordon Rausser agreed that there was a 24.53% probability that those options would expire in the money. Expert Report of Gordon Rausser at 34 (Mar. 31, 2008).

[82] *See* Ex. N.

Plaintiff incurred no actual risk.  Moreover, because each of the other taxpayers realized different economic results, the other taxpayer evidence cannot be probative of any objective profit potential.  Accordingly, Defendant's other taxpayer evidence is of no real probative value and, if admitted, confuses the case by inviting evidence and argument about non-parties.

## CONCLUSION

Richard Egan filed these suits asking that the Court determine whether he is entitled to a refund of taxes he paid in response to IRS adjustments to his returns.  To succeed on his claims, Mr. Egan must prove that the tax treatment of his transactions was proper.  Mr. Egan does not, however, have to prove that a constantly shifting group of other taxpayers, who are complete strangers to him, properly reported the tax effects of their own distinct transactions.  The pattern evidence, therefore, is not probative of any issue in this case.  Conversely, the fact that these other taxpayers are complete strangers to this case, the lack of complete information relating to the selection of other taxpayers, the inability to review information about taxpayers who were not selected, and the incomplete discovery with respect to the selected taxpayers makes the introduction of pattern evidence highly prejudicial.  As such, this Court should grant Plaintiff's motion and exclude the pattern evidence relating to other taxpayers under Rules 401, 402, 403, 404(b), and 703 of the Federal Rules of Evidence.


Dated this 15th day of August 2008

PLAINTIFF
FIDELITY INTERNATIONAL CURRENCY ADVISOR
A FUND, L.L.C., by the Tax Matters Partner;
FIDELITY HIGH TECH ADVISOR A FUND L.L.C., by
the Tax Matters Partner


/s/ Ronald L. Buch, Jr.
David J. Curtin, D.C. Bar #281220

Ronald L. Buch, Jr., D.C. Bar #450903
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email: dcurtin@mckeenelson.com
       rbuch@mckeenelson.com
       lamanti@mckeenelson.com


John O. Mirick, BBO #349240
MIRICK, O'CONNELL, DEMALLIE
& LOUGEE, LLP
100 Front Street
Worcester, MA 01608
Telephone:  (508) 791-8500
Facsimile:  (508) 791-8502
Email: jomirick@mirickoconnell.com

**Certificate of Service**

       I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 15, 2008.

/s/ Ronald L. Buch, Jr.
Ronald L. Buch Jr., D.C. Bar #450903
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email: rbuch@mckeenelson.com

# Exhibit A

*© 2005, Tax Analysts, Tax Notes Today, OCTOBER 27, 2005*

Copyright © 2005 Tax Analysts
Tax Notes Today

OCTOBER 27, 2005 THURSDAY

**DEPARTMENT:** Statutes, Legislation, and Legislative History; IRS Testimony

**CITE:** 2005 TNT 207-24

**LENGTH:** 5826 words

**HEADLINE:** 2005 TNT 207-24 EVERSON TESTIFIES ON IRS EFFORTS TO CLOSE TAX GAP. (Release Date: OCTOBER 26, 2005) (Doc 2005-21758)

**ABSTRACT:** At an October 26 hearing of the Senate Homeland Security and Governmental Affairs Committee, IRS Commissioner Mark Everson testified on steps the IRS has taken to reduce the tax gap and increase enforcement, such as increasing audits against high-income taxpayers and investigating abusive tax shelters.

**AUTHOR:** Everson, Mark
Internal Revenue Service

**GEOGRAPHIC:** United States

**REFERENCES:**
Subject Area:
  Compliance;
  Tax system administration issues

**TEXT:**


WRITTEN TESTIMONY OF
COMMISSIONER OF INTERNAL REVENUE
MARK EVERSON
BEFORE
SUBCOMMITTEE ON FEDERAL FINANCIAL MANAGEMENT, GOVERNMENT
INFORMATION, AND INTERNATIONAL SECURITY
COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS

Release Date: OCTOBER 26, 2005

Published by Tax AnalystsTM

UNITED STATES SENATE
ON THE TAX GAP

OCTOBER 26, 2005

Introduction

Mr. Chairman and members of the subcommittee, I am pleased to be here today to discuss the tax gap with you. Additionally, I would like to provide you with an overview of the steps we have been taking to reduce the tax gap and to provide you with a summary of efforts we have taken to deal with abuses of the tax system. The tax gap is the difference between the amount of tax imposed on taxpayers for a given tax year and the amount that is paid

voluntarily and timely. The tax gap represents, in dollar terms, the annual amount of noncompliance with our tax laws.

This is the third time this year that I have testified on this subject. I appreciate the focus that Congress has given to this issue. The recent disaster recovery and restoration efforts taken in response to the devastating effects of Hurricanes Katrina and Rita serve to further highlight the importance of collecting the taxes that are lawfully owed. An efficient tax collection system is essential to the efficient operation of government, including appropriate Federal responses to natural disasters.

Early Estimates

Today, I will share with you results of our preliminary analysis of the compliance data recently compiled by our National Research Program (NRP). The bottom-line results are that although American taxpayers remain substantially compliant with the tax laws, the tax gap remains quite large in dollar terms. The results for Tax Year 2001 indicate that individual income tax reporting compliance may have gotten a little worse, but not alarmingly so, since 1988, the last time we performed a similar study.

Historically, there have been three types of income that are not well represented in compliance measurement audits (these are audits that are representative of the population and as thorough as possible): informal supplier income, tip income, and other unreported income that is not detected by auditors. Our detailed analysis of the NRP data will be supplemented with other data and special analyses to account more accurately for these three income types. These supplemental analyses in the past have taken several years to complete after the audit data have become available. We are applying new technologies this time, and we expect to have detailed, more reliable estimates of the tax gap available by the end of this year.

In the meantime, we have developed a set of preliminary updates to our tax gap estimates based on an initial analysis of the NRP data. We derived these estimates using a simple approach that reflects the historical magnitudes of adjustments made to the raw audit data to account for informal suppliers, tips, and other undetected noncompliance.

Our preliminary updates employ a range of estimates, reflecting different assumptions and levels of certainty. To give an idea of the magnitudes involved, our old projection of the overall Tax Year 2001 gross tax gap (i.e., for all types of tax, and all forms of noncompliance) was $ 311 billion, based on data from the 1980s and projected forward. Our updated estimates, incorporating data from the recently completed study, range from $ 312 billion to $ 353 billion. The range for the net tax gap (i.e., the amount of the tax gap left after enforcement efforts and collection of late payments) is from $ 257 billion to $ 298 billion. The corresponding noncompliance rate associated with our old projection was 14.9 percent, while the new estimates range from 15 percent to 16.6 percent. I want to emphasize at this stage in our analysis that these ranges are not upper and lower bounds; our final estimates could conceivably lie outside that range, and it is even more likely that our estimates for specific components of the tax gap (e.g., specific line items) will change significantly once we complete the detailed analysis. The range of estimates we are providing today also does not represent a statistically-based confidence interval, although we do plan to include such intervals with our comprehensive estimates at the end of the year.

Noncompliance takes three forms: not filing required returns on time (filing noncompliance); not reporting one's full tax liability even when the return is filed on time (reporting noncompliance); and not paying by the due date the full amount of tax reported on a timely return (payment noncompliance). We have separate tax gap estimates for each of these three types of noncompliance. Our preliminary estimates of underreporting by individuals appear to be consistent with previous studies, indicating that the underreporting portion is about 80 percent of the overall tax gap, with nonfiling and underpayment splitting the remaining 20 percent.

The National Research Program

Before providing more detail about these new estimates, I want to put them in context. I will start by summarizing the features of the new NRP data upon which the estimates are based, and then explain what the estimates do and do not include.

The NRP data that were ready for analysis in early January represent the first comprehensive reporting of

2

compliance data since Tax Year 1988. We conducted several much narrower studies since 1988, but nothing that would allow us to update our estimates of the tax gap. All of our estimates of the tax gap in recent years have been rough projections that assume no change in compliance rates among the major tax gap components; the magnitude of these projections merely reflected growth in tax receipts in these major categories. Like the compliance studies of the past, the NRP was designed to allow us to meet certain objectives: to estimate the overall extent of reporting compliance among individual income tax filers, and to update our audit selection formulas. I will focus today on the first of these objectives.

Regular audits have two important shortcomings as a basis for compliance measurement. First, returns selected for regular audits are not intended to be representative. Second, the audits are not exhaustive, but instead focus on issues that appear to be most in need of checking. In the past, IRS overcame these shortcomings by conducting thorough, exhaustive audits on a representative sample of returns. From the early 1960s through 1988 we periodically conducted the Taxpayer Compliance Measurement Program (TCMP), consisting of line-by-line audits of random samples of returns, which provided us with information on compliance trends, and allowed us to update audit selection formulas. By the 1990s, however, it became apparent that we needed to find a less intrusive way to measure compliance with the tax laws. The National Research Program grew out of that need, and introduced several innovations designed to reduce the burden imposed on taxpayers whose returns were selected for the study.

The first NRP innovation was to compile a comprehensive set of data to supplement what was reported on the selected returns. The sources of the "case building" data included third-party information returns from payers of income (e.g., Forms W-2 and 1099) and prior-year returns filed by the taxpayers. Also, for the first time we added data on dependents from various government sources, as well as data from public records (e.g., current and prior addresses, real estate holdings, business registrations, and involvement with corporations). Together, these data reduced the need to ask taxpayers for information, with some of the selected taxpayers not needing to be contacted at all by the IRS. In effect, these data allowed us to focus our efforts where the return information could not otherwise be verified. This pioneering approach was so successful it is being expanded into our regular operational audit programs.

A second major NRP innovation was to introduce a "classification" process, whereby the randomly selected returns and associated case-building data were first reviewed by experienced auditors, referred to as classifiers, who identified the best way to handle each return in the sample. In this way, each return was either: (1) accepted as filed, without contacting the taxpayer at all (though sometimes with minor adjustments noted for research purposes); (2) selected for correspondence audit of up to three focused issues; or (3) selected for an in-person audit where there were numerous items that needed to be verified. In addition, the classifiers identified compliance issues that the auditors had to evaluate, though the examiners had the ability to expand the audit to investigate other issues as warranted.

Other NRP innovations included streamlining the collection of data, providing auditors with new tools to detect noncompliance, and involving stakeholders (including, representatives of tax professional associations) in the design and implementation of the study. Moreover, a more focused selection process resulted in the NRP sample including around 46,000 returns -- somewhat fewer than previous compliance studies, even though the population of individual tax returns had grown over time. Clearly, the NRP approach was much less burdensome on taxpayers than the old TCMP audits, which examined every line item on every return. At the same time, we expect that the data collected through the NRP will be about the same quality as that collected under TCMP. A portion of the sample was designed to allow us to test the reliability of this methodology.

The new NRP data relate only to the accuracy of timely filed individual income tax returns. We are therefore able to use the data to update our estimates of just the individual income tax underreporting gap and the self-employment tax underreporting gap. All other components of our tax gap estimates remain the same projections to Tax Year 2001 that we have been using for the last few years. It is important to emphasize that the other components of the overall individual income tax gap remain unchanged. Specifically, we do not yet have new estimates for other taxes such as the corporate income tax or the estate tax. Moreover, we do not yet have a new estimate for the individual income tax nonfiling gap, though we anticipate having an update later this year. We are also not changing our Tax Year 2001 figures for the underpayment gap, because these are actual amounts tabulated from our Master File records rather than estimates or projections. (The underpayment gap is the one exception to the rule that the tax gap cannot be observed, and therefore must be estimated. That is because the underpayment gap is the amount that is

reported on timely filed returns, but is not paid on time -- information that is available on IRS records.)

Distinguishing the Tax Gap From Related Concepts

The tax gap is not the same as the so-called "underground economy," though there is some overlap (particularly in the legal-sector cash economy). For example, the tax gap does not include the illegal sector of the economy, and the underground economy does not include tax noncompliance problems such as overstated deductions or improper filing status.

Equally important, the tax gap does not arise solely from tax evasion or cheating. It includes a significant amount of noncompliance due to complexity of the tax laws that results in ignorance, confusion, and carelessness. This distinction is important, though at this point, we do not have sufficiently good data to help us know how much arises from willfulness as opposed to innocent mistakes.

The New Estimates

Our preliminary estimates of the individual income tax underreporting gap based on the new NRP data range from $ 150 to $ 187 billion, representing about half of our overall tax gap estimates of $ 312-$ 353 billion. This is consistent with the fact that the individual income tax accounts for about 46 percent of all tax receipts. Moreover, these figures are roughly in line with our earlier projections from compliance data compiled in the 1980s, though they suggest that reporting compliance among individuals has worsened slightly since Tax Year 1988. It is important to note, however, that the data represent a single point in time for Tax Year 2001 and so cannot tell us whether compliance trends today are improving or getting worse.

Preliminary NRP-Based Tax Gap Estimates, Tax Year 2001

| Tax Gap Component | Gross Tax Gap ($ billions) | Share of Total Gap |
|---|---|---|
| Individual income tax underreporting gap | 150-187 | 48-53% |
| Understated non-business income | 42-57 | 13-16% |
| Understated net business income | 83-99 | 27-28% |
| Overstated adjustments, deductions, exemptions, and credits | 25-30 | 8-9% |
| Self-Employment tax underreporting gap | 51-56 | 16% |
| All other components of the tax gap (not updated yet) | 111 | |
| Total Tax Gap | 312-353 | |

Note: Detail does not add to totals due to rounding

As in previous compliance studies, the NRP data suggest that just over half ($ 83-99 billion) of the individual underreporting gap came from understated net business income (unreported receipts and overstated expenses). About 30 percent ($ 42-$ 57 billion) came from underreported non-business income, such as wages, tips, interest, dividends, and capital gains. The remaining $ 25-$ 30 billion came from overstated subtractions from income (i.e., statutory adjustments, deductions, and exemptions), and from overstated tax credits.

The corresponding NRP-based preliminary estimates of the self-employment tax underreporting gap range from $ 51 to $ 56 billion, and account for about one sixth of the overall tax gap. Self-employment tax is underreported primarily because selfemployment income is underreported for income tax purposes. Taking individual income tax and self-employment tax together, then, we see that individual underreporting contributes about two-thirds of the overall gross tax gap.

Early indications are that the sections of the Form 1040 where the most noncompliance occurs have not changed dramatically since the last compliance study in 1988. The amounts least likely to be misreported on tax returns are subject to both third-party information reporting and withholding, and are therefore the most "visible" (e.g., wages and salaries). Amounts subject to third-party information reporting, but not to withholding (e.g., interest and dividend income), exhibit a somewhat higher misreporting percentage. Amounts subject to partial reporting by third

parties (e.g., capital gains and mortgage interest payments) have a still higher misreporting percentage. And, as expected, amounts not subject to withholding or to third-party information reporting (e.g., sole proprietor income, and the "other income" line on the 1040) are the least "visible" and, therefore, are most likely to be misreported.

We expect to be able to provide good estimates of these misreporting rates for each line of the 1040 once we complete our detailed analysis of the NRP data by the end of this year. In the meantime, early indications are that reporting rates have remained fairly stable, with a few exceptions. First, the underreporting of net income from "flowthrough" entities such as partnerships and S- corporations appears to be on the rise. This is consistent with what we have been finding in our regular audits, as taxpayers use increasingly sophisticated abusive schemes to reduce or eliminate their tax liability. With this in mind, we are conducting our next NRP reporting compliance study on flowthrough entities -- not just to monitor compliance in this area, but also to help develop better audit selection methods and other creative interventions. Second, the reporting of sole proprietor income and expenses (e.g., gross receipts, bad debts, and vehicle expenses) appears to have worsened. With transactions that are less "visible" to the IRS, and with very low audit rates by historical standards, some sole proprietors may have become emboldened to cut corners on their taxes. Other small business owners may simply be swamped by the cost and complexity of meeting their tax obligations and other business requirements. Third, early indications are that taxpayers in 2001 tended to overstate their deductions somewhat more than in 1988, the last tax year for which we have comparable compliance data. Like most business income and expenses, many of these deductions are not subject to third-party information reporting.

What We Are Doing Today to Address the Tax Gap

Most Americans pay their taxes honestly and accurately, and have every right to be confident that when they do so, their neighbors and competitors are doing the same. Let me provide an overview of the steps we have taken recently to bolster this confidence, turning briefly to each of our four Servicewide enforcement priorities.

Our first enforcement priority is to discourage and deter noncompliance, with emphasis on corrosive activity by corporations, high-income individuals, and other contributors to the tax gap. The focus here will be Fiscal Year 2004 data because we are still compiling data for the just-completed Fiscal Year 2005.

   o In 2004, audits of high-income taxpayers jumped 40 percent
     from the year before. We audited almost 200,000 high-income
     individuals last year -- double the number from 2000.

   o Overall, audits for individuals exceeded the one million mark
     last year, up from 618,000 four years earlier.

   o In 2004, the number of audits of the largest businesses --
     those with assets of $ 10 million or more -- finally increased
     after years of decline.

In addition to traditional audits, the IRS also uses computer matching of Forms W-2 and 1099s in its Information Returns Program, or document matching as it is often called. This technique is very effective for verifying income items reported on individual returns against that reported by third parties, including wages, interest, dividends and miscellaneous payments. During FY 04, the IRS closed more than 3.7 million document matching cases and collected about $ 2.7 billion as a result of these taxpayer contacts.

The centerpiece of our enforcement strategy is combating abusive tax shelters, both for corporations and high-income individuals. I want to discuss two important initiatives in this regard. These deal with the Son of Boss tax shelter and executive stock options.

We have continued a program of settlement offers for those who entered into abusive transactions in the past but would like to get their problems behind them. In May of 2004, we made a settlement offer regarding the Son of Boss tax shelter, a particularly abusive transaction used by wealthy individuals to eliminate taxes on large gains, often in the tens of millions of dollars. In this program, for the first time, the IRS required a total concession by the taxpayer of artificial losses claimed and, for most taxpayers, required a payment of penalties. I am pleased with the response

to the offer. So far more than $ 3.7 billion in taxes, interest and penalties have been collected from the more than 1,200 taxpayers who are participating in the settlement initiative. The average taxpayer payment was about $ 2.9 million, with 22 taxpayers paying more than $ 20 million each. Processing of individual settlements continues.

Based on disclosures we have received from promoter investigations and from investor lists from Justice Department litigation, we have determined that over 1,800 investors participated in Son of Boss. We have begun our enforcement follow-up with the more than 600 investors who were ineligible or elected not to participate in the settlement initiative.

In February 2005, we announced a second important settlement initiative -- this one relating to a transaction that involved executive stock options. This abusive tax transaction involved the transfer of stock options or restricted stock to family-controlled entities. These deals were done for the personal benefit of executives, sometimes at the expense of public shareholders. This shelter was not just a matter of tax avoidance but, in some instances, raises basic questions about corporate governance. Again, the settlement offer is a tough one: full payment of the taxes plus a penalty.

A noteworthy point about the stock option settlement offer is that our actions in this matter were closely coordinated with, and supported by, the Securities and Exchange Commission and the Public Company Accounting Oversight Board.

Our settlement initiatives and increased audits have sent a signal to taxpayers: the playing field is no longer as lopsided as it once was. Non-compliant taxpayers might have to pay the entire tax, interest, and a stiff penalty. A taxpayer might have to wrestle with questions like "how much am I going to have to pay the lawyers and expert witnesses to litigate this thing?" Moreover, going to court is a public matter. Damage to one's reputation is a potential factor. Many wealthy individuals, otherwise seen as community leaders, may not want to be identified as paying less than their fair share in taxes.

Another example of cooperation in the battle against abusive shelters is in the international arena. A year ago, I announced the formation of what has come to be known as the Joint International Tax Shelter Information Centre. Since Labor Day 2004, we have had an operational task force of personnel from Australia, Canada, the United Kingdom, and the U.S. working together on-site here in Washington. We are exchanging information about specific abusive transactions. Results to date are promising. Thus far, we have uncovered a number of transactions which, but for the Centre, we would have unraveled only over a number of years, if ever. It makes sense that we continue to work with other countries because, in this increasingly global world, we are up against what is, in essence, a reinforcing commercial network of largely stateless accounting firms, law firms, investment banks, and brokerage houses.

We have also worked jointly with the Department of Justice to obtain civil injunctions against abusive tax scheme promoters and abusive return preparers. The Government stepped up use of civil power in 2001 to prohibit promoters from selling illegal tax schemes on the Internet, at seminars or through other means. Currently the courts have issued permanent or preliminary injunctions against more than 130 abusive scheme promoters and abusive return preparers. An additional 50 suits have been filed by Justice seeking injunction action -- 33 against scheme promoters and 17 against return preparers. Injunctions issued have involved schemes such as:

   o Using abusive trusts to shift assets out of a taxpayer's name
     while retaining control

   o Misusing "corporation sole" laws to establish phony religious
     organizations

   o Using frivolous "Section 861" arguments to evade employment
     taxes

   o Claiming personal housing and living expenses as business
     expenses

o Filing tax returns reporting "zero income"

o Misusing the Disabled Access Credit

In addition, the IRS has over 1,100 promoter and return preparer investigations ongoing in the field; and individual examinations are being conducted on thousands of scheme participants. Most of the investigations and examinations are being conducted by the IRS Small Business/Self-Employed (SB/SE) Division.

Our second enforcement priority is to assure that attorneys, accountants, and other tax practitioners adhere to professional standards and follow the law.

Our system of tax administration depends upon the integrity of practitioners. Altogether, there are approximately 1.2 million tax practitioners and return preparers. The vast majority of practitioners are conscientious and honest, but even honest tax professionals suffered from the sad and steep erosion of ethics in recent years by being subjected to untoward competitive pressures. The tax shelter industry had a corrupting influence on our legal and accounting professions.

We have done quite a bit since March 2004 to restore faith in the work of tax professionals. We have strengthened regulations governing the standards of tax practice to discourage the manufacturing of bogus legal opinions on the validity of tax shelters. The Treasury and IRS standards set forth rules governing what does and does not qualify as an independent opinion about a tax shelter.

Last year, the government won a series of court opinions on privilege. The cases confirm that promoters who develop and market generic tax shelters can no longer protect the identity of their clients by hiding behind a false wall of privilege.

Abusive tax shelters often flourished because penalties were too small. Some blue chip tax professionals actually weighed potential fees from promoting shelters, but not following the law, against the risk of IRS detection and the size of our penalties. Clearly, the penalties were too low. They were no more than a speed bump on a single-minded road to professional riches.

But these speed bumps have become speed traps. Last fall, Congress enacted and the President signed into law the American Jobs Creation Act of 2004. The legislation both created new penalties and increased existing penalties for those who make false statements or fail to properly disclose information on tax shelters. Under the new law, the IRS can now impose monetary penalties not just on tax professionals who violate standards, but also on their employers, firms, or other entities if those parties knew, or should have known, of the misconduct.

Our third enforcement objective is to detect and deter domestic and off-shore based criminal tax activity and related financial criminal activity.

In Fiscal Year 2004, the IRS referred more than 3,000 cases to the Justice Department for possible criminal prosecution, nearly a 20 percent jump over the previous year. We continue our active role in the President's Corporate Fraud Task Force. We are going after promoters of tax shelters -- both civilly and, where warranted, criminally. This tactic is a departure from the past. Previously, during a criminal investigation, all civil activity came to a halt. The result was that our business units were reluctant to refer matters for criminal investigation lest they lose their traditional turf. But, we are now moving forward on parallel tracks with the Department of Justice. We have a number of important criminal investigations underway. The enforcement model is changing.

Our fourth enforcement priority is to discourage and deter noncompliance within taxexempt and governmental entities, and misuse of such entities by third parties for tax avoidance purposes.

Consider, for example, tax-exempt credit-counseling agencies. These organizations are granted tax-exempt status because they are supposed to be educating and assisting people who have credit or cash flow problems. Unfortunately, too many of these organizations, instead, operate for the benefit of insiders or are improperly in league with profit-making companies. We are carefully scrutinizing these organizations. We currently have half the tax-exempt credit counseling industry -- in terms of asset size -- under examination.

Some shelter promoters join with tax-exempt organizations to create abusive shelters. The organization receives a fee from the taxpayer who is taking advantage of its taxfree status. That is an abuse of the tax exemption that our nation bestows upon charities.

It is heartening to see leading members of the non-profit community taking steps to address abuses. I particularly want to salute the Independent Sector -- which earlier this year delivered a constructive report to the Senate Finance Committee. The report states that the "government should ensure effective enforcement of the law" and calls for tougher rules for charities and foundations. The report calls for stronger action by the IRS to hold accountable charities that do not supply accurate and timely public information. I encourage the accounting, legal, and business communities to be as enthusiastic about confronting abuses and the erosion of professional ethics as the nonprofit community. An interesting point to note is that the report supports mandatory electronic filing of all tax returns for non-profits.

The threat to the integrity of our nation's charities is real and growing. At the IRS, we take it very seriously. We are augmenting our resources in the non-profit area. As of the end of last month, we have increased the number of our personnel who audit taxexempt organizations by approximately 30 percent from two years earlier. If we do not act expeditiously, there is a risk that Americans will lose faith in our nation's charitable organizations. If that happens, Americans will stop giving and those in need will suffer.

As we move forward with these priorities, we will leverage our success to achieve greater results within our FY 2006 budget request.

President's FY 2006 Budget Seeks Increase in Enforcement to Address Growing Tax Gap

The President's fiscal year 2006 budget requests $ 10.679 billion for the IRS, a 4.3 percent increase over the fiscal year 2005 enacted level. This request represents a 1 percent decrease in Taxpayer Service and a 2 percent decrease in Business Systems Modernization, but an 8 percent increase in enforcement.

This budget includes $ 265 million for initiatives aimed at enhancing the enforcement of the tax laws. This request is above the increases to fund the pay raise and other cost adjustments ($ 182 million), for a total of $ 446 million for new enforcement investments and cost increases. It is important Congress fully fund these cost increases and new enforcement investments. The President's budget proposal to fund them as a program integrity cap adjustment reflects the importance of this investment to the Administration.

Currently, we do not know what our budget will be for fiscal year 2006. We are very pleased that the Senate has fully funded the President's request. The House bill provides a bit less funding, however, at the level of $ 10.56 billion.

We will use any additional funds for enforcement in several key ways to combat the tax gap. These investments will yield substantial results. IRS enforcement activities, coupled with late payments, recover about $ 55 billion of the tax gap, leaving a net tax gap of between $ 257 billion and $ 298 billion.

Since 2001, the tax year covered by the NRP, we have taken a number of steps to bolster enforcement. We increased our enforcement revenues by nearly 28 percent from $ 33.8 billion in 2001 to $ 43.1 billion in 2004. Audits of high-income taxpayers -- those earning $ 100,000 or more -- topped 195,000 in fiscal year 2004, which is more than double those conducted in 2001. Total audits of all taxpayers topped 1 million last year -- a 37 percent jump from 2001.

We are ramping up our audits on high-income taxpayers and corporations, focusing more attention on abusive shelters and launching more criminal investigations. As discussed earlier, we have collected more than $ 3.7 billion so far in the settlement initiative for Son of Boss, a particularly abusive tax shelter.

The IRS yields more than four dollars in direct revenue from its enforcement efforts for every dollar invested in its total budget. In FY 2004, we brought in a record $ 43.1 billion in enforcement revenue -- an increase of $ 5.5 billion from the year before, or 15 percent.

Beyond the direct revenues generated by increasing audits, collection, and criminal investigations, our enforcement efforts have a deterrent effect on those who might be tempted to skirt their tax obligations.

The nearly 8 percent increase for enforcement activities in the Administration's 2006 IRS budget request, and Senate Appropriations Committee Report would increase audits of corporations and high-income individuals, as well as expand collection and criminal investigation efforts.

Program Performance

If we received the full funding provided in the President's fiscal year 2006 budget request and the Senate Appropriations Committee Report, we would anticipate the following results:

  o Increase in field examinations for high-income individuals
    with complex returns; significant increase in collection cases
    processed; and closing of over 40 percent more delinquent
    balance-due accounts in FY 2008 than in FY 2004;

  o Nearly double the audit coverage for individuals with income
    between $ 250,000 and $ 1 million, from 1.5 percent in FY 2004
    to 2.8 percent in FY 2008;

  o Auditing 15 percent more individuals earning above $ 1 million,
    from 3.4 percent projected for FY 2004 to 3.9 percent in FY
    2008;

  o Double the audit coverage for mid-size corporations, from 7.6
    percent in FY 2004 to 16 percent in FY 2008; and

  o Increased efforts to deter abusive tax shelters among
    corporations

Conclusion

On the whole, our system of self-assessment of tax liabilities appears to be working as well as it did in 1988. However, the new compliance data suggest that some types of income may be less accurately reported now than in the past. It is clear that consistent efforts to keep the complexity and unnecessary burden of the tax system to a minimum, to provide the excellent service that the taxpaying public deserves, and to maintain a strong and well-targeted enforcement presence are necessary to improve compliance rates.

While IRS enforcement efforts have lagged in recent years, that is now changing. We will continue to improve service and respect taxpayer rights. But we will also enforce the law. We won't relax until taxpayers who are unwilling to pay their fair share see that that is not a worthwhile course to follow.

Thank you very much for the opportunity to discuss the tax gap and our efforts to combat it. I am happy to take your questions.

**************** End of Document ****************

# Exhibit B

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
## UNITED STATES DISTRICT COURT

DISTRICT OF                    MASSACHUSETTS

FIDELITY INT'L CURRENCY ADVISOR A FUND

V.

