# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | Case Nos.:  05-40151-FDS |
| | | 06-40130-FDS |
| v. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE DEFENDANT'S SCRIPTED DEPOSITION TESTIMONY OF IRISH WITNESSES

The issue for the Court is whether scripted testimony, negotiated in exchange for the withdrawal of treaty requests and related letters rogatory, should be admitted as evidence at trial. At Defendant's behest, the Court issued letters rogatory to Ireland and the Isle of Man seeking both testimony and documents. As a part of an illusive compromise between Defendant and the Irish witnesses, Defendant agreed to withdraw the Isle of Man letter rogatory (and related Irish and United Kingdom treaty requests). For their part of the settlement, the Irish witnesses agreed to appear in an Irish court and read from a set of questions and answers that had been pre-negotiated by Defendant. This process occurred after this Court had pointly rejected the suggestion that written questions be submitted to the witnesses. Were these Irish witnesses (or any other witness) to physically appear at the trial of this case, this Court would not allow government counsel and these witnesses to read questions and answers from a script. If the

Court would not allow this to be done by a live witness, it certainly should not allow it to be done by counsel through deposition witnesses.

## BACKGROUND

In 2001, Plaintiff invested in FICA A Fund with Alpha Consultants LLC, Helios Trading LLC, and Samuel Mahoney, a citizen of Ireland who contributed $651,000 to FICA A Fund in exchange for a partnership interest. Martin Hawkes, having never been a partner of FICA A Fund, is a complete stranger to Plaintiff. The only connection between Martin Hawkes and this case is that he appears to have invested in other business ventures with Alpha Consultants and Helios Trading.

## I.   The Irish Letter Rogatory

In April 2007, Defendant sought the issuance of a letter rogatory requesting assistance from the judicial authority in Ireland to secure the testimony of Mahoney and Hawkes.[1] Defendant's proposed letter rogatory sought 18 broad categories of documents and testimony on 118 topics. Plaintiff objected to the issuance of the requests, in part because the time and expense necessary to carry out such discovery outweighed any potential benefit to this case. Plaintiff suggested taking the testimony of Mahoney and Hawkes through written questions to reduce the burden and expense of procuring the witnesses' live testimony in Ireland.[2] Out of concern for obtaining credible testimony, this Court rejected the suggestion of depositions by written questions:

> Depositions by written questions under Rule 31 are rarely, if ever, used in modern litigation under any circumstances. That is surely no accident. While depositions by written questions offer one slight advantage over live depositions (the

---

[1] *See* Mot. for Issuance of Letters Rogatory Requesting Int'l Judicial Assistance, Apr. 4, 2007. Defendant also sought to depose a Mr. Hussey but ultimately elected not to do so.

[2] *See* Pl.'s Resp. to Def.'s Mot. for Issuance of Letters Rogatory Requesting Int'l Judicial Assistance at 22-23, Apr. 18, 2007.

reduction of expense through elimination of attorney travel time and transcript costs), they present huge disadvantages, *including the loss of spontaneity, the inability to ask follow-up questions, the inability to observe the witness, and the inability to ensure the integrity of the responses, which may be drafted or edited by lawyers*.[3]

The Court, therefore, issued Defendant's proposed letter rogatory to the judicial authority in Ireland with the understanding that Mahoney and Hawkes would be providing spontaneous testimony that was not "drafted or edited by lawyers."  While Rule 31 depositions by written questions are rare, the scripted testimony Defendant has brought back from Ireland is completely alien to our trial system.

## II.    Defendant's Negotiations with Mahoney and Hawkes

While Plaintiff was not party to these negotiations, the facts have now surfaced.  From the time Defendant sought letters rogatory in April 2007, Mahoney and Hawkes attempted to negotiate a resolution of Defendant's far-reaching inquiry into their business activities.[4]  On February 7, 2008, Mahoney (by telephone) and Hawkes met with Defendant in Dublin, Ireland "so that *pre-negotiated* questions and *pre-negotiated* answers could be run through by the parties."[5]  According to the persons involved, an agreement was reached at this meeting whereby Defendant would discontinue its foreign discovery efforts in both Ireland and the Isle of Man if Mahoney and Hawkes provided acceptable written answers to Defendant's written questions and agreed to read their answers in the Irish court.[6]

---

[3] Mem. & Order on Def.'s Mot. for Issuance of Letters Rogatory Requesting Int'l Judicial Assistance ("Order") at 7, May 23, 2007 (emphasis added).

[4] *See* Ex. A (William Wachtel Aff. ¶ 4, May 2, 2008 (submitted in the Irish High Court)).

[5] Ex. A (Wachtel Aff. ¶ 4 (emphasis added)).  At no point was Plaintiff represented at these discussions or negotiations.

[6] *See* Ex. A (Wachtel Aff. ¶ 5); Ex. B (John A. Lindquist Aff. Ex. JAL2, Apr. 24, 2008 (submitted in the Irish High Court)); Ex. C (Notice of Motion attaching Michael Kealey Aff. ¶ 18, Apr. 23, 2008 (submitted in the Irish High Court)).

The written questions and answers—sometimes referred to as a "transcript"—were carefully crafted and edited with the full assistance of Defendant.[7]  Defendant not only drafted the questions but also suggested acceptable wording for the scripted answers.[8]  The full extent of Defendant's drafting of the answers is unknown, but clearly government counsel's involvement was extensive.[9]  No script was finalized during the February 7 meeting in Dublin, however, because Defendant anticipated adding more questions to the script in the future.[10]  Comparison of earlier and later versions of the scripted questions and answers shows the high degree of editing and finessing involved.[11]  There is no doubt that the answers were the product of negotiation and compromise.

## III.     Defendant's Negotiations Resulted in Scripted Testimony

Defendant proceeded to "examine" Hawkes and Mahoney in a Dublin courtroom on May 13 and 14, 2008.  Each witness, starting with Hawkes on May 13 and followed by Mahoney on May 14, took the witness chair, was handed the script, and proceeded to read each answer after Defendant's barrister read each question.  Both witnesses read from the same script and, of

---

[7] *See* Ex. A (Wachtel Aff. ¶ 4 ("pre-negotiated questions and pre-negotiated answers"), ¶ 5 ("preordained questions and answers"), ¶ 6 ("I sent a copy of the amended version of the question and answers transcript . . . .")); Ex. B (Lindquist Aff. ¶ 36 ("[T]he process of finalizing a set of written questions and answers . . . was not complete.")); Ex. C (Kealey Aff. ¶ 18 ("The said questions and answers were agreed upon between the parties before the meeting and my colleague . . . was asked to read verbatim from the agreed transcript . . . ")); *see also* Ex. C (Kealey Aff. Ex. MJK3 (memorializing discussion of the wording of the questions and answers)).

[8] *See* Ex. C (Kealey Aff. Ex. MJK3, at 7 ("[Dennis Donohue] queried the meaning of 'fundamentally formulaic'; [counsel for the witnesses] stated that this represented a percentage of the capital; [Dennis Donohue] requested that this phrase would be clarified and suggested the following wording 'by that I mean consistent with the percentage set forth in the outline of the proposed transaction and the fees earned were on an aggregate basis.'")).

[9] While it is no smoking gun, the document identification number (3192164.1) at the lower right hand corner of Ex. C (Kealey Aff. Ex. MJK5) appears to be consistent with both the format and sequence of document identification numbers on Defendant's other documents created during the same time period, *see, e.g.,* Notice of Recent Authority (*Stobie Creek*), Mar. 21, 2008 (document identification number 3148735.11).  These identifiers suggest that the scripted questions and answers came from Defendant's computers.

[10] *See* Ex. B (Lindquist Aff. ¶ 37); Ex. C (Kealey Aff. ¶ 18).

[11] *Compare* Ex. C (Kealey Aff. Ex. MJK4), *with* Ex. C (Kealy Aff. Ex. MJK5), *and* Ex. D (M&H Defend. Ex. 1, "*aide memoire*" used during questioning).

course, the "testimony" is identical.  During this scripted portion of the proceeding, the examining lawyer, the witnesses, and the judge simply paged through the script as it was being read.  The script was politely referred to as an "*aide memoire*."[12]  At the outset, Defendant's Irish barrister (Mr. MacEochaidh) addressed the process by which Defendant's examination of the witnesses was to be done.  He noted that "specific questions were put in various ways and at various times to the witnesses and they have agreed to give certain answers."[13]  Additionally, he stated that "these questions are known to the witnesses, and the answers are known or thought to be known to the Defendant."[14]  The *aide memorie* is the final product of Defendant's negotiations and compromise with Mahoney and Hawkes.[15]

The Irish letter rogatory was executed in a way not at all contemplated by this Court.  Had Defendant proposed using its script method when it first requested the Irish letter rogatory, this Court would have rejected the idea, just as it rejected Plaintiff's Rule 31 suggestion.  Defendant's scripted testimony approach is no more acceptable now than it would have been at the outset of the letter rogatory process.  Defendant's decision not to disclose this procedure until it was in place did not improve or enhance its creditability or acceptability.

---

[12] *See* Ex. E (Hawkes Tr. 11:16-25, May 13, 2008 (explaining use of the "*aide-memoire*")); Ex. F (Mahoney Tr. 5:17-18, May 14, 2008 ("Now, Mr. Mahoney, in the *aide memoire* from which we are working . . . .")).

[13] Ex. E (Hawkes Tr. 11:17-19).

[14] *Id.* at 12:23-25.  Mr. Klaus Reichert, foreign counsel for Plaintiff, asserted that "we have never been asked by [Mr. MacEochaidh] to agree to these questions and answers."  *Id.* at 15:25-27.  In an effort to preserve objections to specific questions for the record, however, Mr. Reichert lodged global objections to the line of questioning envisioned by Defendant. *See id.* at 22:7-21; Ex. F (Mahoney Tr. at 3:4-8).

[15] *Compare* Ex. D ("*aide-memoire*"), *with* Ex. C (Kealey Aff. Ex. MJK4), *and* Ex. C (Kealy Aff. Ex. MJK5).

**ARGUMENT**

**I.    The Scripted Testimony Should Be Excluded**

A negotiated set of questions and answers, captured in a script, is not an acceptable substitute for the bona fide examination of witnesses, whether at a deposition or trial.  The full extent to which Defendant drafted the Irish witnesses' testimony is unknown to Plaintiff, but several facts cannot be disputed:  1) this Court was expecting real testimony, not canned questions and answers; 2) Defendant drafted questions that differed significantly from those contained in the Court's letter rogatory; 3) Defendant played a role in editing the witnesses scripted responses to those questions; and 4) the Irish witnesses took the witness stand and read from the script rather than really testify.  The real issue for the Court is whether it will admit such canned testimony when offered at trial.[16]

**A.    The Scripted Testimony Constitutes Impermissible Witness Coaching**

The admissibility of deposition testimony generally is determined in the same manner as if the witness is appearing live.[17]  While the Federal Rules of Civil Procedure allow some departure from normal procedures for a deposition obtained through a letter rogatory, such latitude is intended to accommodate the procedural idiosyncrasies of a foreign jurisdiction, not to allow variances that call into question the very integrity of the process by which that testimony is obtained.[18]  Testimony that has been negotiated and scripted by counsel is the ultimate form of impermissible witness coaching and should be excluded from evidence.  A "live" reading of such

---

[16] Plaintiff's motion seeks exclusion of scripted testimony.  Plaintiff is not, at this time, raising any question-specific objections, all of which were preserved at the outset of the deposition.  Moreover, Plaintiff's motion is not seeking exclusion of testimony that either witness may have provided that was not scripted in the *aide memoire*.

[17] Fed. R. Civ. P. 32(b).

[18] *See* Fed. R. Civ. P. 28(b)(4) (providing that testimony obtained by way of a letter of request "need not be excluded merely because it is not a verbatim transcript, because the testimony was not taken under oath, or because of any similar departure").

testimony does not cure the underlying fact that Mahoney and Hawkes delivered scripted answers rather than their own testimony.  The script controlled the testimony in Dublin, not the witnesses.  The scripted questions and answers are the product of compromise, not the product of the witnesses' credible, spontaneous responses.

Allowing scripted testimony impedes one of the prime functions of a deposition, which is "the memorialization, the freezing, of a witness's testimony at an early stage of the proceedings, before that witness's recollection of the events at issue either has faded or has been altered by intervening events, other discovery, *or the helpful suggestions of lawyers*."[19]  Witness coaching frustrates the very purpose of a deposition:  developing the unfiltered testimony of the witness. "The witness comes to the deposition to testify, not to indulge in a parody of Charlie McCarthy, with lawyers coaching or bending the witness's words to mold a legally convenient record."[20]

Indeed, the rule prohibiting suggestive objections is intended to ensure that it is the witness, rather than counsel, giving the testimony.  "'Frequent and suggestive objections' can 'completely frustrate that objective' and 'obscure or alter the facts of the case and consequently frustrate the entire civil justice system's attempt to find the truth.'"[21]  Courts have rebuked such conduct as witness coaching where counsel "improperly 'interpreted' questions for the witnesses, coached them as to how to answer and engaged in lengthy speaking objections and colloquies"

---

[19] *Hall v. Clifton Precision*, 150 F.R.D. 525, 528 (E.D. Pa. 1993) (emphasis added).

[20] *Id.*

[21] *United States v. Kattar*, 191 F.R.D. 33, 38 (D.N.H. 1999) (quoting *Damaj v. Farmers Ins. Co.*, 164 F.R.D. 559, 560 (N.D. Okla. 1995)); *see also McDonough v. Keniston*, 188 F.R.D. 22, 24 (D.N.H. 1998) (stating that the rule against suggestive objections was designed to "curtail lengthy objections and colloquy which often suggested how deponents should answer").

during a deposition.[22]  Witness coaching prevents the court from discovering "what a witness

saw, heard, or did – what the witness thinks."[23]

      Reading from a script prepared by counsel constitutes unacceptable and impermissible

witness coaching and prevents this Court from determining whether each answer is the real

answer of the Irish witness, or that of Defendant, or a compromise between the two.  The

testimony of the Irish witnesses was the result of a collaborative effort between Defendant and

the witnesses to construct the testimony.  The parties exchanged several drafts of the proposed

questions and answers, and Defendant's role was more than simply propounding questions.

During the February 7, 2008 meeting, Defendant requested that the phrase "fundamentally

formulaic" be clarified and suggested its preferred wording.[24]  Defendant's wording appears in

the final testimony offered by the witnesses.[25]

      In essence, Defendant is answering its own questions.  It is clear that Defendant played a

role in drafting not just the questions to be asked, but the answers to be given.  This practice

vitiates every conceivable purpose and safeguard to obtaining trustworthy deposition testimony.

      Because this scripting attempt is virtually unheard of in our courts, it is not surprising that

reported case law is lacking.  However, one reported decision involves a nearly identical issue

and there the court ordered exclusion of testimony, obtained by letter rogatory, that was similarly

scripted.  *The Mandu* is instructive.[26]  The case involved a collision between Brazilian and

---

[22] *Calzaturficio S.C.A.R.P.A., s.p.a. v. Fabiano Shoe Co.*, 201 F.R.D. 33, 40 (D. Mass. 2001).

[23] *Hall*, 150 F.R.D. at 528.

[24] *See* Ex. C (Kealey Aff. Ex. MJK3, at 7).

[25] *See* Ex. E (Hawkes Tr. 60:21-23 (clarifying definition of "formulaic":  "By that I mean consistent with the percentages set forth in the Outline of Proposed Transactions")).

[26] *The Mandu*; *In re Companhia de Navegacao Lloyd Brasileiro*, 11 F. Supp. 845 (E.D.N.Y. 1935), *cited in* Fed. R Civ. P. 28 advisory committtee's note.

German steamships, with the Great American Insurance Company insuring the cargo of the German ship.[27]  Great American requested that the court issue letters rogatory to obtain information from several German witnesses.[28]  An adjuster associated with Great American interviewed the witnesses and assisted in the preparation of their answers.

> The answers to the interrogatories of the witness Alfred Schmidt were prepared and written out, privately in advance, and not while the witness was before the German court and under oath . . . .

> The effect of this was that as to Schmidt and the four other witnesses, Mundt, Scholz, Dolitzscher, and Warns, the court merely adopted those earlier answers as testimony.

> We thus find that all of the witnesses but Borchert appeared in court with their written statements in question and answer form, or an omnibus statement, which were adopted by the court as their testimony. [29]

In reviewing the process, the court stated that the "depositions are of no greater value than six affidavits" and excluded the testimony, noting that "courts both in England and this country have uniformly suppressed depositions so taken."[30]

The circumstances in which the depositions of Mahoney and Hawkes were taken is remarkably similar to that examined by the Eastern District of New York.  The questions were presented to the deponents well before live testimony was offered.  The answers were reviewed and edited by one of the parties.  There is no meaningful difference between the method by which Defendant took the depositions of Mahoney and Hawkes and the suppressed deposition testimony of the six witnesses in *The Mandu*.

---

[27] *Id.* at 846.

[28] *Id.*

[29] *Id.* at 846-47.

[30] *Id.* at 847 (citing *Shaw v. Lindsey*, 15 Ves. Jr., 38, 33 English Reprints Reports, 798; *Sayer v. Wagstaff*, 5 Beav. 462, 49 English Reprints Reports, 657; *W. Div. of W. N.C.R. Co. v. Drew*, 29 F. Cas. 747, 749 (C.C.N.D. Fla. 1879) (No. 17,434), *aff's sub. nom. R.R. Cos. v. Schutte*, 103 U.S. 118 (1881); *Dodge v. Israel*, 7 F. Cas. 792, 793 (C.C.E.D. Pa. 1822) (No. 3,952); *Richardson v. Golden*, 20 F. Cas. 709, 709-710 (C.C.D. Pa. 1811) (No. 11,782)).

**B.      The Scripted Testimony Is Inconsistent with This Court's Order**

Defendant obtained the testimony of Mahoney and Hawkes in a manner expressly rejected by this Court.  The Federal Rules of Civil Procedure permit a party to take a deposition pursuant to written questions, a process suggested by Plaintiff for the purpose of reducing the cost of foreign discovery.  This Court has described depositions pursuant to written questions as "a poor substitute for oral examination."[31]  The Court raised specific concerns, "including the loss of spontaneity, the inability to ask follow-up questions, the inability to observe the witness, and the inability to ensure the integrity of the responses, which may be drafted or edited by lawyers."[32]  The scripted testimony raises the same concerns expressed by the Court when it rejected the use of written questions.

After the Court rejected a process of deposition by written questions, Defendant did precisely that.  Indeed, Defendant went one step further and assisted with the answers.  Defendant's willingness to deliver the Irish witnesses' testimony in script form cannot be imposed on Plaintiff or this Court.  Defendant acted unilaterally and took the clear risk that the script would be opposed and rejected.  This Court should now reject this scripted "testimony."

**CONCLUSION**

The admissibility of deposition testimony is governed by the same standards that would apply as if the witness were appearing live.  The straight-forward question for this Court is whether it would permit a witness to take the stand and read scripted answers in response to scripted questions, particularly where one of the parties had a hand in drafting both the questions

---

[31] Status Conf. Tr. 32:36-38 (May 2, 2007).

[32] Order at 7.

and answers.  If the Court would not allow such a charade to take place in the courtroom, it

should not permit it by way of deposition obtained by letter rogatory.

Respectfully submitted this 15th day of August 2008.

PLAINTIFF
FIDELITY INTERNATIONAL CURRENCY ADVISOR
A FUND, L.L.C.
by the Tax Matters Partner

/s/ Ronald L. Buch, Jr.
David J. Curtin, D.C. Bar #281220
Ronald L. Buch, Jr., D.C. Bar #450903
Lena Amanti, D.C. Bar #490791
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:  (202) 775-1880
Facsimile:  (202) 775-8586
Email:  dcurtin@mckeenelson.com
        rbuch@mckeenelson.com
        lamanti@mckeenelson.com

John O. Mirick, BBO #349240
MIRICK, O'CONNELL, DEMALLIE
& LOUGEE, LLP
100 Front Street
Worcester, MA 01608
Telephone:  (508) 791-8500
Facsimile:  (508) 791-8502
Email:  jomirick@mirickoconnell.com

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 15, 2008.

/s/ Ronald L. Buch, Jr.
Ronald L. Buch, Jr., D.C. Bar #450903
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone: (202) 775-1880
Facsimile: (202) 775-8586
rbuch@mckeenelson.com

# Exhibit A

2008 No. 1  FTE

## THE HIGH COURT

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856
AND IN THE MATTER OF CIVIL PROCEEDINGS BEFORE THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS AND IN
THE MATTER ENTITLED

FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND L.L.C.

Plaintiff

-and-

UNITED STATES OF AMERICA

Defendants



## AFFIDAVIT OF WILLIAM WACHTEL

William Fry
Solicitors
Fitzwilton House
Wilton Place
Dublin 2
www.williamfry.ie

013964.0017.MJK/AMG

2008 No. 1  FTE

## THE HIGH COURT

### IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856 AND IN THE MATTER OF CIVIL PROCEEDINGS BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS AND IN THE MATTER ENTITLED

**FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND L.L.C.**

Plaintiff

-and-

### UNITED STATES OF AMERICA

Defendants

### AFFIDAVIT OF WILLIAM WACHTEL

I, William Wachtel, of Wachtel and Masyr LLP, 110 East 59th Street, New York, aged 18 years and upwards MAKE OATH and say as follows:

1.    I am a partner in Wachtel and Masyr, Lawyers for The Diversified Group Incorporated (DGI) in the Fidelity International Currency Advisor A Fund L.L.C. v United States of America proceedings in the US.

2.    I make this affidavit on behalf of Mr. Hawkes, Mr. Hussey and Mr. Mahoney, which I am duly authorised to do. I do so from facts within my own knowledge, save where otherwise appears and whereso otherwise appearing, I believe the same to be true and accurate.

3.    I beg to refer to the pleadings already had herein and, in particular, to the affidavits of John A Lindquist sworn on 24 April 2008 ("Mr. Lindquist's affidavit") and of Augustus Cullen sworn on 25 April 2008 ("Mr. Cullen's affidavit"). These affidavits

have been sworn in response to the application on behalf of Messrs. Hawkes, Hussey and Mahoney seeking to set aside the order of this Honourable Court made on an *ex parte* basis on 3 March 2008.

4.    I have over the past 12 months endeavoured to negotiate the resolution of certain discovery disputes between the Department of Justice of the United States of America ('DOJ') and Messrs. Hawkes and Mahoney including the matter presently before the High Court in Ireland. The DOJ did not request any information from Mr. Hussey during this voluntary process as they considered his tenuous link to the proceedings too distant to have any relevance. My above-mentioned efforts culminated in a meeting which I personally attended at the William Fry offices on 7 February 2008 (the 'Meeting'). Also in attendance were Mr. Hawkes, Mr. Mahoney (by telephone conference), Mr. Martin Phelan and Ms. Aisling Holden of William Fry, Solicitors for Messrs. Hawkes and Mahoney, Mr. Dennis Donohue, Mr. Barry Reiferson and Mr. John Lindquist all of the DOJ. The meeting was in essence a proffer session that was arranged so that pre-negotiated questions and pre-negotiated answers could be run through by the parties. The DOJ lawyers made it clear at the meeting that they simply wanted to hear Messrs. Hawkes and Mahoney utter the answers that had already been set forth in a detailed question and answer transcript so they could assess their credibility.

5.    There was an understanding going into the meeting that was reiterated and agreed to by all parties at the meeting. This unambiguous agreement, which the DOJ lawyers said they could not put in writing for policy reasons, was very straight forward. It was agreed that if the DOJ were satisfied that Messrs. Hawkes and Mahoney were credible witnesses in respect of the preordained questions and answers at the meeting and they subsequently provided documentary evidence to corroborate the financial transaction identified in some of the answers, then the DOJ would abandon its foreign discovery efforts in respect of the affairs of Messrs. Hawkes and Mahoney. It was further agreed by all parties that if the questions and answers given could not be used for evidentiary purposes by the DOJ in the proceedings in the United States District Court for the District of Massachusetts, that Messrs. Hawkes and Mahoney would answer Letters Rogatory in writing provided such Letters were limited to the very questions asked during the February 7 Meeting. The Meeting was successfully completed on 7 February in Dublin and at the conclusion of the session I was asked

3

by the DOJ to produce a "cleaned up" version of the transcript subject to some minor amendments that had been agreed at the meeting.

6.   Subsequent to the meeting of 7 February on 15 February 2008, I sent a copy of the amended version of the question and answers transcript together with the requested documentary corroborative evidence to the DOJ with the following statement; "Mission Accomplished". I beg to refer to a copy of such e-mail and attachments which marked with the letters '*WW1*' I have signed my name prior to the swearing hereof. As I heard nothing further to the contrary, I was fully satisfied that the conditions subsequent to the meeting had been fulfilled as agreed, that the DOJ were satisfied with them and that as agreed the foreign discovery would therefore be abandoned.

7.   The DOJ eventually responded to me and I was told that despite Messrs. Hawkes and Mahoney having fulfilled their side of the agreement as reached, they now had a few additional questions they would like Messrs. Hakes and Mahoney to answer. Despite this not being part of the original agreement made at the Meeting, rather than argue unnecessarily I agreed to approach Messrs. Hawkes and Mahoney again to see if they minded accommodating these additional and unexpected requests from the DOJ. I clearly stated that if Messrs. Hawkes and Mahoney did agree to go beyond what had been agreed at the meeting and provide further information, the original agreement of 7 February still remained unchanged. On that basis, I began a process of trying to accommodate the additional questions the DOJ had put forth. Messrs. Hawkes and Mahoney answered the extra questions promptly. Surprisingly, more and more questions kept coming. That very process is still ongoing today and Messrs. Hawkes and Mahoney continue to try to accommodate the DOJ on matters that even go beyond the extent of the Letters Rogatory.

8.   In paragraph 27 of Mr. Lindquist's Affidavit he states in relation to the meeting held on 7 February that "there was no agreement at that time to suspend or terminate this and other pending foreign evidence gathering requests relating to this matter." This assertion is also made in paragraph 18 of Mr. Cullen's Affidavit. I say and believe that at the meeting, there was an agreement to not only suspend but terminate any attempts through court procedure to obtain information from Messrs. Hawkes,

4

Mahoney and Hussey. The agreement was subject to certain conditions subsequent, which have been fulfilled.

9.     In paragraph 18 of his affidavit, Mr. Cullen states that "the agreement referred to by Mr. Kealey at paragraph 18 of his Affidavit was a conditional agreement." He further states that "at the meeting it was expressly made clear that these conditions had to be met before counsel for the United States could take steps to withdraw their foreign evidence gathering requests. These conditions were not met at the meeting.' It was not agreed or possible for all the conditions be met at the meeting. The conditions agreed were that the testimony given by Messrs. Hawkes and Mahoney be truthful, complete and accurate, and that certain documents be furnished after the Meeting. All agreed conditions were fulfilled subsequent to the meeting.

10.     I say and believe that Messrs. Hawkes and Mahoney in good faith reached a clear agreement with the DOJ on 7 February, that they met all of the conditions subsequent to that agreement, and that there is an agreement in place that would be enforced by a court here in the United States.

SWORN by   William Wachtel

this 2 day of May 2008

at 110 E.59th St.,

in the City of New York

before me a Practising Lawyer

and I know the Deponent.

_Practising Lawyer_

ELIZABETH FERREIRA
Notary Public, State of New York
No. 01FE5001798
Qualified in Westchester/NY County
Commission Expires Sept. 14, 2010

5

A COPY WHICH I ATTEST

FOR REGISTRAR

# Exhibit B

2008 No.1 FTE

## THE HIGH COURT

**IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT OF 1856
AND THE MATTER OF THE CIVIL PROCEEDINGS BEFORE THE UNITED
STATES DISTRICT COURT OF THE DISTRICT OF MASSACHUSETTS AND
THE MATTER ENTITLED**

**FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND L.L.C.**

**Plaintiff**

-and-

**UNITED STATES OF AMERICA**

**Defendant**

## AFFIDAVIT OF JOHN A. LINDQUIST

**Trial Attorney**
**United States Department of Justice**
**Tax Division, Civil Trial Section, Northern Region**
**555 4th Street, N.W., Rm. 7836**
**Washington, D.C. 2001**
**Tel. 202/307-6561**

3228908.1

2008 No.1 FTE

## THE HIGH COURT

## IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT OF 1856 AND THE MATTER OF THE CIVIL PROCEEDINGS BEFORE THE UNITED STATES DISTRICT COURT OF THE DISTRICT OF MASSACHUSETTS AND THE MATTER ENTITLED

## FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND L.L.C.

**Plaintiff**

-and-

## UNITED STATES OF AMERICA

**Defendant**

## AFFIDAVIT OF JOHN A. LINDQUIST

I, John A. Lindquist, a trial attorney employed by the United States Department of Justice, Washington, D.C., United States of America, aged 50 MAKE OATH and say as follows:

1. I am an attorney of the Washington D.C. office of the United States Department of Justice, Tax Division, co-counsel for Defendant, the United States of America ("United States") in the pending civil case in the United States of America, *Fidelity International Currency Advisor A Fund v. United States of America*, Civil Nos. 05-40151 and 06-40230 (USDC Massachusetts) and these proceedings.

2. I make this affidavit on behalf of the United States of America, which I am duly authorised to do. I do so from facts within my personal knowledge, save where

3228908.1

otherwise appears and whereso otherwise appearing, I believe the same to be true and accurate.

3. This affidavit is made for the purpose of grounding an opposition to the application to set aside the Order of this Honourable Court made on 3 March 2008 pursuant to Section 1 of the Foreign Tribunals Evidence Act 1856 and Order 39, rules 39-44 of the Rules of the Superior Courts, directing the examination of and the production of documents by Mr. Hawkes, Mr. Hussey and Mr. Mahoney.

4. This order was made following an "ex-parte" application, not by the defendant, but by Counsel for the Minister of Foreign Affairs which acted to give effect to an Application for Judicial Assistance (Letter Rogatory) issued on 2 July, 2007, by the United States District Court for the District of Massachusetts, upon motion by the defendant for the issuance of such a letter rogtoary.

5. I have on 24th April 2008, received and reviewed the papers filed on behalf of Messrs. Hawkes, Hussey, and Mahoney, including the Affidavit of Michael Kealey and exhibits referenced therein.

6. Mr. Kealey's stated grounds for the application to set aside, as stated in paragraph 5 of his affidavit, are predicated upon a misstatement or misunderstanding of facts, or both.

7. Mr. Kealey attests in paragraph 5 of his affidavit that the request for judicial assistance is a fishing expedition by the United States. It is not.

8. Prior to issuance of the The Application for Judicial Assistance (Letter Rogatory) issued on 2 July, 2007, the United States District Court for the District of Massachusetts issued a Memorandum and Order on Defendant's Motion for Issuance of Letters Rogatory Requesting International Judicial Assistance in which Judge Saylor expressly rejected this very contention, holding:

3228908.1

Plaintiff first claims that the requests would violate principles of comity, in that they constitute an improper "fishing expedition" in violation of the procedures of the host countries. It is true that the judicial systems of Ireland and (apparently) the Isle of Man do not permit pre-trial discovery to the extent that is permitted in the United States, and that an examination by letter rogatory would not be permitted under many circumstances where a deposition would be permissible in the United States. Nonetheless, it does not follow that a party cannot use the letter rogatory process to obtain the testimony of a foreign witness unless the party knows exactly what the witness will say, and that anything less would constitute a "fishing expedition."

\* \* \*

Here, the United States has made very detailed allegations of fact, with multiple specific references to record evidence. Furthermore, there is little doubt that the United States intends to use the information at the trial. The government is not simply seeking to undertake a "roving inquiry" in order to "obtain information which may lead to obtaining evidence in general support of a party's case." *State of Minnesota*, [1998] I.L. Pr. 170, 175.

I beg to refer to this Memorandum and Order at pp. 4-5 upon which marked with the letters "JAL1" I have signed my name prior to the swearing hereof.

9.The record evidence shows that during 2001 and 2002 Messrs. Mahoney and Hawkes participated as purported "co-investors" in fifty-five (55) transactions involving a tax strategy known as the Financial Derivatives Investment Strategy ("FDIS"). The transaction at issue in *Fidelity International Currency Advisor A Fund v. United States of America,* Civil Nos. 05-40151 and 06-40230 (USDC Massachusetts) is one of these 55 transactions. There is also other pending litigation in the United States involving some of the other FDIS transactions.

3228908.1

10. Through these 55 FDIS transactions, United States taxpayers claimed in excess of US$1 billion in tax losses. The United States taxing authority has disallowed all of these claimed tax benefits on the basis that that the strategy is an abusive tax shelter.

11. These 55 FDIS transactions were implemented in the United States by the tax shelter promoters within the United States with the direct assistance of Messrs. Mahoney and Hawkes who, in exchange for a fee, agreed to participate and to serve the role of co-investors.

12. However, the evidence shows that the funds for these purported investments by Mr. Mahoney and Mr. Hawkes were not in the main their funds, but paid by the United States promoters of the FDIS strategy. Moreover, to the extent that they provided any funds for this scheme, such funds were returned to them very shortly thereafter.

13. The record evidence shows that the United States promoters, in turn, accounted for the net funding they paid to Messrs. Mahoney and Hawkes as a joint expense in calculating their share of the fees which they had collected from the sale of these transactions.

14. The record evidence shows that Messrs. Mahoney and Hawkes used the offices of Biosphere Finance, Limited, located in Dublin Ireland, to coordinate with the United States promoters and implement these 55 FDIS transactions through the Isle of Man entities Kilsture Limited, Maddox Limited and Trilogy Financial Investments, Limited, entities which they own and/or control.

15. Messrs. Mahoney and Hawkes have represented that they have no documents related to the implementation of these transactions within their possession or control other than the handwritten ledger of Mr. Mahoney which purports to reflect the funding of these transactions. Mr. Mahoney and Mr. Hawkes have refused to produce or consent to the production of the bank account records through which they implemented these 55 FDIS transactions on behalf of the promoters of this tax strategy.

16. The sole records that they have thus far produced reflect that the monies that they received to fund these 55 FDIS transactions were paid to them as purported loans from two entities identified as "D.G." and "Ailesbury." They have also produced records on behalf of unknown third parties which they represent show that they physically received the "D.G." funds from an entity named "United Acquisition, LLC."

3228908.1

However, they have refused to produce or consent to the production of the bank records substantiating their receipt of these funds.

17. Messrs. Mahoney and Hawkes have refused to produce or to consent to the production of, the bank records of any of these entities with respect to these payments.

18. Messrs. Mahoney and Hawkes have refused to produce or to consent to the production of the bank account records for the accounts through which they implemented these 55 FDIS transactions on behalf of the promoters of this tax strategy.

19. The record evidence shows that Messrs. Mahoney and Hawkes were paid an aggregate fee of US$2 million by the United States promoters of these abusive tax shelters as compensation for playing the role of "co-investor." These fee payments were paid through Biosphere Finance, Maddox and Kilsture in six separate payments.

20. The record evidence shows that the fees paid through Maddox and Kilsture were paid through accounts held by these entities with the Isle of Man Bank.

21. Messrs. Mahoney and Hawkes have refused to produce, or to consent to the production of, the bank account statements for these accounts.

22. Mr. Kealey attests in paragraph 5 of his affidavit that the application of 3 March 2008 to the High Court is contrary to an agreement reached on behalf of Messrs. Mahoney, Hawkes, and Hussey with the United States of America. This assertion is not correct.

23. On 7 February 2008, I personally attended a meeting in Ireland with Mr. Martin Phelan and Mr. Martin Hawkes. Mr. Mahoney also attended part of this meeting by telephone. Also in attendance was the lead counsel for the United States in this matter, Mr. Dennis Donohue and Mr. Barry Reiferson, also representing the United States.

24. Also in attendance at the meeting of 7 February 2008 was Mr. William Wachtel, an attorney representing the The Diversified Group, Incorporated, and its president, James Haber.

25. Mr. Wachtel does not represent the Plaintiff in *Fidelity International Currency Advisor A Fund v. United States of America,* Civil Nos. 05-40151 and 06-40230 (USDC Massachusetts). Nor did a representative for plaintiff attend the 7 February 2008 meeting and Mr. Kealey's representation to the contrary at paragraph 18 of his Affidavit is not correct.

3228908.1

26. This meeting was a good faith attempt to obtain voluntarily the same information being requested through this and other pending foreign evidence gathering requests.

27. There was no agreement at that time to suspend or terminate this and other pending foreign evidence gathering requests related to this matter. Nor have we since agreed to do so.

28. Counsel for the United States agreed that we were prepared to seek to withdraw our foreign evidence gathering requests only if certain express conditions were met. Mr. Donohue expressly recited these terms twice during the meeting so as to ensure that there would be no misunderstanding.

29. The agreement referred to by Mr. Kealey at paragraph 18 of his Affidavit was a conditional agreement. Specifically, counsel for the United States agreed that we would take steps to withdraw our foreign evidence gathering requests only if certain conditions were met. Mr. Donohue, lead counsel for the United States, expressly recited these conditions twice during the meeting so as to ensure that there would be no misunderstanding and asked that Mr. Reiferson transcribe them when he repeated them.

30. Pursuant to Mr. Donohue's request, Mr. Reiferson transcribed Mr. Donohue's reiterated statement of the terms of the conditional agreement, which Mr. Reiferson then typed and circulated to me for review. I immediately reviewed this transcription and confirmed that it was accurate. I beg to refer to this transcription upon which marked with the letters "JAL2" I have signed my name prior to the swearing hereof.

31. The notes of Aisling Holden from this meeting paraphrase portions of the discussions. For instance, Ms. Holden's notes do not reflect the material fact that Mr. Donohue restated the terms twice and that, before restating them, directed Mr. Reiferson to transcribe his restatement of the terms. I beg to refer to the notes of Ms. Holden at pp.5-6 of her memo, which marked with the letters "MJK3" are attached to the Affidavit of Mr. Kealey.

32. As reflected in both the transcription by Mr. Reiferson and the notes by Ms. Holden, Mr. Donohue made clear that as a condition to our agreement to seek to terminate all further foreign evidence gathering requests, the United States required that the testimony to be given by Mr. Mahoney and Mr. Hawkes be truthful, complete and accurate, that documents be provided to corroborate the testimony, and that the

3228908.1

testimony and documents be in a form that would be admissible in evidence in the proceeding in the United States District Court for the District of Massachusetts.

33. At the meeting it was expressly made clear and I believe well understood by all attendees that these conditions had to be met before counsel for the United States could take steps to withdraw our foreign evidence gathering requests. These conditions were not met at the meeting.

34. To date, none of these conditions have been met.

35. Indeed, at the meeting of 7 February 2008 the parties expressly discussed the possibility that the testimony of Messrs. Mahoney and Hawkes might not be able to be admitted in evidence in the United States proceeding. Thus, one of the specified conditions might not be able to be met. Mr. Donohue made clear that in that circumstance, it would then be necessary to proceed with the examination of Messrs. Mahoney and Hawkes pursuant to the Letter Rogatory. In that event, Mr. Donohue indicated that if the remaining conditions of our understanding had been met, counsel for the United States would agree to limit the scope of our questions at the Letter Rogatory proceeding to only the previously-provided written questions. Consequently, I believe that all attendees of the meeting were well aware that there had been no agreement by the United States to take steps to terminate or withdraw any of the foreign evidence gathering requests, including the instant Letter Rogatory, unless and until all of the specified conditions had been met.

36. Moreover, Mr Phelan, counsel for Messrs. Mahoney and Hawkes, recognized that the process of finalizing a set of written questions and answers on the subject matter requested by counsel for the United States was not complete. Thus, at the meeting of 7 February 2008, he stated that he wished any additional questions to be in writing and further stated that any answers to such additional questions would in turn also be provided in writing. I beg to refer to the notes of Ms. Holden at p.7 of her memo, which marked with the letters "MJK3" are attached to the Affidavit of Mr. Kealey.

37. In this respect, following the meeting of 7 February 2008, I have engaged in good faith in a series of conferences, either in person or by telephone, with the latest one being on the 23rd April, 2008, one day prior to this motion to set aside, with Mr. William Wachtel, with the objective of finalizing a set of questions and truthful and accurate

3228908.1

answers to such question. I respectfully beg to note that Exhibit MJK5, which is attached to Mr, Kealey's affidavit, is certainly not a finalized set of questions and answers. In fact, among other things, that exhibit shows that there are many questions that are still unanswered.

38. As set forth in paragraphs 15, 18, 19 and 22, above, the condition of providing corroborating documents to the proposed testimony of Mr. Mahoney and Mr. Hawkes also has not been satisfied.

39. Finally, and consequently, the condition that the proposed testimony of Messrs. Mahoney and Hawkes and documents corroborating their testimony be in a form that would be admissible in evidence in the proceeding in the United States District Court for the District of Massachusetts also, and necessarily, has not been met.

40. As indicated above, we have attempted, in good faith, to attempt to resolve this matter informally, but have, to date, been unable to do so.

41. Counsel for Messrs. Mahoney and Hawkes have had more than adequate time to meet the above conditions and given that they have not done so, we respectfully see no reason not, and fully intend, to proceed with the examination of these witnesses now scheduled for 13th through 19th May, 2008.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in Washington, D.C., on this April 24, 2008.

SWORN by John Lindquist

This 24th day of April, 2008

at U.S. Department of Justice,

555 4th Street

in the City of Washington, D.C.

United States of America

JOHN A. LINDQUIST
Trial Attorney, Tax Division

*Helena Lawrence*

HELENA F. LAWRENCE
Notary Public District of Columbia
My Commission Expires 2/14/2010

3227209.1

2008 No.1 FTE

## THE HIGH COURT

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT OF 1856 AND THE MATTER OF THE CIVIL PROCEEDINGS BEFORE THE UNITED STATES DISTRICT COURT OF THE DISTRICT OF MASSACHUSETTS AND THE MATTER ENTITLED

FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND L.L.C.

Plaintiff

-and-

UNITED STATES OF AMERICA

Defendant

## EXHIBIT "JAL1"

Referred to in the Affidavit of **JOHN LINDQUIST** sworn this 24th day of April, 2008.

SWORN by John Lindquist

This 24th day of April, 2008

at U.S. Department of Justice,

555 4th Street

in the City of Washington, D.C.

United States of America

_____

JOHN A. LINDQUIST

Trial Attorney, Tax Division

3228908.1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC, by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | **Civil No. 05-40151-FDS 06-40130-FDS** |
| v. | ) ) | |
| UNITED STATES of AMERICA, | ) ) | |
| Defendant. | ) ) | |

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR ISSUANCE OF LETTERS
ROGATORY REQUESTING INTERNATIONAL JUDICIAL ASSISTANCE

SAYLOR, J.

This is an action challenging the adjustment of a partnership tax return by the Internal Revenue Service. Plaintiff Fidelity International Currency Advisor A Fund, LLC, is a limited liability company organized under Delaware law. Richard J. Egan is the Tax Matters Partner for plaintiff within the meaning of 26 U.S.C. § 6231(a).

Plaintiff timely filed a U.S. Return of Partnership Income (Form 1065) with the IRS for the 2001 tax year. On April 6, 2005, the IRS issued a Notice of Final Partnership Administrative Adjustment ("FPAA") with respect to that return. In substance, the IRS determined that plaintiff's tax liabilities for 2001 were understated by more than $62 million. Plaintiff deposited the disputed amount with the United States Treasury and filed a thirteen-count complaint seeking

readjustment of the disputed partnership items and a return of the deposited amount.[1]

The IRS has taken the position that the plaintiff should not be recognized as a partnership for tax purposes and that the transactions at issue, which created large losses that were used to shelter income, were sham transactions without any economic substance. It further contends that plaintiff participated in an essentially pre-packaged tax shelter that was developed, promoted, or sold by multiple entities, including accounting firms, law firms, and other entities, and that was sold in substantially identical form to more than 50 other clients.

**I.     Background**

On April 4, 2007, the United States moved for the issuance of letters rogatory requesting assistance from the appropriate judicial authorities of Ireland and the Isle of Man. One letter rogatory requests Irish authorities to compel the appearance of Samuel Mahoney, Martin Hawkes, and John Hussey to produce documents and give testimony under oath. The other requests similar assistance from Manx authorities as to Nigel Scott and Oliver Peck. According to the government, the five named individuals "were involved in the marketing and/or implementation and/or have knowledge of certain financial aspects of" the tax shelter at issue, and "this foreign discovery is essential to the United States' defense of this case."

Plaintiff objects to the motion on essentially four grounds: (1) that the proposed letters rogatory are overbroad, and constitute an impermissible "fishing expedition"; (2) that the proposed letters rogatory contain an improper description of the case that mischaracterizes the issues and effectively requires the Court to adopt findings of fact and conclusions of law

---

[1] In June 2006, plaintiff filed a similar action for the tax year 2002. The two matters were consolidated in September 2006.

2

concerning fundamental matters at issue in this case; (3) that the use of local counsel in the Isle of

Man to submit the letter rogatory to the court is improper; and (4) that if the requests are to be

allowed, a protective order should issue preventing the use of the evidence in any other

proceeding.

**II.**     **Analysis**

Under federal law, a United States District Court may issue a letter rogatory seeking to

obtain evidence in a foreign jurisdiction. *See* 28 U.S.C. § 1781; Fed. R. Civ. P. 28(b). Such a

request may be made pursuant to any relevant treaty or convention between the United States and

the foreign state, or directly, outside the treaty context. *See Société Nationale Industrielle*

*Aérospatiale v. United States District Court*, 482 U.S. 522, 544-46 (1987). Where, as here, the

government does not invoke the procedures of any treaty requiring the foreign state to execute

the requests, the execution of the requests relies solely on international comity. *See Société*

*Nationale*, 482 U.S. at 543-44, n.27 & 28.

The Supreme Court has noted that requests for assistance in seeking to obtain foreign

evidence require careful consideration:

> American courts, in supervising pretrial proceedings, should exercise special
> vigilance to protect foreign litigants from the danger that unnecessary, or unduly
> burdensome, discovery may place them in a disadvantageous position. Judicial
> supervision of discovery should always seek to minimize its costs and
> inconvenience and to prevent improper uses of discovery requests. When it is
> necessary to seek evidence abroad, however, the district court must supervise
> pretrial proceedings particularly closely to prevent discovery abuses. For example,
> the additional cost of transportation of documents or witnesses to or from foreign
> locations may increase the danger that discovery may be sought for the improper
> purpose of motivating settlement, rather than finding relevant and probative
> evidence. Objections to 'abusive' discovery that foreign litigants advance should
> therefore receive the most careful consideration. In addition, we have long
> recognized the demands of comity in suits involving foreign states, either as parties

3

> or as sovereigns with a coordinate interest in the litigation.  American courts
> should therefore take care to demonstrate due respect for any special problem
> confronted by the foreign litigant on account of its nationality or the location of its
> operations, and for any sovereign interest expressed by a foreign state.

*Société Nationale*, 482 U.S. at 546 (citation omitted).

With that backdrop, the Court will consider plaintiff's objections in turn.

### A.    Whether the Proposed Letters Rogatory Are Overbroad

Plaintiff first contends that the proposed letters rogatory are overbroad and constitute an improper "fishing expedition."  Plaintiff attacks the breadth of the proposal in multiple ways, asserting in substance (1) that the letters rogatory would violate principles of comity as to the two countries from which information is sought; (2) that the information sought is largely irrelevant to the pending proceeding; and (3) that the proposed letters rogatory would cause the parties (and the witnesses) to incur undue burden and expense.

Plaintiff first claims that the requests would violate principles of comity, in that they constitute an improper "fishing expedition" in violation of the procedures of the host countries.  It is true that the judicial systems of Ireland and (apparently) the Isle of Man do not permit pre-trial discovery to the extent that is permitted in the United States, and that an examination by letter rogatory would not be permitted under many circumstances where a deposition would be permissible in the United States.  Nonetheless, it does not follow that a party cannot use the letter rogatory process to obtain the testimony of a foreign witness unless the party knows exactly what the witness will say, and that anything less would constitute a "fishing expedition."

According to one case from the United Kingdom, "fishing" is the "search for material in the hope of being able to raise allegations of fact, as opposed to the elicitation of evidence to

4

support allegations of fact which have been raised with bona fide and adequate particularization." *State of Minnesota v. Philip Morris Inc.*, [1998] I.L. Pr. 170, 175 (En.).[2] Although the position of the Irish courts is less clear, it appears that in these contexts they permit "testimony" (that is, "evidence which could be used in an Irish court"), but not "discovery." *See Novell Inc. v. M.C.B. Enterprises*, 2001 1 I.R. 608, 11 (Ir. S.C.) (citing English authority).

Here, the United States has made very detailed allegations of fact, with multiple specific references to record evidence. Furthermore, there is little doubt that the United States intends to use the information at the trial. The government is not simply seeking to undertake a "roving inquiry" in order to "obtain information which may lead to obtaining evidence in general support of a party's case." *State of Minnesota*, [1998] I.L. Pr. 170, 175.

Plaintiff next contends that the information sought is largely irrelevant to the proceeding before this Court. This is a variation of an argument it has made on other occasions in the course of this litigation: that information as to so-called "pattern" evidence involving the same tax shelter promoters and advisors, but other taxpayers, is not relevant to this proceeding. Without repeating the arguments and conclusions made at other points in this lawsuit, the Court will simply note that it views the taking of testimony as to this issue to be appropriate at this time.

The Court recognizes that there is something of a "Catch-22" quality to this issue, in that it cannot rule that the evidence is admissible at trial until the evidence has been taken, yet the authorities seem to suggest that the evidence cannot be taken unless it is admissible. Nonetheless, the Court is more than satisfied that this is not a mere "fishing expedition," and that the

---

[2] Case law from the United Kingdom is persuasive, but not controlling, authority in the courts of the Isle of Man, which is a dependency, but not part, of the United Kingdom.

5

government has made sufficiently particularized factual allegations to satisfy the requirements of foreign law.  Accordingly, the proposed letters rogatory are not overbroad and do not seek irrelevant or inadmissible information.

Finally, plaintiff objects to the letters rogatory on the grounds that they would cause the parties and witnesses to incur undue burden and expense.  *See* Fed. R. Civ. P. 26(c); *see also DBMS Consultants Ltd., v. Computer Assocs. Int'l, Inc.*, 131 F.R.D. 367, 370 (D. Mass. 1990).  As a general matter, under Rule 26(c) a court may deny or limit any request to protect a person from "annoyance, embarrassment, oppression, or undue burden or expense."  Furthermore, and as noted, requests for evidence from foreign jurisdictions require special consideration as to ensure, among other things, that the discovery is not abusive.  *See Société Nationale*, 482 U.S. at 546.

Whether the burden or expense is "undue" requires a balancing of the likely expense and difficulty of the requested examinations against the nature and size of the controversy and the prospective value of the foreign evidence.  In this case, that balance is easily struck in favor of permitting the government to obtain the requested evidence.  The stakes are high; plaintiff seeks repayment of more than $62 million in this case as to the 2001 tax year alone.  Furthermore, the discovery is relatively limited, given the scale of the case; the government seeks to take five depositions in two countries.  The Court also notes that although the distance to be traveled is significant, the flying time between Boston and Dublin (approximately seven hours) is not dramatically longer than the flying time between Boston and Los Angeles (approximately five and a half to six hours).

Plaintiff suggests that the burden and expense on the parties may be reduced by requiring the government to take the depositions of four of the witnesses (Hawkes, Hussey, Scott, and

6

Peck) by written questions pursuant to Fed. R. Civ. P. 31. While this approach has been adopted in at least two instances, *see DBMS Consultants*, 131 F.R.D. at 370; *B & L Drilling Electronics v. Totco*, 87 F.R.D. 543, 545 (W.D. Okla. 1978), the Court declines to follow that approach here. Depositions by written questions under Rule 31 are rarely, if ever, used in modern litigation under any circumstances. That is surely no accident. While depositions by written questions offer one slight advantage over live depositions (the reduction of expense through elimination of attorney travel time and transcript costs), they present huge disadvantages, including the loss of spontaneity, the inability to ask follow-up questions, the inability to observe the witness, and the inability to ensure the integrity of the responses, which may be drafted or edited by lawyers. This Court sees no reason to so constrain the government under the circumstances of this case.

In short, given the amount at stake and the complexity of the litigation, the proposed taking of testimony of foreign witnesses is not unduly burdensome within the meaning of Rule 26(c), and need not be denied or limited under the principles articulated by the Supreme Court in *Société Nationale*.

**B.    <u>Whether the Government's Description of the Case is Improper</u>**

Plaintiff next contends that the proposed letters rogatory improperly state defendant's assertions as to the facts of this case as findings of fact by the Court. *See, e.g., Globe-X Mgmt., Ltd. v. Cinar Corp.*, No. 03-1831, 2004 U.S. Dist. LEXIS 21480, at *2 (E.D. Pa. 2004) (ruling that amendments to the proposed letters rogatory sufficiently addressed the plaintiffs' concerns that they did not "fairly summarize" the plaintiffs' claims and included "numerous assertions/characterizations of fact by counsel for Defendants which have not been found as fact by the Court . . . .").

7

It is proper, indeed necessary, for the letter rogatory to provide a description of the case, both to permit the foreign authority to evaluate the request and to ensure that the scope of the inquiry as to each witness is appropriate. *See* 6 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 28.12[9] (3d ed. 1997). The appropriate level of detail will necessarily vary from case to case. Furthermore, because the letter rogatory constitutes a request from the Court for assistance, not from a party, care should be taken to ensure that the synopsis of the case is not unduly argumentative, or state or suggest that the Court has reached factual conclusions at this stage of the proceedings.

The original versions of the letters rogatory submitted by the government were, in fact, problematic in that regard. However, after receiving plaintiff's objections, the government has substantially modified the background section to eliminate the argumentative or otherwise objectionable language. In its current format, both letters rogatory contain a "facts" section of approximately four pages, which identifies several of the "primary issues in this litigation" and which indicates as to factual assertions that they constitute the allegations of the United States (as opposed to factual findings of the Court). After reviewing the revised documents, the Court finds that the two synopses of the litigation in the proposed letters rogatory are appropriate and accordingly plaintiff's objections in that respect are overruled.

    C.    <u>Whether the Government May Submit a Letter Rogatory by Application of Local Counsel</u>

Plaintiff next objects to the fact that the government intends to submit the letter rogatory to the court in the Isle of Man by application of local counsel. Plaintiff cites no authority in support of its position, other than to note that if the government were utilizing the procedures

8

under the Hague Convention on the Taking of Evidence Abroad (which it is not), the letter

rogatory should be issued to the "Central Authority" in the United Kingdom. The government, by

contrast, has cited authority to the effect that the law of the Isle of Man specifically provides for

submission of the letter rogatory to the court by local counsel (and that, according to its local

counsel, this is the "expected procedure"). Accordingly, plaintiff's objections to the proposed

procedure are overruled.[3]

> **D.    Whether a Protective Order Preventing Use of the Evidence in Other Proceedings is Appropriate**

Finally, plaintiff objects to the issuance of letters rogatory unless the evidence obtained

thereby is subject to a protective order precluding its use in other cases. Plaintiff suggests that

such an order would discourage the government from undertaking a wide-ranging "fishing

expedition."

Under the circumstances presented here, the issuance of such an order would be

unnecessary and inappropriate. While the proposed subject matter of the depositions is wide-

ranging, the government has made a sufficient showing of relevance and potential admissibility to

permit the questioning to take place. The Court sees no reason at this time to impose arbitrary

limitations on its use.

**III.    Conclusion**

For the foregoing reasons, defendant's Motion for Issuance of Letters Rogatory

Requesting International Judicial Assistance is GRANTED.

---

[3] Plaintiff has also objected that the particular counsel engaged by the United States has a conflict of interest. The Court understands that the government has engaged different counsel and that the issue has therefore been rendered moot.

9

So Ordered.

Dated: May 22, 2007

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

10

2008 No.1 FTE

**THE HIGH COURT**

**IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT OF 1856
AND THE MATTER OF THE CIVIL PROCEEDINGS BEFORE THE UNITED
STATES DISTRICT COURT OF THE DISTRICT OF MASSACHUSETTS AND
THE MATTER ENTITLED**

**FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND L.L.C.**

**Plaintiff**

-and-

**UNITED STATES OF AMERICA**

**Defendant**

**EXHIBIT "JAL2"**

Referred to in the Affidavit of **JOHN LINDQUIST** sworn this 24th day of April, 2008.

SWORN by John Lindquist
This 24th day of April, 2008
at U.S. Department of Justice,
555 4th Street
in the City of Washington, D.C.
United States of America

JOHN A. LINDQUIST
Trial Attorney, Tax Division

3228908.1

**Lindquist, John A. (TAX)**

---

**From:**   Reiferson, Barry E. (TAX)
**Sent:**    Thursday, March 06, 2008 10:47 AM
**To:**      Donohue, Dennis (TAX); Lindquist, John A. (TAX)
**Cc:**      Vann, Heather (TAX)
**Subject:** Ireland M&H Meeting Transcript

Here is what I had transcribed regarding our agreement with Mahoney and Hawkes.  This is as I wrote it then, unchanged for grammar, etc.


We have an understanding regarding a procedure by which Messrs. Hawkes and Mahoney would provide answers to questions to be propounded by the United States in the Fidelity litigation and assuming the answers are complete and accurate and further assuming documentation corroborating in admissible form and assuming testimony answers are able to be admitted in this litigation, we will agree to withdraw all pending requests. Specifically, our treaty requests in the United Kingdom and Ireland and our letters rogatory in Ireland and the Isle of Man. In addition, if at some time it appears that answers are not admitted into evidence by the District of Massachusetts, and it is necessary to go forward with the Ireland letter rogatory, at that point, assuming the other provisions are met, we would limit going forward with Ireland letter rogatory to propound written questions and those previously agreed upon.

4/24/2008

# Exhibit C Part 1

2008 No. 1   FTE

## THE HIGH COURT

### IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856 AND IN THE MATTER OF CIVIL PROCEEDINGS BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS AND IN THE MATTER ENTITLED

### FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND L.L.C.

Plaintiff

-and-

### UNITED STATES OF AMERICA

Defendants



## NOTICE OF MOTION

William Fry
Solicitors
Fitzwilton House
Wilton Place
Dublin 2
www.williamfry.ie

013964.0017.MJK

2008 No. 1  FTE

## THE HIGH COURT

**IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856 AND IN THE MATTER OF CIVIL PROCEEDINGS BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS AND IN THE MATTER ENTITLED**

### FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND L.L.C.

Plaintiff

-and-

### UNITED STATES OF AMERICA

Defendants

### NOTICE OF MOTION

**TAKE NOTICE** that on 28th day of April 2008, Counsel on behalf of Mr. Martin Hawkes, Mr John Hussey and Mr. Samuel Mahoney will apply to this Honourable Court for:

1.  An Order pursuant to section 1 of the Foreign Tribunals Evidence Act 1856 and Order 39 rules 39-44 of the Rules of the Superior Courts setting aside the Order of this Honourable Court made on 3 March 2008 requiring Mr. Hawkes, Mr. Hussey and Mr. Mahoney to attend before the President of the District Court or such other Judge as may be nominated by him on the 13, 14, 15, 16 and 19 of May 2008 in Court 27 Four Courts Inns Quay Dublin 7, to be examined upon Oath or affirmation and to produce documents in accordance with the matters set out in the Letters Rogatory dated 2 July 2007 from the United States District Court for the District of Massachusetts;

2.  Such further or other order as to this Honourable Court seems fit;

3.  Costs

2

**WHICH APPLICATION** will be grounded on the pleadings already had herein, this Notice of Motion, the affidavit of Michael Kealey sworn on 22 day of April 2008, the exhibits thereto, the nature of the case and the reasons to be offered.

Dated this 22 day of April 2008.

Signed: _WILLIAM FRY_
WILLIAM FRY
Solicitors for Mr Martin Hawkes, Mr John Hussey and Mr Samuel Mahoney
Fitzwilton House
Wilton Place
Dublin 2

To:     The Central Office
        The High Court
        The Four Courts
        Dublin 7

To:     Chief State Solicitors Office
        Osmond House
        Little Ship Street
        Dublin 8

WF-897198-v1

3

2008 No. 1   FTE

## THE HIGH COURT

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856
AND IN THE MATTER OF CIVIL PROCEEDINGS BEFORE THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS AND IN
THE MATTER ENTITLED

FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND L.L.C.

Plaintiff

-and-

UNITED STATES OF AMERICA

Defendants



## AFFIDAVIT OF MICHAEL KEALEY

William Fry
Solicitors
Fitzwilton House
Wilton Place
Dublin 2
www.williamfry.ie

013964.0017.MJK

2008 No. 1  FTE

## THE HIGH COURT

### IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856 AND IN THE MATTER OF CIVIL PROCEEDINGS BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS AND IN THE MATTER ENTITLED

### FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND L.L.C.

Plaintiff

-and-

### UNITED STATES OF AMERICA

Defendants

## AFFIDAVIT OF MICHAEL KEALEY

I, Michael Kealey, of Fitzwilton House, Wilton Place, Dublin 2, aged 18 years and upwards MAKE OATH and say as follows:

1.    I am a solicitor in William Fry, Solicitors for Mr. Martin Hawkes, Mr. John Hussey and Mr. Samuel Mahoney.  Mr. Hawkes, Mr. Hussey and Mr. Mahoney are directors of Biosphere Finance Limited ("Biosphere"), for whom William Fry also act.

2.    I make this affidavit on behalf of Mr. Hawkes, Mr. Hussey and Mr. Mahoney, which I am duly authorised to do. I do so from facts within my own knowledge, save where otherwise appears and whereso otherwise appearing, I believe the same to be true and accurate.

3.    This affidavit is made for the purpose of grounding an application to set aside the Order of this Honourable Court made on 3 March 2008 pursuant to Section 1 of the

2

Foreign Tribunals Evidence Act 1856 and Order 39, rules 39-44 of the Rules of the Superior Courts, directing the examination of and the production of documents by Mr. Hawkes, Mr. Hussey and Mr. Mahoney. This order was made following an "ex-parte" application on behalf of the Defendants in these proceedings.

4.    I beg to refer to the pleadings already had herein when produced and, in particular, to the affidavit of David O'Hagan sworn on 29 February 2008 grounding the application ("Mr. O'Hagan's affidavit").

**Summary**

5.    The grounds upon which the relief in the Notice of Motion herein is sought are, in summary form, as follows:

- The request for judicial assistance is to support, in effect, a fishing expedition by the Defendants;

- The sole or primary purpose of the Letters Rogatory is to seek discovery of documentation rather than testimony;

- The Defendants have not produced before this Honourable Court adequate grounds for the examination of Mr. Hussey who has no evidence of value to give on the matters at issue in these proceedings;

- The application of 3 March 2008 was brought contrary to an agreement reached on behalf of Messrs. Mahoney, Hawkes and Hussey with the Defendants on 7 February 2008.

- This Honourable Court is being asked to make Orders which may well be inconsistent with Orders made following a request by the Defendants for Letters Rogatory before the Courts of the Isle of Man and which is the subject of applications there.

**Background**

6.    Mr. Hawkes, Mr. Hussey and Mr. Mahoney are not parties to these proceedings which are currently pending in the United States District Court for the District of Massachusetts.

3

7.  According to the Letters Rogatory of 2 July 2007, these proceedings involve a set of transactions occurring in 2001 and engaged in by a U.S. taxpayer in partnership with, among others, Mr. Samuel Mahoney. The partnership is the Plaintiff. A set of transactions is alleged to have taken place which resulted in a profit to the foreign partner, Mr. Mahoney, and losses to the U.S. taxpayer. As Mr. Mahoney was not a U.S. taxpayer, he did not have to pay tax on his profit. The Defendants do not accept the legitimacy of the partnership and have therefore disallowed the claimed losses, adjusting the partnership items for US tax purposes. The Plaintiff has issued these proceedings seeking readjustment of the partnership items for tax purposes, pursuant to Title 26 of the United States Code, Section 6226.

8.  The Defendants claim that Messrs. Hawkes, Mahoney and Hussey were involved in the marketing and/or implementation and/or have knowledge of certain financial aspects of the Financial Derivatives Investment Strategy (FDIS) tax-shelter product of which the scheme outlined in the preceding paragraph is said to be an example. The Defendants further allege that Mr Mahoney was not a real partner in the Plaintiff because the U.S. promoters of the transaction funded his investment in the company and paid him a fee. The payments were alleged to have been made through an account at an Isle of Man merchant bank in the name of Biosphere. The Defendants claim that Mr. Mahoney and Mr. Hawkes were employees of two Isle of Man entities, Kilsture Limited and Maddox Limited, which received payments from the U.S. promoters. Kilsture and Maddox are said to be shareholders in Cumberdale Holdings, also an Isle of Man entity. For the sake of completeness, Messrs. Hawkes, Mahoney and Hussey do not accept the accuracy of this description or of many of the facts said to underline their alleged involvement in the FDIS product.

9.  The Letters Rogatory of 2 July 2007 were only finalised after a series of applications by the Defendants (and opposed by the Plaintiff) before the US Courts. On 4 April, 2007, the United States first applied to issue Letters Rogatory, requesting the courts both here in Ireland and in the Isle of Man to compel five individuals (Mr. Hawkes, Mr. Hussey and Mr. Mahoney in Ireland) to give testimony about thirty-one matters and to produce documents relating to twenty-five topics. The Plaintiff has on several occasions applied to the US Courts to restrict the Defendants' wide-ranging discovery demands. As a result of these applications, the terms of the Letters Rogatory were refined and reduced by the Defendants prior to their presentation

4

before this Honourable Court.  It is important to note, however, that a consistent theme of the Plaintiff's objections to the Letters Rogatory was that the factual basis for the request was one-sided, speculative, overstated and inaccurate.  Neither the Plaintiff nor the applicants believe that, notwithstanding the changes made, this has changed.

10.    As is apparent from Mr. O'Hagan's affidavit, a request by the Defendants for an 'ex parte' application in support of the Letters Rogatory of 2 July 2007 was first made to the Chief State's solicitors office on 23 July 2007.  The nine month delay in bringing the requested application is, however, unexplained.

**Documents**

11.    The Letters Rogatory of 7 July 2007 set out eighteen categories of documents to be produced by Messrs. Mahoney, Hawkes and Hussey.  A further three categories of documents are to be produced by Mr. Mahoney alone.  The breath of the request is exemplified by the first numbered category.  The Defendants ask this Honourable Court to oblige the deponents to produce the minutes of all meetings of seven companies and of another company and all its subsidiaries referring to the Plaintiff or to anyone of another fifty-seven FDIS partnerships. No time frame is specified. Of all the companies referred to, only two, Biosphere and Cumberland Investments Limited, are based in the Republic of Ireland and Cumberland is in voluntary liquidation. As it is important for the reasons outlined below, the great majority, if not all, of the other companies referred to are incorporated in the Isle of Man. The request goes on to seek financial statements for all of these companies, as well as company resolutions for them relating to fifty-eight FDIS partnerships, including the Plaintiff.  Every communication and email received or sent by the deponents and Biosphere relating to the FDIS partnerships is also demanded.  The scope and volume of materials sought in the remaining categories is similarly wide. There is no limit to the request in terms of time.

12.    I beg to refer to a true copy of the memorandum of law in support of a motion for issuance of Letters Rogatory requesting international judicial assistance issued by the Defendants on 4 April 2007 upon which marked with the letters *"MJK1"* I have signed my name prior to the swearing hereof.  I say and believe that the true import

and nature of the request is apparent from the opening sentence to the Introduction to the said memorandum of law. This states that the "*Letter Rogatory requests the judicial authorities of Ireland to compel the appearance of Samuel Mahoney, Martin Hawkes and John Hussey to produce documents and give testimony under oath*". It is noteworthy that the request for documents precedes that for testimony, clearly suggesting that the testimony sought is ancillary to the discovery of documents. I say and believe that it is clear, from the terms of request and from the Letters Rogatory as finalised, that the primary, if not sole, purpose of them is to obtain documents.

### Fishing Expedition

13.  The breath of the documents sought in the Letters Rogatory of 2 July 2007 is mirrored in the seventy-six questions sought to be raised with the proposed deponents. I say and believe that the applicants' view that what is sought is a fishing expedition is exemplified by questions 46 to 50, where it is proposed, among other things, to ask the deponents whether they had ever met or spoken with Richard Egan or with the partner in any FDIS partnership or any employee of Carruth Management. The US proceedings have been in being since 2005. There have been a range of interlocutory applications before the US courts. There has been extensive discovery. Depositions have been taken. It is extraordinary that questions as wide as those now sought could be asked unless the Defendants were engaged in a fishing expedition.

### Isle of Man

14.  I say and believe that the Defendants have brought applications for Letters Rogatory before the Courts of the Isle of Man. As outlined above, an initial application was issued by the Defendants against two individuals, that application stands adjourned pending, among other things, the determination of a second application. The second application is against a number of Isle of Man companies. It was issued last November. While I am not privy to the details of the second applications, I understand that they mirror those before this Honourable Court and that both the companies and partnerships from whom material is sought and in the nature of the documents and information requested is very similar in the applications here and the Isle of Man. I say and believe that there is very considerable duplication in the

6

information sought and the bodies from whom that information is, in effect, sought. The Defendants' applications are being resisted in the Isle of Man and were, I believe, the subject of an oral hearing over two days on 2 and 3 April 2008. A decision is awaited from the courts there.

15. The practical effect of this is that, in the event that the Defendants succeed in their application in the Isle of Man, they will receive much of the information and documentation which is the subject of the present application and will do so in the jurisdiction with the closest connection to the great majority of the parties involved. On the other hand, if the Defendants' application was to fail, in whole or in part, this Court would be asked to make Orders that could be inconsistent with those made in the Isle of Man. In effect, some or all of the applicants could be ordered, on pain of contempt of this Honourable Court, to produce documents and information from parties restricted by the Courts of the Isle of Man from giving that material to the Defendants and/or the applicants.

**Agreement**

16. In the period between the initial application for Letters Rogatory (4 April 2007) and the application of 3 March 2008, there has been considerable contact between two of the proposed deponents, Mr. Hawkes and Mr. Mahoney, and the Defendants and their representatives.

17. Correspondence passed between the Office of the Revenue Commissioners, Mr. Hawkes, Mr. Mahoney and their advisors on foot of a request received by the Irish Revenue under Article 27 of the Ireland/US Double Taxation Convention. The information sought included, among other things, bank account details for Biosphere and other companies. This information had been sought by the Defendants for use in these proceedings. Mr. Hawkes and Mr Mahoney responded to those requests in writing. I beg to refer to true copies of relevant correspondence concerning the request from the Revenue Commissioners and Mr Hawkes' and Mr Mahoney's responses upon which pinned together and marked with the letters "*MJK2*" I have signed my name prior to the swearing hereof.

18. In addition, there have been discussions between representatives of the United States Department of Justice, on behalf of the Defendants, and the legal advisors for the

Plaintiff and the legal advisors for the proposed deponents.    This culminated in a meeting on 7 February 2008 in the offices of William Fry, Solicitors. In attendance were three representatives of the United States Department of Justice, the US attorney for the Plaintiff and my colleagues Martin Phelan and Aisling Holden, on behalf of the proposed deponents. Ms. Holden took a note of that meeting. I beg to refer to a true copy of the said note upon which marked with the letters "*MJK3*" I have signed my name prior to the swearing hereof. As is apparent from the note of the meeting, Mr. Denis Donohue of the United States Department of Justice *"stated the terms of the understanding reached. This concerned the understanding by which SM* (Mr. Mahoney) *and MH* (Mr. Hawkes) *would provide answers to the questions to be propounded by the* (US) *Government in Fidelity litigation.    Based on the assumption that the answers provided are complete and accurate and that documents would be provided to corroborate the answers in a form that would be admissible in evidence and assuming that the answers to the written questions were admissible in evidence, the US Department of Justice were prepared to withdraw all pending foreign documentary requests specifically relating to Treaty requests with Ireland, Treaty requests with the UK, Letters Regotary* (sic) *with Ireland and Letters Regatory in the Isle of Man."* I beg to refer also to a true copy of the questions posed by the representatives of the United States Department of Justice at the above mentioned meeting on 7 February 2008 in the offices of William Fry, Solicitors and answers given by both Mr. Hawkes and Mr Mahoney upon which marked with the letters "*MJK4*" I have signed my name prior to the swearing hereof. The said questions and answers were agreed upon between the parties before the meeting and my colleague Aisling Holden was asked to read verbatim from the agreed transcript and Mr. Hawkes and Mr. Mahoney were asked whether they agreed that all answers were correct. I say and believe that Mr. Hawkes and Mr. Mahoney comprehensively provided all information sought at that meeting in the belief that the US Department of Justice would in turn withdraw all application for Letters Rogatory against them. Mr. Hawkes and Mr. Mahoney gave answers to the questions raised of them to the satisfaction of the Defendants, provided corroborative documentation when required and did so in a form which they have been advised is admissible in evidence before the District Court of Massachusetts. In short, they have complied with all aspects of the agreement reached on 7 February 2008. The voluntary process of providing information is ongoing and I beg to refer to the latest copy of the transcript prepared

earlier this month upon which marked with the letters "*MJK5*" I have signed my name prior to the swearing hereof.

19.    In the circumstances, I believe that the Defendants were, as a consequence of the agreement reached on 7 February 2008, estopped from bringing the application for Letters Rogatory brought the following month before this Honourable Court.    I further say and believe that the deponents are of the view that they have provided to the US Department of Justice both directly and through their interaction with Irish Revenue Commissioners sufficient information to meet the Defendants' alleged need for documentation and testimony.

**Mr. Hussey**

20.    Notwithstanding the volume of documents sought from him and the range of questions sought to be asked of him, there is only one substantive reference to Mr. Hussey in the "Facts" section of the Letters Rogatory of 2 July 2007.    That is that: *'John Hussey was a director of both Biosphere Finance and Cumberdale Holdings.'* It is suggested, on foot of this bare suggestion, that: *'The testimony of Mr. Mahoney's alleged business associates, Messrs. Hawkes and Hussey, may also* (sic) *be relevant to the determination as to why Mr. Mahoney became a partner in Fidelity International.'* It is nowhere suggested that Mr. Hussey has any involvement in the matters at issue in these proceedings or that he has any, or could have, any knowledge of them. I am instructed by Mr. Hussey that he had no personal involvement in the FDIS product and has no relevant evidence to give about it or about the matters at issue in the US proceedings. The fact that the Defendants did not ask Mr. Hussey to participate in the detailed Questions and Answer process outlined in paragraph 18 above reinforces Mr. Hussey's belief that the Defendants are fully aware that he has no evidence of value to give in these proceedings.

**Conclusion**

21.    In the circumstances, I beg this Honourable Court for an order in the terms of the Notice of Motion herein.

SWORN by   Michael Kealey

this _3_ day of April 2008

at _____

in the City of Dublin

before me a Practising Solicitor

and I know the Deponent

_____

Practising Solicitor

This Affidavit is filed on behalf of            by WILLIAM FRY, Solicitors, Fitzwilton House,
Wilton Place, Dublin 2.

Filed this _____ day of April 2008.

WF-897218-v3

10

2008 No. 1  FTE

## THE HIGH COURT

**IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856
AND IN THE MATTER OF CIVIL PROCEEDINGS BEFORE THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS AND IN
THE MATTER ENTITLED**

**FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND L.L.C.**

Plaintiff

-and-

**UNITED STATES OF AMERICA**

Defendants

## EXHIBIT "MJK1"

Referred to in the Affidavit of **MICHAEL KEALEY** sworn this 23rd day of April 2008

_____
Deponent

_____
Practising Solicitor/
Commissioner for Oaths

William Fry
Solicitors
Fitzwilton House
Wilton Place
Dublin 2
013964.0017.MJK

11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Nos. 05-40151-FDS (D. Mass.) 06-40130-FDS (D. Mass.) |
| v. | ) ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ISSUANCE OF LETTERS ROGATORY REQUESTING INTERNATIONAL JUDICIAL ASSISTANCE**

The United States of America submits this memorandum in support of its motion for

issuance of letters rogatory requesting assistance from the appropriate judicial authorities of

Ireland and the Isle of Man. In support, the United States is concurrently filing the Declaration of

John Lindquist, to which supporting exhibits are attached.[1] The proposed letters rogatory are

attached to the motion.

**Introduction**

One letter rogatory requests the judicial authorities of Ireland to compel the appearance of

Samuel Mahoney, Martin Hawkes, and John Hussey to produce documents and give testimony

under oath. The other letter rogatory requests the judicial authorities of the Isle of Man to

compel the appearance of Nigel Scott and Oliver Peck to produce documents and give testimony

---

[1] Because the supporting exhibits reference the identities of other taxpayers, the United States is separately moving for leave to file the Declaration of John Lindquist and the attached exhibits under seal. To the extent that supporting exhibits have already been filed in this action, they are also cross-referenced to the Docket Index ("DI") number under which they have been filed. However, for the convenience of the Court, duplicate copies are also attached to the declaration. The exhibits are listed in Appendix A. There are 52 exhibits attached to the Declaration of John Lindquist and referenced in this memorandum. Those 52 exhibits range in number from 1-78. (There are gaps in the exhibit numbering).

2370273.1

under oath. As detailed herein, Messrs. Mahoney, Hawkes, Hussey, Scott, and Peck were involved in the marketing and/or implementation and/or have knowledge of certain financial aspects of the Financial Derivatives Investment Strategy ("FDIS") tax-shelter product at issue, and this foreign discovery is essential to the United States' defense of this case.

The core domestic promoters of this product included The Diversified Group Incorporated ("DGI"), Helios Financial ("Helios"), and Alpha Consultants ("Alpha"). As detailed herein, Mahoney and Hawkes participated as purported foreign partners in each of the FDIS tax shelter products sold by the domestic promoters. For their participation, they appear to have been paid a fee by the domestic promoters. It is unclear exactly how the fees were paid, though it seems the promoters used an elaborate web of foreign entities. It is essential that this foreign discovery be allowed to enable the United States to untangle that elaborate web.

The tax-shelter promoters began marketing the FDIS foreign-partner tax shelter in mid-2001. So far, the United States has identified 58 FDIS transactions. In each transaction, a foreign "partner," as described in the Complaint, (Complaint at ¶34), not subject to United States taxation was needed to make the tax shelter work. In each transaction, the tax-indifferent foreign partner was Samuel Mahoney or his business associate, Martin Hawkes.[2] In each transaction, the

---

[2] Through discovery upon the promoters, the United States has obtained copies of marketing outlines for not only the Egan transaction, but also 57 other nearly identical transactions. These outlines are summarized in Appendices C and D to the Declaration of John Lindquist. Appendix C details information from the collected outlines for each of the 46 FDIS transactions implemented in 2001. The outline for the Egan FDIS transaction is also attached to Appendix C as a sample. Appendix D details information from the collected outlines of the 12 FDIS transactions implemented in 2002. It appears that copies of these outlines were shared with the purported foreign investors prior to the transaction. *See* Govt. Ex. 67 (email dated 11/16/01, from James Haber to Biosphere Finance, forwarding outlines for three of the FDIS transactions). As shown in Appendices C and D, Samuel Mahoney was the foreign partner in 24 of the known FDIS transactions and Martin Hawkes was the foreign partner in 34 of them. The accounting firms and law firms that co-promoted these FDIS transactions are summarized in Appendix B.

2370273.1

foreign partner was to make an initial contribution to the "partnership," only to sell most of that interest shortly thereafter. Each time, the foreign partner was to sell the majority of his recently purchased common interest – 88% of his 93% common interest or 90% of his 95% interest – to the taxpayer. As detailed in each of the outlines for the proposed transactions, the purchase price for the interest was to be exactly one-half of the foreign "partner's" initial capital contribution.

So far the United States' discovery has been largely limited to the tax-shelter promoters and the U.S. taxpayer-participants. It is essential that the United States examine the foreign participants in order to obtain a complete picture of the tax shelter and to present additional evidence showing that the so-called foreign partners were not, in fact, real partners.

The need to take this foreign discovery is particularly acute given the suspicious source of the funding of the foreign partner's capital contributions, the use of a maze of foreign entities to route circuitously payments to these foreign partners, and the intentional transfer of records of various FDIS transactions to foreign entities. The funding of the capital contributions is suspicious because half of each contribution by the foreign partner was seemingly lost within days of being made, when the majority of the foreign partner's interests was purchased by the U.S. taxpayer for half of the initial contribution amount. That suspicious transaction occurred over and over again, with the foreign participants seemingly unfazed by the quick loss of half of his investment. Moreover, the tax-shelter promoters sought to mask their funding of the foreign partner's contributions and a substantial additional amount paid to the foreign partners – apparently to compensate them for serving as phony partners – through the use of a labyrinth of foreign entities. To further conceal the highly-abusive nature of these transactions, the promoters transferred overseas the FDIS records for their 2002 FDIS transactions. It is unclear what other records, if any, including developmental records and records relating to the 2001 transactions,

3

2370273.1

were transferred overseas.

Through domestic discovery, the United States has been able to uncover the web of foreign entities receiving payments from the domestic promoters. Each of those entities has some relationship to Mahoney and/or Hawkes. Mahoney and Hawkes are Irish citizens who were directors of an Irish company known as Biosphere Finance, Ltd. ("Biosphere"), which received payments from the domestic promoters. They also appear to have been employees of two Isle of Man entities known as Kilsture and Maddox, which also received substantial payments from the domestic promoters. Kilsture and Maddox were shareholders of Cumberdale Holdings, also an Isle of Man entity. Nigel Scott, an Isle of Man resident, was an employee of Singer & Friedlander (n/k/a Kaupthing Singer & Friedlander), which appears to have facilitated the creation and operation of Cumberdale, Kilsture, and Maddox. Nigel Scott was also a principal of Cumberdale Holdings, Kilsture, and Maddox, and a manager of Trilogy Financial Products Ltd., which was used to secrete evidence offshore. Oliver Peck, also an Isle of Man resident, is or was the Managing Director of Singer & Friedlander. In addition to facilitating the creation of and operation of Cumberdale, Kilsture, and Maddox, Singer & Friedlander appears to have facilitated payments to Messrs. Mahoney and Hawkes. It appears to have done so, at least in part, through an account at Singer & Friedlander called "The H&M [*i.e.*, Hawkes and Mahoney] Joint Venture account." It further appears that all 2001 FDIS investors, when purchasing the interests of Mahoney or Hawkes, wired the agreed upon amount to that same "H&M Joint Venture account number 20195700" at Singer & Friedlander Limited, London.

4                                                                2370273.1

Alpha have a profit-sharing agreement with DGI.[5] Under the DGI/Helios agreement, Helios was to originate, market, and execute DGI products, and was to be paid a percentage of DGI's net fee.[6]

## B.    The Promoters Coordinated with Law and Accounting Firms.

As described by DGI in its FDIS marketing materials, a number of law firms and accounting firms assisted DGI on a regular basis in its development and marketing of tax shelters.[7]  DGI viewed its ability

> . . . to manage and control the process of getting two to four sets of attorneys and accountants to *expeditiously reach the desired conclusions* as being one of [its] most valuable contributions to [its] clients.

(Emphasis added).[8]  For the FDIS product, DGI enlisted four law firms to review the product and issue opinions, all for the apparent purpose of making each of their opinions appear independent. These included Proskauer Rose, Lord Bissell & Brook, Bryan Cave, and Sidley Austin Brown & Wood (n/k/a Sidley Austin LLP), all of whom were sent a copy of the draft FDIS marketing

---

[4](...continued)
Govt. Ex. 3, at p.5.

[5]  Haber has testified that Ivan Ross of Alpha was integral to DGI's development and marketing of tax shelters and also had a profit sharing agreement with DGI. Haber Dep. Tr. 9/7/00, at 57:5 -23, 58:9 -15, Govt. Ex. 5.  *See also*, Govt. Ex. 1 (marketing agreement between DGI and Helios) and Govt. Exs. 50 and 51 (providing a reconciliation of aggregate fees and expenses for purposes of computing the profit split between DGI, Alpha and Helios) (Govt. Ex. 51 was previously filed as Govt. Ex. 14 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (DI#66) (exhibit filed under seal)).

[6]  Govt. Ex. 1, ¶¶ I a. and II; Haber Dep. Tr. 8/12/03, at 32:7 - 32:21; 32:22 - 33:6, 177:16 - 178:22 Govt. Ex. 64.

[7]  *See* FDIS PowerPoint presentation, Govt. Ex. 18 (Govt. Ex. 7 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).  *See also* Ruble Affidavit, ¶¶ 8-12, Govt. Ex. 7 (describing how Ruble also assisted DGI to develop its Option Partnership Strategy) (Govt. Ex. 6 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

[8]  *See* FDIS PowerPoint presentation, Govt. Ex. 18 (Govt. Ex. 7 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).  These law firms then also issued purported opinions on the same transactions they helped to design.  The particular FDIS transactions upon which they issued opinions are listed in Appendix B.

6

materials for review and comment.[9]  Additionally, these same law firms also assisted in the

drafting of the boilerplate FDIS implementation documents, which were then to be executed for

each FDIS transaction by the law firm of Brown Raysman.[10]  The four opining law firms also

worked with DGI in drafting purportedly independent – but actually cookie-cutter – opinions

blessing the very transaction which they helped design.[11]  As candidly disclosed in an email

exchange between R.J. Ruble of Sidley Austin and Haber, these law firms were even prepared to

engage in play acting to make it appear that they were acting independently:

> Ruble:    just got my lunch invitation from larry cohen [of BDO].  I'll act
> surprised when he hands me the memo.

---

[9]  Govt. Ex. 18 (Helios Email dated 4/4/01 forwarding FDIS marketing materials for review and comment) (Govt. Ex. 7 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)); Govt. Ex. 20 (Ruble email dated 4/5/01, "I have made some modification to the slides which I hope come out when you open them. Basically, I have eliminated the term "Foreign Investor" and replaced it with the term "Investor(s) II") (Govt. Ex. 8 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)). R.J. Ruble of Sidley Austin was involved in various facets of the design and development of the FDIS product. *See* Govt. Exs. 8, 10, 11 and 12 (Govt. Exs. 9, 10, 11, and 12 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (exs. attached to Reiferson Decl., DI# 68)). Ruble was also involved in the design and development of other DGI tax shelter products in prior years. *See* Govt. Ex. 7 (Ruble Affidavit, ¶¶ 8-12, describing how Ruble previously assisted DGI to develop its Option Partnership Strategy) (Govt. Ex. 6 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

[10]  *See* Govt. Ex. 35 (Email dated 5/17/01 from Orrin Tilevitz of DGI to R.J. Ruble forwarding draft operating agreement, along with exhibits thereto, to implement the strategy) (Govt. Ex. 13 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)). DGI records reflect that Brown Raysman was paid $250,000 for its services. Govt. Ex. 14 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (DI#66) (exhibit filed under seal)).

[11]  *See* email dated 4/24/01, Govt. Ex. 30 (Orrin Tilevitz of DGI preparing draft of opinion for the 2001 option spread partnerships) (Govt. Ex. 15 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)); email dated 4/26/01, Govt. Ex. 31 (forwarding partnership opinion from Orrin Tilevitz of DGI to R..J. Ruble of Sidley Austin) (Govt. Ex. 25 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)); email dated 2/7/02 Govt. Ex. 45 ("I've been through the Proskauer draft for the new deal. Ira has done an excellent job pairing down a number of the discussion (sic) from what we have said in the past. In a perfect world I would probably adopt many of the changes Ira made, but it's hard to get changes to boilerplate here. Do you have a problem if we continue to use our form of discussion on most of these issues?") (Govt. Ex. 16 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

Haber:   You don't have to rely on your acting skills because I have already told him that you have it and that we are working together to enhance the opinion.[12]

One of the expenses included in DGI's gross fee was an amount agreed to be paid by DGI to the four law firms for their issuance of the tax-shelter legal opinions.[13]

Similarly, DGI records show that it shared the FDIS design and development documents with the accounting firms who helped DGI target potential customers.[14]  These records reflect that the accounting firms were directed not to leave a copy of the FDIS PowerPoint presentation with potential customers because it "show[ed] too much of the structure."[15]  Haber testified that

---

[12]  See DGI email dated 1/25/02, Govt. Ex. 44 (Govt. Ex. 17 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

[13]  DGI confirmed the amounts payable by it to Sidley Austin, Proskauer Rose, and Bryan Cave for their issuance of opinions by memo dated 1/2/02. See Govt. Exs. 41, 42, and 43 (Govt. Exs. 18, 19, and 20 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (exs. attached to Reiferson Decl., DI# 68)). The 2001 reconciliation of net fees and expenses reflects that DGI paid Sidley Austin $800,000, Proskauer Rose $1,020,000, Bryan Cave $560,000, Lord Bissell & Brook $75,000, and Brown Raysman $250,000. See email dated 5/3/02, with attached 2001 reconciliation, Govt. Ex. 51 (Govt. Ex. 14 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (DI#66) (exhibit filed under seal)).

[14]  See memorandum dated 6/27/01, Govt. Ex. 36 (transmitting FDIS PowerPoint presentation to Grant Thornton) (Govt. Ex. 7 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)); Govt. Exs. 21 and 22 (FDIS PowerPoint presentations produced by BDO) (Govt. Exs. 23 and 24 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (exs. attached to Reiferson Decl., DI# 68)). See also Govt. Ex. 28 (DGI email dated 4/18/01 to Ira Akselrad of Proskauer Rose and Ruble of Sidley Austin, confirming that the referenced attachment named "Transitory Preferred" had also been sent to Charlie Bee of BDO) (Govt. Ex. 4 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)); Govt. Ex. 29 (Fax dated 4/23/01 from BDO to Haber of DGI confirming a conference call for 4/26/01) (Govt. Ex. 22 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

[15]  See Govt. Ex. 21 (Handwritten notes on front page of FDIS marketing materials read "(1) Confirm that this will not be left with client (i) if it is left...shows too much of the structure (ii) if not left, should have some investment-oriented material to leave (2) we need to decide about fee inside or out – (3) if out - how do we justify it . . .") (Govt. Ex. 23 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)). See also Govt. Ex. 22 (FDIS PowerPoint presentation produced by BDO) (Govt. Ex. 24 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)) and Govt. Ex. 36 (transmitting FDIS powerpoint to Grant Thornton and stating "This is to confirm that the enclosed materials will not be distributed to anybody") (Govt. Ex. 7 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

8

2370273.1

the accounting firms, which the promoters called "referral sources," included KPMG, BDO

Seidman, Grant Thornton and RSM McGladrey.[16]  The fee for these accounting firms, like the

fee for DGI, was computed as a fixed percentage of the tax loss to be generated.[17]

## C.    Co-Promoters Shared Fees from the FDIS Tax Shelter.

DGI and its two primary co-promoters, Alpha and Helios, marketed their tax shelter

products to wealthy taxpayers seeking to offset multi-million dollar amounts of ordinary income

or capital gains that had oftentimes been recently realized by the taxpayers on their exercise of

employee stock options or the sale of a business or capital assets.  DGI sold the FDIS tax-shelter

product for an amount based on a percentage of the taxpayer's desired tax loss.[18]  DGI then

allocated the net amount remaining after the payment of all transaction-related fees and expenses

between itself, Alpha, and Helios, if Helios was involved in the transaction, on an agreed-upon

percentage basis.[19]  DGI's records reflect that DGI, Alpha, and Helios shared net profits, after

fees and expenses, on a 40/40/20 basis, respectively, in 2001.[20]

---

[16] Haber Dep. Tr. 2/28/03 at 290:21 - 291: 6, Govt. Ex. 62 (Govt. Ex. 21 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

[17] Govt. Ex. 23 (BDO email dated 4/5/01, describing the proposed fee split with DGI) (Govt. Ex. 26 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

[18] *See* Govt. Ex. 51 (computes the net fee from each of the listed customers as a fixed percentage of the loss amount of the transaction) (Govt. Ex. 14 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (DI#66) (exhibit filed under seal)).

[19] *See* Govt. Ex. 51 (computes Alpha's 40% share of the net profits after shared expenses for 2001) (Govt. Ex. 14 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (DI#66) (exhibit filed under seal)).

[20] *See* Govt. Ex. 32 (email dated April 26, 2001 from Steve Jacoby of SMD, another salesman for DGI products, to Haber of DGI, stating "On Tuesday you told me that DGI and Alpha would get 80% of the profits and Helios would get 2/3 and SMD 1/3 of the remaining 20%."); Govt. Ex. 51 (attached spreadsheet computes Alpha's 40% share of the net profits after shared expenses for 2001); Govt. Ex. 61 (Alpha email dated 2/27/03, computing allocation between DGI, Alpha, and Helios on a 40/40/20 basis for 2002).

9                                    2370273.1

D.    Sham-Partnership Design of the FDIS Tax Shelter.

The tax benefits of the FDIS tax shelter were critically dependent on a multi-member LLC, with a foreign participant, being treated as a valid partnership for federal income tax purposes. *See, e.g., Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949) (a valid partnership for tax purposes requires the parties to join together as partners in good faith with a legitimate business purpose). It is the Government's position that the so-called partnership created here, Fidelity International, does not meet the requisite standard, and is a sham.

Including Egan's transactions, DGI sold 46 identically structured FDIS tax shelters in 2001 (and 12 more in 2002), each using a sham partnership. Those 46 tax shelters generated over $1 billion in phony tax losses.[21] Each of those 46 tax shelters involved the formation of a multi-member LLC, which was treated as a partnership for tax purposes, with the participation of a purported foreign partner, who nominally acquired the bulk of the common interests of the partnership for a relatively small share of its total contributed capital. Once capitalized, the purported partnership would acquire multiple pairs of simultaneously-executed, offsetting European digital options, and would meticulously time the termination of the offsetting options, first to terminate the gain legs of the options, generating massive paper gains to the purported foreign partner. Simultaneously therewith, the partnership would replace the terminated gain legs with options having virtually the exact same terms. Then, almost immediately thereafter, the taxpayer would purchase the bulk of the purported foreign partners' common interest for one-half

---

[21] *See* Appendix C (listing 46 2001 FDIS transactions generating desired tax losses totaling $1,027,050,000); Govt. Ex. 50 (listing 46 2001 FDIS transactions and the adjusted basis of the purported foreign investors, Samuel Mahoney and Martin Hawkes); Govt. Ex. 51 (listing all of DGI's 2001 customers, including those for the forty-six 2001 FDIS transactions generating losses totaling $1,545,950,000) (Govt. Ex. 14 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (Dkt#66) (exhibit filed under seal)).

2370273.1

the foreign partner's purported capital contribution. A few weeks later, the partnership would terminate the remaining options, generating a massive paper loss to the taxpayer who would then claim the paper loss on his personal return as a real economic loss. On the partnership tax return, however, the paper gains and paper losses would virtually offset each other, with the partnership reporting only a small net economic gain or loss on the offsetting option transactions.[22]

Before implementing each of these FDIS transactions, the promoters prepared an outline of the proposed transactions, which detailed the pre-arranged steps common to each of the FDIS transactions.[23] As summarized in Appendix C,[24] those outlines reflect that one of two purportedly independent foreign partners, Samuel Mahoney or Martin Hawkes, participated in each of the forty-six 2001 FDIS transactions.[24] Records produced by DGI reflect that it collected gross fees in excess of $32 million in 2001, from which it fully funded the purportedly independent foreign partners while also paying them $2 million for their short-lived role as a nominee or sham partner.[25] Thus, the taxpayer and the so-called foreign co-investors did not join together in good faith as real partners in these tax-driven ventures, and the purported FDIS

---

[22] In marketing FDIS, DGI highlighted the fact that the face of the partnership return, i.e., Form 1065, reporting the offsetting options transactions "not show a large net loss." Email dated 4/10/01, Govt. Ex. 26.

[23] Both the design memorandum and FDIS marketing materials outline the multiple steps of the transaction. In the first step of the transaction, the taxpayer's basis in the partnership is artificially inflated to make it appear that the taxpayer has sufficient basis to claim a tax deduction for the allocated partnership loss. See DGI memorandum dated 3/23/01, Govt. Ex. 10 (Govt. Ex. 10 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)); FDIS PowerPoint presentation, Govt. Ex. 18 (Govt. Ex. 7 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

[24] See Appendix C.

[25] The forty-six 2001 FDIS transactions, including the Egan transaction, are detailed in a spreadsheet attached to an email to DGI dated May 1, 2002. See email dated 5/1/02, re "2001-Customers-Haber_Invst-4-22-01.xls," Govt. Ex. 50.

11

rtnerships were not valid partnerships for federal income tax purposes. Without the

participation of an independent foreign partner, the FDIS transactions collapse.

E. **Payments to Mahoney and Hawkes, the Foreign "Partners," Routed Through Foreign Entities**

The promoters' internal accounting records show that Mahoney and Hawkes contributed,

at least facially, a combined total of $3,707,715 to participate as purported partners in the forty-

six (46) 2001 FDIS transactions. *See* Govt. Ex. 50. That internal accounting further shows that

Mahoney and Hawkes then received a total of $2,404,737 from the sale of the bulk of their

partnership interests to the taxpayers in these transactions, leaving $1,302,978 as the Mahoney

and Hawkes combined total unrecovered "cost basis" in these transactions. (The unrecovered

"cost basis" of $1,302,978 equals the $3,707,715 total initial contributions minus $2,404,737

from the sale of partnership interests). *See* Govt. Ex. 50. Not only do the domestic promoters

account for this exact amount of $1,302,978 as a joint promoter expense, but their internal

accounting further reflects that they also paid Mahoney and Hawkes the round sum of

$2,000,000. *See* Govt. Ex. 51. From those internal accounting records, it appears that

Mahoney's and Hawkes's purported investment in the forty-six 2001 FDIS transactions was not

only fully funded by the promoters, but Mahoney and Hawkes were also paid a fee of

$2,000,000. What is unclear is precisely how the fee payments were made.

Upon questioning by the Irish Competent Authority, Mr. Mahoney has represented that

the source of his $651,000 capital contribution to Fidelity International was Kilsture. He further

represented that $325,510 of that amount represented salary due him as an employee of Kilsture

and that the balance of $325,490 was a loan from Kilsture to Mr. Mahoney which was repaid by

Mr. Mahoney in full on November 7, 2001. It appears that Kilsture is a shell entity with an

address at Samuel Harris House, 5-11 St. George's Street, Douglas, Isle of Man as its only physical presence on the Isle of Man.[26]  Kilsture and a second entity, Maddox are each 50% shareholder entities of Cumberdale Holdings Ltd. ("Cumberdale Holdings"), also an Isle of Man entity.[27]  It further appears that Cumberdale, Kilsture and Maddox were used solely to route payments to and from Mahoney and Hawkes, though the mechanics used to circuitously route the payments are unclear.

The records of DGI, one of the core domestic promoters, reflect that on March 23, 2001, the same date that DGI announced that it had revised its "contemplated Partnership Strategy,"[28] DGI made substantial payments to both Biosphere and Kilsture.  On that date, DGI paid $952,000 to Biosphere and $120,000 to Kilsture.[29]  The directors of Biosphere were Samuel Mahoney, Martin Hawkes, and John Hussey.[30]  Samuel Mahoney has represented that he was also an employee of Kilsture and that the $651,000 contribution to Fidelity International on October 22, 2001 was made on his behalf by Kilsture, an Isle of Man Company.[31]  A copy of an

---

[26]  That address is still the Isle of Man address for Singer & Friedlander, n/k/a Kaupthing Singer & Friedlander (Isle of Man) Limited, which is a merchant bank and is or was Nigel Scott's and Oliver Peck's employer.

[27]  A sister company of Cumberdale Holdings is Cumberdale Investments Ltd. ("Cumberdale Investments"), which is directed by Messrs. Mahoney, Hawkes, and Hussey (each Irish nationals), and which has approximately eleven dissolved and short-lived subsidiary companies.  These companies appear to have been used by DGI to effect another DGI tax shelter product which it marketed under the name "CFC."  As of March 19, 2002, the address for Cumberdale Investments Ltd. is 43 Ailesbury Road, Ballsbridge, Dublin 4.  Govt. Ex. 70.

[28]  See email dated 3/23/01, Govt. Ex. 10 (email announcing to R.J. Ruble of Sidley Austin that DGI had revised its contemplated Partnership Strategy) (Govt. Ex. 10 to U.S. Mot. to Compel RSM McGladrey's Prod. of Docs. (ex. attached to Reiferson Decl., DI# 68)).

[29]  See HSBC Account Statement of DGI for March 2001, Govt. Ex. 66.

[30]  See Form B1 filed by Biosphere Finance, Govt. Ex. 55.

[31]  See Letter dated 5/22/06 re Interview of Mahoney (p. 1 only), Govt. Ex. 78 ("Mr. Mahoney would now further confirm that the capital contribution of US$651,000 was made on his behalf by Kilsture Limited, an Isle of Man company, and that US$325,510 of this amount represented salary due to (continued...)

2370273.1

produced by Alpha shows that on December 12, 2001, shortly after implementation of the forty-six (46) 2001 FDIS transactions, DGI wired two payments to Cumberdale, through Refco, totaling $1,051,400.69.[32]  The two shareholders of Cumberdale Holdings, Ltd., are Kilsture and Maddox.[33]  Refco Capital Markets is the counterparty in all of the FDIS tax-shelter transactions.

The promoters' records further show that, shortly thereafter, in February 2002, DGI made payments totaling $1,000,000 to Biosphere, Kilsture, and Maddox, comprised of $50,000 to Biosphere on February 15, 2002, purportedly for "Administration and Agency Services;" $570,000 to Maddox on February 22, 2002, purportedly for "Consultancy services;" and $380,000 to Kilsture on February 22, 2002, purportedly for "Consultancy fees."[34]  These payments may be summarized as follows:

| Date | Total | Biosphere | Cumberdale | Kilsture | Maddox |
|---|---|---|---|---|---|
| 3/23/01 | 1,072,000.00 | 952,000.00 | | 120,000.00 | |
| 12/12/01 | 204,710.80 | | 204,710.80 | | |
| 12/12/01 | 846,689.89 | | 846,689.89 | | |
| 2/15/02 | 50,000.00 | 50,000.00 | | | |
| 2/22/02 | 950,000.00 | | | 380,000.00 | 570,000.00 |
| Total | 3,123,400.69 | 1,002,000.00 | 1,051,400.69 | 500,000.00 | 570,000.00 |

Given the timing and amounts of the transatlantic payments, it appears likely that all or some of the cost-basis and $2 million fee for Mahoney's and Hawkes's participation in the forty-six 2001 FDIS transactions was routed to them by DGI through these foreign entities.[35]

---

[31](...continued)
him as an employee of Kilsture Limited and the balance of US$325,490 was a loan [from Kilsture limited] (sic) to Mr. Mahoney which was repaid by Mr. Mahoney in full on 7 November, 2001.")

[32]  *See* Alpha email dated 12/12/01, from John Huber of DGI to Ron Buesinger of Alpha, Govt. Ex. 68.

[33]  *See* Alpha email dated 10/8/02, Govt. Ex. 73 (". . . the two shareholders of Cumberdale Holdings, Ltd. are 1) Maddox Ltd. 2) Kilsture Ltd")(underline in original). *See also* Govt. Exs. 74 and 76.

[34]  *See* email dated 4/30/02, from Mox Tan re Helios 2002 Cash Flows, Govt. Ex. 71.

[35]The evidence suggests that *all* of the cost-basis and $2 million fee for Mahoney's and
(continued...)

2370273.1

Sham-Partnership Design Continued in DGI's 2002 FDIS Transactions.

DGI continued to market FDIS transactions in 2002,[36] but through the facade of Trilogy

Financial Products, Limited ("Trilogy"),[37] which was apparently managed by the now familiar

Nigel Scott. Mr. Scott was an employee of Singer & Friedlander, managed by Oliver Peck.

Haber set forth some of the elements of this plan on January 13, 2002, in an email to BDO:

> As a follow up to our dinner I wanted to outline some of the decisions we made
> and request input on some of the decisions yet to be made.
> 1.   We have decided that neither Alpha or (sic) Helios will be members of the
> LLC in year 2002 transactions.  They would remain as a manager.  By not being
> members they would not receive K-1's.  <u>Follow up query</u>:  Who would be tax
> matters partner?
> 2.   A non U.S. LLC wouldn't accomplish anything since the U.S. member would
> have to report the operations of the LLC in a similar manner to a Form 1065.
> 3.   We continue to negotiate with a London based company to take over our
> marketing efforts in the U.S.  We hope that the negotiations will lead to their
> retaining of all U.S. personnel so that the transition will be seamless to you and
> our prospective clients.
> 4.   We will forward to you a description of our new strategy within the next
> week with the understanding that counsel will be reviewing it at the same time.

*See* Govt Ex. 69.  On April 30, 2002, Haber went to London to acquire 20% of Trilogy.[38]

Trilogy acted as both a facade for the co-promoters and a repository for evidence hidden

offshore.  By email dated May 24, 2002, Mox Tan of Helios circulated a memorandum detailing

---

[35](...continued)
Hawkes's participation in the forty-six 2001 FDIS transactions was routed to them by DGI, but
the United States has so far discovered the payments summarized in the table above.

[36] The FDIS transactions for 2002 are summarized in Appendix D to the Declaration of
John Lindquist.

[37] DGI had a prior working relationship with Trilogy going back as far as 1999.  *See*
email dated 2/15/00, Govt. Ex. 2 (stating that the attached PowerPoint presentation for the "UK
Pathfinder" "...is essentially the same as the Trilogy/Diversified joint presentation that we all
agreed upon in August 1999, spiffed up to incude logos and standardized fonts."  *See also*, Haber
Dep. Tr. 8/12/03, at 47:25-48:21, Govt. Ex. 64.

[38] *See* email dated 4/30/02, Govt. Ex. 49 (". . .  [W]e have a meeting...to run through
how you want to structure your 'acquisition' of 20% of Trilogy . . . .").

15                                                      2370273.1

how Haber and other DGI employees, and Phil Kampf of Helios, would each thereafter be called consultants to Trilogy. According to that email, those individuals would no longer carry business cards with a logo or company identification, their secretaries would no longer identify their company when answering their phone, they should each obtain a personal email address in lieu of their existing company email addresses, and all customer files were to be sent offshore to Trilogy so DGI would be able to contend that it did not to have possession or control of the books and records.[39] Under that marketing and implementation scheme, Samuel Mahoney and Martin Hawkes continued to act as purported foreign partners on the FDIS transactions, but with Trilogy now acting as the nominal promoter of the transaction.[40]

## ARGUMENT

I.    **UNITED STATES DISTRICT COURTS HAVE THE POWER TO ISSUE REQUESTS FOR FOREIGN JUDICIAL ASSISTANCE**

Letters rogatory are formal requests from a court of one nation to the judiciary of a foreign nation for the latter's assistance in obtaining evidence. The execution of a request for judicial assistance by the foreign court is based on comity between nations at peace. *United States v. Zabady*, 546 F. Supp. 35, 39 n.9 (M.D. Pa. 1982); *The Signe*, 37 F. Supp. 819, 820 (E.D.

---

[39]  *See* email dated 5/24/02, with Revised Trilogy U.S. Implementation Memo, Govt. Ex. 52.

[40]  *See* email dated 9/25/02, Govt. Ex. 53 ("They are Trilogy correct?"); email dated 10/1/02, Govt. Ex. 54; email dated 11/5/02, Govt. Ex. 57 ('I have changed "Trilogy Financial Investments Limited" to "Trilogy Investments Ltd."'); email dated 11/7/02, Govt. Ex. 58 ("Don't use Trilogy Financial Investments or Trilogy Financial Products only use **Trilogy Investments Ltd.**")(emphasis in original); email dated 11/21/02, Govt. Ex. 59 ("Sam [Mahoney] will make his contributions to the various aforementioned FUNDS and authorize Trilogy Investments Ltd. to make their contributions to the FUNDS.")(emphasis in original); email dated 1/23/03, Govt. Ex. 60 ("[Jimmy Haber] said that Trilogy will not allow us to release [the closing books] until they are paid in full.")

2370273.1

1941). The power of federal courts to issue letters rogatory derives from 28 U.S.C. § 1781 and from the judiciary's "inherent" authority. *United States v. Reagan*, 453 F.2d 165, 171-73 (6th Cir. 1971), *cert. denied*, 406 U.S. 946 (1972); *United States v. Staples*, 256 F.2d 290 (9th Cir. 1958); *DBMS Consultants v. Computer Assocs. Int'l*, 131 F.R.D. 367, 369 (D. Mass. 1990) ("It is settled that the courts have inherent authority to issue letters rogatory," citing, *United States v. Reagan*, 453 F.2d at 172); *Evanston Ins. Co. v. Oea*, No. CIV S-02-1505, 2006 U.S. Dist. LEXIS 42068 (E.D. Cal. 2006); *United States v. Strong*, 608 F. Supp. 188, 192-94 (E.D. Pa. 1985); *B & L Drilling Electric v. Totco*, 87 F.R.D. 543, 545 (W.D. Okla. 1978).

A United States district court should grant a motion for issuance of letters rogatory unless a party opposing the motion demonstrates "some good reason" for denial. *DBMS Consultants v. Computer Assocs. Int'l*, 131 F.R.D. at 369; see also *Zassenhaus v. Evening Star Newspaper Co.*, 131 U.S. App. D.C. 384, 404 F.2d 1361 (D.C. Cir. 1968) (holding that the district court erred in refusing to issue a letter rogatory to request assistance in effort to secure witness testimony). The sufficiency of the opponent's showing depends on the facts and circumstances of the particular case. See *DBMS Consultants v. Computer Assocs. Int'l*, 131 F.R.D. at 369; *Zassenhaus v. Evening Star Newspaper Co.*, 404 F.2d at 1364; *B & L Drilling Electric v. Totco*, 87 F.R.D. at 545.

## II. THE PROPOSED REQUESTS FOR INTERNATIONAL JUDICIAL ASSISTANCE IS NECESSARY TO THE UNITED STATES' DEFENSE OF THIS SUIT.

### A. Introduction

The foreign discovery sought here is essential to the United States' defense of this suit because the foreign partner– in each instance Samuel Mahoney or Martin Hawkes– was, we

17                                                                 2370273.1

believe, an integral part of the generic and abusive tax-shelter product employed here. As an integral part of each FDIS transaction, the partner (Mahoney or Hawkes) and his business associates and advisors, including John Hussey and Nigel Scott, possess discoverable and essential information. That information is relevant to each of the issues in this case, and integral to at least three of them: (1) whether Fidelity International was a sham partnership because the foreign "partner" was not an actual partner but simply an accommodation partner or nominee who was paid a fee for his participation in the tax-shelter transaction; (2) whether Fidelity International was a sham partnership and therefore should be disregarded for federal income tax purposes because it had no legitimate non-tax business purposes; and (3) whether the FDIS transaction itself, as designed, developed, marketed, and implemented, was a factual and/or economic sham.

**B.    The Discovery Is Necessary to Determine Whether Fidelity International was a Sham Partnership because Mahoney and Hawkes were not In Fact Real Partners.**

This foreign discovery is essential to show whether Fidelity International should be treated as a valid partnership for federal tax purposes. Courts will disregard an entity for federal tax purposes "if it is fictitious or if it has no business purpose . . . other than the creation of tax deductions."[41] The basic inquiry turns on whether considering all the facts "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949). In conducting a sham entity analysis, a court's inquiry is fundamentally objective, focusing upon whether the partners truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both. *Commissioner v. Tower*, 327 U.S. 280, 286, (1946); *Andantech v. Commissioner*,

---

[41] *Ferguson v. Comm'r*, 29 F.3d 98, 101 (2d Cir. 1994) (citations omitted); *accord Merryman v. Comm'r*, 873 F.2d 879, 881 (5th Cir. 1989).

331 F3rd 972, 978-79 ( D.C. Cir.2003) (partnership disregarded because foreign partners did not intend to join together to share in profits and losses of the business but instead were well compensated to facilitate the tax avoidance feature of the transaction).

As such, the existence of a partnership for tax purposes depends on the objective intent of the purported partners. To examine the objective intent of the foreign partners in the Fidelity International transaction and the other related FDIS transactions, the United States must obtain documents and testimony from those purported partners. It is equally essential to obtain documents and testimony from the foreign partners' business associates, who have knowledge regarding the marketing and implementation of the FDIS tax shelter and/or the nature and amounts of payments made by the promoters to Mahoney's and Hawkes's foreign entities.

The foreign partners entered into 58 FDIS transactions over the course of approximately one year, from July 2001 to July 2002. The source of their funding for these transactions is unclear. The foreign partners must therefore explain the funding of each of their capital investments into these 58 FDIS transactions. The evidence indicates that the foreign partners were not real partners at all, but rather nominees paid a fee for participation in the tax shelter. Their participation in those 58 tax shelters is particularly suspicious because each resulted in the nearly immediate loss of 50% of the foreign partner's capital investment within the span of a few weeks from their initial capital investment. Without a behind-the-scenes agreement to compensate him, Samuel Mahoney would have lost $991,815 of initial contributions into these tax shelters. He would have lost $325,500 in Fidelity International alone.[42] Similarly, without more, Martin Hawkes would have lost $979,754 of initial contributions.

There is evidence demonstrating that, despite appearances, Mahoney and Hawkes were

---

[42]*See* Appendix C and Outline of Egan Transaction, a copy of which is attached to Appendix C.

2370273.1

funded for their initial-contribution expenses, and were additionally compensated. The additional compensation was in the form of fees totaling at least $2 million for participation in the FDIS tax shelters. The promoters' records show that they considered Mahoney's and Hawkes's funding and compensation to be a joint expense. DGI's records show that, as of May 1, 2002, the "Co-Investor Adj. Cost basis" for the 46 FDIS transactions entered into in 2001 totaled $1,261,515. The records show that as of that same date, the "Irish Distributions"— Mahoney and Hawkes being the Irish— in the amount of $41,463 related to another six transactions. *See* Govt. Ex. 44. Making this scheme even clearer, DGI booked as an expense "SM-MH Cost Basis," *i.e.*, Samuel Mahoney-Martin Hawkes Cost Basis, of $1,302,978, which equals the total of $1,261,515 from the forty-six 2001 transactions and the $41,463 from the additional six transactions. *See* Govt. Ex. 45.

The United States requires these foreign examinations to obtain additional evidence proving that Mahoney and Hawkes did not intend to join together as partners for the purpose of carrying on a business; *i.e.*, they did not join together to share in the profits or losses of an option investment partnership venture. Instead, we believe the evidence will show they were acting as mere nominees or accommodation partners and were compensated handsomely to facilitate this deceit.

    **C.    The Discovery Is Necessary to Determine Whether Fidelity International Should Be Disregarded Because It Did Not Have a Legitimate Non-Tax Business Purpose.**

As discussed, the basic inquiry in determining whether a partnership is valid for tax purposes is "whether, all facts considered, the parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance." *ASA Investorings v. Commissioner,* 201 F.3d 505, 513 (D.C. Cir 2000). "Where taxpayers use an 'elaborate

partnership' with ... [partners] created solely for the purpose of the questioned transaction, 'the absence of a non-tax purpose is fatal to the recognition of the entity for ...tax purposes.'" *Boca Investorings Partnership v. United States*, 314 F3d 625, 632 (D.C. Cir. 2003) (internal citations omitted.). ("The only logical explanation of the partnership's formation was the exploitation of Temp. Treas.. Reg. §15A.453-1(c)(3)(I) and the gain of a paper tax loss to absorb its enormous capital gains.")

Here, the foreign partners also possess critical evidence as to what was the real purpose of the formation of Fidelity International. They were intimately involved in dozens of FDIS-type tax shelters, including those known as Short-Option-Strategy ("SOS") and its subset FDIS tax shelters, before, during, and after 2001. Either Mahoney or Hawkes was a partner in each of the 58 known FDIS transactions in 2001 and 2002, with Mahoney as the foreign partner in Fidelity International. Moreover, the source of their capital contributions to their FDIS tax-shelter entities and their apparent compensation for participating in this scheme is traceable to an array of foreign entities in which they and/or their business associates were directors, employees, and/or shareholders.

From 1999 to approximately 2001, Mahoney and Hawkes engaged in similar FDIS-type transactions through Biosphere, of which Messrs. Mahoney and Hawkes were directors. Two such transactions are at issue in the Tax Court in the consolidated cases of *Tucker and Heckler v. Commissioner*, Tax Court Docket Nos. 12307-04, 16571-04, 16752-04. John Hussey, one of those the United States seeks to examine here, was the third director of Biosphere Finance.

By 2002, Mahoney and Hawkes were still participating in the FDIS transactions, but now while DGI and Helios were marketing the FDIS tax shelter through Trilogy, an Isle of Man entity which was formerly a United Kingdom entity. Nigel Scott of the Isle of Man appears to have

2370273.1

been Trilogy's manager from 2000 to 2002 while the domestic promoters purported to be consultants of that entity. Tax-shelter-related correspondence was sent to Scott's attention when addressed to Trilogy Investments Ltd. That Trilogy correspondence was sent to the same Isle of Man address identified earlier as belonging to Kilsture and to Nigel Scott's and Oliver Peck's employer, Singer & Friedlander.

Each of the overseas participants and their business associates therefore possesses vital information as to the real purpose of the formation of the FDIS tax-shelter entities, including Fidelity International at issue here. Specifically, Messrs. Mahoney and Hawkes possess critical information regarding why they participated in a tax-shelter venture in which they were destined to lose about half of their purported investment in just a few weeks.

Moreover, they should be equally knowledgeable as to why millions of dollars were paid to them from U.S. tax shelter promoters and participants shortly before and after the 2001 FDIS transactions were implemented. Specifically, they should know why DGI paid $952,000 to Biosphere and $120,000 to Kilsture. They should also know why Helios made a $570,000 payment to Maddox and a $380,000 payment to Kilsture, which Mahoney and Hawkes were closely associated with, and why DGI paid more than $1 million to the Cumberdale entities they directed. Those payments appear to represent a portion of the $2 million in fees paid to Messrs. Mahoney and Hawkes for their participation in this tax shelter scheme in 2001.

Mr. Hussey is knowledgeable regarding the source of the capital contributions made by Biosphere Finance for Mahoney's and Hawkes's involvement in similar FDIS-type transactions in 1999 and 2000. He should be equally knowledgeable regarding payments made by the domestic promoters to Biosphere Finance in 2001 and 2002. Nigel Scott should be knowledgeable regarding the marketing and implementation of the FDIS tax shelter in 2001 and

22

2002, and, critically, should also be able to produce the records of the 2002 FDIS transactions.

The evidence thus far appears to show that Mahoney and Hawkes were merely masquerading as foreign partners to be the recipients of the paper gains generated on the FDIS offsetting options transactions. In their role of tax-indifferent foreign partners, they could facilitate the apparent *raison d' etre* of the FDIS partnership entities – to be a set piece to funnel paper tax losses to the purchasing U.S. taxpayer. This foreign discovery is therefore vital to corroborate that evidential position. Such evidence would conclusively confirm that Fidelity International did not possess a legitimate non-tax business purpose, and should therefore be disregarded for tax purposes.

**D.    The Discovery Is Necessary to Determine Whether the FDIS Transaction Was an Economic Sham and Even Possibly a Factual Sham.**

This discovery is necessary to determine whether the tax shelter employed here, as designed, developed, marketed, and implemented, was an economic sham, if not even a factual sham. It is fundamental that the substance, not the form, of a transaction controls for tax purposes. *Gregory v. Helvering*, 293 U.S. 465 (1935). One incarnation of the basic substance-over-form principle is the sham transaction doctrine. Courts have recognized two types of sham transactions: shams in fact and shams in substance. *ACM Partnership v. Commissioner*, 157 F.3d 231, 247 n.30 (3d Cir. 1998), *cert. denied*, 526 U.S. 1017 (1999). Shams in fact are transactions that are created on paper but in reality never occur. Shams in substance, or economic shams, are transactions that actually occur but lack non-tax economic substance. *Ibid.* If a transaction lacks either the factual or economic substance that its form represents, then purported losses claimed on the transaction are not deductible. *Kirchman v. Commissioner*, 862 F.2d 1486, 1490 (11th Cir. 1989).

Under the economic substance doctrine, transactions that are invented solely to create tax

23                                        2370273.1

deductions and otherwise have no economic substance, even though formally complying with the letter of the Internal Revenue Code, will not be recognized. *Knetsch v. United States*, 364 U.S. 361 (1960); *Dewees v. Commissioner*, 870 F2d 21, 32, 35 (1st Cir. 1989).[43] There is a two-prong test for determining economic substance. The first prong examines whether the transaction has a reasonable possibility of a profit (an objective inquiry). *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778, 781-82 (5th Cir. 2001) (internal citation omitted; emphasis added). The second prong looks to whether there existed a tax-independent business purpose for the transaction (a subjective inquiry). *Id.* The fundamental question for a court is therefore not whether the mere possibility of profit exists, but whether a *reasonable* possibility of profit exists. Critically, in determining profit potential, all expenses and costs associated with the transaction that produces the tax benefits must be taken into account.[44] Moreover, a taxpayer's subjective profit motive cannot salvage a transaction that is otherwise lacking in economic substance. As now Mr. Justice Breyer stated in *Dewees*, the "[c]ase law makes clear that a taxpayer cannot deduct a 'sham transaction' loss, irrespective of his subjective profit motive." *Id.* at 35.

The fact and economic sham analyses require thorough examination of the design, development, marketing, and implementation of the FDIS tax-shelter product. That thorough examination is impossible without the requested foreign discovery. The foreign partners and their business associates have exclusive possession of evidence that goes directly to the heart of the factual-sham and economic-sham issues. The FDIS taxpayers, including the taxpayer here, paid enormous fees to the promoters for their right to participate in an integrated transaction that appeared from the outset to be singularly focused on the generation of paper tax gains and losses.

---

[43] *See also, Yosha v. Commissioner*, 861 F.2d 494, 497 (7th Cir. 1988); *Executive Jet Aviation, Inc. v. United States*, 125 F.3d 1463, 1469 (Fed. Cir. 1997).

[44] *See Long-Term Capital Holdings*, 330 F. Supp 2d at 175-84.

2370273.1

On this score, Mahoney and Hawkes are (or certainly should be) acutely knowledgeable as to the nature of the offsetting option trading strategies employed in the FDIS transactions. They also should be able to explain why they participated in option trading transactions that appear from the outset to have been predestined to lose money not only for them but also for the taxpayers after all the taxpayers' transaction costs are taken into account. Significantly, the funding of and apparent fees paid to Mahoney and Hawkes for their participation appears to have been built into the cost structure of the FDIS transaction.

Moreover, each of the overseas participants should also be able to explain why the domestic promoters made their records inaccessible in the United States. As described earlier, Trilogy was used to secrete evidence of the fraudulent tax-shelter product. The promoters directed that books and records of the FDIS transactions were to be sent offshore to Trilogy so that none of the domestic promoters would have possession or control of them. Nonetheless, Mahoney and Hawkes continued to act as mere nominees for DGI through Trilogy, thereby facilitating the anonymity of the domestic promoters. Such evidence relates directly to the factual sham analysis. Yet DGI has refused to produce any of the documents it transferred offshore to Trilogy. Because of the secreting of evidence overseas, the foreign examinations are the only means of obtaining a wealth of essential evidence.

Given Mahoney's, Hawkes's, Hussey's, Scott's, and Peck's intimate involvement with the overseas arm of the tax-shelter operation, and their exclusive possession of a substantial store of evidence, examination of each of them is essential to the required two-prong economic substance analysis as well as to the factual sham analysis.

III.    **THE INFORMATION SOUGHT THROUGH INTERNATIONAL JUDICIAL ASSISTANCE IS HIGHLY RELEVANT AND IS INTENDED TO BE USED AS EVIDENCE AT TRIAL.**

25                                                    2370273.1

The relevant and essential information the foreign partners and their business associates possess is highly relevant to this case, and will likely be used at trial to support the United States' defenses. While the parties have referred to the procedure of foreign evidence gathering as discovery, it is not discovery in the usual sense. The United States is not seeking here the broad discovery allowed under Federal Rule of Civil Procedure 26. More narrowly, it is seeking critical trial evidence. There can be no doubt that the information possessed by the foreign "partners" and their associates is relevant to both Fidelity International's claims and the United States' defenses. The plaintiff referred to Samuel Mahoney as a "co-investor" in Fidelity International, Compl. at ¶ 31,[45] and described Mahoney as one of four Fidelity International members or partners. Compl. at ¶ 34.[46] Examination directed to the "partners," relating to their involvement in this tax-shelter transaction and dozens of identical tax-shelter transactions, will provide a wealth of evidence that is otherwise unavailable, at least in part because of the secreting efforts of the foreign "partners" and the tax-shelter promoters.

## IV.    THE COURT HAS THE AUTHORITY TO ISSUE REQUESTS FOR FOREIGN JUDICIAL ASSISTANCE IN OBTAINING EVIDENCE IN THE ISLE OF MAN, AND TWO ALTERNATIVE PROCEDURES EXIST FOR ISSUING THAT REQUEST.

The power of federal courts to issue letters rogatory derives from 28 U.S.C. § 1781 and from the judiciary's "inherent" authority. One procedure for issuing those letters rogatory and obtaining evidence is found in The Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, commonly referred to as the Hague Evidence Convention, where the

---

[45]References to the Complaint are to the Complaint in case number 05-40151.

[46]There is a notable absence of the plaintiff's seeking or facilitation of discovery of the foreign "partner." The plaintiff also failed to list the foreign "partner" on his initial disclosures.

2370273.1

receiving nation is a signatory.[47] The Isle of Man is a signatory.[48] A second, and often more

efficient procedure for issuing those letters rogatory is available. Under the second procedure,

the United States may hire a foreign solicitor as its agent. That foreign solicitor would be sent

the letter of request directly from this Court, and would then apply for a commission from the

foreign court to take the testimony of the witnesses. In furtherance of this procedure, the United

States has retained United Kingdom solicitor Mr. Laurence Shore of Herbert Smith LLP,

Exchange House, Primrose Street, London EC2A 2HS, (telephone) +44 20 7374 800043.

      Consistent with the option of transmitting a letter rogatory directly to a foreign solicitor,

the Federal Rules of Civil Procedure permit a deposition to be taken in a foreign country,

pursuant to a letter rogatory, as follows:

> (1) pursuant to any applicable treaty or convention, or (2) **pursuant to a letter of request (whether or not captioned a letter rogatory),** . . . . A . . . letter of request shall be issued on application and notice and on terms that are just and appropriate. It is not requisite to the issuance of . . . a letter of request that the taking of the deposition in any other manner is impracticable or inconvenient; and . . . a letter of request may be issued in proper cases . . . .

Fed. R. Civ. P. 28(b) (emphasis added).

## V. THE PROCEDURE FOR OBTAINING EVIDENCE IN IRELAND BY THE ISSUANCE OF REQUESTS FOR FOREIGN JUDICIAL ASSISTANCE IS GOVERNED BY THE VIENNA CONVENTION ON CONSULAR RELATIONS.

      Compelled evidence from an Irish witness must be taken before an Irish court and

generally may be requested pursuant to a letter rogatory transmitted via the diplomatic channel.

Ireland is not a party to the Hague Evidence Convention. Unlike judicial assistance between the

United States and Isle of Man, judicial assistance between the United States and Ireland is

governed by the Vienna Convention on Consular Relations ("VCCR"), 21 UST 77, TIAS 6820,

---

[47]"The United States ratified the Convention in 1972." *Boreri v. Fiat S.P.A.*, 763 F.2d 17, 19 (1st Cir. 1985).

[48]23 U.S.T. 2555, T.I.A.S. No. 7444, codified at 28 U.S.C. § 1781.

2370273.1

596 U.N.T.S. 261 and the Hague Convention on the Service Abroad of Judicial and

Extra-Judicial Documents in Civil and Commercial Matters , 20 UST 361; to which the United

States and Ireland are parties. The VCCR authorizes transmission of letters rogatory through

diplomatic channels. The VCCR lists in Article 5(j) among the functions of a consular post

"executing letters rogatory or commissions to take evidence for the courts of the sending State in

accordance with international agreements in force, or, in the absence of such international

agreements, in any other manner compatible with the laws and regulations of the receiving

State." The VCCR does not obligate Ireland to execute the request, but simply provides a formal

avenue by which the requests may be made.

2370273.1

The United States will follow the outlined formal procedures in transmitting the letter

rogatory to the appropriate Irish authorities.

Dated:   April 4, 2007

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

/s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Tax Division, U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER L. RICHTARCSIK
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044-0055
Telephone: (202) 307-6561
Facsimile:  (202) 514-5238
E-mail: john.a.lindquist@usdoj.gov
          barry.e.reiferson@usdoj.gov
          heather.l.richtarcsik@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants identified on the Notice of Electronic Filing and copies will be sent to
those indicated as non registered participants on April 4, 2007.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

29                                                    2370273.1

2008 No. 1   FTE

### THE HIGH COURT

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856
AND IN THE MATTER OF CIVIL PROCEEDINGS BEFORE THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS AND IN
THE MATTER ENTITLED

FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND L.L.C.

Plaintiff

-and-

### UNITED STATES OF AMERICA

Defendants

### EXHIBIT "MJK2"

Referred to in the Affidavit of **MICHAEL KEALEY** sworn this 2̶9̶t̶h̶ 23rd day of F̶e̶b̶r̶u̶a̶r̶y̶ April 2008

_____
Deponent

_____
Practising Solicitors/
Commissioner for Oaths

William Fry
Solicitors
Fitzwilton House
Wilton Place
Dublin 2
013964.0017.MJK

12

**Revenue** 

Office of the Revenue Commissioners
Direct Taxes Interpretation and
International Division
Dublin Castle
Dublin 2
Ireland

www.revenue.ie

Oifig na gCoimisinéirí Ioncaim
Rannán Idirnáisiúnta agus Léiriúcháin
Cánacha Díreacha
Caisleán Bhaile Átha Cliath
Baile Átha Cliath 2
Éire

Mr. Samuel Mahoney
123 Howth Road
Dublin 3

24 March 2005

Re: Fidelity International Currency Advisor A Fund, LLC

Dear Mr Mahoney,

I refer to my letter of 22 February 2005 and your partial reply of 11 March 2005.

Could you please now forward the remainder of the information which was
requested in my letter above.

Yours sincerely

John McNamara
Direct Taxes Interpretation & International Division

Tel +353-1-6792777    Ext 46796    Fax +353-1-6793314    Direct Line +353-1-6746796

TOTAL P. 03



**Revenue**

Office of the Revenue Commissioners
Direct Taxes Interpretation and
International Division
Dublin Castle
Dublin 2
Ireland

www.revenue.ie

Oifig na gCoimisinéirí Ioncaim
Rannán Idirnáisiúnta agus Léiriúcháin
Cánacha Díreacha
Caisleán Bhaile Átha Cliath
Baile Átha Cliath 2
Éire

Mr Samuel Mahoney
123 Howth Road
Dublin 3

14 April 2005

Re: Fidelity Trust Currency Advisor A Fund, LLC

Dear Mr Mahoney,

Thank you for your letter of 12 April 2005 to which I will respond as soon as possible.

As regards your letter of 11 March last, you will recall that you phoned me on 18 March (regarding my letter of 22 February) and I explained the context of my letter to you in the course of that conversation.

Yours sincerely,

John McNamara
Direct Taxes: International

Tel +353-1-6792777    Ext 46796    Fax +353-1-6793314    Direct Line  +353-1-6746796



**Revenue**

Office of the Revenue Commissioners
Direct Taxes Interpretation and
International Division
Dublin Castle
Dublin 2
Ireland

www.revenue.ie

Oifig na gCoimisinéirí Ioncaim
Rannán Idirmaisiúnta agus Léiriúcháin
Cánacha Díreacha
Caisleán Bhaile Átha Cliath
Baile Átha Cliath 2
Éire

Mr. Samuel Mahoney
123 Howth Road
Dublin 3

21 April 2005

### Re: Fidelity International Currency Advisor A Fund, LLC

Dear Mr Mahoney,

I refer to your letter of 12 April 2005 and my acknowledgement dated 14 April 2005.

4. Did Helios Financial LLP know that you were not domiciled in Ireland?

5. Noted. Where are you domiciled? Is this a domicile of origin?

7. I note that a capital contribution of $651,000 was advanced on your behalf on 24 October 2001. Was this made on your own behalf and from your own resources or was it made by or on behalf of some other person or entity? Please confirm that the funds were paid into Account No. 11270025 to the benefit of Refco Capital Markets in whose name the account was held.

8. Did you ever file a statement with the Partnership declaring domicile for US tax withholding purposes? If so what country did you declare? Please forward a copy.

9. What was your understanding as to why a foreign partner was being allowed into the partnership?

10. Did you ever enter into the US for any purpose or reason in relation to this partnership?

Revenue 

11. Did you have any prior knowledge or dealings with any of the other partners? If so, please give details.

12. Do you have any written documents or copies of e-mails with respect to the partnership formation or any transactions related to the partnership business? If so, please forward copies.

13. Were you aware from the start of the partnership that your interest was going to be reduced almost immediately? If yes, please explain. If not, at what point did you become aware?

14. Where were the proceeds of $325,500 from the sale of your 88% interest forwarded?

Yours sincerely

John McNamara

John McNamara
Direct Taxes Interpretation & International Division



## William Fry
### TAX ADVISERS

Our Ref      013964.0014.MPH                                    16 May 2005

Office of the Revenue Commissioners
Direct Taxes Interpretation and International Division
Dublin Castle
Dublin 2

F.A.O. Mr. John McNamara

**Re: Mr. Samuel Mahoney, 123 Howth Road, Dublin 3**

Dear Sir,

We act for the above named individual. He has asked us to review communication to date between your offices and himself in relation to your line of inquiry into his investment in Fidelity International Currency Advisor A Fund LLC.

In our client's letter to you of 12 April 2005, he requested you to specify whether his filing for 2001 is the subject of an audit. A written response from your office would be appropriate. In our client's correspondence with your office of 11 March, he requested the statutory basis upon which your line of inquiry is being pursued. Despite the telephone conversation between yourself and our client on 18 March, I believe, again, a written response to this question would be appropriate.

It is somewhat concerning that our client's response to your letter answering your seven queries is met with additional new queries concerning the subject matter of your investigation. Perhaps in the letter in which you identify for us the exact statutory basis upon which you are requesting such information, you could also provide us with your complete list of questions.

For your information, our client has been served notice from the United States Internal Revenue Service with regard to his investment in the Fidelity International Currency Advisor A Fund LLC. Such notice identifies that our client may be the subject matter of legal proceedings in the United States. Please advise us whether our client's responses to your office to date have been forwarded to a member of the United States Internal Revenue Service. Please be advised that due to the potential litigation in the United States, our client

Fitzwilton House, Wilton Place, Dublin 2, Ireland
T: +353-1-639 5000  F: +353-1-639 5333  E: info@williamfry.ie  W: www.williamfry.ie
William Fry Tax Advisers Limited, a company incorporated with limited liability. Registered number 315255.

A list of directors appears on the reverse



may not be in a position to answer some or all of your questions concerning his involvement with the Fidelity International Currency Advisor A Fund LLC.

Please forward all future correspondence in relation to this matter to this office.

Yours sincerely

Martin Phelan

Direct Dial: +353 -1- 639 5139
E-Mail: martin.phelan@williamfry.ie

WF-435309-v1

# Exhibit C Part 2



**Revenue**

| | |
|---|---|
| Office of the Revenue Commissioners | Oifig na gCoimisinéirí Ioncaim |
| Direct Taxes Interpretation and | Rannán Idirnáisiúnta agus Léiriúcháin |
| International Division | Cánacha Díreacha |
| Dublin Castle | Caisleán Bhaile Átha Cliath |
| Dublin 2 | Baile Átha Cliath 2 |
| Ireland | Éire |

www.revenue.ie

Mr. Martin Phelan
William Fry Tax Advisers
Fitzwilton House
Wilton Place
Dublin 2

25 January 2006

Re: Mr. Samuel Mahoney, 123 Howth Road, Dublin 3
Your Ref: 013964.0014.MPH

Dear Mr. Phelan

I refer to your letter of 16 May 2005 and regret the delay in replying.

As you will be aware from your client, the information has been requested in response to a request from the US competent authority under Article 27 of the Ireland/USA Double Taxation Convention.

As your client's tax liability is not dealt with by this Division I am not aware of whether his tax return for 2001 is the subject of an audit. However, when you respond to point 7 of my letter of 21 April 2005 regarding the investment of $651,000 I intend to copy it to the relevant Tax District if it is the case that the capital contribution was made on Mr Mahoney's own behalf. In this context, if the investment was made from your client's own resources I would be obliged if you would indicate the source of these funds.

Yours sincerely,

John McNamara
Direct Taxes Interpretation and International Division

Tel +353-1-6792777    Ext 48020    Fax +353-1-6793314    Direct Line +353-1-6748020





**WilliamFry**
TAX ADVISERS

Our Ref    013964.0014.MPH/BFD                              13 April 2006

Ms Lorayne Ellison
Direct Taxes Interpretation and International Division
Office of the Revenue Commissioners
Dublin Castle
Dublin 2

**Samuel Mahoney**
**123 Howth Road, Dublin 3**

Dear Ms Ellison

Previous correspondence refers resting with your letter to me dated 30 March 2006.
Notwithstanding the fact that it is our opinion that Revenue is not entitled to put such
question in this manner, our client wishes to co-operate with Revenue. Accordingly, I have
set out below Mr Mahoney's responses to the queries posed in Mr McNamara's letter dated
21 April 2005.

4.          Mr Mahoney's domicile was not discussed with Helios Financial LLP
            ("Helios").

5.          Mr Mahoney's domicile of origin is the United Kingdom.

7.          Mr Mahoney has previously advised that the capital contribution of
            US$651,000 was made on his behalf.

            Mr. Mahoney would now further confirm that the capital contribution of
            US$651,000 was made on his behalf by Kilsture Limited, an Isle of Man
            company, and that US$325,510 of this amount represented salary due to him
            as an employee of Kilsture Limited and balance of US$325,490 was a loan
            [from Kilsture Limited] to Mr. Mahoney which was repaid by Mr. Mahoney in
            full on 7 November 2001.

8.          No

Fitzwilton House, Wilton Place, Dublin 2, Ireland
T: +353-1-639 5000  F: +353-1-639 5333  E: info@williamfry.ie  W: www.williamfry.ie
William Fry Tax Advisers Limited, a company incorporated with limited liability. Registered number 315255.



9.  Mr Mahoney's understanding was that there were no restrictions on membership of Helios. Mr Mahoney saw nothing unusual in his membership of Fidelity.

10.  No

11.  Helios was known to Mr Mahoney for several years.

12.  Mr Mahoney has already supplied a copy of the Fidelity Operating Agreement.

13.  No. Although there was a provision in the Operating Agreement permitting either party to make an offer for all or part of the other members interest, there was no agreement or understanding to do so. Mr. Mahoney became aware that his interest was going to be reduced on or about 5 November 2001.

14.  See reply number 7 above.

Yours sincerely

Martin Phelan

Direct Dial: +353 -1- 639 5139
E-Mail: martin.phelan@williamfry.ie

WF-571437-v1

2

**Revenue** 

www.revenue.ie

Office of the Revenue Commissioners
Direct Taxes Interpretation and
International Division
Dublin Castle
Dublin 2
Ireland

Oifig na gCoimisinéirí Ioncaim
Rannán Idirmáisiúnta agus Léiriúcháin
Cánacha Díreacha
Caisleán Bhaile Átha Cliath
Baile Átha Cliath 2
Éire

Mr. Martin Phelan,
William Fry Tax Advisers,
Fitzwilton House,
Wilton Place,
Dublin 2.

4 May, 2006

Re: Samuel Mahoney, 123 Howth Road, Dublin 3
Your Ref: 013964.0014.MPH/BFD

Dear Mr. Phelan,

I acknowledge receipt of your letter dated 13 April, 2006 in the above case. I will now arrange to forward the information you have supplied on behalf of your client to the US tax authorities in accordance with the provisions of Article 27 of our Double Taxation Convention.

Yours sincerely,

Lorayne Ellison
Direct Taxes: Interpretation & International Division



Revenue

www.revenue.ie

Office of the Revenue Commissioners
Large Cases Division
Setanta Centre
Nassau Street
Dublin 2
Ireland

Oifig na gCoimisinéirí Ioncaim
Rannán na gCásanna Móra
Ionad Setanta
Sráid Thobar Phádraig
Baile Átha Cliath 2
Éire

Martin Phelan
M/s William Fry
Fitzwilton House
Wilton Place
Dublin 2

18/06/2007

Re: Biosphere Finance Ltd.    6574666o
Ref: 013964.0016.MPH

Dear Martin,

I refer to our audit meeting on 16 May 2007 and my letter of 24 May 2007.

I now wish to examine the records for the accounting periods 2002 and 2003.

Please contact me when these records are available.

Yours faithfully,

John Gallagher
Anti-avoidance unit



**Revenue**

Office of the Revenue Commissioners
Direct Taxes Interpretation and
International Division
Dublin Castle
Dublin 2
Ireland

www.revenue.ie

Oifig na gCoimisinéirí Ioncaim
Rannán Idirnáisiúnta agus Léiriúcháin
Cánacha Díreacha
Caisleán Bhaile Átha Cliath
Baile Átha Cliath 2
Éire

Mr. Martin Hawkes,
5 Bushfield Avenue,
Donnybrook,
Dublin 4.

21 June, 2007

Dear Mr. Hawkes,

The Revenue Commissioners have received a request for information under Article 27 of the Ireland/US Double Taxation Convention (copy attached for your information). The information requested relates to the Bank of Ireland bank accounts listed below.

Bank Account Details
1. Goldstar Entertainment Ltd – A/C No 32687150 at Bank of Ireland, 94 O'Connell Street, Limerick
2. Biosphere Finance Ltd – A/C No 25683522 at Bank of Ireland, Shannon Industrial Estate, Co. Clare and A/C No 45871020 at Bank of Ireland Treasury & International Banking, PO Box 2386, Colvill House, Talbot Street, Dublin 1
3. Burren Craft Learning Centre Ltd – A/C No 52781128 at Bank of Ireland, 94 O'Connell Street, Limerick

We have been asked to supply the following information for the years 1999-2004 inclusive.

Information required
• All account statements
• All account opening and account closing documentation
• All documents relating to money transfers to or from the accounts

To enable us to respond to this request, I would be obliged if you would provide this information as soon as possible.

Yours sincerely,

Helen O'Grady
Principal Officer
Direct Taxes: Interpretation & International Division

Tel +353-1-6792777    Ext 48539    Fax +353-1-6793314    Direct Line +353-1-6748639

*5 BUSHFIELD AVENUE*
*DONNYBROOK*
*DUBLIN 4.*

*Tel: (01) 4970690 (H)*
*Tel: (01) 2838355 (O)*

26th June 2007

Ms Helen O'Grady
Office of the Revenue Commissioners
Direct Taxes Interpretation & International Division
Dublin Castle
Dublin 2.

Dear Ms O'Grady,

I refer to your letter of 21 June 2007 in relation to a request for information under the DTA.

I have forwarded your letter to my tax adviser, Mr Martin Phelan, William Fry Solicitors, Fitzwilton House, Wilton Place, Dublin 2. I have asked him to respond to you directly on the contents of your letter.

I would appreciate if any further communications on this subject were sent directly to Mr Phelan.

Yours sincerely,

**Martin Hawkes.**



# William Fry
### TAX ADVISERS

Our Ref        013964.0017.MPH                                    10 July 2007

Ms Helen O'Grady
Office of the Revenue Commissioners
Direct Taxes: Interpretation & International Division
Dublin Castle
Dublin 2

**Letter of Request for Information**

Dear Ms O'Grady

Your letter of 21 June 2007 to Mr Martin Hawkes was passed for our attention. Having read the content of your letter we are unable to ascertain the statutory basis on which you seek this information.

Please reissue your notification in the correct statutory format and we will deal with your request in due course on a statutory footing.

Yours sincerely

Martin Phelan

Direct Dial: +353 -1- 639 5139
E-Mail: martin.phelan@williamfry.ie

Fitzwilton House, Wilton Place, Dublin 2, Ireland
T: +353-1-639 5000  F: +353-1-639 5333  E: info@williamfry.ie  W: www.williamfry.ie
William Fry Tax Advisers Limited, a company incorporated with limited liability. Registered number 315255.

Also at 300 Park Avenue - Suite 1700, New York, NY 10022

A list of directors appears on the reverse



# William Fry
### TAX ADVISERS

Our Ref    013964.0018.MPH                                    13 July 2007

Lorraine Ellison
Office of the Revenue Commissioners
Direct Taxes Interpretation
International Division
Dublin Castle
Dublin 2
Ireland

**Letter of Request for Information**

Dear Lorraine

I refer to the letter dated 21 June 2007, received by my client, from Helen O'Grady of the Revenue Commissioners, our letter of response to her dated 10 July 2007 and our telephone conversation of today's date.

In relation to your offer to respond to me in writing, having considered the matter further, I should be obliged if you would respond outlining Revenue's position with regard to the procedure, so that I may consider the matter fully with my client.

I look forward to hearing from you in this regard.

Yours sincerely

Martin Phelan

Direct Dial: +353 -1- 639 5139
E-Mail: martin.phelan@williamfry.ie

WF-781024-v2

Fitzwilton House, Wilton Place, Dublin 2, Ireland
T: +353-1-639 5000  F: +353-1-639 5333  E: info@williamfry.ie  W: www.williamfry.ie
a company incorporated with limited liability. Registered number 315255.



# William Fry
TAX ADVISERS

Our Ref · 013964.0018.MPH                                      7 August 2007

Lorraine Ellison
Office of the Revenue Commissioners
Direct Taxes Interpretation
International Division
Dublin Castle
Dublin 2

**Letter of Request for Information**

Dear Lorraine

Thank you for your letter dated 28 July 2007. My client is currently on vacation, returning next week and I must await instructions from him on his return. In the meantime I wish to raise the following point in relation to your letter:

In paragraph 5 you state that Section 906A TCA permits an authorised officer of the Revenue Commissioners to serve notice on a financial institution seeking particular information, for the purpose of enquiring into a liability in relation to the taxpayer.

Please confirm whether the taxpayer in relation to whom you request the information is Mr. Hawkes or one or all of the 3 companies, details of which were outlined in Helen O'Grady's letter dated 21 June 2007. On the pretext that the taxpayer is either of the aforementioned parties, please confirm on what grounds and for what purpose the US tax authorities require this information as neither Mr Hawkes nor any of the companies are as far as we are aware US tax resident.

I look forward to hearing from you in this regard.

Yours sincerely

Martin Phelan

Direct Dial: +353 -1- 639 5139
E-Mail: martin.phelan@williamfry.ie

WF-789387-v1

Fitzwilton House, Wilton Place, Dublin 2, Ireland
T: +353-1-639 5000  F: +353-1-639 5333  E: info@williamfry.ie  W: www.williamfry.ie
William Fry Tax Advisers Limited, a company incorporated with limited liability. Registered number 315255.

Also at 300 Park Avenue - Suite 1700, New York, NY 10022

A list of directors appears on the reverse
In association with Tughans, Northern Ireland

Revenue

| | |
|---|---|
| Office of the Revenue Commissioners | Oifig na gCoimisinéirí Ioncaim |
| Large Cases Division | Rannán na gCásanna Móra |
| Setanta Centre | Ionad Setanta |
| Nassau Street | Sráid Thobar Phádraig |
| Dublin 2 | Baile Átha Cliath 2 |
| Ireland | Éire |

www.revenue.ie

Martin Phelan
M/s **William Fry**
Fitzwilton House
Wilton Place
Dublin 2

**04/10/2007**

### Re: Biosphere Finance Ltd.  6574666o
### Ref: 013964.0016.MPH

Dear Martin,

I refer to our meeting on 31 August 2007.

Kindly show how the figures for operating costs (2002 €266,110 and 2003 €365,000) are arrived at. I am unable to arrive at these figures from the documentation supplied.

Some of the bank statements in relation to account no. 45871020 are missing. Please forward a copy of statement no. 16, 18, 19, 21, 24, 27, 28 and any statement after no. 33 in 2003.

I note that substantial sums are paid to Coldwell Investments Inc. of Panama. Please state what services were provided by Coldwell and who are its directors and shareholders. Are the directors of Biosphere Finance Ltd connected in any way with the directors or shareholders of Coldwell Investments Ltd. ?

Lodgements to account no. 45871020 do not appear to have been included in taxable receipts. Apart from the payments to Coldwell. dealt with above. there are payments to 904526. If this is another bank account please let me copy statements.

There is no documentation in respect one of the lodgements ie. $279,982.93 on 3 September 2003. The entire amount was paid out to "David", who appears to be connected with Coldwell. Please state what service was provided in this case and why the payment was made to Biosphere if it is not to be included in taxable receipts.

A payment of €20,601.67 is not included in taxable receipts and is described as reimbursement of fees. Where is the corresponding income, due to Biosphere, shown in the accounts ?

Yours faithfully,

John Gallagher
**Anti-avoidance unit**

2008 No. 1  FTE

## THE HIGH COURT

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856
AND IN THE MATTER OF CIVIL PROCEEDINGS BEFORE THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS AND IN
THE MATTER ENTITLED

FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND L.L.C.

Plaintiff

-and-

UNITED STATES OF AMERICA

Defendants

## EXHIBIT "MJK3"

Referred to in the Affidavit of **MICHAEL KEALEY** sworn this ~~29th~~ 23rd day of ~~February~~ April 2008

_____
Deponent

_____
Practising Solicitors/
~~Commissioner for Oaths~~

William Fry
Solicitors
Fitzwilton House
Wilton Place
Dublin 2
013964.0017.MJK

13



**William Fry**
TAX ADVISERS

**MEMO**

| | |
|---|---|
| **TO:** | File |

**FROM:**  Aisling Holden                    **DATE:** 7 February 2008

**CLIENT:**  Biosphere Finance Limited

**MATTER:**  US Litigation / US Litigation – Tax Matters

**FILE NO:**  013964.0017 / 013964.0018.MPH

Note of meeting on 7 February 2008 at 11.00 a.m. in William Fry's offices.

In attendance were:          John Lind Quist (JQ)
                             Dennis Donohue (DD)
                             Barry Reiferson (BR)

                             all of the United States Department of Justice

                             Bill Wachtell (BW), Wachtel & Masyr, LLP

                             Martin Phelan (MPH), William Fry
                             Aisling Holden (AHM), William Fry

**DD**          stated that the purpose of the meeting was that Sam Mahoney (SM) and Martin
               Hawkes (MH) would answer questions relating to their US tax affairs so that the US
               Government would be satisfied that their answers were complete and accurate.

**DD -**        stated that he was interested in various issues concerning capital contributions, the
               return of capital, the fees paid and he anticipated that the answers provided would be
               corroborated through business records.

**BW -**        queried whether the Government would cease their foreign discovery if the
               questions asked were answered and later reiterated in a different form.

**DD -**        stated that the purpose of the meeting was that the answers provided could be put in
               a form for evidence for a court of law in the US.

**MPH -**       clarified that SM and MH would accommodate the written process rather than
               assisting in a series of interviews.

acknowledged that for internal reasons the US Department of Justice were not comfortable for the representations to be made in writing at this moment in time.

On this basis, oral representations would be relied on by all parties and this would illustrate the parties confidence in the process.

DD - acknowledged that they have currently relodged Irish treaty requests, Irish letters regatory, Isle of Man treaty requested and UK letters regatory. This was with a view to obtaining information regarding the source of funding and the various sources of fees.

JQ - acknowledged that it was a complex set of transactions of which there were 2.4m documents from various law firms and accountancy firms and he was in the process of preparing a report on the status of foreign discovery items. The purpose of the meeting was to focus on key issues of the foreign discovery process and, in particular, DD expected three outcomes. Firstly, the receipt of truthful and accurate answers, second, the key aspects of funding would be supported by documentary evidence and, thirdly, there would be a written form of letters regatory.

DD - was concerned with the process of formalising the answers and he stated that Fidelity Counsel could also propound questions. DD would have no control over the questions posed unless SM or MH contradicted the questions.

MPH - queried whether this process would occur by letters regatory and BW confirmed that this would occur by a sworn statement but the Judge could give narrow letters regatory.

DD - indicated that the written questions and answers could be given to the other side and they would be in a position to propound questions in the event that they so wished. The current process was being conducted informally. However, there was a risk that SM and MH could be asked formally by the other side and this could be given in evidence in Court.

BW - stated that they were not prepared to answer any questions that they were not given already.

DD - clarified that objections could be raised if they had no relation to the current proceedings and on this basis objections would be raised on the grounds that it was not relevant.

JW - indicated that he was interested in the testimony regarding the fees and which fees related to which transactions. He indicated that this would give him a right to enquire into other transactions. However, BW indicated that this was a sensitive area.

BW - stated that if the Court rules that the other questions were propounded, this would be fought in other jurisdictions.

*JQ* -   revealed that he could not see any judge supporting Egan.

*MPH* -   queried whether SM and MH would be asked new and additional questions or could they object to these questions being posed.

*DD* -   stated that the Court may take the position that it would eliminate and throw out SM's and MH's answers. In fact the Court may throw out the entire area that the questions related to.

*MPH* -   then queried the benefits of assisting the US Department of Justice with their investigation while there were no obvious benefits for his clients.

*MPH* -   illustrated that the US Department of Justice were offering mere hope as opposed to promising to cease to raise questions in Ireland, the UK and the Isle of Man.

*JQ* -   stated that the clients would not be held to anything until a Court had approved such a measure.

*BW* -   indicated that the purpose of today was to reach a settlement.

*MPH* -   voiced his concerns if his clients participated in a procedure over which they had little control and which could be admissible in evidence.

*DD* -   queried what could be done to resolve the issue and

*MPH* -   responded that the US Department of Justice were dealing with the case and therefore they were authority on what would be admissible into the US Courts.

*BW* -   suggested streamlining the foreign discovery to a limited number of questions and discussions with Counsel with a view to obtaining written answers in advance of the trial and that all parties could proceed on this basis. This was on the assumption that the questions posed would not be problematic.

*BW* -   suggested discussing the questions and the answers that SM and MH would be likely to give.

*MPH* -   however, still had concerns regarding the element of non control over the process.

*MPH* -   queried from the US Government's point of view would the US Department of Justice continue with their enquiries into SM and MH in the event that answers provided were not brought into evidence.

*DD* -   stated his three intentions of today's outcome. Firstly, that he will obtain complete and accurate answers, secondly, that the answers would be corroborated with business records and, thirdly, that this would be brought into evidence. The issue was raised regarding the event that the other side attempted to prevent the answers being brought into evidence (however, DD said that this had a probability of less than 1%).

- further stated that in the event that SM and MH were under direct examination and failed to answer the Judge, their refusal to respond may result in the inadmission of their testimony into evidence and this could result in the foreign evidence being moot.

**DD** - stated that the case for trial had been set at 29 February. However, May had initially been provided.

**BW** - voiced MPH's concerns to ensure that their clients would not be submitted to interviews without closure.

**DD** - With a view to addressing these concerns, DD suggested that the Treaty requests and the Isle of Man proceedings would be withdrawn provided the documents were received. He further stated that the letters regatory would examine MH and SM in regard to the same questions posed on the basis that the same answers would be provided.

**MPH** - stated that he would prefer the US Government to take a view on the 1% risk in the event that his clients go ahead with the agreement and in the event that the US Government did not get completely what they were looking for, the Department of Justice would not proceed in accordance with the agreement.

**JQ** - highlighted the need for trust in this meeting and stated that no documents had been seen and that there was no guarantee that the documents would be delivered.

**JQ** - further stated that there was a narrow range of information required and that the US Department of Justice were prepared to push if required.

At this point, MPH and AHM left the meeting.

The meeting resumed with DD addressing the last proposal regarding the 1% possibility that the other side would propound questions that SM and MH would be required or could be required to answer and risk that the judge would throw out the entire testimonies of the individuals and everything would be inadmissible.

**DD** - stated that in the event that they received the required documents, the US Department of Justice would withdraw the two treaty requests and the letters regatory.

**MPH** - clarified that the Irish letters regatory and the Irish treaty request was of concern to him.

**DD** - explained that the two letters regatory gave permission for oral examination of the individuals.

further stated that in the event that the matter was still pending, the US Department of Justice would withdraw their request and would agree to limit themselves to the questions already stated and they would proceed by written questions. Fidelity would have a right to propound written questions (by either the District Court or a Barrister asking questions) in a law firm. On this basis the US Department of Justice were withdrawing their right to oral examination.

**MPH –** was in agreement with this proposal to pursue written letters regatory with regard to admission into evidence.

**DD –** indicated his hope of obtaining the information outside of the letters regatory procedure and without having to invoke the authority of Court. In this regard, the answers could be transcribed and certified by a Court appointed representative to hear the evidence.

**MPH –** indicated that he had no problem with written questions and written answers. However, he did have a problem with oral questions where his clients would be compelled to answer by order of the Court.

**MPH –** further queried whether this agreement would extend to all current proceedings, both civil and criminal proceedings or was it restricted to the civil proceedings.

**DD –** stated that he had no authority to represent criminal or any other civil proceedings. However, these proceedings were the only proceedings involving foreign discovery matters pending.

**MPH –** queried whether there were any other cases pending.

**DD –** stated that as far as he was aware there were no other cases pending regarding FDIS.

**JQ –** stated that he was aware of two other cases pending. However, these were not being run by the Department of Justice and did not involve foreign discovery.

**MPH –** requested assurances that no further approached would be made to the Irish Revenue Commissioners with regard to the current proceedings.

**MPH –** queried whether the litigation in the US would result in public records and could be admitted as evidence in other trials.

**DD –** clarified that there would be a transcript of the trial and that there was a remote risk that this transcript could be published.

**DD –** also clarified that this evidence could be subject to cross examination and could also be used in other cases. With regard to this current litigation, the US Department of Justice were proposing to withdraw all pending foreign discovery concerning the civil proceedings.

**DD –** stated the terms of the understanding reached. This concerned the understanding by which SM and MH would provide answers to the questions to be propounded by the Government in Fidelity litigation. Based on the assumption that the answers

provided are complete and accurate and that documents would be provided to corroborate the answers in a form that would be admissible in evidence and assuming that the answers to the written questions were admissible in evidence, the US Department of Justice were prepared to withdraw all pending foreign documentary requests specifically relating to Treaty requests with Ireland, Treaty requests with the UK, letters regatory with Ireland and letters regatory in the Isle of Man. In addition, if in future the answers to the questions provided by MH and SM were not admitted into evidence by the District Court of Massachusetts in the US, it would be necessary to go forward with Ireland through letters regatory and the US Department of Justice, assuming all other provisions were met, would withdrawn the aforementioned requests and limit going forward with regard to Ireland letters regatory only the propounded questions which consisted of the questions previously agreed.

*MPH -* agreed with this understanding and proposed to discuss this with his clients.


At this point, MPH, BW and AHM left the room.


MPH, BW, AHM and MH entered the room with a view to going through the proposed questions and answers.


*BW -* proposed to read both the questions and answers in the company of all present.

*MPH -* with regard to question 3, MPH indicated his concern regarding the question of communications with other entities, in particular relating to KPMG. MPH was of the opinion that KPMG is a brand name rather than an entity and further KPMG were the auditors of Biosphere and in this respect SM and MH would have had numerous communications with KPMG.

*DD -* with regard to question 7, DD queried the meaning of "fundamentally formulaic".

*BW -* stated that this represented a percentage of the capital.

*DD -* requested that this phrase would be clarified and suggested the following wording "by that I mean consistent with the percentage set forth in the outline of the proposed transaction and the fees earned were on an aggregate basis".

*JQ -* stated that there had been no reduction in the amount of foreign contribution and on this basis he was withdrawing the last phrase of his question.

*JQ -* referred to the three accounts opened and queried whether the JV represented this one account or were all three accounts opened in 2001 exclusively and limited to FDI's accounts.

*DD -* also raised the issue of whether there was any fee for the year 2002.

- stated that the 2m fee referred to the 2001 transaction and this was the source of capital for the 2002 transaction.

*DD* - queried whether Trilogy consisted if two entities

*JQ* - stated that its name appeared in the formation documents and was replaced by Trilogy in the Isle of Man.

*JQ and DD* indicated that they were interested in the fee structure for 2002 and 2001.

*MPH* - stated that on the basis of what was on the agreed, any further questions should be in writing and any answers that would be provided would also be in writing.

*JQ* - queried how the 2001 fee was agreed. In particular, how the amount of 2m was arrived at. Whether it was agreed after the fact, based on what was fair and reasonable or whether some other method was agreed.

*BW* - stated that he was unaware of the foreign partners were compensated. However, he assumed that they were treated fairly based on the success of the programme. There had been no discussion between MH, SM and Jimmy Habier during or in the course of the relationship.

*JQ* - indicated that payments were made in prior years in respect of other products and queried what would constitute fair and reasonable and whether the parties looked to other years.

*BW* - stated that he was not prepared to second guess the business relationship of the individuals.

*DD* - queried whether the individuals were aware of what Jimmy Habier was receiving out of the arrangement.

*BW* - stated that he was unaware of this and would have to clarify this with the clients. However, he was of the opinion that the clients did not know what monies were going to be taken out first.

At this point, MPH, BW, MH and AHM left the room to discuss the issues raised.

The parties re-entered the room and SM joined the discussions via a conference call.

*BW* - proposed to read out the questions while MH would answer and SM would state whether he was in agreement or whether any issues raised would require further consultation with MPH in private.

When the questions and answers had been completed.

W  -    stated that he would take a note of the edits and circulate the revised draft prior to
        Monday.

At this point the meeting ended and the United States Department of Justice thanked us for
our assistance in this matter.

AHM

WF-879889-v1

2008 No. 1   FTE

## THE HIGH COURT

## IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856 AND IN THE MATTER OF CIVIL PROCEEDINGS BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS AND IN THE MATTER ENTITLED

### FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND L.L.C.

Plaintiff

-and-

### UNITED STATES OF AMERICA

Defendants

### EXHIBIT "MJK4"

Referred to in the Affidavit of **MICHAEL KEALEY** sworn this 29th day of February 2008

_____
Deponent

_____
Practising Solicitors/
Commissioner for Oaths

William Fry
Solicitors
Fitzwilton House
Wilton Place
Dublin 2
013964.0017.MJK

14

## Interview Outline for Mahoney/Hawkes

1. **Govt. Ex. 2451** - By email dated 9/10/01, Mox Tan of Helios Financial distributed the "bios of the two individuals who serve as the co-investors in our transactions."

   a.   Sam Mahoney

       i.   Are you the Sam Mahoney referenced in the attached biography for Sam

           Mahoney.

   b.   **Martin Hawkes**

       i.   Are you the Martin Hawkes referenced in the attached biography for

           Martin Hawkes.

This biography is accurate and I remain a shareholder and director of BF. (Sam answers likewise on this and all subsequent questions.)

2. **Govt. Ex. 2452** - By email Mox Tan of Helios Financial distributed draft marketing materials with respect to a product named "Financial Derivatives Investment Strategy" (hereinafter referenced as "FDIS").

   (a)   Have you ever seen these FDIS marketing materials and please detail what James Haber and/or DGI communicated to you with respect to your participation in the FDIS product as a "co-investor?"

       In the month of May, 2001, JH presented to us by email and phone the opportunity to be co-investors in entities formed to effectuate a strategy DGI had developed. He described how the strategy would work and in all likelihood at some point sent us a similar power point presentation which described the strategy in detail, including the role of a foreign co-investor such as ourselves. Sam and I both agreed to serve as the foreign co-investor in the

1

₁ᵗʰ ₋gy on an alternating basis, and I don't know how it was decided which of us would go first. In any event, during the year 2001, DGI, Helios and Alpha Consultants LLC ("Alpha") and Sam or I (as the foreign partner along with other investors), were members of limited liability companies ("LLCs") that engaged in transactions based on the strategy which came to be known as the "financial derivatives investment strategy" ("FDIS").

Before the first FDIS transaction was entered into, JH promised to pay us an amount to be determined that we all agreed at the time to be fair and commensurate with our respective efforts.

JH also explained to us that all capital contributions to the various LLC's involved in the FDIS transactions and all distributions and proceeds from the sale of LLC interests were to be effectuated through bank accounts we organized. Sam and I therefore caused to be opened a single bank account maintained by Singer and Friedland in the Isle of Man for the FDIS transactions. This account was known as the H & M Joint Venture account No. 20195700 (the "JV Account"). We appointed Maddox Ltd. and Kilsture Ltd. as our agents for the purpose of facilitating the administration of the investments through the H&M Joint Venture Accounts.

The source of our capital contribution to the LLCs in the FDIS transactions aggregating $2,040,000 was twofold. Ailesbury Finance LLC ("Ailesbury"), a Wyoming partnership wired $500,000 to the JV Account on August 30, 2001 and $35,000 on December 5, 2001. The balance of our capital contributions aggregating $1,505,000 was wired into the JV Account from entities controlled by James Haber on various dates in 2001, in which we did not have any economic interest. Here are business records reflecting these contributions as well as the receipt back by Ailesbury of its $535,000 in January 2002.

2

From the 2001 & 2002 FDIS transactions Kilsture and Maddox were paid $2,000,000 as a fee as follows: (i) $100,000 was paid to Biosphere Finance Limited ("Biosphere") in two equal traunches of $50,000 on February 15, 2002 and May 3, 2002; (ii) $1,040,000 was paid in two equal traunches to Maddox Limited ("Maddox") on February 22, 2002 and May 3, 2002; and (iii) $760,000 was paid to Kilsture Limited ("Kilsture") on February 22, 2002 and May 3, 2002.

b.    · Did you have any communications with any of the following entities with respect to the FDIS products implemented in 2001 and 2002:

|  |  |
|---|---|
| 1) | DGI |
| 2) | Helios Financial |
| 3) | Alpha |
| 4) | Refco |
| 5) | Sidley Austin Brown & Wood |
| 6) | Proskauer Rose, LLP |
| 7) | Lord Bissell Bock |
| 8) | Bryan Cave |
| 9) | Brown Raysman |
| 10) | KPMG |
| 11) | Grant Thornton |
| 12) | RSM McGladrey |
| 13) | BDO Seidman |
| 14) | Biosphere Finance, ltd. |
| 15) | Trilogy Financial Products, Ltd. |
| 16) | Trilogy Financial Ltd. |

3

17)    Kilsture, Ltd.

18)    Maddox, Ltd.

19)    Cumberdale Holdings, Ltd.

20)    Please produce all documents you received
       which memorialize the role played by any of
       these entities.

We certainly spoke to representatives of DGI, Alpha, Refco and Helios as the FDIS transactions
were implemented. Moreover, Biosphere Finance was an entity Sam and I owned and or
controlled and Maddox and Kilsture provided agency services as mentioned earlier. We have no
recollection of speaking with representatives of any of these other entities concerning the FDIS
strategy itself or transactions entered into in connection therewith.

3.    **Govt. Ex. 2453 -**  By email dated October 2, 2001, Phil Kampf wrote a potential client
on DGI letterhead, stating:

> Here is the updated letter. I will forward original by mail. I will
> also be e-mailing an outline of the proposed transaction tomorrow
> which gives wire instructions, cost breakdowns, potential profit
> summaries etc. We do not have an engagement letter for the
> transaction.
> Assuming you agree with the content of the outline, we will form
> the entities and forward all of the operating documents to you for
> your review.

a.    Did anyone ever explain to you why there was not engagement letter for the FDIS

transaction? No

b.    Were you ever informed that the FDIS product was marketed using an "Outline of

Proposed Transaction"? No

4

i.    What did you understand that the Outline of Proposed Transaction was? A summary of the transaction that a prospective investor was contemplating entering into with DGI et al.

4.    **Govt. Ex. 2454**   By email dated October 11, 2001, Michael Kerekes of BDO emailed Phil Kampf a completed "Investor Fact Sheet" for Joseph Francis. The completed Investor Fact Sheet lists the Transaction Size as $23,000,000 and, as to whether it is "Capital/Ordinary", selects "Ordinary."

Did you know that DGI used an "Investor Fact Sheet" for purposes of marketing and/or implementing the FDIS product?

No, we did not receive Investor Fact Sheets for Mr. Francis or so far as we remember any Investor.

5.    **Govt. Ex. 2455** - By email dated October 17, 2001, James Haber emailed an Investor Fact Sheet and Outline for Francis to Thomas Levato of Brown Raysman. The Investor Fact Sheet attached to the email lists the Transaction Size as $27,000,000 and, as to whether it is "Capital/Ordinary", states "23MM Ordinary this year with the potential for $4MM later this year or early next year."

i.    Did you receive a copy of the attached Outline of Proposed Transaction for Joseph R. Francis dated October 11, 2001, or any other date? If so, please produce all such documents.

We probably did as we would generally receive an Outline of Proposed Transaction for each Investor that joined an LLC of which either of us was the foreign investor.

5

6.     *Govt. Ex. 2456* - By email dated November 5, 2001, James Haber of Diversified Group, Inc., forwarded an email to Biosphere Finance with respect to the proposed Francis FDIS transaction, which states:

> Please note that Francis is only doing one trade in the partnership for $23MM this year. He has decided that he does not want to do the $4MM trade for next year.

    i.     Did Biosphere Finance Ltd. receive a copy of this email?

    a.     Attached to this email to Biosphere Finance Ltd., is an updated outline of proposed transaction for Francis. Did you receive this attachment?

We probably did receive this email and the attachment.

7.     **Govt. Ex. 2457** - By email dated November 16, 2001, James Haber of Diversified Group, Inc., emailed Biosphere Finance copies of the Outlines of Proposed Transaction for Caputo, Wainwright, Robert G. Ciasulli, and Ronald j. Ciasulli.

    a.     Did Biosphere Finance Ltd. receive a copy of this email and the attached outlines?

We probably did.

8.     **Govt. Ex. 2458** - By email dated November 5, 2002, Elizabeth Jung of DGI sent an Outline of Proposed Transaction for Erb to the email address "bfl@indigo.ie"

    a.     Is this the email address for Biosphere Finance? Yes

    b.     Did Biosphere Finance Ltd. receive a copy of this email and the attached outline?

    i.     Do you understand the transactions referenced in Govt. Exs. 6-8 to have all been FDIS transactions. Yes

    ii.     Did you also receive an "Outline of Proposed Transaction" for every FDIS

6

transaction?  We believe we did

9.   **Govt. Ex. 2459**   -   Govt Exs. 2459.01 through 2459.56 are copies of Outlines of Proposed Transaction which appear to relate to other FDIS transactions implemented in 2001 and 2002.

a.      Did you understand that the "Outline of Proposed Transaction" for the FDIS product to detailed a series of steps for the implementation of the FDIS product.

Our role as foreign investor was primarily that of an implementing party. We were not involved in the structuring or negotiating of the transactions or the documents associated therewith.

As a general matter, the steps we took were in accordance with the steps described in the Outline of Proposed Transaction for each particular transaction. The economics we adhered to with respect to capital contributions were formulaic. By that I mean consistent with the percentages set forth in the Outline of Proposed Transactions. The $2,000,000 in fees as determined after the fact were wholly a function of the aggregate success of the FDIS program and in significant part the fees paid to the promoters. The initials you refer to are we assume mine or Sam's.

10.   **Govt. Ex. 2460**   -   By email dated October 31, 2002, Ron Buesinger of Alpha sent Elizabeth Jung a spreadsheet named "2001-Customers-Haber-Invst-12-31-01-R.xls." The first page of the attached spreadsheet appears to list, as of December 31, 2001, the original cost basis, sale of common, and adjusted cost basis for the co-investor in the 2001 FDIS transactions.

We never received a copy of this spreadsheet.

7

11.   **Govt. Ex. 2461** - Attached hereto is a copy of the Buy-Sell agreement with Richard Egan signed by Sam Mahoney.

    a.    Was this document in fact signed by Sam Mahoney. yes

    b.    Did you enter into a buy-sell agreement with respect to each of the FDIS transactions in which you participated. yes

    c.    Did you understand from the outset that you would be required to sign a buy-sell agreement shortly after the contribution on your behalf. yes

12.   **Govt. Ex. 2462** - Attached hereto is a copy of the wire instructions for Richard Egan with respect to his FDIS transaction. Please explain.

This account was opened in 2001 and was managed by Maddox and Kilsture on our behalf. We did keep our own records but no longer have them so we can't independently verify the accuracy of the numbers you are asking about.

13.   **Govt. Ex. 2463** - Attached are copies of wire transfers for some of the other buy-out payments during 2001 and 2002.

    a.    The wire transfers reflect that the buy-out payments during 2001 were deposited into one of the following three accounts at Singer & Friedlander using the following wire instructions:

| Sub A/c:Singer & Friedlander (Isle of Man); Account no: 30123012; Reference: 11270012 | Sub A/c:Singer & Friedlander (Isle of Man); Account no: 30123012; Reference: The H&M Joint Venture - | Sub A/c:Singer & Friedlander Limited; Account no: 30123012; Reference: S&F Client A/C NO. 11270025 |
|---|---|---|

b.    The wire transfers reflect that the buy-out payments during 2002 were also deposited by wire into the following additional account at Singer & Friedlander using the following wire instructions:

> Sub A/c:Singer & Friedlander (Isle of Man); Reference: Trilogy Investments Limited; Account # 20282910

(1)    Please explain?

Sam and I were exclusively responsible for procuring the creation and management of the Isle of Man accounts through which funds flowed in respect of the FDIS transactions. There was no line of credit utilized. The source of capital for the 2002 transactions was the continuation of the Joint Venture Account.

a.    Govt. Ex. **2464**   -   By email dated May 3, 2002, James Haber of DGI sent Ron Buesinger of Alpha an attached spreadsheet which lists the net fee for 2001 customers. **Are you familiar with these spreadsheets?**

(1)                    i.

We never saw this spreadsheet and did not have a precise understanding of the financial arrangement among DGI, Helios and Alpha. All discussions in this regard were with JH including the ultimate decision on what constituted fair and reasonable fees.

a.    What is Trilogy Investments Limited and what is your relationship to this entity?

In 2002 Trilogy Investment Limited took the place of DGI and Helios and like Kilsture and Maddox are Isle of Man companies.

9

# Exhibit C Part 3

14.    *What* was your fee arrangement with James Haber with respect to the FDIS transactions in 2001?

There was a $2,000,000 fee paid at the end of the day which was agreed to with JH as being fair and reasonable.

15.    Govt. Ex. 2471 - On October 31, 2002, Martin Hawkes wrote an email to James Haber with the subject line "Alpha Fees" stating:

> I presume the basis points are priced off the amount of the profit being sheltered i.e. 60 bps equals roughly EUR315,000? It's not clear from your fax whether the fee has been negotiated or is still in negotiation? If not completed why not suggest plus or minus 15 bps or the usual 30bps depending on whether the refund is received?

This is not FDIS related.

16.    **Govt. Ex. 2472** - On 9/23/02, James Haber sent an email to Ivan Ross of Alpha with an updated account for Alpha. The attached account reflects that the amount due Alpha with respect to six transactions is $366,000, which is computed as the product

$$\$122,000,00 \times 30bps = \$366,000$$

17.    **Govt. Ex. 2474** - On December 6, 2002, Martin of Biosphere Finance Ltd. sent an email to James Haber asking, inter alia, "When should we do a reckoning on fees in relation to the fund structures, Irish companies and Trilogy transactions?

a.    Did Martin Hawkes send this email? Yes

b.    Is the reference to "Trilogy transactions" a reference to the 2002 FDIS

10

transactions? No.

Govt. Ex. **2475** - On May 24, 2002, Mox tan sent an email with the subject line "Revised Trilogy US Implementation Memo" with a copy of the memo attached. This email was sent, inter alia, to Stephen Hubble with Trilogy Financial Products, Ltd., located on 37 Lombard Street, London , England.

a.    Did you ever receive a copy of this memo or a version thereof. No

    i.    Did you have any type of business relationship with Trilogy Financial Products, ltd. at any time during 2001 or 2002. If so, please detail the nature and extent of that relationship. No

    ii.    What was your relationship with Trilogy Financial Products during 2002? If so, please detail the nature and extent of that relationship and produce any documents memorializing that relationship. No

Never saw the memo. We have never had any interest in Trilogy Financial Products, Ltd.

    i.    How were the investments by Trilogy Investments Ltd. in the 2002 FDIS products funded?

The 2002 transactions were funded with funds coming out of the 2001 transactions.

19.    Govt. Ex. **2476** - Attached hereto is are redline changes to a proposed Certificate of Facts with respect to the 2001 FDIS transaction of Kutler for signature of Samuel Mahoney.

a.    In the Certificate of Facts Sam Mahoney is to certify that the following is true and correct in all material aspects, after due inquiry, and knowing that this certificate will be relied upon by Proskauer Rose LLP in rendering its opinion:

> There existed no understanding, agreement, obligation, or arrangement between Co-investor and any of the parties described herein, and to the best of Co-investor's

11

> knowledge there existed non understanding, agreement,
> obligation, or arrangement between any of the parties
> described herein, pursuant to which they committed to
> undertake all or any of the transactions described herein,
> pursuant to which they committed to undertake all or any of
> the transactions described herein upon the happening of any
> other transaction....

20.   Govt. Ex. **2478** - Attached hereto is a proposed Certificate of Facts with respect to the

2001 FDIS transaction of Ronald Ciasulli for signature of Martin Hawkes.

    a.   In the Certificate of Facts for the 2001 FDIS transaction Ronald Ciasulli Hawkes

is to further certify that the following is true and correct in all material aspects to

the best of his knowledge, and knowing that this certificate will be relied upon by

Proskauer Rose LLP in rendering its opinion:

> Co-investor has reviewed the Summary of Transactions...
> and, as to matters related to Co-investor, such summary is
> accurate and complete, and there are no pertinent facts
> relating to the Transactions that have not been set forth in
> such description.

21.   Govt. Ex. **2480** - Attached hereto is a Certificate of Facts with respect to the 2002 FDIS

transaction of Schut which appears to have been signed by Martin Hawkes.

    a.   In the Certificate of Facts for the 2002 FDIS transaction Hawkes further certified

that the following is true and correct in all material aspects to the best of his

knowledge, and knowing that this certificate will be relied upon by Proskauer

Rose LLP in rendering its opinion:

> Co-investor has reviewed the Summary of Transactions...
> and, as to matters related to Co-investor, such summary is
> accurate and complete, and there are no pertinent facts
> relating to the Transactions that have not been set forth in
> such description.

12

have reviewed the certificates of facts that you reference and believe that similar if not identical such certificates were signed by me or Sam for each FDIS LLC of which either of us was the foreign investor and a Proskauer opinion issued. We had no interaction with the Proskauer firm as we took our own counsel. We did understand that a rep letter of some sort would in all likelihood be required. We did not see their proposed tax opinion in advance of the first FDIS transaction in 2001 and may not have seen a tax opinion from Proskauer on the FDIS strategy at any time.  Accordingly, we have no idea what Proskauer understood as to the manner in which the strategy was being marketed. At the time we signed the certificates we had no reason to believe that they were inaccurate.

13

FEB-06-2008 14:32

91%

p.001

07/01/2002.

Funding of Retreat Life.

Loans.

|  |  |  |  |
|---|---|---|---|
| 4/9/01 | D.G. | 380,000 | 500,000 Repaid. |
| 29/10/01 | Ailesbury | | |
| 29/10/01 | D.G. | 300,000 | |
| 1/11/01 | D.G. | 75,000 | |
| 29/11/01 | D.G. | 150,000 | |
| 6/12/01 | D.G. | 600,000 | |
| | Ailesbury | ———— | 35,000 Repaid |
| | | 1,505,000 | 535,000. |

Total    2,040,000.

Avesbury Finance LLC
Loan to H & M Joint Venture Account

| Date | Activity | | Amount |
|------|----------|---|--------|
| 8/30/01 | Funds Advanced | $ | 500,000 |
| 12/5/01 | Funds Advanced | | 35,000 |
| 1/23/02 | Loan Repaid | | (535,000) |
| | | $ | - |

United Acquisition LLC
Analysis of Payments

|  |  | Fee Expense |
|---|---|---|
| Maddox Ltd | 5/3/2002 | 570,000 |
| Kilsure Ltd | 5/3/2002 | 380,000 |
| Biosphere Finance Ltd | 5/3/2002 | 50,000 |
|  |  | 1,000,000 |

Helios Finance LLC
February, 2002 Payments

| Date | Paid to | Amount |
|------|---------|--------|
| 2/15/02 | Biosphere Finance Ltd | $ 50,000 |
| 2/22/02 | Maddox Ltd | 570,000 |
| 2/22/02 | Kilsture Ltd | 380,000 |
| | | $ 1,000,000 |

013964

14

2008 No. 1   FTE

### THE HIGH COURT

**IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856
AND IN THE MATTER OF CIVIL PROCEEDINGS BEFORE THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS AND IN
THE MATTER ENTITLED**

**FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND L.L.C.**

Plaintiff

-and-

**UNITED STATES OF AMERICA**

Defendants

### EXHIBIT "MJK5"

Referred to in the Affidavit of **MICHAEL KEALEY** sworn this 29th *23rd* day of ~~February~~ *April* 2008

_____
Deponent

_____
Practising Solicitor/
~~Commissioner for Oaths~~

William Fry
Solicitors
Fitzwilton House
Wilton Place
Dublin 2
013964.0017.MJK

15

**Interview Outline for Mahoney/Hawkes**

## INTRODUCTION TO FDIS

1. Were you involved with a transaction known as the "Financial Derivatives Investment Strategy" (hereinafter referenced as "FDIS")? **Answer: Yes.**

   *See other version Question # 2(a), pg. 1*

2. How was it that you came to be involved with FDIS? **Answer:** ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *presented to us* ▆▆▆▆▆ *The opportunity to be co-investors in entire*

3. Attached hereto are draft marketing materials for FDIS, marked as Govt. Ex. 2452, which were being circulated by email dated April 5, 2001. Were these draft marketing materials provided to you or shown to you by Haber in May 2001? **Answer: In all likelihood at some point we received a similar power point presentation which described the strategy in detail, including the role of a foreign ~~partner~~ co-investor (see Ex.1) such as ourselves.** *formed to effectuate a strategy btg had developed He described how the strategy would work...*

4. *See other version pg. 1* Based upon Mr. Haber's explanation, did you agree play the role of a foreign ~~partner~~ *"co-investor"* in this strategy? ▆▆▆▆▆▆ *— on an altering basis*

## BIOS FOR MAHONEY      *See other version Question #1*

5. Attached hereto marked as Govt. Ex. 2451 is an email dated 9/10/01, from Mox Tan of Helios Financial which purport to be distributing the "bios of the two individuals who serve as the co-investors in our transactions." The two individuals are identified in this document as Sam Mahoney and Martin Hawkes.

   *Not included on other version - See Question #1*

6. Did you, Sam Mahoney, ever see this email? **Answer: No.**

7. Are you the Sam Mahoney referenced in the attached biography for Sam Mahoney, marked as part of Govt. Ex. 2451? **Answer: Yes.**

8. Was the "bio" for you prepared by you, which is marked as part of Govt. Ex. 2451, prepared by you? **Answer: I think so.**

9. Is the "bio" for you, which is marked as part of Govt. Ex. 2451, accurate? **Answer: yes.**

10. The biography for you lists you as a shareholder and director of Biosphere Financial Ltd. ("BFL").

11. Is BFL an Irish company? **Answer: Yes.**

12. When was BFL incorporated? **Answer: 29th May, 1991**

13. Is this the email address "bfl@indigo.ie" the email address for Biosphere Finance? *(see Question #*

Answer: Yes

14. ████████████████████████████  (see other version Question #1)

15. Were you aware that Mox Tan of Helios Financial was representing to potential FDIS customers that you were one of two individuals "who serve as the co-investors" in the FDIS transactions? Answer: No.

ABSENT from other version

## BIOS FOR MAHONEY

16. Are you the Martin Hawkes referenced in the attached biography for Martin Hawkes, marked as part of Govt. Ex. 2451? Answer: Yes.

see other version Question #1

17. Was this "bio" for you, marked as part of Govt. Ex. 2451, prepared by you? Answer: I think so.

18. Is the "bio" for you, marked as part of Govt. Ex. 2451, accurate? Answer: Yes

19. The biography for Martin Hawkes, marked as part of Govt. Ex. 2451, lists you as a shareholder and director of Biosphere Financial Ltd. ("BFL").

20. Is BFL an Irish company? Answer: Yes

21. Are you still a shareholder and director of BFL? Answer: Yes

## IDENTIFIED FDIS TRANSACTIONS

See Question #10, pg. 7

22. Attached hereto, marked as Govt. Ex. 2460 is an email dated October 31, 2002, from Ron Buesinger of Alpha to Elizabeth Jung of Diversified Group, Inc. ("D.G."), forwarding a spreadsheet named 2001-Customers-HaberInvst-12-31-01-R.xls."

23. Did you ever receive a copy of this email, Govt. Ex. 2460, or the attached spreadsheet? Answer: We never received a copy of this spreadsheet.

24. The attached spreadsheet, marked as Govt. Ex. 2460, lists 47 customers.

25. Do you recognized the names on the attached list  Answer: Yes.

26. What do the names on the list relate to?  Answer: They are all persons who participated in FDIS transactions during 2001.

27. Does this list appear to be complete.  Answer: It appears to be a complete list of the 2001 FDIS transactions in which one or the other of us, Mahoney or Hawkes,

Omitted from other version - see pg. 7

3192164.1

served in the role of foreign partner.  *Not included in other version.*

28.  Attached hereto, marked as Govt. Ex. 2460-1 is a document produced by Alpha [Bates 1Alpha-disk09-002452] entitled Trilogy 2002, which identifies 9 transactions as Trilogy Type transactions.

29.  Did you ever receive a copy of this document? Answer: No.

30.  Do you recognize the transactions identified on this document as Trilogy Type transactions? Answer: Yes.

31.  What are Trilogy Type transactions? Answer: They are FDIS transactions which were implemented in 2002 through Trilogy Investments Limited.

32.  Does this list of 2002 FDIS transactions appear to be complete. Answer: It appears to be a complete list of the 2002 FDIS transactions in which one or the other of us, Mahoney or Hawkes, also served in the role of foreign partner.

33.  The Schut-Elbaum is listed on Govt. Exs. 2460 and 2460-1. Is this the same FDIS transaction? Answer: Yes. It was started in 2001, but carried over to 2002.

34.  Were there a total of 55 FDIS transactions in 2001 and 2002 in which Mahoney or Hawkes served in the role of "foreign partner"? Answer: Yes.

3192164.1

OUTLINES OF PROPOSED TRANSACTION *See other version Question #9, pg. 7*

35.  Attached hereto marked as Govt. Exs. 2459.01 through 2459.55 are copies of documents
     entitled "Outline of Proposed Transaction" for each of the 55 transactions that you have
     identified as either a 2001 or a 2002 FDIS transaction. *Reference is to 2459.55 in other version.*

36.  Do you recognize each of these Outlines of Proposed Transaction as relating to an FDIS
     transaction? **Answer: Yes.**

37.  In each of these outlines the role of "co-investor" is assigned to either "SM" or "MH."
     Do these initials stand for Sam Mahoney and Martin Hawkes, respectively. **Answer:**
     ~~Yes.~~ *"The initials you refer to are we assume mine or Sam's"* *(See pg. 7)*
     *(See other version pg. 2)*

38.  How was it determined whether Mahoney or Hawkes would be the named foreign partner
     in the 2001 and 2002 FDIS transactions? **Answer: Generally, it was on an alternating
     basis, and I don't know how it was decided which of us would go first.** *See other version pg. 4*

39.  Attached hereto marked as Govt. Ex. 2453 is an email dated October 2, 2001, from Phil
     Kampf of Helios Financial ████████████████████████████████
     ███████████ in which he stated:

         Here is the updated letter. I will forward original by mail.
         I will also be e-mailing an outline of the proposed
         transaction tomorrow which gives wire instructions, cost
         breakdowns, potential profit summaries etc. We do not
         have an engagement letter for the transaction. Assuming
         you agree with the content of the outline, we will form the
         entities and forward all of the operating documents to you
         for your review.

     Did you ever see a copy of this email? **Answer: No.**

40.  Did anyone ever explain to you why there was no engagement letter for the FDIS
     transaction? **Answer: No.**

41.  Were you ever informed, as set forth in the email marked as Govt. Ex. 2453, that the
     FDIS product was marketed using the "Outline of Proposed Transaction"? **Answer: No.**

42.  What was your understanding of what the Outline of Proposed Transaction was?
     **Answer:  A summary of the transaction that a prospective investor was** *et al.*
     **contemplating entering into with The Diversified Group, Inc. ("DGI") ~~or Helios~~
     ~~Trading ("Helios")~~.** *(See top of pg. 5)*

43.  Did you understand that the "Outline of Proposed Transaction" for the FDIS product to

3192164.1

detail a series of steps for the implementation of the FDIS product? **Answer: Our role as "foreign investor"** ▓▓▓▓ **was primarily that of an implementing party. We were not involved in the structuring or negotiating of the transactions or the documents associated therewith. As a general matter, the steps we took were in accordance with the steps described in the Outline of Proposed Transaction for each particular transaction. The economics we adhered to with respect to capital contributions were formulaic. By that I mean consistent with the percentages set forth in the Outline of Proposed Transactions.** *(See other version Question #9(a) pg. 7)*

44. Did you know during 2001 and 2002 that there was an "Outline of Proposed Transaction" for each of the FDIS transactions? **Answer: yes.**

*See other version Question #8, pg. 6*

45. Did you receive a copy of each of these outlines of proposed transaction prior to the implementation of the FDIS transaction? ~~Answer: We probably did as we would generally receive an Outline of Proposed Transaction for each DGI or Helios client who formed a multi-member LLC or partnership of which either of us was the foreign partner.~~ *"We believe we did"*
*See other version Question #6*

*See also bottom of pg. 5 - response is same but re: Ex. 2456*

46. Attached hereto as Govt. Ex. 2456 is an email dated November 5, 2001, from James Haber of Diversified Group, Inc., forwarding ▓ BFL an outline of proposed transaction for Francis. Did you receive this email and attachment? **Answer: We probably did receive this email and the attachment.**
*See other version Question #7*

47. Attached hereto as Govt. Ex. 2457 is an email dated November 16, 2001, from James Haber of Diversified Group, Inc., forwarding ▓ BFL Outlines of Proposed Transaction for Caputo, Wainwright, Robert G. Ciasulli, and Ronald J. Ciasulli. Did you receive this email and attachment? **Answer: We probably did receive this email and the attachments.**
*Not explicitly answered in other version - See Question #8, pg 6*

48. Attached hereto as Govt. Ex. 2458 is an email dated November 5, 2002, from Elizabeth Jung of DGI to the email address "bfl@indigo.ie" forwarding an Outline of Proposed Transaction for Erb, one of the 2002 FDIS transactions. Did you receive this email and attachment? **Answer: We probably did receive this email and the attachment.**

*See other version Question #8, pg. 6*

3192164.1

**PURPOSE OF FDIS TRANSACTION**

→ *NOT IN OTHER VERSION*

(49.) Did you understand from your discussions with Mr. Haber with respect to FDIS and the Outlines of Proposed Transaction that you received that a purpose of the FDIS transaction was to generate tax losses for the US taxpayer identified in the title of the Outline of Proposed Transaction? **Answer: Yes.**

→ *See Question #4, Pg 5*

50.  Attached hereto marked as Govt. Ex. 2454

~~████████████████████████████████████████████~~ The Investor Fact Sheet lists the Transaction Size as $27,000,000 and, as to whether it is "Capital/Ordinary", states "23MM Ordinary this year with the potential for $4MM later this year or early next year." Did you receive a copy of the Investor Fact Sheet for any of the participants in FDIS? **Answer: No, we did not receive Investor Fact Sheets for Mr. Francis or, so far as we remember, ~~for any other FDIS transaction.~~** → *But this was answered only w/ regard to Ex. 2464 (see pg. 5)*

**BUY SELL**

→ *NOT IN OTHER VERSION*

(51.) Each of the Outlines of Proposed Transaction for FDIS reference a planned partial buy-out of the interest of the named "foreign partner." Were you aware that this was a planned step in each of the the FDIS transactions? **Answer: Yes.**

52.  Did you enter into a buy-sell agreement with respect to each of the FDIS transactions in which you participated. **Answer: yes** *(see Question #11(b), pg. 8)*

53.  Did you understand from the outset that you would be required to sign a buy-sell agreement shortly after the contribution of capital ~~to the partnership~~ on your behalf. **Answer: yes** *(see Question #11(c), pg. 8).*

*See other version Question #11(c), pg. 8.*

54.  Attached hereto marked as Govt. Ex. 2461 is a copy of the Buy-Sell agreement with Richard Egan purportedly signed by Sam Mahoney. Was this document in fact signed by Sam Mahoney. **Answer: yes**

55.  Did you understand from the outset that you would be required to sign a buy-sell agreement shortly after the contribution of capital ~~by~~ ~~Fidelity International~~ on your behalf.? **Answers: Yes.**

3192164.1

FEE FOR PARTICIPATION

*See other version Question #2 pg. 2*

56. Did James Haber promise you any sort of a fee in exchange for your agreement to serve
as foreign partner in the strategy? Answer: Yes, before the first FDIS transaction was ~~we determine that it~~ *all agreed*
entered into, James Haber promised to pay us an amount ~~that was fair and~~ *at the time to be*
commensurate with the ▓▓▓▓▓▓▓▓ *our respective efforts.*

*See pg. 9*

57. Did you have any discussion with anyone other than James Haber regarding what the
amount of this fee should be? Answer: All discussions in this regard were with
James Haber including the ultimate decision on what constituted ▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *fair + reasonable fees.*

*See pg. 9*

58. Do you know how the amount of this fee was to be computed? Answer: ~~No.~~ *Did not have a precise understanding of the financial arrangement among DTI, Helios + Alpha*

59. Attached hereto marked as Govt. Ex. 2469 is an email dated May 17, 2000 from Haber to
Ivan Ross of Alpha and Mox Tan of Helios Financial, with two attachments. Did you
ever receive or see a copy of this email or the attachments thereto. Answer: No.
*← This Ex. is not included in other version.*

60. The email marked as Govt. Ex. 2469 is dated May 17, 2000. Is this date before or after
the date in May, 2001, when James Haber presented to you by email and phone the
opportunity to play the role of foreign partners in FDIS? Answer: I do not know.

61. During the presentation by James Haber in May 2001 of the opportunity to play the role
of foreign partners in FDIS, did Mr. Haber discuss with you what the amount of your
contribution would be as foreign partners  Answer: No.

62. One of the attachments to the email marked as Govt. Ex. 2469 is an attachment with the
bates number 1Alpha-Disk03-013502 with the title "Profit Analysis."  This attachment
lists the amount of the "Foreign Contribution" as .38% .

63. Did Mr. Haber discuss with you in May 2001 what the amount of the "Foreign
Contribution" would be in the FDIS transactions? Answer: No.

64. Did Mr. Haber discuss with you in May 2001 or thereafter during 2001 that the amount
of the "Foreign Contribution" for the role of foreign partner was a certain pre-agreed
upon fixed percentage? Answer: No.

65. The "Profit Analysis" attached to Govt. Ex. 2469 also lists a "Foreign Fee" equal to
.15%, with the caveat "not to exceed 50,000.

66. Did Mr. Haber discuss with you in May 2001 that he was proposing to pay you a
"Foreign Fee" on each FDIS transaction equal to .15%., with the caveat "not to exceed
50,000" per transaction? Answer: No.

*Not discussed in other version.*

3192164.1

67. Did Mr. Haber discuss with you in May 2001 or thereafter that the amount of the
    "Foreign Fee" to be paid to you for playing the role of foreign partners in FDIS was be a
    certain pre-agreed upon fixed percentage of the amount of transaction? Answer: No.
    → See other version Question #15, pg. 10

68. Attached hereto marked as Govt. Ex. 247 is a ▓▓▓ email dated 31st October, 2002,
    from Martin Hawkes to James Haber with the subject line "Alpha Fees", in which
    Hawkes stated:

    > I presume the basis points are priced off the amount of the profit being sheltered
    > i.e. 60 bps equals roughly EUR315,000? It's not clear from your fax whether the
    > fee has been negotiated or is still in negotiation? If not completed why not
    > suggest plus or minus 15 bps or the usual 30bps depending on whether the refund
    > is received?



    Did Martin Hawkes send this email to James Haber on 31st October 2001 ▓▓▓▓▓▓
    ▓▓▓▓▓▓▓▓▓▓? Answer: yes.
    → dated 2002 in other copy
    "This is not FDIS related" (see pg. 10)

69. Does this email relate to the fee for the amount of income being sheltered by an FDIS
    strategy? Answer: No.

70. What does the phrase "basis points" or "bps" as used in this email mean? Answer: Basis
    points are a percent of the transaction and are stated in hundredths, so here 15bps
    means .15%.
    → Not in other version.

71. Did you ultimately receive the fee promised to you by James Haber in exchange for your
    agreement to serve in the role of a foreign co-investor? Answer: Yes.

72. → See pg. 7
    How was the amount of the fee that you were paid computed? Answer: We were paid a
    fee totaling $2 million, but we do no know how this amount was computed. It is our
    understanding that the $2 million in fees, as determined after the fact, were wholly a
    function of the aggregate success of the FDIS program and in significant part ▓▓ the fees
    paid to the promoter ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

73. How was this $2 million fee paid to you? Answer: (i) $100,000 was paid to Biosphere
    Finance Limited ("BFL") in two equal sums of $50,000 on 15th February, 2002 and
    3rd May, 2002; (ii) ▓▓▓▓▓▓ was paid to Maddox Limited ("Maddox") in two equal
    → See pg. 3

3192164.1

sums of $570,000 on 22ⁿᵈ February, 2002 and 3ʳᵈ May, 2002; and (iii) $760,000 was paid to Kilsture Limited ("Kilsture") in two equal sums of $380,000 on 22ⁿᵈ February, 2002 and 3ʳᵈ May, 2002.

*NOT in other version.*

74. Who paid each of these two $50,000 fee payments to BFL? Answer: The $50,000 fee payments that we received on the 15ᵗʰ of February, 2002, was received from Helios Financial. The fee payment that we received on May 3, 2002, was from DGI, paid through United Acquisition, LLC.

*omitted from other version.*

75. Attached hereto marked as Govt. Ex. 2468 is a document prepared by Helios Financial which lists a payment to BFL in the amount of $50,000 on 15ᵗʰ February, 2002, and identifies the purpose of this payment as for "Consulting" Do you know why Helios Financial identified the purpose of this payment as "Consulting"? Answer: No.

76. Attached hereto marked as Ex. A is a spreadsheet produced to the United States on your behalf by counsel for DGI with respect to United Acquisition, LLC, which reflects a payment from United Acquisition, LLC to Maddox Limited on 3ʳᵈ May 2002, in the amount of $50,000. Do you recognize this spreadsheet? Answer ?

77. Do you know who created the spreadsheet marked as Ex. A? Answer: ?

*NOT in other version.*

78. Who paid these two $570,000 payments to Maddox? Answer: The $570,000 fee payment that Maddox received on the 22ⁿᵈ of February, 2002, was received from Helios Financial. The $570,000 fee payment that Maddox received on 3ʳᵈ May 2002, was from DGI, paid through United Acquisition, LLC.

79. What is Maddox? Answer: Maddox is an Isle of Man entity. (see pg. 9)

*NOT in other version.*

80. Who owns Maddox? Answer: Maddox is owned and controlled by Maurice Hawkes.

*omitted from other version.*

81. Attached hereto marked as Govt. Ex. 2468 is a document prepared by Helios Financial which lists a payment to Maddox in the amount of $570,000 on 22ⁿᵈ February, 2002, and identifies the purpose of this payment as for "Consulting" Do you know why Helios Financial identified the purpose of this payment as "Consulting"? Answer: No.

*omitted from other version.*

82. Attached hereto marked as Govt. Ex. 2467 is a Bank Statement of Helios Financial LLC, Bank of America Account No. 000 0597 1888, for the period 2/1/02 through 2/28/02, which reflects that on 22ⁿᵈ February, 2002, a wire in the amount of $570,000.00 was sent from Helios Financial to Maddox Limited, ID 9545-40041974, Bnf. Bk. Isle of Man Bank. Did Maddox receive this payment of $570,000 through the Isle of Man Bank, Account No. 9545-40041974?

*omitted from other version.*

83. Who paid each of these two $380,000 payments to Kilsture? Answer: The $380,000 fee payment that Kilsture received on the 22ⁿᵈ of February, 2002, was received from

3192164.1

Helios Financial. The fee $380,000 fee payment that Kilsture received on 3rd May 2002, was from DGI, ~~paid through United Acquisition, LLC.~~

84. What is Kilsture? Answer: Kilsture is an Isle of Man entity.

→ *NOT in other version*

85. Who owns Kilsture? Answer: Kilsture is owned and controlled by Sam Mahoney.

→ *Nil in other version.*

86. When was Kilsture incorporated? Answer: ~~22nd October, 1998.~~

→ *omitted from other version*

87. Attached hereto marked as Govt. Ex. 2468 is a document prepared by Helios Financial which lists a payment to Kilsture in the amount of $380,000 on 22nd February, 2002, and identifies the purpose of this payment as for "Consulting" Do you know why Helios Financial identified the purpose of this payment as "Consulting"? Answer: No.

→ *omitted from other version*

88. Attached hereto marked as Govt. Ex. 2467 is a Bank Statement of Helios Financial LLC, Bank of America Account No. 000 0597 1888, for the period 2/1/02 through 2/28/02, which reflects that on 22nd February, 2002, a wire in the amount of $380,000.00 was sent from Helios Financial to Kilsture Limited, ID 9545-40035729, Bnf. Bk. Isle of Man Bank. Did Maddox receive this payment of $570,000 through the Isle of Man Bank, Account No. 9545-40035729? ▮▮▮▮▮▮

→ *NOT discussed in other version.*

89. Why were Maddox and Kilsture paid different fee amounts? Answer: Maddox and Kilsture were paid different amounts because we had an agreement to split our fee from FDIS on a 60/40 basis, 60% to Martin Hawkes and 40% to Sam Mahoney.

**FUNDING OF FDIS**

→ *See pg. 2 – "JH explained to us that all capital contributions... were to be effectuated through bank accounts we organized*

90. Did you and James Haber discuss during May 2001 what would be the source of the funds that you would be contributing as foreign partners? Answer: No.

91. What was the source of the funding for the capital contributions that were being made into the FDIS transactions on your behalf? Answer: The source of the funding for our capital contributions to the partnerships in the FDIS transactions is detailed in a handwritten ledger prepared by Sam Mahoney dated 7th January 2001, entitled "funding of Partnerships," a copy of which is attached hereto marked as Ex. B.

*Ledger not mentioned in other version*

92. Is this ledger, marked as Ex. B, all in the handwriting of Sam Mahoney? Answer: Yes.

93. Was the ledger, marked as Ex. B, created by Sam Mahoney on or about the 7th of January 2001. Answer: yes

94. Was the ledger, marked as Ex. B created at or near the time of the occurrence of the matters set forth therein by, or from information transmitted by, a person with knowledge of those matters. ▮▮▮▮▮▮

3192164.1



*Ledger not mentioned in other version.*

95. Was the ledger, marked as Ex. B, kept Sam Mahoney ▓▓▓▓▓▓▓▓▓ in the course of your regularly conducted business activities. ▓▓▓▓▓

96. Was the ledger, marked as Ex. B, made as a regular practice in your regularly conducted business. ▓▓▓▓▓

97. Where does the funding list of this ledger, Ex. B, come from? **Answer: As reflected in this ledger, Ex. B, funding totaling $1,505,000 was advanced from "D.G." The balance of the funding, totaling $535,000, was advanced from "Ailesbury."**

*Answer in other version does not mention DGI - see pg. 2*

98. What does the reference to "D.G" represent? **Answer: "D.G." references Diversified Group. Funding totaling $1,505,000 was advanced from the Diversified Group.**

99. What does the reference to Ailesbury represent? **Answer: Ailesbury Finance LLC ("Ailesbury"), is a Wyoming partnership that we own and control through** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

100. Does your ledger, Ex. B, reflect that date upon which these funds were received by you? **Answer: The dates upon which the funds were received is noted on the left column by day, month and year, adjacent to the amount that we received. These amounts were received by wire in U.S. dollars.**

101. What was the date upon which you received the amount of $380,000, which is listed in the top row? **Answer: The first $380,000 payment from D.G. was received on or about July 10, 2001 to fund the first FDIS transaction, the same date that this amount was wired by us in U.S. Dollars into the REFCO account of Gupta Investments LLC, Account No. 006453-00000.**

102. Who specifically paid the DG funding? **Answer: The D.G. funds came from DGI, or an entity controlled by it.**

*Omitted from other version*



3192164.1



*Hi [?]
omitted
at [?]
licensed in the
in the
version*

111. How did you account for this funding from D.G. and Ailesbury? Answer: As reflected in the ledger, Ex. B, we classified the funding as "loans."

112. Were there any loan documents with respect to these loans? Answer: No.

113. Was there any interest paid with respect to these loans? Answer: No.

114. Was a line of credit utilized? Answer: There was no line of credit utilized.

115. Was any of this funding from DGI repaid? Answer: No.

116. Was any of the funding from Ailesbury repaid, and if so, when? Answer: Yes. The funding that we received from Ailesbury was fully repaid in January of 2002.

117. Is this repayment reflected in the ledger? Answer: This repayment is reflected in the ledger marked as Ex. B.

118. Attached hereto as Ex. C is a spreadsheet produced by counsel for DGI on your behalf which details the funding from Ailesbury Finance Limited. Do you recognize this document?

119. Was the spreadsheet, marked as Ex. C, prepared by you in the course of your business? Answer:

120. Do you know who prepared the spreadsheet marked as Ex. C? Answer:

*▶ see page 2*

121. The spreadsheet marked as Ex. C reflects that all funding from Ailesbury was repaid on 23rd January, 2002. Is it correct that all funding from Ailesbury was repaid on 23rd January, 2002? Answer:

Page 12 of 23

3192164.1



122.    What was the source of the funding for the 2002 FDIS transactions? **Answer: The source of capital for the 2002 transactions was the continuation of the H&M Joint Venture Account, which contained the remaining balance of the funding by DG from the 2001 FDIS transactions.** *See pg. 9. — BUT see pg. 11 — The 2002 transactions were funded w/ funds coming out of the 2001 transactions*

**BANK ACCOUNTS** *See pg. 2*

123.    Did James Haber explain to you in May 2001 what bank accounts would be used to remit your capital contributions on the 2001 FDIS transactions? **Answer: James Haber explained to us that all capital contributions to the various LLC's involved in the FDIS transactions and all distributions and proceeds from the sale of LLC interests were to be remitted ~~effectuated~~ through bank accounts we organized.**

124.    What Singer & Fridlander bank accounts did you use to implement the 2001 FDIS transactions? **Answer: During 2001 we used three bank accounts maintained by the merchant bank of Singer and Friedlander in the Isle of Man to send and receive funds with respect to the FDIS partnerships.** *See Question #13, pg. 8*

125.    Please identify the name and account numbers for each of these accounts. **Answer: Account Numbers 11270012, 11270025 , and 20195700.** *See Question #13, pg. 8*

126.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
        **Answer: ?** *➔ omitted from other version.*

127.    Did you use Account #11270012 to implement the first six (6) 2001 FDIS transactions? **Answer: Yes.**

128.    Did you use Account #11270025 to implement the next five (5) 2001 FDIS transactions, including Richard Egan's FDIS transaction? **Answer: Yes.**

129.    Did you use Account # 20195700 to implement the ▓▓▓▓ thirty-six (36) FDIS transactions in ▓▓▓? **Answer: Yes.**

130.    Who was responsible for procuring the creation and management of these accounts? **Answer: Sam and I were exclusively responsible for procuring the creation and management of the Isle of Man accounts through which funds flowed in respect of the FDIS transactions.** — *See pg. 9*

131.    Why did you use these three accounts to implement the 2001 FDIS transactions? **Answer: We appointed Maddox Ltd. and Kilsture Ltd. as our agents for the purpose of facilitating the administration of the investments through the H&M Joint Venture Account, # 20195700. This account was opened in 2001 and was managed by Maddox and Kilsture on our behalf. The other two accounts, ▓▓▓▓▓** *See pgs. 2+8*

3192164.1



▨▨▨▨▨▨▨▨ were pre-existing accounts that we controlled separately through Maddox Ltd. and Kilspure Ltd.

→ See pg. 6

132. Attached hereto marked as Govt. Ex. 2462 and 2463 are copies of wire instructions to wire funds to these accounts for certain of the FDIS transactions. Do you recognize these wire instructions? Answer: Yes.

→ Wire instructions discussed in Question #13, pg. 8 of other version

133. Who prepared these wire instructions? Answer: They were prepared at our direction. *not explicitly stated*

→ Not explicitly stated – see pg. 8 of other version

134. What bank accounts did you use to implement the 2002 FDIS transactions? Answer: During 2002 we used two bank accounts maintained by the merchant bank of Singer and Friedlander in the Isle of Man to send and receive funds with respect to the 2002 FDIS transactions.

→ First mentioned on pg. 2 of other version

135. Did you continue to use the H&M Joint Venture Account, # 20195700, to implement the 2002 FDIS transactions? Answer: Yes.

136. Did Trilogy Investments Ltd. also use a Singer & Friedlander Account on the Isle of Man, Account # 20282910, to implement the 2002 FDIS transactions? Answer: Yes. See top of pg. 9

→ See pg. 8

137. Do you now have any books and records in your ▨▨▨▨▨ with respect to these four ▨▨▨▨▨ accounts? Answer: ▨▨▨▨▨
▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨
▨▨▨▨▨▨▨▨▨

**JOINT EXPENSES**     → See pg. 9

138. Attached hereto marked as Govt. Ex. 2464 is an email dated May 3, 2002, from James Haber of DGI to Ron Buesinger of Alpha with an attached spreadsheet concerning income and expenses from 2001. Did you ever receive or see a copy of this document? Answer: We never saw this spreadsheet and did not have a precise understanding of the financial arrangement among DGI, Helios and Alpha.

139. Govt. Ex. 2464 lists as an expense a line item of $1,302,978 for SMMH. This same amount, $1,302,978, is listed on Govt. Ex. 2460 as the total for "Co-Investor Adj. Cost Basis." Does the amount of $1,302,978, accurately reflect the total adjusted cost basis for the contributions made on your behalf in the 2001 FDIS transactions, as the net of the contribution on your behalf, less the amount received from your sale of common? Answer: ?

→ Omitted from other version

140. ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨
▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨
▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

3192164.1



*see Question #16, Pg.10*

142.

**IMPLEMENTATION OF 2002 FDIS** → *Not included in other version.*

146.  Attached hereto as Govt. 2459.49 is an email dated April 5, 2002, from Philip Kampf of Helios Financial forwarding outlines for one of the 2002 FDIS transactions, in which he stated "Please note that Trilogy has replaced diversified and Alpha in the partnership." What was the role of Trilogy Investments Limited in the 2002 FDIS transactions? **Answer: For purposes of implementing the 2002 FDIS transactions, Trilogy Investment Limited took the place of Alpha, DGI and Helios as named participants.**

147.  Attached hereto as Govt. Ex. 2475 is an email dated May 24, 2002, from Mox Tan with an attached memo entitled "Revised Trilogy US Implementation Memo." Did you ever receive a copy of this memo or a version thereof. **Answer: No** *see Question 18(a), Pg.11*

148.  The email marked as Govt. Ex. 2475 is addressed to Stephen Hubble of Trilogy Financial Products, at the email address "stephen.hubble.3gy". Did you have any type of business relationship with Trilogy Financial Products, ltd. at any time during 2001 or 2002. **Answer: No** *see pg. 11* → *Not contained in other version.*

149.  Govt. Exs. 2459.48 and 2459.49 both contain Outlines of Proposed Transaction for 2002 FDIS transactions in which Trilogy Financial Investments Limited, not Trilogy Investments Limited, is identified as a partner and as the manager. Was Trilogy Investments Limited substituted for Trilogy Financial Investments? **Answer: Yes.**

150.  Who owns Trilogy Investments Limited? **Answer: Maddox and Kilsture are the** → *not stated in other version*

Page 15 of 23

3192164.1

beneficial owners of Trilogy Investments Limited?

151.  What was the source of the funding for the contributions that were made on your behalf to the FDIS transactions in 2002? **Answer: The source of capital for the 2002 transactions was the continuation of the H&M Joint Venture Account.** *See pg. 9*
*→ omitted from other version.*

152.  Attached hereto as Govt. Ex. 2473 is an email dated October 21, 2002, from James Haber to "Martin" forwarding a proforma invoice from Trilogy Invesments Limited to RMS McGladrey totaling $1,053,750 for the three 2002 FDIS transactions of DennisThies, Crawford/McNicolas, and Link, in the following amounts:

| 2002 FDIS Transactions | Gross Size | Fee |
|---|---|---|
| Crawford/ McNicolas | $12,000,000 | 300,000 |
| Dennis Thies | $15,150,000 | 378,750 |
| Link | $15,000,000 | 375,000 |
| Total | | 1,053,750 |

Did Trilogy Investments Limited receive a copy of this email and proforma invoice at or near the time of the occurrence of the matters set forth therein in the ordinary course of your business? **Answer: Yes.** *→ omitted from other version*

153.  Attached hereto as Govt. Ex. 2466 is an email dated October 25, 2002, from James Haber to Ronald Wainwright at RSM McGladrey with a copy of an invoice from Trilogy Investments Limited to RMS McGladrey in the amount of $1,053,750 for the three 2002 FDIS transactions of D.Theis, Crwaford/McNicolas, and the Link family. Did Trilogy Investments Ltd. send RSM McGladrey a copy of the attached invoice at or near the time of the occurrence of the matters set forth therein in the course of its regularly conducted business activities? **Answer: Yes.**

154.  Did Trilogy Investments Limited issue the attached invoice from Trilogy Investments Limited in the amount of $1,053,750, attached to the email marked as Govt. Ex. 2466? **Answer: Yes.**

155.  Did Trilogy Investments Limited receive a payment in the amount of $1,053,750 from RSM McGladrey on or about 17th December, 2002 with respect to this invoice, Govt. Ex. 2466? **Answer: Yes.** *→ See other version Question #19, pg. 11*

156.  Attached hereto as Govt. Ex. 2476 is an email dated 24th January, 2003, which references

that a second invoice was sent by Trilogy Investments Limited to RMS McGladrey by fax on or about December 26, 2002 in the amount of $477,500. Did Trilogy Investments Limited, issue a second invoice to RSM McGladrey by fax dated 26th December, 2002, in the amount of $477,500? ~~Answer: Yes.~~ ➤ *Not specified in other version, see pg. 11*

157.  Was this second invoice in the amount of $477,500 with respect to the 2002 FDIS transactions for William Theis, Erb, Whiteside and Weiss, in the following amounts, as listed on Govt. Ex. 2560-1 ➤ *omitted from other version.*

| 2002 FDIS Transactions | Gross Size | Fee |
|---|---|---|
| William Thies | $3,500,000 | 65,000 |
| Erb | $6,500,000 | 87,500 |
| Whiteside | $7,000,000 | 175,000 |
| Weiss | $5,000,000 | 150,000 |
| Total | | 477,500 |

Answer: Yes.
➤ *Not discussed in other version.*

158.  Did Trilogy Investments Limited receive a payment with respect to this second invoice from RSM McGladrey on or about 28th January, 2003 in the amount of $477,500? Answer: Yes.        ➤ *omitted from other version.*

159.  Attached hereto as Govt. Ex. 2477 is an email dated August 8, 2002, from James Haber in which he stated

> In many instances, I will be acting as a consultant to a Non-US company named Trilogy Investments Ltd. and not as a representative of Diversified.

Did James Haber act as a consultant to Trilogy Investments Limited and not as a representative of Diversified during 2002?

amount of $144,970. Do you know if this line item relates to the contributions being made on your behalf and on behalf of Trilogy Investments Limited to the 2002 FDIS transactions? Answer: Yes?

*Wording is different — see pg. 10*

*See Question #20, pg. 12*

162. Attached hereto as Govt. Ex. 2478 is an email dated October 31, 2002, from Elizabeth Jung of DGI regarding a conversation with "Sam" in reference to "Martin's and Trilogy's contributions to LF Investments 2002 LLC," which appears to reflect that the H&M Joint Venture Account was used to make contributions to the 2002 FDIS transactions both on behalf of Martin Hawkes and Trilogy Investments Limited.

163. Does this email accurately reflect the substance of a conversation between Elizabeth Jung and Sam Mahoney on or about October 31, 2002? Answer: ?

164. Was the H&M Joint Venture Account, #20195700 used to make contributions to the 2002 FDIS transactions both on behalf of Martin Hawkes and Trilogy Investments Limited. Answer: ?

*See Question #17, pg. 10*

165. Attached hereto marked as Govt. Ex. 2474 is an email dated December 6, 2002, from Martin Hawkes of Biosphere Finance Ltd., to James Haber asking, inter alia,

> When should we do a reckoning on fees in relation to the fund structures, Irish companies and Trilogy transactions?

Did Martin Hawkes send the email marked as Govt. Ex. 2474 ~~at or near the time of the occurrence of the matters set forth therein in the course of his regularly conducted business activities~~. Answer: Yes *See pg. 10*

166. Is the reference to "Trilogy transactions" in Govt. Ex. 2474 a reference to the 2002 FDIS transactions? Answer: ~~Yes~~ No! *See top of pg. 11*

*omitted from other version.*

167. Attached hereto as Govt. Ex. 2479 is an email from Ron Buesinger dated April 29, 2003, with subject line "Fees" which states that he has been asked, on behalf of Alpha Consultants to invoice Trilogy Investments Limited the sum of $237,000. Do these fees relate to the 2002 FDIS transactions? Answer: ?

*See Question #21, pg. 12*

168. Attached hereto as Govt. Ex. 2480 is an invoice dated April 29, 2003, from Alpha Consultants to Trilogy Investments Limited in the amount of $297,490. Did Trilogy Investments Limited receive this invoice from Alpha Consultants at or near the time of the date of the invoice in the course of its regularly conducted business activities? Answer: ?

169. Did Trilogy Investments Limited make a payment to Alpha Consultants on or about 5th July, 2003 in the amount of $297,490? Answer: ?

3192164.1

170. Was the payment of $297,490 from Trilogy Investments Limited to Alpha Consultants with respect to the 2002 FDIS transactions? *Answer:* ?

171. Did Trilogy Investments Limited make any prior payments to Alpha Consultants with respect to the 2002 FDIS transactions, and if so, in what amounts? *Answer:* ?

*Omitted from other version.*

172. Attached hereto as Govt. Ex. 2481 is an account statement for Helios Financial LLC dated May 2002, which reflects that on 9th May 2003, Trilogy Investments Limited wired Helios the sum of $732,245.00. Did Trilogy Investments Limited make a payment to Helios Financial on or about 5th July, 2003 in the amount of $732,245.00 to Helios Financial ? *Answer:* ?

173. Was the payment of $732,245 from Trilogy Investments Limited to Helios Financial with respect to the 2002 FDIS transactions? *Answer:* ?

## COMMUNICATIONS WITH THIRD PARTIES — *See pg. 4*

*See other version pg. 4*

174. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Biosphere Finance, Ltd.,?  Answer: We are owners and directors of BFL. ~~We used the offices of Biosphere Finance, Ltd., as well as its email address, for purposes of sending and receiving communications with respect to the FDIS strategy and the implementation of the FDIS transactions.~~

175. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Diversified Group Incorporated  Answer: We certainly spoke with and exchanged email with representatives of DGI ~~with respect to the FDIS strategy and the implementation of the FDIS transactions.~~ *as the FDIS transactions were implemented.*

176. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Ailesbury Finance, LLC - Answer: We are indirect owners of Ailesbury and, as detailed above, Ailesbury was used to provide some of the funding for the FDIS transactions. We did not speak with any other representatives of Ailesbury with respect to this funding and Ailesbury did not keep any records of this funding.  *omitted from other version*

177. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Kilsture, Ltd. - Answer: Sam Mahoney owns and controls Kilsture, Ltd., which provided agency services, through Singer & Friedlander, for implementation of the FDIS transactions. We communicated with representatives of Singer & Friedlander with respect to the implementation of the FDIS transactions through Kilsture, Ltd. *See pg. 4 in other version - answer is not this detailed*

**➤ Not discussed in other version**

178. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Maddox, Ltd. - **Answer: Martin Hawkes owns and control Maddox, Ltd., which provided agency services, through Singer & Friedlander, for implementation of the FDIS transactions. We communicated with representatives of Singer & Friedlander with respect to the implementation of the FDIS transactions through Maddox, Ltd.**

179. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Cumberdale Holdings, Ltd. - **Answer: Kilsture and Maddox are the shareholders of Cumberdale Holdings, Ltd. However, Cumberdale Holdings, Ltd., was not involved in any way in the implementation of the FDIS strategy or the FDIS transactions.**

180. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Helios Financial LLC - **Answer: We certainly spoke with and exchanged email with representatives of Helios Financial LLC ~~with respect to the FDIS strategy and the implementation of~~ the FDIS transactions** *were implemented*

*See pg. 4*

181. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of United Acquisition, LLC - **Answer: Upon information and belief, James Haber owns or controls United Acquisition, LLC, and this entity was used by James Haber to wire part of the fee that we received for participating in the FDIS transactions as foreign partners.**

182. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Alpha Consultants LLC and Alpha Trading, LLC - **Answer: We certainly spoke with and exchanged email with representatives of Alpha ~~with respect to the FDIS strategy and the implementation of the~~ FDIS transactions** *were implemented.*

*See pg. 4*

183. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Refco - **Answer: We certainly spoke with and exchanged email with representatives of Refco ~~with respect to the FDIS strategy and the implementation of~~ the FDIS transactions** *were implemented — See pg. 4*

184. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Sidley Austin, (formerly known as Sidley Austin Brown & Wood)  **Answer: We have no recollection of communicating with any representatives of the law firm of Sidley Austin Brown & Wood regarding the FDIS strategy, the implementation of the**

3192164.1

FDIS transactions, or any representations concerning the FDIS transactions.

185.  Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Proskauer Rose, LLP - Answer: We have no recollection of communicating with any representatives of the law firm of Proskauer Rose regarding the FDIS strategy, the implementation of the FDIS transactions, or any representations concerning the FDIS transactions.

186.  Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Lord Bissell Bock - Answer: We have no recollection of communicating with any representatives of the law firm of Lord Bissel Bock regarding the FDIS strategy, the implementation of the FDIS transactions, or any representations concerning the FDIS transactions.

187.  Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Bryan Cave - Answer: We have no recollection of communicating with any representatives of the law firm of Bryan Cave regarding the FDIS strategy, the implementation of the FDIS transactions, or any representations concerning the FDIS transactions.

188.  Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Brown Raysman - Answer: We have no recollection of communicating with any representatives of the law firm of Brown Raysman regarding the FDIS strategy, the implementation of the FDIS transactions, or any representations concerning the FDIS transactions.

189.  Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of KPMG (USA, Ireland, and Isle of Man) - Answer: We have no recollection of communicating with any representatives of the accounting firm of KPMG in the United States regarding the FDIS strategy or the implementation of the FDIS transactions. KPMG, Ireland, was the auditor for Biosphere Finance, Ltd., which received part of the $2 million fee for our participation in the FDIS strategy as foreign partners. However, we have no recollection of communicating with any of the representatives of KPMG, Ireland, regarding the FDIS strategy, the implementation of the FDIS transactions, or the details of this fee. We also have no recollection of communicating with any of the representatives of KPMG, Isle of Man, regarding the FDIS strategy, the implementation of the FDIS transactions, or the details of this fee.

190.  Did you have any communications in 2001 and 2002 concerning the development,

3192164.1

marketing and/or implementation of FDIS with any of the agents or employees of Grant Thornton - Answer: We have no recollection of communicating with any of the representatives of Grant Thornton Man, regarding the FDIS strategy or the implementation of the FDIS transactions.

191.    Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of RSM McGladrey - Answer: We have no recollection of communicating with any of the representatives of the accounting firm of RSM McGladrey regarding the FDIS strategy or the implementation of the FDIS transactions.

192.    Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of BDO Seidman, LLP - Answer: We have no recollection of communicating with any of the representatives of the accounting firm BDO Seidman regarding the FDIS strategy or the implementation of the FDIS transactions.

193.    Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Trilogy Investments Ltd. Answer: Our companies, Maddox and Kilsture, are the beneficial owners of Trilogy Investments Limited. We used Trilogy Investments Limited for purposes of sending and receiving communications with respect to the 2002 FDIS transactions.

*Nature of the Trilogy entity is not discussed in other version except for one sentence on the bottom of Pg. 9*

194.    Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Trilogy Financial Products Ltd. - Answer: We have no recollection of communicating with representatives of any of Trilogy Financial Products, Ltd. concerning the FDIS strategy itself or transactions entered into in connection therewith.

195.    Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Trilogy Financial Investments Ltd. - Answer: Trilogy Investments Ltd. Was substituted for Trilogy Financial Investments Ltd. in two of the FDIS transactions, however, we have no recollection of communicating with representatives of any of Trilogy Financial Investments, Ltd. concerning the FDIS strategy itself or any of the transactions entered into in connection therewith.

*Omitted from other version.*

196.    Do you have any other documents which memorialize the role played by any of these entities. Answer: Other than the ledger attached hereto as Exhibit C, we do not have possession or control of any responsive documents.

197.    CERTIFICATES OF FACT

3192164.1

_Not discussed in other version._

a.)  Did you ever provide any factual representations with respect to the Egan FDIS transaction? Answer: No.

b.     Were you ever asked to provide any factual representations with respect to the Egan FDIS transaction? Answer: ?

3192164.1

# Exhibit D

**Samuel Mahoney's and Martin Hawkes's Proffered Testimony on Direct Examination**

**INTRODUCTION TO FDIS**

1.  Were you involved with a transaction known as the "Financial Derivatives Investment Strategy" (hereinafter referenced as "FDIS")?
    **Answer: Yes.**

2.  How was it that you came to be involved with FDIS?
    **Answer: In the month of May, 2001, James Haber described by email and phone how the strategy would work.**

3.  I show you, marked as Govt. Ex. 2452, draft marketing materials for the Financial Derivatives Investment Strategy ("FDIS"), which were being circulated by email dated April 5, 2001. Were these draft marketing materials provided to you or shown to you by Haber in May 2001?
    **Answer: In all likelihood at some point we received a similar power point presentation which described the strategy in detail, including the role of a foreign partner such as ourselves.**

4.  Based upon Mr. Haber's explanation, did you agree to play the role of a foreign partner in this strategy?
    **Answer: Yes.**

**BIOS FOR MAHONEY**

5.  I show you, marked as Govt. Ex. 2451, an email dated 9/10/01, from Mox Tan of Helios Financial which purport to be distributing the "bios of the two individuals who serve as the co-investors in our transactions." The two individuals are identified in this document as Sam Mahoney and Martin Hawkes.

    Did you, Sam Mahoney, ever see this email?
    **Answer: No.**

6.  Are you the Sam Mahoney referenced in the attached biography for Sam Mahoney, marked as part of Govt. Ex. 2451?
    **Answer: Yes.**

7.  Was the "bio" for you, which is marked as part of Govt. Ex. 2451, prepared by you?
    **Answer: I think so.**

8.  Is the "bio" for you, which is marked as part of Govt. Ex. 2451, accurate?
    **Answer: Yes.**

1


GOVERNMENT'S
EXHIBIT
M-H Defend.
Ex 10
FBI/GJD 800-851-4889

9.   The biography for you lists you as a shareholder and director of Biosphere Finance Ltd. ("BFL").

Is BFL an Irish company?
**Answer: Yes.**

10.  When was BFL incorporated?
**Answer: 29th May, 1991**

11.  Is this email address "bfl@indigo.ie" the email address for Biosphere Finance?
**Answer: Yes**

12.  Are you still a shareholder and director of BFL?
**Answer: Yes**

13.  Were you aware that Mox Tan of Helios Financial was representing to potential FDIS customers that you were one of two individuals "who serve as the co-investors" in the FDIS transactions?
**Answer: No.**

## BIOS FOR HAWKES

14.  Are you the Martin Hawkes referenced in the attached biography for Martin Hawkes, marked as part of Govt. Ex. 2451?
**Answer: Yes.**

15.  Was this "bio" for you, marked as part of Govt. Ex. 2451, prepared by you?
**Answer: I think so.**

16.  Is the "bio" for you, marked as part of Govt. Ex. 2451, accurate?
**Answer: Yes.**

17.  The biography for Martin Hawkes, marked as part of Govt. Ex. 2451, lists you as a shareholder and director of Biosphere Finance Ltd. ("BFL").
Is BFL an Irish company?
**Answer: Yes.**

18.  Are you still a shareholder and director of BFL?
**Answer: Yes.**

## IDENTIFIED FDIS TRANSACTIONS

19.  I show you, marked as Govt. Ex. 2460, an email dated October 31, 2002, from

2

Ron Buesinger of Alpha to Elizabeth Jung of Diversified Group, Inc. ("D.G."),
forwarding a spreadsheet named 2001-Customers-HaberInvst-12-31-01-R.xls."
Did you ever receive a copy of this email, Govt. Ex. 2460, or the attached spreadsheet?
**Answer: We never received a copy of this spreadsheet.**

20.   The attached spreadsheet to this email, on the second page of Govt. Ex. 2460, lists 47
      customers. Do you recognize the names on the attached list?
      **Answer: Yes, as far as I can tell.**

21.   What do the names on the list relate to?
      **Answer: They are all persons who participated in FDIS transactions during 2001.**

22.   Does this list appear to be complete?
      **Answer: It appears to be a complete list of the 2001 FDIS transactions in which one
      or the other of us, Mahoney or Hawkes, served in the role of foreign partner.**

23.   I show you, marked as Govt. Ex. 2465, a document produced by Alpha [Bates1Alpha-
      disk09-002452] entitled Trilogy 2002, which identifies 9 transactions as Trilogy Type
      transactions. Did you ever receive a copy of this document?
      **Answer: No.**

24.   Do you recognize the transactions identified on this document as Trilogy Type
      transactions?
      **Answer: Yes, I believe so.**

25.   What are Trilogy Type Transactions?
      **Answer: They are FDIS transactions which were implemented in 2002 through
      Trilogy Investments Limited.**

26.   Does this list of 2002 FDIS transactions appear to be complete?
      **Answer: It appears to be a complete list of the 2002 FDIS transaction in which one
      or the other of us, Mahoney or Hawkes, also served in the role of foreign partner.**

27.   Schut-Elbaum is listed on both Govt. Exs. 2460 and 2465. Is this the same FDIS
      transaction?
      **Answer: Yes. It was started in 2001, but carried over to 2002.**

28.   Were there a total of 55 FDIS transactions in 2001 and 2002 in which Mahoney or
      Hawkes served in the role of "foreign partner"?
      **Answer: Yes.**

3

## OUTLINES OF PROPOSED TRANSACTION

29.  I show you, marked as Govt. Exs. 2459.01 through 2459.55, an "Outline of Proposed Transaction" for each of the 55 transactions that you have identified as either a 2001 or a 2002 FDIS transaction. Do you recognize each of these Outlines of Proposed Transaction as relating to an FDIS transaction?
**Answer: Yes.**

30.  In each of these outlines the role of "co-investor" is assigned to either "SM" or "MH." Do these initials stand for Sam Mahoney and Martin Hawkes, respectively?
**Answer: Yes.**

31.  How was it determined whether Mahoney or Hawkes would be the named foreign partner in the 2001 and 2002 FDIS transactions?
**Answer: Generally, it was on an alternating basis, and I don't know how it was decided which of us would go first.**

32.  I show you, marked as Govt. Ex. 2453, an email dated October 2, 2001, from Phil Kampf of Helios Financial to David Schostak with respect to the Jerome Schostak FDIS transaction, in which Mr. Kampf stated:

> Here is the updated letter. I will forward original by mail.
> I will also be e-mailing an outline of the proposed
> transaction tomorrow which gives wire instructions, cost
> breakdowns, potential profit summaries etc. We do not
> have an engagement letter for the transaction. Assuming
> you agree with the content of the outline, we will form the
> entities and forward all of the operating documents to you
> for your review.

Did you ever see a copy of this email?
**Answer: No.**

33.  Did anyone ever explain to you why there was no engagement letter for the FDIS transaction?
**Answer: No.**

34.  Were you ever informed, as set forth in the email marked as Govt. Ex. 2453, that the FDIS product was marketed using the "Outline of Proposed Transaction"?
**Answer: No.**

4

35.  What was your understanding of what the Outline of Proposed Transaction was?
     **Answer: A summary of the transaction that a prospective investor was contemplating entering into with The Diversified Group, Inc. ("DGI") or Trilogy Investments Limited.**

36.  Did you understand the "Outline of Proposed Transaction" for the FDIS product to detail a series of steps for the implementation of the FDIS product?
     **Answer: Our role as "foreign investor" in FDIS was primarily that of an implementing party. We were not involved in the structuring or negotiating of the transactions or the documents associated therewith. As a general matter, the steps we took were in accordance with the steps described in the Outline of Proposed Transaction for each particular transaction. The economics we adhered to with respect to the capital contributions were formulaic. By that I mean consistent with the percentages set forth in the Outline of Proposed Transactions.**

37.  Did you know during 2001 and 2002 that there was an "Outline of Proposed Transaction" for each of the FDIS transactions?
     **Answer: Yes.**

38.  Did you receive a copy of each of these outlines of proposed transaction prior to the implementation of the FDIS transaction?
     **Answer: We probably did as we would generally receive an Outline of Proposed Transaction for each DGI or Helios client who formed a multi-member LLC or partnership of which either of us was the "foreign partner."**

39.  I show you, marked as Govt. Ex. 2456, an email dated November 5, 2001, from James Haber of Diversified Group, Inc., forwarding to BFL an outline of proposed transaction for Francis. Did you receive this email and attachment?
     **Answer: We probably did receive this email and the attachment.**

40.  I show you, marked as Govt. Ex. 2457, an email dated November 16, 2001, from James Haber of Diversified Group, Inc., forwarding to BFL Outlines of Proposed Transaction for Caputo, Wainwright, Robert G. Ciasulli, and Ronald J. Ciasulli. Did you receive this email and attachment?
     **Answer: We probably did receive this email and the attachments.**

41.  I show you, marked as Govt. Ex. 2458, an email dated November 5, 2002, from Elizabeth Jung of DGI to the email address "bfl@indigo.ie" forwarding an Outline of Proposed Transaction for Erb, one of the 2002 FDIS transactions. Did you receive this email and attachment?
     **Answer: We probably did receive this email and the attachment.**

**PURPOSE OF FDIS TRANSACTION**

42.    Did you understand from your discussions with Mr. Haber with respect to FDIS and the Outlines of Proposed Transaction that you received that a purpose of the FDIS transaction was to generate tax losses for the US taxpayer identified in the title of the Outline of Proposed Transaction?
Answer: Yes.

43.    I show you, marked as Govt. Ex. 2454, an email dated October 11, 2001, from Michael Kerekes of BDO Seidman, LLP to Phil Kampf of Helios Financial forwarding him a completed Investor Fact Sheet for Joseph Francis, one of the FDIS participants. Also attached hereto marked as Govt. Ex. 2455 is an email dated October 17, 2001, from Phil Kampf to Thomas Lavato at the law firm of Brown Raysman, forwarding him the completed Investor Fact Sheet for Joseph Francis, along with the Outline of Proposed Transaction for Francis' FDIS transaction, asking Levato to form the entities and to get the documents ready for this transaction. The Investor Fact Sheet lists the Transaction Size as $27,000,000 and, as to whether it is "Capital/Ordinary", states "23MM Ordinary this year with the potential for $4MM later this year or early next year." Did you receive a copy of the Investor Fact Sheet for any of the participants in FDIS?
**Answer: No, we did not receive Investor Fact Sheets for Mr. Francis or, so far as we remember, for any other FDIS transaction.**

**BUY SELL**

44.    Each of the Outlines of Proposed Transaction for FDIS reference a planned partial buy-out of the interest of the named "foreign partner." Were you aware that this was a planned step in each of the FDIS transactions?
Answer: Yes.

45.    Did you have a buy-sell understanding with respect to each of the FDIS transaction in which you participated?
Answer: Yes.

46.    Did you understand from the outset that you could be required to effectuate a buy-sell after the "contribution of capital" to the partnership?
Answer: Yes.

47.    And did this apply to the Fidelity International transaction as well?
Answer: Yes.

48.    I show you, marked as Govt. Ex. 2461, a copy of the Buy-Sell agreement with Richard Egan purportedly signed by Sam Mahoney. Was this document in fact signed by Sam Mahoney?
Answer: Yes.

6

## FEE FOR PARTICIPATION

49.  Did James Haber promise you any sort of a fee in exchange for your agreement to serve as foreign partner in the FDIS strategy?
     **Answer: Yes, before the first FDIS transaction was entered into, James Haber promised to pay an amount that was fair and commensurate with the role to be served by Kilsture Limited and Maddox Limited which we appointed as our agents for the purpose of implementing the FDIS transactions. Kilsture and Maddox are Isle of Man companies.**

50.  Did you have any discussion with anyone other than James Haber regarding what the amount of this fee should be?
     **Answer: All discussions in this regard were with James Haber including the ultimate decision on what constituted an amount that would be fair and commensurate with the role to be served by Kilsture and Maddox.**

51.  Do you know how the amount of this fee was to be computed?
     **Answer: No.**

52.  I show you, marked as Govt. Ex. 2469, an email dated May 17, 2001 from Haber to Ivan Ross of Alpha and Mox Tan of Helios Financial, with two attachments. Did you ever receive or see a copy of this email or the attachments thereto?
     **Answer: No.**

53.  The email marked as Govt. Ex. 2469 is dated May 17, 2001. Is this date before or after the date in May, 2001, when James Haber presented to you by email and phone the opportunity to play the role of foreign partners in FDIS?
     **Answer: I do not know.**

54.  During the presentation by James Haber in May 2001 of the opportunity to play the role of foreign partners in FDIS, did Mr. Haber discuss with you what the amount of your contribution would be as foreign partners?
     **Answer: No.**

55.  One of the attachments to the email marked as Govt. Ex. 2469 is an attachment with the Bates number 1Alpha-Disk03-013502 with the title "Profit Analysis." This attachment lists the amount of the "Foreign Contribution" as .38% . Did Mr. Haber discuss with you in May 2001 what the amount of the "Foreign Contribution" would be in the FDIS transactions?
     **Answer: No.**

56.  Did Mr. Haber discuss with you in May 2001 or thereafter during 2001 that the amount of the "Foreign Contribution" for the role of foreign partner was a certain pre-agreed upon fixed percentage?
     **Answer: No.**

7

57.  The "Profit Analysis" attached to Govt. Ex. 2469 also lists a "Foreign Fee" equal to
     .15%, with the caveat "not to exceed 50,000." Did Mr. Haber discuss with you in May
     2001 that he was proposing to pay you a "Foreign Fee" on each FDIS transaction equal to
     .15%, with the caveat "not to exceed 50,000" per transaction?
     **Answer: No.**

58.  Did Mr. Haber discuss with you in May 2001 or thereafter the amount of the "Foreign
     Fee" to be paid for your serving the role of foreign partners in FDIS?
     **Answer: Yes.**

59.  Were these fees ultimately paid?
     **Answer: Yes.**

60.  How was the amount of the fee that you were paid computed?
     **Answer: A fee totaling $2 million was paid, but we do not know how this amount
     was computed. It is our understanding that the $2 million in fees, as determined
     after the fact, were a function of the aggregate success of the FDIS program and in
     significant part a function of the gross amount of the fees paid by the US
     participants.**

61.  How was this $2 million fee paid?
     **Answer: (i) $100,000 was paid to Biosphere Finance Limited ("BFL") in two equal
     sums of $50,000 on 15th February, 2002 and 3rd May, 2002; (ii) $1,140,000 was paid to
     Maddox Limited ("Maddox") in two equal sums of $570,000 on 22nd February, 2002
     and 3rd May, 2002; and (iii) $760,000 was paid to Kilsture Limited ("Kilsture") in
     two equal sums of $380,000 on 22nd February, 2002 and 3rd May, 2002.**

62.  Who paid each of these two $50,000 fee payments to BFL?
     **Answer: The $50,000 fee payments that we received on the 15th of February, 2002,
     were received from Helios Financial. The fee payment that we received on May 3,
     2002, was from DGI, paid through United Acquisition, LLC.**

63.  Attached hereto marked as Govt. Ex. 2468 is a document prepared by Helios Financial
     which lists a payment to BFL in the amount of $50,000 on 15th February, 2002, and
     identifies the purpose of this payment as for "Consulting" Do you know why Helios
     Financial identified the purpose of this payment as "Consulting"?
     **Answer: No.**

64.  Attached hereto marked as part of Govt. Ex. 3025 is a spreadsheet produced to the United
     States on your behalf by counsel for DGI with respect to United Acquisition, LLC, which
     reflects payments from United Acquisition, LLC to BFL, Maddox and Kilsture on 3rd
     May 2002, totaling US$1 million. Do you recognize this spreadsheet?
     **Answer: No.**

8

65.  Do you know who created the spreadsheet marked as Govt. Ex. 3025?
     Answer No.

66.  Who paid these two $570,000 payments to Maddox?
     **Answer: We believe the $570,000 fee payment that Maddox received on or about the 22nd of February, 2002, was received from Helios Financial and the $570,000 fee payment that Maddox received on or about 3rd May, 2002, was from DGI, paid through United Acquisition, LLC.**

67.  What is Maddox?
     **Answer: Maddox is an Isle of Man company which was incorporated on 4th April, 1996**

68.  I show you, marked as Govt. Ex. 2468, a document prepared by Helios Financial which lists a payment to Maddox in the amount of $570,000 on 22nd February, 2002, and identifies the purpose of this payment as for "Consulting." Do you know why Helios Financial identified the purpose of this payment as "Consulting"?
     **Answer: No.**

69.  I show you, marked as Govt. Ex. 2467, a Bank Statement of Helios Financial LLC, Bank of America Account No. 000 0597 1888, for the period 2/1/02 through 2/28/02, which reflects that on 22nd February, 2002, a wire in the amount of $570,000.00 was sent from Helios Financial to Maddox Limited, ID 9545-40041974, Bnf. Bk. Isle of Man Bank. Did Maddox receive this payment of $570,000 through the Isle of Man Bank, Account No. 9545-40041974?
     **Answer: That would appear so.**

70.  Who paid each of these two $380,000 payments to Kilsture?
     **Answer: We believe the $380,000 fee payment that Kilsture received on or about the 22nd of February, 2002, was received from Helios Financial and the $380,000 fee payment that Kilsture received on or about 3rd May 2002, was from DGI, paid through United Acquisition, LLC.**

71.  What is Kilsture?
     **Answer: Kilsture is an Isle of Man company.**

72.  When was Kilsture incorporated?
     **Answer: 22nd October, 1998.**

73.  I show you, marked as Govt. Ex. 2468, a document prepared by Helios Financial which lists a payment to Kilsture in the amount of $380,000 on 22nd February, 2002, and identifies the purpose of this payment as for "Consulting." Do you know why Helios Financial identified the purpose of this payment as "Consulting"?

9

**Answer: No.**

74.   I show you, marked as Govt. Ex. 2467, a Bank Statement of Helios Financial LLC, Bank of America Account No. 000 0597 1888, for the period 2/1/02 through 2/28/02, which reflects that on 22nd February, 2002, a wire in the amount of $380,000.00 was sent from Helios Financial to Kilsture Limited, ID 9545-40035729, Bnf. Bk. Isle of Man Bank. Did Kilsture receive this payment of $380,000 through the Isle of Man Bank, Account No. 9545-40035729?
**Answer: It would appear so.**

75.   Why were Maddox and Kilsture paid different fee amounts?
**Answer: Maddox and Kilsture were paid different amounts because it was agreed to split the fees from FDIS on a 60/40 basis, 60% to Maddox and 40% to Kilsture.**

## FUNDING OF FDIS

76.   Did you and James Haber discuss during May 2001 what would be the source of the funds that you would be contributing in your roles as "foreign partners"?
**Answer: No.**

77.   What was the source of the funding for the "capital contributions" that you were making in your role as "foreign partner"?
**Answer: The source of the funding for our "capital contributions" to the partnerships in the FDIS transactions is detailed in a handwritten ledger prepared by Sam Mahoney dated 7$_{th}$ January 2002, entitled "funding of Partnerships," a copy of which we have produced, which has been marked as Govt. Ex. 3023.**

78.   Is this ledger, marked as Govt. Ex. 3023, all in the handwriting of Sam Mahoney?
**Answer: Yes.**

79.   Was the ledger, marked as Govt. Ex. 3023, created by Sam Mahoney on or about the 7$_{th}$ of January 2002?
**Answer: Yes.**

80.   Was the ledger, marked as Govt. Ex. 3023 created at or near the time of the occurrence of the matters set forth therein by, or from information transmitted by, a person with knowledge of those matters?
**Answer: Yes.**

81.   Was the ledger, marked as Govt. Ex. 3023, kept by Sam Mahoney on behalf of both of you in the course of your regularly conducted business activities?
**Answer: Yes.**

82.  Was the ledger, marked as Govt. Ex. 3023, made as a regular practice in your regularly
     conducted business?
     **Answer: Yes.**

83.  Where does the funding list of this ledger, Govt. Ex. 3023, come from?
     **Answer: As reflected in this ledger, Ex. B, funding totaling $1,505,000 was advanced
     from "D.G."  The balance of the funding, totaling $535,000, was advanced from
     "Ailesbury."**

84.  What does the reference to "D.G" in Govt. Ex. 3023 represent?
     **Answer: "D.G." references Diversified Group.  Funding totaling $1,505,000 was
     advanced from the Diversified Group.**

85.  What does the reference to Ailesbury in Govt. Ex. 3023 represent?
     **Answer: Ailesbury Finance LLC ("Ailesbury"), is a Wyoming partnership,**

86.  Does your ledger, Govt. Ex. 3023, reflect the date upon which these funds were received?
     **Answer: The dates upon which the funds were received is noted on the left column
     by day, month and year, adjacent to the amount that we received.  These amounts
     were received by wire in U.S. dollars.**

87.  On Govt. Ex. 3023, what was the date upon which you received the amount of $380,000,
     which is listed in the top row?
     **Answer: The first $380,000 payment from D.G. was received on or about July 10,
     2001 to fund the first FDIS transaction.**

88.  Who specifically paid the DG funding listed in Govt. Ex. 3023?
     **Answer: The D.G. funds came from DGI, or an entity controlled by it, so far as we
     understood.**

89.  Who specifically paid the Ailesbury funding listed in Govt. Ex. 3023?
     **Answer: The Ailesbury Funding came from Ailesbury Finance.**

90.  Into what accounts were the funds that are referenced on your ledger, marked as Govt.
     Ex. 3023, deposited?
     **Answer: These funds were deposited into the three Singer & Friedlander accounts
     through which the 2001 FDIS transactions were implemented.**

91.  Were any of these funds that were received from DGI used for anything other than the
     FDIS transactions?
     **Answer: No.**

92.  Were any of these funds that were received from Ailesbury used for anything other than
     the FDIS transactions?

11

Answer: No.

93.    How did you account for this funding from D.G. and Ailesbury?
       **Answer: As reflected in the ledger, Govt. Ex. 3023, we classified the funding as**
"**loans.**"

94.    Were there any loan documents with respect to these loans?
       **Answer: No.**

95.    Was there any interest paid with respect to these loans?
       **Answer: No.**

96.    Was a line of credit utilized?
       **Answer: There was no line of credit utilized.**

97.    Was any of this funding from DGI repaid?
       **Answer: No.**

98.    Was any of the funding from Ailesbury repaid, and if so, when?
       **Answer: Yes. The funding that we received from Ailesbury was fully repaid in**
       **January of 2002.**

99.    Is this repayment reflected in the ledger?
       **Answer: This repayment is reflected in the ledger marked as Govt. Ex. 3023.**

100.   Attached hereto as Govt. Ex. 3024 is a spreadsheet produced by counsel for DGI on your
       behalf which details the funding from Ailesbury Finance Limited. Do you recognize this
       document?
       **Answer: No.**

101.   Was the spreadsheet, marked as Govt. Ex. 3024, prepared by you in the course of your
       business?
       **Answer: No.**

102.   Do you know who prepared the spreadsheet marked as Govt. Ex. 3024?
       **Answer: No.**

103.   The spreadsheet marked as Govt. Ex. 3024 reflects that all funding from Ailesbury was
       repaid on or about 23rd January, 2002. Is it correct that all funding from Ailesbury was
       repaid on or about 23rd January, 2002?
       **Answer: Yes.**

104.   What was the source of the funding for the 2002 FDIS transactions?

Answer: The source of funding capital for the 2002 transactions was the money left over in the H&M Joint Venture Account.

## BANK ACCOUNTS

105.  Did James Haber explain to you in May 2001 what bank accounts would be used to remit your "capital contributions" on the 2001 FDIS transactions?
      **Answer: James Haber explained to use that all "capital contributions" to the various LLCs involved in the FDIS transactions and all distributions and proceeds from the sale of LLC interests were to be remitted through bank accounts we organized.**

106.  What Singer & Friedlander bank accounts did you use to implement the 2001 FDIS transactions?
      **Answer: During 2001 we used three bank accounts maintained by the merchant bank of Singer and Friedlander in the Isle of Man to send and receive funds with respect to the FDIS partnerships.**

107.  Are the account numbers for each of these accounts 11270012, 11270025, and 20195700?
      **Answer: As we do not have access to the books it is hard for us to confirm the accuracy of this information, but it would appear so.**

108.  Was Account #11270012 used to implement the first six (6) 2001 FDIS transactions?
      **Answer: It would appear so.**

109.  Was Account #11270025 used to implement the next five (5) 2001 FDIS transactions, including Richard Egan's FDIS transaction?
      **Answer: It would appear so.**

110.  Was Account #20195700 used to implement the remaining thirty-six (36) FDIS transactions in 2001?
      **Answer: It would appear so.**

111.  Who was responsible for procuring the creation and management of these accounts?
      **Answer: Sam and I were exclusively responsible for procuring the creation and management of the Isle of Man accounts through which funds flowed in respect of the FDIS transactions.**

112.  Why did you use these three accounts to implement the 2001 and 2002 FDIS transactions?
      **Answer: We appointed Maddox Ltd. and Kilsture Ltd. as our agents for the purpose of implementing the 2001 and 2002 FDIS transactions through the H & M**

13

Joint Venture Account. This account was opened in 2001 and was managed by Maddox and Kilsture. Other accounts may well have also been used for the FDIS transactions.

113.   I show you, marked as Govt. Ex. 2462 and 2463, copies of wire instructions to wire funds to these accounts for certain of the FDIS transactions. Do you recognize these wire instructions?
       **Answer: Yes.**

114.   Who prepared these wire instructions?
       **Answer: They were prepared with our knowledge.**

115.   Did you continue to use the H&M Joint Venture Account, # 20195700, in connection with the 2002 FDIS transactions?
       **Answer: Yes.**

116.   Did Trilogy Investments Ltd. also use a Singer & Friedlander account on the Isle of Man, Account # 20282910, to implement the 2002 FDIS transactions?
       **Answer: It would appear so.**

117.   Do you now have any books and records in your possession or control with respect to these four Singer & Friedlander accounts?
       **Answer: No.**

## JOINT EXPENSES

118.   I show you, marked as Govt. Ex. 2464, an email dated May 3, 2002, from James Haber of DGI to Ron Buesinger of Alpha with an attached spreadsheet concerning income and expenses from 2001. Did you ever receive or see a copy of this document?
       **Answer: We never saw this spreadsheet and did not have a precise understanding of the financial arrangement among DGI, Helios and Alpha.**

119.   Govt. Ex. 2464 lists as an expense a line item of $1,302,978 for SMMH. This same amount, $1,302,978, is listed on Govt. Ex. 2460 as the total for "Co-Investor Adj. Cost Basis." Does this amount of $1,302,978, accurately reflect the total adjusted cost basis for the contributions made on your behalf in the 2001 FDIS transactions, as the amount of the contributions on your behalf, less the amount received from your sale of your membership interests?
       **Answer: We have no idea.**

120.   Did you in 2002 receive "distributions" from the 2001 FDIS transactions?
       **Answer: We do not recall.**

14

121.   I show you, marked as Govt. Ex. 2482, an email from Ron Buesinger to James Haber dated May 1, 2002, to which is attached a summary of the 2001 FDIS transactions dated April 22, 2002. This summary lists 2002 distributions to you as the "co-investors" totaling $41,463. Do you know if the $41,463 represents "distributions" to you?
**Answer: It is entirely possible but since we do not have access to the records we cannot say for sure.**

122.   I show you, marked as Govt. Ex. 2472, an email dated 23rd September 2002, from James Haber to Ivan Ross of Alpha, to which is attached an "updated account" which lists as a line expense "2002 Irish Distributions" in the amount of $41,463. Do you know if this $41,463 is the same $41,463 that is listed on Govt. Ex. 2482 as "distributions" to you?
**Answer: We do not know.**

123.   Were you aware that Alpha and Helios were treating this $41,463 in "distributions" to you as a joint expense of Helios and Alpha?
**Answer: No.**

## IMPLEMENTATION OF 2002 FDIS

124.   I show you again the document marked as Govt. 2459.49, an email dated April 5, 2002, from Philip Kampf of Helios Financial forwarding outlines for one of the 2002 FDIS transactions, in which he stated "Please note that Trilogy has replaced Diversified and Alpha in the partnership." What was the role of Trilogy Investments Limited in the 2002 FDIS transactions?
**Answer: For the purposes of implementing the 2002 FDIS transactions, Trilogy Investment Limited took the place of Alpha, DGI and Helios as participants.**

125.   I show you, marked as Govt. Ex. 2475, an email dated May 24, 2002, from Mox Tan with an attached memo entitled "Revised Trilogy US Implementation Memo." Did you ever receive a copy of this memo or a version thereof?
**Answer: No.**

126.   The email marked as Govt. Ex. 2475 is addressed to Stephen Hubble of Trilogy Financial Products, at the email address "stephen.hubble.3gy". Did you have any type of business relationship with Trilogy Financial Products, ltd. at any time during 2001 or 2002?
**Answer: No.**

127.   I show you again the documents marked as Govt. Exs. 2459.48 and 2459.49, both of which contain Outlines of Proposed Transaction for 2002 FDIS transactions in which Trilogy Financial Investments Limited, not Trilogy Investments Limited, is identified as a partner and as the manager. Was Trilogy Investments Limited substituted for Trilogy Financial Investments?
**Answer: I don't know.**

128.   Who owned Trilogy Investments Limited?

Answer: Maddox and Kilsture.

129. What was the source of the funding for the "capital contributions" that you, [Mr. Mahoney or Mr. Hawkes], made to the 2002 FDIS transactions in 2002?
**Answer: The source of the "capital contributions" that we made to the 2002 transactions was the money left over in the H&M Joint Venture Account from the 2001 FDIS transactions.**

130. What was the source of the funding for the "capital contributions" that you made on behalf of Trilogy Investments Limited to the 2002 FDIS transactions in 2002?
**Answer: The source of the "capital contributions" that we made to the 2002 transactions on behalf of Trilogy Investments Limited was also the money left over in the H&M Joint Venture Account from the 2001 FDIS transactions.**

131. I show you, marked as Govt. Ex. 2473, an email dated October 21, 2002, from James Haber addressed to "Martin" forwarding a pro forma invoice from Trilogy Investments Limited to RMS McGladrey totaling $1,053,750 for the three 2002 FDIS transactions of Dennis Theis, Crawford/McNicholas, and Link, in the following amounts:

| 2002 FDIS Transactions | Gross Size | Fee |
|---|---|---|
| Crawford/ McNicholas | $12,000,000 | 300,000 |
| Dennis Theis | $15,150,000 | 378,750 |
| Link | $15,000,000 | 375,000 |
| Total | | **1,053,750** |

Did Martin Hawkes receive a copy of this email and pro forma invoice from James Haber on or about October 21, 2002?
**Answer: That appears to be the case.**

132. I show you, marked as Govt. Ex. 2466, an email dated October 25, 2002, from James Haber to Ronald Wainwright at RSM McGladrey with an attached copy of invoice dated October 16, 2002, from Trilogy Investments Limited to RMS McGladrey in the amount of $1,053,750 for the three 2002 FDIS transactions of D.Theis, Crawford/McNicholas, and the Link family. Did Trilogy Investments Ltd. send RSM McGladrey a copy of the attached invoice at or near the time of the occurrence of the matters set forth therein.
**Answer: That appears to be the case.**

16

133.  Did Trilogy Investments Limited receive a payment in the amount of $1,053,750 from RSM McGladrey on or about 17th December, 2002 with respect to this invoice, Govt. Ex. 2466?
      **Answer: That appears to be the case.**

134.  I show you, marked as Govt. Ex. 2476, an email segment dated 24th January, 2003, from James Haber to Phil Kampf which references that a second invoice was sent by Trilogy Investments Limited to RMS McGladrey by fax on or about December 26, 2002 in the amount of $477,500.  Did Trilogy Investments Limited, issue a second invoice to RSM McGladrey by fax dated 26th December, 2002, in the amount of $477,500?
      **Answer: That appears to be the case.**

135.  Was this second invoice in the amount of $477,500, marked as Govt. Ex. 2476. with respect to the 2002 FDIS transactions for William Theis, Erb, Whiteside and Weiss, in the following amounts, as listed on Govt. Ex. 2465?

| 2002 FDIS Transactions | Gross Size | Fee |
|---|---|---|
| William Thies | $3,500,000 | 65,000 |
| Erb | $6,500,000 | 87,500 |
| Whiteside | $7,000,000 | 175,000 |
| Weiss | $5,000,000 | 150,000 |
| Total | | 477,500 |

      **Answer: That appears to be the case.**

136.  Did Trilogy Investments Limited receive a payment with respect to this second invoice from RSM McGladrey on or about 28th January, 2003 in the amount of $477,500?
      **Answer: Yes.**

137.  I show you, marked as Govt. Ex. 2472, an email dated 23rd September 2002, from James Haber to Ivan Ross of Alpha, to which is attached an updated account for Alpha.  The attached updated account lists as a line expense "2002 Irish Contributions" in the amount of $144,970.  Do you know if this line item relates to the "capital contributions" being made by Mahoney, Hawkes and/or Trilogy Investments Limited to the 2002 FDIS transactions?
      **Answer: We don't know.**

17

138.   I show you, marked as Govt. Ex. 2478, an email dated October 31, 2002, from Elizabeth
       Jung of DGI regarding a conversation with "Sam" in reference to "Martin's and Trilogy's
       contributions to LF Investments 2002 LLC," which appears to reflect that the H&M Joint
       Venture Account was used to make "capital contributions" to the 2002 FDIS transactions
       by Martin Hawkes and Trilogy Investments Limited. Does this email accurately reflect
       the substance of a conversation between Elizabeth Jung and Sam Mahoney on or about
       October 31, 2002?
       **Answer: We have no such recollections of such a conversation.**

139.   I show you, marked as Govt. Ex. 2471, a chain email dated 31st October, 2002, from
       Martin Hawkes to James Haber with the subject line "Alpha Fees", in which Hawkes
       stated:

       > I presume the basis points are priced off the amount of the profit being sheltered
       > i.e. 60 bps equals roughly EUR315,000? It's not clear from your fax whether the
       > fee has been negotiated or is still in negotiation? If not completed why not
       > suggest plus or minus 15 bps or the usual 30bps depending on whether the refund
       > is received?

       In response, by email from James Haber to BFL, Haber stated:

       > You assume correctly - that it is 60 basis points off of the loss generated. I've
       > already agreed to the terms, unless you violently object. I thought a 50% haircut
       > versus a doubling of the fee is fair.

       Did Martin Hawkes send this email to James Haber on 31st October, 2002 and did you
       receive this email response from James Haber?
       **Answer: Yes.**

140.   I show you, marked as Govt. Ex. 2474, an email dated December 6, 2002, from Martin
       Hawkes of Biosphere Finance Ltd., to James Haber asking, *inter alia*,

       > When should we do a reckoning on fees in relation to the fund structures, Irish
       > companies and Trilogy transactions?

       Did Martin Hawkes send the email marked as Govt. Ex. 2474 at or near the time of the
       occurrence of the matters set forth therein in the course of his regularly conducted
       business activities?
       **Answer: Yes.**

141.   Does the reference to "Trilogy transactions" in Govt. Ex. 2474 include the 2002 FDIS
       transactions?
       **Answer: Yes.**

18

142.    I show you, marked as Govt. Ex. 2479, an email from Ron Buesinger dated April 29, 2003, with subject line "Fees" which states that he has been asked, on behalf of Alpha Consultants to invoice Trilogy Investments Limited the sum of $237,000. Do these fees relate to the 2002 FDIS transactions?
Answer: We don't know.

143.    I show you, marked as Govt. Ex. 2480, an invoice dated April 29, 2003, from Alpha Consultants to Trilogy Investments Limited in the amount of $297,490. Did Trilogy Investments Limited receive this invoice from Alpha Consultants at or near the time of the date of the invoice in the course of its regularly conducted business activities?
Answer: We do not have access to relevant books and records. Thus, we are not in a position to verify the accuracy of this information.

144.    Did Trilogy Investments Limited make a payment to Alpha Consultants on or about 5th July, 2003 in the amount of $297,490?
Answer: We do not have access to relevant books and records. Thus, we are not in a position to verify the accuracy of this information.

145.    Was the payment of $297,490 from Trilogy Investments Limited to Alpha Consultants with respect to the 2002 FDIS transactions?
Answer: We do not have access to relevant books and records. Thus, we are not in a position to verify the accuracy of this information.

146.    Did Trilogy Investments Limited make any prior payments to Alpha Consultants with respect to the 2002 FDIS transactions, and if so, in what amounts?
Answer: We do not have access to relevant books and records. Thus, we are not in a position to verify the accuracy of this information.

147.    Attached hereto as Govt. Ex. 2481 is an account statement for Helios Financial LLC dated May 2002, which reflects that on 9th May 2003, Trilogy Investments Limited wired Helios the sum of $732,245.00. Did Trilogy Investments Limited make a payment to Helios Financial on or about 5th July, 2003 in the amount of $732,245.00 to Helios Financial?
Answer: We do not have access to relevant books and records. Thus, we are not in a position to verify the accuracy of this information.

148.    Was the payment of $732,245 from Trilogy Investments Limited to Helios Financial with respect to the 2002 FDIS transactions?
Answer: We do not have access to relevant books and records. Thus, we are not in a position to verify the accuracy of this information.

## COMMUNICATIONS WITH THIRD PARTIES

149.  Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Biosphere Finance, Ltd. while serving in the role of foreign partner?
      **Answer: We are owners and directors of BFL. We used the offices of Biosphere Finance, Ltd., as well as its email address, for purposes of sending and receiving communications with respect to the FDIS strategy and the implementation of the FDIS transactions.**

150.  Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Diversified Group Incorporated while serving in the role of foreign partner?
      **Answer: We certainly spoke with and exchanged email with representatives of DGI with respect to the FDIS strategy and the implementation of the FDIS transactions.**

151.  Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Ailesbury Finance, LLC while serving in the role of foreign partner?
      Answer: No.

152.  You have testified that Maddox Limited and Kilsture Limited were appointed as your agents for the purpose of implementing the FDIS transactions. With whom did you communicate at Kilsture Limited?
      **Answer: We communicated with representatives of Singer & Friedlander with respect to the implementation of the FDIS transactions through Kilsture, Ltd.**

153.  You have testified that Maddox Limited and Kilsture Limited were appointed as your agents for the purpose of implementing the FDIS transactions. With whom did you communicate at Maddox Limited?
      **Answer: We communicated with representatives of Singer & Friedlander with respect to the implementation of the FDIS transactions through Maddox, Ltd.**

154.  Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Helios Financial LLC while serving in the role of foreign partner?
      **Answer: Yes, we spoke with and exchanged email with representatives of Helios Financial LLC with respect to the FDIS strategy and the implementation of the FDIS transactions.**

155.  Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of United Acquisition, LLC while serving in the role of foreign partner?
      Answer: No.

156.  Did you have any communications in 2001 and 2002 concerning the development,
marketing and/or implementation of FDIS with any of the agents or employees of Alpha
Consultants LLC and Alpha Trading, LLC while serving in the role of foreign partner?
**Answer: We certainly spoke with and exchanged email with representatives of
Alpha with respect to the FDIS strategy and the implementation of the FDIS
transactions.**

157.  Did you have any communications in 2001 and 2002 concerning the development,
marketing and/or implementation of FDIS with any of the agents or employees of Refco?
**Answer: We certainly spoke with and exchanged email with representatives of
Refco with respect to the FDIS strategy and the implementation of the FDIS
transactions.**

158.  Did you have any communications in 2001 and 2002 concerning the development,
marketing and/or implementation of FDIS with any of the agents or employees of Sidley
Austin, (formerly known as Sidley Austin Brown & Wood)?
**Answer: We have no recollection of communicating with any representatives of the
law firm of Sidley Austin Brown & Wood regarding the FDIS strategy, the
implementation of the FDIS transactions, or any representations concerning the
FDIS transactions.**

159.  Did you have any communications in 2001 and 2002 concerning the development,
marketing and/or implementation of FDIS with any of the agents or employees of
Proskauer Rose, LLP?
**Answer: We have no recollection of any oral communicating with any
representatives of the law firm of Proskauer Rose regarding the FDIS strategy, the
implementation of the FDIS transactions, or any representations concerning the
FDIS transactions.**

160.  Did you have any communications in 2001 and 2002 concerning the development,
marketing and/or implementation of FDIS with any of the agents or employees of Lord
Bissell & Brook?
**Answer: We have no recollection of communicating with any representatives of the
law firm of Lord Bissell & Brook regarding the FDIS strategy, the implementation
of the FDIS transactions, or any representations concerning the FDIS transactions.**

161.  Did you have any communications in 2001 and 2002 concerning the development,
marketing and/or implementation of FDIS with any of the agents or employees of Bryan
Cave?
**Answer: We have no recollection of communicating with any representatives of the
law firm of Bryan Cave regarding the FDIS strategy, the implementation of the
FDIS transactions, or any representations concerning the FDIS transactions.**

21

162. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Brown Raysman?

**Answer: We have no recollection of communicating with any representatives of the law firm of Brown Raysman regarding the FDIS strategy, the implementation of the FDIS transactions, or any representations concerning the FDIS transactions.**

163. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of KPMG (USA, Ireland, and Isle of Man)?

**Answer: We have no recollection of communicating with any representatives of the accounting firm of KPMG in the United States regarding the FDIS strategy or the implementation of the FDIS transactions other than perhaps in connection with the Biosphere audit.**

164. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Grant Thornton?

**Answer: We have no recollection of communicating with any of the representatives of Grant Thornton Man, regarding the FDIS strategy or the implementation of the FDIS transactions.**

165. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of RSM McGladrey?

**Answer: We have no recollection of communicating with any of the representatives of the accounting firm of RSM McGladrey regarding the FDIS strategy or the implementation of the FDIS transactions.**

166. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of BDO Seidman, LLP?

**Answer: We have no recollection of communicating with any of the representatives of the accounting firm BDO Seidman regarding the FDIS strategy or the implementation of the FDIS transactions.**

167. Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Trilogy Investments Ltd.?

**Answer: Yes.**

22

168.  Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Trilogy Financial Products Ltd.?
**Answer: No.**

169.  Did you have any communications in 2001 and 2002 concerning the development, marketing and/or implementation of FDIS with any of the agents or employees of Trilogy Financial Investments Ltd.?
**Answer: No.**

23

170.   Do you have any other documents which memorialize the role played by any of these entities?

Answer: Other than the ledger which we produced, now marked as Govt. Ex. 2463, we do not have possession or control of any responsive documents.

CERTIFICATES OF FACT

171.   Did you ever provide any factual representations with respect to the Egan FDIS transaction?

Answer: Not that we're aware of.

172.   Were you ever asked to provide any factual representations with respect to the Egan FDIS transaction?

Answer: Not that we're aware of.

24

# Exhibit E Part 1

# THE CIRCUIT COURT

### 2008 No 1 FTE

IN THE MATTER OF THE FOREIGN TRIBUNALS (EVIDENCE) ACT 1856
AND IN THE MATTER OF CIVIL PROCEEDINGS BEFORE THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
AND IN THE MATTER ENTITLED

BETWEEN

FIDELITY INTERNATIONAL CURRENCY
ADVISOR A FUND LLC                                        PLAINTIFF

AND

UNITED STATES OF AMERICA                                  DEFENDANT

## TRANSCRIPT OF EVIDENCE HEARD PURSUANT TO LETTERS ROGARTY BEFORE JUDGE CORMAC DUNNE ON THE 13TH OF MAY, 2008 AND FOLLOWING DAYS.

### TRANSCRIPT OF EVIDENCE ON THE 13TH OF MAY, 2008

*Day Number*

# 1

I hereby certify the following to be a true and accurate transcript of my shorthand notes of the above named proceedings.

*Viola Doyle* — Viola Doyle RPR

*Mary McKeon* — Mary McKeon RPR

COPYRIGHT
Transcripts are the work of the shorthand writer and they must not be printed, photocopied, electronically transmitted or reproduced in any manner or supplied or loaned by an appellant to a respondent or to any other party without written permission from the shorthand writer. a

DOYLE COURT REPORTERS LIMITED,
2, ARRAN QUAY, DUBLIN 7,
REPUBLIC OF IRELAND.

Tel.............................+353 1 8722833
Fax............................+353 1 8724486
After Hours..................+353 87 2674750
Email........................info@dcr.ie

**A P P E A R A N C E S**

For the Plaintiff:        Mr. Klaus Reichert, BL
David Curtin - Attorney

Instructed by:         Joe Kelly
A & L Goodbody Solicitors

For the Defendant:      Mr. C. MacEochaidh, BL
Denis Donohue - Attorney
John Linquist - Attorney

Instructed by:         Gus Cullen
Agustus Cullen Law
Solicitors

For the C.S.S.O.:       Mr. C. Dignam, BL

Instructed by:         Mark Tierney
C.S.S.O.

For Mr. Hawkes,
Mr. Mahoney, and
Mr. Hussey:         Mr. C. Lewis, BL

Instructed by:         Aimee Gallagher
William Fry Solicitors

1

2                                    I N D E X

3           Witness                              Page No.    Line No.

4            MARTIN HAWKES

5            EXAMINED BY                             49          1

6           MR. MacEOCHAIDH

7            CROSS-EXAMINED BY MR. REICHERT          93          24

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 1 - 13/05/08

1

```
1    THE PROCEEDINGS COMMENCED ON THE 13TH OF MAY, 2008 AS
2    FOLLOWS:
3
4
5    JUDGE DUNNE:  Morning everybody.
6
7    Now, firstly I would like to welcome everybody here and I
8    understand that we have people from the USA, I would like
9    to extend a particular greeting to them here this morning.
10
11   Now, can we start the housekeeping first and identify who
12   is who and what is what, who is for the Applicant,
13   Defendant.
14
15   MR. DIGNAM:  My name is Conor Dignam.  I appear on behalf
16   --
17
18   JUDGE DUNNE:  Mr. Dignam, is it?
19
20   MR. DIGNAM:  Yes, I appear on behalf of the Chief State
21   Solicitor, instructed by Mark Tierney on behalf of the
22   Chief State Solicitor's Office.  The Chief State Solicitor
23   was the Applicant in the initial Order of the High Court
24   which has culminated in an examination before this court,
25   but as the Court has noted, there are ranks of lawyers, so
26   I am at the very minimal role, I think.
27
28   JUDGE DUNNE:  There are.  So we better identify them all
29   first.  Now, who is next?
30
```

Doyle Court Reporters Ltd.

1    MR. LEWIS:  Judge, Ciaran Lewis is my name.

2

3    JUDGE DUNNE:  Lewis - L-E-W-I-S, is that right?

4

5    MR. LEWIS:  Yes.  I am instructed by William Fry

6    Solicitors.

7

8    JUDGE DUNNE:  Yes, are you a barrister or a solicitor,

9    Mr. Lewis.

10

11    MR. LEWIS:  A barrister, Judge.  I appear on behalf of

12    Samuel Mahoney, Martin Hawkes and John Hussey, who are the

13    proposed witnesses.

14

15    JUDGE DUNNE:  The three witnesses, yes.

16

17    MR. MacEOCHAIDH:  I appear on behalf of -- my name is Colm

18    MacEochaidh, counsel.  I am instructed by Augustus Cullen

19    Law.  I appear on behalf of the Defendant, the United

20    States of America, in the US proceedings.

21

22    JUDGE DUNNE:  Yes.

23

24    MR. REICHERT:  Judge, my name is Klaus Reichert, I am a

25    barrister.

26

27    JUDGE DUNNE:  Reichert is spelt what way?

28

29    MR. REICHERT:  The Christian name as is the German-style.

30

1    JUDGE DUNNE:  Yes, I have that.

2

3    MR. REICHERT:  And the surname is R-E-I-C-H-E-R-T.  I am

4    instructed by A & L Goodbody, and I am for the Plaintiff in

5    the American proceedings, Fidelity International Currency

6    Advisor A Fund LLC.

7

8    JUDGE DUNNE:  So that is the four parties, is that right?

9    Mr. Lewis for the Chief State Solicitor's Office -- sorry,

10    Mr. Dignam.  Mr. Lewis for the three witnesses.

11    Mr. MacEochaidh for the Defendant, USA.  And Mr. Reichert

12    for the Plaintiff in the proceedings.

13

14    Now, gentlemen, have you agreed a protocol or a method of

15    approaching this today?

16

17    MR. MacEOCHAIDH:  If I could begin, Judge, by outlining a

18    certain approach which we hope will be convenient to the

19    Court.  Before I do that, there is a small other

20    housekeeping issue which my US attorneys, who are also

21    instructing me in this matter, that I might introduce them

22    to the Court.  The first, to my right, is Denis N. Donohue

23

24    JUDGE DUNNE:  Mr. Donohue, you are very welcome.

25

26    MR. MacEOCHAIDH:  He is the Chief Senior Litigation Counsel

27    of the Tax Division of the Department of Justice.  And he

28    is accompanied by Mr. John Lindquist, which is L-I-N-D --

29

30    JUDGE DUNNE:  Good morning, Mr. Lindquist, you are very

1    welcome.  L-I-N --

2

3    MR. MacEOCHAIDH:  Q-U-I-S-T.  And he works in the Tax

4    Division of the US Department of Justice, and he is a trial

5    attorney.

6

7    Mr. Donohue, to my right, is the lead counsel in the US

8    litigation for the United States of America.  The Court in

9    Massachusetts, the US District Court, entered eight

10   Protective Orders.  They are orders which require the

11   keeping confidential of certain matters in the process of

12   taking evidence, and it has been a requirement that has

13   been put down, that counsel for the witnesses and the

14   witnesses sign those Protective Orders.  There are two

15   other people in court, and it has been explained to them

16   that they will be invited to say who they are and that they

17   are bound by the protective orders, and those two

18   personnel, it is the videographer and the stenographer.

19

20   JUDGE DUNNE:  Good morning.

21

22   MR. MacEOCHAIDH:  They might for the record say their names

23   and --

24

25   JUDGE DUNNE:  Good morning.  Could you identify yourself,

26   please?

27

28   VIDEOGRAPHER:  Ronan O'Fearail.

29

30   JUDGE DUNNE:  Just come forward so I can hear you.  It is

1          not your fault...

2

3          VIDEOGRAPHER:  Ronan O'Fearail, Doyle Court Reporters.

4

5          JUDGE DUNNE:  Spell your surname, please.

6

7          VIDEOGRAPHER:  O-F-E-A-R-A-I-L.

8

9          JUDGE DUNNE:  And you what company are you from?

10

11         VIDEOGRAPHER:  Doyle Court Reporters.

12

13         JUDGE DUNNE:  Yes, Mr. O'Fearail.  Yes, thank you.

14

15         STENOGRAPHER:  Viola Doyle.

16

17         JUDGE DUNNE:  The first name, please.

18

19         STENOGRAPHER:  Viola - V-I-O-L-A - of Doyle Court

20         Reporters.

21

22         MR. MacEOCHAIDH:  And I think Mr. Flatley as well.

23

24         STENOGRAPHER:  Eric Flatley.

25

26         JUDGE DUNNE:  What is the first name?

27

28         STENOGRAPHER:  E-R-I-C F-L-A-T-E-Y of Eric R. Flatley

29         Stenograph Services.

30

1       JUDGE DUNNE:  Yes.

2

3       MR. MacEOCHAIDH:  And the record will reflect that those

4       persons who have just spoken, those three persons are bound

5       by the eight Protective Orders issued.

6

7       JUDGE DUNNE:  Do each of you understand that you are bound

8       by the orders of confidentiality?  Now, this hearing is in

9       camera.  Are we satisfied that all personnel here are

10      related and have an interest in this transaction?

11

12      MR. MacEOCHAIDH:  I think we are, Judge, yes, thank you.

13

14      JUDGE DUNNE:  Yes, thank you.

15

16      MR. MacEOCHAIDH:  The next issue, if I could, and I know

17      that perhaps Mr. Dignam will introduce the procedure, and

18      in fact I think that is perhaps the best way to start, if

19      counsel for the State explains how we got here.

20

21      MR. DIGNAM:  Yes, I think that is really my role.  I think

22      my role is probably limited to that, given the number of

23      lawyers that are here, Judge.  The Court will be aware

24      from -- I think that a full set of papers has been

25      furnished to your office --

26

27      JUDGE DUNNE:  Yes, I read them, yes.

28

29      MR. DIGNAM:  -- that it is on foot of an Order of

30      Mr. Justice Peart of the 3rd of March, 2008, that the

1    proceedings come before this court today.  That is an Order

2    made under Section 1 of the Foreign Tribunals (Evidence)

3    Act of 1856 and Order 39 of the Rules of the Superior

4    Courts.

5

6    If I could just come back to that Order in a just a moment,

7    Judge, because there has been a variation to the Order

8    which was made on the 3rd of March, essentially to permit

9    the proceedings to be held in camera.

10

11    The application before Mr. Justice Peart was made, as I

12    indicated, by the Chief State Solicitor on the request of

13    the District Court of Massachusetts, which was relayed --

14

15    JUDGE DUNNE:  Yes, Mr. Justice Saylor, isn't that right?

16

17    MR. DIGNAM:  Yes, Judge.  That was relayed to the Irish

18    authorities by diplomatic note from the US Embassy and to

19    the Department of Foreign Affairs and then on to the Chief

20    State Solicitor's Office.  And, I should just say, Judge,

21    that the Order of Mr. Justice Peart departs from the normal

22    practice by which evidence is taken by an Irish court on

23    behalf of a foreign court in this respect:  Normally

24    speaking the evidence is simply taken by a representative

25    either from the office of the Chief State Solicitor's

26    Office or counsel instructed on behalf of that office from,

27    essentially, a list of questions furnished by the

28    requesting authority.  As the Court is aware, the US court

29    in this instance has asked that the examination and

30    cross-examination be conducted by Irish counsel or Irish

1    lawyers with the assistance of US lawyers, and that is the

2    procedure which has been ordered by Mr. Justice Peart,

3    which explains the representation in court today.

4

5    I should just say that in the initial Letter Rogatory from

6    the American court, the request was that the examination

7    and cross-examination be conducted by US lawyers.

8

9    JUDGE DUNNE:  I saw that, yes

10

11    MR. DIGNAM:  And that was thought to possibly present a

12    problem or to present a potential problem in relation to

13    *locus standi* or the right of audience, I should say.  And a

14    further diplomatic note was received on the 6th of

15    February, 2008, I think, on behalf of the American court,

16    indicating that the American court was agreeable to the

17    examination being conducted by Irish counsel with the

18    assistance of the US lawyers, and that explains, I suppose,

19    Mr. Reichert's and Mr. MacEochaidh's involvement in the

20    proceedings.

21

22    As I indicated, Judge, the Order was made on the 3rd of

23    March, 2008, and subsequent to that an application was made

24    to have that Order set aside.  That application was made on

25    behalf of the three witnesses, and that came before

26    Mr. Justice Hedigan on a number of occasions in quite

27    succession.  That motion was, in fact, compromised between

28    the witnesses and the US, the United States as a Defendant

29    to the proceedings, on the 7th of May, 2008, and it was

30    compromised by the insertion of the words that the

1     proceedings were to be held in camera.

2

3     JUDGE DUNNE:  In camera, yes.

4

5     MR. DIGNAM:  I just want to indicate to the Court, because

6     there are, in my respectful submission, errors in the

7     amending Order of the High Court, and it is proposed that

8     the Chief State Solicitor will be applying to Mr. Justice

9     Hedigan for amendments, essentially under the slip rule, of

10    his Order of the 7th of May, 2008, but they don't affect

11    the substance of the proceedings before the Court, it is

12    simply in the recitals part that certain errors appear and

13    an application will be made to Mr. Justice Hedigan when

14    term resumes next week, Judge.

15

16    Essentially, Judge, it is agreed -- firstly, the Order of

17    Mr. Justice Hedigan reflects that an agreement was reached

18    in the matter and it appears to be suggested in the Order

19    that counsel for the Chief State Solicitor's Office

20    informed the court that agreement had been reached in the

21    matter.  That is, in fact, incorrect.

22

23    JUDGE DUNNE:  Where is that stated?

24

25    MR. DIGNAM:  On the second page of the Order of the 7th of

26    May, 2008, the third main paragraph -- sorry, the second

27    main paragraph down:  "And upon counsel for Mr. Martin

28    Hawkes" --

29

30    JUDGE DUNNE:  Yes, I see that, yes.

1

2          MR. DIGNAM.  "... and counsel for the Chief State

3          Solicitor's Office informing the Court that agreement has

4          been reached in the matter."

5

6          That, in fact, is an error.  The Chief State Solicitor's

7          Office didn't indicate to court that agreement had been

8          reached, and in fact the Chief State Solicitor's Office is

9          not a party to any agreement between the witnesses and the

10         United States.

11

12         The second issue is the following paragraph where it says:

13         "That the Court being informed that counsel for the

14         Minister for Foreign Affairs is neither consenting nor

15         objecting to this agreement."  It is correct insofar as it

16         goes, but it is also the case that the Chief State --

17         counsel for the Minister for Foreign Affairs, and indeed,

18         the Chief State Solicitor indicated that those parties were

19         not consenting or objecting to proposed variation of the

20         original Order, in circumstance where it hadn't been

21         possible to get instructions from the requesting authority

22         in the United States in the relatively short space of time

23         that had passed between the bringing of the application to

24         have the Order set aside and this compromise.

25

26         And the final point is in the next paragraph, where it is

27         recited that the Order was varied by consent.  That was by

28         consent of the witnesses and the United States, not by

29         consent of the Chief State Solicitor.

30

1    JUDGE DUNNE:  And are those matters as set out, are you

2    agreed with the other parties as a correct interpretation,

3    a narrative of what, in fact, transpired?

4

5    MR. MacEOCHAIDH:  Yes and no, Judge.  The following

6    arrangement has been put in place, and that is that there

7    has been communication by and on behalf of the Defendant,

8    the United States, with the three proposed witnesses.  And

9    the result of that communication is that the category of

10   questions which were originally set out in the request by

11   Judge Saylor has been significantly narrowed, and therefore

12   the taking of evidence in this forum should be a more

13   straightforward procedure.

14

15   And secondly, the category of documents has been

16   dramatically narrowed.  In addition to that broad

17   arrangement, specific questions were put in various ways

18   and at various times to the witnesses and they have agreed

19   to give certain answers.  And to aid that process, the

20   Court will see that the witnesses, when they are giving

21   evidence, will have what might be described as an

22   aide-memoire of that communication.  That there will be a

23   question and answer session, these questions are known to

24   the witnesses, and the answers are known or thought to be

25   known to the Defendant.

26

27   JUDGE DUNNE:  And this is a format that has now been agreed

28   between the parties?

29

30   MR. MacEOCHAIDH:  It is agreed between the Defendant and

Doyle Court Reporters Ltd.

1          the witnesses.  It is not agreed with the Plaintiff, and we
2          have sought, this morning, to discern what the attitude of
3          the Plaintiff is to that and we simply don't know.  There
4          hasn't been a communication.  So, Mr. Reichert, I don't say
5          that in any pejorative way, I don't know what the attitude
6          of the Plaintiff is.
7
8          JUDGE DUNNE:  Isn't the Court's position that it must,
9          unless there is agreement completely, it must be bound by
10         the Order of Mr. Justice Peart, and that is the genesis of
11         being here, and that in the absence of agreement totally
12         between the parties, this court would not have a
13         jurisdiction to accept a varied methodology.
14
15         MR. MacEOCHAIDH:  A varied what, Judge, sorry?
16
17         JUDGE DUNNE:  A varied method to approach either limiting
18         questions or documents; that this Court's very being is
19         based on the Order of Mr. Justice Peart, which has a
20         specific set of questions implicit in its Order and a
21         specific set of documents implicit in its Order, and that
22         for this Court to vary from that Order could only occur, if
23         at all, on the consent of all parties, because the Order is
24         the genesis of this fora before me today.
25
26         MR. MacEOCHAIDH:  There are, perhaps, two points in reply
27         to that, Judge.  The first is that the application to take
28         evidence in Ireland was moved by my client, the USA, and
29         they presented with the knowledge they then had and the
30         communication which they did or did not have at that time,

Doyle Court Reporters Ltd.

1    the proposed witnesses, a certain category of documents and

2    a certain category of questions which ought to be put.

3    They are the party who, in a sense, know what evidence they

4    want to present before the US District Court Judge, and the

5    District Court Judge in America acceded to that request by

6    the Defendant, which was opposed by the Plaintiff in the

7    USA, and that gave rise ultimately to a request by Judge

8    Saylor.  And what the Court won't find in the Letter of

9    Request is any statement which says ask these questions and

10    these questions only, seek these documents and all of these

11    documents and no other documents.  It isn't put in those

12    terms.  It isn't constrained or in a straitjacket, as it

13    were.

14

15    And secondly, Judge, or rather thirdly, if we look at the

16    Order of Mr. Justice Peart itself and it is perhaps -- I

17    don't know if the Court has it in front of you?  Do you

18    have that Order, Judge?

19

20    JUDGE DUNNE:  Mr. Justice Peart's Order, yes.

21

22    MR. MacEOCHAIDH:  This is the Order of the 3rd of March.

23    The operative part of the Order, which perhaps begins at

24    the, on the second page, and with the words "and do submit

25    themselves" -- they are the witnesses, Judge -- "for

26    examination relating to a foreign civil dispute by Irish

27    counsel on behalf of the Defendant and the Plaintiff, and

28    do produce to the District Court the categories of

29    documents set out in the said Letter Rogatory issued by the

30    United States."

1

2        Well, there are two things there:  One, that Order does not

3        require the particular questions of Judge Saylor to be put,

4        it just says "submit to examination by counsel for the

5        Defendant".  And I have now received my instructions as

6        counsel for the Defendant as to what those questions can

7        be.

8

9        As to the second part of the Order, where it says "and do

10       produce to the District Court the categories of documents

11       set out in the Letter Rogatory;" it is accepted that what

12       we are proposing is that a smaller category be produced.  I

13       think, in fact, there are four documents, there are three

14       documents as opposed to a much, much wider category which

15       are set out in the Letter Rogatory.

16

17       And what I am asking the Court to accept is that if there

18       is a disadvantage or a negative effect of any sort in not

19       doing exactly that which is set out in the Order of

20       Mr. Justice Peart, it is my client's disadvantage; we are

21       the ones who will suffer the effect of not having the

22       documents which Judge Saylor has indicated are required,

23       that being at my client's request.  My client has

24       effectively narrowed its request in communications with the

25       Plaintiff; there is nothing or unusual or strange in that.

26

27       JUDGE DUNNE:  You are saying you are entitled to vary and

28       you are entitled to seek the lesser rather than the

29       greater, at your discretion, you being the original moving

30       party?

```
1
2        MR. MacEOCHAIDH:  Yes, Judge.  I should also say that in
3        relation to what your role might be in that, this is
4        clearly directed at you -- sorry, I should say the Order is
5        directed to -- perhaps I will come back to that in a
6        moment.  Certainly the witnesses are ordered to come before
7        you and produce the documents.  If that Order is not
8        complied with, and in a technical sense that is what is
9        being agreed, who may complain, is the first point.  The
10       only parties who can complain are either the Plaintiff or
11       the Defendant.  I don't see the Plaintiff can complain.
12       The Plaintiff didn't want this to happen in the first
13       place, opposed it tooth and nail.  He doesn't want any
14       documents produced.  So, how they can possibly have a
15       standing to complain about a lesser implementation of the
16       Order?  That is hard to fathom.
17
18       But, secondly, if there is to be a complaint, it would be
19       directed against my client, and my client is willing to
20       take that on the chin, as it were, and explain to Judge
21       Saylor the nature of the agreement reached.
22
23       JUDGE DUNNE:  Mr. Reichert, what do you say?
24
25       MR. REICHERT:  What I say, Judge, is that we have never
26       been asked by My Friend to agree to these questions and
27       answers.  I was not present at the application before
28       Mr. Justice Hedigan, and I was not present, obviously, at
29       the original application before Mr. Justice Peart.  Now, I
30       have taken instructions now, Judge, from Mr. Curtin, who is
```

1      here from United States and is the lead counsel for my

2      client --

3

4      JUDGE DUNNE:  Mr.?

5

6      MR. REICHERT:  Mr. Curtin, Mr. David J Curtin.

7

8      JUDGE DUNNE:  Where is Mr. Curtin?  Good morning,

9      Mr. Curtin.

10

11     MR. CURTIN:  Good morning, Judge.

12

13     JUDGE DUNNE:  You are very welcome.

14

15     MR. REICHERT:  I should say, Judge, that Mr. Curtin's

16     forebearers come from the same part of the world as I do,

17     which is County Kerry.

18

19     JUDGE DUNNE:  Excellent.

20

21     MR. REICHERT:  Despite my name.

22

23     JUDGE DUNNE:  Do you want to attract judicial bias?

24

25     MR. REICHERT:  So, Judge, my instructions are, Judge, that

26     we have no objection now, now that we are being asked for

27     the first time in relation to these questions and answers,

28     we have no objection.  But what I wish to lay down, Judge,

29     and I would be doing this probably at a later stage, but I

30     am going to do it now is, as the procedure that is now

1    being used is to obtain evidence for a foreign dispute, and

2    the evidence that is given here today by witnesses will be

3    taken down and will be sent to the foreign court, and

4    questions in relation to admissibility of such evidence for

5    the substantive trial is a matter for the trial judge in

6    the United States, and what I want to do, Judge, now is lay

7    down a marker in relation to that process, to make an

8    objection at the outset, which I would, my client would

9    wish to rely upon in the United States at the appropriate

10   time.  And I have a shopping list.

11

12   JUDGE DUNNE:  Well, do you propose to, at relevant

13   questions where you have an objection, to state it at that

14   time, reserving your position to argue its inadmissibility

15   or otherwise at the trial, or do you propose to do a

16   general agenda on the totality of the questions and

17   intended or suggested answers?

18

19   MR. REICHERT:  Yes, I think we are here for a global

20   objection, because if I was to object to every single

21   question --

22

23   JUDGE DUNNE:  -- we would be here for a long time.

24

25   MR. REICHERT:  -- we would be here until the end of time.

26   I think given the weather, we would like to be doing other

27   things.

28

29   JUDGE DUNNE:  That is very sensible.

30

1       MR. REICHERT:  I think I want to lay down that marker, and

2       subject to that marker, I have no objection to the

3       questions and answers.  Now, the questions and answers that

4       My Friend has referred to, if they are in written form I

5       would like to have that document produced and will mark it

6       as an exhibit, because he referred to an aide-memoire.  So,

7       let's have that.

8

9       JUDGE DUNNE:  I believe we would need, am I right in saying

10      this, that if there is an amended series of questions which

11      differ in number and volume from the originals and it is

12      now agreed by the parties that that is the method of

13      questioning and the type of questions we are going by, we

14      would need that to form part of the written record and to

15      be added here as, we will say, in substitution for, a),

16      questions in substitution for the specified questions, and

17      b) the documents that you have now decided for the

18      substitution for the listed documents.

19

20      MR. MacEOCHAIDH:  There is no difficulty with that, Judge.

21

22      JUDGE DUNNE:  I think it will keep the record safely right.

23      Do you want some moment?

24

25      MR. MacEOCHAIDH:  Does Mr. Reichert want to do this

26      shopping list?

27

28      MR. REICHERT:  Well, I think it that is perhaps then --

29

30      JUDGE DUNNE:  Do you have your shopping list in writing as

1       well?

2

3       MR. REICHERT:  I can set it out in writing but I will read

4       it out now and I can give it in the form of, manuscript

5       form.

6

7       MR. MacEOCHAIDH:  Before Mr. Reichert begins that, I hope

8       nothing turns on it, I hope not, but when Mr. Reichert said

9       that he was not present at the various points when the

10      motion for judicial assistance was made other than *ex*

11      *parte*; he, of course, was not there personally, however his

12      client was at all times, I am instructed, represented by

13      the attendance in court by the solicitors retained on

14      behalf of the US Plaintiff and, at all times, knew what was

15      happening.  But I don't think anything turns on that and I

16      look forward to hearing the shopping list.

17

18      JUDGE DUNNE:  Now, Mr. Lewis, just in relation to what has

19      been suggested by counsel for the Defendant, are you

20      satisfied on behalf of the three persons that you represent

21      to consent to that?

22

23      MR. LEWIS:  Yes.

24

25      JUDGE DUNNE:  To consent to that amended procedure?

26

27      MR. LEWIS:  Yes, no difficulty with that.

28

29      JUDGE DUNNE:  I just require it for the record that you are

30      consenting.


Doyle Court Reporters Ltd.

1

2          MR. LEWIS:  I should just point out for the record as well,

3          that when the original request was presented to the

4          witnesses, they objected to it for various reasons, but

5          largely because they felt it was oppressive, and an

6          application was brought to challenge --

7

8          JUDGE DUNNE:  I saw that, I saw the affidavit of Mr. --

9

10         MR. LEWIS:  That affidavit would have been served on all

11         parties, including the Plaintiff as well, so when there was

12         an opportunity for controversy about the implementation of

13         the Letter Rogatory which ultimately led to the compromise

14         of the situation, all parties had an opportunity to appear

15         and object.

16

17         JUDGE DUNNE:  Yes.  Now, Mr. Dignam...

18

19         MR. DIGNAM:  Yes, Judge, I just want to make one point,

20         just as Mr. MacEochaidh said, when he indicated that in his

21         view the only parties that could complain about the

22         evidence not being taken in accordance with the strict

23         terms of the Letter Rogatory were the Plaintiff and the

24         Defendant.  I think the Chief State Solicitor could also be

25         a legitimate complainant in relation to that, in

26         circumstances where he is acting on the instructions of the

27         requesting authority, but the Chief State Solicitor isn't

28         raising an objection to that, Judge, he has no instructions

29         from the American court, and particularly where

30         Mr. MacEochaidh's client is willing to take the risk of the

1    displeasure of the US court, if I can put it that way, I am

2    not raising an objection.  I have no instructions to do so.

3

4    JUDGE DUNNE:  Just for the record, to confirm that

5    Mr. Lewis, for the three witnesses, and Mr. Reichert for

6    the Plaintiff company, are agreeing to the amended

7    procedure in respect of the series of questions and the

8    series of documents which differs significantly or to some

9    extent, in any event, to the Letter Rogatory and the

10    substance of the Order of Mr. Justice Peart in relation to

11    the reference to questions and documents.

12

13    MR. MacEOCHAIDH:  I accept Mr. Dignam's gentle admonition,

14    and I think I meant that the only people that can complain

15    across the pond in the US Federal District Court would be

16    the parties I indicated.  Thank you, Mr. Dignam.

17

18    JUDGE DUNNE:  Now, Mr. Reichert, you want to initiate your

19    formal objections?

20

21    MR. DIGNAM:  Just before Mr. Reichert, could I just say one

22    final thing, Judge?

23

24    JUDGE DUNNE:  Yes.

25

26    MR. DIGNAM:  As the Court is aware, there are a number of

27    lawyers, and normally the Chief State Solicitors would have

28    a more direct involvement in the examination itself.  We

29    obviously haven't in these circumstances, it is proposed

30    that we simply maintain a watching brief.  We are here to

Doyle Court Reporters Ltd.

1    assist the Court, and I hope the Court won't take it as, in

2    any sense, disrespectful if I have to excuse myself during

3    the course of the day.

4

5    JUDGE DUNNE:  Not at all.

6

7    MR. REICHERT:  Yes, Judge.  What I want to enter into is

8    what might be described as a global objection or a global

9    stipulation at the outset in relation to the questions and

10   answers, and I am making this and recording this global

11   stipulation objection by reference to the Federal Rules of

12   Evidence and the Federal Rules of Civil Procedure, and the

13   shopping list is as to form:  So leading questions,

14   compound questions, questions that are vague, questions

15   that are without foundation, questions that offend against

16   hearsay, issues of relevance, questions that call for

17   speculation, questions that call for expert opinion, and

18   questions that call for legal conclusions, and those --

19   that is my shopping list of objections, and they should

20   apply to every single question posed today and every answer

21   that has been recorded.

22

23   I am most obliged.

24

25   JUDGE DUNNE:  Now, for clarification purposes on that.  You

26   have said the questions.  Have you any observations on the

27   documents?

28

29   Do you want to take instructions on that?  I, again, want

30   to keep the record absolutely clear for the subsequent

1        court hearing.

2

3        MR. REICHERT:  The documents, we have only been handed a

4        bundle this morning, which I imagine are going to be

5        produced to the witness for the purpose of proving those

6        documents.  And, again, I would record an objection in

7        relation to every document.

8

9        JUDGE DUNNE:  Well, record a potential objection.

10

11       MR. REICHERT:  Well, an objection for the purpose of the

12       record in due course.

13

14       JUDGE DUNNE:  Yes.

15

16       MR. REICHERT:  And we were given the bundle this morning.

17

18       JUDGE DUNNE:  Well, if you wish to reserve your right by

19       virtue of the fact that you have only received them this

20       morning, to elaborate in greater detail, you have that

21       right.

22

23       MR. REICHERT:  I am most obliged, Judge, thank you.

24

25       MR. MacEOCHAIDH:  The large white folder of documents which

26       was produced to the witnesses and to counsel for the

27       Plaintiff is not comprised of documents which we are

28       putting to witnesses for the purpose of proving them.  They

29       are not documents which are being put in evidence.  There

30       are only three documents which will accompany the

1       evidential aspect of this hearing, and those three

2       documents are the -- in due course those three short

3       documents will be shown to counsel for the Plaintiff.  But

4       that big white folder is not what is sought to be relied

5       upon.

6

7       MR. REICHERT:  What is the purpose of it then?  Why is it

8       here?

9

10      MR. MacEOCHAIDH:  The purpose of it is to assist with the

11      question and answer session.  It is to bring a flow to the

12      narrative and to ask persons to identify the documents.  It

13      is a matter for the Defendant how it seeks to prove, if it

14      wishes to prove, those documents before the US court, and

15      if there are some of them that are necessary for the

16      defence of the proceeding, it will do that in the United

17      States

18

19      JUDGE DUNNE:  Well, you can reserve your position.

20

21      MR. REICHERT:  Absolutely my position is reserved.

22

23      JUDGE DUNNE:  Formal objection noted.  If you want to make

24      more elaborate submissions for the record for the American

25      court, you have the right to do so.

26

27      MR. REICHERT:  I am also told that there are three

28      documents.

29

30      JUDGE DUNNE:  Yes.

Doyle Court Reporters Ltd.

1

2     MR. REICHERT:  And then the expression "in due course."

3     Why can't we have them now?

4

5     JUDGE DUNNE:  Mr. MacEochaidh?

6

7     MR. MacEOCHAIDH:  Just one second; can I am just take

8     instruction?

9

10    Just for clarification, the documents are being produced by

11    the witnesses, not the Defendant -- sorry, not the

12    Defendant.  If the Plaintiff wishes to have a copy of the

13    documents, I am sure he could address that to the

14    appropriate place.  There is no difficulty giving them.

15

16    MR. REICHERT:  Well, does My Friend have the documents

17    already?  Have we received them?  I mean, we were told in

18    due course.  Which one is it?

19

20    MR. MacEOCHAIDH:  You have them already.

21

22    MR. REICHERT:  We have them.  So there are three documents;

23    can they be precisely identified?

24

25    MR. MacEOCHAIDH:  If I could just address the Court.  There

26    is absolutely no difficulty where a document is put to a

27    witness, counsel for the Plaintiff will have that document

28    in his folder.  Where a document is sought to be proved by

29    the witness, that document will be in the folder and you

30    will be given it at the proper time.

1

2        MR. REICHERT:  So, to confirm the four corners of documents

3        that are to be used at any stage in this procedure are

4        within the bundle?

5

6        MR. MacEOCHAIDH:  That's correct

7

8        JUDGE DUNNE:  Thank you, gentlemen.

9

10       MR. MacEOCHAIDH:  It is subject to whatever may happen

11       under cross-examination, and there hasn't been an

12       indication yet from the Plaintiff as to whether a

13       cross-examination will happen, but of course it is entirely

14       possible that if Mr. Reichert pursues a cross-examination

15       of witnesses, that will lead to further documentation.

16       That is a matter within the Plaintiff's control.

17

18       And for further clarification, whilst there are only three

19       documents which the witnesses will be invited to prove or

20       to give evidential value to in the course of its question

21       and answer session, the whole of the white folder, we

22       request, accompany the recording of this procedure and sent

23       back to Judge Saylor.

24

25       JUDGE DUNNE:  Yes.  And is there an inventory of documents

26       in the white folder?

27

28       MR. MacEOCHAIDH:  There isn't.

29

30       JUDGE DUNNE:  Would it not be more helpful if this was the

1    case?

2

3    MR. MacEOCHAIDH:  The documents, Judge, are very, very

4    clearly numbered.  Each one will be referred to by a

5    particular tag.  There will be no difficulty in following

6    the manner in which they are set out.

7

8    JUDGE DUNNE:  What I am trying to establish,

9    Mr. MacEochaidh, is there a title or description of each of

10   the documents?

11

12   MR. MacEOCHAIDH:  Yes, there is.  And if the Court thinks

13   it appropriate --

14

15   JUDGE DUNNE:  It is only -- all the Court's questions are

16   for clarity and to avoid confusion and save time.

17

18   MR. MacEOCHAIDH:  Very good.  And I am sure that Judge

19   Saylor will be very appreciative of that.

20

21   JUDGE DUNNE:  Yes.

22

23   MR. MacEOCHAIDH:  Let me take instruction whether it is

24   possible at this stage to put together an index and hand

25   that in.

26

27   JUDGE DUNNE:  It may be.

28

29   MR. MacEOCHAIDH:  But the white, that white folder of

30   notable documents is a matter which should accompany --

1

2      JUDGE DUNNE:  It is just that there is arguably always

3      uncertainty when there isn't an index from A to Z.  I would

4      rather that there was.

5

6      MR. MacEOCHAIDH:  Very good, Judge.  I am sure that can be

7      arranged.

8

9      JUDGE DUNNE:  It saves further complications or allegations

10     at a later stage.

11

12     MR. DIGNAM:  Judge, it will be my solicitor who will have

13     to send the documents and the transcripts, et cetera, to

14     the requesting authority.  And, in those circumstances, I

15     think a copy of the white folder needs to be furnished to

16     him in due course.  It doesn't need to come today but...

17

18     MR. MacEOCHAIDH:  Absolutely.

19

20     JUDGE DUNNE:  Absolutely.  It will be helpful if there was

21     an index.  Desirable, at least.

22

23     MR. MacEOCHAIDH:  I understand that the paralegals in the

24     Department of Justice may be able to put together an index

25     as quickly as possible.

26

27     JUDGE DUNNE:  It would be helpful.

28

29     JUDGE DUNNE:  Now, gentlemen.

30

Doyle Court Reporters Ltd.

FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 1 - 13/05/08

29

1        MR. MacEOCHAIDH:  I think we are ready to begin.

2

3        MR. LEWIS:  Judge, there is one significant --

4

5        JUDGE DUNNE:  Yes, Mr. Lewis.

6

7        MR. LEWIS:  There is one significant issue before we begin.

8        It was indicated to the witnesses last night that it was

9        proposed to video record this proceeding, and the witnesses

10       object to that.  The position is that the provisions that

11       provide for the taking of evidence are set out in the Act,

12       the original act of 1856 and --

13

14       JUDGE DUNNE:  Sure, wasn't that taken out in 1856, wasn't

15       it?

16

17       MR. LEWIS:  No, it certainly wasn't, to my knowledge,

18       Judge, and had there been, it would be much more

19       interesting were it now to happen.  But as matters stand we

20       have been met with this request at the last minute.

21

22       JUDGE DUNNE:  Who has made the request for the evidence to

23       be video recorded?

24

25       MR. MacEOCHAIDH:  My client has.

26

27       MR. LEWIS:  The Act of 1856 provides that a request can

28       come from another judicial authority for the taking of

29       evidence, and then it provides that the judge receiving

30       that request can make the Order -- it is a discretion --

Doyle Court Reporters Ltd.

1     and can provide for the time and place and the manner of

2     taking of the evidence.  Now, as the Court has already

3     heard, such a request was made, an Order was made, but the

4     Order that was made on the *ex parte* basis was amended so

5     that it included the requirement, for example, that Irish

6     counsel ask the questions.  So that the request hasn't been

7     taken and rubber stamped.  The Order that was produced by

8     the Court on that occasion makes no provision for the

9     evidence to be taken on video.  The request that comes from

10    the United States in the Letter Rogatory makes no request

11    that evidence be taken on video.  And my experience in

12    previous proceedings such as these, which haven't been held

13    in court but in a closed office in solicitors' rooms, that

14    counsel identified as the Commissioner to take the

15    evidence, evidence has been taken on video, but that has

16    always been on foot of a specific request that has been

17    done and that fact being recorded in the Order.

18

19    Now, since that hasn't happened in this case, and since

20    there is no valid request that video, that the evidence be

21    recorded by video, it is my submission that the witnesses

22    should not be subjected to a procedure which, in the first

23    instance, is unusual in Irish courts, and in the second

24    instance, isn't provided for in the Order.  What the

25    Defendants request now is something that ought to have been

26    requested in the Letters Rogatory; the High Court ought to

27    have considered as to whether or not it was appropriate and

28    on which submissions could have been made, but it is wholly

29    inappropriate for them now to say, on the eve of this

30    procedure, that the evidence that is going to be taken is

Doyle Court Reporters Ltd.

1    going to be taken on video.

2

3    Now, the Rules of Court also provide that evidence can be

4    taken in such manner as is directed by the Order, but of

5    course no direction has been made that the evidence be

6    taken on video.

7

8    JUDGE DUNNE:  Well, you can say -- the Order states that:

9    "The said Examiner do cause and to be taken down in writing

10    the evidence of the said witnesses according to the rules

11    and practices of this Court pertaining..."

12

13    Now, that is the rules and practice of the High Court, and

14    there is no indication there that video evidence should be

15    taken in the Order of Mr. Justice Peart, nor was that issue

16    canvassed at the agreed terms, at the subsequent

17    application before Mr. Justice Hedigan or the input from

18    both the Defendant and the Plaintiff. So, Mr. MacEochaidh,

19    this only arose last evening, is that right?

20

21    MR. MacEOCHAIDH:  I understand that arrangements were put

22    in place in the last 24 hours for this to take place, but

23    to backtrack a little: In the first instance, what brings

24    the parties and the witnesses to this forum is a request

25    from Judge Saylor, and that request was made -- Judge

26    Saylor made the request on foot of an application by the

27    USA, and the opening paragraph or citation from Judge

28    Saylor was in the following terms:  "The United States

29    District Court, the District of Massachusetts, presents its

30    compliments to the appropriate judicial authority of

1       Ireland and requests international judicial assistance to

2       obtain evidence to be used in civil proceedings before this

3       court in the above captioned matter."

4

5       The important part of that, which I underscore, is that the

6       request is for the purposes of obtaining evidence to be

7       used in civil proceedings before the Court.  It is correct

8       to say that the request of Judge Saylor does not then go on

9       to indicate how it is advised that the foreign court record

10      the taking of the evidence.  That is the first point.

11

12      The second point is, the Irish Order directing the

13      attendance of the witnesses here, which is the primary

14      function of that Order, because without the Order, they

15      wouldn't be here; it is what compels them to attend,

16      directs that the evidence be taken in writing.  It doesn't

17      direct stenography, we could be here doing longhand, but of

18      course it is a practice in the court that stenography take

19      place.

20

21      The third point which I would like to address to the Court

22      is that perhaps there is a sense that this is something

23      that you might bring your discretion to bear upon.  There

24      is an understandable cultural disconnect as to the two

25      jurisdictions.  For example, in this litigation there are

26      numerous witnesses who do not reside within the

27      jurisdiction of the US District Court in Massachusetts;

28      they live all over the USA, and all of those depositions

29      are on the advice of the United States of America and

30      agreed to by Judge Saylor being taken by not just a

1     stenography report but also by video recording.  And the

2     purpose of that, and this is something that you, Judge,

3     will, I think, appreciate readily, that the judge presiding

4     in the USA can best judge the evidence that he is asked to

5     weigh by having access to the demeanour of the witness and

6     not the cold transcript.  And so, when Mr. Justice Saylor

7     asks the Irish authorities, including you, to assist him to

8     obtain evidence to be used in the civil proceedings in the

9     USA, what you can assume, Judge, and you can take judicial

10    notice of, if you wish, is that what he wants is the best

11    evidence.  And if there is a technology that provides

12    better evidence than a transcript, that this court should,

13    bowing to the concepts of international comity, provide

14    that to him.  I should also say that the Rules of Court

15    suggests that it is possible to have regard in Order 39,

16    Rule 43, a copy of which I will hand in.

17    (Document handed to Judge.)

18

19    JUDGE DUNNE:  Yes, I would like to see it.

20

21    MR. MacEOCHAIDH:  It is --

22

23    JUDGE DUNNE:  Order, what is the number?

24

25    MR. MacEOCHAIDH:  Order 39, Rule 43.  Now, if I could just

26    read that to the Court.

27

28    JUDGE DUNNE:  Yes.

29

30    MR. MacEOCHAIDH:  "An Order made under Rule 39" -- and such

1       an Order has made in this case, Judge, "may direct the said

2       examination to be taken in such manner as may be requested

3       by the Commission Repertoire or Letter of Request from the

4       foreign court or tribunal."

5

6       And whilst if I could just pause there, and I have opened

7       those provisions of the Letter of Request, and it doesn't

8       clearly or in express terms indicate that the matter be

9       taken by stenography or video recording, what it does, the

10      Court and I think the Judge will appreciate it, is that it

11      requests, asks that the evidence be taken in a manner that

12      it can be used in civil proceedings.  So, in that sense,

13      one might say that the request is absolutely implicit in

14      the "Letter Repertoire or therein signify to be in

15      accordance with the practice or requirements of Circuit

16      Court or tribunal."

17

18      I would have to concede that the Letter of Request doesn't

19      signify what the practice or requirement of the US courts

20      are in this matter, I am afraid.  I hope you would accept

21      counsel's description of it as being a correct one.

22

23      "Or which for the same reason be requested by the Applicant

24      for such Order."

25

26      Now, the applicant for the Order here, I think I am right

27      in saying, is the Minister for Foreign Affairs, who made ex

28      parte application for the judicial international

29      assistance, and we will hear from Mr. Dignam momentarily as

30      to what his attitude is to the request.  But what I would

Doyle Court Reporters Ltd.

FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 1 - 13/05/08

35

1    say, Judge, that that Order, which isn't the provision

2    which confines the manner in which evidence is taken, it

3    doesn't say use a stenographer or don't use a stenographer.

4    It doesn't say take it down in writing or other such

5    manner.  There is very, very broad discretion as to how

6    this is to proceed.

7

8    My final point on this, it is a matter of considerable

9    importance to my client and therefore I suggest perhaps the

10    manner in which this could be resolved is as follows:  If

11    the Court accepts that it is appropriate to record the

12    evidence both visually and audio-visually and in writing by

13    a stenographer, and that is the end of the problem as far

14    as I am concerned.  If the Court has difficulty with it,

15    what I would suggest is that the proceedings continue with

16    video recording and stenography and let the matter be

17    resolved somewhere else.  If I am ruled against

18    subsequently either in an Irish court or in the US court,

19    the video recording will be destroyed and not used

20    anywhere.  If I am not allowed take it, the issue is moot

21    for me because I can't imagine that I can come back here

22    and do the evidence all over again.  There is very

23    particular time pressure on the taking of this evidence.

24    The trial is set for the third week of September and the

25    procedure that has to be gone through, Victorian and

26    Archain as it is, that to get this evidence back to America

27    is a matter that can take very many weeks.

28

29    So this is our chance.  But if you rule against me, I can't

30    undo your ruling, so I would ask you to preserve my rights

1      which does not prejudice the witnesses, and if they have a

2      complaint they can have that ventilated in another forum,

3      and they may win.

4

5      The final point I would make is what are the practices and

6      the procedures of these courts?  The statute does provide

7      for the taking of video evidence in certain limited

8      circumstances.

9

10     JUDGE DUNNE:  It is mostly in criminal cases, isn't that

11     right, where there is young witnesses or sexual offences?

12

13     MR. MacEOCHAIDH:  Yes, that's right.  For the protection of

14     witnesses confronting their alleged attackers.  It is a

15     practice and procedure well-known to the courts.  It is

16     also, of course, I have been involved in incidents where if

17     there is video evidence, it has to be recorded, it must be

18     recorded.  That practice the Court will be familiar with,

19     and I know, as every member of the profession here knows

20     and I think it has started already, that there is now,

21     without the knowledge of any party in court, there is now

22     the automatic recording of counsel, solicitors and judge

23     intervention in any matter and also all background noises,

24     and that transcript is -- that recording is sent to New

25     Zealand, I understand, and is available 24 hours later.

26     So, that is practice, a modern, proper practice which is

27     appropriate to follow.  And not to be too *ad hominem* about

28     it, this is not a peann luaidhe court, and I would ask that

29     we use proper modern technology and a proper approach to

30     ensure best evidence that the demeanour of these witnesses

```
 1        be available to Judge Saylor.

 2

 3        MR. LEWIS:  Can I just say in reply, I know that My Friend

 4        will probably have some submission to make on this, but

 5        just in reply while Mr. MacEochaidh's arguments are still

 6        --

 7

 8        JUDGE DUNNE:  I would rather hear Mr. Reichert for the

 9        Plaintiff and then Mr. Dignam and then you, as you are the

10        most affected party by any Order the Court makes, you have

11        the final say after hearing everybody who wishes to

12        participate.  What is your view, Mr. Reichert, as lawyer

13        for the Plaintiffs?

14

15        MR. REICHERT:  I am opposed to it.

16

17        JUDGE DUNNE:  Opposed to it.

18

19        MR. REICHERT:  Opposed to it.

20

21        JUDGE DUNNE:  On what basis?

22

23        MR. REICHERT:  The basis, Judge, is since the word 'comity'

24        was used, I think that is a concept that Dicey v. Morris

25        used, it's a very elastic one, but what exact actually does

26        it mean?  But nonetheless, comity does not extend to

27        whatever My Friend wants it to be.  There are specific

28        rules here.  There is a request from the United States

29        court that it is put a particular way.  How that request is

30        executed is a matter for the courts of this sovereign
```

1    State, and it is to be executed in accordance with the
2    rules and practice of this sovereign State, and that is how
3    Mr. Justice Peart's Order is framed. So, I think it is
4    absolutely explicit.
5
6    "The said examiner do cause to be taken down in writing the
7    evidence of the said witness according to the rules and
8    practices of this court pertaining to the examination and
9    cross-examination of witnesses."
10
11    If there was an exception to be made to that practice, then
12    it should have been reflected in the Order of the High
13    Court.  There was the opportunity and clear opportunity to
14    the Defendant before Mr. Justice Hedigan to have that
15    exception made to the rules and practices of the courts to
16    allow videography.  In all of the Foreign Tribunals
17    (Evidence) Act matters that I have been involved in - now I
18    don't wish to give evidence, I am simply making a
19    submission *de benne esse* - there is an exception, a
20    specific exception made to allow for videography.  Rules
21    and practice include stenography.  In most matters where
22    there is witness evidence given, there is a stenographer;
23    that is entirely within the practice of the courts of
24    Ireland.  There is no practice that I am aware of that
25    allows for a video camera to be given, to be used in a
26    courtroom, except in the very specific statutory schemes as
27    the Court may be is aware of.
28
29    JUDGE DUNNE:  Yes.
30

```
 1        MR. REICHERT:  And so, my submissions are, comity does not
 2        require this.  Comity has been satisfied by the Irish High
 3        Court executing the Letter of Request under the Foreign
 4        Tribunals (Evidence) Act.  The Forum Rules, this forum,
 5        apply, not the United States Forum Rules.  Mr. MacEochaidh
 6        used the expression "can be used".  There is no indication
 7        whatsoever anywhere that a transcript cannot be used in the
 8        United States.  And Mr. Curtin has told me that transcripts
 9        without a video are often used in the United States, and if
10        they wish to have expert evidence on Federal Rules of Civil
11        Procedure, let's have them to say that a video must
12        accompany every deposition, and let's have a fight about
13        that.  And, similarly, they had a chance before Mr. Justice
14        Hedigan to put in this specific provision, and I should
15        also say that my solicitor this morning said to him that
16        the Attorney General has a view on this matter.
17
18        JUDGE DUNNE:  Pardon?
19
20        MR. REICHERT:  That the Attorney General has a view on this
21        matter and it is not disposed towards the giving of video
22        evidence.
23
24        MR. MacEOCHAIDH:  Let Mr. Dignam say what the Attorney
25        General's view is.  That is not what I understand it to be.
26
27        MR. REICHERT:  That is what I was instructed by me
28        colleague --
29
30        JUDGE DUNNE:  We are not going to get into a discourse on
```

1        the Attorney General's views at this stage, which are not

2        official or publicised.

3

4        MR. REICHERT:  Nonetheless, Judge, I am very much opposed

5        to this.  It is not in the terms of the Order.  It is the

6        rules and practice of this court and that does not include

7        videography.

8

9        JUDGE DUNNE:  Well, Mr. Dignam, do you wish to make any

10       observations?

11

12       MR. DIGNAM:  Not lengthy submissions, Judge.  Just in

13       relation to the Attorney General's position:  His position

14       is that the practice of the courts, as the Court is well

15       aware, is that there are a number of recordings, audio and

16       visual recordings of proceedings in court, but it is only a

17       practice and it is a matter for the Court to determine

18       whether that practice should be departed from, but it is

19       undoubtedly the practice.  This was notified to us, I

20       think, yesterday afternoon, that it was proposed that there

21       will be a video recording of it, and since then the only

22       research I have been able to carry out, indicates that the

23       Supreme Court, I think, permitted opening submissions in

24       one of the Article 26 references in the mid-1990s to be

25       recorded.  Now, I am not sure to what extent it was

26       broadcast, but it was certainly recorded, but that is the

27       only example of a recording of court proceedings that I am

28       aware of.

29

30       The Attorney General's position is that is the normal

```
 1            practice, and if that is to be departed from, that is a

 2            matter for the Court.  It is also the case that he has no

 3            difficulty with the Court, and I don't mean that in a

 4            disrespectful way, but he has no difficulty with the Court

 5            departing from that practice, but it is really a matter for

 6            the parties to dispute the matter and to make submissions

 7            to the Court.

 8

 9            JUDGE DUNNE:  Thank you very much.  Now, Mr. Lewis.

10

11            MR. MacEOCHAIDH:  Sorry --

12

13            JUDGE DUNNE:  Do you want to say something?

14

15            MR. MacEOCHAIDH:  I will reply after Mr. Lewis speaks.

16

17            MR. LEWIS:  It is unusual for Mr. MacEochaidh to have a

18            reply after my reply, but I will take that in the spirit --

19

20            JUDGE DUNNE:  Are you commenting on what Mr. Dignam has

21            said?

22

23            MR. MacEOCHAIDH:  On what each of them said.

24

25            JUDGE DUNNE:  Well, now, we have to have some finality to

26            this.

27

28            MR. LEWIS:  Perhaps Mr. MacEochaidh could make a brief

29            submission if he wishes for the second time.  I have no

30            difficulty with that.  I will make a reply to all of the
```

1       submissions.

2

3       MR. MacEOCHAIDH:  It is the second time I have had a gentle

4       admonition this morning, which I again accept.

5

6       MR. REICHERT:  Just one last thing, Judge, do indulge me

7       for a moment.  I don't think Mr. MacEochaidh can have his

8       cake and eat it.  Either we have the video, subject to the

9       Court's ruling, or we don't.  We don't have this, I am a

10      little bit pregnant sort of argument.  Obviously not

11      possible, in my submission.

12

13      MR. MacEOCHAIDH:  Very briefly, Judge, just by way of

14      simple explanation as to why there wasn't a clear request

15      made to Judge Saylor and a follow-through clear request

16      made to Judge Hedigan, is that the -- and this is a

17      development which must happen all the time in these

18      international situations, is that the US attorney presumed

19      that there would be no difficulty with the recording of

20      evidence as it might be at a deposition, and what is

21      interesting about that is that the Federal Rules of Civil

22      Procedure, at Rule 30.B.1 provides:  "That where the party

23      requesting the deposition requires it to be recorded, there

24      is no possibility to object to that."

25

26      So, the taking of evidence by deposition in the US, where

27      it is requested to be by video, there is no possibility of

28      objecting.  That is their mindset.

29

30      JUDGE DUNNE:  But that is where there is an expressed

1    request.

2

3    MR. MacEOCHAIDH:  That is their mindset.  They didn't

4    understand that there would be this difficulty in Ireland.

5    Perhaps the most important one that I should have made and

6    I am sorry if I am doing it by way of reply or any other

7    way out of turn is, of course what is not happening here,

8    and I don't mean this in any way to belittle what is

9    happening, especially in role, Judge --

10

11    JUDGE DUNNE:  Don't worry about the Court's ego.

12

13    MR. MacEOCHAIDH:  There is probably enough egos to be

14    worried about here for us all to be concerned about.

15

16    JUDGE DUNNE:  That is what the Court is concerned with, not

17    its own.

18

19    MR. MacEOCHAIDH:  The Supreme Court has ruled that in the

20    *Salinas de Gutarri vs. Judge Peter Smithwick* decision, that

21    this is not the administration of justice, this is not a

22    court.  The Rules of Court, in a sense, have no

23    application.  This is the taking of evidence on deposition

24    is what it is.  A judge in America has sought assistance, I

25    have tried to put that request in a particular context.

26    That is all.  Thank you.

27

28    JUDGE DUNNE:  Now, Mr. Lewis.

29

30    MR. LEWIS:  Yes, Mr. MacEochaidh's last point is perhaps

1           the most effective point for me because, as I have already
2           explained, the Act says look, the court, which is the High
3           Court, will give effect to the request and it will vary, at
4           its discretion, the request if it sees fit, and you already
5           see how it did with the requests that Irish counsel will
6           ask the questions.  It then says that that Order provides
7           for the manner of the taking of evidence.  And then the
8           rules go on to provide, at Rule 43, that the Order will
9           reflect the manner in which the examination will be taken.
10          And so, for this issue to be canvassed, whether or not
11          Mr. MacEochaidh's arguments are convincing or compelling in
12          any way, those are matters that should have been canvassed
13          before the High Court and that is the court which had the
14          jurisdiction to determine this issue.
15
16          So, it is my respectful submission, Judge, that as this is
17          the recording of evidence, that the Court is merely acting
18          on foot of the Order, and that if any of the parties object
19          to an inventive interpretation of the Order, which this
20          certainly is, that you, Judge, have no jurisdiction to say
21          yes, I will allow the matter to be recorded where it didn't
22          provide for it in the Order.
23
24          Now, the second significant point to make is this:  Order
25          39, Rule 43 provides that the Order will direct how the
26          evidence be taken on foot of the request that has been
27          made.  And it says that: "In the absence of any provisions
28          in relation to that, in the absence of any such special
29          directions being given, the order for examination, the same
30          shall be taken in the manner prescribed in Part II of this

1       Order. " And Part II of the Rules of the Superior Courts
2       simply reflect the normal procedure that is taken for the
3       taking of evidence on commission and it doesn't provide
4       specifically for the use of video evidence.
5
6       So, therefore, not only, in my respectful submission,
7       Judge, can you not interpret the Order to allow video
8       evidence to be taken, in the absence of a specific
9       provision in the Order that it be taken on video evidence,
10      you have to comply with the Rules of the Superior Courts
11      which don't expressly provide for it.
12
13      JUDGE DUNNE:  Yes.  Well, it is the Court's view that this
14      matter has been ongoing, I think in the first instance,
15      since February of '08, and there were effectively two High
16      Court Orders:  One in March of '08 and one in May of '08,
17      and in between those Orders the Court is aware that there
18      was certainly an abundance of inter parte correspondence,
19      some of it temperate, and indeed, some of it intemperate,
20      which is not relevant to today's proceedings, but that
21      clearly if there was any confusion from the Defendant's
22      point of view as to the mode of this transaction here,
23      there was ample opportunity to clarify such confusion, and
24      the Court is not making an pronouncement in law whether it
25      can or it cannot deviate from the precise Order of
26      Mr. Justice Peart.  It can be argued that Order 39, 43 may
27      give it a power to vary, but it would appear to this
28      proceedings that it would be manifestly unjust and wrong in
29      the face of the Order when the witnesses are simply
30      notified last night, or yesterday afternoon, that this

1        process was now suggested.

2

3        The Court feels it should be bound by the general rule of

4        taking of evidence in the High Court, which is set out in

5        the Order of Mr. Justice Peart, and I am accordingly

6        refusing the application for video.  Thank you.

7

8        The next step, gentlemen, please?

9

10        MR. MacEOCHAIDH:  Very good, Judge.  I think the next step

11        is to call the first witness.

12

13        JUDGE DUNNE:  The first witness.  We have removed the

14        video?  The video, I assume, has not been activated up to

15        now, was it?

16

17        VIDEOGRAPHER:  It was.  It has.

18

19        MR. REICHERT:  Sorry?

20

21        JUDGE DUNNE:  Sorry, now --

22

23        MR. MacEOCHAIDH:  He will delete it.

24

25        JUDGE DUNNE:  Let this forum get matters clear for the

26        record.  Have the proceedings since I commenced sitting,

27        have they been visually recorded?

28

29        VIDROGRAPHER:  Just this area here.  (Videographer

30        indicating.)

1

2          JUDGE DUNNE:  Well, I would direct that that be all erased.

3

4          VIDEOGRAPHER:  Certainly.

5

6          JUDGE DUNNE:  And that the only record of these proceedings

7          stand as the stenographer's record that appears before us

8          all on the screens here.

9

10         VIDEOGRAPHER:  Yes, I will erase it.

11

12         JUDGE DUNNE:  Thank you very much.  I don't say that in any

13         offensive way, it's just a matter of keeping matters right.

14

15         MR. REICHERT:  Judge, at that point I wish to note an

16         objection for the record, given what we have now just been

17         told.

18

19         MR. MacEOCHAIDH:  Objecting to what?

20

21         MR. REICHERT:  The fact that there has been a video going

22         on.

23

24         JUDGE DUNNE:  You can take it that I have ruled that that

25         be erased and I am satisfied from the undertaking that that

26         will be so, and the only record of these proceedings is the

27         stenographer's note that's available to us all visually as

28         we speak.

29

30         MR. MacEOCHAIDH:  I have no difficulty with that.

1

2          JUDGE DUNNE:  I wasn't aware that we were on camera.

3

4          MR. MacEOCHAIDH:  I have to say, either was I.

5          If we could proceed, Judge, to deal with the testimony.

6

7          Mr. Hawkes, please.

8

9          JUDGE DUNNE:  Yes.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

```
 1          MARTIN HAWKES, HAVING BEEN SWORN, WAS EXAMINED BY
 2          MR. MacEOCHAIDH AS FOLLOWS:
 3
 4          JUDGE DUNNE:  Good morning, Mr. Hawkes -- sorry, good
 5          afternoon at this stage.
 6       A. Good afternoon.
 7
 8    1  Q. MR. MacEOCHAIDH:  Good morning, Mr. Hawkes.  I wonder,
 9          before the examination begins, might I just verify that the
10          aide-memoire that Mr. Hawkes has is the same one that I
11          have?
12       A. It is the latest that I am aware of.
13
14          JUDGE DUNNE:  And have all the representatives copies of
15          Mr. Hawkes' aide-memoire?
16       A. It is the aide-memoire.
17
18          MR. MacEOCHAIDH:  It has been given to the Plaintiff.  The
19          witnesses have it.  I don't know if counsel for the State
20          has it?
21
22          JUDGE DUNNE:  I think that is desirable as well.  Before he
23          is asked any questions I want all parties to have copies of
24          his aide-memoire.
25
26          MR. REICHERT:  We don't have the --
27
28          MR. MacEOCHAIDH:  I understand that.
29          (Document handed to counsel for the Plaintiff.)
30
```

1          JUDGE DUNNE:  Now, has Mr. Dignam got a copy?  Mr. Lewis?

2

3          MR. DIGNAM:  I have.

4

5          MR. LEWIS:  I have a copy that I received this morning, but

6          I am assuming that it is...

7

8          JUDGE DUNNE:  Well, we better clear the matters up now.

9          Can you just check them, Mr. MacEochaidh?

10

11         MR. MacEOCHAIDH:  I will compare the version that

12         Mr. Hawkes has in his hand to the version that I have.

13

14         JUDGE DUNNE:  If you just hand it over to Mr. MacEochaidh

15         for the moment, Mr. Hawkes, and just start and use your top

16         page and correlate.

17

18         MR. REICHERT:  Judge, could this document, then, be marked

19         as an exhibit?

20

21         MR. MacEOCHAIDH:  It is not being produced in evidence.

22

23         JUDGE DUNNE:  Is it an aide-memoire of past recollection

24         recorded or present recollection revived?

25

26         MR. MacEOCHAIDH:  I don't want to have a fight about this.

27

28         MR. REICHERT:  Well, I am going to ask the Court to mark

29         this as an exhibit, because it is a document that is being,

30         that is in the courtroom and the witness is using it.

1

2          JUDGE DUNNE:  Who prepared it?  Can we find out about the

3          document, Mr. MacEochaidh?  Let's find out something more

4          about the document before we make any rulings.

5

6          MR. MacEOCHAIDH:  In the first instance, Judge, there is no

7          difficulty with marking the document which I referred to as

8          an aide-memoire as an exhibit.

9

10         JUDGE DUNNE:  Well, call it **Aide-Memoire Exhibit 1** of

11         Mr. Hawkes.

12

13         MR. MacEOCHAIDH:  Yes, Judge.

14

15         JUDGE DUNNE:  On the basis I am assuming there is no other

16         Exhibit 1 of Mr. Mr. Hawkes?

17

18         MR. MacEOCHAIDH:  No.  There seems to be a very slight

19         variation between the document which Mr. Hawkes had and the

20         document which I have now given him, and I don't know

21         whether he needs to --

22

23         JUDGE DUNNE:  Well, all I want to know is, whatever he has

24         and you have, have the other parties the precise same

25         document?

26

27         MR. MacEOCHAIDH:  We all have the same document.  Now,

28         everybody in court has the same document, I can assure the

29         Court that.  I don't wish to take Mr. Hawkes short, and it

30         might be -- one second --

1

2       JUDGE DUNNE:  Do you want me to rise for five minutes,

3       Mr. MacEochaidh?

4

5       MR. REICHERT:  I would like to get copies for both

6       Mr. Kelly and Mr. Curtin, so that the entire team can

7       follow.

8

9       JUDGE DUNNE:  I think I should rise for five minutes.  I

10      want matters to be run as efficiently as possible with the

11      least procedural objections as possible.

12

13      MR. MacEOCHAIDH:  What I would draw the witness's attention

14      to, and I'd ask him to look at the new document that he has

15      been given, I understand it is 99.9% the same, there may be

16      a very minor deviation, and he might have to satisfy

17      himself --

18

19      JUDGE DUNNE:  I want to clear that up, because I want to be

20      satisfied that all parties, including Mr. Hawkes, have the

21      precise same document, because we have now characterised it

22      as an exhibit.

23

24      MR. MacEOCHAIDH:  Very good.

25

26      JUDGE DUNNE:  I will rise for five minutes, gentlemen.

27

28      **THE PROCEEDINGS BRIEFLY ADJOURNED AND RESUMED AS FOLLOWS:**

29

30      JUDGE DUNNE:  Yes, Mr. MacEochaidh.

1

2          MR. MacEOCHAIDH:  May it please the Court.  I think that

3          housekeeping or administrative matter has been resolved.

4          Might I suggest, that as it is five past one, that --

5

6          JUDGE DUNNE:  2:15 will be appropriate, gentlemen.  Has

7          this document to be marked **Exhibit 1 of Mr. Hawkes**?  Should

8          that endorsement be placed --

9

10         MR. MacEOCHAIDH:  Can we just wait until a quarter past

11         two.  I'm almost certain that that is exactly what will

12         happen, Judge.  I want to be clear with what we are doing.

13

14         JUDGE DUNNE:  I think it should for the record, so that if

15         there are a plethora of documents to be advanced as we

16         proceed, that there is no confusion.   2:15, gentlemen.

17         Thank you.

18

19         **THE PROCEEDINGS ADJOURNED FOR LUNCH**

20

21

22

23

24

25

26

27

28

29

30

1    <u>THE PROCEEDINGS CONTINUED AFTER LUNCH AS FOLLOWS:</u>

2

3    JUDGE DUNNE:  Good afternoon everybody.

4

5    MR. MacEOCHAIDH:  May it please the Court.  Mr. Hawkes, I

6    think we are ready to begin after the false start this

7    morning.

8

9    JUDGE DUNNE:  Just one moment, is my machine...

10   You can proceed now, Mr. MacEochaidh.

11

12   MR. MacEOCHAIDH:  I am told that the witness wasn't sworn.

13   I thought he was.

14

15   JUDGE DUNNE:  He has been sworn.

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

1     2    Q. MR. MacEOCHAIDH:  Mr. Hawkes, were you involved with the

2                transaction known as the Financial Derivatives Investment

3                Strategy?

4         A. Yes.

5     3    Q. How was it that you came to be involved with FDIS?

6         A. In the month of May, 2001, James Haber described by e-mail

7                and phone how the strategy would work.

8     4    Q. I can now show you a document marked Government Exhibit

9                2452.  Take a minute to look at that: Do you have that?

10        A. Yes, I do.

11    5    Q. Which is draft marketing materials which the Financial

12                Derivatives Investment Strategy, which were being circulated by

13                e-mail dated April 5, 2001.  Were these draft market

14                materials provided to you or shown to you by

15                Mr. Haber in May 2001?

16        A. In all likelihood at some point we received a similar

17                power-point presentation which described the strategy in

18                detail, including the role of a foreign partner such as

19                ourselves.

20    6    Q. And based upon Mr. Haber's explanation, did you agree to

21                play the role of a foreign partner in the strategy?

22        A. Yes.

23    7    Q. If I could now show you a document which is marked as

24                Government Exhibit 2451.

25                (Document handed to witness.)

26                Do you have that?

27        A. Yes.

28    8    Q. And are you the Martin Hawkes referenced in the biography

29                for Martin Hawkes marked as part of that exhibit?

30        A. Yes.

# Exhibit E Part 2

1    9    Q. Was this biography for you, marked as part of Government

2         Exhibit 2451, prepared by you?

3    A. I think so.

4    10   Q. Is the bio for you marked as part of Government Exhibit

5         2451 accurate?

6    A. Yes.

7    11   Q. And the biography for Martin Hawkes, marked as part of

8         Govnment Exhibit 2451, lists you as a shareholder and

9         director of Biosphere Finance Limited, or BFL.  Is

10        Biosphere Finance Limited an Irish company?

11   A. Yes.

12   12   Q. Are you still a shareholder of BFL?

13   A. Yes.

14   13   Q. Now, I'd like to show you another document, this is

15        Government Exhibit 2460.

16        (Document handed to witness.)

17        And this is an e-mail dated October 31, 2002, from Ron

18        Buesinger of Alpha to Elizabeth Jung of Diversified Group

19        Inc., known as DG, forwarding a spreadsheet named

20        2001-Customers-HaberInvst-12-31-01-R.xls.  Did you ever

21        receive a copy of this e-mail which we have in front of you

22        as Government Exhibit 2460 or the attached spreadsheet?

23   A. We never received a copy of this spreadsheet.

24

25        JUDGE DUNNE:  Mr. MacEochaidh, could I just interrupt you,

26        regrettably.  It appears you have missed questions 10 and

27        11, is that by arrangement?

28

29        MR. MacEOCHAIDH:  That's deliberate, Judge.  Just to say

30        that those questions are not being put to this witness.

Doyle Court Reporters Ltd.

1

2          JUDGE DUNNE:  That's what I wanted to know.  Thank you.

3          Just for clarification purposes.  Thank you.

4

5    14   Q. MR. MacEOCHAIDH:  And the attached spreadsheet to the

6          e-mail on the second page of that exhibit, Mr. Hawkes,

7          listed 47 customers.  Do you recognise the names on the

8          attached sheet?

9       A. Yes, as far as I can tell.

10   15   Q. What do the names on the list relate to?

11      A. They are all persons who participated in FDIS transactions

12         during 2001.

13   16   Q. Does this list appear to be complete?

14      A. It appears to be a complete list of the 2001 FDIS

15         transactions in which one or the other of us, Mahoney or

16         Hawkes, served in the role of foreign partner.

17   17   Q. I am now going to show you another document, which is

18         marked as Government Exhibit 2465, a document produced by

19         Alpha, having the number Alpha-disk 09-002452, and is

20         entitled "Trilogy 2002," which identifies nine transactions

21         as Trilogy-type transactions.  Do you have that document in

22         front of you?

23      A. Yes.

24   18   Q. And did you ever receive a copy of this document?

25      A. No.

26   19   Q. Do you recognise the transactions identified on this

27         document as Trilogy-type transactions?

28      A. Yes, I believe so.

29   20   Q. And what are Trilogy-type transactions?

30      A. They are FDIS transactions which were implemented in 2002

```
 1              through Trilogy Investments Limited.
 2     21  Q. Does this list of 2002 FDIS transactions appear to be
 3              complete?
 4          A. It appears to be a complete list of the 2002 FDIS
 5              transactions in which one or other of us, Mahoney or
 6              Hawkes, also served in the role of foreign partner.
 7     22  Q. Schut-Elbaum is listed on both Government Exhibit 2460 and
 8              Government Exhibit 2465.  Is this the same FDIS
 9              transaction?
10          A. Yes, it was started in 2001 but carried over to 2002.
11     23  Q. Were there a total of 55 FDIS transactions in 2001 and 2002
12              in which Mahoney or Hawkes served in the role of foreign
13              partner?
14          A. Yes, I believe so.
15     24  Q. I am now going to show you another document, which is
16              marked as Government Exhibit 2459.01 up to 2459.55.  It's a
17              number of documents, Mr. Hawkes.
18              (Documents handed to witness.)
19
20              Which is identified as an "Outlined of Proposed
21              Transaction."  You might take a minute just to look at
22              those.  Did you have a look at those, Mr. Hawkes?
23          A. Yes.
24     25  Q. And these are an Outline of Proposed Transaction for each
25              of the 55 transactions that you have had identified as
26              either a 2001 or 2002 FDIS transaction?
27          A. Yes, that appears to be the case.
28     26  Q. Do you recognise each of these Outlines of Proposed
29              Transactions as related to FDIS transactions?
30          A. From a quick perusal, yes.
```

1    27  Q. In each of these outlines, the role of co-investor is

2            assigned to either SM or MH.  Do these initials stand for

3            Sam Mahoney and Martin Hawkes respectively?

4       A. Yes, I assume so.

5    28  Q. How was it determined whether Mahoney or Hawkes would be

6            the named foreign partner in the 2001 and 2002 FDIS

7            transactions?

8       A. Generally, it was on an alternating basis, and I don't know

9            how it was decided which of us would go first.

10   29  Q. Very good.  Now, to another document, Mr. Hawkes, which is

11          being handed to you, marked as Government Exhibit 2453.

12          (Document handed to witness.)

13          Do you have that?

14       A. 2453, yes.

15   30  Q. This is an e-mail dated October 2, 2001, from Mr. Phil

16          Kampf, Helios Financial, to David Schostak, with respect to

17          Jerome Schostak FDIS transaction in which Mr. Kampf stated:

18          "Here is the updated letter.  I will forward original by

19          mail.  I will also be e-mailing an outline of the proposed

20          transaction tomorrow which gives wire instructions, cost

21          breakdowns, potential profit summaries, etc..  We do not

22          have an engagement letter for the transaction.  Assuming

23          you agree with the content of the outline, we will inform

24          the entities and forward all of the operating documents to

25          you for your review."

26

27          Did you see a copy of this e-mail?

28       A. No.

29   31  Q. Did anyone ever explain to you why there was no engagement

30          letter for the FDIS transaction?

```
 1          A. No.
 2    32    Q. Were you ever informed, as set forth in the e-mail marked
 3             as Government Exhibit 2453, that the FDIS product was
 4             marketed using the Outline of Proposed Transaction?
 5          A. No.
 6    33    Q. What was your understanding of what the Outline of the
 7             Proposed Transaction was?
 8          A. A summary of the transaction that a prospective investor
 9             was contemplating entering into with the Diversified Group
10             Inc. or Trilogy Investments Limited.
11    34    Q. Did you understand the Outline of Proposed Transaction for
12             the FDIS product to detail a series of steps for the
13             implementation of the FDIS product?
14          A. Our role as foreign investor in FDIS was primarily that of
15             an implementing party.  We were not involved in the
16             structuring or the negotiating of the transactions or the
17             documents associated therewith.  As a general matter, the
18             steps we took were in accordance with the steps described
19             in the Outline of Proposed Transaction for each particular
20             transaction.  The economics we adhered to with respect to
21             the capital contributions were formulaic.  By that I mean
22             consistent with the percentages set forth in the Outline of
23             Proposed Transactions.
24    35    Q. Did you know during 2001 and 2002 that there was an Outline
25             of Proposed Transaction for each of the FDIS transactions?
26          A. Yes.
27    36    Q. Did you receive a copy of each of these Outlines of
28             Proposed Transaction prior to the implementation of the
29             FDIS transaction?
30          A. We probably did, as we would generally receive an Outline
```

| | | |
|---|---|---|
| 1 | | of Proposed Transaction for each DGI or Helios client who |
| 2 | | formed a multi-member LLC or partnership of which either of |
| 3 | | us was the foreign partner. |
| 4 | 37 | Q. Another document now, which is marked as Government Exhibit |
| 5 | | 2456, and is being handed to you.  Do you have that, |
| 6 | | Mr. Hawkes? |
| 7 | | A. Yes. |
| 8 | 38 | Q. And it's an e-mail dated November 5, 2001, from James Haber |
| 9 | | of Diversified Group Incorporated forwarding to BFL an |
| 10 | | Outline of Proposed Transaction for Francis.  Did you |
| 11 | | receive this e-mail and attachments? |
| 12 | | A. We probably did receive this e-mail and attachments. |
| 13 | 39 | Q. Now being handed to you is a document marked as Government |
| 14 | | Exhibit 2457.  (Document handed to witness.)  Do you have |
| 15 | | that? |
| 16 | | A. Yes. |
| 17 | 40 | Q. It's an e-mail dated November 16, 2001, from James Haber of |
| 18 | | Diversified Group Incorporated forwarding to BFL Outlines |
| 19 | | of Proposed Transaction for Caputo, Wainwright, Robert G. |
| 20 | | Ciasulli, C-I-A-S-U-L-L-I, Ronald J Ciasulli.  Did you |
| 21 | | receive this e-mail and attachment? |
| 22 | | A. We probably did receive this e-mail and the attachment. |
| 23 | 41 | Q. If you can now look at a document being handed to you, |
| 24 | | which is marked as Government Exhibit 2458.  Do you have |
| 25 | | that? |
| 26 | | A. Yes. |
| 27 | 42 | Q. It's an e-mail dated November 5, 2002, from Elizabeth Jung |
| 28 | | of DGI to the e-mail address BFL@indigo.ie, forwarding an |
| 29 | | Outline of Proposed Transaction for Erb, one of the 2002 |
| 30 | | FDIS transactions.  Did you receive this e-mail and |

1          attachment?

2        A. We probably did receive this e-mail and the attachment.

3    43  Q. Did you understand from your discussions with Mr. Haber

4          with respect to FDIS and the Outlines of Proposed

5          Transaction, that you received -- that a purpose of the

6          FDIS transaction was to generate tax losses for the US

7          taxpayer identified in the title of the Outline of Proposed

8          Transaction?

9        A. Yes.

10   44  Q. Now being handed to you is another document, marked as

11         Government Exhibit 2454, and do you have that?

12       A. Yes.

13   45  Q. And it's an e-mail dated October 11, 2001, from Michael

14         Kerekes, K-E-R-E-K-E-S, of BDO Seidman LLP to Phil Kampf of

15         Helios Financial forwarding a completed Investor Fact Sheet

16         for Joseph Francis, one of the FDIS participants.  Also

17         attached hereto -- sorry, also being handed to you is a

18         document with the marking Government Exhibit 2455, and it's

19         an e-mail dated October 17, 2001, from Phil Kampf to Thomas

20         Levato at the law firm of Brown Raysman forwarding him the

21         completed Investor Fact Sheet for Joseph Francis, along

22         with the Outline of Proposed Transaction for Francis' FDIS

23         transaction, asking Levato to form the entities and to get

24         the documents ready for this transaction.  The Investor

25         Fact Sheet lists the transaction size as $27 million, and

26         as to whether it is "Capital" or "Ordinary" states "23MM

27         Ordinary this year with potential for 4MM later this year

28         or early next year."

29

30         Did you receive a copy of the Investor Fact Sheet for any

|    |    |    |                                                              |
|----|----|----|--------------------------------------------------------------|
| 1  |    |    | of the participants in FDIS?                                 |
| 2  |    | A. | No, we did not receive Investor Fact Sheets for Mr.          |
| 3  |    |    | Francis, or, so far as we remember, for any of the other     |
| 4  |    |    | FDIS transactions.                                           |
| 5  | 46 | Q. | Each of the Outline of Proposed Transaction for FDIS         |
| 6  |    |    | reference a planned partial buy-out of the interests of the  |
| 7  |    |    | named foreign partner.  Were you aware that this was a       |
| 8  |    |    | planned step in each of the FDIS transactions?               |
| 9  |    | A. | Yes.                                                         |
| 10 | 47 | Q. | Did you have a buy-sell understanding with respect to each   |
| 11 |    |    | of the FDIS transactions in which you participated?          |
| 12 |    | A. | Yes, either could buy out the other.                         |
| 13 | 48 | Q. | Did you understand from the outset that you could be         |
| 14 |    |    | required to effectuate a buy-sell after the contribution of  |
| 15 |    |    | capital to the partnership?                                  |
| 16 |    | A. | Yes.                                                         |
| 17 | 49 | Q. | And did this apply to Fidelity International transactions    |
| 18 |    |    | as well?                                                     |
| 19 |    | A. | Yes, I assume so.                                            |
| 20 | 50 | Q. | Now being handed to you is a document marked as Government   |
| 21 |    |    | Exhibit 2461.  (Document handed to witness.)  Do you have a  |
| 22 |    |    | copy of that?                                                |
| 23 |    | A. | Yes.                                                         |
| 24 | 51 | Q. | It's a copy of the buy-sell agreement with Richard Egan,     |
| 25 |    |    | purportedly signed by Sam Mahoney.  Was this document in     |
| 26 |    |    | fact signed by Sam Mahoney?                                  |
| 27 |    | A. | To my eyes, it looks so.                                     |
| 28 | 52 | Q. | Did James Haber promise you any sort of a fee in exchange    |
| 29 |    |    | for your agreement to serve as foreign partner in the FDIS   |
| 30 |    |    | strategy?                                                    |

1      A. Yes, before the first FDIS transaction was entered into,

2         James Haber promised to pay an amount that was fair and

3         commensurate with the role to be served by Kilsture Limited

4         and Maddox Limited, which we appointed as our agents for

5         the purpose of implementing aspects of the FDIS

6         transaction.  Kilsture and Maddox are Isle of Man

7         companies.

8   53  Q. Did you have any discussion with anyone other than James

9         Haber regarding what the amount of this fee should be?

10     A. All discussions in this regard were with James Haber,

11        including the ultimate decision on what constituted an

12        amount that would be fair and commensurate with the role to

13        be served by Kilsture and Maddox.

14  54  Q. Do you know how the amount of this fee was computed?

15     A. No.

16  55  Q. Now being handed to you is a document marked as Government

17        Exhibit 2469.  (Document handed to witness.)  Do you have

18        that?

19     A. Yes.

20  56  Q. It's an e-mail dated May 17, 2001, from Haber to Ivan Ross

21        of Alpha and Mox Tan of Helios Financial, with two

22        attachments.  Did you ever receive or see a copy of this

23        e-mail or the attachments?

24     A. No.

25  57  Q. The e-mail marked as Government Exhibit 2469 is dated May

26        17, 2001.  Is this date before or after the date in May

27        2001 when James Haber presented to you by e-mail and phone

28        the opportunity to play the role of foreign partner in

29        FDIS?

30     A. I don't know.

1   58   Q. During the presentation by James Haber in May 2001 of the
2             opportunity to play the role of foreign partners in FDIS,
3             did Mr. Haber discuss with you what the amount of your
4             contribution would be as foreign partners?
5        A. No.
6   59   Q. One of the attachments to the e-mail which we are looking
7             at, 2469, is an attachment with the Bates number 1
8             Alpha-disk 03-013502 and with the title "Profit Analysis."
9             Do you see that?
10       A. Yes.
11  60   Q. This attachment lists the amount of the foreign
12            contribution as .38%.  Did Mr. Haber discuss with you in
13            May 2001, what the amount of foreign contribution would be
14            in the FDIS transaction?
15       A. No.
16  61   Q. Did Mr. Haber discuss with you in May 2001, or thereafter
17            during 2001, that the amount of the foreign contribution
18            for the role of foreign partner was a certain pre-agreed
19            upon fixed percentage?
20       A. No.
21  62   Q. The "Profit Analysis" attached to the exhibit you have in
22            front of you, 2469, also lists a foreign fee equal to .15%,
23            with a *caveat* "Not to exceed 50,000."  Do you see that?
24       A. Yes.
25  63   Q. Did Mr. Haber discuss with you, in May 2001, that he was
26            proposing to pay you a foreign fee on each FDIS transaction
27            equal to .15%, with a *caveat* "Not to exceed 50,000" per
28            transaction?
29       A. No.
30  64   Q. Did Mr. Haber discuss with you in May 2001, or thereafter,

```
 1              the amount of the foreign fee to be paid for you serving

 2              the role of foreign partners in FDIS?

 3         A. Yes.

 4     65  Q. Were these fees ultimately paid?

 5         A. Yes.

 6     66  Q. How was the amount of the fee that you were paid computed?

 7         A. A fee totalling $2,000,000 was paid, but we do not know how

 8              this amount was computed.  It is our understanding that the

 9              $2,000,000 in fees, as determined after the fact, were a

10              function of the aggregate success of the FDIS programme,

11              and in significant part a function of the gross amount of

12              the fees paid by the US participants.

13     67  Q. How was this $2,000,0000 fee paid?

14         A. 100,000 was received by BFL in two equal sums of $50,000 on

15              15 February, 2002, and 3 May, 2002.  I believe that

16          $1,140,000 --

17

18              JUDGE DUNNE:  Just slow it down a little bit, Mr. Hawkes,

19              for this lady.

20         A. Yes, Judge.  I believe $1,140,000 was paid to Maddox

21              Limited in two equal sums of $570,000 on or about 22nd

22              February, 2002, and on or about 3rd May, 2002.  And

23              thirdly, I believe $760,000 was paid to Kilsture Limited,

24              Kilsture, in two equal sums of $330,000 on or about 22nd

25              February, 2002, and on or about 3rd May, 2002.

26     68  Q. MR. MacEOCHAIDH:  Who paid each of these two $50,000 fee

27              payments to BFL?

28         A. The $50,000 fee payment that we received on the 15th

29              February, 2002, was received from Helios Financial, and the

30              fee payment that we received on May 3, 2002, was from DGI,
```

1           paid through United Acquisitions LLC.

2    69   Q. Another document is now being handed to you marked as

3           Government Exhibit 2468, and is a document prepared by

4           Helios Financial.  Do you have that in front of you?

5         A. I do.

6    70   Q. And it lists a payment to BFL in the amount of $50,000 on

7           15 February, 2002, and identifies the purpose of this

8           payment as for "Consulting Input."  Do you know why Helios

9           Financial identified the purpose of this payment as

10          "Consulting"?

11        A. Just a small correction there.  I believe on the document

12          you have showed me, it shows "Administration and Agency

13          Services."  But the answer to the question is no.

14   71   Q. Thank you.  Another document is now being handed to you,

15          which is marked as Government Exhibit 3025.  (Document

16          handed to witness.)  Do you have that?

17        A. I do.

18   72   Q. And that's a spreadsheet produced to the United States on

19          behalf of, on your behalf, sorry, by counsel for DGI with

20          respect to United Acquisitions LLC, which reflects payments

21          from United Acquisitions LLC to BFL, Maddox and Kilsture on

22          the 3 May, totalling $1 million.  Do you recognise this

23          spreadsheet?

24        A. No.

25   73   Q. Do you know who created the spreadsheet that's in front of

26          you?

27        A. No.

28   74   Q. Who paid these two $570,000 payments to Maddox?

29        A. We believe the $570,000 fee payment that Maddox received on

30          or about 22nd February, 2002, was received from Helios

```
 1              Financial, and the $570,000 fee payment that Maddox

 2              received on or about 3rd May, 2002, was from DGI, paid

 3              through United Acquisitions LLC.

 4     75   Q. And what is Maddox?

 5          A. Maddox is an Isle of Man company.

 6     76   Q. I am now showing you another document, marked as Government

 7              Exhibit 2468.  Do you have that?

 8          A. No, this is 2467.

 9     77   Q. Just one moment, please.

10          A. I already have 2468, I believe, from earlier.

11     78   Q. Very good.  Can you refer to the document you have marked

12              2468?

13          A. Yes.

14     79   Q. Thank you.  And this is a document prepared by Helios

15              Financial, which lists a payment to Maddox in the amount of

16              $570,000 on the 22nd February, 2002, and identifies the

17              purpose of this payment as for consulting.  Do you know why

18              Helios Financial identified the purpose of this payment as

19              "Consulting"?

20          A. No.

21     80   Q. The next document, which is now being handed to you, unless

22              you have it already, is Government Exhibit 2467.  I believe

23              you have that document already?

24          A. Yes.

25     81   Q. This is a bank statement of Helios Financial LLC, Bank of

26              America, at number 000 0597 1888, for the period 1st

27              February, 2002, through to the 28th February, 2002, which

28              reflects that on the 22nd February, 2002, a wire in the

29              amount of $570,000 was sent from Helios Financial to Maddox

30              Limited, bearing ID 9545-40041974, Bnf.Bk.Isle of Man Bank.
```

```
 1              Did Maddox receive this payment of $570,000 through the

 2              Isle of Man bank account number 9545-40041974?

 3           A. I need a moment just to analyse the statement, I haven't

 4              seen it before.  The text, I have to say, is too small to

 5              read, but I think generally I would have to say it appears

 6              so.

 7     82    Q. Very good.  Who paid each of these $380,000 payments to

 8              Kilsture?

 9           A. We believe the $380,000 fee payment that Kilsture received

10              on or about 22nd February, 2002, was received from Helios

11              Financial, and the $380,000 fee payment that Kilsture

12              received on or about 3rd May, 2002, was from DGI paid

13              through United Acquisitions LLC.

14     83    Q. And what is Kilsture?

15           A. Kilsture is an Isle of Man company.

16     84    Q. When was it incorporated?

17           A. I believe it was incorporated on 22nd October, 1998.

18     85    Q. Another document is now being handed to you bearing, in

19              fact it's one you have already, excuse me again.  This

20              document you already have, and I ask you to refer back to

21              it, it's Government Exhibit 2468.  Do you have that there?

22           A. I do.

23     86    Q. And it's a document prepared by Helios Financial, which

24              lists the payment to Kilsture in the amount of $380,000 on

25              the 22nd February, 2002, and identifies its purpose as

26              "Consultancy Fees."  Do you see that?  Do you know why

27              Helios Financial identified the purpose of this payment as

28              consultancy fees?

29           A. No.

30     87    Q. Going back to a document which you already have, and that
```

```
 1              is Government Exhibit 2467?

 2         A. Yes.

 3    88   Q. Do you have that?

 4         A. Yes.

 5    89   Q. A bank statement of Helios Financial LLC, Bank of America,

 6              account number 000 0597 1888, for the period 1 February,

 7              2002, to the 28 February, 2002, which reflects that on the

 8              22 February, 2002, a wire in the amount of $380,000 was

 9              sent from Helios Financial to Kilsture Limited, bearing ID

10              9545-40035729, Bnt.Bk.Isle of Man Bank.  Did Kilsture

11              receive this payment of $380,000 through the Isle of Man

12              bank account bearing account number 9545-435729?

13         A. It would appear so.

14    90   Q. Why were Maddox and Kilsture paid different fee amounts?

15         A. Maddox and Kilsture were paid different amounts because it

16              was agreed to split the fees from FDIS on a 60:40 basis,

17              60% to Maddox and 40% to Kilsture.

18    91   Q. Did you and James Haber discuss, during May 2001, what

19              would be the source of the funds that you'd be contributing

20              in your roles as foreign partners?

21         A. No.

22    92   Q. What was the source of the funding for the capital

23              contributions that you were making in your role as foreign

24              partner?

25         A. The source of the funding for our capital contributions to

26              the partnerships in the FDIS transactions is detailed in a

27              handwritten ledger prepared by Sam Mahoney dated 7 January,

28              2002, entitled "Funding of Partnerships," a copy of which

29              we have produced, which has been marked as Government

30              Exhibit --
```

1     93   Q. That's now being handed to you, Mr. Hawkes.   (Document

2               handed to witness.)  Do you have it?

3          A. I do indeed.

4     94   Q. And is this ledger, which, as you say, is marked as

5               Government Exhibit 3023, all in the handwriting of Sam

6               Mahoney?

7          A. Yes, it appears so to me.

8     95   Q. Was the ledger that we are speaking about created by Sam

9               Mahoney on or about the 7th January, 2002?

10         A. Yes, I assume so.

11    96   Q. And was the ledger we are discussing created at or near the

12              time of the occurrence of the matters set forth in that

13              ledger by or from information transmitted by a person with

14              knowledge of those matters?

15         A. Yes, I would assume so.

16    97   Q. Was the ledger we are discussing kept by Sam Mahoney on

17              behalf of both of you in the course of your regular

18              conducted business activities?

19         A. Yes.

20    98   Q. And was this ledger which we are discussing made as a

21              regular practice in your regularly conducted business?

22         A. Yes.

23    99   Q. Where does the funding list of this ledger that we are

24              discussing come from?

25         A. As reflected in this ledger, a funding totalling $1,505,000

26              was advanced from DG.  The balance of the funding,

27              totalling $535,000, was advanced from Ailesbury.

28   100   Q. What does the reference DG -- what does the reference to DG

29              in the ledger in Government Exhibit 3023 represent?

30         A. DG references Diversified Group.  Funding totalling

```
 1              $1,505,000 was advanced from the Diversified Group.

 2    101   Q. And what does the reference to Ailesbury in Government

 3              Exhibit 3023 represent?

 4          A. Ailesbury Finance LLC, (Ailesbury) is a Wyoming

 5              Partnership.

 6    102   Q. And does your ledger which we are discussing reflect the

 7              date upon which these funds were received?

 8          A. I believe the dates upon which the funds were received is

 9              noted on the left column by day, month and year adjacent to

10              the amount that we received.  These amounts were received

11              by wire in US dollars.

12    103   Q. On the exhibit we are discussing, 3023, what was the date

13              upon which you received the amount of $380,000, which is

14              listed in the top row?

15          A. I can't see reference to $380,000 in this exhibit.  Sorry,

16              I beg your pardon, my apologies, I do see it.  The first

17              $380,000 payment from DG was received on or before July 10,

18              2001, to fund the first FDIS transaction.

19    104   Q. Who specifically paid the DG funding listed in Exhibit

20              3023?

21          A. The DG funds came from DGI or an entity controlled by it,

22              so far as we understood.

23    105   Q. And who specifically paid the Ailesbury funding listed in

24              the exhibit under discussion?

25          A. The Ailesbury funding came from Ailesbury Finance.

26    106   Q. Into what accounts were the funds that are referenced on

27              your ledger in the exhibit we are discussing deposited?

28          A. From the exhibits it appears that these funds were

29              deposited into three Singer & Friedlander accounts through

30              which the 2001 FDIS transactions were implemented.
```

| | | | |
|---|---|---|---|
| 1 | 107 | Q. | Were any of these funds that were received from DGI used |
| 2 | | | for anything other than the FDIS transactions? |
| 3 | | A. | No. |
| 4 | 108 | Q. | Were any of these funds that were received from Ailesbury |
| 5 | | | used for anything other than the FDIS transactions? |
| 6 | | A. | No. |
| 7 | 109 | Q. | How did you account for this funding from DG and Ailesbury? |
| 8 | | A. | As reflected in the ledger, Government Exhibit 3023, we |
| 9 | | | classified the funding as loans. |
| 10 | 110 | Q. | Were there any loan documents with respect to these loans? |
| 11 | | A. | No. |
| 12 | 111 | Q. | Was there any interest paid with respect to these loans? |
| 13 | | A. | No. |
| 14 | 112 | Q. | Was a line of credit utilized? |
| 15 | | A. | No. |
| 16 | 113 | Q. | Was any of this funding from DGI repaid? |
| 17 | | A. | No. |
| 18 | 114 | Q. | Was any of the funding from Ailesbury repaid and if so, |
| 19 | | | when? |
| 20 | | A. | Yes, I believe the funding that we received from Ailesbury |
| 21 | | | was fully repaid in January of 2002. |
| 22 | 115 | Q. | And is this repayment reflected in the ledger? |
| 23 | | A. | This repayment is reflected in the ledger marked as |
| 24 | | | Government Exhibit 3023. |
| 25 | 116 | Q. | You are now being handed a document which is marked as |
| 26 | | | Government Exhibit 3024.  (Document handed to witness.)  Do |
| 27 | | | you have that? |
| 28 | | A. | Yes. |
| 29 | 117 | Q. | This is a spreadsheet produced by counsel for DGI on your |
| 30 | | | behalf which details the funding from Ailesbury Finance |

```
 1              Limited.  Do you recognise this document?

 2         A. No.

 3    118  Q. Was the spreadsheet, which you have in front of you and

 4              marked 3024, prepared by you in the course of your

 5              business?

 6         A. No.

 7    119  Q. Do you know who prepared the spreadsheet you have in front

 8              of you?

 9         A. No.

10    120  Q. The spreadsheet which you have in front of you reflects

11              that all funding from Ailesbury was repaid on or about the

12              23rd January, 2002.  Is it correct that all funding from

13              Ailesbury was repaid on or about 23rd January, 2002?

14         A. Yes, I believe so.

15    121  Q. What was the source of the funding for the 2002 FDIS

16              transactions?

17         A. I believe the source of the funding capital for the 2002

18              transactions was the money left over in the H&M joint

19              venture account.

20    122  Q. Did James Haber explain to you in May 2001 what bank

21              accounts would be used to remit your capital contributions

22              on the 2001 FDIS transactions?

23         A. James Haber explained to us that all capital contributions

24              to the various LLCs involved in the FDIS transactions and

25              all distributions and proceeds from the sale of LLC

26              interests were to be remitted through bank accounts we

27              organised.

28    123  Q. And what Singer & Friedlander bank accounts did you use to

29              implement the 2001 FDIS transactions?

30         A. During 2001 we used three bank accounts maintained by the
```

1              merchant bank of Singer & Friedlander in the Isle of Man to

2              send and receive funds with respect to the FDIS

3              partnerships.

4      124   Q. Are the account numbers for each of these accounts

5              11270012, and 11270025, and 20195700?

6           A. As we do not have access to the books, it is hard for us to

7              confirm the accuracy of this information.  But from

8              examining the exhibits, it would appear so.

9      125   Q. And was account number 11270012 used to implement the first

10             six 2001 FDIS transactions?

11          A. It is certainly possible, but as we do not have access to

12             the books, it is hard for us to confirm the accuracy of

13             that contention.

14     126   Q. Was account number 11270025 used to implement the next five

15             2001 FDIS transactions, including Richard Egan's FDIS

16             transaction?

17          A. It is certainly possible, but as we do not have access to

18             the books, it is hard to confirm the accuracy of that.

19     127   Q. Was account number 20195700 used to implement the remaining

20             36 FDIS transactions in 2001?

21          A. It is certainly possible, but again, as we do not have

22             access to the books, it is hard to confirm the precise

23             accuracy of that information.

24     128   Q. Who was responsible for procuring the creation and

25             management of these accounts?

26          A. Sam and I were exclusively responsible for procuring the

27             creation and management of the Isle of Man accounts through

28             which funds flowed in respect of the FDIS transactions.

29     129   Q. Why did you use these three accounts to implement the 2001

30             and 2002 FDIS transactions?

Doyle Court Reporters Ltd.

```
 1              A. We appointed Maddox Limited and Kilsture Limited as our
 2                 agents for the purpose of implementing the 2001 and 2002
 3                 FDIS transactions through the H&M joint venture account.
 4                 These account references were noted above.  This account
 5                 was opened in 2001 and was managed by Maddox and Kilsture.
 6      130     Q. You are now being handed a document which is marked as
 7                 Government Exhibit 2462, and another document marked as
 8                 Exhibit 2463.  (Documents handed to witness.)  Do you have
 9                 those?
10              A. I do.
11      131     Q. These are copies of wire instructions to wire funds to
12                 these accounts for certain of the FDIS transactions.  Do
13                 you recognise these wire instructions?
14              A. Yes, we recognise the bank account details.
15      132     Q. Who prepared these wire instructions?
16              A. I believe they were prepared with our knowledge.
17      133     Q. Did you continue to use the H&M joint venture account,
18                 number 20195700, in connection with the 2002 FDIS
19                 transactions?
20              A. Yes.
21      134     Q. Did Trilogy Investments Limited also use a Singer &
22                 Friedlander account in the Isle of Man, account number
23                 20282910, to implement the 2002 FDIS transactions?
24              A. It would appear so.
25      135     Q. Do you now have any books and records in your possession or
26                 control with respect to these four Singer & Friedlander
27                 accounts?
28              A. No.
29      136     Q. You are now being handed a document which is marked as
30                 Government Exhibit 2464.  (Document handed to witness.)
```

Doyle Court Reporters Ltd.

```
 1              And do you have that?

 2          A. Yes.

 3   137    Q. It's an e-mail dated May 3, 2002, from James Haber of DGI

 4              to Ron Buesinger of Alpha, with an attached spreadsheet

 5              concerning income and expenses from 2001.  Did you receive

 6              or see a copy of this document?

 7          A. I believe that's from Ivan Ross to Jim Haber, but -- we

 8              never saw this spreadsheet and did not have a precise

 9              understanding of the financial arrangements among DGI,

10              Helios and Alpha.

11   138    Q. The document you have in front of you, Government Exhibit

12              2464, lists as an expense a line item of $1,302,978 for

13              SMMH.   This same amount of $1,302,978 is listed on

14              Government Exhibit 2460 as the total for "Co-investor Adj.

15              cost basis."  Does this amount of 1,302,978 accurately

16              reflect the total adjusted cost basis for the contributions

17              made on your behalf in the 2001 FDIS transactions as the

18              amount of the contributions on your behalf less the amount

19              received from your sale of your membership interests?

20          A. I have no idea.

21   139    Q. Did you, in 2002, receive distributions from the 2001

22              transactions?

23          A. I do not recall.

24   140    Q. Now, you are being handed a document which is marked as

25              Government Exhibit 2482.

26              (Document handed to witness.)

27              Do you have that?

28          A. Yes.

29   141    Q. And this is an e-mail from Ron Buesinger to James Haber,

30              dated May 1, 2002, to which is attached a summary of the
```

1          2001 FDIS transactions dated April 22, 2002.  This summary

2          lists 2002 distributions to you as the co-investors

3          totalling $41,463.  Do you know if the $41,463 represents

4          distributions to you?

5        A. Since we do not have access to the records, we can not say.

6          I cannot say.

7   142  Q. Now you are being handed another Government exhibit, which

8          is marked as Government Exhibit 2472, and do you have that?

9          (Document handed to witness.)

10       A. Yes.

11  143  Q. It's an e-mail dated 23 September, 2002, from James Haber

12         to Ivan Ross of Alpha, to which is attached an updated

13         account which lists as a line expense 2002 Irish

14         distributions in the amount of $41,463.  Do you know if

15         this $41,463 is the same $41,463 that was listed on

16         Government Exhibit 2482, which you have seen, as

17         "Distributions" to you?

18       A. I don't know.

19  144  Q. Were you aware that Alpha and Helios were treating this

20         $41,463 in distributions to you as a joint expense of

21         Helios and Alpha?

22       A. No.

23  145  Q. Would you look now amongst the documents that you have at

24         Government Exhibit 2459.49.  Have you located that?

25       A. I have indeed, yes.

26  146  Q. This is an e-mail dated April 5, 2002, from Philip Kampf of

27         Helios Financial forwarding outlines for one of the 2002

28         FDIS transactions in which he stated:  "Please note that

29         Trilogy has replaced Diversified and Alpha in the

30         partnership."

1
2          What was the role of Trilogy Investments Limited in the
3          2002 FDIS transactions?
4       A. For the purposes of implementing the 2002 FDIS
5          transactions, Trilogy Investments Limited took the place of
6          Alpha, DGI and Helios as participants.
7   147 Q. Now being handed to you is a document marked as Government
8          Exhibit 2475.  (Document handed to witness.)  And do you
9          have that?
10      A. I do.
11  148 Q. And this is an e-mail dated May 24, 2002, from Mox Tan with
12         an attached memo entitled "Revised Trilogy US
13         Implementation Memo."  Did you ever receive a copy of this
14         memo or a version of it?
15      A. No.
16  149 Q. That e-mail which you have in front of you, 2475, is
17         addressed to Stephen Hubble of Trilogy Financial Products
18         at the e-mail address "Stephen.hubble.3GY."  Did you have
19         any type of business relationship with Trilogy Financial
20         Products Limited at any time during 2001 or 2002?
21      A. No.
22  150 Q. And I also think that you have in front of you Government
23         Exhibit 2459.48.  And if you can keep in front of you,
24         2459.49.
25      A. Okay.
26  151 Q. Both of these contain Outlines of Proposed Transactions for
27         2002 FDIS transactions in which Trilogy Financial
28         Investments Limited, not Trilogy Investments Limited, is
29         identified as a partner and as the manager.  Was Trilogy
30         Investments Limited substituted for Trilogy Financial

Doyle Court Reporters Ltd.

1           Investments?

2       A. I don't know.

3   152  Q. Who owned Trilogy Investments Limited?

4       A. Maddox and Kilsture.

5   153  Q. What was the source of the funding for the capital

6           contributions that you made or Mr. Mahoney made to the 2002

7           FDIS transactions in 2002?

8       A. The source of the capital contributions that we made to the

9           2002 transactions was the money left over in the H&M joint

10          venture account from the 2001 FDIS transactions.

11  154  Q. And what was the source of the funding for the capital

12          contributions that you made on behalf of Trilogy

13          Investments Limited to the 2002 FDIS transactions in 2002?

14      A. The source of the capital contributions that were made to

15          the 2002 transactions on behalf of Trilogy Investments

16          Limited was also the money left over in the H&M joint

17          venture account from the 2001 FDIS transactions.

18  155  Q. Now being handed to you is a document marked as Government

19          Exhibit 2473.  (Document handed to witness.)  Do you have

20          that?

21      A. I do.

22  156  Q. This is an e-mail dated October 21, 2002, from James Haber

23          addressed to "Martin" forwarding a pro forma invoice from

24          Trilogy Investments Limited to RSM McGladrey, totalling

25          $1,053,750 for the three 2002 FDIS transactions, Dennis

26          Theis, Crawford/McNicholas and Link in the following

27          amounts: With respect to Crawford/McNicholas, the size

28          being $12,000,000, and the fee being $300,000.  With respect

29          to Dennis Theis, the size being $15,150,000, and the fee

30          being $378,750.  And with respect to Link, the size being

1          $15,000,000, and the fee being 375,000.  The total fees are

2          noted as $1,053,750.  Did you receive a copy of this e-mail

3          and pro forma invoice from James Haber on or about October

4          21, 2002?

5     A.  From the exhibit, that appears to be the case.

6   157   Q.  Now being handed to you, Mr. Hawkes, is Government Exhibit

7          2466.  (Document handed to witness.)  Do you have that?

8     A.  I do.

9   158   Q.  This is an e-mail dated October 25, 2002, from James Haber

10         to Ronald Wainwright at RSM McGladrey, with an attached

11         copy invoice dated October 16, 2002, from Trilogy

12         Investments Limited to RSM McGladrey in the amount

13         $1,053,750 for the three 2002 FDIS transactions of

14         D. Theis, Crawford/McNicholas and the Link family.  Did

15         Trilogy Investments Limited send RSM McGladrey a copy of

16         the attached invoice at or near the time of the occurrence

17         of the matters set forth in that document?

18    A.  From the exhibit, that appears to be the case.

19  159   Q.  Did Trilogy Investments Limited receive a payment in the

20         amount of $1,053,750 from RSM McGladrey on or about the 17

21         December, 2002, with respect to this invoice, Government

22         Exhibit 2466 which you have?

23    A.  From the exhibit, I can see an invoice was raised in

24         October.  As to a receipt in December, I cannot say.

25  160   Q.  Can you look at the Government Exhibit 2466.  If you don't

26         have it in front of you, I can give you another copy?

27    A.  Yes, I have that.

28  161   Q.  When was it received?

29    A.  This is an exhibit which is sent from James Haber to Ronald

30         Wainwright --

| | | |
|---|---|---|
| 1 | 162 | Q. I am sorry, when was the payment received? |
| 2 | | A. I can't speak to that. I don't have any evidence on this |
| 3 | | exhibit to support when a payment was received. |
| 4 | 163 | Q. You are now being handed a document marked as Government |
| 5 | | 2476. (Document handed to witness.) Do you have that? |
| 6 | | A. I do. |
| 7 | 164 | Q. This is an e-mail segment dated 24 January, 2003, from |
| 8 | | James Haber to Phil Kampf which references that a second |
| 9 | | invoice was sent by Trilogy Investments Limited to RMS |
| 10 | | McGladrey by fax on or about the 26th December, 2002, in |
| 11 | | the amount of $477,500. Did Trilogy Investments Limited |
| 12 | | issue a second invoice to RMS McGladrey by fax dated 26 |
| 13 | | December, 2002, in the amount of $477,500? |
| 14 | | A. That appears to be the case. |
| 15 | 165 | Q. Was this second invoice in the amount of $477,500, which is |
| 16 | | marked as Government Exhibit 2476, with respect to the 2002 |
| 17 | | FDIS transactions for William Theis, Erb, Whiteside and |
| 18 | | Weiss, as in the following amounts as listed in 2465 |
| 19 | | Government Exhibit, which I think you have in front of you. |
| 20 | | You might want to look at that. And on the document, we |
| 21 | | can see that with respect to the 2002 FDIS transactions |
| 22 | | relative to William Theis, the gross size is $3,500,000, |
| 23 | | and the fee is $65,000. With respect to Erb, $6,500,000 as |
| 24 | | the gross size, and a fee of $87,500. With respect to |
| 25 | | Whiteside, the gross size is $7,000,000, and the fee is |
| 26 | | $175,000. And with respect to Weiss, the gross size is |
| 27 | | $5,000,000, and the fee is $150,000, and the total fees |
| 28 | | indicated is $477,500. |
| 29 | | A. That appears to be the case. |
| 30 | 166 | Q. Did Trilogy Investments Limited receive a payment with |

```
 1            respect to the second invoice from RSM McGladrey on or

 2            about the 28th January, 2003, in the amount of $477,500?

 3        A.  I don't know.

 4   167  Q.  I think you have in front of you Government Exhibit 2472?

 5        A.  Yes.

 6   168  Q.  This is an e-mail dated 23 September, 2002, from James

 7            Haber to Ivan Ross of Alpha, to which is attached an

 8            updated account for Alpha.  The attached updated account

 9            listed for a line expense 2002 Irish contributions in the

10            amount of $144,970.  Do you know if this line item relates

11            to the capital contributions being made by Mahoney, Hawkes

12            and/or Trilogy Investments Limited to the 2002 FDIS

13            transactions?

14        A.  I don't know.

15   169  Q.  You are now being handed another document marked as

16            Government Exhibit 2478.   (Document handed to witness.)   Do

17            you have that?

18        A.  Yes.

19   170  Q.  This is an e-mail dated October 31, 2002, from Elizabeth

20            Jung of DGI regarding a conversation with Sam in reference

21            to Martin's and Trilogy's contributions to LF Investments

22            2002 LLC, which appears to reflect that the H&M joint

23            venture account was used to make capital contributions to

24            the 2002 FDIS transactions by you and Trilogy Investments

25            Limited.   Does that e-mail accurately reflect the substance

26            of a conversation between Elizabeth Jung and Sam Mahoney on

27            or about October 31, 2002?

28        A.  I have no knowledge of such a conversation.

29   171  Q.  Can I now show you a document marked Government Exhibit

30            2471.   (Document handed to witness.)   Do you have that?
```

1          A. I do.

2     172  Q. And this is a chain e-mail dated 31 October, 2002, from

3             Martin Hawkes to James Haber, with a subject "Alpha fees,"

4             in which you state, or stated:  "I presume the basis points

5             are priced off the amount of the profit being sheltered,

6             i.e. 60 BPS equals roughly EUR315,000?  It's not clear from

7             your fax whether the fee has been negotiated or is still in

8             negotiation?  If not completed, why not suggest plus or

9             minus 15 BPS or the usual 30 BPS, depending on whether the

10            refund is received?"

11

12            And then in response by e-mail from Haber to BFL, Haber

13            stated:  "You assume correctly that it is 60 basis points

14            off of the loss generated.  I have already agreed to the

15            terms unless you violently object.  I thought a 50% hair

16            cut versus a doubling of the fee is fair."

17

18            Did you send this e-mail to James Haber on the 31 October,

19            2002, and did you receive this e-mail in response from

20            James Haber?

21         A. Yes.

22    173  Q. I am now showing you another document which is marked as

23            Government Exhibit 2474, and it's an e-mail dated December

24            6, 2002, from you of Biosphere Finance Limited to James

25            Haber, asking inter alia "When should we do a reckoning on

26            fees in relation to the fund structures, Irish companies

27            and transactions?"  Sorry, if I could just read out the

28            question again from the e-mail:  "When should we do a

29            reckoning on fees in relation to the fund structures, Irish

30            companies and Trilogy transactions?"  Did you send the

```
 1                    e-mail marked as Government Exhibit 2474 at or near the
 2                    time of the occurrence of the matters set out therein in
 3                    the course of your regularly conducted business activities?
 4          A. Yes.
 5    174   Q. Does the reference to Trilogy transactions in Government
 6                    Exhibit 2474 include the 2002 FDIS transactions?
 7          A. On balance, I don't believe it does.
 8    175   Q. The following questions -- just to go back to the last
 9                    answer you gave, when you said "On balance, I don't believe
10                    it does."  Could you explain that answer?
11          A. I believe that there were other transactions involving
12                    Trilogy, and I believe that in the context of this e-mail,
13                    I was not referring to the 2002 FDIS transactions of
14                    Trilogy.
15    176   Q. The next questions which are identified in draft in the
16                    aide-memoire have a strike through them.  The strike
17                    through is to be ignored and we'll proceed as if there were
18                    no strike through, just for the purposes of evidence with
19                    these documents.
20
21                    You are now being handed a document which is marked as
22                    Government Exhibit 2479, and this is an e-mail from Ron
23                    Buesinger dated April 29, 2003, with a subject line "Fees,"
24                    which states that he has been asked on behalf of Alpha
25                    Consultants to invoice Trilogy Investments Limited in the
26                    sum of $237,000.  Do these fees relate to the 2002 FDIS
27                    transactions?
28          A. I don't know.
29    177   Q. Now being handed to you is another document which is marked
30                    as Government Exhibit 2480.  (Document handed to witness.)
```

Doyle Court Reporters Ltd.

1    Do you have that?

2    A. Yes.

3  178 Q. This is an invoice and it's dated April 29, 2003, from

4    Alpha Consultants to Trilogy Investments Limited in the

5    amount of $297,490.  Did Trilogy Investments Limited

6    receive this invoice from Alpha Consultants at or near the

7    time of the date of the invoice in the course of its

8    regularly conducted business activities?

9    A. We do not have access to relevant books and records, thus

10    we are not in a position to verify the accuracy of this

11    information.

12  179 Q. Did Trilogy Investments Limited make a payment to Alpha

13    Consultants on or about the 5th July, 2003, in the amount

14    of $297,490?

15    A. We do not have access to relevant books and records, thus

16    we are not in a position to verify the accuracy of this

17    information.

18  180 Q. And could I just ask you to confirm in your reply to the

19    two previous questions, can you confirm that you can answer

20    for yourself, instead of using the personal pronoun "We"

21    that you can use "I"?

22    A. I am happy to.

23  181 Q. You might do in respect to the two following questions.

24    A. Yes.

25  182 Q. Was the payment of $297,490 from Trilogy Investments

26    Limited to Alpha Consultants with respect to the 2002 FDIS

27    transactions?

28    A. I do not have access to relevant books and records, thus I

29    am not in a position to verify the accuracy of this

30    information.

1    183    Q. Did Trilogy Investments Limited make any prior payments to
2              Alpha Consultants with respect to the 2002 FDIS
3              transactions, and if so, in what amounts?
4          A. I do not have access to relevant books and records, thus I
5              am not in a position to verify the accuracy of this
6              information.
7    184    Q. You are now being handed another document, Mr. Hawkes,
8              which is marked as Government Exhibit 2481.  Do you have
9              that?
10         A. Yes.
11   185    Q. This is an account statement for Helios Financial LLC, and
12             it's dated May 2002, which reflects that on the 9 May,
13             2003, Trilogy Investments Limited wired Helios the sum of
14             -- sorry, I gave you the wrong date of the account
15             statement.  It's an account statement and it's dated May
16             2003, not 2002, which I stated in my question.  In any
17             event, it's reflecting that on the 9th May, 2003, Trilogy
18             Investments Limited wired Helios the sum of $732,245.  Did
19             Trilogy Investments Limited make a payment to Helios
20             Financial on or about the 5th July, 2003, in the amount of
21             $732,245 to Helios Financial?
22         A. I do not have access to relevant books and records, thus I
23             am not in a position to verify the accuracy of this
24             information.
25   186    Q. Was the payment of $732,245 from Trilogy Investments
26             Limited to Helios Financial with respect to the 2002 FDIS
27             transactions?
28         A. I do not have access to relevant books and records, thus I
29             am not in a position to verify the accuracy of this
30             information.

1    187   Q. Did you have any communication in 2001 and 2002 concerning

2           the development, marketing and/or implementation of FDIS

3           with any of the agents or employees of Biosphere Finance

4           Limited while serving in the role of foreign partner?  And

5           you might answer for yourself?

6       A. I am an owner and director of BFL.  I used the offices of

7           Biosphere Finance Limited as well as its e-mail address for

8           purposes of sending and receiving communications with

9           respect to the FDIS strategy and the implementation of the

10          FDIS transactions.

11   188   Q. Did you have any communications in 2001 and 2002 concerning

12          the development, marketing and/or implementation of FDIS

13          with any of the agents or employees of Diversified Group

14          Incorporated while serving in the role of foreign partner?

15      A. I certainly spoke with and exchanged e-mail with

16          representatives of DGI with respect to the FDIS strategy

17          and the implementation of the FDIS transactions.

18   189   Q. Did you have any communications in 2001 and 2002 concerning

19          the development, marketing and/or implementation of FDIS

20          with any of the agents or employees of Ailesbury Finance

21          LLC while serving in the role of foreign partner?

22      A. No.

23   190   Q. You have testified that Maddox Limited and Kilsture Limited

24          were appointed as your agents for the purpose of

25          implementing the FDIS transactions.  With whom did you

26          communicate at Kilsture Limited?

27      A. I communicated with representatives of Singer & Friedlander

28          with respect to the implementation of the FDIS transactions

29          through Kilsture Limited.

30   191   Q. You have also testified that Maddox Limited and Kilsture

```
 1                 Limited were appointed as your agents for the purposes of
 2                 implementing the FDIS transactions.  With whom did you
 3                 communicate at Maddox?
 4            A. I communicated with representatives of Singer & Friedlander
 5                 with respect to the implementation of the FDIS transactions
 6                 through Maddox Limited.
 7     192    Q. Did you have any communication in 2001 and 2002 concerning
 8                 the development, marketing and/or implementation of FDIS
 9                 with any of the agents or employees of Helios Finance LLC
10                 while serving in the role of foreign partner?
11            A. I think I'll respond to this in the plural since I can't be
12                 certain on my own behalf.  Yes, we, Sam or I, spoke with
13                 and exchanged e-mail with representatives of Helios
14                 Financial LLC with respect to the FDIS strategy and the
15                 implementation of the FDIS transactions.
16     193    Q. And did you have any communications in 2001 and 2002
17                 concerning the development, marketing and/or implementation
18                 of the FDIS with any of the agents or employees of United
19                 Acquisitions LLC while serving in the role of a foreign
20                 partner?
21            A. No.
22     194    Q. Did you have any communication in 2001 and 2002 concerning
23                 the development, marketing and/or implementation of FDIS
24                 with any of the agents or employees of Alpha Consultants
25                 LLC and Alpha Trading LLC while serving in the role of
26                 foreign partner?
27            A. Again, I'll reply in the plural, since I am not sure I had
28                 direct communication myself.  We certainly spoke with and
29                 exchanged e-mail with representatives of Alpha with respect
30                 to the FDIS strategy and the implementation of the FDIS
```

1           transactions.

2    195    Q. And did you have any communication in 2001 and 2002

3              concerning the development, marketing and/or implementation

4              of FDIS with any of the agents or employees of Refco?

5           A. Again, I will reply in the plural.  We certainly spoke with

6              and exchanged e-mails with representatives of Refco with

7              respect to the FDIS strategy and the implementation of the

8              FDIS transactions.

9    196    Q. And did you have any communication in 2001 and 2002

10             concerning the development, marketing and/or implementation

11             of FDIS with any of the agents, or employees of Sidley

12             Austin (formerly known as Sidley Austin Brown & Wood)?

13          A. I have no recollection of communicating with any

14             representatives of the law firm of Sidley Austin Brown &

15             Wood concerning the FDIS strategy, the implementation of

16             the FDIS transactions or any representations concerning the

17             FDIS transactions.

18   197    Q. Did you have any communications in 2001 and 2002 concerning

19             the development, marketing and/or implementation of FDIS

20             with any of the agents or employees of Proskauer Rose LLP?

21          A. I have no recollection of any communication, of any oral

22             communication with any representatives of the law firm of

23             Proskauer Rose regarding the FDIS strategy, the

24             implementation of FDIS transactions or any representations

25             concerning the FDIS transactions.

26   198    Q. Did you have any communications in 2001 and 2002 concerning

27             the development, marketing and/or implementation of FDIS

28             with any of the agents or employees of Lord Bissell and

29             Brook?

30          A. I have no recollection of communicating with any

Doyle Court Reporters Ltd.

```
 1              representatives of the law firm of Lord Bissell and Brook
 2              regarding the FDIS strategy, the implementation of FDIS
 3              transactions or any representations concerning the FDIS
 4              transactions.
 5     199   Q. Did you have any communication in 2001 and 2002 concerning
 6              the development, marketing and/or implementation of FDIS
 7              with any of the agents or employees of Bryan Cave?
 8          A. I have no recollection of communicating with any
 9              representatives of the law firm of Bryan Cave regarding the
10              FDIS strategy, the implementation of the FDIS transactions
11              or any representations concerning the FDIS transactions.
12     200   Q. In 2001 and 2002, did you have any communications
13              concerning the development, marketing and/or implementation
14              of FDIS with any of the agents or employees of Brown
15              Raysman?
16          A. I have no recollection of communicating with any
17              representatives of the law firm of Brown Raysman regarding
18              the FDIS strategy, the implementation of the FDIS
19              transactions or any representations concerning the FDIS
20              transactions.
21     201   Q. Did you have any communication in 2001 and 2002 concerning
22              the development, marketing and/or implementation of FDIS
23              with any of the agents or employees of KPMG, whether in the
24              USA, Ireland or the Isle of Man?
25          A. I have no recollection of communicating with any
26              representatives of the accounting firm of KPMG in the
27              United States regarding the FDIS strategy or the
28              implementation of the FDIS transactions, other than perhaps
29              in Ireland in connection with a Biosphere audit.
30     202   Q. And did you have any communication in 2001 and 2002
```

Doyle Court Reporters Ltd.

```
 1              concerning the development, marketing and/or implementation
 2              of FDIS with any of the agents or employees of Grant
 3              Thornton?
 4          A.  I have no recollection of communicating with any of the
 5              representatives of Grant Thornton Man regarding the FDIS
 6              strategy or the implementation of the FDIS transactions.
 7     203  Q.  And did you have any communications in 2001 and 2002
 8              concerning the development, marketing and/or implementation
 9              of FDIS with any of the agents or employees of RSM
10              McGladrey?
11          A.  We have no recollection of communicating with any of the
12              representatives of the accounting firm of RSM McGladrey
13              regarding the FDIS strategy or the implementation of the
14              FDIS transactions.
15     204  Q.  And did you have any communications in 2001 and 2002
16              concerning the development, marketing and/or implementation
17              of the FDIS with any of the agents or employees of BDO
18              Seidman LLP?
19          A.  I have no recollection of communicating with any of the
20              representatives of the accounting firm BDO Seidman
21              regarding the FDIS strategy or the implementation of the
22              FDIS transactions.
23     205  Q.  Did you have any communications in 2001 and 2002 concerning
24              the development, marketing and/or implementation of FDIS
25              with any of the agents or employees of Trilogy Investments
26              Limited?
27          A.  Yes.
28     206  Q.  Did you have any communication in 2001 and 2002 concerning
29              the development, marketing and/or implementation of FDIS
30              with any of the agents or employees of Trilogy Financial
```

    1              Products Limited?

    2         A. No.

    3    207  Q. And did you have any communication in 2001 and 2002

    4              concerning the development, marketing and/or implementation

    5              of FDIS with any of the agents or employees of Trilogy

    6              Financial Investments Limited?

    7         A. No.

    8    208  Q. Do you have any other documents which memorialise the role

    9              played by any of these entities?

   10         A. Other than the ledger which was produced, now marked as

   11              Government Exhibit 2463, I do not have possession or

   12              control of any response of documents.

   13    209  Q. If you could answer the next final two questions in the

   14              first person, please.  Did you ever provide any factual

   15              representations with respect to Egan, to the Egan FDIS

   16              transaction?

   17         A. Not that I am aware of.

   18    210  Q. And were you ever asked to provide any factual

   19              representations with respect to the Egan FDIS transaction?

   20         A. Not that I am aware of.

   21

   22              MR. MacEOCHAIDH:  Thank you, Mr. Hawkes.

   23

   24              THE WITNESS WAS CROSS-EXAMINED BY MR. REICHERT AS FOLLOWS:

   25

   26    211  Q. MR. REICHERT:  Mr. Hawkes, I have your bio, your CV in

   27              front of me.  Just tell me a bit about yourself.

   28

   29              MR. MacEOCHAIDH:  Maybe we could all get a copy of it.

   30

1        MR. REICHERT:  It's your exhibit.

2

3        MR. MacEOCHAIDH:  I have just sat down.  Remind me where it

4        is.  And if you are going to refer to -- you might just

5        refer to exhibit numbers for the record.  Thank you.

6

7        MR. REICHERT:  2451.

8

9        JUDGE DUNNE:  It's Exhibit Number 2451.

10

11       MR. REICHERT:  Yes.

12  212  Q. It says you have a B.Com and an MBA.  Where did you get

13        those qualifications?

14       A. UCD.

15  213  Q. UCD for both?

16       A. Yes.

17  214  Q. Same as myself, UCD.  Tell me, you were, from 1973 to 1976,

18        in the Ministry of Lands.  What role did you play there?

19       A. I had the lowly grades of CO and EO.

20  215  Q. Was that from college or did you go to college at the same

21        time?

22       A. I went to college at the same time.

23  216  Q. And then you went, from 1976 to 1982, you went to the

24        Department of Finance?

25       A. Correct.

26  217  Q. And what did you do during that period?

27       A. I became, again, in the gradation of the Civil Service, an

28        AO and an AP dealing with monetary policy, exchange rate

29        policy and international monetary policy insofar as Ireland

30        has an input into these grand designs.

1

2           JUDGE DUNNE:  Mr. Hawkes, just to assist Judge Saylor,

3           perhaps you'd expand the function of an AP and an AO, so

4           that in American terms he might understand the rank and

5           functions and level as a civil servant.

6    A.  I do not know what the comparable gradations would be in

7           the US, but they would be heading up the ranks, shall we

8           say, they are heading towards the senior ranks of the Civil

9           Service in this country.

10

11   218   Q.  MR. REICHERT:  Would these be akin to Administrative

12           Assistant, Administrative Principal, that sort of thing?

13    A.  AP would be Assistant Principal, and AO would be

14           Administrative Officer.

15

16           JUDGE DUNNE:  And just after Administrative Principal, do

17           you then join the ranks known as a Secretary or Assistant

18           Secretary, is that the level --

19    A.  Next on the hierarchy would be Principal, Assistant

20           Secretary and Secretary.

21

22           JUDGE DUNNE:  So it's on the ladder?

23    A.  It's on the ladder.

24

25   219   Q.  MR. REICHERT:  We are on the ladder.

26    A.  We are on the ladder.

27   220   Q.  Correct me if I am wrong, but my own recollection is didn't

28           we break from Sterling around that time?

29    A.  I was intimately involved in all the drama of breaking with

30           Sterling.

```
 1    221   Q. And perhaps you could expand on that.  I mean, from my own
 2                recollection, we had been pegged to Sterling since the
 3                foundation of this State and then this was the great break?
 4          A. Exactly.  We joined the EMS, I think it was 1979.  The UK
 5                opted not to join, and within roughly a week of our opting
 6                to join, membership became inconsistent with maintaining
 7                the link with Sterling so we had no option but to cut that
 8                very ancient link.
 9    222   Q. And you said you were intimately involved.  That must have
10                been a busy time?
11          A. Extremely.
12    223   Q. And would you describe that as perhaps one of the most
13                important monetary events in the history of this country?
14          A. Oh, yes.  It's historic.
15    224   Q. You then went into the private sector to Bank Nationale de
16                Paris?
17          A. Correct.
18    225   Q. That was in 1982.  What did you do and where were you in
19                the hierarchy?  This was in, just tell me, was this in BNP
20                in Dublin?
21          A. Correct.
22    226   Q. Where were you in the hierarchy and what did you do?
23          A. I joined as an assistant manager and then became a manager
24                with a portfolio dealing with Semi-State corporations and
25                French subsidiaries in Ireland.
26    227   Q. And dare I ask, were you headhunted, to use a phrase that
27                was probably not around at that time, but it's certainly
28                common now?
29          A. No, civil servants were not being headhunted back then.  I
30                was setting a new trend, I suspect.  So it was my choice.
```

| 1 | 228 | Q. And then in 1986, is it true that you left BNP and you |
|---|---|---|
| 2 | | founded Shannon International Leasing which, if I am |
| 3 | | correct, was probably referred to as SIL? |
| 4 | | A. Correct, I was a co-founder. |
| 5 | 229 | Q. Who was the other co-founder? |
| 6 | | A. Cormac Crawford. |
| 7 | 230 | Q. Cormac Crawford. And much as that the only thing that you |
| 8 | | did at the time or was that -- did that take up all your |
| 9 | | time? |
| 10 | | A. That took up all my time. |
| 11 | 231 | Q. And could you give me a, and for the record, a flavour of |
| 12 | | what Shannon International Leasing was? |
| 13 | | A. I suppose we would describe it in general terms as being |
| 14 | | cross border structured finance transactions. |
| 15 | 232 | Q. In relation to what sector? |
| 16 | | A. I seem to recall there were ships involved, I am not sure |
| 17 | | if aircraft were involved, but aircraft were typical in |
| 18 | | Shannon at the time. Shipping is the one I recall at this |
| 19 | | point in time. I can't recall the precise content of some |
| 20 | | of the other transactions, because it was the asset that |
| 21 | | comes to mind. |
| 22 | 233 | Q. Was this a new type of company in Ireland at the time or |
| 23 | | were there others? |
| 24 | | A. It was comparatively new. It would have been in the |
| 25 | | general mode of GPA, but there were others of the same mode |
| 26 | | which were, I suppose, pre-cursors of the IFSC. |
| 27 | 234 | Q. So you sold that to a subsidiary of Credit Lyonnaise, which |
| 28 | | I suppose brings the circle back to France, in 1991? |
| 29 | | A. Correct. |
| 30 | 235 | Q. And from 1991 onwards there is a description in your CV |

1           that you are a promoter and majority shareholder in a

2           number of companies with a diverse range of industries and

3           subject matter investments.  Could you expand on that for

4           us, just to give a pen picture really of what it is you

5           have done since 1991?

6       A.  Well, the company which is mentioned in these proceedings,

7           Basra Finance, is one such company.  Another would be a

8           hotel company which I own and manage.  I have had a small

9           property holding, most of which has now been disposed of.

10          Internet, unfortunately, went the way of many Internet

11          businesses.  I have an involvement with education here and

12          in Africa, more as a philanthropist than anything else.  I

13          have had a shareholding and still have in a post-production

14          company which had the first, I suppose, mandate for a

15          private TV company in this country.  And what else?  I am

16          involved more in, as I say, non-commercial projects in

17          recent years; education in Africa, micro financing in

18          Eastern Europe, ecology in the west of Ireland and so on.

19          So I have got an eclectic portfolio of both commercial and

20          non-commercial interests.

21  236 Q.  One final question.  Is it true to say that you have never

22          held yourself out as a partner of Fidelity International

23          Currency Adviser LLC?

24      A.  Correct.

25

26          MR. REICHERT:  Thank you.

27

28          JUDGE DUNNE:  Mr. Lewis, do you wish to?

29

30          MR. LEWIS:  No, Judge.

1

2          JUDGE DUNNE:  Okay.  Anything arising?

3

4          MR. MacEOCHAIDH:  Judge, I wonder at this point, might I

5          apply to the Court for a very, very short adjournment to

6          take instructions from US counsel in this matter.

7

8          JUDGE DUNNE:  On what aspect?

9

10         MR. MacEOCHAIDH:  On the question as to whether I would

11         pursue a redirect -- sorry, a re-examination of the witness

12         arising on anything that may have arisen from the

13         cross-examination.

14

15         JUDGE DUNNE:  Well, just bear in mind it's ten minutes to

16         four o'clock.  We will be rising at four in any event.

17

18         MR. MacEOCHAIDH:  If I can ask for five minutes --

19

20         JUDGE DUNNE:  And give you time to consult.  Thank you.

21

22         MR. LEWIS:  Just on that point, if Mr. MacEochaidh is

23         considering a re-examination --

24

25         JUDGE DUNNE:  I think he should consult with you all.

26

27         MR. LEWIS:  He might consider, himself, the legal basis of

28         that.

29

30         JUDGE DUNNE:  It shouldn't be a mystery.  Thank you.

1

2          THE PROCEEDINGS ADJOURNED BRIEFLY AND RESUMED AS FOLLOWS:

3

4          JUDGE DUNNE:  Yes, gentlemen.

5

6          MR. MacEOCHAIDH:  Thank you, Judge.  I have no further

7          questions for Mr. Hawkes.

8

9          JUDGE DUNNE:  We are now finished, I understand, with

10         Mr. Hawkes, is that right?

11

12         MR. MacEOCHAIDH:  That's correct.

13

14         JUDGE DUNNE:  Thank you very much, Mr. Hawkes.

15

16         THE WITNESS THEN WITHDREW.

17

18         JUDGE DUNNE:  Now, in relation to the transcript and the

19         efficiency of these proceedings, will the transcript be

20         ready tomorrow so that Mr. Hawkes and his advisers can read

21         it so that we can progress the vouching of the accuracy on

22         an ongoing basis?  I think that's certainly desirable.

23

24         MR. MacEOCHAIDH:  I think the transcript will be available

25         overnight and we will ensure that Mr. Hawkes and his

26         advisors have a copy as soon as possible.  In fact, we can

27         e-mail it to him.

28

29         JUDGE DUNNE:  I think we should progress the approval of

30         the transcript rather than waiting to the last day to have

                         Doyle Court Reporters Ltd.

1        all matters verified and checked, if we can graduate it as

2        we proceed and the way matters are shaping it would appear

3        we may be complete by Thursday?

4

5        MR. MacEOCHAIDH:  I think, tomorrow, if we take Mr.

6        Mahoney, I think we'll finish tomorrow unless the Plaintiff

7        --

8

9        JUDGE DUNNE:  Well, I have to advise you all that I have a

10      commitment in the Special Criminal Court tomorrow morning;

11      it is administrative only, so it's not a hearing.  So, I

12      expect that I will be, I won't be able to preside here

13      until 11:30.  Unfortunately it's unavoidable.  I think it's

14      administrative, it's about bail conditions which, as you

15      know, must achieve immediate attention, so for that reason

16      I have to preside there with my colleagues till is 11:30.

17      That certainly loses us an hour, but if it turns out that

18      we can complete business by sitting for an extra hour

19      tomorrow evening, that will occur.

20

21      MR. MacEOCHAIDH:  There will be no difficulty with that on

22      our side, Judge.

23

24      JUDGE DUNNE:  So, tomorrow morning, gentlemen, 11:30.

25

26      MR. LEWIS:  Judge if I could just mention, for the sake of

27      clarity, the position of Mr. Hussey.  Mr. Hussey is the

28      third witness referred to in the Order.  But Mr. Hussey

29      obviously hasn't been included, from a review of that

30      question and answer transcript, as a necessary witness.

1          And --

2

3          JUDGE DUNNE:  Well, not from that transcript, but by virtue

4          of the judge's Order.

5

6          MR. LEWIS:  He certainly is, and I should say to the Court

7          that he is not here today, being anticipated that he

8          wouldn't be reached today.  I know that Mr. MacEochaidh is

9          reserving his position in relation to Mr. Hussey but I am

10         assuming that, and I understand that the Plaintiffs don't

11         have a strong view on Mr. Hussey.

12

13         JUDGE DUNNE:  What's Mr. MacEochaidh's view at this stage?

14         You are still reserving your position?

15

16         MR. MacEOCHAIDH:  Yes, Judge.  He is required to attend.

17

18         JUDGE DUNNE:  Well then, I think you could -- for his

19         convenience, you will advise him not to be here any earlier

20         than 2:15 in any event on the basis that we are not

21         commencing till 11:30.

22

23         MR. LEWIS:  Very good.  If it transpires that Mr. Hussey

24         isn't required by either of the parties, by either of the

25         Plaintiff or the Defendant to give evidence, I wonder would

26         his presence be required at all or at that point could he

27         be excused?

28

29         JUDGE DUNNE:  I'd say that this is a dynamic that may

30         evolve as the matters evolve.  As of now, I think the

Doyle Court Reporters Ltd.

1      answer is yes, he is required.  But tomorrow may evince a

2      different response; we will see.

3

4      MR. LEWIS:  Very good, Judge.

5

6      JUDGE DUNNE:  Thank you all very much.  11:30.

7

8      **THE PROCEEDINGS ADJOURNED UNTIL THE FOLLOWING DAY, 14TH**

9      **MAY, 2008.**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

## $

$1,053,750 [3] - 80:25, 61:13, 81:20
$1,140,000 [1] - 68:20
$1,302,978 [2] - 77:12, 77:13
$1,505,000 [2] - 71:25, 72:1
$12,000,000 [1] - 80:28
$144,970 [1] - 83:10
$15,000,000 [1] - 81:1
$15,150,000 [1] - 80:29
$150,000 [1] - 82:27
$175,000 [1] - 82:26
$2,000,000 [2] - 66:7, 66:9
$2,000,0000 [1] - 66:13
$237,000 [1] - 85:26
$27 [1] - 62:25
$297,490 [3] - 86:5, 86:14, 86:25
$3,500,000 [1] - 82:22
$378,750 [1] - 80:30
$380,000 [10] - 66:24, 69:7, 69:9, 69:11, 69:24, 70:8, 70:11, 72:13, 72:15, 72:17
$41,463 [6] - 78:3, 78:14, 78:15, 78:20
$477,500 [5] - 82:11, 82:13, 82:15, 82:28, 83:2
$5,000,000 [1] - 82:27
$90,000 [4] - 86:14, 66:26, 68:28, 67:5
$535,000 [1] - 71:27
$570,000 [7] - 66:21, 67:28, 67:29, 68:1, 68:16, 68:29, 69:1
$6,500,000 [1] - 82:23
$65,000 [1] - 82:23
$7,000,000 [1] - 82:25
$732,245 [5] - 87:18, 87:21, 87:25
$760,000 [1] - 66:23
$87,500 [1] - 82:24

## '

'08 [3] - 45:15, 45:16
'comity' [1] - 37:23

## 0

000 [3] - 68:26, 70:6
03-013502 [1] - 65:8
0597 [2] - 68:26, 70:6
09-002452 [1] - 57:19

## 1

1 [9] - 1:5, 7:2, 51:10,

51:16, 53:7, 65:7, 67:22, 70:6, 77:30
1,053,750 [1] - 81:2
1,140,000 [1] - 68:16
1,302,978 [1] - 77:15
10 [2] - 56:26, 72:17
100,000 [1] - 66:14
11 [2] - 58:27, 82:13
11270012 [2] - 75:5, 75:9
11270025 [2] - 75:5, 75:14
11:30 [3] - 101:13, 101:16, 101:24, 102:21, 103:6
13th [1] - 1:1
14th [1] - 103:8
15 [3] - 66:15, 67:7, 84:9
15% [2] - 65:22, 65:27
15th [1] - 68:28
18 [3] - 61:17, 81:11
17 [4] - 62:19, 64:20, 64:26, 81:20
1855 [4] - 7:3, 29:12, 29:14, 29:27
1868 [2] - 68:26, 70:6
1973 [1] - 94:17
1976 [2] - 94:17, 94:23
1979 [1] - 96:4
1982 [2] - 94:23, 96:18
1985 [1] - 97:1
1991 [3] - 97:28, 97:30, 98:5
1998 [1] - 89:17
1st [1] - 68:26

## 2

2 [1] - 59:15
2001 [33] - 56:9, 55:13, 55:15, 57:12, 57:14, 58:10, 58:11, 56:26, 59:6, 59:15, 60:24, 61:8, 61:17, 62:13, 62:19, 64:20, 84:26, 64:27, 65:1, 65:13, 65:16, 65:17, 65:25, 65:30, 70:18, 72:18, 72:30, 74:20, 74:22, 74:29, 74:30, 75:10, 75:15, 75:20, 75:29, 76:2, 76:5, 77:5, 77:17, 77:21, 78:1, 79:20, 80:10, 80:17, 88:1, 88:11, 88:18, 89:7, 89:16, 89:22, 90:2, 90:8, 90:16, 90:25, 91:5, 91:12, 91:21, 91:30, 92:7, 92:15, 92:23, 92:28, 93:3
2001-customers-haberinvst-12-31-01-r.xls [1] - 56:20
2002 [113] - 56:17, 57:20, 57:30, 58:2,

58:4, 58:10, 58:11, 58:26, 59:6, 60:24, 61:27, 61:29, 66:15, 66:22, 66:25, 66:29, 66:30, 67:7, 67:30, 68:2, 68:16, 68:27, 68:28, 69:10, 69:12, 69:25, 70:7, 70:8, 70:28, 71:9, 73:21, 74:12, 74:13, 74:16, 74:17, 75:30, 76:2, 76:18, 76:23, 77:3, 77:21, 77:30, 78:1, 78:2, 78:11, 78:13, 78:26, 78:27, 79:3, 79:4, 79:11, 79:20, 79:27, 80:6, 80:7, 80:9, 80:13, 80:15, 80:22, 80:25, 81:4, 81:9, 81:11, 81:13, 81:21, 82:10, 82:13, 82:16, 82:21, 83:6, 83:9, 83:12, 83:19, 83:22, 83:24, 83:27, 84:2, 84:19, 84:24, 85:6, 85:13, 85:26, 86:26, 87:2, 87:12, 87:16, 87:26, 88:1, 88:11, 88:18, 89:7, 89:16, 89:22, 90:2, 90:9, 90:18, 90:26, 91:5, 91:12, 91:21, 91:30, 92:7, 92:15, 92:23, 92:28, 93:3
2003 [8] - 82:7, 83:2, 83:23, 86:3, 86:13, 87:13, 87:16, 87:17, 87:20
2006 [8] - 1:1, 6:30, 8:15, 8:23, 8:29, 9:10, 9:26, 103:9
20195700 [3] - 75:5, 75:19, 75:18
20282910 [1] - 76:23
21 [2] - 80:22, 81:4
22 [1] - 70:8, 78:1
22nd [8] - 66:21, 66:24, 67:30, 68:16, 68:28, 69:10, 69:17, 69:25
23 [2] - 78:11, 83:6
23mm [1] - 62:26
23rd [2] - 74:12, 74:13
24 [3] - 1:7, 31:22, 36:25, 79:11, 82:7
2451 [3] - 55:24, 56:2, 58:5, 56:8, 94:7, 94:9
2452 [1] - 55:9
2453 [3] - 59:11, 59:14, 60:3
2454 [1] - 62:11
2455 [1] - 62:18
2456 [1] - 61:5
2457 [1] - 61:14
2458 [1] - 61:24
2459.01 [1] - 58:16

2459.48 [1] - 79:23
2459.49 [2] - 78:24, 79:24
2459.55 [1] - 58:16
2460 [4] - 58:15, 56:22, 58:7, 77:14
2451 [1] - 63:21
2452 [1] - 78:7
2463 [2] - 78:8, 93:11
2464 [2] - 76:30, 77:12
2465 [2] - 57:18, 58:8, 82:18
2466 [3] - 81:7, 81:22, 81:25
2467 [3] - 68:8, 68:22, 70:1
2468 [5] - 67:3, 68:7, 68:10, 68:12, 69:21
2469 [4] - 64:17, 64:25, 65:7, 65:22
2471 [1] - 83:30
2472 [2] - 78:8, 83:4
2473 [1] - 80:19
2474 [3] - 84:23, 85:1, 85:6
2475 [2] - 79:8, 79:16
2476 [2] - 82:5, 82:16
2478 [1] - 83:16
2479 [1] - 85:22
2480 [1] - 85:30
2481 [1] - 87:8
2482 [2] - 77:25, 78:16
25 [1] - 81:9
26 [2] - 40:24, 82:12
26th [1] - 82:10
28 [1] - 70:7
28th [2] - 68:27, 83:2
29 [2] - 85:23, 86:3
2:15 [3] - 53:6, 53:16, 102:20

## 3

3 [4] - 66:15, 66:30, 67:22, 77:3
30 [1] - 84:9
30.b.1 [1] - 42:22
300,000 [1] - 80:28
3023 [7] - 71:5, 71:29, 72:3, 72:12, 72:20, 73:8, 73:24
3024 [2] - 73:26, 74:4
3025 [1] - 67:15
31 [5] - 56:17, 83:19, 63:27, 84:2, 84:16
36 [1] - 75:20
375,000 [1] - 81:1
38% [1] - 65:12
39 [5] - 7:3, 33:15, 33:25, 33:30, 44:25, 45:26
3rd [8] - 6:30, 7:8, 8:22, 13:22, 66:22, 66:25, 68:2, 69:12

## 4

40% [1] - 70:17
43 [3] - 33:16, 33:25, 44:8, 44:25, 45:26
47 [1] - 57:7
49 [1] - 1:5
4mm [1] - 62:27

## 5

5 [4] - 55:13, 61:8, 61:27, 78:26
50% [1] - 84:15
50,000 [2] - 65:23, 65:27
55 [2] - 58:11, 58:25
5th [2] - 86:13, 87:20

## 6

6 [1] - 84:24
60 [2] - 84:6, 84:13
60% [1] - 70:17
60:40 [1] - 70:16
6th [1] - 8:14

## 7

7 [1] - 70:27
7th [4] - 8:29, 9:10, 9:25, 71:9

## 9

9 [1] - 87:12
93 [1] - 1:7
9545-40035729 [1] - 70:10
9545-40041974 [2] - 68:30, 69:2
9545-435729 [1] - 70:12
99.9% [1] - 52:15
9th [1] - 87:17

## A

able [3] - 28:24, 40:22, 101:12
absence [4] - 12:11, 44:27, 44:28, 45:8
absolutely [4] - 22:30, 25:26, 34:13, 38:4
Absolutely [3] - 24:21, 28:18, 28:20
abundance [1] - 45:18
acceded [1] - 13:5
accept [8] - 12:13, 14:17, 21:13, 34:20, 42:4
accepted [1] - 14:11
accepts [1] - 35:11
access [12] - 33:5, 75:6, 75:11, 75:17, 75:22, 78:5, 86:9, 86:15, 86:28, 87:4,

FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 1 - 13/05/08

2

87:22, 87:28
accompanied [1] - 3:28
accompany [4] - 23:30, 28:22, 27:30, 39:12
accordance [4] - 20:22, 34:15, 38:1, 60:18
according [2] - 31:10, 38:7
accordingly [1] - 46:5
account [26] - 60:2, 70:6, 70:12, 73:7, 74:19, 75:4, 75:9, 75:14, 75:19, 76:3, 76:4, 76:14, 76:17, 76:22, 78:13, 80:10, 80:17, 83:8, 83:23, 87:11, 87:14, 87:15
accounting [3] - 91:26, 92:12, 92:20
accounts [12] - 72:26, 72:29, 74:21, 74:26, 74:28, 74:30, 75:4, 75:25, 75:27, 75:29, 76:12, 76:27
accuracy [11] - 75:7, 75:12, 75:18, 75:23, 86:10, 86:16, 86:29, 87:5, 87:23, 87:29, 100:21
accurate [1] - 66:5
accurately [2] - 77:15, 83:25
achieve [1] - 101:15
Acquisitions [8] - 67:1, 67:20, 67:21, 68:3, 69:13, 89:19
Act [6] - 7:3, 29:11, 29:27, 38:17, 39:4, 44:2
act [1] - 29:12
acting [2] - 20:26, 44:17
activated [1] - 46:14
activities [3] - 71:18, 85:3, 86:8
ad [1] - 36:27
added [1] - 18:15
addition [1] - 11:16
address [8] - 25:13, 25:25, 32:21, 61:28, 79:18, 88:7
addressed [2] - 79:17, 80:23
adhered [1] - 60:20
Adj [1] - 77:14
adjacent [1] - 72:9
Adjourned [4] - 52:28, 53:19, 100:2, 103:8
adjournment [1] - 99:5
adjusted [1] - 77:16
Administration [1] - 67:12
administration [1] -

43:21
Administrative [4] - 95:11, 95:12, 95:14, 95:16
administrative [3] - 53:3, 101:11, 101:14
admissibility [1] - 17:4
admonition [2] - 21:13, 42:4
advanced [4] - 53:15, 71:26, 71:27, 72:1
advice [1] - 32:29
advise [2] - 101:9, 102:19
advised [1] - 32:9
Adviser [1] - 96:23
advisers [1] - 100:20
Advisory [1] - 3:6
advisors [1] - 100:26
Affairs [4] - 7:19, 10:14, 10:17, 34:27
affect [1] - 9:10
affected [1] - 37:10
affidavit [2] - 20:8, 20:10
afraid [1] - 34:20
Africa [2] - 98:12, 98:17
afternoon [6] - 40:20, 45:30, 49:5, 49:6, 54:3
Agency [1] - 67:12
agenda [1] - 17:16
agents [23] - 64:4, 76:2, 88:3, 88:13, 88:20, 88:24, 89:1, 89:9, 89:18, 89:24, 90:4, 90:11, 90:20, 90:28, 91:7, 91:14, 91:23, 92:2, 92:9, 92:17, 92:25, 92:30, 93:5
aggregate [1] - 66:10
agree [3] - 15:26, 55:20, 59:23
agreeable [1] - 8:16
agreed [14] - 3:14, 9:16, 11:2, 11:18, 11:27, 11:30, 12:1, 15:9, 18:12, 31:16, 32:30, 65:16, 70:16, 84:14
agreeing [1] - 21:6
agreement [11] - 9:17, 9:20, 10:3, 10:7, 10:9, 10:15, 12:9, 12:11, 15:21, 63:24, 63:29
aid [1] - 11:19
Aide [1] - 51:10
akin [8] - 11:22, 18:6, 49:10, 49:15, 49:16, 49:24, 50:23, 51:8, 85:16
Aide-memoire [1] - 51:10

aide-memoire [5] - 11:22, 18:6, 49:10, 49:15, 49:16, 49:24, 50:23, 51:8, 85:16
Ailesbury [15] - 71:27, 72:2, 72:4, 72:23, 72:25, 73:4, 73:7, 73:18, 73:20, 73:30, 74:11, 74:13, 88:20
aircraft [2] - 97:17
akin [1] - 95:11
alia [1] - 84:25
allegations [1] - 28:9
alleged [1] - 36:14
allow [5] - 38:16, 38:20, 44:21, 45:7
allowed [1] - 35:20
allows [1] - 38:25
almost [1] - 53:11
Alpha [26] - 56:18, 57:19, 64:21, 65:8, 77:4, 77:10, 78:12, 78:19, 78:21, 78:29, 79:6, 83:7, 83:8, 84:3, 85:24, 88:4, 88:6, 86:12, 86:26, 87:2, 89:24, 89:25, 89:29
Alpha-disk [2] - 57:19, 65:8
alternating [1] - 59:8
amended [6] - 18:10, 19:25, 21:6, 30:4
amending [1] - 9:7
amendments [1] - 9:9
America [8] - 2:20, 4:8, 13:5, 32:29, 35:26, 43:24, 68:26, 70:5
American [7] - 3:5, 8:5, 8:15, 8:16, 20:29, 24:24, 95:4
amount [55] - 64:2, 64:9, 64:12, 64:14, 65:3, 65:11, 65:13, 65:17, 66:1, 66:6, 66:8, 86:11, 67:6, 68:15, 68:29, 69:24, 70:8, 72:10, 72:13, 77:13, 77:15, 77:18, 78:14, 81:12, 81:20, 82:11, 82:13, 82:15, 83:2, 83:10, 84:5, 86:5, 86:13, 87:20
amounts [5] - 70:14, 70:15, 72:10, 80:27, 82:18, 87:3
ample [1] - 45:23
analyse [1] - 69:3
Analysis [2] - 65:8, 65:21
ancient [1] - 96:3
answer [16] - 11:23, 22:20, 24:11, 26:21, 67:13, 85:9, 85:10, 86:19, 86:5, 93:13, 101:30, 103:1

answers [8] - 11:19, 11:24, 15:27, 16:27, 17:17, 18:3, 22:10
anticipated [1] - 102:7
Aoy [3] - 94:28, 95:3, 95:13
Ap [3] - 94:28, 95:3, 95:13
apologies [1] - 72:16
appear [14] - 1:15, 1:20, 2:11, 2:17, 2:19, 9:12, 20:14, 45:27, 57:13, 58:2, 70:13, 75:8, 76:24, 101:2
applicant [1] - 34:26
Applicants [3] - 1:12, 1:23, 34:23
application [14] - 7:11, 8:23, 8:24, 9:13, 10:23, 12:27, 15:27, 15:29, 20:6, 31:17, 31:26, 34:26, 43:23, 46:6
apply [4] - 22:20, 39:5, 63:17, 99:5
applying [1] - 9:8
appointed [4] - 64:4, 76:1, 88:24, 89:1
appreciate [2] - 33:3, 34:10
appreciative [1] - 27:19
approach [3] - 3:18, 12:17, 36:29
approaching [1] - 3:15
appropriate [5] - 17:9, 25:14, 27:13, 30:27, 31:30, 35:11, 36:27, 53:6
approval [1] - 100:29
April [5] - 55:13, 78:1, 78:26, 85:23, 86:3
Archain [1] - 35:26
area [1] - 46:29
arguably [1] - 28:2
argue [1] - 17:14
argued [1] - 45:26
argument [1] - 42:10
arguments [2] - 37:5, 44:11
arisen [1] - 99:12
arising [3] - 99:2, 99:12
arose [1] - 31:19
arranged [1] - 28:7
arrangement [3] - 11:6, 11:17, 56:27
arrangements [2] - 31:21, 77:9
Article [1] - 40:24
aside [2] - 6:24, 10:24
aspect [2] - 24:1, 99:8
aspects [1] - 84:5
asset [1] - 97:20

assigned [1] - 59:2
assist [4] - 22:1, 24:10, 33:7, 95:2
assistance [9] - 8:1, 8:18, 19:10, 32:1, 34:29, 43:24
Assistant [4] - 95:12, 95:13, 95:17, 95:19
assistant [1] - 96:23
associated [1] - 60:17
assume [7] - 33:9, 46:14, 59:4, 63:19, 71:10, 71:15, 84:13
assuming [3] - 50:6, 51:15, 102:10
Assuming [1] - 59:22
assure [1] - 51:28
attached [13] - 56:22, 57:5, 57:8, 62:17, 65:21, 77:4, 77:30, 78:12, 79:12, 81:10, 81:16, 83:7, 83:8
attachment [8] - 61:21, 61:22, 62:1, 62:2, 65:7, 65:11
attachments [5] - 61:11, 61:12, 64:22, 64:23, 65:6
attackers [1] - 36:14
attend [2] - 32:15, 102:16
attendance [2] - 19:13, 32:13
attention [2] - 52:13, 101:15
attitude [3] - 12:2, 12:5, 34:30
attorney [2] - 4:5, 42:18
Attorney [9] - 39:16, 39:20, 39:24, 40:1, 40:13, 40:30
attorneys [1] - 3:20
attract [1] - 16:23
audience [1] - 8:13
audio [2] - 35:12, 40:15
audio-visually [1] - 35:12
audit [1] - 91:29
Augustus [1] - 2:18
Austin [3] - 90:12, 90:14
authorities [2] - 7:18, 33:7
authority [8] - 7:28, 10:21, 20:27, 28:14, 29:28, 31:30
automatic [1] - 36:22
available [4] - 36:25, 37:1, 47:27, 100:24
avoid [1] - 27:16
aware [14] - 6:23, 7:28, 21:26, 38:24, 38:27, 40:15, 40:28, 45:17, 48:2, 49:12,

FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 1 - 13/05/08

63:7, 78:19, 93:17, 93:20

**B**

B.com [1] - 94:12
background [1] - 36:23
backtrack [1] - 31:23
bail [1] - 101:14
balance [3] - 71:26, 85:7, 85:9
bank [10] - 68:25, 69:2, 70:5, 70:12, 74:20, 74:26, 74:28, 74:30, 75:1, 76:14
Bank [5] - 68:25, 68:30, 70:5, 70:10, 96:15
barrister [3] - 2:8, 2:11, 2:25
based [2] - 12:19, 55:20
basis [13] - 30:4, 37:21, 37:23, 51:15, 59:8, 70:16, 77:15, 77:16, 84:4, 84:13, 99:27, 100:22, 102:20
Basra [1] - 98:7
Bates [1] - 65:7
Bdo [3] - 62:14, 92:17, 92:20
bear [2] - 32:23, 98:15
bearing [4] - 68:30, 69:18, 70:9, 70:12
became [3] - 94:27, 95:6, 96:23
beg [1] - 72:16
begin [4] - 3:17, 29:1, 29:7, 54:6
begins [3] - 13:23, 19:7, 49:9
behalf [24] - 1:15, 1:20, 1:21, 2:11, 2:17, 2:19, 7:23, 7:26, 8:15, 8:25, 11:7, 13:27, 19:14, 19:20, 67:19, 71:17, 73:30, 77:17, 77:18, 80:12, 80:15, 85:24, 89:12
belittle [1] - 43:8
benne [1] - 38:19
best [4] - 6:19, 33:4, 33:10, 36:30
better [3] - 1:28, 33:12, 50:8
between [9] - 8:27, 10:9, 10:23, 11:28, 11:30, 12:12, 45:17, 51:19, 83:26
Bfi [10] - 56:9, 56:12, 61:9, 61:18, 66:14, 66:27, 67:6, 67:21, 84:12, 88:6
Bfi@indigo.ie [1] -

81:28
bias [1] - 16:23
big [1] - 24:4
bio [2] - 56:4, 93:26
biography [3] - 55:28, 56:1, 56:7
Biosphere [6] - 56:9, 56:10, 84:24, 88:3, 88:7, 91:29
Bissell [2] - 90:28, 91:1
bit [8] - 42:10, 66:18, 93:27
Bnt.bk.isle [1] - 66:30
Bnp [2] - 66:19, 97:1
Bnt.bk.isle [1] - 70:10
books [11] - 75:6, 75:12, 75:16, 75:22, 78:25, 86:9, 86:15, 86:28, 87:4, 87:22, 87:28
border [1] - 97:14
bound [3] - 4:17, 6:4, 6:7, 12:9, 46:3
bowling [1] - 33:13
Bps [2] - 84:6, 84:9
break [2] - 95:28, 96:3
breakdowns [1] - 59:21
breaking [1] - 95:29
brief [2] - 21:30, 41:28
Briefly [2] - 52:28, 100:2
briefly [1] - 42:13
bring [2] - 24:11, 32:23
bringing [1] - 10:23
brings [2] - 31:23, 97:28
broad [2] - 11:16, 35:5
broadcast [1] - 40:26
Brook [2] - 90:29, 91:1
brought [1] - 20:6
Brown [5] - 62:20, 90:12, 90:14, 91:14, 91:17
Bryan [2] - 91:7, 91:9
Buesinger [4] - 56:18, 77:4, 77:29, 85:23
bundle [3] - 23:4, 23:16, 26:4
business [7] - 71:18, 71:21, 74:5, 79:19, 85:3, 86:8, 101:16
businesses [1] - 98:11
busy [1] - 96:10
buy [5] - 63:6, 63:10, 63:12, 63:14, 63:24
buy-out [1] - 63:6
buy-sell [3] - 63:10, 63:14, 63:24

**C**

cake [1] - 42:8

camera [5] - 6:9, 7:9, 9:1, 9:3, 38:25, 48:2
cannot [4] - 39:7, 45:25, 78:6, 81:24
canvassed [3] - 31:16, 44:10, 44:12
capital [13] - 60:21, 63:15, 70:22, 70:25, 74:17, 74:21, 74:23, 80:5, 80:8, 80:11, 80:14, 83:11, 83:23
Capital [1] - 62:26
captioned [1] - 32:3
Caputo [1] - 61:19
carried [1] - 58:10
carry [1] - 40:22
case [18] - 10:16, 27:1, 30:19, 34:1, 41:2, 58:27, 81:5, 81:16, 82:14, 82:29
cases [1] - 38:10
categories [2] - 13:28, 14:10
category [5] - 11:9, 11:15, 13:1, 13:2, 14:12, 14:14
Cave [2] - 91:7, 91:9
caveat [2] - 65:23, 65:27
certain [11] - 3:18, 4:11, 9:12, 11:19, 13:1, 13:2, 36:7, 53:11, 65:18, 78:12, 89:12
certainly [14] - 29:17, 40:26, 44:20, 45:18, 75:11, 75:17, 75:21, 88:15, 89:28, 90:5, 96:27, 100:22, 101:17, 102:6
Certainly [2] - 15:6, 47:4
cetera [1] - 28:13
chain [1] - 84:2
challenge [1] - 20:6
chance [2] - 35:29, 39:13
characterised [1] - 52:21
check [1] - 50:9
checked [1] - 101:1
Chief [12] - 1:20, 1:22, 3:9, 3:26, 7:12, 7:19, 7:25, 9:8, 9:19, 10:2, 10:6, 10:8, 10:16, 10:18, 10:29, 20:24, 20:27, 21:27
chin [1] - 15:20
choice [1] - 96:30
Christian [1] - 2:29
Ciaran [1] - 2:1
Clasulla [1] - 61:20
circle [1] - 97:28
Circuit [1] - 34:15
circulated [1] - 55:12
circumstance [1] -

10:20
circumstances [4] - 20:26, 21:29, 28:14, 36:8
citation [1] - 31:27
civil [7] - 13:28, 32:2, 32:7, 33:8, 34:12, 96:5, 96:29
Civil [5] - 22:12, 39:10, 42:21, 94:27, 96:8
clarification [4] - 22:25, 25:10, 26:16, 57:3
clarity [1] - 45:23
clarity [2] - 27:16, 101:27
classified [1] - 73:9
clear [9] - 22:30, 38:13, 42:14, 42:15, 46:25, 50:8, 52:19, 53:12, 84:6
clearly [4] - 15:4, 27:4, 34:8, 45:21
client [11] - 12:26, 14:23, 15:19, 16:2, 17:8, 19:12, 20:30, 29:25, 35:9, 61:1
client's [4] - 14:20, 14:23
closed [3] - 30:13
co [4] - 59:1, 78:2, 97:4, 97:5
Co [2] - 77:14, 94:19
co-founder [2] - 97:4, 97:5
co-investor [1] - 59:1
Co-investor [1] - 77:14
co-investors [1] - 78:2
cold [1] - 33:6
colleague [1] - 39:28
colleagues [1] - 101:16
college [3] - 94:20, 94:22
Colm [1] - 2:17
column [1] - 72:9
Comity [1] - 39:2
comity [3] - 33:13, 37:26, 39:1
commenced [1] - 46:26
Commenced [1] - 1:1
commencing [1] - 102:21
commensurate [2] - 64:3, 64:12
commenting [1] - 41:20
commercial [3] - 98:16, 98:19, 98:20
Commission [1] - 34:3
commission [1] - 45:3
Commissioner [1] - 30:14
commitment [1] - 101:10

common [1] - 96:28
communicate [2] - 88:26, 89:3
communicated [2] - 88:27, 89:4
communicating [5] - 90:13, 90:30, 91:8, 91:16, 91:25, 92:4, 92:11, 92:19
communication [18] - 11:7, 11:9, 11:22, 12:4, 12:30, 88:1, 89:7, 89:22, 89:28, 90:2, 90:9, 90:21, 90:22, 91:5, 91:21, 91:30, 92:28, 93:3
communications [11] - 14:24, 88:8, 88:11, 88:18, 88:16, 90:18, 90:26, 91:12, 92:7, 92:15, 92:23
companies [4] - 84:7, 84:26, 84:30, 98:2
company [11] - 5:9, 21:6, 58:10, 68:5, 69:15, 97:22, 98:6, 98:7, 98:8, 98:14, 98:15
comparable [1] - 95:6
comparatively [1] - 97:24
compare [1] - 50:11
compelling [1] - 44:11
compels [1] - 32:15
complain [3] - 15:9, 15:10, 15:11, 15:15, 20:21, 21:14
complainant [1] - 20:25
complaint [2] - 15:18, 35:2
complete [8] - 57:13, 57:14, 58:3, 58:4, 101:3, 101:16
completed [3] - 62:15, 62:21, 84:8
completely [1] - 12:9
complications [1] - 28:9
complied [1] - 15:8
compliments [1] - 31:30
comply [1] - 45:10
compound [1] - 22:14
comprised [1] - 23:27
compromise [2] - 10:24, 20:13
compromised [2] - 8:27, 8:30
computed [2] - 64:14, 66:6, 66:8
concede [1] - 34:18
concept [1] - 37:24
concepts [1] - 33:13
concerned [3] - 35:14, 43:14, 43:16

FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 1 - 13/05/08

4

concerning [26] -
77:5, 88:1, 88:11,
88:18, 89:7, 89:17,
89:22, 90:3, 90:10,
90:15, 90:16, 90:18,
90:25, 90:26, 91:3,
91:5, 91:11, 91:13,
91:19, 91:21, 92:1,
92:8, 92:16, 92:23,
92:28, 93:4
conclusions [1] -
22:18
conditions [1] -
101:14
conducted [7] - 7:30,
8:7, 8:17, 71:18,
71:21, 85:3, 86:8
confidential [1] - 4:11
confidentiality [1] -
6:8
confines [1] - 36:2
confirm [5] - 21:4,
26:2, 75:7, 75:12,
75:18, 75:22, 86:18,
88:19
confronting [1] -
36:14
confusion [4] - 27:16,
45:21, 46:23, 53:16
connection [1] -
76:18, 91:29
Conor [1] - 1:15
consent [6] - 10:27,
10:28, 10:29, 12:23,
19:21, 19:25
consenting [3] -
10:14, 10:19, 19:30
consider [1] - 99:27
considerable [1] -
35:8
considered [1] - 30:27
considering [1] -
99:23
consistent [1] - 60:22
constituted [1] - 64:11
constrained [1] -
13:12
consult [2] - 99:20,
99:25
Consultancy [1] -
69:26
consultancy [1] -
69:28
Consultants [7] -
85:25, 86:4, 86:6,
86:13, 86:26, 87:2,
89:24
Consulting [3] - 67:8,
67:10, 68:19
consulting [1] - 68:17
contain [1] - 79:26
contemplating [1] -
60:9
content [2] - 59:23,
97:19
contention [1] - 75:13
context [2] - 43:25,

85:12
continue [2] - 35:15,
76:17
Continued [1] - 54:1
contributing [1] -
70:19
contribution [5] -
53:14, 65:4, 65:12,
65:13, 65:17
contributions [15] -
60:21, 70:23, 70:25,
74:21, 74:23, 77:16,
77:18, 80:6, 80:8,
80:12, 80:14, 83:9,
83:11, 83:21, 83:23
control [3] - 26:16,
76:26, 93:12
controlled [1] - 72:21
controversy [1] -
20:12
convenience [1] -
102:19
convenient [1] - 3:18
conversation [3] -
83:20, 83:26, 63:28
convincing [1] - 44:11
copies [4] - 49:14,
49:23, 52:5, 76:11
copy [23] - 25:12,
28:15, 33:16, 50:1,
60:5, 56:21, 56:23,
57:24, 59:27, 60:27,
62:30, 63:22, 63:24,
64:22, 70:28, 77:6,
79:13, 81:2, 81:11,
81:15, 81:26, 93:29,
100:26
Cormac [2] - 97:6,
97:7
corners [1] - 26:2
corporations [1] -
96:24
Correct [7] - 94:25,
95:27, 96:17, 96:21,
97:4, 97:29, 98:24
correct [6] - 10:15,
11:2, 26:6, 32:7,
34:21, 74:12, 97:3,
100:12
correction [1] - 67:11
correctly [1] - 84:13
correlate [1] - 50:16
correspondence [1] -
45:18
cost [3] - 59:20, 77:15,
77:16
Counsel [1] - 3:26
counsel [26] - 2:18,
4:7, 4:13, 6:19, 7:26,
7:30, 8:17, 9:19,
9:27, 10:2, 10:13,
10:17, 13:27, 14:4,
14:6, 16:1, 19:19,
23:26, 24:3, 25:27,
30:6, 30:14, 38:22,
44:5, 49:19, 49:29,
67:19, 73:29, 99:6

counsel's [1] - 34:21
country [3] - 95:9,
96:13, 98:15
County [1] - 16:17
course [17] - 19:11,
22:3, 23:12, 24:2,
25:2, 25:18, 26:13,
26:20, 28:16, 31:5,
32:18, 38:16, 43:7,
71:17, 74:4, 85:3,
86:7
Court [76] - 1:23, 1:25,
3:19, 3:22, 4:8, 4:9,
5:3, 5:11, 5:19, 6:23,
7:13, 7:26, 9:5, 9:7,
9:11, 10:3, 10:13,
11:20, 12:22, 13:4,
13:5, 13:8, 13:17,
13:28, 14:10, 14:17,
21:15, 21:26, 22:1,
25:25, 27:12, 30:2,
30:8, 30:26, 31:3,
31:11, 31:13, 31:29,
32:7, 32:21, 32:27,
33:14, 33:26, 34:10,
34:16, 35:11, 35:14,
36:18, 37:10, 38:13,
38:27, 39:3, 40:14,
40:17, 40:23, 41:2,
41:3, 41:4, 41:7,
43:16, 43:19, 43:22,
44:3, 44:13, 44:17,
45:16, 45:17, 45:24,
46:3, 46:4, 50:28,
51:29, 53:2, 54:5,
99:5, 101:10, 102:6
court [34] - 1:24, 4:15,
7:1, 7:22, 7:23, 7:28,
8:3, 8:6, 8:15, 8:16,
9:20, 10:7, 12:12,
17:3, 19:13, 20:29,
21:1, 23:1, 24:14,
24:25, 30:13, 32:3,
32:9, 32:16, 33:12,
34:4, 35:16, 36:21,
36:28, 37:29, 38:6,
40:6, 40:16, 40:27,
43:22, 44:2, 44:13,
51:28
Courts [6] - 12:8,
12:18, 27:15, 42:9,
43:11, 45:13
courtroom [2] - 38:26,
50:30
courts [5] - 30:23,
34:19, 36:6, 36:15,
37:30, 38:15, 38:23,
40:14
Courts [5] - 7:4, 45:1,
45:10
Crawford [2] - 97:6,
97:7
Crawford
mcnicholas [3] -
80:28, 80:27, 81:14
created [3] - 67:25,
71:8, 71:11

creation [2] - 75:24,
75:27
Credit [1] - 97:27
credit [1] - 73:14
criminal [1] - 36:10
Criminal [1] - 101:10
cross [6] - 7:30, 8:7,
26:11, 26:13, 26:14,
38:9, 97:14, 99:13
Cross [2] - 1:7, 93:24
cross-examination [7]
- 7:30, 8:7, 26:11,
26:13, 26:14, 38:9,
99:13
Cross-examined [2] -
1:7, 93:24
Cullen [1] - 2:18
culminated [1] - 1:24
cultural [1] - 32:24
Currency [2] - 3:5,
96:23
cursors [1] - 97:26
Curting - 15:30,
16:9, 16:8, 16:9,
16:11, 39:8, 62:6
Curtin [6] - 16:15
customers [1] - 57:7
cut [2] - 84:16, 96:7
Cv [2] - 93:26, 97:30

**D**

dare [1] - 98:26
date [6] - 64:26, 72:7,
72:12, 86:7, 87:14
dated [30] - 55:13,
56:17, 59:15, 61:8,
61:17, 61:27, 62:13,
62:19, 64:20, 64:25,
70:27, 77:3, 77:30,
78:1, 78:11, 78:26,
79:11, 80:22, 81:9,
81:11, 82:7, 82:12,
83:6, 83:19, 84:2,
84:23, 85:23, 86:3,
87:12, 87:15
dates [1] - 72:8
David [2] - 16:6, 59:16
de [3] - 38:19, 43:20,
96:15
deal [1] - 46:5
dealing [2] - 54:28,
96:24
December [5] - 61:21,
81:24, 82:10, 82:13,
84:23
decided [2] - 18:17,
59:9
decision [2] - 43:20,
64:11
defence [1] - 24:16
Defendant [20] - 1:13,
2:19, 3:11, 8:28,
11:7, 11:25, 11:30,
13:6, 13:27, 14:5,
14:6, 15:11, 19:19,
20:24, 24:13, 25:11,

25:12, 31:18, 38:14,
102:25
Defendant's [1] -
45:21
Defendants [1] - 30:25
delete [1] - 46:23
deliberate [1] - 56:29
demeanour [2] - 33:5,
36:30
Denis [1] - 3:22
Dennis [2] - 80:25,
80:29
departed [2] - 40:18,
41:1
departing [1] - 41:5
Department [6] - 3:27,
4:4, 7:19, 28:24,
94:24
departs [1] - 7:21
deposited [2] - 72:27,
72:29
deposition [3] - 39:12,
42:20, 42:23, 42:26,
43:23
depositions [1] -
32:28
Derivatives [2] - 55:2,
55:12
describe [2] - 96:12,
97:13
described [5] - 11:21,
22:8, 55:6, 55:17,
60:18
description [3] - 27:9,
34:21, 97:30
designs [1] - 94:30
desirable [2] - 49:22,
100:22
Desirable [1] - 28:21
Despite [1] - 16:21
destroyed [1] - 35:19
detail [3] - 23:20,
55:16, 60:12
detailed [1] - 70:26
details [2] - 73:30,
78:14
determine [2] - 40:17,
44:14
determined [2] - 59:5,
66:9
development [20] -
42:17, 88:2, 88:12,
88:19, 89:8, 89:17,
89:23, 90:3, 90:10,
90:19, 90:27, 91:6,
91:13, 91:22, 92:1,
92:8, 92:16, 92:24,
92:29, 93:4
deviate [1] - 45:25
deviation [1] - 52:16
Dg [9] - 56:19, 71:26,
71:28, 71:30, 72:17,
72:19, 72:21, 73:7
Dgl [15] - 61:1, 61:28,
66:30, 67:19, 68:2,
69:12, 72:21, 73:1,

FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 1 - 13/05/08

5

73:16, 73:29, 77:3,
77:9, 79:6, 83:20,
88:16
Dicey [1] - 37:24
differ [1] - 18:11
different [3] - 70:14,
70:15, 103:2
differs [1] - 21:8
difficulty [14] - 18:20,
19:27, 25:14, 26:26,
27:5, 35:14, 41:3,
41:4, 41:30, 42:19,
43:4, 47:30, 51:7,
101:21
Dignam [27] - 1:15,
1:18, 1:20, 3:10,
6:17, 6:21, 8:29,
7:17, 8:11, 9:5, 9:25,
10:2, 20:17, 20:19,
21:16, 21:21, 21:26,
28:12, 34:29, 37:9,
39:24, 40:9, 40:12,
41:20, 50:1, 50:3
Dignam's [1] - 21:13
diplomatic [2] - 7:18,
8:14
direct [4] - 21:28,
32:17, 34:1, 44:25,
47:2, 89:28
directed [4] - 15:4,
15:5, 15:19, 31:4
directing [1] - 32:12
direction [1] - 31:5
directions [1] - 44:29
director [2] - 50:9,
88:6
directs [1] - 32:16
disadvantage [2] -
14:18, 14:20
discern [1] - 12:2
disconnect [1] - 32:24
discourse [1] - 39:30
discretion [5] - 14:29,
29:30, 32:23, 35:5,
44:4
discuss [5] - 65:3,
65:12, 65:16, 65:25,
65:30, 70:18
discussing [7] -
71:11, 71:16, 71:20,
71:24, 72:6, 72:12,
72:27
discussion [2] - 64:8,
72:24
discussions [2] -
62:3, 64:10
disk [2] - 57:19, 65:8
displeasure [1] - 21:1
disposed [2] - 39:21,
98:9
dispute [3] - 13:26,
17:1, 41:6
disrespectful [2] -
22:2, 41:4
Distributions [1] -
78:17
distributions [6] -

74:25, 77:21, 78:2,
78:4, 78:14, 78:20
District [16] - 4:9, 7:13,
13:4, 13:5, 13:28,
14:10, 21:15, 31:29,
32:27
diverse [1] - 98:2
Diversified [8] - 56:18,
60:3, 61:9, 61:18,
71:30, 72:1, 78:29,
88:13
Division [3] - 3:27, 4:4
document [53] - 18:5,
23:7, 25:26, 25:27,
25:28, 25:29, 50:18,
50:29, 51:3, 51:4,
51:7, 51:19, 51:20,
51:25, 51:27, 51:28,
52:14, 52:21, 53:7,
55:8, 55:23, 56:14,
57:17, 57:18, 57:21,
57:24, 57:27, 58:15,
59:10, 61:4, 61:13,
61:23, 62:10, 62:18,
63:20, 63:25, 64:16,
67:2, 67:3, 67:11,
67:14, 68:8, 68:11,
68:14, 68:21, 68:23,
69:18, 69:20, 69:23,
69:30, 73:25, 74:1,
76:6, 76:7, 76:29,
77:6, 77:11, 77:24,
79:7, 80:18, 81:17,
82:4, 82:20, 83:15,
83:29, 84:22, 85:21,
85:29, 87:7
Document [21] -
33:17, 49:29, 55:25,
56:16, 59:12, 61:14,
63:21, 64:17, 67:15,
71:1, 73:26, 76:30,
77:26, 78:9, 79:8,
80:19, 81:7, 82:5,
83:16, 83:30, 85:30
documentation [1] -
26:15
documents [51] -
11:15, 12:18, 12:21,
13:1, 13:10, 13:11,
13:29, 14:10, 14:13,
14:14, 14:22, 15:7,
15:14, 18:17, 18:18,
21:8, 21:11, 22:27,
23:3, 23:6, 23:25,
23:27, 23:29, 23:30,
24:2, 24:3, 24:12,
24:14, 24:28, 25:10,
25:13, 25:16, 25:22,
26:2, 26:19, 26:25,
27:3, 27:10, 27:30,
28:13, 53:15, 58:17,
59:24, 60:17, 62:24,
73:10, 78:23, 85:19,
93:8, 93:12
Documents [4] -
58:18, 76:8
dollars [1] - 72:11

done [2] - 30:17, 98:5
Donohue [3] - 3:22,
3:24, 4:7
doubling [1] - 84:16
down [11] - 4:13, 9:27,
16:28, 17:3, 17:7,
18:1, 31:9, 35:4,
38:6, 66:19, 94:3
Doyle [4] - 5:3, 5:11,
5:15, 6:19
draft [2] - 55:11,
55:13, 85:15
drama [1] - 95:29
dramatically [1] -
11:16
draw [1] - 52:13
Dublin [1] - 98:20
due [5] - 23:12, 24:2,
26:2, 26:18, 28:16
Dunne [108] - 1:5,
1:18, 1:28, 2:3, 2:8,
2:15, 2:22, 2:27, 3:1,
3:8, 3:24, 3:30, 4:20,
4:25, 4:30, 5:5, 5:9,
5:13, 5:17, 5:26, 6:1,
6:7, 6:14, 6:27, 7:15,
8:9, 9:3, 9:23, 9:30,
11:1, 11:27, 12:8,
12:17, 13:20, 14:27,
15:23, 16:4, 16:8,
16:13, 16:19, 16:23,
17:12, 17:23, 17:29,
18:9, 18:22, 18:30,
19:18, 19:25, 19:29,
20:8, 20:17, 21:4,
21:18, 21:24, 22:5,
22:25, 23:9, 23:14,
23:18, 24:19, 24:23,
24:30, 25:5, 26:8,
26:25, 26:30, 27:8,
27:15, 27:21, 27:27,
28:14, 29:22, 31:8,
33:19, 33:23, 33:28,
36:10, 37:8, 37:17,
37:21, 38:29, 39:18,
39:30, 40:9, 41:9,
41:13, 41:20, 41:25,
42:30, 43:11, 43:16,
43:28, 45:13, 46:13,
46:21, 46:25, 47:2,
47:6, 47:12, 47:24,
48:2, 48:9, 49:4,
49:14, 49:22, 50:1,
50:8, 50:14, 50:23,
51:2, 51:10, 51:15,
51:23, 52:2, 52:9,
52:19, 52:26, 52:30,
53:6, 53:14, 54:3,
54:9, 54:15, 56:25,
57:2, 66:18, 94:9,
95:2, 95:16, 95:22,
98:29, 99:2, 99:6,
99:15, 99:20, 99:25,
99:30, 100:4, 100:9,
100:14, 100:18,

100:29, 101:9,
101:24, 102:3,
102:13, 102:18,
102:29, 103:6
During [2] - 65:1,
74:30
during [7] - 22:2,
57:12, 60:24, 66:17,
70:18, 79:20, 94:28
dynamic [1] - 102:29

E

e-mail [53] - 55:6,
55:13, 56:17, 56:21,
57:6, 59:15, 59:27,
60:2, 61:8, 61:11,
61:12, 61:17, 61:21,
61:22, 61:27, 61:28,
61:30, 62:2, 62:13,
62:19, 64:20, 64:23,
64:25, 64:27, 65:6,
77:3, 77:29, 78:11,
78:26, 79:11, 79:16,
79:18, 80:22, 81:2,
81:9, 82:7, 83:6,
83:19, 83:25, 84:2,
84:12, 84:18, 84:19,
84:23, 84:28, 85:1,
85:12, 85:22, 88:7,
88:15, 89:13, 89:29,
100:27
e-mailing [1] - 59:19
e-mails [1] - 90:6
early [1] - 62:28
Eastern [1] - 98:18
eat [1] - 42:8
eclectic [1] - 98:19
ecology [1] - 98:18
economics [1] - 60:20
education [2] - 98:11,
98:17
effect [3] - 14:18,
14:21, 44:3
effective [1] - 44:1
effectively [2] - 14:24,
45:15
effectuate [1] - 63:14
efficiency [1] - 100:19
efficiently [1] - 52:10
Egan [4] - 63:24,
93:15, 93:19
Egan's [1] - 75:15
ego [1] - 43:11
egos [1] - 43:13
eight [2] - 4:9, 6:5
Either [1] - 42:8
either [11] - 7:25,
12:17, 15:10, 35:18,
48:4, 58:26, 59:2,
61:2, 63:12, 102:24
elaborate [2] - 23:20,
24:24
elastic [1] - 37:25
elbaum [1] - 58:7
Elizabeth [4] - 56:18,
61:27, 83:19, 83:26

Embassy [1] - 7:18
employees [10] - 88:3,
88:13, 88:20, 88:9,
89:18, 89:24, 90:4,
90:11, 90:20, 90:28,
91:7, 91:14, 91:23,
92:2, 92:9, 92:17,
92:25, 92:30, 93:5
Ems [1] - 96:4
end [2] - 17:25, 35:13
endorsement [1] -
53:8
engagement [2] -
59:22, 59:29
ensure [2] - 36:30,
100:25
enter [1] - 22:7
entered [2] - 4:9, 04:1
entering [1] - 60:9
entire [1] - 52:6
entirely [2] - 26:13,
38:23
entitles [2] - 59:24,
62:23, 93:9
entitled [4] - 14:27,
14:28, 57:20, 70:28,
79:12
entity [1] - 72:21
Eo [1] - 94:19
equal [5] - 65:22,
65:27, 66:14, 66:21,
66:24
equals [1] - 84:6
erase [1] - 47:10
erased [2] - 47:2,
47:25
Erb [3] - 81:29, 82:17,
82:23
Eric [3] - 5:24, 5:28
error [1] - 10:6
errors [2] - 9:6, 9:12
especially [1] - 43:9
esse [1] - 38:19
essentially [5] - 7:6,
7:27, 9:9
Essentially [1] - 9:16
establish [1] - 27:8
et [1] - 28:13
etc [1] - 59:21
Eu$16,000 [1] - 84:6
Europe [1] - 98:18
eve [1] - 30:29
evening [2] - 31:19,
101:19
event [4] - 21:9, 87:17,
99:16, 102:20
events [1] - 96:13
Evidence [4] - 7:2,
22:12, 38:17, 39:4
evidence [33] - 4:12,
7:22, 7:24, 11:12,
11:21, 12:20, 13:3,
17:1, 17:2, 17:4,
20:22, 23:29, 29:11,
29:22, 29:29, 30:2,
30:9, 30:11, 30:15,

FIDELITY INTERNATIONAL -v- UNITED STATES OF AMERICA - DAY 1 - 13/05/08

6

30:20, 30:30, 31:3,
31:5, 31:10, 31:14,
32:2, 32:6, 32:10,
32:16, 33:4, 33:8,
33:11, 33:12, 34:11,
35:2, 35:12, 35:22,
35:23, 35:26, 36:7,
36:17, 36:30, 36:7,
36:18, 38:22, 39:10,
39:22, 42:20, 42:25,
43:23, 44:7, 44:17,
44:26, 45:3, 45:4,
45:8, 45:9, 46:4,
50:21, 82:2, 85:18,
102:25
evidential [2] - 24:1,
26:20
evince [1] - 103:1
evolve [2] - 102:30
ex [3] - 19:10, 30:4,
34:27
exact [1] - 37:25
exactly [3] - 14:19,
53:11
Exactly [1] - 96:4
examination [21] -
1:24, 7:29, 7:30, 8:6,
8:7, 8:17, 13:26,
14:4, 21:28, 26:11,
26:13, 26:14, 34:2,
38:8, 38:9, 44:9,
44:29, 49:9, 99:11,
99:13, 99:23
Examined [2] - 1:5,
49:1
examined [2] - 1:7,
93:24
Examiner [1] - 31:9
examiner [1] - 38:5
examining [1] - 75:8
example [3] - 30:5,
32:25, 40:27
exceed [2] - 65:23,
65:27
Excellent [1] - 16:19
except [1] - 38:26
exception [4] - 38:11,
38:15, 38:19, 38:20
exchange [2] - 63:28,
94:28
exchanged [4] -
88:15, 89:13, 89:29,
90:8
exclusively [1] - 75:26
excuse [2] - 22:2,
69:19
excused [1] - 102:27
executed [2] - 37:30,
38:1
executing [1] - 39:3
exhibit [20] - 18:6,
50:19, 50:29, 51:8,
52:22, 55:29, 57:6,
65:21, 72:12, 72:15,
72:24, 72:27, 78:7,
81:5, 81:18, 81:23,
81:29, 82:3, 94:1.

94:5
Exhibit [66] - 51:10,
51:16, 53:7, 55:8,
55:24, 56:2, 56:4,
56:8, 56:15, 56:22,
57:18, 58:7, 58:8,
58:16, 59:11, 60:3,
61:4, 61:14, 61:24,
62:11, 62:18, 63:21,
64:17, 64:26, 67:3,
67:15, 68:7, 68:22,
69:21, 70:1, 70:30,
71:5, 71:29, 72:3,
72:19, 73:8, 73:24,
73:26, 76:7, 76:8,
78:30, 77:11, 77:14,
77:25, 78:8, 78:16,
78:24, 79:8, 79:23,
80:19, 81:6, 81:22,
81:25, 82:16, 82:19,
83:4, 83:16, 83:29,
84:23, 85:1, 85:6,
85:22, 85:30, 87:8,
93:11, 94:9
exhibits [2] - 72:28,
75:8
expand [3] - 95:3,
96:1, 96:3
expect [1] - 101:12
expense [4] - 77:12,
78:13, 78:20, 83:9
expenses [1] - 77:5
experience [1] - 30:11
expert [2] - 22:17,
39:10
explain [4] - 15:20,
59:29, 74:20, 85:10
explained [3] - 4:15,
44:2, 74:23
explains [3] - 6:19,
8:3, 8:16
explanation [2] -
42:14, 55:20
explicit [1] - 38:4
express [1] - 34:8
expressed [1] - 42:30
expression [2] - 25:2,
39:6
expressly [1] - 45:11
extend [2] - 1:9, 37:26
extent [2] - 21:9,
40:25
extra [1] - 101:18
Extremely [1] - 96:11
eyes [1] - 63:27

**F**

face [1] - 45:29
Fact [5] - 62:15, 62:21,
62:25, 62:30, 63:2
fact [14] - 6:18, 8:27,
9:21, 10:6, 10:8,
11:3, 14:13, 23:19,
30:17, 47:21, 63:26,
66:9, 69:19, 100:26
factual [2] - 93:14,

93:18
fair [3] - 64:2, 64:12,
84:16
false [1] - 54:8
familiar [1] - 36:18
family [1] - 81:14
far [4] - 35:13, 57:9,
63:3, 72:22
fee [21] - 66:4, 66:5,
66:12, 69:28, 70:16,
81:1, 82:27, 84:3,
84:26, 84:29, 85:26
Fees [2] - 69:23, 85:23
felt [1] - 20:5
Fidelity [3] - 3:5,
63:17, 98:22
fight [2] - 39:12, 50:28
final [7] - 10:25, 21:22,
35:6, 36:5, 37:11,
93:13, 98:21
finality [1] - 41:25
finance [1] - 97:14
Finance [12] - 56:9,
56:10, 72:4, 72:25,
73:30, 84:24, 88:3,
88:7, 88:20, 89:9,
94:24, 98:7
financial [1] - 77:9
Financial [30] - 55:2,
55:11, 59:16, 62:15,
64:21, 66:29, 67:4,
67:9, 68:1, 68:15,
68:18, 68:25, 68:29,
69:11, 69:23, 69:27,
70:5, 70:9, 78:27,
79:17, 79:19, 79:27,
79:30, 67:11, 87:20,
87:21, 67:26, 69:14,
92:30, 93:6
financing [1] - 98:17
finish [1] - 101:6
finished [1] - 100:9
firm [5] - 62:20, 90:14,
90:22, 91:1, 91:9,
91:17, 91:26, 92:12,
92:20
first [23] - 1:11, 1:29,
3:22, 5:17, 5:26,
12:27, 15:9, 15:12,
16:27, 30:22, 31:23,
32:10, 45:14, 46:11,
46:13, 51:6, 59:9,
64:1, 72:16, 72:18,
75:9, 93:14, 98:14
firstly [2] - 1:7, 9:16
fit [1] - 44:4
five [5] - 52:2, 52:9,
52:26, 53:4, 75:14,
99:18
fixed [1] - 65:19
Flatey [1] - 5:28
Flatleys [3] - 5:22, 5:24,
5:28
flavour [1] - 97:11
flow [1] - 24:11
flowed [1] - 75:28
folder [3] - 23:25.

64:14, 65:22, 65:26,
66:1, 66:6, 66:7,
66:13, 66:28, 66:28,
66:30, 67:29, 68:1,
69:9, 69:11, 70:14,
80:28, 80:29, 81:1,
82:23, 82:24, 82:25,
82:27, 84:7, 84:16
feet [11] - 66:4, 66:5,
68:12, 69:28, 70:16,
81:1, 82:27, 84:3,
84:26, 84:29, 85:26
Fees [2] - 69:23, 85:23
felt [1] - 20:5
Fidelity [3] - 3:5,
63:17, 98:22

24:4, 25:28, 25:29,
26:21, 26:26, 27:29,
28:15
follow [3] - 36:27,
42:15, 52:7
follow-through [1] -
42:15
Following [1] - 103:8
following [8] - 10:12,
11:5, 27:5, 31:28,
80:26, 82:16, 85:8,
86:23
Followed [1] - 1:2, 49:2,
52:28, 54:1, 93:24,
100:2
follows [1] - 35:10
foot [5] - 8:29, 30:16,
31:26, 44:18, 44:26
fora [1] - 12:24
forebearers [1] -
16:16
Foreign [7] - 7:2, 7:19,
10:14, 10:17, 34:27,
36:16, 39:3
foreign [25] - 7:23,
13:26, 17:1, 17:3,
32:9, 34:4, 55:18,
55:21, 57:16, 58:6,
58:12, 59:6, 60:14,
61:3, 63:7, 63:29,
64:28, 65:2, 65:4,
65:11, 65:13, 65:17,
65:18, 65:22, 65:26,
66:1, 66:2, 70:20,
70:23, 88:4, 88:14,
88:21, 89:10, 89:19,
89:26
form [9] - 18:4, 18:14,
19:4, 19:5, 22:13,
82:23
forma [2] - 80:23, 81:3
formal [1] - 21:19
Formal [1] - 24:23
format [1] - 11:27
formed [1] - 61:2
formerly [1] - 90:12
formulaic [1] - 80:21
forth [4] - 60:2, 60:22,
71:12, 81:17
forum [9] - 11:12,
31:24, 36:2, 39:4,
46:25
Forum [2] - 39:4, 39:5
forward [4] - 4:30,
19:16, 59:18, 59:24
forwarding [8] -
56:19, 61:9, 61:18,
61:28, 62:15, 62:20,
78:27, 80:23
foundation [2] -
22:15, 96:3
founded [1] - 97:2
founder [2] - 97:4,
97:5
four [6] - 3:8, 14:13,
26:2, 76:26, 99:16
framed [1] - 38:3

Doyle Court Reporters Ltd.

FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 1 - 13/05/08

7

France[1] - 97:28
Francis[4] - 61:10, 62:16, 62:21, 63:3
Francis[1] - 62:22
French[1] - 98:25
Friedlander[7] - 72:29, 74:28, 75:1, 76:22, 76:26, 86:27, 89:4
Friends - 15:26, 18:4, 25:16, 37:3, 37:27
front [17] - 13:17, 56:21, 57:22, 65:22, 67:4, 67:25, 74:3, 74:7, 74:10, 77:11, 79:16, 79:22, 79:23, 81:26, 82:19, 83:4, 93:27
Fry[1] - 2:5
full [1] - 6:24
fully [1] - 73:21
function [4] - 32:14, 66:10, 66:11, 95:3
functions [1] - 95:5
Fund[1] - 3:6
fund [3] - 72:18, 84:26, 84:29
funding [20] - 70:22, 70:25, 71:23, 71:25, 71:26, 72:19, 72:23, 72:25, 73:7, 73:9, 73:16, 73:18, 73:20, 73:30, 74:11, 74:12, 74:15, 74:17, 80:5, 80:11
Funding[2] - 70:28, 71:30
funds [11] - 70:19, 72:7, 72:8, 72:21, 72:26, 72:28, 73:1, 73:4, 75:2, 75:28, 76:11
furnished [3] - 6:25, 7:27, 28:15

G

General[2] - 39:16, 39:20
general [5] - 17:16, 46:3, 60:17, 97:13, 97:25
Generals [4] - 39:25, 40:1, 40:13, 40:30
generally [2] - 60:30, 69:5
Generally[1] - 59:8
generate [1] - 62:6
generated [1] - 84:14
genesis [2] - 12:10, 12:24
gentle [2] - 21:13, 42:3
gentlemen [5] - 3:14, 26:8, 26:29, 46:8, 52:26, 53:6, 53:16,

100:4, 101:24
German[1] - 2:29
Germanstyle [1] - 2:29
given [12] - 8:22, 17:2, 17:26, 23:16, 25:30, 38:22, 38:25, 44:29, 47:16, 49:18, 51:20, 52:15
global [4] - 17:19, 22:8, 22:10
Goodbody[1] - 3:4
Government[8] - 55:8, 55:24, 56:1, 56:4, 58:15, 58:22, 57:18, 58:7, 58:8, 58:16, 59:11, 60:3, 61:4, 61:13, 61:24, 62:11, 62:18, 63:20, 64:16, 64:25, 67:3, 67:15, 68:6, 68:22, 69:21, 70:1, 70:29, 71:5, 71:29, 72:2, 73:8, 73:24, 73:26, 76:7, 76:30, 77:11, 77:14, 77:25, 78:7, 78:8, 78:16, 78:24, 79:7, 79:22, 80:18, 81:6, 81:21, 81:25, 82:4, 82:16, 62:19, 83:4, 83:16, 83:29, 84:23, 85:1, 85:5, 85:22, 85:30, 87:8, 93:11
Govnment[1] - 56:8
Gpa[1] - 97:25
gradation [1] - 94:27
gradations [1] - 95:6
grades [1] - 94:19
graduate [1] - 101:1
grand [1] - 94:30
Grant[2] - 92:2, 92:5
great [1] - 96:3
greater [2] - 14:29, 23:20
greeting [1] - 1:9
gross [5] - 66:11, 82:22, 82:24, 82:25, 82:26
Group[7] - 56:18, 60:9, 61:9, 61:18, 71:30, 72:1, 88:13
Gutarri[1] - 43:20

H

H&m [8] - 74:18, 76:3, 76:17, 80:9, 80:16, 83:22
Haber[39] - 55:6, 55:15, 61:8, 61:17, 62:3, 63:28, 64:2, 64:9, 64:10, 64:20, 64:27, 65:1, 65:3, 65:12, 65:16, 65:25, 65:30, 70:18, 74:20, 74:23, 77:3, 77:7,

77:29, 78:11, 80:22, 81:3, 81:9, 81:29, 82:8, 83:7, 84:3, 84:12, 84:18, 84:20, 84:25
Haber's [1] - 55:20
hair [1] - 84:15
hand [4] - 27:24, 33:16, 50:12, 50:14
handed [50] - 23:3, 33:17, 49:29, 55:25, 56:16, 58:18, 59:11, 59:12, 61:5, 61:13, 61:14, 61:23, 62:10, 62:17, 63:20, 63:21, 64:16, 64:17, 67:2, 67:14, 67:16, 68:21, 69:18, 71:1, 71:2, 73:25, 73:26, 76:6, 76:8, 76:29, 76:30, 77:24, 77:26, 78:7, 78:9, 79:7, 79:8, 80:18, 80:19, 81:6, 81:7, 82:4, 82:5, 83:15, 83:16, 83:30, 85:21, 85:29, 85:30, 87:7
handwriting [1] - 71:5
handwritten [1] - 70:27
happy [1] - 86:22
hard [6] - 15:16, 75:8, 75:12, 75:18, 75:22
Hawkes [45] - 1:4, 2:12, 9:28, 48:7, 49:1, 49:4, 49:8, 49:10, 50:12, 50:15, 51:11, 51:16, 51:19, 51:29, 52:20, 53:7, 54:5, 55:1, 55:28, 55:29, 56:7, 57:6, 57:18, 58:6, 58:12, 58:17, 58:22, 59:3, 59:5, 59:10, 61:6, 66:18, 71:1, 81:6, 83:11, 84:3, 87:7, 93:22, 93:26, 95:2, 100:7, 100:10, 100:14, 100:20, 100:25
Hawkes' [1] - 49:15
headhunted [2] - 96:26, 96:29
heading [2] - 95:7, 95:8
hear [3] - 4:30, 34:29, 37:8
heard [1] - 30:3
hearing [6] - 6:8, 19:16, 23:1, 24:1, 37:11, 101:11
hearsay [1] - 22:16
Hedigan[2] - 8:26, 9:9, 9:13, 9:17, 15:26, 31:17, 38:14, 39:14, 42:16
held [4] - 7:9, 9:1,

30:12, 98:22
Helios[30] - 59:16, 61:1, 62:15, 64:21, 66:29, 67:4, 67:6, 67:30, 68:14, 68:18, 68:25, 68:29, 69:10, 69:23, 69:27, 70:5, 70:9, 77:10, 78:19, 78:21, 78:27, 79:6, 87:11, 87:13, 87:18, 87:19, 87:21, 87:26, 88:9, 89:13
helpful [3] - 26:30, 28:20, 28:27
hereto [1] - 62:17
hierarchy [3] - 95:19, 96:19, 96:22
High [10] - 1:23, 9:7, 30:26, 31:13, 38:12, 39:2, 44:2, 44:13, 45:15, 46:4
himself [2] - 52:17, 99:27
historic [1] - 96:14
history [1] - 96:13
holding [1] - 98:9
hominem [1] - 36:27
hope [5] - 3:18, 19:7, 19:8, 22:1, 34:20
hotel [1] - 98:8
hour [2] - 101:17, 101:18
hours [2] - 31:22, 36:25
housekeeping [3] - 1:11, 3:20, 53:3
Hubble[1] - 79:17
Hussey [7] - 2:12, 101:27, 101:28, 102:9, 102:11, 102:23

I

Id [2] - 68:30, 70:9
idea [1] - 77:20
identified [11] - 25:23, 30:14, 57:26, 58:20, 58:25, 62:7, 67:9, 68:18, 69:27, 79:29, 85:15
identifies [4] - 57:20, 67:7, 68:16, 69:25
identify [4] - 1:11, 1:28, 4:25, 24:12
ifsc [1] - 97:26
ignored [1] - 85:17
ii [2] - 44:30, 45:1
imagine [2] - 23:4, 35:21
immediate [1] - 101:15
implement [6] - 74:29, 75:9, 75:14, 75:19, 75:29, 76:23
implementation [29] - 15:15, 20:12, 60:13,

60:28, 88:2, 88:9, 88:12, 88:17, 88:19, 88:28, 89:5, 89:8, 89:15, 89:17, 89:23, 89:30, 90:3, 90:7, 90:10, 90:15, 90:19, 90:24, 90:27, 91:2, 91:6, 91:10, 91:13, 91:18, 91:22, 91:28, 92:1, 92:6, 92:8, 92:13, 92:16, 92:21, 92:24, 92:29, 93:4
implementation [1] - 79:13
implemented [2] - 57:30, 72:30
implementing [6] - 60:15, 64:5, 76:2, 79:4, 88:25, 89:2
implicit [3] - 12:20, 12:21, 34:13
importance [1] - 35:9
important [3] - 32:5, 43:5, 96:13
inadmissibility [1] - 17:14
inappropriate [1] - 30:29
inc [2] - 56:19, 60:10
incidents [1] - 36:16
include [5] - 38:21, 40:6, 85:6
included [2] - 30:5, 101:29
including [8] - 20:11, 33:7, 52:20, 55:18, 64:11, 75:15
income [1] - 77:5
inconsistent [1] - 96:6
incorporated [2] - 61:9, 61:18, 68:14
incorporated [2] - 69:16, 69:17
incorrect [1] - 9:21
indeed [4] - 10:17, 45:19, 71:3, 78:25
index [4] - 27:24, 28:3, 28:21, 28:24
indicate [4] - 9:5, 10:7, 32:9, 34:8
indicated [6] - 7:12, 8:22, 10:18, 14:22, 20:20, 21:16, 26:8, 82:28
indicates [1] - 40:22
indicating [2] - 8:16, 46:30
indication [3] - 28:12, 31:14, 39:6
indulge [1] - 42:6
industries [1] - 98:2
inform [1] - 59:23
information [8] - 71:13, 75:7, 75:23, 86:11, 86:17, 86:30, 87:6, 87:14, 87:30
informed [3] - 9:20,

10:13, 60:2
**informing** [7] - 10:3
**initial** [2] - 1:23, 8:5
**initials** [1] - 59:2
**initiate** [1] - 21:18
**input** [2] - 31:17, 94:30
**input** [1] - 57:8
**insertion** [1] - 8:30
**insofar** [2] - 10:15, 94:29
**instance** [6] - 7:29, 30:23, 30:24, 31:23, 45:14, 51:6
**instead** [1] - 86:20
**instructed** [7] - 1:21, 2:5, 2:18, 3:4, 7:26, 19:12, 39:27
**instructing** [1] - 3:21
**instruction** [2] - 25:8, 27:23
**instructions** [13] - 10:21, 14:5, 15:30, 16:25, 20:26, 20:28, 21:2, 22:29, 59:20, 78:11, 78:13, 78:15, 99:6
**intemperate** [1] - 45:19
**intended** [1] - 17:17
**inter** [2] - 45:18, 84:25
**interest** [2] - 6:10, 73:12
**interesting** [2] - 29:19, 42:21
**interests** [4] - 63:6, 74:26, 77:19, 98:20
**international** [5] - 32:1, 33:13, 34:28, 42:18, 94:29
**International** [3] - 3:5, 63:17, 97:2, 97:12, 98:22
**internet** [2] - 98:10
**interpret** [1] - 45:7
**interpretation** [2] - 11:2, 44:19
**interrupt** [1] - 56:25
**intervention** [1] - 36:23
**intimately** [2] - 95:29, 96:9
**introduce** [2] - 3:21, 6:17
**inventive** [1] - 44:19
**inventory** [1] - 26:25
**investment** [2] - 55:2, 55:12
**investments** [1] - 98:3
**investments** [34] - 58:1, 60:10, 78:21, 79:2, 79:5, 79:28, 79:30, 80:1, 80:3, 80:13, 80:15, 80:24, 81:12, 81:15, 81:19, 82:9, 82:11, 82:30,

83:12, 83:21, 83:24, 85:25, 86:4, 86:5, 86:12, 86:25, 87:1, 87:13, 87:16, 87:19, 87:25, 92:25, 93:6
**investor** [5] - 62:15, 62:21, 62:24, 62:30, 63:2
**investor** [4] - 59:1, 60:8, 60:14, 77:14
**investors** [1] - 78:2
**invited** [2] - 4:16, 26:19
**invoice** [14] - 60:23, 81:3, 81:11, 81:16, 81:21, 81:23, 82:9, 82:12, 82:15, 83:1, 85:25, 86:3, 86:6, 86:7
**involved** [11] - 36:16, 38:17, 55:1, 55:5, 60:15, 74:24, 95:29, 96:9, 97:16, 97:17, 98:16
**involvement** [3] - 8:19, 21:28, 98:11
**involving** [1] - 85:11
**Ireland** [10] - 12:28, 32:1, 38:24, 43:4, 91:24, 91:29, 94:29, 96:25, 97:22, 98:18
**Irish** [18] - 7:17, 7:22, 7:30, 8:17, 13:26, 30:5, 30:23, 32:12, 33:7, 35:18, 39:2, 44:5, 56:10, 78:13, 83:9, 84:26, 84:29
**isle** [5] - 64:6, 68:5, 69:2, 69:15, 70:11, 75:1, 75:27, 76:22, 91:24
**issue** [8] - 3:20, 8:16, 10:12, 29:7, 31:15, 35:20, 44:10, 44:14, 82:12
**issued** [2] - 8:5, 13:29
**issues** [1] - 22:16
**item** [2] - 77:12, 83:10
**itself** [2] - 13:16, 21:28
**Ivan** [4] - 64:20, 77:7, 78:12, 83:7

## J

**James** [25] - 55:8, 61:8, 61:17, 63:28, 64:2, 64:9, 64:10, 64:27, 65:1, 70:18, 74:20, 74:23, 77:3, 77:29, 78:11, 80:22, 81:3, 81:9, 81:29, 82:8, 83:6, 84:3, 84:18, 84:20, 84:24
**January** [7] - 70:27, 71:9, 73:21, 74:12, 74:13, 82:7, 83:2
**Jerome** [1] - 59:17

**Jim** [1] - 77:7
**John** [2] - 2:12, 3:28
**join** [3] - 95:17, 96:5, 96:6
**joined** [2] - 98:4, 96:23
**joint** [7] - 74:18, 76:3, 76:17, 78:20, 80:9, 80:16, 83:22
**Joseph** [2] - 62:16, 62:27
**Judge** [44] - 1:5, 1:18, 1:26, 2:1, 2:3, 2:8, 2:11, 2:15, 2:22, 2:24, 2:27, 3:1, 3:8, 3:17, 3:24, 3:30, 4:20, 4:25, 4:30, 5:5, 5:9, 5:13, 5:17, 5:26, 6:1, 6:7, 6:12, 6:14, 6:23, 6:27, 7:7, 7:15, 7:17, 7:20, 8:9, 8:22, 9:3, 9:14, 9:16, 9:23, 9:30, 11:1, 11:5, 11:11, 11:27, 12:8, 12:15, 12:17, 12:27, 13:4, 13:5, 13:7, 13:15, 13:18, 13:20, 13:25, 14:3, 14:22, 14:27, 15:2, 15:20, 15:23, 15:25, 15:30, 16:4, 16:8, 16:11, 16:13, 16:15, 16:19, 16:23, 16:25, 16:28, 17:6, 17:12, 17:23, 17:29, 18:9, 18:20, 18:22, 18:30, 19:18, 19:25, 19:29, 20:8, 20:17, 20:19, 20:28, 21:4, 21:18, 21:22, 21:24, 22:5, 22:7, 22:25, 23:9, 23:14, 23:18, 23:23, 24:19, 24:23, 24:30, 25:5, 26:8, 26:23, 26:25, 26:30, 27:3, 27:8, 27:15, 27:18, 27:21, 27:27, 28:2, 28:8, 28:9, 28:12, 28:20, 28:27, 28:29, 29:3, 29:5, 29:14, 29:18, 29:22, 31:8, 31:25, 31:27, 32:6, 32:30, 33:2, 33:9, 33:17, 33:19, 33:23, 33:28, 34:1, 34:10, 35:1, 36:10, 37:1, 37:8, 37:17, 37:21, 37:23, 38:29, 39:18, 39:30, 40:4, 40:9, 40:12, 41:9, 41:13, 41:20, 41:25, 42:6, 42:13, 42:15, 42:16, 42:30, 43:9, 43:11, 43:16, 43:20, 43:28, 44:16, 44:20, 46:7, 46:13, 46:10, 46:13, 46:21, 46:25, 47:2, 47:6,

47:12, 47:15, 47:24, 48:2, 48:5, 48:9, 49:4, 49:14, 49:22, 50:1, 50:8, 50:14, 50:18, 50:23, 51:2, 51:6, 51:10, 51:13, 51:15, 51:23, 52:2, 52:9, 52:19, 52:26, 52:30, 53:6, 53:12, 53:14, 54:3, 54:9, 54:15, 56:25, 56:29, 57:2, 66:18, 66:20, 94:9, 95:2, 95:16, 95:22, 98:28, 98:30, 99:2, 99:4, 99:8, 99:15, 99:20, 99:25, 99:30, 100:4, 100:6, 100:9, 100:14, 100:18, 100:29, 101:9, 101:22, 101:24, 101:26, 102:3, 102:13, 102:16, 102:18, 102:29, 103:4, 103:6
**judge** [8] - 17:5, 29:29, 33:3, 33:4, 38:22, 43:24
**judge's** [1] - 102:4
**Judicial** [7] - 16:23, 19:10, 29:28, 31:30, 32:1, 33:9, 34:28
**July** [5] - 72:17, 86:13, 87:20
**June** [4] - 56:18, 61:27, 83:20, 83:26
**jurisdiction** [4] - 12:13, 32:27, 44:14, 44:20
**jurisdictions** [1] - 32:25
**justice** [1] - 43:21
**Justice** [23] - 3:27, 4:4, 6:30, 7:11, 7:15, 7:21, 8:2, 8:26, 9:8, 9:13, 9:17, 12:10, 12:19, 13:16, 13:20, 14:20, 15:28, 15:29, 21:10, 28:24, 31:15, 31:17, 33:6, 38:3, 38:14, 39:13, 45:26, 46:5

## K

**Kampf** [8] - 59:16, 59:17, 62:14, 62:19, 78:26, 82:8
**keep** [3] - 18:22, 22:30, 79:23
**keeping** [2] - 4:11, 47:13
**Kelly** [1] - 52:6
**kept** [1] - 71:16
**Kerekes** [2] - 62:14
**Kerry** [1] - 16:17
**Kilsture** [2] - 64:3, 64:6, 64:13, 66:23,

**Kann** [1] - 66:24, 67:21, 69:8, 69:9, 69:11, 69:14, 69:15, 69:24, 70:9, 70:10, 70:14, 70:15, 70:17, 76:1, 76:5, 80:4, 88:23, 88:26, 88:29, 88:30
**Klaus** [1] - 2:24
**knowledge** [8] - 12:29, 29:17, 36:21, 71:14, 78:16, 83:28
**known** [6] - 11:23, 11:24, 11:25, 36:15, 55:2, 56:19, 90:12, 95:17
**knows** [1] - 91:23
**Kpragg** [2] - 91:23, 91:26

## L

**ladder** [4] - 95:22, 95:23, 95:25, 95:26
**lady** [1] - 66:19
**Landa** [1] - 94:18
**largely** [1] - 20:5
**last** [8] - 29:8, 29:20, 31:19, 31:22, 42:6, 43:30, 45:30, 85:8, 100:30
**latest** [1] - 49:12
**Law** [1] - 2:19
**law** [7] - 45:24, 62:20, 90:14, 90:22, 91:1, 91:9, 91:17
**lawyer** [1] - 37:12
**lawyers** [7] - 1:25, 6:23, 8:1, 8:7, 8:18, 21:27
**lay** [3] - 16:28, 17:6, 18:1
**lead** [3] - 4:7, 16:1, 16:15
**leading** [1] - 22:13
**Leasing** [2] - 97:2, 97:12
**least** [2] - 28:21, 52:11
**led** [1] - 20:13
**ledger** [10] - 70:27, 71:4, 71:8, 71:11, 71:13, 71:16, 71:20, 71:23, 71:25, 71:29, 72:6, 72:27, 73:8, 73:22, 73:23, 93:10
**left** [8] - 72:9, 74:18, 80:9, 80:16, 97:1
**legal** [2] - 22:18, 99:27
**legitimate** [1] - 20:25
**lengthy** [1] - 40:12
**less** [1] - 77:18
**lesser** [2] - 14:28, 15:15
**letter** [3] - 59:18, 59:22, 59:30
**Letter** [4] - 8:5, 13:8, 13:29, 14:11, 14:15,

FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 1 - 13/05/08

20:13, 20:23, 21:9,
30:10, 34:3, 34:7,
34:14, 34:18, 39:3
**Letters**[1] - 30:28
**Levatra**[2] - 62:20,
62:23
**level** [2] - 95:5, 95:18
**Lewis**[37] - 2:1, 2:3,
2:5, 2:9, 2:11, 3:9,
3:10, 19:18, 19:23,
19:27, 20:2, 20:10,
21:5, 29:3, 29:5,
29:7, 29:17, 29:27,
37:3, 41:9, 41:15,
41:17, 41:28, 43:28,
43:30, 50:1, 50:5,
98:28, 98:30, 99:22,
99:27, 101:26,
102:6, 102:23, 103:4
**Li**[1] - 63:21
**likelihood** [1] - 55:16
**limited** [2] - 6:22, 36:7
**Limited**[55] - 56:9,
56:10, 59:1, 60:10,
64:3, 64:4, 66:21,
66:23, 68:30, 70:9,
74:1, 76:1, 76:21,
79:2, 79:5, 79:20,
79:28, 79:30, 80:3,
80:13, 80:16, 80:24,
81:12, 81:15, 81:19,
82:9, 82:11, 82:30,
83:12, 83:25, 84:24,
85:25, 86:4, 86:5,
86:12, 86:26, 87:1,
87:13, 87:18, 87:19,
87:26, 88:4, 88:7,
88:23, 89:26, 89:29,
88:30, 89:1, 89:6,
92:26, 93:1, 93:6
**limiting** [1] - 12:17
**Lin**[1] - 4:1
**Lind**[1] - 3:28
**Lindquist**[2] - 3:28,
3:30
**line** [6] - 73:14, 77:12,
78:13, 83:9, 83:10,
85:23
**Line**[1] - 1:3
**Link**[3] - 80:26, 80:30,
81:14
**link** [2] - 96:7, 96:8
**list** [13] - 7:27, 17:10,
18:26, 18:30, 19:16,
22:13, 22:19, 57:10,
57:13, 57:14, 58:2,
58:4, 71:23
**listed** [10] - 18:18,
57:7, 58:7, 72:14,
72:19, 72:23, 77:13,
78:15, 82:18, 83:9
**lists** [10] - 56:8, 62:25,
65:11, 65:22, 67:6,
68:15, 69:24, 77:12,
78:2, 78:13
**Litigation**[1] - 3:26
**litigation** [2] - 4:8,

32:25
**live** [1] - 32:28
**Liz**[20] - 3:6, 61:2,
67:1, 67:20, 67:21,
68:3, 68:25, 69:13,
70:5, 72:4, 74:25,
83:22, 87:11, 88:21,
88:9, 89:14, 89:19,
89:25, 98:23
**Lics**[1] - 74:24
**Llp**[3] - 62:14, 90:20,
92:18
**loan** [1] - 73:10
**loans** [3] - 73:9, 73:10,
73:12
**located** [1] - 78:24
**locus** [1] - 8:13
**longhand** [1] - 32:17
**look** [11] - 13:15,
19:16, 44:2, 52:14,
55:9, 58:21, 58:22,
61:23, 78:23, 81:25,
82:20
**looking** [1] - 65:6
**looks** [1] - 63:27
**Lord**[2] - 90:28, 91:1
**loses** [1] - 101:17
**loss** [1] - 84:14
**losses** [1] - 62:6
**lovely** [1] - 94:19
**luaidhe** [1] - 38:28
**Lunch**[2] - 53:19, 54:1
**Lyonnaise**[1] - 97:27

# M

**Macaochaidh** [100] -
1:6, 2:17, 2:18, 3:11,
3:17, 3:26, 4:3, 4:22,
5:22, 6:3, 6:12, 6:16,
11:5, 11:30, 12:15,
12:26, 13:22, 15:2,
18:20, 18:25, 19:7,
20:20, 21:13, 23:25,
24:10, 25:5, 25:7,
25:20, 25:25, 26:6,
26:10, 26:28, 27:3,
27:9, 27:12, 27:16,
27:23, 27:29, 28:6,
28:18, 28:23, 29:1,
29:25, 31:18, 31:21,
33:21, 33:25, 33:30,
36:13, 39:5, 39:24,
41:11, 41:15, 41:17,
41:23, 41:28, 42:3,
42:7, 42:13, 43:3,
43:13, 43:19, 46:10,
46:23, 47:19, 47:30,
48:4, 49:2, 49:8,
49:18, 49:28, 50:9,
50:11, 50:14, 50:21,
50:26, 51:3, 51:6,
51:13, 51:18, 51:27,
52:3, 52:13, 52:24,
52:30, 53:2, 53:10,
54:5, 54:10, 54:12,
55:1, 55:25, 56:29,

57:5, 86:26, 93:22,
93:29, 94:3, 99:4,
99:10, 99:18, 99:22,
100:6, 100:12,
100:24, 101:5,
101:21, 102:8,
102:16
**Macaochaidh's** [3] -
8:19, 20:30, 37:5,
43:30, 44:11, 102:13
**machine** [1] - 54:9
**Maddox** [22] - 64:4,
64:6, 64:13, 66:20,
67:21, 67:28, 67:29,
68:1, 68:4, 68:5,
68:16, 68:29, 69:1,
70:14, 70:15, 70:17,
76:1, 76:5, 80:4,
88:23, 88:30, 89:3,
89:6
**Mahoney** [16] - 2:12,
57:15, 58:5, 58:12,
59:3, 59:5, 63:25,
63:26, 70:27, 71:6,
71:9, 71:16, 80:6,
83:11, 83:26, 101:6
**mail** [54] - 55:6, 55:13,
56:17, 56:21, 57:6,
59:15, 59:19, 59:27,
60:2, 61:8, 61:11,
61:12, 61:17, 61:21,
61:22, 61:27, 61:28,
61:30, 62:2, 62:13,
62:19, 64:20, 64:23,
64:25, 64:27, 66:6,
77:3, 77:29, 78:11,
78:26, 79:11, 79:16,
79:18, 80:22, 81:2,
81:9, 82:7, 83:6,
83:19, 83:25, 84:2,
84:12, 84:18, 84:19,
84:23, 84:28, 85:1,
85:12, 85:22, 88:7,
88:15, 89:13, 89:29,
100:27
**mailing** [1] - 59:19
**mails** [1] - 90:5
**main** [2] - 9:26, 9:27
**maintain** [1] - 21:30
**maintained** [1] - 74:30
**maintaining** [1] - 96:6
**majority** [1] - 98:1
**Man** [12] - 64:6, 69:5,
68:30, 69:2, 69:15,
70:10, 70:11, 75:1,
75:27, 76:22, 91:24,
92:5
**manage** [1] - 98:8
**managed** [1] - 76:5
**management** [2] -
75:25, 75:27
**manager** [3] - 79:29,
96:23
**mandate** [1] - 98:14
**manifestly** [1] - 45:28
**manner** [11] - 27:8,
30:1, 31:4, 34:2,

34:11, 35:2, 35:5,
35:10, 44:7, 44:9,
44:30
**manuscript** [1] - 19:4
**March** [5] - 6:30, 7:8,
8:23, 13:22, 45:16
**Mark** [1] - 1:21
**mark** [2] - 18:5, 50:28
**marked** [45] - 50:18,
53:7, 55:8, 55:23,
55:29, 56:1, 56:4,
56:7, 57:18, 58:16,
59:11, 60:2, 61:4,
61:13, 61:24, 62:10,
63:20, 64:16, 64:25,
67:2, 67:15, 68:6,
68:11, 70:29, 71:4,
73:23, 73:25, 74:4,
76:6, 76:7, 76:29,
77:24, 78:6, 79:7,
80:18, 82:4, 82:16,
83:15, 83:29, 84:22,
85:1, 85:21, 85:29,
87:8, 93:10
**marker** [3] - 17:7,
18:1, 18:2
**market** [1] - 55:13
**marketed** [1] - 60:4
**marketing** [29] -
55:11, 88:2, 88:12,
88:19, 89:8, 89:17,
89:23, 90:3, 90:10,
90:19, 90:27, 91:3,
91:13, 91:22, 92:1,
92:8, 92:16, 92:24,
92:29, 93:4
**marking** [2] - 51:7,
62:18
**Martin** [10] - 1:4, 2:12,
9:27, 49:1, 55:28,
55:29, 56:7, 59:3,
80:23, 84:3
**Martin's** [1] - 83:21
**Massachusetts** [4] -
4:9, 7:13, 31:29,
32:27
**materials** [2] - 55:11,
55:14
**matter** [29] - 3:21,
9:18, 9:21, 10:4,
17:5, 24:13, 26:16,
27:30, 32:3, 34:8,
34:20, 35:8, 35:16,
35:27, 36:23, 37:30,
39:16, 39:21, 40:17,
41:2, 41:5, 41:6,
44:21, 45:14, 47:13,
53:3, 60:17, 98:3,
99:6
**matters** [17] - 4:11,
11:1, 29:19, 38:17,
38:21, 44:12, 46:25,
47:13, 50:8, 52:10,
71:12, 71:14, 81:17,
85:2, 101:1, 101:2,
102:30
**Mba** [1] - 94:12

**Mcgladrey** [10] -
80:24, 81:10, 81:12,
81:15, 81:20, 82:10,
82:12, 83:1, 92:10,
92:12
**mean** [6] - 25:17,
37:26, 41:3, 43:8,
60:21, 96:1
**meant** [1] - 21:14
**member** [2] - 36:19,
61:2
**membership** [2] -
77:19, 96:6
**memo** [2] - 79:12,
79:14
**Memo** [1] - 79:13
**memoire** [16] - 11:22,
18:6, 49:10, 49:15,
49:16, 49:24, 50:23,
51:8, 51:10, 85:16
**memorialise** [1] - 93:8
**mention** [1] - 101:26
**mentioned** [1] - 98:6
**merchant** [1] - 75:1
**merely** [1] - 44:17
**met** [1] - 29:20
**method** [3] - 3:14,
12:17, 18:12
**methodology** [1] -
12:13
**Mh** [1] - 59:2
**Michael** [1] - 62:13
**micro** [1] - 98:17
**mid-1990s** [1] - 40:24
**Might** [1] - 53:4
**might** [19] - 3:21, 4:22,
11:21, 15:3, 22:8,
32:23, 34:13, 42:20,
49:9, 51:30, 52:16,
58:21, 82:20, 86:23,
88:5, 94:4, 95:4,
99:4, 99:27
**million** [2] - 62:25,
67:22
**mind** [3] - 97:21,
99:15
**mindset** [2] - 42:28,
43:3
**minimal** [1] - 1:26
**Minister** [3] - 10:14,
10:17, 34:27
**Ministry** [1] - 94:18
**minor** [1] - 52:16
**minus** [1] - 84:9
**minute** [3] - 29:20,
55:9, 58:21
**minutes** [5] - 52:2,
52:9, 52:26, 99:15,
99:18
**missed** [1] - 56:26
**mode** [3] - 45:22,
97:25
**modern** [2] - 36:26,
36:29
**moment** [8] - 7:6,
15:6, 18:23, 42:7,

Doyle Court Reporters Ltd.

FIDELITY INTERNATIONAL -v- UNITED STATES OF AMERICA - DAY 1 - 13/05/08

10

50:15, 54:9, 68:9, 69:3
momentarily [1] - 34:29
monetary [3] - 94:28, 94:29, 96:13
money [3] - 74:18, 80:3, 80:16
month [2] - 55:6, 72:9
moot [1] - 35:20
Morning [1] - 1:5
morning [18] - 1:9, 3:30, 4:20, 4:25, 12:2, 16:8, 16:11, 23:4, 23:16, 23:20, 39:15, 42:4, 49:4, 49:8, 50:5, 54:7, 101:10, 101:24
Morris [1] - 37:24
most [5] - 22:23, 23:23, 37:10, 39:21, 43:5, 44:1, 96:12, 98:9
mostly [1] - 36:10
motion [2] - 8:27, 19:10
moved [1] - 12:28
moving [1] - 14:29
Mox [2] - 64:21, 79:11
multi [1] - 61:2
multi-member [1] - 61:2
must [7] - 12:8, 12:9, 36:17, 39:11, 42:17, 96:9, 101:15
mystery [1] - 99:30

**N**

nail [1] - 15:13
name [6] - 1:15, 2:1, 2:17, 2:24, 2:29, 5:17, 5:26, 16:21
named [3] - 56:19, 59:6, 63:7
names [3] - 4:22, 57:7, 57:10
narrative [2] - 11:3, 24:12
narrowed [3] - 11:11, 11:16, 14:24
Nationale [1] - 96:15
nature [1] - 15:21
near [4] - 71:11, 81:16, 85:1, 86:6
necessary [2] - 24:15, 101:30
need [4] - 18:9, 18:14, 26:16, 69:3
needs [2] - 28:15, 51:21
negative [1] - 14:18
negotiated [1] - 84:7
negotiating [1] - 60:16
negotiation [1] - 84:8
never [4] - 15:25,

new [1] - 36:24
new [4] - 52:14, 96:30, 97:22, 97:24
Next [1] - 95:19
next [11] - 1:29, 6:16, 9:14, 10:26, 46:8, 46:10, 82:28, 68:21, 75:14, 85:15, 93:13
night [2] - 29:8, 45:30
nine [1] - 57:20
noises [1] - 36:23
non [2] - 98:16, 98:20
non-commercial [2] - 98:16, 98:20
Nonetheless [1] - 40:4
nonetheless [1] - 37:26
normal [5] - 7:21, 40:30, 45:2
normally [1] - 21:27
Normally [1] - 7:23
notable [1] - 27:30
note [5] - 7:18, 8:14, 47:15, 47:27, 78:28
noted [5] - 1:25, 24:23, 72:9, 76:4, 81:2
nothing [2] - 14:25, 19:8
notice [1] - 33:10
notified [2] - 40:19, 45:30
November [3] - 81:8, 61:17, 61:27
number [10] - 6:22, 8:26, 18:11, 21:26, 33:23, 40:15, 57:19, 58:17, 65:7, 68:26, 69:2, 70:6, 70:12, 75:9, 75:14, 75:19, 75:18, 76:22, 98:2
Number [1] - 94:9
numbered [1] - 27:4
numbers [2] - 75:4, 94:5
numerous [1] - 32:26

**O**

o'clock [1] - 99:16
Ofearail [3] - 4:28, 5:3, 5:13
object [3] - 17:20, 20:15, 29:10, 42:24, 44:18, 84:15
objected [1] - 20:4
Objecting [1] - 47:19
objecting [3] - 10:15, 10:19, 42:28
objection [15] - 16:26, 16:28, 17:8, 17:13, 17:20, 18:2, 20:28, 21:2, 22:8, 22:11, 23:6, 23:9, 23:11, 24:23, 47:16

objections [3] - 21:19, 22:19, 52:11
obliged [2] - 22:23, 23:23
observations [2] - 22:26, 40:19
obtain [3] - 17:1, 32:2, 33:8
obtaining [1] - 32:6
obviously [3] - 15:28, 21:29, 101:29
Obviously [1] - 42:10
occasion [1] - 30:8
occasions [1] - 8:26
occur [2] - 12:22, 101:19
occurrence [3] - 71:12, 81:18, 85:2
October [14] - 56:17, 59:15, 62:13, 62:19, 69:17, 80:22, 81:3, 81:9, 81:11, 81:24, 83:19, 83:27, 84:2, 84:18
Ofearail [1] - 5:7
offences [1] - 36:11
offend [1] - 22:15
offensive [1] - 47:13
office [4] - 6:25, 7:25, 7:26, 30:13
Offices [3] - 1:22, 3:9, 7:20, 7:26, 9:19, 10:3, 10:7, 10:8
Officer [1] - 95:14
offices [1] - 88:6
official [1] - 40:2
often [1] - 39:9
One [4] - 14:2, 45:16, 65:6, 98:21
one [28] - 20:19, 21:21, 25:7, 25:18, 27:4, 29:3, 29:7, 34:13, 34:21, 37:25, 40:24, 42:6, 43:5, 45:16, 49:10, 51:30, 53:4, 54:9, 57:15, 58:5, 61:29, 62:18, 68:9, 69:19, 78:27, 96:12, 97:18, 98:7
ones [1] - 14:21
ongoing [2] - 45:14, 100:22
onwards [1] - 97:30
opened [2] - 34:6, 76:5
opening [2] - 31:27, 40:23
operating [1] - 59:24
operative [1] - 13:23
opinion [1] - 22:17
opportunity [7] - 20:12, 20:14, 38:13, 45:23, 64:28, 65:2
Opposed [2] - 37:17, 37:19
opposed [3] - 13:6,

14:14, 15:13, 37:15, 40:4
oppressive [1] - 20:5
opted [1] - 96:5
opting [1] - 96:5
option [1] - 96:7
oral [1] - 90:21
Order [25] - 1:23, 6:29, 7:1, 7:3, 7:6, 7:7, 7:21, 8:22, 8:24, 9:7, 9:10, 9:15, 8:18, 9:25, 10:20, 10:24, 10:27, 12:10, 12:19, 12:20, 12:21, 12:22, 12:23, 13:16, 13:18, 13:20, 13:22, 13:23, 14:2, 14:9, 14:19, 15:4, 15:7, 15:16, 21:10, 29:30, 30:3, 30:4, 30:7, 30:17, 30:24, 31:4, 31:8, 31:15, 32:12, 32:14, 33:15, 33:23, 33:25, 33:30, 34:1, 34:24, 34:26, 35:1, 37:10, 38:3, 38:12, 40:5, 44:6, 44:8, 44:18, 44:19, 44:22, 44:24, 44:25, 45:1, 45:7, 45:9, 46:25, 45:26, 45:28, 46:5, 101:26, 102:4
order [1] - 44:29
ordered [2] - 8:2, 15:6
Orders [5] - 4:10, 4:14, 6:5, 45:19, 45:17
orders [3] - 4:10, 4:17, 6:8
Ordinary [2] - 62:26, 62:27
organised [1] - 74:27
original [6] - 10:20, 14:29, 15:29, 20:3, 29:12, 59:18
originally [1] - 11:10
originals [1] - 18:11
otherwise [1] - 17:15
ought [3] - 13:2, 30:25, 30:26
ourselves [1] - 55:19
Outline [13] - 58:24, 60:4, 60:8, 60:11, 60:19, 60:22, 60:24, 60:30, 61:10, 61:29, 62:7, 62:22, 63:5
outline [2] - 59:19, 59:23
Outlined [1] - 58:20
Outlines [6] - 58:26, 60:27, 61:16, 62:4, 79:26
outlines [2] - 59:1, 78:27
outlining [1] - 3:17
outset [3] - 17:8, 22:9, 53:13
overnight [1] - 100:25

own [5] - 43:17, 89:12, 95:27, 96:1, 98:8
owned [1] - 80:3
owner [1] - 88:6

**P**

Page [1] - 1:3
page [4] - 9:25, 13:24, 50:16, 57:6
paid [19] - 66:1, 66:4, 66:6, 66:7, 66:12, 66:13, 66:20, 66:23, 66:28, 67:1, 67:28, 68:2, 69:7, 69:12, 70:14, 70:15, 72:19, 72:23, 73:12
papers [1] - 8:24
paragraph [9] - 9:26, 9:27, 10:12, 10:26, 31:27
paralegals [1] - 28:23
Pardon [1] - 39:18
perdon [1] - 72:16
Paris [1] - 96:16
part [11] - 9:12, 13:23, 14:9, 16:16, 18:14, 32:6, 55:29, 56:1, 56:4, 56:7, 68:11
Part [2] - 44:30, 45:1
parts [4] - 19:11, 30:4, 34:28, 45:18
partial [1] - 63:6
participants [4] - 62:16, 63:1, 66:12, 79:6
participate [1] - 37:12
participated [2] - 57:11, 63:11
particular [7] - 1:9, 14:3, 27:5, 35:23, 37:29, 43:25, 60:19
particularly [1] - 20:29
parties [19] - 3:8, 10:18, 11:2, 11:28, 12:12, 12:23, 15:10, 18:12, 20:11, 20:14, 20:21, 21:16, 31:24, 41:6, 44:18, 49:23, 51:24, 52:20, 102:24
partner [20] - 55:18, 55:21, 57:16, 58:6, 58:13, 59:6, 61:3, 63:7, 63:29, 64:28, 65:18, 70:24, 79:29, 88:4, 88:14, 88:21, 89:10, 89:20, 89:26, 98:22
partners [4] - 65:2, 65:4, 66:2, 70:20
partnership [1] - 61:2, 63:15, 78:30
Partnership [1] - 72:5
partnerships [2] - 70:26, 75:3
Partnerships [1] - 70:28

party [7] - 10:9, 13:3, 14:30, 36:21, 37:10, 42:22, 60:15
passed [1] - 10:23
past [3] - 50:23, 53:4, 53:10
pause [1] - 34:6
pay [2] - 64:2, 65:26
payment [25] - 66:28, 66:30, 67:6, 67:8, 67:9, 67:29, 68:1, 68:15, 68:17, 68:18, 69:1, 69:9, 89:11, 69:24, 69:27, 70:11, 72:17, 81:19, 82:1, 82:3, 82:30, 86:12, 86:25, 87:19, 87:25
payments [6] - 66:27, 67:20, 67:28, 69:7, 87:1
peann [1] - 38:28
Pearl [13] - 6:30, 7:11, 7:21, 8:2, 12:10, 12:19, 13:16, 14:29, 15:29, 21:10, 31:15, 45:26, 46:5
Pearl's [4] - 13:20, 38:3
pegged [1] - 96:2
pejorative [1] - 12:5
pen [1] - 98:4
people [3] - 1:8, 4:15, 21:14
per [1] - 55:27
percentage [1] - 65:19
percentages [1] - 60:22
perhaps [14] - 6:17, 6:18, 12:26, 13:16, 13:23, 15:5, 18:28, 32:22, 35:9, 43:30, 91:28, 95:3, 96:1, 96:12
Perhaps [2] - 41:28, 43:5
period [3] - 68:26, 70:8, 94:26
permit [1] - 7:8
permitted [1] - 40:23
person [2] - 71:13, 93:14
personal [1] - 86:20
personally [1] - 19:11
personnel [2] - 4:18, 6:9
persons [8] - 6:4, 19:20, 24:12, 57:11
pertaining [2] - 31:11, 38:8
perusal [1] - 58:30
Peter [1] - 43:20
Phil [4] - 59:15, 62:14, 62:19, 82:8
philanthropist [1] - 96:12
Philip [1] - 78:26

phone [2] - 55:7, 64:27
phrase [1] - 96:26
picture [1] - 98:4
place [6] - 11:6, 15:13, 25:14, 30:1, 31:22, 32:19, 79:5
placed [1] - 53:8
Plaintiff [25] - 3:4, 3:12, 12:1, 12:3, 12:6, 13:6, 13:27, 14:25, 15:10, 15:11, 15:12, 19:14, 20:11, 20:23, 21:6, 23:27, 24:3, 25:12, 25:27, 26:12, 31:18, 37:9, 49:18, 49:29, 101:6, 102:25
Plaintiff's [1] - 26:16
Plaintiffs [2] - 37:13, 102:10
planned [2] - 63:6, 63:8
play [4] - 55:21, 64:28, 65:2, 94:18
played [1] - 93:9
plethora [1] - 53:15
plural [3] - 89:11, 89:27, 90:5
plus [1] - 84:8
point [20] - 10:26, 15:9, 20:2, 20:19, 32:10, 32:12, 32:21, 35:8, 36:5, 43:30, 44:1, 44:24, 46:22, 47:15, 55:16, 55:17, 97:19, 99:4, 99:22, 102:26
points [4] - 12:26, 19:9, 84:4, 84:13
policy [3] - 94:28, 94:29
pond [1] - 21:15
portfolio [2] - 96:24, 98:19
posed [1] - 22:20
position [17] - 12:8, 17:14, 24:19, 24:21, 29:10, 40:13, 40:30, 86:10, 86:16, 86:29, 87:5, 87:23, 87:29, 101:27, 102:9, 102:14
possession [2] - 76:25, 93:11
possibility [2] - 42:24, 42:27
possible [12] - 10:21, 28:14, 27:24, 28:25, 33:15, 42:11, 52:10, 52:11, 75:11, 75:17, 75:21, 100:26
possibly [2] - 8:11, 15:14
post [1] - 98:13
post-production [1] - 93:13

potential [4] - 8:12, 23:9, 59:21, 62:27
power [4] - 45:27, 55:17
power-point [1] - 55:17
practice [22] - 7:22, 31:13, 32:18, 34:15, 34:19, 36:15, 36:18, 38:26, 38:2, 38:11, 38:21, 38:23, 38:24, 40:6, 40:14, 40:17, 40:18, 40:19, 41:1, 41:5, 71:21
practices [4] - 31:11, 36:5, 38:8, 38:15
pre [2] - 85:18, 97:26
pre-agreed [1] - 85:18
pre-cursors [1] - 97:26
precise [6] - 45:25, 51:24, 52:21, 75:22, 77:8, 97:19
precisely [1] - 25:23
pregnant [1] - 42:10
prejudice [1] - 36:1
prepared [10] - 51:2, 56:2, 67:3, 68:14, 69:23, 70:27, 74:4, 74:7, 76:15, 76:16
prescribed [1] - 44:30
presence [1] - 102:28
present [7] - 8:11, 8:12, 13:4, 15:27, 15:28, 19:9, 50:24
presentation [2] - 55:17, 65:1
presented [3] - 12:29, 20:3, 64:27
presents [1] - 31:29
preserve [1] - 35:30
preside [2] - 101:12, 101:16
presiding [1] - 33:3
pressure [1] - 35:23
presume [1] - 84:4
presumed [1] - 42:18
previous [2] - 30:12, 86:19
priced [1] - 84:5
primarily [1] - 60:14
primary [1] - 32:13
Principal [4] - 95:12, 95:13, 95:16, 95:19
private [2] - 96:15, 96:15
pro [2] - 80:23, 81:3
problem [3] - 8:12, 35:13
procedural [1] - 52:11
procedure [13] - 6:17, 8:2, 11:13, 16:30, 19:25, 21:7, 26:3, 26:22, 30:22, 30:30, 35:25, 36:15, 45:2
Procedure [3] - 22:12,

39:11, 42:22
procedures [1] - 36:6
proceed [8] - 35:6, 48:5, 53:16, 54:10, 85:17, 101:2
proceeding [2] - 24:16, 23:9
proceedings [24] - 2:20, 3:5, 3:12, 7:1, 7:9, 8:20, 8:29, 9:1, 9:11, 30:12, 32:2, 32:7, 33:8, 34:12, 35:15, 40:16, 40:27, 45:20, 45:26, 46:26, 47:6, 47:26, 98:6, 100:19
Proceedings [6] - 1:1, 52:28, 53:19, 54:1, 100:2, 103:8
proceeds [1] - 74:25
process [4] - 4:11, 11:19, 17:7, 46:1
procuring [2] - 75:24, 75:26
produce [3] - 13:28, 14:10, 15:7
produced [13] - 14:12, 15:14, 18:5, 23:5, 23:26, 25:10, 30:7, 50:21, 57:18, 67:18, 70:29, 73:29, 93:10
product [3] - 60:3, 60:12, 60:13
production [4] - 98:13
Products [3] - 79:17, 79:20, 93:1
profession [1] - 36:19
Profit [2] - 65:8, 65:21
profit [2] - 59:21, 84:5
programme [1] - 66:10
progress [2] - 100:21, 100:29
projects [1] - 98:16
promise [1] - 63:28
promised [1] - 64:2
promoter [1] - 98:1
pronoun [1] - 86:20
pronouncement [1] - 45:24
proper [4] - 25:30, 36:28, 38:29
property [1] - 98:9
propose [2] - 17:12, 17:15
Proposed [19] - 58:20, 58:24, 58:28, 60:4, 60:7, 60:11, 60:19, 60:23, 60:25, 60:28, 61:1, 61:10, 61:19, 61:29, 62:4, 62:7, 62:22, 63:5, 79:26
proposed [9] - 2:13, 9:7, 10:19, 11:8, 13:1, 21:29, 29:9, 40:20, 59:19
proposing [2] - 14:12,

65:26
Proskauer [2] - 90:20, 90:23
prospective [1] - 60:8
protection [1] - 36:13
Protective [3] - 4:10, 4:14, 6:5
protective [1] - 4:17
protocol [1] - 3:14
prove [3] - 24:13, 24:14, 26:19
proved [1] - 25:28
provide [11] - 29:11, 30:1, 31:3, 33:13, 36:6, 44:8, 44:22, 45:3, 45:11, 93:14, 93:18
provided [3] - 30:24, 55:14
provides [3] - 29:27, 29:29, 33:11, 42:22, 44:6, 44:25
proving [2] - 23:5, 23:28
provision [2] - 30:8, 35:1, 39:14, 45:9
provisions [3] - 29:10, 34:7, 44:27
publicised [1] - 40:2
purportedly [1] - 63:25
purpose [16] - 23:5, 23:11, 23:28, 24:7, 24:10, 33:2, 62:5, 64:5, 67:7, 67:9, 68:17, 68:18, 69:25, 69:27, 76:2, 88:24
purposes [7] - 22:25, 32:6, 57:3, 79:4, 85:18, 88:8, 89:1
pursue [1] - 99:11
pursues [1] - 26:14
put [16] - 4:13, 11:6, 11:17, 13:2, 13:11, 14:3, 21:1, 23:29, 25:26, 27:24, 28:24, 31:21, 37:29, 39:14, 43:25, 56:30
putting [1] - 23:28

**Q**

qualifications [1] - 94:13
quarter [1] - 53:10
questioning [1] - 18:13
questions [46] - 7:27, 11:10, 11:17, 11:23, 12:18, 12:20, 13:2, 13:9, 13:10, 14:3, 14:6, 15:26, 16:27, 17:4, 17:13, 17:16, 18:3, 18:10, 18:13, 18:16, 21:7, 21:11, 22:9, 22:13, 22:14, 22:15, 22:16, 22:17,

FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 1 - 13/05/08

12

22:18, 22:26, 27:15,
30:6, 44:8, 49:23,
58:26, 56:30, 85:6,
85:15, 86:19, 86:23,
93:13, 100:7
quick [1] - 58:30
quickly [1] - 28:25
Quist [1] - 4:3
quite [1] - 8:26

**R**

raised [1] - 81:23
raising [2] - 20:26,
21:2
range [1] - 98:2
rank [1] - 95:4
ranks [4] - 1:25, 95:7,
95:8, 95:17
rate [1] - 94:28
rather [3] - 13:15,
14:28, 28:4, 37:8,
100:30
Raysman [3] - 62:20,
91:15, 91:17
re [2] - 99:11, 99:23
re-examination [2] -
99:11, 99:23
reached [6] - 9:17,
9:20, 10:4, 10:8,
15:21, 102:8
read [5] - 8:27, 19:3,
33:26, 69:5, 84:27,
100:20
readily [1] - 33:3
ready [4] - 29:1, 54:6,
62:24, 100:20
really [5] - 6:21, 41:5,
98:4
reason [2] - 34:23,
101:15
reasons [1] - 20:4
receipt [1] - 81:24
receive [24] - 56:21,
57:24, 60:27, 60:30,
61:11, 61:12, 61:21,
61:22, 61:30, 62:2,
62:30, 63:2, 64:22,
69:1, 70:11, 75:2,
77:5, 77:21, 79:13,
81:2, 81:19, 82:30,
84:19, 98:6
received [32] - 8:14,
14:5, 23:19, 25:17,
50:5, 55:16, 58:23,
62:5, 66:14, 66:28,
66:29, 66:30, 67:29,
67:30, 68:2, 69:9,
69:10, 69:12, 72:7,
72:8, 72:10, 72:13,
72:17, 73:1, 73:4,
73:20, 77:19, 81:28,
82:1, 82:3, 84:10
receiving [2] - 29:29,
88:9
recent [1] - 98:17
recitals [1] - 9:12

recited [1] - 10:27
reckoning [2] - 84:25,
84:29
recognise [7] - 57:7,
57:26, 58:28, 67:22,
74:1, 76:13, 76:14
recollection [13] -
50:23, 50:24, 90:13,
90:21, 90:30, 91:8,
91:16, 91:25, 92:4,
92:11, 92:19, 95:27,
96:2
record [23] - 4:22, 6:3,
8:14, 18:22, 19:26,
20:2, 21:4, 22:30,
23:6, 23:9, 23:12,
24:24, 29:9, 32:9,
35:11, 46:26, 47:6,
47:7, 47:16, 47:26,
53:14, 94:5, 97:11
recorded [12] - 22:21,
29:23, 30:17, 30:21,
36:17, 36:18, 40:25,
40:26, 42:23, 44:21,
46:27, 50:24
recording [12] - 22:10,
26:22, 33:1, 34:9,
35:16, 35:19, 36:22,
36:24, 40:21, 40:27,
42:19, 44:17
recordings [2] -
40:15, 40:16
records [8] - 76:25,
78:5, 86:9, 86:15,
86:28, 87:4, 87:22,
87:28
redirect [1] - 99:11
Refco [2] - 90:4, 90:6
refer [4] - 66:11,
69:20, 94:4, 94:5
reference [8] - 21:11,
22:11, 63:6, 71:28,
72:2, 72:15, 83:20,
85:5
referenced [2] - 55:28,
72:26
references [4] - 40:24,
71:30, 76:4, 82:8
referred [5] - 18:4,
18:6, 27:4, 51:7,
97:3, 101:28
referring [1] - 85:13
reflect [7] - 6:3, 44:9,
45:2, 72:6, 77:16,
83:22, 83:25
reflected [5] - 38:12,
71:25, 73:8, 73:22,
73:23
reflecting [1] - 87:17
reflects [8] - 9:17,
67:20, 68:28, 70:7,
74:10, 87:12
refund [1] - 84:10
refusing [1] - 46:6
regard [3] - 33:15,
64:10
regarding [10] - 64:9,

63:20, 90:23, 91:2,
91:9, 91:17, 91:27,
92:5, 92:13, 92:21
regrettably [1] - 56:26
regular [2] - 71:17,
71:21
regularly [3] - 71:21,
85:3, 86:8
Reichers [24] - 1:7,
2:24, 2:27, 2:29, 3:3,
3:11, 12:4, 15:23,
15:25, 16:6, 16:15,
16:21, 16:25, 17:19,
17:25, 18:1, 18:25,
18:28, 19:3, 19:7,
19:8, 21:5, 21:18,
21:21, 22:7, 23:3,
23:11, 23:16, 23:23,
24:7, 24:21, 24:27,
25:2, 25:16, 25:22,
26:2, 26:14, 37:8,
37:12, 37:15, 37:19,
37:23, 39:1, 39:20,
39:27, 40:4, 42:6,
46:19, 47:15, 47:21,
49:26, 50:18, 50:28,
52:5, 93:24, 93:26,
94:1, 94:7, 94:11,
95:11, 95:25, 98:26
Reicherts [1] - 8:19
relate [2] - 67:10,
65:26
related [2] - 6:10,
56:29
relates [1] - 83:10
relating [1] - 13:26
relation [17] - 8:12,
15:3, 16:27, 17:4,
17:7, 19:16, 20:25,
21:10, 22:9, 23:7,
40:13, 44:28, 84:26,
84:29, 97:15,
100:18, 102:9
relationship [1] -
79:19
relative [1] - 82:22
relatively [1] - 10:22
relayed [2] - 7:13, 7:17
relevance [1] - 22:16
relevant [8] - 17:12,
45:20, 86:9, 86:15,
86:28, 87:4, 87:22,
87:28
relied [1] - 24:4
rely [1] - 17:9
remaining [1] - 75:19
remember [1] - 63:3
Remind [1] - 94:3
remit [1] - 74:21
remitted [1] - 74:26
removed [1] - 46:13
repaid [3] - 73:16,
73:18, 73:21, 74:11,
74:13
repayment [2] - 73:22,
73:23
Repertoire [2] - 34:3,

34:14
replaced [1] - 78:29
reply [11] - 12:26,
37:3, 37:5, 41:15,
41:18, 41:30, 43:6,
86:18, 89:27, 90:5
report [1] - 33:1
Reporters [2] - 5:3,
5:11, 5:20
represent [3] - 19:20,
71:28, 72:3
representation [1] -
6:3
representations [7] -
90:16, 90:24, 91:3,
91:11, 91:19, 93:15,
93:19
representative [1] -
7:24
representatives [18] -
49:14, 88:16, 88:27,
88:4, 89:13, 89:29,
90:6, 90:14, 90:22,
91:1, 91:9, 91:17,
91:26, 92:5, 92:12,
92:20
represented [1] -
19:12
represents [1] - 78:3
Request [3] - 13:9,
34:3, 34:7, 34:18,
39:3
request [36] - 7:12,
8:6, 11:10, 13:5,
13:7, 14:23, 14:24,
20:3, 26:22, 29:20,
29:22, 29:27, 29:30,
30:3, 30:6, 30:9,
30:10, 30:16, 30:20,
30:25, 31:24, 31:25,
31:26, 32:6, 32:8,
34:13, 34:30, 37:28,
37:29, 42:14, 42:15,
43:1, 43:25, 44:3,
44:4, 44:26
requested [6] - 30:26,
34:2, 34:23, 42:27
requesting [6] - 7:28,
10:21, 20:27, 28:14,
42:23
requests [3] - 32:1,
34:11, 44:5
require [4] - 4:10,
14:3, 19:29, 39:2
required [8] - 14:22,
63:14, 102:16,
102:24, 102:26,
103:1
requirement [2] -
4:12, 30:5, 34:19
requirements [1] -
34:15
requires [1] - 42:23
research [1] - 40:22
reserve [2] - 23:18,
24:19
reserved [1] - 24:21

reserving [5] - 17:14,
102:9, 102:14
reside [1] - 32:26
resolved [2] - 35:10,
35:17, 53:3
respect [30] - 7:23,
21:7, 59:16, 60:20,
62:4, 63:10, 67:20,
73:10, 73:12, 75:2,
75:28, 76:25, 80:27,
80:28, 90:30, 91:21,
92:16, 92:21, 82:23,
82:24, 82:26, 93:1,
96:23, 86:26, 87:2,
87:26, 88:9, 88:16,
88:28, 89:5, 89:14,
89:29, 90:7, 93:15,
93:19
respectful [3] - 9:6,
44:16, 45:6
respectively [1] - 59:3
respond [1] - 39:11
response [4] - 84:12,
84:19, 93:12, 103:2
responsible [2] -
75:24, 75:26
result [1] - 11:9
Resumed [2] - 52:28,
100:2
resumes [1] - 9:14
retained [1] - 19:13
review [2] - 59:25,
101:29
Revised [1] - 79:12
revived [1] - 50:24
Richard [2] - 63:24,
75:15
rights [1] - 35:30
rise [4] - 13:7, 52:2,
52:9, 52:26
rising [1] - 99:16
risk [1] - 20:30
Rms [2] - 82:9, 82:12
Robert [1] - 61:19
Rogatory [8] - 8:5,
13:29, 14:11, 14:15,
20:13, 20:23, 21:9,
30:10, 30:26
role [28] - 1:26, 6:21,
6:22, 16:3, 43:9,
55:18, 55:21, 57:16,
58:6, 58:12, 59:1,
60:14, 64:3, 64:12,
64:28, 65:2, 65:16,
66:2, 70:23, 79:2,
88:4, 88:14, 88:21,
89:10, 89:19, 89:25,
93:8, 94:18
roles [1] - 70:20
Ron [4] - 56:17, 77:4,
77:29, 85:22
Ronald [3] - 61:20,
81:10, 81:29
Ronan [2] - 4:28, 5:3
rooms [1] - 30:13
Rose [2] - 90:20, 90:23
Ross [4] - 64:20, 77:7,

FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 1 - 13/05/08

78:12, 83:7
roughly [2] - 84:6, 96:5
row [1] - 72:14
Rsm [5] - 80:24, 81:10, 81:12, 81:15, 81:20, 83:1, 92:9, 92:12
rubber [1] - 30:7
Rule [3] - 33:16, 33:25, 33:30, 42:22, 44:8, 44:25
rule [3] - 9:9, 35:29, 46:3
ruled [3] - 35:17, 43:19, 47:24
rules [8] - 31:10, 31:13, 37:28, 38:2, 38:7, 38:15, 40:6, 44:8
Rules [13] - 7:3, 22:11, 22:12, 31:3, 33:14, 38:20, 39:4, 39:5, 39:10, 42:21, 43:22, 45:1, 45:10
ruling [2] - 35:30, 42:9
rulings [1] - 51:4
run [1] - 52:10

## S

safely [1] - 18:22
sake [1] - 101:26
sale [2] - 74:25, 77:19
Salinas [1] - 43:20
Sam [11] - 59:3, 63:25, 63:26, 70:27, 71:5, 71:8, 71:16, 75:26, 83:20, 83:26, 89:12
Samuel [1] - 2:12
sat [1] - 94:3
satisfied [5] - 6:9, 19:20, 39:2, 47:25, 52:20
satisfy [1] - 52:16
save [1] - 27:16
saves [1] - 28:9
saw [4] - 8:9, 20:8, 77:8
Saylor [17] - 7:15, 11:11, 13:8, 14:3, 14:22, 15:21, 26:23, 27:19, 31:25, 31:26, 31:28, 32:8, 32:30, 33:6, 37:1, 42:15, 95:2
schemes [1] - 38:26
Schoetsak [2] - 59:16, 59:17
Schuf [1] - 58:7
Schuf-elbaum [1] - 58:7
screens [1] - 47:8
second [11] - 9:25, 9:26, 10:12, 13:24, 14:9, 25:7, 30:23, 32:12, 41:29, 42:3, 44:24, 51:30, 57:6,

82:8, 82:12, 82:15, 83:1
secondly [3] - 11:15, 13:15, 15:18
Secretary [4] - 95:17, 95:18, 95:20
Section [1] - 7:2
sector [2] - 96:15, 97:15
see [16] - 9:30, 11:29, 15:11, 33:19, 44:5, 59:27, 64:22, 65:9, 65:23, 69:26, 72:15, 72:10, 77:6, 81:23, 82:21, 103:2
seek [2] - 13:10, 14:26
seeks [1] - 24:13
seen [1] - 97:16
sees [1] - 44:4
segment [1] - 82:7
Seldman [3] - 92:14, 92:18, 92:20
sell [4] - 63:10, 63:14, 83:24
Sem [1] - 96:24
Semi-state [1] - 96:24
send [5] - 26:13, 75:2, 81:15, 84:18, 84:30
sending [1] - 88:8
Senior [1] - 3:26
senior [1] - 95:8
sense [5] - 13:3, 15:8, 22:2, 32:22, 34:12, 43:22
sensible [1] - 17:29
sent [7] - 17:3, 26:22, 36:24, 68:29, 70:9, 81:29, 82:9
September [3] - 35:24, 78:11, 63:6
series [4] - 18:10, 21:7, 21:8, 60:12
servant [1] - 95:5
servants [1] - 96:29
serve [1] - 63:29
served [6] - 20:10, 57:16, 58:6, 58:12, 64:3, 64:13
Service [2] - 94:27, 95:9
Services [2] - 5:29, 67:13
serving [7] - 66:1, 88:4, 88:14, 88:21, 89:10, 89:19, 89:25
session [3] - 11:23, 24:11, 26:21
set [21] - 6:24, 8:24, 10:24, 11:1, 11:10, 12:20, 12:21, 13:29, 14:11, 14:15, 14:19, 19:3, 27:8, 29:11, 35:24, 46:4, 60:2, 60:22, 71:12, 81:17, 85:2
setting [1] - 96:30

sexual [1] - 36:11
shall [2] - 44:30, 95:7
Shannon [3] - 97:2, 97:12, 97:18
shaping [1] - 101:2
shareholder [3] - 56:8, 56:12, 98:1
shareholding [1] - 98:13
Sheet [4] - 62:15, 62:21, 62:25, 62:30
sheet [1] - 57:8
Sheets [1] - 63:2
sheltered [1] - 84:5
Shipping [1] - 97:18
ships [1] - 97:16
shopping [3] - 17:10, 18:26, 18:30, 19:16, 22:13, 22:10
short [4] - 10:22, 24:2, 51:29, 99:5
show [6] - 55:8, 55:23, 56:14, 57:17, 58:15, 83:29
showed [1] - 67:12
showing [3] - 68:6, 84:22
shown [2] - 24:3, 55:14
shows [1] - 67:12
side [1] - 101:22
Sidley [3] - 90:11, 90:12, 90:14
sign [1] - 4:14
signed [2] - 63:25, 63:26
significant [4] - 29:3, 29:7, 44:24, 66:11
significantly [2] - 11:11, 21:8
signify [2] - 34:14, 34:19
Sil [1] - 97:3
similar [1] - 55:16
similarly [1] - 39:13
simple [1] - 42:14
simply [7] - 7:24, 9:12, 12:3, 21:30, 38:18, 45:2, 46:29
Singer [7] - 72:29, 74:28, 75:1, 76:21, 76:26, 88:27, 89:4
single [2] - 17:20, 22:20
sitting [2] - 46:26, 101:18
situation [1] - 20:14
situations [1] - 42:18
six [1] - 75:10
size [8] - 82:25, 80:27, 80:29, 80:30, 82:22, 82:24, 82:25, 82:26
slight [1] - 51:18
slip [1] - 9:9
slow [1] - 66:18
Sm [1] - 59:2

small [4] - 3:19, 67:11, 69:4, 98:8
smaller [1] - 14:12
Smithwick [1] - 43:20
Smmh [1] - 77:13
sold [1] - 97:27
Solicitor [8] - 1:21, 1:22, 7:12, 9:8, 10:16, 10:29, 20:24, 20:27
solicitor [3] - 2:6, 28:12, 39:15
Solicitor's [8] - 1:22, 3:9, 7:20, 7:25, 9:19, 10:3, 10:6, 10:8
solicitors [2] - 19:13, 38:22
Solicitors [2] - 2:6, 21:27
solicitors' [1] - 30:13
somewhere [1] - 35:17
soon [1] - 100:26
Sorry [5] - 41:11, 46:19, 46:21, 72:15, 84:27
sorry [12] - 3:9, 9:26, 12:15, 15:4, 25:11, 43:6, 49:4, 52:17, 67:19, 82:1, 87:14, 99:11
sort [4] - 14:18, 42:10, 63:26, 95:12
sought [4] - 1:22, 24:4, 25:28, 43:24
source [4] - 70:19, 70:22, 70:25, 74:15, 74:17, 80:5, 80:6, 80:11, 80:14
sovereign [2] - 37:30, 38:2
space [1] - 10:22
speaking [2] - 7:24, 71:8
speaks [1] - 41:15
Special [1] - 101:10
special [1] - 44:28
specific [8] - 11:17, 12:20, 12:21, 30:16, 37:27, 38:20, 38:26, 39:14, 45:8
specifically [3] - 45:4, 72:19, 72:23
specified [1] - 18:16
speculation [1] - 22:17
Spell [1] - 5:5
spelt [1] - 2:27
spirit [1] - 41:18
split [1] - 70:16
spoken [1] - 6:4
spreadsheet [13] - 58:19, 58:22, 58:23, 57:5, 67:18, 67:23, 67:25, 73:29, 74:3, 74:7, 74:10, 77:4,

77:8
stage [9] - 16:29, 26:3, 27:24, 28:10, 40:1, 49:5, 102:13
stamped [1] - 30:7
stand [3] - 29:19, 47:7, 59:2
standi [1] - 8:13
standing [1] - 15:15
start [4] - 1:11, 8:18, 50:15, 54:6
started [4] - 36:20, 58:10
State [23] - 1:20, 1:22, 3:9, 6:19, 7:12, 7:20, 7:25, 9:8, 9:19, 10:2, 10:6, 10:8, 10:16, 10:18, 10:29, 20:24, 20:27, 21:27, 38:1, 38:2, 49:19, 96:3
state [3] - 17:13, 84:4, 96:24
statement [7] - 13:9, 68:25, 69:3, 70:5, 87:11, 87:15
States [21] - 2:20, 4:8, 8:28, 10:10, 10:22, 10:28, 11:8, 13:30, 16:1, 17:6, 17:9, 24:17, 30:10, 31:28, 32:29, 37:28, 39:5, 39:8, 39:9, 67:18, 91:27
states [3] - 31:8, 62:26, 86:24
statute [1] - 36:6
statutory [1] - 38:26
Stenograph [1] - 5:29
stenographer [5] - 4:18, 35:3, 35:13, 38:22
Stenographer [4] - 5:15, 5:19, 5:24, 5:28
stenographer's [2] - 47:7, 47:27
stenography [8] - 32:17, 32:18, 33:1, 34:9, 35:16, 38:21
step [5] - 46:9, 46:10, 63:8
Stephen [1] - 79:17
Stephen.hubble.3gy [1] - 79:18
steps [3] - 60:12, 60:18
Sterling [4] - 95:28, 95:30, 96:2, 96:7
still [6] - 37:5, 56:12, 84:7, 98:13, 102:14
stipulation [2] - 22:9, 22:11
straightforward [1] - 11:13
straitjacket [1] - 13:12
strange [1] - 14:25
Strategy [2] - 55:3,

55:12
strategy [16] - 55:7, 55:17, 55:21, 63:30, 88:9, 88:16, 89:14, 80:30, 90:7, 90:15, 90:23, 91:2, 91:10, 91:18, 91:27, 92:6, 92:13, 92:21
strict [1] - 20:22
strike [3] - 85:16, 85:18
strong [1] - 102:11
structured [1] - 97:14
structures [2] - 84:26, 84:29
structuring [1] - 50:16
style [1] - 2:29
subject [8] - 18:2, 26:10, 42:8, 84:3, 85:23, 98:3
subjected [1] - 30:22
submission [8] - 9:6, 30:21, 37:4, 38:19, 41:29, 42:11, 44:16, 45:6
submissions [7] - 24:24, 30:28, 39:1, 40:12, 40:23, 41:6, 42:1
submit [2] - 13:24, 14:4
subsequent [3] - 8:23, 22:30, 31:16
subsequently [1] - 35:18
subsidiaries [1] - 96:25
subsidiary [1] - 97:27
substance [3] - 9:11, 21:10, 83:25
substantive [1] - 17:5
substituted [1] - 79:30
substitution [3] - 18:15, 18:16, 18:18
success [1] - 66:10
succession [1] - 8:27
suffer [1] - 14:21
suggest [4] - 35:9, 36:15, 53:4, 84:8
suggested [4] - 9:18, 17:17, 19:19, 46:1
suggests [1] - 33:15
sum [3] - 85:26, 87:13, 87:18
summaries [1] - 59:21
summary [3] - 60:8, 77:30, 78:1
sums [3] - 66:14, 66:21, 66:24
Superior [3] - 7:3, 45:1, 45:10
support [1] - 82:3
suppose [5] - 8:18, 97:13, 97:26, 97:28, 98:14
Supreme [2] - 40:23,

43:19
surname [2] - 3:3, 5:5
suspect [1] - 96:30
Sworn [1] - 49:1
sworn [2] - 54:12, 54:15

**T**

tag [1] - 27:5
Tan [2] - 64:21, 79:11
tax [1] - 62:6
Tax [2] - 3:27, 4:3
taxpayer [1] - 62:7
team [1] - 52:6
technical [1] - 15:8
technology [2] - 33:11, 36:29
temperate [1] - 45:19
ten [1] - 99:15
term [1] - 9:14
terms [5] - 13:12, 20:23, 31:16, 31:28, 34:8, 40:5, 84:15, 95:4, 97:13
testified [2] - 88:23, 88:30
testimony [1] - 48:5
text [1] - 69:4
Theis [3] - 80:26, 80:29, 81:14, 82:17, 82:22
themselves [1] - 13:25
thereafter [2] - 65:16, 65:30
therefore [3] - 11:11, 35:9, 45:6
therein [2] - 34:14, 85:2
therewith [1] - 80:17
thinks [1] - 27:12
third [4] - 9:26, 32:21, 35:24, 101:28
thirdly [2] - 13:15, 65:23
Thomas [1] - 62:19
Thornton [2] - 92:3, 92:5
three [19] - 2:15, 3:10, 6:4, 8:25, 11:8, 14:13, 19:20, 21:5, 23:30, 24:1, 24:2, 24:27, 25:22, 26:18, 72:29, 74:30, 75:29, 80:25, 81:13
Thursday [1] - 101:3
Tierney [1] - 1:21
title [3] - 27:9, 62:7, 65:8
today [8] - 3:15, 7:1, 8:3, 12:24, 17:2, 22:20, 26:16, 102:7, 102:8
today's [1] - 45:20
together [2] - 27:24, 26:24

tomorrow [8] - 59:20, 100:20, 101:5, 101:6, 101:10, 101:19, 101:24, 103:1
took [3] - 60:18, 79:5, 97:10
tooth [1] - 15:13
top [2] - 50:15, 72:14
total [5] - 58:11, 77:14, 77:16, 81:1, 82:27
totality [1] - 17:16
totalling [7] - 66:7, 67:22, 71:25, 71:27, 71:30, 78:3, 80:24
totally [1] - 12:11
towards [2] - 39:21, 95:8
Trading [1] - 89:25
Transaction [16] - 58:21, 58:24, 60:4, 60:7, 60:11, 60:19, 60:25, 60:28, 61:1, 61:10, 61:19, 61:29, 62:5, 62:6, 62:22, 63:5
transaction [25] - 8:10, 45:22, 55:2, 58:9, 58:26, 59:17, 59:20, 59:22, 59:30, 60:8, 60:20, 60:29, 62:6, 62:23, 62:24, 62:25, 64:1, 64:6, 66:14, 65:26, 65:28, 72:18, 75:16, 93:16, 93:19
transactions [93] - 57:11, 57:16, 57:20, 57:21, 57:26, 57:27, 57:29, 57:30, 58:2, 58:5, 58:11, 58:25, 58:29, 59:7, 60:16, 60:25, 61:30, 63:4, 63:8, 63:11, 63:17, 70:26, 72:30, 73:2, 73:5, 74:16, 74:18, 74:22, 74:24, 74:29, 75:10, 75:15, 75:20, 75:28, 75:30, 76:3, 76:12, 76:19, 76:23, 77:17, 77:22, 78:1, 78:28, 79:3, 79:5, 79:27, 80:7, 80:9, 80:10, 80:13, 80:15, 80:17, 80:25, 81:13, 82:17, 82:21, 83:13, 83:24, 84:27, 84:30, 85:5, 85:6, 85:11, 85:13, 85:27, 86:27, 87:3, 87:27, 88:10, 88:17, 88:25, 88:28, 89:2, 89:5, 89:15, 90:1, 90:8, 90:16, 90:17, 90:24, 90:25, 91:3, 91:4, 91:10, 91:11, 91:19, 91:20,

91:26, 92:6, 92:14, 92:22, 97:14, 97:20
Transactions [3] - 58:29, 60:23, 73:26
transcript [10] - 33:6, 33:12, 35:24, 39:7, 100:18, 100:19, 100:24, 100:30, 101:30, 102:3
transcripts [2] - 28:13, 39:8
transmitted [1] - 71:13
transpired [1] - 11:3
transpires [1] - 102:23
treeting [1] - 78:19
trend [1] - 96:30
trial [8] - 4:4, 17:5, 17:15, 35:24
tribunal [2] - 34:4, 34:16
Tribunals [3] - 7:2, 36:19, 39:4
tried [1] - 43:25
Trilogy [46] - 57:20, 57:21, 57:27, 57:29, 58:1, 60:10, 76:21, 78:29, 79:2, 79:5, 79:12, 79:17, 79:19, 79:27, 79:28, 79:29, 79:30, 80:3, 80:12, 80:15, 80:24, 81:11, 81:15, 81:19, 82:9, 82:11, 82:30, 83:12, 83:24, 84:30, 85:5, 85:12, 86:14, 86:25, 86:4, 86:5, 86:12, 86:25, 87:1, 87:13, 87:17, 87:19, 87:25, 92:25, 92:30, 93:5
Trilogy's [1] - 83:21
Trilogy-type [3] - 57:21, 57:27, 57:29
true [2] - 97:1, 98:21
trying [1] - 27:8
turn [1] - 43:7
turns [3] - 19:8, 19:15, 101:17
Tv [1] - 98:15
two [16] - 4:14, 4:17, 12:26, 14:2, 32:24, 45:15, 53:11, 64:21, 66:14, 66:21, 66:24, 66:26, 67:28, 86:19, 86:23, 93:13
type [8] - 18:13, 57:21, 57:27, 57:29, 79:19, 97:22
typical [1] - 97:17

**U**

Ucd [3] - 94:14, 94:15, 94:17
Uk [1] - 98:4
ultimate [1] - 64:11
ultimately [3] - 13:7, 20:13, 66:4

unavoidable [1] - 101:13
uncertainty [1] - 28:3
under [8] - 7:2, 9:9, 26:11, 33:30, 39:3, 72:24
underscore [1] - 32:5
understandable [1] - 32:24
understood [1] - 72:22
undertaking [1] - 47:25
undo [1] - 35:30
undoubtedly [1] - 40:19
unfortunately [1] - 96:10
Unfortunately [1] - 101:13
United [27] - 2:19, 4:8, 8:28, 10:10, 10:22, 10:28, 11:8, 13:30, 16:1, 17:6, 17:9, 24:15, 30:10, 31:28, 32:29, 37:28, 39:5, 39:8, 39:9, 67:1, 67:18, 67:20, 57:21, 68:3, 69:13, 69:16, 91:27
unjust [1] - 45:28
unless [4] - 12:9, 68:21, 84:15, 101:6
unusual [3] - 14:25, 30:23, 41:17
up [7] - 46:14, 50:8, 52:19, 58:16, 95:7, 97:8, 97:10
updated [4] - 59:18, 78:12, 83:8
Usa [6] - 1:8, 3:11, 12:26, 13:7, 31:27, 32:26, 33:4, 33:9, 91:24
usual [1] - 84:9
utilized [1] - 73:14

**V**

vague [1] - 22:14
valid [1] - 30:20
value [1] - 26:20
variation [2] - 7:7, 10:19, 51:19
varied [4] - 10:27, 12:13, 12:15, 12:17
various [5] - 11:17, 11:18, 19:9, 20:4, 74:24
vary [4] - 12:22, 14:27, 44:3, 45:27
ventilated [1] - 36:2
venture [8] - 74:19, 76:3, 76:17, 80:10, 80:17, 83:23
verified [1] - 101:1
verify [7] - 49:9, 86:10,

86:16, 86:29, 87:5,
87:23, 87:29
version [3] - 50:11,
50:12, 79:14
versus [1] - 84:16
Victorian [1] - 35:25
video [30] - 29:9,
29:23, 30:9, 30:11,
30:15, 30:20, 30:21,
31:1, 31:6, 31:14,
33:1, 34:9, 35:16,
35:19, 36:7, 36:17,
38:25, 39:9, 39:11,
39:21, 40:21, 42:8,
42:27, 45:4, 45:7,
45:9, 46:6, 46:14,
47:21
videographer [1] -
4:18
Videographer [9] -
4:28, 5:3, 5:7, 5:11,
46:17, 46:29, 47:4,
47:10
videography [3] -
38:16, 38:20, 40:7
view [9] - 20:21,
37:12, 39:16, 39:20,
39:25, 45:13, 45:22,
102:11, 102:13
views [1] - 40:1
Viola [3] - 5:15, 5:19
violently [1] - 84:15
virtue [2] - 23:19,
102:3
visual [1] - 40:16
visually [4] - 35:12,
46:27, 47:27
volume [1] - 18:11
vouching [1] - 100:21
vs [1] - 43:20

**W**

Wainwright [3] -
81:19, 81:10, 81:30
wait [1] - 53:10
waiting [1] - 100:30
wants [2] - 33:10,
37:27
watching [1] - 21:30
ways [1] - 11:17
weather [1] - 17:26
week [3] - 9:14, 35:24,
96:5
weeks [1] - 35:27
weigh [1] - 33:5
Weiss [2] - 82:16,
82:26
welcome [4] - 1:7,
3:24, 4:1, 16:13
well-known [1] - 36:15
west [1] - 98:18
whatsoever [1] - 39:7
whilst [2] - 26:18, 34:6
white [7] - 23:25, 24:4,
26:21, 26:26, 27:29,

28:15
Whiteside [2] - 82:17,
82:25
whole [1] - 26:21
wholly [1] - 30:28
wider [1] - 14:14
William [3] - 2:5,
82:17, 82:22
willing [2] - 15:19,
20:30
win [1] - 36:3
wire [8] - 59:20, 68:28,
70:8, 72:11, 76:11,
76:13, 76:15
wired [2] - 87:13,
87:18
wish [10] - 16:28,
17:9, 23:18, 33:10,
38:18, 39:10, 40:9,
47:15, 51:29, 98:28
wishes [4] - 24:14,
26:12, 37:11, 41:29
Withdrew [1] - 100:16
witness [38] - 23:5,
25:27, 25:29, 33:5,
38:7, 38:22, 46:11,
46:13, 50:30, 54:12,
55:25, 56:16, 56:30,
58:18, 59:12, 61:14,
63:21, 64:17, 67:16,
71:2, 73:26, 76:8,
76:30, 77:26, 78:9,
79:8, 80:19, 81:7,
82:5, 83:16, 83:30,
85:30, 99:11,
101:28, 101:30
Witness [3] - 1:3,
93:24, 100:16
witness's [1] - 52:13
witnesses [39] - 2:13,
2:15, 3:10, 4:13,
4:14, 8:25, 8:28,
10:9, 10:28, 11:8,
11:18, 11:20, 11:24,
12:1, 13:1, 13:25,
15:6, 17:2, 20:4,
21:5, 23:26, 23:28,
25:11, 26:15, 26:19,
29:8, 29:9, 30:21,
31:10, 31:24, 32:13,
32:26, 36:1, 36:11,
36:14, 36:30, 38:9,
45:29, 49:19
wonder [3] - 49:8,
99:4, 102:25
Wood [2] - 90:12,
90:15
word [1] - 37:23
words [2] - 8:30,
13:24
works [1] - 4:3
world [1] - 16:16
worried [1] - 43:14
worry [1] - 43:11
writing [7] - 18:30,
19:3, 31:9, 32:16,
35:4, 35:12, 38:6

written [2] - 18:4,
18:14
Wyoming [1] - 72:4

**Y**

year [4] - 62:27, 62:28,
72:9
years [1] - 98:17
yesterday [2] - 40:20,
45:30
young [1] - 36:11
yourself [5] - 4:25,
86:20, 88:5, 93:27,
98:22

**Z**

Zealand [1] - 36:25

# DECLARATION

I, _MARTIN HALKET_, declare that I have read the enclosed transcript and that I am satisfied that it reflects a true and accurate account of the evidence given by me.

Dated this _15th_ day of _May_ 2008.

Signed: _M. Halket_

The enclosed transcript was adopted by _Cormlune_

Judge of the District Court

On this _15th_ day of _May_ 2008.

Signed: _Cormlune_

# Exhibit F Part 1

# THE CIRCUIT COURT

**2008 No 1 FTE**

**IN THE MATTER OF THE FOREIGN TRIBUNALS (EVIDENCE) ACT 1856
AND IN THE MATTER OF CIVIL PROCEEDINGS BEFORE THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
AND IN THE MATTER ENTITLED**

**BETWEEN**

**FIDELITY INTERNATIONAL CURRENCY
ADVISOR A FUND LLC**                                    **PLAINTIFF**

           **AND**

**UNITED STATES OF AMERICA**                            **DEFENDANT**

### TRANSCRIPT OF EVIDENCE HEARD PURSUANT TO LETTERS ROGARTY BEFORE JUDGE CORMAC DUNNE ON THE 13TH OF MAY, 2008 AND FOLLOWING DAYS.

**TRANSCRIPT OF EVIDENCE ON THE 14TH OF MAY, 2008**

*Day Number*

# 2

I hereby certify the following to be a true and accurate transcript of my shorthand notes of the above named proceedings.

✔ *Viola Doyle* — Viola Doyle RPR

✔ *Mary McKeon* — Mary McKeon RPR

COPYRIGHT
Transcripts are the work of the shorthand writer and they must
not be printed, photocopied, electronically transmitted or
reproduced in any manner or supplied or loaned by an appellant
to a respondent or to any other party without written permission
from the shorthand writer.a

DOYLE COURT REPORTERS LIMITED,
2, ARRAN QUAY, DUBLIN 7,
REPUBLIC OF IRELAND.

Tel..................................+353 1 8722833
Fax.................................+353 1 8724486
After Hours......................+353 87 2674750
Email...............................info@dcr.ie

# A P P E A R A N C E S

**For the Plaintiff**:                    Mr. Klaus Reichert, BL
                                          David Curtin - Attorney

Instructed by:                            Joe Kelly
                                          A & L Goodbody Solicitors


**For the Defendant**:                    Mr. C. MacEochaidh, BL
                                          Denis Donohue - Attorney
                                          John Linquist - Attorney

Instructed by:                            Gus Cullen
                                          Agustus Cullen Law
                                          Solicitors


**For the C.S.S.O**:                      Mr. C. Dignam, BL

Instructed by:                            Mark Tierney
                                          C.S.S.O.


**For Mr. Hawkes,
Mr. Mahoney, and
Mr. Hussey**:                             Mr. C. Lewis, BL

Instructed by:                            Aimee Gallagher
                                          William Fry Solicitors

<u>I N D E X</u>

| <u>Witness</u> | <u>Page No.</u> | <u>Line No.</u> |
|---|---|---|
| SAMUEL MAHONEY | | |
| EXAMINED BY | 3 | 1 |
| MR. MacEOCHAIDH | | |
| CROSS-EXAMINED BY MR. REICHERT | 46 | 21 |
| RE-EXAMINED BY MR. MacEOCHAIDH | 65 | 2 |

1

1    **THE PROCEEDINGS RESUMED ON THE 14TH MAY, 2008, AS FOLLOWS:**

2

3    JUDGE DUNNE:  Now, are we ready to start?

4

5    MR. MacEOCHAIDH:  Yes, Judge, we are ready to start.

6    Before I move to the examination of the next witness, there

7    is a small note which I would like to be recorded by way of

8    observation, which is that, when Mr. Hawkes was giving

9    testimony yesterday, he marked two of the exhibits with a

10   pen or a pencil, and those exhibits are numbered 2465 and

11   2467.  And I am simply asking the record to reflect that

12   these original exhibits were marked by the witness, and

13   would ask the Plaintiff to indicate that he concurs that

14   this happened, just for the record.  I can show those

15   documents --

16

17   JUDGE DUNNE:  What is the nature of the mark?  Is it an

18   underlining of a particular --

19

20   MR. MacEOCHAIDH:  They are ticks beside items.

21

22   JUDGE DUNNE:  Well, we can assume that they were done in

23   the context of refreshing his memory at the time.

24

25   MR. MacEOCHAIDH:  Yes, no comment is made --

26

27   JUDGE DUNNE:  There is no issue as to the nature or

28   motivation, simply just --

29

30   MR. MacEOCHAIDH:  That doesn't arise, just to say that the

1          original exhibit altered in the hands of the witness.

2

3          JUDGE DUNNE:  There is consent on all that?  Thank you very

4          much.

5

6          MR. MacEOCHAIDH:  May it please the Court.

7

8          Could we now have Mr. Mahoney, please.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

1  **SAMUEL MAHONEY, HAVING BEEN SWORN, WAS EXAMINED BY**

2  **MR. MacEOCHAIDH AS FOLLOWS:**

3

4        MR. REICHERT:  Could I simply record the same objection

5        that I made yesterday, that global stipulation, applies

6        again today.

7

8        JUDGE DUNNE:  Yes, we can take it as repeated.

9

10  1  Q. MR. MacEOCHAIDH:  Morning, Mr. Mahoney.  To begin with,

11        Mr. Mahoney, can I ask you, were you involved with a

12        transaction known as the Financial Derivatives Investment

13        Strategy, referred to in the following questions as the

14        FDIS?

15     A. Yes.

16  2  Q. How is it that you came to be involved with FDIS?

17     A. In the month of May, 2001, James Haber were described by

18        e-mail and phone how the strategy would work.

19  3  Q. You are now being handed a document, which is marked as

20        Government Exhibit 2452.  (Document handed to witness.)  Do

21        you have that document?

22     A. Yes.

23  4  Q. And will you take a look at it for a moment.  This is draft

24        marketing materials for the Financial Derivatives

25        Investment Strategy which were being circulated by e-mail

26        dated April 5, 2001.  Were these draft marketing materials

27        provided to you or shown to you by Mr. Haber in May 2001?

28     A. In all likelihood at some point we received a similar

29        power-point presentation which described the strategy in

30        detail, including the role of a foreign partner such as

1           ourselves.

2      5    Q. And based upon Mr. Haber's explanation, did you agree to

3           play the role of foreign partner in this strategy?

4           A. Yes.

5      6    Q. You are now being handed a document which is marked as

6           Government Exhibit 2451.   (Document handed to witness.)  Do

7           you have that document?

8           A. I have that.

9      7    Q. As you will see, that is an e-mail dated the 10 September,

10          2001, from Mox Tan of Helios Financial, which purports to

11          be distributing the "bios of the two individuals who serve

12          as the co-investors in our transactions," according to the

13          quotation.  The two individuals are identified in this

14          document as Sam Mahoney and Martin Hawkes.  Did you,

15          Mr. Mahoney, ever see this e-mail?

16          A. No, I didn't.

17     8    Q. Are you the Sam Mahoney referenced in the biography for Sam

18          Mahoney?

19          A. Yes.

20     9    Q. Which is marked at Government Exhibit 2451?

21          A. Yes.

22     10   Q. You are.  Thank you.  And was this bio, or biography, for

23          you, which is marked as part of that exhibit, prepared by

24          you?

25          A. I think so.

26     11   Q. Is this bio, biography, for you, which you have in front of

27          you, accurate?

28          A. Yes.

29     12   Q. The biography for you lists you as a shareholder and

30          director of a company called Biosphere Finance Limited, or

1   BFL, as it has been referred to in some places in these

2   questions.  Is BFL an Irish company?

3  A. Yes.

4  13 Q. When was BFL incorporated?

5   A. 29th May, 1991.

6  14 Q. And is this e-mail address seen there as bfl@indigo.ie the

7   e-mail address for Biosphere Finance?

8   A. Yes.

9  15 Q. Are you still a shareholder and director of BFL?

10   A. Yes.

11  16 Q. Were you aware that Mox Tan of Helios Financial was

12   reporting to potential FDIS customers -- sorry, was

13   representing to potential FDIS customers that you were one

14   of two individuals who served as the co-investors in the

15   FDIS transactions?

16   A. No.

17  17 Q. Now, Mr. Mahoney, in the aide memoire from which we are

18   working, which is known to this forum, the matters

19   identified as numbers 14 to 18 are not for you, so we'll go

20   to the next matter, which I think is number 19 there.

21

22   You are now being handed a document which is marked as

23   Government Exhibit 2460.  (Document handed to witness.)  Do

24   you have that?

25   A. I do.

26  18 Q. And that's an e-mail dated the 31 October, 2002, from Ron

27   Buesinger of Alpha to Elizabeth Jung of Diversified Group

28   Incorporated, also known as D.G. in these questions,

29   forwarding a spreadsheet named 2001-Customers-HaberInvst-

30   12-31-01-R.xls."  Did you ever receive a copy of this

1          e-mail you have in front of you or of the attached

2          spreadsheet?

3      A. I never received a copy of this spreadsheet.

4   19 Q. The attached spreadsheet to this e-mail and the second page

5          of that exhibit lists 47 customers.  Do you recognise the

6          names on the attached list?

7      A. Yes, as far as I can tell.

8   20 Q. I am sorry, I was talking to Mr. Donohue, what did you say?

9      A. Yes, as far as I can tell.

10  21 Q. Thank you.  And what do the names on the list relate to?

11     A. They are all persons who participated in FDIS transactions

12          during 2001.

13  22 Q. And does this list appear to be complete?

14     A. It appears to be a complete list of the 2001 FDIS

15          transactions in which one or the other of us, Mahoney or

16          Hawkes, served in the role of foreign partner.

17  23 Q. Mr. Mahoney, you are now being handed another document,

18          which is marked as Government Exhibit 2465.  (Document

19          handed to witness.)  Do you have that now in front of you?

20     A. I do.

21  24 Q. And will you just take a look at it.  You will see that

22          it's a document produced by Alpha, and it has a Bates

23          number on the bottom of that document, which is

24          Bates-1-Alpha-disk09-002452.  Do you see that?

25     A. I do indeed.

26  25 Q. And it's entitled Trilogy 2002, and identifies line

27          transactions as Trilogy-type transactions.  Did you ever

28          receive a copy of this document?

29     A. No.

30  26 Q. Do you recognise the transactions identified in this

| 1 | | | document as Trilogy-type transactions? |
|---|---|---|---|

1            document as Trilogy-type transactions?

2            A. Yes, I believe so.

3    27    Q. And can you tell us what are Trilogy-type transactions?

4            A. They are FDIS transactions which were implemented in 2002

5                 through Trilogy Investments Limited.

6    28    Q. Does this list of 2002 FDIS transactions appear to be

7                 complete?

8            A. It appears to be a complete list of the 2002 FDIS

9                 transactions in which one or other of us, Mahoney or

10               Hawkes, also served in the role of foreign partner.

11   29    Q. Schut-Elbaum is listed on both Government Exhibit 2460 and

12             Government Exhibit 2465.  Do you see that?

13           A. Yes.

14   30    Q. Is this the same FDIS transaction?

15           A. Yes, it was started in 2001, but carried over to 2002.

16   31    Q. Were there a total of 55 FDIS transactions in 2001 and 2002

17             in which you, Mr. Mahoney, or Mr. Hawkes, served in the

18             role of foreign partner?

19           A. Yes.

20   32    Q. Mr. Mahoney, you are now being handed another document, or

21             documents, and these are marked as Government Exhibits

22             2459.01 to 2459.55.  (Documents handed to witness.)  There

23             is a bundle of documents there.  Do you have that in front

24             of you?

25           A. I do.

26   33    Q. Do you want just to take a moment to look at those

27             documents?

28           A. Yes, I have looked at those now.

29   34    Q. Can I ask the record to reflect that Mr. Mahoney took some

30             minutes to look at those 55 documents, and that he was at

1           his ease in so doing.  Each of the items in that bundle of

2           documents, Mr. Mahoney, is an Outline of Proposed

3           Transaction for each of the 55 transactions that you have

4           identified as either a 2001 or a 2002 FDIS transaction.  Do

5           you recognise each of these Outlines of Proposed

6           Transaction as relating to an FDIS transaction?

7       A. Yes.

8    35 Q. In each of these outlines, the role of co-investor is

9           assigned either to SM or MH.  Do those initials stand for

10          you, Sam Mahoney, and your colleague, Martin Hawkes,

11          respectively?

12      A. Yes.

13   36 Q. How was it determined whether you, Mr. Mahoney, or

14          Mr. Hawkes, would be the named foreign partner in the 2001

15          and 2002 FDIS transactions?

16      A. Generally, it was on an alternating basis, and I don't know

17          how it was decided which of us would go first.

18   37 Q. You are now being shown an exhibit which is marked as

19          Government Exhibit 2453.  Do you have that in front of you?

20      A. I have that, yes.

21   38 Q. This is an e-mail, as you will see, dated the 2nd October,

22          2001, from Phil Kampf of Helios Financial to David Schostak

23          with respect to the Jerome Schostak FDIS transaction.  And

24          Mr. Kampf states in that e-mail: "Here is the updated

25          letter.  I will forward original by mail.  I will also be

26          e-mailing an Outline of the Proposed Transaction tomorrow

27          which gives wire instructions, cost breakdowns, potential

28          profit summaries, etc..  We do not have an engagement

29          letter for the transaction.  Assuming you agree with the

30          content of the outline, we will form the entities and

1                       forward all of the operating documents to you for your

2                       review." That's the end of the quotation in the letter.

3                       Did you ever see a copy of this e-mail?

4            A. No.

5       39   Q. Did anyone ever explain to you why there was no engagement

6                       letter for the FDIS transaction?

7            A. No.

8       40   Q. Were you ever informed, as set forth in that e-mail that

9                       you have in front of you, Exhibit 2453, that the FDIS

10                      product was marketed using the Outline of Proposed

11                      Transaction?

12           A. No.

13      41   Q. What was your understanding of what the Outline of Proposed

14                      Transaction was?

15           A. A summary of the transaction that a prospective investor

16                      was contemplating entering into with the Diversified Group

17                      Inc., DGI, or Trilogy Investments Limited.

18      42   Q. Did you understand the Outline of Proposed Transaction for

19                      the FDIS product to detail a series of steps for the

20                      implementation of the FDIS product?

21           A. Our role as foreign investor in FDIS was primarily that of

22                      an implementing party. We were not involved in the

23                      structuring or negotiating of the transaction or the

24                      documents associated therewith. As a general matter, the

25                      steps we took were in accordance with the steps described

26                      in the Outline of Proposed Transaction for each particular

27                      transaction. The economics we adhered to with respect to

28                      the capital contributions were formulaic. By that I mean

29                      consistent with the percentages set forth in the Outline of

30                      Proposed Transactions.

1    43   Q. Did you know, during 2001 and 2002, that there was an

2           Outline of Proposed Transaction for each of the FDIS

3           transactions?

4       A. Yes.

5    44   Q. Did you receive a copy of each of those Outlines of

6           Proposed Transaction prior to the implementation of the

7           FDIS transaction?

8       A. We probably did, as we would generally receive an Outline

9           of Proposed Transaction for each DGI or Helios client who

10         formed a multi-member LLC or partnership of which either of

11         us was the foreign partner.

12    45   Q. Now you are being handed, Mr. Mahoney, an exhibit marked

13          Government Exhibit 2456. (Document handed to witness.)  And

14          can I ask you, do you have that in front of you?

15       A. I have it in front of me, yes.

16    46   Q. Can I ask you, when you are looking at that, could you go

17          back to that bundle of documents which you received and

18          also take out Government Exhibit -- I am sorry.  You don't

19          have to do what I'm asking you to do.  You can just look at

20          Government Exhibit 2456.  Do you have that in front of you?

21       A. I have it in front of me, yes.

22    47   Q. Very good.  This is an e-mail dated 5th of November, 2001,

23          from James Haber of Diversified Group, forwarding to BFL an

24          Outline of Proposed Transaction for Francis.  Did you

25          receive this e-mail and attachment?

26       A. We probably did receive this e-mail and the attachment.

27    48   Q. You are now being handed, Mr. Mahoney, a document which is

28          marked as Government Exhibit 2457.

29          (Document handed to witness)

30       A. Yes, I have that.

```
 1   49  Q. And you are also being handed, at the same time, an extract
 2           from the bundle you have previously received, and it's
 3           marked Government Exhibit 2459.46.
 4           (Document handed to witness.)
 5       A. Yes, I have that as well.
 6   50  Q. The second document is, in fact, the attachment, which I
 7           would ask you to look at.  Would you look at both of those
 8           documents just for a moment?
 9       A. Yes, I have looked at them.
10   51  Q. You have had a moment to look at those?
11       A. Yes, I have done that.
12   52  Q. The first document, that being Government Exhibit 2457, is
13           an e-mail dated November 16, 2001, and it's from James
14           Haber of the Diversified Group, forwarding to BFL Outlines
15           of Proposed Transaction for Caputo, Wainwright, Robert G
16           Ciasulli, and Ronald J Ciasulli.  Did you receive this
17           e-mail and attachment?
18       A. We probably did receive this e-mail and the attachments.
19   53  Q. Now you are being handed another document.  This one is
20           marked as Government Exhibit 2458.  (Document handed to
21           witness.)  Do you have that?
22       A. I do.
23   54  Q. This is an e-mail, as you will see, dated the 5th November,
24           2002, from Elizabeth Jung of DGI to the e-mail address
25           bfl@indigo.ie forwarding an Outline of Proposed Transaction
26           for Erb, one of the 2002 FDIS transactions.  Did you
27           receive this e-mail and attachment?
28       A. We probably did receive this e-mail and the attachment.
29   55  Q. Did you understand from your discussions with Mr. Haber
30           with respect to FDIS and the Outlines of Proposed
```

1                    Transaction that you received, that a purpose of the FDIS

2                    transaction was to generate tax losses for the US taxpayer

3                    identified in the title of the Outline of Proposed

4                    Transaction?

5          A. Yes.

6    56    Q. Now you are being handed another document, this time it's

7                    marked as Government Exhibit 2454, and a second document

8                    which is marked as Government Exhibit 2455.

9                    (Documents handed to witness.)

10         A. Yes, I have those.

11   57    Q. You have those?

12         A. Mmm-hmm.

13   58    Q. First is an e-mail dated October 11, 2001.  It's from

14                   Michael Kerekes, K-E-R-E-K-E-S, of BDO Seidman LLP to Phil

15                   Kampf of Helios Financial, forwarding a completed Investor

16                   Fact Sheet for Joseph Francis, one of the FDIS

17                   participants.  And that second document you were handed is

18                   an e-mail dated October 17, 2001, and it's from Phil Kampf

19                   to Thomas Lavato at the law firm of Brown Raysman,

20                   forwarding him the completed investor fact sheet for Joseph

21                   Francis, along with the Outline of Proposed Transaction for

22                   Francis' FDIS transaction, asking Lavato to form the

23                   entities and to get the documents ready for this

24                   transaction.  The Investor Fact Sheet lists the transaction

25                   size as $27,000,000 and, as to whether it is "Capital" or

26                   "Ordinary", states "23MM Ordinary this year with the

27                   potential for 4MM later this year or early next year."  Did

28                   you receive a copy of the Investor Fact Sheet for any of

29                   the participants in FDIS?

30         A. No, we did not receive investor fact sheets for

```
 1              Mr. Francis or, so as far as we remember, for any of the
 2              other FDIS transactions.
 3       59   Q. Each of the Outlines of Proposed Transaction for FDIS
 4              reference a planned partial buy-out of the interest of the
 5              named foreign partner.  Were you aware that this was a
 6              planned step in each of the FDIS transactions?
 7            A. Yes.
 8       60   Q. Did you have a buy-sell understanding with respect to each
 9              of the FDIS transactions in which you participated?
10            A. Yes.
11       61   Q. Did you understand from the outset that you could be
12              required to effectuate a buy-sell after the contribution of
13              capital to the partnership?
14            A. Yes.
15       62   Q. And did this apply to the Fidelity International
16              transaction as well?
17            A. Yes.
18       63   Q. Now you are being shown another document.  This is marked
19              as Government Exhibit 2461.  (Document handed to witness.)
20              Do you have that?
21            A. I do.
22       64   Q. This is a copy of the buy-sell agreement with Richard Egan,
23              purportedly signed by you, Mr. Mahoney.  Was this document
24              in fact signed by you, Mr. Mahoney?
25            A. Yes.
26       65   Q. Did James Haber promise you any sort of fee in exchange for
27              your agreement to serve as foreign partner in the FDIS
28              strategy?
29            A. Yes.  Before the first FDIS transaction was entered into,
30              James Haber promised to pay an amount that was fair and
```

1         commensurate with the roles to be served by Kilsture

2         Limited and Maddox Limited, which we appointed as our

3         agents for the purpose of implementing the FDIS

4         transactions.  Kilsture and Maddox are Isle of Man

5         companies.

6    66   Q. Did you have any discussion with anyone other than James

7         Haber regarding what the amount of this fee should be?

8         A. All discussions in this regard were with James Haber,

9         including the ultimate decision on what constituted an

10        amount that would be fair and commensurate with the role to

11        be served by Kilsture and Maddox.

12   67   Q. Do you know how the amount of this fee was to be computed?

13        A. No.

14   68   Q. You are now being shown another document, marked as

15        Government Exhibit 2469.  (Document handed to witness.)  Do

16        you have that?

17        A. I do.

18   69   Q. And this is an e-mail dated 17 May, 2001, from Mr. Haber to

19        Ivan Ross of Alpha and Mox Tan of Helios Financial, with

20        two attachments.  Do you see that?

21        A. I do.

22   70   Q. Did you ever receive or see a copy of this e-mail or the

23        attachments?

24        A. No.

25   71   Q. The e-mail which you have in front of you, and is dated as

26        you can see, May 17, 2001, is this date before or after the

27        date in May of 2001 when James Haber presented to you by

28        e-mail and phone the opportunity to play the role of

29        foreign partner in FDIS?

30        A. I do not know.

1 72 Q. During the presentation by James Haber in May 2001 of the

2     opportunity to play the role of foreign partners in FDIS,

3     did Mr. Haber discuss with you what the amount of your

4     contribution would be as foreign partners?

5    A. No.

6 73 Q. One of the attachments to the e-mail which you have in

7     front of you, that is the one that's marked as Government

8     Exhibit 2469, is an attachment with the Bates number

9     1Alpha-Disk03-013502 with the title "Profit Analysis".  Do

10     you see that?

11    A. Yes.

12 74 Q. This attachment lists the amount of the foreign

13     contribution as.38%.  Did Mr. Haber discuss with you in May

14     2001 what the amount of the foreign contribution would be

15     in the FDIS transactions?

16    A. No.

17 75 Q. Did Mr. Haber discuss with you in May 2001, or thereafter

18     during 2001, that the amount of foreign contribution for

19     the role of foreign partner was a certain pre-agreed upon

20     fixed percentage?

21    A. No.

22 76 Q. In that exhibit, which is 2469, the profit analysis which

23     you have in front of you there, also lists a foreign fee

24     equal to .15% with the caveat "Not to exceed 50,000."  Did

25     Mr. Haber discuss with you in May 2001 that he was

26     proposing to pay you a "Foreign Fee" on each FDIS

27     transaction equal to .15%, with the caveat "Not to exceed

28     50,000" per transaction?

29    A. No.

30 77 Q. Did Mr. Haber discuss with you in May 2001, or after that,

```
 1              the amount of the foreign fee to be paid for your service

 2              -- for your serving the role of foreign partners in FDIS?

 3         A. Yes.

 4     78  Q. And were these fees ultimately paid?

 5         A. Yes.

 6     79  Q. How was the amount of the fee that you were paid computed?

 7         A. A fee totalling $2,000,000 was paid, but we do not know how

 8              this amount was computed.  It is our understanding that

 9              $2,000,000 in fees, as determined after the fact, were a

10              function of the aggregate success of the FDIS programme and

11              in significant part a function of the gross amount of the

12              fees paid by the US participants.

13     80  Q. And how was this $2,000,000 fee paid?

14         A. $100,000 was received by Biosphere Finance limited, BFL, in

15              two equal sums of $50,000 on 15 February, 2002, and 3rd

16              May, 2002.  I believe $1,140,000 was paid to Maddox Limited

17              (Maddox) in two equal sums of $570,000 on or about 22

18              February, 2002, and on or about 3 May, 2002.  And $760,000

19              was paid to, I believe, to Kilsture Limited (Kilsture) in

20              two equal sums of $380,000 on or about 22nd February, 2002,

21              and on or about 3rd May, 2002.

22     81  Q. Just to back-track just a little there.  In relation to the

23              first part of your answer, when you were explaining how the

24              $2,000,000 fee was paid, you referred to the amount of

25              $100,000 being received by Biosphere Finance.  Do you mean

26              as received from Biosphere Finance Limited, that it was

27              paid to them?

28         A. It was paid to them.  It was received on that date by

29              Biosphere.  I can't speak as to what date it was actually

30              paid on.
```

1     82   Q. Who paid each of these two $50,000 fee payments to BFL?

2          A. The $50,000 fee payments that we received on the 15th

3             February, 2002, were received from Helios Financial.  The

4             fee payment that we received on May 3, 2002, was from DGI

5             paid through United Acquisition LLC.

6     83   Q. You are now being handed, Mr. Mahoney, a document marked as

7             Government Exhibit 2468.  (Document handed to witness.)  Do

8             you have that?

9          A. I do.

10    84   Q. You will see that is a document prepared by Helios

11            Financial, and it lists a payment to BFL in the amount of

12            $50,000 on 15 February, 2002, which identifies the purpose

13            of this payment as for administration and agency services.

14            Do you see that?

15         A. I do.

16    85   Q. Do you know why Helios Financial identified the purpose of

17            this payment as administration and agency services?

18         A. No.

19    86   Q. You are now being handed another document, and this one is

20            marked as Government Exhibit 3025.  (Document handed to

21            witness.)  Do you have that?

22         A. I do.

23    87   Q. And you will see that this is a spreadsheet produced to the

24            United States on your behalf by counsel for DGI with

25            respect to United Acquisition LLC, which reflects payment

26            from United Acquisition LLC to BFL, Maddox, and Kilsture on

27            the 3 May, 2002, totalling a sum of $1,000,000.  Do you

28            recognise the spreadsheet?

29         A. No.

30    88   Q. Do you know who created the spreadsheet which is marked

1              there as 3025?

2        A. No.

3    89  Q. Who paid these two $570,000 sums to Maddox?

4        A. I believe the $570,000 fee payment that Maddox received on

5            or about the 22nd February, 2002, was received from Helios

6            Financial, and the $570,000 fee payment that Maddox

7            received on or about the 3rd May, 2002, was from DGI, paid

8            through United Acquisition LLC.

9    90  Q. Mr. Mahoney, what is Maddox?

10       A. Maddox is an Isle of Man company.

11   91  Q. Now you are being handed another document -- sorry, it's a

12           document that you already have.  If you could just look at

13           it, it's marked 2468.

14      A. Yes, I have that.

15   92  Q. And as you can see, and as noted, it's prepared by Helios

16           Financial, and it lists a payment to Maddox in the amount

17           of $570,000 on the 22nd February, 2002, and it identifies

18           the purpose of this payment as for "Consultancy Services."

19           Do you see that?

20      A. I do.

21   93  Q. And do you know why Helios Financial identified the purpose

22           of this payment as "Consultancy Services"?

23      A. No.

24   94  Q. Now you are being handed a document marked as Government

25           Exhibit 2467, and do you have that?

26           (Document handed to witness.)

27      A. I do.

28   95  Q. And as you will see, and looking at this document, it's a

29           bank statement of Helios Financial LLC, Bank of America,

30           Account No. 000 0597 1888, and it's for the period 1

1           February, 2002, to the 28 February, 2002, which reflects

2           that on the 22nd February, 2002, a wire in the amount of

3           $570,000 was sent from Helios Financial to Maddox Limited,

4           bearing ID numbers 9545-40041974, Bnf.Bk Isle of Man Bank.

5           Did Maddox receive this payment of $570,000 through the

6           Isle of Man Bank, Account No. 9545-40041974?

7       A. That would appear so.

8   96  Q. And who paid each of these two $380,000 payments to

9           Kilsture?

10      A. I believe the $380,000 fee payment that Kilsture received

11          on or about the 22 February, 2002, was received from Helios

12          Financial, and the $380,000 fee payment that Kilsture

13          received on or about 3 May, 2002, was from DGI, paid

14          through United Acquisition LLC.

15  97  Q. And, Mr. Mahoney, what is Kilsture?

16      A. Kilsture is an Isle of Man company.

17  98  Q. And when was Kilsture incorporated?

18      A. 22 October, 1998.

19  99  Q. You are now being handed, unless you already have -- you

20          already have, I am sorry -- a document which is marked as

21          Government Exhibit 2468.  Do you have that again in front

22          of you?

23      A. I do have it in front of me, yes.

24  100 Q. And as previously noted, and as you will see, it's prepared

25          by Helios Financial.  And it lists a payment to Kilsture in

26          the amount of $380,000 on the 22 February, 2002.  It

27          identifies the purpose of the payment as for "Consultancy

28          Fees."  Do you see that?

29      A. Yes.

30  101 Q. Do you know why Helios Financial identified the purpose of

```
 1              that payment as for "Consultancy Fees"?

 2         A. No.

 3   102   Q. And if you can look back to another exhibit which you

 4              already have there, and that's the document bearing

 5              Government Exhibit 2467.  Do you have that?

 6         A. I do.

 7   103   Q. And as stated before, it's a bank statement of Helios

 8              Financial LLC.  This one has Bank of America, Account No.

 9              000 0597 1888, and it's for the period 1 February, 2002, to

10              the end of February, 28 February, 2002.  And it reflects

11              that on the 22 February, 2002, a wire in the amount of

12              $380,000 was sent from Helios Financial to Kilsture

13              Limited, and it bore ID reference 9545-40035729 Bnf.Bk.Isle

14              of Man Bank.  Did Kilsture receive this payment of $380,000

15              through the Isle of Man Bank bearing Account No.

16              9545-40035729?

17         A. It would appear so.

18   104   Q. And why were Maddox and Kilsture paid different fee

19              amounts?

20         A. Maddox and Kilsture were paid different amounts because it

21              was agreed to split the fees from FDIS on a 60:40 basis;

22              60% to Maddox and 40% to Kilsture.

23   105   Q. Did you and James Haber discuss, during May of 2001, what

24              would be the source of the funds that you would be

25              contributing in your roles as foreign partners?

26         A. No.

27   106   Q. What was the source of the funding for the capital

28              contributions that you were making in your role as foreign

29              partner?

30         A. The source of the funding for our capital contributions to
```

| | | |
|---|---|---|
| 1 | | the partnerships in the FDIS transactions is detailed in |
| 2 | | the handwritten ledger prepared by Sam Mahoney dated 7 |
| 3 | | January, 2002, and entitled "Funding of Partnerships," a |
| 4 | | copy of which we have produced and which has been marked as |
| 5 | | Government Exhibit 3023. |
| 6 | 107 | Q. You are now being handed that Government Exhibit 3023. |
| 7 | | (Document handed to witness.)  And is that the ledger you |
| 8 | | are referring to? |
| 9 | | A. Yes. |
| 10 | 108 | Q. And is that all your handwriting, Mr. Mahoney? |
| 11 | | A. It is, yes. |
| 12 | 109 | Q. Was the ledger, which you have in front of you, created by |
| 13 | | you on or about the 7 January, 2002? |
| 14 | | A. Yes. |
| 15 | 110 | Q. And was this ledger, which again you have in front of you, |
| 16 | | created at or near the time of the occurrence of the |
| 17 | | matters which are set forth in it by or from information |
| 18 | | transmitted by a person with knowledge of those matters? |
| 19 | | A. Yes. |
| 20 | 111 | Q. And was this letter, which you have there in your hands, |
| 21 | | kept by you on behalf of both of you in the course of your |
| 22 | | regular conducting of business activities? |
| 23 | | A. Yes. |
| 24 | 112 | Q. And was this ledger made as a regular practice in your |
| 25 | | regularly conducted business? |
| 26 | | A. Yes. |
| 27 | 113 | Q. Where does the funding list of this ledger you have in your |
| 28 | | hands come from? |
| 29 | | A. As reflected in this ledger, funding totalling $1,505,000 |
| 30 | | was advanced from "D.G.".  The balance of the funding, |

```
 1            totalling $535,000, was advanced from "Ailesbury".

 2   114   Q. And what does the reference "D.G" in the ledger which you

 3            have in front of you represent?

 4         A. "D.G" references Diversified Group.  Funding totalling

 5            $1,505,000 was advanced from Diversified Group.

 6   115   Q. And what does the reference to Ailesbury in the ledger

 7            represent?

 8         A. Ailesbury Finance LLC (Ailesbury) is a Wyoming partnership.

 9   116   Q. And does your ledger, which you are holding, reflect the

10            date upon which these funds were received?

11         A. The dates upon which the funds were received is noted on

12            the left column by day, month and year adjacent to the

13            amount that we received.  These amounts we received by wire

14            in US dollars.

15   117   Q. In this document, in this ledger, which you are holding,

16            what was the date upon which you received the amount of

17            $385,000 which is listed in the top row?

18         A. The first $380,000 payment from D.G was received on or

19            before July 10, 2001, to fund the first FDIS transaction.

20   118   Q. Who specifically paid the D.G funding listed in the ledger?

21         A. The funds came from DGI, or an entity controlled by it, so

22            far as we understood.

23   119   Q. Who specifically paid the Ailesbury funding listed in the

24            ledger?

25         A. The Ailesbury funding came from Ailesbury Finance.

26   120   Q. And into what accounts were the funds that were referenced

27            in your ledger, which you are holding, deposited?

28         A. These funds were deposited into the three Singer &

29            Friedlander accounts through which the 2001 FDIS

30            transactions were implemented.
```

```
 1    121   Q. Were any of these funds that were received from DGI used
 2                for anything other than the FDIS transactions?
 3          A. No.
 4    122   Q. And were any of these funds that were received from
 5                Ailesbury used for anything other than the FDIS
 6                transactions?
 7          A. No.
 8    123   Q. How did you account for this funding from DG and Ailesbury?
 9          A. As reflected in the ledger, Government Exhibit 3023, we
10                classified the funding as loans.
11    124   Q. And were there any loan documents with respect to these
12                loans?
13          A. No.
14    125   Q. Was there any interest paid with respect to these loans?
15          A. No.
16    126   Q. Was a line of credit utilized?
17          A. There was no line of credit utilized.
18    127   Q. Was any of this funding from DGI repaid?
19          A. No.
20    128   Q. And was any of the funding from Ailesbury repaid, and if
21                so, when?
22          A. Yes.  The funding that we received from Ailesbury was fully
23                repaid in January 2002.
24    129   Q. Is this repayment reflected in this ledger?
25          A. This repayment is reflected in the ledger marked as
26                Government Exhibit 3023.
27    130   Q. Now, Mr. Mahoney, another document is being handed to you
28                -- I am sorry, you already have it, so if you could just
29                look at the document in front of you which is marked as
30                Government Exhibit 3024.
```

1           A. Yes.

2    131    Q. Do you see that?

3           A. I do.

4    132    Q. And you'll see that it's a spreadsheet produced by counsel

5              for DGI on your behalf, which details the funding from

6              Ailesbury Finance Limited.  And do you recognise this

7              document?

8           A. No.

9    133    Q. Was the spreadsheet marked as Government Exhibit 3024

10             prepared by you in the course of your business?

11          A. No.

12   134    Q. Do you know who prepared the spreadsheet marked as

13             Government Exhibit 3024?

14          A. No.

15   135    Q. The spreadsheet which you have in front of you reflects

16             that all funding from Ailesbury was repaid on or about the

17             23rd January, 2002.  Is it correct that all funding from

18             Ailesbury was repaid on that date?

19          A. Yes.

20   136    Q. What was the source of the funding for the 2002 FDIS

21             transactions?

22          A. The source of the funding for the 2002 transactions was the

23             money left over in the H&M joint venture account.

24   137    Q. Mr. Mahoney, did James Haber explain to you in May 2001

25             what bank accounts would be used to remit your capital

26             contributions on the 2001 FDIS transactions?

27          A. James Haber explained to us that all capital contributions

28             to the various LLCs involved in the FDIS transactions and

29             all distributions and proceeds from the sale of LLC

30             interests would be remitted through bank accounts we

Doyle Court Reporters Ltd.

```
 1              organised.
 2    138   Q. And what Singer & Friedlander bank accounts did you use to
 3              implement the 2001 FDIS transactions?
 4          A. During 2001, we used three bank accounts maintained by the
 5              merchant bank of Singer & Friedlander in the Isle of Man to
 6              send and receive funds with respect to the FDIS
 7              partnerships.
 8    139   Q. Are the account numbers for each of these accounts
 9              11270012, and 11270025, and 20195700?
10          A. As we do not have access to the books, it is hard for us to
11              confirm the accuracy of this information, but it would
12              appear so.
13    140   Q. And was account 11270012 used to implement the first six
14              2001 FDIS transactions?
15          A. All 55 of the FDIS transactions went through one or other
16              of these accounts, but I cannot say which.  It was one
17              account bearing three different account numbers at
18              different times.
19    141   Q. And with respect to account 11270025, was this used to
20              implement the next five 2001 FDIS transactions, including
21              Richard Egan's FDIS transaction?
22          A. All 55 of the FDIS transactions went through one or other
23              of these accounts, but I cannot say which.  It was one
24              account bearing three different account numbers at
25              different times.
26    142   Q. And in relation to account 2019577 (sic), was it used to
27              implement the remaining 36 FDIS transactions --
28          A. -- I think that's the wrong number.
29    143   Q. Do you give the same answer to that question?
30          A. I think you read out the wrong account number.
```

1    144    Q. I am sorry.  The correct account number that I am referring

2                to is 20195700.  And the question is, was it used to

3                implement the remaining 36 FDIS transactions in 2001?

4          A. I will give the same answer.  All 55 of the FDIS

5                transactions went through one or other of these accounts,

6                but I cannot say which.  It was one account bearing three

7                different account numbers at different times.

8    145    Q. Thank you.  Who was responsible for procuring the creation

9                and management of these accounts?

10          A. Martin Hawkes and myself were exclusively responsible for

11                procuring the creation and management of the Isle of Man

12                accounts through which funds flowed in respect of the FDIS

13                transactions.

14    146    Q. Why did you use three accounts to implement the 2001 and

15                2002 FDIS transactions?

16          A. We appointed Maddox Limited and Kilsture Limited as our

17                agents for the purpose of implementing the 2001 and 2002

18                FDIS transactions through the H&M joint venture account,

19                whose account numbers were given previously.  This account

20                was opened in 2001 and was managed by Maddox and Kilsture.

21    147    Q. And just to be clear about this, when you say the account

22                numbers were given previously, they are the account numbers

23                we have been speaking to just a moment ago?

24          A. That's right, those three account numbers.

25    148    Q. Now, Mr. Mahoney, other documents are being handed to you

26                there, and they are bearing references Government Exhibit

27                2462 and Government Exhibit 2463.  Do you have those?

28          A. I do.

29    149    Q. These are copies of wire instructions to wire funds to

30                these accounts for certain of the FDIS transactions.  Do

```
 1              you recognise the wire instructions?

 2         A. Yes, I recognise the account details.

 3    150  Q. Do you recognise the wire instructions?

 4         A. Define "wire instructions" for me and I can answer the

 5              question.

 6    151  Q. The wire instructions which are on the document in front of

 7              you?

 8         A. If the wire instructions are the payment instructions, yes,

 9              I recognise that.

10    152  Q. Who prepared these wire instructions or payment

11              instructions?

12         A. They were prepared with our knowledge.

13    153  Q. Did you continue to use the H&M joint venture account

14              bearing numbers 20195700 in connection with the 2002 FDIS

15              transactions?

16         A. Yes.

17    154  Q. And did Trilogy Investments Limited also use a Singer &

18              Friedlander account on the Isle of Man, Account No.

19              20282910, to implement the 2002 FDIS transactions?

20         A. It would appear so.

21    155  Q. Do you have any books and records in your possession or

22              control with respect to these four Singer & Friedlander

23              accounts?

24         A. No.

25    156  Q. You are now being handed another document, this is bearing

26              Government Exhibit number 2464.   (Document handed to

27              witness.)   Do you have that?

28         A. I do.

29    157  Q. And you will see that it's an e-mail dated 3rd May, 2002,

30              from Mr. Ross of DGI to James Haber of Alpha.
```

Doyle Court Reporters Ltd.

```
 1        A. No, I am sorry, what I have is an e-mail dated Friday,
 2           March 8th, 2002, from Ivan Ross to James Haber.
 3   158  Q. Just one second, I will see -- is that correct?  I am
 4           sorry, that is correct.  I have given the wrong date, I
 5           apologise.  It is from Mr. Ross to Mr. Haber, is that
 6           correct?
 7        A. That's correct.
 8   159  Q. And that's Mr. Haber of Alpha.  And there is an attached
 9           spreadsheet, is that correct -- sorry, Mr. Haber of DGI,
10           let the record reflect.
11        A. There is an attached spreadsheet.
12   160  Q. And there is an attached spreadsheet concerning income and
13           expenses from 2001.  Did you ever receive or see a copy of
14           this document?
15        A. We never saw this spreadsheet and did not have a precise
16           understanding of the financial arrangements amongst DGI,
17           Helios and Alpha.
18   161  Q. Government Exhibit 2464 lists as an expense a line item of
19           $1,302,978 for SMMH.  The same amount of $1,302,978 is
20           listed on Government Exhibit 2460 as the total for
21           "Co-Investor ADJ.cost basis."  And you have 2460 in front
22           of you, if you want to just look at that.
23        A. Yes, I have that now.
24   162  Q. The question is:  Does this amount of $1,302,978 accurately
25           reflect the total adjusted cost basis for the contributions
26           made on your behalf in the 2001 FDIS transactions as the
27           amount of the contributions on your behalf less the amount
28           received from your sale of your membership interests?
29        A. I have no idea.
30   163  Q. Did you, in 2002, receive distributions from the 2001 FDIS
```

```
 1              transactions?

 2         A. I do not recall.

 3    164  Q. Now you are being handed, Mr. Mahoney, a document which

 4              bears Government Exhibit No. 2482.  Do you have that?

 5         A. I do.

 6    165  Q. And this, as you will see, is an e-mail from Ron Buesinger,

 7              to James Haber, dated May 1, 2002, to which is attached a

 8              summary of the 2001 FDIS transactions dated April 22, 2002.

 9              This summary lists 2002 distributions to you as the

10              co-investors totalling $41,463.  Do you know if the $41,463

11              represents distributions to you?

12         A. It is entirely possible, but since I do not have access to

13              the records, I cannot say for sure.

14    166  Q. Now you are being handed another document, and this one is

15              marked as Government Exhibit 2472.  Do you have that?

16         A. I do.

17    167  Q. And it's an e-mail, as you can see, dated 23rd September,

18              2002, from James Haber to Ivan Ross of Alpha, to which is

19              attached an updated account which listed -- do you see

20              that?

21         A. I do.

22    168  Q. Which listed as a line expense 2002 Irish distributions in

23              the amount of $41,463.  Do you know if this $41,463 is the

24              same $41,463 that is listed in Government Exhibit 2482,

25              which you were looking at a minute ago, as distributions to

26              you?

27         A. I do not know.

28    169  Q. Were you aware that Alpha and Helios were treating this

29              $41,463 sum in distributions to you as a joint expense of

30              Helios and Alpha?
```

Doyle Court Reporters Ltd.

1      A. No.

2      170   Q. The next two exhibits we have given you already, and I'll

3            just tell you the numbers of them; you have them in the

4            pile of papers.   The two exhibit numbers are 2459.48 and

5            2459.49?

6      A. 2459.48 and 2459.49.

7      171   Q. You have those?

8      A. I have those, yes.

9      172   Q. Now that you have those documents, 2459, in particular, you

10           will see that that's an e-mail dated April 5, 2002.  Do you

11           see that?

12     A. I do.

13     173   Q. That's from Philip Kampf of Helios Financial forwarding

14           outlines for one of the 2002 FDIS transactions, in which he

15           stated:  "Please note that Trilogy has replaced Diversified

16           and Alpha in the partnership."  What was the role of

17           Trilogy Investments Limited in the 2002 FDIS transactions?

18     A. For the purposes of implementing the 2002 FDIS

19           transactions, Trilogy Investments Limited took the place of

20           Alpha, DGI and Helios as participants.

21     174   Q. Now looking at the document that's being handed to you,

22           it's Government Exhibit 2475.   (Document handed to

23           witness.)  Do you have that?

24     A. I do.

25     175   Q. And do you see that is an e-mail dated May 24, 2002, from

26           Mox Tan, with an attached memo entitled "Revised Trilogy US

27           Implementation Memo."  Do you see that?

28     A. Yes, I do.

29     176   Q. Did you ever receive a copy of this memo or any version of

30           it?

```
 1        A. No.
 2   177  Q. And in that e-mail, which I think you are still holding in
 3           your hands, it's addressed to Stephen Hubble of Trilogy
 4           Financial Products at the e-mail address
 5           Stephen.hubble.3gy.  Did you have any type of business
 6           relationship with Trilogy Financial Products Limited at any
 7           time during 2001 or 2002?
 8        A. No.
 9   178  Q. And just going back to those documents which you have in
10           front of you, just for the sake of clarity, they are the
11           ones bearing Government Exhibit No. 2459.48 and 2459.49.
12           You have those again in front of you?
13        A. I do.
14   179  Q. Thank you.  They both, as you see, contain Outlines of
15           Proposed Transaction for 2002 FDIS transactions in which
16           Trilogy Financial Investments Limited and not Trilogy
17           Investments Limited is identified as a partner and as the
18           manager.  Was Trilogy Investments Limited substituted for
19           Trilogy Financial Investments?
20        A. I don't know.
21   180  Q. And, Mr. Mahoney, who owned Trilogy Investments Limited?
22        A. Maddox and Kilsture.
23   181  Q. What was the source of the funding for the capital
24           contributions that you, Mr. Mahoney, made to the 2002 FDIS
25           transactions in 2002?
26        A. The source of the capital contributions that I made in the
27           2002 transactions was the money left over in the H&M joint
28           venture account from the 2001 FDIS transactions.
29   182  Q. And what was the source of the funding for the capital
30           contributions that you made on behalf of Trilogy
```

```
 1              Investments Limited to the 2002 FDIS transactions in 2002?

 2          A. The source of the capital contributions that were made to

 3             the 2002 transactions on behalf of Trilogy Investments

 4             Limited was also the money left over in the H&M joint

 5             venture account from the 2001 FDIS transactions.

 6   183    Q. You are now being handed another document, this is marked

 7             at Government Exhibit 2473.  (Document handed to witness.)

 8             Do you have that?

 9          A. I do.

10   184    Q. It's an e-mail dated October 21, 2002, from James Haber,

11             and it's addressed to "Martin", do you see that?

12          A. I do.

13   185    Q. And it's forwarding a pro forma invoice from Trilogy

14             Investments Limited to RSM McGladrey totalling $1,053,750

15             for the three 2002 FDIS transactions of Denis Theis,

16             Crawford/McNicholas, and Link.  Do you see that?

17          A. I do.

18   186    Q. And they are in the following amounts:  With respect to

19             Crawford/McNicholas, the gross size is stated to be

20             $12,000,000, and the fee is at $300,000.  And with respect

21             to Denis Theis, the gross size is said to be $15,150,000,

22             and the fee is at $378,750.  And with respect to Link, the

23             gross size is at $15,000,000, and the fee is at $375,000.

24             And the total fee in respect of these is $1,053,750.  The

25             question here is:  Did Martin Hawkes receive a copy of this

26             e-mail and pro forma invoice from James Haber on or about

27             October 2002, do you know?

28          A. That appears to be the case.

29   187    Q. You have now just been handed another document, and this

30             one is marked as Government Exhibit 2466.  (Document handed
```

1                 to witness.  Do you have that?

2           A. I do.

3     188   Q. And it is an e-mail dated October 25, 2002, from James

4                 Haber to Ronald Wainwright at RSM McGladrey, with an

5                 attached copy of invoice dated October 16, 2002, from

6                 Trilogy Investments Limited to RSM McGladrey, in the amount

7                 of $1,053,750 for the three 2002 FDIS transactions of

8                 D Theis, Crawford/McNicholas and the Link family.  Did

9                 Trilogy Investments Limited send to RSM McGladrey a copy of

10                the attached invoice at or near the time of the occurrence

11                of the matters which are set forth in it?

12          A. That appears to be the case.

13    189   Q. Did Trilogy Investments Limited receive a payment in the

14                amount of $1,053,750 from RSM McGladrey on or about the

15                17th December, 2002, with respect to this invoice, which I

16                think you still have in your hands, at 2466, that's the

17                Government Exhibit number?

18          A. That appears to be the case.

19    190   Q. You are now being handed a document which bears Government

20                Exhibit No. 2476, and do you have that, Mr. Mahoney?

21          A. I do.

22    191   Q. And it's an e-mail segment dated 24 January, 2003, from

23                James Haber to Phil Kampf which references that a second

24                invoice was sent by Trilogy Investments Limited to RMS

25                McGladrey -- RSM McGladrey by fax on or about December 26,

26                2002, in the amount of $477,500.  Did Trilogy Investments

27                Limited issue a second invoice to RSM McGladrey by fax

28                dated 26 December, 2002, in the amount of $477,500?

29          A. That appears to be the case.

30

1          MR. MacEOCHAIDH:  Judge, it's one o'clock, I am wondering

2          would it be --

3

4          JUDGE DUNNE:  Just finish your page 17.

5

6          MR. MacEOCHAIDH:  Very good.

7    192   Q. You already have, I think, in front of you, Mr. Mahoney,

8          Government Exhibit 2476, isn't that correct?  Sorry, if you

9          look at the exhibit which you have which is at 2465, do you

10         have that, and 2476, which you also have.  Those numbers

11         again are Government Exhibit 2465 and 2476?

12         A. Yes, I have both of those.

13   193   Q. You have those to hand, do you?

14         A. I do.

15   194   Q. And is this second invoice in the amount of $477,500,

16         that's the 2476 document, with respect to the 2002 FDIS

17         transactions for William Theis, Erb, Whiteside and Weiss in

18         the following amounts as listed in Government Exhibit 2465,

19         and I'll just list these for you.  With respect to William

20         Theis, the gross size of that is $3,500,000, and the fee in

21         respect of it is $65,000.  With respect to Erb, which is

22         E-R-B, the gross size of this is $6,500,000, and the fee in

23         respect of it is $87,500.  And with respect to Whiteside,

24         the gross size of it is $7,000,000, and the fee in respect

25         of it is $175,000.  And with respect to Weiss, W-E-I-S-S,

26         the gross size of it is $5,000,000, and the fee in respect

27         of it is $150,000.  And the total fees there in respect of

28         those matters is $477,500.

29         A. Yes, that appears to be the case.

30   195   Q. Did Trilogy Investments Limited receive a payment in

Doyle Court Reporters Ltd.

1          respect of this second invoice from RSM McGladrey on or

2          about the 28th January, 2003, in the amount of $477,500?

3      A. Yes.

4  196  Q. Would you now look at a document which you have in front of

5          you, I think it's Government Exhibit 2472.  Do you have

6          that to hand?

7      A. Yes, I have it.

8  197  Q. And it's an e-mail, do you see that?

9      A. Yes.

10 198  Q. It's dated 23rd September, 2002, and it's from James Haber

11         to Ivan Ross of Alpha, to which is attached an updated

12         account for Alpha.  Do you see that?

13     A. I do.

14 199  Q. The attached updated account lists as a line expense the

15         2002 Irish contributions in the amount of $144,970.  Do you

16         know if this line item relates to the capital contributions

17         being made by Mahoney, by you, or Mr. Hawkes or Trilogy

18         Investments Limited to the 2002 FDIS transactions?

19     A. I don't know.

20

21         JUDGE DUNNE:  I think, gentlemen, we will now resume at.

22         2:15.

23

24         MR. MacEOCHAIDH:  May it please the Court.

25

26         THE PROCEEDINGS ADJOURNED FOR LUNCH

27

28

29

30

```
 1

 2            THE PROCEEDINGS RESUMED AFTER LUNCH AS FOLLOWS:

 3

 4            SAMUEL MAHONEY CONTINUED TO BE EXAMINED BY MR. MACEOCHAIDH

 5            AS FOLLOWS:

 6

 7

 8            JUDGE DUNNE:  Now, I think Mr. MacEochaidh, you had

 9            finished at the end of page 18, is that right?

10

11            MR. MacEOCHAIDH:  That's correct.

12

13            JUDGE DUNNE:  Yes.

14

15            JUDGE DUNNE:  Good afternoon, Mr. Mahoney.

16         A. Afternoon, Judge.

17

18    200  Q. MR. MacEOCHAIDH:  Good afternoon, Mr. Mahoney.

19            Mr. Lindquist is now handing to you a document which bears

20            reference Government Exhibit 2478.  Do you have that?

21         A. I do.

22    201  Q. And you will see that's an e-mail dated the 31 October 2002

23            from Elizabeth Jung of DGI regarding "a conversation with

24            Sam in reference to Martin's and Trilogy's --"

25

26            JUDGE DUNNE:  Mr. MacEochaidh, can I stop you there.  Where

27            is that?  Is that on the next page which are the areas that

28            are stricken out?  Oh page 18, yes I have it now.

29

30            MR. MacEOCHAIDH:  The first paragraph of that.
```

Doyle Court Reporters Ltd.

1

2          JUDGE DUNNE:  Yes

3

4          MR. MacEOCHAIDH:  So I was asking you about the references

5          to Sam and to Martin and Trilogy's contributions to LF

6          investments 2002 LLC, which appears to reflect that the H&M

7          Joint Venture Account was used to make capital

8          contributions to the 2002 FDIS transactions by Martin

9          Hawkes and Trilogy Investments Limited.  Does this e-mail

10         accurately reflect the substance of a conversation between

11         Elizabeth Jung and you on or about the 31st of October,

12         2002

13      A. I have no recollection of such a conversation.

14   202 Q. Now being handed to you is a document which has number

15         Government Exhibit 2471; do you have that?

16      A. Yes, I do.

17   203 Q. You will see that is a chain e-mail of the 31st of October,

18         2002 from Martin Hawkes to James Haber with the subject

19         line "Alpha Fees" in which Mr. Hawkes stated "I presume the

20         basis points are priced off the amount of the profit being

21         sheltered i.e. 60 bps equals roughly EUR315,000?  It is not

22         clear from your fax whether the fee has been negotiated or

23         is still in negotiation?  If not completed, why not suggest

24         plus or minus 15 bps or the usual 30 bps depending on

25         whether the refund is received?"  And that is the end of

26         the quotation.

27

28         In response, by e-mail from James Haber to BFL, Mr. Haber

29         stated "You assume correctly - that it is 60 basis points

30         off of the loss generated.  I've already agreed to the

```
 1              terms, unless you violently object.  I thought a 50%

 2              haircut versus a doubling of the fee is fair."

 3

 4              Did Martin Hawkes send this e-mail to James Haber on the

 5              31st of October, 2002, and did you receive this e-mail from

 6              James Haber?

 7          A. Yes.

 8    204   Q. Now being handed to you is a document marked as Government

 9              Exhibit 2474.  Do you have that?

10          A. I do.

11    205   Q. And it is an e-mail dated the 6th of December, 2002, from

12              Martin Hawkes of Biosphere Finance Limited to James Haber

13              asking: "When should we do a reckoning on fees in relation

14              to the fund structures, Irish companies and Trilogy

15              transactions?"

16

17              Did Martin Hawkes send the e-mail which you have in your

18              hand there at or near the time of the occurrence of the

19              matters set out in it in the course of his regularly

20              conducted business activities?

21          A. Yes.

22    206   Q. And does the reference to "Trilogy transactions" in the

23              document you are holding in your hand include the 2002 FDIS

24              transactions?

25          A. I believe so.

26    207   Q. Now, again, just for the record, Judge, the aide-memoire

27              shows strike-out text but that is to be ignored.

28

29              Now, have you just been handed, Mr. Mahoney, a document

30              which is Government Exhibit 2479?
```

```
 1         A. I have.
 2   208   Q. And this is an e-mail from Ron Buesinger, dated April 29th,
 3            2003.  The subject line "Fees"; do you see that?
 4         A. I do.
 5   209   Q. Which states that he has been asked, on behalf of Alpha
 6            Consultants, to invoice Trilogy Investments Limited the sum
 7            of $237,000.  Did these fees relate to the 2002 FDIS
 8            transaction?
 9         A. I don't know.
10   210   Q. In relation to Government Exhibit 2480, which has just been
11            handed to you, and do you now have that?
12         A. I do.
13   211   Q. You will see it is an invoice dated April 29th of 2003 from
14            Alpha Consultants to Trilogy Investments Limited in the
15            amount of $297,490.  Did Trilogy Investments Limited
16            receive this invoice from Alpha Consultants at or near the
17            time of the date of the invoice in the course of its
18            regularly conducted business activities?
19         A. I do not have access to relevant books and records.  Thus I
20            am not in a position to verify the accuracy of this
21            information.
22   212   Q. Did Trilogy Investments Limited make a payment to Alpha
23            Consultants on or about the 5th of July, 2003 in the amount
24            of $297,490?
25         A. I do not have access to relevant books and records.  Thus I
26            am not in a position to verify the accuracy of this
27            information.
28   213   Q. Was the payment of $297,490 from Trilogy Investments
29            Limited to Alpha Consultants with respect of the 2002 FDIS
30            transactions?
```

# Exhibit F Part 2

Case 4:05-cv-40151-FDS    Document 336-10    Filed 08/15/2008    Page 2 of 52
FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 2 - 14/05/08

40

1        A. I do not have access to relevant books and records.  Thus I

2           am not in a position to verify the accuracy of this

3           information.

4    214   Q. Did Trilogy Investments Limited make any prior payments to

5           Alpha Consultants with respect to the 2002 FDIS

6           transactions, and if so, in what amounts?

7        A. I do not have access to relevant books and records.  Thus I

8           am not in a position to verify the accuracy of this

9           information.

10   215   Q. You are now being handed, Mr. Mahoney, a document which is

11           which is referenced as Government Exhibit 2481.  Do you

12           have that in your hand?

13       A. I do.

14   216   Q. You will see that it is an account statement for Helios

15           Financial LLC dated May 2002 which reflects that on the 9th

16           of May, 2003, Trilogy Investments Limited wired Helios the

17           sum of $732,245.  Did Trilogy Investments Limited make a

18           payment to Helios Financial on or about the 5th of July,

19           2003 in the amount of $732,245 to Helios Financial?

20       A. I do not have access to relevant books and records.  Thus I

21           am not in a position to verify the accuracy of this

22           information.

23   217   Q. And was the payment of $732,245 from Trilogy Investments

24           Limited to Helios Financial with respect to the 2002 FDIS

25           transactions?

26       A. I do not have access to relevant books and records.  Thus,

27           I am not in a position to verify the accuracy of this

28           information.

29   218   Q. Did you have any communications in 2001 and 2002 concerning

30           the development, marketing and/or implementation of FDIS of

Doyle Court Reporters Ltd.

Case 4:05-cv-40151-FDS    Document 336-10    Filed 08/15/2008    Page 3 of 52
FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 2 - 14/05/08

41

```
 1              with any of the agents or employees of Biosphere Finance

 2              Limited while serving in the role of foreign partner?

 3         A.   I am a part owner and director of Biosphere Finance

 4              Limited.  I use the offices of Biosphere Finance Limited as

 5              well as its e-mail address for the purposes of sending and

 6              receiving communications with respect to the FDIS strategy

 7              and the implementation of the FDIS transactions.

 8    219  Q.   Did you have any communication in 2001 or 2002 concerning

 9              the development, marketing and/or implementation of FDIS

10              with any of the agents or employees of Diversified Group

11              Incorporated while serving in the role of foreign partner?

12         A.   I certainly spoke with and exchanged e-mail with

13              representatives of DGI with respect to the FDIS strategy

14              and the implementation of the FDIS transactions.

15    220  Q.   Did you have any communications in 2001 and 2002 concerning

16              the development, marketing and/or implementation of FDIS

17              with any of the agents or employees of Ailesbury Finance

18              LLC while serving in the role of foreign partner?

19         A.   No.

20    221  Q.   Mr. Mahoney, would you like some water?

21         A.   I have some here, thank you.

22    222  Q.   You have testified that Maddox Limited and Kilsture Limited

23              were appointed as your agents for the purpose of

24              implementing the FDIS transactions.  With whom did you

25              communicate at Kilsture Limited?

26         A.   I communicated with representatives of Singer & Friedlander

27              with respect to the implementation of the FDIS transactions

28              through Kilsture Limited.

29    223  Q.   You have testified that Maddox Limited and Kilsture Limited

30              were appointed as your agents for the purposes of
```

Case 4:05-cv-40151-FDS    Document 336-10    Filed 08/15/2008    Page 4 of 52
FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 2 - 14/05/08

42

1           implementing the FDIS transactions.  With whom did you

2           communicate in Maddox Limited?

3      A. I communicated with representatives of Singer & Friedlander

4           with respect to the implementation of the FDIS transactions

5           through Maddox Limited.

6   224  Q. Did you have any communications in 2001 and 2002 concerning

7           the development, marketing and/or implementation of FDIS

8           with any of the agents or employees of Helios Financial LLC

9           while serving in the role of foreign partner?

10      A. Yes, I spoke with and exchanged e-mail with representatives

11          of Helios Financial LLC with respect to the FDIS strategy

12          and the implementation of the FDIS transactions.

13  225  Q. Did you have any communications in 2001 and 2002 concerning

14          the deployment, marketing and/or implementation of FDIS

15          with any of the agents or employees of United Acquisition

16          LLC while serving in the role of foreign partner?

17      A. No.

18  226  Q. Just I should ask that question again because I misspoke

19          and just to repeat that question.  Did you have any

20          communications in 2001 and 2002 concerning the development,

21          marketing and/or implementation of FDIS with any of the

22          agents or employees of United Acquisition LLC while serving

23          in the role of foreign partner?

24      A. No.

25  227  Q. Did you have any communications in 2001 and 2002 concerning

26          the development, marketing and/or implementation of FDIS

27          with any of the agents or employees of Alpha Consultants

28          LLC and Alpha Trading LLC while serving in the role of

29          foreign partner?

30      A. I certainly spoke with and exchanged e-mail with

Case 4:05-cv-40151-FDS    Document 336-10    Filed 08/15/2008    Page 5 of 52
FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 2 - 14/05/08

43

1    representatives of Alpha with respect to the FDIS strategy

2    and the implementation of the FDIS transactions.

3  228 Q. Did you have any communications in 2001 and 2002 concerning

4    the development, marketing and/or implementation of FDIS

5    with any of the agents or employees of Refco?

6    A. I certainly spoke with and exchanged e-mail with

7    representatives of Refco with respect to the FDIS strategy

8    and the implementation of the FDIS transactions.

9  229 Q. Did you have any communications in 2001 and 2002 concerning

10    the development, marketing and/or implementation of FDIS

11    with any of the agents or employees of Sidley Austin

12    (formerly known as Sidley Austin Brown & Wood)?

13    A. I have no recollection of communicating with any

14    representatives of the law firm of Sidley Austin Brown &

15    Wood regarding the FDIS strategy, the implementation of the

16    FDIS transactions or any representations concerning the

17    FDIS transactions.

18  230 Q. Did you have any communications in 2001 and 2002 concerning

19    the development, marketing and/or implementation of FDIS

20    with any of the agents or employees of Proskauer Rose LLP?

21    A. I have no recollection of any oral communication with any

22    representatives of the law firm of Proskauer Rose regarding

23    the FDIS strategy, the implementation of the FDIS

24    transactions or any representations concerning the FDIS

25    transactions.

26  231 Q. Did you have any communications in 2001 and 2002 concerning

27    the development, marketing and/or implementation of FDIS

28    with any of the agents or employees of Lord Bissell &

29    Brook?

30    A. I have no recollection of communicating with any

Case 4:05-cv-40151-FDS    Document 336-10    Filed 08/15/2008    Page 6 of 52
FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 2 - 14/05/08

44

1           representatives of the law firm of Lord Bissell & Brook

2           regarding the FDIS strategy, the implementation of the FDIS

3           strategy or any representations concerning the FDIS

4           transactions.

5      232  Q. Did you have any communications in 2001 and 2002 concerning

6           the development, marketing and/or implementation of FDIS

7           with any of the agents or employees of Bryan Cave?

8      A. I have no recollection of communicating with any

9           representatives of the law firm of Bryan Cave regarding the

10          FDIS strategy, the implementation of the FDIS transactions

11          or any representations concerning the FDIS transactions.

12     233  Q. Did you have any communications in 2001 and 2002 concerning

13          the development, marketing and/or implementation of FDIS

14          with any of the agents or employees of Brown Raysman?

15     A. I have no recollection of communicating with any

16          representatives of the law firm of Brown Raysman regarding

17          the FDIS strategy, the implementation of the FDIS

18          transactions or any representations concerning the FDIS

19          transactions.

20     234  Q. Did you have any communications in 2001 and 2002 concerning

21          the development, marketing and/or implementation of FDIS

22          with any of the agents or employees of KPMG, in the US,

23          Ireland or the Isle of Man?

24     A. I have no recollection of communicating with any

25          representatives of the accounting firm of KPMG in the

26          United States regarding the FDIS strategy or the

27          implementation of the FDIS transactions other than perhaps

28          in Ireland in connection with the Biosphere audit.

29     235  Q. And did you have any communications in 2001 and 2002

30          concerning the development, marketing and/or implementation

```
 1              of FDIS with any of the agents or employees of Grant

 2              Thornton?

 3         A.  I have no recollection of communicating with any of the

 4              representatives of Grant Thornton Man regarding the FDIS

 5              strategy or the implementation of the FDIS transactions.

 6    236  Q.  Did you have any communications in 2001 and 2002 concerning

 7              the development, marketing and/or implementation of FDIS

 8              with any of the agents or employees of RSM McGladrey?

 9         A.  I have no recollection of communicating with any of the

10              representatives of the accounting firm of RSM McGladrey

11              regarding the FDIS strategy or the implementation of the

12              FDIS transactions.

13    237  Q.  Did you have any communications in 2001 and 2002 concerning

14              the development, marketing and/or implementation of FDIS

15              with any of the agents or employees of BDO Seidman LLP?

16         A.  I have no recollection of communicating with any of the

17              representatives of the accounting firm of BDO Seidman

18              regarding the FDIS strategy or the implementation of the

19              FDIS transactions.

20    238  Q.  Did you have any communications in 2001 and 2002 concerning

21              the development, marketing and/or implementation of FDIS

22              with any of the agents or employees of Trilogy Investments

23              Limited?

24         A.  Yes.

25    239  Q.  Did you have any communications in 2001 and 2002 concerning

26              the development, marketing and/or implementation of FDIS

27              with any of the agents or employees of Trilogy Financial

28              Products Limited?

29         A.  No.

30    240  Q.  Did you have any communications in 2001 and 2002 concerning
```

```
 1                the development, marketing and/or implementation of FDIS

 2                with any of the agents or employees of Trilogy Financial

 3                Investments Limited?

 4         A. No.

 5    241  Q. Do you have any other documents which memorialize the role

 6                played by any of these entities?

 7         A. Other than the ledger which I produced, now marked as

 8                Government Exhibit 2463, I do not have possession or

 9                control of any responsive documents.

10    242  Q. Did you ever provide any factual representations with

11                respect to the Egan FDIS transaction?

12         A. Not that I am aware of.

13    243  Q. Were you ever asked to provide any factual representations

14                with respect to the Egan FDIS transaction?

15         A. Not that I am aware of.

16

17                JUDGE DUNNE:  Now, anybody wish to cross-examine?

18

19                PLAINTIFF COUNSEL:  Yes, Judge, thank you.

20

21                THE WITNESS WAS THEN CROSS-EXAMINED BY MR. REICHERT AS

22                FOLLOWS:

23

24    244  Q. MR. REICHERT:  Now, Mr. Mahoney, you have an Exhibit 2451

25                which is your bio, your CV?

26         A. Yes, all right.  Yes, I have that.

27    245  Q. And, really, I just want to go through your CV just to get

28                a picture of who you are?

29         A. It won't be as colourful as my colleague's, I am afraid.

30    246  Q. Yes, Mr. Hawkes was -- his background, with the break from
```

Doyle Court Reporters Ltd.

1                    Sterling, was interesting and fascinating.

2

3                    At the bottom of your CV it sets out your educational

4                    background.

5           A. Um-hum.

6    247    Q. And starting there, you hold a Bachelor of Financial

7                    Services from University College Dublin?

8           A. That's right.

9    248    Q. When did you graduate from UCD?

10          A. A good question.  '89, '90 something like that.

11   249    Q. '89 or '90.  And had you undertaken any courses prior to

12                   going to University College?

13          A. Yes, I had undertaken the Institute of Bankers Ireland

14                   examinations and I had also studied and passed the

15                   examination of the Institute of Chartered Secretaries and

16                   Administrators.

17   250    Q. Could you tell me a little bit about the Institute of

18                   Bankers, we'll come back to University College in a moment,

19                   but could you tell me a little bit about the Institute of

20                   Bankers?

21          A. What would you like to know?

22   251    Q. What is it?

23          A. What is it?  Okay.

24   252    Q. What role does it play?  It's obviously got something to do

25                   with banking but what role does it play in professional

26                   life?

27          A. Well it leads --  well, it is an institute for professional

28                   bankers and it sets and examines courses dealing with

29                   banking, all aspects of banking, from accounting right

30                   through to company law, and it runs a series of courses

| 1 | | which build from the basics right up to the Bachelor of |
| 2 | | Financial Services degree at the end. |
| 3 | 253 | Q. So, the starting point would have been the Institute of |
| 4 | | Bankers, on to University College, was that a line that you |
| 5 | | went? |
| 6 | | A. That was a normal progression. |
| 7 | 254 | Q. A normal progression? |
| 8 | | A. Yes. |
| 9 | 255 | Q. When did you become -- when did you complete your studies |
| 10 | | with the Institute of Bankers? |
| 11 | | A. When I graduated from UCD. |
| 12 | 256 | Q. From UCD? |
| 13 | | A. Yes. |
| 14 | 257 | Q. And when did you enter the educational programme of the |
| 15 | | Institute of Bankers? |
| 16 | | A. Again, it would have been, say, eight or nine years prior |
| 17 | | to that. |
| 18 | 258 | Q. Eight or nine years prior to that.  And are these courses |
| 19 | | that you would have been doing part time or full time? |
| 20 | | A. They are part time. |
| 21 | 259 | Q. Part time courses? |
| 22 | | A. Yes. |
| 23 | 260 | Q. So, perhaps an evening course? |
| 24 | | A. Yes, that's correct.  Evenings, Saturdays and Sundays, that |
| 25 | | sort of thing. |
| 26 | 261 | Q. And it says that you are also an associate of the institute |
| 27 | | of Chartered Secretaries and Administrators? |
| 28 | | A. That's right. |
| 29 | 262 | Q. Could you tell me a bit more about that institute? |
| 30 | | A. It is the professional institute for people who are or want |

Doyle Court Reporters Ltd.

| 1 | | | to become company secretaries.  It is, I think, a necessary |
| 2 | | | qualification to become a secretary of a public company. |
| 3 | 263 | Q. | A secretary of a public company? |
| 4 | | A. | Um. |
| 5 | 264 | Q. | And when did you get your associateship? |
| 6 | | A. | '87, '88, something like that. |
| 7 | 265 | Q. | Yes.  Where did you start out your working life? |
| 8 | | A. | I worked in engineering before I went into banking and I |
| 9 | | | spent a number of years in Germany working for aircraft |
| 10 | | | manufacturing companies there. |
| 11 | 266 | Q. | So you started your working life from school you went to |
| 12 | | | this company in Germany? |
| 13 | | A. | No.  I did technical training and then went to Germany |
| 14 | | | after that, I was about 21. |
| 15 | 267 | Q. | Where did you do your technical training? |
| 16 | | A. | In Belfast. |
| 17 | 268 | Q. | And whereabouts in Belfast? |
| 18 | | A. | At the Institute of Technology there. |
| 19 | 269 | Q. | The Institute of Technology there? |
| 20 | | A. | Um. |
| 21 | 270 | Q. | And when you completed that course, what did you do |
| 22 | | | immediately after the completion? |
| 23 | | A. | Well, when I completed that -- that was part of my ongoing, |
| 24 | | | what would you call it, ongoing training. |
| 25 | 271 | Q. | Yes. |
| 26 | | A. | I was working for a company called Short Brothers who were |
| 27 | | | making aircraft and missiles at that stage. |
| 28 | 272 | Q. | That is the very famous company in Belfast? |
| 29 | | A. | The very famous company in Belfast.  So, after I had |
| 30 | | | finished my training there I then went to Germany. |

| 1  | 273 | Q. And when was that? |
| 2  |     | A. 1970. |
| 3  | 274 | Q. 1970? |
| 4  |     | A. Yes. |
| 5  | 275 | Q. And where did you go to in Germany? |
| 6  |     | A. I went to Munich and to Augsburg. |
| 7  | 276 | Q. To Munich and to Augsburg.  Who did you work there? |
| 8  |     | A. For Dornier. |
| 9  | 277 | Q. That is D-O-R-N-I-E-R? |
| 10 |     | A. And Messerschmitt; you will be familiar with the spelling. |
| 11 | 278 | Q. I won't say why.  And how long did you spend in Germany? |
| 12 |     | A. About seven years. |
| 13 | 279 | Q. About seven years.  And what did you do for Dornier and |
| 14 |     | Messerschmitt? |
| 15 |     | A. I worked originally on aircraft assembly and then with |
| 16 |     | Messerschmitt, I was involved in the development of the Pan |
| 17 |     | European fighter, the tornado, and I ended up working as |
| 18 |     | liaison between Germany and parts of the UK where it was |
| 19 |     | being built. |
| 20 | 280 | Q. And of course this was a time when Pan European fighters |
| 21 |     | was a -- |
| 22 |     | A. -- a big thing. |
| 23 | 281 | Q. -- quite a critical thing? |
| 24 |     | A. It was something they were doing at the time, yes. |
| 25 | 282 | Q. And when you left Germany, where did you go then? |
| 26 |     | A. I came back to Ireland and started working with BNP. |
| 27 | 283 | Q. Why did you go into banking? |
| 28 |     | A. I came back to Ireland in '75 or '76, I am not sure, you |
| 29 |     | may not remember, it wasn't a great time in Ireland to be |
| 30 |     | looking for employment.  I happened to meet the general |

Doyle Court Reporters Ltd.

| | | |
|---|---|---|
| 1 | | manager of BNP who was looking for people to recruit at the |
| 2 | | time.  We kind of struck it off and they recruited me. |
| 3 | 284 | Q. And what did you do with BNP - Banque Nationale de Paris? |
| 4 | | A. I did everything.  I started from the cash and worked up to |
| 5 | | be a lending executive. |
| 6 | 285 | Q. And that was in Dublin? |
| 7 | | A. In Dublin, yes. |
| 8 | 286 | Q. And you say in your CV that you became a senior manager? |
| 9 | | A. Yes. |
| 10 | 287 | Q. What did that involve? |
| 11 | | A. It involved business development but also maintaining a |
| 12 | | portfolio of clients, mostly US, German, Japanese and |
| 13 | | mostly engaged in chemical or engineering backgrounds. |
| 14 | 288 | Q. And was this for the purpose of financing -- |
| 15 | | A. Yes, of course, yes. |
| 16 | 289 | Q. So, that would have involved a great deal of analysis of |
| 17 | | whether or not the loan should, or financing should be |
| 18 | | afforded to a particular company? |
| 19 | | A. Yes, before becoming a loan executive I was a deputy head |
| 20 | | of the Lending Department, the Lending Evaluation |
| 21 | | Department, we will say. |
| 22 | 290 | Q. So you carefully analyse all of these companies? |
| 23 | | A. That's right. |
| 24 | 291 | Q. Before you part with the banks money? |
| 25 | | A. Correct. |
| 26 | 292 | Q. And did that involve you travelling out to these companies? |
| 27 | | A. It did, yes, yes, on a regular basis. |
| 28 | 293 | Q. The next thing you say in your CV is that you joined |
| 29 | | Shannon International Leasing, Mr. Hawkes told us a bit |
| 30 | | about that yesterday? |

```
 1          A. Um-hum.

 2   294    Q. When did you do that?

 3          A. I think it was 1990.  1990.

 4   295    Q. About 1990?

 5          A. Yes.

 6   296    Q. Was that in and around the time that Shannon International

 7             Leasing was founded or was it afterwards?

 8          A. I think it was formed a year or two before that.

 9   297    Q. A year or two?

10          A. Yes.

11   298    Q. Why did you go to Shannon International Leasing?

12          A. I had been having conversations with one of the directors

13             for some time and it suited me to go at that particular

14             time.

15   299    Q. Which one of the directors was it?

16          A. Cormac Crawford.

17   300    Q. Cormac Crawford?

18          A. Yes.

19   301    Q. And did you see this as an opportunity to go to Shannon

20             International Leasing?

21          A. Yes.

22   302    Q. Yes.  And was it, even though it was just a year underway,

23             was it very well established at that time, was it very

24             successful or did the success appear later in time?

25          A. It was already quite successful at that time.

26   303    Q. Already quite successful?

27          A. Yeah, yes.

28   304    Q. And did you take a shareholding in Shannon International

29             Leasing?

30          A. No, I didn't.
```

FIDELITY INTERNATIONAL -v- UNITED STATES OF AMERICA - DAY 2 - 14/05/08

53

| | | |
|---|---|---|
| 1 | 305 | Q. But you became an employee? |
| 2 | | A. That's right. |
| 3 | 306 | Q. And you say that you were general manager of operations and |
| 4 | | business development, and that you were responsible for a |
| 5 | | team of five engaged in marketing, cross-border financial |
| 6 | | services within Europe and the United States. Now I am a |
| 7 | | layperson when it comes to all things like this, but was |
| 8 | | that something similar to what you did with BNP? |
| 9 | | A. Something similar yes. |
| 10 | 307 | Q. Something similar. Could you describe a bit more as to |
| 11 | | what it was that you did with SIL? |
| 12 | | A. Well, we would have a portfolio of clients with whom we |
| 13 | | would either do business or try and do business and it |
| 14 | | entail, basically calling on them, discussing their needs |
| 15 | | or requirements and then trying to meet those needs and |
| 16 | | requirements, if possible. |
| 17 | 308 | Q. Yes. And did that involve aircraft? |
| 18 | | A. No, the one thing it didn't involve was aircraft. |
| 19 | 309 | Q. As we heard yesterday from Mr. Hawkes, Shannon |
| 20 | | International Leasing was sold. And you then say that you |
| 21 | | became a founder and director of Biosphere Finance Limited. |
| 22 | | When that did happen? |
| 23 | | A. 19 -- late 1991, early 1992. |
| 24 | 310 | Q. Yes. So, essentially, you brought your collective |
| 25 | | experience -- |
| 26 | | A. -- together, that's right. |
| 27 | 311 | Q. -- with that, and that was with? |
| 28 | | A. Martin Hawkes and John. |
| 29 | 312 | Q. And you have been engaged in that since then? |
| 30 | | A. That's correct. |

FIDELITY INTERNATIONAL -v- UNITED STATES OF AMERICA - DAY 2 - 14/05/08

54

| 1 | 313 | Q. | Could I take you, now, to Exhibit 2461 which has been put |
| 2 | | | to you earlier today in your direct examination.  It is a |
| 3 | | | document which is headed "buy-sell notice". |
| 4 | | A. | Do you have any idea where it appeared in the list of |
| 5 | | | exhibits?  I have quite a lot of them here. |
| 6 | 314 | Q. | It is a document dated the 5th of November, 2001.  It looks |
| 7 | | | like that. |
| 8 | | | (Document handed to the witness.) |
| 9 | | A. | Thank you very much, that is very kind.  Yes, I have that. |
| 10 | 315 | Q. | Yes.  And you were shown that document earlier today? |
| 11 | | A. | I was. |
| 12 | 316 | Q. | Yes.  There are three pages in that document? |
| 13 | | A. | No, two, I have. |
| 14 | 317 | Q. | Well, the exhibit I have has three pages. |
| 15 | | A. | Sorry, I have found 2461.  It has only two pages. |
| 16 | 318 | Q. | It has only two pages, all right.  We are now going to mark |
| 17 | | | a document -- we are going to mark a document which is |
| 18 | | | going to be **Plaintiff's Exhibit No. 1** and it is going to be |
| 19 | | | handed up to you. |
| 20 | | | (Document handed to witness.) |

21

| 22 | | JUDGE DUNNE:  Are we to ignore your question about Exhibit |
| 23 | | 2461? |

24

| 25 | | MR. REICHERT:  We will, yes, we will move on from that. |

26

| 27 | | JUDGE DUNNE:  Now, is this a document that has been |
| 28 | | produced by the Plaintiff? |

29

| 30 | | MR. REICHERT:  This has been produced by the Plaintiff. |

FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 2 - 14/05/08

55

1

2          JUDGE DUNNE:  And has the Respondent, USA, a copy of it?

3

4          MR. REICHERT:  We will give them a copy.

5

6          JUDGE DUNNE:  And is that your first time seeing this copy,

7          Mr. Mahoney?

8     A.   It is, Your Honour, yes.

9

10         JUDGE DUNNE:  Yes.  And the title of that document is,

11         please?

12

13         MR. REICHERT:  It is "buy-sell notice".  Essentially this

14         is what appears to be, until the witness says otherwise, to

15         my eyes, appears to be the document which is 2461 but

16         signed by Mr. Mahoney.

17

18         JUDGE DUNNE:  Well, I don't want for Judge Saylor's

19         knowledge to have confusion between 2461 and **Plaintiff's**

20         **Exhibit No. 1.**

21

22         MR. REICHERT:  There is going to be no confusion.  I am

23         putting a clear blue line now between 2461 and this

24         document.

25

26         JUDGE DUNNE:  And **Plaintiff's Exhibit No. 1.**

27

28         MR. REICHERT:  Yes.

29

30         JUDGE DUNNE:  And we are characterising this document now

1              as **Plaintiff's Exhibit No. 1.**

2

3              MR. REICHERT:  Most certainly.

4

5              JUDGE DUNNE:  Mr. MacEochaidh, are you aware of that?

6

7              MR. MacEOCHAIDH:  I am sorry, I was talking to Mr. Donohue.

8

9              JUDGE DUNNE:  I will start again.  Mr. Reichert initially

10             referred to **Government Exhibit 2461**, which was in Mr.

11             Mahoney's possession arising from question number 48 on

12             page 6 of the aide-memoire.  Mr. Mahoney eventually

13             identified that as being in his possession, it comprising

14             two pages.  Mr. Reichert moved on from that document to

15             characterise a fresh document that he now has in his

16             possession as **Plaintiff's Exhibit No. 1**, which he says, to

17             all intents and purposes, is the same as Document 2461.

18             The Court now wants to, for the record, for Judge Saylor's

19             sake, to make sure that there will be no confusion as

20             between **Plaintiff's Exhibit No. 1** and **Government Exhibit**

21             **2461**.

22

23             MR. MacEOCHAIDH:  For the record, they are not the same

24             documents; there will be a confusion.

25

26             JUDGE DUNNE:  I am glad that I have raised it.

27

28             MR. MacEOCHAIDH:  I will deal with it in re-direct.

29

30             JUDGE DUNNE:  You can understand the questions from the

1        Court.

2

3        MR. REICHERT:  I understand precisely the distinction.

4        They are not the same document because 2461 --

5

6        JUDGE DUNNE:  It arises at page 6, question number 48 it is

7        first introduced.

8

9        MR. REICHERT:  That appears to be a two-paged version with

10       a signature which is not Mr. Mahoney's signature.  This is

11       a document which has the same typewritten text but contains

12       Mr. Mahoney's signature.

13

14       JUDGE DUNNE:  And is that a three-paged document?

15

16       MR. REICHERT:  It is a three-paged document, because the

17       signing page is replicated with one signature on one copy

18       of the signing page and the other signature on the second

19       signing copy of the signing page.

20

21       JUDGE DUNNE:  Okay.

22

23       MR. REICHERT:  But nonetheless it is, I now have a document

24       **Plaintiff's Exhibit 1** which I am relying on foursquare for

25       this.

26

27       JUDGE DUNNE:  Well, then we will characterise that document

28       as solely **Plaintiff's Exhibit No. 1**, which is a three-paged

29       document.  We will also note that **Government Exhibit 2461**

30       is a two-paged document.  Thank you, gentlemen.

1

2          MR. LEWIS:  Judge, from the point view of clarification.

3

4          JUDGE DUNNE:  Mr. Lewis, are you *ad idem* on these issues?

5

6          MR. LEWIS:  I understand that Mr. Reichert was saying that

7          the **Exhibit 2461** didn't contain Mr. Mahoney's signature.

8          Now, first of all, the question that was put to Mr. Mahoney

9          - question 48 - was, "is that your signature?"

10

11         JUDGE DUNNE:  And the answer was yes.

12

13         MR. LEWIS:  The answer was yes.  When I look at 2461, to my

14         eyes it would appear to contain Mr. Mahoney's signature.

15         Perhaps if a question could be put to Mr. Mahoney whether

16         or not it is his signature, rather than Mr. Reichert --

17

18         JUDGE DUNNE:  On **Plaintiff's Exhibit No.** 1; he has already

19         answered in respect of **Government Exhibit 2461**

20         affirmatively.

21

22         MR. LEWIS:  Yes, I wouldn't want Mr. Reichert's statement

23         to the Court which is recorded as saying that the Exhibit

24         2461 doesn't contain Mr. Mahoney's signature.

25

26         JUDGE DUNNE:  But it is quite clear from the

27         examination-in-chief of Mr. Mahoney that he accepts that

28         that is his signature on **Government Exhibit 2461** at page 6

29         of the aide-memoire; that is quite clear.

30

FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 2 - 14/05/08

59

1          MR. LEWIS:  Yes.

2

3          MR. REICHERT:  Now, it is actually the witness's answers

4          that are the evidence.

5

6          JUDGE DUNNE:  No, no, sorry, no, no, before you move to

7          that, I am dealing with his earlier answer.  You can now --

8          we have no answers yet from Mr. Mahoney on **Plaintiff's**

9          **Exhibit No. 1.**  You are only starting that now --

10

11          MR. REICHERT:  Absolutely

12

13          JUDGE DUNNE:  -- so be clear, don't mix up the two.

14

15          MR. REICHERT:  Most certainly not.

16

17          JUDGE DUNNE:  Thank you.  Now, start.

18

19     319  Q. MR. REICHERT:  **Plaintiff's Exhibit No. 1** that you have

20          there?

21          A. Um-hum.

22     320  Q. If you go to the third page of that document, but

23          familiarise yourself going through the other two pages.  Is

24          that your signature on the third page of that document?

25          A. It is.

26     321  Q. It is.  So, you are aware of this document?

27          A. I am aware of this document, yes.

28     322  Q. Thank you.  The next document I wish to put before you is

29          going to be marked **Plaintiff's Exhibit No. 2.**  And I am

30          going to circulate copies.


Doyle Court Reporters Ltd.

1              (Document handed to witness and parties.)

2              Now, there are two pages to that document?

3        A. Um-hum.

4    323  Q. Is your signature in copy on that document?

5        A. It is my signature on the first page of the document.

6    324  Q. On the first page.  Thank you very much.

7

8              The next document I am going to put before you is going to

9              be marked **Plaintiff's Exhibit No. 3**.  And I am going to

10             circulate copies.

11             (Document handed to witness and parties.)

12

13             MR. MacEOCHAIDH:  Just to make sure that the documents that

14             are being circulated are also being circulated to Judge

15             Dunne.

16

17             JUDGE DUNNE:  I missed your question, Mr. MacEochaidh.

18

19             MR. MacEOCHAIDH:  I am just asking to ensure that the

20             documents that are being circulated go to you, Judge.

21

22             JUDGE DUNNE:  Yes, thank you.

23

24    325  Q. MR. REICHERT:  Mr. Mahoney, you have **Plaintiff's Exhibit**

25             **No. 3** before you?

26        A. I do.

27    326  Q. I would ask you to look through that document, please.

28        A. Yes.

29    327  Q. So, you have looked through the document?

30        A. I have looked through it.


                    Doyle Court Reporters Ltd.

1    328   Q. Can I take you to page 37, internal page 37?

2          A. Page 37, yes.

3    329   Q. Yes.  Do you see your signature on that page?

4          A. You actually have two page 37s.

5    330   Q. Oh.  There is, there are two-page 37s; it is the second

6             page 37?

7          A. Yes, that is my signature.

8    331   Q. That is your signature there.  So --

9

10            JUDGE DUNNE:  Can we clarify, for the record, are the two

11            pages 37 the same or is one page 37 different in content

12            than the page 37 that has Mr. Mahoney's signature?

13

14   332   Q. MR. REICHERT:  Page 37, isn't it true to say, contained --

15            the first page 37 in the sequence that appears to contain

16            signatures of two persons not being yourself?

17         A. That's right.

18   333   Q. And then the second page 37 contains signatures of three

19            persons, one of which is yourself?

20         A. That's correct.

21

22            JUDGE DUNNE:  And the other two signatures on the second

23            page 37 are not the same as on the first page 37?

24

25            MR. REICHERT:  That is entirely correct, Judge.

26

27            JUDGE DUNNE:  We need that clarified.  Thank you.

28

29   334   Q. MR. REICHERT:  That is true, isn't it, Mr. Mahoney?

30         A. Yes.

1   335   Q. Now, in this Operating Agreement, isn't it true to say that

2             you agreed to be a member of Fidelity International

3             Currency Advisor A Fund LLC?

4         A. Yes, that is correct.

5   336   Q. And isn't it true to say that in this Operating Agreement

6             you agreed to make a capital contribution?

7         A. That's correct.

8   337   Q. Now, if I take you to the page directly after the page that

9             contains your signature and to the top of the page that is

10            Exhibit A?

11        A. Yes.

12  338   Q. Is it true that beside your name in that box there is a

13            figure of $651,000 and at the top of the column it says

14            "capital contribution"?

15        A. Yes.

16  339   Q. That capital contribution was made, wasn't it?

17        A. It was.

18  340   Q. Thank you.  Now, I am going to put in **Plaintiff's Exhibit**

19            **No. 4** and this document is now going to be circulated.

20            (Document handed to witness and parties.)

21        A. Thanks.

22

23            JUDGE DUNNE:  Sorry for interrupting you, Mr. Reichert, am

24            I to assume that your new exhibits will also be furnished

25            to the Chief State Solicitor?

26

27            MR. REICHERT:  Yes, absolutely.

28

29            JUDGE DUNNE:  Thank you.

30  341   Q. MR. REICHERT:  Mr. Mahoney, you have looked through all the

1           pages of that exhibit, haven't you?

2       A. Yes, I have.

3   342 Q. Yes.  Mr. Mahoney, you were asked questions by the Revenue

4           Commissioners about the same areas which were covered in

5           your direct testimony concerning Fidelity International

6           Currency Advisor A Fund LLC, isn't that true?

7       A. That's correct.

8   343 Q. And your communications with the Revenue Commissioners were

9           presented to the High Court in that exhibit which you have

10          before you?

11      A. So it would appear, yes.

12  344 Q. By your solicitors?

13      A. By my solicitors, yes.

14      Q. And isn't it true to say that the affidavit of Mr. Keally,

15          who is your solicitor, attaches some of those

16          communications with the Irish Revenue?

17      A. Yes.

18  346 Q. And do you recognise those as the communications that were

19          offered and exhibited to the High Court?

20      A. Yes.

21  347 Q. Finally, Mr. Mahoney, you had an aide-memoire during the

22          course of your direct testimony.  Did that aide-memoire

23          bear any markings such as an exhibit number?

24      A. Oh, no, it didn't.  It is the one that we got yesterday, it

25          is the same one as we got yesterday.

26

27          MR. REICHERT:  Thank you very much.

28

29          JUDGE DUNNE:  Mr. Lewis, have you anything?

30

```
1        MR. LEWIS:  No, Judge.

2

3        JUDGE DUNNE:  Mr. MacEochaidh, anything arising?

4

5        MR. MacEOCHAIDH:  Judge, I wonder might I have five minutes

6        to take instructions from my fellow counsel in this matter?

7

8        JUDGE DUNNE:  In relation to the evidence, is this the last

9        witness in the case or is Mr. Hussey -- there was some

10       discussion about Mr. Hussey.  What is the position about

11       Mr. Hussey?

12

13       MR. MacEOCHAIDH:  Can I confirm that to you in five minutes

14       as well?

15

16       JUDGE DUNNE:  Of course.

17

18       MR. MacEOCHAIDH:  Shall we say a quarter past three?

19

20       JUDGE DUNNE:  Thank you, gentlemen.

21

22       THE PROCEEDINGS ADJOURNED BRIEFLY AND RESUMED AS FOLLOWS:

23

24       JUDGE DUNNE:  Yes gentlemen.

25

26       MR. MacEOCHAIDH:  Thank you, Judge, for that time.

27

28       JUDGE DUNNE:  I hope it was used wisely.

29

30       MR. MacEOCHAIDH:  Time will tell.  Thank you, Mr. Mahoney,
```

1             for waiting.

2             THE WITNESS WAS RE-EXAMINED BY MR. MacEOCHAIDH AS FOLLOWS:

3

4     348   Q. A number of documents were put to you by Mr. Reichert.   I

5             wish to ask you to look at two documents together?

6         A. Right.

7     349   Q. One was -- one of the documents is **Plaintiff's Exhibit 4**.

8             **Plaintiff's Exhibit 4**, that is the extract from "MJK2" to

9             the affidavit of Michael Keary.   You have that, **Plaintiff's**

10            **Exhibit 4**?

11        A. I have it, yes.

12    350   Q. And if you go to the internal pages of that.   On the ninth

13            page there is a letter from William Fry tax advisers?

14        A. Um-hum.

15    351   Q. 13th of April, 2006; do you see that?

16        A. I do.

17    352   Q. And can I also ask you just to take into your hand a copy

18            of the ledger which is **Government Exhibit 3023**.   Will I

19            hand you a copy?

20        A. Yes, it is very difficult to find anything, there is so

21            many exhibits.

22            (Exhibit handed to witness.)

23            Thanks.

24    353   Q. Just taking those two documents together for a moment.   Let

25            me ask you to look at the William Fry letter of the 13th of

26            April, 2006, and in the body of that letter, opposite the

27            No. 7, it is asserted that "Mr. Mahoney has previously

28            advised that the capital contribution of US$651,000 was

29            made on his behalf. Mr. Mahoney will now further confirm

30            that the capital contribution of US$651,000 was made on his

1               behalf by Kilsture Limited, an Isle of Man company."  Okay?

2       A. Yes.

3   354 Q. Can I ask you by reference to the ledger, which is

4               **Government Exhibit 3023** and which is, and you confirmed

5               this morning entitled "Funding of Partnerships", is that

6               right?

7       A. Yes.

8   355 Q. Can I ask you to confirm that the $651,000 amount came from

9               either DG or Ailesbury?

10      A. Yes, it did.

11  356 Q. Now, looking at the ledger which you indicated was in your

12              own handwriting, isn't that correct?

13      A. Yes.

14  357 Q. The words written "repaid" and then the same word again

15              "repaid" at an angle opposite, what I might call, the

16              Ailesbury column, showing the sum, the figure of $500,000

17              and the word "repaid" beside it and the sum of $35,000 and

18              the word "repaid" written beside it -- are you with me when

19              I am talking about that?

20      A. I am, yes.

21  358 Q. Looking at this notation, does this mean that any monies

22              paid by Ailesbury were, in fact, repaid to Ailesbury?

23      A. They were, that's correct.

24  359 Q. Okay.

25

26              In **Plaintiff's Exhibit No. 2**, which was handed to you by

27              Mr. Reichert, it is a document entitled "Contribution

28              Agreement" --

29      A. Yes, I have that.

30  360 Q. Now, in the first paragraph of that agreement, that

1           paragraph which appears to be signed by a Richard J Egan of

2           Fidelity International, there is reference to two effective

3           dates which are self-describing effective dates of October

4           31st 2001 or November 29th, 2001.  Do you see that?

5       A. I see it, yes.

6    361  Q. And then skipping over the next paragraph, in a reference

7           to what would appear to be you and others, there is the

8           assertion "the undersigned consent to the attached

9           amendment to be implemented as of the dates contributed."

10          Do you see that assertion?

11      A. I do, yes.

12   362  Q. Is it possible, Mr. Mahoney, that you put your signature on

13          that part of the document on a time after November 29th,

14          2001?

15      A. I have no way of knowing that.  I would think that I would

16          have signed it on whatever date it was presented to me for

17          signature which doesn't appear to be -- there doesn't

18          appear to be any date on the document.

19   363  Q. There are no dates attached to any of the signatures or

20          associated with the signatures?

21      A. No.

22   364  Q. Repeating the question:  Is it possible that you put your

23          signature on the document on a date after the 29th of

24          November, 2001?

25      A. Again, I have no way of knowing that.  I have no way of

26          knowing that.  You know, anything is possible on God's

27          earth, but I have no way of knowing that one way or

28          another.  I cannot tell, without a date on the document,

29          when it was signed.

30   365  Q. If you consider that the signature relates to what is

```
 1              referred to "an attached amendment to be implemented as of

 2              the dates contributed", does that assist you with working

 3              out the possibility of whether, in fact, your signature was

 4              affixed on this document, placed on this document on a date

 5              after the 29th of November, 2001?

 6         A.   It would certainly seem to imply that, as it says, you

 7              know, the document itself says "this represents a

 8              contribution of cash as of the 29th of November, 2001."

 9   366   Q.   Yes.

10         A.   But, again, you know, I can't speak positively as to dates.

11   367   Q.   Yes, but you would accept that that implication is there

12              and is large in this document?

13         A.   I accept it is in the document.

14   368   Q.   Yes.  Can I ask you perhaps more generally, this question

15              relates to the large number, or relatively large -- well

16              let's not try to multiply it -- the series of transactions

17              we have been dealing with this morning when I put direct

18              questions to you which we were describing the FDIS

19              transactions.  Did you ever put your signature to any of

20              those documents on a date after the effective dates of the

21              documents?

22         A.   No.

23   369   Q.   How do you know that?

24         A.   Because whatever date I would have gotten them in was the

25              day that I would have signed them and that would be the

26              date that was on the document, as far as I am aware.

27   370   Q.   If we could just think about that.  If that is the

28              explanation as to why you believe you never put your

29              signature on a transaction document, transaction documents

30              if I can so refer to them, is that you would have gotten
```

1              them on the date?

2         A. Yes.

3    371  Q. You would have signed them on the date you got them?

4         A. On or about the date that I got them.

5    372  Q. Was it ever possible that you might have received a

6              document and, let me be clear about it, there is nothing

7              wrong about this --

8         A. I accept that.

9    373  Q. Would it be ever be possible for you to put your signature

10             on the document on -- would they have ever sent you the

11             document after its effective date?

12        A. It wouldn't be my practice to do that, but I can't rule out

13             the possibility that it may have happened on one occasion.

14             I don't know is the answer to that question.

15   374  Q. Well --

16        A. But it wouldn't be my normal practice to do that.

17   375  Q. No, Mr. Mahoney, but we are not talking about whether it is

18             your practice in the scenario that you have set up --

19        A. No, you seem to be trying to get me to answer a question

20             that I have already answered, which is, it is not my

21             practice to do it like that.

22   376  Q. Very good.

23        A. I cannot rule out the fact that it may have happened but I

24             have no memory of that.

25   377  Q. I have understood that from your answer.  The scenario that

26             you have presented for circumstances in which you signed

27             the document is when it is sent to you, you sign it?

28        A. Um-hum.

29   378  Q. I am putting to you that it may, if sent to you after the

30             effective date, then you would sign it?

```
 1          A. Yes, or possibly I would have gone back to the originator

 2             of the document and said why am I only getting this now.

 3    379   Q. Have you a recollection of such occurrence?

 4          A. I don't have a recollection of such but I would think that

 5             would be my practice because I am very careful about what I

 6             sign and when I sign it.

 7    380   Q. Now, careful as you are, you nonetheless aren't able to

 8             assist with a clear recollection in respect of Plaintiff's

 9             Exhibit No. 2 as to whether or not you put your signature

10             on that document after?

11          A. But you are asking me --

12    381   Q. You are accepting the possibility of it?

13          A. But you are asking me to confirm a certain date.  I mean,

14             can you tell me what you were doing on October 31, 2001?

15    382   Q. I certainly can't.

16          A. Why would you expect me to do it.

17    383   Q. I am not asking you to confirm the date, I think.  I am not

18             asking you to confirm the date, I am asking you quite a

19             different question and you have given an answer to that,

20             you have conceded the possibility that your signature was

21             affixed to this after that date because of the content of

22             the assertion?

23          A. Yes.

24    384   Q. That is in that statement.

25

26             MR. MacEOCHAIDH:  Thank you, Mr. Mahoney.

27

28             JUDGE DUNNE:  Anything arising?

29

30             MR. REICHERT:  No.
```

1

2          JUDGE DUNNE:  Mr. Lewis?

3

4          MR. LEWIS:  No, Judge.

5

6          JUDGE DUNNE:  Thank you.  Thank you very much, Mr. Mahoney

7     A.  Thank you, Judge.

8

9          **THE WITNESS THEN WITHDREW**

10

11         MR. MacEOCHAIDH:  Thank you, Mr. Mahoney.  Can I confirm to

12         My Friends and to the Court that Mr. Hussey will not be --

13         we have no questions for Mr. Hussey.

14

15         JUDGE DUNNE:  Right.

16

17         MR. MacEOCHAIDH:  Thank you.

18

19         JUDGE DUNNE:  Thank you.

20

21         MR. LEWIS:  Very good.  Well, in those circumstances, if

22         Mr. Hussey could be excused?

23

24         JUDGE DUNNE:  Yes.  Now, that appears, then, to be the end

25         of the questions and answers which, unless the Court is

26         forgetting something, will now bring us back to

27         housekeeping matters of the stenographer's documentation,

28         the documentation as ordered by the High Court, or as

29         limited by the Applicant, the Defendant, the new

30         Plaintiff's exhibits and any other -- I am just trying to

Case 4:05-cv-40151-FDS    Document 336-10    Filed 08/15/2008    Page 34 of 52
FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 2 - 14/05/08

72

1       refresh my own mind as to whether any other exhibits were

2       introduced other than the Plaintiff's exhibits and the

3       Defendant's documents set out in the Letter Rogatory as

4       reduced by the Defendants.

5

6       MR. MacEOCHAIDH:  There was the aide-memoire.

7

8       JUDGE DUNNE:  The aide-memoire.

9

10      MR. MacEOCHAIDH:  I think, for the sake of proper form,

11      should be referred to as **Defendant's Exhibit 1.**

12

13      JUDGE DUNNE:  Yes.

14

15      MR. MacEOCHAIDH:  And entitled the 'aide-memoire' or

16      referred to as the 'aide-memoire'.

17

18      JUDGE DUNNE:  Yes.  Well, from all you gentlemen, what is

19      the suggested process after today?  Is it proposed that --

20      when will the typed up evidence documents be ready?  When

21      will they be ready?  This evening.  Is the Chief State

22      Solicitor represented here and now?

23

24      MR. TIERNEY:  Yes, Judge

25

26      JUDGE DUNNE:  Now, you are the man who has to do the

27      collation, is that right?

28

29      MR. TIERNEY:  Well...

30

1       JUDGE DUNNE:  Well, firstly, the Respondents must read

2       them.  Mr. Lewis, you take significant participation at

3       this stage in the sense that I don't propose that the

4       documents as produced by the stenographer will, that each

5       of the witnesses will get back in the witness-box and the

6       questions be read out and answered and they say "is that

7       right?"  I thought a more efficient manner would be that

8       there would be, they would be prepared by the stenographer

9       and you, as a lawyer to Mr. Mahoney and Mr. Hawkes, might

10      have them go through them meticulously and then confirm to

11      this sitting on a day -- we will discuss the datal sequence

12      as we proceed this afternoon -- that represent correctly.

13      Similarly, that the Defendants would likewise say that they

14      have read them assiduously and that they are satisfied that

15      the typed versions represent the proceedings that occurred

16      here.  Take that as step number one, and if the Court is

17      forgetting something, as I said earlier, don't worry about

18      the Court's ego.

19

20      Step number two would be that the documentation that

21      comprise the Court Order of Mr. Justice Peart in its

22      reduced format, that that would also have to be appended as

23      forming part of the Order.

24

25      And thirdly, the exhibits of the Plaintiff, 1 to 4

26      inclusive, and the exhibit of the Defendant, No. 1, which

27      is the refresher document, would also have to be appended.

28

29      Now, is it the format that all of those documents would be

30      signed by the witnesses and then signed by this -- what is

1       the protocol?  And that is where the chief State

2       Solicitor's Office will come in, your wisdom is awaited

3       eagerly.

4

5       MR. TIERNEY:  I understand that the ordinary practice is

6       that the witnesses would sign the transcripts before you

7       and you have sort of covered that in your - in a more

8       expedited matter where it would be agreed and that it would

9       come before you --

10

11      JUDGE DUNNE:  There is the alternative process if you wish.

12      I want to make it clear, I am not selecting the process, I

13      am suggesting A or B. You can go through -- Mr. Lewis, if

14      you want, we will go through the longhand if you want, it

15      is up to you now.

16

17      MR. LEWIS:  Judge, the Order of the High Court does make

18      certain provision for --

19

20      JUDGE DUNNE:  The what?

21

22      MR. LEWIS:  The Order of the High Court does make certain

23      provision for what is to happen and I think it is --

24

25      JUDGE DUNNE:  -- to sign his deposition in the presence of

26      the examiner.

27

28      MR. LEWIS:  I think it is in accordance with what the Court

29      suggests.  Mr. Mahoney needs to travel at the weekend, so

30      he is desirous to have that matter completed by Friday.

1

2          JUDGE DUNNE:  Yes.

3

4          MR. LEWIS:  My instructions are that he can certainly be in

5          a position, receiving the transcript tomorrow, to have

6          reviewed it and give his approval or otherwise to it.

7

8          JUDGE DUNNE:  Well, the Defendant also has to have equal

9          input into the verification of the accuracy of the

10         typescript.

11

12         MR. LEWIS:  It does, and I would expect the Defendant,

13         having -- they would use all expediency to do that, bearing

14         in mind that the witnesses aren't parties of the

15         proceedings, they are citizens of this jurisdiction.  They

16         will, having made every effort to comply with the Order,

17         they will make every effort to review the transcript as

18         soon as possible, so they should not be incommoded with

19         whatever, perhaps misspoken inconvenience...

20

21         JUDGE DUNNE:  Don't worry about the verbiage.  It is the

22         meaning that is important.

23

24         MR. LEWIS:  We would like to do it by Friday.

25

26         MR. MacEOCHAIDH:  Should we put it in for mention on Friday

27         with a view to everybody signing off on it?

28

29         JUDGE DUNNE:  Well, can we put it a little bit stronger

30         than for mention?  Can we put it in for completion?  I do

Case 4:05-cv-40151-FDS    Document 336-10    Filed 08/15/2008    Page 38 of 52
FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 2 - 14/05/08

76

1       not like the words "for mention"; it is a bit loose.  Can

2       we take it that each of the parties will liaise with the

3       stenographer this morning or this evening, get their

4       relevant copies of documentation, proof read, approve or

5       not, as the case may be, and that on Friday morning -- just

6       let's go to the next step.  If there are concerns about the

7       product and/or the transcripts, how are they expressed or

8       corrected?

9

10      MR. LEWIS:  Perhaps let's cross that bridge if --

11

12      JUDGE DUNNE:  Well, I have to try and plan it.  I don't

13      want to be planning bridges in the middle of crisis.  I

14      want to anticipate and plan.

15

16      MR. LEWIS:  Well, we won't know until Friday.

17

18      JUDGE DUNNE:  Well, would you not be reading tomorrow?  Do

19      you want me to sit at 2 o'clock tomorrow?  Listen,

20      gentlemen this is all about efficiency.

21

22      MR. LEWIS:  I think practically we wouldn't have had an

23      opportunity to review --

24

25      JUDGE DUNNE:  When will the transcripts be available?

26

27      MR. MacEOCHAIDH:  This evening.

28

29      JUDGE DUNNE:  Will we not meet at 2 o'clock tomorrow?

30      There is the morning, you can all work in the morning,

FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 2 - 14/05/08

78

1

2          JUDGE DUNNE:  I would consider it desirable that your

3          exhibits, but I want Mr. Lewis's view on this, and he may

4          not have a view as of now, that is why tomorrow at 2 p.m.

5          would be useful, it would appear to me to be desirable that

6          the reduced schedule of documents that the Defendant

7          sought, and the exhibits of the Plaintiff and the exhibits

8          of the Defendant may be matters to be, if not signed by the

9          witness, they certainly form part of the evidence to some

10         extent, that they get some authentification for the Court

11         as a matter of record.  Now, what format that is, it is not

12         for me to suggest, but I think between the Defendant, you

13         for the witnesses, and the Chief State Solicitor's Office,

14         some wisdom could be ascribed as to how that can be dealt

15         with.

16

17         MR. LEWIS:  Very good.

18

19         JUDGE DUNNE:  Are you all clear on what the Court is trying

20         to establish?

21

22         MR. LEWIS:  Yes, Judge.

23

24         MR. REICHERT:  Yes, Judge

25

26         MR. MacEOCHAIDH:  Yes, Judge

27

28         JUDGE DUNNE:  That those documents either have the same

29         status of authentification as the evidence itself, or some

30         parallel status, but that they form some part of the

Doyle Court Reporters Ltd.

FIDELITY INTERNATIONAL -V- UNITED STATES OF AMERICA - DAY 2 - 14/05/08

79

1          totality of the evidence in any event.

2

3          MR. MacEOCHAIDH:  Yes, Judge

4

5          JUDGE DUNNE:  Everybody clear?  Thank you very much.

6          2 p.m. tomorrow.

7

8          <u>THE PROCEEDINGS ADJOURNED UNTIL THE FOLLOWING DAY, THURSDAY</u>

9          <u>THE 15TH OF MAY, 2008, AT 2 P.M.</u>

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

| $ | '88 [1] - 49:6 | 22:29, 24:24, 24:26, | 22nd [4] - 18:20, 18:5, | 3 |
|---|---|---|---|---|
| | '89 [2] - 47:10, 47:11 | 25:3, 25:4, 25:14, | 18:17, 19:2 | |
| $1,000,000 [1] - 17:27 | '90 [2] - 47:10, 47:11 | 25:20, 26:3, 26:14, | 23mm [1] - 12:26 | 3 [7] - 1:5, 16:18, 17:4, |
| $1,053,750 [4] - 32:14, | 'aide [2] - 72:15, 72:16 | 26:17, 26:20, 28:13, | 23rd [3] - 24:17, | 17:27, 19:13, 60:9, |
| 32:24, 33:7, 33:14 | 'aide-memoire' [2] - | 28:26, 28:30, 29:8, | 29:17, 35:10 | 60:25 |
| $1,140,000 [1] - 16:16 | 72:15, 72:16 | 31:7, 31:28, 32:5, | 24 [2] - 30:25, 33:22 | 30 [1] - 37:24 |
| $1,302,978 [3] - 28:19, | | 40:29, 41:8, 41:15, | 2451 [3] - 4:6, 4:20, | 3023 [6] - 21:5, 21:6, |
| 28:24 | 0 | 42:6, 42:13, 42:20, | 46:24 | 23:9, 23:26, 65:18, |
| $1,505,000 [2] - 21:29, | | 42:25, 43:3, 43:9, | 2452 [1] - 3:20 | 66:4 |
| 22:5 | 000 [2] - 18:30, 20:9 | 43:18, 43:26, 44:5, | 2453 [2] - 8:19, 9:9 | 3024 [3] - 23:30, 24:9, |
| $100,000 [2] - 16:14, | 0597 [2] - 18:30, 20:9 | 44:12, 44:20, 44:29, | 2454 [1] - 12:7 | 24:13 |
| 16:25 | | 45:6, 45:13, 45:20, | 2455 [1] - 12:8 | 3025 [2] - 17:20, 18:1 |
| $12,000,000 [1] - | 1 | 45:25, 45:30, 54:6, | 2456 [2] - 10:13, 10:20 | 31 [3] - 5:26, 36:22, |
| 32:20 | | 67:4, 67:14, 67:24, | 2457 [2] - 10:28, 11:12 | 70:14 |
| $144,970 [1] - 35:15 | 1 [14] - 1:5, 18:30, | 68:5, 68:8, 70:14 | 2458 [1] - 11:20 | 31st [4] - 37:11, 37:17, |
| 39:24, 39:28 | 20:9, 29:7, 54:18, | 2001-customers- | 2459 [1] - 30:9 | 38:5, 67:4 |
| $15,000,000 [1] - | 55:20, 55:26, 58:1, | haberinvst [1] - 5:29 | 2459.01 [1] - 7:22 | 36 [2] - 26:27, 26:3 |
| 32:33 | 56:16, 56:20, 57:24, | 2002 [11] - 5:26, 6:26, | 2459.48 [1] - 11:3 | 37 [12] - 61:1, 61:2, |
| $15,150,000 [1] - | 57:28, 58:18, 59:9, | 7:4, 7:6, 7:8, 7:16, | 2459.48 [2] - 30:4, | 61:6, 61:11, 61:12, |
| 32:21 | 59:19, 72:11, 73:25, | 7:16, 8:4, 8:15, 10:1, | 30:6, 31:11 | 61:14, 61:15, 61:18, |
| $150,000 [1] - 34:27 | 73:26 | 11:24, 11:26, 16:15, | 2459.49 [3] - 30:5, | 61:23 |
| $175,000 [1] - 34:25 | 10 [2] - 4:9, 22:19 | 16:16, 16:18, 16:20, | 30:6, 31:11 | 37s [2] - 61:4, 61:5 |
| $2,000,000 [4] - 16:7, | 11 [1] - 12:13 | 16:21, 17:3, 17:4, | 2459.55 [1] - 7:22 | 3rd [4] - 16:15, 16:21, |
| 16:9, 16:13, 16:24 | 11270012 [2] - 25:9, | 17:12, 17:27, 18:5, | 2460 [4] - 5:23, 7:11, | 18:7, 27:29 |
| $237,000 [1] - 39:7 | 25:13 | 18:7, 18:17, 19:1, | 28:20, 28:21 | |
| $27,000,000 [1] - | 11270025 [2] - 25:9, | 19:2, 19:11, 19:13, | 2461 [17] - 13:19, 54:1, | 4 |
| 12:25 | 25:19 | 19:26, 20:9, 20:10, | 54:15, 54:23, 55:15, | |
| $297,490 [2] - 39:15, | 12-31-01-r.xls [1] - | 20:11, 21:3, 21:13, | 55:19, 55:23, 56:10, | 4 [5] - 62:19, 65:7, |
| 39:24, 39:28 | 5:30 | 23:23, 24:17, 24:20, | 56:17, 56:21, 57:4, | 65:8, 65:10, 73:25 |
| $3,500,000 [1] - 34:20 | 13th [2] - 65:15, 65:25 | 24:22, 26:15, 26:17, | 57:29, 58:7, 58:13, | 40% [1] - 20:22 |
| $300,000 [1] - 32:20 | 14 [1] - 5:19 | 27:14, 27:19, 27:29, | 58:19, 58:24, 58:28 | 46 [1] - 1:7 |
| $35,000 [1] - 66:17 | 14th [1] - 1:1 | 28:2, 28:30, 29:7, | 2462 [1] - 26:27 | 47 [1] - 6:5 |
| $375,000 [1] - 32:23 | 15 [2] - 16:15, 17:12, | 29:8, 29:9, 29:18, | 2463 [2] - 26:27, 46:8 | 48 [3] - 56:11, 57:6, |
| $378,750 [1] - 32:22 | 37:24 | 29:22, 30:10, 30:14, | 2464 [2] - 27:26, 28:18 | 58:9 |
| $380,000 [3] - 18:20, | 15% [2] - 15:24, 15:27 | 30:17, 30:18, 30:25, | 2466 [6] - 1:10, 6:18, | 4mm [1] - 12:27 |
| 19:8, 19:10, 19:12, | 16th [1] - 17:2, 79:9 | 31:7, 31:15, 31:24, | 7:12, 34:9, 34:11, | |
| 19:26, 20:12, 20:14, | 16 [2] - 11:13, 33:5 | 31:25, 31:27, 32:1, | 34:16 | 5 |
| 22:18 | 17 [4] - 12:18, 14:18, | 32:3, 32:10, 32:15, | 2466 [2] - 32:30, 33:16 | |
| $385,000 [1] - 22:17 | 14:26, 34:4 | 32:27, 33:3, 33:5, | 2467 [3] - 1:11, 18:25, | 5 [2] - 3:26, 30:10 |
| $41,463 [6] - 29:10, | 17th [1] - 13:15 | 33:7, 33:15, 33:26, | 20:5 | 50% [1] - 38:1 |
| 29:23, 29:24, 29:29 | 18 [5] - 5:19, 36:9, | 33:28, 34:16, 35:10, | 2468 [3] - 17:7, 18:13, | 50,000 [2] - 15:24, |
| $477,500 [5] - 33:26, | 36:28 | 35:15, 35:18, 36:22, | 19:21 | 15:28 |
| 33:28, 34:15, 34:28, | 1888 [2] - 18:30, 20:9 | 37:6, 37:18, 37:12, | 2469 [3] - 14:15, 15:8, | 55 [6] - 7:16, 7:30, 8:3, |
| 35:2 | 19 [2] - 5:20, 53:23 | 37:18, 38:5, 38:11, | 15:22 | 25:15, 25:22, 26:4 |
| $5,000,000 [1] - 34:26 | 1970 [2] - 50:2, 50:3 | 38:23, 39:7, 39:29, | 2471 [1] - 37:15 | 5th [5] - 10:22, 11:23, |
| $50,000 [4] - 16:15, | 1990 [3] - 52:3, 52:4 | 40:5, 40:15, 40:24, | 2472 [2] - 29:15, 35:5 | 39:23, 40:18, 54:6 |
| 17:1, 17:2, 17:12 | 1991 [2] - 5:5, 53:23 | 40:29, 41:8, 41:15, | 2473 [1] - 32:7 | |
| $500,000 [1] - 66:16 | 1992 [1] - 53:23 | 42:6, 42:13, 42:20, | 2474 [1] - 38:9 | 6 |
| $535,000 [1] - 22:1 | 1998 [1] - 19:18 | 42:25, 43:3, 43:9, | 2475 [1] - 30:22 | |
| $570,000 [1] - 16:17, | 1alpha-disk03- | 43:18, 43:26, 44:5, | 2476 [5] - 33:20, 34:8, | 6 [6] - 56:12, 57:6, |
| 18:3, 18:4, 18:6, | 013502 [1] - 15:9 | 44:12, 44:20, 44:29, | 34:10, 34:11, 34:16 | 58:28 |
| 18:17, 19:3, 19:5 | | 45:6, 45:13, 45:20, | 2478 [1] - 36:20 | 60 [2] - 37:21, 37:29 |
| $6,500,000 [1] - 34:22 | 2 | 45:25, 45:30 | 2479 [1] - 38:30 | 60% [1] - 20:22 |
| $65,000 [1] - 34:21 | | 2003 [7] - 33:22, 35:2, | 2480 [1] - 39:10 | 60:40 [1] - 20:21 |
| $651,000 [2] - 62:13, | 2 [11] - 1:8, 59:29, | 39:3, 39:13, 39:23, | 2481 [1] - 40:11 | 65 [1] - 1:8 |
| 66:8 | 66:26, 70:9, 76:19, | 40:16, 40:19 | 2482 [2] - 29:4, 29:24 | 6th [1] - 38:11 |
| $7,000,000 [1] - 34:24 | 76:29, 77:3, 77:7, | 2006 [2] - 65:15, 65:26 | 25 [1] - 33:3 | |
| $732,245 [3] - 40:17, | 78:4, 79:6, 79:9 | 2008 [2] - 1:1, 79:9 | 26 [2] - 33:25, 33:28 | 7 |
| 40:19, 40:23 | 2001 [73] - 3:17, 3:26, | 20195700 [3] - 25:9, | 28 [2] - 19:1, 20:10 | |
| $760,000 [1] - 16:18 | 3:27, 4:10, 6:12, | 26:2, 27:14 | 28th [1] - 35:2 | 7 [3] - 21:2, 21:13, |
| $87,500 [1] - 34:23 | 6:14, 7:15, 7:16, 8:4, | 2019577 [1] - 25:26 | 29th [8] - 5:5, 39:2, | 65:27 |
| | 8:14, 8:22, 10:1, | 20282910 [1] - 27:19 | 39:13, 67:4, 67:13, | |
| • | 10:22, 11:13, 12:13, | 21 [3] - 1:7, 32:10, | 67:23, 68:5, 68:8 | 8 |
| | 12:18, 14:18, 14:26, | 49:14 | 2:15 [1] - 35:22 | |
| '75 [1] - 50:28 | 14:27, 15:1, 15:14, | 22 [5] - 16:17, 19:11, | 2nd [1] - 8:21 | 8th [1] - 28:2 |
| '76 [1] - 50:28 | 15:17, 15:18, 15:25, | 19:18, 19:26, 20:11, | | |
| '87 [1] - 49:6 | 15:30, 20:23, 22:19, | 29:8 | | |

**9**

9545-40035729 [2] -
20:13, 20:16
9545-40041974 [2] -
19:4, 19:6
9th [1] - 40:15

**A**

able [1] - 70:7
Absolutely [2] - 59:11,
77:6
absolutely [1] - 62:27
accept [3] - 68:11,
68:13, 69:8
accepting [1] - 70:12
accepts [1] - 58:27
access [6] - 25:10,
29:12, 39:19, 39:25,
40:1, 40:7, 40:20,
40:26
accordance [2] - 9:25,
74:28
according [1] - 4:12
account [29] - 23:8,
24:23, 25:8, 25:13,
25:17, 25:19, 25:24,
25:26, 26:30, 26:1,
26:8, 26:7, 26:18,
26:19, 26:21, 26:22,
26:24, 27:2, 27:13,
27:18, 29:19, 31:28,
32:5, 35:12, 35:14,
40:14
Account [6] - 18:30,
19:6, 20:8, 20:15,
27:18, 37:7
accounting [4] -
44:25, 45:10, 45:17,
47:29
accounts [16] - 22:26,
22:29, 24:25, 24:30,
25:2, 25:4, 25:8,
25:16, 25:23, 26:5,
26:9, 26:12, 26:14,
26:30, 27:23
accuracy [4] - 25:11,
39:20, 39:26, 40:2,
40:8, 40:21, 40:27,
75:9
accurate [1] - 4:27
accurately [2] - 28:24,
37:10
Acquisition [7] - 17:5,
17:25, 17:26, 18:8,
19:14, 42:15, 42:22
activities [3] - 21:22,
38:20, 39:18
ad [1] - 58:4
add [1] - 77:14
address [6] - 5:6, 5:7,
11:24, 31:4, 41:5
addressed [2] - 31:3,
32:11
adhered [1] - 9:27
Adj.cost [1] - 28:21

adjacent [1] - 22:12
Adjourned [3] - 35:26,
84:22, 79:8
adjusted [1] - 28:25
administration [2] -
17:13, 17:17
Administrators [2] -
47:16, 48:27
advanced [3] - 21:30,
22:1, 22:5
advised [1] - 65:28
advisers [1] - 65:13
Advisor [2] - 62:3,
63:6
affidavit [2] - 63:14,
65:9
affirmatively [1] -
58:20
affixed [2] - 68:4,
70:21
afforded [1] - 51:18
afraid [1] - 46:29
afternoon [4] - 36:15,
36:18, 73:12, 77:12
Afternoon [1] - 36:16
afterwards [1] - 52:7
agency [2] - 17:13,
17:17
agents [4] - 14:3,
26:17, 41:1, 41:10,
41:17, 41:23, 41:30,
42:8, 42:15, 42:22,
42:27, 43:5, 43:11,
43:20, 43:26, 44:7,
44:14, 44:22, 45:1,
45:8, 45:15, 45:22,
45:27, 46:2
aggregate [1] - 16:10
ago [2] - 26:23, 29:25
agree [2] - 4:2, 8:29
agreed [7] - 15:19,
20:21, 37:30, 62:2,
62:6, 74:8, 77:11
apologise [3] - 62:1,
62:5, 66:28
agreement [3] - 13:22,
13:27, 66:30
aide [8] - 5:17, 38:26,
56:12, 58:29, 63:21,
63:22, 72:6, 72:6
aide-memoire [7] -
38:26, 56:12, 58:29,
63:21, 63:22, 72:6,
72:8
Aillesbury [19] - 22:1,
22:6, 22:8, 22:23,
22:25, 23:5, 23:8,
23:20, 23:22, 24:6,
24:16, 24:18, 41:17,
66:9, 66:16, 66:22
aircraft [3] - 49:9,
49:27, 50:15, 53:17,
53:18
alleged [1] - 77:10
Alpha [23] - 5:27, 6:22,
14:19, 27:30, 28:8,
28:17, 29:18, 29:28,

29:30, 30:16, 30:20,
35:11, 35:12, 37:19,
39:5, 39:14, 39:16,
39:22, 39:29, 40:5,
42:27, 42:28, 43:1
altered [1] - 2:1
alternating [1] - 8:16
alternative [1] - 74:11
amendment [2] - 67:9,
68:1
America [2] - 18:29,
20:8
amount [37] - 13:30,
14:7, 14:10, 14:12,
15:3, 15:12, 15:14,
15:18, 16:1, 16:6,
16:8, 16:11, 16:24,
17:11, 18:16, 19:2,
19:26, 20:11, 22:13,
22:16, 28:19, 28:24,
28:27, 29:23, 33:6,
33:14, 33:26, 33:28,
34:15, 35:2, 35:15,
37:20, 39:15, 39:23,
40:19, 66:8
amounts [6] - 20:19,
20:20, 22:13, 32:16,
34:18, 40:6
analyse [1] - 51:22
Analysis [1] - 15:9
analysis [2] - 15:22,
51:16
angle [1] - 66:15
answer [11] - 16:23,
25:29, 26:4, 27:4,
58:11, 58:13, 59:7,
69:14, 69:19, 69:25,
70:19
answered [3] - 58:19,
69:20, 73:6
answers [3] - 59:3,
59:8, 71:25
anticipate [1] - 76:14
apologise [1] - 28:5
appear [13] - 6:13, 7:6,
19:7, 20:17, 25:12,
27:20, 52:24, 58:14,
63:11, 67:7, 67:17,
67:18, 78:5
appeared [1] - 54:4
appended [2] - 73:22,
73:27
Applicant [1] - 71:29
applies [1] - 3:5
apply [1] - 13:15
appointed [4] - 14:2,
26:16, 41:23, 41:30
appropriate [1] -
77:29
approval [1] - 75:6
approve [1] - 76:4
April [7] - 3:26, 29:8,
30:10, 39:2, 39:13,
65:15, 65:28
areas [2] - 36:27, 63:4
arise [1] - 1:30
arises [1] - 57:6

arising [3] - 56:11,
64:3, 70:28
arrangements [1] -
28:16
as.38% [1] - 15:13
ascribed [1] - 78:14
aspects [1] - 47:29
assembly [1] - 50:15
asserted [1] - 85:27
assertion [3] - 67:8,
67:10, 70:22
assiduously [1] -
73:14
assigned [1] - 8:9
assist [3] - 68:2, 70:8,
77:21
associate [1] - 48:26
associated [2] - 9:24,
67:20
associateship [1] -
49:5
assume [1] - 1:22,
37:29, 62:24
Assuming [1] - 8:29
attached [16] - 6:1,
6:4, 6:6, 28:8, 28:11,
28:12, 29:7, 29:19,
30:26, 33:5, 33:10,
35:11, 35:14, 67:8,
67:19, 68:1
attaches [1] - 63:15
attachment [8] -
10:25, 10:26, 11:6,
11:17, 11:27, 11:28,
15:8, 15:12
attachments [4] -
11:18, 14:20, 14:23,
15:8
audit [1] - 44:28
Augsburg [2] - 50:6,
50:7
Austin [3] - 43:11,
43:12, 43:14
authentication [2] -
78:10, 78:29
available [1] - 76:25
awaited [1] - 74:2
aware [9] - 5:11, 13:5,
29:28, 46:12, 46:15,
56:5, 59:26, 59:27,
68:26

**B**

Bachelor [2] - 47:6,
48:1
back-track [1] - 16:22
background [2] -
48:30, 47:4
backgrounds [1] -
51:13
balance [1] - 21:30
bank [7] - 18:29, 20:7,
24:25, 24:30, 25:2,
25:4, 25:5
Bank [8] - 18:29, 19:4,

19:6, 20:8, 20:14,
20:15
Bankers [6] - 47:13,
47:18, 47:20, 48:4,
48:10, 48:15
bankers [1] - 47:28
banking [5] - 47:25,
47:29, 49:6, 50:27
banks [1] - 51:24
Banque [1] - 51:3
based [1] - 4:2
basics [1] - 48:1
basis [7] - 8:16, 20:21,
28:21, 28:25, 37:20,
37:29, 51:27
Bates [2] - 6:22, 15:8
Bates-1-alpha-disk
09-002452 [1] - 6:24
Bdo [3] - 12:14, 45:15,
45:17
bear [1] - 63:23
bearing [11] - 19:4,
20:4, 20:15, 25:17,
25:24, 26:6, 26:26,
27:14, 27:25, 31:11,
75:13
bears [1] - 29:4,
33:19, 36:19
became [3] - 51:8,
53:1, 53:21
become [3] - 48:9,
49:1, 49:2
becoming [1] - 51:19
begin [1] - 3:10
behalf [10] - 17:24,
21:21, 24:5, 26:26,
28:27, 31:30, 32:3,
39:5, 65:29, 66:1
Belfast [3] - 49:16,
49:17, 49:28, 49:29
beside [4] - 1:20,
62:12, 66:17, 66:18
better [1] - 77:22
between [6] - 37:10,
50:18, 55:19, 55:23,
56:20, 78:12
Bfi [11] - 5:1, 5:2, 5:4,
5:9, 10:23, 11:14,
16:14, 17:1, 17:11,
17:26, 37:28
bfi@indigo.ie [2] -
5:6, 11:25
big [1] - 50:22
bio [3] - 4:22, 4:26,
46:25
biography [4] - 4:17,
4:22, 4:26, 4:29
bios [1] - 4:11
Biosphere [12] - 4:30,
5:7, 16:14, 16:25,
16:26, 16:29, 38:12,
41:1, 41:3, 41:4,
44:28, 53:21
Bissell [2] - 43:28,
44:1
bit [7] - 47:17, 47:19,

48:29, 51:29, 53:10, 75:29, 78:1
**blue** [1] - 55:23
**Bntbk** [1] - 19:4
**Bntbk.isle** [1] - 20:13
**Bnp** [4] - 50:26, 51:1, 51:3, 53:8
**body** [1] - 65:26
**books** [8] - 25:10, 27:21, 39:19, 39:25, 40:1, 40:7, 40:20, 40:26
**border** [1] - 53:5
**bore** [1] - 20:13
**bottom** [2] - 6:23, 47:3
**box** [2] - 62:12, 73:5
**bps** [3] - 37:21, 37:24
**break** [1] - 46:30
**breakdowns** [1] - 8:27
**bridge** [1] - 78:10
**bridges** [1] - 78:13
**Briefly** [1] - 64:22
**bring** [1] - 71:28
**Brook** [2] - 43:29, 44:1
**Brothers** [1] - 49:26
**brought** [1] - 53:24
**Brown** [5] - 12:19, 43:12, 43:14, 44:14, 44:16
**Bryan** [2] - 44:7, 44:9
**Buesinger** [3] - 5:27, 29:6, 39:2
**build** [1] - 48:1
**built** [1] - 50:19
**bundle** [4] - 7:23, 8:1, 10:17, 11:2
**business** [10] - 21:22, 21:25, 24:10, 31:5, 38:20, 39:18, 51:11, 53:4, 53:13
**buy** [6] - 13:4, 13:8, 13:12, 13:22, 54:3, 55:13
**buy-out** [1] - 13:4
**buy-sell** [6] - 13:8, 13:12, 13:22, 54:3, 55:13

### C

**cannot** [6] - 25:16, 25:23, 26:6, 29:13, 67:28, 69:23
**capital** [17] - 9:28, 13:13, 10:27, 20:30, 24:25, 24:27, 31:23, 31:26, 31:29, 32:2, 35:18, 37:7, 62:6, 62:14, 62:16, 65:28, 65:30
**Capital** [1] - 12:25
**Caputo** [1] - 11:15
**careful** [2] - 70:5, 70:7
**carefully** [1] - 51:22
**carried** [1] - 7:15
**case** [7] - 32:28,

33:12, 33:18, 33:29, 34:29, 64:9, 76:5
**cash** [2] - 51:4, 68:8
**Cave** [2] - 44:7, 44:9
**caveat** [2] - 15:24, 15:27
**certain** [5] - 15:19, 26:30, 70:13, 74:18, 74:22
**certainly** [10] - 41:12, 42:30, 43:6, 56:3, 59:15, 68:6, 70:15, 75:4, 77:24, 78:9
**chain** [1] - 37:17
**characterise** [2] - 56:15, 57:27
**characterising** [1] - 55:30
**Chartered** [2] - 47:15, 48:27
**chemical** [1] - 51:13
**chief** [2] - 58:27, 74:1
**Chief** [4] - 62:25, 72:21, 77:20, 78:13
**Clasulti** [2] - 11:16
**circulate** [2] - 59:30, 60:10
**circulated** [5] - 3:25, 60:14, 60:20, 62:19
**circumstances** [2] - 69:26, 71:21
**citizens** [1] - 75:15
**clarification** [1] - 58:2
**clarified** [1] - 61:27
**clarify** [1] - 61:10
**clarity** [1] - 31:10
**classified** [1] - 23:10
**clear** [12] - 26:21, 37:22, 55:23, 58:26, 58:29, 59:13, 69:6, 70:8, 74:12, 77:18, 78:19, 79:5
**client** [1] - 10:9
**clients** [2] - 51:12, 53:12
**co** [4] - 4:12, 5:14, 8:8, 29:10
**Co** [1] - 26:21
**co-investor** [1] - 8:8
**Co-investor** [1] - 28:21
**co-investors** [3] - 4:12, 5:14, 29:10
**collation** [1] - 72:27
**colleague** [1] - 8:10
**colleague's** [1] - 46:29
**collective** [1] - 53:24
**College** [4] - 47:7, 47:12, 47:18, 48:4
**colourful** [1] - 46:29
**column** [3] - 22:12, 62:13, 66:16
**commensurate** [2] - 14:1, 14:10
**comment** [1] - 1:25
**Commissioners** [2] - 63:4, 63:8

**communicate** [2] - 41:25, 42:2
**communicated** [2] - 41:26, 42:3
**communicating** [8] - 43:13, 43:30, 44:8, 44:15, 44:24, 45:3, 45:9, 45:16
**communication** [2] - 41:8, 43:21
**communications** [23] - 40:29, 41:6, 41:15, 42:6, 42:13, 42:20, 42:25, 43:3, 43:9, 43:18, 43:26, 44:5, 44:12, 44:20, 44:29, 45:6, 45:13, 45:20, 45:25, 45:30, 63:8, 63:16, 63:18
**companies** [5] - 14:5, 38:14, 49:10, 51:22, 51:26
**company** [14] - 4:30, 5:2, 18:10, 19:16, 47:30, 49:1, 49:2, 49:3, 49:12, 49:26, 49:28, 49:29, 51:18, 66:1
**complete** [5] - 6:13, 6:14, 7:7, 7:8, 48:9
**completed** [8] - 12:15, 12:20, 37:23, 49:21, 49:23, 74:30, 77:12, 77:13
**completion** [2] - 49:22, 75:30
**comply** [1] - 75:16
**comprise** [1] - 73:21
**comprising** [1] - 56:13
**computed** [3] - 14:12, 16:6, 16:8
**conceded** [1] - 70:20
**concern** [1] - 77:18
**concerning** [27] - • 28:12, 40:29, 41:8, 41:15, 42:6, 42:13, 42:20, 42:25, 43:3, 43:9, 43:16, 43:18, 43:24, 43:26, 44:3, 44:5, 44:11, 44:12, 44:18, 44:20, 44:30, 45:6, 45:13, 45:20, 45:25, 45:30, 83:5
**concerns** [2] - 76:6, 77:8
**concurs** [1] - 1:13
**conducted** [3] - 21:25, 38:20, 39:18
**conducting** [1] - 21:22
**confirm** [6] - 25:11, 64:13, 65:29, 66:8, 70:13, 70:17, 70:18, 71:11, 73:10
**confirmed** [1] - 66:4
**confusion** [4] - 55:19, 55:22, 56:19, 56:24
**connection** [2] -

27:14, 44:28
**consent** [2] - 2:3, 67:8
**consider** [2] - 67:30, 78:2
**consistent** [1] - 9:29
**constituted** [1] - 14:9
**Consultancy** [4] - 18:18, 18:22, 19:27, 20:1
**Consultants** [7] - 39:6, 39:14, 39:16, 39:23, 39:29, 40:5, 42:27
**contain** [5] - 31:14, 58:7, 58:14, 58:24, 61:15
**contained** [1] - 61:14
**contains** [3] - 57:11, 61:18, 62:9
**contemplating** [1] - 9:16
**content** [5] - 8:30, 61:11, 70:21
**context** [1] - 1:23
**continue** [1] - 27:13
**Continued** [1] - 36:4
**contributed** [2] - 67:9, 68:2
**contributing** [1] - 20:25
**contribution** [11] - 13:12, 15:4, 15:13, 15:14, 15:18, 62:6, 62:14, 62:16, 65:28, 65:30, 68:8
**Contribution** [1] - 66:27
**contributions** [15] - 9:28, 20:28, 20:30, 24:26, 24:27, 28:25, 28:27, 31:24, 31:26, 31:30, 32:2, 35:15, 35:16, 37:5, 37:8
**control** [2] - 27:22, 46:9
**controlled** [1] - 22:21
**conversation** [3] - 36:23, 37:10, 37:13
**conversations** [1] - 52:12
**copies** [4] - 26:29, 59:30, 60:10, 76:4
**copy** [22] - 5:30, 6:3, 6:28, 9:3, 10:5, 12:28, 13:22, 14:22, 21:4, 28:13, 30:29, 32:25, 33:5, 33:9, 55:2, 55:4, 55:6, 57:17, 57:19, 60:4, 65:17, 65:19
**Cormac** [2] - 52:16, 52:17
**correct** [16] - 24:17, 26:1, 28:3, 28:4, 28:6, 28:7, 28:9, 34:8, 36:11, 48:24, 53:30, 61:20, 61:25, 62:4, 62:7, 63:7,

66:12, 66:23
**Correct** [1] - 51:25
**corrected** [1] - 76:8
**correctly** [2] - 37:29, 73:12
**cost** [2] - 8:27, 28:25
**counsel** [3] - 17:24, 24:4, 64:6
**Counsel** [1] - 46:19
**course** [10] - 21:21, 24:10, 38:19, 39:17, 48:23, 49:21, 50:20, 51:15, 63:22, 64:16
**courses** [3] - 47:11, 47:26, 47:30, 48:18, 48:21
**Court** [17] - 2:6, 35:24, 56:18, 57:1, 58:23, 63:9, 63:19, 71:12, 71:25, 71:28, 73:16, 73:21, 74:17, 74:22, 74:28, 78:10, 78:19
**Courts** [1] - 73:18
**covered** [2] - 63:4, 74:7
**Crawford** [2] - 52:16, 52:17
**Crawford mcnicholas** [3] - 32:16, 32:19, 33:8
**created** [3] - 17:30, 21:12, 21:16
**creation** [2] - 26:8, 26:11
**credit** [2] - 23:16, 23:17
**crisis** [1] - 76:13
**critical** [1] - 50:23
**cross** [3] - 46:17, 53:5, 76:10
**Cross** [2] - 1:7, 46:21
**cross-border** [1] - 53:5
**cross-examine** [1] - 46:17
**cross-examined** [2] - 1:7, 46:21
**Currency** [2] - 62:3, 63:6
**customers** [3] - 5:12, 5:13, 6:5
**CV** [5] - 46:25, 46:27, 47:3, 51:8, 51:28

### D

**data** [1] - 73:11
**date** [26] - 14:26, 14:27, 16:28, 16:29, 22:10, 22:16, 24:18, 28:4, 39:17, 67:16, 67:18, 67:23, 67:28, 68:4, 68:20, 68:24, 68:26, 69:1, 69:3, 69:4, 69:11, 69:30, 70:13, 70:17, 70:18, 70:21

dated [37] - 3:26, 4:9,
5:26, 8:21, 10:22,
11:13, 11:23, 12:13,
12:18, 14:18, 14:25,
21:2, 27:29, 28:11,
29:7, 29:8, 29:17,
30:10, 30:25, 32:10,
33:3, 33:5, 33:22,
33:28, 35:10, 36:22,
38:11, 39:2, 39:13,
40:15, 54:6
dates [8] - 22:11, 67:3,
67:9, 87:19, 68:2,
68:10, 68:20
David [1] - 8:22
de [1] - 51:3
deal [2] - 51:16, 56:28
dealing [3] - 47:28,
59:7, 68:17
dealt [1] - 78:14
December [4] - 33:15,
33:25, 33:28, 38:11
decided [1] - 8:17
decision [1] - 14:9
Defendant [7] - 71:29,
73:26, 75:8, 75:12,
78:6, 78:8, 78:12
Defendant's [2] - 72:3,
72:11
Defendants [2] - 72:4,
73:13
Define [1] - 27:4
definitely [1] - 77:13
degree [1] - 46:2
Denis [2] - 32:15,
32:21
Department [2] -
51:20, 51:21
departure [1] - 77:28
deployment [1] -
42:14
deposited [2] - 22:27,
22:28
deposition [1] - 74:25
deputy [1] - 51:19
Derivatives [2] - 3:12,
3:24
describe [1] - 53:10
described [3] - 3:17,
3:29, 9:25
describing [2] - 67:3,
68:18
desirable [1] - 78:2,
78:5
desirous [1] - 74:30
detail [2] - 3:30, 9:19
detailed [1] - 21:1
details [2] - 24:5, 27:2
determined [2] - 8:13,
16:9
development [22] -
40:30, 41:9, 41:16,
42:7, 42:20, 42:26,
43:4, 43:10, 43:19,
43:27, 44:6, 44:13,
44:21, 44:30, 45:7,

45:14, 45:21, 45:26,
46:1, 50:16, 51:11,
53:4
Dg [8] - 5:28, 21:30,
22:2, 22:4, 22:18,
22:20, 23:8, 68:9
Dgi [17] - 9:17, 10:9,
11:24, 17:4, 17:24,
18:7, 19:13, 22:21,
23:1, 23:18, 24:5,
27:30, 28:9, 28:16,
30:20, 36:23, 41:13
different [10] - 20:18,
20:20, 25:17, 25:18,
25:24, 25:25, 26:7,
61:11, 70:19
difficult [1] - 65:20
direct [3] - 54:2,
56:28, 63:5, 63:22,
68:17
directly [1] - 62:8
director [4] - 4:30, 5:9,
41:3, 53:21
directors [2] - 52:12,
52:15
discuss [7] - 15:3,
15:13, 15:17, 15:25,
15:30, 20:23, 73:11
discussing [1] - 53:14
discussion [2] - 14:6,
64:10
discussions [2] -
11:29, 14:8
distinction [1] - 57:3
distributing [1] - 4:11
distributions [7] -
24:29, 28:30, 29:9,
29:11, 29:22, 29:25,
29:29
Diversified [8] - 5:27,
9:16, 10:23, 11:14,
22:4, 22:5, 30:15,
41:10
document [104] - 3:19,
3:21, 4:5, 4:7, 4:14,
5:22, 6:17, 6:22,
6:23, 6:26, 7:1, 7:20,
10:27, 11:6, 11:12,
11:19, 12:6, 12:7,
12:17, 13:18, 13:23,
14:14, 17:6, 17:10,
17:19, 18:11, 18:12,
18:24, 18:28, 19:20,
20:4, 22:15, 23:27,
23:29, 24:7, 27:6,
27:25, 28:14, 29:3,
29:14, 30:21, 32:6,
32:29, 33:19, 34:16,
35:4, 36:19, 37:14,
38:8, 38:23, 38:29,
40:10, 54:3, 54:6,
54:10, 54:12, 54:17,
54:27, 55:10, 55:15,
55:24, 55:30, 56:14,
56:15, 57:4, 57:11,
57:14, 57:16, 57:23,
57:27, 57:29, 57:30,

59:22, 59:24, 59:26,
59:27, 59:28, 60:2,
60:4, 60:5, 60:8,
60:27, 60:29, 62:19,
66:27, 67:13, 67:18,
67:23, 67:28, 68:4,
68:7, 68:12, 68:13,
68:26, 68:29, 69:6,
69:10, 69:11, 69:27,
70:2, 70:10, 73:27
Document [24] - 3:20,
4:6, 5:23, 6:18,
10:13, 10:29, 11:4,
11:20, 13:19, 14:15,
17:7, 17:20, 18:26,
21:7, 27:26, 30:22,
32:7, 32:30, 54:8,
54:20, 56:17, 60:1,
60:11, 62:20
documentation [5] -
71:27, 71:28, 73:20,
76:4, 77:22
documents [33] -
1:15, 7:21, 7:23,
7:27, 7:30, 8:2, 9:1,
9:24, 10:17, 11:8,
12:23, 23:11, 26:25,
30:9, 31:9, 46:5,
48:9, 58:24, 60:13,
60:20, 65:4, 65:5,
65:7, 65:24, 68:20,
68:21, 68:29, 72:3,
72:20, 73:4, 73:29,
78:6, 78:28
Documents [2] - 7:22,
12:9
dollars [1] - 22:14
done [3] - 1:22, 11:11
Donohue [2] - 6:8,
56:7
Dornier [3] - 50:8,
50:9, 50:13
doubling [1] - 38:2
draft [2] - 3:23, 3:26
Dublin [3] - 47:7, 51:6,
51:7
Dunne [60] - 1:3, 1:17,
1:22, 1:27, 2:3, 3:8,
34:4, 35:21, 36:8,
36:13, 36:15, 36:26,
37:2, 46:17, 54:22,
54:27, 55:2, 55:6,
55:10, 55:18, 55:26,
55:30, 56:5, 56:9,
56:26, 56:30, 57:6,
57:14, 57:21, 57:27,
58:4, 58:11, 58:18,
58:26, 59:6, 59:13,
59:17, 60:15, 60:17,
60:22, 61:10, 61:22,
61:27, 62:23, 62:29,
63:29, 64:3, 64:8,
64:16, 64:20, 64:24,
64:28, 70:28, 71:2,
71:6, 71:15, 71:19,
71:24, 72:8, 72:13,
72:18, 72:26, 73:1,

74:11, 74:20, 74:25,
75:2, 75:8, 75:21,
75:29, 76:12, 76:18,
76:25, 76:29, 77:6,
77:18, 78:2, 78:19,
78:28, 79:5
During [2] - 15:1, 25:4
during [8] - 6:12, 10:1,
15:18, 20:23, 31:7,
63:21

---

**E**

e-mail [37] - 3:18,
3:25, 4:9, 4:15, 5:6,
5:7, 5:26, 6:1, 6:4,
6:21, 8:24, 9:3, 9:8,
10:22, 10:25, 10:26,
11:13, 11:17, 11:18,
11:23, 11:24, 11:27,
11:28, 12:13, 12:18,
14:18, 14:22, 14:25,
14:28, 15:6, 27:29,
28:1, 29:6, 29:17,
30:10, 30:25, 31:2,
31:4, 32:10, 32:26,
33:3, 33:22, 35:8,
36:22, 37:9, 37:17,
37:28, 38:4, 38:5,
38:11, 38:17, 39:2,
41:5, 41:12, 42:10,
42:30, 43:6
e-mailing [1] - 8:20
eagerly [1] - 74:3
early [2] - 12:27, 53:23
earth [1] - 67:27
ease [1] - 8:1
economics [1] - 9:27
educational [2] - 47:3,
48:14
effective [5] - 67:2,
67:3, 68:20, 69:11,
69:30
effectuate [1] - 13:12
efficiency [1] - 76:20
efficient [1] - 73:7
effort [2] - 75:16,
75:17
Egan [4] - 13:22,
46:11, 46:14, 67:1
Egar's [1] - 25:21
ego [1] - 73:18
eight [1] - 48:16
Eight [1] - 48:18
either [5] - 8:4, 8:9,
10:10, 53:13, 66:9,
78:28
elbaum [1] - 7:11
Elizabeth [4] - 5:27,
11:24, 36:23, 37:11
employee [1] - 53:1
employees [20] - 41:1,
41:10, 41:17, 42:8,
42:15, 42:22, 42:27,
43:5, 43:11, 43:20,
43:28, 44:7, 44:14,
44:22, 45:1, 45:8,

45:15, 45:22, 45:27,
46:2
employment [1] -
50:30
end [8] - 9:2, 20:10,
36:9, 37:25, 48:2,
71:24
ended [1] - 50:17
engaged [3] - 51:13,
53:5, 53:29
engagement [2] -
8:28, 9:5
engineering [2] - 49:8,
51:13
ensure [1] - 60:19
entail [1] - 53:14
enter [1] - 48:14
entered [1] - 13:29
entering [1] - 9:16
entirely [2] - 29:12,
61:25
entities [3] - 8:30,
12:23, 46:6
entitled [6] - 6:26,
21:3, 30:26, 66:5,
66:27, 72:15
entity [1] - 22:21
equal [6] - 15:24,
15:27, 16:15, 16:17,
16:20, 75:8
equals [1] - 37:21
Erb [4] - 11:26, 34:17,
34:21, 34:22
essentially [1] - 53:24
Essentially [1] - 55:13
establish [1] - 78:20
established [3] -
52:23
etc [1] - 8:28
eur315,000 [1] - 37:21
Europe [1] - 53:6
European [2] - 50:17,
50:20
Evaluation [1] - 51:20
evening [4] - 48:23,
72:21, 76:3, 76:27
Evenings [1] - 48:24
event [1] - 79:1
eventually [1] - 56:12
evidence [9] - 59:4,
64:8, 72:20, 77:9,
77:20, 77:25, 78:9,
78:29, 79:1
examination [4] - 1:6,
47:15, 54:2, 58:27
examination-in-chief
[1] - 58:27
examinations [1] -
47:14
examine [1] - 46:17
Examined [3] - 1:5,
3:1, 36:4
examined [4] - 1:7,
1:8, 46:21, 65:2
examiner [1] - 74:26
examines [1] - 47:28

exceed [2] - 15:24, 15:27
exchange [1] - 13:26
exchanged [4] - 41:12, 42:10, 42:30, 43:6
exclusively [1] - 26:10
excused [1] - 71:22
executive [2] - 51:5, 51:19
exhibit [14] - 2:1, 4:23, 6:5, 8:18, 10:12, 15:22, 20:3, 30:4, 34:9, 54:14, 63:1, 63:9, 63:23, 73:26
Exhibit [93] - 3:20, 4:6, 4:20, 5:23, 8:18, 7:11, 7:12, 8:19, 9:9, 10:13, 10:18, 10:20, 10:28, 11:3, 11:12, 11:20, 12:7, 12:8, 13:19, 14:15, 15:8, 17:7, 17:20, 18:25, 19:21, 20:5, 21:5, 21:6, 23:9, 23:26, 23:30, 24:9, 24:13, 26:26, 26:27, 27:26, 28:18, 28:20, 29:4, 29:15, 29:24, 30:22, 31:11, 32:7, 32:30, 33:17, 33:20, 34:8, 34:11, 34:18, 35:5, 36:20, 37:15, 38:9, 38:30, 39:10, 40:11, 46:8, 46:24, 54:1, 54:18, 54:22, 55:20, 55:26, 56:1, 56:10, 56:16, 56:20, 57:24, 57:28, 57:29, 58:7, 58:18, 58:19, 58:23, 58:28, 59:9, 59:19, 59:29, 60:9, 60:24, 62:10, 62:18, 65:7, 65:8, 65:10, 65:18, 65:22, 66:4, 66:26, 70:9, 72:11
exhibited [1] - 63:19
Exhibits [1] - 7:21
exhibits [16] - 1:9, 1:10, 1:12, 30:2, 54:5, 62:24, 65:21, 71:30, 72:1, 72:2, 73:25, 77:22, 77:30, 78:3, 78:7
expect [2] - 70:16, 75:12
expediency [1] - 75:13
expedited [1] - 74:8
expense [4] - 28:18, 29:22, 29:29, 35:14
expenses [1] - 28:13
experience [1] - 53:25
explain [2] - 9:5, 24:24
explained [1] - 24:27
explaining [1] - 16:23
explanation [2] - 4:2, 68:28

**F**

Fact [3] - 12:16, 12:24, 12:28
fact [8] - 11:6, 12:20, 13:20, 13:24, 16:9, 66:22, 68:3, 69:23
factual [2] - 46:10, 46:13
fair [3] - 13:30, 14:10, 38:2
familiar [1] - 50:10
familiarise [1] - 59:23
family [1] - 33:8
famous [2] - 49:28, 49:29
far [5] - 6:7, 6:9, 13:1, 22:22, 68:26
fascinating [1] - 47:1
fax [3] - 33:25, 33:27, 37:22
Fdia [148] - 3:14, 3:16, 5:12, 5:13, 6:15, 6:11, 6:14, 7:4, 7:6, 7:8, 7:14, 7:16, 8:4, 8:6, 8:15, 8:23, 9:6, 9:9, 9:19, 9:20, 9:21, 10:2, 10:17, 11:26, 11:30, 12:1, 12:16, 12:22, 12:29, 13:2, 13:3, 13:6, 13:9, 13:27, 13:29, 14:3, 14:29, 15:2, 15:15, 15:26, 16:2, 16:10, 20:21, 21:1, 22:19, 22:29, 23:2, 23:5, 24:20, 24:28, 24:28, 25:3, 25:6, 25:14, 25:15, 25:20, 25:21, 25:22, 25:27, 26:3, 26:4, 26:12, 26:15, 26:18, 26:30, 27:14, 27:19, 28:26, 28:30, 29:8, 30:14, 30:17, 30:18, 31:15, 31:24, 31:28, 32:1, 32:5, 32:15, 33:7, 34:16, 35:18, 37:8, 38:23, 39:7, 39:29, 40:5, 40:24, 40:30, 41:6, 41:7, 41:9, 41:13, 41:14, 41:16, 41:24, 41:27, 42:1, 42:4, 42:7, 42:11, 42:12, 42:14, 42:21, 42:26, 43:1, 43:2, 43:4, 43:7, 43:8, 43:10, 43:15, 43:16, 43:17, 43:19, 43:23, 43:24, 43:27, 44:2, 44:3, 44:6, 44:10, 44:11, 44:13, 44:17, 44:18,

44:21, 44:26, 44:27, 45:1, 45:4, 45:5, 45:7, 45:11, 45:12, 45:14, 45:18, 45:19, 45:21, 45:26, 46:1, 46:11, 46:14, 68:18
February [6] - 16:15, 16:18, 16:20, 17:3, 17:12, 18:5, 18:17, 19:1, 19:2, 19:11, 19:26, 20:9, 20:10, 20:11
fee [27] - 13:26, 14:7, 14:12, 15:23, 16:1, 16:6, 16:7, 16:13, 16:24, 17:1, 17:2, 17:4, 18:4, 18:6, 19:10, 19:12, 20:18, 32:20, 32:22, 32:23, 32:24, 34:20, 34:22, 34:24, 34:26, 37:22, 38:2
Fee [1] - 15:26
Fees [4] - 19:26, 20:1, 37:19, 39:3
fees [7] - 16:4, 16:9, 16:12, 20:21, 34:27, 38:13, 39:7
fellow [1] - 64:6
Fidelity [4] - 13:15, 62:2, 63:5, 67:2
fighter [1] - 50:17
fighters [1] - 50:20
figure [2] - 62:13, 66:16
Finally [1] - 63:21
Finance [4] - 4:30, 5:7, 16:14, 16:25, 16:26, 22:8, 22:25, 24:6, 38:12, 41:1, 41:3, 41:4, 41:17, 53:21
Financial [35] - 3:12, 3:24, 4:10, 5:11, 8:22, 12:15, 14:19, 17:3, 17:11, 17:16, 18:6, 18:16, 18:21, 18:29, 19:3, 19:12, 19:25, 19:30, 20:8, 20:12, 30:13, 31:4, 31:6, 31:16, 31:19, 40:15, 40:18, 40:19, 40:24, 42:8, 42:11, 45:27, 46:2, 47:6, 48:2
financial [2] - 28:16, 53:5
financing [2] - 51:14, 51:17
fine [1] - 77:4
finish [1] - 34:4
finished [2] - 36:9, 49:30
firm [8] - 12:19, 43:14, 43:22, 44:1, 44:9, 44:16, 44:25, 45:10, 45:17

first [18] - 8:17, 11:12, 13:29, 16:23, 22:18, 22:19, 25:13, 36:30, 55:6, 57:7, 58:8, 60:5, 60:6, 61:15, 61:23, 66:30
First [1] - 12:13
firstly [1] - 73:1
five [4] - 25:20, 53:5, 64:5, 64:13
fixed [1] - 15:20
flowed [1] - 28:12
following [3] - 3:13, 32:18, 34:18
Following [1] - 79:8
Follows [7] - 1:1, 3:2, 36:2, 38:5, 46:22, 64:22, 66:2
foreign [29] - 3:30, 4:3, 6:16, 7:10, 7:18, 8:14, 9:21, 10:11, 13:5, 13:27, 14:29, 15:2, 15:4, 15:12, 15:14, 15:18, 15:19, 15:23, 16:1, 16:2, 20:25, 20:28, 41:2, 41:11, 41:18, 42:9, 42:16, 42:23, 42:29
Foreign [1] - 16:26
forgetting [2] - 71:26, 73:17
form [7] - 8:30, 12:22, 72:10, 77:23, 77:24, 78:9, 78:30
forma [2] - 32:13, 32:26
format [3] - 73:22, 73:29, 78:11
formed [2] - 10:10, 52:8
formerly [1] - 43:12
forming [1] - 73:23
formulaic [1] - 9:28
forth [4] - 9:8, 9:29, 21:17, 33:11
forum [1] - 5:18
forward [2] - 8:25, 9:1
forwarding [5] - 5:29, 10:23, 11:14, 11:25, 12:15, 12:20, 30:13, 32:13
founded [1] - 52:7
founder [1] - 53:21
four [1] - 27:22
foursquare [1] - 57:24
Francis [4] - 10:24, 12:16, 12:21, 13:1
Francis [1] - 12:22
fresh [1] - 56:15
Friday [7] - 28:1, 74:30, 75:24, 75:26, 76:5, 76:16, 77:13
Friedlander [7] - 22:29, 25:2, 25:5, 27:18, 27:22, 41:26, 42:3

Friends [1] - 71:12
front [26] - 4:26, 6:1, 6:19, 7:23, 8:19, 9:9, 10:14, 10:15, 10:20, 10:21, 14:25, 15:7, 15:23, 19:21, 19:23, 21:12, 21:15, 22:3, 23:29, 24:15, 27:5, 28:21, 31:10, 31:12, 34:7, 35:4
Fry [2] - 65:13, 65:25
full [1] - 48:19
fully [1] - 23:22
function [2] - 16:10, 16:11
Fund [2] - 82:3, 63:6
fund [2] - 22:19, 38:14
funding [20] - 20:27, 20:30, 21:27, 21:29, 21:30, 22:20, 22:23, 22:25, 23:8, 23:10, 23:18, 23:20, 23:22, 24:5, 24:16, 24:17, 24:20, 24:22, 31:23, 31:29
Funding [3] - 21:3, 22:4, 66:5
funds [11] - 20:24, 22:10, 22:11, 22:21, 22:26, 22:28, 23:1, 23:4, 25:6, 26:12, 26:29
furnished [1] - 62:24

**G**

general [3] - 9:24, 50:30, 53:3
Generally [1] - 8:16
generally [2] - 10:8, 68:14
generate [1] - 12:2
generated [1] - 37:30
gentlemen [7] - 35:21, 57:30, 64:20, 64:24, 72:18, 76:20, 77:1
German [1] - 51:12
Germany [8] - 49:9, 49:12, 49:13, 49:30, 50:5, 50:11, 50:18, 50:25
given [6] - 26:19, 26:22, 28:4, 30:2, 70:19
glad [1] - 56:26
global [1] - 3:5
Gods [1] - 67:26
Government [66] - 3:20, 4:6, 4:20, 5:23, 6:18, 7:11, 7:12, 7:21, 8:19, 10:13, 10:18, 10:20, 10:28, 11:3, 11:12, 11:20, 12:7, 12:8, 13:19, 14:15, 15:7, 17:7, 17:20, 18:24, 19:21, 20:5, 21:5, 21:6,

23:9, 23:26, 23:30, 24:9, 24:13, 26:26, 26:27, 27:26, 28:18, 28:20, 29:4, 29:15, 29:24, 30:22, 31:11, 32:7, 32:30, 33:17, 33:19, 34:8, 34:11, 34:18, 35:5, 36:20, 37:15, 38:8, 38:30, 39:10, 40:11, 46:8, 56:10, 56:20, 57:29, 58:19, 58:28, 65:18, 66:4
graduate [1] - 47:9
graduated [1] - 48:11
Grant [2] - 45:1, 45:4
great [2] - 50:29, 51:16
gross [8] - 16:11, 32:19, 32:21, 32:23, 34:20, 34:22, 34:24, 34:26
Group [7] - 5:27, 9:16, 10:23, 11:14, 22:4, 22:5, 41:10

**H**

H&m [2] - 24:23, 26:18, 27:13, 31:27, 32:4, 37:6
Haber [38] - 3:17, 3:27, 10:23, 11:14, 11:29, 13:26, 13:30, 14:7, 14:8, 14:18, 14:27, 15:1, 15:3, 15:13, 15:17, 15:25, 15:30, 20:23, 24:24, 24:27, 27:30, 28:2, 28:5, 28:8, 28:9, 29:7, 29:18, 32:10, 32:26, 33:4, 33:23, 35:10, 37:18, 37:28, 38:4, 38:6, 38:12
Haber's [1] - 4:2
haircut [1] - 38:2
hand [7] - 34:13, 35:6, 38:18, 38:23, 40:12, 65:17, 65:19
handed [59] - 3:19, 3:20, 4:5, 4:6, 5:22, 5:23, 6:17, 6:19, 7:20, 7:22, 10:12, 10:13, 10:27, 10:29, 11:1, 11:4, 11:19, 11:20, 12:6, 12:9, 12:17, 13:19, 14:15, 17:6, 17:7, 17:19, 17:20, 18:11, 18:24, 18:26, 19:19, 21:6, 21:7, 23:27, 26:25, 27:25, 27:26, 29:3, 29:14, 30:21, 30:22, 32:6, 32:7, 32:29, 32:30, 33:19, 37:14, 38:8, 38:29, 39:11, 40:10, 54:8, 54:19,

54:20, 60:1, 60:11, 62:20, 65:22, 66:26
handling [1] - 36:19
hands [5] - 2:1, 21:20, 21:28, 31:3, 33:16
handwriting [2] - 21:10, 66:12
handwritten [1] - 21:2
hard [1] - 25:10
Hawkes [21] - 1:8, 4:14, 6:16, 7:10, 7:17, 8:10, 8:14, 26:10, 32:25, 35:17, 37:9, 37:18, 37:19, 38:4, 38:12, 38:17, 46:30, 51:29, 53:19, 53:28, 73:9
head [1] - 51:19
headed [1] - 54:3
heard [1] - 53:19
Helios [31] - 4:10, 5:11, 8:22, 10:9, 12:15, 14:19, 17:3, 17:10, 17:16, 18:5, 18:15, 18:21, 18:29, 19:3, 19:11, 19:25, 19:30, 20:7, 20:12, 28:17, 29:28, 29:30, 30:13, 30:20, 40:14, 40:16, 40:18, 40:19, 40:24, 42:8, 42:11
High [6] - 63:9, 63:19, 71:28, 74:17, 74:22
hmm [1] - 12:12
hold [1] - 47:6
holding [5] - 22:9, 22:15, 22:27, 31:2, 38:23
Honour [1] - 55:8
hope [1] - 64:26
housekeeping [1] - 71:27
Hubbie [1] - 31:3
hum [6] - 47:5, 52:1, 59:21, 60:3, 65:14, 69:28
Hussey [6] - 64:9, 64:10, 64:11, 71:12, 71:13, 71:22

**I**

Id [2] - 19:4, 20:13
idea [2] - 28:29, 54:4
idem [1] - 58:4
identified [10] - 4:13, 5:19, 6:30, 8:4, 12:3, 17:16, 18:21, 19:30, 31:17, 56:13
identifies [4] - 6:26, 17:12, 18:17, 19:27
ignore [1] - 54:22
ignored [1] - 38:27
immediately [1] - 49:22
implement [1] - 25:3, 25:13, 25:20, 25:27,

26:3, 26:14, 27:19
implementation [1] - 30:27
implementation [38] - 9:20, 10:6, 40:30, 41:7, 41:9, 41:14, 41:16, 41:27, 42:4, 42:7, 42:12, 42:14, 42:21, 42:26, 43:2, 43:4, 43:8, 43:10, 43:15, 43:19, 43:23, 43:27, 44:2, 44:6, 44:10, 44:13, 44:17, 44:21, 44:27, 44:30, 45:5, 45:7, 45:11, 45:14, 45:18, 45:21, 45:26, 46:1
implemented [4] - 7:4, 22:30, 67:9, 68:1
implementing [8] - 9:22, 14:3, 26:17, 30:18, 41:24, 42:1
implication [1] - 68:11
imply [1] - 68:6
important [1] - 75:22
inc [1] - 9:17
include [1] - 38:23
including [3] - 3:30, 14:9, 25:20
inclusive [1] - 73:26
income [1] - 28:12
incommoded [1] - 75:18
inconvenience [1] - 75:19
incorporated [2] - 5:28, 41:11
incorporated [2] - 5:4, 19:17
indeed [1] - 6:25
indicate [2] - 1:13, 77:7
indicated [1] - 66:11
individuals [4] - 4:11, 4:13, 5:14
information [3] - 21:17, 25:11, 39:21, 39:27, 40:3, 40:9, 40:22, 40:28
informed [1] - 9:8
initials [1] - 8:9
input [1] - 75:9
institute [9] - 47:13, 47:15, 47:17, 47:19, 48:3, 48:10, 48:15, 49:18, 49:19
institute [4] - 47:27, 48:26, 48:29, 48:30
instructions [13] - 8:27, 26:29, 27:1, 27:3, 27:4, 27:6, 27:8, 27:10, 27:11, 64:6, 75:4, 77:3
intents [1] - 56:17
interest [2] - 13:4, 23:14
interesting [1] - 47:1

interests [2] - 24:30, 28:28
internal [2] - 61:1, 65:12
international [10] - 13:15, 51:29, 52:6, 52:11, 52:20, 52:28, 53:20, 62:2, 63:5, 67:2
interrupting [1] - 62:23
introduced [2] - 57:7, 72:2
investment [2] - 3:12, 3:25
investments [1] - 37:6
investments [2] - 7:5, 9:17, 27:17, 30:17, 30:19, 31:16, 31:17, 31:18, 31:19, 31:21, 32:1, 32:3, 32:14, 33:6, 33:9, 33:13, 33:24, 33:26, 34:30, 35:18, 37:9, 39:6, 39:14, 39:15, 39:22, 39:28, 40:4, 40:16, 40:17, 40:23, 45:22, 46:3
investor [8] - 8:8, 9:15, 9:21, 12:20, 12:30, 28:21
investor [2] - 12:15, 12:24, 12:28
investors [3] - 4:12, 5:14, 29:10
invoice [13] - 32:13, 32:26, 33:5, 33:10, 33:15, 33:24, 33:27, 34:15, 35:1, 39:6, 39:13, 39:16, 39:17
involve [4] - 51:10, 51:26, 53:17, 53:18
involved [7] - 3:11, 3:16, 9:22, 24:28, 50:16, 51:11, 51:16
Ireland [5] - 44:23, 44:28, 47:13, 50:26, 50:28, 50:29
Irish [5] - 5:2, 29:22, 35:15, 38:14, 63:16
isle [11] - 14:4, 18:10, 19:4, 19:6, 19:16, 20:15, 25:5, 26:11, 27:18, 44:23, 66:1
issue [2] - 1:27, 33:27
issues [1] - 58:4
item [2] - 28:16, 35:16
items [2] - 1:20, 8:1
itself [2] - 68:7, 78:29
Ivan [4] - 14:19, 29:2, 29:18, 35:11

**J**

James [26] - 3:17, 10:23, 11:13, 13:26, 13:30, 14:6, 14:8,

14:27, 15:1, 20:23, 24:24, 24:27, 27:30, 28:2, 29:7, 29:18, 32:10, 32:26, 33:3, 33:23, 35:10, 37:18, 37:28, 38:4, 38:6, 38:12
January [6] - 21:3, 21:13, 23:23, 24:17, 33:22, 36:2
Japanese [1] - 51:12
Jerome [1] - 8:23
John [1] - 53:28
joined [1] - 51:28
Joint [1] - 37:7
joint [8] - 24:23, 26:18, 27:13, 29:29, 31:27, 32:4
Joseph [2] - 12:16, 12:20
Judge [103] - 1:3, 1:5, 1:17, 1:22, 1:27, 2:3, 3:8, 34:1, 34:4, 35:21, 36:8, 36:13, 36:15, 36:16, 36:26, 37:2, 38:26, 46:17, 46:19, 54:22, 54:27, 55:2, 55:6, 55:10, 55:18, 55:26, 55:30, 56:5, 56:9, 56:18, 56:26, 56:30, 57:6, 57:14, 57:21, 57:27, 58:2, 58:4, 58:11, 58:18, 58:26, 59:6, 59:13, 59:17, 60:14, 60:17, 60:20, 60:22, 61:10, 61:22, 61:25, 61:27, 62:23, 62:29, 63:29, 64:1, 64:3, 64:5, 64:8, 64:16, 64:20, 64:24, 64:26, 64:28, 70:28, 71:2, 71:4, 71:6, 71:7, 71:15, 71:19, 71:24, 72:8, 72:13, 72:18, 72:24, 72:26, 73:1, 74:11, 74:17, 74:20, 74:25, 75:2, 75:8, 75:21, 75:29, 76:12, 76:18, 76:25, 76:29, 77:6, 77:16, 77:18, 77:27, 78:2, 78:19, 78:22, 78:24, 78:26, 78:28, 79:3, 79:5
July [3] - 22:19, 39:23, 40:18
June [4] - 5:27, 11:24, 36:23, 37:11
jurisdiction [1] - 75:15
Justice [1] - 73:21

**K**

Kampf [6] - 8:22, 8:24, 12:15, 12:18, 30:13, 33:23
Kealy [2] - 63:14, 65:9

**kept** [1] - 21:21
**Kerekes** [2] - 12:14
**Kilsture** [29] - 14:1, 14:4, 14:11, 16:19, 17:26, 19:9, 19:10, 19:12, 19:15, 19:16, 19:17, 19:25, 20:12, 20:14, 20:18, 20:20, 20:22, 26:16, 26:20, 31:22, 41:22, 41:25, 41:28, 41:29, 66:1
**kind** [2] - 51:2, 54:9
**knowing** [4] - 67:15, 67:25, 67:26, 67:27
**knowledge** [3] - 21:18, 27:12, 55:19
**known** [4] - 3:12, 5:18, 5:28, 43:12
**Kpmg** [2] - 44:22, 44:25

**L**

**large** [3] - 68:12, 68:15
**last** [1] - 64:8
**late** [1] - 53:23
**Lavato** [2] - 12:19, 12:22
**law** [7] - 12:19, 43:14, 43:22, 44:1, 44:9, 44:16, 47:30
**lawyer** [1] - 73:9
**layperson** [1] - 53:7
**leads** [1] - 47:27
**Leasing** [6] - 51:29, 52:7, 52:11, 52:20, 52:29, 53:20
**ledger** [21] - 21:2, 21:7, 21:12, 21:15, 21:24, 21:27, 21:29, 22:2, 22:6, 22:9, 22:15, 22:20, 22:24, 22:27, 23:9, 23:24, 23:25, 46:7, 65:18, 66:3, 66:11
**left** [5] - 22:12, 24:23, 31:27, 32:4, 50:25
**lending** [1] - 51:5
**Lending** [2] - 51:20
**less** [1] - 28:27
**letter** [8] - 8:25, 8:29, 9:2, 9:6, 21:20, 65:13, 65:25, 65:26
**Letter** [1] - 72:3
**Lewis** [26] - 58:2, 58:4, 58:6, 58:13, 58:22, 59:1, 63:29, 64:1, 71:2, 71:4, 71:21, 73:2, 74:13, 74:17, 74:22, 74:28, 75:4, 75:12, 75:24, 76:10, 76:16, 76:22, 77:3, 77:16, 78:17, 78:22
**Lewiss** [1] - 78:3
**Li** [1] - 37:5
**liaise** [1] - 76:2

**liaison** [1] - 50:18
**life** [3] - 47:26, 49:7, 49:11
**likelihood** [1] - 3:28
**likewise** [1] - 73:13
**limited** [2] - 16:14, 71:29
**Limited** [58] - 4:30, 7:5, 9:17, 14:2, 16:16, 16:19, 18:26, 19:3, 20:13, 24:6, 26:16, 27:17, 30:17, 30:19, 31:6, 31:16, 31:17, 31:18, 31:21, 32:1, 32:4, 32:14, 33:6, 33:9, 33:13, 33:24, 33:27, 34:30, 35:18, 37:9, 38:12, 39:6, 39:14, 39:15, 39:22, 39:29, 40:4, 40:16, 40:17, 40:24, 41:2, 41:4, 41:22, 41:25, 41:28, 41:29, 42:2, 42:5, 45:23, 45:28, 46:3, 53:21, 66:1
**Lindquist** [1] - 36:19
**Linq** [1] - 1:3
**line** [11] - 6:26, 23:16, 23:17, 28:18, 29:22, 35:14, 35:16, 37:19, 39:3, 48:4, 55:23
**Links** [2] - 32:16, 32:22, 33:8
**list** [9] - 6:6, 6:10, 6:13, 6:14, 7:6, 7:8, 21:27, 34:19, 54:4
**listed** [9] - 7:11, 22:17, 22:20, 22:23, 28:20, 29:19, 29:22, 29:24, 34:18
**Listen** [1] - 76:19
**lists** [11] - 4:29, 6:5, 12:24, 15:12, 15:23, 17:11, 18:16, 19:25, 28:18, 29:9, 35:14
**Liq** [2] - 10:10, 17:5, 17:25, 17:26, 18:8, 18:29, 19:14, 20:8, 22:8, 24:29, 37:6, 40:15, 41:18, 42:8, 42:11, 42:16, 42:22, 42:28, 62:3, 63:6
**Liqs** [1] - 24:28
**Liq** [3] - 12:14, 43:20, 45:15
**loan** [3] - 23:11, 51:17, 51:19
**loans** [3] - 23:10, 23:12, 23:14
**longhand** [1] - 74:14
**look** [18] - 3:23, 6:21, 7:26, 7:30, 10:19, 11:7, 11:10, 18:12, 20:3, 23:29, 28:22, 34:9, 35:4, 58:13, 60:27, 65:5, 65:25
**looked** [5] - 7:28,

11:9, 60:29, 60:30, 62:30
**Looking** [1] - 66:21
**looking** [7] - 10:16, 18:28, 29:25, 30:21, 50:30, 51:1, 66:11
**looks** [1] - 54:6
**loose** [1] - 76:1
**Lord** [2] - 43:28, 44:1
**loss** [1] - 37:30
**losses** [1] - 12:2
**Lunch** [2] - 35:26, 36:2

**M**

**Maceochaidh** [43] - 1:8, 1:8, 1:5, 1:20, 1:25, 1:30, 2:6, 3:2, 3:10, 34:1, 34:6, 35:24, 36:4, 36:8, 36:11, 38:18, 38:28, 38:30, 37:4, 56:5, 56:7, 56:23, 56:28, 60:13, 60:17, 60:19, 64:3, 64:5, 64:13, 64:18, 64:26, 64:30, 65:2, 70:26, 71:11, 71:17, 72:6, 72:10, 72:15, 75:26, 76:27, 78:26, 79:3
**Maddox** [24] - 14:2, 14:4, 14:11, 16:16, 16:17, 17:26, 18:3, 18:4, 18:6, 18:9, 18:10, 18:16, 19:3, 19:5, 20:16, 20:20, 20:22, 26:16, 26:20, 31:22, 41:22, 41:29, 42:2, 42:5
**Mahoney** [68] - 1:4, 2:8, 3:1, 3:10, 3:11, 4:14, 4:15, 4:17, 4:18, 5:17, 6:15, 6:17, 7:9, 7:17, 7:20, 7:29, 8:2, 8:10, 8:13, 10:12, 10:27, 13:23, 13:24, 17:6, 18:9, 19:15, 21:2, 21:10, 23:27, 24:24, 26:25, 29:3, 31:21, 31:24, 33:20, 34:7, 35:17, 38:4, 38:15, 36:18, 38:29, 40:10, 41:20, 46:24, 55:7, 55:16, 56:12, 58:8, 58:15, 58:27, 59:8, 60:24, 61:29, 62:30, 63:3, 63:21, 64:30, 65:27, 65:29, 67:12, 69:17, 70:26, 71:6, 71:11, 73:9, 74:29
**Mahoney's** [7] - 56:11, 57:10, 57:12, 58:7, 59:14, 58:24, 61:12
**mail** [58] - 3:18, 3:25, 4:9, 4:15, 5:6, 5:7,

5:26, 6:1, 6:4, 8:21, 8:24, 8:25, 9:3, 9:8, 10:22, 10:25, 10:26, 11:13, 11:17, 11:18, 11:23, 11:24, 11:27, 11:28, 12:13, 12:18, 14:18, 14:22, 14:25, 14:28, 15:6, 27:29, 28:1, 29:6, 29:17, 30:10, 30:25, 31:2, 31:4, 32:10, 32:26, 33:3, 33:22, 35:8, 36:22, 37:9, 37:17, 37:28, 38:4, 38:5, 38:11, 38:17, 39:2, 41:5, 41:12, 42:10, 42:30, 43:6
**mailing** [1] - 8:26
**maintained** [1] - 25:4
**maintaining** [1] - 51:11
**Man** [13] - 14:4, 18:10, 19:4, 19:6, 19:16, 20:14, 20:15, 25:5, 26:11, 27:18, 44:23, 45:4, 66:1
**man** [1] - 72:26
**managed** [1] - 26:20
**management** [2] - 26:9, 26:11
**manager** [4] - 31:18, 51:1, 51:8, 53:3
**manner** [1] - 73:7
**manufacturing** [1] - 49:10
**March** [1] - 28:2
**mark** [3] - 1:17, 54:16, 54:17
**marked** [37] - 1:9, 1:12, 3:19, 4:5, 4:20, 4:23, 5:22, 6:18, 7:21, 8:18, 10:12, 10:28, 11:3, 11:20, 12:7, 12:8, 13:18, 14:14, 15:7, 17:6, 17:20, 17:30, 18:13, 18:24, 19:20, 21:4, 23:25, 23:29, 24:9, 24:12, 29:15, 32:6, 32:30, 38:6, 46:7, 59:29, 60:9
**marketed** [1] - 9:10
**marketing** [23] - 3:24, 3:26, 40:30, 41:9, 41:16, 42:7, 42:14, 42:21, 42:25, 43:4, 43:10, 43:19, 43:27, 44:6, 44:13, 44:21, 44:30, 45:7, 45:14, 45:21, 45:26, 46:1, 53:5
**markings** [1] - 63:23
**Martin** [21] - 4:14, 8:10, 26:10, 32:11, 32:25, 37:5, 37:8, 37:18, 38:4, 38:12, 38:17, 53:26

**Martin's** [1] - 36:24
**materials** [2] - 3:24, 3:26
**matter** [8] - 5:20, 9:24, 64:6, 74:8, 74:30, 78:11
**matters** [8] - 5:18, 21:17, 21:18, 33:11, 34:28, 38:19, 71:27, 78:8
**Mcgladrey** [11] - 32:14, 33:4, 33:6, 33:9, 33:14, 33:25, 33:27, 35:1, 45:8, 45:10
**mean** [5] - 9:28, 16:25, 66:21, 70:13, 77:6
**meaning** [1] - 75:22
**meet** [3] - 50:30, 53:15, 76:29
**member** [2] - 10:10, 62:2
**membership** [1] - 28:28
**memo** [2] - 30:26, 30:29
**Memo** [1] - 30:27
**memoire** [5] - 5:17, 38:26, 56:12, 58:29, 63:21, 63:22, 72:6, 72:8
**memoire'** [2] - 72:15, 72:16
**memorialize** [1] - 46:5
**memory** [2] - 1:23, 69:24
**mention** [4] - 75:26, 75:30, 78:1, 77:4
**merchant** [1] - 25:5
**Messerschmitt** [3] - 50:10, 50:14, 50:16
**meticulously** [1] - 73:10
**Mh** [1] - 8:9
**Michael** [2] - 12:14, 65:9
**middle** [1] - 76:13
**might** [4] - 64:5, 66:15, 69:5, 73:9
**mind** [3] - 72:1, 75:14, 77:19
**minus** [1] - 37:24
**minute** [1] - 29:25
**minutes** [3] - 7:30, 64:5, 64:13
**misinterpretations** [1] - 77:10
**missed** [1] - 60:17
**missiles** [1] - 49:27
**misspoke** [1] - 42:18
**misspoken** [1] - 75:19
**mix** [1] - 59:13
**Mjk2** [1] - 65:8
**Mmm-hmm** [1] - 12:12
**moment** [3] - 3:23, 7:26, 11:8, 11:10,

26:23, 47:18, 65:24
money [4] - 24:23, 31:27, 32:4, 51:24
monies [1] - 86:21
month [2] - 3:17, 22:12
morning [7] - 66:5, 68:17, 76:3, 76:5, 76:30, 77:13
Morning [1] - 3:10
Most [2] - 58:3, 59:15
mostly [2] - 51:12, 51:13
motivation [1] - 1:28
move [3] - 1:6, 54:25, 59:6
moved [1] - 56:14
Mox [4] - 4:10, 5:11, 14:19, 30:26
multi [1] - 10:10
multi-member [1] - 10:10
multiply [1] - 68:16
Munich [2] - 50:6, 50:7
must [1] - 73:1

**N**

name [1] - 62:12
named [3] - 5:29, 8:14, 13:5
names [2] - 6:6, 6:10
Nationale [1] - 51:3
nature [2] - 1:17, 1:27
near [4] - 21:16, 33:10, 38:18, 39:16
necessary [2] - 49:1, 77:9
need [1] - 61:27
needs [3] - 53:14, 53:15, 74:29
negotiated [1] - 37:22
negotiating [1] - 9:23
negotiation [1] - 37:23
never [3] - 6:3, 26:15, 68:28
new [2] - 62:24, 71:29
next [12] - 1:6, 5:20, 12:27, 25:20, 30:2, 36:27, 51:28, 59:28, 60:8, 67:6, 76:6, 77:18
nine [2] - 48:16, 48:18
ninth [1] - 65:12
nonetheless [2] - 57:23, 70:7
normal [3] - 48:6, 48:7, 69:16
notation [1] - 86:21
note [3] - 1:7, 30:15, 57:29
noted [3] - 18:15, 19:24, 22:11
nothing [1] - 69:6
notice [2] - 54:3,

55:13
November [5] - 10:22, 11:13, 11:23, 54:6, 67:4, 67:13, 67:24, 68:5, 68:8
number [17] - 5:20, 6:23, 15:8, 25:28, 25:30, 26:1, 27:26, 33:17, 37:14, 49:9, 56:11, 57:6, 63:23, 65:4, 68:15, 73:16, 73:20
numbered [1] - 1:10
numbers [14] - 5:19, 19:4, 25:8, 25:17, 25:24, 26:7, 26:19, 26:22, 26:24, 27:14, 30:3, 30:4, 34:10

**O**

o'clock [3] - 34:1, 76:19, 76:29, 77:3
object [1] - 38:1
objection [1] - 3:4
observation [1] - 1:8
obviously [1] - 47:24
occasion [1] - 69:13
occurred [1] - 73:15
occurrence [4] - 21:16, 33:10, 38:18, 70:3
October [16] - 5:26, 8:21, 12:13, 12:18, 19:18, 32:10, 32:27, 33:3, 33:5, 36:22, 37:11, 37:17, 38:5, 67:3, 70:14
offered [1] - 63:19
Office [3] - 74:2, 77:20, 78:13
offices [1] - 41:4
One [3] - 15:8, 65:7
one [33] - 5:13, 6:15, 7:9, 11:19, 11:26, 12:16, 15:7, 17:19, 20:8, 25:15, 25:16, 25:22, 25:23, 26:5, 26:6, 28:3, 29:14, 30:14, 32:30, 34:1, 52:12, 52:15, 53:18, 57:17, 61:11, 61:19, 63:24, 63:25, 65:7, 67:27, 69:13, 73:16
ones [1] - 31:11
ongoing [2] - 49:23, 49:24
opened [1] - 26:20
operating [1] - 9:1
Operating [2] - 62:1, 62:5
operations [1] - 53:3
opportunity [4] - 14:28, 15:2, 52:19, 76:23
opposite [2] - 65:26, 66:15

oral [1] - 43:21
order [1] - 77:11
Order [5] - 73:21, 73:23, 74:17, 74:22, 75:16
ordered [1] - 71:28
ordinarily [1] - 77:27
Ordinary [2] - 12:26
ordinary [1] - 74:5
organised [1] - 25:1
original [3] - 1:12, 2:1, 8:25
originally [1] - 50:15
originator [1] - 70:1
otherwise [3] - 55:14, 75:6, 77:10
ourselves [1] - 4:1
Outline [13] - 8:2, 8:26, 9:10, 9:13, 9:18, 9:26, 9:29, 10:2, 10:8, 10:24, 11:25, 12:3, 12:21
outline [1] - 8:30
Outlines [5] - 8:5, 10:5, 11:14, 11:30, 13:3, 31:14
outlines [1] - 8:8, 30:14
outset [1] - 13:11
own [2] - 66:12, 72:1
owned [1] - 31:21
owner [1] - 41:3

**P**

Page [3] - 1:13, 61:2, 61:14
page [11] - 6:4, 34:4, 36:9, 36:27, 36:28, 56:12, 57:6, 57:17, 57:16, 57:19, 58:28, 59:22, 59:24, 60:5, 60:6, 61:1, 61:3, 61:4, 61:5, 61:6, 61:11, 61:12, 61:15, 61:18, 61:23, 62:8, 62:9, 65:13
paged [5] - 57:9, 57:14, 57:16, 57:28, 57:30
pages [16] - 54:12, 54:14, 54:15, 54:16, 56:14, 59:23, 60:2, 61:11, 63:1, 65:12
paid [24] - 16:1, 16:4, 16:6, 16:7, 16:12, 16:13, 16:16, 16:19, 16:24, 16:27, 16:28, 16:30, 17:1, 17:5, 18:3, 18:7, 19:8, 19:13, 20:18, 20:20, 22:20, 22:23, 23:14, 66:22
Pan [2] - 50:16, 50:20
papers [1] - 30:4
paragraph [4] - 36:30, 66:30, 67:1, 67:6

parallel [1] - 78:30
Paris [1] - 51:3
Part [1] - 48:21
part [14] - 4:23, 16:11, 16:23, 41:3, 48:19, 48:20, 49:23, 51:24, 67:13, 73:23, 77:23, 77:24, 78:9, 78:30
partial [1] - 13:4
participants [4] - 12:17, 12:29, 16:12, 30:20
participated [2] - 6:11, 13:9
participation [1] - 73:2
particular [3] - 1:18, 9:26, 30:9, 51:18, 52:13
parties [2] - 60:1, 60:11, 62:20, 75:14, 76:2
partner [26] - 3:30, 4:3, 6:16, 7:10, 7:18, 8:14, 10:11, 13:5, 13:27, 14:29, 15:19, 20:29, 31:17, 41:2, 41:11, 41:18, 42:9, 42:16, 42:23, 42:29
partners [4] - 15:2, 15:4, 16:2, 20:25
partnership [4] - 10:10, 13:13, 22:8, 30:16
partnerships [2] - 21:1, 25:7
Partnerships [2] - 21:3, 66:5
parts [1] - 50:18
party [1] - 9:22
passed [1] - 47:14
past [1] - 64:18
pay [2] - 13:30, 15:26
payment [26] - 17:4, 17:11, 17:13, 17:17, 17:25, 18:4, 18:6, 18:16, 18:18, 18:22, 19:5, 19:10, 19:12, 19:25, 19:27, 20:1, 20:14, 22:18, 27:8, 27:10, 33:13, 34:30, 39:22, 39:28, 40:18, 40:23
payments [4] - 17:1, 17:2, 19:8, 40:4
Pearl [1] - 73:21
pen [1] - 1:10
pencil [1] - 1:10
people [2] - 48:30, 51:11
per [1] - 15:28
percentage [1] - 15:20
percentages [1] - 9:29
Perhaps [2] - 58:15, 76:10
perhaps [4] - 44:27, 48:23, 68:14, 75:19

period [2] - 18:30, 20:9
person [1] - 21:18
persons [3] - 6:11, 61:16, 61:19
Phil [4] - 8:22, 12:14, 12:18, 33:23
Philip [1] - 30:13
phone [2] - 3:18, 14:28
picture [1] - 46:28
pile [1] - 30:4
place [2] - 30:19
placed [1] - 68:4
places [1] - 5:1
Plaintiff [9] - 1:13, 46:19, 54:28, 54:30, 73:25, 78:7
Plaintiff's [24] - 54:18, 55:19, 55:26, 56:1, 56:16, 56:20, 57:24, 57:28, 58:18, 59:8, 59:19, 59:29, 60:9, 60:24, 62:18, 65:7, 65:8, 65:9, 66:26, 70:8, 71:30, 72:2
plan [2] - 76:12, 76:14
planned [2] - 13:4, 13:6
planning [1] - 76:13
play [5] - 4:3, 14:28, 15:2, 47:24, 47:25
played [1] - 48:6
plus [1] - 37:24
Pm [4] - 77:7, 78:4, 79:6, 79:9
point [4] - 3:28, 3:29, 48:3, 58:2
points [2] - 37:20, 37:29
portfolio [2] - 51:12, 53:12
position [8] - 39:20, 39:26, 40:2, 40:8, 40:21, 40:27, 64:10, 75:5
positively [1] - 68:10
possession [5] - 27:21, 46:8, 56:11, 56:13, 56:16
possibility [4] - 68:3, 69:13, 70:12, 70:20
possible [5] - 29:12, 53:16, 67:12, 67:22, 67:26, 69:5, 69:9, 75:18, 77:12
possibly [1] - 70:1
potential [4] - 5:12, 5:13, 8:27, 12:27
power [1] - 3:29
power-point [1] - 3:29
practically [1] - 76:22
practice [8] - 21:24, 69:12, 69:16, 69:18, 69:21, 70:5, 74:5, 77:29

pre [1] - 15:19
pre-agreed [1] - 15:19
precise [1] - 28:15
precisely [1] - 57:3
prepared [10] - 4:23,
17:10, 18:15, 19:24,
21:2, 24:10, 24:12,
27:10, 27:12, 73:8
presence [1] - 74:25
presentation [2] -
3:29, 15:1
presented [4] - 14:27,
63:9, 67:16, 69:26
presume [1] - 37:19
previously [5] - 11:2,
19:24, 26:19, 26:22,
65:27
priced [1] - 37:20
primarily [1] - 9:21
pro [2] - 32:13, 32:26
proceed [1] - 73:12
proceedings [2] -
73:15, 76:15
Proceedings [5] - 1:1,
35:26, 36:2, 64:22,
79:8
proceeds [1] - 24:29
process [3] - 72:19,
74:11, 74:12
procuring [2] - 26:8,
26:11
produced [8] - 6:22,
17:23, 21:4, 24:4,
46:7, 54:28, 54:30,
73:4
product [4] - 9:10,
9:19, 9:20, 76:7
Products [3] - 31:4,
31:6, 45:28
professional [3] -
47:25, 47:27, 48:30
Profit [1] - 15:9
profit [3] - 8:28, 15:22,
37:20
programme [2] -
16:10, 48:14
progression [2] -
48:6, 48:7
promise [1] - 13:26
promised [1] - 13:30
proof [1] - 76:4
proper [1] - 72:10
propose [1] - 73:3
Proposed [19] - 8:2,
8:5, 8:26, 9:10, 9:13,
9:18, 9:26, 9:30,
10:2, 10:6, 10:9,
10:24, 11:15, 11:25,
11:30, 12:3, 12:21,
13:3, 31:15
proposed [1] - 72:19
proposing [1] - 15:26
Proskauer [2] - 43:20,
43:22
prospective [1] - 9:15
protocol [1] - 74:1

provide [2] - 46:10,
46:13
provided [1] - 3:27
provision [2] - 74:18,
74:23
public [2] - 49:2, 49:3
purportedly [1] -
13:23
purports [1] - 4:10
purpose [11] - 12:1,
14:3, 17:12, 17:16,
19:18, 18:21, 19:27,
19:30, 26:17, 41:23,
51:14
purposes [4] - 30:18,
41:5, 41:30, 56:17
put [17] - 54:1, 58:8,
58:15, 59:28, 60:8,
62:18, 65:4, 67:12,
67:22, 68:17, 68:19,
68:28, 69:9, 70:9,
75:26, 75:29, 76:30
putting [2] - 55:23,
69:29

**Q**

qualification [1] - 49:2
quarter [1] - 64:18
questions [9] - 3:13,
5:2, 5:28, 58:30,
63:3, 68:18, 71:13,
71:25, 73:6
quite [1] - 50:23,
52:25, 52:26, 54:5,
58:26, 58:29, 70:18
quotation [3] - 4:13,
9:2, 37:26

**R**

raised [1] - 56:26
rather [1] - 58:16
Raysmans [3] - 12:19,
44:14, 44:16
re [1] - 58:28
Re [2] - 1:8, 65:2
re-direct [1] - 58:28
Reexamined [2] - 1:8,
65:2
read [5] - 25:30, 73:1,
73:6, 73:14, 76:4
reading [1] - 76:18
ready [5] - 1:3, 1:5,
12:23, 72:20, 72:21
really [1] - 46:27
receive [24] - 5:30,
6:28, 10:5, 10:8,
10:25, 10:26, 11:16,
11:18, 11:27, 11:28,
12:28, 12:30, 14:22,
19:5, 20:14, 25:6,
28:13, 28:30, 30:29,
32:25, 33:13, 34:30,
38:5, 39:16
received [30] - 3:28,
6:3, 10:17, 11:2,

12:1, 16:14, 16:25,
16:26, 16:28, 17:2,
17:3, 17:4, 18:4,
18:5, 18:7, 19:10,
19:11, 19:13, 22:10,
22:11, 22:13, 22:16,
22:18, 23:1, 23:4,
23:22, 28:28, 37:25,
69:5
receiving [2] - 41:6,
75:5
reckoning [1] - 38:13
recognise [10] - 6:5,
6:30, 8:5, 17:28,
24:6, 27:1, 27:2,
27:3, 27:9, 63:18
recollection [1] -
37:13, 43:13, 43:21,
43:30, 44:8, 44:15,
44:24, 45:3, 45:9,
45:18, 70:3, 70:4,
70:8
record [10] - 1:11,
1:14, 3:4, 7:29,
28:10, 38:26, 58:18,
58:23, 61:10, 78:11
recorded [2] - 1:7,
58:23
records [8] - 27:21,
29:13, 39:19, 39:25,
40:1, 40:7, 40:20,
40:26
recruit [1] - 51:1
recruited [1] - 51:2
reduced [3] - 72:4,
73:22, 78:6
Refco [2] - 43:5, 43:7
refer [1] - 68:30
reference [10] - 13:4,
20:13, 22:2, 22:6,
36:20, 38:24, 38:22,
66:3, 67:2, 67:6
referenced [4] - 4:17,
22:26, 40:11
references [4] - 22:4,
26:26, 33:23, 37:4
referred [7] - 3:13, 5:1,
16:24, 56:10, 68:1,
72:11, 72:16
referring [2] - 2:18,
26:1
reflect [7] - 1:11, 7:29,
22:9, 28:10, 28:25,
37:6, 37:10
reflected [4] - 21:29,
23:9, 23:24, 23:25
reflects [5] - 17:25,
19:1, 20:10, 24:15,
40:15
refresh [1] - 72:1
refresher [1] - 73:27
refreshing [1] - 1:23
refund [1] - 37:25
regard [1] - 14:8
regarding [11] - 14:7,
36:23, 43:15, 43:22,
44:2, 44:9, 44:16,

44:26, 45:4, 45:11,
45:18
regular [3] - 21:22,
21:24, 51:27
regularly [3] - 21:25,
38:19, 39:18
Reichert [35] - 1:7, 3:4,
46:21, 46:24, 54:25,
54:30, 55:4, 55:13,
55:22, 55:28, 56:3,
56:9, 56:14, 57:3,
57:9, 57:16, 57:23,
58:6, 58:16, 59:3,
59:11, 59:15, 59:19,
60:24, 61:14, 61:25,
61:29, 62:23, 62:27,
62:30, 63:27, 65:4,
66:27, 70:30, 78:24
Reicherts [1] - 58:22
relate [2] - 8:10, 39:7
relates [3] - 35:16,
67:30, 68:15
relating [1] - 8:6
relation [5] - 16:22,
25:26, 38:13, 39:10,
64:8
relationship [1] - 31:6
relatively [1] - 68:15
relevant [7] - 39:19,
39:25, 40:1, 40:7,
40:20, 40:26, 76:4
relying [1] - 57:24
remaining [2] - 25:27,
26:3
remember [2] - 13:1,
50:29
remit [1] - 24:25
remitted [1] - 24:30
repaid [10] - 23:18,
23:20, 23:23, 24:16,
24:18, 66:14, 66:15,
66:17, 66:18, 66:22
repayment [2] - 23:24,
23:25
repeat [1] - 42:19
repeated [1] - 3:6
Repeating [1] - 67:22
replaced [1] - 30:15
replicated [1] - 57:17
reporting [1] - 5:12
represent [4] - 22:3,
22:7, 73:12, 73:15
representations [7] -
43:16, 43:24, 44:3,
44:11, 44:18, 46:10,
46:13
representatives [15] -
41:13, 41:26, 42:3,
42:10, 43:1, 43:7,
43:14, 43:22, 44:1,
44:9, 44:16, 44:25,
45:4, 45:10, 45:17
represented [1] -
72:22
representing [1] -
5:13
represents [2] - 29:11,

68:7
required [1] - 13:12
requirements [2] -
53:15, 53:16
respect [41] - 8:23,
9:27, 11:30, 13:8,
17:25, 23:11, 23:14,
25:6, 25:19, 26:12,
27:22, 32:18, 32:20,
32:22, 32:24, 33:15,
34:16, 34:19, 34:21,
34:23, 34:24, 34:25,
34:26, 34:27, 35:1,
39:29, 40:5, 40:24,
41:6, 41:13, 41:27,
42:4, 42:11, 43:1,
43:7, 46:11, 46:14,
58:19, 70:8
respectively [1] - 8:11
Respondent [1] - 55:2
Respondent [1] -
73:1
response [1] - 37:28
responsible [3] - 26:8,
26:10, 53:4
responsive [1] - 46:9
resume [1] - 35:21
Resumed [3] - 1:1,
38:2, 64:22
retaking [1] - 77:8
Revenue [3] - 63:3,
63:8, 63:16
review [4] - 9:2, 75:17,
76:23, 77:8
reviewed [1] - 75:6
Revised [1] - 30:26
Richard [3] - 13:22,
25:21, 67:1
Rmr [1] - 33:24
Robert [1] - 11:15
Rogatory [1] - 72:3
role [24] - 3:30, 4:3,
6:16, 7:10, 7:18, 8:8,
9:21, 14:10, 14:28,
15:2, 15:19, 16:2,
20:28, 30:16, 41:2,
41:11, 41:18, 42:9,
42:16, 42:23, 42:28,
46:5, 47:24, 47:25
roles [2] - 14:1, 20:25
Ron [3] - 5:26, 29:6,
39:2
Ronald [2] - 11:16,
33:4
Rose [2] - 43:20, 43:22
Rose [8] - 14:19,
27:30, 28:2, 28:5,
29:18, 35:11
roughly [1] - 37:21
row [1] - 22:17
Rsm [10] - 32:14, 33:4,
33:6, 33:9, 33:14,
33:25, 33:27, 35:1,
45:8, 45:10
rule [2] - 69:12, 69:23
runs [1] - 47:30

## S

**sake** [3] - 31:10, 56:19, 72:10
**sale** [2] - 24:29, 28:28
**Sam** [7] - 4:14, 4:17, 8:10, 21:2, 36:24, 37:5
**Samuel** [3] - 1:4, 3:1, 36:4
**satisfied** [1] - 73:14
**Saturdays** [1] - 48:24
**saw** [1] - 28:15
**Saylor's** [2] - 55:18, 56:18
**scenario** [2] - 69:18, 69:25
**schedule** [1] - 78:6
**school** [1] - 49:11
**Schostak** [2] - 8:22, 8:23
**Schut** [1] - 7:11
**Schut-elbaum** [1] - 7:11
**second** [13] - 6:4, 11:6, 12:7, 12:17, 28:3, 33:23, 33:27, 34:15, 35:1, 57:18, 61:5, 61:18, 61:22
**Secretaries** [2] - 47:15, 48:27
**secretaries** [1] - 49:1
**secretary** [2] - 49:2, 49:3
**see** [48] - 4:9, 4:15, 6:21, 6:24, 7:12, 8:21, 9:3, 11:23, 14:20, 14:22, 14:26, 15:10, 17:10, 17:14, 17:23, 18:15, 18:19, 18:28, 19:24, 19:28, 24:2, 24:4, 27:29, 29:17, 29:19, 30:10, 30:11, 30:25, 30:27, 31:14, 32:11, 32:16, 35:8, 35:12, 36:22, 37:17, 39:3, 39:13, 40:14, 52:19, 61:3, 65:15, 67:4, 67:5, 67:10
**seeing** [1] - 55:6
**seem** [2] - 68:6, 69:19
**segment** [1] - 33:22
**Seidman** [3] - 12:14, 45:15, 45:17
**selecting** [1] - 74:12
**self** [1] - 67:3
**self-describing** [1] - 67:3
**sell** [3] - 13:8, 13:12, 13:22, 54:3, 55:13
**send** [4] - 25:6, 33:9, 38:4, 38:17
**sending** [1] - 41:5
**senior** [1] - 51:8
**sense** [1] - 73:3

**sent** [6] - 19:3, 20:12, 33:24, 69:10, 69:27, 69:29
**September** [3] - 4:9, 29:17, 35:10
**sequence** [2] - 61:15, 73:11
**series** [3] - 9:19, 47:30, 68:16
**serve** [2] - 4:11, 13:27
**served** [6] - 5:14, 6:16, 7:10, 7:17, 14:1, 14:11
**service** [1] - 16:1
**services** [2] - 17:13, 17:17, 53:6
**Services** [4] - 18:18, 18:22, 47:7, 48:2
**serving** [8] - 16:2, 41:2, 41:11, 41:18, 42:9, 42:16, 42:22, 42:28
**set** [7] - 9:8, 9:29, 21:17, 33:11, 38:19, 69:18, 72:3
**sets** [2] - 47:3, 47:28
**seven** [2] - 50:12, 50:13
**Shall** [1] - 64:18
**Shannon** [6] - 51:29, 52:6, 52:11, 52:19, 52:28, 53:19
**shareholder** [2] - 4:29, 5:9
**shareholding** [1] - 52:28
**Sheet** [3] - 12:16, 12:24, 12:28
**sheet** [1] - 12:20
**sheets** [1] - 12:30
**sheltered** [1] - 37:21
**Short** [1] - 49:26
**show** [1] - 1:14
**showing** [1] - 66:16
**shown** [5] - 3:27, 8:18, 13:18, 14:14, 54:10
**shows** [1] - 38:27
**sic** [1] - 25:26
**Sidley** [3] - 43:11, 43:12, 43:14
**sign** [6] - 69:27, 69:30, 70:6, 74:6, 74:25
**signature** [29] - 57:10, 57:12, 57:17, 57:18, 58:7, 58:9, 58:14, 58:16, 58:24, 58:28, 59:24, 60:4, 60:5, 61:3, 61:7, 61:8, 61:12, 62:9, 67:12, 67:17, 67:23, 67:30, 68:3, 68:19, 68:29, 69:9, 70:9, 70:20
**signatures** [5] - 61:16, 61:18, 61:22, 67:19, 67:20
**signed** [12] - 13:23, 13:24, 55:16, 67:1,

67:16, 67:29, 68:25, 69:3, 69:26, 73:30, 78:8
**significant** [2] - 16:11, 73:2
**signing** [6] - 57:17, 57:18, 57:19, 75:27, 77:27
**Sil** [1] - 53:11
**similar** [4] - 3:28, 53:8, 53:9, 53:10
**Similarly** [1] - 73:13
**simply** [4] - 1:11, 1:28, 3:4, 77:23
**Singer** [7] - 22:28, 25:2, 25:5, 27:17, 27:22, 41:26, 42:3
**sit** [1] - 76:19
**sitting** [1] - 73:11
**six** [1] - 25:13
**size** [8] - 12:25, 32:19, 32:21, 32:23, 34:20, 34:22, 34:24, 34:26
**skipping** [1] - 67:6
**Sm** [1] - 8:9
**small** [1] - 1:7
**Smmh** [1] - 28:19
**sold** [1] - 53:20
**solely** [1] - 57:28
**Solicitor** [2] - 62:25, 72:22
**solicitor** [1] - 63:15
**Solicitor's** [1] - 74:2, 77:20, 78:13
**solicitors** [2] - 63:12, 63:13
**soon** [1] - 75:18
**sorry** [12] - 5:12, 6:8, 10:18, 18:11, 19:20, 23:28, 26:1, 28:1, 28:4, 28:9, 56:7, 59:6
**Sorry** [3] - 34:8, 54:15, 62:23
**sort** [3] - 13:26, 48:25, 74:7
**sought** [1] - 78:7
**source** [9] - 20:24, 20:27, 20:30, 24:20, 24:22, 31:23, 31:26, 31:29, 32:2
**speaking** [1] - 26:23
**specifically** [2] - 22:20, 22:23
**spelling** [1] - 50:10
**spend** [1] - 50:11
**spent** [1] - 49:9
**split** [1] - 20:21
**spreadsheet** [15] - 5:29, 6:2, 6:3, 6:4, 17:23, 17:28, 17:30, 24:4, 24:9, 24:12, 24:15, 28:9, 28:11, 28:12, 28:15
**stage** [2] - 49:27, 73:3
**stand** [1] - 8:9

**start** [5] - 1:3, 1:5, 49:7, 56:9, 59:17
**started** [4] - 7:15, 49:11, 50:26, 51:4
**starting** [3] - 47:6, 48:3, 59:9
**State** [5] - 62:25, 72:21, 74:1, 77:20, 78:13
**statement** [5] - 18:29, 20:7, 40:14, 58:22, 70:24
**statements** [1] - 77:19
**states** [3] - 8:24, 12:26, 39:5
**States** [3] - 17:24, 44:26, 53:6
**status** [3] - 77:21, 78:29, 78:30
**stenographer** [3] - 73:4, 73:8, 76:3
**stenographer's** [1] - 71:27
**Step** [1] - 73:20
**step** [3] - 13:6, 73:16, 76:6
**Stephen** [1] - 31:3
**Stephen.hubble.3gy** [1] - 31:5
**steps** [3] - 9:19, 9:25
**Sterling** [1] - 47:1
**still** [4] - 5:9, 31:2, 33:16, 37:23
**stipulation** [1] - 3:5
**stop** [1] - 36:26
**Strategy** [2] - 3:13, 3:25
**strategy** [19] - 3:18, 3:29, 4:3, 13:28, 41:6, 41:13, 42:11, 43:1, 43:7, 43:15, 43:23, 44:2, 44:3, 44:10, 44:17, 44:26, 45:5, 45:11, 45:18
**stricken** [1] - 36:28
**strike** [1] - 38:27
**strike-out** [1] - 38:27
**stronger** [1] - 75:29
**struck** [1] - 51:2
**structures** [1] - 38:14
**structuring** [1] - 9:23
**studied** [1] - 47:14
**studies** [1] - 48:9
**subject** [2] - 37:18, 39:3
**substance** [1] - 37:10
**substituted** [1] - 31:18
**success** [2] - 16:10, 52:24
**successful** [3] - 52:24, 52:25, 52:26
**suggest** [2] - 37:23, 78:12
**suggested** [1] - 72:19
**suggesting** [1] - 74:13
**suggests** [1] - 74:29

**suited** [1] - 52:13
**sum** [6] - 17:27, 29:29, 39:6, 40:17, 66:16, 66:17
**summaries** [1] - 8:28
**summary** [3] - 9:15, 29:8, 29:9
**sums** [4] - 16:15, 16:17, 16:20, 18:3
**Sundays** [1] - 48:24
**swearing** [2] - 77:21, 77:23
**Sworn** [1] - 3:1

## T

**Tan** [4] - 4:10, 5:11, 14:19, 30:26
**tax** [2] - 12:2, 65:13
**taxpayer** [1] - 12:2
**team** [1] - 53:5
**technical** [2] - 49:13, 49:15
**Technology** [2] - 49:18, 49:19
**terms** [1] - 38:1
**testified** [2] - 41:22, 41:29
**testimony** [3] - 1:9, 63:5, 63:22
**text** [2] - 38:27, 57:11
**Theis** [5] - 32:15, 32:21, 33:8, 34:17, 34:20
**thereafter** [1] - 15:17
**therewith** [1] - 9:24
**third** [2] - 59:22, 59:24
**thirdly** [1] - 73:25
**Thomas** [1] - 12:19
**Thornton** [2] - 45:2, 45:4
**three** [16] - 22:28, 25:4, 25:17, 25:24, 26:6, 26:14, 26:24, 32:15, 33:7, 54:12, 54:14, 57:14, 57:16, 57:28, 61:18, 64:18
**three-paged** [3] - 57:14, 57:16, 57:28
**Thursday** [1] - 79:8
**ticks** [1] - 1:20
**Tierney** [4] - 72:24, 72:29, 74:5, 77:27
**title** [2] - 12:3, 15:9, 55:10
**today** [4] - 3:6, 54:2, 54:10, 72:19
**together** [3] - 53:26, 65:5, 65:24
**tomorrow** [10] - 8:26, 75:5, 76:18, 76:19, 76:29, 77:4, 77:7, 77:12, 78:4, 79:6
**took** [4] - 7:29, 9:25, 30:19
**top** [3] - 22:17, 62:9,

62:13
tornado [1] - 50:17
total [5] - 7:16, 28:20, 28:25, 32:24, 34:27
totality [1] - 79:1
totalling [7] - 16:7, 17:27, 21:29, 22:1, 22:4, 29:10, 32:14
track [1] - 16:22
Trading [1] - 42:28
training [4] - 49:13, 49:15, 49:24, 49:30
transaction [26] - 3:12, 7:14, 8:4, 8:6, 8:23, 8:29, 9:6, 9:15, 9:23, 9:27, 10:7, 12:2, 12:22, 12:24, 13:16, 13:29, 15:27, 15:28, 22:19, 25:21, 39:8, 46:11, 46:14, 68:29
Transaction [18] - 8:3, 8:6, 8:26, 9:11, 9:14, 9:18, 9:26, 10:2, 10:6, 10:9, 10:24, 11:15, 11:25, 12:1, 12:4, 12:21, 13:3, 31:15
transactions [92] - 4:12, 5:15, 6:11, 6:15, 8:27, 8:30, 7:1, 7:3, 7:4, 7:6, 7:9, 7:16, 8:3, 8:15, 10:3, 11:26, 13:2, 13:6, 13:9, 14:4, 15:15, 21:1, 22:30, 23:2, 23:6, 24:21, 24:22, 24:26, 24:28, 25:3, 25:14, 25:15, 25:20, 25:22, 25:27, 26:3, 26:5, 26:13, 26:15, 26:18, 26:30, 27:15, 27:19, 28:26, 29:1, 29:8, 30:14, 30:17, 30:19, 31:15, 31:25, 31:27, 31:28, 32:1, 32:3, 32:5, 32:15, 33:7, 34:17, 35:18, 37:8, 38:15, 38:22, 38:24, 39:30, 40:6, 40:25, 41:7, 41:14, 41:24, 41:27, 42:1, 42:4, 42:12, 43:2, 43:8, 43:16, 43:17, 43:24, 43:25, 44:4, 44:10, 44:11, 44:18, 44:19, 44:27, 45:5, 45:12, 45:19, 68:16, 68:19
Transactions [1] - 9:30
transcript [2] - 75:5, 75:17
transcripts [5] - 74:6, 76:7, 76:25, 77:24, 77:28
transmitted [1] - 21:18
travel [1] - 74:29

travelling [1] - 51:26
treating [1] - 29:28
Trilogy [43] - 6:26, 6:27, 7:1, 7:3, 7:5, 9:17, 27:17, 30:15, 30:17, 30:19, 30:26, 31:3, 31:6, 31:16, 31:18, 31:19, 31:21, 31:30, 32:3, 32:13, 33:6, 33:9, 33:13, 33:24, 33:26, 34:30, 35:17, 37:9, 38:14, 38:22, 39:6, 39:14, 39:15, 39:22, 39:28, 40:4, 40:16, 40:17, 40:23, 45:22, 45:27, 46:2
Trilogy's [2] - 36:24, 37:5
Trilogytype [3] - 6:27, 7:1, 7:3
true [7] - 61:14, 61:29, 62:1, 62:5, 62:12, 63:6, 63:14
try [3] - 53:13, 68:16, 76:12
trying [4] - 53:15, 69:19, 71:30, 78:19
two [33] - 1:9, 4:11, 4:13, 5:14, 14:20, 16:15, 16:17, 16:20, 17:1, 18:3, 19:8, 30:2, 30:4, 52:8, 52:9, 54:13, 54:15, 54:16, 56:14, 57:9, 57:30, 59:13, 59:23, 60:2, 61:4, 61:5, 61:10, 61:16, 61:22, 65:5, 65:24, 67:2, 73:20
two-page [1] - 61:5
two-paged [2] - 57:9, 57:30
type [4] - 6:27, 7:1, 7:3, 31:5
typed [3] - 72:20, 73:15, 77:19
typescript [1] - 75:10
typewritten [1] - 57:11
typos [1] - 77:9

**U**

Ucd [3] - 47:9, 48:11, 48:12
Uk [1] - 50:18
ultimate [1] - 14:9
ultimately [1] - 16:4
Um-hum [8] - 47:5, 52:1, 59:21, 60:3, 65:14, 69:28
underlining [1] - 1:18
undersigned [1] - 67:8
understood [2] - 22:22, 69:25
undertaken [2] -

47:11, 47:13
underway [1] - 52:22
United [10] - 17:5, 17:24, 17:25, 17:26, 18:8, 19:14, 42:15, 42:22, 44:26, 53:6
University [4] - 47:7, 47:12, 47:16, 48:4
unless [3] - 19:19, 38:1, 71:25
up [8] - 48:1, 50:17, 51:4, 54:19, 59:13, 69:18, 72:20, 74:15, 77:14
updated [4] - 8:24, 29:19, 35:11, 35:14
Us$861,000 [2] - 65:28, 85:30
Usa [1] - 55:2
useful [1] - 78:5
usual [2] - 37:24, 77:28
utilized [2] - 23:16, 23:17

**V**

various [1] - 24:28
Venture [1] - 37:7
venture [5] - 24:23, 26:18, 27:13, 31:28, 32:5
verbiage [1] - 75:21
verification [1] - 75:9
verify [6] - 39:20, 39:26, 40:2, 40:8, 40:21, 40:27
version [2] - 30:29, 57:9
versions [1] - 73:15
versus [1] - 38:2
view [4] - 58:2, 75:27, 78:3, 78:4
violently [1] - 38:1

**W**

Wainwright [2] - 11:15, 33:4
waiting [1] - 65:1
wants [1] - 56:18
water [1] - 41:20
weekend [1] - 74:29
Weiss [3] - 34:17, 34:25
whereabouts [1] - 49:17
Whiteside [2] - 34:17, 34:23
William [4] - 34:17, 34:19, 65:13, 65:25
wire [12] - 8:27, 19:2, 20:11, 22:13, 26:29, 27:1, 27:3, 27:4, 27:6, 27:8, 27:10
wired [1] - 40:16
wisdom [2] - 74:2,

78:14
wisely [1] - 64:28
wish [4] - 46:17, 59:28, 65:5, 74:11
Withdrew [1] - 71:9
Witness [4] - 1:3, 46:21, 65:2, 71:9
witness [33] - 1:6, 1:12, 2:1, 3:20, 4:6, 5:23, 6:19, 7:22, 10:13, 10:29, 11:4, 11:21, 12:9, 13:19, 14:15, 17:7, 17:21, 18:26, 21:7, 27:27, 30:23, 32:7, 33:1, 54:8, 54:20, 55:14, 60:1, 60:11, 62:20, 64:9, 65:22, 73:5, 78:9
witness's [1] - 59:3
witness-box [1] - 73:5
witnesses [5] - 73:5, 73:30, 74:6, 75:14, 78:13
wonder [1] - 64:5
wondering [1] - 34:1
Wood [2] - 43:12, 43:15
word [4] - 66:14, 66:17, 66:18, 77:22
words [2] - 66:14, 76:1
worry [2] - 73:17, 75:21
written [2] - 66:14, 66:18
Wyoming [1] - 22:8

**Y**

year [7] - 12:26, 12:27, 22:12, 52:8, 52:9, 52:22
years [5] - 48:16, 48:18, 49:9, 50:12, 50:13
yesterday [6] - 1:9, 3:5, 51:30, 53:19, 63:24, 63:25
yourself [3] - 59:23, 61:16, 61:19

# DECLARATION

I, _SAM MAHONEY_ ,declare that I have read the enclosed transcript and that I am satisfied that it reflects a true and accurate account of the evidence given by me.

Dated this _15th_ day of _MAY_ 2008.

Signed:_ S. Mahoney _

---

The enclosed transcript was adopted by _____

Judge of the District Court

On this _15st_ day of _May_ 2008.

Signed:_____