UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY IN SUPPORT OF UNITED STATES OF AMERICA'S SECOND MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM RSM McGLADREY**

The United States and RSM McGladrey agree that "the burden of establishing non-waiver lies with the proponent of the privilege." (RSM Opp. at 17.) Here, that proponent is, of course, RSM. Despite its burden, RSM failed even to address the sixty exhibits demonstrating how RSM carefully coordinated its tax-shelter marketing with DGI and other promoters and professional firms, and disclosed so-called confidential communications to its business associates.[1] Instead, RSM merely urges the Court to ignore the contemporaneous documentary evidence and to instead rely almost entirely on the self-serving–and entirely unsupported and often contradicted– testimony of an RSM partner (Ronald Wainwright) who himself entered into

---

[1] RSM's claim that the exhibits supporting our motion are of questionable evidentiary value hardly deserves mention. First, RSM cites no support for the proposition that the exhibits should be stricken, purportedly because "doing so would require a separate, lengthy memorandum." (RSM Opp. at 2, n.1.) The Court has routinely accepted this evidence during motion practice, as the exhibits are documents obtained in discovery. They are also on our trial exhibit list and are supported by business-records declarations of the producing third party under Federal Rule of Evidence 902(11). Here, most of the exhibits are RSM's own documents. In some instances, the exhibits are documents produced by Bryan Cave, and in other instances they were produced by DGI. The Rule 902(11) certifications can be produced upon request.

one of the two DGI-and-RSM-promoted tax-shelter transactions at issue here. Even under the best of circumstances, the unsupported declaration and testimony could not possibly refute the vast array of documentary evidence demonstrating waiver, much less meet RSM's burden of establishing non-waiver. Nonetheless, even the documentary evidence furnished by RSM, when coupled with the documentary evidence referred to in our opening memorandum, leaves no doubt as to the non-privileged status of the withheld documents.[2]

The plaintiff also filed a response to this motion, purportedly to correct certain factual representations. As usual, the plaintiff does not submit evidence of its own, but merely contends that the United States' representations are wrong. The plaintiff even puts its typical spin on the facts. The United States consistently supports its representations with documentary evidence, and did so in its opening memorandum. The United States replies below to the plaintiff's various arguments.

---

[2]As discussed in greater detail below, apart from a few invoices (which, in fact, undermine its position), RSM fails to introduce any genuine documentary evidence supporting its various claims. It mostly relies on the declaration of its partner, Ronald Wainwright, who admittedly coordinated its extensive tax-shelter activity (*see, e.g.*, Govt. Ex. 69, Wainwright *Fidelity Int'l* Dep. Tr. at 31:16-20, 32:4-10), and selective deposition-transcript excerpts. Instead of refuting any of the documentary evidence with contemporaneous documentary evidence of its own, RSM spends much of its opposition arguing that it was somehow blindsided by this motion, even though the United States advised the Court and RSM at almost every monthly status conference this year that this motion was forthcoming in the absence of RSM's complete production, or at least its own investigation of waiver. RSM decided long ago that, at least during negotiations, it would seek to shift the burden to the United States and refuse to even consider its own documents and evidence of waiver. It decided instead to create its own exhibit for use here by engaging in a last-minute email exchange with counsel. Then, RSM sought additional time to respond to the motion so that it could consider the evidence, and "identify potential affiants and gather the necessary facts." (RSM Mot. for Extension of Time at 2.) While taking the additional time, RSM failed to identify any new affiants, relying entirely on Ronald Wainwright, who was subpoenaed and deposed in *Fidelity International* and *Fidelity High Tech*, and, in fact, was represented in his personal capacity by RSM's counsel. Those "necessary facts," as RSM sees them, come from Mr. Wainwright, an RSM employee, and come with virtually no evidentiary support whatsoever.

## Introduction

The United States subpoenaed documents from RSM relating to each of these cases and tax-shelter products.  Each subpoena sought documents relating to RSM's involvement in the design of, development of, marketing of, promotion of, implementation of, opining on, and/or reporting of the tax-shelter product known as SOS, and its progeny– FDIS and Stock Dribble. The United States served those subpoenas because of RSM's central role in this case, as described in the opening memorandum.[3]  The *Fidelity International* subpoena was served in October 2006, and was limited by letter dated December 1, 2006 to documents related only to the SOS and FDIS transactions.[4]  The *Fidelity High Tech* subpoena was served on March 14, 2008, and requested documents relating to Stock Dribble and its variants.

The United States also sought, through the *Fidelity High Tech* subpoena, documents evidencing the existence of an attorney-client relationship between RSM and Bryan Cave, and such a relationship relating to Stock Dribble.  RSM provided no responsive documents to these

---

[3]Despite its central role as an admitted marketer of FDIS, Stock Dribble, and other tax-shelter products, RSM insists here that "it is undisputed that . . . [RSM] was not involved in . . . marketing or implementing the particular transactions that Plaintiffs undertook in 2001." (RSM Opp. at 4.)  We dispute that assertion, and the evidence proves it to be untrue, or at least intentionally misleading.  RSM marketed FDIS and other tax-shelter products, as described at length in the opening memorandum and shown in the exhibits.  (*See, e.g.*, Govt. Ex. 2)(". . . one of our focuses is to continue to develop and expand our relationships with intermediaries and thereby develop new strategies to offer to our clients.")  RSM later prepared and signed Richard Egan's 2001 and 2002 Form 1040 U.S. Individual Income Tax Returns, and also prepared and signed the plaintiffs' 2002 Form 1065 Partnership Returns, all at issue in this case.  In signing the tax returns, RSM went against its own so-called "advice" to disclose.  RSM also, by signing the returns, participated in the non-disclosure of the very same tax-shelter products it had marketed and implemented, and which it now claims was the subject of advice by its own attorneys.  It is a poor attempted sleight of hand for RSM to say that it was not involved in the Egans' "particular transactions" because it was not the initial marketer of the products to the Egans, but instead came in later to finish the job.

[4]That subpoena was the subject of a prior motion to compel, which resulted in RSM's initial production.

targeted requests, and instead referred only to its previously produced "engagement letter," which is part of the record here. (Govt. Ex. 43.) RSM also objected to the subpoena requests aimed at the existence or non-existence of an attorney-client relationship as not relevant, and possibly subject to privilege claims.

In the five months since service of the *Fidelity High Tech* subpoena, RSM produced no additional evidence of any relevant attorney-client relationship with Bryan Cave. Then, in response to this motion, RSM produced a handful of invoices from Bryan Cave to H&R Block, apparently relating to these and various other tax-shelter promoters and tax-shelter products that RSM seems to have marketed throughout the years. We examine those invoices more closely below. In the meantime, to the extent those invoices relate to SOS, FDIS, and/or Stock Dribble, they should have been produced in response to the subpoenas in these cases. They were not. That failure on the part of RSM calls into question the completeness of its earlier productions, the relevance of its attachments, or both. To the extent RSM failed to produce or log other responsive documents, the United States demands immediate compliance with the subpoenas.

### Argument

I. **The Invoices Attached to Wainwright's Declaration Further Evidence That RSM Never Intended to Keep Confidential its Communications with Bryan Cave, and Therefore No Privilege Attached.**

In order for privilege to attach in the first instance, RSM must have intended its communications to remain confidential. *See*, *e.g.*, *United States v. Whitney*, 2006 U.S. Dist. LEXIS 74522 (D. Mass. Aug. 11, 2006) (*citing Kevlik v. Goldstein*, 724 F.2d 844, 849 (1st Cir. 1984)). The evidence demonstrates that RSM never intended, nor practiced, confidentiality.

4

The only new documents RSM provides to support its non-waiver argument, which are invoices from Bryan Cave to H&R Block, actually make even clearer that RSM never intended to keep from DGI its communications with Bryan Cave. According to RSM, it began receiving "legal advice" from Bryan Cave **as early as** August 2001." (RSM Opp. at 14-15) (emphasis added). In support of that assertion, RSM produces an October 2001 invoice showing charges from Bryan Cave for the months of August and September, 2001. (Wainwright Decl. Ex. A at 2.) But, that invoice shows that RSM involved DGI in its supposedly confidential communications from the very beginning in August 2001.

