UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Nos. 05-40151-FDS 06-40130-FDS |
| v. | ) ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| FIDELITY HIGH TECH ADVISOR A FUND, L.L.C., by the Tax Matters Partner | ) ) ) | |
| Plaintiff, | ) ) | Civil Nos. 06-40243-FDS Civil Nos. 06-40244-FDS |
| v. | ) ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

**UNITED STATES OF AMERICA'S OPPOSITION TO PLAINTIFF'S
MOTION TO EXCLUDE "OTHER TAXPAYER" EVIDENCE**

The plaintiff seeks again to exclude relevant evidence. This time, the plaintiff seeks to exclude highly relevant and admissible evidence relating to the design and promotion of the FDIS and Stock Dribble tax-shelter products at issue here.

The evidence the plaintiff seeks to exclude is not specified in the motion, and is described simply as "other-taxpayer" evidence.[1] The plaintiff appears to seek to exclude all evidence of

---

[1]The plaintiff's failure to identify the evidence it wishes to have excluded makes it impossible to respond completely. It also makes it impossible to determine precisely what relief

(continued...)

other identically structured transactions, also promoted and implemented by the plaintiff's so-called partners and advisors.  It appears that the plaintiff's motion even applies to the generic memoranda, outlines, and draft opinion letters it received from the promoters.  Those documents describe in detail the cookie-cutter transactions the taxpayers, Richard and Maureen Egan, bought.

The evidence of other taxpayer transactions is highly relevant to the issues before the Court.  Specifically, the evidence is necessary to determine whether the tax-shelter products the taxpayers bought were, *as designed and implemented*, objectively devoid of economic substance. That objective look at whether these transactions had any non-tax economic substance requires examination of whether there was a reasonable possibility of a non-tax profit from the transactions, as designed and implemented.  Moreover, this evidence is also critical in determining whether the Fidelity International transaction, when viewed objectively, could  have produced a reasonable potential for profit for the taxpayer's purported partners, Samuel Mahoney, Alpha, and Helios.  This evidence will be particularly helpful on this issue because taxpayer's purported partners were also partners in many other similar transactions.

Contrary to the plaintiff's argument, this evidence will not be used to show whether the other taxpayers had a legitimate business purpose in entering into these transactions, which is a subjective determination.  Nonetheless, this similar-transaction evidence will show, if not conclusively prove, that the principal purpose of all of these cookie-cutter generic transactions was to reap massive tax benefits.  This conclusion would tend to undermine the taxpayer's

---

[1](...continued)
the plaintiff seeks.  Attached hereto as Appendix 1 is a summary list of the exhibits identified on the U.S.'s exhibit list which plaintiff may consider to be other-taxpayer evidence.  As discussed herein, all of this evidence is highly relevant to multiple issues in this case.

assertion that he had a primary non-tax business purpose for entering these transactions.

The evidence will also show that the transactions were meticulously preplanned as part of a prepackaged scheme designed to generate artificial tax benefits. As such, the step-transaction doctrine, among other things, requires the disregard of these intermediate, tax-motivated steps, and the disregard of Fidelity International and Fidelity High Tech as valid partnerships for tax purposes.

There is no provision that could possibly allow the plaintiff to prevent the United States from demonstrating the falsity of the plaintiff's assertions that it entered into unique rather than cookie-cutter transactions and that these were not mass-marketed tax shelters designed to generate artificial tax benefits. To the contrary, the First Circuit is clear that this type of evidence is admissible and goes to objective determinations about the transactions, notwithstanding a taxpayer's self-serving claims of its own subjective intent. *See Dewees v. Commissioner*, 870 F.2d 21, 35 (1st Cir. 1989). The evidence the plaintiff seeks to exclude will serve as rebuttal to the plaintiff's self-serving claims in this case. It will also serve to demonstrate affirmatively that, among other things, these transactions lacked economic substance and that the steps of the transactions were meticulously preplanned to generate artificial tax benefits. This evidence is not only admissible, but also essential, and the plaintiff's motion should be rejected out of hand.

## Background

While the plaintiff argues that these "other taxpayers" are "strangers" to the "partnership," that assertion is demonstrably false. The design and promotion of these products was performed by, among others, Alpha, Helios, and The Diversified Group Inc. (DGI). Alpha and Helios became "partners" in the plaintiff "partnership," Fidelity International. (Pl.'s Resp. to Interrog. 34; Compl. at ¶ 34.) They were also, according to the taxpayers, advisors on the

transactions.  (Pl.'s Resp. to Interrog. 19.)  In fact, the taxpayers and their in-house advisors made

sure before going forward with their tax-shelter purchases that Helios and Alpha had

implemented tax-shelter products like these before.  (*See* Govt. Ex. 1.)  These and the plaintiff's

other factual misstatements are no-doubt intended to divert attention from the fact that the

plaintiff was well aware that the "other taxpayers" had implemented the same tax shelters,

structured the same way, and that, as meticulously preplanned, these transactions had no

reasonable possibility of non-tax profit and were devoid of any economic substance and

legitimate non-tax purpose.

## Argument

### I.     The Evidence the Plaintiff Moves To Exclude is Relevant and Admissible.

This evidence is admissible under Federal Rule of Evidence 402 because it is relevant,

and, in fact, highly relevant.  Under Federal Rule of Evidence 402, which the plaintiff fails even

to address, all relevant evidence is admissible.  Rule 401 defines relevant evidence to be

"evidence having any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the

evidence."  The evidence the plaintiff seeks to exclude is relevant to rebut the plaintiff's claims

that it engaged in unique transactions that were not mass-marketed, (See *Fidelity Int'l* Compl. at

¶ 23; *High Tech* Compl. at ¶ 24), and to demonstrate that the claimed tax benefits do not survive

the application of the economic-substance and step-transaction doctrines.  In the context of this

type of mass-marketed tax-shelter product, the First Circuit has specifically included this type of

evidence in the scope of evidence deemed relevant.  As the First Circuit held, this type of

evidence is admissible to demonstrate the objective features of a transaction notwithstanding the

taxpayer's self-serving claims of his own subjective intent.  *See Dewees v. Commissioner*, 870

F.2d 21, 35 (1st Cir. 1989) (Breyer J.).  As the First Circuit explained, it "might not be reasonable to think a coin was unbalanced because it lands 'heads' once, but that conclusion becomes far more reasonable when 'heads' turns up 1,100 times in a row."  *Id.* at 32.  The plaintiff would prefer that only its self-serving testimony about only one proverbial coin flip be admitted; but, the plaintiff's wishes in that regard have no support in, and in fact, as next discussed, contradict, the settled law. [2]

## II.    Other Taxpayer Transactions Have Frequently Been Admitted in Evidence.

The courts have repeatedly recognized that evidence relating to other-taxpayer transactions involving the same tax-shelter product is relevant to the economic substance analysis.  In *Sochin v. Commissioner*, 843 F.2d 351 (9th Cir.), *cert. denied,* 488 U.S. 824 (1988), the taxpayers argued that the Tax Court improperly considered evidence of other-investor transactions involved in the same program.  In rejecting this contention, the Ninth Circuit stated:

> The tax court admitted evidence of other investor transactions in the GGS program as relevant to the sham determination.  As discussed above, at least part of the sham analysis focuses on the "economic substance" of the transaction; i.e. whether it was "likely to produce economic benefits aside from a tax deduction."  A consideration of the entire investment program directly relates to the analysis of Taxpayers' probable economic benefits.  It is also directly relevant to the court's assessment of Taxpayers' credibility with respect to their assertions of a non-tax based motive.