UNITED STATES OF AMERICA

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 05-40151

TO:   KPMG LLP
      757 Third Avenue
      New York, NY 10017

☐ **YOU ARE COMMANDED** to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

SEE ATTACHMENT TO SUBPOENA

| PLACE   The United States Attorney's Office, District of Massachusetts, 1 Courthouse Way, John Joseph Moakley Courthouse, Boston, MA 02210 | DATE AND TIME  4/14/2006 10:00 am |
|---|---|

☐ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE  3/31/2006 |
|---|---|

| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER  John A. Lindquist III, Trial Attorney, U.S. Department of Justice, Tax Division P.O. Box 55, Ben Franklin Station, Washington, DC 20044-0055 | Telephone:  202-307-6561 |
|---|---|

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

SERVED ON (PRINT NAME) MANNER OF SERVICE

SERVED BY (PRINT NAME) TITLE

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ______________________ DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

**Rule 45, Federal Rules of Civil Procedure, Parts C & D:**

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the mmmdemanding party to contest the claim.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FIDELITY INTERNATIONAL CURRENCY )
ADVISOR A FUND, L.L.C., by the Tax )
Matters Partner, )
         )
             Plaintiff, )     Civil No. 05-40151
         )
         v. )     Judge Saylor
         )
UNITED STATES OF AMERICA, )
         )
             Defendant. )

## ATTACHMENT TO SUBPOENA
## TO KPMG FOR PRODUCTION OF DOCUMENTS

Pursuant to FED. R. CIV. P. 45, the Custodian of Records for KPMG, LLP ("KPMG"), is

hereby required to produce for inspection and copying the documents set forth below, from

whichever office or location these documents may exist.

The production of the requested documents may be effected by mailing the originals or

clear copies of each to Matthew C. Hicks, Trial Attorney, Tax Division, United States

Department of Justice, Post Office Box 55, Ben Franklin Station, Washington, D.C. 20044. If

you are unwilling or unable to transmit originals or copies in the manner described above, you

are requested to advise the undersigned counsel for the United States forthwith upon receipt

hereof, in which event, the documents requested herein will be produced for inspection and

copying at 555 4th Street, N.W., Room 7836, Washington, D.C. on April 14, 2006, at 10:00 a.m.,

and continuing from day to day thereafter for so long as is reasonably necessary to examine and

copy them.

1622542.1

## DEFINITIONS

1.     As used herein, (a) the singular shall include the plural, and vice versa, (b) masculine and feminine pronouns shall be deemed to be interchangeable, (c) the words "or" and "and" shall mean "and/or," and the word "or" shall not be interpreted to narrow the scope of any request and shall be interpreted in its broadest sense, as denoting "and/or," (d) the words "any" and "all" shall mean "any and all," and the word "any" shall not be interpreted to narrow the scope of any discovery or other request, and shall be interpreted in its broadest sense, as denoting "any and all."

2.     The term "document" and derivatives and pluralizations of the same is to be liberally construed to include all originals, copies, and nonidentical copies (whether by reason of handwritten notations thereon or otherwise) kept in any form including paper and electronic means, including but not limited to the following: any letter, report, record, corporate minute, memorandum, contract, affidavit, agreement, appraisal, deed, lease, book, record, summary or record of personal conversation, routing slip, correspondence, communication of any nature, note, notebook of any character, ledger, financial statement, material, literature, brochure, publication, prospectus, offering, computation, check or other instrument, computer tape or disk, electronic transmission including but not limited to electronic mail, telegram, telex and telephone facsimile, and any other type of written or documentary or other tangible material on which information or data may be recorded, stored, or otherwise contained. As to any document that is written in another language, the term "document" also includes any translations of that document into English. As to any document in electronic form, the term "document" includes all metadata associated with document, as well as all printed versions of the document.

1622542.1

3.    The terms POSSESSION, CUSTODY, OR CONTROL include actual and constructive possession, custody, or control.  These requests include any document or thing that you possess or have the right to obtain from a third party upon demand, or which otherwise may be secured from any other source for the purpose of fully responding to these requests, including attorneys, accountants or other agents.

4.    The term "person" shall be construed to mean and include an individual, trust, estate, partnership, company, corporation, governmental body, or other entity, whether domestic or foreign.

5.    The term "Diversified Group" or "DGI" refers to The Diversified Group, Incorporated, a Delaware limited liability company, and all employees and/or partners thereof, including, but not limited to James Haber ("Haber") and Orrin Tilevitz.

6.    The term "Brown & Wood" refers to the law firm of Brown & Wood and its successor in interest, Sidley, Austin, Brown & Wood, and all employees and/or partners thereof, including, but not limited to RJ Ruble, Jacob Amato, John Felkamp, and Susan L. Sodano.

7.    The term "KPMG" includes both KPMG, LLP, a Delaware Limited Liability Partnership and KPMG International, a Swiss association, and all employees and/or partners thereof, including, but not limited to Timothy Patrick Speiss, Stephen J. Spruck, Brent S. Lipschultz, Holly T. Belanger, Monica M. Odoy, Deborah A. Fields, Daniel J. Coburn, Rob Arthur, Robert Pritti, Leslie Kost, Steven Gremminger, Randall Bickham, Jeffrey Stein, John Lanning, Richard Smith, Jeffrey Eischeid, Philip Weisner, Mark Watson, Larry DeLap, David Greenberg, Carol Warley, Carl Hasting, Richard Rosenthal, and Brian Rivotto.

1622542.1

8.     The term BDO refers to the accounting firm of BDO Seidman, LLP, and all employees and/or partners thereof, including, but not limited to Michael Kerekes, Robert Greisman, and Paul Shanbrom.

9.     The term "Lord Bissell" refers to the law firm of Lord Bissell & Brook, LLP, 111 South Wacker Drive, Chicago, IL 60606, and all employees and/or partners thereof, including but not limited to John Trustkowski, John Hughes, and Sergei Mytko.

10. The term "Proskauer Rose" refers to the law firm of Proskauer Rose, LLP, 1585 Broadway, New York, NY 10036-8299, and all employees and/or partners thereof, including but not limited to Ira Akselrad.

11. The term "Bryan Cave" refers to the law firm Bryan Cave, LLP, 700 Thirteenth Street, N.W., Washington, DC 20005-3960, and all employees and/or partners thereof, including but not limited to John Barrie and Elizabeth Ann Smith.

12. The term "Alpha Consultants" refers to Alpha Consultants, LLC, a Florida limited liability company, and all employees and/or partners thereof, including but not limited to Ivan J. Ross, Robert H. Fasulu, G. Felix Cua, Yoshiyuki Nobumoto, Ronald Buesinger, and Donald S. Underitz.

13. The term "Alpha Consultants, Inc." refers to Alpha Consultants, Inc., a Florida Corporation, and all employees and/or partners thereof, including but not limited to Ivan J. Ross, Robert H. Fasulu, G. Felix Cua, Yoshiyuki Nobumoto, Ronald Buesinger, and Donald S. Underitz.

1622542.1

14. The term "Helios Financial" refers to Helios Financial, 225 West Washington Street, Suite 2200, Chicago, Illinois, and all employees and/or partners thereof, including but not limited to Mox Tan and Phil Kampf.

15. The term "REFCO" refers to Refco Capital Markets, Ltd., 200 Liberty Street, 23rd Floor, NY, NY 10281, and all employees and/or partners thereof, including but not limited to Thomas Yorke.

16. The term "Samuel Mahoney" refers to    Samuel Mahoney, Martin Hawkes, John Hussey, Biosphere Finance, and Biosphere Holdings.

17. The term "FLIP" refers to the product known as "Foreign Leveraged Investment Program."

18. The term "BLIPS" refers to the product known as "Bond Linked Issue Premium Structure."

19.    The term "OPIS" refers to the product known as "Offshore Portfolio Investment Strategy."

20. The term "SOS" refers to the product known as "Short-Option Strategy" and all variants thereof, including, but not limited to, the Financial Derivatives Investment Strategy ("FDIS").

21. The term "FDIS" refers to the "Financial Derivatives Investment Strategy, also referenced as the "Diversified Strategy," the "New Partnership Strategy," "Short-Option Strategy," and the "Partnership Option Strategy."

22. The term "Tax Shelter Products" refers to FLIP, OPIS, BLIPS, and SOS.

23.    The term "FICA A Fund" refers to Fidelity International Currency Advisor A Fund LLC, EIN 36-4381795.

1622542.1

## INSTRUCTIONS

1.    If a document was, but no longer is, in your possession, custody or control, state:

   a.    how the document was disposed of;

   b.    the name, current address, and telephone number of the natural or non-natural person who currently has possession, custody or control over the document;

   c.    the date of disposition;

   d.    the name, current address, and telephone number of each natural or non-natural person who authorized said disposition or who had knowledge of said disposition.

2.    If a document cannot be located, describe with particularity the efforts made to locate the document and the specific reason for its disappearance or unavailability.

3.    If a document has information on both sides, provide copies of both sides or make available the original documents.

4.    To the extent that any document is written both in English and another language, provide a copy of the document written in English.

5.    If any document has been previously produced to the Internal Revenue Service in the course of its promoter examination of KPMG, LLP, the document should be produced with the same bates number that it was produced to the Internal Revenue Service in its promoter examination of KPMG, LLP.

6.    If any document has been previously produced previously produced to the Senate Permanent Subcommittee on Investigations ("PSI") in the course of its investigation of potentially abusive tax shelters, the document should be produced with the same bates number that it was produced to the PSI.

1622542.1

7.    For documents that have not been produced to the Government or the PSI, please number them consecutively with a Bates stamp identifier that is distinguishable from those used in the prior the productions to the Government and the PSI. We suggest you use Bates Stamp numbers beginning with the prefix "KPMG.F."

8.    We also request that the custodian of records for KPMG certify the documents requested pursuant to Rule 902(11) of the Federal Rules of Evidence and Section 1746 of Title 28 of the United States Code. A proposed certification is enclosed. Please forward the certification as soon as possible, although its execution should in no way delay your production of the requested documents by the subpoena's return date.

9.    If any document is withheld under any claim of privilege or for any reason, list such documents by supplying separately as to each such document the following information:

    a.    the date of the document, the type of document (e.g. letter, notebook, etc.), and the number of pages of which it consists;

    b.    the date on which the document came into KPMG's possession or control, if different from the date appearing on the document itself;

    c.    the name and title of the signor of the document (and if it was not signed, the answer shall so state and shall give the name and title of the person who prepared it, if known, and if not known, shall so state);

    d.    the name and title of each recipient or addresses of such document (whether specifically named therein or not);

    e.    the present whereabouts of the document and the name and address of the custodian thereof;

1622542.1

f.    an indication that it claims privilege therefor with a citation to the statute, regulation or rule claimed to apply;

g.    a brief statement of the grounds on which the claim of privilege rests;

h.    a general statement of the subject matter; and

i.    the identity of all persons (and their positions) who received copies of such document subsequent to the time of initial distribution.

All of the above is required so that the United States may have the factual basis to determine whether such documents are, in fact, privileged. If a claimed privilege applies to only a portion of any document, that portion only should be withheld and the remainder of the document should be produced. As used herein, "claim of privilege" includes, but is not limited to, any claim that a document either may or must be withheld from production pursuant to any statute or regulation.

10. If a document in electronic form is password protected, the password protection is to be disabled and/or the password to disable the password protection is also to be produced.

## REQUESTS FOR PRODUCTION

The documents requested under this subpoena relate to all documents involving KPMG's development, marketing, promotion, implementation and/or reporting of potentially abusive tax shelters during the time period from January 1, 1996 through and including December 31, 2005, including, but not limited to the development, marketing promotion, implementation and/or reporting of FLIP, OPIS, BLIPS, and SOS. In connection with this request, please provide or make available for our review the following specific categories of documents in your possession, custody, or control:

1622542.1

### Documents related to list maintenance

1.    All documents that KPMG produced to the IRS in the course of a concluded tax promoter audit of KPMG in the same form in which they were produced to the IRS.

2.    All transcripts memorializing interviews of KPMG personnel in the course of the promoter audit referenced above.

### Documents related to PSI Investigation

3.    All documents produced by KPMG to the Senate Permanent Subcommittee on Investigations ("PSI") with respect to the PSI's investigation into the promotion of potentially abusive tax shelters by professionals.

### Generic Documents related to KPMG's Tax Shelter Products

4.    All form documents used by KPMG to market FLIPS, OPIS, BLIPS and SOS products, including all powerpoint presentations, marketing opinions, confidentiality agreements, engagement letters, training materials, and implementation documents.

5.    Identification of the current address or last known address of all KPMG personnel who participated in the development, marketing, promotion, implementation and/or sale of FLIPS, OPIS, BLIPS, and SOS products;

6.    All documents generically discussing the development, marketing, promotion, implementation and/or reporting of the FLIP, BLIPS, OPIS, SOS products.

7.    All documents generated by KPMG generically discussing the development, marketing, promotion, implementation and/or reporting of the FLIP, BLIPS, OPIS, SOS and FDIS products.

8.    All documents generated by DGI, Helios Financial, Alpha Consultants, Alpha Consultants, Inc., Brown & Wood, Proskauer Rose, Lord Bissell, Bryan Cave, BDO, Refco, and

Samuel Mahoney, or any other person, generically discussing in any way the development, marketing, promotion, implementation, and reporting of the financial products.

9.      All documents discussing IRS Notice 99-59, Notice 2000-44, and/or the list maintenance requirements under 26 U.S.C. §6112.

10. All documents referencing IRS Notice 99-59 and/or Notice 2000-44 and any of the Tax Shelter Products.

11. All documents referencing IRS Notice 99-59 and/or Notice 2000-44 generated by DGI, Helios Financial, Alpha Consultants, Alpha Consultants, Inc., Brown & Wood, Proskauer Rose, Lord Bissell, Bryan Cave, BDO, Refco, and/or Samuel Mahoney.

12. All documents related to the decision by KPMG in 2000 to modify its sales practices for the Tax Shelter Products.

13. All documents regarding the fee structure(s) for the Tax Shelter Products.

14. All documents regarding development and/or design of the Tax Shelter Products.

15. All documents regarding the marketing,      promotion, implementation, or reporting of the Tax Shelter Products.

16. All documents regarding the issuance of opinions with respect to the Tax Shelter Products.

17. All documents with respect to the steps for implementation of the Tax Shelter Products.

18. All documents relating to the involvement of DGI in the SOS products, including, but not limited to, all communications regarding the development of the product, the implementation documents, the fee structure, the opinion, and/or the reporting of the proposed transactions.

19. All documents relating to the involvement of Brown & Wood in the SOS products, including, but not limited to, all communications regarding the development of the product, the

1622542.1

implementation documents, the fee structure, the opinion, and/or the reporting of the proposed transactions.

20. All documents relating to the involvement of Proskauer Rose in the SOS products, including, but not limited to, all communications regarding the development of the product, the implementation documents, the fee structure, the opinion, and/or the reporting of the proposed transactions.

21. All documents relating to the involvement of Lord Bissell in the SOS products, including, but not limited to, all communications regarding the development of the product, the implementation documents, the fee structure, the opinion, and/or the reporting of the proposed transactions.

22. All documents relating to the involvement of Bryan Cave in the SOS products, including, but not limited to, all communications regarding the development of the product, the implementation documents, the fee structure, the opinion, and/or the reporting of the proposed transactions.

23. All documents relating to the involvement of Alpha Consultants in the SOS products, including, but not limited to, all communications regarding the development of the product, the implementation documents, the fee structure, the opinion, and/or the reporting of the proposed transactions.

24. All documents relating to the involvement of Alpha Consultants, Inc., in the SOS products, including, but not limited to, all communications regarding the development of the product, the implementation documents, the fee structure, the opinion, and/or the reporting of the proposed transactions.

1622542.1

25. All documents relating to the involvement of Helios Financial in the SOS products, including, but not limited to, all communications regarding the development of the product, the implementation documents, the fee structure, the opinion, and/or the reporting of the proposed transactions.

26. All documents relating to the involvement of Refco in the SOS products, including, but not limited to, all communications regarding the development of the product, the implementation documents, the fee structure, the opinion, and/or the reporting of the proposed transactions.

27. All documents outlining the topics to be discussed at the marketing, sales and/or promotional meetings targeting participants for SOS products.

28. All documents regarding the preparation of tax returns to report the SOS transactions and all decisions regarding the procedure and manner in which those returns would be prepared.

29. All documents regarding the development and use of templates to prepare the tax returns for the SOS products.

30. All documents, including, but not limited to, internal correspondence, e-mail, or notes, discussing any tax benefits involved with offsetting digital options.

31. All documents indicating which KPMG employees were compensated, or were to be compensated, directly and/or indirectly, as a result of the implementation of SOS products.

32. All documents indicating how KPMG employees were compensated, or were to be compensated, directly and/or indirectly, with respect to the implementation of the SOS products.

33. All documents indicating how any third party was to be compensated, directly and/or indirectly, as a result of the SOS products, including, but not limited to, any kick-backs or royalties.

1622542.1

34. All KPMG marketing, sales or promotional material for the SOS products, including all drafts.

35. All documents related to the proposed language of the opinions to be issued by Brown & Wood, Proskauer Rose, Lord Bissell, Bryan Cave and/or any other person, with respect to the SOS products.

36. All documents related to the proposed language of the opinions to be issued by Brown & Wood, Proskauer Rose, Lord Bissell, Bryan Cave and/ or any other party, for the SOS products, including all drafts of the form opinion.

37. All documents related to the decision to have more than one law firm available to write the opinion for the SOS transactions.

38. All documents related to the preparation of client representation letters for the SOS transactions, including any documents relating to the representations that were to be made by participants and any drafts of the form representation letter(s).

### Client Specific Documents related to SOS and FDIS

39. All documents relating to the development, marketing, promotion, implementation, and reporting of the SOS and FDIS transactions, including, but not limited to, those transactions which involved the persons identified on Exhibit A.

40. All notes taken by employees of KPMG or by third parties at sales or promotional meetings for SOS.

41. All documents related to the signing of any confidentiality agreements for the SOS transactions, including, but not limited to transactions involving the persons identified on Exhibit A.

1622542.1

42. All documentation generated by DGI, Helios Financial, Alpha Consultants, Alpha Consultants, Inc., Brown & Wood, Proskauer Rose, Lord Bissell, Bryan Cave, BDO, Refco, and/or Samuel Mahoney for the SOS transactions, including, but not limited to the transactions involving the persons identified on Exhibit A.

43. All master agreements for the SOS transactions, including, but not limited to, the FDIS transactions involving the persons identified on Exhibit A.

44. All due diligence documentation for the SOS transactions, including, but not limited to, the FDIS transactions involving the persons identified on Exhibit A.

45. All credit support agreements for the SOS transactions, including, but not limited to, the FDIS transactions involving the persons identified on Exhibit A, and including any third-party guarantees, involving any of the persons identified on Exhibit A.

46. All documents concerning financial risk to participants in the SOS transactions, including, but not limited to, the SOS transactions involving the persons identified on Exhibit A.

47. All documents concerning the probability of profit and actual profitability of the SOS transactions, including, but not limited to, the SOS transactions involving the persons identified on Exhibit A.

48. All documents concerning the business purpose of the SOS transactions, including, but not limited to, the SOS transactions involving the persons identified on Exhibit A.

49. All documents related to the preparation of client representation letters for the SOS transactions, including any documents relating to the representations that were to be made by SOS participants and any drafts of the representation letters.

1622542.1

50. All documents concerning any exit interviews or feedback from any of the SOS participants regarding the SOS transactions, including, but not limited to, the SOS transactions involving the persons identified on Exhibit A.

51. All documents concerning the application of the step transaction doctrine to the SOS transactions, including, but not limited to, the SOS transactions involving the persons identified on Exhibit A.

52. All documents concerning any transactions similar to the transactions described in IRS Notice 2000-44 in which an any employee of KPMG, DGI, Brown & Wood, Proskauer Rose, Lord Bissell, Alpha Consultants, Alpha Consultants, Inc., Helios Financial and/or Refco was a participant.

53. All documents     concerning the $158,630,921.00 loss claimed by Richard J. and Maureen E. Egan on their 2001 Form 1040 and reported by Fidelity International Currency Advisor A Fund, LLC, on its 2001 Form 1065 and Schedule K-1 for Richard J. Egan.

54. All documents concerning the $154,503,242.00 gain reported by Fidelity International Currency Advisor A Fund, LLC, on its 2001 Form 1065 and Schedule K-1 for Samuel Mahoney.

55. All documents concerning the transactions that resulted in the loss and gain     referenced in paragraphs 53 and 54, above.

56. All documents concerning the following persons or phrases:

    a.    Richard J. Egan, Maureen E. Egan, Michael J. Egan, James Reiss, Patrick W. Shea, Carolyn Fiddy, Steven J. Drew, Stephanie H. Denby, Carruth Management, Carruth Associates, Fidelity World Currency Advisor A Fund, LLC, and Fidelity International Currency Advisor A Fund, LLC (or "FICAA");

1622542.1

b.  Samuel Mahoney, Martin Hawkes, John Hussey, Biosphere Finance, Biosphere

Holdings;

c.  Helios Trading, The Diversified Group, James Haber, Mox Tan, Philip Kampf,

John Huber, Steve Jacoby, Orrin Tilevitz;

d.  Alpha Consultants, Ivan J. Ross, Robert H. Fasulu, G. Felix Cua, Yoshiyuki

Nobumoto, Ronald Buesinger;

e.  Refco Capital Markets, Thomas Yorke, Elizabeth J. Yung, Mathew Hoff;

f.  KPMG, Timothy Speiss, Stephen Spruck, Brent Lipschultz, Holly Belanger,

Monica Odoy, Deborah Fields, Daniel Coburn, Rob Arthur, Robert Pritti, Leslie

Kost, Steven Gremminger, Randall Bickham, Jeffrey Stein, John Lanning, Richard

Smith, Jeffrey Eischeid, Philip Weisner, Mark Watson, Larry DeLap, David

Greenberg, Carol Warley, Carl Hasting, Richard Rosenthal;

g.  R.J. Ruble, Tom Smith, Thomas Humphries, Paul Cringle, Eric Haueter, Susan

Sodano, Brown & Wood, Sidley Austin Brown & Wood;

h.  Proskauer Rose, Ira Akselrad, Jay Waxenberg.

i.  SOS, FOCUS, option spread, spread option, CMBO, and complex multivariate

barrier option.

j.  Financial Derivatives Investment Strategy," also referred to as FDIS, or the

"Diversified Strategy," the "Partnership Strategy," "Short-Option Strategy," and

the "Partnership Option Strategy."

57. All records, documents, and materials created or maintained by KPMG LLP during the

years 2000 through 2002 in connection with the FICA A Fund transaction at issue in this case,

including but not limited to records of KPMG's Boston, New York, and Washington, D.C.

1622542.1

offices, and particularly including records and files created or maintained by Timothy Speiss,

Brent Lipschultz, and Robert Prifti.

58. All outlines of the proposed transactions, including, but not limited to, all documents

entitled "Outline of Proposed Transaction."

59. All closing documents and drafts of closing documents for FDIS and/or SOS transactions,

including but not limited to the Summary of Transaction, Economic Summary of Trades, Option

Confirmations, Daily Values, Operating Agreement for each entity, Contribution Agreement for

each entity, and Buy-Sell Notice.

60. All opinions and drafts of opinions issued with respect to the FDIS and/or SOS

transactions, including but not opinions that were issued by Brown & Wood, Proskauer Rose,

Bryan Cave, and/or Lord Bissell.

Dated: March 2/ , 2006.

MICHAEL J. SULLIVAN
United States Attorney

DENNIS M. DONOHUE
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044-0055
Telephone: (202) 307-6429
Facsimile: (202) 514-5238

Page 17 of 19                    1622542.1

APPENDIX A

**Individuals**

1 Caputo Ed

2 Civello Nelson

3 Cowan David

4 Dziedzic Stan

5 Egan Richard & Maureen

6 Geewax John

7 Giesecke John

8 Giffen Catherine

9 Ginsburg Alan

10 Hoyt Barry G.

11 Jarmel Andrew M.

12 Powers John

13 Schostak Jerome L.

14 Scommenga Roger A.

15 Terker Bruce

16 Tschetter Ron

**Entities**

1 AHG Trading LLC

2 Affco Investments 2001 LLC

3 Affco, LLC

4 AHG Invesments LLC

5 Anbar Investments LLC

6 Anbar, Inc.

7 Andbar Trading LLC

8 CKG Trading 2001 LLC

9 Cliffside Investments LLC

10 Cowan Investments 2001 LLC

11 DC Trading LLC

12 EGC Investments 2001 LLC

13 EGC Trading LLC

14 Fidelity Hich Tech Advisor A. Fund, LLC

15 Fidelity Internaltional Currency Advisor A Fund, LLC

16 Geewax, Terker & Co.

17 JHP Trading LLC

18 JJG Trading LLC

19 JLS Investments 2001 LLC

20 JLS Trading LLC

21 JMB Trading LLC

22 LaGitt 88 Trust

23 LG88 Trading LLC

24 NDC Investments LLC

25 NDC Trading LLC

1622542.1

26 PCT Trading LLC

27 Powers Children Trust

28 RAS Investments 2001 LLC

29 RAS Trading 2001 LLC

30 RT Investments 2001 LLC

31 RT Trading LLC

32 SJD Investments LLC

33 SJD Trading LLC

34 TFT Investments 2001 LLC

35 TFT Trading LLC

36 The Taffen Family Trust

37 WFT Investments LLC

38 WFT Trading LLC

39 Wolff Family Trust

1622542.1

# Exhibit C

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF _____ COLUMBIA _____

Fidelity International Currency Advisor A Fund, LLC

v.

United States of America

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 05-40151-FDS (D. Mass.)

TO:   Bryan Cave LLP
      700 Thirteenth Street N.W.
      Washington, DC 20005-3960

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment to Subpoena to Bryan Cave LLP for the Production of Documents

| PLACE   Department of Justice, Judiciary Center Building, 7th floor, 555 Fourth Street NW, Washington, DC 20001 | DATE AND TIME 11/8/2006 10:00 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

   Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)   Attorney for Defendant | DATE 10/24/2006 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Barry E. Reiferson; US Department of Justice, Tax Division, P.O. Box 55, Ben Franklin Station, Washington, DC 20001
(202) 514-6058

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 05-40151-FDS (D. Mass.) |
| | ) | |
| v. | ) | Judge Saylor |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## ATTACHMENT TO SUBPOENA TO BRYAN CAVE LLP FOR THE PRODUCTION OF DOCUMENTS

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, the Custodian of Records for

Bryan Cave LLP is hereby required to produce for inspection and copying the documents set forth

below, from whichever office or location these documents may exist.

The production of the requested documents may be effected by mailing the originals or

clear copies to Barry E. Reiferson, Trial Attorney, Tax Division, United States Department of

Justice, Post Office Box 55, Ben Franklin Station, Washington, DC 20044.  If you are unwilling

or unable to transmit originals or copies in the manner described above, you are requested to

advise the undersigned counsel for the United States forthwith upon receipt hereof, in which

event the documents requested herein will be produced for inspection and copying at the

Department of Justice, Judiciary Center Building, 7th floor, 555 Fourth Street NW, Washington,

DC 20001, on November 8, 2006, at 10:00 a.m., and continuing from day to day thereafter for so

long as is reasonably necessary to examine and copy them.

1935807.1

## DEFINITIONS

1.   As used herein, (a) the singular shall include the plural, and vice versa, (b) masculine and

feminine pronouns shall be deemed to be interchangeable, (c) the words "or" and "and"

shall mean "and/or," and the word "or" shall not be interpreted to narrow the scope of any

request and shall be interpreted in its broadest sense, as denoting "and/or," (d) the words

"any" and "all" shall mean "any and all," and the word "any" shall not be interpreted to

narrow the scope of any discovery or other request, and shall be interpreted in its broadest

sense, as denoting "any and all."

2.   The term "document," and derivatives and pluralizations of the same, is to be liberally

construed to include all originals, copies, and nonidentical copies (whether by reason of

handwritten notations thereon or otherwise) kept in any form including paper and

electronic forms, including but not limited to the following: any letter, report, record,

corporate minute, memorandum, contract, affidavit, agreement, appraisal, deed, lease,

book, record, summary or record of personal conversation, routing slip, correspondence,

communication of any nature, note, notebook of any character, ledger, financial

statement, material, literature, brochure, publication, prospectus, offering, computation,

check or other instrument, computer tape or disk, photograph, phonorecord, electronic

transmission including but not limited to electronic mail, telegram, telex and telephone

facsimile, and any other type of written or documentary or other tangible material on

which information or data may be recorded, stored, or otherwise contained.  As to any

document that is written in another language, the term "document" also includes any

translation of that document into English.  As to any document in electronic form, the

term "document" includes all metadata associated with the document, as well as all printed versions of the document.

3.   A document "relating to" a given subject matter means a document or statement that relates to, constitutes, embodies, compromises, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, analyzes, contains information concerning, or is in any way pertinent to, that subject matter.

4.   The terms "possession," "custody," and "control" include actual and constructive possession, custody, or control.  These requests include any document or thing that you possess or have the right to obtain from a third party upon demand, or which otherwise may be secured from any other source for the purpose of fully responding to these requests, including attorneys, accountants or other agents.

5.   The term "person" shall be construed to mean and include an individual, trust, estate, partnership, company, corporation, governmental body, or other entity, whether domestic or foreign.

6.   The terms "The Diversified Group" and "DGI" refer to The Diversified Group, Incorporated, a Delaware corporation, and its affiliated companies, including, but not limited to, Diversified Financial Corp., Diversified Capital Corp., Diversified Capital Leasing Corp., and Diversified Capital International Inc., and to all employees, officers, and/or shareholders thereof, including but not limited to James Haber, Orrin Tilevitz, and Steven F. Jacoby.

7.   The term "Helios" refers to Helios Financial LLC, Helios Group LLC, Helios Advisory LLC, and Helios Trading LLC, each located at 401 N. Michigan Avenue, Suite 2950,

Chicago, IL, or at 225 West Washington Street, Suite 2200, Chicago, IL, or at 950 Third

Avenue, 23rd Floor, NY, NY, and to Helios Group, Inc., a Delaware corporation, and all

employees, members, and/or partners of any of those entities, including, but not limited

to, Mox Tan, Phil Kampf, James Haber and Orrin Tilevitz.