Specifically, this October 2001 invoice shows that on August 30, 2001, John Barrie of Bryan Cave met with both Wainwright and Orrin Tilevitz of DGI, and that they discussed Section "6112 listing" issues.[5] As described in the opening memorandum, "listing" refers to the requirement, under 26 U.S.C. § 6112, that advisors of so-called reportable transactions maintain lists of individuals involved in those reportable transactions. Incredibly, documents involving "listing" communications comprise some of the very documents that RSM is withholding on grounds of privilege. (*See* U.S. Opening Mem. at 26.) What is more, this invoice seriously calls into question Wainwright's claim that he was not aware in August 2001 that DGI and Bryan Cave had any professional relationship. (RSM Opp. at 6; Wainwright Decl. at ¶ 9). But even more importantly, this invoice totally refutes Wainwright's assertion that he did not disclose the substance of any confidential communication with Bryan Cave to DGI. (Wainwright Decl. at ¶ 18). This invoice in fact shows that he was present at a meeting with Bryan Cave and DGI

---

[5]The invoice indicates that Bryan Cave billed for "work on 6112 listing issues; conference with **R. Wainwright**, [and] **O. Tilevitz** [of DGI] **regarding same**." (Id., August 30, 2001 entry)(emphasis added).

where "listing" issues were discussed.  This invoice vividly confirms our position that Bryan Cave, RSM, and DGI were engaged in a highly-coordinated group effort (with others) to co-promote tax shelters and then to conceal their illicit activities from the IRS.

In short, despite RSM's assertions that this invoice represented the beginning of a confidential attorney-client relationship, this invoice in fact shows RSM sharing purported confidential information with DGI from the very outset of RSM's claimed attorney-client relationship with Bryan Cave.  RSM's makes light of the fact that there was only a single meeting during August 2001 between RSM, Bryan Cave, and DGI. (RSM Opp. at 7.)  But, as described in the opening memorandum, the "listing" issues that Bryan Cave discussed in August 2001 with DGI were routinely discussed with DGI.  (*See* U.S. Opening Mem. at 13-15.) Significantly, there is a major gap in the invoices selectively produced by RSM.  It provided no invoices for the months of November 2001 through June 2002.[6]  So, it is also entirely possible that Bryan Cave billed H&R Block for additional conferences and meetings with DGI.  And, Bryan Cave may also have billed DGI for conferences and meetings with RSM.  But in the final analysis, the number of occasions that confidentiality is breached is irrelevant.  One occasion is sufficient to destroy a confidential attorney client communication.  *See*, *e.g.*, *XYZ Corp. v. United States (In re Keeper of the Records)*, 348 F.3d 16, 23 (1st Cir. 2003) ("it is crystal clear that any previously privileged information actually revealed . . . loses any veneer of privilege.").

---

[6] Moreover, many of the entries on these selectively-produced invoices relate to other promoters and transactions.  For example, a good portion of the Bryan Cave charges relate to a firm called "21st Securities," (*see*, *e.g.*, Wainwright Decl. Ex. B at 2), and not to the promoters or products at issue here.  Mr. Wainwright described 21st Securities as another "intermediary" that offered other tax strategies.  (Govt. Ex. 70, Wainwright *Fidelity High Tech* Dep Tr. at 46:8-16.)

Indeed, as shown by these newly produced invoices, the group coordination effort continued into 2002.  In June 2002, Bryan Cave billed H&R Block for a "telephone conference with **R. Wainwright**, **J**. **Haber** [of DGI], **O. Tilevitz** [of DGI] **et al regarding new regulations**."  (Wainwright Decl. Ex. B at 6) (emphasis added).  Pointedly, communications regarding proposed tax regulations constitute another set of documents on RSM's privilege log.  (*See* U.S. Opening Mem. at 26.)  Moreover, it is unclear who "et al" refers to here, but it is certainly possible, if not likely, there were additional outsiders, beyond DGI, present.  That telephone conference lasted for 3 ½ hours, but RSM incredulously claims that no "confidential communications" were shared. (RSM Opp. at 18.)  RSM makes that incredulous claim based on Wainwright's similar assertion, (Wainwright Decl. at ¶ 19), which is refuted by this invoice.  Then, in July 2002, Bryan Cave billed for "work on **disclosure matters**; telephone conference with **J. Haber** and **R. Wainwright regarding same**; **review strategies**."  (Wainwright Ex. C at 4, June 18, 2002 entry) (emphasis added).  That call lasted four hours.  (Id.)  This invoice also totally refutes Wainwright's assertion that he did not disclose the substance of any confidential communication with Bryan Cave.  (Wainwright Decl. at ¶ 18.)  And, documents regarding tax shelter "disclosure" issues constitute another set of documents which have been withheld by RSM on grounds of privilege.  (*See* U.S. Opening Mem. at 26.)

In sum,  RSM's own proffered documentary evidence makes it eminently clear that the group effort between RSM, DGI, and Bryan Cave began at the very outset of this so-called engagement and lasted through and beyond 2002 (as further described in the opening memorandum).  Wainwright's statements under oath that no confidential information was disclosed are belied by the group meetings with RSM, Bryan Cave, and DGI where that

information was discussed. Thus, RSM could in no way have intended or expected that its communications with Bryan Cave would be confidential. As such, no privilege attached in the first instance.

## II.    Even Assuming, *Arguendo*, That Privilege Attached, RSM Expressly Waived Any Privilege, and That Waiver Extends to All Communications on the Same Subject Matter.

RSM waived any privilege that may have attached to these documents by disclosing the contents of the communications to, at least, DGI. The law is clear that "privilege evaporates the moment that confidentiality ceases to exist." *XYZ Corp. v. U.S.*, 348 F.3d at 23; *United States v. Mubayyid*, 2007 U.S. Dist. LEXIS 63821 (D. Mass. 2007) (Saylor, J.). In this case, RSM's "confidentiality" ceased to exist the same day it is purported to have begun, when, on August 30, 2001, RSM, DGI, and Bryan Cave had their group meeting. *XYZ Corp. v. U.S.*, 348 F.3d at 23. Further, "[w]ith isthmian exceptions . . . , the presence of third parties[, such as DGI,] is sufficient to undermine the needed confidentiality." *Id.* at 23.

Despite DGI's involvement with the group effort, RSM attempts to inappropriately narrow the breadth of the waiver. RSM's narrow view is wrong on the facts and the law.

### A.    RSM is Wrong on the Facts.

RSM's assertion that it simply disclosed the general subject matter of the advice it received, but not the actual advice, (RSM Opp. at 20), is belied by the evidence. The documentary evidence cited in our opening memorandum, as well as the invoices attached to RSM's opposition, shows that RSM repeatedly disclosed the so-called advice it had received regarding tax-shelter-disclosure issues, listing issues, and other issues. As next discussed, this distinction is important here.

## B.    RSM is Wrong on the Law.

Having misstated the facts, RSM then argues that there is generally no waiver where only the subject of the communications, and not the communications themselves, were disclosed. (RSM Opp. at 20.)  But, that principle refers to an instance where a client discloses to a third party only that he is discussing a specific subject with an attorney, but never reveals the advice given.  *See*, *e.g.*, *United States v. Cunningham*, 672 F.2d 1064, 1073 (2d Cir. 1982); *United States v. Delevo*, 2002 U.S. Dist. LEXIS 7893, 20-21 (D. Mass. Apr. 4, 2002).  That is not at all what happened here.  Here, RSM routinely shared its Bryan Cave communications with DGI.

It is under this backdrop of routinely sharing confidential information that RSM argues that there has been no subject-matter waiver.  (RSM Opp. at 21.)  As discussed in our opening memorandum and as reiterated here (as shown by the invoices), we are not asserting that RSM simply disclosed the subject matter of its communications with Bryan Cave.  Rather, we are arguing that RSM made an express disclosure of its so-called advice from Bryan Cave to DGI and possibly others.