*Sochin* at 355 (citations omitted). *See also*, *Karme v. Commissioner,* 673 F.2d 1062 (9th Cir. 1982).

Moreover, the Court of Federal Claims recently made clear in *Jade Trading, LLC v.*

---

[2] We incorporate by reference our opposition to plaintiff's motion to quash our subpoena issued to KPMG. (Docket Entry No. 19.)  In that memorandum, we cited the abundant case law, including some recent cases, holding that evidence of other-taxpayer transactions is relevant to support the application of the economic substance and step transaction doctrines to the taxpayer's transaction.

5

*United States*, 65 Fed.Cl. 188  (2005), involving a tax shelter product similar to the one employed here, that one of the indicia of a sham transaction is that the transaction has been structured identically for all participants:

> Importantly for purposes of the present motion, the Tax Court held that evidence of the promoters' dealings with participants other than the petitioners was "admissible in order to determine whether the transactions with petitioners [were] bona fide." *Id.* at 972 n. 6.   In analyzing whether the transactions at issue were shams, the Court noted that the contracts at issue operated identically for all other participants.  *Id.* at 988.

*Jade Trading, LLC v. United States*, 65 Fed.Cl. 188, 191 (2005)*.  See also*, *Douglas v. United States*, 410 F. Supp. 2d 292, 297-298 (S.D.N.Y. 2006); *Stobie Creek Invs., LLC v. United States*, Ord. on Mot. to Exclude Pattern Evidence (Fed. Cl. 2008) (Govt. Ex. 2).  *Accord, Brannen v. Commissioner*, 78 T.C. 471 (1982), *aff'd*, 722 F.2d 695 (11th Cir. 1984), (court admitted evidence with respect to nineteen other similar partnerships); *Barrister Equipment Associates Series # 115, Barrister Associates, Tax Matters Partner v. Commissioner of Internal Revenue*, T.C. Memo. 1994-205, (court found evidence of the activities of a shelter promoter and his controlled and affiliated entities relevant to whether the transactions at issue had economic substance and were entered into with a profit objective).  Incredibly, despite the fact we have cited much of this case law in opposition to earlier discovery motions by the plaintiff seeking to exclude similar-transaction evidence, plaintiff makes not a whit of mention of any of this case law in its memorandum.

Rather, in seeking to exclude this evidence, the plaintiff notes that the First Circuit has repeatedly upheld transactions even if they were not motivated by a non-tax business purpose. (Pl.'s Mem. at 22-23.)   But, this case law does not lend support to plaintiff's position. What the First Circuit held in those cases is that the transactions there at issue were not fictitious and had

genuine substance. See, *e.g. Stone v. Commissioner*, 360 F.2d 737, 740 (1st Cir. 1966); *Fabreeka Products Co. v. Commissioner*, 294 F.2d 876, 878 (1st Cir. 1961). Yet the similar-transaction evidence here, which plaintiff seeks to exclude, will make eminently clear that the taxpayers' transactions were completely bereft of substance. That is, this evidence will show that all of the similar FDIS and Stock Dribble transactions were similarly designed and implemented, and could not objectively have, especially when taking into account the promoters' uniformly exorbitant fees and costs, a reasonable potential for profit. As the Seventh Circuit held in *Yosha v. Commissioner*, 861 F.2d 494, 498-499 (7th Cir. 1988) (26 U.S.C. § 165(c), "A transaction not 'entered into for profit' is, at the least . . . , a transaction that lacks economic substance." (Internal citations omitted.)

The objective test for economic substance also lies at the heart of *Dewees*. The *Dewees* Court affirmed the relevance of other-transaction evidence in determining the objective lack of economic substance of the taxpayers' transaction. The plaintiff nonetheless spends much of its brief trying to distinguish *Dewees*; but, its attempts amount to a distinction without a difference. For example, contrary to plaintiff's contention, for purposes of relevancy, it can make no difference whatsoever whether the other taxpayers engaging in similar transactions are or are not parties in the suit. (Pl.'s Mem. at 25.) The simple fact is that the First Circuit in *Dewees* recognizes the relevance of this evidence, and the plaintiff has not overcome this holding, which is simply irreconcilable to its position on its motion.

III.    **Plaintiff's Argument Seeking to Exclude the Characteristics Which Its Transactions Have in Common with Other Similar FDIS and Stock Dribble Transactions is Meritless**.

Seeming to recognize the relevance of other-transaction evidence, the plaintiff erroneously contends that the objective similarities should be disregarded because of the

7

speculative possibility that the other purchasers may have intended different outcomes.  (Pl.'s Mem. at 11-12, 21 n62.)  As an initial matter, the similarities between the dozens of transactions is a matter to be determined at trial, and not a matter which can be decided based on arguments in a motion.  That is especially so where the plaintiff seeks to exclude the very evidence that can demonstrate the similarities.  Beyond that, in making its argument, the plaintiff disregards the numerous remarkable similarities between these transactions, and the fact that the promoters (such as DGI, Helios, Alpha, and Refco) treated them as a single line of business with nearly identical structures and characteristics.  Those characteristics are also demonstrated through the very evidence the plaintiff seeks to exclude. The characteristics shared by all or almost all of the FDIS transactions, for example, include the following:

1.    Use of single member LLCs (disregarded for tax purposes) and multi-member LLCs ("MMLLCs") (treated as partnerships);

2.    Execution by the single-member LLC ("SMLLC") of option pairs (one long and one short), with counterparty Refco having the following characteristics:

      a.    Highly liquid underlying assets,

      b.    Identical expiries,

      c.    Digital payoffs in insignificantly different amounts,

      d.    Imposition of large fees by Refco in amounts based upon the net exposure from the combined position rather than the individual option values,

      e.    Extremely large premiums with small actual net economic cost, and

      f.    Probability of only between 20% and 30% for a favorable outcome on the options,

3.    Taxpayer's transfer of SMLLC ownership to the MMLLC, thus transferring the options to a "partnership;"

4.    Assertion by the taxpayer that his basis in the MMLLC was increased by the premium charged for the contributed long options, while the premium received for the short options should be disregarded;

5.    Participation of either Samuel Mahoney or Martin Hawkes as a foreign "partner" in the transaction, initially holding a large percentage of the common interests in the MMLLC at a comparatively small cost which was funded by the transaction's promoters;

6.    Subsequent execution of additional pairs of options by the MMLLC, sharing the same characteristic as the initial options;

7.    Termination and simultaneous replacement of a portion of the MMLLC's options in a way that had no impact on their risk/reward profile, generated no proceeds to be distributed, and was claimed to produce extremely large losses;

8.    Allocation of the majority of the claimed losses to the foreign "partner," based upon his common-ownership share;

9.    Transfer of most of foreign "partner's" interest to the taxpayer at a discounted price;

10.    Early termination of the MMLLC-generated options, with losses in amounts that parallel the previously recorded bookkeeping "gains;"

11.    Allocation of the claimed "losses" principally to the taxpayer based on his recently increased common-ownership share;

12.    Based upon the early terminations, tax losses recorded in the same tax year rather than the next year in which the options were originally scheduled to expire; and

13.    Extremely large fees to DGI/Helios and the accounting firms based on a percent of the long option premiums on the basis-generating options, which equated to the taxpayer's desired loss on the transaction.