8. The term "Alpha" refers to Alpha Consultants, LLC, a Florida limited liability company;

Alpha Consultants, Inc., a Florida corporation; Alpha Strategic Management, Ltd., a

Florida limited partnership; and Alpha Strategic Management, LLC, a Florida limited

liability company; and all employees, members, and/or partners thereof, including, but not

limited to, Ivan J. Ross, Robert H. Fasulu, G. Felix Cua, Yoshiyuki Nobumoto, Ronald

Buesinger, Michael G. Leonard, and Donald S. Uderitz.

9. The term "Refco" refers to Refco Capital Markets, Ltd., which has or had an office at 200

Liberty Street, 23rd Floor, New York, NY 10281, and to Refco Securities, LLC, which has

or had an office at One World Financial Center, 24th Floor, New York, NY 10281, and

all employees, members, and/or partners thereof, including, but not limited to, Thomas

Yorke, Elizabeth Jung, Cathleen Scappatura, Miriam, LaFuente, Jim Behrmann, Angie

Lee, Alex Vojvodich, Mathew Hoff, David Weaver, and Walter Peters.

10. The term "Trilogy" refers to Trilogy Financial Products, Ltd.; Trilogy Investments, Ltd.;

and their related entities, including, but not limited to, any related entity which has or had

an office at 14 Athol Street, Douglas, Isle of Man, or at 5-11 St. Georges Street, Douglas,

Isle of Man; and all employees and/or partners thereof, including, but not limited to, Mox

Tan, Phil Kampf, James Haber, Orrin Tilevitz, and John Huber.

11. The terms "Samuel Mahoney" and "Mahoney" refer to Samuel Mahoney, Martin

1935807.1

Hawkes, John Hussey, Biosphere Finance, and/or Biosphere Holdings.

12.     The term "Carruth" refers to Carruth Associates LLC and Carruth Management LLC, which have or had an office at 116 Flanders Rd., Westborough, MA 01581, and all employees, members, and/or partners thereof, including, but not limited to, Robin Calkins, Michael Egan, Carolyn Fiddy, David Henry, Judy Irvin, Jim Reiss, Melissa Seaver, and Pat Shea.

13.     The term "Tequesta" refers to Tequesta Capital Advisors LP, Tequesta Fund LP, and their related entities, which have or had an office at 4270 S Decatur Blvd., Las Vegas, NV 89103 and/or at 3801 PGA Blvd., Palm Beach Gardens, FL 33410, and all employees, members, and/or partners thereof, including, but not limited to, Ron Buesinger, Gary Helene, and Ivan Ross.

14.     The term "Bryan Cave" refers to the law firm Bryan Cave, LLP, which has an office at 700 Thirteenth Street, N.W., Washington, DC 20005-3960, and all employees and/or partners thereof, including, but not limited to, John Barrie, Kathleen M. Gamcana, and Elizabeth Ann Smith.

15.     The term "Proskauer Rose" refers to the law firm of Proskauer Rose, LLP, which has an office at One International Place, Boston, MA 02110-2600, and all employees and/or partners thereof, including, but not limited to, Ira Akselrad and Matthew Sabloff.

16.     The term "Brown & Wood" refers to the law firm of Brown & Wood and its successor in interest, Sidley Austin Brown & Wood (n/k/a Sidley Austin LLP), and all employees and/or partners thereof, including, but not limited to, R.J. Ruble, Jacob Amato, John Felkamp, Susan L. Sodano, Thomas Humphries, Paul Cringle, and Eric Haueter.

1935807.1

17. The term "Lord Bissell" refers to the law firm of Lord Bissell & Brook, LLP, 111 South Wacker Drive, Chicago, IL 60606, and all employees and/or partners thereof, including, but not limited to, John Trustkowski, John Hughes, and Sergei Mytko.

18. The term "BWM&S" refers to the law firm of Burke, Warren, McKay & Seritella, P.C., which has an office at 330 North Wabash Avenue, 22nd Floor, Chicago, Illinois 60611-3607, and all employees and/or partners thereof, including, but not limited to, Stephanie Denby.

19. The term "Brown Raysman" refers to the law firm of Brown Raysman Millstein Felder & Steiner LLP, which has an office at 900 Third Avenue, New York, NY 10022-4728, and all employees and/or partners thereof, including, but not limited to, Thomas Levato.

20. The term "Solomon and Weinberg" refers to the law firm of Solomon and Weinberg, located at 685 Third Avenue, New York, NY 10017, or at 900 Third Avenue, New York, NY 10022, and all employees and/or partners thereof, including, but not limited to Craig H. Solomon and Mark Weinberg.

21. The term "KPMG" includes both KPMG, LLP, a Delaware Limited Liability Partnership, and KPMG International, a Swiss association, and all employees and/or partners thereof, including, but not limited to, Timothy Patrick Speiss, Stephen J. Spruck, Brent S. Lipschultz, Holly T. Belanger, Monica M. Odoy, Deborah A. Fields, Daniel J. Coburn, Rob Arthur, Robert Pritti, Leslie Kost, Steven Gremminger, Randall Bickham, Jeffrey Stein, John Lanning, Richard Smith, Jeffrey Eischeid, Philip Weisner, Mark Watson, Larry DeLap, David Greenberg, Carol Warley, Carl Hasting, Richard Rosenthal, and Brian Rivotto.

1935807.1

22.    The term "BDO Seidman" refers to the accounting firm of BDO Seidman, LLP, and all

employees and/or partners thereof, including, but not limited to, Charles Bee, Pam

Packard, Larry Cohen, Michael Kerekes, Robert Greisman, and Paul Shanbrom.

23.    The term "Grant Thornton" refers to the accounting firm of Grant Thornton, LLP, 175

West Jackson Boulevard 20th Floor Chicago, IL 60604, and all employees and/or partners

thereof, including, but not limited to, Israel Press and Joseph Machara.

24.    The term "RSM McGladrey" refers to the accounting firm of RSM McGladrey, Inc., and

all employees and/or partners thereof, including, but not limited to, Ronald G.

Wainwright, Jr.

25.    The term "SOS" refers to the product known as "Short-Option Strategy" and all variants

thereof, including, but not limited to, the Financial Derivatives Investment Strategy

("FDIS").

26.    The term "FDIS" refers to the product known as "Financial Derivatives Investment

Strategy," also referred to as the "Diversified Strategy," the "Partnership Strategy,"

"Short-Option Strategy," and "Partnership Option Strategy."

27.    The term "Tax Shelter Products" refers to SOS, FDIS, and any other tax shelter product

the same as or similar to those transactions identified in IRS Notice 2000-44.

28.    The term "FICA A Fund" refers to Fidelity International Currency Advisor A Fund LLC,

EIN 36-4381795.

29.    The term "Fidelity World" refers to Fidelity World Currency Advisor A Fund, LLC.

30.    The term "Egan" refers to Richard Egan and/or Maureen Egan, and any of their

consultants, advisors, agents, partners, or employees.

1935807.1

31.    The term "client-specific" means relating to a specific Bryan Cave client or group of

clients, or to any other person or entity, identifiable by name(s).


## INSTRUCTIONS

1.    If a document was, but no longer is, in your possession, custody or control, state:

    a.    how the document was disposed of;

    b.    the name, current address, and telephone number of the person who currently has

        possession, custody or control over the document;

    c.    the date of disposition; and

    d.    the name, current address, and telephone number of each person who authorized

        said disposition or who had or has knowledge of said disposition.

2.    If a document cannot be located, describe with particularity the efforts made to locate the

document and the specific reason for its disappearance or unavailability.

3.    If a document has information on both sides, provide copies of both sides or make

available the original document.

4.    To the extent that any document is written both in English and another language,

provide a copy of the document written in English.

5.    If any document has been previously produced to the Internal Revenue Service ("IRS") in

the course of any examination, the document should be produced with the same Bates number

used in the production to the IRS.

6.    If any document  has been previously produced to the Senate Permanent Subcommittee

on Investigations ("PSI"), the document should be produced with the same Bates number used in

the production to the PSI.

7.      For documents that have not been produced to the IRS or the PSI, please number them consecutively with a Bates-stamp identifier that is distinguishable from those used in the prior productions to the IRS and the PSI.  We suggest you use Bates-stamp numbers beginning with the prefix "BC".

8.      We request that the custodian of records for Bryan Cave certify the documents requested pursuant to Rule 902(11) of the Federal Rules of Evidence and Section 1746 of Title 28 of the United States Code.  A proposed certification is enclosed.  Please forward the certification as soon as possible, although its execution should in no way delay your production of the requested documents by the subpoena's return date.

9.      If any document is withheld under any claim of privilege or for any reason, list such documents by supplying separately as to each such document the following information:

   a.      the date  of the document, the type of document (e.g. letter, notebook, etc.), and the number of pages of which it consists;

   b.      the date on which the document came into your possession or control, if different from the date appearing on the document itself;

   c.      the name and title of the signer of the document (and if it was not signed, the answer shall so state and shall give the name and title of the person who prepared it, if known, and if not known, shall so state);

   d.      the name and title of each recipient or addressees of such document (whether specifically named therein or not);

   e.      the present whereabouts of the document and the name and address of the

1935807.1

custodian thereof;

f.    an indication that you claim privilege therefor with a citation to the statute, regulation or rule claimed to apply;

g.    a brief statement of the grounds on which the claim of privilege rests;

h.    a general statement of the subject matter; and

i.    the identity of each person (and his or her position) who received a copy of such document after the time of initial distribution.

All of the above is required so that the United States may have the factual basis to determine whether such documents are, in fact, privileged. If a claimed privilege applies to only a portion of any document, that portion only should be withheld and the remainder of the document should be produced. As used herein, "claim of privilege" includes, but is not limited to, any claim that a document either may or must be withheld from production pursuant to any statute or regulation.

10.    If a document in electronic form is password protected, the password protection is to be disabled and/or the password to overcome the password protection is also to be produced.

11.    The documents shall be produced as they are kept in the usual course of business and shall be organized and labeled to correspond with the separately-numbered request(s) to which they are responsive.

12.    Unless otherwise provided, these requests encompass any responsive document created at any time from January 1, 2000 to present.

1935807.1

## REQUESTS FOR PRODUCTION

The documents requested under this subpoena relate to the involvement of Bryan Cave in the design of, development of, marketing of, promotion of, implementation of, opining on, and/or reporting of certain transactions, including, but not limited to, the design, development, marketing, promotion, implementation, opining on, and/or reporting of SOS and/or FDIS. In connection with this request, please provide or make available for our review and copying the following specific categories of documents in your possession, custody, or control:

### Identification of Current and Former Personnel

1.     All documents identifying the current address or last known address of all persons who participated in any way in the design of, development of, marketing of, promotion of, implementation of, opining on, and/or reporting of SOS and/or FDIS.

### Documents Relating to any IRS Promoter Investigation and to Document Retention

2.     All documents that Bryan Cave has produced to the Internal Revenue Service ("IRS") in the course of any IRS promoter investigation, to be produced in the same form in which they were produced to the IRS.

3.     All documents Bryan Cave received from the IRS in the course of any IRS promoter investigation.

4.     All transcripts memorializing any interviews of Bryan Cave personnel in the course of any IRS promoter investigation.

5.     All documents memorializing or relating to the document-retention policy of Bryan Cave, Refco, DGI, Trilogy, Helios, and/or Alpha, including, but not limited to, documents directing the destruction or transfer of documents of Bryan Cave, Refco, DGI, Trilogy,

Helios, and/or Alpha.

## Generic Documents Relating to Tax Shelter Products

6.    All documents relating to the development of SOS and/or FDIS, including, but not limited to, all form documents, standardized documents, templates, confidentiality agreements, engagement letters, outlines, pro forma tax returns, closing binders, draft opinions, invoices, handwritten notes, and correspondence.

7.    All documents relating to the promotion of SOS and/or FDIS, including, but not limited to, all form documents, standardized documents, templates, PowerPoint presentations, marketing opinions, listing agreements, confidentiality agreements, engagement letters, training materials, outlines, pro forma tax returns, handwritten notes, and correspondence.

8.    All documents relating to the marketing of SOS and/or FDIS, including, but not limited to, all form documents, standardized documents, templates, PowerPoint presentations, marketing opinions, listing agreements, confidentiality agreements, engagement letters, training materials, outlines, pro forma tax returns, handwritten notes, and correspondence.

9.    All documents relating to the implementation of SOS and/or FDIS, including, but not limited to, all form documents, standardized documents, templates, confidentiality agreements, engagement letters, outlines, pro forma tax returns, closing binders, draft opinions, invoices, handwritten notes, and correspondence.

10.    All documents relating to the reporting of SOS and/or FDIS, including, but not limited to, all form documents, standardized documents, templates, confidentiality agreements, engagement letters, outlines, pro forma tax returns, closing binders, draft opinions, invoices, handwritten notes, and correspondence.

1935807.1

11. All documents generated by Bryan Cave relating to the development, marketing, promotion, implementation, and/or reporting of SOS and/or FDIS.

12. All documents relating to the involvement of Bryan Cave in SOS and/or FDIS, including, but not limited to, all documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS.

13. All documents relating to the involvement of Helios in SOS and/or FDIS, including, but not limited to, all documents relating to the development, marketing, promotion, issuance of opinions regarding, implementation, and/or reporting of SOS and/or FDIS.

14. All documents relating to the involvement of Alpha in SOS and/or FDIS, including, but not limited to, all documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS.

15. All documents relating to the involvement of Mahoney in SOS and/or FDIS, including, but not limited to, all documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS.

16. All documents relating to the involvement of DGI in SOS and/or FDIS, including, but not limited to, all documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS.

17. All documents relating to the involvement of Trilogy in SOS and/or FDIS, including, but not limited to, all documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS.

18. All documents relating to the involvement of Carruth in SOS and/or FDIS, including, but not limited to, all documents relating to the development, marketing, promotion,

1935807.1

implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS.

19.    All documents relating to the involvement of Tequesta in SOS and/or FDIS, including, but not limited to, all documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS.

20.    All documents relating to the involvement of Brown & Wood in SOS and/or FDIS, including, but not limited to, all documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS.

21.    All documents relating to the involvement of Proskauer Rose in SOS and/or FDIS, including, but not limited to, all documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS.

22.    All documents relating to the involvement of Lord Bissell in SOS and/or FDIS, including, but not limited to, all documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS.

23.    All documents relating to the involvement of BWM&S in SOS and/or FDIS, including, but not limited to, all documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS.

24.    All documents relating to the involvement of Brown Raysman in SOS and/or FDIS, including, but not limited to, all documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS.

1935807.1

25.   All documents relating to the involvement of Solomon and Weinberg in SOS and/or

      FDIS, including, but not limited to, all documents relating to the development, marketing,

      promotion, implementation, issuance of opinions regarding, and/or reporting of SOS

      and/or FDIS.

26.   All documents relating to the involvement of KPMG in SOS and/or FDIS, including, but

      not limited to, all documents relating to the development, marketing, promotion,

      implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS.

27.   All documents relating to the involvement of BDO Seidman in SOS and/or FDIS,

      including, but not limited to, all documents relating to the development, marketing,

      promotion, implementation, issuance of opinions regarding, and/or reporting of SOS

      and/or FDIS.

28.   All documents relating to the involvement of Grant Thornton in SOS and/or FDIS,

      including, but not limited to, all documents relating to the development, marketing,

      promotion, implementation, issuance of opinions regarding, and/or reporting of SOS

      and/or FDIS.

29.   All documents relating to the involvement of RSM McGladrey in SOS and/or FDIS,

      including, but not limited to, all documents relating to the development, marketing,

      promotion, implementation, issuance of opinions regarding, and/or reporting of SOS

      and/or FDIS.

30.   All documents relating to the involvement of Refco in SOS and/or FDIS, including, but

      not limited to, all documents relating the development, marketing, promotion,

      implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS.

1935807.1

31.    To the extent not provided in response to requests 1 through 30, all documents relating to

how SOS and/or FDIS were developed.

32.    To the extent not provided in response to requests 1 through 30, all documents relating to

how SOS and/or FDIS were to be promoted, including all draft documents.

33.    To the extent not provided in response to requests 1 through 30, all documents relating to

how SOS and/or FDIS were to be marketed, including all draft documents.

34.    To the extent not provided in response to requests 1 through 30, all documents relating to

how SOS and/or FDIS were to be implemented, including all draft documents.

35.    To the extent not provided in response to requests 1 through 30, all documents relating to

how opinions were to be issued for SOS and/or FDIS by Bryan Cave, Proskauer Rose,

Brown & Wood, Lord Bissell, BWM&S, Brown Raysman, and/or any other entity.

36.    All documents discussing or referencing IRS Notice 99-59, Notice 2000-44, and/or the

list maintenance requirements under 26 U.S.C. §6112.

37.    All documents, including draft documents, relating to the fees for SOS and/or FDIS,

including documents relating to fee calculation and invoicing.

38.    All documents, including all draft documents, relating to how Mahoney was to be paid, or

to Mahoney's payment, with respect to SOS and/or FDIS, and including, but not limited

to, wire transfers, checks, account statements, employment contracts, loan agreements,

and/or documents concerning forgiveness of debt.

39.    All documents relating to the potential or actual availability and/or willingness of any law

firm and/or lawyer to write an opinion for the SOS and/or FDIS transactions, including,

but not limited to, documents relating to the decision to have more than one law firm

1935807.1

write an opinion.

40.    All documents relating to the proposed language of the opinions to be issued by Bryan

Cave, Proskauer Rose, Brown & Wood, Lord Bissell, BWM&S, Brown Raysman,

Solomon and Weinberg, and/or any other entity, for SOS and/or FDIS, including all drafts

of the opinions.

41.    All documents relating to how client-representation letters were to be prepared for SOS

and/or FDIS, including, but not limited to, any documents relating to the representations

that were to be made by participants and drafts of the form representation letter(s).

42.    All documents relating to how SOS and/or FDIS were to be reported for federal and/or

state tax purposes, including, but not limited to, the use of pro forma tax returns.

43.    All documents relating to the steps for implementation of SOS and/or FDIS.

44.    All documents indicating how any person or other entity, including Bryan Cave, was to

be compensated, directly and/or indirectly, with respect to the development, promotion,

marketing, implementation, opining on, and/or reporting of the SOS and/or FDIS

transactions, including, but not limited to, any royalties, kickbacks, or any other form of

compensation.

**Client-Specific and Other Documents Relating to SOS and/or FDIS**

45.    All client-specific documents relating to the development, marketing, promotion,

implementation, issuance of opinions regarding, and/or reporting of the SOS and/or FDIS

transactions.

46.    All client-specific documents relating to the development, marketing, promotion,

implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS

1935807.1

transactions that were promoted, sold, marketed, and/or implemented through KPMG, including, but not limited to, transactions involving the individuals and entities identified in Appendix A.

47.    All client-specific documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS transactions that were promoted, sold, marketed, and/or implemented through BDO Seidman, including, but not limited to, transactions involving the individuals and entities identified in Appendix A.

48.    All client-specific documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS transactions that were promoted, sold, marketed, and/or implemented through Grant Thornton, including, but not limited to, transactions involving the individuals and entities identified in Appendix A.

49.    All client-specific documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS transactions for which Bryan Cave issued an opinion, including, but not limited to, transactions involving the individuals and entities identified in Appendix A.

50.    All client-specific documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS transactions for which Brown & Wood issued an opinion, including, but not limited to, those transactions which involved the individuals and entities identified in Appendix A.

51.    All client-specific documents relating to the development, marketing, promotion,

1935807.1

implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS

transactions for which Proskauer Rose issued an opinion, including, but not limited to,

transactions involving the individuals and entities identified in Appendix A.

52.    All client-specific documents relating to the development, marketing, promotion,

implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS

transactions for which Lord Bissell issued an opinion, including, but not limited to,

transactions involving the individuals and entities identified in Appendix A.

53.    All client-specific documents relating to the development, marketing, promotion,

implementation, issuance of opinions regarding, and/or reporting of SOS and/or FDIS

transactions for which Solomon and Weinberg issued an opinion, including, but not

limited to, transactions involving the individuals and entities identified in Appendix A.

54.    To the extent not provided in response to requests 45 through 53, all client-specific

documents relating to the development, marketing, promotion, implementation, issuance

of opinions regarding, and/or reporting of all SOS and/or FDIS transactions, including,

but not limited to, those transactions involving Trilogy, Mahoney, Egan, Carruth,

Tequesta, and the individuals and entities identified in Appendix A.

55.    All opinions, including draft opinions, relating to the SOS and/or FDIS transactions,

including, but not limited to, those relating to transactions involving the individuals and

entities identified in Appendix A.

56.    All federal and state tax returns reporting any SOS and/or FDIS transaction, including,

but not limited to, the returns for the transactions involving the individuals and entities

identified in Appendix A.

1935807.1

57. All notes taken by Bryan Cave, including by its employees, officers, partners, members, and/or shareholders, or by third parties, at sales or promotional meetings for SOS and/or FDIS, including, but not limited to, those taken at meetings relating to transactions involving the individuals and entities identified in Appendix A.

58. All outlines of proposed SOS and/or FDIS transactions, including, but not limited to, all documents entitled "Outline of Proposed Transaction."

59. All documents relating to the signing of any confidentiality agreements for the SOS and/or FDIS transactions, including, but not limited to, those relating to transactions involving the individuals and entities identified in Appendix A.

60. All documents relating to any engagement agreements for the SOS and/or FDIS transactions, including, but not limited to, those relating to transactions involving the individuals and entities identified in Appendix A.

61. All documents relating to any representation letters for the SOS and/or FDIS transactions, including, but not limited to, those relating to transactions involving the individuals and entities identified in Appendix A.

62. All closing binders for the SOS and/or FDIS transactions, including, but not limited to, those relating to transactions involving the individuals and entities identified in Appendix A.

63. All Operating Agreements for the SOS and/or FDIS transactions, including, but not limited to, those relating to transactions involving the individuals and entities identified in Appendix A.

64. All Contribution Agreements for the SOS and/or FDIS transactions, including, but not

1935807.1

limited to, those relating to transactions involving the individuals and entities identified in Appendix A.

65.    All master agreements for the SOS and/or FDIS transactions, including, but not limited to, those relating to the transactions involving the individuals and entities identified in Appendix A.

66.    All due diligence documentation for the SOS and/or FDIS transactions, including, but not limited to, those relating to the transactions involving the individuals and entities identified in Appendix A.

67.    All credit support agreements for the SOS and/or FDIS transactions, including, but not limited to, those relating to the FDIS transactions involving the individuals and entities identified in Appendix A, and including any third-party guarantees relating to any of the individuals and entities identified in Appendix A.

68.    All documents concerning, opining on, discussing, or addressing in any way, financial risk to participants in the SOS and/or FDIS transactions, including, but not limited to, those relating to the SOS and/or FDIS transactions involving the individuals and entities identified in Appendix A.

69.    All documents concerning, opining on, discussing, or addressing in any way, the probability of profit and actual profitability of the SOS and/or FDIS transactions, including, but not limited to, those relating to the SOS and/or FDIS transactions involving the individuals and entities identified in Appendix A.

70.    All documents concerning, opining on, discussing, or addressing in any way, the business purpose of the SOS and/or FDIS transactions, including, but not limited to, those relating

1935807.1

to the SOS and/or FDIS transactions involving the individuals and entities identified in Appendix A.

71.    All documents relating to any exit interviews or feedback from any of the SOS and/or FDIS participants regarding the SOS and/or FDIS transactions, including, but not limited to, those relating to the SOS and/or FDIS transactions involving the individuals and entities identified in Appendix A.

72.    All documents concerning, opining on, discussing, or addressing in any way, the application of the step transaction doctrine to the SOS and/or FDIS transactions, including, but not limited to, those relating to the SOS and/or FDIS transactions involving the individuals and entities identified in Appendix A.

73.    All documents concerning the $158,630,921.00 loss claimed by Richard J. and Maureen E. Egan on their 2001 Form 1040 and reported by Fidelity International Currency Advisor A Fund, LLC, on its 2001 Form 1065 and Schedule K-1 for Richard J. Egan.

74.    All documents concerning the $154,503,242.00 gain reported by Fidelity International Currency Advisor A Fund, LLC, on its 2001 Form 1065 and Schedule K-1 for Samuel Mahoney.

75.    All LLC agreements for Alpha, Helios, and the entities identified in Appendix A.

76.    All documents relating to the disposition of assets by any SOS and/or FDIS participant relating to any SOS and/or FDIS transaction, including, but not limited to, dispositions by Mahoney, Alpha, Helios, Refco, KPMG, and the individuals and entities identified in Appendix A.

77.    All documents relating to the initial investment of any partner in FICA A Fund.

1935807.1

78.  To the extent not provided in response to request 77, all documents relating to the initial investment of any partner in any entity identified in Appendix A.

79.  All documents relating to the net worth of any party contributing assets to or investing in FICA A Fund.

80.  To the extent not provided in response to requests 1 through 79, all correspondence to or from Bryan Cave that relates to any person or entity identified in Appendix A, and also relates to SOS and/or FDIS, including, but not limited to, recommendations and referrals.

81.  To the extent not provided in response to requests 1 through 79, all correspondence to or from Brown & Wood that relates to any person or entity identified in Appendix A, and/or relates to SOS and/or FDIS.

82.  To the extent not provided in response to requests 1 through 79, all correspondence to or from Lord Bissell that relates to any person or entity identified in Appendix A, and/or relates to SOS and/or FDIS.

83.  To the extent not provided in response to requests 1 through 79, all correspondence to or from Proskauer Rose that relates to any person or entity identified in Appendix A, and/or relates to SOS and/or FDIS.

84.  To the extent not provided in response to requests 1 through 79, all correspondence to or from Solomon and Weinberg that relates to any person or entity identified in Appendix A, and/or relates to SOS and/or FDIS.

85.  To the extent not provided in response to requests 1 through 79, all correspondence to or from KPMG that relates to any person or entity identified in Appendix A, and/or relates to SOS and/or FDIS.

1935807.1

86.    To the extent not provided in response to requests 1 through 79, all correspondence to or from BDO Seidman that relates to any person or entity identified in Appendix A, and/or relates to SOS and/or FDIS.

87.    To the extent not provided in response to requests 1 through 79, all correspondence to or from Grant Thornton that relates to any person or entity identified in Appendix A, and/or relates to SOS and/or FDIS.

88.    To the extent not provided in response to requests 1 through 79, all correspondence to or from RSM McGladrey that relates to any person or entity identified in Appendix A, and/or relates to SOS and/or FDIS.

89.    All complaints or petitions, including amended complaints or petitions, relating to SOS, FDIS, or other Tax Shelter Products, filed by any person or entity identified in Appendix A.

90.    To the extent not provided in response to requests 1 through 89, all records, documents, and materials created or maintained by Bryan Cave during the years 2000 through 2002 relating to the FICA A Fund transactions at issue in this case.

1935807.1

**Miscellaneous**

91.    All documents to, from, or concerning Stratecon, the Stratecon Group, or the Innovative

Solutions practices of KPMG.


Dated: October 24, 2006.