RSM undoubtedly argues that its disclosures were simply limited to the subject matter of Bryan Cave's legal advice in order that it may appear to fit within the factual situation of the First Circuit's decision in *XYZ Corp.*  RSM's reliance on *XYZ Corp.* is misplaced, and grossly off the mark.  As an initial matter, *XYZ Corp.* involved a question of implied waiver.  As the First Circuit made clear in *XYZ Corp.*,  "There was no express waiver [of any communications in that case], so the question is one of implied waiver."[7]  Notably, this case has nothing to do with an

---

[7]348 F.3d 23.  There was no express waiver in *XYZ Corp.* because no confidential advice was disclosed in the one telephone conference at issue there.  Rather XYZ's counsel in that telephone conference was merely helping to advocate "XYZ's position to its co-venturer."  Thus the communications made during the call were not confidential in the first instance and thus not subject to privilege.  *Id.*

9

implied waiver.  Here we have an express waiver, or more accurately, a continuing series of

express waivers.  A brief discussion of the difference may prove helpful.  The Ninth Circuit has

clearly described the difference between an express waiver and an implied waiver:

> Despite the somewhat misleading nomenclature, an "express" waiver need not be
> effectuated by words or accompanied by the litigant's subjective intent. [Internal
> citation omitted].  Rather, the privilege may be waived by the client's, and in some
> cases the attorney's, actions, even if the disclosure that gave rise to the waiver was
> inadvertent.  *See Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18 at
> 24-25 & n.13 (9th Cir. 1981); 8 Wigmore on Evidence § 2325, at 632-33.  To avoid
> confusion, some commentators use the term "waiver by voluntary disclosure" to
> distinguish this type of waiver from "implied waiver," or "waiver by claim
> assertion."  See Mueller & Kirkpatrick §§ 5.28, 5.30, at 530, 549; Weinstein's
> Federal Evidence §§ 503.40-.41[1], at 503-102 to -104.3.

*Bittaker v. Woodford*, 331 F.3d 715, 720, n. 4 (9th Cir. 2003).  The waiver by disclosure to a

third party is an express waiver.  As also described by the Ninth Circuit, "[a]n express waiver

occurs when a party discloses information to a third party who is not bound by the privilege, or

otherwise shows disregard for the privilege by making the information public." *Id.* at 719.  These

disclosures "are typically within the full control of the party holding the privilege . . . ." *Id.*

RSM had full control over these communications, and chose to disclose them to DGI.  Given that

voluntary disclosure, and the resulting express waiver, RSM's arguments that an implied waiver,

as opposed to an express waiver, does not create a sweeping subject-matter waiver, are irrelevant.

Additionally, the First Circuit made clear that even in cases involving implied waivers,

"n[o]thing in . . . [*XYZ Corp.*] is intended to suggest that extrajudicial disclosures can never work

an implied waiver of anything beyond that which actually was disclosed." *XYZ Corp. v. U.S.*,

348 F.3d at 25, n.6.

Most importantly, the facts of this case are entirely different from those in *XYZ Corp.*

That case involved commercial negotiations conducted between co-venturers, that negotiation

being required by a supply agreement. *XYZ Corp. v. U.S.*, 348 F.3d at 19.  The issue there was

whether the negotiation, not privileged in the first instance, had a "ripple effect" whereby one could imply from the negotiations a broad subject matter waiver. In contrast, RSM expressly waived privilege as to a wide range of topics, including disclosure and list maintenance. Its waiver was effectuated by regularly disclosing its so-called advice from Bryan Cave, and even making DGI a part of group sessions with Bryan Cave.

Regardless of the type of waiver, express or implied, "it is crystal clear that any previously privileged information actually revealed . . . loses any veneer of privilege." *XYZ Corp. v. U.S.*, 348 F.3d at 23. Here, that applies to the panoply of information actually disclosed by RSM, which includes, again, communications relating to listing issues and tax-shelter disclosure issues. Given the express waiver, the remaining matter for consideration is whether the waiver extends to all communications dealing with the same subject matter. It does.[8]

Because the waiver here was an express waiver, it extends to all communications on the same subject matter. *See, e.g.*, *Weil v. Investment/Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981). In fact, even "a waiver premised on inadvertent disclosure will be deemed to encompass 'all other such communications on the same subject.'" *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 883-884 (1st Cir. 1995) (*citing Weil v. Investment/Indicators, Research & Mgmt., Inc.*, 647 F.2d at 24-25 & n.13 (9th Cir. 1981). That subject-matter waiver also applies to "disclosures deemed grossly negligent or reckless." *VLT, Inc. v. Lucent Techs.*, 2003 U.S. Dist. LEXIS 723, *13 (D. Mass. Jan. 21, 2003). The evidence demonstrates that RSM intended to disclose any "advice" it received from Bryan Cave. As such,

---

[8]Only upon in camera review can the full and precise extent of this subject-matter waiver be determined, but, based on a review of RSM's privilege log, (Appendix 1), the waiver extends to all communications on the subjects described in the chart on page 26 of the opening memorandum. It appears, however, that the extent of the specific voluntary disclosures alone, and the coextensive waiver, would require RSM's production of all withheld documents. As such, the court may not need to reach a determination as to the scope of a subject-matter waiver.

RSM loses any protection over the withheld communications, just as it would if its actions in disclosing were considered grossly negligent, reckless, or even inadvertent.

III.    **The Plaintiff's Misplaced Complaints About the Well-Supported Factual Assertions Should be Given No Consideration, Particularly in the Absence of Any Presentation of Contrary Evidence by the Plaintiff.**

The plaintiff has seen fit to take this opportunity to interject in this dispute in which it claims to have no position. In doing so, it comes forth with no evidence of its own, but merely complains that the factual assertions are somehow incomplete.

For example, the United States described that the plaintiff hired RSM to sign the plaintiff's and the Egans' tax returns when KPMG was fired for refusing to sign the tax returns without the requisite tax-shelter disclosure statements. In retort, the plaintiff describes the same process, only far more verbosely and colorfully. The plaintiff takes approximately two full single-spaced pages of its brief to get to the point– KPMG was fired for including a disclosure statement in the tax return it prepared but which Egan did not file. (Pl. Resp. at 2-4.) Even Robert Prifti of KPMG, who, according to the plaintiff, "advised Plaintiff with respect to these transactions," (Pl. Opp. at 6), testified twice that the Egans fired KPMG for requiring disclosure. In his *Fidelity International* deposition, Mr. Prifti even described the leadup to the firing, and how he learned of it. He testified that Pat Shea of Carruth (the Egans' wealth-management company) was "very upset" that KPMG included a disclosure statement. (Govt. Ex. 71, Prifti *Fidelity Int'l* Dep. Tr. at 102:13-14.) He "recall[ed] Pat Shea leaving the building" where Mr. Prifti "could see him through the windows walking outside and being very upset." (Govt. Ex. 72, Id. at 103:12-13.) As Mr. Prifti described the aftermath, "[a]t a later date, and I'm not sure if it was days or a week or two, KPMG's relationship was terminated." (Govt. Ex. 73, Prifti *Fidelity Int'l* Dep. Tr. at 101:10-15.) There was no question as to the firing, as demonstrated by what

occurred when Mr. Prifti returned to Carruth's offices.  According to Mr. Prifti, when he "went

out to the family office to further review other entities, . . . [he] remember[s] Michael Egan

saying ['what's he doing here,['] and . . . [he] was asked to lea[ve]."  (Govt. Ex. 74, Id. at

103:20-104:1.)  Similarly, in his *Fidelity High Tech* deposition, Mr. Prifti testified that his

"understanding is *they fired us* and weren't going to pay any more fees."  (Govt. Ex. 75, Prifti

*Fidelity High Tech* Dep. Tr. at 116:6-7) (emphasis added).  In short, even taking as true

everything the plaintiff alleges on this point (which we do not), it comes down to the plaintiff

firing KPMG for requiring disclosure, and its subsequent hiring of RSM which did not require

disclosure.  What is clearly untrue is the plaintiff's assertion of RSM's "position" on disclosure.

As even RSM acknowledges, it "advised" its clients, albeit half-heartedly, to disclose these

transactions.

       The plaintiff also takes exception to the United States' description of Bryan Cave as part

of a group effort among professional firms.  As has been cited throughout this case, the

promoters of these transactions, including DGI, made available at least four law firms to write

opinion letters for DGI's customers.  One of those law firms was Bryan Cave.  (Govt. Ex. 61.)

The others included Sidley Austin, which provided the Egans with a so-called tax opinion, and

Proskauer Rose, which provided a non-disclosure opinion.  (Id.)  The plaintiff argues now that,

regardless of what DGI and the other promoters coordinated with these law firms, because the

lead partner on this engagement for Bryan Cave had not met nor directly communicated with the

lead partner on the engagement for Sidley Austin, the effort was not coordinated through DGI.