The upshot of this identical structuring is that there was little or no profit potential – particularly given exceptionally large expenditures on professional "fees"– and massive tax losses claimed with trivial actual economic losses, all resulting from a complex set of meticulously preplanned steps carried out in the same sequence with many of the very same parties. As Dr. Kolbe stated in his declaration in opposition to the plaintiff's denied motion to exclude expert testimony, with respect to FDIS, "these transactions involve eight basic steps" . . . which conclusion is tested "by reference to data on 46 other, similar sets of transactions undertaken at about the same time under the guidance of the same advisors." (Kolbe Decl., *Fidelity Int'l* Docket Entry No. 272 Ex. 1, at 15.)

There are numerous demonstrations that the promoters and even the taxpayers themselves understood these transactions to be exemplars of standard tax-reduction products marketed and promoted by Helios, Alpha, and DGI. DGI and Helios prepared Investor Fact Sheets showing the amount of each taxpayer's desired loss, and whether the sought-for loss was to be capital or ordinary (or a combination of the two). So-called Outlines of Proposed Transaction detailed the pre-planned steps to achieve this end. Standard or Model legal opinions – redacted to exclude the participants of prior transactions – were used as marketing tools and were frequently provided to potential buyers. Participants were tracked on a single customer list both by the promoters and by Refco. Fees for legal opinions and accounting fees were frequently grouped together and paid by DGI and Helios as an aggregate expense. Finally, and most critically, the promoters funded the purported foreign investors in the FDIS transactions, Mahoney and Hawkes, on an aggregate basis. For their services, Mahoney and Hawkes were paid an aggregate fee totaling $2,000,000. In so doing, the promoters themselves implemented these transactions in the aggregate, not as separate stand alone transactions. Thus, the United States' proposed use of pattern evidence is

not only highly relevant, but necessary to unravel the full extent of the sham.

Despite the plaintiff's argument, slight alterations, all in line with the identical and preplanned structure, do not affect admissibility. The evidence will demonstrate the fallacy of the plaintiff's argument, assuming the plaintiff is not successful in its motion aimed at hiding that evidence. The fact is that this evidence is relevant to a number of issues central to these cases.

### A.    This Evidence is Relevant to Rebut Plaintiff's Factual Allegations.

The evidence the plaintiff seeks to exclude will be introduced to demonstrate, among other things, that, despite the plaintiff's repeated contrary assertions, the transactions here were, in fact, cookie-cutter transactions that were devoid of economic substance and a primary business-purpose beyond the generation of massive and artificial tax benefits. In fact, just as set forth in the so-called Investor Fact Sheets and Outlines of Proposed Transaction, the evidence shows that the tax-shelter products the taxpayers purchased each followed a template, consisting of a series of integrated transactional steps to generate fictitious tax benefits, that dozens of other taxpayers also purchased from the same promoters. The cookie-cutter nature of these transactions can be sufficiently demonstrated only by the presentation of the templates, which can be additionally illustrated by a summary exhibit. Those templates are contained in the marketing materials from the promoters, and, among other places, in what the promoters called closing binders. Those closing binders were prepared for every FDIS and Stock Dribble transaction, and include a rather voluminous transaction summary for each transaction. The summaries leave no doubt that the dozens of transactions were identically structured and not remotely individualized.

### B.    This Evidence is Relevant to Show Lack of Economic Substance.

In addition, this evidence is relevant because it shows, among other things, that the taxpayers' transactions, when objectively viewed under the economic-substance test, had a

11

predetermined outcome that was entirely tax motivated and devoid of economic substance. Under the economic-substance doctrine, transactions that are invented solely to create tax deductions and otherwise have no economic substance, even though formally complying with the letter of the Internal Revenue Code, will not be recognized. *Knetsch v. United States*, 364 U.S. 361 (1960); *Dewees v. Commissioner*, 870 F2d at 35.[3]  Part of the test for determining economic substance requires an objective inquiry into whether the transaction had a reasonable possibility of generating a non-tax profit. *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778, 781-82 (5th Cir. 2001) (internal citation omitted; emphasis added).  The other part of the test requires a subjective inquiry into whether there existed a tax-independent business purpose for the transaction. *Id.*  This evidence is relevant to both the objective and subjective tests.

The objective test looks at the design of the tax shelters.  The design of these tax shelters, as with the design of any standardized product, can be gleaned only by looking beyond one purchaser's self-serving statements.  That dozens of other participants also claimed enormous tax benefits from their implementation of nearly identical transactions, employing the identical steps, following identical outlines, demonstrates that the deals were not in fact designed to make money, but to produce artificial tax benefits.

**C.     Evidence is Relevant to Rebut Plaintiff's Claims of Non-Tax Business Purpose.**

The pattern established by this evidence is also relevant to the Court's assessment of the plaintiff's credibility in asserting a valid business purpose for the transaction. *Sochin v. Comm'r*,

---

[3]*See also*, *Coltec Indust., Inc. v. United States*, 454 F.3d 1340, 1355 (Fed. Cir. 2006) ("the law does not permit the taxpayer to reap tax benefits from a transaction that lacks economic reality"); *Executive Jet Aviation, Inc. v. United States*, 125 F.3d 1463, 1469 (Fed. Cir. 1997); *Yosha v. Commissioner*, 861 F.2d 494, 497 (7th Cir. 1988).

843 F.2d at 355. Courts have consistently acknowledged the relevance of evidence of similar

transactions in evaluating the credibility of claims as to the subjective economic substance of a

transaction. *See*, *e.g.*, *Sochin*, 843 F.2d at 355; *Karme v. Commissioner*, 673 F.2d 1062, 1064

(9th Cir. 1982); *Brown v. Comm'r*, 85 T.C. 968, 972 n.6 (1985); *Brannen v. Comm'r*, 78 T.C.

471, 512 (1982), aff'd, 722 F.2d 695 (11th Cir. 1984); *see also*, *Fox v. Comm'r*, 82 T.C. 1001,

1017 (1984) (considering the transaction details of other investors in its analysis of taxpayers'

profit motive). The relevance of this evidence to the subjective prong of the economic-substance

test is more pronounced here, where the plaintiff's so-called partners, Helios/DGI and Alpha,

were also partners in the other FDIS transactions. Thus, the evidence will be able to show

whether Helios/DGI and Alpha entered into these transactions as partners for a legitimate non-tax

profit motive or whether they did so to facilitate a highly-egregious series of tax avoidance

transactions. That issue is, in turn, highly relevant as to whether Helios and Alpha were real

partners in Fidelity International and also whether this purported partnership had a valid business

purpose.