                                        _____
                                        BARRY E. REIFERSON
                                        Trial Attorney, Tax Division
                                        U.S. Department of Justice
                                        P.O. Box 55, Ben Franklin Station
                                        Washington, D.C.  20044-0055
                                        Telephone:  (202) 514-6058
                                        Facsimile: (202) 514-5238
                                        E-mail: barry.e.reiferson@usdoj.gov

1935807.1

# APPENDIX A

## <u>Name</u>

1. 2001 Equity Trading LLC

2. Fidelity High Tech Advisor A Fund LLC

3. Fidelity High Tech Index A Fund LLC

4. Fidelity High Tech Option A Fund LLC

5. Fidelity International Currency Advisor A Fund LLC

6. Fidelity World Currency Advisor A Fund LLC

7. Acajoux Equities LLC

8. Acajoux Investments LLC

9. Acajoux Trading LLC

10. AD Global 2001 Fund LLC

11. AFFCO Investments 2001 LLC

12. Affco, LLC

13. AHG Investments LLC

14. AHG Trading LLC

15. Akselrad, Harold

16. Aldridge, David S.

17. Alpine Group, Inc.

18. AMJ Trading LLC

19. AN Investments LLC

# APPENDIX A

20.    AN Trading LLC

21.    Anbar Investments LLC

22.    Anbar Trading LLC

23.    Anbar, Inc.

24.    Bennett, Phillip R.

25.    BET Trading LLC

26.    BFS Trading 2001 LLC

27.    BGH Trading LLC

28.    Buske, Thomas A.

29.    Butler, William

30.    Caputo, Edward G.

31.    CCP Trading LLC

32.    CF Trading LLC

33.    CFPT Investments LLC

34.    CFPT Investments LLC

35.    CGG Auto Trust

36.    CGK Trading LLC

37.    CGS Auto Trust

38.    Chadds Peak Investments LLC

39.    Cheris, Albert B.

# APPENDIX A

40. Chester Investors LLC

41. CHS Trading LLC

42. Ciasulli, Robert G.

43. Ciasulli, Ronald J.

44. Ciccarello, Rudy

45. Civello, Nelson

46. CJT Trading LLC

47. Cliffside Investments LLC

48. Cole, Robert

49. Corporex Investments LLC

50. Corporex Realty & Investment Corp.

51. Corporex Trading LLC

52. Cowan Investments LLC

53. Cowan, David

54. Crawford, Reagan

55. CSH Investments LLC

56. CTN Trading LLC

57. DC Trading LLC

58. DJR Investments LLC

59. DJR Trading LLC

# APPENDIX A

60.    DP Trading LLC

61.    DPT Trading LLC

62.    DRG Trading LLC

63.    DSG Trading LLC

64.    DTH Trading LLC

65.    DWT Investments LLC

66.    DWT Trading LLC

67.    Dziedzic, Stanley, J.

68.    Egan, Maureen

69.    Egan, Richard

70.    EGC Investments 2001 LLC

71.    EGC Trading LLC

72.    Elbaum, Steven S.

73.    Equity Trading 2001 Fund LLC

74.    Europa International, Inc

75.    Europa International, Inc.

76.    Europa Investments LLC

77.    Europa Trading LLC

78.    Francis, Joseph

79.    Francois, Curtis

1950326.1

# APPENDIX A

80.     FX Investments LLC

81.     Gabriel Trading LLC;

82.     Garvy, Robert

83.     Geewax, John J.

84.     Geewax, Terker & Co.

85.     Geewax, Terker & Company

86.     Geisecke, John

87.     GG Auto Trus

88.     Giffen, Catherine K.

89.     Ginsburg, Alan

90.     GN Investments LLC

91.     GN Trading LLC

92.     Gould, Suzanne Grossinger

93.     Grossinger Motor Corp., Inc.

94.     Grossinger, Caroline

95.     Grossinger, Garry

96.     Grossinger, Schiller

97.     Grossinger, Sharon

98.     Grossinger, Suzanne

99.     Grossprops Associates LLC

# APPENDIX A

100.  GT Investments 2001 LLC

101.  Gupta Investments LLC

102.  Gupta, D.R.

103.  Gupta, D.S.

104.  Gupta, Jai N.

105.  Gupta, Shasi A.

106.  Holland, David T.

107.  Holland, David T.

108.  Hoyt, Barry G.

109.  HWN Trading LLC

110.  Irrevocable Trust for Christopher J. Theis

111.  Irrevocable Trust for Dennis P. Theis

112.  Irrevocable Trust for Dennis W. Theis

113.  Irwin Grossinger Trust

114.  Jacob Trading LLC

115.  Jacqueline Trading LLC;

116.  Jarmel, Andrew M.

117.  JB Trading LLC

118.  JES Trading LLC

119.  JHP Trading LLC

1950326.1

# APPENDIX A

120. JHT Investments LLC

121. JHT Trading LLC

122. JJG Trading LLC

123. JLS Investments LLC

124. JLS Trading LLC

125. JMG Trading LLC

126. JNG Trading LLC

127. JRF Investments LLC

128. JRF Trading LLC

129. JSB Trading, Inc.

130. JZ Trading LLC

131. Kastin

132. Kealakeva Investments LLC

133. Kutler Investments LLC

134. Kutler, Jon

135. Laurelgrove Ltd.

136. LG88 Trading LLC

137. Lunt Realty Corp.

138. Mastin

139. Maxin Corporation

# APPENDIX A

140.   McNeill Family Partnership

141.   McNeill, John "Sandy"

142.   McNeill, Ronald "Ronnie"

143.   MCP Trading LLC

144.   MFP Equities LLC

145.   NDC Investments LLC

146.   NDC Trading LLC

147.   Nix, Harold W.

148.   NJR Trading LLC

149.   NPR Investments LLC

150.   NPR Investments LLC

151.   NPR Investments LLC

152.   Nussdorf, A.

153.   Nussdorf, G.

154.   Nussdorf, R.

155.   Nussdorfs, S.

156.   Paley, Douglas

157.   Paley, Steven

158.   Paley, William

159.   Palitz, Michael C.

1950326.1

# APPENDIX A

160.    Patterson, Charles C.

161.    PCT Trading LLC

162.    Perles, Steven R.

163.    Pitt Des Moines, Inc.

164.    Portillo, Richard

165.    Powers Childrens Trust

166.    Power, John

167.    PT Trading LLC

168.    RAG Investments LLC

169.    RAG Trading LLC

170.    RAS Investments 2001 LLC

171.    RAS Trading 2001 LLC

172.    RC Investments LLC

173.    RC Trading, LLC

174.    Reid, Daniel J.

175.    RGC Investments LLC

176.    RGC Trading LLC

177.    RGW Investments LLC

178.    RGW Trading LLC

179.    RJC Investments LLC

# APPENDIX A

180. RJC Investments LLC

181. RJP Investments LLC

182. RJS Investments LLC

183. RJS Investments LLC

184. RJS Trading LLC

185. RM Equities LLC

186. RM Investments 2001 LLC

187. RM Portfolio LLC

188. RM Trading LLC

189. RMC Trading LLC

190. RN Investments LLC

191. RN Trading LLC

192. Roach, Nelson J.

193. RT Investments 2001 LLC

194. RT Trading LLC

195. RWC Investments LLC

196. RWC Trading LLC

197. Sabella, Richard J.

198. SAG Trading LLC

199. Samuel Trading LLC

1950326.1

# APPENDIX A

200.  Schiller, Carolina Grossinger

201.  Schostak, Jerome

202.  Schut, Bragi F.

203.  Scommenga, Roger A.

204.  SE Trading 2001 LLC

205.  SEBFS Investments LLC

206.  SEBFS Investments LLC

207.  Sheridan Investments LLC

208.  Sheridan Trading 2001 LLC

209.  Siegel, David R.

210.  SJD Investments LLC

211.  SJD Trading LLC

212.  Slevin, James E.

213.  SM Equities LLC

214.  SM Investments LLC

215.  SM Portfolio LLC

216.  SM Trading LLC

217.  SN Investments LLC

218.  SN Trading LLC

219.  Solomon, Craig

# APPENDIX A

220.    SP Trading LLC

221.    SRP Trading LLC

222.    Stein, Keith

223.    Steven R. Perles, PC

224.    TAB Investments 2001 LLC

225.    TAB Trading LLC

226.    Tafeen Family trust

227.    Taylor, James

228.    Tenex Corp.

229.    Tenex Corporation

230.    Tenex Trading LLC

231.    Terker, Bruce E.

232.    TFT Investments 2001 LLC

233.    TFT Trading LLC

234.    Theis Investments LLC

235.    Theis Investments LLC

236.    Theis Investments LLC

237.    Theis Investments LLC

238.    Theis, James

239.    Theis, Thomas J.

1950326.1

# APPENDIX A

240.  Theis, William F. Sr.

241.  Theis, William F. Jr.

242.  Thomas, Paul

243.  TJT Trading LLC

244.  Tschetter, Ron

245.  Wainwright, Ron

246.  WFT Investments LLC

247.  WFT Trading LLC

248.  WFTJR Trading LLC

249.  WFTSR Trading LLC

250.  Wolff Family Trust

251.  WPB Trading LLC

252.  Zeretksy, Jane

# Exhibit D

AO88 (Rev. 12/07) Subpoena in a Civil Case

<div align="center">

### Issued by the

# UNITED STATES DISTRICT COURT

### District of Massachusetts

</div>

| | |
|---|---|
| Fidelity High Tech Advsior A Fund | **SUBPOENA IN A CIVIL CASE** |
| V. | |
| United States of America | Case Number:[1]  06-40243-FDS |

TO:  RSM McGladrey, Inc.
24 Federal Street
Boston, MA  02110

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment to Subpoena to RSM McGladrey for the Production of Documents

| PLACE     Office of the United States Attorney, John Joseph Moakley United States Courthouse, Suite 9200, 1 Courthouse Way, Boston, MA 02210 | DATE AND TIME 3/28/2008 10:00 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)       (Attorney for Defendant) | DATE 3/14/2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Barry Reiferson, U.S. Department of Justice, Tax Division, Civil Trial Section, Northern Region, P.O. Box 55, Ben Franklin Station, Washington, DC  20044 (202) 514-6058

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FIDELITY HIGH TECH ADVISOR A FUND, )
L.L.C., by the Tax Matters Partner,           )
                                                              )
                          Plaintiff,                     )          Civil Nos. 06-40243 and 06-40244
                                                              )
            v.                                             )          Judge Saylor
                                                              )
UNITED STATES OF AMERICA,              )
                                                              )
                          Defendant.                  )

**ATTACHMENT TO SUBPOENA TO RSM McGLADREY
FOR THE PRODUCTION OF DOCUMENTS**

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, the Custodian of Records for

RSM McGladrey LLP is hereby required to produce for inspection and copying the documents set

forth below, from whichever office(s) or location(s) these documents may exist.

The production of the requested documents may be made by mailing the originals or clear

copies of each (or, preferably, electronic copies as single-page TIFF with load files), and any files

required to be produced as specified below in native format, to Barry E. Reiferson, Trial

Attorney, Tax Division, United States Department of Justice, Post Office Box 55, Ben Franklin

Station, Washington, DC 20044. All electronic spreadsheets, such as any file or document

created using Microsoft Excel, Lotus 1-2-3, or Corel Quattro Pro, must be produced in native

format. All presentations created using presentation software including but not limited to

Microsoft PowerPoint must be produced in native format. If you require a street address, one will

be provided upon request. If you are unwilling or unable to transmit originals or copies in the

manner described above, you are requested to advise the undersigned counsel for the United

States upon receipt of this subpoena, in which event the documents requested will be produced

for inspection and copying at the office of the United States Attorney, John Joseph Moakley

United States Courthouse, Suite 9200, 1 Courthouse Way, Boston, MA 02210, on March 28,

2008, at 10:00 a.m., and continuing from day to day thereafter for so long as is reasonably

necessary to examine and copy them.  To the extent any document responsive to this request has

already been produced in the same format it would be produced here to the United States by RSM

McGladrey in response to a subpoena in *Fidelity International Currency Advisor A Fund v. US,*

Civ. Nos. 05-40151 and 06-40130 (D. Mass.), it need not be produced again in response to this

subpoena.

## DEFINITIONS

1.  As used herein, (a) the singular shall include the plural, and vice versa, (b) masculine and

    feminine pronouns shall be deemed to be interchangeable, (c) the words "or" and "and"

    shall mean "and/or," and the word "or" shall not be interpreted to narrow the scope of any

    request and shall be interpreted in its broadest sense, as denoting "and/or," (d) the words

    "any" and "all" shall mean "any and all," and the word "any" shall not be interpreted to

    narrow the scope of any discovery or other request, and shall be interpreted in its broadest

    sense, as denoting "any and all."

2.  The term "document," and derivatives and pluralizations of the same, is to be liberally

    construed to include all originals, copies, and nonidentical copies (whether by reason of

    handwritten notations thereon or otherwise) kept in any form including paper and

    electronic forms, including but not limited to the following: any letter, report, record,

    corporate minute, memorandum, contract, affidavit, agreement, appraisal, deed, lease,

    book, record, summary or record of personal conversation, routing slip, correspondence,

3113332.11

communication of any nature, note, notebook of any character, ledger, financial statement, material, literature, brochure, publication, prospectus, offering, computation, check or other instrument, computer tape or disk, photograph, phonorecord, electronic transmission including but not limited to electronic mail, telegram, telex and telephone facsimile, and any other type of written or documentary or other tangible material on which information or data may be recorded, stored, or otherwise contained. As to any document that is written in another language, the term "document" also includes any translation of that document into English. As to any document in electronic form, the term "document" includes all metadata associated with the document, as well as all printed versions of the document.

3.    A document "relating to" a given subject matter means a document or statement that relates to, constitutes, embodies, comprises, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, analyzes, concerns, contains information concerning, or is in any way pertinent to, that subject matter.

4.    The terms "possession," "custody," and "control" include actual and constructive possession, custody, or control. These requests include any document or thing that you possess or have the right to obtain from a third party upon demand, or which otherwise may be secured from any other source for the purpose of fully responding to these requests, including attorneys, accountants or other agents.

5.    The term "person" shall be construed to mean and include an individual, trust, estate, partnership, company, corporation, governmental body, or other business or non-business entity, whether domestic or foreign.

3113332.11

6.  The terms "The Diversified Group" and "DGI" refer to The Diversified Group, Incorporated, a Delaware corporation, and its affiliated companies, including, but not limited to, Diversified Financial Corp., Diversified Capital Corp., Diversified Capital Leasing Corp., and Diversified Capital International Inc., and to its employees, officers, agents, and/or shareholders, including but not limited to James Haber, Orrin Tilevitz, John Huber, Elizabeth Jung, Mox Tan, Phil Kampf, Joel L. Heilprin, Irwin Rosen, and Steven F. Jacoby.

7.  The term "Helios" refers to Helios Financial LLC, Helios Group LLC, Helios Advisory LLC, and Helios Trading LLC, each located at 401 N. Michigan Avenue, Suite 2950, Chicago, IL, or at 225 West Washington Street, Suite 2200, Chicago, IL, or at 950 Third Avenue, 23rd Floor, NY, NY, and to Helios Group, Inc., a Delaware corporation, and all employees, members, and/or partners of any of those entities, including, but not limited to, Mox Tan, Phil Kampf, Joel L. Heilprin, Irwin Rosen, James Haber, and Orrin Tilevitz.

8.  The term "Alpha" refers to Alpha Consultants, LLC, a Florida limited liability company; Alpha Consultants, Inc., a Florida corporation; Alpha Strategic Management, Ltd., a Florida limited partnership; and Alpha Strategic Management, LLC, a Florida limited liability company; and all employees, members, and/or partners thereof, including, but not limited to, Ivan J. Ross, Robert H. Fasulu, G. Felix Cua, Yoshiyuki Nobumoto, Ronald Buesinger, Michael G. Leonard, Gary Helene, Irwin Rosen, and Donald S. Uderitz.

9.  The term "Refco" refers to Refco Capital Markets, Ltd., which has or had an office at 200 Liberty Street, 23rd Floor, New York, NY 10281, and to Refco Securities, LLC, which has or had an office at One World Financial Center, 24th Floor, New York, NY 10281, and all

employees, members, and/or partners thereof, including, but not limited to, Thomas

Yorke, Elizabeth Jung, Cathleen Scappatura, Miriam, LaFuente, Jim Behrmann, Angie

Lee, Alex Vojvodich, Mathew Hoff, David Donora, David Weaver, and Walter Peters.

10.    The term "Trilogy" refers to Trilogy Financial Products, Ltd.; Trilogy Investments, Ltd.;

and their related entities, including, but not limited to, any related entity which has or had

an office at 14 Athol Street, Douglas, Isle of Man, or at 5-11 St. Georges Street, Douglas,

Isle of Man; and all employees and/or partners thereof, including, but not limited to, Nigel

Scott, John Hussey, Samuel Mahoney, Martin Hawkes, Mox Tan, Phil Kampf, James

Haber, Orrin Tilevitz, and John Huber.

11.    The term "Biosphere" refers to Biosphere Finance, Biosphere Holdings, Samuel

Mahoney, Martin Hawkes, and/or John Hussey.

12.    The term "Carruth" refers to Carruth Associates LLC, Carruth Management LLC, and

Carruth Partners LLC, which have or had an office at 116 Flanders Rd., Westborough,

MA 01581, and all employees, members, and/or partners thereof, including, but not

limited to, Robin Calkins, Michael Egan, Carolyn Fiddy, David Henry, Judy Irvin, James

Reiss, Melissa Seaver, and Patrick Shea.

13.    The term "Tequesta" refers to Tequesta Capital Advisors LP, Tequesta Fund LP, and their

related entities, which have or had an office at 4270 S Decatur Blvd., Las Vegas, NV

89103 and/or at 3801 PGA Blvd., Palm Beach Gardens, FL 33410, and all employees,

members, and/or partners thereof, including, but not limited to, Ron Buesinger, Gary

Helene, and Ivan Ross.

14.    The term "Proskauer Rose" refers to the law firm of Proskauer Rose, LLP, which has an

office at One International Place, Boston, MA 02110-2600, and all employees and/or

partners thereof, including, but not limited to, Ira Akselrad, Mitchell Gaswirth, Michael

Swiader, Matthew Sabloff, Jay Waxenberg, Rory Judd Albert, and Janet Korins.

15.    The term "Brown & Wood" refers to the law firm of Brown & Wood and its successor in

interest, Sidley Austin Brown & Wood (n/k/a Sidley Austin LLP), and all employees

and/or partners thereof, including, but not limited to, R.J. Ruble, Jacob Amato, John

Felkamp, Susan L. Sodano, Thomas Humphries, Paul Cringle, and Eric Haueter.

16.    The term "Lord Bissell" refers to the law firm of Lord Bissell & Brook, LLP, 111 South

Wacker Drive, Chicago, IL 60606, and all employees and/or partners thereof, including,

but not limited to, John Trustkowski, John Hughes, Douglas Chalmers, Bobbie Hirsh, and

Sergei Mytko.

17.    The term "BWM&S" refers to the law firm of Burke, Warren, McKay & Seritella, P.C.,

which has an office at 330 North Wabash Avenue, 22nd Floor, Chicago, Illinois

60611-3607, and all employees and/or partners thereof, including, but not limited to,

Stephanie Denby.

18.    The term "Brown Raysman" refers to the law firm of Brown Raysman Millstein Felder &

Steiner LLP, which has an office at 900 Third Avenue, New York, NY 10022-4728, and

all employees and/or partners thereof, including, but not limited to, Robert Unger and

Thomas Levato.

19.    The term "Bryan Cave" refers to the law firm Bryan Cave, LLP, which has an office at

700 Thirteenth Street, N.W., Washington, DC 20005-3960, and all employees and/or

partners thereof, including, but not limited to, John P. Barrie, Kathleen M. Giancana,

3113332.11

James R. Arnold, and Elizabeth Ann Smith.

20.    The term "KPMG" includes both KPMG, LLP, a Delaware Limited Liability Partnership, and KPMG International, a Swiss association, and all employees and/or partners thereof, including, but not limited to, Timothy Patrick Speiss, Stephen J. Spruck, Brent S. Lipschultz, Holly T. Belanger, Monica M. Odoy, Deborah A. Fields, Daniel J. Coburn, Rob Arthur, Robert Prifti, Leslie Kost, Steven Gremminger, Randall Bickham, Jeffrey Stein, Tracie Henderson, David Rivkin, Deke Carbo, Dale Baumann, Mike Watkins, Bob Pederson, John Lanning, Richard Smith, Jeffrey Eischeid, Philip Weisner, Mark Watson, Larry DeLap, David Greenberg, Carol Warley, Carl Hastings, Richard Rosenthal, and Brian Rivotto.

21.    The term "BDO Seidman" refers to the accounting firm of BDO Seidman, LLP, and all employees and/or partners thereof, including, but not limited to, Charles Bee, Pam Packard, Larry Cohen, Michael Kerekes, Robert Greisman, and Paul Shanbrom.

22.    The term "Grant Thornton" refers to the accounting firm of Grant Thornton, LLP, 175 West Jackson Boulevard 20th Floor Chicago, IL 60604, and all employees and/or partners thereof, including, but not limited to, Israel Press and Joseph Machara.

23.    The term "RSM McGladrey" refers to the professional services and/or accounting firm of RSM McGladrey, Inc., and to McGladrey & Pullen, LLP, and to all employees and/or partners of RSM McGladrey, Inc. and McGladrey & Pullen, LLP, including, but not limited to, Ronald G. Wainwright, Jr., Donald Dwight, Joe Giso, David Sterling, Todd Jackson, Dave Klintworth, Joe Bodan, Don Natenstedt, Bill Carter, Jef Flemmer, Roger Neumann, Joe Vegock, John Thomas, Steve Schamberger, Pat Murphy, Kimpa Moss, Duane Tyler, Michael G. Belitsos, Richard How, Karen Bowman, Bruce Jorth, and Frank

3113332.11

Compiani.

24.    The term "Stock Dribble" refers to a transaction, product, "strategy," or "technique"
known as "754 transaction," "stock dribble," "deferred stock sale," "H1," "Helios 1,"
"Stock Sale," "Capital Gain Reduction," or any variation of any or all of those products,
"strategies," or "techniques" and/or the transaction or set of transactions that is the
subject of this case and/or the "stock dribble transaction" as defined in the following
paragraph.  By example, the term "stock dribble" was used as follows in an email dated
January 5, 2002, from Orrin Tilevitz to Ira Akselrad at Proskauer Rose:

> Attached is my draft of the Egan opinion. The deal is a variation of the stock
> dribble [where] investors contribute appreciated stock plus options to an LLC
> taxed as a partnership, then the 99% member contributes her membership
> interest to a limited partnership, the better to avoid the Florida intangible tax.

> Jimmy asked that you please make this opinion your top priority so
> that we can get paid.

25.    The terms "stock dribble transaction" and "stock dribble transactions" refer to any and all
stock dribble transactions, or variations thereof, whether engaged in by Richard Egan;
Maureen Egan; Fidelity High Tech Advisor A Fund; Fidelity High Tech Index A Fund;
Fidelity High Tech Option A Fund; Ronald McNeill; John "Sandy" McNeill;  RM
Portfolio, LLC; SM Portfolio LLC; Robert Garvy; Arby LLC; RG Investments I, LLC;
Sharon Grossinger; Gary Grossinger; Suzanne Grossinger; Caroline Grossinger Schiller;
SGG Auto Trust; GG Auto Trust; CGS Auto Trust; Jacqueline Trading LLC; Gabriel
Trading, LLC; Samuel Trading, LLC; Jacob Trading LLC, and/or any other person or
entity.

26.    The term "Fidelity High Tech" refers to Fidelity High Tech Advisor A Fund, EIN 36-

3113332.11

4380425; and to Fidelity High Tech Index A Fund and Fidelity High Tech Option A Fund.

27.    The term "Egan" refers to Richard Egan and/or Maureen Egan, and any of their consultants, advisors, agents, partners, employees, or entities in which they held a beneficial interest.

28.    The term "client-specific" means relating to a specific RSM McGladrey client or group of clients, or to any other person or entity, identifiable by name(s).

## INSTRUCTIONS

1.    If a document was, but no longer is, in your possession, custody or control, state:

    a.    how the document was disposed of;

    b.    the name, current address, and telephone number of the person who currently has possession, custody or control over the document;

    c.    the date of disposition;

    d.    the name, current address, and telephone number of each person who authorized said disposition or who had or has knowledge of said disposition.

2.    If a document cannot be located, describe with particularity the efforts made to locate the document and the specific reason for its disappearance or unavailability.

3.    If a document has information on both sides, provide copies of both sides or make available the original document.

4.    To the extent that any document is written both in English and another language, provide a copy of the document written in English.

5.    If any document has been previously produced to the Internal Revenue Service ("IRS") in

3113332.11

the course of any examination, the document should be produced with the same Bates number used in the production to the IRS.

6.    If any document has been previously produced to the Senate Permanent Subcommittee on Investigations ("PSI"), the document should be produced with the same Bates number used in the production to the PSI.

7.    For documents that have not been produced to the IRS or the PSI, please number them consecutively with a Bates-stamp identifier that is distinguishable from those used in the prior productions to the IRS and the PSI.  We suggest you use Bates-stamp numbers beginning with the prefix "RSM-HT-".

8.    We request that the custodian of records for RSM McGladrey certify the documents requested pursuant to Rule 902(11) of the Federal Rules of Evidence and Section 1746 of Title 28 of the United States Code.  A proposed certification is enclosed.  Please forward the certification as soon as possible, although its execution should in no way delay your production of the requested documents by the subpoena's return date.

9.    If any document is withheld under any claim of privilege or for any reason, list such documents by supplying separately as to each such document the following information:

    a.    the date of the document, the type of document (e.g. letter, notebook, etc.), and the number of pages of which it consists;

    b.    the date on which the document came into your possession or control, if different from the date appearing on the document itself;

    c.    the name and title of the signer of the document (and if it was not signed, the answer shall so state and shall give the name and title of the person who prepared

3113332.11

it, if known, and if not known, shall so state);

d.    the name and title of each recipient or addressees of such document (whether specifically named therein or not);

e.    the present whereabouts of the document and the name and address of the custodian thereof;

f.    an indication that you claim privilege therefor with a citation to the statute, regulation or rule claimed to apply;

g.    a brief statement of the grounds on which the claim of privilege rests;

h.    a general statement of the subject matter; and

i.    the identity of each person (and his or her position) who received a copy of such document after the time of initial distribution.

All of the above is required so that the United States may have the factual basis to determine whether such documents are, in fact, privileged. If a claimed privilege applies to only a portion of any document, that portion only should be withheld and the remainder of the document should be produced. As used herein, "claim of privilege" includes, but is not limited to, any claim that a document either may or must be withheld from production pursuant to any statute or regulation.

10.    If a document in electronic form is password protected, the password protection is to be disabled and/or the password to overcome the password protection is also to be produced.

11.    The documents shall be produced as they are kept in the usual course of business and shall be organized and labeled to correspond with the separately-numbered request(s) to which they are responsive.

3113332.11

12.     Unless otherwise provided, these requests encompass any responsive document created at any time from January 1, 2000 to present.

## REQUESTS FOR PRODUCTION

The documents requested under this subpoena relate to the involvement of RSM McGladrey in the design of, development of, marketing of, promotion of, implementation of, opining on, advising on, and/or reporting of certain transactions, including, but not limited to, the design of, development of, marketing of, promotion of, implementation of, opining on, advising on and/or reporting of Stock Dribble. In connection with this request, please provide or make available for our review and copying the following specific categories of documents in your possession, custody, or control:

### Identification of current and former personnel

1.     All documents identifying the current address or last known address of all persons who participated in any way in the design of, development of, marketing of, promotion of, implementation of, opining on, advising on, and/or reporting of Stock Dribble.

### Identification of attorney-client relationship

2.     All documents evidencing the existence of an attorney-client relationship between RSM McGladrey and Bryan Cave relating to Stock Dribble.

3.     All documents evidencing the existence of an attorney-client relationship relating to Stock Dribble between RSM McGladrey and any lawyer or law firm.

4.     All documents evidencing the non-existence of an attorney-client relationship relating to Stock Dribble between RSM McGladrey and Bryan Cave.

5.     All documents evidencing the non-existence of an attorney-client relationship relating to

3113332.11

Stock Dribble between RSM McGladrey and any layer or law firm.

**Documents relating to any promoter investigation and to document retention**

6.    All documents that RSM McGladrey has produced to the Internal Revenue Service

("IRS") in the course of any tax-shelter-promoter investigation relating to Stock Dribble,

to be produced in the same form in which they were produced to the IRS.

7.    All documents RSM McGladrey received from the IRS in the course of any tax-shelter-

promoter investigation relating to Stock Dribble.

8.    All transcripts memorializing any interviews of RSM McGladrey personnel in the course

of any tax-shelter-promoter investigation relating to Stock Dribble.

9.    All documents memorializing or relating to the document-retention policy of RSM

McGladrey, Refco, DGI, Trilogy, Helios, and/or Alpha, including, but not limited to,

documents directing the destruction or transfer of documents of RSM McGladrey, Refco,

DGI, Trilogy, Helios, and/or Alpha.

**Generic Documents relating to Stock Dribble**

10.    All documents relating to the development of Stock Dribble, including, but not limited to,

all form documents, standardized documents, templates, confidentiality agreements,

designation agreements, engagement letters, outlines, pro forma tax returns, closing

binders, draft opinions, invoices, handwritten notes, and correspondence.

11.    All documents relating to the promotion of Stock Dribble, including, but not limited to,

all form documents, standardized documents, templates, PowerPoint and other

presentations, marketing opinions, non-disclosure opinions, listing agreements,

confidentiality agreements, engagement letters, training materials, outlines, investor fact

3113332.11

sheets, factual representations, pro forma tax returns, closing binders, handwritten notes, and correspondence.

12.    All documents relating to the marketing of Stock Dribble, including, but not limited to, all form documents, standardized documents, templates, PowerPoint and other presentations, marketing opinions,  non-disclosure opinions, listing agreements, confidentiality agreements, engagement letters, training materials, outlines, investor fact sheets, factual representations, pro forma tax returns, closing binders, handwritten notes, and correspondence.

13.    All documents relating to the implementation of Stock Dribble, including, but not limited to, all form documents, standardized documents, templates, confidentiality agreements, engagement letters, draft opinions, draft non-disclosure opinions, listing agreements, outlines, investor fact sheets, factual representations, pro forma tax returns, closing binders, handwritten notes, and correspondence.

14.    All documents relating to the reporting of Stock Dribble, including, but not limited to, all form documents, standardized documents, templates, confidentiality agreements, engagement letters, opinions, non-disclosure opinions, listing agreements, outlines, investor fact sheets, factual representations, pro forma tax returns, closing binders, disclosure statements, handwritten notes, and correspondence.

15.    All documents relating to RSM McGladrey's opining or advising on Stock Dribble, including, but not limited to, all form documents, standardized documents, templates, confidentiality agreements, engagement letters, outlines, draft documents, invoices, investor fact sheets, factual representations, pro forma tax returns, closing binders,

3113332.11

handwritten notes, and correspondence.

16.   All documents generated by RSM McGladrey relating to the development, marketing, promotion, implementation, and/or reporting of Stock Dribble.

17.   All documents relating to the involvement of RSM McGladrey in Stock Dribble, including, but not limited to, all documents relating to the development, marketing, promotion, implementation, issuance of opinions regarding, advising on, and/or reporting of Stock Dribble.

18.   All documents relating to the involvement of Helios, Alpha, DGI, Refco, Brown & Wood, Brown Raysman, Lord Bissell, Bryan Cave, Proskauer Rose, KPMG, BDO Seidman, Grant Thornton, Trilogy, Biosphere, Tequesta, Carruth, BWM&S, and/or any other entity in Stock Dribble, including, but not limited to, all documents relating to the development of, marketing of, promotion of, issuance of opinions regarding, implementation of, advice on, and/or reporting of Stock Dribble.

19.   All documents evidencing any communications between RSM McGladrey and Carruth relating to Egan or Stock Dribble, including, but not limited to, all documents relating to the development of, marketing of, promotion of, implementation of, issuance of opinions regarding, advising on, and/or reporting of Stock Dribble.

20.   All documents evidencing any communications between RSM McGladrey and BWM&S relating to Egan or Stock Dribble, including, but not limited to, all documents relating to the development of, marketing of, promotion of, implementation of, issuance of opinions regarding, advising on, and/or reporting of Stock Dribble.