That flawed logic is undermined by the record.  As described in the United States' opening

memorandum here, Bryan Cave's tax opinion-letter was widely circulated as a template, even to

RSM's customers such as the McNeills.  That template opinion, (Govt. Ex. 5), demonstrates the

coordination among firms. Additionally, as to the so-called independent advice the plaintiff received, Sidley Austin was in such a rush to churn out the cookie-cutter opinion letter, it simply asked DGI for a "model." As the Sidley partner said then, "I want to get Egan out asap. To help me, do you have a bryan cave [sic] model I can use for setting up the facts." (Govt. Ex. 62.) Those "facts" were the representations– including the purported existence of a non-tax business purpose for the Egans' employment of these tax-shelter transactions– that formed the very foundation of the opinion letter. Richard Egan signed those representations on the plaintiff's behalf. So, while, as the plaintiff seems to concede, the professional firms may have in some instances coordinated their efforts through DGI rather than directly with the customers such as the Egans, their efforts with respect to FDIS and Stock Dribble were most certainly coordinated, and, as alleged, a group effort.

The close coordination of the marketing effort has been described through an array of documentary evidence throughout this litigation. As the Court stated with respect to the Proskauer Rose opinion letters, including the one the plaintiff touts here,

> the evidence indicates that the letters were drafted by multiple parties, over multiple months or years, based in large part on generic or boilerplate opinions. Their purpose was not to analyze pending or imminent claims; instead, it was to induce the taxpayers to invest in the strategy (or, put differently, to provide comfort to those investors, particularly with respect to the possible imposition of future tax penalties).

(Ord. on Mot. to Compel Proskauer at 25.) Despite the coordination between these professional firms throughout the marketing stage, the plaintiff argues in its response, (Pl. Resp. at 8), that Bryan Cave's determination after the promulgation of the 2002 Treasury regulations that the transactions had to be disclosed somehow demonstrates a lack of coordination. It does not. The fact that, as RSM described it, "the world ha[d] become more difficult and changed

14

substantially," (Govt. Ex. 29), and some participants in the group effort had belatedly found religion, so to speak, does not change the facts.  Indeed, RSM, unlike Bryan Cave, was willing to participate even in this "more difficult" environment, albeit for more money.  (Id.)  Similarly, the plaintiff was also willing to continue, albeit without the tax-shelter disclosure as demanded by KPMG, advised by Bryan Cave, and "advised," with a wink and a nod, by RSM.

The plaintiff similarly complains of the names by which these products were marketed. In making its complaints, the plaintiff incorrectly alleges that we have inconsistently applied the terms FDIS and Stock Dribble.  That is simply untrue.  From the early days of the *Fidelity International* cases (the first of these two sets of cases), when the United States first discovered the promoters' marketing materials calling that transaction the Financial Derivatives Investment Strategy, or FDIS, we have used that acronym.  We have consistently described it as a subset of, or variation of, the abusive tax-shelter known as SOS (Short-Option Strategy).[9]  In fact, when the plaintiff filed an unsuccessful motion to quash the United States' subpoena to KPMG, the United States described the plaintiff's tax shelter as "the culmination of years of coordinated design and redesign of similarly fraudulent tax shelter products by various professionals and their clients– the so-called investors such as the plaintiff" . . ., that redesign being "intended to, at least cosmetically, differentiate the fraudulent shelter employed in this case from other fraudulent shelters such as those known as FLIP, OPIS, and BLIPS."  (Opp. to Mot. to Quash KPMG Subpoena at 2.)  The United States advised the Court then that

> [d]espite the efforts of the promoters and their clients to alter appearances, the [tax] shelters share common roots, goals, and, of course, outcomes– the sheltering of

---

[9]The plaintiff does not like those names because they indicate that the transactions were abusive tax shelters, and the public was on notice in 2000 that these were considered abusive tax shelters.

hundreds of millions of dollars from federal income taxation based on the employment of transactions designed and implemented for that very purpose (and in some cases based only on the reporting of transactions that never occurred). The complete picture includes but is not limited to the iteration of the tax shelter employed in this case, which did not simply come into being one day in 2001.

(Id.) At the motion hearing on KPMG-subpoena matter, on May 11, 2006, the following

colloquy took place between the Court and the United States, on May 11, 2006:

> THE COURT: * * *  As I understand it, at least with regard to KPMG, what the government or -- is saying is that Mr. Egan -- and I'm going to use the term Mr. Egan loosely to cover the plaintiff and any related parties, and I apologize to Mr. Egan if that's not correct, but Mr. Egan and others invested in or purchased these FDIS; do I have that right acronym?

> MR. DONOHUE: That's correct, your Honor.

> THE COURT: -- products. **The FDIS was a follow on to the SOS products.**

> MR. DONOHUE: That's correct.

> THE COURT: The government has sought what it describes as transactional information regarding FDIS and SOS; that is, other investors or taxpayers, who bought or -- or invested in, whatever the right word is, those products, which is an unknown number, but it's 200, 250, that order of magnitude taxpayers.

> MR. DONOHUE: One hundred sixty-five, your Honor.

> THE COURT: One hundred sixty-five for SOS. But isn't FDIS an unknown number?MR. D

> Mr. DONOHUE: **FDIS is a subset**, so --

> THE COURT: So within your 165?

> MR. DONOHUE: Within the 165 is the FDIS transactions.

> THE COURT: All right. And then for earlier shelter products, BLIPS and FLIPS and OPIS, if I have my acronyms right, the government is not seeking particular transactional documents, but is acquiring from KPMG developmental materials, marketing materials, promotional materials, reporting materials.

16

MR. DONOHUE:  That's correct, your Honor.

THE COURT:  All right.  And if I understand the government's position on this, essentially what they're saying is that one of the central core issues here is is this is a sham, a sham in substance, possibly a factual sham, but certainly there's an issue as to whether it's a sham in substance; that is, it had no economic substance, which has both a subjective and an objective component, and the government says to the extent that these are cookie-cutter deals, or prepackaged in which every taxpayer more or less got the same thing, that that goes to the objective component; and at least conceivably, depending on the knowledge and intentions of the taxpayer, may relate to the subject component.  Mr. Donohue, do I have that about right?

MR. DONOHUE:  You do, your Honor.

(May 11, 2006 Tr. at 16:13-17:25) (emphasis added).  The United States consistently described FDIS as a subset of and follow-up product to SOS.  To the extent the plaintiff does not like the name given the FDIS product by the promoters and firms that marketed it, we can also point out that it was sometimes– in connection with the opinion letters, including the Sidley Austin opinion to the Egans– called the "Standard Partnership" deal.  (Govt. Ex. 63.)  But, if we were to adopt that name, the plaintiff would no doubt complain that it is suggestive of a cookie-cutter, or standard, transaction.

The Fidelity High Tech transaction has consistently been referred to as Stock Dribble. That is in fact what the lead promoters, like DGI, called it.  In a memorandum from James Haber of DGI to Ira Akselrad of Proskauer Rose, Haber asked Proskauer to prepare a number of cookie-cutter opinion letters, including one for the Egans, for the "Stock Dribble" deal.  (Govt. Ex. 64.) That is also what DGI called it when it sent the Egans' representatives a memorandum, which it called the "stock dribble memo," describing the transaction in detail.  (Govt. Ex. 65.)[10] Interestingly, the memorandum referred to generic "investor[s]," LLCs, and corporations, because the deal was cookie-cutter in nature.  The plaintiffs nonetheless maintain here that they

---

[10]The memorandum also referred to the transaction as a deferred stock sale.

thought it was unique to them.  More relevant here though, the plaintiff took no exception then–years before litigation– to calling this transaction "stock dribble."