Moreover, this evidence will also show whether the foreign partner, Samuel Mahoney, and

his business associate, Martin Hawkes, could possibly have entered into these transactions with a

profit-making objective. As expert testimony will show, the foreign partner's purported capital

investment in these transactions was predestined from the outset to be an economic disaster.

While such an abysmal outcome is possibly understandable if it occurs once or a few times

(*Dewees,* 870 F.2d 32), it would make absolutely no economic sense to consistently make such

money-losing "investments" by investing in the same type of venture on forty-six separate

occasions in a period of a little over three months. (Kolbe Expert Report, *Fidelity Int'l*, at 75-

76.) Yet that is what this evidence will show and that is also why this evidence of similar

13

transactions is so powerful and why plaintiff so desperately wants to exclude it.

The plaintiff persists in its allegations– wrong on both the law and the facts– that this evidence relates to the "activities of other taxpayers whom plaintiff does not know," (Pl.'s Mem. at 21), and that, as such, the evidence is not relevant. (*Id.*) While relevant even if the other tax-shelter participants were strangers, the others were well known to the plaintiff's partners and so-called advisors. Helios and Alpha, the plaintiff's so-called partners, were involved in every one of these transactions. (*See*, *e.g.*, Govt. Ex. 3.)

As a partnership proceeding, evidence must be presented as to all of the purported partners and not just as to the Egans. Those partners include the promoters, such as Helios and Alpha. As such, the plaintiff is essentially seeking to exclude evidence relating to the very products two "partners" sold to a third– the taxpayers– so that the taxpayers' and their in-house advisors' self-serving statements can stand alone and unchallenged. But, because all relevant evidence is admissible, the plaintiff cannot succeed. The plaintiff would like to have this trial be nothing more than a parade of family members and employees who will undoubtedly make a myriad of self-serving statements. But, as described above, those self-serving statements must be viewed in the context of other relevant evidence.

Notwithstanding the falsity of the plaintiff's argument that these are strangers, the plaintiff's argument that this evidence should be excluded under Rule 403 is untenable on other grounds. Even assuming, *arguendo*, that the other purchasers of these products are strangers, this strawman can be put aside quickly. The United States is not offering this evidence to prove the taxpayers' subjective intent. In fact, it is the plaintiff that has claimed repeatedly that it intended to make an investment and not to enter into an abusive tax shelter. This evidence does not relate to the subjective intent of dozens of other purchasers either. Rather, it relates to the objective

14

facts of the other transactions sold by the same promoters and so-called partners.  The First

Circuit summed it up in *Dewees*, holding that "the objective features of transactions like those

here at issue are sufficient to overcome a taxpayer's own account of his profit-seeking state of

mind."  Dewees, 870 F.2d at 35 (citing *Miller v. Commissioner*, 84 T.C. 827, 836-37 (1985),

rev'd on other grounds, 836 F.2d 1274 (10th Cir.1988); *Smith v. Commissioner*, 78 T.C. 350

(1982); *Siegel v. Commissioner*, 78 T.C. 659, 699 (1982);  *Bessenyey v. Commissioner*, 45 T.C.

261, 273-74 (1965), aff'd, 379 F.2d 252 (2d Cir.1967); *Fleischer v. Commissioner*, 403 F.2d 403,

406 (2d Cir.1968).  The evidence also relates to the subjective intent of the other "partners"–

Helios and Alpha– which is imputed to the plaintiff.

> **D.     This Evidence is Relevant to the Application of the Step-Transaction Doctrine.**

This evidence is also relevant to the application of the step-transaction doctrine, which

provides that "interrelated yet formally distinct steps in an integrated transaction may not be

considered independently of the overall transaction." *Comm'r v. Clark*, 489 U.S. 726, 738

(1989).  In the partnership context, application of the doctrine can result in a conclusion that a

partnership, such as the plaintiff, be disregarded.  It may also result in a conclusion that a

taxpayer, such as Richard Egan, never became a member of a partnership, or that transactions

should be attributed to a partner rather than the partnership. *See, e.g.*, *Andantech v. Comm'r*, 331

F.3d 972, 978 (D.C. Cir. 2003).  Plaintiffs contend that the creation of Fidelity International and

Fidelity High Tech, the purchase of offsetting digital options, and the various subsequent steps

were undertaken independently for business reasons.  This evidence – along with other evidence

the United States will offer at trial – will prove, however, that these steps were preplanned and

integrated, as part of a prepackaged scheme designed to generate artificial tax benefits.  As such,

the evidence demonstrates that the step-transaction doctrine, among other things, compels the disregard of these intermediate, tax-motivated steps, as well as Fidelity International and Fidelity High Tech as valid partnerships for tax purposes.

It is only by incorrectly claiming that this is character evidence that the plaintiff inappropriately avoids discussing admissibility under Rule 402. But, 404(b) has no application here. It provides, in relevant part, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The evidence here is not intended to prove Richard Egan's character or propensity, or anyone else's for that matter. The evidence will not be offered to show "character" or "action in conformity therewith" on a particular occasion. It will be used to show, among other things, the design of cookie-cutter products that lack economic substance. The features of these products do not fall within the ambit of character evidence of *persons* as described in Rule 404(b). Accordingly, Rule 404(b) does not provide any basis to exclude the evidence.[4]

## IV. This Evidence is Admissible Also Under Rule 1006.

While the plaintiff has failed to identify the evidence it wishes to exclude, the United States believes that much of the evidence relating to other iterations of these tax-shelter products will be presented through the use of summary exhibits. Those summary exhibits would also be admissible. The contents of voluminous records may be presented at trial as a summary if the records underlying the summary are admissible in evidence and are made available to the opposing party at a reasonable time and place. Fed. R. Evid. 1006; *Conoco Inc. v. Dep't of*

---

[4]Not only does the main prohibition of Rule 404(b) not apply, this evidence would clearly fall within one of the rule's numerous exceptions, including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

*Energy*, 99 F.3d 387, 393 (Fed. Cir. 1996); *Jade Trading v. United States*, 67 Fed. Cl. 608, 613

(2005). The United States intends to establish the admissibility of the underlying documents at

trial. The underlying documents were all produced to plaintiff during discovery in this case.