21.   All documents evidencing any communications between Proskauer Rose and RSM

3113332.11

McGladrey relating to Egan or Stock Dribble, including, but not limited to, all documents

relating to the development of, marketing of, promotion of, implementation of, issuance

of opinions regarding, advising on, and/or reporting of Stock Dribble.

22.   All documents evidencing any communications between RSM McGladrey and Lord

Bissell relating to Egan or Stock Dribble, including, but not limited to, all documents

relating to the development of, marketing of, promotion of, implementation of, issuance

of opinions regarding, advising on, and/or reporting of Stock Dribble.

23.   All documents evidencing any communications between RSM McGladrey and Refco

relating to Egan or the Stock Dribble, including, but not limited to, all documents relating

to the development of, marketing of, promotion of, implementation of, issuance of

opinions regarding, advising on, and/or reporting of Stock Dribble.

24.   To the extent not provided in response to requests 1 through 23, all documents relating to

how Stock Dribble was developed.

25.   To the extent not provided in response to requests 1 through 24, all documents relating to

how Stock Dribble was to be promoted, including all draft documents.

26.   To the extent not provided in response to requests 1 through 25, all documents relating to

how Stock Dribble was to be marketed, including all draft documents.

27.   To the extent not provided in response to requests 1 through 26, all documents relating to

how Stock Dribble was to be implemented, including all draft documents.

28.   To the extent not provided in response to requests 1 through 27, all documents relating to

how or in what form opinions were to be issued for Stock Dribble by Proskauer Rose,

Brown & Wood, Lord Bissell, BWM&S, Brown Raysman, Bryan Cave, and/or any other

3113332.11

entity.

29.    All documents relating in any way to Stock Dribble and discussing or referencing IRS

Notice 99-59, Notice 2000-44, and/or the list-maintenance requirements under 26 U.S.C.

§6112.

30.    All documents, including draft documents, relating to the fees for, or other payments

relating to Stock Dribble, including, but not limited to, documents relating to fee

calculation, fee allocation, or fee invoicing by DGI, Helios, Alpha, RSM McGladrey,

KPMG, Proskauer Rose, Lord Bissell, Trilogy, Arbay LLC, and/or any other entity.

31.    All documents relating to the potential or actual availability and/or willingness and/or

ability of any law firm and/or lawyer to write an opinion for the Stock Dribble

transactions, including, but not limited to, documents relating to the decision to have

more than one law firm write an opinion.

32.    All documents relating to the proposed language of the opinions to be issued by

Proskauer Rose, Brown & Wood, Lord Bissell, BWM&S, Brown Raysman, Bryan Cave,

and/or any other entity, for Stock Dribble, including all drafts of the opinions.

33.    All documents relating to the preparation of client-representations or factual-

representations or so-called certificates of facts for Stock Dribble, including, but not

limited to, any documents relating to the representations that were to be made by

participants and drafts of the representations.

34.    All documents relating to how Stock Dribble was to be reported for federal and/or state

tax purposes, including, but not limited to, the use of pro forma tax returns.

35.    All documents relating to the steps for implementation of Stock Dribble.

3113332.11

36.    All documents indicating how any person or other entity, including, but not limited to, RSM McGladrey and Ronald Wainwright, was to be compensated, directly and/or indirectly, with respect to the development of, promotion of, marketing of, implementation of, opining on, advising on, and/or reporting of the Stock Dribble transactions.

37.    All documents indicating any royalties, kickbacks, accommodation-party treatment, reduced fees, or any other form of compensation, that was provided to any person or entity with respect to Stock Dribble.

38.    All documents indicating any royalties, kickbacks, accommodation-party treatment, reduced fees, and/or any other form of compensation that was provided by DGI, Alpha, or Helios to any person or entity that James Haber or any other person or entity classified or treated as an "accommodation client," including, but not limited to, Ira Akselrad, Harold Akselrad, Jay Waxenberg, Rory Judd Albert, Ronald Wainwright, Keith Stein, Richard Sabella, Craig Solomon, Michael G. Belitsos, Richard How, Karen Bowman, Bruce Jorth, and Frank Compiani.

39.    All documents relating to the signing of any designation agreement with respect to the list-maintenance requirements for the Stock Dribble transactions.

### Client-Specific and Other Documents relating to Stock Dribble

40.    All client-specific documents relating to the development of, marketing of, promotion of, implementation of, issuance of opinions regarding, advising on, and/or reporting of any of the Stock Dribble transactions, including, but not limited to, those transactions involving Richard Egan; Maureen Egan; Fidelity High Tech Advisor A Fund; Fidelity High Tech

3113332.11

Index A Fund; Fidelity High Tech Option A Fund; Ronald McNeill; John "Sandy" McNeill; RM Portfolio, LLC; SM Portfolio LLC; Robert Garvy; Arby LLC; RG Investments I, LLC; Sharon Grossinger; Gary Grossinger; Suzanne Grossinger; Caroline Grossinger Schiller; SGG Auto Trust; GG Auto Trust; CGS Auto Trust; Jacqueline Trading LLC; Gabriel Trading, LLC; Samuel Trading, LLC; and Jacob Trading LLC.

41. All opinions, including draft opinions, relating to any Stock Dribble transaction.

42. All draft and final federal and state tax returns reporting any Stock Dribble transaction or the financial consequences of any Stock Dribble transaction.

43. All documents, including, but not limited to, notes, memoranda, correspondence, letters, emails, and spreadsheets, relating to the preparation of any draft and final federal and state tax returns reporting any Stock Dribble transaction or the financial consequences of any Stock Dribble transaction.

44. All notes taken by RSM McGladrey, including by its employees, officers, partners, members, and/or shareholders, or by third parties, at sales or promotional meetings for Stock Dribble.

45. All outlines for any Stock Dribble transaction, including, but not limited to, all documents entitled "Outline of Proposed Transaction."

46. All documents concerning the tax benefits to be generated by any Stock Dribble transaction, including, but not limited to, all documents entitled "Investor Fact Sheet."

47. All check lists for the implementation of any Stock Dribble transction.

48. All documents relating to the signing of any confidentiality agreements for the Stock Dribble transactions.

3113332.11

49.  All documents relating to any engagement agreements, engagement letters, or consulting agreements for the Stock Dribble transactions, including, but not limited to, any such engagements or agreements with DGI, Helios, Alpha, Trilogy, RSM McGladrey, KPMG, or any other person or entity.

50.  All documents relating to any representation letters or certificates of facts for the Stock Dribble transactions.

51.  All documents relating to any assumptions to be made by RSM McGladrey in rendering its advice concerning Stock Dribble.

52.  All documents relating to any assumptions to be made by Proskauer Rose in rendering its advice or issuing its opinions concerning Stock Dribble.

53.  All closing binders for the Stock Dribble transactions.

54.  All Operating Agreements for the Stock Dribble transactions.

55.  All Contribution Agreements for the Stock Dribble transactions.

56.  All master agreements for the Stock Dribble transactions.

57.  All due diligence documentation for the Stock Dribble transactions.

58.  All credit support agreements for the Stock Dribble transactions.

59.  All documents concerning, opining on, discussing, or addressing in any way, financial risk to participants in the Stock Dribble transactions.

60.  All documents concerning, opining on, discussing, or addressing in any way, the probability of profit and actual profitability of the Stock Dribble transactions.

61.  All documents concerning, opining on, discussing, or addressing in any way, the business purpose of the Stock Dribble transactions.

3113332.11

62.   All documents concerning, opining on, discussing, or addressing in any way, the economic substance of the Stock Dribble transactions.

63.   All documents relating to any exit interviews or feedback from any of the Stock Dribble participants regarding the Stock Dribble transactions.

64.   All documents concerning, opining on, discussing, or addressing in any way, the application of the step transaction doctrine to the Stock Dribble transactions.

65.   All documents concerning the loss claimed by Richard J. and/or Maureen E. Egan on their 2001 Form 1040 and reported by Fidelity High Tech on its 2001 Form 1065 and Schedules K-1.

66.   All documents concerning the gain reported by Fidelity High Tech on its 2001 Form 1065 and Schedules K-1.

67.   All documents relating to the disposition of assets by any Stock Dribble participant relating to any Stock Dribble transaction, including, but not limited to, dispositions by Alpha, Helios, and Refco.

68.   All documents relating to the initial investment of any partner in Fidelity High Tech.

69.   All documents relating to the net worth of any party contributing assets to or investing in Fidelity High Tech.

70.   To the extent not provided in response to requests 1 through 69, all correspondence to or from RSM McGladrey that relates to Stock Dribble, including, but not limited to, recommendations and referrals.

71.   To the extent not provided in response to requests 1 through 70, all correspondence to or from Brown & Wood that relates to Stock Dribble.

3113332.11

72.    To the extent not provided in response to requests 1 through 71, all correspondence to or from Proskauer Rose that relates to Stock Dribble.

73.    To the extent not provided in response to requests 1 through 72, all correspondence to or from DGI that relates to Stock Dribble.

74.    To the extent not provided in response to requests 1 through 73, all correspondence to or from Helios that relates to Stock Dribble.

75.    To the extent not provided in response to requests 1 through 74, all correspondence to or from Alpha that relates to Stock Dribble.

76.    To the extent not provided in response to requests 1 through 75, all correspondence to or from Carruth that relates to Stock Dribble.

77.    To the extent not provided in response to requests 1 through 76, all correspondence to or from Egan that relates to Stock Dribble.

78.    All email records of Ronald Wainwright during the period January 1, 2001 through December 31, 2002.

79.    All complaints or petitions, including amended complaints or petitions, relating to any Stock Dribble transaction.

80.    To the extent not provided in response to requests 1 through 79, all records, documents, and materials created or maintained by RSM McGladrey during the years 2000 through 2002 relating to Stock Dribble.

81.    All documents concerning the termination of KPMG by Egan as their tax-return preparer on or about August 23, 2002.

82.    All documents concerning the substitution of RSM McGladrey as the tax-return preparer

3113332.11

for Egan following the termination of KPMG by Egan as their tax-return preparer on or about August 23, 2002.

83.    The employment records of Ronald Wainwright and Donald Dwight, including, but not limited to, any documents concerning their compensation and performance.

84.    All communications between RSM McGladrey and Ronald Wainwright and/or any other current or former RSM McGladrey employee that relate in any way to any person's involvement with Stock Dribble or any transaction developed and/or promoted by DGI, Helios, and/or Alpha.

85.    All documents maintained and/or collected by RSM McGladrey in connection with *McNeill et al. v. RSM McGladrey et al.*, in the General Court of Justice, Superior Court Division, State of North Carolina.  This request (#85) excludes documents created after July 11, 2006 by attorneys representing RSM McGladrey to the extent those documents were not subsequently disclosed to any person not employed or retained by RSM McGladrey.

3113332.11

86.    All documents maintained and/or collected by RSM McGladrey in connection with

*Samuel Trading, LLC, et al. v. The Diversified Group Incorporated*, Case No. 05C 5513

(N.D. Ill.), and/or any related litigation concerning the participation of Sharon Grossinger,

Gary Grossinger, Suzanne Grossinger, Caroline Grossinger Schiller, SGG Auto Trust,

GG Auto Trust, CGS Auto Trust, Jacqueline Trading LLC, Gabriel Trading LLC, Samuel

Trading LLC, and/or Jacob Trading LLC in a Stock Dribble transaction.

Dated: March 14, 2008.


BARRY E. REIFERSON
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044-0055
Telephone: (202) 514-6058
Facsimile: (202) 514-5238
E-mail: barry.e.reiferson@usdoj.gov

# Exhibit E

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

FIDELITY HIGH TECH ADVISOR A FUND, )
L.L.C., by the Tax Matters Partner, )
                                  )
        Plaintiff,          )
                                    )
v.                                )    Civil No. 06-40243-FDS
                                    )           06-40244-FDS
UNITED STATES OF AMERICA,       )
                                    )
        Defendant.      )

## UNITED STATES' RESPONSE TO PLAINTIFF'S
## SECOND SET OF INTERROGATORIES

The United States, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure

and Rule 33.1 of the Local Rules of the United States District Court for the District of

Massachusetts, responds to Plaintiff's Second Set of Interrogatories as follows:

### GENERAL OBJECTIONS

1.   The United States objects to the interrogatories to the extent that the information

requested is not relevant to this action and is also not reasonably calculated to lead to the

discovery of admissible evidence.

2.   The United States objects to the interrogatories to the extent that they seek

information that is protected from disclosure by the governmental deliberative process privilege.

3.   The United States objects to the interrogatories to the extent they seek information

that is protected from disclosure by the attorney work product privilege.

4.   The United States objects to the interrogatories to the extent they seek information

that is protected from disclosure by the attorney-client privilege.

3189121.1

5. The United States objects to the interrogatories to the extent that they are overbroad, unduly burdensome, vague and/or ambiguous.

6. The United States objects to these interrogatories as premature since discovery is still open in this case and expert depositions have not yet been taken by either party.

7. The United States objects to the interrogatories to the extent they request "each" or "all" elements or facts supporting the United States' legal contentions. Contention interrogatories should ask only for the principal facts and principal materials supporting a party's contentions. *See e.g., IBP, Inc. v. Mercantile Bank of Topeka,* 179 F.R.D. 316, 321 (D.Kan.1998); *Bradley v. Val-Mejias,* 2001 WL 1249339 (D.Kan. 2001). *See also SJ Berwin & Co. v. Evergreen Entertainment Group, Inc.,* 1994 WL 185687, at *2 (S.D.N.Y. 1994) (contention interrogatories should not be a vehicle for requiring a party to regurgitate all factual information learned in discovery).

8. The United States objects to the interrogatories to the extent that they call for a legal conclusion.

9. The United States further objects to plaintiff's numbering of these interrogatories because many of plaintiff's interrogatories includes multiple subparts, so that these interrogatories are actually interrogatories numbers 8-48.

**DEFINITIONS**

1.) The term "Fidelity High Tech" means Fidelity High Tech Advisor A Fund, LLC, which may have been formed in Delaware on July 19, 2000.

- 3 -

2.) The term "Fidelity High Tech Index" means Fidelity High Tech Index A Fund, LLC, which may have been formed in Delaware on July 20, 2000.

3.) The term "Fidelity High Tech Option" means Fidelity High Tech Option A Fund, LLC, which may have been formed in Delaware on July 19, 2000.

## RESPONSE TO INTERROGATORIES

### INTERROGATORY NO. 8

Does Defendant contend that the April 5, 2002 opinion issued by Proskauer to Richard Egan (Bates numbered 042244 through 042290) was factually or legally incorrect as of the date of the opinion? If so, set forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:**    The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege. The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

supporting, the United States' legal contentions. The United States objects to this interrogatory

to the extent it calls for a legal conclusion. The United States objects to this interrogatory on the

grounds that it is overbroad and unduly burdensome. The United States objects to this

interrogatory as premature since discovery is still open in this case and expert depositions have

not yet been taken by either party. The United States also notes that this interrogatory consists of

four separate interrogatories, i.e., (1) whether the United States contends that the April 5, 2002

opinion issued by Proskauer to Richard Egan was factually incorrect as of the date of the opinion;

(2) if yes, the reasons for that contention; (3) whether the United States contends that the April

- 4 -

5, 2002 opinion issued by Proskauer to Richard Egan was legally incorrect as of the date of the opinion; and (4) if yes, the reasons for that contention.

Notwithstanding and without waiving the foregoing objections and the general objections set forth above, and with the understanding that discovery is ongoing, the United States responds to this interrogatory as follows: The United States contends that the April 5, 2002 opinion issued by Proskauer to Richard Egan contains a plethora of misleading, inaccurate or incorrect factual or legal statements, including, but not limited to, the following:

(1) Pages 8-10 of the opinion contain representations by the "Investor," and the "Investment Advisor" that are materially false. For example, a representation is made that "Investors believed they had a reasonable opportunity to earn a profit from the option trades in excess of all fees and transaction costs without regard to tax benefits." (See p. 9). Another representation states that "Each investor contributed his or her membership interests in HTIA [Fidelity High Tech Index] and HTOA [Fidelity High Tech Option] to HTAA [Fidelity High Tech] for substantial non-tax business reasons." (See p. 9). The United States contends that Richard and Maureen Egan entered into the transactions at issue in order to generate an artificially high basis to shelter capital gains income from the sale of certain stock. Moreover, the United States contends that it is irrelevant whether or not Richard and Maureen Egan believed they had a reasonable opportunity to earn a profit on the transaction since the profit prong of the economic substance test requires an objective analysis. Thus, this test requires that the transaction be viewed from the perspective of a rational investor, and so viewed, requires that there be a reasonable possibility of economic profit on the transaction in excess of all transaction

- 5 -

costs, whether direct or indirect. Page 9 of the opinion states that "[t]here existed no

understanding, agreement, obligation, or arrangement pursuant to which any of the parties

described herein committed to undertake all or any of the transactions described herein upon the

happening of any other transaction, except to the extent that the owner of the Options and Bank

[Refco Capital Markets, Ltd.] were contractually obligated to perform under the Options in

accordance with their stated terms." (See p. 9). The United States contends that the steps of the

transaction were pre-planned. *See e.g.,* 1EGAN010314-319, 2EGAN026234-235,

2EGAN031564-566, 2EGAN026343, 1CARRUTH038228, 1CARRUTH038268-269,

2CARRUTH037311-313, 2CARRUTH048172-177, 1BWMS04861-866, 3CARRUTH049062-

067.

    (2) Pages 10-12 of the opinion contain conclusions regarding the transaction. The United

States contends that those conclusions, particularly regarding the tax treatment of the

transactions, are incorrect since, *inter alia,* the transaction lacked economic substance and should

not be recognized for federal income tax purposes.

    (3) Page 13 of the opinion contains a conclusion that HTAA [Fidelity High Tech] and LP

[MEE Holdings LP] will be treated as partnerships, citing, *inter alia, ASA Investerings P'ship v.*

*Comm'r,* 201 F.3d 505 (D.C.Cir. 2000). The United States contends that the alleged "partners"

did not "join together as partners to conduct business activity for a purpose other than tax

avoidance," *ASA Investerings* at 513, but rather that Richard and Maureen Egan entered into the

transactions at issue in order to generate an artificially high basis to shelter capital gains income

from the sale of certain stock.

- 6 -

(4) Page 14 of the opinion states that "each pair of Options in an option spread likely would be treated as a separate instrument." The United States contends that the paired options were economically one single position.

(5) Page 19 of the opinion states that "[a]s further discussed below, it is likely that these potential claims would not be treated as liabilities for purposes of Section 752." The discussion continues through at least page 24 where it is stated that "[h]ere the Short Option [sic] are European-style options, which means that they could only be exercised or settled only on their termination date. Thus, until that time, the claims of Bank [Refco Capital Markets, Ltd.] against Investors under the Short Option were entirely speculative and contingent." The United States contends that the obligations inherent in the short option positions transferred to Fidelity High Tech Advisor A Fund, LLC, constitute liabilities for purposes of Section 752 and Treas. Reg. §1.752-6T. The term "liability" in Section 752 encompasses all liabilities, including contingent liabilities. *See Coltec Industries v United States*, 454 F.3d 1340 (Fed. Cir. 2006). Thus, Fidelity High Tech Advisor A Fund, LLC's assumption of the obligations under the short option positions constituted a distribution of money to the purported partners under Section 752(b), thereby decreasing their basis in the purported partnership. Moreover, *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727, T.C.M (1975) is inapposite to these facts because it did not involve simultaneously executed long and short options of the same underlying property with virtually identical terms, which offsetting options eliminated all financial risk to the purported partners in excess of the net premiums paid by them. Also, *Helmer* did not involve offsetting option

3189121.1

- 7 -

transactions which were entered into as part of an elaborate and prearranged scheme to avoid federal income taxes.

(6) Pages 28-34 of the opinion contains a discussion under the heading "Sham Transaction, Economic Substance, and Business Purposes Doctrines." The United States contends that the discussion under this heading contains numerous misstatements of the law and facts, some, but not all, of which are highlighted below. In sum, the United States contends that the transactions at issue were a sham, lacked economic substance and lacked a business purpose since it is clear that Richard and Maureen Egan entered into the transactions at issue in order to generate an artificially high basis to shelter capital gains income from the sale of certain stock. The United States contends that a correct analysis of the law is that under the economic substance doctrine, transactions that are invented solely to create tax deductions and otherwise have no economic substance (such as the transaction at issue here), even though formally complying with the letter of the Internal Revenue Code, will not be recognized. *Knetsch v. United States*, 364 U.S. 361 (1960); *Dewees v. Commissioner*, 870 F2d 21, 32, 35 (1st Cir. 1989).[1] There is a two-prong test for determining economic substance. The first prong examines whether the transaction has a reasonable possibility of a profit (an objective inquiry). *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778, 781-82 (5th Cir. 2001) (internal citation omitted; emphasis added). The second prong looks to whether there existed a tax-independent business purpose for the transaction (a subjective inquiry). *Id.* The fundamental question for a

---

[1] *See also, Yosha v. Commissioner*, 861 F.2d 494, 497 (7th Cir. 1988); *Executive Jet Aviation, Inc. v. United States*, 125 F.3d 1463, 1469 (Fed. Cir. 1997).

- 8 -

court is therefore not whether the mere possibility of profit exists, but whether a *reasonable*

possibility of profit exists. Critically, in determining profit potential, all expenses and costs

associated with the transaction that produces the tax benefits must be taken into account.[2]

Moreover, a taxpayer's subjective profit motive cannot salvage a transaction that is otherwise

lacking in economic substance. As now Mr. Justice Breyer stated in *Dewees*, the "[c]ase law

makes clear that a taxpayer cannot deduct a 'sham transaction' loss, irrespective of his subjective

profit motive." *Dewees* at 35.

    (7) Pages 34-36 of the opinion contains a discussion under the heading "Notice 2000-

44." The United States contends that the discussion under that heading is wrong, inter alia,

because a transaction will be treated as being the same as or "substantially similar" to one of the

types of transactions that the IRS has determined to be a tax avoidance transaction if the

transaction is expected to obtain the same or similar types of tax benefits and is either factually

similar or is based on the same or a similar tax strategy.[3] The term "substantially similar" is to be

broadly construed in favor of disclosure.[4] The United States' position is that the transaction at

issue is "substantially similar" to a transaction described in Notice 2000-44. Notice 2002-44 is

entitled "Tax-Avoidance Using Artificially High Basis" and sets forth two totally dissimilar

transactions – both of which have as their common unifying threads (1) the attempt to

---

[2] *See Long-Term Capital Holdings*, 330 F. Supp 2d at 175-84.

[3] *See e.g.*, Treas. Reg. § 1.6011-4T(b)(1)(i)

[4] *See e.g.*, Treas. Reg. § 1.6011-4T(b)(1)(i)

- 9 -

artificially-inflate the basis of a partnership interest and (2) the use of that inflated basis to support the deductibility of uneconomic losses. Thus the Notice was intended to put taxpayers on notice that the IRS would disallow losses (and likely impose penalties) with respect to transactions involving the assumption of purportedly contingent liabilities by partnerships to artificially inflate the partners' outside bases in their partnership interests. The types of purportedly contingent obligations referred to in the Notice were therefore intended to be simply illustrative, and nothing in the Notice indicates that it was intended to be applicable only to the two abusive schemes referred to in the Notice. It therefore is of no moment that the steps of the transaction at issue in this litigation were somewhat different than those in the Notice. The critical fact is that the plaintiff and Mrs. Egan's variant of the Son of BOSS scheme utilizes purported contingent obligations in the same manner described in Notice 2000-44 in an attempt to artificially increase outside basis both to eliminate gain as well as to produce a non economic loss.

In any event, the main basis-inflating steps of the transaction at issue are substantially similar to those in the two factual situations in Notice 2000-44. In those two transactions, the inflated bases of the partnership interests are derived through a carefully-sequenced set of pre-planned steps by which alleged liabilities on the taxpayers' transactions are assumed by a partnership. In both transactions, the taxpayers characterize such liabilities as "contingent liabilities" for purposes of Section 752 of the Internal Revenue Code – with the consequence that the taxpayers' bases in their partnership interests do not reflect their actual economic investment. In both transactions, the taxpayers actual out-of-pocket investment is only a small fraction of

- 10 -

their claimed basis in their partnership interests, thereby causing the basis in their partnership interests to be artificially inflated.

That is exactly what occurred in the instant case where the taxpayer claims to have a basis in Fidelity High Tech which is equal to the premiums allegedly paid for the long options unreduced by the premiums allegedly received for the short options. This treatment results in the taxpayer claiming a basis in his partnership interest that is much higher than their actual cash investment. Moreover, both the transactions set forth in Notice 2000-44 and the transaction at issue generate losses which have no economic reality and both rely upon artificially-inflated partnership bases to support the deductibility of the non economic loss.

For all of these reasons, the transaction at issue is substantially similar to the Notice 2000-44 transactions because it seeks to obtain the same type of tax benefits and is based on a similar tax strategy as the transactions described in the Notice.

(8) Pages 36-38 of the opinion contains a discussion under the heading "Step Transaction Doctrine Not Applicable" that is incorrect. The United States contends that Fidelity High Tech Option and Fidelity High Tech Index entered into a series of options transactions with Refco on January 31, 2001 and assigned those resulting interests to Fidelity High Tech on February 7, 2001 when Maureen Egan transferred her 100% interest in Fidelity High Tech Option to Fidelity High Tech and Richard Egan transferred his 100% interest in Fidelity High Tech Index to Fidelity High Tech. The step transaction doctrine is applicable to collapse the steps of the purchase of the options by Fidelity High Tech Option and Fidelity High Tech Index and its contribution of those options to Fidelity High Tech as nothing but transitory steps. That is

- 11 -

because there is no valid independent significance or business reason for Fidelity High Tech Option and Fidelity High Tech Index rather than Fidelity High Tech, to have purchased those options, and, therefore, for purposes of the overall transaction, Fidelity High Tech should be treated as having entered directly into the options contracts with Refco. Similarly, since the intended result of the entire transaction was for Richard and Maureen Egan to generate an artificially high basis to shelter capital gains income from the sale of certain stock, then they can not claim a right to favorable tax treatment for the various intermediate steps leading up to that intended result (the basis generator steps).

(9) Pages 38-39 of the opinion contains a discussion under the heading "The Partnership Anti-Abuse Regulations: Disregard of HTAA [Fidelity High Tech] under Common Law" that contains incorrect conclusions. To begin with, the Partnership Anti-Abuse Regulations clearly apply here to disregard HTAA. Moreover, and just for example, on page 39 it is stated that "it is likely that the IRS would be unsuccessful were it to assert that the Transactions are inconsistent with the intent of subchapter K." That statement is called into question by the fact the plain language of the Partnership Anti-Abuse Regulations clearly apply here given that, among other things, the intended result of the entire transaction was for Richard and Maureen Egan to generate an artificially high basis to shelter capital gains income from the sale of certain stock.

(10) Pages 40-46 of the opinion contains a discussion under the heading "Section 6662" that is incorrect. The United States contends that the plaintiff was negligent and/or disregarded the rules or regulations. Thus, a 20 percent penalty under I.R.C. § 6662(b) should be imposed on any portion of the underpayment attributable to the plaintiff's negligence or disregard of rules or

3189121.1

- 12 -

regulations. Moreover, the United States contends that a 20 percent penalty under I.R.C. § 6662(b) should be imposed because of a substantial understatement of income tax and/or a substantial valuation misstatement. In addition, the United States contends that a 40% substantial overvaluation penalty under I.R.C. § 6662(b) should also be imposed because under the economic substance doctrine, the basis of the taxpayer's stock would be zero or alternatively under the step transaction or substance over form doctrines would be the net premium paid for the options, thereby giving rise to a very large basis overvaluation. Moreover, the exception in former I.R.C. § 6664(c) regarding reasonable cause and good faith does not apply. This legal opinion could not be reasonably relied upon by the taxpayer for all of the reasons stated in response to this interrogatory. In fact, the opinion was a purely pre-packaged, boilerplate document prepared by the promoters of the transactions (with finishing touches by the taxpayer's own lawyer who contributed to its factual misrepresentations) and was used solely as a marketing tool. Its "prefabricated" and "canned" factual and legal conclusions were solely designed to insulate the taxpayer against the imposition of penalties should the transaction ever be discovered by the IRS and could in no way be considered an independent legal opinion presenting the actual facts of the transaction and objectively analyzing the applicable law.

## INTERROGATORY NO. 9

Please set forth bases, facts, and evidence for Defendant's denial that Fidelity High Tech is a "partnership in fact or for purposes of federal income tax law." Answer ¶ 5, *Fidelity High Tech Advisor A Fund, LLC v. United States*, Nos. 06-40243 & 06-40244 (D. Mass.).

- 13 -

**RESPONSE:**    The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege.  The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

supporting, the United States' legal contentions.  The United States objects to this interrogatory

to the extent it calls for a legal conclusion.  Notwithstanding and without waiving the foregoing

objections and the general objections set forth above, and with the understanding that discovery

is ongoing, the United States responds to this interrogatory as follows:  The United States

contends that the plaintiff has failed to establish that the purported partnership called Fidelity

High Tech is not a factual sham.  The principal factual basis of this position is that this entity was

organized for the sole purpose of illegally avoiding federal and state income taxes.  As such, it

was not formed for a legal purpose as is required by state law.  Consequently, this entity would

not be recognized to exist as a partnership under state law.

Even if Fidelity High Tech existed as a partnership under state law, this entity was a sham

for federal income tax purposes.  That is, the alleged "partners" did not "join together as partners

to conduct business activity for a purpose other than tax avoidance." *ASA Investerings P'ship v.*

*Comm'r*, 201 F.3d 505, 513 (D.C.Cir. 2000). " '[T]he absence of a nontax business purpose is

fatal' to the argument that the Commissioner should respect an entity for federal tax purposes."