Stock Dribble, like FDIS, has been consistently described as a variation of earlier tax-shelter products, and was, in fact, a restructured Short-Option Strategy.  That is evidenced in the plaintiff's and other documents.  As discussed within KPMG, the Egans were being marketed an SOS transaction in July 2000.  (Govt. Ex. 66.)  The Egans later acknowledged their purchase of an SOS.  In 2001, Pat Shea, an Egan representative, "noted [to KPMG] that . . . [Egan] did a Short Option strategy in 2000."  (Govt. Ex. 67 at ¶ 5.)  Later in 2001, that SOS was restructured to be a Stock Dribble.  Near the end of 2001, another Egan representative at Carruth sent an email to Michael Egan, referring to the deal as "Helios I," named after one of the other promoters of this and the FDIS transaction, and discussing the "restructuring" of the original SOS to be a Stock Dribble.  For reasons to be discussed at length at trial but unnecessary to discuss here, it was to the Egans' benefit at that time to restructure the deal to alter the planned stock sales in Fidelity High Tech.  Under the restructured Stock Dribble, Egan could "dribble out the stock instead of selling all of it."  (Govt. Ex. 68.)

To the extent the plaintiff does not like the United States' presentation of evidence, it may present its own.  But it may not present unsupported allegations of misrepresentations.

### Conclusion

The evidence demonstrates that RSM never intended to keep confidential the so-called legal advice it received from Bryan Cave.  It intended to, and routinely did, share it with DGI.  Even assuming that privilege attached anyway, RSM has not taken even the first step in meeting its burden of demonstrating non-waiver.  To the contrary, RSM has simply produced a few exhibits that, when fully vetted, further demonstrate waiver.  Beyond that, RSM relies on its own

self-serving assertions of non-waiver, made without a shred of documentary support, by an RSM

employee who engaged in his own FDIS tax shelter.

      Given the complete lack of evidence offered by RSM, and the mountain of evidence

offered against it, RSM must produce the withheld documents which are entirely unprotected

based on RSM's own intentions and actions.  Moreover, RSM must produce any additional

documents, like the newly produced invoices, that it has failed to produce or log.

                          Respectfully submitted,

                          MICHAEL J. SULLIVAN
                          United States Attorney

                         /s/ Dennis M. Donohue
                          DENNIS M. DONOHUE
                          CHIEF SENIOR LITIGATION COUNSEL
                          OFFICE OF CIVIL LITIGATION
                          Tax Division, U.S. Department of Justice
                          P.O. Box 403, Ben Franklin Station
                          Washington, D.C.  20044
                          Telephone: (202) 307-6492
                          Facsimile: (202) 307-2504
                          E-mail: dennis.donohue@usdoj.gov

                          JOHN A. LINDQUIST
                          BARRY E. REIFERSON
                          HEATHER L. VANN
                          Trial Attorneys, Tax Division
                          U.S. Department of Justice
                          P.O. Box 55, Ben Franklin Station
                          Washington, D.C.  20044-0055
                          Telephone: (202) 307-6561
                          Facsimile:  (202) 514-5238
                          E-mail: john.a.lindquist@usdoj.gov
                                  barry.e.reiferson@usdoj.gov
                                  heather.vann@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants identified on the Notice of Electronic Filing and copies will be sent to
Proskauer and those indicated as non registered participants on August 26, 2008.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY | ) | |
| ADVISOR A FUND, L.L.C., by the Tax | ) | |
| Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Nos. 05-40151-FDS (D. Mass.) |
| | ) | 06-40130-FDS (D. Mass.) |
| v. | ) | |
| | ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF BARRY E. REIFERSON**

I, Barry E. Reiferson, pursuant to the provisions of 28 U.S.C. §1746, certify as follows:

1.      I am a Trial Attorney with the U.S. Department of Justice, employed in the Tax Division, Northern Region, with a post of duty at Washington, D.C.

2.      I am one of the assigned trial attorneys for defendant United States in this case.

3.      I make this declaration based upon my personal knowledge and the documents referenced herein.

4.      The documents filed as Government Exhibits 61 through 68 in support of this motion are true and correct copies of documents obtained by the United States in discovery in this case.

5.      The documents filed as Government Exhibits 69 through 75 in support of this motion are true and correct copies of deposition-transcript excerpts obtained by the United States in

discovery in this case and in *Fidelity High Tech v. U.S.*, Case Nos. 06-40243 & 06-40244

(D. Mass.).

      I declare under penalty of perjury that the foregoing is true and correct.

      Executed in Washington, D.C., on this 26th day of August, 2008.

/s/ Barry E. Reiferson
BARRY E. REIFERSON
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 514-6058

**From:**           James Haber [jhaber@divgroup.com]
**Sent:**           Monday, October 08, 2001 4:13 PM
**To:**           Shea, Pat
**Cc:**           Stephanie Denby; Fiddy, Carolyn
**Subject:**           Re: our trades

Pat,
Thank you for your good wishes.
Summaries should be on their way to you.  If you do not have them, let me know.  I am
available on the18th, pick a time.  We work with the law firm.
Opinions will be delivered in January.  Have you decided on a law firm.
Choices are: Proskauer Rose LLP, Sidley Austin Brown & Wood LLP, Bryan Cave or Lord
Bissell & Brook.
Jimmy

----- Original Message -----
From: "Shea, Pat" <PatS@cmllc.com>
To: <jhaber@divgroup.com>
Cc: "Fiddy, Carolyn" <Carolyn@cmllc.com>
Sent: Monday, October 08, 2001 11:14 AM
Subject: our trades


>
> Jimmy---
>
> I spoke with Ron this morning and he was running the examples of
> trades
for
> us -- he will forward them to you to reformat them and get them to
> us--
>
> I don't know what effect, if any,  the attack on Aphganistan will have
> on our strategy or timing but we are looking to do the trades Tues or
> Wed--
we
> have wired the $$$ to Refco ---
>
> When will we get the opinion letter and do I have to contact anyone or
will
> you take care of that ??
>
> I will be in NY October 16-18 and have asked  Tim Speiss if the three
> of
us
> can meet on the morning of the 18th -- does that work on your
> schedule--
mid
> morning best for me---
>
> Is there anything else you need from us for this trade this week---
>
> Thanks--
>
> Hope you had a nice trip--
>
> Hope you and yours stay safe in these scary times
>
> pat
>

1

**GOVERNMENT EXHIBIT**

**61**

022304

2EGAN022304

# Govt. Exhibit 62-

# Document Filed Under Seal

3539885.1

# MEMORANDUM
## Via Email

**TO:**    R.J. Ruble, Esq.          **DATE:**    January 2, 2002

**FROM:**   James Haber

---

Below is a list of tax opinions we propose to be prepared by your firm and proposed compensation for such preparation:

|     | **Client Name** | **Opinion Type** | Notes |
|-----|-----------------|------------------|-------|
| 1.  | JSB Montana | Old Style Partnership | Complete Already |
| 2.  | Phillip Bennett | Old Style Partnership | Complete Already |
| 3.  | Michael Palitz | Old Style Partnership | Complete Already |
| 4.  | William Weiss | Old Style Partnership | Complete Already |
| 5.  | Charles Patterson | Old Style Partnership | ] |
| 6.  | Harold Nix | Old Style Partnership | ]  Same LLC |
| 7.  | Nelson Roach | Old Style Partnership | ] |
| 8.  | David Cowan | Standard Partnership | To be paid directly by client (75,000) |
| 9.  | Richard & Maureen Egan | Standard Partnership | |
| 10. | Barry Hoyt | Basis Only Sec. 351 | ] Principals of Anbar |
| 11. | Andrew Jarmel | Basis Only Sec. 351 | ] |
| 12. | Anbar Inc. | Standard Partnership | Owned by Hoyt / Jarmel |
| 13. | Jerome Schostak | Standard Partnership | To be paid directly by client (75,000) |
| 14. | Stan Dziedzic | Standard Partnership | |
| 15. | Ed Caputo | Standard Partnership | Represented by Richard Siegel (knows you from prior deal) |
| 16. | John Giesecke | Standard Partnership | ] |
| 17. | Catherine Giffen | Standard Partnership | ]  Same LLC |
| 18. | Affco, LLC | Standard Partnership | Owned by Powers, LaGitt, Powers Children Trust |
| 19. | LaGitt 88 Trust | Basis Only Sec. 351 | ] |
| 20. | John Powers | Basis Only Sec. 351 | ] Own Affco, LLC (Affco is taxed as |
| 21. | Powers Children Trust | Basis Only Sec. 351 | ] an S Corp.) |
| 22. | Alan Ginsburg | Standard Partnership | |
| 23. | Roger Scommenga | Standard Partnership | |
| 24. | Wolff Family Trust | Standard Partnership | |