The plaintiff alleges, but provides no support for the allegation, that the United States is

withholding the very evidence it used to identify these other transactions. That allegation is

false. The other transactions were identified through the documents produced by the promoters,

including Helios, Alpha, and DGI. All of those documents were provided to the plaintiff. To the

extent the number of known and identical transactions changed from time to time, it was because

new information was produced to both parties that showed that some other transactions were

implemented in other years, or were dissimilar, or were incompletely described in the produced

documents and therefore could not be relied on as similar. To the extent the plaintiff is aware of

other FDIS or Stock Dribble transactions, it may identify them and seek the supporting

documents' admission. But, it is impossible to comprehend how the plaintiff argues that this

evidence is inadmissible because other FDIS and Stock Dribble transactions, which are yet

unidentified, are not included.[5]

While the United States disagrees with plaintiffs' characterizations of this evidence as

"incomplete" and "selective," more fundamentally, these arguments misapprehend the

requirements of Rule 1006. A party offering a summary of voluminous documents is not

_____

[5]The plaintiff also puts forth the red herring that there are incomplete records of the other
tax-shelter participants. The issue is the design and implementation of these products, not the
subjective motivations of the other participants. As described earlier, this evidence is not being
used to show subjective intent of the other taxpayer-participants. The subjective motivations of
the other participants is of no relevance and cannot lend support to the motion. That is
undoubtedly why the plaintiff complains that it must learn more about the other participants, but
never states whether it would be better or worse for the plaintiff if the other participants entered
into the same cookie-cutter transactions but under a different set of subjective circumstances.

required to summarize everything contained on all documents – that would defeat the purpose of the summary.  A summary needs only to accurately reflect the material that is selected to be summarized.  *See*, *e.g.*, *United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004) ("a chart summarizing evidence must be an accurate compilation of the voluminous records sought to be summarized"); *United States v. Taylor*, 210 F.3d 311, 315-16 (5th Cir. 2000) ("A necessary precondition to the admission of summary charts is that they accurately reflect the underlying records").  Indeed, a summary can properly include only the evidence favoring one party.  *United States v. Bishop*, 264 F.3d 535, 547 (5th Cir. 2001); *United States v. Swanquist*, 161 F.3d 1064, 1073 (7th Cir. 1998) ("A party is not obligated . . . to include within its charts or summaries its opponent's version of the facts.").  Any summary evidence here would accurately reflect the underlying documents, as will be shown when authenticated at trial.

Given the admissibility of this evidence by summary or other means, the plaintiff's argument relating to Rule 703 is a non-starter.  The experts may use admissible evidence under Rule 703.[6]

---

[6]In fact, the experts could even use inadmissible evidence deemed sufficiently probative. (Fed.R.Evid. 703).

**Conclusion**

The Plaintiff's motion to exclude should be denied because the other-transaction evidence is not only highly relevant to the factual issues in this case, but also necessary to unravel the full extent of the sham upon which plaintiff's own claims are grounded.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

/s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Tax Division,    U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

JOHN A. LINDQUIST
BARRY E. REIFERSON
HEATHER L. VANN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044-0055
Telephone: (202) 307-6561
Facsimile:  (202) 514-5238
E-mail:    john.a.lindquist@usdoj.gov
            barry.e.reiferson@usdoj.gov
            heather.vann@usdoj.gov

Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and copies will be sent to those indicated as non registered participants on September 3, 2008.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

APPENDIX 1

1.    The Investor Fact Sheets and Outlines of Proposed Transaction for the 2001 FDIS
      transactions have been identified by the United States on its list of exhibits to include
      EX1124, EX1320, EX1212, EX1194, EX1317, EX1357, EX1354, EX1028, EX1029,
      EX1030, EX1041, EX0909, EX0920, EX0950, EX0957, EX0958, EX0959, EX0960,
      EX0965, EX0971, EX1024, EX1025, EX1026, EX1031, EX1044, EX1051, EX1055,
      EX1056, EX1063, EX1079, EX1090, EX1122, EX1123, EX1132, EX1134, EX1255,
      EX1256, EX1316, EX1321, EX1331, EX1284, EX1144, EX1330, EX1333, EX1142,
      EX1332, EX1336, EX1293, EX1204, EX1211, EX1375, EX1163, EX1193, EX1335,
      EX1745, EX1713, EX1650, EX1755, EX2076, EX2081, EX1259, EX1157, EX1247,
      EX1169, EX1340, EX1351, EX1347, EX1341, EX1339, EX1246, EX1322, EX1314,
      EX1349, EX1270, EX1205, EX1140, EX1141, EX1369, EX1311, EX1036, EX1137,
      EX1260, EX1265, EX1291, EX1294, EX1297, EX1248, EX1313, EX1301, EX1299,
      EX1345, EX1312, EX1156, EX1222, EX1220, EX1274, EX1273, EX1272, EX1271,
      EX1228, EX1283, EX1304, EX1254, EX1370, EX1305, EX1296, EX1348, EX1261,
      EX1231, EX1196, EX1155, EX1346, EX1300, EX1318, EX1319, EX1342, and EX1152.

2.    The Draft and Marketing Opinions for the FDIS and Stock Dribble products have been
      identified by the United States on its list of exhibits to include EX0850, EX0864,
      EX0880, EX0881, EX0882, EX0883, EX0884, EX0886, EX0888, EX0897, EX0898,
      EX0906 EX0933, EX0994, EX1545, EX1602, EX1603, EX1608, EX1610, EX1612,
      EX1613, EX1614, EX1615, EX1620, EX1623, and EX1659.

3.    Checklists for Implementation of the 2001 FDIS transactions have been identified by the
      United States on its list of exhibits as EX1549, EX1550, EX1551, EX1552, EX1553,
      EX1554, and EX1555.

4.    Alpha's Summary of the generated tax benefits for the 2001 and 2002 FDIS transactions
      have been identified by the United States on its list of exhibits to include EX1491,
      EX1490, EX1611, EX1435, EX1438, EX1440, EX1470, EX1657, EX1660, EX1147,
      EX1489, EX1493, EX2110, EX2109, EX2107, EX2105, EX2106, and EX2108.

5.    The 2001Forms 1065, U.S. Partnership Tax Returns, for the 2001 FDIS transactions have
      been identified by the United States on its list of exhibits as EX1618, EX1619, EX1543,
      EX1616, EX1782, EX1783, EX1784, EX1785, EX1786, EX1787, EX1788, EX1789,
      EX1790, EX1791, EX1792, EX1793, EX1794, EX1795, EX1796, EX1797, EX1798,
      EX1799, EX1800, EX1801, EX1802, EX1803, EX1804, EX1805, EX1806, EX1807,
      EX1808, EX1809, EX1810, EX1811, EX1812, EX1813, EX1814, EX1815, EX1816,
      EX1817, EX1818, EX1819, EX1820, EX1821, EX1822, EX1823, EX1824, EX1825,
      EX1826, and EX1827.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, L.L.C., by the Tax Matters Partner, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Nos. 05-40151-FDS |
| | | 06-40130-FDS |
| v. | ) ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| FIDELITY HIGH TECH ADVISOR A FUND, L.L.C., by the Tax Matters Partner | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Nos. 06-40243-FDS |
| | | Civil Nos. 06-40244-FDS |
| v. | ) ) | Judge Saylor |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

**DECLARATION OF BARRY E. REIFERSON**

I, Barry E. Reiferson, pursuant to the provisions of 28 U.S.C. §1746, certify as follows:

1.     I am a Trial Attorney with the U.S. Department of Justice, employed in the Tax Division, Northern Region, with a post of duty at Washington, D.C.