*Saba P'ship v. Comm'r*, 273 F.3d 1135, 1141 (D.C.Cir. 2001), *quoting ASA Investerings P'ship v.*

*Comm'r*, 201 F.3d at 512. *See also Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949)(a

valid partnership for tax purposes requires the parties to join together as partners in good faith

3189121.1

- 14 -

with a legitimate business purpose). The fundamental factual basis of this position is that this

purported entity was not formed or availed of for a valid business purpose. Rather, it was

organized and availed of solely for purposes of tax avoidance which was to be accomplished by

artificially inflating the basis of the partners' partnership interests and then to generate paper

losses that had no independent economic significance for federal income tax purposes.

INTERROGATORY NO. 10

     Does Defendant contend that any of the Option A Trades or the Index A Trades were
shams in fact, i.e., that they did not in fact occur? If so, set forth the bases for, and all facts and
evidence supporting, Defendant's position.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege. The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

supporting, the United States' legal contentions. The United States also notes that this

interrogatory consists of two separate interrogatories, i.e., (1) whether the United States contends

that any of the Option A Trades or the Index A Trades were shams in fact, i.e., that they did not

in fact occur and (2) if yes, the reasons for that contention. Notwithstanding and without waiving

the foregoing objections and the general objections set forth above, the United States does not

contend that the Option A Trades or the Index A Trades were shams in fact, i.e., that they did not

in fact occur.

3189121.1

- 15 -

## INTERROGATORY NO. 11

Does Defendant contend that, for federal income tax purposes, the purchase by Index A and Option A of put options and their simultaneous sale of different put options to the same counterparty constituted the acquisition of a single asset? If so, set forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege. The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

supporting, the United States' legal contentions. The United States objects to this interrogatory

as premature since discovery is still open in this case and expert depositions have not yet been

taken by either party. The United States also notes that this interrogatory consists of two separate

interrogatories, i.e., (1) whether the United States contends that, for federal income tax purposes,

the purchase by Index A and Option A of put options and their simultaneous sale of different put

options to the same counterparty constituted the acquisition of a single asset and (2) if yes, the

reasons for that contention. Notwithstanding and without waiving the foregoing objections and

the general objections set forth above, and with the understanding that discovery is ongoing, the

United States responds to this interrogatory as follows: The United States contends that the

almost entirely offsetting pairs of options utilized in the transaction were so closely matched that

the two sides of each pair would be considered by options traders as a single, unified position. In

each case, the events that might give rise to gain were also events that would give rise to a

roughly equivalent loss on the other side of the pair. The United States contends that viewing the

individual options in each pair as separate and independent is inconsistent with their real

- 16 -

economic consequences. This position is also supported in immense detail by the expert reports

of Drs. Rausser, Kolbe and DeRosa.

INTERROGATORY NO. 12

Does Defendant contend that the short option positions entered into by Index A (RCM
2001-01-31-06 and RCM 2001-02-12-04) constituted liabilities for purposes of I.R.C. § 752(a)
and (b) at the time Plaintiff contributed his membership interest in Index A to Fidelity High
Tech? If so, set forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege. The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

supporting, the United States' legal contentions. The United States objects to this interrogatory

as premature since discovery is still open in this case and expert depositions have not yet been

taken by either party. The United States also notes that this interrogatory consists of two separate

interrogatories, i.e., (1) whether the United States contends that the short-option positions entered

into by Index A (RCM 2001-01-31-06 and RCM 2001-02-12-04) constituted liabilities for

purposes of I.R.C. §752(a) and (b) at the time Plaintiff contributed his membership interests in

Index A to Fidelity High Tech and (2) if yes, the reasons for that contention. Notwithstanding

and without waiving the foregoing objections and the general objections set forth above, and with

the understanding that discovery is ongoing, the United States responds to this interrogatory as

follows: The United States contends that the obligations inherent in the short option positions

(written call options RCM 2001-01-31-06 and RCM 2001-02-12-04) transferred to Fidelity High

- 17 -

Tech constitute liabilities for purposes of Section 752 and Treas. Reg. §1.752-6T. The term

"liability" in Section 752 encompasses all liabilities, including contingent liabilities. *See Coltec*

*Industries v. United States*, 454 F.3d 1340 (Fed. Cir. 2006). Thus, FICA A Fund 's assumption

of the obligations under the short option positions constituted a distribution of money to the

purported partners under Section 752(b), thereby decreasing their basis in the purported

partnership. Moreover, *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727, T.C.M (1975) is

inapposite to these facts because it did not involve simultaneously executed long and short

options of the same underlying property with virtually identical terms, which offsetting options

eliminated all financial risk to the purported partners in excess of the net premiums paid by them.

Also, *Helmer* did not involve offsetting option transactions which were entered into as part of an

elaborate and prearranged scheme to avoid federal income taxes.


## INTERROGATORY NO. 13

Does Defendant contend that the short option positions entered into by Index A (RCM
2001-01-31-06 and RCM 2001-02-12-04) constituted liabilities for purposes of Treas. Reg. §
1.752-6? If so, set forth the bases for, and all facts and evidence supporting, Defendant's
position.

**RESPONSE:** The United States interprets this interrogatory to be the same in substance as

Interrogatory 12 and thus, our objections and responses to that interrogatory are incorporated

herein by reference.

- 18 -

## INTERROGATORY NO. 14

Does Defendant contend that the short option positions entered into by Option A (RCM 2001-01-31-03 and RCM 2001-02-12-01) constituted liabilities for purposes of I.R.C. § 752(a) and (b) at the time Plaintiff contributed his membership interests in Option A to Fidelity High Tech? If so, set forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege. The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

supporting, the United States' legal contentions. The United States objects to this interrogatory

as premature since discovery is still open in this case and expert depositions have not yet been

taken by either party. The United States also notes that this interrogatory consists of two separate

interrogatories, i.e., (1) whether the United States contends that the short-option positions entered

into by Option A (RCM 2001-01-31-03 and RCM 2001-02-12-01) constituted liabilities for

purposes of I.R.C. §752(a) and (b) at the time Maureen Egan contributed her membership

interests in Option A to Fidelity High Tech and (2) if yes, the reasons for that contention.

Notwithstanding and without waiving the foregoing objections and the general objections set

forth above, and with the understanding that discovery is ongoing, the United States responds to

this interrogatory as follows: The United States contends that the obligations inherent in the short

option positions (written call options RCM 2001-01-31-03 and RCM 2001-02-12-01) transferred

to Fidelity High Tech constitute liabilities for purposes of Section 752 and Treas. Reg. §1.752-

6T. The term "liability" in Section 752 encompasses all liabilities, including contingent

liabilities. *See Coltec Industries v United States*, 454 F.3d 1340 (Fed. Cir. 2006). Thus, FICA A

3189121.1

- 19 -

Fund 's assumption of the obligations under the short option positions constituted a distribution

of money to the purported partners under Section 752(b), thereby decreasing their basis in the

purported partnership. Moreover, *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727, T.C.M

(1975) is inapposite to these facts because it did not involve simultaneously executed long and

short options of the same underlying property with virtually identical terms, which offsetting

options eliminated all financial risk to the purported partners in excess of the net premiums paid

by them. Also, *Helmer* did not involve offsetting option transactions which were entered into as

part of an elaborate and prearranged scheme to avoid federal income taxes.


## INTERROGATORY NO. 15

Does Defendant contend that the short option positions entered into Option A (RCM
2001-01-31-03 and RCM 2001-02-12-01) constituted liabilities for purposes of Treas. Reg. §
1.752-6? If so, set forth the bases for, and all facts and evidence supporting, Defendant's
position.

**RESPONSE:**   The United States interprets this interrogatory to be the same in substance as

Interrogatory 14 and thus, our objections and responses to that interrogatory are incorporated

herein by reference.


## INTERROGATORY NO. 16

Does Defendant contend that Maureen Egan's initial basis in her Fidelity High Tech
interest under I.R.C. § 722 is reduced by the amounts received by Maureen Egan (through her
membership interest in Option A) from the contemporaneous sales of the put options to the same
counterparty? If so, set forth the bases for, and all facts and evidence supporting, Defendant's
position.

- 20 -

**RESPONSE:**   The United States objects to the interrogatories to the extent that the information

requested is not relevant to this action and is also not reasonably calculated to lead to the

discovery of admissible evidence. The United States objects to this interrogatory to the extent

that the information requested is protected from disclosure by the governmental deliberative

process privilege, the attorney work product privilege and/or the attorney-client privilege. The

United States further objects to this interrogatory to the extent that it requests all the bases, facts

and evidence supporting, the United States' legal contentions. The United States objects to this

interrogatory to the extent it calls for a legal conclusion. The United States objects to this

interrogatory on the grounds that it is overbroad and unduly burdensome. The United States

objects to this interrogatory as premature since discovery is still open in this case and expert

depositions have not yet been taken by either party. The United States also notes that this

interrogatory consists of two separate interrogatories, i.e., (1) whether the United States contends

that Maureen Egan's initial basis in her Fidelity High Tech interest under I.R.C. § 722 is reduced

by the amounts received by Maureen Egan (through her membership interest in Option A) from

the contemporaneous sales of the put options to the same counterparty; and (2) if yes, the reasons

for that contention.  Notwithstanding and without waiving the foregoing objections and the

general objections set forth above, and with the understanding that discovery is ongoing, the

United States responds to this interrogatory as follows: The United States contends that Maureen

Egan's initial basis in her Fidelity High Tech interest under I.R.C. § 722 is reduced by the

amounts received by Maureen Egan (through her membership interest in Option A) from the

contemporaneous sales of the put options to the same counterparty. The reasons supporting this

- 21 -

position are the same as those set forth in the United States' Responses to Interrogatory 12 and

14.


INTERROGATORY NO. 17

Does Defendant contend that Maureen E. Egan did not transfer her interest in Fidelity High Tech to MEE Holdings for state tax purposes? If so, set forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:**    The United States objects to the interrogatories to the extent that the information

requested is not relevant to this action and is also not reasonably calculated to lead to the

discovery of admissible evidence. The United States objects to this interrogatory to the extent

that the information requested is protected from disclosure by the governmental deliberative

process privilege, the attorney work product privilege and/or the attorney-client privilege. The

United States further objects to this interrogatory to the extent that it requests all the bases, facts

and evidence supporting, the United States' legal contentions. The United States objects to this

interrogatory to the extent it calls for a legal conclusion. The United States objects to this

interrogatory on the grounds that it is overbroad and unduly burdensome. The United States

objects to this interrogatory as premature since discovery is still open in this case and expert

depositions have not yet been taken by either party. The United States also notes that this

interrogatory consists of two separate interrogatories, i.e., (1) whether the United States contends

that Maureen E. Egan transferred her interest in Fidelity High Tech to MEE Holdings for state

tax purposes; and (2) if yes, the reasons for that contention.

- 22 -

Notwithstanding and without waiving the foregoing objections and the general objections

set forth above, and with the understanding that discovery is ongoing, the United States responds

to this interrogatory as follows: The United States does contend that the overarching, and

possibly sole, reason that Maureen E. Egan transferred her 99% interest in Fidelity High Tech to

MEE Holdings was not for state tax purposes but rather to effect a technical termination of the

Fidelity High Tech partnership under Section 708, thereby allowing plaintiff to argue that an

"exchange" took place for purposes of Section 743(b) with respect to both Mrs and Mr. Egan's

interests in the partnership. Moreover, plaintiff has never explained why Mrs. Egan's transfer of

her interest in Fidelity High Tech to MEE Holdings in which she indirectly owns the same

proportionate interest through her grantor trust would have any effect of reducing or eliminating

Florida state tax. In its Interrogatory No. 54 served on April 4, 2008, the United States has

requested plaintiff to explain with specificity why this transfer would have any effect on Florida

state tax.

## INTERROGATORY NO. 18

Does Defendant contend that Fidelity High Tech's sale of stock at a loss in 2002 was not
a recognition event for federal income tax purposes? If so, set forth the bases for, and all facts
and evidence supporting, Defendant's position.

**RESPONSE:**    The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege. The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

3189121.1

- 23 -

supporting, the United States' legal contentions. The United States objects to this interrogatory

as premature since discovery is still open in this case and expert depositions have not yet been

taken by either party. The United States also notes that this interrogatory consists of two separate

interrogatories, i.e., (1) whether the United States contends that Fidelity High Tech's sale of

stock at a loss in 2002 was not a recognition event for federal income tax purposes and (2) if yes,

the reasons for that contention. Notwithstanding and without waiving the foregoing objections

and the general objections set forth above, and with the understanding that discovery is ongoing,

the United States responds to this interrogatory as follows: The United States contends that the

transactions at issue are sham transactions that lack economic substance and are not recognized

at all for federal income tax purposes. Thus, the United States contends that the taxpayer must

clear many hurdles, such as those involving the sham transaction doctrine and the step

transaction doctrine (neither of which the taxpayer can clear) before principles of recognition are

applied to the facts of the case. The United States also contends that Fidelity High Tech's sale of

stock at a loss in 2002 was not an event with independent economic significance because the

purported losses that were generated were solely paper losses. Thus Fidelity High Tech's sale of

stock was not a "realization or recognition event" for federal income tax purposes. Ignoring for

the moment that the transaction should have been disregarded altogether for tax purposes because

it lacked economic substance, the United States alternatively contends that the paper losses

should have been recognized and reported as a net amount under the step transaction and

substance over form doctrines.

- 24 -

## INTERROGATORY NO. 19

Does Defendant contend that the Transactions are part of a pattern of similar transactions engaged in by other taxpayers? If so, set forth the bases for, and all facts and evidence supporting Defendant's position, including the name of each taxpayer.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege. The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

supporting, the United States' legal contentions. The United States objects to this interrogatory

as premature since discovery is still open in this case and expert depositions have not yet been

taken by either party. The United States also notes that this interrogatory consists of two separate

interrogatories, i.e., (1) whether the United States contends that Transactions are part of a pattern

of similar transactions engaged in by other taxpayers and (2) if yes, the reasons for that

contention. Notwithstanding and without waiving the foregoing objections and the general

objections set forth above, and with the understanding that discovery is ongoing, the United

States responds to this interrogatory as follows: The United States contends that it appears from

the documents produced so far in discovery in the Fidelity International cases and the Fidelity

High Tech cases that other persons or entities that may have been involved in a transaction

similar to the one in the instant case. Thus far, we have identified the following similar

transactions: Ronald McNeill; John "Sandy" McNeill; RM Portfolio, LLC; SM Portfolio LLC;

Robert Garvy; Arbay LLC; RG Investments I, LLC; Sharon Grossinger; Gary Grossinger;

Suzanne Grossinger; Caroline Grossinger Schiller; SGG Auto Trust; GG Auto Trust; CGS Auto

- 25 -

Trust; Jacqueline Trading LLC; Gabriel Trading, LLC; Samuel Trading, LLC; Jacob Trading

LLC, 2650 Lawrence LLC, Grossinger Motorcorp, Inc., Grossprops Associates, LLC, Irwin

Grossinger Trust, Lunt Realty Corp., RM Equities, LLC, SM Equities, LLC, MFP Equities, LLC,

McNeill Family Limited Partnership, RG Trading 2003 LLC, RG Investments 2003, LLC, JTB

Investments 2002 LLC, JTB Trading, LLC, J.T. Burns, RBF Investments, LLC, RBF Trading,

LLC, RB Forsland, LLC and Forsland Family 2002 Trust. All such evidence of participation in a

transaction similar to the one at issue in the instant case by the foregoing persons or entities is

already in possession of plaintiff.

INTERROGATORY NO. 20

What fees did Refco charge or receive in connection with the Transactions? Please set
forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege. The United States objects to

this interrogatory as premature since discovery is still open in this case and expert depositions

have not yet been taken by either party. The United States further objects to this interrogatory to

the extent that it requests all the bases, facts and evidence supporting, the United States' position.

The United States also notes that this interrogatory consists of two separate interrogatories, i.e.,

(1) what fees the United States contends that Refco charged or received in connection with the

Transactions and (2) the bases for, and all facts and evidence supporting that contention.

Notwithstanding and without waiving the foregoing objections and the general objections set

3189121.1

- 26 -

forth above, and with the understanding that discovery is ongoing, the United States responds to

this interrogatory as follows: The United States contends that the taxpayers paid Refco a so-

called bid-ask fee of $1 million for the four initial options, two of which were entered into by

Fidelity High Tech Option and two of which were entered into by Fidelity High Tech Index on

January 31, 2001. The United States further contends that taxpayers also paid Refco a so-called

bid-ask fee of a smaller amount on the close out of the four initial options. See also, the Expert

Report of A. Lawrence Kolbe, dated March 31, 2008 at pp. 26-30.


INTERROGATORY NO. 21

Does Defendant contend that Refco took any risks in the Transaction? If your answer is
"no," set forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege. The United States objects to

this interrogatory as premature since discovery is still open in this case and expert depositions

have not yet been taken by either party. The United States also notes that this interrogatory

consists of two separate interrogatories, i.e., (1) whether the United States contends that Refco

took any risks in the Transaction and (2) if no, the reasons for that contention. Notwithstanding

and without waiving the foregoing objections and the general objections set forth above, and with

the understanding that discovery is ongoing, the United States responds to this interrogatory as

follows: The United States contends that Refco took no risk on the transaction. It was required to

make a net payout if both offsetting options were in the money at expiration but it had been

- 27 -

handsomely compensated for this exposure. On paper, it was also exposed to a one option payout

to the taxpayers if the options were held to expiration and the NASDAQ 100 at the market

closing on the date was in between 2,288.15 and 2,288.20. However, this was not a real risk to

Refco since Refco had the ability to manage this risk to ensure that one option payout did not

occur. And, in fact, none of the transaction documents assign a separate probability to the

possibility of this occurring. This position is further explained in detail in the expert reports of

Drs. Kolbe, Rausser and DeRosa all dated March 31, 2008.

## INTERROGATORY NO. 22

State the name of each law firm Defendant contends Plaintiff relied upon or had a
relationship with concerning the Transactions. Please set forth the bases for, and all facts and
evidence supporting, Defendant's position.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege. The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

supporting, the United States' position. The United States objects to this interrogatory as vague

because it is unclear what is meant by "relied upon" or "had a relationship with" means. The

United States objects to this interrogatory as premature since discovery is still open in this case

and expert depositions have not yet been taken by either party. The United States also notes that

this interrogatory consists of two separate interrogatories, i.e., (1) what law firms the United

States contends that Plaintiff relied upon or had a relationship with concerning the Transactions

- 28 -

and (2) all facts and evidence supporting that contention. Notwithstanding and without waiving the foregoing objections and the general objections set forth above, and with the understanding that discovery is ongoing, the United States responds to this interrogatory as follows: The United States contends that Plaintiff sought and/or received advice relating to the transactions from Brown & Wood LLP (*see e.g.,* 2CARRUTH048257), Proskauer Rose, LLP and Burke, Warren, McKay & Serritella, P.C.

INTERROGATORY NO. 23

State the name and current address of each person and entity that Defendant contends developed and marketed the alleged tax strategy underlying the Transactions.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information requested is protected from disclosure by the governmental deliberative process privilege, the attorney work product privilege and/or the attorney-client privilege. The United States objects to this interrogatory as overbroad, unduly burdensome. The United States further objects to this interrogatory to the extent that it requests all the bases, facts and evidence supporting, the United States' legal contentions. The United States objects to this interrogatory as premature since discovery is still open in this case and expert depositions have not yet been taken by either party. Notwithstanding and without waiving the foregoing objections and the general objections set forth above, and with the understanding that discovery is ongoing, the United States responds to this interrogatory as follows: The United States contends that the following entities and persons developed and marketed the transactions at issue:

- 29 -

(1) The Diversified Group, formerly at 950 Third Avenue, 23rd Floor, NY, NY, (James Haber, Orrin Tilevitz, John Huber, Elizabeth Jung, Mox Tan, Phil Kampf, Joel L. Heilprin, and Steven F. Jacoby);

(2) Helios, which refers to Helios Financial LLC, Helios Group LLC, Helios Advisory LLC, and Helios Trading LLC, each located at 401 N. Michigan Avenue, Suite 2950, Chicago, IL, or at 225 West Washington Street, Suite 2200, Chicago, IL, or at 950 Third Avenue, 23rd Floor, NY, NY, and to Helios Group, Inc., a Delaware corporation, (Mox Tan, Phil Kampf, Joel L. Heilprin, James Haber, and Orrin Tilevitz);

(3) Alpha, which refers to Alpha Consultants, LLC, a Florida limited liability company; Alpha Consultants, Inc., a Florida corporation; Alpha Strategic Management, Ltd., a Florida limited partnership; and Alpha Strategic Management, LLC, a Florida limited liability company, (Ivan J. Ross, Robert H. Fasulu, G. Felix Cua, Yoshiyuki Nobumoto, Ronald Buesinger, Michael G. Leonard, Gary Helene, and Donald S. Uderitz);

(4) Trilogy, which refers to Trilogy Financial Products, Ltd.; Trilogy Investments, Ltd.; and their related entities, including, but not limited to, any related entity which has or had an office at 14 Athol Street, Douglas, Isle of Man, or at 5-11 St. Georges Street, Douglas, Isle of Man, (Nigel Scott, John Hussey, Samuel Mahoney, Martin Hawkes, Mox Tan, Phil Kampf, James Haber, Orrin Tilevitz, and John Huber);

(5) KPMG, which includes both KPMG, LLP, a Delaware Limited Liability Partnership, and KPMG International, a Swiss association (Timothy Patrick Speiss, Stephen J. Spruck, Brent S. Lipschultz, Holly T. Belanger, Monica M. Odoy, Deborah A. Fields, Daniel J. Coburn, Rob

- 30 -

Arthur, Robert Prifti, Leslie Kost, Steven Gremminger, Randall Bickham, Jeffrey Stein, Tracie

Henderson, David Rivkin, Deke Carbo, Dale Baumann, Mike Watkins, Bob Pederson, John

Lanning, Richard Smith, Jeffrey Eischeid, Philip Weisner, Mark Watson, Larry DeLap, David

Greenberg, Carol Warley, Carl Hastings, Richard Rosenthal, and Brian Rivotto).

(6) Proskauer Rose, which refers to the law firm of Proskauer Rose, LLP, which has an

office at One International Place, Boston, MA 02110-2600, and all employees and/or partners

thereof, including, but not limited to, Ira Akselrad, Mitchell Gaswirth, Michael Swiader,

Matthew Sabloff, Jay Waxenberg, Rory Judd Albert, and Janet Korins.

(7) RSM McGladrey, which refers to the accounting firm of RSM McGladrey, Inc., and

all employees and/or partners thereof, including, but not limited to, Ronald G. Wainwright, Jr.,

Donald Dwight, Joe Giso, David Sterling, Todd Jackson, Dave Klintworth, Joe Bodan, Don

Natenstedt, Bill Carter, Jef Flemmer, Roger Neumann, Joe Vegock, John Thomas, Steve

Schamberger, Pat Murphy, Kimpa Moss, Duane Tyler, Michael G. Belitsos, Richard How, Karen

Bowman, Bruce Jorth, and Frank Compiani.

(8) Bryan Cave, which refers to the law firm Bryan Cave, LLP, which has an office at 700

Thirteenth Street, N.W., Washington, DC 20005-3960, and all employees and/or partners

thereof, including, but not limited to, John P. Barrie, Kathleen M. Giancana, James R. Arnold,

and Elizabeth Ann Smith.

(9) Lord Bissell, which refers to the law firm of Lord Bissell & Brook, LLP, 111 South

Wacker Drive, Chicago, IL 60606, and all employees and/or partners thereof, including, but not

limited to, John Trustkowski, John Hughes, Douglas Chalmers, Bobbie Hirsh, and Sergei Mytko.

- 31 -

## INTERROGATORY NO. 24

Does Defendant contend that the Transactions were reported on Fidelity High Tech's Forms 1065 for the tax years ending December 21, 2001 and December 31, 2001 in a manner that was designed to reduce or minimize the risk of audit by the IRS? If so, set forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information requested is protected from disclosure by the governmental deliberative process privilege, the attorney work product privilege and/or the attorney-client privilege. The United States further objects to this interrogatory to the extent that it requests all the bases, facts and evidence supporting, the United States' legal contentions. The United States objects to this interrogatory as premature since discovery is still open in this case and expert depositions have not yet been taken by either party. The United States also notes that this interrogatory consists of two separate interrogatories, i.e., (1) whether the United States contends that that the Transactions were reported on Fidelity High Tech's Forms 1065 for the tax years ending December 21, 2001 and December 31, 2001 in a manner that was designed to reduce or minimize the risk of audit by the IRS and (2) if yes, the reasons for that contention. Notwithstanding and without waiving the foregoing objections and the general objections set forth above, and with the understanding that discovery is ongoing, the United States responds to this interrogatory as follows: The United States does contend that the Transactions were reported on Fidelity High Tech's Forms 1065 for the tax years ending December 21, 2001 and December 31, 2001 in a manner that was designed to reduce or minimize the risk of audit by the IRS. See the Expert Report of David LaRue, dated March 31, 2008, which thoroughly sets forth the principal bases, facts and evidence supporting that contention.

- 32 -

## INTERROGATORY NO. 25

If Defendant contends that Plaintiff's ability to hedge his concentrated position in EMC stock was not limited by the EMC Securities Trading Policy in effect for 2000 through 2006 (Bates numbers 011501 through 011502), set forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:** The United States objects to the interrogatories to the extent that the information requested is not relevant to this action and is also not reasonably calculated to lead to the discovery of admissible evidence since it seeks information relating to 2003, 2004, 2005 and 2006. The United States objects to this interrogatory to the extent that the information requested is protected from disclosure by the governmental deliberative process privilege, the attorney work product privilege and/or the attorney-client privilege. The United States further objects to this interrogatory to the extent that it requests all the bases, facts and evidence supporting, the United States' legal contentions. The United States objects to this interrogatory as premature since discovery is still open in this case and expert depositions have not yet been taken by either party. Notwithstanding and without waiving the foregoing objections and the general objections set forth above, and with the understanding that discovery is ongoing, the United States responds to this interrogatory as follows: The United States contends that the document produced with the Bates numbers 011501 through 011502 did not limit Plaintiff's ability from 2000 through 2002 to hedge his concentrated position in EMC stock because it is not addressed to plaintiff and it is not signed by plaintiff. Even assuming this document correctly reflects EMC's security trading policy during the period of 2000 -2002, it places no limits on a shareholder's hedging of his or her EMC stock position. Rather, it deals with EMC stock sales. Moreover, various documents in the record make clear that the plaintiff was not precluded from selling EMC stock and could sell

- 33 -

the stock at intervals during the year. See, e.g. Bates Nos. 1BWMS04273-274,

12CARRUTH060166, 12CARRUTH060174, 1HT000084 and 1HT00001. Moreover, it does

not appear that Mrs. Egan was covered by the trading policy since it applies to EMC employees

and members of the Board. See 1EGAN011501. Mrs. Egan resigned as a member of the EMC

board in the firm's first quarter of 2001. See 12CARRUTH060167.


## INTERROGATORY NO. 26

If Defendant contends that the Index A Trades or Option A Trades did not in fact occur,
set forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:**  The United States interprets this interrogatory to be the same in substance as

Interrogatory 10 and thus, our objections and responses to that interrogatory are incorporated

herein by reference.


## INTERROGATORY NO. 27

If Defendant contends that Index A did not realize a net gain of $14,643 as a result of the
January 31, 2001 trades (RCM 2001-01-31-07 and RCM 2001-01-31-06) and the February 12,
2001 trades (RCM 2001-02-12-04 and RCM 2001-02-12-05), set forth the bases for, and all facts
and evidence supporting, Defendant's Position.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege. The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

supporting, the United States' legal contentions. The United States objects to this interrogatory

- 34 -

as premature since discovery is still open in this case and expert depositions have not yet been

taken by either party. Notwithstanding and without waiving the foregoing objections and the

general objections set forth above, and with the understanding that discovery is ongoing, the

United States responds to this interrogatory as follows: The United States contends that Index A

realized a net gain of $14,643 as a result of the January 31, 2001 trades and the February 12,

2001 trades, before taking into account the various fees and costs paid to advisors to enter into

the transaction.


## INTERROGATORY NO. 28

If Defendant contends that Option A did not realize a net gain of $1,449,552 as a result of
the January 31, 2001 trades (RCM 2001-01-31-04 and RCM 2001-01-31-03) and the February
12, 2001 trades (RCM 2001-02-12-01 and RCM 2001-02-12-02), set forth the bases for, and all
facts and evidence supporting, Defendant's position.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege. The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

supporting, the United States' legal contentions. The United States objects to this interrogatory

as premature since discovery is still open in this case and expert depositions have not yet been

taken by either party. Notwithstanding and without waiving the foregoing objections and the

general objections set forth above, and with the understanding that discovery is ongoing, the

United States responds to this interrogatory as follows: The United States contends that Option A

realized a net gain of $1,449,552 as a result of the January 31, 2001 trades and the February 12,

- 35 -

2001 trades, before taking into account the various fees and costs paid to advisors to enter into the transaction.

## INTERROGATORY NO. 29

If Defendant contends that Refco did not act as an arms-length counterparty for the Index A Trades and Option A Trades, set forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information requested is protected from disclosure by the governmental deliberative process privilege, the attorney work product privilege and/or the attorney-client privilege. The United States further objects to this interrogatory to the extent that it requests all the bases, facts and evidence supporting, the United States' legal contentions. The United States objects to this interrogatory as premature since discovery is still open in this case and expert depositions have not yet been taken by either party. Notwithstanding and without waiving the foregoing objections and the general objections set forth above, and with the understanding that discovery is ongoing, the United States responds to this interrogatory as follows: The United States contends that additional fees were paid to Refco for the Index A Trades and Option A Trades, which is described in various documents as a "bid/ask" fee. The United Stated contends that the so-called bid/ask fee was calculated not on the individual option values, but on the difference between the two binary payout figures for the options within a given pair and that in each case, the bid/ask fee was 10% of this potential net payout. The United States contends that additional compensation in the form of the 10% bid/ask fee shows that Refco did not act as an arms-length counterparty

- 36 -

for the Index A Trades and Option A Trades. See the Expert Report of David DeRosa, dated

March 31, 2008, which notes that the fees charged by Refco were not competitively priced and

were materially excessive.  Exorbitant fees by one party are not normally consistent with an

arms-length transaction.