**GOVERNMENT EXHIBIT**

**63**

SABWZ0292882

PRODUCED BY SIDLEY AUSTIN TO UNITED STATES ON 10/11/07

1SA00902

| 25. | The Tafeen Family Trust | Standard Partnership | |
| 26. | Ron Tschetter | Standard Partnership | |
| 27. | Nelson Civello | Standard Partnership | |
| 28. | Geewax, Terker & Co. | Standard Partnership | Owned by Geewax & Terker |
| 29. | Bruce Terker | Basis Only Sec. 721 Contribution | ] |
| 30. | John Geewax | Basis Only Sec. 721 Contribution | ] Own Geewax, Terker & Co. |

### Proposed Fee Arrangements

### Summary

```
 7 Old Style Opinions (1 Midco)
16 New Style Opinions
 7 Basis Only Opinions
30 Total Opinions
22 Clients
```

| Paid Directly By Client | | |
|---|---|---|
| Schostak | $ | 75,000 |
| Cowan | | 75,000 |
| | | |
| To Be Paid by DGI | | 800,000 |
| | | |
| Smith Credit | | 250,000 |
| Total Payments | | $1,200,000 |

SABWZ0292883

PRODUCED BY SIDLEY AUSTIN TO UNITED STATES ON 10/11/07

1SA00903

# M E M O R A N D U M
## Via Email

**TO:**    Ira Akselrad, Esq.      **DATE:**    January 2, 2002

**FROM:**    James Haber

---

Below is a list of tax opinions we propose to be prepared by your firm and proposed compensation for such preparation:

| | Client Name | Opinion Type | Notes |
|---|---|---|---|
| 1. | Keith Stein | Standard Partnership | Same LLC as Akselrad |
| 2. | Harold Akselrad | Standard Partnership | Same LLC as Stein |
| 3. | Richard Sabella | Standard Partnership | |
| 4. | Douglas Paley | Standard Partnership | |
| 5. | William Paley | Standard Partnership | |
| 6. | Steven Paley | Standard Partnership | Same LLC as Zaretsky |
| 7. | Jane Zaretsky | Standard Partnership | Same LLC as Steven Paley |
| 8. | Ronald Ciasulli | Standard Partnership | Will be paid directly by client ($25,000) |
| 9. | Corporex | Standard Partnership | Principal is William Butler |
| 10. | William Butler | Basis Only – Sec 351 Exchange | |
| 11. | Joseph Francis | Standard Partnership | |
| 12. | Richard Portillo | Standard Partnership | |
| 13. | Daniel Reid | Standard Partnership | |
| 14. | Robert Cole | Standard Partnership | |
| 15. | Ronald McNeill | Standard Partnership | |
| 16. | John "Sandy" McNeill | Standard Partnership | |
| 17. | Glenn Nussdorf | Standard Partnership | ]        **Revision** |
| 18. | Ruth Nussdorf | Standard Partnership | ] One Family  **$150,000 to be paid** |
| 19. | Arlene Nussdorf | Standard Partnership | ]       **direct by client** |
| 20. | Stephen Nussdorf | Standard Partnership | ] |
| 21. | Richard & Maureen Egan | Stock Dribble | |
| 22. | Ronnie McNeill | Stock Dribble | |
| 23. | John "Sandy" McNeill | Stock Dribble | |
| 24. | Alpine | CFC | |

**DGI 78379**

GOVERNMENT
EXHIBIT

64

1DGI-09-54-106011

| 25. | Pitt Des Moines | CFC | |
| 26. | Steven Perles | CFC & Basis (Sec. 351 Exchange) | |
| 27. | Craig Solomon | CFC & Basis (Sec. 351 Exchange) | |
| 28. | Jon Kutler | Standard Partnership | (Already in the works) |

## Summary

20 Standard Partnership Opinions (including Kutler)
  1 Basis only
  3 Stock Dribble
  2 CFC
 _2 CFC & Basis Combo._
28 Total Opinions

19 Clients [Paley Family, Nussdorf, Corporex/Butler counted as one, McNeill's counted as two (not 4)].

Out of the 19 clients 4 are accommodation clients (Stein, Akselrad, Sabella & Solomon).

## Proposed Fees

### Paid by Client Direct

| | | |
|---|---|---|
| Kutler | $ 200,000 | |
| Ron Ciasulli | 25,000 | |
| **Nussdorf (4 opinions)** | **150,000** | **- revision** |

### Paid By DGI

| | | |
|---|---|---|
| Solomon | 50,000 | |
| Sabella / Stein | 70,000 | |
| Subtotal | $ 495,000 | |
| For All Others (14 clients, 23 opinions) | **900,000** | |
| TOTAL | $1,395,000 | |

**DGI 78380**

PRODUCED BY DIVERSIFIED TO UNITED STATES ON 10/03/06

**From:**      James Haber [jhaber@divgroup.com]
**Sent:**      Monday, November 05, 2001 1:42 PM
**To:**        Pat Shea; Stephanie Denby
**Subject:**   stock dribble memo

**Attachments:**   summary memo--III.doc



summary
memo--III.doc (78 KE

I will be happy to review this with you at your earliest convenience.


----- Original Message -----
From: "Orrin Tilevitz" <otilevitz@divgroup.com>
To: "Haber Jimmy" <jhaber@divgroup.com>
Sent: Monday, November 05, 2001 12:46 PM
Subject: Most recent stock dribble memo


>
>

GOVERNMENT
EXHIBIT

65

1

049061
3CARRUTH049061

950 Third Avenue, 23rd Floor
New York, NY 10022
Phone: (212) 688-2700
Fax: (212) 688-7908

# THE DIVERSIFIED GROUP INCORPORATED

## MEMORANDUM

**TO:**       Files

**FROM:**   Orrin Tilevitz, Esq.

**DATE:**    October 31, 2001

**SUBJECT:**   Deferred  Stock Sale

Confidential—
Attorney-Client
Privilege

Investor I, an individual, would like to dispose of corporate stock over a period of time.  The following technique confers certain tax advantages as he disposes of the stock gradually, and may also give  Investor a partial hedge against a price decline pending the sale.

Assume the stock has a fair market value of $20 million and a basis of zero in Investor's hands.

### Technique

**STEP 1.**  Another party ("Investor II") either already owns a quantity of the same stock or acquires it.  Assume the basis and fair market value of this stock are both $202,020.

**STEP 2.**  Investor I and Investor II (together, the "Investors") each forms a single-member Delaware limited liability company ($SMLLC_1$ and $SMLLC_2$) and contributes cash to it.  (The cash contributed by Investor II need not be in proportion to the value of the stock.)



Each LLC (i) buys an option (a "long option") from an institutional counterparty, *e.g.,* Lehman Brothers, and (ii) issues an option (a "short option") with an identical expiration date and a similar, but not identical, strike price to the same counterparty.  The options are cash-settled single-payoff options.  Together, each set of options is called an "option spread".  The options are European-style (that is, exercisable only at expiration), but are valued daily and may be sold—together or (subject to any credit requirements imposed by the counterparty, separately) before expiration, either back to the counterparty or to any other willing buyer .

1

PRODUCED BY CARRUTH TO UNITED STATES ON 10/16/06

049062
3CARRUTH049062

The options may be puts or calls, and the underlying property may be anything, but would most likely be S&P or NASDQ indices. Each option spread is identical.

For example, say $SMLLC_1$ pays a premium of $20 million for a long call option. The terms of the option are that the LLC will receive $60 million (the single payoff) if the property is worth 107 or more (the "strike price") when the option expires. At the same time, the LLC issues to the counterparty a short call option on the same property, and receives in exchange a premium of $19.4 million. The terms of this option are that the LLC must pay the counterparty $58.2 million if the property is worth 107.01 or more when the option expires. Each LLC receives a separate confirmation for each option. Together, the long and short options are called an "option spread" in which each LLC is risking a $600,000 net premium for the possibility of a net payoff of $1.8 million. The probability of this payoff is, say, 25%. This net payoff may be an imprecise economic hedge against price declines in the stock or is otherwise a speculation, consistent with the Investors' overall investment objectives, on the movement of the markets.