2.     I am one of the assigned trial attorneys for defendant United States in this case.

3.     I make this declaration based upon my personal knowledge and the documents referenced herein.

4.     The documents attached as Government Exhibits 1 and 3 are true and correct copies of

documents obtained by the United States in discovery in this case.  Government Exhibit 2 is a

true and correct copy of an Order of the Court of Federal Claims.

       I declare under penalty of perjury that the foregoing is true and correct.

       Executed in Washington, D.C., on this 3rd day of September, 2008

               /s/ Barry E. Reiferson
               BARRY E. REIFERSON
               Trial Attorney, Tax Division
               U.S. Department of Justice
               Post Office Box 55
               Ben Franklin Station
               Washington, D.C.  20044
               Telephone: (202) 514-6058

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants identified on the Notice of Electronic Filing and paper copies will be sent to
those indicated as non registered participants on September 3, 2008.

/s/ Barry E. Reiferson
Trial Attorney, US Department of Justice, Tax Division

MEMO RE. Due Diligence Helios Financial LLC

TO· file
FROM: Pat Shea
DATE: July 21, 2000

Objective – before entering in to a significant transaction with Helios as a facilitator we wanted reasonable assurance they were experienced in transactions of this size and could handle our deal.

References—

KPMG- John Schrier, Partner has worked with Jim Haber for several years.  He assured me that :
Helios has handled deals this size.
They have a great reputation in the field.
They have the necessary financing relationships.
KPMG did an internal background check on them. He could not provide me a copy but assured me that it was a very favorable report.  KPMG does an extensive check in to the business practices and personal backgrounds of businesses that they partner with.They found that Jim Haber had some litigation against him as a result of a messy divorce.  KPMG was not too concerned because it was personal and brought by disgruntled ex-spouse.
 In late 80's early 90's litigation was brought against Haber by unhappy participant in a tax shelter deal that went sour. Everyone involved was sued (including Jim Haber). The suit was dropped and determined without merit.
Jim is involved in another business Diversified Partners that runs similar deals.
He has a second company because he has different partners. My references were positive for either entity and Jim Haber individually.

Stephanie made a couple of calls to Bank Of America and received glowing reports.
Highly reputable
Well respected in financial circles
High level of integrity

She also spoke with an attorney that has done some legal work on one of their transactions and was told they performed everything they promised and the deal took place without a hitch.

She felt a comfort level with them based on the information that we had  and the fact  that we got them through KPMG.

I spoke w Jordan Dickstein of Paine Webber in NY who has handled some deals with Helios and Haber
Very efficient
Very reliable organization



036036

Have worked together on several deals and have never had any problems
This is a larger deal in size than he has personally worked on but much less complicated
than some of the others.
Highly recommend Helios


Ira Akselrad
Proskauer Rose LLP (large NY law firm)
They have done several deals with Jim Haber and his group Helios—many larger than
100m
All have gone off without a hitch
They refer firm clients to them on a regular basis
Very timely with delivering all paperwork and reports
Very thorough and a straight dealer
Very favorable reference

036037

# In the United States Court of Federal Claims

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| **STOBIE CREEK INVESTMENTS, LLC, and** | \* | |
| **JFW ENTERPRISES, INC.,** | | |
| | \* | |
| | | |
| Plaintiffs, | \* | |
| | | |
| v. | \* | No. 05-748T & 07-520T |
| | | |
| **THE UNITED STATES,** | \* | (Filed Mar. 20, 2008) |
| | | |
| Defendant. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER ON MOTION *IN LIMINE* TO EXCLUDE PATTERN EVIDENCE OR, ALTERNATIVELY, TO COMPEL

Plaintiffs on February 19, 2008, filed Plaintiffs' Motion *in Limine* To Exclude Non-Party "Pattern" Evidence or in the Alternative Motion To Compel. Defendant responded on March 19, 2008. See Order entered on Dec. 10, 2007, ¶ 2 (notifying parties that, pursuant to RCFC 7.2(a), motions in limine subject to ruling without reply briefs).

This is the first evidentiary ruling requested by plaintiffs that carries the whiff of desperation. Plaintiffs cannot be allowed to introduce evidence that the Stobie Creek partnership transactions – the subject of this refund action – were designed or structured for the Welles family, or that they were unique to the Welleses, or were not marketed to many individuals to increase the basis of assets unless defendant has the correlative opportunity to rebut the evidence. The "Spreadsheet Prepared by Barbara Aprile," DX 649, see Order entered Mar. 14, 2008 (granting, in part, motion to compel), is offered pursuant to Fed. R. Evid. 1006 as a summary chart to rebut any such assertions. Either plaintiffs may abandon their arguments on point, or defendant may offer a properly authenticated exhibit that meets the foundational requirements of Rule 1006 (and defendant represents that the chart is compliant, see Def's Br. filed Mar. 19, 2008, at 4 & n.4, 4-5 n.5). If plaintiffs are changing their litigation strategy on point, they shall notify defendant as soon as possible.

Even if plaintiffs no longer intend to prove that the Stobie Creek transactions were not based on a template offered to many individuals by one law firm and implemented by one

GOVERNMENT
EXHIBIT

2

investment bank, the summary chart, DX 649, may be offered to support defendant's case under the economic substance and step-transaction doctrines. While defendant deprecates plaintiffs' arguments that the Stobie Creek transactions were unique as "melt[ing] under the application of the economic substance and step transaction doctrine," see id. at 5, these arguments cannot prevent defendant from adducing pattern evidence in order to characterize the Stobie Creek transactions under these two doctrines.

The economic substance doctrine has been applied by courts for over seventy years, and its application has recently been reaffirmed by the Federal Circuit in Coltec Industries v. United States, 454 F.3d 1340, 1351-53 (Fed. Cir. 2006). The economic substance doctrine requires "disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality." Coltec, 454 F.3d at 1352. Although taxpayers have "an unquestioned right to decrease or avoid [their] taxes by means which the law permits, the law does not permit the taxpayer to reap tax benefits from a transaction that lacks economic reality." Id. at 1355 (citing Gregory v. Helvering, 293 U.S. 465, 469 (1935)) (internal citation omitted). The economic substance doctrine effectuates the Congressional purpose underlying the tax code by disregarding, for the purposes of tax treatment, transactions that comply literally with statute but lack economic substance. See id. at 1354. A taxpayer claiming a deduction "bears the burden of proving that the transaction has economic substance." Id. at 1355. Moreover, the economic substance of a transaction must be viewed objectively, id. at 1356, and the transaction to be analyzed is the one that gave rise to the alleged tax benefit. Id. at 1356-57.

Mindful of the law that courts should consider the substance of transactions, rather than their form, an additional doctrine, the step-transaction doctrine, instructs courts that "interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction." Comm'r v. Clark, 489 U.S. 726, 738 (1989). The Federal Circuit continues to apply this doctrine "'by ignoring for tax purposes, steps of an integrated transaction that separately are without substance.'" Falconwood Corp. v. United States, 422 F.3d 1339 (Fed. Cir. 2005) (quoting Dietzsch v. United States, 498 F.2d 1344, 1346 (Ct. Cl. 1974)).