Dated: April 10, 2008

*Heather Vann*

HEATHER VANN
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-2822

3189121.1

CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing UNITED STATES' RESPONSE

TO SECOND SET OF INTERROGATORIES has been made upon the following by hand delivery,

this 10th day of April, 2008:

> Lena Amanti
> McKee Nelson LLP
> Suite 200
> 1919 M Street, NW
> Washington, DC 20036

*Heather Vann*
HEATHER L. VANN
Trial Attorney, Tax Division

# Exhibit F

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

FIDELITY HIGH TECH ADVISOR A FUND )
L.L.C., by the Tax Matters Partner, )
                               )
          Plaintiff, )
                               )
       v.                       )     Civil No. 06-40243-FDS
                               )                  06-40244-FDS
UNITED STATES OF AMERICA, )
                               )
          Defendant. )

**UNITED STATES RESPONSE TO PLAINTIFF'S
THIRD SET OF INTERROGATORIES**

        The United States, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure

and Rule 33.1 of the Local Rules of the United States District Court for the District of

Massachusetts, responds to Plaintiff's Third Set of Interrogatories as follows:

**GENERAL OBJECTIONS**

      1.    The United States objects to the interrogatories to the extent that the information

requested is not relevant to this action and is also not reasonably calculated to lead to the

discovery of admissible evidence.

      2.    The United States objects to the interrogatories to the extent that they seek

information that is protected from disclosure by the governmental deliberative process privilege.

      3.    The United States objects to the interrogatories to the extent they seek  information

that is protected from disclosure by the attorney work product privilege.

      4.    The United States objects to the interrogatories to the extent they seek information

that is protected from disclosure by the attorney-client privilege.

5. The United States objects to the interrogatories to the extent that they are overbroad, unduly burdensome, vague and/or ambiguous.

6. The United States objects to these interrogatories as premature since discovery is still open in this case and expert depositions have not yet been taken by either party.

7. The United States objects to the interrogatories to the extent they request "each" or "all" elements or facts supporting the United States' legal contentions. Contention interrogatories should ask only for the principal facts and principal materials supporting a party's contentions. *See e.g.*, *IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D.Kan.1998); *Bradley v. Val-Mejias*, 2001 WL 1249339 (D.Kan. 2001). *See also SJ Berwin & Co. v. Evergreen Entertainment Group, Inc.,* 1994 WL 185687, at *2 (S.D.N.Y. 1994) (contention interrogatories should not be a vehicle for requiring a party to regurgitate all factual information learned in discovery).

8. The United States objects to the interrogatories to the extent that they call for a legal conclusion.

9. The United States further objects to plaintiff's numbering of these interrogatories because many of plaintiff's interrogatories includes multiple subparts, so that these interrogatories are actually interrogatories numbers 8-48.

## DEFINITIONS

1.) The term "Fidelity High Tech" means Fidelity High Tech Advisor A Fund, LLC, which may have been formed in Delaware on July 19, 2000.

2.) The term "Fidelity High Tech Index" means Fidelity High Tech Index A Fund, LLC, which may have been formed in Delaware on July 20, 2000.

- 2 -

3.) The term "Fidelity High Tech Option" means Fidelity High Tech Option A Fund, LLC, which may have been formed in Delaware on July 19, 2000.

4.) The term "Other Taxpayers," as defined by Plaintiff means "the taxpayers identified in response to Interrogatory No. 19 as engaging in transactions alleged to have the same or similar pattern as the High Tech Transactions and all taxpayers subsequently identifie[d] as engaging in transactions following the same or similar alleged pattern." In our response to Interrogatory No. 19, dated April 10, 2008, defendant stated, *inter alia*:

> Thus far, we have identified the following similar transactions: Ronald McNeill; John "Sandy" McNeill; RM Portfolio, LLC; SM Portfolio LLC; Robert Garvy; Arbay LLC; RG Investments I, LLC; Sharon Grossinger; Gary Grossinger; Suzanne Grossinger; Caroline Grossinger Schiller; SGG Auto Trust; GG Auto Trust; CGS Auto Trust; Jacqueline Trading LLC; Gabriel Trading, LLC; Samuel Trading, LLC; Jacob Trading LLC, 2650 Lawrence LLC, Grossinger Motorcorp, Inc., Grossprops Associates, LLC, Irwin Grossinger Trust, Lunt Realty Corp., RM Equities, LLC, SM Equities, LLC, MFP Equities, LLC, McNeill Family Limited Partnership, RG Trading 2003 LLC, RG Investments 2003, LLC, JTB Investments 2002 LLC, JTB Trading, LLC, J.T. Burns, RBF Investments, LLC, RBF Trading, LLC, RB Forsland, LLC and Forsland Family 2002 Trust. All such evidence of participation in a transaction similar to the one at issue in the instant case by the foregoing persons or entities is already in possession of plaintiff.

## RESPONSE TO INTERROGATORIES

<u>INTERROGATORY NO. 30</u>

For all Other Taxpayers, set forth all facts and evidence that Defendant contends make these transactions similar or dissimilar to the High Tech Transactions, including the following:

- (a)    the date each Other Taxpayer entered into the transactions;
- (b)    the assets contributed by each Other Taxpayer to any partnership, limited liability company, or S corporation;
- (c)    the types of options purchased or sold by each Other Taxpayer as part of the transactions;
- (d)    the amount of gain or loss recognized by each Other Taxpayer in connection with the transactions;

- 3 -                                                3273170.1

(e)    the date any gain or loss was recognized;

(f)    the event or events that resulted in the recognition of gain or loss;

(g)    how each Other Taxpayer reported the transactions on its federal income tax and partnership returns;

(h)    the identity of law firm that opined on the transaction for each Other Taxpayer; and

(i)    the identity of each accounting firm or other professional firm that advised the Other Taxpayer with respect to the transactions.

**RESPONSE:**    The United States objects to this interrogatory on the ground that it represents nine separate interrogatories. The United States objects to this interrogatory on the ground that many of the terms incorporated therein are vague and ambiguous. The United States further objects to this interrogatory to the extent that the information requested is protected from disclosure by the governmental deliberative process privilege, the attorney work product privilege and/or the attorney-client privilege. The United States further objects to this interrogatory to the extent that it requests all the bases, facts and evidence supporting, the United States' legal contentions. The United States objects to this interrogatory to the extent it calls for a legal conclusion. The United States further objects to this interrogatory on the grounds that it is overbroad and unduly burdensome. The United States further objects to these interrogatories as premature since discovery is still open in this case and expert depositions have not yet been taken by either party.   Without waiving these objections, the identified transactions may be summarized as follows:

| Taxpayer(s) | Outline of Proposed Transaction (bates) | Date of Outline | Amount of basis bump for Stock Dribble | Investor Fact Sheet (bates) | Closing Binder (bates numbers) | Partnership Tax Return (bates) | Name of law firm issuing purported legal opinion | Name of Accounting Firm |
|---|---|---|---|---|---|---|---|---|
| Ronnie McNeill | 1ALPHA-DISK03-005736 TO 1ALPHA-DISK03-005737; 6RMS-F055545; 1DGI-02-15-022014 TO 1DGI-02-15-022015 | 10/30/01 | $56,000,000 see 4RSM-F042903 | 3GTFID-0025194 | RM Portfolio LLC Closing documents 1DIG-02-15-021801 to 1DIG-02-15-022013 | 1rsm-f003528 to 1rsm-f003538 | Proskauer Rose - see 1DGI-09-54-106011 TO 1DGI-09-54-106012 | RSM McGladrey - see 4RSM-F04242 |

- 4 -

3273170.1

| Taxpayer(s) | Outline of Proposed Transaction (bates) | Date of Outline | Amount of basis bump for Stock Dribble | Investor Fact Sheet (bates) | Closing Binder (bates numbers) | Partnership Tax Return (bates) | Name of law firm issuing purported legal opinion | Name of Accounting Firm |
|---|---|---|---|---|---|---|---|---|
| Sandy McNeill and McNeill Family Partnership | 1ALPHA-DISK03-005741 TO 1ALPHA-DISK03-005743; 6RMS-F055545 | 10/30/01 | $56,000,000 $1,150,000 - see 4RSM-F042903 | | SM PORTFOLIO 2001 LLC Closing Documents 1PR-Egan-0006399 to 1PR-Egan-0006592 | 4RSM-F041795 (reflects Form 1065 not filed) | Proskauer Rose - see 1DGI-09-54-106011 TO 1DGI-09-54-106012 | RSM McGladrey - see 4RSM-F04242 |
| Grossingers | Alpha3-09861-09869; 1dgi-02-17-024352 to 1dgi-02-17-024358 | 11/15/01 | $23,500,000 see 4RSM-F042903; See 5RSM-F045777 re 842,000 shs of Bank One stock sold | See Alpha3-09861-09869; 5RSM-F045801 to 5RSM-F045802 | 1dgi-02-17-024048 to 1dgi-02-17-024351 | 5RSM-F045688 to 5RSM-F045767 (containing copies of k1s) | Lord Bissell & Brook | RSM McGladrey - see 4RSM-F04242 |
| J.T. Burns and Forsland Family 2002 Trust | See 1DGI-06-36-061172 TO 1DGI-06-36-061178; see also 1DGI-06-36-062678; 1DGI-06-36-063050; 1DGI-09-55-110228 | 2/4/02 | 70,000,000 70,000,000 | 1DGI-06-36-061176 TO 061178 | See 1alpha-disk03-032269 to 1alpha-disk03-032825 | | Bryan Cave - see 1DGI-06-36-061008 | RSM McGladrey |
| Robert Garvy | See 1Alpha-disk04-025819 TO 1Alpha-disk04-025821; 1DGI-06-36-063064 TO 1DGI-06-36-063066 | 2/10/03 | 22,454,470 | | | | | RSM McGladrey |

## INTERROGATORY NO. 31

Does Defendant contend that Plaintiff and the Other Taxpayers had the same stated or represented business purpose? Set forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:** The United States objects to this interrogatory upon the ground that the phrase "same stated or represented business purpose" is vague and ambiguous. Without waiving this objection, the United States contends that both Plaintiff and the Other Taxpayers had no valid business purpose for entering into the referenced transactions. To the extent that Plaintiff or the Other Taxpayers have stated or represented anything to the contrary, the United States contends that such representations are false and/or fraudulent.

3273170.1

INTERROGATORY NO. 32

Does Defendant contend that Trilogy or Biosphere was involved in the High Tech Transactions or the transactions of the Other Taxpayers? If so, set forth the bases for, and all facts and evidence supporting, Defendant's position, including identification of all individuals employed by or exerting control over Trilogy or Biosphere and identification of the role that Trilogy or Biosphere played in the High Tech Transactions or the transactions of Other Taxpayers.

**RESPONSE:**    The United States objects to this interrogatory on the ground that it represents at least three separate interrogatories. The United States further objects to this interrogatory on the ground that the plaintiff fails to narrowly define for the purpose of this interrogatory Trilogy and Biosphere. The United States further objects on the ground that the terms "involved" and "exerted control" are vague and ambiguous. The United States further objects on the ground that discovery is ongoing, and the United States reserves the right to supplement this response. Without waiving the foregoing objections, the United States contends that Trilogy and Biosphere were involved in the implementation of the transaction implemented in 2003 by Robert Garvy with the assistance of Arbay LLC. See, e.g., email dated May 1, 2003, from Biosphere to DGI re payment made on behalf of Arbay today with a value date of May 5th 2003, at Bates 1Alpha-disk03-028132; email dated April 24, 2003, from Biosphere to Helios re Garvy Documents at Bates 1DGI-06-36-063729.

INTERROGATORY NO. 33

State all facts showing that Irwin Rosen had knowledge of the facts regarding the High Tech Transactions.

3273170.1

**RESPONSE:** The United States objects to this interrogatory to the extent that it requests all the facts and evidence supporting the United States' legal contentions. The United States further objects on the ground that the interrogatory is overbroad and unduly burdensome. Without waiving the foregoing objections, in 2001, Irwin Rosen was a Vice-President of The Diversified Group Incorporated. As such, Mr. Rosen would have had knowledge of all of DGI's tax-shelter transactions, including Fidelity High Tech.


## INTERROGATORY NO. 34

Does Defendant contend that it is unusual for an exchange-traded option to have a negative expected value at the time of inception? If so, set forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:**    The United States objects to this interrogatory upon the ground that the options at in the High Tech transaction here were not "exchange-traded options." As such, the interrogatory is an improper hypothetical. Interrogatories calling for an opinion or contention based on hypothetical facts are always improper. *See, e.g., Mobil Oil Corporation v. Department of Energy*, 1982 W.L. 1135 (and cases cited therein.); *Kendrick v. Sullivan*, 125 F.R.D. at 3; *Abbott v. United States*, 177 F.R.D. 92, 93-94. The United States further objects to this interrogatory upon the ground that the terms "unusual" and "negative expected value" are vague and ambiguous. The United States further objects to this interrogatory to the extent that it requests all the facts and evidence supporting the United States' legal contentions.

3273170.1

INTERROGATORY NO. 35

Does Defendant contend that in 2002 there were transfers of partnership interests in High

Tech among its members? If so, set forth bases for, and all facts and evidence supporting,

Defendant's position.

**RESPONSE:**    The United States objects to this interrogatory on the ground that it is premature,

as discovery is ongoing. Without waiving the foregoing objection, the United States is not aware

of transfers in 2002 of partnership interests in High Tech among its members.


INTERROGATORY NO. 36

Does Defendant contend that the Index A Trades and Option A Trades produced net

losses? If so, set forth the bases for, and all facts and evidence supporting, Defendant's position.

RESPONSE: Yes. The United States objects to this interrogatory because it calls for all facts

and evidence supporting the United States' contentions. Without waiving the United States'

objection, the bases for, and the facts and evidence supporting, Defendant's position is detailed

in the expert reports of Kolbe and Rausser. See Rausser Initial Report, submitted March 31,

2008, at pp. 25-28; Kolbe Initial Report, submitted March 31, 2008, at pp. 31-39; Rausser

Rebuttal Report, submitted April 30, 2008, at pp. 3-4; Kolbe Rebuttal Report, submitted April

30, 2008, at pp. 4-12.


INTERROGATORY NO. 37

Identify each statement, written or oral, made by or attributed to KPMG that Defendant

3273170.1

contends shows that KPMG has stated that the High Tech Transactions, or alleged similar

transaction, constituted a sham.

**RESPONSE:**   The United States objects to this interrogatory on the ground that it is overbroad

and unduly burdensome.  The United States further objects on the ground that the interrogatory is

vague and ambiguous.  Without waiving the foregoing objections, the report prepared by the U.S.

Senate's Permanent Subcommittee on Investigations, entitled *THE ROLE OF PROFESSIONAL*

*FIRMS IN THE U.S. TAX SHELTER INDUSTRY*, details many statements, written and oral, that

show that KPMG had knowledge that the substance of its tax-shelter products, like the Fidelity

High Tech product, did not mirror their form and were shams.

INTERROGATORY NO. 38

        Does Defendant contend that Index A and Option A held call options?  If so, set forth the

bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:**   No.

INTERROGATORY NO. 39

        Does Defendant contend that Internal Revenue Code section 988 applies to the High Tech

Transactions?  If so, set forth the bases for, and all facts and evidence supporting, Defendant's

position.

**RESPONSE:**   No.

- 9 -

INTERROGATORY NO. 40

Does Defendant contend that the High Tech Transactions involved a termination of gain legs of the option spreads followed by a replacement of the terminated legs with legs providing High Tech with the same legal entitlements as those provided by the terminated legs? If so, set forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:**  No.

INTERROGATORY NO. 41

Does Defendant contend that High Tech reported net losses from the Index A Trades and Option A Trades on its December 21, 2001 or its December 31, 2002 Schedules K-1? Set forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:**  The United States objects to this interrogatory as vague and ambiguous. The United States further objects to the extent the interrogatory calls for all facts and evidence supporting the United States' legal position. Without waiving this objection, the United States responds as follows: No, but the United States contends that plaintiff reported losses that may be related to the Index A Trades and Option A Trades on its December 21, 2001 or its December 31, 2002 Schedules K-1, and also claimed an inflated non-economic basis from the Index A Trades and Option A Trades on its December 21, 2001 and December 31, 2002 Forms 1065.

INTERROGATORY NO. 42

Does Defendant contend that an investor entering into an option transaction considers

3273170.1

data regarding the results of similar transactions entered into by other persons? If so, set for the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information requested is protected from disclosure by the governmental deliberative process privilege, the attorney work product privilege and/or the attorney-client privilege. The United States further objects to this interrogatory to the extent that it requests all the bases, facts and evidence supporting, the United States' legal contentions. The United States objects to this interrogatory to the extent it calls for a legal conclusion. The United States objects to this interrogatory on the grounds that it is overbroad and unduly burdensome. The United States objects to this interrogatory as premature since discovery is still open in this case and expert depositions have not yet been taken by either party. The United States further objects to the extent this is a hypothetical interrogatory. The United States further objects because this interrogatory is vague and ambiguous.

Without waiving this objection, the United States states prior performance of comparable investments is a routinely-used tool in considering new investments. Investors commonly consider whether a proposed investment has generated positive returns historically and therefore may be expected to do so going forward.

3273170.1

## INTERROGATORY NO. 43

State the grounds, including other relevant expert reports and literature in the expert's field, upon which Defendant, or its experts, rely to support the claim that "other taxpayer" evidence is a type of data reasonably relied upon by experts in forming opinions such as those opinions being expressed in the case.

**RESPONSE:** See the United States' Combined Response in Opposition To Plaintiff's Motion to Exclude the Expert Testimony and Reports of Dr. A. Lawrence Kolbe and Dr. Gordon Rausser at pp. 25-27, and the cited declarations of Dr. A. Lawrence Kolbe and Dr. Gordon Rausser wherein it is stated "that the comparison of similar transactions is 'an essential tool used by financial economists in their work' and is a 'mainstream activit[y] of financial economics.'" (Declaration citations omitted.)

## INTERROGATORY NO. 44

Does Defendant contend that Line 25 of the Schedules K-1 for High Tech's December 21, 2001 tax year should have been completed? If so, set forth the bases for, and all facts and evidence supporting, Defendant's position, including what information should have been included on Line 25.

**RESPONSE:**   The United States objects to this interrogatory to the extent that the information requested is protected from disclosure by the governmental deliberative process privilege, the attorney work product privilege and/or the attorney-client privilege. The United States further objects to this interrogatory to the extent that it requests all the bases, facts and evidence supporting, the United States' legal contentions. The United States objects to this interrogatory to the extent it calls for a legal conclusion. The United States objects to this interrogatory on the

- 12 -

grounds that it is overbroad and unduly burdensome. The United States objects to this interrogatory as premature since discovery is still open in this case and expert depositions have not yet been taken by either party.

Without waiving these objections, the United States does contend that Line 25 of the Schedules K-1 for High Tech's December 21, 2001 tax year should have been completed. The 2001 Form 1065 Instructions expressly direct a partnership to enter on the line 25 supplemental Information space of Schedule K-1, or on an attached schedule if more space is needed, "[a]ny information or statements a partner needs to comply with section 6111 (registration of tax shelters) or section 6662(d)2)(B)(ii) (regarding adequate disclosure of items that may cause an understatement of income tax)." See Bates 1KPMG-F-00010360.

Without waiving these objections, the United States further states that the High Tech Transaction does cause an understatement of tax. Moreover, it is a listed transaction and also should have been disclosed by plaintiff on line 25 for this reason insofar as the transaction was designed to create a phantom $160 million step-up in the basis of low basis-stock contributed to the partnership for the sole and unlawful purpose of evading federal income tax. See Bates 1BWMS03770 to 03771.

3273170.1

INTERROGATORY NO. 45

Does Defendant contend that High Tech's tax returns for its December 21, 2001 and

December 31, 2002 tax years did not provide the information necessary to determine how the

capital account balances reported on Item J of members' Schedules K-1 were calculated? If so,

set forth the bases for, and all facts and evidence supporting, Defendant's position.

**RESPONSE:**   The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege.  The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

supporting, the United States' legal contentions.  The United States objects to this interrogatory

to the extent it calls for a legal conclusion. The United States objects to this interrogatory on the

grounds that it is overbroad and unduly burdensome. The United States objects to this

interrogatory as premature since discovery is still open in this case and expert depositions have

not yet been taken by either party.

Without waving these objections, the United States states that Item J(a) of the Form K-1

for Maureen Egan for the period ending December 21, 2001, incorrectly represents that Mrs.

Egan did not have a capital account as of the beginning of the December 21, 2001 tax year.  A

memorandum dated January 24, 2001, from Pat Shea to Mike Egan states:

> On Sept. 8, 2000 MEE86REVTST transferred 1,999,800 shares of EMC to
> Fidelity High Tech Advisor A Fund –
>
> On Sept. 8, 2000 Dick transferred his Goldman Account 20, 200 shares of EMC to
> Fidelity High Tech Advisor A Fund.
>
> The stock is sitting in the Fidelity High Tech Advisor A fund in the respective

3273170.1

percentages — 99% MEE86REVTST 1% Richard J. Egan —

We intentionally want the transaction between Dick and Maureen so that the trade only gets reported on one 1040 return — elegance in reporting – not exposing other family entities to IRS scrutiny.

See Bates 1BWMS03770 to 03771.

Without waving these objections, the United States further states Item J(b) of the Form

K-1 for Maureen Egan for the period ending December 21, 2001, incorrectly represents that

during the year ending December 21, 2001, Maureen Egan contributed capital to the partnership

int the amount of $166,935,575.

Without waving these objections, the United States further states that Item J(c) of the

Form K-1 for Maureen Egan for the period ending December 21, 2001, represents that during the

year ending December 21, 2001, Maureen Egan's share of lines 3, 4 and 7, Form 1065, Schedule

M-2, as -$161,923,687.  Schedule M-2 - line 7 of the Form 1065 of FHTAA for the period

ending December 21, 2001 inaccurately describes the decrease in the capital account as "DUE

TO SINGLE MEMBER LLC'S SETTLEMENT OF FOREIGN EXCHANGE OPTIONS."  See

Bates 1Carruth042537.  The High Tech transaction does not in fact involve any foreign exchange

options.


INTERROGATORY NO. 46

Identify each third party with whom each of Defendant's experts (or his agents) communicated for the purpose of gathering information for consideration in his expert opinions and reports, the dates upon which each communication occurred, and the substances of each communication.

**RESPONSE:**   None.

- 15 -

INTERROGATORY NO. 47

Does Defendant contend that Plaintiff and Maureen Egan were required to identify the source of their basis in their High Tech interests on their 2001 and 2002 individual tax returns? If so, set forth the bases for, and all facts and evidence supporting, Defendant's position, including where and how this information should have been identified.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege. The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

supporting, the United States' legal contentions. The United States objects to this interrogatory

to the extent it calls for a legal conclusion. The United States objects to this interrogatory on the

grounds that it is overbroad and unduly burdensome. The United States objects to this

interrogatory as premature since discovery is still open in this case and expert depositions have

not yet been taken by either party.

Without waiving these objections, the United States does contend that Plaintiff and

Maureen Egan were required to identify the source of their basis in their High Tech interests on

their 2001 and 2002 individual tax returns for the reasons stated in our response to Interrogatory

44.

INTERROGATORY NO. 48

State the facts, if any, showing that Proskauer Rose LLP, or any of its lawyers, believed that the tax opinion it issued to Plaintiff and Maureen Egan concerning High Tech was not correct.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information

3273170.1

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege. The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

supporting, the United States' legal contentions. The United States objects to this interrogatory

to the extent it calls for a legal conclusion. The United States objects to this interrogatory on the

grounds that it is overbroad and unduly burdensome. The United States objects to this

interrogatory as premature since discovery is still open in this case and expert depositions have

not yet been taken by either party.   The United States further objects to this interrogatory

because the term "correct" is undefined and is vague and ambiguous in this context.  The United

States further objects because the interrogatory assumes facts that have not been established, such

as that the opinion was issued to Richard Egan and Maureen Egan.


## INTERROGATORY NO. 49

Does Defendant contend that it was improper for High Tech to capitalize the fees it paid
in connection with the High Tech Transactions? If so, set forth the bases for, and all facts and
evidence supporting, Defendant's position.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege.  The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

supporting, the United States' legal contentions.  The United States objects to this interrogatory

to the extent it calls for a legal conclusion. The United States objects to this interrogatory on the

grounds that it is overbroad and unduly burdensome. The United States objects to this

interrogatory as premature since discovery is still open in this case and expert depositions have

not yet been taken by either party.

Without waiving these objections, the United States does contend that it was improper for

High Tech to capitalize the fees it paid in connection with the High Tech Transactions. The fees

are not deductible, regardless as to how they are reported, because they were incurred in

connection with a sham transaction.


## INTERROGATORY NO. 50

Identify and describe each claim, argument, or position that Defendant is asserting in this
case that is not contained in Exhibit A to the 2001 and 2002 High Tech notices of final
partnership administrative adjustment, and identify all material facts support each claim,
argument, or position.

**RESPONSE:** The United States objects to this interrogatory to the extent that the information

requested is protected from disclosure by the governmental deliberative process privilege, the

attorney work product privilege and/or the attorney-client privilege. The United States further

objects to this interrogatory to the extent that it requests all the bases, facts and evidence

supporting, the United States' legal contentions. The United States objects to this interrogatory

to the extent it calls for a legal conclusion. The United States objects to this interrogatory on the

grounds that it is overbroad and unduly burdensome. The United States objects to this

interrogatory as premature since discovery is still open in this case and expert depositions have

not yet been taken by either party. The United States reserves the right to amend its response to

3273170.1

this interrogatory following the completion of discovery.

Dated: May 12, 2008

_Heather Vann (BER)_

HEATHER L. VANN
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-2822
Heather.Vann@usdoj.gov

3273170.1

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing UNITED STATES' RESPONSE

TO PLAINTIFF'S THIRD SET OF INTERROGATORIES has been made upon the following via

hand delivery, this 12th day of May, 2008:

> Lena Amanti
> MCKEE NELSON LLP
> 1919 M Street, N.W., Suite 200
> Washington, D.C.  20036

BARRY E. REIFERSON
Trial Attorney, Tax Division

Exhibits G and H
filed under seal

# Exhibit I

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FIDELITY INTERNATIONAL CURRENCY<br>ADVISOR A FUND, L.L.C., by the Tax Matters<br>Partner,<br><br>          Plaintiff,<br><br>     v.<br><br>UNITED STATES OF AMERICA,<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Nos. 05-40151-FDS
06-40130-FDS

**UNITED STATES' RESPONSE TO PLAINTIFF'S
SECOND SET OF REQUESTS FOR ADMISSION**

The United States, pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure

and Rule 36.1 of the Local Rules of the United States District Court for the District of

Massachusetts, responds to Plaintiff's Second Set of Requests for Admission (Requests) by

denying every allegation in the Requests, except to the extent expressly admitted, and answers

the individually numbered paragraphs set forth in the Requests, which are restated herein, as

follows:

Request for Admission No. 26

In September and October of 2001, Plaintiff and his wife, both personally and through
entities in which they had an ownership interest, held over 15 million shares of EMC stock.

**RESPONSE:**    The United States admits that in the fall of 2001, following the exercise of his

EMC stock options, Richard and Maureen Egan beneficially owned approximately 25,000,000

shares of EMC stock. Because many of the trust instruments and other documents governing

interlocking entities and the ownership of EMC stock and other assets by the taxpayer and his

2970208.1

- 2 -

family are not available in the documents produced by various parties in this matter, it is not

possible at this time to determine the precise number of shares beneficially owned by the

taxpayer. However, it is possible to estimate ownership from selected documents. See Expert

Report of Gordon Rausser, Ph.D., dated August 7, 2007, p. 70, fn. 147 and accompanying text.

See also Exhibit 929 to the deposition of Richard Egan. Otherwise, the United States denies the

allegations of this Request.

<u>Request for Admission No. 27</u>

Richard Egan served as U.S. Ambassador to Ireland from when he was sworn in on
August 30, 2001 until he resigned on January 31, 2003.

**RESPONSE:** Denies.

<u>Request for Admission No. 28</u>

With the exception of FICA A Fund, no member of any of the limited liability companies
Defendant identified in Appendix C of its Motion to Compel Production of Documents, *United
States v. Diversified Group, Inc.,* No. 07-40004 (D. Mass June 15, 2007), had a concentrated
position in EMC stock in 2000 and 2001.

**RESPONSE:** Denies. Currently, the United States is not qualified to attest to the accuracy of

the statements made in this Request. However, upon being shown credible supporting

documentation, the United States is prepared to enter into a stipulation with respect to the

statements made in this Request.

2970208.1

- 3 -

<u>Request for Admission No. 29</u>

The HOMER transaction involves the purchase of offsetting options.

**RESPONSE:** The United States objects to this request for admission upon the ground that the information requested is not relevant to this action and is also not reasonably calculated to lead to the discovery of admissible evidence and, therefore, is outside the scope of Rule 26(b)(1) of the Federal Rules of Civil Procedure.

<u>Request for Admission No. 30</u>

The HOMER transaction is not a listed transaction.

**RESPONSE:** The United States objects to this request for admission upon the ground that the information requested is not relevant to this action and is also not reasonably calculated to lead to the discovery of admissible evidence and, therefore, is outside the scope of Rule 26(b)(1) of the Federal Rules of Civil Procedure.

<u>Request for Admission No. 31</u>

The PICO transaction involves the purchase of offsetting options.

**RESPONSE:** The United States objects to this request for admission upon the ground that the information requested is not relevant to this action and is also not reasonably calculated to lead to the discovery of admissible evidence and, therefore, is outside the scope of Rule 26(b)(1) of the Federal Rules of Civil Procedure.