**STEP 3.** The Investors contribute their stock and sole membership interests in $SMLLC_1$ and $SMLLC_2$, respectively, to a third Delaware limited liability company (Fund) in exchange for equal membership interests. Fund will serve indefinitely as a joint investment vehicle for the Investors after the stock sale. As discussed below, each Investor's outside basis in Fund includes the premium paid for the Long Option; the short option premium received is ignored.



**STEP 4.** The initial option spreads expire or are "unwound" (that is, sold back to the counterparty at then-current value).

2

049063
3CARRUTH049063

**STEP 5.**  Before Fund enters into new option spreads or other hedges (if any), Investor I contributes his membership interest in Fund to an S corporation or partnership (or LLC taxed as a partnership).[1] Investor I intends to use this new entity to manage investments for his immediate family.



Alternatively, if Investor I is itself an entity, the membership interest in Fund might be distributed to Investor I's interest-holders.

**STEP 6.**  . Fund makes a timely section 754[2] election.



---

[1] Or perhaps a non-grantor trust; see discussion in footnotes *infra*. A foreign corporation would do just as well.

[2] Section references are to the Internal Revenue Code of 1986, as amended, and Treasury regulations issued thereunder.

PRODUCED BY CARRUTH TO UNITED STATES ON 10/16/06

049064
3CARRUTH049064

STEP 7.  The stock position may continue to be managed using options or other techniques

STEP 8.  Fund sells the stock.

## Discussion

1.  Under the entity classification regulations, Regs. § 301.7701-2 and –3, in the absence of an election (which will not be made), Fund is classified as a partnership, and SMLLC$_1$ and SMLLC$_2$ are disregarded as entities.

2.  Under section 721, neither Investor recognizes gain on the contribution of the stock and membership interests to Fund.  Section 721(b) does not apply because, since identical assets are being transferred (even if the identical assets are transferred in disproportionate amounts) the transfers do not result in diversification.  Regs. § 1.351-1(c)(1)(i) and (c)(5).[3]

3.  On the disposition or expiration of the options, Fund will recognize gain or loss to the extent the options have appreciated or declined in value since they were acquired initially by SMLLC$_1$ and SMLLC$_2$.  This gain or loss will be passed through to the Investors in accordance with their interests in Fund.  Neither Investor will recognize gain or loss directly upon such events.

4.  Each long and short option should be treated as a separate instrument for tax purposes. See *Smith v. Commissioner*, 78 T.C. 350 (1982),

5.  Under section 722, the outside bases of the Investors in Fund equal the cost basis of each in the stock plus the long option premium paid by SMLLC$_1$ and SMLLC$_2$.  The short option is not a "liability" so that it does not affect this analysis and need not be taken into account under section 752(d).  *Helmer v. Comm'r*, T.C. Memo. 1975-160.

6.  Whether the contribution by Investor I of his membership interest in Fund to the S corporation (or other investment entity) constitute a tax-free transactions under section 351 (or otherwise) should be immaterial under these facts because Investor I's outside basis in Fund approximates the fair market value of the membership interest.

7.  As the result of a section 754 election, under section 743(b)(1),  if a partnership interest is transferred by "sale or exchange", the transferee's share of the partnership's inside basis is adjusted (up or down) to reflect the transferee's outside basis.  A transfer by "sale or exchange" plainly includes at least some tax-free transfers, see Regs. § 1.755-1(b)(5) (describing how basis adjustments are allocated in transferred-basis transactions).  The principal partnership tax treatise, McKee, Nelson & Whitmire, *Federal Taxation of Partnership and Partners* (3d ed., 2001 Cum. Supp. #3), states: "It seems that a transfer under § 351 is an 'exchange' for purposes of the various 'sale or exchange' provisions of Subchapter K.  Accordingly . . . [t]he basis of partnership assets with respect to the

---

[3] Alternatively, it might be possible for Investor II not to transfer an option spread, or even to transfer cash instead of stock, relying on the provision that the nonidentical assets constitute "an insignificant portion of the total value of assets transferred" within the meaning of Regs. § 1.351-1(c)(5) (second sentence).

4

PRODUCED BY CARRUTH TO UNITED STATES ON 10/16/06

049065
3CARRUTH049065

corporation may be adjusted under § 743(b) if a § 754 election is made." *Id.*, ¶ 15.07[1] at notes 233 and 235. *See also* ¶ 24.03[1] (stating that a distribution by a partnership or corporation would be a "sale or exchange"), and *id.* note 40 (suggesting transferring interest to wholly-owned corporation in section 351 transaction to rectify basis discrepancy for partner who acquired a partnership interest for which no section 754 election was in effect). The treatise also notes that "The language of § 721 indicates that such transfers [of partnership interests in exchange for other partnership interests) are "exchanges" for purposes of § 743(b) . . . ." Id. at ¶ 15.07[3]. Therefore, section 743(b) applies to the transfers by Investor I of his interest in Fund.[4]

8. The basis adjustment applies only to property owned by the partnership at the moment of the transfer. *See* Regs. § 1.743-1(d)(2). Since at the moment of the transfers Fund owned only the stock, the entire basis adjustment is allocated to it under section 755 and the regulations thereunder.

9. As a result, the Investor I's shares of Fund's inside basis in the corporate stock equal his outside basis in Fund, which approximates fair market value. Investor II's share of the inside basis is his original basis, which was assumed also to approximate fair market value. Any gain or loss recognized by Fund on the sale of this stock will be computed with reference to this basis. It would appear that this basis is used for reporting purposes as well. See instructions to Form 1065, Schedule D.

10. Even if Investor I's purchase of the option spread (through SMLLC$_1$) results in a hedge against price declines in the stock, it should not result in a constructive sale under section 1259 because (i) in the absence of regulations (and none have been issued) entering into an option does not result in a constructive sale and (ii) even when the regulations are issued, they will apply only to financial transactions that "have the effect of eliminating substantially all of the taxpayer's risk of loss *and* opportunity for income and gain [emphasis added]". Joint Committee on Taxation, General Explanation of Tax Legislation Enacted in 1997, 177. Even if the option spread here were to eliminate substantially all of Investor I's risk of loss, it would not eliminate his opportunity for gain, so section 1259 will not apply.

11. Section 269 should not affect this tax result if Investor I contributes his membership interest to a corporation because

    a. Section 269 applies only to the acquisition to secure the benefit of a deduction, *etc.*, with the taxpayer "would not otherwise enjoy". Investor I could have gotten the same tax benefit, a step-up in his share of Fund's inside basis,

---

[4] A transfer to a non-grantor trust presumably also would be treated as a sale or exchange. See Regs. § 1.1001-2(c), example 5 (grantor recognizes gain under section 1001 when trust loses grantor status). However, the authority of this example has been questioned. McKee does not discuss this issue but states: "Although the legislative history of the provision does not make clear the purpose of this limitation [*i.e.*, that there must be a "sale or exchange" ], the major effect seems to be the exclusion of transfers by gift". Id at ¶ 24.03[1]. Therefore, for a transfer to a non-grantor trust to result in the required "sale or exchange", it would appear that the transfer cannot be as a gift.

PRODUCED BY CARRUTH TO UNITED STATES ON 10/16/06

049066

3CARRUTH049066

without using a corporation at all. *See, Cromwell Corp. v. Commissioner*, 43 T.C. 313 (1964); and

b.  Section 269 applies permits the IRS to disallow only a "deduction, credit or other allowance." Here the corporation is being used only to avoid recognition of gain, and gain avoidance is not a "deduction, credit or other allowance." *Cherry v. U.S.*, 264 F. Supp. 969 (C.D. Cal. 1967); *see also, Bijou Park Properties, Inc. v. Commissioner*, 47 T.C. 207 (1966).

6

PRODUCED BY CARRUTH TO UNITED STATES ON 10/16/06

049067
3CARRUTH049067

Govt. Exhibit 66-

Document Filed
Under Seal

3539887.1

# Govt. Exhibit 67-

# Document Filed Under Seal

3539888.1

**From:**      Reiss, James
**Sent:**      Friday, November 09, 2001 2:09 PM
**To:**        Egan, Mike
**Cc:**        Shea, Pat
**Subject:**   Helios I Deal

Mike:

With regards to our conversation this morning about the Helios I restructuring.......

I think it still would be worthwhile to pursue this.  The benefit of the restructuring is that we can dribble out stock instead of selling all of it.  It would provide more flexibility if you prefer not to sell all the shares at one time.