Defendant dispatches plaintiffs' other arguments in short order. (1) The exhibit does not implicate 26 U.S.C. § 6103(b) (2000), because it does not purport to disclose information submitted to the Internal Revenue Service. (2) The exhibit is not irrelevant or unfair or prejudicial, within the contemplation of Fed. R. Evid. 403, insofar as it does not present a full picture of all foreign currency trades during the relevant period engaged in by the Deutsche Bank, with fees paid for use of a template proprietary to Jenkins & Gilchrist. To the extent, however, that data in DX 649 are incorrect, incomplete, or slanted and are found not to accurately portray the transactions selected, the weight accorded to the exhibit will be

impacted negatively. The court will not admit the exhibit (on voir dire) or will strike it after witness examination on its substance, if the summary chart is shown to be so faulty that it does not constitute relevant evidence (Fed. R. Evid. 401) or otherwise prejudices plaintiffs (Fed. R. Evid. 403).

(3) Fed. R. Evid. 404(b), dealing with pattern evidence relating to an individual's behavior, is facially inapplicable. (4) Defendant represents that DX 649 will "facilitate[] the comparison of transactional details of hundreds of taxpayers who purchased offsetting options, with nearly identical terms, and received tax opinions from Jenkins." Def's Br. filed Mar. 19, 2008, at 11. Voir dire of the exhibit will substantiate whether this characterization is accurate. If not, the exhibit will not be admitted as evidence that tends to make less likely plaintiffs' assertion that the Stobie Creek transactions did not follow a template that was designed to result in an increase in tax basis.

Alternatively, plaintiffs have moved to compel production of documents that defendant insists were produced nine months ago and were keyed to the DX 649 entries by pin-point citations to Bates page numbers of the documents produced. See Def's Br. filed Mar. 13, 2008, at 13 (stating that response to request for production served on June 18, 2007). If plaintiffs show that defendant's representations are inaccurate, the exhibit will be excluded.

Plaintiffs also seek documents reflecting advice from "dozens of the nation's leading legal and accounting firms" given to taxpayers that certain "transactions were based upon valid interpretations and applications of the governing tax law," particularly with respect to I.R.S. Notice 2000-44. Pls.' Br. filed Feb. 19, 2008, at 13; see I.R.S. Notice 2000-4, 2000-2 C.B. 255 (describing transactions entered into for tax avoidance by generating artificially high basis and disallowing such transactions). Plaintiffs suggest that, if pattern evidence is relevant to the case, the court should order defendant to provide these documents to enable plaintiffs' presentation of rebuttal pattern evidence "that would show that many of the country's leading legal and accounting firms advised their clients that the tax positions taken by taxpayers in cases similar to the one at issue were valid." Pls.' Br. filed Feb. 19, 2008, at 14.

Defendant discounts this evidence as irrelevant to the defenses against penalties raised by plaintiffs. Defendant correctly notes that such advice "could not be relevant to a reasonable cause defense by plaintiffs because plaintiffs do not allege that [Jeffrey F. Wells] ever saw the advice they now seek to compel, let alone that he relied on it." Def.'s Br. filed Mar. 19, 2008, at 13. Defendant's point is well taken: if plaintiffs intend to use these documents as so-called rebuttal pattern evidence, such advice necessarily would consist of materials that Mr. Welles could not have seen. If Mr. Welles could not have seen this advice,

3

he could not have relied upon it in engaging in the transactions at issue.  Defendant also is correct in asserting that advice given by tax professionals is not considered authority under the substantial authority defense to a substantial underpayment penalty.  <u>See</u> Treas. Reg. § 1.6662-4(d)(3)(iii) ("Conclusions reached in  treatises, legal periodicals, legal opinions or opinions rendered by tax  professionals are not authority" for the purposes of raising the substantial authority defense.) Accordingly, based on the foregoing,

 **IT IS ORDERED**, as follows:

 Plaintiffs's motion to exclude DX 649 and related testimony is denied, and plaintiffs' related motion to compel is denied.


 s/ Christine O.C. Miller

 _____
 **Christine Odell Cook Miller**
 Judge

**From:** Ron Buesinger
**Sent:** Thursday, October 31, 2002 11:45 AM
**To:** Elizabeth Jung
**Subject:** 2001-Customers-Haber-Invst-12-31-01-R.xls
**Attachments:** 2001-Customers-Haber-Invst-12-31-01-R.xls