2970208.1

- 4 -

<u>Request for Admission No. 32</u>

The PICO transaction is not substantially similar to Notice 2000-44.

**RESPONSE:** The United States objects to this request for admission upon the ground that the information requested is not relevant to this action and is also not reasonably calculated to lead to the discovery of admissible evidence and, therefore, is outside the scope of Rule 26(b)(1) of the Federal Rules of Civil Procedure.

<u>Request for Admission No. 33</u>

FICA A Fund's 2001 Form 1065 and accompanying schedules disclosed that FICA A Fund had allocated a large taxable gain to a foreign partner and a large taxable loss to Plaintiff.

**RESPONSE:** Denies.

<u>Request for Admission No. 34</u>

Sidley Austin issued an opinion letter addressed to Plaintiff stating that Plaintiff was more likely than not entitled to report a taxable loss as a result of his investment in FICA A Fund.

**RESPONSE:** Denies.

<u>Request for Admission No. 35</u>

Plaintiff had an attorney-client relationship with Sidley Austin.

**RESPONSE:** Denies.

2970208.1

- 5 -

<u>Request for Admission No. 36</u>

Sidley Austin has not produced any documents evidencing that it advised Plaintiff that Plaintiff could not rely on any opinion issued by Sidley Austin or any of Sidley Austin's partners.

**RESPONSE:**  Denies.


<u>Request for Admission No. 37</u>

Plaintiff was advised that, in addition to Sidley Austin, at least three other law firms would be willing to provide an opinion stating that the proposed tax treatment of the FICA A Fund transaction more likely than not was proper.

**RESPONSE:**  Denies.


<u>Request for Admission No. 38</u>

Proskauer Rose issued an opinion letter addressed to Plaintiff stating that the FICA A Fund transaction more likely than not was not substantially similar to the transactions described in Notice 2000-44.

**RESPONSE:**  Denies.


<u>Request for Admission No. 39</u>

Sidley Austin is producing documents to Defendant relating to Plaintiff and the transactions at issue in this case without a subpoena having been issued to Sidley Austin by Defendant in this case.

**RESPONSE:**  The United States admits that Sidley Austin is producing documents to

Defendant in this litigation without a subpoena having been issued to Sidley Austin by the

Defendant in this case.  The United States further admits that these documents include

2970208.1

documents relating to the development, marketing and implementation of the FDIS transactions,

including plaintiff's FDIS transction.


*Heather L. Vann*

HEATHER L. VANN
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-2822

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing UNITED STATES' RESPONSE

TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION has been made upon the

following by via hand delivery, this 8th day of January, 2008:

Lena Amanti
MCKEE NELSON LLP
1919 M Street, N.W. Ste 200
Washington, D.C.


HEATHER VANN
Trial Attorney, Tax Division

# Exhibit J

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FIDELITY INTERNATIONAL CURRENCY      )
ADVISOR A FUND, L.L.C., by the Tax       )
Matters Partner,                                        )
                                                               )
                        Plaintiff,                         )          Civil No. 05-40151
                                                               )
        v.                                                     )          Judge Saylor
                                                               )
UNITED STATES OF AMERICA,             )
                                                               )
                        Defendant.                      )

UNITED STATES' RESPONSE TO PLAINTIFF'S
SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS NOS. 6-30

        The United States, pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure

and Rule 34.1 of the Local Rules of the United States District Court for the District of

Massachusetts, responds to Plaintiff's Second Set of Requests for Production of Documents,

Nos. 6-30, as follows:

                                **GENERAL OBJECTIONS**

        1.        The United States objects to these requests to produce on the ground that the

materials requested are not relevant to this action and are also not reasonably calculated to lead to

the discovery of admissible evidence in this suit for adjustment of a final partnership

administrative adjustment (FPAA).  In a federal tax case, any challenge by a taxpayer to the

Commissioner's determination that taxes are owing must be resolved in a trial *de novo*, rather

than by review of an existing administrative record.  *See e.g., Revell, Inc. v. Riddell*, 273 F.2d

649, 658-59 (9th Cir. 1959); *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327-28

(1974).  An FPAA is the equivalent of a notice of deficiency in a refund action.  *In re G-1*

1

*Holdings, Inc.*, Civ. No. 02-03082 (WGB) (D.N.J. July 16, 2004). In an FPAA action, the partner must establish that the FPAA is incorrect, which, in turn, requires the court to apply the law to the facts of the case. The reasons for the Commissioner's determination are not relevant because the court does not review the administrative policy and procedure of that determination. *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327-2.

The United States also objects to those requests that ask for "records, documents, and materials" relating to certain IRS Notices and regulations, which would include internal IRS and Treasury memoranda and analyses, because it seeks internal documents containing opinions, interpretations, and deliberations of IRS and Treasury employees. Such documents have been repeatedly held to be neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in a federal tax suit, and thus not discoverable. *Ruth v. United States*, 823 F.2d 1091, 1094 (7th Cir. 1987); *ISI Corporation v. United States*, 503 F.2d 558, 559 (9th Cir. 1974), *aff'g*, 31 A.F.T.R.2d 73-635 (N.D. Cal. 1972); *Vienna Sausage Manufacturing Co. v. United States*, (Civil No. 81-C-6942, USDC N.D. Ill. June 9, 1983); *Garrity v. United States*, 46 A.F.T.R.2d 80-5145 (E.D. Mich. 1980); *Simons-Eastern Co. v. United States*, 55 F.R.D. 88 (N.D. Ga. 1972); *Cf. Hernandez v. Commissioner*, 490 U.S. 703 n.13 (1989)("[i]n ascertaining the IRS' justifications for its administrative practice, our practice is to rely on the agency's official rulings, not on the unofficial interpretations of particular IRS officials.")

2.    The United States also objects to the production of many of the materials requested on the ground that they are protected from disclosure by the governmental deliberative process privilege. In federal tax cases the governmental deliberative process privilege has been held to preclude discovery of IRS employees' predecisional opinions and deliberations. *ISI*

1861365.1

*Corporation v. United States*, 503 F.2d 558, 559 (9th Cir. 1974), *aff'g*, 31 A.F.T.R.2d 73-635

(N.D. Cal. 1972); *Weir Foundation v. United States*, 508 F.2d 894, 895 n.2 (2d Cir. 1974), *aff'g*,

72-1 U.S.T.C. ¶8,435 (S.D.N.Y. 1972); *Piks Corp. v. United States*, 50 A.F.T.R.2d 82-5230

(N.D. Ohio 1982); *Rodgers v. Hyatt*, 91 F.R.D. 399, 404-06 (D. Colo. 1980); *Simons-Eastern Co.

v. United States*, 55 F.R.D. 88 (N.D. Ga. 1972); *Detroit Screwmatic Co. v. United States*, 49

F.R.D. 77 (S.D.N.Y. 1970). *Cf. Green v. Internal Revenue Service*, 556 F. Supp. 79, 84-85 (N.D.

Ind. 1982), *aff'd* 734 F.2d 18 (7th Cir. 1984)(FOIA action).

      The governmental deliberative process privilege is a qualified privilege, which generally

exempts from disclosure communications that are part of the decision-making process of a

governmental agency. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150-152; *United States v.

Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993). The privilege is designed to encourage frank and

uninhibited communication among governmental officials in the course of creating public policy.

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. at 151-152; *Enviro Tech Intern., Inc. v. U.S. E.P.A.*,

371 F.3d 370, 375 (7th Cir. 2004).

      Where the privilege applies to materials requested to be produced, a court must balance

the purpose of the privilege against the "objective" need (if any) for the information in the

litigation. *United States v. Leggett and Platt, Inc.*, 542 F.2d 655, 658-59 (6th Cir. 1976). Where

the materials requested to be produced are "objectively" irrelevant to the resolution to any of the

issues in the litigation, as those requested here, the party requesting the documents cannot, as a

matter of law, make a showing of need. *United States v. Leggett and Platt, Inc.*, 542 F.2d at

658-59.

<center>3</center>

<div align="right">1861365.1</div>

3.       The United States also objects to the requests as overly burdensome.  In determining whether documents are predecisional and deliberative, and therefore, subject to the governmental deliberative process privilege, the agency first considers whether the document falls within the scope of the deliberative process privilege; that is, whether the document was generated before the adoption of an agency policy or position and whether the document reflects the give-and-take of the consultation process leading up to the formulation of an agency policy or position.  The agency also considers whether the document is recommendatory in nature or is a draft of what may become a final document; whether the document weighs the pros and cons as to the agency's ultimate adoption of one viewpoint or another; and whether the material is so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication within the agency.   The United States has asked the IRS and Treasury to review their files to identify any responsive documents and to determine whether to assert a formal claim of privilege to any of these documents.

## RESPONSE TO REQUESTS

Request No. 6: A copy of the CD, or all documents contained on the CD, referenced in Bates-numbered document 1IRS1159, sent from Tim Erickson to Bill Conway, which Mr. Erickson describes as "containing information [he] received from other promoter cases regarding your investor, Richard Egan, for the 2001 tax year."

Response:

The United States has attempted and is continuing to attempt to locate this CD and all the documents contained on it.  We will timely supplement our response if we find either.

Request No. 7: All records, documents, and materials contained in the files maintained by the following individuals regarding the FICA A Fund Examination:
- James Fee
- William Kahnke

1861365.1

- John Klotsche
- Heather Malloy
- Denis McSweeney
- Deborah Morrill
- Henry Singleton
- Jonathan Zelnik

<u>Response</u>:

The documents requested, if any, to the extent not privileged, were produced in the

exchange of documents described in our initial disclosures or in response to the Plaintiff's First

Set of Requests for Production of Documents.

<u>Request No. 8</u>: All records, documents, and materials collected, created, or
maintained by the government regarding Samuel Mahoney, Martin Hawkes, or
Biosphere Finance Ltd. This request includes all inter- and intra-governmental
communications regarding Samuel Mahoney, Martin Hawkes, or Biosphere Finance
Ltd., including, but not limited to, communications involving any of the following
individuals:
- John Aletta
- William Conway
- Linda Garrard
- Peter MacIntyre
- John McNamara
- Denis McSweeny
- Carol Poindexter

<u>Response</u>:

The United States objects on the ground that the request is overly broad. The United

States also objects to this request because it seeks documents that constitute return or return

information protected from disclosure by 26 U.S.C. section 6103 and may seek documents to

which we do not have access that are protected from disclosure by the law enforcement privilege

and/or Rule 6(e) of the Federal Rules of Criminal Procedure. Responsive documents from the

examination of Fidelity International's 2001 income tax return, if any, to the extent not

<div align="center">5</div>

<div align="right">1861365.1</div>

privileged, were produced in the exchange of documents described in our initial disclosures or in response to the Plaintiff's First Set of Requests for Production of Documents.

Request No. 9: All records, documents, and materials evidencing payments made to Samuel Mahoney in connection with his investment in FICA A Fund.

Response:

The documents requested, if any, to the extent not privileged, were produced in the exchange of documents described in our initial disclosures or in response to the Plaintiff's First Set of Requests for Production of Documents.

Request No. 10: All records, documents, and materials collected, created, or maintained by the IRS in connection with the entities listed in Appendix A to Attachment to Subpoena to KPMG for Production of Documents, issued by the government to KPMG on March 31, 2006, a copy of which is attached as Exhibit A for reference.

Response:

The United States objects to this request to the extent it seeks documents that constitute return or return information protected from disclosure by 26 U.S.C. section 6103. Responsive documents from the examination of Fidelity International's 2001 income tax return, if any, to the extent not privileged, were produced in the exchange of documents described in our initial disclosures or in response to the Plaintiff's First Set of Requests for Production of Documents.

Request No. 11: All opinions prepared by any professional firm in the possession, custody, or control of the Government regarding the tax treatment of or reporting requirements for any SOS, FDIS, or FOCUS investment strategy.

Response:

The documents requested, to the extent not privileged, were produced in the exchange of documents described in our initial disclosures or in response to the Plaintiff's First Set of Requests for Production of Documents. The United States otherwise objects to this request

6                                              1861365.1

because it seeks documents that constitute return or return information protected from disclosure by 26 U.S.C. section 6103 and may seek documents to which we do not have access that are protected from disclosure by the law enforcement privilege and/or Rule 6(e) of the Federal Rules of Criminal Procedure or by Rule 26(b)(4)(B) of the Federal Rules of Civil Procedure.

> **Request No. 12:** All expert reports obtained by the Government in connection with its examination of any SOS, FDIS, or FOCUS investment strategy, regardless of whether the expert was engaged by the Government or any other person.  If the expert report is in the public record, all records, documents, and materials underlying the report.

**Response:**

The United States objects to this request because it seeks documents that constitute return or return information protected from disclosure by 26 U.S.C. section 6103 and may seek documents to which we do not have access that are protected from disclosure by the law enforcement privilege and/or Rule 6(e) of the Federal Rules of Criminal Procedure or by Rule 26(b)(4)(B) of the Federal Rules of Civil Procedure.

> **Request No. 13:** All expert reports obtained by the Government regarding the treatment of short positions in connection with the Government's examination of any SOS, FDIS, or FOCUS investment strategy, regardless of whether the expert was engaged by the Government or any other person.  If the expert report is in the public record, all records, documents, and materials underlying the report.

**Response:**

The United States objects to this request because it seeks documents that constitute return or return information protected from disclosure by 26 U.S.C. section 6103 and may seek documents to which we do not have access that are protected from disclosure by the law enforcement privilege and/or Rule 6(e) of the Federal Rules of Criminal Procedure or by Rule 26(b)(4)(B) of the Federal Rules of Civil Procedure.

1861365.1

Request No. 14: All analyses by the Government of SOS, FDIS, or FOCUS investment strategies, including, but not limited to, records, documents, and materials reflecting consideration by the IRS.

Response:

The United States objects to this request because it seeks documents that contain return or return information protected from disclosure by 26 U.S.C. section 6103 and that are protected by the deliberative process privilege, the attorney-client privilege, and the attorney work product doctrine. Responsive documents from the examination of Fidelity International's 2001 income tax return, if any, to the extent not privileged, were produced in the exchange of documents described in our initial disclosures or in response to the Plaintiff's First Set of Requests for Production of Documents.

Request No. 15: All records, documents, and materials underlying the IRS's determination, if any, that this case involves a transaction that is the same as or substantially similar to a transaction described in Notice 2000-44.

Response:

The United States objects to this request because it seeks documents that are not relevant or likely to lead to the discovery of admissible evidence. This is a de novo proceeding in which Richard Egan has the burden of proving that Fidelity International was correct in reporting, among other things, that he lost $158,630,921 in 2001. Counsel for the United States has, in any case, attempted to produce everything in the administrative file to the extent not privileged. Accordingly, documents responsive to this request, if any, to the extent not privileged, were produced in the exchange of documents described in our initial disclosures or in response to the Plaintiff's First Set of Requests for Production of Documents.

8

1861365.1

Request No. 16: All records, documents, and materials concerning the issuance or interpretation of Notice 2000-44.

Response:

As explained in the general objections, the United States objects to this request to produce on the ground that the materials requested are not relevant to the subject matter of this litigation and are not reasonably calculated to lead to the discovery of admissible evidence as is required by Rule 26(b)(1) of the Federal Rules of Civil Procedure. As also explained in the general objections, the United States objects to the disclosure of many of the documents requested to be produced by this request (either in whole or part) on the ground that they are protected from disclosure by the governmental deliberative process privilege. Without waiving these objections, the United States is producing herewith a CD which contains a privilege log which details all of the documents generated by the Internal Revenue Service relating to this request which are being withheld by the United States as privileged. All other documents generated by the Internal Revenue Service related to this request are being produced on the CD. See attached CD and summary table detailing the contents of he CD.

Request No. 17: All records, documents, and materials concerning the issuance or interpretation of Chief Counsel Notice 2003-20.

Response:

As explained in the general objections, the United States objects to this request to produce on the ground that the materials requested are not relevant to the subject matter of this litigation and are not reasonably calculated to lead to the discovery of admissible evidence as is required by Rule 26(b)(1) of the Federal Rules of Civil Procedure. As also explained in the

9                                                    1861365.1

general objections, the United States objects to the disclosure of many of the documents

requested to be produced by this request (either in whole or part) on the ground that they are

protected from disclosure by the governmental deliberative process privilege. Without waiving

these objections, the United States is producing herewith a privilege log which details all of the

documents generated by the Internal Revenue Service relating to this request which are being

withheld by the United States as privileged. All other documents generated by the Internal

Revenue Service related to this request are being produced on the CD. See attached CD and

summary table detailing the contents of he CD.

   **Request No. 18**: All records, documents, and materials concerning the
issuance or interpretation of Announcement 2004-46.

   **Response**:

   The United States objects to this request for production upon the ground of relevancy and

upon the ground that the requested information is other taxpayer information that is subject to

protection from disclosure pursuant to 26 U.S.C. Section 6103. As to any internal documents

concerning the interpretation of Announcement 2000-46, the United States additionally objects

that they are protected by the deliberative process privilege, the attorney-client privilege, and/or

the work-product doctrine.

   **Request No. 19**: All records, documents, and materials concerning the
issuance or interpretation of Treas. Reg. § 1.752-6.

   **Response**:

   As explained in the general objections, the United States objects to this request to

produce on the ground that the materials requested are not relevant to the subject matter of this

litigation and are not reasonably calculated to lead to the discovery of admissible evidence as is

1861365.1

required by Rule 26(b)(1) of the Federal Rules of Civil Procedure.  As also explained in the

general objections, the United States objects to the disclosure of many of the documents

requested to be produced by this request (either in whole or part) on the ground that they are

protected from disclosure by the governmental deliberative process privilege.  Without waiving

these objections, the United States is producing herewith a privilege log which details all of the

documents generated by the Internal Revenue Service relating to this request which are being

withheld by the United States as privileged.  In addition, without waiving these objections, the

United States is producing a draft privilege log which details the documents generated by the

Department of Treasury relating to this request which are being withheld by the United States as

privileged.   All other documents generated by the Internal Revenue Service related to this

request are being produced on the CD.  See attached CD and summary table detailing the

contents of he CD.   All other documents generated by the Department of Treasury related to this

request have been requested and will be produced.

> **Request No. 20**: All records, documents, and materials concerning the
> issuance or interpretation of Revenue Ruling 88-77.

**Response:**

As explained in the general objections, the United States objects to this request to

produce on the ground that the materials requested are not relevant to the subject matter of this

litigation and are not reasonably calculated to lead to the discovery of admissible evidence as is

required by  Rule 26(b)(1) of the Federal Rules of the Procedure.  As also explained in the

general objections, the United States objects to the disclosure of many of the documents

requested to be produced by this request (either in whole or part) on the ground that they are

11                                    1861365.1

protected from disclosure by the governmental deliberative process privilege. Without waiving these objections, the United States is producing herewith a privilege log which details all of the documents generated by the Internal Revenue Service relating to this request which are being withheld by the United States as privileged. All other documents generated by the Internal Revenue Service related to this request are being produced.

Request No. 21: All pleadings, records, documents, and materials maintained by the IRS in connection with *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975), including, but not limited to, all documents previously produced by the Government in any other proceeding concerning this subject.

Response:

The United States objects to this request as vague, ambiguous, and overly broad. Further, as explained in the general objections, the United States objects to this request to produce on the ground that the materials requested are not relevant to the subject matter of this litigation and are not reasonably calculated to lead to the discovery of admissible evidence as is required by Rule 26(b)(1) of the Federal Rules of Civil Procedure.

Request No. 22: All records, documents, and materials in any promoter examination file that refer to FICA A Fund or Richard Egan.

Response:

The documents requested, if any, to the extent not privileged, were produced in the exchange of documents described in our initial disclosures or in response to the Plaintiff's First Set of Requests for Production of Documents.

Request No. 23: All records, documents, and materials in any promoter examination file that refer to SOS, FDIS, or FOCUS.

Response:

The United States objects to this request to the extent it seeks documents that constitute

1861365.1

return or return information protected from disclosure by 26 U.S.C. section 6103. Other

responsive documents, if any, to the extent not privileged, were produced in the exchange of

documents described in our initial disclosures or in response to the Plaintiff's First Set of

Requests for Production of Documents.

> Request No. 24: All transcripts, reports, video recordings, or notes of
> interviews or Q&As from the promoter examinations, whether prepared by or on
> behalf of the Government or the party under examination, of the following entities:
> - Alpha
> - Diversified Group Inc.
> - Helios
> - KPMG
> - Proskauer
> - Refco Capital Markets Ltd.
> - Sidley Austin

The United States objects to this request to the extent it seeks documents that constitute return or

return information protected from disclosure by 26 U.S.C. section 6103. The United States also

objects because notes of the IRS might be protected by the deliberative process privilege, the

attorney-client privilege, or the attorney work product doctrine.

> Request No. 25: All transcripts, video recordings, or notes of the IRS
> interviews of James Haber on February 27 and 28, 2003.

Response:

The United States objects because the interviews are not identified with sufficient

particularity to allow counsel for the United States to determine whether the government has any

responsive documents. The United States also objects to this request to the extent it seeks

documents that constitute return or return information protected from disclosure by 26 U.S.C.

section 6103. The United States also objects because notes of the IRS might be protected by the

deliberative process privilege, the attorney-client privilege, or the attorney work product doctrine.

<div style="text-align:center">13</div>

1861365.1

<u>Request No. 26</u>: All transcripts, reports, video recordings, or notes of each of the following depositions:

- Thomas Humphreys of Sidley Austin in *Eacho v. KPMG* and *Gaslow v. KPMG* (July 28, 2005)
- John MacKinnon of Sidley Austin in the McNair matter (October 28, 2004)
- John MacKinnon of Sidley Austin in *Eacho v. KPMG* and *Gaslow v. KPMG* (May 11, 2005)
- Thomas Smith, Jr., of Sidley Austin in the Jacoboni matter (December 16, 2003)
- Thomas Smith, Jr., of Sidley Austin in *Adams v. KPMG* and *Wilson v. KPMG* (May 12, 2005)

<u>Response</u>:

The United States objects because the cases are not identified with sufficient particularity to allow counsel for the United States to determine whether the government has any responsive documents. The United States also objects because the documents requested are presumably part of the public record and, as such, are available to Richard Egan to the same extent that they are available to the United States, which was not a party to these suits.

<u>Request No. 27</u>: All records, documents, and materials upon which the Government relied in asserting accuracy-related penalties against FICA A Fund.

<u>Response</u>:

The United States objects to this request because it seeks documents that are not relevant or likely to lead to the discovery of admissible evidence. This is a de novo proceeding in which Richard Egan has the burden of proving that Fidelity International was correct in reporting, among other things, that he lost $158,630,921 in 2001. Counsel for the United States has, in any case, attempted to produce everything in the administrative file to the extent not privileged. Accordingly, documents responsive to this request, if any, to the extent not privileged, were produced in the exchange of documents described in our initial disclosures or in response to the Plaintiff's First Set of Requests for Production of Documents.

<div align="center">14</div>

1861365.1

Request No. 28: All transcripts and video recordings of depositions and hearings that took place in the following cases: *Jenkens & Gilchrist v. Diversified Group*, 1:00-cv-06484-SAS (S.D.N.Y.); *Diversified Group v. Daugerdas*, No. 1:00-cv-00771-SAS-GWG (S.D.N.Y.).

Response:

The United States objects because the documents requested, to the extent available, are

part of the public record and, as such, are available to Richard Egan to the same extent that they

are available to the United States, which was not a party to these suits.

Request No. 29: All records, documents, and materials evidencing statements that were made by Richard Egan or his agents or advisors, including, but not limited to, Michael Egan, Patrick Shea, Jim Reiss, or Stephanie Denby, in the course of the FICA A Fund Examination.

Response:

The documents requested, if any, to the extent not privileged, were produced in the

exchange of documents described in our initial disclosures or in response to the Plaintiff's First

Set of Requests for Production of Documents.

1861365.1

**Request No. 30**: The following Bates-numbered documents, which are documents that the government did not produce in response to Plaintiff's First Set of Requests for Production of Documents and constitute gaps in the Bates-numbered documents produced in response to that request:

- 5IRS0001-5IRS0006
- 5IRS1244
- 5IRS1249-5IRS1250
- 5IRS1252-5IRS1275
- 5IRS1892-5IRS1903
- 5IRS1905-5IRS1925
- 5IRS2781-5IRS3112
- 5IRS3789

Response:

As noted in our response of June 23, 2006, to your letter of June 9, 2006, the documents listed in this request are protected from production by 26 U.S.C. section 6103 or other privileges.

A supplemental privilege log is attached.

Dated August 10, 2006.

MICHAEL J. SULLIVAN
United States Attorney

JOHN A. LINDQUIST
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044-0055
Telephone: (202) 307-6561
Facsimile: (202) 514-5238
E-mail: John.A.Lindquist@usdoj.gov

16                                              1861365.1

## Privilege Log Supplement

| Beginning Bates No. | Ending Bates No. | No. of Pages | Date | Description | Produced w/Redactions Y/N | Privilege(s)/Statutory Protection(s) Claimed |
|---|---|---|---|---|---|---|
| 5IRS00001 | 5IRS00006 | 6 | 2006 | Letter from IRS to Counsel for United States | N | AC, WP |
| 5IRS01244 | 5IRS01244 | 1 | 10/5/2001 | Documents concerning taxpayer other than Egan. | N | 26 U.S.C. 6103 |
| 5IRS01249 | 5IRS01250 | 2 | 10/4/2001 | Documents concerning taxpayer other than Egan. | N | 26 U.S.C. 6103 |
| 5IRS01252 | 5IRS01272 | 21 | | Documents concerning taxpayer other than Egan. | N | 26 U.S.C. 6103 |
| 5IRS01273 | 5IRS01273 | 1 | 10/5/2001 | Documents concerning taxpayer other than Egan. | N | 26 U.S.C. 6103 |
| 5IRS01274 | 5IRS01274 | 1 | 10/5/2001 | Documents concerning taxpayer other than Egan. | N | 26 U.S.C. 6103 |
| 5IRS01275 | 5IRS01275 | 1 | 10/5/2001 | Documents concerning taxpayer other than Egan. | N | 26 U.S.C. 6103 |
| 5IRS01892 | 5IRS01903 | 12 | 6/6/2004 | Documents concerning taxpayer other than Egan. | N | 26 U.S.C. 6103 |
| 5IRS01905 | 5IRS01925 | 21 | 6/15/2004 | Documents concerning taxpayer other than Egan. | N | 26 U.S.C. 6103 |
| 5IRS02781 | 5IRS02946 | 166 | 1/29/2003 | Documents concerning taxpayer other than Egan. | N | 26 U.S.C. 6103 |
| 5IRS02947 | 5IRS03112 | 166 | 1/29/2003 | Documents concerning taxpayer other than Egan. | N | 26 U.S.C. 6103 |
| 5IRS03789 | 5IRS03789 | 1 | 11/2/2001 | Documents concerning taxpayer other than Egan. | N | 26 U.S.C. 6103 |

## CERTIFICATE OF SERVICE

I hereby certify that the United States' Response to Plaintiff's Second Set of Requests for Production of Documents Nos. 6-30 was served upon the plaintiff by sending a copy to his attorneys at the following address on the 10th day of August, 2006.

David J. Curtin
MCKEE NELSON LLP
1919 M Street, N.W., Suite 800
Washington, D.C. 20036

JOHN A. LINDQUIST
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044-0055
Telephone: (202) 307-6561
Facsimile: (202) 514-5238
E-mail: John.A.Lindquist@usdoj.gov

17                                          1861365.1

# Exhibits K, L, and M filed under seal

# Exhibit N



December 31, 2001

2001 Customers / Trading Fund Name / SM-LC Investment / SM-LC Investment #2 / Fund Cash Investment / Co-Investor Buyout / Total Cash Investment (Exclusive of Fees) / December 31, 2001 Values (Common Interest / Preferred Interest / Separate Entity Value) / Total Value / Pre-Tax Economic Gain / (Loss) / Gain / (Loss) as Percentage of Investment

### 2001 Client Summary

| Number of Clients | Total Investment | Total Value | Pre-Tax Loss | Percentage Loss |
|---|---|---|---|---|
| 59 | $36,098,630 | $29,829,003 | ($6,269,627) | -17.37% |

### Winning Trades

| | Profitable 0% to 10% | Profitable 11% to 20% | Profitable 21% to 50% | Profitable 51% to 80% | Total Profitable Trades |
|---|---|---|---|---|---|
| Number of Clients | 5 | 3 | 2 | 2 | 12 |
| Percentage of Clients | 8.47% | 5.08% | 3.39% | 3.39% | 20.34% |
| Value of LLC Interests | $2,381,347 | $3,332,295 | $280,000 | $671,372 | $6,685,014 |
| Percentage of Total Value | 6.60% | 9.23% | 0.78% | 1.86% | 18.46% |

### Losing Trades

| | Loss of 0% to -10% | Loss of -11% to -20% | Loss of -21% to -30% | Loss of -31% to -40% | Loss of -41% to -65% | Total Losing Trades |
|---|---|---|---|---|---|---|
| Number of Clients | 7 | 7 | 10 | 10 | 13 | 47 |
| Percentage of Clients | 11.86% | 11.86% | 16.95% | 16.95% | 22.03% | 79.66% |
| Value of LLC Interests | $4,003,564 | $8,107,260 | $7,086,542 | $3,851,250 | $6,385,000 | $29,433,616 |
| Percentage of Total Value | 11.09% | 22.46% | 19.63% | 10.67% | 17.69% | 81.54% |

### Equity Returned to Client

| | Percent Investment Returned to Client 35% | Percent Investment Returned to Client 50% | Percent Investment Returned to Client 75% | Percent Investment Returned to Client 90% | Percent Investment Returned to Client 100% + |
|---|---|---|---|---|---|
| Percent of Clients | 100.00% | 94.91% | 54.24% | 32.20% | 20.33% |

1ALPHA-DISK04-033116