Maybe Pat can find out the cost of doing this restructuring and he/we can discuss it further.

Jim



GOVERNMENT
EXHIBIT
68

HT002033

PRODUCED BY EGAN TO UNITED STATES ON 11/08/07

1HT002033

00031
1  general statement, it was a group of individuals

2  that were technically oriented and had

3  experience with very large and complex clients

4  and transactions.

5      Q.  Was there a name for this core group of

6  tax partners, was there a group name or anything

7  to that effect?

8      A.  It was referred to as the Tax Solutions

9  Group.

10     Q.  And are you still with the Tax

11  Solutions Group today?

12     A.  No.

13     Q.  And what was your next position after

14  May of 2000?

15     A.  I was still the director of tax for a

16  number of offices.  And in February of --

17  approximately February of 2001, I was asked to

18  lead a group of partners throughout the firm in

19  a group called the Structured Transactions

20  Group.

21     Q.  Roughly how large was that group?

22     A.  There were approximately 100 partners

GOVERNMENT
EXHIBIT
69

**Wainwright, Ronald  10-29-07**                    **Page 31**

00032
1  in the group national.

2     Q.  And what was the responsibility of this

3  group?

4     A.  This was a group of partners who were

5  responsible with interacting with various

6  vendors and what we refer to as intermediaries

7  in the marketplace that were aggressively

8  approaching our clients with complex tax

9  strategies of all different types, including

10  other accounting firms, law firms.

11     Q.  And did you interact with these vendors

12  and intermediaries for purposes of providing

13  services to RSM's clients then?

14     A.  We interacted with intermediaries to

15  understand what the strategies were that they

16  had developed and what the strategies were that

17  they were either approaching our clients with or

18  what the strategies were that were in the

19  marketplace, so that when clients asked for our

20  guidance, counsel on a strategy that had been

21  independently presented to them, we could

22  comment on that strategy.

**Wainwright, Ronald  10-29-07**                    **Page 32**

00046

 1  BY MR. REIFERSON:

 2    Q.   How about after the termination of

 3  the joint venture?

 4        MR. NEUMEIER:  Same objections.

 5  BY THE WITNESS:

 6    A.   Yes.

 7  BY MR. REIFERSON:

 8    Q.   With whom was RSM McGladrey working

 9  to implement tax strategies after the

10  termination of the joint venture?

11    A.   With a number of what we referred to

12  as intermediaries in the marketplace.

13    Q.   Who were those intermediaries?

14    A.   Twenty-First Securities, the

15  Diversified Group, Peachtree Financial

16  Solutions.  Those are the ones that I recall.

17    Q.   Do you recall a firm called Helios?

18    A.   Yes.

19    Q.   Was Helios an intermediary, as you

20  use that term?

21    A.   Yes.

22    Q.   Do you recall any other firms that

23  you considered intermediaries at that time?

24    A.   The ones I recall I cited earlier.

25    Q.   With whom did you work at

GOVERNMENT
EXHIBIT

70

**Wainwright, Ronald   5-30-08**                    **Page 46**

1   Hopkinton.

2       Q    Who else was in attendance at that

3   meeting?

4       A    I believe Bill Connolly from KPMG was also

5   there.

6       Q    What was said at that meeting and by whom

7   about that disclosure notice that was placed in that

8   draft return?

9       A    There were discussions with Tim and Pat

10  privately, and then there were other discussions in

11  the conference room that we generally sat, and those

12  discussions that I recall from the conference room

13  where we generally sat were Pat being very upset

14  that the disclosure was in there, especially after

15  paying Proskauer Rose to opine that the transaction

16  is not substantially similar.

17      Q    You were aware at that time that Proskauer

18  had already, in fact, been paid?

19      A    I have no knowledge if they were paid or

20  not.

21      Q    Had you seen the Proskauer Rose opinion?

22      A    I knew it was there.  I never read it from

GOVERNMENT
EXHIBIT
71

1    page 1 to the end.

2         Q    Do you know how much had been paid for

3    that opinion?

4         A    I do not, sir.

5         Q    You said that there were private meetings

6    or side meetings prior to the conference room.   Were

7    you party to those private meetings?

8         A    I was not.

9         Q    After Pat Shea indicated he was upset,

10   what then happened?

11        A    I can recall Pat Shea leaving the

12   building.   I could see him through the windows

13   walking outside and being very upset.

14        Q    And then what happened?

15        A    At a later date, and I'm not sure if it

16   was days or a week or two, KPMG's relationship was

17   terminated.

18        Q    How were you notified that it was

19   terminated?

20        A    It was not a written letter.   I went out

21   to the family office to further review other

22   entities, and I remember Michael Egan saying what's

GOVERNMENT
EXHIBIT

72

1          Q    Who was involved in reviewing the form

2    1040 that was filed by the Egans for the year 2001?

3          A    Tim Speiss and myself.

4          Q    You indicated this morning that you didn't

5    know whether or not the return that you reviewed

6    was, in fact, filed?

7          A    That's a correct statement.

8          Q    Did you ever have any understanding or

9    belief that it was not filed?

10          A    The reason for my comment is the return

11    that we gave the Egans contained disclosure of the

12    transaction.  KPMG's relationship was terminated

13    because of that disclosure.  So my sense is it's

14    possible that the return that was filed was not the

15    exact return KPMG signed, i.e., without disclosure.

16          Q    So were you the one who presented the

17    return to the Egans with this disclosure on it?

18          A    Tim Speiss did.

19          Q    Were you there at that time?

20          A    Yes, I was.

21          Q    Where was that?

22          A    It was at the Carruth family office in

GOVERNMENT
EXHIBIT

73

THIS DOCUMENT CONTAINS CONFIDENTIAL MATERIAL

1   page 1 to the end.

2        Q    Do you know how much had been paid for

3   that opinion?

4        A    I do not, sir.

5        Q    You said that there were private meetings

6   or side meetings prior to the conference room.   Were

7   you party to those private meetings?

8        A    I was not.

9        Q    After Pat Shea indicated he was upset,

10  what then happened?

11       A    I can recall Pat Shea leaving the

12  building.   I could see him through the windows

13  walking outside and being very upset.

14       Q    And then what happened?

15       A    At a later date, and I'm not sure if it

16  was days or a week or two, KPMG's relationship was

17  terminated.

18       Q    How were you notified that it was

19  terminated?

20       A    It was not a written letter.   I went out

21  to the family office to further review other

22  entities, and I remember Michael Egan saying what's

GOVERNMENT
EXHIBIT
74

1   he doing here, and I was asked to leaf.

2        Q    And that's how you learned that KPMG had

3   been terminated?

4        A    That's how I learned.  I don't know

5   whether there was formal termination otherwise.

6        Q    Was KPMG ever asked to destroy its files

7   with respect to the return that it had reviewed?

8        A    No, sir.

9        Q    You don't recall any direction for KPMG to

10  destroy the someone form 1040 draft that it had

11  reviewed and put the disclosure notice on?

12       A    Not that I'm aware of.

13       Q    You indicated that the H2 transaction was

14  not a cookie cutter transaction, and my question is

15  did anyone ever tell you that?

16       A    Tim Speiss did.

17       Q    He expressly used those words?

18       A    Not cookie cutter.  He said the

19  transaction is a highly customized transaction, and

20  it's not one that is similar to the short option

21  transaction that they use to market.

22       Q    And there you're referring to it's not

00116

1    A.   Tim Speiss.

2    Q.   Did you ever have any discussions with

3 Mr. Tim Speiss as to whether or not the Egans had

4 asked for an adjustment of their bills in August of

5 2002?

6    A.   My understanding is they fired us and

7 weren't going to pay any more fees.  That's my vague

8 recollection.

9    Q.   Do you have any knowledge as to whether or

10 not the Egans ever instituted litigation against

11 KPMG?

12   A.   Not to my knowledge.

13        MR. LINDQUIST:  No further questions.

14        MR. CURTIN:  I have no questions.  Thank

15 you.

16        THE VIDEOGRAPHER:  The time is 12:35.  We

17 are off the record.

18        (Deposition concluded at 12:35 p.m.)

19

20

21

22

23

24

25

GOVERNMENT
EXHIBIT

75

**Prifti, Robert  6-20-08**                    **Page 116**