2001 deals.  Please note there are two tabs

1ALPHA DISK04-031854

**GOVERNMENT EXHIBIT**

**3**

**2001 Customers**

**December 31, 2001**

| | Trading Fund Name | Co-Investor Orig Cost basis 12/31/2001 | Sale of Common | Co-Investor Adj Cost basis | Alpha Investment Current Value | DGI Investment Current Value | DGI Investment | Helios Investment Current Value | Current Value |
|---|---|---|---|---|---|---|---|---|---|
| Jal N. Gupta Rev Trust | Guoa Investments LLC | $380,000 | ($220,000) | $42,815 | $40,000 | $36,842 | | | $36,842 |
| Jon B. Kutler | Kalakakoa Investments LLC | $154,000 | $57,200 | $57,700 | $12,975 | $10,800 | | | |
| David Cowen | Cowen Investments LLC | $57,200 | $52,200 | $57,700 | | $12,000 | | | |
| William Paley | Acapex Trading LLC | $67,780 | $43,880 | $43,880 | | $7,706 | $9,240 | | |
| Douglas Paley | Acapux Investments LLC | $87,780 | $43,880 | $43,880 | | $7,706 | $9,240 | | |
| Steven Paley & Jane Zaretsk | Acapux Equities LLC | $109,440 | $54,720 | $43,890 | $11,520 | $9,600 | $11,520 | | |
| Richard Egan | Anbar Investments LLC | $63,600 | ($175,285) | $14,571 | $14,571 | | | $7,000 | $7,000 |
| Anbar, Inc. | Anbar Investments LLC | $63,600 | ($175,285) | ($591,885) | $14,571 | | | $8,800 | $8,800 |
| Tschetter | RT Investments 2001 LLC | $48,825 | ($27,430) | $21,395 | $10,595 | $5,245 | | $525 | $525 |
| Cnello | NDC Investments LLC | $27,900 | $17,304 | $10,596 | $4,896 | $3,198 | | $3,198 | $3,198 |
| Alan H. Ginsburg | AHG Investments 2001 LLC | $48,190 | $28,807 | $19,025 | $525 | $3,778 | | $1,779 | $1,779 |
| Giffen & Gieseckie | CiNuSe Investments LLC | $65,000 | ($225,000) | $19,000 | $300 | $3,828 | | $8,800 | $8,800 |
| Geevan, Tenker & Co. | GT Investments 2001 LLC | $38,000 | $19,000 | $19,000 | $525 | $4,000 | | $4,005 | $4,005 |
| Corpcoex Realty & Investmen | Corpcoex Investments LLC | $38,000 | ($130,000) | $7,132 | $7,847 | $4,000 | | | |
| Wolff McNulty | WFT Investments LLC | $87,400 | $30,868 | $16,928 | $5,562 | $4,000 | $10,000 | | |
| Scomegna | RAB Investments 2001 LLC | $23,940 | $43,700 | $5,287 | $5,200 | $4,000 | | | |
| Joseph R. Francis | RAS Investments 2001 LLC | $38,000 | $8,500 | $19,800 | $2,525 | $2,620 | $2,525 | | |
| James H. Taylor | JRF Investments LLC | $45,600 | $49,972 | $7,100 | $2,763 | $2,620 | $2,620 | | |
| Jerome L. Schostak | JLS Investments 2001 LLC | $171,100 | ($326,032) | $19,000 | $19,040 | $15,600 | $15,600 | $15,600 | |
| Tefken | TFT Investments 2001 LLC | $47,500 | $19,000 | $19,000 | | $3,991 | | | $3,991 |
| Buskie | TAB Investments 200 LLC | $9,500 | ($45,079) | $4,750 | $8,401 | $3,920 | | | |
| Portillo | RJP Investments LLC | $45,600 | $3,750 | $4,800 | $4,800 | $4,800 | | | |
| Rudy Ciccarello | RJP Investments 2001 LLC | $1,900 | ($950) | $950 | $473 | $541 | | | |
| John H. Powers | FX Investments LLC | $57,700 | $57,700 | $16,928 | $707 | $500 | $1,000 | | |
| AN Investments LLC | AN Investments 2001 LLC | $148,800 | $74,400 | $74,400 | $19,872 | $3,974 | $5,741 | $3,974 | $3,974 |
| GN Investments LLC | GN Investments 2001 LLC | $47,500 | $23,750 | $23,750 | | $8,070 | $8,070 | $8,070 | $8,070 |
| RN Investments LLC | RN Investments 2001 LLC | $47,500 | $23,750 | $23,750 | | $8,070 | $8,070 | $8,070 | $8,070 |
| SN Investments LLC | SN Investments 2001 LLC | $47,500 | $23,750 | $23,750 | | $8,070 | $8,070 | $8,070 | $8,070 |
| Harold Aestrid & Slein | HA Investments 2001 LLC | $38,000 | $19,000 | $19,000 | | $3,920 | | | |
| Stan Dziedzic | FX Investments LLC | $9,500 | ($4,750) | $4,750 | | $3,920 | $3,920 | | $3,991 |
| Romek McNeill | SJD Investments 2001 LLC | $1,900 | ($950) | $950 | $707 | $500 | $1,000 | $1,000 | |
| Sandy McNeill | RM Investments 2001 LLC | $57,700 | $50,047 | $16,928 | $473 | $500 | $500 | $500 | |
| Dan Reid | SM Investments 2001 LLC | $102,600 | $51,300 | $51,300 | | $10,800 | $10,800 | $6,000 | $6,000 |
| Robert Cole | RWC Investments LLC | $81,700 | $40,850 | $40,850 | $7,203 | $8,070 | $8,070 | $8,070 | $8,070 |
| Richard Sabeto | RJS Investments LLC | $83,600 | ($109,060) | ($25,460) | | $8,800 | $8,800 | $8,070 | $8,070 |
| Steven A. Crawford | CSH Investments LLC | $51,400 | $45,000 | $17,200 | $1,377 | $5,204 | $5,204 | | |
| Francois & Thomas | CFPT Investments LLC | $38,000 | $28,850 | $19,000 | $540 | $4,000 | $4,000 | $4,000 | |
| William F. Thies, Sr. | Thies Investments LLC | $157,700 | $78,850 | $78,850 | | $16,600 | $16,600 | $13,313 | $13,313 |
| Europa International, Inc. | Europa Investments LLC | $41,800 | $20,900 | $20,900 | $540 | $4,000 | $6,600 | $5,928 | $5,928 |
| Dennis W. Thies | DWT Investments LLC | $81,700 | $28,850 | $28,850 | | $4,400 | $3,828 | $3,828 | $3,828 |
| Robert A. Ganry | RAG Investments 2001 LLC | $38,000 | $19,000 | $19,000 | | $10,800 | $10,800 | $3,193 | $3,193 |
| Tenex Corp. | Sheridan Investments LLC | $38,000 | $19,000 | $19,000 | $8,800 | $4,427 | $4,427 | $3,480 | $3,480 |
| Robert G. Casuli | RGC Investments LLC | $81,200 | $40,650 | $25,460 | | $8,800 | $8,800 | $4,400 | $4,400 |
| Ronald J. Casuli | RJC Investments 2001 LLC | $38,000 | $19,000 | $19,000 | | $5,204 | $8,204 | $1,793 | $1,793 |
| Caputo | EGC Investments LLC | $76,000 | ($38,000) | $38,000 | | $7,721 | $8,000 | $7,721 | $7,721 |
| Wainwright | WAI Investments LLC | $4,750 | ($2,375) | $2,375 | | $391 | $500 | $391 | $391 |
| Schufelbeam | SEBFS Investments LLC | | | | | $4,400 | $500 | | |

| | Co-Investor Total Net basis | $3,707,715 | ($2,404,737) | $1,302,978 | Alpha Total Net basis $193,674 ($1,109,304) | DGI Total Net basis $296,176 ($23,169) | $189,520 | Helios Total Net basis $167,027 ($22,493) | $135,825 |
| | | | | | $325,345 | | | | $129,149 ($5,676) |
| | | | | | | | | | $4,400 |

1ALPHA-DISK04-021855

December 31, 2001

## 2001 Customers

| Customers | Fund Name | Alpha Investment | Current Value | DGI Investment | Current Value | Helios Investment | Current Value |
|---|---|---|---|---|---|---|---|
| CTN | AD Global 2001 Fund LLC | $5,000 | $5,296 | $5,000 | $5,296 | | |
| Chester | Equity Trading 2001 Fund LLC | $25,000 | $2,759 | $25,000 | $2,759 | | |
| Weiss | WW Investments 2001 LLC | $20,000 | $64,641 | $20,000 | $64,641 | | |
| Paltz | 2001 Equity Trading LLC | $10,000 | $16,669 | $10,000 | $16,669 | | |
| Nix, Patterson & Roach | NPR Investments LLC | $50,000 | $79,142 | $50,000 | $79,142 | | |
| Ronnie McNeil | RM Portfolio LLC | $0 | $0 | $453,800 | $541,921 | | |
| | | $110,000 | $168,507 | $563,800 | $710,428 | | |

### Total for All Deals:

| | Cost Basis: | Current Value: | Gain / (Loss): |
|---|---|---|---|
| Total Alpha Investment: | $435,345 | $464,683 | $29,338 |
| Total DGI Investment: | $753,320 | $877,455 | $124,135 |
| Total Helios Investment: | $135,825 | $129,149 | ($6,676) |
| Totals: | $1,324,490 | $1,471,287 | $146,797 |